# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 10/29/2010

NYSCEF DOC. NO. 1

INDEX NO. 651884/2010

RECEIVED NYSCEF: 10/29/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------x

ALDEN GLOBAL DISTRESSED OPPORTUNITIES FUND,
L.P., ALDEN GLOBAL DISTRESSED OPPORTUNITIES
MASTER FUND, L.P., ARROWGRASS DISTRESSED
OPPORTUNITIES FUND LIMITED, ARROWGRASS
MASTER FUND LTD., BENNETT OFFSHORE
RESTRUCTURING FUND, INC., BENNETT
RESTRUCTURING FUND, L.P., BRF SENIOR INCOME, L.P.,
CFIP MASTER FUND, LTD., DEBELLO INVESTORS LLC,
GREYWOLF CAPITAL OVERSEAS MASTER FUND,
GREYWOLF CAPITAL PARTNERS II LP, GREYWOLF CLO
I, LTD., NORMANDY HILL CAPITAL, L.P., SCOGGIN
CAPITAL MANAGEMENT II LLC, SCOGGIN
INTERNATIONAL FUND LTD., SCOGGIN WORLDWIDE
FUND LTD, WEXFORD SPECTRUM INVESTORS LLC,

                        Plaintiffs,

           -against-

JPMORGAN CHASE BANK, N.A., MERRILL LYNCH
CAPITAL CORPORATION, CITICORP NORTH AMERICA,
INC., and BANK OF AMERICA, N.A.,

                        Defendants.

-------------------------------------------------------------------------x

Index No. _____

**SUMMONS**

TO:


JPMorgan Chase Bank, N.A.
c/o C T Corporation System
111 Eighth Avenue
New York, New York 10011

Merrill Lynch Capital Corporation
c/o C T Corporation System
111 Eighth Avenue
New York, New York 10011

Citicorp North America, Inc.
c/o CT Corporation System
277 Park Avenue
New York, New York 10017

Bank of America, N.A.
One Bryant Park
New York, New York 10036

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is CPLR 503(a) and (d) in that Plaintiff's principal place of business is New York County and Defendant resides in New York County.

Dated: New York, New York
      October 29, 2010

Respectfully submitted,

ARKIN KAPLAN RICE LLP

By: _____
Howard J. Kaplan
Johnny J. Yeh
Deana Davidian
590 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 333-0200
Facsimile: (212) 333-2350

*Attorneys for Plaintiffs*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------------x
                                                                                :
ALDEN GLOBAL DISTRESSED OPPORTUNITIES FUND,    :
L.P., ALDEN GLOBAL DISTRESSED OPPORTUNITIES    :  Index No. _____
MASTER FUND, L.P., ARROWGRASS DISTRESSED       :
OPPORTUNITIES FUND LIMITED, ARROWGRASS         :
MASTER FUND LTD., BENNETT OFFSHORE             :
RESTRUCTURING FUND, INC., BENNETT              :
RESTRUCTURING FUND, L.P., BRF SENIOR INCOME, L.P.,:
CFIP MASTER FUND, LTD., DEBELLO INVESTORS LLC,  :
GREYWOLF CAPITAL OVERSEAS MASTER FUND,         :
GREYWOLF CAPITAL PARTNERS II LP, GREYWOLF CLO :
I, LTD., NORMANDY HILL CAPITAL, L.P., SCOGGIN   :  **COMPLAINT**
CAPITAL MANAGEMENT II LLC, SCOGGIN             :
INTERNATIONAL FUND LTD., SCOGGIN WORLDWIDE      :
FUND LTD, WEXFORD SPECTRUM INVESTORS LLC,       :
                                                                                :
                        Plaintiffs,                                             :
                                                                                :
            -against-                                                           :
                                                                                :
JPMORGAN CHASE BANK, N.A., MERRILL LYNCH       :
CAPITAL CORPORATION, CITICORP NORTH AMERICA,    :
INC., and BANK OF AMERICA, N.A.,                :
                                                                                :
                        Defendants.                                             :
                                                                                :
                                                                                :
                                                                                :
-------------------------------------------------------------------------------x

        Plaintiffs, by and through their attorneys, Arkin Kaplan Rice LLP, as and for their

Complaint against Defendants JPMorgan Chase Bank, N.A. ("JP Morgan"), Merrill Lynch

Capital Corporation ("Merrill Lynch"), Citicorp North America, Inc. ("Citicorp"), Bank of

America, N.A. ("Bank of America") (the "Lead Banks"), and JP Morgan as administrative agent,

allege as follows:

## NATURE OF THE ACTION

1.      This case arises out of the Lead Banks' willful breaches of a Credit Agreement dated May 17, 2007 (the "Credit Agreement") by financing a leveraged buyout in December 2007 that allowed prominent Chicago-based real estate investor Samuel Zell ("Zell") to take the Tribune Company ("Tribune" or the "Company") private.

2.      The Lead Banks knew that this financing was barred by the terms of the Credit Agreement and that it was tainted with fraud and other misconduct. The Lead Banks funded anyway – with the express approval of JP Morgan as administrative agent under the Credit Agreement – and collected more than $120 million in fees. As a result, Tribune incurred more than $3.7 billion in additional debt and soon thereafter spiraled into bankruptcy.

3.      In 2007, when Tribune decided to accept Zell's proposal to take the Company private, it decided to engage first in a leveraged recapitalization to pay off certain previously issued debt and to allow shareholders to liquidate a portion of their stock rather than waiting for the going private transactions to close. The going private transactions were expected to close approximately six months after the leveraged recapitalization.

4.      Tribune and the Lead Banks decided to enter into a single credit agreement that would govern the financing of both phases, which were referred to as "steps." The leveraged recapitalization ("Step One") closed in June 2007, and consisted of (among other things) a successful tender offer by Tribune for 52% of its outstanding common stock, and the retirement of approximately $2.6 billion in previously-issued debt. The Lead Banks loaned approximately $8 billion to Tribune and collected approximately $120.6 million in fees in connection with Step One.

5.      The Lead Banks did not actually bear the risk of default on these loans, because

2

they successfully "syndicated" this debt, meaning that all or portions of the loans were sold to investors (the "Step One Lenders").

6.    After the Step One transactions, the Company's financial condition deteriorated swiftly and significantly, and concerns emerged regarding Tribune's ability to undertake billions of dollars of additional debt obligations associated with the going private transactions ("Step Two"), which were scheduled to close in December 2007.

7.    Pursuant to the Credit Agreement, financing for Step Two was subject to various conditions, including (1) that Tribune would be solvent after the closing of Step Two; and (2) that Tribune had not suffered a Material Adverse Effect. The Step Two financing could not occur unless these and other terms and conditions were satisfied.

8.    Despite knowing that the Credit Agreement's terms and conditions relating to Step Two were not satisfied, the Lead Banks closed the Step Two financing, loaning an additional $3.7 billion to Tribune that the Lead Banks knew Tribune could never repay. The Step Two financing had a devastating effect on Tribune and the Step One Lenders. The Lead Banks, in contrast, had succeeded in eliminating their own exposure, either through syndication or, upon information and belief, through purchase of "insurance" in the form of credit default swaps and similar instruments.

9.    The inevitable occurred on or about December 8, 2008, just one year after the closing of Step Two, when Tribune filed for bankruptcy.

10.    The true extent of the Lead Banks' misconduct was laid bare in Tribune's bankruptcy proceedings. The Honorable Kevin J. Carey appointed Kenneth N. Klee, Esq. – a professor of law at the UCLA School of Law – to conduct an independent investigation of Tribune's claims. In his capacity as examiner (the "Examiner"), Professor Klee issued an

3

expansive report detailing the misconduct of Tribune's management and the Lead Banks' repeated bad acts. This report concluded the following:

- The Lead Banks knew based on their own internal analyses that the consummation of Step Two would likely render Tribune insolvent;

- The Lead Banks sought to obtain additional information regarding Tribune's financial condition but did not challenge Tribune when the Company refused to provide such information;

- The Lead Banks hired a solvency expert, but never asked the solvency expert to provide them with an opinion of whether the consummation of Step Two would render Tribune insolvent;

- The Lead Banks ignored numerous "red flags" – including their own internal analyses, Tribune's refusal to respond to requests for information, and the state of the market and Tribune's general financial condition – indicating that the third-party solvency opinion provided by Valuation Research Corporation ("VRC") for Tribune was tainted by false and misleading information and was altogether untrue.

11.     The Lead Banks' own internal documents also demonstrate that they were focused on the risks to their own reputations, rather than on harm to the Step One Lenders, if they did not fund in light of the defaults under the Credit Agreement. JP Morgan believed that "risk [was] greater if [the Lead Banks] do not fund" the Step Two transactions. Merrill Lynch admitted that it was "[n]ot 100% but leaning to not fund" since Tribune was "not a solvent company," but was also "not planning on being [the] lone wolf" that did not close. Citicorp thought that it might be less problematic "to not fund" rather than risking a Tribune bankruptcy, but ultimately funded anyway.

12.     Despite these warning signs, the Lead Banks pressed forward with Step Two. The Lead Banks – improperly motivated by tens of millions of dollars worth of fees and the desire to curry favor with the billionaire Zell – ignored their own internal valuation analyses, accepted Tribune's representations of solvency that they knew were false, and financed Step

Two despite their knowledge that doing so would render Tribune insolvent.

      13.    JP Morgan, as agent under the Credit Agreement, is especially culpable, because it disregarded evidence that the financing of Step Two would drive Tribune into bankruptcy and ignored provisions in the Credit Agreement that barred the financing of Step Two from even becoming effective.

      14.    Plaintiffs are Step One Lenders who were damaged by the Lead Banks' misconduct. In the Tribune bankruptcy, Plaintiffs are expected to receive far less than the amount due and owing to them under the Credit Agreement. The Lead Banks' breaches of the Credit Agreement directly caused Tribune's inability to pay these obligations, and the Lead Banks are thus liable for the losses incurred on these debt obligations.

      15.    Plaintiffs also seek a declaratory judgment that Sections 2.13 and 2.15 of the Credit Agreement (the "Sharing Provision") do not apply to any recovery in this action or any distribution in the related Tribune bankruptcy case pending in Delaware. Pursuant to the Sharing Provision, holders of debt arising from Step Two (the "Step Two Lenders"), including certain Defendants, have taken the position that any recovery by Plaintiffs must be shared *pro rata* with the Step Two Lenders, including JP Morgan, no matter how fraudulent or egregious the Lead Banks' conduct. The Sharing Provision does not apply by its terms and in any event such an interpretation of the Sharing Provision is barred by settled New York law, which does not allow a breaching party to avoid responsibility for its own wrongdoing.

      16.    As a direct and proximate result of the Lead Banks' misconduct, Plaintiffs have been harmed and have commenced the instant action to seek redress for the Lead Banks' malfeasance.

**PARTIES**

17.    Plaintiff Alden Global Distressed Opportunities Fund, L.P. is a partnership existing under and by virtue of the laws of the State of Delaware.

18.    Plaintiff Alden Global Distressed Opportunities Master Fund, L.P. is an exempted limited partnership existing under and by virtue of the laws of the Cayman Islands.

19.    Plaintiff Arrowgrass Distressed Opportunities Fund Limited is a limited liability company existing under and by virtue of the laws of the Cayman Islands.

20.    Plaintiff Arrowgrass Master Fund Ltd. is a limited liability company existing under and by virtue of the laws of the Cayman Islands.

21.    Plaintiff Bennett Offshore Restructuring Fund, Inc. is an exempted company existing under and by virtue of the laws of the Cayman Islands.

22.    Plaintiff Bennett Restructuring Fund, L.P. is a limited partnership existing under and by virtue of the laws of the State of Delaware.

23.    BRF Senior Income, L.P. is a limited partnership existing under and by virtue of the laws of the State of Delaware.

24.    Plaintiff CFIP Master Fund, Ltd. is an exempted company existing under and by virtue of the laws of the Cayman Islands.

25.    Plaintiff DeBello Investors LLC is a limited liability company existing under and by virtue of the laws of the State of Delaware.

26.    Plaintiff Greywolf Capital Overseas Master Fund is an exempted company existing under and by virtue of the laws of the Cayman Islands.

27.    Plaintiff Greywolf Capital Partners II LP is a limited partnership existing under and by virtue of the laws of the State of Delaware.

28.     Plaintiff Greywolf CLO I, Ltd. is an exempted company existing under and by virtue of the laws of the Cayman Islands.

29.     Plaintiff Normandy Hill Capital, L.P. is an exempted limited partnership existing under and by virtue of the laws of the Cayman Islands.

30.     Plaintiff Scoggin Capital Management II LLC is a limited liability company existing under and by virtue of the laws of the State of Delaware.

31.     Plaintiff Scoggin International Fund Ltd. is a corporation existing under and by virtue of the laws of the Cayman Islands.

32.     Plaintiff Scoggin Worldwide Fund Ltd. is a limited liability company existing under and by virtue of the laws of the Cayman Islands.

33.     Plaintiff Wexford Spectrum Investors LLC is a limited liability company existing under and by virtue of the laws of the State of Delaware.

34.     Plaintiffs are all holders of Step One debt issued under the Credit Agreement.

35.     Upon information and belief, Defendant JP Morgan is a national banking association authorized to do business in the State of New York.

36.     Upon information and belief, Defendant Merrill Lynch is a corporation organized and existing under and by virtue of the laws of the State of Delaware, with its principal executive offices located at 4 World Financial Center, 23rd Floor, New York, New York 10080.

37.     Upon information and belief, Defendant Citicorp is a corporation organized and existing under and by virtue of the laws of the State of Delaware, with its principal executive offices located at 388 Greenwich Street, New York, New York 10013.

38.     Upon information and belief, Defendant Bank of America is a national banking association authorized to do business in the State of New York.

7

**JURISDICTION AND VENUE**

39.     This Court has jurisdiction over this action pursuant to New York Civil Practice

Law and Rules ("CPLR") Sections 301 and 302.  In addition, Defendants have consented to the

jurisdiction of this Court pursuant to Section 8.11(a) of the Credit Agreement.

40.     Venue in this county is proper pursuant to CPLR Section 503(a) and (c) as at least

one of the Defendants' reside and/or has its principal place of business in New York County.  In

addition, Defendants have agreed that venue lies in the County of New York pursuant to Section

8.11(b) of the Credit Agreement.

**FACTUAL BACKGROUND**

## I.     TRIBUNE COMPANY

41.     Tribune owns and oversees a media and entertainment conglomerate that provides

newspaper, radio, television, and entertainment products and services to nearly 80% of

households in the United States.  The Company's operations are divided into two business

groups: (1) the publishing group; and (2) the broadcasting group.  The publishing group owns

major newspapers and related Internet portals in many of the most significant markets in the

U.S., and its assets include the *Chicago Tribune*, the *Los Angeles Times*, the *Baltimore Sun*, the

*Orlando Sentinel*, and the *Hartford Courant* newspapers.  The broadcasting group includes

numerous radio and television stations that reach major markets and metropolitan areas.  In

addition, the Company has holdings and interests in many other prominent media and

entertainment properties.  Prior to being taken private in December 2007, the Company was

publicly traded and listed on the New York Stock Exchange.

42.     Beginning in late 2005, Tribune's Board of Directors (the "Board") undertook a

strategic review of the Company's business and considered possible changes to the structure,

ownership, and control of the Company and its assets.  The Board undertook this review in part

8

to address the Company's deteriorating financial performance in the preceding years and to provide liquidity to certain large shareholders who wanted to sell their Tribune holdings. On or about October 17, 2005, the Company retained Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") as financial advisor to assist in this review, and, approximately one year later, the Company retained Citigroup Global Markets Inc. ("CGMI") to provide additional advice and guidance.

43.    On or about September 21, 2006, the Board formed a special committee (the "Special Committee") to explore further the possibility of a strategic transaction and retained Morgan Stanley & Co. ("Morgan Stanley") to serve as financial advisor to the Special Committee.

44.    The Special Committee considered several alternatives, including a leveraged recapitalization of the Company. The Special Committee also considered several third-party proposals. One of the proposals was from Equity Group Investments, LLC ("EGI") – a company controlled by Zell – which contemplated a leveraged buy out that would take the Company private and place it under Zell's control.

45.    By mid-February of 2007, the Special Committee recommended to the Board that the Company focus exclusively on two proposals: (1) the EGI proposal; and (2) the recapitalization of the Company and spin-off of its broadcasting group.

46.    Concurrently, Tribune's management developed an operational plan for 2007, which was approved by the Board on or about February 13, 2007 (the "February 2007 Plan"). The February 2007 Plan set forth projections relating to the Company's future performance and served as a reference point in determining the viability of strategic alternatives.

## II.    THE TRANSACTIONS

47.    Tribune decided to proceed with EGI's proposal. However, because of

9

anticipated delays arising from FCC regulations, Tribune also decided to engage in leveraged recapitalization transactions similar in form to the recapitalization and spin-off transactions that Tribune had considered concurrently with EGI's proposal.

48.     These leveraged recapitalization transactions formed the core of Step One and included, among other things, a tender offer by Tribune for 52% of its common stock, and the repayment of approximately $2.6 billion in previously issued debt.

49.     Step Two, which would take the Company private, was scheduled to occur six months after the closing of Step One, and would include a buyout of all remaining shareholders and a subsequent merger with an entity to be controlled by an Employee Stock Ownership Plan (the "ESOP"). The Company, which would survive the merger, would then be owned by the ESOP, and concurrent transactions would place control of the Company in Zell's hands.

50.     The Credit Agreement is crafted such that each step could accomplish its purpose irrespective of the closing of the other. More specifically, Step One was not conditioned on completion of Step Two, which would close months later only if certain additional terms and conditions were satisfied.[1] The Step One tender offer would not have been unwound if those terms and conditions were not satisfied or if Step Two otherwise failed to close. Similarly, as Tribune acknowledged in its Form 10-Q filed on May 9, 2007, "[c]ompletion of the Share Repurchase [Step One] is not a condition to the Merger [Step Two]," which would proceed even if Tribune failed to complete the Step One tender offer.

51.     On April 1, 2007, the Special Committee and the Board convened, and recommended unanimously that the Board approve the Step One and Step Two transactions.

---

[1]     For example, the merger contemplated by Step Two required the satisfaction of numerous additional conditions, including stockholder approval, an FCC order, and even the consent of Major League Baseball, which was necessary because of Tribune's interest in the Chicago Cubs.

52.    On the same day, the Board approved the Step One and Step Two transactions, including the establishment of the ESOP, the tender offer contemplated in Step One, the merger and going private transactions contemplated in Step Two, and entry into and performance of a Credit Agreement dated May 17, 2007, to finance these transactions.[2]

### A.    The Step One Financing

53.    To finance the leveraged recapitalization, including the tender offer, the Defendants agreed to loan $8.028 billion under the Credit Agreement, with JP Morgan, as administrative agent, Merrill Lynch, as syndication agent, and Citicorp and Bank of America, as co-documentation agents, and MLPFS, CGMI, J.P. Morgan Securities ("JPMS"), and Banc of America Securities LLC ("BofA Securities") as the lead arrangers. The Credit Agreement initially consisted of the following facilities:

    (1)    $1.5 billion Senior Tranche X Term Loan Facility;

    (2)    $5.515 billion Senior Tranche B Term Loan Facility;

    (3)    $263 million Delayed Draw Senior Tranche B Term Loan Facility; and

    (4)    $750 million Revolving Credit Facility.

54.    Tribune used the proceeds of these facilities to finance the tender offer, refinance certain other debt obligations of the Company, and pay fees, costs, and expenses incurred in Step One.

55.    The Step One debt was guaranteed by Tribune's subsidiaries.

---

[2]    In addition to the Credit Agreement, Tribune entered into separate agreements with various other parties to effectuate the Step One and Step Two transactions. Although these agreements were necessary to place the Company under Zell's control, only the Credit Agreement is significant for purposes of this action.

### B.    The Step Two Financing

56.    To consummate the merger and pay fees and expenses related to Step Two, the Company arranged for approximately $4.2 billion of additional financing. This amount would derive from two sources: (1) the Credit Agreement, which granted Tribune the right to request an additional $2.105 billion (the "Incremental Facility") upon the consummation of Step Two; and (2) and a "bridge" facility, which would provide approximately $2.1 billion in additional funds (the "Bridge Facility") upon the consummation of Step Two.[3]

### 1.    The Incremental Facility

57.    Pursuant to the Credit Agreement, the Incremental Facility would be effected by joinder agreements (the "Increase Joinders") executed by Tribune, JP Morgan, as the administrative agent, and the relevant lending party. However, before the Incremental Facility could become effective, the Credit Agreement required the satisfaction of certain conditions.

58.    Section 2.17(b) of the Credit Agreement provided that "[t]he Incremental Term Commitments[4] shall become effective, as of the Increase Effective Date;[5] provided that:" (1) "no Default[6] shall have occurred and be continuing or would result from the borrowings to be made;" (2) certain representations made by the Company contained in Section 4.01 of the Credit Agreement "are true and correct in all material respects" and have been certified as correct by the Company's Chief Financial Officer; and (3) no Material Adverse Effect "shall . . . have

---

[3]    For reasons explained below, the Bridge Facility was later reduced from $2.1 billion to $1.6 billion.

[4]    An "Incremental Term Commitment" is defined as additional Tranche B commitments or commitments to provide a new tranche of term advances that is requested by the Borrower on the closing date of Step Two and not to exceed $2.105 billion.  (Credit Agreement § 2.17(a).)

[5]    The "Increase Effective Date" is defined as the date "on which Borrower proposes that the increased or new commitments shall be effective."  (Credit Agreement § 2.17(a).)

[6]    Default is defined as "any Event of Default or any event that, unless cured or waived, would constitute an Event of Default but for the requirement that notice be given or time elapse or both."  (Credit Agreement § 1.01.)  In turn, the Events of Default are set forth under Article VI of the Credit Agreement.

occurred." A "Material Adverse Effect" includes "any facts, circumstances, events or changes

that are materially adverse to the business assets, financial condition, result of operations on an

ongoing basis or continuing operations of the Company or its subsidiaries as a whole."[7]

59.    The Credit Agreement made clear that the Step Two financing could not close

unless the conditions in Section 2.17 of the Credit Agreement were met. Pursuant to Section

5.02, the Company covenanted not to incur any debt except as permitted by certain provisions of

the Credit Agreement:

> So long as any Advance shall remain unpaid, any Letter of Credit is outstanding
> . . . , any Lender shall have any Commitment hereunder or any other Obligation
> shall remain outstanding . . . unless the Required Lenders[8] shall otherwise consent
> in writing, [Tribune] will not and will not cause or permit any Subsidiaries to:
>
> (c)    Debt.  Incur, create, assume or permit to exist, directly or indirectly, any
> Debt, except:
> * * *
>      (iii)    Debt incurred under this Agreement and the other Loan
> Documents; **provided that the incurrence of Incremental Term Loans is
> subject to the additional conditions thereto set forth in Section 2.17**.

60.    In addition, the funding of the Incremental Facility was subject to the satisfaction

of various conditions and the accuracy of certain specified representations and warranties,

including that, "upon and after consummation of [Step Two] and as of the [Step Two] Closing

Date, immediately after giving effect to [Step Two], [Tribune] is Solvent," and "since April 1,

2007, there has not been any event, development or state of circumstances that has or would

---

[7]    Prior to the date of the merger, the definition of "Material Adverse Effect" was supplied by the Merger Agreement, which excepted changes in general economic or industry conditions or the securities, credit or financial markets in general. In order for general economic or industry conditions to constitute a Material Adverse Effect, such conditions must have had a disproportionate affect on the Company.

[8]    Required Lenders was defined at any given time as "Lenders owed or holding at least a majority of the sum of (a) the aggregate principal amount of the Advances outstanding at such time, (b) the aggregate amount of participation in undrawn Letters of Credit, (c) the aggregate Unused Revolving Credit Commitments at such time, (d) the aggregate amount of any outstanding Initial Tranche B Commitment and outstanding Tranche X Commitment, and (e) the aggregate Unused Delayed Draw Tranche B Commitments at such time." (Credit Agreement § 1.01.)

reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect."
(Credit Agreement §§ 4.01(l)(ii) and 4.01(e)(i).)

61.    An Event of Default under Section 6 of the Credit Agreement also occurred if (1)
any Loan Party as defined therein failed to perform or observe Section 5.02; or (2) "any
representation or warranty made by or on behalf of any Loan Party in [or in connection with] any
Loan Document . . . shall prove to have been incorrect in any material respect when made or
deemed made."[9]

62.    Debt generated by the Step Two Incremental Facility was, like Step One debt,
guaranteed by Tribune's subsidiaries.

### 2.    The Bridge Facility

63.    Prior to the consummation of Step Two, Defendants also committed to providing
an additional $2.1 billion in funds to Tribune through a separate Bridge Facility.

64.    Loans made pursuant to the Bridge Facility would also be guaranteed by
Tribune's subsidiaries, but were expressly subordinated to loans made pursuant to the Credit
Agreement.

## III.    SYNDICATION OF THE STEP ONE DEBT

65.    Following the consummation of Step One, Defendants immediately syndicated
the debt associated therewith.  Through the process of syndication, Defendants sold interests in
the Step One loans to private investors and essentially divested themselves of the risks associated
with Tribune's future financial performance.

66.    Defendants syndicated the debt pursuant to a confidential information

---

[9]    With respect to negative covenants, the Credit Agreement provided for a 30-day cure period.  (Credit
Agreement § 6.01(c).)  However, a "Default," as used in Section 2.17 of the Credit Agreement, included any event
that would constitute an Event of Default unless cured or waived.  (Credit Agreement § 1.01.)

memorandum for public investors dated April 2007 ("CIM"). The CIM described certain requirements to consummate the merger contemplated by Step Two, including "compliance with certain covenants, no material adverse change in Tribune's business, and the delivery of a solvency opinion."

## IV.    VRC'S FLAWED STEP TWO SOLVENCY OPINION

67.    Between the closing of Step One and Step Two, Tribune's financial performance deteriorated significantly in relation to comparable periods in prior years. Tribune's underperformance was substantially worse than the general decline in the industry.

68.    In an effort to satisfy the provisions and conditions of the agreements governing Step Two, the Company took active steps to ensure that a third-party would issue a favorable solvency opinion with respect to Step Two.

69.    To that end, Tribune's management – who had arranged for VRC to provide the solvency opinions for both Step One and Step Two – undertook efforts to guarantee that VRC would provide a favorable Step Two solvency opinion. These efforts included (1) instructing VRC to use revised financial projections in October 2007 that dramatically increased Tribune's projected growth rate in later years as compared to the February 2007 Plan; and (2) misleading VRC to believe that Morgan Stanley had opined that Tribune would be able to refinance approximately $8 billion in debt incurred by Step One and Step Two (the "Zell Debt") when it came due in 2014 and 2015.

### A.    Tribune's Revised Financial Projections

70.    In or about October 2007, and in anticipation of the closing of Step Two, Tribune revised the February 2007 Plan upon which Step One and Step Two had originally been based and created a new plan (the "October 2007 Plan"). Tribune sought to offset the effects of its deteriorating financial performance by making unjustifiable changes to the assumptions used for

15

its February 2007 Plan. Thus, while the October 2007 Plan was less optimistic than the February 2007 Plan for initial years, it contemplated that the Company's revenue and profitability would grow in later years at a rate well beyond the expectations originally reflected in the February 2007 Plan.

71.    The Company's projections assumed that it could mitigate the declines affecting the publishing group by substantially growing its interactive business, by generating revenue with contract delivery and print services, and by enhancing the profitability of the broadcasting group. These assumptions – which the Examiner concluded were speculative and "unsupportable" given the Company's history of declining financial performance – gave rise to grossly inflated projections forecasting a dramatic recovery in the Company's fortunes.

72.    Additionally, the October 2007 Plan relied on other baseless assumptions to grossly inflate the Company's projections of profitability in later years.

73.    As the Examiner concluded, the October 2007 Plan "bears the earmarks of a conscious effort to counterbalance the decline in Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to furnish a source of additional value to support a solvency conclusion."

74.    The Company instructed VRC to use its misleading October 2007 Plan in preparing its Step Two solvency opinion. Upon receipt of the October 2007 Plan, VRC performed its own comprehensive analysis of Tribune management's projections, and reached substantial downward valuation conclusions based on that analysis. Nevertheless, as the Examiner concluded, despite calculating downward valuations, "VRC inexplicably ignored *all* of the conclusions it reached in these memoranda and proceeded to use the October 2007 projections *without change* in its Step Two solvency opinion." The Examiner further concluded

that these improper assumptions "significantly (and upwardly) affected VRC's Step Two valuation conclusions by approximately $613 million."

### B.    Refinancing of the Zell Debt

75.    As a condition to issuing its Step Two solvency opinion, on or about December 1, 2007, VRC requested a representation from the Company and its financial advisor that VRC could reasonably assume that the Company could refinance the Zell Debt when it came due in 2014 and 2015.

76.    On or about December 2, 2007, Tribune's management informed VRC that Morgan Stanley, financial advisor to the Special Committee, had agreed that the Company could refinance the Zell Debt even in a "downside" scenario. Upon information and belief, Morgan Stanley had not told the Company that it agreed with management's refinancing assumptions.

77.    Nevertheless, on or about December 20, 2007, the Company provided a representation letter to VRC that stated in part: "Based upon (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes it is reasonable and appropriate for VRC to assume that Tribune . . . would be able to refinance." VRC's Step Two solvency opinion relied in part on that representation letter, which expressly cited management's purported discussions with Morgan Stanley regarding the Company's ability to refinance the Zell Debt when it came due.

78.    Indeed, as the Examiner concluded, Tribune "used Morgan Stanley's imprimatur to bolster VRC's solvency opinion and push Step Two over the goal line, without authorization from Morgan Stanley."

### C.    VRC's Issuance of a False Step Two Solvency Opinion

79.    Tribune's efforts ensured that VRC would issue a favorable Step Two solvency opinion by increasing the Company's enterprise valuation by more than $600 million. Tribune's

efforts were ultimately successful, and VRC issued a favorable, but totally false, Step Two

solvency opinion on December 20, 2007.

80.    VRC's Step Two solvency opinion was an essential factor in Tribune's closing of

Step Two. As noted earlier, the Credit Agreement expressly required that Tribune issue solvency

certificates and represent that the Company would remain solvent following Step Two. As the

Examiner concluded, "[a]lthough the solvency *certificate* delivered on the Step Two Financing

Closing Date was separate from the solvency *opinion* required under the Merger Agreement, the

record is clear that Tribune's Chief Financial Officer would not have issued the former had VRC

not issued the latter. Accordingly, as a practical matter, a favorable solvency opinion from VRC

or another independent firm effectively was a closing condition to the Step Two Financing."

81.    Defendants were aware that VRC's Step Two solvency opinion was premised on

misleading assumptions but nonetheless financed Step Two.

## V.    THE DEFENDANTS' KNOWLEDGE OF TRIBUNE'S INSOLVENCY

82.    As Tribune was cultivating a favorable – and false – Step Two solvency opinion,

Defendants were, concurrently, conducting their own joint and individual due diligence. Indeed,

as the Examiner concluded, both "compelling market indicia" and more traditional valuation

metrics plainly established that the Step Two financing would render Tribune insolvent.

### A.    Market Information Concerning
### Tribune's Precarious Financial Condition

83.    Shortly after the June 4, 2007 closing of Step One, there were substantial changes

in the financial markets. In July 2007, Tribune noted these market changes and their possible

effect on Tribune's ability to close Step Two, stating that "the Company is preparing for the

possibility that general market conditions may have an adverse effect on a successful syndication

of our second step financing."

18

84.    In the summer of 2007, Defendants expressed concerns about the impact of market changes on Tribune's ability to survive Step Two. For example, internal JP Morgan e-mails expressed apprehension that JP Morgan was "totally underwater on this underwrite" and that "this deal will fail without a lot more help from Zell." A Merrill Lynch banker wrote that it was "too difficult to really put a confidence level" on the likelihood of Step Two closing, in part because "the company's fundamental performance likely needs to be better in the last half of the year than it has been in the first." A Citicorp managing director testified that it "occurred to me that this company was in more trouble than we thought it was when we first signed the deal. We'd be stupid not to know that . . . we were not going to be able to sell the second step debt."

85.    Defendants' knowledge that Step Two would render Tribune insolvent was further reinforced by information available in the market from August through December 2007. For example, on or about August 14, 2007, a Lehman Brothers analyst tracking the Company warned that "[i]f the privatization deal does end up going through [as a result of Step Two], we continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% – given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if [Step Two] occurs . . . . So by our calculations, if [Step Two] happens, the company will not be able to cover the estimated annual interest expense from the operations let alone have excess free cash flow to pay down debt each year."

86.    Nor were Tribune's own disclosures particularly optimistic. On or about October 24, 2007, Tribune announced its third quarter 2007 results in a Form 8-K and accompanying press release. A little more than a week later, Tribune filed its Form 10-Q for the quarter. These documents revealed that Tribune's third quarter 2007 consolidated revenues amounted to $1.28

billion, down 4% from the prior year.

87.    Although financial results for the fourth quarter 2007 were not published publicly until early 2008 – after the closing of the Step Two financing – Tribune continued to issue press releases during the fourth quarter, which indicated the continuing decline in Tribune's performance. For example, on or about November 27, 2007, Tribune issued a press release for period 10 (ending October 28, 2007), announcing that consolidated revenues had declined 9.3% in that period from the prior year. Similarly, on or about December 12, 2007, Tribune issued its final revenue-related press release of the year, observing that period 11 revenues were down 3.3% from the prior year, but noting that advertising revenues for period 11 in 2007 benefited from a shift in the Thanksgiving week from period 12 in 2006 to period 11 in 2007 (thereby understating the actual extent of the decline).

88.    Tribune's common stock prices also eroded during this period, trading as low as $25.41 (a discount of more than 25% to the tender offer price of $34.00), and Tribune's bond prices began declining in relation to par, slumping to as low as almost 50 cents on the dollar for certain tranches of Tribune's longer-term maturity bond debt.

89.    Concerns regarding Tribune's troubled financial state were perhaps most clearly borne out by the pricing of credit default swaps tied to the Company. These instruments, which reflect market attitudes concerning the likelihood of Tribune's insolvency, experienced a marked and substantial increase in their pricing between June and December 2007 and revealed the market's lack of confidence that Tribune would survive the consummation of Step Two.

90.    These indicia of Tribune's performance were troubling to many parties, including Defendants. Defendants began to conduct their own due diligence in connection with Step Two.

91.    Indeed, upon information and belief, Defendants had come to believe that they

could not finance Step Two without rendering Tribune insolvent.  A Citicorp managing director explained: "On the one hand the market had collapsed and we knew that if we funded this we were going to lose money, but separately the company's performance was deteriorating and we didn't want to fund the second stage of a transaction and cause the company's insolvency by doing so."  A Merrill Lynch banker aptly summarized the situation as he welcomed a new member to the team in August 2007: "We will have a bit of work to do as the second-step financing for the Zell buyout moves closer to execution.  Lots of focus internally because we have a sizable [sic] commitment and the business is underperforming."

**B.     The Defendants' Joint Due Diligence Revealed
that Step Two Would Render Tribune Insolvent**

92.     On or about August 23, 2007, Defendants jointly sent Tribune a five-page due diligence outline seeking detailed financial information concerning the Company.

93.     While purporting to provide certain answers to Defendants' inquiries, Chandler Bigelow, Tribune's Chief Financial Officer, also stated that the answers provided were "not endorsed or adopted by Tribune management" and were "not to be disclosed to any other person or otherwise used in connection with the syndication or marketing of the [Step Two] financing."

94.     On or about November 8, 2007, Defendants sent Tribune's management a lengthy list of questions specifically directed at VRC's solvency analysis in connection with Step Two.

95.     Tribune waited nearly a month to respond to Defendants' solvency concerns.  On or about December 7, 2007, Mr. Bigelow sent VRC's answers (which had been edited by Tribune's management) to Defendants, with a disclaimer that VRC was making "no representation or warranty . . . as to the accuracy or completeness of any information provided in this memorandum [or] information received from Tribune" and that "[t]his Memorandum is not intended to be a representation of Tribune's or any other company's solvency."

21

96.     In or about late September 2007, Defendants jointly retained Murray Devine, a

valuation advisory firm, to assist them in understanding issues bearing on the Company's

solvency.  Defendants admittedly *never asked* Murray Devine to provide them with an opinion of

whether Step Two would render the Company insolvent.

97.     Five days later, Defendants, with Murray Devine's assistance, sent an extensive

set of follow-up questions to VRC concerning solvency, including questions pertaining to (1)

VRC's valuation of the anticipated S-Corporation/ESOP tax savings; (2) VRC's assumption that

Tribune could refinance its debts in the future; (3) the relevance of the current trading values for

Tribune's debt and credit default swaps to VRC's solvency analyses; and (4) the reasons for the

discounted cash flow ("DCF") valuation increase between Step One and Step Two while the

other valuation methods declined.  Neither Tribune nor VRC provided written answers to

Defendants' follow-up questions.

98.     On or about December 14, 2007, Defendants held a conference call to discuss

solvency.  A Bank of America senior vice president took the following notes of this call:

- JP Morgan expressed the view that "risk [was] greater if [Defendants] do not fund."

- Merrill Lynch was "[n]ot 100% but leaning to not fund" since Tribune was "not a solvent company," yet Merrill Lynch was "not planning on being [the] lone wolf" that did not close.

- Citicorp expressed the view that it might be less problematic "to not fund" rather than risking a Tribune bankruptcy.[10]

99.     On or about December 17, 2007, Defendants sent a final set of questions to

Tribune.  Again, these questions concerned VRC's solvency conclusions, namely the process by

---

[10]     This senior vice president also wrote: "If in good faith – good defense."  Upon information and belief, this notation reflects the excuses Defendants planned to marshal to avoid a fraudulent conveyance finding in Tribune-related bankruptcy proceedings Defendants knew would be forthcoming.

22

which VRC arrived at its conclusions and VRC's independence. Tribune's general counsel

responded the next day that the Board "did not react well" to these questions, but was "willing to

provide an excerpt from the draft minutes of today's meeting" to address Defendants' concerns.

100.    Tribune ignored or failed to adequately address Defendants' solvency concerns

with respect to Step Two. As the Examiner concluded, at a minimum, the Defendants "had

sufficient knowledge to be placed on inquiry notice regarding Tribune's possible insolvency as

Step Two approached." The fact that Defendants had gone out of their way to retain Murray

Devine to assist in Defendants' due diligence concerning Tribune's insolvency is, in the words of

the Examiner, "tangible evidence that the Lead Banks not only were on inquiry notice, but were

inquiring."

### C.    Defendants' Individual Due Diligence Confirms the Findings of Their Joint Due Diligence

101.    In addition to Defendants' joint due diligence, certain Defendants performed

internal analyses between September and December 2007 that showed that Step Two would

render the Company insolvent.

#### 1.    JP Morgan's Due Diligence

102.    An internal JP Morgan document from September 2007 states: "JPMorgan deal

team's DCF and sum-of-the-parts analysis based on revised July projection[s] indicate that the

current valuation of Tribune is approximately $[10] to $[13] billion, potentially failing the

solvency tests (*i.e.*, debt amount exceeds the value of Borrower)."

103.    Upon information and belief, this conclusion is supported by internal JP Morgan

analyses conducted in December 2007.

#### 2.    Merrill Lynch's Due Diligence

104.    From August 2007 through December 2007, Merrill Lynch prepared numerous

draft financial analyses to investigate the issue of Tribune's solvency following Step Two. Merrill Lynch's valuation analyses, prepared in the weeks before the closing of Step Two, show varying degrees of insolvency (as reflected by equity value) in all three of the "low" and "mid" range valuations:

| Document | Low | Mid | High |
|---|---|---|---|
| 12/16/07 Analysis I | ($1.545 billion) | ($287 million) | ($1.027 billion) |
| 12/16/07 Analysis II | ($1.946 billion) | ($688 million) | $626 million |
| 12/16/07 Analysis III | ($1.946 billion) | ($487 million) | $1.027 billion |

### 3.    Citicorp's Due Diligence

105.    In December 2007, Citicorp prepared an internal analysis assessing Tribune's solvency following consummation of Step Two. The analysis compared five values for both a comparable companies approach and a DCF approach. More specifically, Citicorp applied its valuation parameters to its own projections and Tribune management's projections; Citicorp also compared the valuations presented by VRC to the Board on December 4, 2007:

| Approach | Citicorp Valuation Using Citicorp Projections | Citicorp Valuation w/Tribune Base Case | Citicorp Valuation w/Tribune Downside Case | VRC Valuation High Range | VRC Valuation Low Range |
|---|---|---|---|---|---|
| Comparable Companies | ($1.428 billion) | $215 million | ($1.064 billion) | $2.201 billion | $1.047 billion |
| Discounted Cash Flow | ($1.653 billion) | $2.130 billion | ($836 billion) | $2.641 billion | $1.548 billion |

106.    Citicorp's analysis showed insolvency using Tribune management's downside scenario if Citicorp's internal valuation parameters were applied, as well as using Citicorp's own projections.

4.    Bank of America's Due Diligence

107.    Bank of America's Leveraged Finance Screening Committee received memoranda from its deal team on August 3, 2007 and December 13, 2007, which calculated Tribune's enterprise values at $8.2 billion and $12.3 billion, respectively. Total debt following Step Two was estimated on both dates to be $12.2 billion. On its face, Bank of America's memorandum dated December 13, 2007 appears to indicate that Tribune would barely be solvent following Step Two.

108.    Moreover, upon information and belief, EGI told Bank of America that the likelihood of obtaining a clean Step Two solvency opinion was less than 50%.

**D.    Defendants' Knowledge that Step Two Would Render the Company Insolvent**

109.    Collectively, these analyses establish that Defendants knew that Step Two would, if consummated, likely render Tribune insolvent. Indeed, as the Examiner concluded, Defendants "were aware of the significant possibility that Tribune would be rendered insolvent by the consummation of Step Two."

110.    Moreover, Defendants knew or should have known that VRC's solvency opinion was fraudulent, yet financed Step Two despite their knowledge of the risk of insolvency.

111.    Upon information and belief, Defendants were motivated to close Step Two to protect their relationship with Zell, who was a client to some or all of the Defendants and who would generate additional business for them in the future. Defendants were also concerned that their refusal to close Step Two would harm their reputation as lenders in the eyes of their other clients.

112.    Upon information and belief, Defendants were also motivated by large fees paid up front by Tribune. Indeed, Step Two was quite lucrative for Defendants. On Step Two's

closing date, Tribune paid Merrill Lynch and JP Morgan (and their affiliates) $37.9 million and

$13.8 million respectively in fees. In addition, Tribune paid Citicorp and Bank of America (and

their affiliates) $11.5 million and $6.9 million respectively in fees. These fees were incurred on

top of the $120.6 million in fees Tribune had already paid to Defendants in connection with Step

One.

113.    Given these incentives, Defendants chose to proceed with the financing of Step

Two despite their knowledge that doing so would render the Company insolvent. In doing so,

Defendants chose to place at risk the loans that they had syndicated to the Step One Lenders.

## VI.    DEFENDANTS ACT TO PROTECT THEMSELVES IN THE EVENT OF A TRIBUNE BANKRUPTCY

114.    Defendants, having already decided that they would proceed with the Step Two

financing even though doing so would render Tribune insolvent, acted to protect their own

financial interests so that Tribune's bankruptcy would have minimal impact on them.

115.    Upon information and belief, to the extent Defendants could not syndicate

Tribune's debt, Defendants actively purchased credit default protection to offset any harm they

would sustain in the event of a Tribune bankruptcy.

116.    Defendants also forced Tribune to borrow less money under the subordinated

Bridge Facility, thus reducing their exposure to subordinated loans. Upon information and

belief, Defendants threatened to modify the terms of the Incremental Facility and the Bridge

Facility pursuant to certain "Market Flex Provisions" of a fee letter if Tribune borrowed the full

$2.1 billion to which it was entitled.[11]  As a result, Tribune borrowed only $1.6 billion under the

subordinated Bridge Facility.

---

[11]    In April 2007, Tribune and certain of the Defendants entered into a fee letter regarding the financing of Step Two, pursuant to which Defendants could change specific terms of the Incremental Facility and the Bridge Facility if they reasonably believed that the changes were necessary to achieve a successful syndication.

117.    Prior to the closing of Step Two, certain Step One Lenders objected to this change to the Defendants' contractual obligations.  By reducing the subordinated Bridge Facility by $500 million, Tribune was required to use its own cash to finance $500 million of costs associated with Step Two.

118.    In correspondence with JP Morgan's counsel, counsel to certain of the Step One Lenders noted that this change was prohibited by Section 5.02(j)(ii) of the Credit Agreement, and an amendment to Section 5.02(j)(ii) required the consent of the Required Lenders under the Credit Agreement (including the Step One Lenders).  Such consent was never given.

119.    The agreement governing the Bridge Facility, dated December 20, 2007 (the "Bridge Agreement") thus breached Section 5.02(j)(ii) of the Credit Agreement, which constituted a Default under Section 2.17 of the Credit Agreement and prevented the Incremental Facility from becoming effective.

## VII.    THE CONSUMMATION OF STEP TWO

120.    Among its duties and obligations as administrative agent, JP Morgan was required under the Credit Agreement to execute Increase Joinders to give effect to the Incremental Facility if the conditions set forth in Section 2.17 were satisfied.  If such conditions were not satisfied, then JP Morgan was required to refrain from executing any Increase Joinders.

121.    Upon information and belief, by December 2007, JP Morgan knew that the Incremental Facility could not become effective because the borrowings would violate the terms of Section 2.17.

122.    Despite this knowledge, JP Morgan, in its capacity as administrative agent, improperly executed multiple Increase Joinders on or about December 20, 2007.

123.    JP Morgan, Merrill Lynch, Citicorp, and Bank of America also improperly executed Increase Joinders as lenders.

27

124.     The plain wording of the Increase Joinders themselves makes clear that Defendants should never have executed them.  Specifically, the Increase Joinders were "subject to all of the terms in the Credit Agreement and to the conditions set forth in Section 2.17 thereof."  In addition, the Increase Joinders set forth conditions precedent largely identical to the conditions in Section 2.17 of the Credit Agreement: "No Default shall have occurred and be continuing or would result from the borrowings to be made on the Increase Effective Date."

125.     In executing the Increase Joinders, JP Morgan acted in bad faith, intentionally, and/or in reckless disregard of its obligations under the Credit Agreement.

## VIII.    THE AFTERMATH OF STEP TWO

126.     The market's reaction after the closing of Step Two was appropriately harsh.  The New York Times called it "one of the most absurd deals ever" in its bizarre marriage of the slumping newspaper market and the frothy leveraged loan market.  An analyst with Gabelli & Co. stated: "I certainly hope no one else is thinking of doing what Tribune has done.  It's a mess."  Tribune's own advisors were reportedly divided during the negotiations, with some advisors "uncomfortable with the level of debt in Sam Zell's proposal."

127.     Tribune's bond ratings plummeted after consummation of Step Two, indicating that it was unlikely that the Company would have the financial capacity to pay interest and repay principal with respect to its new debt burden.  Moody's and S&P lowered Tribune's credit rating to Caa2 and CCC+, respectively, whereas assuming solely the consummation of Step One, the ratings were Ba1 and BB-, respectively.  Moody's Caa2 rating meant the bonds were of "poor standing," "may be in default," or there "may be present elements of danger with respect to principal and interest."  S&P's CCC+ rating meant that the credit had a "negative outlook."  S&P also noted the likelihood that Tribune could ultimately violate a debt covenant: "Leverage levels are high enough and expected EBITDA declines large enough, that Tribune is unlikely to

continue to service its current capital structure over the intermediate term, even with significant asset sales."

128.    The Examiner concluded, "it is highly likely that a court would conclude that Tribune was rendered insolvent and left without adequate capital after giving effect to the Step Two Transactions," and that such a conclusion is "not [a] particularly close question[]."

129.    The Examiner, after conducting a particularized investigation of the acts and knowledge of each Defendant, concluded that JP Morgan, Merrill Lynch, Citicorp, and Bank of America failed to act in good faith in connection with Step Two.

130.    As a result of the Step Two financing, the value of Plaintiffs' Step One guarantees were substantially diminished.  If the Step Two transactions had not occurred, the Step One Lenders would have recovered the full amounts owed even in the event of a Tribune bankruptcy. As a result of the Step Two financing, however, Plaintiffs will recover far less in the Tribune bankruptcy.

## IX.    BANKRUPTCY OF TRIBUNE

131.    On or about December 8, 2008, the Company and certain of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

132.    Competing plans of reorganization have been filed, and certain Step Two Lenders seek to enforce the Sharing Provision in bankruptcy court.

133.    Based on their exchanges with some or all of Defendants, and upon information and belief, Defendants claim that the Sharing Provision applies to any and all payments received by Plaintiffs in connection with Step One for which Defendants have not also received a *pro rata* payment, including any payments received in the Tribune bankruptcy proceedings and any damages awarded in this action.

134.    Based on their exchanges with some or all of the Defendants, and upon information and belief, Defendants claim that the Sharing Provision applies, regardless of any rulings by the bankruptcy court requiring Defendants to return sums to the bankruptcy estate and avoiding, subordinating, or disallowing their claims, and regardless of any rulings by this Court regarding Defendants' liability for breaches of contract or tortious behavior.

135.    JP Morgan and the largest Step Two Lenders have filed a proposed plan of reorganization with the bankruptcy court that expressly relies on the Sharing Provision to protect a recovery to the Step Two Lenders.

136.    Plaintiffs (among others) are filing a competing plan of reorganization that provides for the litigation of claims against the Step Two Lenders and litigation of the Sharing Provision issue.

137.    Plaintiffs believe that the enforceability of the Sharing Provision is not a matter for the bankruptcy court to decide and, thus, raise this issue in this action.

### CAUSES OF ACTION

### COUNT ONE
### (Breach of Contract)
### –Against All Defendants–

138.    Plaintiffs repeat and reallege paragraphs 1 through 137 as if fully set forth herein.

139.    The Step Two financing could not become effective – and thus could not close – unless the conditions in Section 2.17 were satisfied.

140.    Such conditions were not satisfied.

141.    Defendants breached Section 2.17 by closing the Step Two financing even though they knew that such conditions were not satisfied.

142.    JP Morgan breached Section 2.17 by executing the Increase Joinders despite its knowledge that such conditions were not satisfied, and, thus, the Increase Joinders were not

effective.

143.    Plaintiffs, as assignees, each hold a portion of Step One debt, and are parties to the Credit Agreement.

144.    Plaintiffs are Step One Lenders who were damaged by Defendants' misconduct. In the Tribune bankruptcy, Plaintiffs will likely receive far less than the amount due and owing under the Credit Agreement. Defendants' breaches of the Credit Agreement directly caused Tribune's inability to pay these obligations, and Defendants are thus liable for the losses incurred on these debt obligations.

**COUNT TWO**
**(Breach of the Covenant of Good Faith and Fair Dealing)**
**–Against All Defendants–**

145.    Plaintiffs repeat and reallege paragraphs 1 through 144 as if fully set forth herein.

146.    Plaintiffs, as assignees, are parties to the Credit Agreement.

147.    Defendants owed an obligation of good faith and fair dealing to Plaintiffs.

148.    Defendants impaired the value of the Credit Agreement and the subsidiary guarantees with respect to Plaintiffs, frustrated the purpose of the Credit Agreement, and acted in a manner inconsistent with the intent and expectations of the parties.

149.    As a result of Defendants' breaches, Plaintiffs suffered damages in an amount to be determined, but which is the difference between the value of the obligations due to them from Tribune in the absence of the insolvency induced by Step Two, and their actual recovery in the bankruptcy proceedings.

150.    By reason of the foregoing, Defendants are liable for breach of the covenant of good faith and fair dealing, the exact amount to be proven at trial.

## COUNT THREE

### (Inducement of Breach of Contract)
### –Against All Defendants–

151.    Plaintiffs repeat and reallege paragraphs 1 through 150 as if fully set forth herein.

152.    Plaintiffs, as assignees, were parties to the Credit Agreement with Tribune.

153.    Tribune's obligations under the Credit Agreement included the following: (1) to repay advances made by Step One Lenders, including Plaintiffs; and (2) to refrain from consummating the Step Two financing if doing so would render the Company insolvent or cause a Material Adverse Effect.

154.    Defendants had knowledge of the Credit Agreement and of Tribune's obligations thereunder.

155.    Defendants induced Tribune to breach representations, warranties, conditions, and covenants contained in the Credit Agreement by causing Tribune to consummate the Step Two financing. Specifically, by consummating the Step Two financing, Tribune breached its covenant with Plaintiffs not to enter into the transaction if doing so would render the Company insolvent or cause a Material Adverse Effect.

156.    JP Morgan consummated the Step Two financing by executing Increase Joinders.

157.    Absent Defendants' acts, Tribune could not have consummated Step Two.

158.    Defendants knew that proceeding with Step Two would cause, or was highly likely to cause, Tribune to become insolvent or a Material Adverse Effect on the Company.

159.    Defendants' acts were also improper in that they entailed aiding and abetting or inducing the breach of fiduciary duties by Tribune's officers and directors.

160.    By entering into Step Two, it became impossible for Tribune to pay in full the advances it had received from the Step One Lenders, as called for by the Credit Agreement.

161.    Plaintiffs were injured by Defendants' actions, in that they did not receive the full amount due and owing to them under the Credit Agreement as a direct result of Defendants' misconduct.

162.    Plaintiffs' loss was a direct and proximate result of the breach induced by Defendants.

## COUNT FOUR
### (Breach of Contract/Gross Negligence)
### –Against JP Morgan–

163.    Plaintiffs repeat and reallege paragraphs 1 through 162 and reincorporate allegations against JP Morgan in Count One, Count Two, and Count Three as if fully set forth herein.

164.    Under Section 7.01 of the Credit Agreement, Plaintiffs, as Step One Lenders, "appoint[ed] and authorize[d] the Agent to take such action as agent on its behalf and to exercise such powers and discretion under this [Credit] Agreement as are delegated to the Agent by the terms hereof, together with such powers and discretion as are reasonably incidental thereto."

165.    Hence, JP Morgan had duties and obligations under the Credit Agreement that were owed to Plaintiffs.

166.    JP Morgan breached its duties and obligations to Plaintiffs, including by, without limitation, executing Increase Joinders pursuant to Section 2.17 of the Credit Agreement, notwithstanding its knowledge that conditions to the effectiveness of the Incremental Facility set forth under Section 2.17 were not satisfied.

167.    In executing the Increase Joinders, JP Morgan acted in bad faith, intentionally, or in reckless disregard of its obligations under the Credit Agreement.

168.    Plaintiffs were damaged by Defendants' gross negligence and/or willful misconduct. In the Tribune bankruptcy, Plaintiffs will likely receive far less than the amount

33

due and owing under the Credit Agreement. Defendants' breaches of the Credit Agreement directly caused Tribune's inability to pay these obligations, and Defendants are thus liable for the losses incurred on these debt obligations.

## COUNT FIVE
### (Declaratory Judgment)
### –Against JP Morgan as Administrative Agent–

169.    Plaintiffs repeat and reallege paragraphs 1 through 168 as if fully set forth herein.

170.    Section 7.05 of the Credit Agreement provides an indemnity to JP Morgan as agent.

171.    Section 7.05 is unenforceable because (1) JP Morgan had the duty and obligation to exercise reasonable care in financing the Step Two transactions, which was owed to Plaintiffs, as Step One Lenders; (2) JP Morgan breached its duty and obligation by executing Increase Joinders pursuant to Section 2.17 of the Credit Agreement, notwithstanding its knowledge that financing Step Two would cause Tribune to become insolvent, drive it into bankruptcy, and render it unable to satisfy its payment obligations under the Credit Agreement; and (3) in executing the Increase Joinders, JP Morgan acted in bad faith, intentionally, or in reckless disregard of its obligations under the Credit Agreement.

172.    Plaintiffs were damaged by JP Morgan's gross negligence and/or willful misconduct.

173.    Because Plaintiffs' damages resulted from JP Morgan's gross negligence and/or willful misconduct, JP Morgan is not entitled to rely on Section 7.05 with respect to any damages owed to Plaintiffs in this action.

174.    By reason of the foregoing, there exists an actual controversy between Plaintiffs and JP Morgan, and Plaintiffs are entitled to a declaration that JP Morgan is not entitled to rely

on Section 7.05 with respect to any damages owed to Plaintiffs in this action.

175.    No further or consequential relief is or could be claimed in connection with this request for declaratory judgment.

## COUNT SIX
### (Declaratory Judgment)
### –Against All Defendants–

176.    Plaintiffs repeat and reallege paragraphs 1 through 175 as if fully set forth herein.

177.    Section 2.13 of the Credit Agreement specifies that Tribune's payments of principal and interest shall be made to the Agent. The Agent in turn is to distribute funds ratably in accordance with the Credit Agreement.

178.    Subsection 2.13(f) requires ratable distribution of interest to lenders under the Credit Agreement, and *pro rata* distribution of principal by tranche.

179.    Section 2.15 of the Credit Agreement requires Lenders that receive payments (including by set-off) to ratably "share" the payment with other Lenders:

> If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of the Advances owing to it . . . in excess of its ratable share of payments on account of the Advances obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in the Advances owing to them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them.

180.    Based on their exchanges with some or all of Defendants, and upon information and belief, Defendants claim that the Sharing Provision applies to any and all payments received by Plaintiffs in connection with Step One for which Defendants have not also received a *pro rata* payment, including any payments received in the Tribune bankruptcy proceedings and any damages awarded in this action.

181.    Based on their exchanges with some or all of the Defendants, and upon

35

information and belief, Defendants claim that the Sharing Provision applies, regardless of any rulings by the Bankruptcy Court requiring Defendants to return sums to the bankruptcy estate and avoiding, subordinating, or disallowing their claims, and regardless of any rulings by this Court regarding Defendants' liability for breaches of contract or tortious behavior.

182.    Defendants are not entitled to any relief under the Sharing Provision with respect to any damages received by Plaintiffs in this action.

183.    Defendants are not entitled to any relief under the Sharing Provision with respect to any claims that are avoided, disallowed, or subordinated by the Bankruptcy Court, or that are not included in an adopted plan of reorganization.

184.    Defendants are not entitled to any relief under the Sharing Provision with respect to any funds that they are required to return to the estate as a fraudulent conveyance.

185.    The Sharing Provision is inapplicable under its plain language.

186.    The Sharing Provision is also unenforceable in each of these circumstances against Plaintiffs because, *inter alia*, (1) Defendants materially breached the Credit Agreement; (2) Defendants engaged in tortious actions that would make enforcement of these clauses inequitable and against public policy; (3) Defendants are estopped from enforcing these clauses; and (4) the Credit Agreement did not intend that these clauses would apply under the circumstances set forth herein.

187.    By reason of the foregoing, there exists an actual controversy between Plaintiffs and Defendants, and Plaintiffs are entitled to a declaration that the Sharing Provision does not apply to (1) any payments received by Plaintiffs in connection with the bankruptcy proceeding; or (2) any damages received by Plaintiffs in this action.

188.    No further or consequential relief is or could be claimed in connection with this

36

request for declaratory judgment, except that if Defendants have received payments from Plaintiffs pursuant to the Sharing Provision, Defendants would be required to return such payments.

## COUNT SEVEN
### (Declaratory Judgment)
### –Against All Defendants–

189.    Plaintiffs repeat and reallege paragraphs 1 through 188 as if fully set forth herein.

190.    Section 6.01(b) provides that an "Event of Default" has occurred if any representation or warranty made by or on behalf of Tribune in connection with the Credit Agreement or related loan agreements shall prove to have been incorrect in any material respect when made or deemed made.

191.    An Event of Default occurred because Tribune's representation, set forth in Section 4.01(l)(ii) that it would be solvent following the consummation of Step Two was incorrect.  Tribune became insolvent following Step Two.

192.    Section 6.01(c) provides that an Event of Default has occurred if "any Loan Party shall fail to perform or observe any term, covenant or agreement contained in Section . . . 5.02."

193.    Section 5.02(j)(ii) provides that "unless the Required Lenders shall otherwise consent in writing, Borrower will not and will not cause or permit any Subsidiaries to . . . [d]irectly or indirectly . . . amend or modify, or permit the amendment or modification of, any provision of any Transaction Document [including the Merger Agreement] . . . in any manner that is adverse in any material respect to the interests of the Lenders."

194.    Pursuant to Section 5.11(a) of the Merger Agreement, Tribune (i) committed to "negotiate definitive agreements with respect thereto on the terms and conditions contained in the Financing Commitments," (ii) committed to "enforce its rights under the Financing

Commitments," and (iii) agreed that it "shall not permit any amendment or modification to be made to, or any waiver of any material provision or remedy under, the Debt Commitment Letter if such amendment, modification, waiver or remedy reduces the aggregate amount of the Financing, or amends the conditions to the drawdown of that Financing or any other terms thereof in any respect that could be reasonably expected to affect the availability of the Financing or delay the Closing, in each case, in any material respect."

195.    By forcing Tribune to borrow $1.6 billion rather than the $2.1 billion to which it was entitled, Defendants essentially forced Tribune to amend or modify its obligations under the Merger Agreement and to waive its rights to enforce the full loan amount of $2.1 billion under the Bridge Facility.

196.    Such modification was adverse in a material respect to Plaintiffs, who are Step One Lenders, because it caused Tribune to expend $500 million of its own cash to close Step Two, which would otherwise have become a distributable asset in Tribune's bankruptcy. In sum, as Defendants reduced their exposure to subordinated loans to which they had committed themselves, they increased the exposure to Plaintiffs.

197.    An Event of Default occurred because Section 5.02(j)(ii) was violated.

198.    Section 2.17(a) of the Credit Agreement provides that, in order for the Incremental Facility to be effective, "no Default shall have occurred and be continuing or would result from the borrowings to be made on the Increase Effective Date."

199.    The aforementioned Events of Defaults constitute Defaults that prevent the Incremental Facility from becoming effective.

200.    The Sharing Provision applies only to debt that is validly issued under the Credit Agreement.

201.    As the Incremental Facility was not effective, the Sharing Provision will not apply to the $2.1 billion issued by Defendants to finance Step Two that was purportedly issued pursuant to Section 2.17 of the Credit Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

    i.      Awarding Plaintiffs in an amount to be determined at trial;

    ii.     Declaring that JP Morgan is not entitled to rely on Section 7.05 of the Credit Agreement with respect to any damages owed to Plaintiffs in this action;

    iii.   Declaring that Plaintiffs are not obliged to make payments to Defendants pursuant to Sections 2.13 or 2.15 of the Credit Agreement; and

    iv.   Declaring that Section 2.13 does not apply to the $2.1 billion issued by Defendants to finance Step Two that was purportedly issued pursuant to Section 2.17 of the Credit Agreement;

    v.     Awarding Plaintiffs interest, costs and expenses, and such other relief as this Court may deem just and equitable.

Dated: New York, New York
       October 29, 2010

Respectfully submitted,

ARKIN KAPLAN RICE LLP

By: _____

Howard J. Kaplan
Johnny J. Yeh
Deana Davidian
590 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 333-0200
Facsimile: (212) 333-2350

*Attorneys for Plaintiffs*