## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 Cases |
| TRIBUNE COMPANY, *et al.*, | Case No. 08-13141 (KJC) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. 6091, 6184 & 6186 |

### OMNIBUS OBJECTION OF STEP ONE PLAN PROPONENTS TO THE SPECIFIC DISCLOSURE STATEMENT RELATING TO (I) THE OAKTREE PLAN, (II) THE AURELIUS PLAN AND (III) THE BRIDGE LENDER PLAN

The Step One Plan Proponents,[1] by and through their undersigned counsel, respectfully submit this Objection to the Specific Disclosure Statements relating to the Joint Plans of Reorganization for Tribune Company and its Subsidiaries proposed by (I) the Debtors, the Official Committee Of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo") and JPMorgan Chase Bank, N.A. ("JPMorgan" and, collectively with the Debtors, the Creditors' Committee, Oaktree and Angelo, the "Oaktree Plan Proponents"), with their plan [D.I. 6089] and Specific Disclosure Statement [D.I. 6091] referred to herein as the "Oaktree Plan"[2] and the "Oaktree DS", respectively), (II) Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius"), Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for certain series of Senior Notes, Law Debentures Trust Company of New York, in its

---

[1] "Step One Plan Proponents" means the proponents of the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims [D.I. 6185]. The Step One Plan Proponents currently hold approximately $812,000,000 in principal amount of Step One Loans.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Oaktree Plan.

capacity as successor Indenture Trustee for certain series of Senior Notes and Wilmington Trust Company, in its capacity as successor Indenture Trustee for the Phones Notes (collectively, the "Aurelius Plan Proponents", with their plan [D.I.6184] and Specific Disclosure Statement [D.I. 6182] referred to herein as the "Aurelius Plan" and the "Aurelius DS ") and (III) King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (collectively, the "Bridge Lender Plan Proponents", with their plan [D.I. 6186] and Specific Disclosure Statement [D.I. 6187] referred to herein as the "Bridge Lender Plan" and the "Bridge Lender DS").  In support of this Objection, the Step One Plan Proponents respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.      A pretty simple litmus test can be applied to each of the four disclosure statements in this case:  To what extent does each disclosure statement contain an extensive and accurate discussion of the Examiner's Report and to what extent do they make only passing reference to the Examiner's Report while spending pages and pages asserting how their view of reality is the right one?  Applying this test, only the Step One DS discusses the Examiner's Report at length and adheres faithfully to its findings and conclusions.  In contrast, the Oaktree DS, the Aurelius DS and the Bridge Lender DS barely refer to the Examiner's Report at all and, when they do, they only pick and choose the few phrases that, taken out of context, purport to support their views.

2.      The Oaktree Plan Proponents, the Aurelius Plan Proponents and the Bridge Lender Plan Proponents are certainly entitled to express their own views and pursue their own objectives.  In doing so, however, they should be required to disclose exactly *why* their views vary so substantially from the views expressed by the Court-appointed Examiner and, in the case of the Oaktree Plan Proponents, why they think their proposed Settlement is fair and equitable

and why their views vary so substantially from a logical allocation of liability and recoveries and

from a plain reading of the Senior Loan Agreement.[3]

## II.    STANDARD FOR DISCLOSURE

3.    Section 1125 of the Bankruptcy Code requires the distribution of a disclosure

statement before or at the time of solicitation of a plan of reorganization.  "[I]t is understood that

the general purpose of the disclosure statement is to provide 'adequate information' to enable

'impaired' classes of creditors and interest holders to make an informed judgment about the

proposed plan."  *In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001)

(citation omitted).  The Bankruptcy Code defines "adequate information" in relevant part as:

> information of a kind, and in sufficient detail, as far as reasonably
> practicable in light of the nature and history of the debtor and the
> condition of the debtor's books and records, that would enable a
> hypothetical reasonable investor typical of claims or interests in
> the relevant class to make an informed judgment about the plan . . .

11 U.S.C. § 1125(a)(1).

4.    A disclosure statement must contain "simple and clear language delineating the

consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code

alternatives so that [creditors] can intelligently accept or reject the Plan."  *In re Copy Crafters*

*Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988); *see also In re Ferretti*, 128 B.R. 16,

19 (Bankr. D.N.H. 1991) (a disclosure statement "must clearly and succinctly inform the average

[] creditor what it is going to get, when it is going to get it, and what contingencies there are to

getting its distribution").

---

[3]    The Step One Plan Proponents also believe that the Oaktree Plan, the Aurelius Plan and the Bridge
Lender Plan are not confirmable as a matter of law for numerous reasons.  However, the Step One
Plan Proponents accept that such arguments are more appropriately addressed at the Plan
confirmation hearing and therefore will not make those arguments here.

5.    The Third Circuit has long emphasized the importance of the debtor's "full" and "honest" disclosure. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.    Given this reliance, we cannot overemphasize the debtor's obligations to provide sufficient data . . ."); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated.").

## III.    THE OAKTREE DS

6.    Ignoring the 1200-plus pages of findings, analyses and conclusions documented in the Examiner's Report[4] will not make them disappear into the night.    Given how profoundly the Oaktree Plan varies from the conclusions expressed in the Examiner's Report, the Oaktree DS must provide the rationale for those variations.    The most significant variations that need clear and cogent explanation are:

- <u>First</u>, the Oaktree DS fails to explain why the nominal settlement amount it proposes with respect to the LBO-Related Causes of Action against the Step Two Loans[5] is remotely sufficient, given the conclusions in the Examiner's Report that it is "highly likely" that the Step Two Loans are avoidable as constructive fraudulent transfers and "somewhat likely" that they are avoidable as intentional fraudulent transfers.

---

[4]    "<u>Examiner's Report</u>" (D.I. 5247 – 5250).

[5]    "<u>Step Two Loans</u>" as used herein means loans arising in respect of Incremental Senior Loans, subject to resolution of the intercreditor dispute (the "<u>Sharing Provision Dispute</u>") between Step One Lenders and Step Two Lenders as to whether the ratable distribution and sharing provisions of the Senior Loan Agreement (including, without limitation, Sections 2.13 and 2.15 thereof) apply or are otherwise enforceable under the terms of the Senior Loan Agreement and under the circumstances of the LBO Related Causes of Action.    The "<u>Step Two Lenders</u>" shall mean lenders with respect to the Step Two Loans.

- <u>Second</u>, the Oaktree DS fails to provide adequate information regarding the basis for the ratable sharing of distributions and the ratable sharing of the settlement amount with respect to the Step One Loans[6] and Step Two Loans in light of the Examiner's findings that it is "highly unlikely" that the Step One Loans are avoidable as fraudulent transfers.

- <u>Third</u>, the Oaktree DS fails to provide adequate information as to why Step One Loan claims and the Step Two Loan claims should be classified in the same class, despite the fundamental dissimilarities between the Step One Loan and Step Two Loan claims.

- <u>Fourth</u>, the Oaktree DS fails to provide adequate disclosure regarding the third party releases in favor of the Step Two Lenders and the Senior Loan Agent, including the consideration being provided by the Step Two Lenders and the Senior Loan Agent for such releases.

- <u>Fifth</u>, the Oaktree DS fails to provide adequate information regarding the uses of the Senior Lender Holdback and the payment of Senior Lender fees and expenses due under the Senior Loan Agreement.

- <u>Sixth</u>, the Oaktree DS fails to provide adequate information regarding the nature and amount of claims against the Debtors held by Oaktree, Angelo and JPMorgan. This information is critical for creditors to understand potential conflicts of interests in connection with negotiation of the Oaktree Plan.

For the foregoing reasons, and as further detailed below, the Oaktree DS is inadequate and the Court should deny its approval and require additional disclosures identified herein.

## A.    THE OAKTREE DS FAILS TO DISCLOSE THE BASIS ON WHICH THE PROPOSED SETTLEMENT OF THE "HIGHLY LIKELY" LBO-RELATED CAUSES OF ACTION AGAINST THE STEP TWO LOANS CAN REMOTELY BE CONSIDERED TO BE FAIR OR EQUITABLE

### *1.    The Oaktree DS Fails To Disclose How the Proposed Settlement Is "Fair" to the Estates*

7.    Avoidance of the Step Two Loans will likely yield a nearly par recovery for Step One Lenders.  This is because the bulk of the distributable value of these estates is in the subsidiary Guarantor Debtors while the Senior Noteholders, Bridge Lenders and PHONES are

---

[6] "<u>Step One Loans</u>" as used herein means loans arising under the Senior Loan Agreement, other than Step Two Loans.  The "<u>Step One Lenders</u>" shall mean the lenders with respect to the Step One Loans.

either subordinated to the Step One Lenders at the Guarantor Debtor level and/or only at the parent level. As a result, if the Step Two Loans are avoided, it will leave the Step One Lenders as the only material financial creditors at the Guarantor Debtor level entitled to the benefit of the successful avoidance of the Step Two Loans.

8.  Under the Oaktree Plan, however, the Step Two Loans are left in place subject only to the nominal and grossly inadequate "Settlement." From a disclosure perspective, the Oaktree DS is remarkably deficient in explaining how the proposed Settlement amount is a remotely fair settlement of "highly likely" fraudulent transfer claims. While the Step One Lenders will be vigorously contesting the Settlement itself at the Plan confirmation hearing, the Oaktree DS itself is objectionable for its abject failure to provide the necessary disclosure as to how the Settlement can possibly be "fair." If the Oaktree Plan Proponents truly believe that the exhaustive findings and conclusions in the Examiner's Report concerning the fraudulent nature of the Step Two Loans are wrong, the Oaktree DS should be required to describe in detail *how* the Examiner's findings and conclusions are so erroneous.

**2.  *The Oaktree DS Fails To Disclose How the Proposed Settlement Is "Equitable" to the Step One Lenders***

9.  Even if it were possible to consider the Settlement to be "fair," the Settlement is not remotely "equitable" as to how it treats the Step One Loans because it does not allocate any incremental recovery to the Step One Lenders. While the Oaktree DS is silent on this point, the implication is that the Step Two Lenders are not providing *any* consideration to the Step One Lenders even though it is only the Step Two Loans that are "highly likely" to be avoidable as fraudulent transfers.

10.  According to the valuation in the Debtors' General Disclosure Statement, the Guarantor Debtors represent approximately 92% of the Reorganized Debtors' Distributable

Value. Except for holders of General Unsecured Claims of the Guarantor Debtors (which both the Oaktree Plan and the Step One Plan propose to pay in full), the guarantees of the Step One Loans and the Step Two Loans are the only other unsubordinated claims against these Debtors. Thus, in the "highly likely" event the Step Two Loans are avoided, the Step One Lenders would receive substantially all of the distributable value from the Guarantor Debtors, resulting in a nearly par recovery overall.

11.    If 92% of the value is at the Guarantor Debtor level, one would assume that 92% of the Settlement consideration should be allocated to the creditors of the Guarantor Debtors, *i.e.*, the Step One Lenders. One would also assume that the Settlement that the Step Two Lenders are proposing at the parent level would be allocated entirely against the Step Two Loans, with nothing allocated against the Step One Loans. However, the Oaktree DS is silent on both of these allocation issues. If the Oaktree Plan Proponents do not agree with the Step One Lenders view of allocation as just noted, the Oaktree DS should be required to explain exactly *how* the Oaktree Plan Proponents came up with their own allocations and *why* they disagree with the logical allocations noted above.

12.    Disclosure of the Oaktree Plan Proponents' views as to why the Settlement is fair overall and why the proposed allocation is equitable to the Step One Lenders is an essential element to understanding the Oaktree Plan itself. For creditors to effectively evaluate whether the proposed Settlement in the Oaktree Plan is fair and reasonable, the Oaktree DS must provide parties with some meaningful explanation or other analysis, including: (a) a valuation of the "highly likely" LBO-Related Causes of Action with respect to the Step Two Loans; (b) a valuation of the "highly unlikely" LBO-Related Causes of Action with respect to the Step One Loans; (c) an explanation of how the amount of the Settlement was derived; (d) an explanation of

how the Settlement is allocated between the parent and the Guarantor Debtors; and (e) an explanation of how the allocation as between the Step Two Lenders and the Step One Lenders at both the parent and the Guarantor Debtor levels was determined.

**B.    THE OAKTREE DS FAILS TO PROVIDE ADEQUATE INFORMATION REGARDING THE BASIS FOR PRO RATA SHARING OF DISTRIBUTIONS BY THE STEP ONE LENDERS AND STEP TWO LENDERS**

13.    While it took the Examiner several hundred pages to explain why the Step Two Loans were fraudulent conveyances, the Oaktree Plan Proponents' explanation of the ratable distributions to Step One Lenders and Step Two Lenders is limited to two vague footnotes and a passing reference.[7]  These footnotes and passing references can hardly be characterized as "adequate" given the materiality of the aggregate amount of claims held, or in the case of the Step Two Lenders purportedly held, by these parties.  It defies logic that the material differences in likelihood of avoidability between the Step One Lenders' claims and Step Two Lenders' claims would still yield a ratable allocation of the settlement liability and ratable distributions. This deviation mandates an adequate explanation.

14.    The Oaktree Plan Proponents' misapplication of the so-called "Sharing Provisions" of the Senior Loan Agreement turns logic on its head.   In the Oaktree Plan Proponents' view, it appears that plain vanilla provisions that are intended to ensure that the Debtors did not inadvertently pay one claim more than another are now to be interpreted as an insurance policy to foist liability for the Step Two fraudulent transfers on the Step One Lenders. In large part it was the Step Two Loans and other Step Two Transactions that drove Tribune into bankruptcy, and yet the Oaktree Plan Proponents appear to be suggesting that the price of a

---

[7]    *See* Oaktree DS at 9 n.13 (referring to distributions being made "[i]n accordance with the terms of the Senior Loan Agreement"; *id.*. at 12 n.23 (same); *id.* at 19 (same).

settlement for avoidable transfers to Step Two Lenders should be borne pro rata by the innocent Step One Lenders. If that is their assertion, it is wrong as a matter of contract and law.

15.    If the Step One Plan Proponents are correct that the Oaktree Plan Proponents are seeking to apply the Sharing Provisions to benefit the Step Two Lenders – who are the recipients of fraudulent transfers – the Oaktree DS should say so and should disclose *how* this could possibly be the case.

## C.    THE OAKTREE DS FAILS TO PROVIDE ADEQUATE DISCLOSURE REGARDING THE SINGLE CLASSIFICATION OF STEP ONE LOAN CLAIMS AND STEP TWO LOAN CLAIMS DESPITE BEING DISSIMILAR

16.    The Step One Lender claims and the Step Two Lender claims are fundamentally dissimilar. This is a fact that has been acknowledged by the Oaktree Plan Proponents. For instance, in JPMorgan's objection to the motion of Aurelius Capital Management to appoint a chapter 11 trustee, JPMorgan recognized that the Examiner's "most important and relevant conclusions" were "that 'Step One' was a distinct transaction from 'Step Two,' that Step One was not an intentional or constructive fraudulent transfer, and that, as a result, the over $6.4 billion of Senior Lender claims with respect to Step One are valid and enforceable." Objection of J.P Morgan Chase Bank, N.A. and JPMorgan Securities, Inc. to Motion of Aurelius Capital Management, LP, for the Appointment of a Chapter 11 Trustee at 9-10 [D.I. 5965]. The distinction between the Step One Loan claims and the Step Two Loan claims has also been acknowledged by Angelo and Oaktree. In the Prior Oaktree Plan and Disclosure Statement dated September 17, 2010,[8] while nominally placing all of the Senior Loan Claims into a single class, the Prior Oaktree Plan provided that the Step One Lender claims were allowed, while Step Two

---

[8]    *See* Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P. (the "Prior Oaktree Plan") [D.I. 5728] and related Disclosure Statement (the "Prior Oaktree DS") [D.I. 5729].

Lender claims were disallowed and made subject to objection by a post-confirmation litigation trust. Prior Oaktree Plan at 25.

17.    However, despite acknowledging their dissimilar nature, the Oaktree Plan Proponents propose placing the Step One Loan claims and the Step Two Loan claims in the same class, in contradiction to well established law. *See, e.g., In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (noting that "[d]issimilar claims may not be classified together"). The Oaktree DS should not be approved absent adequate disclosure regarding the basis for placing dissimilar Step One Loan claims and Step Two Loan claims in the same class.

## D.    THE OAKTREE DS FAILS TO PROVIDE ADEQUATE INFORMATION REGARDING ITS THIRD PARTY RELEASES

18.    The Oaktree Plan contains broad third party releases of claims against the Step Two Lenders and JPMorgan, as Senior Loan Agent, in connection with the incurrence of the Step Two Loans, including, but not limited to, the LBO Related Causes of Action. *See* Oaktree Plan § 11.2.2. The courts in this jurisdiction apply non-exclusive multi-factor balancing tests to determine the propriety of the releases of non-debtor third parties under the circumstances. *See In re Exide Techs.*, 303 B.R. 48, 71-75 (Bankr. D. Del. 2003) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), and *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001), for the standards governing debtor and third party releases, respectively).

19.    The Oaktree DS is deficient in at least two respects with respect to the releases. First, the disclosures are unclear as to whether direct third party contract claims are excluded from the releases. Specifically, section 11.2.2 of the Oaktree Plan states, "notwithstanding the foregoing  . . . such release, waiver, and discharge shall not operate as a release, waiver or discharge of any contractual obligation of any non-Debtor party due to any other non-Debtor

party." The Step One Plan Proponents' focus is particularly on direct claims that Step One Lenders have against various non-debtor parties associated with the Step Two Loans. The Step Two Loans were incurred in violation of the Senior Loan Agreement, they are not entitled to any benefit of the Sharing Provisions in the Senior Loan Agreement, and their incurrence caused direct and continuing economic damage to the Step One Lenders. Certain of these claims are asserted in state court litigation that is already pending, and while the releases do not appear to purport to release those state court litigation claims, the Oaktree DS should be clear and unequivocal on this point. *See Alden Global Distressed Debt Opportunities Fund, et al. v. JPMorgan Chase Bank, et al.*, index 651884/2010, filed October 29, 2010, in the Supreme Court of the State of New York (the "NY Litigation").

20.    Second, although the releases by third parties purport to be consensual (through the inclusion of an opt-out provision), there is insufficient information in the Oaktree DS concerning the consideration being paid by the Released Parties. For instance, the Oaktree DS fails to provide adequate information regarding the consideration being provided to the Step One Lenders by the Step Two Lenders and the Senior Loan Agent for the release of the LBO Related Causes of Action with respect to the Step Two Loans. As discussed above, the "highly likely" fraudulent conveyance claims against the Step Two Lenders provide Step One Lenders with a "highly likely" opportunity for a nearly par recovery. Unless the Oaktree DS provides supplemental disclosure on this issue, Step One Lenders will not be able effectively to evaluate the releases and the Oaktree Plan. *See In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506-07 (Bankr. D.N.J. 1997) (holding that section 524(e) of the Bankruptcy Code prohibits the release of a third-party from liability, except where the affected creditor expressly consents to the release and receives consideration in exchange for that agreement).

21.     The recent *Quigley* bankruptcy decision from the Southern District of New York is also worth noting. *See In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010). In *Quigley*, the court held that, if liability on account of third party claims will be released or limited as a result of a plan, the liquidation analysis required under section 1129(a)(7) of the Bankruptcy Code to confirm such plan must take into account the value of the creditors' claims against such third parties:

> [T]he 'best interest' test is not limited to comparing distributions, *i.e.*, the amounts that creditors will receive.  The express language of § 1129(a)(7) also requires [the court] to consider the value of the property that each dissenting creditor will <u>retain</u> under the plan and in the hypothetical chapter 7.

*Id.* at 144-45.  As such, any release of claims of third parties against the Step Two Lenders and the Senior Loan Agent may not be granted absent consideration equal to the value of such claims being released, and the Oaktree DS should be required to provide adequate information on that subject.

## E.     THE OAKTREE DS FAILS TO PROVIDE ADEQUATE INFORMATION REGARDING PAYMENT OF LENDER FEES

22.     The Oaktree Plan includes a "Senior Lender Holdback" that allows JPMorgan, as Senior Loan Agent, to retain $32.5 million "to be used for the reimbursement of fees and/or expenses incurred by JPMorgan."  Oaktree Plan § 7.3.2.  The Oaktree Plan and Disclosure Statement should provide detailed information regarding the uses of the Senior Lender Holdback, including whether such holdback would be used by JPMorgan only for payment of its fees and expenses as Senior Loan Agent or also for payment of fees and expenses of JPMorgan as Senior Lender and/or Oaktree Plan Proponent as well.  Additionally, the Oaktree DS should disclose what protocols the Debtors intend to institute to ensure that the Senior Lender Holdback is used in a manner consistent with the Senior Loan Agreement and the Oaktree Plan.  The protocols should also be clear as to which agent fees are and are not reimbursable, given that

JPMorgan's fees and expenses incurred in unsuccessfully defending against fraudulent transfer and other challenges would clearly *not* be reimbursable.

23.     Moreover, the Senior Loan Agreement provides that "Borrower further agrees to pay promptly following demand all reasonable and documented out-of-pocket costs and expenses of the Agent, the Lead Arrangers *and the Lenders*, if any (including, without limitation, reasonable and documented counsel fees and expenses), in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement, the Notes and the other documents to be delivered hereunder . . . ." Senior Loan Agreement § 8.04(a) (emphasis added).  As such, the Oaktree DS should clarify whether the Step One Plan Proponents will have access to the Senior Lender Holdback to pay for the fees and expenses (including reasonable and documented counsel fees and expenses) in connection with the enforcement of their rights under the Senior Loan Agreement in these chapter 11 cases and in the NY Litigation or whether the Debtors will be making other accommodations for the payment of the Step One Plan Proponents' fees and expenses prior to the making of other distributions under the Oaktree Plan.

**F.     THE OAKTREE DS FAILS TO PROVIDE ADEQUATE INFORMATION REGARDING THE CLAIMS OF THE OAKTREE PLAN PROPONENTS**

24.     The Oaktree Plan Proponents include, among others, (i) certain investment funds and accounts managed by Oaktree and/or its affiliates and Angelo and/or its affiliates, "each in its capacity as Holders of Senior Loan Claims, or as a general partner or manager of an entity that is a Holder of Senior Loans"; and (ii) JPMorgan and certain of its affiliates, "as the Senior Loan Agent and as a Holder of Senior Loans Claims." Oaktree DS at 1.  However, the Oaktree DS fails to provide information regarding whether the Senior Loans held by Oaktree, Angelo and JPMorgan are predominately Step One Loans or Step Two Loans, whether Oaktree, Angelo and

JPMorgan hold other claims against or interests in the Debtors and the amounts of such Step One Loans and/or Step Two Loans, or other claims or interests so held.

25.     Upon information and belief, Oaktree, Angelo and JPMorgan are significant (if not the largest) holders of Step Two Loans.  If true, such holdings clearly illustrate a potential conflict of interest by the Oaktree Plan Proponents who propose settling "highly likely" fraudulent conveyance claims against the Step Two Lenders for nominal consideration that is in large part being paid for by Step One Lenders.  In order for Step One Lenders to fully evaluate the fairness of the settlement proposed by the Oaktree Plan, including whether it was arm's length, it is vital that the Oaktree DS identify exactly who is purportedly negotiating on their behalves.  Specifically, the Oaktree DS should disclose the exact holdings of Oaktree, Angelo and JPMorgan, by claim and amount, including all Step One Loans, Step Two Loans, Swaps, Senior Noteholder claims and any other claims or other positions that might help readers evaluate these proponents' positions.

## IV.     THE AURELIUS DS

26.     In the 116 pages of the Aurelius DS, there is not a single mention (not even in a footnote) of the Examiner's conclusions regarding the probability of succeeding on the avoidance of Step One Transactions, *i.e.*, it is "highly unlikely that the Tribune Entities were rendered insolvent in Step One" and "a court is reasonably likely to conclude that the Step One Transactions did not constitute an intentional fraudulent transfer."  The Aurelius DS only states:

> The Pre-LBO Debtholder Plan is intended to prosecute all claims and causes of action addressed in the Examiner's Report; yet, the Proponents recognize that while the Examiner conducted a through review of the 2007 leveraged buyout and a comprehensive analysis of the potential litigation outcomes, the Proponents also recognize that the Examiner is not a court of law nor would the Examiner's Report be conclusive in any litigation brought involving the legal issues analyzed therein.

Aurelius DS at 22. If the Aurelius Plan Proponents would like to continue to lure Senior Noteholders with prospects of highly unlikely 100% recoveries, the Aurelius DS must disclose the Examiner's conclusions regarding these "potential litigation outcomes."

27.    In a similar instance of cherry-picking the portions of the Examiner's Report favorable to the Aurelius Plan Proponents, the Aurelius DS also provides recovery scenarios for "Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom." As the Aurelius Plan Proponents know, the merits of such a scenario were specifically addressed in the Examiner's Report. In considering the potential theories for achieving this result, the Examiner concluded "it is difficult to find a doctrinal basis that would support barring that debt from participating in avoidance recoveries." Specifically, on the theory of "equitable estoppel," the Examiner stated that "equitable estoppel is at best an imperfect fit, as that doctrine typically requires some form of representation from the party against whom estoppel is sought in favor of the party seeking estoppel, with some courts requiring a false representation. In the current case, the LBO Lenders did not make any representations to the Non-LBO Creditors." Examiner's Report, vol. 2, at 302-03. As the Aurelius Plan is a "litigation plan" and urges creditors to forego meaningful recoveries on the Effective Date, it is incumbent upon the Aurelius Plan Proponents to make creditors aware of the probability of succeeding on that litigation. Without adequate disclosure concerning the Examiner's conclusions and/or an explanation of why the Examiner is incorrect, it would be materially misleading for the Aurelius Plan Proponents to solicit creditors on the current basis.

## V.    THE BRIDGE LENDER DS

28.    The settlements proposed in the Bridge Lender Plan represent neither anything resembling the Examiner's Report nor anything resembling the Debtors' valuation analysis.

Unless the Bridge Lenders can provide adequate information supporting the basis for each of the recoveries proposed in the Bridge Lender Plan settlements, the Bridge Lender DS should not be used to solicit unknowing creditors.   For instance, the Bridge Lender DS should provide adequate information explaining the basis for paying Senior Noteholders 138% of the distributable enterprise value of Tribune in cash.   Similarly, the Bridge Lender DS lacks adequate information explaining what theory in the Examiner's Report supports a cash recovery of 7.7% for the subordinated Bridge Lender claims.   In addition to explaining the proposed settlement recoveries, to the extent that the Bridge Lender Plan continues to provide the Bridge Lenders with third party releases, the Bridge Lender DS should adequately disclose what consideration the "Bridge Loan Lender Parties" (as used in the Bride Lender DS) are providing for these releases.  From the face of the Bridge Lender DS, these releases appear to be gratuitous

## VI.    CONCLUSION

WHEREFORE, the Step One Plan Proponents respectfully request that the Court: (i) decline to approve the Oaktree DS, Aurelius DS and Bridge Lender DS, (ii) condition any further consideration of the Oaktree DS, Aurelius DS and Bridge Lender DS on the incorporation of modifications proposed herein and (iii) grant such other relief as appropriate.

Dated:  November 16, 2010              MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                    /s/ Daniel Butz
                                    Derek C. Abbott (No. 3376)
                                    Daniel B. Butz (No. 4227)
                                    1201 N. Market Street
                                    P.O. Box 1347
                                    Wilmington, DE 19899-1347
                                    Telephone: 302.658.9200
                                    Facsimile: 302.658.3989

ARKIN KAPLAN RICE LLP
Howard Kaplan
Johnny Yeh
Deana Davidian
590 Madison Avenue, 35th Floor
New York, NY 10022
Telephone: 212.333.0200
Facsimile: 212.333.2350

OLSHAN GRUNDMAN FROME ROSENZWEIG
& WOLOSKY LLP
Adam Friedman
Steve Wolosky
Fredrick Levy
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone: 212.451.2300
Facsimile: 212.451.2222

BRACEWELL & GIULIANI LLP
Evan Flaschen
Daniel Connolly
Andrew Schoulder
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, CT 06103-1516
Telephone: 860-256-8537
Facsimile: 860-760-6310

*Counsel to the Step One Credit Agreement Lenders*