**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,<br><br>                   Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered<br><br>Hearing Date: November 29, 2010<br>Time: 10:00 a.m. (EST) |

**THE AD HOC COMMITTEE OF TRIBUNE SUBSIDIARY TRADE CREDITORS' OBJECTION TO THE PROPOSED SPECIFIC DISCLOSURE STATEMENTS RELATING TO THE PLANS OF REORGANIZATION OF (I) THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A.; (II) KING STREET CAPITAL, L.P. AND MARATHON ASSET MANAGEMENT, L.P.; (III) CERTAIN HOLDERS OF STEP ONE SENIOR LOAN CLAIMS; AND (IV) AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR IN DENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST COMPANY, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

TO:    THE HONORABLE KEVIN J. CAREY
          CHIEF UNITED STATES BANKRUPTCY JUDGE

       The Ad Hoc Committee (the "OpCo Trade Committee") of Subsidiary Trade Creditors (the "Trade Creditors"), by its undersigned counsel, for its objection (the "Objection") to the proposed disclosure statements (the "Disclosure Statements") relating to the proposed plans of reorganization (the "Plans") filed by various parties-in-interest in these cases, respectfully represents:

## INTRODUCTION

1. The OpCo Trade Committee's Objection is based on the Disclosure Statements' inadequate information relating to the values and assets and liabilities of the various operating company debtors, and the recoveries Trade Creditors are proposed to receive under the Plans. The Plans (excluding the "Aurelius" and "King Street" Plans, which are briefly described below) provide for Trade Creditors to be paid in full, in cash. There is an aggregate "cap" of $150 million, however, for all of the Trade Creditors' claims, notwithstanding that, in the aggregate, more than $1 billion in claims have been filed against the various Debtors. As a consequence, there is no way for Trade Creditors to know what they are receiving under the Plans, notwithstanding that the Plans nominally provide for payment in full of their claims. Given the size of the claims pool and the fact that the Plan proponents felt it necessary to impose a "cap" on the amounts payable on account of the Trade Creditors' claims, the anticipated "100%" cash recovery to Trade Creditors may be illusory. The Disclosure Statements must disclose how the Plan proponents determined that the aggregate amount of allowed subsidiary trade claims would be less than $150 million.

2. As a practical matter, we suspect that the voluminous Disclosure Statements will have little effect on how Trade Creditors will vote because they are largely incomprehensible (even more so here than in most Chapter 11 cases because there are four competing Plans). That said, one aspect of the Disclosure Statements that every Trade Creditor will hopefully review is the estimated recovery on its claims. As such, every effort must be made to ensure that disclosure with respect to plan treatment of Trade Creditors is accurate and not misleading. The OpCo Trade Committee proposes that Trade Creditors receive a short summary of the proposed Plan treatments so that they can actually understand what they are voting for or against, what

2

they will receive under the Plans, and when they will receive distributions. In any event, for the reasons herein, the Disclosure Statements should not be approved, unless they are modified as set forth below.

## ARGUMENT

### The Disclosure Statements Do Not Provide "Adequate Information" and Must Therefore Be Denied.

#### A. The Standard for Approval of the Disclosure Statement

3. The primary purpose of a disclosure statement is to give creditors the information necessary for them to decide whether or not to accept the debtor's plan. *Tenn-Fla Partners v. First Union Nat'l Bank of Fla.*, 229 B.R. 720 (W.D. Tenn. 1999); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168 (Bankr. S.D. Ohio 1988). Section 1125 obligates a plan proponent to submit a disclosure statement with "adequate information," which is defined as:

> information of the kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the Debtors' books and records that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

4. Approval of a disclosure statement should be denied when it does not contain adequate information. *See Menard Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 696 (4th Cir. 1989). "Adequate information" must enable individual creditors, as well as institutional investors, to make an informed judgment about the proposed Plan.[1]

---

[1] A disclosure statement should contain "[a]ll factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *In re Microwave Products of America, Inc.*, 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989) (internal quotations omitted). Among the types of information that generally must be included are the following:

- a description of the available assets and their value;
- the anticipated future of the company;

3

### B. The Disclosure Statement Does Not Contain Adequate Information Regarding the Treatment of Claims

5. Page 3 of the Debtors' proposed Disclosure Statement contains the following statement: "As a result of these settlements . . . <u>holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors will receive payment in full in Cash</u>." (Emphasis added.) Page 7 of the Debtors' proposed Disclosure Statement, however, states: "Each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive an amount of Cash (paid out of the Distributable Cash Pool) equal to the lesser of (i) 100% of such Holders' Allowed General Unsecured Claim Against a Filed Subsidiary Debtor or (ii) a Pro Rata share of $150,000,000." The "Step One" proposed Disclosure Statement provides similar treatment.[2]

6. Page 13 of the Debtors' proposed Disclosure Statement provides an aggregate estimate for allowed trade claims against <u>all</u> operating company Debtors at between $85 million to $150 million. Upon information and belief, however, the face value of claims filed against such Debtors far exceeds $1 billion. The Debtors' proposed Disclosure Statement lacks any

---

- the present condition of the debtor while in Chapter 11;
- the estimated return to creditors under a Chapter 7 liquidation;
- the estimated administrative expenses, including attorneys' and accountants' fees;
- financial information, data, valuations, or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;
- information relevant to the risks imposed on creditors under the plan;
- the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; and
- the relationship of the debtor with any affiliates.

*See also In re United States Brass Corp.*, 194 B.R. 420 (Bankr. E.D. Tex. 1996); *In re Dakota Rail, Inc.*, 104 B.R. 138, 142 (Bankr. D. Minn. 1989). Disclosure of all the factors listed above, however, may still be insufficient to permit creditors to evaluate a plan. *See In re Dakota Rail, Inc.*, 104 B.R. at 143 (citing *In re Scioto Valley Mortgage Co.*, 88 B.R. at 171)

[2] Under the "Aurelius" Plan, trade claims against the non-guarantor subsidiary Debtors are in classes 2G through 49G and trade claims against guarantor Debtors are in classes 50G through 111G. Under the "Aurelius" Plan, the trade claims of the non guarantor subsidiaries would be paid in full, plus postpetition interest (about 6 million dollars in total according to Aurelius). All the trade claims of the guarantor Debtors (estimated by Aurelius to be $112 million) would receive an eight cent initial recovery (plus an interest in the litigation trusts), subject to an offer by Aurelius to buy those claims for 25 cents at effectiveness under certain circumstances specified in their Plan. Under the "King Street" Plan, trade claims are treated in a similar fashion; provided, that under the "King Street" Plan, if various settlements are approved, trade claims will be treated as they are under the Debtors' Plan and the "Step One" Plan. Although the Plans differ, the "Aurelius" and "King Street" Plans are equally inadequate.

meaningful information as to how the plan proponents arrived at the $85 million to $150 million claims estimate. Such information must be included in the Disclosure Statement. Further, although the timing of payments on account of allowed trade claims does not appear to be specifically set forth in the Debtors' proposed Disclosure Statement, Sections 1.1.119 and 3.3.5 of the Debtors' proposed Plan [Docket No. 6089] provide that the initial Distribution Date shall be no later than thirty (30) days after the Effective Date. Given the size of the asserted claims pool, the Debtors' optimistic timing for claims distributions appears dubious, at best.

7. Notwithstanding the statement on page 13 of the Debtors' proposed Disclosure Statement that Trade Creditors will receive a "100%" recovery, the document does not say or disclose whether, on the Distribution Date, allowed subsidiary trade claims will be paid in full or whether such claims would receive a partial distribution (and, if the latter, how much such distribution will be). That information is critical and absolutely necessary for a Trade Creditor to determine whether to accept or reject a Plan. The Debtors' Disclosure Statement should set forth how much - - i.e., how many cents on the dollar - - the Trade Creditors will receive on account of allowed claims in the "initial" distribution. Moreover, the Debtors' Disclosure Statement does not include information relating to the administration of the post-confirmation claims reconciliation process. Due to the importance such process will play in these cases, such information must be included in the Disclosure Statements. For all of these reason, the "adequate information" standard of Section 1125 of the Bankruptcy Code has not been satisfied and must be rectified.

8. A fundamental element of the Debtors' plan proposal, as described in the Debtors' proposed Disclosure Statement, is a settlement of certain fraudulent conveyance claims which principally belong to the subsidiary Debtors that guaranteed the LBO debt. The disclosure that is

nowhere to be found in any of the Disclosure Statements, however, is an explanation of how creditors of the parent Debtor may reap the benefits of any settlement or litigation of subsidiary Debtors' fraudulent conveyance claims when it appears that subsidiary creditors will not be paid in full.  This explanation must be included in the Disclosure Statements for Section 1125 to be satisfied.  The Debtors' Plan <u>assumes</u> that all allowed Trade Creditors are being paid in full and, therefore, no settlement proceeds in respect of the LBO fraudulent conveyance claims would go to the Trade Creditors.  The Disclosure Statements must set forth a meaningful and reasonable basis for the assumption that Trade Creditors will be paid in full.

**C.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Value of Each Debtor**

9.    Confirmation of a plan under the Bankruptcy Code by definition applies to each debtor as a separate entity unless the estates are being substantively consolidated.  Under each of the Plans, and the accompanying Disclosure Statements, there appears to be no meaningful debtor-by-debtor financial information.  Such information is necessary for several reasons:

- First, unless subsidiary trade claims are being paid in full in cash, it is inappropriate to aggregate the claims pool without debtor-by-debtor financial information.  There must be disclosure as to the separate claims pools for each of the subsidiary Debtors and how much of the $150 million "cap" is applicable to each Debtor.  No such information is provided, thereby violating Section 1125 of the Bankruptcy Code.

- Second, if the Debtors' Plan (and the other plans) are viewed as "pot" plans with a maximum consideration of $150 million being paid pro rata on account of <u>all</u> subsidiary trade claims, how much of such $150 million is being allocated to each Debtor and why isn't such treatment a *de facto* substantive consolidation of the estate for such purpose?  Yet, the disclosure statements state that the Debtors are not being substantively consolidated. Such disclosure must be provided as a necessary component of adequate information under Section 1125(a).

- Third, in order to evaluate the "best interests test" under Section 1129(a), which is applicable to each creditor regardless of whether such creditor's class votes to accept (or reject) a plan, the liquidation value and assets and liabilities of each Debtor must be identified and disclosed.

6

10. The OpCo Trade Committee reserves the right to amend and/or supplement this objection and reserves all rights with respect to confirmation issues.

WHEREFORE, for all of the foregoing reasons, we respectfully request that this Court (i) deny approval of the various Disclosure Statements pursuant to Section 1125 of the Bankruptcy Code, unless modified in accordance with the foregoing, and (ii) grant such other and further relief as it deems appropriate.

Dated: November 18, 2010
      Wilmington, Delaware

Respectfully submitted,

ANDREWS KURTH LLP

By: /s/ Paul N. Silverstein
Paul N. Silverstein (NYS Bar No. PS 5098)
Robin Russell (TX Bar No. 17424001)
Jeremy B. Reckmeyer (NYS Bar No. JR 7536)
450 Lexington Avenue
New York, New York 10017
Telephone Number: (212) 850-2800
Facsimile Number: (212) 850-2929

*Counsel to the Ad Hoc Committee
of Subsidiary Trade Creditors*