## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **TRIBUNE COMPANY, et al.,**[1] | : | **Case No. 08-13141 (KJC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |

## THE BRIDGE AGENT'S OBJECTION TO THE MOTION OF THE DEBTORS FOR AN ORDER (I) ESTABLISHING PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT PLANS OF REORGANIZATION; (II) APPROVING FORMS OF BALLOTS, MASTER BALLOTS AND RELATED INSTRUCTIONS; (III) APPROVING SOLICITATION PACKAGE CONTENTS AND AUTHORIZING DISTRIBUTION OF SOLICITATION AND NOTICE MATERIALS; (IV) FIXING VOTING RECORD DATE; (V) ESTABLISHING NOTICE AND OBJECTION PROCEDURES IN RESPECT OF CONFIRMATION; (VI) SETTING CONFIRMATION SCHEDULE AND ESTABLISHING PARAMETERS OF CONFIRMATION-RELATED DISCOVERY; (VII) ESTABLISHING NEW DEADLINES FOR RETURN OF MEDIA OWNERSHIP CERTIFICATIONS; (VIII) AUTHORIZING

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

**EXPANSION OF BALLOTING AND TABULATION AGENT'S RETENTION AND ALLOCATION OF COSTS OF SAME; AND (IX) GRANTING RELATED RELIEF**

Wells Fargo Bank, N.A., as successor administrative agent (in such capacity and not individually, the "Bridge Agent") under that certain $1.6 billion Senior Unsecured Interim Loan Agreement dated as of December 20, 2007, by and among Tribune Company, each lender from time to time party thereto, and the other named parties thereto, hereby submits this Objection to the Motion of the Debtors for an Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plans of Reorganization; (II) Approving Forms of Ballots, Master Ballots and Related Instructions; (III) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (IV) Fixing Voting Record Date; (V) Establishing Notice and Objection Procedures in Respect of Confirmation; (VI) Setting Confirmation Schedule and Establishing Parameters of Confirmation-Related Discovery; (VII) Establishing New Deadline for Return of Media Ownership Certifications; (VIII) Authorizing Expansion of Balloting and Tabulation Agent's Retention and Allocation of Costs of Same; and (IX) Granting Related Relief (the "Solicitation Procedures Motion").

## PRELIMINARY STATEMENT

1.      In the Solicitation Procedures Motion, the Debtors are once again attempting to limit discovery into the massively complex legal and factual issues associated with the LBO-Related Causes of Action the Debtors propose to settle.  Specifically, the Debtors seek an order that would (a) limit further fact discovery on the LBO-Related Causes of Action; (b) limit expert testimony; and (c) limit the length of the confirmation hearing.  The limitations, sought under the guise of efficiency, clearly seek one goal – to limit scrutiny of the Debtor/LBO Lender Plan and the settlements that form the back bone of that plan.  Given the relationship between the findings of the Examiner and the settlements supported by the Debtors, it is not surprising that

-2-

the Debtors would seek to limit additional discovery on the LBO-Related Causes of Action and the parties' ability to bring such evidence before the Court. The Bridge Agent submits, however, that it is in the interest of all parties to have a full and fair confirmation hearing given the allegations that have been leveled in the LBO-Related Causes of Action. Accordingly, the Debtors' efforts to limit confirmation related discovery and the scope of the confirmation hearing itself should be denied, particularly at this early stage of the confirmation proceedings.

2.      In addition, the Debtors seek to allocate 75% of the fees, costs and expenses associated with the Solicitation Procedures Motion to the proponents of the competing plans. The Debtors, however, cite no authority for such extraordinary relief. Given well-settled bankruptcy law that the debtor is responsible for all costs associated with its reorganization, the Court should deny the Debtors' request to allocate such costs.

## OBJECTION

## I.    The Court Should Not Set the Contours of the Confirmation Hearing as Requested by the Debtors

3.      This is not the Debtors' first attempt to limit scrutiny of the failed LBO Transaction, as they previously sought to shorten the length and narrow the contours of the confirmation hearing in connection with the Debtors' prior plan which was purportedly based on a self-described "global settlement." On July 6, 2010, the Debtors filed their (I) Opposition to the Motion of the Bridge Agent for Entry of Orders (A) Establishing Procedures of Adjudicating the Debtors' Objections to the Bridge Loan Claims in Conjunction with Plan Confirmation Proceedings and (B) Allowing Such Claim in Full and (II) Cross Motion for Entry of Preliminary Pre-Trial Scheduling Order for the Plan Confirmation Hearing (the "Scheduling Motion").

4.      The Scheduling Motion sought, among other things, to limit both fact and expert evidence that parties objecting to the Debtors' plan could present at the confirmation hearing,

-3-

limit the length of the confirmation hearing to five days, and set the standard by which the Court

would analyze the settlement that was then the lynchpin of the Debtors' plan to the "lowest rung

of reasonableness" test. (Proposed Order to Scheduling Motion at 1-2). A hearing on the

Debtors' Scheduling Motion was held on July 14, 2010.

     5.     In considering the Debtors' Scheduling Motion, the Court refused to limit

discovery or the length of the confirmation hearing because it was premature to do so and made

clear that it would "not fix standards prior to confirmation." Hr. Tran. 39, 40, July 14, 2010.[2]

     6.     Notwithstanding the Court's ruling, the Debtors yet again seek an order that limits

(a) fact discovery; (b) expert testimony; and (c) the length of the confirmation hearing. And, as

with the Debtors' Scheduling Motion, it is once again premature for the Court to define the

parameters of the confirmation hearing at this time. There are four competing plans that are

involved in the confirmation process – the Debtors/LBO Lender Plan, the Pre-LBO Debtholder

Plan, the Bridge Plan, and the Step One Plan. Discovery on the four plans has yet to commence

and will not be complete any earlier than March 2011. Until the parties complete discovery and

have an opportunity to assess what evidence is necessary to support their respective plans and the

objections they may raise to the plans proposed by other creditor constituencies, it would be

premature for the Court to limit the timing and scope of the confirmation hearing.

### A.     The Debtors' Attempts to Limit Fact Discovery Should be Rejected

     7.     In the Solicitation Procedures Motion, the Debtors seek the Court's determination

that "no additional fact discovery regarding the merits of the LBO-Related Causes of Action

shall be taken in connection with the Confirmation Hearing." (Solicitation Procedures Motion at

44). The Debtors' attempt to eliminate additional fact discovery into such matters is not

---

[2] The relevant portion of the July 14, 2010 transcript is attached hereto as Exhibit A.

-4-

surprising given certain of the Examiner's findings.  However, contrary to the Debtors'

assertions, discovery has not been "exhaustive."  (Solicitation Procedures Motion at 43).

　　　　8.　　　The Examiner himself acknowledged that his Investigation into the LBO-Related

Causes of Action was not exhaustive when he stated that, had he more time, he "certainly would

have conducted further discovery."  (Examiner's Report, vol. 1, p. 6).  Indeed, throughout the

Examiner's Report, the Examiner noted that additional discovery was needed in connection with

a number of topics, including the following:

- The Examiner became aware of the contents of Mr. Petrik's notes [regarding the Lead Bank's view on the question of solvency] after all Lead Bank interviews had concluded, shortly before the deadline for filing the Report.  Accordingly, the Examiner was not able to question the participants about the information contained in those notes or confront witnesses with inconsistencies between these notes and their prior (in some instances sworn) statements to the Examiner.  (Examiner's Report, vol. 2, pp. 273-74).

- The production of documents furnished by BofA [including the Petrik notes] raise questions regarding whether (1) the redacted sections are, in fact, protected by any privilege that would prevent the use of such information by the Examiner; and (2) under applicable law, such privilege, if valid, was waived.  Nevertheless, the Examiner's review of this production occurred at a time when these questions could not have been answered within the deadline set by the Bankruptcy Court for the filing of the Report.  (Examiner's Report, vol. 2, pp. 337-38 n. 939).

- As discussed in the Report, however, the information adduced in the Investigation regarding certain actions by the Lead Banks in the fall of 2007 suggests that further investigation is warranted, among other things, on the question whether deliberations by the Lead Banks in the months preceding the Step Two Closing are protected from disclosure based on assertions of attorney-client privilege.  (Examiner's Report, vol. 1, pp. 15-16).

- The Examiner also did not have an opportunity to interview all of the witnesses who might have shed light on the question of what the Lead Banks knew and said to one another leading to the Step Two Closing, to the extent contentions of privilege do not shield those communications.  Further investigation therefore is merited.  (Examiner's Report, vol. 2, p. 337).

- The Examiner did not have a sufficient opportunity to evaluate potential preference claims and defenses relating to bonuses, deferred compensation, retention, severance, and change in control payments made to directors and officers of the Tribune Entities, and to payments on intercompany claims, during the one-year period prior to the Petition Date. (Examiner's Report, vol. 1, p. 23).

- In light of the compressed time frame of the Investigation, however, the Examiner was unable to draw conclusions regarding which specific members of senior management were responsible for [management's dishonesty and bad faith in preparing the October 2007 projections, advising the Tribune Board and Special Committee of aspects of VRC's opinion, and procuring the Step Two solvency opinion]. Based on the record, it would be premature for the Examiner to draw specific conclusions about Mr. FitzSimons [sic]. The Examiner sincerely wishes he had had more time to investigate this matter and reach conclusions. (Examiner's Report, vol. 2, p. 385 n. 1165).

Such statements belie the Debtors' assertions that additional discovery is not needed.

9.      Discovery on these issues will almost certainly reveal facts that the Bridge Agent and other parties will use in both supporting their plan and objecting to others, as the issues go to the heart of the LBO-Related Causes of Action. Moreover, some of these issues involve the Debtors' proposed treatment of intercompany claims (discussed in more detail below) and allocation of value between its corporate entities, discovery on which will be similarly beneficial to the Bridge Agent and other parties because they significantly impact creditor recoveries.

10.      In addition, although the Examiner conducted 38 interviews during the course of his work, only 15 interviews were transcribed. Thus, the parties have no record of what was or was not said during the course of the remaining 23 interviews. Accordingly, it is difficult for the parties or the Court to evaluate in a meaningful way a number of the findings contained in the Examiner's Report, to the extent that the Examiner's Report will be relied upon by plan proponents to support their respective plans. Moreover, the Examiner explicitly stated that had he "had more time to conduct the Investigation, he would have conducted more than the 38 interviews that he held." (Examiner's Report, vol. 1, p. 32).

-6-

11.     Lastly, while the Debtors suggest that the Examiner "did extensive work relating to financial issues," including the intercompany claims issue, the Examiner explained that is not the case. (Solicitation Motion at p. 42). Rather, it is clear that the Examiner did not conduct an extensive analysis of intercompany claims. As the Examiner explained, he simply took the Debtors' analysis at face value:

> The Examiner has reviewed the Parties' submissions regarding intercompany claims existing as of the Petition Date. Based on this review, the Examiner has determined that no Party has challenged the analysis prepared by the Debtors regarding the likely percentage range of intercompany claims that would be allowed for purposes of determining recoveries to creditors in various avoidance scenarios. Because Question One is limited to claims and defenses asserted by the Parties, the Examiner has not independently analyzed the validity of such claims, which represent hundreds of thousands of individual transactions over the Debtors' history. The Examiner uses the Debtors' analysis of intercompany claims supplied to the Examiner in the analysis of Recovery Scenarios contained in Annex B to this Volume of the Report.

(Examiner's Report, vol. II, p. 309). The Examiner further stated that

> additional analysis of collectability as to an individual intercompany receivable and an evaluation of the substance of the transactions informing such balances would be necessary to ensure that 'due from' and 'due to' balances are properly characterized (*e.g.*, that they reflect true obligations and recovery rights versus, for example, equity investments). This evaluation would require additional investigation.

(Examiner's Report, vol. 2, p. 153 n. 462).

12.     Given that the parties did not have the opportunity to conduct discovery concerning intercompany claims prior to the time that briefs were submitted to the Examiner, no party was in a position to object to the intercompany claims analysis prepared by the Debtors at that time. The Bridge Agent, for one, believes that there are substantial flaws with the Debtors' intercompany claims analysis and intends to conduct comprehensive discovery with respect to such matters. Accordingly, additional discovery will be necessary to evaluate the Debtors'

treatment of intercompany claims and any order regarding the contours of discovery should, at a minimum, make clear that parties are free to pursue such discovery.

### B.    Expert Testimony Should Not be Limited to the Reasonableness of the Settlements

13.    Finally, the Solicitation Procedures Motion seeks to "limit expert testimony on the merits of the LBO-Related Causes of Action to the reasonableness of the settlements embodied on the various Plans." (Solicitation Procedures Motion at 44). The requested limit on expert discovery should not be imposed for a number of reasons. First, it is premature at this stage of the proceedings to rule on the scope of permissible expert testimony. Only after the completion of discovery will the issues be sufficiently crystallized for the Court to have the proper contextual basis to determine whether certain subject matters are appropriate for expert testimony. Second, it would be inappropriate to allow the Debtors to impose their view of the confirmation hearing on other parties in interest by way of a blanket, abstract in limine motion. In this respect, stakeholders should be permitted to introduce any expert evidence (subject to Federal Rule of Evidence 702) that supports their objection. Third, it is difficult to understand what such a limitation would mean from a practical perspective. Any testimony concerning the merits of the LBO-Related Causes of Action would theoretically bear upon the reasonableness of the settlements embodied in the various plans. Thus, the Court should reject the Debtors' proposal to the extent that it would purport to limit the scope of expert testimony at the confirmation hearing.

### C.    The Debtors' Proposed Scope of the Confirmation Hearing is Unworkable

14.    The Debtors next propose to limit the confirmation hearing to five days, which is grossly insufficient given the complexity of these cases and the fact that there are four competing plans. Indeed, the Debtors previously proposed a five-day trial when there was only one plan

being considered (and fewer parties objecting to that plan). (Proposed Order to Scheduling Motion at 1). It is thus entirely disingenuous for the Debtors to now propose a five-day trial to litigate the confirmability of four competing plans when they previously proposed that a five-day hearing would be necessary to litigate just one.

15.     Moreover, the Debtors' attempt to limit the scope of the trial is apparently tied to their request that the Court analyze the Debtors' Proposed Settlements under a lower level of scrutiny.[3] The standard the Debtors suggest the court should apply to evaluate the settlements – the lowest rung of reasonableness standard as informed by the Texaco/Martin factors – is inappropriate given that the Proposed Settlements are the centerpiece of the Debtor/LBO Lender Plan.

16.     This Court has stated that "it is the 'duty of the Bankruptcy Court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable.'" In re Exide Tech., et al., 303 B.R. 48, 67 (Bankr. D. Del. 2003) (citations omitted). Here, the Proposed Settlements are not just part of the Debtor/LBO Lender Plan but rather form the very essence of the plan. As such, the Bridge Agent submits that the current Proposed Settlements and the Debtor/LBO Lender Plan should be held to a higher standard of analysis.[4] See In re Louise's, Inc., 211 B.R. 798, 802 (D. Del. 1997) ("The Settlement Agreement, presented here as a compromise of the Exclusivity Motion issue, is so tainted with provisions unrelated to the exclusivity issue that it cannot be fairly denoted a Rule 9019 compromise. In reality, the Settlement Agreement is a vehicle for Connecticut General to implement a plan of reorganization guaranteed to be more favorable to Connecticut General than all other interested parties.").

---

[3] "Proposed Settlements" refers to the Litigation Settlement and the Step Two/Disgorgement Settlement set forth in the Debtor/LBO Lender Plan.

[4] The Bridge Agent only briefly highlights its position on the appropriate legal standard the Court should utilize in analyzing the Proposed Settlements here and will further address the issue in its forthcoming objection to the Debtor/LBO Lender Plan.

17.     Just as the forthcoming discovery will highlight the parties' respective plan positions, it will also likely reveal facts that bear upon the parties' and the Court's analysis of the appropriate legal standard by which to judge the Proposed Settlements. Therefore, until discovery is complete, it is premature to determine the length and contours of the confirmation hearing.

## II.     The Solicitation Costs Must be Paid in Full by the Debtors

18.     In addition to the discovery limitations set forth above, in the Solicitation Procedures Motion the Debtors assert that Epiq Bankruptcy Solutions, LLC should be retained as the Voting Agent for the noticing, solicitation, and tabulation process for the Plans, which would be solicited jointly in a single consolidated package. Despite such joint solicitation, however, the Debtors request authority to allocate 75% of the Voting Agent's fees, costs and expenses in connection with such process (the "Solicitation Costs") to the proponents (the "Competing Plan Proponents") of the Pre-LBO Debtholder Plan, the Bridge Plan, and the Step One Plan (the "Competing Plans"). For the reasons set forth below, the Court should deny this extraordinary request.

19.     First, it is a basic tenet of bankruptcy law that a debtor is responsible for substantially all of the costs associated with its reorganization, including the costs incurred in connection with plan solicitation. See In re Visual Indus., Inc., 57 F.3d 321, 324 (3d Cir. 1995) (stating that the general costs of reorganization are chargeable against the unburdened assets of the debtor's estate); In re Chicago Lutheran Hosp. Ass'n, 89 B.R. 719, 727 (Bankr. N.D. Ill. 1988) ("The general rule is that the costs of administration of the estate and attorney fees for services rendered to the debtor in possession are charged against the estate."); In re Korupp Associates, Inc., 30 B.R. 659 (Bankr. D. Me. 1983) (same); see also Jensen-Conklin, Susan,

-10-

Financial Reporting By Chapter 11 Debtors: An Introduction to Statement of Position 90-7, 66

AM. BANKR. L.J. 1, 6 (Winter 1992) ("In addition to its regularly incurred expenses, the

chapter 11 debtor must also bear expenses attributable to the reorganization process. These

include . . . the expenses associated with the plan solicitation process . . . ."). Further, the mere

fact that the Competing Plans are not proposed by the Debtors does not change the fact that each

proposes a plan of reorganization for the Debtors, and the costs associated with soliciting such

plans are therefore expenses attributable to the Debtors' reorganization process. Any contrary

position would chill the filing and solicitation of competing plans, which is a statutory right of

parties in interest under section 1121 after termination of the exclusive periods.

20.     Second, the Debtors cite to no authority to support the requested allocation of

Solicitation Costs, particularly in a multi-billion dollar reorganization case such as this. Indeed,

such a request appears to be completely at odds with the typical practice in cases within the

Third Circuit. For example, in the recently approved solicitation procedures order in In re TCI 2

Holdings, LLC, the Bankruptcy Court for the District of New Jersey appointed the debtors'

claims and solicitation agent to also serve as the solicitation agent for the first lien lenders as

proponents of a competing plan and ordered that "[t]he [d]ebtors shall be responsible for

payment of all fees, costs, and expenses incurred by [the solicitation agent] . . . in connection

with both [p]lans." Case No. 09-13654 (JHW), Docket No. 1085, ¶¶ 10, 48 (Bankr. D. N.J. Jan.

8, 2010). Similarly, in In re Magnachip Semiconductor Finance Company, the Bankruptcy Court

for the District of Delaware approved the solicitation of competing disclosure statements and

plans of the debtor and the creditors' committee in a single package and did not require the

creditors' committee to pay a pro rata portion of the solicitation agent's expenses in connection

therewith.  Case No. 09-12008 (PJW), Docket No. 249 (Bankr. D. Del. Aug. 31, 2009).

-11-

21.     The Debtor/LBO Lender Plan lacks support from any party that would benefit materially from the LBO-Related Causes of Action, undoubtedly due to the fact that the terms of the so-called settlements in the Debtor/LBO Lender Plan are grossly one-sided in favor of the Senior Lenders and their agents and arrangers. Adding insult to injury, the Debtors do not seek to allocate any of the Solicitation Costs to the Debtor/LBO Lender Plan Proponents, but rather to parties such as the Bridge Agent that have already incurred significant expenses in connection with preparing a competing plan and disclosure statement to give creditors a fair and reasonable alternative to the Debtor/LBO Lender Plan. Allocating the Solicitation Costs to the Competing Plan Proponents would only further the one-sided playing field by chilling their efforts to provide alternatives to the stakeholders in these chapter 11 cases.

22.     Accordingly, and for the reasons described above, the Bridge Agent respectfully requests that any order approving the Solicitation Procedures Motion provide that the Solicitation Costs are reorganization costs that must be paid in full by the Debtors.

## RESERVATION OF RIGHTS

23.     In addition to the foregoing objections, the Bridge Agent also may have certain technical issues with respect to the form of the ballots for the Bridge Plan and related instructions. In the event that such matters cannot be resolved, the Bridge Agent reserves all rights to bring such matters to the attention of the Court.

-12-

## CONCLUSION

24.     For the foregoing reasons, the Bridge Agent respectfully requests that the Court

refrain from entering an order that (a) limits fact discovery; (b) limits expert testimony; (c) limits

the length of the confirmation hearing; or (d) allocates any fees, costs and expenses associated

with the Solicitation Procedures Motion to the proponents of the Competing Plans.

Dated:   November 19, 2010
           Wilmington, Delaware

                                         FOX ROTHSCHILD LLP

                                         Jeffrey M. Schlerf (No. 3047)
                                         Eric M. Sutty (No. 4007)
                                         John H. Strock (No. 4965)
                                         Citizens Bank Center
                                         919 North Market Street, Suite 1600
                                         Wilmington, Delaware 19801
                                         Telephone: (302) 654-7444
                                         Facsimile: (302) 656-8920

                                              -and-

                                         David G. Hille (admitted *pro hac vice*)
                                         Scott Greissman (admitted *pro hac vice*)
                                         Andrew W. Hammond (admitted *pro hac vice*)
                                         WHITE & CASE LLP
                                         1155 Avenue of the Americas
                                         New York, NY 10036
                                         (212) 819-8200


                                         Thomas E Lauria (admitted *pro hac vice*)
                                         WHITE & CASE LLP
                                         200 South Biscayne Boulevard, Suite 4900
                                         Miami, Florida 33131
                                         (305) 371-2700


                                         *Attorneys for the Bridge Agent*

-13-