# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 11 |
| TRIBUNE COMPANY, *et al.*, | Case No. 08-13141 (KJC)<br>Jointly Administered |
| Debtors. | **Ref. Docket No. 6255** |

## OBJECTION OF AURELIUS CAPITAL MANAGEMENT, LP TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER SETTING CONFIRMATION SCHEDULE AND ESTABLISHING PARAMETERS OF CONFIRMATION-RELATED DISCOVERY

Aurelius Capital Management, LP ("Aurelius"), on behalf of its managed entities, by and through its undersigned counsel, respectfully submits this objection (the "Objection") to the Motion for Entry of an Order Setting Confirmation Schedule and Establishing Parameters of Confirmation-Related Discovery (the "Contours Motion") filed by the Debtors and joined by JPMorgan Chase Bank, N.A. ("JPMorgan"), Angelo Gordon & Co., L.P., Oaktree Capital Management, L.P., and the Official Committee of Unsecured Creditors (the "Creditors' Committee").[1] In support of its Objection, Aurelius represents as follows:

---

[1] The full title of the Debtors' Contours Motion is the Motion of the Debtors for an Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plans of Reorganization; (II) Approving Forms of Ballots, Master Ballots and Related Instructions; (III) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (IV) Fixing Voting Record Date; (V) Establishing Notice and Objection Procedures in Respect of Confirmation; (VI) Setting Confirmation Schedule and Establishing Parameters of Confirmation-Related Discovery; (VII) Establishing New Deadline for Return of Media Ownership Certifications; (VIII) Authorizing Expansion of Balloting and Tabulation Agents Retention and Allocation of Costs of Same; and (IX) Granting Related Relief [Docket No. 6255]. Pursuant to an agreement with the Debtors, Aurelius timely filed a brief in opposition to the portions of the Debtors' motion that do not relate to the contours of the confirmation hearing and related discovery on Friday, November 19, 2010.

## PRELIMINARY STATEMENT

The central issue in these bankruptcy cases is, and always has been, how the estate claims and causes of action (the "LBO Claims") relating to the Debtors' 2007 leveraged buyout transaction (the "LBO") — which saddled the Debtors with approximately $8 billion in additional debt, but provided Tribune and its subsidiaries with no benefit of any kind — will be treated in a plan of reorganization.[2] For nearly two years, the primary parties responsible for the LBO and targeted by the LBO Claims — the agents, arrangers and lenders who financed the LBO (the "Lead Banks"), the current holders of the LBO debt (collectively with the Lead Banks, the "LBO Lenders"), and the Debtors' management — have made every attempt to block meaningful inquiry into the merits of the LBO Claims. They vigorously opposed the appointment of an examiner (the "Examiner") to investigate the LBO Claims, interfered with his examination by withholding critical information based upon highly questionable privilege assertions, and presented scripted, copy-cat testimony lacking in credibility in response to his questions. These same parties then excluded Aurelius and the other pre-LBO debtholders — the principal beneficiaries of the LBO Claims — from every negotiation session leading to the Debtor/Committee/LBO Lender Plan in order to foment a collusive settlement.[3]

The Debtors, whose management is beholden to the holders of the LBO debt for their ongoing employment (employment that already has been explicitly threatened), and the special litigation committee created by the Debtors (the "Debtors' Special Committee"), who failed in a spectacular fashion to properly discharge their duties to the Debtors' estates and the pre-LBO lenders, now come before the Court to propose a settlement that releases approximately $15

---

[2] The LBO was conducted in a two-phase process referred to as "Step One" and "Step Two."

[3] The current holders of the LBO debt met with Aurelius for the first time last week, long after cutting the deal with the Debtors and filing the Debtor/Committee/LBO Lender Plan (as defined herein) and related disclosure statement.

billion[4] in estate claims and causes of action against the LBO Lenders and others for a mere $521 million (the "LBO Lender Settlement"), and forms the basis for a plan of reorganization (the "Debtor/Committee/LBO Lender Plan").[5] Incredibly, this one-sided settlement comes (i) on the heels of an Examiner's report (the "Examiner's Report") concluding that the LBO Claims pose a serious risk of enormous liability to the settling LBO Lenders and carry the prospect of value for pre-LBO lenders that is far in excess of the proposed settlement payments, and (ii) notwithstanding the commencement of an adversary proceeding on behalf of the Debtors' estates against the settling LBO Lenders for the sole benefit of the non-LBO lenders, alleging in great detail a full panoply of valuable and meritorious claims, including claims for actual and constructive fraudulent transfer, preferential transfer, equitable estoppel, equitable subordination, claim disallowance, and unjust enrichment (the "LBO Lender Adversary Complaint"). Numerous independent claims and theories alleged by the LBO Lender Adversary Complaint would, if proven, make the non-LBO creditors of the Debtors whole.[6]

Now comes the latest maneuver in the LBO Lenders' effort to escape from the wreckage caused by the LBO. By their Contours Motion, the Debtors and LBO Lenders seek an order from this Court (i) precluding all parties-in-interest from taking *any discovery* regarding the merits of

---

[4] This amount does not include pre-judgment interest, which would increase the amount awarded upon successful prosecution of the disgorgement claims.

[5] Specifically, pursuant to the LBO Lender Settlement, the LBO Lenders are foregoing a mere $401 million in potential plan distributions in exchange for the release of $8.7 billion in total avoidance claims concerning Step One senior loans (approximately $6.6 billion) and Step Two senior loans (approximately $2.1 billion), and more than $1.8 billion in Step One disgorgement claims. The Debtor/Committee/LBO Lender Plan also releases all former shareholders, who were paid approximately $4.3 billion at Step One of the LBO, and certain shareholders who were cashed out at Step Two of the LBO, for no consideration at all. In addition, the Debtor/Committee/LBO Lender Plan settles the Step Two LBO Lenders' approximately $318 million of Step Two disgorgement liability for only an additional $120 million (the "Step Two Disgorgement Settlement"). *See* Responsive Statement by Aurelius Capital Management, LP, Deutsche Bank Trust Company Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company [Docket No. 6293], at 4-5.

[6] *See* Complaint, *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Company)*, No. 08-13141, Adv. Pro. No. 10-53963 (Bankr. D. Del. Nov. 1, 2010) [Docket No. 6201].

the to-be settled LBO Claims — and, thereby, precluding any fact testimony whatsoever at the hearing respecting the merits of underlying claims, (ii) precluding all parties-in-interest from presenting any expert testimony regarding the merits of those LBO Claims at the confirmation hearing, and (iii) shoe-horning the combined confirmation hearing — which will involve multiple contested matters, including, *inter alia*, four materially different plans, each raising numerous complex issues, plus the determination of the size of the claim arising from the Debtors' exchangeable subordinated notes (the "PHONES"), plus the settlement hearing required to approve the LBO Lender Settlement, plus the settlement hearing required to approve an intercompany settlement worth billions of dollars — into a maximum of five hearing days. In effect, the proponents of the Debtor/Committee/LBO Lender Plan ask this Court to decide upon the fairness of a multi-billion dollar settlement without hearing any live fact or expert testimony regarding the merits of the underlying claims to be settled.[7]

The relief sought by the Debtors and the LBO Lenders could not be more counter to established 9019 caselaw and practice, as well the due process rights afforded by the Federal Rules of Bankruptcy Procedure and protected by the United States Constitution. Such relief would completely eviscerate protected discovery and evidentiary rights, including (i) the right to conduct discovery of relevant information, (ii) the right to present relevant expert testimony, and (iii) the right to challenge an adversary's privilege claims. *See* FED. R. BANKR. P. 7026; 9014(c); FED. R. CIV. P. 26(b); FED. R. EVID. 702.

---

[7] The LBO Lender Settlement, Debtor/Committee/LBO Lender Plan, and Contours Motion are also supported by the Creditors' Committee, which is highly conflicted and has completely disregarded its fiduciary duties to pre-LBO bondholders throughout these cases. Upon information and belief, most of the Creditors' Committee members who voted in favor of the Debtor/Committee/LBO Lender Plan did so not because it is in the best interest of the estates and the non-LBO creditors, but because it provides an increased or full recovery for their specific trade claims. Tellingly, *none* of the bondholder representatives who sit on the Creditors' Committee support the Debtor/Committee/LBO Lender Plan. In fact, the Creditors' Committee sought no input from Aurelius, the largest holder of Senior Notes, prior to joining the proposed LBO Lender Settlement.

The Debtors and the LBO Lenders fail to cite to a single statute or case warranting such an extreme deprivation of rights, relying instead on their erroneous view of the law applicable to proposed estate settlements, the handful of 2004 depositions taken by the Creditors' Committee nearly a year ago, and the Examiner's Report. The law regarding judicial evaluation of estate settlements, however, is explicit: a bankruptcy judge must "apprise[] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

While extolling the virtues of the Examiner's investigation as a basis to preclude all discovery regarding the merits of the LBO Claims, the Contours Motion is devoid of any reference to the Debtors' and LBO Lenders' position as to the admissibility of and weight to be given the Examiner's Report, or to the transcripts of his interviews, at the confirmation hearing. And even assuming, *arguendo*, that the parties might at some point stipulate to, or the Court could theoretically direct, an expansive use at the confirmation hearing of the Examiner's findings and conclusions, the parties opposing the LBO Lender Settlement would *still* require substantial pre-hearing discovery. In the first place, the Examiner acknowledges that he was forced to leave open several areas of inquiry bearing directly upon the liability of the LBO Lenders, including what the Lead Banks knew about the Debtors' solvency prior to Step Two of the LBO, and whether there is a basis for equitably subordinating or disallowing the LBO Lenders' claims. Second, key elements of the LBO Lender Adversary Complaint turn on the intent, good faith, and credibility of the Lead Banks' employees and, thus, can only be "canvassed" through live testimony. The Debtors wrongfully seek to prevent this Court from assessing the testimony of

these witnesses, and their purported justifications for structuring and funding such a grossly overleveraged LBO.

The Creditors' Committee's Rule 2004 depositions are also grossly inadequate as a substitute for merits discovery respecting the claims the Debtors seek to release pursuant to the LBO Lender Settlement. The Creditors' Committee conducted its depositions *before* receiving the majority of the documents it sought in its investigation, and deposed only *one* settling defendant. In short, the Creditors' Committee "investigation" is woefully inadequate as a basis to preclude further discovery.

The Debtors and the LBO Lenders cannot be permitted to settle billions of dollars in claims against themselves for a sliver of their value, while simultaneously foreclosing discovery into the merits of the claims being settled and constraining the ability of their adversaries to put on their case at the confirmation hearing. The Contours Motion should be denied in its entirety, and the Case Management Order proposed by Aurelius (the "Proposed CMO"), which provides parties-in-interest with an opportunity for full and fair discovery while clearing an efficient path towards a confirmation hearing, should be approved.

## ARGUMENT

## I. THE CONTOURS MOTION IS CONTRARY TO WELL-SETTLED LAW AND SHOULD BE DENIED

In keeping with their efforts to shield the LBO and the LBO Lender Settlement from scrutiny, the Debtors and the LBO Lenders seek a ruling from this Court that (i) "no additional fact discovery regarding the merits of the LBO-Related Causes of Action shall be taken in connection with the Confirmation Hearing," (ii) "expert testimony on the merits of the LBO-Related Causes of Action [be limited] to the reasonableness of the settlements embodied in the various Plans," and (iii) the confirmation hearing last no more than five days. Contours Motion ¶ 72; Debtors'

Proposed Order ¶¶ 44-45. In support of this draconian request, the Debtors argue that applicable case law regarding a court's evaluation of a proposed settlement ameliorates the need for such discovery and testimony, and that, rather than taking their own discovery and presenting their own testimony, parties-in-interest should instead rely upon (i) the 2004 investigation conducted by the Creditors' Committee, and (ii) the investigation undertaken by the Examiner. *See* Contours Motion ¶¶ 64-72. Each of these arguments fails as a basis to foreclose discovery and live trial testimony regarding the merits of the pending avoidance, disgorgement and subordination claims against the LBO Defendants, or to limit the duration of the confirmation hearing to five days so that such testimony cannot be presented.

### A. The Debtors and the LBO Lenders Have Not, And Cannot, Articulate Any Basis For Precluding Discovery And Expert Testimony Regarding The LBO Claims

#### 1. The Factors Applied By Courts In Evaluating Settlements Explicitly Include The Merits Of The Underlying Litigation

The Contours Motion refers merely to a "variety of factors spelled out in the case law" by which a court is to determine whether the proposed settlements are "fair and reasonable and in the best interests of the estate." Contours Motion ¶ 64. Not surprisingly, the Debtors and the LBO Lenders fail to enumerate these "factors," the *very first* of which is the underlying action's "probability of success on the merits." Additional factors include (i) the balancing of the complexity and delay of litigation with the benefits of settlement, (ii) the "paramount interest" of creditors, and (iii) "the extent to which the settlement is truly the result of 'arms-length bargaining.'" *In re Exide Techs.*, 303 B.R. 48, 67-68 (Bankr. D. Del. 2003) (Carey, J.); *see also In re Spansion*, No. 09-10690, 2009 WL 1531788, at *4 (Bankr. D. Del. June 2, 2009) (Carey, J.).

While certain cases instruct that a court may canvass issues to see whether the settlement falls below the lowest point in the range of reasonableness, this Court has previously recognized that "this may be a circumstance, not unlike some others [the Court has] faced, in which . . . the

Court will have to do more than just canvas [sic] the issues." Hr'g. Tr. 20:14-16, July 14, 2010 ("July 14 Hr'g. Tr.").[8] The Court has also stressed that, notwithstanding the Debtor/LBO Lenders' repeated requests (the latest of which comes via the Contours Motion for a pre-hearing ruling as to the applicable standards), the Court "will not fix standards prior to confirmation." *Id.* at 40:20-22; 20:10.

Moreover, while the requirement that a court "canvass the issues" alleviates the need for a court actually to adjudicate the underlying claims, it in no way obviates the need for this Court to grapple with the relevant facts through a fulsome evidentiary presentation in order to "assess the risks associated with prosecuting the litigation." *Spansion*, 2009 WL 1531788, at *7 (internal citations and formatting omitted).

Indeed, the Supreme Court has held that under all circumstances it is "essential" that settlements of estate causes of action "receive the 'informed, independent judgment' of the bankruptcy court" that the settlement is "both 'fair and equitable.'" *TMT Trailer Ferry*, 390 U.S. at 424. The Supreme Court stated further that:

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Id.*

In accord with the Supreme Court's mandate, this Court previously has stressed that bankruptcy court review of a proposed settlement of estate causes of action must include an

---

[8] A true and correct copy of the July 14 Hearing Transcript is annexed hereto as **Exhibit A**.

analysis of "the specifics of the [a]ctions," so that the court may "evaluat[e] the strengths and weaknesses of the litigation." *Spansion*, 2009 WL 1531788, at \*7. This Court has also acknowledged *in this case* that while the question of the "ethicacy [sic] of the claims against the LBO lenders" may not "have to be tried in full," the issue is "important enough that regardless of what the parties want to do . . . the Court needs to hear . . . whether the claims are good or bad." July 14 Hr'g. Tr. 43:19-23.

Accordingly, the very discovery and expert testimony that the Debtors and the LBO Lenders seek to preclude outright — that of the merits of the LBO Claims — is crucial to this Court's analysis of the LBO Lender Settlement. Clearly, this Court cannot exercise "informed and independent judgment" in the manner mandated by the Supreme Court, without the benefit of live testimony and the discovery that precedes it relevant to the merits of the LBO Claims and any asserted defenses thereto.

For example, some of the most critical issues impacting the strength of the LBO Claims, and the recovery that would inure to the benefit of the non-LBO lenders, are (i) whether the Debtors were insolvent at Step One and Step Two of the LBO, (ii) what the Lead Banks knew about the Debtors' financial condition prior to each of these steps, and (iii) whether any or all aspects of the LBO should be deemed an intentional fraudulent transfer. 11 U.S. C. § 548; *See* LBO Lender Adversary Complaint.

The Court cannot possibly exercise informed and independent judgment regarding these issues without the benefit of live testimony (or at least pre-trial deposition testimony) from, among others, the Lead Banks and the Debtors regarding, *inter alia*, (i) the impact they believed the LBO would have on the Debtors and their existing creditors, and (ii) the Debtors' projections (and modifications thereto) in advance of Step One and Step Two.

Expert testimony regarding, *inter alia*, (i) the Debtors' financial condition at Step One and Step Two, and (ii) the reasonableness of the projections supporting the Debtors' purported solvency determinations at each of these steps, is also crucial. Indeed, hearings regarding proposed estate settlements of avoidance claims almost always involve expert testimony of this nature. For example, in *Exide*, this Court conducted a 7-day confirmation hearing on a single plan of reorganization that proposed to settle fraudulent transfer and equitable subordination claims, and permitted the parties to present competing expert reports and live testimony regarding whether the Debtors were solvent at the time of the challenged fraudulent transfer.[9] 303 B.R. at 53-55; *see also, e.g., In re Capmark Fin. Grp. Inc.*, No. 09-13684, 2010 WL 4313046, at *6-9, 19-23 (Bankr. D. Del. Nov. 1, 2010) (expert testified regarding solvency in connection with potential fraudulent conveyance claims); *Lease-A-Fleet, Inc. v. Meridian Bank (In re Lease-A-Fleet, Inc.)*, No. 91-12996S, 1993 WL 102041, at *9-10 (Bankr. E.D. Pa. Mar. 19, 1993) (extensive expert testimony was presented, and ultimately relied upon by the court, regarding the probability of success of the insolvency prong of the underlying fraudulent conveyance claims).

Furthermore, such expert testimony is routinely permitted regardless of whether an examiner's report regarding the merits of the claims being settled has been issued. *See, e.g., In re Granite Broad. Corp.*, 369 B.R. 120 (Bankr. S.D.N.Y. 2007) (permitting, at the confirmation hearing, expert and fact testimony regarding the underlying merits of the challenged transaction notwithstanding the existence of an examiner's report); *In re Best Prods. Co., Inc.*, 168 B.R. 35, 45, 53-56 (Bankr. S.D.N.Y. 1994) (where debtors' plan proposed to settle pending fraudulent conveyance claims that were the subject of an "extensive" examiner's report, expert testimony was

---

[9] In *Exide*, the Court also permitted parties to present fact evidence regarding critical components of the underlying claims being settled. *Id.* at 53-55, 69.

presented regarding topics including the debtors' financial condition at the time of the challenged transactions and the reasonableness of the debtors' projections).

The Debtors and the LBO Lenders cannot possibly argue that they are prejudiced, or even surprised, by the need for such expert testimony in August. JPMorgan designated Professor Daniel Fischel, one of the most prolific testifying experts in the country, to testify regarding "Tribune's solvency at the time of the [LBO], related valuation issues and other matters related to the business of Tribune." *See* Initial Disclosure of Identity of Expert Witness and Summary of Topics by JPMorgan Chase Bank, N.A. and JP Morgan Securities, Inc., at 2 (July 15, 2010).[10] JPMorgan will have been working with Mr. Fischel for nearly a year by the time the confirmation hearing commences. Thus, the LBO Lenders have an expert who can testify regarding the strength of the claims the Debtors seek to release — *but they are simply afraid to permit him to do so.*

Aurelius is confounded as to how the Debtors and the LBO Lenders intend to meet their burden of showing that the LBO Settlement is fair and equitable, without the LBO Lenders presenting expert testimony regarding, *inter alia*, the likelihood (in their minds at least) that a court would find that the Debtors were solvent, adequately capitalized, and able to meet their debts as they came due, at each phase of the LBO. Nevertheless, if Debtors and the LBO Lenders choose to attempt to do so, that is their choice, but other parties-in-interest should not be shackled by their decision. Similarly, the Debtors and the LBO Lenders may, as a matter of their hearing strategy, seek to avoid or minimize the significance of the facts respecting the transaction and their specific conduct, and instead argue only legal defenses or general platitudes about the alleged unforseeability of economic downturn of 2008. The Debtors and the LBO Lenders cannot, however, stop the many parties opposed to the settlement from presenting their side of the case as

---

[10] A true and correct copy of the Initial Disclosure of Identity of Expert Witness and Summary of Topics by JPMorgan Chase Bank, N.A. and JP Morgan Securities, Inc. is annexed hereto as **Exhibit B**.

they see fit, or obtaining the necessary discovery to do so. Such a prohibition runs directly counter to applicable case law, the Federal Rules of Bankruptcy Procedure and the Federal Rules of Evidence.[11]

### 2. Discovery And Testimony Regarding The Merits Of The LBO Claims Are Particularly Important Here, Given That The Debtors Have Abdicated Their Duty To Negotiate A Fair And Equitable Settlement

Discovery and testimony regarding the merits of the LBO Claims — by the parties for whom the LBO Lender Adversary Complaint was brought — are particularly important here, given that the Debtors, by their own admission, abdicated their duty to negotiate aggressively a fair and equitable settlement that is in the best interests of creditors.[12] In response to the Creditors' Committee's motion for standing to prosecute and settle the LBO Claims, the Debtors insisted that they alone should retain settlement authority regarding the LBO Claims.[13] Towards that end — or so it may have appeared — following the issuance of the Examiner's Report, the Debtors created and then vested the Debtors' Special Committee with exclusive authority to, among other things:

(i)     "review[], evaluat[e] and approv[e] . . . the structure, terms or conditions of, and authorize[] the execution and filing of, any plan of reorganization";

---

[11] *See* FED. R. BANKR. P. 7026, 9014; FED. R. CIV. P. 26(b) (permitting discovery into "any nonprivileged matter that is relevant to any party's claim or defense"); FED. R. EVID. 702 (permitting a party to present expert testimony where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"); *Corestates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 201 (3d Cir. 1999) (holding that a party is entitled to take discovery of its confirmation objection).

[12] Aurelius reserves the right to argue that even greater scrutiny should be applied to the LBO Lender Settlement in this case, given, among other things, (i) the Debtors' failure to conduct arm's-length negotiations or to discharge their duty to obtain a settlement that maximizes value for all of the Debtors' creditors, and (ii) their apparent refusal, throughout the majority of the negotiations, to agree to any settlement that did not release Sam Zell and the Debtors' management, notwithstanding that these parties would not be contributing any value to the estates in return for such releases.

[13] *See* Debtors (I) Supplemental Response and Limited Objection to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors Estates and Supplement to Motion, and (II) Response and Limited Objection to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and Settle Certain Claims of the Debtors Estates [Docket No. 5909], at 3.

(ii)     "tak[e] such action from time to time, as the Special Committee deems appropriate or advisable, to resolve any and all claims, causes of action, avoidance powers or rights, and legal or equitable remedies against the Company or any of its subsidiaries . . . including, without limitation, [the LBO Claims] . . . including, without limitation, the review, evaluation and approval of any support agreement or any agreement for the satisfaction, settlement, discharge and/or release of any" LBO Claims; and

(iii)    "take[] such action from time to time as the Special Committee deems appropriate or advisable to fully inform itself with respect to any [LBO Claims] or the structure, terms or condition of any [P]lan."[14]

The Debtors also resolved that they could "not file and pursue any Plan unless the Plan has been approved by the Special Committee." Tribune Co., Unanimous Written Consent of the Board of Directors in Lieu of a Meeting, at 2 (Aug. 26, 2010).[15]

Thus, the Debtors' Special Committee was granted *sole authority* to act on behalf of the Debtors for purposes of settling the LBO Claims. Nevertheless, and quite incredibly, Mark Shapiro, the chairman of Debtors Special Committee, conceded that he *did not "consider it part of [his] fiduciary duty to determine whether it would be a fairer result to settle [the LBO Claims] then [sic] to litigate [them]."* Shapiro Deposition 35:16-20, Oct. 13, 2010 ("Shapiro Dep.") (emphasis added).[16] Rather, Mr. Shapiro testified that "plenty of people . . . will do that now and/or in the future," including "the parties that are represented in this bankruptcy," "the court appointed mediator," and "the bankruptcy judge." *Id.* at 31:6-10; 35:20-21. Mr. Shapiro further testified that he:

(i)      was not involved in the negotiations that led to the LBO Lender Settlement, *see id.* at 25-26:21-7;

---

[14] *See* Debtors' Application for an Order Authorizing the Retention of Jones Day as Special Counsel for the Special Committee of Tribune Company's Board of Directors Pursuant to 11 U.S.C. §§ 327(e) & 1107, *Nunc Pro Tunc* to August 22, 2010 [Docket No. 5562] ¶ 7.

[15] A true and correct copy of the Tribune Company's Unanimous Written Consent of the Board of Directors in Lieu of a Meeting is annexed hereto as **Exhibit C**.

[16] A true and correct copy of the Shapiro Deposition is annexed hereto as **Exhibit D**.

(ii)     does not understand the details of the LBO Lender Settlement, *see id.* at 15:11-15; 28:18-23; and

(iii)     has no understanding of the value of the LBO Claims being settled, *see id.* at 30:7-20; 35-36:25-4.

Mary Wilderotter, the other member of the four-person Special Committee who has been deposed in these cases, echoed Mr. Shapiro's testimony, testifying that:

(i)     the Debtors Special Committee did not evaluate what the LBO-Related Causes of Action would be worth if successfully litigated, *see* Wilderotter Deposition 45:15-22, Oct. 13, 2010 ("Wilderotter Dep."); [17]

(ii)     she did not "recall" whether the bridge loan debt was released under the settlement, *id.* at 33:5-9;

(iii)     she did not participate in the negotiations or have any calls regarding the Step Two Disgorgement Settlement, *see id.* at 35:18-20; and

(iv)     she did not "have a recognition" of how the $120 million paid in connection with the Step Two Disgorgement Settlement was determined, *id.* at 36:13-17.

Plainly, the assertion in the Debtors' Contours Motion that the LBO Lender Settlement "is the product of an unimpeachable arms-length negotiation" (and therefore deserving of some deference) is outright laughable.  Contours Motion ¶ 70.  But it gets worse:  The Chairman of the Debtors Special Committee also admitted to spoliating virtually all of his emails respecting the work of the Debtors Special Committee.  Shapiro Dep. 107:3-5.  Mr. Shapiro elaborated that he "constantly" deleted emails relating to the Debtors Special Committee so that "as soon as I read it and take it in, it's gone," and that "if it was sent to me hardcopy . . . then definitely it would be shredded."  *Id.* 107:3-5, 14-15, 128:20-22.  *See also id.* at 105 (testifying that he "shredded" the resolution forming the Special Committee as soon as he received confirmation that the company had received it).  Mr. Shapiro's blatant disregard for the discovery rules imposed by the Federal

---

[17] A true and correct copy of the Wilderotter Deposition is annexed hereto as **Exhibit E**.

Rules of Bankruptcy Procedure is yet further evidence that the "negotiation" conducted by the Debtors should have no bearing on this Court's assessment of the LBO Lender Settlement, or support a curtailment of the parties' discovery rights.

### 3. The Examiner's Investigation Is Not A Basis For Precluding Parties-In-Interest From Taking Their Own Discovery And Presenting Fact and Expert Testimony at the Confirmation Hearing

The Debtors and the LBO Lenders' assertion that the Examiner's investigation should preclude parties-in-interest from taking discovery of the LBO Claims also fails. Remarkably, while the Debtors and the LBO Lenders argue that the Examiner's investigation should supplant discovery, they have taken no position as to whether the Examiner's factual findings, legal conclusions, or interview notes *should even be admitted into evidence. See* Contours Motion ¶¶ 67-72; *see also* Letter from James F. Bendernagel, Jr. to David M. Zensky, at 1 (Nov. 12, 2010) (declining to disclose the Debtors' position as to the admissibility of the Report or the weight, if any, to be accorded to statements or opinions in the Report).[18]  Depending on the degree to which the parties seek to challenge the Examiner's findings of fact and conclusions of law, the resolution of this issue may lessen the need to present certain evidence at the confirmation hearing and, by extension, to take certain discovery. Nevertheless, regardless of the outcome of this issue, the Examiner's conclusions clearly are not binding on this Court, and parties-in-interest must be free to challenge, or, if necessary, support and/or strengthen the Examiner's conclusions, by conducting their own discovery and presenting their own evidence at the confirmation hearing.

Moreover, the Examiner himself acknowledged the limitations of his investigation, noting that "*formal depositions (and the cross-examination that accompanies an adversarial process) might well produce information different from that which the Examiner was able to adduce in [his]*

---

[18] A true and correct copy of Mr. Bendernagel's letter is annexed hereto as **Exhibit F**.

*interviews*." Examiner's Report Vol. 1, at 37 (emphasis added). The Examiner stated further that, unlike his investigation, which was taken without regard for evidentiary and procedural rights and protections, and in which many interviews were unsworn and off the record, "the adversarial process allows rebuttal witnesses and documents that may impeach or contradict other testimony or documents." *Id.* At bottom, the Examiner stressed that ***"neither the Investigation nor the resulting Report are intended to serve as proxies for what an adjudicative process would produce."*** *Id.*

The Examiner also acknowledged that his investigation was limited by the time in which he had to conduct it. The Examiner cautioned that he "would have conducted more" interviews had he had more time, and that he "did not have an opportunity to interview all of the witnesses who might have shed light on the question of what the Lead Banks knew and said to one another leading up to the Step Two Closing." *Id.* at 32; Examiner's Report Vol. 2, at 337. Additionally, the Examiner left "in equipoise" the question of whether Step One LBO Lenders can "benefit from avoidance of payments made and obligations incurred in the Step Two transactions," and stated that ***"further investigation is . . . merited"*** **regarding whether an evidentiary basis exists for equitably subordinating or disallowing the LBO Lenders' claims.** *Id.* at 301, 337.

The Examiner's investigation was also frustrated by the Lead Banks' efforts to shield information from his review, on the basis of highly questionable privilege assertions. The Examiner found that "[t]he Lead Banks, . . . represented by skilled counsel, plainly attempted to clothe as much of their deliberations as possible [regarding what they knew about the Debtors' financial condition in advance of Step Two] under the umbrella of attorney-client and other privileges." *Id.* at 336-37. The Examiner stated further that "in their testimony before the Examiner, witnesses for the Lead Banks tended to speak from the same script in discussing key

events as well as their activities during the months preceding Step Two Closing," leading the

Examiner to "greet[] portions of the testimony furnished by witnesses for the Lead Banks with a

healthy dose of skepticism." *Id.* at 337. Plainly, parties-in-interest must be permitted to, at a

minimum, explore the issues left open by the Examiner, and challenge the questionable privilege

assertions highlighted in his Report.

The issues left open by the Examiner, including the LBO Lenders' understanding of the

effect that Step Two would have on the Debtors' financial condition in advance of the transaction,

are critical to this Court's assessment of the LBO Lender Settlement. The Debtors and the LBO

Lenders base their assertion that the LBO Lender Settlement is reasonable on the contention that,

of the six recovery scenarios annexed to the Examiner's Report that do not address shareholder

disgorgement, only the "complete victory scenario" results in a greater recovery for non-LBO

lenders than that provided by the LBO Lender Settlement.[19] But the recovery scenarios annexed to

the Examiner's Report "do not consider the potential effect" of, among other things, "equitable

subordination [and] equitable disallowance,"[20] or the possibility that Step One LBO Lenders will

not be able to benefit from Step Two avoidance or disgorgement. Examiner's Report Vol. 2,

Annex B, at B-1. Yet the Examiner found that these equitable claims and remedies, which could

result in a full recovery for non-LBO lenders, could very well apply:

> if the evidence showed that the Lead Banks knew that Step Two would render
> Tribune insolvent, but they proceeded to fund anyway, a case could be made for
> equitable subordination (and possibly equitable disallowance) not just of the Step
> Two Debt but, possibly, some or all of the remainder of the LBO Lender Debt.

---

[19] Specific Disclosure Statement Relating to Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 6091], at 17.

[20] The Debtor/Committee/LBO Lender Plan Proponents also fail to disclose that the recovery scenarios annexed to the Examiner's Report represent only a handful of the numerous potential outcomes the Examiner found could result from prosecution of the LBO Claims, and bear no relation to the Examiner's conclusions regarding which of these or the other possible scenarios is more likely to occur.

Examiner's Report Vol. 2, at 334.

With regard to this critical issue, the Examiner's Report details substantial evidence indicating that this was the case. For example, email evidence shows that Citibank referred to the pre-LBO debt as the Lead Banks' "equity cushion," and that the Lead Banks were unconcerned with whether the Debtors would be able to honor their pre-LBO debt, as long as they could service their LBO debt obligations. Examiner's Report Vol. 1, at 299. Similarly, notes taken by Bank of America banker Daniel Petrik "suggest that the Lead Banks *did not believe that [the Debtors']* *solvency opinion was valid*, but were mindful that even if [the opinion] were wrong, the structural seniority enjoyed by the LBO Lenders over certain of Tribune's creditors afforded them a cushion." Examiner's Report Vol. 2, at 334. Tellingly, Bank of America originally attempted to withhold these notes from production by claiming that they were attorney-client privileged, and reconsidered this position only at the Examiner's urging. *Id.* at 274, n. 738. Additionally, the Examiner became aware of Mr. Petrik's notes only after all of the Lead Bank interviews had concluded, and "was not able to question the participants about the information contained in those notes or confront witnesses with inconsistencies between these notes and their prior (in some instances sworn) statements to the Examiner." *Id.* at 273-74. Parties-in-interest must be permitted to do so now, as well as to discover whether similar documents have also been withheld on equally spurious claims of privilege.

Other details highlighted in the Examiner's Report further underscore the need to allow parties-in-interest to conduct their own investigation. For instance, Merrill Lynch's senior banker Todd Kaplan disclaimed any knowledge about a valuation analysis of Tribune, and could not recall whether he or other lenders had any reservations about closing Step Two, notwithstanding documentary evidence to the contrary, including a document *on Merrill Lynch stationery* entitled

"Valuation Analysis of Tribune Company." *Id.* at 279-80. Mr. Kaplan's testimony was rendered even more questionable when, subsequent to his interview, Merrill Lynch's counsel submitted "extensive additions . . . [that] contradict[ed] Mr. Kaplan's testimony" that the Examiner afforded no weight. Examiner's Report Vol. 1, at 629 n. 2620. Clearly, parties-in-interest should be permitted to depose and, if necessary, call at trial, witnesses such as Mr. Kaplan, whose credibility is central to the question of whether the Lead Banks' claims should be equitably subordinated or disallowed, or if Step One Lenders should be permitted to benefit from the avoidance or disgorgment of Step Two payments and obligations.

The consideration provided under the LBO Lender Settlement is but a fraction of the recovery that pre-LBO lenders would receive if the LBO Lenders' claims are subject to equitable subordination or disallowance, and/or that the Step One Lenders are not permitted to benefit from the avoidance or disgorgement of Step Two payments and obligations. Unless the Debtors and LBO Lenders are prepared *to concede* for purposes of the Confirmation Hearing that the Lead Banks knew at the time that closing Step Two would render the Debtors insolvent, parties-in-interest must be permitted to pursue discovery, and present fact and expert testimony, regarding these and other issues.

### 4. The Creditors' Committee's 2004 Investigation Cannot Supplant The Right Of Parties-In-Interest To Conduct Their Own Discovery And Present Expert Testimony

The Creditors' Committee's woefully inadequate 2004 investigation also cannot preclude parties-in-interest from conducting discovery or presenting expert testimony in connection with objections to the LBO Lender Settlement. The depositions taken by the Creditors' Committee were conducted in December 2009 and January 2010, before the vast majority of the documents now residing in the Document Depository were produced, and before the specific theories of the estates' claims for relief crystallized. Accordingly, the Creditors' Committee did not even have

the benefit of the documents that the Lead Banks did produce when determining who would be deposed or what specific areas of inquiry should be explored, and was unable to test the veracity of the witnesses' testimony or to confront them with potentially inconsistent documents. The depositions were also taken before the LBO Lender Settlement was negotiated, before the Debtor/Committee/LBO Lender Plan was filed, and before the Creditors' Committee was granted standing. Obviously, these depositions were never intended to serve as a surrogate for confirmation discovery.

Moreover, during the course of its "investigation," the Creditors' Committee deposed only *one of the Lead Banks* (and none of the LBO Lenders) named as defendants in the LBO Lender Adversary Complaint, all of whom the Debtors now seek to release. Indeed, the Examiner stated in his report that he was "surprised to learn at the outset of his investigation that . . . only seven Rule 2004 depositions had been conducted." Examiner's Report Vol. 1, at 32. The Debtor and LBO Lenders position that parties-in-interest should be forced to rely on the investigations conducted by the Examiner and the Creditors' Committee would mean that *all but one* of the Lead Banks seeking to settle billions of dollars of claims against them would be fully released *without ever having been deposed*. Such a result is untenable. Clearly, the strengths and weakness of the LBO Claims being settled cannot be assessed without obtaining sworn testimony from the defendants to those claims.

### 5. The Debtors and LBO Lenders' Reliance On *In Re Capmark* Is Misplaced

Finally, *In re Capmark Financial Group Inc.* does not support the Debtors' proposition that the parties-in-interest here should be precluded from taking discovery, or that the Court should be prevented from hearing expert testimony regarding the merits of the underlying LBO Claims. *See* Contours Motion ¶¶ 70-72 (citing *Capmark*, 2010 WL 4313046. Contrary to the assertion made

by the debtors and the LBO Lenders, *Capmark* involved extensive discovery and expert testimony relating to critical elements of the underlying fraudulent transfer claims, including solvency. *See Capmark*, 2010 WL 4313046, at *19-23, 45. Moreover, the fraudulent conveyance claims at issue in *Capmark* were far less complex than those presented here, involved much narrower factual questions, and sought far less value. For example, the parties in *Capmark* were able to stipulate to critical legal standards, as well as the financial condition of the debtors at various points in time, and all of the challenged transfers were made in satisfaction of antecedent debt. *See id.* at *5-8, 41. Indeed, Judge Sontchi remarked that "a constructively fraudulent transfer would be exceedingly difficult to establish," and that the settled avoidance action was "unlikely to succeed." *Id.* at *41, 43.[21] Judge Sontchi also found that, unlike the matter at hand, the "[d]ebtors bargained hard with the [defendants to the settled claims]." *Id.* at *32. Nevertheless, the *Capmark* court still devoted five full days solely to consideration of the proposed settlement, divorced from any plan proceedings. *See id.* at *3. Clearly, the broader, more valuable, far more complex claims at issue here will require even greater analysis.

## B. The Debtors and LBO Lenders' Request That Only Up To Five Days Be Scheduled For The Confirmation Hearing Should Be Rejected Out Of Hand

In yet another attempt to prevent any inquiry into the facts underlying the strength of the claims asserted by the LBO Lender Adversary Complaint that the Debtors seek to release, the Debtors and the LBO Lenders request that the Court schedule only "up to five (5) consecutive calendar days" for the confirmation hearing. Contours Motion ¶ 72. This request should be rejected out of hand. Such a condensed period of time cannot possibly accommodate the myriad contested matters that will need to be resolved in order to assess the virtually unprecedented

---

[21] Indeed, while the transaction at issue in *Capmark* might have been avoidable as a preferential transfer, had a timely preference claim been brought, it could not possibly have qualified as a fraudulent transfer, as the lenders there received the challenged transfers in satisfaction of antecedent debt. *See Capmark*, 2010 WL 4313046, at *41.

occurrence of *four competing plans*, including, (i) whether the LBO Lender Settlement should be approved (requiring an analysis of all the *Martin* and *Texaco* factors), (ii) whether the Court should approve the intercompany claim settlement proposed by the Debtor/Committee/LBO Lender Plan, the details of which will not be disclosed until 15 days prior to the deadline for objections to confirmation,[22] (iii) valuation of the Debtors for reorganization purposes, and the allocation of that value among Tribune and its subsidiaries, (iv) whether each of the four competing plans otherwise satisfy the requirements of the Bankruptcy Code, including each of the elements provided under Section 1129, and (v) the appropriate amount of the PHONES claim.

Certainly, confirmation hearings involving far less complexity have lasted significantly longer than five days. Indeed, this Court recently devoted more than six days to a confirmation hearing involving only a single plan. *In re Abitibibowater Inc.*, No. 09-11296 (Bankr. D. Del.) (Carey, J.); *see also, e.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 230 (Bankr. S.D.N.Y. 2009) (Rule 1129 confirmation hearing on a single proposed plan involving a Rule 9109 evaluation of a settlement lasting 19 days); *In re Coram Healthcare Corp.*, 315 B.R. 321, 327-329 (Bankr. D. Del. 2004) (Rule 1129 confirmation hearing on two proposed plans involving a Rule 9019 evaluation of a settlement lasting 12 days); *In re Mirant Corp.*, 334 B.R. 800, 809 (Bankr. N.D. Tex. 2005) (portion of bifurcated Rule 1129 confirmation hearing regarding valuation lasting 27 days over eleven weeks); *In re Quigley Co., Inc.*, 437 B.R. 102, 111 (Bankr. S.D.N.Y. 2010) (Rule 1129 confirmation hearing on a single proposed plan lasting 15 days); *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 369 (Bankr. D. Del. 2006) (hearing regarding debtors' valuation lasting 26 days); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 148 (Bankr. S.D.N.Y. 2007) (Rule 1129 confirmation hearing on a single proposed plan involving a Rule 9019 evaluation of a settlement

---

[22] *See* Debtor/Committee/LBO Lender Plan, §§ 1.1.122, 1.1.177.

lasting nine days); *In re Best Prods.*, 177 B.R. 791, 796 (S.D.N.Y. 1995) (Rule 1129 confirmation

hearing on a single proposed plan involving a Rule 9019 evaluation of a settlement lasting eight

days).

And an actual trial of the LBO Claims, which would require adjudication of the claims

rather than an assessment of their merits, would take far longer than the time-frame Aurelius

estimates for this confirmation hearing. *See, e.g., Statutory Comm. of Unsecured Creditors v.*

*Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 290 (Bankr. S.D.N.Y. 2007)

(devoting 50 days to fraudulent conveyance trial alone); *In re TOUSA, Inc.*, 422 B.R. 783, 786

(Bankr. S.D. Fla. 2009) (devoting 13 days to fraudulent conveyance trial alone).

The matters at issue here cannot possibly be addressed in less than 15 full trial days, and

even that time-frame would be challenging. At the very least, the Court should decline to rule on

the length of the trial until discovery has concluded and confirmation objections have been filed.

## II.   THE COURT SHOULD ENTER AURELIUS'S PROPOSED CASE MANAGEMENT ORDER

Finally, the Court should enter Aurelius's Proposed CMO, which provides all

parties-in-interest with an opportunity to take relevant discovery, while simultaneously clearing an

efficient path towards a confirmation hearing in this case.[23] Aurelius has engaged in

meet-and-confer discussions with the other parties-in-interest regarding the deadlines set forth in

the Proposed CMO, and the parties have reached a consensus regarding a majority of the dates.

With regard to the scope, timing and duration of the confirmation hearing, the parties have further

---

[23] A true and correct copy of Aurelius's Proposed CMO is annexed hereto as **Exhibit G**. The expeditious schedule contemplated by the Proposed CMO is dependent on the parties' compliance with the deadlines set therein. Clearly, if these deadlines are not strictly observed, the schedule will have to be altered. Additionally, the proposed dates are subject to the Court's availability to schedule the Confirmation Hearing, and the parties have agreed to roll forward the dates in their respective CMOs accordingly once the trial dates have been scheduled.

agreed that such issues may be addressed in a future application to the Court. *See* Proposed CMO ¶ 37. The remaining issues in dispute are as follows:

**Completion of Fact Discovery (¶ 3)**: The Debtors, the LBO Lenders and the Creditors' Committee seek a cut-off date for all fact discovery on February 4, 2011. It is unrealistic given the anticipated volume of fact discovery relating to the Debtors' LBO Lender Settlement, the four proposed plans, and all other outstanding issues related to the confirmation (which are discussed in greater detail below in connection with fact depositions) to be completed in roughly a one-month time-frame (especially if the Debtors and their plan proponents refuse to commence discovery until December 3 as discussed below). Rather, Aurelius submits that it is reasonable to estimate roughly six weeks to complete fact discovery by February 18, 2011, and that any fact discovery which is necessary for the parties to complete their expert reports should be completed by February 4.

**Commencement of Discovery (¶ 4)**: The Debtors, the LBO Lenders and the Creditors' Committee seek to delay fact discovery from commencing until December 3. We disagree given the volume of fact discovery that must be addressed in preparation for the confirmation hearing and believe that discovery should commence (including all deadlines to respond as set forth in Aurelius's Proposed CMO) in advance of the November 29, 2010, hearing.

**Production of Documents (¶ 7)**: The Debtors and the LBO Lenders and the Creditors' Committee refuse to agree to a deadline for completing their document production, but rather they seek leave of court to merely exercise best efforts to produce documents on a rolling basis within 30 calendar days of service of document requests, *with the ability to delay their production beyond 30 days*. Indeed, the federal rules require a 30-day production deadline, and the Debtors and their plan proponents have provided no basis to vary from this rule. *See* FED. R. CIV. P. 34; FED. R.

BANKR. P. 7034. Where the discovery schedule is as expedited as is the case here, it is essential to have a hard stop of 30 days following service so that additional delays in the schedule such as fact depositions can be avoided. With regard to those discovery requests that are in dispute, the Debtors and the LBO Lenders seek 20 days to produce responsive documents upon resolution of the dispute, whereas Aurelius submits that 10 days is more than sufficient.

**Interrogatories and Requests for Admissions (¶¶ 8, 9)**: The Debtors and the LBO Lenders object to interrogatories seeking the parties' positions with respect to specific conclusions reached by the Examiner. *See* Proposed CMO ¶ 8(iii). Such interrogatory requests, which will be narrowly tailored to the Examiner's conclusions in its lengthy report and whether they will be contested, will be enormously helpful to determine the scope of discovery and narrow issues for trial. The Debtors cannot, while demanding such substantive limitations to interrogatory requests, also seek similar limitations on requests for admission ("RFAs") by seeking to restrict their use exclusively to the authenticity of documents. *See* Proposed CMO ¶ 9. Rule 36 of Federal Rules of Civil Procedure, which permits RFAs, clearly applies without limitation to contested matters. *See* FED. R. BANKR. P. 9014 (applying FED R. CIV. P. 36 to contested matters). Again, the Debtors and the LBO Lenders fail to give any basis to vary from the rule, and it would be inappropriate to do so unless they agree to answer interrogatories as proposed by Aurelius regarding the Examiner's conclusions in his report.

**Privilege Logs (¶ 10)**: The Debtors and the LBO Lenders seek to relieve parties of the obligation to produce privilege logs that itemize or describe individual documents, unless otherwise ordered by this Court. This is contrary to the Federal Rules of Civil Procedure, which require that parties withholding discoverable information by claiming privilege or other protections "expressly make the claim," and describe the nature of the information withheld in a

manner that "will enable other parties to assess the claim." FED. R. CIV. P. 26(b); *see* FED. R. BANKR. P. 7026; 9014. Compliance with this requirement is particularly important here, given that (i) the Examiner viewed with suspicion the assertions of attorney-client and other privileges made by several of the LBO Lenders, and (ii) the Debtors and the LBO Lenders have indicated an intention to withhold all information regarding the negotiation of the LBO Lender Settlement on an alleged claim of common interest or joint defense privilege, and/or pursuant to the Mediation Order[24] and the Document Depository Order.[25] Accordingly, compliance with document-by-document privilege logs is essential for those critical areas such as what the Debtors and the Lead Banks thought about the Debtors' financial condition in advance of Step Two, and the Debtors' negotiation of the LBO Lender Settlement.

**Fact Depositions (¶ 12):** The Debtors and the LBO Lenders seek to limit discovery to ten depositions for each Plan Proponent Group to share amongst its members, to address all matters to be tried in the confirmation hearing, which is grossly inadequate. It comes as no surprise that the Debtors and the LBO Lenders seek to shield their respective senior management (the vast majority of whom have never been deposed in connection with the Debtors' bankruptcy proceedings), their professional advisors, as well as the Debtors' Special Committee (whose abdication of their fiduciary duty warrants closer examination especially where relevant documents have been spoliated in the weeks leading up to the LBO Lender Settlement as already discussed), from having to testify under oath regarding the full breadth of issues relevant to, inter alia, the various proposed plans and the proposed LBO Lender Settlement.

---

[24] *See* Order Appointing Mediator [Docket No. 5591].

[25] *See* Order (I) Authorizing the Debtors to Establish a Document Depository and Directing the Committee to Deliver Certain Documents to the Depository Pursuant to Federal Rule of Bankruptcy Procedure 2004 and (II) Establishing Settlement Negotiation Protections Pursuant to 11 U.S.C. § 105(A) [Docket No. 2858].

In fact, the issues as to which substantive areas for deposition discovery is wholly appropriate include, among other things, (i) the process and substance of the Debtors' consideration of the strength and settlement value of the claims asserted in the LBO Lender Adversary Complaint; (ii) the process and substance of the Creditors' Committee's consideration of the strength and settlement value of the claims asserted in the LBO Lender Adversary Complaint; (iii) the process by which the LBO Lender Settlement was negotiated and entered into, including the degree to which the Debtors/Creditors' Committee truly did bargain at arm's-length and seek to maximize the recovery for the non-LBO lenders; (iv) whether any aspect of the proposed LBO Lender Settlement was collusive, or resulted from undue or improper pressure brought to bear on the Debtors' management; (v) the merits of the LBO Claims that the Debtor and LBO Lenders now seek to settle, including the strength and likelihood of the Debtors' estates prevailing on each of the thirteen (13) claims contained in the LBO Lender Adversary Complaint, bearing in mind the number of Lead Banks and other defendants with key information bearing on the strength of these claims; and (vi) the dubious claims of privilege made by the LBO Lenders, and the question of missing emails, as noted by the Examiner; (vii) the value of the claims being reserved for future litigation and the basis for the proposed allocation of proceeds resulting from such litigation; (viii) the massive and complex intercompany settlement; (ix) the proper treatment of the Swap Claim and size of the PHONES Claim; (x) the consolidated reorganization value of the Debtors and the allocation of such value between the various Debtors and non-Debtors; (xi) the releases, exculpation and bar order proposed by the Debtor/Committee/LBO Lender Plan; and (xii) other issues pertinent to the four proposed plans. Aurelius submits that a minimum of 40 fact depositions is warranted to adequately address these significant areas of discovery, without

precluding its ability to seek more fact depositions, with the Court's approval as the factual record develops.

Moreover, the Debtors fail to appreciate that they created the construct of combining the 9019 hearing on the LBO Lender Settlement with the confirmation hearing on their proposed plan. Had those been commenced as two separate contested matters, there would be at least ten (10) depositions permitted for each of those proceedings, thereby doubling the minimum number of depositions allotted to Aurelius pursuant to the Debtors and their plan proponents' current proposal. Finally, as this Court is aware, the confirmation hearing will address multiple contested matters including but not limited to the four competing plans, the 9019 hearing, and the size of claims arising from the PHONES, each of which could be a separate contested matter onto itself and pursuant to which the parties would be permitted to conduct at least ten (10) fact depositions.

**Discovery Disputes (¶ 14):** The Debtors, the LBO Lenders and the Creditors' Committee seek — in advance of any meet and confer with regard to future discovery requests — to limit submissions addressing discovery disputes to a total of *three pages*. Rule 7026-1 of the Local Rules for the United States Bankruptcy Court District of Delaware, which sets forth discovery-related motion procedures that the parties seek to replace with its expedited procedure in their proposed CMOs, does not even contain any page limits. Moreover, page limitations cannot be agreed to in advance of knowing the magnitude and/or nature of the objections and responses from the Debtors and their plan proponents. For instance, if the Debtors and their plan proponents object to 20 document requests even after the parties meet and confer in good faith, or raise multiple alleged privileges, it will be impossible to address those objections in any meaningful way in three pages for the Court. It is further reasonable to anticipate that there will many more objections from the Debtors and their plan proponents to withhold or refuse to produce documents

than from Aurelius and its plan proponents, so that such page limits would disproportionately prejudice the challengers to the LBO Lender Settlement. Aurelius does agree, however, that each Plan Proponent Group should work together to submit combined letters to the Court on discovery disputes.

**Pre-Trial Brief (¶ 26):** For a case of this complexity, Aurelius proposes that the parties submit a substantive pre-trial brief prior to the confirmation hearing discussing the factual and legal matters that the parties intend to address at the hearing. Incredibly, the Debtors, the LBO Lenders and the Creditors' Committee oppose the parties' right to submit such a brief. They rely instead on the typical confirmation plan-related objections and briefs in support of each plan. *See* Proposed CMO ¶¶ 24-25. Such briefing on the components of the plans and satisfaction (or lack thereof) of the Code is different from a brief highlighting the specific evidence to be presented and applicable legal standards that the parties believe the Court should apply at the confirmation hearing, principally with respect to the merits of the LBO Lender Adversary Complaint and the LBO Lender Settlement, which should greatly aid this Court as it undertakes its review of the proposed settlement and plans under consideration. Moreover, the objection to the plans due on February 11, 2011, which is the first brief to be submitted by the parties, precedes the deadlines for completion of fact and expert discovery in the Proposed CMO. *See* Proposed CMO ¶ 24.

## CONCLUSION

For the foregoing reasons, Aurelius respectfully requests that the Court (i) deny the Contours Motion in full, and (ii) enter the Proposed CMO, in the form attached hereto as Exhibit G.

Dated: November 22, 2010      ASHBY & GEDDES, P.A.
       Wilmington, Delaware

       _____
       William P. Bowden (No. 2533)
       Amanda M. Winfree (No. 4615)
       500 Delaware Avenue
       P.O. Box 1150
       Wilmington, DE  19899
       (302) 654-1888

       - and -

       Daniel H. Golden (admitted pro hac vice)
       David M. Zensky (admitted pro hac vice)
       Abid Qureshi (admitted pro hac vice)
       AKIN GUMP STRAUSS HAUER & FELD LLP
       One Bryant Park
       New York, NY 10036
       (212) 872-1000

       *Attorneys for Aurelius Capital Management, LP*