Exhibit E

1

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
----------------------------------

In Re:

      TRIBUNE COMPANY, et al.,

                  Debtors.

----------------------------------

Chapter 11
Case Number
08-13143(KJC)
  Jointly
Administered

                        October 13, 2010
                        3:11 p.m.

Videotaped deposition of MARY AGNES WILDEROTTER,

taken by Aurelius Capital Management, pursuant

to Notice and Subpoena, held at the offices of

Frontier Communications, 3 High Ridge Park,

Stamford, Connecticut, before Joseph R. Danyo,

a Shorthand Reporter and Notary Public within

and for the State of New York.

```
 1
 2    A P P E A R A N C E S :
 3
          FRIEDMAN KAPLAN SEILER & ADELMAN LLP
 4           Attorneys for Aurelius Capital
               Management
 5           1633 Broadway
             New York, New York 10019-6708
 6
          By:   WILLIAM P. WEINTRAUB, ESQ.
 7              EAMONN O'HAGAN, ESQ.
 8
 9        BROWN RUDNICK LLP
             Attorneys for Wilmington Trust on behalf
10             of PHONES
             185 Asylum Street
11           Hartford, Connecticut 06103
12        By:   DYLAN P. KLETTER, ESQ.
13
14        CHADBOURNE & PARKE LLP
             Attorneys for the Committee of Unsecured
15             Creditors
             30 Rockefeller Plaza
16           New York, New York 10112
17        By:   ALEXANDRA K. NELLOS, ESQ.
18                        -and-
19        ZUCKERMAN SPAEDER LLP
             1800 M Street, N.W.
20           Suite 1000
             Washington, D.C. 20036-5807
21
          By:   ANDREW GOLDFARB, ESQ.
22              (Via Teleconference)
23
24
25
```

1

2    A P P E A R A N C E S : (Continued)

3

          SIDLEY AUSTIN LLP
4            Attorneys for the Debtors
             1501 K Street, N.W.
5            Washington, D.C. 20005

6        By:   DAVID M. MILES, ESQ.

7

8         WILMER CUTLER PICKERING HALE and DORR LLP
             Attorneys for Angelo Gordon & Co.
9            399 Park Avenue
             New York, New York 10022
10

         By:   LIPI M. PATEL, ESQ.
11

12

          JENNER & BLOCK LLP
13           Attorneys for EGI-TRB LLC and Samuel
                Zell
14           353 N. Clark Street
             Chicago, Illinois 60654-3456
15

         By:   DOUGLAS A. SONDGEROTH, ESQ.
16

17

          DAVIS POLK & WARDWELL LLP
18           Attorneys for JP Morgan
             450 Lexington Avenue
19           New York, New York 10017

20       By:   SASHA E. POLONSKY, ESQ.

21

22        WHITE & CASE LLP
             Attorneys for the Bridge Agent
23              Wells Fargo
             1155 Avenue of the Americas
24           New York, New York 10036-2787

25       By:   BRIAN FRITZ, ESQ.

1

2    A P P E A R A N C E S : (Continued)

3

            McCARTER & ENGLISH LLP
4               Attorneys for Deutsche Bank
                405 N. King Street
5               Eighth Floor
                Wilmington, Delaware 19801
6

        By:    KATE BUCK, ESQ.
7               (Via Teleconference)

8

9        KAYE SCHOLER LLP
            Attorneys for Merrill Lynch LLP
10          425 Park Avenue
            New York, New York 10022-3598
11

        By:    JOSEPH OTCHIN, ESQ.
12              (Via Teleconference)

13

14       JONES DAY LLP
            Attorneys for the Witness
15          222 East 41st Street
            New York, New York 10017-6702
16

        By:    FREDRICK E. SHERMAN, ESQ.
17              BRAD B. ERENS, ESQ.

18

19    Also Present:

20       HENRY MARTE,
            Videographer
21

22                         oOo

23

24

25

1

2          THE VIDEOGRAPHER:  This marks the

3          beginning of videotape number one in the

4          videotaped deposition of Ms. Maggie

5          Wilderotter in the matter of In Re Tribune

6          Company, et al., filed in the United

7          States Bankruptcy Court for the District

8          of Delaware.  This deposition is being

9          held at Frontier Communications, 3 High

10         Ridge Park, Stamford, Connecticut, on

11         Wednesday, October 13, 2010 at

12         approximately 3:11 p.m.

13         The court reporter is Joe Danyo.  The

14         video operator is Henry Marte.  We are

15         both here on behalf of Hudson Reporting &

16         Video.

17         Will counsel please identify

18         themselves for the record.

19         MR. WEINTRAUB:  Yes, I am William

20         Weintraub of Friedman Kaplan Seiler &

21         Adelman representing Aurelius Capital

22         Management.

23         MR. SHERMAN:  Fredrick Sherman, Jones

24         Day in New York City, representing the

25         witness.

```
1                      Wilderotter
2             MR. MILES:  David Miles, Sidley
3      Austin, representing the debtors.
4             MS. NELLOS:  Alexandra Nellos,
5      Chadbourne & Parke, representing the
6      unsecured creditors committee.
7             MR. KLETTER:  Dylan Kletter, Brown
8      Rudnick, representing the Wilmington Trust
9      on behalf of the PHONES.
10            MS. PATEL:  Lipi Patel, Wilmer Hale,
11     representing Angelo Gordon.
12            MR. SONDGEROTH:  Doug Sondgeroth,
13     Jenner & Block, representing EGI-TRB and
14     Samuel Zell.
15            MS. POLONSKY:  Sasha Polonsky, Davis
16     Polk & Wardwell, representing JP Morgan.
17            MR. O'HAGAN:  Eamonn O'Hagan of
18     Friedman Kaplan Seiler & Adelman, also
19     representing Aurelius Capital.
20            THE VIDEOGRAPHER:  Will the court
21     reporter please administer the oath.
22     M A R Y   A G N E S   W I L D E R O T T E R,
23     having been first duly sworn by Joseph R. Danyo,
24     a Notary Public for the State of New York, was
25     examined and testified as follows:
```

1                    Wilderotter

2    EXAMINATION BY MR. WEINTRAUB:

3        Q.    Good afternoon, Ms. Wilderotter.   My

4    name is William Weintraub.   I am an attorney with

5    Friedman Kaplan Seiler & Adelman representing

6    Aurelius Capital Management in this matter.   Have

7    you had your deposition taken before?

8        A.    In this matter?

9        Q.    In any matter.

10        A.    Yes.

11        Q.    So you understand that you are

12    required to give truthful answers to my questions

13    today?

14        A.    Yes.

15        Q.    And it would help the court reporter

16    and all of us if you wait until I finish asking

17    my question until you begin to answer it.   Do you

18    understand that?

19        A.    Yes.

20        Q.    Thank you.   And, if there is a

21    question that you don't understand, if you tell

22    me you don't understand it, I will try to

23    rephrase it as best I can.   Is that all right?

24        A.    Yes.

25        Q.    Thank you.   Are you a member of the

```
 1                    Wilderotter
 2    special committee of the board of directors of
 3    Tribune Company?
 4         A.   Yes.
 5         Q.   Has the special committee asked to
 6    meet with Aurelius Capital Management?
 7         A.   Not that I know of.
 8         Q.   Is the special committee willing to
 9    meet with Aurelius Capital Management?
10         A.   Yes.
11         Q.   Do you think that Aurelius Capital
12    Management should be permitted to participate in
13    the ongoing negotiations concerning the plan of
14    reorganization for the debtors?
15         A.   Sure.
16         Q.   Has anyone told you that Aurelius
17    Capital Management should not be part of the
18    negotiations?
19         A.   No.
20         Q.   Has anyone told you that Aurelius
21    Capital Management is close-minded about the
22    negotiations?
23         A.   No.
24         Q.   Has anyone told you that Aurelius
25    Capital Management is requiring to be paid in
```

1                        Wilderotter

2    full, par plus accrued interest, in connection

3    with its distributions in the Tribune case?

4          A.    Not that I know of.

5          Q.    In your role as a member of the

6    special committee, to whom do you owe fiduciary

7    duties?

8          A.    I owe fiduciary duties to the

9    stakeholders, the creditors that own the debt of

10   this company.

11         Q.    Anyone else?

12         A.    I have a fiduciary responsibility

13   first and foremost to help get the company

14   reorganized and out of bankruptcy on behalf of

15   the creditors.

16         Q.    Does one of those goals take

17   precedence over the other, reorganization versus

18   getting out of bankruptcy as quickly as possible?

19         A.    I think they are all-inclusive.

20         Q.    What do you mean by all-inclusive?

21         A.    That reorganization is about getting

22   the company out of bankruptcy.

23         Q.    To whom does Tribune as debtor in

24   possession owe fiduciary duties?

25         A.    Who are you talking about?

1                          Wilderotter

2          Q.    Tribune, the debtor.  The debtor in

3    possession.

4          A.    The company?

5          Q.    Yes.

6          A.    I'm not here to speak for the

7    company.

8          Q.    Are you a member of the board of

9    directors of the company?

10         A.    Yes.

11         Q.    Do you have an understanding as to

12   whom the company as debtor in possession has

13   fiduciary duties to?

14         A.    They have fiduciary duties similar to

15   what I talked about.  They have a duty to the

16   creditors to reorganize the company and to

17   maximize what the creditors will get from that

18   reorganization to try to meet the needs of the

19   creditors as part of this process.

20         Q.    Do you see any difference between the

21   fiduciary duties of the special committee and the

22   fiduciary duties of Tribune?

23         A.    No.

24         Q.    Why was the special committee formed?

25         A.    The special committee was formed

1                        Wilderotter

2   because there are a number of members of the

3   board of directors that have or could have

4   conflicts of interest.

5           Q.    Is that the only reason?

6           A.    Yes.  The four members of the special

7   committee are the independent members who were

8   not part of the transaction when it took place.

9           Q.    Was there any other reason for

10   forming the special committee, to your knowledge?

11           A.    No, not that I know of.

12           Q.    When was Don Liebentritt made chief

13   restructuring officer?

14           A.    I don't know the exact date, but the

15   title of chief restructuring officer I think was

16   put with Don Liebentritt in August.

17           Q.    Do you know why he was made chief

18   restructuring officer?

19           A.    Well, he was acting as the general

20   counsel of Tribune, and he was basically spending

21   full time on the restructuring, and we felt that

22   he should continue from a continuity perspective

23   to work restructuring on behalf of Tribune.

24           Q.    Was there any change in his duties

25   from being counsel to the corporation to being a

1                     Wilderotter

2    chief restructuring officer?

3         A.   I think that his duties as chief

4    restructuring officer are the same duties he had

5    before with regard to the company and the

6    bankruptcy.

7         Q.   So what was the purpose of changing

8    his title?

9         A.   Well, the general counsel role does a

10   lot more in a company than just looking at a

11   restructuring.  They handle the legal activities

12   on a day-to-day basis for the operations of the

13   company, and Don is no longer doing that.

14        Q.   So Mr. Liebentritt is doing less than

15   he was doing before?

16        A.   His role has been restricted to the

17   restructuring.

18        Q.   Whose decision was it to make Mr.

19   Liebentritt chief restructuring officer?

20        A.   I don't believe that I know who took

21   a leadership role on that, but it was a

22   management decision.  Management makes decisions

23   on the people that are involved in the company.

24   It did come to the special committee and asked us

25   if we felt that was a good idea, and we felt for

1                        Wilderotter

2   continuity, yes, it would be a good idea.

3          Q.   Who at management made that decision?

4          A.   I am sure it was Randy Michaels as

5   the CEO in conjunction with probably Don

6   Liebentritt and Sam Zell also participated, I am

7   sure, in discussions on it as the chairman of the

8   board.

9          Q.   You agree with the decision to make

10  Mr. Liebentritt chief restructuring officer?

11         A.   Yes.

12         Q.   Has there been any friction between

13  Mr. Liebentritt and Mr. Shapiro?

14         A.   Not that I know of.

15         Q.   Did Mr. Shapiro ever express any

16  frustration with Mr. Liebentritt, to your

17  knowledge?

18         A.   Frustration, no.

19              MR. WEINTRAUB:  I am going to mark

20         some documents.  I would like to mark this

21         as Exhibit 1.  For those on the phone,

22         this is document MW 10.  That is the first

23         Bates number.

24              (Wilderotter Exhibit 1, Document

25         beginning with Bates number MW 10

1                    Wilderotter

2            containing e-mail dated September 20, 2010

3            from Mark Shapiro to Don Liebentritt, was

4            so marked for identification, as of this

5            date.)

6        Q.    This is an e-mail dated September 20,

7    2010 from Mark Shapiro to you.  Do you recall

8    receiving this?

9        A.    It was sent to Don Liebentritt.

10       Q.    I'm sorry.  With a copy to you.

11       A.    Correct.

12       Q.    Do you recall receiving this?

13       A.    I don't recall, but I probably did

14   since it was sent to me.

15       Q.    Do you normally read e-mails that are

16   sent to you?

17       A.    I do.

18       Q.    Do you remember reading this one?

19       A.    Now that you put it in front of me, I

20   do remember it.

21       Q.    In essence, what was going on here,

22   if you recall?

23       A.    Well, if I read it, it sounds like

24   that Mark wanted Don to do a more formal

25   statement that wasn't sent out.

1                     Wilderotter

2          Q.   He says in the first sentence, "Don,

3    need to tell you that I am still disturbed that

4    we never sent out a formal statement."

5          Did, independent of this e-mail, Mr.

6    Shapiro ever express his annoyance or being

7    disturbed to you?

8          A.   About what?

9          Q.   About the fact that they never sent

10   out the formal statement that he is speaking to

11   Mr. Liebentritt about.

12         A.   Not that I recall.

13         Q.   Did you respond to this e-mail?

14         A.   Not that I recall.

15              MR. WEINTRAUB:  I am going to mark

16         this as Exhibit 2.

17              (Wilderotter Exhibit 2, Document

18         beginning with Bates number MS 37

19         containing e-mail dated September 20, 2010

20         from Ms. Wilderotter to Mark Shapiro, was

21         so marked for identification, as of this

22         date.)

23              MR. WEINTRAUB:  This is MS 37.  That

24         is the first Bates stamp number.  It is

25         another e-mail.

```
 1                    Wilderotter
 2          A.    Um-hum.
 3          Q.    I don't think this was in the
 4   production that you gave to us.  We can
 5   double-check on that, but do you recall sending
 6   this e-mail to Mr. Shapiro on September 20, 2010?
 7          A.    Yes, as I read it.
 8          Q.    It says, "Wow, are you okay, or do we
 9   need a committee caucus?"
10          A.    Right.
11          Q.    "Frankly, Don is used to doing what
12   he wants with no accountability.  I am sure your
13   e-mail is a shock to him, but rightly so.  Let us
14   know if you want to do a quick call.  Best,
15   Maggie."
16                Again, does this refresh your
17   recollection as to what was going on at that
18   time?
19          A.    Well, again I think it states that
20   Mark came on strong with Don.  Don has not been
21   used to providing accountability to a special
22   committee, so this was new for him, and I just
23   wanted to make sure that if Mark was frustrated
24   we could talk about it, if that is what he wanted
25   to do.
```

1                    Wilderotter

2       Q.    Why did you punctuate this by

3  beginning with "wow"?

4       A.    Because it was an e-mail that was

5  pretty direct.

6       Q.    When you say in your e-mail, "I am

7  sure your e-mail is a shock to him, but rightly

8  so," what did you mean by rightly so?

9       A.    Well, I think that Mark brought up an

10  accountability for Don to make sure that he

11  follows through on the things that Mark had asked

12  him to do, and he hadn't done that.

13      Q.    What was going on at this time that

14  Don was not doing?

15      A.    Well, it says here he didn't send out

16  a formal statement from the company following

17  Oaktree's filing on Friday.

18      Q.    And do you know why Don didn't do

19  that?

20      A.    I have no idea.

21      Q.    Did you ever inquire?

22      A.    No, because it says here that he gave

23  a reason that Randy's letter to the employees and

24  to anyone in the press that inquired about it was

25  his response.

1                    Wilderotter

2          Q.    Was that response satisfactory to

3     you?

4          A.    It wasn't satisfactory to me, but

5     Mark was the one having the dialogue with him.

6          Q.    As a member of the special committee,

7     did you think any action needed to be taken?

8          A.    Yes, I said, if Mark wanted to have a

9     quick call about it, I would be happy to

10    participate in that.

11         Q.    Did you have that call?

12         A.    No.  Mark said he didn't feel he

13    needed to have that call.

14         Q.    So Mark was interacting directly with

15    Mr. Liebentritt?

16         A.    Correct.

17         Q.    Were you interacting at all with Mr.

18    Liebentritt on this?

19         A.    Not that I recall.

20         Q.    Were there any other issues with Mr.

21    Liebentritt during this period that you recall?

22              MR. SHERMAN:  Which period is that?

23              MR. WEINTRAUB:  The period of this

24         e-mail, which was in September 2010.

25         A.    Well, there has been a lot of

 1                      Wilderotter

 2    interactions with Don Liebentritt during this

 3    period of time.

 4          Q.    Were any of them not satisfactory to

 5    you?

 6          A.    You would have to give me a specific

 7    instance for me to respond to that.

 8          Q.    Do any stand out in your mind?

 9          A.    Do any stand out in my mind?  No.

10                MR. WEINTRAUB:  I am going to mark

11          this as 3, and for those on the phone,

12          this is MS 115.

13                (Wilderotter Exhibit 3, Document

14          beginning with Bates number MS 115, was so

15          marked for identification, as of this

16          date.)

17          A.    Okay.

18          Q.    I am going to start at the bottom of

19    the first page, which is MS 115.  Do you recall

20    receiving Mr. Shapiro's e-mail of September 9 at

21    the time that it was sent?

22          A.    Now that you have put it in front of

23    me, yes.

24          Q.    He is saying here towards the end of

25    that very short paragraph, "I would add that Don

1                    Wilderotter

2  has made some wrong turns and because of it has

3  lost the confidence and trust of several of the

4  constituencies.  Further, the process has lacked

5  leadership from the debtors' side."

6              Do you know what wrong turns Mr.

7  Shapiro is referring to?

8       A.   No.

9       Q.   Did you ask him?

10      A.   No.  I asked him if he had any

11 thoughts on course corrections.

12      Q.   No, but my question was did you ask

13 him what the wrong turns were?

14      A.   No.

15      Q.   Were you aware of what the wrong

16 turns were?

17      A.   No.

18      Q.   Do you think as a member of the

19 special committee it would have been within your

20 responsibilities to find out what the wrong turns

21 were?

22      A.   Well, this was an assessment between

23 Mark in a meeting with Don, and it is his

24 observations, so I felt that what I wanted to

25 know from Mark is if he had thoughts on any

1                    Wilderotter

2    course corrections.

3          Q.    Did he?

4          A.    He said he was arranging a meeting

5    with principals from Angelo, Oaktree and

6    JP Morgan with our legal counsel to see if they

7    could bridge issues.

8          Q.    Were you at that meeting?

9          A.    No.

10         Q.    Were you asked to be at that meeting?

11         A.    No.

12         Q.    Why not?

13               MR. SHERMAN:   Objection to the form.

14         Q.    Why were you not asked to be at that

15    meeting, if you know?

16         A.    I don't think anybody felt it was

17    necessary with the chairman of the special

18    committee going to the meeting why I would have

19    to go too.

20         Q.    Did you think you needed to be at

21    that meeting?

22         A.    No.

23         Q.    Do you know which constituencies Mr.

24    Shapiro was referring to when he said that Don

25    has lost the confidence and trust of several of

1                    Wilderotter

2    the constituencies?

3          A.    No.

4          Q.    Did you ask him?

5          A.    No.

6          Q.    Do you think that would have been

7    important information for you to know as a member

8    of the special committee?

9          A.    Not at that point in time.

10         Q.    At what point in time would it have

11   been important to you?

12         A.    After he had a meeting with the

13   principals.

14         Q.    Which principals?

15         A.    Angelo, Oaktree, JP Morgan, that

16   meeting, to find out if they could bridge the

17   issues.

18         Q.    Do you know that those are the

19   principals he was referring to in his e-mail?

20         A.    Well, he said he was arranging a

21   meeting with those principals as a follow-up in

22   this e-mail.

23         Q.    Do you know why Angelo Gordon,

24   Oaktree or JP Morgan would have lost confidence

25   in Mr. Liebentritt?

1                    Wilderotter

2           MR. SHERMAN:  Objection to the form.

3      Q.    You can answer the question.

4      A.    Could you ask it again, please.

5      Q.    Do you know why Angelo Gordon,

6  Oaktree and JP Morgan might have lost confidence

7  in Mr. Liebentritt?

8           MR. SHERMAN:  Objection to the form.

9           THE WITNESS:  What does that mean?

10          MR. SHERMAN:  You can answer if you

11          understand it.  It is a technical

12          objection.  Counsel can either restate it

13          if he wants to.  You can answer it if you

14          understand it.  That is it.

15     A.    I don't know specifically from this

16  e-mail exchange why they would have any

17  objections at this point.

18     Q.    I wasn't asking about objections, I

19  was asking if you knew why they might have lost

20  confidence and trust.

21     A.    The only thing I could do is give you

22  my thoughts on it.  I don't know why

23  specifically, because I never talked to any of

24  the members of these principals, so that would

25  only be my speculation if I were to answer that.

1                    Wilderotter

2         Q.    Did Mr. Shapiro tell you why Oaktree,

3   JP Morgan and Angelo Gordon might have lost trust

4   and confidence in Mr. Liebentritt?

5              MR. SHERMAN:   Objection to the form.

6         A.    I don't recall a specific

7   conversation with Mark Shapiro about each of

8   these specific individuals and why they had lost

9   confidence in terms of what they would have told

10  him specifically.

11        Q.    Did you have a general conversation

12  with Mr. Shapiro about that?

13        A.    I have not had a general conversation

14  with Mr. Shapiro.  We have had conversations at

15  the special committee level.

16        Q.    What did the special committee

17  discuss about the possible loss of confidence and

18  trust of Angelo Gordon, Oaktree and JP Morgan in

19  Mr. Liebentritt?

20        A.    Well, that Don Liebentritt has worked

21  for Sam Zell for many years and that relationship

22  could have an impact on the negotiations and the

23  discussions.

24        Q.    Was that relationship taken into

25  account when Mr. Liebentritt was made chief

1                      Wilderotter

2    restructuring officer?

3          A.    Yes.

4          Q.    And he was made chief restructuring

5    officer despite that relationship?

6          A.    He was made chief restructuring

7    officer with an understanding that he has had a

8    long-term relationship with Sam.

9          Q.    So that was considered to be a

10   benefit?

11         A.    It was never discussed.

12         Q.    It was never discussed with who?

13         A.    But we knew he had a relationship

14   with Sam Zell for years.

15         Q.    So that was not a consideration in

16   the special committee's supporting the

17   appointment of Mr. Liebentritt as chief

18   restructuring officer?

19               MR. SHERMAN:   Objection to the form.

20         Q.    You can answer the question.

21         A.    So ask it again, please.

22               MR. WEINTRAUB:   Could you read it

23         back.

24               (Record read)

25         A.    It was not.

1                          Wilderotter

2          Q.    Was it discussed among the special

3    committee as to whether or not it would be a good

4    idea to appoint someone who has a relationship

5    with Mr. Zell as chief restructuring officer?

6          A.    No.

7          Q.    Why not?  Do you know?

8          A.    It just wasn't discussed.

9          Q.    Was it not considered to be an

10   important issue?

11         A.    No.

12         Q.    Do you know if Mr. Liebentritt

13   profited in any way from the LBO transactions

14   through his relationship with EGI?

15         A.    Do I know if he profited in any way?

16         Q.    Yes.

17         A.    From this transaction?

18         Q.    From the LBO -- you know, when I

19   refer to the LBO transaction, you know what I am

20   referring to?  The step 1 and step 2

21   transactions?

22         A.    Right.

23         Q.    Do you know if Mr. Liebentritt

24   profited?

25         A.    I have no idea.

1                    Wilderotter

2         Q.    Did you ask him?

3         A.    No.

4         Q.    Did anyone from the special committee

5    ask him?

6         A.    I don't know.  You would have to ask

7    the other members.

8         Q.    But, to your knowledge, it was never

9    asked by the special committee?

10        A.    Correct.

11              MR. WEINTRAUB:  I am going to mark as

12        the next exhibit the term sheet.

13              (Wilderotter Exhibit 4, Term sheet,

14        was so marked for identification, as of

15        this date.)

16              MR. WEINTRAUB:  For those on the

17        phone, this is the term sheet that was

18        attached to the second mediator's report.

19              (Brad Erens enters the room)

20        Q.    Have you seen this document before?

21        A.    Yes.

22        Q.    When was the first time you saw it?

23        A.    I don't recall.  I would have to go

24    back and look at my files to see.

25        Q.    Do you recall if you saw drafts of

1                          Wilderotter

2    this before the version that was attached to the

3    mediator's report was filed with the court?

4         A.    I don't recall.

5         Q.    To the best of your recollection,

6    did you see this term sheet for the first time

7    at or around the time that it was filed with the

8    court?

9              MR. SHERMAN:  Do you want to give her

10         a date?

11             MR. WEINTRAUB:  Yes.

12        Q.    It was filed on October 12th.

13             MR. SHERMAN:  Which was yesterday.

14             MR. WEINTRAUB:  Yes.

15        A.    So did I see it?  Yes, I did see it

16   at or around that date.

17        Q.    Do you recall if you saw it before

18   yesterday?

19        A.    Yes.

20        Q.    Do you recall when that was?

21        A.    We had a special committee meeting

22   this week, which was I think on Tuesday.

23        Q.    Today is Wednesday.

24        A.    Monday.  I'm sorry.

25        Q.    So that would have been the 11th?

1                          Wilderotter

2    12th?

3         A.    Yes.

4         Q.    It was a holiday.

5         A.    Yes.  Some of us had to work.

6         Q.    You weren't the only one.

7               What is your understanding of what

8    LBO claims are being settled under this term

9    sheet or pursuant to this term sheet?

10        A.    You want me to read this to you or

11   what?

12        Q.    I would just like your understanding

13   of what is being settled.

14        A.    That there are partial settlements of

15   step 1 and step 2 causes of action that were

16   taken into consideration in the settlement with

17   certain principals.

18        Q.    Do you have an understanding of what

19   was being settled separate and apart from reading

20   the term sheet?

21        A.    Yes, I do have an understanding.

22        Q.    Can you give me what that

23   understanding is?

24        A.    Yes, the understanding is that for

25   both step 1 and step 2 what we were trying to do

1                          Wilderotter

2    in a settlement with specific debtors, with the

3    debtor, with the creditors, is to make sure that

4    we could give recovery to the appropriate

5    creditors in a fair and equitable way for the

6    restructuring of the company, and it was about a

7    settlement where the lenders would provide

8    specific money and give up some of their recovery

9    to some of the unsecured creditors and other

10   creditors to make sure that there was an

11   equitable settlement for a number of people that

12   had participated in the debt for the company.

13        Q.   The term sheet releases all step 2

14   claims except for certain claims which would

15   include the bridge loan disallowance claims,

16   disgorgement claims against what are identified

17   in the term sheet as non-settling parties and

18   shareholders redeemed in step 2.  Is that a fair

19   statement?

20        A.   Can you repeat that again.

21        Q.   Probably not, but I am sure he can

22   read it back.

23             (Record read)

24        A.   I don't know what shareholders

25   redeemed in step 2 means.

1                    Wilderotter

2        Q.    Those shareholders who in connection

3   with the second step of the two-step transaction

4   tendered their stock and were paid.  Those

5   shareholders are not being released under --

6        A.    I don't know if this term sheet takes

7   care of all of those folks and the bridge loan

8   and the disgorgement claims and that is all it

9   does.

10        Q.    Does it include those claims?

11        A.    No, it does not include the bridge

12   loan or it doesn't -- and it doesn't preclude

13   anyone from moving forward with any legal

14   activity that they would need to do.

15        Q.    So the term sheet does not release --

16   I'm sorry -- so the term sheet does or does not

17   release the bridge loan disallowance claims in

18   your mind, in your view?

19        A.    It does not.

20        Q.    Okay.  You are sure about that?

21        A.    Well, I can go back through my notes

22   and take a look at it.  If you want to hand me

23   notes I am happy to look at it.

24        Q.    Do you have an independent

25   understanding?

1                    Wilderotter

2          A.    I have an independent understanding,

3    but those are complicated settlements, and I

4    would be happy to go back and look at my notes

5    and give you an answer other than the answer I

6    gave you.

7          Q.    You are a member of the special

8    committee which has been charged with exercising

9    fiduciary duties for the benefit of the

10   stakeholders in this case.

11         A.    I am.

12         Q.    You do not have an independent

13   understanding of the settlement you approved?

14         A.    I have an independent understanding

15   of it, but I also take notes as I go through and

16   review a settlement this complicated, and there

17   are a lot of parties that are associated with a

18   settlement like this, so calling out every single

19   party just from my own memory and recollection is

20   hard for me to do.

21         Q.    Do you think the bridge loan is an

22   insignificant part in this Chapter 11 case?

23         A.    I am not going to comment on

24   individual creditors.   I think from our

25   perspective as a special committee, we took a

1                        Wilederotter

2    look at trying to maximize the right kind of

3    settlement that would be in the best interests of

4    all of the parties.

5            Q.    So do you recall if the bridge loan,

6    the bridge loan debt was being released or not

7    being released under the settlement?

8            A.    My recollection -- I don't recall.  I

9    would have to look at my notes.

10           Q.    According to the term sheet, in

11   exchange for the releases, the senior noteholders

12   get an additional $120 million and a greater

13   percentage of the recoveries from the litigation

14   trust.  Is that correct?

15           A.    My understanding is the $120 million

16   is an incremental dollar amount that was given to

17   help with the settlements by the lenders.

18           Q.    What was being released in exchange

19   for that $120 million?

20           A.    Again, I would be happy -- let me go

21   back and look through all of the documentation.

22   If I could look at my documentation, I could tell

23   you specifically.

24           Q.    What would you need to look at to

25   refresh your recollection?

1                    Wilderotter

2          A.    My notes and my sheets from the

3    special committee meeting where we went through

4    all of this in great detail --

5          Q.    Is this --

6          A.    -- on Monday --

7          Q.    I didn't mean to interrupt.

8          A.    -- on Monday that I looked at.

9          Q.    Is that anything different or in

10   addition to what you produced to us in connection

11   with our request for documents?

12         A.    No.  So you have it.

13         Q.    Do you know how the $120 million

14   figure was arrived at?

15         A.    I was not in the room for those

16   negotiations and discussions, but I know it was

17   through negotiations and discussions on how it

18   was arrived.

19         Q.    Who conducted those negotiations and

20   discussions?

21         A.    Well, there were members of I know

22   Oaktree and Angelo Gordon, JP Morgan, the

23   unsecured creditors committee, Don Liebentritt

24   was there, David Heiman, who represents the

25   special committee, participated in that.  The

1                    Wilderotter

2    lawyers from Sidley participated.  My

3    understanding is the Lazard folks participated.

4    So there were a number of people, and we have

5    advisors that represent us that participated in

6    the settlement discussions.

7         Q.    Did you participate at all in those

8    discussions?

9         A.    No.

10        Q.    How were you kept abreast of those

11   discussions?

12        A.    Through special committee phone

13   calls, through updates that were sent in e-mail.

14   That is how we were kept abreast.

15        Q.    How many special committee phone

16   calls were there about how the $120 million

17   figure was arrived at?

18        A.    There were no specific calls.  There

19   were calls about the entire settlement and

20   progress on the settlement.

21        Q.    Did you ask anyone how the

22   $120 million figure was arrived at?

23        A.    All of those terms were explained as

24   we went through the specific terms and conditions

25   of the settlement.

1                        Wilderotter

2          Q.    And how was the $120 million figure

3    explained to you?

4          A.    Well, if you would like to give me my

5    notes, I would be happy to let you know what that

6    is.

7          Q.    I am just trying to --

8          A.    I am just telling you that on the

9    record telling the truth, I would have to refresh

10   my memory to go through all of the terms and

11   conditions that we discussed in making my

12   decision.

13         Q.    Do you have an independent

14   recollection apart from your handwritten notes as

15   to how the $120 million figure was arrived at?

16         A.    I don't have a recognition without

17   being able to look at my information.

18         Q.    Was yesterday the first time you had

19   heard the 120 -- I'm sorry -- the Monday meeting

20   the first time you had ever heard the

21   $120 million figure?

22         A.    If it was not Monday, it was, you

23   know, right around Monday, but, yes, I know there

24   was negotiations that took place over the

25   weekend.

1                    Wilderotter

2          Q.    Were different figures used prior to

3    Monday for the payment being made from the

4    lenders?

5          A.    Yes.

6          Q.    What figures were those?

7          A.    I don't recall off the top of my

8    head, but they were less than that number.

9          Q.    Was there a discussion about a figure

10   that was more than that number?

11         A.    Not that I know of or recall.

12         Q.    And you feel $120 million is an

13   appropriate number?

14         A.    Yes, I do.

15         Q.    What is your basis for that

16   statement?

17         A.    For the -- the financial advisors and

18   the advisors that took us through the

19   information, and there was a third-party

20   assessment of the settlement that was also

21   reviewed that felt that this was a very fair

22   settlement.

23         Q.    Apart from what the financial

24   advisors, the other advisors and the third-party

25   assessment, do you have an independent view as

1                    Wilderotter

2    to whether or not the $120 million is a fair

3    figure?

4         A.    My independent view is based upon

5    advisors advising me on what is right, what is

6    fair and what is equitable.

7         Q.    Did you ask anyone if $120 million

8    was an appropriate figure?

9         A.    Yes.

10        Q.    Who did you ask?

11        A.    Part of the discussion of the special

12   committee with the advisors was was this a good

13   settlement agreement?  Is this fair and

14   equitable?  And part of my assessment and

15   decision was also based upon the fact that when

16   the examiner's report looked at what would be

17   fair from a settlement perspective, this was -- I

18   think there were five or six different

19   scenarios -- that this overall settlement was

20   better than five of the six scenarios that were

21   actually put on the table.

22        Q.    Have you read the examiner's report?

23        A.    I did.

24        Q.    All of it?

25        A.    I read through most of it.

1                    Wilderotter

2        Q.    Did you read the recovery scenarios?

3        A.    I did.

4        Q.    Did you have access to the examiner's

5   model?

6        A.    No.

7        Q.    Did you ask for access to the

8   examiner's model?

9        A.    No.

10       Q.    Why not?

11       A.    Because it is not up to me to make an

12  assessment on his models.

13       Q.    Who was it up to?

14       A.    It is up to our advisors who were

15  looking at all of the analysis to derive what

16  would be appropriate for a settlement.

17       Q.    Who were your advisors?

18       A.    As I mentioned, the advisors for the

19  company and the special committee include Jones

20  Day and Sidley and Lazard primarily as the

21  advisors.

22       Q.    Sidley is the advisor to the company?

23       A.    Correct.

24       Q.    And Lazard is the advisor to the

25  company?

1                          Wilderotter

2           A.    Correct.

3           Q.    Did you get any independent advice

4    for the special committee, not from Sidley or

5    from Lazard?

6           A.    Yes, from Jones Day.

7           Q.    And how long has Jones Day been

8    involved in the case?

9           A.    Since August.

10          Q.    What date?

11          A.    I don't know the date off the top of

12   my head.

13          Q.    Who selected Jones Day?

14          A.    The special committee selected Jones

15   Day.

16          Q.    When were they selected?

17          A.    In August.

18          Q.    Was that before or after the special

19   committee was appointed by the board?

20          A.    It was in conjunction with the

21   special committee being appointed.

22          Q.    Was there a meeting to determine

23   whether or not to retain Jones Day?

24          A.    Yes.

25          Q.    Who was at that meeting?

1                      Wilderotter

2          A.    The members of the special committee.

3          Q.    Who recommended Jones Day?

4          A.    I recommended Jones Day.

5          Q.    What was your basis for recommending

6    them?

7          A.    Twofold.  I have worked with Jones

8    Day in the past.  I know they have a strong

9    bankruptcy practice from an understanding

10   perspective, and they were not involved in the

11   case.  There were many attorneys from many law

12   firms that are involved in the case.

13         Q.    Do you know if Jones Day represents

14   any of the LBO lenders who might be targets of

15   the LBO litigation?

16         A.    I don't know if they represent any of

17   them on other matters.  I know that they are not

18   involved in this specific matter.

19         Q.    Were you looking specifically for

20   conflict-free counsel, or was that not a

21   consideration?

22         A.    I was looking specifically for, yes,

23   conflict-free counsel, yes.

24         Q.    Did you investigate whether or not

25   Jones Day currently represents any of the lenders

1                        Wilderotter

2    who are potential targets of the LBO litigation?

3          A.    Yes, we had Jones Day clear conflicts

4    to make sure that was the case.

5          Q.    I didn't ask you if you had them

6    clear conflicts.  Did you investigate whether or

7    not they were --

8          A.    That is how we investigated, whether

9    they were involved or not.  And I also checked

10   with Don Liebentritt to make sure that from his

11   understanding since he was interacting with many

12   of the lawyers in the case if Jones Day would

13   have any conflict.

14         Q.    When you say you had them clear

15   conflicts, what do you mean by that?

16         A.    They took a look to make sure that

17   there would be no conflict of interest in them

18   representing the special committee based upon any

19   work that they were doing for folks that were

20   involved in the bankruptcy.

21         Q.    Did you ask them whether or not they

22   were currently representing any of the LBO

23   lenders in unrelated matters?

24         A.    Yes.

25         Q.    And they told you yes, they are?

1                          Wilderotter

2          A.    No, they told us that they had no

3    conflicts with regard to the subject.

4          Q.    That wasn't my question.

5          A.    Well, then ask it again, and I will

6    try to answer it.

7          Q.    Did you ask Jones Day whether or not

8    it was currently representing any of the LBO

9    lenders in unrelated matters?

10         A.    No.

11         Q.    Why not?

12         A.    I asked them if they were

13   representing any of the LBO lenders in this

14   matter or had any interaction with regard to this

15   specific matter.

16         Q.    Was there any reason why you didn't

17   ask them if they were currently representing any

18   of the LBO lenders in unrelated matters?

19         A.    No.

20         Q.    Do you think it would have been

21   consistent with your fiduciary duties to seek to

22   find a law firm that was not currently

23   representing any of the LBO lenders in unrelated

24   matters?

25         A.    I think it was my responsibility to

1                    Wilderotter

2   make sure that Jones Day had no conflicts on this

3   matter.

4           Q.    And so far as you are concerned the

5   fact that Jones Day may be representing LBO

6   lenders in unrelated matters is not a conflict?

7           A.    It is not a conflict for me.

8           Q.    Was this discussed with the rest of

9   the committee?

10          A.    Yes.

11          Q.    What did other committees have to say

12  about the issue?

13          A.    We collectively discussed whether

14  Jones Day would be good counsel for us as a

15  special committee, and part of that decision

16  process was the fact that they didn't represent

17  any of the LBO lenders in this matter.

18          Q.    Did the special committee value any

19  of the step 2 claims that are being released

20  pursuant to the term sheet?

21          A.    I don't understand the question.

22          Q.    Did the special committee do an

23  assessment of what the claims might be worth that

24  were being released under the term sheet?

25          A.    What kind of an assessment are you

1                    Wilderotter

2    talking about?

3         Q.    Any assessment.

4         A.    We looked at the information that was

5    given to us by our advisors and went through all

6    of that information in terms of what the total

7    dollar amounts were and then what the settlement

8    amounts were based upon each individual category

9    of the lenders and also the creditors.

10        Q.    What did your advisors tell you about

11   the potential value of the LBO claims?

12        A.    The potential value of the claims?

13   It is over $500 million in terms of the total

14   settlement amount.

15        Q.    I'm not talking about how much was

16   being paid in settlement.  I am asking you was

17   there an evaluation done of what those claims

18   might be worth if the plaintiff in those lawsuits

19   was successful in litigation.

20        A.    No.

21        Q.    No valuation was done?

22        A.    No.

23        Q.    Did the special committee consider

24   the probability that if step 2 was found to be a

25   fraudulent conveyance and step 1 was not, that

1                      Wilderotter

2    the step 1 lenders might nonetheless be prevented

3    from recovering on the avoided claims ahead of

4    the non-LBO lenders?

5         A.    I don't understand the question.

6         Q.    I will try to rephrase it.  Did the

7    special committee consider the probability or

8    possibility that if step 2 was found to be a

9    fraudulent conveyance and step 1 was not, that

10   the step 1 lenders might be prevented from

11   recovering on those avoided claims ahead of the

12   non-LBO lenders?

13        A.    I don't understand the question, so I

14   can't answer it.

15        Q.    Do you recall the examiner's

16   discussion in the report about theories of

17   equitable estoppel?

18        A.    No.

19        Q.    Did you read the portion of the

20   examiner's report about what might happen and

21   what the issues would be if both step 1 and

22   step 2 loans were set aside as fraudulent

23   conveyances?

24        A.    Do I recall?  No.

25        Q.    Do you recall discussion in the

1                        Wilderotter

2    examiner's report about what the result might be

3    if step 2 was set aside but step 1 was not?

4              A.    No.

5              Q.    Was that discussed in the special

6    committee?

7              A.    No, not that I recall.

8              Q.    Was any incremental value assigned to

9    the increase in the percentage from the

10   litigation trust that was being given to the

11   noteholders under this term sheet?

12             A.    Was any incremental value assigned to

13   it?  Well, there is incremental value associated

14   with it.

15             Q.    And what is that?

16             A.    It would be the value of what is in

17   the litigation trust.

18             Q.    And was that offset at all by the

19   decrease in the claims that are being assigned to

20   the trust?

21             A.    Was it offset at all by the decrease

22   in the claims?  I don't know.

23             Q.    Was that discussed?

24             A.    Not in that -- not in the form of the

25   question that you have asked me.  I don't recall

1                    Wilderotter

2   that.

3        Q.   Was there any discussion about why

4   the senior noteholders were being given a step up

5   in terms of the percentage interest in the

6   liquidating trust, the litigation trust?

7             MR. MILES:  Could you read the

8        question back.

9             (Record read)

10       A.   I don't understand the question.

11       Q.   You are aware that the term sheet

12  provides that the first $90 million coming out of

13  the litigation trust goes to the senior

14  noteholders and then thereafter they get

15  65 percent of the proceeds?

16       A.   Correct.

17       Q.   Okay.  How were those numbers arrived

18  at?

19       A.   Through negotiation.

20       Q.   With the senior noteholders?

21       A.   It was part of the settlement

22  agreement negotiations that were put in place.

23       Q.   Was it negotiated with the senior

24  noteholders?

25       A.   I don't know.  I wasn't in the room.

1                        Wilderotter

2          Q.    So you don't know who it was

3    negotiated with?

4          A.    No.

5          Q.    And that was not explained to you?

6          A.    Not in particular I don't, no.  I

7    know that they all agreed to the settlement

8    agreement, the parties.

9          Q.    And they would be who?

10         A.    The creditors of Oaktree, Angelo

11   Gordon, JP Morgan and the unsecured creditors

12   committee.

13         Q.    Was there any discussion of how the

14   $90 million figure was arrived at?

15         A.    I would have to look at my notes to

16   be able to answer that question.

17         Q.    Was there any discussion as to how

18   the 65 percent figure was arrived at?

19         A.    I would have to look at my notes.

20         Q.    You don't have any independent

21   recollection?

22         A.    I don't have a recollection of it.

23         Q.    Do you recall if that was discussed

24   before the meeting on Monday, October 12?

25         A.    I don't recall it being discussed

1                        Wilderotter

2    before then.

3            Q.    Did the special committee consider

4    the possibility that step 1 lenders who

5    participated in step 2 might be barred from

6    benefiting from step 2 avoidance?

7            A.    I don't know what that means.

8            Q.    There is an overlap of population

9    between, in some instances, between lenders who

10   were in step 1 and lenders who were in step 2.

11           A.    Right.

12           Q.    Was there any discussion with the

13   special committee as to the possibility that

14   step 1 lenders who were also step 2 lenders would

15   be barred from benefiting from a step 2

16   avoidance?

17           A.    Not that I recall.

18           Q.    Nobody raised that question?

19           A.    I don't recall.  So maybe somebody

20   did, but I don't recall.

21           Q.    Do you recall any discussion about

22   that?

23           A.    I would have to look at my notes.

24           Q.    And, if it wasn't in your notes,

25   would that mean there was no discussion of it?

1                       Wilderotter

2          A.   It would probably -- no, it wouldn't

3    mean that.  It would just give me the opportunity

4    to look to see if I would recall something

5    different than what I am telling you.

6          Q.   So right now, as we sit here, you

7    have no independent recollection?

8          A.   I don't have any recollection of it.

9          Q.   Do you know why the step 1

10   shareholders are being released for no

11   consideration?

12         A.   I don't understand the question.

13         Q.   What part of the question is

14   confusing to you?

15         A.   You want to tell me which noteholders

16   you are talking about?

17         Q.   I'm sorry.  I thought I said

18   shareholders.

19              (Record read)

20         A.   No.

21         Q.   Was that discussed?

22         A.   I am sure it was.

23         Q.   That would be in your notes?

24         A.   That would be in my notes, so my

25   recollection would have to be after I would read

1                         Wilderotter

2    through my notes.

3         Q.   Then, if it was not in your notes,

4    would that mean it wasn't discussed?

5         A.   No.  I would just use my notes for my

6    own personal recollection.

7         Q.   Do you know the reason why the

8    percentage recovery for the unsecured creditors

9    of the subsidiaries increased from 50 percent to

10   100 percent?

11        A.   I would have to look at my notes.  I

12   know it was discussed.

13        Q.   Was there any discussion of buying

14   their claims to support the plan, or I'm sorry,

15   buying the support of the plan by paying them in

16   full?

17             MR. MILES:  Read the question back

18        with the question before it as well.

19             (Record read)

20        A.   I don't recall that being discussed.

21        Q.   Do you know the basis for giving the

22   other parent general unsecured creditors an

23   option to obtain a higher percentage cash

24   recovery than the senior noteholders?

25        A.   Run that by me again.

1                    Wilderotter

2          Q.    Do you know the basis for giving the

3    other parent general unsecured creditors an

4    option to obtain a higher percentage cash

5    recovery than the senior noteholders?

6          A.    Than the senior noteholders?  I would

7    have to look at my notes.  I know there was

8    discussion about that as well.

9          Q.    Do you recall any of that discussion?

10         A.    No, I would have to refresh my memory

11   on looking at the information.

12         Q.    Do you know why the senior

13   noteholders are being paid in cash as opposed to

14   cash and stock?

15         A.    No.

16         Q.    Was that discussed?

17         A.    No, it was not discussed.

18         Q.    Do you know how the $77 million

19   reserve for the allowance of the bridge loan

20   claims was determined?

21         A.    I would have to look at my notes to

22   refresh my memory.

23         Q.    You don't have an independent

24   recollection of that?

25         A.    There are many pieces to this

54

1                          Wilderotter

2   settlement, and it is complex, and I would have

3   to look at my notes to make sure that I could

4   truthfully answer your question.

5           Q.   Do you recall if you understood how

6   that reserve was established at the time that you

7   approved the term sheet?

8           A.   I don't recall that as a specific

9   issue being called out, but we went through all

10  of the terms and conditions of the term sheet

11  with our advisors.  The entire special committee

12  did.

13          Q.   And that was at a meeting on Monday?

14          A.   Yes.

15          Q.   How long did that meeting last?

16          A.   It was --

17               MR. SHERMAN:   Endless.

18          A.   It was endless, yes.

19          Q.   It couldn't have been endless because

20  we are sitting here now.

21          A.   One to two hours.

22          Q.   One to two hours?

23          A.   Yes.

24               MR. SHERMAN:   It only seemed endless.

25          Q.   Who was present at that meeting?

1                    Wilderotter

2          A.    It was a telephonic meeting, so I can

3    give you a sense.  I don't know if I will miss

4    somebody, because there were a number of people

5    that were included as part of the call, but all

6    the members of the special committee were on the

7    call.  Jones Day, our counsel, was on the call,

8    Lazard was on the call, our financial advisors,

9    taking us through the settlement issues.  Members

10   from Sidley were on the call.  Don Liebentritt

11   was on the call.  David Kurtz, who was from

12   Lazard, took us through the information.

13         Q.    Did Mr. Kurtz lead the discussion?

14         A.    Part of it, yes.

15         Q.    Who else was leading the discussion?

16         A.    Well, there were many parts of it

17   that were talked about by the Sidley attorneys,

18   by Lazard, by Don Liebentritt, by Jones Day, so

19   there were different facets of the meeting that

20   were led, and discussions were led by different

21   people.

22         Q.    What part did Mr. Kurtz lead?

23         A.    He took us through the financial

24   analysis and the terms and conditions of the

25   settlement itself.

1                        Wilderotter

2          Q.    And what financial analysis would

3    that be?

4          A.    You have that information.

5          Q.    In the deck?

6          A.    It is in the deck.  Yes.  He took us

7    through the deck.

8          Q.    What portion did Sidley discuss?

9          A.    Sidley participated with Lazard in

10   providing color or information about different

11   parts of the material in the deck.

12         Q.    What portion did Mr. Liebentritt

13   handle?

14         A.    He did the intro in the beginning to

15   talk about that this was an overall proposed

16   settlement for the special committee to consider,

17   that they had been negotiating with the parties

18   all weekend and felt very close, that this was

19   very close to a final settlement that everyone

20   could agree to.

21         Q.    And what part did Jones Day handle?

22         A.    Advice and counsel to the special

23   committee including in our executive session a

24   discussion on the fairness and recommendation

25   that was put in front of us.

1                    Wilderotter

2          Q.   Of this two-hour meeting, what

3    portion of it was the general meeting and what

4    portion of it was the executive session?

5          A.   I don't know from a time split, but

6    probably, you know, at least two-thirds of the

7    time was really going through the information on

8    the settlement itself and Q and A, and the

9    balance maybe 15 or 20 minutes we did in

10   executive session.

11         Q.   Prior to this two-hour conference

12   call, had there been a meeting of the special

13   committee to discuss the terms of this term

14   sheet?

15         A.   Of this term sheet, the final term

16   sheet, no.  It was based upon discussions that

17   took place over the weekend, so it was sort of a

18   final -- almost a final term sheet.

19         Q.   When was the last special committee

20   meeting before the October 12 special committee

21   meeting?

22         A.   I would have to go look at my

23   calendar to let you know what that was.

24         Q.   What would you need to look at?

25         A.   My calendar dates.

1                        Wilderotter

2          Q.    Will you do that and supplement your

3    answer after?

4          A.    Absolutely.

5          Q.    Did the special committee do any

6    decision trees in connection with this October 12

7    meeting?

8          A.    What do you mean by decision trees?

9          Q.    Looking at what the consequences

10   would be of making one decision as opposed to

11   another and the probabilities that would result

12   or could result from making one decision as

13   opposed to another.

14         A.    The special committee did a lot of

15   deliberation and Q and A as part of this meeting

16   on what was being proposed.

17         Q.    Other than the two-hour meeting, I

18   assume that there was no decision tree presented

19   in the two-hour meeting?

20              MR. SHERMAN:   Objection to form.

21         Your assumption is really not an issue in

22         the case.

23              MR. WEINTRAUB:   I'm sorry?

24              MR. SHERMAN:   I objected to the form.

25         I was pointing out that what you assume is

1                    Wilderotter

2          probably not an issue in the case.  Why

3          don't you rephrase the question.

4          Q.   Was a decision tree presented to the

5    special committee in connection with the

6    October 12 meeting?

7          A.   Since I don't really know what you

8    mean by a decision tree, I can't answer that

9    question.

10          Q.   No one used that term during the

11    meeting?

12          A.   No one used a decision tree term

13    during the meeting.

14          Q.   And no document that would give

15    different alternative paths depending upon

16    different decisions was used at the meeting?

17          A.   The document that was used at the

18    meeting you have in your possession, so you have

19    everything that was presented at that meeting.

20          Q.   And I take it, since you are not

21    familiar with the term that I am using, decision

22    tree, you don't recall a decision tree being used

23    or discussed in advance of the October 12 meeting

24    by the special committee?

25          A.   I never heard the term "decision

1                            Wilderotter

2    tree" before in conjunction with this case.

3         Q.    Do you know if -- did the special

4    committee do any weighted average settlement

5    calculations to determine the likelihood or

6    unlikelihood of certain events occurring and

7    certain recoveries being yielded from those

8    events?

9         A.    The special committee had a lot of

10   discussion with our advisors during that

11   telephone call on what the terms and conditions

12   were and what the pros and cons were of those

13   terms and conditions, and that to me is what we

14   spent the time focused on on that call.

15        Q.    Do you remember a discussion about an

16   incremental $12 million recovery for the senior

17   noteholders in certain circumstances?

18        A.    Not that I recall, but I would have

19   to look at my notes.

20        Q.    Do you know the source of cash that

21   is being used to pay $420 million to the senior

22   noteholders as reflected in the term sheet?

23        A.    From the individual parties?

24        Q.    Yes, who is paying what.

25        A.    Yes.  You have that in that document.

1                          Wilderotter

2          Q.    That is in the deck?

3          A.    It is in the deck, yes.

4          Q.    Is that on a by lender basis?

5          A.    I would have to look at the deck to

6    see how detailed it is, but it deals with the

7    lenders, yes.  The lenders are outlined in the

8    deck.

9          Q.    Do you know how that $420 million

10   figure was arrived at?

11         A.    Yes, it is in the deck.

12         Q.    But, aside from being in the deck, do

13   you know how it got into the deck?

14         A.    It was negotiated as part of the

15   settlement.

16         Q.    And --

17         A.    With the parties.

18         Q.    Do you know who proposed it?

19         A.    No.  I don't know which individual

20   proposed it.

21         Q.    Do you know which of the release

22   parties are providing funds under the settlement?

23         A.    Yes, it is in the deck.

24         Q.    Other than in the deck, you have no

25   independent knowledge?

1                      Wilderotter

2          A.    I have independent knowledge based

3    upon, if you want me to recite who it is, I would

4    be happy to do that if you want to pull the deck

5    out.

6          Q.    We are going to get to the deck.

7          A.    All right.

8          Q.    Are you familiar with section 2.13 of

9    the credit agreement?

10         A.    I don't know what 2.13 of the credit

11   agreement is.

12         Q.    You never heard 2.13 mentioned at any

13   of your meetings?

14         A.    Not that I know of.

15         Q.    Have you heard the sharing provision

16   between the step 1 and step 2 lenders mentioned

17   in any of your meetings?

18         A.    The sharing agreement, not that I

19   recall.

20         Q.    Are you generally aware that there is

21   a provision of the credit agreement that would

22   require the step 1 lenders to share recoveries

23   with the step 2 lenders?

24         A.    I don't recall off the top of my

25   head.

1                           Wilderotter

2            Q.   You don't recall if that was

3     discussed in connection with the term sheet?

4            A.   I don't recall.  I would have to look

5     at my notes.

6            Q.   The term sheet mentions the retiree

7     settlement.  What is your understanding of the

8     retiree settlement?

9            A.   Do you want to tell me where this is

10    on the term sheet so I can look at it?

11           Q.   On page 2 in the box labeled "Other

12    Parent General Unsecured Claims."

13           A.   Okay.

14           Q.   The third bullet point.

15           A.   Okay.  What is the question?

16           Q.   What is your understanding of the

17    terms of the retiree settlement agreement?

18           A.   Of the retiree claimant settlement

19    agreement?

20           Q.   Yes.  What is being settled under

21    that agreement?

22           A.   The retiree claim, this basically

23    says that it would be allowed based upon what is

24    in that agreement and they would be eligible to

25    receive distributions without reduction, offset,

64

1                          Wilderotter

2    counterclaim or subordination.

3          Q.    Did you make an independent

4    determination that the retiree settlement

5    agreement is fair?

6          A.    No, not to that specific agreement.

7          Q.    Have you --

8          A.    Only to the total settlements that

9    were put in front of us.

10          Q.    Have you read the retiree settlement

11    agreement?

12          A.    No.

13          Q.    Has it been described to you?

14          A.    I have to look at my notes to see

15    what kind of notes I have on that or not.

16          Q.    You don't have an independent

17    recollection of what is being settled under the

18    retiree settlement agreement?

19          A.    Correct.

20          Q.    Do you know why the retirees are

21    being given an option under the term sheet?

22          A.    Again, I know that it is part of the

23    settlement agreement overall, and there were puts

24    and takes on all of these terms and conditions.

25          Q.    Did you have any input into the puts

1                          Wilderotter

2    and takes?

3            A.    No.

4            Q.    Were you consulted about the puts and

5    takes?

6            A.    I was not consulted on the puts and

7    takes.  I was asked to review this in a holistic

8    fashion to see if this was fair and equitable and

9    a good settlement for the parties.

10           Q.    And that holistic review was the

11   two-hour meeting on October 12?

12           A.    Correct.

13           Q.    On page 3 of the term sheet, there is

14   a discussion of the step 2 disgorgement

15   settlement.  What is your understanding of what

16   is being released under that settlement?

17           A.    Do you want me to just read this to

18   you?

19           Q.    No, I would like to know if you have

20   an understanding based upon the work that you did

21   in approving the settlement agreement as to what

22   is being released.

23           A.    I do have an understanding, but this

24   is a complicated settlement, and I don't want to

25   regurgitate to you anything that would be

1                          Wilderotter

2    incorrect.  I would be happy to take you through

3    this or I could look at my notes again and take

4    you through what we discussed there, but it is

5    what it is based upon what is said here.

6            Q.    Other than just reading the words to

7    me, is it your testimony you don't have an

8    independent understanding of what is being

9    released?

10           A.    I have an independent understanding,

11   but it is based upon what is on this piece of

12   paper.

13           Q.    Can you explain to me then what is

14   your understanding of what is being released?

15           A.    It is right here on this piece of

16   paper.  I am happy to read it to you, but I'm not

17   going to try to take this out of context, because

18   it is complicated, and I don't want to leave

19   anything out, and then it would seem like I

20   didn't answer this truthfully, so I am happy to

21   read this to you if that is what you would like

22   me to do.

23           Q.    Was this explained to you at the

24   meeting on October 12?

25           A.    Yes, it was.

1                        Wilderotter

2          Q.    Do you recall what was explained to

3    you?

4          A.    Yes, and I have my notes and I would

5    be happy to look at my notes and talk to you

6    about that further.

7          Q.    Other than what is in your notes, you

8    have no independent recollection of --

9          A.    I have an independent recollection,

10   but I don't want to talk about that unless I look

11   at my notes.

12         Q.    What is your understanding of how the

13   funding and reimbursement arrangement works with

14   respect to this disgorgement settlement?

15         A.    I would be happy to look at my notes

16   and tell you about what my understanding is.

17         Q.    Other than that, do you have any

18   understanding of how the disgorgement and

19   reimbursement arrangements work?

20         A.    I have already answered the question.

21         Q.    Do you know how much the step 2

22   arrangers were paid?  Strike that.  Let me start

23   that again.  Do you know the dollar amount of

24   exposure that the step 2 arrangers have in the

25   disgorgement claim?

1                        Wilderotter

2          A.    I would have to look at my notes.

3          Q.    You don't have an independent

4    recollection of the potential disgorgement claim

5    against the step 2 arrangers?

6          A.    I would have to look at my notes.

7          Q.    Do you know how much of the

8    disgorgement claim against the step 2 lenders was

9    against the incremental lenders as opposed to the

10   bridge lenders?

11         A.    I would have to look at my notes.

12         Q.    You don't have an independent

13   recollection of that?

14         A.    I would have to look at my notes.

15         Q.    You don't have an independent memory?

16         A.    I would have to look at my notes.

17         Q.    Is it your understanding that the

18   arrangers are going to be advancing up to

19   $120 million to pay for the settlement that is

20   set forth in the step 2 disgorgement settlement

21   as described in the term sheet?

22         A.    As soon as I look at my notes, I

23   would be happy to answer the question.

24         Q.    You don't have an independent

25   recollection?

1                          Wilderotter

2          A.    I'm not a lawyer, so I need to look

3     at my notes to see what the actual information is

4     to answer that question.

5          Q.    So as we sit here today, which is

6     October 13th, you don't recall the meeting --

7     what was discussed about this on Monday at the

8     meeting on Monday?

9          A.    I don't recall the intimate details

10    that you are asking me.  I would have to refer to

11    my notes to make sure that I answered the

12    question appropriately.

13         Q.    You don't recall where $120 million

14    is coming from under the settlement?

15         A.    Yes.  It is in my notes, and it is in

16    the deck that you already have.

17         Q.    Do you have an understanding as to

18    whether or not the parties that would be

19    advancing the $120 million would have a right to

20    be reimbursed for that $120 million?

21         A.    I don't have a recollection of that.

22    I need to look at my notes.

23         Q.    Do you know what claims are being

24    transferred to the litigation trust as opposed to

25    the creditor trust?

1                    Wilderotter

2          A.   I need to look at my notes.

3          Q.   Are you aware that there are two

4    different trusts?

5          A.   Yes.

6          Q.   What is the reason for the two

7    trusts?

8          A.   I would be more than happy to talk

9    about that when I would have my notes in front of

10   me.

11         Q.   Let's go to the deck.

12              MR. SHERMAN:  At some point, if we

13              could have a five or seven-minute break.

14              It is up to you.

15              MR. WEINTRAUB:  No, we can do it now.

16              THE VIDEOGRAPHER:  The time is 4:23

17              p.m.  We are going off the record.

18              (Recess taken)

19              THE VIDEOGRAPHER:  This marks the

20              beginning of videotape number two.  The

21              time is 4:33 p.m.  We are going back on

22              the record.

23   BY MR. WEINTRAUB:

24         Q.   We are back on the record.  You are

25   still under oath.  You mentioned to me just

1                    Wilderotter

2    before we went back on the record you checked the

3    date of the meeting prior to the Monday,

4    October 11 meeting.

5         A.    Right, and it looks like it was

6    Tuesday, September 28.

7         Q.    Do you recall what was discussed at

8    that meeting?

9         A.    I think we went through the step 1

10   settlement agreement that was being proposed with

11   Oaktree and Angelo Gordon.

12        Q.    That was the settlement agreement

13   that emanated or resulted from the two-day

14   mediation in Wilmington?

15        A.    That is my understanding, yes.

16        Q.    Were you present at that meeting in

17   Wilmington?

18        A.    No.

19        Q.    I'm sorry.  That mediation in

20   Wilmington.

21        A.    No.

22        Q.    Was anyone from the special committee

23   present?

24        A.    My understanding is David Heiman was

25   there from Jones Day representing the special

1                      Wilderotter

2    committee.

3            Q.    But none of the members of the

4    special committee were there?

5            A.    Not that I know of.

6            Q.    How were the members of the special

7    committee kept apprised of what was going on in

8    the mediation in Wilmington?

9            A.    From David Heiman, and also Don

10   Liebentritt would give us updates on how it was

11   going usually by e-mail.

12           Q.    How frequently were you getting

13   e-mail updates from Mr. Liebentritt?

14           A.    I would have to look at the updates

15   that I got.

16           Q.    Did you produce those to us in the

17   document production?

18           A.    If I had them, you have them.  Yes.

19           Q.    So that means if I don't have them,

20   you don't have them?

21           A.    That's correct.

22           MR. SHERMAN:  Assuming you have been

23           careful with your copies.

24           MR. WEINTRAUB:  I try to be careful.

25           We are going to mark as the next exhibit

1                     Wilderotter

2          what we will refer to as the deck, which

3          was the document that was discussed at the

4          October 11 meeting, and this is the

5          version which I believe has your

6          handwritten note on it.

7               THE WITNESS:  Okay.

8               MR. WEINTRAUB:  For those on the

9          phone, this document begins at MW 28 and

10          runs through MW 38.

11               (Wilderotter Exhibit 5, Document

12          bearing Bates numbers MW 28 through MW 38,

13          was so marked for identification, as of

14          this date.)

15          Q.    Have you seen this document before?

16          A.    Yes.

17          Q.    Is this the document that you

18     referred to earlier throughout the deposition

19     when you said you needed to see your notes?

20          A.    Yes.

21          Q.    Do you have any other notes of the

22     October 11 meeting other than the notes that are

23     on this document?

24          A.    No.

25          Q.    On page 1 of the document, in the

1                    Wilderotter

2    background and summary, there is a description in

3    the first paragraph that talks about a framework

4    for a plan of reorganization that aims to settle

5    and release senior lenders and step 1

6    shareholders with respect to LBO-related causes

7    of action and bridge lenders with respect to

8    their disgorgement exposure.  Is that your

9    recollection of what was discussed at the

10   meeting?

11          A.    Yes.

12          Q.    Is this at all inconsistent with the

13   term sheet that we were discussing earlier?

14          A.    I don't think so.  I would have to

15   compare page to page to the term sheet in order

16   to make that assessment.

17          Q.    To the best of your knowledge and

18   understanding, was the term sheet that we

19   reviewed which was filed with the bankruptcy

20   court consistent with the settlement that you

21   approved based upon this deck?

22          A.    Yes.

23          Q.    On the first page on the left-hand

24   side, there is some handwriting.  Is that your

25   handwriting?

```
 1                        Wilderotter

 2          A.    Correct.

 3          Q.    What does that say with respect to

 4   Aurelius?  You can't write on the exhibit.  You

 5   keep that.  Do we have another copy?

 6                (Wilderotter Exhibit 5 was remarked)

 7          A.    And the question was?

 8          Q.    What does the handwriting say with

 9   respect to Aurelius?

10          A.    I don't think it says anything with

11   respect to Aurelius.

12                MR. SHERMAN:  Where are you directing

13          her attention?

14                MR. WEINTRAUB:  On page 1 of the

15          deck.

16                THE WITNESS:  Right.

17                MR. WEINTRAUB:  Where the page is

18          entitled "Background and Summary."

19                THE WITNESS:  Right.

20          Q.    Then it says "Aurelius paren."

21          A.    "600 million.  They are opposed to

22   this deal and any deal that doesn't give

23   100 percent payment of their shares."

24          Q.    So whose comment was that?  Was that

25   your comment?
```

1                    Wilderotter

2          A.    It was being discussed by the Lazard

3    folks when they were taking us through the deck,

4    when they were taking us through the summary, so

5    David Kurtz, as you can see his name is here

6    along with Don Liebentritt, as I mentioned, did

7    the intros, so I wrote that down because that is

8    what they said.

9          Q.    Now which one of those gentlemen said

10   that, or did they both say it?

11         A.    I don't recall which one said it,

12   because they were both speaking.

13         Q.    Did anyone say that that was not the

14   case?  That that was not a correct statement?

15         A.    No.

16         Q.    So the premise that the special

17   committee had was that Aurelius would only take

18   full payment plus interest?

19              MR. SHERMAN:  Objection to the form.

20         Q.    You can answer the question.

21         A.    We made our decision based upon all

22   of the collective input from our advisors

23   including Don Liebentritt and Lazard and Sidley

24   and Jones Day, and this note that I put was what

25   was said in the meeting.  There was no other

```
 1                     Wilderotter
 2   discussion about Aurelius with regard to that
 3   note.
 4         Q.    Do you remember exactly or
 5   approximately what was said by the person saying
 6   it with respect to Aurelius?
 7         A.    I don't remember exactly, but this
 8   paraphrase -- this was my understanding of what
 9   was said.
10         Q.    Were these part of the introductory
11   remarks?
12         A.    Correct.
13         Q.    Was there any discussion beyond that
14   statement?
15         A.    No.  Not that I recall.
16         Q.    At the top of the page.
17         A.    Yes.
18         Q.    Can you tell me what that handwriting
19   says?
20         A.    Yes.  It was a note that as we look
21   at approval for this settlement that we would
22   need to take not just the step 1 view, but the
23   step 2 deal together, so you would look at this
24   holistically as a good settlement for recovery to
25   the available noteholders and the creditors, so
```

1                    Wilderotter

2    we shouldn't just take it one piece at a time,

3    but we should take it collectively in how we look

4    at this.

5         Q.    Did someone suggest that it should be

6    taken one piece at a time?

7         A.    No.  Someone suggested we should look

8    at it holistically.

9         Q.    Was an explanation given as to why it

10   should be looked at holistically?

11        A.    Because it was a cumulative summary

12   for all of the parties based upon what is in this

13   deck.

14        Q.    On page 2 of the document, there is

15   some more handwriting.  Can you tell me what that

16   says?

17        A.    Yes.  So in the step 1 settlement,

18   when we first looked at that step 1 settlement

19   previous to the Monday meeting, the value of the

20   settlement was 328 million, and now including

21   both steps as part of the settlement it increased

22   to 521 million.

23        Q.    What were the sources of payment for

24   the increase?

25        A.    I would have to go to a different

1                    Wilderotter

2    page to go through those if you want to do that.

3         Q.    You can do that.

4         A.    So, if you go, I don't see a page

5    number on it, but it is the page that says

6    summary settlement analysis.

7         Q.    Okay.  That would be page 6.

8         A.    Page 6.  So if you look at the

9    settlement analysis and you have the 401,468.

10        Q.    Where are you looking?

11        A.    It is the total settlement column,

12   the last column.

13        Q.    Um-hum.

14        A.    If you add the 120 million, which is

15   the settlement payment from the step 2 lenders,

16   and add that to the 401,468, that gives you your

17   521,468.

18        Q.    What are the components of the 401?

19        A.    If you take a look at the 327,733

20   payment under the step 1 settlement.

21        Q.    Let's --

22        A.    Under payment.  And you add that to

23   the 73,735, which is the step 2 payment, it shows

24   the total of 401,468.

25        Q.    Let's look at the column labeled

1                    Wilderotter

2   senior loan claim subsidiary.  What is your

3   understanding of what that -- I guess not column.

4   It is on the left-hand side, and it goes across

5   the page horizontally.  What is your

6   understanding of that horizontal line?  What does

7   that represent?

8         A.   I took a look at all of the senior

9   loan claims cumulatively, not just parent, but

10  parent plus subsidiary together, and it would be

11  the value that would be distributed of the

12  $6.6 billion from a recovery perspective.

13        Q.   But I am asking you what does that

14  horizontal line represent?  Do you know?

15        A.   I don't have the details of that, no.

16  It is the claim in total and then what the

17  recovery would be, what percentage recovery.

18        Q.   Do you see under the column payment

19  across from senior loan claim subsidiary, a

20  parenthetical and a $40,306,000?

21        A.   I see that, yes.

22        Q.   Do you know what that represents?

23        A.   It would be a payment in the step 1

24  settlement, right.

25        Q.   With respect to the subsidiaries?

1                     Wilderotter

2          A.    Correct.

3          Q.    And then under the step 2 settlement,

4    do you see the parenthetical, 42,500,000?

5          A.    Yes.

6          Q.    What does that represent?

7          A.    It would represent an incremental

8    increase in payments based upon step 2 added to

9    step 1 to get to the final total settlement

10   amount.

11         Q.    Then the final total settlement

12   amount with respect to that horizontal column is

13   how much?  82 million --

14         A.    806.

15         Q.    Is it your understanding that that

16   82,806,000 represents the settlement payment for

17   the fraudulent conveyance claims with respect to

18   the Tribune subsidiaries?

19         A.    I don't understand the question.

20         Q.    The --

21         A.    It represents the total settlement

22   for the senior loan claims.

23         Q.    With respect to the subsidiaries?

24         A.    And the parent at the 401,468.

25         Q.    I'm not looking --

1                          Wilderotter

2          A.    For the subsidiaries.

3          Q.    I am just going horizontally.

4          A.    Yes.

5          Q.    So I am looking at the components for

6    what is being paid with respect to the step 1 and

7    step 2 settlement with respect to the fraudulent

8    conveyance claims with respect to the

9    subsidiaries.

10         A.    Right.

11         Q.    Okay.  Do you know the amount of the

12   debt that the subsidiary guarantors guaranteed in

13   connection with the LBO transactions?

14         A.    No, not off the top of my head.

15         Q.    Would the number $12 billion sound

16   about right?

17         A.    In terms of the 12,970 on this page?

18   Is that what you are talking about?

19         Q.    No, in terms of the loans made with

20   respect to step 1 and step 2 that were guaranteed

21   by the subsidiaries.

22         A.    I don't know the answer to that.

23         Q.    Does it sound like it might be

24   something like 10 or $12 billion?

25              MR. SHERMAN:  Objection to the form.

1                        Wilderotter

2          Q.    Do you know?

3          A.    I don't know the number.

4          Q.    Well, whatever the number is, let's

5    start with the asserted claim then.  You see that

6    column?

7          A.    Yes.

8          Q.    So that is $8.722 billion?

9          A.    Yes.

10         Q.    So is it your understanding that the

11   claims with respect to the guarantees made by the

12   subsidiaries is being resolved for a payment of

13   $82 million?

14         A.    82,806, yes.  That would be their

15   part of the settlement.

16         Q.    Do you think that is a fair

17   settlement?

18         A.    I think you have to look at the

19   settlement in total.  That is how I looked at it.

20   And I felt this was a fair settlement.

21         Q.    Was there any discussion of whether

22   or not there was any benefit to the subsidiaries

23   when they guaranteed the debt of the parent?

24         A.    There was no discussion that I

25   recall.

84

1                    Wilderotter

2          Q.    Let's go back to page 3.  There is a

3    question mark.  I assume you put it there next to

4    subsidiary GUC?

5          A.    Right.

6          Q.    Do you recall why you put a question

7    mark there?

8          A.    I didn't know what the GUC stood for

9    when I first went through the deck, so I asked

10   the question and found out it was the unsecured

11   creditors.

12         Q.    Does this refresh your recollection

13   as to my earlier question as to do you know why

14   the recovery for the subsidiary GUCs went from

15   50 cents on the dollar to 100 percent?

16         A.    No, because my question was about

17   what the acronym stood for.

18         Q.    But --

19         A.    Because I didn't know.

20         Q.    But looking at the 85 million in cash

21   100 percent recovery, that doesn't refresh your

22   recollection?

23         A.    No.

24         Q.    On page 4, in the lower right-hand

25   corner, there is some handwriting.  Can you tell

1                      Wilderotter

2    me what that means, the reference there?

3           A.    If I recall, we were talking about

4    what percent of the debt the lenders had versus

5    the bonds, the parent, the trade and swap, so it

6    was a breakdown for 81 percent of the debt

7    lenders and 19 percent, and then the lenders

8    would give up 46 percent of that, and that would

9    be added to the bonds, the parent, the trade and

10   the swap, so it would increase what the bonds,

11   parent, trade and the swap got to 65 percent

12   down from 81 percent in terms of their percentage

13   that they would take away based upon this

14   settlement.

15          Q.    So this 65 percent, this is the

16   sharing of the litigation trust, or is this

17   what this settlement returns in terms of cents on

18   the dollar given the face amount of the bond

19   claims?

20          A.    My understanding is that it is how

21   the numbers were derived in terms of the splits

22   between those specific creditors of which lenders

23   were giving up part of what they would have

24   gotten to the bonds, the parent, the trade and

25   the swap.

1                       Wilderotter

2          Q.   I'm sorry if I wasn't clear.  Splits

3   in terms of sharing in the litigation trust, or

4   this is in terms of recoveries?

5          A.   In recoveries.

6          Q.   I'm sorry.  So recoveries on the

7   effective date of the plan when distributions are

8   made to creditors?

9          A.   I don't know the last part of your

10  question in terms of when it would happen, but my

11  understanding is it was a split on the

12  recoveries.

13         Q.   So is it your understanding that the

14  bondholders are recovering 65 cents on the dollar

15  on the effective date of the plan?

16         A.   No.  What you have to do is look

17  at -- we can go to the page and look at what each

18  group gets as a percentage.

19         Q.   Okay.  Unless I am misreading it, we

20  are looking at 32.7 percent for the bonds on page

21  6?

22         A.   Yes.

23         Q.   So again my question is what does the

24  65 percent represent?

25         A.   I would have to go back and look at

1                          Wilderotter

2    recreating the numbers, but it was how originally

3    what -- let me see if I can find the exact

4    number.  So if you went to the next page on the

5    summary settlement analysis.

6         Q.    Um-hum.

7         A.    You can see that the pro rata share

8    and the proposed sharing of the 81 and the 19.3

9    and then the proposed sharing of reducing the

10   senior loan down to 35 and the 65 percent on the

11   proposed sharing for the bonds, the parent, trade

12   and the swap.

13        Q.    And that is proposed sharing of what?

14        A.    This is the litigation trust splits.

15        Q.    That was my original question.

16        A.    Okay.

17        Q.    So you are revising your answer to

18   say that the 65 percent is not the recovery, but

19   it is the sharing?

20        A.    Well, it is the sharing for the

21   distribution.

22        Q.    How is that 65 percent arrived at?  I

23   don't mean numerically how it was arrived at.

24        A.    It was arrived at through negotiation

25   of the settlement.

1                         Wilderotter

2          Q.    Were those negotiations described to

3    you during the October 11 meeting?

4          A.    The results of the negotiations were

5    described to us based upon this deck that we

6    reviewed.

7          Q.    So you were just given the conclusion

8    as opposed to how the conclusion was arrived at?

9          A.    Correct.

10         Q.    On page 5.

11         A.    Does that start with confirmation

12   considerations?

13         Q.    Yes.  The page numbers are on the

14   lower left next to Lazard.

15         A.    I know.  My glasses are like this.

16         Q.    I have the same problem.  There is a

17   reference to Judge Carey on the upper left-hand

18   corner of that page.

19         A.    Um-hum.

20         Q.    What was said about Judge Carey?

21         A.    We were talking about the likelihood

22   of how different alternatives would be viewed by

23   the bankruptcy judge.

24         Q.    What different alternatives were you

25   discussing?

1                         Wilderotter

2           A.    The likelihood of this settlement

3      being accepted by the courts versus alternatives.

4           Q.    What alternatives were being

5      discussed?

6           A.    Well, I think that you can see in the

7      center of this document there was a discussion

8      about a challenge by a number of creditor

9      constituencies including the senior notes, the

10     bridge and the phone classes about this purity

11     plan, which would be all litigation for the LBO

12     would go into the post bankruptcy environment.

13     There would be no settlements, in other words,

14     for any of the parties prior to emerging out of

15     bankruptcy, and that would be an option that the

16     judge could look at versus the settlement

17     proposal that was on the table.

18          Q.    Who gave the name to this litigation

19     plan the purity plan?

20          A.    I don't recall who named it that.

21     That is how it was referred to in the discussion.

22          Q.    Is that an acronym or a value

23     judgment?  What does purity mean in connection

24     with the reference to the plan?

25          A.    Just that there was no settlement.

1                         Wilderotter

2         Q.    Do you know why that is referred to

3    as purity?

4         A.    No.

5         Q.    On your handwritten notes on the

6    lower left it says something about hold up.  How

7    long will this hold up the process?  Is that what

8    it says?

9         A.    Right.  Um-hum.

10        Q.    Then beneath that, it says shouldn't.

11        A.    Right.

12        Q.    What does that handwriting discuss or

13   reference?

14        A.    It was referencing whether the judge

15   would look at one -- the settlement agreement

16   that we were recommending asynchronously to a

17   settlement that might be recommended by other

18   creditors and would that hold up the process, and

19   we were basically told that it wouldn't hold up

20   the process, because all of these would be viewed

21   at the same time by the judge.

22        Q.    Was there any discussion of which

23   plan would more likely be approved by the judge

24   than the other?

25        A.    As you can see here, both could be

1                    Wilderotter

2    viewed depending on what was put in front of the

3    judge.  I think that as a member of the special

4    committee, based upon the fact that the judge

5    appointed a mediator, and a mediator worked

6    through this settlement with the parties that

7    came to terms on this settlement, that the judge

8    would take into consideration that his decision

9    on having mediation and having a judge

10   participate in that mediation and the fact that

11   the settlement is a good settlement, that that

12   would be taken into consideration and would be

13   considered a very viable option.

14        Q.   Was there any discussion as to what

15   advantage there was that another judge was the

16   mediator?

17        A.   No.

18        Q.   What was said about this plan being a

19   good plan?

20        A.   Which plan?

21        Q.   The plan that is being proposed by

22   the special committee.

23        A.   What was said about it being a good

24   plan?

25        Q.   Yes.

1                      Wilderotter

2          A.   Well, there was a number of things

3     that was said.  I think as you go through this

4     document, we went through all of the

5     considerations.  If you go to page 8, this is

6     120 million more than was required, because the

7     step 1 lenders gave up more in the settlement.

8               It was also viewed and reviewed by an

9     expert, an outside expert, that was involved to

10    take a third-party point of view on this

11    settlement, and this expert found the settlement

12    to be a good settlement and a positive

13    settlement.

14              It also included the support of the

15    unsecured creditors committee, the support of the

16    mediator.  It was a product of extensive

17    negotiations that took place.  It also actually

18    was a better settlement, as I mentioned earlier,

19    than five of the six scenarios that were proposed

20    in the examiner's report as possibilities for

21    settlement, and I think that it favors, you know,

22    it showed favor for non-LBO lenders.  It has very

23    narrow releases, so it doesn't take away

24    anybody's right on a go-forward basis from a

25    litigation perspective.  So there were many

1                    Wilderotter

2    pieces of this settlement consideration that we

3    felt was a positive outcome on behalf of the

4    creditors.

5         Q.    Let's go back over what you were just

6    saying.  You said the 120 million.  What was the

7    source of that 120 million?

8         A.    It was the lenders.

9         Q.    Which lenders?

10        A.    It is the consortium, I think the

11   lenders would be JP Morgan, Bank of America, Citi

12   and Merrill Lynch.

13        Q.    How was that number determined?

14        A.    I don't know.  As I mentioned before,

15   I was not involved in those discussions.

16        Q.    And you mentioned -- well, let me

17   back up.  How did you determine that that was a

18   fair number?

19        A.    I think I just told you that I

20   looked -- as a member of the special committee

21   and the entire special committee looked at the

22   holistic view of step 1 and step 2 and the

23   settlement together to decide that this overall

24   settlement was a good settlement.

25        Q.    What claims did that $120 million

1                     Wilderotter

2  settle?

3        A.   I don't have the detail of what

4  claims that settled.  I can go back through here

5  and look at the notes again.

6        Q.   How do you know that it was a fair

7  settlement if you don't know which claims were

8  being settled?

9        A.   Well, it is basically the loan

10 disgorgement settlement fund that was

11 underwritten by the lenders.

12       Q.   What was the extent of the exposure

13 to the lenders who had disgorgement risk?

14       A.   I don't know if that is in here or

15 not.

16       Q.   Do you have an independent

17 recollection of it?

18       A.   I don't, no.

19       Q.   You didn't find it in your notes?

20       A.   I'm not looking for it.  No.

21       Q.   Could you look for it?

22       A.   I don't know if it is in here or not.

23 On page 6, the bonds total asserted claim was

24 1 billion 283, and the step 2 payment of the

25 120 million was the settlement.

1                    Wilderotter

2           Q.    So the step 2 payment of 120 million

3    was settling the bond claim for 1 million 283?

4    Is that what you are testifying?

5           A.    1 million 283, no.

6           Q.    1 billion 283.   Then I didn't

7    understand your answer.

8           A.    No, I was saying no to the 1 million

9    283.

10          Q.    I'm sorry.

11          A.    That is my understanding that, if you

12    look at the asserted claim and the waterfall

13    recovery across the board.

14          Q.    So your understanding --

15          A.    You have 238 million that was part of

16    the step 1 settlement and an additional payment

17    of $120 million in the step 2 settlement payment.

18          Q.    And that is settling the bond claim

19    for 1 billion 283?

20          A.    I can't attest that that is what it

21    would all be inclusive of.   It is the line that

22    is on here in this settlement analysis.

23          Q.    But is it your testimony that part of

24    what is being settled with the $120 million

25    payment is the bond claim of 1 billion 283?

1                    Wilderotter

2          A.   It seems to me that that is what this

3     says, yes.

4          Q.   So that is your understanding?

5          A.   Well, I would have to go back and

6     look here to see if -- let me go back and read

7     the rest.

8          Q.   This was explained to you on Monday,

9     the 11th?

10         A.   That's correct.

11         Q.   To the best of your recollection, the

12    120 million was settling the 1 billion 283

13    million?

14         A.   It was an amount for the loan

15    disgorgement settlement fund that was

16    underwritten by the senior lenders.  It would go

17    to the non-LBO senior noteholders, and it would

18    be actually -- that is basically my knowledge of

19    it.

20         Q.   So the claim that is being released

21    in exchange for the $120 million payment, do you

22    have an understanding what that claim is?

23         A.   I don't have the details of the

24    claim.

25         Q.   But you think it is a fair

1                    Wilderotter

2    settlement?

3         A.   I think overall it is a fair

4    settlement, yes.

5         Q.   You mentioned an outside expert who I

6    think you said gave an opinion of the fairness of

7    the settlement?

8         A.   Correct.

9         Q.   Was that someone who was present at

10   the October 11 meeting?

11        A.   No.

12        Q.   Who was that outside expert?

13        A.   My understanding is his name is

14   Bernie Black.

15        Q.   Have you read Mr. Black's report?

16        A.   I have not.

17        Q.   Did Mr. Black prepare a written

18   report?

19        A.   He prepared -- I don't know if he

20   prepared a written report, but he prepared a

21   report that was given to our advisors.

22        Q.   Who are your advisors?

23        A.   Lazard is our financial advisor, and

24   Sidley is the law firm that also advised the

25   company.

1                       Wilderotter

2          Q.    Who retained Mr. Black?

3          A.    The company retained him.

4          Q.    When?

5          A.    In March of this year.

6          Q.    Was that before or after the special

7     committee was --

8          A.    It was before the special committee

9     was formed.

10         Q.    Did the special committee retain its

11    own expert to review the fairness of the

12    settlement?

13         A.    No.

14         Q.    Did Mr. Black make a verbal

15    presentation to the special committee on the day

16    of the October 11 meeting?

17         A.    No.

18         Q.    How was Mr. Black's conclusion of the

19    fairness of the settlement communicated to the

20    members of the special committee?

21         A.    By our financial advisors and our

22    lawyers.

23         Q.    When you say our financial advisors?

24         A.    Lazard and Sidley.

25         Q.    I'm sorry.  Let me finish the

1                      Wilderotter

2     question.  Did the special committee have its own

3     separate financial advisor?

4          A.    No.

5          Q.    So, when you say our financial

6     advisor, you mean Tribune's financial advisor?

7          A.    Tribune's financial advisors.

8          Q.    And you said Sidley?

9          A.    I said Lazard and Sidley.

10         Q.    Was Sidley counsel to the special

11    committee?

12         A.    No.

13         Q.    Did Jones Day participate in that

14    presentation?

15         A.    Yes.

16         Q.    Do you know whether the October 11

17    meeting was the first time that Jones Day had

18    heard the results of Mr. Black's analysis?

19         A.    I don't know the answer to that.

20         Q.    Did you --

21         A.    You would have to ask them.  I didn't

22    ask them.

23         Q.    You did not ask them?

24         A.    No.

25         Q.    Do you know what Mr. Black's

1                    Wilderotter

2    qualifications are?

3         A.    He is a professor of law at

4    Northwestern, and he is an expert on these types

5    of bankruptcy settlements.

6         Q.    What type of bankruptcy settlement is

7    this?

8         A.    He is an expert on bankruptcy

9    settlements.

10        Q.    Was he a practicing attorney?

11        A.    I have no idea.

12        Q.    Do you know if he is a tenured

13   professor?

14        A.    I have no idea.

15        Q.    Do you know if he ever practiced law?

16        A.    I have no idea.

17        Q.    Do you know if he has ever testified

18   in a case as to the reasonableness of a

19   settlement?

20        A.    I don't know the answer to that.

21        Q.    Did you ask?

22        A.    No.

23        Q.    You mentioned earlier that the

24   releases are narrow.  That was one of the reasons

25   you gave as to this being an appropriate

1                    Wilderotter

2    settlement.

3         A.    Correct.

4         Q.    I asked you earlier if you knew

5    whether or not the bridge, the avoiding actions

6    against the bridge were being released or not.

7    Can you answer that question now?

8         A.    On page 3 on the bridge loan, it says

9    that 78 million reserve subject to allowance of

10   the bridge claim, so it implied a 5 percent

11   recovery plus interest in litigation trust

12   proceeds.

13        Q.    Do you know how the 78 million dollar

14   figure was determined?

15        A.    No.  In negotiation.

16        Q.    That was a negotiated amount?

17        A.    I would assume so.  I don't know.

18        Q.    Did you ask?

19        A.    No.

20        Q.    Did anyone from the special committee

21   ask?

22        A.    Not that I recall.

23        Q.    I would like you to go back to the

24   term sheet which is Exhibit 4.

25        A.    I don't have the exhibits.

1               Wilderotter

2               THE VIDEOGRAPHER:  The time is 5:14

3        p.m.  We are going off the record.

4               (Recess taken)

5               THE VIDEOGRAPHER:  The time is 5:15

6        p.m.  We are going back on the record.

7   BY MR. WEINTRAUB:

8        Q.   We have now located Exhibit 4.  I

9   would like you to turn to page 5, please.  Feel

10  free to look at your handwritten notes on the

11  deck if that would help you answer this question.

12  Under the releases in paragraph 1, it says that

13  current and former holders of senior loan claims

14  and bridge loan claims are being released.  I

15  asked you earlier if you knew why the bridge loan

16  claims were being released.

17               MR. SHERMAN:  What is your question?

18        Q.   Do you know why the bridge loan

19  claims are being released?

20               MR. MILES:  Could you read back the

21             question before counsel asked him what his

22             question was.

23               (Record read)

24        Q.   And I am asking you again now do you

25  know why the bridge loan claims are being

1                    Wilderotter

2    released, and, if you need your notes to assist

3    you with that, please feel free to look at your

4    notes.

5            A.    I don't have the details of that, so,

6    no.

7            Q.    Do you know the size of the bridge

8    loan claims against the subsidiaries?  Dollar

9    amount.

10           A.    Are you talking about the bridge

11   reserve?

12           Q.    No.  I am talking about how much the

13   bridge lenders are owed by the subsidiaries

14   under --

15           A.    I don't have that information.  No, I

16   don't know that.

17           Q.    Was there any discussion at the

18   October 11 meeting about the subsidiary

19   guarantees and the subordination of the bridge

20   loan guarantee claims to the credit agreement

21   lender guarantee claims?

22           A.    Wow.  Not that I know of.

23           Q.    You don't recall that?

24           A.    I don't recall that.

25           Q.    Nobody asked about that?

1                            Wilderotter

2          A.    Nobody asked me that question.

3          Q.    And you didn't ask that question?

4          A.    I didn't ask that question, no.

5          Q.    It wasn't apparent to you at the

6    meeting?  On page 5 of the deck, under the first

7    bullet point, there is a sub-bullet point talking

8    about "JP Morgan will be able to deliver the

9    votes necessary to have an impaired accepting

10   class."  Do you see that?

11         A.    Yes.

12         Q.    Do you recall that discussion?

13         A.    I recall the statement being made

14   that Angelo Gordon, Oaktree Group and JP Morgan

15   would be able to deliver votes necessary to have

16   an impaired accepting class.

17         Q.    Do you know what they meant by

18   deliver the votes?

19         A.    Well, I believe that when you have a

20   settlement, all the creditors get to vote on that

21   settlement and make a decision on whether it is

22   acceptable or not, and this would be the

23   percentage of votes associated with that

24   settlement vote.

25         Q.    Did you know how Angelo Gordon,

1                          Wilderotter

2     Oaktree and JP Morgan would go about delivering

3     the votes?

4          A.    No.

5          Q.    Was there ever any discussion of

6     Oaktree pressuring creditors to vote for a plan

7     of settlement?

8          A.    No.

9          Q.    Were you aware Oaktree was pressuring

10    anyone?

11         A.    No.

12         Q.    The next main bullet point, which

13    would be the second darkened bullet point on the

14    page, talks about avoiding potential

15    complications.  Do you see that?

16         A.    Yes.

17         Q.    What potential complications is the

18    deck referring to?

19         A.    The complications of deciding how

20    much of the equity or the new stock would be

21    reserved in the litigation trust.  That is what

22    it talks about, the complications of making that

23    decision.

24         Q.    The complications of calculating it?

25         A.    I think it is not just calculating

1                        Wilderotter

2    it, but also reserving it.

3          Q.    What are the complications of

4    reserving it?

5          A.    Well, we didn't get into the details

6    of what the complications were, but it is the

7    consideration that being able to distribute all

8    of the new common stock at emergence would be a

9    lot cleaner than having to decide what kind of

10   equity would be reserved in the litigation trust.

11         Q.    When you say you didn't get into the

12   complications, is that because you didn't ask?

13         A.    We didn't ask, and it wasn't

14   discussed.

15         Q.    Was there any reason why it wasn't

16   asked by the special committee?

17         A.    Because it wasn't -- it just wasn't

18   discussed.  No reason.

19         Q.    Was it not an important consideration

20   then?

21         A.    It is a consideration just like all

22   of the other considerations.

23         Q.    How would you weight that

24   consideration as opposed to other considerations?

25         A.    I wouldn't weight them at all.  I

1                        Wilderotter

2   look at this holistically.

3        Q.   Did you consider that particular

4   consideration, being the complications associated

5   with reserving the stock, in determining to

6   approve the settlement?

7        A.   It is one consideration.

8        Q.   Was it given any greater weight than

9   any other consideration?

10       A.   No.

11       Q.   Was the special committee told if any

12  of the other creditor constituencies had

13  approached the debtor about a competing plan or a

14  full reserve plan?

15            MR. SHERMAN:   I'm sorry.   Can I hear

16       that again.

17            (Record read)

18       A.   I think the special committee knew

19  that there could be a competing plan that was

20  outlined on page 5 that was referred to as the

21  purity plan that could be an alternative plan

22  that could be considered.

23       Q.   Was the purity plan discussed at the

24  October 11 meeting?

25       A.   Yes.

1                          Wilderotter

2          Q.    How extensive was the discussion of

3    it?

4          A.    The discussion was basically that it

5    would be an alternative plan.  We talked about

6    that the major difference is there would be no

7    settlement on the LBO litigation.  It would all

8    go into post bankruptcy.  That would also

9    complicate matters for the company when it

10   emerges from bankruptcy in terms of dealing with

11   lots of litigation on a go-forward basis.

12         Q.    Is it the special committee's view

13   that the company won't be dealing with litigation

14   under the currently proposed plan?

15         A.    No, we would be, but we would have

16   some settlements that were taken into

17   consideration, so it would alleviate some of the

18   overhang of litigation.

19         Q.    How would that alleviation of

20   overhang of litigation, how was that measured in

21   terms of benefit to the company?

22         A.    It was measured in the context of

23   this settlement that would take a number of the

24   large senior lender creditors, the UCC, so the

25   unsecured creditor committee, and it would take

1                       Wilderotter

2    those folks into consideration that with the

3    settlement it would reduce the risk of some level

4    of litigation, but it still preserves the right

5    for litigation for many of the parties as they

6    look on a go-forward basis.

7         Q.   When you say risk of litigation, risk

8    to whom?

9         A.   To the company in terms of going

10   through litigation with a number of the parties

11   on a number of the subjects.

12        Q.   Why did the special committee think

13   that the releases given under the proposed

14   settlement would be less litigation involving the

15   company than the purity plan?

16        A.   Well, I think it is about getting

17   some of the settlements done up front, getting

18   some of the payments done based upon that

19   settlement up front instead of having years and

20   years of litigation to settle any settlements at

21   all.  That is how we looked at it.

22        Q.   What analysis was done as to how

23   involved or uninvolved the company would be in

24   the litigation under the purity plan?

25        A.   I don't know the answer to that.

1                          Wilderotter

2          Q.    Was there any thinking that there

3   would be less litigation involving the company

4   under this particular -- under the term sheet

5   plan that is described in the deck?

6          A.    Less litigation for what?

7          Q.    Involving the company.

8          A.    On what?  Under what plan are you

9   talking about?

10         Q.    Under the plan that is outlined in

11  this deck versus the purity plan.

12              MR. SHERMAN:  I think I object to

13              form.  Can you just try that question

14              front to end again.

15              MR. WEINTRAUB:  I believe the witness

16              has testified that the special committee

17              thought that there would be less risk for

18              the company under the term sheet plan than

19              the purity plan going forward, because the

20              company would be less involved in

21              litigation.

22         Q.    Then correct me where I am wrong.

23         A.    I think what I said is by having some

24  of the settlements done up front, it takes

25  away -- my understanding of what was discussed at

1                         Wilderotter

2    this meeting on the purity plan is that all LBO

3    litigation would go into post bankruptcy.  There

4    would be no settlements at all up front in our

5    proposed settlement plan, and, because of that,

6    there would be more overhead on the part of the

7    company to manage a lot more -- the potential to

8    manage a lot more litigation.

9          Q.    When you say overhead, do you mean

10   expense?

11         A.    Not just expense, but time and effort

12   and energy and focus.  As we all know, that takes

13   a lot of time, effort, energy and focus.

14         Q.    How did you analyze the difference in

15   terms of what you term overhead between the

16   purity plan and the term sheet plan?

17         A.    I think what we looked at is

18   $520 million of value could be given to a number

19   of the creditors.

20               MR. WEINTRAUB:  I move to strike

21         that.

22               MR. SHERMAN:  Let her finish.

23               MR. WEINTRAUB:  That is not

24         responsive.

25               MR. SHERMAN:  Then you can move to

1                    Wilderotter

2        strike.

3              You are entitled to finish.

4        A.    For some of the litigation now versus

5    down the road.

6              MR. WEINTRAUB:  I move to strike as

7              non-responsive.

8        Q.    Was an analysis done of the overhead

9    to the company under the purity plan versus the

10   term sheet plan?

11       A.    I don't know if an analysis was done.

12       Q.    Did you do that analysis or any kind

13   of analysis like that?

14       A.    A written analysis, no.

15       Q.    A mental analysis?

16       A.    Yes, there was a discussion that we

17   had on it on the 11th.

18       Q.    What was said during that discussion?

19       A.    I've already told you what was said.

20   It was a discussion of the alternative of a

21   purity plan versus the settlement plan that we

22   voted to approve, and part of that discussion was

23   advancing value to a number of the creditors for

24   some of the litigation now versus down the road,

25   that that was a positive.

1                     Wilderotter

2          Q.   My question was not about advancing

3    value to the constituents, my question was about

4    what you referred to as the overhead to the

5    company going forward in litigation.

6               MR. SHERMAN:  Now I have lost track

7          of what your question is.  I thought she

8          responded to your last question.

9               MR. WEINTRAUB:  I don't believe she

10         did.

11              MR. SHERMAN:  Why don't you ask --

12         leave that question and give her a

13         question.

14         Q.   Are the officers and directors being

15    released under the term sheet plan?

16         A.   Not as far as I know.

17         Q.   So the company will be involved under

18    the term sheet plan in litigation involving its

19    officers and directors?

20         A.   It could be.

21         Q.   You said you had a hard stop at 5:50?

22         A.   Yes, I do.

23              MR. WEINTRAUB:  I'm not finished.  I

24         know that there are other people that want

25         to ask questions and you may want to ask

1                     Wilderotter

2         some questions, so I am going to stop now,

3         and we'll have to talk about when we can

4         resume at another time.

5              MR. SHERMAN:  We are not going to

6         resume at another time.  We had an

7         agreement on a schedule, and we met the

8         agreement, so ask all the questions you

9         want between now and ten to 6, and then we

10        are finished, but we can fight that out in

11        front of a judge eventually.

12             MR. WEINTRAUB:  We will fight that.

13        We don't need to fight that out here.  We

14        started at 3 o'clock in the afternoon or a

15        few minutes after.

16             MR. SHERMAN:  We started a few

17        minutes afterwards because technically you

18        weren't ready to proceed.  We were here at

19        3 o'clock, and you told us you would need

20        some time to get set up, but we're talking

21        about a couple of minutes.

22             MR. WEINTRAUB:  We're talking about a

23        couple of minutes.  And also I was here.

24        The court reporter was not here.

25             MR. SHERMAN:  Who ordered the court

1                        Wilderotter

2        reporter?

3            MR. WEINTRAUB:  I ordered the court

4        reporter.

5            MR. SHERMAN:  I guess that is your

6        responsibility.

7            MR. WEINTRAUB:  No, what is the

8        responsibility is we have noticed a

9        deposition and -- let me finish, Counsel.

10       We were given a curtailed day.  We could

11       have started at 9 o'clock in the morning,

12       but Ms. Wilderotter was not available at

13       9 o'clock in the morning, so we were given

14       from 3 to 6.  I don't concede -- let me

15       finish, Counsel.

16           MR. SHERMAN:  If you want to take

17       away the rest of your minutes by making

18       speeches, be my guest.

19           MR. WEINTRAUB:  I am going to,

20       because we are going to come back for

21       another deposition, and Judge Carey will

22       decide that, and the speech that I'm going

23       to make in the next few minutes is not

24       going to make a difference one way or the

25       other, but I do want the record to be

1                    Wilderotter

2          clear that most depositions are not three

3          hours, and we didn't agree to a three-hour

4          deposition.  We were given an ultimatum of

5          she is available from 3 to 6.  So we

6          didn't agree that that is the only

7          deposition that we would take.  We didn't

8          agree that we were going to take a

9          curtailed deposition.

10              At this point, I'm going to turn it

11          over to anyone else who has questions.  I

12          believe Brown Rudnick has some questions.

13              MR. SHERMAN:  Before you turn it

14          over, let me say, one, I think you were

15          offered a time period and you agreed that

16          you would do the deposition in the time

17          period.

18              I would also point out to you that

19          the notice of deposition that you served

20          called for areas of questioning far more

21          limited than what you have done.  You

22          didn't serve a notice, an amended notice,

23          and yet we have allowed you to take and

24          you have probably taken more than half of

25          the time asking questions outside your

1                    Wilderotter

2        notice of deposition.

3            I think if you probably restricted

4        yourself to what you noticed the

5        deposition for, you would have been

6        complete about an hour ago.  There is

7        nothing in your notice of deposition, you

8        never sent an amendment, that talked about

9        the plan or the proposed plan that you

10       have questioned about for about two hours

11       now.

12           MR. WEINTRAUB:  We can both make

13       speeches.

14           MR. SHERMAN:  If you have more

15       questions, ask them.  If not, let somebody

16       else ask questions.

17           MR. WEINTRAUB:  I'm not done with my

18       questions, but I will respond to what you

19       said.  Your firm canceled the deposition

20       saying there were new developments, and

21       the new development was the term sheet

22       that we spent a lot of time talking about,

23       because that was a new development, and

24       that is perfectly relevant to the trustee

25       motion, which seeks an independent

```
 1                    Wilderotter
 2         fiduciary to take over this case.
 3              I'm not finished with my deposition,
 4         and Judge Carey will decide who is right,
 5         you or me.
 6              MR. SHERMAN:  Ultimately that is
 7         true.
 8              MR. WEINTRAUB:  Yes.  I will turn it
 9         over to Brown Rudnick.
10    EXAMINATION BY MR. KLETTER:
11         Q.   Good afternoon, my name is Dylan
12    Kletter.  I'm with Brown Rudnick.  We represent
13    the PHONES.  Given what you have heard, I am
14    going to try and move a little quickly here.  Is
15    that fine with you?
16         A.   Yes.
17              MR. SHERMAN:  As long as we can hear
18         you.
19         Q.   You testified earlier today that the
20    special committee formed because of conflicts of
21    interest?
22         A.   I testified that members of the board
23    of directors that were independent directors on
24    the board could have conflicts based upon the
25    examiner's report and based upon that the special
```

1              Wilderotter

2    committee was formed with the four independent

3    directors that were not part of the board or

4    participated in the LBO.

5          Q.    So that conflict, that potential

6    conflict arose in December 2007?

7          A.    I don't know when the conflict arose.

8    It might have been even before that.

9          Q.    Prior to the formation of the special

10   committee, had you ever suggested the need to

11   form a special committee?

12         A.    No.

13         Q.    Has Mr. Zell ever assisted the

14   special committee?

15         A.    No.

16         Q.    You testified throughout today that

17   you received legal advice from Sidley Austin and

18   Jones Day, is that correct?

19         A.    Yes.

20         Q.    Is there any other law firm that you

21   have received legal advice from in these

22   bankruptcy cases?

23         A.    I don't know.  There might have been

24   other law firms that participated throughout the

25   last couple of years as part of the process, but

1                          Wilderotter

2    Sidley and Jones Day are who we have been using

3    as the special committee.

4          Q.    Have you ever received legal advice

5    from an individual not affiliated with a law

6    firm?

7          A.    Have I ever --

8          Q.    In connection with your role on the

9    board of directors and the independent committee.

10         A.    No.

11              MR. SHERMAN:   Clarification.  You are

12              talking about the special committee?

13              MR. KLETTER:   The special committee

14              or the board of directors, has she ever

15              received legal representation from an

16              individual in connection with these cases

17              from someone who is not affiliated with a

18              law firm.

19              MR. SHERMAN:   Some lawyer?

20              MR. KLETTER:   A lawyer or an

21              individual obviously.

22         Q.    Have you only been receiving legal

23    advice in connection with these cases from law

24    firms, to the best of your knowledge?

25         A.    I am really not quite sure what the

121

1                         Wilderotter

2    question is.

3         Q.    Let me be more specific.  Have you

4    ever considered Don Liebentritt to be your

5    attorney in these cases?

6         A.    He was the general counsel of the

7    company, and then he was the chief restructuring

8    officer.

9         Q.    I understand.

10        A.    He does provide guidance and input to

11   the board and the special committee.

12        Q.    Did you ever consider him your

13   attorney as a member of the board or the special

14   committee in these cases?

15        A.    I have considered him our attorney as

16   the general counsel of the company as a board

17   member, yes.

18        Q.    When he was appointed CRO, did that

19   belief cease?

20        A.    He is still a counselor to the

21   special committee and to the board.

22        Q.    So, even though Mr. Liebentritt is no

23   longer general counsel, you still consider him a

24   legal advisor?

25        A.    I consider him an advisor.

Wilderotter

1    Q.   But a legal advisor?

2    A.   I don't necessarily separate out

3    legal versus -- it is advice as part of the whole

4    process, and as the chief restructuring officer

5    he does provide advice to both the special

6    committee and the board.

7    Q.   To the best of your knowledge, has

8    Jones Day worked closely with Sidley and the

9    special committee to assess the status of these

10   bankruptcy cases upon their appointment?

11   A.   Yes, they have worked closely with

12   the advisors to the company.

13   Q.   Are you aware whether Sidley has

14   disclosed certain conflicts of interest in this

15   case?

16   A.   I'm not aware.

17   Q.   Would it concern you if Sidley had

18   conflicts of interest that they were advising

19   Jones Day?

20   MR. MILES:  Can I have the question

21   back.

22   A.   I'm not sure I understand the

23   question.

24   MR. SHERMAN:  You are going to hear

1                    Wilderotter

2          it again, and then we will see if anyone

3          understands it.

4               (Record read)

5               MR. SHERMAN:  Do you want to restate

6          that?

7               MR. KLETTER:  Sure.

8          Q.   If it was your understanding that

9     Sidley had conflicts of interest in this case,

10    would it concern you that they were bringing

11    Jones Day up to speed in this case?

12               MR. MILES:  I object to the form.  Is

13          that a hypothetical?

14               MR. KLETTER:  I guess she didn't

15          know, so, yes, it is a hypothetical.

16               MR. SHERMAN:  Objection to form.

17          A.   I don't know.

18          Q.   To the best of your knowledge, you

19    are not aware of any conflicts of interest with

20    Sidley & Austin?

21          A.   To the best of my knowledge, I'm not

22    aware.

23          Q.   Can you explain to me in layman terms

24    the difference in roles between Sidley and Jones

25    Day in this case?

1                           Wilderotter

2           A.    Yes.    Sidley has been the lawyer, the

3    legal firm that the company hired to give us

4    advice and counsel with regard to the bankruptcy

5    in the proceedings, and Jones Day was hired to be

6    advice and counsel to the special committee as

7    part of this process.

8           Q.    Did you receive legal advice in

9    connection with the current settlement from

10   Sidley Austin?

11          A.    Yes.

12          Q.    Did you receive legal advice in

13   connection with the settlement attached to the

14   first mediator's report from Sidley Austin?

15          A.    Yes.

16          Q.    Did you receive legal advice from

17   Sidley Austin in connection with the April

18   settlement?

19          A.    The April settlement?

20              MR. SHERMAN:    You are asking her in

21          her role on the special committee?

22              MR. KLETTER:    The special committee

23          wasn't formed in April, so I am asking in

24          her role on the board of directors.

25          A.    I don't know the answer to that

1                          Wilderotter

2    because I don't know what settlement you are

3    talking about in April, but, as I said, Sidley

4    has been our attorneys for the board.

5            Q.    Are you aware that Angelo Gordon,

6    JP Morgan, Centerbridge and Law Debenture entered

7    into a settlement support agreement in April of

8    this year?

9            A.    Yes.

10           Q.    Had you received any legal advice

11   from Sidley in connection --

12               MR. SHERMAN:   I have a problem.   You

13           didn't serve a separate notice of

14           deposition or subpoena.   I don't think

15           your questioning is within the boundaries

16           of anything that was in either the

17           subpoena or the notice, and, to the extent

18           some parties are complaining we are short

19           of time, I think you probably ought to be

20           careful about that.

21           Q.    During this current settlement, did

22   the special committee ever reach out to creditor

23   constituencies?

24           A.    Did the special committee?   As a

25   committee?

1                    Wilderotter

2          Q.    Yes.

3          A.    No.

4          Q.    In your view, was JP Morgan a

5    critical component of this settlement plan?

6          A.    Yes.

7          Q.    Why is that?

8          A.    Because they were a big lender as

9    part of the process.

10         Q.    Are you familiar with the law firm of

11   Novack & Macy?

12         A.    No.

13         Q.    Did you have any role in the

14   application seeking to retain Novack & Macy in

15   this case?

16         A.    No.

17         Q.    Did you as the member of the special

18   committee have any role in whether to file a

19   complaint against Morgan Stanley in this case?

20         A.    The board of directors had a role in

21   looking at filing a complaint in this case

22   against Morgan Stanley.

23         Q.    Do you consider the board of

24   directors taking that action consistent with the

25   duties of the special committee in this case?

1                        Wilderotter

2          A.    Yes, I do.

3          Q.    What is your view of the special

4    committee in terms of who to resolve or take

5    claims against?

6                 MR. SHERMAN:   I --

7          A.    One more time.

8          Q.    Just trying to move quickly here.

9          A.    I know.

10         Q.    Do you have a view of whether it is

11   up to the special committee or the board of

12   directors to initially decide to pursue lawsuits

13   against various entities in this case?

14         A.    I think it is situational.  I think

15   you have to look at each instance, and we would

16   make that decision based upon the special

17   committee's role, which our role is really about

18   working to get a settlement, a restructuring, in

19   order to get the company to emerge out of

20   bankruptcy and to maximize value to the creditors

21   as part of that process.  That is our scope.  So,

22   if there was something in that scope, the special

23   committee would be involved.

24         Q.    Is one of the scopes of the special

25   committee to resolve certain LBO causes of

1                     Wilderotter

2    action?

3         A.    No.

4              MR. KLETTER:    Do you want to go back

5         for these last few minutes?

6              MR. WEINTRAUB:    Sure.    Let's go to

7         page 8 of the deck.

8              MR. SHERMAN:    I take it that means

9         none of the other lawyers in the room had

10        questions?    Is that right?    Yes.    Okay.

11        Mr. Brown Rudnick, Mr. Phones, you have

12        now finished your questions?

13             MR. KLETTER:    We have finished our

14        questions, subject to the continuance of

15        this deposition.

16             MR. SHERMAN:    No, somebody is going

17        to say he is finished.    We are not playing

18        tag team.    He said he was suspending to

19        let you go.    You go or you run out the

20        clock or otherwise we are finished for

21        today or you say you are finished.    Do you

22        have any more questions?

23             MR. KLETTER:    I don't think that is

24        appropriate.

25             MR. SHERMAN:    I understand you don't.

```
 1                      Wilderotter
 2              MR. WEINTRAUB:  We are not going to
 3         joust because now you are taking up my
 4         time.  So may I continue?
 5              MR. SHERMAN:  Your idea is you guys
 6         can ask as many questions as you want and
 7         then reserve until next time and pass the
 8         baton back and forth.  Just so it is
 9         clear.
10              MR. WEINTRAUB:  Counsel, may I
11         continue?
12              MR. SHERMAN:  You can continue as
13         soon as I am finished talking.
14              MR. WEINTRAUB:  Are you going to be
15         finished soon?
16              MR. SHERMAN:  If you listen, you will
17         find out.  Our position is that you have
18         finished, because you don't have any more
19         questions.
20              MR. KLETTER:  I understand your
21         position.
22    EXAMINATION (Continued)
23    BY MR. WEINTRAUB:
24         Q.   On page 8 of the deck.
25         A.   Yes.
```

1                      Wilderotter

2          Q.    Your handwritten notes towards the

3    top of the page, six scenarios, five of six.

4          A.    Yes.

5          Q.    What does that refer to?

6          A.    It refers to certain scenarios of

7    settlement that were in the examiner's report.

8          Q.    Did you personally review those

9    scenarios?

10         A.    No.

11         Q.    Did anyone on the special committee

12   review those scenarios?

13         A.    I don't know.

14         Q.    Did you discuss it with any of the

15   other members of the special committee?

16         A.    It was discussed at the time that we

17   talked about the settlement considerations on

18   October 11.

19         Q.    So, other than what is printed in the

20   deck and what was discussed by who made the

21   presentation, you didn't make an independent

22   review of the five of six scenarios referred to

23   in your notes?

24         A.    That's correct.

25         Q.    Are you familiar with the

1                         Wilderotter

2    nomenclature used by the examiner in the report

3    in terms of probability of success in litigation?

4              A.    The nomenclature?

5              Q.    The words.

6              A.    Probability of success in --

7              Q.    Yes.  When he says something is

8    reasonably likely or reasonably unlikely, are you

9    familiar with the terminology that he used in the

10   report?

11             A.    I am familiar with that terminology.

12             Q.    Did you attribute any percentages in

13   your own mind to the terms used by the examiner

14   in the report?

15             A.    I didn't -- no, not percentages.

16             Q.    So, when he used the term "highly

17   likely," you didn't associate a percentage with

18   that?

19             A.    No.

20             Q.    Do you have an opinion?

21             A.    It is a high percentage.

22             Q.    How high?

23             A.    I don't know.  High.  More than

24   50 percent.

25             Q.    More than 60 percent?

1                    Wilderotter

2       A.   Probably.

3       Q.   More than 70 percent?

4            MR. SHERMAN:  I object to the form.

5       Q.   You can answer the question.

6       A.   Maybe.

7       Q.   More than 80 percent?

8       A.   I don't know.  It is highly likely.

9  It is what it is.

10      Q.   What about reasonably likely?

11      A.   Again, I didn't assign a percentage

12  to any of those terms.

13      Q.   So you didn't assign a percentage to

14  somewhat likely?

15      A.   No.

16      Q.   Close but likely?

17      A.   No.

18      Q.   Equipoise?

19      A.   I don't even know what equipoise is.

20  Sorry.

21      Q.   Somewhat unlikely?

22      A.   No.

23      Q.   Reasonably unlikely?

24      A.   No.

25      Q.   Highly unlikely?

1                          Wilderotter

2           A.    No.

3                 MR. WEINTRAUB:  I would like to mark

4           as the next exhibit an excerpt of the

5           examiner's report.

6                 (Wilderotter Exhibit 6, Excerpt of

7           examiner's report, was so marked for

8           identification, as of this date.)

9           Q.    You testified earlier that you read

10    portions of the examiner's report?

11          A.    I did.

12          Q.    Can you turn to the first page of the

13    exhibit which -- second page of the exhibit which

14    is page 32.

15          A.    Yes.

16          Q.    Do you see the highlighted language

17    there?

18          A.    Yes.

19          Q.    Can you read that, please?  You can

20    read it to yourself.

21          A.    Yes.

22          Q.    Did the special committee take that

23    statement into account in making a determination

24    as to whether or not to accept the term sheet?

25          A.    No.

```
 1                      Wilderotter
 2        Q.   Do you agree with this statement?
 3        A.   I'm not in a position to agree with
 4   the statement.  I'm not a lawyer.  I haven't
 5   reviewed all the facts of the case.  It is just a
 6   conclusion that the examiner put in here.
 7        Q.   So you don't agree with it or
 8   disagree with it?
 9        A.   I don't agree or disagree with it.
10        Q.   I am going to ask you the same
11   question with respect to the highlighted language
12   on page 54.
13        A.   Okay.
14        Q.   Was that taken into account by the
15   special committee --
16        A.   No.
17        Q.   -- in making its determination?
18        A.   No.
19        Q.   Do you agree with it or disagree with
20   it?
21        A.   I was not on the board or part --
22   associated with Tribune in October 2007, so I
23   neither agree nor disagree.
24        Q.   Did you make an independent
25   determination as to whether or not there was an
```

1                         Wilderotter

2    unjustifiable growth rate assumption for the

3    years 2013 through 2017?

4          A.    No.

5          Q.    You have no opinion on that?

6          A.    No.

7          Q.    Page 63.  Do you remember reading

8    this part of the report?

9          A.    Yes.

10         Q.    Was the highlighted language taken

11   into account by the special committee in

12   evaluating the settlement?

13         A.    No.

14         Q.    Do you have a view as to whether

15   Tribune's management was deceitful in the

16   preparation and issuance of this aspect of the

17   October forecast?

18         A.    I was not around during that period

19   of time, so I have no opinion on that at this

20   point.

21         Q.    That is not anything the special

22   committee looked into?

23         A.    No.

24         Q.    The next page of the report is 183.

25   The shaded language.  Was this conclusion taken

1                     Wilderotter

2    into account by the special committee in

3    evaluating the settlement?

4           A.    On all of these specific paragraphs,

5    no.

6           Q.    Can you just, if you want to,

7    quickly, go through the rest of the pages and

8    tell me if any of the shaded language was

9    something that was taken into account by the

10   committee and we can focus on that.

11          A.    Yes.  The answer would be what we

12   took into account was to reserve the right for

13   members of this bankruptcy if they want to file

14   lawsuits or litigation to try to narrow releases

15   and make sure that there is still the right and

16   we didn't take a right away from people, that if

17   they wanted to pursue claims, they could do so.

18   That is how we looked at it.

19          Q.    But the step 1 lenders are being

20   released, correct?

21          A.    There is still the case that if --

22   there is still an opportunity to assess what

23   happened in step 1.

24          Q.    If the settlement is approved there

25   is an opportunity to --

                         Wilderotter

1

2        A.   Well, the settlement is one thing.  I

3    am talking about from the examiner's report

4    perspective.

5        Q.   I am talking about did you take into

6    account any of the shaded conclusions of the

7    examiner in determining whether or not the

8    settlement was fair and reasonable?

9        A.   I would have to read all of them

10   first before I can answer.

11       Q.   That is what we are doing.

12       A.   Yes.  What does equipoise mean?

13       Q.   I believe it means 50-50.

14       A.   Okay.

15            MR. SHERMAN:  Here is a man that

16            knows how to quantify words.  It probably

17            means an equal balance is probably what it

18            means.

19            MR. WEINTRAUB:  I will admit I had to

20            look it up when I first read it.

21            MR. SHERMAN:  You thought it had to

22            do with horseback riding, did you?

23            MR. WEINTRAUB:  That's right.

24            THE WITNESS:  It is like a spelling

25            bee.  If you could do your question one

1                      Wilderotter

2          more time.

3          Q.   Did the special committee or you as a

4   member of the special committee take into

5   consideration in evaluating the settlement any of

6   the conclusions highlighted in the shaded

7   language in the pages that I have handed to you

8   which are excerpts from the examiner's report?

9                MR. SHERMAN:  Let's be clear the

10               question you are asking.  You are asking

11               with respect to each of the highlighted

12               pieces individually, or are you asking

13               whether they gave any consideration in the

14               process to the fact that there was an

15               examiner's report that contained these?

16               MR. WEINTRAUB:  No, each individual.

17               MR. SHERMAN:  You just want her to

18               focus whether they discussed these

19               individual ones?  I just want to

20               understand what you are asking.

21          Q.    Let me clarify.  I thought we were on

22   the same wavelength, but then you veered away at

23   the last second.  I am asking you did the members

24   of the special committee take into consideration

25   the examiner's conclusions as referenced in the

1                    Wilderotter

2    highlighted sections in determining whether to go

3    along with the settlement set forth in the term

4    sheet?

5         A.   Since there is only part of this that

6    is highlighted, I would say that in a restrictive

7    sense we didn't look at each one of these

8    paragraphs and take those into consideration in

9    making our decision.

10        Q.   Are there any -- we can go through

11   them one at a time.  I am trying to save time,

12   but maybe I will have to go through them one at a

13   time.  Was there anything that you agree with or

14   disagree with in these conclusions?

15             MR. SHERMAN:  In your highlighted

16        conclusions?

17             MR. WEINTRAUB:  Yes.

18             MR. SHERMAN:  You are not asking

19        about the whole?  You are not, I take it,

20        suggesting in your questions that they are

21        unaware that there was an examiner's

22        report and didn't consider it at all?

23        Q.   No, did you agree with it?  Did you

24   disagree with it?

25             MR. SHERMAN:  But that is why I

1                         Wilderotter

2         wanted the clarification.  You obviously

3         prepared an exhibit which has a few pages

4         out of a very lengthy report and you

5         highlighted a few lines on those pages and

6         you focus on those in particular, so your

7         question is specifically did they talk

8         about these particular --

9             MR. WEINTRAUB:  No, I guess we will

10        do it the long way.

11        A.   Well, let me answer the question.

12        Q.   No, I will restart.

13        A.   Okay.

14        Q.   I think we went through the first one

15    and the second one at page 54.

16        A.   Correct.

17        Q.   I think we asked you about page 63.

18    Is that correct?

19        A.   Yes.

20        Q.   Okay.  Page 183.  Here the examiner's

21    conclusion is "In measuring capital adequacy at

22    the time of step 1, however, a court is highly

23    likely to consider all obligations that were

24    reasonably foreseeable at the time of step 1

25    including those caused by step 2."

1                         Wilderotter

2                Do you agree with that statement?

3         A.    I don't agree or disagree with the

4    statement.

5         Q.    Did you consider that the examiner's

6    opinion -- that this statement reflects the

7    examiner's opinion?  Did you take that into

8    consideration in approving the settlement set

9    forth in the term sheet?

10        A.    Not that specific line, no.

11        Q.    Was there some other aspect of the

12   report that you took into consideration?

13        A.    I think as you look at the

14   settlement, it is about capital and the

15   allocation of capital that was either from the

16   debt that was raised in either step 1 and/or

17   step 2, and in holistic approaches we looked at

18   the capital, not from an adequacy point of view,

19   but in terms of the right amount for settlement

20   and also a litigation trust and the opportunity

21   that, if folks are going to have litigation on a

22   go-forward basis, they could be based on this

23   examiner's report.  We took that into

24   consideration as part of the settlement.

25        Q.    How were you using the term "capital"

142

1                        Wilderotter

2  in your last answer?

3         A.    Capital in terms of the total amount

4  of debt raised.

5         Q.    Total amount of debt raised at what

6  time?

7         A.    Total amount of debt raised.  There

8  is step 1 debt, and then there was step 2 debt.

9  There are two different tranches of debt.

10        Q.    You took the amount of debt into

11 consideration in reaching the settlement?

12        A.    Yes.

13        Q.    Is that what you understand the

14 examiner to be referring to when he uses the term

15 "capital adequacy" on page 183?

16        A.    No, he is referring to -- I'm not

17 going to get into what he is referring to,

18 because I'm not the examiner.

19        Q.    So you don't know what he is

20 referring to?

21        A.    I would have to read not just his

22 conclusion, but what led up in the dialogue of

23 his report to that conclusion to give you an

24 answer.

25        Q.    Did you read that previously?

1                              Wilderotter

2          A.    Not that I remember this section.

3          Q.    With respect to page 187?

4          A.    Okay.

5          Q.    The examiner says in the highlighted

6    carry-over to page 188.

7          A.    Right.

8          Q.    The examiner finds that "A court is

9    highly likely to find that Tribune was solvent as

10   of and after giving effect to the step 1

11   transactions if the step 2 debt is not included

12   for purposes of that determination.  The examiner

13   finds that to the extent that the effects of

14   step 2 including the step 2 debt are considered

15   in connection with step 1 solvency, credible

16   assertions could be made that Tribune was

17   insolvent at step 1, but the examiner concludes

18   that it is somewhat likely, although a very close

19   call, that a court nonetheless would find that

20   Tribune was solvent in that circumstance as

21   well."

22                Do you agree or disagree with that

23   conclusion?

24         A.    I can't make a judgment on whether I

25   agree or not, because I was not there and I have

1                       Wilderotter

2    not read all of the details associated with that.

3    The conclusion I draw from that is the examiner

4    feels that it would be highly likely that the

5    company was still considered solvent after the

6    step 1 tranche of debt that was raised.

7         Q.    But then in the second sentence he

8    says, "To the extent the effects of the step 2

9    including the step 2 debt are considered in

10   connection with step 1 solvency, credible

11   assertions could be made that Tribune was

12   insolvent in step 1."

13        A.    But it also says it would be a close

14   call.  Right.

15        Q.    What do you understand a close call

16   to mean?

17        A.    Well, that it would still be somewhat

18   likely that the court would still find that

19   Tribune was still solvent.

20        Q.    So what percentage would you put on

21   somewhat likely?

22        A.    I wouldn't put any percentage on it.

23   I haven't done enough homework on that to have

24   that opinion.

25        Q.    What percentage would you put on

1                      Wilderotter

2    although a very close call?

3          A.    I wouldn't.

4          Q.    Do you think that although a very

5    close call and somewhat likely are the same

6    percentage?

7          A.    I have no idea.

8          Q.    On page 220, "The examiner finds that

9    a court is highly likely to conclude that the

10   step 2 transactions rendered Tribune insolvent."

11              Do you agree or disagree with that

12   statement?

13         A.    I don't have an opinion on it,

14   because you would have to look at all of the

15   facts associated with coming to that conclusion.

16         Q.    Was the examiner's determination that

17   a court is highly likely to conclude that step 2,

18   the step 2 transactions rendered Tribune

19   insolvent, was that taken into consideration by

20   the special committee in agreeing to the

21   settlement?

22         A.    No.

23         Q.    It was not?  Was it ignored?

24         A.    No, it wasn't ignored, but we all

25   know that that is a backdrop for what the

146

1                         Wilderotter

2   settlement was.  The examiner's report was part

3   of the backdrop of all of the decisions that we

4   made overall.

5            Q.    When you say a backdrop, what do you

6   mean by a backdrop?

7            A.    We know that the examiner's report

8   has come out.  We know that he has drawn specific

9   conclusions that would need to be reviewed and

10  looked at and decisions made whether they are

11  true or not.  That is part of the backdrop of

12  this settlement process.

13           Q.    When did you join the Tribune board

14  of directors?

15           A.    I don't know the exact date, but it

16  was in the first part of 2008.

17           Q.    Or the end of 2007 possibly?

18           A.    No.

19           Q.    Who approached you about joining the

20  Tribune board?

21           A.    Sam Zell.

22           Q.    How do you know Sam Zell?

23           A.    I have known Sam Zell from a business

24  perspective for a number of years.  I sat on

25  several public company boards that he has had a

1                     Wilderotter

2    majority interest in.

3         Q.    How did you come to sit on those

4    boards?

5         A.    Actually, it was one of his partners.

6    Many years ago I was in the cable television

7    industry and they bought a company, a hardware

8    provider in that industry, and one of his

9    partners asked me if I would like to serve on

10   that board, and I did.

11             I served on that board for several

12   years.  I never met Sam during that period of

13   time.  It wasn't until after I left that board of

14   directors that I met Sam subsequently down the

15   road when I served on another board that he

16   happened to be chairman of.

17        Q.    How many boards have you served on

18   where Sam Zell was either a shareholder of the

19   company or on the board?

20        A.    Three.

21        Q.    What companies are those?

22        A.    Antech, Jaycor and Anexter.

23        Q.    Do you still sit on any of those

24   boards?

25        A.    No.

1                      Wilderotter

2          Q.    Why not?

3          A.    I left the Antech board when I took a

4    new job that did not allow me the time and

5    attention to continue to focus on that.  I left

6    the Jaycor board because it was sold to Clear

7    Channel.  And I left the Anexter board when I

8    took the job here at Frontier, because Anexter is

9    a customer of Frontier, and I felt it was a

10   conflict.

11         Q.    I'm sorry.

12               MR. WEINTRAUB:  Could you read back

13         the answer.

14               (Record read)

15         Q.    Do you know where Don Liebentritt

16   worked before becoming the chief restructuring

17   officer of Tribune?

18         A.    No.  I know he has worked with Sam in

19   the past.

20         Q.    Do you know how extensively he has

21   worked with Sam?

22         A.    No.

23         Q.    How do you know that he worked with

24   Sam in the past?

25         A.    Because he has told me that.

Wilderotter

1

2    Q.    Since joining the Tribune board, what

3    communications have you had with Mr. Zell?

4        A.    A lot.

5        Q.    How frequently do you speak?

6        A.    It depends.    We will talk sometimes

7    once a month, sometimes a couple of times a

8    month, at board meetings.

9        Q.    What do you talk about?

10        A.    We talk about the business.    We talk

11    about the business environment.    We talk about

12    the economy.

13        Q.    Do you talk about the work of the

14    special committee?

15        A.    Since we formed the special

16    committee, I have not -- I actually talked to Sam

17    about the special committee yesterday.

18        Q.    What was the nature of that

19    conversation?

20        A.    We had approved the settlement, and

21    he and I talked after that approval, and he said

22    how did the meeting go, and I said it went fine

23    and we approved the settlement.

24        Q.    Did you talk before the meeting with

25    Mr. Zell about the settlement?

1                     Wilderotter

2          A.    No.

3          Q.    Before I think you said yesterday,

4    before yesterday, when was the last time you

5    spoke with Mr. Zell?

6          A.    Last week.

7          Q.    What was that conversation about?

8          A.    It was about The New York Times

9    article.

10         Q.    What did he say about The New York

11   Times article?

12         A.    He of course was disappointed in the

13   article as I think all of us were, and he and I

14   had a conversation with regard to leadership and

15   the instances that were cited in the article.

16         Q.    What communications have you had with

17   Chandler Bigelow since joining the Tribune board?

18         A.    Well, I sit on and chair the

19   compensation committee, and Chandler as the CFO

20   attends those meetings.  I have also had

21   interactions with him with regard to budget

22   reviews reporting, board reports on the

23   financials of the company, so I have interacted

24   with him as most board members would interact

25   with a CFO.

1                          Wilderotter

2          Q.    Did you interact with him about

3    whether or not he would be released under the

4    plan?

5          A.    Excuse me?

6          Q.    Did you interact with him on whether

7    or not he would be released under the plan?

8          A.    No.

9          Q.    Do you think he should be released

10   under the plan?

11         A.    Under what plan?

12         Q.    The plan term sheet.

13         A.    No.

14         Q.    Why not?

15         A.    Because I believe he is a solid CFO

16   and he is doing a good job for Tribune.

17         Q.    I meant released --

18              MR. SHERMAN:  He is talking about

19         legal release.

20         Q.    From liability.

21         A.    I meant like he is gone.

22              MR. SHERMAN:  No, lawyer's secret

23         language.

24         A.    Sorry.  No.  I don't think he should

25   be released in your vernacular.  Sorry.

1                          Wilderotter

2          Q.    Why not?

3          A.    Because I think you have to look at

4    what the examiner's report said about the

5    financial management and the schedules and

6    forecasts that they prepared and take a look at

7    that and decide whether there is anything to it

8    or not.

9          Q.    Is that something that the special

10   committee has undertaken to look --

11         A.    No.

12         Q.    -- into whether or not there was

13   anything to it?

14         A.    No.

15         Q.    Do you agree or disagree with what

16   the examiner has said about Mr. Bigelow?

17         A.    I have my own opinion that I think

18   Chandler Bigelow is an honest CFO with a lot of

19   integrity, but again I wasn't around during that

20   period of time, so I have no knowledge to dispute

21   the examiner's decision or support it.

22         Q.    Do you know if the board as distinct

23   from the special committee has undertaken an

24   investigation into the allegations against Mr.

25   Bigelow?

Wilderotter

A.   I believe that the board has looked
at Chandler Bigelow in light of the examiner's
report, and we have concluded that he should
continue to be the CFO of the company.

Q.   What was the basis for that
conclusion?

A.   That we don't believe, based upon the
investigations that have been done on the
information, that Chandler has done anything
wrong.

Q.   And what investigations were done on
the information?

A.   How the board has looked at through
management and third-party views of what Chandler
worked on on behalf of the company, that there
was nothing that he did wrong in the position he
was in in the financial group, so we have
confidence in him and that he should stay as CFO
until that is proven otherwise.

Q.   Who conducted that investigation?

A.   I don't know who in particular, but
it was a discussion that took place at a board
meeting.

Q.   Was there a written report?

                         Wilderotter

1

2       MR. SHERMAN:  Excuse me.  Are you

3  suggesting that the questions, the line of

4  questioning you are now pursuing falls

5  within your notice of deposition and

6  subpoena?

7       MR. WEINTRAUB:  I'm not suggesting

8  one way or the other.  I am asking my

9  questions.  Are you instructing the

10  witness not to answer?

11       THE WITNESS:  Yes, I have to go too,

12  so.

13       MR. SHERMAN:  I think at that point

14  it becomes moot.  What I am suggesting is

15  that you served a notice of deposition and

16  you served a subpoena.  You called for

17  questioning on certain subjects, and you

18  are wandering beyond the subjects.

19       MR. WEINTRAUB:  I don't believe I am,

20  Counsel.

21       MR. SHERMAN:  We probably don't have

22  to argue about it at this point.

23       MR. WEINTRAUB:  I am sure we don't

24  right now, but we will argue that in front

25  of Judge Carey, I am sure very shortly.

1                    Wilderotter

2              MR. SHERMAN:  I am sure we have a lot

3         of things to argue about.

4              MR. WEINTRAUB:  But we don't have to

5         fight about the meaning of equipoise.

6              MR. SHERMAN:  No.  You have a numbers

7         idea of it, and I have a verbal idea of

8         what it means.

9              THE WITNESS:  Thank you very much.  I

10        appreciate your coming here.

11             MR. SHERMAN:  We'll read and sign.

12             THE VIDEOGRAPHER:  The time is 6:11

13        p.m.  We are going off the record.

14             (Time noted:  6:11 p.m.)

15                    _____

16

17   Subscribed and sworn to

18   before me this_____day of_____, 2010.

19   _____

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4              I, Joseph R. Danyo, a Shorthand

5    Reporter and Notary Public, within and for the

6    State of New York, do hereby certify:

7              That I reported the proceedings in

8    the within entitled matter, and that the within

9    transcript is a true record of such proceedings.

10             I further certify that I am not

11   related, by blood or marriage, to any of the

12   parties in this matter and that I am in no way

13   interested in the outcome of this matter.

14             IN WITNESS WHEREOF, I have hereunto

15   set my hand this 14th day of October, 2010.

16

17

18

19                         JOSEPH R. DANYO

20

21

22

23

24

25

1

2                        I N D E X

3   Witness                                      Page

4   MARY AGNES WILDEROTTER                          6

5

6

7

8                      E X H I B I T S

9   Wilderotter                                  Page

10      1   Document beginning with Bates          13
            number MW 10 containing e-mail
11          dated September 20, 2010 from Mark
            Shapiro to Don Liebentritt
12
        2   Document beginning with Bates          15
13          number MS 37 containing e-mail
            dated September 20, 2010 from Ms.
14          Wilderotter to Mark Shapiro

15      3   Document beginning with Bates          19
            number MS 115
16
        4   Term sheet                             27
17
        5   Document bearing Bates numbers         73
18          MW 28 through MW 38

19      5   Remarked                               75

20      6   Excerpt of examiner's report          133

21                         oOo

22

23

24

25

1        OCTOBER 13, 2010 -  MARY AGNES WILDEROTTER

2                    E R R A T A

3        I wish to make the following changes, for the

4    following reasons:

5    PAGE LINE

     _____ _____    CHANGE  _____
6                   REASON  _____

7    _____ _____    CHANGE  _____
                    REASON  _____
8
     _____ _____    CHANGE  _____
9                   REASON  _____

10   _____ _____    CHANGE  _____
                    REASON  _____
11
     _____ _____    CHANGE  _____
12                  REASON  _____

13   _____ _____    CHANGE  _____
                    REASON  _____
14
     _____ _____    CHANGE  _____
15                  REASON  _____

16   _____ _____    CHANGE  _____
                    REASON  _____
17
     _____ _____    CHANGE  _____
18                  REASON  _____

19   _____ _____    CHANGE  _____
                    REASON  _____
20
     _____ _____    CHANGE  _____
21                  REASON  _____

22   _____ _____    CHANGE  _____
                    REASON  _____
23
     _____ _____    CHANGE  _____
24                  REASON  _____
     _____ _____    CHANGE  _____
                    REASON  _____