Exhibit 1

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

CHAPTER 11

CASE NO. 08-13141(KJC)

IN RE:                              :
                                    :
                                    :
TRIBUNE COMPANY, ET AL,             :
          DEBTORS.                  :


        Transcript of the videotape deposition of

MARK SHAPIRO, called for Oral Examination in the

above-captioned matter, said deposition taken by and

before SILVIA P. WAGE, a Certified Shorthand

Reporter, Certified Realtime Reporter, Registered

Professional Reporter, and Notary Public for the

State of New Jersey, at the offices of JONES DAY,

222 East 41st Street, New York, New York, on

Wednesday, October 13, 2010, commencing at 3:26 p.m.


JOB NO. 3831

HUDSON REPORTING & VIDEO                 1-800-310-1769

2

```
 1   A P P E A R A N C E S:
 2
             FRIEDMAN KAPLAN SEILER & ADELMAN, LLP
 3           BY:  ROBERT J. LACK, ESQ.
             BY:  GREGORY W. FOX, ESQ.
 4           1633 Broadway
             New York, New York  10019-6708
 5           (212) 833-1100
             Rlack@fklaw.com
 6           Gfox@fklaw.com
             Counsel for Aurelius Capital Management LP
 7
             JONES DAY
 8           BY:  THOMAS F. CULLEN, JR., ESQ.
             BY:  DAVID G. HEIMAN, ESQ.
 9           51 Louisiana Avenue, N.W.
             Washington D.C. 20001-2113
10           (202) 879-3939
             Tfcullen@jonesday.com
11           Dgheiman@jonesday.com
             Counsel for Special Committee
12
             SIDLEY AUSTIN LLP
13           BY:  JAMES F. BENDERNAGEL, JR.
             1501 K Street, N.W.
14           Washington D.C.  200005
             (202) 736-8136
15           Jbendernagel@sidley.com
             Counsel for the Debtors
16
             HENNIGAN BENNETT & DORMAN, LLP
17           BY:  JAMES O. JOHNSTON, ESQ.
             865 South Figueroa Street, Suite 2900
18           Los Angeles, California  90017
             (213) 694-1030
19           Johnstonj@hbdlawyers.com
             Counsel for the Credit Agreement Creditors
20
             DAVIS POLK & WARDWELL, LLP
21           BY:  KAREN LUFTGLASS, ESQ.
             450 Lexington Avenue
22           New York, New York  10017
             (212) 450-4775
23           Karen.luftglass@davispolk.com
             Counsel for J.P. Morgan Chase
24
25
```

```
 1    A P P E A R A N C E S   C O N T I N U E D:
 2
              JENNER & BLOCK LLP
 3            BY:  ANDREW W. VAIL, ESQ.
              353 N. Clark Street
 4            Chicago, Illinois  60654-3456
              (312) 840-8688
 5            Avail@jenner.com
              Counsel for Sam Zell and GITRB
 6
              CHADBOURNE & PARKE LLP
 7            BY:  MARC D. ASHLEY, ESQ.
              30 Rockefeller Plaza
 8            New York, New York  10112
              (212) 408-5100
 9            Mashley@chadbourne.com
              Counsel for the Creditors Committee
10
              BROWN RUDNICK LLP
11            BY:  KATE S. BROMBERG, ESQ.
              Seven Times Square
12            New York, New York  10036
              (212) 209-4800
13            Kbromberg@brownrudnick.com
              Counsel for Wilmington Trust Company
14
              ZUCKERMAN SPAEDER, LLP
15            BY:  LAURA NEISH, ESQ.
              1540 Broadway, Suite 1604
16            New York, New York  10036
              (646) 746-8649
17            Lneish@zuckerman.com
              Special Counsel for the Debtors Committee
18
              WILMER HALE
19            BY:  MICHELLE GOLDIS, ESQ.
              399 Park Avenue
20            New York, New York  10022
              (212) 295-6329
21            Michelle.goldis@wilmerhale.com
              Counsel for Angelo Gordon
22            (VIA TELEPHONE)
23
24
25
```

```
 1   A P P E A R A N C E S   C O N T I N U E D:

 2
         McCARTER & ENGLISH
 3       BY:  KATHARINE L. MAYER, ESQ.
         405 N. King Street, 8th Floor
 4       Wilmington, Delaware  19801
         (302) 984-6312
 5       Kmayer@mccarter.com
         Counsel for Deutsche Bank Trust Company
 6       (VIA TELEPHONE)

 7       WHITE & CASE, LLP
         BY:  J. CHRISTOPHER SHORE, ESQ.
 8       1155 Avenue of the Americas
         New York, New York  10036-2787
 9       (212) 819-8394
         Cshore@whitecase.com
10       Counsel for the Bridge Lenders

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X
 2   WITNESS:  MARK SHAPIRO                    PAGE
        EXAMINATION BY MR. LACK               9
 3      EXAMINATION BY MS. BROMBERG           152
 4
                    E X H I B I T S
 5
     NO.          DESCRIPTION                  PAGE
 6   Shapiro-1    Term Sheet for Joint Plans   11
                  Supported by Debtors Official
 7                Committee of Unsecured
                  Creditors, Oaktree, Angelo
 8                Gordon and J.P. Morgan and
                  endorsed by mediator released
 9                on 10/12/10
     Shapiro-2    Term Sheet of Joint Plan of  12
10                Debtors, Oaktree and Angelo
                  Gordon arising from mediation
11                released on 9/28/10
     Shapiro-3    Series of e-mails and        12
12                attachment entitled, Special
                  Committee Discussion Materials
13                dated 10/10/10 FW50 to FW62
     Shapiro-4    9/9/10 series of e-mails MS115 72
14                & 116
     Shapiro-5    9/13/10 e-mail MS2           79
15   Shapiro-6    10/1/10 series of e-mails    82
                  MS102 to 104
16   Shapiro-7    9/28/10 e-mail MS97          86
     Shapiro-8    8/26/10 Tribune Company      94
17                Unanimous Written Consent of
                  the Board of Directors in Lieu
18                of a Meeting MW5 to MW8
     Shapiro-9    9/7/10 e-mail and attachment 95
19                entitled Tribune Company
                  Unanimous Written Consent of
20                the Board of Directors in Lieu
                  of a Meeting FW7 to FW10
21   Shapiro-10   notice of deposition and     100
                  subpoena
22   Shapiro-11   10/11/10 Privilege Log of Mark 109
                  Shapiro
23   Shapiro-12   draft minutes of Special     123
                  Committee meetings 9/1/10 FW37
24                & 38
     Shapiro-13   draft minutes, of Special    123
25                Committee meetings 9/10/10
```

1

E X H I B I T S

2

Shapiro-14   draft minutes, of Special         123
3                      Committee meetings 9/17/10
                       FW39 & FW40
4       Shapiro-15   draft minutes of Special          124
                       Committee meetings 9/28/10
5                      FW42 & FW43
        Shapiro-16   9/30/10 e-mail MS101              142
6       Shapiro-17   e-mail MS0000059 to 60            153
        Shapiro-18   Exhibit B from Docket No. 4808    156

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line      Page Line       Page Line     Page Line

 7   71   14       113  8          113  22

 8

 9

10   Request for Production of Documents

11   Page Line      Page Line       Page Line     Page Line

12   NONE

13

14

15   Stipulations

16   Page Line      Page Line       Page Line     Page Line

17   NONE

18

19

20   Confidential Marking

21   Page Line      Page Line       Page Line     Page Line

22

23

24

25
```

1                   THE VIDEOGRAPHER:  This is Tape No. 1

2      of the video deposition of Mr. Mark Shapiro in the

3      matter of In Re: Tribune Company, et al, debtors, in

4      the United States Bankruptcy Court for the District

5      of Delaware, No. 08-13141.

6                   This deposition is being held at the law

7      offices of Jones Day at 222 East 41st Street, New

8      York, New York on October 13th, 2010, approximately,

9      3:26 p.m.

10                  My name is George Munoz of the firm of

11     Hudson Court Reporting and I am a legal video

12     specialist.  The court reporter is Silvia Wage in

13     association with Hudson Court Reporting.

14                  For the record, will counsel, please,

15     introduce themselves.

16                  MR. CULLEN:  Thomas Cullen and David

17     Heiman of Jones Day representing the Special

18     Committee.

19                  MR. LACK:  Robert Lack and Gregory

20     Fox of Friedman, Kaplan, Seiler, Adelman, LLP,

21     representing Aurelius Capital Management LP.

22                  MS. BROMBERG:  Kate Bromberg with

23     Brown & Rudnick, LLP, representing Wilmington Trust

24     Company.

25                  MR. ASHLEY:  Marc Ashley of

1    Chadbourne and Parke for the Creditors Committee.

2              MS. NEISH:  Laura Neish, Zuckerman

3    Spaeder, Special Counsel of the Debtors Committee.

4              MR. VAIL:  Andrew Vail, I represent

5    Sam Zell and GITRB.

6              MS. LUFTGLASS:  Karen Luftglass of

7    Davis, Polk and Wardwell for J.P. Morgan Chase.

8              MR. JOHNSTON:  Jim Johnston,

9    Hennigan, Bennett and Dorman on behalf of the group

10   known as Credit Agreement Creditors.

11             MR. BENDERNAGEL:  Jim Bendernagel of

12   Sidley Austin for the debtors.

13   M A R K   S H A P I R O,

14             (Business Address) 304 Hudson Street, Suite

15             602, New York, New York  10013, after having

16             been duly sworn, was examined and testifies

17             as follows:

18   EXAMINATION BY MR. LACK:

19        Q.      Good afternoon, Mr. Shapiro.  My name

20   is Bob Lack.  I represent Aurelius Capital

21   Management LP, one of the creditors of the Tribune

22   Company bankruptcy.

23        A.      Yes, sir.

24        Q.      If at any point in time this

25   afternoon you don't understand one of my questions,

1   please, let me know so I can rephrase it, so you'll

2   understand it before you answer it; is that all

3   right?

4          A.      Will do.

5          Q.      Can you, please, state your full name

6   for the record.

7          A.      Mark Shapiro.

8          Q.      What is your home address?

9          A.      West Park, Connecticut.

10         Q.      And what is your business address?

11         A.      I don't know my actual address; 604

12  Hudson Street.

13         Q.      New York City?

14         A.      New York City, sorry.

15         Q.      What is your current employment?

16         A.      I'm the Chief Executive Officer of

17  Dick Clark Productions.

18         Q.      For how long have you been CEO of

19  Dick Clark Productions?

20         A.      A few months.

21         Q.      And what was your position prior to

22  being CEO of Dick Clark Productions?

23                 MALE VOICE ON PHONE:  Could you

24  please keep your voices up for the people on the

25  phone.

1           MR. LACK:  Yes, of course.

2           MALE VOICE ON PHONE:   Thank you.

3      A.       I was Chief Executive Officer and

4  Director/President of Six Flags Incorporated.

5      Q.       Are you currently a member of the

6  Special Committee of the Board of Directors of

7  Tribune Company?

8      A.       Yes, I am.

9      Q.       For how long have you been a member

10  of that committee?

11      A.       Approximately, a month.

12           MR. LACK:  I'd like the reporter to

13  mark as Shapiro Exhibit 1 a copy of a document

14  entitled, Term Sheet for Joint Plans Supported by

15  Debtors Official Committee of Unsecured Creditors,

16  Oaktree, Angelo Gordon and J.P. Morgan and endorsed

17  by Mediator.  This document was released on

18  October 12th, 2010.

19           (Deposition Exhibit No. Shapiro-1, Term

20  Sheet for Joint Plans Supported by Debtors Official

21  Committee of Unsecured Creditors, Oaktree, Angelo

22  Gordon and J.P. Morgan and endorsed by mediator

23  released on 10/12/10, was marked for

24  identification.)

25           MR. LACK:  I'd also like to have the

1   reporter mark as Shapiro Exhibit 2 a document

2   entitled, Term Sheet of Joint Plan of Debtors,

3   Oaktree and Angelo Gordon arising from mediation.

4   This document was released on September 28, 2010.

5           (Deposition Exhibit No. Shapiro-2, Term

6   Sheet of Joint Plan of Debtors, Oaktree and Angelo

7   Gordon arising from mediation released on 9/28/10,

8   was marked for identification.)

9           MR. LACK:  And next I'd like to mark

10  as Shapiro Exhibit 3 for identification a copy of a

11  document produced, I guess, two days ago with

12  production numbers FW50 through FW62.  Attached to a

13  series of cover e-mails is a document entitled,

14  Special Committee Discussion Materials, dated

15  October 10th, 2010.

16          (Deposition Exhibit No. Shapiro-3, series of

17  e-mails and attachment entitled, Special Committee

18  Discussion Materials dated 10/10/10 FW50 to FW62,

19  was marked for identification.)

20          Q.      Mr. Shapiro, could you identify

21  what's been marked as Exhibit 1?

22          A.      This says, Term Sheet for Joint Plans

23  Afforded by Debtors Official Committee of Unsecured

24  Creditors, Oaktree, Angelo Gordon, J.P. Morgan and

25  endorsed by the Mediator.

1          Q.          Have you seen this document before?

2          A.          No, I have not.

3          Q.          Has the Special Committee ever

4   discussed this particular document having this

5   document before it?

6          A.          No.

7          Q.          Have you -- looking through the

8   document now, can -- are you familiar with the

9   contents of the document, even if not with the

10  precise document itself?

11         A.          Yes.

12         Q.          What is your understanding that the

13  contents of this document represents?

14         A.          The joint plans supported by Oaktree,

15  Angelo, J.P. Morgan, the debtor, Unsecured Creditors

16  Committee and endorsed by the Mediator.

17         Q.          What role, if any, did the Special

18  Committee of Tribune have in the -- in arriving at

19  the contents of Exhibit 1, the term sheet?

20         A.          Driving in the contents.

21         Q.          I'm sorry?

22         A.          Driving in the contents; I'm sorry.

23         Q.          What role did the Special Committee

24  of Tribune have in arriving at the contents that are

25  reflected in Shapiro Exhibit 1?

1          A.          We didn't.

2          Q.          Who was involved, to your knowledge,

3     in arriving at the contents of Shapiro Exhibit 1?

4          A.          A court appointed mediator, Oaktree,

5     Angelo Gordon, J.P. Morgan, Unsecured Creditors

6     Committee, Sidley, the counsel for the debtors,

7     Chief Restructuring Officer for the debtors and

8     Lazard, the financial advisor for the debtors, and

9     potentially the counsel for Special Committee, I

10    think, was involved.

11         Q.          Did you personally have any role in

12    arriving at the contents of Shapiro Exhibit 1?

13         A.          Arriving at the numbers or...

14         Q.          Arriving at any of the contents.

15         A.          No.

16         Q.          In particular, under the section

17    that's entitled, Planning Settlements, there is a

18    number $120 million in cash.  Do you see that number

19    toward the top of the first page?

20         A.          Yes.

21         Q.          Did you have any role in arriving at

22    that number?

23         A.          No.

24         Q.          Do you know who on behalf of the

25    debtors, if anyone, did have a role in arriving at

1    that number?

2        A.        Don't know.

3        Q.        Do you know if Mr. Liebentritt, the

4    Chief Restructuring Officer, had any role in

5    arriving at that number?

6        A.        Don't know.

7        Q.        To your knowledge, did any of the

8    members of the Special Committee have any role in

9    arriving at that number?

10       A.        They didn't.

11       Q.        So, in other words, if I were to ask

12   you how the $120 million number was arrived at, you

13   would not be able to tell me?

14       A.        Relied on my financial advisors for

15   that.

16       Q.        And those financial advisors were

17   who?

18       A.        Lazard, Sidley Austin, the council,

19   our counsel to the Special Committee and the Chief

20   Restructuring Officer.

21       Q.        Did any or all of those persons or

22   entities that you just mentioned explain to you as

23   the chairman of the Special Committee how the

24   $120 million figure was arrived at?

25       A.        Not that I recall, specifically.

1          Q.          Did the Special Committee -- has the

2    Special Committee approved or endorsed the term

3    sheet that's shown in Shapiro Exhibit 1?

4          A.          Have we endorsed this specific term

5    sheet?

6          Q.          Yes.

7          A.          Or this plan?

8          Q.          Well, let me first -- do I understand

9    from your earlier testimony that the committee

10   itself never saw this particular piece of paper?

11         A.          I don't recall seeing this particular

12   piece of paper.

13         Q.          Do you know if any of the members of

14   the committee have seen Shapiro Exhibit 1?

15         A.          I can't answer for them.

16         Q.          Okay.  With respect to the plan, the

17   proposed plan that's embodied in Shapiro Exhibit 1,

18   did the Special Committee review and approve that

19   plan?

20         A.          Yes.

21         Q.          When did it do so?

22         A.          On October 11th.

23         Q.          Was there a meeting of the Special

24   Committee that occurred on October 11th?

25         A.          Yes, there was.

1          Q.        How did it occur, in person or by

2   telephone?

3          A.        By telephone.

4          Q.        And who was present?

5          A.        Special Committee, Chief

6   Restructuring Officer, Lazard, counsel to the

7   Special Committee, counsel to the debtor, and I

8   believe one more was on there.  And I can't remember

9   who it was, though.  I think -- I can't speculate,

10  but I thought there was one more party on it.

11         Q.        Well, you said the Special Committee.

12  Were all four members of the Special Committee

13  present on the telephone?

14         A.        Yes, they were.

15         Q.        For the entire meeting?

16         A.        Yes, they were.

17         Q.        And who from Lazard was present on

18  the telephone?

19         A.        There may have been a couple, but I

20  know David Kurtz was one of them, financial advisor.

21         Q.        Who from Jones Day was present?

22         A.        David Heiman, he may have had some of

23  his cohorts on there as well.  I don't remember.

24         Q.        Who from Sidley Austin was present?

25         A.        Jim Conlan and he probably had some

1    of his partners on there as well.

2         Q.        Why was anyone from Sidley Austin

3    present at this meeting?

4         A.        They're the counsel to the debtor.

5         Q.        But didn't the Special Committee have

6    its own counsel?

7         A.        We did.

8         Q.        And wasn't it delegated the Special

9    Committee the responsibility to decide what plan

10   Tribune Company would propose in the bankruptcy?

11        A.        Propose?  That wasn't the job of the

12   Special Committee.

13        Q.        Did the Special Committee have any

14   responsibility for approving a plan that would then

15   be proposed by the debtor in the bankruptcy

16   proceeding?

17        A.        Yes.

18        Q.        And did it have the exclusive

19   responsibility for doing that?

20        A.        Absolutely.

21        Q.        Okay.  And did the Special Committee

22   hire counsel to advise it, the Special Committee, in

23   carrying out that responsibility?

24        A.        Yes, we did.

25        Q.        And did you believe that Jones Day

1    was insufficient in advising the Special

2    Committee --

3                    MR. CULLEN:  Objection,

4    argumentative.

5        Q.        -- in carrying out that role?

6                    MR. CULLEN:  Objection,

7    argumentative.

8             You can answer that question.

9        A.        No.

10       Q.        Why did the Special Committee include

11   Sidley Austin, the debtors' counsel, in the meeting

12   of the Special Committee that you're referring to?

13       A.        You have to ask the Chief

14   Restructuring Officer that.

15       Q.        So did you invite Sidley Austin to

16   attend?

17       A.        I didn't invite anyone.

18       Q.        So it's your understanding

19   Mr. Liebentritt, Chief Restructuring Officer,

20   invited Sidley Austin to attend?

21       A.        It's my understanding the Chief

22   Restructuring Officer set up the phone call.  Who

23   did the inviting I'm not sure.

24       Q.        Now, when did the telephone call --

25   when did the meeting of October 11th, 2010 begin,

1    what time?

2          A.        I believe it was -- it was 9 or 10

3    a.m.

4          Q.        Central time?

5          A.        Eastern time.

6          Q.        Eastern time.

7           And do you have a BlackBerry?

8          A.        Yes.

9          Q.        Is the time of the meeting in your

10   BlackBerry?

11         A.        I'm not sure.

12         Q.        Can you check it now and see whether

13   your meeting reflects the time of the meeting --

14   that your BlackBerry reflects the time of the

15   meeting that you testified to you had two days ago?

16               MR. CULLEN:  We're not going to

17   search through his BlackBerry at this time.  We can

18   do that at a break, if you'd like.

19               MR. LACK:  You're directing him not

20   to take the BlackBerry out of his pocket and look at

21   October 11th and testify as to what time the meeting

22   was scheduled?

23               MR. CULLEN:  It's your time, counsel.

24               MR. LACK:  It's my time.

25         Q.        Go ahead and do it.  I'm sure it will

 1  not take you very long.

 2         A.       (The witness complies.)

 3         Q.       You can leave that on the table next

 4  to you, Mr. Shapiro, in case you need to look at it

 5  again.

 6         A.       (The witness complies.)

 7         Q.       Thank you so much.

 8         A.       Yes.

 9         Q.       Can you tell me by consulting your

10  BlackBerry what time the Special Committee meeting

11  on October 11th, 2010 began?

12         A.       My BlackBerry would not tell me that.

13  I can tell you what time it was scheduled for.

14         Q.       Okay.  What time was it scheduled

15  for?

16         A.       Ten a.m. Eastern.

17         Q.       And did your recollection of what

18  happened two days ago begin at 10 a.m. Eastern?

19         A.       As I said, 9 or 10 a.m., I can't

20  remember exactly.

21         Q.       So you don't remember whether the

22  meeting started on time or an hour earlier?

23         A.       That's correct.

24         Q.       Okay.  Does your BlackBerry show that

25  you had any other appointments on the morning of the

1    11th?

2             A.          No.

3             Q.          Okay.  Now, when did the meeting

4    finish?

5             A.          It lasted, approximately, 75 minutes.

6    That's what I remember.

7             Q.          Can you describe to me the sequence

8    of what happened during the meeting?

9             A.          The -- our financial advisor, the

10   financial advisor to the debtor, took the Special

11   Committee through, I believe, Exhibit C.

12            Q.          Three?

13            A.          Or three, chapter and verse, Q&A

14   along the way, broke into executive session for

15   further Q&A and then voted on the plan.

16            Q.          How would you allocate the 75 minutes

17   among the Lazard presentation and the executive

18   session and the voting?

19            A.          I don't recall.

20            Q.          Did the Lazard presentation take up

21   more than half the meeting or less than half the

22   meeting?

23            A.          I don't recall, I'm sorry, I just

24   don't.  I don't know.

25            Q.          What was the vote on the plan?

1          A.       Unanimous to support the plan.

2          Q.       Now, you stated that during the

3    meeting, the financial advisor went through what's

4    been marked as Shapiro Exhibit 3.

5          I take it you're referring to the part of

6    the exhibit excluding the first two pages, which are

7    transmittal e-mails?

8          A.       I'm sorry?

9          Q.       Exhibit 3 includes -- the first two

10   pages are a cover e-mail or several cover e-mails.

11         A.       Right.

12         Q.       Okay.

13         A.       That's -- that was in my deck as

14   well, the first two pages minus the Frank Wood part.

15         Q.       Okay, all right.

16         And by "deck," you mean the series of

17   presentation slides?

18         A.       The e-mail cover.

19         Q.       The e-mail, okay.

20         A.       Yeah.

21         Q.       Okay.  When did you first receive the

22   Special Committee discussion materials of

23   October 10th, which are part of Exhibit 3?

24         A.       I don't recall.

25         Q.       Did you receive them before the

1    meeting?

2         A.        Correct, yes.

3         Q.        Did you receive them on October 10th?

4         A.        I don't recall.  My answer doesn't

5    change.  I can read the e-mail cover here, which

6    says there is an e-mail from Don to the group at

7    10:51 a.m., Sunday night.

8         Q.        Okay.  And did you read the

9    discussion materials prior to the beginning of the

10   Special Committee meeting at 9 or 10 a.m. on the

11   11th?

12        A.        Yes.

13        Q.        So you read the materials between

14   10:51 p.m. on Sunday, October 10th, and 9 or 10 a.m.

15   on Monday, October 11th; is that right?

16        A.        That's correct.

17        Q.        Okay.  Did you read the entirety of

18   the materials?

19        A.        Yes, that's correct.

20        Q.        Did you take any notes on the

21   materials when you read them?

22        A.        No.

23        Q.        Did you take any notes during the

24   meeting of the Board of the Special Committee on the

25   11th?

1          A.          No.

2          Q.          Do you know whether any other members

3    of the Special Committee took notes?

4          A.          Can't answer that.

5          Q.          Now, let me ask you some questions

6    about Exhibit 3 and the discussion materials.

7               I'd like you to turn to Page FW54, which is

8    the second page of the materials.

9          A.          (The witness complies.)

10         Q.          Actually, it's the one that says Page

11   2 in the lower left.

12              At the top it says -- under background and

13   summary -- "Following September 28th, additional

14   mediation sessions were held and on October 8th an

15   agreement was reached between Oaktree, Angelo, J.P.

16   Morgan and the UCC to settle Step 2 Senior Lender

17   Avoidance Claims and Step 2 Lender Agent and

18   Arranger Disgorgement Claims."  Do you see that

19   reference?

20         A.          Yes, I do.

21         Q.          Were you involved at all in reaching

22   an agreement with Oaktree with respect to the Step 2

23   claims?

24         A.          No.

25         Q.          What about with Angelo Gordon?

1          A.       No.

2          Q.       J.P. Morgan?

3          A.       No.

4          Q.       And were you involved in reaching an

5     agreement with the UCC?  You understand that means

6     the Committee of Unsecured Creditors?

7          A.       No.

8          Q.       Who did have those discussions to

9     reach the agreement, to your knowledge?

10          A.       The mediator, court appointed

11     mediator, financial advisor, CRO, speculating the

12     lawyers as well.

13          Q.       Did you personally ever have any

14     discussions with the mediator himself?

15               MS. LUFTGLASS:  I just want to remind

16     everyone there is a mediation order in the case that

17     protects certain discussions and materials and I

18     think that some of the materials that we might get

19     into in some of these discussions might be protected

20     pursuant to that order.  So J.P. Morgan just wants

21     to reserve all our rights on the record.

22               MR. LACK:  I'm quite aware of the

23     mediation order and the mediation order governs what

24     can be used in court and what's admissible into

25     evidence.  It doesn't govern what you can ask people

1    about during depositions.

2                    MR. BENDERNAGEL:  That's not true.

3                    MR. LACK:  It is true.

4                    MR. BENDERNAGEL:  But you got your

5    statement on the record.  You can debate that in

6    front of a judge.

7                    MR. LACK:  Well, you can read

8    Paragraph 7.

9                    MR. BENDERNAGEL:  I have.

10                    MR. LACK:  Okay, good.

11                    MR. BENDERNAGEL:  You've read it

12    wrong.

13        Q.        Now, looking further down the page,

14    about two-thirds of the way down, it says, "Included

15    in the amounts above is $120 million Step 2 Loan

16    Disgorgement Settlement Fund to be underwritten by

17    J.P. Morgan, Sidley and B of A.  The proceeds of

18    which would go to non-LBO senior note holders

19    (Sidley and B of A have not yet agreed)."

20          Was there any discussion about that

21    $120 million Step 2 Loan Disgorgement Settlement

22    Fund at the Special Committee meeting?

23        A.        Yes.

24        Q.        What do you recall of the discussion?

25        A.        What I most recall is that I made a

1    point of mentioning to the Special Committee that at

2    one point the debtor, to my knowledge, although I

3    was not involved personally because this is prior to

4    the Special Committee, but what I've been told is

5    that the debtor was close to a deal or a settlement

6    plan with the senior lenders, how many of which I

7    can't recall, at about $375 million.  And so this

8    plan was -- is clearly, especially, when you count

9    the 120, north of that.  So, in terms of maximizing

10   recovery, we clearly were in a better place on

11   October 11th than they supposedly were when the last

12   deal fell apart.

13          Q.       And, by the senior lenders, you're

14   referring to the -- what are referred to as the LBO

15   lenders?

16          A.       J.P. Morgan, Oaktree, Angelo, the

17   banks, yes.

18          Q.       Okay.  And is it your understanding

19   that Sidley and Bank of American have still not yet

20   agreed to participate in the $120 million

21   Disgorgement Settlement Fund?

22          A.       I don't know the answer to that

23   question.

24          Q.       Is it your understanding that J.P.

25   Morgan would front the money, the $120 million?

1          A.          I don't -- I don't recall.

2          Q.          And what did you think the $120

3    million was being used to buy in this settlement?

4          A.          It was money for releases with regard

5    to -- it seems here disgorgement, I can't remember

6    all the details but related to Step 2.

7          Q.          Including avoidance of the Step 2

8    loan applications?

9          A.          I don't remember that detail.

10         Q.          Was your understanding that the

11   difference between the term sheet that was marked

12   previously as Exhibit 2 and the term sheet that is

13   marked as Exhibit 1 is that the LBO lenders would be

14   released for the avoidance claims with respect to

15   Step 2?

16                      MR. BENDERNAGEL:  Object to the form

17   of the question.

18         A.          It was my understanding that the

19   first deal stopped at Step 1 and the second deal

20   went deeper to Step 2.

21         Q.          Okay.

22         A.          And at the same time recovery was

23   maximized.  That's kind of the breath of my

24   knowledge on that.

25         Q.          Well, what was the difference in the

1    consideration between the deal that dealt with only

2    Step 1 and the deal that dealt with both Step 1 and

3    Step 2?

4            A.       I believe more money.

5            Q.       How much more?

6            A.       I believe it was 120 million.

7            Q.       And was there any discussion about

8    whether the release of the avoidance claims in Step

9    2, whether the value of that release was

10   $120 million?

11           A.       I don't recall.

12           Q.       Did the Special Committee have any

13   discussion about whether it was a fair trade to

14   trade the release of the Step 2 claims for

15   $120 million?

16           A.       We use our best judgment relying upon

17   the advice of our financial advisors.  In terms of

18   the numbers, specifically, what's fair, I think

19   that's subjective.  It's speculative, then, now,

20   probably going forward.

21           You know, I took comfort in the fact that

22   our job was to motivate all the parties to get to

23   the table, to talk with each other, to bridge gaps,

24   resolve differences and sign up to a plan that

25   included as many groups as we possibly could and

1    went deep into the capital structure as we possibly

2    could, you know, that's part of my fiduciary.  And I

3    believe that they succeeded in doing that.

4          What the numbers were, certainly, there's a

5    lot of advisors, not just at our table we relied on

6    but, of course, all the parties that are represented

7    in this bankruptcy have their own group of advisors

8    and, of course, there's the court appointed

9    mediator.  It seemed to be good with him and, of

10   course, then there's still the bankruptcy judge.

11   And so there's plenty of iterations that go, I would

12   think, and people if they don't think it's fair will

13   have their opportunity to speak up, not to mention

14   there's still litigation trust on top of that.

15         Q.    Well, besides from motivating people

16   to sign up on the plan, what else did you see, if

17   anything, as being part of your fiduciary duties as

18   a member of the Special Committee?

19         A.    Being very purely independent, no

20   discussion with the overall board, work on behalf of

21   the company and all its constituencies, to get this

22   company out of bankruptcy as quick as possible but,

23   most importantly, to act in an independent way and

24   to maximize recovery as deep as we possibly could

25   for all constituencies, motivating them, getting

1    them to the table, getting dialogue going, bridging

2    gaps, pedal to the metal in terms of urgency and

3    immediacy so that everyone's talking.  Those were --

4    that was my job.

5        Q.       When you speak of maximizing

6    recovery, were you referring to maximizing recovery

7    in the context of a settlement?

8        A.       Correct.

9        Q.       Did you consider it part of your

10    fiduciary duty to consider whether recovery could be

11    maximized through a litigation as opposed to a

12    settlement?

13        A.       I think in this -- no, I left that to

14    the mediator to determine whether it was going to

15    fall, settlement, litigation trust, both, one or the

16    other.  You know, again, the numbers were really a

17    lot.  There are a lot of professionals that deal

18    with the fairness of that.  Getting consensus was

19    more part of my job, getting them to the table.

20        Q.       So you understood that one of the

21    alternatives to settling Step 2 was to litigate Step

22    2, turn it over to a litigation trust that would

23    pursue avoidance claims against LBO entities; is

24    that right?

25        A.       Well, you're telling me that now.

1    Yes, I understand.

2         Q.        Well, did you -- you understood that

3    before I just said it?

4         A.        I understood there was a lot of

5    litigation that could take place from day one.  Step

6    1, Step 2, officers, I mean, you name it, everybody,

7    shareholders, it seemed like there was a lot of

8    potential litigation, kind of where it falls into

9    what phrases and avoidance or whatever words you're

10   using.  No, I wasn't really schooled, specifically,

11   on where that litigation was going to fall.

12        Q.        Well, you're familiar with the term

13   avoidance, right?

14        A.        Yes.

15        Q.        In fact, you went through a

16   bankruptcy at your prior job at Six Flags, right?

17        A.        Yes.

18        Q.        Okay.  So isn't it the case that the

19   prior plan, that's the one that was reflected in

20   Exhibit 2, would have left the resolution of the

21   Step 2 claims to be handled by a litigation trust?

22                  MR. BENDERNAGEL:  Object to the form

23   of the question.  Which is the prior plan that

24   you're referring to?

25        Q.        The one that's in Exhibit --

1         A.       We didn't deal with any avoidance

2    claims, to my knowledge, in Six Flags.  I'm not

3    schooled as a bankruptcy lawyer.

4         Q.       No, I'm not -- okay.  Let me turn

5    back to Tribune and make clear we're discussing the

6    same thing.

7              Exhibit 1, the term sheet that was released

8    yesterday, we placed a term sheet that had been

9    released following the beginning of the mediation,

10   which was Exhibit 2, right?

11        A.       That's correct.

12        Q.       And exhibit -- and Exhibit 2, the

13   claims with respect to Step 2, were going to be

14   handled in the litigation trust, do you remember

15   that or not?

16        A.       In the first deal?

17        Q.       The previous deal.

18        A.       In the previous -- yes.

19        Q.       Okay.  And so at that point you

20   understood that they could be adjudicated in the

21   process of litigation brought by a litigation

22   trustee?

23        A.       I don't really -- didn't really

24   understand the process, counselor.

25        Q.       Okay.  But you voted to approve it?

1          A.          I knew there was a Step 1 deal.

2    Correct, the first settlement plan was a Step 1.

3    The second was included in Step 2 as well.

4          Q.          And you voted to approve the plan

5    that was in Step 2 at the time it was presented to

6    you as a Special Committee member?

7          A.          Step 1 or Step 2?

8          Q.          The Step 1 plan that's in Exhibit 2.

9          A.          Yes, we did.

10          Q.          Okay.  And now you understand that

11    under the current plan that was released yesterday

12    that the Step 2 claims against the -- many of the

13    Step 2 claims, to be more precise, against LBO

14    lenders would be settled rather than litigated?

15          A.          That's my understanding.

16          Q.          Okay.  And did you consider it part

17    of your fiduciary duty to determine whether it would

18    be a fairer result to settle those claims then to

19    litigate those claims?

20          A.          No, I think there's plenty of people

21    that will do that now and/or in the future.  I saw

22    it as a deeper deal, a deeper deal in terms of

23    recovery, in terms of dollars and in terms of

24    creditors, which is our goal.

25          Q.          Did you reach any personal conclusion

1    as to whether the $120 million was a fair settlement

2    of the Step 2 claims that were being settled under

3    the current plan?

4           A.        I rely on my advisors for that.

5           Q.        So your advisors expressed an opinion

6    that it was fair?

7           A.        Absolutely.

8           Q.        Okay.  And did you --

9           A.        And conveyed that the mediator

10    believed it was a good deal as well.

11           Q.        Okay.  But did you -- after hearing

12    that, did you personally come to a conclusion on

13    your own as to whether you agreed with that

14    assessment or did you just accept the assessment?

15                    MR. CULLEN:   Objection, foundation,

16    form.  This is a dense epistemological thicket.

17           Q.        Do you understand the question I

18    asked?

19           A.        I think I've answered it.  I said I

20    relied on advisors.

21           Q.        Okay.  But --

22           A.        I believe there was -- my advisors

23    were on the phone.  There was -- I believe there was

24    a third-party expert was hired as well to look at

25    it.  I think mediators were signing off -- were

1    signing off, the financial advisors of all these

2    other firms were signing off and, most importantly,

3    they had UCC on board, too.  So it seemed like there

4    were a lot more people better schooled than me

5    saying it was fair, so much so considering they all

6    have divergent views that they're all signing up to

7    it.  I thought the advisors were probably right and

8    I went along and voted for it.

9         Q.       Okay.  Did you question any of the

10   advisors during the presentation, during the Special

11   Committee meeting?

12        A.       Yes, I'm sure I did.

13        Q.       What questions did you ask them?

14        A.       I don't recall, specifically.  But,

15   as I mentioned earlier, there was a lot of Q&A back

16   and forth.

17        Q.       Well, do you recall any of the

18   questions that were asked by yourself?

19        A.       I think I mentioned the point I made

20   about the 120 million.  I asked about the mediator's

21   opinion on all of this, how long it would take to

22   get it all signed up and get the plan out, asked if

23   the advisors thought this was a better deal than

24   anything that's ever been on the table, along those

25   lines.

1          Q.          Now, going back to Exhibit 3, which

2     is the discussion materials, and staying on Page

3     FW54, there is a reference about halfway down the

4     page, a bullet point that says, "Additionally, the

5     distribution of the $78 million bridge reserve has

6     not been fully negotiated and could provide an

7     opportunity to deliver incremental settlement value

8     to the senior notes, parent trade and swaps in

9     excess of their expected sharing in that amount."

10    Do you see that language?

11         A.          Yes.

12         Q.          Can you tell me what that means?

13         A.          I can't.

14         Q.          Was that discussed at all during the

15    meeting of the Special Committee?

16         A.          I believe it was.

17         Q.          And what do you recall about that

18    discussion?

19         A.          I just remember them taking us

20    through the entire deck.  Every bullet was read,

21    every item was, you know, they tried to define it.

22    I'm not sure, you know, where I was at that moment,

23    I mean, deep in thought on the point before it or

24    after it or getting ready to pose a question.  I

25    can't remember, specifically, what was discussed

1    about that bullet at this time.

2         Q.        Is there a potential plan to move

3    some of the $78 million into additional compensation

4    to the senior notes?

5         A.        I have no idea.

6         Q.        Now, if you turn to Page FW57, in the

7    middle of the page, it says, "It is expected that

8    this plan will face challenge by a number of

9    creditor constituencies including the senior notes,

10   bridge and PHONES" -- and it's P-H-O-N-E-S, all caps

11   -- "classes."

12        And then it says, "It is likely that these

13   parties will assert that the settlements are unfair

14   and that the settlement plan should not be imposed."

15        Do you see that language?

16        A.        Yes.

17        Q.        Was that subject of challenges to

18   this plan discussed at the Special Committee

19   meeting?

20        A.        I believe it was.

21        Q.        And what was said about that?

22        A.        It was explained just as you

23   described it.

24        Q.        Were there any questions asked about

25   it?

1          A.          I don't recall.

2          Q.          And then among the arguments that

3    were listed here or the first argument that's listed

4    here is, quote, "The settlement payment is

5    insufficient," unquote.  Do you see that reference?

6          A.          Yes.

7          Q.          Was there any answer to that argument

8    that was presented by the financial advisor at the

9    Special Committee meeting?

10         A.          Not that I recall, other than

11   financial advisors saying this is -- these are the

12   arguments we're going to get, but we believe it's a

13   fair and equitable deal.

14         Q.          Okay.

15         A.          And there is a litigation trust that

16   -- for those that, you know, believe that there

17   should be more, they'll have plenty of opportunity

18   to litigate that and the mediator believes it's a

19   fair deal and the financial advisors of all these

20   firms believe it's a fair deal and it's a lot more

21   than, certainly, was on the table in the past.  So

22   we've come much further than it used to be and there

23   will be sufficient time in the bankruptcy process

24   for those that don't believe it's sufficient to have

25   their say in court and just overall in a

1    bankruptcy -- this is just my own editorializing

2    here -- I've always found that nobody ever thinks

3    they're getting enough.  So I wasn't really thrown

4    by that line.

5        Q.      What was -- was it your view that if

6    there was some unfairness in this plan, that it

7    would be taken care of in the bankruptcy

8    confirmation process?

9        A.      No.  I think that fair or unfairness

10   is in the eye of the beholder and the advisors

11   taking us through the plan and the mediator and the

12   other senior lenders and the UCC didn't think it was

13   unfair.

14       Q.      Right.  But you were aware that there

15   were other constituencies, including my client,

16   Aurelius Capital Management, that did think the plan

17   was unfair?

18       A.      I didn't -- I never spoke with

19   Aurelius.  So we were just being told that you can

20   likely expect that some of these other parties will

21   say it's unfair.

22       Q.      Why didn't you ever speak to

23   Aurelius?

24       A.      Well, I -- you know, why didn't

25   Aurelius ever speak to me?  I mean, I guess Center

1    Bridge was -- I don't think Aurelius got to the

2    table until late in the game and my financial

3    advisors were speaking to all constituencies and

4    they included me in conversations or I got the ball

5    rolling with constituencies that they thought we

6    could actually make progress with and they thought

7    we were too far apart with Center Bridge at the

8    time.

9         Q.        Well, I'm asking about Aurelius.

10        A.        Well, they kind of -- Center Bridge

11   morphed into Aurelius.

12        Q.        Do you acknowledge that you have a

13   fiduciary duty to Aurelius?

14        A.        Fiduciary duty to all constituencies.

15        Q.        Including Aurelius?

16        A.        Absolutely.

17        Q.        Okay.  And isn't it true that you did

18   personally speak to people at Oaktree?

19        A.        Yes.

20        Q.        Okay.  And you did personally speak

21   to people at J.P. Morgan, right?

22        A.        Yes.

23        Q.        Okay.  But you never personally spoke

24   to anyone at Aurelius?

25        A.        Or the PHONES or Angelo Gordon or the

1  Unsecured Creditors Committee or -- I'm sure there's

2  piles and piles and piles of trade partners and

3  vendors and so probably 90 percent of the people I

4  didn't speak to.

5       Q.      Did the Special Committee ask anyone

6  from Aurelius or the PHONES or the Bridge classes to

7  make any presentation to it about what they thought

8  would be a fair settlement?

9       A.      No, no constituency did they ever do

10  that.

11      Q.      I'm sorry?

12      A.      The Special Committee never asked

13  anyone other than financial advisors to make any

14  kind of presentation.

15      Q.      Okay.  But you testified a few

16  minutes ago that you were aware that all of the

17  various other constituencies were supportive of this

18  plan, right?

19      A.      That's right.

20      Q.      So someone had to go out and find

21  that out, right?

22      A.      We were informed that.

23      Q.      By Lazard?

24      A.      By the document.

25      Q.      Okay.  By Lazard?

1          A.          By our Chief Restructuring Officer.

2          Q.          Okay.  And do you know whether Lazard

3    ever had any contact with Aurelius?

4          A.          I have no idea.

5          Q.          Do you know whether Mr. Liebentritt

6    ever had any contact with Aurelius?

7          A.          Don't know.

8          Q.          Now, under the arguments that were

9    anticipated against the plan that appear on FW57, is

10   the statement, quote, "The senior lenders should not

11   share in any disgorgement amount or benefit from

12   claim avoidance."  Do you see that reference?

13         A.          Yes.

14         Q.          Do you have any understanding of what

15   that refers to?

16         A.          No, I don't.  I don't recall.

17         Q.          Was that topic discussed --

18         A.          As I mentioned --

19         Q.          -- during the Special Committee

20   meeting?

21         A.          -- every bullet was read, to my

22   recollection.  How deep into the discussion we went,

23   I don't recall on that specific bullet point.

24         Q.          Was -- were you aware that there were

25   claims that were discussed by the examiner that were

1   labeled equitable estoppel?

2          A.      No.

3          Q.      Have you ever heard that term?

4          A.      No, I have not.

5          Q.      Have you read the examiner's report?

6          A.      Yes, actually.

7          Q.      The whole thing?

8          A.      Once.

9          Q.      Okay.  And do you recall that the

10   examiner considered whether there were arguments

11   that even if the Step 1 debt was not avoided, that

12   Step 1 lenders who participated in the planning of

13   Step 2 could be precluded from getting the benefits

14   of avoiding Step 2?

15          A.      No, I don't recall that.  I read it

16   the morning after it was filed.  I think it was,

17   actually, two parts that I read it in.  I can't

18   remember -- recall.  But I, certainly, know that

19   even if I read it again, half of it would go right

20   over my head.

21          Q.      So you don't recall any arguments of

22   topics like equitable estoppel or waiver or

23   ratification participation, assumption of risk?

24                 MR. CULLEN:  Objection.

25                 MR. LACK:  I've asked a compound

1    question, so I'll rephrase it.

2                    MR. CULLEN:  Foundation and form.

3          Q.      I'll ask you, do you recall the

4    concept of equitable estoppel ever being discussed

5    in the Special Committee?

6          A.      I don't, I don't recall.

7          Q.      Do you recall the concept of waiver

8    ever being discussed in the Special Committee?

9          A.      I don't recall.

10         Q.      Do you recall the concept of

11   ratification ever being discussed in the Special

12   Committee?

13         A.      I don't recall.

14         Q.      What about do you recall whether the

15   concept of assumption of risk has ever been

16   discussed?

17         A.      Don't recall.

18         Q.      Do you recall whether the financial

19   advisor presenting the presentation at the Special

20   Committee meeting on October 11th had any answer to

21   the argument that the senior lenders should not

22   share in any disgorgement amount or benefit from

23   claim avoidance?

24                    MR. CULLEN:  At that meeting,

25   counsel?

1                    MR. LACK:  At that meeting.

2          A.        I don't recall.

3          Q.        Do you recall whether they ever made

4    a presentation on -- in responding to that argument?

5          A.        Don't recall.

6          Q.        Was it ever discussed in the Special

7    Committee an argument in sum and substance that if

8    Step 1 is not avoided, it doesn't matter whether

9    Step 2 is avoided because the LBO lenders will get

10   paid anyway?

11                   MR. CULLEN:  Objection, foundation,

12   form.

13         A.        I don't recall.

14         Q.        If you turn to FW60.

15         A.        (The witness complies.)

16         Q.        Under the heading senior notes.

17         A.        Uh-huh.

18         Q.        The last sentence says, "The

19   $120 million settlement amount reflects the risk

20   that the bankruptcy court may find that Step 1

21   senior lenders may not be able to share in

22   disgorgement recoveries."  Do you see that?

23         A.        Correct.

24         Q.        Was that discussed during the Special

25   Committee meeting?

1          A.          It was read through.

2          Q.          Can you explain to me what that

3     statement means?

4          A.          No.

5          Q.          And then the next bullet point talks

6     about incremental $12 million.  Do you see that

7     reference?

8          A.          Yes.

9          Q.          Can you tell me what that means?

10          A.          No.

11          Q.          Do you have any idea how the

12     $12 million was computed?

13          A.          No, I don't.

14          Q.          Was it explained to the Special

15     Committee during the meeting how it was computed?

16          A.          I'm -- I can't recall.

17          Q.          If you turn to the next page, FW61.

18          A.          (The witness complies.)

19          Q.          In the middle of the page it has a

20     bullet point that starts with the phrase, "While

21     Step 1 shareholders are not contributing," do you

22     see that?

23          A.          Yes.

24          Q.          Okay.  Your understanding is, is it

25     not, that in the current plans being proposed by the

1    company and various others that the shareholders of

2    Tribune who received payments in Step 1 are not

3    being asked to contribute any money to a settlement;

4    is that right?

5        A.      That's what it says here.

6        Q.      Was that your understanding?

7        A.      I can't recall exactly my

8    understanding of that point.

9        Q.      Well, let me make it a little bit

10   more general.

11           You understand that there were shareholders

12   of Tribune who got paid in -- for their shares in

13   Step 1 and shareholders who got paid in Step 2,

14   right?

15       A.      Uh-huh, yes.

16       Q.      You understand that under the plan

17   that's currently being proposed by the company that

18   the Step 1 shareholders will be released but the

19   Step 2 shareholders would not?

20       A.      Yes.

21       Q.      Why is that?

22       A.      I relied on my advisors, in terms of

23   the fairness of the deal.  I don't know.

24       Q.      Well, did you have any understanding

25   that there was a greater risk of liability to the

1    Step 2 shareholders than there was to the Step 1

2    shareholders?

3         A.        Yes.

4         Q.        What was your understanding with

5    respect to --

6         A.        I just recall in the examiner's

7    report about Step 1, something about 50 percent or

8    less than 50 percent, and then Step 2 there was a

9    higher degree of probability that there would be a

10   claim.

11        Q.        Did you think about whether it made

12   sense that someone should pay nothing simply because

13   the risk of liability was less than 50 percent?

14        A.        I'm sorry.  What was the question?

15        Q.        Did you think about whether it made

16   sense that someone should pay nothing because their

17   risk of liability --

18        A.        I relied on my advisors to tell me if

19   it made sense, if they thought that was fair.

20        Q.        Do you think it would make a

21   difference whether the risk of liability was 10

22   percent or 33 percent?

23        A.        I don't know.

24                  MR. CULLEN:  Objection, foundation,

25   form.

1          A.          I don't know.  That's not my area of

2    specialty.

3          Q.          Now, if you turn to the next page,

4    FW62.

5          A.          (The witness complies.)

6          Q.          The second bullet point says, "The

7    examiner prepared his analysis assuming $6.1 billion

8    of distributable value."  Do you see that?

9          A.          Yes.

10          Q.          And you're familiar with a phrase

11    called distributable value or distributable

12    enterprise value or DEV?

13          A.          Sure.

14          Q.          Okay.  Now, what did Lazard, the

15    financial advisor to the debtor -- Lazard's the

16    financial advisor to the Special Committee or to the

17    debtor or both?

18          A.          To the debtor.

19          Q.          Okay.  What did Lazard think that the

20    DEV of Tribune was as of October 10th, 2010?

21          A.          I have no idea.

22          Q.          Did you know whether it believed it

23    was $6.1 billion?

24          A.          I don't know.

25          Q.          Did you ever hear that it thought it

1    was $6.8 billion?

2           A.        I don't recall.

3           Q.        Do you know whether the analysis on

4    the bottom half of Page FW62 is dependent on the

5    $6.1 billion number?

6           A.        Well, it says in the bullet that --

7    about what examiner -- how the examiner prepared his

8    analysis.  I don't know -- I don't recall if that

9    was 6.8 or 6.1 or to answer your question how that

10   was prepared.

11          Q.        Okay.  Do you think the -- okay,

12   strike that.

13           To your understanding, when did J.P. Morgan

14   first indicate a willingness to pay an amount of

15   $100 million or more in the settlement?

16                    MR. BENDERNAGEL:  Object to the

17   question.  It's vague.

18          A.        In mediation, in the first round of

19   mediation.

20          Q.        Before the term sheet was released

21   that's Exhibit 2?

22          A.        I don't recall when the term sheet

23   was released.

24          Q.        Well, the term sheet was released on

25   September 28th, 2010.  Do you recall whether --

1          A.          The first mediation is really my
2   answer.  I don't know the dates.  I can pull the
3   BlackBerry out, but given that I wasn't at the
4   mediations, I don't know the dates.
5          Q.          And was it the case that the debtor
6   refused to accept J.P. Morgan's offer, which was in
7   excess of a hundred million dollars, during the
8   mediation?
9                      MR. CULLEN:  Objection, foundation,
10  form.
11         A.          During the first mediation, I recall
12  that -- with the J.P. Morgan claim they were ready
13  to put up a hundred million dollars and the debtor,
14  they couldn't reach agreement.
15         Q.          Why not?
16         A.          I don't -- I don't recall what the
17  reasons were.
18         Q.          Well, what changed between that time
19  and yesterday?
20         A.          Another mediation.
21         Q.          Was J.P. Morgan now willing to put in
22  more money than it was before?
23         A.          I don't know.  I don't know how they
24  got to that $120 million.  What I know is that the
25  mediator believed that numbers should be higher and

1    J.P. Morgan said they were willing to, you know, do

2    what they could to reach a deal and wanted my --

3    wanted my role to get everybody back at the table.

4    That was my job, to just to make sure people are

5    talking, get them back to the table.  So I think

6    Oaktree and J.P. kept talking and the debtor kept

7    talking and they walked into mediation too and they

8    came out with an agreement.

9         Q.      But given that J.P. Morgan was

10   willing to contribute, why wasn't J.P. Morgan

11   included in the first term sheet?

12              MR. CULLEN:  Objection, foundation,

13   form.

14        A.      Because as I said, at that time there

15   were too many issues, I guess, bridging the gaps for

16   them or too much of a gap, excuse me, for them to

17   get into the first deal, first settlement plan.

18   There was too much of a divide.  It wasn't just

19   about money.  There were other terms as well.

20        Q.      Do you recall what they were?

21        A.      No.

22        Q.      Were you involved in negotiating

23   them?

24        A.      No.

25        Q.      Was J.P. Morgan left out of the first

1    term sheet so it could sweeten a subsequent term

2    sheet?

3                    MR. CULLEN:  Objection, foundation,

4    form.

5              You can address the question, if you can

6    understand it.

7         A.      So who could sweeten the term sheet?

8         Q.      The debtor could sweeten the term

9    sheet, the second term sheet, by including J.P.

10   Morgan in the second round of the term sheet.

11        A.      No, I don't -- I don't -- I think the

12   debtor was prepared to file that first plan with or

13   without J.P. Morgan.

14        Q.      Now, I take it the Special Committee

15   never performed a valuation of the Step 2 avoidance

16   claims?

17        A.      Not to my knowledge.

18        Q.      Was Lazard ever asked to do so?

19        A.      I don't recall.

20           Can we take a quick bathroom break?

21        Q.      Of course, of course.

22        A.      Just real quick.

23                    THE VIDEOGRAPHER:  It's 4:19 p.m.

24   we're going off the record.

25              (There is a brief recess taken.)

1                    THE VIDEOGRAPHER:  The time is

2      4:28 p.m.  We're back on the regard.

3           Q.       Mr. Shapiro, comparing Exhibits 1 and

4      2, do you recall that in the prior term sheet, the

5      percentage recovery of subsidiary Unsecured

6      Creditors was either 10 percent or 50 percent

7      depending on whether they accepted or rejected the

8      plan?

9           A.       I don't recall, specifically.

10          Q.       Well, do you recall that there was a

11     change in the treatment of the subsidiary general

12     Unsecured Creditors in the most recent plan so that

13     they now were getting a 100 percent recovery?

14          A.       Yes.

15          Q.       And why was that done?

16          A.       I can't remember.  That was

17     discussed, though, on the call.  It went like from

18     50 percent to 100 percent, yeah.

19          Q.       Well, why, what was the reason?

20          A.       I don't remember.

21          Q.       Well, it was two days ago.  You don't

22     remember what the reason was for giving the class

23     100 percent recovery; isn't that unusual in

24     bankruptcy?

25          A.       I don't recall.

```
 1        Q.        Was it to buy the support of the
 2   subsidiary creditors who were members of the
 3   Unsecured Creditors Committee?
 4        A.        I don't -- I don't know.  I wasn't in
 5   negotiation.
 6        Q.        Did anybody ask the question, if the
 7   Special Committee --
 8        A.        It was discussed.
 9        Q.        -- why are we giving this class?
10        A.        It was discussed.  I don't remember
11   what the reason was.
12        Q.        Do you know who asked the question,
13   if anybody did?
14        A.        No.  I remember it was, specifically,
15   pointed out by the -- by one of the advisors on the
16   call, whoever was speaking at the time.
17        Q.        And did that --
18        A.        You have to ask them.
19        Q.        Did -- was there any response to the
20   -- when they pointed it out?
21        A.        I don't recall.
22        Q.        And going back to the current term
23   sheet, Shapiro Exhibit 1, if you turn to the second
24   page, you'll see that there are estimated recovery
25   percentages on the effective date stated for various
```

1    classes of creditors.  Do you see that?

2            A.        Yes.

3            Q.        And you see the estimated recovery

4    percentage on the effective date for the senior note

5    holder claims is 32.73 percent?

6            A.        Yes.

7            Q.        And do you see that for the other

8    parent general unsecured claims, the estimated

9    recovery percentage on the effective date was 35,

10   18 percent under something called option one?

11           A.        Yes.

12           Q.        Do you see that?

13            Can you tell me why the percentages are

14   different for these two creditor classes?

15           A.        I can't tell you.

16           Q.        Was that discussed at all in the

17   Special Committee meeting?

18           A.        I don't recall.  This is the first --

19   the second deal.  Yeah, I don't recall.

20           Q.        If you look at the bottom of Page 1

21   of Shapiro Exhibit 1, it refers to a reserve of

22   $77.7 million in cash held and distributed if bridge

23   loan claims are allowed.  Do you see that?

24           A.        Yes.

25           Q.        How was the amount of that reserve

1    determined?

2         A.        I'm sure just like all the other

3    numbers that you've asked me about.  I mean, we

4    relied on the advice of our counsel and our

5    financial advisors.  I'm not sure how they got to

6    exactly the numbers.  But they had a mediation.

7    They had discussion.  They had a lot of financial

8    advisors in the room and they came to a deal and

9    then they took us through the deal and we tried to

10   question -- we questioned things we didn't

11   understand, what we could remember and, ultimately,

12   it was the guidance of our Special Committee counsel

13   and financial advisor that it was a fair deal and,

14   certainly, much better than anything that had ever

15   been presented in the past over the course of two

16   years.

17        Q.        What independent judgment, if any,

18   did you bring to the process of analyzing the plan

19   that's shown in Shapiro Exhibit 1?

20        A.        Just by querying certain things I

21   understood or maybe didn't understand enough and

22   then I relied on the advice of my financial advisors

23   and counsel.

24        Q.        Was there anything in your personal

25   experience as a corporate executive or someone who

1    went through bankruptcy that you relied on or was it

2    just the advisors?

3         A.        Well, the recovery was greater.

4         Q.        The recovery was greater than the

5    previous --

6         A.        Recovery was greater for more

7    classes.  The litigation was reduced, which was also

8    a part of our job.  And it had the endorsement of

9    several parties that as aforementioned it didn't

10   previously have and it had the endorsement of the

11   mediator, who worked tirelessly to get to a deal.

12   And, from what I was being told from advisors and

13   counsel, he was pleased and willing to not only sign

14   off on it but endorse it publically, which he did by

15   signing off on the press release.

16        Q.        Okay.  So did you place substantial

17   weight on the mediator's -- your understanding that

18   the mediator agreed with this proposal?

19        A.        He was one of several cods in the

20   wheel.

21        Q.        Okay.  Do you know what, if any,

22   independent judgment Miss Wilderotter brought to the

23   process of evaluating the plan in Shapiro Exhibit 1?

24        A.        Ask her.  I can't speak for her.

25        Q.        Well, based on her participation in

1    meetings that you attended, do you know, did she

2    contribute anything, independent judgement?

3         A.      She asked questions just like the

4    rest of us then complained about having to do a

5    deposition.  That I remember.

6         Q.      Okay.  Was there anything that was

7    ever said by the financial advisor Lazard that you

8    disagreed with?

9         A.      Over the course of Special Committee?

10        Q.      Yes.

11        A.      Oh, sure.

12        Q.      Well, can you name anything?

13        A.      Specifically, the, you know, when we

14   first got named as a Special Committee and one of my

15   first moves was to bring everyone together.  I

16   wanted to get the -- a plan that had fallen apart

17   between Oaktree, J.P. Morgan and Angelo Gordon, at

18   least, get those parties back in a room.  And my

19   Chief Restructuring Officer along with my financial

20   advisor thought it was too soon to do that.  He

21   needed to make progress and more discussion before

22   doing that.  And they were vehement about it, but I

23   was -- I refused to accept that and reached out to

24   some of the parties myself to make sure that we got

25   people to New York and got a room and started laying

1    out what are the issues and let them go at it one on

2    one, as opposed to phone calls or silence, which was

3    what was occurring at the time.

4         Q.        What was the reason that the CRO and

5    the financial advisor thought it was too soon to

6    attempt those negotiations?

7         A.        It's just what they said.  It's just

8    too soon.

9         Q.        They didn't give --

10        A.        Needed to make more progress before

11   getting people in a room.  The same with Step 1,

12   Step 2, I was adamant that we keep going, keep

13   fighting, keep arguing, keep talking, continue to go

14   heavy on dialogue and work with the mediator to

15   resolve some of the Step 2 claims and get J.P.

16   Morgan on board and Unsecured Creditors Committee,

17   as deep as we could go, as much recovery as we could

18   get.

19        And I was, actually, thankful that the

20   mediator really encouraged the groups not to file a

21   plan until he had another mediation session to try

22   to do just that, to go deeper.  Because if he had

23   not done that, I don't think I would have prevailed

24   and I think they would have filed a Step 1 plan.

25        Q.        Now, you understood that --

1          A.          Step 1 only plan, that didn't include

2     the Unsecured Creditors Committee.  It didn't

3     include JPM, that didn't include the endorsement of

4     the mediator and left open a lot of litigation,

5     which would have been a problem for the estate going

6     forward.  So I was pleased that he agreed with,

7     certainly, where I was but, of course, we weren't

8     talking.

9          Q.          Why would the litigation be a problem

10    for the estate going forward?

11         A.          Well, just in an effort to resolve as

12    many claims as possible.  And there's, certainly,

13    going to be litigation post emergence.  But, you

14    know, part of my mission I saw was to resolve as

15    much litigation as we could.

16         Q.          Now, you understood that the -- as

17    more cash was put into the settlement plan, at the

18    same time claims, litigation claims, would be

19    released, right?

20         A.          People were paying for the release.

21         Q.          So, in other words, there was a risk

22    that the claims release could be worth more than the

23    cash contributed?

24         A.          Yes.

25         Q.          Right?

1        A.        I do understand that.

2        Q.        And did you make an analysis of what

3   the value was of the release claims and compare it

4   to the cash that was going to be contributed?

5        A.        I think you went through that in one

6   of the pages.  Again, I'm talking out of turn here,

7   but there was something about 318 million or 100

8   million.  I mean, it's on one of these pages that we

9   just looked at it.

10        But the bottom line is I relied on my

11   financial advisors to tell me that that $120 million

12   was fair given the liability or risk of the claim --

13        Q.        Okay.

14        A.        -- or probability of the claim.

15        Q.        Did your financial advisors ever

16   construct any decision trees in connection with

17   advising the committee?

18        A.        (No response.)

19        Q.        Do you know what I mean by "decision

20   trees?"

21        A.        No.

22        Q.        Did they ever compute any

23   probabilities of various outcomes and weigh the

24   expected outcome by the probability of it occurring?

25        A.        No, not that I recall.  I'm not sure

1    the examiner did either.  I don't know how he came

2    to these percentages.

3         Q.      Well, you mentioned the examiner.

4    You recalled the examiner used certain phrases in

5    his report such as highly likely, reasonably

6    likely --

7         A.      Yes.

8         Q.      -- somewhat likely and some --

9         A.      Yes, I do recall that.

10        Q.      Okay.  And did you in your own mind

11   associate any percentages with any of those phrases?

12        A.      No.  I remember that Step 1 was less

13   likely and Step 2 was more likely.  I can't remember

14   exactly what the percentages were.  But I remember

15   there was a whole issue with the valuation thing too

16   because he was using, I thought, a lower number, the

17   6.1 that you were referencing, when he should have

18   been using 6.8, which I think they used when they

19   took us through the deck.  So, you know, there was a

20   lot -- a lot to argue about with what the examiner

21   did.

22        Q.      So you now recall they did use a 6.8

23   number?

24        A.      No, I recall -- yeah, well, the

25   model, I think, suggested it was 6.8.  It never said

1    it in the document.

2         Q.        Okay.  But didn't I ask you a few

3    minutes ago whether Lazard had given you a number

4    that was larger than 6.1 billion?

5         A.        Well, I was just confused then.  I

6    thought you were saying -- you were asking me about

7    the 6.1.

8         Q.        Do you recall now that Lazard was

9    using 6.8 billion as the DEV?

10        A.        I don't know about the DEV, but I

11   just remember that the model was based on 6.8

12   billion is what I think.  I recall the examiner had

13   less.

14        Q.        What model were you referring to in

15   that answer you just gave?

16        A.        The summary sheet, which is the page

17   I have right here.

18        Q.        You mean the presentation, Exhibit 3?

19        A.        Yes.

20        Q.        So, in your mind, do you -- did you

21   associate any percentage with, for example, the

22   words reasonably unlikely?

23        A.        No.

24        Q.        So you don't have any view about how

25   much below 50 percent reasonably unlikely is?

1        A.        No, I don't recall exactly what it
2    was.  I thought that there was reference to
3    percentages, but I don't recall them.
4        Q.        You mean in the examiner report?
5        A.        Yeah.
6        Q.        Okay.  Incidentally, when you read
7    the examiner report, was there anything there that
8    you recall reading that you disagreed with?
9        A.        No, because I wasn't on the board
10   when all this took place.  So I really wasn't in a
11   position to agree or disagree.
12       Q.        Well, when did you join the Board of
13   Directors of Tribune?
14       A.        I don't know the exact date, but it
15   was post the -- post all the funding, Step 1, Step 2
16   and then --
17       Q.        Right.  But was it before or after
18   the examiner report?
19       A.        Oh, it was before the examiner's
20   report; sorry.
21       Q.        Do you recall, approximately, when?
22       A.        Well before.
23       Q.        Was it sometime in 2008?
24       A.        When was the examiner report?
25       Q.        The examiner report was --

1      A.      Earlier this year, right, yeah.

2      Q.      Yes.

3      A.      So '07 or '08 sometime I joined the

4  Board.

5      Q.      It was after Step 2?

6      A.      Yes, well after all the funding took

7  place, financing.

8      Q.      Okay.  And do you recall the examiner

9  report stated that one or more members of Tribune's

10  senior financial management were not honest or

11  candid in connection with key aspects of the Step 2

12  transactions and that these circumstances led,

13  approximately, to the Step 2 closing to the

14  detriment of Tribune's creditors?

15      A.      Yes.

16      Q.      And do you remember that the examiner

17  stated, quote, "These acts go well beyond gross

18  negligence or recklessness but enter into the

19  terrain reserved for intentional misconduct"?

20      A.      Yes, I remember that.

21      Q.      Did the Special Committee investigate

22  the statement in the examiner's report about

23  management misconduct?

24      A.      The -- I think the company had the

25  auditors look into it.  Specifically, the actions of

1    Chandler Bigelow and also the Chief Restructuring

2    Officer asked that, I think, Sidley look into it and

3    Jones Day further looked into it.

4         Q.        On behalf of the Special Committee or

5    on behalf of the debtor?

6         A.        I can't remember who it was on behalf

7    of.

8         Q.        So the Committee has asked certain

9    professionals to investigate the allegations or the

10    statements --

11        A.        The board has.

12        Q.        The board has.

13         And has there been any follow-up action

14    concerning any action concerning members of

15    management as a result of the investigation that's

16    been taking place?

17        A.        A lot of discussion and questioning

18    and, as I said that to my knowledge, they -- three

19    different parties looked into it and I think that

20    the resolution or the conclusion was that there was

21    a strong disagreement with regard to what the

22    examiner wrote and the examiner didn't speak to all

23    the parties that the examiner should have spoken to

24    is what I was told, including a whole discussion,

25    obviously, and pending litigation on Morgan Stanley

1     and kind of what they signed off on or didn't sign

2     off on.  It seemed like there's -- it was a quagmire

3     still to be fully resolved.

4             Q.        Have the investigations that were

5     done by the auditors, Sidley and Jones Day, have

6     they been concluded?

7             A.        To my knowledge.

8             Q.        When were they concluded?

9             A.        A month ago or so -- I'm sorry, no,

10    no.  I would say two weeks ago; sorry.

11            Q.        Okay.  And the auditors were who?

12            A.        I'm not sure.  I can't remember who

13    the auditors were.

14            Q.        Were they the auditors that audit

15    Tribune --

16            A.        Yes.

17            Q.        -- Company's annual financial

18    statements?

19            A.        Yes.

20            Q.        And so I take it the questions of

21    management misconduct are not part of the Special

22    Committee's charter but are left with the Board of

23    Directors?

24            A.        I'm not sure where they ultimately

25    fall to.  But, certainly, we were there to focus on

1    getting settlement plan and bankruptcy.  As far as

2    open litigation that wasn't -- that wasn't left to

3    the Special Committee in particular.

4         Q.      Do you have any -- have you formed

5    any personal views or conclusions with respect to

6    the allegations of management misconduct?

7         A.      No, I, you know, I don't know enough.

8    I wasn't there when it happened.

9         Q.      Is it fair to say based on your

10   testimony today that there is disagreement among the

11   advisors with respect to the management misconduct?

12              MR. CULLEN:  Objection, foundation,

13   form and object to the extent that it calls for

14   privileged information.  So I'll instruct him not to

15   answer as to any disagreement among the advisors.

16        Q.      Did the auditors agree with the

17   conclusion of the examiner with respect to the

18   management misconduct?

19        A.      No, I don't believe they did.  I

20   don't believe -- I believe they disagreed with the

21   examiner and as did Sidley, as did Jones Day.

22        Q.      So is it fair to say that based on

23   that conclusion that the Special Committee does not

24   plan to take any action against Mr. Bigelow?

25        A.      No.

1                    MR. CULLEN:  Objection, foundation,

2      form.  I think he already told you it's not our job.

3            A.      Right.

4            Q.      Is it fair to say that --

5            A.      I wasn't brought in to determine, you

6      know, the liability and all these different

7      litigation matters, who is guilty of what or

8      innocent of what or what happened in the process

9      but --

10           Q.      Well, you're a member of the Board of

11     Directors, right?

12           A.      Yes.

13           Q.      Is it the -- is the Board of

14     Directors -- is it fair to say the Board of

15     Directors has decided not to take any action against

16     Mr. Bigelow?

17           A.      Yes, that's correct.

18                   MR. LACK:  Let me mark as Shapiro

19     Exhibit 4 a document produced by Mr. Shapiro in

20     redacted form with production numbers MS115 and 116.

21     These are series of e-mails dated September 9, 2010.

22           (Deposition Exhibit No. Shapiro-4, 9/9/10

23     series of e-mails MS115 & 116, was marked for

24     identification.)

25                   MR. BENDERNAGEL:  This is Shapiro-4?

1             MR. LACK:  Uh-huh.

2             MR. BENDERNAGEL:  Thank you.

3        Q.        Can you identify what's been marked

4    as Shapiro Exhibit 4?

5        A.        Yes, an e-mail to Jeff Berg and

6    Maggie Wilderotter from me.  They are members of the

7    Special Committee.

8        Q.        Now, did you meet with Oaktree for

9    two hours on September 8th, 2010?

10       A.        Yeah, I don't know if it was exactly

11   that day.  It says yesterday in the e-mail of

12   September 9th, but it's about there, if I was going

13   to get specific.

14       Q.        And who was the person at Oaktree

15   with whom you met?

16       A.        Ken Liang.

17       Q.        What's Mr. Liang's position at

18   Oaktree?

19       A.        I'm not sure of his title.  He's one

20   of the principals there.  He's working on the

21   bankruptcy for them.

22       Q.        And why did you meet with Mr. Liang

23   on September -- on or about September 8th?

24       A.        Just to hear them out, try to get

25   some history, understand why things were where they

1    were, where it got off course, how it got derailed,

2    you know, different plans that were being discussed,

3    why they never came to fruition.

4            Q.        And what did you mean when you said

5    in your e-mail, quote, "Don has made some wrong

6    turns and because of it has lost the confidence and

7    trust of several of the constituencies," unquote?

8            A.        I just overall I think that, you

9    know, many of the constituencies felt that Don

10   Liebentritt we're talking about here had agreed to

11   certain things or given them certain deadlines, need

12   hits or issues that were resolved and -- just

13   typical negotiation stuff where people thought the

14   debtor was re-trading just like you've thought the

15   debtor -- the debtor thought the constituencies were

16   re-trading and kind of issues that some people

17   thought had a pin in them were still left

18   unresolved.

19           And I think there had been a pattern of this

20   occurring over the course of two years and it was my

21   assessment and in meeting with and talking with some

22   of the constituencies that they had lost confidence

23   in Don, to a certain extent, and just overall they

24   thought that the debtor lacked direction.

25           Q.        Were the constituencies who lost the

1    confidence, did they include Oaktree?

2         A.      Yes.

3         Q.      Who else?

4         A.      J.P. Morgan.

5         Q.      Anyone else?

6         A.      That's all.

7         Q.      Then you said in your e-mail, quote,

8    "Further, the processes lacked leadership from the

9    debtor side," unquote.  Do you see that?

10        A.      Yes.

11        Q.      And that's consistent with what you

12   just said a few minutes ago?

13        A.      Yes, it is.

14        Q.      And did you determine that you would

15   provide the leadership that was lacking from the

16   debtor's side?

17        A.      I would attempt to join the team of

18   individuals that were attempting to provide the

19   leadership.  I think that David Heiman from Jones

20   Day played a central role in doing that and I think

21   Don, David Kurtz and Jim Conlan, you know,

22   ultimately, as a team, we came together and together

23   brought that leadership.

24        Q.      Now, at the top of Shapiro Exhibit 4,

25   you wrote to Miss Wilderotter and Mr. Berg, quote,

1    "Arranging a meeting for next Wednesday with

2    principals from Angelo, OT" -- that's Oaktree,

3    right?

4              A.        Yes.

5              Q.        "(Continuing.) And JPM" -- that's

6    J.P. Morgan?

7              A.        Yes.

8              Q.        "Heiman and I will be present and

9    we're going to see if we can bridge -- if we can all

10   bridge the issues and lock arms on the plan,"

11   unquote.

12             A.        Yes.

13             Q.        What did you mean by, quote, "all

14   bridge the issues and lock arms on the plan?"

15             A.        Exactly what that says.  I mean, you

16   know, in many ways viewed my role and David's role

17   as a mediator in this thing, get folks talking, get

18   them to the table, get the issues on the table, get

19   them discussing the issues back and forth, find out

20   where the gaps were and try to bridge them and don't

21   let them out of the room until they reach a deal.

22   We were unsuccessful in doing it that day, but we,

23   certainly, spent a lot of time and effort in trying

24   to make that happen.

25             Q.        Well, when you were unsuccessful at

1    that time, did you consider trying to reach out to

2    other constituencies other than Oaktree and J.P.

3    Morgan?

4           A.       My financial advisors and counsel

5    felt that we were close enough with this group that

6    we should keep going with this group, that should be

7    our focus, and I followed that advice.

8           Q.       Now, you understood at the time that

9    the various parties that were seeking to lock arms

10   on the plan, as you put it, were all potential

11   defendants in fraudulent conveyance litigation, the

12   debtor and the LBO lenders; is that right?

13          A.       Uh-huh.

14                   MR. JOHNSTON:  Object to the form of

15   the question.

16          A.       Sure, yes.

17          Q.       And did you consider involving any

18   potential Plaintiffs in the fraudulent conveyance

19   litigation as potential participants in your plan?

20          A.       I was merely following up on progress

21   that had been made with the senior lenders.  So

22   progress had been made and then fallen off the

23   track.  Progress had been made again and fallen off

24   the track.  I was picking up the pieces.  Who

25   determined who those principals were in those

1    initial conversations was purely the discretion of

2    my counsel and financial advisors.

3        Q.      Did you ever consider consulting with

4    Aurelius or any of the other potential Plaintiffs in

5    the fraudulent conveyance claims in developing a

6    plan?

7        A.      At this time I didn't even know who

8    Aurelius was.

9        Q.      If I substitute the word senior note

10   holders for that in that question, would you ever

11   consider involving senior note holders?

12       A.      Absolutely.  And my financial

13   advisors and CRO said they were talking to all

14   constituency.  They wanted to go as deep as they

15   could, but this was the right place to focus for the

16   time being.

17       Q.      What did your financial advisor tell

18   you about the positions taken by the senior note

19   holders?

20       A.      He just said he was talking to Center

21   Bridge.

22       Q.      Okay.  And, after Center Bridge left

23   the scene, it was replaced by Aurelius or -- well,

24   Aurelius was there before Center Bridge left the

25   scene but -- I'll rephrase the question.

1          A.          I got it, yeah.

2          Q.          Was there ever any discussion that

3    you were present at about Aurelius's participation

4    and the views that your financial advisor had of a

5    Aurelius itself?

6          A.          Yes, financial advisors told me that

7    according to the mediator and from discussions in

8    the first mediation, that they were just miles

9    apart.  They're having conversations but just miles

10   apart.

11         Q.          Miles apart from whom?

12         A.          Miles apart from reaching some kind

13   of settlement.

14         Q.          With?

15         A.          The debtor.

16         Q.          And the reason for that is explained

17   to you was what?

18         A.          They didn't give one, just miles

19   apart, the mediator says we're miles apart, keep our

20   eye on the ball and focused on these principles.

21                MR. LACK:  Let me mark now as Shapiro

22   Exhibit 5 for identification a document produced by

23   Mr. Shapiro with production numbers MS2, an e-mail

24   dated September 13, 2010.

25                (Deposition Exhibit No. Shapiro-5, 9/13/10

1    e-mail MS2, was marked for identification.)

2            Q.        Can you identify this?

3            A.        Yes, an e-mail to Ken Liang from

4    Oaktree.

5            Q.        You state in -- could you just read

6    what you wrote in the e-mail?

7            A.        Yeah.  "Very good call this morning

8    with my team.  Kurtz" -- meaning, David Kurtz from

9    Lazard -- "will call you to discuss choreography for

10   Wednesday."

11           Q.        What was being choreographed?

12           A.        Just another word for the agenda,

13   what the itinerary, what the plan is.  It's synonym.

14           Q.        And who did you refer to when you

15   said "my team?"

16           A.        David Heiman from Jones Day, the

17   players we've talked about, David Kurtz from Lazard,

18   Don Liebentritt, Jim Conlan.

19           Q.        What was going to happen on

20   Wednesday?

21           A.        I think that was the meeting.  Yeah,

22   it says in the last one you gave me, Exhibit 4, it

23   says, arranging a meeting for next Wednesday.

24           Q.        Okay.

25           A.        And then Monday I send him an e-mail

1    saying, all right, we've talked, we talked about how

2    it's going to go, how it's going to work for the

3    meeting Wednesday and the meeting took place

4    Wednesday.  So now we actually have the date which

5    would have been the 15th, September 15th.

6          Q.        Okay.  Now, when did the negotiations

7    with the Unsecured Creditors Committee with respect

8    to its participation or in the plan begin?

9                    MR. BENDERNAGEL:  Object to the form

10   of the question.  It's vague.

11         Q.        I'll rephrase the question.

12         A.        Yeah.

13         Q.        Did there come a time in which the

14   debtor had contact with the Unsecured Creditors

15   Committee about becoming a plan proponent?

16                   MR. BENDERNAGEL:  Object to the form

17   of the question.  Are you talking about in the

18   context of the settlement mediation or -- this has

19   been going on for years.

20                   MR. LACK:  No, at anytime.

21         Q.        This particular proposed plan,

22   Exhibit 1.

23         A.        I don't know.

24                   MR. LACK:  Let me mark as Shapiro

25   Exhibit 6 a document produced by Mr. Shapiro with

1   production numbers MS102 through 104, a series of

2   e-mails dated October 1st, 2010.

3          (Deposition Exhibit No. Shapiro-6, 10/1/10

4   series of e-mails MS102 to 104, was marked for

5   identification.)

6          A.      Thank you.

7          Q.      Can you identify this document?

8          A.      This is an e-mail from myself to Don

9   Liebentritt responding to Liebentritt's e-mail that

10  he sent to -- oh, a note that he was preparing, a

11  note that he was preparing to send to Miriam at J.P.

12  Morgan and Ken Liang at Oaktree at my request.

13         Q.      And in -- that proposed e-mail is

14  shown on Page MS103, 104?

15         A.      Yes.

16         Q.      All right.  In the middle of MS103,

17  it says, in this draft e-mail to J.P. Morgan and

18  Oaktree, quote, "We are working with JPM and the UCC

19  on the Step 2 settlement of the estate claims

20  against the senior lenders," unquote.  Do you see

21  that?

22              MR. CULLEN:  Second full paragraph,

23  at the same time we're working with?

24              MR. LACK:  Correct.

25         A.      Yeah, okay.

1          Q.        What does that refer to?

2          A.        They're working on -- my

3    understanding of it was they were working on

4    bringing JPM and UCC into the deal.  That was my

5    takeaway.

6          Q.        Who on the debtor's side was working

7    on bringing the UCC into the deal?

8          A.        David Kurtz and Don Liebentritt.

9          Q.        And who at UCC would --

10         A.        And probably Conlan, too.  I have no

11   idea.  I don't know one person on the UCC.

12         Q.        So this process was under way as of

13   October 1st, 2010?

14         A.        Seems like it, yes.

15         Q.        Do you know whether it began earlier

16   than that?

17         A.        I don't know.  Well, excuse me.  Let

18   me just rephrase that.

19              I know that they were always working on

20   bringing -- trying to get UCC into the deal and at

21   many times it fell apart.  With regard to this

22   specific Step 2 settlement of estate claims, I don't

23   know when that started.

24         Q.        Okay.  Was there any discussion at

25   the Special Committee meeting on October 11th of

1    Aurelius's views concerning settlement?

2         A.        Yeah, I think some of those bullets

3    that we went over represented some of the problems,

4    if you would, that Aurelius might have with that

5    plan.

6         Q.        Was it mentioned during the meeting

7    that the plan, specifically, did not include

8    Aurelius?

9         A.        No.  I mean, you knew it didn't

10    include Aurelius.  My only, you know, recollection,

11    specifically, about senior note holders is the Step

12    1 plan that was going to get filed had the recovery

13    much lower than it ended up being after the second

14    mediation, which produced the next settlement

15    proposal, I mean, a significant jump.  I think to

16    the tune of like 35 cents on the dollar, somewhere

17    around there, and that was progress.  But they were

18    pointing out that no matter what, though, we're

19    still miles apart and they're going to have issues

20    with this plan.

21         Q.        Did anyone say during the Special

22    Committee meeting that Aurelius was opposed to this

23    deal or any deal that doesn't give 100 percent

24    payment?

25         A.        I don't -- I don't recall that.

1          Q.        Was -- were you involved in any
2    discussion about excluding Aurelius from any
3    negotiations in meetings?
4          A.        No.
5          Q.        Were you involved in any discussion
6    about excluding Aurelius from meetings with the
7    mediator?
8          A.        No.   I was told that in the second
9    mediation, at some juncture, that the mediator just
10   wanted to meet with senior lenders because he didn't
11   think they were making progress with the senior note
12   holders.
13         Q.        Were you informed of any exclusion of
14   Aurelius from meetings between the mediator and the
15   Unsecured Creditors Committee?
16         A.        No.
17         Q.        And did you think that Aurelius
18   should be allowed to participate in negotiations?
19                   MR. CULLEN:   Objection, foundation,
20   form.
21         A.        That's up to the mediator.   I would
22   think that, you know, all constituencies, you know,
23   were being -- at sometime or another over these two
24   years were being spoken with and being heard and at
25   the table and, you know, in the court, on conference

1    calls.  I mean, you know, you're trying to bring

2    consensus as deep as you possibly can as quick as

3    you possibly can to folks that, you know, spend a

4    lot of money investing in a company that they're

5    potentially losing their investment.  So,

6    absolutely, everybody should be acknowledged and

7    recognized and be heard.  And I think the process

8    was doing that inside and outside of the court, from

9    what I was being told.

10         Q.        We need to change the videotape.

11                   THE VIDEOGRAPHER:  The time is

12    5:04 p.m.  We are going off the record.

13         (There is a brief recess taken.)

14                   THE VIDEOGRAPHER:  This is tape No.

15    2.  The time is 5:07 p.m.  We are back on the

16    record.

17                   MR. LACK:  I'd like the reporter to

18    mark as Shapiro Exhibit 7 for identification a

19    document produced by Mr. Shapiro with production

20    number MS97.  This consists of an e-mail dated

21    September 28, 2010.

22         (Deposition Exhibit No. Shapiro-7, 9/28/10

23    e-mail MS97, was marked for identification.)

24         A.        Thank you.

25         Q.        Can you identify Exhibit 7?

1          A.          Yeah.  This is an e-mail from myself
2     to the Special Committee.
3          Q.          And what's the subject of the e-mail?
4          A.          It's an update.  I'm giving an update
5     to the Special Committee.
6          Q.          Okay.  There is a reference here to
7     something called the D&O issue.  Do you see that?
8          A.          Yes, directors and officers.
9          Q.          What does that mean?
10          A.          That is the litigation that was
11     either sure to come or was potentially going to come
12     related to the directors and officers of the Tribune
13     Board that approved the Step 1 and Step 2 financing,
14     as I understand it.
15          Q.          You received a message from Mr. Wood
16     that says, quote, "The D&O issue is a little
17     perplexing.  Could it be that Oaktree looks at it as
18     a little sweetener for the Step 2 Plaintiffs (it
19     wouldn't, under their suggestion, be used in Step 1,
20     therefore it is all there for Step 2)?"  Do you see
21     that?
22          A.          Yes.
23          Q.          Do you have any understanding of what
24     Mr. Wood was referring to?
25          A.          No, with regard to the parenthetical.

Case 08-13141-BLS   Doc 6589-1   Filed 11/23/10   Page 89 of 166

88

1    But the -- he was voicing -- it seemed to me he was

2    voicing concern of why aren't the D&Os going to get

3    a release.

4         Q.      And did you have any view on that?

5         A.      Yeah, I said that the lawyers were

6    going to decide and I think that part of their

7    analysis in determining whether or not that release

8    is going to go on the plan will have to do with how

9    Aurelius is going to feel about and react

10   accordingly.

11        Q.      And that's what you meant when you

12   said at the top of the page, quote, "All has to do

13   with how to defend against Aurelius --

14        A.      Correct.

15        Q.      -- that's what this is about" --

16        A.      Yeah.

17        Q.      -- unquote?

18        A.      It's my understanding.  If the D&O

19   releases are in or out, Aurelius is going to take a

20   position.  And I think that part of their

21   determination, as I just said, of whether or not

22   they were going to give releases, had a lot to do

23   with how they thought Aurelius was going react to

24   it.

25        Q.      What did you perceive Aurelius'

1   position to be with respect to the releases of the

2   officers and directors?

3          A.       I didn't know.  And I still don't.  I

4   was -- that's what the lawyers were debating back

5   and forth.

6          Q.       Was it your understanding that the

7   officers and directors of Tribune that approved the

8   LBO were covered by D&O insurance?

9          A.       Correct.  Well, a certain amount of

10  it, yeah.

11         Q.       And that that D&O insurance would be

12  available to the litigation trust, if it brought

13  claims against those directors and officers?

14         A.       No, that's not where I was going with

15  that.  D&O is -- whether or not there was going to

16  be a release for the directors and officers, that's

17  what this was about.  This wasn't about the

18  insurance, to my knowledge.

19         Q.       Okay.  But the directors and officers

20  did have --

21         A.       Yes.

22         Q.       -- D&O insurance?

23         A.       Yes, they did.  They still do.

24         Q.       And how much was the insurance for?

25         A.       I believe there is a cap of

1    $200 million, somewhere in that neighborhood.

2          Q.        And was there any discussion that

3    releasing the directors and officers would make that

4    $200 million of insurance unavailable to be used --

5          A.        No.

6          Q.        -- for --

7          A.        This wasn't about insurance money.

8    This e-mail was not about insurance money

9    whatsoever.

10         Q.        Okay.  Under the current plan

11   proposal are the directors and officers being

12   released?

13         A.        I don't believe they are.

14         Q.        Did the Special Committee obtain an

15   estimate of the value of the claim that could be

16   made against the directors and officers?

17         A.        Not that I'm aware of.

18         Q.        Now, when was the idea of forming the

19   Special Committee proposed?

20         A.        It was proposed immediately

21   following, -- as I mentioned earlier, there was a

22   potential plan that was -- I just know of it as the

23   375 plan.  I don't recall exactly how the 375 got

24   broken up or where it went or any of that.  But the

25   375 plan was with J.P. Morgan -- excuse me -- with

1    Oaktree, Angelo and I can't recall if it was with

2    J.P. Morgan or not, but it was a plan that almost

3    went through and at the last minute it fell apart.

4    And so now I hear the company was two years into

5    bankruptcy, yet another plan had fallen apart.  It

6    seemed like we were about to enter a time when who

7    knows, everybody might be starting plans and the

8    process might really get out of whack.  The debtor

9    had, clearly, lost control of the process situation,

10   as I later learned, and had lacked leadership and

11   confidence among many of the constituencies and the

12   general counsel of the company came forward to the

13   independent members of the board and said that he

14   felt we should consider a Special Committee to see

15   this bankruptcy through.

16          Q.     The general counsel at that time was

17   Mr. Liebentritt?

18          A.     Yes, it was.

19          Q.     Okay.  And so, approximately, when

20   did he propose forming a Special Committee?

21          A.     I would say around the beginning of

22   September.

23          Q.     And what is your understanding of the

24   purpose of the Special Committee?

25          A.     I think you hit a lot of that

1    earlier.  I mean, the idea was to be purely

2    independent, no conflicts of interest and I know

3    that, at least, two of us, maybe all of them, I

4    don't know, weren't even here or on the board when

5    this Step 1, Step 2 plan was approved, to see this

6    bankruptcy through as quick as we possibly could, to

7    maximize recovery as deep as we possibly could or as

8    many constituencies as we possibly could, to

9    motivate the constituencies, Unsecured Creditors

10   Committee, J.P. Morgan, you know, all the way down

11   the line to get to the table and reach an agreement,

12   to minimize litigation and to -- if there was going

13   to be litigation, see that it was going to be after

14   the fact so that the company could emerge and

15   preserve the value of the estate continuing the

16   business operations, which were trending upwards

17   significantly at the time.

18         Hold on, I just want to make sure I got

19   everything there.  And just really act as the

20   decision maker for the debtor, whether it be a

21   compass or a guide or at times of actually voting to

22   work with the general counsel and potentially other

23   parties to see that this thing stayed on track and

24   didn't get derailed again.  That was the gist of it.

25   Independence was a, you know, must.  It was the

1  riding factor or writing factor.

2      Q.        Independence in what sense?

3      A.        No conflicts of interest, you know,

4  no -- for example, you know, history of approving

5  the deal, the Step 1, Step 2 financing, independence

6  of thought, you know, doing what was best for the

7  debtor, the creditors, the company, the employees,

8  our partners, the communities in which we serve and,

9  you know, making decisions that were in the best

10  interest of the estate.

11      Q.        Did independence encompass

12  independence from Mr. Zell?

13      A.        Absolutely, that was one of the

14  factors, yeah.  Nobody that worked for Mr. Zell

15  previously or was paid by Mr. Zell or contributed to

16  the ESOP or whatever contributed to the LBO, if you

17  will.

18      Q.        Do you know whether, in fact, all of

19  the members of the Special Committee meet the

20  criteria of never having worked for Mr. Zell?

21      A.        I don't know.

22          MR. JOHNSTON:  Objection, vague.

23      Q.        Were there only four members of the

24  Board of Directors of Tribune that were independent

25  at the time the committee was set up, in your view?

1        A.        I didn't make a view.  I was asked to

2   serve by the general counsel.  I was told I was

3   independent and, you know, I accepted the role.

4        Q.        So was it the case that

5   Mr. Liebentritt selected the members of the

6   independent -- the Special Committee?

7        A.        Yes.  And we were told -- at least, I

8   was told individually that I was independent.  I

9   assumed they were as well, but I can't speak for

10  them.

11       Q.        Okay.  And were there certain people

12  who were considered but not chosen to be on the

13  Special Committee --

14                 MR. CULLEN:  Objection, form.

15       Q.        -- to your knowledge?

16                 MR. CULLEN:  Objection, foundation.

17       A.        Not that I'm aware of.

18                 MR. LACK:  I'd like the reporter to

19  mark as Shapiro Exhibit 8 for identification a

20  document produced by Miss Wilderotter with

21  production numbers MW5 through MW8.  It's entitled

22  Tribune Company Unanimous Written Consent of the

23  Board of Directors in Lieu of a Meeting,

24  August 26th, 2010.

25                 (Deposition Exhibit No. Shapiro-8, 8/26/10

1    Tribune Company Unanimous Written Consent of the

2    Board of Directors in Lieu of a Meeting MW5 to MW8,

3    was marked for identification.)

4            Q.       Could you identify this document?

5            A.       Yes, this is a consent by the Board

6    of Directors to form a Special Committee.

7            Q.       Does this document, Shapiro

8    Exhibit 8, set forth the powers and authority of the

9    Special Committee?

10           A.       Yes, it does.

11           Q.       Turning to the last page, MW8, no

12   signatures appear on this page.  Do you know whether

13   the signatures of the directors of the Tribune

14   Company were ultimately all obtained?

15           A.       Absolutely.

16           MR. LACK:  I'd like the reporter now

17   to mark as Shapiro Exhibit 9 for identification a

18   document produced by Mr. Wood with production

19   numbers FW7through FW10 consisting of a cover e-mail

20   and then a document entitled, Tribune Company

21   Unanimous Written Consent of the Board of Directors

22   in Lieu of a Meeting.  There is no date on the first

23   -- on that document, but the e-mail, the cover

24   e-mail, is dated September 7th, 2010.

25           (Deposition Exhibit No. Shapiro-9, 9/7/10

1   e-mail and attachment entitled Tribune Company

2   Unanimous Written Consent of the Board of Directors

3   in Lieu of a Meeting FW7 to FW10, was marked for

4   identification.)

5        A.      Right.

6        Q.      Do you recognize Shapiro Exhibit 9?

7        A.      Yes.

8        Q.      What is it?

9        A.      It's a consent that Don Liebentritt

10  moved from his role of general counsel to CRO and

11  David Eldersveld, who is the No. 2, if you will,

12  under Don in the legal department moved to become

13  the general counsel.

14        Q.      Whose idea was it that

15  Mr. Liebentritt would move from being general

16  counsel to CRO?

17        A.      I think it was a combination.  It was

18  something discussed by Don, myself and David Heiman.

19        Q.      Is it correct that this Unanimous

20  Consent, this resolution that would change

21  Mr. Liebentritt's role from general counsel to CRO,

22  was circulated on September 7th, 2010?

23        A.      Do I know that it was circulated on

24  September 10th?

25        Q.      Was that your recollection?

1          A.        I'm just reading the e-mail.  It

2     seems like it was sent out.

3          Q.        Well, you're a recipient of --

4          A.        I've seen this.

5          Q.        Yes, okay.

6           Do you remember receiving this -- does this

7     refresh your recollection that you got this

8     resolution --

9          A.        I signed it and faxed it in.

10          Q.        On September 7th?

11          A.        I don't know the date that I faxed it

12     in.  It might have been the 8th, but, yes, I

13     received it.

14          Q.        Was the resolution ultimately signed

15     by all the members?

16          A.        Absolutely.

17          Q.        Do you know when that occurred?

18          A.        I don't know.  But I asked,

19     specifically, about both these documents, which is

20     why I've answered them absolutely.

21          Q.        Now, in terms of the role played by

22     Mr. Liebentritt and Mr. Eldersveld, as of

23     September 7th, did Mr. Liebentritt become the Chief

24     Restructuring Officer in terms of his activity?

25          A.        Whatever date they got all the

1    signatures in, he effectively took over.  I think

2    that Randy -- Michael Zucele (phonetic) sent out an

3    e-mail.  I believe he sent out an e-mail to the

4    company informing them and that's when it took place

5    or he sent out an e-mail to the Board informing them

6    that we're making this move, you know, announcing

7    it.  It might have been done in the press release, I

8    can't remember.

9         Q.     My question was -- just so I

10   understand your testimony, is it your testimony that

11   Mr. Liebentritt did not start becoming CRO at the

12   time -- on September 7th but waited until some --

13   until all the signatures were obtained?

14              MR. CULLEN:  Objection, foundation,

15   form.

16        A.     I don't -- as I said, I don't know

17   exactly.  Signatures may have been obtained that

18   day.

19             What I know is that a determination was

20   made, folks consented, sent it in and Don continued

21   in his role.  This is a formal title is all this is.

22   As you know, Don has been the CRO for this process

23   for quite a long time.  His title just happened to

24   be general counsel.  But, in truth, he's spending

25   90 percent of his time working on the restructuring

1    and probably not enough time working on the everyday

2    day-to-day business operations of the company as

3    acting general counsel.  So we just formalized the

4    switch, put David in the role so that the company

5    would have the proper attention of a full-time GC

6    and the restructuring would have a full-time proper

7    attention of a full-time CRO.

8            Q.      Did Mr. Liebentritt after he became

9    CRO continue to provide legal advice to the company?

10           A.      With regard to?

11           Q.      With regard to anything.

12                   MR. CULLEN:  Objection, foundation,

13   form.

14           A.      I don't know.  I have no idea.

15           Q.      I'll narrow it.

16            Did Mr. Liebentritt after he became CRO

17   continue to provide legal advice with respect to

18   restructuring matters?

19           A.      I have no idea.

20           Q.      Did you as head of the Special

21   Committee go up to Mr. Eldersveld for legal advice

22   in-house with respect to the restructuring?

23           A.      David Eldersveld, no, never, never

24   spoke more than once.

25           Q.      And who did -- with whom did you --

1    from whom did you seek legal advice with respect to

2    the restructuring matters?

3         A.        David Heiman.

4         Q.        Okay.  So that you relied exclusively

5    on outside counsel for legal advice?

6                   MR. CULLEN:  Objection, foundation,

7    form.

8         A.        For legal advice for the Special

9    Committee --

10        Q.        Yes.

11        A.        -- with regard to the restructuring

12   process, yes.

13                  THE WITNESS:  It would help if our

14   team could spell counsel right; right?  That's never

15   a good sign.

16                  MR. BENDERNAGEL:  It cost extra.

17                  MR. LACK:  I'd like the reporter to

18   mark as Shapiro Exhibit 10 a copy of the original

19   notice of deposition and subpoena in connection with

20   this deposition.  The notice of deposition is dated

21   October 1st, 2010, for the deposition of Mark

22   Shapiro, and then there's a subpoena attached to it,

23   also, dated October 1st, 2010.

24                  (Deposition Exhibit No. Shapiro-10, notice

25   of deposition and subpoena, was marked for

1    identification.)

2          A.       Thanks.

3          Q.       Have you ever seen Exhibit 10 before?

4    If you could page through it, I'm going to ask about

5    various parts of it.

6          A.       No.

7          Q.       Okay.  Let me just to be clear.  Have

8    you ever seen the notice of deposition part that's

9    the first page -- is up to where it says Exhibit 1?

10         A.       Which page, I'm sorry?

11         Q.       You'll see there's a notice of

12   deposition and then there's something -- a page, a

13   separator page, that has Exhibit 1 on it.

14         A.       Yes, I see that.

15         Q.       Have you ever seen the notice of

16   deposition before?

17         A.       No.

18         Q.       And then following Exhibit 1, there's

19   a term sheet and then after that is something called

20   a subpoena and a case under the bankruptcy code.

21          Have you ever seen this document before?

22         A.       No.

23         Q.       Now, you'll see --

24         A.       It was sent to me, but I didn't look

25   at it.

1          Q.        Okay, all right.

2          And you'll see in the middle of the page,

3    there is a box checked.  It says, "You are commanded

4    to produce and permit inspection and copying of the

5    following documents."  Do you see that section?

6          A.        I trust you, yeah.  I don't see it

7    but...

8          Q.        You can look at it.  Take your time.

9                    MR. CULLEN:  You are commanded, here.

10         A.        Yes, got it, check.

11         Q.        And do you see after that checkbox

12   and legend, there is a description of certain

13   documents that are being requested?

14         A.        Yes.

15         Q.        Were you aware prior to reading this

16   subpoena that's part of Exhibit 10 that you were

17   requested to produce documents in connection with

18   this case?

19                   MR. CULLEN:  Objection, foundation,

20   form.

21         You can address the question.

22         A.        With regard to this deposition?

23         Q.        Yes.

24         A.        Yes.

25         Q.        Okay.  And were you aware that you

1    were required by the subpoena to produce, quote,

2    "All documents concerning the term sheet of joint

3    plan of debtors, Oaktree and Angelo Gordon arising

4    from mediation that was attached to the mediator's

5    report filed in the above captioned Chapter 11 cases

6    by the Honorable Kevin Gross on September 28th,

7    2010"?

8          A.    Yes, yes.

9          Q.    And were you aware that you were

10   required to produce all documents concerning any

11   consideration, discussion and negotiation of such

12   term sheet or any of the terms thereon whether

13   involving a Special Committee of the Board of

14   Directors of Tribune Company or other persons, were

15   you aware of that?

16         A.    Yes.

17         Q.    And were you aware that you were

18   required to produce all documents concerning any

19   press release or other public disclosure concerning

20   such term sheet or any settlement relating thereto?

21         A.    Yes.

22         Q.    And were you aware that you were

23   required to produce all minutes, resolutions or

24   other documents concerning the responsibilities and

25   authority of the Special Committee?

1      A.      Yes.

2      Q.      Okay.  What did you do to comply with

3  those responsibilities to bring us those documents?

4      A.      I had my assistant work with our IT

5  department to pull everything I had and I believe we

6  did it in 48 hours.

7      Q.      Who is your assistant that worked on

8  this?

9      A.      Jaclyn Sobel.

10     Q.      Can you spell that for the reporter.

11     A.      J-A-C-L-Y-N Sobel, S-O-B-E-L.

12     Q.      And, so when we see Miss Sobel's name

13  at the top of, for example, Shapiro Exhibit 7, it's

14  because she printed out your e-mail?

15     A.      Exactly.

16     Q.      Okay.  Did you personally review the

17  documents that were produced in connection with this

18  subpoena to see whether they were a complete set of

19  documents that were called for under the subpoena?

20     A.      Package, yes, entire package.

21     Q.      And do you have in your possession

22  any of the minutes or draft minutes of any of the

23  Special Committee meetings?

24     A.      No.

25     Q.      Why is that?

1         A.         I don't keep that stuff.

2         Q.         You don't keep minutes of the

3    meetings of which -- a committee in which you're

4    chairman?

5         A.         No, I don't take the minutes, I don't

6    keep them.

7         Q.         Okay.  Did you ever receive any

8    drafts --

9         A.         And that includes when I was CEO of a

10   public company for four years.  I just don't.  I

11   rely on my counsel for that, with a need.

12        Q.         Were you ever sent the drafts of the

13   minutes of any of the committee meetings by e-mail?

14        A.         I don't recall.  I don't recall.

15        Q.         Do you recall reading over any draft

16   minutes?

17        A.         I don't recall.  It's a good

18   question.  I don't recall.

19        Q.         Did you have -- do you have in your

20   possession, custody and control the resolution that

21   established the Special Committee?

22        A.         Yes, at one time I did, yes.

23        Q.         No longer?

24        A.         No, I shredded it, as soon as I faxed

25   it.

1        Q.        I see.  So, as soon as you sign the

2   resolution --

3        A.        Right.

4        Q.        -- you shredded the document?

5        A.        No, I faxed it --

6        Q.        I'm sorry.

7        A.        -- to Robin Mariella.  I waited for

8   her to either call me or e-mail me because she had

9   actually sent me an e-mail saying, we didn't receive

10  your signature.  So then I did it -- waited until

11  she told me and then I stuck it in my shredder.

12       Q.        Why did you shred it?

13       A.        I just have too much paper in my

14  office.

15       Q.        Why shred it as opposed to just stick

16  it in the wastebasket?

17       A.        Well, I just shred everything.  I

18  mean, I don't know where that stuff's going to go.

19  The garbage man takes it out.  It's in my garage.

20  The next guy picks it up.

21       Q.        So you signed it at your home?

22       A.        Yes, I'm sorry, yeah.

23       Q.        Okay, all right.

24            And so do you delete e-mails that you

25  receive concerning Special Committee subjects?

1                    MR. CULLEN:  Objection, foundation,

2      form.

3           Q.      Have you ever deleted e-mails

4      relating to the Special Committee?

5           A.      Yes, a lot.

6           Q.      How -- when most recently?

7           A.      You know, unless it's really --

8      unless like this deck that you gave me, Exhibit 3,

9      this might be like the only thing that I would save

10     because it just has so much good information that I

11     have to study it or have more questions or go back

12     to understand the plan, I have it on file.

13     Otherwise, you know, I'm crazy, I keep like two

14     e-mails in my in box.  I delete constantly.  As soon

15     as I read it and take it in, it's gone.

16          Q.      Well, you see on the first page of

17     Exhibit Shapiro 3 it was this deck, meaning, the

18     presentation?

19          A.      Right.

20          Q.      D-E-C-K, like deck of cards, right?

21          A.      Right.

22          Q.      This presentation was e-mailed to

23     you, right?

24          A.      Right.

25          Q.      Yet the -- you didn't produce this

1    document in discovery, in response to the subpoena,

2    why was that?

3         A.      Because it probably was just deleted

4    from my e-mail.  I never looked at it.  I have a

5    hardcopy and I'm not sure who turned it --

6         Q.      You have a hardcopy --

7         A.      -- into a hardcopy of this deck.

8         Q.      Where?

9         A.      In my bag.

10        Q.      In your bag here?

11        A.      Yes.

12        Q.      That you didn't produce?

13        A.      I thought it was turned in.  It must

14   have been a mistake it wasn't turned in or maybe it

15   was after the fact when I turned it in.

16        Q.      Does it have notes on it or is it

17   identical to --

18        A.      It's exactly identical to this.

19        Q.      And so is it your testimony that when

20   you received this e-mail on Sunday night,

21   October 10th, you printed it out and then deleted

22   the e-mail?

23        A.      Yeah, or I'm not sure if a hardcopy

24   was sent to me.  My assistant might have put it in

25   my, you know, Sunday night -- yeah, maybe I printed

1    it out Sunday night or Monday morning.  I can't

2    remember.  But I turned in my stuff last week.

3         Q.      Right.

4         A.      So October 11th, I think, was this

5    Monday.  So whatever your next set of documents

6    you'll get, you'll end up getting that hardcopy.

7         Q.      Okay.  I appreciate that.

8         A.      Well, you have one but I'll send you

9    mine.

10        Q.      Have you continued -- since you

11   received notice that you had gotten the subpoena,

12   have you continued to delete from your e-mail

13   documents related to the Tribune Company Special

14   Committee?

15        A.      No.  I mean, probably but you have

16   those because we print out my deleted stuff, too.

17        Q.      Oh, okay.

18        A.      You know, we go through all my files,

19   personal folders, in box, deleted folders,

20   everything.  That's why she works with IT.

21        Q.      Okay, all right.

22                MR. LACK:  Let me mark as Shapiro

23   Exhibit 11 for identification a document entitled,

24   Privilege Log of Mark Shapiro October 11, 2010.

25                (Deposition Exhibit No. Shapiro-11, 10/11/10

1    Privilege Log of Mark Shapiro, was marked for

2    identification.)

3         A.      Thank you.

4         Q.      Have you ever seen this document

5    before?

6         A.      No.

7         Q.      I'm sorry?

8         A.      No.

9         Q.      Do you have any understanding of who

10   prepared it?

11        A.      Debtor it looks like.  I'm not sure.

12   I have no idea.  It looks like Don maybe.  I don't

13   know.  I'm guessing at this point.

14        Q.      I'm not asking you to guess.

15        If you turn to Page 4 of the privilege log,

16   I'm just going to ask you --

17        A.      It's all privilege log of Mark

18   Shapiro, so it seems like somebody who -- it would

19   be prepared by either Jones Day or the debtors'

20   lawyers of all my e-mails.

21        Q.      Okay, fair enough.

22        I'd like to ask you about Item No. 24 on

23   Page 4 of the privilege log.

24        A.      Yes.

25        Q.      This is described as a communication

1    between yourself and Don Liebentritt on

2    September 29th, 2010, and the subject matter is

3    e-mail regarding MIP hearing.  Do you see that?

4            A.       Uh-huh.

5            Q.       What does MIP stand for?

6            A.       Management Incentive Plan, I believe.

7            Q.       And is that a Management Incentive

8    Plan covering who?

9            A.       Management.

10           Q.       Of Tribune?

11           A.       Correct.

12           Q.       And the upper management of Tribune?

13           A.       It depends.  Each company is

14   different.  I'm not sure what this was in

15   particular.  But MIP can be for just senior

16   management.  MIP can be for, you know, management

17   down to VP level.  MIP can be down to director

18   level.

19           Q.       Well, in connection with the MIP

20   that's discussed in Item 24, who did it cover?

21           A.       I don't see the document.

22           Q.       Right, I understand that.  They

23   didn't produce the document --

24           A.       I see.

25           Q.       -- to us because they withheld it.

112

1    And that's why it's on this list.  This is a list of

2    withheld or redacted documents, okay?

3         A.      Got it.

4         Q.      So my question is who does the

5    Management Incentive Plan cover?

6         A.      Well, depending what year you're

7    talking about.  I mean, again, it's different for

8    most companies.  It's different in various forms

9    over the course of this bankruptcy process for

10   Tribune.  Having said that, there are -- there was

11   going to be a MIP hearing coming up that, I think,

12   included almost 600 members or employees of the

13   Tribune Company.

14        Q.      Okay.  Including Mr. Liebentritt?

15        A.      Yes.

16        Q.      Okay.  And why did you send this

17   e-mail to Mr. Liebentritt?

18              MR. CULLEN:  Objection, foundation,

19   form and --

20        Q.      Do you recall?

21              MR. CULLEN:  -- possibly -- you can

22   ask the foundational question, if he recalls.  If he

23   doesn't, we can all --

24              MR. LACK:  That's what I'm trying to

25   do.

1          A.        Yeah, I have no idea.

2          Q.        And --

3          A.        Pure speculation.

4          Q.        Okay.  And can you explain to me why

5    a communication from yourself to Mr. Liebentritt is

6    considered attorney-client privilege when you said

7    you didn't rely on Mr. Liebentritt?

8                    MR. CULLEN:  Objection.  I'm going to

9    advise him not to answer.

10                   MR. LACK:  Let me finish.

11                   MR. CULLEN:  He didn't make the --

12                   MR. LACK:  Let me finish the question

13   then you can make your --

14         A.        Sure.

15         Q.        Can you explain to me why a

16   communication from yourself to Mr. Liebentritt on

17   February -- on September 29th, 2010 is considered

18   attorney-client privilege when you said you didn't

19   rely on Mr. Liebentritt for legal advice concerning

20   the restructuring?

21                   MR. CULLEN:  Objection, foundation,

22   form, competence of the witness.  I'll direct him

23   not to answer.

24                   THE WITNESS:  You're calling me

25   incompetent?

1          A.          I don't know.

2                      MR. CULLEN:  On this topic.

3                      MR. LACK:  You're directing him not

4     to answer for what reason?

5                      MR. CULLEN:  Because you're asking

6     him to reconstruct the basis for this privilege log

7     being done.  You and I both know there could have

8     been any of a dozen reasons.

9          Q.          Okay.  Is the answer you don't know

10    why --

11         A.          Based on what you have here.  I mean,

12    if there was an e-mail that said -- you know --

13         Q.          Okay.  Were you --

14         A.          -- I can give you a million examples.

15         Q.          Were you relying on Mr. Liebentritt

16    for legal advice with respect to the Management

17    Incentive Plan?

18         A.          No.

19         Q.          Okay.  Now, let me ask you about Item

20    32 on Page 5.

21         A.          I want to be clear, though, because I

22    don't want to, you know, my words getting twisted in

23    any way.

24              I ask opinions of everybody on my team.

25    That doesn't mean I'm relying on his legal advice

1    for anything.  I rely on David Heiman for my legal

2    advice to the Special Committee.  But I ask opinions

3    on any number of subjects, you know, including

4    whether or not the Cubs should trade Carlos

5    Zambrano.

6          He lives in Chicago.  I like to know his

7    opinion.  We talk socially.  We talk sports.  We

8    talk news, politics and we talk about the

9    bankruptcy.  I'll ask his opinion on a lot of

10   things.  And his opinion may weigh into my thinking,

11   but I don't seek legal guidance -- I mean, legal

12   advice from him.

13         Q.      Okay.

14         A.      I do seek legal clarifications from

15   him if I want to understand what the process is in

16   the bankruptcy or the next phase or this hearing or

17   disclosure hearing or, you know, how long it's going

18   to take potentially to emerge.  I mean, I'll ask

19   mechanical questions very often.

20         Q.      Okay.

21         (There is a discussion off the record.)

22         Q.      It's just been pointed out to me that

23   the privilege log is really Shapiro Exhibit 11; is

24   that correctly marked in front of you?

25         A.      Yes, it is, 11 to me.

116

1          Q.       Okay.  So, if I referred to it as

2     Exhibit 10, I correct myself.

3                    MR. CULLEN:  Yeah, I think you

4     said -- I don't know.

5                    MR. LACK:  I may have just marked it

6     wrong on my copy here.

7          Q.       Let me ask you about Item No. 32 on

8     the fifth page --

9          A.       Yes.

10         Q.       -- of Exhibit 11.  This is a

11    communication -- an e-mail from David Kurtz of

12    Lazard to yourself and Mr. Liebentritt with a copy

13    to Mr. Heiman regarding negotiations with J.P.

14    Morgan and Oaktree.  And it's dated October 1st,

15    2010.  Do you see that?

16         A.       Yes.

17         Q.       Do you have any recollection of that

18    e-mail?

19         A.       No.

20         Q.       Do you know whether Jones Day was

21    giving legal advice to Lazard in connection with

22    this restructuring?

23         A.       No, I have no idea.

24         Q.       And let me ask you about now item --

25         A.       But it would be an update, I mean,

1    you know.

2              Q.        I'm sorry, it would be an update?

3              A.        Under oath here so...

4         It would be an update.  David Kurtz didn't

5    send me a lot of e-mails.  So, when he did -- I have

6    a, you know, fairly good memory, you know, with

7    regard to, you know, something he might have sent

8    me.  So David Kurtz would typically be sending an

9    e-mail update like it says here regarding

10   negotiations.  He's probably providing an update on

11   the J.P. Morgan and Oaktree discussions.

12             Q.        Well, did Mr. Kurtz directly

13   negotiate with Oaktree and J.P. Morgan?

14             A.        Mr. Kurtz was always talking, always

15   talking with members of J.P. Morgan, Oaktree, you

16   know, many constituencies, Center Bridge.  I mean,

17   he was -- often times he had a point for the debtor

18   with regard to negotiation or any kind of bankruptcy

19   restructuring discussions.

20             Q.        And they would have been hired for

21   the debtor before the Special Committee began?

22             A.        Correct.

23             Q.        And did Mr. Kurtz periodically send

24   e-mails to you and others saying about -- reporting

25   on the negotiations he had?

1          A.        Never.

2          Q.        Well, when you say it was an update,

3    what --

4          A.        On the Special Committee he did, but

5    I thought you were talking about the Board.

6          Q.        No, I'm sorry.  Let me clarify it.

7    Thank you.

8              Did Mr. Kurtz periodically send e-mails to

9    you and other people associated with the Special

10   Committee about his negotiations with J.P. Morgan?

11         A.        It would be very rare.  It would have

12   to be something I'd prompt because he did his

13   reporting to Don Liebentritt.  Liebentritt would

14   talk to Heiman.  Heiman would talk to us or

15   Liebentritt might talk to us directly.

16         Q.        Okay.

17         A.        But, usually, Kurtz isn't going to

18   come directly to the Special Committee.  It's not

19   just the proper change of command, unless I reach to

20   him, you know, with a phone call or an e-mail to

21   prompt him.

22         Q.        Okay.  And is it your assumption

23   looking at this log, Item 32, that he's responding

24   to something you prompted him to do?

25                   MR. CULLEN:  Objection, foundation,

1    form.

2         A.       As I said, I don't know.  I'm just at

3    this point -- just given what's on this Excel

4    spreadsheet, it's merely -- I'm speculating.

5         Q.       Okay.  Let me ask you about the next

6    item, No. 33, an e-mail from yourself to James

7    Conlan, Don Liebentritt, David Kurtz, a copy to Miss

8    Sobel regarding negotiations with J.P. Morgan and

9    Oaktree.

10         Now, Mr. Conlan was -- is a lawyer at Sidley

11    Austin, right?

12         A.       Correct.

13         Q.       And can you tell me without revealing

14    the content of the e-mail, why you were sending an

15    e-mail regarding negotiations with J.P. Morgan and

16    Oaktree to a lawyer at Sidley Austin?

17              MR. CULLEN:  Objection, foundation.

18         But you can answer it, to the extent you

19    can.

20         A.       I have no idea what this specific

21    e-mail is.  But why I would ever send e-mails to Jim

22    Conlan is because he's on the team.  He's on the

23    restructuring, just like that opening meeting I

24    talked about was September 5th.  It's Kurtz, it's

25    Heiman, it's Liebentritt, it' Conlan.  Those are the

1    main players in restructuring conversations for the

2    debtor.

3          Q.      Did Sidley Austin provide legal

4    advice to the Special Committee?

5          A.      No, David Heiman provides the advice.

6    He's on the calls, though.  He clarifies things.  He

7    might explain things, but we take legal advice only

8    from David Heiman.  Such as when we were voting on

9    the Step 2 plan, we have an executive session, we

10   ask everyone to get off the phone and then we ask

11   our counselor, David Heiman, for advice, only one we

12   ever ask for advice.

13         Q.      And during that time who else is

14   present on the call, other than Mr. Heiman and the

15   four members of the committee?

16         A.      Well, you mean on the executive

17   session part of it?

18         Q.      Yes.

19         A.      That's it.

20         Q.      Okay.  Now, can you tell me,

21   approximately, how many times since the Special

22   Committee was formed the committee has met in an

23   official meeting?

24              MR. CULLEN:  Objection, foundation,

25   but...

121

1        A.        I would say because the committee

2    members get paid per meeting, official meeting, so I

3    would say that it's probably around 10 or 12 times.

4        Q.        And have all those meetings been by

5    phone?

6        A.        Yes.  I've had several in-person

7    meetings but not the committee as a whole, just me

8    with the lawyers.

9        Q.        Okay.  But have you ever been

10   physically present in a room with any of the three

11   other members of the Special Committee?

12                 MR. CULLEN:  For a special --

13       Q.        For a Special Committee meeting?

14       A.        For a meeting, no.

15       Q.        Thank you.

16       A.        Always by phone.  It's very spread

17   out group; Cincinnati, Los Angeles, Connecticut and

18   Maggie is often in San Francisco so...

19       Q.        Do you recall -- aside from the

20   meeting you testified about on October 11th, do you

21   recall dates of any of the -- any other meetings in

22   October 2010?

23       A.        No, I don't off the top of my head.

24       Q.        Would it help if you consulted your

25   BlackBerry?

1      A.        Blackberry?  You really like that

2    BlackBerry.  Yes, I'll do that.

3      Q.        It's called refreshing your

4    recollection.

5      A.        I'll do that for you.  Can I do some

6    other e-mails while I'm here or no?

7      Q.        I would appreciate it not.

8         I would just like to know what your

9    BlackBerry shows as being other meetings in October

10   2010.

11     A.        All right.  For October, nothing on

12   the 1st -- maybe I'll give you a day by day, okay.

13     Q.        That's fine.

14     A.        Nothing on the 2nd.  Nothing on the

15   3rd.  Nothing on the 4th.  Nothing on the 5th; 6th,

16   no; 7th, no; 8th no; 9th, 10th, no.  Lots of calls

17   between myself and the -- David Heiman, Don

18   Liebentritt's of the world, but no Special Committee

19   meetings in October.

20     Q.        Does your BlackBerry show a Special

21   Committee meeting on the 11th?

22     A.        Yes, that's the one I talked about,

23   the infamous 10 a.m./9 a.m. Eastern.

24              MR. LACK:  Okay.  I'd like to mark as

25   a series of exhibits copies of the minutes, draft

1   minutes, of Special Committee meetings that were

2   produced by Mr. Wood.  I'd like to mark as Shapiro

3   Exhibit 12 a document with production numbers FW37

4   to 38, draft minutes of the meeting of the Special

5   Committee, September 1st, 2010.

6          (Deposition Exhibit No. Shapiro-12, draft

7   minutes of Special Committee meetings 9/1/10 FW37 &

8   38, was marked for identification.)

9          MR. LACK:  I'd like to mark as

10  Shapiro Exhibit 13 draft minutes of the Special

11  Committee meeting of September 10th.  It bears

12  production number FW36.

13         (Deposition Exhibit No. Shapiro-13, draft

14  minutes, of Special Committee meetings 9/10/10 FW36,

15  was marked for identification.)

16         MR. LACK:  If I didn't give the

17  production number for Shapiro-12, it was FW37 to 38.

18         I'd like to mark as Exhibit 14 for

19  identification draft of the minutes of the Special

20  Committee meeting of September 17th, production

21  number FW39 and 40.

22         (Deposition Exhibit No. Shapiro-14, draft

23  minutes, of Special Committee meetings 9/17/10 FW39

24  & FW40, was marked for identification.)

25         MR. LACK:  And I'd also like to mark

1   as Shapiro Exhibit 15 for identification draft

2   minutes of the meeting of the Special Committee

3   dated September 28th, 2010, with production numbers

4   FW42 and 43.

5         (Deposition Exhibit No. Shapiro-15, draft

6   minutes of Special Committee meetings 9/28/10 FW42 &

7   FW43, was marked for identification.)

8         Q.      If you could look at the four

9   exhibits I just marked, Shapiro Exhibits 12 through

10  15.

11                MR. HEIMAN:  He wants to...

12                MR. LACK:  I know.  I'm waiting for

13  him to hit send.

14        A.      A lot of minutes come in.

15        Q.      That's all right.

16         Do you recognize these four exhibits,

17  Shapiro-12 through 15, as drafts of the minutes of

18  the meeting of the Special Committee on the dates

19  said there?

20        A.      Yes.

21        Q.      Who prepared these meetings, to your

22  knowledge?

23        A.      Jones Day.

24        Q.      Who at Jones Day?

25        A.      I don't know.

1        Q.        Who from Jones Day attended the

2    Special Committee, were they just the people who

3    were mentioned in the minutes?

4        A.        Well, usually, the Special Committee

5    and then David Heiman and his team.

6        Q.        Okay.  On Shapiro-12, it shows four

7    people from Jones Day, Mr. Heiman, Mr. Aarons,

8    Mr. Sherman and Miss Kitslar (phonetic).

9        A.        Right.

10        Q.        And so your understanding is one of

11    them prepared the minutes?

12        A.        I assume, I don't know.

13        Q.        Okay.

14        A.        I know David always has a lot of

15    people on the phone.  Other than October 11th, I

16    don't hear from any of them.

17        Q.        Okay.

18        A.        David does the speaking, so I don't

19    know how many people are on or not on.

20        Q.        And have you -- did you receive at

21    some point these drafts by e-mail or otherwise?

22        A.        I don't know.  I don't recall.

23        Q.        Is this the first time you're seeing

24    them?

25        A.        I don't recall.  As I mentioned

1    before, you asked me about the minutes and I said I

2    don't recall.

3         Q.       But seeing these documents in front

4    of you now --

5         A.       Yes.

6         Q.       -- have you ever seen any of them

7    before?

8         A.       Give me a minute to read all of them.

9    I don't recall seeing them.

10         Q.       Do you know whether minutes of any of

11    the meetings have been finalized or adopted by you?

12         A.       I don't know.

13         Q.       And on the --

14         A.       The Eldersveld one is the only one I

15    remember seeing.

16         Q.       The Eldersveld one being?

17         A.       9/29, it's Exhibit 12.

18         Q.       Okay.  9/29, meaning, that's the

19    draft date?

20         A.       Correct.

21         Q.       On Exhibit 13, there is a reference

22    in the second paragraph to something called pre-read

23    materials.

24         A.       Which one?

25         Q.       Exhibit 13.

1          A.         Okay.

2          Q.         "Prior to the meeting, the members of

3    the Special Committee were provided with materials

4    related to pending Chapter 11 plan proposal defined

5    as the, quote, 'pre-read materials.'"

6          A.         Right.

7                     MR. CULLEN:  Pre-read.

8                     MR. LACK:  Pre-read?  Pre-read, okay,

9    sorry, I stand corrected.

10         Q.         Pre-read materials.  Well, I guess

11   the question would be -- I guess it's not going to

12   -- not going to work well in the transcript.  I was

13   going to ask you whether you pre-read pre-read

14   materials.

15             Did you read the --

16         A.         Do it phonetically with pre R-e-d.

17         Q.         I know, I know.  That's why I said --

18         A.         Did I prep-read which part?

19         Q.         Did you read before the

20   September 10th board meeting the materials that were

21   sent to you in advance of the meeting by Jones Day?

22         A.         Which materials were they?  I mean --

23         Q.         Well --

24         A.         I don't remember.

25         Q.         -- that they --

1       A.        I don't remember.

2       Q.        Okay, all right.

3       A.        But, if materials are sent for a

4    committee meeting or a board meeting, I usually read

5    through them to make sure I'm prepared, especially,

6    since I'm usually directing the meeting.

7       Q.        Okay.

8       A.        But I don't recall what these meeting

9    materials were.

10       Q.        After the meeting occurred, do you

11    shred the materials?

12       A.        Well, I may be looking at it on

13    e-mail, so it may not be printed out.

14       Q.        Would you delete the e-mail after the

15    meeting?

16       A.        Usually.  As you can tell from

17    October 11th, I didn't delete that one but usually

18    I'll be done with it and delete it.

19       Q.        Okay.

20       A.        Or if it was sent to me hardcopy,

21    then I never looked at e-mail, then definitely it

22    would be shredded.

23            My assistant will prepare, if I'm not in the

24    office, a package every night that will be Fed Ex'd

25    to me for the next day, whatever my meetings are,

1    and it might be in there, then I'll be done with it.

2         Q.        Was the examiner report ever

3    discussed at the Special Committee meeting?

4         A.        Yes.

5         Q.        When?

6         A.        One of the earlier meetings.

7         Q.        One of the four that's referred to

8    here or something else?

9         A.        No, I don't -- I mean, as I told you,

10   I think we've done like 10 to 12 meetings.  So, if

11   there's only four here, it could be in here.  I

12   haven't read through them, but definitely there was

13   one meeting where we discussed the examiner's

14   report.

15        Q.        Was the October 11th meeting, which

16   you testified lasted 75 minutes, the only meeting of

17   the Special Committee that lasted an hour or more?

18        A.        I don't recall.

19        Q.        Do you recall whether anyone gave a

20   presentation or who, if anyone, gave a presentation

21   on the examiner's report?

22        A.        No.  I remember, you know, the entire

23   team was on the call and there was discussion about

24   it.  I don't know that it was a presentation, but I

25   know Maggie and I both read the examiner's report or

1    portions of.  In her case, I'm not sure how much she

2    read.  And a subject came up with regard to Chandler

3    and it was discussed.  And I remember David,

4    specifically, kind of clarifying what the examiner's

5    report said.

6                        MR. CULLEN:  Okay.

7            Q.        Do you agree that it's correct to

8    characterize the June 2007 transaction and the

9    December 2007 transaction as two steps of a single

10   LBO transaction?

11                       MR. CULLEN:  Objection, form,

12   foundation.

13                       MR. JOHNSTON:  Object to the form of

14   the question.

15                       MR. VAIL:  I also object that it's

16   beyond the scope of the notice of the deposition.

17                       MR. BENDERNAGEL:  And I'll join that

18   objection.

19           A.        I wasn't there at the time.  It's

20   tough to make a judgment on that, is it one whole

21   plan, two...

22           Q.        So you have no view?

23           A.        That's tough to make a judgment on

24   that.

25           Q.        It's tough to make a judgment why?

1           MR. JOHNSTON:  Object to the form of

2    the question.

3           MR. CULLEN:  Objection.

4      A.        I've answered it.

5           THE WITNESS:  How about asked and

6    answered, that's a legitimate objection.  You guys

7    haven't used that today at all.

8           MR. CULLEN:  It's a little used.

9    He's actually pretty good on asked and answered.

10          MR. LACK:  Thank you very much.

11          MR. BENDERNAGEL:  That could change.

12          MR. CULLEN:  Don't get all chesty.

13          MR. LACK:  Now that he's mentioned

14   it...

15     Q.        I asked you about the examiner's

16   report, statements about management misconduct.

17          Do you recall disagreeing with any aspect --

18   leaving aside the part about management misconduct,

19   do you recall disagreeing with any of the

20   conclusions the examiner drew with respect to the

21   LBO transaction?

22          MR. CULLEN:  That was asked and

23   answered, actually.

24     Q.        You can answer it again then.

25     A.        Yeah, I mean, me personally, again, I

1    wasn't there.  I remember that a lot of folks had

2    issues with what the examiner said and who he did or

3    didn't interview in order to reach that conclusion.

4         Q.        Right.  But I -- I thought you

5    answered that with respect to the management

6    misconduct.

7         A.        Uh-huh.

8         Q.        Leaving aside the management

9    misconduct --

10        A.        Okay.

11        Q.        -- okay, there were -- for example,

12   the examiner stated in Volume II of his report that,

13   quote, "A court is somewhat likely to find that the

14   Tribune entities incurred the obligations and made

15   the transfers in the Step 2 transactions with actual

16   intent to hinder, delay or defraud creditors,"

17   unquote.

18        A.        Right.

19        Q.        Is that a statement that you --

20             MR. BENDERNAGEL:  Object to it.

21        Q.        -- agree or disagree with?

22             MR. CULLEN:  Objection, asked and

23   answered.

24             MR. BENDERNAGEL:  It's asked and

25   answered and it's also about the management.  That's

1    what it's based on.

2                    MR. JOHNSTON:  It also calls for a

3    legal conclusion.

4         Q.        Okay.  Let me ask you about -- so

5    okay.  Let me ask you about the following.

6         A.        I'm not here to opine on, you know,

7    whether the examiner was right or wrong.  I'm just

8    telling you what others said.  I wasn't there when

9    this LBO took place.  I came in after the fact.

10        Q.        Okay.

11        A.        I don't know enough about that

12   history and I know that there was always going to be

13   a litigation with regard to this case and/or the

14   examiner's report and I didn't see that as my role

15   to be judge and jury --

16        Q.        Okay.

17        A.        -- for the examiner's report when I

18   took the chairman job of the Special Committee.

19        Q.        Let me ask you about another

20   conclusion of the examiner.

21            The examiner wrote, quote, "A court is

22   highly likely to conclude that the Step 2

23   transactions rendered Tribune insolvent," unquote.

24        A.        Yeah.

25                    MR. BENDERNAGEL:  Object to the form

1   of the question.

2          Q.       Did you agree with that conclusion?

3                   MR. JOHNSTON:  Same objection.

4                   MR. CULLEN:  Objection.

5                   MR. VAIL:  I'll join the objection.

6                   MR. BENDERNAGEL:  And I'm going to

7   add an objection.  I'm looking at Schedule A of

8   what's Exhibit Shapiro-10, which is the subjects for

9   examination.  And it's hard to see how the question

10  you just asked falls within any of these four

11  topics.  It doesn't even come close.  And I think

12  you ought to explain how it is that it falls into

13  these explanations.

14         Q.       Did you see it as a --

15                  MR. BENDERNAGEL:  That's not the

16  question.  The question is, did you notice it as a

17  subject for examination?

18                  MR. LACK:  Oh, yeah, I think it is

19  within that.

20                  MR. BENDERNAGEL:  Well, point to

21  where it is in here.

22                  MR. LACK:  I'll connect it up.

23                  MR. BENDERNAGEL:  No, no, no.  I'd

24  like you to answer my question.

25                  MR. LACK:  Yeah, I'd be happy to.

1          It has to do with Subject 3, the actions of

2     the Special Committee since its formation.

3                    MR. BENDERNAGEL:  Including meetings?

4     All right.  Well, ask the question in that context.

5     So this is limited to since the Special Committee

6     met your question.

7                    MR. LACK:  Well, that's --

8                    MR. BENDERNAGEL:  Well, that's -- you

9     said that's related to No. 3 and that's what it

10    should be.  It should be related to -- I want to

11    make sure I understand.

12         Q.       As a member of the Special Committee

13    of Tribune Company, did you ever reach a view as to

14    whether the examiner's statement, quote, "A court is

15    highly likely to conclude that the Step 2

16    transactions render Tribune insolvent," unquote --

17                   MR. BENDERNAGEL:  Same objection.

18         Q.       -- was correct or incorrect?

19                   MR. BENDERNAGEL:  Same objection.

20                   MR. VAIL:  Join, form.

21                   MR. CULLEN:  Form.

22         A.       No.

23         Q.       So you never --

24         A.       No.  Did we reach a conclusion; is

25    what you're asking?

1          Q.        Right.

2          A.        No.

3          Q.        Okay.  Did you reach a conclusion as

4    to the correctness or incorrectness of anything in

5    the examiner's report, other than the management

6    misconduct stuff that you talked about?

7                    MR. CULLEN:  I'm going to object to

8    this as a really unfair question.  As any of us

9    who've read the examiner's report know that there

10   are three propositions per sentence, which you might

11   or might not disagree with.

12                   MR. LACK:  Right.  But Mr. Shapiro

13   said that wasn't his job, to reach conclusions about

14   the examiner's report.

15         Q.        Is that correct, that that wasn't

16   your job, to reach conclusions about the examiner's

17   report?

18         A.        With regard to the bankruptcy case

19   and/or the liability -- I don't even recall.  You'd

20   have to read it back to me on the transcript where

21   we are, I mean, you're mixing it all up.

22              The bottom line is the only thing that I

23   have attested to here -- and that was based on

24   investigations or analysis done by Jones Day, the

25   audit, and Sidley with regard to Chandler Bigelow's

1    conduct and the accusations made against him.

2        Q.        Right.

3        A.        And we're not necessarily even

4    deciding whether or not there's right or wrong in

5    there.  We're deciding based on the fact pattern of

6    the evidence that's there, is he fit to remain in

7    his job.  That's what we decided on.

8        Q.        Right.

9        A.        Everything else whether or not Step 1

10    or Step 2 is equal or likelihood or liability,

11    that's not our job.  That's not why I was put on the

12    Special Committee and I don't have the expertise and

13    I'm not qualified.  I'm not a judge.  I'm not a

14    jury.  I'm not here to determine that.  I was never

15    asked to determine that either on any question you

16    have with regard to that examiner's report.

17        Q.        Okay.  So you weren't asked to make

18    any judgments about whether Tribune was solvent or

19    insolvent at any particular point in time?

20        A.        Never, never was asked that.

21        Q.        Okay, all right.

22         Let me ask you a few questions that will go,

23    I think, pretty quickly and then we'll take a break

24    because I know there are some other people who may

25    have some questions to ask.

1          A.          I have a 6:30 meeting, but go ahead.

2          Q.          No, I understand, I understand.

3     We're --

4          A.          Sure, go ahead.

5               We won't have to take a break, if you guys

6     are ready to go.

7          Q.          How did you come to join the Tribune

8     Board of Directors?

9          A.          Sam Zell.  Sam Zell invited me.

10         Q.          And how did Sam Zell know of you?

11         A.          I reached out to him.

12         Q.          What was the circumstance?

13         A.          I thought I could offer a lot of

14    value to the company.  I grew up in Chicago.  I grew

15    up reading the Chicago Tribune and the Sun Times.

16    I'm a newspaper freak, if you will.  I'm a news

17    junkie.  I'm a political junkie.  I was CEO of Six

18    Flags, my most profitable park was in Chicago, so I

19    was there often.  I used to run all content at ESPN,

20    all production programming, radio, international,

21    ABC Sports, all under my purview.  So I had a lot of

22    relationships in Major League Baseball including

23    that of the Commissioner.

24               I knew they were going to be selling the

25    Cubs and I thought I could be helpful there.  I had

1   a big hand in helping ESPN become what it became.

2   And I thought the WGN had the same opportunity to

3   become a brand, a major cable network, that could

4   really derive some value from the cable operators

5   that it wasn't getting heretofore.  And I thought I

6   could help build that network into a brand, into a

7   major profit center.

8          Journalism is also a big part of my

9   background.  Mom worked at Time magazine for

10  35 years, so I grew up in the news business and

11  majored in journalism.  So I knew some of the

12  struggles he was facing with regard to cutting costs

13  and how many of the newspaper writers would, you

14  know, go crazy, how could you dare cut back on our

15  righteous journalistic principles.  Same thing I had

16  to do at ESPN, by the way, covering sports for

17  Sports Center.  What else?  They owned radio.  I was

18  in charge of 300 radio stations at ESPN Radio and

19  ES1.  I thought I could be helpful with one station,

20  WGN Radio.

21         A lot of synergies bottom line and real

22  passion and an intimate knowledge of that business

23  and when I saw in the paper that he was taking it

24  over, I made a mental note to tap him out a note of

25  my interest on being on the board if and when he

1    formed it.  Unfortunately, that kind of time passed

2    and the next thing you know I read in the paper

3    about the board.  It had already been formed.  So I

4    was kind of too late to the party.  Nevertheless I

5    still wrote him a letter.

6            He called me.  I came in and talked to him

7    about it and a little while later he had me meet

8    some of the board members and then he asked me to

9    join.

10        Q.        Have you met Mr. Zell previously?

11        A.        Never, cold call.

12        Q.        Had you had any business dealings

13    with any of your prior jobs with Mr. Zell or any of

14    his companies?

15        A.        Never.

16        Q.        Isn't it true that Mr. Zell was a

17    potential purchaser of Six Flags in this bankruptcy?

18                  MR. VAIL:  Objection, form, beyond

19    the scope.

20        A.        Potential purchaser of Six Flags?

21        Q.        Yes.

22        A.        No.

23        Q.        Were you aware during Six Flags'

24    bankruptcy that Mr. Zell or any entity associated

25    with him was seeking to purchase Six Flags out of

1    the bankruptcy?

2                    MR. VAIL:   Same objection.

3          A.        It's incorrect.  He wasn't seeking to

4    purchase Six Flags.  During the restructuring

5    process, he showed interest in potentially investing

6    and/or buying some of the bonds of Six Flags.

7          Q.        Okay.

8          A.        He never did, to my knowledge.

9          Q.        How did you learn that he showed

10   interest in investing?

11         A.        Because he reached out to one of our

12   creditors or one of your bond holders during the

13   restructuring process and he also mentioned to me

14   that he was going to be making that phone call.

15         Q.        Who mentioned to you?

16         A.        Sam mentioned to me that he was going

17   to be making a phone call to one of the bond

18   holders.

19         Q.        And this was before or after you

20   contacted Mr. Zell about being on the board of

21   directors?

22         A.        Years after, two years after,

23   something like that.

24         Q.        So this was -- this call that Mr.

25   Zell made to you in connection with Six Flags was in

142

1   2010?

2           A.      It wasn't even a call.  It was at the

3   end of a board meeting, I believe, and Tribune that

4   he mentioned, hey, you know, bonds are trading at a

5   pretty good price, I have a lot of confidence in you

6   as an operator.  I may reach out to one of the bond

7   holders to inquire as to getting involved with the

8   restructuring in an investment way.

9           MR. LACK:  Let me just grab a

10  document here.   Shapiro Exhibit 16 is production

11  number MS101, an e-mail from Mr. Shapiro to Mr. Zell

12  dated September 30th, 2010.

13          (Deposition Exhibit No. Shapiro-16, 9/30/10

14  e-mail MS101, was marked for identification.)

15          Q.      Can you identify this?

16          A.      E-mail from me to Sam Zell.

17          Q.      Can you read what you wrote to Mr.

18  Zell?

19          A.

20

21          Q.

22

23          A.

24

25

1

2

3

4

5

6

7

8

9          Q.

10

11         A.

12

13         Q.

14

15

16         A.

17

18         Q.

19

20         A.

21         Q.

22         A.

23

24

25         Q.

1

2              A.

3

4

5                      MR. VAIL:   I'm also going to ask that

6      the testimony relating to this potential investment

7      opportunity be designated as confidential.   It has

8      nothing to do with the subject matter of this

9      proceeding.   It's, also, again, beyond the scope of

10     the deposition notice.   So, to make a record, all

11     the conversations relating to Exhibit No. 16, second

12     sentence in it, third sentence, fourth sentence in

13     it, I'm designating as confidential for attorneys

14     eyes only.

15                     MR. LACK:   Designated under what

16     order?

17                     MR. VAIL:   Under common law, on

18     protectable business information.

19                     MR. LACK:   Okay, thank you.

20                     MR. BENDERNAGEL:   There is a

21     document, depository generalized protective order,

22     in the case.   You can designate it under that.

23                     MR. LACK:   We'll --

24              A.      It's got nothing to do with this,

25     bottom line.

1          MR. VAIL:  Should we hash out whether

2     or not this testimony and this issue should not be

3     designated confidential?  Do you have --

4          MR. BENDERNAGEL:  Let's finish the

5     deposition.

6          MR. LACK:  Let's go on.

7          Q.     I finished my questioning about this

8     exhibit.  So I just wanted to know what you were

9     referring to.  That's all.

10          Isn't it true that you are also a member of

11     the Board of Directors of Frontier Communications

12     Corporation?

13          A.     Yes.

14          Q.     That's the company that Miss

15     Wilderotter is the CEO?

16          A.     Correct; just joined it.

17          Q.     When did you join it?

18          A.     Within the last I want to say three,

19     four months.

20          Q.     And are you --

21          A.     Five months.

22          Q.     -- also a trustee of a REIT called

23     Equity Residential?

24          A.     Yes.

25          Q.     When did you become a trustee?

146

1          A.          I don't know exactly.  I want to say

2     a year maybe.

3          Q.          And isn't that a REIT of which Mr.

4     Zell is the chairman?

5          A.          Yes, yes, he is.

6          Q.          Did Six Flags' banks or investment

7     banks include any of the LBO lenders in this case?

8          A.          Yes, J.P. Morgan, Merrill used to be,

9     I'm not sure if they were at the end.  I don't think

10    they were.  Citi at one point was in it, you know,

11    held some paper.

12         Q.          It wasn't true --

13         A.          Sure, given the $3 billion debt Six

14    Flags had at one time or another everybody had a

15    piece of it.

16         Q.          Are any of the LBO lenders lenders

17    currently to Dick Clark Production?

18         A.          Bank of America.

19         Q.          Any others?

20         A.          Not that I'm aware of.

21         Q.          Isn't it the case that as of the end

22    of 2008 Citigroup Global Markets owns more than 9

23    percent of Six Flags stock?

24         A.          Who?

25         Q.          Citigroup Global Markets --

1          A.          I have no idea.

2          Q.          -- owned more than 9 percent of Six

3     Flags' stock?

4          A.          I don't know.  You got a few big

5     banks in town.  It's tough to find a lot of

6     companies that aren't involved with Bank of America

7     or J.P. Morgan.

8          Q.          And was it the case that early in

9     January of this year that Six Flags approached J.P.

10    Morgan, Bank of America, Barclay's and Deutsche Bank

11    to arrange a $830 million senior security credit

12    authority?

13         A.          Yes.

14                     MS. LUFTGLASS:  I'm going to object.

15    It's beyond the scope here of the subpoena.

16                     MR. LACK:  It's not beyond the scope.

17    It goes to his independence as a member of the

18    Special Committee.

19                     MR. BENDERNAGEL:  You can make that

20    argument at the appropriate time.  Just finish the

21    deposition.

22                     MR. LACK:  I just did.

23                     MR. BENDERNAGEL:  I think you got the

24    wrong person.

25         Q.          How was Jones Day selected as counsel

1    to Special Committee?

2         A.        They were -- it was a recommendation

3    of Maggie Wilderotter.

4         Q.        And did she tell you that Jones Day

5    was her personal counsel?

6         A.        No, I just knew she had experience

7    working with them.

8         Q.        Did she tell you that Jones Day

9    represented Frontier Communications?

10        A.        No.  But Jones Day wasn't necessarily

11   the first choice.  There were many law firms as

12   evidenced by this table and the phone that were

13   already taken up in the bankruptcy proceedings.

14                  MR. CULLEN:  How do you feel now,

15   Dave?

16        A.        Fortunately, we found one.

17                  MR. HEIMAN:  First I heard of that.

18        Q.        And at what point was Jones Day --

19                  THE WITNESS:  Don't worry, you'll

20   have lots of future business with me, not in

21   bankruptcy, but other stuff.

22        Q.        Was Jones Day --

23        A.        As you can imagine, as the chairman

24   of the committee, I would probably choose somebody I

25   had more familiarity, somebody I worked with before,

1  especially, in bankruptcy proceedings, you know, in

2  understanding the past history.  And --

3        Q.        Was Jones Day selected before the

4  Special Committee was formally established?

5        A.        Before it was formally voted in,

6  yeah.

7        Q.        And were you aware when Jones Day --

8  did Special Committee vote to retain Jones Day?

9        A.        Yes.

10        Q.        And were you aware at the time that

11  you voted to retain Jones Day, that Jones Day

12  represents a number of the LBO lenders in unrelated

13  matters?

14        A.        No, no, I wasn't aware.

15        Q.        Did you ever look at Jones Day's

16  website to see what clients Jones Day talked about

17  on the website?

18        A.        No.

19        Q.        Did you know that Jones Day in

20  September 2010 did transactions for J.P. Morgan

21  Chase?

22        A.        No.

23        Q.        Did you know that Jones Day in

24  September 2010 did a transaction for Morgan Stanley?

25        A.        No.

1              Who are you with, Brown Rudnick?  I'm just

2      curious.

3           Q.      No.

4           A.      I didn't hear.

5           Q.      No, Friedman Kaplan.

6           A.      Oh, got it.

7           Q.      Did you know that Jones Day in May of

8      2010 did a transaction for Merrill Lynch as a

9      client?

10          A.      No.

11          Q.      Do you know that Jones Day has

12     represented --

13          A.      You can probably stipulate I didn't

14     know any of the --

15          Q.      Okay.

16          A.      Good luck with that argument, I mean.

17          Q.      If I showed you -- if I showed you

18     what --

19          A.      We just did a bankruptcy at Six Flags

20     and Brown Rudnick was one of the partners that

21     signed up to a consensual deal.  So I guess she

22     can't be at the table either.  I mean, I got it.  I

23     get the stipulation.

24          Q.      All right.  I mean, can we take a

25     five-minute break at this point.

1          A.      Do you need it?

2                  MR. CULLEN:  Do you need it?

3                  MR. BENDERNAGEL:  It doesn't answer

4     the question.

5                  MS. BROMBERG:  I have a few

6     questions.  It shouldn't take too long.

7                  THE WITNESS:  Yeah, I'm ready to go.

8                  MR. LACK:  I just want to give other

9     people --

10         A.      Is she allowed to ask, though,

11    because we did a deal?  I mean, we did Six Flags.

12                 MS. BROMBERG:  I can represent I was

13    not a part --

14                 MR. HEIMAN:  He was supposed to be

15    done at six, right?

16                 MR. LACK:  No, we were supposed to be

17    done at 6:30 -- 6:30.

18          (There is a discussion off the record.)

19                 MR. CULLEN:  Let's not talk about it.

20    Let's go.  Let's finish.

21         A.      Go ahead.

22                 MR. HEIMAN:  After what you said, you

23    think I'm sticking around?

24                 THE WITNESS:  Couldn't be more

25    pleased.

152

1          Q.        I'm going to stop my questioning at

2     this point.  I'm not going to say that I have no

3     further questions because there are issues that have

4     arisen concerning document production, privilege

5     claims and so on, which are unable to explore

6     because some of the documents haven't been produced.

7     But, as of now, I will yield the floor to other

8     counsel.

9          A.        Let it be known for the record that I

10    was here at 3 o'clock ready to go and for whatever

11    reasons you weren't.

12         Q.        There is already a record that I was

13    addressing the Court at 3 o'clock this afternoon.

14    But I appreciate you're making yourself available.

15         A.        I walked in the room at 2:30 and said

16    I was ready to start at 2:30.  Nobody got here

17    early.

18         Q.        Thank you for your time.

19         A.        Thank you, seriously.

20    EXAMINATION BY MS. BROMBERG:

21         Q.        Hi, Mr. Shapiro.  I'm Kate Bromberg

22    with Brown Rudnick and I just have a few questions

23    for you.

24         A.        Haven't we met before?  No.

25         Q.        No.

1          First, I wanted to join in the reservation

2   of rights of counsel from Friedman Kaplan regarding

3   the document production, the privilege issues for

4   the record.  And I just wanted to ask you a few

5   questions.

6          First of all, are you aware that there is an

7   application pending by the debtors to retain counsel

8   to pursue claims against Morgan Stanley?

9          A.      No.

10         Q.      Okay.  What role did the Special

11  Committee play in determining whether to pursue

12  claims against Morgan Stanley?

13                 MR. CULLEN:  Objection, foundation.

14         Q.      Okay.  Well, in that case --

15                 MR. BENDERNAGEL:  Why is this

16  relevant to this case?

17                 MS. BROMBERG:  You will see.

18         A.      E-mail I sent to Don or something

19  like that.

20                 MS. BROMBERG:  Which exhibit number

21  are we on now?

22                 MR. CULLEN:  Seventeen.

23                 MR. BENDERNAGEL:  Seventeen.

24         (Deposition Exhibit No. Shapiro-17, e-mail

25  MS0000059 to 60, was marked for identification.)

154

1          Q.          So, Mr. Shapiro, have you had a

2    moment to look at this exhibit?

3          A.          Yes.

4          Q.          Do you see that it's Ken Liang from

5    Oaktree is forwarding you an e-mail from Don

6    Liebentritt that says that they're going to file a

7    complaint against Morgan Stanley and you say,

8    "That's complete news to me.  We'll follow up"?

9          A.          Yep.

10          MR. ASHLEY:  I'm sorry, Kate.  Can

11    you tell me what Bate's number?  We don't have any

12    copies of --

13          MS. BROMBERG:  I'm sorry.  Yeah, it's

14    MS0000059 to 60 and that's for Shapiro-17.

15          Q.          And so you had no idea that the

16    debtors were going to pursue these claims against

17    Morgan Stanley?

18          A.          (No response.)

19          Q.          But it's your understanding that the

20    claims related to the LBO were part of the mandate

21    of the Special Committee to settle and authorize any

22    settlements related to?

23          A.          I'm sorry, can you repeat the

24    question?

25          Q.          Was it your understanding that part

1   of the mandate of the Special Committee was to

2   authorize the settlement of any claims relating to

3   the LBO?

4         A.        Authorize the settlement or just

5   releases --

6         Q.        Any decision relating to them

7   releasing the settlement.

8         A.        Yeah.  I mean, yeah, that was under

9   our auspices.

10         Q.        And do you know what these Morgan

11   Stanley claims are?

12         A.        It had to do with the examiner's

13   report and about -- I tell you what I do know.  It

14   was about the projections and whether or not Morgan

15   Stanley, I believe -- could be wrong here -- that

16   Morgan Stanley signed off on the projections that

17   were at the time presented to the board.  Morgan

18   Stanley, I believe, claimed they didn't sign off and

19   the debtor claimed that they did.  And so I know

20   there was disagreement there and there was potential

21   for litigation.  The news that they actually were

22   going to file something to move forward was totally

23   news to me.

24         Q.        Is that something you would have

25   expected the Special Committee to be consulted

1    about?

2         A.       No, not to be consulted necessarily

3    but I would just have liked a heads up, something

4    happening in the bankruptcy process, a filing of

5    this nature that, you know, Don should have probably

6    brought it to your attention.

7                   MS. BROMBERG:  Okay.  I only have a

8    couple of these.  But I would like to mark as

9    Shapiro-18 this document.  This is Exhibit B.  This

10   is from Docket No. 4808.  It was filed in April.

11   It's a settlement term sheet.  So it's not part of

12   this production.

13        Q.       And Mr. Shapiro, have you -- and

14   actually I'd like you to take term sheet, you know,

15   Exhibits 1 and 2 to look at in connection with these

16   questions as well.

17                  (Deposition Exhibit No. Shapiro-18, Exhibit

18   B from Docket No. 4808, was marked for

19   identification.)

20        Q.       So have you had --

21                  MR. VAIL:  Do you have any extra

22   copies to share with counsel?

23                  MS. BROMBERG:  I'm sorry.  I just --

24   I distributed them, the ones I have.

25                  MR. BENDERNAGEL:  What is this

 1   document?

 2                MS. BROMBERG:  As I said, it's part

 3   of the disclosure statement filed in April, the

 4   settlement term sheet, part of the Docket No. 4808.

 5   There are copies for counsel and that's,

 6   unfortunately, all I have with me.

 7                MR. CULLEN:  Filed in April?

 8                MS. BROMBERG:  Yeah.

 9                MR. BENDERNAGEL:  So this is the term

10   sheet for the original settlement --

11                MS. BROMBERG:  Yeah, term sheet for

12   the original settlement.

13        Q.      Have you seen this before?

14        A.      I don't recall.

15        Q.      In connection with being on the board

16   during this time, do you think -- I mean, do you

17   think you would have seen it probably?

18        A.      Well, if there was going be a plan

19   filed or to be filed, if it got that close, we would

20   have had a board meeting about it to discuss it,

21   maybe in connection they would have distributed a

22   term sheet or they would not have.  It would have

23   just been a discussion about it.

24        Q.      And do you have an understanding of

25   the construct of this term sheet and the way that

1    the plan was formulated in April?

2         A.      No, I don't remember.  I don't

3    recall.

4         Q.      Do you see -- I mean, if you look at

5    the exhibits side by side, do you see that they're

6    pretty similar --

7         A.      Uh-huh.

8         Q.      -- to each other?

9              MR. BENDERNAGEL:  Object to the form

10   of the question, vague.

11        Q.      Did you say uh-huh, for the record?

12        A.      Uh-huh, I'm listening.

13        Q.      Uh-huh, you're listening, okay.

14           So did the Special Committee do anything in

15   connection with the term sheet in September and

16   October regarding the construct of the plan?

17        A.      Not that I recall.

18              MR. CULLEN:  Objection, foundation,

19   form.

20        A.      Not that I recall.

21        Q.      Okay.  So it wouldn't be within the

22   province of the Special Committee to know that the

23   term -- that the term sheets and the plans are very

24   similar but the parties are different?

25              MR. CULLEN:  Objection, foundation,

1    form.

2                    MR. JOHNSTON:   Objection to the form

3    of the question.

4            A.       I don't know.

5            Q.       Okay.  So the Special Committee was

6    not involved with the drafting of the term sheets?

7            A.       No, we weren't involved in the

8    drafting, no.

9            Q.       And --

10           A.       Never.

11           Q.       And you testified earlier that you

12   negotiated directly with Oaktree and J.P. Morgan?

13                   MR. CULLEN:   Objection.   I think that

14   misstates his testimony.

15           Q.       Okay.  Did you negotiate with Oaktree

16   in putting together the term sheet reflected in

17   Shapiro Exhibit 2?

18           A.       No, no, I didn't.   I mean, I had

19   conversations with Oaktree and J.P. Morgan to get

20   them to the table and try to get everybody to get to

21   a consensus and reach resolution and conclusion.

22   But, no, I didn't negotiate terms.

23           Q.       So what was the substance of the

24   conversation that you had with Oaktree about -- I

25   mean, there is lot of communication reflected but

160

1   generally?

2        A.      Yeah, there's plenty of e-mails.   I

3   mean, to which are you speaking directly or

4   specifically, I guess?

5        Q.      Well, in your conversation with Ken

6   Liang when you were talking about trying to reach a

7   concession --

8        A.      Right.

9        Q.      -- what were the substance of these

10  discussions, you know, just as a general question?

11       A.      To me, to call to get together to get

12  in a room, to get the issues on the table, to work

13  with David Kurtz, to work with Don, you know, to

14  find out from J.P. Morgan what their issues were,

15  get them out on a piece of paper and then make sure

16  that -- have Ken give a formal response to why he

17  can't or won't meet a certain term and then let them

18  go back and forth.   It's their job to negotiate.

19  It's my job to keep them talking, keep the dialogue,

20  keep getting them to the table.

21          And, frankly, I don't want to know all the

22  ins and outs of every single issue and term that

23  they don't agree on.   It's kind of above my pay

24  grade, but I want to make sure there's a

25  constructive dialogue and that just seemed like that

1   kept breaking down.

2         Q.       And did you ever have any meetings

3   with the UCC, the Creditors Committee?

4         A.       No, I never did.

5         Q.       Okay.  And I think this was touched

6   on before, that the parties that you spoke to

7   directly with were potential defendants in the

8   litigation.  And you're aware of that, right?

9                  MR. CULLEN:  Objection, asked and

10  answered.

11          But go ahead.

12        Q.       What's your date of birth?

13        A.       Why is that relevant?  Is that on the

14  scope of everything?

15                 MR. CULLEN:  And how much do you

16  weigh?

17                 MR. BENDERNAGEL:  Is that a serious

18  question?

19                 MR. BROMBERG:  Yeah, it's a serious

20  question.

21                 MR. BENDERNAGEL:  What his date of

22  birth is?

23                 MR. BROMBERG:  It's a serious

24  question.

25                 THE WITNESS:  Why do you want to know

1    my date of birth?  Very, very, private, very private

2    about that kind of stuff; 1970.  Did you think I was

3    older or younger?

4                        MR. BENDERNAGEL:  You really want all

5    this on the transcript?

6        Q.        So is it fair to say that you never

7    negotiated or spoke with any of the Plaintiffs in

8    the litigation lawsuits?

9        A.        No, I never did.  That is fair to

10   say.

11       Q.        Between the time that the Special

12   Committee was formed and the court order authorizing

13   the retention of Jones Day, who was advising the

14   Special Committee as counsel?  There was about a

15   three-week period.

16                        MR. JOHNSTON:  Objection, asked and

17   answered.

18       A.        Yeah, nobody.  I mean, we -- when we

19   got together, we got together with Jones Day.  It

20   had to go through, you know, formal approval, I

21   believe, by the courts.  But we were meeting as a

22   group.

23       Q.        So, prior to the formal

24   authorization, you were meeting with Jones Day and

25   getting counsel from them?

1          A.         Correct.

2          Q.         Okay.  No further questions.

3          A.         Thank you.

4                     MR. LACK:  Other people have any

5     questions?

6                     MR. SHORE:  Not on this motion, no.

7                     MR. CULLEN:  Thank you all very much.

8                     THE VIDEOGRAPHER:  One second,

9     please.

10          It's 6:29 p.m.  We're going off the record.

11          (Deposition is adjourned at approximately

12     6:29 p.m.)

13

14     Subscribed and sworn to

15     before me this_____day of_____, 2010.

16     _____

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3           I, SILVIA P. WAGE, a Notary Public and

 4     Certified Court Reporter of the State of New Jersey,

 5     License No. 30X100182700, Certified Realtime

 6     Reporter and Registered Professional Reporter, do

 7     hereby certify that prior to the commencement of the

 8     examination, MARK SHAPIRO was duly sworn by me to

 9     testify the truth, the whole truth and nothing but

10     the truth.

11           I DO FURTHER CERTIFY that the foregoing is a

12     true and accurate transcript of the testimony as

13     taken stenographically by and before me at the time,

14     place and on the date hereinbefore set forth.

15           I DO FURTHER CERTIFY that I am neither a

16     relative nor employee nor attorney nor counsel of

17     any of the parties to this action, and that I am

18     neither a relative nor employee of such attorney or

19     counsel, and that I am not financially interested in

20     the action.

21

22     _____

23     Notary Public of the State of New Jersey

24     My Commission expires November 9, 2012

25     Dated:  October 14, 2010
```

```
 1        OCTOBER 13, 2010 - MARK SHAPIRO
 2                  E R R A T A
 3        I wish to make the following changes, for the
 4    following reasons:
 5    PAGE LINE
      _____ _____      CHANGE    _____
 6                     REASON    _____
 7    _____ _____      CHANGE    _____
                       REASON    _____
 8
      _____ _____      CHANGE    _____
 9                     REASON    _____
10    _____ _____      CHANGE    _____
                       REASON    _____
11
      _____ _____      CHANGE    _____
12                     REASON    _____
13    _____ _____      CHANGE    _____
                       REASON    _____
14
      _____ _____      CHANGE    _____
15                     REASON    _____
16    _____ _____      CHANGE    _____
                       REASON    _____
17
      _____ _____      CHANGE    _____
18                     REASON    _____
19    _____ _____      CHANGE    _____
                       REASON    _____
20
      _____ _____      CHANGE    _____
21                     REASON    _____
22    _____ _____      CHANGE    _____
                       REASON    _____
23
      _____ _____      CHANGE    _____
24                     REASON    _____
      _____ _____      CHANGE    _____
                       REASON    _____
```