**EXHIBIT 1**

**Black Line Comparison of the Proposed November 23, 2010 Disclosure Statement
to the Proposed October 22, 2010 Disclosure Statement**

~~IN THE~~ UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., [1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## JOINT DISCLOSURE STATEMENT FOR THE FOLLOWING PLANS OF REORGANIZATION:

1) [COMPETING PLAN] **FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON, AND CO., L.P., AND JPMORGAN CHASE BANK, N.A.;**

2) [COMPETING PLAN] **JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST**

---

[1] ~~The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (0634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.~~ listed on the following page.

**COMPANY, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES;**

3)  **JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY KING STREET ACQUISITION COMPANY, L.L.C., KING STREET CAPITAL, L.P. AND MARATHON ASSET MANAGEMENT, L.P.; AND**

4)  **PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY CERTAIN HOLDERS OF STEP ONE SENIOR LOAN CLAIMS**

DATED: ~~October 22,~~November [●], 2010

---

THE JOINT DISCLOSURE STATEMENT (AS DEFINED HEREIN) HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE FILING AND DISSEMINATION OF THE JOINT DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF ANY COMPETING PLAN (AS DEFINED HEREIN).  ACCEPTANCES OF THE COMPETING PLANS MAY NOT BE SOLICITED UNTIL THE JOINT DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

---

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

**IMPORTANT DATES**

- Date by which ballots and master ballots must be received:
    **[●] at 4:00 p.m. (prevailing Eastern Time)**

- Date by which objections to confirmation of the Competing Plans must be filed and served:
    **[●] at 4:00 p.m. (prevailing Eastern Time)**

- Hearing on confirmation of the Competing Plans:
    **[●] at [●] __.m. (prevailing Eastern Time)**

**TABLE OF CONTENTS**

**VOLUME I – GENERAL DISCLOSURE STATEMENT:**

VOLUME I – GENERAL DISCLOSURE STATEMENT: ........................................... i
I.      INTRODUCTION ................................................................................... ~~2~~1
        A.      Overview of Chapter 11 ........................................................ ~~5~~4
        B.      Parties Entitled to Vote on the Competing Plans. ................ ~~5~~4
        C.      Solicitation Package. ............................................................ ~~6~~5
        D.      Voting Procedures, Ballots, and Voting Deadline. .............. ~~6~~5
        E.      Confirmation Hearing and Deadline for Objections to Confirmation. ................. ~~7~~6
II.     GENERAL INFORMATION .................................................................. 7
        A.      The Debtors' Businesses and Properties. .............................. ~~8~~7
                1.      Company Overview. ................................................... ~~8~~7
                2.      The Debtors' Properties. ............................................ 8
        B.      Operations of the Debtors. .................................................. ~~9~~8
                1.      Publishing Segment. .................................................. ~~9~~8
                2.      Broadcasting Segment. ............................................. ~~14~~13
                3.      Additional Investments. ........................................... 15
        C.      Recent Operations. .............................................................. ~~17~~16
        D.      Current Management of the Debtors ..................................... ~~18~~17
                1.      Board of Directors. ................................................... ~~18~~17
                2.      Special Committee of the Board of Directors. ........... ~~18~~17
                3.      Subcommittees of the Board of Directors. ................. 18
                4.      Compensation of Directors. ...................................... ~~19~~18
                5.      Executive Officers. .................................................. ~~19~~18
III.    SUMMARY OF CERTAIN PREPETITION LIABILITIES ...................... ~~20~~19
        A.      Prepetition Funded Debt and Capital Structure of the Tribune Entities. .......... ~~20~~19
                1.      Prepetition Capital Structure. .................................... ~~20~~19
                2.      Prepetition Funded Debt Structure ............................ ~~21~~20
        B.      Prepetition Trade Payables & Other Operating Liabilities. ......... ~~26~~25
        C.      Prepetition Compensation and Benefit Programs. ................. ~~26~~25
                1.      Retirement Programs. ............................................... ~~26~~25
                2.      Severance Programs. ................................................. ~~30~~29
                3.      Management Incentive Plan ("MIP"). ........................ ~~30~~29
                4.      Local Bonus Programs. ............................................. ~~32~~31
                5.      Collective Bargaining Agreements. ........................... ~~32~~31
                6.      Management Equity Incentive Program. ..................... 33
                7.      Equity-Based Compensation Provisions of Incentive Compensation Plan.
                        .................................................................................. ~~34~~33
                8.      Employee Stock Ownership Plan. ............................. ~~34~~33
                9.      Transitional Compensation Plan ............................... ~~34~~33
                10.     Nonqualified Retirement / Deferred Compensation Plans ........ 34
                11.     Certain Individual Letter Agreements. ....................... 35

D.     Pending Litigation and Certain Other Legal Matters Involving the Debtors.........35

     1.   *Newsday* and *Hoy* Circulation Misstatements........................................... 36

     2.   ESOP Lawsuit...................................................................................~~37~~36

     3.   FCC Related Matters........................................................................ 38

     4.   Miscellaneous Other Litigation....................................................... 39

IV.    DEBTORS' DESCRIPTION OF THE EVENTS LEADING UP TO CHAPTER 11 ..~~40~~39

V.    DEBTORS' DESCRIPTION OF EVENTS DURING THE CHAPTER 11 CASES ...... 40

A.     Procedural Motions........................................................................~~41~~40

B.     "First-Day" Motions .....................................................................41

C.     Employee Compensation and Benefits ..........................................41

D.     Cash Management...........................................................................~~43~~42

E.     Post-Petition Financing..................................................................43

F.     Professional Retentions..................................................................44

     1.   Retention of Professionals by the Debtors' Estates. .................. 44

     2.   Retention of Jones Day by the Special Committee....................~~45~~44

     3.   The Creditors' Committee and its Advisors. ...........................~~45~~44

G.     Certain Administrative Matters and Other Motions........................45

     1.   Disposition of Certain Executory Contracts and Unexpired Leases......... 45

     2.   Certain other Motions filed by the Debtors. ..........................~~48~~47

     ~~3.~~   ~~Schedules of Assets and Liabilities; Statements of Financial Affairs.~~ ...... 48

     ~~4.~~   ~~All Filed Claims and Bar Date.~~ ........................................................ 48

     ~~5.~~   ~~General Unsecured Claims Against Filed Subsidiary Debtors.~~ ............ 48

     ~~6.~~   ~~Bankruptcy Rule 2015.3 Reports.~~ ....................................................... 50

     ~~7.~~   Fee Disgorgement Motion. ............................................................~~48~~50

     ~~8.~~   ~~WTC Complaint.~~ ............................................................................. 51

     ~~4.~~9.   Limited Motion to Disqualify Counsel to the Official Committee of Unsecured Creditors...................................................................~~49~~52

     ~~10.~~   ~~Pursuit of Preference Avoidance Actions.~~ ...................................... 52

     ~~5.~~11.   The Committee's Standing Motions ~~49~~. ........................................ 52

     ~~6.~~12.   Motion to Appoint a Chapter 11 Trustee. .....................................~~50~~54

     ~~7.~~   ~~Schedules of Assets and Liabilities; Statements of Financial Affairs.~~ ...... 50

     ~~8.~~   ~~Filed Claims and Bar Date.~~ .................................................................. 50

     ~~9.~~   ~~Bankruptcy Rule 2015.3 Reports.~~ ...................................................... 50

     ~~13.~~   ~~Motion to Approve Tolling Agreement.~~ ......................................... 54

     ~~14.~~   ~~Motion to Disqualify Akin Gump Strauss Hauer & Feld LLP as Counsel to Aurelius.~~ ....................................................................................... 54

     ~~15.~~   ~~Certain Holders of Step One Senior Loan Claims' New York State Court Action.~~ ........................................................................................... 54

H.     Chicago Cubs Transaction .............................................................~~51~~55

I.     Morgan Stanley Swap Agreement .................................................~~53~~56

VI.    THE FORMER SETTLEMENT SUPPORT AGREEMENT AND FORMER PLAN.~~54~~57

VII.    THE EXAMINER AND CLAIMS RELATING TO THE LEVERAGED ESOP TRANSACTIONS ...................................................................................~~54~~58

A.     The Leveraged ESOP Transactions ...............................................~~54~~58

B.     Appointment of an Examiner.........................................................~~58~~61

C.       Investigation and Report of the Examiner. ........................................ 5962

D.       Mediation. ............................................................................................ 6063

VIII.    EXCLUSIVITY PERIOD ................................................................................ 6063

IX.      VOTING PROCEDURES AND REQUIREMENTS ........................................ 6164

A.       Voting Deadline. ................................................................................. 6164

B.       Holders of Claims Entitled to Vote .................................................... 6165

C.       Vote Required for Acceptance by a Class .......................................... 6265

1.       Class of Claims. .................................................................... 6265

2.       Class of Interests. .................................................................. 6265

D.       Voting Procedures ............................................................................... 6266

1.       Ballots. .................................................................................. 6266

2.       Withdrawal or Change of Votes on the Competing Plans. .... 6366

X.       CONFIRMATION OF THE PLAN ................................................................. 6366

A.       Confirmation Hearing ......................................................................... 6366

B.       Statutory Requirements for Confirmation of a Competing Plan ....... 6568

1.       Acceptance. ............................................................................ 6569

2.       Fair and Equitable Test. ......................................................... 6569

3.       Feasibility. ............................................................................. 6670

4.       Best Interests Test and Liquidation Analysis ........................ 6670

XI.      PROJECTED FINANCIAL INFORMATION  AND REORGANIZATION VALUE 6670

A.       Projected Financial Information. ........................................................ 6670

B.       Reorganization Value .......................................................................... 6771

XII.     GENERAL RISK FACTORS .......................................................................... 6771

A.       FCC-Related Considerations and Risks Relating to Emergence. ...... 6872

B.       Risks Related to the Debtors' Businesses. .......................................... 6973

XIII.    CONCLUSION ................................................................................................ 7882

EXHIBITS TO THE GENERAL DISCLOSURE STATEMENT:

Exhibit A        –    Corporate Organizational Chart

Exhibit B        –    Collective Bargaining Agreements

Exhibit C        –    Examiner's Report

Exhibit D        –    Liquidation Analysis

Exhibit E        –    Financial Projections

Exhibit F        –    Reorganized Value Analysis

Exhibit G        –    Selected Historical Financial Information


**VOLUME II        –    ADDENDA TO THE GENERAL DISCLOSURE STATEMENT:**

~~Addendum I            [SPECIFIC DISCLOSURE STATEMENT(S) RELATING TO THE COMPETING PLAN(S)]~~

Addendum I        --    Specific Disclosure Statement Relating to First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon, & Co., L.P., and JPMorgan Chase Bank, N.A.

Addendum II        --    Specific Disclosure Statement for the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its managed Entities, Deutsche Bank Trust Company Americas, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, in Its Capacity as Successor Indenture Trustee for the PHONES Notes

Addendum III        --    Specific Disclosure Statement for Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P.

Addendum IV        --    Specific Disclosure Statement for Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims

**VOLUME III        –    RESPONSIVE STATEMENT(S):**

Statement I        --    [RESPONSIVE STATEMENT(S)]Responsive Statements of Debtor/Committee/Lender Plan Proponents

Statement II        --    Responsive Statement of Noteholder Plan Proponents

Statement III    --    Responsive Statement of Bridge Plan Proponents

Statement IV    --    Responsive Statement of Step One Plan Proponents

**VOLUME I – GENERAL DISCLOSURE STATEMENT:**

## I.    INTRODUCTION

On December 8, 2008 (the "Petition Date"), Tribune Company ("Tribune" or the "Company") and certain of its subsidiaries (collectively, the "Debtors")[2] filed voluntary petitions for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), Tribune's subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major League Baseball franchise (the "Chicago Cubs"), commenced a Chapter 11 Case on October 12, 2009 as one of the steps necessary to complete a transaction involving the Chicago Cubs and certain related assets. In all, the Debtors now comprise 111 entities.

[●]Four (4) separate sets of plan proponents (collectively, the "Proponents") have each proposed a plan (collectively, the "Competing Plans") for reorganizing the Debtors, as follows:

1)    [LIST OF COMPETING PLANS AND PLAN PROPONENTS]First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as the same may be amended from time to time, the "Debtor/Committee/Lender Plan");

2)    Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its Managed Entities, Deutsche Bank Trust Company Americas, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, in Its Capacity as Successor Indenture Trustee for the PHONES Notes (as the same may be amended from time to time, the "Noteholder Plan");

3)    Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (as the same may be amended from time to time, the "Bridge Plan"); and

4)    Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (as the same may be amended from time to time, the "Step One Plan").

The purpose of this disclosure statement (including all exhibits hereto, the "General Disclosure Statement"), which was prepared by the Debtors, is to set forth information concerning the history of the Debtors, a description of their businesses, operations and capital structure, events leading up to the Chapter 11 Cases and significant events occurring in the Chapter 11 Cases. This General Disclosure Statement also contains general information regarding the solicitation of votes on the Competing Plans. This General Disclosure Statement does not contain disclosures that are by their nature specific to individual Competing Plans and does not contain certain disclosures that were contained in the Disclosure Statement for the Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries, as approved by the Bankruptcy Court on June 7, 2010 (the "Tribune Disclosure Statement") that were specific to the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries, filed April 12, 2010 (as amended, supplemented, or modified the "Tribune Plan").

---

[2]    The Debtors are set forth on the cover page of the Joint Disclosure Statement. Capitalized terms used but not otherwise defined in this General Disclosure Statement shall have the meanings ascribed to such terms in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as applicable.

The Proponents have each prepared a specific disclosure statement (each a "Specific Disclosure Statement" and, together with the General Disclosure Statement, the "Joint Disclosure Statement") with respect to each of their respective Competing Plans. The Specific Disclosure Statements, which represent only the views of their respective Proponents, are attached as addenda to this General Disclosure Statement. Each Specific Disclosure Statement sets forth information concerning, among other things, (a) the terms, provisions and implications of the applicable Proponent's Competing Plan and (b) the Holders of Claims against and Interests in the Debtors and their rights under the applicable Proponent's Competing Plan. Certain Proponents or parties in interest have also prepared a statement (collectively, the "Responsive Statements") concerning their views on the Competing Plans. The Responsive Statements are annexed to this General Disclosure Statement.

On [●], 2010, the Bankruptcy Court approved the Joint Disclosure Statement in accordance with section 1125 of the Bankruptcy Code as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against, or Interests in, the Debtors to make an informed judgment as to whether to accept or reject each Competing Plan, and authorized its use in connection with the solicitation of votes with respect to each Competing Plan. **APPROVAL OF THE JOINT DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF ANY COMPETING PLAN**. No solicitation of votes may be made except pursuant to the Joint Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on any of the Competing Plans, Holders of Claims should not rely on any information relating to the Debtors and their businesses other than that contained in the Joint Disclosure Statement, the Competing Plans, the Responsive Statements, and all exhibits and appendices hereto and thereto.

THE STATEMENTS CONTAINED IN THIS GENERAL DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF SUCH DOCUMENTS, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS GENERAL DISCLOSURE STATEMENT AND THE SPECIFIC DISCLOSURE STATEMENTS WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

CERTAIN INFORMATION CONTAINED IN THIS GENERAL DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND FINANCIAL PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE XII OF THIS GENERAL DISCLOSURE STATEMENT, "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS GENERAL DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NONE OF THE DEBTORS NOR ANY OF THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, NEITHER THIS GENERAL DISCLOSURE STATEMENT NOR ANY OF THE SPECIFIC DISCLOSURE STATEMENTS SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN

SETTLEMENT NEGOTIATIONS.  SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, NEITHER THIS GENERAL DISCLOSURE STATEMENT NOR ANY OF THE SPECIFIC DISCLOSURE STATEMENTS SHALL BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL ANY OF THEM BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF ANY OF THE COMPETING PLANS AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS GENERAL DISCLOSURE STATEMENT AND/OR THE SPECIFIC DISCLOSURE STATEMENTS, OR ANY OF THEIR EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS, PREPARED THE FINANCIAL PROJECTIONS SET FORTH IN THIS GENERAL DISCLOSURE STATEMENT.  WHILE THE DEBTORS HAVE PRESENTED THESE FINANCIAL PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE FINANCIAL PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' AND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT THEY DO NOT AND CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

IN ADDITION TO THE FOREGOING, ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THE JOINT DISCLOSURE STATEMENT AND THE COMPETING PLANS IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT ANY COMPETING PLAN.

THE JOINT DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

THE JOINT DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR

ADEQUACY OF THE STATEMENTS CONTAINED IN THE JOINT DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THE JOINT DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WERE PREPARED.

THE INFORMATION CONTAINED IN THE JOINT DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE COMPETING PLANS AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. THE JOINT DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE COMPETING PLANS.  ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THE JOINT DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

## A.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from all debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan.  The Proponents are submitting the Joint Disclosure Statement to holders of Claims against and Interests in each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

More than one plan of reorganization may be proposed for a debtor or a group of debtors under chapter 11.  However, only one plan of reorganization will ultimately be confirmed by the Bankruptcy Court and become effective.

**B.**    **Parties Entitled to Vote on the Competing Plans.**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by a plan, but who will receive no distribution under the plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, please see Article IX of this General Disclosure Statement, "Voting Procedures and Requirements."

**Please refer to the Specific Disclosure Statements for information concerning the parties in interest that are entitled to vote on each Competing Plan. You may be entitled to vote on multiple Competing Plans.**

**C.**    **Solicitation Package.**

Accompanying the Joint Disclosure Statement (which is provided on CD-ROM) is a package of materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving the Joint Disclosure Statement and procedures for soliciting and tabulating votes on the Competing Plans (the "Solicitation Order") which, among other things, approves the Joint Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, details the procedures for distributing Solicitation Packages to the holders of claims against the Debtors that are entitled to vote on the Competing Plans, establishes the procedures for tabulating ballots used in voting on the Competing Plans and sets the deadline for objecting to confirmation of the Competing Plans;

- the notice of the hearing to consider confirmation of the Competing Plans; and

- ~~a ballot~~ballots and a postage-paid return envelope (ballots are provided only to holders of Claims that are entitled to vote on the Competing Plans), which will be used by creditors and equity holders who are entitled to vote on the Competing Plans.

**D.**    **Voting Procedures, Ballots, and Voting Deadline.**

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your ~~ballot~~ballots, please indicate your acceptance or rejection of the Competing Plans by voting in favor of or against one or more of the Competing Plans (provided that you are the holder of an impaired claim entitled to vote on such Competing Plan(s)). You may choose to accept any or all of the Competing Plans, reject any or all of the Competing Plans, ~~,~~or abstain from voting on some or all Competing Plans.

Each ballot has been coded to reflect the class or classes of claims it represents. Accordingly, in voting to accept or reject the Competing Plans, you must use only the coded ballot or ballots sent to you with the Joint Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original ~~ballot~~ballots and return ~~it~~them in the envelope provided. Only original signatures will be accepted. **Ballots should not be sent to the Debtors or any of the Proponents.** Please return your completed ~~ballot~~ballots to the Voting Agent, unless you are the beneficial holder of a Claim who receives a ballot from a broker, bank,

commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), in which case you must return the ~~ballot~~ballots to such Voting Nominee.

You may have previously received a ballot for voting to accept or reject the Tribune Plan, which was proposed by the Debtors. Ballots that were distributed in connection with the Tribune Plan are no longer valid. If you cast a vote to accept or reject the Tribune Plan, that vote will not be counted as a vote to accept or reject any of the Competing Plans. If you want to have a vote counted to accept or reject some or all of the Competing Plans, you must complete and return your ballot by the Voting Deadline.

**If you are a beneficial holder of a Claim who receives a ballot from a Voting Nominee, in order for your vote to be counted, your ballot must be completed in accordance with the voting instructions on the ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a master ballot to the Voting Agent so that it is received no later than [●] at [●] (prevailing Eastern Time) (the "Voting Deadline"). If you are the holder of any other type of Claim, in order for your vote to be counted, your ballot must be properly completed in accordance with the voting instructions on the ballot and received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent") no later than the Voting Deadline. Any ballot received after the Voting Deadline shall be counted at the sole discretion of the Proponents of the applicable Competing Plan, unless otherwise ordered by the Bankruptcy Court. Do not return any debt instruments or equity securities with your ballot.**

**Any executed ballot that does not indicate either an acceptance or rejection of the applicable Competing Plan or indicates both an acceptance and rejection of the applicable Competing Plan will not be counted as a vote either to accept or reject such Competing Plan.**

If you are a holder of a Claim who is entitled to vote on a Competing Plan and did not receive a ballot, received a damaged ballot or lost your ballot, please ~~call~~contact the Voting Agent at (~~646) 282-2400 or toll-free at (800) 622-1125.~~888) 287-7568 or tribunevote@epiqsystems.com.

If you have any questions about the procedures for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain an additional copy of the Joint Disclosure Statement and its Exhibits and/or appendices, please contact the Voting Agent.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE COMPETING PLANS, SEE ARTICLE IX OF THIS GENERAL DISCLOSURE STATEMENT, "VOTING PROCEDURES AND REQUIREMENTS."

Before voting on the Competing Plans, each Holder of Claims in classes that are entitled to vote on the Competing Plans should read, in their entirety, the Joint Disclosure Statement, the Competing Plans, the Responsive Statements, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

### E.    Confirmation Hearing and Deadline for Objections to Confirmation.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [●] at [●] (prevailing Eastern Time), before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the

announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing. Any objection to Confirmation of a Competing Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code, Bankruptcy Rule 9014, and the procedures set forth in Article X.A of this General Disclosure Statement.

## II.    GENERAL INFORMATION

*The following summaries of the Debtors' businesses and properties, operations of the Debtors, recent operations of the Debtors, and current management of the Debtors were prepared by the Debtors.*

### A.    The Debtors' Businesses and Properties.

1.    Company Overview.

Tribune is a leading media and entertainment company reaching more than eighty percent (80%) of households in the United States through its newspapers, other publications and websites, its television and radio stations, its "Superstation" WGN America, and its other news and entertainment offerings. Tribune was founded in 1847 and incorporated in Illinois in 1861. In 1968, as a result of a corporate restructuring, Tribune became a holding company incorporated in Delaware. In 1983, after 136 years of private ownership, Tribune became a public company. Throughout the 1980s and 1990s, Tribune grew rapidly through a series of acquisitions. In 2000, Tribune acquired The Times Mirror Company ("Times Mirror").

Tribune returned to private ownership in 2007 when its board of directors, based on the recommendation of a special committee of the board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune employee stock ownership plan (the "ESOP"), EGI-TRB, LLC (the "Zell Entity"), a Delaware limited liability company wholly-owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On December 20, 2007, Tribune completed the Leveraged ESOP Transactions, culminating with the cancellation of all issued and outstanding shares of Tribune's common stock as of that date, other than shares held by the ESOP, and with Tribune becoming wholly-owned by the ESOP.

Tribune directly or indirectly owns all (or substantially all) of the equity in 128 subsidiaries (Tribune and its subsidiaries collectively, the "Tribune Entities"), of which 110 are Debtors. Tribune and certain of its subsidiaries also have equity interests, which are generally minority interests, in various businesses in which one or more third parties are also holders of equity interests. These particular businesses are not Debtors as of the date of this General Disclosure Statement. A corporate organizational chart detailing the ownership structure for Tribune and its majority and wholly-owned subsidiaries as of the date of this General Disclosure Statement is attached as Exhibit A to the Joint Disclosure Statement.

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the Internal Revenue Code of 1986, as amended (the "IRC"), which election became effective as of the beginning of Tribune's 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations, Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax. Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders. As of the date of the General Disclosure Statement, the ESOP was the sole stockholder of Tribune and is not taxed on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax

treatment under Section 401(a) of the IRC. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

> 2.     The Debtors' Properties.

The corporate headquarters of the Tribune Entities is located at 435 North Michigan Avenue, Chicago, Illinois 60611. The Tribune Entities own an aggregate of approximately 7,710,000 square feet of office, production and other space in approximately 54 locations. The Tribune Entities also lease parking lots, offices, and other space which aggregate to approximately 3,567,748 square feet in approximately 166 separate locations and also lease or own towers and transmitter space in approximately 84 locations.

## B.     Operations of the Debtors.

The Tribune Entities' primary sources of revenue are from (i) the sale of advertising in newspapers and other publications and on websites owned by or affiliated with the Tribune Entities, (ii) the distribution of preprinted insert advertisements, (iii) the sale of newspapers and other publications to distributors and individual subscribers, (iv) the provision of commercial printing and delivery services to third parties, primarily other newspaper companies, (v) the sale of entertainment listings data and syndicated content, (vi) the sale of advertising on the Tribune Entities' television and radio stations, and on its "Superstation" WGN America, and (vii) the distribution of WGN America through cable, satellite, and other similar distribution methods. The Tribune Entities' operations are divided into two primary industry segments: (a) publishing (the "Publishing Segment") and (b) broadcasting (the "Broadcasting Segment").[3] These segments operate almost completely in the United States.[4]

> 1.     Publishing Segment.

The Publishing Segment accounted for seventy percent (70%) of the Tribune Entities' consolidated revenues in 2009 and sixty-six (66%) of consolidated revenues for the first three quarters of 2010. This segment currently operates eight major-market daily newspapers, distributes preprinted insert advertisements, provides commercial printing and delivery services to third parties, and distributes entertainment listings and syndicated content through its Tribune Media Services business unit. The daily newspapers published by the Tribune Entities, which have collectively garnered 84 Pulitzer Prizes, include the following market leading papers: the *Los Angeles Times*, the *Chicago Tribune*, *The Baltimore Sun*, the *Orlando Sentinel*, the *South Florida Sun Sentinel*, the *Hartford Courant*, *The Morning Call,* and the *Daily Press*.

The Tribune Entities' newspapers collectively have paid circulation of approximately 2 million copies daily and 3.1 million copies on Sundays. In addition, the Tribune Entities publish over 100 "niche" publications that target various geographic, ethnographic and demographic audiences and include the upscale *Chicago Magazine,* the Spanish language newspaper *Hoy*, which is published in Chicago and Los Angeles, and Chicago's *RedEye*, which targets a younger demographic.

The table below sets forth information concerning the Tribune Entities' average paid circulation for the six months ended March 2010, as reported to the Audit Bureau of Circulations, for its daily newspapers (in thousands). Average daily circulation is based on a five-day (Monday-Friday) average.

---

[3]     Certain administrative activities are not included in either segment and are instead considered as general corporate operations.

[4]     These segments also reflect the way the Tribune Entities sell their products to the marketplace, manage operations, and make business decisions.

|  | Daily | Sunday |
|---|---|---|
| *Los Angeles Times* | 617 | 942 |
| *Chicago Tribune* | 452 | 794 |
| *The Baltimore Sun* | 202 | 344 |
| *Orlando Sentinel* | 191 | 291 |
| *South Florida Sun Sentinel* | 180 | 264 |
| *Hartford Courant* | 139 | 202 |
| *Allentown Morning Call* | 104 | 123 |
| *Daily Press* (Newport News, VA) | 65 | 91 |
| **Total Net Paid Circulation** | **1,950** | **3,051** |

The Publishing Segment also manages the websites of the Tribune Entities' daily newspapers, television stations, and other branded products that target specific areas of interest. In 2009, those websites collectively averaged 49 million monthly unique visitors and over 510 million monthly page views. For the first three quarters of 2010, those websites collectively averaged almost 51 million monthly unique visitors and over 498 million monthly average page views. The Publishing Segment employed approximately 10,300 full-time equivalent employees in the fourth quarter of 2009 and about 9,950 in the third quarter of 2010. The primary businesses of the Publishing Segment are described below.

a)       Los Angeles Times Media Group

The Los Angeles Times Media Group is a leading provider of news and information in the Los Angeles metropolitan area. Its operations are principally comprised of the publication of the *Los Angeles Times* and its related businesses. The *Los Angeles Times* has been published continuously since 1881. The newspaper has won 39 Pulitzer Prizes and is the largest daily metropolitan newspaper in the United States in circulation. The Los Angeles market ranks second in the nation in terms of population. In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside Counties, the *Los Angeles Times* competes for advertising and circulation with 18 local daily newspapers and three national newspapers, with its largest local competitor having about 197,000 in average daily circulation. The *Los Angeles Times* ranks fourth in the United States for average daily paid circulation and second on Sundays for paid circulation. Approximately eighty-one percent (81%) and eighty-four percent (84%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

The *Los Angeles Times* publishes two daily editions: the East edition and the West edition. Additional daily and semi-weekly community newspapers are either inserted into the paper in selected geographic areas or distributed to homes and through vending boxes to provide targeted local news coverage. The Los Angeles Times Media Group operates latimes.com, an online expanded version of the newspaper, providing local, national and international news along with features reporting, findlocal.latimes.com, covering entertainment, reviews and things to do in Southern California, and theenvelope.com, a comprehensive year-round entertainment awards website. For the first three quarters of 2010, the Los Angeles Times Media Group's digital media reached an average of about 8.4 million monthly unique visitors and averaged over 135 million monthly page views. The Los Angeles Times Media Group also operates several targeted publications and their related websites, including (i) the free Spanish language newspaper, *Hoy*, which provides local, national and international news and features of interest to the largest Hispanic market in the United States and (ii) *Brand X*, which focuses on lifestyle and entertainment features. In addition, the Los Angeles Times Media Group's production facility prints the local edition of *The Wall Street Journal*, and its outside carriers deliver the *Orange County Register*, *The Wall Street Journal*, *The New York Times* and numerous other local publications.

b)    Chicago Tribune Media Group

The Chicago Tribune Media Group is a leading provider of news and information in Chicagoland. Its operations are principally comprised of the publication of the *Chicago Tribune* and its related businesses. Founded in 1847, the *Chicago Tribune* has won 25 Pulitzer Prizes and its print and online coverage attracts the largest news-seeking audience in the Midwest. The Chicago market ranks third in the nation in terms of population. The *Chicago Tribune* ranks eighth in the United States for average daily paid circulation and fourth on Sunday for paid circulation. Approximately eighty-five percent (85%) and seventy-eight percent (78%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

The Chicago Tribune Media Group is a multi-product, multi-channel news and information source. The Chicago Tribune Media Group operates chicagotribune.com, the web edition of the newspaper, and ChicagoNow.com, a local blog network. For the first three quarters of 2010, the Chicago Tribune Media Group's digital media reached an average of 3.8 million monthly unique visitors and averaged over 127 million monthly page views. The Chicago Tribune Media Group also operates several targeted publications, including (i) *RedEye*, a free daily publication targeting young, urban commuters; (ii) *Hoy*, a free Spanish language newspaper; (iii) *Chicago Magazine*, an upscale monthly paid magazine; (iv) *TheMash*, a weekly newspaper for high school students; and (v) *Triblocal*, the largest community-driven weekly newspaper in Chicagoland. Additionally, the Chicago Tribune Media Group provides an integrated and comprehensive direct mail service and is the leading distributor of third-party print publications in the Chicagoland area. Its production facility prints the local edition of *The Wall Street Journal* and *The New York Times*, and its outside carriers deliver the *Chicago Sun-Times*, *The Wall Street Journal*, and *The New York Times* along with other national and local publications.

c)    Baltimore Sun Media Group

The Baltimore Sun Media Group publishes *The Baltimore Sun*, Maryland's largest newspaper, which has won 15 Pulitzer Prizes since it began publishing a daily newspaper in 1837. The Baltimore market ranks 20th in the nation in terms of population. It competes with other Maryland and Washington, D.C. based daily and weekly newspapers as well as regional editions of national daily newspapers. Approximately seventy-seven percent (77%) and sixty-nine percent (69%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

The Baltimore Sun Media Group's operations also include 18 community newspapers, the largest of which are *The Howard County Times, The Columbia Flier, The Towson Times* and *The Aegis*, along with *b*, a free daily publication targeting young adults, six magazines, and eight directories. The Baltimore Sun Media Group also operates the market-leading website, baltimoresun.com, along with numerous niche online properties. For the first three quarters of 2010, the Baltimore Sun Media Group's digital media reached an average of more than 1.5 million monthly unique visitors and averaged over 39 million monthly page views. It also has a custom media division that works with regional companies to produce more than 30 specialized publications.

In addition, The Baltimore Sun Media Group prints the full circulation of the *Washington Times*, and also has printing contracts with the *New York Daily News* and *The Korea Daily*. The Baltimore Sun Media Group has distribution and delivery agreements with 33 publications including *The Washington Post, USA Today*, the *New York Post, The New York Times* and *The Wall Street Journal*.

d)     Florida Media Group

The Florida Media Group is a leading provider of news and information in Southern and Central Florida. Its operations are principally compromised of the publication of the *South Florida Sun Sentinel*, the *Orlando Sentinel*, and their related businesses. The Tribune Entities' Florida properties share significant resources in the areas of advertising sales, editorial coverage, and back office administration and have implemented significant regionalization and integration strategies.

The *Orlando Sentinel* primarily serves a six-county area in Central Florida. The newspaper is the only major daily newspaper in the Orlando market, although it competes with other Florida and national newspapers, as well as with other media. The *Orlando Sentinel* has been published since 1876 and has won three Pulitzer Prizes. The Orlando market ranks 26th in the nation in terms of population. Approximately eighty-one percent (81%) and eighty percent (80%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

To serve the Central Florida market, the Florida Media Group also operates (i) orlandosentinel.com, a breaking news and information website; (ii) *Sentinel Express*, a free weekly publication used to distribute advertising and content to newspaper non-subscribers in Central Florida; (iii) *el Sentinel*, a weekly Spanish language newspaper, and its companion website, elsentinel.com; and (iv) *Everything Orlando*, a free niche product, and its companion website Everythingorlando.com. For the first three quarters of 2010, the *Orlando Sentinel's* digital media reached an average of over 1.7 million monthly unique visitors and averaged over 44 million monthly page views. The Florida Media Group offers direct marketing and direct mail services through Tribune Direct/Orlando in addition to printing and distribution services for other publications.

The *South Florida Sun Sentinel* is the major daily newspaper serving the Broward/Palm Beach County market. The Miami/Fort Lauderdale/Miami Beach metropolitan area, which includes Broward and Palm Beach counties, ranks seventh in the nation in terms of population. Approximately eighty-one percent (81%) and seventy-six percent (76%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

The Florida Media Group also serves the news and information needs of South Florida through (i) sunsentinel.com, a breaking news and information website; (ii) *el Sentinel*, a weekly Spanish language newspaper; (iii) *Teenlink*, a weekly newspaper distributed in Broward County high schools; (iv) several weekly community newspapers; and (v) other niche publications. For the first three quarters of 2010, the *South Florida Sun Sentinel's* digital media reached an average of 1.1 million monthly unique visitors and averaged over 45 million monthly page views.

Other publications produced by the Florida Media Group in South Florida include: *City & Shore*, a bimonthly lifestyle magazine; *City Link*, an alternative weekly newspaper; *Home Source*, a comprehensive monthly guide to South Florida real estate and home improvement; *Jewish Journal*, a collection of weekly newspapers serving South Florida's Jewish community; and *South Florida Parenting*, a monthly magazine providing parenting information and resources for local families. The *South Florida Sun Sentinel* currently prints and transports all of the *Palm Beach Post's* circulation and its outside carriers deliver approximately eighty percent (80%) of the *Palm Beach Post's* single copy and approximately thirty percent (30%) of their home delivery copies. The *South Florida Sun Sentinel* also has printing contracts with *The New York Times* and *USA Today* for their daily papers and has distribution agreements with major dailies such as the *Miami Herald, The Wall Street Journal, USA Today, The New York Times*, and several other daily publications.

e)    CT1 Media

CT1 Media is a leading provider of news, information and entertainment in Connecticut. Its operations are principally comprised of the publication of the *Hartford Courant* and its related businesses. The *Hartford Courant*, founded in 1764, is the oldest continuously published newspaper in the United States. It is the most widely circulated and read newspaper in Connecticut. Winner of two Pulitzer Prizes and twice named among the best-designed newspapers in the world, the *Hartford Courant* serves the state's northern and central regions. The *Hartford Courant's* primary market is the Hartford market, which ranks 45th in the nation in terms of population and includes Hartford, Tolland and Middlesex counties. Approximately eighty-nine percent (89%) and seventy-eight percent (78%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes. CT1 Media also operates courant.com, Connecticut's leading online news site, publishes three weekly alternative newspapers in Connecticut and operates a shared-mail company that distributes advertising supplements to more than one million households in Connecticut and Massachusetts. For the first three quarters of 2010, the Hartford Courant's digital media reached an average of almost 700,000 monthly unique visitors and averaged about 21 million monthly page views.

f)    *The Morning Call*

*The Morning Call*, published since 1895, is the major regional newspaper for nine counties in eastern Pennsylvania and one county in western New Jersey. Its primary market, the Allentown-Bethlehem-Easton metropolitan area, is the 62nd largest market in the nation in terms of population. Approximately seventy-six percent (76%) of the paper's daily and eighty percent (80%) of Sunday circulation was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes and to schools. *The Morning Call* also offers full service direct marketing and saturation preprint delivery through non-subscriber distribution and owns and operates the premier regional website, themorningcall.com. For the first three quarters of 2010, *The Morning Call's* digital media reached an average of over 390,000 monthly unique visitors and averaged over 14 million page views.

g)    *Daily Press*

Founded in 1896, the *Daily Press* serves the Virginia Peninsula market, which includes Newport News, Hampton, Williamsburg and eight other cities and counties. This market, together with Norfolk, Portsmouth, Virginia Beach and Chesapeake, is known as Virginia's Hampton Roads region and is the 35th largest market in the nation in terms of population. The *Daily Press* is the only major daily newspaper in its primary market, although it competes with other regional and national newspapers, as well as with other media. Approximately eighty-eight percent (88%) and eighty-six percent (86%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes. The *Daily Press* also publishes *The Virginia Gazette*, a semi-weekly publication which primarily serves Williamsburg, Virginia, and the surrounding counties, the weekly *Tidewater Review*, published for the greater West Point, Virginia community, and several special interest publications. The *Daily Press* also distributes news, advertising and other information through various multimedia channels, including its online affiliates dailypress.com, hrtownsquare.com, hrvarsity.com and hrmilitary.com. For the first three quarters of 2010, the *Daily Press'* digital media reached an average of over 260,000 monthly unique visitors and averaged about nine million monthly page views.

h)    Tribune Media Services

Tribune Media Services ("TMS") is a leading provider of information and entertainment products for print, electronic and on-air media. Through its Entertainment Products division, TMS distributes

television and movie listings and related editorial content under the TMS and Zap2it brands. This division also publishes monthly television listings magazines and offers direct marketing services for cable and satellite operators. TMS's News & Features division (i) syndicates comics, editorial cartoons, feature articles, opinion columns, games and puzzles; (ii) creates and distributes a variety of online information products; and (iii) licenses editorial content from national periodicals. TMS also markets news, features, information graphics and multimedia content to media clients around the world through McClatchy-Tribune Information Services. For the first three quarters of 2010, TMS's Zap2it.com web site reached an average of about 2.4 million monthly unique visitors and averaged over 38 million monthly page views.

> 2.    Broadcasting Segment.

The Broadcasting Segment, which accounted for thirty percent (30%) of the Tribune Entities' consolidated operating revenues in 2009, includes 23 television stations in 19 markets, of which seven stations are in the top ten markets in the United States. The Tribune Entities also own and operate the "Superstation" WGN America, which is seen in over 72 million homes, the Chicago radio station WGN-AM, which first went on the air in 1924, and CLTV, Chicago's first and only 24-hour cable news channel. Through its television stations and WGN America, the Broadcasting Segment reaches more than eighty percent (80%) of television households in the United States. The Broadcasting Segment employed approximately 2,750 full-time equivalent employees in the fourth quarter of 2009 and approximately 2,400 in the third quarter of 2010.

Thirteen of the Tribune Entities' television stations are affiliates of The CW Network. These stations are located in New York, Los Angeles, Chicago, Dallas, Washington, D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, Hartford and New Orleans. The Tribune Entities also have seven television stations affiliated with the FOX Network. These stations are located in Seattle, Sacramento, Indianapolis, Hartford, San Diego, Grand Rapids and Harrisburg. In addition, the Tribune Entities have an ABC Network television station affiliate in New Orleans and two independent stations in Philadelphia and Seattle.

Prior to the consummation of the transactions involving the Chicago Cubs' business, the Broadcasting Segment included Tribune's subsidiaries that operated the Chicago Cubs' business and held a twenty-five percent (25%) equity interest in regional sports network Comcast SportsNet Chicago, LLC. As discussed in Article V.H of this General Disclosure Statement, in October 2009, the Tribune Entities contributed their interest in the Chicago Cubs' business and their twenty-five percent (25%) equity interest in Comcast SportsNet Chicago to Chicago Baseball Holdings, LLC. Results discussed herein for 2009 exclude results relating to the Chicago Cubs' business.

> a)    Television

The programming on the Tribune Entities' television stations consists of network-provided shows, syndicated series, news, local and regional sports coverage, feature films, and children's programs. These stations acquire most of their programming from outside sources, including The CW Network, the FOX Network, the ABC Network and major studios such as Warner Bros. A portion of the programming, including news and sports programming, is produced locally. Select information regarding the Tribune Entities' television stations is shown in the following summary table.

| | National Market Rank | % of U.S. Households | Channel | Major Over the Air Affiliation | Expiration of FCC License[5] | Year Acquired |
|---|---|---|---|---|---|---|
| WPIX - New York, NY | 1 | 6.5 | 11 | CW | 2015 | 1948 |
| KTLA—Los Angeles, CA | 2 | 4.9 | 5 | CW | 2014 | 1985 |
| WGN—Chicago, IL | 3 | 3.0 | 9 | CW | 2013 | 1948 |
| WPHL—Philadelphia, PA | 4 | 2.6 | 17 | IND | 2015 | 1992 |
| KDAF—Dallas, TX | 5 | 2.2 | 33 | CW | 2014 | 1997 |
| WDCW—Washington, D.C. | 9 | 2.1 | 50 | CW | 2012 | 1999 |
| KIAH—Houston, TX | 10 | 1.9 | 39 | CW | 2014 | 1996 |
| KCPQ—Seattle, WA | 13 | 1.6 | 13 | FOX | 2015 | 1999 |
| KZJO—Seattle, WA | 13 | 1.6 | 22 | IND | 2015 | 1998 |
| WSFL—Miami, FL | 16 | 1.4 | 39 | CW | 2013 | 1997 |
| KWGN—Denver, CO* | 17 | 1.4 | 2 | CW | 2014 | 1966 |
| KTXL—Sacramento, CA | 20 | 1.2 | 40 | FOX | 2014 | 1997 |
| KPLR—St. Louis, MO | 21 | 1.1 | 11 | CW | 2014 | 2003 |
| KRCW—Portland, OR | 22 | 1.0 | 32 | CW | 2015 | 2003 |
| WTTV—Indianapolis, IN** | 27 | 1.0 | 4 | CW | 2013 | 2002 |
| WXIN—Indianapolis, IN | 27 | 1.0 | 59 | FOX | 2013 | 1997 |
| KSWB—San Diego, CA | 28 | 0.9 | 69 | FOX | 2014 | 1996 |
| WTIC—Hartford, CT | 30 | 0.9 | 61 | FOX | 2015 | 1997 |
| WCCT—Hartford, CT | 30 | 0.9 | 20 | CW | 2015 | 2001 |
| WPMT—Harrisburg, PA | 39 | 0.6 | 43 | FOX | 2015 | 1997 |
| WXMI—Grand Rapids, MI | 41 | 0.6 | 17 | FOX | 2013 | 1998 |
| WGNO—New Orleans, LA | 52 | 0.5 | 26 | ABC | 2013 | 1983 |
| WNOL—New Orleans, LA | 52 | 0.5 | 38 | CW | 2013 | 2000 |

*This television station is party to a local marketing agreement with the FOX Network television station affiliate in the market owned by Local TV, LLC.

** WTTK (also in the Indianapolis market) is owned and operated as a satellite station, with a license expiration date in 2013.

In 2009, the television group contributed ninety-seven percent (97%) of the Broadcasting Segment's operating revenues. Approximately eighty-one percent (81%) of these revenues were derived from advertising. The Tribune Entities' television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price.

The television group includes WGN America, a broad entertainment network distributed in over 72 million homes across America by cable, satellite, and telcos. Its programming emphasis is entertainment and consists of first-run programs, syndicated sit-coms, blockbuster movies, cable exclusives, and live sports.

b)    Radio/Other

WGN-AM, Chicago, is a news and talk radio station. It operates on frequency 720-AM and is the flagship station of the Chicago Cubs (MLB) radio network and the Chicago Blackhawks (NHL) and also airs Northwestern University (NCAA) Men's basketball and football games. WGN-AM is the only radio

---

[5] Certain of the Debtors' business operations are subject to regulation by the ~~Federal Communications Commission (the "FCC"~~FCC (as defined in Article III.D.3 herein) under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, as amended (the "Communications Act"). Television and radio stations may not operate in the United States without the authorization of the FCC, and FCC approval is required for the issuance, renewal, transfer, and assignment of station operating licenses. The FCC also regulates the multiple and combined ownership of television and radio broadcast stations as well as the cross-ownership of broadcast stations and newspapers in the same market.

station owned by the Tribune Entities. In 2009, radio/other operations contributed three percent (3%) of the Broadcasting Segment's operating revenues.

3.    Additional Investments.

Various Tribune Entities (including non-Debtors) have investments (typically minority equity interests) in private corporations, limited liability companies and partnerships that are not Debtors in these Chapter 11 Cases. The Tribune Entities' significant investments are as follows:

| Investment | Description | Tribune Entities' Ownership | Partners[6] |
|---|---|---|---|
| Television Food Network | Lifestyle cable network and website with a focus on food and entertaining | 31.3% | Scripps Networks Interactive, Inc. |
| CareerBuilder | Online recruitment company that connects job seekers and employers | 30.8% | Gannett Co., Inc. The McClatchy Company Microsoft Corporation |
| Classified Ventures | A network of automotive and real estate classified advertising websites, including cars.com, apartments.com and homegain.com | 27.8% | The McClatchy Company Gannett Co., Inc. The Washington Post Company A.H. Belo Corporation |
| Homefinder | An online real estate company that connects home buyers, sellers and real estate professionals | 33.3% | The McClatchy Company Gannett Co., Inc. |
| Topix | Provider of news and community information on the web, connecting people to the information and discussions that matter to them in every U.S. town and city | 33.7% | Gannett Co., Inc. The McClatchy Company Former and Current Management |
| quadrantONE | National premium advertising network of websites of the leading media companies in the U.S. | 25.0% | The New York Times Company Hearst Corporation Gannett Co., Inc. |
| Legacy.com | Provider of online obituaries | 48.3% | Individual Investors |
| Metromix | National network of local entertainment websites | 48.9% | Gannett Co., Inc. |
| Newsday Holdings LLC | Parent company of the entity that owns and operates *Newsday*, the leading daily newspaper in Long Island, and its related websites and other media properties | 2.8% | Cablevision Systems Corp. |
| Chicago Baseball | Owns and operates the | 5.0% | Ricketts Acquisition LLC |

---

[6]    As used in this summary table, the term "Partners" refers to the parent company of each partner or in the case of an LLC, the parent company of each member. Actual legal partners, or, in the case of LLCs, members, may be affiliates of such parent companies.

| Investment | Description | Tribune Entities' Ownership | Partners[6] |
|---|---|---|---|
| Holdings, LLC | Chicago Cubs Major League Baseball franchise and related businesses | | |

### C.    Recent Operations.

The Tribune Entities' consolidated operating results for the three quarters ended September 26, 2010 and September 27, 2009 and fiscal years ended December 27, 2009 and December 28, 2008 are shown in the table below.[7]

| TRIBUNE ENTITIES CONSOLIDATED STATEMENTS OF OPERATIONS ($ in millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | First Three Quarters | | | | Year Ended | | |
| | Sept. 26, 2010 | | Sept. 27, 2009 | | Dec. 27, 2009 | | Dec. 28, 2008 |
| **Revenues** | | | | | | | |
| Publishing | $ | 1,541 | $ | 1,644 | $ | 2,243 | $ | 2,765 |
| Broadcasting | | 793 | | 690 | | 939 | | 1,165 |
| **Total Revenues** | $ | 2,334 | $ | 2,334 | $ | 3,183 | $ | 3,930 |
| | | | | | | | |
| **Cash Operating Expenses** | | | | | | | |
| Publishing | $ | 1,333 | $ | 1,447 | $ | 1,916 | $ | 2,303 |
| Broadcasting | | 541 | | 540 | | 713 | | 804 |
| Corporate | | 38 | | 43 | | 60 | | 37 |
| **Total Cash Operating Expenses** | $ | 1,912 | $ | 2,030 | $ | 2,689 | $ | 3,144 |
| | | | | | | | |
| **Operating Cash Flow** | | | | | | | |
| Publishing | $ | 208 | $ | 197 | $ | 327 | $ | 462 |
| Broadcasting | | 252 | | 150 | | 226 | | 361 |
| Corporate | | (38) | | (43) | | (60) | | (37) |
| **Total Operating Cash Flow** | $ | 422 | $ | 304 | $ | 494 | $ | 786 |
| | | | | | | | |
| **Income on Equity Investments, Net** | $ | 121 | $ | 89 | $ | 123 | $ | 85 |

---

[7]    The Tribune Entities' results of operations are preliminary and unaudited and exclude discontinued operations (Chicago Cubs group and Newsday) and Comcast SportsNet Chicago. The Debtors use cash operating expenses and operating cash flow to evaluate internal performance. "Cash operating expenses" are defined as operating expenses before depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. "Operating cash flow" is defined as earnings before interest income, interest expense, equity income and losses, depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. Cash operating expenses and operating cash flow are not measures of financial performance under Generally Accepted Accounting Principles ("GAAP") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

At September 26, 2010, the Tribune Entities' available cash balance was approximately $1.8 billion, an increase of over $300 million from the end of 2009. For the first three quarters of 2010, cash provided by core operations was $374 million and the Company received cash distributions of $97 million from TV Food Network. These cash inflows were partially offset by $58 million of capital expenditures and $74 million of reorganization costs.

At the end of 2009, the Tribune Entities' available cash balance was approximately $1.5 billion, up from approximately $600 million at the end of 2008. The increase in cash reflected $701 million in proceeds from the Chicago Cubs transaction received in the fourth quarter of 2009 and net cash flow generated from operations. During 2009, core operations produced approximately $596 million of cash. In addition, the Company received approximately $40 million from the operations of the Chicago Cubs and Comcast SportsNet and $89 million from TV Food Network in 2009. Offsetting these cash inflows was $112 million of capital expenditures, $91 million of capital gains and other tax payments, $225 million of repayments of the Tribune Entities' DIP Facility, $14 million to collateralize the Tribune Entities' letters of credit and $96 million of reorganization costs (including interest on post-petition financing).

**D.    Current Management of the Debtors.**

1.    Board of Directors.

In accordance with the Amended and Restated Bylaws of Tribune, the board of directors of Tribune (the "Board of Directors") currently consists of ten directors. Set forth below are the directors of Tribune, as of the date of the filing of this General Disclosure Statement.[8]

| Name | Title |
| --- | --- |
| Samuel Zell | Chairman |
| Jeffrey S. Berg | Board Member |
| Brian L. Greenspun | Board Member |
| Betsy D. Holden | Board Member |
| William A. Osborn | Board Member |
| William C. Pate | Board Member |
| Mark Shapiro | Board Member |
| Mary Agnes Wilderotter | Board Member |
| Frank E. Wood | Board Member |

2.    Special Committee of the Board of Directors.

On August 27, 2010, the Board of Directors formed a special committee of independent directors for the purpose of supervising the Chapter 11 Cases (the "Special Committee"). The Special Committee consists of four independent directors of the Board of Directors: (i) Mark Shapiro; (ii) Jeffrey S. Berg; (iii) Mary Agnes Wilderotter; and (iv) Frank E. Wood (the "Independent Directors"). The Independent Directors were appointed to the Board of Directors upon or after the consummation of the Leveraged ESOP Transactions.

3.    Subcommittees of the Board of Directors.

The Board of Directors has a standing audit committee (the "Audit Committee") whose function includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal

---

[8]    This General Disclosure Statement contains only information pertaining to Tribune's Board of Directors, which information does not apply in the case of each of Tribune's subsidiaries.

controls.  Betsy D. Holden, William A. Osborn (chair) and Frank E. Wood currently serve on the Audit Committee.

The Board of Directors also has a standing compensation committee (the "Compensation Committee"), which has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of Tribune's principal executive officer, to evaluate Tribune's principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level.  The Compensation Committee also has the responsibility to review annually with the principal executive officer and approve the compensation for the other senior executive officers, including the three most highly-compensated executive officers other than the principal executive officer and principal financial officer.  Furthermore, the Compensation Committee has the responsibility to review and approve incentive and other compensation plans, if any, covering certain other management employees of the Debtors.  The current members of the Compensation Committee are Brian L. Greenspun, William C. Pate, and Mary Agnes Wilderotter (chair).

    4.  Compensation of Directors.

The directors who are employees of the Tribune Entities receive no additional compensation for service as a director.  In 2010, the non-employee directors will receive cash compensation in the form of a $125,000 retainer and will be reimbursed for actual out-of-pocket expenses incurred in attending meetings.  The chair of the Audit Committee will also be paid an additional $15,000 cash retainer and each member of the Audit Committee, including the chair, will be paid an additional $6,000 cash retainer.  The chair of the Special Committee will also be paid a one-time $35,000 cash retainer and each member of the Special Committee, other than the chair, will also be paid a one-time $25,000 cash retainer.  Each member of the Special Committee will also be paid a fee of $1,500 for each in-person or telephonic meeting of the Special Committee attended by such member.

    5.  Executive Officers.

The members of the executive management team of the Tribune Entities and each member's position as of the date of this General Disclosure Statement are as set forth below.

| Name | Title |
|---|---|
| Gerald A. Spector | Chief Operating Officer, Tribune |
| Jerry Kersting | President, Tribune Broadcasting |
| ~~Marc Chase~~Don Meek | Executive Vice President, Tribune ~~Interactive~~Digital |
| Nils Larsen | ~~Executive Vice~~ Co-President and Chief Investment Officer, Tribune; |
|  | Chairman , Tribune Broadcasting[9] |
| Chandler Bigelow III | Executive Vice President and Chief Financial Officer, Tribune |
| Donald J. Liebentritt | ~~Executive Vice~~ Co-President and Chief Restructuring Officer, Tribune[10] |
| David P. Eldersveld | Senior Vice President and General Counsel, Tribune[11] |
| Tony Hunter |  |
|  | Co-President, Tribune; President, Publisher and Chief Executive |

---

[9] Mr. Larsen assumed the position Chairman of Tribune Broadcasting in October of 2010.

[10] Mr. Liebentritt assumed the position of ~~Executive Vice President and~~ Chief Restructuring Officer in September of 2010.

[11] Mr. Eldersveld assumed the position of Senior Vice President and General Counsel in September of 2010.

Eddy Hartenstein          Officer, Chicago Tribune Company
                          Co-President, Tribune; Publisher and Chief Executive Officer,
                          Los Angeles Times Communications, LLC

On October 22, 2010, Tribune announced that its Board of Directors appointed an executive council that will assume the responsibilities of the Office of the Chief Executive and President and oversee the company's publishing and broadcast operations (the "Executive Council"). The Executive Council is composed of (i) Donald J. Liebentritt, (ii) Nils Larsen, (iii) Tony Hunter (President, Publisher and Chief Executive Officer of Chicago Tribune Company), and (iv) Eddy Hartenstein (Publisher and Chief Executive Officer of Los Angeles Times Communications, LLC). The Executive Council will report directly to Tribune's Board of Directors.

## III.    SUMMARY OF CERTAIN PREPETITION LIABILITIES

*The following summary of certain prepetition liabilities of the Debtors was prepared by the Debtors.*

### A.    Prepetition Funded Debt and Capital Structure of the Tribune Entities.

1.    Prepetition Capital Structure.

As further discussed in Article VII.A of this General Disclosure Statement, Tribune returned to private ownership in 2007.[12] On April 1, 2007, Tribune entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company,[13] the Zell Entity,[14] and Tesop Corporation, a Delaware corporation wholly-owned by the ESOP (the "Merger Sub"). The Merger Agreement provided for a series of transactions that, if various conditions were satisfied, would ultimately culminate in the Merger Sub merging with and into Tribune, and following such merger, for Tribune to continue as the surviving corporation wholly-owned by the ESOP (the "Merger"). On April 1, 2007, pursuant to the terms of that certain ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune and GreatBanc Trust Company, the ESOP purchased 8,928,571 shares of Tribune's common stock from Tribune at a price of $28 per share.[15] The ESOP paid for this purchase with a promissory note of the ESOP in favor of Tribune in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from Tribune to the ESOP and/or distributions paid on the shares of Tribune common stock held by the ESOP.

On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in Tribune in exchange for (i) the purchase of 1,470,588 shares of Tribune's common stock at a price of $34 per share and (ii) an unsecured subordinated exchangeable promissory note of Tribune in the principal amount of $200 million.

---

[12]    The descriptions contained in this General Disclosure Statement provide only a brief overview of the Leveraged ESOP Transactions. Additional details concerning the Leveraged ESOP Transactions are available in Tribune's Quarterly Report on Form 10-Q for the third quarter ending September 28, 2008 and in the Examiner's report included as Exhibit G hereto.

[13]    GreatBanc Trust Company was not party to the Merger Agreement in its individual or corporate capacity, but solely as trustee of Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

[14]    The Zell Entity was party to the Merger Agreement solely for the limited purpose provided therein.

[15]    GreatBanc Trust Company was not a party to the ESOP Purchase Agreement in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

On April 25, 2007, Tribune commenced a tender offer to repurchase up to 126 million shares (approximately fifty percent (50%) of the then-outstanding shares) of Tribune's common stock that were then-outstanding at a price of $34 per share in cash. The tender offer expired on May 24, 2007 and 126 million shares of Tribune's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Senior Loan Agreement (as defined and discussed below).

On December 20, 2007, Tribune merged with Merger Sub, with Tribune surviving the Merger. Upon consummation of the Merger, the 8,928,571 shares of Tribune's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represented the only outstanding shares of capital stock of Tribune after the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of Tribune, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by Tribune, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by stockholders, was cancelled and automatically converted into the right to receive $34, without interest and less any applicable withholding taxes, and Tribune became wholly-owned by the ESOP.

Pursuant to the Zell Entity Purchase Agreement, on December 20, 2007, the Zell Entity tendered the shares of Tribune common stock it had acquired pursuant to the Zell Entity Purchase Agreement. Tribune also retired the unsecured subordinated exchangeable promissory note held by the Zell Entity, including approximately $6 million of accrued interest. Following the consummation of the Merger, the Zell Entity purchased from Tribune, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. As the $315 million investment was greater than the cash due from Tribune to the Zell Entity for the shares tendered and notes retired, accrued interest, and legal fees, the amounts were netted against each other and the balance of $56 million was paid by the Zell Entity to Tribune. The warrant entitles the Zell Entity to purchase 43,478,261 shares of Tribune's common stock (subject to adjustment), which represented approximately forty percent (40%) of the economic equity interest in Tribune following the Merger (on a fully-diluted basis). The initial aggregate exercise price for the warrant was $500 million (subject to adjustment), increasing by $10 million per year for the first ten years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees.

The terms of the ESOP provide that common shares held by the ESOP are to be allocated on a noncontributory basis to eligible employees of Tribune. As of December 27, 2009, approximately 1.6 million of the common shares held by the ESOP have been allocated to eligible employees of Tribune. As of the date of this General Disclosure Statement, no distributions have been made to eligible employees on account of such shares.

      2.      Prepetition Funded Debt Structure.

In connection with the Leveraged ESOP Transactions and in order to fund ongoing general corporate and working capital needs, Tribune entered into financing facilities in May 2007 and December 2007.[16] Tribune is also the obligor on (i) a series of outstanding note and debenture issuances and (ii) exchangeable subordinated debentures that predated the Merger, as well as a subordinated promissory note, which was issued immediately following the Merger. Additionally, Tribune (in its capacity as servicer) and Tribune Receivables LLC, a wholly-owned special purpose subsidiary which is not a Debtor, were parties to a trade receivables securitization facility for which Barclays Bank PLC

---

[16]    Please refer to Article III.A.2 of this General Disclosure Statement for a further discussion of the financing facilities entered in connection with the Leveraged ESOP Transactions.

("Barclays") was the administrative agent and Tribune Receivables LLC was the borrower.[17] Accordingly, Tribune's prepetition debt structure was comprised of the following components: (a) a Senior Loan Agreement; (b) a Bridge Facility (as defined below); (c) various issuances of outstanding notes and debentures (the "Senior Notes"); (d) the EGI-TRB LLC Notes (as defined below); (e) exchangeable subordinated debentures (the "PHONES Notes"); and (f) a Receivables Facility (as defined below). As of the Petition Date, Tribune's funded debt totaled approximately $12.706 billion in principal amount, as follows:

| Debt Instrument | Approximate Principal Amount Outstanding as of the Petition Date |
| --- | --- |
| Senior Credit Facility | $8.622 billion[18] |
| Bridge Facility | $1.600 billion |
| Senior Notes | $1.263 billion |
| EGI-TRB LLC Notes | $0.235 billion |
| PHONES Notes[19] | $0.759 billion |
| Receivables Facility | $0.225 billion |
| Total | $12.706 billion |

A brief overview of Tribune's debt facilities, outstanding note and debenture issuances, and any guarantees of such facilities and issuances by Tribune's subsidiaries is set forth below. All of the indebtedness described in subparagraphs (a) through (e) below – the Senior Loan Agreement indebtedness, the Bridge Facility indebtedness, the Senior Notes, the EGI-TRB LLC Notes, and the PHONES Notes – are obligations of the parent company, Tribune. This indebtedness is *pari passu* in payment priority at Tribune, except for the EGI-TRB LLC Notes and the PHONES. The EGI-TRB LLC Notes and the PHONES Notes are contractually subordinated to all funded indebtedness at Tribune. The Senior Loan Agreement indebtedness and the Senior Notes are secured, equally and ratably, by a stock pledge (the "Stock Pledge") of the equity in two subsidiaries. None of the Bridge Facility, the EGI-TRB LLC Notes, or the PHONES Notes are secured. Additionally, the indebtedness under the Senior Loan Agreement and the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries (the "Guarantor Subsidiaries"),[20] which have guaranteed (i) the Senior Loan

---

[17]  The trade receivables securitization facility was amended and continued post-petition pursuant to orders entered by the Bankruptcy Court on January 15, 2009 and April 8, 2009. The trade receivables securitization facility was terminated on February 26, 2010.

[18]  The amount outstanding on account of the Senior Credit Facility includes the Swap Claim (which is defined and described below).

[19]  The Debtors have been informed by the Trustee for the PHONES Notes that the Trustee and certain holders of the PHONES have disputed that the outstanding amount of the PHONES Notes that were submitted for redemption and not settled for cash has been reduced as a result of such submission.

[20]  The Guarantor Subsidiaries are those subsidiaries deemed material under the Credit Agreement, and are comprised of the following: 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Tribune CNLBC, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun- Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune

Agreement indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate basis to the Senior Loan Agreement indebtedness. None of the Senior Notes, PHONES Notes, or the EGI-TRB LLC Notes are guaranteed by, or constitute obligations of, any of Tribune's subsidiaries. Instead, they are liabilities solely of Tribune.

> a)     Senior Loan Agreement.

On May 17, 2007, Tribune entered into an $8.028 billion senior secured credit agreement (the "Senior Loan Agreement") with JPMorgan Chase Bank, N.A., as administrative agent and financial institutions from time to time party thereto.[21] The Senior Loan Agreement consists of the following loan facilities: (i) a $1.5 billion Senior Tranche X Term Facility (the "Tranche X Facility"), (ii) a $5.515 billion Senior Tranche B Term Facility (the "Tranche B Facility"), (iii) a $263 million Delayed Draw Senior Tranche B Term Facility (the "Delayed Draw Facility"); (iv) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"); and (v) $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility").[22] On December 27, 2007, Tribune entered into a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Senior Loan Agreement. On June 4, 2007, the Company used the proceeds from the Tranche X Facility and the Tranche B Facility in connection with the consummation of a tender offer to repurchase certain shares of the Company's common stock that were then outstanding and to, among other things, refinance the Company's former five-year credit agreement and former bridge credit agreement.

Under the terms of the Senior Loan Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Senior Loan Agreement and other debt with respect to borrowed money. On July 2, 2007, Tribune entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount, and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents were terminated on the Petition Date. As of that date, Tribune's aggregate liability in connection with the Swap Documents was approximately $150.9 million, which liability is subject to the guarantee of the Senior Loan Agreement indebtedness by the Guarantor Subsidiaries on a *pari passu* basis with Tribune's Senior Loan Agreement indebtedness.[23]

---

Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WCCT, Inc. (f/k/a WTXX Inc.).

[21] The Senior Loan Agreement was subsequently amended on June 4, 2007, and all references thereto include the June 4, 2007 amendment.

[22] The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million.

[23] Tribune was also party to an interest rate swap agreement with Morgan Stanley, which was terminated as of the Petition Date. Morgan Stanley, as the non-defaulting party under the swap agreement, calculated that approximately $52 million was owing to Tribune under that agreement as of the Petition Date. Approximately $9.5 million of this amount was paid to Tribune post-petition. While Tribune asserts a claim for the balance of

As of the Petition Date, with the exception of the aforementioned liability in connection with the Swap Documents, the total principal amount outstanding under the Senior Loan Agreement was approximately $8.472 billion, including approximate outstanding balances on the Tranche X Facility, Tranche B Facility and the Revolving Credit Facility of $512 million, $7.723 billion[24] and $237 million, respectively.[25]  The Senior Loan Agreement indebtedness is secured by a pledge of the equity interests of Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC, both of which are Debtors, and is guaranteed, on a senior priority basis, by the Guarantor Subsidiaries.

b)      Bridge Facility.

On December 20, 2007, Tribune entered into a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Interim Credit Agreement") with Merrill Lynch as administrative agent, JPMorgan Chase Bank, N.A. as Syndication Agent, Citicorp North America, Inc. ("Citicorp") and Bank of America, N.A. ("Bank of America") as Co- Documentation Agents, and the Initial Lenders named therein. Pursuant to the Interim Credit Agreement, Tribune borrowed $1.6 billion under a 12 month bridge facility (the "Bridge Facility").  The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by Tribune, among other ways, in connection with the consummation of the Merger and for general corporate purposes.  The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinated basis, by the Guarantor Subsidiaries.  As of the Petition Date, the approximate outstanding balance of the Bridge Facility was $1.6 billion.

c)      The Senior Notes.

Pursuant to Indentures entered into between 1992 and 1997, Tribune is obligated on Senior Notes in the aggregate approximate amount of $1.263 billion.  Each outstanding series and the approximate principal amounts owing as of the Petition Date are as follows:

| Indenture | Interest Rate | Maturity Date | Outstanding Amount[26] | CUSIP # |
|-----------|---------------|---------------|------------------------|---------|
| 1992 | 6.25% | November 10, 2026 | $.120 million | 89605HBY9 |
| 1995 | 7.25% | March 1, 2013 | $82.083 million | 887364AA5 |
| 1995 | 7.5% | July 1, 2023 | $98.750 million | 887364AB3 |
| 1996 | 6.61% | September 15, 2027 | $84.960 million | 887364AF4 |
| 1996 | 7.25% | November 15, 2096 | $148.000 million | 887360AT2 |
| 1997 | 4.875% | August 15, 2010 | $450.000 million | 896047AE7 |
| 1997 | 5.25% | August 15, 2015 | $330.000 million | 896047AF4 |
| 1997 | 5.67% | December 8, 2008 | $69.550 million | 89604KAN8 |
| **Total** | | | **$1.263 billion** | |

The Senior Notes are not guaranteed.  The Senior Notes are secured by the Stock Pledge on a *pari passu* basis with the indebtedness under the Senior Loan Agreement.

---

approximately $42 million, Morgan Stanley has asserted a right to set-off approximately $38 million of this amount.

[24]   The outstanding indebtedness under the Tranche B Facility includes amounts outstanding under the Incremental Facility and the Delayed Draw Facility.

[25]   As of the Petition Date, Tribune had $99.8 million of letters of credit outstanding under the Revolving Credit Facility.

[26]   "The "Outstanding Amount" does not include accrued interest or fees as of the Petition Date.  In addition, the "Outstanding Amount" does not purport to represent the Allowed amount of the Senior Noteholder Claims.

d)     The EGI-TRB LLC Notes.

On December 20, 2007, Tribune executed a $225 million subordinated promissory note in favor of the Zell Entity, which thereafter assigned minority interests in such notes to certain permitted assignees (collectively, the "EGI-TRB LLC Notes").  The notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries.  As of the Petition Date, the aggregate outstanding principal balance of the EGI-TRB LLC Notes, including accrued payment-in-kind interest, totaled $235.3 million.  The EGI-TRB LLC Notes mature in 2018.

On August 11, 2010, the EGI-TRB LLC Notes filed a conditional objection to the Tribune Plan alleging, among other things, that the PHONES Notes are contractually subordinated to the EGI-TRB LLC Notes.  No order has been entered by the Bankruptcy Court with respect to this issue.

e)     The PHONES Notes.

In April 1999, Tribune issued eight million Exchangeable Subordinated Debentures due 2029 (the "PHONES Notes") for an aggregate principal amount of $1.256 billion.  At the time of issuance, the value of one PHONES Notes was related to the value of one "reference share" of America Online ("AOL") common stock, which was then trading at $157 per share.  On November 22, 1999, AOL common stock split on a two-to one basis, changing the reference to two shares of AOL for each PHONES Notes.  On January 11, 2001, AOL and Time Warner Inc. merged to form AOL Time Warner Inc. with the merged entity continuing to trade under the ticker AOL.  On October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner Inc. and began trading as TWX.  As a result of the split and subsequent merger, two shares of TWX common stock now represent the "reference shares" for each PHONES Notes.  Tribune was eligible to redeem the PHONES Notes at any time for the higher of the principal value of the PHONES Notes or the then-current market value of two shares of Time Warner common stock, subject to certain adjustments.  In addition, prior to the Petition Date, Holders of PHONES Notes were contractually entitled to exchange a PHONES Notes for an amount of cash equal to ninety-five percent (95%) (or one hundred percent (100%) under certain circumstances) of the then-current market value of two shares of Time Warner stock.  The approximate carrying value of PHONES Notes on the Petition Date was $759 million comprised of $703 million for PHONES Notes not submitted for exchange and a $56 million liability for PHONES Notes exchanged that were not settled in cash.  The Debtors have been informed by the Trustee for the PHONES Notes that the Trustee and certain holders of the PHONES have disputed that the outstanding amount of the PHONES Notes that were submitted for redemption and not settled for cash has been reduced as a result of such submission.  The PHONES Notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries.

f)     The Receivables Facility.

Prior to the Petition Date, Tribune, Tribune Receivables, LLC, a non-Debtor special purpose subsidiary of Tribune (the "Receivables Subsidiary"), and certain other subsidiaries of Tribune entered into a $300 million trade receivables securitization facility (the "Receivables Facility") led by Barclays, as administrative agent.  The Receivables Facility, entered into in July 2008, enabled certain of Tribune's subsidiaries (the "Operating Subsidiaries") to sell certain trade receivables and related assets (the "Receivables") to Tribune on a daily basis.  Tribune, in turn, sold such Receivables to the Receivables Subsidiary, also on a daily basis.  Receivables transferred to the Receivables Subsidiary are considered assets of the Receivables Subsidiary and not Tribune or any of the Operating Subsidiaries.  As of the Petition Date, the total amount outstanding under the Receivables Facility was $225 million.  As discussed in Article V.E below, following the Petition Date, the Receivables Facility was amended, restated and incorporated into the Amended DIP Facility (defined below).  On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid.  On February

25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

### B.    Prepetition Trade Payables & Other Operating Liabilities.

In addition to the funded debt described above, Tribune and its Debtor subsidiaries had liabilities as of the Petition Date to various trade vendors. Such liabilities related to the purchase of broadcast rights, newsprint and ink, and other goods and services used in the Debtors' business operations. As of the Petition Date, the Debtors had approximately $115 million of trade payables, including accruals for goods or services received but not invoiced. These amounts remain subject to the claims reconciliation process, which is discussed further in Article V.G.8 of this General Disclosure Statement.

### C.    Prepetition Compensation and Benefit Programs.[27]

The Debtors employed approximately 11,929 full-time and 2,555 part-time employees as of December 31, 2009, and the Debtors' gross expenses for their employees' compensation and benefit programs were approximately $1.1 billion during calendar year 2009. In addition to standard wages, such costs include a number of programs which were implemented by the Debtors in the ordinary course of business and are designed to reward the Debtors' management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefit package.

Certain of these compensation and benefit programs are generally described below, with the exception of insured and self-insured programs (e.g., health plans), customary fringe benefit policies (e.g., vacation, sick leave), individual employment agreements and collectively bargained agreements (except for the information set forth in Sections III.C.5 and III.C.11 below).

The descriptions set forth below are not, and are not intended to be, comprehensive and, as previously noted, do not include certain customary employee benefits provided by the Debtors. All such benefit programs and the Debtors' other compensation and benefit programs are governed by applicable program terms and conditions, as in effect or amended from time to time. In addition, the Debtors reserve the right to modify, amend or terminate any or all of their employee benefit and compensation programs in the ordinary course of business in their sole discretion, subject to applicable modification, amendment or termination provisions and/or applicable law. Moreover, nothing in this General Disclosure Statement shall limit the Debtors' rights to implement or seek implementation of any compensation and benefit programs as may be appropriate.

#### 1.    Retirement Programs.

The Debtors provide retirement benefits to employees through numerous defined benefit pension plans and defined contribution 401(k) plans sponsored either by the Debtors or by unions. These benefits are generally described below.

##### a)    Single Employer Pension Plans

The Debtors currently maintain four qualified single-employer defined benefit pension plans.[28] A description of the Debtors' single-employer pension plans follows.

---

[27]    Unless otherwise specified, the Compensation and Benefit Programs discussed in this Section were implemented by the Debtors prior to the Petition Date.

i)      Tribune Company Pension Plan

The Tribune Company Pension Plan is the Debtors' primary pension plan and is a tax-qualified, noncontributory, defined benefit pension plan for eligible employees.[29]  Substantially all of the accrued benefits provided under the plan were earned by employees based on final average pay benefit formulas used in other defined benefit plans sponsored by the Debtors that were merged into the Tribune Company Pension Plan.  Although the Tribune Company Pension Plan most recently provided benefits using a cash balance allocation, its assets and liabilities are almost entirely attributable to the benefits earned under prior plan formulas, the majority of which were frozen prior to January 1, 2006 and the last of which was frozen as of December 31, 2006.

As discussed above, from December 31, 2007 through December 31, 2009, the Tribune Company Pension Plan provided benefits in the form of an annual cash balance allocation to a hypothetical account established for each eligible employee participating in the plan in an amount equal to three percent (3%) of the employee's eligible compensation.  In addition, each eligible employee's account was credited with interest quarterly to provide an annual effective rate equal to the ten-year, United States Treasury rate in effect on November 30th of the preceding year.  Beginning in 2010, the Debtors discontinued the annual cash balance allocations; however, the Debtors continue to credit employees' accounts with the aforementioned interest.  In place of the cash balance allocation, the Debtors currently provide retirement benefits through matching contributions to employees' accounts under the existing defined contribution 401(k) Plans, discussed below.  These changes did not affect any benefits earned prior to 2010 under the Tribune Company Pension Plan.

The Debtors estimate that, as of January 1, 2010, there were approximately 10,988 active employees participating in the Tribune Company Pension Plan, as well as approximately 9,895 retirees receiving benefits from the Tribune Company Pension Plan.  As of that date, there were also approximately 16,316 additional persons who were neither active employees of the Debtors nor currently receiving benefits under the Tribune Company Pension Plan, but that were eligible to receive benefits thereunder in the future..

The funding status of the Tribune Company Pension Plan is generally determined either in accordance with GAAP ("Accounting Funding") or in accordance with the Pension Protection Act ("Cash Funding").  On an Accounting Funding basis, the Tribune Company Pension Plan was approximately eighty-eight percent (88%) funded at the end of 2009.  On a Cash Funding basis, the Tribune Company Pension Plan was between approximately ninety-five percent (95%) and one hundred percent (100%) funded at the end of 2009.[30]

As of January 1, 2010, the Tribune Company Pension Plan maintained assets with a market value of approximately $1.3 billion. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will not be any Cash Funding requirements for the plan in

---

[28]    Two additional plans, the Major League Baseball Pension Plan for Non-Uniformed Personnel and the Minor League Players Pension Plan, were previously maintained by one of the Debtors.  However, these plans were assumed and assigned as a part of the Chicago Cubs transaction.

[29]    The formal name of the Tribune Company Pension Plan is the Tribune Company Cash Balance Pension Plan.

[30]    The Cash Funding calculation yields a lower deficit than the Accounting Funding calculation for a number of reasons.  For example, for purposes of the Cash Funding calculation, assets are "smoothed" by averaging the three most recent year-end asset values, with the benefit of averaging limited to one hundred and ten percent (110%) of the actual most recent year-end asset value. Under the Pension Protection Act rules, the Cash Funding calculation also applies a different discount rate to discount liabilities than the Accounting Funding method.

2010-2011, but that such Cash Funding requirements will be approximately (in millions) $61 in 2012, $72 in 2013, $63 in 2014, and $59 in 2015. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

ii)    Other Single Employer Qualified Defined Benefit Pension Plans

In addition to the Tribune Company Pension Plan, the Debtors maintain the following three qualified defined benefit pension plans for eligible employees:

- *Baltimore Sun Company Employees Retirement Plan.* As of January 1, 2010, the Baltimore Sun Company Employees Retirement Plan maintained assets with a market value of approximately $46 million. Based on current actuarial analyses and the Debtors' business plans, the Debtors anticipate that the Cash Funding requirements for the Baltimore Sun Company Employees Retirement Plan will be approximately (in millions) $4 in 2010, $4 in 2011, $5 in 2012, $4 in 2013, $4 in 2014, and $4 in 2015. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

- *Tribune Company Hourly Pension Plan.* As of January 1, 2010, the Tribune Company Hourly Pension Plan maintained assets with a market value of approximately $17.6 million. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be less than $1 million in Cash Funding requirements for the Tribune Company Hourly Pension Plan per year in 2010-2015. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

- *Baltimore Mailers Union Local No. 888 Plan.*[31] As of January 1, 2010, the Baltimore Mailers Union Local No. 888 Plan maintained assets with a market value of approximately $8.1 million. Contributions, funded by concessions negotiated in collective bargaining, occur each pay period. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be no additional Cash Funding requirement for the Baltimore Mailers Union Local No. 888 Plan in 2010 and that additional Cash Funding of approximately $0.3 million will be required each year in 2011-2015. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates. These estimates do not include routine contractual contributions that continue to be made each year.

b)    Multiemployer Pension Plans

The Debtors also participate in 16 multiemployer plans at various locations pursuant to certain of their collective bargaining agreements. These plans, which are summarized in the below table, generally require monthly contributions based on hours worked.

| Business Unit/Department | Union / Local | Plan Name | Estimated Number Current Employees of Debtors Covered | CBA Exp. Date | Est. Total Participants | Approximate Contribution | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2007 | 2008 | 2009 | 2010 |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) |
| (1) Chicago | GCC/#7 | GCIU-Employer | 140 | May-12 | 56,367 | $464,118 | $467,830 | $451,612 | $466,000 |

---

[31]    The formal name of the Baltimore Mailers Union Local No. 888 Plan is the Baltimore Mailers Union Local No. 888 and the Baltimore Sun Company Retirement Plan.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tribune - Pressmen | | Retirement Fund | | | | | | | |
| (2) Chicago Tribune - Drivers | IBT/#706 | Chicago Newspaper Publishers Drivers Union Pension Fund | 133 | Dec-10 | 1,039 | 1,813,473 | 1,696,538 | 1,661,276 | 1,666,000 |
| (3) Baltimore Sun - Pressroom | GCC/#31 | GCIU-Employer Retirement Fund | 81 | Apr-12 | 56,367 | 304,725 | 276,049 | 366,168 | 325,000 |
| (4) Chicago Tribune - Machinists | IAM/#126 | IAM National Pension Fund | 43 | Sep-12 | 227,988 | 226,741 | 207,952 | 204,588 | 194,000 |
| (5) KTLA - Newsroom | AFTRA | AFTRA Health and Retirement Plan | 36 | Aug-11 | 40,859 | 592,191 | 544,431 | 656,898 | 634,000 |
| (6) WPIX - Directors | DGA | Directors Guild of America Producers Pension Plan | 26 | Oct-08 | 17,141 | 74,445 | 80,391 | 80,487 | 70,000 |
| (7) WGN-TV - Newsroom | AFTRA | AFTRA Health and Retirement Plan | 47 | N/A** | 40,859 | 593,528 | 587,836 | 717,151 | 711,000 |
| (8) Baltimore Sun - Drivers | IBT/#355 | Truck Drivers and Helpers Local 355 Pension Fund | 28 | Dec-10 | 3,490 | 141,138 | 105,754 | 137,783 | 112,000 |
| (9) WPIX - Newsroom | AFTRA | AFTRA Health and Retirement Plan | 36 | May-09 | 40,859 | 489,995 | 508,626 | 478,933 | 462,000 |
| (10) WPIX - Stagehands | IATSE/#1 | IATSE Local #1 Pension Plan and Annuity Funds** | 21 | Mar-11 | 11,195 | 97,746 | 110,313 | 129,565 | 165,000 |
| (11) WGN-TV - Stagehands | IATSE/#2 | Stagehands Local #2 Pension Plan and Annuity Funds*** | 68 | May-11 | 1,035 | 54,485 | 47,252 | 57,082 | 55,000 |
| (12) KLTA-TEC Electricians | IBEW/#40 | Motion Picture Association Pension Plan | 4 | Jul-10 | 328 | 46,276 | 28,336 | 29,141 | 27,000 |
| (13) WGN-TV - Op. Engs. | IUOE/#399 | IUOE Central Pension Fund | 3 | May-11 | 167,959 | 10,567 | 8,893 | 10,162 | 10,000 |
| (14) Baltimore Sun - Composers | CWA/ITU | CWA/ITU Negotiated Pension Fund | 1 | Dec-04 | 50,957 | 2,603 | 2,603 | 2,893 | 3,000 |
| **TOTAL** | | | 667 | | | **$4,912,031** | **$4,672,804** | **$4,983,739** | **$4,900,000** |

\*    The Debtors' multiemployer pension plans generally require contributions based on the hours worked by participating employees, which may vary from year to year.  Accordingly, the Debtors' contributions to such Plans may vary from year to year.  Each contribution set forth in this summary chart is applicable only to the specific year noted.

\*\*    The parties have entered into an open-ended contract extension that may be terminated by either party upon 30 days prior written notice.

\*\*\*    WPIX Stagehands and WGN-TV Stagehands each participate in two separate multiemployer pension plans: a local pension plan and a local annuity fund.

c)    401(k) Plans.

The Debtors maintain various tax-qualified 401(k) retirement plans, which permit eligible employees to make voluntary contributions on a pre-tax basis and some of which also provide for contributions by the Debtors (the "401(k) Plans").  The 401(k) Plans allow participants to invest their account balances in various investments.  As of January 1, 2008, the Debtors ceased contributions to the 401(k) Plans for non-union employees in conjunction with the introduction of the ESOP and the cash balance allocations under the Tribune Company Pension Plan.

The Debtors modified the 401(k) Plans for non-union employees effective January 1, 2010.  The Debtors currently match each dollar an employee contributes up to two percent (2%) of such employee's eligible pay and match $0.50 for each dollar contributed between two percent (2%) and six percent (6%) of such employee's eligible pay.  The Debtors also may make annual discretionary contributions based on the achievements of certain performance goals.

d)    Retiree Welfare Benefit Programs.

Historically, the Debtors maintained numerous medical, dental, prescription drug and life insurance programs for eligible retired union and non-union employees.  Effective January 1, 2009, the Debtors consolidated the majority of these retiree welfare benefit programs, and they are now administered or insured by United Healthcare Services, Inc.  These programs provide coverage to retirees

at different levels based on which Debtor employed the individual, the retiree's year of retirement, collective bargaining agreement requirements and the retiree's eligibility for Medicare coverage.

As of January 1, 2010, the Debtors estimate that there were approximately 5,000 active employees who may be eligible for a retiree medical program, and 530 active employees who will be eligible for retiree life insurance upon retirement. As of January 1, 2010, the Debtors estimate that there were approximately 1,500 retirees covered by a retiree medical program and 2,185 retirees covered by retiree life insurance.

     2.      Severance Programs.

Prior to the Petition Date and in the ordinary course of business, the Debtors customarily provided employees whose employment was terminated without cause (the "Terminated Employees") with severance payments (the "Severance Payments") equal to their base wages for specified periods of time that correlated with their number of years of employment (the "Severance Period"). Terminated Employees typically received Severance Payments either (i) in a single, lump-sum Severance Payment (the "Lump-Sum Severance") or (ii) through salary continuation in the form of regular biweekly paychecks for the duration of the Severance Period (the "Salary Continuation Severance"). On February 4, 2009, the Bankruptcy Court entered an order authorizing the Debtors to implement a severance program for employees whose employment is terminated in certain circumstances after the Petition Date (the "Post-Petition Severance Program").

     3.      Management Incentive Plan ("MIP").

The Debtors maintain a management incentive plan, also referred to as the "MIP," which historically has been part of the Incentive Compensation Plan (defined and discussed further below). The MIP provides cash compensation to certain of the Debtors' management employees to the extent that performance goals approved by the Compensation Committee are met. MIP participants typically consist of those management employees, other than those in sales positions, with target cash incentive award opportunities of at least fifteen percent (15%) of their base salary. Approximately 670 of the Tribune Entities' employees participated in the MIP in 2009.

The Debtors have used a consistent methodology over the years in setting annual MIP targets and in subsequently determining MIP cash awards. During this time, each MIP participant had an annual target award opportunity expressed as a percentage of his or her base salary. The Debtors then used these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as a consolidated company-wide bonus pool. Within the Publishing Segment, each individual newspaper (combined with any subsidiaries) was measured as a separate business unit; within the Broadcasting Segment, each television and radio station (or station group in duopoly markets) was measured as a separate business unit; and certain other operations considered to be general corporate operations as well as certain group offices that oversee the entire Publishing Segment or Broadcasting Segment also constituted distinct business units. Beginning in the fourth quarter of each year, a budget and operating plan was developed by each business unit for the following year, as well as a consolidated budget and operating plan for the Tribune Entities as a whole. The operating cash flow goals established in the planning process for a given business unit served as the primary performance target for that year's MIP. Business units were generally eligible for bonus pools ranging from forty percent (40%) to two hundred percent (200%) of the applicable target pool based on performance ranging from threshold-level to maximum-level achievement of applicable MIP goals, respectively. Additionally, in accordance with the MIP, prior to the Petition Date, the Debtors historically made discretionary MIP cash awards to participants whose business units did not satisfy one or more of their stated goals (even at threshold levels), and otherwise adjusted pool amounts and individual awards, both positively and negatively, in

their discretion even in cases where applicable goals were met in whole or in part. Any such adjustments were consistent with the MIP parameters discussed above.

By orders entered on May 12, 2009 and September 30, 2009, respectively, the Bankruptcy Court authorized the Debtors to pay awards for 2008 under the MIP totaling approximately $12.2 million to eligible employees other than certain executives and up to $3.1 million to such executives. In addition, as discussed in Article V.C of this General Disclosure Statement, on July 22, 2009 the Debtors filed a motion with the Bankruptcy Court seeking authority to implement a 2009 Management Incentive Plan consisting of a self-funding ordinary course MIP program consistent with the Debtors' historical MIP programs, but containing certain modifications relative to prior years (including, for example, reductions to payout percentages at various levels of goal achievement compared with historical levels), as well as a new self-funding Transition MIP ("TMIP") program and a self-funding Key Operators Bonus ("KOB") program for certain participants (the "2009 MIP Motion"). The Washington-Baltimore Newspaper Guild, Local 32035 of The Newspaper Guild-Communications Workers of America, AFL-CIO (the "Guild") and the United States Trustee filed objections to the 2009 MIP Motion, which included the 2009 MIP, the TMIP and the KOB. These objections were litigated at an evidentiary hearing before the Bankruptcy Court on September 25, 2009. A complete transcript of the September 25, 2009 hearing is available upon written request to counsel for the Debtors. Upon the conclusion of the hearing, the Debtors asked the Bankruptcy Court to consider the MIP, TMIP and KOB as an integrated whole, not in parts. The Court then took under advisement, and did not immediately rule on, the 2009 MIP, TMIP and KOB programs.

At a hearing on January 27, 2010, in response to the Debtors' request that the 2009 MIP, TMIP and KOB now be considered separately, the Bankruptcy Court approved the 2009 MIP, and suggested that the Debtors consider incorporating the TMIP and KOB into a chapter 11 plan of reorganization. By order entered January 28, 2010, the Bankruptcy Court authorized the Debtors to implement the ordinary course MIP component of the 2009 Management Incentive Plan and to pay ordinary course MIP awards in an aggregate amount not to exceed $45.6 million. Payment of 2009 MIP bonuses totaling $42.1 million was made on February 26, 2010. The Debtors followed the Bankruptcy Court's suggestion, and filed a motion to voluntarily dismiss, without prejudice, their request for entry of an order authorizing the implementation of the TMIP and KOB. Following a March 23, 2010 hearing on this motion, the Bankruptcy Court entered an order that day granting this motion. At that hearing, the Court stated that "regardless of what my expressed words were at the [January 27, 2010] hearing, I didn't suggest that the part of the plan that was proposed and which I had under advisement should or could be the same plan that was under consideration or that I would approve it in the context of the confirmation." The Court further stated that it was not providing "any inclination of whether in that context it should be approved or not." The Court also stated that "whatever record was made [with respect to the TMIP and KOB, including at the September 25, 2009 hearing] would be included in whatever presumably confirmation hearing record was made if there were still objections to it."

On May 26, 2010, the Debtors moved the Bankruptcy Court for the authority to continue their self-funding ordinary course annual cash management incentive plan for 2010 (the "2010 MIP") for approximately 640 management employees, including the Debtors' top executives, with aggregate bonus opportunities depending on the Debtors' performance relative to certain 2010 consolidated operating cash flow goals (the "2010 MIP Motion"). Aggregate bonus opportunities under the 2010 MIP ranged from $30.8 million (provided that the Debtors achieved at least the level of planned consolidated operating cash flow set forth in their 2010 operating plan) to $42.9 million (for performance at or in excess of a specified maximum performance goal). As with the 2009 MIP, the 2010 MIP contained certain modifications relative to prior years, including, for example, reductions to payout percentages for certain participants at various levels of goal achievement compared with historical levels. The United States Trustee and Wells Fargo, as administrative agent under the Debtors' Bridge Loan Agreement, filed objections to the 2010 MIP Motion. On July 23, 2010, based on subsequent discussions with the Committee, the Debtors filed a

notice of certain revisions to the 2010 MIP (such notice referred to as the "Notice of Revisions to 2010 MIP," and the 2010 MIP Motion, as revised per the foregoing notice, referred to as the "Revised 2010 MIP Motion"). The Revised 2010 MIP Motion increased the required operating cash flow performance level at each potential payout level, decreased payout percentages for many participants in the 2010 MIP at various performance levels, and utilized a uniform payout-performance structure for all participants, as opposed to the bifurcated structure in the 2010 MIP Motion. Aggregate bonus opportunities under the Revised 2010 MIP Motion range from $16.5 million (provided that the Debtors achieve at least an increased threshold level of performance above the level of planned consolidated operating cash flow set forth in their 2010 operating plan) to $42.9 million (for performance at or in excess of an increased maximum performance goal). The On November 10, 2010, the Bankruptcy Court entered an order approving the substantial majority of the relief requested in the Revised 2010 MIP Motion is scheduled to be heard on November 10, 2010. (the "2010 MIP Order").[32]

The Debtors intend to continue their historical annual MIP program in 2010 and subsequent years, including after the consummation of a plan of reorganization. Any creditor wishing further detail can access the 2010 MIP Motion and the Notice of Revisions to 2010 MIP on the Bankruptcy Court's docket.

### 4.    Local Bonus Programs.

The Debtors maintain a variety of commission and incentive bonus programs for certain sales and other personnel who generally do not participate in the MIP. These programs are implemented locally and designed to incentivize and reward achievements of the Debtors' employees based upon specific metrics relevant to the respective employees' local or departmental line of work (the "Local Bonus Programs"). During 2009, approximately 2,500 of the Debtors' employees participated in the Local Bonus Programs. Generally, these programs are developed and implemented locally by individual newspapers, broadcast stations and corporate office departments. The majority of these programs are based on performance factors such as revenue generation, increasing market share, expense targets, and some discretionary factors. Payouts under most of the Local Bonus Programs are based upon year-end, quarter-end or month-end performance. The Debtors paid an aggregate of approximately $24.8 million, $22.2 million, and $20.7 million, respectively during 2007, 2008, and 2009 in connection with the Local Bonus Programs.[33]

### 5.    Collective Bargaining Agreements.

As of October 10, 2010, approximately ten percent (10%) of the Debtors' employees in the Publishing Segment and approximately thirty-two percent (32%) of the Debtors' employees in the Broadcasting Segment were represented by unions and covered under various collective bargaining

---

[32]    The 2010 MIP Order did not authorize payment of 2010 MIP awards to certain of the Debtors' employees, but preserved the Debtors' right to seek approval of the 2010 MIP as to such individuals at a future time. In addition, the 2010 MIP Order provided that in the event the Bankruptcy Court or any other court of competent jurisdiction enters a final non-appealable order or judgment finding that, as part of Tribune's leveraged buy-out transactions in 2007, a 2010 MIP Participant breached his or her fiduciary duty or committed an intentional tortious wrong, then such MIP Participant shall, within ten (10) days after receiving notice from a representative of the Debtors' estates of the finality of such order, repay Tribune the full amount of the 2010 MIP award payment received by such 2010 MIP Participant.

[33]    As further discussed in Article V.C of this General Disclosure Statement, on February 3, 2009 and May 12, 2009, the Bankruptcy Court entered orders authorizing the Debtors to pay prepetition amounts outstanding in connection with the Local Bonus Programs in an aggregate amount of up to $8.8 million and $1.1 million, respectively.

agreements. Specifically, the Tribune Entities in the Publishing Segment are party to ten collective bargaining agreements and the Tribune Entities in the Broadcasting Segment are party to 15 collective bargaining agreements. The following table summarizes certain information concerning the union representation of the Tribune Entities' employees.[134]

| | Department | Union/Local Name | Approximate Number of Employees | | | |
| | | | Full-Time | Part-Time | Per Diems/ Seasonal | Expiration Date |
|---|---|---|---|---|---|---|
| **Publishing** | | | | | | |
| *Baltimore Sun* | Packagers | GCC-IBT/888 | 104 | 51 | 0 | 12/ 2008** |
| *Baltimore Sun* | Transportation | GCC-IBT/355 | 18 | 10 | 0 | 12/2010 |
| *Baltimore Sun* | Pressroom | GCC-IBT/31 | 81 | 0 | 0 | 4/2012 |
| *Baltimore Sun* | Various* | TNG/Baltimore-Washington | 212 | 9 | 0 | 6/2012 |
| *Baltimore Sun†* | Prepress | GCC-IBT/582 | 1 | 0 | 0 | 4/2012 |
| *Chicago Tribune* | Machinists | IAM/126 | 43 | 0 | 0 | 9/ 2012 |
| *Chicago Tribune* | Pressroom | GCC-IBT/7 | 135 | 5 | 0 | 5/2012 |
| *Chicago Tribune* | Drivers | IBT/706 | 126 | 7 | 0 | 12/2010 |
| *LA Times* | Pressroom | GCC-IBT | 146 | 2 | 0 | 5/2011 |
| *Morning Call* | Pressroom | GCC-IBT/160M | 20 | 0 | 0 | 6/ 2011 |
| *Subtotal* | | | *886* | *84* | *0* | |
| **Broadcasting and Entertainment** | | | | | | |
| KTLA (Los Angeles) | Newspersons | AFTRA | 22 | 0 | 14 | 8/2011 |
| WPIX (New York) | Directors | DGA | 6 | 1 | 19 | 10/ 2008** |
| WPIX (New York) | Newswriters | TNG/3 | 23 | 1 | 13 | 12/2012 |
| WGN-TV (Chicago) | Newspersons | AFTRA | 28 | 4 | 15 | *** |
| WGN-AM (Chicago) | Engineers | IBEW/1220 | 2 | 1 | 6 | 3/ 2012 |
| WPIX (New York) | Newspersons | AFTRA | 25 | 1 | 10 | 5/ 2009** |
| WPIX (New York) | Engineers | IBEW/1212 | 69 | 1 | 64 | 6/ 2009** |
| WGN-TV (Chicago) | Engineers | IBEW/1220 | 81 | 0 | 101 | 3/ 2009** |
| WGN-TV (Chicago) | Newswriters | IBEW/1220 | 5 | 0 | 12 | 3/ 2009** |
| WPHL (Philadelphia) | Technicians | IBEW/98 | 11 | 2 | 1 | 12/ 2012 |
| KTLA (Los Angeles) | Technicians | IATSE | 68 | 3 | 314 | 7.2010 |
| KTLA (Los Angeles) | Electricians | IBEW/40 | 2 | 0 | 2 | 7/2010 |
| WPIX (New York) | Stagehands | IATSE/1 | 3 | 0 | 18 | 3/2011 |
| WGN-TV (Chicago) | Stagehands | IATSE/2 | 0 | 0 | 68 | 5/2011 |
| WGN-TV (Chicago) | Engineers | IUOE/399 | 3 | 0 | 0 | 5/2011 |
| *Subtotal* | | | *348* | *14* | *657* | |
| **TOTAL** | | | **1,234** | **98** | **657** | |

\*   Includes editorial, advertising, circulation, administrative and marketing employees.

---

[134] A list of all Collective Bargaining Agreements, including full names of such agreements, is attached hereto as Exhibit B.

† No employees are employed under this particular collective bargaining agreement. However, approximately 10 former bargaining unit members with lifetime job guarantees continued to be employed at the Baltimore Sun in other capacities.
** In the case of each expired collective bargaining agreement included in this summary chart, the Debtors are currently in the process of negotiating the terms of a renewed collective bargaining agreement. During such negotiations, the Debtors intend to continue performing their obligations under the collective bargaining agreement as required by applicable law.
*** The parties have entered into an open ended contract extension that may be terminated by either party upon 30-days written notice.

6.    Management Equity Incentive Program.

On December 20, 2007, Tribune's Board of Directors approved a management equity incentive plan (the "MEIP") pursuant to which certain of the Debtors' key employees were eligible to receive benefits. The MEIP provided for units that represented a right to receive cash equal to the fair market value of Tribune's common stock. MEIP awards were made to eligible members of the Debtors' management and other key employees at the discretion of the Board of Directors.

7.    Equity-Based Compensation Provisions of Incentive Compensation Plan.

In 1997, Tribune established the Tribune Company Incentive Compensation Plan (as amended and restated effective in 2004, the "Incentive Compensation Plan"). The Incentive Compensation Plan authorized grants of various forms of incentive compensation to management and other employees, as well as certain non-employee agents, of the Debtors. Historically, awards under the Incentive Compensation Plan were made to certain eligible members of the Debtors' management and other key employees at the discretion of the Board of Directors or, as applicable, of senior executives. As stated, the MIP program, providing for annual cash incentive awards, is one component of the Incentive Compensation Plan. The Incentive Compensation Plan also authorized other forms of incentive awards comprised of equity-based compensation grants, including grants of stock options, stock appreciation rights, restricted or unrestricted stock, or restricted stock units.

8.    Employee Stock Ownership Plan.

As discussed in Article VII.A of this General Disclosure Statement, on April 1, 2007, Tribune established the ESOP as an employee retirement benefit plan. Pursuant to the terms of the ESOP, each eligible employee received a pro rata allocation of stock for the 2008 plan year and will receive another for the 2009 plan year based upon such employee's relative eligible compensation, including base salary, wages and commissions, but excluding bonuses and overtime. ESOP participants were to receive a distribution of the value of the shares allocated to their accounts if during 2008 or 2009 such participants retired after age 65, became disabled or died. With respect to each such participant, the distribution was to be based on the value of the shares determined by the trustee of the ESOP as of December 31 of such participant's year of retirement, disability, or death, with the ESOP receiving the cash value of the shares from Tribune. As of both December 31, 2009 and December 31, 2008, the trustee of the ESOP determined the value of the shares to be $0; therefore, no distributions have been made under the ESOP.

9.    Transitional Compensation Plan

In 1985, the Debtors implemented a transitional compensation plan for executive employees (as amended and restated in 2006, the "Transitional Compensation Plan"). The Transitional Compensation Plan provided for benefits upon a qualifying event or circumstances occurring as a result of a "change in control" (as defined in the Transitional Compensation Plan) of Tribune. Generally, and subject to certain exceptions specified in the Transitional Compensation Plan, eligible employees received benefits for their termination of employment within a defined time period (length of period varies by individual) following a change in control, prior to a change in control if the termination was at the request of any third-party participating in or causing the change in control, or otherwise in anticipation of a change in control.

As of the date of this General Disclosure Statement, no benefits were outstanding under the Transitional Compensation Plan.

          10.     Nonqualified Retirement / Deferred Compensation Plans.

          a)     Noncontributory Plans.

The IRC limits the amount of annual earnings that may be considered when calculating benefits under qualified pension and 401(k) plans. As a result, Tribune and Times Mirror (prior to its merger with Tribune) established various supplemental retirement plans. These plans include the Tribune Company Supplemental Retirement Plan, Tribune Company Supplemental Defined Contribution Plan, and Times Mirror Excess Pension Plan. These were unfunded plans providing benefits substantially equal to the difference between the amount that would have been provided under the corresponding qualified plan in the absence of applicable IRC limits, and the amount actually provided under the qualified plan. In accordance with the provisions of the plans, in connection with the completion of the Merger, amounts accrued under the Tribune Company Supplemental Retirement Plan and Tribune Company Supplemental Defined Contribution Plan (with a few exceptions) were paid at the end of fiscal year 2007. Approximately $94,000 in accrued benefits remained in the Tribune Company Supplemental Defined Contribution Plan as of the Petition Date.

The Times Mirror Excess Pension Plan did not contain a provision for payouts upon a change in control; therefore, accrued amounts were not distributed at the time of the Merger and payments were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under the Times Mirror Excess Pension Plan was approximately $10.1 million.

In connection with Tribune's acquisition of Times Mirror, Tribune also assumed The Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers, and The Times Mirror Pension Plan for Directors. By December 2005, all accruals under these plans had ceased. The Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers provided additional retirement benefits for certain executives of Times Mirror. The Times Mirror Pension Plan for Directors provided benefits for a period following a director's service on the board of directors of Times Mirror, with such period based on the number of years during which the director served on such board. Payments under both of these plans were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these plans was approximately $43.3 million.

          b)     Contributory Plans.

Tribune sponsored The Times Mirror Deferred Compensation Plan for Executives and the Times Mirror Deferred Compensation Plan for Directors, which Tribune assumed in connection with the Times Mirror acquisition. A participant's benefit under these plans was based on his or her "account balance," which was based on the amount of a participant's compensation that was deferred under the plan, adjusted for hypothetical earnings or losses based on investment benchmarks selected by the participant or credited interest designated under the plan, as applicable. Payments under each of these plans, as well as adjustments for hypothetical earnings and losses, were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these plans was approximately $22.1 million.

11.    Certain Individual Letter Agreements.

In addition to the nonqualified deferred compensation plans described above, the Debtors are parties to individual agreements that entitle certain former employees to various retirement-related payments.  The individual agreements vary with respect to benefit amounts, benefit formulas, and payment provisions.  Payments under the individual agreements were suspended as of the commencement of the Chapter 11 Cases.  As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these agreements was approximately $17.0 million.

### D.    Pending Litigation and Certain Other Legal Matters Involving the Debtors

The Debtors are involved from time to time in a variety of litigation and legal matters that are incidental to their businesses.  As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to section 362 of the Bankruptcy Code.  Certain pending litigation related to prepetition causes of action and certain other legal matters which may result in litigation following the Effective Date are described below.  The descriptions below are not, and are not intended to be, a comprehensive list of all actions or matters involving the Debtors and specifically exclude, among others, administrative actions, workers compensation actions and actions involving union grievances.  In addition, the matters discussed below are included for disclosure purposes only and are not an admission, and are not intended to be an admission, of liability with respect to any claim or action.

As of October 7, 2010, the face-value of all timely-filed litigation-related proofs of claim against Tribune that have not already been disallowed by Bankruptcy Court order, withdrawn, or otherwise expunged from the Debtors' claims register  is approximately $40.8 million plus an unknown amount attributable to contingent, unliquidated, and disputed claims.  That amount, however, assumes that all pending litigation-related proofs of claim against Tribune are not frivolous and will be successfully prosecuted for the full amount demanded.  It also includes duplicate claims.  After accounting for duplicate claims, the face-value of claims arising from litigation pending against Tribune is approximately $10.3 million plus an unknown amount attributable to contingent, unliquidated, and disputed claims.  The Debtors continue to review and defend the various litigation claims and the ultimate allowed amount is uncertain.

As of October 7, 2010,  the face-value of all timely-filed litigation-related proofs of claim against Tribune's subsidiaries that are Debtors that have not already been disallowed by Bankruptcy Court order, withdrawn, or otherwise expunged from the Debtors' claims register is approximately $214.4 million plus an unknown amount attributable to contingent, unliquidated, and disputed claims.  That amount, however, assumes that all pending litigation-related proofs of claim against the Debtor subsidiaries are not frivolous and will be successfully prosecuted for the full amount demanded.  It also includes duplicate claims.  After accounting for (i) duplicate claims, (ii) claims that are the subject of objections pending before the Bankruptcy Court, and (iii) claims that have been settled in principle as of the date of the General Disclosure Statement, the face-value of litigation-related claims against the Debtor subsidiaries is approximately $66.6 million plus an unknown amount attributable to contingent, unliquidated, and disputed claims.  The Debtors continue to review and defend the various litigation-related claims and, where warranted, will submit appropriate objections to the Bankruptcy Court in respect of such claims.  Accordingly, the ultimate allowed amount of litigation-related claims against the Debtor subsidiaries is uncertain.

1.    *Newsday* and *Hoy* Circulation Misstatements.

In February 2004, a purported class action lawsuit was filed in New York federal court by certain advertisers in *Newsday* and an affiliate publication, *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications (the "New York Circulation Action"). Plaintiffs in the New York Circulation Action also allege that certain entities that paid Distribution Systems of America, Inc., a *Newsday* subsidiary, to deliver advertising flyers were overcharged. Due to the commencement of these Chapter 11 Cases, the New York Circulation Action, captioned *Crabhouse of Douglaston Inc. d/b/a/ Douglaston Manor, et al., v. Newsday, Inc. et al.*, Case No. CV 04-558 (E.D.N.Y. Feb. 10, 2004), has been stayed with respect to the remaining Debtor defendants: Hoy, LLC (the publisher of *Hoy, New York*) and Distribution Systems of America, LLC Inc. The litigation is ongoing with respect to Tribune ND, Inc., a Guarantor Non-Debtor, as successor to Newsday, Inc. On June 14, 2010, the Bankruptcy Court entered an order disallowing and expunging the proofs of claim asserted against Tribune Company, Hoy, LLC, and Distribution Systems of America, Inc. on account of the New York Circulation Action in their entirety.

In addition to the New York Circulation Action, a stockholder derivative suit was filed against the Debtors and certain of their current and former directors and officers in the United States District Court for the Northern District of Illinois captioned *Hill v. Tribune Co.*, Case No. 05-2602 (WTH). The suit, which was filed as a result of the circulation misstatements at *Newsday* and *Hoy*, alleged breaches of fiduciary duties and other managerial and director failings under Delaware law and the federal securities laws. The consolidated securities class action lawsuit was dismissed with prejudice on September 29, 2006. The dismissal was appealed to the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit"). On April 2, 2008, the Seventh Circuit issued an opinion affirming the dismissal of the securities class action lawsuit. Plaintiffs in the securities class action lawsuit have filed a petition for a rehearing *en banc* by the Seventh Circuit. Due to the commencement of the Chapter 11 Cases, this action is currently stayed.

On December 17, 2007, *Newsday* and *Hoy*, New York reached a non-prosecution agreement with the United States Attorney's Office for the Eastern District of New York that ended a federal inquiry into the circulation practices of Newsday, Inc. and Hoy Publications LLC, as successor-in-interest to Hoy, LLC. The agreement recognized (i) *Newsday's* and *Hoy*, New York's full cooperation with the investigation, (ii) the implementation of new practices and procedures to prevent fraudulent circulation practices, (iii) the payment as of December 2007 of approximately $83 million in restitution to advertisers, and (iv) a civil forfeiture payment of $15 million.

2.    ESOP Lawsuit.

In September 2008, a lawsuit was filed in the United States District Court for the Central District of California (the "California District Court") by current and former employees of the *Los Angeles Times*. The lawsuit named as defendants a former director and current directors of Tribune, the trustee of the ESOP, the Tribune Employee Benefits Committee, and certain current and former members, EGI-TRB, LLC, and, nominally, the ESOP. The lawsuit alleged breaches by defendants of duties and obligations under the Employer Retirement Income Security Act of 1974, as amended ("ERISA") and state law. On November 17, 2008, the California District Court transferred the case to the United States District Court for the Northern District of Illinois (the "Illinois District Court"). The lawsuit, captioned, *Neil v. Zell*, Case No. 08-6833 (RRP), seeks relief, including damages, for the benefit of the ESOP (the "Neil Litigation"). In an amended complaint filed on December 30, 2008, plaintiffs added as defendants several current and former Tribune officers who had allegedly served on the Employee Benefits Committee.

On March 13, 2009, Tribune filed an adversary proceeding (the "Neil Adversary Proceeding") captioned *Tribune Company v. Dan Neil, et al.* (*In re Tribune Company*), Adv. Pro. No. 09-50445 (KJC) (Bankr. D. Del. Mar. 13, 2009), which sought declaratory and injunctive relief to stay all further prosecution of the Neil Litigation.  On May 20, 2009, Tribune withdrew its preliminary injunction motion without prejudice to its right to refile because the plaintiffs dropped Tribune as a defendant from the underlying lawsuit in an amended complaint dated December 30, 2008.  At a status conference held on June 25, 2009, Tribune advised the Bankruptcy Court that the parties had agreed that the underlying lawsuit would go forward solely with respect to briefing and decision on a motion to dismiss for failure to state a claim upon which relief could be granted (the "Motion to Dismiss").  In connection therewith, Tribune negotiated the terms under which its primary fiduciary liability insurance carrier agreed to advance the defense costs associated with the Motion to Dismiss to Tribune's directors and officers named in the suit.  Tribune filed a motion to authorize the payment and advancement of insurance proceeds on August 17, 2009, which was granted on September 2, 2009.  On November 16, 2009, upon agreement by the parties, the Bankruptcy Court stayed the Neil Adversary Proceeding pending resolution of the motion to dismiss filed in the Neil Litigation.

On December 17, 2009, the Illinois District Court granted in part and denied in part the Motion to Dismiss.  The court dismissed all claims against the directors and officers of Tribune, except that it denied the Motion to Dismiss as to certain claims against Tribune board member Samuel Zell.  The court also denied the Motion to Dismiss as to claims against the ESOP trustee and EGI-TRB.  On March 2, 2010, EGI-TRB and Zell filed an answer to the amended complaint.  On the same day, they filed a motion for judgment on the pleadings.  Also on March 2, 2010, GreatBanc Trust Company, the ESOP trustee, filed a motion for reconsideration of the Illinois District Court's December 17, 2009, ruling.

On March 5, 2010, Tribune filed in the Neil Adversary Proceeding a motion for preliminary injunction enjoining the Neil plaintiffs from seeking any equitable relief that would affect property of Tribune's bankruptcy estates (the "Preliminary Injunction Motion").  The parties in the Neil Adversary Proceeding stipulated to a briefing schedule that provides for briefing on the Preliminary Injunction Motion after the resolution of the motions for judgment on the pleadings and reconsideration filed in the Neil Litigation.

On March 18, 2010, the Illinois District Court requested briefing on certain issues regarding equitable relief raised in EGI-TRB's and Zell's motion for judgment on the pleadings and GreatBanc Trust Company's motion for reconsideration.  On August 9, 2010, the Illinois District Court issued a decision that granted in part and denied in part EGI-TRB's and Zell's motion for judgment on the pleadings.  In that decision the Illinois District Court found that one of plaintiffs' claims for relief – removing Zell and EGI-TRB from having any fiduciary responsibility over the ESOP – might constitute appropriate equitable relief if plaintiffs succeed in proving their ERISA claims against Zell and EGI-TRB. The Illinois District Court also recognized that developments in Tribune's bankruptcy proceeding or elsewhere might moot the availability of that relief and if that occurs, Zell and EGI-TRB would be dismissed as defendants.

On June 8, 2010, GreatBanc Trust Company filed a motion for partial summary judgment as to damages.  ~~That motion is opposed and is pending consideration.~~ On November 9, 2010, the Illinois District Court issued a decision granting the Neil plaintiffs partial summary judgment on one claim against GreatBanc Trust Company.  The Illinois District Court found that GreatBanc Trust Company's purchase of unregistered stock did not meet the definition of "employer security" found in the Internal Revenue Code and, therefore, the purchase of stock was a "prohibited transaction" under ERISA.  The Illinois District Court specifically stated that its ruling "will not bind Tribune in a later case".  The Illinois

District Court further noted that the Neil plaintiff may seek damages against GreatBanc, but may not seek damages from Tribune because "Tribune is not a fiduciary."[1]

The ESOP has also been the subject of ongoing investigation by the United States Department of Labor ("DOL") and an audit by the Internal Revenue Service ("IRS"). On May 28, 2009, the DOL filed an unliquidated proof of claim against Tribune, and on June 10, 2009, the DOL filed a similar claim against 70 other Debtors. The DOL's claims state that it is conducting an investigation of the ESOP for possible violations of ERISA, including ERISA sections 404 and 406. Pursuant to its investigation, the DOL has sought and obtained documents from the ESOP Trustee, GreatBanc Trust Company, and its financial advisor, Duff & Phelps, and the DOL has conducted interviews of personnel of both of those entities. The IRS did not file a proof of claim relating to the ERISA issues being investigated by the DOL, but has conducted an interview of a representative of Duff & Phelps.

       3.     FCC Related Matters.

Various aspects of the Debtors' operations are subject to regulation by governmental authorities in the United States. The Debtors' television and radio broadcasting operations are subject to ~~FCC~~Federal Communications Commission ("FCC") jurisdiction under the Communications Act. FCC rules govern, among other things, the term, renewal and transfer of radio and television broadcasting licenses and limit concentrations of broadcasting ownership that the FCC considers to be inconsistent with the public interest. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs.

On November 30, 2007, the FCC issued an order (the "FCC Order") granting the Debtors' applications to transfer control of the Debtors from the existing stockholders to the ESOP in connection with the Leveraged ESOP Transactions. In the FCC Order, the FCC rejected the Debtors' request for "permanent" waivers of the newspaper/broadcast cross-ownership rule, which generally restricts the common ownership of a daily newspaper and a television station or radio station in the same local market, in order to permit continued common ownership of (i) WSFL-TV and the *South Florida Sun-Sentinel* in Miami, Florida; (ii) WTXX-TV (now WCCT-TV)/WTIC-TV and the *Hartford Courant in* Hartford, Connecticut; (iii) KTLA-TV and the *Los Angeles Times* in Los Angeles, California; and (iv) WPIX-TV and *Newsday* in New York, New York. The "permanent" waivers would have continued as long as the Debtors owned the properties; they would not have permitted subsequent sales of the properties intact. The FCC granted the Debtors "temporary" or time-limited waivers with respect to these cross-owned properties for a six-month period beginning January 1, 2008, and provided for extension of these waivers in three circumstances. First, the FCC ruled that if it were to adopt a revised newspaper/broadcast cross-ownership rule before January 1, 2008, it would grant applicants a two-year waiver of the rule, to among other things, allow parties an opportunity to make individualized waiver showings and the FCC to consider them. The date on which the two-year period is to commence is open to interpretation. On December 18, 2007, the FCC voted to adopt a revised rule (the "2008 Order"). Second, the FCC ordered that, if Tribune should challenge the denial of the requested "permanent" waivers in court, it would grant a waiver that would last either for two years or until six months after the conclusion of the litigation, whichever is longer, provided that the applicants did not abandon that litigation before a court decision was reached. Third, the FCC ordered that, in the event the applicants were not able to come into compliance with any revised cross-ownership rule during the two-year period because the revised rule was subject to a judicial stay, then the waiver would extend until six months after the expiration of any such stay. On December 3, 2007, the applicants appealed the FCC Order to the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit"), captioned *Tribune Co. v. FCC*, Case

---

[1] As noted above, the Illinois District Court previously dismissed Tribune's directors and officers from the Neil case and held that no monetary relief was available from defendants Sam Zell and EGI-TRB.

No. 07-1488. That appeal is pending, but the D.C. Circuit has held the appeal in abeyance pending the resolution of petitions for reconsideration of the FCC Order pending before the FCC. The terms of any waivers the FCC may grant in connection with the FCC Applications may affect the course of the pending appeal.

The FCC Order also granted the Debtors a "permanent" waiver of the newspaper/broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the *Chicago Tribune* in Chicago, Illinois; a "permanent" "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV (now WCCT-TV) in Hartford, Connecticut; and continued satellite station status to WTTK-TV, licensed to Kokomo, Indiana, to permit continued common ownership with WTTV-TV in Bloomington, Indiana. Both WTTK-TV and WTTV-TV are in the Indianapolis market. Various parties have petitioned for reconsideration of the FCC Order with the FCC; the Debtors have filed an opposition to such filings with the FCC.

In the 2008 Order, the FCC announced revised waiver standards for the newspaper/broadcast cross-ownership rule. Under the revised waiver standards, the Debtors would be entitled to a presumption in favor of common ownership in three of four of the Debtors' cross-ownership markets which are the subject of FCC temporary waivers (Los Angeles, CA; Miami, FL; and New York, NY). Various parties, including the Debtors, have sought reconsideration before the FCC or judicial review of the 2008 Order, and proceedings for such judicial review are pending in the United States Court of Appeals for the Third Circuit (the "Third Circuit"). On March 23, 2010, the Third Circuit lifted the stay that had been in effect and set a briefing schedule for the challenges to the 2008 Order, which concluded on August 16, 2010. ~~The date for oral~~ Oral argument has ~~not yet~~ been set. for February 24, 2011.

4.    Miscellaneous Other Litigation.

As of the Petition Date, there were approximately 50 prepetition personal injury cases pending against the Debtors. There were also at least 45 prepetition cases pending against the Debtors involving media-related claims, such as defamation, slander and libel. In addition, the Debtors were subject to at least 15 employment–related cases (such as wrongful termination and breach of employment contract). Approximately two-thirds of the plaintiffs in these lawsuits filed a proof of claim prior to the Bar Date (defined below), and the Claims reflected therein will be evaluated during the claims reconciliation process (discussed in Article V.G.8 below).

## IV.    DEBTORS' DESCRIPTION OF THE EVENTS LEADING UP TO CHAPTER 11

*The following summary of the events leading up to the Debtor's chapter 11 cases was prepared by the Debtors.*

In 2008, the newspaper publishing industry experienced an unprecedented decline which was exacerbated by the recent recession. While the Debtors believe that their newspaper advertising revenue continued to be in line with, and in some cases superior to, other large metropolitan newspapers during that time, newspaper advertising revenue generally has been in significant decline, down industry-wide approximately fifteen to twenty percent (15-20%) in 2008 over the preceding year in major metropolitan markets, and down industry-wide nearly $2 billion, or eighteen percent (18%), in the third quarter of 2008 alone. Further, while the Debtors' television broadcasting stations outperformed the broader television broadcasting industry, the Debtors' 2008 broadcasting revenue nevertheless lagged behind their 2007 performance, again largely as a result of declining advertising revenue. Through November 2008, Tribune's consolidated revenue was down ten percent (10%) versus 2007, with publishing advertising revenues down eighteen percent (18%) and broadcasting and entertainment revenues down three percent

(3%). On a consolidated basis, Tribune's operating cash flow (excluding equity compensation, one-time items and discontinued operations) was down thirty-three percent (33%) in 2008.

Prior to the Petition Date, the Debtors implemented and continue to implement aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Strategic initiatives aimed at generating incremental cash flow through cost savings included improvements in operating efficiencies, reductions in workforce, web width (newspaper page size) reductions and newspaper redesigns. They also included revenue enhancement initiatives such as entering into arrangements to print and deliver other companies' newspapers, increasing the number of hours of television news programming, and improving the efficiency and effectiveness of the sales force. Additionally, in 2008 the Debtors implemented a strategy to monetize various assets including the July 2008 joint venture involving the Newsday operations, the April 2008 sale of real estate associated with the Debtors' former Southern Connecticut newspapers, the January 2008 sale of a studio production lot in Hollywood, California and the September 2008 sale of an equity stake in CareerBuilder LLC. Tribune also continued its efforts to select a winning bidder for the Chicago Cubs baseball operations and related assets, consistent with Tribune's announcement in April 2007 that it intended to pursue the disposition of an interest in that business. The consummation of certain transactions pursuant to which the Chicago Cubs and related assets and liabilities were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries, is described in more detail in Article V.H of this General Disclosure Statement.

Notwithstanding the Debtors' aggressive efforts to enhance revenue, reduce expenses and monetize various assets, the Debtors believe that the impact of the unprecedented economic downturn left them with weak operating results and significant liquidity challenges. In December 2008 alone, the Debtors faced debt service and related payments of approximately $200 million, with another $1.3 billion due in 2009, including $512 million of the Tranche X debt maturing in June 2009.

Against a backdrop of declining revenues in a recession, uncertainty in the capital markets and substantial debt service requirements, the Debtors concluded that the most responsible course of action was to restructure their balance sheet in order to restore liquidity and return to financial health.

## V.    DEBTORS' DESCRIPTION OF EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for reorganization under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Kevin J. Carey. The following is a brief description of certain major events that have occurred during the Chapter 11 Cases. Because of the size of the Debtors' cases, not all events have been described below. For a complete overview of the proceedings in the Chapter 11 Cases, please refer to the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

### A.    Procedural Motions

On the Petition Date, the Debtors filed the Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion"), which requested procedural consolidation of these Chapter 11 Cases for ease of administration. The Bankruptcy Court approved the Joint Administration Motion on December 10, 2008. A supplemental joint administration order was entered by the Bankruptcy Court on October 14, 2009 jointly administering the Chapter 11 Cases of Tribune CNLBC with the Chapter 11 Cases of the other Debtors, and making certain "first day" orders and other orders previously entered in the Debtors' Chapter 11 Cases applicable to Tribune CNLBC.

B.      **"First-Day" Motions**

On the Petition Date, the Debtors also filed several motions seeking typical "first day" relief in the Chapter 11 Cases. The purpose of such motions was to ensure that the Debtors were able to transition into the Chapter 11 process with as little disruption to their businesses as possible and to enable the Debtors' businesses to function smoothly while the Chapter 11 process was pending.

The "first day" motions filed by the Debtors sought authority to, among other things, (i) make tax payments to federal, state and local taxing authorities on an uninterrupted basis; (ii) continue prepetition insurance programs and pay premium installments outstanding in connection therewith; (iii) honor prepetition customer obligations and continue customer programs; (iv) pay prepetition wages and other benefits to the Debtors' employees; (v) continue use of the Debtors' existing cash management system, bank accounts and business forms; (vi) prevent utility companies from discontinuing, altering or refusing service; (vii) pay the prepetition commissions of the Debtors' brokers; (viii) pay certain prepetition claims of shippers, warehousemen and other lien claimants; (ix) make payments to certain prepetition creditors that are vital to the Debtors' uninterrupted operations; and (x) continue selling receivables and related rights and to obtain post-petition financing, among other similar relief. All of the Debtors' first-day motions were ultimately granted by the Bankruptcy Court in substantially the manner requested by the Debtors. A summary of certain material relief sought in connection with the "first-day" motions and other related relief is set forth below.

C.      **Employee Compensation and Benefits**

On the Petition Date, the Debtors filed a motion seeking court authority to continue, among other things, to pay employee wages, reimburse business expenses, and continue contributions to employee benefit plans (the "Employee Wage Motion"). Specifically, the Debtors requested (i) the ability to pay employee wages that were outstanding as of the Petition Date, (ii) satisfy obligations outstanding with respect to employee expense reports and various federal, state and local taxes withheld from the employees' wages, and (iii) pay amounts outstanding in connection with various benefit programs maintained by the Debtors for their employees, including employee health care programs, vacation, sick day and holiday benefits, employee savings plans, disability and other types of insurance, retiree medical programs and workers compensation. By order entered on December 10, 2008, the Bankruptcy Court granted the relief requested in the Employee Wage Motion in substantially the manner requested by the Debtors.

In addition, on December 24, 2008, the Debtors moved the Bankruptcy Court for authority to pay certain prepetition contributions owed to certain union pension plans pursuant to collective bargaining agreements and to continue making contributions to those union pension plans post-petition in the ordinary course of business (the "Union Pension Motion"). Also on December 24, 2008, the Debtors filed a motion requesting authority to implement a retention plan for certain key, non-insider and non-management employees who were necessary for an effective and orderly transition of operations under a local marketing agreement in Denver and a shared services agreement in St. Louis (the "Incentive Plan Motion"). The Bankruptcy Court granted both the Union Pension Motion and the Incentive Plan Motion on January 13, 2009.

On January 13, 2009, the Debtors moved the Bankruptcy Court to implement a severance policy for non-union employees and to continue severance for union employees (the "Severance Motion"), which asked for the authority to allow, but not require, the Debtors to pay severance based on time employed for nonunion employees, and, in regard to union employees, to honor the severance provisions of the respective collective bargaining agreements. Also on January 13, 2009, the Debtors filed a motion to allow the payment of prepetition non-insider incentive programs in an amount not to exceed $8.8

million (the "Incentive Motion"). By order dated February 3, 2009, the Bankruptcy Court granted the Incentive Motion and authorized the Debtors to fund the non-insider incentive plan. The Bankruptcy Court granted the Severance Motion by order entered February 4, 2009.

On April 22, 2009, the Debtors moved the Court for the authority to make certain payments under the 2008 MIP and to comply with certain other local bonus obligations (the "2008 MIP Motion"). The MIP payments were analyzed by Mercer (U.S.), Inc. ("Mercer"), an independent compensation consultant engaged by the compensation committee of Tribune's Board of Directors. The MIP payments totaled approximately $12.243 million, with respect to approximately 670 participants, and specifically excluded certain of the Debtors' executives. The 2008 MIP Motion also sought authority to pay approximately $1.1 million in the aggregate under certain local bonus programs maintained by the Debtors. The order granting the relief requested in the 2008 MIP Motion was granted on May 12, 2009.

Finally, on July 22, 2009, the Debtors filed the 2009 MIP Motion requesting authority to pay earned 2008 MIP awards to certain of the Debtors' executives and to implement a 2009 Management Incentive Plan (i) continuing the self-funding ordinary course MIP for 2009 for approximately 720 management employees, (ii) including a self-funding pay-for-performance TMIP bonus opportunity to incentivize 21 members of the Debtors' core management team to deliver strong operating results while performing substantial restructuring duties, and (iii) including a self-funding pay-for-performance bonus opportunity for 23 leaders of key operations (six of whom also participate in the TMIP) to incentivize such key leaders to achieve transformation of their respective operations by exceeding certain "stretch" operating cash flow goals. On September 30, 2009, the Bankruptcy Court entered an order approving only the payment of earned but unpaid 2008 MIP awards to certain of the Debtors' executives. On January 28, 2010, the Bankruptcy Court entered an order authorizing the payment of earned but unpaid 2009 MIP awards to all participants in the MIP in an aggregate amount not to exceed $45.6 million. The Bankruptcy Court continued to take under advisement the TMIP and KOB programs. On March 4, 2010, the Debtors filed a motion to voluntarily dismiss, without prejudice, their request in the 2009 MIP Motion for entry of an order authorizing the implementation of the TMIP and KOB programs. The Bankruptcy Court granted the Debtors' motion by order dated March 23, 2010.

As discussed more fully in Article III.C.3 of this General Disclosure Statement, on ~~May 26,~~November 10, 2010, ~~the Debtors moved~~ the Bankruptcy Court ~~for the authority to continue their 2010 MIP. The Revised 2010 MIP Motion is scheduled to be heard on November 10, 2010.~~entered an order authorizing the Debtors to make certain payments under the 2010 MIP.

**D.    Cash Management.**

Prior to the Petition Date, the Debtors utilized a centralized cash management system (the "Cash Management System") to collect funds from their operations and to pay operating and administrative expenses in connection therewith. In order to, among other things, avoid administrative inefficiencies, the Debtors moved the Bankruptcy Court for an order (i) approving the Cash Management System; (ii) authorizing the continued use of their existing, prepetition bank accounts and business forms; (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis; (iv) granting administrative priority status to intercompany claims between and among the Debtors and between and among the Debtors and their non-Debtor affiliates; and (v) authorizing use of cash collateral in their deposit accounts as of the Petition Date and providing adequate protection to the cash management banks for the Debtors use of the cash collateral (the "Cash Management Motion"). By order signed December 10, 2008, the Bankruptcy Court approved the Cash Management Motion and waived the requirements of section 345(b) on an interim basis (the "Interim Order"). The Interim Order granted administrative priority status to intercompany claims and transactions on an interim basis. The final hearing on the Cash Management Motion was initially set for January 5, 2009, but was continued several times to April 30,

2009. The order granting administrative superpriority status to post-petition intercompany claims and transactions was entered on April 30, 2009 (the "Final Order"). The Final Order granted relief under section 345(b) in regard to certain foreign accounts but continued the interim waiver of section 345(b) guidelines on an interim basis. After entry of the Final Order, the Debtors and the U.S. Trustee resolved their remaining investment guidelines issues under section 345(b), and the Bankruptcy Court entered an order in respect of such issues on July 30, 2009.

### E.    Post-Petition Financing.

As discussed in Article III.A.2.f, prior to the Petition Date, Tribune established the Receivables Facility. After the Petition Date, the Debtors and Barclays amended the Receivables Facility to allow for it to be utilized as interim debtor-in-possession financing (the "Interim DIP Facility") and to provide liquidity for continued operations during the Chapter 11 Cases. On December 8, 2008, the Debtors filed motions seeking Bankruptcy Court authorization for the (i) continued post-petition transfers of certain of the Debtors' receivables to the Receivables Subsidiary and (ii) Receivables Subsidiary to continue to obtain loans up to $300 million. The Debtors also sought Bankruptcy Court approval to permit the Debtors to (a) guarantee certain of the obligations of the Receivables Subsidiary and provide security in respect of such guaranty and (b) perform its reimbursement, cash collateral and other obligations under a new post-petition letter of credit facility (the "Letter of Credit Facility") to be provided by Barclays, as issuer and as administrative agent, and permitting the Debtors to obtain letters of credit in an aggregate amount up to $50 million. On December 11, 2008, the Bankruptcy Court granted interim approval of the Debtors' motions and, on January 15, 2009, the Bankruptcy Court granted final approval.

The Debtors and Barclays subsequently amended the Receivables Facility to allow its use as a more permanent asset-backed debtor-in-possession financing (the "Amended DIP Facility"). The Amended DIP Facility is comprised of a $75 million revolving line of credit, a $150 million term loan on terms similar to the Interim DIP Facility, and a letter of credit facility. The scheduled termination date of the Amended DIP Facility was amended to the earlier of April 10, 2010 or the Debtors' emergence from the Chapter 11 Cases. The Amended DIP Facility was approved by the Bankruptcy Court on April 8, 2009.

On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid. On February 25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

Although the Debtors have terminated the Amended DIP Facility, they amended and extended the Letter of Credit Facility. On March 2, 2010, the Debtors filed a motion with the Bankruptcy Court seeking authorization to enter into an amendment extending the term of the Letter of Credit Facility to the earlier to occur of (i) April 9, 2011 or (ii) certain contingencies specified in the proposed amendment, and permitting, among other things, the Debtors to obtain letters of credit in an aggregate amount up to $30 million.[2] The Bankruptcy Court approved the amendment to the Letter of Credit Facility by order entered March 22, 2010.

Two letters of credit in the aggregate amount of $15.5 million have been issued and are outstanding under the Letter of Credit Facility.

---

[2]    *See* Motion of the Debtors for an Order Authorizing Debtors to Amend the Letter of Credit Facility Pursuant to Sections 105, 362(d), 363(b)(1), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code and Granting Other Related Relief [Docket No. 3666].

**F.      Professional Retentions.**

1.      Retention of Professionals by the Debtors' Estates.

The Debtors applied for orders authorizing (i) the retention of Sidley Austin LLP ("Sidley") as its general reorganization and bankruptcy counsel and (ii) Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") as Delaware bankruptcy co-counsel under section 327(a) of the Bankruptcy Code on December 26, 2008.  The order approving Sidley's retention was entered on February 20, 2009, and the order approving Cole Schotz's was entered on February 3, 2009.

The Debtors also retained Alvarez & Marsal North America, LLC ("Alvarez") as restructuring advisor.  The application to retain Alvarez was filed on December 26, 2008, and the order approving Alvarez's retention was entered on February 11, 2009.  In addition, the Debtors filed an application to retain Lazard Frères & Co., LLC ("Lazard") as their investment banker and financial advisor.  The application to retain Lazard was filed on December 26, 2008.  The order approving Lazard's retention was entered on March 13, 2009.  Finally, the Debtors filed an application to retain Deloitte & Touche LLP ("Deloitte") as their provider of certain financial, accounting, and advisory services on July 24, 2009.  The order approving Deloitte's retention was entered on August 11, 2009.

To further assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors have also retained the following professionals with the Bankruptcy Court's approval: (i) Daniel J. Edelman, Inc., as corporate communications and investor relations advisor; (ii) Dow Lohnes PLLC, as special counsel for certain regulatory matters; (iii) Ernst & Young LLP, to provide valuation, business modeling services, and market survey services to the Debtors; (iv) Jenner & Block LLP, as special counsel for certain litigation matters; (v) Jones Day, as special counsel for certain litigation matters; (vi) McDermott Will & Emery, LLP, as special counsel for general domestic legal matters; (vii) Mercer, as compensation consultant; (viii) Paul Hasting Janofsky & Walker LLP, as special counsel for general real estate and related matters; (ix) PricewaterhouseCoopers, LLP, as compensation and tax advisor and independent auditor; (x) Reed Smith LLP, as special counsel; (xi) Seyfarth Shaw LLP, as special counsel for certain employment litigation matters; (xii) McDermott Will & Emery LLP, as special counsel for general transactional matters; (xiii) Levine Sullivan Koch & Schulz LLP, as special counsel for First Amendment issues; (xiv) Sitrick and Company, as corporate communications consultants; and (xv) Novack and Macey LLP, as special litigation counsel in connection with the Morgan Stanley Claims.

In addition, the Debtors filed a motion seeking authorization to continue paying certain professionals utilized in the ordinary course of the Debtors' businesses (the "Ordinary Course Motion").  The Ordinary Course Motion was approved by order entered January 15, 2009.

2.      Retention of Jones Day by the Special Committee.

In order to effectively fulfill its responsibilities concerning the plan of reorganization, the Special Committee filed an application with the Bankruptcy Court to retain Jones Day as special counsel on August 30, 2010.  The Bankruptcy Court approved the Special Committee's retention of Jones Day by order entered September 15, 2010.

3.      The Creditors' Committee and its Advisors.

On December 18, 2008, the U.S. Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee") and subsequently amended that appointment on December 30, 2008 and May 26, 2009 to add and/or replace certain Creditors' Committee

members. The Creditors' Committee is currently comprised of the following parties: (i) JPMorgan Chase Bank, N.A.; (ii) Deutsche Bank Trust Company Americas; (iii) Warner Bros. Television; (iv) Buena Vista Television; (v) William Niese; (vi) Pension Benefit Guaranty Corporation; (vii) Wilmington Trust Company; and (viii) Washington-Baltimore Newspaper Guild, Local 32035.

On January 16, 2009, the Creditors' Committee applied for an order authorizing the retention of (i) Chadbourne & Parke, LLP ("Chadbourne"), as counsel for the Creditors' Committee and (ii) Landis, Rath & Cobb, LLP ("Landis"), as Delaware bankruptcy co-counsel. The orders approving the retention of Chadbourne and Landis were entered on February 20, 2009. Also on January 16, 2009, the Creditors' Committee applied for an order to retain AlixPartners, LLP ("AlixPartners") as its financial advisor. The order approving the retention of AlixPartners was entered on February 20, 2009. On January 30, 2009, the Creditors' Committee subsequently moved to allow them to retain Moelis & Company, LLC ("Moelis") as investment bankers. The order approving the retention of Moelis was signed on March 13, 2009. Finally, on August 13, 2009, the Creditors' Committee requested authorization to retain Zuckerman Spaeder LLP ("Zuckerman") as special counsel. An order approving the retention of Zuckerman was entered on September 3, 2009.

### G.    Certain Administrative Matters and Other Motions.

1.    Disposition of Certain Executory Contracts and Unexpired Leases.

a)    Unexpired Leases

In an effort to streamline business operations and reduce inefficiencies, the Debtors began the process of examining their real property leases in order to determine whether any of their operations could be consolidated. Since the Petition Date, the Debtors have obtained five orders from the Bankruptcy Court authorizing the rejection of over 70 real estate leases and subleases for certain office, operational, and studio properties that were no longer required for the Debtors' ongoing business operations.[3] On July 28, 2009, the Debtors also obtained authority from the Bankruptcy Court to abandon certain property and related obligations located at 2 Park Avenue, New York, New York.

The Debtors also sought and obtained authority to assume 226 real estate leases that are valuable assets and useful to the Debtors' ongoing businesses.[4] In addition, Debtor WGN Continental Broadcasting Company ("WGN") sought and obtained authority to assume two leases relating to the operation of WGN's digital transmitters located atop Chicago's Willis (Sears) Tower.[5] Los Angeles Times

---

[3]    *See* Order Authorizing Debtors' First Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated January 15, 2009; Order Authorizing Debtors' Second Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated February 20, 2009; Order Authorizing Debtors' Third Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated March 23, 2009; Order Authorizing Debtors' Fourth Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated June 24, 2009 [Docket No. 1629]; Order Authorizing Debtors' Fifth Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated September 2, 2009.

[4]    *See* Order Authorizing Debtors to (I) Assume Certain Unexpired Leases of Nonresidential Real Property and (II) Set Cure Amounts with Respect Thereto, dated June 24, 2009 [Docket No. 1628].

[5]    *See* Order Authorizing Debtor WGN Continental Broadcasting Company to (I) Assume Certain Unexpired Leases of Nonresidential Real Property and (II) Setting Cure Amount with Respect Thereto, dated September 2, 2009.

Communication LLC ("LATC") also sought and obtained authority to assume a lease pertaining to certain non-residential real property valuable to LATC's business operations.[6]

b)       Motions to Assume Certain Executory Contracts.

The Debtors also sought authority to assume, assume and assign or reject various agreements, including the following:

- On May 21, 2009, Tribune Broadcasting Company, WGN Continental Broadcasting Company, ChicagoLand Television, News, Inc., Tribune Entertainment Company, and certain Broadcast Subsidiaries (as defined in the Nielsen Assumption Motion, defined below) moved the Bankruptcy Court for an order authorizing the assumption of certain amended ratings services agreements and ancillary agreements with the Nielsen Company (US), LLC and the waiver and release of certain claims pursuant to a settlement and release agreement (the "Nielsen Assumption Motion"). The Nielsen Assumption Motion was approved by an order signed June 9, 2009.

- On June 26, 2009, certain of the Debtors filed a motion seeking the authority, pursuant to section 365 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, to assume various syndicated program agreements entered into with King World Productions, Inc., and CBS Studios, Inc., and/or CBS Television Distribution and CBS Studios, Inc. (collectively, "CBS") and to compromise, waive, and release one-half of the prepetition amounts owed to CBS (the "CBS Motion"). An order approving the CBS Motion was signed July 14, 2009 (the "CBS Order"). Pursuant to the CBS Order, the Debtors were only required to pay one-half of the outstanding prepetition amounts owed to CBS under the various agreements in order to assume the agreements.

- On July 8, 2009, Debtor Tribune Media Services, Inc. filed a motion seeking authority to assume certain prepetition local advertising sales agreements and to assign prepetition and post-petition local advertising sales agreements to Advantage Newspaper Consultants Inc., which was approved by order of the Bankruptcy Court on July 24, 2009.

- On July 22, 2009, Tribune and Chicago Tribune Company ("CTC") filed a motion seeking authority (i) to assume the Metromix LLC limited liability agreement, as amended (the "Metromix Agreement"), (ii) compromise and release claims, and (iii) enter into new agreements (the "Metromix Motion"). The Metromix Motion sought the authority to assume the Metromix Agreement as amended to permit, but not require, Tribune to make additional capital contributions to the Metromix LLC joint venture, if required. In addition, the Metromix Motion sought the authority to enter into four new agreements resolving certain disputes, among other things. An order approving the Metromix Motion was entered by the Bankruptcy Court on August 10, 2009.

- On August 14, 2009, Tribune and the Publishing Debtors (as defined in the Classified Ventures Motion) filed a motion to approve the assumption by Tribune of the Limited Liability Company Agreement of Classified Ventures, LLC, and the assumption by the Publishing Debtors of their Affiliate Agreements with Classified Ventures, LLC (the

---

[6]    *See* Order (I) Authorizing Debtor Los Angeles Times Communications LLC to Assume a Certain Unexpired Lease of Nonresidential Real Property Pursuant to Section 365 of the Bankruptcy Code and (II) Setting Cure Amount with Respect Thereto, dated December 14, 2009 [Docket No. 2834].

"Classified Ventures Motion").[7]  The Classified Ventures Motion sought authority for Tribune and the subsidiary Debtors which publish daily newspapers to assume certain agreements with Classified Ventures necessary to enable such Debtors to continue generating revenue from the sale of certain online classified advertising in their respective markets.  The Classified Ventures Motion also requested authority to pay certain cure amounts related to the requested assumption.  An order granting this relief was entered on September 2, 2009.

- On November 10, 2009, the Debtors moved for an order authorizing rejection of the service agreement between Tribune and Kenexa Brassring, Inc. (the "Kenexa Agreement").  The Bankruptcy Court entered an order authorizing the Debtors to reject the Kenexa Agreement on November 25, 2009.

- On November 13, 2009, the Debtors requested authority to assume a service agreement entered into between Debtor Tribune Publishing Company and Hewlett-Packard Company covering certain services to its advertisers (the "Hewlett-Packard Agreement").  The Debtors were granted authority to assume the Hewlett-Packard Agreement, as amended, on November 25, 2009.

- On January 6, 2010, Tribune Broadcasting Company, WGN Continental Broadcasting Company, Tribune Television Company, Tribune Television Holdings, inc., Tribune Television Northwest, Inc., Tribune Television New Orleans, Inc., Channel 39, Inc., Channel 40, Inc., KSWB, Inc., KTLA Inc., WPIX, Inc., KIAH Inc. (f/k/a KHCW Inc.), WCCT, Inc. (f/k/a WTXX Inc.), and WDCW Broadcasting, Inc., sought approval to assume certain amended syndicated program agreements with Universal City Studios Productions LLP, a subsidiary of NBC Universal, Inc., and the compromise, waiver and release of certain claims (the "NBC Motion").  An order granting the relief requested in the NBC Motion was entered on January 25, 2010.

- On April 29, 2010, Tribune filed a motion seeking authority to reject that certain master agreement dated as of January 28, 2004 (the "Master Agreement") and related preferred pricing plan dated January 1, 2006 (as amended, modified, or supplemented, the "Preferred Pricing Plan," and together with the Master Agreement, the "Agreement") between Tribune and Dun & Bradstreet.  The Bankruptcy Court entered an order authorizing the rejection of the Agreement on May 14, 2010.

     2.     Certain other Motions filed by the Debtors.

On April 29, 2009, the Debtors filed a motion seeking authorization to enter into a post-petition station affiliation agreement and related agreements with the CW Network (the "CW Motion"), pursuant to which the CW Network would provide programming for broadcast on certain of the Debtors' television stations.  An order granting the CW Motion was entered by the Bankruptcy Court on May 12, 2009.

On January 6, 2010, the Debtors filed a motion for authorization to compromise and settle a certain working capital account and related amounts with Hearst Danbury Holdings LLC, et al., in connection with a prepetition sale transaction involving Debtors Tribune and Southern Connecticut

---

[7]    As used in the Classified Ventures Motion, the term "Publishing Debtors" refers to Chicago Tribune Company, Los Angeles Times Communications LLC, The Hartford Courant Company, Orlando Sentinel Communications Company, Sun-Sentinel Company, The Daily Press, Inc., The Morning Call, Inc., and The Baltimore Sun Company.

Newspapers, Inc. (the "SCNI Motion").  An order granting the SCNI Motion was entered by the Bankruptcy Court on January 26, 2010.

       3.       Schedules of Assets and Liabilities; Statements of Financial Affairs.

On March 23, 2009, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with respect to each of the Debtors.  Certain of the Schedules and Statements were amended on April 13, 2009, June 12, 2009, March 2, 2010, and May 13, 2010, and Schedules and Statements for Tribune CNLBC were filed with the Bankruptcy Court on October 12, 2009 and amended June 9, 2010.  Among other things, the Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such claims.  The Statements provide information including, among other things, payments or other transfers of property made by the Debtors to creditors on or within 90 days before the Petition Date or, in the case of "insiders," payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

       4.       All Filed Claims and Bar Date.

By order entered March 25, 2009, the Bankruptcy Court set June 12, 2009 at 4:00 p.m. (prevailing Eastern Time) (the "Bar Date") as the final date and time for filing certain proofs of claim in the Debtors' Chapter 11 Cases.[8]  As of the Bar Date, over 6,000 claims asserting approximately $606 billion in the aggregate were filed in the Chapter 11 Cases.  The Debtors and their professionals have assembled specialized teams to review and reconcile the various categories of Claims.  While the Claims reconciliation process is still ongoing, preliminary analysis suggests that the filed claims that are likely to be allowed may not vary substantially from the aggregate liabilities of approximately $13.7 billion reflected in the Schedules.

       5.       General Unsecured Claims Against Filed Subsidiary Debtors.

There are approximately 34,249 general unsecured claims against the Filed Subsidiary Debtors reflected either in the Debtors' Schedules (as defined herein) or in timely-filed proofs of claim.  Those Claims are asserted in a face amount of $3,366,545,793 according to the claims register maintained by the Debtors' claims agent, Epiq.  The Debtors have conducted an ongoing review of those Claims since the Petition Date, and believe that the overwhelming majority of those Claims will not be Allowed by the Bankruptcy Court for one or more reasons, including, but not limited to, (i) that such Claims duplicate other Claims that may be Allowed, (ii) such Claims will be resolved through the assumption of contracts and the cure of any amounts due thereunder under any of the Competing Plans, (iii) such Claims have been satisfied by the applicable Filed Subsidiary Debtor(s) since the Petition Date, and/or (iv) such Claims do not otherwise reflect a legitimate obligation owed by one of the Filed Subsidiary Debtors.

The Debtors have raised objections to numerous general unsecured claims against the Filed Subsidiary Debtors since the Petition Date, and the process of objecting to, or consensually resolving, such Claims is ongoing.  The Debtors believe that, when that process is concluded, the aggregate amount of general unsecured claims that will ultimately be Allowed against the Filed Subsidiary Debtors is between $85 and $150 million.

The general unsecured claims asserted against the Filed Subsidiary Debtors may be categorized as set forth in the chart below.  This chart is an estimate only, and reflects the number of claims asserted

---

[8] An order was entered on June 7, 2010 establishing July 26, 2010 at 4:00 p.m. (prevailing Eastern Time) as the final date and time for filing certain proofs of claim against Tribune CNLBC.

against the Filed Subsidiary Debtors that have not been disallowed or are the subject of a pending objection (except in certain circumstances described in the chart), as well as the face amount of those Claims. The chart then sets forth the Debtors' estimate as to the range of aggregate amounts for Claims in the relevant subcategory that will be Allowed. The ultimate amount of the general unsecured claims that may be Allowed against the Filed Subsidiary Debtors may be higher or lower than the amounts projected by the Debtors, and is subject to determinations of the Bankruptcy Court. The chart below also necessarily reflects assumptions by the Debtors as to the amounts of individual claims that may ultimately be Allowed, which may not reflect the ultimate determinations as to such Claims, and additionally do not represent an agreement by any of the Debtors as to the amount of any particular Claim.

All categories of general unsecured claims in the chart below include Claims that have been asserted in partially or entirely-unliquidated amounts. As a result, some of the ranges set forth below slightly exceed the face amount of the Claims asserted within a subcategory. The Debtors have not attempted to quantify such amounts for purposes of this Joint Disclosure Statement; however, the Debtors do not believe that such amounts when liquidated will cause the aggregate amount of Allowed general unsecured claims against the Filed Subsidiary Debtors to exceed $150 million.

| Claim Type | Total Active Filed Claims & Filed Active Scheduled Records | | Estimated Range of Estimated Allowed Claims | | Notes |
|---|---|---|---|---|---|
| | Count | Amount | Low | High | |
| Asserted as 503(b)(9) | 370 | 3,122,684 | 2,000,000 | 2,200,000 | The estimated range shown reflects the unsecured portion of Claims asserted with priority under section 503(b)(9) of the Bankruptcy Code. |
| Employee & Former Employee | 293 | 18,525,761 | 13,900,000 | 16,000,000 | The estimated range shown assumes approval of the Retiree Claims Settlement contained in the Debtor/Committee/Lender Plan. |
| Insurance | 113 | 2,825,201,380 | 100,000 | 500,000 | The estimated range shown assumes continuation of the Debtors' insurance programs and maintenance of the Debtors' insurance policies on the terms set forth in Section 6.9 of the proposed plans of reorganization. |
| Litigation | 116 | 214,360,736 | - | 52,000,000 | The estimated range provided reflects (i) the removal of duplicate claims ($45mm), (ii) pending settlements for less than the face amount of the claim amount ($1mm), (iii) pending objections ($101mm), (iv) the portion of potential exposure covered by insurance ($39mm), and (v) the Debtors' reasonable review and evaluation of the remaining claims. The high end of the estimated range provided reflects unliquidated claims. |
| Real Estate | 34 | 8,656,112 | 8,000,000 | 9,000,000 | This category is comprised of lease rejection Claims and other lease-related Claims. |

| | | | | |
|---|---|---|---|---|
| Tax & Regulatory | 187 | 57,992,440 | 1,000,000 | 8,000,000 | The estimated range provided includes the portions of tax-related claims not facially entitled to priority under Section 507(a)(8) of the Bankruptcy Code (or any other applicable priority) and other regulatory Claims. |
| Trade payables | 33,136 | 238,686,680 | 60,000,000 | 62,300,000 | The estimated range provided reflects the taking into account of duplicative Claims. Claims for future contract obligations that will ultimately not require a Cash distribution under any of the Competing Plans, and the removal of Claims that will be satisfied through the payment of cure amounts under executory contracts to be assumed. |
| Total Claims | 34,249 | 3,366,545,793 | 85,000,000 | 150,000,000 | |

> 6.      Bankruptcy Rule 2015.3 Reports.

The Debtors are required to comply with new Bankruptcy Rule 2015.3 ("Rule 2015.3"), which became effective immediately prior to the Petition Date. Pursuant to Rule 2015.3, the Debtors must file certain reports with the Bankruptcy Court, which provide additional financial reporting for non-Debtor entities in which the Debtors hold a "controlling or substantial" interest (the "2015.3 Reports"). As of the Petition Date, the Debtors wholly-owned 18 non-debtor entities and directly owned a non-majority equity interest in 8 non-debtor operating entities (the "Non-Majority Entities"). Because of the nature of the Debtors' interest in the Non-Majority Entities, the Debtors sought a determination that they do not have a "controlling or substantial" interest in those entities. Further, because of the commercial and competitive sensitivity of entity level financial information, the Debtors also sought a determination that "cause" existed to excuse entity level financial reporting for the Non-Majority Entities. Finally, due to the negotiations concerning a potential transaction involving the Chicago Cubs as well as the prohibition imposed by Major League Baseball on certain financial disclosures, the Debtors sought to exclude the Chicago Cubs and related assets from the requirements of Rule 2015.3. The Debtors filed a motion on January 12, 2009, seeking (i) additional time to file their initial 2015.3 Reports or (ii) a modification of such reporting requirements (the "2015.3 Motion"). On February 10, 2009, March 23, 2009, April 9, 2009, and August 17, 2009, the Debtors filed supplements to the 2015.3 Motion requesting authorization to comply in the manner set forth above. On July 29, 2009, the Debtors filed 2015.3 Reports for each of Tribune's wholly-owned non-Debtor subsidiaries, with the exception of the Chicago Cubs-related entities. Subsequently, the Debtors reached agreement with the U.S. Trustee's office on a reporting protocol for the Non-Majority Entities and an agreed order was entered September 2, 2009. Rule 2015.3 Reports for these Non-Majority Entities were filed on October 6, 2009. On January 29, 2010, the Debtors filed their second set of Rule 2015.3 Reports for the wholly-owned non-Debtors and the Non-Majority Entities. The Debtors filed their third set of Rule 2015.3 Reports for the wholly-owned non-Debtors and the Non-Majority entities on July 29, 2010.

> 7.      3.  Fee Disgorgement Motion.

On October 23, 2009, Law Debenture filed a motion, joined by Centerbridge Credit Advisors LLC and Deutsche Bank Trust Company Americas, (i) seeking the disgorgement of fees and expenses paid since the Petition Date by non-Debtor Tribune (FN) Cable Ventures, Inc. ("TCV") to certain

professionals retained by the agent to the Senior Lenders under the Senior Loan Agreement and/or a former steering committee that was formed by the Senior Lenders since the Petition Date (collectively, the "Senior Lender Fees"), and (ii) requiring that no further payments of the Senior Lender fees be made (the "Fee Disgorgement Motion"). The Debtors, the Agent and the Senior Lender steering committee opposed the Fee Disgorgement Motion. The Fee Disgorgement Motion was heard on December 1, 2009 and March 26, 2010. The Bankruptcy Court did not rule on the Fee Disgorgement Motion at the March 26 hearing. However in connection with a Settlement Support Agreement entered into by Angelo, Gordon & Co. L.P. ("Angelo Gordon"); Centerbridge Credit Partners, L.P.; Centerbridge Credit Partners Master, L.P.; Centerbridge Special Credit Partners, L.P.; Law Debenture; and JPMorgan Chase Bank, N.A., on April 9, 2010 (the "Settlement Support Agreement"), a stipulation by and among JPMorgan Chase Bank, N.A., Law Debenture, and Centerbridge Credit Advisors LLC was filed with the Bankruptcy Court pursuant to which the Fee Disgorgement Motion was withdrawn without prejudice and the parties thereto agreed to the resumption of the Senior Lender Fee payments. The Settlement Support Agreement and stipulation of withdrawal reserved Law Debenture's right to renew the Fee Disgorgement Motion in the event that the Settlement Support Agreement was terminated. Also, on April 9, 2010, the Debtors filed a notice with the Bankruptcy Court indicating, in view of the stipulation, the intention of the Non-Debtor Guarantors and subsidiaries, including TCV, to recommence payment of Senior Lender Fees upon the expiration of five business days' notice. Such payments were subsequently resumed.

On August 25, 2010, Law Debenture reinstated its Fee Disgorgement Motion on the grounds that the Settlement Support Agreement had been terminated. On October 12, 2010, Law Debenture filed a supplement to the reinstated Fee Disgorgement Motion (the "Fee Disgorgement Supplement"), alleging that TCV's payment on account of the Senior Lender Fees, made on or around August 31, 2010, and its replenishment of retainers held by Davis Polk and FTI Consulting violated an agreement made on the record. The Debtors filed a response to the Fee Disgorgement Supplement stating that Law Debenture mischaracterized both the payments made and the nature of the parties' agreement regarding the withdrawal of the Fee Disgorgement Motion. The Bankruptcy Court has not yet ruled on the reinstated Fee Disgorgement Motion as supplemented; and further payments of Senior Lender Fees have been halted pending a ruling by the Bankruptcy Court or other resolution of the issues raised therein.

Non-Debtor TCV has paid approximately $50,235,970 in the aggregate in Senior Lender Fees, with the last payment occurring on or about August 30, 2010 in the amount of $3,106,256. On December 11, 2009, April 29, 2010 and July 30, 2010 the Debtors filed notices disclosing the payment of Senior Lender Fees by TCV. The Debtors intend to file an additional disclosure in respect of the August payment.

8.        WTC Complaint.

On March 4, 2010, WTC filed with the Bankruptcy Court a complaint (the "WTC Complaint") purporting to seek equitable subordination, disallowance of claims, damages and a constructive trust against certain of the Debtors' Senior Lenders, denominated in the WTC Complaint as the "Lead Banks" (the "WTC Adversary Proceeding"). The relief sought in the WTC Complaint is alleged to arise out of the Leveraged ESOP Transactions. The Debtors filed a motion on March 18, 2010 seeking a determination that the WTC Complaint violated the automatic stay imposed by section 362 of the Bankruptcy Code, requesting that WTC be required to demonstrate why it should not be held in contempt of court for filing the WTC Complaint, and seeking to halt all proceedings respecting the WTC Complaint. The Debtors' motion is based on the grounds that, *inter alia*, the WTC Complaint violates the automatic stay imposed by section 362 of the Bankruptcy Code and constitutes an attempt to exercise control of causes of action belonging to the Debtors' bankruptcy estates (the "Automatic Stay Motion"). On April 5, 2010, WTC filed a response to the Debtors' motion attaching a proposed amended complaint which adds additional defendants including Samuel Zell, the Zell Entity, and Sam Investment Trust. On

April 7, 2010, the Creditors' Committee filed a statement supporting the Debtors' motion noting, among other things, that WTC's actions, through its attorneys, have disadvantaged the Creditors' Committee and its constituency. By order of the Bankruptcy Court, dated October 8, 2010, the WTC Adversary Proceeding has been stayed until further order.

> 9.      1.  Limited Motion to Disqualify Counsel to the Official Committee of Unsecured Creditors.

On September 13, 2010, Aurelius Capital Management LP ("Aurelius"), the Holder of a substantial amount of the Senior Notes, filed a motion seeking to disqualify Chadbourne & Parke LLP ("Chadbourne") from representing the Creditors' Committee in connection with matters related to (i) the Mediation and (ii) any potential or actual LBO-Related Causes of Action or the settlement thereof (the "Committee Disqualification Motion"). Aurelius also requested that the Court direct Zuckerman Spaeder LLP, the Creditors' Committee's special conflicts counsel, to handle all matters related to the Mediation and the resolution of the LBO-Related Causes of Action. At a hearing held on September 22, 2010, the Bankruptcy Court denied the Disqualification Motion to the extent it sought to disqualify Chadbourne in regard to the Mediation.[9] The Bankruptcy Court further scheduled a status conference on October 4, 2010 to address the remainder of the relief requested in the Disqualification Motion. Following the October 4, 2010 status conference, Aurelius and Chadbourne negotiated a resolution of the issues presented in the Committee Disqualification Motion. On October 8, 2010, Aurelius withdrew the Disqualification Motion with prejudice.

> 10.     Pursuit of Preference Avoidance Actions.

Prior to December 8, 2010, the Debtors and Creditors' Committee commenced various preference avoidance actions against third-parties and insiders of the Debtors or entered into tolling agreements with these third-parties and insiders, which extended the applicable statute of limitations for purposes of initiating such preference causes of action. The face amount of all the preference actions being pursued by the Debtors or Creditors' Committee is greater than $500 million. Pursuant to various orders of the Bankruptcy Court, all of these preference actions were stayed pending the outcome of the Confirmation Hearing or June 11, 2011, whichever occurs first. The Debtor/Committee/Lender Plan Proponents cannot predict the amount of proceeds that will be generated from these preference actions given the various defenses that may be asserted by the preference defendants, and the fact that preference actions involving payments on behalf of the Filed Subsidiary Debtors are not likely to be pursued if the Debtor/Committee/Lender Plan is confirmed. The Debtors, as well as the Creditors' Committee, made their decision to pursue certain preference actions, and not pursue others, based on a detailed factual review of the defenses under section 547(c) of the Bankruptcy Code involving the transfers, a "cost benefit" analysis attendant to bringing the specific preference claims, and the need to preserve viable Estate causes of action in the event the Debtor/Committee/Lender Plan is not confirmed.

> 11.     5.  The Committee's Standing Motions.

> a)      The LBO Standing Motions

On February 1, 2010, the Creditors' Committee filed a motion seeking authority to prosecute certain estate causes of action against the Debtors' pre-petition lenders related to the Leveraged ESOP

---

[9] See Order Denying in Part the Motion of Aurelius Capital Management, LP to Disqualify Chadbourne & Parke LLP [Docket No. 5810].

Transactions ("Original LBO Standing Motion"). The Debtors opposed the relief requested in the Original Standing Motion, including the Committee's request for settlement authority over estate causes of action. The Original Standing Motion was scheduled to be heard by the Bankruptcy Court on February 18, 2010, but was continued and ultimately withdrawn *sine die* by the Creditors' Committee in light of the April 9, 2010 Settlement Support Agreement and subsequent filing by the Debtors of the Plan incorporating the settlement terms. On or about September 13, 2010, the Committee supplemented its Original Standing Motion to add certain new causes of action related to the Leveraged ESOP Transactions and on September 14 filed a new standing motion seeking authorization to prosecute certain causes of action related to the Leveraged ESOP Transactions against various non-lender parties, including directors, officers, subsidiaries, Zell defendants and large shareholders (the "New LBO Standing Motion," and together with the Original Standing Motion, the "LBO Standing Motions").

The Debtors objected to the Standing Motions, but only as to the Committee's request for settlement authority in respect of estate causes of action, including actions related to the Leveraged ESOP Transactions. In addition, on October 7, 2010, the Bridge Agent filed a limited objection to the Standing Motions seeking a ruling that the Standing Motions do not prejudice and reserve the rights of parties in interest to seek the establishment or appointment of a disinterested fiduciary to pursue all claims. On October 11, 2010, Aurelius filed a limited objection to the Standing Motions seeking a ruling that, among other things, (i) all settlements by the Creditors' Committee be subject to court approval and (ii) the Creditors' Committee, or another independent fiduciary, be given authority to prosecute the Intercompany Claims. On October 14, 2010, the Wilmington Trust Company filed a limited objection to the Standing Motions, which objected to the narrow scope of the relief requested in the Standing Motions and questioned whether the Creditors' Committee could objectively bring the causes of action under the Standing Motions. The Wilmington Trust Company proposed as an alternative that the Creditors' Committee be authorized to file the complaints pursuant to the Standing Motions but that causes of action filed by the Creditors' Committee be immediately stayed to allow for the plan confirmation process to proceed. Finally, on October 19, 2010, Merrill Lynch filed an objection to the New Standing Motion stating that Merrill Lynch did not object to the Bankruptcy Court granting the Creditors' Committee standing but that certain claims and allegations in the New Standing Motion against Merrill Lynch were defective. The Standing Motions were heard on October 22, 2010, and adjourned to October 26, 2010, for an additional status hearing regarding entry of an agreed order. The Bankruptcy Court entered an order approving the Standing Motions on October 27, 2010 (the "LBO Standing Order").

Pursuant to the LBO Standing Order, the Committee initiated two adversary proceedings on November 1, 2010: *Official Comm. Of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Case no. 10-53963 (KJC) (Bankr. D. Del. Nov. 1, 2010) and *Official Comm. Of Unsecured Creditors v. Fitzsimons (In re Tribune Co.)*, Case No. 10-54010 (KJC) (Bankr. D. Del. Nov. 1, 2010) (collectively, the "LBO Avoidance Adversaries"). The LBO Avoidance Adversaries seek to avoid allegedly fraudulent transfers made to certain lenders and equity holders that received transfers in connection with the Leveraged ESOP Transactions.

### b)    The Preference Standing Motions

On November 11, 2010, the Creditors' Committee filed a motion requesting standing to bring certain preference actions on behalf of the Debtors pursuant to sections 547 and 550 of the Bankruptcy Code against certain former and current insiders of the Debtors who received payments from the Debtors in the year prior to the Petition Date and certain other identified entities (the "Preference Standing Motion"). On November 17, 2010, the Creditors' Committee filed an amended Preference Standing Motion seeking standing to pursue a preference action against Eagle Aircraft & Transportation Management, an alleged insider, in addition to the parties identified in the Preference Standing Motion (the "Amended Preference Standing Motion"). On November 22, 2010, Aurelius filed a response and

limited objection to the Amended Preference Standing Motion, which requested (i) that the Bankruptcy Court order the Creditors' Committee to commence all potential preference actions, (ii) that all such filed actions be stayed pending the completion of the competing plan process; (iii) that no settlements of the preference action be approved prior to the completion of the competing plan process; and (iv) that upon completion of the competing plan process, all preference actions be transferred to the applicable litigation trust. The Amended Preference Standing Motion is scheduled to be heard on November 29, 2010.

12.    6. Motion to Appoint a Chapter 11 Trustee.

Aurelius also filed a motion on September 13, 2010, requesting that the Bankruptcy Court appoint a trustee to administer both the affairs of the Debtors and the Chapter 11 Cases pursuant to 11 U.S.C. § 1104 (the "Trustee Motion"). On October 15, 2010, the Debtors, the Creditors' Committee, the Credit Agreement Lenders, and JPMorgan filed timely objections to the relief requested in the Trustee Motion. The hearing on the Trustee Motion has been adjourned to a date and time to be determined by the Court.

7.    Schedules of Assets and Liabilities; Statements of Financial Affairs.

On March 23, 2009, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with respect to each of the Debtors. Certain of the Schedules and Statements were amended on April 13, 2009, June 12, 2009, March 2, 2010, and May 13, 2010, and Schedules and Statements for Tribune CNLBC were filed with the Bankruptcy Court on October 12, 2009 and amended June 9, 2010. Among other things, the Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such claims. The Statements provide information including, among other things, payments or other transfers of property made by the Debtors to creditors on or within 90 days before the Petition Date or, in the case of "insiders," payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

8.    Filed Claims and Bar Date.

By order entered March 25, 2009, the Bankruptcy Court set June 12, 2009 at 4:00 p.m. (prevailing Eastern Time) (the "Bar Date") as the final date and time for filing certain proofs of claim in the Debtors' Chapter 11 Cases.[10] As of the Bar Date, over 6,000 claims asserting approximately $606 billion in the aggregate were filed in the Chapter 11 Cases. The Debtors and their professionals have assembled specialized teams to review and reconcile the various categories of claims. While the claims reconciliation process is still ongoing, preliminary analysis suggests that the filed claims that are likely to be allowed may not vary substantially from the aggregate liabilities of approximately $13.7 billion reflected in the Schedules.

9.    Bankruptcy Rule 2015.3 Reports.

The Debtors are required to comply with new Bankruptcy Rule 2015.3 ("Rule 2015.3"), which became effective immediately prior to the Petition Date. Pursuant to Rule 2015.3, the Debtors must file certain reports with the Bankruptcy Court, which provide additional financial reporting for non-Debtor entities in which the Debtors hold a "controlling or substantial" interest (the "2015.3 Reports"). As of the Petition Date, the Debtors wholly-owned 18 non-debtor entities and directly owned a non-majority equity interest in 8 non-debtor operating entities (the "Non-Majority Entities"). Because of the nature of the Debtors' interest in the Non-Majority Entities, the Debtors sought a determination that they do not have a

---

[10] An order was entered on June 7, 2010 establishing July 26, 2010 at 4:00 p.m. (prevailing Eastern Time) as the final date and time for filing certain proofs of claim against Tribune CNLBC.

~~"controlling or substantial" interest in those entities. Further, because of the commercial and competitive sensitivity of entity level financial information, the Debtors also sought a determination that "cause" existed to excuse entity level financial reporting for the Non-Majority Entities. Finally, due to the negotiations concerning a potential transaction involving the Chicago Cubs as well as the prohibition imposed by Major League Baseball on certain financial disclosures, the Debtors sought to exclude the Chicago Cubs and related assets from the requirements of Rule 2015.3. The Debtors filed a motion on January 12, 2009, seeking (i) additional time to file their initial 2015.3 Reports or (ii) a modification of such reporting requirements (the "2015.3 Motion"). On February 10, 2009, March 23, 2009, April 9, 2009, and August 17, 2009, the Debtors filed supplements to the 2015.3 Motion requesting authorization to comply in the manner set forth above. On July 29, 2008, the Debtors filed 2015.3 Reports for each of Tribune's wholly-owned non-Debtor subsidiaries, with the exception of the Chicago Cubs-related entities. Subsequently, the Debtors reached agreement with the U.S. Trustee's office on a reporting protocol for the Non-Majority Entities and an agreed order was entered September 2, 2009. Rule 2015.3 Reports for these Non-Majority Entities were filed on October 6, 2009. On January 29, 2010, the Debtors filed their second set of Rule 2015.3 Reports for the wholly-owned non-Debtors and the Non-Majority Entities. The Debtors filed their third set of Rule 2015.3 Reports for the wholly-owned non-Debtors and the Non-Majority entities on July 29, 2010.~~

13.     Motion to Approve Tolling Agreement.

The Debtors filed a motion on October 28, 2010, seeking authority to enter into tolling agreements between Tribune and each of the Filed Subsidiary Debtors (the "Tolling Agreement Motion"). The Tolling Agreement Motion requests an extension of the statute of limitations to bring avoidance actions imposed by section 546(a) of the Bankruptcy Code, which requires that avoidance actions be brought within two (2) years of the Petition Date, until June 30, 2011. The Tolling Agreement Motion was approved by the Bankruptcy Court on November 12, 2010, and all avoidance causes of action between Tribune and the Filed Subsidiary Debtors were subsequently tolled.

14.     Motion to Disqualify Akin Gump Strauss Hauer & Feld LLP as Counsel to Aurelius.

On November 12, 2010, Oaktree and Angelo Gordon filed a motion (the "Akin Disqualification Motion") requesting that the Bankruptcy Court disqualify Aurelius' bankruptcy counsel, Akin Gump Strauss Hauer & Feld, LLP ("Akin"). In the Disqualification Motion, Oaktree and Angelo Gordon assert that Akin currently represents both Oaktree and Angelo Gordon in the Debtors' bankruptcy as FCC counsel and that Akin's representation predated Akin's representation of Aurelius. Oaktree and Angelo Gordon further assert that, under the Model Rules of Professional Conduct, which govern attorneys' ethical obligations to their clients, Akin's representation of Aurelius constitutes a clear conflict of interest which requires disqualification of Akin pursuant to the Model Rules of Professional Conduct. The hearing on the Akin Disqualification Motion is scheduled for December 15, 2010.

15.     Certain Holders of Step One Senior Loan Claims' New York State Court Action

On October 29, 2010, in conjunction with filing the Step One Plan, certain Step One Plan Proponents (the "SOCAL Parties") filed a complaint in the Supreme Court of the State of New York against JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citicorp North America Inc., and Bank of America, N.A. (collectively, the "Arrangers") asserting claims against the Arrangers with respect to issues arising out of or relating to the Leveraged ESOP Transactions and the Senior Loan Agreement (the "SOCAL Action"). The claims asserted in the SOCAL Action include claims for breach of contract, breach of covenant of good faith and fair dealing, inducement to breach of contract, gross negligence, and declaratory relief respecting certain provisions of the Senior Loan Agreement. On

November 16, the Arrangers filed a motion in the Bankruptcy Court seeking an order finding (among other things) the SOCAL Parties in contempt for violating the Order Appointing Mediator and the automatic stay under 11 U.S.C. § 362 and enjoining the SOCAL Parties from further violations of the Order Appointing Mediator and the automatic stay.  On November 19, 2010, the Debtors filed a joinder in connection with the Arrangers' motion to enforce the Order Appointing Mediator and to suspend the SOCAL Action pending the outcome of the plan confirmation hearing.

## H.    Chicago Cubs Transaction

During the pendency of the Chapter 11 Cases, the Tribune Entities pursued and consummated certain transactions pursuant to which the Chicago Cubs and related assets and liabilities, including the Company's 25.34% interest in CSN Chicago, were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries (collectively, "New Cubs LLC"). Tribune first announced its intention to dispose of an interest in the Chicago Cubs and its attendant assets in April 2007, on the same day that Tribune announced the completion of its strategic review process and its decision to convert from a public company to a privately-held company.  Thereafter, Tribune and Tribune CNLBC acted to identify parties that were both likely to have an interest in acquiring an interest in the Chicago Cubs and assets and the financial resources to complete such a transaction. In furtherance of those efforts, Tribune engaged J.P. Morgan Securities Inc. in July 2007 to aid in identifying suitable investors and to act as Tribune's financial advisor in connection with the proposed transaction.

From mid-2007 to early 2009, Tribune engaged in an intensive process to identify a transaction partner and ultimately reduced the number of interested parties from more than 100 to a single party.  The prevailing party was a new entity formed by the Ricketts family ("Ricketts Acquisition LLC"). Following an extended period of negotiations, on August 21, 2009, Tribune and Ricketts Acquisition LLC, among other parties, entered an agreement (the "Cubs Formation Agreement") governing the contribution of certain assets and liabilities related to the businesses of the Chicago Cubs owned by Tribune and its subsidiaries to New Cubs LLC.  The contributed assets included, but were not limited to, the Chicago Cubs Major League Baseball franchise, spring training and Dominican Republic baseball operations, Wrigley Field and certain other real estate used in the business, and a 25.34% interest in CSN Chicago, which operates a local sports programming network in the Chicago area (collectively, the "Cubs Business").

On August 24, 2009, the Debtors filed a motion with the Bankruptcy Court seeking authority to enter into the Cubs Formation Agreement and to perform all transactions necessary to effect the contribution of the Cubs Business to New Cubs LLC.  On the same day, the Debtors announced that the principal entity holding the assets and liabilities of the Cubs Business, Tribune CNLBC, would commence a Chapter 11 case to implement the transactions contemplated by the Cubs Formation Agreement.  The Debtors also sought approval for notice and other procedures relating to the transactions by filing a motion with the Bankruptcy Court on August 24, 2009.  The Bankruptcy Court approved the Debtors' notice and other procedures for the transactions on August 31, 2009 and, on September 24, 2009, authorized the Debtors to perform the transactions under the Cubs Formation Agreement.  On October 6, 2009, Major League Baseball announced unanimous approval of the transactions. Tribune CNLBC filed its voluntary Chapter 11 petition on October 12, 2009, and the Bankruptcy Court granted a motion to approve the transactions contemplated by the Cubs Formation Agreement as to Tribune CNLBC on October 14, 2009.  The transactions contemplated by the Cubs Formation Agreement and the agreements related thereto closed on October 27, 2009.

In addition to the Cubs Formation Agreement, Tribune, Tribune CNLBC, and several of their affiliates entered into a number of ancillary agreements implementing various aspects of the Chicago Cubs-related transactions.  Among those ancillary agreements are guarantees of collection by Tribune of

the liabilities of New Cubs LLC under (i) certain senior indebtedness incurred in connection with the Chicago Cubs-related transactions, which consists of (a) a $25 million senior secured revolving credit facility, and (b) a $425 million senior secured term loan facility, and (ii) $248.75 million of subordinated indebtedness. Each of the guarantees is a guarantee of collection and not of payment. Tribune has no obligation to make any payment on such guarantees unless and until New Cubs LLC fails to make a payment on any of the above obligations when due, the relevant lender(s) exhaust all legal and equitable remedies against New Cubs LLC and other guarantors and the collateral posted by New Cubs LLC and other guarantors to secure the obligations (including foreclosure and similar remedies), and the lenders have failed to collect the full amount of the guaranteed obligations. Tribune's obligations under such guarantees are limited to the initial principal amount of the obligations reduced by principal payments made by New Cubs LLC or on its behalf, cash proceeds realized from the lenders' exercise of remedies, and any principal amounts that may be forgiven by the lenders plus any unpaid premium on, or unpaid interest accruing on such principal amount.

Pursuant to the Cubs Formation Agreement, Tribune and its contributing subsidiaries and affiliates received a special distribution from New Cubs LLC of approximately $705 million in cash and other consideration, which amount remains subject to final adjustments and is being held by Tribune CNLBC pending resolution of the Chapter 11 Cases, and a five percent (5%) membership interest in New Cubs LLC valued at $21 million.[11] Further, the majority of the liabilities of the Cubs Business were assumed by New Cubs LLC or one of its affiliates. The unsecured pre-bankruptcy guaranties entered into by Tribune CNLBC of Tribune's obligations under its pre-bankruptcy credit facilities and other exceptions set forth in the Cubs Formation Agreement were not assumed by New Cubs LLC or one of its affiliates and remain as obligations of Tribune CNLBC.

## I.    Morgan Stanley Swap Agreement

On December 19, 1994, Morgan Stanley Capital Services, Inc. ("MSCS") and Times Mirror entered into an interest rate swap in respect of a $100 million notional amount, which was memorialized in an ISDA Master Agreement, dated as of August 5, 1994, and a Confirmation to such agreement, dated as of December 19, 1994 (collectively, the "Swap Agreement"). Between 2006 and 2008, Morgan Stanley & Co., Inc. ("MS&Co.") purchased approximately $38.365 million in face amount of the Tribune 7.5% debentures, due July 1, 2023 (the "7.5% Debentures"). During 2008 and 2009, MS&Co. transferred all of its interest in the 7.5% Debentures to MSCS.

It is Tribune's belief that in November 2008, Tribune engaged MS&Co. to provide advisory services.[12] Tribune has stated that it understands that MS&Co. and MSCS deny that any agreements were

---

[11]    The Cubs transaction was consummated as the contribution of assets into a partnership formed with the Ricketts family. Tribune received an opinion of counsel solely for its own benefit which, although not binding on the IRS, opined that the receipt of cash attributable to partnership borrowings should not be taxable. Tribune has not reserved or set aside cash for taxes associated with the transaction. Tribune expects to recognize annual taxable income from the partnership that will be taxable to Tribune as a C corporation after its emergence from bankruptcy. Those amounts are taken into account in Tribune's financial projections and models. Tribune's Projected Pro Forma Consolidated Balance Sheet included as Exhibit F reflects $1.03 billion of deferred income taxes, which includes deferred tax liabilities resulting from Tribune's contribution of assets to New Cubs LLC.

[12]    Tribune also asserts that during this time (i) Tribune and MS&Co. engaged in negotiations with respect to the terms of an engagement letter, and (ii) during these negotiations, MS&Co. agreed to transfer to a third party any financial instruments that could be materially adverse to the interests of Tribune, in order for MS&Co. to qualify as a "disinterested person" under the Bankruptcy Code and to serve as Tribune's financial advisor in the event Tribune determined to commence a chapter 11 proceeding. MS&Co. could only serve as Tribune's financial advisor if MS&Co. qualified as a "disinterested person" under the Bankruptcy Code. In order to

reached. Shortly after November 20, 2008, Tribune and MS&Co. determined that it would be prudent for Tribune to retain a financial advisor that satisfied the disinterested person requirement under the Bankruptcy Code, and for MS&Co. to continue to serve as financial advisor to provide for an efficient transition to the new advisor. MS&Co. informed Tribune that, as a formal engagement agreement had not been reached, it required Tribune to execute an indemnification agreement in order for MS&Co. to assist Tribune during this transition period. On November 30, 2008, Tribune and MS&Co. executed an indemnification agreement.[13]

Tribune's bankruptcy filing was an Event of Default under Section 5(a)(ii) of the Swap Agreement. MSCS designated December 9, 2008 as the Early Termination Date for the interest rate swap and, by letter dated December 18, 2008, informed Tribune that it had set off $38.365 million in principal amount of the 7.5% Debentures (plus accrued interest and expenses) against the $50,433,470.16 MSCS had determined, as the non-defaulting party under the Swap Agreement, it owed Tribune. MSCS asserted that such setoff was permitted pursuant to the Bankruptcy Code's "safe harbors."

It is Tribune's belief that MSCS did not have such a right of setoff, and that even if such setoff right did exist, it was not protected. By letter dated March 20, 2009, MSCS advised that the correct amount owing to Tribune under the Swap Agreement was $51,945,000 (the "Termination Amount") and that the prior figure was the result of a calculation error. MSCS again informed Tribune that it had set off $38.365 million in principal amount of the 7.5% Debentures (plus accrued interest and expenses) against the Termination Amount. The parties engaged in arm's-length negotiations to resolve their dispute with respect to the MSCS Claim, and on May 29, 2009, MSCS paid Tribune $9.5 million in partial satisfaction of the amount owing to Tribune under the Swap Agreement, without prejudice to the respective rights, claims, or defenses of the parties.

## VI.    THE FORMER SETTLEMENT SUPPORT AGREEMENT AND FORMER PLAN

On or about April 9, 2010, certain creditor constituencies comprised of Angelo Gordon; Centerbridge Credit Partners, L.P.; Centerbridge Credit Partners Master, L.P.; Centerbridge Special Credit Partners, L.P.; Law Debenture; and JPMorgan Chase Bank, N.A., entered into a Settlement Support Agreement pursuant to which such parties agreed to support a settlement of the LBO-Related Causes of Action in accordance with a certain term sheet (the "Settlement Term Sheet") summarizing certain primary terms of the Settlement Support Agreement. The Settlement Support Agreement was filed with the Bankruptcy Court on April 12, 2010. Also on April 12, 2010, the Debtors filed the Tribune Plan that reflected and sought to implement the terms of the Settlement Term Sheet through a Global Settlement of all LBO-Related Causes of Action. The Tribune Plan was subsequently amended on June 4, 2010.

The Debtors filed their motion seeking approval of the Tribune Disclosure Statement and solicitation procedures on April 12, 2010 (the "Tribune Solicitation Motion") and the motion was heard on May 20, 2010, followed by several subsequent hearings to resolve objections. On June 7, 2010, the Bankruptcy Court entered an order approving the Tribune Disclosure Statement, as amended, and the solicitation procedures. The order set the hearing on confirmation of the Tribune Plan for August 16, 2010 (the "Tribune Confirmation Hearing").

---

qualify as a "disinterested person" under the Bankruptcy Code, MS&Co. (and its affiliate, MSCS) could not hold financial instruments that could be materially adverse to the interests of the estate or of any claim of creditors or equity security holders.

[13]    At the December 1, 2008 meeting of Tribune's Board of Directors, the Board of Directors terminated MS&Co.'s engagement as financial advisor to Tribune.

The investigation initiated by the Examiner, as discussed in Article VII.C of this General Disclosure Statement, and the process for confirmation of the Tribune Plan occurred on more or less parallel tracks, with the Examiner's Report being publicly issued on August 3, 2010. After the issuance of the Examiner's Report, the various creditor constituencies undertook their own review and assessment of the Examiner's findings and conclusions, including an assessment as to the implications thereof for their respective claims.

The Debtors are advised that on or about August 9, 2010, after the filing of the Examiner's Report, the Settlement Support Agreement was terminated. The Tribune Confirmation Hearing, having been initially continued, was subsequently taken off the Bankruptcy Court's calendar. After weeks of negotiations throughout the month of August failed to result in any new consensus, the Debtors asked the Bankruptcy Court to appoint a mediator to assist the parties in resolving disputes in connection with the formulation and proposal of a confirmable plan of reorganization, including the appropriate resolution of the LBO-Related Causes of Action. The order appointing the Honorable Kevin Gross as mediator was entered on September 1, 2010. See Article VII.D of this General Disclosure Statement.

## VII.    THE EXAMINER AND CLAIMS RELATING TO THE LEVERAGED ESOP TRANSACTIONS

### A.    The Leveraged ESOP Transactions

On April 1, 2007, Tribune's then board of directors, based on the recommendation of a special committee of independent directors, approved the Leveraged ESOP Transactions with (i) the ESOP, a newly formed Tribune employee stock ownership plan, (ii) the Zell Entity, and (iii) Samuel Zell. The Leveraged ESOP Transactions proceeded in two principal steps, commonly called the "Step One Transactions" and "Step Two Transactions."[14]

In step one, consummated in June 2007, the ESOP purchased shares of Tribune common stock, and Tribune consummated a cash tender offer for nearly fifty percent (50%) of its outstanding common stock. In order to finance the tender offer, Tribune entered into the $8.028 billion Senior Loan Agreement. A number of Tribune's domestic subsidiaries, the Guarantor Subsidiaries, provided unsecured guarantees of Tribune's indebtedness under the Senior Loan Agreement. The following charts illustrate the sources and uses of cash at step one of the Leveraged ESOP Transactions:

---

[14]    By using the term "steps," which has been adopted colloquially as shorthand by other parties in the Chapter 11 Cases, the Debtors, among others, do not endorse any conclusion that the June 2007 and December 2007 transactions described below were merely "steps" of a single transaction. The Debtors believe that the two transactions were distinct and should not be "collapsed" together for purposes of avoidance actions.

Sources & Uses – Step One ($ in millions) [15,16]



| STEP 1 - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| A | Tranche B Term Loan | $5,515.0 |
| | Tranche X Term Loan | 1,500.0 |
| | Delayed Draw Tranche B Term Loan ($263 capacity) | 0.0 |
| | Revolving Credit Facility ($750 capacity) | 0.0 |
| B | EGI-TRB Equity Investment (1.47 million shares @ $34) | 50.0 |
| | Exchangeable EGI-TRB Note | 200.0 |
| | **Total Sources** | **$7,265.0** |
| | | |
| | **Uses** | **Amount** |
| C | Repay Bridge Credit Agreement (a)(b) | $1,325.0 |
| | Repay Term Loan (b) | 1,500.0 |
| D | TRB repurchases 126 million shares @ $34 | 4,284.0 |
| | Bank Fees | 134.1 |
| | Other Fees | 21.9 |
| | **Total Uses** | **$7,265.0** |

---

[15] Source: Company's public filings and books and records.

[16] Note:    ESOP's $250 million purchase of Tribune equity not shown as this transaction did not involve the actual transfer of any cash.

Note:    Part B of the transaction was completed on April 23, 2007.  Parts A, C and D were completed on June 4, 2007.

Note:    On June 4, 2007, simultaneously with the funding of the Credit Agreement loans, Tribune made capital contributions in the aggregate amount of $3.98 billion, directly or indirectly, to twenty-one subsidiary guarantors with outstanding promissory note balances owed to Los Angeles Times International, Ltd.  ("LATI"), a solvent, non-Debtor, non-guarantor direct subsidiary of Tribune. The subsidiaries in turn used the proceeds from their respective capital contributions to repay their outstanding balances owed on the LATI notes. These transactions were required to occur as a simultaneous condition to the initial borrowing. (See Section 3.01(m) of the Credit Agreement.) The Credit Agreement also required that the proceeds of the Tranche X and Tranche B loans be used solely for purposes that included the transactions described above. In addition, pursuant to Sections 3.01(m) and 5.01(m) of the Credit Agreement, in May 2007, TFLLC, a guarantor, was formed, with the sole member being Tribune. Upon the closing of the Credit Agreement in June 2007, the following transactions occurred: (i) Tribune made a capital contribution of $3.0 billion to TFLLC; (ii) TFLLC loaned to eight guarantor publishing subsidiaries a total of $3.0 billion in exchange for intercompany promissory notes; and (iii) the publishing subsidiaries who received the loans from TFLLC made dividend payments in an aggregate amount totaling $3.0 billion to Tribune.  In each of the above-transactions, the capital contributions, loans or loan repayments, and dividends were accomplished via book entry rather than the actual movement of cash.

(a)    Repayment of Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 (as subsequently amended, the "Bridge Credit Agreement").  This repayment includes $300 million that was paid between April 23, 2007 and June 3, 2007.

(b)    In addition to payment of principal, interest expense of $3.1 million and $6.3 million was paid on the Bridge Credit Agreement and Term Loan, respectively.

In step two, which was completed on December 20, 2007, Tribune merged with the Merger Sub, a Delaware corporation wholly owned by the ESOP, with Tribune surviving the Merger. Upon the Merger, all issued and outstanding shares of Tribune's common stock, other than shares held by Tribune or the ESOP, were cancelled, and Tribune became wholly owned by the ESOP. Also on December 20, 2007, Tribune borrowed an additional $2.1 billion under the Senior Loan Agreement and entered into the Bridge Loan Agreement, pursuant to which Tribune borrowed approximately $1.6 billion. The proceeds of the additional borrowings under the Senior Loan Agreement and of the borrowings under the Bridge Loan Agreement were used for, among other things, the consummation of the merger.[17] The following charts illustrate the sources and uses of cash at step two of the Leveraged ESOP Transactions (in millions):

**Sources & Uses – Step Two ($ in millions)[18]**



| STEP II - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| Cash from Balance Sheet | $582.9 |
| Tranche B Term Loan | 2,105.0 |
| Bridge Facility | 1,600.0 |
| EGI-TRB Net Cash Payment | 56.1 |
| **Total Sources** | **$4,344.0** |
| | |
| **Uses** | **Amount** |
| Cash Settlement of Stock Based Awards | $134.9 |
| TRB repurchases 117.1 million shares @ $34 | 3,981.9 |
| Cash Distribution triggered by Change of Control (a) | 104.0 |
| Bank Fees | 73.4 |
| Other Fees | 49.7 |
| **Total Uses** | **$4,344.0** |
| | |
| **MEMO: Details to Step F** | |
| Subordinated EGI-TRB Note Investment | $225.0 |
| EGI-TRB Warrant | 90.0 |
| Credit for TRB Shares | (50.0) |
| Credit for Exchangeable EGI-TRB Note | (200.0) |
| **Subtotal** | **65.0** |
| | |
| Credit for PIK Interest on Exchangeable EGI-TRB Note | (6.4) |
| Credit for Reimbursed Legal Fees | (2.5) |
| **Total Net Cash To Be Invested by EGI-TRB** | **$56.1** |

---

[17] The Bridge Loan Agreement indebtedness is unsecured, but is guaranteed, on a subordinated basis to the Senior Loan Agreement indebtness, by the Guarantor Subsidiaries.
[18] Source: Company's public filings and books and records.
  Note:    Schedule details payments made on December 20, 2007, or shortly thereafter.
  (a)    Includes payments related to deferred compensation, non-qualified retirement and transitional compensation plans.

The following chart shows the financial projections prepared by the Company in February 2007 and October 2007. The financial projections set forth below were included in the information utilized by the Company, the Board of Directors, a special committee of the Board of Directors and their respective financial and legal advisors in evaluating the Leveraged ESOP Transactions. The following chart also shows the Company's actual 2007 and 2008 performance.[19]

**Summary Projections**
**($ in millions)[20]**

| | | | | | PROJECTIONS VS. ACTUALS | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2007PF** | **2007A** (a) | **Var. ($)** | **Var. (%)** | **2008P** | **2008A** (a) | **Var. ($)** | **Var. (%)** |
| **February Model** (b) | | | | | | | | |
| Revenue | $5,121.3 | $4,837.5 | ($283.7) | (5.5%) | $4,744.3 | $3,927.1 | ($817.2) | (17.2%) |
| Operating Cash Flow | 1,280.8 | 1,160.8 | (120.0) | (9.4%) | 1,263.9 | 779.0 | (484.8) | (38.4%) |
| | | | | | | | | |
| **October Model** (c) | | | | | | | | |
| Revenue | $4,856.7 | $4,837.5 | ($19.1) | (0.4%) | $4,442.0 | $3,927.1 | ($515.0) | (11.6%) |
| Operating Cash Flow | 1,160.1 | 1,160.8 | 0.6 | 0.1% | 1,095.0 | 779.0 | (316.0) | (28.9%) |

Additional information concerning the Leveraged ESOP Transactions and events leading up to the Leveraged ESOP Transactions can be found in the "Offer to Purchase" filed by Tribune with the SEC on April 25, 2007, in connection with the Leveraged ESOP Transactions, a copy of which is attached hereto as Exhibit G.

### B.    Appointment of an Examiner

On January 13, 2010, Wilmington Trust Company ("WTC"), as successor indenture trustee for the PHONES Notes, filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code for the limited purpose of investigating the Leveraged ESOP Transactions and any potential claims related thereto (the "Examiner Motion"). The Examiner Motion was subsequently resolved by the parties consensually, resulting in the entry by the Bankruptcy Court on April 20, 2010 of an Agreed Order Directing the Appointment of an Examiner ("Examiner Order"). On April 30, 2010, the U.S. Trustee appointed Kenneth N. Klee to be the examiner (the "Examiner") and, on the same day, filed an application with the Bankruptcy Court requesting approval of such appointment. The U.S. Trustee's application was approved on May 10, 2010 and Kenneth N. Klee was appointed Examiner by order entered on the same date. On May 11, 2010, the Bankruptcy Court entered an order approving the Examiner's proposed work and expense plan and modifying the Examiner Order (the "Supplemental Order").

---

[19] Please refer to Article XI.A of this General Disclosure Statement for a discussion concerning the reasons underlying the variance between the projections prepared in February 2007 and October 2007 and actual 2007 and 2008 performance.
Source:  February and October Models, 2007 Management Financial Report, 2008 Post-Audit Adjusted Management Financial Report, Company Disclosures.
Note:  The Board approved the February Model on Feb. 13, 2007 and October Model on Oct. 17, 2007.
Note:  All Operating Cash Flow figures are exclusive of Stock Based Compensation.  See Exhibit F to the Disclosure Statement for additional information regarding Operating Cash Flow.
(a)     Actual results are adjusted to exclude impact of Cubs and Tribune Entertainment, and exclude Newsday in 2008 only.
(b)     Model adjusted to exclude Recycler, Tribune Entertainment, and Newsday in 2008.
(c)     Model adjusted to exclude Newsday in 2008.

The Examiner filed a motion on July 23, 2010, seeking an order (i) discharging the Examiner, (ii) granting the Examiner and his professionals relief from third-party discovery, (iii) authorizing the disposition of the non-confidential documents comprising the record of the Examiner's investigation, (iv) exculpating the Examiner and his professionals in connection with the Examiner's investigation and the report filed by the Examiner with the Bankruptcy Court, (v) approving a procedure for the filing and consideration of final fee applications of the Examiner and his professionals, and (vi) authorizing and directing the reimbursement of the reasonable fees and costs incurred by the Examiner and his professionals in connection with any future services provided by the Examiner (the "Discharge Motion"). The order approving the Discharge Motion was entered on August 26, 2010, and the Examiner has been discharged thereby.

## C.    Investigation and Report of the Examiner.

Pursuant to the Examiner Order and Supplemental Order, the Examiner's principal duties were to investigate and evaluate the following questions:

- Question One:  evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties (as defined in the Examiner Order) in connection with the Leveraged ESOP Transactions – defined as the LBO-Related Causes of Action – that may be asserted against any entity and that may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, former and/or present members of Tribune's board of directors, the Debtors' lenders and the Debtors' advisors, and including without limitation, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and equitable subordination, and to evaluate the potential defenses asserted by the Parties to such potential claims and causes of action;

- Question Two:  evaluate whether WTC violated the automatic stay under 11 U.S.C. §362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust; and

- Question Three:  evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order.

Shortly after being designated, the Examiner conducted in person meetings with the Parties and invited the Parties to share their views in writing on the issues to be considered by the Examiner. The Examiner also established a procedure for the Parties to present a substantially agreed upon statement of basic facts and legal, financial, and factual analyses of the issues being investigated. The Examiner and his advisors interviewed 38 witnesses, of which 33 of the interviews were conducted in person. In addition to counsel, the Examiner was assisted by a financial advisor who developed a financial analysis of issues presented, including issues concerning solvency, unreasonable capital, the flow of funds, and matters pertaining to intercompany claims.

On July 26, 2010, the Examiner filed a report in respect of his investigation. The Examiner did not reach definitive conclusions regarding the issues considered in the Report and instead established a range of potential conclusions. Specifically, the Examiner determined to frame his conclusions utilizing the following continuum:  (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.

The Examiner's conclusions are summarized on pages 5 through 28 of Volume 1 of his report. A copy of the Examiner's report is included on the CD-ROM accompanying the Joint Disclosure Statement as Exhibit C, and readers are encouraged to read the entirety of the Examiner's report.

### D.    Mediation.

At the Debtors' request, on September 1, 2010, the Bankruptcy Court appointed the Honorable Kevin Gross, Bankruptcy Judge for the United States Bankruptcy Court for the District of Delaware, as a mediator (the "Mediator") in the Chapter 11 Cases to conduct a non-binding mediation concerning the terms of a plan of reorganization, including the appropriate resolution of the LBO-Related Causes of Action (the "Mediation"). The parties to the Mediation included (i) the Debtors, (ii) the Committee, (iii) JPMorgan Chase Bank, N.A., (iii) Angelo Gordon , (iv) the Credit Agreement Lenders,[21] (v) the Step One Credit Agreement Lenders,[22] (vi) Wells Fargo Bank, N.A. ("Wells Fargo"), (vii) Law Debenture Trust Company of New York ("Law Debenture"), (viii) Deutsche Bank Trust Company Americas, (ix) Centerbridge Credit Advisors LLC, (x) Aurelius, (xi) EGI-TRB LLC, and (xii) Wilmington Trust Company (collectively, the "Mediation Parties"). On September 20, 2010 each of the Mediation Parties submitted to the Mediator a statement setting forth such Mediation Party's position respecting the structure and economic substance of an acceptable plan of reorganization.

The Mediation began on September 26, 2010 and the parties to the Mediation continued settlement discussions on September 27, 2010. On September 28, 2010, the Mediator filed the Mediator's Report, which, among other things, reported that the Mediation resulted in a settlement agreement between the Debtors, on the one hand, and Angelo Gordon and Oaktree Capital Management, L.P., on the other hand. The terms of the settlement are contained in the Term Sheet of Joint Plan of the Settling Parties, attached as Exhibit A to the Mediator's Report (the "First Mediation Term Sheet"). After the filing of the First Mediation Term Sheet, the Mediator continued settlement discussions with certain parties. Subsequently, the Mediator filed the Mediator's Second Report on October 12, 2010, which stated, among other things, that the continued Mediation had resulted in an expanded settlement among the Debtors, the Creditors' Committee, Oaktree, Angelo Gordon, and JPMorgan. The terms of the expanded settlement are contained in the Term Sheet of Joint Plan Supported by Debtors, Official Committee of Unsecured Creditors, Oaktree, Angelo Gordon, and JPMorgan and Endorsed by Mediator, attached as Exhibit A to the Mediator's Second Report (the "Second Mediation Term Sheet").

## VIII.    EXCLUSIVITY PERIOD.

On March 27, 2009, July 24, 2009, November 13, 2009, February 1, 2010, and March 31, 2010, the Debtors filed motions requesting an extension of the Debtors' exclusive period within which to file a chapter 11 plan and/or solicit acceptances thereto. The Bankruptcy Court granted each of these motions and extended the Debtors' exclusive period to file a plan through and including April 30, 2010, and their exclusive period to solicit votes on such plan through and including May 31, 2010. On April 30, 2010, the Debtors filed an additional motion requesting an extension only of the Debtors' exclusive period

---

[21] "Credit Agreement Lenders" means those certain holders of senior loan claims and senior loan guaranty claims as disclosed in the Eighth Amended Joint Verified Statement of Representation of More Than One Creditor by Hennigan Bennett & Dorman LLP and Young Conaway Stargatt & Taylor LLP [Docket No. 5868], as may be amended, modified or supplemented from time to time.

[22] "Step One Credit Agreement Lenders" means those certain holders of step one senior loan claims and senior loan guaranty claims as disclosed in the Joint Verified Statement of Representation of More Than One Creditor by Olshan Grundman Frome Rosenzweig & Wolosky LLP and Arkin Kaplan Rice LLP [Docket No. 5896], as may be amended, modified or supplemented from time to time.

within which to solicit a chapter 11 plan through and including August 8, 2010. The Debtors' exclusive period to file a chapter 11 plan and solicit acceptances expired on August 8, 2010.

## IX.    VOTING PROCEDURES AND REQUIREMENTS

The following section describes in summary fashion the procedures and requirements that have been established for voting on the Competing Plans.

[TO BE DETERMINED IN ACCORDANCE WITH SOLICITATION ORDER.]

If you are entitled to vote to accept or reject one or more of the Competing Plans, with the package accompanying this Joint Disclosure Statement, you will receive separate, color-coded ballots (each a "Ballot") for each of the Competing Plans on which you are entitled to vote. Ballots and accompanying instructions relating to the Debtor/Committee/Lender Plan are blue. Ballots and accompanying instructions relating to the Noteholder Plan are purple. Ballots and accompanying instructions relating to the Step One Plan are yellow. Ballots and accompanying instructions relating to the Bridge Plan are green. Please note that, for your vote to accept or reject a particular Competing Plan to be counted, you must complete all required information on the Ballot for that particular Competing Plan, execute such Ballot and return such Ballot to the address indicated on the Ballot. In addition, each of the Competing Plans calls for various elections to be made, either on the Ballot or on a separate election form, as set forth in the instructions accompanying the Ballot. If you wish to make any of the elections under one of the Competing Plans, you should check the appropriate boxes on the Ballot or, as applicable, return the separate election form, completed and executed in accordance with the applicable instructions.

If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims. If you are entitled to vote on one or more of the Competing Plans and did not receive a Ballot for each of the Competing Plans on which you are entitled to vote, received a damaged Ballot or lost your Ballot, please contact the Voting Agent, Epiq Bankruptcy Solutions, LLC, at (888) 287-7568 or tribunevote@epiqsystems.com.

### A.    Voting Deadline.

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE COMPETING PLANS, ALL BALLOTS (INCLUDING THOSE BALLOTS TRANSMITTED BY VOTING NOMINEES) MUST BE **RECEIVED BY** THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE COMPETING PLANS. ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:

**FOR FIRST CLASS MAIL:**

Tribune Company Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014

**FOR OVERNIGHT MAIL AND HAND DELIVERY:**

Tribune Company Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY 10017

Ballots will only be counted if mailed to the above address. Ballots cannot be transmitted orally, by facsimile or by electronic mail. Accordingly, you are urged to return your signed and completed Ballot promptly. Any executed ballot received that does not indicate either an acceptance or rejection of a particular Competing Plan or that indicates both an acceptance and rejection of a particular Competing Plan shall not be counted.

**B.        Holders of Claims Entitled to Vote**

In general, a holder of a claim may vote to accept or reject a plan of reorganization if (i) the holder's claim or interest is "allowed," (i.e., generally not disputed, contingent, or unliquidated), and (ii) such holder's claim or equity interest is "impaired" (as defined below) by the plan. However, if a holder of an allowed and impaired claim will not receive any distribution under a plan, than such holder is deemed to have rejected the plan and is not entitled to vote. In the same vein, a holder of an allowed and unimpaired claim will be presumed to have accepted the plan and will not be entitled to vote.

Under the Bankruptcy Code, a class of claims or equity interests is presumed impaired unless a plan (i) does not alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder thereof; or (ii) regardless of any legal right to an accelerated payment of such claim or equity interest the plan (a) cures all existing defaults, except the defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code, (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim for any damages incurred as a result of any such holder's reasonable reliance on such legal right to an accelerated payment, (d) if such claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such claim for any actual pecuniary loss incurred by such holder as a result of such failure, and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

**Please refer to the Specific Disclosure Statements for information concerning the parties in interest that are entitled to vote on each Competing Plan.**

ANY VOTE NOT SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE WILL NOT BE COUNTED PURSUANT TO SECTION 1126(E) OF THE BANKRUPTCY CODE.

**C.        Vote Required for Acceptance by a Class**

1.        Class of Claims.

A Class of Claims shall have accepted a Competing Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Competing Plan in accordance with the Solicitation Order.

2.        Class of Interests.

A Class of Interests shall have accepted a Competing Plan if it is accepted by at least two-thirds (⅔) in amount of the Allowed Interests in such Class that have voted on the Competing Plan in accordance with the Solicitation Order.

**D.        Voting Procedures**

1.        Ballots.

All votes to accept or reject the Competing Plans with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of ballot.

ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF A PARTICULAR COMPETING PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION WITH RESPECT TO A PARTICULAR COMPETING PLAN WILL NOT BE COUNTED AS A VOTE EITHER TO ACCEPT OR REJECT SUCH COMPETING PLAN.

ANY BALLOT THAT IS RECEIVED BUT WHICH IS NOT SIGNED OR THAT OTHERWISE CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE CONSIDERED AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERRING ACCEPTANCE OR REJECTION OF ANY OF THE COMPETING PLANS.

All ballots (including those ballots transmitted by Voting Nominees) must be delivered to the Voting Agent, at its address set forth above, and received by the Voting Deadline.  THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.

**If you are entitled to vote and you did not receive a ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth in this General Disclosure Statement.**

2.        Withdrawal or Change of Votes on the Competing Plans.

After the Voting Deadline, no vote may be withdrawn without the prior consent of the applicable Proponent – which consent shall be given in such Proponent's sole discretion or order of the Bankruptcy Court.

Any Holder of a Claim who has submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot.  If more than one timely, properly completed ballot is received with respect to the same Claim, the ballot that will be counted will be the ballot that the Voting Agent determines was the last to be received.

## X.        CONFIRMATION OF THE PLAN

**A.        Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  The Confirmation Hearing pursuant to section 1128 of the Bankruptcy

Code will be held on [●] at [●] **(prevailing Eastern Time)**, before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of a Competing Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Competing Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before [●] at [●], (prevailing Eastern Time)** by the following parties:

**Counsel to the Debtors:**

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Attn: Jessica C.K. Boelter

Cole, Schotz, Meisel, Forman & Leonard, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Facsimile: (302) 652-3117
Attn: J. Kate Stickles (No. 2917)

**The U.S. Trustee:**

U.S. Trustee
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box #35
Wilmington, Delaware 19899
Facsimile: (302) 573-6497
Attn: David Klauder

**Counsel to the Official Committee of Unsecured Creditors:**

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 10112
~~Fax~~Facsimile (212) 541-5369
Attn: David M. LeMay

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
~~Fax~~Facsimile (302) 467-4450
Attn: Adam G. Landis

Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington D.C. 20036
~~Telecopier~~Facsimile: (202) 822-8106
Attn: James Sottile

**Counsel ~~For~~to Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.**

Hennigan, Bennett & Dorman LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
~~Telecopier~~Facsimile: (213) 694-1234
Attn: Bruce Bennett

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
~~Telecopier~~Facsimile: (302) 571-1253
Attn: Robert S. Brady

**Co-Counsel ~~For~~to Angelo, Gordon & Co, L.P.**

Wilmer Cutler Pickering Hale &
Dorr LLP
399 Park Avenue
New York, New York 10022
~~Telecopier~~Facsimile: (212) 230-8888
Attn: Andrew Goldman

**Counsel ~~For~~to JPMorgan Chase Bank, N.A.**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
~~Telecopier~~Facsimile: (212) 701 5800
Attn: Damian S. Schaible

Richards Layton & Finger
One Rodney Square
920 North King Street; Wilmington, Delaware 19801
~~Telecopier~~Facsimile: (302) 651-7701
Attn: Mark Collins

**Counsel to Aurelius Capital Management, LP**

| | |
|---|---|
| Akin Gump Strauss Hauer & Feld LLP | Ashby & Geddes, P.A. |
| One Bryant Park | 500 Delaware Avenue, P.O. Box 1150 |
| New York, New York 10036 | Wilmington, Delaware 19899 |
| Facsimile: [●] | Facsimile: [●] |
| Attn: Daniel Golden | Attn: William Bowden |

**Counsel to Deutsche Bank Trust Company Americas**

| | |
|---|---|
| McCarter & English, LLP | McCarter & English LLP |
| 245 Park Avenue | Renaissance Centre |
| New York, New York 10167 | 405 W. King Street |
| Facsimile: [●] | Wilmington, Delaware 19801 |
| Attn: David Adler | Facsimile: [●] |
| | Attn: Katharine Mayer |

**Counsel to Law Debenture Trust Company of New York**

| | |
|---|---|
| Kasowitz, Benson, Torres & Friedman LLP | Bifferato Gentilotti LLC |
| 1633 Broadway | 800 N. King Street, Plaza Level |
| New York, New York 10019 | Wilmington, Delaware 19801 |
| Facsimile: (212) 506-1800 | Facsimile: (302) 429-8600 |
| Attn: David Rosner | Attn: Garvan McDaniel |

**Counsel to Wilmington Trust Company**

| | |
|---|---|
| Brown Rudnick LLP | Sullivan Hazeltine Allinson LLC |
| Seven Times Square | 4 East 8th Street, Suite 400 |
| New York, New York 10036 | Wilmington, Delaware 19801 |
| Facsimile: [●] | Facsimile: [●] |
| Attn: Robert Stark | Attn: William Sullivan |

**Counsel to King Street Acquisition Company, LLC, King Street Capital, LP, and Marathon Asset Management, LP**

| | |
|---|---|
| White & Case LLP | Fox Rothschild LLP |
| 1155 Avenue of the Americas | 919 North Market Street, Suite 1600 |
| New York, New York 10036 | Wilmington, Delaware 19801 |
| Facsimile: [●] | Facsimile: [●] |
| Attn: Thomas Lauria | Attn: Jeffrey Schlerf |

**Counsel to Holders of Certain Step One Senior Loan Claims**

| | |
|---|---|
| Arkin Kaplan Rice LLP | Olshan Grundman Frome Rosenzweig & Wolosky LLP |
| 590 Madison Avenue, 35th Floor | Park Avenue Tower |
| New York, New York 10022 | 65 East 55th Street |
| Facsimile: (212) 333-2350 | New York, New York 10022 |
| Attn: Howard Kaplan | Facsimile: (212) 451-2222 |
| | Attn: Adam Friedman |

| | |
|---|---|
| Morris, Nichols, Arsht & Tunnell LLP | Bracewell & Giuliani LLP |
| 1201 North market Street, 18th Floor | 25 Asylum Street, Suite 2600 |
| P.O. Box 1347 | Hartford, CT 06103 |
| Wilmington, Delaware 19899-1347 | Facsimile: (860) 246-3201 |
| Facsimile: (302) 351-9357 | Attn: Evan Flaschen |
| Attn: Derek Abbott | |

[INSERT ADDITIONAL PLAN PROPONENT(S)]

   Objections to confirmation of a Competing Plan are governed by Rule 9014 of the Bankruptcy Rules. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

B.        **Statutory Requirements for Confirmation of a Competing Plan**

At the Confirmation Hearing, the Bankruptcy Court will confirm a plan only if it finds all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that a plan (i) is accepted by all impaired classes of claims and interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) is feasible, and (iii) is in the "best interests" of holders of claims and interests impaired under the plan.

1.        Acceptance.

a)        Acceptance of a Plan.

As set forth in the Specific Disclosure Statements, certain classes of Claims and Interests are Impaired under the Competing Plans (the "Impaired Classes of Claims") and are entitled to vote to accept or reject the Competing Plans.  As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept the plan unless the plan satisfies the "fair and equitable test" (as described below) as applied to such nonaccepting impaired class.

Impaired Classes of Claims that are entitled to vote on the Competing Plan will have accepted a Competing Plan if such Competing Plan is accepted by at least two-thirds (⅔) in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Competing Plan.

2.        Fair and Equitable Test.

The Proponents may seek to confirm their respective Competing Plans notwithstanding the non-acceptance or deemed nonacceptance of such Competing Plan by any Impaired Class of Claims or Interests.  To obtain such confirmation, the Proponent must demonstrate that their Competing Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting Impaired Class.  Generally, a plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner substantially equivalent with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(a)        Holders of Secured Claims.  Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale, and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(b)        Unsecured Creditors.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c)        Interest Holders.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity

interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(B) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

3.      Feasibility.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine that confirmation of a plan of reorganization is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under such plan. This condition is often referred to as the "feasibility" of the plan of reorganization.

PLEASE REVIEW EACH SPECIFIC DISCLOSURE STATEMENT FOR INFORMATION CONCERNING THE FEASIBILITY OF THE APPLICABLE COMPETING PLAN.

4.      Best Interests Test and Liquidation Analysis.

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of an impaired claim or impaired interest receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation.

An analysis of the estimated aggregate amount of liquidation proceeds available to holders of Claims against and Interests in the Debtors in a chapter 7 liquidation is attached as Exhibit D to this General Disclosure Statement (the "Liquidation Analysis"). THE LIQUIDATION ANALYSIS WAS PREPARED BY THE DEBTORS WITH THE ASSISTANCE OF THEIR ADVISORS.

PLEASE REVIEW EACH SPECIFIC DISCLOSURE STATEMENT FOR INFORMATION CONCERNING THE ALLOCATION OF PROCEEDS TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER A PARTICULAR COMPETING PLAN AS WELL AS FOR INFORMATION CONCERNING HOW SUCH ALLOCATIONS COMPARE TO RECOVERIES THAT WOULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION.

## XI.    PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE

A.      **Projected Financial Information.**

The Debtors, with the assistance of various professionals, including their financial advisors, prepared the Financial Projections, attached as Exhibit E hereto, for each of the four fiscal years 2010, 2011, 2012 and 2013 (the "Financial Projection Period"). THE FINANCIAL PROJECTIONS WERE PREPARED BY THE DEBTORS.

The Debtors have prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the current circumstances. Those assumptions the Debtors considered to be significant are described herein and in the notes which are part of the Financial Projections. The

Financial Projections have not been examined or compiled by independent accountants.  Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the period covered by the Financial Projections may vary from the projected results, and the variations may be material.

The Debtors do not, as a matter of course, publish their business plans, strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

**B.      Reorganization Value.**[23]

The Debtors' investment banker and financial adviser, Lazard, has undertaken a valuation analysis to determine the value available for distribution to holders of Allowed Claims (the "Reorganized Value Analysis").  Lazard's Reorganized Value Analysis is attached as Exhibit F to this General Disclosure Statement.

As set forth in the Reorganized Value Analysis, and subject to the assumptions and qualifications stated therein, solely for purposes of determining the value available for distribution pursuant to a plan of reorganization, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $2.9 to $3.5 billion, with an approximate mid-point estimate of $3.2 billion as of the December 27, 2010 (the "Assumed Effective Date").  Lazard further estimates that adding the value of the Other Assets of approximately $1.7 to $2.0 billion (with an approximate mid-point value of $1.9 billion) and the estimated cash balance at the Assumed Effective Date of approximately $1.7 billion to the Enterprise Value range yields a range of Distributable Value for the Reorganized Debtors from $6.3 billion to $7.1 billion with an approximate mid-point of $6.75 billion.  Based on total estimated gross debt of $1.1 billion projected as of the Assumed Effective Date, Lazard's mid-point estimate of Distributable Value reduced by approximately $1.4 billion of cash, assumed to be distributed pursuant to a plan of reorganization implies a value for the new equity of the Reorganized Debtors (the "Equity Value") of approximately $4.3 billion.

THE SUMMARY OF LAZARD'S REORGANIZATION VALUE ANALYSIS SET FORTH IN THIS ARTICLE XI.B IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE REORGANIZATION VALUE ANALYSIS, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.

THE REORGANIZED VALUE ANALYSIS WAS PREPARED BY LAZARD FOR THE DEBTORS.  PLEASE REFER TO THE SPECIFIC DISCLOSURE STATEMENTS FOR THE APPLICABLE PROPONENTS' VIEWS REGARDING THE REORGANIZED VALUE ANALYSIS, WHICH MAY DIFFER FROM THE CONCLUSIONS SET FORTH IN EXHIBIT F.

**XII.      GENERAL RISK FACTORS**

THE IMPLEMENTATION OF ANY OF THE COMPETING PLANS IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW. IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT A COMPETING PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE COMPETING

---

[23] Capitalized words used but not defined in this Article XI.B shall have the meanings ascribed to such terms in the Reorganized Value Analysis.

PLANS SHOULD READ AND CAREFULLY CONSIDER THE GENERAL RISK FACTORS SET FORTH BELOW IN ADDITION TO THOSE SET FORTH IN THE SPECIFIC DISCLOSURE STATEMENTS (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND THEREWITH), PRIOR TO VOTING TO ACCEPT OR REJECT THE COMPETING PLANS.  THESE GENERAL RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISK INVOLVED IN CONNECTION WITH A COMPETING PLAN AND THEIR IMPLEMENTATION, OR ALTERNATIVES TO THE COMPETING PLAN.

### A.      FCC-Related Considerations and Risks Relating to Emergence.

      1.      Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate a Competing Plan.

Both the Debtors' commencement of the Chapter 11 Cases and their emergence from bankruptcy require the consent of the FCC.  The FCC previously granted consent for the assignment of the Debtors' FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under chapter 11 of the Bankruptcy Code.  For the Reorganized Debtors to continue the operation of the Debtors' broadcast stations, the Debtors filed applications with the FCC (the "FCC Applications") to obtain prior approval of the FCC for the assignment of the FCC licenses from the Debtors as "debtors-in-possession" to the Reorganized Debtors (the "FCC Approval").  In the FCC Applications, the Debtors are seeking waivers of several of the FCC's broadcast ownership rules.  Grant of these waiver requests will be necessary in order to allow the assignment of combinations of media properties currently held by the Debtors in six markets in which the combinations currently operate under waivers of the FCC ownership rules.  Absent continued waivers from the FCC, Reorganized Tribune will not be able to own and operate these combinations.  To grant the FCC approval, the FCC must determine that the Reorganized Debtors will comply with the twenty-five percent (25%) limitation on foreign ownership and voting rights set forth in Section 310(b) of the Communications Act and the FCC's broadcast multiple and cross-ownership rules upon their emergence from bankruptcy.

      2.      The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy.

The Debtors operate television broadcast stations, a radio station, and certain associated facilities under authority granted by the FCC.  Under Section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses.  Except in the case of "involuntary" assignments, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated.

      a)      "Involuntary" Transfers and Assignments.

For purposes of processing applications, the FCC classifies a licensee's change in status to a debtor in possession under chapter 11 of the Bankruptcy Code as an "involuntary" assignment, even though the chapter 11 filing is within the control of the licensee or its parent company.  The FCC considers such involuntary assignments to be *pro forma* transactions and accordingly evaluates them under more abbreviated, or so-called "short-form," procedures than applications involving a substantial change in control, which are evaluated under "long-form" procedures.  The FCC has granted the Debtors' applications for consent to such involuntary assignments of their broadcast licenses to the Debtors' licensees as debtors in possession.  Reorganized Tribune's emergence from bankruptcy as a restructured company will require further consent of the FCC to effectuate an assignment of these broadcast licenses to the Reorganized Debtors.

Actions ordered by the Bankruptcy Court could require further consent of the FCC. For example, the appointment of a chapter 11 trustee by the Bankruptcy Court would require FCC consent. The FCC typically treats changes of this sort that are ordered by the Bankruptcy Court as involuntary assignments or transfers for which consent may be sought using *pro forma* procedures.

          b)        FCC Consent Required for Emergence from Bankruptcy.

The FCC treats emergence from bankruptcy by a licensee or its parent company as a "voluntary" assignment of FCC licenses or a transfer of control of FCC licensees when control will be transferred to a post-bankruptcy holder. A "voluntary" assignment or transfer of control requires prior approval of the FCC. In the FCC's view, a debtor in possession is an interim controlling party. The FCC thus expects the outcome of the proceeding to be, among other things, a restructuring and that the restructuring will not be implemented until the FCC has granted applications seeking approval of the new control structure and demonstrating the legal qualifications of any new parties that will have attributable ownership interests or positions in the new entity.

If the proposed resolution of a bankruptcy proceeding changes ultimate control of the FCC licensees (as, for example, when new parties will hold fifty percent (50%) or more of the stock of the restructured company), the transaction will be viewed as a substantial change in control, with consent sought on an FCC "long form" application, Form 314 (assignment) or Form 315 (transfer of control). The FCC treats a transaction as an "assignment" if the consummation of the transaction would change the identity of the entity holding the FCC license; changes in ownership or control in which the licensee entity remains unchanged typically are treated as "transfers of control." The application procedures for transfers and assignments are essentially the same. Even though a company may emerge from bankruptcy or receivership through a court order, the FCC will use the procedures applicable to a voluntary transfer or assignment when the consummation of the application would place the licenses in a new "permanent" holder. The company may not emerge from bankruptcy until the FCC has granted its consent.

**B.**      **Risks Related to the Debtors' Businesses.**

          1.        The Debtors' Actual Financial Results May Vary Significantly From the Projections.

The Projections were prepared by the Debtors' management in consultation with their professional advisors. The Projections have not been examined or compiled by independent accountants. While the Debtors have presented the Projections with numerical specificity, they have necessarily based the Projections on a variety of estimates and assumptions that may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Debtors and the Reorganized Debtors' control. The Proponents do not and cannot make any representations as to the accuracy of the Projections or to the Debtors or the Reorganized Debtors' ability to achieve the projected results. Some assumptions inevitably will not materialize. Furthermore, events and circumstances occurring subsequent to the date on which the Projections were prepared may differ from any assumed facts and circumstances. Alternatively, any events and circumstances that come to pass may well have been unanticipated, and thus may affect financial results in a materially adverse or materially beneficial manner. The Projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

2.    Failure to Attract and Maintain Employees May Adversely Affect the Debtors' Financial Results.

The Debtors believe that among their most valuable assets are their highly skilled employees, who have the ability to leave the Debtors and deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations. Although the Debtors have tried to maintain the confidence and dedication of their personnel through the pendency of the Chapter 11 Cases, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such personnel with comparable personnel. In addition, the Debtors cannot be sure that such key personnel will not leave after consummation of a plan and the Debtors emergence from the Chapter 11 Cases. Because the Debtors believe their success depends to a significant degree upon the continued contributions of its employees, the Debtors believe further attrition may hinder the Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

In addition, upon emergence from the Chapter 11 Cases, the Debtors may need to attract and retain new personnel, including key management, sales, marketing, and other personnel. Accomplishing this may be difficult due to many factors, including uncertainty created by the Debtors' Chapter 11 Cases. The failure to continue to attract and retain such individuals could materially adversely affect the Debtors' ability to compete.

3.    Adverse Publicity in Connection with the Chapter 11 Cases or Otherwise Could Negatively Affect Business.

Adverse publicity or news coverage relating to the Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after emergence from the Chapter 11 Cases.

4.    Advertising Demand Will Continue to be Impacted by Changes in Economic Conditions and Fragmentation of the Media Landscape.

Advertising revenue is the primary source of revenue for the Debtors' publishing and broadcasting businesses. National and local economic conditions, particularly in major metropolitan markets, affect the levels of retail, national and classified newspaper advertising revenue, as well as television advertising revenue. Changes in gross domestic product, consumer spending, auto sales, housing sales, unemployment rates, job creation and circulation levels all impact demand for advertising. Consolidation across various industries, including large department stores and telecommunications companies, may also reduce the Debtors' overall advertising revenue. Retailers and other advertisers may also choose to reduce their overall advertising spending to reduce their operating costs, which could reduce the Debtors' advertising revenues. Deteriorations in national and local economic conditions increase the risk of financial distress and business failures among the Debtors' advertising customers, which may result in reduced advertising demand and decreased advertising revenue, and may also result in the Debtors being unable to fully collect upon advertising receivables.

Competition for newspaper advertising is based on reader demographics, price, service, advertiser results, and circulation and readership levels, and competition for television advertising is based on audience share and ratings information, audience engagement and price. Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable systems and networks, satellite television and radio, Internet sites, magazines, direct marketing and solo and shared mail programs, affects the Debtors' ability to retain and attract advertising clients and may continue to

negatively impact advertising rates. In recent years, the advertising industry generally has experienced a secular shift toward Internet advertising and away from traditional media. In particular, Internet sites devoted to recruitment, automobiles, real estate, and other classified advertising categories have become significant competitors of the Debtors' newspapers.

In broadcasting, the proliferation of cable and satellite channels, advances in mobile and wireless technology, the migration of television audiences to the Internet and the viewing public's increased control over the manner and timing of their media consumption through personal video recording devices have resulted in greater fragmentation of the television viewing audience and a more difficult sales environment. Other advances in technology, such as increasing use of local-cable advertising "interconnects," which allow for easier insertion of advertising on local cable systems, have also increased competition for television advertisers. In addition, video compression technologies permit greater numbers of channels to be carried within existing bandwidth on cable, satellite and other television distribution systems. These compression technologies, as well as other technological developments, are applicable to all video delivery systems, including digital over-the-air broadcasting, and have the potential to provide vastly expanded programming to highly targeted audiences. Reduction in the cost of creating and programming additional channel capacity could lower entry barriers for new channels and encourage the development of increasingly specialized niche programming on cable, satellite and other television distribution systems, which could further increase the competition for advertising revenue in the broadcasting industry.

Seasonal variations in consumer spending cause the Debtors' quarterly advertising revenues to fluctuate. Second and fourth quarter advertising revenues are typically higher than first and third quarter advertising revenues, reflecting slower economic activity in the winter and summer and the stronger fourth quarter holiday season. In addition, differences in annual political and biennial Olympic-related advertising can cause the Debtors' revenues to fluctuate from year to year, in particular with respect to broadcasting revenues.

All of these factors continue to contribute to a difficult sales environment and may further adversely impact the Debtors' ability to grow or maintain their revenues.

      5.      Circulation and Audience Share May Continue to Decline as Consumers Migrate to Other Media Alternatives.

Competition for newspaper circulation is based primarily upon the content of a newspaper, service, price, and to an increasing degree, upon the availability of alternative media sources. The Debtors' circulation revenues have declined, reflecting general trends in the newspaper industry, including declining newspaper buying by young people and the consumer migration toward the Internet and other available forms of media for news. The Debtors have attempted to take advantage of the growth of online media by operating local Internet sites in each of their daily newspaper markets, but face increasing competition from other online sources. In addition, in order to address declining circulation in certain markets, the Debtors may increase marketing designed to retain their existing subscriber base and continue to introduce niche publications targeted at commuters and young adults. The Debtors may also increase marketing efforts to drive traffic to their proprietary Internet sites. Any such increased marketing efforts would involve additional cost and expense. However, certain regulatory changes have made the Debtors' efforts at marketing more difficult. For example, the National Do Not Call Registry has impacted the way newspapers sell home-delivery circulation, particularly for the larger newspapers that historically have relied on telemarketing.

Competition for audience share is based primarily on the perceived quality of the original and syndicated programming offered on the Debtors' broadcast stations, and to an increasing degree on the

availability of alternative media sources to view this programming. Technological innovation, and the resulting proliferation of alternative programming sources, such as cable, satellite television, telephone company fiber lines, satellite radio, video-on-demand, pay-per-view, the Internet, home video and entertainment systems, and portable entertainment systems, have fragmented television viewing audiences and subjected television broadcast stations to new types of competition. Over the past decade, the aggregate viewership of non-network programming distributed via multi-channel, video program distributors such as cable television and satellite systems has increased, while the aggregate viewership of the major television networks has declined. Technologies that enable users to view content of their own choosing, in their own time, and to fast-forward or skip advertisements, such as digital video recorders, portable digital devices, and the Internet, may cause changes in consumer behavior or could hinder Nielsen's ability to accurately measure the Debtors' television audience, both of which could affect the attractiveness of the Debtors' offerings to advertisers. If these trends continue to occur, the Debtors' operating results could be adversely affected.

      6.      Changes in the Regulatory Landscape Could Affect the Debtors' Business Operations and Asset Mix.

Various aspects of the Debtors' operations are subject to regulation by governmental authorities in the United States. Changes in the current regulatory environment could result in increased operating costs or the need to divest one or more of the Debtors' properties.

The Debtors' television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act. A television or radio station may not operate in the United States without the authorization of the FCC. Accordingly, the Debtors' businesses depend upon the Debtors' ability to continue to hold television and radio broadcasting licenses from the FCC, which generally have a term of eight years.

The Communications Act empowers the FCC to regulate other aspects of the Debtors' businesses, in addition to imposing licensing requirements. For example, the FCC has the authority to:

- determine the frequencies, location and power of the Debtors' broadcast stations;

- regulate the equipment used by the Debtors' broadcast stations;

- adopt and implement regulations and policies concerning the ownership and operation of the Debtors' television stations; and

- impose penalties on the Debtors for violations of the Communications Act or FCC regulations.

Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs. Broadcasters also are subject to a wide variety of other programming-related and technical regulations, including requirements to broadcast children's educational and informational programming and to provide for sponsorship identification and a prohibition on the broadcast of indecent programming during hours in which the viewing or listening audience is likely to include children.

The Debtors' failure to observe FCC rules and policies could result in the imposition by the FCC of various sanctions, including monetary forfeitures, reporting conditions, and short-term license renewals. In 2006 Congress substantially increased the financial penalties for the airing of indecent programming material outside of "safe harbor" hours. Accordingly, the inadvertent broadcasting of

indecent programming may subject a broadcaster to substantial fines. Serious and repeated failures of a broadcast licensee to comply with applicable regulations may, in extreme cases, result in the revocation or non-renewal of a license. In addition, adverse adjudications relating to statutory "character" issues (such as felony or certain anti-trust convictions) and non-compliant media holdings of the Debtors' principals and the Debtors' investors in some instances could reflect adversely upon the Debtors' qualifications as a television and radio licensee.

Cable operators and direct broadcast satellite systems are generally required to carry the primary signal of local commercial television stations pursuant to the FCC's cable "must carry" or direct broadcast satellite "carry-one, carry-all" rules. These cable operators and direct broadcast satellite systems are prohibited from carrying a broadcast signal, however, without obtaining the station's consent. For each distributor, a local television broadcaster must make a choice once every three years whether to proceed under the "must carry" or "carry-one, carry-all" rules or to waive the right to mandatory but uncompensated carriage and negotiate a grant of retransmission consent to permit the cable system operator or satellite service provider to carry the station's signal, in most cases in exchange for some form of consideration from the system operator. If the Debtors' retransmission consent agreements are terminated or not renewed, or if the Debtors' broadcast signal is distributed on less favorable terms, the Debtors' ability to distribute their programming could be adversely affected.

From time to time, the FCC revises existing regulations and policies in ways that could affect the Debtors' broadcasting operations. Revision of existing cable ownership rules and broadcast multiple ownership and cross-ownership rules and policies by the FCC and other changes in the FCC's rules and policies may continue to affect the competitive landscape in ways that could increase the competition the Debtors face, including competition from larger media, entertainment and telecommunications companies, which may have greater access to capital and resources.

In addition, Congress and the FCC may, in the future, adopt new laws, regulations and policies regarding a wide variety of matters (including technological changes or changes in spectrum assigned to specific services) that could, directly or indirectly, materially and adversely affect the operation and ownership of the Debtors' broadcast properties. For example, the National Broadband Plan, a report to Congress prepared by the FCC's staff and issued on March 16, 2010, contains several recommendations for legislative and regulatory action that could significantly affect television broadcasting, including (i) the reallocation of portions of the present television broadcasting spectrum for non-broadcast mobile and wireless services; (ii) incentive spectrum auctions to encourage current spectrum holders to relinquish all or a portion of their current holdings; (iii) the imposition of user fees on spectrum holders; and (iv) rule changes to permit and encourage spectrum sharing and innovative uses of spectrum. The Debtors cannot predict what regulations or legislation may be proposed, what regulations or legislation may be finally enacted, or what effect, if any, such regulations or legislation could have on the operation and ownership of the Debtors' broadcasting properties.

      7.     The Availability and Cost of Quality Network-Provided and Syndicated Programming May Impact the Debtors' Television Ratings.

The cost of syndicated programming represents a significant portion of television operating expenses. Programming emphasis at the Debtors' stations is placed on network-provided programming, syndicated series, feature motion pictures, local and regional sports coverage, locally produced news, and children's programs. Much of the Debtors' stations' programming is acquired from outside sources, including the broadcast networks with which the Debtors' stations are affiliated and major studios with whom the Debtors are not affiliated.

Syndicated programming costs are impacted largely by market factors, including demand from other stations within the market or cable channels. Availability of syndicated programming depends on the production of compelling programming and the willingness of studios to offer the programming to unaffiliated buyers. In addition, the Debtors usually acquire syndicated programming rights several years in advance of availability to telecast programs and those rights often require multi-year commitments, making it difficult to predict accurately how a program will perform.

In addition, as network affiliation agreements come up for renewal, the Debtors may not be able to negotiate terms comparable to or more favorable than the current agreements. Also, the impact of reverse network compensation payments made by the Debtors to networks pursuant to their affiliation agreements requiring compensation for network programming may have a negative effect on the Debtors' financial condition or results of operations.

The Debtors' inability to continue to acquire or produce affordable programming for their stations could adversely affect operating results or the Debtors' financial condition.

8.    Newsprint Prices May Continue to be Volatile and Difficult to Predict and Control.

Newsprint is one of the largest expenses of the Debtors' publishing units. The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of suppliers. In addition, in an effort to support higher newsprint prices, newsprint mills often reduce their production of newsprint by shutting down mills or taking downtime in their production schedules. The Debtors have historically been able to realize favorable newsprint pricing by virtue of the Debtors' company-wide volume and a long-term contract with a significant supplier. However, the volatility of newsprint prices has increased over the last three years with significant price increases in 2008, followed by significant price reductions in 2009, and significant price increases again in 2010. Newsprint prices will continue to be impacted by many factors including the relative supply of and demand for newsprint, the exchange rate between U.S. and Canadian dollars and the level of energy prices, which is a significant factor in the cost structure of the newsprint mills. In addition, failure to maintain the Debtors' current consumption levels, further supplier consolidation or the inability to maintain the Debtors' existing relationships with their newsprint suppliers could adversely impact newsprint prices in the future.

9.    The Debtors' Ability to Grow Depends on the Development of the Debtors' Interactive Businesses.

The Debtors' growth depends to a significant degree upon the development of their interactive businesses. The growth and success of the Debtors' interactive businesses over the long term depends on various factors, among other things:

- increasing online traffic and attracting and retaining a base of frequent visitors to the Debtors' Internet sites, which may be adversely affected by search engines (including Google, the primary search engine directing traffic to the Debtors' Internet sites) changing the algorithms responsible for directing search queries to Internet sites;

- attracting advertisers to the Debtors' Internet sites, which depends partly on the Debtors' ability to generate online traffic and partly on the rate at which users click through advertisements, which may be adversely affected by the development of new technologies to block the display of the Debtors' advertisements;

- maintaining or increasing the advertising rates of the inventory on the Debtors' Internet sites amid significant increases in inventory in the marketplace, which may depend on the market position of the Debtors' brands and the market position and growth of advertising networks and exchange-based advertising marketplaces;

- exploiting new and existing technologies to distinguish the Debtors' products and services from those of the Debtors' competitors and developing new content, products and services, which may move in unanticipated directions due to the development of competitive alternatives, rapid technological change, regulatory changes and shifting market preferences;

- investing funds and resources in online opportunities, in which some of the Debtors' existing competitors and possible additional entrants may have greater operational, financial and other resources than the Debtors or may be better positioned to compete for certain opportunities;

- maintaining and forming strategic relationships to attract more consumers, which will depend on the efforts of the Debtors' partners, fellow investors and licensees that may be beyond the Debtors' control;

- attracting and retaining talent for critical positions; and

- the impact that filing for chapter 11 bankruptcy may have had on the Debtors' public image, normal business operations, financial condition, liquidity or cash flow.

The Debtors believe that even if the Debtors continue to develop their interactive businesses, they may not be successful in generating or increasing revenue from their interactive businesses due to increasing competition and current economic conditions. If the Debtors are not successful in maintaining or growing revenues from their interactive businesses to offset continued declines in revenues from their newspapers, their businesses, operating results or financial condition could be adversely affected.

The Debtors host Internet services that enable individuals to exchange information, generate content, comment on content and engage in various online activities. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. While the Debtors monitor postings to such websites, claims may be brought against the Debtors for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that may be posted online or generated by the Debtors' users. The Debtors' defense of such actions could be costly and involve significant time and attention of their management and other resources.

        10.     The Debtors' Success Will Depend on the Debtors' Ability to Adapt to Technological Change.

The Debtors' businesses are subject to rapid technological change, evolving industry standards, and the emergence of new media technologies and services. In the past, innovations in communications technology, including the explosive growth of the Internet, the spread of satellite and cable television, and the expansion of alternative programming sources have affected many aspects of the Debtors' business. While the Debtors have made significant investments to address the opportunities and challenges presented by these technological changes, these efforts have not always been successful. In the future, the Debtors' ability to profitably grow their business will depend upon their ability to adapt to future technological innovation. No assurance can be given that the Debtors will be successful in this regard.

11.    The Debtors May be Required to Write Down Goodwill or Other Intangible Assets Which May Adversely Affect Their Financial Position and Results of Operations.

The Debtors review goodwill and other indefinite-lived intangible assets for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Accounting Standards Codification Topic 350, "Intangibles – Goodwill and Other."

To perform the annual impairment review, the Debtors estimate the fair values of their reporting units to which goodwill has been allocated using many critical factors, including projected future revenue, operating cash flows, and market growth, market multiples, discount rates and consideration of market valuations of comparable companies. The estimated fair values of other intangible assets subject to the annual impairment review, which include newspaper mastheads and FCC licenses, are generally calculated based on projected future discounted cash flow analyses. Adverse changes in expected results of operations and/or unfavorable changes in other economic factors used to estimate fair values, including market multiples and discount rates, could result in non-cash impairment charges in the future, which may have a material adverse effect on the consolidated statements of operations.

12.    Events Beyond the Debtors' Control May Result in Unexpected Adverse Operating Results.

The Debtors' results of operations could be affected in various ways by global or domestic events beyond the Debtors' control, such as wars, political unrest, acts of terrorism, and natural disasters. Such events can quickly result in significant declines in advertising revenues and significant increases in newsgathering costs. Coverage of the war in Iraq and Hurricane Katrina are two examples where newsgathering costs increased and, in the case of Hurricane Katrina, revenues dropped off significantly at the Debtors' two New Orleans television stations.

13.    Changes in Accounting Standards Can Significantly Impact the Debtors' Reported Earnings and Operating Results.

Generally accepted accounting principles and accompanying pronouncements and implementation guidelines (collectively, "GAAP") for many aspects of the Debtors' businesses, including those related to intangible assets, pensions, employee stock ownership plans, income taxes, derivatives, equity-based compensation and broadcast rights, are complex and involve significant judgments. Changes in these rules or their interpretation could significantly change the Debtors' reported earnings and operating results.

14.    Adverse Results from Litigation or Governmental Investigations can Impact the Debtors' Business Practices and Operating Results.

From time to time, the Debtors are parties to litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations could result in significant monetary damages, fines, penalties, or injunctive relief that could adversely affect the Debtors' operating results or financial condition as well as the Debtors' ability to conduct their businesses as they are presently being conducted.

15.    The Debtors Could Be Faced with Additional Tax Liabilities.

The Debtors are subject to federal and state income taxes and are regularly audited by federal and state taxing authorities. In the years currently under audit, or eligible for future audit, the Debtors

consummated certain significant business transactions that they treated or intend to treat as not resulting in gain for income tax purposes but as resulting in gain or loss for financial accounting purposes. In addition, the Debtors treated or intend to treat significant amounts of income as not subject to tax because of the Debtors' status as an S corporation. Significant judgment is required in evaluating the Debtors' tax positions and in establishing appropriate reserves. The Debtors analyze their tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. The resolutions of the Debtors' tax positions are unpredictable and could result in tax liabilities and associated cash payments that are significantly higher or lower than that which has been provided for by the Debtors.

    16.    The Debtors' Company-Sponsored Pension Plans are Currently Underfunded, and Over Time the Debtors Will Likely be Required to Make Cash Contributions to the Pension Plans, Reducing the Cash Available for Working Capital and Other Corporate Uses.

The Debtors provide pension benefits to eligible employees under certain company-sponsored defined benefits pension plans. In 2008, the market value of the Debtors' pension plan assets declined significantly due to negative investment returns. As a result, in accordance with GAAP (Accounting Standards Codification Topic 715, "Compensation Retirement Benefits"), the Debtors' recognized a net pension obligation for the underfunded status of its company-sponsored pension plans at the end of 2008. In 2009, the net pension obligation declined slightly due to an increase in pension assets resulting from investment returns but that increase was largely offset by higher liabilities due to a lower discount rate and other factors.

Cash Funding requirements are not driven directly by the GAAP underfunded position, but by the Pension Protection Act ("PPA"), which uses a different method to calculate the underfunded amount, as described in Article III.C.1.a.i hereof. Using the PPA methodology and based on various assumptions, the Debtors project that significant cash contributions will be required in the future. Actual Cash Funding may be more or less than these projections. For example, if PPA discount rates remain low and/or investment returns are below expectations, then without legislative relief the projected contributions may be higher than currently anticipated. As a result, the Debtors may have less cash available for working capital and other corporate uses, which may have an adverse impact on the Debtors' operations, financial condition and liquidity.

In addition, the Debtors participate in multiemployer pension plans on behalf of employees represented by certain unions. Contributions to these multiemployer pension plans could increase as a result of future collective bargaining, funding deficiencies or other factors. The Debtors' obligations to make contributions to their pension plans and multiemployer pension plans in which they participate would reduce the cash available for working capital and other corporate uses and may have a material adverse impact on the Debtors' operations, financial condition and liquidity.

    17.    Labor Strikes, Lock-Outs and Protracted Negotiations can Lead to Business Interruptions and Increased Operating Costs.

As of December 31, 2009, union employees comprise about fifteen percent (15%) of the Debtors' workforce. The Debtors are required to negotiate collective bargaining agreements across their respective business units on an ongoing basis. Complications in labor negotiations can lead to work slowdowns or other business interruptions and greater overall employee costs.

18.    Acquisitions, Investments and Dispositions Pose Inherent Financial and Other Risks and Challenges.

The Debtors continuously evaluate their businesses and make strategic acquisitions, dispositions, and investments.  These transactions involve challenges and risks in negotiation, execution, valuation and integration.  There can be no assurance that any such transaction can be completed.  Moreover, competition for certain types of acquisitions and investments is significant.  Even if successfully negotiated, closed and integrated, certain acquisitions or investments may prove not to advance the Debtors' businesses strategy and may fall short of expected return on investment targets.  In certain of the Debtors' investments, the Debtors have taken or may take a minority position in a company with limited voting rights and an inability to exert absolute control over the entity.

## XIII.    CONCLUSION

Please refer to the Specific Disclosure Statements for the Proponents' views regarding the implications and consequences of confirmation of their respective Competing Plans.  Following such review, please vote to accept or reject the Competing Plans by returning your ballot(s) so that they are received no later than 4:00 p.m. (prevailing Eastern Time) on [●], 2010.

Dated: ~~October 22,~~November [●], 2010

Respectfully submitted,

TRIBUNE COMPANY (for itself and on behalf of the ~~Affiliate~~other Debtors, as Debtors and Debtors in Possession, and the Guarantor Non-Debtors and Non-Guarantor Non-Debtors)

By: _____
Name: Donald J. Liebentritt
~~Executive Vice~~ Title: Co-President and Chief Restructuring
            Officer
, Tribune

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue
Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

Counsel to the Debtors, Debtors-in-Possession, and Certain Non-Debtor Affiliates

**VOLUME II**  –  **ADDENDA TO THE GENERAL DISCLOSURE STATEMENT:**

**VOLUME III    –    RESPONSIVE STATEMENT(S):**