# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>Related to Docket Nos. 6514, 6550, 6553 |

## REPLY OF DEBTORS TO (I) RESPONSE AND LIMITED OBJECTION OF AURELIUS CAPITAL MANAGEMENT L.P. AND (II) LIMITED OBJECTION OF WILMINGTON TRUST COMPANY TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, SETTLE AND RECOVER CERTAIN CAUSES OF ACTION ON BEHALF OF DEBTORS' ESTATES ARISING UNDER AND PURSUANT TO 11 U.S.C. §§ 547 AND 550

The debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") by and through their undersigned counsel, hereby submit this Reply to the Response and Limited Objection ("Aurelius Objection") filed by

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Aurelius Capital Management L.P. ("Aurelius") and the Limited Objection ("WTC Objection") of Wilmington Trust Company ("WTC"), in each case, to the motion filed by the Official Committee of Unsecured Creditors ("Committee") for standing to commence, prosecute, settle and recover certain preference causes of action ("Preference Standing Motion"). In further support of their Reply, the Debtors state as follows:

## PRELIMINARY STATEMENT

Aurelius and WTC seek to force the filing of lawsuits for $905 million in alleged "preference claims" against thousands of vendors. According to Aurelius and WTC, these $905 million in total payments (a number that is simply lifted from the Statement of Financial Affairs and therefore grossly overstates the viable preference universe) must be the subject of immediate litigation or tolling in order to preserve substantial value to creditors. They urge that complaints be indiscriminately filed (or tolling agreements obtained) without any regard for whether the payments are in fact subject to characterization as a preference, and without regard to materiality, applicable defenses, or the potential impact on business relationships. In short, Aurelius and WTC urge the Debtors to abandon their judgment altogether in favor of wholesale and indiscriminate litigation.

The positions taken in the Aurelius and WTC Objections are untenable and irresponsible. As an initial matter, they grossly overstate the actual universe of viable potential preference recoveries, by completely ignoring the analysis performed by Alvarez & Marsal North America, LLC ("A&M") and that was previously provided to them. As described more fully in the declaration of A&M Managing Director, Brian Whittman ("Whittman Declaration"), after application of quantifiable section 547(c) defenses, a reasonable materiality threshold and relevant qualitative factors, the $905 million in gross third party payments reduces to

approximately $345 million.[2] Of this amount, the Committee is pursuing or preserving about $248.6 million and the Debtors are pursuing or preserving through tolling agreements approximately $96.8 million. The analysis and support for the potential preference recoveries is set forth in detail in the preference analysis prepared by the Debtors through their financial advisors, A&M.[3] Specifically, the Committee has filed standing motions in order to preserve or file complaints on transfers to (i) JPMorgan or other Senior and Bridge Lenders in connection with payments made in the 90 days prior to the Petition Date (approximately $231 million) and (ii) professionals (approximately $17 million), while the Debtors will enter into tolling agreements with or commence actions exclusively against third parties other than those included within the Committee's complaint. The Committee will also preserve by tolling agreements or file complaints for transfers made within the year prior to bankruptcy to "insiders" (approximately $180 million, which is incremental to the third party amounts described above). Hence the current estimates of total payments to third parties or insiders that will be the subject of preference complaints or preserved by tolling agreements approximates $525 million.

      Aurelius and WTC also ignore the fact that, unlike many distressed businesses on the doorstep of bankruptcy, the Debtors did not suffer severe liquidity constraints in the weeks and months preceding their filing. This means that the Debtors were not engaged in a pattern of "stretching" vendors followed by accelerated payments under creditor pressure on the eve of bankruptcy. Prior to the bankruptcy, the Debtors were generally conducting business operations according to normal terms. Indeed, when the Debtors commenced these cases they had

---

[2] Schedule 3(b) to the SOFA reflects gross payments by wire, ACH or check within 90 days prior to the Petition Date of about $959 million. The Debtors have since determined, however, that the correct amount of the scheduled payments should be approximately $905 million.

[3] Prior to the November 29, 2010 hearing, the Debtors intend to file a copy of the preference analysis, with supporting "backup" documentation, with a motion seeking leave to file under seal, in order not to disclose publicly vender specific information concerning potential preferences and defenses. A redacted copy of the analysis will also be filed with the Court.

approximately $368 million in cash on hand. Moreover, there is absolutely nothing surprising about companies with aggregate annual revenues in excess of $4 billion making $900 million in operating payments and regularly scheduled debt service payments (including presumably on the bonds held by Aurelius) over a three month period. And, given the Debtors' liquidity and their normal operations preceding bankruptcy, it would be surprising if many of these payments bore the earmarks of transactions "outside the ordinary course," and, predictably, they do not. As the Debtors' analysis bears out, most of these payments simply do not give rise to viable preference recoveries of any significance.

Aurelius' and WTC's arguments also completely disregard the value of the Debtors' businesses and the relative benefit to creditors in pursuing "all" payments in the months preceding bankruptcy as preference claims. The plan of reorganization (the "<u>Settlement Plan</u>") proposed by the Debtors, the Committee, Angelo Gordon & Co., L.P., Oaktree Capital Management, L.P., and JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>") reflects distributable value for the Debtors of about $6.75 billion, the vast majority of which derives from the subsidiaries, as to which Aurelius and WTC have no cognizable economic interest. Yet Aurelius and WTC would have the Committee pursue on behalf of the estates claims against almost 3,000 third parties. Over one-half of these claims are under $25,000 in gross amount and 1/3 are under $10,000 in gross amount and would likely not yield any clear material benefit to the estates beyond the potential recoveries from causes of action the Debtors or Committee are already pursuing.[4]

---

[4] Moreover, even these recoveries would overwhelmingly belong to the subsidiary Debtors, where, under two of the four pending plans, creditors would receive payment in full and where Aurelius and WTC have no claims (*i.e.*, either the recovery would "round trip" back to the preference defendant in a 100% payment plan or, at a minimum, the recovery would inure to the benefit of subsidiary creditors, not the pre-LBO Lenders). The Settlement Plan and the Step One Plan both contemplate payment in full of subsidiary Debtor creditors.

While Aurelius and WTC are focused solely on their own parochial interests and perceived tactical advantage, the Debtors have analyzed potential preference claims from the perspective of what is in the best interests of the businesses as ongoing operations that generate value for the benefit of all creditors. In the context of a reorganizing business, the "best interest of the estates" is not only determined by a static arithmetic calculation of section 547 defenses and the cost of litigation versus recovery, although these calculations were a material part of the Debtors' (and Committee's) calculus. As applied to operating companies undergoing reorganization (as opposed to a liquidation), the best interest of the estates must also take into account the preservation of value globally, and requires an analysis of not only section 547(c) defenses, but also an analysis of ongoing business relationships and other qualitative factors. *See* discussion at ¶¶ 18-19, *infra*; *see also In re The Gibson Group, Inc.*, 66 F.3d 1436, 1442 (6th Cir. 1995); *In re Adelphia Communications Corp.*, 330 B.R. 364, 383 (Bankr. S.D.N.Y. 2005).

As set forth below, the Debtors and the Committee have performed an in-depth review of potential preference claims and have reached reasoned determinations as to the universe of claims which should be preserved based on the relevant facts and circumstances. The Debtors and Committee have collaborated extensively throughout this process, sharing and probing the relevant data, vetting conclusions and ultimately concurring in both the appropriate scope and division of responsibilities for the pursuit or preservation of preference claims. In stark contrast, Aurelius and WTC seek to force litigation without the exercise of any judgment or the benefit of any analysis whatsoever. Their approach has nothing to do with maximization of value or the best interests of the estates; rather, it has everything to do with gamesmanship and a strategy designed to undermine the Debtors and the Committee at every turn. The Debtors believe that the positions taken by Aurelius and WTC are inconsistent with the proper exercise of

fiduciary duties and, at best, are irresponsible. Notably, no other creditor constituency seeks to require the prosecution of "all" payments within 90 days of the Petition Date or has otherwise taken issue with the judgment of the Debtors and the Committee.

There is simply no merit in Aurelius' and WTC's suggestions that the Committee or the Debtors are not taking all necessary action to pursue or preserve preference claims that meet the criteria set forth in the preference analysis. As discussed below, approximately $345 million in gross third party Avoidance Actions (as defined herein) will either be the subject of tolling agreements or filed complaints prior to the December 8, 2010 deadline, and the Committee intends to file or toll another $180 million of "insider" claims. As to the preservation of any section 502(d) objection, the law is clear that the Debtors retain the right to use section 502(d) irrespective of the passing of the section 546(a) statute of limitations.[5] In any event, the Debtors have not waived and are expressly preserving, section 502(d) objections both in filed complaints and in tolling agreements.

The relief sought by the Aurelius and WTC Objections – whether it be the request to substitute their opinion for the analysis and conclusions of Debtors and Committee and to force the Committee to act on that opinion, or the equally unsupported request that no settlements even be allowed to be brought before the Court before the plan process is concluded – should be denied. Apart from being utterly devoid of merit on the substance, the Aurelius and

---

[5] The Debtors can object to any claim filed in the Debtors' bankruptcy proceeding by any creditor that received a preferential transfer pursuant to section 502(d) of the Bankruptcy Code. *See* 11 U.S.C. § 502(d). The application of section 502(d) is also not contingent on a successful avoidance action or even the filing of an avoidance action. *See In re Am. West Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000); *In re McLean Indus., Inc.*, 196 B.R. 670, 676-77 (Bankr. S.D.N.Y. 1995); *In re Benniger*, 357 B.R. 337, 359 (Bankr. W.D. Pa. 2006) ("Section 502(d) disallowance is proper even if statute of limitation has expired with respect to avoidable transfer"); *In re Buchholz*, 224 B.R. 13, 22 n.6 (Bankr. D.N.J. 1998) ("11 U.S.C. § 502(d). . . is not subject to the 546(b) time limitations. . . majority view is that motion under section 502(d) is timely, even though time to bring a section 544 action has expired."); *Collier on Bankruptcy*, ¶ 502.05[a] ("Most courts find that there is no prohibition against the trustee's asserting section 502(d) as an affirmative defense to a claim of a creditor even if the trustee's claim is time-barred or otherwise nonrecoverable."); *see also In re TWA Inc.*, 305 B.R. 221, 225-26 (Bankr. D. Del. 2004) (finding that objecting to a claim under 502(d) was distinct from and not contingent on the actual filing of a preference action).

6

WTC Objections' procedurally impermissible attempt to masquerade as a motion should likewise not be sanctioned. The Objections should be overruled and all relief impermissibly requested therein should be denied.[6]

### STATUS OF THE CASE AND JURISDICTION

1. On December 8, 2008 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[7] In all, the Debtors comprise 111 entities.

2. On December 18, 2008, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee").

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a) and 363(b) of the Bankruptcy Code.

4. Pursuant to Bankruptcy Code §546(a), the bar date for commencing avoidance actions in these cases is December 8, 2010 ("Bar Date").

5. On November 11, 2010, the Committee filed the Preference Standing Motion and the Debtors have consented to the relief requested therein. On November 23, the Committee filed another motion for standing to commence preference actions against estate professionals.

---

[6] The Debtors object to all relief requested in the Objections, including the attempt to prohibit parties from even bringing before the Court a settlement for approval.
[7] Tribune CNLBC, LLC was formerly known as Chicago National League Ball Club, LLC. An additional Debtor, Tribune CNLBC, LLC, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009.

7

6. On November 22, 2010, Aurelius, holder of unsecured notes issued by Tribune, and WTC, as successor Indenture Trustee for the PHONES, also securities issued by Tribune, filed the Aurelius Objection and Wilmington Objection, respectively.

## BACKGROUND

### A. The Preference Analysis

7. As set forth in the Whittman Declaration, the Debtors, through their financial advisors, have undertaken an extensive and detailed analysis of payments made (a) to third parties within 90 days prior to the Petition Date, and (b) to insiders within one year prior to the Petition Date. The Debtors, through A&M, have reviewed all such payments made, whether by wire, ACH or check, by Tribune on its own behalf and for its subsidiaries.[8] (Whittman Decl., ¶ 3.) In reviewing these transfers, A&M applied both quantitative and qualitative factors to each payment, including a materiality threshold; an assessment of the relative cost versus benefit of pursuing the transfer; the existence of quantifiable defenses; "First Days Orders" authorizing for payment of prepetition claims to certain vendors, customers and employees; whether the claim, if not paid, would give rise to a priority claim; the importance of ongoing business relationships; and the probable assumption of all or virtually all subsidiary Debtors' executory contracts under any of the pending competing reorganization plans. *Id.*

8. In considering the "cost benefit" calculus attendant to bringing specific preference claims, the Debtors set a materiality threshold for claims, depending upon whether the payments were made to current or former vendors. The Debtors determined, taking into account various factors, including the distributable value of the companies and the claims against the Debtors, that an appropriate materiality threshold for pursuing preference claims would be

---

[8] Due to Tribune's centralized cash management system, most of the payments to subsidiary creditors were actually initiated by Tribune for the account of the subsidiaries, with appropriate intercompany accounting for the liability of the subsidiary respecting such payment.

$100,000 net of quantifiable defenses for vendors with whom they still do business. With respect to payments to vendors with whom the Debtors no longer do business, the threshold was lowered to $25,000, net of quantifiable defenses. These thresholds are justified by the relationship between the number and amount of potential preference claims: during the 90 days preceding the Petition Date, nearly 3,000 vendors (the "Vendor Pool") received payments aggregating approximately $905 million. Nearly 70% of the Vendor Pool received payments under $50,000; however, the dollar value of total payments to this group accounted for only 3.2% of the total amount of payments made. Another 358 vendors received payments aggregating between $50,000 and $100,000, accounting for only an additional 2.8% of the total amount of payments made. Accordingly, approximately 80% of the Vendor Pool accounted for only 6% of total payments in the 90 days preceding the Debtors' bankruptcy. Conversely, 577 vendors or approximately 20% of the Vendor Pool, received payments over $100,000 and represent virtually all (94%) of the total payments made. Looking at the amounts net of quantifiable defenses, 93% of the Vendor Pool represents payment amounts under $100,000, constituting only 16% of the total payments made. Accordingly, over 84% of payments net of calculated defenses are unaffected by the materiality thresholds. (Whittman Decl., ¶ 22.)

9. As set forth in the Whittman Declaration, the Debtors, through their financial advisors, further performed an analysis of applicable, quantifiable defenses under section 547(c) of the Bankruptcy Code. They undertook this analysis, on a transferee-by-transferee basis, and applied the defenses conservatively. The application of these defenses can be summarized as follows:

  (a) <u>Ordinary Course</u>

  The Debtors employed a "look back" period of 13 months prior to the 90-day preference period to calculate the average days-to-pay each particular vendor. The Debtors then considered each of the transfers made to a specific vendor during the 90-day

preference period, and if the calculated days-to-pay for a particular payment was within 7-days of the calculated prepetition average, the Debtors considered such payments to be within the ordinary course of business. Payments outside of that narrow window were not considered to be in the ordinary course of business.

        (b)    <u>Contemporaneous Exchange</u>

The Debtors again applied a conservative standard for this defense, such that only payments that were made within one day of the applicable invoice date would be considered a contemporaneous exchange of new value.

        (c)    <u>Subsequent Advances of New Value</u>

The Debtors calculated the aggregate potential preference exposure of each transferee on an ongoing basis during the 90-day preference period, taking into account subsequent advances of new value.

(Whittman Decl., ¶¶ 14-17.)

        10.    The Debtors also took into account qualitative factors, including (a) whether the payments would have been authorized and paid under applicable "First Day Orders;"[9] (b) whether the claims, had they not been paid, would have given rise to priority claims; (c) whether the vendors who received payments qualified as Critical Vendors (as defined in the Whittman Declaration) or §503(b)(9) claimants, all of whom entered into written agreements post-petition to provide ongoing goods and services on the same trade terms as in effect prior to the Petition Date, and some of whom made additional concessions to the Debtors; (d) the importance of specific business relationships, and (e) whether the vendor was party to an assumed executory contract or to a contract that would be virtually certain to be assumed under any plan of reorganization. (Whittman Decl., ¶¶ 24-26.)

        11.    Based on their analyses, the Debtors and Committee have concluded that over $345 million in third party preference claims (on a gross basis) should be filed or preserved through tolling agreements (the "<u>Avoidance Actions</u>"). The Committee has filed the current standing motions in order to preserve or file complaints on transfers to (i) "insiders"

---

[9] "First Day Orders" means those orders entered by this Court on December 10, 2009, which authorized certain emergency relief in connection with the Debtors' bankruptcy filings [Docket Nos. 45, 46, 49, 50, 53, 59].

10

(approximately $180 million, which is incremental to the third party amounts described herein), (ii) professionals (approximately $17 million), and (iii) JPMorgan or other Senior and Bridge Lenders in connection with payments made in the 90 days prior to the Petition Date (approximately $231 million). The Debtors will enter into tolling agreements with or commence Avoidance Actions exclusively against third parties (other than those included within the Committee's complaint). The current estimates of payments to third parties that will be filed or preserved through tolling agreements by the Debtors totals approximately $97 million. (Whittman Decl., ¶ 28.) In total, gross preference claims to be pursued or preserved, including against insiders, approximate $525 million.

12. As a result of their analyses, the Debtors, working with the Committee, determined that the following claims (i.e. the Other Potential Preference Claims) should not be pursued:

    a. Claims with "net" (i.e. after calculated defenses) estimated recoveries under $100,000 against current vendors and net estimated recoveries under $25,000 against inactive vendors (as opposed to claims against inactive vendors with a net exposure over $25,000, which the Debtors' intend to preserve). These represent claims against approximately 1786 current vendors, totaling approximately $102.2 million on a gross basis and $12.1 million net of calculated defenses, and claims against approximately 862 inactive vendors, totaling approximately $34.7 million on a gross basis and $2.9 million net of calculated defenses. Approximately 91% of these vendors account for claims under $25,000 in amount.

    b. Claims against vendors with whom the Debtors entered into Critical Vendor or §503(b)(9) agreements post-petition and who remain key vendors to the Debtors. These represent claims against 17 vendors totaling approximately $99.2 million on a gross basis and approximately $18.9 million net of calculated defenses. This category includes payments made to three print vendors currently in bankruptcy which are further discussed below.

    c. Claims against third parties, which do not appear to be subject to § 547(c) defenses, with whom the Debtors have strategic business relationships (including approximately $6.6 million in payments to the Debtors' sole supplier of newsprint ink), or as to which business judgment considerations militate against pursuit of such claims. These represent

           claims against 15 vendors totaling approximately $14.6 million on a gross basis and $6.7 million net of calculated defenses.

    d.    Claims for payments to third parties (including customer refunds and employee reimbursements) for whom the Debtors subsequently obtained court authorization under "First Day Orders" to make payment for prepetition amounts owing. Payments were made to 14 parties, and total approximately $14.7 million on a gross basis and approximately $4.8 million net of calculated defenses.

    13.    Accordingly, with respect to these Other Potential Preference Claims totaling approximately $45.5 million on a "net" basis (after calculated defenses but without taking into account qualitative factors), and approximately $265.5 million on a gross basis, the Debtors have concluded, and the Committee concurs, that prosecution is not warranted under the relevant facts and circumstances, including because pursuit of such claims would (i) entail pursuing thousands of claims for low dollar recoveries, (ii) be inconsistent with relief obtained and payments subsequently made under Court authorization, (iii) in many cases, needlessly risk disruption to ongoing and important business relationships with key vendors at operating subsidiaries, and (iv) not be in the best interest of the Debtors' estates under all relevant circumstances. (Whittman Decl., ¶¶ 24-27.) The Debtors' analysis respecting the categories of claims to be preserved and those not to be preserved was vetted thoroughly with the Committee's advisors, who also conducted their own independent investigation of potential preference causes of action. The end result is that the Committee and the Debtors share a common assessment of potential preference claims and the manner in which they should be treated in these cases.

    14.    The Debtors and Committee have provided Aurelius and WTC with the preference analysis and relevant backup and have repeatedly invited them to share any questions or concerns regarding the analysis and the conclusions reached. Specifically, the Debtors and Committee have shared their analyses and conclusions with Aurelius and WTC, both in writing (with supporting backup), in two conference calls on October 28, 2010 and November 5, 2010

and in an in-person meeting on November 11, 2010. At the November 11, 2010 meeting, Aurelius suggested for the first time that it might file an emergency standing motion in order to pursue preference claims that the Debtors and Committee did not intend to file or preserve. On November 12, 2010, the Debtors notified Aurelius and WTC that they and the Committee would consent to an expedited hearing on any such standing motion that Aurelius or WTC might file. In response to certain inquiries received by return emails from Messrs. Golden and Novod, the Debtors sent a further letter to Messrs. Golden and Novod on November 18, 2010 addressing their questions and summarizing (again) the conclusions concerning preference actions that would be preserved and those that would not be pursued. Copies of the November 12, 2010 email correspondence and November 18, 2010 letter are attached to the Aurelius Objection as Exhibit A and B, respectively. Rather than seeking such standing, however, Aurelius and WTC instead waited until Monday, November 22, 2010 to seek to force the Committee to bring "all" preference claims, without filing a motion seeking such relief, and without regard to applicable defenses or any other considerations. Remarkably, neither Aurelius nor WTC cite even a single case in support of the extraordinary relief sought.

## ARGUMENT

I. **AURELIUS AND WTC HAVE NO LEGAL BASIS FOR FORCING THE COMMITTEE TO ASSUME STANDING AND HAVE NOT MET THEIR BURDEN OF DEMONSTRATING AN UNJUSTIFIED REFUSAL TO BRING THE OTHER PREFERENCE CLAIMS.**

15. The most striking feature of the Aurelius Objection and the WTC Objection is the complete absence of any supporting authority for any proposition advanced. Neither Aurelius nor WTC even attempts to meet its burden of demonstrating an unjustified refusal of the Debtors (or Committee) to bring the Other Preference Claims. Nor do they provide any authority for the unusual request, via an objection no less, that the Committee be directed to

assume standing to bring actions which only Aurelius and WTC appear to want prosecuted. Clearly, if Aurelius and WTC can demonstrate that the Debtors or Committee have unjustifiably refused to preserve or prosecute causes of action which it would be in the best interests of these estates to preserve or prosecute, they should have sought such relief on their own behalf, as they were invited to do on an expedited basis by the Debtors and Committee. Perhaps indicative of the seriousness of their arguments, Aurelius and WTC seek no such relief.

16.    However, even if Aurelius and WTC had filed the appropriate motion seeking standing (rather than improperly attempting to bootstrap an objection into a motion), they would not have been able to carry their burden. Although the procedure is not exact, a request for derivative standing to pursue avoidance actions to a third party (in this case, the Committee at the behest of Aurelius and WTC) generally requires a showing that (i) a demand was made; (ii) the demand was declined; (iii) a colorable claim that would benefit the estate exists, based on a cost/benefit analysis; and (iv) the decision not to pursue such claims is unjustified. *In re STN Enters.*, 779 F.2d 901, 904-05 (2d Cir. 1985); *In re G-I Holdings, Inc.*, 313 B.R. 612, 628 (Bankr. D. N.J. 2004); *In re Valley Media, Inc.*, 2003 WL 21956410, *2-3 (Bankr. D. Del. 2003) ("The Third Circuit's *Cybergenics* opinion does not set forth the exact procedures bankruptcy courts should follow in allowing creditors derivative standing. However, the Third Circuit stated that it agreed with recent Second and Seventh Circuit opinions addressing this issue"). The burden of proof, in the first instance, is on the moving party. *In re The Gibson Group, Inc.*, 66 F.3d 1436, 1446 (6th Cir. 1995); *STN Enters.*, 779 F.2d at 905; *In re Prosser*, 2009 WL 2424409, *5 n.23 (Bankr. D. V.I. 2009); *G-I Holdings*, 313 B.R. at 629. Only after finding that a moving party has satisfied each of the four elements set forth above and the debtor has then failed to show that its decision was justified, should a court confer standing on a

creditors' committee or other third party. *STN Enters.*, 779 F.2d at 905; *The Gibson Group*, 66 F.3d at 1446; *G-I Holdings*, 313 B.R. at 629.

17.  Neither Aurelius nor WTC, however, has even attempted to carry its burden nor could either show that derivative standing was justified. On the other hand, as evinced by the Whittman Declaration, the efforts undertaken by the Debtors' professionals reflect a serious and well-considered analysis that fully supports the Debtors' decision not to pursue certain payments. Because Aurelius and WTC have not even attempted to carry their burden and because ample business justification exists to support that the Debtors' and Committee's conclusions, the Aurelius and WTC Objections should be overruled.

## II. THE CONCLUSIONS REACHED BY THE DEBTORS AND COMMITTEE REFLECT AN APPROPRIATE EXERCISE OF BUSINESS JUDGMENT AND ARE IN THE BEST INTEREST OF THE ESTATES.

### A. The Assessment of Materiality, Quantifiable Defenses and Qualitative Factors Reflects An Appropriate Exercise of Business Judgment, Consistent with Fiduciary Duties

18.  It is uncontested that the Debtors, as debtors-in-possession, have a fiduciary duty to maximize the value of their estates.. *See, e.g., Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics v. Chinery*, 330 F.3d 548 (3d Cir. 2003); *In re Nat'l Forge Co.*, 326 B.R. 532 (Bankr. W.D. Pa. 2005). In chapter 11 reorganization, unlike a chapter 7 liquidation, maximization of the debtor's estate includes a duty to not impede a debtor's ability to successfully reorganize. *See In re The Gibson Group, Inc.*, 66 F.3d 1436, 1442 (6th Cir. 1995) ("the maximization of the value of the estate is not necessarily the primary goal [of chapter 11]."); *In re Adelphia Communications Corp.*, 330 B.R. 364, 383 (Bankr. S.D.N.Y. 2005) ("One such factor [in determining whether a decision was justified] is whether prosecution of the litigation would impede the Debtors' reorganization or assist it").

19. Further, implicit in its fiduciary duties is the requirement that a debtor, in deciding whether to bring a preference action, utilize its judgment and only bring actions that would actually benefit the estate. *See In re Taxman Clothing Company*, 49 F.3d 310, 315 (7th Cir. 1995) ("[a debtor's] duty is to endeavor to maximize the value of the estate, which is the *net* assets. The performance of this duty will sometimes require him to forbear attempting to collect a particular asset. . . .") (Posner, J.); *see also In re M&S Grading, Inc.*, 541 F.3d 859, 866 (8th Cir. 2008) (upholding denial of derivative standing when debtor exercised sound business judgment, consulted with competent professionals, and declined to commence litigation thought likely to be unsuccessful); *In re Grand Eagle Companies, Inc.*, 310 B.R. 79, 84-85 (Bankr. N.D. Ohio 2004) (stating that the business judgment rule as it relates to bringing avoidance actions is weighing the possible recovery versus the cost of litigation). Consistent with their fiduciary duties, in assessing which preference claim should be pursued or preserved, the Debtors determined that the pursuit of certain payments would not be beneficial to the Debtors' estates after consideration of the materiality of the payments in issue and an analysis of both quantifiable defenses and qualitative factors in respect of each transferee receiving payments. (*See* Whittman Decl., ¶ 3.) In carefully making this determination, the Debtors were cognizant that both ethical canons and the proper exercise of business judgment require that they not simply "shoot first and ask questions later," when determining to take the significant step of commencing litigation, particularly with parties with whom the Debtors do business. The position urged by Aurelius and WTC – that the Debtors file or toll "all" potential preference claims without regard to defenses or costs – is indefensible on its face and inconsistent with the appropriate exercise of fiduciary duties. As other courts have determined, simply challenging a payment without regard to its materiality or the relative costs and benefits of doing so (including

through assessing applicable defenses) is inappropriate and, in severe instances, sanctionable. *See In re Aphton Corp.*, 423 B.R. 76, 96-97 (Bankr. D. Del. 2010); *In re Nat'l Energy & Gas Transmission, Inc.*, 2009 WL 902058 (Bankr. D. Md. 2009) (authorizing sanctions under Rule 9011 when plaintiff clearly ignored defendant's obvious earmarking defense among other facts and "cho[osing] to initiate a baseless action. . . ."); *see also In re Taxman Clothing Company*, 49 F.3d 310, 315 (7th Cir. 1995) (finding that pursuit of actions which will cost more to pursue than could be recovered constituted a breach of a trustee's fiduciary duty).

20.     Moreover, the judgments made by the Debtors were uniformly conservative, belying the allegation by Aurelius that the Debtors' analysis was geared to finding reasons not to bring preference claims. (Aurelius Obj., ¶¶ 9-11.) For example, the section 547(c) defenses considered by the Debtors were applied on a more conservative basis than are often utilized in the cases. For example, in determining whether payments appeared to have been made in the ordinary course of business under § 547(c)(4), A&M applied only a 7 day variance in either direction from the average historic payment terms, whereas courts have allowed a significantly wider variance. *See, e.g., In re Global Tissue LLC*, 2004 WL 1510091, *3 (3d Cir. 2004) (allowing range of 26 to 50 days to constitute ordinary course). Likewise, in applying the contemporaneous exchange for new value defense, only a one day lag in payments following the Debtors' receipt of consideration was recognized. Again, courts often allow greater latitude when considering this defense. *See, e.g., In re Hechinger Invest. Co. of Del., Inc.*, 489 F.3d 568, (3d Cir. 2007) (citing cases for proposition that seven and eleven days between transfer and payment could still constitute contemporaneous exchange). Further, the Debtors properly considered whether a claim, if not paid, would give rise to a priority claim entitled to payment in full (such as taxes) - another valid consideration in determining whether to

pursue preference claims. *See Neuger v. U.S. (In re Tenna Corp.)*, 801 F.2d 819 (6th Cir. 1986); *Tire Kings of Am., Inc. v. Hoffman Tire Co., Inc. (In re Tire Kings of Am., Inc.)*, 164 B.R. 40, 41 (Bankr. M.D. Pa. 1993) (finding that tax payments will not constitute a preference if they would be entitled to priority status and are receiving more than they would in a liquidation); 92 B.R. 616, 620 (Bankr. E.D. Pa. 1988) (same). Similarly, where payments would have been made under court authorization pursuant to "First Day Orders," the Debtors did not include them in the universe of claims to be pursued. Often, these were payments made to or on behalf of employees, customers, critical vendors or §503(b)(9) claimants. As detailed in the Whittman Declaration, the Debtors determined, and the Committee concurred, that risking harm to those relationships would not be in the best interest of the estates. (Whittman Decl., ¶ 24-27.)

### B. The Failure to File Proofs of Claim in The Bankruptcy Cases of Three Critical Vendors is Immaterial to the Preference Recoveries in the Debtors' Cases

21.     Aurelius points to supposedly "alarming facts" pertaining to potentially preferential payments made by the Debtors to three critical vendors (print vendors) each of which subsequently filed its own chapter 11 case. The Debtors did not file proofs of claim in these cases because they were owed no money by such vendors. Further, in one such case, they were not even listed as a creditor and, upon information and belief, never received any notice. In any event, the relevant facts surrounding these payments belie Aurelius' rhetoric. First, the payments were made to important print vendors, each of whom qualified as a Critical Vendor under the relevant First Day Order and signed a Critical Vendor agreement. Had the prepetition payments not been made, the Debtors would almost certainly have paid these vendors pursuant to such Court authorization. Second, after the calculation of quantifiable defenses, these payments resulted in "net" potential preferences of $8.5 million. (Whittman Decl., ¶ 27.) Third, on information and belief, in none of the chapter 11 cases of these print vendors are recoveries to

creditors forecast to exceed 35¢ on the dollar (in the print vendor chapter 11 case where Debtors were not listed as creditors, no plan has yet been filed). Assuming the Debtors had filed a contingent claim and actually used estate resources to pursue such preference payments, and assuming a judgment had been obtained for the full "net" preferences, the Debtors would have received an unsecured claim entitled to a distribution in an amount significantly discounted from the "net" preference claim amount (i.e., by about two-thirds in the cases of at least two of the three vendors), before even taking into account the costs of pursuing such preference claims. Finally, the print vendors would themselves then have an unsecured claim back against the relevant subsidiary Debtors for the amount of their preference disgorgement, and would likely benefit from a much higher payout (perhaps 100¢ on the dollar). The circular result is that the preference recovery to the Debtors obtained via an unsecured claim distribution in another chapter 11 case would be severely diluted (if in fact any recovery was obtained) and the chapter 11 print vendor would have a corresponding claim back against the Debtors for the disgorgement. The "cost benefit" analysis in this scenario is hardly compelling. However, these "alarming" facts highlighted by Aurelius perfectly encapsulate the true purpose and objective of the Aurelius and WTC Objections. Aurelius and WTC's concern is not value preservation or the best interest of the estates but leveraging any opportunity to try and cast blame on their opponents (in this case, the Debtors and the Committee) for perceived tactical advantage.

## CONCLUSION

For all the foregoing reasons, the Debtors respectfully request that the Aurelius Objection and WTC Objection be overruled.

Dated: Wilmington, Delaware
November 24, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Janet E. Henderson
James W. Ducayet
Jillian K. Ludwig
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION