## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | Related to Docket No. 6624 |

## DECLARATION OF BRIAN WHITTMAN, MANAGING DIRECTOR AT
## ALVAREZ & MARSAL NORTH AMERICA, LLC

I, BRIAN WHITTMAN, declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746 as follows:

1.    I am a Managing Director at Alvarez & Marsal North America, LLC

("A&M"), a limited liability corporation.  A&M was retained by the above-captioned debtors

and debtors in possession (collectively, the "Debtors") to advise them in connection with their

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates. Inc (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (0199); KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817). Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

restructuring with the approval of this Court on February 11, 2009. I am generally familiar with the work performed by A&M for the Debtors and am competent to testify to the facts set forth herein. I have over fifteen (15) years of financial restructuring and bankruptcy experience and have been working with the Debtors since November 2008. A&M is a leading independent global professional services firm with significant experience in advising debtors in complex bankruptcy cases, including its current retention in the Lehman Brothers bankruptcy.

2.      I am familiar with the Debtors' books and records, including the payments made and transactions entered into by the Debtors during the Preference Period (as defined herein). I also am familiar with the Debtors' businesses and cash management system. If called as a witness I would testify competently to the facts herein.

3.      On behalf of the Debtors, and with the support of the Debtors' counsel on certain legal matters, A&M has undertaken a comprehensive review of payments made to (a) third parties within ninety (90) days prior to the Petition Date, and (b) insiders within one (1) year prior to the Petition Date (together, the "Preference Period"). In reviewing these transfers, A&M applied both quantitative and qualitative factors in analyzing the payments to each transferee, including a materiality threshold; assessment of the relative cost versus benefit of pursuing the transfer; the existence of applicable quantifiable defenses; court authorization of payment to certain vendors; customers and employees; whether the payment, if not made, would give rise to a priority claim; the importance of ongoing vendor relationships; and the assumption of executory contracts in these cases and probable assumption of most or all subsidiary Debtor executory contracts under any reorganization plan, as discussed more fully herein. This analysis was vetted thoroughly with the Committee's advisors, including the Committee's financial

2

advisor, AlixPartners, LLP.  The analysis was also presented to representatives of Aurelius

Capital Management L.P. ("Aurelius") and Wilmington Trust Company ("WTC").

4.      The discussions contained within the remainder of this declaration focus

solely on payments made to third parties within the Preference Period.

5.      In performing its analysis, A&M first completed a preliminary review of

transactions during the Preference Period in order to assemble the universe of possible

preferential transfers.  In performing this initial review, A&M and the Debtors compiled a

database, culled from the Debtors' books and records as set forth on the Debtors' statements of

financial affairs, listing a total of approximately $905 million[2] in gross payments to a variety of

parties made during the Preference Period.  A&M next categorized the transfers into two (2)

categories: (i) disbursements from Subsidiary Accounts and (ii) disbursements from the Tribune

Company accounts on behalf of both the parent company and its subsidiaries.

6.      The next step in the analysis involved a programmatic review of the

payments made during the Preference Period on a transferee-by-transferee basis, which was

supplemented by an additional qualitative review in certain instances.  The level of review took

into consideration the materiality and amount of the transactions and whether possible preference

exposure remained after the estimation of applicable, quantifiable defenses, which are more fully

discussed below.  Payments were accessed on a net basis, *i.e.*, gross payments less applicable,

quantifiable defenses, to determine if pursuit of such payments would be beneficial to the

Debtors' estates, as discussed more fully below.  Based upon my experience, and the experience

of A&M in connection with preference analyses generally, the use of a "net of defenses" basis,

rather than simply a gross basis in assessing potential preference payments is supported by the

---

[2] This amount excludes certain transfers that were inadvertently listed on the schedules but are not payments that could be pursued by either Tribune or its subsidiaries as preferences as they either were payments made on behalf of non-Debtors, payments to other Debtors (which are subject to a tolling agreement) or other errors.

practice in other cases, including both liquidations and reorganizations, and provides a more accurate picture of the viable preferences.  Conducting an analysis on a gross basis, *e.g.*, equating preference claims to a debtor's gross expenditures during a preference period, would be misleading as it fails to account for payments during that time that were either not preferential or were subject to quantifiable defenses.

      7.    Upon completion of the analysis, as discussed below, it was determined that the following payment types were unlikely to yield any material recovery for the Debtors' Estates or would be potentially disruptive to important business relationships, are subject to other mitigating considerations, or, where noted, were to be pursued by the Committee and, as such, are not included in any of the actions which the Debtors will bring or seek to preserve:

    a.  Postage payments and prepayments in the ordinary course;

    b.  Payments to taxing authorities;

    c.  Payments currently being pursued by the Committee;

    d.  Payments made to parties to assumed executory contracts or leases;

    e.  Wire transfers under $50,000;

    f.  Payments to parties of aggregate amounts, net of estimated defenses under section 547(c) of the Bankruptcy Code, that were less than (a) $25,000 for former vendors no longer doing business with the Debtors, and (b) $100,000 for current vendors with an ongoing business relationship; and

    g.  Payments (i) excluded pursuant to the Debtors' business judgment based on unique factual circumstances or key relationships with the Debtors, (ii) that would have been authorized and paid under First Day Orders,[3] and (iii) to qualifying vendors with whom the Debtors had entered into agreements to pay prepetition claims under either the Critical Vendor or Section 503(b)(9) Orders[4] of this Court.

---

[3] "First Day Orders" means those orders entered by this Court on December 10, 2009, which authorized certain emergency relief in connection with the Debtors' bankruptcy filing [Docket Nos. 45, 46, 49, 50, 53, 59].

[4] "Critical Vendor" and "Section 503(b)(9) Orders" means the Order Granting the Debtors Motion for (i) An Order Authorizing, on an Emergency Basis, Payment of Certain Prepetition Claims of Critical Vendors and (ii) an Order Authorizing, but not Directing, After Notice and a Hearing, the Debtors to Pay Certain Obligations Arising in Connection with Goods Received by the Debtors Within the Twenty Day Period Before the Petition Date [Docket No. 60] and Order Granting the Debtors Motion For An Order Authorizing, But Not Directing, The Debtors to Pay Certain Obligations arising in Connection with Goods Received by the Debtors Within the Twenty Day Period Before the Petition Date [Docket No. 205], respectively.

For the following reasons, A&M concluded, with the concurrence of the Committee which performed its own independent analysis, that such payments should not be pursued.

### A. Postage Payments

8.    I understand that, in the ordinary course of their business, the Debtors paid approximately $40.6 million to the United States Postal Services either through programs that routinely direct debited the Debtors' bank accounts for meter usage or for prepayments of future postage usage. A&M isolated such payments and determined that such payments were generally not payments on account of antecedent debt and were often in the nature of prepayments for future services or payments made contemporaneously with new value received by the Debtors. These payments were excluded from the estimate of recoverable payments.

### B. Payments to Taxing Authorities

9.    A&M determined that approximately $11.7 million in payments were made to taxing authorities during the Preference Period. A&M, with the assistance of the Debtors' other professionals, determined, after reviewing the transfers, that the taxes paid would likely be priority claims that would be entitled to full payment under the Bankruptcy Code and which would have been authorized to be paid under an applicable First Day Order. These payments were excluded from the estimate of recoverable payments.

### C. Payments Being Pursued by the Committee

10.    Upon information and belief, the Committee is currently pursuing the recovery of approximately $248.6 million of potentially preferential third party payments,[5]

---

[5] Upon information and belief, this amount includes possible preferential transfers to certain insiders, certain of the Debtors' professionals, and certain avoidance actions related to the LBO Transactions but does not include the approximately $180 million of potential preference payments to current and former directors and officers that is also being pursued by the Committee.

which were therefore excluded from the actions the Debtors intended to pursue or preserve. Such payments were not subject to further review by A&M.

### D. Payments to Parties to Assumed Contracts or Leases

11.    A&M's analysis also excluded all payments made during the Preference Period on account of an executory contract or unexpired lease when such contract or lease was later assumed by the Debtors pursuant to an order of this Court. Approximately $7.4 million in payments were thus excluded on account of assumed contracts or leases.

### E. Wire Transfers Under $50,000

12.    A&M excluded wire transfers made by the Debtors that were less than $50,000 from the preference analysis, which totaled – in the aggregate – approximately $2.6 million in gross payments. The Debtors did not have sufficient documentation and information concerning these wire transfers to allow A&M to efficiently calculate whether or not such payments might be preferential; however, a limited review indicates that $0.9 million are tax payments that would be subject to the discussion in category B above and that an additional $0.3 million were in fact intercompany transfers already subject to a tolling agreement. A&M concluded, based upon their review of the cost of researching payments by wire less than $50,000, that the costs involved with researching these types of transactions, not to mention the litigation costs attendant to bringing suit, would likely outweigh any recovery from the prosecution of such payments. However, to the extent any party who will otherwise be pursued for a potential preference also received a wire transfer for an amount under $50,000 such amount will be included in the preference action pursuant to the analysis.

13.    Removing the payments discussed in categories A, B, D, and E as well as the payments being pursued by the Committee in category C above from the original gross

amount of $905 million, left approximately $593 million in remaining gross payments to analyze for possible preference exposure.

**F.  Payments Subject to a 547(c) Defense**

14.     In determining which payments should be pursued, A&M reviewed the remaining $593 million in payments to determine whether a vendor may have a quantifiable (i) ordinary course; (ii) contemporaneous exchange; and/or (iii) new value defenses under section 547(c) of the Bankruptcy Code.  A&M first assessed these defenses based upon detailed data available from the Debtors' accounting system for parties paid by ACH or check on a systematic or mathematical basis utilizing the following criteria.  In the event a payment was subject to a defense under section 547(c), such payment was not excluded in its entirety.  Instead, the amount subject to the defense was subtracted from the gross amount and the net amount was subject to further analysis to determine whether it would be cost effective to pursue such payment net of quantifiable defenses.  It is my understanding that any actions initiated by the Debtor will be for the gross amount.

**a.  Ordinary Course**

15.     In determining whether a payment qualified as ordinary course, A&M utilized a variance of plus or minus seven (7) days from the average time between invoice and payment and employed a "look back" period of thirteen (13) months prior to the Preference Period to calculate the average number of days it took to pay a vendor's invoice from the date of such invoice.  Once the average time between a given vendor's invoice and payment was calculated, A&M looked at the vendor's 90-day payment data to identify those payments falling inside and outside the range.  Those payments falling within the 14-day ordinary course range are identified as payments susceptible to a valid defense and, as such, unlikely to result in a

recovery for the estates.   Payments made outside of this narrow window were not considered to

have been made in the ordinary course of business and were included in a vendor's exposure,

provided such payments were not susceptible to another defense or basis for exclusion.

     **b.  Contemporaneous Exchange**

     16.    Only payments that were made within one (1) day of the applicable

invoice date were considered as possibly subject to the contemporaneous exchange defense.  All

payments outside this narrow window were included in the calculation of a vendors' exposure.

Based on my experience, a window of one (1) day for contemporaneous exchange is

conservative and, in some cases that I am aware of, a larger range has been used.

     **c.  New Value**

     17.    In their analysis, A&M and the Debtors calculated the aggregate potential

preference exposure of each transferee on an ongoing basis during the Preference Period.  This

analysis took into account subsequent advances of unpaid, and where applicable, paid new value

that itself appeared avoidable as a preference.  As such, the total preference exposure of a given

defendant was reduced, as appropriate, by the invoiced value of goods supplied by such vendor

to the Debtors during the Preference Period after payment was made.

     18.    The forgoing defenses were first applied through a calculated process for

vendors paid by ACH or check for which historic data was readily available.  In addition certain

vendors which were paid by wire were subjected to one or more of the above tests.  Newsprint

vendors were also reviewed for payments related to goods received in the twenty (20) day

prepetition period which would fall within A&M's analysis for goods received under Section

503(b)(9).

19.    In addition to the application of the defenses described above, A&M and the Debtors reviewed payments to certain other parties without a long payment history or of a one-time nature and identified an additional $231.1 million in gross payments subject to one or more of the above defenses, resulting in the party having no net preference exposure in connection with such payments. This includes payments made to Deutsche Bank on account of certain senior notes in accordance with contractual terms ($189 million); payments made to Barclays and Citibank in connection with certain swap instruments ($19 million); and payments made to a lease administrator, who then remitted payment to lessors of the Debtors for regular rental payments ($7 million).[6]

20.    This left $363 million in remaining gross payments. A&M determined based on the criteria set forth above that approximately $282 million of the remaining payments made during the Preference Period would be subject to a defense under section 547(c) of the Bankruptcy Code. While it is likely that payment recipients, including those whose net recoveries were over $100,000, would assert additional defenses and/or assert the above defenses, particularly ordinary course, in a more expansive fashion than the Debtors' conservative fourteen (14) day window for ordinary course and one (1) day for contemporaneous exchange, the analysis was not adjusted further.

21.    After determining the "net" amount of potentially preferential payments to each party based upon an application of the above defenses, A&M considered a number of additional factors to determine an appropriate materiality threshold for pursuit of such claims. In A&M's experience, a materiality threshold is commonly applied in large chapter 11 cases. Based on an analysis of the number and amount of preference claims relative to recoveries A&M

---

[6] Included in this category are four (4) of the Debtors retained professionals (including A&M for $1.4 million) who were engaged by the Debtors in the month prior to the Petition Date and were paid a retainer and/or regular disbursements during the period from their engagement to the Petition Date.

concluded that a materiality threshold against (a) an inactive vendor with a possible net recovery of $25,000 or more and (b) an active vendor with a possible net recovery of $100,000 or more (the "Materiality Threshold") was appropriate under all the circumstances.  In determining the Materiality Threshold, A&M took into account that there would be costs associated with litigation and, in the case of active vendors, the potential damage to the relationship with the vendor, including the potential of having to replace the vendor, loss of favorable pricing and/or trade terms with the vendor, the overall disruption to the applicable business unit, and total impact on the relevant Debtor's Estate.  The analysis also considered the possibility of parties asserting additional defenses under section 547(c), including the possibility of a more aggressive approach to new value or ordinary course defenses.

      22.     Finally, in setting the Materiality Threshold, A&M considered the relationship between the number and amount of potential preference claims:  during the 90 days preceding the Petition Date, approximately 3,000 vendors (the "Vendor Pool") received payments aggregating approximately $905 million.  Nearly 70% of the Vendor Pool received payments under $50,000; however the dollar value of total payments to this group accounted for only 3.2% of the total amount of payments made.  Another 358 vendors received payments aggregating between $50,000 and $100,000, accounting for only an additional 2.8% of the total amount of payments made.  Accordingly, approximately 80% of the Vendor Pool accounted for only 6% of total payments in the 90 days preceding the Debtors' bankruptcy.  Conversely, 582 vendors or approximately 20% of the Vendor Pool, received  payments over $100,000 and represent virtually all (94%) of the total payments made.  Looking at the amounts net of quantifiable defenses, approximately 93% of the Vendor Pool received payments under $100,000, representing only 16% of the total payments made.  Thus, over 84% of payments

exceed the Materiality Thresholds.  The Materiality Thresholds were also devised against the backdrop of the Debtors' estimated reorganization value of $6.75 billion[7].

      23.    Ultimately, this analysis excluded approximately $137 million in gross payments but only $15 million of potential preference payments net of quantifiable defenses. The following chart summarizes the concepts covered in this paragraph:

---

[7] Lazard's analysis of the reorganization value of the Debtors' was included as Exhibit F to the General Disclosure Statement for the Following Plans of Reorganization [Docket No. 6090].

| | | Approx. Number of Parties | Total Payments During Preference Period ("Gross") | Application of 547(c) Defenses | Total Payment Net of Calculated Defenses ("Net") |
|---|---|---|---|---|---|
| 1. | Gross and Net Payments Under $100,000 | 2,325 | 53,683,350 | (39,840,602) | 13,842,747 |
| 2. | Gross Payments Over $100,000; Net Under $100,000 | 385 | 88,016,013 | (83,819,387) | 4,196,626 |
| 3. | Gross and Net Payments Over $100,000 | 89 | 220,630,480 | (158,367,268) | 62,263,212 |
| | Total | 2,799 | 362,329,842 | (282,027,257) | 80,302,585 |
| 1. | Gross and Net Payments Under $100,000 | | | | |
| a. | Active Vendors | 1,507 | 32,662,780 | (23,925,297) | 8,737,483 |
| b. | Inactive Vendors - Net Between $25,000 & $100,000 | 51 | 2,672,630 | (387,900) | 2,284,730 |
| c. | Inactive Vendors - Net Under $25,000 | 767 | 18,347,939 | (15,527,405) | 2,820,534 |
| | | 2,325 | 53,683,350 | (39,840,602) | 13,842,747 |
| 2. | Gross Payments Over $100,000; Net Under $100,000 | | | | |
| a. | Active Vendors | 279 | 69,577,432 | (66,251,840) | 3,325,591 |
| b. | Inactive Vendors - Net Between $25,000 & $100,000 | 11 | 2,098,496 | (1,341,988) | 756,508 |
| c. | Inactive Vendors - Net Under $25,000 | 95 | 16,340,085 | (16,225,559) | 114,526 |
| | | 385 | 88,016,013 | (83,819,387) | 4,196,626 |
| 4. | Potential Pursuit (1b, 2b and 3) | 151 | 225,401,606 | (160,097,155) | 65,304,451 |
| 5. | No Pursuit - Below Materiality (1a, 1c, 2a, and 2c) | 2,648 | 136,928,236 | (121,930,102) | 14,998,134 |
| | Total | 2,799 | 362,329,842 | (282,027,257) | 80,302,585 |
| | Less Excluded Parties: | | | | |
| i. | No Pursuit - Below Materiality (1a, 1c, 2a, and 2c) | 2,648 | 136,928,236 | (121,930,102) | 14,998,134 |
| ii. | Business Judgment | 14 | 14,641,732 | (7,921,403) | 6,720,329 |
| iii. | First Day Orders (Other than Critical Vendor) | 14 | 14,750,969 | (9,910,667) | 4,840,303 |
| iv. | Critical Vendor / 503(b)(9) Agreements | 17 | 99,171,528 | (80,232,276) | 18,939,252 |
| | Total Excluded Parties | 2,693 | 265,492,466 | (219,994,448) | 45,498,018 |
| | Pursue (Debtors) | 106 | 96,837,376 | (62,032,809) | 34,804,567 |
| | Other Third Parties Subject to Pursuit by Committee | 18 | 248,594,894 | (2,753,798) | 245,841,097 |
| | Total Third Parties to Pursue by Debtors and Committee | 124 | 345,432,271 | (64,786,607) | 280,645,664 |

| Breakout of Active Vendors Excluded Due to $100k Net Threshold (1a and 2a) | | | | |
|---|---|---|---|---|
| Net Payments Under $10,000 | 1,482 | 77,273,273 | (75,525,000) | 1,748,273 |
| Net Payments Between $10,000 and $25,000 | 137 | 5,786,121 | (3,622,987) | 2,163,134 |
| Net Payments Between $25,000 and $50,000 | 95 | 8,936,548 | (5,659,052) | 3,277,496 |
| Net Payments Between $50,000 and $100,000 | 72 | 10,244,270 | (5,370,099) | 4,874,171 |
| | 1,786 | 102,240,212 | (90,177,138) | 12,063,074 |

## G. Payments Excluded Pursuant to the Debtors' Business Judgment

24.    A&M analysis also identified avoidance actions against certain vendors

for payments made during the Preference Period that, if excluded, could harm the Debtors'

Estates. All payments listed below show both the gross amount and the net amount (*i.e.*, after application of the defenses described above). Based upon my experience in similar chapter 11 bankruptcies, these types of exclusions are common to preserve the value of the reorganized debtor. The criteria used in making these determinations are set forth below.

### a. Strategic Business Relationships

25.    A&M classified fourteen (14) vendors as having a strategic business relationship with the Debtors which received payment during the Preference Period totaling approximately $14.6 million ($6.7 million net of quantifiable defenses). In isolating these vendors, A&M and the Debtors reviewed vendors who could be pursued after applying the defenses and Materiality Thresholds discussed above to determine whether such vendor was a single source provider of goods and services or provider of proprietary information, among other high-value, hard to replace, and necessary vendors. Based on this review, if the risk of disruption resulting from the potential loss of such vendor, plus the burdens of pursuing the vendor, outweighed the potential benefits – giving effect to potential defenses – such vendors were excluded from potential preference actions.

### b. First Day Orders

26.    A&M's analysis also isolated fourteen (14) entities that were paid approximately $14.8 million ($4.8 million net of quantifiable defenses) during the Preference Period. In isolating these vendors, A&M reviewed all vendors who, if not paid prepetition, likely would have received payment under the Debtors' "First Day Orders," including customers entitled to refunds, employee reimbursements, and other entities for whom the Debtors obtained court authorization to make payments for prepetition amounts through their "First Day Orders." A&M's analysis of these payments showed that such payments, if unpaid as of the Petition Date,

13

could and likely would have been paid pursuant to the authority granted in the First Day Orders in order to preserve the value of the Debtors' Estates during bankruptcy. The analysis also took into account applicable defenses, the existence of costs and other burdens incurred in pursuing such actions, including legal fees and the potential need to replace vendors, as well as, in the case of refund payments, the damage to the customer relationships. It is A&M's view that these factors outweigh any benefit that would be derived from pursuing such actions.

### c. Payments to Critical Vendors and/or Pursuant to 11 U.S.C. § 503(b)(9)

27.    In addition to the payments to the entities under the First Day Orders, A&M, in their analysis, isolated payments made during the Preference Period to those entities who qualified as "Critical Vendors" pursuant to the Debtors' Critical Vendors Order and that subsequently entered into agreements with the Debtors pursuant to which their prepetition claims were paid and they continued to provide trade terms to the Debtors as well as vendors who entered into similar agreements in accordance with the section 503(b)(9) Order. These vendors were and remain critical to the Debtors' ongoing business. These vendors, on the whole, made material concessions to the Debtors, including, at minimum, continuance of prepetition payment terms and, in some cases, additional concessions such as discounts or agreement to the write-off of a portion of prepetition liabilities, among others. Our analysis reviewed the amount of prepetition payments made in light of these vendors' concessions. The analysis, in determining whether to avoid such payments, also took into consideration the burden of possibly replacing such vendors. As a result of this analysis, the Debtors and A&M determined that the burdens of litigating the preference actions and the potential damage to the Debtors' vendor base would be more harmful than beneficial to the Debtors' Estates. On this basis, approximately $99.2 million

(or $18.9 million net of quantifiable defenses) in payments made to seventeen (17) critical vendors were excluded.

28.    As a result of the analysis performed by A&M and the Debtors, it is my understanding that the Debtors intend to file or preserve by tolling agreements total gross preference claims (aside from insider claims) in the aggregate of approximately $97.8 million of the total payments made to third parties during the ninety (90) days prior to the Petition Date and that the Committee will pursue an additional $248.6 million (excluding insider preferences).  As such, a total of $345.4 million in third party preference claims will be either pursued or preserved by the Debtors and the Committee.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of November, 2010

Brian Whittman
Managing Director
Alvarez & Marsal North America, LLC