## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., [1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## JOINT DISCLOSURE STATEMENT FOR THE FOLLOWING PLANS OF REORGANIZATION:

1) **FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON, AND CO., L.P., AND JPMORGAN CHASE BANK, N.A.;**

2) **JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST COMPANY, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES;**

3) **AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY KING STREET ACQUISITION COMPANY, L.L.C., KING STREET CAPITAL, L.P. AND MARATHON ASSET MANAGEMENT, L.P.; AND**

4) **FIRST AMENDED PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY CERTAIN HOLDERS OF STEP ONE SENIOR LOAN CLAIMS**

DATED: November [●], 2010

THE JOINT DISCLOSURE STATEMENT (AS DEFINED HEREIN) HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THE JOINT DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF ANY COMPETING PLAN (AS DEFINED HEREIN). ACCEPTANCES OF THE COMPETING PLANS MAY NOT BE SOLICITED UNTIL THE JOINT DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the following page.

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

**IMPORTANT DATES**

- Date by which ballots and master ballots must be received:
    **[●] at 4:00 p.m. (prevailing Eastern Time)**

- Date by which objections to confirmation of the Competing Plans must be filed and served:
    **[●] at 4:00 p.m. (prevailing Eastern Time)**

- Hearing on confirmation of the Competing Plans:
    **[●] at [●] __.m. (prevailing Eastern Time)**

## GENERAL DISCLOSURE STATEMENT

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................... 1

        A.    Overview of Chapter 11. ...........................................................................4
        B.    Parties Entitled to Vote on the Competing Plans. ....................................5
        C.    Solicitation Package. .................................................................................5
        D.    Voting Procedures, Ballots, and Voting Deadline. ...................................5
        E.    Confirmation Hearing and Deadline for Objections to Confirmation. ....6
II.     GENERAL INFORMATION ....................................................................................... 7

        A.    The Debtors' Businesses and Properties. ..................................................7
              1.    Company Overview. .......................................................................7
              2.    The Debtors' Properties. ................................................................ 8
        B.    Operations of the Debtors. ........................................................................8
              1.    Publishing Segment. ...................................................................... 8
              2.    Broadcasting Segment. ................................................................ 13
              3.    Additional Investments. .............................................................. 15
        C.    Recent Operations. ..................................................................................16
        D.    Current Management of the Debtors. ......................................................17
              1.    Board of Directors. ...................................................................... 17
              2.    Special Committee of the Board of Directors. ............................ 17
              3.    Subcommittees of the Board of Directors. .................................. 18
              4.    Compensation of Directors. ........................................................ 18
              5.    Executive Officers. ...................................................................... 18
III.    SUMMARY OF CERTAIN PREPETITION LIABILITIES ..................................... 19

        A.    Prepetition Funded Debt and Capital Structure of the Tribune Entities. ...............19
              1.    Prepetition Capital Structure. ..................................................... 19
              2.    Prepetition Funded Debt Structure. ............................................ 20
        B.    Prepetition Trade Payables & Other Operating Liabilities. ....................25
        C.    Prepetition Compensation and Benefit Programs. ..................................25
              1.    Retirement Programs. ................................................................. 25
              2.    Severance Programs. .................................................................... 29
              3.    Management Incentive Plan ("MIP"). ........................................ 29
              4.    Local Bonus Programs. ................................................................ 31
              5.    Collective Bargaining Agreements. ............................................ 31
              6.    Management Equity Incentive Program. ..................................... 33
              7.    Equity-Based Compensation Provisions of Incentive Compensation Plan.
                    ...................................................................................................... 33
              8.    Employee Stock Ownership Plan. ............................................... 33
              9.    Transitional Compensation Plan ................................................. 33
              10.   Nonqualified Retirement / Deferred Compensation Plans. ......... 34
              11.   Certain Individual Letter Agreements. ....................................... 35
        D.    Pending Litigation and Certain Other Legal Matters Involving the Debtors. ........35
              1.    *Newsday* and *Hoy* Circulation Misstatements. ........................... 36
              2.    ESOP Lawsuit. ............................................................................ 36
              3.    FCC Related Matters. .................................................................. 38

|  |  | 4. | Miscellaneous Other Litigation | 39 |

IV.  DEBTORS' DESCRIPTION OF THE EVENTS LEADING UP TO CHAPTER 11 ..... 39

V.  DEBTORS' DESCRIPTION OF EVENTS DURING THE CHAPTER 11 CASES ...... 40

A.  Procedural Motions ........................................................................................40
B.  "First-Day" Motions .......................................................................................41
C.  Employee Compensation and Benefits ...........................................................41
D.  Cash Management ...........................................................................................42
E.  Post-Petition Financing ...................................................................................43
F.  Professional Retentions ...................................................................................44
    1. Retention of Professionals by the Debtors' Estates ................................. 44
    2. Retention of Jones Day by the Special Committee .................................. 44
    3. The Creditors' Committee and its Advisors ............................................ 44
G.  Certain Administrative Matters and Other Motions .......................................45
    1. Disposition of Certain Executory Contracts and Unexpired Leases ......... 45
    2. Certain other Motions filed by the Debtors ............................................ 47
    3. Schedules of Assets and Liabilities; Statements of Financial Affairs ..... 48
    4. All Filed Claims and Bar Date ................................................................ 48
    5. General Unsecured Claims Against Filed Subsidiary Debtors ................. 48
    6. Bankruptcy Rule 2015.3 Reports ............................................................ 50
    7. Fee Disgorgement Motion ....................................................................... 50
    8. WTC Complaint ....................................................................................... 51
    9. Limited Motion to Disqualify Counsel to the Official Committee of Unsecured Creditors ............................................................................... 52
    10. Pursuit of Preference Avoidance Actions ................................................ 52
    11. The Committee's Standing Motions ......................................................... 53
    12. Motion to Appoint a Chapter 11 Trustee ................................................. 53
    13. Motion to Approve Tolling Agreement .................................................... 54
    14. Motion to Disqualify Akin Gump Strauss Hauer & Feld LLP as Counsel to Aurelius ................................................................................................. 54
    15. Certain Holders of Step One Senior Loan Claims' New York State Court Action .................................................................................................... 55
H.  Chicago Cubs Transaction ..............................................................................55
I.  Morgan Stanley Swap Agreement ...................................................................57

VI.  THE FORMER SETTLEMENT SUPPORT AGREEMENT AND FORMER PLAN.... 58

VII.  THE EXAMINER AND CLAIMS RELATING TO THE LEVERAGED ESOP TRANSACTIONS .................................................................................................... 58

A.  The Leveraged ESOP Transactions .................................................................58
B.  Appointment of an Examiner ...........................................................................62
C.  Investigation and Report of the Examiner .......................................................63
D.  Mediation ........................................................................................................64

VIII.  EXCLUSIVITY PERIOD ....................................................................................... 64

IX.  VOTING PROCEDURES AND REQUIREMENTS ................................................ 65

A.  Voting Deadline ...............................................................................................65
B.  Holders of Claims Entitled to Vote .................................................................66

C.    Vote Required for Acceptance by a Class ...................................................66
     1.    Class of Claims. .......................................................... 66
     2.    Class of Interests. ....................................................... 66
D.    Voting Procedures.............................................................................67
     1.    Ballots. ........................................................................ 67
     2.    Withdrawal or Change of Votes on the Competing Plans. ....................... 67
X.    CONFIRMATION OF THE PLAN................................................................ 67
    A.    Confirmation Hearing ......................................................................67
    B.    Statutory Requirements for Confirmation of a Competing Plan .........................69
     1.    Acceptance. ................................................................. 70
     2.    Fair and Equitable Test. ................................................ 70
     3.    Feasibility.................................................................... 71
     4.    Best Interests Test and Liquidation Analysis........................................... 71
XI.    PROJECTED FINANCIAL INFORMATION  AND REORGANIZATION VALUE ... 71
    A.    Projected Financial Information. .........................................................71
    B.    Reorganization Value.......................................................................72
XII.    GENERAL RISK FACTORS ...................................................................... 72
    A.    FCC-Related Considerations and Risks Relating to Emergence. .........................73
    B.    Risks Related to the Debtors' Businesses. ...............................................74

XIII.    CONCLUSION.......................................................................... 83

## EXHIBITS TO THE GENERAL DISCLOSURE STATEMENT:

Exhibit A    –    Corporate Organizational Chart

Exhibit B    –    Collective Bargaining Agreements

Exhibit C    –    Examiner's Report

Exhibit D    –    Liquidation Analysis

Exhibit E    –    Financial Projections

Exhibit F    –    Reorganized Value Analysis

Exhibit G    –    Selected Historical Financial Information

# I.   INTRODUCTION

On December 8, 2008 (the "Petition Date"), Tribune Company ("Tribune" or the "Company") and certain of its subsidiaries (collectively, the "Debtors")[2] filed voluntary petitions for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) ("Tribune CNLBC"), Tribune's subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major League Baseball franchise (the "Chicago Cubs"), commenced a Chapter 11 Case on October 12, 2009 as one of the steps necessary to complete a transaction involving the Chicago Cubs and certain related assets. In all, the Debtors now comprise 111 entities.

Four (4) separate sets of plan proponents (collectively, the "Proponents") have each proposed a plan (collectively, the "Competing Plans") for reorganizing the Debtors, as follows:

1) First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (as the same may be amended from time to time, the  "Debtor/Committee/Lender Plan");

2) Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its Managed Entities, Deutsche Bank Trust Company Americas, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, in Its Capacity as Successor Indenture Trustee for the PHONES Notes (as the same may be amended from time to time, the "Noteholder Plan");

3) Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (as the same may be amended from time to time, the "Bridge Lender Plan"); and

4) First Amended Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (as the same may be amended from time to time, the "Step One Lender Plan").

The purpose of this disclosure statement (including all exhibits hereto, the "General Disclosure Statement"), which was prepared by the Debtors, is to set forth information concerning the history of the Debtors, a description of their businesses, operations  and capital structure, events leading up to the Chapter 11 Cases and significant events occurring in the Chapter 11 Cases.  This General Disclosure Statement also contains general information regarding the solicitation of votes on the Competing Plans. This General Disclosure Statement does not contain disclosures that are by their nature specific to individual Competing Plans and does not contain certain disclosures that were contained in the Disclosure Statement for the Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries, as approved by the Bankruptcy Court on June 7, 2010 (the "Tribune Disclosure Statement") that were specific to the  Joint Plan of Reorganization for Tribune Company and Its Subsidiaries, filed April 12, 2010 (as amended, supplemented, or modified the "Tribune Plan").

---

[2]   The Debtors are set forth on the cover page of the Joint Disclosure Statement.  Capitalized terms used but not otherwise defined in this General Disclosure Statement shall have the meanings ascribed to such terms in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as applicable.

The Proponents have each prepared a specific disclosure statement (each a "Specific Disclosure Statement" and, together with the General Disclosure Statement, the "Joint Disclosure Statement") with respect to each of their respective Competing Plans. The Specific Disclosure Statements, which represent only the views of their respective Proponents, are attached as addenda to this General Disclosure Statement. Each Specific Disclosure Statement sets forth information concerning, among other things, (a) the terms, provisions and implications of the applicable Proponent's Competing Plan and (b) the Holders of Claims against and Interests in the Debtors and their rights under the applicable Proponent's Competing Plan. Certain Proponents or parties in interest have also prepared a statement (collectively, the "Responsive Statements") concerning their views on the Competing Plans. The Responsive Statements are annexed to this General Disclosure Statement.

On [●], 2010, the Bankruptcy Court approved the Joint Disclosure Statement in accordance with section 1125 of the Bankruptcy Code as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against, or Interests in, the Debtors to make an informed judgment as to whether to accept or reject each Competing Plan, and authorized its use in connection with the solicitation of votes with respect to each Competing Plan. **APPROVAL OF THE JOINT DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF ANY COMPETING PLAN.** No solicitation of votes may be made except pursuant to the Joint Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on any of the Competing Plans, Holders of Claims should not rely on any information relating to the Debtors and their businesses other than that contained in the Joint Disclosure Statement, the Competing Plans, the Responsive Statements, and all exhibits and appendices hereto and thereto.

THE STATEMENTS CONTAINED IN THIS GENERAL DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF SUCH DOCUMENTS, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS GENERAL DISCLOSURE STATEMENT AND THE SPECIFIC DISCLOSURE STATEMENTS WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

CERTAIN INFORMATION CONTAINED IN THIS GENERAL DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND FINANCIAL PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE XII OF THIS GENERAL DISCLOSURE STATEMENT, "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS GENERAL DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NONE OF THE DEBTORS NOR ANY OF THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, NEITHER THIS GENERAL DISCLOSURE STATEMENT NOR ANY OF THE SPECIFIC DISCLOSURE STATEMENTS SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN

SETTLEMENT NEGOTIATIONS.  SUBJECT TO APPLICABLE THIRD CIRCUIT LAW, NEITHER THIS GENERAL DISCLOSURE STATEMENT NOR ANY OF THE SPECIFIC DISCLOSURE STATEMENTS SHALL BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL ANY OF THEM BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF ANY OF THE COMPETING PLANS AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS GENERAL DISCLOSURE STATEMENT AND/OR THE SPECIFIC DISCLOSURE STATEMENTS, OR ANY OF THEIR EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL ADVISORS, PREPARED THE FINANCIAL PROJECTIONS SET FORTH IN THIS GENERAL DISCLOSURE STATEMENT.  WHILE THE DEBTORS HAVE PRESENTED THESE FINANCIAL PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE FINANCIAL PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' AND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT THEY DO NOT AND CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES.  ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

IN ADDITION TO THE FOREGOING, ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THE JOINT DISCLOSURE STATEMENT AND THE COMPETING PLANS IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT ANY COMPETING PLAN.

THE JOINT DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

THE JOINT DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR

ADEQUACY OF THE STATEMENTS CONTAINED IN THE JOINT DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THE JOINT DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WERE PREPARED.

THE INFORMATION CONTAINED IN THE JOINT DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE COMPETING PLANS AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. THE JOINT DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE COMPETING PLANS. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THE JOINT DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

### A.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from all debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Proponents are submitting the Joint Disclosure Statement to holders of Claims against and Interests in each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

More than one plan of reorganization may be proposed for a debtor or a group of debtors under chapter 11. However, only one plan of reorganization will ultimately be confirmed by the Bankruptcy Court and become effective.

**B.       Parties Entitled to Vote on the Competing Plans.**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by a plan, but who will receive no distribution under the plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, please see Article IX of this General Disclosure Statement, "Voting Procedures and Requirements."

**Please refer to the Specific Disclosure Statements for information concerning the parties in interest that are entitled to vote on each Competing Plan. You may be entitled to vote on multiple Competing Plans.**

**C.       Solicitation Package.**

Accompanying the Joint Disclosure Statement (which is provided on CD-ROM) is a package of materials called the "Solicitation Package." The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving the Joint Disclosure Statement and procedures for soliciting and tabulating votes on the Competing Plans (the "Solicitation Order") which, among other things, approves the Joint Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the voting deadline, details the procedures for distributing Solicitation Packages to the holders of claims against the Debtors that are entitled to vote on the Competing Plans, establishes the procedures for tabulating ballots used in voting on the Competing Plans and sets the deadline for objecting to confirmation of the Competing Plans;

- the notice of the hearing to consider confirmation of the Competing Plans; and

- ballots and a postage-paid return envelope (ballots are provided only to holders of Claims that are entitled to vote on the Competing Plans), which will be used by creditors and equity holders who are entitled to vote on the Competing Plans.

**D.       Voting Procedures, Ballots, and Voting Deadline.**

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your ballots, please indicate your acceptance or rejection of the Competing Plans by voting in favor of or against one or more of the Competing Plans (provided that you are the holder of an impaired claim entitled to vote on such Competing Plan(s)). You may choose to accept any or all of the Competing Plans, reject any or all of the Competing Plans, or abstain from voting on some or all Competing Plans.

Each ballot has been coded to reflect the class or classes of claims it represents. Accordingly, in voting to accept or reject the Competing Plans, you must use only the coded ballot or ballots sent to you with the Joint Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original ballots and return them in the envelope provided. Only original signatures will be accepted. **Ballots should not be sent to the Debtors or any of the Proponents.** Please return your completed ballots to the Voting Agent, unless you are the beneficial holder of a Claim who receives a ballot from a broker, bank, commercial bank, trust

company, dealer, or other agent or nominee (each, a "Voting Nominee"), in which case you must return the ballots to such Voting Nominee.

You may have previously received a ballot for voting to accept or reject the Tribune Plan, which was proposed by the Debtors. Ballots that were distributed in connection with the Tribune Plan are no longer valid. If you cast a vote to accept or reject the Tribune Plan, that vote will not be counted as a vote to accept or reject any of the Competing Plans. If you want to have a vote counted to accept or reject some or all of the Competing Plans, you must complete and return your ballot by the Voting Deadline.

**If you are a beneficial holder of a Claim who receives a ballot from a Voting Nominee, in order for your vote to be counted, your ballot must be completed in accordance with the voting instructions on the ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a master ballot to the Voting Agent so that it is received no later than [•] at [•] (prevailing Eastern Time) (the "Voting Deadline"). If you are the holder of any other type of Claim, in order for your vote to be counted, your ballot must be properly completed in accordance with the voting instructions on the ballot and received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent") no later than the Voting Deadline. Any ballot received after the Voting Deadline shall be counted at the sole discretion of the Proponents of the applicable Competing Plan, unless otherwise ordered by the Bankruptcy Court. Do not return any debt instruments or equity securities with your ballot.**

**Any executed ballot that does not indicate either an acceptance or rejection of the applicable Competing Plan or indicates both an acceptance and rejection of the applicable Competing Plan will not be counted as a vote either to accept or reject such Competing Plan.**

If you are a holder of a Claim who is entitled to vote on a Competing Plan and did not receive a ballot, received a damaged ballot or lost your ballot, please contact the Voting Agent at (888) 287-7568 or tribunevote@epiqsystems.com.

If you have any questions about the procedures for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain an additional copy of the Joint Disclosure Statement and its Exhibits and/or appendices, please contact the Voting Agent.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE COMPETING PLANS, SEE ARTICLE IX OF THIS GENERAL DISCLOSURE STATEMENT, "VOTING PROCEDURES AND REQUIREMENTS."

Before voting on the Competing Plans, each Holder of Claims in classes that are entitled to vote on the Competing Plans should read, in their entirety, the Joint Disclosure Statement, the Competing Plans, the Responsive Statements, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

E.    **Confirmation Hearing and Deadline for Objections to Confirmation.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [•] at [•] (prevailing Eastern Time), before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the

announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing. Any objection to Confirmation of a Competing Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code, Bankruptcy Rule 9014, and the procedures set forth in Article X.A of this General Disclosure Statement.

## II.    GENERAL INFORMATION

*The following summaries of the Debtors' businesses and properties, operations of the Debtors, recent operations of the Debtors, and current management of the Debtors were prepared by the Debtors.*

### A.    The Debtors' Businesses and Properties.

1.    Company Overview.

Tribune is a leading media and entertainment company reaching more than eighty percent (80%) of households in the United States through its newspapers, other publications and websites, its television and radio stations, its "Superstation" WGN America, and its other news and entertainment offerings. Tribune was founded in 1847 and incorporated in Illinois in 1861. In 1968, as a result of a corporate restructuring, Tribune became a holding company incorporated in Delaware. In 1983, after 136 years of private ownership, Tribune became a public company. Throughout the 1980s and 1990s, Tribune grew rapidly through a series of acquisitions. In 2000, Tribune acquired The Times Mirror Company ("Times Mirror").

Tribune returned to private ownership in 2007 when its board of directors, based on the recommendation of a special committee of the board comprised entirely of independent directors, approved a series of transactions (collectively, the "Leveraged ESOP Transactions") with a newly formed Tribune employee stock ownership plan (the "ESOP"), EGI-TRB, LLC (the "Zell Entity"), a Delaware limited liability company wholly-owned by Sam Investment Trust (a trust established for the benefit of Samuel Zell and his family), and Samuel Zell. On December 20, 2007, Tribune completed the Leveraged ESOP Transactions, culminating with the cancellation of all issued and outstanding shares of Tribune's common stock as of that date, other than shares held by the ESOP, and with Tribune becoming wholly-owned by the ESOP.

Tribune directly or indirectly owns all (or substantially all) of the equity in 128 subsidiaries (Tribune and its subsidiaries collectively, the "Tribune Entities"), of which 110 are Debtors. Tribune and certain of its subsidiaries also have equity interests, which are generally minority interests, in various businesses in which one or more third parties are also holders of equity interests. These particular businesses are not Debtors as of the date of this General Disclosure Statement. A corporate organizational chart detailing the ownership structure for Tribune and its majority and wholly-owned subsidiaries as of the date of this General Disclosure Statement is attached as Exhibit A to the Joint Disclosure Statement.

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the Internal Revenue Code of 1986, as amended (the "IRC"), which election became effective as of the beginning of Tribune's 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations, Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax. Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders. As of the date of the General Disclosure Statement, the ESOP was the sole stockholder of Tribune and is not taxed on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax

treatment under Section 401(a) of the IRC. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

2.    The Debtors' Properties.

The corporate headquarters of the Tribune Entities is located at 435 North Michigan Avenue, Chicago, Illinois 60611. The Tribune Entities own an aggregate of approximately 7,710,000 square feet of office, production and other space in approximately 54 locations. The Tribune Entities also lease parking lots, offices, and other space which aggregate to approximately 3,567,748 square feet in approximately 166 separate locations and also lease or own towers and transmitter space in approximately 84 locations.

## B.    Operations of the Debtors.

The Tribune Entities' primary sources of revenue are from (i) the sale of advertising in newspapers and other publications and on websites owned by or affiliated with the Tribune Entities, (ii) the distribution of preprinted insert advertisements, (iii) the sale of newspapers and other publications to distributors and individual subscribers, (iv) the provision of commercial printing and delivery services to third parties, primarily other newspaper companies, (v) the sale of entertainment listings data and syndicated content, (vi) the sale of advertising on the Tribune Entities' television and radio stations, and on its "Superstation" WGN America, and (vii) the distribution of WGN America through cable, satellite, and other similar distribution methods. The Tribune Entities' operations are divided into two primary industry segments: (a) publishing (the "Publishing Segment") and (b) broadcasting (the "Broadcasting Segment").[3] These segments operate almost completely in the United States.[4]

1.    Publishing Segment.

The Publishing Segment accounted for seventy percent (70%) of the Tribune Entities' consolidated revenues in 2009 and sixty-six (66%) of consolidated revenues for the first three quarters of 2010. This segment currently operates eight major-market daily newspapers, distributes preprinted insert advertisements, provides commercial printing and delivery services to third parties, and distributes entertainment listings and syndicated content through its Tribune Media Services business unit. The daily newspapers published by the Tribune Entities, which have collectively garnered 84 Pulitzer Prizes, include the following market leading papers: the *Los Angeles Times*, the *Chicago Tribune, The Baltimore Sun*, the *Orlando Sentinel*, the *South Florida Sun Sentinel*, the *Hartford Courant, The Morning Call,* and the *Daily Press*.

The Tribune Entities' newspapers collectively have paid circulation of approximately 2 million copies daily and 3.1 million copies on Sundays. In addition, the Tribune Entities publish over 100 "niche" publications that target various geographic, ethnographic and demographic audiences and include the upscale *Chicago Magazine,* the Spanish language newspaper *Hoy*, which is published in Chicago and Los Angeles, and Chicago's *RedEye*, which targets a younger demographic.

The table below sets forth information concerning the Tribune Entities' average paid circulation for the six months ended March 2010, as reported to the Audit Bureau of Circulations, for its daily newspapers (in thousands). Average daily circulation is based on a five-day (Monday-Friday) average.

---

[3]    Certain administrative activities are not included in either segment and are instead considered as general corporate operations.

[4]    These segments also reflect the way the Tribune Entities sell their products to the marketplace, manage operations, and make business decisions.

|                                    | **Daily** | **Sunday** |
|------------------------------------|-----------|------------|
| *Los Angeles Times*                | 617       | 942        |
| *Chicago Tribune*                  | 452       | 794        |
| *The Baltimore Sun*                | 202       | 344        |
| *Orlando Sentinel*                 | 191       | 291        |
| *South Florida Sun Sentinel*       | 180       | 264        |
| *Hartford Courant*                 | 139       | 202        |
| *Allentown Morning Call*           | 104       | 123        |
| *Daily Press* (Newport News, VA)   | 65        | 91         |
| **Total Net Paid Circulation**     | **1,950** | **3,051**  |

The Publishing Segment also manages the websites of the Tribune Entities' daily newspapers, television stations, and other branded products that target specific areas of interest. In 2009, those websites collectively averaged 49 million monthly unique visitors and over 510 million monthly page views. For the first three quarters of 2010, those websites collectively averaged almost 51 million monthly unique visitors and over 498 million monthly average page views. The Publishing Segment employed approximately 10,300 full-time equivalent employees in the fourth quarter of 2009 and about 9,950 in the third quarter of 2010. The primary businesses of the Publishing Segment are described below.

a)      Los Angeles Times Media Group

The Los Angeles Times Media Group is a leading provider of news and information in the Los Angeles metropolitan area. Its operations are principally comprised of the publication of the *Los Angeles Times* and its related businesses. The *Los Angeles Times* has been published continuously since 1881. The newspaper has won 39 Pulitzer Prizes and is the largest daily metropolitan newspaper in the United States in circulation. The Los Angeles market ranks second in the nation in terms of population. In its primary circulation areas of Los Angeles, Orange, Ventura, San Bernardino and Riverside Counties, the *Los Angeles Times* competes for advertising and circulation with 18 local daily newspapers and three national newspapers, with its largest local competitor having about 197,000 in average daily circulation. The *Los Angeles Times* ranks fourth in the United States for average daily paid circulation and second on Sundays for paid circulation. Approximately eighty-one percent (81%) and eighty-four percent (84%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

The *Los Angeles Times* publishes two daily editions: the East edition and the West edition. Additional daily and semi-weekly community newspapers are either inserted into the paper in selected geographic areas or distributed to homes and through vending boxes to provide targeted local news coverage. The Los Angeles Times Media Group operates latimes.com, an online expanded version of the newspaper, providing local, national and international news along with features reporting, findlocal.latimes.com, covering entertainment, reviews and things to do in Southern California, and theenvelope.com, a comprehensive year-round entertainment awards website. For the first three quarters of 2010, the Los Angeles Times Media Group's digital media reached an average of about 8.4 million monthly unique visitors and averaged over 135 million monthly page views. The Los Angeles Times Media Group also operates several targeted publications and their related websites, including (i) the free Spanish language newspaper, *Hoy*, which provides local, national and international news and features of interest to the largest Hispanic market in the United States and (ii) *Brand X*, which focuses on lifestyle and entertainment features. In addition, the Los Angeles Times Media Group's production facility prints the local edition of *The Wall Street Journal*, and its outside carriers deliver the *Orange County Register*, *The Wall Street Journal*, *The New York Times* and numerous other local publications.

9

b)    Chicago Tribune Media Group

The Chicago Tribune Media Group is a leading provider of news and information in Chicagoland. Its operations are principally comprised of the publication of the *Chicago Tribune* and its related businesses. Founded in 1847, the *Chicago Tribune* has won 25 Pulitzer Prizes and its print and online coverage attracts the largest news-seeking audience in the Midwest. The Chicago market ranks third in the nation in terms of population. The *Chicago Tribune* ranks eighth in the United States for average daily paid circulation and fourth on Sunday for paid circulation. Approximately eighty-five percent (85%) and seventy-eight percent (78%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

The Chicago Tribune Media Group is a multi-product, multi-channel news and information source. The Chicago Tribune Media Group operates chicagotribune.com, the web edition of the newspaper, and ChicagoNow.com, a local blog network. For the first three quarters of 2010, the Chicago Tribune Media Group's digital media reached an average of 3.8 million monthly unique visitors and averaged over 127 million monthly page views. The Chicago Tribune Media Group also operates several targeted publications, including (i) *RedEye*, a free daily publication targeting young, urban commuters; (ii) *Hoy*, a free Spanish language newspaper; (iii) *Chicago Magazine*, an upscale monthly paid magazine; (iv) *TheMash*, a weekly newspaper for high school students; and (v) *Triblocal*, the largest community-driven weekly newspaper in Chicagoland. Additionally, the Chicago Tribune Media Group provides an integrated and comprehensive direct mail service and is the leading distributor of third-party print publications in the Chicagoland area. Its production facility prints the local edition of *The Wall Street Journal* and *The New York Times*, and its outside carriers deliver the *Chicago Sun-Times*, *The Wall Street Journal*, and *The New York Times* along with other national and local publications.

c)    Baltimore Sun Media Group

The Baltimore Sun Media Group publishes *The Baltimore Sun*, Maryland's largest newspaper, which has won 15 Pulitzer Prizes since it began publishing a daily newspaper in 1837. The Baltimore market ranks 20th in the nation in terms of population. It competes with other Maryland and Washington, D.C. based daily and weekly newspapers as well as regional editions of national daily newspapers. Approximately seventy-seven percent (77%) and sixty-nine percent (69%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

The Baltimore Sun Media Group's operations also include 18 community newspapers, the largest of which are *The Howard County Times, The Columbia Flier, The Towson Times* and *The Aegis*, along with *b*, a free daily publication targeting young adults, six magazines, and eight directories. The Baltimore Sun Media Group also operates the market-leading website, baltimoresun.com, along with numerous niche online properties. For the first three quarters of 2010, the Baltimore Sun Media Group's digital media reached an average of more than 1.5 million monthly unique visitors and averaged over 39 million monthly page views. It also has a custom media division that works with regional companies to produce more than 30 specialized publications.

In addition, The Baltimore Sun Media Group prints the full circulation of the *Washington Times*, and also has printing contracts with the *New York Daily News* and *The Korea Daily*. The Baltimore Sun Media Group has distribution and delivery agreements with 33 publications including *The Washington Post, USA Today*, the *New York Post, The New York Times* and *The Wall Street Journal*.

d)    Florida Media Group

The Florida Media Group is a leading provider of news and information in Southern and Central Florida. Its operations are principally compromised of the publication of the *South Florida Sun Sentinel*, the *Orlando Sentinel*, and their related businesses. The Tribune Entities' Florida properties share significant resources in the areas of advertising sales, editorial coverage, and back office administration and have implemented significant regionalization and integration strategies.

The *Orlando Sentinel* primarily serves a six-county area in Central Florida. The newspaper is the only major daily newspaper in the Orlando market, although it competes with other Florida and national newspapers, as well as with other media. The *Orlando Sentinel* has been published since 1876 and has won three Pulitzer Prizes. The Orlando market ranks 26th in the nation in terms of population. Approximately eighty-one percent (81%) and eighty percent (80%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

To serve the Central Florida market, the Florida Media Group also operates (i) orlandosentinel.com, a breaking news and information website; (ii) *Sentinel Express*, a free weekly publication used to distribute advertising and content to newspaper non-subscribers in Central Florida; (iii) *el Sentinel*, a weekly Spanish language newspaper, and its companion website, elsentinel.com; and (iv) *Everything Orlando*, a free niche product, and its companion website Everythingorlando.com. For the first three quarters of 2010, the *Orlando Sentinel's* digital media reached an average of over 1.7 million monthly unique visitors and averaged over 44 million monthly page views. The Florida Media Group offers direct marketing and direct mail services through Tribune Direct/Orlando in addition to printing and distribution services for other publications.

The *South Florida Sun Sentinel* is the major daily newspaper serving the Broward/Palm Beach County market. The Miami/Fort Lauderdale/Miami Beach metropolitan area, which includes Broward and Palm Beach counties, ranks seventh in the nation in terms of population. Approximately eighty-one percent (81%) and seventy-six percent (76%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes.

The Florida Media Group also serves the news and information needs of South Florida through (i) sunsentinel.com, a breaking news and information website; (ii) *el Sentinel*, a weekly Spanish language newspaper; (iii) *Teenlink*, a weekly newspaper distributed in Broward County high schools; (iv) several weekly community newspapers; and (v) other niche publications. For the first three quarters of 2010, the *South Florida Sun Sentinel's* digital media reached an average of 1.1 million monthly unique visitors and averaged over 45 million monthly page views.

Other publications produced by the Florida Media Group in South Florida include: *City & Shore*, a bimonthly lifestyle magazine; *City Link*, an alternative weekly newspaper; *Home Source*, a comprehensive monthly guide to South Florida real estate and home improvement; *Jewish Journal*, a collection of weekly newspapers serving South Florida's Jewish community; and *South Florida Parenting*, a monthly magazine providing parenting information and resources for local families. The *South Florida Sun Sentinel* currently prints and transports all of the *Palm Beach Post's* circulation and its outside carriers deliver approximately eighty percent (80%) of the *Palm Beach Post's* single copy and approximately thirty percent (30%) of their home delivery copies. The *South Florida Sun Sentinel* also has printing contracts with *The New York Times* and *USA Today* for their daily papers and has distribution agreements with major dailies such as the *Miami Herald*, *The Wall Street Journal*, *USA Today*, *The New York Times*, and several other daily publications.

e)    CT1 Media

CT1 Media is a leading provider of news, information and entertainment in Connecticut. Its operations are principally comprised of the publication of the *Hartford Courant* and its related businesses. The *Hartford Courant*, founded in 1764, is the oldest continuously published newspaper in the United States. It is the most widely circulated and read newspaper in Connecticut. Winner of two Pulitzer Prizes and twice named among the best-designed newspapers in the world, the *Hartford Courant* serves the state's northern and central regions. The *Hartford Courant's* primary market is the Hartford market, which ranks 45th in the nation in terms of population and includes Hartford, Tolland and Middlesex counties. Approximately eighty-nine percent (89%) and seventy-eight percent (78%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes. CT1 Media also operates courant.com, Connecticut's leading online news site, publishes three weekly alternative newspapers in Connecticut and operates a shared-mail company that distributes advertising supplements to more than one million households in Connecticut and Massachusetts. For the first three quarters of 2010, the Hartford Courant's digital media reached an average of almost 700,000 monthly unique visitors and averaged about 21 million monthly page views.

f)    *The Morning Call*

*The Morning Call*, published since 1895, is the major regional newspaper for nine counties in eastern Pennsylvania and one county in western New Jersey. Its primary market, the Allentown-Bethlehem-Easton metropolitan area, is the 62nd largest market in the nation in terms of population. Approximately seventy-six percent (76%) of the paper's daily and eighty percent (80%) of Sunday circulation was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes and to schools. *The Morning Call* also offers full service direct marketing and saturation preprint delivery through non-subscriber distribution and owns and operates the premier regional website, themorningcall.com. For the first three quarters of 2010, *The Morning Call's* digital media reached an average of over 390,000 monthly unique visitors and averaged over 14 million page views.

g)    *Daily Press*

Founded in 1896, the *Daily Press* serves the Virginia Peninsula market, which includes Newport News, Hampton, Williamsburg and eight other cities and counties. This market, together with Norfolk, Portsmouth, Virginia Beach and Chesapeake, is known as Virginia's Hampton Roads region and is the 35th largest market in the nation in terms of population. The *Daily Press* is the only major daily newspaper in its primary market, although it competes with other regional and national newspapers, as well as with other media. Approximately eighty-eight percent (88%) and eighty-six percent (86%) of the paper's daily and Sunday circulation, respectively, was home delivered in 2010, with the remainder primarily sold at newsstands and vending boxes. The *Daily Press* also publishes *The Virginia Gazette*, a semi-weekly publication which primarily serves Williamsburg, Virginia, and the surrounding counties, the weekly *Tidewater Review*, published for the greater West Point, Virginia community, and several special interest publications. The *Daily Press* also distributes news, advertising and other information through various multimedia channels, including its online affiliates dailypress.com, hrtownsquare.com, hrvarsity.com and hrmilitary.com. For the first three quarters of 2010, the *Daily Press'* digital media reached an average of over 260,000 monthly unique visitors and averaged about nine million monthly page views.

h)    Tribune Media Services

Tribune Media Services ("<u>TMS</u>") is a leading provider of information and entertainment products for print, electronic and on-air media. Through its Entertainment Products division, TMS distributes

television and movie listings and related editorial content under the TMS and Zap2it brands. This division also publishes monthly television listings magazines and offers direct marketing services for cable and satellite operators. TMS's News & Features division (i) syndicates comics, editorial cartoons, feature articles, opinion columns, games and puzzles; (ii) creates and distributes a variety of online information products; and (iii) licenses editorial content from national periodicals. TMS also markets news, features, information graphics and multimedia content to media clients around the world through McClatchy-Tribune Information Services. For the first three quarters of 2010, TMS's Zap2it.com web site reached an average of about 2.4 million monthly unique visitors and averaged over 38 million monthly page views.

> 2.    Broadcasting Segment.

The Broadcasting Segment, which accounted for thirty percent (30%) of the Tribune Entities' consolidated operating revenues in 2009, includes 23 television stations in 19 markets, of which seven stations are in the top ten markets in the United States. The Tribune Entities also own and operate the "Superstation" WGN America, which is seen in over 72 million homes, the Chicago radio station WGN-AM, which first went on the air in 1924, and CLTV, Chicago's first and only 24-hour cable news channel. Through its television stations and WGN America, the Broadcasting Segment reaches more than eighty percent (80%) of television households in the United States. The Broadcasting Segment employed approximately 2,750 full-time equivalent employees in the fourth quarter of 2009 and approximately 2,400 in the third quarter of 2010.

Thirteen of the Tribune Entities' television stations are affiliates of The CW Network. These stations are located in New York, Los Angeles, Chicago, Dallas, Washington, D.C., Houston, Miami, Denver, St. Louis, Portland, Indianapolis, Hartford and New Orleans. The Tribune Entities also have seven television stations affiliated with the FOX Network. These stations are located in Seattle, Sacramento, Indianapolis, Hartford, San Diego, Grand Rapids and Harrisburg. In addition, the Tribune Entities have an ABC Network television station affiliate in New Orleans and two independent stations in Philadelphia and Seattle.

Prior to the consummation of the transactions involving the Chicago Cubs' business, the Broadcasting Segment included Tribune's subsidiaries that operated the Chicago Cubs' business and held a twenty-five percent (25%) equity interest in regional sports network Comcast SportsNet Chicago, LLC. As discussed in Article V.H of this General Disclosure Statement, in October 2009, the Tribune Entities contributed their interest in the Chicago Cubs' business and their twenty-five percent (25%) equity interest in Comcast SportsNet Chicago to Chicago Baseball Holdings, LLC. Results discussed herein for 2009 exclude results relating to the Chicago Cubs' business.

> a)    Television

The programming on the Tribune Entities' television stations consists of network-provided shows, syndicated series, news, local and regional sports coverage, feature films, and children's programs. These stations acquire most of their programming from outside sources, including The CW Network, the FOX Network, the ABC Network and major studios such as Warner Bros. A portion of the programming, including news and sports programming, is produced locally. Select information regarding the Tribune Entities' television stations is shown in the following summary table.

| | National Market Rank | % of U.S. Households | Channel | Major Over the Air Affiliation | Expiration of FCC License[5] | Year Acquired |
|---|---|---|---|---|---|---|
| WPIX - New York, NY | 1 | 6.5 | 11 | CW | 2015 | 1948 |
| KTLA—Los Angeles, CA | 2 | 4.9 | 5 | CW | 2014 | 1985 |
| WGN—Chicago, IL | 3 | 3.0 | 9 | CW | 2013 | 1948 |
| WPHL—Philadelphia, PA | 4 | 2.6 | 17 | IND | 2015 | 1992 |
| KDAF—Dallas, TX | 5 | 2.2 | 33 | CW | 2014 | 1997 |
| WDCW—Washington, D.C. | 9 | 2.1 | 50 | CW | 2012 | 1999 |
| KIAH—Houston, TX | 10 | 1.9 | 39 | CW | 2014 | 1996 |
| KCPQ—Seattle, WA | 13 | 1.6 | 13 | FOX | 2015 | 1999 |
| KZJO—Seattle, WA | 13 | 1.6 | 22 | IND | 2015 | 1998 |
| WSFL—Miami, FL | 16 | 1.4 | 39 | CW | 2013 | 1997 |
| KWGN—Denver, CO* | 17 | 1.4 | 2 | CW | 2014 | 1966 |
| KTXL—Sacramento, CA | 20 | 1.2 | 40 | FOX | 2014 | 1997 |
| KPLR—St. Louis, MO | 21 | 1.1 | 11 | CW | 2014 | 2003 |
| KRCW—Portland, OR | 22 | 1.0 | 32 | CW | 2015 | 2003 |
| WTTV—Indianapolis, IN** | 27 | 1.0 | 4 | CW | 2013 | 2002 |
| WXIN—Indianapolis, IN | 27 | 1.0 | 59 | FOX | 2013 | 1997 |
| KSWB—San Diego, CA | 28 | 0.9 | 69 | FOX | 2014 | 1996 |
| WTIC—Hartford, CT | 30 | 0.9 | 61 | FOX | 2015 | 1997 |
| WCCT—Hartford, CT | 30 | 0.9 | 20 | CW | 2015 | 2001 |
| WPMT—Harrisburg, PA | 39 | 0.6 | 43 | FOX | 2015 | 1997 |
| WXMI—Grand Rapids, MI | 41 | 0.6 | 17 | FOX | 2013 | 1998 |
| WGNO—New Orleans, LA | 52 | 0.5 | 26 | ABC | 2013 | 1983 |
| WNOL—New Orleans, LA | 52 | 0.5 | 38 | CW | 2013 | 2000 |

*This television station is party to a local marketing agreement with the FOX Network television station affiliate in the market owned by Local TV, LLC.
** WTTK (also in the Indianapolis market) is owned and operated as a satellite station, with a license expiration date in 2013.

In 2009, the television group contributed ninety-seven percent (97%) of the Broadcasting Segment's operating revenues. Approximately eighty-one percent (81%) of these revenues were derived from advertising. The Tribune Entities' television stations compete for audience and advertising with other television and radio stations, cable television and other media serving the same markets. Competition for audience and advertising is based upon various interrelated factors including programming content, audience acceptance and price.

The television group includes WGN America, a broad entertainment network distributed in over 72 million homes across America by cable, satellite, and telcos. Its programming emphasis is entertainment and consists of first-run programs, syndicated sit-coms, blockbuster movies, cable exclusives, and live sports.

  b)    Radio/Other

WGN-AM, Chicago, is a news and talk radio station. It operates on frequency 720-AM and is the flagship station of the Chicago Cubs (MLB) radio network and the Chicago Blackhawks (NHL) and also airs Northwestern University (NCAA) Men's basketball and football games. WGN-AM is the only radio

---

[5] Certain of the Debtors' business operations are subject to regulation by the FCC (as defined in Article III.D.3 herein) under the Communications Act of 1934, 47 U.S.C. § 151 et seq., as amended (the "Communications Act"). Television and radio stations may not operate in the United States without the authorization of the FCC, and FCC approval is required for the issuance, renewal, transfer, and assignment of station operating licenses. The FCC also regulates the multiple and combined ownership of television and radio broadcast stations as well as the cross-ownership of broadcast stations and newspapers in the same market.

station owned by the Tribune Entities.  In 2009, radio/other operations contributed three percent (3%) of the Broadcasting Segment's operating revenues.

3.    Additional Investments.

Various Tribune Entities (including non-Debtors) have investments (typically minority equity interests) in private corporations, limited liability companies and partnerships that are not Debtors in these Chapter 11 Cases.  The Tribune Entities' significant investments are as follows:

| Investment | Description | Tribune Entities' Ownership | Partners[6] |
|---|---|---|---|
| Television Food Network | Lifestyle cable network and website with a focus on food and entertaining | 31.3% | Scripps Networks Interactive, Inc. |
| CareerBuilder | Online recruitment company that connects job seekers and employers | 30.8% | Gannett Co., Inc.<br>The McClatchy Company<br>Microsoft Corporation |
| Classified Ventures | A network of automotive and real estate classified advertising websites, including cars.com, apartments.com and homegain.com | 27.8% | The McClatchy Company<br>Gannett Co., Inc.<br>The Washington Post Company<br>A.H. Belo Corporation |
| Homefinder | An online real estate company that connects home buyers, sellers and real estate professionals | 33.3% | The McClatchy Company<br>Gannett Co., Inc. |
| Topix | Provider of news and community information on the web, connecting people to the information and discussions that matter to them in every U.S. town and city | 33.7% | Gannett Co., Inc.<br>The McClatchy Company<br>Former and Current Management |
| quadrantONE | National premium advertising network of websites of the leading media companies in the U.S. | 25.0% | The New York Times Company<br>Hearst Corporation<br>Gannett Co., Inc. |
| Legacy.com | Provider of online obituaries | 48.3% | Individual Investors |
| Metromix | National network of local entertainment websites | 48.9% | Gannett Co., Inc. |
| Newsday Holdings LLC | Parent company of the entity that owns and operates *Newsday*, the leading daily newspaper in Long Island, and its related websites and other media properties | 2.8% | Cablevision Systems Corp. |

---

[6]    As used in this summary table, the term "Partners" refers to the parent company of each partner or in the case of an LLC, the parent company of each member.  Actual legal partners, or, in the case of LLCs, members, may be affiliates of such parent companies.

| Investment | Description | Tribune Entities' Ownership | Partners[6] |
|---|---|---|---|
| Chicago Baseball Holdings, LLC | Owns and operates the Chicago Cubs Major League Baseball franchise and related businesses | 5.0% | Ricketts Acquisition LLC |

### C.    Recent Operations.

The Tribune Entities' consolidated operating results for the three quarters ended September 26, 2010 and September 27, 2009 and fiscal years ended December 27, 2009 and December 28, 2008 are shown in the table below.[7]

| | First Three Quarters | | Year Ended | |
|---|---|---|---|---|
| **TRIBUNE ENTITIES** **CONSOLIDATED STATEMENTS OF OPERATIONS** ($ in millions) | Sept. 26, 2010 | Sept. 27, 2009 | Dec. 27, 2009 | Dec. 28, 2008 |
| **Revenues** | | | | |
| Publishing | $    1,541 | $    1,644 | $    2,243 | $    2,765 |
| Broadcasting | 793 | 690 | 939 | 1,165 |
| **Total Revenues** | $    2,334 | $    2,334 | $    3,183 | $    3,930 |
| | | | | |
| **Cash Operating Expenses** | | | | |
| Publishing | $    1,333 | $    1,447 | $    1,916 | $    2,303 |
| Broadcasting | 541 | 540 | 713 | 804 |
| Corporate | 38 | 43 | 60 | 37 |
| **Total Cash Operating Expenses** | $    1,912 | $    2,030 | $    2,689 | $    3,144 |
| | | | | |
| **Operating Cash Flow** | | | | |
| Publishing | $    208 | $    197 | $    327 | $    462 |
| Broadcasting | 252 | 150 | 226 | 361 |
| Corporate | (38) | (43) | (60) | (37) |
| **Total Operating Cash Flow** | $    422 | $    304 | $    494 | $    786 |
| | | | | |
| **Income on Equity Investments, Net** | $    121 | $    89 | $    123 | $    85 |

---

[7]    The Tribune Entities' results of operations are preliminary and unaudited and exclude discontinued operations (Chicago Cubs group and Newsday) and Comcast SportsNet Chicago. The Debtors use cash operating expenses and operating cash flow to evaluate internal performance. "Cash operating expenses" are defined as operating expenses before depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items. "Operating cash flow" is defined as earnings before interest income, interest expense, equity income and losses, depreciation and amortization, write-downs of intangible assets and properties, stock-based compensation, ESOP expense, certain special items (including severance), non-operating items, and reorganization items.  Cash operating expenses and operating cash flow are not measures of financial performance under Generally Accepted Accounting Principles ("GAAP") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

At September 26, 2010, the Tribune Entities' available cash balance was approximately $1.8 billion, an increase of over $300 million from the end of 2009. For the first three quarters of 2010, cash provided by core operations was $374 million and the Company received cash distributions of $97 million from TV Food Network. These cash inflows were partially offset by $58 million of capital expenditures and $74 million of reorganization costs.

At the end of 2009, the Tribune Entities' available cash balance was approximately $1.5 billion, up from approximately $600 million at the end of 2008. The increase in cash reflected $701 million in proceeds from the Chicago Cubs transaction received in the fourth quarter of 2009 and net cash flow generated from operations. During 2009, core operations produced approximately $596 million of cash. In addition, the Company received approximately $40 million from the operations of the Chicago Cubs and Comcast SportsNet and $89 million from TV Food Network in 2009. Offsetting these cash inflows was $112 million of capital expenditures, $91 million of capital gains and other tax payments, $225 million of repayments of the Tribune Entities' DIP Facility, $14 million to collateralize the Tribune Entities' letters of credit and $96 million of reorganization costs (including interest on post-petition financing).

### D.    Current Management of the Debtors.

#### 1.    Board of Directors.

In accordance with the Amended and Restated Bylaws of Tribune, the board of directors of Tribune (the "Board of Directors") currently consists of ten directors. Set forth below are the directors of Tribune, as of the date of the filing of this General Disclosure Statement.[8]

| Name | Title |
| --- | --- |
| Samuel Zell | Chairman |
| Jeffrey S. Berg | Board Member |
| Brian L. Greenspun | Board Member |
| Betsy D. Holden | Board Member |
| William A. Osborn | Board Member |
| William C. Pate | Board Member |
| Mark Shapiro | Board Member |
| Mary Agnes Wilderotter | Board Member |
| Frank E. Wood | Board Member |

#### 2.    Special Committee of the Board of Directors.

On August 27, 2010, the Board of Directors formed a special committee of independent directors for the purpose of supervising the Chapter 11 Cases (the "Special Committee"). The Special Committee consists of four independent directors of the Board of Directors: (i) Mark Shapiro; (ii) Jeffrey S. Berg; (iii) Mary Agnes Wilderotter; and (iv) Frank E. Wood (the "Independent Directors"). The Independent Directors were appointed to the Board of Directors upon or after the consummation of the Leveraged ESOP Transactions.

---

[8]    This General Disclosure Statement contains only information pertaining to Tribune's Board of Directors, which information does not apply in the case of each of Tribune's subsidiaries.

3.      Subcommittees of the Board of Directors.

The Board of Directors has a standing audit committee (the "Audit Committee") whose function includes reviewing and monitoring Tribune's financial reporting and accounting practices and internal controls. Betsy D. Holden, William A. Osborn (chair) and Frank E. Wood currently serve on the Audit Committee.

The Board of Directors also has a standing compensation committee (the "Compensation Committee"), which has the responsibility to review annually and approve corporate goals and objectives relevant to the compensation of Tribune's principal executive officer, to evaluate Tribune's principal executive officer's performance in light of those goals and objectives and, based on that evaluation, to determine and approve the principal executive officer's compensation level. The Compensation Committee also has the responsibility to review annually with the principal executive officer and approve the compensation for the other senior executive officers, including the three most highly-compensated executive officers other than the principal executive officer and principal financial officer. Furthermore, the Compensation Committee has the responsibility to review and approve incentive and other compensation plans, if any, covering certain other management employees of the Debtors. The current members of the Compensation Committee are Brian L. Greenspun, William C. Pate, and Mary Agnes Wilderotter (chair).

4.      Compensation of Directors.

The directors who are employees of the Tribune Entities receive no additional compensation for service as a director. In 2010, the non-employee directors will receive cash compensation in the form of a $125,000 retainer and will be reimbursed for actual out-of-pocket expenses incurred in attending meetings. The chair of the Audit Committee will also be paid an additional $15,000 cash retainer and each member of the Audit Committee, including the chair, will be paid an additional $6,000 cash retainer. The chair of the Special Committee will also be paid a one-time $35,000 cash retainer and each member of the Special Committee, other than the chair, will also be paid a one-time $25,000 cash retainer. Each member of the Special Committee will also be paid a fee of $1,500 for each in-person or telephonic meeting of the Special Committee attended by such member.

5.      Executive Officers.

The members of the executive management team of the Tribune Entities and each member's position as of the date of this General Disclosure Statement are as set forth below.

| Name | Title |
| --- | --- |
| Gerald A. Spector | Chief Operating Officer, Tribune |
| Jerry Kersting | President, Tribune Broadcasting |
| Don Meek | Executive Vice President, Tribune Digital |
| Nils Larsen | Co-President and Chief Investment Officer, Tribune; Chairman , Tribune Broadcasting[9] |
| Chandler Bigelow III | Executive Vice President and Chief Financial Officer, Tribune |
| Donald J. Liebentritt | Co-President and Chief Restructuring Officer, Tribune[10] |
| David P. Eldersveld | Senior Vice President and General Counsel, Tribune[11] |

---

[9] Mr. Larsen assumed the position Chairman of Tribune Broadcasting in October of 2010.

[10] Mr. Liebentritt assumed the position of Chief Restructuring Officer in September of 2010.

[11] Mr. Eldersveld assumed the position of Senior Vice President and General Counsel in September of 2010.

| Tony Hunter | Co-President, Tribune; President, Publisher and Chief Executive Officer, Chicago Tribune Company |
| Eddy Hartenstein | Co-President, Tribune; Publisher and Chief Executive Officer, Los Angeles Times Communications, LLC |

On October 22, 2010, Tribune announced that its Board of Directors appointed an executive council that will assume the responsibilities of the Office of the Chief Executive and President and oversee the company's publishing and broadcast operations (the "Executive Council"). The Executive Council is composed of (i) Donald J. Liebentritt, (ii) Nils Larsen, (ii) Tony Hunter, and (iv) Eddy Hartenstein. The Executive Council will report directly to Tribune's Board of Directors.

## III.   SUMMARY OF CERTAIN PREPETITION LIABILITIES

*The following summary of certain prepetition liabilities of the Debtors was prepared by the Debtors.*

### A.   Prepetition Funded Debt and Capital Structure of the Tribune Entities.

1.   Prepetition Capital Structure.

As further discussed in Article VII.A of this General Disclosure Statement, Tribune returned to private ownership in 2007.[12]  On April 1, 2007, Tribune entered into an Agreement and Plan of Merger (the "Merger Agreement") with GreatBanc Trust Company,[13] the Zell Entity,[14] and Tesop Corporation, a Delaware corporation wholly-owned by the ESOP (the "Merger Sub"). The Merger Agreement provided for a series of transactions that, if various conditions were satisfied, would ultimately culminate in the Merger Sub merging with and into Tribune, and following such merger, for Tribune to continue as the surviving corporation wholly-owned by the ESOP (the "Merger"). On April 1, 2007, pursuant to the terms of that certain ESOP Purchase Agreement, dated as of April 1, 2007, by and between Tribune and GreatBanc Trust Company, the ESOP purchased 8,928,571 shares of Tribune's common stock from Tribune at a price of $28 per share.[15]  The ESOP paid for this purchase with a promissory note of the ESOP in favor of Tribune in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from Tribune to the ESOP and/or distributions paid on the shares of Tribune common stock held by the ESOP.

On April 23, 2007, pursuant to a purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), the Zell Entity made an initial investment of $250 million in Tribune in exchange for (i) the purchase of 1,470,588 shares of Tribune's common stock at a price of $34 per share and (ii) an unsecured subordinated exchangeable promissory note of Tribune in the principal amount of $200 million.

---

[12]   The descriptions contained in this General Disclosure Statement provide only a brief overview of the Leveraged ESOP Transactions. Additional details concerning the Leveraged ESOP Transactions are available in Tribune's Quarterly Report on Form 10-Q for the third quarter ending September 28, 2008 and in the Examiner's report included as Exhibit G hereto.

[13]   GreatBanc Trust Company was not party to the Merger Agreement in its individual or corporate capacity, but solely as trustee of Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

[14]   The Zell Entity was party to the Merger Agreement solely for the limited purpose provided therein.

[15]   GreatBanc Trust Company was not a party to the ESOP Purchase Agreement in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, a separate trust created under the ESOP.

On April 25, 2007, Tribune commenced a tender offer to repurchase up to 126 million shares (approximately fifty percent (50%) of the then-outstanding shares) of Tribune's common stock that were then-outstanding at a price of $34 per share in cash. The tender offer expired on May 24, 2007 and 126 million shares of Tribune's common stock were repurchased and subsequently retired on June 4, 2007 utilizing proceeds from the Senior Loan Agreement (as defined and discussed below).

On December 20, 2007, Tribune merged with Merger Sub, with Tribune surviving the Merger. Upon consummation of the Merger, the 8,928,571 shares of Tribune's common stock held by the ESOP were converted into 56,521,739 shares of common stock and represented the only outstanding shares of capital stock of Tribune after the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of Tribune, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by Tribune, the ESOP or Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by stockholders, was cancelled and automatically converted into the right to receive $34, without interest and less any applicable withholding taxes, and Tribune became wholly-owned by the ESOP.

Pursuant to the Zell Entity Purchase Agreement, on December 20, 2007, the Zell Entity tendered the shares of Tribune common stock it had acquired pursuant to the Zell Entity Purchase Agreement. Tribune also retired the unsecured subordinated exchangeable promissory note held by the Zell Entity, including approximately $6 million of accrued interest. Following the consummation of the Merger, the Zell Entity purchased from Tribune, for an aggregate of $315 million, a $225 million subordinated promissory note and a 15-year warrant. As the $315 million investment was greater than the cash due from Tribune to the Zell Entity for the shares tendered and notes retired, accrued interest, and legal fees, the amounts were netted against each other and the balance of $56 million was paid by the Zell Entity to Tribune. The warrant entitles the Zell Entity to purchase 43,478,261 shares of Tribune's common stock (subject to adjustment), which represented approximately forty percent (40%) of the economic equity interest in Tribune following the Merger (on a fully-diluted basis). The initial aggregate exercise price for the warrant was $500 million (subject to adjustment), increasing by $10 million per year for the first ten years of the warrant, for a maximum aggregate exercise price of $600 million (subject to adjustment). Thereafter, the Zell Entity assigned minority interests in the subordinated promissory note and the warrant to certain permitted assignees.

The terms of the ESOP provide that common shares held by the ESOP are to be allocated on a noncontributory basis to eligible employees of Tribune. As of December 27, 2009, approximately 1.6 million of the common shares held by the ESOP have been allocated to eligible employees of Tribune. As of the date of this General Disclosure Statement, no distributions have been made to eligible employees on account of such shares.

2.    Prepetition Funded Debt Structure.

In connection with the Leveraged ESOP Transactions and in order to fund ongoing general corporate and working capital needs, Tribune entered into financing facilities in May 2007 and December 2007.[16] Tribune is also the obligor on (i) a series of outstanding note and debenture issuances and (ii) exchangeable subordinated debentures that predated the Merger, as well as a subordinated promissory note, which was issued immediately following the Merger. Additionally, Tribune (in its capacity as servicer) and Tribune Receivables LLC, a wholly-owned special purpose subsidiary which is not a Debtor, were parties to a trade receivables securitization facility for which Barclays Bank PLC

---

[16]    Please refer to Article III.A.2 of this General Disclosure Statement for a further discussion of the financing facilities entered in connection with the Leveraged ESOP Transactions.

("Barclays") was the administrative agent and Tribune Receivables LLC was the borrower.[17] Accordingly, Tribune's prepetition debt structure was comprised of the following components: (a) a Senior Loan Agreement; (b) a Bridge Facility (as defined below); (c) various issuances of outstanding notes and debentures (the "Senior Notes"); (d) the EGI-TRB LLC Notes (as defined below); (e) exchangeable subordinated debentures (the "PHONES Notes"); and (f) a Receivables Facility (as defined below). As of the Petition Date, Tribune's funded debt totaled approximately $12.706 billion in principal amount, as follows:

| Debt Instrument | Approximate Principal Amount Outstanding as of the Petition Date |
| --- | --- |
| Senior Credit Facility | $8.622 billion[18] |
| Bridge Facility | $1.600 billion |
| Senior Notes | $1.263 billion |
| EGI-TRB LLC Notes | $0.235 billion |
| PHONES Notes[19] | $0.759 billion |
| Receivables Facility | $0.225 billion |
| Total | $12.706 billion |

A brief overview of Tribune's debt facilities, outstanding note and debenture issuances, and any guarantees of such facilities and issuances by Tribune's subsidiaries is set forth below. All of the indebtedness described in subparagraphs (a) through (e) below – the Senior Loan Agreement indebtedness, the Bridge Facility indebtedness, the Senior Notes, the EGI-TRB LLC Notes, and the PHONES Notes – are obligations of the parent company, Tribune. This indebtedness is *pari passu* in payment priority at Tribune, except for the EGI-TRB LLC Notes and the PHONES. The EGI-TRB LLC Notes and the PHONES Notes are contractually subordinated to all funded indebtedness at Tribune. The Senior Loan Agreement indebtedness and the Senior Notes are secured, equally and ratably, by a stock pledge (the "Stock Pledge") of the equity in two subsidiaries. None of the Bridge Facility, the EGI-TRB LLC Notes, or the PHONES Notes are secured. Additionally, the indebtedness under the Senior Loan Agreement and the indebtedness under the Bridge Facility constitute unsecured obligations at those Tribune subsidiaries (the "Guarantor Subsidiaries"),[20] which have guaranteed (i) the Senior Loan

---

[17]    The trade receivables securitization facility was amended and continued post-petition pursuant to orders entered by the Bankruptcy Court on January 15, 2009 and April 8, 2009.  The trade receivables securitization facility was terminated on February 26, 2010.

[18]    The amount outstanding on account of the Senior Credit Facility includes the Swap Claim (which is defined and described below).

[19]    The Debtors have been informed by the Trustee for the PHONES Notes that the Trustee and certain holders of the PHONES have disputed that the outstanding amount of the PHONES Notes that were submitted for redemption and not settled for cash has been reduced as a result of such submission.

[20]    The Guarantor Subsidiaries are those subsidiaries deemed material under the Credit Agreement, and are comprised of the following: 5800 Sunset Productions Inc.; California Community News Corporation; Channel 39, Inc.; Channel 40, Inc.; Tribune CNLBC, LLC; Chicago Tribune Company; Chicagoland Publishing Company; Chicagoland Television News, Inc.; Courant Specialty Products, Inc.; Distribution Systems of America, Inc.; Eagle New Media Investments, LLC; Eagle Publishing Investments, LLC; Forsalebyowner.com corp.; Forum Publishing Group, Inc.; Gold Coast Publications, Inc.; Homeowners Realty, Inc.; Homestead Publishing Company; Hoy Publications, LLC; Internet Foreclosure Service, Inc.; KIAH Inc.; KPLR, Inc.; KSWB Inc.; KTLA Inc.; KWGN Inc.; Los Angeles Times Communications LLC; New Mass. Media, Inc.; Orlando Sentinel Communications Company; Patuxent Publishing Company; Southern Connecticut Newspapers, Inc.; Star Community Publishing Group, LLC; Stemweb, Inc.; Sun- Sentinel Company; The Baltimore Sun Company; The Daily Press, Inc.; TMLH 2, Inc.; TMLS I, Inc.; TMS Entertainment Guides, Inc.; Tower Distribution Company; Tribune (FN) Cable Ventures, Inc.; Tribune Broadcast Holdings, Inc.; Tribune

Agreement indebtedness on a senior priority basis, and (ii) the Bridge Facility indebtedness on a subordinate basis to the Senior Loan Agreement indebtedness. None of the Senior Notes, PHONES Notes, or the EGI-TRB LLC Notes are guaranteed by, or constitute obligations of, any of Tribune's subsidiaries. Instead, they are liabilities solely of Tribune.

a)        Senior Loan Agreement.

On May 17, 2007, Tribune entered into an $8.028 billion senior secured credit agreement (the "Senior Loan Agreement") with JPMorgan Chase Bank, N.A., as administrative agent and financial institutions from time to time party thereto.[21] The Senior Loan Agreement consists of the following loan facilities: (i) a $1.5 billion Senior Tranche X Term Facility (the "Tranche X Facility"), (ii) a $5.515 billion Senior Tranche B Term Facility (the "Tranche B Facility"), (iii) a $263 million Delayed Draw Senior Tranche B Term Facility (the "Delayed Draw Facility"); (iv) a $750 million Revolving Credit Facility (the "Revolving Credit Facility"); and (v) $2.105 billion in new incremental term loans under the Tranche B Facility (the "Incremental Facility").[22] On December 27, 2007, Tribune entered into a number of increase joinders pursuant to which the Incremental Facility became a part of the Tranche B Facility under the Senior Loan Agreement. On June 4, 2007, the Company used the proceeds from the Tranche X Facility and the Tranche B Facility in connection with the consummation of a tender offer to repurchase certain shares of the Company's common stock that were then outstanding and to, among other things, refinance the Company's former five-year credit agreement and former bridge credit agreement.

Under the terms of the Senior Loan Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Senior Loan Agreement and other debt with respect to borrowed money. On July 2, 2007, Tribune entered into an International Swap and Derivatives Association, Inc. ("ISDA") Master Agreement, a schedule to the 1992 ISDA Master Agreement and on July 3, 2007, entered into three interest rate swap confirmations (collectively, the "Swap Documents") with Barclays, which Swap Documents provide for (i) a two-year hedge with respect to $750 million in notional amount, (ii) a three-year hedge with respect to $1 billion in notional amount, and (iii) a five-year hedge with respect to $750 million in notional amount. The Swap Documents were terminated on the Petition Date. As of that date, Tribune's aggregate liability in connection with the Swap Documents was approximately $150.9 million, which liability is subject to the guarantee of the Senior Loan Agreement indebtedness by the Guarantor Subsidiaries on a *pari passu* basis with Tribune's Senior Loan Agreement indebtedness.[23]

---

Broadcasting Company; Tribune Broadcasting Holdco, LLC; Tribune California Properties, Inc.; Tribune Direct Marketing, Inc.; Tribune Entertainment Company; Tribune Finance LLC; Tribune Interactive, Inc.; Tribune Los Angeles, Inc.; Tribune Manhattan Newspaper Holdings, Inc.; Tribune Media Net, Inc.; Tribune Media Services, Inc.; Tribune National Marketing Company; Tribune ND, Inc.; Tribune New York Newspaper Holdings, LLC; Tribune NM, Inc.; Tribune Television Company; Tribune Television Holdings, Inc.; Tribune Television New Orleans, Inc.; Tribune Television Northwest, Inc.; Virginia Gazette Companies, LLC; WDCW Broadcasting, Inc.; WGN Continental Broadcasting Company; WPIX, Inc.; and WCCT, Inc. (f/k/a WTXX Inc.).

[21]    The Senior Loan Agreement was subsequently amended on June 4, 2007, and all references thereto include the June 4, 2007 amendment.

[22]    The Revolving Credit Facility includes a letter of credit subfacility in an amount up to $250 million and a swing line facility in an amount up to $100 million.

[23]    Tribune was also party to an interest rate swap agreement with Morgan Stanley, which was terminated as of the Petition Date. Morgan Stanley, as the non-defaulting party under the swap agreement, calculated that approximately $52 million was owing to Tribune under that agreement as of the Petition Date. Approximately $9.5 million of this amount was paid to Tribune post-petition. While Tribune asserts a claim for the balance of

As of the Petition Date, with the exception of the aforementioned liability in connection with the Swap Documents, the total principal amount outstanding under the Senior Loan Agreement was approximately $8.472 billion, including approximate outstanding balances on the Tranche X Facility, Tranche B Facility and the Revolving Credit Facility of $512 million, $7.723 billion[24] and $237 million, respectively.[25] The Senior Loan Agreement indebtedness is secured by a pledge of the equity interests of Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC, both of which are Debtors, and is guaranteed, on a senior priority basis, by the Guarantor Subsidiaries.

b)     Bridge Facility.

On December 20, 2007, Tribune entered into a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Interim Credit Agreement") with Merrill Lynch as administrative agent, JPMorgan Chase Bank, N.A. as Syndication Agent, Citicorp North America, Inc. ("Citicorp") and Bank of America, N.A. ("Bank of America") as Co- Documentation Agents, and the Initial Lenders named therein. Pursuant to the Interim Credit Agreement, Tribune borrowed $1.6 billion under a 12 month bridge facility (the "Bridge Facility"). The total proceeds of $3.705 billion from the Bridge Facility and the Incremental Facility were used by Tribune, among other ways, in connection with the consummation of the Merger and for general corporate purposes. The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinated basis, by the Guarantor Subsidiaries. As of the Petition Date, the approximate outstanding balance of the Bridge Facility was $1.6 billion.

c)     The Senior Notes.

Pursuant to Indentures entered into between 1992 and 1997, Tribune is obligated on Senior Notes in the aggregate approximate amount of $1.263 billion. Each outstanding series and the approximate principal amounts owing as of the Petition Date are as follows:

| Indenture | Interest Rate | Maturity Date | Outstanding Amount[26] | CUSIP # |
|-----------|---------------|---------------|------------------------|---------|
| 1992 | 6.25% | November 10, 2026 | $.120 million | 89605HBY9 |
| 1995 | 7.25% | March 1, 2013 | $82.083 million | 887364AA5 |
| 1995 | 7.5% | July 1, 2023 | $98.750 million | 887364AB3 |
| 1996 | 6.61% | September 15, 2027 | $84.960 million | 887364AF4 |
| 1996 | 7.25% | November 15, 2096 | $148.000 million | 887360AT2 |
| 1997 | 4.875% | August 15, 2010 | $450.000 million | 896047AE7 |
| 1997 | 5.25% | August 15, 2015 | $330.000 million | 896047AF4 |
| 1997 | 5.67% | December 8, 2008 | $69.550 million | 89604KAN8 |
| **Total** | | | **$1.263 billion** | |

The Senior Notes are not guaranteed. The Senior Notes are secured by the Stock Pledge on a *pari passu* basis with the indebtedness under the Senior Loan Agreement.

---

approximately $42 million, Morgan Stanley has asserted a right to set-off approximately $38 million of this amount.

[24]     The outstanding indebtedness under the Tranche B Facility includes amounts outstanding under the Incremental Facility and the Delayed Draw Facility.

[25]     As of the Petition Date, Tribune had $99.8 million of letters of credit outstanding under the Revolving Credit Facility.

[26]     "The "Outstanding Amount" does not include accrued interest or fees as of the Petition Date. In addition, the "Outstanding Amount" does not purport to represent the Allowed amount of the Senior Noteholder Claims.

d)      The EGI-TRB LLC Notes.

On December 20, 2007, Tribune executed a $225 million subordinated promissory note in favor of the Zell Entity, which thereafter assigned minority interests in such notes to certain permitted assignees (collectively, the "EGI-TRB LLC Notes"). The notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries. As of the Petition Date, the aggregate outstanding principal balance of the EGI-TRB LLC Notes, including accrued payment-in-kind interest, totaled $235.3 million. The EGI-TRB LLC Notes mature in 2018.

On August 11, 2010, the EGI-TRB LLC Notes filed a conditional objection to the Tribune Plan alleging, among other things, that the PHONES Notes are contractually subordinated to the EGI-TRB LLC Notes. No order has been entered by the Bankruptcy Court with respect to this issue.

e)      The PHONES Notes.

In April 1999, Tribune issued eight million Exchangeable Subordinated Debentures due 2029 (the "PHONES Notes") for an aggregate principal amount of $1.256 billion. At the time of issuance, the value of one PHONES Notes was related to the value of one "reference share" of America Online ("AOL") common stock, which was then trading at $157 per share. On November 22, 1999, AOL common stock split on a two-to-one basis, changing the reference to two shares of AOL for each PHONES Notes. On January 11, 2001, AOL and Time Warner Inc. merged to form AOL Time Warner Inc. with the merged entity continuing to trade under the ticker AOL. On October 16, 2003, AOL Time Warner Inc. changed its name to Time Warner Inc. and began trading as TWX. As a result of the split and subsequent merger, two shares of TWX common stock now represent the "reference shares" for each PHONES Notes. Tribune was eligible to redeem the PHONES Notes at any time for the higher of the principal value of the PHONES Notes or the then-current market value of two shares of Time Warner common stock, subject to certain adjustments. In addition, prior to the Petition Date, Holders of PHONES Notes were contractually entitled to exchange a PHONES Notes for an amount of cash equal to ninety-five percent (95%) (or one hundred percent (100%) under certain circumstances) of the then-current market value of two shares of Time Warner stock. The approximate carrying value of PHONES Notes on the Petition Date was $759 million comprised of $703 million for PHONES Notes not submitted for exchange and a $56 million liability for PHONES Notes exchanged that were not settled in cash. The Debtors have been informed by the Trustee for the PHONES Notes that the Trustee and certain holders of the PHONES have disputed that the outstanding amount of the PHONES Notes that were submitted for redemption and not settled for cash has been reduced as a result of such submission. The PHONES Notes are obligations solely of Tribune and are not guaranteed by Tribune's subsidiaries.

f)      The Receivables Facility.

Prior to the Petition Date, Tribune, Tribune Receivables, LLC, a non-Debtor special purpose subsidiary of Tribune (the "Receivables Subsidiary"), and certain other subsidiaries of Tribune entered into a $300 million trade receivables securitization facility (the "Receivables Facility") led by Barclays, as administrative agent. The Receivables Facility, entered into in July 2008, enabled certain of Tribune's subsidiaries (the "Operating Subsidiaries") to sell certain trade receivables and related assets (the "Receivables") to Tribune on a daily basis. Tribune, in turn, sold such Receivables to the Receivables Subsidiary, also on a daily basis. Receivables transferred to the Receivables Subsidiary are considered assets of the Receivables Subsidiary and not of Tribune or any of the Operating Subsidiaries. As of the Petition Date, the total amount outstanding under the Receivables Facility was $225 million. As discussed in Article V.E below, following the Petition Date, the Receivables Facility was amended, restated and incorporated into the Amended DIP Facility (defined below). On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid. On February

25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

### B.    Prepetition Trade Payables & Other Operating Liabilities.

In addition to the funded debt described above, Tribune and its Debtor subsidiaries had liabilities as of the Petition Date to various trade vendors. Such liabilities related to the purchase of broadcast rights, newsprint and ink, and other goods and services used in the Debtors' business operations. As of the Petition Date, the Debtors had approximately $115 million of trade payables, including accruals for goods or services received but not invoiced. These amounts remain subject to the claims reconciliation process, which is discussed further in Article V.G.8 of this General Disclosure Statement.

### C.    Prepetition Compensation and Benefit Programs.[27]

The Debtors employed approximately 11,929 full-time and 2,555 part-time employees as of December 31, 2009, and the Debtors' gross expenses for their employees' compensation and benefit programs were approximately $1.1 billion during calendar year 2009. In addition to standard wages, such costs include a number of programs which were implemented by the Debtors in the ordinary course of business and are designed to reward the Debtors' management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefit package.

Certain of these compensation and benefit programs are generally described below, with the exception of insured and self-insured programs (e.g., health plans), customary fringe benefit policies (e.g., vacation, sick leave), individual employment agreements and collectively bargained agreements (except for the information set forth in Sections III.C.5 and III.C.11 below).

The descriptions set forth below are not, and are not intended to be, comprehensive and, as previously noted, do not include certain customary employee benefits provided by the Debtors. All such benefit programs and the Debtors' other compensation and benefit programs are governed by applicable program terms and conditions, as in effect or amended from time to time. In addition, the Debtors reserve the right to modify, amend or terminate any or all of their employee benefit and compensation programs in the ordinary course of business in their sole discretion, subject to applicable modification, amendment or termination provisions and/or applicable law. Moreover, nothing in this General Disclosure Statement shall limit the Debtors' rights to implement or seek implementation of any compensation and benefit programs as may be appropriate.

#### 1.    Retirement Programs.

The Debtors provide retirement benefits to employees through numerous defined benefit pension plans and defined contribution 401(k) plans sponsored either by the Debtors or by unions. These benefits are generally described below.

#### a)    Single Employer Pension Plans

The Debtors currently maintain four qualified single-employer defined benefit pension plans.[28] A description of the Debtors' single-employer pension plans follows.

---

[27]    Unless otherwise specified, the Compensation and Benefit Programs discussed in this Section were implemented by the Debtors prior to the Petition Date.

i)        Tribune Company Pension Plan

The Tribune Company Pension Plan is the Debtors' primary pension plan and is a tax-qualified, noncontributory, defined benefit pension plan for eligible employees.[29]  Substantially all of the accrued benefits provided under the plan were earned by employees based on final average pay benefit formulas used in other defined benefit plans sponsored by the Debtors that were merged into the Tribune Company Pension Plan.  Although the Tribune Company Pension Plan most recently provided benefits using a cash balance allocation, its assets and liabilities are almost entirely attributable to the benefits earned under prior plan formulas, the majority of which were frozen prior to January 1, 2006 and the last of which was frozen as of December 31, 2006.

As discussed above, from December 31, 2007 through December 31, 2009, the Tribune Company Pension Plan provided benefits in the form of an annual cash balance allocation to a hypothetical account established for each eligible employee participating in the plan in an amount equal to three percent (3%) of the employee's eligible compensation.  In addition, each eligible employee's account was credited with interest quarterly to provide an annual effective rate equal to the ten-year, United States Treasury rate in effect on November 30th of the preceding year.  Beginning in 2010, the Debtors discontinued the annual cash balance allocations; however, the Debtors continue to credit employees' accounts with the aforementioned interest.  In place of the cash balance allocation, the Debtors currently provide retirement benefits through matching contributions to employees' accounts under the existing defined contribution 401(k) Plans, discussed below.  These changes did not affect any benefits earned prior to 2010 under the Tribune Company Pension Plan.

The Debtors estimate that, as of January 1, 2010, there were approximately 10,988 active employees participating in the Tribune Company Pension Plan, as well as approximately 9,895 retirees receiving benefits from the Tribune Company Pension Plan.  As of that date, there were also approximately 16,316 additional persons who were neither active employees of the Debtors nor currently receiving benefits under the Tribune Company Pension Plan, but that were eligible to receive benefits thereunder in the future..

The funding status of the Tribune Company Pension Plan is generally determined either in accordance with GAAP ("Accounting Funding") or in accordance with the Pension Protection Act ("Cash Funding").  On an Accounting Funding basis, the Tribune Company Pension Plan was approximately eighty-eight percent (88%) funded at the end of 2009.  On a Cash Funding basis, the Tribune Company Pension Plan was between approximately ninety-five percent (95%) and one hundred percent (100%) funded at the end of 2009.[30]

As of January 1, 2010, the Tribune Company Pension Plan maintained assets with a market value of approximately $1.3 billion. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will not be any Cash Funding requirements for the plan in

---

[28]   Two additional plans, the Major League Baseball Pension Plan for Non-Uniformed Personnel and the Minor League Players Pension Plan, were previously maintained by one of the Debtors.  However, these plans were assumed and assigned as a part of the Chicago Cubs transaction.

[29]   The formal name of the Tribune Company Pension Plan is the Tribune Company Cash Balance Pension Plan.

[30]   The Cash Funding calculation yields a lower deficit than the Accounting Funding calculation for a number of reasons.  For example, for purposes of the Cash Funding calculation, assets are "smoothed" by averaging the three most recent year-end asset values, with the benefit of averaging limited to one hundred and ten percent (110%) of the actual most recent year-end asset value. Under the Pension Protection Act rules, the Cash Funding calculation also applies a different discount rate to discount liabilities than the Accounting Funding method.

2010-2011, but that such Cash Funding requirements will be approximately (in millions) $61 in 2012, $72 in 2013, $63 in 2014, and $59 in 2015. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

ii)    Other Single Employer Qualified Defined Benefit Pension Plans

In addition to the Tribune Company Pension Plan, the Debtors maintain the following three qualified defined benefit pension plans for eligible employees:

- *Baltimore Sun Company Employees Retirement Plan.* As of January 1, 2010, the Baltimore Sun Company Employees Retirement Plan maintained assets with a market value of approximately $46 million. Based on current actuarial analyses and the Debtors' business plans, the Debtors anticipate that the Cash Funding requirements for the Baltimore Sun Company Employees Retirement Plan will be approximately (in millions) $4 in 2010, $4 in 2011, $5 in 2012, $4 in 2013, $4 in 2014, and $4 in 2015. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

- *Tribune Company Hourly Pension Plan.* As of January 1, 2010, the Tribune Company Hourly Pension Plan maintained assets with a market value of approximately $17.6 million. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be less than $1 million in Cash Funding requirements for the Tribune Company Hourly Pension Plan per year in 2010-2015. Actual Cash Funding requirements are highly dependent on assumptions and could vary considerably from these estimates.

- *Baltimore Mailers Union Local No. 888 Plan.*[31] As of January 1, 2010, the Baltimore Mailers Union Local No. 888 Plan maintained assets with a market value of approximately $8.1 million. Contributions, funded by concessions negotiated in collective bargaining, occur each pay period. Based on current actuarial analyses, various assumptions, and the Debtors' business plans, the Debtors anticipate that there will be no additional Cash Funding requirement for the Baltimore Mailers Union Local No. 888 Plan in 2010 and that additional Cash Funding of approximately $0.3 million will be required each year in 2011-2015. Actual funding requirements are highly dependent on assumptions and could vary considerably from these estimates. These estimates do not include routine contractual contributions that continue to be made each year.

b)    Multiemployer Pension Plans

The Debtors also participate in 16 multiemployer plans at various locations pursuant to certain of their collective bargaining agreements. These plans, which are summarized in the below table, generally require monthly contributions based on hours worked.

| Business Unit/Department | Union / Local | Plan Name | Estimated Number Current Employees of Debtors Covered | CBA Exp. Date | Est. Total Participants | Approximate Contribution | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2007 | 2008 | 2009 | 2010 |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) |
| (1) Chicago | GCC/#7 | GCIU-Employer | 140 | May-12 | 56,367 | $464,118 | $467,830 | $451,612 | $466,000 |

---

[31]    The formal name of the Baltimore Mailers Union Local No. 888 Plan is the Baltimore Mailers Union Local No. 888 and the Baltimore Sun Company Retirement Plan.

27

| Tribune - Pressmen | Retirement Fund | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (2) Chicago Tribune - Drivers | IBT/#706 | Chicago Newspaper Publishers Drivers Union Pension Plan | 133 | Dec-10 | 1,039 | 1,813,473 | 1,696,538 | 1,661,276 | 1,666,000 |
| (3) Baltimore Sun - Pressroom | GCIU/#31 | GCIU-Employer Retirement Fund | 81 | Apr-12 | 56,367 | 304,725 | 276,049 | 366,168 | 325,000 |
| (4) Chicago Tribune – Machinists | IAM/#126 | IAM National Pension Fund | 43 | Sep-12 | 227,988 | 226,741 | 207,952 | 204,588 | 194,000 |
| (5) KTLA – Newsroom | AFTRA | AFTRA Health and Retirement Plan | 36 | Aug-11 | 40,859 | 592,191 | 544,431 | 656,898 | 634,000 |
| (6) WPIX – Directors | DGA | Directors Guild of America Producers Pension Plan | 26 | Oct-08 | 17,141 | 74,445 | 80,391 | 80,487 | 70,000 |
| (7) WGN-TV – Newsroom | AFTRA | AFTRA Health and Retirement Plan | 47 | N/A** | 40,859 | 593,528 | 587,836 | 717,151 | 711,000 |
| (8) Baltimore Sun – Drivers | IBT/#355 | Truck Drivers and Helpers Local 355 Pension Fund | 28 | Dec-10 | 3,490 | 141,138 | 105,754 | 137,783 | 112,000 |
| (9) WPIX – Newsroom | AFTRA | AFTRA Health and Retirement Plan | 36 | May-09 | 40,859 | 489,995 | 508,626 | 478,933 | 462,000 |
| (10) WPIX – Stagehands | IATSE/#1 | IATSE Local #1 Pension Plan and Annuity Funds** | 21 | Mar-11 | 11,195 | 97,746 | 110,313 | 129,565 | 165,000 |
| (11) WGN-TV – Stagehands | IATSE/#2 | Stagehands Local #2 Pension Plan and Annuity Funds*** | 68 | May-11 | 1,035 | 54,485 | 47,252 | 57,082 | 55,000 |
| (12) KLTA-TEC Electricians | IBEW/#40 | Motion Picture Association Pension Plan | 4 | Jul-10 | 328 | 46,276 | 28,336 | 29,141 | 27,000 |
| (13) WGN-TV - Op. Engs. | IUOE/#399 | IUOE Central Pension Fund | 3 | May-11 | 167,959 | 10,567 | 8,893 | 10,162 | 10,000 |
| (14) Baltimore Sun - Composers | CWA/ITU | CWA/ITU Negotiated Pension Fund | 1 | Dec-04 | 50,957 | 2,603 | 2,603 | 2,893 | 3,000 |
| **TOTAL** | | | 667 | | | $4,912,031 | $4,672,804 | $4,983,739 | $4,900,000 |

*    The Debtors' multiemployer pension plans generally require contributions based on the hours worked by participating employees, which may vary from year to year.  Accordingly, the Debtors' contributions to such Plans may vary from year to year.  Each contribution set forth in this summary chart is applicable only to the specific year noted.

**   The parties have entered into an open-ended contract extension that may be terminated by either party upon 30 days prior written notice.

***  WPIX Stagehands and WGN-TV Stagehands each participate in two separate multiemployer pension plans: a local pension plan and a local annuity fund.

c)      401(k) Plans.

The Debtors maintain various tax-qualified 401(k) retirement plans, which permit eligible employees to make voluntary contributions on a pre-tax basis and some of which also provide for contributions by the Debtors (the "401(k) Plans").  The 401(k) Plans allow participants to invest their account balances in various investments.  As of January 1, 2008, the Debtors ceased contributions to the 401(k) Plans for non-union employees in conjunction with the introduction of the ESOP and the cash balance allocations under the Tribune Company Pension Plan.

The Debtors modified the 401(k) Plans for non-union employees effective January 1, 2010.  The Debtors currently match each dollar an employee contributes up to two percent (2%) of such employee's eligible pay and match $0.50 for each dollar contributed between two percent (2%) and six percent (6%) of such employee's eligible pay.  The Debtors also may make annual discretionary contributions based on the achievements of certain performance goals.

d)      Retiree Welfare Benefit Programs.

Historically, the Debtors maintained numerous medical, dental, prescription drug and life insurance programs for eligible retired union and non-union employees.  Effective January 1, 2009, the Debtors consolidated the majority of these retiree welfare benefit programs, and they are now administered or insured by United Healthcare Services, Inc.  These programs provide coverage to retirees

28

at different levels based on which Debtor employed the individual, the retiree's year of retirement, collective bargaining agreement requirements and the retiree's eligibility for Medicare coverage.

As of January 1, 2010, the Debtors estimate that there were approximately 5,000 active employees who may be eligible for a retiree medical program, and 530 active employees who will be eligible for retiree life insurance upon retirement.  As of January 1, 2010, the Debtors estimate that there were approximately 1,500 retirees covered by a retiree medical program and 2,185 retirees covered by retiree life insurance.

  2.  Severance Programs.

Prior to the Petition Date and in the ordinary course of business, the Debtors customarily provided employees whose employment was terminated without cause (the "Terminated Employees") with severance payments (the "Severance Payments") equal to their base wages for specified periods of time that correlated with their number of years of employment (the "Severance Period").  Terminated Employees typically received Severance Payments either (i) in a single, lump-sum Severance Payment (the "Lump-Sum Severance") or (ii) through salary continuation in the form of regular biweekly paychecks for the duration of the Severance Period (the "Salary Continuation Severance").  On February 4, 2009, the Bankruptcy Court entered an order authorizing the Debtors to implement a severance program for employees whose employment is terminated in certain circumstances after the Petition Date (the "Post-Petition Severance Program").

  3.  Management Incentive Plan ("MIP").

The Debtors maintain a management incentive plan, also referred to as the "MIP," which historically has been part of the Incentive Compensation Plan (defined and discussed further below).  The MIP provides cash compensation to certain of the Debtors' management employees to the extent that performance goals approved by the Compensation Committee are met. MIP participants typically consist of those management employees, other than those in sales positions, with target cash incentive award opportunities of at least fifteen percent (15%) of their base salary.  Approximately 670 of the Tribune Entities' employees participated in the MIP in 2009.

The Debtors have used a consistent methodology over the years in setting annual MIP targets and in subsequently determining MIP cash awards.  During this time, each MIP participant had an annual target award opportunity expressed as a percentage of his or her base salary.  The Debtors then used these individual bonus opportunities to determine target bonus pools for each business unit and segment, as well as a consolidated company-wide bonus pool.  Within the Publishing Segment, each individual newspaper (combined with any subsidiaries) was measured as a separate business unit; within the Broadcasting Segment, each television and radio station (or station group in duopoly markets) was measured as a separate business unit; and certain other operations considered to be general corporate operations as well as certain group offices that oversee the entire Publishing Segment or Broadcasting Segment also constituted distinct business units.  Beginning in the fourth quarter of each year, a budget and operating plan was developed by each business unit for the following year, as well as a consolidated budget and operating plan for the Tribune Entities as a whole.  The operating cash flow goals established in the planning process for a given business unit served as the primary performance target for that year's MIP. Business units were generally eligible for bonus pools ranging from forty percent (40%) to two hundred percent (200%) of the applicable target pool based on performance ranging from threshold-level to maximum-level achievement of applicable MIP goals, respectively.  Additionally, in accordance with the MIP, prior to the Petition Date, the Debtors historically made discretionary MIP cash awards to participants whose business units did not satisfy one or more of their stated goals (even at threshold levels), and otherwise adjusted pool amounts and individual awards, both positively and negatively, in

their discretion even in cases where applicable goals were met in whole or in part. Any such adjustments were consistent with the MIP parameters discussed above.

By orders entered on May 12, 2009 and September 30, 2009, respectively, the Bankruptcy Court authorized the Debtors to pay awards for 2008 under the MIP totaling approximately $12.2 million to eligible employees other than certain executives and up to $3.1 million to such executives. In addition, as discussed in Article V.C of this General Disclosure Statement, on July 22, 2009 the Debtors filed a motion with the Bankruptcy Court seeking authority to implement a 2009 Management Incentive Plan consisting of a self-funding ordinary course MIP program consistent with the Debtors' historical MIP programs, but containing certain modifications relative to prior years (including; for example, reductions to payout percentages at various levels of goal achievement compared with historical levels), as well as a new self-funding Transition MIP ("TMIP") program and a self-funding Key Operators Bonus ("KOB") program for certain participants (the "2009 MIP Motion"). The Washington-Baltimore Newspaper Guild, Local 32035 of The Newspaper Guild-Communications Workers of America, AFL-CIO (the "Guild") and the United States Trustee filed objections to the 2009 MIP Motion, which included the 2009 MIP, the TMIP and the KOB. These objections were litigated at an evidentiary hearing before the Bankruptcy Court on September 25, 2009. A complete transcript of the September 25, 2009 hearing is available upon written request to counsel for the Debtors. Upon the conclusion of the hearing, the Debtors asked the Bankruptcy Court to consider the MIP, TMIP and KOB as an integrated whole, not in parts. The Court then took under advisement, and did not immediately rule on, the 2009 MIP, TMIP and KOB programs.

At a hearing on January 27, 2010, in response to the Debtors' request that the 2009 MIP, TMIP and KOB now be considered separately, the Bankruptcy Court approved the 2009 MIP, and suggested that the Debtors consider incorporating the TMIP and KOB into a chapter 11 plan of reorganization. By order entered January 28, 2010, the Bankruptcy Court authorized the Debtors to implement the ordinary course MIP component of the 2009 Management Incentive Plan and to pay ordinary course MIP awards in an aggregate amount not to exceed $45.6 million. Payment of 2009 MIP bonuses totaling $42.1 million was made on February 26, 2010. The Debtors followed the Bankruptcy Court's suggestion, and filed a motion to voluntarily dismiss, without prejudice, their request for entry of an order authorizing the implementation of the TMIP and KOB. Following a March 23, 2010 hearing on this motion, the Bankruptcy Court entered an order that day granting this motion. At that hearing, the Court stated that "regardless of what my expressed words were at the [January 27, 2010] hearing, I didn't suggest that the part of the plan that was proposed and which I had under advisement should or could be the same plan that was under consideration or that I would approve it in the context of the confirmation." The Court further stated that it was not providing "any inclination of whether in that context it should be approved or not." The Court also stated that "whatever record was made [with respect to the TMIP and KOB, including at the September 25, 2009 hearing] would be included in whatever presumably confirmation hearing record was made if there were still objections to it."

On May 26, 2010, the Debtors moved the Bankruptcy Court for the authority to continue their self-funding ordinary course annual cash management incentive plan for 2010 (the "2010 MIP") for approximately 640 management employees, including the Debtors' top executives, with aggregate bonus opportunities depending on the Debtors' performance relative to certain 2010 consolidated operating cash flow goals (the "2010 MIP Motion"). Aggregate bonus opportunities under the 2010 MIP ranged from $30.8 million (provided that the Debtors achieved at least the level of planned consolidated operating cash flow set forth in their 2010 operating plan) to $42.9 million (for performance at or in excess of a specified maximum performance goal). As with the 2009 MIP, the 2010 MIP contained certain modifications relative to prior years, including, for example, reductions to payout percentages for certain participants at various levels of goal achievement compared with historical levels. The United States Trustee and Wells Fargo, as administrative agent under the Debtors' Bridge Loan Agreement, filed objections to the 2010 MIP Motion. On July 23, 2010, based on subsequent discussions with the Committee, the Debtors filed a

notice of certain revisions to the 2010 MIP (such notice referred to as the "Notice of Revisions to 2010 MIP," and the 2010 MIP Motion, as revised per the foregoing notice, referred to as the "Revised 2010 MIP Motion"). The Revised 2010 MIP Motion increased the required operating cash flow performance level at each potential payout level, decreased payout percentages for many participants in the 2010 MIP at various performance levels, and utilized a uniform payout-performance structure for all participants, as opposed to the bifurcated structure in the 2010 MIP Motion. Aggregate bonus opportunities under the Revised 2010 MIP Motion range from $16.5 million (provided that the Debtors achieve at least an increased threshold level of performance above the level of planned consolidated operating cash flow set forth in their 2010 operating plan) to $42.9 million (for performance at or in excess of an increased maximum performance goal). On November 10, 2010, the Bankruptcy Court entered an order approving the substantial majority of the relief requested in the Revised 2010 MIP Motion (the "2010 MIP Order").[32]

The Debtors intend to continue their historical annual MIP program after consummation of a plan of reorganization.

4.    Local Bonus Programs.

The Debtors maintain a variety of commission and incentive bonus programs for certain sales and other personnel who generally do not participate in the MIP. These programs are implemented locally and designed to incentivize and reward achievements of the Debtors' employees based upon specific metrics relevant to the respective employees' local or departmental line of work (the "Local Bonus Programs"). During 2009, approximately 2,500 of the Debtors' employees participated in the Local Bonus Programs. Generally, these programs are developed and implemented locally by individual newspapers, broadcast stations and corporate office departments. The majority of these programs are based on performance factors such as revenue generation, increasing market share, expense targets, and some discretionary factors. Payouts under most of the Local Bonus Programs are based upon year-end, quarter-end or month-end performance. The Debtors paid an aggregate of approximately $24.8 million, $22.2 million, and $20.7 million, respectively during 2007, 2008, and 2009 in connection with the Local Bonus Programs.[33]

5.    Collective Bargaining Agreements.

As of October 10, 2010, approximately ten percent (10%) of the Debtors' employees in the Publishing Segment and approximately thirty-two percent (32%) of the Debtors' employees in the Broadcasting Segment were represented by unions and covered under various collective bargaining agreements. Specifically, the Tribune Entities in the Publishing Segment are party to ten collective bargaining agreements and the Tribune Entities in the Broadcasting Segment are party to 15 collective

---

[32]    The 2010 MIP Order did not authorize payment of 2010 MIP awards to certain of the Debtors' employees, but preserved the Debtors' right to seek approval of the 2010 MIP as to such individuals at a future time. In addition, the 2010 MIP Order provided that in the event the Bankruptcy Court or any other court of competent jurisdiction enters a final non-appealable order or judgment finding that, as part of Tribune's leveraged buy-out transactions in 2007, a 2010 MIP Participant breached his or her fiduciary duty or committed an intentional tortious wrong, then such MIP Participant shall, within ten (10) days after receiving notice from a representative of the Debtors' estates of the finality of such order, repay Tribune the full amount of the 2010 MIP award payment received by such 2010 MIP Participant.

[33]    As further discussed in Article V.C of this General Disclosure Statement, on February 3, 2009 and May 12, 2009, the Bankruptcy Court entered orders authorizing the Debtors to pay prepetition amounts outstanding in connection with the Local Bonus Programs in an aggregate amount of up to $8.8 million and $1.1 million, respectively.

bargaining agreements. The following table summarizes certain information concerning the union representation of the Tribune Entities' employees.[34]

| | Department | Union/Local Name | Approximate Number of Employees | | | |
|---|---|---|---|---|---|---|
| | | | Full-Time | Part-Time | Per Diems/ Seasonal | Expiration Date |
| *Publishing* | | | | | | |
| *Baltimore Sun* | Packagers | GCC-IBT/888 | 104 | 51 | 0 | 12/ 2008** |
| *Baltimore Sun* | Transportation | GCC-IBT/355 | 18 | 10 | 0 | 12/2010 |
| *Baltimore Sun* | Pressroom | GCC-IBT/31 | 81 | 0 | 0 | 4/2012 |
| *Baltimore Sun* | Various* | TNG/Baltimore-Washington | 212 | 9 | 0 | 6/2012 |
| *Baltimore Sun†* | Prepress | GCC-IBT/582 | 1 | 0 | 0 | 4/2012 |
| *Chicago Tribune* | Machinists | IAM/126 | 43 | 0 | 0 | 9/ 2012 |
| *Chicago Tribune* | Pressroom | GCC-IBT/7 | 135 | 5 | 0 | 5/2012 |
| *Chicago Tribune* | Drivers | IBT/706 | 126 | 7 | 0 | 12/2010 |
| *LA Times* | Pressroom | GCC-IBT | 146 | 2 | 0 | 5/2011 |
| *Morning Call* | Pressroom | GCC-IBT/160M | 20 | 0 | 0 | 6/ 2011 |
| *Subtotal* | | | *886* | *84* | *0* | |
| ***Broadcasting and Entertainment*** | | | | | | |
| KTLA (Los Angeles) | Newspersons | AFTRA | 22 | 0 | 14 | 8/2011 |
| WPIX (New York) | Directors | DGA | 6 | 1 | 19 | 10/ 2008** |
| WPIX (New York) | Newswriters | TNG/3 | 23 | 1 | 13 | 12/2012 |
| WGN-TV (Chicago) | Newspersons | AFTRA | 28 | 4 | 15 | *** |
| WGN-AM (Chicago) | Engineers | IBEW/1220 | 2 | 1 | 6 | 3/ 2012 |
| WPIX (New York) | Newspersons | AFTRA | 25 | 1 | 10 | 5/ 2009** |
| WPIX (New York) | Engineers | IBEW/1212 | 69 | 1 | 64 | 6/ 2009** |
| WGN-TV (Chicago) | Engineers | IBEW/1220 | 81 | 0 | 101 | 3/ 2009** |
| WGN-TV (Chicago) | Newswriters | IBEW/1220 | 5 | 0 | 12 | 3/ 2009** |
| WPHL (Philadelphia) | Technicians | IBEW/98 | 11 | 2 | 1 | 12/ 2012 |
| KTLA (Los Angeles) | Technicians | IATSE | 68 | 3 | 314 | 7.2010 |
| KTLA (Los Angeles) | Electricians | IBEW/40 | 2 | 0 | 2 | 7/2010 |
| WPIX (New York) | Stagehands | IATSE/1 | 3 | 0 | 18 | 3/2011 |
| WGN-TV (Chicago) | Stagehands | IATSE/2 | 0 | 0 | 68 | 5/2011 |
| WGN-TV (Chicago) | Engineers | IUOE/399 | 3 | 0 | 0 | 5/2011 |
| *Subtotal* | | | *348* | *14* | *657* | |
| **TOTAL** | | | **1,234** | **98** | **657** | |

\* Includes editorial, advertising, circulation, administrative and marketing employees.

† No employees are employed under this particular collective bargaining agreement. However, approximately 10 former bargaining unit members with lifetime job guarantees continued to be employed at the Baltimore Sun in other capacities.

---

[34] A list of all Collective Bargaining Agreements, including full names of such agreements, is attached hereto as Exhibit B.

\*\* In the case of each expired collective bargaining agreement included in this summary chart, the Debtors are currently in the process of negotiating the terms of a renewed collective bargaining agreement. During such negotiations, the Debtors intend to continue performing their obligations under the collective bargaining agreement as required by applicable law.
\*\*\* The parties have entered into an open ended contract extension that may be terminated by either party upon 30-days written notice.

6.    Management Equity Incentive Program.

On December 20, 2007, Tribune's Board of Directors approved a management equity incentive plan (the "MEIP") pursuant to which certain of the Debtors' key employees were eligible to receive benefits. The MEIP provided for units that represented a right to receive cash equal to the fair market value of Tribune's common stock. MEIP awards were made to eligible members of the Debtors' management and other key employees at the discretion of the Board of Directors.

7.    Equity-Based Compensation Provisions of Incentive Compensation Plan.

In 1997, Tribune established the Tribune Company Incentive Compensation Plan (as amended and restated effective in 2004, the "Incentive Compensation Plan"). The Incentive Compensation Plan authorized grants of various forms of incentive compensation to management and other employees, as well as certain non-employee agents, of the Debtors. Historically, awards under the Incentive Compensation Plan were made to certain eligible members of the Debtors' management and other key employees at the discretion of the Board of Directors or, as applicable, of senior executives. As stated, the MIP program, providing for annual cash incentive awards, is one component of the Incentive Compensation Plan. The Incentive Compensation Plan also authorized other forms of incentive awards comprised of equity-based compensation grants, including grants of stock options, stock appreciation rights, restricted or unrestricted stock, or restricted stock units.

8.    Employee Stock Ownership Plan.

As discussed in Article VII.A of this General Disclosure Statement, on April 1, 2007, Tribune established the ESOP as an employee retirement benefit plan. Pursuant to the terms of the ESOP, each eligible employee received a pro rata allocation of stock for the 2008 plan year and will receive another for the 2009 plan year based upon such employee's relative eligible compensation, including base salary, wages and commissions, but excluding bonuses and overtime. ESOP participants were to receive a distribution of the value of the shares allocated to their accounts if during 2008 or 2009 such participants retired after age 65, became disabled or died. With respect to each such participant, the distribution was to be based on the value of the shares determined by the trustee of the ESOP as of December 31 of such participant's year of retirement, disability, or death, with the ESOP receiving the cash value of the shares from Tribune. As of both December 31, 2009 and December 31, 2008, the trustee of the ESOP determined the value of the shares to be $0; therefore, no distributions have been made under the ESOP.

9.    Transitional Compensation Plan

In 1985, the Debtors implemented a transitional compensation plan for executive employees (as amended and restated in 2006, the "Transitional Compensation Plan"). The Transitional Compensation Plan provided for benefits upon a qualifying event or circumstances occurring as a result of a "change in control" (as defined in the Transitional Compensation Plan) of Tribune. Generally, and subject to certain exceptions specified in the Transitional Compensation Plan, eligible employees received benefits for their termination of employment within a defined time period (length of period varies by individual) following a change in control, prior to a change in control if the termination was at the request of any third-party participating in or causing the change in control, or otherwise in anticipation of a change in control.

As of the date of this General Disclosure Statement, no benefits were outstanding under the Transitional Compensation Plan.

10.    Nonqualified Retirement / Deferred Compensation Plans.

a)    Noncontributory Plans.

The IRC limits the amount of annual earnings that may be considered when calculating benefits under qualified pension and 401(k) plans. As a result, Tribune and Times Mirror (prior to its merger with Tribune) established various supplemental retirement plans. These plans include the Tribune Company Supplemental Retirement Plan, Tribune Company Supplemental Defined Contribution Plan, and Times Mirror Excess Pension Plan. These were unfunded plans providing benefits substantially equal to the difference between the amount that would have been provided under the corresponding qualified plan in the absence of applicable IRC limits, and the amount actually provided under the qualified plan. In accordance with the provisions of the plans, in connection with the completion of the Merger, amounts accrued under the Tribune Company Supplemental Retirement Plan and Tribune Company Supplemental Defined Contribution Plan (with a few exceptions) were paid at the end of fiscal year 2007. Approximately $94,000 in accrued benefits remained in the Tribune Company Supplemental Defined Contribution Plan as of the Petition Date.

The Times Mirror Excess Pension Plan did not contain a provision for payouts upon a change in control; therefore, accrued amounts were not distributed at the time of the Merger and payments were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under the Times Mirror Excess Pension Plan was approximately $10.1 million.

In connection with Tribune's acquisition of Times Mirror, Tribune also assumed The Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers, and The Times Mirror Pension Plan for Directors. By December 2005, all accruals under these plans had ceased. The Times Mirror Company Supplemental Retirement Plan for Certain Times Mirror Officers provided additional retirement benefits for certain executives of Times Mirror. The Times Mirror Pension Plan for Directors provided benefits for a period following a director's service on the board of directors of Times Mirror, with such period based on the number of years during which the director served on such board. Payments under both of these plans were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these plans was approximately $43.3 million.

b)    Contributory Plans.

Tribune sponsored The Times Mirror Deferred Compensation Plan for Executives and the Times Mirror Deferred Compensation Plan for Directors, which Tribune assumed in connection with the Times Mirror acquisition. A participant's benefit under these plans was based on his or her "account balance," which was based on the amount of a participant's compensation that was deferred under the plan, adjusted for hypothetical earnings or losses based on investment benchmarks selected by the participant or credited interest designated under the plan, as applicable. Payments under each of these plans, as well as adjustments for hypothetical earnings and losses, were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these plans was approximately $22.1 million.

34

11.    Certain Individual Letter Agreements.

In addition to the nonqualified deferred compensation plans described above, the Debtors are parties to individual agreements that entitle certain former employees to various retirement-related payments. The individual agreements vary with respect to benefit amounts, benefit formulas, and payment provisions. Payments under the individual agreements were suspended as of the commencement of the Chapter 11 Cases. As of the date the Chapter 11 Cases commenced, the estimated aggregate present value liability under these agreements was approximately $17.0 million.

### D.    Pending Litigation and Certain Other Legal Matters Involving the Debtors

The Debtors are involved from time to time in a variety of litigation and legal matters that are incidental to their businesses. As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to section 362 of the Bankruptcy Code. Certain pending litigation related to prepetition causes of action and certain other legal matters which may result in litigation following the Effective Date are described below. The descriptions below are not, and are not intended to be, a comprehensive list of all actions or matters involving the Debtors and specifically exclude, among others, administrative actions, workers compensation actions and actions involving union grievances. In addition, the matters discussed below are included for disclosure purposes only and are not an admission, and are not intended to be an admission, of liability with respect to any claim or action.

As of October 7, 2010, the face-value of all timely-filed litigation-related proofs of claim against Tribune that have not already been disallowed by Bankruptcy Court order, withdrawn, or otherwise expunged from the Debtors' claims register is approximately $40.8 million plus an unknown amount attributable to contingent, unliquidated, and disputed claims. That amount, however, assumes that all pending litigation-related proofs of claim against Tribune are not frivolous and will be successfully prosecuted for the full amount demanded. It also includes duplicate claims. After accounting for duplicate claims, the face-value of claims arising from litigation pending against Tribune is approximately $10.3 million plus an unknown amount attributable to contingent, unliquidated, and disputed claims. The Debtors continue to review and defend the various litigation claims and the ultimate allowed amount is uncertain.

As of October 7, 2010, the face-value of all timely-filed litigation-related proofs of claim against Tribune's subsidiaries that are Debtors that have not already been disallowed by Bankruptcy Court order, withdrawn, or otherwise expunged from the Debtors' claims register is approximately $214.4 million plus an unknown amount attributable to contingent, unliquidated, and disputed claims. That amount, however, assumes that all pending litigation-related proofs of claim against the Debtor subsidiaries are not frivolous and will be successfully prosecuted for the full amount demanded. It also includes duplicate claims. After accounting for (i) duplicate claims, (ii) claims that are the subject of objections pending before the Bankruptcy Court, and (iii) claims that have been settled in principle as of the date of the General Disclosure Statement, the face-value of litigation-related claims against the Debtor subsidiaries is approximately $66.6 million plus an unknown amount attributable to contingent, unliquidated, and disputed claims. The Debtors continue to review and defend the various litigation-related claims and, where warranted, will submit appropriate objections to the Bankruptcy Court in respect of such claims. Accordingly, the ultimate allowed amount of litigation-related claims against the Debtor subsidiaries is uncertain.

1.      *Newsday* and *Hoy* Circulation Misstatements.

In February 2004, a purported class action lawsuit was filed in New York federal court by certain advertisers in *Newsday* and an affiliate publication, *Hoy*, New York, alleging that they were overcharged for advertising as a result of inflated circulation numbers at these two publications (the "New York Circulation Action"). Plaintiffs in the New York Circulation Action also allege that certain entities that paid Distribution Systems of America, Inc., a *Newsday* subsidiary, to deliver advertising flyers were overcharged. Due to the commencement of these Chapter 11 Cases, the New York Circulation Action, captioned *Crabhouse of Douglaston Inc. d/b/a/ Douglaston Manor, et al., v. Newsday, Inc. et al.*, Case No. CV 04-558 (E.D.N.Y. Feb. 10, 2004), has been stayed with respect to the remaining Debtor defendants: Hoy, LLC (the publisher of *Hoy,* New York) and Distribution Systems of America, Inc. The litigation is ongoing with respect to Tribune ND, Inc., a Guarantor Non-Debtor, as successor to Newsday, Inc. On June 14, 2010, the Bankruptcy Court entered an order disallowing and expunging the proofs of claim asserted against Tribune Company, Hoy, LLC, and Distribution Systems of America, Inc. on account of the New York Circulation Action in their entirety.

In addition to the New York Circulation Action, a stockholder derivative suit was filed against the Debtors and certain of their current and former directors and officers in the United States District Court for the Northern District of Illinois captioned *Hill v. Tribune Co.*, Case No. 05-2602 (WTH). The suit, which was filed as a result of the circulation misstatements at *Newsday* and *Hoy,* alleged breaches of fiduciary duties and other managerial and director failings under Delaware law and the federal securities laws. The consolidated securities class action lawsuit was dismissed with prejudice on September 29, 2006. The dismissal was appealed to the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit"). On April 2, 2008, the Seventh Circuit issued an opinion affirming the dismissal of the securities class action lawsuit. Plaintiffs in the securities class action lawsuit have filed a petition for a rehearing *en banc* by the Seventh Circuit. Due to the commencement of the Chapter 11 Cases, this action is currently stayed.

On December 17, 2007, *Newsday* and *Hoy*, New York reached a non-prosecution agreement with the United States Attorney's Office for the Eastern District of New York that ended a federal inquiry into the circulation practices of Newsday, Inc. and Hoy Publications LLC, as successor-in-interest to Hoy, LLC. The agreement recognized (i) *Newsday's* and *Hoy*, New York's full cooperation with the investigation, (ii) the implementation of new practices and procedures to prevent fraudulent circulation practices, (iii) the payment as of December 2007 of approximately $83 million in restitution to advertisers, and (iv) a civil forfeiture payment of $15 million.

2.      ESOP Lawsuit.

In September 2008, a lawsuit was filed in the United States District Court for the Central District of California (the "California District Court") by current and former employees of the *Los Angeles Times*. The lawsuit named as defendants a former director and current directors of Tribune, the trustee of the ESOP, the Tribune Employee Benefits Committee, and certain current and former members, EGI-TRB, LLC, and, nominally, the ESOP. The lawsuit alleged breaches by defendants of duties and obligations under the Employer Retirement Income Security Act of 1974, as amended ("ERISA") and state law. On November 17, 2008, the California District Court transferred the case to the United States District Court for the Northern District of Illinois (the "Illinois District Court"). The lawsuit, captioned, *Neil v. Zell*, Case No. 08-6833 (RRP), seeks relief, including damages, for the benefit of the ESOP (the "Neil Litigation"). In an amended complaint filed on December 30, 2008, plaintiffs added as defendants several current and former Tribune officers who had allegedly served on the Employee Benefits Committee.

On March 13, 2009, Tribune filed an adversary proceeding (the "Neil Adversary Proceeding") captioned *Tribune Company v. Dan Neil, et al.* (*In re Tribune Company*), Adv. Pro. No. 09-50445 (KJC) (Bankr. D. Del. Mar. 13, 2009), which sought declaratory and injunctive relief to stay all further prosecution of the Neil Litigation.  On May 20, 2009, Tribune withdrew its preliminary injunction motion without prejudice to its right to refile because the plaintiffs dropped Tribune as a defendant from the underlying lawsuit in an amended complaint filed December 30, 2008.  At a status conference held on June 25, 2009, Tribune advised the Bankruptcy Court that the parties had agreed that the underlying lawsuit would go forward solely with respect to briefing and decision on a motion to dismiss for failure to state a claim upon which relief could be granted (the "Motion to Dismiss").  In connection therewith, Tribune negotiated the terms under which its primary fiduciary liability insurance carrier agreed to advance the defense costs associated with the Motion to Dismiss to Tribune's directors and officers named in the suit.  Tribune filed a motion to authorize the payment and advancement of insurance proceeds on August 17, 2009, which was granted on September 2, 2009.  On November 16, 2009, upon agreement by the parties, the Bankruptcy Court stayed the Neil Adversary Proceeding pending resolution of the motion to dismiss filed in the Neil Litigation.

On December 17, 2009, the Illinois District Court granted in part and denied in part the Motion to Dismiss.  The court dismissed all claims against the directors and officers of Tribune, except that it denied the Motion to Dismiss as to certain claims against Tribune board member Samuel Zell.  The court also denied the Motion to Dismiss as to claims against the ESOP trustee and EGI-TRB.  On March 2, 2010, EGI-TRB and Zell filed an answer to the amended complaint.  On the same day, they filed a motion for judgment on the pleadings.  Also on March 2, 2010, GreatBanc Trust Company, the ESOP trustee, filed a motion for reconsideration of the Illinois District Court's December 17, 2009, ruling.

On March 5, 2010, Tribune filed in the Neil Adversary Proceeding a motion for preliminary injunction enjoining the Neil plaintiffs from seeking any equitable relief that would affect property of Tribune's bankruptcy estates (the "Preliminary Injunction Motion").  The parties in the Neil Adversary Proceeding stipulated to a briefing schedule that provides for briefing on the Preliminary Injunction Motion after the resolution of the motions for judgment on the pleadings and reconsideration filed in the Neil Litigation.

On March 18, 2010, the Illinois District Court requested briefing on certain issues regarding equitable relief raised in EGI-TRB's and Zell's motion for judgment on the pleadings and GreatBanc Trust Company's motion for reconsideration.  On August 9, 2010, the Illinois District Court issued a decision that granted in part and denied in part EGI-TRB's and Zell's motion for judgment on the pleadings.  In that decision the Illinois District Court found that one of plaintiffs' claims for relief – removing Zell and EGI-TRB from having any fiduciary responsibility over the ESOP – might constitute appropriate equitable relief if plaintiffs succeed in proving their ERISA claims against Zell and EGI-TRB.  The Illinois District Court also recognized that developments in Tribune's bankruptcy proceeding or elsewhere might moot the availability of that relief and if that occurs, Zell and EGI-TRB would be dismissed as defendants.

On June 8, 2010, GreatBanc Trust Company filed a motion for partial summary judgment as to damages.  On November 9, 2010, the Illinois District Court issued a decision granting the Neil plaintiffs partial summary judgment on one claim against GreatBanc Trust Company.  The Illinois District Court found that GreatBanc Trust Company's purchase of unregistered stock did not meet the definition of "employer security" found in the Internal Revenue Code and, therefore, the purchase of stock was a "prohibited transaction" under ERISA.  The Illinois District Court specifically stated that its ruling "will not bind Tribune in a later case".  The Illinois District Court further noted that the Neil plaintiff may seek

damages against GreatBanc, but may not seek damages from Tribune because "Tribune is not a fiduciary."[35]

The ESOP has also been the subject of ongoing investigation by the United States Department of Labor ("DOL") and an audit by the Internal Revenue Service ("IRS"). On May 28, 2009, the DOL filed an unliquidated proof of claim against Tribune, and on June 10, 2009, the DOL filed a similar claim against 70 other Debtors. The DOL's claims state that it is conducting an investigation of the ESOP for possible violations of ERISA, including ERISA sections 404 and 406. Pursuant to its investigation, the DOL has sought and obtained documents from the ESOP Trustee, GreatBanc Trust Company, and its financial advisor, Duff & Phelps, and the DOL has conducted interviews of personnel of both of those entities. The IRS did not file a proof of claim relating to the ERISA issues being investigated by the DOL, but has conducted an interview of a representative of Duff & Phelps.

3.      FCC Related Matters.

Various aspects of the Debtors' operations are subject to regulation by governmental authorities in the United States. The Debtors' television and radio broadcasting operations are subject to Federal Communications Commission ("FCC") jurisdiction under the Communications Act. FCC rules govern, among other things, the term, renewal and transfer of radio and television broadcasting licenses and limit concentrations of broadcasting ownership that the FCC considers to be inconsistent with the public interest. Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs.

On November 30, 2007, the FCC issued an order (the "FCC Order") granting the Debtors' applications to transfer control of the Debtors from the existing stockholders to the ESOP in connection with the Leveraged ESOP Transactions. In the FCC Order, the FCC rejected the Debtors' request for "permanent" waivers of the newspaper/broadcast cross-ownership rule, which generally restricts the common ownership of a daily newspaper and a television station or radio station in the same local market, in order to permit continued common ownership of (i) WSFL-TV and the *South Florida Sun-Sentinel* in Miami, Florida; (ii) WTXX-TV (now WCCT-TV)/WTIC-TV and the *Hartford Courant* in Hartford, Connecticut; (iii) KTLA-TV and the *Los Angeles Times* in Los Angeles, California; and (iv) WPIX-TV and *Newsday* in New York, New York. The "permanent" waivers would have continued as long as the Debtors owned the properties; they would not have permitted subsequent sales of the properties intact. The FCC granted the Debtors "temporary" or time-limited waivers with respect to these cross-owned properties for a six-month period beginning January 1, 2008, and provided for extension of these waivers in three circumstances. First, the FCC ruled that if it were to adopt a revised newspaper/broadcast cross-ownership rule before January 1, 2008, it would grant applicants a two-year waiver of the rule, to among other things, allow parties an opportunity to make individualized waiver showings and the FCC to consider them. The date on which the two-year period is to commence is open to interpretation. On December 18, 2007, the FCC voted to adopt a revised rule (the "2008 Order"). Second, the FCC ordered that, if Tribune should challenge the denial of the requested "permanent" waivers in court, it would grant a waiver that would last either for two years or until six months after the conclusion of the litigation, whichever is longer, provided that the applicants did not abandon that litigation before a court decision was reached. Third, the FCC ordered that, in the event the applicants were not able to come into compliance with any revised cross-ownership rule during the two-year period because the revised rule was subject to a judicial stay, then the waiver would extend until six months after the expiration of any such stay. On December 3, 2007, the applicants appealed the FCC Order to the United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit"), captioned *Tribune Co. v. FCC*, Case

---

[35] As noted above, the Illinois District Court previously dismissed Tribune's directors and officers from the *Neil* case and held that no monetary relief was available from defendants Sam Zell and EGI-TRB.

No. 07-1488. That appeal is pending, but the D.C. Circuit has held the appeal in abeyance pending the resolution of petitions for reconsideration of the FCC Order pending before the FCC. The terms of any waivers the FCC may grant in connection with the FCC Applications may affect the course of the pending appeal.

The FCC Order also granted the Debtors a "permanent" waiver of the newspaper/broadcast cross-ownership rule to permit continued common ownership of WGN-AM, WGN-TV and the *Chicago Tribune* in Chicago, Illinois; a "permanent" "failing station" waiver of the television duopoly rule to permit continued common ownership of WTIC-TV and WTXX-TV (now WCCT-TV) in Hartford, Connecticut; and continued satellite station status to WTTK-TV, licensed to Kokomo, Indiana, to permit continued common ownership with WTTV-TV in Bloomington, Indiana. Both WTTK-TV and WTTV-TV are in the Indianapolis market. Various parties have petitioned for reconsideration of the FCC Order with the FCC; the Debtors have filed an opposition to such filings with the FCC.

In the 2008 Order, the FCC announced revised waiver standards for the newspaper/broadcast cross-ownership rule. Under the revised waiver standards, the Debtors would be entitled to a presumption in favor of common ownership in three of four of the Debtors' cross-ownership markets which are the subject of FCC temporary waivers (Los Angeles, CA; Miami, FL; and New York, NY). Various parties, including the Debtors, have sought reconsideration before the FCC or judicial review of the 2008 Order, and proceedings for such judicial review are pending in the United States Court of Appeals for the Third Circuit (the "Third Circuit"). On March 23, 2010, the Third Circuit lifted the stay that had been in effect and set a briefing schedule for the challenges to the 2008 Order, which concluded on August 16, 2010. Oral argument has been set for February 24, 2011.

4.     Miscellaneous Other Litigation.

As of the Petition Date, there were approximately 50 prepetition personal injury cases pending against the Debtors. There were also at least 45 prepetition cases pending against the Debtors involving media-related claims, such as defamation, slander and libel. In addition, the Debtors were subject to at least 15 employment–related cases (such as wrongful termination and breach of employment contract). Approximately two-thirds of the plaintiffs in these lawsuits filed a proof of claim prior to the Bar Date (defined below), and the Claims reflected therein will be evaluated during the claims reconciliation process (discussed in Article V.G.8 below).

## IV.     DEBTORS' DESCRIPTION OF THE EVENTS LEADING UP TO CHAPTER 11

*The following summary of the events leading up to the Debtor's chapter 11 cases was prepared by the Debtors.*

In 2008, the newspaper publishing industry experienced an unprecedented decline which was exacerbated by the recent recession. While the Debtors believe that their newspaper advertising revenue continued to be in line with, and in some cases superior to, other large metropolitan newspapers during that time, newspaper advertising revenue generally has been in significant decline, down industry-wide approximately fifteen to twenty percent (15-20%) in 2008 over the preceding year in major metropolitan markets, and down industry-wide nearly $2 billion, or eighteen percent (18%), in the third quarter of 2008 alone. Further, while the Debtors' television broadcasting stations outperformed the broader television broadcasting industry, the Debtors' 2008 broadcasting revenue nevertheless lagged behind their 2007 performance, again largely as a result of declining advertising revenue. Through November 2008, Tribune's consolidated revenue was down ten percent (10%) versus 2007, with publishing advertising revenues down eighteen percent (18%) and broadcasting and entertainment revenues down three percent

39

(3%). On a consolidated basis, Tribune's operating cash flow (excluding equity compensation, one-time items and discontinued operations) was down thirty-three percent (33%) in 2008.

Prior to the Petition Date, the Debtors implemented and continue to implement aggressive strategic initiatives to enhance operating cash flow and mitigate the impact of the severe economic downturn. Strategic initiatives aimed at generating incremental cash flow through cost savings included improvements in operating efficiencies, reductions in workforce, web width (newspaper page size) reductions and newspaper redesigns. They also included revenue enhancement initiatives such as entering into arrangements to print and deliver other companies' newspapers, increasing the number of hours of television news programming, and improving the efficiency and effectiveness of the sales force. Additionally, in 2008 the Debtors implemented a strategy to monetize various assets including the July 2008 joint venture involving the Newsday operations, the April 2008 sale of real estate associated with the Debtors' former Southern Connecticut newspapers, the January 2008 sale of a studio production lot in Hollywood, California and the September 2008 sale of an equity stake in CareerBuilder LLC. Tribune also continued its efforts to select a winning bidder for the Chicago Cubs baseball operations and related assets, consistent with Tribune's announcement in April 2007 that it intended to pursue the disposition of an interest in that business. The consummation of certain transactions pursuant to which the Chicago Cubs and related assets and liabilities were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries, is described in more detail in Article V.H of this General Disclosure Statement.

Notwithstanding the Debtors' aggressive efforts to enhance revenue, reduce expenses and monetize various assets, the Debtors believe that the impact of the unprecedented economic downturn left them with weak operating results and significant liquidity challenges. In December 2008 alone, the Debtors faced debt service and related payments of approximately $200 million, with another $1.3 billion due in 2009, including $512 million of the Tranche X debt maturing in June 2009.

Against a backdrop of declining revenues in a recession, uncertainty in the capital markets and substantial debt service requirements, the Debtors concluded that the most responsible course of action was to restructure their balance sheet in order to restore liquidity and return to financial health.

## V.    DEBTORS' DESCRIPTION OF EVENTS DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for reorganization under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Kevin J. Carey. The following is a brief description of certain major events that have occurred during the Chapter 11 Cases. Because of the size of the Debtors' cases, not all events have been described below. For a complete overview of the proceedings in the Chapter 11 Cases, please refer to the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

### A.    Procedural Motions

On the Petition Date, the Debtors filed the Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion"), which requested procedural consolidation of these Chapter 11 Cases for ease of administration. The Bankruptcy Court approved the Joint Administration Motion on December 10, 2008. A supplemental joint administration order was entered by the Bankruptcy Court on October 14, 2009 jointly administering the Chapter 11 Cases of Tribune CNLBC with the Chapter 11 Cases of the other Debtors, and making certain "first day" orders and other orders previously entered in the Debtors' Chapter 11 Cases applicable to Tribune CNLBC.