B.    **"First-Day" Motions**

On the Petition Date, the Debtors also filed several motions seeking typical "first day" relief in the Chapter 11 Cases. The purpose of such motions was to ensure that the Debtors were able to transition into the Chapter 11 process with as little disruption to their businesses as possible and to enable the Debtors' businesses to function smoothly while the Chapter 11 process was pending.

The "first day" motions filed by the Debtors sought authority to, among other things, (i) make tax payments to federal, state and local taxing authorities on an uninterrupted basis; (ii) continue prepetition insurance programs and pay premium installments outstanding in connection therewith; (iii) honor prepetition customer obligations and continue customer programs; (iv) pay prepetition wages and other benefits to the Debtors' employees; (v) continue use of the Debtors' existing cash management system, bank accounts and business forms; (vi) prevent utility companies from discontinuing, altering or refusing service; (vii) pay the prepetition commissions of the Debtors' brokers; (viii) pay certain prepetition claims of shippers, warehousemen and other lien claimants; (ix) make payments to certain prepetition creditors that are vital to the Debtors' uninterrupted operations; and (x) continue selling receivables and related rights and to obtain post-petition financing, among other similar relief. All of the Debtors' first-day motions were ultimately granted by the Bankruptcy Court in substantially the manner requested by the Debtors. A summary of certain material relief sought in connection with the "first-day" motions and other related relief is set forth below.

C.    **Employee Compensation and Benefits**

On the Petition Date, the Debtors filed a motion seeking court authority to continue, among other things, to pay employee wages, reimburse business expenses, and continue contributions to employee benefit plans (the "Employee Wage Motion"). Specifically, the Debtors requested (i) the ability to pay employee wages that were outstanding as of the Petition Date, (ii) satisfy obligations outstanding with respect to employee expense reports and various federal, state and local taxes withheld from the employees' wages, and (iii) pay amounts outstanding in connection with various benefit programs maintained by the Debtors for their employees, including employee health care programs, vacation, sick day and holiday benefits, employee savings plans, disability and other types of insurance, retiree medical programs and workers compensation. By order entered on December 10, 2008, the Bankruptcy Court granted the relief requested in the Employee Wage Motion in substantially the manner requested by the Debtors.

In addition, on December 24, 2008, the Debtors moved the Bankruptcy Court for authority to pay certain prepetition contributions owed to certain union pension plans pursuant to collective bargaining agreements and to continue making contributions to those union pension plans post-petition in the ordinary course of business (the "Union Pension Motion"). Also on December 24, 2008, the Debtors filed a motion requesting authority to implement a retention plan for certain key, non-insider and non-management employees who were necessary for an effective and orderly transition of operations under a local marketing agreement in Denver and a shared services agreement in St. Louis (the "Incentive Plan Motion"). The Bankruptcy Court granted both the Union Pension Motion and the Incentive Plan Motion on January 13, 2009.

On January 13, 2009, the Debtors moved the Bankruptcy Court to implement a severance policy for non-union employees and to continue severance for union employees (the "Severance Motion"), which asked for the authority to allow, but not require, the Debtors to pay severance based on time employed for nonunion employees, and, in regard to union employees, to honor the severance provisions of the respective collective bargaining agreements. Also on January 13, 2009, the Debtors filed a motion to allow the payment of prepetition non-insider incentive programs in an amount not to exceed $8.8

million (the "Incentive Motion"). By order dated February 3, 2009, the Bankruptcy Court granted the Incentive Motion and authorized the Debtors to fund the non-insider incentive plan. The Bankruptcy Court granted the Severance Motion by order entered February 4, 2009.

On April 22, 2009, the Debtors moved the Court for the authority to make certain payments under the 2008 MIP and to comply with certain other local bonus obligations (the "2008 MIP Motion"). The MIP payments were analyzed by Mercer (U.S.), Inc. ("Mercer"), an independent compensation consultant engaged by the compensation committee of Tribune's Board of Directors. The MIP payments totaled approximately $12.243 million, with respect to approximately 670 participants, and specifically excluded certain of the Debtors' executives. The 2008 MIP Motion also sought authority to pay approximately $1.1 million in the aggregate under certain local bonus programs maintained by the Debtors. The order granting the relief requested in the 2008 MIP Motion was granted on May 12, 2009.

Finally, on July 22, 2009, the Debtors filed the 2009 MIP Motion requesting authority to pay earned 2008 MIP awards to certain of the Debtors' executives and to implement a 2009 Management Incentive Plan (i) continuing the self-funding ordinary course MIP for 2009 for approximately 720 management employees, (ii) including a self-funding pay-for-performance TMIP bonus opportunity to incentivize 21 members of the Debtors' core management team to deliver strong operating results while performing substantial restructuring duties, and (iii) including a self-funding pay-for-performance bonus opportunity for 23 leaders of key operations (six of whom also participate in the TMIP) to incentivize such key leaders to achieve transformation of their respective operations by exceeding certain "stretch" operating cash flow goals. On September 30, 2009, the Bankruptcy Court entered an order approving only the payment of earned but unpaid 2008 MIP awards to certain of the Debtors' executives. On January 28, 2010, the Bankruptcy Court entered an order authorizing the payment of earned but unpaid 2009 MIP awards to all participants in the MIP in an aggregate amount not to exceed $45.6 million. The Bankruptcy Court continued to take under advisement the TMIP and KOB programs. On March 4, 2010, the Debtors filed a motion to voluntarily dismiss, without prejudice, their request in the 2009 MIP Motion for entry of an order authorizing the implementation of the TMIP and KOB programs. The Bankruptcy Court granted the Debtors' motion by order dated March 23, 2010.

As discussed more fully in Article III.C.3 of this General Disclosure Statement, on November 10, 2010, the Bankruptcy Court entered an order authorizing the Debtors to make certain payments under the 2010 MIP.

D.     **Cash Management.**

Prior to the Petition Date, the Debtors utilized a centralized cash management system (the "Cash Management System") to collect funds from their operations and to pay operating and administrative expenses in connection therewith. In order to, among other things, avoid administrative inefficiencies, the Debtors moved the Bankruptcy Court for an order (i) approving the Cash Management System; (ii) authorizing the continued use of their existing, prepetition bank accounts and business forms; (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis; (iv) granting administrative priority status to intercompany claims between and among the Debtors and between and among the Debtors and their non-Debtor affiliates; and (v) authorizing use of cash collateral in their deposit accounts as of the Petition Date and providing adequate protection to the cash management banks for the Debtors use of the cash collateral (the "Cash Management Motion"). By order signed December 10, 2008, the Bankruptcy Court approved the Cash Management Motion and waived the requirements of section 345(b) on an interim basis (the "Interim Order"). The Interim Order granted administrative priority status to intercompany claims and transactions on an interim basis. The final hearing on the Cash Management Motion was initially set for January 5, 2009, but was continued several times to April 30, 2009. The order granting administrative superpriority status to post-petition intercompany claims and

transactions was entered on April 30, 2009 (the "Final Order"). The Final Order granted relief under section 345(b) in regard to certain foreign accounts but continued the interim waiver of section 345(b) guidelines on an interim basis. After entry of the Final Order, the Debtors and the U.S. Trustee resolved their remaining investment guidelines issues under section 345(b), and the Bankruptcy Court entered an order in respect of such issues on July 30, 2009.

### E.    Post-Petition Financing.

As discussed in Article III.A.2.f, prior to the Petition Date, Tribune established the Receivables Facility. After the Petition Date, the Debtors and Barclays amended the Receivables Facility to allow for it to be utilized as interim debtor-in-possession financing (the "Interim DIP Facility") and to provide liquidity for continued operations during the Chapter 11 Cases. On December 8, 2008, the Debtors filed motions seeking Bankruptcy Court authorization for the (i) continued post-petition transfers of certain of the Debtors' receivables to the Receivables Subsidiary and (ii) Receivables Subsidiary to continue to obtain loans up to $300 million. The Debtors also sought Bankruptcy Court approval to permit the Debtors to (a) guarantee certain of the obligations of the Receivables Subsidiary and provide security in respect of such guaranty and (b) perform its reimbursement, cash collateral and other obligations under a new post-petition letter of credit facility (the "Letter of Credit Facility") to be provided by Barclays, as issuer and as administrative agent, and permitting the Debtors to obtain letters of credit in an aggregate amount up to $50 million. On December 11, 2008, the Bankruptcy Court granted interim approval of the Debtors' motions and, on January 15, 2009, the Bankruptcy Court granted final approval.

The Debtors and Barclays subsequently amended the Receivables Facility to allow its use as a more permanent asset-backed debtor-in-possession financing (the "Amended DIP Facility"). The Amended DIP Facility is comprised of a $75 million revolving line of credit, a $150 million term loan on terms similar to the Interim DIP Facility, and a letter of credit facility. The scheduled termination date of the Amended DIP Facility was amended to the earlier of April 10, 2010 or the Debtors' emergence from the Chapter 11 Cases. The Amended DIP Facility was approved by the Bankruptcy Court on April 8, 2009.

On November 19, 2009, the outstanding term and revolving loan balances under the Amended DIP Facility were repaid. On February 25, 2010, the Debtors provided written notice to the Administrative Agent for the Amended DIP Facility terminating the Amended DIP Facility effective February 26, 2010.

Although the Debtors have terminated the Amended DIP Facility, they amended and extended the Letter of Credit Facility. On March 2, 2010, the Debtors filed a motion with the Bankruptcy Court seeking authorization to enter into an amendment extending the term of the Letter of Credit Facility to the earlier to occur of (i) April 9, 2011 or (ii) certain contingencies specified in the proposed amendment, and permitting, among other things, the Debtors to obtain letters of credit in an aggregate amount up to $30 million.[36] The Bankruptcy Court approved the amendment to the Letter of Credit Facility by order entered March 22, 2010.

Two letters of credit in the aggregate amount of $15.5 million have been issued and are outstanding under the Letter of Credit Facility.

---

[36]    *See* Motion of the Debtors for an Order Authorizing Debtors to Amend the Letter of Credit Facility Pursuant to Sections 105, 362(d), 363(b)(1), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code and Granting Other Related Relief [Docket No. 3666].

### F.    Professional Retentions.

1.    Retention of Professionals by the Debtors' Estates.

The Debtors applied for orders authorizing (i) the retention of Sidley Austin LLP ("Sidley") as its general reorganization and bankruptcy counsel and (ii) Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") as Delaware bankruptcy co-counsel under section 327(a) of the Bankruptcy Code on December 26, 2008.  The order approving Sidley's retention was entered on February 20, 2009, and the order approving Cole Schotz's was entered on February 3, 2009.

The Debtors also retained Alvarez & Marsal North America, LLC ("Alvarez") as restructuring advisor.  The application to retain Alvarez was filed on December 26, 2008, and the order approving Alvarez's retention was entered on February 11, 2009.  In addition, the Debtors filed an application to retain Lazard Frères & Co., LLC ("Lazard") as their investment banker and financial advisor.  The application to retain Lazard was filed on December 26, 2008.  The order approving Lazard's retention was entered on March 13, 2009.  Finally, the Debtors filed an application to retain Deloitte & Touche LLP ("Deloitte") as their provider of certain financial, accounting, and advisory services on July 24, 2009.  The order approving Deloitte's retention was entered on August 11, 2009.

To further assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors have also retained the following professionals with the Bankruptcy Court's approval: (i) Daniel J. Edelman, Inc., as corporate communications and investor relations advisor; (ii) Dow Lohnes PLLC, as special counsel for certain regulatory matters; (iii) Ernst & Young LLP, to provide valuation, business modeling services, and market survey services to the Debtors; (iv) Jenner & Block LLP, as special counsel for certain litigation matters; (v) Jones Day, as special counsel for certain litigation matters; (vi) McDermott Will & Emery, LLP, as special counsel for general domestic legal matters; (vii) Mercer, as compensation consultant; (viii) Paul Hasting Janofsky & Walker LLP, as special counsel for general real estate and related matters; (ix) PricewaterhouseCoopers, LLP, as compensation and tax advisor and independent auditor; (x) Reed Smith LLP, as special counsel; (xi) Seyfarth Shaw LLP, as special counsel for certain employment litigation matters; (xii) McDermott Will & Emery LLP, as special counsel for general transactional matters; (xiii) Levine Sullivan Koch & Schulz LLP, as special counsel for First Amendment issues; (xiv) Sitrick and Company, as corporate communications consultants; and (xv) Novack and Macey LLP, as special litigation counsel in connection with the Morgan Stanley Claims.

In addition, the Debtors filed a motion seeking authorization to continue paying certain professionals utilized in the ordinary course of the Debtors' businesses (the "Ordinary Course Motion").  The Ordinary Course Motion was approved by order entered January 15, 2009.

2.    Retention of Jones Day by the Special Committee.

In order to effectively fulfill its responsibilities concerning the plan of reorganization, the Special Committee filed an application with the Bankruptcy Court to retain Jones Day as special counsel on August 30, 2010.  The Bankruptcy Court approved the Special Committee's retention of Jones Day by order entered September 15, 2010.

3.    The Creditors' Committee and its Advisors.

On December 18, 2008, the U.S. Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee") and subsequently amended that appointment on December 30, 2008 and May 26, 2009 to add and/or replace certain Creditors' Committee

members. The Creditors' Committee is currently comprised of the following parties: (i) JPMorgan Chase Bank, N.A.; (ii) Deutsche Bank Trust Company Americas; (iii) Warner Bros. Television; (iv) Buena Vista Television; (v) William Niese; (vi) Pension Benefit Guaranty Corporation; (vii) Wilmington Trust Company; and (viii) Washington-Baltimore Newspaper Guild, Local 32035.

On January 16, 2009, the Creditors' Committee applied for an order authorizing the retention of (i) Chadbourne & Parke, LLP ("Chadbourne"), as counsel for the Creditors' Committee and (ii) Landis, Rath & Cobb, LLP ("Landis"), as Delaware bankruptcy co-counsel. The orders approving the retention of Chadbourne and Landis were entered on February 20, 2009. Also on January 16, 2009, the Creditors' Committee applied for an order to retain AlixPartners, LLP ("AlixPartners") as its financial advisor. The order approving the retention of AlixPartners was entered on February 20, 2009. On January 30, 2009, the Creditors' Committee subsequently moved to allow them to retain Moelis & Company, LLC ("Moelis") as investment bankers. The order approving the retention of Moelis was signed on March 13, 2009. Finally, on August 13, 2009, the Creditors' Committee requested authorization to retain Zuckerman Spaeder LLP ("Zuckerman") as special counsel. An order approving the retention of Zuckerman was entered on September 3, 2009.

### G.      Certain Administrative Matters and Other Motions.

1.      Disposition of Certain Executory Contracts and Unexpired Leases.

a)      Unexpired Leases

In an effort to streamline business operations and reduce inefficiencies, the Debtors began the process of examining their real property leases in order to determine whether any of their operations could be consolidated. Since the Petition Date, the Debtors have obtained five orders from the Bankruptcy Court authorizing the rejection of over 70 real estate leases and subleases for certain office, operational, and studio properties that were no longer required for the Debtors' ongoing business operations.[37] On July 28, 2009, the Debtors also obtained authority from the Bankruptcy Court to abandon certain property and related obligations located at 2 Park Avenue, New York, New, York.

The Debtors also sought and obtained authority to assume 226 real estate leases that are valuable assets and useful to the Debtors' ongoing businesses.[38] In addition, Debtor WGN Continental Broadcasting Company ("WGN") sought and obtained authority to assume two leases relating to the operation of WGN's digital transmitters located atop Chicago's Willis (Sears) Tower.[39] Los Angeles

---

[37]     *See* Order Authorizing Debtors' First Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated January 15, 2009; Order Authorizing Debtors' Second Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated February 20, 2009; Order Authorizing Debtors' Third Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated March 23, 2009; Order Authorizing Debtors' Fourth Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated June 24, 2009 [Docket No. 1629]; Order Authorizing Debtors' Fifth Omnibus Motion to Reject Certain Leases of Nonresidential Real Property, dated September 2, 2009.

[38]     *See* Order Authorizing Debtors to (I) Assume Certain Unexpired Leases of Nonresidential Real Property and (II) Set Cure Amounts with Respect Thereto, dated June 24, 2009 [Docket No. 1628].

[39]     *See* Order Authorizing Debtor WGN Continental Broadcasting Company to (I) Assume Certain Unexpired Leases of Nonresidential Real Property and (II) Setting Cure Amount with Respect Thereto, dated September 2, 2009.

Times Communication LLC ("LATC") also sought and obtained authority to assume a lease pertaining to certain non-residential real property valuable to LATC's business operations.[40]

b)      Motions to Assume Certain Executory Contracts.

The Debtors also sought authority to assume, assume and assign or reject various agreements, including the following:

- On May 21, 2009, Tribune Broadcasting Company, WGN Continental Broadcasting Company, ChicagoLand Television, News, Inc., Tribune Entertainment Company, and certain Broadcast Subsidiaries (as defined in the Nielsen Assumption Motion, defined below) moved the Bankruptcy Court for an order authorizing the assumption of certain amended ratings services agreements and ancillary agreements with the Nielsen Company (US), LLC and the waiver and release of certain claims pursuant to a settlement and release agreement (the "Nielsen Assumption Motion"). The Nielsen Assumption Motion was approved by an order signed June 9, 2009.

- On June 26, 2009, certain of the Debtors filed a motion seeking the authority, pursuant to section 365 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, to assume various syndicated program agreements entered into with King World Productions, Inc., and CBS Studios, Inc., and/or CBS Television Distribution and CBS Studios, Inc. (collectively, "CBS") and to compromise, waive, and release one-half of the prepetition amounts owed to CBS (the "CBS Motion"). An order approving the CBS Motion was signed July 14, 2009 (the "CBS Order"). Pursuant to the CBS Order, the Debtors were only required to pay one-half of the outstanding prepetition amounts owed to CBS under the various agreements in order to assume the agreements.

- On July 8, 2009, Debtor Tribune Media Services, Inc. filed a motion seeking authority to assume certain prepetition local advertising sales agreements and to assign prepetition and post-petition local advertising sales agreements to Advantage Newspaper Consultants Inc., which was approved by order of the Bankruptcy Court on July 24, 2009.

- On July 22, 2009, Tribune and Chicago Tribune Company ("CTC") filed a motion seeking authority (i) to assume the Metromix LLC limited liability agreement, as amended (the "Metromix Agreement"), (ii) compromise and release claims, and (iii) enter into new agreements (the "Metromix Motion"). The Metromix Motion sought the authority to assume the Metromix Agreement as amended to permit, but not require, Tribune to make additional capital contributions to the Metromix LLC joint venture, if required. In addition, the Metromix Motion sought the authority to enter into four new agreements resolving certain disputes, among other things. An order approving the Metromix Motion was entered by the Bankruptcy Court on August 10, 2009.

- On August 14, 2009, Tribune and the Publishing Debtors (as defined in the Classified Ventures Motion) filed a motion to approve the assumption by Tribune of the Limited Liability Company Agreement of Classified Ventures, LLC, and the assumption by the Publishing Debtors of their Affiliate Agreements with Classified Ventures, LLC (the

---

[40]  *See* Order (I) Authorizing Debtor Los Angeles Times Communications LLC to Assume a Certain Unexpired Lease of Nonresidential Real Property Pursuant to Section 365 of the Bankruptcy Code and (II) Setting Cure Amount with Respect Thereto, dated December 14, 2009 [Docket No. 2834].

"Classified Ventures Motion").[41]  The Classified Ventures Motion sought authority for Tribune and the subsidiary Debtors which publish daily newspapers to assume certain agreements with Classified Ventures necessary to enable such Debtors to continue generating revenue from the sale of certain online classified advertising in their respective markets.  The Classified Ventures Motion also requested authority to pay certain cure amounts related to the requested assumption.  An order granting this relief was entered on September 2, 2009.

- On November 10, 2009, the Debtors moved for an order authorizing rejection of the service agreement between Tribune and Kenexa Brassring, Inc. (the "Kenexa Agreement").  The Bankruptcy Court entered an order authorizing the Debtors to reject the Kenexa Agreement on November 25, 2009.

- On November 13, 2009, the Debtors requested authority to assume a service agreement entered into between Debtor Tribune Publishing Company and Hewlett-Packard Company covering certain services to its advertisers (the "Hewlett-Packard Agreement").  The Debtors were granted authority to assume the Hewlett-Packard Agreement, as amended, on November 25, 2009.

- On January 6, 2010, Tribune Broadcasting Company, WGN Continental Broadcasting Company, Tribune Television Company, Tribune Television Holdings, inc., Tribune Television Northwest, Inc., Tribune Television New Orleans, Inc., Channel 39, Inc., Channel 40, Inc., KSWB, Inc., KTLA Inc., WPIX, Inc., KIAH Inc. (f/k/a KHCW Inc.), WCCT, Inc. (f/k/a WTXX Inc.), and WDCW Broadcasting, Inc., sought approval to assume certain amended syndicated program agreements with Universal City Studios Productions LLP, a subsidiary of NBC Universal, Inc., and the compromise, waiver and release of certain claims (the "NBC Motion").  An order granting the relief requested in the NBC Motion was entered on January 25, 2010.

- On April 29, 2010, Tribune filed a motion seeking authority to reject that certain master agreement dated as of January 28, 2004 (the "Master Agreement") and related preferred pricing plan dated January 1, 2006 (as amended, modified, or supplemented, the "Preferred Pricing Plan," and together with the Master Agreement, the "Agreement") between Tribune and Dun & Bradstreet.  The Bankruptcy Court entered an order authorizing the rejection of the Agreement on May 14, 2010.

    2.    Certain other Motions filed by the Debtors.

On April 29, 2009, the Debtors filed a motion seeking authorization to enter into a post-petition station affiliation agreement and related agreements with the CW Network (the "CW Motion"), pursuant to which the CW Network would provide programming for broadcast on certain of the Debtors' television stations.  An order granting the CW Motion was entered by the Bankruptcy Court on May 12, 2009.

On January 6, 2010, the Debtors filed a motion for authorization to compromise and settle a certain working capital account and related amounts with Hearst Danbury Holdings LLC, et al., in connection with a prepetition sale transaction involving Debtors Tribune and Southern Connecticut

---

[41]  As used in the Classified Ventures Motion, the term "Publishing Debtors" refers to Chicago Tribune Company, Los Angeles Times Communications LLC, The Hartford Courant Company, Orlando Sentinel Communications Company, Sun-Sentinel Company, The Daily Press, Inc., The Morning Call, Inc., and The Baltimore Sun Company.

Newspapers, Inc. (the "SCNI Motion"). An order granting the SCNI Motion was entered by the Bankruptcy Court on January 26, 2010.

        3.      Schedules of Assets and Liabilities; Statements of Financial Affairs.

On March 23, 2009, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with respect to each of the Debtors. Certain of the Schedules and Statements were amended on April 13, 2009, June 12, 2009, March 2, 2010, and May 13, 2010, and Schedules and Statements for Tribune CNLBC were filed with the Bankruptcy Court on October 12, 2009 and amended June 9, 2010. Among other things, the Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such claims. The Statements provide information including, among other things, payments or other transfers of property made by the Debtors to creditors on or within 90 days before the Petition Date or, in the case of "insiders," payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

        4.      All Filed Claims and Bar Date.

By order entered March 25, 2009, the Bankruptcy Court set June 12, 2009 at 4:00 p.m. (prevailing Eastern Time) (the "Bar Date") as the final date and time for filing certain proofs of claim in the Debtors' Chapter 11 Cases.[42] As of the Bar Date, over 6,000 claims asserting approximately $606 billion in the aggregate were filed in the Chapter 11 Cases. The Debtors and their professionals have assembled specialized teams to review and reconcile the various categories of Claims. While the Claims reconciliation process is still ongoing, preliminary analysis suggests that the filed claims that are likely to be allowed may not vary substantially from the aggregate liabilities of approximately $13.7 billion reflected in the Schedules.

        5.      General Unsecured Claims Against Filed Subsidiary Debtors.

There are approximately 34,249 general unsecured claims against the Filed Subsidiary Debtors reflected either in the Debtors' Schedules (as defined herein) or in timely-filed proofs of claim. Those Claims are asserted in a face amount of $3,366,545,793 according to the claims register maintained by the Debtors' claims agent, Epiq. The Debtors have conducted an ongoing review of those Claims since the Petition Date, and believe that the overwhelming majority of those Claims will not be Allowed by the Bankruptcy Court for one or more reasons, including, but not limited to, (i) that such Claims duplicate other Claims that may be Allowed, (ii) such Claims will be resolved through the assumption of contracts and the cure of any amounts due thereunder under any of the Competing Plans, (iii) such Claims have been satisfied by the applicable Filed Subsidiary Debtor(s) since the Petition Date, and/or (iv) such Claims do not otherwise reflect a legitimate obligation owed by one of the Filed Subsidiary Debtors.

The Debtors have raised objections to numerous general unsecured claims against the Filed Subsidiary Debtors since the Petition Date, and the process of objecting to, or consensually resolving, such Claims is ongoing. The Debtors believe that, when that process is concluded, the aggregate amount of general unsecured claims that will ultimately be Allowed against the Filed Subsidiary Debtors is between $85 and $150 million.

The general unsecured claims asserted against the Filed Subsidiary Debtors may be categorized as set forth in the chart below. This chart is an estimate only, and reflects the number of claims asserted

---

[42] An order was entered on June 7, 2010 establishing July 26, 2010 at 4:00 p.m. (prevailing Eastern Time) as the final date and time for filing certain proofs of claim against Tribune CNLBC.

against the Filed Subsidiary Debtors that have not been disallowed or are the subject of a pending objection (except in certain circumstances described in the chart), as well as the face amount of those Claims. The chart then sets forth the Debtors' estimate as to the range of aggregate amounts for Claims in the relevant subcategory that will be Allowed. The ultimate amount of the general unsecured claims that may be Allowed against the Filed Subsidiary Debtors may be higher or lower than the amounts projected by the Debtors, and is subject to determinations of the Bankruptcy Court. The chart below also necessarily reflects assumptions by the Debtors as to the amounts of individual claims that may ultimately be Allowed, which may not reflect the ultimate determinations as to such Claims, and additionally do not represent an agreement by any of the Debtors as to the amount of any particular Claim.

All categories of general unsecured claims in the chart below include Claims that have been asserted in partially or entirely-unliquidated amounts. As a result, some of the ranges set forth below slightly exceed the face amount of the Claims asserted within a subcategory. The Debtors have not attempted to quantify such amounts for purposes of this Joint Disclosure Statement; however, the Debtors do not believe that such amounts when liquidated will cause the aggregate amount of Allowed general unsecured claims against the Filed Subsidiary Debtors to exceed $150 million.

| Claim Type | Total Active Filed Claims & Filed Active Scheduled Records | | Estimated Range of Estimated Allowed Claims | | Notes |
| | Count | Amount | Low | High | |
|---|---|---|---|---|---|
| Asserted as 503(b)(9) | 370 | 3,122,684 | 2,000,000 | 2,200,000 | The estimated range shown reflects the unsecured portion of Claims asserted with priority under section 503(b)(9) of the Bankruptcy Code. |
| Employee & Former Employee | 293 | 18,525,761 | 13,900,000 | 16,000,000 | The estimated range shown assumes approval of the Retiree Claims Settlement contained in the Debtor/Committee/ Lender Plan. |
| Insurance | 113 | 2,825,201,380 | 100,000 | 500,000 | The estimated range shown assumes continuation of the Debtors' insurance programs and maintenance of the Debtors' insurance policies on the terms set forth in Section 6.9 of the proposed plans of reorganization. |
| Litigation | 116 | 214,360,736 | - | 52,000,000 | The estimated range provided reflects (i) the removal of duplicate claims ($45mm), (ii) pending settlements for less than the face amount of the claim amount ($1mm), (iii) pending objections ($101mm), (iv) the portion of potential exposure covered by insurance ($39mm), and (v) the Debtors' reasonable review and evaluation of the remaining claims. The high end of the estimated range provided reflects unliquidated claims. |
| Real Estate | 34 | 8,656,112 | 8,000,000 | 9,000,000 | This category is comprised of lease rejection Claims and other lease-related Claims. |

| | | | | |
|---|---|---|---|---|
| Tax & Regulatory | 187 | 57,992,440 | 1,000,000 | 8,000,000 | The estimated range provided includes the portions of tax-related claims not facially entitled to priority under Section 507(a)(8) of the Bankruptcy Code (or any other applicable priority) and other regulatory Claims. |
| Trade payables | 33,136 | 238,686,680 | 60,000,000 | 62,300,000 | The estimated range provided reflects the taking into account of duplicative Claims, Claims for future contract obligations that will ultimately not require a Cash distribution under any of the Competing Plans, and the removal of Claims that will be satisfied through the payment of cure amounts under executory contracts to be assumed. |
| Total Claims | 34,249 | 3,366,545,793 | 85,000,000 | 150,000,000 | |

6.      Bankruptcy Rule 2015.3 Reports.

The Debtors are required to comply with new Bankruptcy Rule 2015.3 ("Rule 2015.3"), which became effective immediately prior to the Petition Date.  Pursuant to Rule 2015.3, the Debtors must file certain reports with the Bankruptcy Court, which provide additional financial reporting for non-Debtor entities in which the Debtors hold a "controlling or substantial" interest (the "2015.3 Reports").  As of the Petition Date, the Debtors wholly-owned 18 non-Debtor entities and directly owned a non-majority equity interest in 8 non-debtor operating entities (the "Non-Majority Entities").  Because of the nature of the Debtors' interest in the Non-Majority Entities, the Debtors sought a determination that they do not have a "controlling or substantial" interest in those entities.  Further, because of the commercial and competitive sensitivity of entity level financial information, the Debtors also sought a determination that "cause" existed to excuse entity level financial reporting for the Non-Majority Entities.  Finally, due to the negotiations concerning a potential transaction involving the Chicago Cubs as well as the prohibition imposed by Major League Baseball on certain financial disclosures, the Debtors sought to exclude the Chicago Cubs and related assets from the requirements of Rule 2015.3.  The Debtors filed a motion on January 12, 2009, seeking (i) additional time to file their initial 2015.3 Reports or (ii) a modification of such reporting requirements (the "2015.3 Motion").  On February 10, 2009, March 23, 2009, April 9, 2009, and August 17, 2009, the Debtors filed supplements to the 2015.3 Motion requesting authorization to comply in the manner set forth above.  On July 29, 2009, the Debtors filed 2015.3 Reports for each of Tribune's wholly-owned non-Debtor subsidiaries, with the exception of the Chicago Cubs-related entities.  Subsequently, the Debtors reached agreement with the U.S. Trustee's office on a reporting protocol for the Non-Majority Entities and an agreed order was entered September 2, 2009.  Rule 2015.3 Reports for these Non-Majority Entities were filed on October 6, 2009.  On January 29, 2010, the Debtors filed their second set of Rule 2015.3 Reports for the wholly-owned non-Debtors and the Non-Majority Entities.  The Debtors filed their third set of Rule 2015.3 Reports for the wholly-owned non-Debtors and the Non-Majority entities on July 29, 2010.

7.      Fee Disgorgement Motion.

On October 23, 2009, Law Debenture filed a motion, joined by Centerbridge Credit Advisors LLC and Deutsche Bank Trust Company Americas, (i) seeking the disgorgement of fees and expenses paid since the Petition Date by non-Debtor Tribune (FN) Cable Ventures, Inc. ("TCV") to certain

professionals retained by the agent to the Senior Lenders under the Senior Loan Agreement and/or a former steering committee that was formed by the Senior Lenders since the Petition Date (collectively, the "Senior Lender Fees"), and (ii) requiring that no further payments of the Senior Lender fees be made (the "Fee Disgorgement Motion"). The Debtors, the Agent and the Senior Lender steering committee opposed the Fee Disgorgement Motion. The Fee Disgorgement Motion was heard on December 1, 2009 and March 26, 2010. The Bankruptcy Court did not rule on the Fee Disgorgement Motion at the March 26 hearing. However in connection with a Settlement Support Agreement entered into by Angelo, Gordon & Co. L.P. ("Angelo Gordon"); Centerbridge Credit Partners, L.P.; Centerbridge Credit Partners Master, L.P.; Centerbridge Special Credit Partners, L.P.; Law Debenture; and JPMorgan Chase Bank, N.A., on April 9, 2010 (the "Settlement Support Agreement"), a stipulation by and among JPMorgan Chase Bank, N.A., Law Debenture, and Centerbridge Credit Advisors LLC was filed with the Bankruptcy Court pursuant to which the Fee Disgorgement Motion was withdrawn without prejudice and the parties thereto agreed to the resumption of the Senior Lender Fee payments. The Settlement Support Agreement and stipulation of withdrawal reserved Law Debenture's right to renew the Fee Disgorgement Motion in the event that the Settlement Support Agreement was terminated. Also, on April 9, 2010, the Debtors filed a notice with the Bankruptcy Court indicating, in view of the stipulation, the intention of the Non-Debtor Guarantors and subsidiaries, including TCV, to recommence payment of Senior Lender Fees upon the expiration of five business days' notice. Such payments were subsequently resumed.

On August 25, 2010, Law Debenture reinstated its Fee Disgorgement Motion on the grounds that the Settlement Support Agreement had been terminated. On October 12, 2010, Law Debenture filed a supplement to the reinstated Fee Disgorgement Motion (the "Fee Disgorgement Supplement"), alleging that TCV's payment on account of the Senior Lender Fees, made on or around August 31, 2010, and its replenishment of retainers held by Davis Polk and FTI Consulting violated an agreement made on the record. The Debtors filed a response to the Fee Disgorgement Supplement stating that Law Debenture mischaracterized both the payments made and the nature of the parties' agreement regarding the withdrawal of the Fee Disgorgement Motion. The Bankruptcy Court has not yet ruled on the reinstated Fee Disgorgement Motion as supplemented and further payments of Senior Lender Fees have been halted pending a ruling by the Bankruptcy Court or other resolution of the issues raised therein.

Non-Debtor TCV has paid approximately $50,235,970 in the aggregate in Senior Lender Fees, with the last payment occurring on or about August 30, 2010 in the amount of $3,106,256. On December 11, 2009, April 29, 2010 and July 30, 2010 the Debtors filed notices disclosing the payment of Senior Lender Fees by TCV. The Debtors intend to file an additional disclosure in respect of the August payment.

8.    WTC Complaint.

On March 4, 2010, WTC filed with the Bankruptcy Court a complaint (the "WTC Complaint") purporting to seek equitable subordination, disallowance of claims, damages and a constructive trust against certain of the Debtors' Senior Lenders, denominated in the WTC Complaint as the "Lead Banks" (the "WTC Adversary Proceeding"). The relief sought in the WTC Complaint is alleged to arise out of the Leveraged ESOP Transactions. The Debtors filed a motion on March 18, 2010 seeking a determination that the WTC Complaint violated the automatic stay imposed by section 362 of the Bankruptcy Code, requesting that WTC be required to demonstrate why it should not be held in contempt of court for filing the WTC Complaint, and seeking to halt all proceedings respecting the WTC Complaint. The Debtors' motion is based on the grounds that, *inter alia*, the WTC Complaint violates the automatic stay imposed by section 362 of the Bankruptcy Code and constitutes an attempt to exercise control of causes of action belonging to the Debtors' bankruptcy estates (the "Automatic Stay Motion"). On April 5, 2010, WTC filed a response to the Debtors' motion attaching a proposed amended complaint which adds additional defendants including Samuel Zell, the Zell Entity, and Sam Investment Trust. On

April 7, 2010, the Creditors' Committee filed a statement supporting the Debtors' motion noting, among other things, that WTC's actions, through its attorneys, have disadvantaged the Creditors' Committee and its constituency. As part of his investigation, the Examiner was directed to "evaluate whether Wilmington Trust Company violated the automatic stay under 11 U.S.C. § 362 by its filing" of the WTC Complaint. The Examiner concluded that the claims raised in the WTC Complaint were either reasonably unlikely or highly unlikely to have violated the automatic stay. Examiner's Report, Vol. III at 9-30. By order of the Bankruptcy Court, dated October 8, 2010, the WTC Adversary Proceeding has been stayed until further order.

9.      Limited Motion to Disqualify Counsel to the Official Committee of Unsecured Creditors.

On September 13, 2010, Aurelius Capital Management LP ("Aurelius"), the Holder of a substantial amount of the Senior Notes, filed a motion seeking to disqualify Chadbourne & Parke LLP ("Chadbourne") from representing the Creditors' Committee in connection with matters related to (i) the Mediation and (ii) any potential or actual LBO-Related Causes of Action or the settlement thereof (the "Committee Disqualification Motion"). Aurelius also requested that the Court direct Zuckerman Spaeder LLP, the Creditors' Committee's special conflicts counsel, to handle all matters related to the Mediation and the resolution of the LBO-Related Causes of Action. At a hearing held on September 22, 2010, the Bankruptcy Court denied the Disqualification Motion to the extent it sought to disqualify Chadbourne in regard to the Mediation.[43] The Bankruptcy Court further scheduled a status conference on October 4, 2010 to address the remainder of the relief requested in the Disqualification Motion. Following the October 4, 2010 status conference, Aurelius and Chadbourne negotiated a resolution of the issues presented in the Committee Disqualification Motion. On October 8, 2010, Aurelius withdrew the Disqualification Motion with prejudice.

10.      Pursuit of Preference Avoidance Actions.

Prior to December 8, 2010, the Debtors and Creditors' Committee commenced various preference avoidance actions against third-parties and insiders of the Debtors or entered into tolling agreements with these third-parties and insiders, which extended the applicable statute of limitations for purposes of initiating such preference causes of action. The face amount of all the preference actions being pursued by the Debtors or Creditors' Committee is greater than $500 million. Pursuant to various orders of the Bankruptcy Court, all of these preference actions were stayed pending the outcome of the Confirmation Hearing or June 11, 2011, whichever occurs first. The Debtor/Committee/Lender Plan Proponents cannot predict the amount of proceeds that will be generated from these preference actions given the various defenses that may be asserted by the preference defendants, and the fact that preference actions involving payments on behalf of the Filed Subsidiary Debtors are not likely to be pursued if the Debtor/Committee/Lender Plan is confirmed. The Debtors, as well as the Creditors' Committee, made their decision to pursue certain preference actions, and not pursue others, based on a detailed factual review of the defenses under section 547(c) of the Bankruptcy Code involving the transfers, a "cost benefit" analysis attendant to bringing the specific preference claims, and the need to preserve viable Estate causes of action in the event the Debtor/Committee/Lender Plan is not confirmed.

---

[43] *See* Order Denying in Part the Motion of Aurelius Capital Management, LP to Disqualify Chadbourne & Parke LLP [Docket No. 5810].

11.    The Committee's Standing Motions.

a)    The LBO Standing Motions

On February 1, 2010, the Creditors' Committee filed a motion seeking authority to prosecute certain estate causes of action against the Debtors' pre-petition lenders related to the Leveraged ESOP Transactions ("Original LBO Standing Motion"). The Debtors opposed the relief requested in the Original Standing Motion, including the Committee's request for settlement authority over estate causes of action. The Original Standing Motion was scheduled to be heard by the Bankruptcy Court on February 18, 2010, but was continued and ultimately withdrawn *sine die* by the Creditors' Committee in light of the April 9, 2010 Settlement Support Agreement and subsequent filing by the Debtors of the Plan incorporating the settlement terms. On or about September 13, 2010, the Committee supplemented its Original Standing Motion to add certain new causes of action related to the Leveraged ESOP Transactions and on September 14 filed a new standing motion seeking authorization to prosecute certain causes of action related to the Leveraged ESOP Transactions against various non-lender parties, including directors, officers, subsidiaries, Zell defendants and large shareholders (the "New LBO Standing Motion," and together with the Original Standing Motion, the "LBO Standing Motions").

The Debtors objected to the Standing Motions, but only as to the Committee's request for settlement authority in respect of estate causes of action, including actions related to the Leveraged ESOP Transactions. In addition, on October 7, 2010, the Bridge Agent filed a limited objection to the Standing Motions seeking a ruling that the Standing Motions do not prejudice and reserve the rights of parties in interest to seek the establishment or appointment of a disinterested fiduciary to pursue all claims. On October 11, 2010, Aurelius filed a limited objection to the Standing Motions seeking a ruling that, among other things, (i) all settlements by the Creditors' Committee be subject to court approval and (ii) the Creditors' Committee, or another independent fiduciary, be given authority to prosecute the Intercompany Claims. On October 14, 2010, the Wilmington Trust Company filed a limited objection to the Standing Motions, which objected to the narrow scope of the relief requested in the Standing Motions and questioned whether the Creditors' Committee could objectively bring the causes of action under the Standing Motions. The Wilmington Trust Company proposed as an alternative that the Creditors' Committee be authorized to file the complaints pursuant to the Standing Motions but that causes of action filed by the Creditors' Committee be immediately stayed to allow for the plan confirmation process to proceed. Finally, on October 19, 2010, Merrill Lynch filed an objection to the New Standing Motion stating that Merrill Lynch did not object to the Bankruptcy Court granting the Creditors' Committee standing but that certain claims and allegations in the New Standing Motion against Merrill Lynch were defective. The Standing Motions were heard on October 22, 2010, and adjourned to October 26, 2010, for an additional status hearing regarding entry of an agreed order. The Bankruptcy Court entered an order approving the Standing Motions on October 27, 2010 (the "LBO Standing Order").

Pursuant to the LBO Standing Order, the Committee initiated two adversary proceedings on November 1, 2010: *Official Comm. Of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Tribune Co.)*, Case no. 10-53963 (KJC) (Bankr. D. Del. Nov. 1, 2010) and *Official Comm. Of Unsecured Creditors v. Fitzsimons (In re Tribune Co.)*, Case No. 10-54010 (KJC) (Bankr. D. Del. Nov. 1, 2010) (collectively, the "LBO Avoidance Adversaries"). The LBO Avoidance Adversaries seek to avoid allegedly fraudulent transfers made to certain lenders and equity holders that received transfers in connection with the Leveraged ESOP Transactions.

b)    The Preference Standing Motions

On November 11, 2010, the Creditors' Committee filed a motion requesting standing to bring certain preference actions on behalf of the Debtors pursuant to sections 547 and 550 of the Bankruptcy

Code against certain former and current insiders of the Debtors' who received payments from the Debtors in the year prior to the Petition Date and certain other identified entities (the "Preference Standing Motion"). On November 17, 2010, the Creditors' Committee filed an amended Preference Standing Motion seeking standing to pursue a preference action against Eagle Aircraft & Transportation Management, an alleged insider, in addition to the parties identified in the Preference Standing Motion (the "Amended Preference Standing Motion"). On November 23, 2010, the Creditors' Committee filed a motion requesting leave, standing and authority to toll and/or commence, prosecute, and settle and recover certain causes of action on behalf of the Debtors' estates arising under sections 547 and 550 of the Bankruptcy Code against certain of the Debtors' professionals who received payments from Tribune in the ninety (90) days prior to the Petition Date (the "Professionals Preference Standing Motion").

On November 22, 2010, Aurelius filed a response and limited objection to the Amended Preference Standing Motion, which requested (i) that the Bankruptcy Court order the Creditors' Committee to commence all potential preference actions; (ii) that all such actions be stayed pending the completion of the competing plan process; (iii) that no settlements of the preference action be approved prior to the completion of the competing plan process; and (iv) that upon completion of the competing plan process, all preference actions be transferred to the applicable litigation trust. On November 22, 2010, Wilmington Trust Company filed a limited objection and joinder to Aurelius' response.

The Bankruptcy Court entered an order on November 29, 2010 (the "Preference Standing Order") granting the Creditors' Committee leave, standing and authority to commence and prosecute the preference actions identified in the Preference Standing Order, subject to the terms set forth in the Preference Standing Order. On that same date, the Bankruptcy Court entered an order (the "Professionals Preference Standing Order") granting the Creditors' Committee leave, standing and authority to, at the option of the Creditors' Committee, either toll or to commence and prosecute the preference actions identified in the Professional Preference Standing Order, subject to the terms set forth in the Professionals Preference Standing Order.

12.     Motion to Appoint a Chapter 11 Trustee.

Aurelius filed a motion on September 13, 2010, requesting that the Bankruptcy Court appoint a trustee to administer both the affairs of the Debtors and the Chapter 11 Cases pursuant to 11 U.S.C. § 1104 (the "Trustee Motion"). On October 15, 2010, the Debtors, the Creditors' Committee, the Credit Agreement Lenders, and JPMorgan filed timely objections to the relief requested in the Trustee Motion. The hearing on the Trustee Motion has been adjourned to a date and time to be determined by the Court.

13.     Motion to Approve Tolling Agreement.

The Debtors filed a motion on October 28, 2010, seeking authority to enter into tolling agreements between Tribune and each of the Filed Subsidiary Debtors (the "Tolling Agreement Motion"). The Tolling Agreement Motion requests an extension of the statute of limitations to bring avoidance actions imposed by section 546(a) of the Bankruptcy Code, which requires that avoidance actions be brought within two (2) years of the Petition Date, until June 30, 2011. The Tolling Agreement Motion was approved by the Bankruptcy Court on November 12, 2010, and all avoidance causes of action between Tribune and the Filed Subsidiary Debtors were subsequently tolled.

14.     Motion to Disqualify Akin Gump Strauss Hauer & Feld LLP as Counsel to Aurelius.

On November 12, 2010, Oaktree and Angelo Gordon filed a motion (the "Akin Disqualification Motion") requesting that the Bankruptcy Court disqualify Aurelius' bankruptcy counsel, Akin Gump

Strauss Hauer & Feld, LLP ("Akin"). In the Disqualification Motion, Oaktree and Angelo Gordon assert that Akin currently represents both Oaktree and Angelo Gordon in the Debtors' bankruptcy as FCC counsel and that such representation predated Akin's representation of Aurelius. Oaktree and Angelo Gordon further assert that, under the Model Rules of Professional Conduct, which govern attorneys' ethical obligations to their clients, Akin's representation of Aurelius constitutes a clear conflict of interest which requires disqualification of Akin pursuant to the Model Rules of Professional Conduct. The hearing on the Akin Disqualification Motion is scheduled for December 15, 2010.

15.     Certain Holders of Step One Senior Loan Claims' New York State Court Action

On October 29, 2010, in conjunction with filing the Step One Plan, certain Step One Plan Proponents (the "SOCAL Parties") filed a complaint in the Supreme Court of the State of New York against JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citicorp North America Inc., and Bank of America, N.A. (collectively, the "Arrangers") asserting claims against the Arrangers with respect to issues arising out of or relating to the Leveraged ESOP Transactions and the Senior Loan Agreement (the "SOCAL Action"). The claims asserted in the SOCAL Action include claims for breach of contract, breach of covenant of good faith and fair dealing, inducement to breach of contract, gross negligence, and declaratory relief respecting certain provisions of the Senior Loan Agreement. On November 16, the Arrangers filed a motion in the Bankruptcy Court seeking an order finding (among other things) the SOCAL Parties in contempt for violating the Order Appointing Mediator and the automatic stay under 11 U.S.C. § 362 and enjoining the SOCAL Parties from further violations of the Order Appointing Mediator and the automatic stay. On November 19, 2010, the Debtors filed a joinder in connection with the Arrangers' motion to enforce the Order Appointing Mediator and to suspend the SOCAL Action pending the outcome of the plan confirmation hearing.

**H.     Chicago Cubs Transaction**

During the pendency of the Chapter 11 Cases, the Tribune Entities pursued and consummated certain transactions pursuant to which the Chicago Cubs and related assets and liabilities, including the Company's 25.34% interest in CSN Chicago, were contributed to a newly formed limited liability company, Chicago Baseball Holdings, LLC and its subsidiaries (collectively, "New Cubs LLC"). Tribune first announced its intention to dispose of an interest in the Chicago Cubs and its attendant assets in April 2007, on the same day that Tribune announced the completion of its strategic review process and its decision to convert from a public company to a privately-held company. Thereafter, Tribune and Tribune CNLBC acted to identify parties that were both likely to have an interest in acquiring an interest in the Chicago Cubs and assets and the financial resources to complete such a transaction. In furtherance of those efforts, Tribune engaged J.P. Morgan Securities Inc. in July 2007 to aid in identifying suitable investors and to act as Tribune's financial advisor in connection with the proposed transaction.

From mid-2007 to early 2009, Tribune engaged in an intensive process to identify a transaction partner and ultimately reduced the number of interested parties from more than 100 to a single party. The prevailing party was a new entity formed by the Ricketts family ("Ricketts Acquisition LLC"). Following an extended period of negotiations, on August 21, 2009, Tribune and Ricketts Acquisition LLC, among other parties, entered an agreement (the "Cubs Formation Agreement") governing the contribution of certain assets and liabilities related to the businesses of the Chicago Cubs owned by Tribune and its subsidiaries to New Cubs LLC. The contributed assets included, but were not limited to, the Chicago Cubs Major League Baseball franchise, spring training and Dominican Republic baseball operations, Wrigley Field and certain other real estate used in the business, and a 25.34% interest in CSN Chicago, which operates a local sports programming network in the Chicago area (collectively, the "Cubs Business").

On August 24, 2009, the Debtors filed a motion with the Bankruptcy Court seeking authority to enter into the Cubs Formation Agreement and to perform all transactions necessary to effect the contribution of the Cubs Business to New Cubs LLC. On the same day, the Debtors announced that the principal entity holding the assets and liabilities of the Cubs Business, Tribune CNLBC, would commence a Chapter 11 case to implement the transactions contemplated by the Cubs Formation Agreement. The Debtors also sought approval for notice and other procedures relating to the transactions by filing a motion with the Bankruptcy Court on August 24, 2009. The Bankruptcy Court approved the Debtors' notice and other procedures for the transactions on August 31, 2009 and, on September 24, 2009, authorized the Debtors to perform the transactions under the Cubs Formation Agreement. On October 6, 2009, Major League Baseball announced unanimous approval of the transactions. Tribune CNLBC filed its voluntary Chapter 11 petition on October 12, 2009, and the Bankruptcy Court granted a motion to approve the transactions contemplated by the Cubs Formation Agreement as to Tribune CNLBC on October 14, 2009. The transactions contemplated by the Cubs Formation Agreement and the agreements related thereto closed on October 27, 2009.

In addition to the Cubs Formation Agreement, Tribune, Tribune CNLBC, and several of their affiliates entered into a number of ancillary agreements implementing various aspects of the Chicago Cubs-related transactions. Among those ancillary agreements are guarantees of collection by Tribune of the liabilities of New Cubs LLC under (i) certain senior indebtedness incurred in connection with the Chicago Cubs-related transactions, which consists of (a) a $25 million senior secured revolving credit facility, and (b) a $425 million senior secured term loan facility, and (ii) $248.75 million of subordinated indebtedness. Each of the guarantees is a guarantee of collection and not of payment. Tribune has no obligation to make any payment on such guarantees unless and until New Cubs LLC fails to make a payment on any of the above obligations when due, the relevant lender(s) exhaust all legal and equitable remedies against New Cubs LLC and other guarantors and the collateral posted by New Cubs LLC and other guarantors to secure the obligations (including foreclosure and similar remedies), and the lenders have failed to collect the full amount of the guaranteed obligations. Tribune's obligations under such guarantees are limited to the initial principal amount of the obligations reduced by principal payments made by New Cubs LLC or on its behalf, cash proceeds realized from the lenders' exercise of remedies, and any principal amounts that may be forgiven by the lenders plus any unpaid premium on, or unpaid interest accruing on such principal amount.

Pursuant to the Cubs Formation Agreement, Tribune and its contributing subsidiaries and affiliates received a special distribution from New Cubs LLC of approximately $705 million in cash and other consideration, which amount remains subject to final adjustments and is being held by Tribune CNLBC pending resolution of the Chapter 11 Cases, and a five percent (5%) membership interest in New Cubs LLC valued at $21 million.[44] Further, the majority of the liabilities of the Cubs Business were assumed by New Cubs LLC or one of its affiliates. The unsecured pre-bankruptcy guaranties entered into by Tribune CNLBC of Tribune's obligations under its pre-bankruptcy credit facilities and other exceptions set forth in the Cubs Formation Agreement were not assumed by New Cubs LLC or one of its affiliates and remain as obligations of Tribune CNLBC.

---

[44]    The Cubs transaction was consummated as the contribution of assets into a partnership formed with the Ricketts family. Tribune received an opinion of counsel solely for its own benefit which, although not binding on the IRS, opined that the receipt of cash attributable to partnership borrowings should not be taxable. Tribune has not reserved or set aside cash for taxes associated with the transaction. Tribune expects to recognize annual taxable income from the partnership that will be taxable to Tribune as a C corporation after its emergence from bankruptcy. Those amounts are taken into account in Tribune's financial projections and models. Tribune's Projected Pro Forma Consolidated Balance Sheet included as Exhibit F reflects $1.03 billion of deferred income taxes, which includes deferred tax liabilities resulting from Tribune's contribution of assets to New Cubs LLC.

## I.      Morgan Stanley Swap Agreement

On December 19, 1994, Morgan Stanley Capital Services, Inc. ("MSCS") and Times Mirror entered into an interest rate swap in respect of a $100 million notional amount, which was memorialized in an ISDA Master Agreement, dated as of August 5, 1994, and a Confirmation to such agreement, dated as of December 19, 1994 (collectively, the "Swap Agreement").  Between 2006 and 2008, Morgan Stanley & Co., Inc. ("MS&Co.") purchased approximately $38.365 million in face amount of the Tribune 7.5% debentures, due July 1, 2023 (the "7.5% Debentures").  During 2008 and 2009, MS&Co. transferred all of its interest in the 7.5% Debentures to MSCS.

It is Tribune's belief that in November 2008, Tribune engaged MS&Co. to provide advisory services.[45]  Tribune has stated that it understands that MS&Co. and MSCS deny that any agreements were reached.  Shortly after November 20, 2008, Tribune and MS&Co. determined that it would be prudent for Tribune to retain a financial advisor that satisfied the disinterested person requirement under the Bankruptcy Code, and for MS&Co. to continue to serve as financial advisor to provide for an efficient transition to the new advisor.  MS&Co. informed Tribune that, as a formal engagement agreement had not been reached, it required Tribune to execute an indemnification agreement in order for MS&Co. to assist Tribune during this transition period.  On November 30, 2008, Tribune and MS&Co. executed an indemnification agreement.[46]

Tribune's bankruptcy filing was an Event of Default under Section 5(a)(ii) of the Swap Agreement.  MSCS designated December 9, 2008 as the Early Termination Date for the interest rate swap and, by letter dated December 18, 2008, informed Tribune that it had set off $38.365 million in principal amount of the 7.5% Debentures (plus accrued interest and expenses) against the $50,433,470.16 MSCS had determined, as the non-defaulting party under the Swap Agreement, it owed Tribune.  MSCS asserted that such setoff was permitted pursuant to the Bankruptcy Code's "safe harbors."

It is Tribune's belief that MSCS did not have such a right of setoff, and that even if such setoff right did exist, it was not protected.  By letter dated March 20, 2009, MSCS advised that the correct amount owing to Tribune under the Swap Agreement was $51,945,000 (the "Termination Amount") and that the prior figure was the result of a calculation error.  MSCS again informed Tribune that it had set off $38.365 million in principal amount of the 7.5% Debentures (plus accrued interest and expenses) against the Termination Amount.  The parties engaged in arm's-length negotiations to resolve their dispute with respect to the MSCS Claim, and on May 29, 2009, MSCS paid Tribune $9.5 million in partial satisfaction of the amount owing to Tribune under the Swap Agreement, without prejudice to the respective rights, claims, or defenses of the parties.

---

[45]   Tribune also asserts that during this time (i) Tribune and MS&Co. engaged in negotiations with respect to the terms of an engagement letter, and (ii) during these negotiations, MS&Co. agreed to transfer to a third party any financial instruments that could be materially adverse to the interests of Tribune, in order for MS&Co. to qualify as a "disinterested person" under the Bankruptcy Code and to serve as Tribune's financial advisor in the event Tribune determined to commence a chapter 11 proceeding.  MS&Co. could only serve as Tribune's financial advisor if MS&Co. qualified as a "disinterested person" under the Bankruptcy Code.  In order to qualify as a "disinterested person" under the Bankruptcy Code, MS&Co. (and its affiliate, MSCS) could not hold financial instruments that could be materially adverse to the interests of the estate or of any claim of creditors or equity security holders.

[46]   At the December 1, 2008 meeting of Tribune's Board of Directors, the Board of Directors terminated MS&Co.'s engagement as financial advisor to Tribune.

## VI.    THE FORMER SETTLEMENT SUPPORT AGREEMENT AND FORMER PLAN

On or about April 9, 2010, certain creditor constituencies comprised of Angelo Gordon; Centerbridge Credit Partners, L.P.; Centerbridge Credit Partners Master, L.P.; Centerbridge Special Credit Partners, L.P.; Law Debenture; and JPMorgan Chase Bank, N.A., entered into a Settlement Support Agreement pursuant to which such parties agreed to support a settlement of the LBO-Related Causes of Action in accordance with a certain term sheet (the "Settlement Term Sheet") summarizing certain primary terms of the Settlement Support Agreement. The Settlement Support Agreement was filed with the Bankruptcy Court on April 12, 2010. Also on April 12, 2010, the Debtors filed the Tribune Plan that reflected and sought to implement the terms of the Settlement Term Sheet through a Global Settlement of all LBO-Related Causes of Action. The Tribune Plan was subsequently amended on June 4, 2010.

The Debtors filed their motion seeking approval of the Tribune Disclosure Statement and solicitation procedures on April 12, 2010 (the "Tribune Solicitation Motion") and the motion was heard on May 20, 2010, followed by several subsequent hearings to resolve objections. On June 7, 2010, the Bankruptcy Court entered an order approving the Tribune Disclosure Statement, as amended, and the solicitation procedures. The order set the hearing on confirmation of the Tribune Plan for August 16, 2010 (the "Tribune Confirmation Hearing").

The investigation initiated by the Examiner, as discussed in Article VII.C of this General Disclosure Statement, and the process for confirmation of the Tribune Plan occurred on more or less parallel tracks, with the Examiner's Report being publicly issued on August 3, 2010. After the issuance of the Examiner's Report, the various creditor constituencies undertook their own review and assessment of the Examiner's findings and conclusions, including an assessment as to the implications thereof for their respective claims.

The Debtors are advised that on or about August 9, 2010, after the filing of the Examiner's Report, the Settlement Support Agreement was terminated. The Tribune Confirmation Hearing, having been initially continued, was subsequently taken off the Bankruptcy Court's calendar. After weeks of negotiations throughout the month of August failed to result in any new consensus, the Debtors asked the Bankruptcy Court to appoint a mediator to assist the parties in resolving disputes in connection with the formulation and proposal of a confirmable plan of reorganization, including the appropriate resolution of the LBO-Related Causes of Action. The order appointing the Honorable Kevin Gross as mediator was entered on September 1, 2010. See Article VII.D of this General Disclosure Statement.

## VII.    THE EXAMINER AND CLAIMS
## RELATING TO THE LEVERAGED ESOP TRANSACTIONS

### A.    The Leveraged ESOP Transactions

On April 1, 2007, Tribune's then board of directors, based on the recommendation of a special committee of independent directors, approved the Leveraged ESOP Transactions with (i) the ESOP, a newly formed Tribune employee stock ownership plan, (ii) the Zell Entity, and (iii) Samuel Zell. The Leveraged ESOP Transactions proceeded in two principal steps, commonly called the "Step One Transactions" and "Step Two Transactions."[47]

---

[47]    By using the term "steps," which has been adopted colloquially as shorthand by other parties in the Chapter 11 Cases, the Debtors, among others, do not endorse any conclusion that the June 2007 and December 2007

In step one, consummated in June 2007, the ESOP purchased shares of Tribune common stock, and Tribune consummated a cash tender offer for nearly fifty percent (50%) of its outstanding common stock.  In order to finance the tender offer, Tribune entered into the $8.028 billion Senior Loan Agreement.  A number of Tribune's domestic subsidiaries, the Guarantor Subsidiaries, provided unsecured guarantees of Tribune's indebtedness under the Senior Loan Agreement.  The following charts illustrate the sources and uses of cash at step one of the Leveraged ESOP Transactions:

transactions described below were merely "steps" of a single transaction.  The Debtors believe that the two transactions were distinct and should not be "collapsed" together for purposes of avoidance actions.

### Sources & Uses – Step One ($ in millions) [48,49]



| STEP I - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| **A** Tranche B Term Loan | $5,515.0 |
| Tranche X Term Loan | 1,500.0 |
| Delayed Draw Tranche B Term Loan ($263 capacity) | 0.0 |
| Revolving Credit Facility ($750 capacity) | 0.0 |
| **B** EGI-TRB Equity Investment (1.47 million shares @ $34) | 50.0 |
| Exchangeable EGI-TRB Note | 200.0 |
| Total Sources | $7,265.0 |
| | |
| **Uses** | **Amount** |
| **C** Repay Bridge Credit Agreement (a)(b) | $1,325.0 |
| Repay Term Loan (b) | 1,500.0 |
| **D** TRB repurchases 126 million shares @ $34 | 4,284.0 |
| Bank Fees | 134.1 |
| Other Fees | 21.9 |
| Total Uses | $7,265.0 |

[48] Source: Company's public filings and books and records.

[49] Note:    ESOP's $250 million purchase of Tribune equity not shown as this transaction did not involve the actual transfer of any cash.

Note:    Part B of the transaction was completed on April 23, 2007. Parts A, C and D were completed on June 4, 2007.

Note:    On June 4, 2007, simultaneously with the funding of the Credit Agreement loans, Tribune made capital contributions in the aggregate amount of $3.98 billion, directly or indirectly, to twenty-one subsidiary guarantors with outstanding promissory note balances owed to Los Angeles Times International, Ltd. ("LATI"), a solvent, non-Debtor, non-guarantor direct subsidiary of Tribune. The subsidiaries in turn used the proceeds from their respective capital contributions to repay their outstanding balances owed on the LATI notes. These transactions were required to occur as a simultaneous condition to the initial borrowing. (See Section 3.01(m) of the Credit Agreement.) The Credit Agreement also required that the proceeds of the Tranche X and Tranche B loans be used solely for purposes that included the transactions described above. In addition, pursuant to Sections 3.01(m) and 5.01(m) of the Credit Agreement, in May 2007, TFLLC, a guarantor, was formed, with the sole member being Tribune. Upon the closing of the Credit Agreement in June 2007, the following transactions occurred: (i) Tribune made a capital contribution of $3.0 billion to TFLLC; (ii) TFLLC loaned to eight guarantor publishing subsidiaries a total of $3.0 billion in exchange for intercompany promissory notes; and (iii) the publishing subsidiaries who received the loans from TFLLC made dividend payments in an aggregate amount totaling $3.0 billion to Tribune. In each of the above-transactions, the capital contributions, loans or loan repayments, and dividends were accomplished via book entry rather than the actual movement of cash.

(a)    Repayment of Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 (as subsequently amended, the "Bridge Credit Agreement"). This repayment includes $300 million that was paid between April 23, 2007 and June 3, 2007.

(b)    In addition to payment of principal, interest expense of $3.1 million and $6.3 million was paid on the Bridge Credit Agreement and Term Loan, respectively.

In step two, which was completed on December 20, 2007, Tribune merged with the Merger Sub, a Delaware corporation wholly owned by the ESOP, with Tribune surviving the Merger. Upon the Merger, all issued and outstanding shares of Tribune's common stock, other than shares held by Tribune or the ESOP, were cancelled, and Tribune became wholly owned by the ESOP. Also on December 20, 2007, Tribune borrowed an additional $2.1 billion under the Senior Loan Agreement and entered into the Bridge Loan Agreement, pursuant to which Tribune borrowed approximately $1.6 billion. The proceeds of the additional borrowings under the Senior Loan Agreement and of the borrowings under the Bridge Loan Agreement were used for, among other things, the consummation of the merger.[50] The following charts illustrate the sources and uses of cash at step two of the Leveraged ESOP Transactions (in millions):

**Sources & Uses – Step Two ($ in millions)[51]**



| STEP II - SOURCES & USES | | |
|---|---|---|
| **Sources** | | **Amount** |
| | Cash from Balance Sheet | $582.9 |
| E | Tranche B Term Loan | 2,105.0 |
| | Bridge Facility | 1,600.0 |
| F | EGI-TRB Net Cash Payment | 56.1 |
| | Total Sources | $4,344.0 |
| | | |
| **Uses** | | **Amount** |
| G | Cash Settlement of Stock Based Awards | $134.9 |
| H | TRB repurchases 117.1 million shares @ $34 | 3,981.9 |
| | Cash Distribution triggered by Change of Control (a) | 104.0 |
| | Bank Fees | 73.4 |
| | Other Fees | 49.7 |
| | Total Uses | $4,344.0 |
| | | |
| | **MEMO: Details to Step F** | |
| | Subordinated EGI-TRB Note Investment | $225.0 |
| | EGI-TRB Warrant | 90.0 |
| | Credit for TRB Shares | (50.0) |
| | Credit for Exchangeable EGI-TRB Note | (200.0) |
| | Subtotal | 65.0 |
| | | |
| | Credit for PIK Interest on Exchangeable EGI-TRB Note | (6.4) |
| | Credit for Reimbursed Legal Fees | (2.5) |
| | Total Net Cash To Be Invested by EGI-TRB | $56.1 |

---

[50] The Bridge Loan Agreement indebtedness is unsecured, but is guaranteed, on a subordinated basis to the Senior Loan Agreement indebtness, by the Guarantor Subsidiaries.

[51] Source: Company's public filings and books and records.

Note:   Schedule details payments made on December 20, 2007, or shortly thereafter.

(a)   Includes payments related to deferred compensation, non-qualified retirement and transitional compensation plans.

The following chart shows the financial projections prepared by the Company in February 2007 and October 2007. The financial projections set forth below were included in the information utilized by the Company, the Board of Directors, a special committee of the Board of Directors and their respective financial and legal advisors in evaluating the Leveraged ESOP Transactions. The following chart also shows the Company's actual 2007 and 2008 performance.[52]

### Summary Projections
### ($ in millions)[53]

| PROJECTIONS VS. ACTUALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2007PF | 2007A (a) | Var. ($) | Var. (%) | 2008P | 2008A (a) | Var. ($) | Var. (%) |
| **February Model** (b) | | | | | | | | |
| Revenue | $5,121.3 | $4,837.5 | ($283.7) | (5.5%) | $4,744.3 | $3,927.1 | ($817.2) | (17.2%) |
| Operating Cash Flow | 1,280.8 | 1,160.8 | (120.0) | (9.4%) | 1,263.9 | 779.0 | (484.8) | (38.4%) |
| | | | | | | | | |
| **October Model** (c) | | | | | | | | |
| Revenue | $4,856.7 | $4,837.5 | ($19.1) | (0.4%) | $4,442.0 | $3,927.1 | ($515.0) | (11.6%) |
| Operating Cash Flow | 1,160.1 | 1,160.8 | 0.6 | 0.1% | 1,095.0 | 779.0 | (316.0) | (28.9%) |

Additional information concerning the Leveraged ESOP Transactions and events leading up to the Leveraged ESOP Transactions can be found in the "Offer to Purchase" filed by Tribune with the SEC on April 25, 2007, in connection with the Leveraged ESOP Transactions, a copy of which is attached hereto as Exhibit G.

### B.    Appointment of an Examiner

On January 13, 2010, Wilmington Trust Company ("WTC"), as successor indenture trustee for the PHONES Notes, filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code for the limited purpose of investigating the Leveraged ESOP Transactions and any potential claims related thereto (the "Examiner Motion"). The Examiner Motion was subsequently resolved by the parties consensually, resulting in the entry by the Bankruptcy Court on April 20, 2010 of an Agreed Order Directing the Appointment of an Examiner ("Examiner Order"). On April 30, 2010, the U.S. Trustee appointed Kenneth N. Klee to be the examiner (the "Examiner") and, on the same day, filed an application with the Bankruptcy Court requesting approval of such appointment. The U.S. Trustee's application was approved on May 10, 2010 and Kenneth N. Klee was appointed Examiner by order entered on the same date. On May 11, 2010, the Bankruptcy Court entered an order approving the Examiner's proposed work and expense plan and modifying the Examiner Order (the "Supplemental Order").

---

[52] Please refer to Article XI.A of this General Disclosure Statement for a discussion concerning the reasons underlying the variance between the projections prepared in February 2007 and October 2007 and actual 2007 and 2008 performance.

Source:  February and October Models, 2007 Management Financial Report, 2008 Post-Audit Adjusted Management Financial Report, Company Disclosures.

Note:  The Board approved the February Model on Feb. 13, 2007 and October Model on Oct. 17, 2007.

Note:  All Operating Cash Flow figures are exclusive of Stock Based Compensation. See Exhibit F to the Disclosure Statement for additional information regarding Operating Cash Flow.

(a)    Actual results are adjusted to exclude impact of Cubs and Tribune Entertainment, and exclude Newsday in 2008 only.

(b)    Model adjusted to exclude Recycler, Tribune Entertainment, and Newsday in 2008.

(c)    Model adjusted to exclude Newsday in 2008.

The Examiner filed a motion on July 23, 2010, seeking an order (i) discharging the Examiner, (ii) granting the Examiner and his professionals relief from third-party discovery, (iii) authorizing the disposition of the non-confidential documents comprising the record of the Examiner's investigation, (iv) exculpating the Examiner and his professionals in connection with the Examiner's investigation and the report filed by the Examiner with the Bankruptcy Court, (v) approving a procedure for the filing and consideration of final fee applications of the Examiner and his professionals, and (vi) authorizing and directing the reimbursement of the reasonable fees and costs incurred by the Examiner and his professionals in connection with any future services provided by the Examiner (the "Discharge Motion"). The order approving the Discharge Motion was entered on August 26, 2010, and the Examiner has been discharged thereby.

C.    **Investigation and Report of the Examiner.**

Pursuant to the Examiner Order and Supplemental Order, the Examiner's principal duties were to investigate and evaluate the following questions:

- Question One: evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties (as defined in the Examiner Order) in connection with the Leveraged ESOP Transactions – defined as the LBO-Related Causes of Action – that may be asserted against any entity and that may bear liability, including, without limitation, the Debtors, the Debtors' former and/or present management, former and/or present members of Tribune's board of directors, the Debtors' lenders and the Debtors' advisors, and including without limitation, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and equitable subordination, and to evaluate the potential defenses asserted by the Parties to such potential claims and causes of action;

- Question Two: evaluate whether WTC violated the automatic stay under 11 U.S.C. §362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages and Constructive Trust; and

- Question Three: evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JPMorgan Chase Bank N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order.

Shortly after being designated, the Examiner conducted in person meetings with the Parties and invited the Parties to share their views in writing on the issues to be considered by the Examiner. The Examiner also established a procedure for the Parties to present a substantially agreed upon statement of basic facts and legal, financial, and factual analyses of the issues being investigated. The Examiner and his advisors interviewed 38 witnesses, of which 33 of the interviews were conducted in person. In addition to counsel, the Examiner was assisted by a financial advisor who developed a financial analysis of issues presented, including issues concerning solvency, unreasonable capital, the flow of funds, and matters pertaining to intercompany claims.

On July 26, 2010, the Examiner filed a report in respect of his investigation. The Examiner did not reach definitive conclusions regarding the issues considered in the Report and instead established a range of potential conclusions. Specifically, the Examiner determined to frame his conclusions utilizing the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely. The Examiner assessed claims against various defendants on such continuum. With respect to EGI-TRB LLC and Sam Zell, the Examiner determined that the alleged claims are unlikely to succeed.

63

All of the Examiner's conclusions are summarized on pages 5 through 28 of Volume I of his report. A copy of the Examiner's report is included on the CD-ROM accompanying the Joint Disclosure Statement as Exhibit C, and readers are encouraged to read the entirety of the Examiner's report.

### D.    Mediation.

At the Debtors' request, on September 1, 2010, the Bankruptcy Court appointed the Honorable Kevin Gross, Bankruptcy Judge for the United States Bankruptcy Court for the District of Delaware, as a mediator (the "Mediator") in the Chapter 11 Cases to conduct a non-binding mediation concerning the terms of a plan of reorganization, including the appropriate resolution of the LBO-Related Causes of Action (the "Mediation"). The parties to the Mediation included (i) the Debtors, (ii) the Committee, (iii) JPMorgan Chase Bank, N.A., (iii) Angelo Gordon , (iv) the Credit Agreement Lenders,[54] (v) the Step One Credit Agreement Lenders,[55] (vi) Wells Fargo Bank, N.A. ("Wells Fargo"), (vii) Law Debenture Trust Company of New York ("Law Debenture"), (viii) Deutsche Bank Trust Company Americas, (ix) Centerbridge Credit Advisors LLC, (x) Aurelius, (xi) EGI-TRB LLC, and (xii) Wilmington Trust Company (collectively, the "Mediation Parties"). On September 20, 2010 each of the Mediation Parties submitted to the Mediator a statement setting forth such Mediation Party's position respecting the structure and economic substance of an acceptable plan of reorganization.

The Mediation began on September 26, 2010 and the parties to the Mediation continued settlement discussions on September 27, 2010. On September 28, 2010, the Mediator filed the Mediator's Report, which, among other things, reported that the Mediation resulted in a settlement agreement between the Debtors, on the one hand, and Angelo Gordon and Oaktree Capital Management, L.P., on the other hand. The terms of the settlement are contained in the Term Sheet of Joint Plan of the Settling Parties, attached as Exhibit A to the Mediator's Report (the "First Mediation Term Sheet"). After the filing of the First Mediation Term Sheet, the Mediator continued settlement discussions with certain parties. Subsequently, the Mediator filed the Mediator's Second Report on October 12, 2010, which stated, among other things, that the continued Mediation had resulted in an expanded settlement among the Debtors, the Creditors' Committee, Oaktree, Angelo Gordon, and JPMorgan. The terms of the expanded settlement are contained in the Term Sheet of Joint Plan Supported by Debtors, Official Committee of Unsecured Creditors, Oaktree, Angelo Gordon, and JPMorgan and Endorsed by Mediator, attached as Exhibit A to the Mediator's Second Report (the "Second Mediation Term Sheet").

### VIII.    EXCLUSIVITY PERIOD.

On March 27, 2009, July 24, 2009, November 13, 2009, February 1, 2010, and March 31, 2010, the Debtors filed motions requesting an extension of the Debtors' exclusive period within which to file a chapter 11 plan and/or solicit acceptances thereto. The Bankruptcy Court granted each of these motions and extended the Debtors' exclusive period to file a plan through and including April 30, 2010, and their exclusive period to solicit votes on such plan through and including May 31, 2010. On April 30, 2010, the Debtors filed an additional motion requesting an extension only of the Debtors' exclusive period

---

[54] "Credit Agreement Lenders" means those certain holders of senior loan claims and senior loan guaranty claims as disclosed in the Eighth Amended Joint Verified Statement of Representation of More Than One Creditor by Hennigan Bennett & Dorman LLP and Young Conaway Stargatt & Taylor LLP [Docket No. 5868], as may be amended, modified or supplemented from time to time.

[55] "Step One Credit Agreement Lenders" means those certain holders of step one senior loan claims and senior loan guaranty claims as disclosed in the Joint Verified Statement of Representation of More Than One Creditor by Olshan Grundman Frome Rosenzweig & Wolosky LLP and Arkin Kaplan Rice LLP [Docket No. 5896], as may be amended, modified or supplemented from time to time.

within which to solicit a chapter 11 plan through and including August 8, 2010. The Debtors' exclusive period to file a chapter 11 plan and solicit acceptances expired on August 8, 2010.

## IX.    VOTING PROCEDURES AND REQUIREMENTS

The following section describes in summary fashion the procedures and requirements that have been established for voting on the Competing Plans.

If you are entitled to vote to accept or reject one or more of the Competing Plans, with the package accompanying this Joint Disclosure Statement, you will receive separate, color-coded ballots (each a "Ballot") for each of the Competing Plans on which you are entitled to vote. Ballots and accompanying instructions relating to the Debtor/Committee/Lender Plan are blue. Ballots and accompanying instructions relating to the Noteholder Plan are purple. Ballots and accompanying instructions relating to the Step One Lender Plan are yellow. Ballots and accompanying instructions relating to the Bridge Lender Plan are green. Please note that, for your vote to accept or reject a particular Competing Plan to be counted, you must complete all required information on the Ballot for that particular Competing Plan, execute such Ballot and return such Ballot to the address indicated on the Ballot. In addition, each of the Competing Plans calls for various elections to be made, either on the Ballot or on a separate election form, as set forth in the instructions accompanying the Ballot. If you wish to make any of the elections under one of the Competing Plans, you should check the appropriate boxes on the Ballot or, as applicable, return the separate election form, completed and executed in accordance with the applicable instructions.

If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims. If you are entitled to vote on one or more of the Competing Plans and did not receive a Ballot for each of the Competing Plans on which you are entitled to vote, received a damaged Ballot or lost your Ballot, please contact the Voting Agent, Epiq Bankruptcy Solutions, LLC, at (888) 287-7568 or tribunevote@epiqsystems.com.

### A.    Voting Deadline.

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE COMPETING PLANS, ALL BALLOTS (INCLUDING THOSE BALLOTS TRANSMITTED BY VOTING NOMINEES) MUST BE **RECEIVED BY** THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE COMPETING PLANS. ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:

**FOR FIRST CLASS MAIL:**

Tribune Company Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014

**FOR OVERNIGHT MAIL AND HAND DELIVERY:**

Tribune Company Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC

757 Third Avenue, Third Floor
New York, NY 10017

Ballots will only be counted if mailed to the above address. Ballots cannot be transmitted orally, by facsimile or by electronic mail. Accordingly, you are urged to return your signed and completed Ballot promptly. Any executed ballot received that does not indicate either an acceptance or rejection of a particular Competing Plan or that indicates both an acceptance and rejection of a particular Competing Plan shall not be counted.

**B.       Holders of Claims Entitled to Vote**

In general, a holder of a claim may vote to accept or reject a plan of reorganization if (i) the holder's claim or interest is "allowed," (i.e., generally not disputed, contingent, or unliquidated), and (ii) such holder's claim or equity interest is "impaired" (as defined below) by the plan. However, if a holder of an allowed and impaired claim will not receive any distribution under a plan, than such holder is deemed to have rejected the plan and is not entitled to vote. In the same vein, a holder of an allowed and unimpaired claim will be presumed to have accepted the plan and will not be entitled to vote.

Under the Bankruptcy Code, a class of claims or equity interests is presumed impaired unless a plan (i) does not alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder thereof; or (ii) regardless of any legal right to an accelerated payment of such claim or equity interest the plan (a) cures all existing defaults, except the defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code, (b) reinstates the maturity of such claim or interest as it existed before the default, (c) compensates the holder of such claim for any damages incurred as a result of any such holder's reasonable reliance on such legal right to an accelerated payment, (d) if such claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such claim for any actual pecuniary loss incurred by such holder as a result of such failure, and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

**Please refer to the Specific Disclosure Statements for information concerning the parties in interest that are entitled to vote on each Competing Plan.**

ANY VOTE NOT SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE WILL NOT BE COUNTED PURSUANT TO SECTION 1126(E) OF THE BANKRUPTCY CODE.

**C.       Vote Required for Acceptance by a Class**

1.       Class of Claims.

A Class of Claims shall have accepted a Competing Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Competing Plan in accordance with the Solicitation Order.

2.       Class of Interests.

A Class of Interests shall have accepted a Competing Plan if it is accepted by at least two-thirds (⅔) in amount of the Allowed Interests in such Class that have voted on the Competing Plan in accordance with the Solicitation Order.

66

D.    **Voting Procedures**

1.    Ballots.

All votes to accept or reject the Competing Plans with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of ballot.

ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF A PARTICULAR COMPETING PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION WITH RESPECT TO A PARTICULAR COMPETING PLAN WILL NOT BE COUNTED AS A VOTE EITHER TO ACCEPT OR REJECT SUCH COMPETING PLAN.

ANY BALLOT THAT IS RECEIVED BUT WHICH IS NOT SIGNED OR THAT OTHERWISE CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE CONSIDERED AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERRING ACCEPTANCE OR REJECTION OF ANY OF THE COMPETING PLANS.

All ballots (including those ballots transmitted by Voting Nominees) must be delivered to the Voting Agent, at its address set forth above, and received by the Voting Deadline. THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.

**If you are entitled to vote and you did not receive a ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth in this General Disclosure Statement.**

2.    Withdrawal or Change of Votes on the Competing Plans.

After the Voting Deadline, no vote may be withdrawn without the prior consent of the applicable Proponent – which consent shall be given in such Proponent's sole discretion or order of the Bankruptcy Court.

Any Holder of a Claim who has submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot. If more than one timely, properly completed ballot is received with respect to the same Claim, the ballot that will be counted will be the ballot that the Voting Agent determines was the last to be received.

## X.    CONFIRMATION OF THE PLAN

A.    **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [●] at [●] (**prevailing Eastern Time**), before the Honorable Kevin J. Carey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Fifth Floor, Courtroom No. 5, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of a Competing Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Competing Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before [●] at [●], (prevailing Eastern Time)** by the following parties:

**Counsel to the Debtors:**

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Attn: Jessica C.K. Boelter

Cole, Schotz, Meisel, Forman & Leonard, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Facsimile: (302) 652-3117
Attn: J. Kate Stickles (No. 2917)

**The U.S. Trustee:**

U.S. Trustee
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box #35
Wilmington, Delaware 19899
Facsimile: (302) 573-6497
Attn: David Klauder

**Counsel to the Official Committee of Unsecured Creditors:**

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York 10112
Facsimile (212) 541-5369
Attn: David M. LeMay

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Facsimile (302) 467-4450
Attn: Adam G. Landis

Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington D.C. 20036
Facsimile: (202) 822-8106
Attn: James Sottile

**Counsel to Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.**

Hennigan, Bennett & Dorman LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Facsimile: (213) 694-1234
Attn: Bruce Bennett

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Facsimile: (302) 571-1253
Attn: Robert S. Brady

**Co-Counsel to Angelo, Gordon & Co, L.P.**

Wilmer Cutler Pickering Hale &
Dorr LLP
399 Park Avenue
New York, New York 10022
Facsimile: (212) 230-8888
Attn: Andrew Goldman

**Counsel to JPMorgan Chase Bank, N.A.**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Facsimile: (212) 701 5800
Attn: Damian S. Schaible

Richards Layton & Finger
One Rodney Square
920 North King Street; Wilmington, Delaware 19801
Facsimile: (302) 651-7701
Attn: Mark Collins

**Counsel to Aurelius Capital Management, LP**

Akin Gump Strauss Hauer & Feld LLP

Ashby & Geddes, P.A.

One Bryant Park
New York, New York 10036
Facsimile: [●]
Attn. Daniel Golden

500 Delaware Avenue, P.O. Box 1150
Wilmington, Delaware 19899
Facsimile: [●]
Attn: William Bowden

**Counsel to Deutsche Bank Trust Company Americas**

McCarter & English, LLP
245 Park Avenue
New York, New York 10167
Facsimile: [●]
Attn: David Adler

McCarter & English LLP
Renaissance Centre
405 W. King Street
Wilmington, Delaware 19801
Facsimile: [●]
Attn: Katharine Mayer

**Counsel to Law Debenture Trust Company of New York**

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Facsimile: (212) 506-1800
Attn: David Rosner

Bifferato Gentilotti LLC
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Facsimile: (302) 429-8600
Attn: Garvan McDaniel

**Counsel to Wilmington Trust Company**

Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Facsimile: [●]
Attn: Robert Stark

Sullivan Hazeltine Allinson LLC
4 East 8th Street, Suite 400
Wilmington, Delaware 19801
Facsimile: [●]
Attn: William Sullivan

**Counsel to King Street Acquisition Company, LLC, King Street Capital, LP, and Marathon Asset Management, LP**

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Facsimile: [●]
Attn: Thomas Lauria

Fox Rothschild LLP
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
Facsimile: [●]
Attn: Jeffrey Schlerf

**Counsel to Holders of Certain Step One Senior Loan Claims**

Arkin Kaplan Rice LLP
590 Madison Avenue, 35th Floor
New York, New York 10022
Facsimile: (212) 333-2350
Attn: Howard Kaplan

Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Facsimile: (212) 451-2222
Attn: Adam Friedman

Morris, Nichols, Arsht & Tunnell LLP
1201 North market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Facsimile: (302) 351-9357
Attn: Derek Abbott

Bracewell & Giuliani LLP
225 Asylum Street, Suite 2600
Hartford, CT 06103
Facsimile: 860-246-3201
Attn: Evan Flaschen, Daniel S. Connolly, and Andrew Schoulder

Objections to confirmation of a Competing Plan are governed by Rule 9014 of the Bankruptcy Rules.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.    Statutory Requirements for Confirmation of a Competing Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm a plan only if it finds all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that a plan (i) is accepted by all impaired classes of claims and interests or, if rejected by an impaired

class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) is feasible, and (iii) is in the "best interests" of holders of claims and interests impaired under the plan.

        1.      Acceptance.

        a)      Acceptance of a Plan.

As set forth in the Specific Disclosure Statements, certain classes of Claims and Interests are Impaired under the Competing Plans (the "Impaired Classes of Claims") and are entitled to vote to accept or reject the Competing Plans. As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept the plan unless the plan satisfies the "fair and equitable test" (as described below) as applied to such nonaccepting impaired class.

Impaired Classes of Claims that are entitled to vote on the Competing Plan will have accepted a Competing Plan if such Competing Plan is accepted by at least two-thirds (⅔) in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Competing Plan.

        2.      Fair and Equitable Test.

The Proponents may seek to confirm their respective Competing Plans notwithstanding the non-acceptance or deemed nonacceptance of such Competing Plan by any Impaired Class of Claims or Interests. To obtain such confirmation, the Proponent must demonstrate that their Competing Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting Impaired Class. Generally, a plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner substantially equivalent with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

        (a)      Holders of Secured Claims. Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale, and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

        (b)      Unsecured Creditors. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

        (c)      Interest Holders. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-

CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(B) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

        3.     Feasibility.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine that confirmation of a plan of reorganization is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under such plan. This condition is often referred to as the "feasibility" of the plan of reorganization.

PLEASE REVIEW EACH SPECIFIC DISCLOSURE STATEMENT FOR INFORMATION CONCERNING THE FEASIBILITY OF THE APPLICABLE COMPETING PLAN.

        4.     Best Interests Test and Liquidation Analysis.

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of an impaired claim or impaired interest receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation.

An analysis of the estimated aggregate amount of liquidation proceeds available to holders of Claims against and Interests in the Debtors in a chapter 7 liquidation is attached as <u>Exhibit D</u> to this General Disclosure Statement (the "<u>Liquidation Analysis</u>"). THE LIQUIDATION ANALYSIS WAS PREPARED BY THE DEBTORS WITH THE ASSISTANCE OF THEIR ADVISORS.

PLEASE REVIEW EACH SPECIFIC DISCLOSURE STATEMENT FOR INFORMATION CONCERNING THE ALLOCATION OF PROCEEDS TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER A PARTICULAR COMPETING PLAN AS WELL AS FOR INFORMATION CONCERNING HOW SUCH ALLOCATIONS COMPARE TO RECOVERIES THAT WOULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION.

### XI.    PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE

**A.    Projected Financial Information.**

The Debtors, with the assistance of various professionals, including their financial advisors, prepared the Financial Projections, attached as <u>Exhibit E</u> hereto, for each of the four fiscal years 2010, 2011, 2012 and 2013 (the "<u>Financial Projection Period</u>"). THE FINANCIAL PROJECTIONS WERE PREPARED BY THE DEBTORS.

The Debtors have prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the current circumstances. Those assumptions the Debtors considered to be significant are described herein and in the notes which are part of the Financial Projections. The Financial Projections have not been examined or compiled by independent accountants. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period covered by the Financial Projections may vary from the projected results, and the variations may be material.

The Debtors do not, as a matter of course, publish their business plans, strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

### B.    Reorganization Value.[56]

The Debtors' investment banker and financial adviser, Lazard, has undertaken a valuation analysis to determine the value available for distribution to holders of Allowed Claims (the "Reorganized Value Analysis"). Lazard's Reorganized Value Analysis is attached as Exhibit F to this General Disclosure Statement.

As set forth in the Reorganized Value Analysis, and subject to the assumptions and qualifications stated therein, solely for purposes of determining the value available for distribution pursuant to a plan of reorganization, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $2.9 to $3.5 billion, with an approximate mid-point estimate of $3.2 billion as of the December 27, 2010 (the "Assumed Effective Date"). Lazard further estimates that adding the value of the Other Assets of approximately $1.7 to $2.0 billion (with an approximate mid-point value of $1.9 billion) and the estimated cash balance at the Assumed Effective Date of approximately $1.7 billion to the Enterprise Value range yields a range of Distributable Value for the Reorganized Debtors from $6.3 billion to $7.1 billion with an approximate mid-point of $6.75 billion. Based on total estimated gross debt of $1.1 billion projected as of the Assumed Effective Date, Lazard's mid-point estimate of Distributable Value reduced by approximately $1.4 billion of cash, assumed to be distributed pursuant to a plan of reorganization implies a value for the new equity of the Reorganized Debtors (the "Equity Value") of approximately $4.3 billion.

THE SUMMARY OF LAZARD'S REORGANIZATION VALUE ANALYSIS SET FORTH IN THIS ARTICLE XI.B IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE REORGANIZATION VALUE ANALYSIS, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.

THE REORGANIZED VALUE ANALYSIS WAS PREPARED BY LAZARD FOR THE DEBTORS. PLEASE REFER TO THE SPECIFIC DISCLOSURE STATEMENTS FOR THE APPLICABLE PROPONENTS' VIEWS REGARDING THE REORGANIZED VALUE ANALYSIS, WHICH MAY DIFFER FROM THE CONCLUSIONS SET FORTH IN EXHIBIT F.

### XII.    GENERAL RISK FACTORS

THE IMPLEMENTATION OF ANY OF THE COMPETING PLANS IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW. IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT A COMPETING PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE COMPETING PLANS SHOULD READ AND CAREFULLY CONSIDER THE GENERAL RISK FACTORS SET FORTH BELOW IN ADDITION TO THOSE SET FORTH IN THE SPECIFIC DISCLOSURE STATEMENTS (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND THEREWITH), PRIOR TO VOTING TO ACCEPT OR REJECT THE COMPETING PLANS. THESE GENERAL RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING

---

[56] Capitalized words used but not defined in this Article XI.B shall have the meanings ascribed to such terms in the Reorganized Value Analysis.

THE ONLY RISK INVOLVED IN CONNECTION WITH A COMPETING PLAN AND THEIR
IMPLEMENTATION, OR ALTERNATIVES TO THE COMPETING PLAN.

A.      **FCC-Related Considerations and Risks Relating to Emergence.**

      1.      Inability to Obtain FCC Approval and Media Ownership Waivers Would
      Adversely Affect Ability to Consummate a Competing Plan.

Both the Debtors' commencement of the Chapter 11 Cases and their emergence from bankruptcy
require the consent of the FCC. The FCC previously granted consent for the assignment of the Debtors'
FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under chapter 11 of the
Bankruptcy Code. For the Reorganized Debtors to continue the operation of the Debtors' broadcast
stations, the Debtors filed applications with the FCC (the "FCC Applications") to obtain prior approval of
the FCC for the assignment of the FCC licenses from the Debtors as "debtors-in-possession" to the
Reorganized Debtors (the "FCC Approval"). In the FCC Applications, the Debtors are seeking waivers
of several of the FCC's broadcast ownership rules. Grant of these waiver requests will be necessary in
order to allow the assignment of combinations of media properties currently held by the Debtors in six
markets in which the combinations currently operate under waivers of the FCC ownership rules. Absent
continued waivers from the FCC, Reorganized Tribune will not be able to own and operate these
combinations. To grant the FCC approval, the FCC must determine that the Reorganized Debtors will
comply with the twenty-five percent (25%) limitation on foreign ownership and voting rights set forth in
Section 310(b) of the Communications Act and the FCC's broadcast multiple and cross-ownership rules
upon their emergence from bankruptcy.

      2.      The FCC Must Approve the Debtors' FCC Applications before Emergence from
      Bankruptcy.

The Debtors operate television broadcast stations, a radio station, and certain associated facilities
under authority granted by the FCC. Under Section 310(d) of the Communications Act, the consent of
the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that
holds or controls FCC licenses. Except in the case of "involuntary" assignments, prior consent of the
FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be
consummated.

      a)      "Involuntary" Transfers and Assignments.

For purposes of processing applications, the FCC classifies a licensee's change in status to a
debtor in possession under chapter 11 of the Bankruptcy Code as an "involuntary" assignment, even
though the chapter 11 filing is within the control of the licensee or its parent company. The FCC
considers such involuntary assignments to be *pro forma* transactions and accordingly evaluates them
under more abbreviated, or so-called "short-form," procedures than applications involving a substantial
change in control, which are evaluated under "long-form" procedures. The FCC has granted the Debtors'
applications for consent to such involuntary assignments of their broadcast licenses to the Debtors'
licensees as debtors in possession. Reorganized Tribune's emergence from bankruptcy as a restructured
company will require further consent of the FCC to effectuate an assignment of these broadcast licenses
to the Reorganized Debtors.

Actions ordered by the Bankruptcy Court could require further consent of the FCC. For example,
the appointment of a chapter 11 trustee by the Bankruptcy Court would require FCC consent. The FCC
typically treats changes of this sort that are ordered by the Bankruptcy Court as involuntary assignments
or transfers for which consent may be sought using *pro forma* procedures.

b)      FCC Consent Required for Emergence from Bankruptcy.

The FCC treats emergence from bankruptcy by a licensee or its parent company as a "voluntary" assignment of FCC licenses or a transfer of control of FCC licensees when control will be transferred to a post-bankruptcy holder. A "voluntary" assignment or transfer of control requires prior approval of the FCC. In the FCC's view, a debtor in possession is an interim controlling party. The FCC thus expects the outcome of the proceeding to be, among other things, a restructuring and that the restructuring will not be implemented until the FCC has granted applications seeking approval of the new control structure and demonstrating the legal qualifications of any new parties that will have attributable ownership interests or positions in the new entity.

If the proposed resolution of a bankruptcy proceeding changes ultimate control of the FCC licensees (as, for example, when new parties will hold fifty percent (50%) or more of the stock of the restructured company), the transaction will be viewed as a substantial change in control, with consent sought on an FCC "long form" application, Form 314 (assignment) or Form 315 (transfer of control). The FCC treats a transaction as an "assignment" if the consummation of the transaction would change the identity of the entity holding the FCC license; changes in ownership or control in which the licensee entity remains unchanged typically are treated as "transfers of control." The application procedures for transfers and assignments are essentially the same. Even though a company may emerge from bankruptcy or receivership through a court order, the FCC will use the procedures applicable to a voluntary transfer or assignment when the consummation of the application would place the licenses in a new "permanent" holder. The company may not emerge from bankruptcy until the FCC has granted its consent.

**B.      Risks Related to the Debtors' Businesses.**

1.      The Debtors' Actual Financial Results May Vary Significantly From the Projections.

The Projections were prepared by the Debtors' management in consultation with their professional advisors. The Projections have not been examined or compiled by independent accountants. While the Debtors have presented the Projections with numerical specificity, they have necessarily based the Projections on a variety of estimates and assumptions that may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Debtors and the Reorganized Debtors' control. The Proponents do not and cannot make any representations as to the accuracy of the Projections or to the Debtors or the Reorganized Debtors' ability to achieve the projected results. Some assumptions inevitably will not materialize. Furthermore, events and circumstances occurring subsequent to the date on which the Projections were prepared may differ from any assumed facts and circumstances. Alternatively, any events and circumstances that come to pass may well have been unanticipated, and thus may affect financial results in a materially adverse or materially beneficial manner. The Projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

2.      Failure to Attract and Maintain Employees May Adversely Affect the Debtors' Financial Results.

The Debtors believe that among their most valuable assets are their highly skilled employees, who have the ability to leave the Debtors and deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations. Although the Debtors have tried to maintain the confidence and dedication of their personnel through the pendency of the Chapter 11 Cases, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such personnel with comparable personnel. In addition, the Debtors cannot be sure that such key personnel

will not leave after consummation of a plan and the Debtors emergence from the Chapter 11 Cases. Because the Debtors believe their success depends to a significant degree upon the continued contributions of its employees, the Debtors believe further attrition may hinder the Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

In addition, upon emergence from the Chapter 11 Cases, the Debtors may need to attract and retain new personnel, including key management, sales, marketing, and other personnel. Accomplishing this may be difficult due to many factors, including uncertainty created by the Debtors' Chapter 11 Cases. The failure to continue to attract and retain such individuals could materially adversely affect the Debtors' ability to compete.

3.      Adverse Publicity in Connection with the Chapter 11 Cases or Otherwise Could Negatively Affect Business.

Adverse publicity or news coverage relating to the Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote name recognition and a positive image after emergence from the Chapter 11 Cases.

4.      Advertising Demand Will Continue to be Impacted by Changes in Economic Conditions and Fragmentation of the Media Landscape.

Advertising revenue is the primary source of revenue for the Debtors' publishing and broadcasting businesses. National and local economic conditions, particularly in major metropolitan markets, affect the levels of retail, national and classified newspaper advertising revenue, as well as television advertising revenue. Changes in gross domestic product, consumer spending, auto sales, housing sales, unemployment rates, job creation and circulation levels all impact demand for advertising. Consolidation across various industries, including large department stores and telecommunications companies, may also reduce the Debtors' overall advertising revenue. Retailers and other advertisers may also choose to reduce their overall advertising spending to reduce their operating costs, which could reduce the Debtors' advertising revenues. Deteriorations in national and local economic conditions increase the risk of financial distress and business failures among the Debtors' advertising customers, which may result in reduced advertising demand and decreased advertising revenue, and may also result in the Debtors being unable to fully collect upon advertising receivables.

Competition for newspaper advertising is based on reader demographics, price, service, advertiser results, and circulation and readership levels, and competition for television advertising is based on audience share and ratings information, audience engagement and price. Competition from other media, including other metropolitan, suburban and national newspapers, broadcasters, cable systems and networks, satellite television and radio, Internet sites, magazines, direct marketing and solo and shared mail programs, affects the Debtors' ability to retain and attract advertising clients and may continue to negatively impact advertising rates. In recent years, the advertising industry generally has experienced a secular shift toward Internet advertising and away from traditional media. In particular, Internet sites devoted to recruitment, automobiles, real estate, and other classified advertising categories have become significant competitors of the Debtors' newspapers.

In broadcasting, the proliferation of cable and satellite channels, advances in mobile and wireless technology, the migration of television audiences to the Internet and the viewing public's increased control over the manner and timing of their media consumption through personal video recording devices have resulted in greater fragmentation of the television viewing audience and a more difficult sales

environment. Other advances in technology, such as increasing use of local-cable advertising "interconnects," which allow for easier insertion of advertising on local cable systems, have also increased competition for television advertisers. In addition, video compression technologies permit greater numbers of channels to be carried within existing bandwidth on cable, satellite and other television distribution systems. These compression technologies, as well as other technological developments, are applicable to all video delivery systems, including digital over-the-air broadcasting, and have the potential to provide vastly expanded programming to highly targeted audiences. Reduction in the cost of creating and programming additional channel capacity could lower entry barriers for new channels and encourage the development of increasingly specialized niche programming on cable, satellite and other television distribution systems, which could further increase the competition for advertising revenue in the broadcasting industry.

Seasonal variations in consumer spending cause the Debtors' quarterly advertising revenues to fluctuate. Second and fourth quarter advertising revenues are typically higher than first and third quarter advertising revenues, reflecting slower economic activity in the winter and summer and the stronger fourth quarter holiday season. In addition, differences in annual political and biennial Olympic-related advertising can cause the Debtors' revenues to fluctuate from year to year, in particular with respect to broadcasting revenues.

All of these factors continue to contribute to a difficult sales environment and may further adversely impact the Debtors' ability to grow or maintain their revenues.

     5.     Circulation and Audience Share May Continue to Decline as Consumers Migrate to Other Media Alternatives.

Competition for newspaper circulation is based primarily upon the content of a newspaper, service, price, and to an increasing degree, upon the availability of alternative media sources. The Debtors' circulation revenues have declined, reflecting general trends in the newspaper industry, including declining newspaper buying by young people and the consumer migration toward the Internet and other available forms of media for news. The Debtors have attempted to take advantage of the growth of online media by operating local Internet sites in each of their daily newspaper markets, but face increasing competition from other online sources. In addition, in order to address declining circulation in certain markets, the Debtors may increase marketing designed to retain their existing subscriber base and continue to introduce niche publications targeted at commuters and young adults. The Debtors may also increase marketing efforts to drive traffic to their proprietary Internet sites. Any such increased marketing efforts would involve additional cost and expense. However, certain regulatory changes have made the Debtors' efforts at marketing more difficult. For example, the National Do Not Call Registry has impacted the way newspapers sell home-delivery circulation, particularly for the larger newspapers that historically have relied on telemarketing.

Competition for audience share is based primarily on the perceived quality of the original and syndicated programming offered on the Debtors' broadcast stations, and to an increasing degree on the availability of alternative media sources to view this programming. Technological innovation, and the resulting proliferation of alternative programming sources, such as cable, satellite television, telephone company fiber lines, satellite radio, video-on-demand, pay-per-view, the Internet, home video and entertainment systems, and portable entertainment systems, have fragmented television viewing audiences and subjected television broadcast stations to new types of competition. Over the past decade, the aggregate viewership of non-network programming distributed via multi-channel, video program distributors such as cable television and satellite systems has increased, while the aggregate viewership of the major television networks has declined. Technologies that enable users to view content of their own choosing, in their own time, and to fast-forward or skip advertisements, such as digital video recorders,

portable digital devices, and the Internet, may cause changes in consumer behavior or could hinder Nielsen's ability to accurately measure the Debtors' television audience, both of which could affect the attractiveness of the Debtors' offerings to advertisers. If these trends continue to occur, the Debtors' operating results could be adversely affected.

6.      Changes in the Regulatory Landscape Could Affect the Debtors' Business Operations and Asset Mix.

Various aspects of the Debtors' operations are subject to regulation by governmental authorities in the United States. Changes in the current regulatory environment could result in increased operating costs or the need to divest one or more of the Debtors' properties.

The Debtors' television and radio broadcasting operations are subject to FCC jurisdiction under the Communications Act. A television or radio station may not operate in the United States without the authorization of the FCC. Accordingly, the Debtors' businesses depend upon the Debtors' ability to continue to hold television and radio broadcasting licenses from the FCC, which generally have a term of eight years.

The Communications Act empowers the FCC to regulate other aspects of the Debtors' businesses, in addition to imposing licensing requirements. For example, the FCC has the authority to:

- determine the frequencies, location and power of the Debtors' broadcast stations;

- regulate the equipment used by the Debtors' broadcast stations;

- adopt and implement regulations and policies concerning the ownership and operation of the Debtors' television stations; and

- impose penalties on the Debtors for violations of the Communications Act or FCC regulations.

Federal law also regulates the rates charged for political advertising and the quantity of advertising within children's programs. Broadcasters also are subject to a wide variety of other programming-related and technical regulations, including requirements to broadcast children's educational and informational programming and to provide for sponsorship identification and a prohibition on the broadcast of indecent programming during hours in which the viewing or listening audience is likely to include children.

The Debtors' failure to observe FCC rules and policies could result in the imposition by the FCC of various sanctions, including monetary forfeitures, reporting conditions, and short-term license renewals. In 2006 Congress substantially increased the financial penalties for the airing of indecent programming material outside of "safe harbor" hours. Accordingly, the inadvertent broadcasting of indecent programming may subject a broadcaster to substantial fines. Serious and repeated failures of a broadcast licensee to comply with applicable regulations may, in extreme cases, result in the revocation or non-renewal of a license. In addition, adverse adjudications relating to statutory "character" issues (such as felony or certain anti-trust convictions) and non-compliant media holdings of the Debtors' principals and the Debtors' investors in some instances could reflect adversely upon the Debtors' qualifications as a television and radio licensee.

Cable operators and direct broadcast satellite systems are generally required to carry the primary signal of local commercial television stations pursuant to the FCC's cable "must carry" or direct

broadcast satellite "carry-one, carry-all" rules. These cable operators and direct broadcast satellite systems are prohibited from carrying a broadcast signal, however, without obtaining the station's consent. For each distributor, a local television broadcaster must make a choice once every three years whether to proceed under the "must carry" or "carry-one, carry-all" rules or to waive the right to mandatory but uncompensated carriage and negotiate a grant of retransmission consent to permit the cable system operator or satellite service provider to carry the station's signal, in most cases in exchange for some form of consideration from the system operator. If the Debtors' retransmission consent agreements are terminated or not renewed, or if the Debtors' broadcast signal is distributed on less favorable terms, the Debtors' ability to distribute their programming could be adversely affected.

From time to time, the FCC revises existing regulations and policies in ways that could affect the Debtors' broadcasting operations. Revision of existing cable ownership rules and broadcast multiple ownership and cross-ownership rules and policies by the FCC and other changes in the FCC's rules and policies may continue to affect the competitive landscape in ways that could increase the competition the Debtors face, including competition from larger media, entertainment and telecommunications companies, which may have greater access to capital and resources.

In addition, Congress and the FCC may, in the future, adopt new laws, regulations and policies regarding a wide variety of matters (including technological changes or changes in spectrum assigned to specific services) that could, directly or indirectly, materially and adversely affect the operation and ownership of the Debtors' broadcast properties. For example, the National Broadband Plan, a report to Congress prepared by the FCC's staff and issued on March 16, 2010, contains several recommendations for legislative and regulatory action that could significantly affect television broadcasting, including (i) the reallocation of portions of the present television broadcasting spectrum for non-broadcast mobile and wireless services; (ii) incentive spectrum auctions to encourage current spectrum holders to relinquish all or a portion of their current holdings; (iii) the imposition of user fees on spectrum holders; and (iv) rule changes to permit and encourage spectrum sharing and innovative uses of spectrum. The Debtors cannot predict what regulations or legislation may be proposed, what regulations or legislation may be finally enacted, or what effect, if any, such regulations or legislation could have on the operation and ownership of the Debtors' broadcasting properties.

7.    The Availability and Cost of Quality Network-Provided and Syndicated Programming May Impact the Debtors' Television Ratings.

The cost of syndicated programming represents a significant portion of television operating expenses. Programming emphasis at the Debtors' stations is placed on network-provided programming, syndicated series, feature motion pictures, local and regional sports coverage, locally produced news, and children's programs. Much of the Debtors' stations' programming is acquired from outside sources, including the broadcast networks with which the Debtors' stations are affiliated and major studios with whom the Debtors are not affiliated.

Syndicated programming costs are impacted largely by market factors, including demand from other stations within the market or cable channels. Availability of syndicated programming depends on the production of compelling programming and the willingness of studios to offer the programming to unaffiliated buyers. In addition, the Debtors usually acquire syndicated programming rights several years in advance of availability to telecast programs and those rights often require multi-year commitments, making it difficult to predict accurately how a program will perform.

In addition, as network affiliation agreements come up for renewal, the Debtors may not be able to negotiate terms comparable to or more favorable than the current agreements. Also, the impact of reverse network compensation payments made by the Debtors to networks pursuant to their affiliation

agreements requiring compensation for network programming may have a negative effect on the Debtors' financial condition or results of operations.

The Debtors' inability to continue to acquire or produce affordable programming for their stations could adversely affect operating results or the Debtors' financial condition.

8.    Newsprint Prices May Continue to be Volatile and Difficult to Predict and Control.

Newsprint is one of the largest expenses of the Debtors' publishing units. The price of newsprint has historically been volatile and the consolidation of North American newsprint mills over the years has reduced the number of suppliers. In addition, in an effort to support higher newsprint prices, newsprint mills often reduce their production of newsprint by shutting down mills or taking downtime in their production schedules. The Debtors have historically been able to realize favorable newsprint pricing by virtue of the Debtors' company-wide volume and a long-term contract with a significant supplier. However, the volatility of newsprint prices has increased over the last three years with significant price increases in 2008, followed by significant price reductions in 2009, and significant price increases again in 2010. Newsprint prices will continue to be impacted by many factors including the relative supply of and demand for newsprint, the exchange rate between U.S. and Canadian dollars and the level of energy prices, which is a significant factor in the cost structure of the newsprint mills. In addition, failure to maintain the Debtors' current consumption levels, further supplier consolidation or the inability to maintain the Debtors' existing relationships with their newsprint suppliers could adversely impact newsprint prices in the future.

9.    The Debtors' Ability to Grow Depends on the Development of the Debtors' Interactive Businesses.

The Debtors' growth depends to a significant degree upon the development of their interactive businesses. The growth and success of the Debtors' interactive businesses over the long term depends on various factors, among other things:

- increasing online traffic and attracting and retaining a base of frequent visitors to the Debtors' Internet sites, which may be adversely affected by search engines (including Google, the primary search engine directing traffic to the Debtors' Internet sites) changing the algorithms responsible for directing search queries to Internet sites;

- attracting advertisers to the Debtors' Internet sites, which depends partly on the Debtors' ability to generate online traffic and partly on the rate at which users click through advertisements, which may be adversely affected by the development of new technologies to block the display of the Debtors' advertisements;

- maintaining or increasing the advertising rates of the inventory on the Debtors' Internet sites amid significant increases in inventory in the marketplace, which may depend on the market position of the Debtors' brands and the market position and growth of advertising networks and exchange-based advertising marketplaces;

- exploiting new and existing technologies to distinguish the Debtors' products and services from those of the Debtors' competitors and developing new content, products and services, which may move in unanticipated directions due to the development of competitive alternatives, rapid technological change, regulatory changes and shifting market preferences;

- investing funds and resources in online opportunities, in which some of the Debtors' existing competitors and possible additional entrants may have greater operational, financial and other resources than the Debtors or may be better positioned to compete for certain opportunities;

- maintaining and forming strategic relationships to attract more consumers, which will depend on the efforts of the Debtors' partners, fellow investors and licensees that may be beyond the Debtors' control;

- attracting and retaining talent for critical positions; and

- the impact that filing for chapter 11 bankruptcy may have had on the Debtors' public image, normal business operations, financial condition, liquidity or cash flow.

The Debtors believe that even if the Debtors continue to develop their interactive businesses, they may not be successful in generating or increasing revenue from their interactive businesses due to increasing competition and current economic conditions. If the Debtors are not successful in maintaining or growing revenues from their interactive businesses to offset continued declines in revenues from their newspapers, their businesses, operating results or financial condition could be adversely affected.

The Debtors host Internet services that enable individuals to exchange information, generate content, comment on content and engage in various online activities. The law relating to the liability of providers of these online services for activities of their users is currently unsettled both within the United States and internationally. While the Debtors monitor postings to such websites, claims may be brought against the Debtors for defamation, negligence, copyright or trademark infringement, unlawful activity, tort, including personal injury, fraud, or other theories based on the nature and content of information that may be posted online or generated by the Debtors' users. The Debtors' defense of such actions could be costly and involve significant time and attention of their management and other resources.

     10.    The Debtors' Success Will Depend on the Debtors' Ability to Adapt to Technological Change.

The Debtors' businesses are subject to rapid technological change, evolving industry standards, and the emergence of new media technologies and services. In the past, innovations in communications technology, including the explosive growth of the Internet, the spread of satellite and cable television, and the expansion of alternative programming sources have affected many aspects of the Debtors' business. While the Debtors have made significant investments to address the opportunities and challenges presented by these technological changes, these efforts have not always been successful. In the future, the Debtors' ability to profitably grow their business will depend upon their ability to adapt to future technological innovation. No assurance can be given that the Debtors will be successful in this regard.

     11.    The Debtors May be Required to Write Down Goodwill or Other Intangible Assets Which May Adversely Affect Their Financial Position and Results of Operations.

The Debtors review goodwill and other indefinite-lived intangible assets for impairment annually, or more frequently if events or changes in circumstances indicate that an asset may be impaired, in accordance with Accounting Standards Codification Topic 350, "Intangibles – Goodwill and Other."

To perform the annual impairment review, the Debtors estimate the fair values of their reporting units to which goodwill has been allocated using many critical factors, including projected future revenue, operating cash flows, and market growth, market multiples, discount rates and consideration of market

valuations of comparable companies. The estimated fair values of other intangible assets subject to the annual impairment review, which include newspaper mastheads and FCC licenses, are generally calculated based on projected future discounted cash flow analyses. Adverse changes in expected results of operations and/or unfavorable changes in other economic factors used to estimate fair values, including market multiples and discount rates, could result in non-cash impairment charges in the future, which may have a material adverse effect on the consolidated statements of operations.

12.     Events Beyond the Debtors' Control May Result in Unexpected Adverse Operating Results.

The Debtors' results of operations could be affected in various ways by global or domestic events beyond the Debtors' control, such as wars, political unrest, acts of terrorism, and natural disasters. Such events can quickly result in significant declines in advertising revenues and significant increases in newsgathering costs. Coverage of the war in Iraq and Hurricane Katrina are two examples where newsgathering costs increased and, in the case of Hurricane Katrina, revenues dropped off significantly at the Debtors' two New Orleans television stations.

13.     Changes in Accounting Standards Can Significantly Impact the Debtors' Reported Earnings and Operating Results.

Generally accepted accounting principles and accompanying pronouncements and implementation guidelines (collectively, "GAAP") for many aspects of the Debtors' businesses, including those related to intangible assets, pensions, employee stock ownership plans, income taxes, derivatives, equity-based compensation and broadcast rights, are complex and involve significant judgments. Changes in these rules or their interpretation could significantly change the Debtors' reported earnings and operating results.

14.     Adverse Results from Litigation or Governmental Investigations can Impact the Debtors' Business Practices and Operating Results.

From time to time, the Debtors are parties to litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations could result in significant monetary damages, fines, penalties, or injunctive relief that could adversely affect the Debtors' operating results or financial condition as well as the Debtors' ability to conduct their businesses as they are presently being conducted.

15.     The Debtors Could Be Faced with Additional Tax Liabilities.

The Debtors are subject to federal and state income taxes and are regularly audited by federal and state taxing authorities. In the years currently under audit, or eligible for future audit, the Debtors consummated certain significant business transactions that they treated or intend to treat as not resulting in gain for income tax purposes but as resulting in gain or loss for financial accounting purposes. In addition, the Debtors treated or intend to treat significant amounts of income as not subject to tax because of the Debtors' status as an S corporation. Significant judgment is required in evaluating the Debtors' tax positions and in establishing appropriate reserves. The Debtors analyze their tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. The resolutions of the Debtors' tax positions are unpredictable and could result in tax liabilities and associated cash payments that are significantly higher or lower than that which has been provided for by the Debtors.

16.     The Debtors' Company-Sponsored Pension Plans are Currently Underfunded, and Over Time the Debtors Will Likely be Required to Make Cash Contributions to the Pension Plans, Reducing the Cash Available for Working Capital and Other Corporate Uses.

The Debtors provide pension benefits to eligible employees under certain company-sponsored defined benefits pension plans.  In 2008, the market value of the Debtors' pension plan assets declined significantly due to negative investment returns.  As a result, in accordance with GAAP (Accounting Standards Codification Topic 715, "Compensation Retirement Benefits"), the Debtors' recognized a net pension obligation for the underfunded status of its company-sponsored pension plans at the end of 2008.  In 2009, the net pension obligation declined slightly due to an increase in pension assets resulting from investment returns but that increase was largely offset by higher liabilities due to a lower discount rate and other factors.

Cash Funding requirements are not driven directly by the GAAP underfunded position, but by the Pension Protection Act ("PPA"), which uses a different method to calculate the underfunded amount, as described in Article III.C.1.a.i hereof.  Using the PPA methodology and based on various assumptions, the Debtors project that significant cash contributions will be required in the future.  Actual Cash Funding may be more or less than these projections.  For example, if PPA discount rates remain low and/or investment returns are below expectations, then without legislative relief the projected contributions may be higher than currently anticipated.  As a result, the Debtors may have less cash available for working capital and other corporate uses, which may have an adverse impact on the Debtors' operations, financial condition and liquidity.

In addition, the Debtors participate in multiemployer pension plans on behalf of employees represented by certain unions.  Contributions to these multiemployer pension plans could increase as a result of future collective bargaining, funding deficiencies or other factors.  The Debtors' obligations to make contributions to their pension plans and multiemployer pension plans in which they participate would reduce the cash available for working capital and other corporate uses and may have a material adverse impact on the Debtors' operations, financial condition and liquidity.

17.     Labor Strikes, Lock-Outs and Protracted Negotiations can Lead to Business Interruptions and Increased Operating Costs.

As of December 31, 2009, union employees comprise about fifteen percent (15%) of the Debtors' workforce.  The Debtors are required to negotiate collective bargaining agreements across their respective business units on an ongoing basis.  Complications in labor negotiations can lead to work slowdowns or other business interruptions and greater overall employee costs.

18.     Acquisitions, Investments and Dispositions Pose Inherent Financial and Other Risks and Challenges.

The Debtors continuously evaluate their businesses and make strategic acquisitions, dispositions, and investments.  These transactions involve challenges and risks in negotiation, execution, valuation and integration.  There can be no assurance that any such transaction can be completed.  Moreover, competition for certain types of acquisitions and investments is significant.  Even if successfully negotiated, closed and integrated, certain acquisitions or investments may prove not to advance the Debtors' businesses strategy and may fall short of expected return on investment targets.  In certain of the Debtors' investments, the Debtors have taken or may take a minority position in a company with limited voting rights and an inability to exert absolute control over the entity.

82

## XIII.    CONCLUSION

Please refer to the Specific Disclosure Statements for the Proponents' views regarding the implications and consequences of confirmation of their respective Competing Plans.  Following such review, please vote to accept or reject the Competing Plans by returning your ballot(s) so that they are received no later than 4:00 p.m. (prevailing Eastern Time) on [●], 2010.

Dated:  November [●], 2010

Respectfully submitted,

TRIBUNE COMPANY (for itself and on behalf of
the other Debtors, as Debtors and Debtors in
Possession, and the Guarantor Non-Debtors and
Non-Guarantor Non-Debtors)

By: _____

Name: Donald J. Liebentritt
Title: Co-President and Chief Restructuring
      Officer, Tribune

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue
Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

Counsel to the Debtors, Debtors-in-Possession, and Certain Non-Debtor Affiliates

**SPECIFIC DISCLOSURE STATEMENTS:**

A.    **SPECIFIC DISCLOSURE STATEMENT RELATING TO FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON, & CO., L.P., AND JPMORGAN CHASE BANK, N.A.**

B.    **SPECIFIC DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST COMPANY, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES**

C.    **SPECIFIC DISCLOSURE STATEMENT FOR AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY KING STREET ACQUISITION COMPANY, L.L.C., KING STREET CAPITAL, L.P. AND MARATHON ASSET MANAGEMENT, L.P.**

**D.**   **SPECIFIC DISCLOSURE STATEMENT FOR FIRST AMENDED PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY CERTAIN HOLDERS OF STEP ONE SENIOR LOAN CLAIMS**