# EXHIBIT 5

# RESPONSIVE STATEMENT OF BRIDGE PROPONENTS IN RESPECT OF COMPETING PLANS IN CHAPTER 11 CASES OF TRIBUNE COMPANY AND ITS SUBSIDIARIES[1]

## I. RECOMMENDATION

King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. (in their respective capacities as Holders of Bridge Loan Claims, the "**Bridge Proponents**"), recommend that Creditors:

(i) **VOTE TO ACCEPT:**

- the Joint Plan of Reorganization for Tribune Company and its Subsidiaries, dated October 29, 2010 (the "**Bridge Lender Plan**"), proposed by the Bridge Proponents; and

(ii) **VOTE TO REJECT:**

- the Joint Plan of Reorganization for Tribune Company and its Subsidiaries, dated October 22, 2010 (the "**Debtor/Committee/Lender Plan**"), proposed by the Debtors, the Official Committee of Unsecured Creditors (the **"Creditors' Committee"**), Oaktree Capital Management, L.P. ("**Oaktree**"), Angelo Gordon & Co. L.P. ("**Angelo Gordon**") and JPMorgan Chase Bank, N.A. ("**JPMorgan**," and together with the Debtors, the Creditors' Committee, Oaktree and Angelo Gordon, the "**Debtor/Committee/Lender Proponents**");

- the Plan of Reorganization for Tribune Company and its Subsidiaries, dated October 29, 2010 (the "**Step One Lender Plan**," and together with the Debtor/Committee/Lender Plan, the "**LBO Lender Plans**"), proposed by the Holders of certain Step One Senior Loan Claims (the "**Step One Proponents**"); and

- the Joint Plan of Reorganization for Tribune Company and its Subsidiaries, dated October 29, 2010 (the "**Noteholder Plan,**" and together with the Bridge Lender Plan and the LBO Lender Plans, the "**Competing Plans**"), proposed by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for certain series of Senior Notes, Law Debenture Trust Company of New York, in its capacity as successor Indenture Trustee for certain series of Senior Notes and Wilmington Trust Company, in its capacity as successor Indenture Trustee for the PHONES Notes.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bridge Lender Plan referred to below. This Responsive Statement is filed without prejudice to the right of (i) the Bridge Proponents to amend the Bridge Lender Plan and related disclosure statement and (ii) the Bridge Proponents or any person or entity on their behalf to object to any other Competing Plan or any disclosure statement in respect thereof, in each case on any basis.

## II. OVERVIEW

> The Bridge Proponents urge Creditors to vote to accept the Bridge Lender Plan and to reject the other Competing Plans. The Bridge Proponents believe that the Bridge Lender Plan is the Competing Plan most likely to be confirmed because, unlike the other Competing Plans, it is the only reorganization plan that provides a reasonable and balanced path towards the Debtors' emergence from these protracted and expensive Chapter 11 Cases by embodying a good faith restructuring and settlement proposal that is fair to ALL constituencies. The Debtors have already at great cost withdrawn one reorganization plan the Debtors had previously proposed (with the support of its current co-proponents – the Creditors' Committee, JPMorgan and Angelo Gordon). Bankruptcy Judge Carey, who is presiding over these Chapter 11 Cases, has in at least one case in the past refused to confirm a chapter 11 plan that embodied a litigation settlement but which was not fully consensual and which he determined was not fair to non-consenting creditors. See In re Exide Techs., 303 B.R. 48 (Bankr. D. Del. 2003). The Bridge Proponents believe that, after all of the time and expense associated with these Chapter 11 Cases, creditors should not risk supporting any reorganization plan which is patently unfair to one constituency or another or is otherwise fatally flawed.

## III. INTRODUCTION AND RELEVANT BACKGROUND

The Competing Plans each represent the respective terms and conditions proposed by the applicable proponents of a chapter 11 reorganization plan for Tribune Company (**"Tribune"**) and its subsidiaries (together with Tribune, the **"Debtors"**). Tribune and the other Debtors commenced these Chapter 11 Cases less than one year after completing a $12 billion leveraged buyout of Tribune's existing public shareholders (the **"Leveraged ESOP Transaction"**). The Leveraged ESOP Transaction was consummated over a period of seven months ending in December of 2007. The Leveraged ESOP Transaction is one of the largest failed leveraged buyouts in history and has given rise to billions of dollars of massively complex litigation claims against hundreds of potential defendants (the "**LBO-Related Causes of Action**"). The LBO-Related Causes of Action were extensively investigated in the Examiner's Report, which contains thousands of pages of factual findings, legal analyses and supporting documentation. General descriptions of the Leveraged ESOP Transaction, the LBO-Related Causes of Action and the Examiner's Report are set forth in Sections VII.A, VII.B and VII.C of the General Disclosure Statement, dated October 22, 2010, filed by the Debtors. The Examiner's Report and all exhibits thereto are filed with the Bankruptcy Court.

The proponents of the Competing Plans all generally agree that the LBO-Related Causes of Action must be addressed in some fashion before any reorganization plan can be confirmed and the Debtors can emerge from these Chapter 11 Cases. The main differences among the Competing Plans relate to the extent to which those plans propose to resolve the LBO-Related Causes of Action, rather than litigate them to judgment.

At one end of the spectrum is the Debtor/Committee/Lender Plan, which was constructed and is supported mainly by certain Senior Lenders. The Senior Lenders financed the Leveraged ESOP Transaction and have the most to lose in connection with the LBO-Related Causes of

2

Action. The Debtor/Committee/Lender Plan purports to "settle" the vast majority of the LBO-Related Causes of Action, including claims against all of the LBO Lenders (other than the Bridge Loan Lenders[2]), their agents and arrangers (the **"Arrangers"**), former Tribune shareholders and numerous other third parties. It appears that no holder of Pre-LBO Debt currently supports the Debtor/Committee/Lender Plan.

The Step One Lender Plan is substantially similar to the Debtor/Committee/Lender Plan, but eliminates the so-called proposed settlement of any LBO-Related Causes of Action in respect of step two of the Leveraged ESOP Transaction. The Step One Lender Plan also reserves a portion of the distributions otherwise payable to the Senior Lenders pending resolution of an intercreditor dispute over sharing of distributions between the Senior Lenders who only funded step one of the Leveraged ESOP Transaction, and the other Senior Lenders. No creditor constituency other than certain Step One Lenders currently supports the Step One Lender Plan.

At the other end of the spectrum is the Noteholder Plan, which is supported by certain principal potential plaintiff/beneficiaries of the LBO-Related Causes of Action (the "**Pre-LBO Lenders**"). The Noteholder Plan provides for minimum distributions to Creditors at Confirmation and, essentially, the full preservation and post-Confirmation litigation of LBO-Related Causes of Action.

## IV. CREDITORS SHOULD ACCEPT THE BRIDGE LENDER PLAN

The Bridge Loan Lenders are both defendants and potential beneficiaries of the LBO-Related Causes of Action. The Bridge Loan Lenders provided $1.6 billion of financing in connection with step two of the Leveraged ESOP Transaction and are uniquely situated among the LBO Lenders. The Bridge Loan Claims are potentially subject to avoidance along with the Claims of the Senior Lenders. However, if the Step One Lender Claims are avoided or if other contingencies occur, the Bridge Loan Lenders' recovery would increase dramatically. Given the Bridge Loan Lenders' unique position and perspective in these Chapter 11 Cases, the Bridge Proponents believe that the settlements proposed in the Bridge Lender Plan provide balanced recoveries that are fair to all constituencies, unlike those proposed in the other Competing Plans. Moreover, while all constituencies will likely take issue with various elements of the Examiner's Report, no party can dispute that the Examiner recognized for each creditor constituency a wide range of potential outcomes with varying degrees of certainty. In light of the foregoing, the Bridge Proponents believe that the Bridge Lender Plan is the fairest and most equitable Competing Plan, and is the Competing Plan most likely to be confirmed by the Bankruptcy Court.[3]

---

[2]   Under the Debtor/Committee/Lender Plan, the EGI-TRB LLC Noteholders are also not receiving releases.

[3]   In the event any or all Plan Settlements are not accepted by the applicable Creditor classes and approved by the Bankruptcy Court, the Trust structure will take effect with respect to such Creditor classes, who will receive Initial Distributions on the Effective Date consistent with the Noteholder Plan, adjusted based on the allocation of value as between Tribune and the Guarantor Subsidiaries determined by the Bankruptcy Court at Confirmation.

3

**A.**     *The settlements proposed in the Bridge Lender Plan are fair.*

The Bridge Lender Plan is the only Competing Plan which is structured to fairly resolve the LBO-Related Causes of Action against each of the three principal LBO Lender defendant constituencies in light of, among other things, the findings and the potential range of recoveries in the Examiner's Report. A chart of the settlements of the LBO-Related Causes of Actions proposed in the Bridge Lender Plan (the "**Proposed Bridge Lender Plan Settlements"**) is set forth on page 7 of the Bridge Lender Specific Disclosure Statement, and is also attached as Annex I hereto. The potential range of creditor recoveries documented by the Examiner is set forth on page 10 of the Bridge Lender Specific Disclosure Statement, and is as follows:

| Constituency | Range of Recoveries[4] |
|---|---|
| Senior Loan Claims | $4.671 billion (case 6) – $7.013 billion (case 5) |
| Bridge Loan Lender Claims | $0 (cases 7 & 8) – $278.61 million (case 6) |
| Senior Notes | $95.1 million (case 2) – $1.306 billion (case 6) |
| PHONES Notes | $0 (cases 2-5, 7) – $772.36 million (case 6) |
| EGI-TRB LLC Notes | $0 (all cases but 6) – $59.87 million (case 6) |
| General Unsecured Claims | $10.29 million (case 2) – $202.33 million (case 6) |

The Proposed Bridge Lender Plan Settlements are voluntary, unlike the so-called settlements in the LBO Lender Plans, and are comprised of three independent and severable settlements with each of the three principal LBO Lender defendant constituencies (i.e., the Step One Lenders, the Step Two Lenders and the Bridge Loan Lenders). Like the Noteholder Plan, the Bridge Lender Plan provides that any LBO-Related Causes of Action that are not settled at Confirmation will be preserved and litigated afterwards. Therefore, if the Proposed Bridge Lender Plan Settlements are not approved, the Bridge Lender Plan will make distributions to creditors in a manner that, in many respects, is substantially identical to that provided by the Noteholder Plan, adjusted if the allocation of value as between Tribune and the Guarantor Subsidiaries described in the Bridge Lender Plan is accepted.

The Bridge Proponents believe that the other Competing Plans are flawed and unfair and are far less likely to be confirmed by the Bankruptcy Court than the Bridge Lender Plan, and that the Bridge Lender Plan provides the best opportunity for the Debtors to emerge from these protracted and bitterly contested Chapter 11 Cases. The Bridge Proponents, therefore, recommend that Creditors vote to accept the Bridge Lender Plan and reject the other Competing Plans.

---

[4]     These estimated recoveries are based on the Debtors' previous total enterprise value for the Debtors of $6.1 billion. Since the Examiner's Report was issued, the Debtors have increased the total enterprise value for the Debtors to $6.75 billion. All such additional value is allocated in the Debtor/Committee/Lender Plan to the Guarantor Subsidiaries, therefore impacting only the range of recovery for the Senior Loan Claims.

NEWYORK 7919253 (2K)

1. *__The Proposed Bridge Lender Plan Settlements are fair to the Senior Lenders.__*

As set forth in the Bridge Lender Specific Disclosure Statement and on Annex I hereto, if the Proposed Bridge Lender Plan Settlements are accepted and approved, the Step One Lenders will receive approximately $4.7 billion of distributable value, which is approximately 71% of their Step One Lender Claims. The Step Two Lenders would receive $950 million of distributable value, which is approximately 45% of their Step Two Lender Claims. All LBO-Related Causes of Action against parties not contributing consideration to the Proposed Bridge Lender Plan Settlements, such as former lenders, former shareholders, agents, Arrangers, advisors, directors, officers, Samuel Zell and EGI-TRB LLC, are fully preserved. Under the Proposed Bridge Lender Plan Settlements, the Senior Loan Claims would also share in 25% of any future recoveries as a result of the preserved LBO-Related Causes of Action, which may be substantial.

As discussed more fully in the Bridge Lender Specific Disclosure Statement, the Bridge Proponents believe that these recoveries are fair and reasonable to the Holders of Senior Loan Claims in light of, among other things, (i) the potential range of recoveries for all of the Senior Loan Claims outlined in the Examiner's Report ($4.671 billion - $7.013 billion), (ii) the enhanced risk of avoidance of the Step Two Lender Claims versus the Step One Lender Claims, as outlined in the Examiner's Report, (iii) the uncertainty regarding whether the Step One Lenders would be required to share distributions received on account of the Step One Lender Claims with the Step Two Lenders, (iv) the potential challenge to the enforceability of the Bridge Loan Subordination Provision and (v) the potential reallocation of distributable value to Tribune from the Guarantor Subsidiaries if the Debtors' "resolution" of Intercompany Claims and related value allocation are not accepted.

2. *__The Proposed Bridge Lender Plan Settlements are fair to the Bridge Loan Lenders.__*

If the Proposed Bridge Lender Plan Settlements are accepted by the LBO Lenders and approved by the Bankruptcy Court, as set forth in the Bridge Lender Specific Disclosure Statement, and subject to the qualifications therein, and on Annex I the Bridge Loan Lenders (other than the Original Bridge Loan Lenders) would recover $125 million, which is approximately 7.7%[5] of their claims. In the event that only the Bridge Loan Lender Settlement is approved, the Bridge Loan Lenders (other than the Original Bridge Loan Lenders) would recover $125 million (approximately 7.7% of their claims) and 5% of any future recoveries as a result of preserved causes of action to be potentially brought against, among other parties, officers and directors of Tribune, selling stockholders, Samuel Zell and EGI-TRB LLC. The releases to be granted to the Original Bridge Loan Lenders pursuant to the Bridge Loan Lender Settlement are significant relative to the distribution the Original Bridge Loan Lenders are being required to forgo. The Bridge Loan Lenders (other than the Original Bridge Loan Lenders) have meaningful

---

[5]   This percentage recovery estimate does not take into account Claims held by Original Bridge Loan Lenders. The percentage recovery for the Bridge Loan Lenders increases to the extent cash distributions are not made in respect of the Claims of the Original Bridge Lenders.

5

potential causes of action against the Original Bridge Loan Lenders in connection with, among other things, the arrangement of Step Two and the syndication of debt under the Bridge Loan Agreement, as well as their related misconduct and nondisclosures. Moreover, it should be noted that the Debtors' original and now defunct plan of reorganization, which had the support of JPMorgan and other Original Bridge Loan Lenders, provided the Original Bridge Loan Lenders with an estimated 0.44% recovery in exchange for releases. As discussed more fully in the Bridge Lender Specific Disclosure Statement and in part V.B.2 below, the Bridge Proponents believe that these recoveries are fair given the range of potential recoveries on the Bridge Loan Claims and other factors.

### 3.     *The Proposed Bridge Lender Plan Settlements are fair to the Pre-LBO Lenders.*

If the Proposed Bridge Lender Plan Settlements are accepted by the LBO Lenders and approved by the Bankruptcy Court, very substantial cash distributions will also be provided to the Pre-LBO Lenders on or about the Effective Date. As set forth in the Bridge Lender Specific Disclosure Statement and on Annex I, the Senior Noteholders would recover $750 million, or approximately 58.5% of their claims, and would also receive a 50% share of future litigation recoveries. The PHONES Noteholders would recover $75 million (approximately 9.9% of their claims), and would also receive a 20% share of future litigation recoveries. As set forth on Annex I, other unsecured creditors would also receive material recoveries under the Proposed Bridge Lender Plan Settlements. As discussed more fully in the Bridge Lender Specific Disclosure Statement, the Bridge Proponents believe that these recoveries are fair in light of, among other things, (i) the potential range of recoveries for all Pre-LBO Lenders, (ii) the probability of a judicial determination that the Leveraged ESOP Transaction was a fraudulent conveyance in its entirety, as outlined in the Examiner's Report, and (iii) the time and expense of engaging in extremely complex litigation.

### B.     *The other Competing Plans may not be confirmable.*

As set forth in part V below, the Debtor/Committee/Lender Plan purports to be a "Settlement Plan", but is really only a mechanism for the Senior Lenders to settle all LBO-Related Causes of Action against them on their own terms. It appears that no holder of Pre-LBO Debt supports the purported settlement of such claims under the Debtor/Committee/Lender Plan which, not surprisingly, is unfairly one-sided in favor of the Senior Lenders and otherwise fatally flawed in its current form.

Moreover, as set forth in part VI below, the Step One Lender Plan is even more biased and one-sided. That plan does not even purport to be a settlement and merely assigns a settlement value to the LBO-Related Causes of Action only with regard to the Step One Lenders. All other claims are preserved for post-Confirmation litigation or resolution. Not surprisingly, the Step One Lender Plan currently does not have the support of any creditor constituency other than the Step One Lenders.

As set forth in part VII below, the Noteholder Plan resolves almost nothing at Confirmation. While this may seem facially attractive because it puts off to a later date the need to address the overarching litigation issues which might delay or impede Confirmation, the Noteholder Plan leaves the Debtors burdened with substantial post-Confirmation litigation they

6

were presumably expecting to resolve when they began the chapter 11 process. Therefore, the Noteholder Plan, if confirmed, would create great uncertainty as to timing, expense and expected recoveries in these Chapter 11 Cases and constituencies would not have the opportunity to elect a settlement proposal and resolve their claims. Moreover, without an impaired accepting creditor class at the Subsidiary Debtors, the Noteholder Plan may not be confirmable in any event.

## V.     CREDITORS SHOULD REJECT THE DEBTOR/COMMITTEE/LENDER PLAN

*A.     The Bridge Proponents believe that the Debtor/Committee/Lender Plan embodies a one-sided resolution of the principal LBO-Related Causes of Action which was constructed by, and is grossly favorable to, the Senior Lenders and their agents and Arrangers.*

As set forth below, the disparity between the settlement consideration and the substantial value of the claims being settled and/or released under the Debtor/Committee/Lender Plan is immense. The Debtor/Committee/Lender Plan and the related specific disclosure statement provide absolutely no basis whatsoever that could possibly justify this self-interested arrangement.

### 1.     *No holders of Pre-LBO Debt support the Debtor/Committee/Lender Plan.*

The Debtor/Committee/Lender Proponents include Oaktree, Angelo Gordon and JPMorgan, who are significant holders of Senior Loan Claims which are subject to avoidance. As outlined in the Examiner's Report, they are likely also subject to substantial disgorgement claims. JPMorgan, for example, arranged and served as agent for the financing for the Leveraged ESOP Transaction, and is subject to potentially massive fee disgorgement claims and other liabilities for its conduct in that regard. Moreover, the Debtors are admittedly conflicted and have abdicated prosecution of the LBO-Related Causes of Action to the Creditors' Committee.

With one exception, the Debtor/Committee/Lender Proponents are the very same parties who supported the Debtors' earlier and now defunct "global" settlement of the LBO-Related Causes of Action and chapter 11 plan. Notably, the Debtors' earlier plan had the support of at least one major Senior Noteholder. It appears that the Debtor/Committee/Lender Plan now lacks support from any holder of Pre-LBO Debt.

The Bridge Proponents believe that the Debtor/Committee/Lender Plan lacks such support because, as discussed below, the terms of the so-called settlements in the Debtor/Committee/Lender Plan are grossly one-sided in favor of the Senior Lenders and their agents and Arrangers. The Bridge Proponents also believe that the Debtor/Committee/Lender Plan is otherwise fatally flawed and that the Bankruptcy Court will agree. As a consequence, the Debtor/Committee/Lender Plan is unlikely to be confirmed in its current form.

### 2.     *The LBO-Related Causes of Action against the Senior Lenders are being settled for a fraction of their potential value.*

The Debtor/Committee/Lender Plan provides that the Senior Lenders will forgo $401 million of value otherwise distributable to them, in full settlement of most LBO-Related Causes

7

of Action against the Senior Lenders in respect of step one and step two of the Leveraged ESOP Transaction. These potential claims could result in billions of dollars of Senior Loan Claims being avoided, and billions of dollars of payments in respect of Step One Senior Loans and other assets being recovered from the Senior Lenders.

First, the purported $401 million settlement amount is misleading. In fact, a portion of such amount totaling $63 million is attributable to Senior Lender recoveries which are artificially enhanced as a result of the misallocation in the Debtor/Committee/Lender Plan of distributable value between Tribune, on the one hand, and the Guarantor Subsidiaries, on the other hand. As discussed in part V.C below, the Bridge Proponents believe that the Debtor/Committee/Lender Plan improperly and unfairly settles Intercompany Claims in favor of the Guarantor Subsidiaries, thereby artificially inflating the distributable value of the Guarantor Subsidiaries at the expense of the Tribune Estate and its Creditors. In fact, as discussed below, a proper allocation of distributable value would enhance the recovery of all Creditors at the Tribune level, at the expense of amounts otherwise distributable under the Debtor/Committee/Lender Plan to the Senior Lenders. In short, the Senior Lenders are improperly settling claims against them with, in part, amounts distributable to other Creditors at the Tribune level.

Moreover, the settlement amount of $401 million ascribes a minimal likelihood to the possibility that any of these claims would succeed. Essentially, the Debtor/Committee/Lender Proponents propose that minimal value should be given to any LBO-Related Causes of Action that the Examiner concluded have less than a fifty percent (50%) chance of prevailing (<u>i.e.</u>, below "equipoise" per the Examiner's Report). The Bridge Proponents believe that the Bankruptcy Court is unlikely to take such a view in analyzing the reasonableness of the settlements under the Debtor/Committee/Lender Plan, and will instead consider (appropriately weighted) all relevant risks identified by the Examiner.

The Examiner's Report provided that step two of the Leveraged ESOP Transaction was highly likely to have been a constructively fraudulent conveyance with regards to Tribune, reasonably likely to have been a constructively fraudulent conveyance with regards to the Guarantor Subsidiaries and somewhat likely to have been an intentionally fraudulent conveyance based, among other things, on the actions of the agents and Arrangers. The Examiner's Report also states that:

- even if step one and step two of the Leveraged ESOP Transaction are viewed separately, there was at least some likelihood that step one of the Leveraged ESOP Transaction, standing alone, was an intentionally or constructively fraudulent conveyance; and

- there was a material risk (only somewhat unlikely) that step one and step two of the Leveraged ESOP Transaction would be collapsed for purposes of solvency but, if collapsed, there was also a material likelihood (somewhat unlikely "although an exceedingly close call") that the Leveraged ESOP Transaction as a whole rendered Tribune insolvent and was, therefore, a constructively fraudulent conveyance.

8

The Bridge Proponents believe that the Bankruptcy Court will conclude that, even if the Examiner determined that the likelihood of the foregoing to be less than "equipoise", the chances are far from remote, and the consequences are sufficiently grave as to warrant a settlement amount substantially in excess of $401 million.  For example, if the Bankruptcy Court were to find that step one and step two of the Leveraged ESOP Transaction are collapsed and avoided, and no benefit is granted for value provided, the Senior Lenders' recoveries in these Chapter 11 Cases could be reduced by $2.8 billion.  Notably, this risk does not take into account additional potential disgorgement liability for certain Senior Lenders.

*3.    The Debtor/Committee/Lender Plan includes free releases of billions of dollars of claims against third parties.*

The Debtor/Committee/Lender Plan also releases:

- billions of dollars of disgorgement claims against current and former Step One Lenders;

- billions of dollars of disgorgement claims against Tribune's former shareholders who received proceeds of the Leveraged ESOP Transaction at step one of the Leveraged ESOP Transaction;

- all claims against the agents and Arrangers of step one of the Leveraged ESOP Transaction;

- all LBO-Related Causes of Action against the agents and Arrangers of step two of the Leveraged ESOP Transaction; and

- claims against the Former Bridge Loan Agent (even while disputing the Bridge Loan Claims).

The Examiner's Report extensively addresses the facts and circumstances giving rise to each of these potential claims and, in some cases, states that further investigation could yield even more information.  Yet, remarkably, the former Senior Lenders, former shareholders and the agents and Arrangers (in their capacities as such) are apparently required to contribute <u>absolutely nothing</u> in exchange for these releases in connection with step one of the Leveraged ESOP Transaction under the Debtor/Committee/Lender Plan.  The Debtor/Committee/Lender Plan provides no meaningful discussion of these releases or why they are justified.  The Bridge Proponents believe that these releases, as a matter of law, cannot stand absent substantial additional consideration from the released parties, and that the Bankruptcy Court will agree and refuse to confirm the Debtor/Committee/Lender Plan on that basis.

*4.    The so-called "Step Two/Disgorgement Settlement" releases significant claims for a fraction of their value.*

Under the so-called "Step Two/Disgorgement Settlement" outlined in the Debtor/Committee/Lender Plan, the Arrangers (JPMorgan, Citicorp North America, Inc., Bank

9

of America, N.A. and Merrill Lynch Capital Corporation) are supposedly paying some portion of an additional $120 million to Senior Noteholders to settle any liability for arranging step two of the Leveraged ESOP Transaction.  Once again, the Bridge Proponents believe that the amount of consideration being paid to eliminate the billions of dollars of exposure associated with the claims and liabilities being settled and released is far too small.  $120 million is patently insufficient because, among other reasons:

- the Examiner concluded that it is reasonably likely that a court would conclude that the Arrangers did not act in good faith in connection with step two of the Leveraged ESOP Transaction and could potentially be exposed to claims for the billions of dollars of losses incurred by creditors in connection therewith;

- $120 million is even less than the fees earned by the Arrangers in connection with the Leveraged ESOP Transaction ($200 million), which are subject to claims for disgorgement that are also released under the so-called "Step Two/Disgorgement Settlement"; and

- sufficient details are not disclosed as to how a Bridge Loan Lender could participate in the settlement (even if it wanted to), what it would have to contribute to participate or any other terms of participation.

In short, the so-called "Step Two/Disgorgement Settlement" is no settlement at all; it is an arrangement concocted by the Arrangers – the parties most responsible for the Leveraged ESOP Transaction – to release them of liability associated with the most problematic elements of one of the largest failed leveraged buyouts in history that they helped create.

### 5. *The releases of the Former Bridge Loan Agent are unsupportable.*

The Bridge Proponents believe that the release of the Former Bridge Loan Agent in the Debtor/Committee/Lender Plan deserves special attention and criticism.  The Examiner concluded that a court is reasonably likely to hold that the Former Bridge Loan Agent did not act in good faith in connection with step two of the Leveraged ESOP Transaction.  The Debtors are disputing the Bridge Loan Claims.  Neither the current Bridge Loan Agent nor any current Bridge Loan Lender is being released.  No one disputes that it is the Former Bridge Loan Agent's conduct which is at issue in the LBO-Related Causes of Action, and that the Former Bridge Loan Agent possesses all relevant information in that regard and in connection with the structuring, arrangement and consummation of the Bridge Loan Agreement.  It is impossible to tell if the Former Bridge Loan Agent, in its capacity as such, is contributing meaningful value to the so-called settlement under the Debtor/Committee/Lender Plan.  There is simply no rational basis for releasing the Former Bridge Loan Agent under these circumstances (the Step One Plan Proponents apparently agree – see part VI.B below).  On this basis alone, the Debtor/Committee/Lender Plan is likely not confirmable and Creditors should reject the Debtor/Committee/Lender Plan.

10

**B.     The Debtor/Committee/Lender Plan denies the Bridge Loan Lenders the full value of their Claims, rights and remedies.**

*1.     The Debtor/Committee/Lender Plan improperly limits the Bridge Loan Lenders' recovery to $77.8 million, or 4.86% of their Claims.*

The Debtor/Committee/Lender Plan disputes the Bridge Loan Claims and provides that distributions in respect of those Claims will be made post-Confirmation if and when such Claims are Allowed. However, the Debtor/Committee/Lender Plan limits the amount potentially distributable on account of Bridge Loans to $77,819,000. This cap on the Bridge Loan Lenders' recovery is a mere fraction of what the Bridge Loan Lenders would receive if any number of issues are resolved in their favor. <u>Unless all issues respecting the Bridge Loans are to be litigated at Confirmation, the full amount of the Bridge Loan Lenders' potential recoveries must be preserved.</u> Otherwise, the Debtor/Committee/Lender Plan artificially and unfairly limits the Bridge Loan Lenders' ability to prosecute their claims and is, therefore, unconfirmable.

*2.     The Bridge Loan Lenders could recover up to $700 million, or 43.75% of their Claims, if certain disputes are resolved in their favor.*

The Examiner, in setting forth his recovery scenarios in the Examiner's Report, acknowledged the possibility of a recovery for the Bridge Loan Lenders which is substantially higher than $77.8 million, presenting an upside (in case 6) of up to $278.61 million. The Bridge Proponents believe that the Bridge Loan Lenders' true upside is in fact much higher than that presented by the Examiner. The Examiner calculated this recovery assuming that the Debtors' valuation of Tribune (and corresponding treatment of Intercompany Claims) was appropriate. For the reasons set forth below, the Bridge Proponents believe that at least $700 million must be preserved for the Bridge Loan Lenders for the Debtor/Committee/Lender Plan to be confirmable.

- The Debtor/Committee/Lender Plan implements a supposed "Intercompany Claims Settlement" for which the Debtor/Committee/Lender Proponents provide absolutely no meaningful disclosure. This Intercompany Claims Settlement is seemingly designed by the Debtor/Committee/Lender Proponents to increase the allocation of distributable value to the Guarantor Subsidiaries at the expense of Tribune where the Bridge Loan Lenders, and other constituencies, are *pari passu*. However, pursuant to Section 7 of the Bridge Loan Guaranty Agreement (the **"Intercompany Claims Subordination Provision"**), <u>Intercompany Claims owed by Tribune to any of the Guarantor Subsidiaries may not be paid until the Bridge Loan Lender Claims are paid in full</u>. Allowing all Intercompany Claims, and honoring the Intercompany Claims Subordination Provision, yields a base line recovery for the Bridge Loan Lender Claims, if no fraudulent conveyance, <u>in excess of $144 million</u>. Unless all issues relating to Intercompany Claims are litigated at Confirmation, $144 million is the absolute minimum that must be preserved in respect of the Bridge Loan Lender Claims.

- If both step one and step two of the Leveraged ESOP Transaction are avoided, there is the possibility that the Bridge Loan Lenders could recover as much as

11

$700 million, if either (a) the LBO Lenders' Claims are preserved on account of $1.6 billion of value provided (as the Senior Lenders have argued) or (b) the provision in the Bridge Loan Guaranty Agreement subordinating the Bridge Loan Guaranty to the Senior Loan Guaranty (the **"Bridge Loan Subordination Provision"**) is deemed unenforceable. Unless these issues are litigated at Confirmation, $700 million is the absolute minimum that must be preserved in respect of the Bridge Loan Claims.

### C.    *The Debtor/Committee/Lender Plan improperly "resolves" Intercompany Claims.*

The Debtor/Committee/Lender Proponents acknowledge the existence, as of the Petition Date, of tens of thousands of Intercompany Claims totaling tens of billions of dollars which arose as a consequence of, among other things, the massive complexities and interconnectedness of the Debtors' corporate structure and enterprises. The purported "resolution" of Intercompany Claims, and the associated allocation of distributable value between Tribune, on the one hand, and the Guarantor Subsidiaries, on the other, are an integral feature of the Debtor/Committee/Lender Plan. The Bridge Proponents believe that the resolution of Intercompany Claims, and the consequent allocation of distributable value among the Estates in the Debtor/Committee/Lender Plan, violate the Intercompany Claims Subordination Provision and are not otherwise fair in light of the actual facts and the relative rights of the various creditor constituencies.[6] Only minimal disclosure is provided regarding the details of the Intercompany Claims resolution in the Debtor/Committee/Lender Plan, and the Bridge Proponents believe that the Debtors are improperly shifting substantial value from Tribune to the Guarantor Subsidiaries on account of Intercompany Claims to enhance the recovery of the Senior Lenders at the expense of the Bridge Loan Lenders and other unsecured creditors at the Tribune level.

## VI.    CREDITORS SHOULD REJECT THE STEP ONE LENDER PLAN

### A.    *The Step One Lender Plan makes no attempt to settle any claims or causes of action except those relating to step one of the Leveraged ESOP Transaction; it has less support than even the Debtor/Committee/Lender Plan.*

The Step One Lender Plan does not even purport to be a settlement and merely assigns a value to the LBO-Related Causes of Action only with regard to the Step One Lenders. All other claims are preserved for post-Confirmation litigation or resolution. Without a real settlement being proposed, the Step One Lender Plan is releasing valuable claims potentially worth billions of dollars in exchange for a sum that not a single beneficiary of such claims is willing to accept. Moreover, it is unlikely that any significant impaired creditor class would accept the Step One Lender Plan, therefore rendering it unconfirmable.

---

[6]    The Bridge Proponents believe that Intercompany Claims cannot be fairly addressed by one representative for all the Estates, and expect extensive discovery will be taken and challenges made at Confirmation regarding any settlement of Intercompany Claims that adversely impacts the Bridge Loan Lenders. See In re Adelphia Commc'ns Corp., 336 B.R. 610, 671 (Bankr. S.D.N.Y. 2006), aff'd, 342 B.R. 122 (S.D.N.Y. 2006) ("[I]f the Debtors actually took sides [in interdebtor disputes] in a way that injured one or another of the estates to whom they owed their duties of loyalty, that would result in at least the appearance of impropriety, and, the Court fears, the reality as well.").

12

### B.     The Step One Lender Plan also has many of the same flaws as the Debtor/Committee/Lender Plan.

- The Step One Lender Plan provides that the Step One Lenders will forgo $290 million of value otherwise distributable to them, in full settlement of most LBO-Related Causes of Action against the Step One Lenders.  The Step One Lender Claims being settled could result in billions of dollars of Senior Loan Claims being avoided, and billions of dollars of payments in respect of Step One Senior Loans and other assets being recovered from the Senior Lenders.  Therefore, the Bridge Proponents believe that the Bankruptcy Court will conclude that $290 million is not sufficient consideration to eliminate the substantial exposure of the Step One Lenders.

- The Step One Lender Plan releases billions of dollars of disgorgement claims against former Step One Lenders and shareholders whose shares were purchased with the proceeds of the Step One Senior Loans in exchange for no additional value provided.

- The Step One Lender Plan releases extremely valuable claims against the agents and Arrangers of step one of the Leveraged ESOP Transaction in exchange for nothing (notably, the Step One Lender Plan does not release the Former Bridge Loan Agent, showing that even the Step One Proponents realize that it is illogical and unfair to provide such a release).

- The Step One Lender Plan sets the same artificial cap on recovery for Holders of Bridge Loan Lender Claims as the Debtor/Committee/Lender Plan, which (as discussed in part V.B above) renders the Step One Lender Plan unconfirmable.

As described more fully in part V above, these flaws render the Step One Lender Plan unconfirmable, just as they render the Debtor/Committee/Lender Plan unconfirmable as a matter of law.

### VII.     CREDITORS SHOULD REJECT THE NOTEHOLDER PLAN

The Noteholder Plan resolves none of the LBO-Related Causes of Action or related claims or causes of action at Confirmation.  While the proposed deferment of critical issues which might otherwise delay or impede Confirmation may seem facially attractive, the Noteholder Plan leaves the Debtors burdened with substantial post-Confirmation litigation.  Therefore, the Noteholder Plan, if confirmed, would create great uncertainty as to timing, expense and expected recoveries in these Chapter 11 Cases.   To the extent that the Debtors and their Creditors can leverage the millions of dollars expended in these Chapter 11 Cases to achieve a settlement under a confirmed plan, parties should take advantage of that opportunity.  These deficiencies alone does not render the Noteholder Plan unconfirmable, but the failure to even propose potential settlements of critical issues makes it truly the Competing Plan of last resort.  However, the Bridge Proponents believe that the Noteholder Plan may also lack an impaired accepting class at the Subsidiary Debtors, which would render it unconfirmable.

13

## VIII. CONCLUSION

The Bridge Lender Plan is the best option of the four Competing Plans and the plan most likely to be confirmed by the Bankruptcy Court because it provides the clearest path for the Debtors' emergence from these expensive and protracted Chapter 11 Cases.  Unlike any of the other Competing Plans, the Bridge Lender Plan embodies a good faith restructuring and settlement proposal that is fair to all constituencies.  By contrast, the Debtor/Committee/Lender Plan and the Step One Lender Plan suffer from fatal deficiencies including that, among other things, (i) neither is truly a settlement amongst parties on both sides of potential LBO-Related Causes of Action and (ii) both plans release extremely valuable claims in exchange for a small fraction of their actual value.  The Noteholder Plan, while facially appealing, solves nothing and simply postpones resolution of critical issues in these Chapter 11 Cases to a future date.  The Bridge Loan Lenders, therefore, encourage Creditors to accept the Bridge Lender Plan and reject the other Competing Plans.

ANNEX I

| | Step One Lenders | Step Two Lenders | Senior Noteholders | PHONES Noteholders | Other Parent Claims | Other Guarantor Debtor Claims |
|---|---|---|---|---|---|---|
| **Step One Lender Settlement** | Estimated Recovery Percentage on Effective Date: At least 66.3% (71.0% if the Step Two Lender Settlement is also approved)<br><br>Form of Recovery:<br>• $4.389 billion of DEV<br>• 25% of the Trust Interests (to be shared pro rata with the Step Two Lenders if the Step Two Lender Settlement is approved)<br><br>See Section 5.15(a)(i) of the Bridge Lender Plan. | See Step Two Lender Settlement. | Estimated Recovery Percentage on Effective Date: At least 46.8% (58.5% if Step Two Lender Settlement is also approved)<br><br>Form of Recovery:<br>• $600 million in Cash<br>• 50% of the Trust Interests<br><br>See Section 5.15(a)(ii)(C) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 5.3% (9.9% if the Step Two Lender Settlement is also approved)<br><br>Form of Recovery:<br>• $40 million in Cash<br>• 20% of the Trust Interests<br><br>See Section 5.15(a)(ii)(D) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 48.2% (58.8% if the Step Two Lender Settlement is also approved)<br><br>Form of Recovery:<br>• $55 million in Cash<br>• 5% of the Trust Interests<br><br>See Section 5.15(a)(ii)(A) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: 100%<br><br>Form of Recovery: Paid in full in Cash (approximately $85 million).<br><br>See Section 5.15(a)(ii)(B) of the Bridge Lender Plan. |
| **Step Two Lender Settlement** | Estimated Recovery Percentage on Effective Date: At least 4.7% (71.0% if the Step One Lender Settlement is also approved)<br><br>Form of Recovery: $309 million of DEV<br><br>See Section 5.15(b)(ii) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 45.1%<br><br>Form of Recovery:<br>• $950 million of DEV<br>• 25% of the Trust Interests (if the Step One Lender Settlement is also approved and in such case to be shared pro rata with the Step One Lenders)<br><br>See Section 5.15(b)(i) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 11.7% (58.5% if Step One Lender Settlement is also approved)<br><br>Form of Recovery: $150 million in Cash<br><br>See Section 5.15(b)(ii) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 4.6% (9.9% if the Step One Lender Settlement is also approved)<br><br>Form of Recovery: $35 million in Cash<br><br>See Section 5.15(b)(ii) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 10.5% (58.8% if the Step One Lender Settlement is also approved)<br><br>Form of Recovery: $12 million in Cash<br><br>See Section 5.15(b)(ii) of the Bridge Lender Plan. | No additional recovery. |
| **Bridge Loan Lender Settlement** | • If the Step One Lender Settlement is approved: the Bridge Loan Lenders will receive an estimated recovery percentage on the Effective Date of 7.7% in the form of $125 million in Cash.<br>• If the Step One Lender Settlement is not approved and the Bridge Loan Lender Settlement is approved on a standalone basis: the Bridge Loan Lenders will receive an estimated recovery percentage on the Effective Date of at least 7.7% in the form of $125 million in Cash, and 5% of the Creditors' Trust Interests.<br>• In either case, the Original Bridge Loan Lenders forgo Cash and Trust recoveries in exchange for releases.[7] | | | | | |

---

[7]  See note 4.