## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, <u>et al.</u>, | ) Case No. 08-13141 (KJC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Hearing Date: Dec. 15, 2010 at 10:00 a.m.** |
| | ) **Response Deadline: Dec. 3, 2010 at 4:00 p.m.** |
| | ) **Related Docket No. 6433** |

## <u>OPPOSITION TO MOTION OF OAKTREE CAPITAL MANAGEMENT, L.P., AND ANGELO, GORDON & CO. L.P. FOR AN ORDER DISQUALIFYING AKIN GUMP STRAUSS HAUER & FELD LLP FROM REPRESENTING AURELIUS CAPITAL MANAGEMENT, LP</u>

William P. Bowden (#2553)
Amanda M. Winfree (#4615)
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

Lawrence S. Robbins
Michael L. Waldman
Daniel N. Lerman
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
(202) 775-4500
lrobbins@robbinsrussell.com

*Counsel for Akin Gump Strauss Hauer & Feld LLP*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

    A.    Movants Consent To Akin Gump's Representation of Centerbridge .................... 2

    B.    Movants Consent To Akin Gump's Representation Of Aurelius ........................... 4

    C.    Movants' Tactical Use Of This Disqualification Motion ....................................... 5

ARGUMENT ....................................................................................................... 7

    I.    LEGAL STANDARD ................................................................................. 7

    II.    THIS COURT SHOULD REJECT MOVANTS' BELATED ATTEMPT TO OBJECT TO A CONFLICT OF INTEREST TO WHICH THEY CONSENTED ....................................................................................... 9

        A.    Any Conflict Of Interest Implicated By Akin Gump's Representation Of Aurelius Is Consentable Under Rule 1.7(b)(3) Because It Does Not Involve The Assertion Of *A Claim* By One Client *Against* Another *In The Same Tribunal* ........................................... 9

        B.    Movants Consented To Akin Gump's Representation Of Aurelius ......... 14

        C.    Movants' Consent Was Fully Informed .................................................. 16

        D.    Movants Have Forfeited Their Right To Object To Any Conflict ........... 19

    III.    THE DRASTIC REMEDY OF DISQUALIFICATION IS UNJUSTIFIED BECAUSE LESS PREJUDICAL ALTERNATIVES ARE READILY AVAILABLE ......................................................................................... 25

        A.    Disqualification Will Not Serve The Purposes Of Rule 1.7 .................... 26

        B.    Disqualification Would Severely Prejudice Aurelius .............................. 30

        C.    Less Drastic Measures Will Alleviate Any Conflict Without Prejudicing Either Party .................................................................... 33

CONCLUSION ................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Boston Scientific Corp. v. Johnson & Johnson Inc.*,
   647 F. Supp. 2d 369 (D. Del. 2009)................................................................*passim*

*Brotherhood Ry. Carmen of U.S. and Canada v. Delpro Co.*,
   549 F. Supp. 780 (D. Del. 1982)..........................................................................1, 8

*Century Indemnity Co. v. Congoleum Corp.*,
   426 F.3d 675 (3d Cir. 2005) ...............................................................................*passim*

*Conley v. Chaffinch*,
   431 F. Supp. 2d 494 (D. Del. 2006)............................................................20, 24, 25

*Elonex I.P. Holdings, Ltd v. Apple Computer, Inc.*,
   142 F. Supp. 2d 579 (D. Del. 2001).................................................................*passim*

*In re Corn Derivatives Antitrust Litigation*,
   748 F.2d 157 (3d Cir. 1984) ....................................................................................26

*In re Flanigan's Enterprises, Inc.*,
   70 B.R. 248 (Bankr. S.D. Fla. 1987) .......................................................................13

*In re Meridian Aotomotive Systems-Composite Operations, Inc.*,
   340 B.R. 740 (Bankr. D. Del. 2006) ........................................................................19

*Jack Eckerd Corp. v. Dart Group Corp.*,
   621 F. Supp. 725 (D. Del. 1985)..............................................................................26

*Kabi Pharmacia AB v. Alcon Surgical, Inc.*,
   803 F. Supp. 957 (D. Del. 1992)..............................................................................19

*Kaiser Group Int'l, Inc. v. Nova Hut*,
   272 B.R. 846 (Bankr. D. Del. 2002) ........................................................................12

*Liberate Technologies LLC v. Worldgate Communications, Inc.*,
   133 F. Supp. 2d 357 (D. Del. 2001).........................................................................20

*Madukwe v. Delaware State University*,
   552 F. Supp. 2d 452 (D. Del. 2008).........................................................................20

*Raymond Professional Group, Inc., v. William A. Pope Co.*,
   400 B.R. 624 (Bankr. N.D. Ill. 2009) ......................................................................20

TABLE OF AUTHORITIES–cont'd

Page(s)

*Richardson-Merrell, Inc. v. Koller*,
  472 U.S. 424 (1985) ................................................................................................ 25

*Straubinger v. Schmitt*, 792 A.2d 481 (N.J. App. 2002) ................................................ 13

*SWS Financial Fund A v. Salomon Bros. Inc.*,
  790 F. Supp. 1392 (N.D. Ill. 1992) .............................................................. 26, 30, 36

*Talecris Biotherapeutics, Inc. v. Baxter International Inc.*,
  491 F. Supp. 2d 510 (D. Del. 2007) .................................................................... 8

*United States v. Miller*,
  624 F.2d 1198 (3d Cir. 1980) ...................................................................... *passim*

*Wyeth v. Abbott Laboratories*,
  692 F. Supp. 2d 453 (D.N.J. 2010) ......................................................... 30, 33, 36

**Statutes**

11 U.S.C. § 548 ...................................................................................................... 12

**Rules**

FED. R. BANKR. P. 7001 ............................................................................................ 12

FED. R. BANKR. P. 7003 ............................................................................................ 12

**Miscellaneous**

John D. Ayer, *How to Think About Bankruptcy Ethics*, 60 AM. BANKR. L. J. 355 (1986) ........... 13

Richard E. Flamm, Lawyer Disqualification: Conflicts of Interest
  and Other Bases (2003) ..................................................................................... 30, 33

G. HAZARD & W. HODES, THE LAW OF LAWYERING (3d ed. Supp. 2004) ................................... 14

MODEL RULES OF PROF'L CONDUCT R. 1.7 ................................................................. *passim*

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (2000) ................................... *passim*

Michael P. Richman, *Multiple Clients in Bankruptcy Cases: When Do You Need
  Consent?*, 21 AM. BANKR. INST. J. 14 (March 2002) .......................................... 11, 12

## INTRODUCTION

"[M]otions to disqualify are often thinly veiled attempts to deprive opposing parties of their counsel of choice." *Brotherhood Ry. Carmen of U.S. and Canada v. Delpro Co.*, 549 F. Supp. 780, 786 (D. Del. 1982). The present disqualification motion is no exception.

Akin Gump Strauss Hauer & Feld LLP has been involved in these reorganization proceedings for more than a year—first representing Centerbridge Credit Advisors ("Centerbridge") which held senior notes issued by Tribune Company, and then representing Aurelius Capital Management, LP, on behalf of its managed entities (collectively, "Aurelius"), which acquired most of Centerbridge's Tribune senior note holdings. Movants, who are represented before the Federal Communications Commission by Akin Gump, have been aware of these representations from the very start. They also knew that both Centerbridge and Aurelius would likely take positions adverse to their own, and that Akin Gump's representations in these bankruptcy proceedings therefore gave rise to a potential conflict of interest. Yet until the thirteenth hour, they never objected. Indeed, they expressly consented to Akin Gump's representation of Centerbridge, and then again to its representation of Aurelius, so long as Akin Gump put in place an ethical wall separating the lawyers representing movants before the FCC from those representing Centerbridge and Aurelius in this Court. Akin Gump strictly adhered to that ethical wall—and that should have been the end of the matter.

But then the bankruptcy proceedings began to heat up some more. Dissatisfied with this turn of events, movants sought to exploit the potential conflict of interest to extract Aurelius's consent to a litany of onerous restrictions on Akin Gump's representation in this Court. When Aurelius declined to accede to those conditions, movants asked this Court to do what they had previously agreed not to do: disable Aurelius from retaining the counsel of its choice. This Court should deny that request.

Because "motions to disqualify are generally disfavored," courts will disqualify an attorney only where absolutely necessary to advance the goals of the ethical rule at issue. *Boston Scientific Corp. v. Johnson & Johnson Inc.*, 647 F. Supp. 2d 369, 373 (D. Del. 2009). Disqualification is plainly unwarranted here because movants consented to any conflict of interest arising from Akin Gump's representation of Aurelius. But even if this Court concludes otherwise, it should deny the disqualification motion in light of the availability of less restrictive alternatives, such as maintaining the ethical wall, having another law firm represent Aurelius on FCC/communications law issues, and restricting Akin Gump from conducting any discovery against movants. Those alternative remedies would serve the purposes of the conflict of interest rules without unduly prejudicing Aurelius—as disqualifying its uniquely experienced bankruptcy and litigation counsel plainly would. Such a measured approach would therefore be most faithful to the Third Circuit's mandate that courts use their discretion to tailor "sanctions to be just and fair to all parties involved." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980) (internal quotations omitted).

## STATEMENT OF FACTS

### A. Movants Consent To Akin Gump's Representation Of Centerbridge

In August 2009, Centerbridge Credit Advisors retained Akin Gump Strauss Hauer & Feld LLP as bankruptcy counsel in these chapter 11 cases. At that time, Centerbridge held senior notes issued by Tribune Company. Golden Decl. ¶ 3. When the Centerbridge representation commenced in August 2009, Akin Gump was advising Angelo, Gordon & Co. on FCC-related regulatory issues pertaining to its senior loan debt holdings in the debtors. In September 2009, shortly after the Centerbridge representation began, Akin Gump was also retained to provide similar counsel to Oaktree Capital Management, L.P., pertaining to its senior loan debt holdings

in the debtors.    Akin Gump's representation of Angelo Gordon and Oaktree ("movants" here) before the FCC has been led by Tom Davidson and Phil Marchesiello, lawyers based in Akin Gump's Washington, D.C., office who specialize in FCC matters.    Akin Gump's representation of Centerbridge before this Court has been spearheaded by Daniel Golden, a bankruptcy lawyer in the firm's New York office.    *Id.* ¶ 4.

Because Akin Gump recognized (as did movants) that Centerbridge was likely to advance positions in connection with the reorganization proceeding that were at odds with those taken by movants, the firm took steps to secure movants' consent to its representation of Centerbridge. To that end, in November 2009, Daniel Golden sought—and received—Angelo Gordon's consent to the Centerbridge representation.    *Id.* ¶ 6.    Tom Davidson received similar consent from Oaktree in early 2010, as reflected in an email exchange between Mr. Davidson and Emily Alexander, Senior Vice President of Legal at Oaktree.    On January 28, 2010, Ms. Alexander emailed Mr. Davidson, observing that other Akin Gump lawyers were now "involved in the Tribune representation on the bankruptcy side that could have positions opposite to ours." Ms. Alexander therefore sought assurances that "there was a wall set up between those of you on the FCC side."    Mr. Davidson wrote back to confirm that there was, indeed, such an ethical wall in place.    *Id.* ¶¶ 7, 8; Ex. 3.

Pursuant to that ethical wall, attorneys and staff representing Centerbridge in these reorganization proceedings were prohibited from having any communication with attorneys and staff assigned to the FCC representation regarding their respective cases.    In addition, the attorneys and staff representing Centerbridge in the chapter 11 cases were prohibited from obtaining access to documents, communications, or other non-public information relating to the FCC representation.    Likewise, the attorneys and staff working on the FCC representation were

3

prohibited from obtaining access to documents, communications, or other non-public information relating to the Centerbridge representation.   Golden Decl. ¶ 9.

The Centerbridge representation involved several matters in which Centerbridge took positions that were adverse to those taken by Oaktree and Angelo Gordon.  Notwithstanding the periodic adversity of their positions, however, movants never withdrew their consent or otherwise objected at any point during Akin Gump's year-long representation of Centerbridge. *Id.* ¶¶ 10–16.

### B.  Movants Consent to Akin Gump's Representation Of Aurelius

Akin Gump represented Centerbridge in these chapter 11 cases until September 17, 2010, when Aurelius acquired most of Centerbridge's senior notes.  At that time, Aurelius was already a substantial holder of senior notes of Tribune and was a represented party in these proceedings. After Aurelius acquired senior note holdings from Centerbridge, Aurelius formally retained Akin Gump as its counsel in financial restructuring and litigation matters before this Court.   Golden Decl. ¶¶ 17–18; Gropper Decl. ¶¶ 3–4.

The very same day that Aurelius acquired Centerbridge's Tribune senior note holdings, Daniel Golden advised the parties of the sale; later that same day, Mr. Golden also advised Angelo Gordon that Akin Gump was likely to be retained by Aurelius to represent it in these cases.    Golden Decl. ¶¶ 19, 21; Ex. 5.   As they had with respect to the Centerbridge representation, both movants consented to the Aurelius representation.  First, Thomas Fuller, Senior Managing Director at Angelo Gordon, informed Mr. Golden on September 20, 2010, that Akin Gump was free to take on the Aurelius representation—even though he believed that the proceedings could become contentious.  Golden Decl. ¶ 22. Second, on October 13, 2010, Mr. Davidson informed Emily Alexander and others at Oaktree that the ethical wall established at the

time of the Centerbridge representation remained in full force. Oaktree Managing Director Ken Liang responded that, in Oaktree's view, Aurelius was apt to be "more litigious than Centerbridge" and would likely attempt to "derail the restructuring." Nevertheless, far from withholding consent for the Aurelius representation, Mr. Liang simply sought and accepted an assurance that Aurelius would not "use the Akin multiple representations to disqualify Akin as our FCC counsel." *Id.* ¶¶ 24–25; Ex. 10. Aurelius has not done so.

Throughout its representation of Aurelius, Akin Gump has continued to maintain the strict ethical wall that it established during the Centerbridge representation. In addition, Aurelius has retained another law firm, Lerman Senter PLLC, to serve as its communications counsel in connection with the Tribune restructuring; consequently, no Akin Gump bankruptcy attorneys have appeared before the FCC or billed any time to movants' FCC matters. Similarly, no Akin Gump communications attorneys have appeared in or billed time in connection with the representation of Aurelius in these chapter 11 proceedings. Golden Decl. ¶¶ 40, 52-54; Gropper Decl. ¶ 8.

### C. Movants' Tactical Use Of This Disqualification Motion

The first inkling of any objection by movants to Akin Gump's representation of Aurelius came only after several important events in the debtors' cases had taken place. First, at an October 4, 2010, status conference and then again at an October 13, 2010, telephonic conference, Mr. Golden indicated that Aurelius would be filing a competing reorganization plan. Golden Decl. ¶¶ 26–28; Exs. 7–8. At the October 13th hearing, Akin Gump also was largely successful on behalf of Aurelius in litigating a dispute over the timing of the submission of the plan and plan-related documents. *Id.* ¶ 8. Next, on October 15, Mr. Golden emailed Bruce Bennett and Andrew Goldman, counsel for movants, to confirm that movants' prior consent to Akin Gump's

representation of Aurelius would permit Akin Gump to seek discovery of Angelo Gordon and Oaktree. Golden Decl. ¶ 29; Ex. 11. Finally, after hearing no response to that email, Akin Gump sent "litigation hold" letters on October 16 to both Oaktree and Angelo Gordon requesting that they preserve certain documents related to the chapter 11 cases. Golden Decl. ¶ 30; Ex. 12.

Several more days elapsed without any comment from movants. Then, on October 19, 2010, Mr. Bennett sent an email to Daniel Golden and others in Akin Gump's New York office claiming that neither Angelo Gordon nor Oaktree had in fact "agreed to waive or not to assert any of the conflicts Akin Gump has in representing adversaries of either of them." Remarkably, Mr. Bennett asserted in the email that "none of the Oaktree representatives I have spoken with has had *any* conversations with you or any other member of your firm concerning any waiver of conflicts or any consent to Akin Gump representing *any position adverse to it* in the Tribune cases." Golden Decl. ¶ 32; Ex. 13 (emphasis added). That claim, of course, directly contradicts the email exchanges outlined above showing that Oaktree representatives expressly acknowledged that Centerbridge and Aurelius were both likely to take positions "adverse" to those taken by Oaktree.

Mr. Golden forwarded Mr. Bennett's email to Angelo Gordon's Thomas Fuller, who subsequently re-confirmed that Angelo Gordon indeed consented to Akin Gump's representation of Aurelius so long as Akin Gump would not serve as Aurelius's FCC counsel. Golden Decl. ¶ 33–34; Ex. 14. Moving the goalposts once again, however, Mr. Bennett followed up with yet another email purporting to deny that movants had ever consented to Akin Gump's representation. That email, sent on October 27, demanded that Akin Gump accept several new terms and conditions as a "precondition" to movants' consent. Specifically, movants insisted that Akin Gump: (1) "advise Oaktree and Angelo Gordon that Aurelius is not and will not be

adverse to either of them in connection with the pending and any future proceedings before the FCC"; (2) refrain from taking "any position or make any statements that are inconsistent with any position and statements made by Akin Gump in connection with its representation of Oaktree and Angelo Gordon"; and (3) promise not to "conduct any discovery against Oaktree or examine any of its employees or agents in court or in depositions, . . . [or] take any action directly adverse to Oaktree other than actions that are applicable to holders of Senior Loan Claims generally." Golden Decl. ¶ 35; Ex. 15.

Believing that those newly minted conditions were motivated by strategy rather than legitimate concerns about conflicts, Mr. Golden emailed Mr. Bennett a counterproposal on November 3, 2010. That proposal confirmed that the ethical wall would remain in place, agreed that Akin Gump would conduct no discovery against Oaktree, and apprised Mr. Bennett that Aurelius had retained another law firm to conduct all of its work before the FCC. Golden Decl. ¶¶ 36–41; Ex. 16. Although those prophylactic measures should have been more than sufficient to allay any legitimate concerns movants had, movants were not satisfied. Seeking to deny Aurelius the benefit of its chosen counsel, movants filed the present disqualification motion in this Court.

## ARGUMENT

### I.    LEGAL STANDARD

The Model Rules of Professional Conduct of the American Bar Association govern the practice of law before this Court. D. Del. L.R. 83.6(d). Although this Court is authorized to disqualify an attorney for violating the Model Rules, disqualification "is never automatic, and the court has wide discretion in framing its sanctions to be just and fair to all parties involved."

*Boston Scientific Corp. v. Johnson & Johnson Inc.*, 647 F. Supp. 2d 369, 373 (D. Del. 2009) (internal quotations and citation omitted).

"The attempt by an opposing party to disqualify the other side's lawyer must be viewed as a part of the tactics of an adversary proceeding. As such it demands judicial scrutiny to prevent literalism from possibly overcoming substantial justice to the parties." *Brotherhood Ry. Carmen of U.S. & Canada v. Delpro Co.*, 549 F. Supp. 780, 786 (D. Del. 1982) (internal quotations omitted). When facing a disqualification motion, courts therefore "consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). The party seeking disqualification has the burden of "clearly demonstrat[ing] that continued representation would be impermissible." *Talecris Biotherapeutics, Inc. v. Baxter International Inc.*, 491 F. Supp. 2d 510 (D. Del. 2007) (internal quotations omitted).

Model Rule 1.7, the Rule at issue in this case, provides:

(a)  Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
   (1) the representation of one client will be directly adverse to another client; or
   (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b)  Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
   (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
   (2) the representation is not prohibited by law;
   (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

MODEL RULES OF PROF'L CONDUCT R. 1.7.

## II.    THIS COURT SHOULD REJECT MOVANTS' BELATED ATTEMPT TO OBJECT TO A CONFLICT OF INTEREST TO WHICH THEY CONSENTED

Movants complain that Akin Gump's representation of Aurelius gives rise to a concurrent conflict of interest under Rule 1.7.    Although it is not entirely clear that Akin Gump's representation in this case is in fact "directly adverse" to movants (particularly given the unique circumstances of bankruptcy proceedings), we will assume for present purposes that Akin Gump's representation constitutes a "concurrent conflict of interest" within the meaning of Rule 1.7(a). As we show below, however, any such conflict is plainly a *consentable* one under Rule 1.7(b), and movants have provided the requisite informed consent.    And even if this Court were to conclude otherwise, it should deny the motion on the ground that movants have forfeited any entitlement to seek the extraordinary remedy of disqualification.

### A.    Any Conflict Of Interest Implicated By Akin Gump's Representation Of Aurelius Is Consentable Under Rule 1.7(b)(3) Because It Does Not Involve The Assertion Of *A Claim* By One Client *Against* Another *In The Same Tribunal*

Movants assert (Mot. ¶¶ 29–30) that the putative conflict in this matter is not subject to consent. That is simply not so. Rule 1.7(b) allows a client to consent to a concurrent conflict of interest so long as "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal." The plain text of the Rule therefore permits consent unless *both* of two requirements are met:  (1) the clients must be represented by the same attorney *in the same tribunal*; and (2) one client must assert *a claim against* the other client represented by the attorney in that tribunal. Neither requirement is present here.

9

*First*, the conflict alleged in this case does not arise from Akin Gump's concurrent representation of two clients in the same tribunal. Rather, it arises from Akin Gump's representation of movants in one tribunal (the FCC) and its representation of Aurelius in an entirely different tribunal (this Court). Movants admit as much, stating that Akin Gump represents Oaktree and Angelo Gordon directly "before the FCC" and only "indirectly" in this reorganization proceeding. Mot. ¶ 21; see also *id.* ¶ 30 (asserting that Akin Gump "renders services" to movants only *"in connection with"* the Tribune reorganization proceeding) (emphasis added). The deliberate use of that qualified language reflects the fact that Akin Gump represents movants only in proceedings *before the FCC*, and any tangential involvement by those communications lawyers in the bankruptcy proceedings in this Court is strictly limited to "advis[ing]" movants on the FCC ramifications of the various reorganization plans. *Id.* ¶ 20. That advisory role—providing technical expertise and ensuring compliance with FCC regulations—does not constitute representation in the "assertion of a claim" against Aurelius in this Court. [1]

To be sure, Akin Gump's representation of movants in the FCC proceedings is *related* to movants' involvement in the debtors' reorganization—a proceeding in which they are represented by a different set of lawyers altogether. But the mere fact that two proceedings are

---

[1] Indeed, before filing the disqualification motion movants *conceded* that Akin Gump's representation of Oaktree and Angelo Gordon was limited to its activities before the FCC. In his letter seeking to extract further concessions from Akin Gump, Bruce Bennett sought assurances that Akin Gump would not represent Aurelius if Aurelius intended to be "adverse to Oaktree or Angelo Gordon in any part of the Tribune matters *where Akin Gump already represents* Oaktree and Angelo Gordon." The letter went on to expressly define the scope of that current representation as "the pending . . . *proceedings before the FCC*." Ex. 15 (emphasis added). In other words, movants acknowledged that (1) the scope of Akin Gump's representation of Oaktree and Angelo Gordon was limited to its activities *before the FCC*, and (2) any conflict this created by Akin Gump's representation of Aurelius in this Court was nevertheless a *consentable* conflict.

10

related (or even "inextricably intertwined," *id.* ¶ 19) cannot somehow meld two distinct tribunals into one for purposes of Rule 1.7(b)(3).

*Second,* even if Akin Gump's *FCC* work on behalf Oaktree and Angelo Gordon somehow constituted representation of movants in *this Court*, any conflict is still subject to consent under Rule 1.7(b)(3) because no client has in fact brought any "claim . . . against another client" in this case. Model Rule 1.7(b)(3). The determination whether one client has brought a claim against another within the meaning of Rule 1.7(b)(3) "requires an examination of the context of the litigation." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 122 cmt. g(iii) (2000). The context here, of course, is a chapter 11 reorganization, and numerous authorities have recognized that concurrent conflicts of interest are consentable in such proceedings. The Restatement, for example, provides that a single attorney may, with consent, represent "multiple creditors or debtors in a bankruptcy proceeding." *Id.* And the Third Circuit has similarly accepted that a client can consent to concurrent conflicts of interest in the bankruptcy context—even where the clients' interests are directly adverse. See, *e.g.*, *Century Indemnity Co. v. Congoleum Corp.*, 426 F.3d 675, 691 (3d Cir. 2005) (finding the existence of a concurrent conflict of interest and then analyzing whether the purported consent to that conflict was "truly informed" under Rule 1.7(b)).

This line of authority permitting consent to conflicts in bankruptcy cases is readily explained by the fact that chapter 11 reorganizations generally do not "pit creditor against creditor in a direct manner." Michael P. Richman, *Multiple Clients in Bankruptcy Cases: When Do You Need Consent?*, 21 AM. BANKR. INST. J. 14, 14 (March 2002). Even when clear disputes arise between different classes of creditors (or creditors of different priority status), those disputes are not directly adversarial in the "sense of one client *facing off against another*, each

being represented by the same firm." *Id.* (emphasis added).   Unlike the parties in a breach of contract, divorce, or infringement action, creditors in a reorganization proceeding rarely bring any "claim" directly "against" each other within the meaning of Rule 1.7(b)(3).

Indeed, chapter 11 provides a distinct mechanism for bringing such directly adversarial claims: the "adversary proceeding." FED. R. BANKR. P. 7001.  Those proceedings are initiated when one party files a *complaint* against another party, see *id.* at 7003, and therefore involve the assertion of a claim by one party against another.  Thus, for example, if a creditor (through its lawyer) files a complaint seeking to avoid a fraudulent transfer to a lender represented by the same lawyer, see 11 U.S.C. § 548, that representation might pose a nonconsentable conflict under Rule 1.7(b)(3).  Cf. *Kaiser Group Int'l, Inc. v. Nova Hut*, 272 B.R. 846 (Bankr. D. Del. 2002) (discussing purported conflict in adversary proceeding but concluding movant waived any objection by virtue of its tactical delay in seeking disqualification).  But such avoidance actions are conducted separately from the reorganization proceeding itself, which is (by definition) not an adversary proceeding.

This case involves a chapter 11 reorganization, not an adversary proceeding, and Aurelius did not file any complaint (or its equivalent, such as a counterclaim or cross-claim) against movants.  Aurelius and movants have simply proposed different reorganization plans.  Those plans are similar in some respects, dissimilar in others.  Although each creditor presumably prefers its own plan, Rule 1.7(b)(3) does not bar concurrent representation in a matter where one client merely takes a *position* that is different from—or even conflicts with—that of another party in the matter.  Rather, it precludes such representation only where two clients effectively stand on opposite sides of the "v." Accordingly, the mere proposal of a *plan* to this Court—even if dubbed a "competing" one—cannot by any stretch of the imagination be characterized as

"claim by one client against another client." Put simply, Aurelius filed no "claim" at all—much less one "against" movants.[2]

Movants nevertheless ask this Court to adopt a novel—and hopelessly expansive—definition of "claim" that would encompass any filing in any case in which two clients take differing positions on any matter. That interpretation not only does violence to the plain language of Rule 1.7(b)(3), but also ignores the unique characteristics of bankruptcy proceedings. In the bankruptcy context, the relationships among the myriad parties are remarkably fluid, shifting in real time as events unfold; "today's enemy is tomorrow's friend." John D. Ayer, *How to Think About Bankruptcy Ethics*, 60 AM. BANKR. L. J. 355, 386 (1986). Thus, "[u]nlike other forums and battlefields, where the lines of conflict are clearly drawn, in bankruptcy court, interested parties face proceedings with multiple litigants where the parties' interests, positions and relationships may change several times from pre-filing to post-filing and even thereafter." *In re Flanigan's Enterprises, Inc.*, 70 B.R. 248, 250 (Bankr. S.D. Fla. 1987). In light of these unique circumstances—and the dramatic consequences of attorney disqualification—it is particularly important that courts closely adhere to the plain language of Rule 1.7(b)(3), which refers to "claims," not "positions" or "interests."[3]

---

[2] "Decisions involving clients sophisticated in the use of lawyers," moreover, "rarely hold that a conflict is nonconsentable." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 122 cmt. g(iv) (2000). As noted below with respect to informed consent, movants are experienced users of legal services and are well informed of the risks that may attend to dual representation.

[3] Nor is the fact that bankruptcy proceedings often involve multiple creditors seeking payment from a limited pot of money sufficient to create a nonconsentable conflict. See RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 128 cmt. d(i), illus. 1 (lawyer can represent two pedestrians in lawsuit against driver with insufficient funds to compensate both plaintiffs); see also, *e.g.*, *Straubinger v. Schmitt*, 792 A.2d 481 (N.J. App. 2002).

**B.    Movants Consented To Akin Gump's Representation Of Aurelius**

Because the alleged conflict in this case is subject to consent under Rule 1.7(b)(3), the next question is whether movants gave "informed consent, confirmed in writing" to Akin Gump's representation of Aurelius.    Model Rule 1.7(b)(4).    They did.    The "in writing" requirement is not a stringent one: it is satisfied by electronic communications, MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. 20, and "[n]o particular format is required," G. HAZARD & W. HODES, THE LAW OF LAWYERING § 11.22, 11-70 (3d ed. Supp. 2004).    Thus, any reasonably contemporaneous confirmation—by either the lawyer or the client—will suffice to waive a conflict of interest.    See MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. 20; G. HAZARD & W. HODES, supra, at § 11.22, 11-70.    Ignoring an extensive trail of correspondence, movants protest that they never consented to Akin Gump's representation of Aurelius in this proceeding.    That assertion, however, is belied by movants' own submissions in connection with this motion.

As early as the Centerbridge representation, movants recognized, and consented to, Akin Gump's role on behalf of an adverse party in the Chapter 11 proceedings.    With respect to Oaktree, that consent is evidenced by the email exchange between Tom Davidson and Emily Alexander.    On January 28, 2010, Ms. Alexander sent an email to Mr. Davidson expressly acknowledging that Akin Gump represented Centerbridge in the bankruptcy proceedings and that Centerbridge "could have positions opposite" to Oaktree's.    Nevertheless, Ms. Alexander stated that she "just wanted to confirm" that Akin Gump had established an ethical wall between its FCC and bankruptcy attorneys.    Mr. Davidson responded by email "to confirm in writing" that Akin Gump indeed had an ethical wall in place to insulate "those Akin lawyers representing Angelo Gordon and Oaktree" from "any Akin lawyers representing Centerbridge."    Golden Decl. ¶¶ 7–8; Ex. 3.    That correspondence plainly constituted a consent to representation (conditioned

14

on the presence of the ethical wall) followed by an acknowledgment and "confirm[ation] in writing" of that consent. Daniel Golden received Angelo Gordon's consent to the Centerbridge representation in November 2009. Golden Decl. ¶ 6.

Akin Gump continued to represent Centerbridge in the reorganization proceedings—without any objection whatsoever from movants—until Centerbridge sold most of its Tribune senior note holdings to Aurelius nearly seven months later, on September 17, 2010. Both movants then reaffirmed their consent specifically with respect to Akin Gump's representation of Aurelius. First, just a few days after Centerbridge sold its holdings to Aurelius, Daniel Golden contacted Thomas Fuller to confirm that Angelo Gordon consented to Akin Gump's representation of Aurelius (just as it had to Akin Gump's representation of Centerbridge). Mr. Fuller stated that Angelo Gordon consented to that representation, and Mr. Golden reiterated that the ethical wall would remain in place. *Id.* ¶ 22.

Then, on October 19, 2010, Mr. Golden again spoke to Mr. Fuller to reiterate that Akin Gump would not represent Aurelius on any FCC-related matters and that the ethical wall remained in effect. Golden Decl. ¶ 31. Shortly after that phone call, however, Mr. Golden received the first email from Bruce Bennett claiming that movants never actually waived any conflicts associated with Akin Gump's representation of Aurelius. Ex. 13. Blindsided by that email, which contradicted all prior discussions with Angelo Gordon, Mr. Golden asked Mr. Fuller to "confirm whether or not Angelo Gordon has an issue with" Akin Gump's representation of Aurelius. Mr. Fuller responded immediately that he would "get to the bottom of this"—an acknowledgment that Mr. Bennett's letter in fact contradicted the prior consent granted by Mr. Fuller on behalf of Angelo Gordon. Golden Decl. ¶ 33; Ex. 14. Mr. Fuller then called Mr. Golden back and—yet again—confirmed that Angelo Gordon had indeed waived any

15

objection to Akin Gump's representation of Aurelius.  Golden Decl. ¶ 34.  In other words, Angelo Gordon, through its Senior Managing Director, expressly consented to Akin Gump's representation of Auerlius—not once, not twice, but *three* times.  And that consent is confirmed in writing by the October 19, 2010, email from Mr. Fuller to Mr. Golden.

Oaktree separately consented to Akin Gump's representation of Aurelius.    On October 13, 2010, Mr. Davidson emailed Ms. Alexander and others at Oaktree to apprise them of the fact that the Akin Gump attorneys who were previously representing Centerbridge in the reorganization were now representing Aurelius in the same proceedings.  Mr. Davidson therefore "confirm[ed] in writing" that the ethical wall would remain in full force.  Responding the same day, Oaktree Managing Director Ken Liang acknowledged the dual representation and stated that he "just want[ed] to make sure" that Aurelius would not "use the Akin multiple representations to disqualify Akin as our FCC counsel."  Ex. 10.  That email exchange therefore serves as written confirmation of Oaktree's consent to Akin Gump's representation of Aurelius so long as the ethical wall remained in place and Aurelius did not seek to disable Akin Gump from representing movants before the FCC—conditions to which Aurelius readily agreed.[4]

C.    **Movants' Consent Was Fully Informed**

"Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client."  MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt.

---

[4] After Mr. Liang's consent, Mr. Davidson wrote back to confirm that those conditions were acceptable to Aurelius, and, out of an abundance of caution, sought a more formal declaration of consent in light of that confirmation. Ex. 10. Movants did not respond until after Akin Gump made clear that Aurelius would be filing a competing plan and won a scheduling dispute relating to the plan at the October 13th hearing, Golden Decl. ¶ 28, and after Akin Gump sent a litigation hold letter to movants on October 16, 2010, Ex. 12. Only then did movants—for the first time—suggest that they had never consented to Akin Gump's representation of Aurelius. As discussed below, that change of heart was motivated by strategy, not ethics.

18.  According to movants, their consent was uninformed because they were unaware of "the risks and advantages" of the representation and had no "reasonable opportunity to consider the risks and alternatives and to raise questions and concerns."[5]  *Id.* at cmt. 20.  That argument is entirely meritless.

To begin with, as noted above, movants had already consented to—and were well "informed" by—Akin Gump's representation of Centerbridge prior to its representation of Aurelius.  That representation proceeded in this Court (without objection from movants) for more than a year.  The "reasonable opportunity" requirement simply serves to ensure that an attorney does not strong-arm a client into consenting before the client has had the opportunity to fully consider the issue.  Surely movants could not have needed *more than a year* to mull over the potential consequences of concurrent representation in this case.  That is particularly true given that Akin Gump's year-long representation of Centerbridge provided an object lesson in the potential consequences of dual representation; because Aurelius holds the same interest in Tribune as that held by Centerbridge, any "risks and advantages" that attended to Akin Gump's representation of Centerbridge would apply with equivalent force to its representation of Aurelius.

Indeed, movants clearly *did* understand the risks and advantages of dual representation, and they conveyed that understanding to Akin Gump attorneys.  Thus, in her January 28, 2010, email, Emily Alexander acknowledged that Centerbridge "could have positions opposite to ours," and Ken Liang later surmised that "Aurelius will be much more litigious than

---

[5] Movants attribute these factors to the Third Circuit's decision in *In re Congoleum Corp.*, 426 F.3d 675 (2005).  Mot. ¶ 32.  That decision, however, does not contain the language quoted by movants.  Rather, the quoted language comes from comment 20 to Rule 1.7.  The comment refers to "risks and advantages," not "risks and disadvantages."

Centerbridge" and that Aurelius would likely attempt "to *derail* the restructuring"—potential "risks," to say the least. Ex. 10 (emphasis added). Nevertheless, movants accepted these risks of dual representation so long as Akin Gump kept the ethical wall in place (and so long as Aurelius didn't seek to disqualify their FCC counsel). That is *precisely* the type of informed consultation contemplated by the Rules: a frank discussion and acknowledgment of the potential risks of continued representation coupled with mutually agreeable efforts to minimize those risks.

Where a client is a sophisticated user of legal services, moreover, its consent is even more likely to have been adequately informed. See *Elonex I.P. Holdings, Ltd v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 584–85 (D. Del. 2001) ("[T]he undisputed facts in the record show that Apple, a sophisticated multi-national corporation, . . . cannot credibly claim that it was unaware that its interests were adverse" to the other client's); MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. 22 ("[I]f the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, . . . consent is more likely to be effective."); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 122 cmt. g(iv) (1998) (distinguishing between sophisticated and unsophisticated clients). It is difficult to imagine parties more experienced in the use of lawyers than movants: Angelo Gordon and Oaktree are sophisticated multinational business entities that collectively manage more than $100 billion in assets, see http://www.oaktreecapital.com/about/default.aspx; http://www.angelogordon.com/; each company is advised in these extremely complex proceedings by in-house counsel, as well as outside lawyers other than Akin Gump; and Akin Gump's representation of Centerbridge provided movants with first-hand experience in the potential pitfalls of concurrent representation. Movants can hardly describe themselves as

18

unsophisticated clients "incapable of adequately appreciating the risks of the conflict." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 122 cmt. g(iv).[6]

In any event, the question whether consent was informed with the meaning of Rule 1.7(b)(4) is a highly factual one. Accordingly, if this Court is unpersuaded by the declarations submitted by the parties, then resolving the informed consent question will likely entail depositions and other discovery of movants and their counsel. There is simply no reason to embark on that path, and every good reason not to. Such a trial within a trial would be burdensome to this Court, costly and potentially embarrassing to the parties (including to movants), and entirely peripheral to the real subject matter of these chapter 11 proceedings. See *Elonex*, 142 F. Supp. 2d at 584 (noting that depriving a client of its counsel through disqualification would be "more likely to *decrease* the integrity of and public confidence in these proceedings"). This Court should therefore reject outright movants' argument that their consent to Akin Gump's representation of Aurelius was uninformed.[7]

### D.   Movants Have Forfeited Their Right To Object To Any Conflict By Virtue Of Their Tactical Delay In Lodging An Objection

Even if this Court concludes that movants failed to provide the requisite informed consent, it should nevertheless deny the motion on the ground that movants have forfeited any

---

[6] The authorities cited by movants in support of their informed consent argument are inapposite. *In re Congoleum Corp.*, 426 F.3d at 690–91, involved a purported consent to all future conflicts, and that waiver came not from the clients, but their lawyer, who was unauthorized to consent on their behalf and never even *informed* his clients of the potential conflict. *In re Meridian Aotomotive Systems-Composite Operations, Inc.*, 340 B.R. 740, 748 (Bankr. D. Del. 2006), merely noted that termination of the attorney-client relationship does not constitute consent to an adverse representation under Rules 1.7 and 1.9. And *Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957, 963 (D. Del. 1992), was based on *former* Rule 1.7, which had no "informed consent" requirement, and the case was decided on the ground that the client was not even "consulted" regarding the adverse representation in question.

[7] Movants do not dispute that Akin Gump "reasonably believes that [it] will be able to provide competent and diligent representation to each affected client," or that "the representation is not prohibited by law." Model Rule 1.7(b)(1), (b)(2). Akin Gump's belief that it can vigorously represent Aurelius in this Court without in any way hampering its zealous representation of movants before the FCC is a reasonable one.

right to seek disqualification. "Waiver is a valid basis for denial of a motion to disqualify." *Conley v. Chaffinch*, 431 F. Supp. 2d 494, 498 (D. Del. 2006). To determine whether a party has waived its right to disqualify its opposing party's counsel, courts consider a variety of equitable factors, including "the length of the delay in bringing a motion to disqualify, when the movant learned of the conflict, whether the movant was represented by counsel during the delay, why the delay occurred, and whether disqualification would result in prejudice to the nonmoving party." *Id.* at 499 (internal quotations omitted); see *Madukwe v. Delaware State University*, 552 F. Supp. 2d 452, 463 (D. Del. 2008) (same). Importantly, when considering those factors courts pay particular attention to whether the motion was delayed for tactical reasons. *Liberate Technologies LLC v. Worldgate Communications, Inc.*, 133 F. Supp. 2d 357, 359 n.2 (D. Del. 2001); see *Raymond Professional Group, Inc., v. William A. Pope Co.*, 400 B.R. 624, 638 (Bankr. N.D. Ill. 2009) ("In an effort to discourage tactical gamesmanship, courts have determined that motions to disqualify should be made with reasonable promptness after a party discovers the facts which [led] to the motion.") (internal quotations omitted). Because movants were long aware of a potential conflict of interest in this case yet failed to object until they saw which way the wind was blowing, the timing of their disqualification motion indicates that tactics, not ethics, were movants' primary concern.

Movants attempt to explain their delay in filing this motion by claiming that they were caught by surprise by Akin Gump's representation of Aurelius. To that end, movants assert that "Akin Gump recently purported to undertake a *brand new* representation of Aurelius" and that they were unaware of even the possibility that Aurelius could take positions adverse to their own. Mot. ¶ 4 (emphasis added), ¶ 33. That's wrong on both counts. First, Akin Gump's representation in this case cannot fairly be characterized as "brand new." Akin Gump

represented Centerbridge in this proceeding beginning in August 2009. When Centerbridge sold most of its Tribune senior note holdings to Aurelius, Aurelius requested that Akin Gump continue with that representation. Movants can hardly claim to have been taken by surprise by the fact that Akin Gump agreed to serve the exact same role in these proceedings on behalf of Aurelius as it did for Centerbridge. See *Elonex*, 142 F. Supp. 2d at 584 ("[T]he record in this case does not describe the simple situation in which a trusting client has been betrayed by its attorney who unexpectedly filed suit against it on behalf of another.").

Second, movants' assertion that they had no warning that Aurelius might take a position adverse to their own is demonstrably false. For one thing, the Centerbridge representation gave movants plenty of notice of what adversity looked like. As early as January 28, 2010, Emily Alexander acknowledged that Centerbridge "could have positions opposite to ours" and yet consented to Akin Gump's representation of Centerbridge. Ex. 3. And indeed, over the course of that year-long representation, Centerbridge did, in fact, take several positions that were adverse to movants. Thus, for example, the Joinder filed by Centerbridge more than a year ago raised serious questions about the 2007 leveraged buy-out—questions that Centerbridge asserted warranted discovery of LBO lenders (including movants). Golden Decl. ¶ 11. Subsequently, movants themselves filed a motion seeking discovery from Centerbridge regarding the transactions that culminated in the LBO. *Id.* ¶ 12. Notwithstanding those disputes, movants made no objection whatsoever—none—to Akin Gump's continued representation of Centerbridge.[8]

---

[8] Indeed, by virtue of consenting to the Centerbridge representation notwithstanding the fact that Centerbridge "could have positions opposite to ours," movants essentially consented to the representation of any client with Centerbridge's same interests. See MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. 22 ("[I]f the client agrees to consent to a particular *type* of conflict with which the client is already familiar,

Nor did movants initially have any problem with Akin Gump's representation of Aurelius. Although movants suggest that they were unaware of that representation until October 16, 2010, Mot. ¶ 17, Daniel Golden informed Angelo Gordon on September 17, 2010 (the day that Aurelius purchased Centerbridge's Tribune holdings) that it would likely be retained by Aurelius in these proceedings, Golden Decl. ¶ 21. At a mediation session on September 26 and 27, moreover, Akin Gump appeared on behalf of Aurelius—as did both movants. *Id.* ¶ 20. And as the email exchanges discussed above demonstrate, movants accepted the Aurelius representation, even though they were aware that Aurelius was likely to be even *more* adversarial than Centerbridge. See *Id.* ¶ 22 (Fuller conversation); Ex. 10 (Liang email).

The question, then, is what changed between September 17, 2010, and October 19, 2010, when Mr. Bennett denied that movants had waived any purported conflict of interest. The answer is that events in these reorganization proceedings—and not any concern over any newly arising conflict of interest—led them to file this motion. Thus, for example, on October 4, 2010, Daniel Golden stated at a status conference that Aurelius intended to file a competing reorganization plan. Golden Decl. ¶¶ 26–27. At a follow-up telephonic conference on October 13, 2010, Mr. Golden again indicated that Aurelius would file its own plan. At that telephonic conference, this Court also resolved several scheduling disputes in Aurelius's favor. *Id.* ¶ 28. Then, two days later, Mr. Golden sent an email to movants' counsel reiterating that movants had agreed not to assert any conflict and seeking to confirm that movants' waiver extended to "serv[ing] discovery on Oaktree and Angelo." *Id.* ¶ 29; Ex. 11. Receiving no response, Akin

---

then the consent ordinarily will be effective with regard to that type of conflict.") (emphasis added). Even if the Centerbridge consent does not qualify as such a prospective consent, it certainly demonstrates that movants' claim to have been sandbagged by Aurelius is disingenuous.

Gump emailed litigation hold letters to movants on October 16, 2010.   Golden Decl. ¶ 30; Ex. 12.

Only after all this—in a conversation and follow-up email on October 18 and 19, respectively—did movants raise any objection to Akin Gump's representation of Aurelius.  Even then, however, movants chose not to file a motion to disqualify.  Instead, Bruce Bennett emailed Daniel Golden on October 27, 2010, seeking to force Akin Gump to accept limitations on its representation of Aurelius in return for a renewed waiver.  In addition, Mr. Bennett demanded that "Akin Gump advise Oaktree and Angelo Gordon that Aurelius is not and will not be adverse to either of them in connection with the pending and any future proceedings before the FCC." Ex. 15.  In other words, movants attempted to hamstring not only Akin Gump's representation of Aurelius, but also the ability of Aurelius's *separate FCC counsel* to advocate zealously on its client's behalf.  In an effort to resolve the matter, Akin Gump accepted several of movants' proposed conditions, but it declined to accept some of the more onerous ones.  Golden Decl. ¶¶ 36–40; Ex. 16.  It was only then that movants filed the disqualification motion.

Movants justify the motion as necessary to safeguard client confidences and promote the purposes of Rule 1.7.  As discussed below, the presence of the ethical wall that has remained intact for the duration of this representation is sufficient to protect those legitimate interests.  The larger point here, however, is that movants saw no threat to client confidences as a result of Akin Gump's year-long representation of Centerbridge or its initial representation of Aurelius.  Rather, they balked only after things stopped going their way.  Put another way, movants' real objection is not to any alleged conflict of interest, but rather to the fact that Akin Gump's lawyers were simply doing their job.

23

Forcing Aurelius to retain new bankruptcy counsel at this late hour, however, would clearly "result in prejudice to the nonmoving party." *Conley*, 431 F. Supp. 2d at 499 (internal quotations omitted). As discussed in further detail below, Akin Gump has been working on this case for nearly sixteen months. During that time, it has attained significant experience with and knowledge of the complex factual and legal issues at hand. In particular, because Akin Gump conceived of and drafted the reorganization plan supported by Aurelius, it is uniquely positioned to promote and defend it. Indeed, Akin Gump has conducted significant work on that plan in the time since movants filed their disqualification motion.

In sum, movants were on notice of a conflict when Akin Gump commenced its representation of Centerbridge in September 2009. A month passed between the time that at least one of the movants learned that Akin Gump would represent Aurelius and the time that movants first informed Akin Gump they had any objections to that representation. Almost another month passed before movants actually filed this motion to disqualify. And then movants set their hearing on this motion for yet another month after that.[9] That leisurely pace does not evidence a party truly concerned about client confidences or conflicting loyalties, but rather one seeking a tactical advantage as a disputed reorganization proceeding heats up. As movants doubtless appreciate (and likely intend), disqualification would clearly prejudice Aurelius, which would lose the benefit of the wellspring of knowledge that Akin Gump has developed through the course of its involvement in these cases for nearly sixteen months and especially over the intense plan activity of the last three months.[10] Considering these factors "under the totality of

---

[9] Although movants could have sought expedited consideration of their motion, they chose not to.

[10] To date, Akin Gump bankruptcy lawyers have devoted more than 5,800 hours to the Aurelius representation since movants were first informed of Akin Gump's representation of Aurelius. Golden Decl. ¶ 43. Given the current pace of activities in these chapter 11 proceedings, this number will be

circumstances present in this case," *id.*, compels the conclusion that movants have forfeited their right to seek the extraordinary remedy of disqualification.

## III.  THE DRASTIC REMEDY OF DISQUALIFICATION IS UNJUSTIFIED BECAUSE LESS PREJUDICAL ALTERNATIVES ARE READILY AVAILABLE

If this Court does not agree that movants have consented to or forfeited their right to object to the alleged conflict, it should still deny the motion because there are less drastic—and entirely sufficient—alternatives to disqualification.   "[M]otions to disqualify are generally disfavored." *Boston Scientific Corp v. Johnson and Johnson Inc.*, 647 F. Supp. 2d 369, 373 (D. Del. 2009).   That is because disqualification denies a client the right to "retain the counsel of his choice" and restricts the ability of attorneys to practice "without excessive restrictions." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980).   Indeed, the Supreme Court has expressed concern over the "tactical use of disqualification motions to harass opposing counsel," *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985), and the Third Circuit—like virtually every other court—has echoed that same note of caution, see *In re Congoleum Corp.*, 426 F.3d at 686.

Accordingly, "disqualification never is automatic." *Miller*, 624 F.2d at 1201.   Rather, whether disqualification is warranted depends on the facts of the case, and a court has "wide discretion in framing its sanctions to be just and fair to all parties involved." *Id.* (internal quotations omitted).   The Third Circuit has articulated a balancing test to guide courts in the exercise of that discretion.   On the one hand, courts should "consider the ends that the disciplinary rule is designed to serve" and whether "disqualification is an appropriate means of enforcing the applicable disciplinary rule." *Id.*   On the other hand, courts must consider

considerably higher by the time of the actual hearing on this motion. *Id.* ¶ 51.

"countervailing" factors such as the client's interest in retaining its own counsel and the prejudice that it would suffer as a result of disqualification. *Id.*; see *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 162 (3d Cir. 1984); *Jack Eckerd Corp. v. Dart Group Corp.*, 621 F. Supp. 725, 733 (D. Del. 1985) (discussing Third Circuit's balancing test).

Both sides of the equation weigh heavily against disqualification in this case: disqualification is unnecessary to advance the purposes of Rule 1.7; it would, however, severely prejudice Aurelius. Moreover, Akin Gump has already agreed to adopt several prophylactic measures that would alleviate any (legitimate) concerns regarding a potential conflict of interest. Specifically, the firm has agreed to forgo conducting discovery against movants, to keep the ethical wall firmly in place, and to play no role in representing Aurelius in the FCC proceedings. Ex. 16. Unlike disqualification, those less drastic remedies will adequately protect the interests of both parties—without unduly prejudicing either.

## A.    Disqualification Will Not Serve The Purposes Of Rule 1.7

As noted, a court should impose the extreme remedy of disqualification only if it determines that doing so is necessary to effectuate the purpose of the applicable ethical rule. *Miller*, 624 F.2d at 1201. Rule 1.7, the applicable rule here, serves the twin purposes of ensuring undivided loyalty and protecting client confidences. See MODEL RULES OF PROF'L CONDUCT R. 1.7 cmt. 1; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 cmt. b; *In re Congoleum Corp.*, 426 F.3d at 675; *SWS Financial Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392, 1400 (N.D. Ill. 1992). In determining whether disqualification is necessary to safeguard those duties, courts look to several factors: (1) the relatedness of the representations; (2) whether work on the matter "is being done out of different offices in different cities"; and (3) whether the law firm has "maintained an ethical wall" between the representations. *Elonex I.P. Holdings,*

*Ltd v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 584 (D. Del. 2001); see *Boston Scientific*, 647 F. Supp. 2d at 374.[11]    An examination of those factors compels the conclusion that disqualification is unnecessary to effectuate the purposes of Rule 1.7 and is therefore an excessive remedy under Third Circuit law.

First, although it is true that Akin Gump's representations here involve a related matter, those representations occur in two *entirely different tribunals*: the FCC and this Court.  Second, it is undisputed that substantially all work connected to the Tribune matter is "being done out of different offices in different cities." *Elonex*, 142 F. Supp. 2d at 584.  Specifically, the FCC work on behalf of movants is performed from Akin Gump's Washington, D.C. office, whereas Aurelius's bankruptcy work is conducted out of Akin Gump's New York office. Golden Decl. ¶ 4.  Thus, not only are the two representations non-overlapping—communications law on the one hand and bankruptcy law on the other—but they are quite literally separated by hundreds of miles.

Third, Akin Gump has in fact "maintained an ethical wall" between its FCC work for movants and its bankruptcy work on behalf of Aurelius. *Elonex*, 142 F. Supp. 2d at 584; see Golden Decl. ¶ 23, 52–53.  Taken together, these factors demonstrate that Akin Gump's continued representation in this case will not "materially interfere with its independent professional judgment" or undermine client confidences. *Id.*  Accordingly, movants have failed to meet their burden of demonstrating that disqualification is necessary to effectuate the ends that Rule 1.7 was designed to serve. See *Miller*, 624 F.2d at 1201.

---

[11] Movants ignore the second and third factors—whether the work was done in different offices and whether the firm erected an ethical wall—and focus solely on the relatedness of the matters.  Mot. ¶¶ 36–38.

Movants seek to avoid that conclusion by leveling a particularly disturbing charge—that Akin Gump attorneys on opposite sides of the ethical wall shared client confidences. In support, movants point to a January 19, 2010, email exchange discussing the possibility that Akin Gump attorneys might review movants' FCC strategy from a bankruptcy law perspective. Based on that correspondence, movants leap to the conclusion—which they emboss with underlining, italics, and bold font—that "in fact, Akin Gump bankruptcy attorneys were consulted on the impact of FCC issues on the Angelo Gordon and Oaktree positions in this bankruptcy proceeding." Mot. ¶ 14. Accordingly, movants surmise that "bankruptcy lawyers at Akin certainly had access to the FCC advice being provided to Oaktree and Angelo Gordon." *Id.*

That assertion is utterly baseless. Indeed, movants excise a crucial part of the email exchange that directly refutes their accusation. On January 19, 2010, Phil Marchesiello emailed Angelo Gordon Managing Director Gavin Baiera and Oaktree Vice President Edgar Lee, suggesting that "someone at Akin take a closer look at the defensibility of our suggested [FCC] approach from a bankruptcy law perspective." Mr. Baiera responded, "I think it makes sense to have Akin be prepared" to defend that approach. Ex. 1. That's where the email chain cited by movants stops, and those two emails—alone—form the basis of movants' accusation that Akin Gump attorneys must have breached the ethical wall. What movants omit from their exhibit, *see* Baiera Decl. Ex. A, is that later that same morning Mr. Lee sent an email referring Akin Gump's communications lawyers to two bankruptcy lawyers at Hennigan, Bennett & Dorman, LLP, movants' special counsel for reorganization. The email instructs Phil Marchesiello and Tom Davidson to reach out to *those* lawyers (Bruce Bennett and Jim Johnston) "to discuss [the] bankruptcy matters as they relate to FCC approval." Ex. 1. In other words, movants' *own* counsel, not Akin, provided the bankruptcy advice to movants on the FCC matter.

There's more.  One week after the email exchange selectively quoted by movants, Tom Davidson emailed Emily Alexander and stated that he and Edgar Lee had "agreed that Oaktree and Angelo Gordon should use another firm for the bankruptcy analysis in an abundance of caution to avoid any actual or appearance of a conflict."  He went on to explain, "[t]hat is the approach that has been followed.  *There has been no discussion of the matter with any Akin bankruptcy lawyer.*  Instead, Jim Johnson [with Hennigan, Bennett & Dorman, LLP] is handling the bankruptcy work on this matter."  Ex. 2 (emphasis added).  Akin Gump has reviewed its billing records and has determined, based on those records, that no attorneys involved in the Centerbridge or Aurelius representations provided advice to movants at any time.  Golden Decl. ¶ 54.  Movants' suggestion to the contrary, which is based on an inexplicable distortion of the record, is simply false.

Along similar lines, movants assert that Akin Gump, pursuant to the FCC representation, has received "confidential information, including sensitive information regarding the Tribune holdings of Oaktree and Angelo Gordon and the structure and ownership of their funds."  Mot. ¶ 3.  It is unclear what sensitive information—if any—movants are referring to, since they level this charge without any citation or apparent evidentiary support.  But to the extent that movants imply that Akin Gump attorneys involved in the Centerbridge or Aurelius representations received any such information, that implication is, again, false.  The only such information regarding movants' Tribune holdings is what has been publicly disclosed in the Bankruptcy Rule 2019(a) statements filed by Hennigan, Bennett & Dorman, LLP, which represents movants and other lenders in connection with this reorganization proceeding.  Golden Decl. ¶ 53.

Asserting a breach of ethics is a serious charge.  That is, in part, why courts have cautioned that "[v]ague and unsupported allegations are not sufficient" to satisfy the burden of

the party seeking the extraordinary remedy of disqualification. *Elonex*, 142 F. Supp. 2d at 581 (alteration in original) (internal quotations omitted).  All movants advance here, however, are "[v]ague and unsupported allegations" that Akin Gump has betrayed its clients' confidences.  We categorically deny these unsupported—and unsupportable—charges.

**B.    Disqualification Would Severely Prejudice Aurelius**

As the above discussion makes clear, disqualification is unwarranted in this case even without taking into account the prejudice that Aurelius would suffer.  That conclusion is all the more irrefutable after considering "countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Miller*, 624 F.2d at 1201.

"The sanction of disqualification foists substantial costs upon innocent third parties.  The innocent client . . . may suffer delay, inconvenience and expense and will be deprived of its choice of counsel." *Salomon Bros.*, 790 F. Supp. at 1400.  The risk of such prejudice is particularly acute in cases involving "complex, specialized issues that require experienced, knowledgeable counsel."  *Wyeth v. Abbott Laboratories*, 692 F. Supp. 2d 453, 458 (D.N.J. 2010); see also *Salomon Bros.*, 790 F. Supp. at 1400 (noting that in the event of a disqualification "the new attorney may find it difficult to master fully the subtle legal and factual nuances of a complex case (like this one), actually impairing the adversarial process"); RICHARD E. FLAMM, LAWYER DISQUALIFICATION: CONFLICTS OF INTEREST AND OTHER BASES § 24.4, 485–85 (2003) ("The nonmoving client suffer[s] a particularly onerous hardship in a situation where the case is complex . . . , where counsel is highly skilled in the relevant area of the law[,] or where counsel has obtained specialized knowledge of the nonmoving party's operations, or the factual and legal issues in the case.").  This is precisely such a case.

Bankruptcy proceedings are by definition highly technical.    Indeed, in creating a specialized corps of full-time judges to adjudicate bankruptcy matters, Congress expressly recognized the complex nature of such proceedings.    This case is no exception to that general rule.    The present disqualification motion is entry number *6,433* on the case docket.    The underlying legal and factual issues are extraordinarily complex.    And the case has seen its fair share of the twists and turns that characterize complex bankruptcy proceedings.

Having commenced its representation of Centerbridge nearly sixteen months ago, Akin Gump attorneys have become deeply immersed in this proceeding's complex history.    All told, Akin Gump bankruptcy lawyers devoted in excess of 2,700 hours to the Centerbridge matter alone, in the process acquiring crucial knowledge and insights regarding the Tribune reorganization.    Golden Decl. ¶ 16.    Since it began representing Aurelius in September, Akin Gump has crafted Aurelius's entire restructuring and litigation strategy, participated in numerous hearings and status conferences before this Court, and developed the reorganization plan supported by Aurelius and others.    Gropper Decl. ¶¶ 10–13.    Akin Gump filed that plan on October 29, 2010, and has made substantial efforts to promote the plan on behalf of Aurelius.    To that end, Akin Gump has filed: (1) Aurelius's responsive statement detailing the four competing plans; (2) Aurelius's objections to the disclosure statement relating to the other plans, (3) Aurelius's oppositions to the Debtor's proposed voting and solicitation procedures; (4) Aurelius's competing case management order; and (5) Aurelius's amended disclosure and responsive statements.    Golden Decl. ¶¶ 44–51.    If this Court grants the disqualification motion at this late stage of the game, Akin Gump's vast knowledge of this case would be extraordinarily difficult—and costly—to replicate.

Movants nevertheless suggest that "Aurelius will incur no prejudice from the disqualification" because it only "just retained Akin Gump." Mot. ¶ 39. That assertion misunderstands the nature of Akin Gump's representation in this case. Because Centerbridge sold most of its Tribune holdings to Aurelius, Aurelius stands in much the same position as did Centerbridge. Thus, while Akin Gump has represented Aurelius since September 2010, it has represented Aurelius's predecessor in interest since August 2009. Indeed, that is precisely why Aurelius retained Akin Gump to represent it in this proceeding: Akin Gump is uniquely qualified to serve Aurelius's interests because it spent the prior year effectively advocating *on behalf of those very interests*. As described above, moreover, Akin Gump has undertaken substantial efforts developing and prosecuting the Aurelius-backed restructuring plan. Indeed, from September 2010 to the present, Akin Gump bankruptcy lawyers have devoted more than 5,800 hours to the Aurelius representation. Golden Decl. ¶ 43. And Akin Gump's work on behalf of Aurelius has not slowed down during the pendency of this disqualification motion. The firm is currently gearing up within an expedited timeframe for the confirmation hearing currently scheduled for the week of March 7, 2011, and is presently preparing to serve debtors and other parties with document requests and interrogatories in connection with that hearing. *Id.* ¶ 51. Movants' attempt to minimize Akin Gump's efforts on behalf of Aurelius and its familiarity with the legal and factual issues in this complex case is therefore highly disingenuous.

To be sure, Aurelius *could* attempt to "retain replacement counsel." Mot. ¶ 39. But the question isn't whether Aurelius can find *some* counsel. Rather, the question is whether Aurelius will be prejudiced by being denied the opportunity "to retain the counsel of [its] choice." *Miller*, 624 F.2d at 1201. Perhaps the prejudice to Aurelius would be lessened if this reorganization were in its incipient stages. But these proceedings are in full swing, and no last-minute crash

course will enable replacement counsel to attain Akin Gump's level of understanding of the history, facts, legal issues, and strategy of the case. That is particularly true given that any replacement counsel would need to be prepared for the confirmation hearing currently scheduled for the week of March 7, 2011.[12] Movants, in contrast, will suffer no prejudice whatsoever by permitting Akin Gump to continue to represent Aurelius in this matter because, as described below, less extreme remedies will adequately protect movants' interests in loyalty and confidentiality.

### C.   Less Drastic Measures Will Alleviate Any Conflict Without Prejudicing Either Party

Movants assume that disqualification is the "only" remedy for the alleged conflict of interest. Mot. 1. That suggestion—that a concurrent conflict of interest "all but mandates disqualification"—is directly "contrary to Third Circuit precedent." *Boston Scientific Corp.*, 647 F. Supp. 2d at 374 n.7.[13] Instead, the court must determine whether disqualification would be "fair to all parties involved." *Miller*, 624 F.2d at 1201 (internal quotations omitted). Courts are especially reluctant to disqualify an attorney where "less drastic measures would suffice to alleviate the ethical problem." RICHARD E. FLAMM, LAWYER DISQUALIFICATION: CONFLICTS OF INTEREST AND OTHER BASES § 25.5 at 497 (2003) (emphasis added); see *Wyeth*, 692 F. Supp. 2d at 457 (noting that the "modern approach" is "for courts, when faced with a conflict problem, to carefully examine the totality of the circumstances, taking a balanced approach that includes

---

[12] Aurelius intends to file a motion to move the confirmation hearing to April 11, 2011. Regardless of whether the confirmation hearing is in April or March, the schedule is extremely tight for a case of this scope and Aurelius would suffer extreme prejudice if it had to retain and bring up to speed new counsel.

[13] Courts in the Third Circuit are less likely than other courts to disqualify an attorney for violating Rule 1.7. See *Boston Scientific Corp.*, 647 F. Supp. 2d at 374 n.7 (Although "case law from other jurisdictions suggest[] that a violation of Model Rule 1.7 should result in disqualification, . . . [i]n the Third Circuit, and under this court's precedent, whether disqualification is appropriate depends on the facts of the case and is never automatic").

evaluating the impact, nature, and degree of a conflict"); see also *Elonex*, 142 F. Supp. at 583 ("[D]isqualification is a severe sanction.").

Here, there clearly are less drastic measures that would serve the ends of Rule 1.7 while avoiding injustice to the parties—namely the procedures that the parties *themselves* proposed while attempting to negotiate a resolution to the purported conflict of interest in this case. In his October 27, 2010, email, Bruce Bennett set forth numerous conditions on Akin Gump's continued representation of Aurelius. Although several of those conditions would unduly hamper Akin Gump's ability "to practice without excessive restrictions," *Miller*, 624 F.2d at 1201, Akin Gump nevertheless sought to resolve the matter as equitably as possible. To that end, on November 3, 2010, Daniel Golden responded to Mr. Bennett with a proposed resolution that accepted several of Mr. Bennett's conditions. Specifically, Mr. Golden stated that: (1) Aurelius had retained another law firm, Lerman Senter PLLC, to serve as its communications counsel in connection with the Tribune restructuring and thus assured Mr. Bennett that Akin Gump would play no role in the FCC on behalf of Aurelius; (2) Aurelius would agree "not to utilize Akin Gump to conduct any discovery against [movants] or examine any of [their] employees or agents in court or in depositions"; and (3) Akin Gump would "continue to maintain the ethical barrier already established separating" the attorneys working on the FCC representation of movants from those working on the bankruptcy representation of Aurelius. Ex. 16.

Needless to say, movants rejected those sensible proposals, opting instead to move for disqualification.[14] But the prophylactic measures outlined by Mr. Golden are sufficient to allay

---

[14] Movants assert that "Akin Gump has indicated that Aurelius is preparing to directly attack (nominally through other counsel) Oaktree's and Angelo Gordon's interests in the Tribune proceedings now pending

any legitimate concerns posed by Akin Gump's representation in this case: the ethical wall ensures that no client confidences could be unintentionally shared; the use of another law firm as FCC counsel further minimizes that risk and guarantees that Akin Gump would not represent different parties in the same tribunal; and Aurelius's promise not to use Akin Gump attorneys to conduct discovery against movants is a significant concession aimed at avoiding even the appearance of direct adversity in this Court. It bears repeating that each of these measures was proposed or previously accepted by movants themselves, and each has been strictly adhered to by Akin Gump.

In sum, if any remedy is required at all, it is the remedy that the parties themselves should have been able to reach without this Court's intervention: maintaining an ethical wall and limiting Akin Gump's discovery against movants. Unlike mandatory disqualification, these reasonable prophylactic measures would allow Aurelius to continue to use its chosen counsel, which has an unparalleled familiarity with these proceedings and is uniquely qualified to advocate on Aurelius's behalf. And it would do so without prejudicing movants in any way, since Akin Gump's continued compliance with these restrictions would ensure fidelity to the duties of loyalty and confidentiality promoted by Rule 1.7. The proposed remedy would also spare the parties—and this Court—the cost and distraction of additional discovery into such fact-intensive issues such as whether movants' consent was fully informed. In contrast to these reasonable measures, the "blunt device" of disqualification would serve only to reward movants'

---

before the FCC." Mot. ¶ 4. They predicate that assertion on Mr. Golden's statement that Aurelius's FCC counsel, Lerman Senter, would represent Aurelius "without limitation." Ex. 16. That phrase was a direct response to Bruce Bennett's proposed limitations on the positions Aurelius could take before the FCC, Ex. 13, and was intended to reflect only the fact that Akin Gump would take no part in representing Aurelius before the FCC. At no time did Akin Gump even hint, much less threaten, that it was poised to "directly attack" movants' FCC positions. Golden Decl. ¶ 41.

tactical effort to harass its opponent and further delay these proceedings.[15] *Salomon Bros.*, 790 F. Supp. at 1400.

## CONCLUSION

For the reasons stated above, this Court should deny the disqualification motion because movants consented to or waived their right to object to any conflict of interest implicated by Akin Gump's representation of Aurelius in these cases. In the alternative, this Court should deny the motion in light of the availability of less drastic measures that would alleviate movants' concerns without prejudicing either party.

---

[15] This Court, of course, has an interest in maintaining the standards of the legal profession. We do not suggest otherwise. "However, a court must exercise extreme caution not to act under the misguided belief that disqualification raises the standard of legal ethics and the public's respect; the opposite effect is just as likely—encouragement of vexatious tactics, which increase public cynicism about the administration of justice." *Wyeth*, 692 F. Supp. 2d at 458–59 (internal quotations omitted); see also *Elonex*, 142 F. Supp. 2d at 584.

Respectfully submitted,

/s/ William P. Bowden
_____

William P. Bowden (#2553)
Amanda M. Winfree (#4615)
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

Lawrence S. Robbins (admitted *pro hac vice*)
Michael L. Waldman (pending *pro hac vice*)
Daniel N. Lerman (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER
& SAUBER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
(202) 775-4500
lrobbins@robbinsrussell.com

*Counsel for Akin Gump Strauss*
*Hauer & Feld LLP*

Dated:  December 3, 2010

37