## Exhibit 1

**December 5, 2010 Specific Disclosure Statement**
**(Without Appendices and Exhibits)**

> THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE DEBTOR/COMMITTEE/LENDER PLAN. THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. SOLICITATION OF ACCEPTANCE OR REJECTION OF THE DEBTOR/COMMITTEE/LENDER PLAN MAY OCCUR ONLY AFTER THE BANKRUPTCY COURT APPROVES THE JOINT DISCLOSURE STATEMENT.

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**SPECIFIC DISCLOSURE STATEMENT RELATING TO FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A.**

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street; Chicago, IL 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410; Wilmington, DE 19801
Telecopier: (302) 652-3117

*Counsel For Debtors and Debtors In Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel For the Official Committee of Unsecured Creditors*

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telecopier: (213) 694-1234

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391; Wilmington, Delaware 19899
Telecopier: (302) 571-1253

*Counsel For Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE &
DORR LLP
Andrew Goldman
399 Park Avenue; New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
450 Lexington Avenue; New York, New York 10017
Telecopier: (212) 701 5800

RICHARDS LAYTON & FINGER
Mark Collins
One Rodney Square
920 North King Street; Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel For JPMorgan Chase Bank, N.A.*

**DATED: December [●], 2010**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the following page.

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## EXHIBITS TO THE DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT

Exhibit A – First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P. and JPMorgan Chase Bank, N.A.

Exhibit B – Second Mediation Term Sheet

Exhibit C – Intercompany Claims Analysis

TABLE OF CONTENTS

I.      INTRODUCTION..........................................................................................................1
        A.      Parties Entitled to Vote on the Debtor/Committee/Lender Plan. ..........................3
        B.      Voting Procedures, Ballots, and Voting Deadline. ..............................................3
II.     OVERVIEW OF THE DEBTOR/COMMITTEE/LENDER PLAN.................................3
        A.      General Overview. ........................................................................................3
        B.      Plan Treatment. ............................................................................................6
        C.      Estimated Recoveries in Respect of Allowed Claims. .......................................10
                1.      Summary of Estimated Unclassified Claims Against all Debtors and of Estimated
                        Recoveries in Respect Thereof........................................................12
                2.      Summary of Estimated Allowed Claims and Interests against Tribune and the
                        Filed Subsidiary Debtors and of Estimated Recoveries in Respect Thereof........12
                3.      Summary of Estimated Allowed Claims Against and Interests for Each Guarantor
                        Non-Debtor, if any, that becomes a Debtor and of Estimated Recoveries in
                        Respect Thereof. ..........................................................................17
        D.      Settlement Of Claims Related To The Leveraged ESOP Transactions. ...........19
                1.      The Terms of the Settlement. ...........................................................19
                2.      The Reasonableness of the Settlement. ..............................................20
        E.      The Trusts.................................................................................................25
        F.      Certain Other Key Plan Provisions..................................................................27
                1.      Assumption of Executory Contracts and Leases...................................27
                2.      Pursuit of Preference Actions..........................................................29
                3.      Restructuring Transactions.............................................................30
                4.      Compensation and Benefit Programs.................................................31
                5.      Intercompany Claims Settlement. ....................................................31
                6.      Retiree Claims Settlement...............................................................32
                7.      Pre-Effective Date Settlement of Estate Claims. .................................33
                8.      Certain Indemnity and Guaranty Obligations Related to the Chicago Cubs
                        Transactions. ..............................................................................33
                9.      Senior Lender Holdback. ................................................................34
                10.     Injunctions, Releases and Discharge..................................................34
        G.      Issuance and Distribution of New Securities and Related FCC Matters............37
                1.      Issuance of New Securities..............................................................38
                2.      Distribution of New Common Stock and New Warrants........................39
                3.      FCC Matters................................................................................39
III.    DESCRIPTION OF DEBT AND NEW CAPITAL STRUCTURE OF THE DEBTORS............45
        A.      New Senior Secured Term Loan Agreement. .....................................................45
        B.      Description of Exit Facility.............................................................................46
        C.      Description of Capital Stock. ..........................................................................46
IV.     BEST INTERESTS TEST AND LIQUIDATION ANALYSIS .....................................47
V.      RISK FACTORS........................................................................................................48
        A.      General Bankruptcy Law Considerations and Risks Related to the
                Debtor/Committee/Lender Plan. ......................................................................48
                1.      Objections to the Classification of Claims May Change the Composition of the
                        Classes and the Vote Required of Each Class for the Approval of the
                        Debtor/Committee/Lender Plan. ......................................................48
                2.      Failure to Obtain Confirmation of the Debtor/Committee/Lender Plan May
                        Result in Liquidation or an Alternative Plan on Less Favorable Terms. ............49
                3.      Undue Delay in Confirmation of the Debtor/Committee/Lender Plan May
                        Disrupt the Debtors' Operations. .....................................................50

4. If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms. ...................................................50

B. FCC-Related Considerations and Risks Respecting the Debtors' Businesses. ..................50
1. The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy. ...................................................................................................50
2. Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Debtor/Committee/Lender Plan. .52

C. Risks Related to the Debtors' Businesses. ...........................................................54
1. Historical Financial Information Will Not Be Comparable. ...............................54
2. The Debtors Could Be Faced with Additional Tax Liabilities. ...........................54
3. The Reorganized Debtors May Continue to Have Substantial Indebtedness.......55

D. Risks to Creditors Who Will Receive Securities. ................................................55
1. The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants. ...........................56
2. Lack of Dividends May Adversely Affect Liquidity of the New Common Stock.56
3. Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock. ...............................................................................56
4. The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value. .................................................57
5. Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities. ........................................................................................................57

E. Risks Related to Interests in the Litigation Trust and the Creditors' Trust. ....................58

VI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN. ........................................................................58
A. Federal Income Tax Consequences to the Debtors. ................................................59
1. Termination of Subchapter S Corporation Status. ...........................................59
2. Cancellation of Debt and Reduction of Tax Attributes. ....................................59

B. Federal Income Tax Treatment of the Creditors' Trust and Litigation Trust (collectively, the "Trusts") and the Receipt and Ownership of Beneficial Interests in the Trusts..........60

C. Federal Income Tax Treatment of the CT Reserve(s) and the LT Reserve(s) (collectively, the "Trust Reserve(s)"). .....................................................................................61

D. Federal Income Tax Consequences to Holders of Claims and Interests. ...........................61
1. General. ...........................................................................................................62
2. Market Discount. .............................................................................................62
3. Amounts Attributable to Disallowance of Disputed Claims. ..............................63
4. U.S. Holders of Senior Loan Claims and Senior Guaranty Claims (not including the guaranty of the Swap Claim). ......................................................................63
5. U.S. Holders of Bridge Loan Claims. ..............................................................64
6. U.S. Holders of Senior Noteholder Claims. .....................................................65
7. U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan). 65
8. U.S. Holders of General Unsecured Claims against the Filed Subsidiary Debtors (not including Claims against the Filed Subsidiary Debtors arising from a Non-Qualified Former Employee Benefit Plan). ..........................................................65
9. U.S. Holders of Convenience Claims. ..............................................................65
10. U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan. ...............................................................................................................65
11. U.S. Holders of EGI-TRB LLC and PHONES Notes Claims. ..............................66
12. U.S. Holders of Securities Litigation Claims ...................................................66

|     |     | 13. | U.S. Holders of Tribune Interests. | 66 |
|     |     | 14. | Definition of "Security." | 66 |
|     |     | 15. | Federal Income Tax Treatment of the New Senior Secured Term Loan. | 66 |
|     |     | 16. | Federal Income Tax Treatment of New Warrants. | 67 |
|     |     | 17. | Non-United States Persons. | 68 |
|     |     | 18. | Information Reporting and Backup Withholding. | 68 |
|     | E. | Federal Income Tax Treatment of Other Parent Claims Reserve and Subsidiary GUC Reserve (collectively, "Reserves"). | | 68 |
|     | F. | Federal Income Tax Treatment of the Step Two/Disgorgement Settlement. | | 69 |
|     | G. | Importance of Obtaining Professional Tax Assistance. | | 69 |
|     | H. | Reservation of Rights. | | 69 |
| VII. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE DEBTOR/COMMITTEE/LENDER PLAN. | | | 69 |
|     | A. | Continuation of the Chapter 11 Cases. | | 69 |
|     | B. | Approval of a Competing Plan. | | 70 |
|     | C. | Liquidation under Chapter 7 or Chapter 11 | | 70 |
| VIII. | CONCLUSION AND RECOMMENDATION | | | 70 |

## I.    INTRODUCTION

On October 22, 2010, (i) the Debtors; (ii) the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code (the "Creditors' Committee"); (iii) certain investment funds and accounts managed by Oaktree Capital Management, L.P. and/or its affiliates ("Oaktree") and Angelo, Gordon & Co., L.P. and/or certain of its affiliates ("Angelo Gordon"), each in its capacity as Holders of Senior Loan Claims, or as a general partner or manager of an entity that is a Holder of Senior Loan Claims; and (iv) JPMorgan Chase Bank, N.A. and certain of its affiliates ("JPMorgan"), as the Senior Loan Agent and as a Holder of Senior Loan Claims (collectively, the "Debtor/Committee/Lender Plan Proponents") filed the Joint Plan of Reorganization for Tribune and Its Subsidiaries (as the same may be amended from time to time, the "Debtor/Committee/Lender Plan") with the Bankruptcy Court.  A copy of the Debtor/Committee/Lender Plan is attached to this Specific Disclosure Statement (the "Debtor/Committee/Lender Disclosure Statement") as Exhibit A.[2]  The Debtor/Committee/Lender Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Debtor/Committee/Lender Plan also constitutes a Prepackaged Plan for any Guarantor Non-Debtors for which the commencement of a chapter 11 case becomes necessary or appropriate to conclude the restructuring provided under the Debtor/Committee/Lender Plan.  The Guarantor Non-Debtors are (i) Tribune (FN) Cable Ventures, Inc.; (ii) Tribune Interactive, Inc.; (iii) Tribune ND, Inc.; and (iv) Tribune National Marketing Company.

The Debtor/Committee/Lender Plan Proponents submit this Debtor/Committee/Lender Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against each of the Debtors in connection with (i) the solicitation of acceptances of the Debtor/Committee/Lender Plan and (ii) the hearing to consider confirmation of the Debtor/Committee/Lender Plan.  The purpose of this Debtor/Committee/Lender Disclosure Statement is to describe the Debtor/Committee/Lender Plan and to provide certain information regarding implementation the Debtor/Committee/Lender Plan, as required under section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Debtor/Committee/Lender Plan so that they can make an informed decision in doing so.  Creditors who have the right to vote on the Debtor/Committee/Lender Plan are advised and encouraged to read in their entirety (i) the Debtor/Committee/Lender Plan, (ii) this Debtor/Committee/Lender Disclosure Statement, and (iii) the General Disclosure Statement (which contains, among other things, information concerning the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases.

**THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE DEBTOR/COMMITTEE/LENDER PLAN TO VOTE TO ACCEPT THE DEBTOR/COMMITTEE/LENDER PLAN.**

THIS SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN KEY INFORMATION CONTAINED IN THE DEBTOR/COMMITTEE/LENDER PLAN AND DOES NOT CONTAIN A DISCUSSION OF OR INCORPORATE ALL TERMS OF THE DEBTOR/COMMITTEE/ LENDER PLAN.  STATEMENTS IN THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ENTIRE DEBTOR/COMMITTEE/LENDER PLAN AND EXHIBITS AND SCHEDULES ATTACHED TO THE DEBTOR/COMMITTEE/LENDER PLAN, WHICH CONTROL IN THE EVENT OF ANY

---

[2]  Capitalized terms used but not otherwise defined in this Debtor/Committee/Lender Disclosure Statement shall have the meanings ascribed to such terms in the Debtor/Committee/Lender Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Debtor/Committee/Lender Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

INCONSISTENCY OR INCOMPLETENESS. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE DEBTOR/COMMITTEE/LENDER PLAN DESCRIBED IN THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE DEBTOR/COMMITTEE/LENDER PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE DEBTOR/COMMITTEE/ LENDER PLAN, HOWEVER, IT WILL THEN BIND ALL CLAIM AND INTEREST HOLDERS.

THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS RESERVE THE RIGHT TO MODIFY OR WITHDRAW THE DEBTOR/COMMITTEE/LENDER PLAN IN ITS ENTIRETY OR IN PART, FOR ANY REASON. IN ADDITION, SHOULD THE DEBTOR/COMMITTEE/LENDER PLAN, OR ANY INDIVIDUAL DEBTOR'S PLAN, FAIL TO BE ACCEPTED BY THE REQUISITE NUMBER AND AMOUNT OF CLAIMS AND INTERESTS VOTING, AS REQUIRED TO SATISFY SECTION 1129 OF THE BANKRUPTCY CODE, THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS RESERVE THE RIGHT TO RECLASSIFY CLAIMS OR INTERESTS OR OTHERWISE AMEND, MODIFY OR WITHDRAW THE DEBTOR/COMMITTEE/LENDER PLAN IN ITS ENTIRETY OR IN PART.

THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION. THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT AND THE DEBTOR/COMMITTEE/LENDER PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

A.    **Parties Entitled to Vote on the Debtor/Committee/Lender Plan.**

The following summary chart sets forth the Classes that are entitled to vote on the Debtor/Committee/Lender Plan:

| Class | Description |
| --- | --- |
| 1C | Senior Loan Claims against Tribune |
| 1D | Bridge Loan Claims against Tribune |
| 1E | Senior Noteholder Claims against Tribune |
| 1F | Other Parent Claims against Tribune |
| 1I | EGI-TRB LLC Notes Claims against Tribune |
| 1J | PHONES Notes Claims against Tribune |
| 50C-111C[3] | Senior Guaranty Claims against relevant Guarantor Debtors |
| 2E-111E | General Unsecured Claims against relevant Filed Subsidiary Debtors |

Please refer to Section 3.1 of the Debtor/Committee/Lender Plan for a detailed description of the classification of Claims against and Interests in the Debtors under the Debtor/Committee/Lender Plan. A list of the Debtors and the number corresponding to each Debtor for classification purposes is included as Appendix A to the Debtor/Committee/Lender Plan.

B.    **Voting Procedures, Ballots, and Voting Deadline.**

Detailed instructions for completing the ballot included in the package containing this Debtor/Committee/Lender Disclosure Statement are set forth in Article IX of the General Disclosure Statement.

II.    **OVERVIEW OF THE DEBTOR/COMMITTEE/LENDER PLAN**

The following summary is qualified in its entirety by, and should be read in conjunction with, the discussions and information appearing elsewhere in this Debtor/Committee/Lender Disclosure Statement and the Debtor/Committee/Lender Plan. The Debtor/Committee/Lender Plan Proponents, moreover, reserve the right to modify the Debtor/Committee/Lender Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

A.    **General Overview.**

The Debtor/Committee/Lender Plan has been proposed by several of the most significant constituents in these Chapter 11 Cases—the Debtors, the Creditors' Committee, JPMorgan, in its capacity as Senior Loan Agent and as a Senior Lender, and Oaktree and Angelo Gordon (who are, along with JPMorgan, the largest Holders of Senior Loan Claims). The agreement between the Debtors and the other Debtor/Committee/Lender Plan Proponents that is embodied in the Debtor/Committee/Lender Plan is the result of the Mediation (as described in Article VII.D of the General Disclosure Statement) that was overseen by U.S. Bankruptcy Court Judge Kevin Gross. A summary of the terms of the agreement between the Debtor/Committee/Lender Plan Proponents is set forth in the Second Mediation Term Sheet

---

[3]    As set forth in Section 3.4.3(a) of the Debtor/Committee/Lender Plan, the votes cast in respect of the Debtor/Committee/Lender Plan by Holders of Allowed Senior Guaranty Claims in Classes 50C through 111C will also be counted as votes cast on the Prepackaged Plan of the relevant Guarantor Non-Debtors that may become Debtors.

appended to the Second Mediation Report. A copy of the Second Mediation Term Sheet is attached hereto as Exhibit B.

In summary, the Debtor/Committee/Lender Plan has two primary components. First, the Debtor/Committee/Lender Plan provides for certain settlements of LBO-Related Causes of Action held by the Debtors' Estates against current and former Senior Lenders, the Senior Loan Agent and the Senior Loan Arrangers, participating current and former Bridge Lenders and Bridge Loan Arrangers, and the Step One Selling Stockholders. Significant portions of the distributions to be made to Holders of Senior Noteholder Claims, Other Parent Claims, Convenience Claims and General Unsecured Claims against the Filed Subsidiary Debtors are on account of and in consideration of these settlements. In particular, the aggregate additional distributions to these creditor Classes is approximately $401 million of Cash consideration on account of the settlement of the Estate's LBO-Related Causes of Action against the Senior Lenders and possibly more in the event that Allowed Other Parent Claims and Allowed General Unsecured Claims against Filed Subsidiaries are higher than the Debtors' estimates. In addition, the Debtor/Committee/Lender Plan provides for a Step Two/Disgorgement Settlement against current and former Senior Lenders, Bridge Lenders or Step Two Arrangers who received payments prior to the Petition Date on account of the Incremental Senior Loans or Bridge Loans (the "Step Two Payees") and who elect to participate in the Step Two/Disgorgement Settlement.[4] The Holders of Senior Noteholder Claims shall receive an additional $120 million of Cash consideration on account of the Step Two/Disgorgement Settlement. Procedures by which Step Two Payees can elect to participate in the Step Two/Disgorgement Settlement are set forth in Exhibit 5.15.1(2) to the Debtor/Committee/Lender Plan. Amounts payable under the Step Two/Disgorgement Settlement are allocated among the Step Two Payees pro rata in accordance with the payments received by each such Step Two Payee, giving equal weight to amounts received in respect of the Incremental Senior Loans and Bridge Loans. Accordingly, each Step Two Payee, in order to participate in the Step Two/Disgorgement Settlement, must contribute (i) such party's pro rata share (based on interest and fees received in respect of the Bridge Loans, as no principal payments were made on account of the Bridge Loans) of $56,730,213, and (ii) such party's pro rata share (based on principal, interest and fees received under the Senior Loan Agreement in respect of the Incremental Senior Loans) of $63,269,787. On this basis, of the $120 million total Step Two/Disgorgement Settlement, approximately $102 million is allocable to the Step Two Arrangers, who have agreed to participate in the Step Two/Disgorgement Settlement. If there is insufficient participation in the Step Two/Disgorgement Settlement from the Step Two Payees to yield the remaining approximately $18 million, the Step Two Arrangers have agreed to advance an amount of Cash necessary to fund the shortfall, subject to receiving reimbursement from the proceeds of Litigation Trust recoveries with respect to the claims against the Step Two Payees that do not elect to participate in the Step Two/Disgorgement Settlement, but with no backstop or other fees payable on account of such advances.[5] To afford the Step Two Arrangers repose with respect to the Step Two/Disgorgement Settlement and to induce the Step Two Arrangers to participate in the Step Two/Disgorgement Settlement and to provide the foregoing backstop, Step Two Payees who elect to participate in the Step Two/Disgorgement Settlement, as part of their election to participate, will agree to release claims against the Step Two Arrangers. Because the Step Two Arrangers are providing the foregoing backstop and thus bear the risk of loss if any Step Two Payee does not elect to participate in the Step Two/Disgorgement Settlement, the

---

[4] Approximately $318 million of the approximately $401 million of Cash settlement consideration is being funded by distributions otherwise allocable to the Holders of Senior Loan Claims, and approximately $83 million of the $401 million of Cash settlement consideration is being funded by distributions otherwise allocable to the Holders of Allowed Senior Guaranty Claims.

[5] The agreement of each Step Two Arranger to participate in the Step Two/Disgorgement and to provide the aforementioned backstop is subject to the terms of the Step Two/Disgorgement Settlement Undertaking (which is attached as Exhibit 5.15.1(1) to the Settlement Plan).

Step Two Arrangers may modify the procedures for participation in the Step Two/Disgorgement Settlement at any time.

As a result of these settlements, on the Effective Date, (i) the Holders of Allowed Senior Noteholder Claims will receive their Pro Rata share of $420 million in Cash plus trust interests described below, (ii) the Holders of Allowed Other Parent Claims[6] can choose to receive (a) Cash in an amount equal to 35.18% of their Allowed Claim or (b) Cash in an amount equal to 32.73% of their Allowed Claims plus trust interests described below, and (iii) the Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors will receive payment in full in Cash.[7] As described in greater detail in Article II.D herein, the Debtor/Committee/Lender Plan Proponents believe that the settlements of LBO-Related Causes of Action set forth in the Debtor/Committee/Lender Plan represent good faith, fair, equitable and reasonable compromises that are in the best interests of the Debtors, their respective Estates and all Holders of Claims and Interests in these Chapter 11 Cases.

A second component of the Debtor/Committee/Lender Plan is the preservation of the Estate's remaining LBO-Related Causes of Action for the benefit of Tribune's creditors and the assignment of those causes of action to the Litigation Trust and the Creditors' Trust (collectively, the "Trusts"). The Trusts will provide for an independent Litigation Trustee or Creditors' Trustee to pursue the Preserved Causes of Action except Disclaimed State Law Avoidance Claims for which Holders of such Claims have expressly elected to opt-out of such assignment. The transfer of such causes of action to the Trusts will allow the Debtors to emerge from bankruptcy and continue with their on-going business operations largely uninterrupted by the enormous costs and distraction of litigation surrounding the LBO-Related Causes of Action. Pursuant to the terms of the Debtor/Committee/Lender Plan, Holders of Impaired Allowed Claims against Tribune Company, other than Securities Litigation Claims, will receive beneficial interests in the Trusts and the right to participate in the Trusts' recoveries, subject to applicable contractual subordination provisions except as otherwise noted.

The Senior Lender Proponents believe that absent the Settlement, the Holders of Allowed Senior Loan Claims would have the right to participate in recoveries from the Trusts on a Pro Rata basis with the Holders of Senior Noteholder Claims and Other Parent Claims and would receive the benefits of the contractual subordination provisions applicable to the PHONES Notes Claims and the EGI-TRB LLC Notes Claim. Under the Settlement, however, the beneficial interests granted to Holders of Allowed Senior Noteholder Claims, Allowed PHONES Notes Claims, Allowed EGI-TRB LLC Notes Claims and electing Holders of Allowed Other Parent Claims will provide such Holders with their Pro Rata share (subject to the contractual subordination of the PHONES and EGI-TRB Notes enforced only within such group) of (i) the first $90 million realized from Net Creditors' Trust Proceeds and Net Litigation Trust Proceeds (excluding 90% of the proceeds of claims against the Non-Settling Step Two Payees to the extent necessary to repay any portion of the Step Two/Disgorgement Settlement backstopped by the Step Two Arrangers) (the "Parent GUC Trust Preference") and, thereafter and after repayment of the Trusts' Loan, (ii) sixty-five percent (65%) of both the Net Litigation Trust and Net Creditors' Trust Proceeds until payment in full of all of the foregoing claims.[8] The Holders of Allowed PHONES Notes Claims and

---

[6] Although some Other Parent Claims may not be entitled to the benefit of the contractual subordination of the PHONES Notes Claims and the EGI-TRB LLC Notes Claims, as part of the Settlement, the Senior Lenders allocated sufficient settlement consideration necessary to enable all Allowed Other Parent Claims to receive the same distributions under the Settlement Plan.

[7] Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors are anticipated to receive payment in full in Cash based on the assumption that the aggregate amount of Allowed General Unsecured Claims against Filed Subsidiary Debtors will not exceed $150 million, which is the upper end of the Debtors' current estimate of such claims as set forth in greater detail in the General Disclosure Statement.

[8] Due to the contractual subordination of the PHONES Notes Claims and EGI-TRB LLC Notes Claims, any portion of the Parent GUC Trust Preference or any other recoveries from the Trusts that Holders of such claims

EGI-TRB LLC Notes Claims will participate in the Parent GUC Trust Proceeds subject to enforcement of applicable subordination turnover provisions. As part of the Settlement, the Holders of Allowed Senior Loan Claims and Holders of Bridge Loan Claims, to the extent that they become Allowed, will share in the remaining thirty-five percent (35%) of the Trusts' recoveries. Moreover, the Holders of Senior Loan Claims will not participate in certain trust recoveries to which they may otherwise be entitled on account of the subordination and turnover provisions in the PHONES Notes and EGI-TRB LLC Notes.

## B.    Plan Treatment.

Under the Debtor/Committee/Lender Plan generally, all Allowed Administrative Expense Claims, Allowed DIP Facility Claims, and Allowed Priority Tax Claims against Tribune will be paid in full. All Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Interests in the Filed Subsidiary Debtors will be Reinstated. The Debtor/Committee/Lender Plan provides no recovery to the Holders of Securities Litigation Claims, Tribune Interests, and Bridge Loan Guaranty Claims and further provides that Intercompany Claims shall be resolved pursuant to the Intercompany Claims Settlement.

As more fully described in the Debtor/Committee/Lender Plan and Article II.C.1 hereof, which sets forth the estimated recoveries on account of each Class of Claims against and Interests in the Debtors, the Debtor/Committee/Lender Plan generally provides the following:[9]

- Senior Loan Claims (Class 1C). Senior Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement, other than the Senior Lender Fee/Expense Claims, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date. Each Holder of a Senior Loan Claim shall receive, subject to Section 5.4.2 of the Debtor/Committee/Lender Plan, (i) a Pro Rata share of (a) 1.50% of the Remaining Distributable Cash, (b) 1.50% of the New Senior Secured Term Loan, and (c) 1.50% of the New Common Stock (subject to dilution by the Equity Incentive Plan ((a), (b) and (c) the "Senior Loan Claims Distribution"), (ii) a Pro Rata share of 71.64% of the Remaining Bridge Loan Reserve,[10] (iii) if such Holder has not opted out of making the assignment in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro

---

would otherwise receive shall instead be distributed to (a) the Senior Noteholders and (b) those Holders of Other Parent Claims that elect "Option 2" set forth in Section 3.2.6(c)(ii) of the Settlement Plan and that are entitled to the benefit of the contractual subordination provisions in the PHONES Notes Indenture and the EGI-TRB LLC Notes. Until (i) the Holders of Allowed Senior Noteholder Claims and (ii) the Holders of Other Parent Claims that elect "Option 2" set forth in Section 3.2.6(c)(ii) of the Settlement Plan and that are entitled to the benefit of the contractual subordination provisions in the PHONES Notes Indenture and the EGI-TRB LLC Notes receive payment in full of the Allowed Amount of such Holders' Claims, all distributions that would otherwise be made on account of Allowed EGI-TRB LLC Notes and/or PHONES Notes Claims shall be turned over to such Holders.

[9] Unless otherwise provided in the Debtor/Committee/Lender Plan or the Confirmation Order, the treatment of any Claim or Interest under the Debtor/Committee/Lender Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

[10] The "Remaining Bridge Loan Reserve" is an amount equal to the Bridge Loan Reserve ($77,819,000, or such other amount as may be determined by the Bankruptcy Court) minus an amount equal to the lesser of (a) (i) the amount of the Allowed Bridge Loan Claims divided by $1,619,507,000 times (ii) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve. To the extent the Bridge Loan Claim is Disallowed in whole or in part, the Settlement Plan allocates the Remaining Bridge Loan Reserve to the Holders of Allowed Senior Loan Claims, Allowed Senior Noteholder Claims and Allowed Other Parent Claims. Pursuant to the Settlement, the Senior Lenders have agreed to re-allocate a portion of their share of the Remaining Bridge Loan Reserve in an amount equal to 17.98% of the Remaining Bridge Loan Reserve to the Holders of Allowed Senior Noteholder Claims and Allowed Other Parent Claims in order to provide for such Holders to receive their "natural recovery" as if the Bridge Loan Claims and Step Two Senior Loan Claims had been Disallowed in full.

Rata share, calculated based upon the aggregate amount of Allowed Senior Loan Claims that do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of the Class 1C Creditors' Trust Interests, and (iv) a Pro Rata share of the Class 1C Litigation Trust Interests.[11]

In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

- Senior Guaranty Claims (50C-111C). The Senior Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Senior Guaranty Agreement as of the Petition Date, plus, to the extent allowable under the Bankruptcy Code, all postpetition interest and other amounts due and owing under the Senior Guaranty Agreement from and after the Petition Date. Holders of Allowed Senior Guaranty Claims (including the Swap Claim) shall, subject to Section 5.4.2 of the Debtor/Committee/Lender Plan, collectively receive: (i) 98.50% of the New Senior Secured Term Loan; (ii) 98.50% of the Remaining Distributable Cash; and (iii) 98.50% of the New Common Stock. The distributions payable to the Holder(s) of the Swap Claim shall be paid directly to such Holder by the Disbursing Agent and all other distributions payable to the Holders of the Senior Guaranty Claims shall be paid to the Senior Loan Agent for distribution in accordance with Section 7.3 of the Debtor/Committee/Lender Plan, and prior to distributing such amounts the Senior Loan Agent is only authorized to retain $32,500,000 from the Distributable Cash included in such distribution (such amount, the "Senior Lender Holdback"), to be used by the Senior Loan Agent, or, to the extent unused, distributed, solely in accordance with Section 7.3 of the Debtor/Committee/Lender Plan.

- Bridge Loan Claims (Class 1D). Bridge Loan Claims shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan. Each Holder of an Allowed Bridge Loan Claim shall receive, after a final determination of the allowance of the Bridge Loan Claims, (i) a Pro Rata share of the Bridge Loan Distribution Amount (an amount up to $77,819,000 (or such other amount as may be determined by the Bankruptcy Court)if the Bridge Loan Claims are Allowed in full);[12] (ii) if such Holder has not opted out

---

[11]  Other than as specifically set forth in the Debtor/Committee/Lender Plan, distributions made on account of Senior Loan Claims shall be made by the Disbursing Agent to the Senior Loan Agent for further distribution to the Holders of Senior Loan Claims in accordance with the terms of the Senior Loan Agreement.

[12] The portion, if any, of the $77,819,000 or such other amount as may be determined by the Bankruptcy Court that the Allowed Bridge Loan Claims will receive is based on the ratio of the Allowed Claims to $1,619,507,000 (the total amount if the Bridge Loan Claims were to be Allowed in full). The Debtor/Committee/Lender Plan provides for the establishment of a Bridge Loan Reserve in the amount of Cash equal to $77,819,000 or such other amount as may be determined by the Bankruptcy Court. The Bridge Loan Reserve will be funded out of the Distributable Cash Pool. Although the Debtor/Committee/Lender Plan Proponents believe that $77,819,000 is the appropriate amount of the Bridge Loan Reserve, it is possible that the Bankruptcy Court will conclude that the Bridge Loan Reserve should be a higher (possibly significantly higher) or lower amount. Any increase or decrease in the Bridge Loan Reserve amount will impact (a) the amount of Remaining Distributable Cash provided to Holders of Allowed Senior Guaranty Claims, (b) the amount that ultimately may be distributed to Holders of Allowed Bridge Loan Claims, if any, and (c) the Remaining Bridge Loan Reserve that may be distributed to Holders of Allowed Senior Loan Claims, Allowed Senior Noteholder Claims and Allowed Other Parent Claims in the event any of the Bridge Loan Claims are disallowed.

of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Bridge Loan Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of the Class 1D Creditors' Trust Interests; and (iii) a Pro Rata share of the Class 1D Litigation Trust Interests. To the extent that any Bridge Loan Claims are Allowed, Bridge Loan Claims held by the Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Claims unless otherwise agreed by such Settling Step Two Payees.

- Senior Noteholder Claims (Class 1E). Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77 less any Senior Noteholder Claims held by Morgan Stanley Capital Services, Inc. or its Affiliates and Related Persons, including, without limitation, Morgan Stanley & Co., Inc. ("MSCS"). The Senior Noteholder Claims owned by MSCS shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan.[13] Each Holder of an Allowed Senior Noteholder Claim (Class 1E) shall receive such Holder's Pro Rata share of (i) $300,000,000 in Cash (paid out of the Distributable Cash Pool),[14] (ii) the proceeds of the Step Two/Disgorgement Settlement in the aggregate amount of $120,000,000 in Cash, (iii) 23.51% of the Remaining Bridge Loan Reserve, (iv) the Class 1E Litigation Trust Interests, and (v) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Senior Noteholder Claims that do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, the Class 1E Creditors' Trust Interests.

- Other Parent Claims (Class 1F). Other Parent Claims will be Allowed as follows: (i) the Swap Claim shall be Allowed against Tribune in the amount of $150,948,822, (ii) the Claims of the Retiree Claimants shall be Allowed in accordance with the Retiree Claims Settlement, and (iii) additional Other Parent Claims shall be subject to allowance, disallowance, or offset under the applicable provisions of the Debtor/Committee/Lender Plan. Each Holder of an Allowed Other Parent Claim may elect on such Holder's Ballot to receive either (i) Option 1: (y) an amount of Cash (paid out of the Distributable Cash Pool) equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claims and (z) a Pro Rata share of 4.85% of the Remaining Bridge Loan Reserve; or (ii) Option 2: (w) an amount of Cash (paid out of the Distributable Cash Pool) equal to 32.73% of such Holder's Allowed Other Parent Claim (x) such Holder's Pro Rata share of 4.85% of the Remaining Bridge Loan Reserve, (y) if such Holders has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan and that elect the treatment set forth in Section 3.2.6(c)(ii) of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Other Parent Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of

---

[13] If the Senior Noteholder Claims held by MSCS are disallowed, the consideration that would otherwise be distributed to MSCS on account of its Senior Noteholder Claims shall instead be distributed to the other Holders of Allowed Senior Noteholder Claims.

[14] The Distributable Cash Pool is an amount of Cash equal to (i) if the Average Distributable Cash is more than $25 million greater than the Effective Date Cash, the Effective Date Cash plus $25 million, or (ii) if the Average Distributable Cash is more than $25 million less than the Effective Date Cash, the Effective Date Cash less $25 million, or (iii) if the Average Distributable Cash is within $25 million higher or lower than the Effective Date Cash, the Average Distributable Cash.

the Class 1F Creditors' Trust Interests, and (z) a Pro Rata share of the Class 1F Litigation Trust Interests.[15]

- Convenience Claims (Class 1G). Each Holder of an Allowed Convenience Claim against Tribune shall receive payment in full in Cash on account of such Claim; provided, however, that, subject to Section 7.4 of the Debtor/Committee/Lender Plan, post-petition interest shall not be paid to any Holder on any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.

- EGI-TRB LLC Notes Claims (Class 1I). EGI-TRB LLC Notes Claims shall be subject to challenge by the Litigation Trust pursuant to Section 5.17 of the Debtor/Committee/Lender Plan. Each Holder of an Allowed EGI-TRB LLC Notes Claim, shall receive (i) a Pro Rata share of the Class 1I Litigation Trust Interests and (ii) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed EGI-TRB LLC Notes Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of the Class 1I Creditors' Trust Interests, provided that, with respect to any distribution on account of the Debtor/Committee/Lender Plan shall give effect to the contractual subordination of the EGI-TRB LLC Notes.

- PHONES Notes Claims (Class 1J). Each Holder of an Allowed PHONES Notes Claim, shall receive (i) a Pro Rata share of the Class 1J Litigation Trust Interests and (ii) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed PHONES Notes Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of the Class 1J Creditors' Trust Interests, provided that, with respect to any distribution on account of Allowed Claims 1J Class, the Debtor/Committee/Lender Plan shall give effect to the contractual subordination of the PHONES Notes.

- Subsidiary Debtor General Unsecured Claims (Class 2E-111E). Each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive an amount of Cash (paid out of the Distributable Cash Pool) equal to the lesser of (i) 100% of such Holders' Allowed General Unsecured Claim Against a Filed Subsidiary Debtor or (ii) a Pro Rata share of (x) $150,000,000 plus (y) an amount equal to the aggregate amount of Allowed General Unsecured Claims against a Filed Subsidiary Debtor arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim; provided, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim.

In addition, the Debtor/Committee/Lender Plan constitutes a prepackaged plan for each of the Guarantor Non-Debtors, if any, that commences Chapter 11 Cases to effectuate the restructuring contemplated under the Debtor/Committee/Lender Plan and becomes party to the Debtor/Committee/Lender Plan. With the exception of Senior Guaranty Claims, Bridge Loan Guaranty

---

[15] Section 10.1.1(n) of the Debtor/Committee/Lender Plan provides that, as a condition precedent to the effectiveness of the Debtor/Committee/Lender Plan, the Creditor Proponents shall have determined, in their sole discretion, that the aggregate amount of Allowed Other Parent Claims shall not exceed $400,000,000, excluding (i) Allowed Other Parent Claims against Tribune for indemnification, reimbursement, or contribution arising from or relating to the assertion of any Preserved Cause of Action by the Litigation Trust or the Creditors' Trust; (ii) Allowed Other Parent Claims asserted by the PBGC as a result of termination of any Pension Plan; and (iii) Allowed Other Parent Claims arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim.

Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Senior Guaranty Claims, Bridge Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired and conclusively deemed to have accepted the Prepackaged Debtor/Committee/Lender Plan.

### C.    Estimated Recoveries in Respect of Allowed Claims.

In order to determine the treatment of creditors of Tribune, the Subsidiary Debtors and the Guarantor Non-Debtors, the Debtors' management, its advisors, and the Debtor/Committee/Lender Plan Proponents reviewed the relationship between the value of each legal entity and third-party claims and Intercompany Claims at each such legal entity. For purposes of this analysis, this relationship was modeled to calculate the value available for distribution to each legal entity's creditors and stockholders taking into account the flow of value between legal entities consistent with the Intercompany Claims Settlement. Certain key assumptions utilized in making those calculations are summarized below.

## KEY FACTORS AND ASSUMPTIONS

- <u>Guarantor Debtors</u>. Claims against the Guarantor Debtors include DIP Facility Claims, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Senior Guaranty Claims, Bridge Loan Guaranty Claims, General Unsecured Claims, Intercompany Claims, and Securities Litigation Claims. The Bridge Loan Guaranty Claims are contractually subordinated to the Senior Guaranty Claims and the Plan gives effect to such contractual subordination. These claims are otherwise *pari passu* in priority of payment against the Subsidiary Debtors.

- <u>Tribune</u>. Claims against Tribune include DIP Facility Claims, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, Convenience Claims, EGI-TRB LLC Notes Claims, PHONES Notes Claims, Intercompany Claims, and Securities Litigation Claims. The PHONES Notes Claims and the EGI-TRB LLC Notes Claims are subordinated to the Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Non-Qualified Former Employee Benefit Claims against Tribune, and most other General Unsecured Claims. The Plan gives effect to the foregoing subordination provisions.

- <u>Intercompany Claims</u>. The Debtors and their advisors reviewed the Intercompany Claims as reflected in their books and records at the Petition Date in order to determine an appropriate estimate of Allowed Intercompany Claims. The Intercompany Claims are comprised of hundreds of thousands of individual transactions over the history of the Debtors. The review of these claims included a focus on (i) the most significant portion of these amounts which arose in the seven years preceding the Petition Date and (ii) amounts related to large, "one time" transactions.[16] In addition, due to the prepetition debt structure which creates distinctions between Guarantor Debtors (and Guarantor Non-Debtors), Non-Guarantor Debtors, and Tribune, the review also focused on claims amongst these groups. The review resulted in the identification of certain categories of transactions, which were then assessed on both the legal and financial merits in terms of the transaction(s) likely creating Allowed Intercompany Claims. Based on this review and an assessment of the strength of potential legal arguments, the Debtors made estimates of likely Allowed Intercompany Claims. As discussed in Article II.D herein, the Debtor/Committee/Lender Plan implements the Intercompany Claims Settlement based upon the aforementioned analysis and related determinations by the Debtors.

- <u>Subordinated Claims</u>. The Other Parent Claims generally include the Swap Claim, Claims against Tribune arising under Non-Qualified Former Employee Benefit Plans, and a limited number of contract and other claims.[17] The Debtor/Committee/Lender Plan Proponents believe that the vast majority, if not all, of the

---

[16] This review included the analysis of a prepetition transfer made by Tribune of approximately $368.8 million in cash to a new investment account. Specifically, immediately prior to the Petition Date, Tribune transferred approximately $368.8 million in cash from its concentration and investment accounts at JPMorgan Chase Bank, N.A. and Bank of America, N.A. to new investment accounts at Fidelity Investments Institutional Services Company held by (i) Chicago Tribune Company and WGN Continental Broadcasting Company (which became Filed Subsidiary Debtors on December 8, 2008), (ii) Tribune CNLBC (which became a Filed Subsidiary Debtor on October 12, 2009), and (iii) Tribune Interactive, Inc. (which is a Guarantor Non-Debtor). These transfers were done in order to implement certain business objectives, including the preservation of liquidity and the continued availability of funding for subsidiary operations. These intercompany transfers were appropriately accounted for on the books and records of Tribune and its subsidiaries. For purposes of determining entitlements of Holders of Allowed Claims against and Interests in the Debtors, the aforementioned $368.8 million is deemed to have been returned to Tribune.

[17] The Debtor/Committee/Lender Plan Proponents have included the Swap Claim as an Other Parent Claim because, among other things, the Swap Claim might have the benefit of certain statutory defenses to avoidance that other Claims do not have. While the Swap Claim is also included as a Senior Guaranty Claim, (i) Section 3.1.1 of the Debtor/Committee/Lender Plan provides that in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim and (ii) the Holder(s) of the Swap Claim will not receive postpetition interest unless the Guarantor Debtors are determined to be solvent on a collective basis.

Claims in the Other Parent Claims Class are entitled to the benefit of the contractual subordination of the PHONES Notes Claims and EGI-TRB LLC Notes Claims. Although some Other Parent Claims may not be entitled to the benefit of the contractual subordination of the PHONES Notes Claims and the EGI-TRB LLC Notes Claims, as part of the Settlement the Senior Lenders allocated sufficient settlement consideration necessary to enable all Allowed Other Parent Claims to receive the same distributions under the Debtor/Committee/Lender Plan. The Debtor/Committee/Lender Plan does not, however, specify which of the Other Parent Claims are senior or subordinated to the PHONES Notes Claims or EGI-TRB LLC Notes Claims in respect of distributions on Litigation Trust Interests or Creditors Trust Interests. The Debtor/Committee/Lender Plan Proponents believe that this issue is more appropriately left for determination at such time as the Distribution Trust and/or Creditors' Trust make any distributions to the Holders of Allowed Other Parent Claims that elect "Option 2".

The following charts summarize the projected distributions to Holders of Allowed Claims and Interests under the Debtor/Committee/Lender Plan. The projections of estimated recoveries are only an estimate and subject to a number of variables, including the amount of Allowed Claims with any particular Class. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Debtor/Committee/Lender Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Debtor/Committee/Lender Plan depends upon the ability of the Debtor/Committee/Lender Plan Proponents to obtain confirmation of the Debtor/Committee/Lender Plan and meet the conditions to confirmation and effectiveness of the Debtor/Committee/Lender Plan, as discussed in the General Disclosure Statement and this Debtor/Committee/Lender Disclosure Statement. Accordingly, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Debtor/Committee/Lender Disclosure Statement and the Debtor/Committee/Lender Plan for a complete description of the classification and treatment of Allowed Claims against and Interests under the Debtor/Committee/Lender Plan.

     1.     Summary of Estimated Unclassified Claims Against all Debtors and of Estimated Recoveries in Respect Thereof

| Unclassified Claims | | | |
|---|---|---|---|
| **Affected Claims & Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery** |
| **DIP Facility Claims** | $0 | Unimpaired | Estimated Recovery Percentage on Effective Date:  100% Form of Recovery: ▪ Cash. See Section 2.1 of the Debtor/Committee/Lender Plan. |
| **Administrative Expense Claims** | $125 to $175 million | Unimpaired | Estimated Recovery Percentage on Effective Date:  100% Form of Recovery: ▪ Cash. See Section 2.2 of the Debtor/Committee/Lender Plan. |
| **Priority Tax Claims** | $125 to $175 million | Unimpaired | Estimated Recovery Percentage on Effective Date:  100% Form of Recovery: ▪ Cash in full or in installments, together with interest. See Section 2.3 of the Debtor/Committee/Lender Plan. |

     2.     Summary of Estimated Allowed Claims and Interests against Tribune and the Filed Subsidiary Debtors and of Estimated Recoveries in Respect Thereof.

| Claims Against and Interests in Tribune (Debtor 1) | | | |
|---|---|---|---|
| Affected Claims & Description | Estimated Allowed Claims | Treatment | Estimated Recovery |
| Priority Non-Tax Claims (Class 1A) | $0 to $1 million | Unimpaired | Estimated Recovery Percentage on Effective Date: 100%<br>Form of Recovery:<br>• Reinstatement.<br>See Section 3.2.1 of the Debtor/Committee/Lender Plan. |
| Other Secured Claims (Class 1B) | Undetermined | Unimpaired | Estimated Recovery Percentage on Effective Date: 100%<br>Form of Recovery:<br>• Reinstatement.<br>See Section 3.2.2 of the Debtor/Committee/Lender Plan. |
| Senior Loan Claims (Class 1C) | $8.571 billion | Impaired | Estimated Recovery Percentage on Effective Date: 1.09%[18]<br>Form of Recovery on the Effective Date:<br>• The Senior Loan Claims Distribution (i.e. 1.50% of Remaining Distributable Cash, 1.50% of the New Senior Secured Term Loan and 1.50% of the New Common Stock).<br>• Class 1C Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1C Creditors' Trust Interests.<br>Potential Post-Effective Date Recovery:<br>• 71.64% of the Remaining Bridge Loan Reserve.[19]<br>See Section 3.2.3 of the Debtor/Committee/Lender Plan. |
| Bridge Loan Claims (Class 1D) | $0, as of the Effective Date[20] | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Potential Post-Effective Date Recovery:<br>• The Bridge Loan Distribution Amount.[21]<br>• Class 1D Litigation Trust Interests and, if such Holder has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1D Creditors' Trust Interests.<br>See Section 3.2.4 of the Debtor/Committee/Lender Plan. |
| Senior Noteholder Claims (Class 1E) | $1.283 billion | Impaired | Estimated Recovery Percentage on Effective Date:[22] 32.73%<br>Form of Recovery on the Effective Date:<br>• $300 million in Cash paid out of the Distributable Cash Pool and $120 million in Cash paid from the proceeds of the Step Two/Disgorgement Settlement. |

[18] In accordance with the terms of the Senior Loan Agreement, distributions will be made ratably to all Holders of Senior Loan Claims.

[19] The "Remaining Bridge Loan Reserve" is an amount equal to the Bridge Loan Reserve ($77,819,000, or such other amount as may be determined by the Bankruptcy Court) minus an amount equal to the lesser of (a) (i) the amount of the Allowed Bridge Loan Claims divided by $1,619,507,000 times (ii) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve.

[20] Bridge Loan Claims shall be subject to challenge from the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan. To the extent that any Bridge Loan Claims are Allowed, Bridge Loan Claims held by the Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Claims unless otherwise agreed by such Settling Step Two Payees.

[21] The Bridge Loan Distribution Amount is an amount, after the final determination of the allowance of the Bridge Loan Claims, equal to the lesser of (a)(i) the amount of the Allowed Bridge Loan Claim divided by $1,619,507,000 times (ii) the Bridge Loan Reserve; and (b) the $77,819,000 or such other amount as may be determined by the Bankruptcy Court that the Allowed Bridge Loan Claims will receive, if any, is based on the ratio of the Allowed Claims to $1,619,507,000 (the total amount if the Bridge Loan Claims were Allowed in full).

| | | | |
|---|---|---|---|
| | | | ▪ Class 1E Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1E Creditors' Trust Interests.<br>Potential Post-Effective Date Recovery:<br>▪ 23.51% of the Remaining Bridge Loan Reserve.<br>See Section 3.2.5 of the Debtor/Committee/Lender Plan. |
| **Other Parent Claims (Class 1F)** | $260 to $350 million[23] | **Impaired** | Estimated Recovery Percentage on Effective Date:  **35.18%**<br>Form of Recovery on the Effective Date:<br>▪ At the election of each Holder of an Allowed Other Parent Claim:<br>  o Option 1:  Cash (paid out of the Distributable Cash Pool) equal to 35.18% of such Holder's Allowed Other Parent Claim; **or**<br>  o Option 2:  Cash (paid out of the Distributable Cash Pool) equal to 32.73% of such Holder's Allowed Other Parent Claim and Class 1F Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1F Creditors' Trust Interests.<br>Potential Post-Effective Date Recovery:<br>  o For claimants selecting either Option 1 or Option 2:  4.85% of the Remaining Bridge Loan Reserve.<br>See Section 3.2.6 of the Debtor/Committee/Lender Plan. |
| **Convenience Claims (Class 1G)** | $0 to $1 million | **Unimpaired** | Estimated Recovery Percentage on Effective Date:  **100%**<br>Form of Recovery:<br>▪ Cash; provided, however, that post-petition interest shall not be paid.<br>See Section 3.2.7 of the Debtor/Committee/Lender Plan. |
| **EGI-TRB LLC Notes Claims (Class** | $0, as of the Effective Date[24] | **Impaired** | Estimated Recovery Percentage on Effective Date:  **0%**<br>Form of Recovery:<br>▪ Class 1I Litigation Trust Interests and, if such Holder has |

[22] Deutsche Bank Trust Company of Americas ("DBTCA"), the successor indenture trustee for the Debtors' 1992, 1995 and 1997 Indentures, asserts that the Debtors should pay for the fees and expenses of DBTCA based on the following assertions: (i) Tribune is contractually obligated to pay such fees and expenses under each of the Indentures; (ii) the fees and expenses of DBTCA are entitled to be treated as an administrative claim; and (iii) the Debtors are paying the fees and expenses of various major constituencies (including the fees and expenses of the Indenture Trustee under the 1996 Indenture) as identified in Sections 9.1.1 through 9.1.4 of the Plan. DBTCA asserts that if the Debtors do not reimburse DBTCA for its fees and expenses, DBTCA is entitled under each of the applicable Indentures to assert a lien on all property held or collected by it for reimbursement of its fees and expenses. In the event DBTCA asserts such a charging lien, DBTCA has informed the Debtors that it will reimburse itself for fees and expenses prior to making any distributions to the Senior Noteholders. If DBTCA asserts a charging lien, DBTCA contends that the Holders of Senior Noteholder Claims under the 1992, 1995 and 1997 Indentures will receive a distribution that is less than that set forth in the chart above and less than that which will be received by the Holders of Senior Noteholder Claims under the 1996 Indenture. At this time, the Debtors do not take a position on whether DBTCA has the right to assert a charging lien under the applicable Indentures. However, the Debtors do not believe that DBTCA's assertion of a charging lien results in the disparate treatment of Class 1D Claims.

[23] This estimate includes the Swap Claim and the estimated Allowed amount of Claims held by the Retiree Claimants. The Swap Claim shall be Allowed against Tribune in the amount of $150,948,822. The Claims of the Retiree Claimants shall be Allowed in accordance with the Retiree Claims Settlement. Additional Other Parent Claims shall be subject to allowance or disallowance under the applicable provisions of the Debtor/Committee/Lender Plan, including, but not limited to Article VIII of the Debtor/Committee/Lender Plan.

| | | | |
|---|---|---|---|
| 1I) | | | not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1I Creditors' Trust Interests.[25]<br>See Section 3.2.8 of the Debtor/Committee/Lender Plan. |
| **PHONES Notes Claims (Class 1J)** | $760,880,790 to 1.197 billion[26] | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>▪ Class 1J Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1J Creditors' Trust Interests.[27]<br>See Section 3.2.9 of the Debtor/Committee/Lender Plan. |
| **Intercompany Claims (Class 1K)** | N/A | Impaired | Estimated Recovery Percentage on Effective Date: N/A<br>Form of Recovery:<br>▪ The treatment set forth in the Intercompany Claims Settlement.<br>See Section 3.2.10 of the Debtor/Committee/Lender Plan.. |
| **Securities Litigation Claims (Class 1L)** | Undetermined | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>▪ All Securities Litigation Claims against Tribune shall be extinguished.<br>See Section 3.2.12 of the Debtor/Committee/Lender Plan. |
| **Tribune Interests (Class 1M)** | N/A | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>▪ All Tribune Interests in Tribune shall be extinguished.<br>See Section 3.2.13 of the Debtor/Committee/Lender Plan. |
| **Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2-111)** | | | |
| **Priority Non-Tax Claims (Classes 2A-111A)** | $0 to $1 million | Unimpaired | Estimated Recovery Percentage on Effective Date: 100%<br>Form of Recovery:<br>▪ Reinstatement.<br>See Section 3.3.1 of the Debtor/Committee/Lender Plan. |
| **Other Secured Claims (Classes 2B-111B)** | Undetermined | Unimpaired | Estimated Recovery Percentage on Effective Date: 100%<br>Form of Recovery:<br>▪ Reinstatement.<br>See Section 3.3.2 of the Debtor/Committee/Lender Plan. |
| **Senior Guaranty Claims (Classes 50C-111C)** | $8.722 billion[28] | Impaired | Estimated Recovery Percentage on Effective Date: 69.95%[29]<br>Form of Recovery:[30]<br>▪ 98.50% of the New Senior Secured Term Loan;<br>▪ 98.50% of the Remaining Distributable Cash; and<br>▪ 98.50% of the New Common Stock.<br>See Section 3.3.3 of the Debtor/Committee/Lender Plan. |

---

[24] EGI-TRB LLC Notes Claims against Tribune shall be subject to challenge by the Litigation Trust pursuant to Section 5.17 of the Debtor/Committee/Lender Plan.

[25] See footnote 7, *supra*, regarding enforcement of the contractual subordination of the EGI-TRB LLC Notes Claims.

[26] The PHONES Notes Claims shall be Allowed in the amount determined by the Bankruptcy Court. The estimated range set forth herein may vary from the Allowed amount of PHONES Notes Claims determined by the Bankruptcy Court.

[27] See footnote 7, *supra*, regarding enforcement of the contractual subordination of the PHONES Notes Claims.

[28] The estimated Allowed amount of Senior Guaranty Claims set forth herein includes the estimated principal amount plus accrued but unpaid interest as of the Petition Date. The Allowed amount of Senior Guaranty Claims will also include all other amounts due and owing under the Senior Guaranty Agreement as of the Petition Date, plus, to the extent allowable under the Bankruptcy Code, all postpetition interest and other amounts due and

| | | | |
|---|---|---|---|
| **Bridge Loan Guaranty Claims (Class 50D-111D)** | $0, as of the Effective Date[31] | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>  ▪ Distributions that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Holders of Senior Guaranty Claims. Accordingly, Bridge Loan Guaranty Claims shall be extinguished.<br>See Section 3.3.4 of the Debtor/Committee/Lender Plan. |
| **General Unsecured Claims (Classes 2E-111E)** | $85 to 150 million | Impaired | Estimated Recovery Percentage on Effective Date: 100%[32]<br>Form of Recovery:<br>  ▪ Cash (paid out of the Distributable Cash Pool) equal to the lesser of (i) 100% of such Holders Allowed General Unsecured Claim against a Filed Subsidiary Debtor or (ii) a Pro Rata share of (x) $150,000,000 plus (y) an amount equal to the aggregate amount of Allowed General Unsecured Claims against a Filed Subsidiary Debtor arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim; provided, however, that post-petition interest shall not accrue or be paid.<br>See Section 3.3.5 of the Debtor/Committee/Lender Plan. |
| **Intercompany Claims (Class 2K-111K)** | N/A | Impaired | Estimated Recovery Percentage on Effective Date: N/A<br>Form of Recovery:<br>  ▪ The treatment set forth in the Intercompany Claims Settlement.<br>See Section 3.3.6 of the Debtor/Committee/Lender Plan. |
| **Securities Litigation Claims (Classes 2L-111L)** | Undetermined | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>  ▪ All Securities Litigation Claims against Tribune shall be extinguished.<br>See Section 3.3.7 of the Debtor/Committee/Lender Plan. |
| **Interests in the Filed Subsidiary Debtors** | N/A | Unimpaired | Estimated Recovery Percentage on Effective Date: 100%<br>Form of Recovery:<br>  ▪ Reinstatement.<br>See Section 3.3.8 of the Debtor/Committee/Lender Plan. |

owing under the Senior Guaranty Agreement from and after the Petition Date.  Neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.  The Holder(s) of Allowed Senior Guaranty Claims will not receive postpetition interest unless the Guarantor Debtors are determined to be solvent on a collective basis.

[29] The estimated Allowed amount of Senior Guaranty Claims is asserted against each of the Guarantor Subsidiaries. The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by the estimated Allowed amount of Senior Guaranty Claims set forth herein.

[30] In accordance with the terms of the Senior Loan Agreement, distributions will be made ratably to all Holders of Senior Guaranty Claims

[31] Bridge Loan Guaranty Claims may be challenged by an Estate representative on or prior to the Effective Date and subsequently shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan.  To the extent that any Bridge Loan Guaranty Claims are Allowed, Bridge Loan Guaranty Claims held by the Settling Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Guaranty Claims unless otherwise agreed by such Settling Step Two Payees.

[32] The recovery percentage for Holders of Allowed General Unsecured Claims against Filed Subsidiary Debtors assumes that the aggregate amount of Allowed General Unsecured Claims against Filed Subsidiary Debtors does not exceed $150 million, which is the upper end of the Debtors' current estimate of such claims as set forth in greater detail in the General Disclosure Statement.

16

| (Classes 2M-111M) | | | |
|---|---|---|---|

3.      Summary of Estimated Allowed Claims Against and Interests for Each Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated Recoveries in Respect Thereof.

The Debtor/Committee/Lender Plan also constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence cases under chapter 11 of the Bankruptcy Code.  For any Guarantor Non-Debtor that commences a chapter 11 case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth above for the Filed Subsidiary Debtors.

The Guarantor Non-Debtors are Tribune (FN) Cable Ventures, Tribune Interactive, Inc., Tribune N.D. Inc., and Tribune National Marketing Company.  Tribune (FN) Cable Ventures, Inc. is a holding company owned by Tribune Broadcasting Company with a 31.3% interest in the Television Food Network general partnership.  Tribune Interactive, Inc. is owned by Tribune (88.5%) and Chicago Tribune Company (11.5%) and manages the website operations for Tribune's publishing and broadcasting subsidiaries and assists in the management of Tribune's various online classified businesses.  Tribune ND, Inc. is a holding company owned by Tribune with an approximate three percent (3%) interest in Newsday Holdings, LLC, which is the parent company of the entity that owns and operates *Newsday*.  Tribune National Marketing Company is a holding company owned by Tribune with a 30.8% interest in Career Builder (the United States' largest online job web site) and a 13.9% interest in Classified Ventures (which operates automotive and real estate classified advertising websites).  See further discussion in Article II.B.3 of the General Disclosure Statement, titled "Additional Investments."

Additional financial reporting information for the Guarantor Non-Debtors may be found in the Periodic Reports of Debtors Pursuant to Bankruptcy Rule 2015.3 filed with the Bankruptcy Court on July 29, 2009, January 29, 2010, and July 29, 2010.  Pursuant to Bankruptcy Rule 2015.3, these reports include, among other things, balance sheet, operating statement, and cash flow statement information relating to the Guarantor Non-Debtors.  Copies of these reports may be obtained from the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

As noted above, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated.  In addition, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the Prepackaged Plan.

The treatment of Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims under the Prepackaged Plan is as follows:

| Claims Against Guarantor Non-Debtors, If Any, That Become Debtors |
|---|

| Senior Guaranty Claims | $8.722 billion[33] | Impaired | Estimated Recovery Percentage on Effective Date: 69.95%[34]<br>Form of Recovery:<br>  ▪ The distributions provided under Section 3.3.3 of the Debtor/Committee/Lender Plan and the guaranties described in Section 5.6 of the Debtor/Committee/Lender Plan.[35]<br>See Section 3.4.3(a) of the Debtor/Committee/Lender Plan. |
| Bridge Loan Guaranty Claims | $0, as of the Effective Date[36] | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>  ▪ Distributions that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Holders of Senior Guaranty Claims. Accordingly Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished.<br>See Section 3.4.3(b) of the Debtor/Committee/Lender Plan. |
| Intercompany Claims | Undetermined | Impaired | Estimated Recovery Percentage on Effective Date: N/A<br>Form of Recovery:<br>  ▪ The treatment set forth in the Intercompany Claims Settlement.<br>See Section 3.4.4 of the Debtor/Committee/Lender Plan. |
| Securities Litigation Claims | Undetermined | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>  ▪ All Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished.<br>See Section 3.4.5 of the Debtor/Committee/Lender Plan. |

### D.    Settlement Of Claims Related To The Leveraged ESOP Transactions.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Debtor/Committee/Lender Plan, the Debtor/Committee/Lender Plan constitutes a request to authorize and approve a good faith settlement of all LBO-Related Causes of Action other than those specifically preserved by the settlement that was reached as a result of the Mediation (consisting of two mutually conditional settlements, the Litigation

---

[33] The estimated Allowed amount of Senior Guaranty Claims set forth herein includes the estimated principal amount plus accrued but unpaid interest as of the Petition Date. The Allowed amount of Senior Guaranty Claims will also include all other amounts due and owing under the Senior Guaranty Agreement as of the Petition Date, plus, to the extent allowable under the Bankruptcy Code, all postpetition interest and other amounts due and owing under the Senior Guaranty Agreement from and after the Petition Date. Neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim. The Holder(s) of Allowed Senior Guaranty Claims will not receive postpetition interest unless the Guarantor Debtors are determined to be solvent on a collective basis.

[34] The estimated Allowed amount of Senior Guaranty Claims is asserted against each of the Guarantor Subsidiaries. The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by the estimated Allowed amount of Senior Guaranty Claims set forth herein.

[35] In accordance with the terms of the Senior Loan Agreement, distributions will be made ratably to all Holders of Senior Guaranty Claims.

[36] Bridge Loan Guaranty Claims may be challenged by an Estate representative on or prior to the Effective Date and subsequently shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan. To the extent that any Bridge Loan Guaranty Claims are Allowed, Bridge Loan Guaranty Claims held by the Settling Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Guaranty Claims unless otherwise agreed by such Settling Step Two Payees.

18

Settlement and the Step Two/Disgorgement Settlement, as defined below, collectively referred to herein as the "Settlement"). The Settlement was brokered by and with the support of the Mediator.

    1.     The Terms of the Settlement.

Under the Settlement, creditors of the Debtors, other than the Senior Lenders and Bridge Lenders (the "Non-LBO Creditors"), will receive cash recoveries totaling approximately $598 million, plus a share of recoveries obtained by the Creditors' Trust and Litigation Trust from prosecution of the Preserved Causes of Action. Of the $598 million in total cash recoveries, $521 million is being provided as Settlement consideration by the current Senior Lenders, the Step Two Arrangers, and certain current or former Senior Lenders, and Bridge Lenders that received principal, interest or fees in respect of the Bridge Loan Agreement or Incremental Senior Loans prior to the Petition Date and will be distributed under the Debtor/Committee/Lender Plan to the Holders of Senior Noteholder Claims, Other Parent Claims, Convenience Claims, and General Unsecured Claims against the Filed Subsidiary Debtors. In return, the Estate would release all LBO-Related Causes of Action other than certain specific Preserved Causes of Action against such parties in certain capacities, as described below. All Preserved Causes of Action would be transferred primarily to either the Creditors' Trust or the Litigation Trust for pursuit after the Effective Date of the Debtor/Committee/Lender Plan for the benefit of Tribune's creditors.

        a.     Litigation Settlement.

As consideration for the Litigation Settlement, (i) Holders of Senior Loan Claims would relinquish as settlement consideration approximately $401 million in cash to which they would be entitled if their Claims were allowed in full, (ii) the Step Two/Disgorgement Settlement would be consummated as set forth below, and (iii) the proceeds of recoveries obtained by the Creditors' Trust and the Litigation Trust will be disproportionately allocated to creditors other than the Holders of Senior Loan Claims, as set forth below. The incremental $401 million in immediate cash consideration derived from the Litigation Settlement would be distributed to the Holders of Allowed Senior Noteholder Claims, Other Parent Claims, Convenience Claims, and General Unsecured Claims against the Filed Subsidiary Debtors. In connection with the Litigation Settlement, all Senior Loan Claims and Senior Guaranty Claims would be Allowed and all LBO-Related Causes of Action of the Estates against the Senior Lenders and the respective agents and arrangers of the Senior Loans, other than specifically preserved claims, would be released.

        b.     Step Two/Disgorgement Settlement.

As consideration for the Step Two/Disgorgement Settlement, (i) the Step Two Arrangers and current or former Senior Lenders or Bridge Lenders that received principal, interest or fees in respect of the Bridge Loans and the Incremental Senior Loans prior to the Petition Date would together contribute a total of $120 million in cash as additional settlement consideration to be distributed to Holders of Allowed Senior Noteholder Claims, and (ii) the Litigation Settlement would be consummated as set forth above. The cash value of this additional settlement will be available on the Effective Date because amounts allocable to any Senior Lenders or Bridge Lenders that do not elect to participate in the Step Two/Disgorgement Settlement will be advanced by the Step Two Arrangers (i.e., JPMorgan, Merrill Lynch, Bank of America and Citigroup), subject to reimbursement of such advances from the recoveries of the Litigation Trust on the related Preserved Causes of Action. In connection with the Step Two/Disgorgement Settlement, claims (the "Disgorgement Claims") against any participating current or former holder of Senior Loans and/or Bridge Loans for disgorgement of principal, interest and fees paid on account of the Incremental Term Loan B tranche of the Senior Loan Agreement and/or the Bridge Loan Agreements (collectively, the "Step Two Loans") and claims against the Step Two Arrangers and each of their affiliates in their capacity as agents and arrangers of the Step Two Loans will be released.

c.      Releases.

The releases under the Debtor/Committee/Lender Plan are narrowly drawn. In all cases, the releases provided under the Debtor/Committee/Lender Plan do not include claims against the released parties in their capacities (if any) as Step Two Selling Stockholders or Advisors. Furthermore, all claims against Tribune's directors and officers related to the leveraged buy-out of Tribune that occurred in 2007 are preserved for prosecution after the Effective Date for the benefit of Tribune's creditors.

d.      Creditors' Trust and Litigation Trust.

Except for those Claims that are settled and released as described in the preceding two paragraphs, all Preserved Causes of Action[37] will be transferred to either the Creditors' Trust or the Litigation Trust to be prosecuted for the benefit of creditors. The Trusts would be funded with a $20 million loan from Reorganized Tribune, with the Trusts jointly and severally liable for repayment of the loan.

As further settlement consideration, in lieu of distributing all recoveries on the Preserved Causes of Action Pro Rata to all creditors of Tribune, net recoveries on the Preserved Causes of Action (after costs of collection and any reserve for future costs) would be allocated among the creditors of Tribune in the following order of priority:

first: 100% of such net recoveries would be distributed to Holders of Allowed Senior Noteholder Claims, electing Other Parent Claims, EGI-TRB LLC Notes Claims and PHONES Notes Claims against Tribune (the "Non-LBO Parent Creditors") (distributed in accordance with applicable contractual subordination provisions as they apply to the Non-LBO Parent Creditors), until such Holders have received $90 million in the aggregate;

second: 100% of such net recoveries would next be applied to repay in full the Trust loan from Reorganized Tribune described above; and

thereafter: 65% of net recoveries would be distributed to the Non-LBO Parent Creditors, and the remaining 35% would be distributed to the Senior Lenders.

2.      The Reasonableness of the Settlement.

The Debtor/Committee/Lender Plan Proponents believe that the Settlement embodied in the Debtor/Committee/Lender Plan is fair and reasonable and in the best interests of the Estate. It is the product of a Bankruptcy Court-ordered mediation process and was brokered by and with the support of the Bankruptcy Court-appointed Mediator. Further, it has the support of the Debtors, as well as a diverse group of creditors. Any litigation relating to the LBO-Related Causes of Action would seek recoveries from the Senior Lenders and others who participated in the Leveraged ESOP Transactions for the benefit of the Senior Notes and other general unsecured creditors. Any ruling on such LBO-Related Causes of Action, whether for or against the Debtors' Estates, would be adverse to some of the Settling Plan Proponents and favorable to others. It is therefore significant that, after many months of investigations and difficult negotiations, the Debtor/Committee/Lender Plan Proponents have agreed that the Settlement embodied in the Debtor/Committee/Lender Plan is fair and reasonable and in the best interests of the Estate.

---

[37] As of the Effective Date the Debtors will disclaim the state law constructive fraudulent transfer claims against Step Two Selling Stockholders that they otherwise could have pursued under Section 544(b). Such claims will then be transferred to the Creditors' Trust absent an opt-out by the original Holder of such claims.

As is clear from the Examiner's Report, there are a wide range of potential outcomes on the LBO-Related Causes of Action from complete failure with respect to both Step One and Step Two that would result in the Senior Loan Claims being allowed in full to a complete victory that would result in both Steps being found to be fraudulent transfers with respect to both the Tribune parent and the Guarantor Subsidiaries. Indeed, the Examiner's Report analyzed the recoveries to the Non-LBO Creditors with respect to claims against the Lenders in six different scenarios.[38] Only one of the six, the complete victory scenario, results in Non-LBO Creditors recovering more than the $598 million which is awarded to them in total cash consideration under the Debtor/Committee/Lender Plan ($521 million of which is incremental Settlement value and $77 million of which is "natural" or "base case" value, assuming no litigation recoveries). Moreover, the $521 million in Settlement consideration does not take into account the additional value to the Non-LBO Parent Creditors from their disproportionate share of recoveries from the Trusts under the Settlement.[39] In the complete victory scenario, the Non-LBO Creditors are paid in full, recovering some $2.3 billion. In the other five scenarios, the incremental recoveries to Non-LBO Creditors resulting from the LBO-Related Causes of Action range from $0 (complete loss) to approximately $205 million to 244 million[40] (fraudulent transfer for Tribune at both Step One and Step Two but only at Step Two for guarantor subsidiaries).

The Examiner concluded that the more probable scenarios were those that resulted in less than a complete victory and recoveries substantially less than the Settlement. He found that the prospects for a complete victory were less than 50%, characterizing the chances of prevailing on arguments that would lead to such a victory as "somewhat unlikely," "reasonably unlikely" or "highly unlikely." While certain Debtor/Committee/Lender Plan Proponents disagree with some of the Examiner's conclusions, the Debtor/Committee/Lender Plan Proponents nevertheless believe that the Settlement strikes a reasonable balance between scenarios the Examiner found more probable, which would result in recoveries substantially less than the Settlement, and the significantly less likely complete victory scenario that would result in a full recovery. The Debtor/Committee/Lender Plan Proponents also agree that the issues are complex and highly dependent on factual and legal matters as to which the outcome at trial is uncertain, and any litigation over such matters would result in significant delays, costs to the estate and potential harm to the Debtors' businesses.

Taking the Examiner's conclusions with respect to Step One and Step Two as a whole, the Debtor/Committee/Lender Plan Proponents believe that the Settlement is fair and reasonable. With respect to Step One, the Examiner identified three principal scenarios for the outcome of the LBO-Related Causes of Action: (i) complete loss, which results in no recovery; (ii) success at Tribune but not guarantor subsidiaries, which results in approximately $197 million to $235 million in litigation recoveries[41]; and

---

[38] The Examiner includes two additional scenarios, Cases 7 and 8, which are variants on the Examiner's Case 3 (step two fraudulent transfer at Tribune and guarantor subsidiaries). Cases 7 and 8 add disgorgement proceeds from actions against Step Two Selling Stockholders. These claims are included in the Preserved Causes of Action under the Debtor/Committee/Lender Plan.

[39] Under the Debtor/Committee/Lender Plan, the General Unsecured Creditors of the Subsidiary Debtors will receive a 100% cash recovery (without Post-petition interest) on their Allowed Claims.

[40] These litigation recovery amounts are derived from the Examiner's recovery scenarios, taking Case 5 (Step One fraudulent transfer at Tribune and Step Two fraudulent transfer at Tribune and guarantor subsidiaries) less the "natural recoveries" in Case 1 (base case-no litigation recoveries) and using assumed high and low intercompany balances, respectively, from an intercompany claims settlement. As reflected in the Intercompany Claims Settlement, the Debtor/Committee/Lender Plan assumes a settlement of Intercompany Claims at the midpoint in the settlement range, between the high and low intercompany balances.

[41] These litigation recovery amounts are derived from the Examiner's recovery scenarios, taking Case 4 (Tribune only fraudulent transfer recoveries at Step One and Step Two) less the "natural recoveries" in Case 1 (base case – no litigation recoveries) and using assumed high and low intercompany balances, respectively, from an

(iii) complete victory at Tribune and guarantor subsidiaries, which results in full recovery. The Examiner concluded that there was more than a 50% chance of a complete loss on the Step One LBO-Related Causes of Action. In so concluding, he analyzed separately each of the arguments that could lead to a finding of a fraudulent transfer at Step One. For instance, the Examiner found that there was no credible evidence that the Tribune Entities entered into the Step One Transactions in order to hinder, delay or defraud creditors. In addition, with respect to the constructive fraudulent transfer claims arising from the Step One Transactions, the Examiner concluded that it was "highly unlikely" (the Examiner's lowest probability) that the Debtors would be found to have been insolvent at the time of the Step One Transactions if the Step One and Step Two Transactions were not collapsed, and the Examiner concluded that it was somewhat unlikely that those transactions should be collapsed for purposes of determining solvency. If the Step One and Step Two Transactions were collapsed, the Examiner found that it was somewhat unlikely that Tribune would be insolvent, although an extremely close call. As for the guarantor subsidiaries, he concluded that they were more likely than the parent to be found solvent assuming collapse of the Step One and Step Two Transactions.

With respect to Step Two, the Examiner concluded that it was highly likely that a plaintiff would prevail on some LBO-Related Causes of Action and reasonably likely that a plaintiff would prevail as to others. However, the Examiner also concluded that a complete victory in these scenarios would only result in an additional $45 million to $53 million in distributable value resulting from litigation recoveries for Holders of Non-LBO Creditor claims[42] unless Senior Lenders were equitably estopped or otherwise barred from sharing in Step Two disgorgement recoveries (a question the Examiner left in "equipoise"). Even in this latter situation, the Examiner concluded that successful disgorgement would only result in approximately $275 million for Non-LBO Creditors.[43]

Further, Senior Lender recoveries are not likely to be materially affected by the Examiner's conclusions regarding potential avoidability of the Step Two Transactions. This is because the Allowed Senior Loan Claims arising from the Step One Transactions exceed the aggregate value that could be distributed from the Estates, and the holders of Senior Loan Claims would share in recoveries from third parties as a result of such avoidance (which recoveries could include nearly $4 billion of proceeds from the Senior Loans distributed to shareholders in connection with the Step Two Transactions), absent a successful argument that equitable estoppel or some similar argument would bar them from sharing in such recoveries. Additionally, consistent with the terms of the Senior Loan Agreement, because all holders of Senior Loan Claims (i.e. Senior Loan Claims arising in connection with the Step One Transactions and Step Two Transactions) share ratably in the distributions from the Debtors, the Senior Lenders as a whole are not materially impacted by the avoidance of the Step Two obligations.

        a.    The Trusts

---

intercompany claims settlement. As noted, the Debtor/Committee/Lender Plan assumes a settlement of Intercompany Claims at the midpoint in the settlement range, between the high and low intercompany balances.

[42] Litigation recovery amounts derived from Examiner's recovery scenarios, taking Examiner's Case 3 (Step Two fraudulent transfer at Tribune and guarantor subsidiaries ) less the "natural recoveries" in Case 1 (base case—no litigation recoveries) and assumed high and low intercompany balances, respectively, from an intercompany claims settlement.

[43] The Examiner's Case 3 (Step Two fraudulent transfer at Tribune and guarantor subsidiaries) includes $298 million of net disgorgement proceeds. This amount is based on a gross number of $344 million, comprised of pre-petition principal, interest and fee payments to lenders ($318 million) and advisory fee payments ( $25.6 million), from which the Examiner makes deductions for value conferred, collectability risk and costs, resulting in a recovery of $298 million. Removing the advisory fee payments (which are not released under the Debtor/Committee/Lender Plan), and their share of the deductions, results in $275 million in recoveries on the Step Two Disgorgement Claims.

In addition to the $521 million of settlement value described above, the Settlement provides an important additional element of value to Non-LBO Parent Creditors in the form of a preferred share of recoveries from the Trusts. Absent the preferred sharing of Trust recoveries by the Non-LBO Parent Creditors (i.e. if, instead, the Non-LBO Parent creditors shared in Trust recoveries *pari passu* with other Tribune creditors of the same priority) the Non-LBO Parent Creditors would receive less than 20% of Trust recoveries. By contrast, under the Settlement, Non-LBO Parent Creditors will receive the first $90 million in net recoveries from the Trusts and 65% of further net recoveries obtained by the Trusts after repayment of a $20 million loan from the Debtors to fund prosecution of the claims. This additional value further supports the Debtor/Committee/Lender Plan Proponents' view that the Settlement is fair and reasonable.

        b.    Complexity, Expense and Inconvenience of, and Delay From, Litigation.

The Debtor/Committee/Lender Plan takes into account the impact that litigation would be expected to have on the value of the Debtors' Estates. To date, the out-of-pocket cost of these Chapter 11 Cases has been staggering, with the billings for Estate professional fees alone exceeding $135 million through August 2010. Further, the mere fact of being in bankruptcy already has forced the Debtors to forego opportunities that clearly would have enhanced value. Extending the bankruptcy further in order to allow for litigation of the LBO-Related Causes of Action prior to emergence would result in further associated costs and further lost business opportunities.

Moreover, the prosecution of all potential claims relating to the Leveraged ESOP Transactions would only compound these difficulties. Unbounded litigation on all conceivable claims would necessarily expand the scope of such litigation, and with it the costs, complexities, inconvenience and delay attendant thereto. The Debtor/Committee/Lender Plan Proponents submit that the Settlement, embraced by diverse creditor constituencies, embodies a fair and reasonable compromise that will mitigate, to the extent possible, these negative effects.

        c.    Paramount Interest of Creditors.

The Debtor/Committee/Lender Plan Proponents believe the Settlement furthers the paramount interest of all creditors by providing for a reasonable resolution of certain of the LBO-Related Causes of Action and allowing the Debtors to emerge promptly from bankruptcy. At the same time, the Debtor/Committee/Lender Plan preserves for the benefit of the Estates and their creditors valuable claims related to the Leveraged ESOP Transactions, as against the Non-Settling Defendants. In reaching this judgment, the Debtors have considered and balanced all of the factors described above. The Debtors' judgment is shared by a cross-section of the creditor constituencies of the Debtors, including a major component of the Senior Lenders and the Creditors Committee.

In light of each party's view of the litigation uncertainties and the clear and substantial savings in terms of cost and time value of money that will be realized for the estates and ultimately their creditors through a prompt resolution of the issues, the Debtor/Committee/Lender Plan Proponents have concluded that there is an overlap between what the Senior Lenders should be willing to pay and what the Non-LBO Parent creditors should be willing to accept in settlement of the LBO-Related Causes of Action in light of their respective post-investigation views of the merits of the litigation and to minimize cost and delay. The Debtor/Committee/Lender Plan Proponents believe that a fair and reasonable settlement that avoids what could be years of protracted, prohibitively expensive and value destroying litigation will be beneficial to all parties as the best means of preserving and fairly allocating the value of the Estates and thus is the best outcome possible for parties in interest in these cases.

        d.    Releases and Bar Order

The Debtor/Committee/Lender Plan Proponents believe that releases to be provided under the Debtor/Committee/Lender Plan are reasonable and in the best interests of the Estate. The releases are narrowly drawn and do not release any Claims against officers or directors of Tribune, Advisors of Tribune in their capacity as such, or Step Two Selling Stockholders. Although Step One Selling Stockholders receive releases for Step One LBO-Related Causes of Action, the Debtor/Committee/Lender Plan Proponents believe that those releases are in the best interests of the Estate in light of the low likelihood of success of the Claims, as determined by the Examiner, and the litigation and non-litigation costs associated with prosecution of the Claims.

In return for the substantial consideration that would be provided by the Released Parties in connection with the Settlement, the Released Parties desire to obtain full resolution of any claims that might be asserted, with no possibility of being exposed to additional liability on account of claims they have already paid substantial amounts to settle. Such provisions, which are variously known as bar orders or contribution bars, are common in multi-party litigations involving settlements with some parties and not others. The Settlement therefore provides for a bar order forbidding prosecution by a Barred Person against a Released Party of claims sounding in contribution or non-contractual indemnity arising out of or reasonably flowing from the Released Claims or the Preserved Causes of Action. If, after the Effective Date, a claim is brought by the Trusts or another party asserting claims on behalf of the Debtors' estates against a Barred Person and a court determines that the Barred Person would have recovered on a claim for contribution or non-contractual indemnity against a Released Party absent the bar order, the Barred Person would be entitled to a reduction in the judgment against them equal in amount to the Released Party's proportionate share of fault. Absent such a bar order, Released Parties cannot be afforded repose. Barred Persons are not prejudiced since, by virtue of the judgment reduction provision associated with the bar order, any judgment awarded to the Creditors' Trust or Litigation Trust (or any other party asserting a Preserved Cause of Action) would be reduced by the amount of the Released Party's proportionate share of fault.

Creditors are not prejudiced since the bar order simply prevents them from indirectly imposing additional liability on Released Parties on account of claims that Released Parties have paid substantial amounts to settle. The provisions of the bar order do not apply to claims for contractual indemnity, claims for which a court has determined there is no joint liability between a Barred Person and a Released Party, or any claims for contribution or non-contractual indemnity that are asserted with respect to any claims that have not been brought by or on behalf of the Debtors' estates, the Litigation Trust, the Creditors' Trust or any Person asserting a Preserved Cause of Action. To be clear, nothing in the Bar Order precludes the rights of any Barred Person to assert claims, other than Barred Claims, against any Released Party.

        e.    Creditors' Trust and Litigation Trust.

As noted above, the Debtor/Committee/Lender Plan allows for post-confirmation litigation of Preserved Causes of Action potentially worth billions of dollars, including the following:

- Claims to avoid Bridge Loan Claims;
- Claims to recover payments made to shareholders in connection with the Step Two Transactions;
- Claims against officers, directors, and professionals;
- Claims against EGI-TRB LLC and Sam Zell;
- Claims against the Advisors, including Merrill Lynch, Citigroup Global Markets, Inc., and Valuation Research Corporation; and

- The Morgan Stanley Claims.

With respect to EGI-TRB LLC and Mr. Zell, the Examiner determined that the alleged claims are unlikely to succeed. All Preserved Causes of Action will be transferred to either the Creditors' Trust or the Litigation Trust which will have full authority to pursue all relevant parties, including lenders (including the Senior Lenders themselves in capacities other than those in which they are released), financial advisors, lawyers, shareholders, directors, and officers.

### E.    The Trusts.

As noted above, the Debtor/Committee/Lender Plan provides that certain causes of action, defined in the Debtor/Committee/Lender Plan as the "Preserved Causes of Action," will be preserved and transferred to either a Litigation Trust or Creditors' Trust, both of which will be established pursuant to the Debtor/Committee/Lender Plan. The Preserved Causes of Action include the following:[44]

- Disclaimed State Law Avoidance Claims (i.e., any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that the Debtors or the Debtors' Estates could assert pursuant to section 544(b) of the Bankruptcy Code against Step Two Selling Stockholders, solely with respect to funds received in their capacities as such; provided, however, that Disclaimed State Law Avoidance Claims shall not include any claims for intentional fraudulent conveyance, and which are deemed transferred on the Effective Date to the Creditors' Trust by Holders of Claims against the Debtors, unless such Holders has elected to "opt out" of such assignment;

- any and all LBO-Related Causes of Action that the Tribune Entities or the Debtors' Estates may have or are entitled to assert on behalf of their respective estates (whether or not asserted) against the Non-Settling Defendants under any provision of the Bankruptcy Code or any applicable nonbankruptcy law including, without limitation, any and all claims under chapter 5 of the Bankruptcy Code;

- Advisor Claims (i.e. any and all LBO-Related Causes of Action against any Person based upon, arising out of, related to, or in connection with such Person's conduct as an advisor);

- Morgan Stanley Claims (i.e. all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, and including any and all rights, claims and actions (including avoidance actions arising under chapter 5 of the Bankruptcy Code) that Tribune or any of its Affiliates may have against MSCS);[45] and

- claims and causes of action against Non-Settling Step Two Payees to the extent such claims or causes of action seek recovery of payments (i) under the Senior Loan Agreement on account of the Incremental Senior Loans or (ii) under the Bridge Loan Agreement, in each case whether

---

[44] The Preserved Causes of Action do not include any claims, causes of action, suits or proceedings that are settled on or prior to the Effective Date.

[45] As set forth in Section 1.1.142 of the Debtor/Committee/Lender Plan, Morgan Stanley Claims include but are not limited to rights, claims and actions arising from or related to (a) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS, (b) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, and (c) any advisory engagement or potential advisory engagement of, and/or advice given by, or information analyses withheld, MSCS, including but not limited to (i) services provided by MSCS as an Advisor, and (ii) the agreement between Tribune and MSCS dated as of November 30, 2008, regardless of whether such rights, claims and actions may be asserted pursuant to the Bankruptcy Code or any other applicable law. For avoidance of doubt, rights, claims and actions arising from or related to (a)-(c) in the preceding sentence are Preserved Causes of Action and are not released pursuant to this Plan or the Confirmation Order.

based on avoidance and disallowance of Senior Loan Claims or Bridge Loan Claims or any other theory.

The Disclaimed State Law Avoidance Claims (which, together with any proceeds therefrom and any interest and earnings on such proceeds, comprise the Creditors' Trust Assets) will be transferred to the Creditors' Trust in accordance with the procedures set forth in Article XIV of the Debtor/Committee/Lender Plan for the benefit of the Creditor Trust Beneficiaries (i.e. recipients of beneficial interests in the Creditors' Trust). Specifically, on the Effective Date, and subject to section 14.3.1 of the Debtor/Committee/Lender Plan, the Debtors will disclaim all rights to pursue or prosecute the Disclaimed State Law Avoidance Claims such that any and all rights to pursue such Disclaimed State Law Avoidance Claims shall revert to those entities who could have pursued such claims Disclaimed State Law Avoidance Claims prior to the Petition Date.[46] As of the Effective Date, Holders of Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims and PHONES Notes Claims shall be deemed to transfer any Disclaimed State Law Avoidance Claims that they may have to the Creditors' Trust, unless such person has elected to "opt-out" of such assignment in accordance with the procedures approved by the Bankruptcy Court. The remaining Preserved Causes of Action (which, together with any proceeds therefrom and any interest and earnings on such proceeds, comprise the Litigation Trust Assets) will automatically vest in the Litigation Trust on the Effective Date for the benefit of the Litigation Trust Beneficiaries, i.e. those Classes receiving beneficial interest in the Litigation Trust. The Trusts will additionally be funded by a delayed draw term loan in an aggregate principal amount of $20 million to be made by Reorganized Tribune to the Trusts pursuant to the terms of the Trust' Loan Agreement.[47]

The Trusts shall each be managed and operated by a trustee. The duties, responsibilities and powers of the Creditors' Trustee and the Litigation Trustee (collectively, the "Trustees") are described in Section 14.4.2 and Section 13.3.2, respectively, of the Debtor/Committee/Lender Plan. Among other things, the Creditors' Trustee shall be responsible for: (i) prosecuting through judgment and/or settling the Transferred State Law Avoidance Claims and any defense asserted by the Creditors' Trust in connection with any counterclaim or cross claim asserted against the Creditors' Trust; (ii) calculating and making distributions to Creditors' Trust Beneficiaries in accordance with the provisions of the Debtor/Committee/Lender Plan; (ii) filing all required tax returns, and obligations on behalf of the Creditors' Trust; (iv) otherwise administering the Creditors' Trust; and (v) providing quarterly reports to the Creditors' Trust Beneficiaries. The Litigation Trustee shall be responsible for, among other things, (i) prosecuting through judgment and/or settling the Litigation Trust Assets and any defense asserted by the Litigation Trust in connection with any counterclaim or cross claim against the Litigation Trust; (ii) calculating and making distributions required under the Debtor/Committee/Lender Plan to be made from the Litigation Trust Assets; (iii) filing all required tax returns, and paying taxes and all other obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (iv) otherwise administering the Litigation Trust; and (v) filing quarterly reports with the Bankruptcy Court and providing annual reports

---

[46] In no event shall any Released Claims be disclaimed. In addition, out of an abundance of caution, the Confirmation Order shall provide that the automatic stay is lifted to permit the Creditors' Trustee and other Holders of Claims who have "opted out" of the transfer of Disclaimed State Law Avoidance Claims to the Creditors' Trust pursuant to Section 14.3.1 of the Debtor/Committee/Lender Plan to pursue such Disclaimed State Law Avoidance Claims.

[47] Constructive fraudulent transfer Claims against shareholders arising under state law are being disclaimed by the Debtors as of the Effective Date. Unless they opt out, Holders of such Claims are transferring them to the Creditors' Trust on the Effective Date because all constructive fraudulent transfer Claims against shareholders could be subject to unique defenses under the Bankruptcy Code if such Claims were asserted by or on behalf of the Debtors while the same is not true for intentional fraudulent transfer claims against shareholders which have been asserted by the Creditors' Committee on behalf of the Debtors in the Committee Complaint and will be transferred to the Litigation Trust on the Effective Date.

to the Litigation Trust Beneficiaries. The Trustees shall be entitled to receive reasonable compensation for services rendered on behalf of the Trusts on terms to be set forth in the Litigation Trust Agreement and the Creditors' Trust Agreement, as applicable, and may employ various professionals as needed to assist her or him in fulfilling her or his obligations under the Debtor/Committee/Lender Plan. The Creditors' Trust Agreement and the Litigation Trust Agreement will be substantially in the form of Exhibit 14.1 and Exhibit 13.1 to the Debtor/Committee/Lender Plan, respectively, and will be filed with the Plan Supplement.

An advisory board will also be established for each Trust, the initial members of which shall be the members of the Creditors' Committee. The advisory board will have the functions, duties and rights provided in the Creditors' Trust Agreement and the Litigation Trust Agreement, as applicable.

The Trusts will be dissolved no later than five (5) years from the Effective Date. However, the Bankruptcy Court, upon motion by a party in interest, may extend the term of either Trust for a finite period if (i) such extension is necessary to the purpose the Trust, (ii) the Creditors' Trustee or Liquidation Trustee, as applicable, receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable. Upon dissolution of either Trust, any remaining Cash on hand and other assets in such Trust will be distributed to the appropriate beneficiaries in accordance with the terms of the Creditors' Trust Agreement and Litigation Trust Agreement, as applicable.

### F. Certain Other Key Plan Provisions.

1.    Assumption of Executory Contracts and Leases.

Under section 365 of the Bankruptcy Code, the Debtors have the right, subject to Bankruptcy Court approval, to assume or reject executory contracts and unexpired leases to which the Debtors are a party. If a Debtor rejects an executory contract or unexpired lease that it entered into prior to the Petition Date, such contract or lease will be treated as if it were breached by the applicable Debtor(s) on the date immediately preceding the Petition Date, and the other party to the agreement may assert a claim for damages incurred as a result of the rejection, which will be treated as a prepetition unsecured claim pursuant to section 365(g) of the Bankruptcy Code. In the case of the rejection of unemployment agreements and real property leases, damages are subject to certain limitations imposed by sections 365 and 502 of the Bankruptcy Code.

a.    Assumption, Rejection and Cure Obligations.

On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 of the Debtor/Committee/Lender Plan or is set forth on Exhibit 6.3 to the Debtor/Committee/Lender Plan, to be filed with the Plan Supplement, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each

27

executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to Article 6 of the Debtor/Committee/Lender Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of the Debtor/Committee/Lender Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

Subject to the terms of Article VII and Section 6.1.1 of the Debtor/Committee/Lender Plan and except for any Customer Program otherwise designated on Exhibit 6.3 to the Debtor/Committee/Lender Plan, all refund and subscriber credit programs or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective as of the Effective Date and the proposed cure amount with respect to each shall be zero dollars. Nothing contained in Section 6.1.2 of the Debtor/Committee/Lender Plan shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person. Except with respect to any Customer Programs included on Exhibit 6.3 to the Debtor/Committee/Lender Plan, as a result of the deemed assumption of the Debtors' refund, subscriber credit and other obligations under the Customer Programs to subscribers and former subscribers pursuant to Section 6.1.2 of the Debtor/Committee/Lender Plan, all Proofs of Claim on account of or in respect of any such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court, and the Debtors' Claims Agent shall be authorized as of the Effective Date to expunge such Proofs of Claim from the claims register.

The Debtor/Committee/Lender Plan Proponents have not yet determined how to treat certain insurance policies issued by ACE American Insurance Company and/or its affiliates (collectively, "ACE") to or on behalf of the Debtors and any related agreements (hereinafter, the "ACE Policies and Agreements"), including whether or not such agreements are executory and whether they will be assumed. Subject to the Debtors' rights, if any, to assume or to reject such contracts, nothing contained in this Debtor/Committee/Lender Disclosure Statement, the Debtor/Committee/Lender Plan, the Confirmation Order, any exhibit to the Debtor/Committee/Lender Plan, any Plan Supplement or any other Debtor/Committee/Lender Plan document (including any provision that purports to be peremptory or supervening), shall in any way operate to, or have the effect of, waiving or impairing in any respect the legal, equitable or contractual rights or defenses of the parties to the ACE Policies and Agreements. For the avoidance of doubt, nothing in this Debtor/Committee/Lender Disclosure Statement or in the Debtor/Committee/Lender Plan shall be read to authorize the unilateral amendment by the Debtors of any of the terms of the ACE Policies and Agreements. In any event, ACE has reserved all of its rights and defenses under the ACE Policies and Agreements and applicable non-bankruptcy law with respect to the ACE Policies and Agreements.

b.     Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The Bankruptcy Code provides for the calculation of "cure amounts" which may, in some instances, be payable by the Debtors to the non-Debtor party in connection with executory contracts or unexpired leases that are assumed by the Debtors. The proposed cure amount for any executory contract or unexpired lease that is assumed pursuant to the Debtor/Committee/Lender Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court as part of the Plan Supplement or other pleading approved by Angelo Gordon, Oaktree, JPMorgan (collectively, the "Creditor Proponents") and the Debtors. Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability

of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed conditionally assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

        c.     Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 to the Debtor/Committee/Lender Plan shall be rejected pursuant to section 365 of the Bankruptcy Code. Each contract or lease listed on Exhibit 6.3 to the Debtor/Committee/Lender Plan, to be filed with the Plan Supplement, shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The Debtors reserve their right to amend Exhibit 6.3 to the Debtor/Committee/Lender Plan to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto. Listing a contract or lease on Exhibit 6.3 to the Debtor/Committee/Lender Plan shall not constitute an admission by a Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

        d.     Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Debtor/Committee/Lender Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

        2.     Pursuit of Preference Actions.

The Debtors and Creditors' Committee have commenced various preference avoidance actions against third parties and insiders of the Debtors or entered into tolling agreements with various preference defendants extending the applicable statute of limitations for purposes of initiating such preference causes of action as discussed in Article V.G.D. of the General Disclosure Statement. The Debtor/Committee/Lender Plan provides that these preference causes of action, along with any proceeds therefrom, will be (i) retained by the Reorganized Debtors to the extent the preference causes of action constitute Ordinary Litigation Claims, and (ii) transferred to the Litigation Trust to the extent the preference causes of action constitute LBO-Related Causes of Action. Most of the preference actions being pursued by the Creditors' Committee against the Senior Lenders, Bridge Lenders and insiders constitute LBO-Related Causes of Action. The remainder of the preference actions, some of which are being pursued by the Creditors' Committee but most of which are being pursued by the Debtors, constitute Ordinary Litigation Claims. To the extent any potential preference avoidance action was not commenced as of the Effective Date, or the time to commence such actions was not extended by tolling agreements as of the Effective Date, the Debtor/Committee/Lender Plan does not preserve any such potential causes of action.

        3.     Restructuring Transactions.

During the Chapter 11 Cases, the Debtors and their advisors undertook an analysis of the Debtors' corporate structure. These efforts have focused on, among other things, identifying modifications to the corporate structure that would reduce administrative inefficiencies and expenses,

streamline post-emergence tax reporting and facilitate future strategic decision making. Consistent with the terms of Section 5.2 of the Debtor/Committee/Lender Plan, the Debtors retain the right to implement these initiatives through a Plan Supplement. Restructuring Transactions may include, among other transactions, (i) converting certain of the Reorganized Debtors into limited liability companies, or merging certain of the Reorganized Debtors into newly formed limited liability companies in jurisdictions where conversion is not available and (ii) consolidating and reallocating certain operations of the Reorganized Debtors within the organizational structure of Reorganized Tribune.

The Debtor/Committee/Lender Plan provides that on or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors.

The Debtor/Committee/Lender Plan provides that in each case in which the surviving, resulting or acquiring person in any such Restructuring Transaction is a successor to a Debtor or Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Debtor or Reorganized Debtor pursuant to the Debtor/Committee/Lender Plan to pay or otherwise satisfy the Allowed Claims against such Debtor or Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Debtor or Reorganized Debtor will perform such obligations. Implementation of the Restructuring Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in the Debtor/Committee/Lender Plan. Exhibit 5.2 to the Debtor/Committee/Lender Plan, which shall be filed with the Plan Supplement, shall set forth the Restructuring Transactions and a detailed description of the actions and steps required to implement each Restructuring Transaction. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 5.2 of the Debtor/Committee/Lender Plan. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order. To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC shall have been obtained.

4.      Compensation and Benefit Programs.

With the exception of the Compensation and Benefit Programs described in Article III.C.6–III.C.11 of the General Disclosure Statement (i.e., the Management Equity Incentive Program, the Equity-Based Compensation Provisions of the Incentive Compensation Plan, the Employee Stock Ownership Plan, the Transitional Compensation Plan, the Nonqualified Retirement / Deferred Compensation Plans, and Certain Individual Letter Agreements), the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Debtor/Committee/Lender Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify or terminate any such Employee Benefit Plan either prior to or after the Effective Date.

5.      Intercompany Claims Settlement.

The Debtor/Committee/Lender Plan provides for the settlement and compromise of Intercompany Claims.  Intercompany Claims are any pre-Petition Date Claims against any of the Debtors held by another Debtor or non-Debtor Affiliate.  The terms of the Intercompany Claims Settlement shall be set forth in Exhibit 1.1.122 to the Debtor/Committee/Lender Plan, which will be filed with the Plan Supplement.

The Debtors expect that the treatment of Intercompany Claims pursuant to the Intercompany Claims Settlement will be substantially similar to that set forth in the intercompany claims analysis provided by the Debtors to the Examiner; however, the Debtors continue to review that analysis and reserve the right to make modifications thereto where it deems appropriate.  The Examiner attached the intercompany claims analysis provided by the Debtors to the Examiner's Report as Exhibit 1071 thereto (the "Intercompany Claims Analysis") and noted that no party had challenged the analysis contained therein.  A copy of the Intercompany Claims Analysis attached to the Examiner's Report as Exhibit 1071 is attached hereto as Exhibit C.  The Intercompany Claims Analysis was based upon the preliminary review of the Intercompany Claims by the Debtors and their financial advisors, and is subject to further modification based upon further review and analysis.

The Intercompany Claims Settlement is limited to pre-Petition Date claims.  Post-petition claims against any of the Debtors held by another Debtor or non-Debtor Affiliate involving cash, accounts receivable, accounts payable or other transactions in the ordinary course of business ("Postpetition Intercompany Claims") were addressed in the Final Order (I) Approving Cash Management Systems, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, and (III) Granting Superpriority Expense Status to Postpetition Intercompany Transactions, entered on April 29, 2009 (the "Final Cash Management Order").  The Final Cash Management Order provides that Postpetition Intercompany Claims shall be treated as Administrative Claims for all purposes in these Chapter 11 Cases.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Debtor/Committee/Lender Plan, of the Intercompany Claims Settlement as proposed pursuant to the Debtor/Committee/Lender Plan.  The treatment of Intercompany Claims pursuant to the Intercompany Claims Settlement takes into account the Debtor/Committee/Lender Plan Proponents' views of the appropriate treatment of Intercompany Claims asserted by Tribune against the Debtor Subsidiaries, including the Debtor/Committee/Lender Plan Proponents' view of the proper application of section 7 of the Bridge Loan Guaranty Agreement.

6.      Retiree Claims Settlement.

31

The Debtor/Committee/Lender Plan will implement a settlement between the Debtors and approximately 200 individuals holding claims arising from Non-Qualified Former Employee Benefit Plans relating to their former employment with various of the Debtors or their predecessors (the "Retiree Claims"). This settlement is embodied in the Stipulation Between Debtors and Retiree Claimants Settling and Allowing Claims (the "Retiree Claimant Settlement Agreement"), which is attached to the Debtor/Committee/Lender Plan as Exhibit 5.15.4.

The majority of the Retiree Claims arise from non-qualified pension claims and deferred compensation claims. The Debtors scheduled the Retiree Claims in an aggregate amount of approximately $82 million. The holders of the Retiree Claims (the "Retiree Claimants") asserted, through individual proofs of claim, an aggregate amount of approximately $113 million on account of the Retiree Claims. The proposed settlement establishes the Allowed amount of each Retiree Claim, with the total Allowed amount of all Retiree Claims being approximately $103 million. The Retiree Claimant Settlement Agreement resolves the disputes between the Debtors and the Retiree Claimants regarding: (i) the discount rates and mortality tables most appropriately applied to those Retiree Claims that are based on future annuity payments; (ii) whether the Retiree Claims for deferred compensation are entitled to interest for the prepetition period of the 2008 calendar year; and (iii) with respect to some of the Retiree Claims, the factual basis for such claims, including whether the claimant was entitled to annuity or other benefit payments, the type of annuity or other benefit, and the specific amounts owed. The Debtors and counsel for the Retiree Claimants worked closely with the Creditors' Committee and a committee of certain Senior Lenders in negotiating the Retiree Claimant Settlement Agreement.

In accordance with the Retiree Claimants Settlement Agreement, each of the Retiree Claims will be Allowed General Unsecured Claims in the "Total Agreed Amount" indicated on Schedule A to the Retiree Claimants Settlement Agreement. To the extent a Retiree Claim is a claim for future annuity payments, that component of the Total Agreed Amount has been calculated pursuant to a formula for determining the present value of future annuity payments and the applicable mortality tables (the "Annuity Formula"). The Annuity Formula utilizes the United States Internal Revenue Code § 417(e) Lump Sum Rates for 2008 plan year payments, with (i) applicable interest rates for 2008 plan year payments determined as of January 1, 2008 with a two-month lookback to the November 2007 segment rates of 4.60%, 4.82% and 4.91%, and (ii) the RP-2000 Healthy mortality table (weighted 50% male and 50% female), using scale AA for (x) seven (7) years from the valuation date for annuitants and (y) fifteen (15) years from the valuation date for non-annuitants. An additional 5.165% of the present value of the future annuity payments (the "Litigation Adjustment") has also been included in the Total Agreed Amounts for those Retiree Claims involving future annuity payments, to represent the compromise, based on the potential cost and outcome of litigating the differences between the discount rates and mortality tables used by the Debtors and those used by the Retiree Claimants. To the extent any Retiree Claim listed on Schedule A to the Retiree Claimants Settlement Agreement is a claim for deferred compensation payments, that component of the Total Agreed Amount has been calculated to include one half of the amount of interest allocable to the prepetition portion of the 2008 calendar year ("Allowed 2008 Deferred Compensation Interest") that the Retiree Claimants argue accrued under the terms of the relevant plans and agreements. Each Total Agreed Amount listed on Schedule A to the Retiree Claimants Settlement Agreement shall constitute an Allowed General Unsecured Claim against the specific Debtor identified on the same row as such Total Agreed Amount on Schedule A to the Retiree Claimants Settlement Agreement.

Pursuant to the Retiree Claimants Settlement Agreement, the agreed Allowed amounts of the Retiree Claims are conditioned upon confirmation of the Debtor/Committee/Lender Plan, as amended from time to time, or another plan of reorganization, in each case providing for the classification and treatment of the Retiree Claims consistent with their classification and treatment under the Debtor/Committee/Lender Plan.

With respect to claims that are similar in nature to the Retiree Claims but not a part of the Retiree Claimants Settlement Agreement ("Similar Claims"), the Debtors intend to liquidate such Similar Claims consistent with the formulas and principles applicable to the Retiree Claims under the Retiree Claimants Settlement Agreement, including the Annuity Formula, the Allowed 2008 Deferred Compensation Interest, and the Litigation Adjustment. In order to achieve this result, the Debtors will engage in negotiations with holders of Similar Claims and, as necessary, employ the procedures for objecting to claims described in this Specific Disclosure Statement and the Debtor/Committee/Lender Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Debtor/Committee/Lender Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

       7.     Pre-Effective Date Settlement of Estate Claims.

The Debtor/Committee/Lender Plan does not affect the Debtors' ability to settle claims or causes of action that the Debtors or their Estates may have or are entitled to assert prior to confirmation or effectiveness of the Debtor/Committee/Lender Plan. If the Debtors were to settle any such claims or causes of action, the Debtors expect that any order approving such settlement would address the appropriate allocation of the proceeds.

       8.     Certain Indemnity and Guaranty Obligations Related to the Chicago Cubs Transactions.

Section 5.8.3 of the Debtor/Committee/Lender Plan provides that the indemnification or guaranty obligations of the Debtors contained in (i) that certain Indemnity Agreement between CSC Holdings, Inc., NMG Holdings, Inc. and Tribune dated July 29, 2008; (ii) that certain Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Credit Agreement Loans (as defined therein) and the Private Placement Notes (as defined therein); and (iii) that certain Subordinated Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Loans (as defined therein) shall continue in full force and effect. The parties to these agreements and the nature and scope of the Debtors' indemnification and guaranty obligations pursuant to these agreement are described in the Motion For Orders Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 (I) Authorizing Tribune Debtors and CNLBC to (A) Enter into and Perform Obligations Under Formation Agreement and Ancillary Agreements, (B) Effect Proposed Business Combination Respecting Cubs-Related Assets, Including Interests in Wrigley Field, Comcast Sports Network, and Related Assets Free and Clear of All Liens, Claims, Rights, Interests and Encumbrances, and (C) Assume and Assign Executory Contracts; (II) Authorizing Debtor Tribune Company to Enter into Guarantees of Debt Financing; (III) Authorizing Debtors WGN Continental Broadcast Company and Tribune Company to Enter Into and Perform Obligations Under Radio and Television Broadcast Agreements; and (IV) Granting Related Relief [Docket No. 2004]. The Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 (I) Authorizing Debtors and Debtors in Possession to (A) Enter into and Perform Obligations Under Formation Agreement and Ancillary Agreements, (B) Effect Proposed Business Combination Respecting Cubs-Related Assets, Interests in Wrigley Field, Comcast Sports Net, and Related Assets Free and Clear of All Liens, Claims, Rights, Interests and Encumbrances, and (C) Assume and Assign Executory Contracts; (II) Authorizing Debtor Tribune Company to Enter into Guarantees of Debt Financing; (III) Authorizing Debtors WGN Continental Broadcast Company and Tribune Company to Enter Into and Perform Obligations Under Radio and Television Broadcast Agreements; and (IV) Granting Related Relief, which was entered on September 24,2009, requires that these indemnification and guaranty obligations continue to remain in full force and effect [Docket No. 2213].

9.    Senior Lender Holdback.

As a component of the Settlement, except for the Senior Lender Holdback, the Senior Loan Agent shall not hold back, withhold, keep, reserve, recoup, setoff against, delay delivery of, or refuse to deliver any distributions payable to the Holders of Senior Loan Claims at any time for any reason whatsoever. All other rights of JPMorgan and the Senior Lenders under the Senior Loan Agreement or otherwise are expressly preserved as described in Section 7.3 of the Debtor/Committee/Lender Plan. JPMorgan shall be irrevocably entitled to utilize the Senior Lender Holdback as described in Section 7.3 of the Debtor/Committee/Lender Plan and shall ultimately distribute any unused portion of the Senior Lender Holdback to the Holders of Senior Loan Claims in accordance with the provisions of the Senior Loan Agreement in accordance with Section 7.3 of the Debtor/Committee/Lender Plan. JPMorgan's fees and expenses incurred from the Petition Date through the Effective Date will be Reimbursed on the Effective Date in accordance with Section 9.1 of the Debtor/Committee/Lender Plan and not from the Senior Lender Holdback.

10.    Injunctions, Releases and Discharge.

a.    Discharge

Except as otherwise provided in the Debtor/Committee/Lender Plan, the confirmation of the Debtor/Committee/Lender Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective date and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors. As of the Effective Date, except as otherwise provided in the Debtor/Committee/Lender Plan, all Persons are precluded and enjoined from asserting against the Debtors or the Reorganized Debtors or their property any Claims, causes of action or Interests based upon any prepetition act, omission, transaction or activity, and all Persons holding discharged Claims or terminated equity Interests are permanently enjoined from pursuing any judicial or non judicial enforcement actions or other proceedings of any kind  against the Debtors, Reorganized Debtors or their property on account of such discharged Claims or terminated Interests.

b.    Releases

i).    Debtor Released Claims

The Debtor/Committee/Lender Plan provides for the release on the Effective Date of estate claims and causes of action against a limited number of "Released Parties". Specifically, except for the Preserved Causes of Action (i.e. (i) LBO-Related Causes of Action against Non-Settling Defendants, (ii) Advisor Claims, (iii) Morgan Stanley Claims, (iv) objections, claims and causes of action for avoidance and disallowance of Bridge Loan Claims and Bridge Loan Guaranty Claims, (v) claims and causes of action against Non-Settling Step Two Payees for the recovery of prepetition payments on account of Incremental Senior Loans or under the Bridge Loan Agreement and (vi) Disclaimed State Law Avoidance Claims) and as otherwise specified in the Debtor/Committee/Lender Plan, the Reorganized Debtors and any Person seeking to exercise rights of the Debtors' shall, on the Effective Date release, and cause the Subsidiary Non-Debtors to release, the Released Parties from all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities of any nature, including the Released LBO-Related Causes of Action based upon any pre-Effective Date act, omission, transaction event or occurrence in connection with the Debtors, their property, Estates, Chapter 11 Cases,

34

Debtor/Committee/Lender Plan, the Disclosure Statement or Restructuring Transactions.[48] The Released Parties are (a) the Debtors, non-Debtor affiliates (including Subsidiary Non-Debtors), the Reorganized Debtors; (b) the current and former Senior Lenders in all capacities except their capacities, if any, as (i) Step Two Selling Stockholders, (ii) Non-Settling Step Two Payees, and (iii) Advisors; (c) the Settling Step Two Payees in all capacities except their capacities, if any, as (i) Step Two Selling Stockholders, (ii) Advisors, and (iii) Bridge Lenders; (d) each of the following, solely in their capacities as such; (i) the Creditors' Committee, (ii) the present and former members of the Creditors' Committee, (iii) the Senior Loan Agent and the Former Bridge Loan Agent, (iv) the Step One Selling Stockholders, (v) the Released Step Two Stockholder Parties, (vi) the Proponents; and (e) Related Persons to each of the foregoing parties to the extent provided in the Debtor/Committee/Lender Plan.

        ii).    Holder Released Claims.

The Debtor/Committee/Lender Plan also provides for consensual releases on the Effective Date of the Released Parties by Persons who elect to provide such releases, of all pre-Effective Date claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities of any nature, including the LBO-Related Causes of Action, in connection with the Debtors, their assets, property, Estates, Chapter 11 Cases, Debtor/Committee/Lender Plan, Disclosure Statement or Restructuring Transactions ("Holder Released Claims"). Specifically, except as otherwise provided in the Debtor/Committee/Lender Plan or Confirmation Order, on the Effective Date, each Holder of a Claim or Interest that (a) has voted to accept the Debtor/Committee/Lender Plan and has not opted out of granting the releases, (b) has voted to reject the Debtor/Committee/Lender Plan but has opted to grant the releases, or (c) otherwise agrees to provide the releases shall be deemed to have released each of the Released Parties from the Holder Released Claims. The consensual release of Holder Released Claims shall not be construed as a release of the Preserved Causes of Action or any Claims against non-Debtors arising under ERISA held by the DOL.[49] Any Holder of a Claim or Interest opting not to grant the releases of Holder Released Claims shall not receive the benefit of the releases of Holder Released Claims, even if otherwise entitled to the benefit of such release. Further, subject to Section 11.2.2 of the Debtor/Committee/Lender Plan, the provisions of the Debtor/Committee/Lender Plan shall not be deemed to release any claims or causes of action that a non-Debtor creditor may have against another non-Debtor creditor that are not property of the Debtors' Estates or could not be brought by or on behalf of the Debtors' Estates, the Litigation Trust or the Creditors' Trust.[50]

        iii).    Release of Guarantor Non-Debtors from Senior Guaranty Claims and Bridge Loan Guaranty Claims.

All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of

---

[48] With the exception of the Released LBO-Related Causes of Action, Section 11.2.1 of the Debtor/Committee/ Lender Plan does not release any party from liability to the Debtors and the Estates for actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order.

[49] The Debtor/Committee/Lender Plan does not release claims arising under ERISA that are held or assertable by any participant, beneficiary, or fiduciary of the applicable ERISA plan against non-Debtor ERISA plan fiduciaries.

[50] To the extent that the claims asserted by the SOCAL Parties in the SOCAL Action do not constitute property of the Debtors' estates, such claims shall not be affected by the releases set forth in Section 11.2.1 of the Debtor/Committee/Lender Plan, by the releases set forth in Section 11.2.2 of the Debtor/Committee/Lender Plan, or the related injunction set forth in Section 11.2.4 of the Debtor/Committee/Lender Plan to the extent that the SOCAL Parties have not elected to grant (or receive) the releases set forth in Section 11.2.2 of the Debtor/Committee/Lender Plan pursuant to clauses (a), (b) or (c) thereof. All rights of the Step Two Arrangers and all other parties against the SOCAL Parties, with respect to the SOCAL Action and otherwise, are preserved.

the Senior Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Guaranty Claims and Bridge Loan Guaranty Claims; provided, however, that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of the Debtor/Committee/Lender Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Creditor Proponents, as of the Effective Date, of each of the Holders of Senior Guaranty Claims and the Senior Loan Agents of and from any and all Debtor Released Claims, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of the Settlement Plan. Pursuant to Bankruptcy Rule 9019 and/or 11 U.S.C. § 1123(b)(3), the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Guarantor Non-Debtor Release and adequate factual findings that the Guarantor Non-Debtor Release is: (i) fair, equitable and reasonable; (ii) necessary and essential to the Debtors' successful reorganization; (iii) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors and the Agents; (iv) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (v) consistent with public policy and due process principles. Notwithstanding the foregoing, in the event that the Guarantor Non-Debtor Release set forth in Section 11.2.5 of the Debtor/Committee/Lender Plan does not become effective for any reason whatsoever, all Senior Guaranty Claims against the Guarantor Non-Debtors and any and all rights of subordination in respect of the Bridge Loan Guaranty Agreement shall and shall be deemed to have been assigned and transferred as of the Effective Date by the Senior Lenders and the Senior Loan Agent to the Senior Guaranty Claim Assignee.

      c.     Non-Release of Certain Defined Benefit Plans.

Notwithstanding anything to the contrary in the Debtor/Committee/Lender Plan, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under the ERISA) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Settlement Plan (including Section 11.2 of the Debtor/Committee/Lender Plan), the entry of the Confirmation Order or the Chapter 11 Cases. Notwithstanding anything to the contrary in the Debtor/Committee/Lender Plan, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the ERISA, the controlled group members.

      d.     Injunctions.

      i).     Injunction Related to Releases

Except as provided in the Debtor/Committee/Lender Plan or Confirmation Order, as of the Effective Date all Persons holding a Released Claim are permanently enjoined from pursuing, on account of or based on the Released Claims, any judicial or non judicial enforcement actions or other actions or proceedings of any kind against the Released Parties or their property.

      e.     Bar Order.

The Debtor/Committee/Lender Plan contains a bar order that is described in detail in Section II.D.2.d., *supra*.

        f.      Exculpation.

The Debtor/Committee/Lender Plan provides that, to the fullest extent permitted by law, none of the Debtor/Committee/Lender Plan Proponents (including without limitation the Special Committee of Tribune's Board of Directors formed during the Chapter 11 Cases), none of the current or former members of the Creditors' Committee, in their capacities as such, and none of the respective Related Persons to any of the foregoing, shall have any liability to any person or entity for acts or omissions in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including the Debtor/Committee/Lender Plan, pursuit of confirmation or implementation of any plans of reorganization, including the Debtor/Committee/Lender Plan, the property to be distributed under the Debtor/Committee/Lender Plan, the Disclosure Statement, Restructuring Transactions, Plan Supplement, releases and injunctions under the Debtor/Committee/Lender Plan or the management or operation of the Debtors (except for liability resulting from willful misconduct or gross negligence as determined by a Final Order). The exculpation set forth in Section 11.5 of the Debtor/Committee/Lender Plan only relates to acts, omissions, and circumstances occurring on or after the Petition Date.

        g.      Corporation Indemnities/Insurance.

For purposes of the Debtor/Committee/Lender Plan, the indemnification or reimbursement obligations of Tribune and the other Debtors to any Persons who are or were directors, officers or employees of the Debtor on or after the Petition Date against and for any obligations, pursuant to corporate governance documents, laws or regulations, agreements or any combination of the foregoing, but excluding any obligations of Tribune and the other Debtors to any Person in respect of indemnification or reimbursement in connection with any LBO-Related Causes of Action arising prior to the Petition Date, shall survive confirmation of the Debtor/Committee/Lender Plan. In accordance with the Order Authorizing Tribune Company to Purchase Tail Coverage Respecting the Debtors' Existing Directors and Officers and Fiduciary Liability Insurance Policies [Docket No. 3190], the Debtors may in their discretion purchase "Tail Coverage" as defined in motion with respect to such Order.

## G.    Issuance and Distribution of New Securities and Related FCC Matters.

Certain of the Debtors' business operations are subject to regulation by the Federal Communications Commission (the "FCC") under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, as amended (the "Communications Act"). Television and radio stations may not operate in the United States without the authorization of the FCC; and FCC approval is required for the issuance, renewal, transfer, and assignment of station operating licenses. The FCC also regulates the multiple and combined ownership of television and radio broadcast stations as well as the cross-ownership of broadcast stations and newspapers in the same market. Because the Debtors' operations include newspapers, television stations, and a radio station, the Debtor/Committee/Lender Plan must comply with certain FCC-related multiple and cross-ownership requirements and restrictions. The Debtor/Committee/Lender Plan must also comply with limitations on foreign ownership and foreign voting rights of broadcast licensees administered by the FCC.

Both the Debtors' commencement of the Chapter 11 Cases and their emergence from bankruptcy require the consent of the FCC. The FCC previously granted consent for the assignment of the Debtors' FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under chapter 11 of the Bankruptcy Code. For the Reorganized Debtors to continue the operation of the Debtors' broadcast

stations, the Debtors filed applications with the FCC (the "FCC Applications") to obtain prior approval of the FCC for the assignment of the FCC licenses from the Debtors as "debtors-in-possession" to the Reorganized Debtors (the "FCC Approval").

    1.    Issuance of New Securities.

    On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Debtor/Committee/Lender Plan without further act or action under applicable law, regulation, order or rule. Except as otherwise provided in the Debtor/Committee/Lender Plan, including as specifically provided in Section 5.4.2 of the Debtor/Committee/Lender Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Debtor/Committee/Lender Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtor/Committee/Lender Plan Proponents of its desire to receive instead such New Class B Common Stock by the date announced by the Debtor/Committee/Lender Plan Proponents in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing. The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) to the Debtor/Committee/Lender Plan, which shall be filed with the Plan Supplement, sets forth the rights and preferences of the New Common Stock. The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock. To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares. The New Warrant Agreement substantially in the form of Exhibit 1.1.154 to the Debtor/Committee/Lender Plan, which shall be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants. The issuance of the New Common Stock and the New Warrants and the distribution thereof under the Debtor/Committee/Lender Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Debtor/Committee/Lender Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

    2.    Distribution of New Common Stock and New Warrants.

    If the Effective Date occurs, on the Effective Date Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Debtor/Committee/Lender Plan without further act or action under applicable law, regulation, order or rule. The Debtor/Committee/Lender Plan authorizes the Debtors to issue two classes of New Common Stock: New Class A Common Stock and New Class B Common Stock. New Class A Common stock will have voting rights consistent with standard voting common stock. New Class B Common Stock will have more limited voting rights and is designed to be non-attributable under the FCC's rules.

    Specifically, holders of New Class B Common Stock will be entitled to vote as a separate class on any amendment, repeal, or modification of any provision of the Restated Certificate of Incorporation for Reorganized Tribune that adversely affects the rights of the New Class B Common Stock in a manner different from the rights of the New Class A Common Stock. In addition, the holders of New Class B

38

Common Stock will be entitled to vote together with holders of the New Class A Common Stock on the following non-ordinary course transactions to the extent that these matters are submitted to a vote of the holders of New Class A Common Stock: (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the New Class A Common Stock or New Class B Common Stock as to dividends or liquidation preference, including with respect to an increase in the number of New Class A Common Stock or New Class B Common Stock; (ii) any amendment to the Restated Certificate of Incorporation or the Bylaws of Reorganized Tribune; (iii) any amendment to any stockholders or comparable agreement; (iv) any sale, lease, or other disposition of all or substantially all of the assets of Reorganized Tribune through one or more transactions; (v) any recapitalization, reorganization, share exchange, consolidation or merger of Reorganized Tribune or its capital stock; (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Tribune, including any stock option or stock incentive plan; (vii) any redemption, purchase or other acquisition by Reorganized Tribune of any of its capital stock (except for purchases from employees upon termination of employment); and (viii) any liquidation, dissolution, distribution of assets or winding-up of Reorganized Tribune.

Each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Debtor/Committee/Lender Plan will be required to demonstrate to the Debtors' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Debtor/Committee/Lender Plan. Applicable FCC ownership requirements and restrictions, which are discussed in more detail below, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons.

    3.    FCC Matters.

In order for certain combinations of the existing broadcasting and newspaper assets of the Debtors to continue to be held by Reorganized Tribune under the Debtor/Committee/Lender Plan, waivers of certain FCC broadcast multiple and cross-ownership rules must be obtained. Specifically, the Debtors will need to obtain waivers of the FCC's newspaper/broadcast cross-ownership rule and local television ownership or "duopoly" rule.[51] In addition, there are specific FCC-related ownership restrictions and requirements for equity holders of entities that hold FCC broadcast licenses. Applicable FCC ownership requirements and restrictions, which are discussed in more detail below, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons.

**THE FOLLOWING SUMMARY OF CERTAIN FCC RULES AND POLICIES IS FOR INFORMATION PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO FCC OWNERSHIP ISSUES AND OTHER CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN.**

---

[51] The Debtors will not request any waivers in or regarding the FCC Applications, however, to accommodate separate media interests held by prospective stockholders independent of their interest in the Debtors. Instead, any prospective stockholders that might need independent waivers will receive New Class B Common Stock (or New Warrants) such that waivers are no longer necessary.

a.    FCC Media Ownership and Cross Ownership Rules.

Certain multiple ownership and cross-ownership rules promulgated by the FCC prohibit common ownership of "attributable interests" in certain combinations of broadcast and other media properties. The following is a summary of the FCC's principal policies on identifying and assessing "attributable interests" in media outlets. "Attributable interests" generally include the following interests in a media company: general partnership interests or managing membership interests in a limited liability company, non-insulated limited partnership or limited liability company interests, positions as an officer or director (or the right to appoint officers or directors), five percent (5%) or greater direct or indirect interests in the voting stock of a corporation, time brokerage agreements between same-market radio or television stations, joint sales agreements between same-market radio broadcast stations, and certain significant investment interests coupled with some same-market media interests or significant programming arrangements.

Attribution traces through chains of ownership. In general, an individual or entity that has an attributable interest in another entity will also be deemed to hold each of that entity's attributable media interests. In addition, the FCC treats all partnership interests as attributable, except for those limited partnership interests that are "insulated" by the terms of the limited partnership agreement from "material involvement" in the media-related activities of the partnership. The FCC applies the same attribution and insulation standards to limited liability companies and other new business forms.

Currently, a minority stockholder in a media corporation with a single majority stockholder (i.e., a single holder of more than fifty percent (50%) of the outstanding voting power of the corporation) is not deemed to hold an attributable interest in that corporation or its media outlets based on the ownership of a minority voting stock interest of five percent (5%) or more. The FCC is considering whether or not to retain the single majority stockholder exemption in a pending rulemaking proceeding.

Combinations of direct and indirect equity and debt interests exceeding thirty-three percent (33%) of the total asset value (equity plus debt) of a media outlet may be deemed attributable if the holder has another attributable broadcast or daily newspaper interest in the same market or provides more than fifteen percent (15%) of the programming to the broadcast station in which the interest is held. Also, a person or entity that provides more than fifteen percent (15%) of the weekly programming for a television or radio station and has an attributable interest in another television or radio station in the same market is deemed to hold an attributable interest in the station to which it provides programming.

The FCC's broadcast multiple ownership and cross-ownership rules limit certain combinations of attributable interests in television broadcast stations and radio broadcast stations, and its cross-ownership rules restrict the ownership in the same market of attributable interests in (i) combinations of radio stations and television stations and (ii) combinations of radio or television stations with daily newspapers of general circulation. The FCC regards an entity with an "attributable interest" in a media outlet as an "owner" of that media outlet for purposes of applying these rules. Thus, prospective stockholders that may hold five percent (5%) or more of the New Class A Common Stock of Reorganized Tribune or persons who are officers or directors of Reorganized Tribune will need to assess (a) what attributable interests they may hold in daily newspapers of general circulation or other radio or television licensees and (b) whether the attributable media interests that they hold would conflict with their holding attributable interests in the daily newspapers or broadcast licensees of the Reorganized Debtors.

As explained in more detail below, the permissibility of particular combinations of attributable media interests may depend upon market size and other market characteristics. Generally, the FCC's media ownership rules place limits on (i) same-market ownership of broadcast stations and a daily newspaper of general circulation published in the market's dominant language; (ii) local television station

40

ownership; (iii) local radio station ownership; (iv) same-market ownership of television and radio stations; and (v) nationwide television station ownership. The FCC has pending proceedings to revise some of these rules and to adopt new rules, and the FCC's broadcast ownership rules are being challenged in the courts. No waivers will be sought and no special showings will be submitted to accommodate separate media interests of prospective stockholders independent of their interests in the Reorganized Debtors. Certain rules that could give rise to a prohibited combination for a prospective stockholder of Reorganized Tribune include the following:

- Newspaper/Broadcast Cross-Ownership Rule. The FCC generally prohibits the cross-ownership of a daily newspaper and either a television or radio broadcast station in the same market, absent a waiver. In a decision dated December 18, 2007 (the "2008 Order"), the FCC adopted modified waiver standards; however, those changes are the subject of a pending appeal to the Third Circuit. In March 2010, the Third Circuit lifted the stay it had issued in September 2003 in connection with its review of the FCC's changes to its media ownership rules and allowed the 2008 Order to become effective. Under the 2008 Order, a daily newspaper is one that is published at least four days per week in the dominant language of the market and which is circulated generally in the community of publication. The revised waiver standards adopted in the 2008 Order presumptively allow the ownership of attributable interests in a broadcast station and a daily newspaper of general circulation that is published in the market served by the broadcast station only when (i) the market at issue is one of the 20 largest "Designated Market Areas" or "DMAs" as determined by the Nielsen television ratings service; (ii) the combination involves only one daily newspaper and only one radio or television station; and (iii) if the combination involves a television station, (a) at least eight independently-owned and operating major newspapers and/or full-power television stations would remain in the DMA and (b) the television station is not among the top four ranked stations in the DMA. The FCC also presumptively permits cross-ownership if either the newspaper or the broadcast station is deemed "failed" or "failing" under FCC standards or if the proposed cross-ownership would result in a new source of local television news totaling at least seven hours per week. All other newspaper/broadcast combinations are presumed not to be in the public interest; however, that presumption can be overcome if the parties can demonstrate that, post-merger, the cross-owned entity would increase the diversity of independent news outlets and increase competition among independent news sources in the relevant market.

- Local Television Station Ownership Rule (Duopoly Rule). Under the local television ownership rule (often called the "duopoly rule"), a single entity may have attributable interests in two television stations in the same DMA if (i) the two stations do not have overlapping service areas, or (ii) notwithstanding the combination there are at least eight independently owned and operating full-power commercial and non-commercial television stations serving the DMA and at least one of the combining stations is not ranked among the top four stations in the DMA. In addition, if any entity with an attributable interest in a television station provides more than fifteen percent (15%) of the programming of another station in the same market pursuant to a time brokerage or local marketing agreement, then for purposes of applying this rule, the entity will be deemed to hold an attributable interest in the station to which it provides programming. The FCC has initiated a rule making proceeding to determine whether it should treat television joint sales agreements as attributable interests under its ownership rules and, if so, whether it should use a standard comparable to the one in effect for radio joint sales agreements, under which the FCC treats joint sales agreements as attributable if they cover fifteen percent (15%) or more of the brokered station's weekly commercial time. The FCC's duopoly rule and policies regarding ownership of television stations in the same market apply only to full-power television

41

stations and not to television satellite stations, Class A or low power television stations, or television translator stations.

- Local Radio Station Ownership Rule. The FCC's local radio multiple ownership rule limits the number of radio stations in which one entity may hold an attributable interest in a local geographic market. In determining the size of a market, the rules consider both commercial and non-commercial stations and use a definition of a local radio market based on Arbitron "Metro" markets and, when there is no defined Arbitron market, a definition based upon the composite service contours of commonly owned stations with overlapping service areas. These limits are as follows: In a radio market with 45 or more radio stations, a party may hold an attributable interest in up to eight radio stations, not more than five of which are in the same broadcast service (AM or FM); in a radio market with between 30 and 44 radio stations, a party may hold an attributable interest in up to seven radio stations, not more than four of which are in the same broadcast service; in a radio market with between 15 and 29 radio stations, a party may hold an attributable interest in up to six radio stations, not more than four of which are in the same broadcast service; and in a radio market with 14 or fewer radio stations, a party may hold an attributable interest in up to five radio stations, not more than three of which are in the same broadcast service, except that a party may not hold an attributable interest in more than fifty percent (50%) of the stations in the market.

- Radio/Television Station Cross-Ownership Rule. The FCC's radio/television cross-ownership rule permits the common attributable ownership of more than one full-power AM and/or FM radio station and up to two television stations in the same market. The total number of radio stations permitted to be under common attributable ownership depends on the number of independently-owned media voices in the local market as follows: (i) in markets with at least 20 independently owned media voices, a single entity may hold attributable interests in up to two television stations and six radio stations. Alternatively, such an entity may hold an attributable interest in one television station and seven radio stations in the same market; (ii) in a market that includes at least ten independently-owned media voices, a single entity may hold attributable interests in up to two television stations and up to four radio stations; and (iii) regardless of the number of independently-owned media voices in a market, a single entity may hold an attributable interest in up to two television stations and one radio station in any market. Under all of these scenarios, the requirements of the local television and local radio ownership rules also must be met.

- National Television Station Ownership Rule. By statute, one party may hold attributable interests in television stations that reach, in the aggregate, no more than thirty-nine percent (39%) of all United States television households. The corresponding FCC rule on national television ownership limits provides that, when calculating a television station's nationwide aggregate audience, all UHF stations are considered to serve only fifty percent (50%) of the households in their DMA and all VHF stations are considered to serve all households in their DMA, including households that cannot naturally receive such a VHF station over the air. The FCC currently is considering whether to initiate a proceeding to modify or abolish this so-called UHF discount in light of the changes resulting from the transition to digital television broadcasting. If a broadcast licensee has an attributable interest in a second television station in a market, whether by virtue of ownership, a time brokerage agreement or a parent-satellite operation, the audience for that market will not be counted twice for purposes of determining compliance with the national cap.

  b.    Issuance of New Class B Common Stock to Ensure Compliance with FCC Media Ownership and Cross-Ownership Rules

In processing the FCC Applications, the FCC will consider, among other things, whether the prospective licensees and those considered to be "parties" to the applications possess the legal, character, and other qualifications to hold an interest in a broadcast station. The FCC Applications require the Debtors to include information about the Reorganized Debtors and the "parties" to the FCC Applications – including certain of the proposed stockholders of the Reorganized Debtors – sufficient for the FCC to grant its consent to the transactions contemplated by the Debtor/Committee/Lender Plan. Prospective stockholders of the Reorganized Debtors, including those under common ownership or control, that would hold or control five percent (5%) or more of the New Class A Common Stock in Reorganized Tribune under the Debtor/Committee/Lender Plan will be parties to the FCC Applications and required to report certain information for FCC regulatory purposes. Specifically, each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Debtor/Committee/Lender Plan will be required to demonstrate to the Debtor/Committee/Lender Plan Proponents' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Debtor/Committee/Lender Plan.

To be eligible to receive five percent (5%) or more of the New Class A Common Stock, a Claim Holder will be required to submit a Media Ownership Certification that provides information about the Holder and its affiliates to establish that the issuance of New Class A Common Stock to that Holder would not result in a violation of law, impair the qualifications of the Reorganized Debtors to hold FCC broadcast licenses, or impede the grant of any FCC Applications on behalf of the Reorganized Debtors. In general, the information provided in the Media Ownership Certifications will enable the Debtors to establish that prospective "parties" to the FCC Applications (i) have the requisite "character" qualifications required by the FCC and (ii) do not hold media interests that, together with their prospective interest in the Reorganized Debtors, would create an unlawful media combination under the FCC's rules. Specifically, to be eligible to receive five percent (5%) or more of New Class A Common Stock, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Debtor/Committee/Lender Plan will be required to provide a Media Ownership Certification by the deadline established by the Bankruptcy Court or to the reasonable satisfaction of the Debtor/Committee/Lender Plan Proponents, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder. Such Holders will also be required to certify to and inform the Debtor/Committee/Lender Plan Proponents of any changes in the information provided in their Media Ownership Certifications between the submission of the certification and the Effective Date by executing an amended Media Ownership Certification. Any such Holder that fails to provide the Media Ownership Certification by the deadline established by the Bankruptcy Court, or that does not do so to the reasonable satisfaction of the Debtor/Committee/Lender Plan Proponents, may be allocated New Class B Common Stock in lieu of New Class A Common Stock at the Debtor/Committee/Lender Plan Proponents' discretion; provided, however, that to the extent a Creditor Proponent has been approved by the FCC as a party to the FCC Applications, Reorganized Tribune shall not be entitled to issue shares of New Class B Common Stock to such Creditor Proponent at emergence without its express consent unless the issuance of Class A Common Stock to a Creditor Proponent would result in a violation of the Communications Act or the FCC's rules or unless such Creditor Proponent has failed to comply with or satisfy any conditions imposed by the FCC as part of the FCC Approval or any commitment made in the FCC Applications, in which case Reorganized Tribune may issue shares of New Class B Common Stock to such Creditor Proponent only to the minimum extent necessary to cure or avoid such violation or non-compliance. Notwithstanding the foregoing, the Debtors will not request any waivers under the Communications Act or the FCC's rules in or regarding the FCC Applications to accommodate separate media interests held by a Creditor Proponent independent of the interest in Reorganized Tribune. Specifically, Reorganized Tribune in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock if the Debtor/Committee/Lender Plan

43

Proponents determine, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with applicable provisions of the Debtor/Committee/Lender Plan), that such Holder may have other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to the Debtor/Committee/Lender Plan. Except as otherwise provided in the Debtor/Committee/Lender Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtor/Committee/Lender Plan Proponents of its intent to receive such New Class B Common Stock by the date announced by the Debtor/Committee/Lender Plan Proponents in a filing with the Bankruptcy Court and that will be no earlier than the first day of the Confirmation Hearing.

       c.     Limitations on Foreign Ownership or Control of Broadcast Licensees.

      Section 310(b) of the Communications Act restricts, among other things, foreign ownership or control of FCC broadcast licenses. Foreign entities may not have direct or indirect ownership or voting rights of more than twenty-five percent (25%) in a corporation controlling the licensee of a broadcast station if the FCC finds that the public interest will be served by the refusal or revocation of such a license due to such foreign ownership or voting rights. The FCC has interpreted this provision to mean that the agency must make an affirmative public interest finding before it will permit the twenty-five percent (25%) foreign ownership cap to be exceeded. With very few exceptions, the FCC has not made such an affirmative finding in connection with the assignment of a broadcast license; the provision, therefore, generally serves as a prohibition on foreign ownership or voting interests exceeding twenty-five percent (25%). In assessing compliance with the twenty-five percent (25%) foreign ownership limitation, the FCC calculates the voting rights separately from the equity ownership percentage, and the twenty-five percent (25%) ceiling must be met for both. Warrants and other future interests typically are not counted by the FCC toward the foreign ownership ceiling unless and until converted. The FCC historically has treated partnerships with foreign partners as foreign controlled if any general partner is foreign, or if any foreign limited partner is not adequately insulated (using FCC criteria) from material involvement in the partnership's media activities and business. In a few specific circumstances, the FCC also has treated certain economic interests in a company other than direct equity interests as "ownership" for purposes of its foreign ownership determination. The FCC uses a "multiplier" to determine the ownership interest of each entity in the chain of ownership in cases of indirect ownership, such as a situation in which there are layers of investment short of control between the entity to be acquired and the licensee.

       d.     Issuance of a Combination of New Common Stock and New Warrants to Ensure Compliance with Applicable Limitations on Foreign Ownership and Control of Broadcast Licensees.

      Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Debtor/Committee/Lender Plan will be required (i) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (ii) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of the Debtors, confirm the absence of any changes. Any such Holder that fails to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, that fails to provide an amended Foreign Ownership Certification if one is required, that does not provide a Foreign Ownership Certification that is reasonably satisfactory to the Debtor/Committee/Lender Plan Proponents or that fails to provide a timely confirmation, if required, that its foreign ownership and voting

44

rights percentages have not changed may be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants.

Any Holder of a Claim that is eligible to receive New Common Stock under the Debtor/Committee/Lender Plan that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with the applicable provisions of the Debtor/Committee/Lender Plan), is or is deemed pursuant to the applicable provisions of the Debtor/Committee/Lender Plan to be, more than twenty-five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to Section 310(b) of the Communications Act, shall receive New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock based on an allocation mechanism that is to be determined. The allocation mechanism shall ensure, based on the aggregated results of the Foreign Ownership Certifications, the compliance of Reorganized Tribune with Section 310(b) of the Communications Act.

**HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE DEBTOR/COMMITTEE/LENDER PLAN THAT ARE REQUIRED TO EXECUTE MEDIA OWNERSHIP CERTIFICATIONS MUST COMPLETE AND RETURN A MEDIA OWNERSHIP CERTIFICATION PRIOR TO THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. ALL HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE DEBTOR/COMMITTEE/LENDER PLAN MUST COMPLETE AND RETURN A FOREIGN OWNERSHIP CERTIFICATION BY THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. ALL SUCH HOLDERS ARE ENCOURAGED TO CONSULT THEIR OWN ADVISORS CONCERNING THE COMPLETION OF THE MEDIA OWNERSHIP CERTIFICATION AND FOREIGN OWNERSHIP CERTIFICATION AND THEIR TREATMENT UNDER THE DEBTOR/COMMITTEE/LENDER PLAN.**

## III.    DESCRIPTION OF DEBT AND NEW CAPITAL STRUCTURE OF THE DEBTORS

### A.    New Senior Secured Term Loan Agreement.

Section 5.6 of the Debtor/Committee/Lender Plan provides that on the Effective Date, if the Creditor Proponents and the Debtors have not elected to have the Reorganized Debtors replace the New Senior Secured Term Loan in its entirety with distributions of Cash (a) Reorganized Tribune, as borrower, (b) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Creditor Proponents in consultation with the Debtors) as guarantors, (c) the administrative agent party thereto, and (d) the Holders of Claims receiving a distribution of the New Senior Secured Term Loan under the Debtor/Committee/Lender Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement. If issued, the New Senior Secured Term Loan shall be in an aggregate principal amount of not more than the lesser of (i) $1.1 billion or (ii) two times the Debtors' trailing twelve month operating cash flow excluding minority equity interest as of the end of the fiscal quarter most recently ended prior to the Effective Date.

For purposes of formulating the Financial Projections, attached as Exhibit E to the General Disclosure Statement, the Debtors have estimated the New Senior Secured Term Loan to be in an aggregate principal amount of $1.1 billion, to be amortized at a rate of 1% per annum, and to have an effective interest rate of 6.75% in 2011 and 2010 and 7.20% in 2013, which represent the Debtors'

45

estimates as to market terms as of the date hereof based on information the Debtors have received from potential financing sources. However, the actual terms of the New Senior Secured Term Loan Agreement may vary, in whole or in part, from the aforementioned terms, based upon, among other things, changes in market conditions for loan facilities of this type and the Debtors' business and financial needs at emergence from Chapter 11. The principal terms of the New Senior Secured Term Loan shall be consistent with the Terms of the New Senior Secured Term Loan that will be filed with the Plan Supplement as Exhibit 5.6 to the Debtor/Committee/Lender Plan.

### B.    Description of Exit Facility.

Section 5.10 of the Debtor/Committee/Lender Plan provides that on the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility. The terms of the Exit Facility shall be consistent with those that will be disclosed in Exhibit 5.10 to the Debtor/Committee/Lender Plan, which will be filed with the Plan Supplement.

### C.    Description of Capital Stock.

The Debtor/Committee/Lender Plan provides that on the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Debtor/Committee/Lender Plan without further act or action under applicable law, regulation, order or rule. The powers, preferences and rights, as well as certain limitations, qualifications and restrictions associated with the New Common Stock shall be set forth in their entirety in the Certificate of Incorporation of Reorganized Tribune a form of which will be filed with the Plan Supplement as Exhibit 5.3.1(1) to the Debtor/Committee/Lender Plan. The terms of the New Warrants shall be set forth in their entirety in the New Warrant Agreement, a form of which will be filed with the Plan Supplement as Exhibit 1.1.154 to the Debtor/Committee/Lender Plan.

## IV.    BEST INTERESTS TEST AND LIQUIDATION ANALYSIS

As discussed in Article X.B.4 of the General Disclosure Statement, the "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of an Impaired Claim or Impaired Interest receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation. The Debtors, with the assistance of their advisors, have prepared a hypothetical liquidation analysis, attached as Exhibit D to the General Disclosure Statement (the "Liquidation Analysis"), which details, among other things, the estimated hypothetical recovery range for holders of Claims against and Interests in the Debtors in a chapter 7 liquidation. To demonstrate that the proposed Debtor/Committee/Lender Plan satisfies the "best interests" test, the Debtors, with the assistance of their advisors, have also prepared the chart below, which compares the estimated recovery of each Impaired Class of Claims under the Debtor/Committee/Lender Plan against the high end of the hypothetical recovery range set forth in the Liquidation Analysis for such Claims in a chapter 7 liquidation.[52]

---

[52] The Estimated Plan Recovery column includes incremental settlement payments of $358.4 million to the Senior Noteholder Claims, $80.4 million to the Other Parent Claims and $82.8 million to the Subsidiary General Unsecured Claims, with a reduction in recovery to the Senior Loan and Guarantee Claims of $401.5 million. Estimated Plan

($ in 000's)

| Claims | Estimated Allowed Claims & Bridge Claim | Estimated Plan Recovery [2] | | Liquidation Analysis (High Values) | | Difference |
|---|---|---|---|---|---|---|
| | | Recovery $ | Recovery % | Recovery $ | Recovery % | Recovery $ (Liquidation vs. Plan) |
| Senior Loan [1] | $ 8,722,140 | $ 6,194,045 | 71.02% | $ 3,743,009 | 42.91% | $ (2,451,035) |
| Bridge Loan [3] | 1,619,507 | 77,819 | 4.81% | 19,544 | 1.21% | (58,275) |
| Senior Noteholder | 1,283,056 | 420,000 | 32.73% | 15,484 | 1.21% | (404,516) |
| PHONES Notes | 760,881 | - | 0.00% | - | 0.00% | - |
| EGI-TRB LLC Notes | 235,300 | - | 0.00% | - | 0.00% | - |
| Other Parent [1] | 264,742 | 93,136 | 35.18% | 3,195 | 1.21% | (89,942) |
| Subsidiary GUC [4] | 85,000 | 85,000 | 100.00% | 2,041 | 2.40% | (82,959) |
| Total | $ 12,970,627 | $ 6,870,000 | | $ 3,783,273 | | $ (3,086,727) |

Notes to Table:

1. The $150.9 million Swap Claim is included in (i) the Senior Loan Claim at the Filed Subsidiary Debtors, and (ii) Other Parent Claims at Tribune Company. The Senior Loan Claims and the Senior Guaranty Claims may increase by as much as $66 million to account for undrawn letters of credit being drawn in a liquidation. The recovery in the Liquidation Analysis assumes that these letters of credit are drawn.

2. Excludes any proceeds from the Litigation or Creditors' Trust but includes the $120 million Step 2 Disgorgement Settlement.

3. For purposes of this analysis, Bridge Loan Claims are assumed to be Allowed; however, pursuant to the terms of the Debtor/Committee/Lender Plan, Bridge Loan Claims are subject to challenge by the Litigation Trust, and distributions with respect to the Bridge Loan Claims are reserved pending allowance of the Bridge Loan Claims. Per Sections 3.2.3, 3.2.5, and 3.2.6 of the Debtor/Committee/Lender Plan, if the Bridge Loan Claims are not Allowed, such reserve would be allocated to the Holders of Allowed Senior Loan Claims, Allowed Senior Noteholder Claims, and Allowed Other Parent Claims. Similarly, if the Bridge Loan Claims were not Allowed in a chapter 7 liquidation, estimated recoveries on account of such Claims would flow to the Holders of Senior Loan Claims, Senior Noteholder Claims, and Other Parent Claims.

4. The Subsidiary GUC claim may increase by as much as $35 million in a liquidation as a result of contract cure costs shifting to unsecured claims. The recovery in the Liquidation Analysis reflects $120 million of Subsidiary General Unsecured Claims.

Under the Debtor/Committee/Lender Plan, all non-subordinated prepetition Claims recover substantially more than under a hypothetical liquidation; therefore, the Debtor/Committee/Lender Plan Proponents believe that the "best interests" of creditors test is satisfied. The subordinated Claims (PHONES Notes and EGI-TRB LLC Notes) receive no initial recovery in either instance but may benefit from recoveries from the Litigation or Creditors' Trust, subject to subordination.

As described in Exhibit D to the General Disclosure Statement, the Liquidation Analysis does not consider recoveries from potential Claims arising from the Leveraged ESOP Transactions. As explained in herein, the Debtor/Committee/Lender Plan provides for the settlement of certain Claims related the Leveraged ESOP Transactions (subject to Bankruptcy Court approval of the Debtor/Committee/Lender Plan) and for certain other Claims related to the Leveraged ESOP Transactions to be assigned to the Litigation Trust. In either event, it is assumed that the recoveries from these Claims would be substantially similar in either a reorganization or a liquidation and thus not change the conclusion regarding the "best interests" test.

In addition, as noted in Exhibit D to the General Disclosure Statement, the Liquidation Analysis does not incorporate the Intercompany Claims Settlement embodied in the Debtor/Committee/Lender Plan. The Liquidation Analysis assumes that all Intercompany Claims, including prepetition Intercompany Claims and post-petition Intercompany Claims, are satisfied under a hypothetical liquidation in their respective order of priority at the value detailed in the Debtors' books and records,

Recovery excluding the settlement payments is still, in each case, in excess of the hypothetical recovery set forth in the Liquidation Analysis.

without consideration to any potential adjustments and/or settlement of Claim amounts that might be made to the value of the Intercompany Claims under the Debtor/Committee/Lender Plan.

## V.     RISK FACTORS

THE IMPLEMENTATION OF THE DEBTOR/COMMITTEE/LENDER PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE DEBTOR/COMMITTEE/LENDER PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE DEBTOR/COMMITTEE/LENDER PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS SPECIFIC DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE IN THE DEBTOR/COMMITTEE/LENDER PLAN), PRIOR TO VOTING TO ACCEPT OR REJECT THE DEBTOR/COMMITTEE/LENDER PLAN.  THESE SPECIFIC RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISK INVOLVED IN CONNECTION WITH THE DEBTOR/COMMITTEE/LENDER PLAN AND THEIR IMPLEMENTATION, OR ALTERNATIVES TO THE DEBTOR/COMMITTEE/LENDER PLAN. FOR ADDITIONAL RISK FACTORS PLEASE SEE ARTICLE XII OF THE GENERAL DISCLOSURE STATEMENT ENTITLED "GENERAL RISK FACTORS."

A.     **General Bankruptcy Law Considerations and Risks Related to the Debtor/Committee/Lender Plan.**

1.     Objections to the Classification of Claims May Change the Composition of the Classes and the Vote Required of Each Class for the Approval of the Debtor/Committee/Lender Plan.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Plan Proponents believe that the Debtor/Committee/Lender Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Debtor/Committee/Lender Plan to be confirmed.  In such event, the Debtor/Committee/Lender Plan Proponents intend, to the extent permitted by the Bankruptcy Court and the Debtor/Committee/Lender Plan, to make such reasonable modifications of the classifications under the Debtor/Committee/Lender Plan to permit Confirmation and to use the acceptances of the Debtor/Committee/Lender Plan received in response to this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder was initially a member, or any other Class under the Debtor/Committee/Lender Plan, by changing the composition of such Class and the vote required of that Class for approval of the Debtor/Committee/Lender Plan.

2.     Failure to Obtain Confirmation of the Debtor/Committee/Lender Plan May Result in Liquidation or an Alternative Plan on Less Favorable Terms.

Although the Debtor/Committee/Lender Plan Proponents believe that the Debtor/Committee/Lender Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Though the

Debtor/Committee/Lender Plan Proponents disagree with this contention, and, again, believe that the Debtor/Committee/Lender Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that modifications to the Debtor/Committee/Lender Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes in support of the Debtor/Committee/Lender Plan.

In addition, Sections 10.1.1(b) and (c) of the Debtor/Committee/Lender Plan provide that it is a condition precedent to the effectiveness of the Debtor/Committee/Lender Plan that the Confirmation Order authorize and approve the Settlement and the Step Two/Disgorgement Settlement in all respects without modification. Pursuant to Section 10.2 of the Debtor/Committee/Lender Plan, these conditions may not be waived, modified or amended. Accordingly, although the Debtor/Committee/Lender Plan Proponents believe that the Settlement and Step Two/Disgorgement Settlement should receive such authorization and approval, there can be no assurance that the Bankruptcy Court will concur and, in the event the Confirmation Order does not authorize and approve the Settlement and Step Two/Disgorgement Settlement in all respects without modification, the Debtor/Committee/Lender Plan cannot become effective.

The Debtor/Committee/Lender Plan provides that the Debtor/Committee/Lender Plan Proponents reserve the right to seek confirmation of the Debtor/Committee/Lender Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by various Classes of Claims and Interests under the Debtor/Committee/Lender Plan. In the event such Classes fail to accept the Debtor/Committee/Lender Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtor/Committee/Lender Plan Proponents reserve the right: (a) to request that the Bankruptcy Court confirm the Debtor/Committee/Lender Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Debtor/Committee/Lender Plan in accordance with Section 13 thereof. While the Debtor/Committee/Lender Plan Proponents believe that the Debtor/Committee/Lender Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because the Debtor/Committee/Lender Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Debtor/Committee/Lender Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Debtor/Committee/Lender Plan.

If the Debtor/Committee/Lender Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Debtor/Committee/Lender Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would substantially erode to the detriment of all stakeholders.

     3.     Undue Delay in Confirmation of the Debtor/Committee/Lender Plan May Disrupt the Debtors' Operations.

Although the Debtor/Committee/Lender Plan is designed to minimize the length of the Debtors' bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Debtor/Committee/Lender Plan will be confirmed. The continuation of the Chapter 11 Cases, particularly if the Debtor/Committee/Lender Plan is not approved or confirmed in the timeframe currently contemplated, could adversely affect operations and relationships with the Debtors' customers, vendors, employees, regulators and partners. If confirmation and consummation of the Debtor/Committee/Lender Plan does not occur expeditiously, the

Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

    4.     If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms.

There can be no assurance with respect to timing of the Effective Date. The occurrence of the Effective Date is also subject to the conditions precedent described in Section 10.1 of the Debtor/Committee/Lender Plan. Failure to meet any of these conditions could result in the Debtor/Committee/Lender Plan not being consummated.

If the Effective Date of the Debtor/Committee/Lender Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Debtor/Committee/Lender Plan.

    **B.**     **FCC-Related Considerations and Risks Respecting the Debtors' Businesses.**

    1.     The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy.

The Debtors operate television broadcast stations, a radio station, and certain associated facilities under authority granted by the FCC. Under Section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses. Except in the case of "involuntary" assignments, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated. For additional information concerning FCC-related considerations and risks see Article XII of the General Disclosure Statement "General Risk Factors."

        a.     FCC Processing of Applications for Consent to Emerge from Bankruptcy.

On April 28, 2010, the Debtors filed the FCC Applications, by which Debtors sought the consent of the FCC for each of the Debtors holding FCC licenses to assign its FCC licenses to the Reorganized Debtors. The FCC Applications included requests for waivers of the FCC's newspaper/broadcast cross-ownership rule and local television multiple ownership or "duopoly" rule, including a "failing station" waiver and continued "satellite" exemption. The Debtors filed 16 applications for consent to assignment of broadcast station licenses, together with applications seeking consent to assign satellite earth station, private land mobile, private fixed microwave, and other categories of FCC licenses held by the Debtors. Tribune provided local public notice of the filing of the FCC Applications through broadcast announcements and notices in local newspapers servicing their broadcast markets. The Debtors have amended the FCC Applications from time to time.

On May 13, 2010, the FCC's Media Bureau issued a public notice announcing that the FCC has accepted all of the FCC Applications for filing upon initial review. Although the FCC has accepted and is currently processing the FCC Applications, the Debtor/Committee/Lender Plan Proponents anticipate that the FCC will not grant the FCC Applications until the Bankruptcy Court has confirmed the Debtor/Committee/Lender Plan and authorized the transactions proposed in the Debtor/Committee/Lender Plan.

The FCC's public notice of May 13, 2010 set a deadline of June 14, 2010 for interested persons to file petitions to deny the FCC Applications. On that date, a coalition of Washington, D.C.-based public

advocacy groups (the "Washington Public Advocacy Groups"); the International Brotherhood of Teamsters ("IBT"); Wilmington Trust; and Neil Ellis, a competing newspaper publisher in the Hartford market ("Neil Ellis") filed petitions to deny the FCC Applications (collectively, the "Petitions to Deny").

On June 29, 2010, Tribune and JPMorgan filed oppositions to the Petitions to Deny. On July 12, 2010, Washington Public Advocacy Groups, IBT, Wilmington Trust, and Neil Ellis filed replies to the oppositions of Tribune and JPMorgan. The pleading cycle in this proceeding is now closed.

The Debtors have amended the FCC Applications on several occasions and anticipate that further amendments will be necessary to reflect the filing of the Debtor/Committee/Lender Plan and the Debtor/Committee/Lender Disclosure Statement. Although the formal pleading cycle in the FCC proceeding has closed, additional filings may be submitted so long as they are made part of the public record in the proceeding, and the FCC may request additional comment.

The FCC is reviewing the FCC Applications and all filings made by parties to the proceeding. In addition to the consideration of any waiver requests, the FCC's review of the FCC Applications will focus on whether the existing media interests (broadcast and daily newspaper holdings) of the parties to the FCC Applications, when combined with other media interests held by parties to the FCC Applications comply with the FCC's broadcast multiple ownership rules. The FCC also will consider compliance with limitations on foreign ownership, the parties' other legal qualifications, their prior records before the FCC, and certain categories of prior adverse determinations against parties to the FCC Applications by courts and other administrative bodies.

In some instances, the FCC may request that the applicants supply additional information through amendments to an application. There is no time limit on the FCC's consideration of assignment applications. The FCC has a stated goal of processing all such applications within 180 days, although processing often exceeds this timeframe when petitions to deny or objections are filed.

In this case, the consummation of the Debtor/Committee/Lender Plan will not occur until the FCC has granted the FCC Applications and issued the necessary consents to implement the Debtor/Committee/Lender Plan as confirmed by the Bankruptcy Court. If the grant is made by the FCC *en banc*, parties may file petitions for reconsideration with the agency or an appeal with the D.C. Circuit within a period of 30 days of issuance of the decision. If the grant is made by the FCC's staff under delegated authority, an interested party may request that the staff reconsider its decision or the FCC review the grant *en banc* within 30 days of issuance of the decision, and the FCC may reconsider the action on its own initiative for a period of 40 days following issuance of the decision. It is highly unusual for the FCC to rescind grant of consent to an assignment or transfer upon reconsideration or review. Parties are entitled to close upon the grant of FCC consent even if petitions for reconsideration, applications for review, or judicial appeals are filed and remain pending, but any such consummation is subject to any further order that the FCC or a court might issue.

      2.      Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Debtor/Committee/Lender Plan.

In the FCC Applications, the Debtors are seeking waivers of several of the FCC's broadcast ownership rules. Grant of these waiver requests will be necessary in order to allow the assignment of combinations of media properties currently held by the Debtors in six markets in which the combinations currently operate under waivers of the FCC ownership rules. Absent continued waivers from the FCC, Reorganized Tribune will not be able to own and operate these combinations.

As a result of a decision issued by the FCC on November 30, 2007 (the "FCC Order"), the Debtors received seven waivers that allow them to hold clusters of media properties in six markets despite non-compliance with the FCC's rules. These waivers are as follows:

      1)    A "temporary" waiver of the FCC's newspaper/broadcast cross-ownership rule to own WPIX-TV and *Newsday* in New York;

      2)    A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own KTLA-TV and the *Los Angeles Times* in Los Angeles;

      3)    A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WSFL-TV and the Ft. Lauderdale-based *South Florida Sun-Sentinel* in Miami;

      4)    A "permanent" waiver of the newspaper/broadcast cross-ownership rule to own WGN, WGN-TV and the *Chicago Tribune* in Chicago;

      5)    A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WTIC-TV, and WCCT-TV (formerly WTTX-TV), and the *Hartford Courant* in Hartford;

      6)    A "permanent" "failing station" waiver of the FCC's television local ownership or "duopoly" rule to own WTIC-TV and WCCT-TV in Hartford; and

      7)    A "permanent" exemption of the FCC's "duopoly" rule to permit operation of WTTK-TV, a full-power television station licensed to Kokomo, Indiana, as a "satellite" rebroadcasting the programming of WTTV-TV, Bloomington, Indiana.

The "temporary" newspaper/broadcast cross-ownership rule waivers that resulted from the FCC Order are time limited. They extend until the latest of the following: (i) the expiration of a two-year period for the filing and evaluation of individualized waiver showings, the commencement of which is open to interpretation, (ii) six months following the conclusion of the litigation over the FCC Order pending in the D.C. Circuit, which the Debtors initiated on December 3, 2007, or (iii) six months after the expiration of any judicial stay to which the FCC's modified waiver standards for the cross-ownership rule as adopted in the 2008 Order may be subject. The "permanent" waivers continue as long as the Debtors own the properties, but the waivers do not permit assignments of the combinations intact, and waivers will be needed in order for the Reorganized Debtors to maintain their existing properties.

In the FCC Applications, the Debtors are seeking extensions of the waivers covering these seven media combinations. In the case of the newspaper/broadcast cross-ownership rule waivers, the Debtors are requesting "permanent" relief that effectively would allow them (i) to hold the ownership combinations or interests at least until the next "long form" assignment or transfer and (ii) upon such assignment or transfer to dispose of the interests in combination to a single purchaser. Alternatively, the Debtors are seeking a temporary waiver of the newspaper/broadcast cross-ownership rule that would extend until 18 months after the FCC completes its pending rulemaking review of that rule and the FCC's action becomes a final order no longer subject to judicial review. In the case of the Hartford television "duopoly" and the Indianapolis "satellite" waivers, the Debtors are seeking a continuation of those "permanent" waivers that would allow the combinations to be commonly held until the next "long-form" assignment or transfer.

In the requests for waivers filed as part of the FCC Applications, the Debtors intend to demonstrate that cross-ownership waiver relief is justified under the criteria announced in the 2008 Order, which took effect on March 23, 2010, with the Third Circuit's lifting of its stay, as well as the general

"public interest" waiver test adopted with the newspaper/broadcast cross-ownership rule in 1975. In the cross-ownership markets, synergies and efficiencies attributable to cross-ownership allow the Debtors' combined media properties to deliver an exceptional level of local news – both quantitatively and qualitatively. The Debtors' combined properties have earned strong ratings and many journalistic awards as testament to their community service and success. Each cross-owned market is also remarkably diverse and competitive with respect to traditional media properties (broadcast, cable and print) and even more so when new technological offerings, particularly those available over the Internet and wireless services, are taken into account.

The waiver filings also argue that any forced regulatory separation of the cross-owned properties would have adverse public interest effects. First, in today's challenging media marketplace, the assumption that an alternative purchaser would be willing and able to acquire any of the properties simply is not valid. Second, even assuming that such a purchaser could be found, it is unlikely that the new owners would have the resources and, absent efficiencies from cross-ownership, the ability to maintain the amount and caliber of local news, information, and community services currently offered by each cross-owned combination.

Under the standards set forth in the 2008 Order to analyze the waivers, cross-ownership relief is presumptive in New York, Los Angeles, and Miami, because, as explained in the FCC Applications, (i) those markets are among the Top 20 largest DMAs, (ii) the Debtors own only one broadcast outlet in each market, (iii) the television station at issue does not rank among the top four rated television stations, and (iv) at least eight "major media voices" exist exclusive of the combination. In Chicago and Hartford, where the Debtors hold more than one broadcast property, the Debtors are not entitled to a presumptive waiver, but their waiver requests assert that those combinations also are entitled to relief because (i) the stations have increased the amount of news provided to the market, (ii) the cross-owned properties exercise independent news judgment, (iii) the level of concentration in the DMA is not adversely affected, and (iv) the struggling financial condition of the Debtors justifies relief.

In the FCC Applications, the Debtors also contend that continued waiver of the television "duopoly" rule for the Hartford properties is justified under either the FCC's "failed" or "failing station" standards. In the Indianapolis market, the Debtors have argued that continued operation of WTTK-TV as a "satellite" is appropriate under FCC policies.

In each of the seven requests, the Debtors stress that grant of the relief they request is required under the FCC's policies affording comity to the bankruptcy process. FCC precedent establishes that the agency is required to reconcile its policies with those underlying the bankruptcy laws. The FCC has previously taken comity into account in granting ownership waivers, and, in all seven instances involving the Debtors' properties; waivers would merely allow the Reorganized Debtors to maintain the existing combinations.

It is possible that the FCC will deny the Debtors' request for "permanent waivers," or grant temporary waivers of shorter duration than requested, with respect to one or more of the media combinations or interests for which the Debtors are seeking waivers. In the event that the FCC does not grant the requested waivers, the Debtors could be required to come into compliance with the applicable ownership rule by disposing of properties deemed non-conforming by a date set by the FCC, which date could be prior to the Debtors' emergence from bankruptcy. It is possible that the FCC will require the Debtors to place one or more properties deemed by the FCC to be non-compliant with its ownership rules into a divestiture trust prior to the Debtors' emergence from bankruptcy. If the present difficult financial climate for businesses overall and for media industries in particular persists, the Debtors could face difficulty locating buyers willing to purchase the non-conforming properties and could be forced to dispose of properties at prices that the Debtors otherwise would consider unacceptable.

In addition, it is possible that, in evaluating the FCC Applications, the FCC could determine that the Debtor/Committee/Lender Plan neither complies with nor ensures compliance with the FCC's broadcast multiple and/or cross-ownership rules and/or the twenty-five percent (25%) foreign ownership limit in Section 310(b) of the Communications Act. For example, the FCC may not agree with the Debtors and determine that the New Class B Common Stock should be considered attributable rather than non-attributable under its rules. Such a finding could cause the FCC to determine that certain prospective stockholders of the Reorganized Debtors would not be in compliance with the FCC's broadcast multiple and/or cross-ownership rules upon consummation of the currently proposed Debtor/Committee/Lender Plan. Further, the FCC could require the Debtor/Committee/Lender Plan Proponents to amend the Debtor/Committee/Lender Plan and/or the FCC Applications, which could delay FCC Approval and consummation of the Debtor/Committee/Lender Plan. The FCC's consideration of the Petitions to Deny also could cause a delay in FCC Approval and consummation of the Debtor/Committee/Lender Plan, increasing the cost to the Debtors of emerging from bankruptcy.

## C.    Risks Related to the Debtors' Businesses.

1.    Historical Financial Information Will Not Be Comparable.

As a result of the consummation of the Debtor/Committee/Lender Plan and the transactions contemplated thereby, the Debtors will be operating their current businesses under a new capital structure and will be subject to the fresh start accounting rules. Accordingly, the Debtors' financial condition and results of operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.    The Debtors Could Be Faced with Additional Tax Liabilities.

The Debtors are subject to federal and state income taxes and are regularly audited by federal and state taxing authorities. In the years currently under audit, or eligible for future audit, the Debtors consummated certain significant business transactions that they treated or intend to treat as not resulting in gain for income tax purposes but as resulting in gain or loss for financial accounting purposes. In addition, the Debtors treated or intend to treat significant amounts of income as not subject to tax because of the Debtors' status as an S corporation. Significant judgment is required in evaluating the Debtors' tax positions and in establishing appropriate reserves. The Debtors analyze their tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. The resolutions of the Debtors' tax positions are unpredictable and could result in tax liabilities and associated cash payments that are significantly higher or lower than that which has been provided for by the Debtors. In addition, a change in the tax laws of the United States and adjustments to tax positions as a result of audits could materially affect the consequences of the Debtor/Committee/Lender Plan to the Debtors and/or their stockholders.

3.    The Reorganized Debtors May Continue to Have Substantial Indebtedness.

The Reorganized Debtors may continue to have substantial indebtedness following the Effective Date, which may include a New Senior Secured Term Loan in an aggregate principal amount of not more than the lesser of (a) $1.1 billion or (b) two times the Debtors' trailing twelve month operating cash flow, excluding minority equity interest, as of the end of the fiscal quarter most recently ended prior to the Effective Date. For purposes of the Financial Projections attached as Exhibit E to the General Disclosure Statement, the aggregate principal amount of the New Senior Secured Term Loan is assumed to be $1.1 billion. While the Reorganized Debtors' management believes that future operating cash flow, together with financing arrangements, will be sufficient to finance operating requirements under the Reorganized Debtors' business plan, the Reorganized Debtors' leverage and debt service requirements could make it

54

more vulnerable to economic downturns in the markets the Reorganized Debtors serve or in the economy generally.

The degree to which the Reorganized Debtors will be indebted could have important consequences because it may:

- require the Reorganized Debtors to dedicate a substantial portion of their cash flows to the payment of principal and interest on their debt which will reduce the funds available for other purposes;
- limit the Reorganized Debtors liquidity and operational flexibility and their ability to respond to the challenging general and industry-specific economic and business conditions that currently exist or that the Reorganized Debtors may face in the future;
- require the Reorganized Debtors in the future to defer planned capital expenditures, further reduce the size of the Reorganized Debtors' workforce, reduce discretionary spending, dispose of assets or forgo acquisitions or other strategic opportunities, any of which decisions may affect the Reorganized Debtors' revenues and place them at a competitive disadvantage compared to their competitors with less debt or with comparable debt at more favorable interest rates and who, as a result, may be better positioned to withstand economic downturns or pursue key acquisitions or other strategic opportunities;
- limit the Reorganized Debtors' ability to obtain additional financing in the future;
- expose the Reorganized Debtors to increased interest rate risk because a substantial portion of the Reorganized Debtors' debt obligations may be at variable interest rates; and
- place the Reorganized Debtors at a competitive disadvantage because they may be more highly leveraged than some of their competitors.

In addition, any new financing facility that the Reorganized Debtors may enter into as of the Effective Date pursuant to the Debtor/Committee/Lender Plan will likely contain covenants that impose operating and financial restrictions on the Reorganized Debtors. These covenants could adversely affect the Reorganized Debtors' ability to finance future operations, potential acquisitions or capital needs or to engage in business activities that may be in their interest, including implementing the Reorganized Debtors' Debtor/Committee/Lender Plan.

### D.    Risks to Creditors Who Will Receive Securities.

The ultimate recoveries under the Debtor/Committee/Lender Plan to Holders of Claims that receive shares of New Common Stock or New Warrants to purchase shares of New Common Stock pursuant to the Debtor/Committee/Lender Plan will depend on the realizable value of the shares of New Common Stock. Shares of New Common Stock are subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Debtor/Committee/Lender Plan, each Holder of Claims that are to be satisfied in whole or part through a distribution of New Common Stock should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Debtor/Committee/Lender Plan.

1.    The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants.

No established market exists for the New Common Stock or New Warrants and there can be no assurance that an active market for the shares of the New Common Stock or New Warrants will develop, nor can any assurance be given as to the prices at which such securities might be traded. Although Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the

NASDAQ stock market, there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. If a trading market does not develop or is not maintained, holders of shares of the New Common Stock and New Warrants may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Debtor/Committee/Lender Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, the Reorganized Debtors' performance and investor expectations thereof. In addition, some persons who receive shares of the New Common Stock and/or the New Warrants may prefer to liquidate their investment in the near term rather than hold such securities on a long-term basis. Accordingly, any market for such securities may be volatile, at least for an initial period following the Effective Date, and may be depressed until the market has had time to absorb any such sales and to observe the Reorganized Debtors' performance.

    2.    Lack of Dividends May Adversely Affect Liquidity of the New Common Stock.

The Debtors do not anticipate that cash dividends or other distributions will be made with respect to the New Common Stock in the foreseeable future. In addition, covenants in certain debt instruments to which the Reorganized Debtors will be a party may restrict their ability to pay dividends and make certain other payments. Further, such restrictions on dividends may have an adverse impact on the market demand for the New Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Debtor/Committee/Lender Plan.

    3.    Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock.

If holders of New Common Stock sell substantial amounts of New Common Stock or Reorganized Tribune issues substantial additional amounts of its equity securities, or there is a belief that such sales or issuances could occur, the market price of the New Common Stock could decline significantly. Reorganized Tribune may issue New Warrants to purchase shares of New Class A Common Stock in certain circumstances. If Holders who receive New Warrants in connection with the implementation of the Debtor/Committee/Lender Plan exercise such warrants and purchase a significant number of shares of New Class A Common Stock, the market price of the New Class A Common Stock may be adversely affected. In addition, any new issuances of equity securities by Reorganized Tribune including as a result of warrant exercises, may be dilutive to existing stockholders of Reorganized Tribune.

    4.    The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value.

In certain circumstances, Reorganized Tribune may issue shares of New Class B Common Stock and/or New Warrants. The New Class A Common Stock and New Class B Common Stock generally provide identical economic rights, but holders of the New Class B Common Stock have limited voting rights, including that such holders have no right to vote in the election of directors. The holders of the New Warrants have no voting rights. The difference in voting rights of the New Class A Common Stock on the one hand, and New Class B Common Stock and New Warrants on the other hand, could diminish the value of the New Class B Common Stock and the New Warrants to the extent that investors or

potential future purchasers of the New Class B Common Stock or the New Warrants ascribe value to the superior voting rights of the New Class A Common Stock. The Certificate of Incorporation of Reorganized Tribune, which will be filed with the Plan Supplement as Exhibit 5.3.1(1) to the Debtor/Committee/Lender Plan, contains more information about the rights and limitations associated with the New Class B Common Stock. In addition, the New Warrant Agreement, which will be filed with the Plan Supplement as Exhibit 1.1.154 to the Debtor/Committee/Lender Plan, contains more information about the rights and limitations associated with the New Warrants.

     5.     Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities.

To the extent that New Common Stock, New Warrants or any other securities are issued under the Debtor/Committee/Lender Plan and are covered by section 1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock or New Warrants pursuant to the Debtor/Committee/Lender Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would be permitted to sell such New Common Stock or New Warrants without registration if they are able to comply with the provisions of rule 144 under the Securities Act.

Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. As noted above (see "The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants"), there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. Efforts to list the New Class A Common Stock, if successful, would include registering the New Class A Common Stock under the Exchange Act. Registration under the Exchange Act is a separate process from registration under the Securities Act and would not be sufficient to permit resales by persons who receive New Common Stock or New Warrants pursuant to the Debtor/Committee/Lender Plan and who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code. Reorganized Tribune has no current plans to list the New Class B Common Stock on the NYSE or for quotation on the NASDAQ Stock Market or to register the New Class B Common Stock or New Warrants under the Securities Act, the Exchange Act or under equivalent state securities laws such that the recipients of the New Class B Common Stock or New Warrants would be able to resell their securities pursuant to an effective registration statement.

The Certificate of Incorporation contains restrictions on stockholders' ability to transfer New Common Stock and New Warrants designed to ensure compliance with the FCC broadcast multiple ownership and cross-ownership rules and the limitations on foreign ownership or control of FCC broadcast licenses imposed by the Communications Act. Furthermore, certificates for shares of New Common Stock and certificates for New Warrants may bear a legend restricting the sale, transfer, assignment, conversion or other disposal of such securities.

**E.**     **Risks Related to Interests in the Litigation Trust and the Creditors' Trust.**

Distributions on account of interests in the Litigation Trust and the Creditors' Trust will be dependent upon the successful liquidation of the Litigation Trust Assets and Creditors' Trust Assets and the proceeds of such Litigation Trust Assets and Creditors' Trust Assets being in excess of certain liabilities and expenses of the Litigation Trust and Creditors' Trust, as the case may be. The

Debtor/Committee/Lender Plan Proponents can make no assurances that there will be any distributions from the Litigation Trust or the Creditors' Trust.

## VI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN

The following discussion is a summary of certain U.S. federal income tax aspects of the Debtor/Committee/Lender Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Debtor/Committee/Lender Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Debtor/Committee/Lender Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Debtor/Committee/Lender Plan. No representations or assurances are being made to the U.S. Holders of Claims or Interests with respect to the U.S. federal income tax consequences described in the Debtor/Committee/Lender Plan.

\*       \*       \*       \*

Any discussion of U.S. federal tax issues set forth in this Debtor/Committee/Lender Disclosure Statement was written solely in connection with the confirmation of the Debtor/Committee/Lender Plan to which the transactions described in this Debtor/Committee/Lender Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

\*       \*       \*       \*

### A.    Federal Income Tax Consequences to the Debtors.

1.    Termination of Subchapter S Corporation Status.

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the IRC, which election became effective as of the beginning of its 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations (such as the built-in gains tax applicable to Tribune's net unrealized gains as of the beginning of the 2008 fiscal year that are recognized in the subsequent ten taxable years), Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax. Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders. The ESOP, which, as of the Petition Date, was the sole stockholder of Tribune, does not pay taxes on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

As a result of the implementation of the Debtor/Committee/Lender Plan, Tribune will no longer be eligible to be treated as a subchapter S corporation beginning on the Effective Date. Accordingly, Reorganized Tribune and its subsidiaries will be subject to entity-level tax on all of their income and gains beginning on the Effective Date at corporate income tax rates. As described below, Reorganized Tribune is expected to have limited tax attributes available to offset such income and gains.

2.    Cancellation of Debt and Reduction of Tax Attributes.

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt. For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor. COD Income is not required to be included in taxable income, however, if the debtor is in bankruptcy (the "Bankruptcy Exception"). Instead, the debtor is required to reduce certain of its tax attributes by the amount of excluded COD Income, generally in the following order: net operating losses ("NOLs"), general business credit carryforwards, minimum tax credit carryforwards, capital loss carryforwards, the tax basis of the debtor's assets, passive activity loss or credit carryovers, and, finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Liability Floor Rule").

The Debtors expect to realize substantial COD Income as a result of the implementation of the Debtor/Committee/Lender Plan. The precise amount of COD Income will depend on, among other things, the fair market value of the New Common Stock and New Warrants, which cannot be known with certainty until after the Effective Date. Pursuant to the Bankruptcy Exception, this COD Income will not be included in the Debtors' taxable income, but they will have to reduce their Tax Attributes after calculating the tax for the taxable year of discharge.

As a subchapter S corporation, Tribune does not currently have any NOLs or other significant Tax Attributes other than tax basis in assets. Although the projected COD Income is expected to exceed the Debtors' aggregate tax basis in assets, under the Liability Floor Rule the Debtors' will not be required to reduce such basis below their total liabilities after the discharge.

**B.    Federal Income Tax Treatment of the Creditors' Trust and Litigation Trust (collectively, the "Trusts") and the Receipt and Ownership of Beneficial Interests in the Trusts.**

It is intended that each of the Trusts will qualify as a "liquidating trust" for U.S. federal income tax purposes. A liquidating trust is generally treated as a grantor trust for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. Consistent with the requirements for liquidating trust treatment, the Creditors' Trust Agreement and the Litigation Trust Agreement (collectively, the "Trust Agreements") will each require all relevant parties to treat, for U.S. federal income tax purposes, the transfer of each of the Creditors' Trust Assets or the Litigation Trust Assets, as applicable (the "Trust Assets"), to the relevant Trust as (i) a transfer of the Trust Assets (other than amounts set aside in Trust Reserves on account of Disputed Claims if such Trust Reserves are subject to entity-level tax, as discussed below) to the Creditors' Trust Beneficiaries or the Litigation Trust Beneficiaries, as applicable (the "Trust Beneficiaries"), which transfer should be taxable (as described below) to each such Trust Beneficiary in its taxable year that includes the Effective Date, followed by (ii) a transfer of such Trust Assets by the Trust Beneficiaries to the Trust, with the Trust Beneficiaries being treated as the grantors and owners of the Trust.

The Debtor/Committee/Lender Plan generally provides that, subject to the terms of Trust Agreements, promptly after the Effective Date, the Creditors' Trustee and the Litigation Trustee (each, a "Trustee"), as applicable, will determine and file with the court the estimated fair market value of the assets of each such Trust as of the Effective Date. The Trust Beneficiaries and the Trustees will each be required to use such valuation consistently for all U.S. federal income tax purposes, including for determining tax basis and gain or loss.

Consistent with the treatment of each Trust as a liquidating trust, the Trust Agreements will require each Trust Beneficiary to report on its U.S. federal income tax return its allocable share of each Trust's income, losses, if any, and expenses (the relevant Trust's "Tax Items"). Therefore, a Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the income of each Trust whether or not the Trust has made any distributions to such Trust Beneficiary. The ability of a Trust Beneficiary to benefit from any deduction or losses may depend on the particular situation of that Trust Beneficiary.

The Trustees will each file with the Internal Revenue Service ("IRS") tax returns for the Trusts as grantor trusts and will also send to each Trust Beneficiary separate statements setting forth such holder's share of each Trust's Tax Items. Each Trust Beneficiary will be required to report such Tax Items on its U.S. federal income tax return.

This discussion assumes each Trust will be respected as a grantor trust owned by the Trust Beneficiaries for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Trusts and the Trust Beneficiaries could differ materially from those discussed herein. For instance, it is possible that all income of each Trust could be subject to entity-level tax. It is also possible that the IRS might assert that the rights of the Trust Beneficiaries to receive Trust distributions should defer the ability of a Trust Beneficiary to claim a loss until the liquidation of the respective Trust is completed. Trust Beneficiaries should consult their own tax advisors about the tax consequences of their beneficial interests in the Trusts.

## C.    Federal Income Tax Treatment of the CT Reserve(s) and the LT Reserve(s) (collectively, the "Trust Reserve(s)").

Each Trustee may establish one or more Trust Reserves on account of Disputed Claims. The amount(s) held back in the Trust Reserve(s) will be equal to the amount(s) necessary to satisfy the distributions to which the Holders of Disputed Claims would be entitled if all such Disputed Claims were to be subsequently Allowed.

For U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), each Trustees may (i) make an election pursuant to Treasury Regulation Section 1.468B-9 to treat the Trust Reserve(s) as a "disputed ownership fund" within the meaning of that Section, (ii) allocate taxable income or loss to the Trust Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the Trust Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise resolved. The Trust beneficiaries will be bound by such election, if made by the Trustee, and as such will be required, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

The Trust Reserve(s) may be structured in a manner intended to cause it to be subject to a separate entity-level tax on any income earned by the Trust Reserve(s), including any taxable income of the Trusts allocable to the Trust Reserve(s). Therefore, distributions from the Trust Reserve(s) may be reduced to satisfy any taxes payable by the Trust Reserve(s).

Holders of Claims should note the tax treatment of the Trust Reserve(s) is unclear and should consult their own tax advisors.

**D.      Federal Income Tax Consequences to Holders of Claims and Interests.**

The U.S. federal income tax consequences of the transactions contemplated by the Debtor/Committee/Lender Plan to Holders of Claims and Interests that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any individual who is a citizen or resident of the United States, or any entity (i) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (ii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iii) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "U.S. Holder" means a beneficial owner of a Claim or Interest that is a United States Person. The general U.S. federal income tax consequences to Holders of Claims or Interests that are Non-United States Persons are discussed below.

The U.S. federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Debtor/Committee/Lender Plan and the distributions provided for thereby will depend upon, among other things, (i) the manner in which a U.S. Holder acquired a Claim; (ii) the length of time the Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (v) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (vi) the method of tax accounting of the U.S. Holder; (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (viii) whether the Claim is a capital asset in the hands of the U.S. Holder. Certain holders of Claims or Interests (such as foreign persons, subchapter S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary. In addition, this summary does not discuss consequences to holders of the Swap Claim. There also may be state, local, and/or non-U.S. income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests that are not addressed in this discussion.

The discussion that follows does not describe the tax consequences of the receipt and holding of beneficial interests in the Trusts, which are discussed above.

EACH U.S. HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE DEBTOR/COMMITTEE/LENDER PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE DEBTOR/COMMITTEE/LENDER PLAN.

1.      General.

A U.S. Holder of a Claim may recognize ordinary income or loss with respect to any portion of its Claim attributable to accrued but unpaid interest. A U.S. Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of

its Claim pursuant to the Debtor/Committee/Lender Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as a payment of interest, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of surrendering its Claim. In general, a U.S. Holder that previously included in its income accrued but unpaid interest attributable to its Claim will recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of the distribution it may receive under the Debtor/Committee/Lender Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors intend to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Debtor/Committee/Lender Plan with respect to a Claim first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a U.S. Holder receives consideration in an amount that is less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such U.S. Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such U.S. Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Debtor/Committee/Lender Plan by U.S. Holders of Claims or Interests that hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the U.S. Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate U.S. Holder only to offset capital gains, and by an individual U.S. Holder only to the extent of capital gains plus $3,000 of other income.

2.    Market Discount.

The market discount provisions of the IRC may apply to holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition (any such excess, "market discount"). In general, a market discount obligation is treated as having accrued market discount as of any date equal to the total market discount multiplied by a fraction, the numerator of which is the number of days the holder has owned the market discount obligation and the denominator of which is the total number of days that remained until maturity at the time the holder acquired the market discount obligation. If a U.S. Holder has Claims that were acquired with market discount and such U.S. Holder realizes gain upon the exchange of its Claims for property pursuant to the Debtor/Committee/Lender Plan, such U.S. Holder may be required to include as ordinary income some or all of such market discount to the extent of such realized gain. U.S. Holders who have Claims with market discount should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances. In particular, U.S. Holders of Claims that are "securities" for U.S. federal income tax purposes and that are exchanged for New Common Stock and, if applicable, New Warrants should consult their tax advisors regarding possible recognition of ordinary income upon a subsequent disposition of such New Common Stock or New Warrants. See "Definition of Security," below.

3.    Amounts Attributable to Disallowance of Disputed Claims

Certain Holders of Allowed Claims have a contingent right to receive additional distributions on account of the disallowance of Disputed Claims. It is possible that such contingent claims should be

ignored until such cash is received, at which time the recipient would account for such cash by reference to the accounting that would have resulted if such cash had been received at the time the recipient received its initial distribution pursuant to the Debtor/Committee/Lender Plan. The existence of such a contingent right may also affect the timing of recognition of any loss by such Holder. Alternatively, such a contingent claim might be ascribed value in determining the tax consequences of the initial distribution pursuant to the Debtor/Committee/Lender Plan, with any difference between such ascribed value and the amount of cash actually received accounted for when such cash is actually received. Holders with such contingent rights to receive additional distributions should consult their own tax advisors regarding the treatment of such rights. For ease of discussion, the existence of such contingent rights will not be referred to in the discussion that follows.

    4.    U.S. Holders of Senior Loan Claims and Senior Guaranty Claims (not including the guaranty of the Swap Claim).

U.S. Holders of Allowed Senior Loan and Senior Guaranty Claims will receive New Common Stock (and where applicable, New Warrants), Cash, Creditors' Trust Interests and Litigation Trust Interests (collectively, "Trust Interests") and may receive interests in the New Senior Secured Term Loan, in exchange for their Claims.

Each such U.S. Holder will realize gain or loss in an amount equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock and any New Warrants received, (ii) the fair market value of the Holder's share of Trust Assets, if any, (iii) the Cash received, and (iv) the "issue price" of the Holder's interest in the New Senior Secured Term Loan, if received. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of an interest in the New Senior Secured Term Loan.

The tax consequences to a U.S. Holder of a Senior Loan and Senior Guaranty Claim depend on whether its Claim is a "security" for U.S. federal income tax purposes. Although not free from doubt, the New Senior Secured Term Loan will likely not constitute a security for U.S. federal income tax purposes. See "Definition of 'Security'," below. U.S. Holders are encouraged to consult with their tax advisors in connection with the determination of whether the New Senior Secured Term Loan constitutes a security for U.S. federal income tax purposes. The remainder of this discussion assumes that the New Senior Secured Term Loan will not constitute a security for U.S. federal income tax purposes.

If the Claim does not constitute a security for U.S. federal income tax purposes, the exchange of the Claim for New Common Stock (and where applicable, New Warrants), the Holder's share of Trust Assets, Cash and the Holder's interest in the New Senior Secured Term Loan, if received, will be a taxable transaction, and the U.S. Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a U.S. Holder's tax basis in the New Common Stock, the Holder's share of the Trust Assets, if any, and any New Warrants received in the exchange will equal the fair market value of such assets on the date received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in such assets will commence on the day after the date received. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of a Holder's interest in the New Senior Secured Term Loan.

If the Claim constitutes a security for U.S. federal income tax purposes, the exchange of such Claim will be treated as a recapitalization for U.S. federal income tax purposes. In such a case, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss,

except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the issue price of the Holder's interest in the New Senior Secured Term Loan, if received, (b) the fair market value of the Holder's share of Trust Assets, if any, and (c) the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the Holder's interest in the New Senior Secured Term Loan, if received, (ii) the fair market value of the Holder's share of Trust Assets, if any, and (iii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in its share of Trust Assets, if any, will equal the fair market value of such assets on the date received. A U.S. Holder's holding period in its share of Trust Assets, if any, will commence on the day after the date received. A U.S. Holder's tax basis in the Holder's interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in the Holder's interest in the New Senior Secured Term Loan, if received, will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding an interest in the New Senior Secured Term Loan.

  5. U.S. Holders of Bridge Loan Claims.

U.S. Holders of Allowed Bridge Loan Claims will receive Trust Interests and Cash in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of the Trust Assets, and (ii) the amount of Cash received.

  6. U.S. Holders of Senior Noteholder Claims.

U.S. Holders of Allowed Senior Noteholder Claims will receive Trust Interests and Cash in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, and (ii) the amount of Cash received.

  7. U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan).

U.S. Holders of Allowed Other Parent Claims will receive Cash and may receive Trust Interests in exchange for their Claims. Accordingly, a U.S. Holder of an Allowed Other Parent Claim should generally recognize income or loss in an amount equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the amount of Cash received, and (ii) the fair market value of the Holder's share of Trust Assets.

8. U.S. Holders of General Unsecured Claims against the Filed Subsidiary Debtors (not including Claims against the Filed Subsidiary Debtors arising from a Non-Qualified Former Employee Benefit Plan).

U.S. Holders of Allowed General Unsecured Claims will receive Cash in exchange for their Claims. Each U.S. Holder of an Allowed General Unsecured Claim will recognize income or loss equal to the difference between (i) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of Cash received.

9. U.S. Holders of Convenience Claims.

U.S. Holders of Allowed Convenience Claims will receive Cash in exchange for their Claims. Each U.S. Holder of a Convenience Claim will recognize income or loss in an amount equal to the difference between (i) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of Cash received.

10. U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan.

U.S. Holders of Allowed Claims arising from a Non-Qualified Former Employee Benefit Plan will receive Cash and may receive Trust Interests in exchange for their Claims. The amount of Cash received as part of the exchange (including any cash subsequently received on account of the disallowance of Disputed Claims) and the fair market value of the U.S. Holder's share of Trust Assets will likely be treated as compensation income to a U.S. Holder. Under Treasury Regulations promulgated under Section 409A of the IRC, such a payment may be treated as an acceleration of deferred compensation, and, if so, would be subject to an additional twenty percent (20%) tax, and interest would be due at the federal underpayment rate plus one percent (1%) on the underpayments of income tax on the amount of such deferred compensation had it been included in income in the first year it was no longer subject to a substantial risk of forfeiture.

11. U.S. Holders of EGI-TRB LLC and PHONES Notes Claims.

U.S. Holders of Allowed EGI-TRB LLC Claims and PHONES Notes Claims will receive Trust Interests in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, if any.

12. U.S. Holders of Securities Litigation Claims

Pursuant to the Debtor/Committee/Lender Plan, all Securities Litigation Claims will be extinguished, and U.S. Holders of Securities Litigation Claims will receive nothing in exchange for such Claims. As a result, each U.S. Holder of a Securities Litigation Claim generally will recognize a loss equal to the U.S. Holder's adjusted tax basis, if any, in such Claim, except to the extent that such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

13. U.S. Holders of Tribune Interests.

Pursuant to the Debtor/Committee/Lender Plan, all Tribune Interests will be extinguished, and U.S. Holders of Tribune Interests will receive nothing in exchange for such Tribune Interests. As a result, each U.S. Holder of Tribune Interests generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Tribune Interests extinguished under the Debtor/Committee/Lender Plan, except to the

65

extent that such U.S. Holder previously claimed a loss with respect to such Tribune Interests under its regular method of accounting.

14.    Definition of "Security."

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

15.    Federal Income Tax Treatment of the New Senior Secured Term Loan.

If interests in the New Senior Secured Term Loan are "publicly traded," the issue price of an interest is generally expected to equal its fair market value on the Effective Date. If interests in the New Senior Secured Term Loan are not publicly traded, the issue price of an interest will depend on whether a substantial amount of the New Senior Secured Term Loan is exchanged for debt instruments that are publicly traded, in which case the issue price of interests in the New Senior Secured Term Loan is generally expected to be determined by reference to the fair market value of the publicly traded debt for which a substantial amount of the New Senior Secured Term Loan has been exchanged. Otherwise, the issue price of an interest in the New Senior Secured Term Loan is generally expected to equal its stated redemption price at maturity. For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

A U.S. Holder who receives an interest in the New Senior Secured Term Loan will generally be required to include stated interest on the New Senior Secured Term Loan in income in accordance with U.S. Holder's regular method of tax accounting. In addition, if the New Senior Secured Term Loan is treated as issued with original issue discount for U.S. federal income tax purposes, a U.S. Holder of an interest in the New Senior Secured Term Loan will also be required to include in income as interest the amount of such original issue discount over the term of the New Senior Secured Term Loan based on the constant yield method. In such a case, a U.S. Holder will also be required to include amounts in income before they are received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to its interest in the New Senior Secured Term Loan.

16.    Federal Income Tax Treatment of New Warrants.

66

In general, a U.S. Holder of a New Warrant will recognize gain or loss upon the sale of the New Warrant in an amount equal to the difference between the amount realized on the sale and such Holder's adjusted tax basis in the New Warrant. Gain or loss attributable to the sale of a New Warrant will generally be capital gain or loss.

Although the U.S. federal income tax consequences of the exercise of a New Warrant on a cashless basis are not entirely clear, a U.S. Holder should not recognize any gain or loss in respect of the receipt of New Common Stock upon the cashless exercise of a New Warrant because such exchange should be treated as a recapitalization for U.S. federal income tax purposes. A U.S. Holder's tax basis in the New Common Stock received upon the exercise of a New Warrant should equal such Holder's tax basis in the New Warrant exercised. The holding period for the New Common Stock received upon the exercise of a New Warrant should include such Holder's holding period for the New Warrant. Due to the absence of authority on the U.S. federal income tax treatment of the exercise of warrants on a cashless basis, there can be no assurance that the IRS or a court would take a similar position as described above. Accordingly, U.S. Holders should consult their tax advisors concerning the possible tax consequences of the cashless exercise of the New Warrants.

A U.S. Holder should not recognize any gain or loss in respect of the receipt of New Common Stock upon the exercise of a New Warrant for a cash payment of the exercise price, which is expected to be a nominal amount. A U.S. Holder's tax basis in the New Common Stock received upon the exercise of a New Warrant should equal such Holder's tax basis in the New Warrant exercised plus the exercise price paid by the Holder. It is not clear whether the exercise of a New Warrant for a cash payment of equal to the exercise price should be treated as a purchase of the entirety of the New Common Stock received or as a purchase of only a portion of the New Common Stock worth the cash paid, with the rest of the New Common Stock treated as received pursuant to a recapitalization with consequences described in the preceding paragraph. If such exercise were treated as a purchase of the entirety of the New Common Stock received, a U.S. Holder's holding period for the Common Stock would commence upon the day following the date the New Warrant is exercised (or possibly on the date of exercise). U.S. Holders should consult their tax advisors regarding the tax consequences of exercise of a New Warrant by payment of the exercise price.

17.    Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Debtor/Committee/Lender Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

18.    Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Debtor/Committee/Lender Plan, may be subject to information reporting by the payor to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of twenty-eight percent (28%)) under certain circumstances. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) is notified by the IRS of a failure to report interest or dividends properly, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that the holder is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, under certain

circumstances, corporations and financial institutions. Holders of Allowed Claims and Interests are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

Recent legislation generally imposes withholding of 30% on payments to certain foreign entities (including financial intermediaries), after December 31, 2012, of dividend payments on and the gross proceeds of dispositions of U.S. common stock and possibly warrants, unless various U.S. information reporting and due diligence requirements (that are in addition to, and potentially significantly more onerous than, the requirement to deliver an IRS Form W-8BEN) have been satisfied. Non-U.S. Holders should consult their tax advisers regarding the possible implications of this legislation for their receipt of interests in the New Common Stock and New Warrants.

### E.    Federal Income Tax Treatment of Other Parent Claims Reserve and Subsidiary GUC Reserve (collectively, "Reserves").

Reorganized Tribune may establish one or more Reserves to make distributions to Holders of Disputed Claims that become Allowed Claims after the Effective Date. Distributions from each such Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed, and to Holders of Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed.

Each Reserve may be structured in a manner intended to cause it to be subject to a separate entity-level tax on its income. Therefore, distributions from each such Reserve may be reduced to satisfy any taxes payable by the Reserve.

Holders of Claims should note the tax treatment of such Reserve(s) is unclear and should consult their own tax advisors.

### F.    Federal Income Tax Treatment of the Step Two/Disgorgement Settlement.

The federal income tax treatment of the Step Two/Disgorgement Settlement is uncertain. It is expected that the payment of Cash pursuant to the Step Two/Disgorgement Settlement should be treated as separate from the receipt of consideration on account of a participant's Claim. Settling Step Two Payees may be entitled to a deduction for all or a portion of the amount paid pursuant to the Step Two/Disgorgement, although amounts advanced in respect of Non-Settling Step Two Payees may be subject to special treatment. Settling Step Two Payees should consult their tax advisors with respect to their participation in the Step Two/Disgorgement Settlement.

### G.    Importance of Obtaining Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S.

FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN.

### H.    Reservation of Rights.

This Article VI is subject to change (possibly substantially) based on subsequent changes to other provisions of the Debtor/Committee/Lender Plan. The Debtor/Committee/Lender Plan Proponents and their advisors reserve the right to further modify, revise or supplement this Article VI and the other tax related sections of the Debtor/Committee/Lender Plan up to ten days prior to the date by which objections to Confirmation of the Debtor/Committee/Lender Plan must be filed and served.

### VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE DEBTOR/COMMITTEE/LENDER PLAN

If the Debtor/Committee/Lender Plan is not confirmed, the alternatives include (i) continuation of the Chapter 11 Cases, (ii) approval of a Competing Plan, or (iii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### A.    Continuation of the Chapter 11 Cases.

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases. If the Debtors remain in chapter 11 for an extended period of time, they could have difficulty operating with the high costs, operating financing and the eroding confidence of their employees, customers and trade vendors.

In addition, if the Debtors fail to settle outstanding Claims through the Debtor/Committee/Lender Plan, litigation of certain Claims may be required, which litigation may take years to resolve, be burdensome and expensive, prolong the Chapter 11 Cases, and have a detrimental impact on the Debtors' businesses and enterprise value.

### B.    Approval of a Competing Plan.

The Debtor/Committee/Lender Plan Proponents believe that the Debtor/Committee/Lender Plan provides the best option for restructuring the Debtors. Please refer to the Debtor/Committee/Lender Plan Proponents' Responsive Statement included in Volume III of the Joint Disclosure Statement for a detailed discussion of the Debtor/Committee/Lender Plan Proponents' views regarding the inferiority of other Competing Plans.

### C.    Liquidation under Chapter 7 or Chapter 11.

If the Debtor/Committee/Lender Plan or another plan of reorganization is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to liquidate the assets of the Debtors. The Debtors believe that in a liquidation under chapter 7 additional administrative expenses involved in the appointment of a trustee and professionals to assist such trustee, along with expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. In addition, the Debtor/Committee/Lender Plan Proponents believe that the Liquidation Analysis attached as Exhibit D to the General Disclosure Statement is speculative as it is necessarily premised upon assumptions and estimates. As such, the Liquidation Analysis can give no

assurance as to the value which would be realized in chapter 7 liquidation. Further, as demonstrated in Article IV above, the Debtor/Committee/Lender Plan Proponents believe that recoveries to creditors in a chapter 7 liquidation would be substantially lower less than those provided pursuant to the Debtor/Committee/Lender Plan.

The Debtors could also be liquidated under a chapter 11 plan of reorganization. In a chapter 11 liquidation, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7 and a trustee would not be required. Thus, chapter 11 liquidation might result in larger recoveries than in chapter 7 liquidation; however, the delay in distributions could result in lower present values being received and higher administrative costs.

## VIII.   CONCLUSION AND RECOMMENDATION

The Debtor/Committee/Lender Plan Proponents believe that the Debtor/Committee/Lender Plan furthers the paramount interest of all creditors by providing for the resolution of the LBO-Related Causes of Action and a reasonable procedure for the resolution of other causes of action for the benefit of certain creditors through the creation and funding of the Creditors' Trust and the Litigation Trust. This will allow the Debtors to emerge promptly from bankruptcy while preserving the opportunity for certain creditors to pursue additional recoveries through litigation.

**The Debtor/Committee/Lender Plan Proponents urge all Holders of Claims to (i) vote to accept the Debtor/Committee/Lender Plan and (ii) return their ballots so that they are received no later than [●] (prevailing Eastern Time) on [●], 2010.**

Date:  December [●], 2010

TRIBUNE COMPANY (for itself and on behalf of   the other Debtors, as Debtors and Debtors in Possession, and the Guarantor Non-Debtors and Non-Guarantor Non-Debtors)


By: _____

Name:  Donald J. Liebentritt
Title:    Co-President and Chief Restructuring Officer, Tribune

71

Date: December [●], 2010

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TRIBUNE COMPANY, <u>ET</u> <u>AL</u>
Warner Bros. Television, solely in its capacity as Co-
Chair of the Creditors' Committee and not in its
individual capacity

By: _____

Name:  Wayne M. Smith

Title:   Vice President, Senior Litigation & Chief
Patent Counsel

Date:  December [●], 2010

OAKTREE CAPITAL MANAGEMENT, L.P.:

By: _____

Name:  Ken Liang

Title:   Managing Director


By: _____

Name:  Edgar Lee

Title:   Senior Vice President

Date: December [●], 2010

ANGELO, GORDON & CO., L.P.:

By: _____

Name:

Title:

Date:  December [●], 2010

JPMORGAN CHASE BANK, N.A.:

By: _____

Name:

Title: