# FIRST USA COMMERCIAL CARD PROGRAM

## Master Agreement

This First USA Commercial Card Program Master Agreement (the **"Agreement"**) is dated as of Oct. 18, 1999, between **THE TRIBUNE COMPANY** (the **"Company"**), a Delaware corporation, with its principal place of business at 435 North Michigan, Chicago, IL 60611, and **FIRST USA FINANCIAL SERVICES, INC.** (**"First USA"**), a Utah industrial loan corporation.

### RECITALS

WHEREAS, First USA is a member and licensee of Visa U.S.A., Inc. (**"Visa"**) and MasterCard International, Inc. (**"MasterCard"**) and as such is authorized to issue Visa and MasterCard credit cards bearing Visa and MasterCard logos and service marks, to open Visa and MasterCard accounts and to offer Visa and MasterCard services and benefits as they may be made available; and

WHEREAS, First USA has developed a commercial card system composed of Visa and MasterCard credit cards and unique card-use controls, and First USA offers specialty reports to facilitate and expedite the purchase of, and payment for, goods and services acquired for the legitimate business benefit of a business concern (the **"Program"**); and

WHEREAS, the Company desires to participate in the Program, subject to the terms of this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual agreements, provisions, and covenants contained in this Agreement, the parties agree as follows:

### SECTION 1
### DEFINITIONS

**1.1 DEFINITIONS.** Certain terms used in this Agreement, unless the context requires otherwise, shall have the following meanings.

**"Account"** means the Visa or MasterCard account of a Cardholder and/or the Company maintained with First USA.

**"Billing Cycle"** means a monthly period that ends on the same day each calendar month, unless such day is not a Business Day, in which case, the last day of such period shall be the immediately preceding Business Day.

**"Business Day"** means a day, other than a Saturday or a Sunday, on which commercial banks generally are open for business in Salt Lake City, Utah, and New York, New York.

**"Card"** means a Visa or MasterCard charge card issued by First USA pursuant to this Agreement.

**"Cardholder"** means an individual in whose name a Card is issued or any other employee, officer or director of, or other individual designated by, the Company as being expressly authorized to use a Card or Account.

**"Cardholder Agreement"** means an agreement between First USA and a Cardholder governing the use of a Card as amended from time to time.

**"Certificate of Destruction"** means a written statement executed by an Authorized Signer, in form and substance satisfactory to First USA, identifying certain Cards by Account numbers and Cardholder names and confirming (i) that the Company has destroyed such Cards, or (ii) that the Company used reasonable efforts to retrieve such Cards but was unable to do so.

**"Ordinary Course Transactions"** means all charges to an Account that are made for the business purposes of the Company or otherwise benefit the Company directly or indirectly.

**"Other Transactions"** means all Transactions which are not Ordinary Course Transactions.

**"Transaction"** means a purchase, a cash advance or any other account activity that results in a debit to an Account.

**"Unauthorized Transaction"** means any Transaction by a person, other than the Cardholder to whom the relevant Card was issued, who was not authorized to use such Card by either such Cardholder or the Company and from which Transaction neither the Cardholder nor the Company receives any direct or indirect benefit.

r'ona.doc

### SECTION 2
### CARD ISSUANCE

**2.1 PROGRAM PARTICIPATION.** Subject to the terms of this Agreement, First USA may arrange for the issuance of Cards to, and/or the establishment of Accounts for, the Company with such capabilities as may be elected by the Company on Exhibit A hereto. Accounts shall be established for designated departments, individuals, or groups within the Company and/or for Company vehicles and may or may not be evidenced by Cards.

The Company and Cardholders shall use the Cards and Accounts for business or commercial purposes only and not for personal, family, or household purposes. The Company shall adopt internal policies and controls to ensure that the Cards and Accounts are used by Cardholders strictly for business or commercial purposes.

**2.2 EMBOSSING.** First USA shall prepare Cards bearing the Cardholder's name or a description of a vehicle by make, model and vehicle identification number, as appropriate, and, if elected, the Company's name, trademark, or logo (the **"Marks"**), in a form supplied by the Company and conforming to First USA and Visa/MasterCard guidelines. If the Company elects to have its Marks embossed on the Cards, the Company hereby grants First USA a non-exclusive limited license to apply the Marks to the Cards solely for use in connection with the Program and for no other purpose.

**2.3 CARD DELIVERY.** First USA, in its sole discretion, may deliver Cards and/or related materials (a) to the Company, or (b) directly to the relevant Cardholders. Upon its receipt of any Card, the Company shall promptly deliver such Card to the Cardholder named thereon together with any related materials supplied by First USA. The Company shall comply with such security procedures regarding the custody and handling of Cards as First USA may reasonably prescribe from time to time.

**2.4 CREDIT LIMITS.** First USA, in its sole discretion, shall authorize extensions of credit with respect to (a) each Card or Account up to a specified total dollar amount (the **"Account Credit Limit"**), and (b) the Company up to a specified total dollar amount (the **"Aggregate Credit Limit"**).

First USA may, at any time, investigate (i) the creditworthiness of any Cardholder to whom a Card is to be or has been issued, and (ii) the financial condition of the Company, with regard to the issuance of Cards or maintenance of Accounts. Based on any such investigations and relevant Account histories, First USA may decline to issue or establish, or may cancel, any Card or Account, or may increase or decrease any Account Credit Limit or the Aggregate Credit Limit. First USA shall from time to time advise the Company of changes to any Account Credit

**EXHIBIT**
B
tabbies

Limit or the Aggregate Credit Limit. In no event shall First USA be obligated to grant credit in excess of any applicable credit limit.

**2.5  ISSUANCE, RENEWAL, REPLACEMENT AND CANCELLATION OF CARDS.**

(a)  Promptly following its execution of this Agreement, the Company will provide to First USA a written or electronically transmitted request (a **"Card Request"**) which shall include the names, titles, and corporate addresses of those Cardholders and the make, model and vehicle identification number of vehicles to whom or for which the Company wishes First USA to issue a Card or establish an Account. Each such Card Request must be executed or provided by a person (an **"Authorized Signer"**) for whom First USA has an effective Authority Certification. An **"Authority Certification"** shall mean a certificate of an authorized officer or representative of the Company certifying to the identity of the then-incumbent officers, partners, members or other representatives of the Company who are authorized to execute Card Requests and certifying the authenticity of a specimen signature of each Authorized Signer listed in such Authority Certification. The Authority Certification most recently received by First USA shall supersede any prior Authority Certification unless specifically stated to the contrary in writing. Each Cardholder listed on a Card Request shall be deemed an authorized user of the Card or Cards issued to such Cardholder and any corresponding Accounts. The Company may, from time to time, submit additional Card Requests authorizing the issuance of new Cards or the establishment of new Accounts. The Company agrees not to submit, without the prior written consent of First USA, a Card Request with respect to any person whose Card privileges have previously been canceled.

(b)  First USA shall issue Cards and establish Accounts as soon as reasonably practicable, generally within seven to ten Business Days after receipt of an Authorized Signer's properly submitted Card Request. Where emergency issuance of a Card is requested, First USA may fulfill such request at an additional charge as set forth on Exhibit B. The billing for such charge shall occur in the next billing statement for the relevant Account. Unless First USA receives contrary written instructions from the Company, and subject to First USA's rights hereunder, First USA shall replace each expiring Card with a replacement Card at least 30 days prior to the Card's expiration date.

(c)  Each Cardholder shall be required to sign the Card issued to such Cardholder and shall be subject to the terms of the Cardholder Agreement, if any.

(d)  In the event that the Company or a Cardholder knows of or suspects the loss, theft or possible unauthorized use of a Card or Account, the Company or the Cardholder, as the case may be, shall immediately notify First USA by calling 1-800-270-7760, or such other number as First USA may provide, and writing to P.O. Box 57510, Salt Lake City, Utah 84157-0510.

(e)  If the Company requests First USA to cancel a Card or Account or terminate the authority of any Cardholder to use a particular Card or Account, the Company shall incur no further liability in respect of Transactions that occur with respect to such canceled Card or Account (or Transactions made by such Cardholder, as the case may be) after the Company fully complies with this Section and necessary changes are effected by First USA in the processing system (which shall occur within a reasonable time). The Company shall (i) telephone First USA at 1-800-270-7760 or such other number as First USA may provide, (ii) specify the relevant Cardholder's name, Account number and last known home and business address, (iii) request that such Cardholder's Card or Account, or his or her authority to use the Card or Account be canceled, (iv) promptly confirm such request in writing, and (v) notify the relevant Cardholder of such request.

(f)  Notwithstanding anything to the contrary contained herein, the Company shall immediately request the cancellation of the Card or Account of any Cardholder in the event that such Cardholder's employment or other relationship with the Company is terminated. In addition, the Company agrees to provide such documentation and take such actions as First USA may reasonably request in connection with a claim with Visa or MasterCard or any issuer relating to such terminated Cardholder. If the Company fails to notify First USA within two Business Days after such termination, or if the Company fails to provide the documentation or take the actions required by First USA as a result of such termination, the Company shall be liable for all Transactions with respect to such Cardholder's Card and Account occurring prior to the time 24 hours after notice of termination is given in accordance with this Section 2.5(f). Such indebtedness shall be payable within 30 days of the Company's receipt of an invoice therefor.

**2.6  TRANSACTION DATA; ACCOUNT MAINTENANCE.**

(a)  Unless an alternative reporting system is selected in Exhibit B, First USA shall make Card and Account transaction data available to the Company

through First USA's PaymentNet™ internet-based reporting system. Through PaymentNet™, First USA shall provide the Company with password-protected daily access to Card and Account transaction data and other reports at no additional charge to the Company. Such reporting shall be provided in accordance with such manuals, training materials and other information as First USA shall provide from time to time. If the Company selects an alternative reporting system, the Company's use of such alternative system shall be subject to the terms contained in a Transaction Data Addendum attached hereto.

(b)  The Company may from time to time, and in accordance with guidelines established by First USA, perform certain account maintenance functions online, including, without limitation, adjustment of Account Credit Limits and blocking of Visa and MasterCard Merchant Category Codes (**"MCCs"**). The Company, on behalf of itself and its owners, directors, officers, employees, agents, and representatives (collectively, the **"Company Group"**), hereby releases and agrees to indemnify and hold harmless First USA, its affiliates, and their respective directors, officers, employees, agents, and representatives (collectively, the **"First USA Group"**) from and against any loss, claim, damages, liability, cost, expense, action or cause of action whatsoever that any of them now have or may hereafter have against any member of the First USA Group, or to which any member of the First USA Group may become subject, arising out of or relating to any online maintenance activity performed by any member of the Company Group or any other person using a Company password.

**SECTION 3**
**CARD AND ACCOUNT USE**

**3.1  PURCHASES.** Cardholders may use Cards and Accounts to purchase, in the normal course of business, goods and services in accordance with the MCCs selected and/or blocked at the Company's request. First USA shall use reasonable efforts to deny requests for purchase authorizations that fall outside such parameters, and to deny requests for cash advances for Cardholders who are not permitted to obtain cash advances or who have exceeded the predetermined cash advance limit, provided Transaction authorization is required. Under no circumstances, however, shall First USA be liable to the Company or otherwise (nor shall the Company be relieved of its obligation to pay the amounts so charged or advanced) in the event any such Transactions are permitted.

**3.2  USE OF CARDS.** First USA may cancel or suspend the right of any Cardholder to use any Card or Account, in its sole discretion at any time. Each Transaction is subject to the terms and conditions of the Cardholder Agreement, if any, in effect at the time of the Transaction. First USA shall have no obligation or responsibility to the Company or to any Cardholder in the event that any merchant, entity or person refuses to honor a Card or Account. A Card or Account may be used only by the Cardholder(s) to whom it is issued or who are authorized to use it, as the case may be, and may not be transferred to another Cardholder or any other person or entity.

Without limiting any other rights of First USA hereunder or under applicable law, First USA may refuse to authorize any Transaction in the event that: (a) any balance owed in respect of the Account to which such Transaction relates or any balance owed by the Company on any Account, is past due; (b) the amount of the Transaction plus the outstanding balance (including Transactions authorized but not yet posted) of all Accounts would exceed the Aggregate Credit Limit; (c) the amount of the Transaction plus the outstanding balance (including Transactions authorized but not yet posted) of the relevant Account would exceed the Account Credit Limit for such Account; or (d) any other reason exists for declining a Transaction as set forth herein, in the Cardholder Agreement or the operating regulations of Visa or MasterCard or under applicable law.

**3.3  OBLIGATIONS OF THE COMPANY.** The Company shall:

(a)  Communicate to all Cardholders the business use policy described in Section 2.1.

(b)  Establish and maintain a process to ensure the timely and accurate reimbursement of all legitimate business expenses to its Cardholders.

(c)  Not exceed or permit Cardholders to exceed the Aggregate Credit Limit or any Account Credit Limit.

(d)  Return to First USA, or provide a Certificate of Destruction with respect to, all Cards and related Program materials upon the expiration or termination of this Agreement.

(e)  Make all reasonable attempts to ensure that each Cardholder complies with the terms of the Cardholder Agreement, if any.

## SECTION 4
## LIABILITY FOR USE

### 4.1 PROMISE TO PAY.

(a) Except to the extent otherwise provided in Exhibit A with respect to contingent liability travel and entertainment Accounts, the Company agrees to pay and perform when due all indebtedness, obligations and liabilities arising under each Account established pursuant to this Agreement, of every kind, nature and character whatsoever, including, without limitation, (i) all amounts payable under or in connection with each Account, (ii) any and all costs (including attorneys' fees) incurred in enforcing the obligations of the Cardholder and the Company hereunder, and (iii) all of its obligations hereunder (collectively, the "Obligations").

(b) The Obligations shall be enforceable irrespective of the validity, legality or enforceability of the Cardholders' obligations and shall not in any way be affected by or conditional upon (i) any action taken under the Cardholder Agreements or the exercise of any right or power thereby conferred, (ii) the bankruptcy or similar proceedings involving a Cardholder, the Company or others, (iii) any modification, alteration, or amendment of, or addition to, any Cardholder Agreement whether with or without the Company's knowledge or consent, or (iv) any other action, inaction or circumstance whatsoever (with or without notice to or knowledge of or consent by the Company) that may in any manner vary the risks of the Company or might otherwise constitute a legal or equitable discharge of any surety or guarantor.

(c) The Company hereby waives (i) all guarantor and suretyship defenses to the Company's liability hereunder, and (ii) all presentments, demands for performance or payment, protests, notices of protest, nonperformance, dishonor, default and non-payment, notices of the existence, creation or occurrence of new or additional obligations by the Cardholders, and all other notices or formalities, except as expressly set forth herein or to which the Company may otherwise be entitled.

(d) All amounts due under the Cards and Accounts shall be billed directly to the Company and shall be payable in full upon receipt by the Company, except as otherwise provided in Exhibit A. The Company shall remit payment to First USA under the terms described herein.

(e) All payments hereunder shall be made in U.S. dollars and by wire transfer (or such other arrangement as is mutually agreed upon by the Company and First USA). Transactions in foreign currencies will be converted to .U.S. Dollars and posted to the Accounts at the exchange rate determined by MasterCard (or its affiliates) or Visa (or its affiliates), using their then current currency conversion procedures and charges. The currency conversion rate is generally either a wholesale market rate or a government-mandated rate in effect on the date of conversion, increased by the applicable conversion charge determined by MasterCard or Visa. The currency conversion rate used on the conversion date may differ from the rate in effect on the date a Card or Account is used.

(f) With respect to Account balances subject to the Company's guaranty (as described on Exhibit A), in the event that any amount owing by a Cardholder remains unpaid for 61 days after the date of the first invoice on which such amount appears and First USA believes that the Company may be liable for such amount pursuant to this Agreement, First USA may invoice the Company for such amount. Upon receipt of the invoice, the Company shall immediately pay to First USA the full amount thereof for which it is liable pursuant to this Agreement. If the Company determines that the invoice contains charges for which it is not liable, the Company must submit documentary evidence in support thereof, in form satisfactory to First USA, as well as submit any documentation and take any actions required by Visa or MasterCard in connection with its corporate liability waiver program, in the event such coverage is available.

(g) Subject to the terms hereof, the Company shall be liable for, and shall repay to First USA, the full Face Value of all Transactions made by use of the Cards or the Accounts, and any fees resulting from such use. "Face Value" means the amount shown on the transaction form (or other data) evidencing the Transaction with the merchant. Notwithstanding the foregoing, the Company shall not be liable for charges or Card use: (i) resulting from Card theft or other fraudulent use by non-Cardholders reported in accordance with Section 2.5(d), unless such theft or fraudulent use occurs as a result of the Company's lack of reasonable security precautions and controls surrounding the Cards or Accounts or such use results in a benefit, directly or indirectly, to the Company or any Cardholder; or (ii) by any person to the extent that charges are incurred, or use occurs, after the Company has fully complied with Paragraph 2.5(e).

### 4.2 DISPUTED AMOUNTS.

(a) The Company and its Cardholders shall use reasonable efforts to resolve all business-to-business purchase disputes directly with the relevant merchants, including, without limitation, any disputes relating to purchase price discrepancies or quality, warranty, or performance issues.

(b) The Company may dispute an amount reflected on a billing statement (unless the Transaction resulted from the use of a Card issued to a vehicle for which no signature is required, in which event the Company may not dispute such amount) if (i) the amount does not reflect the actual Face Value of the Transaction; (ii) the Transaction did not result from the use of the relevant Card or Account; (iii) the amount being disputed is a fee that is not properly accrued under this Agreement; or (iv) the Company is not liable for that amount pursuant to Section 4.1. The Company shall notify First USA in writing of its intention to dispute an amount within 60 days following the date of the billing statement on which the disputed Transaction or fee first appears. First USA shall promptly investigate the dispute. Pending such investigation, a conditional credit in the amount of the dispute will be applied to the Account. If First USA determines that the amount is properly payable by the Company, the Company will remit such amount to First USA on Company's receipt of its next billing statement. No fees (including interest, finance charges, or late fees) will accrue because of the disputed amount pending resolution of the dispute, although such fees may be imposed retroactively if it is determined that the amount is properly payable.

### 4.3 CHARGEBACKS. In the event that any Transaction is posted to an Account involving fraud, unauthorized use, or any other circumstance under which the merchant may be held liable under applicable Visa or MasterCard rules, the Company shall so notify First USA in writing. First USA shall attempt to charge the Transaction back to the merchant in accordance with Visa or MasterCard procedures; provided, however, if the Transaction resulted from the use of a Card issued to a vehicle for which no signature is required, no chargeback will be granted for such Transaction. Any accepted chargeback will be credited to the Company's next billing statement. The Company shall not be relieved of liability for the Transaction if the chargeback is rejected in accordance with Visa or MasterCard rules.

## SECTION 5
## PROGRAM FEES, TERM AND
## TERMINATION OF AGREEMENT

### 5.1 FEES. The Company agrees to pay to First USA all fees described in Exhibit B. Any fees originating from the Visa or MasterCard system will be included in the billing statement for the Billing Cycle in which the fees accrue. Fees not listed in Exhibit B but agreed by the Company, or fees originating outside the Visa or MasterCard billing system, may be invoiced separately and each such invoice shall be payable upon receipt.

### 5.2 TERM. This Agreement shall have an initial term (the "Initial Term") of one year commencing on the date hereof. The Company may renew this Agreement for an additional three-year renewal term (the "Renewal Term") by giving written notice of renewal at least 60 days prior to the end of the Initial Term. In addition, either party may terminate this Agreement at any time upon 90 days' prior written notice to the other party; provided, that (a) if the Company terminates this Agreement prior to the end of the Initial Term, a condition precedent to such termination shall be the repayment by the Company to First USA of the signing bonus described on Exhibit B attached hereto, and (b) if the Company terminates this Agreement after the end of the Initial Term but prior to the end of the Renewal Term, a condition precedent to such termination shall be the repayment by the Company to First USA of the bonus, if any, paid by First USA upon renewal. Prior to expiration or termination of this Agreement for any reason, the Company agrees to either retrieve all Cards from Cardholders, cut such Cards in half, and return them to First USA; or provide a Certificate of Destruction with respect to such Cards.

### 5.3 TERMINATION WITH CAUSE. Unless the context otherwise requires, a party to this Agreement may terminate this Agreement at any time upon the Default of the other party. "Default" shall mean: (i) failure of the Company to remit payment to First USA in accordance with the terms hereof; (ii) the failure of either party to comply with any other term of this Agreement or any other agreement between the parties, provided such failure is not remedied within 15 days of the defaulting party's receipt of written notice from the other party specifying the breach; (iii) the representation by the Company of any facts in connection with this Agreement that prove to have been materially incorrect or misleading when such representation was made; (iv) the filing by or against either party of any petition in

bankruptcy, insolvency, receivership, or reorganization or pursuant to any other debtor relief law or the entry of any order appointing a receiver, custodian, trustee, liquidator, or any other person with similar authority with respect to the assets of either party; (v) the insolvency, dissolution, reorganization, assignment for the benefit of creditors or any other material adverse change in the financial condition of either party; (vi) the entry of any adverse judgment, order, or award against the Company that has a material adverse impact on the financial condition of the Company; (vii) any change in control or material change of ownership of the Company to which First USA does not give its prior written approval; (viii) any other event having a material adverse financial impact on the Company or a detrimental effect on the ability of the Company to perform the Obligations, including, without limitation, the taking of any action by the Company to consolidate or merge or sell any substantial part of its assets; or (ix) fraudulent or other unauthorized use of Cards or Accounts or credit losses with respect thereto exceeding First USA's operating tolerances.

Notwithstanding anything to the contrary set forth herein, upon a Default by the Company, First USA may, at its sole discretion, suspend all services and obligations hereunder or may shorten the Billing Cycle in lieu of termination of this Agreement until such time as First USA determines to its satisfaction that such Default has been cured. By suspending its services and/or obligations as aforesaid, First USA shall not be deemed to have waived any right which it may have, whether as a result of the Default to which such suspension of services or obligations relates or otherwise, to terminate this Agreement.

### 5.4 REMEDIES UPON TERMINATION; DAMAGES.

(a) Except where a remedy is expressly provided herein or as otherwise provided in Section 5.4(b), termination of this Agreement will be a party's sole remedy for breach (other than a breach of any obligation to comply with or assure compliance with applicable law); provided, that no termination or expiration of this Agreement shall release or discharge the Company from the payment of any amount otherwise payable under this Agreement.

(b) A breaching party shall be liable for any actual damages caused by its breach, but neither party will be liable under any provision of this Agreement for any punitive or exemplary damages, or for any special, indirect or consequential damages (including, without limitation, costs incurred in developing and implementing the Program, lost revenues, lost profits, or lost prospective economic advantages) arising from or in connection with any performance or failure to perform under this Agreement, including an unjustified, willful, or deliberate failure to perform, even if such party knew or should have known of the existence of such damages, and each party hereby releases and waives any claims against the other party for such damages.

## SECTION 6
## MISCELLANEOUS

6.1 REPRESENTATIONS AND WARRANTIES. The Company represents and warrants that this Agreement constitutes the legal, valid, binding and enforceable agreement of the Company and that its execution and performance of this Agreement (a) do not constitute a breach of any agreement of the Company with any party, or of any duty arising in law or equity, (b) do not violate any law, rule or regulation applicable to it, (c) are within the Company's corporate powers, and (d) have been authorized by all necessary corporate action of the Company.

6.2 NOTICES. Except as otherwise provided herein, any notice or other communication to be given under this Agreement shall be in writing and delivered personally, by overnight delivery via a nationally-recognized delivery service or by prepaid registered or certified mail, addressed to the relevant party at its address for notices specified on Exhibit B, or to such other address as such party may from time to time designate in writing to the other. The date of delivery of a notice (i) delivered personally shall be deemed to be the date delivered; (ii) sent by overnight delivery shall be deemed to be the following day; and (iii) sent by mail shall be deemed to be three Business Days after the date on which such notice is deposited in the United States mail.

6.3 CHANGES. Changes to this Agreement shall be effective only if made by written agreement signed by both parties. Changes to any Cardholder Agreement shall be effective immediately upon receipt by the Cardholder of notice of such changes.

6.4 FINANCIAL STATEMENTS. The Company agrees that its consolidated audited financial statements shall in all cases during the term hereof be timely filed with the Securities and Exchange Commission and shall be publicly

available via the Internet or similarly accessible means not later than 120 days following the end of each fiscal year of the Company. All such financial statements shall include an income statement for the applicable fiscal year and a balance sheet, shall have been prepared in accordance with generally accepted accounting principles, consistently applied, and shall be in accordance with the books and records of the Company. In the event that, at any time, such financial statements are not available as described above, then the Company shall provide, in a timely manner, such other current financial information concerning the Company as First USA may request.

6.5 ASSIGNMENT. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns; provided, that the Company may not assign this Agreement or any interest, payment, or rights hereunder without the prior written consent of First USA.

6.6 FORCE MAJEURE. If either party is rendered unable, wholly or in part, by a force outside the control of such party (including, but not limited to, an act of God, war, fire, flood, explosion, act of governmental authority, strike, civil disturbance or breakdown of telephone, computer or automated mailing equipment) to carry out its obligations under this Agreement (other than a payment obligation), or First USA is notified by a state or federal regulatory body or by Visa or MasterCard that any aspect of the Program or this Agreement does not comply with any applicable law, regulation, rule, policy, or order applicable to First USA, the affected party shall give the other party prompt written notice to that effect. Thereafter, the affected obligations of the party giving the notice shall be suspended and the failure to perform such obligations shall not be deemed a breach of or Default under this Agreement so long as the affected party is unable to so perform for such reason.

6.7 ENTIRE AGREEMENT. This Agreement contains the entire understanding between the parties on the subject matter hereof and supersedes all prior discussions, representations and agreements between the parties. All exhibits and addenda attached hereto are hereby incorporated by reference and made a part of this Agreement.

6.8 SEVERABILITY AND WAIVER. If any portion of this Agreement is stricken as an invalid provision, the remaining portions shall remain in full force and effect and shall continue to be binding upon the parties. Failure of either party to exercise any of its rights under this Agreement in a particular instance shall not be construed as a waiver of those rights or any other rights for any purpose.

· 6.9 MEDIATION. Except to the extent covered by applicable Visa and MasterCard rules, should any disagreement or dispute related to this Agreement or any Transactions (each a "Dispute"), arise between the Company and First USA either during this Agreement or after termination or expiration hereof, the parties agree to exchange relevant information and cooperate in good faith to attempt to resolve the Dispute. If the parties are unable to settle such Dispute, a formal mediation procedure may be commenced by either party under the then-current Center of Public Resources ("CPR") Model Procedure for Mediation of Business Disputes by giving written notice to the other party and delivering a written request to CPR to select an experienced neutral mediator and a proposed time and date for mediation. All mediators shall be selected from the CPR Panel of Neutrals unless the parties mutually agree to a different neutral mediator. All mediators' fees shall be equally shared by the parties. The parties shall participate in good faith in the mediation and if the parties reach a resolution of the Dispute, it shall be reduced to writing. The mediation shall take place in Salt Lake City, Utah unless otherwise agreed by the parties. If the Dispute cannot be settled by mediation, the parties shall be free to institute other proceedings or to take other actions permitted by applicable law and this Agreement to resolve such Dispute.

6.10 CHOICE OF LAW; JURISDICTION. This Agreement is made in, and all credit is extended from, the State of Utah and this Agreement shall be governed by and construed in accordance with the substantive laws of the State of Utah, and as applicable, federal law. The parties hereto irrevocably consent to the personal jurisdiction of the courts of the State of Utah and of any federal courts located therein for purposes of all legal proceedings arising from or relating to this Agreement or the transactions contemplated hereby. The Company hereby waives any right it may have to personal service of summons, complaint or other process in connection with any such action and agrees that service may be made by registered or certified mail addressed to the Company at its address for notices contained herein.

6.11 SURVIVAL. Sections 4, 6.9, 6.10 and 6.12 shall survive the termination or expiration of this Agreement.

r'one.doc

**6.12 CONFIDENTIALITY.** All information furnished by either party in connection with this Agreement, the Program, or the Transactions contemplated hereby shall be kept confidential (and shall be used by the other party only in connection with this Agreement), except to the extent that such information (a) is already lawfully known when received, (b) thereafter becomes lawfully obtainable from other sources, (c) is required to be disclosed in any document filed with the Securities and Exchange Commission, the Federal Deposit Insurance Corporation, or any other agency of any government, or (d) is required by law to be disclosed, provided that notice of such disclosure has been given (when legally permissible) by the party proposing to make such disclosure, which notice, when practicable, shall be given sufficiently in advance of the proposed disclosure to permit the other party to take legal action to prevent the disclosure. Upon termination of this Agreement, each party shall promptly cause all copies of documents or extracts thereof containing any such information and data which has been provided by or which relates to the other party to be returned to such other party; provided, that each party may retain in its files copies of such materials as it shall deem necessary solely for archival purposes.

**6.13 NAME AND TRADEMARK.** Except as otherwise provided for herein, neither party shall use the name or logo of the other party without such party's written consent.

**6.14 VISA AND MASTERCARD FEE ADJUSTMENTS.** In the event that there is a change deemed by First USA to be material in the way First USA is compensated by Visa or MasterCard, First USA may seek to re-negotiate the financial terms of this Agreement. The Company shall have no obligation to renegotiate such terms; provided, that if the parties cannot agree on an adjustment of such terms, then First USA at its option may (a) allow this Agreement to remain in effect without any such adjustment, or (b) terminate this Agreement upon written notice to the Company.

**6.15 RELATIONSHIP OF PARTIES.** Nothing contained in this Agreement shall be construed as constituting or creating a partnership, joint venture, agency, or other association or relationship between First USA and the Company. To the extent that either party undertakes or performs any duty for itself or for the other party as required by this Agreement, the party shall be construed to be acting as an independent contractor and not as a partner, joint venturer, or agent for the other party.

r'one.doc

IN WITNESS WHEREOF, the parties hereto have by their duly authorized representatives executed this Agreement as of the day and year first written above.

**FIRST USA:**

**FIRST USA FINANCIAL SERVICES, INC.**

By: _____

Name:    James Baumgartner

Title:    President

**COMPANY:**

**THE TRIBUNE COMPANY**

By: _____

Name: _____

Title: _____

**Company Attestation:**

The undersigned, a duly authorized officer or representative of the Company, does hereby certify that the Company has been duly authorized to enter into and perform this Agreement and that the person signing above on behalf of the Company, whose execution of this Agreement was witnessed by the undersigned, is an officer, partner, member or other representative of the Company possessing authority to execute this Agreement.

By: _____

Name: _____

Title: _____

r'one.doc

# EXHIBIT A

**Card Capabilities:**

1. **Fleet/Fuel (MasterCard only).**

   The Company _____ elects ___X___ does not elect to add Fleet/Fuel capabilities to the Cards and Accounts so that Cardholders may purchase, in the normal course of business, goods and services related to the fuel and maintenance needs of its vehicles for the benefit of the Company. The amount of each Transaction shall be posted to the appropriate Account according to MasterCard procedures and the procedures outlined in this Agreement.

2. **Purchasing.**

   The Company ___X___ elects _____ does not elect to add Purchasing Card capabilities to the Cards and Accounts so that Cardholders may purchase, in the normal course of business, goods and services for the benefit of the Company. The amount of each Transaction will be posted to the appropriate Account according to Visa and MasterCard procedures and the procedures outlined in this Agreement.

3. **Central Travel.**

   The Company _____ elects ___X___ does not elect to add Central Travel Account capabilities to the Accounts so that Company personnel may purchase, in the normal course of business, transportation on common carriers through Travel Agents, for the benefit of the Company. The amount of each Transaction will be posted to the appropriate Account according to Visa and MasterCard procedures and the procedures outlined in this Agreement.

   The Company from time to time shall provide First USA with Travel Agent Authorizations, which shall be in such form and content as First USA, in its sole discretion, shall determine. A Travel Agent Authorization shall: (i) contain the name and address of each Travel Agent through whom Transactions may be made; and (ii) be fully completed and executed by an Authorized Signer and delivered to First USA.

   The Company shall be responsible for instructing its Travel Agents in the handling and processing of Transactions. Travel Agents shall, for the purposes of this Agreement, be deemed to be agents of the Company and not of First USA. No fee shall be payable by First USA to any Travel Agent for performing any services hereunder.

   As used herein, the following terms shall have the meanings indicated below:

   "**Travel Agent Authorization**" means a request by the Company to First USA to authorize a Travel Agent to charge Transactions to an Account.

   "**Travel Agents**" means travel agents or agencies designated by the Company in accordance with the foregoing provisions.

4. **Travel and Entertainment.**

   The Company _____ elects ___X___ does not elect to add travel and entertainment purchase capabilities to the Cards and Accounts so that Cardholders may purchase, in the normal course of business, travel and entertainment and related goods and services for the benefit of the Company. The amount of each Transaction will be posted to the appropriate Account according to Visa and MasterCard procedures and the procedures outlined in this Agreement. Check one of the following to be applicable if the Company elects travel and entertainment capabilities:

   _____ The Company shall have full corporate liability for all travel and entertainment charges. Accordingly, all terms and conditions of this Agreement for billing and payment set forth in Section 4 of this Agreement and all other provisions applicable to general corporate liability for charges made with the Cards and Accounts shall also be applicable to travel and entertainment charges.

   **OR**

   _____ The Company shall have full corporate liability for travel and entertainment charges, but only with respect to the Visa and MasterCard travel and entertainment Merchant Category Codes defined for the Accounts during the implementation process. Accordingly, all terms and conditions of this Agreement for billing and payment set forth in Section 4 of this Agreement and all other provisions applicable to general corporate liability for charges made

r'one.doc

with the Cards and Accounts shall also be applicable to such travel and entertainment charges. With respect to all other travel and entertainment charges, the Company elects to have contingent liability for travel and entertainment charges in accordance with the following terms and conditions:

With respect to obligations and liabilities arising from such other travel and entertainment Transactions ("**Other T&E Transactions**"), each Cardholder shall be liable for all indebtedness related to such Transactions with respect to his or her Card, as provided in the Cardholder Agreement. All such amounts shall be billed to the relevant Cardholder and shall be payable in full upon receipt by the Cardholder. The Cardholder shall remit payment to First USA under the terms described herein and in the Cardholder Agreement. The Company hereby irrevocably, absolutely and unconditionally guarantees to First USA the prompt payment and performance when due of all indebtedness, obligations and liabilities (including, without limitation, related fees) from time to time outstanding with respect to each Account, for Other T&E Transactions that constitute Ordinary Course Transactions; provided, that the Company shall not be liable for any indebtedness related to Other T&E Transactions that constitute Other Transactions, Unauthorized Transactions or Ordinary Course Transactions previously reimbursed by the Company to the Cardholder.

**OR**

_____ The Company shall be contingently liable for all travel and entertainment charges in accordance with the following terms and conditions:

With respect to obligations and liabilities arising from travel and entertainment Transactions ("**T&E Transactions**"), each Cardholder shall be liable for all indebtedness related to such Transactions with respect to his or her Card, as provided in the Cardholder Agreement. All amounts due under each Card and Account shall be billed to the relevant Cardholder and shall be payable in full upon receipt by the Cardholder. The Cardholder shall remit payment to First USA under the terms described herein and in the Cardholder Agreement. The Company hereby irrevocably, absolutely and unconditionally guarantees to First USA the prompt payment and performance when due of all indebtedness, obligations and liabilities (including, without limitation, related fees) from time to time outstanding with respect to each Account, for T&E Transactions that constitute Ordinary Course Transactions; provided, that the Company shall not be liable for any indebtedness related to T&E Transactions that constitute Other Transactions, Unauthorized Transactions or Ordinary Course Transactions previously reimbursed by the Company to the Cardholder.

**5.    Cash Advance.**

The Company _____ elects _____ does not elect to add cash advance capabilities to the Cards and Accounts so that Cardholders may obtain cash advances for business or commercial purposes. The amount of each cash advance Transaction will be posted to the appropriate Account according to MasterCard and Visa procedures and the procedures outlined in this Agreement. First USA shall provide access to cash through participating Automated Teller Machine ("ATM") networks and Visa and MasterCard member offices. Cardholders who are so authorized may obtain cash by activating an ATM with a Card or by presenting the Card at a Visa and MasterCard member office. First USA may establish predetermined cash advance limits for each Cardholder as agreed by First USA and the Company. First USA may refuse cash advance access to any Cardholder in its sole discretion. The cash advance feature may be disabled by any Authorized Signer upon written notice to First USA, subject to Section 3.1 of this Agreement.

**6.    Logo.**

The Company _____ elects _____ does not elect to have its name, trademark, or logo, in a form supplied by the Company to First USA and conforming to First USA and Visa and MasterCard guidelines, embossed on the Cards.

## EXHIBIT B

1.   **Program Contacts:**

### Primary, Day to Day Contacts:

| The Tribune Company | First USA | |
|---|---|---|
| Name: WILLIAM CAPODANNO | Name: | |
| Title: | Title: | Client Relations Specialist |
| Address: | Address: | 3995 South 700 East, Suite 400 Salt Lake City, Utah 84107 |
| Phone: | Phone: | |

### Notice Contacts:

| The Tribune Company | First USA | |
|---|---|---|
| Name: CRANE KENNEY | Name: | Cynthia Smith |
| Title: | Title: | Senior Vice President |
| Address: | Address: | 3995 South 700 East, Suite 400 Salt Lake City, Utah 84107 |
| Phone: | Phone: | (801) 281-5800 |

2.   **Pricing Assumptions:**

Pricing assumptions with respect to Net Spend, number of Accounts to be requested, and Average File Turn are as follows:

For Fleet Cards:  N/A

| Contract Year | Net Spend | Number of Cards |
|---|---|---|
| Year 1 | $ | |
| Year 2 | $ | |
| Year 3 | $ | |

Average File Turn: _____ days

For T&E Cards:  N/A

| Contract Year | Net Spend | Number of Cards |
|---|---|---|
| Year 1 | $ | |
| Year 2 | $ | |
| Year 3 | $ | |

Average File Turn: _____ days

r'one.doc

For Purchasing Cards:

| Contract Year | Net Spend | Number of Cards |
|---|---|---|
| Year 1 | $36,000,000 | 1,000 |
| Year 2 | $36,000,000 | 1,000 |
| Year 3 | $36,000,000 | 1,000 |

Average File Turn: __29__ days


For Travel Accounts:  N/A

| Contract Year | Net Spend | Number of Accounts |
|---|---|---|
| Year 1 | $ | |
| Year 2 | $ | |
| Year 3 | $ | |

Average File Turn: _____ days


"Net Spend" means the aggregate amount of individual purchases posted to Accounts, net of the aggregate amount of all refunds to Accounts (such as credits for returned merchandise or disputed billing items), and shall not include (i) those amounts representing annual fees, finance charges and other fees or charges posted to Accounts (such as late fees, returned check fees, cash advance fees, collection costs, administrative fees and reporting fees) and (ii) the amount of all cash advance Transactions and fees. Net Spend shall also exclude fraudulent or unauthorized charges posted to the Accounts and any amounts posted to an Account with respect to which a Card has been reported lost or stolen.

"Average File Turn" means the average number of days between the Transaction date and the payment posting date of the full amount due with respect to such Transaction.

Variances: The fees described in this Exhibit B are calculated based upon the information listed above.  To the extent that for any quarterly period any actual amount or value varies from a Pricing Assumption by an amount which First USA in its sole discretion deems to be material, First USA reserves the right to ratably adjust the fees specified in this Exhibit B for the remaining term of the Agreement to compensate for such variance.


3.     **Billing and Payment:**

Billing and payment of all charges made using the Commercial Card Program are subject to the following:

a.     Billing Cycle/Payment Frequency:  Monthly

b.     Payment Method Options for payments made by Company:  Check, EDI, Wire Transfer, ACH Debit or Credit

c.     Payment Method for payments made by individual Cardholder:  Check

r'one.doc

4.    **Fees:**

    a.    Annual Administration Fee:

        Fleet Cards: $ N/A  per Card per year or $____ per Card per month.

        Purchasing Cards: $ 0.00  per Card per year or $ 0.00  per Card per month.

        T&E Cards: $ N/A  per Card per year or $____ per Card per month.

        Central Travel Account:  $ N/A  per Account per year or $____ per Account per month.

        Provided, however, if no Cards are issued, the annual administrative fee shall be charged for each Account number.

    b.    Cash advance Fee:  Per Transaction (if Cash Advances are permitted under Exhibit A):
        2.5% of cash advance amount; minimum $2.50 per Transaction.

    c.    Late Payment Fee:  For each product selected on Exhibit A, per occurrence:

        Fleet Card and Purchasing Card grace period after statement billing date: 14 days
        1.0% late fee at 15 days
        2.5% late fee at 45 days and every 30 days thereafter

        Central Travel Account grace period after statement billing date: 25 days
        1.0% late fee at 30 days
        2.5% late fee at 60 days and every 30 days thereafter

        T&E Card (Company bill/Company pay) grace period after statement billing date: 25 days
        1.0% late fee at 30 days
        2.5% late fee at 60 days and every 30 days thereafter

        T&E Card (Cardholder bill/Cardholder pay) grace period after statement billing date: 25 days
        $10.00 late fee at 30 days
        2.5% late fee at 60 days and every 30 days thereafter

    d.    Currency Conversion:  1% of gross purchased amount

    e.    Copy Retrieval Fee, Per Request:  $10.00 each

    f.    Returned Item (Insufficient Funds) Fee:  $15.00 per occurrence

    g.    Emergency Card Replacement Fee:  $25.00 if effected through First USA.  If effected through MasterCard or Visa,
        the Company shall pay any fees charged by MasterCard and Visa for emergency card replacement.

    h.    Complete Company Card Design and Production:  $____ setup and $____ per Card.

    i.    Development of custom mappers:  $100 per hour; minimum charge $400; maximum charge $2,000.

    j.    Development of customized reports:  $100 per hour; minimum charge $400; no maximum charge.

5.    **Issue Term of Cards:**

    Each Card shall be issued for a period of three years.

6.    **Reporting Software Choice:** PaymentNet™ (at no additional charge), unless another choice is indicated below:

| ProCard: | | Cost | |
|----------|---|------|---|
| Smart Data: | | Cost | |
| InfoSpan: | | Cost | |
| Other: | | Cost | |

Monthly Data Transmission Fee Per Additional Transmission Endpoint (In excess of two): $_____.

7.    **Authorized Signer(s):**

The individual(s) named below are authorized to act on behalf of the Company in administering all aspects of the Program, including, but not limited to, requesting Cards or Accounts for Cardholders, making administrative changes to the Program or Card controls, and terminating use of Cards or Accounts.

| Authorized Signers | | |
|---|---|---|
| PATRICK MC GLINN | | |
| Authorized Signer (Print Name) | Authorized Signer (Signature) | Title |
| WILLIAM CAPODANNO | | |
| Authorized Signer (Print Name) | Authorized Signer (Signature) | Title |
| | | |
| Authorized Signer (Print Name) | Authorized Signer (Signature) | Title |
| | | |
| Authorized Signer (Print Name) | Authorized Signer (Signature) | Title |

The undersigned, a duly authorized officer or representative of the Company, does hereby certify that each of the persons listed in this **Exhibit B** as an Authorized Signer is an officer, partner, member or other representative of the Company possessing authority to execute Card Requests and each specimen signature of each such person set forth above is such person's genuine signature.

By: _____
Name: _____
Title: _____

**Performance Incentive.**

(a) <u>Calculation of Incentive.</u>  For each Contract Year (or, if this Agreement is terminated prior to the end of a Contract Year, the period from the end of the preceding Contract Year to the termination date), First USA shall pay to the Company an incentive calculated as a percentage of the Net Spend for such period, in accordance with the following table and terms (the "Incentive").

**750 Cards**

| Average Payment Term | Average Annual Net Spend Per Card | | | |
|---|---|---|---|---|
| | $20,000 to $29,999 | $30,000 to $39,999 | $40,000 To $49,999 | $50,000 & Over |
| 5 Days or Less | 0.80% | 0.90% | 1.05% | 1.10% |
| 6 - 10 Days | 0.75% | 0.85% | 1.00% | 1.05% |
| 11 - 15 Days | 0.70% | 0.80% | 0.95% | 1.00% |

**1,000 Cards**

| Average Payment Term | Average Annual Net Spend Per Card | | | |
|---|---|---|---|---|
| | $20,000 to $29,999 | $30,000 to $39,999 | $40,000 To $49,999 | $50,000 & Over |
| 5 Days or Less | 0.70% | 0.80% | 0.90% | 1.00% |
| 6 - 10 Days | 0.65% | 0.75% | 0.85% | 0.95% |
| 11 - 15 Days | 0.60% | 0.70% | 0.80% | 0.90% |

**1,250 Cards**

| Average Payment Term | Average Annual Net Spend Per Card | | | |
|---|---|---|---|---|
| | $20,000 to $29,999 | $30,000 to $39,999 | $40,000 To $49,999 | $50,000 & Over |
| 5 Days or Less | 0.60% | 0.70% | 0.80% | 0.90% |
| 6 - 10 Days | 0.55% | 0.65% | 0.75% | 0.85% |
| 11 - 15 Days | 0.50% | 0.60% | 0.70% | 0.80% |

The Incentive is subject to reduction by all Losses.  The Incentive shall be determined by deducting the Losses incurred by First USA on the Company's Accounts during the twelve-month Incentive period from the gross Incentive amount for such period.  Upon termination of this Agreement, the Losses for the six-month period ending on the termination date (the "**Last Six-Month Period**") will be deemed, for purposes of calculating the Incentive, to be equal to the Losses for the six-month period immediately preceding the Last Six-Month Period.

In all cases, the Incentive is calculated annually and is payable within 60 days after the end of each Contract Year.  In the event that the due date for any Incentive payment falls on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

In the event this Agreement is terminated prior to the end of a Contract Year, the actual Net Spend for the elapsed portion of such Contract Year shall be annualized solely for the purpose of determining, in accordance with the foregoing table, the percentage to be applied to such actual Net Spend.

r'one.doc

(b)     <u>Bonus</u>.  First USA shall pay to the Company an initial $50,000 signing bonus 60 days after the first Cards are activated. First USA shall pay to the Company a $110,000 bonus if the Company renews the Agreement for an additional three-year term.

(c)     <u>Variances</u>.  The Incentive is calculated based upon the Pricing Assumptions listed in this Exhibit.  To the extent that for any annual period any actual amount or value varies from a Pricing Assumption by an amount which First USA in its sole discretion deems to be material, First USA reserves the right to ratably adjust the Incentive for the remaining term of the Agreement to compensate for such variance.

(d)     <u>Definitions</u>.

"Contract Year" means a 12-month period beginning on the date hereof or an anniversary of such date.

"Losses" means losses incurred by First USA on Accounts due to fraud or other unauthorized use and all other amounts that are outstanding under Accounts and are not paid within 180 days of their respective due dates.

r'one.doc

**<u>Annex B</u>**

**FIRST AMENDMENT TO**
**COMMERCIAL CARD AGREEMENT**

THIS FIRST AMENDMENT TO COMMERCIAL CARD AGREEMENT (the "Amendment") is dated as of ___Jan. 22___, 2000, between First USA Financial Services, Inc. ("First USA"), and The Tribune Company (the "Company").

WITNESSETH:

WHEREAS, First USA and the Company entered into that certain First USA Commercial Card Program Application and Master Agreement dated October 18, 1999 (the "Agreement"); and

WHEREAS, the Agreement had an Initial Term of one-year and the parties desire to renew the Agreement for an additional three-year Renewal Term that shall commence upon the end of the Initial Term.

WHEREAS, the parties have therefore agreed to modify the Agreement as provided herein;

NOW, THEREFORE, in consideration of the agreements herein contained and subject to the terms and conditions herein set forth, First USA and the Company hereby agree as follows:

1.    Definitions. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.    Incentive. First USA and the Company wish to amend the "Performance Incentive(s)" section contained in Exhibit A to the Agreement. Accordingly, the "Performance Incentive(s)" section in Exhibit A to the Agreement is hereby deleted in its entirety and in place thereof shall be a new section which shall read as follows:

**"Performance Incentive(s).**

(a)    Calculation of Incentive. For each Contract Year (or, if this Agreement is terminated prior to the end of a Contract Year, the period from the end of the preceding Contract Year to the termination date), First USA shall pay to the Company an incentive calculated as a percentage of the Net Spend for such period, in accordance with the following tables and terms (the "Incentive").

**1 – 1,000 Cards**

| Average Payment Term | Annual Net Spend | | | | | | |
|---|---|---|---|---|---|---|---|
| | $10,000,000 to $14,999,999 | $15,000,000 to $19,999,999 | $20,000,000 to $24,999,999 | $25,000,000 to $29,999,999 | $30,000,000 to $34,999,999 | $35,000,000 to $39,999,999 | $40,000,000 & Over |
| 5 Days or less | 0.50% | 0.60% | 0.70% | 0.80% | 0.90% | 1.00% | 1.05% |
| 6 – 10 days | 0.40% | 0.50% | 0.60% | 0.70% | 0.80% | 0.90% | 0.95% |
| 11 – 15 days | 0.30% | 0.40% | 0.50% | 0.60% | 0.70% | 0.80% | 0.85% |

**1,001 – 2,000 Cards**

| Average Payment Term | Annual Net Spend | | | | | | |
|---|---|---|---|---|---|---|---|
| | $10,000,000 to $14,999,999 | $15,000,000 to $19,999,999 | $20,000,000 to $24,999,999 | $25,000,000 to $29,999,999 | $30,000,000 To $34,999,999 | $35,000,000 to $39,999,999 | $40,000,000 & Over |
| 5 Days or less | 0.45% | 0.55% | 0.65% | 0.75% | 0.85% | 0.95% | 1.00% |
| 6 – 10 days | 0.35% | 0.45% | 0.55% | 0.65% | 0.75% | 0.85% | 0.90% |
| 11 – 15 days | 0.25% | 0.35% | 0.45% | 0.55% | 0.65% | 0.75% | 0.80% |

**2,000 & Over Cards**

| Average Payment Term | Annual Net Spend | | | | | | |
|---|---|---|---|---|---|---|---|
| | $10,000,000 to $14,999,999 | $15,000,000 to $19,999,999 | $20,000,000 to $24,999,999 | $25,000,000 to $29,999,999 | $30,000,000 To $34,999,999 | $35,000,000 to $39,999,999 | $40,000,000 & Over |
| 5 Days or less | 0.40% | 0.50% | 0.60% | 0.70% | 0.80% | 0.90% | 1.00% |
| 6 – 10 days | 0.30% | 0.40% | 0.50% | 0.60% | 0.70% | 0.80% | 0.90% |
| 11 – 15 days | 0.20% | 0.30% | 0.40% | 0.50% | 0.60% | 0.70% | 0.80% |

The Incentive is subject to reduction by all Losses. The Incentive shall be determined by deducting the Losses incurred by First USA on the Company's Accounts during the twelve-month Incentive period from the gross Incentive amount for such period. Upon termination of this Agreement, the Losses for the six-month period ending on the termination date (the **"Last Six-Month Period"**) will be deemed, for purposes of calculating the Incentive, to be equal to the Losses for the six-month period immediately preceding the Last Six-Month Period.

In all cases, the Incentive is calculated annually and is payable within 60 days after the end of each Contract Year. In the event that the due date for any Incentive payment falls on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

In the event this Agreement is terminated prior to the end of a Contract Year, the actual Net Spend for the elapsed portion of such Contract Year shall be annualized solely for the purpose of determining, in accordance with the foregoing table, the percentage to be applied to such actual Net Spend.

(b)     Bonus. First USA shall pay to the Company a $110,000 bonus upon commencement of the three-year Renewal Term. If either party elects to terminate this Agreement prior to the end of the Term, the Company shall refund to First USA a portion of the signing bonus in an amount equal to the number of months remaining in the Renewal Term multiplied by $3,055.56. In addition, in order to recoup any losses related to the prepaid signing bonus, the Company agrees that First USA may make a pro rata adjustment to any remaining Incentive to reflect the actual term of this Agreement.

(c)    <u>Variances</u>. The Incentive is calculated based upon the Pricing Assumptions listed in this Exhibit. To the extent that for any annual period any actual amount or value varies from a Pricing Assumption by an amount which First USA in its sole discretion deems to be material, First USA reserves the right to ratably adjust the Incentive for the remaining term of the Agreement to compensate for such variance.

(d)    <u>Definitions</u>.

"Contract Year" means a 12-month period beginning on the date hereof or an anniversary of such date.

"Losses" means losses incurred by First USA on Accounts due to fraud or other unauthorized use and all other amounts that are outstanding under Accounts and are not paid within 180 days of their respective due dates.

"Renewal Term" means the three-year period beginning immediately after the last day of the Initial Term."

3.    <u>Exhibit C</u>. The parties desire to add a new Exhibit C to the Agreement regarding PaymentNet™ functionality and service level commitments, which are reflected in Exhibit 1-A attached hereto. Accordingly, a new Exhibit C shall be added to the Agreement in the form attached hereto as Exhibit 1-A.

4.    <u>Continued Effect</u>. Except to the extent amended hereby, all terms, provisions and conditions of the Agreement shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

5.    <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

6.    <u>Successors and Assigns</u>. This Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, First USA and the Company have caused this Amendment to be executed by their respective authorized officers as of the date first written above.

FIRST USA:

First USA Financial Services, Inc.

By: _____

Name:  James Baumgartner

Title:   President

**COMPANY:**

The Tribune Company

By: _Linda Riley Mitchell_
Name: LINDA RILEY MITCHELL
Title: VP - FINANCE SERVICES

# EXHIBIT 1-A

## EXHIBIT C

## PAYMENTNET    FUNCTIONALITY/SERVICE LEVEL COMMITMENTS

PaymentNet    is written in HTML with limited Javascript utilization and is designed internally specifically for use with First USA commercial card programs.

Internet access is secure password protected.   Access is only permitted via First USA's extranet or inside the Company's firewall as an Intranet.

PaymentNet    offers the following features.

| | |
|---|---|
| ξ | Unlimited Data Access |
| ξ | General Ledger Interface |
| ξ | Access to All Users |
| ξ | Reporting Capabilities |
| ξ | Merchant Profile Utility |
| ξ | Editable Data |
| ξ | Security |

**Additional Technical Enhancements**

ξ   **Expense Reporting Interface**

First USA has designed a simple expense reporting system, PaymentNet.ER    (currently in Beta testing), within PaymentNet .    The original phase of PaymentNet.ER    is designed with prepopulation functionality and approval routing capabilities. Subsequent phases will include a basic compliance engine, for rules-based exception management, including tax and cash issues, which are common concerns in expense management. This system is not designed to replace the major expense reporting systems, but to satisfy the less robust expense reporting needs of companies without the heavy cost.

ξ   **PaymentNet. COM    - Cardholder On-line Maintenance**

PaymentNet's On-line Cardholder Maintenance, PaymentNet.COM    was developed for use with First USA commercial card accounts.  This component allows the Tribune's Human Resource department or Program Administrator to perform new application submission, terminations, and account maintenance, such as suspension, directly on-line.  Terminations and maintenance actions are effective immediately. Application information is submitted to our new accounts department for processing.

ξ   **PaymentNet.ESP    - Electronic Statement and Payment**

First USA has developed an Electronic Statement and Payment (PaymentNet.ESP   ) system to accompany PaymentNet .   This technology, developed for use with First USA's corporate card program, allows Cardholders to access statement information and remit payment over the Internet.

Through the PaymentNet.ESP    system, Cardholders can review their statements and remit payment from anywhere around the world.  The Cardholder simply logs into the system (access to PaymentNet    is optional for these travelers), and a copy of the Cardholder's statement is downloaded onto his or her computer.  The statement may then be reviewed for accuracy and expense reconciliation.  After the statement has been reviewed, the traveler can use the system to pay First USA directly from his or her own checking or savings account.

## SERVICE LEVEL COMMITMENTS

Capitalized terms used, but not defined, herein shall have the same meaning as in the Agreement.

First USA shall make all reasonable efforts to meet the following Service Level Commitments.

### Service Level Commitments:

#### Reporting

Through PaymentNet™, First USA shall provide electronic reports to the Company on delinquencies, denial listings, suspension/cancellation, unusual activity analysis and any related Transaction write-offs.

#### System Up-Time

PaymentNet™ shall be capable of performing during 99% of the total number of scheduled available minutes in each month during the term of the Agreement. The number of scheduled available minutes shall be 20 hours per day (between the hours of 5:00 am and 1:00 am, central time), 7 days per week. PaymentNet shall be deemed to be "capable of performing" if it is (i) available for processing transactions and inquiries and (ii) its response times in connection with inquiries are as follows:

- ξ Login page is available within 10 seconds of a Company user directing their browser to the Paymentech web site (www.paymentweb.com);
- ξ Paymentech home page is available within 10 seconds of a user entering the login information and pressing the "Login Now" button;
- ξ Paymentech Transaction screen is available within 30 seconds of a user clicking the PaymentNet option on the home page;
- ξ Transaction Detail screen is available within 15 seconds of a user clicking on a specified transaction; and
- ξ User is navigated back to the Transaction screen from the Transaction Detail screen within 15 seconds of clicking the "Save" button on the Transaction Detail screen.

Response times that fail the requirements listed above that are attributable to the Company's system, system failures of third parties that are outside the control of First USA or general Internet failures, shall not be deemed to be failures by First USA.

#### Additional Service Level Commitments

With respect to at least 99% of the transactions processed by PaymentNet, (i) all charges received by First USA will be populated and available in the PaymentNet system within 24 hours of such receipt, and (ii) First USA will transmit and populate all data accurately in the PaymentNet system.

### Service Level Commitment Failures:

If First USA fails to achieve the Service Level Commitments, the Company's remedies shall be limited to termination in accordance with the agreement and the remedy described as follows:

For each month in which First USA fails to satisfy a Service Level Commitment, the "Average Payment Term" used in the calculation of the Company's Incentive will be improved by one cell above the cell corresponding to the actual performance of the Company as long as the Company makes the payment within 15 days.

If First USA fails to satisfy the same service level commitment for two consecutive months during the term of the Agreement, or fails to satisfy a service level commitment (whether the failure is for the same commitment or different commitments) for three consecutive months during the term of the Agreement, then First USA shall promptly report to the Company the reasons for its failure to satisfy the service level commitment(s), propose a remediation plan for taking such action as First USA deems appropriate to correct such service level commitment failure(s), and implement the remediation plan as soon as practicable.

In the event that First USA cannot cure any service level commitment failure within a reasonable time, First USA may seek to re-negotiate such service level commitment. The Company shall have no obligation to renegotiate such service level commitment; provided, that if the parties cannot agree on an adjustment of such service level commitment, then First USA and the Company, at either's option may (i) allow this Agreement to remain in effect without any such adjustment, or (ii) terminate this Agreement upon at least 90 days', but not more than 120 days', written notice to the other party (whereupon a transition period will automatically start on the termination date specified in such notice).

**Annex C**

## SECOND AMENDMENT TO
## COMMERCIAL CARD AGREEMENT

THIS SECOND AMENDMENT TO COMMERCIAL CARD AGREEMENT (the "Amendment") is dated as of August, 21 2001, between Chase Manhattan Bank USA, National Association ("Chase") successor in interest to First USA Financial Services, Inc. ("First USA") and The Tribune Company (the "Company").

### WITNESSETH:

WHEREAS, First USA and the Company entered into that certain First USA Commercial Card Master Agreement dated October 18, 1999 (the "Agreement"); and

WHEREAS, the Chase and the Company have agreed to modify the Agreement as provided herein;

NOW, THEREFORE, in consideration of the agreements herein contained and subject to the terms and conditions herein set forth, Chase and the Company hereby agree as follows:

1.    Definitions. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein. The parties agree to modify the definition of "Transaction" in the Agreement which shall now read as follows:

"**Transaction**" means a purchase, a cash advance, the use of a convenience check, or any other account activity that results in a debit to an Account.

2.    Convenience Checks. The parties wish to amend Exhibit A, Section 5, of the Agreement. Accordingly, Exhibit A, Section 5, of the Agreement is hereby deleted in its entirety and in place thereof shall be a new section, which shall read as follows:

**Convenience Checks.**

The Company elects to add Convenience Check capabilities to the Cards and Accounts so that Cardholders may use Convenience Checks for business or commercial purposes. Chase may establish predetermined convenience check limits for each Cardholder as agreed by Chase and the Company. Chase may refuse convenience check access to any Cardholder in its sole discretion. The convenience check feature may be disabled by any Authorized Signer upon written notice to Chase, subject to Section 3.1 of this Agreement.

3.    <u>Continued Effect</u>.  Except to the extent amended hereby, all terms, provisions and conditions of the Agreement shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

4.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

5.    <u>Successors and Assigns</u>.  This Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Chase and the Company have caused this Amendment to be executed by their respective authorized officers as of the date first written above.

**Chase:**

**Chase Manhattan Bank USA, N.A.**

By: _____
Name: Dona Grevenow
Title: Vice President Finance

**COMPANY:**

The Tribune Company

By: LINDA RILEY MITCHELL
Name: Linda Riley Mitchell
Title: VP - Finance Services

amendfin2.doc

**Annex D**

## THIRD AMENDMENT TO
## COMMERCIAL CARD AGREEMENT

THIS THIRD AMENDMENT TO COMMERCIAL CARD AGREEMENT (the "Amendment") is dated as of ⟨handwritten⟩, 2001, between Chase Manhattan Bank USA, National Association ("Chase") successor in interest to First USA Financial Services, Inc. ("First USA") and The Tribune Company (the "Company").

### W I T N E S S E T H :

WHEREAS, First USA and the Company entered into that certain First USA Commercial Card Master Agreement dated October 18, 1999 (the "Agreement"); and

WHEREAS, the Chase and the Company have agreed to modify the Agreement as provided herein;

NOW, THEREFORE, in consideration of the agreements herein contained and subject to the terms and conditions herein set forth, Chase and the Company hereby agree as follows:

1.    <u>Definitions</u>. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.    <u>Fees</u>. Section 4 of Exhibit A to the Agreement shall be amended to reflect the fees applicable to convenience checks. Accordingly, a new Section 4.j shall be added which shall read as follows:

"j.    Convenience Checks: 2% of check amount; minimum $2.00 per Check, maximum $30.00 per Check."

3.    <u>Continued Effect</u>. Except to the extent amended hereby, all terms, provisions and conditions of the Agreement shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

4.    <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

5.    <u>Successors and Assigns</u>. This Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

1

IN WITNESS WHEREOF, Chase and the Company have caused this Amendment
to be executed by their respective authorized officers as of the date first written above.

**Chase:**

**Chase Manhattan Bank USA, N.A.**

By: _Dana V?_

Name: _Dana Corevenas_

Title: _Vice President Finance_

**COMPANY:**

**The Tribune Company**

By: _Linda Riley Mitchell_

Name: _LINDA RILEY MITCHELL_

Title: _VP FINANCE SERVICES_

2

**Annex E**

## FOURTH AMENDMENT TO
## COMMERCIAL CARD AGREEMENT

THIS FOURTH AMENDMENT TO FIRST USA COMMERCIAL CARD AGREEEMENT (the "Amendment") is dated as of _May 1_, 2003 between Chase Manhattan Bank USA, National Association ("Chase"), successor in interest to First USA Financial Services, Inc., ("First USA"), and The Tribune Company. (the "Company").

### WITNESSETH:

WHEREAS, First USA and the Company entered into that certain First USA Commercial Card Program Master Agreement dated October 18, 1999 (the "Agreement"); and

WHEREAS, Chase and the Company have agreed to modify the incentive and signing bonus available to the Company under the agreement and modify the terms of the agreement;

NOW, THEREFORE, in consideration of the agreements herein contained and subject to the terms and conditions herein set forth, Chase and the Company hereby agree as follows:

1.      Definitions.  Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.      Agreement Term. Chase and the Company wish to amend Section 5.2 of the Agreement.  Accordingly, Section 5.2 in the Agreement is hereby deleted in its entirety and in place thereof shall be a new section, which shall read as follows:

"**5.2     TERM.** This Agreement shall have an initial term (the **"Initial Term"**) of three years commencing on the date of this Amendment. In addition, either party may terminate this Agreement at any time upon 90 days' prior written notice to the other party.  Prior to expiration or termination of this Agreement for any reason, the Company agrees to either retrieve all Cards from Cardholders, cut such Cards in half, and return them to Chase; or provide a Card Cancellation Confirmation with respect to such Cards."

3.      Incentive.  The parties wish to amend the "Performance Incentive(s)" section contained in Exhibit A of the Agreement that was previously amended in section 2 of the First Amendment.  Accordingly, the "Performance Incentive(s)" section in Exhibit A to the Agreement is hereby deleted in its entirety and in place thereof shall be a new section which shall read as follows:

"Performance Incentive(s).

(a)    <u>Calculation of Incentive</u>.  For each Contract Year (or, if this Agreement is terminated prior to the end of a Contract Year, the period from the end of the preceding Contract Year to the termination date), First USA shall pay to the Company an incentive calculated as a percentage of the Net Spend for such period, in accordance with the following tables and terms (the "Incentive").

## Average Annual Net Spend

| Purchasing Card Volume / Average Payment Terms | $40,000,000 to$49,999,999 | $50,000,000 to$59,999,999 | $60,000,000 to$69,999,999 | $70,000,000 to$79,999,999 | $80,000,000 to$89,999,999 | $90,000,000 to$99,999,999 | $100,000,000 & Over |
|---|---|---|---|---|---|---|---|
| 1 Day or less | 1.10% | 1.18% | 1.20% | 1.22% | 1.24% | 1.25% | 1.27% |
| 2 Days | 1.09% | 1.17% | 1.19% | 1.21% | 1.22% | 1.24% | 1.26% |
| 3 Days | 1.08% | 1.16% | 1.18% | 1.20% | 1.21% | 1.22% | 1.25% |
| 4 Days | 1.07% | 1.15% | 1.17% | 1.19% | 1.20% | 1.21% | 1.24% |
| 5 Days | 1.05% | 1.13% | 1.16% | 1.18% | 1.19% | 1.20% | 1.23% |
| 6 - 10 Days | 1:00% | 1.08% | 1.10% | 1.12% | 1.13% | 1.15% | 1.17% |
| 11 - 14 Days | .95% | 1.03% | 1.06% | 1.08% | 1.09% | 1.10% | 1.12% |

### Large Ticket  Volume Percent of Total Volume*

| Large Ticket Average Tran Size | 16% - 20% | 21% - 30% | 31% - 40% | 41% - 50% |
|---|---|---|---|---|
| $5,000 or Less | -0.00% | -0.03% | -0.14% | -0.20% |
| $5,001 to $6,000 | -0.03% | -0.17% | -0.27% | -0.33% |
| $6,001 to $7,000 | -0.06% | -0.26% | -0.37% | -0.43% |
| $7,001 to $8,000 | -0.13% | -0.33% | -0.44% | -0.50% |
| $8,001 to $9,000 | -0.18% | -0.39% | -0.49% | -0.55% |
| $9,001 to $10,000 | -0.23% | -0.43% | -0.54% | -0.60% |
| $10,001 to $25,000 | -0.47% | -0.67% | -0.78% | -0.84% |
| $25,001 to $50,000 | -0.55% | -0.75% | -0.86% | -0.92% |
| Over 50,000 | -0.62% | -0.83% | -0.93% | -0.99% |

*Merchant does not have to register for participation in program.

*Must be Level II or Level III data capable.

*US Large Ticket only.

*Merchant must be an MCC other than:

-    Airline, passenger railway, restaurant, vehicle rental.

*Single transaction threshold amount USD $4,445**

**In April 2003, the single transaction threshold amount will be reduced to USD $3,808.

2

The Incentive is subject to reduction by all Losses. The Incentive shall be determined by deducting the Losses incurred by Chase on the Company's Accounts during the twelve-month Incentive period from the gross Incentive amount for such period. Upon termination of this Agreement, the Losses for the six-month period ending on the termination date (the **"Last Six-Month Period"**) will be deemed, for purposes of calculating the Incentive, to be equal to the Losses for the six-month period immediately preceding the Last Six-Month Period. The Incentive shall be calculated only on non-large ticket interchange transactions and sales volume. If Losses in one year exceed the amount of any or all Incentives earned, Chase may carry forward the amount of such Loss to offset against future Incentives or invoice the Company for the balance owing, which shall be payable within 14 days.

The applicable payment grid for the incentive payouts will be based on "Cumulative Annual Net Spend" and "Cumulative Average Payment Terms". Cumulative Annual Net Spend is defined as the total Net Spend, program to date, divided by the number of program years to date. Cumulative Average Payment Term is defined as 15 days less than the average number of days between the Transaction posting date and the payment posting date of the full amount due, averaged over the life of the program.

In the event this Agreement is terminated prior to the end of a Contract Year, the actual Net Spend for the elapsed portion of such Contract Year shall be annualized solely for the purpose of determining, in accordance with the foregoing table, the percentage to be applied to such actual Net Spend.

(b)      Variances. The Incentive is calculated based upon the Company's current performance of its Card Program with Chase. To the extent that for any annual period any of the performance variables varies materially from the Company's current performance levels, the parties agree to renegotiate in good faith adjustments to future Incentive payments or charges for Fees (as set forth below) for the remaining term of the Agreement to compensate for such variance. If the Federal Funds Rate changes by more than one half of one percent from the rate on the effective date of this Agreement, Chase reserves the right to ratably adjust future Incentive payments or charge Fees (as set forth below) for the remaining term of the Agreement to compensate for the change in its cost of funds.

(c)      Bonus. Chase shall pay the Company a $100,000 bonus, which will be paid within 30 days of the date of this amendment. In the event the company terminates this Agreement at any time during the Initial Term, for other than a default by Chase as defined in Section 5.3, the Company shall refund to Chase a portion of the signing bonus (the "Early Termination Fee") in an amount determined by multiplying (i) $2,777.77 by (ii) the number of months remaining in the Initial Term."

3

4.   Continued Effect.  Except to the extent amended hereby, all provisions and conditions of the Agreement shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

5.   Counterparts.  This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

6.   Successors and Assigns.  This Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Chase and the Company have caused this Amendment to be executed by their respective authorized officers as of the date first written above.

Chase:

Chase Manhattan Bank USA, NA

By: _____
Name: _____Dina Brennan_____
Title: ____VP____

Company:

The Tribune Company

By: _____
Name: ___J. Mark G. Mallory___
Title: ___VP / Controller___

4

**Annex F**

## FIFTH AMENDMENT TO
## COMMERCIAL CARD AGREEMENT

THIS FIFTH AMENDMENT TO (the "Amendment") is dated as of _____, 2004, between Chase Manhattan Bank, USA N.A. ("Chase"), successor in interest to First USA Financial Services Inc., ("First USA") and The Tribune Company (the "Company").

### WITNESSETH:

WHEREAS, Chase and the Company entered into that certain First USA Commercial Card Program Master Agreement dated October 18, 1999, which Agreement was amended by that certain First Amendment to Commercial Card Agreement dated as of January 22, 2001 and amended by that Second Amendment dated August 21, 2001 and amended by that Third Amendment dated August 28, 2001 and amended by that Fourth Amendment dated May 1, 2003 (such agreement, as amended, being hereinafter referred to as the "Agreement"); and

WHEREAS, the parties have agreed to modify the Agreement as provided herein;

NOW, THEREFORE, in consideration of the agreements herein contained and subject to the terms and conditions herein set forth, Chase and the Company hereby agree as follows:

1.    Definitions. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.    Performance Incentive. The parties wish to amend the "Performance Incentive(s)" section contained in Exhibit B of the Agreement that was previously amended in section 2 of the First Amendment and section 3 of the Fourth Amendment. Accordingly, the Performance Incentive section in Exhibit B to the Agreement is hereby deleted in its entirety and in place thereof shall be a new section which shall read as follows:

(a)    Calculation of Incentive. For each Contract Year (or, if this Agreement is terminated prior to the end of a Contract Year, the period from the end of the preceding Contract Year to the termination date), Chase shall pay to the Company an incentive calculated as a percentage of the Net Spend for such period, in accordance with the following table and terms (the "Incentive").

1

Purchasing Volume ONLY

| Average Payment Terms | Average Annual Net Spend | | | | | |
|---|---|---|---|---|---|---|
| | $ 40,000,000 $ 49,999,999 | $ 50,000,000 $ 59,999,999 | $ 60,000,000 $ 69,999,999 | $ 70,000,000 $ 79,999,999 | $ 80,000,000 $ 89,999,999 | $ 90,000,000 $ 99,999,999 |
| 1 Day or less | 1.12% | 1.20% | 1.22% | 1.24% | 1.26% | 1.27% |
| 2 Days | 1.11% | 1.19% | 1.21% | 1.23% | 1.24% | 1.26% |
| 3 Days | 1.10% | 1.18% | 1.20% | 1.22% | 1.23% | 1.24% |
| 4 Days | 1.09% | 1.17% | 1.19% | 1.21% | 1.22% | 1.23% |
| 5 Days | 1.07% | 1.15% | 1.18% | 1.20% | 1.21% | 1.22% |
| 6 - 10 Days | 1.02% | 1.10% | 1.12% | 1.14% | 1.15% | 1.17% |
| 11 - 14 Days | 0.97% | 1.05% | 1.08% | 1.10% | 1.11% | 1.12% |

| Average Payment Terms | Average Annual Net Spend | | | | | |
|---|---|---|---|---|---|---|
| | $ 100,000,000 $ 109,999,999 | $ 110,000,000 $ 119,999,999 | $ 120,000,000 $ 129,999,999 | $ 130,000,000 $ 139,999,999 | $ 140,000,000 $ 149,999,999 | $ 150,000,000 & Over |
| 1 Day or less | 1.29% | 1.30% | 1.30% | 1.31% | 1.31% | 1.32% |
| 2 Days | 1.28% | 1.29% | 1.29% | 1.30% | 1.30% | 1.31% |
| 3 Days | 1.27% | 1.28% | 1.28% | 1.29% | 1.29% | 1.30% |
| 4 Days | 1.26% | 1.26% | 1.27% | 1.28% | 1.28% | 1.29% |
| 5 Days | 1.25% | 1.23% | 1.26% | 1.26% | 1.27% | 1.27% |
| 6 - 10 Days | 1.19% | 1.20% | 1.20% | 1.21% | 1.21% | 1.22% |
| 11 - 14 Days | 1.14% | 1.15% | 1.16% | 1.16% | 1.17% | 1.17% |

| Large Ticket Average Transaction Size | Large Ticket Volume Percent of Total Volume | | | | | |
|---|---|---|---|---|---|---|
| | 11% - 15% | 16% - 20% | 21% - 30% | 31% - 40% | 41% - 50% | 51% - 60% |
| $5,000 or Less | 0.00% | 0.00% | -0.03% | -0.14% | -0.20% | -0.24% |
| $5,001 to $6,000 | 0.00% | 0.00% | -0.17% | -0.27% | -0.33% | -0.37% |
| $6,001 to $7,000 | 0.00% | -0.06% | -0.26% | -0.37% | -0.43% | -0.47% |
| $7,001 to $8,000 | 0.00% | -0.13% | -0.33% | -0.44% | -0.50% | -0.54% |
| $8,001 to $10,000 | -0.02% | -0.25% | -0.43% | -0.54% | -0.60% | -0.64% |
| $10,001 to $12,000 | -0.21% | -0.38% | -0.50% | -0.60% | -0.66% | -0.71% |
| $12,001 to $15,000 | -0.40% | -0.52% | -0.58% | -0.67% | -0.73% | -0.77% |
| $15,001 to $20,000 | -0.60% | -0.65% | -0.68% | -0.74% | -0.80% | -0.85% |
| $20,001 to $25,000 | -0.72% | -0.73% | -0.74% | -0.78% | -0.84% | -0.88% |
| $25,001 to $50,000 | -0.79% | -0.82% | -0.85% | -0.86% | -0.92% | -0.96% |
| Over 50,000 | -0.85% | -0.88% | -0.91% | -0.93% | -0.99% | -1.03% |

*Merchant does not have to register for participation in program.
*Must be Level II or Level III data capable.
*Merchant must be an MCC other than:
- Airline, lodging, vehicle rental, passenger railway or restaurant.
*Single US Region transaction threshold amount UDS $5,333.
*Single International transaction threshold amount UDS $2,700.
*The Large Ticket criteria listed herein is quoted as of the date of this Amendment. This criteria is subject to change at MasterCard's discretion.

amendm2.doc

The Large Ticket adjustment grid above will apply to all Large Ticket volume over 10%

The Incentive is subject to reduction by all Losses. If Losses in one year exceed the amount of any or all Incentives earned, Chase may carry forward the amount of such Loss to offset against future Incentives or invoice the Company for the balance owing, which shall be payable within 14 days ("Carryforward Losses"). The Incentive shall be determined by deducting the Losses incurred by Chase on the Company's Accounts during the twelve-month Incentive period and any outstanding Carryforward Losses from the gross Incentive amount for such period. Upon termination of this Agreement, the Losses for the preceding six-month period ending on the termination date (the **"Last Six-Month Period"**) will be deemed, for purposes of calculating the Incentive, to be equal to the Losses for the six-month period immediately preceding the Last Six-Month Period plus any outstanding Carryforward Losses. The Incentive shall be calculated only on qualified Net Spend sales volume.

The applicable payment grid for the incentive payouts will be based on "Average Annual Net Spend" and "Average Payment Terms". Incentive payouts will then be based on "Average Annual Net Spend". Average Annual Net Spend is defined as the total Net Spend during each Contract Year. Average Payment Term is defined as 15 days less than the average number of days between the Transaction posting date and the payment posting date of the full amount due, averaged over each Contract Year.

In the event this Agreement is terminated prior to the end of a Contract Year, the actual Net Spend for the elapsed portion of such Contract Year shall be annualized solely for the purpose of determining, in accordance with the foregoing table, the percentage to be applied to such actual Net Spend.

(b)     Variances. The Incentive is calculated based upon the Company's current performance of its Card Program with Chase. To the extent that for any annual period any of the performance variables varies materially from the Company's current performance levels, the parties agree to renegotiate in good faith adjustments to future Incentive payments or charges for Fees (as set forth below) for the remaining term of the Agreement to compensate for such variance.

(c)     Bonus. Chase has paid the Company a $100,000 bonus in accordance with the terms of Fourth Amendment. In the event the company terminates this Agreement at any time during the Initial Term, for other than a default by Chase as defined in Section 5.3, the Company shall refund to Chase a portion of the signing bonus (the "Early Termination Fee") in an amount determined by multiplying (i) $2,777.77 by (ii) the number of months remaining in the Initial Term."

3.    Continued Effect.    Except to the extent amended hereby, all terms, provisions and conditions of the Agreement shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

4.    Counterparts.    This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

5.    Successors and Assigns.    This Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Chase and the Company have caused this Amendment to be executed by their respective authorized officers as of the date first written above.

**CHASE:**

**Chase Manhattan Bank, USA N.A.**

By: _____
Name: _____Dana Brevenaw____
Title: _____VP_____

**COMPANY:**

**The Tribune Company**

By: ___Michael Gart____
Name: ___MICHAEL GART___
Title: ___DIRECTOR /SUPPLIER   SERVICES___

4

**Annex G**

**SIXTH AMENDMENT TO
COMMERCIAL CARD AGREEMENT**

THIS SIXTH AMENDMENT TO COMMERCIAL CARD AGREEMENT (the "Amendment") is dated as of _FEBRUARY 4_ , 2005, between Chase Manhattan Bank, USA N.A. ("Chase"), successor in interest to First USA Financial Services Inc., ("First USA") and Tribune Company (the "Company").

WITNESSETH:

WHEREAS, Chase and the Company entered into that First USA Commercial Card Program Master Agreement dated October 18, 1999, which Agreement was amended by that certain First Amendment dated January 22, 2001 and amended by that Second Amendment dated August 21, 2001 and amended by that Third Amendment dated August 28, 2001 and amended by that Fourth Amendment dated May 1, 2003 and amended by that Fifth Amendment dated February 2, 2004 (such Agreement, as amended, being hereinafter referred to as the "Agreement"); and

WHEREAS, the parties have agreed to modify the Performance Incentive;

NOW, THEREFORE, in consideration of the agreements herein contained and subject to the terms and conditions herein set forth, Chase and the Company hereby agree as follows:

1.    Definitions.  Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.    Performance Incentive.    The parties wish to amend the Performance Incentive(s) section contained in Exhibit B of the Agreement.  Accordingly, the Performance Incentive(s) section in Exhibit B of the Agreement is hereby deleted in its entirety and in place thereof shall be a new section, which shall read as follows:

"(a)    Calculation of Incentive.  For each Contract Year (or, if this Agreement is terminated prior to the end of a Contract Year, the period from the end of the preceding Contract Year to the termination date), Chase shall pay to the Company an incentive calculated as a percentage of the Net Spend for such period, in accordance with the following table and terms (the "Incentive"). The below incentive will be effective as of September 1, 2004.

## Tribune Company

| Purchasing Volume ONLY | | Qualified Annual Charge Volume | | | | |
|---|---|---|---|---|---|---|
| | | $ 5,000,000 | $ 10,000,000 | $ 20,000,000 | $ 40,000,000 | $ 50,000,000 |
| Average File Turn | Average Payment Terms | $ 9,999,999 | $ 19,999,999 | $ 39,999,999 | $ 49,999,999 | $ 59,999,999 |
| 3 Days | -12 Days | 0.89% | 0.99% | 1.19% | 1.20% | 1.37% |
| 4 to 6 days | -9 to -11 days | 0.88% | 0.96% | 1.18% | 1.19% | 1.36% |
| 7 to 9 days | -6 to -8 days | 0.87% | 0.97% | 1.17% | 1.18% | 1.35% |
| 10 to 16 days | +1 day to -5 days | 0.91% | 1.01% | 1.16% | 1.17% | 1.34% |
| 17 Days | 2 Days | 0.90% | 1.00% | 1.15% | 1.16% | 1.33% |
| 18 Days | 3 Days | 0.89% | 0.99% | 1.14% | 1.15% | 1.32% |
| 19 Days | 4 Days | 0.88% | 0.98% | 1.13% | 1.14% | 1.31% |
| 20 Days | 5 Days | 0.87% | 0.97% | 1.12% | 1.12% | 1.30% |
| 21 - 25 Days | 6 - 10 Days | 0.86% | 0.96% | 1.11% | 1.11% | 1.20% |
| 26 - 29 Days | 11 - 14 Days | 0.85% | 0.95% | 1.10% | 1.10% | 1.17% |

| Purchasing Volume ONLY | | Qualified Annual Charge Volume | | | | |
|---|---|---|---|---|---|---|
| | | $ 60,000,000 | $ 70,000,000 | $ 80,000,000 | $ 90,000,000 | $ 100,000,000 |
| Average File Turn | Average Payment Terms | $ 69,999,999 | $ 79,999,999 | $ 89,999,999 | $ 99,999,999 | $ 109,999,999 |
| 3 Days | -12 Days | 1.38% | 1.38% | 1.39% | 1.39% | 1.41% |
| 4 to 6 days | -9 to -11 days | 1.37% | 1.37% | 1.38% | 1.38% | 1.38% |
| 7 to 9 days | -6 to -8 days | 1.36% | 1.36% | 1.37% | 1.37% | 1.37% |
| 10 to 16 days | +1 day to -5 days | 1.35% | 1.35% | 1.36% | 1.36% | 1.36% |
| 17 Days | 2 Days | 1.34% | 1.34% | 1.35% | 1.35% | 1.34% |
| 18 Days | 3 Days | 1.33% | 1.33% | 1.34% | 1.34% | 1.33% |
| 19 Days | 4 Days | 1.32% | 1.32% | 1.33% | 1.33% | 1.32% |
| 20 Days | 5 Days | 1.31% | 1.31% | 1.32% | 1.32% | 1.31% |
| 21 - 25 Days | 6 - 10 Days | 1.30% | 1.29% | 1.30% | 1.30% | 1.30% |
| 26 - 29 Days | 11 - 14 Days | 1.19% | 1.20% | 1.20% | 1.21% | 1.21% |

| Purchasing Volume ONLY | | Qualified Annual Charge Volume | | | | |
|---|---|---|---|---|---|---|
| | | $ 110,000,000 | $ 120,000,000 | $ 130,000,000 | $ 140,000,000 | $ 150,000,000 |
| Average File Turn | Average Payment Terms | $ 119,999,999 | $ 129,999,999 | $ 139,999,999 | $ 149,999,999 | $ 174,999,999 |
| 3 Days | -12 Days | 1.42% | 1.43% | 1.47% | 1.50% | 1.51% |
| 4 to 6 days | -9 to -11 days | 1.39% | 1.40% | 1.44% | 1.47% | 1.48% |
| 7 to 9 days | -6 to -8 days | 1.37% | 1.38% | 1.42% | 1.45% | 1.46% |
| 10 to 16 days | +1 day to -5 days | 1.36% | 1.36% | 1.40% | 1.43% | 1.44% |
| 17 Days | 2 Days | 1.34% | 1.35% | 1.39% | 1.42% | 1.43% |
| 18 Days | 3 Days | 1.33% | 1.34% | 1.38% | 1.41% | 1.42% |
| 19 Days | 4 Days | 1.32% | 1.33% | 1.37% | 1.40% | 1.41% |
| 20 Days | 5 Days | 1.31% | 1.32% | 1.35% | 1.39% | 1.39% |
| 21 - 25 Days | 6 - 10 Days | 1.29% | 1.29% | 1.30% | 1.33% | 1.34% |
| 26 - 29 Days | 11 - 14 Days | 1.21% | 1.22% | 1.25% | 1.27% | 1.29% |

| Purchasing Volume ONLY | | Qualified Annual Charge Volume | | | |
|---|---|---|---|---|---|
| | | $ 175,000,000 | $ 200,000,000 | $ 250,000,000 | 400,000,000 |
| Average File Turn | Average Payment Terms | $ 199,999,999 | $ 249,999,999 | $ 399,999,999 | * |
| 3 Days | -12 Days | 1.53% | 1.54% | 1.55% | 1.53% |
| 4 to 6 days | -9 to -11 days | 1.50% | 1.51% | 1.52% | 1.51% |
| 7 to 9 days | -6 to -8 days | 1.47% | 1.48% | 1.49% | 1.50% |
| 10 to 16 days | +1 day to -5 days | 1.45% | 1.46% | 1.47% | 1.48% |
| 17 Days | 2 Days | 1.44% | 1.45% | 1.46% | 1.47% |
| 18 Days | 3 Days | 1.43% | 1.44% | 1.45% | 1.46% |
| 19 Days | 4 Days | 1.42% | 1.43% | 1.44% | 1.45% |
| 20 Days | 5 Days | 1.40% | 1.41% | 1.42% | 1.43% |
| 21 - 25 Days | 6 - 10 Days | 1.35% | 1.36% | 1.37% | 1.38% |
| 26 - 29 Days | 11 - 14 Days | 1.30% | 1.31% | 1.32% | 1.33% |

* All fraud and credit losses will be deducted from rebate.

| The Average Transaction Size and the Average Spend per Card calculations shall be performed for the total volume (including Large Ticket) | | | |
|---|---|---|---|

| Adjustment for Average Transaction Size | | Adjustment for Average Spend per Card | |
|---|---|---|---|
| Average Transaction Size | Rebate Adjustment | Average Spend per Card | Rebate Adjustment |
| $ 100 | -0.05% | $ 3,000 | -0.05% |
| $ 150 | -0.04% | $ 5,000 | -0.04% |
| $ 200 | -0.03% | $ 10,000 | -0.03% |
| $ 300 | -0.03% | $ 15,000 | -0.02% |
| $ 450 | -0.02% | $ 30,000 | -0.01% |
| $ 550 | -0.01% | $ 40,000 | -0.01% |
| $ 600 | 0.00% | $ 50,000 | 0.00% |
| $ 750 | 0.01% | $ 60,000 | 0.00% |
| | | $ 70,000 | 0.01% |

| Large Ticket Average Trans Size | Large Ticket Volume Percent of Total Volume | | | | | |
|---|---|---|---|---|---|---|
| | 11% - 15% | 16% - 20% | 21% - 30% | 31% - 40% | 41% - 50% | 51% - 60% |
| $5,000 or Less | 0.00% | 0.00% | -0.03% | -0.14% | -0.20% | -0.24% |
| $5,001 to $6,000 | 0.00% | 0.00% | -0.17% | -0.27% | -0.33% | -0.37% |
| $6,001 to $7,000 | 0.00% | -0.06% | -0.26% | -0.37% | -0.43% | -0.47% |
| $7,001 to $8,000 | 0.00% | -0.13% | -0.33% | -0.44% | -0.50% | -0.54% |
| $8,001 to $10,000 | -0.02% | -0.25% | -0.43% | -0.54% | -0.60% | -0.64% |
| $10,001 to $12,000 | -0.21% | -0.38% | -0.50% | -0.60% | -0.66% | -0.71% |
| $12,001 to $15,000 | -0.40% | -0.52% | -0.58% | -0.67% | -0.73% | -0.77% |
| $15,001 to $20,000 | -0.60% | -0.65% | -0.68% | -0.74% | -0.80% | -0.83% |
| $20,001 to $25,000 | -0.72% | -0.75% | -0.74% | -0.78% | -0.84% | -0.88% |
| $25,001 to $50,000 | -0.76% | -0.82% | -0.85% | -0.86% | -0.92% | -0.96% |
| Over 50,000 | -0.85% | -0.88% | -0.91% | -0.93% | -0.99% | -1.03% |

* All fraud and credit losses will be deducted from rebate.

The above rebates are contingent on each consortium participant maintaining an Investment Grade credit rating with both S&P and Moody's. If any of the participants have their credit rating downgraded to below Investment Grade, JPMorgan Chase reserves the right to revise rebate for that participant.

*Merchant does not need to register for participation in program.
*Must be Level III data capable.
*Merchant must be an MCC other than:
    - Airline, lodging, vehicle rental, passenger railway or restaurant.
*Single US Region Transaction threshold amount USD $5,333.
*Single International Transaction threshold amount USD $2,700.
*The Large Ticket criteria listed herein is quoted as of the date of this Amendment. This criteria is subject to change at MasterCard's discretion.

    The applicable payment grid for the incentive payouts will be based on "Average Annual Net Spend," "Average Fileturn" and "Average Transaction Size." Incentive payouts will then be based on "Annual Net Spend". Average Annual Net Spend is defined as the total Net Spend over the Contract Year, divided by the total number of days in the Contract Year, multiplied by 365. Annual Net Spend is defined as Net Spend during the Contract Year. In all cases, the Incentive is calculated annually and is payable within 60 days after the end of each Contract Year. In the event that the due date for any Incentive payment falls on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

    The Incentive is subject to reduction by all Losses. If Losses in one year exceed the amount of any or all Incentives earned, Bank will invoice the Company for the balance owing, which shall be payable within 14 days. The Incentive shall be determined by deducting the Losses incurred by Bank on the Company's Accounts during the twelve-month Incentive period from the gross Incentive amount for such period. Upon termination of this Agreement, the Losses for the preceding six-month period ending on the termination date (the "Last Six-Month Period") will be deemed, for purposes of

calculating the Incentive, to be equal to the Losses for the six-month period immediately preceding the Last Six-Month Period plus any outstanding previously invoiced Losses.

The Incentive shall be calculated only on qualified Net Spend sales volume. If more than ten percent of the total Net Spend is attributed to large ticket or non-standard interchange rates, the Large Ticket Adjustment grid included herein will apply.

Definitions.

"Contract Year" means a 12-month period beginning on the date hereof or an anniversary of such date.

"Losses" means losses incurred by Bank on Accounts for collection fees (including cardholder late and delinquency fees) paid and due to fraud or other unauthorized use and all other amounts that are outstanding under Accounts and are not paid within 180 days of their respective due dates. Losses also include all monies owed by Company in any capacity, whether or not due, and Bank shall have the right to set off such losses against any Incentive payable. Any subsequent recovery of such losses by Bank will be credited back to the Company."

4.     Continued Effect.    Except to the extent amended hereby, all terms, provisions and conditions of the Agreement shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

5.     Counterparts.    This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

6.     Successors and Assigns.    This Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Chase and the Company have caused this Amendment to be executed by their respective authorized officers as of the date first written above.

**CHASE:**

**Chase Manhattan Bank, USA N.A.**

By: _Clare T. Trauth_
Name: Clare T. Trauth
Title: Vice President

**COMPANY:**

**Tribune Company**

By: _Ed Mc Gonigle_
Name: Enda Mc Gonigle
Title: Corporate Purchasing Manager

**Tribune Company**

By: _Michael Riordan_
Name: Michael Riordan
Title: Director, Shared Services

**Annex H**

## SEVENTH AMENDMENT TO
## COMMERCIAL CARD AGREEMENT

THIS SEVENTH AMENDMENT TO COMMERCIAL CARD AGREEMENT (the "Amendment") is dated as of APRIL 7 , 2005, between Chase Manhattan Bank, USA N.A. ("Chase"), successor in interest to First USA Financial Services, Inc. ("First USA") and Tribune Company (the "Company").

## WITNESSETH:

WHEREAS, Chase and the Company entered into that First USA Commercial Card Program Master Agreement dated October 18, 1999, which Agreement was amended by that certain First Amendment dated January 22, 2001 and amended by that Second Amendment dated August 21, 2001 and amended by that Third Amendment dated August 28, 2001 and amended by that Fourth Amendment dated May 1, 2003 and amended by that Fifth Amendment dated February 2, 2004, and amended by that Sixth Amendment dated February 4, 2005 (such Agreement, as amended, being hereinafter referred to as the "Agreement"); and

WHEREAS, the parties have agreed to modify the Agreement as provided herein;

NOW, THEREFORE, in consideration of the agreements herein contained and subject to the terms and conditions herein set forth, Chase and the Company hereby agree as follows:

1. Definitions. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2. Performance Incentive. The parties wish to amend the Performance Incentive(s) section contained in Exhibit B of the Agreement. Accordingly, the Performance Incentive(s) section in Exhibit B of the Agreement is hereby deleted in its entirety and in place thereof shall be a new section, which shall read as follows:

"(a) Calculation of Incentive. For each Contract Year (or, if this Agreement is terminated prior to the end of a Contract Year, the period from the end of the preceding Contract Year to the termination date), Chase shall pay to the Company an incentive calculated as a percentage of the Net Spend for such period, in accordance with the following table and terms (the "Incentive"). The below incentive will be effective as of September 1, 2004.

1

| Purchasing Volume ONLY | | Qualified Annual Charge Volume | | | | |
|---|---|---|---|---|---|---|
| | | $5,000,000 | $10,000,000 | $20,000,000 | $40,000,000 | $50,000,000 |
| Average File Turn | Average Payment Terms | $9,999,999 | $19,999,999 | $39,999,999 | $49,999,999 | $59,999,999 |
| 3 Days | -12 Days | 0.89% | 0.99% | 1.19% | 1.20% | 1.37% |
| 4 to 6 days | -9 to -11 days | 0.88% | 0.98% | 1.18% | 1.19% | 1.36% |
| 7 to 9 days | -6 to -8 days | 0.87% | 0.97% | 1.17% | 1.18% | 1.35% |
| 10 to 16 days | +1 day to -5 days | 0.91% | 1.01% | 1.16% | 1.17% | 1.34% |
| 17 Days | 2 Days | 0.90% | 1.00% | 1.15% | 1.16% | 1.33% |
| 18 Days | 3 Days | 0.89% | 0.99% | 1.14% | 1.15% | 1.32% |
| 19 Days | 4 Days | 0.88% | 0.98% | 1.13% | 1.14% | 1.31% |
| 20 Days | 5 Days | 0.87% | 0.97% | 1.12% | 1.12% | 1.30% |
| 21 - 25 Days | 6 - 10 Days | 0.86% | 0.96% | 1.11% | 1.11% | 1.29% |
| 26 - 29 Days | 11 - 14 Days | 0.85% | 0.95% | 1.10% | 1.10% | 1.17% |

| Purchasing Volume ONLY | Qualified Annual Charge Volume | | | | |
|---|---|---|---|---|---|
| | | $60,000,000 | $70,000,000 | $80,000,000 | $90,000,000 | $100,000,000 |
| Average File Turn | Average Payment Terms | $69,999,999 | $79,999,999 | $89,999,999 | $99,999,999 | $109,999,999 |
| 3 Days | -12 Days | 1.38% | 1.38% | 1.39% | 1.39% | 1.41% |
| 4 to 6 days | -9 to -11 days | 1.37% | 1.37% | 1.38% | 1.38% | 1.38% |
| 7 to 9 days | -6 to -8 days | 1.36% | 1.36% | 1.37% | 1.37% | 1.37% |
| 10 to 16 days | +1 day to -5 days | 1.35% | 1.35% | 1.36% | 1.36% | 1.36% |
| 17 Days | 2 Days | 1.34% | 1.34% | 1.35% | 1.35% | 1.34% |
| 18 Days | 3 Days | 1.33% | 1.33% | 1.34% | 1.34% | 1.33% |
| 19 Days | 4 Days | 1.32% | 1.32% | 1.33% | 1.33% | 1.32% |
| 20 Days | 5 Days | 1.31% | 1.31% | 1.32% | 1.32% | 1.31% |
| 21 - 25 Days | 6 - 10 Days | 1.30% | 1.29% | 1.30% | 1.30% | 1.30% |
| 26 - 29 Days | 11 - 14 Days | 1.19% | 1.20% | 1.21% | 1.21% | 1.21% |

| Purchasing Volume ONLY | Qualified Annual Charge Volume | | | | |
|---|---|---|---|---|---|
| | | $110,000,000 | $120,000,000 | $130,000,000 | $140,000,000 | $150,000,000 |
| Average File Turn | Average Payment Terms | $119,999,999 | $129,999,999 | $139,999,999 | $149,999,999 | $174,999,999 |
| 3 Days | -12 Days | 1.42% | 1.43% | 1.47% | 1.50% | 1.51% |
| 4 to 6 days | -9 to -11 days | 1.39% | 1.40% | 1.44% | 1.47% | 1.48% |
| 7 to 9 days | -6 to -8 days | 1.37% | 1.38% | 1.42% | 1.45% | 1.46% |
| 10 to 16 days | +1 day to -5 days | 1.36% | 1.36% | 1.40% | 1.43% | 1.44% |
| 17 Days | 2 Days | 1.34% | 1.35% | 1.39% | 1.42% | 1.43% |
| 18 Days | 3 Days | 1.33% | 1.34% | 1.38% | 1.41% | 1.42% |
| 19 Days | 4 Days | 1.32% | 1.33% | 1.37% | 1.40% | 1.41% |
| 20 Days | 5 Days | 1.31% | 1.32% | 1.35% | 1.39% | 1.39% |
| 21 - 25 Days | 6 - 10 Days | 1.29% | 1.29% | 1.30% | 1.33% | 1.34% |
| 26 - 29 Days | 11 - 14 Days | 1.21% | 1.22% | 1.25% | 1.29% | 1.29% |

2

amendfm2.doc

| Purchasing Volume ONLY | | Qualified Annual Charge Volume | | | |
|---|---|---|---|---|---|
| | | $175,000,000 $199,999,999 | $200,000,000 $249,999,999 | $250,000,000 $399,999,999 | $400,000,000 + |
| Average File Turn | Average Payment Terms | | | | |
| 3 Days | -12 Days | 1.53% | 1.54% | 1.55% | 1.56% |
| 4 to 6 days | -9 to -11 days | 1.50% | 1.51% | 1.52% | 1.53% |
| 7 to 9 days | -6 to -8 days | 1.47% | 1.48% | 1.49% | 1.50% |
| 10 to 16 days | +1 day to -5 days | 1.45% | 1.46% | 1.47% | 1.48% |
| 17 Days | 2 Days | 1.44% | 1.45% | 1.46% | 1.47% |
| 18 Days | 3 Days | 1.43% | 1.44% | 1.45% | 1.46% |
| 19 Days | 4 Days | 1.42% | 1.43% | 1.44% | 1.45% |
| 20 Days | 5 Days | 1.40% | 1.41% | 1.42% | 1.43% |
| 21 - 25 Days | 6 - 10 Days | 1.35% | 1.36% | 1.37% | 1.38% |
| 26 - 29 Days | 11 - 14 Days | 1.30% | 1.31% | 1.32% | 1.33% |

*All fraud and credit losses will be deducted from rebate.

The Average Transaction Size and the Average Spend per Card calculations shall be performed for the total volume (including Large Ticket)

| Adjustment for Average Transaction Size | |
|---|---|
| Average Transaction Size | Rebate Adjustment |
| $100 | -0.05% |
| $150 | -0.04% |
| $200 | -0.03% |
| $300 | -0.03% |
| $450 | -0.02% |
| $550 | -0.01% |
| $600 | 0.00% |
| $750 | 0.01% |

| Adjustment for Average Spend per Card | |
|---|---|
| Average Spend per Card | Rebate Adjustment |
| $3,000 | -0.05% |
| $5,000 | -0.04% |
| $10,000 | -0.03% |
| $15,000 | -0.02% |
| $30,000 | -0.01% |
| $40,000 | -0.01% |
| $50,000 | 0.00% |
| $60,000 | 0.00% |
| $70,000 | 0.01% |

amendfm2.doc

3

| Large Ticket Average Tran Size | Large Ticket Volume Percent of Total Volume | | | | | |
|---|---|---|---|---|---|---|
| | 11% - 15% | 16% - 20% | 21% - 30% | 31% - 40% | 41% - 50% | 51% - 60% |
| $5,000 or Less | 0.00% | 0.00% | -0.03% | -0.14% | -0.20% | -0.24% |
| $5,001 to $6,000 | 0.00% | 0.00% | -0.17% | -0.27% | -0.33% | -0.37% |
| $6,001 to $7,000 | 0.00% | -0.06% | -0.26% | -0.37% | -0.43% | -0.47% |
| $7,001 to $8,000 | 0.00% | -0.13% | -0.33% | -0.44% | -0.50% | -0.54% |
| $8,001 to $10,000 | -0.02% | -0.25% | -0.43% | -0.54% | -0.60% | -0.64% |
| $10,001 to $12,000 | -0.21% | -0.38% | -0.50% | -0.60% | -0.66% | -0.71% |
| $12,001 to $15,000 | -0.40% | -0.52% | -0.58% | -0.67% | -0.73% | -0.77% |
| $15,001 to $20,000 | -0.60% | -0.65% | -0.68% | -0.74% | -0.80% | -0.85% |
| $20,001 to $25,000 | -0.72% | -0.73% | -0.74% | -0.78% | -0.84% | -0.88% |
| $25,001 to $50,000 | -0.79% | -0.82% | -0.85% | -0.86% | -0.92% | -0.96% |
| Over 50,000 | -0.85% | -0.88% | -0.91% | -0.93% | -0.99% | -1.03% |

* All fraud and credit losses will be deducted from rebate.

The above rebates are contingent on each consortium participant maintaining an Investment Grade credit rating with both S&P and Moody's. If any of the participants have their credit rating downgraded to below Investment Grade, JPMorgan Chase reserves the right to revise rebate for that participant.

*Merchant does not need to register for participation in program.
*Must be Level III data capable.
*Merchant must be an MCC other than:
- Airline, lodging, vehicle rental, passenger railway or restaurant.
*Single US Region Transaction threshold amount USD $5,333.
*Single International Transaction threshold amount USD $2,700.
*The Large Ticket criteria listed herein is quoted as of the date of this Amendment. This criteria is subject to change at MasterCard's discretion.

The applicable payment grid for the incentive payouts will be based on "Average Annual Net Spend," "Average Fileturn" and "Average Transaction Size." Incentive payouts will then be based on "Annual Net Spend". Average Annual Net Spend is defined as the total Net Spend over the Contract Year, divided by the total number of days in the Contract Year, multiplied by 365. Annual Net Spend is defined as Net Spend during the Contract Year. The Incentive is calculated quarterly and is payable within 30 days after the end of each quarter. In the event that the due date for any Incentive payment falls on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

The Incentive is subject to reduction by all Losses. If Losses in one year exceed the amount of any or all Incentives earned, Bank will invoice the Company for the balance owing, which shall be payable within 14 days. The Incentive shall be determined by deducting the Losses incurred by Bank on the Company's Accounts during the twelve-month Incentive period from the gross Incentive amount for such period. Upon termination of this Agreement, the Losses for the preceding six-month period ending on the termination date (the "Last Six-Month Period") will be deemed, for purposes of calculating the Incentive, to be equal to the Losses for the six-month period immediately preceding the Last Six-Month Period plus any outstanding previously invoiced Losses.

The Incentive shall be calculated only on qualified Net Spend sales volume. If more than ten percent of the total Net Spend is attributed to large ticket or non-standard interchange rates, the Large Ticket Adjustment grid included herein will apply.

Definitions.

"Contract Year" means a 12-month period beginning on the date hereof or an anniversary of such date.

"Losses" means losses incurred by Bank on Accounts for collection fees (including cardholder late and delinquency fees) paid and due to fraud or other unauthorized use and all other amounts that are outstanding under Accounts and are not paid within 180 days of their respective due dates. Losses also include all monies owed by Company in any capacity, whether or not due, and Bank shall have the right to set off such losses against any Incentive payable. Any subsequent recovery of such losses by Bank will be credited back to the Company."

   3.   Continued Effect.   Except to the extent amended hereby, all terms, provisions and conditions of the Agreement shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

   4.   Counterparts.   This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

   5.   Successors and Assigns.   This Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

amendfn2.dot

5

IN WITNESS WHEREOF, Chase and the Company have caused this Amendment to be executed by their respective authorized officers as of the date first written above.

**CHASE:**

**Chase Manhattan Bank, USA N.A.**

By: _Clare J. Trauth_

Name: _Clare T. Trauth_

Title: _Vice President_

**COMPANY:**

**Tribune Company**

By: _[signature]_

Name: _MICHAEL RIORDAN_

Title: _DIRECTOR, SHARED SERVICES_

6

# **Annex I**

# EIGHTH AMENDMENT TO
# COMMERCIAL CARD AGREEMENT

THIS EIGHTH AMENDMENT (the "Amendment") TO COMMERCIAL CARD AGREEMENT dated as of 6/21/05 between JPMorgan Chase Bank, N.A. (the "Bank"), and Tribune Company (the "Company") whose Master Agreement was made as of October 18, 1999.

The Bank and the Company agree to amend the Agreement as follows:

1.    Definitions. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.    Amendment. Section 5.2 of the Agreement is hereby amended as follows:

TERM. This Agreement shall be extended through December 2007, unless written notice of termination is given by either party at least 90 days prior to the end of the Term.

3.    Amendment. A new Section 8 in Exhibit B is hereby added to the Agreement as follows:

Signing Bonus

Bank will pay the Company a one-time bonus of $500,000 within 30 days of the execution of this Agreement. $370,000 of this one-time bonus is tied to the following annual volume targets for Years 1-3 of the Amendment (2005-2007): $230MM, $250MM, $250MM. If the program fails to achieve annual GDV target, then the client will pay back a proportional amount of the initial incentive fund paid relating to each year's target volume. For example, if Year 1 is 10% below target, then 10% of that year's target bonus allocation will be repaid or:
[$230,000/($230,000+$250,000+$250,0000] = .315 x $370,000 = $116,575
$116,575 x 10% = $11,657

Years 2 and 3 would be calculated:
[$250,000/($230,000+$250,000+$250,000)] = .342 x $370,000 = $126,712
$126,712 x 10% = $12,671

Any payback amounts will be deducted from the 4th Quarter Rebate payment for the year in which the shortage occurred.

The remaining amount of the one-time bonus, $130,000, is tied to the Amendment term and will be repaid to the bank on a pro rata calendar basis if the Amendment is terminated

1

prior to December 31, 2007.

4. _Amendment_.  A new Section 9 in Exhibit B is hereby added to the Agreement, as follows:

Additional Volume Incentives.  Bank shall provide 15 basis points on incremental volume above the highest previous year and above the minimum annual volume targets for years 1, 2 and 3.

5. · _Continued Effect_.  Except to the extent amended hereby, all terms, provisions and conditions of the Agreement, as it may have been amended from time to time, shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

6. _Counterparts_.  This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

IN WITNESS WHEREOF, the Bank and the Company have caused this Amendment to be executed by their respective authorized officers as of the effective date written above.

**JPMORGAN CHASE BANK, N.A.:**

By: _____

Name: ~~Madeleine N. Pember~~

Title: ~~Vice President~~

**TRIBUNE COMPANY:**

By: _____

Name: MICHAEL RIORDAN

Title: DIRECTOR, SHARED SERVICES

**Annex J**

## NINTH AMENDMENT TO
## COMMERCIAL CARD AGREEMENT

THIS NINTH AMENDMENT (the "Amendment") to COMMERCIAL CARD AGREEMENT (the "Agreement') is dated December 14, 2007 (the "Effective Date") between Chase Bank USA, N.A., as successor in interest to Chase Manhattan Bank USA, National Association (the "Chase"), and Tribune Company, (the "Company")

WHEREAS, Chase and Company entered into that FIRST USA COMMERCIAL CARD PROGRAM MASTER AGREEMENT dated October 18, 1999, as amended from time to time; and

WHEREAS, Chase and Company agree to amend the Agreement as follows:

1.    Definitions. Capitalized terms used in this Amendment and defined in the Agreement shall be used herein as so defined, except as otherwise provided herein.

2.    Amendment.    References to "FIRST USA" will be deemed to be references to "CHASE".

3.    Amendment.    References to "THE TRIBUNE COMPANY" will be deemed to be references to "TRIBUNE COMPANY".

4.    Amendment.    The first two sentences in Section 5.2 of the Agreement as previously amended is hereby deleted and replaced with the following:

" TERM.    This Agreement shall have a term of three (3) years commencing as of the Effective Date of the Ninth Amendment to this Agreement (the "Initial Term").

5.    Amendment. Exhibit B of the Agreement is hereby deleted in its entirety and replaced with a new Exhibit B, attached hereto.

6.    Continued Effect. Except to the extent amended hereby, all terms, provisions and conditions of the Agreement, as it may have been amended from time to time, shall continue in full force and effect and the Agreement shall remain enforceable and binding in accordance with its terms.

7.    Counterparts. This Amendment may be executed in any number of counterparts, all of which when taken together shall constitute one and the same document, and each party hereto may execute this Amendment by signing any of such counterparts.

IN WITNESS WHEREOF, the Bank and the Company have caused this Amendment to be executed by their respective authorized officers as of the effective date written above.

CHASE BANK USA, N.A.:

By:    _Clare J. Trauth_

Name:    CLARE T. TRAUTH

Title:    VICE PRESIDENT

TRIBUNE COMPANY:

By:    _[signature]_

1

Name: _MICHAEL RIORDAN_

Title: _DIRECTOR, SHARED SERVICES_

**Company Attestation:**

The undersigned, a duly authorized officer or representative of the Company, does hereby certify that the Company has been duly authorized to enter into and perform this Amendment and that the person signing above on behalf of the Company, whose execution of this Amendment was witnessed by the undersigned, is an officer, partner, member or other representative of the Company possessing authority to execute this Amendment.

By: _____ *

Name: _R. MARK MALLORY_

Title: _VICE PRESIDENT & CONTROLLER_

*Note: The person signing the attestation shall be someone different from the person signing above on behalf of the Company.

2

**AMENDED & RESTATED**
**EXHIBIT B**
TRIBUNE COMPANY
INCENTIVES & FEES

## DEFINITIONS

"Association" means Visa.

"Average Fileturn" means the number of days between the transaction posting date and the posting date of payment in full, averaged over the rebate calculation period.

"Average Large Ticket Transaction Size" means Large Ticket Transaction Volume divided by the total number of transactions included in the calculation of Large Ticket Transaction Volume.

"Average Payment Terms" means the average number of calendar days after a billing cycle until the date full payment of the cycle end balance is posted by the Chase.

"Charge Volume" means total U.S. dollar charges made on a Chase Visa Commercial Card, net of returns, and excluding cash advances, convenience check amounts, fraudulent charges and any transactions that do not qualify for interchange under applicable Association rules.

"Contract Year" means a 12-month period beginning on the effective date of the Agreement or any anniversary of such date.

"Credit Losses" means all amounts due to Chase in connection with any Account that Chase has written off as uncollectible, excluding Fraud Losses.

"Fraud Losses" means all amounts due to Chase in connection with any Account that Chase has written off as uncollectible as a result of a card being lost, stolen, misappropriated, improperly used or compromised.

"Gross Charge Volume" means Charge Volume plus Large Ticket Transaction Volume up to 10% of Charge Volume.

"Large Ticket Transaction" means a transaction that the Associations have determined is eligible for a Large Ticket Rate. As of the date of this Agreement, the Large Ticket transaction amount (i) may exceed $4,100.00, (ii) will include level II and III data, (iii) is acknowledged by the supplier's acquirer, (iv) applies only to U.S. dollar transactions, and (iv) is subject to change at any time by the Association.

"Large Ticket Transaction Volume" means total U.S. dollar Large Ticket Transactions made on a Chase Visa Commercial Card, net of returns and excluding cash advances, convenience check amounts, fraudulent charges and any transactions that do not qualify for interchange under applicable Association rules.

"Losses" means all Credit Losses and Fraud Losses.

"Media Consortium" means Tribune Company, Advance Publications, Inc. and New York Times Company

"Settlement Terms" means the combination of the number of calendar days in a billing cycle and the number of calendar days following the end of a billing cycle to the date the payment is due. Settlement Terms are expressed as X & Y, where X is the number of calendar days in the billing cycle and Y is the number of calendar days following the end of a billing cycle to the date the payment is due.

3

**Large Ticket Rebate**

If the Large Ticket Transaction Volume exceeds 10% of Charge Volume, the Bank will pay (i) a rebate on the first 10% of the aggregate Large Ticket Transaction Volume at the same rate as Charge Volume and (ii) a rebate of 0.50% on the aggregate Large Ticket Transaction Volume in excess of 10% of Charge Volume.

**General Rebate Terms**

Rebates will be calculated quarterly in arrears. Rebate amounts are subject to reduction by all Losses. If Losses exceed the rebate earned for any Contract year, Chase will invoice the Company for the amount in excess of the rebate, which amount shall be payable within 14 days. Upon termination of the Program, the Losses for the six-month period immediately preceding the termination will be deemed to be equal to the Losses for the prior six-month period.

Rebate payments will be made within 90 days after the end of the Contract Year via Automated Clearing House ("ACH") credit to an account designated by the Company.

To qualify for any rebate payment, all of the following conditions apply.

a.  Settlement of any centrally billed account(s) must be by automatic debit or by Company initiated ACH or wire.
b.  Payments must be received by Chase in accordance with the Settlement Terms.  Delinquent payments shall be subject to a Past Due Fees as specified below.  Settlement Terms are 30 & 14.
c.  The Company is not in Default under the Agreement.
d.  Account(s) must be current at the time of rebate calculation and payment.

amendfin2.doc

## FEES

A.  Annual Administrative Fee:

| | |
|---|---|
| Fleet Cards | N/A |
| Purchasing Cards | $0.00 per Card per year or $0.00 per Card per month |
| T&E Cards | N/A |
| Central Travel Account | N/A |

Provided, however, if no Cards are issued, the annual administrative fee shall be charged for each Account number.

B.  Cash Advance Fee:
Per Transaction (if Cash Advances are permitted under Exhibit A):
2.5% of cash advance amount; minimum $2.50 per Transaction

C.  Late Payment Fee:  For each product selected on Exhibit A, per occurrence:

Fleet Card and Purchasing Card grace period after statement billing date: 14 days
1.0% late fee at 15 days
2.5% late fee at 45 days and every 30 days thereafter

Central Travel Account grace period after statement billing date: 25 days
1.0% late fee at 30 days
2.5% late fee at 60 days and every 30 days thereafter

T&E Card (Company bill/Company pay) grace period after statement billing date: 25 days
1.0% late fee at 30 days
2.5% late fee at 60 days and every 30 days thereafter

T&E Card (Cardholder bill/Cardholder pay) grace period after statement billing date: 25 days
$10.00 late fee at 30 days
2.5% late fee at 60 days and every 30 days thereafter

D.  Currency Conversion:                                                      1% of gross purchased amount

E.  Copy Retrieval Fee, Per Request:                                         Dispute related - $0.00
          Non-dispute related:  first three copy requests at No Charge, thereafter $5 per copy request.

F.  Returned Item (Insufficient Funds) Fee:                                  $15.00 per occurrence

G.  Emergency Card Replacement Fee:

$25.00 if requested through Chase.  If requested through Visa, the Company shall pay any fees charged by Visa for emergency card replacement.

H.  Complete Company Card Design and Production:                             At cost

I.  Development of custom mappers:          $100 per hour; minimum charge $400; maximum charge $2,000

J.  Development of customized reports:       $100 per hour; minimum charge of $400; maximum charge $2,000

K.  Reporting Software

PaymentNet™                                                                 No Charge

amendfin2.doc

6

L.   FTP

     Daily                                        No Charge
     Weekly                                    No Charge
     Bi-weekly                               No Charge
     Monthly                                No Charge

M.   Training – One Annual On-site Training at Client Site      No Charge

**Other**

Should the Company request services not in this schedule, the Company agrees to pay the fee associated with such service.

7