# Exhibit B –
# Blackline of Responsive Statement to December 3rd Version

**RESPONSIVE STATEMENT OF
<u>STEP ONE LENDER PLAN PROPONENTS</u>**

**THIS STATEMENT IS ADDRESSED PRIMARILY TO THE STEP ONE LENDERS
~~AND THE GENERAL UNSECURED CREDITORS OF THE SUBSIDIARY DEBTORS~~
WHO ARE URGED TO VOTE IN FAVOR OF THE STEP ONE LENDER PLAN AS
IT IS THE ONLY PLAN THAT TREATS STEP ONE LENDERS FAIRLY
BY OFFERING THEM A NEAR PAR RECOVERY ~~AND PROVIDES GREATER
CERTAINTY OF A PAR RECOVERY FOR GENERAL UNSECURED CREDITORS OF
THE SUBSIDIARY DEBTORS~~**

<u>**To the Step One Lenders**</u>

Don't be fooled by the Debtor/Committee/Lender Plan's attempt to settle "highly likely" fraud claims against the Step Two Lenders for pennies on the dollar. The Step Two Lenders should be knocked out entirely, not merely inconvenienced with a nominal settlement payment, and no distributions payable to Step One Lenders should be surcharged under the inapplicable Sharing Provisions for the benefit of the Step Two Lenders. And don't be fooled by the Noteholder Plan's and the Bridge Lender Plan's fantastic promises of huge recoveries from the Step One Lenders. Suing the Step One Lenders on "highly unlikely" grounds will have no result other than to drain the Litigation Trust of tens of millions of dollars that would otherwise be distributed to creditors. The Step One Lender Plan promises no more and no less than what the Examiner's Report concluded was appropriate in this case – a fair distribution on the Effective Date to the Step One Lenders and to all legitimate creditors and a fair chance to recover a second distribution upon the successful challenge to the fraudulent Step Two Transactions.

~~<u>**To the General Unsecured Creditors of the Subsidiary Debtors**</u>~~

~~The assertion in the Debtor/Committee/Lender Plan that the General Unsecured Creditors of the Subsidiary Debtors will receive a 100% recovery is neither a promise nor an offer any of the Debtor/Committee/Lender Plan Proponents is willing to guarantee, because recoveries are~~

~~capped at $150 million even if General Unsecured Claims are much higher than that. The Step One Lender Plan, on the other hands, offers substantially more certainty of a greater recovery – 50% greater to be exact. The numbers speak for themselves – the Debtor/Committee/Lender Plan caps the distribution to General Unsecured Creditors of the Subsidiary Debtors at $150 million, whereas the Step One Lender Plan offers a much higher cap of $225 million if the General Unsecured Creditors and the Step One Lenders accept the Plan. To put the 50% higher cap in context – if the Debtors and the Creditors' Committee have misjudged their ability to reduce the current total of $3.3 billion of General Unsecured Claims to $150 million, and the total is $225 million, these General Unsecured Creditors would receive only a 67% recovery under the Debtor/Committee/Lender Plan whereas they would still receive a recovery of 100% under the Step One Lender Plan. Even if the total exceeds $225 million, these General Unsecured Creditors will always recover 50% more under the Step One Lender Plan than they would under the Debtor/Committee/Lender Plan. While the Step One Proponents cannot guarantee a 100% recovery, we can offer greater certainty of a higher recovery for General Unsecured Creditors of the Subsidiary Debtors.~~

I. **PRELIMINARY STATEMENT: ONLY ONE PLAN IS CONSISTENT WITH THE EXAMINER'S REPORT**

One independent Examiner's Report. Four competing Plans. And while there are a myriad of issues addressed in each Plan, it has been abundantly clear from the beginning of this case that the one overarching issue that will determine creditor recoveries is the allegation that actual or constructive fraud drove Tribune into bankruptcy.

As the Examiner's Report makes clear, the Step Two Loans were precisely that – actual and constructive fraudulent transfers that drove Tribune into bankruptcy. Yet, the largest Step Two Lenders – Oaktree, Angelo Gordon and JPMorgan Chase -- continue their efforts to

dominate and corrupt the bankruptcy process to shield themselves from fraudulent transfer liability and protect their own recoveries.

The Noteholders and the Bridge Lenders offer their own restructuring views that are also starkly inconsistent with the Examiner's Report. The Noteholders proposes to sue the Step One Lenders, ignoring that the Examiner concluded that any challenge to the Step One Loans is not likely to succeed. The Bridge Lenders propose nothing less than elevating their own subordinated claims to senior status, even though the Examiner's Report concluded that the Bridge Loans were highly likely to be avoidable as fraudulent transfers.

Only the Step One Lender Plan is consistent with the Examiner's Report. The so-called Debtor/Committee/Lender Plan, Noteholder Plan and Bridge Lender Plan are not only irreconcilable with the Examiner's Report but also driven by motivations and interests detrimental to the interests of the Step One Lenders. The Debtor/Committee/Lender Plan also compounds its errors by seeking to apply sharing provisions in the Senior Loan Agreement that, in fact, do not apply. By seeking to apply the sharing provisions, the Debtor/Committee/Lender Plan would deny the Step One Lenders their right to a par recovery and, instead, have the Step One Lenders pay for the fraudulent transfer sins of the Step Two Lenders.

## II. EXAMINER'S REPORT: THE STEP TWO TRANSACTIONS ARE FRAUDULENT, THE STEP ONE TRANSACTIONS ARE NOT

While the exhaustive Examiner's Report spans more than a thousand pages, one need only read the first few pages to get to the contrasting punch lines for the Step Two and Step One Transactions.

On the issue of "constructive fraudulent transfer," which requires a finding that Tribune was insolvent at the time or rendered insolvent as a result of the transactions:

- "[T]he Examiner finds that it is **highly likely** that a court would conclude that Tribune was rendered insolvent and left without adequate capital after giving effect to the **Step Two Transactions**."

- Conversely, based on the Examiner's conclusion that the Step One Transactions and Step Two Transactions should not be collapsed, "it is **highly unlikely** that the Tribune Entities were rendered insolvent in **Step One**."

On the issue of "intentional fraudulent transfer":

- "[It] is **somewhat likely** that a court would conclude that the **Step Two Transactions** constituted **intentional** fraudulent transfers and fraudulently incurred obligations."

- Conversely, "the Examiner **did not find credible evidence** that the Tribune Entities entered into the **Step One Transactions** to hinder, delay or defraud creditors."

The Step Two Transactions were fraudulent, plain and simple, and if the Step Two Lenders are not willing to provide for a fair settlement of the claims against them, they should be sued for as long as it takes to right the grievous wrongs they perpetrated. At the same time, a cost-benefit analysis makes it clear that it would be wasteful and virtually pointless to challenge the Step One Transactions. Spending tens of millions of dollars in a futile challenge to the Step One Lenders will benefit only the lawyers, no one else.[1]

### III. ONLY THE STEP ONE LENDER PLAN IS FAITHFUL TO THE CONCLUSIONS IN THE EXAMINER'S REPORT CONCERNING

---

[1] Nor can it be reasonably argued that there would be an "economy of savings" in challenging both the Step Two and Step One Transactions concurrently, because as the Examiner's Report makes clear, the facts, the circumstances, the parties, the motivations, the main legal issues and the evidentiary requirements barely overlap between Step One and Step Two.

**FRAUDULENT TRANSFER ALLEGATIONS AS TO THE STEP TWO AND STEP ONE TRANSACTIONS**

While each of the four Plans asserts that it embodies the findings set forth in the Examiner's report, only the Step One Lender Plan is faithful to the Examiner's actual continuum of culpability for fraudulent conveyance liability -- that a fraudulent transfer challenge would be "*highly unlikely*" to succeed against the Step One Lenders and "*highly likely*" to succeed against the Step Two Lenders. Based on the Examiner's Report, an appropriate plan of reorganization would allow the claims of the Step One Lenders in full while preserving a fraudulent transfer against the Step Two Lenders. That is precisely the approach that the Step One Lender Plan takes. The other three Plans, however, take very different approaches, each of them highly detrimental to the interests of the legitimate Step One Lenders.

A. **The Debtor/Committee/Lender Plan Grants Full Bankruptcy Releases to the Step Two Lenders and the Step Two Agent for a Nominal Settlement Amount**

The Debtor/Committee/Lender Plan acknowledges the obvious infirmities of the Step Two Lenders' claims but, rather than preserve litigation rights against the Step Two Lenders, it provides for a forced settlement of those litigation rights in exchange for a nominal settlement amount. This settlement not only eliminates any *highly likely* challenge to the claims of the Step Two Lenders and the conduct of the Step Two Agent, JPMorgan Chase, but also proposes to shield the Step Two Lenders and their Agent forever more from bankruptcy attack. Then, to add insult to injury and as discussed in more detail in the next section of this Statement, the Debtor/Committee/Lender Plan provides that the settlement amount should be borne pro rata by the Step One Lenders, even though it is only the Step Two Loans that are subject to serious challenge.

It should be noted that Debtor/Committee/Lender Plan Proponents Oaktree and Angelo Gordon also supported a prior Plan dated September 17, 2010 (the "**First Oaktree/Angelo Plan**").[2] Ironically, *the First Oaktree/Angelo Plan adopted exactly the same approach as the current Step One Lender Plan.* In the First Oaktree/Angelo Plan, the claims of the Step One Lenders were "deemed Allowed in an aggregate amount equal to all amounts payable…, including principal, interest, and all other amounts," while the claims of the Step Two Lenders were described as "subject to challenge by the Litigation Trust."

Oaktree and Angelo Gordon had it right the first time. There is no point in challenging the Step One Loans while there is every reason to challenge the Step Two Loans. That is exactly what the Step One Lender Plan provides, neither more nor less.

**B.     The Noteholder Plan Proposes To Sue Everyone without Distinction**

On the other end of the spectrum is the Noteholder Plan. The problem that the Senior Noteholders face is that a successful challenge only to the Step Two Lenders would leave the Senior Noteholders with, at best, a nominal recovery, as is made clear in the recovery scenarios in Annex B to the second volume of the Examiner's Report. It is only if the claims of the Step One Lenders are also successfully challenged that there is any prospect for a substantial recovery by the Senior Noteholders.

Therefore, not surprisingly, while legitimately preserving the *highly likely* fraudulent transfer claims against the Step Two Lenders, the Noteholder Plan also illegitimately preserves the *highly unlikely* fraudulent transfer claims against the Step One Lenders. In doing so, the Noteholder Plan will impose tens of millions of dollars of incremental expense on the Litigation

---

[2] Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P. [D.I. 5728].

Trust – thus reducing and delaying creditor recoveries – in the pursuit of *highly unlikely* claims. The Noteholder Plan also "conveniently" provides the Noteholders with control to appoint the majority of the members of the Litigation Trust, meaning it is the Noteholders' lawyers who are hoping to be paid all of the Trust's litigation fees.

The Noteholder Plan is trying to have it both ways. The Noteholder Plan argues that the Examiner's Report supports suing the Step Two Lenders but then ignores the fact that the Examiner's Report does *not* support suing the Step One Lenders. The Noteholder Plan should be viewed for what it is – a heavy-handed attempt to bully the Step One Lenders into putting a substantial amount of money on the table rather than risk being sued. But let there be no doubt, the Step One Lenders categorically reject such tactics.

### C. The Bridge Lender Plan Is Just as Indefensible

Right next to the Noteholder Plan on the extreme end is the Bridge Lender Plan. In addition to commenting on the Step One and Step Two Loans, the Examiner's Report also reviewed the Bridge Loans and concluded that the Bridge Loans were "*highly likely*" to be avoidable as fraudulent transfers. Yet, the Bridge Lender Plan provides the subordinated Bridge Lenders with a recovery far in excess of what they would be entitled to under any legitimate recovery scenario, while at the same time seeking to buy the support of Senior Noteholders by promising to pay to Senior Noteholders 138% of the distributable enterprise value of Tribune. The Bridge Lender Plan makes no sense and merits no further comment.

### IV. THE DEBTOR/COMMITTEE/LENDER PLAN IMPROPERLY APPLIES THE SHARING PROVISIONS IN THE SENIOR LOAN AGREEMENT TO THE SUBSTANTIAL DETRIMENT OF THE STEP ONE LENDERS

In an objection to the chapter 11 trustee motion, Debtor/Committee/Lender Plan Proponent, JPMorgan Chase, recognized that the Examiner's "most important and relevant

conclusions" were "that 'Step One' was a distinct transaction from 'Step Two,' that Step One was not an intentional or constructive fraudulent transfer, and that, as a result, the over $6.4 billion of Senior Lender claims with respect to Step One are valid and enforceable."[3] However, when it comes to settling the challenge against the Step Two Loans, the Debtor/Committee/Lender Plan provides that the settlement amount should come jointly out of the pockets of the Step One Lenders in addition to the Step Two Lenders.

While this makes no sense on its face and the Debtor/Committee/Lender Plan makes no effort to explain it, the Debtor/Committee/Lender Plan's logic is presumably the same as set forth in the First Oaktree/Angelo Plan. Specifically, the First Oaktree/Angelo Plan relied on the so-called Sharing Provisions of the Senior Loan Agreement to assert that all distributions payable to the Step One Lenders must be shared with the Step Two Lenders. This is flat-out wrong, for a number of reasons.

A group of Step One Lenders has already filed a state court litigation against JPMorgan Chase Bank, Merrill Lynch Capital Corporation, Citicorp North America and Bank of America to resolve the Sharing Provisions dispute (the "**NY Litigation**").[4] The NY Litigation sets forth a number of grounds why the Sharing Provisions do not apply under the current circumstances and also as to the defendants' grossly improper conduct. Those grounds include, for example, breach of contract, breach of the covenant of good faith and fair dealing, inducement of breach of

---

[3] Objection of J.P Morgan Chase Bank, N.A. and JPMorgan Securities, Inc.'s to Motion of Aurelius Capital Management, LP, for the Appointment of a Chapter 11 Trustee at 9-10 [D.I. 5965].

[4] *Alden Global Distressed Debt Opportunities Fund, et al. v. JPMorgan Chase Bank, et al.*, index 651884/2010, filed Oct, 29, 2010 in the Supreme Court of the State of New York. A copy of the Complaint in this litigation is available upon request from counsel for the Step One Lender Plan Proponents.

contract, gross negligence and willful misconduct, including willful breach of the defendants' duties under the Senior Loan Agreement in connection with the Step Two financing.

Focusing on the Sharing Provisions, they apply only to loans that are outstanding. By definition, if the Step Two Loans are not outstanding because they have been avoided as fraudulent transfers, the Sharing Provisions do not apply to them. Further, NY law is clear that a party cannot benefit from its own misconduct and, therefore, NY law would not permit the Step Two Lenders to share in a distribution when their own actions breached the Senior Loan Agreement and have caused their own Step Two Loans to be avoidable.

Similarly the Senior Loan Agreement provides that the Sharing Provisions are applicable to the Step Two Loans only if they qualify as "Incremental Term Loans" under the Senior Loan Agreement. However, the Step Two Loans were incurred notwithstanding the failure to meet several of those conditions. For example, one of the conditions to qualification is that Tribune had to be solvent at the time of incurrence and after giving effect thereto. As the Examiner's Report makes abundantly clear, however, it is *highly likely* that Tribune was rendered insolvent by the Step Two Loans. The Examiner's Report also makes clear that the Step Two Loan Agent (JPMorgan Chase) was heavily involved in the solvency analysis and it is highly likely that the Agent was fully aware of Tribune's insolvent status. Given insolvency, the Step Two Loans could not have qualified as Incremental Term Loans and, therefore, the Sharing Provisions simply do not apply to the Step Two Loans as a matter of contract.

The NY Litigation asserts additional grounds on which the Sharing Provisions are not enforceable if they even apply at all, but the point is that, as the First Oaktree/Angelo Plan explicitly acknowledged and the current Debtor/Committee/Lender Plan implicitly acknowledges, the Step One Loans are valid and unchallengeable while the Step Two Loans are

fraudulent and fully challengeable. As the NY Litigation will demonstrate, the Sharing Provisions simply cannot apply in those circumstances.

V.  **THE LACK OF TRANSPARENCY OF OAKTREE, ANGELO GORDON AND JPMORGAN'S HOLDINGS AS A BAROMETER FOR THEIR MOTIVATIONS**

The Step One Lenders (among others) objected to the fact that the Disclosure Statement for the Debtor/Committee/Lender Plan did not identify the holdings of three of the plan proponents – JPMorgan, Oaktree and Angelo Gordon. Although the Bankruptcy Court ruled at the Disclosure Statement hearing on November 29, 2010 that JPMorgan, Oaktree and Angelo Gordon only had to disclose the aggregate (not individual) holdings of the three lenders, in the Step One Lenders' view, the quantum and breakdown of those three parties' holdings as between Step One and Step Two ~~will very likely~~may demonstrate that their true motivation is to benefit their Step Two positions at the expense of the $4 billion plus of Step One Loans held by third parties such as the Step One Lenders.

~~It is ironic that while~~Although these ~~same~~ lenders refused to disclose their individual Step One and Step Two holdings, JPMorgan's counsel made the following general proposition to the Bankruptcy Court during the Disclosure Statement hearing:

> [E]ach investor should be entitled to know what its advocate in the case thinks of that issue. It's a fact. That's the fact that they are going to have to grapple with because they can't believe what Plan A says or what Plan B says *if it's been proposed by somebody who doesn't have their interests at heart.*"[5]

And yet, ~~JPMorgan, Oaktree and Angelo Gordon refuse to disclose exactly who they are advocates for. While disclosing their aggregate~~ *combined* ~~Step One and Step Two positions, they adamantly opposed being required to disclose a breakdown of their Step Two Loan holdings compared to~~ their ~~Step One Loan holdings. According~~according to counsel for Oaktree and

---

[5] 11/29/10 Hearing Transcript ("**Hr'g Tr.**") at 134:5-9.

Angelo Gordon, the breakdown in holdings between Step One and Step Two, even in the aggregate rather than by lender, was "proprietary".[6] ~~To put the proposition of JPMorgan's counsel into perspective, if~~As a result, Step One Lenders are unable to determine whether Oaktree, Angelo Gordon, and JPMorgan are their legitimate advocates~~, how is it then, that Step One Lenders can believe what the Debtor/Committee/Lender Plan says~~ ~~*if they do not in the first instance know if its been proposed by somebody who even has*~~ and "have their interests at heart~~?~~."

~~The Step One Proponents urge you to consider whether Oaktree, Angelo Gordon and JPMorgan are really representing the interests of Step One Lenders. Upon information and belief, Oaktree, Angelo Gordon and JPMorgan hold almost two-thirds in amount of the Step Two Loans, but possibly not even 25% of the Step One Loans. If this is correct, Oaktree, Angelo Gordon and JPMorgan are not advocates at all for the Step One Lenders and it then comes as no surprise that the purported "settlement" between Step One Lenders and Step Two Lenders under the Debtor/Committee/Lender Plan turns the Examiner's Report on its head in favor of the Step Two Lenders.~~

The Step One Proponents have publicly disclosed ~~that they hold approximately 13%, or $812 million, of Step One Loans~~our Step One Loan holdings; Oaktree, Angelo Gordon, and JPMorgan have not. Step One Lenders, we are your advocates and believe that the Step One Lender Plan is in your best interests. We urge you to support the plan that is proposed by the only senior lender group that has been transparent with their holdings and their goals – the Step One Proponents.

---

[6] Hr'g Tr. at 75:17-18.

## VI.    CONCLUSION

The Debtor/Committee/Lender Plan, the Noteholder Plan and the Bridge Lender Plan all treat the Step One Loans and the Step Two Loans as though they are of equal merit from a fraudulent transfer perspective. They are not. The independent Examiner's Report concludes that challenges to the Step Two Loans are highly *likely* to succeed while challenges to the Step One Loans are highly *unlikely* to succeed. Logically, then, if the Examiner himself were to draft a plan, it would essentially provide as follows: "Step One Loans ALLOWED. Step Two Loans DISALLOWED." This is exactly what the Step One Lender Plan, and *only* the Step One Lender Plan, provides. The other three Plans provide otherwise and should be rejected out of hand.