<u>**Exhibit 1**</u>

**December 6, 2010 Specific Disclosure Statement**
**(Without Appendices and Exhibits)**

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE DEBTOR/COMMITTEE/LENDER PLAN. THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. SOLICITATION OF ACCEPTANCE OR REJECTION OF THE DEBTOR/COMMITTEE/LENDER PLAN MAY OCCUR ONLY AFTER THE BANKRUPTCY COURT APPROVES THE JOINT DISCLOSURE STATEMENT.

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**SPECIFIC DISCLOSURE STATEMENT RELATING TO FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A.**

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street; Chicago, IL 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410; Wilmington, DE 19801
Telecopier: (302) 652-3117

*Counsel For Debtors and Debtors In Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel For the Official Committee of Unsecured Creditors*

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Telecopier: (213) 694-1234

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391; Wilmington, Delaware 19899
Telecopier: (302) 571-1253

*Counsel For Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue; New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
450 Lexington Avenue; New York, New York 10017
Telecopier: (212) 701 5800

RICHARDS LAYTON & FINGER
Mark Collins
One Rodney Square
920 North King Street; Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel For JPMorgan Chase Bank, N.A.*

**DATED: December [●], 2010**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the following page.

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

**EXHIBITS TO THE DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT**

Exhibit A –    First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A.

Exhibit B –    Second Mediation Term Sheet

Exhibit C –    Intercompany Claims Analysis

v

TABLE OF CONTENTS

I.      INTRODUCTION....................................................................................................1
        A.      Parties Entitled to Vote on the Debtor/Committee/Lender Plan.........................3
        B.      Voting Procedures, Ballots, and Voting Deadline...............................................3
II.     OVERVIEW OF THE DEBTOR/COMMITTEE/LENDER PLAN.....................3
        A.      General Overview.................................................................................................3
        B.      Plan Treatment.....................................................................................................6
        C.      Estimated Recoveries in Respect of Allowed Claims......................................10
                1.      Summary of Estimated Unclassified Claims Against all Debtors and of Estimated
                        Recoveries in Respect Thereof................................................................12
                2.      Summary of Estimated Allowed Claims and Interests against Tribune and the
                        Filed Subsidiary Debtors and of Estimated Recoveries in Respect Thereof.......12
                3.      Summary of Estimated Allowed Claims Against and Interests for Each Guarantor
                        Non-Debtor, if any, that becomes a Debtor and of Estimated Recoveries in
                        Respect Thereof.......................................................................................17
        D.      Settlement Of Claims Related To The Leveraged ESOP Transactions...........19
                1.      The Terms of the Settlement...................................................................19
                2.      The Reasonableness of the Settlement.....................................................20
        E.      The Trusts...........................................................................................................25
        F.      Certain Other Key Plan Provisions....................................................................27
                1.      Assumption of Executory Contracts and Leases.....................................27
                2.      Pursuit of Preference Actions..................................................................29
                3.      Restructuring Transactions.....................................................................30
                4.      Compensation and Benefit Programs.......................................................31
                5.      Intercompany Claims Settlement.............................................................31
                6.      Retiree Claims Settlement.......................................................................32
                7.      Pre-Effective Date Settlement of Estate Claims.....................................33
                8.      Certain Indemnity and Guaranty Obligations Related to the Chicago Cubs
                        Transactions...........................................................................................33
                9.      Senior Lender Holdback..........................................................................34
                10.     Injunctions, Releases and Discharge........................................................34
        G.      Issuance and Distribution of New Securities and Related FCC Matters..........38
                1.      Issuance of New Securities......................................................................38
                2.      Distribution of New Common Stock and New Warrants..........................39
                3.      FCC Matters............................................................................................40
III.    DESCRIPTION OF DEBT AND NEW CAPITAL STRUCTURE OF THE DEBTORS...........46
        A.      New Senior Secured Term Loan Agreement......................................................46
        B.      Description of Exit Facility................................................................................46
        C.      Description of Capital Stock..............................................................................46
IV.     BEST INTERESTS TEST AND LIQUIDATION ANALYSIS.........................47
V.      RISK FACTORS..................................................................................................48
        A.      General Bankruptcy Law Considerations and Risks Related to the
                Debtor/Committee/Lender Plan..........................................................................48
                1.      Objections to the Classification of Claims May Change the Composition of the
                        Classes and the Vote Required of Each Class for the Approval of the
                        Debtor/Committee/Lender Plan................................................................48
                2.      Failure to Obtain Confirmation of the Debtor/Committee/Lender Plan May
                        Result in Liquidation or an Alternative Plan on Less Favorable Terms............49
                3.      Undue Delay in Confirmation of the Debtor/Committee/Lender Plan May
                        Disrupt the Debtors' Operations..............................................................50

          4.     If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms. .................................................50

   B.   FCC-Related Considerations and Risks Respecting the Debtors' Businesses. .................50
         1.     The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy. ......................................................................................................50
         2.     Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Debtor/Committee/Lender Plan. .52

   C.   Risks Related to the Debtors' Businesses. ..........................................................................54
         1.     Historical Financial Information Will Not Be Comparable. .................................54
         2.     The Debtors Could Be Faced with Additional Tax Liabilities. ............................54
         3.     The Reorganized Debtors May Continue to Have Substantial Indebtedness.......55

   D.   Risks to Creditors Who Will Receive Securities...............................................................56
         1.     The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants. ...........................56
         2.     Lack of Dividends May Adversely Affect Liquidity of the New Common Stock.56
         3.     Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock. .............................................................................56
         4.     The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value.....................................................57
         5.     Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities.............................................................................................................57

   E.   Risks Related to Interests in the Litigation Trust and the Creditors' Trust......................58

VI.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN...........................................................................58
   A.   Federal Income Tax Consequences to the Debtors. ..........................................................59
         1.     Termination of Subchapter S Corporation Status. ...............................................59
         2.     Cancellation of Debt and Reduction of Tax Attributes. .......................................59

   B.   Federal Income Tax Treatment of the Creditors' Trust and Litigation Trust (collectively, the "Trusts") and the Receipt and Ownership of Beneficial Interests in the Trusts.........60

   C.   Federal Income Tax Treatment of the CT Reserve(s) and the LT Reserve(s) (collectively, the "Trust Reserve(s)")........................................................................................................61

   D.   Federal Income Tax Consequences to Holders of Claims and Interests. ..........................61
         1.     General. ................................................................................................................62
         2.     Market Discount....................................................................................................62
         3.     Amounts Attributable to Disallowance of Disputed Claims. ...............................63
         4.     U.S. Holders of Senior Loan Claims and Senior Guaranty Claims (not including the guaranty of the Swap Claim)..........................................................................63
         5.     U.S. Holders of Bridge Loan Claims. ..................................................................64
         6.     U.S. Holders of Senior Noteholder Claims. .........................................................65
         7.     U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan). 65
         8.     U.S. Holders of General Unsecured Claims against the Filed Subsidiary Debtors (not including Claims against the Filed Subsidiary Debtors arising from a Non-Qualified Former Employee Benefit Plan)............................................................65
         9.     U.S. Holders of Convenience Claims. ..................................................................65
         10.    U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan.......................................................................................................................65
         11.    U.S. Holders of EGI-TRB LLC and PHONES Notes Claims..............................66
         12.    U.S. Holders of Securities Litigation Claims .......................................................66

|  | 13. | U.S. Holders of Tribune Interests...............................................................66 |
|  | 14. | Definition of "Security."..............................................................................66 |
|  | 15. | Federal Income Tax Treatment of the New Senior Secured Term Loan. ...........66 |
|  | 16. | Federal Income Tax Treatment of New Warrants................................................67 |
|  | 17. | Non-United States Persons...........................................................................68 |
|  | 18. | Information Reporting and Backup Withholding..............................................68 |
| E. | Federal Income Tax Treatment of Other Parent Claims Reserve and Subsidiary GUC Reserve (collectively, "Reserves")..............................................................................68 |
| F. | Federal Income Tax Treatment of the Step Two/Disgorgement Settlement.....................69 |
| G. | Importance of Obtaining Professional Tax Assistance. ..................................................69 |
| H. | Reservation of Rights.......................................................................................................69 |
| VII. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE DEBTOR/COMMITTEE/LENDER PLAN.................................................................69 |
| A. | Continuation of the Chapter 11 Cases...........................................................................69 |
| B. | Approval of a Competing Plan.......................................................................................70 |
| C. | Liquidation under Chapter 7 or Chapter 11...................................................................70 |
| VIII. | CONCLUSION AND RECOMMENDATION ..................................................................70 |

## I.    INTRODUCTION

On October 22, 2010, (i) the Debtors; (ii) the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code (the "Creditors' Committee"); (iii) certain investment funds and accounts managed by Oaktree Capital Management, L.P. and/or its affiliates ("Oaktree") and Angelo, Gordon & Co., L.P. and/or certain of its affiliates ("Angelo Gordon"), each in its capacity as Holders of Senior Loan Claims, or as a general partner or manager of an entity that is a Holder of Senior Loan Claims; and (iv) JPMorgan Chase Bank, N.A. and certain of its affiliates ("JPMorgan"), as the Senior Loan Agent and as a Holder of Senior Loan Claims (collectively, the "Debtor/Committee/Lender Plan Proponents") filed the Joint Plan of Reorganization for Tribune and Its Subsidiaries (as the same may be amended from time to time, the "Debtor/Committee/Lender Plan") with the Bankruptcy Court.  A copy of the Debtor/Committee/Lender Plan is attached to this Specific Disclosure Statement (the "Debtor/Committee/Lender Disclosure Statement") as Exhibit A.[2]  The Debtor/Committee/Lender Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Debtor/Committee/Lender Plan also constitutes a Prepackaged Plan for any Guarantor Non-Debtors for which the commencement of a chapter 11 case becomes necessary or appropriate to conclude the restructuring provided under the Debtor/Committee/Lender Plan.  The Guarantor Non-Debtors are (i) Tribune (FN) Cable Ventures, Inc.; (ii) Tribune Interactive, Inc.; (iii) Tribune ND, Inc.; and (iv) Tribune National Marketing Company.

The Debtor/Committee/Lender Plan Proponents submit this Debtor/Committee/Lender Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against each of the Debtors in connection with (i) the solicitation of acceptances of the Debtor/Committee/Lender Plan and (ii) the hearing to consider confirmation of the Debtor/Committee/Lender Plan.  The purpose of this Debtor/Committee/Lender Disclosure Statement is to describe the Debtor/Committee/Lender Plan and to provide certain information regarding implementation the Debtor/Committee/Lender Plan, as required under section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Debtor/Committee/Lender Plan so that they can make an informed decision in doing so.  Creditors who have the right to vote on the Debtor/Committee/Lender Plan are advised and encouraged to read in their entirety (i) the Debtor/Committee/Lender Plan, (ii) this Debtor/Committee/Lender Disclosure Statement, and (iii) the General Disclosure Statement (which contains, among other things, information concerning the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases.

**THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE DEBTOR/COMMITTEE/LENDER PLAN TO VOTE TO ACCEPT THE DEBTOR/COMMITTEE/LENDER PLAN.**

THIS SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN KEY INFORMATION CONTAINED IN THE DEBTOR/COMMITTEE/LENDER PLAN AND DOES NOT CONTAIN A DISCUSSION OF OR INCORPORATE ALL TERMS OF THE DEBTOR/COMMITTEE/ LENDER PLAN.  STATEMENTS IN THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ENTIRE DEBTOR/COMMITTEE/LENDER PLAN AND EXHIBITS AND SCHEDULES ATTACHED TO THE DEBTOR/COMMITTEE/LENDER PLAN, WHICH CONTROL IN THE EVENT OF ANY

---

[2]  Capitalized terms used but not otherwise defined in this Debtor/Committee/Lender Disclosure Statement shall have the meanings ascribed to such terms in the Debtor/Committee/Lender Plan; provided, however, that any capitalized term used herein that is not defined herein or in the Debtor/Committee/Lender Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

INCONSISTENCY OR INCOMPLETENESS. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE DEBTOR/COMMITTEE/LENDER PLAN DESCRIBED IN THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE DEBTOR/COMMITTEE/LENDER PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE DEBTOR/COMMITTEE/ LENDER PLAN, HOWEVER, IT WILL THEN BIND ALL CLAIM AND INTEREST HOLDERS.

THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS RESERVE THE RIGHT TO MODIFY OR WITHDRAW THE DEBTOR/COMMITTEE/LENDER PLAN IN ITS ENTIRETY OR IN PART, FOR ANY REASON. IN ADDITION, SHOULD THE DEBTOR/COMMITTEE/LENDER PLAN, OR ANY INDIVIDUAL DEBTOR'S PLAN, FAIL TO BE ACCEPTED BY THE REQUISITE NUMBER AND AMOUNT OF CLAIMS AND INTERESTS VOTING, AS REQUIRED TO SATISFY SECTION 1129 OF THE BANKRUPTCY CODE, THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS RESERVE THE RIGHT TO RECLASSIFY CLAIMS OR INTERESTS OR OTHERWISE AMEND, MODIFY OR WITHDRAW THE DEBTOR/COMMITTEE/LENDER PLAN IN ITS ENTIRETY OR IN PART.

THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION. THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DEBTOR/COMMITTEE/LENDER DISCLOSURE STATEMENT AND THE DEBTOR/COMMITTEE/LENDER PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

A.    **Parties Entitled to Vote on the Debtor/Committee/Lender Plan.**

The following summary chart sets forth the Classes that are entitled to vote on the Debtor/Committee/Lender Plan:

| Class | Description |
|---|---|
| 1C | Senior Loan Claims against Tribune |
| 1D | Bridge Loan Claims against Tribune |
| 1E | Senior Noteholder Claims against Tribune |
| 1F | Other Parent Claims against Tribune |
| 1I | EGI-TRB LLC Notes Claims against Tribune |
| 1J | PHONES Notes Claims against Tribune |
| 50C-111C[3] | Senior Guaranty Claims against relevant Guarantor Debtors |
| 2E-111E | General Unsecured Claims against relevant Filed Subsidiary Debtors |

Please refer to Section 3.1 of the Debtor/Committee/Lender Plan for a detailed description of the classification of Claims against and Interests in the Debtors under the Debtor/Committee/Lender Plan. A list of the Debtors and the number corresponding to each Debtor for classification purposes is included as Appendix A to the Debtor/Committee/Lender Plan.

B.    **Voting Procedures, Ballots, and Voting Deadline.**

Detailed instructions for completing the ballot included in the package containing this Debtor/Committee/Lender Disclosure Statement are set forth in Article IX of the General Disclosure Statement.

II.    **OVERVIEW OF THE DEBTOR/COMMITTEE/LENDER PLAN**

The following summary is qualified in its entirety by, and should be read in conjunction with, the discussions and information appearing elsewhere in this Debtor/Committee/Lender Disclosure Statement and the Debtor/Committee/Lender Plan. The Debtor/Committee/Lender Plan Proponents, moreover, reserve the right to modify the Debtor/Committee/Lender Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

A.    **General Overview.**

The Debtor/Committee/Lender Plan has been proposed by several of the most significant constituents in these Chapter 11 Cases—the Debtors, the Creditors' Committee, JPMorgan, in its capacity as Senior Loan Agent and as a Senior Lender, and Oaktree and Angelo Gordon (who are, along with JPMorgan, the largest Holders of Senior Loan Claims). The agreement between the Debtors and the other Debtor/Committee/Lender Plan Proponents that is embodied in the Debtor/Committee/Lender Plan is the result of the Mediation (as described in Article VII.D of the General Disclosure Statement) that was overseen by U.S. Bankruptcy Court Judge Kevin Gross. A summary of the terms of the agreement between the Debtor/Committee/Lender Plan Proponents is set forth in the Second Mediation Term Sheet

---

[3]   As set forth in Section 3.4.3(a) of the Debtor/Committee/Lender Plan, the votes cast in respect of the Debtor/Committee/Lender Plan by Holders of Allowed Senior Guaranty Claims in Classes 50C through 111C will also be counted as votes cast on the Prepackaged Plan of the relevant Guarantor Non-Debtors that may become Debtors.

appended to the Second Mediation Report.  A copy of the Second Mediation Term Sheet is attached hereto as Exhibit B.

In summary, the Debtor/Committee/Lender Plan has two primary components.  First, the Debtor/Committee/Lender Plan provides for certain settlements of LBO-Related Causes of Action held by the Debtors' Estates against current and former Senior Lenders, the Senior Loan Agent and the Senior Loan Arrangers, participating current and former Bridge Lenders and Bridge Loan Arrangers, and the Step One Selling Stockholders.  Significant portions of the distributions to be made to Holders of Senior Noteholder Claims, Other Parent Claims, Convenience Claims and General Unsecured Claims against the Filed Subsidiary Debtors are on account of and in consideration of these settlements.  In particular, the aggregate additional distributions to these creditor Classes is approximately $401 million of Cash consideration on account of the settlement of the Estate's LBO-Related Causes of Action against the Senior Lenders and possibly more in the event that Allowed Other Parent Claims and Allowed General Unsecured Claims against Filed Subsidiaries are higher than the Debtors' estimates.  In addition, the Debtor/Committee/Lender Plan provides for a Step Two/Disgorgement Settlement against current and former Senior Lenders, Bridge Lenders or Step Two Arrangers who received payments prior to the Petition Date on account of the Incremental Senior Loans or Bridge Loans (the "Step Two Payees") and who elect to participate in the Step Two/Disgorgement Settlement.[4]  The Holders of Senior Noteholder Claims shall receive an additional $120 million of Cash consideration on account of the Step Two/Disgorgement Settlement.  Procedures by which Step Two Payees can elect to participate in the Step Two/Disgorgement Settlement are set forth in Exhibit 5.15.1(2) to the Debtor/Committee/Lender Plan.  Amounts payable under the Step Two/Disgorgement Settlement are allocated among the Step Two Payees pro rata in accordance with the payments received by each such Step Two Payee, giving equal weight to amounts received in respect of the Incremental Senior Loans and Bridge Loans.  Accordingly, each Step Two Payee, in order to participate in the Step Two/Disgorgement Settlement, must contribute (i) such party's pro rata share (based on interest and fees received in respect of the Bridge Loans, as no principal payments were made on account of the Bridge Loans) of $56,730,213, and (ii) such party's pro rata share (based on principal, interest and fees received under the Senior Loan Agreement in respect of the Incremental Senior Loans) of $63,269,787.  On this basis, of the $120 million total Step Two/Disgorgement Settlement, approximately $102 million is allocable to the Step Two Arrangers, who have agreed to participate in the Step Two/Disgorgement Settlement.  If there is insufficient participation in the Step Two/Disgorgement Settlement from the Step Two Payees to yield the remaining approximately $18 million, the Step Two Arrangers have agreed to advance an amount of Cash necessary to fund the shortfall, subject to receiving reimbursement from the proceeds of Litigation Trust recoveries with respect to the claims against the Step Two Payees that do not elect to participate in the Step Two/Disgorgement Settlement, but with no backstop or other fees payable on account of such advances.[5]  To afford the Step Two Arrangers repose with respect to the Step Two/Disgorgement Settlement and to induce the Step Two Arrangers to participate in the Step Two/Disgorgement Settlement and to provide the foregoing backstop, Step Two Payees who elect to participate in the Step Two/Disgorgement Settlement, as part of their election to participate, will agree to release claims against the Step Two Arrangers. Because the Step Two Arrangers are providing the foregoing backstop and thus bear the risk of loss if any Step Two Payee does not elect to participate in the Step Two/Disgorgement Settlement, the

---

[4]  Approximately $318 million of the approximately $401 million of Cash settlement consideration is being funded by distributions otherwise allocable to the Holders of Senior Loan Claims, and approximately $83 million of the $401 million of Cash settlement consideration is being funded by distributions otherwise allocable to the Holders of Allowed Senior Guaranty Claims.

[5]  The agreement of each Step Two Arranger to participate in the Step Two/Disgorgement and to provide the aforementioned backstop is subject to the terms of the Step Two/Disgorgement Settlement Undertaking (which is attached as Exhibit 5.15.1(1) to the Settlement Plan).

4

Step Two Arrangers may modify the procedures for participation in the Step Two/Disgorgement Settlement at any time.

As a result of these settlements, on the Effective Date, (i) the Holders of Allowed Senior Noteholder Claims will receive their Pro Rata share of $420 million in Cash plus trust interests described below, (ii) the Holders of Allowed Other Parent Claims[6] can choose to receive (a) Cash in an amount equal to 35.18% of their Allowed Claim or (b) Cash in an amount equal to 32.73% of their Allowed Claims plus trust interests described below, and (iii) the Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors will receive payment in full in Cash.[7] As described in greater detail in Article II.D herein, the Debtor/Committee/Lender Plan Proponents believe that the settlements of LBO-Related Causes of Action set forth in the Debtor/Committee/Lender Plan represent good faith, fair, equitable and reasonable compromises that are in the best interests of the Debtors, their respective Estates and all Holders of Claims and Interests in these Chapter 11 Cases.

A second component of the Debtor/Committee/Lender Plan is the preservation of the Estate's remaining LBO-Related Causes of Action for the benefit of Tribune's creditors and the assignment of those causes of action to the Litigation Trust and the Creditors' Trust (collectively, the "Trusts"). The Trusts will provide for an independent Litigation Trustee or Creditors' Trustee to pursue the Preserved Causes of Action except Disclaimed State Law Avoidance Claims for which Holders of such Claims have expressly elected to opt-out of such assignment. The transfer of such causes of action to the Trusts will allow the Debtors to emerge from bankruptcy and continue with their on-going business operations largely uninterrupted by the enormous costs and distraction of litigation surrounding the LBO-Related Causes of Action. Pursuant to the terms of the Debtor/Committee/Lender Plan, Holders of Impaired Allowed Claims against Tribune Company, other than Securities Litigation Claims, will receive beneficial interests in the Trusts and the right to participate in the Trusts' recoveries, subject to applicable contractual subordination provisions except as otherwise noted.

The Senior Lender Proponents believe that absent the Settlement, the Holders of Allowed Senior Loan Claims would have the right to participate in recoveries from the Trusts on a Pro Rata basis with the Holders of Senior Noteholder Claims and Other Parent Claims and would receive the benefits of the contractual subordination provisions applicable to the PHONES Notes Claims and the EGI-TRB LLC Notes Claim. Under the Settlement, however, the beneficial interests granted to Holders of Allowed Senior Noteholder Claims, Allowed PHONES Notes Claims, Allowed EGI-TRB LLC Notes Claims and electing Holders of Allowed Other Parent Claims will provide such Holders with their Pro Rata share (subject to the contractual subordination of the PHONES and EGI-TRB Notes enforced only within such group) of (i) the first $90 million realized from Net Creditors' Trust Proceeds and Net Litigation Trust Proceeds (excluding 90% of the proceeds of claims against the Non-Settling Step Two Payees to the extent necessary to repay any portion of the Step Two/Disgorgement Settlement backstopped by the Step Two Arrangers) (the "Parent GUC Trust Preference") and, thereafter and after repayment of the Trusts' Loan, (ii) sixty-five percent (65%) of both the Net Litigation Trust and Net Creditors' Trust Proceeds until payment in full of all of the foregoing claims.[8] The Holders of Allowed PHONES Notes Claims and

---

[6] Although some Other Parent Claims may not be entitled to the benefit of the contractual subordination of the PHONES Notes Claims and the EGI-TRB LLC Notes Claims, as part of the Settlement, the Senior Lenders allocated sufficient settlement consideration necessary to enable all Allowed Other Parent Claims to receive the same distributions under the Settlement Plan.

[7] Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors are anticipated to receive payment in full in Cash based on the assumption that the aggregate amount of Allowed General Unsecured Claims against Filed Subsidiary Debtors will not exceed $150 million, which is the upper end of the Debtors' current estimate of such claims as set forth in greater detail in the General Disclosure Statement.

[8] Due to the contractual subordination of the PHONES Notes Claims and EGI-TRB LLC Notes Claims, any portion of the Parent GUC Trust Preference or any other recoveries from the Trusts that Holders of such claims

EGI-TRB LLC Notes Claims will participate in the Parent GUC Trust Proceeds subject to enforcement of applicable subordination turnover provisions. As part of the Settlement, the Holders of Allowed Senior Loan Claims and Holders of Bridge Loan Claims, to the extent that they become Allowed, will share in the remaining thirty-five percent (35%) of the Trusts' recoveries. Moreover, the Holders of Senior Loan Claims will not participate in certain trust recoveries to which they may otherwise be entitled on account of the subordination and turnover provisions in the PHONES Notes and EGI-TRB LLC Notes.

## B.    Plan Treatment.

Under the Debtor/Committee/Lender Plan generally, all Allowed Administrative Expense Claims, Allowed DIP Facility Claims, and Allowed Priority Tax Claims against Tribune will be paid in full. All Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Interests in the Filed Subsidiary Debtors will be Reinstated. The Debtor/Committee/Lender Plan provides no recovery to the Holders of Securities Litigation Claims, Tribune Interests, and Bridge Loan Guaranty Claims and further provides that Intercompany Claims shall be resolved pursuant to the Intercompany Claims Settlement.

As more fully described in the Debtor/Committee/Lender Plan and Article II.C.1 hereof, which sets forth the estimated recoveries on account of each Class of Claims against and Interests in the Debtors, the Debtor/Committee/Lender Plan generally provides the following:[9]

- Senior Loan Claims (Class 1C). Senior Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement, other than the Senior Lender Fee/Expense Claims, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date. Each Holder of a Senior Loan Claim shall receive, subject to Section 5.4.2 of the Debtor/Committee/Lender Plan, (i) a Pro Rata share of (a) 1.50% of the Remaining Distributable Cash, (b) 1.50% of the New Senior Secured Term Loan, and (c) 1.50% of the New Common Stock (subject to dilution by the Equity Incentive Plan ((a), (b) and (c) the "Senior Loan Claims Distribution"), (ii) a Pro Rata share of 71.64% of the Remaining Bridge Loan Reserve,[10] (iii) if such Holder has not opted out of making the assignment in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro

---

would otherwise receive shall instead be distributed to (a) the Senior Noteholders and (b) those Holders of Other Parent Claims that elect "Option 2" set forth in Section 3.2.6(c)(ii) of the Settlement Plan and that are entitled to the benefit of the contractual subordination provisions in the PHONES Notes Indenture and the EGI-TRB LLC Notes. Until (i) the Holders of Allowed Senior Noteholder Claims and (ii) the Holders of Other Parent Claims that elect "Option 2" set forth in Section 3.2.6(c)(ii) of the Settlement Plan and that are entitled to the benefit of the contractual subordination provisions in the PHONES Notes Indenture and the EGI-TRB LLC Notes receive payment in full of the Allowed Amount of such Holders' Claims, all distributions that would otherwise be made on account of Allowed EGI-TRB LLC Notes and/or PHONES Notes Claims shall be turned over to such Holders.

[9] Unless otherwise provided in the Debtor/Committee/Lender Plan or the Confirmation Order, the treatment of any Claim or Interest under the Debtor/Committee/Lender Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

[10] The "Remaining Bridge Loan Reserve" is an amount equal to the Bridge Loan Reserve ($77,819,000, or such other amount as may be determined by the Bankruptcy Court) minus an amount equal to the lesser of (a) (i) the amount of the Allowed Bridge Loan Claims divided by $1,619,507,000 times (ii) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve. To the extent the Bridge Loan Claim is Disallowed in whole or in part, the Settlement Plan allocates the Remaining Bridge Loan Reserve to the Holders of Allowed Senior Loan Claims, Allowed Senior Noteholder Claims and Allowed Other Parent Claims. Pursuant to the Settlement, the Senior Lenders have agreed to re-allocate a portion of their share of the Remaining Bridge Loan Reserve in an amount equal to 17.98% of the Remaining Bridge Loan Reserve to the Holders of Allowed Senior Noteholder Claims and Allowed Other Parent Claims in order to provide for such Holders to receive their "natural recovery" as if the Bridge Loan Claims and Step Two Senior Loan Claims had been Disallowed in full.

Rata share, calculated based upon the aggregate amount of Allowed Senior Loan Claims that do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of the Class 1C Creditors' Trust Interests, and (iv) a Pro Rata share of the Class 1C Litigation Trust Interests.[11]

In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

- Senior Guaranty Claims (50C-111C). The Senior Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Senior Guaranty Agreement as of the Petition Date, plus, to the extent allowable under the Bankruptcy Code, all postpetition interest and other amounts due and owing under the Senior Guaranty Agreement from and after the Petition Date. Holders of Allowed Senior Guaranty Claims (including the Swap Claim) shall, subject to Section 5.4.2 of the Debtor/Committee/Lender Plan, collectively receive: (i) 98.50% of the New Senior Secured Term Loan; (ii) 98.50% of the Remaining Distributable Cash; and (iii) 98.50% of the New Common Stock. The distributions payable to the Holder(s) of the Swap Claim shall be paid directly to such Holder by the Disbursing Agent and all other distributions payable to the Holders of the Senior Guaranty Claims shall be paid to the Senior Loan Agent for distribution in accordance with Section 7.3 of the Debtor/Committee/Lender Plan, and prior to distributing such amounts the Senior Loan Agent is only authorized to retain $32,500,000 from the Distributable Cash included in such distribution (such amount, the "Senior Lender Holdback"), to be used by the Senior Loan Agent, or, to the extent unused, distributed, solely in accordance with Section 7.3 of the Debtor/Committee/Lender Plan.

- Bridge Loan Claims (Class 1D). Bridge Loan Claims shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan. Each Holder of an Allowed Bridge Loan Claim shall receive, after a final determination of the allowance of the Bridge Loan Claims, (i) a Pro Rata share of the Bridge Loan Distribution Amount (an amount up to $77,819,000 (or such other amount as may be determined by the Bankruptcy Court) if the Bridge Loan Claims are Allowed in full);[12] (ii) if such Holder has not opted out

---

[11] Other than as specifically set forth in the Debtor/Committee/Lender Plan, distributions made on account of Senior Loan Claims shall be made by the Disbursing Agent to the Senior Loan Agent for further distribution to the Holders of Senior Loan Claims in accordance with the terms of the Senior Loan Agreement.

[12] The portion, if any, of the $77,819,000 or such other amount as may be determined by the Bankruptcy Court that the Allowed Bridge Loan Claims will receive is based on the ratio of the Allowed Claims to $1,619,507,000 (the total amount if the Bridge Loan Claims were to be Allowed in full). The Debtor/Committee/Lender Plan provides for the establishment of a Bridge Loan Reserve in the amount of Cash equal to $77,819,000 or such other amount as may be determined by the Bankruptcy Court. The Bridge Loan Reserve will be funded out of the Distributable Cash Pool. Although the Debtor/Committee/Lender Plan Proponents believe that $77,819,000 is the appropriate amount of the Bridge Loan Reserve, it is possible that the Bankruptcy Court will conclude that the Bridge Loan Reserve should be a higher (possibly significantly higher) or lower amount. Any increase or decrease in the Bridge Loan Reserve amount will impact (a) the amount of Remaining Distributable Cash provided to Holders of Allowed Senior Guaranty Claims, (b) the amount that ultimately may be distributed to Holders of Allowed Bridge Loan Claims, if any, and (c) the Remaining Bridge Loan Reserve that may be distributed to Holders of Allowed Senior Loan Claims, Allowed Senior Noteholder Claims and Allowed Other Parent Claims in the event any of the Bridge Loan Claims are disallowed.

of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Bridge Loan Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of the Class 1D Creditors' Trust Interests; and (iii) a Pro Rata share of the Class 1D Litigation Trust Interests.  To the extent that any Bridge Loan Claims are Allowed, Bridge Loan Claims held by the Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Claims unless otherwise agreed by such Settling Step Two Payees.

- Senior Noteholder Claims (Class 1E).  Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77 less any Senior Noteholder Claims held by Morgan Stanley Capital Services, Inc. or its Affiliates and Related Persons, including, without limitation, Morgan Stanley & Co., Inc. ("MSCS").  The Senior Noteholder Claims owned by MSCS shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan.[13]  Each Holder of an Allowed Senior Noteholder Claim (Class 1E) shall receive such Holder's Pro Rata share of (i) $300,000,000 in Cash (paid out of the Distributable Cash Pool),[14] (ii) the proceeds of the Step Two/Disgorgement Settlement in the aggregate amount of $120,000,000 in Cash, (iii) 23.51% of the Remaining Bridge Loan Reserve, (iv) the Class 1E Litigation Trust Interests, and (v) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Senior Noteholder Claims that do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, the Class 1E Creditors' Trust Interests.

- Other Parent Claims (Class 1F).  Other Parent Claims will be Allowed as follows: (i) the Swap Claim shall be Allowed against Tribune in the amount of $150,948,822, (ii) the Claims of the Retiree Claimants shall be Allowed in accordance with the Retiree Claims Settlement, and (iii) additional Other Parent Claims shall be subject to allowance, disallowance, or offset under the applicable provisions of the Debtor/Committee/Lender Plan.  Each Holder of an Allowed Other Parent Claim may elect on such Holder's Ballot to receive either (i) Option 1: (y) an amount of Cash (paid out of the Distributable Cash Pool) equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claims and (z) a Pro Rata share of 4.85% of the Remaining Bridge Loan Reserve; or (ii) Option 2:  (w) an amount of Cash (paid out of the Distributable Cash Pool) equal to 32.73% of such Holder's Allowed Other Parent Claim (x) such Holder's Pro Rata share of 4.85% of the Remaining Bridge Loan Reserve, (y) if such Holders has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan and that elect the treatment set forth in Section 3.2.6(c)(ii) of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Other Parent Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of

---

[13] If the Senior Noteholder Claims held by MSCS are disallowed, the consideration that would otherwise be distributed to MSCS on account of its Senior Noteholder Claims shall instead be distributed to the other Holders of Allowed Senior Noteholder Claims.

[14] The Distributable Cash Pool is an amount of Cash equal to (i) if the Average Distributable Cash is more than $25 million greater than the Effective Date Cash, the Effective Date Cash plus $25 million, or (ii) if the Average Distributable Cash is more than $25 million less than the Effective Date Cash, the Effective Date Cash less $25 million, or (iii) if the Average Distributable Cash is within $25 million higher or lower than the Effective Date Cash, the Average Distributable Cash.

the Class 1F Creditors' Trust Interests, and (z) a Pro Rata share of the Class 1F Litigation Trust Interests.[15]

- Convenience Claims (Class 1G). Each Holder of an Allowed Convenience Claim against Tribune shall receive payment in full in Cash on account of such Claim; provided, however, that, subject to Section 7.4 of the Debtor/Committee/Lender Plan, post-petition interest shall not be paid to any Holder on any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.

- EGI-TRB LLC Notes Claims (Class 1I). EGI-TRB LLC Notes Claims shall be subject to challenge by the Litigation Trust pursuant to Section 5.17 of the Debtor/Committee/Lender Plan. Each Holder of an Allowed EGI-TRB LLC Notes Claim, shall receive (i) a Pro Rata share of the Class 1I Litigation Trust Interests and (ii) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed EGI-TRB LLC Notes Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of the Class 1I Creditors' Trust Interests, provided that, with respect to any distribution on account of the Debtor/Committee/Lender Plan shall give effect to the contractual subordination of the EGI-TRB LLC Notes.

- PHONES Notes Claims (Class 1J). Each Holder of an Allowed PHONES Notes Claim, shall receive (i) a Pro Rata share of the Class 1J Litigation Trust Interests and (ii) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed PHONES Notes Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, of the Class 1J Creditors' Trust Interests, provided that, with respect to any distribution on account of Allowed Claims 1J Class, the Debtor/Committee/Lender Plan shall give effect to the contractual subordination of the PHONES Notes.

- Subsidiary Debtor General Unsecured Claims (Class 2E-111E). Each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive an amount of Cash (paid out of the Distributable Cash Pool) equal to the lesser of (i) 100% of such Holders' Allowed General Unsecured Claim Against a Filed Subsidiary Debtor or (ii) a Pro Rata share of (x) $150,000,000 plus (y) an amount equal to the aggregate amount of Allowed General Unsecured Claims against a Filed Subsidiary Debtor arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim; provided, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim.

In addition, the Debtor/Committee/Lender Plan constitutes a prepackaged plan for each of the Guarantor Non-Debtors, if any, that commences Chapter 11 Cases to effectuate the restructuring contemplated under the Debtor/Committee/Lender Plan and becomes party to the Debtor/Committee/Lender Plan. With the exception of Senior Guaranty Claims, Bridge Loan Guaranty

---

[15] Section 10.1.1(n) of the Debtor/Committee/Lender Plan provides that, as a condition precedent to the effectiveness of the Debtor/Committee/Lender Plan, the Creditor Proponents shall have determined, in their sole discretion, that the aggregate amount of Allowed Other Parent Claims shall not exceed $400,000,000, excluding (i) Allowed Other Parent Claims against Tribune for indemnification, reimbursement, or contribution arising from or relating to the assertion of any Preserved Cause of Action by the Litigation Trust or the Creditors' Trust; (ii) Allowed Other Parent Claims asserted by the PBGC as a result of termination of any Pension Plan; and (iii) Allowed Other Parent Claims arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim.

Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Senior Guaranty Claims, Bridge Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired and conclusively deemed to have accepted the Prepackaged Debtor/Committee/Lender Plan.

      C.      **Estimated Recoveries in Respect of Allowed Claims.**

In order to determine the treatment of creditors of Tribune, the Subsidiary Debtors and the Guarantor Non-Debtors, the Debtors' management, its advisors, and the Debtor/Committee/Lender Plan Proponents reviewed the relationship between the value of each legal entity and third-party claims and Intercompany Claims at each such legal entity. For purposes of this analysis, this relationship was modeled to calculate the value available for distribution to each legal entity's creditors and stockholders taking into account the flow of value between legal entities consistent with the Intercompany Claims Settlement. Certain key assumptions utilized in making those calculations are summarized below.

---

### KEY FACTORS AND ASSUMPTIONS

- <u>Guarantor Debtors</u>. Claims against the Guarantor Debtors include DIP Facility Claims, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Senior Guaranty Claims, Bridge Loan Guaranty Claims, General Unsecured Claims, Intercompany Claims, and Securities Litigation Claims. The Bridge Loan Guaranty Claims are contractually subordinated to the Senior Guaranty Claims and the Plan gives effect to such contractual subordination. These claims are otherwise *pari passu* in priority of payment against the Subsidiary Debtors.

- <u>Tribune</u>. Claims against Tribune include DIP Facility Claims, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, Convenience Claims, EGI-TRB LLC Notes Claims, PHONES Notes Claims, Intercompany Claims, and Securities Litigation Claims. The PHONES Notes Claims and the EGI-TRB LLC Notes Claims are subordinated to the Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Non-Qualified Former Employee Benefit Claims against Tribune, and most other General Unsecured Claims. The Plan gives effect to the foregoing subordination provisions.

- <u>Intercompany Claims</u>. The Debtors and their advisors reviewed the Intercompany Claims as reflected in their books and records at the Petition Date in order to determine an appropriate estimate of Allowed Intercompany Claims. The Intercompany Claims are comprised of hundreds of thousands of individual transactions over the history of the Debtors. The review of these claims included a focus on (i) the most significant portion of these amounts which arose in the seven years preceding the Petition Date and (ii) amounts related to large, "one time" transactions.[16] In addition, due to the prepetition debt structure which creates distinctions between Guarantor Debtors (and Guarantor Non-Debtors), Non-Guarantor Debtors, and Tribune, the review also focused on claims amongst these groups. The review resulted in the identification of certain categories of transactions, which were then assessed on both the legal and financial merits in terms of the transaction(s) likely creating Allowed Intercompany Claims. Based on this review and an assessment of the strength of potential legal arguments, the Debtors made estimates of likely Allowed Intercompany Claims. As discussed in Article II.D herein, the Debtor/Committee/Lender Plan implements the Intercompany Claims Settlement based upon the aforementioned analysis and related determinations by the Debtors.

- <u>Subordinated Claims</u>. The Other Parent Claims generally include the Swap Claim, Claims against Tribune arising under Non-Qualified Former Employee Benefit Plans, and a limited number of contract and other claims.[17] The Debtor/Committee/Lender Plan Proponents believe that the vast majority, if not all, of the

---

[16] This review included the analysis of a prepetition transfer made by Tribune of approximately $368.8 million in cash to a new investment account. Specifically, immediately prior to the Petition Date, Tribune transferred approximately $368.8 million in cash from its concentration and investment accounts at JPMorgan Chase Bank, N.A. and Bank of America, N.A. to new investment accounts at Fidelity Investments Institutional Services Company held by (i) Chicago Tribune Company and WGN Continental Broadcasting Company (which became Filed Subsidiary Debtors on December 8, 2008), (ii) Tribune CNLBC (which became a Filed Subsidiary Debtor on October 12, 2009), and (iii) Tribune Interactive, Inc. (which is a Guarantor Non-Debtor). These transfers were done in order to implement certain business objectives, including the preservation of liquidity and the continued availability of funding for subsidiary operations. These intercompany transfers were appropriately accounted for on the books and records of Tribune and its subsidiaries. For purposes of determining entitlements of Holders of Allowed Claims against and Interests in the Debtors, the aforementioned $368.8 million is deemed to have been returned to Tribune.

[17] The Debtor/Committee/Lender Plan Proponents have included the Swap Claim as an Other Parent Claim because, among other things, the Swap Claim might have the benefit of certain statutory defenses to avoidance that other Claims do not have. While the Swap Claim is also included as a Senior Guaranty Claim, (i) Section 3.1.1 of the Debtor/Committee/Lender Plan provides that in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim and (ii) the Holder(s) of the Swap Claim will not receive postpetition interest unless the Guarantor Debtors are determined to be solvent on a collective basis.

11

Claims in the Other Parent Claims Class are entitled to the benefit of the contractual subordination of the PHONES Notes Claims and EGI-TRB LLC Notes Claims. Although some Other Parent Claims may not be entitled to the benefit of the contractual subordination of the PHONES Notes Claims and the EGI-TRB LLC Notes Claims, as part of the Settlement the Senior Lenders allocated sufficient settlement consideration necessary to enable all Allowed Other Parent Claims to receive the same distributions under the Debtor/Committee/Lender Plan. The Debtor/Committee/Lender Plan does not, however, specify which of the Other Parent Claims are senior or subordinated to the PHONES Notes Claims or EGI-TRB LLC Notes Claims in respect of distributions on Litigation Trust Interests or Creditors Trust Interests. The Debtor/Committee/Lender Plan Proponents believe that this issue is more appropriately left for determination at such time as the Distribution Trust and/or Creditors' Trust make any distributions to the Holders of Allowed Other Parent Claims that elect "Option 2".

The following charts summarize the projected distributions to Holders of Allowed Claims and Interests under the Debtor/Committee/Lender Plan. The projections of estimated recoveries are only an estimate and subject to a number of variables, including the amount of Allowed Claims with any particular Class. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Debtor/Committee/Lender Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Debtor/Committee/Lender Plan depends upon the ability of the Debtor/Committee/Lender Plan Proponents to obtain confirmation of the Debtor/Committee/Lender Plan and meet the conditions to confirmation and effectiveness of the Debtor/Committee/Lender Plan, as discussed in the General Disclosure Statement and this Debtor/Committee/Lender Disclosure Statement. Accordingly, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Debtor/Committee/Lender Disclosure Statement and the Debtor/Committee/Lender Plan for a complete description of the classification and treatment of Allowed Claims against and Interests under the Debtor/Committee/Lender Plan.

    1.    Summary of Estimated Unclassified Claims Against all Debtors and of Estimated Recoveries in Respect Thereof

| Unclassified Claims | | | |
|---|---|---|---|
| **Affected Claims & Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery** |
| **DIP Facility Claims** | $0 | Unimpaired | Estimated Recovery Percentage on Effective Date: 100% <br> Form of Recovery: <br> ▪ Cash. <br> See Section 2.1 of the Debtor/Committee/Lender Plan. |
| **Administrative Expense Claims** | $125 to $175 million | Unimpaired | Estimated Recovery Percentage on Effective Date: 100% <br> Form of Recovery: <br> ▪ Cash. <br> See Section 2.2 of the Debtor/Committee/Lender Plan. |
| **Priority Tax Claims** | $125 to $175 million | Unimpaired | Estimated Recovery Percentage on Effective Date: 100% <br> Form of Recovery: <br> ▪ Cash in full or in installments, together with interest. <br> See Section 2.3 of the Debtor/Committee/Lender Plan. |

    2.    Summary of Estimated Allowed Claims and Interests against Tribune and the Filed Subsidiary Debtors and of Estimated Recoveries in Respect Thereof.

| Claims Against and Interests in Tribune (Debtor 1) | | | |
|---|---|---|---|
| **Affected Claims & Description** | **Estimated Allowed Claims** | **Treatment** | **Estimated Recovery** |
| **Priority Non-Tax Claims (Class 1A)** | $0 to $1 million | **Unimpaired** | Estimated Recovery Percentage on Effective Date: **100%** <br> Form of Recovery: <br> ▪ Reinstatement. <br> See Section 3.2.1 of the Debtor/Committee/Lender Plan. |
| **Other Secured Claims (Class 1B)** | Undetermined | **Unimpaired** | Estimated Recovery Percentage on Effective Date: **100%** <br> Form of Recovery: <br> ▪ Reinstatement. <br> See Section 3.2.2 of the Debtor/Committee/Lender Plan. |
| **Senior Loan Claims (Class 1C)** | $8.571 billion | **Impaired** | Estimated Recovery Percentage on Effective Date: **1.09%**[18] <br> Form of Recovery on the Effective Date: <br> ▪ The Senior Loan Claims Distribution (i.e. 1.50% of Remaining Distributable Cash, 1.50% of the New Senior Secured Term Loan and 1.50% of the New Common Stock). <br> ▪ Class 1C Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1C Creditors' Trust Interests. <br> Potential Post-Effective Date Recovery: <br> ▪ 71.64% of the Remaining Bridge Loan Reserve.[19] <br> See Section 3.2.3 of the Debtor/Committee/Lender Plan. |
| **Bridge Loan Claims (Class 1D)** | $0, as of the Effective Date[20] | **Impaired** | Estimated Recovery Percentage on Effective Date: **0%** <br> Potential Post-Effective Date Recovery: <br> ▪ The Bridge Loan Distribution Amount.[21] <br> ▪ Class 1D Litigation Trust Interests and, if such Holder has not opted out of making the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1D Creditors' Trust Interests. <br> See Section 3.2.4 of the Debtor/Committee/Lender Plan. |
| **Senior Noteholder Claims (Class 1E)** | $1.283 billion | **Impaired** | Estimated Recovery Percentage on Effective Date: **32.73%** <br> Form of Recovery on the Effective Date:[22] <br> ▪ $300 million in Cash paid out of the Distributable Cash Pool and $120 million in Cash paid from the proceeds of the Step Two/Disgorgement Settlement. |

[18] In accordance with the terms of the Senior Loan Agreement, distributions will be made ratably to all Holders of Senior Loan Claims.

[19] The "Remaining Bridge Loan Reserve" is an amount equal to the Bridge Loan Reserve ($77,819,000, or such other amount as may be determined by the Bankruptcy Court) minus an amount equal to the lesser of (a) (i) the amount of the Allowed Bridge Loan Claims divided by $1,619,507,000 times (ii) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve.

[20] Bridge Loan Claims shall be subject to challenge from the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan. To the extent that any Bridge Loan Claims are Allowed, Bridge Loan Claims held by the Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Claims unless otherwise agreed by such Settling Step Two Payees.

[21] The Bridge Loan Distribution Amount is an amount, after the final determination of the allowance of the Bridge Loan Claims, equal to the lesser of (a)(i) the amount of the Allowed Bridge Loan Claim divided by $1,619,507,000 times (ii) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve. Thus, the portion of the $77,819,000 or such other amount as may be determined by the Bankruptcy Court that the Allowed Bridge Loan Claims will receive, if any, is based on the ratio of the Allowed Claims to $1,619,507,000 (the total amount if the Bridge Loan Claims were Allowed in full).

| | | | |
|---|---|---|---|
| | | | ▪ Class 1E Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1E Creditors' Trust Interests.<br>Potential Post-Effective Date Recovery:<br>▪ 23.51% of the Remaining Bridge Loan Reserve.<br>See Section 3.2.5 of the Debtor/Committee/Lender Plan. |
| **Other Parent Claims (Class 1F)** | $260 to $350 million[23] | **Impaired** | Estimated Recovery Percentage on Effective Date: 35.18%<br>Form of Recovery on the Effective Date:<br>▪ At the election of each Holder of an Allowed Other Parent Claim:<br>  o Option 1: Cash (paid out of the Distributable Cash Pool) equal to 35.18% of such Holder's Allowed Other Parent Claim; **or**<br>  o Option 2: Cash (paid out of the Distributable Cash Pool) equal to 32.73% of such Holder's Allowed Other Parent Claim and Class 1F Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1F Creditors' Trust Interests.<br>Potential Post-Effective Date Recovery:<br>  o For claimants selecting either Option 1 or Option 2: 4.85% of the Remaining Bridge Loan Reserve.<br>See Section 3.2.6 of the Debtor/Committee/Lender Plan. |
| **Convenience Claims (Class 1G)** | $0 to $1 million | **Unimpaired** | Estimated Recovery Percentage on Effective Date: 100%<br>Form of Recovery:<br>▪ Cash; provided, however, that post-petition interest shall not be paid.<br>See Section 3.2.7 of the Debtor/Committee/Lender Plan. |
| **EGI-TRB LLC Notes Claims (Class** | $0, as of the Effective Date[24] | **Impaired** | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>▪ Class 1I Litigation Trust Interests and, if such Holder has |

---

[22] Deutsche Bank Trust Company of Americas ("DBTCA"), the successor indenture trustee for the Debtors' 1992, 1995 and 1997 Indentures, asserts that the Debtors should pay for the fees and expenses of DBTCA based on the following assertions: (i) Tribune is contractually obligated to pay such fees and expenses under each of the Indentures; (ii) the fees and expenses of DBTCA are entitled to be treated as an administrative claim; and (iii) the Debtors are paying the fees and expenses of various major constituencies (including the fees and expenses of the Indenture Trustee under the 1996 Indenture) as identified in Sections 9.1.1 through 9.1.4 of the Plan. DBTCA asserts that if the Debtors do not reimburse DBTCA for its fees and expenses, DBTCA is entitled under each of the applicable Indentures to assert a lien on all property held or collected by it for reimbursement of its fees and expenses. In the event DBTCA asserts such a charging lien, DBTCA has informed the Debtors that it will reimburse itself for fees and expenses prior to making any distributions to the Senior Noteholders. If DBTCA asserts a charging lien, DBTCA contends that the Holders of Senior Noteholder Claims under the 1992, 1995 and 1997 Indentures will receive a distribution that is less than that set forth in the chart above and less than that which will be received by the Holders of Senior Noteholder Claims under the 1996 Indenture. At this time, the Debtors do not take a position on whether DBTCA has the right to assert a charging lien under the applicable Indentures. However, the Debtors do not believe that DBTCA's assertion of a charging lien results in the disparate treatment of Class 1D Claims.

[23] This estimate includes the Swap Claim and the estimated Allowed amount of Claims held by the Retiree Claimants. The Swap Claim shall be Allowed against Tribune in the amount of $150,948,822. The Claims of the Retiree Claimants shall be Allowed in accordance with the Retiree Claims Settlement. Additional Other Parent Claims shall be subject to allowance or disallowance under the applicable provisions of the Debtor/Committee/Lender Plan, including, but not limited to Article VIII of the Debtor/Committee/Lender Plan.

| 1I) | | | not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1I Creditors' Trust Interests.[25] <br> See Section 3.2.8 of the Debtor/Committee/Lender Plan. |
|---|---|---|---|
| **PHONES Notes Claims (Class 1J)** | $760,880,790 to 1.197 billion[26] | **Impaired** | <u>Estimated Recovery Percentage on Effective Date:</u>  0% <br> <u>Form of Recovery:</u> <br> ▪ Class 1J Litigation Trust Interests and, if such Holder has not opted out of the assignment provided in Section 14.3.1 of the Debtor/Committee/Lender Plan, Class 1J Creditors' Trust Interests.[27] <br> See Section 3.2.9 of the Debtor/Committee/Lender Plan. |
| **Intercompany Claims (Class 1K)** | N/A | **Impaired** | <u>Estimated Recovery Percentage on Effective Date:</u>  N/A <br> <u>Form of Recovery:</u> <br> ▪ The treatment set forth in the Intercompany Claims Settlement. <br> See Section 3.2.10 of the Debtor/Committee/Lender Plan.. |
| **Securities Litigation Claims (Class 1L)** | Undetermined | **Impaired** | <u>Estimated Recovery Percentage on Effective Date:</u>  0% <br> <u>Form of Recovery:</u> <br> ▪ All Securities Litigation Claims against Tribune shall be extinguished. <br> See Section 3.2.12 of the Debtor/Committee/Lender Plan. |
| **Tribune Interests (Class 1M)** | N/A | **Impaired** | <u>Estimated Recovery Percentage on Effective Date:</u>  0% <br> <u>Form of Recovery:</u> <br> ▪ All Tribune Interests in Tribune shall be extinguished. <br> See Section 3.2.13 of the Debtor/Committee/Lender Plan. |
| **Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2-111)** | | | |
| **Priority Non-Tax Claims (Classes 2A-111A)** | $0 to $1 million | **Unimpaired** | <u>Estimated Recovery Percentage on Effective Date:</u>  100% <br> <u>Form of Recovery:</u> <br> ▪ Reinstatement. <br> See Section 3.3.1 of the Debtor/Committee/Lender Plan. |
| **Other Secured Claims (Classes 2B-111B)** | Undetermined | **Unimpaired** | <u>Estimated Recovery Percentage on Effective Date:</u>  100% <br> <u>Form of Recovery:</u> <br> ▪ Reinstatement. <br> See Section 3.3.2 of the Debtor/Committee/Lender Plan. |
| **Senior Guaranty Claims (Classes 50C-111C)** | $8.722 billion[28] | **Impaired** | <u>Estimated Recovery Percentage on Effective Date:</u> 69.95%[29] <br> <u>Form of Recovery:</u>[30] <br> ▪ 98.50% of the New Senior Secured Term Loan; <br> ▪ 98.50% of the Remaining Distributable Cash; and <br> ▪ 98.50% of the New Common Stock. <br> See Section 3.3.3 of the Debtor/Committee/Lender Plan. |

---

[24] EGI-TRB LLC Notes Claims against Tribune shall be subject to challenge by the Litigation Trust pursuant to Section 5.17 of the Debtor/Committee/Lender Plan.

[25] See footnote 7, *supra*, regarding enforcement of the contractual subordination of the EGI-TRB LLC Notes Claims.

[26] The PHONES Notes Claims shall be Allowed in the amount determined by the Bankruptcy Court. The estimated range set forth herein may vary from the Allowed amount of PHONES Notes Claims determined by the Bankruptcy Court.

[27] See footnote 7, *supra*, regarding enforcement of the contractual subordination of the PHONES Notes Claims.

[28] The estimated Allowed amount of Senior Guaranty Claims set forth herein includes the estimated principal amount plus accrued but unpaid interest as of the Petition Date. The Allowed amount of Senior Guaranty Claims will also include all other amounts due and owing under the Senior Guaranty Agreement as of the Petition Date, plus, to the extent allowable under the Bankruptcy Code, all postpetition interest and other amounts due and

| | | | |
|---|---|---|---|
| **Bridge Loan Guaranty Claims (Class 50D-111D)** | $0, as of the Effective Date[31] | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>• Distributions that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Holders of Senior Guaranty Claims. Accordingly, Bridge Loan Guaranty Claims shall be extinguished.<br>See Section 3.3.4 of the Debtor/Committee/Lender Plan. |
| **General Unsecured Claims (Classes 2E-111E)** | $85 to 150 million | Impaired | Estimated Recovery Percentage on Effective Date: 100%[32]<br>Form of Recovery:<br>• Cash (paid out of the Distributable Cash Pool) equal to the lesser of (i) 100% of such Holders Allowed General Unsecured Claim against a Filed Subsidiary Debtor or (ii) a Pro Rata share of (x) $150,000,000 plus (y) an amount equal to the aggregate amount of Allowed General Unsecured Claims against a Filed Subsidiary Debtor arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim; provided, however, that post-petition interest shall not accrue or be paid.<br>See Section 3.3.5 of the Debtor/Committee/Lender Plan. |
| **Intercompany Claims (Class 2K-111K)** | N/A | Impaired | Estimated Recovery Percentage on Effective Date:  N/A<br>Form of Recovery:<br>• The treatment set forth in the Intercompany Claims Settlement.<br>See Section 3.3.6 of the Debtor/Committee/Lender Plan. |
| **Securities Litigation Claims (Classes 2L-111L)** | Undetermined | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>• All Securities Litigation Claims against Tribune shall be extinguished.<br>See Section 3.3.7 of the Debtor/Committee/Lender Plan. |
| **Interests in the Filed Subsidiary Debtors** | N/A | Unimpaired | Estimated Recovery Percentage on Effective Date: 100%<br>Form of Recovery:<br>• Reinstatement.<br>See Section 3.3.8 of the Debtor/Committee/Lender Plan. |

owing under the Senior Guaranty Agreement from and after the Petition Date.  Neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.  The Holder(s) of Allowed Senior Guaranty Claims will not receive postpetition interest unless the Guarantor Debtors are determined to be solvent on a collective basis.

[29] The estimated Allowed amount of Senior Guaranty Claims is asserted against each of the Guarantor Subsidiaries. The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by the estimated Allowed amount of Senior Guaranty Claims set forth herein.

[30] In accordance with the terms of the Senior Loan Agreement, distributions will be made ratably to all Holders of Senior Guaranty Claims

[31] Bridge Loan Guaranty Claims may be challenged by an Estate representative on or prior to the Effective Date and subsequently shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan.  To the extent that any Bridge Loan Guaranty Claims are Allowed, Bridge Loan Guaranty Claims held by the Settling Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Guaranty Claims unless otherwise agreed by such Settling Step Two Payees.

[32] The recovery percentage for Holders of Allowed General Unsecured Claims against Filed Subsidiary Debtors assumes that the aggregate amount of Allowed General Unsecured Claims against Filed Subsidiary Debtors does not exceed $150 million, which is the upper end of the Debtors' current estimate of such claims as set forth in greater detail in the General Disclosure Statement.

16

| (Classes 2M-111M) | | | |
|---|---|---|---|

3.  Summary of Estimated Allowed Claims Against and Interests for Each Guarantor Non-Debtor, if any, that becomes a Debtor and of Estimated Recoveries in Respect Thereof.

The Debtor/Committee/Lender Plan also constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence cases under chapter 11 of the Bankruptcy Code.  For any Guarantor Non-Debtor that commences a chapter 11 case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth above for the Filed Subsidiary Debtors.

The Guarantor Non-Debtors are Tribune (FN) Cable Ventures, Tribune Interactive, Inc., Tribune N.D. Inc., and Tribune National Marketing Company.  Tribune (FN) Cable Ventures, Inc. is a holding company owned by Tribune Broadcasting Company with a 31.3% interest in the Television Food Network general partnership.  Tribune Interactive, Inc. is owned by Tribune (88.5%) and Chicago Tribune Company (11.5%) and manages the website operations for Tribune's publishing and broadcasting subsidiaries and assists in the management of Tribune's various online classified businesses.  Tribune ND, Inc. is a holding company owned by Tribune with an approximate three percent (3%) interest in Newsday Holdings, LLC, which is the parent company of the entity that owns and operates *Newsday*.  Tribune National Marketing Company is a holding company owned by Tribune with a 30.8% interest in Career Builder (the United States' largest online job web site) and a 13.9% interest in Classified Ventures (which operates automotive and real estate classified advertising websites).  See further discussion in Article II.B.3 of the General Disclosure Statement, titled "Additional Investments."

Additional financial reporting information for the Guarantor Non-Debtors may be found in the Periodic Reports of Debtors Pursuant to Bankruptcy Rule 2015.3 filed with the Bankruptcy Court on July 29, 2009, January 29, 2010, and July 29, 2010.  Pursuant to Bankruptcy Rule 2015.3, these reports include, among other things, balance sheet, operating statement, and cash flow statement information relating to the Guarantor Non-Debtors.  Copies of these reports may be obtained from the publicly-available docket located, free of charge, on the Debtors' website: http://chapter11.epiqsystems.com/tribune.

As noted above, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated.  In addition, except for Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the Prepackaged Plan.

The treatment of Loan Guaranty Claims, Intercompany Claims, and Securities Litigation Claims under the Prepackaged Plan is as follows:

**Claims Against Guarantor Non-Debtors, If Any, That Become Debtors**

| Senior Guaranty Claims | $8.722 billion[33] | Impaired | Estimated Recovery Percentage on Effective Date: 69.95%[34]<br>Form of Recovery:<br>▪ The distributions provided under Section 3.3.3 of the Debtor/Committee/Lender Plan and the guaranties described in Section 5.6 of the Debtor/Committee/Lender Plan.[35]<br>See Section 3.4.3(a) of the Debtor/Committee/Lender Plan. |
|---|---|---|---|
| Bridge Loan Guaranty Claims | $0, as of the Effective Date[36] | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>▪ Distributions that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Holders of Senior Guaranty Claims. Accordingly Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished.<br>See Section 3.4.3(b) of the Debtor/Committee/Lender Plan. |
| Intercompany Claims | Undetermined | Impaired | Estimated Recovery Percentage on Effective Date: N/A<br>Form of Recovery:<br>▪ The treatment set forth in the Intercompany Claims Settlement.<br>See Section 3.4.4 of the Debtor/Committee/Lender Plan. |
| Securities Litigation Claims | Undetermined | Impaired | Estimated Recovery Percentage on Effective Date: 0%<br>Form of Recovery:<br>▪ All Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished.<br>See Section 3.4.5 of the Debtor/Committee/Lender Plan. |

### D.    Settlement Of Claims Related To The Leveraged ESOP Transactions.

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Debtor/Committee/Lender Plan, the Debtor/Committee/Lender Plan constitutes a request to authorize and approve a good faith settlement of all LBO-Related Causes of Action other than those specifically preserved by the settlement that was reached as a result of the Mediation (consisting of two mutually conditional settlements, the Litigation

---

[33] The estimated Allowed amount of Senior Guaranty Claims set forth herein includes the estimated principal amount plus accrued but unpaid interest as of the Petition Date. The Allowed amount of Senior Guaranty Claims will also include all other amounts due and owing under the Senior Guaranty Agreement as of the Petition Date, plus, to the extent allowable under the Bankruptcy Code, all postpetition interest and other amounts due and owing under the Senior Guaranty Agreement from and after the Petition Date. Neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim. The Holder(s) of Allowed Senior Guaranty Claims will not receive postpetition interest unless the Guarantor Debtors are determined to be solvent on a collective basis.

[34] The estimated Allowed amount of Senior Guaranty Claims is asserted against each of the Guarantor Subsidiaries. The estimated recovery set forth herein was calculated by taking the cumulative recovery from the Claims against each Guarantor Debtor and Guarantor Non-Debtor divided by the estimated Allowed amount of Senior Guaranty Claims set forth herein.

[35] In accordance with the terms of the Senior Loan Agreement, distributions will be made ratably to all Holders of Senior Guaranty Claims.

[36] Bridge Loan Guaranty Claims may be challenged by an Estate representative on or prior to the Effective Date and subsequently shall be subject to challenge by the Litigation Trust pursuant to Article XIII of the Debtor/Committee/Lender Plan. To the extent that any Bridge Loan Guaranty Claims are Allowed, Bridge Loan Guaranty Claims held by the Settling Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Guaranty Claims unless otherwise agreed by such Settling Step Two Payees.

Settlement and the Step Two/Disgorgement Settlement, as defined below, collectively referred to herein as the "Settlement"). The Settlement was brokered by and with the support of the Mediator.

     1.      The Terms of the Settlement.

Under the Settlement, creditors of the Debtors, other than the Senior Lenders and Bridge Lenders (the "Non-LBO Creditors"), will receive cash recoveries totaling approximately $598 million, plus a share of recoveries obtained by the Creditors' Trust and Litigation Trust from prosecution of the Preserved Causes of Action. Of the $598 million in total cash recoveries, $521 million is being provided as Settlement consideration by the current Senior Lenders, the Step Two Arrangers, and certain current or former Senior Lenders, and Bridge Lenders that received principal, interest or fees in respect of the Bridge Loan Agreement or Incremental Senior Loans prior to the Petition Date and will be distributed under the Debtor/Committee/Lender Plan to the Holders of Senior Noteholder Claims, Other Parent Claims, Convenience Claims, and General Unsecured Claims against the Filed Subsidiary Debtors. In return, the Estate would release all LBO-Related Causes of Action against such parties in certain capacities, as described below. All Preserved Causes of Action would be transferred primarily to either the Creditors' Trust or the Litigation Trust for pursuit after the Effective Date of the Debtor/Committee/Lender Plan for the benefit of Tribune's creditors.

     a.      Litigation Settlement.

As consideration for the Litigation Settlement, (i) Holders of Senior Loan Claims would relinquish as settlement consideration approximately $401 million in cash to which they would be entitled if their Claims were allowed in full, (ii) the Step Two/Disgorgement Settlement would be consummated as set forth below, and (iii) the proceeds of recoveries obtained by the Creditors' Trust and the Litigation Trust will be disproportionately allocated to creditors other than the Holders of Senior Loan Claims, as set forth below. The incremental $401 million in immediate cash consideration derived from the Litigation Settlement would be distributed to the Holders of Allowed Senior Noteholder Claims, Other Parent Claims, Convenience Claims, and General Unsecured Claims against the Filed Subsidiary Debtors. In connection with the Litigation Settlement, all Senior Loan Claims and Senior Guaranty Claims would be Allowed and all LBO-Related Causes of Action of the Estates against the Senior Lenders and the respective agents and arrangers of the Senior Loans, other than specifically preserved claims, would be released.

     b.      Step Two/Disgorgement Settlement.

As consideration for the Step Two/Disgorgement Settlement, (i) the Step Two Arrangers and current or former Senior Lenders or Bridge Lenders that received principal, interest or fees in respect of the Bridge Loans and the Incremental Senior Loans prior to the Petition Date would together contribute a total of $120 million in cash as additional settlement consideration to be distributed to Holders of Allowed Senior Noteholder Claims, and (ii) the Litigation Settlement would be consummated as set forth above. The cash value of this additional settlement will be available on the Effective Date because amounts allocable to any Senior Lenders or Bridge Lenders that do not elect to participate in the Step Two/Disgorgement Settlement will be advanced by the Step Two Arrangers (i.e., JPMorgan, Merrill Lynch, Bank of America and Citigroup), subject to reimbursement of such advances from the recoveries of the Litigation Trust on the related Preserved Causes of Action. In connection with the Step Two/Disgorgement Settlement, claims (the "Disgorgement Claims") against any participating current or former holder of Senior Loans and/or Bridge Loans for disgorgement of principal, interest and fees paid on account of the Incremental Term Loan B tranche of the Senior Loan Agreement and/or the Bridge Loan Agreements (collectively, the "Step Two Loans") and claims against the Step Two Arrangers and each of their affiliates in their capacity as agents and arrangers of the Step Two Loans will be released.

    c.      Releases.

The releases under the Debtor/Committee/Lender Plan are narrowly drawn. In all cases, the releases provided under the Debtor/Committee/Lender Plan do not include claims against the released parties in their capacities (if any) as Step Two Selling Stockholders or Advisors. Furthermore, all claims against Tribune's directors and officers related to the leveraged buy-out of Tribune that occurred in 2007 are preserved for prosecution after the Effective Date for the benefit of Tribune's creditors.

    d.      Creditors' Trust and Litigation Trust.

Except for those Claims that are settled and released as described in the preceding two paragraphs, all Preserved Causes of Action[37] will be transferred to either the Creditors' Trust or the Litigation Trust to be prosecuted for the benefit of creditors. The Trusts would be funded with a $20 million loan from Reorganized Tribune, with the Trusts jointly and severally liable for repayment of the loan.

As further settlement consideration, in lieu of distributing all recoveries on the Preserved Causes of Action Pro Rata to all creditors of Tribune, net recoveries on the Preserved Causes of Action (after costs of collection and any reserve for future costs) would be allocated among the creditors of Tribune in the following order of priority:

first: 100% of such net recoveries would be distributed to Holders of Allowed Senior Noteholder Claims, electing Other Parent Claims, EGI-TRB LLC Notes Claims and PHONES Notes Claims against Tribune (the "Non-LBO Parent Creditors") (distributed in accordance with applicable contractual subordination provisions as they apply to the Non-LBO Parent Creditors), until such Holders have received $90 million in the aggregate;

second: 100% of such net recoveries would next be applied to repay in full the Trust loan from Reorganized Tribune described above; and

thereafter: 65% of net recoveries would be distributed to the Non-LBO Parent Creditors, and the remaining 35% would be distributed to the Senior Lenders.

    2.      The Reasonableness of the Settlement.

The Debtor/Committee/Lender Plan Proponents believe that the Settlement embodied in the Debtor/Committee/Lender Plan is fair and reasonable and in the best interests of the Estate. It is the product of a Bankruptcy Court-ordered mediation process and was brokered by and with the support of the Bankruptcy Court-appointed Mediator. Further, it has the support of the Debtors, as well as a diverse group of creditors. Any litigation relating to the LBO-Related Causes of Action would seek recoveries from the Senior Lenders and others who participated in the Leveraged ESOP Transactions for the benefit of the Senior Notes and other general unsecured creditors. Any ruling on such LBO-Related Causes of Action, whether for or against the Debtors' Estates, would be adverse to some of the Settling Plan Proponents and favorable to others. It is therefore significant that, after many months of investigations and difficult negotiations, the Debtor/Committee/Lender Plan Proponents have agreed that the Settlement embodied in the Debtor/Committee/Lender Plan is fair and reasonable and in the best interests of the Estate.

---

[37] As of the Effective Date the Debtors will disclaim the state law constructive fraudulent transfer claims against Step Two Selling Stockholders that they otherwise could have pursued under Section 544(b). Such claims will then be transferred to the Creditors' Trust absent an opt-out by the original Holder of such claims.

As is clear from the Examiner's Report, there are a wide range of potential outcomes on the LBO-Related Causes of Action from complete failure with respect to both Step One and Step Two that would result in the Senior Loan Claims being allowed in full to a complete victory that would result in both Steps being found to be fraudulent transfers with respect to both the Tribune parent and the Guarantor Subsidiaries. Indeed, the Examiner's Report analyzed the recoveries to the Non-LBO Creditors with respect to claims against the Lenders in six different scenarios.[38] Only one of the six, the complete victory scenario, results in Non-LBO Creditors recovering more than the $598 million which is awarded to them in total cash consideration under the Debtor/Committee/Lender Plan ($521 million of which is incremental Settlement value and $77 million of which is "natural" or "base case" value, assuming no litigation recoveries). Moreover, the $521 million in Settlement consideration does not take into account the additional value to the Non-LBO Parent Creditors from their disproportionate share of recoveries from the Trusts under the Settlement.[39] In the complete victory scenario, the Non-LBO Creditors are paid in full, recovering some $2.3 billion. In the other five scenarios, the incremental recoveries to Non-LBO Creditors resulting from the LBO-Related Causes of Action range from $0 (complete loss) to approximately $205 million to 244 million[40] (fraudulent transfer for Tribune at both Step One and Step Two but only at Step Two for guarantor subsidiaries).

The Examiner concluded that the more probable scenarios were those that resulted in less than a complete victory and recoveries substantially less than the Settlement. He found that the prospects for a complete victory were less than 50%, characterizing the chances of prevailing on arguments that would lead to such a victory as "somewhat unlikely," "reasonably unlikely" or "highly unlikely." While certain Debtor/Committee/Lender Plan Proponents disagree with some of the Examiner's conclusions, the Debtor/Committee/Lender Plan Proponents nevertheless believe that the Settlement strikes a reasonable balance between scenarios the Examiner found more probable, which would result in recoveries substantially less than the Settlement, and the significantly less likely complete victory scenario that would result in a full recovery. The Debtor/Committee/Lender Plan Proponents also agree that the issues are complex and highly dependent on factual and legal matters as to which the outcome at trial is uncertain, and any litigation over such matters would result in significant delays, costs to the estate and potential harm to the Debtors' businesses.

Taking the Examiner's conclusions with respect to Step One and Step Two as a whole, the Debtor/Committee/Lender Plan Proponents believe that the Settlement is fair and reasonable. With respect to Step One, the Examiner identified three principal scenarios for the outcome of the LBO-Related Causes of Action: (i) complete loss, which results in no recovery; (ii) success at Tribune but not guarantor subsidiaries, which results in approximately $197 million to $235 million in litigation recoveries[41]; and

---

[38] The Examiner includes two additional scenarios, Cases 7 and 8, which are variants on the Examiner's Case 3 (step two fraudulent transfer at Tribune and guarantor subsidiaries). Cases 7 and 8 add disgorgement proceeds from actions against Step Two Selling Stockholders. These claims are included in the Preserved Causes of Action under the Debtor/Committee/Lender Plan.

[39] Under the Debtor/Committee/Lender Plan, the General Unsecured Creditors of the Subsidiary Debtors will receive a 100% cash recovery (without Post-petition interest) on their Allowed Claims.

[40] These litigation recovery amounts are derived from the Examiner's recovery scenarios, taking Case 5 (Step One fraudulent transfer at Tribune and Step Two fraudulent transfer at Tribune and guarantor subsidiaries) less the "natural recoveries" in Case 1 (base case-no litigation recoveries) and using assumed high and low intercompany balances, respectively, from an intercompany claims settlement. As reflected in the Intercompany Claims Settlement, the Debtor/Committee/Lender Plan assumes a settlement of Intercompany Claims at the midpoint in the settlement range, between the high and low intercompany balances.

[41] These litigation recovery amounts are derived from the Examiner's recovery scenarios, taking Case 4 (Tribune only fraudulent transfer recoveries at Step One and Step Two) less the "natural recoveries" in Case 1 (base case – no litigation recoveries) and using assumed high and low intercompany balances, respectively, from an

(iii) complete victory at Tribune and guarantor subsidiaries, which results in full recovery. The Examiner concluded that there was more than a 50% chance of a complete loss on the Step One LBO-Related Causes of Action. In so concluding, he analyzed separately each of the arguments that could lead to a finding of a fraudulent transfer at Step One. For instance, the Examiner found that there was no credible evidence that the Tribune Entities entered into the Step One Transactions in order to hinder, delay or defraud creditors. In addition, with respect to the constructive fraudulent transfer claims arising from the Step One Transactions, the Examiner concluded that it was "highly unlikely" (the Examiner's lowest probability) that the Debtors would be found to have been insolvent at the time of the Step One Transactions if the Step One and Step Two Transactions were not collapsed, and the Examiner concluded that it was somewhat unlikely that those transactions should be collapsed for purposes of determining solvency. If the Step One and Step Two Transactions were collapsed, the Examiner found that it was somewhat unlikely that Tribune would be insolvent, although an extremely close call. As for the guarantor subsidiaries, he concluded that they were more likely than the parent to be found solvent assuming collapse of the Step One and Step Two Transactions.

With respect to Step Two, the Examiner concluded that it was highly likely that a plaintiff would prevail on some LBO-Related Causes of Action and reasonably likely that a plaintiff will prevail as to others. However, the Examiner also concluded that a complete victory in these scenarios would only result in an additional $45 million to $53 million in distributable value resulting from litigation recoveries for Holders of Non-LBO Creditor claims[42] unless Senior Lenders were equitably estopped or otherwise barred from sharing in Step Two disgorgement recoveries (a question the Examiner left in "equipoise"). Even in this latter situation, the Examiner concluded that successful disgorgement would only result in approximately $275 million for Non-LBO Creditors.[43]

Further, Senior Lender recoveries are not likely to be materially affected by the Examiner's conclusions regarding potential avoidability of the Step Two Transactions. This is because the Allowed Senior Loan Claims arising from the Step One Transactions exceed the aggregate value that could be distributed from the Estates, and the holders of Senior Loan Claims would share in recoveries from third parties as a result of such avoidance (which recoveries could include nearly $4 billion of proceeds from the Senior Loans distributed to shareholders in connection with the Step Two Transactions), absent a successful argument that equitable estoppel or some similar argument would bar them from sharing in such recoveries. Additionally, consistent with the terms of the Senior Loan Agreement, because all holders of Senior Loan Claims (i.e. Senior Loan Claims arising in connection with the Step One Transactions and Step Two Transactions) share ratably in the distributions from the Debtors, the Senior Lenders as a whole are not materially impacted by the avoidance of the Step Two obligations.

    a.    The Trusts

---

intercompany claims settlement. As noted, the Debtor/Committee/Lender Plan assumes a settlement of Intercompany Claims at the midpoint in the settlement range, between the high and low intercompany balances.

[42] Litigation recovery amounts derived from Examiner's recovery scenarios, taking Examiner's Case 3 (Step Two fraudulent transfer at Tribune and guarantor subsidiaries) less the "natural recoveries" in Case 1 (base case—no litigation recoveries) and assumed high and low intercompany balances, respectively, from an intercompany claims settlement.

[43] The Examiner's Case 3 (Step Two fraudulent transfer at Tribune and guarantor subsidiaries) includes $298 million of net disgorgement proceeds. This amount is based on a gross number of $344 million, comprised of pre-petition principal, interest and fee payments to lenders ($318 million) and advisory fee payments ($25.6 million), from which the Examiner makes deductions for value conferred, collectability risk and costs, resulting in a recovery of $298 million. Removing the advisory fee payments (which are not released under the Debtor/Committee/Lender Plan), and their share of the deductions, results in $275 million in recoveries on the Step Two Disgorgement Claims.

In addition to the $521 million of settlement value described above, the Settlement provides an important additional element of value to Non-LBO Parent Creditors in the form of a preferred share of recoveries from the Trusts. Absent the preferred sharing of Trust recoveries by the Non-LBO Parent Creditors (i.e. if, instead, the Non-LBO Parent creditors shared in Trust recoveries *pari passu* with other Tribune creditors of the same priority) the Non-LBO Parent Creditors would receive less than 20% of Trust recoveries. By contrast, under the Settlement, Non-LBO Parent Creditors will receive the first $90 million in net recoveries from the Trusts and 65% of further net recoveries obtained by the Trusts after repayment of a $20 million loan from the Debtors to fund prosecution of the claims. This additional value further supports the Debtor/Committee/Lender Plan Proponents' view that the Settlement is fair and reasonable.

        b.       Complexity, Expense and Inconvenience of, and Delay From, Litigation.

The Debtor/Committee/Lender Plan takes into account the impact that litigation would be expected to have on the value of the Debtors' Estates. To date, the out-of-pocket cost of these Chapter 11 Cases has been staggering, with the billings for Estate professional fees alone exceeding $135 million through August 2010. Further, the mere fact of being in bankruptcy already has forced the Debtors to forego opportunities that clearly would have enhanced value. Extending the bankruptcy further in order to allow for litigation of the LBO-Related Causes of Action prior to emergence would result in further associated costs and further lost business opportunities.

Moreover, the prosecution of all potential claims relating to the Leveraged ESOP Transactions would only compound these difficulties. Unbounded litigation on all conceivable claims would necessarily expand the scope of such litigation, and with it the costs, complexities, inconvenience and delay attendant thereto. The Debtor/Committee/Lender Plan Proponents submit that the Settlement, embraced by diverse creditor constituencies, embodies a fair and reasonable compromise that will mitigate, to the extent possible, these negative effects.

        c.       Paramount Interest of Creditors.

The Debtor/Committee/Lender Plan Proponents believe the Settlement furthers the paramount interest of all creditors by providing for a reasonable resolution of certain of the LBO-Related Causes of Action and allowing the Debtors to emerge promptly from bankruptcy. At the same time, the Debtor/Committee/Lender Plan preserves for the benefit of the Estates and their creditors valuable claims related to the Leveraged ESOP Transactions, as against the Non-Settling Defendants. In reaching this judgment, the Debtors have considered and balanced all of the factors described above. The Debtors' judgment is shared by a cross-section of the creditor constituencies of the Debtors, including a major component of the Senior Lenders and the Creditors Committee.

In light of each party's view of the litigation uncertainties and the clear and substantial savings in terms of cost and time value of money that will be realized for the estates and ultimately their creditors through a prompt resolution of the issues, the Debtor/Committee/Lender Plan Proponents have concluded that there is an overlap between what the Senior Lenders should be willing to pay and what the Non-LBO Parent creditors should be willing to accept in settlement of the LBO-Related Causes of Action in light of their respective post-investigation views of the merits of the litigation and to minimize cost and delay. The Debtor/Committee/Lender Plan Proponents believe that a fair and reasonable settlement that avoids what could be years of protracted, prohibitively expensive and value destroying litigation will be beneficial to all parties as the best means of preserving and fairly allocating the value of the Estates and thus is the best outcome possible for parties in interest in these cases.

        d.       Releases and Bar Order

The Debtor/Committee/Lender Plan Proponents believe that releases to be provided under the Debtor/Committee/Lender Plan are reasonable and in the best interests of the Estate. The releases are narrowly drawn and do not release any Claims against officers or directors of Tribune, Advisors of Tribune in their capacity as such, or Step Two Selling Stockholders. Although Step One Selling Stockholders receive releases for Step One LBO-Related Causes of Action, the Debtor/Committee/Lender Plan Proponents believe that those releases are in the best interests of the Estate in light of the low likelihood of success of the Claims, as determined by the Examiner, and the litigation and non-litigation costs associated with prosecution of the Claims.

In return for the substantial consideration that would be provided by the Released Parties in connection with the Settlement, the Released Parties desire to obtain full resolution of any claims that might be asserted, with no possibility of being exposed to additional liability on account of claims they have already paid substantial amounts to settle. Such provisions, which are variously known as bar orders or contribution bars, are common in multi-party litigations involving settlements with some parties and not others. The Settlement therefore provides for a bar order forbidding prosecution by a Barred Person against a Released Party of claims sounding in contribution or non-contractual indemnity arising out of or reasonably flowing from the Released Claims or the Preserved Causes of Action. If, after the Effective Date, a claim is brought by the Trusts or another party asserting claims on behalf of the Debtors' estates against a Barred Person and a court determines that the Barred Person would have recovered on a claim for contribution or non-contractual indemnity against a Released Party absent the bar order, the Barred Person would be entitled to a reduction in the judgment against them equal in amount to the Released Party's proportionate share of fault. Absent such a bar order, Released Parties cannot be afforded repose. Barred Persons are not prejudiced since, by virtue of the judgment reduction provision associated with the bar order, any judgment awarded to the Creditors' Trust or Litigation Trust (or any other party asserting a Preserved Cause of Action) would be reduced by the amount of the Released Party's proportionate share of fault.

Creditors are not prejudiced since the bar order simply prevents them from indirectly imposing additional liability on Released Parties on account of claims that Released Parties have paid substantial amounts to settle. The provisions of the bar order do not apply to claims for contractual indemnity, claims for which a court has determined there is no joint liability between a Barred Person and a Released Party, or any claims for contribution or non-contractual indemnity that are asserted with respect to any claims that have not been brought by or on behalf of the Debtors' estates, the Litigation Trust, the Creditors' Trust or any Person asserting a Preserved Cause of Action. To be clear, nothing in the Bar Order precludes the rights of any Barred Person to assert claims, other than Barred Claims, against any Released Party.

        e.      Creditors' Trust and Litigation Trust.

As noted above, the Debtor/Committee/Lender Plan allows for post-confirmation litigation of Preserved Causes of Action potentially worth billions of dollars, including the following:

- Claims to avoid Bridge Loan Claims;

- Claims to recover payments made to shareholders in connection with the Step Two Transactions;

- Claims against officers, directors, and professionals;

- Claims against EGI-TRB LLC and Sam Zell;

- Claims against the Advisors, including Merrill Lynch, Citigroup Global Markets, Inc., and Valuation Research Corporation; and

24

- The Morgan Stanley Claims.

With respect to EGI-TRB LLC and Mr. Zell, the Examiner determined that the alleged claims are unlikely to succeed. All Preserved Causes of Action will be transferred to either the Creditors' Trust or the Litigation Trust which will have full authority to pursue all relevant parties, including lenders (including the Senior Lenders themselves in capacities other than those in which they are released), financial advisors, lawyers, shareholders, directors, and officers.

## E.    The Trusts.

As noted above, the Debtor/Committee/Lender Plan provides that certain causes of action, defined in the Debtor/Committee/Lender Plan as the "Preserved Causes of Action," will be preserved and transferred to either a Litigation Trust or Creditors' Trust, both of which will be established pursuant to the Debtor/Committee/Lender Plan. The Preserved Causes of Action include the following:[44]

- Disclaimed State Law Avoidance Claims (i.e., any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that the Debtors or the Debtors' Estates could assert pursuant to section 544(b) of the Bankruptcy Code against Step Two Selling Stockholders, solely with respect to funds received in their capacities as such; provided, however, that Disclaimed State Law Avoidance Claims shall not include (i) any claims for intentional fraudulent conveyance and (ii) any and all LBO-Related Causes of Action arising under state fraudulent conveyance law set forth in count eighteen of the amended complaint filed by the Creditors' Committee on December [●], 2010 in the lawsuit entitled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC));[45]

- any and all LBO-Related Causes of Action that the Tribune Entities or the Debtors' Estates may have or are entitled to assert on behalf of their respective estates (whether or not asserted) against the Non-Settling Defendants under any provision of the Bankruptcy Code or any applicable nonbankruptcy law including, without limitation, any and all claims under chapter 5 of the Bankruptcy Code;

- Advisor Claims (i.e. any and all LBO-Related Causes of Action against any Person based upon, arising out of, related to, or in connection with such Person's conduct as an advisor);

- Morgan Stanley Claims (i.e. all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, and including any and all rights, claims and actions (including avoidance actions arising under chapter 5 of the Bankruptcy Code) that Tribune or any of its Affiliates may have against MSCS);[46] and

---

[44] The Preserved Causes of Action do not include any claims, causes of action, suits or proceedings that are settled on or prior to the Effective Date.

[45] For the avoidance of doubt, Disclaimed State Law Avoidance Claims shall not include any LBO-Related Causes of Action arising under state fraudulent conveyance law against any Released Parties

[46] As set forth in Section 1.1.142 of the Debtor/Committee/Lender Plan, Morgan Stanley Claims include but are not limited to rights, claims and actions arising from or related to (a) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS, (b) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, and (c) any advisory engagement or potential advisory engagement of, and/or advice given by, or information analyses withheld, MSCS, including but not limited to (i) services provided by MSCS as an Advisor, and (ii) the agreement between Tribune and MSCS dated as of November 30, 2008, regardless of whether such rights, claims and actions may be asserted pursuant to the Bankruptcy Code or

- claims and causes of action against Non-Settling Step Two Payees to the extent such claims or causes of action seek recovery of payments (i) under the Senior Loan Agreement on account of the Incremental Senior Loans or (ii) under the Bridge Loan Agreement, in each case whether based on avoidance and disallowance of Senior Loan Claims or Bridge Loan Claims or any other theory.

The Disclaimed State Law Avoidance Claims (which, together with any proceeds therefrom and any interest and earnings on such proceeds, comprise the Creditors' Trust Assets) will be transferred to the Creditors' Trust in accordance with the procedures set forth in Article XIV of the Debtor/Committee/Lender Plan for the benefit of the Creditor Trust Beneficiaries (i.e. recipients of beneficial interests in the Creditors' Trust). Specifically, on the Effective Date, and subject to section 14.3.1 of the Debtor/Committee/Lender Plan, the Debtors will disclaim all rights to pursue or prosecute the Disclaimed State Law Avoidance Claims such that any and all rights to pursue such Disclaimed State Law Avoidance Claims shall revert to those entities who could have pursued such claims Disclaimed State Law Avoidance Claims prior to the Petition Date.[47] As of the Effective Date, Holders of Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims and PHONES Notes Claims shall be deemed to transfer any Disclaimed State Law Avoidance Claims that they may have to the Creditors' Trust, unless such person has elected to "opt-out" of such assignment in accordance with the procedures approved by the Bankruptcy Court. The remaining Preserved Causes of Action (which, together with any proceeds therefrom and any interest and earnings on such proceeds, comprise the Litigation Trust Assets) will automatically vest in the Litigation Trust on the Effective Date for the benefit of the Litigation Trust Beneficiaries, i.e. those Classes receiving beneficial interest in the Litigation Trust. The Trusts will additionally be funded by a delayed draw term loan in an aggregate principal amount of $20 million to be made by Reorganized Tribune to the Trusts pursuant to the terms of the Trust' Loan Agreement.[48]

The Trusts shall each be managed and operated by a trustee. The duties, responsibilities and powers of the Creditors' Trustee and the Litigation Trustee (collectively, the "Trustees") are described in Section 14.4.2 and Section 13.3.2, respectively, of the Debtor/Committee/Lender Plan. Among other things, the Creditors' Trustee shall be responsible for: (i) prosecuting through judgment and/or settling the Transferred State Law Avoidance Claims and any defense asserted by the Creditors' Trust in connection with any counterclaim or cross claim asserted against the Creditors' Trust; (ii) calculating and making distributions to Creditors' Trust Beneficiaries in accordance with the provisions of the Debtor/Committee/Lender Plan; (ii) filing all required tax returns, and obligations on behalf of the Creditors' Trust; (iv) otherwise administering the Creditors' Trust; and (v) providing quarterly reports to the Creditors' Trust Beneficiaries. The Litigation Trustee shall be responsible for, among other things, (i)

---

any other applicable law. For avoidance of doubt, rights, claims and actions arising from or related to (a)-(c) in the preceding sentence are Preserved Causes of Action and are not released pursuant to this Plan or the Confirmation Order.

[47] In no event shall any Released Claims be disclaimed. In addition, out of an abundance of caution, the Confirmation Order shall provide that the automatic stay is lifted to permit the Creditors' Trustee and other Holders of Claims who have "opted out" of the transfer of Disclaimed State Law Avoidance Claims to the Creditors' Trust pursuant to Section 14.3.1 of the Debtor/Committee/Lender Plan to pursue such Disclaimed State Law Avoidance Claims.

[48] Constructive fraudulent transfer Claims against shareholders arising under state law are being disclaimed by the Debtors as of the Effective Date. Unless they opt out, Holders of such Claims are transferring them to the Creditors' Trust on the Effective Date because all constructive fraudulent transfer Claims against shareholders could be subject to unique defenses under the Bankruptcy Code if such Claims were asserted by or on behalf of the Debtors while the same is not true for intentional fraudulent transfer claims against shareholders which have been asserted by the Creditors' Committee on behalf of the Debtors in the Committee Complaint and will be transferred to the Litigation Trust on the Effective Date.

prosecuting through judgment and/or settling the Litigation Trust Assets and any defense asserted by the Litigation Trust in connection with any counterclaim or cross claim against the Litigation Trust; (ii) calculating and making distributions required under the Debtor/Committee/Lender Plan to be made from the Litigation Trust Assets; (iii) filing all required tax returns, and paying taxes and all other obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (iv) otherwise administering the Litigation Trust; and (v) filing quarterly reports with the Bankruptcy Court and providing annual reports to the Litigation Trust Beneficiaries. The Trustees shall be entitled to receive reasonable compensation for services rendered on behalf of the Trusts on terms to be set forth in the Litigation Trust Agreement and the Creditors' Trust Agreement, as applicable, and may employ various professionals as needed to assist her or him in fulfilling her or his obligations under the Debtor/Committee/Lender Plan. The Creditors' Trust Agreement and the Litigation Trust Agreement will be substantially in the form of Exhibit 14.1 and Exhibit 13.1 to the Debtor/Committee/Lender Plan, respectively, and will be filed with the Plan Supplement.

An advisory board will also be established for each Trust, the initial members of which shall be the members of the Creditors' Committee. The advisory board will have the functions, duties and rights provided in the Creditors' Trust Agreement and the Litigation Trust Agreement, as applicable.

The Trusts will be dissolved no later than five (5) years from the Effective Date. However, the Bankruptcy Court, upon motion by a party in interest, may extend the term of either Trust for a finite period if (i) such extension is necessary to the purpose the Trust, (ii) the Creditors' Trustee or Liquidation Trustee, as applicable, receives an opinion of counsel or a ruling form the IRS stating that such extension would not adversely affect the status of the Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable. Upon dissolution of either Trust, any remaining Cash on hand and other assets in such Trust will be distributed to the appropriate beneficiaries in accordance with the terms of the Creditors' Trust Agreement and Litigation Trust Agreement, as applicable.

**F.      Certain Other Key Plan Provisions.**

1.      Assumption of Executory Contracts and Leases.

Under section 365 of the Bankruptcy Code, the Debtors have the right, subject to Bankruptcy Court approval, to assume or reject executory contracts and unexpired leases to which the Debtors are a party. If a Debtor rejects an executory contract or unexpired lease that it entered into prior to the Petition Date, such contract or lease will be treated as if it were breached by the applicable Debtor(s) on the date immediately preceding the Petition Date, and the other party to the agreement may assert a claim for damages incurred as a result of the rejection, which will be treated as a prepetition unsecured claim pursuant to section 365(g) of the Bankruptcy Code. In the case of the rejection of unemployment agreements and real property leases, damages are subject to certain limitations imposed by sections 365 and 502 of the Bankruptcy Code.

a.      Assumption, Rejection and Cure Obligations.

On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 of the

Debtor/Committee/Lender Plan or is set forth on <u>Exhibit 6.3</u> to the Debtor/Committee/Lender Plan, to be filed with the Plan Supplement, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to Article 6 of the Debtor/Committee/Lender Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of the Debtor/Committee/Lender Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

Subject to the terms of Article VII and Section 6.1.1 of the Debtor/Committee/Lender Plan and except for any Customer Program otherwise designated on <u>Exhibit 6.3</u> to the Debtor/Committee/Lender Plan, all refund and subscriber credit programs or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective as of the Effective Date and the proposed cure amount with respect to each shall be zero dollars. Nothing contained in Section 6.1.2 of the Debtor/Committee/Lender Plan shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person. Except with respect to any Customer Programs included on <u>Exhibit 6.3</u> to the Debtor/Committee/Lender Plan, as a result of the deemed assumption of the Debtors' refund, subscriber credit and other obligations under the Customer Programs to subscribers and former subscribers pursuant to Section 6.1.2 of the Debtor/Committee/Lender Plan, all Proofs of Claim on account of or in respect of any such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court, and the Debtors' Claims Agent shall be authorized as of the Effective Date to expunge such Proofs of Claim from the claims register.

The Debtor/Committee/Lender Plan Proponents have not yet determined how to treat certain insurance policies issued by ACE American Insurance Company and/or its affiliates (collectively, "ACE") to or on behalf of the Debtors and any related agreements (hereinafter, the "<u>ACE Policies and Agreements</u>"), including whether or not such agreements are executory and whether they will be assumed. Subject to the Debtors' rights, if any, to assume or to reject such contracts, nothing contained in this Debtor/Committee/Lender Disclosure Statement, the Debtor/Committee/Lender Plan, the Confirmation Order, any exhibit to the Debtor/Committee/Lender Plan, any Plan Supplement or any other Debtor/Committee/Lender Plan document (including any provision that purports to be peremptory or supervening), shall in any way operate to, or have the effect of, waiving or impairing in any respect the legal, equitable or contractual rights or defenses of the parties to the ACE Policies and Agreements. For the avoidance of doubt, nothing in this Debtor/Committee/Lender Disclosure Statement or in the Debtor/Committee/Lender Plan shall be read to authorize the unilateral amendment by the Debtors of any of the terms of the ACE Policies and Agreements. In any event, ACE has reserved all of its rights and defenses under the ACE Policies and Agreements and applicable non-bankruptcy law with respect to the ACE Policies and Agreements.

b.    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The Bankruptcy Code provides for the calculation of "cure amounts" which may, in some instances, be payable by the Debtors to the non-Debtor party in connection with executory contracts or unexpired leases that are assumed by the Debtors. The proposed cure amount for any executory contract or unexpired lease that is assumed pursuant to the Debtor/Committee/Lender Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court as part of the Plan

28

Supplement or other pleading approved by Angelo Gordon, Oaktree, JPMorgan (collectively, the "Creditor Proponents") and the Debtors.  Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed conditionally assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

        c.      Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 to the Debtor/Committee/Lender Plan shall be rejected pursuant to section 365 of the Bankruptcy Code. Each contract or lease listed on Exhibit 6.3 to the Debtor/Committee/Lender Plan, to be filed with the Plan Supplement, shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.  The Debtors reserve their right to amend Exhibit 6.3 to the Debtor/Committee/Lender Plan to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto.  Listing a contract or lease on Exhibit 6.3 to the Debtor/Committee/Lender Plan shall not constitute an admission by a Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

        d.      Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Debtor/Committee/Lender Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

        2.      Pursuit of Preference Actions.

The Debtors and Creditors' Committee have commenced various preference avoidance actions against third parties and insiders of the Debtors or entered into tolling agreements with various preference defendants extending the applicable statute of limitations for purposes of initiating such preference causes of action as discussed in Article V.G.D. of the General Disclosure Statement.  The Debtor/Committee/ Lender Plan provides that these preference causes of action, along with any proceeds therefrom, will be (i) retained by the Reorganized Debtors to the extent the preference causes of action constitute Ordinary Litigation Claims, and (ii) transferred to the Litigation Trust to the extent the preference causes of action constitute LBO-Related Causes of Action.  Most of the preference actions being pursued by the Creditors' Committee against the Senior Lenders, Bridge Lenders and insiders constitute LBO-Related Causes of Action.  The remainder of the preference actions, some of which are being pursued by the Creditors' Committee but most of which are being pursued by the Debtors, constitute Ordinary Litigation Claims. To the extent any potential preference avoidance action was not commenced as of the Effective Date, or the time to commence such actions was not extended by tolling agreements as of the Effective Date, the Debtor/Committee/Lender Plan does not preserve any such potential causes of action.