3.    Restructuring Transactions.

During the Chapter 11 Cases, the Debtors and their advisors undertook an analysis of the Debtors' corporate structure.  These efforts have focused on, among other things, identifying modifications to the corporate structure that would reduce administrative inefficiencies and expenses, streamline post-emergence tax reporting and facilitate future strategic decision making.  Consistent with the terms of Section 5.2 of the Debtor/Committee/Lender Plan, the Debtors retain the right to implement these initiatives through a Plan Supplement.  Restructuring Transactions may include, among other transactions, (i) converting certain of the Reorganized Debtors into limited liability companies, or merging certain of the Reorganized Debtors into newly formed limited liability companies in jurisdictions where conversion is not available and (ii) consolidating and reallocating certain operations of the Reorganized Debtors within the organizational structure of Reorganized Tribune.

The Debtor/Committee/Lender Plan provides that on or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions.  The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions.  The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors.

The Debtor/Committee/Lender Plan provides that in each case in which the surviving, resulting or acquiring person in any such Restructuring Transaction is a successor to a Debtor or Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Debtor or Reorganized Debtor pursuant to the Debtor/Committee/Lender Plan to pay or otherwise satisfy the Allowed Claims against such Debtor or Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Debtor or Reorganized Debtor will perform such obligations.  Implementation of the Restructuring Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in the Debtor/Committee/Lender Plan.  Exhibit 5.2 to the Debtor/Committee/Lender Plan, which shall be filed with the Plan Supplement, shall set forth the Restructuring Transactions and a detailed description of the actions and steps required to implement each Restructuring Transaction.  On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 5.2 of the Debtor/Committee/Lender Plan.  The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-

party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order. To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC shall have been obtained.

4.      Compensation and Benefit Programs.

With the exception of the Compensation and Benefit Programs described in Article III.C.6– III.C.11 of the General Disclosure Statement (i.e., the Management Equity Incentive Program, the Equity-Based Compensation Provisions of the Incentive Compensation Plan, the Employee Stock Ownership Plan, the Transitional Compensation Plan, the Nonqualified Retirement / Deferred Compensation Plans, and Certain Individual Letter Agreements), the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Debtor/Committee/Lender Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify or terminate any such Employee Benefit Plan either prior to or after the Effective Date.

5.      Intercompany Claims Settlement.

The Debtor/Committee/Lender Plan provides for the settlement and compromise of Intercompany Claims. Intercompany Claims are any pre-Petition Date Claims against any of the Debtors held by another Debtor or non-Debtor Affiliate. The terms of the Intercompany Claims Settlement shall be set forth in Exhibit 1.1.122 to the Debtor/Committee/Lender Plan, which will be filed with the Plan Supplement.

The Debtors expect that the treatment of Intercompany Claims pursuant to the Intercompany Claims Settlement will be substantially similar to that set forth in the intercompany claims analysis provided by the Debtors to the Examiner; however, the Debtors continue to review that analysis and reserve the right to make modifications thereto where it deems appropriate. The Examiner attached the intercompany claims analysis provided by the Debtors to the Examiner's Report as Exhibit 1071 thereto (the "Intercompany Claims Analysis") and noted that no party had challenged the analysis contained therein. A copy of the Intercompany Claims Analysis attached to the Examiner's Report as Exhibit 1071 is attached hereto as Exhibit C. The Intercompany Claims Analysis was based upon the preliminary review of the Intercompany Claims by the Debtors and their financial advisors, and is subject to further modification based upon further review and analysis.

The Intercompany Claims Settlement is limited to pre-Petition Date claims. Post-petition claims against any of the Debtors held by another Debtor or non-Debtor Affiliate involving cash, accounts receivable, accounts payable or other transactions in the ordinary course of business ("Postpetition Intercompany Claims") were addressed in the Final Order (I) Approving Cash Management Systems, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, and (III) Granting Superpriority Expense Status to Postpetition Intercompany Transactions, entered on April 29, 2009 (the "Final Cash Management Order"). The Final Cash Management Order provides that Postpetition Intercompany Claims shall be treated as Administrative Claims for all purposes in these Chapter 11 Cases.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Debtor/Committee/Lender Plan, of the Intercompany Claims Settlement as proposed pursuant to the Debtor/Committee/Lender Plan. The treatment of Intercompany Claims pursuant to the

Intercompany Claims Settlement takes into account the Debtor/Committee/Lender Plan Proponents' views of the appropriate treatment of Intercompany Claims asserted by Tribune against the Debtor Subsidiaries, including the Debtor/Committee/Lender Plan Proponents' view of the proper application of section 7 of the Bridge Loan Guaranty Agreement.

6.   Retiree Claims Settlement.

The Debtor/Committee/Lender Plan will implement a settlement between the Debtors and approximately 200 individuals holding claims arising from Non-Qualified Former Employee Benefit Plans relating to their former employment with various of the Debtors or their predecessors (the "Retiree Claims"). This settlement is embodied in the Stipulation Between Debtors and Retiree Claimants Settling and Allowing Claims (the "Retiree Claimant Settlement Agreement"), which is attached to the Debtor/Committee/Lender Plan as Exhibit 5.15.4.

The majority of the Retiree Claims arise from non-qualified pension claims and deferred compensation claims. The Debtors scheduled the Retiree Claims in an aggregate amount of approximately $82 million. The holders of the Retiree Claims (the "Retiree Claimants") asserted, through individual proofs of claim, an aggregate amount of approximately $113 million on account of the Retiree Claims. The proposed settlement establishes the Allowed amount of each Retiree Claim, with the total Allowed amount of all Retiree Claims being approximately $103 million. The Retiree Claimant Settlement Agreement resolves the disputes between the Debtors and the Retiree Claimants regarding: (i) the discount rates and mortality tables most appropriately applied to those Retiree Claims that are based on future annuity payments; (ii) whether the Retiree Claims for deferred compensation are entitled to interest for the prepetition period of the 2008 calendar year; and (iii) with respect to some of the Retiree Claims, the factual basis for such claims, including whether the claimant was entitled to annuity or other benefit payments, the type of annuity or other benefit, and the specific amounts owed. The Debtors and counsel for the Retiree Claimants worked closely with the Creditors' Committee and a committee of certain Senior Lenders in negotiating the Retiree Claimant Settlement Agreement.

In accordance with the Retiree Claimants Settlement Agreement, each of the Retiree Claims will be Allowed General Unsecured Claims in the "Total Agreed Amount" indicated on Schedule A to the Retiree Claimants Settlement Agreement. To the extent a Retiree Claim is a claim for future annuity payments, that component of the Total Agreed Amount has been calculated pursuant to a formula for determining the present value of future annuity payments and the applicable mortality tables (the "Annuity Formula"). The Annuity Formula utilizes the United States Internal Revenue Code § 417(e) Lump Sum Rates for 2008 plan year payments, with (i) applicable interest rates for 2008 plan year payments determined as of January 1, 2008 with a two-month lookback to the November 2007 segment rates of 4.60%, 4.82% and 4.91%, and (ii) the RP-2000 Healthy mortality table (weighted 50% male and 50% female), using scale AA for (x) seven (7) years from the valuation date for annuitants and (y) fifteen (15) years from the valuation date for non-annuitants. An additional 5.165% of the present value of the future annuity payments (the "Litigation Adjustment") has also been included in the Total Agreed Amounts for those Retiree Claims involving future annuity payments, to represent the compromise, based on the potential cost and outcome of litigating the differences between the discount rates and mortality tables used by the Debtors and those used by the Retiree Claimants. To the extent any Retiree Claim listed on Schedule A to the Retiree Claimants Settlement Agreement is a claim for deferred compensation payments, that component of the Total Agreed Amount has been calculated to include one half of the amount of interest allocable to the prepetition portion of the 2008 calendar year ("Allowed 2008 Deferred Compensation Interest") that the Retiree Claimants argue accrued under the terms of the relevant plans and agreements. Each Total Agreed Amount listed on Schedule A to the Retiree Claimants Settlement Agreement shall constitute an Allowed General Unsecured Claim against the specific Debtor identified on

the same row as such Total Agreed Amount on Schedule A to the Retiree Claimants Settlement Agreement.

Pursuant to the Retiree Claimants Settlement Agreement, the agreed Allowed amounts of the Retiree Claims are conditioned upon confirmation of the Debtor/Committee/Lender Plan, as amended from time to time, or another plan of reorganization, in each case providing for the classification and treatment of the Retiree Claims consistent with their classification and treatment under the Debtor/Committee/Lender Plan.

With respect to claims that are similar in nature to the Retiree Claims but not a part of the Retiree Claimants Settlement Agreement ("Similar Claims"), the Debtors intend to liquidate such Similar Claims consistent with the formulas and principles applicable to the Retiree Claims under the Retiree Claimants Settlement Agreement, including the Annuity Formula, the Allowed 2008 Deferred Compensation Interest, and the Litigation Adjustment. In order to achieve this result, the Debtors will engage in negotiations with holders of Similar Claims and, as necessary, employ the procedures for objecting to claims described in this Specific Disclosure Statement and the Debtor/Committee/Lender Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Debtor/Committee/Lender Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Debtors' Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

7.    Pre-Effective Date Settlement of Estate Claims.

The Debtor/Committee/Lender Plan does not affect the Debtors' ability to settle claims or causes of action that the Debtors or their Estates may have or are entitled to assert prior to confirmation or effectiveness of the Debtor/Committee/Lender Plan. If the Debtors were to settle any such claims or causes of action, the Debtors expect that any order approving such settlement would address the appropriate allocation of the proceeds.

8.    Certain Indemnity and Guaranty Obligations Related to the Chicago Cubs Transactions.

Section 5.8.3 of the Debtor/Committee/Lender Plan provides that the indemnification or guaranty obligations of the Debtors contained in (i) that certain Indemnity Agreement between CSC Holdings, Inc., NMG Holdings, Inc. and Tribune dated July 29, 2008; (ii) that certain Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Credit Agreement Loans (as defined therein) and the Private Placement Notes (as defined therein); and (iii) that certain Subordinated Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Loans (as defined therein) shall continue in full force and effect. The parties to these agreements and the nature and scope of the Debtors' indemnification and guaranty obligations pursuant to these agreement are described in the Motion For Orders Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 (I) Authorizing Tribune Debtors and CNLBC to (A) Enter into and Perform Obligations Under Formation Agreement and Ancillary Agreements, (B) Effect Proposed Business Combination Respecting Cubs-Related Assets, Including Interests in Wrigley Field, Comcast Sports Network, and Related Assets Free and Clear of All Liens, Claims, Rights, Interests and Encumbrances, and (C) Assume and Assign Executory Contracts; (II) Authorizing Debtor Tribune Company to Enter into Guarantees of Debt Financing; (III) Authorizing Debtors WGN Continental Broadcast Company and Tribune Company to Enter Into and Perform Obligations Under Radio and Television Broadcast Agreements; and (IV) Granting Related Relief [Docket No. 2004]. The Order Pursuant to 11 U.S.C. §§

105(a), 363 and 365 (I) Authorizing Debtors and Debtors in Possession to (A) Enter into and Perform Obligations Under Formation Agreement and Ancillary Agreements, (B) Effect Proposed Business Combination Respecting Cubs-Related Assets, Interests in Wrigley Field, Comcast Sports Net, and Related Assets Free and Clear of All Liens, Claims, Rights, Interests and Encumbrances, and (C) Assume and Assign Executory Contracts; (II) Authorizing Debtor Tribune Company to Enter into Guarantees of Debt Financing; (III) Authorizing Debtors WGN Continental Broadcast Company and Tribune Company to Enter Into and Perform Obligations Under Radio and Television Broadcast Agreements; and (IV) Granting Related Relief, which was entered on September 24,2009, requires that these indemnification and guaranty obligations continue to remain in full force and effect [Docket No. 2213].

9.      Senior Lender Holdback.

As a component of the Settlement, except for the Senior Lender Holdback, the Senior Loan Agent shall not hold back, withhold, keep, reserve, recoup, setoff against, delay delivery of, or refuse to deliver any distributions payable to the Holders of Senior Loan Claims at any time for any reason whatsoever. All other rights of JPMorgan and the Senior Lenders under the Senior Loan Agreement or otherwise are expressly preserved as described in Section 7.3 of the Debtor/Committee/Lender Plan.  JPMorgan shall be irrevocably entitled to utilize the Senior Lender Holdback as described in Section 7.3 of the Debtor/Committee/Lender Plan and shall ultimately distribute any unused portion of the Senior Lender Holdback to the Holders of Senior Loan Claims in accordance with the provisions of the Senior Loan Agreement in accordance with Section 7.3 of the Debtor/Committee/Lender Plan.  JPMorgan's fees and expenses incurred from the Petition Date through the Effective Date will be Reimbursed on the Effective Date in accordance with Section 9.1 of the Debtor/Committee/Lender Plan and not from the Senior Lender Holdback.

10.     Injunctions, Releases and Discharge.

a.      Discharge

Except as otherwise provided in the Debtor/Committee/Lender Plan, the confirmation of the Debtor/Committee/Lender Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective date and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors.  As of the Effective Date, except as otherwise provided in the Debtor/Committee/Lender Plan, all Persons are precluded and enjoined from asserting against the Debtors or the Reorganized Debtors or their property any Claims, causes of action or Interests based upon any prepetition act, omission, transaction or activity, and all Persons holding discharged Claims or terminated equity Interests are permanently enjoined from pursuing any judicial or non judicial enforcement actions or other proceedings of any kind  against the Debtors, Reorganized Debtors or their property on account of such discharged Claims or terminated Interests.

b.      Releases

i).     Debtor Released Claims

The Debtor/Committee/Lender Plan provides for the release on the Effective Date of estate claims and causes of action against a limited number of "Released Parties".  Specifically, except for the Preserved Causes of Action (i.e. (i) LBO-Related Causes of Action against Non-Settling Defendants, (ii) Advisor Claims, (iii) Morgan Stanley Claims, (iv) objections, claims and causes of action for avoidance and disallowance of Bridge Loan Claims and Bridge Loan Guaranty Claims, (v) claims and causes of action against Non-Settling Step Two Payees for the recovery of prepetition payments on account of

Incremental Senior Loans or under the Bridge Loan Agreement and (vi) Disclaimed State Law Avoidance Claims) and as otherwise specified in the Debtor/Committee/Lender Plan, the Reorganized Debtors and any Person seeking to exercise rights of the Debtors' shall, on the Effective Date release, and cause the Subsidiary Non-Debtors to release, the Released Parties from all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities of any nature, including the LBO-Related Causes of Action based upon any pre-Effective Date act, omission, transaction event or occurrence in connection with the Debtors, their property, Estates, Chapter 11 Cases, Debtor/Committee/Lender Plan, the Disclosure Statement or Restructuring Transactions.[49] The Released Parties are (a) the Debtors, non-Debtor affiliates (including Subsidiary Non-Debtors), the Reorganized Debtors; (b) the current and former Senior Lenders in all capacities except their capacities, if any, as (i) Step Two Selling Stockholders, (ii) Non-Settling Step Two Payees, and (iii) Advisors; (c) the Settling Step Two Payees in all capacities except their capacities, if any, as (i) Step Two Selling Stockholders, (ii) Advisors, and (iii) Bridge Lenders; (d) each of the following, solely in their capacities as such; (i) the Creditors' Committee, (ii) the present and former members of the Creditors' Committee, (iii) the Senior Loan Agent and the Former Bridge Loan Agent, (iv) the Step One Selling Stockholders, (v) the Released Step Two Stockholder Parties, (vi) the Proponents; and (e) Related Persons to each of the foregoing parties to the extent provided in the Debtor/Committee/Lender Plan.

      ii).    Holder Released Claims.

      The Debtor/Committee/Lender Plan also provides for consensual releases on the Effective Date of the Released Parties by Persons who elect to provide such releases, of all pre-Effective Date claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, and liabilities of any nature, including the LBO-Related Causes of Action, in connection with the Debtors, their assets, property, Estates, Chapter 11 Cases, Debtor/Committee/Lender Plan, Disclosure Statement or Restructuring Transactions ("Holder Released Claims"). Specifically, except as otherwise provided in the Debtor/Committee/Lender Plan or Confirmation Order, on the Effective Date, each Holder of a Claim or Interest that (a) has voted to accept the Debtor/Committee/Lender Plan and has not opted out of granting the releases, (b) has voted to reject the Debtor/Committee/Lender Plan but has opted to grant the releases, (c) is deemed to accept the Debtor/Committee/Lender Plan and has been provided an opportunity but has not opted out of granting the releases, or (d) otherwise agrees to provide the releases shall be deemed to have released each of the Released Parties from the Holder Released Claims. The consensual release of Holder Released Claims shall not be construed as a release of the Preserved Causes of Action or any Claims against non-Debtors arising under ERISA held by the DOL.[50] Any Holder of a Claim or Interest opting not to grant the releases of Holder Released Claims shall not receive the benefit of the releases of Holder Released Claims, even if otherwise entitled to the benefit of such release. Further, subject to Section 11.2.2 of the Debtor/Committee/Lender Plan, the provisions of the Debtor/Committee/Lender Plan shall not be deemed to release any claims or causes of action that a non-Debtor creditor may have against another non-Debtor creditor that are not property of the Debtors' Estates or could not be brought by or on behalf of the Debtors' Estates, the Litigation Trust or the Creditors' Trust.[51]

---

[49] With the exception of the Released LBO-Related Causes of Action, Section 11.2.1 of the Debtor/Committee/ Lender Plan does not release any party from liability to the Debtors and the Estates for actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order.

[50] The Debtor/Committee/Lender Plan does not release claims arising under ERISA that are held or assertable by any participant, beneficiary, or fiduciary of the applicable ERISA plan against non-Debtor ERISA plan fiduciaries.

[51] To the extent that the claims asserted by the SOCAL Parties in the SOCAL Action do not constitute property of the Debtors' estates, such claims shall not be affected by the releases set forth in Section 11.2.1 of the Debtor/Committee/Lender Plan, by the releases set forth in Section 11.2.2 of the Debtor/Committee/Lender Plan, or the related injunction set forth in Section 11.2.4 of the Debtor/Committee/Lender Plan to the extent that the

iii).    Release of Guarantor Non-Debtors from Senior Guaranty Claims and Bridge
Loan Guaranty Claims.

All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of the Senior Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Guaranty Claims and Bridge Loan Guaranty Claims; provided, however, that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of the Debtor/Committee/Lender Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Creditor Proponents, as of the Effective Date, of each of the Holders of Senior Guaranty Claims and the Senior Loan Agents of and from any and all Debtor Released Claims, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of the Settlement Plan. Pursuant to Bankruptcy Rule 9019 and/or 11 U.S.C. § 1123(b)(3), the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Guarantor Non-Debtor Release and adequate factual findings that the Guarantor Non-Debtor Release is: (i) fair, equitable and reasonable; (ii) necessary and essential to the Debtors' successful reorganization; (iii) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors and the Agents; (iv) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (v) consistent with public policy and due process principles. Notwithstanding the foregoing, in the event that the Guarantor Non-Debtor Release set forth in Section 11.2.5 of the Debtor/Committee/Lender Plan does not become effective for any reason whatsoever, all Senior Guaranty Claims against the Guarantor Non-Debtors and any and all rights of subordination in respect of the Bridge Loan Guaranty Agreement shall and shall be deemed to have been assigned and transferred as of the Effective Date by the Senior Lenders and the Senior Loan Agent to the Senior Guaranty Claim Assignee.

c.    Non-Release of Certain Defined Benefit Plans.

Notwithstanding anything to the contrary in the Debtor/Committee/Lender Plan, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under the ERISA) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Settlement Plan (including Section 11.2 of the Debtor/Committee/Lender Plan), the entry of the Confirmation Order or the Chapter 11 Cases. Notwithstanding anything to the contrary in the Debtor/Committee/Lender Plan, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the ERISA, the controlled group members.

---

SOCAL Parties have not elected to grant (or receive) the releases set forth in Section 11.2.2 of the Debtor/Committee/Lender Plan pursuant to clauses (a), (b) or (c) thereof. All rights of the Step Two Arrangers and all other parties against the SOCAL Parties, with respect to the SOCAL Action and otherwise, are preserved.

    d.    Injunctions.

    i).    Injunction Related to Releases

Except as provided in the Debtor/Committee/Lender Plan or Confirmation Order, as of the Effective Date all Persons holding a Released Claim are permanently enjoined from pursuing, on account of or based on the Released Claims, any judicial or non judicial enforcement actions or other actions or proceedings of any kind against the Released Parties or their property.

    e.    Bar Order.

The Debtor/Committee/Lender Plan contains a bar order that is described in detail in Section II.D.2.d., *supra*.

    f.    Exculpation.

The Debtor/Committee/Lender Plan provides that, to the fullest extent permitted by law, none of the Debtor/Committee/Lender Plan Proponents (including without limitation the Special Committee of Tribune's Board of Directors formed during the Chapter 11 Cases), none of the current or former members of the Creditors' Committee, in their capacities as such, and none of the respective Related Persons to any of the foregoing, shall have any liability to any person or entity for acts or omissions in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including the Debtor/Committee/Lender Plan, pursuit of confirmation or implementation of any plans of reorganization, including the Debtor/Committee/Lender Plan, the property to be distributed under the Debtor/Committee/Lender Plan, the Disclosure Statement, Restructuring Transactions, Plan Supplement, releases and injunctions under the Debtor/Committee/Lender Plan or the management or operation of the Debtors (except for liability resulting from willful misconduct or gross negligence as determined by a Final Order). The exculpation set forth in Section 11.5 of the Debtor/Committee/Lender Plan only relates to acts, omissions, and circumstances occurring on or after the Petition Date.

    g.    Corporation Indemnities/Insurance.

For purposes of the Debtor/Committee/Lender Plan, the indemnification or reimbursement obligations of Tribune and the other Debtors to any Persons who are or were directors, officers or employees of the Debtor on or after the Petition Date against and for any obligations, pursuant to corporate governance documents, laws or regulations, agreements or any combination of the foregoing, but excluding any obligations of Tribune and the other Debtors to any Person in respect of indemnification or reimbursement in connection with any LBO-Related Causes of Action arising prior to the Petition Date, shall survive confirmation of the Debtor/Committee/Lender Plan. In accordance with the Order Authorizing Tribune Company to Purchase Tail Coverage Respecting the Debtors' Existing Directors and Officers and Fiduciary Liability Insurance Policies [Docket No. 3190], the Debtors may in their discretion purchase "Tail Coverage" as defined in motion with respect to such Order.

## G.    Issuance and Distribution of New Securities and Related FCC Matters.

Certain of the Debtors' business operations are subject to regulation by the Federal Communications Commission (the "FCC") under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, as amended (the "Communications Act"). Television and radio stations may not operate in the United States without the authorization of the FCC; and FCC approval is required for the issuance,

renewal, transfer, and assignment of station operating licenses. The FCC also regulates the multiple and combined ownership of television and radio broadcast stations as well as the cross-ownership of broadcast stations and newspapers in the same market. Because the Debtors' operations include newspapers, television stations, and a radio station, the Debtor/Committee/Lender Plan must comply with certain FCC-related multiple and cross-ownership requirements and restrictions. The Debtor/Committee/Lender Plan must also comply with limitations on foreign ownership and foreign voting rights of broadcast licensees administered by the FCC.

Both the Debtors' commencement of the Chapter 11 Cases and their emergence from bankruptcy require the consent of the FCC. The FCC previously granted consent for the assignment of the Debtors' FCC licenses from the Debtors to the Debtors as "debtors-in-possession" under chapter 11 of the Bankruptcy Code. For the Reorganized Debtors to continue the operation of the Debtors' broadcast stations, the Debtors filed applications with the FCC (the "FCC Applications") to obtain prior approval of the FCC for the assignment of the FCC licenses from the Debtors as "debtors-in-possession" to the Reorganized Debtors (the "FCC Approval").

     1.     Issuance of New Securities.

On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Debtor/Committee/Lender Plan without further act or action under applicable law, regulation, order or rule. Except as otherwise provided in the Debtor/Committee/Lender Plan, including as specifically provided in Section 5.4.2 of the Debtor/Committee/Lender Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Debtor/Committee/Lender Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtor/Committee/Lender Plan Proponents of its desire to receive instead such New Class B Common Stock by the date announced by the Debtor/Committee/Lender Plan Proponents in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing. The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) to the Debtor/Committee/Lender Plan, which shall be filed with the Plan Supplement, sets forth the rights and preferences of the New Common Stock. The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock. To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares. The New Warrant Agreement substantially in the form of Exhibit 1.1.154 to the Debtor/Committee/Lender Plan, which shall be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants. The issuance of the New Common Stock and the New Warrants and the distribution thereof under the Debtor/Committee/Lender Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Debtor/Committee/Lender Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

     2.     Distribution of New Common Stock and New Warrants.

If the Effective Date occurs, on the Effective Date Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Debtor/Committee/Lender Plan without further act or action under applicable law, regulation, order or rule. The Debtor/Committee/Lender Plan authorizes the Debtors to issue two classes of New Common Stock: New Class A Common Stock and New Class B Common Stock. New Class A Common stock will have voting rights consistent with standard voting common stock. New Class B Common Stock will have more limited voting rights and is designed to be non-attributable under the FCC's rules.

Specifically, holders of New Class B Common Stock will be entitled to vote as a separate class on any amendment, repeal, or modification of any provision of the Restated Certificate of Incorporation for Reorganized Tribune that adversely affects the rights of the New Class B Common Stock in a manner different from the rights of the New Class A Common Stock. In addition, the holders of New Class B Common Stock will be entitled to vote together with holders of the New Class A Common Stock on the following non-ordinary course transactions to the extent that these matters are submitted to a vote of the holders of New Class A Common Stock: (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the New Class A Common Stock or New Class B Common Stock as to dividends or liquidation preference, including with respect to an increase in the number of New Class A Common Stock or New Class B Common Stock; (ii) any amendment to the Restated Certificate of Incorporation or the Bylaws of Reorganized Tribune; (iii) any amendment to any stockholders or comparable agreement; (iv) any sale, lease, or other disposition of all or substantially all of the assets of Reorganized Tribune through one or more transactions; (v) any recapitalization, reorganization, share exchange, consolidation or merger of Reorganized Tribune or its capital stock; (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Tribune, including any stock option or stock incentive plan; (vii) any redemption, purchase or other acquisition by Reorganized Tribune of any of its capital stock (except for purchases from employees upon termination of employment); and (viii) any liquidation, dissolution, distribution of assets or winding-up of Reorganized Tribune.

Each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Debtor/Committee/Lender Plan will be required to demonstrate to the Debtors' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Debtor/Committee/Lender Plan. Applicable FCC ownership requirements and restrictions, which are discussed in more detail below, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons.

3.    FCC Matters.

In order for certain combinations of the existing broadcasting and newspaper assets of the Debtors to continue to be held by Reorganized Tribune under the Debtor/Committee/Lender Plan, waivers of certain FCC broadcast multiple and cross-ownership rules must be obtained. Specifically, the Debtors will need to obtain waivers of the FCC's newspaper/broadcast cross-ownership rule and local television ownership or "duopoly" rule.[52] In addition, there are specific FCC-related ownership restrictions and

---

[52] The Debtors will not request any waivers in or regarding the FCC Applications, however, to accommodate separate media interests held by prospective stockholders independent of their interest in the Debtors. Instead, any prospective stockholders that might need independent waivers will receive New Class B Common Stock (or New Warrants) such that waivers are no longer necessary.

requirements for equity holders of entities that hold FCC broadcast licenses.  Applicable FCC ownership requirements and restrictions, which are discussed in more detail below, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons.

**THE FOLLOWING SUMMARY OF CERTAIN FCC RULES AND POLICIES IS FOR INFORMATION PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO FCC OWNERSHIP ISSUES AND OTHER CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN.**

        a.      FCC Media Ownership and Cross Ownership Rules.

Certain multiple ownership and cross-ownership rules promulgated by the FCC prohibit common ownership of "attributable interests" in certain combinations of broadcast and other media properties. The following is a summary of the FCC's principal policies on identifying and assessing "attributable interests" in media outlets. "Attributable interests" generally include the following interests in a media company: general partnership interests or managing membership interests in a limited liability company, non-insulated limited partnership or limited liability company interests, positions as an officer or director (or the right to appoint officers or directors), five percent (5%) or greater direct or indirect interests in the voting stock of a corporation, time brokerage agreements between same-market radio or television stations, joint sales agreements between same-market radio broadcast stations, and certain significant investment interests coupled with some same-market media interests or significant programming arrangements.

Attribution traces through chains of ownership.  In general, an individual or entity that has an attributable interest in another entity will also be deemed to hold each of that entity's attributable media interests.  In addition, the FCC treats all partnership interests as attributable, except for those limited partnership interests that are "insulated" by the terms of the limited partnership agreement from "material involvement" in the media-related activities of the partnership.  The FCC applies the same attribution and insulation standards to limited liability companies and other new business forms.

Currently, a minority stockholder in a media corporation with a single majority stockholder (i.e., a single holder of more than fifty percent (50%) of the outstanding voting power of the corporation) is not deemed to hold an attributable interest in that corporation or its media outlets based on the ownership of a minority voting stock interest of five percent (5%) or more.  The FCC is considering whether or not to retain the single majority stockholder exemption in a pending rulemaking proceeding.

Combinations of direct and indirect equity and debt interests exceeding thirty-three percent (33%) of the total asset value (equity plus debt) of a media outlet may be deemed attributable if the holder has another attributable broadcast or daily newspaper interest in the same market or provides more than fifteen percent (15%) of the programming to the broadcast station in which the interest is held.  Also, a person or entity that provides more than fifteen percent (15%) of the weekly programming for a television or radio station and has an attributable interest in another television or radio station in the same market is deemed to hold an attributable interest in the station to which it provides programming.

The FCC's broadcast multiple ownership and cross-ownership rules limit certain combinations of attributable interests in television broadcast stations and radio broadcast stations, and its cross-ownership rules restrict the ownership in the same market of attributable interests in (i) combinations of radio

stations and television stations and (ii) combinations of radio or television stations with daily newspapers of general circulation. The FCC regards an entity with an "attributable interest" in a media outlet as an "owner" of that media outlet for purposes of applying these rules. Thus, prospective stockholders that may hold five percent (5%) or more of the New Class A Common Stock of Reorganized Tribune or persons who are officers or directors of Reorganized Tribune will need to assess (a) what attributable interests they may hold in daily newspapers of general circulation or other radio or television licensees and (b) whether the attributable media interests that they hold would conflict with their holding attributable interests in the daily newspapers or broadcast licensees of the Reorganized Debtors.

As explained in more detail below, the permissibility of particular combinations of attributable media interests may depend upon market size and other market characteristics. Generally, the FCC's media ownership rules place limits on (i) same-market ownership of broadcast stations and a daily newspaper of general circulation published in the market's dominant language; (ii) local television station ownership; (iii) local radio station ownership; (iv) same-market ownership of television and radio stations; and (v) nationwide television station ownership. The FCC has pending proceedings to revise some of these rules and to adopt new rules, and the FCC's broadcast ownership rules are being challenged in the courts. No waivers will be sought and no special showings will be submitted to accommodate separate media interests of prospective stockholders independent of their interests in the Reorganized Debtors. Certain rules that could give rise to a prohibited combination for a prospective stockholder of Reorganized Tribune include the following:

- Newspaper/Broadcast Cross-Ownership Rule. The FCC generally prohibits the cross-ownership of a daily newspaper and either a television or radio broadcast station in the same market, absent a waiver. In a decision dated December 18, 2007 (the "2008 Order"), the FCC adopted modified waiver standards; however, those changes are the subject of a pending appeal to the Third Circuit. In March 2010, the Third Circuit lifted the stay it had issued in September 2003 in connection with its review of the FCC's changes to its media ownership rules and allowed the 2008 Order to become effective. Under the 2008 Order, a daily newspaper is one that is published at least four days per week in the dominant language of the market and which is circulated generally in the community of publication. The revised waiver standards adopted in the 2008 Order presumptively allow the ownership of attributable interests in a broadcast station and a daily newspaper of general circulation that is published in the market served by the broadcast station only when (i) the market at issue is one of the 20 largest "Designated Market Areas" or "DMAs" as determined by the Nielsen television ratings service; (ii) the combination involves only one daily newspaper and only one radio or television station; and (iii) if the combination involves a television station, (a) at least eight independently-owned and operating major newspapers and/or full-power television stations would remain in the DMA and (b) the television station is not among the top four ranked stations in the DMA. The FCC also presumptively permits cross-ownership if either the newspaper or the broadcast station is deemed "failed" or "failing" under FCC standards or if the proposed cross-ownership would result in a new source of local television news totaling at least seven hours per week. All other newspaper/broadcast combinations are presumed not to be in the public interest; however, that presumption can be overcome if the parties can demonstrate that, post-merger, the cross-owned entity would increase the diversity of independent news outlets and increase competition among independent news sources in the relevant market.

- Local Television Station Ownership Rule (Duopoly Rule). Under the local television ownership rule (often called the "duopoly rule"), a single entity may have attributable interests in two television stations in the same DMA if (i) the two stations do not have overlapping service areas, or (ii) notwithstanding the combination there are at least eight

independently owned and operating full-power commercial and non-commercial television stations serving the DMA and at least one of the combining stations is not ranked among the top four stations in the DMA. In addition, if any entity with an attributable interest in a television station provides more than fifteen percent (15%) of the programming of another station in the same market pursuant to a time brokerage or local marketing agreement, then for purposes of applying this rule, the entity will be deemed to hold an attributable interest in the station to which it provides programming. The FCC has initiated a rule making proceeding to determine whether it should treat television joint sales agreements as attributable interests under its ownership rules and, if so, whether it should use a standard comparable to the one in effect for radio joint sales agreements, under which the FCC treats joint sales agreements as attributable if they cover fifteen percent (15%) or more of the brokered station's weekly commercial time. The FCC's duopoly rule and policies regarding ownership of television stations in the same market apply only to full-power television stations and not to television satellite stations, Class A or low power television stations, or television translator stations.

- Local Radio Station Ownership Rule. The FCC's local radio multiple ownership rule limits the number of radio stations in which one entity may hold an attributable interest in a local geographic market. In determining the size of a market, the rules consider both commercial and non-commercial stations and use a definition of a local radio market based on Arbitron "Metro" markets and, when there is no defined Arbitron market, a definition based upon the composite service contours of commonly owned stations with overlapping service areas. These limits are as follows: In a radio market with 45 or more radio stations, a party may hold an attributable interest in up to eight radio stations, not more than five of which are in the same broadcast service (AM or FM); in a radio market with between 30 and 44 radio stations, a party may hold an attributable interest in up to seven radio stations, not more than four of which are in the same broadcast service; in a radio market with between 15 and 29 radio stations, a party may hold an attributable interest in up to six radio stations, not more than four of which are in the same broadcast service; and in a radio market with 14 or fewer radio stations, a party may hold an attributable interest in up to five radio stations, not more than three of which are in the same broadcast service, except that a party may not hold an attributable interest in more than fifty percent (50%) of the stations in the market.

- Radio/Television Station Cross-Ownership Rule. The FCC's radio/television cross-ownership rule permits the common attributable ownership of more than one full-power AM and/or FM radio station and up to two television stations in the same market. The total number of radio stations permitted to be under common attributable ownership depends on the number of independently-owned media voices in the local market as follows: (i) in markets with at least 20 independently owned media voices, a single entity may hold attributable interests in up to two television stations and six radio stations. Alternatively, such an entity may hold an attributable interest in one television station and seven radio stations in the same market; (ii) in a market that includes at least ten independently-owned media voices, a single entity may hold attributable interests in up to two television stations and up to four radio stations; and (iii) regardless of the number of independently-owned media voices in a market, a single entity may hold an attributable interest in up to two television stations and one radio station in any market. Under all of these scenarios, the requirements of the local television and local radio ownership rules also must be met.

- National Television Station Ownership Rule. By statute, one party may hold attributable interests in television stations that reach, in the aggregate, no more than thirty-nine percent (39%) of all United States television households. The corresponding FCC rule on national television ownership limits provides that, when calculating a television station's nationwide

aggregate audience, all UHF stations are considered to serve only fifty percent (50%) of the households in their DMA and all VHF stations are considered to serve all households in their DMA, including households that cannot naturally receive such a VHF station over the air. The FCC currently is considering whether to initiate a proceeding to modify or abolish this so-called UHF discount in light of the changes resulting from the transition to digital television broadcasting. If a broadcast licensee has an attributable interest in a second television station in a market, whether by virtue of ownership, a time brokerage agreement or a parent-satellite operation, the audience for that market will not be counted twice for purposes of determining compliance with the national cap.

      b.      Issuance of New Class B Common Stock to Ensure Compliance with FCC Media Ownership and Cross-Ownership Rules

In processing the FCC Applications, the FCC will consider, among other things, whether the prospective licensees and those considered to be "parties" to the applications possess the legal, character, and other qualifications to hold an interest in a broadcast station. The FCC Applications require the Debtors to include information about the Reorganized Debtors and the "parties" to the FCC Applications – including certain of the proposed stockholders of the Reorganized Debtors – sufficient for the FCC to grant its consent to the transactions contemplated by the Debtor/Committee/Lender Plan. Prospective stockholders of the Reorganized Debtors, including those under common ownership or control, that would hold or control five percent (5%) or more of the New Class A Common Stock in Reorganized Tribune under the Debtor/Committee/Lender Plan will be parties to the FCC Applications and required to report certain information for FCC regulatory purposes. Specifically, each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Debtor/Committee/Lender Plan will be required to demonstrate to the Debtor/Committee/Lender Plan Proponents' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Debtor/Committee/Lender Plan.

To be eligible to receive five percent (5%) or more of the New Class A Common Stock, a Claim Holder will be required to submit a Media Ownership Certification that provides information about the Holder and its affiliates to establish that the issuance of New Class A Common Stock to that Holder would not result in a violation of law, impair the qualifications of the Reorganized Debtors to hold FCC broadcast licenses, or impede the grant of any FCC Applications on behalf of the Reorganized Debtors. In general, the information provided in the Media Ownership Certifications will enable the Debtors to establish that prospective "parties" to the FCC Applications (i) have the requisite "character" qualifications required by the FCC and (ii) do not hold media interests that, together with their prospective interest in the Reorganized Debtors, would create an unlawful media combination under the FCC's rules. Specifically, to be eligible to receive five percent (5%) or more of New Class A Common Stock, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Debtor/Committee/Lender Plan will be required to provide a Media Ownership Certification by the deadline established by the Bankruptcy Court or to the reasonable satisfaction of the Debtor/Committee/Lender Plan Proponents, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder. Such Holders will also be required to certify to and inform the Debtor/Committee/Lender Plan Proponents of any changes in the information provided in their Media Ownership Certifications between the submission of the certification and the Effective Date by executing an amended Media Ownership Certification. Any such Holder that fails to provide the Media Ownership Certification by the deadline established by the Bankruptcy Court, or that does not do so to the reasonable satisfaction of the Debtor/Committee/Lender Plan Proponents, may be allocated New Class B Common Stock in lieu of New Class A Common Stock at the

Debtor/Committee/Lender Plan Proponents' discretion; provided, however, that to the extent a Creditor Proponent has been approved by the FCC as a party to the FCC Applications, Reorganized Tribune shall not be entitled to issue shares of New Class B Common Stock to such Creditor Proponent at emergence without its express consent unless the issuance of Class A Common Stock to a Creditor Proponent would result in a violation of the Communications Act or the FCC's rules or unless such Creditor Proponent has failed to comply with or satisfy any conditions imposed by the FCC as part of the FCC Approval or any commitment made in the FCC Applications, in which case Reorganized Tribune may issue shares of New Class B Common Stock to such Creditor Proponent only to the minimum extent necessary to cure or avoid such violation or non-compliance. Notwithstanding the foregoing, the Debtors will not request any waivers under the Communications Act or the FCC's rules in or regarding the FCC Applications to accommodate separate media interests held by a Creditor Proponent independent of the interest in Reorganized Tribune. Specifically, Reorganized Tribune in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock if the Debtor/Committee/Lender Plan Proponents determine, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with applicable provisions of the Debtor/Committee/Lender Plan), that such Holder may have other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to the Debtor/Committee/Lender Plan. Except as otherwise provided in the Debtor/Committee/Lender Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Debtor/Committee/Lender Plan Proponents of its intent to receive such New Class B Common Stock by the date announced by the Debtor/Committee/Lender Plan Proponents in a filing with the Bankruptcy Court and that will be no earlier than the first day of the Confirmation Hearing.

          c.      Limitations on Foreign Ownership or Control of Broadcast Licensees.

Section 310(b) of the Communications Act restricts, among other things, foreign ownership or control of FCC broadcast licenses. Foreign entities may not have direct or indirect ownership or voting rights of more than twenty-five percent (25%) in a corporation controlling the licensee of a broadcast station if the FCC finds that the public interest will be served by the refusal or revocation of such a license due to such foreign ownership or voting rights. The FCC has interpreted this provision to mean that the agency must make an affirmative public interest finding before it will permit the twenty-five percent (25%) foreign ownership cap to be exceeded. With very few exceptions, the FCC has not made such an affirmative finding in connection with the assignment of a broadcast license; the provision, therefore, generally serves as a prohibition on foreign ownership or voting interests exceeding twenty-five percent (25%). In assessing compliance with the twenty-five percent (25%) foreign ownership limitation, the FCC calculates the voting rights separately from the equity ownership percentage, and the twenty-five percent (25%) ceiling must be met for both. Warrants and other future interests typically are not counted by the FCC toward the foreign ownership ceiling unless and until converted. The FCC historically has treated partnerships with foreign partners as foreign controlled if any general partner is foreign, or if any foreign limited partner is not adequately insulated (using FCC criteria) from material involvement in the partnership's media activities and business. In a few specific circumstances, the FCC also has treated certain economic interests in a company other than direct equity interests as "ownership" for purposes of its foreign ownership determination. The FCC uses a "multiplier" to determine the ownership interest of each entity in the chain of ownership in cases of indirect ownership, such as a situation in which there are layers of investment short of control between the entity to be acquired and the licensee.

     d.     Issuance of a Combination of New Common Stock and New Warrants to Ensure Compliance with Applicable Limitations on Foreign Ownership and Control of Broadcast Licensees.

Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Debtor/Committee/Lender Plan will be required (i) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (ii) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of the Debtors, confirm the absence of any changes. Any such Holder that fails to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, that fails to provide an amended Foreign Ownership Certification if one is required, that does not provide a Foreign Ownership Certification that is reasonably satisfactory to the Debtor/Committee/Lender Plan Proponents or that fails to provide a timely confirmation, if required, that its foreign ownership and voting rights percentages have not changed may be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants.

Any Holder of a Claim that is eligible to receive New Common Stock under the Debtor/Committee/Lender Plan that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with the applicable provisions of the Debtor/Committee/Lender Plan), is or is deemed pursuant to the applicable provisions of the Debtor/Committee/Lender Plan to be, more than twenty-five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to Section 310(b) of the Communications Act, shall receive New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock based on an allocation mechanism that is to be determined. The allocation mechanism shall ensure, based on the aggregated results of the Foreign Ownership Certifications, the compliance of Reorganized Tribune with Section 310(b) of the Communications Act.

**HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE DEBTOR/COMMITTEE/LENDER PLAN THAT ARE REQUIRED TO EXECUTE MEDIA OWNERSHIP CERTIFICATIONS MUST COMPLETE AND RETURN A MEDIA OWNERSHIP CERTIFICATION PRIOR TO THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. ALL HOLDERS OF CLAIMS ELIGIBLE TO RECEIVE NEW COMMON STOCK UNDER THE DEBTOR/COMMITTEE/LENDER PLAN MUST COMPLETE AND RETURN A FOREIGN OWNERSHIP CERTIFICATION BY THE DEADLINE ESTABLISHED BY THE BANKRUPTCY COURT AND SUPPLEMENT SUCH CERTIFICATIONS AS AND WHEN REQUIRED. ALL SUCH HOLDERS ARE ENCOURAGED TO CONSULT THEIR OWN ADVISORS CONCERNING THE COMPLETION OF THE MEDIA OWNERSHIP CERTIFICATION AND FOREIGN OWNERSHIP CERTIFICATION AND THEIR TREATMENT UNDER THE DEBTOR/COMMITTEE/LENDER PLAN.**

**III.    DESCRIPTION OF DEBT AND NEW CAPITAL STRUCTURE OF THE DEBTORS**

    **A.    New Senior Secured Term Loan Agreement.**

Section 5.6 of the Debtor/Committee/Lender Plan provides that on the Effective Date, if the Creditor Proponents and the Debtors have not elected to have the Reorganized Debtors replace the New Senior Secured Term Loan in its entirety with distributions of Cash (a) Reorganized Tribune, as borrower, (b) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the

Restructuring Transactions, but excluding any entities identified by the Creditor Proponents in consultation with the Debtors) as guarantors, (c) the administrative agent party thereto, and (d) the Holders of Claims receiving a distribution of the New Senior Secured Term Loan under the Debtor/Committee/Lender Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement. If issued, the New Senior Secured Term Loan shall be in an aggregate principal amount of not more than the lesser of (i) $1.1 billion or (ii) two times the Debtors' trailing twelve month operating cash flow excluding minority equity interest as of the end of the fiscal quarter most recently ended prior to the Effective Date.

For purposes of formulating the Financial Projections, attached as <u>Exhibit E</u> to the General Disclosure Statement, the Debtors have estimated the New Senior Secured Term Loan to be in an aggregate principal amount of $1.1 billion, to be amortized at a rate of 1% per annum, and to have an effective interest rate of 6.75% in 2011 and 2010 and 7.20% in 2013, which represent the Debtors' estimates as to market terms as of the date hereof based on information the Debtors have received from potential financing sources. However, the actual terms of the New Senior Secured Term Loan Agreement may vary, in whole or in part, from the aforementioned terms, based upon, among other things, changes in market conditions for loan facilities of this type and the Debtors' business and financial needs at emergence from Chapter 11. The principal terms of the New Senior Secured Term Loan shall be consistent with the Terms of the New Senior Secured Term Loan that will be filed with the Plan Supplement as <u>Exhibit 5.6</u> to the Debtor/Committee/Lender Plan.

### B.      Description of Exit Facility.

Section 5.10 of the Debtor/Committee/Lender Plan provides that on the Effective Date, without any requirement for further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility. The terms of the Exit Facility shall be consistent with those that will be disclosed in <u>Exhibit 5.10</u> to the Debtor/Committee/Lender Plan, which will be filed with the Plan Supplement.

### C.      Description of Capital Stock.

The Debtor/Committee/Lender Plan provides that on the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Debtor/Committee/Lender Plan without further act or action under applicable law, regulation, order or rule. The powers, preferences and rights, as well as certain limitations, qualifications and restrictions associated with the New Common Stock shall be set forth in their entirety in the Certificate of Incorporation of Reorganized Tribune a form of which will be filed with the Plan Supplement as <u>Exhibit 5.3.1(1)</u> to the Debtor/Committee/Lender Plan. The terms of the New Warrants shall be set forth in their entirety in the New Warrant Agreement, a form of which will be filed with the Plan Supplement as <u>Exhibit 1.1.154</u> to the Debtor/Committee/Lender Plan.

### IV.     BEST INTERESTS TEST AND LIQUIDATION ANALYSIS

As discussed in Article X.B.4 of the General Disclosure Statement, the "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of an Impaired Claim or Impaired Interest receive property with a value not less than the

amount such holder would receive in a chapter 7 liquidation. The Debtors, with the assistance of their advisors, have prepared a hypothetical liquidation analysis, attached as <u>Exhibit D</u> to the General Disclosure Statement (the "<u>Liquidation Analysis</u>"), which details, among other things, the estimated hypothetical recovery range for holders of Claims against and Interests in the Debtors in a chapter 7 liquidation. To demonstrate that the proposed Debtor/Committee/Lender Plan satisfies the "best interests" test, the Debtors, with the assistance of their advisors, have also prepared the chart below, which compares the estimated recovery of each Impaired Class of Claims under the Debtor/Committee/Lender Plan against the high end of the hypothetical recovery range set forth in the Liquidation Analysis for such Claims in a chapter 7 liquidation.[53]

($ in 000's)

| Claims | Estimated Allowed Claims & Bridge Claim | Estimated Plan Recovery [2] | | Liquidation Analysis (High Values) | | Difference Recovery $ (Liquidation vs. Plan) |
|---|---|---|---|---|---|---|
| | | Recovery $ | Recovery % | Recovery $ | Recovery % | |
| Senior Loan [1] | $      8,722,140 | $  6,194,045 | 71.02% | $  3,743,009 | 42.91% | $      (2,451,035) |
| Bridge Loan [3] | 1,619,507 | 77,819 | 4.81% | 19,544 | 1.21% | (58,275) |
| Senior Noteholder | 1,283,056 | 420,000 | 32.73% | 15,484 | 1.21% | (404,516) |
| PHONES Notes | 760,881 | - | 0.00% | - | 0.00% | - |
| EGI-TRB LLC Notes | 235,300 | - | 0.00% | - | 0.00% | - |
| Other Parent [1] | 264,742 | 93,136 | 35.18% | 3,195 | 1.21% | (89,942) |
| Subsidiary GUC [4] | 85,000 | 85,000 | 100.00% | 2,041 | 2.40% | (82,959) |
| Total | $    12,970,627 | $  6,870,000 | | $  3,783,273 | | $      (3,086,727) |

Notes to Table:
1. The $150.9 million Swap Claim is included in (i) the Senior Loan Claim at the Filed Subsidiary Debtors, and (ii) Other Parent Claims at Tribune Company. The Senior Loan Claims and the Senior Guaranty Claims may increase by as much as $66 million to account for undrawn letters of credit being drawn in a liquidation. The recovery in the Liquidation Analysis assumes that these letters of credit are drawn.
2. Excludes any proceeds from the Litigation or Creditors' Trust but includes the $120 million Step 2 Disgorgement Settlement.
3. For purposes of this analysis, Bridge Loan Claims are assumed to be Allowed; however, pursuant to the terms of the Debtor/Committee/Lender Plan, Bridge Loan Claims are subject to challenge by the Litigation Trust, and distributions with respect to the Bridge Loan Claims are reserved pending allowance of the Bridge Loan Claims. Per Sections 3.2.3, 3.2.5, and 3.2.6 of the Debtor/Committee/Lender Plan, if the Bridge Loan Claims are not Allowed, such reserve would be allocated to the Holders of Allowed Senior Loan Claims, Allowed Senior Noteholder Claims, and Allowed Other Parent Claims. Similarly, if the Bridge Loan Claims were not Allowed in a chapter 7 liquidation, estimated recoveries on account of such Claims would flow to the Holders of Senior Loan Claims, Senior Noteholder Claims, and Other Parent Claims.
4. The Subsidiary GUC claim may increase by as much as $35 million in a liquidation as a result of contract cure costs shifting to unsecured claims. The recovery in the Liquidation Analysis reflects $120 million of Subsidiary General Unsecured Claims.

Under the Debtor/Committee/Lender Plan, all non-subordinated prepetition Claims recover substantially more than under a hypothetical liquidation; therefore, the Debtor/Committee/Lender Plan Proponents believe that the "best interests" of creditors test is satisfied. The subordinated Claims (PHONES Notes and EGI-TRB LLC Notes) receive no initial recovery in either instance but may benefit from recoveries from the Litigation or Creditors' Trust, subject to subordination.

As described in <u>Exhibit D</u> to the General Disclosure Statement, the Liquidation Analysis does not consider recoveries from potential Claims arising from the Leveraged ESOP Transactions. As explained

---

[53] The Estimated Plan Recovery column includes incremental settlement payments of $358.4 million to the Senior Noteholder Claims, $80.4 million to the Other Parent Claims and $82.8 million to the Subsidiary General Unsecured Claims, with a reduction in recovery to the Senior Loan and Guarantee Claims of $401.5 million. Estimated Plan Recovery excluding the settlement payments is still, in each case, in excess of the hypothetical recovery set forth in the Liquidation Analysis.

in herein, the Debtor/Committee/Lender Plan provides for the settlement of certain Claims related the Leveraged ESOP Transactions (subject to Bankruptcy Court approval of the Debtor/Committee/Lender Plan) and for certain other Claims related to the Leveraged ESOP Transactions to be assigned to the Litigation Trust. In either event, it is assumed that the recoveries from these Claims would be substantially similar in either a reorganization or a liquidation and thus not change the conclusion regarding the "best interests" test.

In addition, as noted in Exhibit D to the General Disclosure Statement, the Liquidation Analysis does not incorporate the Intercompany Claims Settlement embodied in the Debtor/Committee/Lender Plan. The Liquidation Analysis assumes that all Intercompany Claims, including prepetition Intercompany Claims and post-petition Intercompany Claims, are satisfied under a hypothetical liquidation in their respective order of priority at the value detailed in the Debtors' books and records, without consideration to any potential adjustments and/or settlement of Claim amounts that might be made to the value of the Intercompany Claims under the Debtor/Committee/Lender Plan.

## V.    RISK FACTORS

THE IMPLEMENTATION OF THE DEBTOR/COMMITTEE/LENDER PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE DEBTOR/COMMITTEE/LENDER PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE DEBTOR/COMMITTEE/LENDER PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS SPECIFIC DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE IN THE DEBTOR/COMMITTEE/LENDER PLAN), PRIOR TO VOTING TO ACCEPT OR REJECT THE DEBTOR/COMMITTEE/LENDER PLAN. THESE SPECIFIC RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISK INVOLVED IN CONNECTION WITH THE DEBTOR/COMMITTEE/LENDER PLAN AND THEIR IMPLEMENTATION, OR ALTERNATIVES TO THE DEBTOR/COMMITTEE/LENDER PLAN. FOR ADDITIONAL RISK FACTORS PLEASE SEE ARTICLE XII OF THE GENERAL DISCLOSURE STATEMENT ENTITLED "GENERAL RISK FACTORS."

A.    **General Bankruptcy Law Considerations and Risks Related to the Debtor/Committee/Lender Plan.**

1.    Objections to the Classification of Claims May Change the Composition of the Classes and the Vote Required of Each Class for the Approval of the Debtor/Committee/Lender Plan.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Plan Proponents believe that the Debtor/Committee/Lender Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Debtor/Committee/Lender Plan to be confirmed. In such event, the Debtor/Committee/Lender Plan Proponents intend, to the extent permitted by the Bankruptcy Court and the Debtor/Committee/Lender Plan, to make such reasonable modifications of the classifications under the Debtor/Committee/Lender Plan to permit Confirmation and to use the acceptances of the Debtor/Committee/Lender Plan received in

response to this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such holder was initially a member, or any other Class under the Debtor/Committee/Lender Plan, by changing the composition of such Class and the vote required of that Class for approval of the Debtor/Committee/Lender Plan.

       2.      Failure to Obtain Confirmation of the Debtor/Committee/Lender Plan May Result in Liquidation or an Alternative Plan on Less Favorable Terms.

Although the Debtor/Committee/Lender Plan Proponents believe that the Debtor/Committee/Lender Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Though the Debtor/Committee/Lender Plan Proponents disagree with this contention, and, again, believe that the Debtor/Committee/Lender Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that modifications to the Debtor/Committee/Lender Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes in support of the Debtor/Committee/Lender Plan.

In addition, Sections 10.1.1(b) and (c) of the Debtor/Committee/Lender Plan provide that it is a condition precedent to the effectiveness of the Debtor/Committee/Lender Plan that the Confirmation Order authorize and approve the Settlement and the Step Two/Disgorgement Settlement in all respects without modification. Pursuant to Section 10.2 of the Debtor/Committee/Lender Plan, these conditions may not be waived, modified or amended. Accordingly, although the Debtor/Committee/Lender Plan Proponents believe that the Settlement and Step Two/Disgorgement Settlement should receive such authorization and approval, there can be no assurance that the Bankruptcy Court will concur and, in the event the Confirmation Order does not authorize and approve the Settlement and Step Two/Disgorgement Settlement in all respects without modification, the Debtor/Committee/Lender Plan cannot become effective.

The Debtor/Committee/Lender Plan provides that the Debtor/Committee/Lender Plan Proponents reserve the right to seek confirmation of the Debtor/Committee/Lender Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by various Classes of Claims and Interests under the Debtor/Committee/Lender Plan. In the event such Classes fail to accept the Debtor/Committee/Lender Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtor/Committee/Lender Plan Proponents reserve the right: (a) to request that the Bankruptcy Court confirm the Debtor/Committee/Lender Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Debtor/Committee/Lender Plan in accordance with Section 13 thereof. While the Debtor/Committee/Lender Plan Proponents believe that the Debtor/Committee/Lender Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because the Debtor/Committee/Lender Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Debtor/Committee/Lender Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Debtor/Committee/Lender Plan.

If the Debtor/Committee/Lender Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Debtor/Committee/Lender Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would substantially erode to the detriment of all stakeholders.

3.    Undue Delay in Confirmation of the Debtor/Committee/Lender Plan May Disrupt the Debtors' Operations.

Although the Debtor/Committee/Lender Plan is designed to minimize the length of the Debtors' bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Debtor/Committee/Lender Plan will be confirmed. The continuation of the Chapter 11 Cases, particularly if the Debtor/Committee/Lender Plan is not approved or confirmed in the timeframe currently contemplated, could adversely affect operations and relationships with the Debtors' customers, vendors, employees, regulators and partners. If confirmation and consummation of the Debtor/Committee/Lender Plan does not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

4.    If the Effective Date Fails to Occur, the Debtors May Liquidate or Adopt an Alternative Plan with Less Favorable Terms.

There can be no assurance with respect to timing of the Effective Date. The occurrence of the Effective Date is also subject to the conditions precedent described in Section 10.1 of the Debtor/Committee/Lender Plan. Failure to meet any of these conditions could result in the Debtor/Committee/Lender Plan not being consummated.

If the Effective Date of the Debtor/Committee/Lender Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Debtor/Committee/Lender Plan.

**B.    FCC-Related Considerations and Risks Respecting the Debtors' Businesses.**

1.    The FCC Must Approve the Debtors' FCC Applications before Emergence from Bankruptcy.

The Debtors operate television broadcast stations, a radio station, and certain associated facilities under authority granted by the FCC. Under Section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses. Except in the case of "involuntary" assignments, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated. For additional information concerning FCC-related considerations and risks see Article XII of the General Disclosure Statement "General Risk Factors."

a.    FCC Processing of Applications for Consent to Emerge from Bankruptcy.

On April 28, 2010, the Debtors filed the FCC Applications, by which Debtors sought the consent of the FCC for each of the Debtors holding FCC licenses to assign its FCC licenses to the Reorganized Debtors. The FCC Applications included requests for waivers of the FCC's newspaper/broadcast cross-ownership rule and local television multiple ownership or "duopoly" rule, including a "failing station" waiver and continued "satellite" exemption. The Debtors filed 16 applications for consent to assignment of broadcast station licenses, together with applications seeking consent to assign satellite earth station, private land mobile, private fixed microwave, and other categories of FCC licenses held by the Debtors. Tribune provided local public notice of the filing of the FCC Applications through broadcast

announcements and notices in local newspapers servicing their broadcast markets. The Debtors have amended the FCC Applications from time to time.

On May 13, 2010, the FCC's Media Bureau issued a public notice announcing that the FCC has accepted all of the FCC Applications for filing upon initial review. Although the FCC has accepted and is currently processing the FCC Applications, the Debtor/Committee/Lender Plan Proponents anticipate that the FCC will not grant the FCC Applications until the Bankruptcy Court has confirmed the Debtor/Committee/Lender Plan and authorized the transactions proposed in the Debtor/Committee/Lender Plan.

The FCC's public notice of May 13, 2010 set a deadline of June 14, 2010 for interested persons to file petitions to deny the FCC Applications. On that date, a coalition of Washington, D.C.-based public advocacy groups (the "Washington Public Advocacy Groups"); the International Brotherhood of Teamsters ("IBT"); Wilmington Trust; and Neil Ellis, a competing newspaper publisher in the Hartford market ("Neil Ellis") filed petitions to deny the FCC Applications (collectively, the "Petitions to Deny").

On June 29, 2010, Tribune and JPMorgan filed oppositions to the Petitions to Deny. On July 12, 2010, Washington Public Advocacy Groups, IBT, Wilmington Trust, and Neil Ellis filed replies to the oppositions of Tribune and JPMorgan. The pleading cycle in this proceeding is now closed.

The Debtors have amended the FCC Applications on several occasions and anticipate that further amendments will be necessary to reflect the filing of the Debtor/Committee/Lender Plan and the Debtor/Committee/Lender Disclosure Statement. Although the formal pleading cycle in the FCC proceeding has closed, additional filings may be submitted so long as they are made part of the public record in the proceeding, and the FCC may request additional comment.

The FCC is reviewing the FCC Applications and all filings made by parties to the proceeding. In addition to the consideration of any waiver requests, the FCC's review of the FCC Applications will focus on whether the existing media interests (broadcast and daily newspaper holdings) of the parties to the FCC Applications, when combined with other media interests held by parties to the FCC Applications comply with the FCC's broadcast multiple ownership rules. The FCC also will consider compliance with limitations on foreign ownership, the parties' other legal qualifications, their prior records before the FCC, and certain categories of prior adverse determinations against parties to the FCC Applications by courts and other administrative bodies.

In some instances, the FCC may request that the applicants supply additional information through amendments to an application. There is no time limit on the FCC's consideration of assignment applications. The FCC has a stated goal of processing all such applications within 180 days, although processing often exceeds this timeframe when petitions to deny or objections are filed.

In this case, the consummation of the Debtor/Committee/Lender Plan will not occur until the FCC has granted the FCC Applications and issued the necessary consents to implement the Debtor/Committee/Lender Plan as confirmed by the Bankruptcy Court. If the grant is made by the FCC *en banc*, parties may file petitions for reconsideration with the agency or an appeal with the D.C. Circuit within a period of 30 days of issuance of the decision. If the grant is made by the FCC's staff under delegated authority, an interested party may request that the staff reconsider its decision or the FCC review the grant within 30 days of issuance of the decision, and the FCC may reconsider the action on its own initiative for a period of 40 days following issuance of the decision. It is highly unusual for the FCC to rescind grant of consent to an assignment or transfer upon reconsideration or review. Parties are entitled to close upon the grant of FCC consent even if petitions for reconsideration,

applications for review, or judicial appeals are filed and remain pending, but any such consummation is subject to any further order that the FCC or a court might issue.

      2.      Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Debtor/Committee/Lender Plan.

In the FCC Applications, the Debtors are seeking waivers of several of the FCC's broadcast ownership rules. Grant of these waiver requests will be necessary in order to allow the assignment of combinations of media properties currently held by the Debtors in six markets in which the combinations currently operate under waivers of the FCC ownership rules. Absent continued waivers from the FCC, Reorganized Tribune will not be able to own and operate these combinations.

As a result of a decision issued by the FCC on November 30, 2007 (the "FCC Order"), the Debtors received seven waivers that allow them to hold clusters of media properties in six markets despite non-compliance with the FCC's rules. These waivers are as follows:

      1)      A "temporary" waiver of the FCC's newspaper/broadcast cross-ownership rule to own WPIX-TV and *Newsday* in New York;

      2)      A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own KTLA-TV and the *Los Angeles Times* in Los Angeles;

      3)      A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WSFL-TV and the Ft. Lauderdale-based *South Florida Sun-Sentinel* in Miami;

      4)      A "permanent" waiver of the newspaper/broadcast cross-ownership rule to own WGN, WGN-TV and the *Chicago Tribune* in Chicago;

      5)      A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WTIC-TV, and WCCT-TV (formerly WTTX-TV), and the *Hartford Courant* in Hartford;

      6)      A "permanent" "failing station" waiver of the FCC's television local ownership or "duopoly" rule to own WTIC-TV and WCCT-TV in Hartford; and

      7)      A "permanent" exemption of the FCC's "duopoly" rule to permit operation of WTTK-TV, a full-power television station licensed to Kokomo, Indiana, as a "satellite" rebroadcasting the programming of WTTV-TV, Bloomington, Indiana.

The "temporary" newspaper/broadcast cross-ownership rule waivers that resulted from the FCC Order are time limited. They extend until the latest of the following: (i) the expiration of a two-year period for the filing and evaluation of individualized waiver showings, the commencement of which is open to interpretation, (ii) six months following the conclusion of the litigation over the FCC Order pending in the D.C. Circuit, which the Debtors initiated on December 3, 2007, or (iii) six months after the expiration of any judicial stay to which the FCC's modified waiver standards for the cross-ownership rule as adopted in the 2008 Order may be subject. The "permanent" waivers continue as long as the Debtors own the properties, but the waivers do not permit assignments of the combinations intact, and waivers will be needed in order for the Reorganized Debtors to maintain their existing properties.

In the FCC Applications, the Debtors are seeking extensions of the waivers covering these seven media combinations. In the case of the newspaper/broadcast cross-ownership rule waivers, the Debtors are requesting "permanent" relief that effectively would allow them (i) to hold the ownership

combinations or interests at least until the next "long form" assignment or transfer and (ii) upon such assignment or transfer to dispose of the interests in combination to a single purchaser. Alternatively, the Debtors are seeking a temporary waiver of the newspaper/broadcast cross-ownership rule that would extend until 18 months after the FCC completes its pending rulemaking review of that rule and the FCC's action becomes a final order no longer subject to judicial review. In the case of the Hartford television "duopoly" and the Indianapolis "satellite" waivers, the Debtors are seeking a continuation of those "permanent" waivers that would allow the combinations to be commonly held until the next "long-form" assignment or transfer.

In the requests for waivers filed as part of the FCC Applications, the Debtors intend to demonstrate that cross-ownership waiver relief is justified under the criteria announced in the 2008 Order, which took effect on March 23, 2010, with the Third Circuit's lifting of its stay, as well as the general "public interest" waiver test adopted with the newspaper/broadcast cross-ownership rule in 1975. In the cross-ownership markets, synergies and efficiencies attributable to cross-ownership allow the Debtors' combined media properties to deliver an exceptional level of local news – both quantitatively and qualitatively. The Debtors' combined properties have earned strong ratings and many journalistic awards as testament to their community service and success. Each cross-owned market is also remarkably diverse and competitive with respect to traditional media properties (broadcast, cable and print) and even more so when new technological offerings, particularly those available over the Internet and wireless services, are taken into account.

The waiver filings also argue that any forced regulatory separation of the cross-owned properties would have adverse public interest effects. First, in today's challenging media marketplace, the assumption that an alternative purchaser would be willing and able to acquire any of the properties simply is not valid. Second, even assuming that such a purchaser could be found, it is unlikely that the new owners would have the resources and, absent efficiencies from cross-ownership, the ability to maintain the amount and caliber of local news, information, and community services currently offered by each cross-owned combination.

Under the standards set forth in the 2008 Order to analyze the waivers, cross-ownership relief is presumptive in New York, Los Angeles, and Miami, because, as explained in the FCC Applications, (i) those markets are among the Top 20 largest DMAs, (ii) the Debtors own only one broadcast outlet in each market, (iii) the television station at issue does not rank among the top four rated television stations, and (iv) at least eight "major media voices" exist exclusive of the combination. In Chicago and Hartford, where the Debtors hold more than one broadcast property, the Debtors are not entitled to a presumptive waiver, but their waiver requests assert that those combinations also are entitled to relief because (i) the stations have increased the amount of news provided to the market, (ii) the cross-owned properties exercise independent news judgment, (iii) the level of concentration in the DMA is not adversely affected, and (iv) the struggling financial condition of the Debtors justifies relief.

In the FCC Applications, the Debtors also contend that continued waiver of the television "duopoly" rule for the Hartford properties is justified under either the FCC's "failed" or "failing station" standards. In the Indianapolis market, the Debtors have argued that continued operation of WTTK-TV as a "satellite" is appropriate under FCC policies.

In each of the seven requests, the Debtors stress that grant of the relief they request is required under the FCC's policies affording comity to the bankruptcy process. FCC precedent establishes that the agency is required to reconcile its policies with those underlying the bankruptcy laws. The FCC has previously taken comity into account in granting ownership waivers, and, in all seven instances involving the Debtors' properties; waivers would merely allow the Reorganized Debtors to maintain the existing combinations.

It is possible that the FCC will deny the Debtors' request for "permanent waivers," or grant temporary waivers of shorter duration than requested, with respect to one or more of the media combinations or interests for which the Debtors are seeking waivers. In the event that the FCC does not grant the requested waivers, the Debtors could be required to come into compliance with the applicable ownership rule by disposing of properties deemed non-conforming by a date set by the FCC, which date could be prior to the Debtors' emergence from bankruptcy. It is possible that the FCC will require the Debtors to place one or more properties deemed by the FCC to be non-compliant with its ownership rules into a divestiture trust prior to the Debtors' emergence from bankruptcy. If the present difficult financial climate for businesses overall and for media industries in particular persists, the Debtors could face difficulty locating buyers willing to purchase the non-conforming properties and could be forced to dispose of properties at prices that the Debtors otherwise would consider unacceptable.

In addition, it is possible that, in evaluating the FCC Applications, the FCC could determine that the Debtor/Committee/Lender Plan neither complies with nor ensures compliance with the FCC's broadcast multiple and/or cross-ownership rules and/or the twenty-five percent (25%) foreign ownership limit in Section 310(b) of the Communications Act. For example, the FCC may not agree with the Debtors and determine that the New Class B Common Stock should be considered attributable rather than non-attributable under its rules. Such a finding could cause the FCC to determine that certain prospective stockholders of the Reorganized Debtors would not be in compliance with the FCC's broadcast multiple and/or cross-ownership rules upon consummation of the currently proposed Debtor/Committee/Lender Plan. Further, the FCC could require the Debtor/Committee/Lender Plan Proponents to amend the Debtor/Committee/Lender Plan and the FCC Applications, which could delay FCC Approval and consummation of the Debtor/Committee/Lender Plan. The FCC's consideration of the Petitions to Deny also could cause a delay in FCC Approval and consummation of the Debtor/Committee/Lender Plan, increasing the cost to the Debtors of emerging from bankruptcy.

### C.    Risks Related to the Debtors' Businesses.

1.    Historical Financial Information Will Not Be Comparable.

As a result of the consummation of the Debtor/Committee/Lender Plan and the transactions contemplated thereby, the Debtors will be operating their current businesses under a new capital structure and will be subject to the fresh start accounting rules. Accordingly, the Debtors' financial condition and results of operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.    The Debtors Could Be Faced with Additional Tax Liabilities.

The Debtors are subject to federal and state income taxes and are regularly audited by federal and state taxing authorities. In the years currently under audit, or eligible for future audit, the Debtors consummated certain significant business transactions that they treated or intend to treat as not resulting in gain for income tax purposes but as resulting in gain or loss for financial accounting purposes. In addition, the Debtors treated or intend to treat significant amounts of income as not subject to tax because of the Debtors' status as an S corporation. Significant judgment is required in evaluating the Debtors' tax positions and in establishing appropriate reserves. The Debtors analyze their tax positions and reserves on an ongoing basis and make adjustments when warranted based on changes in facts and circumstances. The resolutions of the Debtors' tax positions are unpredictable and could result in tax liabilities and associated cash payments that are significantly higher or lower than that which has been provided for by the Debtors. In addition, a change in the tax laws of the United States and adjustments to tax positions as a result of audits could materially affect the consequences of the Debtor/Committee/Lender Plan to the Debtors and/or their stockholders.

3.    The Reorganized Debtors May Continue to Have Substantial Indebtedness.

The Reorganized Debtors may continue to have substantial indebtedness following the Effective Date, which may include a New Senior Secured Term Loan in an aggregate principal amount of not more than the lesser of (a) $1.1 billion or (b) two times the Debtors' trailing twelve month operating cash flow, excluding minority equity interest, as of the end of the fiscal quarter most recently ended prior to the Effective Date. For purposes of the Financial Projections attached as Exhibit E to the General Disclosure Statement, the aggregate principal amount of the New Senior Secured Term Loan is assumed to be $1.1 billion. While the Reorganized Debtors' management believes that future operating cash flow, together with financing arrangements, will be sufficient to finance operating requirements under the Reorganized Debtors' business plan, the Reorganized Debtors' leverage and debt service requirements could make it more vulnerable to economic downturns in the markets the Reorganized Debtors serve or in the economy generally.

The degree to which the Reorganized Debtors will be indebted could have important consequences because it may:

- require the Reorganized Debtors to dedicate a substantial portion of their cash flows to the payment of principal and interest on their debt which will reduce the funds available for other purposes;
- limit the Reorganized Debtors liquidity and operational flexibility and their ability to respond to the challenging general and industry-specific economic and business conditions that currently exist or that the Reorganized Debtors may face in the future;
- require the Reorganized Debtors in the future to defer planned capital expenditures, further reduce the size of the Reorganized Debtors' workforce, reduce discretionary spending, dispose of assets or forgo acquisitions or other strategic opportunities, any of which decisions may affect the Reorganized Debtors' revenues and place them at a competitive disadvantage compared to their competitors with less debt or with comparable debt at more favorable interest rates and who, as a result, may be better positioned to withstand economic downturns or pursue key acquisitions or other strategic opportunities;
- limit the Reorganized Debtors' ability to obtain additional financing in the future;
- expose the Reorganized Debtors to increased interest rate risk because a substantial portion of the Reorganized Debtors' debt obligations may be at variable interest rates; and
- place the Reorganized Debtors at a competitive disadvantage because they may be more highly leveraged than some of their competitors.

In addition, any new financing facility that the Reorganized Debtors may enter into as of the Effective Date pursuant to the Debtor/Committee/Lender Plan will likely contain covenants that impose operating and financial restrictions on the Reorganized Debtors. These covenants could adversely affect the Reorganized Debtors' ability to finance future operations, potential acquisitions or capital needs or to engage in business activities that may be in their interest, including implementing the Reorganized Debtors' Debtor/Committee/Lender Plan.

D.    **Risks to Creditors Who Will Receive Securities.**

The ultimate recoveries under the Debtor/Committee/Lender Plan to Holders of Claims that receive shares of New Common Stock or New Warrants to purchase shares of New Common Stock pursuant to the Debtor/Committee/Lender Plan will depend on the realizable value of the shares of New Common Stock. Shares of New Common Stock are subject to a number of material risks, including, but

not limited to, those specified below. Prior to voting on the Debtor/Committee/Lender Plan, each Holder of Claims that are to be satisfied in whole or part through a distribution of New Common Stock should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Debtor/Committee/Lender Plan.

1.    The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants.

No established market exists for the New Common Stock or New Warrants and there can be no assurance that an active market for the shares of the New Common Stock or New Warrants will develop, nor can any assurance be given as to the prices at which such securities might be traded. Although Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market, there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. If a trading market does not develop or is not maintained, holders of shares of the New Common Stock and New Warrants may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Debtor/Committee/Lender Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, the Reorganized Debtors' performance and investor expectations thereof. In addition, some persons who receive shares of the New Common Stock and/or the New Warrants may prefer to liquidate their investment in the near term rather than hold such securities on a long-term basis. Accordingly, any market for such securities may be volatile, at least for an initial period following the Effective Date, and may be depressed until the market has had time to absorb any such sales and to observe the Reorganized Debtors' performance.

2.    Lack of Dividends May Adversely Affect Liquidity of the New Common Stock.

The Debtors do not anticipate that cash dividends or other distributions will be made with respect to the New Common Stock in the foreseeable future. In addition, covenants in certain debt instruments to which the Reorganized Debtors will be a party may restrict their ability to pay dividends and make certain other payments. Further, such restrictions on dividends may have an adverse impact on the market demand for the New Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Debtor/Committee/Lender Plan.

3.    Future Sales or Issuances of Equity, Including Issuances in Respect of New Warrants to Purchase New Class A Common Stock, May Depress the Stock Price of the New Common Stock.

If holders of New Common Stock sell substantial amounts of New Common Stock or Reorganized Tribune issues substantial additional amounts of its equity securities, or there is a belief that such sales or issuances could occur, the market price of the New Common Stock could decline significantly. Reorganized Tribune may issue New Warrants to purchase shares of New Class A Common Stock in certain circumstances. If Holders who receive New Warrants in connection with the implementation of the Debtor/Committee/Lender Plan exercise such warrants and purchase a significant number of shares of New Class A Common Stock, the market price of the New Class A Common Stock may be adversely affected. In addition, any new issuances of equity securities by Reorganized Tribune including as a result of warrant exercises, may be dilutive to existing stockholders of Reorganized Tribune.

4.      The Limited Voting Rights of the New Class B Common Stock and the Lack of Voting Rights of the New Warrants Could Impact their Attractiveness to Investors and, as a Result, their Market Value.

In certain circumstances, Reorganized Tribune may issue shares of New Class B Common Stock and/or New Warrants. The New Class A Common Stock and New Class B Common Stock generally provide identical economic rights, but holders of the New Class B Common Stock have limited voting rights, including that such holders have no right to vote in the election of directors. The holders of the New Warrants have no voting rights. The difference in voting rights of the New Class A Common Stock on the one hand, and New Class B Common Stock and New Warrants on the other hand, could diminish the value of the New Class B Common Stock and the New Warrants to the extent that investors or potential future purchasers of the New Class B Common Stock or the New Warrants ascribe value to the superior voting rights of the New Class A Common Stock. The Certificate of Incorporation of Reorganized Tribune, which will be filed with the Plan Supplement as Exhibit 5.3.1(1) to the Debtor/Committee/Lender Plan, contains more information about the rights and limitations associated with the New Class B Common Stock. In addition, the New Warrant Agreement, which will be filed with the Plan Supplement as Exhibit 1.1.154 to the Debtor/Committee/Lender Plan, contains more information about the rights and limitations associated with the New Warrants.

5.      Certain Holders May be Restricted in Their Ability to Transfer or Sell Their Securities.

To the extent that New Common Stock, New Warrants or any other securities are issued under the Debtor/Committee/Lender Plan and are covered by section 1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New Common Stock or New Warrants pursuant to the Debtor/Committee/Lender Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would be permitted to sell such New Common Stock or New Warrants without registration if they are able to comply with the provisions of rule 144 under the Securities Act.

Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. As noted above (see "The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants"), there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. Efforts to list the New Class A Common Stock, if successful, would include registering the New Class A Common Stock under the Exchange Act. Registration under the Exchange Act is a separate process from registration under the Securities Act and would not be sufficient to permit resales by persons who receive New Common Stock or New Warrants pursuant to the Debtor/Committee/Lender Plan and who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code. Reorganized Tribune has no current plans to list the New Class B Common Stock on the NYSE or for quotation on the NASDAQ Stock Market or to register the New Class B Common Stock or New Warrants under the Securities Act, the Exchange Act or under equivalent state securities laws such that the recipients of the New Class B Common Stock or New Warrants would be able to resell their securities pursuant to an effective registration statement.

The Certificate of Incorporation contains restrictions on stockholders' ability to transfer New Common Stock and New Warrants designed to ensure compliance with the FCC broadcast multiple ownership and cross-ownership rules and the limitations on foreign ownership or control of FCC broadcast licenses imposed by the Communications Act. Furthermore, certificates for shares of New Common Stock and certificates for New Warrants may bear a legend restricting the sale, transfer, assignment, conversion or other disposal of such securities.

**E.      Risks Related to Interests in the Litigation Trust and the Creditors' Trust.**

Distributions on account of interests in the Litigation Trust and the Creditors' Trust will be dependent upon the successful liquidation of the Litigation Trust Assets and Creditors' Trust Assets and the proceeds of such Litigation Trust Assets and Creditors' Trust Assets being in excess of certain liabilities and expenses of the Litigation Trust and Creditors' Trust, as the case may be. The Debtor/Committee/Lender Plan Proponents can make no assurances that there will be any distributions from the Litigation Trust or the Creditors' Trust.

**VI.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN**

The following discussion is a summary of certain U.S. federal income tax aspects of the Debtor/Committee/Lender Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Debtor/Committee/Lender Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Debtor/Committee/Lender Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Debtor/Committee/Lender Plan. No representations or assurances are being made to the U.S. Holders of Claims or Interests with respect to the U.S. federal income tax consequences described in the Debtor/Committee/Lender Plan.

*      *      *      *

Any discussion of U.S. federal tax issues set forth in this Debtor/Committee/Lender Disclosure Statement was written solely in connection with the confirmation of the Debtor/Committee/Lender Plan to which the transactions described in this Debtor/Committee/Lender Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

*      *      *      *

**A.      Federal Income Tax Consequences to the Debtors.**

1.      Termination of Subchapter S Corporation Status.

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the IRC, which election became effective as of the beginning of its 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations (such as the built-in gains tax applicable to Tribune's net unrealized gains as of the beginning of the 2008 fiscal year that are recognized in the subsequent ten taxable years), Tribune and its qualified subchapter S subsidiaries are not currently subject to corporate level federal income tax. Instead, the income of Tribune and such subsidiaries is required to be reported by its stockholders. The ESOP, which, as of the Petition Date, was the sole stockholder of Tribune, does not pay taxes on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

As a result of the implementation of the Debtor/Committee/Lender Plan, Tribune will no longer be eligible to be treated as a subchapter S corporation beginning on the Effective Date. Accordingly, Reorganized Tribune and its subsidiaries will be subject to entity-level tax on all of their income and gains beginning on the Effective Date at corporate income tax rates. As described below, Reorganized Tribune is expected to have limited tax attributes available to offset such income and gains.

    2.      Cancellation of Debt and Reduction of Tax Attributes.

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt. For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor. COD Income is not required to be included in taxable income, however, if the debtor is in bankruptcy (the "Bankruptcy Exception"). Instead, the debtor is required to reduce certain of its tax attributes by the amount of excluded COD Income, generally in the following order: net operating losses ("NOLs"), general business credit carryforwards, minimum tax credit carryforwards, capital loss carryforwards, the tax basis of the debtor's assets, passive activity loss or credit carryovers, and, finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Liability Floor Rule").

The Debtors expect to realize substantial COD Income as a result of the implementation of the Debtor/Committee/Lender Plan. The precise amount of COD Income will depend on, among other things, the fair market value of the New Common Stock and New Warrants, which cannot be known with certainty until after the Effective Date. Pursuant to the Bankruptcy Exception, this COD Income will not be included in the Debtors' taxable income, but they will have to reduce their Tax Attributes after calculating the tax for the taxable year of discharge.

As a subchapter S corporation, Tribune does not currently have any NOLs or other significant Tax Attributes other than tax basis in assets. Although the projected COD Income is expected to exceed the Debtors' aggregate tax basis in assets, under the Liability Floor Rule the Debtors' will not be required to reduce such basis below their total liabilities after the discharge.

    **B.**      **Federal Income Tax Treatment of the Creditors' Trust and Litigation Trust (collectively, the "Trusts") and the Receipt and Ownership of Beneficial Interests in the Trusts.**

It is intended that each of the Trusts will qualify as a "liquidating trust" for U.S. federal income tax purposes. A liquidating trust is generally treated as a grantor trust for U.S. federal income tax

purposes. In general, a grantor trust is not a separate taxable entity. Consistent with the requirements for liquidating trust treatment, the Creditors' Trust Agreement and the Litigation Trust Agreement (collectively, the "Trust Agreements") will each require all relevant parties to treat, for U.S. federal income tax purposes, the transfer of each of the Creditors' Trust Assets or the Litigation Trust Assets, as applicable (the "Trust Assets"), to the relevant Trust as (i) a transfer of the Trust Assets (other than amounts set aside in Trust Reserves on account of Disputed Claims if such Trust Reserves are subject to entity-level tax, as discussed below) to the Creditors' Trust Beneficiaries or the Litigation Trust Beneficiaries, as applicable (the "Trust Beneficiaries"), which transfer should be taxable (as described below) to each such Trust Beneficiary in its taxable year that includes the Effective Date, followed by (ii) a transfer of such Trust Assets by the Trust Beneficiaries to the Trust, with the Trust Beneficiaries being treated as the grantors and owners of the Trust.

The Debtor/Committee/Lender Plan generally provides that, subject to the terms of Trust Agreements, promptly after the Effective Date, the Creditors' Trustee and the Litigation Trustee (each, a "Trustee"), as applicable, will determine and file with the court the estimated fair market value of the assets of each such Trust as of the Effective Date. The Trust Beneficiaries and the Trustees will each be required to use such valuation consistently for all U.S. federal income tax purposes, including for determining tax basis and gain or loss.

Consistent with the treatment of each Trust as a liquidating trust, the Trust Agreements will require each Trust Beneficiary to report on its U.S. federal income tax return its allocable share of each Trust's income, losses, if any, and expenses (the relevant Trust's "Tax Items"). Therefore, a Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the income of each Trust whether or not the Trust has made any distributions to such Trust Beneficiary. The ability of a Trust Beneficiary to benefit from any deduction or losses may depend on the particular situation of that Trust Beneficiary.

The Trustees will each file with the Internal Revenue Service ("IRS") tax returns for the Trusts as grantor trusts and will also send to each Trust Beneficiary separate statements setting forth such holder's share of each Trust's Tax Items. Each Trust Beneficiary will be required to report such Tax Items on its U.S. federal income tax return.

This discussion assumes each Trust will be respected as a grantor trust owned by the Trust Beneficiaries for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Trusts and the Trust Beneficiaries could differ materially from those discussed herein. For instance, it is possible that all income of each Trust could be subject to entity-level tax. It is also possible that the IRS might assert that the rights of the Trust Beneficiaries to receive Trust distributions should defer the ability of a Trust Beneficiary to claim a loss until the liquidation of the respective Trust is completed. Trust Beneficiaries should consult their own tax advisors about the tax consequences of their beneficial interests in the Trusts.

C.    **Federal Income Tax Treatment of the CT Reserve(s) and the LT Reserve(s) (collectively, the "Trust Reserve(s)").**

Each Trustee may establish one or more Trust Reserves on account of Disputed Claims. The amount(s) held back in the Trust Reserve(s) will be equal to the amount(s) necessary to satisfy the distributions to which the Holders of Disputed Claims would be entitled if all such Disputed Claims were to be subsequently Allowed.

For U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), each Trustees may (i) make an election pursuant to Treasury Regulation Section

1.468B-9 to treat the Trust Reserve(s) as a "disputed ownership fund" within the meaning of that Section, (ii) allocate taxable income or loss to the Trust Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the Trust Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise resolved. The Trust beneficiaries will be bound by such election, if made by the Trustee, and as such will be required, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

The Trust Reserve(s) may be structured in a manner intended to cause it to be subject to a separate entity-level tax on any income earned by the Trust Reserve(s), including any taxable income of the Trusts allocable to the Trust Reserve(s). Therefore, distributions from the Trust Reserve(s) may be reduced to satisfy any taxes payable by the Trust Reserve(s).

Holders of Claims should note the tax treatment of the Trust Reserve(s) is unclear and should consult their own tax advisors.

### D.    Federal Income Tax Consequences to Holders of Claims and Interests.

The U.S. federal income tax consequences of the transactions contemplated by the Debtor/Committee/Lender Plan to Holders of Claims and Interests that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any individual who is a citizen or resident of the United States, or any entity (i) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (ii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iii) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "U.S. Holder" means a beneficial owner of a Claim or Interest that is a United States Person. The general U.S. federal income tax consequences to Holders of Claims or Interests that are Non-United States Persons are discussed below.

The U.S. federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Debtor/Committee/Lender Plan and the distributions provided for thereby will depend upon, among other things, (i) the manner in which a U.S. Holder acquired a Claim; (ii) the length of time the Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (v) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (vi) the method of tax accounting of the U.S. Holder; (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (viii) whether the Claim is a capital asset in the hands of the U.S. Holder. Certain holders of Claims or Interests (such as foreign persons, subchapter S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary. In addition, this summary does not discuss consequences to holders of the Swap Claim. There also may be state, local, and/or non-U.S. income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests that are not addressed in this discussion.

The discussion that follows does not describe the tax consequences of the receipt and holding of beneficial interests in the Trusts, which are discussed above.

EACH U.S. HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE DEBTOR/COMMITTEE/LENDER PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE DEBTOR/COMMITTEE/LENDER PLAN.

    1.      General.

A U.S. Holder of a Claim may recognize ordinary income or loss with respect to any portion of its Claim attributable to accrued but unpaid interest. A U.S. Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Debtor/Committee/Lender Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as a payment of interest, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of surrendering its Claim. In general, a U.S. Holder that previously included in its income accrued but unpaid interest attributable to its Claim will recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of the distribution it may receive under the Debtor/Committee/Lender Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors intend to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Debtor/Committee/Lender Plan with respect to a Claim first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a U.S. Holder receives consideration in an amount that is less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such U.S. Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such U.S. Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Debtor/Committee/Lender Plan by U.S. Holders of Claims or Interests that hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the U.S. Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate U.S. Holder only to offset capital gains, and by an individual U.S. Holder only to the extent of capital gains plus $3,000 of other income.

    2.      Market Discount.

The market discount provisions of the IRC may apply to holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition (any such excess, "market discount"). In general, a market discount obligation is treated as having accrued market discount as of any date equal to the total market discount multiplied by a fraction, the numerator of which is the number of days the holder has owned the market discount obligation and the denominator of which is the total number of days that remained until maturity at the time the holder acquired the market discount obligation. If a U.S. Holder has Claims that were acquired with market discount and such U.S. Holder

realizes gain upon the exchange of its Claims for property pursuant to the Debtor/Committee/Lender Plan, such U.S. Holder may be required to include as ordinary income some or all of such market discount to the extent of such realized gain. U.S. Holders who have Claims with market discount should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances. In particular, U.S. Holders of Claims that are "securities" for U.S. federal income tax purposes and that are exchanged for New Common Stock and, if applicable, New Warrants should consult their tax advisors regarding possible recognition of ordinary income upon a subsequent disposition of such New Common Stock or New Warrants. See "Definition of Security," below.

     3.     Amounts Attributable to Disallowance of Disputed Claims

Certain Holders of Allowed Claims have a contingent right to receive additional distributions on account of the disallowance of Disputed Claims. It is possible that such contingent claims should be ignored until such cash is received, at which time the recipient would account for such cash by reference to the accounting that would have resulted if such cash had been received at the time the recipient received its initial distribution pursuant to the Debtor/Committee/Lender Plan. The existence of such a contingent right may also affect the timing of recognition of any loss by such Holder. Alternatively, such a contingent claim might be ascribed value in determining the tax consequences of the initial distribution pursuant to the Debtor/Committee/Lender Plan, with any difference between such ascribed value and the amount of cash actually received accounted for when such cash is actually received. Holders with such contingent rights to receive additional distributions should consult their own tax advisors regarding the treatment of such rights. For ease of discussion, the existence of such contingent rights will not be referred to in the discussion that follows.

     4.     U.S. Holders of Senior Loan Claims and Senior Guaranty Claims (not including the guaranty of the Swap Claim).

U.S. Holders of Allowed Senior Loan and Senior Guaranty Claims will receive New Common Stock (and where applicable, New Warrants), Cash, Creditors' Trust Interests and Litigation Trust Interests (collectively, "Trust Interests") and may receive interests in the New Senior Secured Term Loan, in exchange for their Claims.

Each such U.S. Holder will realize gain or loss in an amount equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock and any New Warrants received, (ii) the fair market value of the Holder's share of Trust Assets, if any, (iii) the Cash received, and (iv) the "issue price" of the Holder's interest in the New Senior Secured Term Loan, if received. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of an interest in the New Senior Secured Term Loan.

The tax consequences to a U.S. Holder of a Senior Loan and Senior Guaranty Claim depend on whether its Claim is a "security" for U.S. federal income tax purposes. Although not free from doubt, the New Senior Secured Term Loan will likely not constitute a security for U.S. federal income tax purposes. See "Definition of 'Security'," below. U.S. Holders are encouraged to consult with their tax advisors in connection with the determination of whether the New Senior Secured Term Loan constitutes a security for U.S. federal income tax purposes. The remainder of this discussion assumes that the New Senior Secured Term Loan will not constitute a security for U.S. federal income tax purposes.

If the Claim does not constitute a security for U.S. federal income tax purposes, the exchange of the Claim for New Common Stock (and where applicable, New Warrants), the Holder's share of Trust Assets, Cash and the Holder's interest in the New Senior Secured Term Loan, if received, will be a

taxable transaction, and the U.S. Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a U.S. Holder's tax basis in the New Common Stock, the Holder's share of the Trust Assets, if any, and any New Warrants received in the exchange will equal the fair market value of such assets on the date received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in such assets will commence on the day after the date received. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of a Holder's interest in the New Senior Secured Term Loan.

If the Claim constitutes a security for U.S. federal income tax purposes, the exchange of such Claim will be treated as a recapitalization for U.S. federal income tax purposes. In such a case, a U.S. Holder of such Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim. A U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the issue price of the Holder's interest in the New Senior Secured Term Loan, if received, (b) the fair market value of the Holder's share of Trust Assets, if any, and (c) the amount of Cash received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and any New Warrants received in exchange for its Claim will equal its adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the fair market value of the Holder's interest in the New Senior Secured Term Loan, if received, (ii) the fair market value of the Holder's share of Trust Assets, if any, and (iii) the amount of Cash received as part of the exchange. If a U.S. Holder receives both New Common Stock and New Warrants in exchange for its Claim, such basis will be allocated between the New Common Stock and the New Warrants in proportion to their relative fair market values on the date received. A U.S. Holder's holding period in the New Common Stock and any New Warrants will include the holding period in its Claim surrendered. A U.S. Holder's tax basis in its share of Trust Assets, if any, will equal the fair market value of such assets on the date received. A U.S. Holder's holding period in its share of Trust Assets, if any, will commence on the day after the date received. A U.S. Holder's tax basis in the Holder's interest in the New Senior Secured Term Loan, if received, will equal the issue price of the Holder's interest in the New Senior Secured Term Loan. A U.S. Holder's holding period in the Holder's interest in the New Senior Secured Term Loan, if received, will commence on the day after the date received.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding an interest in the New Senior Secured Term Loan.

     5.     U.S. Holders of Bridge Loan Claims.

U.S. Holders of Allowed Bridge Loan Claims will receive Trust Interests and Cash in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of the Trust Assets, and (ii) the amount of Cash received.

     6.     U.S. Holders of Senior Noteholder Claims.

U.S. Holders of Allowed Senior Noteholder Claims will receive Trust Interests and Cash in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim

surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, and (ii) the amount of Cash received.

      7.     U.S. Holders of Other Parent Claims (not including the Swap Claim and Claims against Tribune arising from a Non-Qualified Former Employee Benefit Plan).

U.S. Holders of Allowed Other Parent Claims will receive Cash and may receive Trust Interests in exchange for their Claims. Accordingly, a U.S. Holder of an Allowed Other Parent Claim should generally recognize income or loss in an amount equal to the difference between the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and the sum of (i) the amount of Cash received, and (ii) the fair market value of the Holder's share of Trust Assets.

      8.     U.S. Holders of General Unsecured Claims against the Filed Subsidiary Debtors (not including Claims against the Filed Subsidiary Debtors arising from a Non-Qualified Former Employee Benefit Plan).

  ·  U.S. Holders of Allowed General Unsecured Claims will receive Cash in exchange for their Claims. Each U.S. Holder of an Allowed General Unsecured Claim will recognize income or loss equal to the difference between (i) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of Cash received.

      9.     U.S. Holders of Convenience Claims.

U.S. Holders of Allowed Convenience Claims will receive Cash in exchange for their Claims. Each U.S. Holder of a Convenience Claim will recognize income or loss in an amount equal to the difference between (i) the adjusted tax basis in its Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of Cash received.

     10.    U.S. Holders of Claims arising from a Non-Qualified Former Employee Benefit Plan.

U.S. Holders of Allowed Claims arising from a Non-Qualified Former Employee Benefit Plan will receive Cash and may receive Trust Interests in exchange for their Claims. The amount of Cash received as part of the exchange (including any cash subsequently received on account of the disallowance of Disputed Claims) and the fair market value of the U.S. Holder's share of Trust Assets will likely be treated as compensation income to a U.S. Holder. Under Treasury Regulations promulgated under Section 409A of the IRC, such a payment may be treated as an acceleration of deferred compensation, and, if so, would be subject to an additional twenty percent (20%) tax, and interest would be due at the federal underpayment rate plus one percent (1%) on the underpayments of income tax on the amount of such deferred compensation had it been included in income in the first year it was no longer subject to a substantial risk of forfeiture.

     11.    U.S. Holders of EGI-TRB LLC and PHONES Notes Claims.

U.S. Holders of Allowed EGI-TRB LLC Claims and PHONES Notes Claims will receive Trust Interests in exchange for their Claims. Accordingly, a U.S. Holder of such a Claim should generally recognize gain or loss in an amount equal to the difference between the Holder's adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the Holder's share of Trust Assets, if any.

     12.    U.S. Holders of Securities Litigation Claims

Pursuant to the Debtor/Committee/Lender Plan, all Securities Litigation Claims will be extinguished, and U.S. Holders of Securities Litigation Claims will receive nothing in exchange for such Claims. As a result, each U.S. Holder of a Securities Litigation Claim generally will recognize a loss equal to the U.S. Holder's adjusted tax basis, if any, in such Claim, except to the extent that such U.S. Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

13.    U.S. Holders of Tribune Interests.

Pursuant to the Debtor/Committee/Lender Plan, all Tribune Interests will be extinguished, and U.S. Holders of Tribune Interests will receive nothing in exchange for such Tribune Interests. As a result, each U.S. Holder of Tribune Interests generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Tribune Interests extinguished under the Debtor/Committee/Lender Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Tribune Interests under its regular method of accounting.

14.    Definition of "Security."

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

15.    Federal Income Tax Treatment of the New Senior Secured Term Loan.

If interests in the New Senior Secured Term Loan are "publicly traded," the issue price of an interest is generally expected to equal its fair market value on the Effective Date. If interests in the New Senior Secured Term Loan are not publicly traded, the issue price of an interest will depend on whether a substantial amount of the New Senior Secured Term Loan is exchanged for debt instruments that are publicly traded, in which case the issue price of interests in the New Senior Secured Term Loan is generally expected to be determined by reference to the fair market value of the publicly traded debt for which a substantial amount of the New Senior Secured Term Loan has been exchanged. Otherwise, the issue price of an interest in the New Senior Secured Term Loan is generally expected to equal its stated redemption price at maturity. For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

A U.S. Holder who receives an interest in the New Senior Secured Term Loan will generally be required to include stated interest on the New Senior Secured Term Loan in income in accordance with U.S. Holder's regular method of tax accounting. In addition, if the New Senior Secured Term Loan is treated as issued with original issue discount for U.S. federal income tax purposes, a U.S. Holder of an interest in the New Senior Secured Term Loan will also be required to include in income as interest the amount of such original issue discount over the term of the New Senior Secured Term Loan based on the constant yield method. In such a case, a U.S. Holder will also be required to include amounts in income before they are received. A U.S. Holder's tax basis in its interest in the New Senior Secured Term Loan will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to its interest in the New Senior Secured Term Loan.

16.    Federal Income Tax Treatment of New Warrants.

In general, a U.S. Holder of a New Warrant will recognize gain or loss upon the sale of the New Warrant in an amount equal to the difference between the amount realized on the sale and such Holder's adjusted tax basis in the New Warrant. Gain or loss attributable to the sale of a New Warrant will generally be capital gain or loss.

Although the U.S. federal income tax consequences of the exercise of a New Warrant on a cashless basis are not entirely clear, a U.S. Holder should not recognize any gain or loss in respect of the receipt of New Common Stock upon the cashless exercise of a New Warrant because such exchange should be treated as a recapitalization for U.S. federal income tax purposes. A U.S. Holder's tax basis in the New Common Stock received upon the exercise of a New Warrant should equal such Holder's tax basis in the New Warrant exercised. The holding period for the New Common Stock received upon the exercise of a New Warrant should include such Holder's holding period for the New Warrant. Due to the absence of authority on the U.S. federal income tax treatment of the exercise of warrants on a cashless basis, there can be no assurance that the IRS or a court would take a similar position as described above. Accordingly, U.S. Holders should consult their tax advisors concerning the possible tax consequences of the cashless exercise of the New Warrants.

A U.S. Holder should not recognize any gain or loss in respect of the receipt of New Common Stock upon the exercise of a New Warrant for a cash payment of the exercise price, which is expected to be a nominal amount. A U.S. Holder's tax basis in the New Common Stock received upon the exercise of a New Warrant should equal such Holder's tax basis in the New Warrant exercised plus the exercise price paid by the Holder. It is not clear whether the exercise of a New Warrant for a cash payment of equal to the exercise price should be treated as a purchase of the entirety of the New Common Stock received or as a purchase of only a portion of the New Common Stock worth the cash paid, with the rest of the New Common Stock treated as received pursuant to a recapitalization with consequences described in the preceding paragraph. If such exercise were treated as a purchase of the entirety of the New Common Stock received, a U.S. Holder's holding period for the Common Stock would commence upon the day following the date the New Warrant is exercised (or possibly on the date of exercise). U.S. Holders should consult their tax advisors regarding the tax consequences of exercise of a New Warrant by payment of the exercise price.

17.    Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Debtor/Committee/Lender Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S.

federal income tax purposes, or (ii) such holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

      18.     Information Reporting and Backup Withholding.

     Certain payments, including the payments with respect to Claims pursuant to the Debtor/Committee/Lender Plan, may be subject to information reporting by the payor to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of twenty-eight percent (28%)) under certain circumstances. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) is notified by the IRS of a failure to report interest or dividends properly, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that the holder is a United States person that is not subject to backup withholding. Certain persons are exempt from backup withholding, including, under certain circumstances, corporations and financial institutions. Holders of Allowed Claims and Interests are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

     Recent legislation generally imposes withholding of 30% on payments to certain foreign entities (including financial intermediaries), after December 31, 2012, of dividend payments on and the gross proceeds of dispositions of U.S. common stock and possibly warrants, unless various U.S. information reporting and due diligence requirements (that are in addition to, and potentially significantly more onerous than, the requirement to deliver an IRS Form W-8BEN) have been satisfied. Non-U.S. Holders should consult their tax advisers regarding the possible implications of this legislation for their receipt of interests in the New Common Stock and New Warrants.

    **E.**      **Federal Income Tax Treatment of Other Parent Claims Reserve and Subsidiary GUC Reserve (collectively, "Reserves").**

     Reorganized Tribune may establish one or more Reserves to make distributions to Holders of Disputed Claims that become Allowed Claims after the Effective Date. Distributions from each such Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed, and to Holders of Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed.

     Each Reserve may be structured in a manner intended to cause it to be subject to a separate entity-level tax on its income. Therefore, distributions from each such Reserve may be reduced to satisfy any taxes payable by the Reserve.

     Holders of Claims should note the tax treatment of such Reserve(s) is unclear and should consult their own tax advisors.

    **F.**      **Federal Income Tax Treatment of the Step Two/Disgorgement Settlement.**

     The federal income tax treatment of the Step Two/Disgorgement Settlement is uncertain. It is expected that the payment of Cash pursuant to the Step Two/Disgorgement Settlement should be treated as separate from the receipt of consideration on account of a participant's Claim. Settling Step Two

Payees may be entitled to a deduction for all or a portion of the amount paid pursuant to the Step Two/Disgorgement, although amounts advanced in respect of Non-Settling Step Two Payees may be subject to special treatment. Settling Step Two Payees should consult their tax advisors with respect to their participation in the Step Two/Disgorgement Settlement.

### G.    Importance of Obtaining Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE DEBTOR/COMMITTEE/LENDER PLAN.

### H.    Reservation of Rights.

This Article VI is subject to change (possibly substantially) based on subsequent changes to other provisions of the Debtor/Committee/Lender Plan. The Debtor/Committee/Lender Plan Proponents and their advisors reserve the right to further modify, revise or supplement this Article VI and the other tax related sections of the Debtor/Committee/Lender Plan up to ten days prior to the date by which objections to Confirmation of the Debtor/Committee/Lender Plan must be filed and served.

### VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE DEBTOR/COMMITTEE/LENDER PLAN

If the Debtor/Committee/Lender Plan is not confirmed, the alternatives include (i) continuation of the Chapter 11 Cases, (ii) approval of a Competing Plan, or (iii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### A.    Continuation of the Chapter 11 Cases.

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases. If the Debtors remain in chapter 11 for an extended period of time, they could have difficulty operating with the high costs, operating financing and the eroding confidence of their employees, customers and trade vendors.

In addition, if the Debtors fail to settle outstanding Claims through the Debtor/Committee/Lender Plan, litigation of certain Claims may be required, which litigation may take years to resolve, be burdensome and expensive, prolong the Chapter 11 Cases, and have a detrimental impact on the Debtors' businesses and enterprise value.

### B.    Approval of a Competing Plan.

The Debtor/Committee/Lender Plan Proponents believe that the Debtor/Committee/Lender Plan provides the best option for restructuring the Debtors. Please refer to the Debtor/Committee/Lender Plan Proponents' Responsive Statement included in Volume III of the Joint Disclosure Statement for a detailed

discussion of the Debtor/Committee/Lender Plan Proponents' views regarding the inferiority of other Competing Plans.

C.      **Liquidation under Chapter 7 or Chapter 11.**

If the Debtor/Committee/Lender Plan or another plan of reorganization is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to liquidate the assets of the Debtors. The Debtors believe that in a liquidation under chapter 7 additional administrative expenses involved in the appointment of a trustee and professionals to assist such trustee, along with expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. In addition, the Debtor/Committee/Lender Plan Proponents believe that the Liquidation Analysis attached as Exhibit D to the General Disclosure Statement is speculative as it is necessarily premised upon assumptions and estimates. As such, the Liquidation Analysis can give no assurance as to the value which would be realized in chapter 7 liquidation. Further, as demonstrated in Article IV above, the Debtor/Committee/Lender Plan Proponents believe that recoveries to creditors in a chapter 7 liquidation would be substantially lower less than those provided pursuant to the Debtor/Committee/Lender Plan.

The Debtors could also be liquidated under a chapter 11 plan of reorganization. In a chapter 11 liquidation, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7 and a trustee would not be required. Thus, chapter 11 liquidation might result in larger recoveries than in chapter 7 liquidation; however, the delay in distributions could result in lower present values being received and higher administrative costs.

## VIII.    CONCLUSION AND RECOMMENDATION

The Debtor/Committee/Lender Plan Proponents believe that the Debtor/Committee/Lender Plan furthers the paramount interest of all creditors by providing for the resolution of the LBO-Related Causes of Action and a reasonable procedure for the resolution of other causes of action for the benefit of certain creditors through the creation and funding of the Creditors' Trust and the Litigation Trust. This will allow the Debtors to emerge promptly from bankruptcy while preserving the opportunity for certain creditors to pursue additional recoveries through litigation.

**The Debtor/Committee/Lender Plan Proponents urge all Holders of Claims to (i) vote to accept the Debtor/Committee/Lender Plan and (ii) return their ballots so that they are received no later than [●] (prevailing Eastern Time) on [●], 2010.**

Date:  December [●], 2010

TRIBUNE COMPANY (for itself and on behalf of   the other Debtors, as Debtors and Debtors in Possession, and the Guarantor Non-Debtors and Non-Guarantor Non-Debtors)

By: _____

Name:  Donald J. Liebentritt
Title:    Co-President and Chief Restructuring Officer, Tribune

71

Date:  December [●], 2010

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TRIBUNE COMPANY, ET AL
Warner Bros. Television, solely in its capacity as Co-
Chair of the Creditors' Committee and not in its
individual capacity

By: _____

Name:  Wayne M. Smith

Title:   Vice President, Senior Litigation & Chief
Patent Counsel

Date:  December [●], 2010

OAKTREE CAPITAL MANAGEMENT, L.P.:

By: _____

Name:  Ken Liang

Title:   Managing Director


By: _____

Name:  Edgar Lee

Title:   Senior Vice President

Date:  December [●], 2010

ANGELO, GORDON & CO., L.P.:

By: _____

Name:

Title:

Date:  December [●], 2010

JPMORGAN CHASE BANK, N.A.:

By: _____

Name:

Title: