## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| | ) |
| In re | ) |
| | )   Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | )   Case No. 08-13141 (KJC) |
| | )   Jointly Administered |
| Debtors. | ) |
| | ) |

**SPECIFIC DISCLOSURE STATEMENT FOR THE JOINT PLAN OF
REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES
PROPOSED BY AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS
MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS
CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF
SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS
CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF
SENIOR NOTES AND WILMINGTON TRUST COMPANY, IN ITS CAPACITY AS
SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES**
[December 7, 2010 Version]

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
*Counsel for Aurelius Capital Management, LP*

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
Philip C. Dublin
One Bryant Park
New York, New York 10036
(212) 872-1000

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800
*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for
certain series of Senior Notes*

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre, 405 N. King Street
Wilmington, DE 19801
302-984-6300

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Richard F. Casher
1633 Broadway
New York, New York 10019
 (212) 506-1700
*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for
certain series of Senior Notes*

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
(302) 429-1900

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the following page.

BROWN RUDNICK LLP                    SULLIVAN HAZELTINE ALLINSON LLC
Robert J. Stark                         William D. Sullivan (I.D. No. 2820)
Martin S. Siegel                       Elihu E. Allinson, III (I.D. No. 3476)
Gordon Z. Novod                    4 East 8th Street, Suite 400
Seven Times Square                Wilmington, DE 19801
New York, NY 10036              302-428-8191
212-209-4800

*Counsel for Wilmington Trust Company, solely in its capacity as Successor Indenture Trustee for the PHONES Notes*

DATED:  December 7, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE NOTEHOLDER PLAN.  THIS NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  SOLICITATION OF ACCEPTANCE OR REJECTION OF THE NOTEHOLDER PLAN MAY OCCUR ONLY AFTER THE BANKRUPTCY COURT APPROVES THIS NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT.**

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# Table of Contents

Page

**I. SUMMARY OF THE NOTEHOLDER PLAN** .............................................................5

    **A.**    **Introduction** ...........................................................................5

    **B.**    **Special Considerations** ...........................................................17
            1.    Senior Loan Claim Sharing Resolution .........................................17
            2.    PHONES Notes Claim Resolution................................................18
            3.    Put Options and Claims Purchase ................................................19
            4.    Intercompany Claims .............................................................22
            5.    LBO-Related Causes of Action ...................................................23

    **C.**    **The Noteholder Plan is Fair, Reasonable and In the Best Interests of the Debtors' Estates and All Creditors** ...........................23

**II. TREATMENT UNDER THE NOTEHOLDER PLAN** ...........................................25

**III. ESTIMATED RECOVERIES UNDER THE NOTEHOLDER PLAN** ...............30

**IV. ESTIMATED LIQUIDATION RECOVERIES     UNDER THE NOTEHOLDER PLAN** ..................................................................44

**V. CLASSES ENTITLED TO VOTE ON THE NOTEHOLDER PLAN** ..................56

**VI. CERTAIN FACTORS AFFECTING THE NOTEHOLDER PLAN** ..................58

    **A.**    **Certain Risk Factors Specific to the Noteholder Plan** ...........................58
            1.    Length of Litigation ...............................................................58
            2.    Impact of Timing on Value of New Common Stock/New Warrants ...........................................................................58
            3.    Outcome of Litigation Trust Causes of Action and State Law Avoidance Claims..........................................................58
            4.    Determination of Senior Loan Claim Sharing Resolution............59
            5.    Determination of PHONES Notes Claims Resolution..................59
            6.    Assumptions Regarding DEV and Allocation of DEV..................60
            7.    Claims Purchase Price Caps.......................................................60
            8.    FCC Related Considerations and Risks Respecting the Debtors' Businesses ...............................................................60

    **B.**    **Additional Factors to Be Considered** ......................................65
            1.    The Proponents Have No Duty to Update .....................................65

2.    No Representations Outside the Joint Disclosure Statement .........65
3.    Proponents Can Withdraw the Noteholder Plan ...........................65
4.    No Legal or Tax Advice Is Provided to You by the
      Noteholder Specific Disclosure Statement ...................................65
5.    No Admission Made .....................................................................65
6.    A Liquid Trading Market for the Trust Interests is Unlikely
      to Develop ...................................................................................66

C.    **Certain Tax Matters** ...................................................................66

**VII. CONFIRMATION OF THE NOTEHOLDER PLAN** ..........................................66

A.    **Requirements for Confirmation of the Noteholder Plan**.....................66
      1.    Requirements of Section 1129(a) of the Bankruptcy Code ...........66
      2.    Requirements of Section 1129(b) of the Bankruptcy Code ...........69
      3.    Failure to Vote on the Noteholder Plan ........................................71

**VIII. ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION
      OF THE NOTEHOLDER PLAN** ...................................................................71

A.    **Liquidation Under Chapter 7** ..........................................................71

B.    **Alternative Plan of Reorganization**..................................................71

**IX. CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW
      CONSIDERATIONS** ....................................................................................72

A.    **Federal and State Securities Law Considerations.** ..............................72

B.    **Subsequent Transfers of New Securities**............................................72

**X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
      NOTEHOLDER PLAN** ................................................................................73

A.    **Federal Income Tax Consequences to the Debtors**..............................75
      1.    Termination of Subchapter S Corporation Status .........................75
      2.    Cancellation of Debt and Reduction of Tax Attributes ................75

B.    **Federal Income Tax Consequences to Holders of Claims and
      Interests**.......................................................................................76
      1.    Consequences of Exchanges .......................................................77

C.    **Consequences of Holding Exchanged Consideration** ...........................86
      1.    Federal Income Tax Treatment of the New Senior Secured
            Term Loan ................................................................................86
      2.    Ownership and Disposition of New Common Stock ....................87

       3.     Tax Treatment of the Distribution Trust and Holders of
             Distribution Trust Interests ...........................................................88
       4.     Tax Treatment of the Creditors' Trust and Holders of
             Creditors' Trust Interests .............................................................89
       5.     Basis Allocation ..........................................................................91
       6.     Limitations on Capital Losses......................................................91

**D.**      **Additional Considerations............................................................92**
       1.     Accrued but Unpaid Interest .........................................................92
       2.     Market Discount...........................................................................92

**E.**      **Non-U.S. Holders ........................................................................93**
       1.     General Consequences to Non-U.S. Holders................................93

**F.**      **Information Reporting and Backup Withholding ...............................95**
       1.     Recent Legislation .......................................................................95

**G.**      **Federal Income Tax Treatment of Disputed Claims Reserves............95**

**H.**      **Importance of Obtaining Professional Tax Assistance.........................96**

**XI. CONCLUSION .............................................................................................97**

THE INFORMATION CONTAINED IN THIS SPECIFIC DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION (THE "NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT") FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, AND WILMINGTON TRUST COMPANY, IN ITS CAPACITY AS THE PHONES NOTES INDENTURE TRUSTEE, ARE INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES, AS MAY BE MODIFIED AMENDED, AND/OR SUPPLEMENTED FROM TIME TO TIME (THE "NOTEHOLDER PLAN") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE NOTEHOLDER PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE NOTEHOLDER PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

ALL CREDITORS ENTITLED TO VOTE ON THE NOTEHOLDER PLAN ARE ADVISED AND ENCOURAGED TO READ THE GENERAL DISCLOSURE STATEMENT, THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT AND THE NOTEHOLDER PLAN *IN THEIR ENTIRETY* BEFORE VOTING TO ACCEPT OR REJECT THE NOTEHOLDER PLAN OR ANY OTHER PLAN FILED IN THESE CASES (COLLECTIVELY, THE "COMPETING PLANS").  ALL CREDITORS ENTITLED TO VOTE ON THE NOTEHOLDER PLAN SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION XII OF THE GENERAL DISCLOSURE STATEMENT AND SECTION VI OF THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE NOTEHOLDER PLAN OR ANY COMPETING PLAN.  A COPY OF THE NOTEHOLDER PLAN IS ANNEXED HERETO AS EXHIBIT A. SUMMARIES AND STATEMENTS MADE IN THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE NOTEHOLDER PLAN AND THE EXHIBITS ANNEXED TO THE NOTEHOLDER PLAN AND THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT, THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT AND THE TERMS OF THE NOTEHOLDER PLAN, THE TERMS OF THE NOTEHOLDER PLAN WILL GOVERN.

THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY

CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION, VALUATION, THE ALLOCATION OF VALUE AMONG THE DEBTORS AND THEIR NON-DEBTOR AFFILIATES, ILLUSTRATIVE CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED, AT LEAST IN PART, ON ESTIMATES AND ASSUMPTIONS OBTAINED DIRECTLY FROM THE DEBTORS, AS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. MOREOVER, THE PROPONENTS RESERVE ALL OF THEIR RESPECTIVE RIGHTS TO ASSERT AT CONFIRMATION THAT THE VALUATION AND ALLOCATION OF VALUE MAY BE DIFFERENT THAN AS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN OR ADOPTED BY THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN AND IN THE GENERAL DISCLOSURE STATEMENT.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, BUT NOT LIMITED TO, RISKS ASSOCIATED WITH (I) FUTURE FINANCIAL RESULTS AND LIQUIDITY, INCLUDING THE ABILITY TO FINANCE OPERATIONS IN THE NORMAL COURSE, (II) VARIOUS FACTORS THAT MAY AFFECT THE VALUE OF THE NEW COMMON STOCK TO BE ISSUED UNDER THE NOTEHOLDER PLAN, (III) THE RELATIONSHIPS WITH AND PAYMENT TERMS PROVIDED BY TRADE CREDITORS, (IV) ADDITIONAL FINANCING REQUIREMENTS POST-RESTRUCTURING, (V) FUTURE DISPOSITIONS AND ACQUISITIONS, (VI) THE EFFECT OF COMPETITIVE PRODUCTS, SERVICES OR PRICING BY COMPETITORS, (VII) CHANGES TO THE COSTS OF COMMODITIES AND RAW MATERIALS, (VIII) THE PROPOSED RESTRUCTURING AND COSTS ASSOCIATED THEREWITH, (IX) THE ABILITY TO OBTAIN RELIEF FROM THE BANKRUPTCY COURT TO FACILITATE THE SMOOTH OPERATION UNDER CHAPTER 11, (X) THE CONFIRMATION AND CONSUMMATION OF THE NOTEHOLDER PLAN AND (XI) EACH OF THE OTHER RISKS IDENTIFIED IN THE GENERAL DISCLOSURE STATEMENT AND THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE PROPONENTS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING

STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE
EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE
BANKRUPTCY COURT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND
OTHER ACTIONS OR THREATENED ACTIONS, THE NOTEHOLDER SPECIFIC
DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS
AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER,
BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.
THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT WILL NOT BE
ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE
DEBTORS, THE PROPONENTS OR ANY OTHER PARTY, NOR WILL IT BE
CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR
OTHER LEGAL EFFECTS OF THE NOTEHOLDER PLAN AS TO HOLDERS OF
CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS IN THESE
CHAPTER 11 CASES.

THE STATEMENTS CONTAINED IN THE NOTEHOLDER SPECIFIC
DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS
ANOTHER TIME IS SPECIFIED HEREIN AND THE DELIVERY OF THE
NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT SHALL NOT CREATE AN
IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION
STATED SINCE THE DATE HEREOF.  CREDITORS ENTITLED TO VOTE ON THE
NOTEHOLDER PLAN SHOULD CAREFULLY READ THE GENERAL
DISCLOSURE STATEMENT AND THE NOTEHOLDER SPECIFIC DISCLOSURE
STATEMENT IN THEIR ENTIRETY, INCLUDING THE NOTEHOLDER PLAN,
PRIOR TO VOTING ON THE NOTEHOLDER PLAN OR ANY OF THE
COMPETING PLANS.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED
TO IN THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT DO NOT
PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN
THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE
AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN
SUCH AGREEMENT.

**THE PROPONENTS BELIEVE THAT THE NOTEHOLDER PLAN IS
FAIR AND EQUITABLE, WILL PRESERVE ALL CREDITORS' APPLICABLE
RIGHTS WITH RESPECT TO CAUSES OF ACTION ARISING OUT OF THE
2007 LEVERAGED BUYOUT OF THE TRIBUNE ENTITIES, WILL MAXIMIZE
THE RECOVERY FOR THE DEBTORS' CREDITORS AND ALL PARTIES IN
INTEREST, ENABLE THE DEBTORS TO REORGANIZE SUCCESSFULLY,
AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND, THAT
ACCEPTANCE OF THE NOTEHOLDER PLAN IS IN THE BEST INTERESTS
OF THE DEBTORS AND THEIR CREDITORS.**

THE PROPONENTS URGE CREDITORS TO VOTE TO ACCEPT THE NOTEHOLDER PLAN ON THE PURPLE BALLOT AND TO RANK THE NOTEHOLDER PLAN AS THEIR MOST PREFERRED PLAN ON THE PURPLE BALLOT.  THE PROPONENTS BELIEVE THAT THE NOTEHOLDER PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR THE DEBTORS' CREDITORS AND PRESERVES CREDITORS' RIGHTS TO DUE PROCESS.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# I.

## SUMMARY OF THE NOTEHOLDER PLAN[2]

**A.    Introduction**[3]

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in the Noteholder Specific Disclosure Statement, the General Disclosure Statement and the Noteholder Plan.  Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius"), Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for certain series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of Senior Notes ("Law Debenture"), and Wilmington Trust Company, in its capacity as the PHONES Notes Indenture Trustee ("Wilmington Trust"), are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code (the "Proponents").  The Proponents reserve the right to modify the Noteholder Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The Noteholder Plan described herein constitutes a separate plan of reorganization for each of the 111 Debtors and, to the extent they commence chapter 11 cases prior to the date the Noteholder Plan is confirmed by the Bankruptcy Court, a prepackaged plan of reorganization for the each of the Subsidiary Non-Debtors.

1.    Overview

Aurelius, one of the co-proponents of the Noteholder Plan, is the largest holder of Tribune's Senior Notes and one of the largest holders of the PHONES Notes.[4]  The Senior Notes and the PHONES Notes – often referred to as the "Pre-LBO Bonds" – were issued prior to the 2007 leveraged buyout of Tribune.[5]   Joining Aurelius as co-proponents of the Noteholder Plan are Deutsche Bank, Law Debenture and Wilmington Trust, all three indenture trustees for the Pre-LBO Bonds.

In accordance with the findings set forth in the Examiner's Report, including, among others, that some if not all of the claims arising out of the leveraged buyout of the Tribune Entities in 2007 may be found to be fraudulent transfers subject to avoidance under applicable provisions of the Bankruptcy Code and/or other applicable law, the Noteholder Plan provides that all litigation related to the leveraged buyout will be preserved and, following the Effective Date, will be prosecuted by a multi-trust structure comprised of the Litigation Trust and the Creditors' Trust, while still providing a substantial distribution of the Debtors' total distributable

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Noteholder Plan.
[3] The description of the Noteholder Plan contained in the Noteholder Specific Disclosure Statement is qualified in its entirety by the Noteholder Plan and the operative provisions thereof.  To the extent there is any inconsistency between the description of the Noteholder Plan in the Noteholder Specific Disclosure Statement and Noteholder Plan, the Noteholder Plan and the operative provisions therein shall control.
[4] Entities managed by Aurelius Capital Management, LP beneficially own Senior Notes with a face value of approximately $657.7 million and PHONES Notes with a face value of approximately $165.9 million (assuming an Original Principal Amount (as defined in the PHONES Notes Indenture) of $157.00 per PHONES Note).
[5] A description of the leveraged buyout can be found in section VII.A of the General Disclosure Statement.

enterprise value ("<u>DEV</u>") upon the Debtors' emergence from chapter 11.[6]  The causes of action
to be prosecuted by the Trusts include litigation regarding, among other things, (i) the
avoidability of the indebtedness incurred by the Debtors in connection with the 2007 leveraged
buyout, (ii) whether recipients of pre-Effective Date payments in respect of the debt incurred
pursuant to the leveraged buyout will be required to disgorge such payments,
(iii) whether the shareholders that had their stock redeemed in connection with the leveraged
buyout will be required to disgorge such payments, (iv) claims against the Debtors' officers,
directors and advisors, (v) claims against Sam Zell and his Affiliates, (vi) the applicability of the
subordination provisions in the Bridge Loan Agreement (to the extent required), (vii) to the
extent not determined prior to the Effective Date, the PHONES Notes Claims Resolution,[7]
(viii) to the extent not determined prior to the Effective Date, the Senior Loan Claim Sharing
Resolution and (ix) to the extent not determined prior to the Effective Date, the appropriate
treatment for Intercompany Claims (the foregoing, together with any other causes of action that
may be prosecuted by the Litigation Trust and the Creditors' Trust are referred to as the "<u>Trust
Causes of Action</u>").

      As a result of the trust components of the Noteholder Plan, the Proponents believe that
the Noteholder Plan will be able to go effective expeditiously and with fewer conditions than the
other plans of reorganization that have been proposed in the Debtors' Chapter 11 Cases.  For
example, confirmation and effectiveness of the Noteholder Plan are not conditioned upon, among
other things (i) the Bankruptcy Court reaching a particular conclusion on certain aspects of the
causes of action arising from the leveraged buyout, (ii) the Bankruptcy Court approving a
transparently self-serving settlement reached between the principal targets of the Examiner's
Report and a Creditors' Committee rife with conflicts or (iii) the Bankruptcy Court granting
sweeping and unjustified releases, exculpations and indemnification to parties that, through their
fraudulent activities, materially and adversely harmed the Debtors' Estates and their Creditors,
including innocent pre-leveraged buyout creditors.

      Although ultimate recoveries for each Impaired Class of Claims will be based on the final
resolution of the Trust Causes of Action, the Noteholder Plan permits between 34.7% and

---

[6] To the extent any Trust Causes of Action are commenced prior to the Effective Date, control over the prosecution of such causes of action will be transferred to the Litigation Trust or the Creditors' Trust, as applicable, on the Effective Date pursuant to the terms of the Noteholder Plan.

[7] Prior to the Petition Date, Holders of PHONES Notes were contractually entitled to exchange PHONES Notes for an amount of Cash equal to ninety five percent (95%) (or one hundred percent (100%) under certain circumstances) of the then-current market value of two shares of Time Warner Inc. stock. According to the General Disclosure Statement, the approximate carrying value of PHONES Notes on the Petition Date was $759 million, comprised of $703 million of PHONES Notes not submitted for exchange and a $56 million liability for PHONES Notes that were exchanged but not settled in Cash.  Prior to PHONES Notes being submitted for exchange, there were approximately $1.197 billion in PHONES Notes outstanding.  The Debtors, in the General Disclosure Statement, represent that they have been informed by the PHONES Notes Indenture Trustee that the PHONES Notes Indenture Trustee and certain Holders of the PHONES Notes have disputed that the aggregate outstanding amount of the PHONES Notes should be reduced by the amount of PHONES Notes submitted for exchange but not paid for in Cash.  In fact, the Proof of Claim filed by the PHONES Notes Indenture Trustee, on behalf of the Holders of the PHONES Notes, includes the PHONES Notes tendered for exchange in the aggregate amount of the PHONES Notes Claims, noting that the exchanges with respect to such PHONES Notes were not consummated because the issuer failed to make the required exchange payments and thus, the Allowed amount of PHONES Notes Claims should be $1.197 billion.  In connection with Confirmation, the Proponents are seeking a determination by the Bankruptcy Court regarding the classification of the PHONES Notes Exchange Claims for purposes of the Noteholder Plan.  The outcome of the PHONES Notes Claims Resolution will determine the amount of the PHONES Notes Claims and PHONES Notes Exchange Claims and the priority of the PHONES Notes Exchange Claims vis-à-vis the PHONES Notes Claims.  It is possible that the PHONES Notes Claims Resolution will determine that the PHONES Notes Exchange Claims should be classified as PHONES Notes Claims due to the failure of the issuer to consummate the exchange.  Alternately, the PHONES Notes Claims Resolution might determine that the PHONES Notes Exchange Claims should be classified as Subordinated Securities Claims and, therefore, subordinate to payment in full of the PHONES Notes Claims.  The outcome of the PHONES Notes Claims Resolution will affect, among other things, both the amount of Initial Distributions allocable to the PHONES Notes (and, accordingly, the amount actually paid over to the Senior Noteholders on account of enforcement of the subordination provisions of the PHONES Notes Indenture) and the series of Trust Interests that will be distributed to the Holders of PHONES Notes Exchange Claims.

51.2%[8] of the Debtors' DEV to be distributed to Creditors upon the Debtors' emergence from chapter 11 (i.e., between $2.340 billion and $3.458 billion of the Debtors' DEV).[9]  Initial Distributions to each Class of Claims will generally represent a recovery assuming that the resolution of all Trust Causes of Action has the least favorable outcome vis-à-vis such Class.

2.  Valuation

The Noteholder Plan is not tied to a specific valuation upon its filing but rather distributions to Creditors will be premised, in part, on the DEV determined by the Bankruptcy Court in connection with Confirmation.  The Debtors' financial advisor, Lazard, has, however, estimated the Debtors' DEV to be $6.75 billion, with such value allocated approximately $4.3 billion to the value of the New Common Stock, approximately $1.1 billion to the value of the New Senior Secured Term Loan and $1.4 billion to Cash that will be distributed to Creditors. *See* General Disclosure Statement, Exhibit F.  The Proponents are not adopting Lazard's valuation for purposes of the Noteholder Plan at this time based on the fact that, among other things: (i) the underlying projections for Lazard's valuation were not provided to the Proponents with sufficient lead time to be able to analyze properly the description of the analyses performed by Lazard and (ii) the projections were qualified in their entirety as not being "a complete description of the analyses performed by Lazard."  However, for purposes of enabling Creditors to analyze, on an "apples to apples" basis, their projected recoveries under the Noteholder Plan as compared to the  plan of reorganization filed by the Debtors, the Creditors' Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. on October 22, 2010 (the "Debtor/Committee/Lender Plan"), the recoveries described in section III herein utilize the Debtors' $6.75 billion DEV and the allocation of the DEV among Tribune, on the one hand, and its Subsidiaries (on a consolidated basis), on the other, in a manner consistent with the Debtor/Committee/Lender Plan.  The Proponents expressly reserve their rights to assert that a different DEV for the Tribune Entities and/or different allocation of DEV among Tribune and the Subsidiaries is correct at Confirmation.

3.  Trusts

Pursuant to the terms of the Noteholder Plan, three distinct Trusts will be created on the Effective Date: (i) a Litigation Trust; (ii) a Distribution Trust; and (iii) a Creditors' Trust.  The Trusts are structured such that the Litigation Trust is a sub-trust of the Distribution Trust, while the Creditors' Trust is an unrelated entity.

The Litigation Trust will be created in order to prosecute the Litigation Trust Causes of Action, which will be transferred from the Debtors' Estates to the Litigation Trust on the Effective Date of the Noteholder Plan, along with all of the rights of the Debtors and the Creditors' Committee with respect to the Litigation Trust Causes of Action necessary to protect,

---

[8] This range is premised upon on a DEV of $6.750 billion; however, the allocation of such DEV among Tribune and its Subsidiaries and, accordingly, ultimate recoveries by Creditors of Tribune and its Subsidiaries will depend on a determination by the Bankruptcy Court of (i) the actual DEV; (ii) the allocation of the DEV among Tribune and its Subsidiaries; (iii) the Senior Loan Claim Sharing Resolution; and (iv) the PHONES Notes Claims Resolution.  For the avoidance of doubt, the Proponents expressly reserve all rights to assert that a different DEV for the Tribune Entities and/or different allocation of DEV among Tribune and the Subsidiaries is correct at Confirmation.

[9] Accordingly, based on the amount of DEV distributed to Creditors in connection with Initial Distributions, between $3.292 billion and $4.410 billion of the DEV will be held in the Distribution Trust Reserve pending the outcome of LBO-Related Causes of Action and the issuance of the Litigation Distribution Orders.

conserve, and liquidate all Litigation Trust Causes of Action as quickly as reasonably practicable, including, without limitation, control over (including the right to waive) all attorney/client privileges, work product privileges, accountant/client privileges and any other evidentiary privileges relating to the Litigation Trust Causes of Action that, prior to the Effective Date, belonged to the Debtors pursuant to applicable federal and state law.  The Litigation Trust Causes of Action include, but are not limited to the following: (i) all claims and causes of action belonging to the Debtors' Estates arising out of the 2007 leveraged buyout of the Tribune Entities including, without limitation, causes of action related to the avoidability of all debt incurred by the Debtors in connection with leveraged buyout and the disgorgement of all amounts paid to lenders, advisors and agents in connection with the leveraged buyout; (ii) all claims and causes of action against the Debtors' officers, directors and advisors (including Valuation Research Corporation); (iii) Intercompany Claims Avoidance Actions; (iv) claims and causes of action against Sam Zell and his Affiliates; (v) the Morgan Stanley Claims, which arise from, among other things, the Debtors' retention of MSCS, a certain swap transaction and the disposition of certain notes, bonds and other indebtedness held by MSCS; and (vi) all claims and Estate causes of action under chapter 5 of the Bankruptcy Code that are not Abandoned Claims.

When Litigation Trust Causes of Action are resolved pursuant to either a settlement or litigation, any net recoveries obtained by the Litigation Trust in connection therewith will be transferred to the Distribution Trust for distribution to Holders of Distribution Trust Interests in accordance with the terms of the Distribution Trust Agreement and the Litigation Distribution Orders.  The distribution of proceeds to Holders of Distribution Trust Interests from the Litigation Trust Causes of Action and other value held in the Distribution Trust will be determined by the Bankruptcy Court or such other court of competent jurisdiction based on the outcome of the Litigation Trust Causes of Action.  Accordingly, the Distribution Trust's role will be, among other things, to (i) hold all DEV remaining on the Effective Date of the Noteholder Plan after Initial Distributions have been made and until a resolution of the Litigation Trust Causes of Action is reached, (ii) receive the proceeds of the Litigation Trust Causes of Action and (iii) make distributions to Holders of Distribution Trust Interests in accordance with the terms of the Litigation Distribution Orders (which orders will provide for the allocation of distributions among the Holders of Distribution Trust Interests based on the resolution (by settlement or litigation) of the applicable Litigation Trust Causes of Action).

The Creditors' Trust will be created on the Effective Date and have dual functions – first, it will function as a litigation trust with respect to the State Law Avoidance Claims, which consist of claims and causes of action fundamentally different and distinct from those that will be prosecuted by the Litigation Trust.  Second, and unlike the Litigation Trust, the Creditors' Trust will directly make distributions of the proceeds recovered in connection with the State Law Avoidance Claims to Holders of Creditors' Trust Interests.  The Creditors' Trust Interests and the Creditors' Trust Distribution Orders will govern the relative rights and priorities of distributions made on account of the State Law Avoidance Claims.  All Holders of Claims against Tribune will be deemed to have transferred, on the Effective Date, any right they may possess to bring the State Law Avoidance Claims to the Creditors' Trust in exchange for Creditors' Trust Interests unless such Holder of Claims against Tribune has elected, on the applicable Noteholder Ballot, not to make such contribution (the "Non-Contribution Election").  State Law Avoidance Claims include, but are not limited to: (i) claims; (ii) causes of action; (iii)

avoidance powers or rights; and (iv) legal or equitable remedies against the shareholders in Tribune whose stock was redeemed in connection with the leveraged buyout.

Each Trust will be governed by a three member trust advisory board and managed by a trustee.  Aurelius will initially designate two (2) members to the Distribution Trust Advisory Board while the PHONES Notes Indenture Trustee will initially designate one (1) member; *provided, however*, that each such member appointed by Aurelius shall be independent of Aurelius.  The trustee for the Distribution Trust will be initially designated by Aurelius after reasonable consultation with each of the other Proponents; *provided*, *however*, that the trustee for the Distribution Trust shall be independent of Aurelius.  The identities of each of the designees to the Distribution Trust Advisory Board as well as the trustee for the Distribution Trust will be disclosed in the Noteholder Plan Supplement.   In addition, the designation of each of the designees to the Distribution Trust Advisory Board as well as the trustee for the Distribution Trust shall be subject to final appointment by the Bankruptcy Court upon entry of the Confirmation Order.  With respect to the Creditors' Trust Advisory Board and the Litigation Trust Advisory Board, Aurelius will appoint two (2) members to each such board while the PHONES Notes Indenture Trustee will appoint one (1) member to each such board.  The respective trustees for the Creditors' Trust and Litigation Trust will be appointed by Aurelius after reasonable consultation with each of the other Proponents.  The identity of each of the appointees to the Creditors' Trust Advisory Board and the Litigation Trust Advisory Board as well as the respective trustees for the Creditors' Trust and Litigation Trust will be disclosed in the Noteholder Plan Supplement.

Each Trust Advisory Board and the trustees of the respective Trusts shall owe fiduciary duties to the potential beneficiaries of their respective Trusts*; provided,* that the members of the Creditors' Trust Advisory Board and the Litigation Trust Advisory Board, and each of their respective trustees, shall not have any fiduciary obligation to potential trust beneficiaries who are also defendants in Litigation Trust Causes of Action or are the subject of State Law Avoidance Claims as such obligations would relate to such parties in their capacities as defendants in the Litigation Trust Causes of Action or State Law Avoidance Claims, as applicable, the purpose of such fiduciary duties being to maximize the value of the assets of the applicable Trusts, including causes of action and other property, as applicable.

To the extent the Senior Noteholders have actually received distributions from all sources of recovery under the Noteholder Plan with a value aggregating the entire principal amount (plus pre-Petition Date interest) on the Senior Notes, the advisory boards of the Litigation Trust, Distribution Trust and the Creditors' Trust may be reconstituted as follows:  (i) pursuant to the terms of the Litigation Trust Agreement, the holders of the Class 1I Distribution Trust Interests may elect, by majority vote, to replace any member of the Litigation Trust Advisory Board that was not appointed by the PHONES Notes Trustee; and (ii) pursuant to the Creditors' Trust Agreement, the holders of the Class 1I Creditors' Trust Interests may elect, by majority vote, to replace any member of the Creditors' Trust Board that was not appointed by the PHONES Notes Trustee.

The initial funding for the Distribution Trust will be obtained through a contribution from the Debtors of $40 million in Cash.  The Distribution Trust will use a portion of such funding to provide the initial funding for the Litigation Trust.  Any portion of the Distribution Trust Initial

Funding that has not been utilized prior to the wind-up of the Distribution Trust will revert back to the Reorganized Debtors and will, under no circumstances, be distributed to the Holders of Distribution Trust Interests or become part of the Distribution Trust Reserves.  The initial funding for the Creditors' Trust will be obtained through interest free loans from the Distribution Trust.  Each of the Trusts will have the authority to use proceeds from its assets and obtain from other sources additional financing, if necessary, in each case as set forth in the applicable trust agreement.

    4.   Initial Distributions

    Except for (i) Initial Distributions to Holders of Other Guarantor Debtor Claims who will receive Cash equal to 8% of their Allowed Other Guarantor Debtor Claim,[10] and (ii) Initial Distributions to Holders of Other Non-Guarantor Debtor Claims, who will be paid in full, in Cash, on their Allowed Claims (including Postpetition Interest), Initial Distributions to all Classes of Claims entitled to an Initial Distribution will be comprised of a "strip" of consideration consisting of a Pro Rata share of:  (a) New Common Stock and/or New Warrants; (b) the New Senior Secured Term Loan; and (c) Cash; *provided*, *however*, that notwithstanding the default distribution of a strip of consideration, in accordance with the terms of the Other Parent Claims Put Option, Holders of Other Parent Claims may receive an increased Cash-only distribution under the Noteholder Plan.

    After Initial Distributions are made, the remaining DEV will be placed into the Distribution Trust and reserved for distribution to Creditors pending the determination of the Litigation Trust Causes of Action and, if not determined in connection with Confirmation, the Senior Loan Claim Sharing Resolution (discussed in section I.B(1)) and the PHONES Notes Claims Resolution (discussed in section I.B.(2)).  In addition to providing for a substantial portion of the Debtors' DEV to be distributed to Creditors on the Effective Date, or as soon thereafter as practicable, the Noteholder Plan also avoids any possibility that Initial Distributions will be subject to disgorgement based on the outcome of the Litigation Trust Causes of Action or, to the extent not determined prior to the Effective Date, the Senior Loan Claim Sharing Resolution, since Initial Distributions are generally based upon the minimum distribution each Class would be entitled to receive regardless of the outcome of the Trust Causes of Action and the allocation of the DEV among Tribune and the Subsidiaries as set forth in the Debtor/Committee/Lender Plan.[11]

    In order to calculate the Initial Distributions and potential future distributions, the Noteholder Plan provides that the Bankruptcy Court will determine the total DEV for the

---

[10] In the event that an Other Guarantor Debtor Claims Class as a whole votes to accept the Noteholder Plan, each Holder of an Other Guarantor Debtor Claim in such Class that is Allowed as of the Voting Deadline can elect to put its Allowed Claim to the Claims Purchaser in exchange for Cash equal to 25% of its Allowed Claim, with the Claims Purchaser, as transferee of such Other Guarantor Debtor Claim, receiving all distributions on account thereof (i.e., Initial Distributions and Distribution Trust Interests).  To the extent the aggregate consideration  necessary to purchase Other Guarantor Debtor Put Claims exceeds the Other Guarantor Debtor Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Guarantor Debtor Put Claims in the applicable Class, rounded to the nearest whole dollar, at the Other Guarantor Debtor Purchase Price and the remaining portion of the applicable Other Guarantor Debtor Put Claims shall receive their Pro Rata portion of the Initial Distribution and Distribution Trust Interests on account of such remaining portion of the applicable Other Guarantor Debtor Put Claims.

[11] Notwithstanding anything contained in the Noteholder Plan, all current and former Holders of Senior Loan Claims and all Loan Agents and advisors that received payments in respect of such Claims or in connection with the incurrence of obligations of the Debtors prior to the Effective Date (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action.

Tribune Entities in connection with the Confirmation Hearing.  The Bankruptcy Court will also determine, in connection with the Confirmation Hearing, the allocation of the DEV among Tribune and the Subsidiaries (on a consolidated basis), which may include allocations based on the value of Intercompany Claims.  The DEV and the ultimate allocation of DEV determined by the Bankruptcy Court may differ from the total DEV and the allocation of value contained in the specific disclosure statement to the Debtor/Committee/Lender Plan and, accordingly, Initial Distributions shall be based on such DEV and the allocation of such DEV among Tribune and the Subsidiary Debtors (on a consolidated basis) as is determined by the Bankruptcy Court in connection with Confirmation.  However, for illustrative purposes only, the Noteholder Specific Disclosure Statement references a DEV of $6.75 billion, with such DEV allocated (again, for illustrative purposes only) 8.4% (or $564 million) to Tribune and 91.6% (or $6.186 billion) to the Subsidiaries (on a consolidated basis) in order for Creditors to compare recoveries under the Noteholder Plan and Debtor/Committee/Lender Plan on an "apples to apples" basis.[12]

Under the Noteholder Plan, the following Holders of Claims will receive Initial Distributions: (i) Step One Lenders; (ii) Senior Noteholders; (iii) Holders of Other Parent Claims; (iv) Holders of Other Guarantor Debtor Claims; and (v) Holders of Other Non-Guarantor Debtor Claims.[13]  Additionally, Step Two Lenders may receive Initial Distributions, but only in the event that the Bankruptcy Court determines that the sharing provisions of the Senior Loan Agreement are enforceable regardless of whether Step Two Senior Loan Claims or Step Two Senior Loan Guaranty Claims are avoided.  Certain Creditors, including Bridge Loan Lenders, PHONES Noteholders, EGI-TRB LLC Noteholders and Holders of Subordinated Securities Claims will not receive an Initial Distribution under the Noteholder Plan.

For the purpose of calculating the Initial Distributions at Tribune, the Parent Consideration will, in the first instance, be divided Pro Rata among all Classes of Claims at Tribune (other than Intercompany Claims).  For the avoidance of doubt, all such Classes (*i.e.*, Step One Senior Loan Claims, Step Two Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims, Other Parent Claims and Subordinated Securities Claims) will be treated *pari passu* for purposes of allocating the Initial Distributions, without regard to any subordination provisions in the applicable documents or under applicable law or any potential claims for, among other things, avoidance or subordination.

Based on the illustrative $6.75 billion DEV, with 8.4% being allocated to Tribune (again, for illustrative purposes only), the Senior Noteholders will receive an Initial Distribution equal to an approximate recovery of 4.3%[14] on the Senior Noteholder Claims (taking into account their Pro Rata benefit of the subordination provisions of the PHONES Notes Indenture and EGI-TRB LLC Notes and a reduction of value on account of Distributable Cash otherwise allocable to the Senior Noteholders that will be used to satisfy a portion of the Other Non-Guarantor Debtor Claims).

---

[12] The Proponents reserve their respective rights to assert that the DEV and the allocation of the DEV among Tribune and the Subsidiaries may be different than that set forth in the Debtor/Committee/Lender Plan.

[13] For clarity, it is noted herein that Holders of Allowed Other Parent Claims and Allowed Other Guarantor Debtor Claims, in each case, as of the Voting Deadline, will be presented with an option to put their Allowed Claims and, thus, their consideration under the Plan, to the Claims Purchaser for a Cash payment of 15% and 25% (subject to the Claims Purchase Price Caps) of their Allowed Claims, respectively, subject to the conditions set forth in the Noteholder Plan.

[14] All estimated recoveries set forth herein are for illustrative purposes only and assume a $6.75 billion DEV allocated 8.4% to Tribune and 91.6% to Tribune's subsidiaries on a consolidated basis.

Each Holder of an Allowed Other Parent Claim that does not elect the Other Parent Claims Put Option, if consummated, will receive an Initial Distribution equal to an approximate recovery of 4.3% - 4.4% of its Allowed Other Parent Claim.  In the event that the Allowed Other Parent Claims Class as a whole votes to accept the Noteholder Plan, each Holder of an Other Parent Claim that is Allowed as of the Voting Deadline and that has made the Other Parent Claims Put Election will put such Allowed Claim to the Claims Purchaser in exchange for Cash equal to 15% of its Allowed Claim.[15]

Each Holder of an Allowed Other Guarantor Debtor Claim that does not elect the Other Guarantor Debtor Claims Put Option, if consummated, will receive an Initial Distribution equal to an approximate recovery of 8% of its Allowed Other Guarantor Debtor Claims.  In the event that an Other Guarantor Debtor Claims Class as a whole votes to accept the Noteholder Plan, each Holder of an Other Guarantor Debtor Claim in such Class that is Allowed as of the Voting Deadline and has made the Other Guarantor Debtor Claims Put Election will put such Allowed Claim to the Claims Purchaser in exchange for Cash equal to 25% of its Allowed Claim.[16]

Each Holder of an Allowed Other Non-Guarantor Debtor Claim will receive payment in full, in Cash (including Postpetition Interest) on account of its Allowed Claim.

After the Initial Distributions on account of Senior Noteholder Claims (including a Pro Rata share of the distributions that would be allocable in respect of the PHONES Notes Claims and EGI-TRB LLC Notes Claims, but for the subordination provisions contained in the applicable documents), Other Parent Claims, Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims are accounted for, and in order to ensure that DEV sufficient to satisfy all remaining Noteholder Claims in full will be available for distribution in the event the LBO Debt is avoided, all remaining DEV will be deemed consolidated into one pool of DEV (the "Remaining Consideration Pool").  From the Remaining Consideration Pool, an amount of DEV sufficient to compensate all Noteholder Claims (*i.e.*, all Senior Noteholder Claims, PHONES Notes Claims (including PHONES Notes Exchange Claims that are classified as PHONES Notes Claims), Other Parent Claims, Other Guarantor Debtor Claims and Subordinated Securities Claims arising from Pre-LBO Debt, if any, in full (including Postpetition Interest through December 8, 2012), after giving effect to the Initial Distributions discussed above, will be placed into the Distribution Trust Reserve (such amount referred to herein as the "Non-LBO Debt Reserve DEV").  After reservation of the Non-LBO Debt Reserve DEV, all remaining DEV in the Remaining Consideration Pool (the "LBO Debt Reserve DEV") will be allocated, on a Pro Rata basis, and without regard to the subordination provisions in the applicable documents or

---

[15] If the Other Parent Claims Class votes in favor of the Noteholder Plan, for each Holder of an Allowed Other Parent Claim that elects the Other Parent Claims Put Option and does not make the Non-Contribution Election, the Initial Distributions and Trust Interests that would otherwise go to such Holder will be distributed to the Claims Purchaser. To the extent the aggregate consideration necessary to purchase the Other Parent Put Claims exceeds the Other Parent Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Parent Put Claims, rounded to the nearest whole dollar, at the Other Parent Claims Purchase Price and the remaining portion of the Other Parent Put Claims shall receive their Pro Rata portion of the Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests on account of such remaining portion of the Other Parent Put Claims.

[16] If an Other Guarantor Debtor Claims Class votes in favor of the Noteholder Plan, for each Holder of an Allowed Other Guarantor Debtor Claim that elects the Other Guarantor Debtor Claims Put Option, the Initial Distributions and Distribution Trust Interests that would otherwise go to such Holder will be distributed to the Claims Purchaser.  To the extent the aggregate consideration necessary to purchase Other Guarantor Debtor Put Claims exceeds the Other Guarantor Debtor Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Guarantor Debtor Put Claims in the applicable Class, rounded to the nearest whole dollar, at the Other Guarantor Debtor Purchase Price and the remaining portion of the applicable Other Guarantor Debtor Put Claims shall receive their Pro Rata portion of the Initial Distribution and Distribution Trust Interests on account of such remaining portion of the applicable Other Guarantor Debtor Put Claims.

any potential claims for, among others, avoidance or subordination, among the Step One Lender Claims, the Step Two Lender Claims and the Bridge Loan Lender Claims.

Holders of Step One Lender Claims will receive an Initial Distribution equal to their Pro Rata share of the LBO Debt Reserve DEV (*i.e.*, their own worst-case recovery if all LBO-Related Causes of Action were successful), resulting in an approximate recovery of 34.2%-38.7% on the Step One Lender Claims. Additionally, in the event that the Senior Loan Claim Sharing Resolution enforces the sharing provisions of the Senior Loan Agreement, Holders of Step Two Lender Claims will also receive their Pro Rata share of the LBO Debt Reserve DEV resulting in an approximate recovery of 34.2%-38.7% on the Step Two Lender Claims. The Pro Rata share of the LBO Debt Reserve DEV in respect of the Bridge Loan Lender Claims and, if the sharing provisions of the Senior Loan Agreement are found not to apply (or the Court defers consideration of the Senior Loan Claim Sharing Resolution), the Step Two Lender Claims, will be transferred to the Distribution Trust Reserve, in each case for ultimate distribution in accordance with the Litigation Distribution Orders.

For the avoidance of doubt, Initial Distributions to LBO Lenders, to the extent applicable, will be on account of their Senior Loan Claims against both Tribune and the Guarantor Debtors, with the ultimate allocation of such distribution among Tribune and the Guarantor Debtors determined in connection with the Litigation Distribution Orders, and will not be subject to disgorgement.

5. <u>Distributions of Distribution Trust Interests and Creditors' Trust Interests</u>

In addition to the Initial Distributions set forth above, the Noteholder Plan provides that most Creditors will also receive interests in the Distribution Trust and, in some circumstances, interests in the Creditors' Trust. Each type of Trust Interest provides the Holder thereof with separate and distinct rights, and future distributions (if any) to all Creditors will be based upon their Trust Interests. Whether a Class receives distributions on account of its Trust Interests will depend, among other things, on the final resolution of the Trust Causes of Action, as well as the Senior Loan Claim Sharing Resolution.

The Distribution Trust Interests shall determine the distributions of the Distribution Trust Reserve, as well as the proceeds of the Litigation Trust Causes of Action, in accordance with the Litigation Distribution Orders, the Senior Loan Claim Sharing Resolution and the PHONES Notes Claim Resolution. All Classes of Impaired Claims, other than Intercompany Claims, shall be eligible to receive Distribution Trust Interests; *provided*, *however*, that, to the extent applicable, subject to the Claims Purchase Caps, Holders of Other Parent Claims and Other Guarantor Debtor Claims that elect the Other Parent Claims Put Option or Other Guarantor Debtor Claims Put Option, respectively (and if applicable), shall not be entitled to receive Distribution Trust Interests as such Distribution Trust Interests will, instead, be distributed to the Claims Purchaser.

Similarly, the Creditors' Trust Interests will determine the distributions of the proceeds of the State Law Avoidance Claims, in accordance with the Creditors' Trust Distribution Orders, the Senior Loan Claim Sharing Resolution and the PHONES Notes Claim Resolution. Holders of Step One Senior Loan Claims, Step Two Senior Loan Claims, Bridge Loan Claims, Senior

Noteholder Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims, Other Parent Claims and Subordinated Securities Claims that do not make the Non-Contribution Election shall receive a Pro Rata share of Creditors' Trust Interests allocable to their Class, calculated according to the amount of Creditors in such Class that do not elect the Non-Contribution Election. Notwithstanding the foregoing, subject to the Other Parent Claims Purchase Price Cap, Holders of Other Parent Claims that elect the Other Parent Claims Put Option shall not be entitled to receive Creditors' Trust Interests if the Claims Purchase is consummated and such Creditors' Trust Interests will, instead, be distributed to the Claims Purchaser.

6.   <u>Corporate Governance of Reorganized Tribune</u>

        The board of directors of Reorganized Tribune shall have seven (7) members, one of which will be the chief executive officer of Reorganized Tribune (to the extent the position is not vacant).  Four of the remaining members of the initial board of directors of Reorganized Tribune shall be initially designated by the Senior Lenders and two of the remaining members of the board of directors of Reorganized Tribune shall be initially designated by Aurelius; *provided*, that the members initially designated by Aurelius shall be independent of Aurelius; *provided*, *further*, that the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, shall have the right at any time to replace the members of the board of directors of Reorganized Tribune initially designated by Aurelius for any reason, with or without cause.   The designation of the members of the initial board of directors of Reorganized Tribune shall be subject to final appointment by the Bankruptcy Court upon entry of the Confirmation Order.  All members of the initial board of directors of Reorganized Tribune will be in compliance with all applicable requirements of the Communications Act and the FCC's rules.

        Three members of the initial board of directors of Reorganized Tribune (including the chief executive officer of Reorganized Tribune, to the extent the position is not vacant, and two of the members initially designated by the Senior Lenders) shall serve for a one-year term; two members of the initial board of directors of Reorganized Tribune (one of the members initially designated by the Senior Lenders and one of the members initially designated by Aurelius) shall serve for a two-year term; and two members of the initial board of directors of Reorganized Tribune (one of the members initially designated by the Senior Lenders and one of the members initially designated by Aurelius) shall serve for a three-year term, and in each case be subject to re-election based on a shareholder vote pursuant to the terms of the Certificate of Incorporation and applicable law.  Notwithstanding anything contained herein, until the termination or dissolution of the Distribution Trust, the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, shall have the right, pursuant to the terms of the New Class C Common Stock, to appoint two members to the board of directors of Reorganized Tribune, which directors shall be independent directors under applicable SEC rules and regulations; *provided, however,* the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, may only (i) replace a member of the board of directors of Reorganized Tribune initially designated by Aurelius or (ii) elect a successor for a member of the board of directors of Reorganized Tribune previously appointed by Aurelius or the Distribution Trustee, at the direction of the Distribution Trust Advisory Board.

7.  Post-Effective Date Capital Structure

    a.  *New Senior Secured Term Loan Agreement*

Subject to the terms of section 5.6 of the Noteholder Plan, on the Effective Date: (i) Reorganized Tribune, as borrower; (ii) the other Reorganized Debtors and certain of the Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), as guarantors; (iii) the administrative agent party thereto; (iv) the Distribution Trust; and (v) the Holders of Claims receiving a distribution of the New Senior Secured Term Loan under the Noteholder Plan shall become parties to, and be bound by the terms of, the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement.  If issued, the New Senior Secured Term Loan shall (1) be guaranteed by the U.S. subsidiaries of Reorganized Tribune (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), (2) be secured by certain assets of Reorganized Tribune and the guarantors thereof subject to specified exceptions and customary intercreditor arrangements, (3) have interest payable in Cash quarterly, (4) have principal payable in Cash quarterly, with the unpaid balance payable on the final maturity date thereof, (5) mature on the fifth anniversary of the Effective Date, (6) include usual and customary affirmative and negative covenants for term loan facilities of this type, and (7) be repayable by Reorganized Tribune at any time prior to scheduled maturity without premium or penalty.  The New Senior Secured Term Loan Agreement shall contain terms substantially as set forth in Exhibit 5.6 to be filed with the Debtor/Committee/Lender Plan Supplement.

    b.  *Description of Exit Facility*

Section 5.10 of the Noteholder Plan provides that on the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.  The terms of the Exit Facility shall be consistent with those that will be disclosed in Exhibit 5.10 to the Debtor/Committee/Lender Plan.

    c.  *New Common Stock and New Warrants*

On, or as promptly as reasonably practicable after, the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Noteholder Plan.

On the Effective Date, the Distribution Trust, for purposes of funding the Distribution Trust Reserve, will receive New Warrants and one share of New Class C Common Stock. Reorganized Tribune shall not issue any other shares of New Class C Common Stock at any time without the prior written consent of the Distribution Trust, such consent to be in the sole discretion of the Distribution Trust.  The New Class C Common Stock shall not be subject to

optional redemption.  On the date on which the Distribution Trust is dissolved or otherwise wound down, Reorganized Tribune shall redeem the outstanding share of New Class C Common Stock at a price of $1.00 per share.  As the sole holder of New Class C Common Stock, the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, shall have the right to elect two members of the board of directors of Reorganized Tribune.  New Class C Common Stock may not be transferred without the approval of the board of directors of Reorganized Tribune.  Without the consent or approval of the Distribution Trust (such consent to be in the sole discretion of the Distribution Trust), Reorganized Tribune will not directly or indirectly, by way of merger, consolidation, operation of law or otherwise:  (i) alter or change the rights, preferences or privileges of the New Class C Common Stock; (ii) take any action, including amending Reorganized Tribune's Certificate of Incorporation or bylaws that would adversely affect the rights, preferences or privileges of the New Class C Common Stock; (iii) increase or decrease the authorized number of shares of New Class C Common Stock; or (iv) increase or decrease the authorized size of Reorganized Tribune's board of directors.

Except as otherwise provided in the Noteholder Plan, including as specifically provided in Section 5.4.2 thereof, each Holder of a Claim to receive a distribution of New Common Stock pursuant to the Noteholder Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock or New Warrants if such Holder informs the Debtors and the Proponents of its desire to receive such New Class B Common Stock or New Warrants by the date announced by the Proponents in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing.  New Class A Common Stock will have voting rights consistent with standard voting common stock.  New Class B Common Stock will have more limited voting rights and is designed to be non-attributable under the FCC's rules.  New Warrants can be exercised for the purchase of either Class A Common Stock or Class B Common Stock, at the option of the holder thereof.

Specifically, holders of New Class B Common Stock will be entitled to vote as a separate class on any amendment, repeal or modification of any provision of the Restated Certificate of Incorporation for Reorganized Tribune that adversely affects the rights of the New Class B Common Stock in a manner different from the rights of the New Class A Common Stock.  In addition, the holders of New Class B Common Stock will be entitled to vote together with holders of the New Class A Common Stock on the following non-ordinary course transactions to the extent that these matters are submitted to a vote of the holders of New Class A Common Stock:  (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking pari passu with or senior to the New Class A Common Stock or New Class B Common Stock; (ii) any amendment to the Restated Certificate of Incorporation of Reorganized Tribune or the Bylaws of Reorganized Tribune; (iii) any amendment to any stockholders or comparable agreement; (iv) any sale, lease or other disposition of all or substantially all of the assets of Reorganized Tribune through one or more transactions; (v) any recapitalization, reorganization, share exchange, consolidation or merger of Reorganized Tribune or its capital stock; (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Tribune, including any stock option or stock incentive plan; (vii) any redemption, purchase or other acquisition by Reorganized Tribune of any of its capital stock (except for purchases from

employees upon termination of employment); and (viii) any liquidation, dissolution, distribution of assets or winding-up of Reorganized Tribune.

Each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Noteholder Plan will be required to demonstrate that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Noteholder Plan.  Applicable FCC ownership requirements and restrictions, discussed in detail on pages 33-38 of the Debtor/Committee/Lender Specific Disclosure Statement, include (i) FCC broadcast multiple ownership and cross-ownership restrictions and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of licenses by non-U.S. persons.

Notwithstanding anything contained herein, the Distribution Trustee will not, absent the prior consent of the FCC, implement any distribution to the Holders of Distribution Trust Interests that would result in a transfer of control of Reorganized Tribune that would require FCC consent.

## B.    Special Considerations

### 1.    Senior Loan Claim Sharing Resolution

The Noteholder Plan provides that the Bankruptcy Court will determine the applicability of Sections 2.13 and 2.15 of the Senior Loan Agreement in the event that the Step Two Senior Loan Claims and/or Step Two Senior Loan Guaranty Claims are avoided.  Sections 2.13 and 2.15 of the Senior Loan Agreement provide, among other things, that Senior Lenders must share ratably with all other Senior Lenders any payments received on account of Senior Loan Claims. This sharing is applicable to any Senior Loan Lender that receives payment on account of its Senior Loan Claims, and sharing applies across all Senior Lenders regardless of whether they are categorized as Step One Lenders or Step Two Lenders.  The Senior Loan Agreement is silent, however, as to whether the sharing provisions are enforceable by Senior Loan Lenders whose Claims are avoided.

Pursuant to the Noteholder Plan, the Proponents are requesting that the Bankruptcy Court determine, either in connection with Confirmation or thereafter, the enforceability of the sharing provisions in these Chapter 11 Cases.  Specifically, the Proponents seek a determination regarding whether the sharing provisions would be enforceable (and thereby mandate sharing among all Senior Lenders) regardless of whether Step Two Lender Claims are avoided in connection with the LBO-Related Causes of Action (the "Senior Loan Claim Sharing Resolution").  The Senior Loan Claim Sharing Resolution will determine whether the Step Two Lenders receive an Initial Distribution and whether the series of Trust Interests allocated to the Step Two Lender Claims will provide for a ratable share of the Step One Lender recoveries in the event that Step Two is avoided, or whether the series of Trust Interests distributed to Step Two Lenders will receive distributions only in the event Step Two Senior Loan Claims are found not to be avoided or if all LBO Debt is avoided.  If it is found that sharing will not apply in the event that Step Two Lender Claims are avoided, then Step Two Lenders

(i) will not receive an Initial Distribution, and instead the Initial Distribution that would otherwise be allocable to the Step Two Lenders will be held in the Distribution Trust Reserves pending the resolution of the Litigation Trust Causes of Action, nor (ii) will they receive any distributions on account of their Trust Interests until the LBO-Related Causes of Action are resolved with respect to their Claims.

2.      PHONES Notes Claim Resolution

As set forth in further detail in section III.A.2.e. of the General Disclosure Statement, prior to the Petition Date, Holders of PHONES Notes were contractually entitled to exchange PHONES Notes for an amount of Cash equal to ninety five percent (95%) (or one hundred percent (100%) under certain circumstances) of the then-current market value of two shares of Time Warner Inc. stock. According to the General Disclosure Statement, the approximate carrying value of PHONES Notes on the Petition Date was $759 million, comprised of $703 million of PHONES Notes not submitted for exchange and a $56 million liability for PHONES Notes that were exchanged but not settled in Cash (the "PHONES Notes Exchange Claims"). The Debtors, in the General Disclosure Statement, represent that they have been informed by the PHONES Notes Indenture Trustee that the PHONES Notes Indenture Trustee and certain Holders of the PHONES Notes have disputed that the aggregate outstanding amount of the PHONES Notes should be reduced by the amount of PHONES Notes submitted for exchange but not paid for in Cash. In fact, the Proof of Claim filed by the PHONES Notes Indenture Trustee, on behalf of the Holders of the PHONES Notes, includes the PHONES Notes tendered for exchange in the aggregate amount of the PHONES Notes Claims, noting that the exchanges with respect to such PHONES Notes were not consummated because the issuer failed to make the required exchange payments and thus, the Allowed amount of PHONES Notes Claims should be $1.197 billion.

In connection with Confirmation, the Proponents are seeking a determination by the Bankruptcy Court regarding the classification of the PHONES Notes Exchange Claims for purposes of the Noteholder Plan (the "PHONES Notes Claim Resolution"). The outcome of the PHONES Notes Claims Resolution will determine the amount of the PHONES Notes Claims and PHONES Notes Exchange Claims and the priority of the PHONES Notes Exchange Claims vis-à-vis the PHONES Notes Claims. It is possible that the PHONES Notes Claims Resolution will determine that the PHONES Notes Exchange Claims should be classified as PHONES Notes Claims due to the failure of the issuer to consummate the exchange. Alternately, the PHONES Notes Claims Resolution might determine that the PHONES Notes Exchange Claims should be classified as Subordinated Securities Claims and, therefore, subordinate to payment in full of the PHONES Notes Claims or as General Unsecured Claims. The outcome of the PHONES Notes Claims Resolution will affect, among other things, both the amount of Initial Distributions allocable to the PHONES Notes (and, accordingly, the amount actually paid over to the Senior Noteholders on account of enforcement of the subordination provisions of the PHONES Notes Indenture) and the series and amount of Trust Interests that will be distributed to the Holders of PHONES Notes Exchange Claims.

3.    Put Options and Claims Purchase

a)    *Other Parent Claims Put Option*

While the Proponents believe that that the Trust Causes of Action will be successful and that Holders of non-LBO claims will receive significantly greater recoveries upon the resolution of such Causes of Action, the Proponents recognize that not all Holders of Other Parent Claims and Other Guarantor Debtor Claims will want to wait for the resolution of Trust Cases of Action to receive further distributions on account of their Claims; nor will some of the Holders of Other Parent Claims want to receive a strip of consideration consisting of Cash, New Common Stock and New Senior Secured Term Loan.  In consideration of the foregoing, the Proponents have given Creditors in such Classes an option to "cash out" on the Effective Date by selling their Claims for a fixed amount by making the election to participate in the Put Option on their Purple ballot (assuming other contingencies described in Article I.B.3 of the Noteholder Specific Disclosure Statement are met).

Pursuant to the terms of the Noteholder Plan, if the Class of Other Parent Claims votes in favor of the Noteholder Plan, Holders of Other Parent Claims that are Allowed as of the Voting Record Date will be given the opportunity to "put" (*i.e.*, sell) their Claims to the Claims Purchaser in exchange for Cash in an amount equal to 15% of their Allowed Other Parent Claims, subject to the Other Parent Claims Purchase Price Cap.  Accordingly, the Other Parent Claims Put Option will allow Holders of Allowed Other Parent Claims to essentially "cash out" of the Debtors' Chapter 11 Cases on the Initial Distribution Date by selling their Allowed Other Parent Claims in exchange for a lump sum Cash payment from the Claims Purchaser (up to the amount of the Other Parent Claims Purchase Price Cap) in an amount greater than the Initial Distribution than they would otherwise be entitled to receive under the Noteholder Plan, instead of receiving a lesser recovery through their Initial Distribution and waiting for further distributions from the Distribution Trust and Creditors' Trust.

The Claims Purchase of the Other Parent Claims that make the Other Parent Claims Put Election will only occur if certain conditions are met.  These conditions are as follows:

- The Other Parent Claims Put Option is only applicable to Holders of an Other Parent Claims that are Allowed as of the Voting Record Date.

- Such Holder of an Allowed Other Parent Claim must check the Other Parent Claim Put Election on its Noteholder Ballot.  Making this election indicates that the Other Parent Claim Holder (i) elects to sell, subject to the Other Parent Claims Purchase Price Cap, its Allowed Other Parent Claims to the Claims Purchaser in the event that all applicable preconditions to consummation of the Claims Purchase are met, rather than accept the treatment provided to Holders of Allowed Other Parent Claims under the Noteholder Plan, and (ii) that such Holder of Other Parent Claims will, subject to the Other Parent Claims Purchase Price Cap, in exchange for payment in Cash for its Other Parent Claim, transfer such Claim and all attendant rights to Initial Distributions and distributions on account of Trust Interests to the Claims Purchaser.

- The Holder of the Allowed Other Parent Claim does not make the Non-Contribution Election on its Noteholder Ballot and, instead, agrees to transfer, on the Effective Date, any State Law Avoidance Claims it may possess to the Creditors' Trust.

- The Other Parent Claims Class must, as a whole, vote to accept the Noteholder Plan.

- The Noteholder Plan must be confirmed by the Bankruptcy Court.

If all of the above conditions are satisfied, the Other Parent Claims Put Option will be consummated and Holders of Allowed Other Parent Claims who elect the Other Parent Claims Put Option will (a) be bound by the Other Parent Claims Put Election and will not be able to alter their Noteholder Ballot to select different treatment, (b) not receive any Initial Distributions or Trust Interests on account of their Other Parent Claims and will, instead, transfer any rights to receive such Initial Distributions and Trust Interests to the Claims Purchaser and (c) have their involvement in the Debtors Chapter 11 Cases in their capacity as Other Parent Claim Holders terminated; *provided, however*, that if the Other Parent Claims Purchase Price Cap is exceeded, the Holders of Other Parent Put Claims shall (x) receive Initial Distributions and Trust Interests on account of that portion of their Other Parent Put Claim that is in excess of the Other Parent Claims Purchase Price Cap (discussed in more detail below) and (y) shall not have their involvement in the Chapter 11 Cases terminated with respect to such portion of their Other Parent Put Claim.

The Claims Purchase of the Other Parent Put Claims will be subject to the Other Parent Claims Purchase Price Cap. The Other Parent Claims Purchase Price Cap caps the maximum aggregate amount of the Other Parent Claims Purchase Price paid for the Other Parent Put Claims at $24.25 million, unless otherwise increased in the sole discretion of the Claims Purchaser. To the extent the aggregate consideration necessary to purchase the Other Parent Put Claims exceeds $24.25 million, the Claims Purchaser will purchase a Pro Rata percent of all of such Other Parent Put Claims, rounded to the nearest whole dollar. The remaining portion of each Other Parent Put Claim that remains (i.e., for which Cash payment is not made) shall receive a Pro Rata portion of the Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests allocable to that part of the Other Parent Put Claim.

b)   *Other Guarantor Debtor Claims Put Option*

Pursuant to the terms of the Noteholder Plan, if the applicable Class of Other Guarantor Debtor Claims in which a specific Other Guarantor Debtor Claim resides votes in favor of the Noteholder Plan, Holders of Other Guarantor Debtor Claims in such Class that are Allowed as of the Voting Record Date will be given the opportunity to "put" (*i.e.*, sell) their Allowed Other Guarantor Debtor Claims to the Claims Purchaser in exchange for Cash in an amount equal to 25% of their Allowed Other Guarantor Debtor Claims, subject to the Other Guarantor Debtor Claims Purchase Cap. Accordingly, the Other Guarantor Debtor Claims Put Option will allow Holders of Allowed Guarantor Debtor Claims to essentially "cash out" of the Debtors' Chapter 11 Cases on the Initial Distribution Date by selling their Allowed Other Guarantor Debtor Claims in exchange for a lump sum Cash payment from the Claims Purchaser (up to the amount

of the Other Guarantor Debtor Claims Purchase Cap) in an amount greater than the Initial Distribution than they would otherwise be entitled to receive under the Noteholder Plan, instead of receiving a lesser recovery through their Initial Distribution and waiting for further distributions from the Distribution Trust.

The Claims Purchase of the Other Guarantor Debtor Claims that make the Other Guarantor Debtor Claims Put Election will only occur if certain conditions are met. These conditions are as follows:

- The Other Guarantor Debtor Claims Put Option is only applicable to Holders of an Other Guarantor Debtor Claims that are Allowed as of the Voting Record Date.

- Such Holder of an Allowed Other Guarantor Debtor Claim must check the Other Guarantor Debtor Claim Put Election on its Noteholder Ballot. Making this election indicates that the Other Guarantor Debtor Claim Holder (i) elects to sell, subject to the Other Guarantor Debtor Claims Purchase Price Cap, its Allowed Other Guarantor Debtor Claims to the Claims Purchaser in the event that all applicable preconditions to consummation of the Claims Purchase are met, rather than accept the treatment provided to Holders of Allowed Other Guarantor Debtor Claims under the Noteholder Plan, and (ii) that such Holder of Other Guarantor Debtor Claims will, subject to the Other Guarantor Debtor Claims Purchase Price Cap, in exchange for payment in Cash for its Other Guarantor Debtor Claim, transfer such Claim and all attendant rights to Initial Distributions and distributions on account of Distribution Trust Interests to the Claims Purchaser.

- The applicable Class of Other Guarantor Debtor Claims in which such Holder's Claim resides must, as a whole, vote to accept the Noteholder Plan.

- The Noteholder Plan must be confirmed by the Bankruptcy Court.

If all of the above conditions are satisfied, the Other Guarantor Debtor Claims Put Option will be consummated and Holders of Allowed Other Guarantor Debtor Claims who elect the Other Guarantor Debtor Claims Put Option will (a) be bound by the Other Guarantor Debtor Claims Put Election and will not be able to alter their Noteholder Ballot to select different treatment, (b) not receive any Initial Distributions on account of their Other Guarantor Debtor Claims and will, instead, transfer any rights to receive such Initial Distributions and Distribution Trust Interests to the Claims Purchaser and (c) have their involvement in the Debtors Chapter 11 Cases in their capacity as Other Guarantor Debtor Claim Holders terminated; *provided, however*, that if the Other Guarantor Debtor Claims Purchase Price Cap is exceeded, the Holders of Other Guarantor Debtor Put Claims shall (x) receive Initial Distributions and Distribution Trust Interests on account of that portion of their Other Guarantor Debtor Put Claim that is in excess of the Other Guarantor Debtor Claims Purchase Cap (discussed in more detail below) and (y) shall not have their involvement in the Chapter 11 Cases terminated with respect to the remaining portion of their Other Guarantor Debtor Put Claim.

The Claims Purchase of the Other Guarantor Debtor Claims will be subject to the Other Guarantor Debtor Put Claims Purchase Price Cap.  The Other Guarantor Debtor Claims Purchase Price Cap caps the maximum aggregate amount of the Other Guarantor Debtor Purchase Price paid for the Other Guarantor Debtor Put Claims at $20.75 million, unless otherwise increased in the sole discretion of the Claims Purchaser.  To the extent the aggregate consideration necessary to purchase the Other Guarantor Debtor Put Claims exceeds $20.75 million, the Claims Purchaser will purchase a Pro Rata percent of all of such Other Guarantor Debtor Put Claims, rounded to the nearest whole dollar.  The remaining portion of each Other Guarantor Debtor Put Claim that remains (*i.e.*, for which Cash payment is not made) shall receive a Pro Rata portion of the Initial Distribution and Distribution Trust Interests allocable to that part of the Other Guarantor Debtor Put Claim.

       4.    <u>Intercompany Claims</u>

The Debtors state in the General Disclosure Statement that Intercompany Claims are comprised of hundreds of thousands of individual transactions aggregating approximately $6.23 billion-$8.57 billion. While the Proponents have not performed an independent analysis regarding the amount, nature and allowability of the Intercompany Claims and do not take a position on the validity, allowability, avoidability or amount of any Intercompany Claims that may exist, according to an analysis prepared by the Debtors and relied upon by the Examiner, Intercompany Claims held by Guarantor Subsidiaries against Tribune are reported to aggregate approximately $4.59 billion-$6.41 billion, while Intercompany Claims held by Tribune against the Guarantor Subsidiaries are reported to aggregate between $1.64 billion-$2.16 billion.  That same analysis performed by the Debtors and relied upon by the Examiner estimates that approximately 40% – 56% of the Claims of Guarantor Subsidiaries against Tribune will likely be Allowed while 47% – 61% of Tribune Claims against the Guarantor Subsidiaries will likely be Allowed.

In addition to the forgoing risk of value shifting, certain Intercompany Claims arising out of transactions undertaken between 2006 and 2008 (including Claims arising out of the repayment of certain intercompany notes, aggregating approximately $3.98 billion[17], on June 4, 2007) may be subject to avoidance as preferential transfers or fraudulent conveyances under Bankruptcy Code sections 547 and 548, respectively, or subject to recharacterization as capital contributions or other equity infusions.  The disposition of the Intercompany Claims Avoidance Actions would similarly affect allocation of value among Tribune and its subsidiaries.

Currently the time limitations under applicable law, including under the Bankruptcy Code, within which the Debtors and Non-Debtor Subsidiaries may commence the Intercompany Claims Avoidance Actions (the "<u>Statutes of Limitation</u>") may expire on or around December 8, 2010.  Accordingly, the Debtors, with the support of certain parties in interest in the Chapter 11 Cases, obtained Bankruptcy Court approval of a tolling agreement (the "<u>Tolling Agreement</u>") to toll the applicable Statutes of Limitation.  By entering into the Tolling Agreement, the Debtors and the Non-Debtor Subsidiaries have preserved the Intercompany Claims Avoidance Actions and waived the applicable Statutes of Limitation.  The Tolling Agreement extends the Statutes of Limitation until June 30, 2011 (unless certain other termination events occur).  With the

---

[17] The information contained herein was obtained in Exhibits 1071 and 1072 to the Examiner's Report.

extension of the Statutes of Limitation with respect to the Intercompany Claims Avoidance Actions, the Intercompany Claims Avoidance Actions will be investigated and prosecuted post-Confirmation.  The Noteholder Plan contemplates that all matters related to Intercompany Claims will be either litigated in connection with Confirmation or become Litigation Trust Causes of Action, the resolution of which will impact ultimate distributions to Creditors.

Based on the foregoing, all Intercompany Claims will be deemed Disputed Claims under the Noteholder Plan.  The Bankruptcy Court will determine in connection with Confirmation whether Holders of Intercompany Claims will be entitled to vote to accept or reject the Noteholder Plan.  If no Holders of Claims in a particular Class vote to accept or reject the Noteholder Plan, except for such Classes that are deemed to reject the Noteholder Plan, the Noteholder Plan shall be deemed accepted by the Holders of such Claims in such Class.  *See In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir. 1988); *In re Adelphia Commc'ns Corp., et al.*, 368 B.R. 140, 261-262 (Bankr. S.D.N.Y. 2007); *cf. In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989).   For the avoidance of doubt, Classes 1J through 111J are not deemed to reject the Noteholder Plan.

> 5.    Related Causes of Action

Aggregate recoveries for most Classes under the Noteholder Plan depend heavily on the ultimate outcome of the LBO-Related Causes of Action and the State Law Avoidance Claims. While the Examiner's Report contains detailed analyses and projected outcomes regarding the LBO-Related Causes of Action to be pursued by the Litigation Trust and State Law Avoidance Claims to be pursued by the Creditors' Trust, it is not known with certainty how a court will rule on the issues, nor what the ultimate recoveries will be.  Furthermore, it is unknown how long it will take to settle or reach and recover on judgments in the LBO-Related Causes of Action and the State Law Avoidance Claims.

All current and former LBO Lenders, and all Loan Agents and advisors that received payments in respect of such Claims or in connection with the incurrence of such obligations of the Debtors prior to the Effective Date, (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action (but they will not be required to disgorge any consideration received under the Noteholder Plan regardless of the final resolution of the Litigation Trust Causes of Action).  All proceeds of the Litigation Trust Causes of Action and all amounts held in the Distribution Trust Reserve, net of any additional expenses of the Litigation Trust and Distribution Trust (including without limitation any taxes required to be paid by such Trusts), shall be distributed to the Holders of Distribution Trust Interests in accordance with the terms of the Noteholder Plan and the Litigation Distribution Orders.

## C.    The Noteholder Plan is Fair, Reasonable and In the Best Interests of the Debtors' Estates and All Creditors

The Proponents believe that the Noteholder Plan is fair, reasonable and in the best interests of the Debtors' Estates and all Creditors.  The Noteholder Plan is intended to prosecute all claims and causes of action addressed in the Examiner's Report; yet, the Proponents recognize that while the Examiner conducted a thorough review of the 2007 leveraged buyout

and a comprehensive analysis of the potential litigation outcomes, the Proponents also recognize that the Examiner is not a court of law nor would the Examiner's Report be conclusive in any litigation brought involving the legal issues analyzed therein.  Accordingly, the Noteholder Plan, unlike other plans proposed in the Chapter 11 Cases, is not premised on a proposed settlement derived from the Proponents' artificial, self-serving interpretation of how a court would adjudicate the LBO-Related Causes of Action and the State Law Avoidance Claims.  Instead, the Noteholder Plan generally distributes, on the Effective Date, the minimum recovery each Class would receive taking into account such Class's own worst outcome of the Trust Causes of Action and leaves the questions of fact and law regarding the LBO-Related Causes of Action and the State Law Avoidance Claims to be determined by the appropriate court of law or settled by the applicable parties after the Effective Date of the Noteholder Plan.

**THE PROPONENTS BELIEVE THAT THE NOTEHOLDER PLAN WILL ENABLE THE DEBTORS TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE NOTEHOLDER PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE PROPONENTS URGE CREDITORS TO VOTE TO ACCEPT THE NOTEHOLDER PLAN ON THE PURPLE BALLOT AND TO RANK THE NOTEHOLDER PLAN AS THEIR MOST PREFERRED PLAN ON THE PURPLE BALLOT.**

# II.

## TREATMENT UNDER THE NOTEHOLDER PLAN

### Chart of Consideration Allocable to Each Class

The following is representative of the consideration each Class of Claims is entitled to receive under the Noteholder Plan.  Each of the recovery components for Impaired Classes, *i.e.*, Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests, are explained in further detail in the preceding section and in the operative provisions of the Noteholder Plan.

*Treatment of Administrative and Priority Tax Claims*

| Class[18] | Treatment |
|---|---|
| DIP Facility Claims | Payment in full in Cash. |
| Administrative Expense Claims | Payment in full in Cash at the time such Administrative Expense Claim becomes Allowed. |
| Priority Tax Claims | At the option of the Reorganized Debtors either (i) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, (ii) regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code or (iii) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors. |

*Unimpaired Classes Whose Claims Are Being Reinstated*

| Class[19] | Treatment |
|---|---|
| Priority Non-Tax Claims Classes | Reinstated. |
| Other Secured Claims | Reinstated. |

*Other Classes of Claims and Interests*

| Class | Initial Distribution | Distribution Trust Interests | Creditors' Trust Interests |
|---|---|---|---|
| Step One Senior Loan Claims (Class1C)/Step One | Pro Rata share of LBO Debt Reserve DEV allocable to Step One Lender Claims | Class 1C Distribution Trust Interests on account of Claims | Class 1C Creditors' Trust Interests, but only to the extent such Holder of a Step |

---

[18] Treatment applies to such Class at all Debtor entities.
[19] Treatment applies to such Class at all Debtor entities.

| **Class** | **Initial Distribution** | **Distribution Trust Interests** | **Creditors' Trust Interests** |
|---|---|---|---|
| Senior Loan Guaranty Claims (Classes 50C-111C). | Classes, on account of Claims against Tribune and the Guarantor Debtors. | against Tribune and Class 50C-111C Distribution Trust Interests on account of Claims against the respective Guarantor Debtors. | One Senior Loan Claim has not made the Non-Contribution Election. |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | Pro Rata share of LBO Debt Reserve DEV allocable to Step Two Lender Classes, on account of Claims against Tribune and the Guarantor Debtors, but only in the event the Senior Loan Claim Sharing Resolution is determined in favor of Step Two Lenders (*i.e.*, sharing is enforced). If the Senior Loan Claim Sharing Resolution is not determined in favor of Step Two Lenders or if the Bankruptcy Court defers consideration of the Senior Loan Claim Sharing Resolution, the Initial Distribution otherwise allocable to the Step Two Lenders will be placed in the Distribution Trust Reserve for ultimate distribution in accordance with the Litigation Distribution Orders. | Class 1D Distribution Trust Interests on account of Claims against Tribune and Class 50D-111D Distribution Trust Interests on account of Claims against the respective Guarantor Debtors. | Class 1D Creditors' Trust Interests, but only to the extent such Holder of a Step Two Senior Loan Claim has not made the Non-Contribution Election. |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | The amount of the LBO Debt Reserve DEV otherwise allocable to the Classes of Bridge Loan Lenders shall be placed in the Distribution Trust Reserve for ultimate distribution in accordance with the Litigation Distribution Orders. | Class 1E Distribution Trust Interests and Class 50E-111E Distribution Trust Interests, as applicable. | Class 1E Creditors' Trust Interests, but only to the extent such Holder of a Bridge Loan Claim has not made the Non-Contribution Election. |
| Senior Noteholder Claims (Class 1F). | Pro Rata share of Parent DEV allocable to Senior Noteholder Class, plus a Pro Rata share of initial distributions otherwise allocable to the EGI-TRB LLC Notes Class and the PHONES Notes Class in accordance with the applicable subordination provisions in the | Class 1F Distribution Trust Interests. | Class 1F Creditors' Trust Interests, but only to the extent such Holder of a Senior Noteholder Claim has not made the Non-Contribution Election. |

| Class | Initial Distribution | Distribution Trust Interests | Creditors' Trust Interests |
|---|---|---|---|
| | EGI-TRB LLC Notes and the PHONES Notes Indenture, less the amount of Cash received as an Initial Distribution that is necessary to fund any shortfall to ensure that Holders of Allowed Other Non-Guarantor Debtor Claims are paid in full, in Cash (including Postpetition Interest). | | |
| Other Parent Claims (Class 1G). [20] | Pro Rata share of Parent DEV; *provided, however*, if the Class of Other Parent Claims votes to accept the Noteholder Plan, subject to the Other Parent Claims Purchase Price Cap, each Holder of an Allowed Other Parent Claim shall have the right to put its Allowed Other Parent Claim to the Claims Purchaser in exchange for payment in Cash equal to 15% of such Holder's Allowed Other Parent Claim. | Class 1G Distribution Trust Interests; *provided, however*, that to the extent the Other Parent Claims Class votes to accept the Noteholder Plan and the Claims Purchase is consummated, Holders of Other Parent Claims that elected the Other Parent Claims Put Option shall not receive Class 1G Distribution Trust Interests. | Class 1G Creditors' Trust Interests, but only to the extent such Holder of Other Parent Claims has not made the Non-Contribution Election; *provided, however*, that to the extent the Other Parent Claims Class votes to accept the Noteholder Plan and the Claims Purchase is consummated, such Holder did not elect the Other Parent Claims Put Option. |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | Payment in full, in Cash (including Postpetition Interest). | n/a | n/a |
| Other Guarantor Debtor Claims (Classes 50G-111G). [21] | Cash equal to 8% of their Allowed Other Guarantor Debtor Claim; *provided, however*, if the applicable Class of Other Guarantor Debtor Claims votes to accept the Noteholder Plan, subject to the Other Guarantor Debtor | Class 50G-111G Distribution Trust Interests; *provided, however*, that to the extent the applicable Other Guarantor Debtor Claims Class votes to accept the Noteholder | n/a |

---

[20] If Class 1G accepts the Noteholder Plan, for each Allowed Other Parent Claim that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Parent Claim, shall receive all distributions on account thereof (*i.e.*, Initial Distributions, Distribution Trust Interests and Creditors' Trust Interests).  In order for an Other Parent Claims Put Option to be effective, the Holder of an Allowed Other Parent Claim electing the Other Parent Claims Put Option must also not make the Non-Contribution Election.  To the extent the aggregate consideration  necessary to purchase the Other Parent Put Claims exceeds the Other Parent Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Parent Put Claims, rounded to the nearest whole dollar, at the Other Parent Claims Purchase Price and the remaining portion of the Other Parent Put Claims shall receive their Pro Rata portion of the Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests on account of such remaining portion of the Other Parent Put Claims.

[21] For each of Class 50G-111G that accepts the Noteholder Plan, for each Allowed Other Guarantor Debtor Claim in such accepting Class that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Guarantor Debtor Claim, shall receive all distributions on account thereof (i.e., Initial Distributions and Distribution Trust Interests).  To the extent the aggregate consideration  necessary to purchase Other Guarantor Debtor Put Claims exceeds the Other Guarantor Debtor Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Guarantor Debtor Put Claims in the applicable Class, rounded to the nearest whole dollar, at the Other Guarantor Debtor Purchase Price and the remaining portion of the applicable Other Guarantor Debtor Put Claims shall receive their Pro Rata portion of the Initial Distribution and Distribution Trust Interests on account of such remaining portion of the applicable Other Guarantor Debtor Put Claims.

| Class | Initial Distribution | Distribution Trust Interests | Creditors' Trust Interests |
|---|---|---|---|
| | Purchase Price Cap, each Holder of an Allowed Other Guarantor Debtor Claim in the applicable accepting Class shall be able to put its Allowed Other Guarantor Debtor Claim to the Claims Purchaser in exchange for payment in Cash equal to 25% of such Holder's Allowed Other Guarantor Debtor Claim in such accepting Class. | Plan, each Holder of an Other Guarantor Debtor Claim in such Class that elected the Other Guarantor Debtor Claims Put Option shall not receive Class 50G-111G Distribution Trust Interests, as applicable. | |
| EGI-TRB LLC Notes Claims (Class 1H). | Pro Rata share of Parent DEV allocable to EGI-TRB LLC Notes Claims will be (i) turned over to Senior Noteholders on account of the subordination provisions in the EGI-TRB LLC Notes and (ii) the remainder placed in the Distribution Trust Reserves for other potential beneficiaries of the subordination provisions of the EGI-TRB LLC Notes pending allowance of such potential beneficiaries' Claims and ultimately distributed in accordance with the Litigation Distribution Orders. | Class 1H Distribution Trust Interests; *provided, however*, that distributions on account of Class 1H Distribution Trust Interests shall be allocated in accordance with the subordination provisions of the EGI-TRB LLC Notes. | Class 1H Creditors' Trust Interests, but only to the extent such Holder of EGI-TRB LLC Notes Claims has not made the Non-Contribution Election; *provided, however*, that distributions on account of Class 1H Creditors' Trust Interests may be allocated in accordance with the subordination provisions of the EGI-TRB LLC Notes to the extent deemed applicable pursuant to the Creditors' Trust Distribution Orders. |
| PHONES Notes Claims (Class 1I).[22] | Pro Rata share of Parent DEV allocable to PHONES Notes Claims will be (i) turned over to Senior Noteholders on account of the subordination provisions in the PHONES Notes Indenture and (ii) the remainder placed in the Distribution Trust Reserves for other potential beneficiaries of the subordination provisions of the PHONES Notes Indenture pending allowance of such potential beneficiaries' Claims and ultimately distributed in accordance with the Litigation | Class 1I Distribution Trust Interests; *provided, however*, that distributions on account of Class 1I Distribution Trust Interests shall be allocated in accordance with the subordination provisions of the PHONES Notes Indenture. | Class 1I Creditors' Trust Interests, but only to the extent such Holder of PHONES Notes Claims has not made the Non-Contribution Election; *provided, however*, that distributions on account of Creditors' Trust Interests may be allocated in accordance with the subordination provisions of the PHONES Notes Indenture, to the extent deemed applicable pursuant to the Creditors' Trust Distribution Orders. |

---

[22] The PHONES Notes Claims Class may include PHONES Notes Exchange Claims depending on the PHONES Notes Claims Resolution.  The PHONES Notes Claims and the PHONES Notes Exchange Claims shall be Allowed in the amount(s) determined by the Bankruptcy Court.

| Class | Initial Distribution | Distribution Trust Interests | Creditors' Trust Interests |
|---|---|---|---|
| | Distribution Orders. | | |
| Subordinated Securities Claims (Class 1K).[23] | The amount that would have equated to an initial distribution otherwise allocable to Subordinated Securities Claims shall be placed in the Distribution Trust Reserve for ultimate distribution in accordance with the Litigation Distribution Orders. | Class 1K Distribution Trust Interests on account of Claims against Tribune. | Class 1K Creditors' Trust Interests, but only to the extent such Holder of a Subordinated Securities Claim has not made the Non-Contribution Election. |

---

[23] The Proponents do not believe that the ESOP and/or any present or former participants in the ESOP in their capacity as such has an Allowed Claim against the Filed Subsidiary Debtors.  Accordingly, under the Noteholder Plan, any Claim against the Debtors by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such is treated as a Subordinated Securities Claim against Tribune (Class 1K); *provided, however,* that in the event that the Bankruptcy Court determines that the ESOP and/or any present or former participants in the ESOP in their capacity as such has an Allowed Claim against a Guarantor Debtor or Non-Guarantor Debtor, such Allowed Claim shall constitute an Other Guarantor Debtor Claim or an Other Non-Guarantor Debtor Claim, as applicable, against such Filed Subsidiary Debtor.

# III.

## ESTIMATED RECOVERIES UNDER THE NOTEHOLDER PLAN

All estimated recoveries contemplated in the following charts are based solely on consideration related to the DEV.  For illustrative purposes and to enable Creditors to compare their estimated recoveries under the Debtor/Committee/Lender Plan to their estimated recoveries under the Noteholder Plan, the DEV of $6.75 billion and the 8.4%/91.6% allocation of DEV between Tribune and its Subsidiaries are used herein for illustrative purposes only.  As previously noted, the actual DEV and allocation of the DEV among Tribune and its Subsidiaries will be determined by the Bankruptcy Court in connection with Confirmation and the Proponents reserve all rights to assert at Confirmation that the DEV or the allocation thereof between Tribune and the Subsidiaries is different than set forth herein.

Projected recoveries may be significantly higher or lower than shown below based on the outcome of the Trust Causes of Action; however, regardless of litigation results, all Creditors will be entitled to keep their Initial Distributions.  For the avoidance of doubt, all value contained in the Distribution Trust Reserves, net of costs and expenses, will ultimately be distributed to holders of Distribution Trust Interests in accordance with the terms of the Litigation Distribution Orders.

*Chart 1– Assumptions: (i) Step Two Lenders share in all Step One Lender recoveries even if Step Two Lender Claims are avoided; (ii) PHONES Notes Claims are Allowed in the amount of $703 million; and (iii) PHONES Notes Exchange Claims are classified as Subordinated Securities Claims and Allowed in the amount of $56 million.*

The following chart depicts estimated recoveries for each Class of Claims and Interests under the Noteholder Plan using the Chart 1 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $3.458 billion or 51.2% of the DEV using these assumptions.

| Class | Estimated Claim Amounts[24] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|

---

[24] For the exclusive purpose of making Initial Distributions under the Noteholder Plan, the Step One Senior Loan Claims and Step Two Senior Loan Claims have been provisionally Allowed in the amounts listed above.  For the avoidance of doubt, the Claims of the LBO Lenders continue to be subject to challenge by the Litigation Trust.

| Class | Estimated Claim Amounts[24] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 38.7% | 38.7% or 45.9%[25] | 57.4% | 76.0% | 75.6% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 38.7% | 38.7% or 45.9%[26] | 57.4% | 76.0% | 75.6% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 38.7% or 0.0%[27] | 0.0% | 0.0% | 4.8% |
| Senior Noteholder Claims (Class 1F).[28] | $1.283 billion | 4.8% | 100.0% | 100.0% | 7.9% | 4.8% |
| Other Parent Claims (Class 1G). | $154 million[29] | 4.4% or 15.0%[30] | 100.0% | 76.5% | 7.2% | 4.4% |

[25] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[26] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[27] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[28] Estimated percentage recoveries shown for the Senior Noteholder Class are gross percentages. The actual estimated recovery percentages retained by the Senior Noteholders will be reduced to account for any payments required to be made on account of the Other Non-Guarantor Debtor Claims. Thus, for example, the net Initial Distribution for Senior Noteholder Claims will be 4.3%.

[29] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[30] The lower percentage recovery is based on a circumstance where the applicable Holder has not elected the Other Parent Claims Put Option or the conditions precedent for the Other Parent Claims Put Option have not been satisfied. The higher percentage recovery reflects a circumstance where the Holder elects the Other Parent Claims Put Option and the conditions precedent for the Other Parent Claims Put Option have been

| Class | Estimated Claim Amounts[24] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[31] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[32] | 8.0% or 25.0%[33] | 100.0% | 100.0% | 8.0%[34] | 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $703 million | 0.0% | 100.0% | 32.8% | 0.0% | 0.0% |

satisfied.  The Other Parent Claims Put Option provides that if Class 1G accepts the Noteholder Plan, for each Allowed Other Parent Claim that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Parent Claim, shall receive all distributions on account thereof (*i.e.*, Initial Distributions, Distribution Trust Interests, Creditors' Trust Interests and the seller will not receive any further distribution on account of their Claim).  In order for an Other Parent Claims Put Option to be effective, the Holder of an Allowed Other Parent Claim electing the Other Parent Claims Put Option must also not make the Non-Contribution Election.  To the extent the aggregate consideration necessary to purchase the Other Parent Put Claims exceeds the Other Parent Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Parent Put Claims, rounded to the nearest whole dollar, at the Other Parent Claims Purchase Price and the remaining portion of the Other Parent Put Claims shall receive their Pro Rata portion of the Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests on account of such remaining portion of the Other Parent Put Claims.

[31] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors.  The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[32] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors.  The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[33] The lower percentage recovery is based on a circumstance where the applicable Holder has not elected the Other Guarantor Debtor Put Option or the conditions precedent for the Other Guarantor Debtor Claims Put Option have not been satisfied.  The higher percentage recovery reflects a circumstance where the Holder elects the Other Guarantor Debtor Claims Put Option and the conditions precedent for the Other Guarantor Debtor Claims Put Option have been satisfied.  The Other Guarantor Debtor Claims Put Option provides that for each of 50G-111G that accepts the Noteholder Plan, for each Allowed Other Guarantor Debtor Claim that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Guarantor Debtor Claim, shall receive all distributions on account thereof (*i.e.*, Initial Distributions, Distribution Trust Interests and the seller will not receive any further distribution on account of their Claim).  To the extent the aggregate consideration  necessary to purchase the Other Guarantor Debtor Put Claims exceeds the Other Guarantor Debtor Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Guarantor Debtor Put Claims, rounded to the nearest whole dollar, at the Other Guarantor Debtor Claims Purchase Price and the remaining portion of the Other Guarantor Debtor Put Claims shall receive their Pro Rata portion of the Initial Distribution and Distribution Trust Interests on account of such remaining portion of the Other Guarantor Debtor Put Claims.

[34] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the holders of such claims are not increased under this scenario.  As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

| Class | Estimated Claim Amounts[24] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Subordinated Securities Claims (Class 1K). | $56 million | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

33

*Chart 2 – Assumptions: (i) Step Two Lenders share in all Step One Lender recoveries even if Step Two Lender Claims are avoided; and (ii) PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

The following chart depicts estimated recoveries for each Class of Claims and Interests under the Noteholder Plan using the Chart 2 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $3.057 billion or 45.3% of the DEV using these assumptions.

| Class | Estimated Claim Amounts[35] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 34.2% | 34.2% or 40.5%[36] | 57.4% | 76.0% | 75.6% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 34.2% | 34.2% or 40.5%[37] | 57.4% | 76.0% | 75.6% |

[35] For the exclusive purpose of making Initial Distributions under the Noteholder Plan, the Step One Senior Loan Claims and Step Two Senior Loan Claims have been provisionally Allowed in the amounts listed above.  For the avoidance of doubt, the Claims of the LBO Lenders continue to be subject to challenge by the Litigation Trust.

[36] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[37] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[35] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 34.2% or 0.0%[38] | 0.0% | 0.0% | 4.8% |
| Senior Noteholder Claims (Class 1F).[39] | $1.283 billion | 4.8% | 100.0% | 100.0% | 7.8% | 4.8% |
| Other Parent Claims (Class 1G). | $154 million[40] | 4.3% or 15.0%[41] | 100.0% | 62.6% | 6.7% | 4.3% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[42] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

---

[38] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[39] Estimated percentage recoveries shown for the Senior Noteholder Class are gross percentages. The actual estimated recovery percentages retained by the Senior Noteholders will be reduced to account for any payments required to be made on account of the Other Non-Guarantor Debtor Claims. Thus, for example, the net Initial Distribution for Senior Noteholder Claims will be 4.3%.

[40] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[41] The lower percentage recovery is based on a circumstance where the applicable Holder has not elected the Other Parent Claims Put Option or the conditions precedent for the Other Parent Claims Put Option have not been satisfied. The higher percentage recovery reflects a circumstance where the Holder elects the Other Parent Claims Put Option and the conditions precedent for the Other Parent Claims Put Option have been satisfied. The Other Parent Claims Put Option provides that if Class 1G accepts the Noteholder Plan, for each Allowed Other Parent Claim that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Parent Claim, shall receive all distributions on account thereof (*i.e.*, Initial Distributions, Distribution Trust Interests, Creditors' Trust Interests and the seller will not receive any further distribution on account of their Claim). In order for an Other Parent Claims Put Option to be effective, the Holder of an Allowed Other Parent Claim electing the Other Parent Claims Put Option must also not make the Non-Contribution Election. To the extent the aggregate consideration necessary to purchase the Other Parent Put Claims exceeds the Other Parent Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Parent Put Claims, rounded to the nearest whole dollar, at the Other Parent Claims Purchase Price and the remaining portion of the Other Parent Put Claims shall receive their Pro Rata portion of the Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests on account of such remaining portion of the Other Parent Put Claims.

[42] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

| Class | Estimated Claim Amounts[35] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are not_ Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are_ Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[43] | 8.0% or 25.0%[44] | 100.0% | 100.0% | 8.0%[45] | 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $1.197 billion | 0.0% | 100.0% | 21.1% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $0 | N/A | N/A | N/A | N/A | N/A |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |

[43] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[44] The lower percentage recovery is based on a circumstance where the applicable Holder has not elected the Other Guarantor Debtor Claims Put Option or the conditions precedent for the Other Guarantor Debtor Claims Put Option have not been satisfied. The higher percentage recovery reflects a circumstance where the Holder elects the Other Guarantor Debtor Claims Put Option and the conditions precedent for the Other Guarantor Debtor Claims Put Option have been satisfied. The Other Guarantor Debtor Claims Put Option provides that for each of 50G-111G that accepts the Noteholder Plan, for each Allowed Other Guarantor Debtor Claim that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Guarantor Debtor Claim, shall receive all distributions on account thereof (*i.e.*, Initial Distributions, Distribution Trust Interests, and the seller will not receive any further distribution on account of their Claim). To the extent the aggregate consideration necessary to purchase the Other Guarantor Debtor Put Claims exceeds the Other Guarantor Debtor Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Guarantor Debtor Put Claims, rounded to the nearest whole dollar, at the Other Guarantor Debtor Claims Purchase Price and the remaining portion of the Other Guarantor Debtor Put Claims shall receive their Pro Rata portion of the Initial Distribution and Distribution Trust Interests on account of such remaining portion of the Other Guarantor Debtor Put Claims.

[45] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the holders of such claims are not increased under this scenario. As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

| Class | Estimated Claim Amounts[35] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

*Chart 3– Assumptions: (i) Step Two Lenders do not share in Step One Lender recoveries if Step Two Lender Claims are avoided; (ii) PHONES Notes Claims are Allowed in the amount of $703 million; and (iii) PHONES Notes Exchange Claims are classified as Subordinated Securities Claims and Allowed in the amount of $56 million,*

The following chart depicts estimated recoveries for each Class of Claims and Interests under the Noteholder Plan using the Chart 3 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $2.644 billion or 39.2% of the DEV using these assumptions.

| Class | Estimated Claim Amounts[46] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 38.7% | 38.7% or 45.9%[47] | 75.6% | 100.0% | 75.6% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 0.0% | 38.7% or 45.9%[48] | 0.0% | 0.0% | 75.6% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 38.7% or 0.0%[49] | 0.0% | 0.0% | 4.8% |

---

[46] For the exclusive purpose of making Initial Distributions under the Noteholder Plan, the Step One Senior Loan Claims and Step Two Senior Loan Claims have been provisionally Allowed in the amounts listed above.  For the avoidance of doubt, the Claims of the LBO Lenders continue to be subject to challenge by the Litigation Trust.

[47] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[48] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[46] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Senior Noteholder Claims (Class 1F). [50] | $1.283 billion | 4.8% | 100.0% | 100.0% | 7.9% | 4.8% |
| Other Parent Claims (Class 1G). | $154 million[51] | 4.4% or 15.0%[52] | 100.0% | 76.5% | 7.2% | 4.4% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[53] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[54] | 8.0% or 25.0%[55] | 100.0% | 100.0% | 8.0%[56] | 8.0% |

[49] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[50] Estimated percentage recoveries shown for the Senior Noteholder Class are gross percentages. The actual estimated recovery percentages retained by the Senior Noteholders will be reduced to account for any payments required to be made on account of the Other Non-Guarantor Debtor Claims. Thus, for example, the net Initial Distribution for Senior Noteholder Claims will be 4.3%.

[51] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[52] The lower percentage recovery is based on a circumstance where the applicable Holder has not elected the Other Parent Claims Put Option or the conditions precedent for the Other Parent Claims Put Option have not been satisfied. The higher percentage recovery reflects a circumstance where the Holder elects the Other Parent Claims Put Option and the conditions precedent for the Other Parent Claims Put Option have been satisfied. The Other Parent Claims Put Option provides that if Class 1G accepts the Noteholder Plan, for each Allowed Other Parent Claim that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Parent Claim, shall receive all distributions on account thereof (*i.e.*, Initial Distributions, Distribution Trust Interests, Creditors' Trust Interests and the seller will not receive any further distribution on account of their Claim). In order for an Other Parent Claims Put Option to be effective, the Holder of an Allowed Other Parent Claim electing the Other Parent Claims Put Option must also not make the Non-Contribution Election. To the extent the aggregate consideration necessary to purchase the Other Parent Put Claims exceeds the Other Parent Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Parent Put Claims, rounded to the nearest whole dollar, at the Other Parent Claims Purchase Price and the remaining portion of the Other Parent Put Claims shall receive their Pro Rata portion of the Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests on account of such remaining portion of the Other Parent Put Claims.

[53] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[54] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

| Class | Estimated Claim Amounts[46] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $703 million | 0.0% | 100.0% | 32.8% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $56 million | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Subsidiaries (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Subsidiaries (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

[55] The lower percentage recovery is based on a circumstance where the applicable Holder has not elected the Other Parent Claims Put Option or the conditions precedent for the Other Guarantor Debtor Claims Put Option have not been satisfied.  The higher percentage recovery reflects a circumstance where the Holder elects the Other Guarantor Debtor Claims Put Option and the conditions precedent for the Other Guarantor Debtor Claims Put Option have been satisfied.  The Other Guarantor Debtor Claims Put Option provides that for each of 50G-111G that accepts the Noteholder Plan, for each Allowed Other Guarantor Debtor Claim that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Guarantor Debtor Claim, shall receive all distributions on account thereof (*i.e.*, Initial Distributions, Distribution Trust Interests and the seller will not receive any further distribution on account of their Claim).  To the extent the aggregate consideration  necessary to purchase the Other Guarantor Debtor Put Claims exceeds the Other Guarantor Debtor Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Guarantor Debtor Put Claims, rounded to the nearest whole dollar, at the Other Guarantor Debtor Claims Purchase Price and the remaining portion of the Other Guarantor Debtor Put Claims shall receive their Pro Rata portion of the Initial Distribution and Distribution Trust Interests on account of such remaining portion of the Other Guarantor Debtor Put Claims.

[56] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the holders of such claims are not increased under this scenario.  As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

*Chart 4– Assumptions: (i) Step Two Lenders do not share in Step One Lender recoveries if Step Two Lender Claims are avoided; and (ii) PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

The following chart depicts estimated recoveries for each Class of Claims and Interests under the Noteholder Plan using the Chart 4 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $2.340 billion or 34.7% of the DEV using these assumptions.

| Class | Estimated Claim Amounts[57] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 34.2% | 34.2% or 40.5%[58] | 75.6% | 100.0% | 75.6% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 0.0% | 34.2% or 40.5%[59] | 0.0% | 0.0% | 75.6% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 34.2% or 0.0%[60] | 0.0% | 0.0% | 4.8% |

[57] For the exclusive purpose of making Initial Distributions under the Noteholder Plan, the Step One Senior Loan Claims and Step Two Senior Loan Claims have been provisionally Allowed in the amounts listed above.  For the avoidance of doubt, the Claims of the LBO Lenders continue to be subject to challenge by the Litigation Trust.

[58] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[59] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[60] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[57] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are not_ Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are_ Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Senior Noteholder Claims (Class 1F). [61] | $1.283 billion | 4.8% | 100.0% | 100.0% | 7.8% | 4.8% |
| Other Parent Claims (Class 1G). | $154 million[62] | 4.3% or 15.0%[63] | 100.0% | 62.6% | 6.7% | 4.3% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[64] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[65] | 8.0% or 25.0%[66] | 100.0% | 100.0% | 8.0%[67] | 8.0% |

[61] Estimated percentage recoveries shown for the Senior Noteholder Class are gross percentages. The actual estimated recovery percentages retained by the Senior Noteholders will be reduced to account for any payments required to be made on account of the Other Non-Guarantor Debtor Claims. Thus, for example, the net Initial Distribution for Senior Noteholder Claims will be 4.3%.

[62] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[63] The lower percentage recovery is based on a circumstance where the applicable Holder has not elected the Other Parent Claims Put Option or the conditions precedent for the Other Parent Claims Put Option have not been satisfied. The higher percentage recovery reflects a circumstance where the Holder elects the Other Parent Claims Put Option and the conditions precedent for the Other Parent Claims Put Option have been satisfied. The Other Parent Claims Put Option provides that if Class 1G accepts the Noteholder Plan, for each Allowed Other Parent Claim that is put to the Claims Purchaser, the Claims Purchaser, as transferee of such Other Parent Claim, shall receive all distributions on account thereof (i.e., Initial Distributions, Distribution Trust Interests, Creditors' Trust Interests and the seller will not receive any further distribution on account of their Claim). In order for an Other Parent Claims Put Option to be effective, the Holder of an Allowed Other Parent Claim electing the Other Parent Claims Put Option must also not make the Non-Contribution Election. To the extent the aggregate consideration necessary to purchase the Other Parent Put Claims exceeds the Other Parent Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Parent Put Claims, rounded to the nearest whole dollar, at the Other Parent Claims Purchase Price and the remaining portion of the Other Parent Put Claims shall receive their Pro Rata portion of the Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests on account of such remaining portion of the Other Parent Put Claims.

[64] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated Claim amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[65] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[66] The lower percentage recovery is based on a circumstance where the applicable Holder has not elected the Other Guarantor Debtor Claims Put Option or the conditions precedent for the Other Guarantor Debtor Claims Put Option have not been satisfied. The higher percentage recovery reflects a circumstance where the Holder elects the Other Guarantor Debtor Claims Put Option and the conditions precedent for the Other Guarantor Debtor Claims Put Option have been satisfied. The Other Guarantor Debtor Claims Put Option provides that for each of 50G-111G that accepts the Noteholder Plan, for each Allowed Other Guarantor Debtor Claim that is put to the Claims Purchaser, the Claims Purchaser, as

| Class | Estimated Claim Amounts[57] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are not_ Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are_ Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $1.197 billion | 0.0% | 100.0% | 21.1% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $0 | N/A | N/A | N/A | N/A | N/A |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Subsidiaries (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Subsidiaries (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

transferee of such Other Guarantor Debtor Claim, shall receive all distributions on account thereof (*i.e.*, Initial Distributions, Distribution Trust Interests and the seller will not receive any further distribution on account of their Claim). To the extent the aggregate consideration necessary to purchase the Other Guarantor Debtor Put Claims exceeds the Other Guarantor Debtor Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Guarantor Debtor Put Claims, rounded to the nearest whole dollar, at the Other Guarantor Debtor Claims Purchase Price and the remaining portion of the Other Guarantor Debtor Put Claims shall receive their Pro Rata portion of the Initial Distribution and Distribution Trust Interests on account of such remaining portion of the Other Guarantor Debtor Put Claims.

[57] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the holders of such claims are not increased under this scenario. As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

**IV.**

**ESTIMATED LIQUIDATION RECOVERIES
UNDER THE NOTEHOLDER PLAN**


The estimated recoveries displayed in the following charts apply the Debtors' Liquidation Analysis (which can be found at Exhibit D to the General Disclosure Statement) to the basic constructs outlined in the Noteholder Plan; *provided, however*, that (i) the Put Options and (ii) the Senior Noteholder backstop of the Other Non-Guarantor Debtor Claims recovery would be unavailable in a liquidation scenario.  The following charts utilize a $3.783 billion liquidation value, which represents the Debtors' high-end estimated liquidation value after chapter 11 Administrative and Priority Claims are paid (net of $560 million of pension termination claims) (the "Liquidation Value").  Additionally, although the Debtors' Liquidation Analysis contemplates an entity-by-entity valuation, it does not set forth an illustrative Liquidation Value split between Tribune and its Subsidiaries.  Accordingly, for illustrative purposes and to facilitate a comparison on an apples-to-apples basis with the recovery scenarios outlined under the Noteholder Plan, the following charts assume that 8.4% of the Liquidation Value is allocable to Tribune with 91.6% of such Liquidation Value allocable to the Subsidiaries.

All Initial Distributions contemplated herein shall be paid using consideration obtained from Estate assets and not from any other funding source, i.e., the Distribution Trust Assets or the Creditors' Trust Assets.

*Chart 1– Assumptions: (i) Step Two Lenders share in all Step One Lender recoveries even if Step Two Lender Claims are avoided; (ii) PHONES Notes Claims are Allowed in the amount of $703 million; and (iii) PHONES Notes Exchange Claims are classified as Subordinated Securities Claims and Allowed in the amount of $56 million.*

The following chart depicts estimated recoveries for each Class of Claims and Interests in a liquidation scenario using the Chart 1 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $914 million or 24.1% of the Liquidation Value using these assumptions.

| Class | Estimated Claim Amounts[68] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 9.9% | 9.9% or 11.8%[69] | 32.1% | 42.6% | 42.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 9.9% | 9.9% or 11.8%[70] | 32.1% | 42.6% | 42.3% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 9.9% or 0.0%[71] | 0.0% | 0.0% | 2.7% |
| Senior Noteholder Claims (Class 1F). | $1.283 billion | 2.7% | 100.0% | 62.8% | 4.0% | 2.7% |

---

[68] For the hypothetical purpose of making Initial Distributions under a liquidation scenario, the Step One Senior Loan Claims and Step Two Senior Loan Claims would be provisionally Allowed in the amounts listed above.

[69] The lower percentage recovery is based on the outcome where all Step One Senior Loan Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[70] The lower percentage recovery is based on the outcome where all Step One Senior Loan Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[71] The higher percentage recovery is based on the outcome where all Step One Senior Loan Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[68] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Other Parent Claims (Class 1G). | $154 million[72] | 2.5% | 100.0% | 41.0% | 3.7% | 2.5% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[73] | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[74] | 0.0% - 8.0% | 100.0% | 100.0% | 0.0% - 8.0%[75] | 0.0 % - 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $703 million | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $56 million | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |

[72] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[73] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors.  The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[74] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors.  The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[75] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the holders of such claims are not increased under this scenario.  As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

| Class | Estimated Claim Amounts[68] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

47

*Chart 2 – Assumptions: (i) Step Two Lenders share in all Step One Lender recoveries even if Step Two Lender Claims are avoided; and (ii) PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

The following chart depicts estimated recoveries for each Class of Claims and Interests in a liquidation scenario using the Chart 2 – Assumptions. The Initial Distribution to all Classes in the aggregate is $513 million or 13.6% of the Liquidation Value using these assumptions.

| Class | Estimated Claim Amounts[76] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are_ Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 5.3% | 5.3% or 6.3%[77] | 32.1% | 42.6% | 42.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 5.3% | 5.3% or 6.3%[78] | 32.1% | 42.6% | 42.3% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 5.3% or 0.0%[79] | 0.0% | 0.0% | 2.7% |

---

[76] For the hypothetical purpose of making Initial Distributions under a liquidation scenario, the Step One Senior Loan Claims and Step Two Senior Loan Claims would be provisionally Allowed in the amounts listed above.

[77] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[78] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[76] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are_ Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Senior Noteholder Claims (Class 1F). | $1.283 billion | 2.7% | 100.0% | 63.6% | 4.0% | 2.7% |
| Other Parent Claims (Class 1G).[80] | $154 million | 2.4% | 100.0% | 33.6% | 3.5% | 2.4% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[81] | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[82] | 0.0% - 8.0% | 100.0% | 100.0% | 0.0% - 8.0%[83] | 0.0% - 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

[79] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated _pari passu_ if all LBO-Debt is avoided.  The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[80] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[81] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors.  The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[82] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors.  The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[83] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the holders of such claims are not increased under this scenario.  As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

| Class | Estimated Claim Amounts[76] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are_ Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| PHONES Notes Claims (Class 1I). | $1.197 billion | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $0 million | N/A | N/A | N/A | N/A | N/A |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

*Chart 3– Assumptions: (i) Step Two Lenders do not share in Step One Lender recoveries if Step Two Lender Claims are avoided; (ii) PHONES Notes Claims are Allowed in the amount of $703 million; and (iii) PHONES Notes Exchange Claims are classified as Subordinated Securities Claims and Allowed in the amount of $56 million,*

The following chart depicts estimated recoveries for each Class of Claims and Interests in a liquidation scenario using the Chart 3 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $705 million or 18.6% of the Liquidation Value using these assumptions.

| Class | Estimated Claim Amounts[84] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 9.9% | 9.9% or 11.8%[85] | 42.3% | 56.1% | 42.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 0.0% | 9.9% or 11.8%[86] | 0.0% | 0.0% | 42.3% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 9.9% or 0.0%[87] | 0.0% | 0.0% | 2.7% |

---

[84] For the hypothetical purpose of making Initial Distributions under a liquidation scenario, the Step One Senior Loan Claims and Step Two Senior Loan Claims would be provisionally Allowed in the amounts listed above.

[85] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[86] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[84] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Senior Noteholder Claims (Class 1F). | $1.283 billion | 2.7% | 100.0% | 62.8% | 4.0% | 2.7% |
| Other Parent Claims (Class 1G). | $154 million[88] | 2.5% | 100.0% | 41.0% | 3.7% | 2.5% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[89] | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[90] | 0.0% - 8.0% | 100.0% | 100.0% | 0.0% - 8.0%[91] | 0.0% - 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

---

[87] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[88] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[89] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors.  The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[90] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors.  The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[91] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the holders of such claims are not increased under this scenario.  As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

| Class | Estimated Claim Amounts[84] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are_ Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| PHONES Notes Claims (Class 1I). | $703 million | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $56 million | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

*Chart 4– Assumptions: (i) Step Two Lenders do not share in Step One Lender recoveries if Step Two Lender Claims are avoided; and (ii) PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

     The following chart depicts estimated recoveries for each Class of Claims and Interests in a liquidation scenario using the Chart 4 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $401 million or 10.6% of the Liquidation Value using these assumptions.

| Class | Estimated Claim Amounts[92] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 5.3% | 5.3% or 6.3%[93] | 42.3% | 56.1% | 42.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 0.0% | 5.3% or 6.3%[94] | 0.0% | 0.0% | 42.3% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 5.3% or 0.0%[95] | 0.0% | 0.0% | 2.7% |

---

[92] For the hypothetical purpose of making Initial Distributions under a liquidation scenario, the Step One Senior Loan Claims and Step Two Senior Loan Claims would be provisionally Allowed in the amounts listed above.

[93] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[94] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[95] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The lower percentage recovery is based on the outcome where all LBO Debt is avoided

| Class | Estimated Claim Amounts[92] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders _are_ Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Senior Noteholder Claims (Class 1F). | $1.283 billion | 2.7% | 100.0% | 63.6% | 4.0% | 2.7% |
| Other Parent Claims (Class 1G).[96] | $154 million | 2.4% | 100.0% | 33.6% | 3.5% | 2.4% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[97] | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% | 0.0% - 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[98] | 0.0% - 8.0% | 100.0% | 100.0% | 0.0% - 8.0%[99] | 0.0% - 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[96] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[97] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[98] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[99] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the holders of such claims are not increased under this scenario. As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

| Class | Estimated Claim Amounts[92] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders are Not Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| PHONES Notes Claims (Class 1I). | $1.197 billion | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $0 million | N/A | N/A | N/A | N/A | N/A |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

# V.

## CLASSES ENTITLED TO VOTE ON THE NOTEHOLDER PLAN

The following chart describes whether each Class of Claims and Interests is entitled to vote to accept or reject the Noteholder Plan.  For a complete description of voting procedures and deadlines, please see section IX of the General Disclosure Statement.

| Class | Impaired/Unimpaired | Entitled to Vote |
|---|---|---|
| Priority Non-Tax Claims[100] | Unimpaired | No |
| Other Secured Claims[101] | Unimpaired | No |

[100] Treatment applies to such Class at all Debtor entities.

| Class | Impaired/Unimpaired | Entitled to Vote |
|---|---|---|
| Step One Senior Loan Claims | Impaired | Yes |
| Step One Senior Loan Guaranty Claims | Impaired | Yes |
| Step Two Senior Loan Claims | Impaired | Yes |
| Step Two Senior Loan Guaranty Claims | Impaired | Yes |
| Bridge Loan Claims | Impaired | Yes |
| Bridge Loan Guaranty Claims | Impaired | Yes |
| Senior Noteholder Claims | Impaired | Yes |
| PHONES Notes Claims | Impaired | Yes |
| EGI-TRB LLC Notes Claims | Impaired | Yes |
| Other Parent Claims | Impaired | Yes |
| Other Guarantor Debtor Claims | Impaired | Yes |
| Other Non-Guarantor Debtor Claims | Unimpaired | No |
| Intercompany Claims | Impaired | To be determined[102] |
| Subordinated Securities Claims | Impaired | Yes |
| Tribune Interests | Impaired | No |
| Interests in Guarantor Debtors | Unimpaired | No |
| Interests in Non-Guarantor Debtors | Unimpaired | No |

---

[101] Treatment applies to such Class at all Debtor entities.

[102] The Bankruptcy Court will determine in connection with Confirmation whether Holders of Intercompany Claims will be entitled to vote to accept or reject the Noteholder Plan

# VI.

## CERTAIN FACTORS AFFECTING THE NOTEHOLDER PLAN

**A.      Certain Risk Factors Specific to the Noteholder Plan**

1.      Length of Litigation

The Litigation Trust Causes of Action and State Law Avoidance Claims are complex and fact intensive in nature.  It is difficult to estimate the length of time it will take to settle or reach a judgment regarding the Trust Causes of Action and, therefore, difficult to estimate how long it will be before Holders of Trust Interests will receive recoveries on account of the Trust Causes of Action.

2.      Impact of Timing on Value of New Common Stock/New Warrants

The length of litigation of the Litigation Trust Causes of Action may have a negative impact on the value of New Common Stock and New Warrants eventually distributed to Creditors based on the Litigation Trust Distribution Orders.  Due to the need for a resolution regarding the Senior Loan Claim Sharing Resolution and PHONES Notes Claim Resolution prior to making distributions to certain Classes on account of both their Litigation Trust Interests and Creditors' Trust Interests and, further, due to the need for a resolution on certain of the Litigation Trust Causes of Action to determine which parties are entitled to receive the DEV in the Distribution Trust Reserve, the value of the New Common Stock portion of the DEV may increase or decrease if the equity value of Tribune increases or decreases over the course of such time.  Accordingly, it cannot be guaranteed that the DEV held in the Distribution Trust Reserves will not decrease between the time of Confirmation and ultimate distributions to Creditors from the Distribution Trust Reserves and, therefore, Creditors might receive New Common Stock and/or New Warrants that have lower values than they had on the Confirmation Date.  Conversely, the DEV held in the Distribution Trust Reserve may appreciate between the time of Confirmation and ultimate distributions to Creditors from the Distribution Trust Reserve, in which case Creditors entitled to receive distributions from the Distribution Trust Reserve will be permitted to receive and retain New Common Stock and/or New Warrants that have a higher value than ascribed to such New Common Stock or New Warrants on the Confirmation Date.

3.      Outcome of Litigation Trust Causes of Action and State Law Avoidance Claims

Although the Proponents believe, based on their own review of the Litigation Trust Causes of Action and the State Law Avoidance Claims, and also based upon the Examiner's Report filed in the Chapter 11 Cases, that the Litigation Trust Causes of Action and State Law Avoidance Actions will be successful and yield substantial additional recoveries for non-LBO Lender Creditors and, potentially, even the LBO Lenders, the assumed outcomes are speculative in nature and cannot be guaranteed.  Even in light of a positive result, it is impossible to determine the amount of additional recovery Holders of Trust Interests would receive on account of a settlement or judgment regarding the Litigation Trust Causes of Action and the State Law Avoidance Claims.

58

4.    Determination of Senior Loan Claim Sharing Resolution

The Initial Distribution to Step Two Lenders is dependent upon the Senior Loan Claim Sharing Resolution resulting in an outcome that is favorable to the Step Two Lenders.  It is unknown at this time whether the Bankruptcy Court will determine the Senior Loan Claim Sharing Resolution in connection with Confirmation or at any time prior to the Effective Date of the Noteholder Plan.  It is also possible that the Senior Loan Claim Sharing Resolution will not be determined until a final determination regarding all LBO Related Causes of Action is reached.  Accordingly, as of the date hereof, it cannot be certain that Step Two Lenders will receive an Initial Distribution on or within a reasonable time after the Initial Distribution Date.  In fact, it is unknown whether Step Two Lenders will receive any distributions at all under the Noteholder Plan.

Furthermore, ultimate recovery to Step One Lenders will be heavily affected by the Senior Loan Claim Sharing Resolution and the LBO-Related Causes of Action.  Specifically, in the event that Step One Lender Claims are not avoided and sharing is found to apply even if Step Two Lenders Claims are avoided, the Step One Lenders will receive a significantly lower percentage of recovery due to the requirement to share all recoveries ratably with the Step Two Lenders.  Conversely, if Step One Lender Claims are not avoided and the Step Two Lender Claims are avoided and sharing is found not to apply, Step One Lenders will receive a greater overall recovery not only on account of their Initial Distribution but, potentially, also on account of their Trust Interests. Certain holders of Senior Loan Claims have asserted that, if the Bankruptcy Court does not determine the Senior Loan Claim Sharing Resolution in connection with Confirmation, Step Two Lenders will oppose the Step One Lenders receiving their Initial Distributions despite the fact that Initial Distributions otherwise allocable to Step Two Lenders will be held in reserve pending the outcome of the Senior Loan Claims Sharing Resolution.  The Proponents do not believe that, if Step Two Lenders oppose Step One Lenders receiving their Initial Distributions in such circumstance that such opposition will be successful.

5.    Determination of PHONES Notes Claims Resolution

As described in further detail above, prior to the Petition Date, certain Holders of PHONES Notes sought to exercise the right to redeem their PHONES Notes, as provided for in the PHONES Notes Indenture.  The ultimate outcome of the PHONES Notes Claim Resolution is unknown at this time and, therefore, it cannot be determined whether Holders of PHONES Notes Exchange Claims will have such Claims treated as PHONES Notes Claims, which would be entitled to receive distributions along with Class 1I or, whether they would qualify as Subordinated Securities Claims and, thus, be classified in Class 1K, which may not be entitled to receive any distributions until a later time, if ever.

Furthermore, the Pro Rata share of Initial Distributions allocable to the PHONES Notes Claims Class will change based on the ultimate treatment of the PHONES Notes Exchange Claims – *i.e.*, if such Claims are treated as Subordinated Securities Claims, the aggregate pool of PHONES Notes Claims will be reduced by approximately $494 million to $703 million if the PHONES Notes Exchange Claims are treated as if the exchanged PHONES Notes were deemed not to be exchanged as a result of the Debtors' failure to make payments on account of such exchanged PHONES Notes.  The ultimate treatment of the PHONES Notes Exchange Claims

may increase or decrease the DEV allocable to other Classes that are being treated *pari passu* with the PHONES Notes Claims for purposes of allocating Initial Distributions as well as the Classes of Claim entitled o the benefit of the subordination provisions in the PHONES Notes Indenture.

6.    Assumptions Regarding DEV and Allocation of DEV

All estimated recoveries set forth herein rely on the Debtors' valuation and are used for illustrative purposes only.  The Noteholder Plan and Noteholder Specific Disclosure Statement assume for illustrative purposes a $6.750 billion DEV with, such DEV allocated (again, for illustrative purposes only) 8.4% (or $564 million) to Tribune and 91.6% (or $6.186 billion) to the Subsidiaries (on a consolidated basis).  The Proponents reserve their respective rights to assert that the DEV and the allocation of the DEV among Tribune and the Subsidiaries may be different than that set forth in the Debtor/Committee/Lender Plan.  At Confirmation, the Bankruptcy Court may determine that either a higher or lower value should be used for purposes of DEV.  Furthermore, the Bankruptcy Court may determine that the allocation of DEV among Tribune and the Subsidiaries is different than that stated in the Debtors' valuation.  To the extent that the Bankruptcy Court concludes that the DEV is higher or lower and/or that the allocation of DEV should be different, the recoveries to Creditors might be materially different than set forth herein.

7.    Claims Purchase Price Caps

The Cash amounts paid pursuant to the Other Parent Claims Put Option and the Other Guarantor Debtor Claims Put Option are capped at an aggregate amount of $45.00 million, consisting of the Other Parent Claims Purchase Price Cap of $24.25 million and the Other Guarantor Debtor Claims Purchase Price Cap of $20.75 million.  Based on the Debtors' estimates of Allowed Other Parent Claims and Allowed Other Guarantor Claims, the Proponents believe that the Claims Purchase Price Caps will be sufficient to pay the Claims Purchase Price for all Other Parent Claims and Other Guarantor Debtor Claims electing the Put Option; however, until the Voting Deadline and a review of all Noteholder Ballots is conducted, it is not possible for the Proponents to ensure that the Claims Purchase Price Cap will be sufficient to pay for all Put Claims.  Accordingly, there is a risk that despite making the Other Parent Put Claim Election or Other Guarantor Debtor Put Claim Election on the applicable Noteholder Ballot, such Holder's Claim may not be purchased in full and such Holder may, instead, receive the applicable portion of the Claims Purchase Price (i.e., in the Cash of Other Parent Claims, 15% and in the Case of Other Guarantor Debtor Claims, 25%) for only a portion of its Other Parent Put Claim or Other Guarantor Debtor Put Claim, as applicable, and my receive Initial Distributions, Distribution Trust Interests and, in the Case of the Other Parent Claims, Creditors' Trust Interests, for the remaining portion of such Claim.

8.    FCC Related Considerations and Risks Respecting the Debtors' Businesses

The Debtors operate television broadcast stations, a radio station, and certain associated facilities under authority granted by the FCC.  Under Section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses.  Except in the case of "involuntary"

assignments, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated.  For additional information concerning FCC-related considerations and risks, see section XII of the General Disclosure Statement "General Risk Factors."

a)  *FCC Processing of Applications for Consent to Emerge from Bankruptcy*

On April 28, 2010, the Debtors filed the FCC Applications by which the Debtors sought the consent of the FCC for each of the Debtors holding FCC licenses to assign its FCC licenses to the Reorganized Debtors.  The FCC Applications included requests for waivers of the FCC's newspaper/broadcast cross-ownership rule and local television multiple ownership or "duopoly" rule, including a "failing station" waiver and continued "satellite" exemption.  The Debtors filed 16 applications for consent to assignment of broadcast station licenses, together with applications seeking consent to assign satellite earth station, private land mobile, private fixed microwave, and other categories of FCC licenses held by the Debtors.  Tribune provided local public notice of the filing of the FCC Applications through broadcast announcements and notices in local newspapers servicing their broadcast markets.

On May 13, 2010, the FCC's Media Bureau issued a public notice announcing that the FCC has accepted all of the FCC Applications for filing upon initial review.  Although the FCC has accepted and is currently processing the FCC Applications, the Noteholder Plan Proponents anticipate that the FCC will not grant the FCC Applications until the Bankruptcy Court has confirmed the Noteholder Plan and authorized the transactions proposed in the Noteholder Plan.

The FCC's public notice of May 13, 2010 set a deadline of June 14, 2010 for interested persons to file petitions to deny the FCC Applications.  On that date, a coalition of Washington, D.C.-based public advocacy groups (the "Washington Public Advocacy Groups); the International Brotherhood of Teamsters ("IBT"); Wilmington Trust; and Neil Ellis, a competing newspaper publisher in the Hartford market ("Neil Ellis") filed petitions to deny the FCC Applications (collectively, the "Petitions to Deny").

On June 29, 2010, Tribune and JPMorgan filed oppositions to the Petitions to Deny.  On July 12, 2010, Washington Public Advocacy Groups, IBT, Wilmington Trust, and Neil Ellis filed replies to the oppositions of Tribune and JPMorgan.

Wilmington Trust will be withdrawing its petition to deny, reply and related submissions to the FCC.

The Debtors have amended the FCC Applications on several occasions, and the Proponents anticipate that further amendments will be necessary to reflect the filing of the Noteholder Plan and the Noteholder Specific Disclosure Statement.  Although the formal pleading cycle in the FCC proceeding has closed, additional filings may be submitted so long as they are made part of the public record in the proceeding, and the FCC may request additional comment.

The FCC is reviewing the FCC Applications and all filings made by parties to the proceeding.  In addition to the consideration of any waiver requests, the FCC's review of the FCC Applications will focus on whether the existing media interests (broadcast and daily

newspaper holdings) of the parties to the FCC Applications, when combined with other media interests held by parties to the FCC Applications, comply with the FCC's broadcast multiple ownership rules. The FCC also will consider compliance with limitations on foreign ownership, the parties' other legal qualifications, their prior records before the FCC, and certain categories of prior adverse determinations against parties to the FCC Applications by courts and other administrative bodies. In some instances, the FCC may request that the applicants supply additional information through amendments to an application. There is no time limit on the FCC's consideration of assignment applications. The FCC has a stated goal of processing all such applications within 180 days, although processing often exceeds this time frame when petitions to deny or objections are filed.

In this case, the consummation of the Noteholder Plan will not occur until the FCC has granted the FCC Applications and issued the necessary consents to implement the Noteholder Plan as confirmed by the Bankruptcy Court. If the grant is made by the FCC *en banc,* parties may file petitions for reconsideration with the agency or an appeal with the D.C. Circuit within a period of 30 days of issuance of the decision. If the grant is made by the FCC's staff under delegated authority, an interested party may request that the staff reconsider its decision or the FCC review the grant *en banc* within 30 days of issuance of the decision, and the FCC may reconsider the action on its own initiative for a period of 40 days following issuance of the decision. It is highly unusual for the FCC to rescind grant of consent to an assignment or transfer upon reconsideration or review. Parties are entitled to close upon the grant of FCC consent even if petitions for reconsideration, applications for review, or judicial appeals are filed and remain pending, but any such consummation is subject to any further order that the FCC or a court might issue.

b) *Inability to Obtain FCC Approval and Media Ownership Waivers Would Adversely Affect Ability to Consummate the Noteholder Plan*

In the FCC Applications, the Debtors are seeking waivers of several of the FCC's broadcast ownership rules. Grant of these waiver requests will be necessary in order to allow the assignment of combinations of media properties currently held by the Debtors in six markets in which the combinations currently operate under waivers of the FCC ownership rules. Absent continued waivers from the FCC, Reorganized Tribune will not be able to own and operate these combinations.

As a result of a decision issued by the FCC on November 30, 2007 (the "FCC Order"), the Debtors received seven waivers that allow them to hold clusters of media properties in six markets despite non-compliance with the FCC's rules. These waivers are as follows:

    i.    A "temporary" waiver of the FCC's newspaper/broadcast cross-ownership rule to own WPIX-TV and *Newsday* in New York;

    ii.    A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own KTLA-TV and the *Los Angeles Times* in Los Angeles;

    iii.    A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WSFL-TV and the Ft. Lauderdale-based *South Florida Sun-Sentinel* in Miami;

    iv.    A "permanent" waiver of the newspaper/broadcast cross-ownership rule to own WGN, WGN-TV and the *Chicago Tribune* in Chicago;

    v.     A "temporary" waiver of the newspaper/broadcast cross-ownership rule to own WTIC-TV, and WCCT-TV (formerly WTTX-TV), and the *Hartford Courant* in Hartford;

    vi.    A "permanent" "failing station" waiver of the FCC's television local ownership or "duopoly" rule to own WTIC-TV and WCCT-TV in Hartford; and

    vii.   A "permanent" exemption of the FCC's "duopoly" rule to permit operation of WTTK-TV, a full-power television station licensed to Kokomo, Indiana, as a "satellite" rebroadcasting the programming of WTTV-TV, Bloomington, Indiana.

The "temporary" newspaper/broadcast cross-ownership rule waivers that resulted from the FCC Order are time limited. They extend until the latest of the following: (i) the expiration of a two-year period for the filing and evaluation of individualized waiver showings, the commencement of which is open to interpretation, (ii) six months following the conclusion of the litigation over the FCC Order pending in the D.C. Circuit, which the Debtors initiated on December 3, 2007, or (iii) six months after the expiration of any judicial stay to which the FCC's modified waiver standards for the cross-ownership rule, as adopted in a decision dated December 18, 2007 (the "2008 Order"), may be subject. The "permanent" waivers continue as long as the Debtors own the properties, but the waivers do not permit assignments of the combinations intact, and new waivers will be needed in order for the Reorganized Debtors to maintain their existing properties.

In the FCC Applications, the Debtors are seeking extensions of the waivers covering these seven media combinations. In the case of the newspaper/broadcast cross-ownership rule waivers, the Debtors are requesting "permanent" relief that effectively would allow them (i) to hold the ownership combinations or interests at least until the next "long form" assignment or transfer and (ii) upon such assignment or transfer to dispose of the interests in combination to a single purchaser. Alternatively, the Debtors are seeking a temporary waiver of the newspaper/broadcast cross-ownership rule that would extend until 18 months after the FCC completes its pending rulemaking review of that rule and the FCC's action becomes a final order no longer subject to judicial review. In the case of the Hartford television "duopoly" and the Indianapolis "satellite" waivers, the Debtors are seeking a continuation of those "permanent" waivers that would allow the combinations to be commonly held until the next "long-form" assignment or transfer.

In the requests for waivers filed as part of the FCC Applications, the Debtors attempt to demonstrate that cross-ownership waiver relief is justified under the criteria announced in the 2008 Order, which took effect on March 23, 2010, with the Third Circuit's lifting of its stay, as well as the general "public interest" waiver test adopted with the newspaper/broadcast cross-ownership rule in 1975. The Debtors contend that in the cross-ownership markets, synergies and efficiencies attributable to cross-ownership allow the Debtors' combined media properties to deliver an exceptional level of local news - both quantitatively and qualitatively. The Debtors' point out that their combined properties have earned strong ratings and many journalistic awards as testament to their community service and success. The Debtors argue that each cross-owned market is also remarkably diverse and competitive with respect to traditional media properties (broadcast, cable and print) and even more so when new technological offerings, particularly those available over the Internet and wireless services, are taken into account. The waiver filings

also argue that any forced regulatory separation of the cross-owned properties would have adverse public interest effects.

Under the standards set forth in the 2008 Order to analyze the waivers, cross-ownership relief is presumptive in New York, Los Angeles, and Miami, because, as explained in the FCC Applications, (i) those markets are among the top 20 largest designated market areas, (ii) the Debtors own only one broadcast outlet in each market, (iii) the television station at issue does not rank among the top four rated television stations and (iv) at least eight "major media voices" exist exclusive of the combination. In Chicago and Hartford, where the Debtors hold more than one broadcast property, the Debtors are not entitled to a presumptive waiver, but their waiver requests assert that those combinations also are entitled to relief because (i) the stations have increased the amount of news provided to the market, (ii) the cross-owned properties exercise independent news judgment, (iii) the level of concentration in the DMA is not adversely affected, and (iv) the struggling financial condition of the Debtors justifies relief.

In the FCC Applications, the Debtors also contend that continued waiver of the television "duopoly" rule for the Hartford properties is justified under either the FCC's "failed" or "failing station" standards. In the Indianapolis market, the Debtors have argued that continued operation of WTTK-TV as a "satellite" is appropriate under FCC policies.

In each of the seven requests, the Debtors stress that grant of the relief they request is required under the FCC's policies affording comity to the bankruptcy process. FCC precedent establishes that the agency is required to reconcile its policies with those underlying the bankruptcy laws. The FCC has previously taken comity into account in granting ownership waivers, and, in all seven instances involving the Debtors' properties; waivers would merely allow the Reorganized Debtors to maintain the existing combinations.

It is possible that the FCC will deny the Debtors' request for "permanent waivers," or grant temporary waivers of shorter duration than requested, with respect to one or more of the media combinations or interests for which the Debtors are seeking waivers. In the event that the FCC does not grant the requested waivers, the Debtors could be required to come into compliance with the applicable ownership rule by disposing of properties deemed non-conforming by a date set by the FCC, which date could be prior to the Debtors' emergence from bankruptcy. It is possible that the FCC will require the Debtors to place one or more properties deemed by the FCC to be non-compliant with its ownership rules into a divestiture trust prior to the Debtors' emergence from bankruptcy. If the present difficult financial climate for businesses overall and for media industries in particular persists, the Debtors could face difficulty locating buyers willing to purchase the non-conforming properties and could be forced to dispose of properties at prices that the Debtors otherwise would consider unacceptable.

In addition, it is possible that, in evaluating the FCC Applications, the FCC could determine that the Noteholder Plan neither complies with nor ensures compliance with the FCC's broadcast multiple and/or cross-ownership rules and/or the twenty-five percent (25%) foreign ownership limit in Section 310(b) of the Communications Act. In that case, the FCC could require the Proponents to amend the Noteholder Plan and the FCC Applications, which could delay FCC Approval and consummation of the Noteholder Plan. The FCC's consideration of the Petitions to Deny or other objections also could cause a delay in FCC Approval and

consummation of the Noteholder Plan, increasing the cost to the Debtors of emerging from bankruptcy.

**B.    Additional Factors to Be Considered**

1.    The Proponents Have No Duty to Update

The statements contained in the Noteholder Specific Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of the Noteholder Specific Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Proponents have no duty to update the Noteholder Specific Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.    No Representations Outside the Joint Disclosure Statement

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Noteholder Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Joint Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Noteholder Plan that are other than as contained in, or included with, the Noteholder Specific Disclosure Statement should not be relied upon by you in arriving at your decision.

3.    Proponents Can Withdraw the Noteholder Plan

Under the Noteholder Plan, the Proponents can withdraw the Noteholder Plan with respect to any Debtors and proceed with Confirmation of the Noteholder Plan with respect to other Debtors.

4.    No Legal or Tax Advice Is Provided to You by the Noteholder Specific Disclosure Statement

The contents of the Noteholder Specific Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

The Noteholder Specific Disclosure Statement is not legal advice to you. The Noteholder Specific Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Noteholder Plan or object to Confirmation of the Noteholder Plan.

5.    No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Noteholder Plan on the Debtors or on Holders of Claims or Interests.

6.      A Liquid Trading Market for the Trust Interests is Unlikely to Develop

A liquid trading market for the Trust Interests is unlikely to develop.  As of the Effective Date, the Trust Interests are not expected to be listed for trading on any stock exchange or trading system.  Consequently, the trading liquidity of the Trust Interests may be limited as of the Effective Date.

## C.      Certain Tax Matters

For a summary of certain federal income tax consequences of the Noteholder Plan to Holders of Claims and Interests, see section X below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE NOTEHOLDER PLAN."

## VII.

## CONFIRMATION OF THE NOTEHOLDER PLAN

## A.      Requirements for Confirmation of the Noteholder Plan

1.      Requirements of Section 1129(a) of the Bankruptcy Code

(a)      General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in Section 1129 of the Bankruptcy Code have been satisfied:

(i)      The Noteholder Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)      The Proponents have complied with the applicable provisions of the Bankruptcy Code.

(iii)      The Noteholder Plan has been proposed in good faith and not by any means proscribed by law.

(iv)      Any payment made or promised by the Proponents, the Debtors or by a Person issuing securities or acquiring property under the Noteholder Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Noteholder Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Noteholder Plan is reasonable, or if such payment is to be fixed after Confirmation of the Noteholder Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)      The Proponents have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Noteholder Plan, as a director or officer of Reorganized Tribune, an affiliate of the Debtors participating in a plan with the Debtors, or a successor to the Debtors under the Noteholder Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors, Holders of Interests and with public policy, and the Proponents have disclosed the identity of any insider that will be employed or retained by Reorganized Tribune, and the nature of any compensation for such insider.

(vi)     With respect to each Class of Claims or Interests, each Holder of an Impaired Claim or Impaired Interest either has accepted the Noteholder Plan or will receive or retain under the Noteholder Plan on account of such Holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(vii)    Except to the extent the Noteholder Plan meets the requirements of Section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Interests has either accepted the Noteholder Plan or is not Impaired under the Noteholder Plan.

(viii)   Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Noteholder Plan provides that Administrative Expense Claims and Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date and that Priority Tax Claims will receive treatment in accordance with the Bankruptcy Code.

(ix)     At least one Class of Impaired Claims has accepted the Noteholder Plan, determined without including any acceptance of the Noteholder Plan by any insider holding a Claim in such Class.

(x)      Confirmation of the Noteholder Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Noteholder Plan, unless such liquidation or reorganization is proposed in the Noteholder Plan. See discussion of "Feasibility" below.

(xi)     The Noteholder Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in Section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to Confirmation of the Noteholder Plan, for

the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

      (b)      <u>The Best Interests Test and the Debtors' Liquidation Analysis</u>

Pursuant to Section 1129(a)(7) of the Bankruptcy Code (often called the "<u>Best Interests Test</u>"), Holders of Allowed Claims and Interests must either (a) accept the Noteholder Plan or (b) receive or retain under the Noteholder Plan property of a value, as of the Noteholder Plan's assumed Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code ("<u>Chapter 7</u>").

The first step in meeting the Best Interests Test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of Chapter 7 cases. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the Chapter 7 cases. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority Claims that may result from the termination of the Debtors' businesses and the use of Chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to Creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Noteholder Plan on the Effective Date.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a Chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the Chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of the Creditors' Committee appointed by the United States Trustee pursuant to Section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a Chapter 7 liquidation, additional Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior Creditors are paid in full, with interest, and no equity holder receives any distribution until all Creditors are paid in full, with interest.

The Debtors, with the assistance of their restructuring and financial advisors, have prepared a hypothetical liquidation analysis (the "<u>Liquidation Analysis</u>") in connection with the General Disclosure Statement. See Exhibit D to the General Disclosure Statement. The

Proponents adopt the Liquidation Analysis in its entirety for illustrative purposes relating to the Noteholder Specific Disclosure Statement.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a Chapter 7 case, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) where applicable, the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Proponents have determined that in a Chapter 7 case, Confirmation of the Noteholder Plan will provide each Creditor of the Debtors and each Holder of a Claim or Interest with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS MADE BY THE DEBTORS AND THEIR ADVISORS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT. FURTHERMORE, THE PROPONENTS HAVE NOT CONDUCTED AN INDEPENDENT ANALYSIS OF THE DEBTORS' LIQUIDATION ANALYSIS AND CANNOT ENSURE THE ACCURACY THEREOF.  THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH IN THE GENERAL DISCLOSURE STATEMENT.  THE PROPONENTS ARE USING THE DEBTORS' ANALYSIS SOLELY FOR ILLUSTRATIVE PURPOSES.

(c)    Feasibility

The Bankruptcy Code requires a plan proponent to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Noteholder Plan meets this requirement, the Proponents have analyzed the Debtors' ability to meet their financial obligations as contemplated thereunder. As part of this analysis, the Proponents have reviewed preliminarily the Financial Projections and Reorganized Value Analysis prepared by the Debtors and annexed to the General Disclosure Statement as Exhibits E and F, respectively.  The Financial Projections are based upon the estimated value of the Reorganized Debtors as of December 27, 2010.  While the Proponents did not have a sufficient opportunity to review the Financial Projections in order to, among other things, make an informed judgment as to the appropriate DEV, based upon the Financial Projections, the Proponents believe the Debtors will be able to make all payments required to be made pursuant to the Noteholder Plan.

2.    Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Noteholder Plan over the rejection or deemed rejection of the Noteholder Plan by a Class of Claims or Interests if the Noteholder Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

      (a)     <u>No Unfair Discrimination</u>.

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

      (b)     <u>Fair and Equitable Test</u>.

This test applies to Classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in such Class.  As to the dissenting Class, the test sets different standards, depending on the type of Claims or Interests in such class:

      (i)     <u>Secured Claims</u>.  Each Holder of an Impaired secured Claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the Allowed amount of its secured Claim and receives deferred Cash payments having a value, as of the effective date of the Noteholder Plan, of at least the Allowed amount of such Claim or (ii) receives the "indubitable equivalent" of its Allowed secured Claim.  Secured Claims are not Impaired under the Noteholder Plan.

      (ii)     <u>Unsecured Claims</u>.  Either (i) each Holder of an Impaired unsecured Claim receives or retains under the Noteholder Plan property of a value equal to the amount of its Allowed unsecured Claim or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive or retain any property under the Noteholder Plan.

      (iii)     <u>Interests</u>.  Either (i) each Interest Holder will receive or retain under the Noteholder Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the Holders of Interests that are junior to the Interests of the dissenting Class will not receive or retain any property under the Noteholder Plan.

The Proponents believe the Noteholder Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Class 1L (Tribune Interests) is deemed to reject the Noteholder Plan, because there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such  dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

3.      Failure to Vote on the Noteholder Plan

If no Holders of Claims in a particular Class vote to accept or reject the Noteholder Plan, except for such Classes that are deemed to reject the Noteholder Plan, the Noteholder Plan shall be deemed accepted by the Holders of such Claims in such Class.  *See In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir. 1988); *In re Adelphia Commc'ns Corp., et al.*, 368 B.R. 140, 261-262 (Bankr. S.D.N.Y. 2007); *cf. In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989).

## VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE NOTEHOLDER PLAN

If the Noteholder Plan is not confirmed and consummated, alternatives to the Noteholder Plan include (i) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, (ii) confirmation of a Competing Plan or (iii) confirmation of another plan of reorganization proposed in the Chapter 11 Cases.

**A.      Liquidation Under Chapter 7**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recovery of Holders of Claims and Interests and the Debtors' liquidation analysis are set forth in section VII above, entitled "CONFIRMATION OF THE NOTEHOLDER PLAN OF REORGANIZATION"; Requirements for Confirmation of the Noteholder Plan of Reorganization; Consensual Confirmation; Best Interests Test."  The Proponents believe that liquidation under Chapter 7 would result in smaller distributions being made to Creditors than those provided for in the Noteholder Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a Chapter 7 trustee and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

**B.      Alternative Plan of Reorganization**

If the Noteholder Plan is not confirmed, the Proponents or any other party in interest in the Chapter 11 Cases (including the Debtors) could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets under chapter 11. With respect to an alternative plan, the Proponents have explored various alternatives in connection with the formulation and development of the Noteholder Plan.  The Proponents believe that the Noteholder Plan, as described herein, enables Creditors of the Debtors to realize the most value under the circumstances.  In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation

71

under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7.  Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case.  Although preferable to a chapter 7 liquidation, the Proponents believe that any alternative liquidation under Chapter 11 is a much less attractive alternative to Creditors of the Debtors than the Noteholder Plan because of the greater return provided by the Noteholder Plan.

## IX.

## CERTAIN FEDERAL, STATE AND FOREIGN SECURITIES LAW CONSIDERATIONS

**A.    Federal and State Securities Law Considerations.**

Upon consummation of the Noteholder Plan, the Proponents and the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the shares of New Common Stock, the New Warrants, the Distribution Trust Interests and the Creditors' Trust Interests from the registration requirements of the Securities Act and of any state or local securities or "blue sky" laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or interest in, or a claim for an administrative expense in a case concerning, the debtor under the plan.  The Proponents believe that Reorganized Tribune is a successor to Tribune under the Noteholder Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the shares of New Common Stock and the New Warrants under the Noteholder Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state or local securities laws.  The Proponents further believe that each of the Distribution Trust and the Creditors' Trust is a successor to Tribune under the Noteholder Plan for purposes of section 1145 of the Bankruptcy Code, and that the distribution of Distribution Trust Interests and Creditors' Trust Interests under the Noteholder Plan, to the extent they constitute "securities" within the meaning of federal and state or local securities laws, satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state or local securities laws.

**B.    Subsequent Transfers of New Securities.**

In general, recipients of the New Common Stock and the New Warrants, and recipients of Distribution Trust Interests and Creditors' Trust Interests, to the extent such interests constitute "securities" within the meaning of federal and state or local securities laws, will be able to resell their shares of New Common Stock or New Warrants, Distribution Trust Interests and Creditors' Trust Interests without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the Holder of such stock, warrant or interest is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.  In addition, the New Common Stock, the New Warrants, the Distribution Trust Interests and Creditors' Trust Interests generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the

several states.  However, recipients of the New Common Stock, the New Warrants, the Distribution Trust Interests and Creditors' Trust Interests issued under the Noteholder Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (iv) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act.  Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

To the extent that recipients of the New Common Stock or New Warrants, and recipients of Distribution Trust Interests and Creditors' Trust Interests, to the extent such interests constitute "securities" within the meaning of federal and state or local securities laws, under the Noteholder Plan are deemed to be "underwriters," the resale of the shares of New Common Stock, New Warrants, Distribution Trust Interests and Creditors' Trust Interests, received by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws.  Persons deemed to be "underwriters" may, however, be permitted to resell such New Common Stock, New Warrants, Distribution Trust Interests and Creditors' Trust Interests without registration pursuant to the provisions of Rule 144 under the Securities Act if certain conditions are met.  This rule permits the public resale of securities if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW COMMON STOCK, THE NEW WARRANTS, THE DISTRIBUTION TRUST INTERESTS OR THE CREDITORS' TRUST INTERESTS, NONE OF THE PROPONENTS, THE DEBTORS OR REORGANIZED DEBTORS MAKE ANY REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW COMMON STOCK, THE NEW WARRANTS, THE DISTRIBUTION TRUST INTERESTS OR THE CREDITORS' TRUST INTERESTS ISSUED UNDER THE NOTEHOLDER PLAN. THE PROPONENTS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## X.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE NOTEHOLDER PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Noteholder Plan to Holders of Claims and Interests and the Debtors.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations (the "Treasury Regulations") promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Noteholder Specific Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  Events occurring after the date of this Noteholder Specific Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Noteholder Plan.

For purposes of the following discussion, a "United States Person" is any individual who is a citizen or resident of the United States, or any entity (i) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (ii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iii) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control or (b) that has elected to continue to be treated as a United States Person for U.S. federal income tax purposes.  In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership.  A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person.  For purposes of the following discussion and unless otherwise noted below, the term "U.S. Holder" means a beneficial owner of a Claim or Interest that is a United States Person.  A "Non-U.S. Holder" means a beneficial owner of a Claim or Interest that is a Non-United States Person.

Generally, this discussion does not apply to Holders of Claims and Interests that are not United States Persons, but a brief discussion of the general consequences to Non-U.S. Holders is included in this discussion.  This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such Holders in light of their individual circumstances.  This discussion does not address tax issues with respect to the Swap Claim.  This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies).  In addition, this summary does not address estate, gift, foreign, state, or local tax consequences of the Noteholder Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE NOTEHOLDER PLAN.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE NOTEHOLDER SPECIFIC DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

\*       \*       \*       \*

## A.       Federal Income Tax Consequences to the Debtors

### 1.       Termination of Subchapter S Corporation Status

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the Tax Code, which election became effective as of the beginning of its 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries. Subject to certain limitations (such as the built-in gains tax applicable to Tribune's net unrealized gains as of the beginning of the 2008 fiscal year that are recognized in the subsequent ten taxable years), Tribune and its subsidiaries are not currently subject to corporate level federal income tax. Instead, the income of Tribune and its subsidiaries is required to be reported by its stockholders. The ESOP, which, as of the Petition Date, was the sole stockholder of Tribune, does not pay taxes on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the Tax Code. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

As a result of the implementation of the Noteholder Plan, Tribune will no longer be eligible to be treated as a subchapter S corporation beginning on the Effective Date. Accordingly, Reorganized Tribune will be subject to entity-level tax on all of its income and gains beginning on the Effective Date at corporate income tax rates. As described below, Reorganized Tribune is expected to have limited tax attributes available to offset such income and gains.

### 2.       Cancellation of Debt and Reduction of Tax Attributes

As a result of the Noteholder Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt ("COD") income upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of Cash paid and the fair market value of any

other consideration, including stock of the Reorganized Debtors, given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding.  Instead, as a price for the exclusion of COD income under the foregoing rule, Section 108 of the Tax Code requires the debtor to reduce its tax attributes by the amount of COD income which it excluded from gross income. Any reduction in tax attributes in respect of COD incurred does not occur until the end of the taxable year after such attributes have been applied.  As a general rule, tax attributes will be reduced in the following order: (i) net operating losses ("NOLs"); (ii) most tax credits; (iii) capital loss carryovers; (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (v) foreign tax credits.  A debtor with COD income may elect first to reduce the basis of its depreciable assets under Tax Code Section 108(b)(5).

The Proponents expect that the Debtors will realize substantial COD income as a result of the implementation of the Noteholder Plan.  The precise amount of COD income will depend on, among other things, the fair market value of the New Common Stock, which cannot be known with certainty until after the Effective Date.  Pursuant to Section 108 of the Tax Code, this COD Income will not be included in the Debtors' taxable income, but the Debtors will be required to reduce their tax attributes after calculating the tax for the taxable year of discharge.

As a subchapter S corporation, Tribune does not currently have any NOLs or other significant tax attributes other than tax basis in assets.  Although the projected COD income may exceed the Debtors' aggregate tax basis in assets, the Debtors' will not be required to reduce such basis below their total liabilities after the discharge.

## B.    Federal Income Tax Consequences to Holders of Claims and Interests

The U.S. federal income tax consequences of the transactions contemplated by the Noteholder Plan to U.S. Holders of Claims and Interests will depend upon a number of factors. The U.S. federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Noteholder Plan and the distributions provided for thereby will depend upon, among other things: (i) the manner in which a U.S. Holder acquired a Claim; (ii) the length of time the Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (v) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (vi) the method of tax accounting of the U.S. Holder; (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (viii) whether the Claim is a capital asset in the hands of the U.S. Holder.

To the extent that a Holder receives a Distribution Trust Interest, such Holder should review "Tax Treatment of the Distribution Trust and Holders of Distribution Trust Interests," in addition to the applicable discussion of tax consequences of its exchange.

76

To the extent that a Holder does not make the Non-Contribution Election and receives Creditors' Trust Interests, such Holder should review "Tax Treatment of the Creditors' Trust and Holders of Creditors' Trust Interests."  Holders receiving Creditors' Trusts Interests should also review "Basis Allocation," for a discussion of allocation of basis between the Creditors' Trust Interests and other consideration received by such Holders pursuant to the Noteholder Plan.

1.    Consequences of Exchanges

(a)    *Consequences to U.S. Holders of Step One Senior Loan Claims (Class 1C) and Step One Senior Loan Guaranty Claims (Classes 50C through 111C)*

Pursuant to the Noteholder Plan, Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims will receive their Pro Rata share of (i) the Step One Lender Initial Distribution,[103] (ii) their designated Distribution Trust Interests and (iii) if applicable, their designated Creditors' Trust Interests.

The Step One Lender Initial Distribution consists of a certain percentage of New Common Stock, New Senior Secured Term Loan, and Distributable Cash, along with the Distribution Trust Interests also received by Holders.

Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its surrendered Claim, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock received, (ii) any Cash received, (iii) the "issue price" of the New Senior Secured Term Loan received and (iv) the value of the Distribution Trust Interests received (to the extent it is not allocable to accrued interest). See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan. The Distribution Trustee will provide Holders with the value of the Distribution Trust Interests, from time to time, as relevant for tax purposes.  See "Tax Treatment of Distribution Trust and Holders of Distribution Trust Interests," below, for further details regarding the valuation of Distribution Trusts Interests.

The tax consequences to a U.S. Holder of a Step One Senior Loan Claim and Step One Senior Loan Guaranty Claim depend on whether the Senior Secured Term Loan and the New Senior Secured Term Loan are each a "security" for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances.  Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument.  These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security.  Treatment of an instrument with an initial term between five and ten years is generally unsettled.  Numerous factors other than the term of an instrument could be taken into account in determining whether a

---

[103] For the avoidance of doubt, Initial Distributions, if any,  to Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims will be on account of their Step One Lender Claims against both Tribune and the Guarantor Debtors, with the ultimate allocation of such distribution among Tribune and the Guarantor Debtors determined in connection with the Litigation Distribution Orders.

debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued. The Senior Secured Term Loan has a term of five years, and may or may not be treated as a security for U.S. federal income tax purposes.

If the Claim does not constitute a security for U.S. federal income tax purposes, the exchange of such Claim for New Common Stock, the New Senior Secured Term Loan, Cash, and Distribution Trust Interests will be a taxable transaction, and the U.S. Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a U.S. Holder's initial tax basis in its New Common Stock will equal the fair market value of the New Common Stock after the Effective Date. A U.S. Holder's tax basis in its New Senior Secured Term Loan will equal the issue price of the New Senior Secured Term Loan on the Effective Date. A U.S. Holder's tax basis in the Distribution Trust Interests should equal their fair market value as of the Effective Date. A U.S. Holder's holding period in such assets will commence on the day after the Effective Date. See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan.

If the Claim constitutes a security for U.S. federal income tax purposes, the exchange of such Claim will be treated as a recapitalization for U.S. federal income tax purposes. In such a case, a U.S. Holder of such a Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim.

If the exchange of the Claim is a recapitalization and the New Senior Secured Term Loan is a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the amount of Cash and the value of the Distribution Trust Interests received as part of the exchange. A U.S. Holder's tax basis in the New Senior Secured Term Loan and the New Common Stock received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the amount of Cash received as part of the exchange. Such basis will be allocated between the New Senior Secured Term Loan and the New Common Stock received in proportion to their relative fair market values. A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date. A U.S. Holder's holding period in the New Senior Secured Term Loan and the New Common Stock will include the holding period in its surrendered Claim. A U.S. Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

If the exchange of the Claim is a recapitalization and the New Senior Secured Term Loan is not a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the amount of Cash, (b) the value of the Distribution Trust Interests and (c) the issue price of the New Senior Secured Term Loan

received as part of the exchange.  A U.S. Holder's tax basis in the New Common Stock received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the Cash received in the exchange and (ii) the fair market value of the New Senior Secured Term Loan received.  A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date.   A U.S. Holder's holding period in the New Common Stock will include the holding period in its Claim surrendered.  In this case, however, a U.S. Holder's holding period in the New Senior Secured Term Loan and the Distribution Trust Interests would begin on the day following the Effective Date.

In each case, Holders of Step One Senior Loan Claims not making the Non-Contribution Election and, accordingly, receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Noteholder Plan as described by this section.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding the New Senior Secured Term Loan.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust Interests received. The U.S. federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(b)     *Consequences to U.S. Holders of Step Two Senior Loan Claims (Class 1D) and Step Two Senior Loan Guaranty Claims (Classes 50D through 111D)*

Pursuant to the Noteholder Plan, Holders of Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims shall receive their Pro Rata share of (i) their designated Distribution Trust Interests, (ii) if applicable, their designated Creditors' Trust Interests and (iii) only in the event the Senior Loan Claim Sharing Resolution determines that the sharing provisions of the Senior Loan Agreement are enforceable regardless of whether Step Two Lender Claims are avoided, the Step Two Lender Initial Distribution.[104]

The Step Two Lender Initial Distribution, if received, consists of a certain percentage of New Common Stock, New Senior Secured Term Loan, and Distributable Cash, along with the Distribution Trust Interests also received by Holders.

If the Holders of Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims receive the Step Two Lender Initial Distribution under the Noteholder Plan, the consequences to the Holders will be the same as those described in "Consequences to U.S.

---

[104] For the avoidance of doubt, Initial Distributions to Holders of Step Two Senior Loan Claim and Step Two Senior Loan Guaranty Claims will be made on account of their Step Two Lender Claims against both Tribune and the Guarantor Debtors, with the ultimate allocation of such distribution among Tribune and the Guarantor Debtors determined in connection with the Litigation Distribution Orders.

Holders of Step One Senior Loan Claims (Class 1C) and Step One Senior Loan Guaranty Claims (Classes 50C through 111C)," above.

If the Holders do not receive the Step Two Lender Initial Distribution, those Holders will receive only their designated Distribution Trust Interests on account of their Claims. The amount received, if any, from the Distribution Trust is contingent on the value obtained from the Distribution Trust Reserves and the proceeds of the Litigation Trust Causes of Action. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Distribution Trust Interests received (to the extent it is not allocable to accrued interest) and (ii) the Holder's allocable tax basis in the Claims surrendered by the Holder.  The character of such gain or loss will depend on a number of factors as described in the paragraph above.  To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest.  A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date.  A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

In each case, Holders of Step Two Senior Loan Claims not making the Non-Contribution Election and, accordingly receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Noteholder Plan as described by this section.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Liquidation Trust beneficial interests received.  The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(c)     *Consequences to U.S. Holders of Senior Noteholder Claims (Class 1F)*

Pursuant to the Noteholder Plan, Holders of Senior Noteholder Claims will receive their Pro Rata share of (i) the Senior Noteholder Initial Distribution, (ii) their designated Distribution Trust Interests and (iii) if applicable, their designated Creditors' Trust Interests.

The Senior Noteholder Initial Distribution consists of a certain percentage of New Common Stock, New Senior Secured Term Loan, and Distributable Cash, along with the Distribution Trust Interests also received by Holders.

Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its surrendered Claim, determined immediately prior to the Effective Date, and the sum of (i) the fair market value of the New Common Stock received, (ii) any Cash received, (iii) the "issue price" of the New Senior Secured Term Loan received, and (iv) value of the Distribution Trust Interests received (to the extent it is not allocable to accrued interest).  See "Federal Income Tax Treatment of the New Senior Secured Term Loan," below, for a discussion related to the determination of the issue price of the New Senior Secured Term Loan.  The

Distribution Trustee will provide Holders with the value of the Distribution Trust Interests, from time to time, as relevant for tax purposes.  See "Tax Treatment of Distribution Trust and Holders of Distribution Trust Interests," below, for further details regarding the valuation of Distribution Trusts Interests.

The tax consequences to a U.S. Holder of a Senior Noteholder Claim depend on whether the Senior Notes and the New Senior Secured Term Loan are securities for U.S. federal income tax purposes.  See discussion of the definition of a security above.  The Senior Notes have terms exceeding ten years, and accordingly, the Debtors expect to treat the Senior Notes as securities.

Since the Senior Noteholder Claims constitute securities for U.S. federal income tax purposes, the exchange of such Claim will be treated as a recapitalization for U.S. federal income tax purposes.  In such a case, a U.S. Holder of such a Claim who realizes a loss on the exchange will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim.

If the exchange of the Claim is a recapitalization and the New Senior Secured Term Loan is a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the amount of Cash and the value of the Distribution Trust Interests received as part of the exchange.  A U.S. Holder's tax basis in the New Senior Secured Term Loan and the New Common Stock received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the amount of Cash and the value of the Distribution Trust Interests received as part of the exchange.  Such basis will be allocated between the New Senior Secured Term Loan and the New Common Stock received in proportion to their relative fair market values.  A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date.  A U.S. Holder's holding period in the New Senior Secured Term Loan and the New Common Stock will include the holding period in its surrendered Claim.  A U.S. Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

If the exchange of the Claim is a recapitalization and the New Senior Secured Term Loan is not a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized on the exchange and (ii) the sum of (a) the amount of Cash, (b) the value of the Distribution Trust Interests and (c) the issue price of the New Senior Secured Term Loan received as part of the exchange.  A U.S. Holder's tax basis in the New Common Stock received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of the items specified in clauses (a), (b) and (c) of the preceding sentence.  A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date.  A U.S. Holder's holding period in the New Common Stock will include the holding period in its Claim surrendered.  A U.S. Holder's holding period in the New Senior Secured Term Loan and the Distribution Trust Interests would begin on the day following the Effective Date.

In each case, Holders of Senior Noteholder Claims not making the Non-Contribution Election and, accordingly, receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Noteholder Plan as described by this section.

See "Federal Income Tax Treatment of New Senior Secured Term Loan," below, for a discussion related to the tax considerations of holding the New Senior Secured Term Loan.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust Interests received. The U.S. federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(d)     *Consequences to U.S. Holders of Bridge Loan Claims (Class 1E) and Bridge Loan Guaranty Claims (Classes 50E through 111E)*

Pursuant to the Noteholder Plan, Holders of Bridge Loan Claims and Bridge Loan Guaranty Claims will receive their Pro Rata share of their designated Distribution Trust Interests.

The amount received, if any, from the Distribution Trust (on account of the Distribution Trust Interests held) is contingent on the value obtained from the Distribution Trust Reserves and the proceeds of the Litigation Trust Causes of Action. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Distribution Trust Interests received after the impact of the subordination provisions and to the extent it is not allocable to accrued interest, and (ii) the Holder's tax basis in the Claims surrendered by the Holder. The character of such gain or loss will depend on a number of factors as described in the paragraph above. To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

Holders of Bridge Loan Claims, not making the Non-Contribution Election and receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Noteholder Plan as described by this section.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(e)     *Consequences to U.S. Holders of EGI-TRB LLC Notes Claims (Class 1H) and PHONES Notes Claims (Class 1I)*

Pursuant to the Noteholder Plan, Holders of EGI-TRB LLC Notes Claims and PHONES Notes Claims will receive their Pro Rata share of (i) their designated Distribution Trust Interests and (ii) if applicable, their designated Creditors' Trust Interests both subject to the subordination provisions of the EGI-TRB Notes and PHONES Notes Indenture.

The amount received, if any, from the Distribution Trust (on account of the Distribution Trust Interests held) is contingent on the value obtained from the Distribution Trust Reserves and the proceeds of the Litigation Trust Causes of Action.  The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Distribution Trust Interests received after the impact of the subordination provisions and to the extent it is not allocable to accrued interest, and (ii) the Holder's tax basis in the Claims surrendered by the Holder.  The character of such gain or loss will depend on a number of factors as described in the paragraph above.  To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest.  A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date.  A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

Holders of these Claims are also entitled to their Pro Rata Share of Parent DEV, but, pursuant to the Noteholder Plan, such shares will be turned over to the Senior Noteholders in accordance certain subordination provisions set forth in the EGI-TRB Notes.  U.S. Holders will not be subject to any federal tax consequences for these Pro Rata shares turned over to the Senior Noteholders.

Holders of EGI-TRB LLC Notes Claims and PHONES Notes Claims not making the Non-Contribution Election and receiving Creditors' Trust Interests (subject to the subordination provisions set forth in the EGI-TRB Notes) should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Noteholder Plan as described by this section.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received.  The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(f)     *Consequences to U.S. Holders of Other Parent Claims (Class 1G)*

Pursuant to the Noteholder Plan, Holders of Other Parent Claims receive their Pro Rata share of (i) the Other Parent Claims Initial Distribution, (ii) their designated Distribution Trust Interests and (iii) if applicable, their designated Creditors' Trust Interests; *provided*, *however*, if the Class of Other Parent Claims votes in favor of the Noteholder Plan, each Holder

of an Other Parent Claim, Allowed as of the Voting Record Date, that does not make the Non-Contribution Election shall have the right to put its Allowed Other Parent Claim to the Claims Purchaser in exchange for payment in Cash in the amount of 15% of such Holder's Allowed Other Parent Claim.

The Other Parent Claims Initial Distribution shall consist of a certain percentage of New Common Stock, New Senior Secured Term Loan, and Distributable Cash, along with the Distribution Trust Interests also received by Holders.  The Other Guarantor Debtor Claims Initial Distribution shall consist of Cash.

The consequences to the Holders of Other Parent Claims will be the same as those described in "Consequences to U.S. Holders of Step One Senior Loan Claims (Class 1C) and Step One Senior Loan Guaranty Claims (Classes 50C through 111C)," above.

In each case, Holders of Other Parent Claims not making the Non-Contribution Election (and not electing the Other Parent Claims Put Option if applicable) and, accordingly receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the Noteholder Plan as described by this section.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received.  The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(g)    *Consequences to U.S. Holders of Other Non-Guarantor Debtor Claims (Classes 2G – 49G)*

Pursuant to the Noteholder Plan, Holders of Other Non-Guarantor Debtor Claims will receive payment in full, in Cash (including Postpetition Interest).

A Holder should recognize capital gain or loss (which capital gain or loss would be a long-term capital gain or loss to the extent that the Holder has held its Claim for more than one year) in an amount equal to the amount of Cash received over the Holder's adjusted basis in its Claim.  To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income. See "Accrued but Unpaid Interest" below.

(h)    *Consequences to U.S. Holders of Other Guarantor Debtor Claims (Classes 50G-111G)*

Holders of Other Guarantor Debtor Claims shall receive their Pro Rata share of (i) the Other Guarantor Debtor Claims Initial Distribution and (ii) designated Distribution Trust Interests; *provided*, *however*, if the applicable Class of Other Guarantor Debtor Claims votes in favor of the Noteholder Plan, each Holder of an Other Guarantor Debtor Claim that is Allowed as of the Voting Record Date shall have the right to put its Allowed Other Guarantor Debtor

Claim to the Claims Purchaser in exchange for payment in Cash in the amount of 25% of such Holder's Allowed Other Guarantor Debtor Claim.

Each such U.S. Holder will realize gain or loss equal to the difference between the adjusted tax basis in its surrendered Claim, determined immediately prior to the Effective Date, and the sum of (i) any Cash received and (ii) the value of the Distribution Trust Interests received (to the extent it is not allocable to accrued interest). The Distribution Trustee will provide Holders with the value of the Distribution Trust Interests, from time to time, as relevant for tax purposes. See "Tax Treatment of Distribution Trust and Holders of Distribution Trust Interests," below, for further details regarding the valuation of Distribution Trusts Interests. The character of such gain or loss will depend on a number of factors as described in the paragraph above. To the extent that any portion of the Distribution Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(i)      *Consequences to U.S. Holders of Intercompany Claims (Class 1J and Classes 2J through 111J)*

Pursuant to the Noteholder Plan, Intercompany Claims against Tribune will be reinstated, discharged or otherwise satisfied in accordance with the terms of the Confirmation Order and/or the Litigation Distribution Orders. As of the date hereof, the ultimate treatment of the Intercompany Claims has not been determined.

(j)      *Consequences to U.S. Holders of Subordinated Securities Claims (Class 1K – 111K)*

Pursuant to the Noteholder Plan, Holders of Subordinated Securities Claims will receive their Pro Rata Share of (i) their designated Distribution Trust Interests and (ii) if applicable, Creditors' Trust Interests.

The amount received, if any, from the Distribution Trust (on account of the Distribution Trust Interests held) is contingent on the value obtained from the Distribution Trust Reserves and the proceeds of the Litigation Trust Causes of Action. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Distribution Trust Interests received after the impact of the subordination provisions and to the extent it is not allocable to accrued interest, and (ii) the Holder's tax basis in the Claims surrendered by the Holder. The character of such gain or loss will depend on a number of factors as described in the paragraph above. To the extent that any portion of the Distribution

Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest.  A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date.  A Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

In each case, Holders of Subordinated Securities Claims not making the Non-Contribution Election and receiving Creditors' Trust Interests should see "Basis Allocation," below, for a discussion of basis allocation among Creditors' Trust Interests and consideration received pursuant to the plan as described by this section.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Distribution Trust beneficial interests received.  The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

(k)    *Consequences to U.S. Holders of Tribune Interests (Class 1L)*

Pursuant to the Noteholder Plan, all Tribune Interests will be extinguished, and U.S. Holders of Tribune Interests will receive nothing in exchange for such Tribune Interests. As a result, each U.S. Holder of Tribune Interests generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Tribune Interests extinguished under the Noteholder Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Tribune Interests under its regular method of accounting.  However, U.S. Holders of Tribune Interests are urged to consult with their own tax advisors regarding their own specific situation and tax consequences.  Generally, a Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its claim for more than one year) if the Claim is a capital asset in the Holder's hands.

## C.    **Consequences of Holding Exchanged Consideration**

1.    <u>Federal Income Tax Treatment of the New Senior Secured Term Loan</u>

At this time, it is anticipated that the New Senior Secured Term Loan will be "publicly traded."  Accordingly, its issue price is generally expected to equal its fair market value on the Effective Date.  If the New Senior Secured Term Loan is not publicly traded, its issue price will depend on whether the debt instrument giving rise to a U.S. Holder's Claim is publicly traded.  If the debt instrument giving rise to such U.S. Holder's Claim is publicly traded, the issue price of the New Senior Secured Term Loan is generally expected to equal the portion of the fair market value of the Claim surrendered which is allocable to the New Senior Secured Term Loan.  If the debt instrument giving rise to such U.S. Holder's Claim is not publicly traded, the issue price of the New Senior Secured Term Loan is generally expected to equal its stated redemption price at maturity.  For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a

national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

A U.S. Holder who receives the New Senior Secured Term Loan will generally be required to include stated interest on the New Senior Secured Term Loan in income in accordance with U.S. Holder's regular method of tax accounting.  In addition, if the New Senior Secured Term Loan is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes, a U.S. Holder of the New Senior Secured Term Loan will be required to include in income the amount of such original issue discount over the term of the New Senior Secured Term Loan based on the constant yield method.  In such a case, a U.S. Holder will be required to include amounts in income before they are received.  A U.S. Holder's tax basis in the New Senior Secured Term Loan will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to the New Senior Secured Term Loan.

    2.    <u>Ownership and Disposition of New Common Stock</u>

    (a)    *Dividends on New Common Stock*

Distributions made with respect to New Common Stock received under the Noteholder Plan generally will be treated as dividends to a U.S. Holder to the extent of current and accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles at the end of the tax year of the distribution.  To the extent the distributions exceed the current and accumulated earnings and profits, the excess will be treated first as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the New Common Stock, and thereafter as capital gain.  Corporate holders generally will be entitled to claim the dividends received deduction with respect to dividends paid on New Common Stock, subject to applicable restrictions, including satisfaction of applicable holding period requirements.

    (b)    *Sale or Other Disposition of New Common Stock*

Upon the sale or other disposition of New Common Stock received under the Noteholder Plan, a U.S. Holder generally will recognize capital gain or loss equal to the difference between (i) the amount of Cash and the fair market value of any property received upon the sale or other disposition and (ii) the U.S. Holder's adjusted tax basis in the New Common Stock.  Such capital gain or loss will be long-term if the U.S. Holder's holding period in respect of such New Common Stock is more than one year.  The deductibility of capital losses is subject to limitations, see discussion below.

3.    <u>Tax Treatment of the Distribution Trust and Holders of Distribution Trust Interests</u>

(a)    *Classification of the Distribution Trust*

The Distribution Trust (of which the Litigation Trust is a sub-trust) is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through type entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Distribution Trust has been structured with the intention of complying with such general criteria. Pursuant to the Noteholder Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Distribution Trustee, and the Holders of Distribution Trust Interests) are required to treat, for U.S. federal income tax purposes, the Distribution Trust as a grantor trust of which the Holders of Distribution Trust Interests are the owners and grantors. The following discussion assumes that the Distribution Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Distribution Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Distribution Trust, the U.S. federal income tax consequences to the Distribution Trust, the Holders of Distribution Trust Interests and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Distribution Trust).

(b)    *General Tax Reporting by the Distribution Trust and Beneficiaries*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Distribution Trustee, and the Holders of Distribution Trust Interests) must treat the transfer of the Distribution Trust Assets to the Distribution Trust in accordance with the terms of the Noteholder Plan. Pursuant to the Noteholder Plan, the Distribution Trust Assets are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the Holders of the respective Claims in satisfaction of their Claims (with each Holder receiving an undivided interest in such assets in accord with their economic interests in such assets), followed by the transfer by the Holders to the Distribution Trust of such assets in exchange for Distribution Trust Interests. Accordingly, all parties must treat the Distribution Trust as a grantor trust of which the Holders of Distribution Trust Interests are the owners and grantors, and treat the Holders of Distribution Trust Interests as the direct owners of an undivided interest in the Distribution Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.

Pursuant to the Noteholder Plan, the Distribution Trustee shall provide a good faith valuation of the Litigation Trust Causes of Action as soon as practicable following the Effective Date (that comprise part of the Distribution Trust Assets), and the Distribution Trustee will in good faith value the remaining Distribution Trust Assets. All parties to the Distribution Trust (including, without limitation, the Debtors, the Distribution Trustee and the Holders of Distribution Trust Interests) must consistently use such valuation for all U.S. federal income tax

purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Allocations of taxable income of the Distribution Trust among the Holders of Distribution Trust Interests shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Distribution Trust had distributed all its assets (valued at their tax book value) to the Holders of the Distribution Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Distribution Trust.  Similarly, taxable loss of the Distribution Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Distribution Trust Assets.  The tax book value of the Distribution Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Taxable income or loss allocated to a Holder of a Distribution Trust Asset will be treated as income or loss with respect to such Holder's undivided interest in the Distribution Trust Assets, and *not* as income or loss with respect to its prior Allowed Claim.  The character of any income and the character and ability to use any loss will depend on the particular situation of the Holder.

The U.S. federal income tax obligations of a Holder with respect to its Distribution Trust Interests are not dependent on the Distribution Trust distributing any Cash or other proceeds.  Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Distribution Trust income even if the Distribution Trust does not make a concurrent distribution to the Holder.  In general, a distribution of Cash by the Distribution Trust will not be separately taxable to a Holder of Distribution Trust Interests since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Distribution Trust).

The Distribution Trustee will file with the IRS returns for the Distribution Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).  The Distribution Trustee will annually send to each Holder of a Distribution Trust Interest a separate statement regarding the receipts and expenditures of the Distribution Trust as relevant for U.S. federal income tax purposes and will instruct all such Holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

4.    <u>Tax Treatment of the Creditors' Trust and Holders of Creditors' Trust Interests</u>

In general, pursuant to the Noteholder Plan, Holders of Allowed Step One Senior Loan Claims, Step Two Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims and Subordinated Securities Claims that do not make the Non-Contribution Election will receive Creditors' Trust

Interests in exchange for their State Law Avoidance Claims and may be entitled to distributions from the Creditors' Trust based on the Creditors' Trust Distribution Orders.

(a)    *Tax Treatment of Creditors' Trust*

The Creditors' Trust is intended to qualify as, and the discussion below assumes that the Creditors' Trust will be respected as, a grantor trust for U.S. federal income tax purposes.  In general, a grantor trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a disregarded passthrough entity.  No ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Creditors' Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences to the Creditors' Trust, the Creditors' Trust Beneficiaries and the Debtors could vary significantly from those discussed herein, including with respect to the potential for an entity level tax on the Creditors' Trust's income.

In Revenue Procedure 94-45, the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Title 11 plan.  In general, the Creditors' Trust has been structured with the intention of complying with the criteria of Revenue Procedure 94-45.  Pursuant to the Noteholder Plan, and in conformity with Revenue Procedure 94-45, all parties are required to treat, for U.S. federal income tax purposes, the Creditors' Trust as a grantor trust of which the Creditor Trust Beneficiaries are the owners and grantors. For U.S. federal income tax purposes, all parties (including the Debtors, the Creditors' Trustee and the Creditors' Trust Beneficiaries) must treat the transfer of the Creditor Trust Assets as a transfer of such assets directly by the Creditors' Trust Beneficiaries to the Creditors' Trust.  Subject to the terms of the Creditors' Trust Agreement, and the powers of any advisory board established thereunder, the Creditors' Trustee will determine the fair market value of the Creditors' Trust Assets as soon as possible after the Effective Date, and the Creditors' Trust Beneficiaries and the Creditors' Trustee must consistently use this valuation for all U.S. federal income tax purposes.

(b)    *General Tax Reporting by the Creditors' Trust and Beneficiaries*

Assuming the Creditors' Trust qualifies as a liquidating trust, the U.S. federal income tax consequences of the Creditors' Trust and the Creditors' Trust Beneficiaries generally should be similar to those described above with respect to the Distribution Trust and the Holders of Distribution Trust Interests (other than the Reorganized Debtors); *provided*, that the grantor trust may report gain or loss based on the value of the property upon formation of the Creditors' Trust and, since the basis of a Creditors' Trust Beneficiary may be greater or less than such amount, the gain or loss recognized by any Creditors' Trust Beneficiary may need to be adjusted to reflect the corresponding difference in basis.  The Creditors' Trustee will file with the IRS tax returns for the Creditors' Trust treating such trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).  Such trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction or credit, and will instruct the holder to report such items on its U.S. federal income tax return or to forward the appropriate information to the beneficial owners with instructions to report such items on their U.S. federal income tax returns.

(c)     *Tax Treatment of CT Reserve*

Pursuant to the Noteholder Plan, the Creditors' Trustee may hold the assets of the Creditors' Trust allocable to, or retained on account of, Claims that are Disputed, as determined from time to time, separately from other assets of the Creditors' Trust in the CT Reserve. The Creditors' Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), make an election to treat the CT Reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9. In addition, all parties must report consistently with such treatment.

Under section 468B(g) of the Tax Code, amounts earned in an escrow account, settlement fund or similar fund are generally subject to tax on a current basis, as the amounts are earned. A disputed ownership fund is generally subject to a separate entity level tax in a manner similar to either a corporation or a QSF depending upon the nature of the assets transferred to the fund. The Debtors currently expect that the CT Reserve will be subject to tax in a manner similar to a corporation.

In general, in determining the CT Reserve's taxable income, (i) any amounts transferred by the Debtors to the reserve will be excluded from the reserve's income, (ii) any sale or exchange of property by the CT Reserve (including recoveries on litigation assets to the extent allocated to the CT Reserve) will result in the recognition of gain or loss equal to the difference between such property's fair market value on the date of disposition and the reserve's adjusted tax basis in such property and (iii) any interest income or other earnings with respect to the CT Reserve's assets will be included in the reserve's taxable income.

Pursuant to the Noteholder Plan, the Creditors' Trustee will take into account in determining the CT Reserve's taxable income or loss with respect to any given taxable year the portion of the Creditors' Trust's taxable income or loss that would have been allocated to the Holders of Claims that are Disputed had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are Disputed), and as a distribution from the CT Reserve any assets previously allocated to or retained on account of Claims that are Disputed as and when, and to the extent, such Claims are subsequently resolved (following which time such assets will no longer be held in the CT Reserve).

5.      Basis Allocation

Holders receiving Creditors' Trust Interests will not recognize gain or loss upon receipt of the Creditors' Trust Interests in exchange for the Holders' State Law Avoidance Claims. Such Holders will have a carryover basis in the Creditors' Trust Interests. However, Holders receiving Creditors' Trusts Interests in addition to other consideration received pursuant to the Noteholder Plan should allocate their basis among all consideration received pursuant to the Noteholder Plan. With this basis allocation, Holders should use the relative fair market value of the Creditors' Trust Interests to allocate basis between the Creditors' Trusts Interests and other consideration received.

6.      Limitations on Capital Losses

A Holder of a Claim who recognizes a capital loss as a result of the distributions under the Noteholder Plan will be subject to limits on the use of such capital loss.  For a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains.  A non-corporate holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three taxable years preceding the capital loss year, but may carry over unused capital losses for the five taxable years following the capital loss year.

**D.    Additional Considerations**

    1.    <u>Accrued but Unpaid Interest</u>

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Noteholder Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Noteholder Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Noteholder Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

    2.    <u>Market Discount</u>

Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the

case of a debt instrument issued with OID, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).  To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

**E.    Non-U.S. Holders**

1.    <u>General Consequences to Non-U.S. Holders</u>

A Holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Noteholder Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

(a)    *Non-U.S. Holders of Distribution Trust Interests and Creditors' Trust Interests*

The Distribution Trustee will comply with all applicable governmental withholding requirements.  Thus, in the case of any Non-U.S. Holders of Distribution Trust Interests or Creditors' Trust Interests, the Distribution Trustee or Creditors' Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). Significantly, as discussed above, a Holder of Distribution Trust Interests or Creditors' Trust Interests is treated for federal income tax purposes as holding an undivided interest in the underlying assets of the Distribution Trust or Creditors' Trust.  Accordingly, the Distribution Trustee will treat any amounts received by the Distribution Trust or the Creditors' Trust, the economic benefit of which inures to a Holder of Distribution Trust Interests or Creditors' Trust Interests on the basis described above with respect to the allocation of taxable income as received by the beneficiary in respect of the underlying asset, and *not* in respect of its Allowed Claim.  Absent the receipt of a ruling from the IRS or an opinion of counsel (that is satisfactory to the Distribution Trustee or Creditors' Trustee) that no withholding is required, the Debtors

expect that the Distribution Trustee or Creditors' Trustee would withhold with respect to such ordinary income.

(b)     *Non-U.S. Holders of New Common Stock*

If a Non-U.S. Holder receives New Common Stock under the Noteholder Plan, dividends made with respect to the New Common stock will be subject to withholding up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

(c)     *Non-U.S. Holders of New Senior Secured Term Loan*

Subject to the discussion below concerning backup withholding, payments of interest on the New Senior Secured Term Loan to a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax, if the Non-U.S. Holder:

(i)     does not own, actually or constructively, for U.S. federal income tax purposes, ten percent (10%) or more of the total combined voting power of all classes of the voting stock of the company that is the applicable borrower;

(ii)     is not, for U.S. federal income tax purposes, a "controlled foreign corporation" related, directly or indirectly, to the company through stock ownership under applicable rules of the Code;

(iii)     is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; and

(iv)     in each case, the certification requirement, as described below, is fulfilled with respect to the beneficial owner of the New Senior Secured Term Loan.

The certification requirement referred to above generally will be fulfilled if the Non-U.S. Holder provides to the Company or its paying agent an IRS Form W-8BEN (or successor form), signed under penalties of perjury, which includes the Non-U.S. Holder's name and address and a certification as to the Non-U.S. Holder's non-U.S. status.  Other methods might be available to satisfy the certification requirements described above, depending on a Non-U.S. Holder's particular circumstances.

In general, the gross amount of payments of interest that do not qualify for the exception from withholding described above will be subject to U.S. withholding tax at a rate of thirty percent (30%) unless (i) the Non-U.S. Holder provides a properly completed IRS Form W-8BEN (or successor form) claiming an exemption from or reduction in withholding under an applicable tax treaty or (ii) such interest is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business and the Non-U.S. Holder provides a properly completed IRS Form W-8ECI (or successor form).

As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Noteholder Plan does not generally address the consequences to Non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Noteholder Plan, including owning an interest in the Distribution Trust.

## F.    Information Reporting and Backup Withholding

All distributions to Holders of Claims under the Noteholder Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, as discussed above under "General Consequences to Non-U.S. Holders," a Holder of a Distribution Trust Interest that is a *not* a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate.  A Non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Noteholder Plan.  As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Noteholder Plan does not generally address the consequences to Non-U.S. holders of Allowed Claims.

### 1.    Recent Legislation

Under legislation recently enacted into law, certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied.  Payments subject to such requirements include dividends on and the gross proceeds of dispositions of New Common Stock and likely include distributions by the Distribution Trust.  These requirements are different from, and in addition to, the withholding tax requirements described above under "General Consequences to Non-U.S. Holders."  Non-U.S. holders should consult their tax advisor concerning the application of this legislation to their particular circumstances.

## G.    Federal Income Tax Treatment of Disputed Claims Reserves

Reorganized Tribune may establish one or more Disputed Claims Reserves ("Reserves") to make distributions to Holders of Disputed Claims that become Allowed Claims after the

Effective Date.  Distributions from each such Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed, and to Holders of Allowed Claims (whether such Claims were Allowed on or after the Effective Date) when any Disputed Claims are subsequently disallowed.

Reorganized Tribune may elect to treat each Reserve as a as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 for U.S. federal income tax purposes.  As a disputed ownership fund, the assets of such Reserve would be treated as directly owned by Reorganized Tribune.

Pursuant to such election to treat such Reserve as a disputed ownership fund, such Reserve will likely be taxable as a "qualified settlement fund" ("QSF"), separate and apart from Reorganized Tribune, subject to a separate entity level tax on its income at the highest rate applicable for trusts and estates upon any amounts earned by such reserve.  Therefore, distributions from each such Reserve may be reduced to satisfy any taxes payable by the QSF.

Holders of Disputed Claims should note the tax treatment of such Reserves is unclear, especially in light of the uncertainty of treating the Litigation Trust and Distribution Trust as one trust, and should consult their own tax advisors.

**H.      Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE NOTEHOLDER PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE NOTEHOLDER PLAN.

# XI.

## CONCLUSION

The Proponents believe that Confirmation and implementation of the Noteholder Plan is in the best interests of all Creditors, and urge Holders of Impaired Claims and Interests to vote to accept the Noteholder Plan and to evidence such acceptance by returning their Noteholder Ballots so that they will be received no later than the Voting Deadline.

Dated: New York, New York
December 7, 2010

AURELIUS CAPITAL MANAGEMENT, LP
on behalf of its managed entities

By:    Dan Gropper
Title:  Managing Director


WILMINGTON TRUST COMPANY
as successor Indenture Trustee for the PHONES Notes

_____

By:    Patrick Healy
Title:  Vice President


DEUTSCHE BANK TRUST COMPANY AMERICAS
as successor Indenture Trustee for certain series of Senior Notes

_____

By:    Rodney Gaughan
Title:  Vice President


_____

By:    Michael Dunlaevy
Title:  Director


LAW DEBENTURE TRUST COMPANY OF NEW YORK
as successor Indenture Trustee for certain series of Senior Notes

_____

By:    James Heaney
Title:  Managing Director


Signature Page for the Noteholder Specific Disclosure Statement

AURELIUS CAPITAL MANAGEMENT, LP
on behalf of its managed entities


By:    Dan Gropper
Title:  Managing Director


WILMINGTON TRUST COMPANY
as successor Indenture Trustee for the PHONES Notes


By:    Patrick Healy
Title:  Vice President


DEUTSCHE BANK TRUST COMPANY AMERICAS
as successor Indenture Trustee for certain series of Senior Notes


By:    Rodney Gaughan
Title:  Vice President


By:    Michael Dunlaevy
Title:  Director


LAW DEBENTURE TRUST COMPANY OF NEW YORK
as successor Indenture Trustee for certain series of Senior Notes


By:    James Heaney
Title:  Managing Director

AURELIUS CAPITAL MANAGEMENT, LP
on behalf of its managed entities

_____

By:     Dan Gropper
Title:   Managing Director


WILMINGTON TRUST COMPANY
as successor Indenture Trustee for the PHONES Notes


_____

By:     Patrick Healy
Title:   Vice President


DEUTSCHE BANK TRUST COMPANY AMERICAS
as successor Indenture Trustee for certain series of Senior Notes

_____

By:     Rodney Gaughan
Title:   Vice President


_____

By:     ~~Michael Dunlaevy~~      Stanley Burg
Title:   ~~Director~~                  Vice President


LAW DEBENTURE TRUST COMPANY OF NEW YORK
as successor Indenture Trustee for certain series of Senior Notes


_____

By:     James Heaney
Title:   Managing Director

AURELIUS CAPITAL MANAGEMENT, LP
on behalf of its managed entities


_____

By:     Dan Gropper
Title:  Managing Director


WILMINGTON TRUST COMPANY
as successor Indenture Trustee for the PHONES Notes


_____

By:     Patrick Healy
Title:  Vice President


DEUTSCHE BANK TRUST COMPANY AMERICAS
as successor Indenture Trustee for certain series of Senior Notes


_____

By:     Rodney Gaughan
Title:  Vice President


_____

By:     Michael Dunlaevy
Title:  Director


LAW DEBENTURE TRUST COMPANY OF NEW YORK
as successor Indenture Trustee for certain series of Senior Notes

_____

By:     James Heaney
Title:  Managing Director


Signature Page for the Noteholder Specific Disclosure Statement

## EXHIBIT A

**THE NOTEHOLDER PLAN**