**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re:

TRIBUNE COMPANY, *et al.*,[1]

Debtors.

Chapter 11

Case No. 08-13141 (KJC)

Jointly Administered

**FIRST AMENDED PLAN OF REORGANIZATION
FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES
PROPOSED BY CERTAIN HOLDERS OF STEP ONE SENIOR LOAN CLAIMS**

Derek C. Abbott
Daniel B. Butz
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 18th floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

~~Howard J. Kaplan~~Evan D. Flaschen
~~Johnny Yeh~~
~~Deana Davidian~~
~~ARKIN KAPLAN RICE LLP~~
~~590 Madison Avenue, 35th Floor~~
~~New York, NY 10022~~
Daniel S. Connolly
Andrew Schoulder
BRACEWELL & GIULIANI LLP
225 Asylum Street, Suite 2600
Hartford, CT 06103
Telephone: ~~212.333.0200~~860.947.9000
Facsimile: ~~212.333.2350~~860.246.3201

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the following page.

Adam H. FriedmanHoward J. Kaplan
Steve Wolosky
Fredrick J. Levy
OLSHAN GRUNDMAN
FROME ROSENZWEIG &
WOLOSKY LLP
Johnny Yeh
Deana Davidian
ARKIN KAPLAN RICE LLP
Park590 Madison Avenue
Tower, 35th Floor
65 East 55th Street
New York, NY  10022
Telephone:
212.451.2300212.333.0200
Facsimile:
212.451.2222212.333.2350

Counsel for the Step One Proponents

Evan D. Flaschen
Daniel S. Connolly
Andrew Schoulder
BRACEWELL & GIULIANI LLP
225 Asylum Street, Suite 2600
Hartford, CT 06103
Telephone:  860.947.9000
Facsimile:  860.246.3201

Counsel for the Step One Proponents

DATED:  December 1,7, 2010

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WA TL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WL VI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, IL 60611.

ARTICLE I: DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS ........................... 42

1.1    Definitions. .......................................................................................................... 42
1.2    Rules of Interpretation. ...................................................................................... 433
1.3    Computation of Time. ........................................................................................ 434
1.4    Exhibits and Plan Supplement. ......................................................................... 434
1.5    Deemed Acts. ...................................................................................................... 434

ARTICLE II: TREATMENT OF  ADMINISTRATIVE AND PRIORITY TAX CLAIMS ..... 434

2.1    DIP Facility Claims. ........................................................................................... 434
2.2    Administrative Expense Claims. ........................................................................ 435
2.3    Priority Tax Claims. ........................................................................................... 435

ARTICLE III: CLASSIFICATION AND  TREATMENT OF CLASSIFIED CLAIMS
                  AND INTERESTS ...................................................................................... 435

3.1    Summary of Classification and Treatment of Classified Claims and
        Interests. ............................................................................................................ 435
3.2    Classification and Treatment of Claims Against and Interests in Tribune
        Company (Debtor 1). ......................................................................................... 437
3.3    Classification and Treatment of Claims Against and Interests in Filed
        Subsidiary Debtors (Debtors 2 through 111). ................................................... 445
3.4    Prepackaged Plans for and Treatment of Claims Against and Interests in
        Guarantor Non-Debtors, if Any, That Become Debtors. .................................. 450

ARTICLE IV: ACCEPTANCE OR REJECTION OF PLAN .................................................. 452

4.1    Impaired Classes of Claims and Interests Entitled to Vote. ............................. 452
4.2    Acceptance by an Impaired Class of Claims. .................................................... 452
4.3    Presumed Acceptances by Unimpaired Classes. ............................................... 452
4.4    Presumed Rejection of the Plan. ........................................................................ 452
4.5    Confirmability and Severability of this Plan. .................................................... 452

ARTICLE V: MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 453

5.1    Non-Substantive Consolidation. ........................................................................ 453
5.2    Restructuring Transactions. .............................................................................. 453
5.3    Corporate Governance, Directors, Officers and Corporate Action. ................. 454
5.4    Issuance and Distribution of New Securities and Related Matters. .................. 456
5.5    Reporting Requirements Under Securities Exchange Act of 1934 and
        Listing of New Class A Common Stock on Securities Exchange or
        Quotation System. .............................................................................................. 459
5.6    New Senior Secured Term Loan Agreement. ..................................................... 459
5.7    Continued Corporate Existence and Vesting of Assets in the Reorganized
        Debtors. .............................................................................................................. 460

5.8     Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge
        Agreement, Notes Issued Under the Loan Agreements, Senior Notes,
        Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES
        Notes, Old Common Stock and Other Tribune Interests.................................. 460
5.9     Cancellation of Liens and Guaranties.................................................... 462
5.10    Exit Facility.............................................................................................. 462
5.11    Equity Incentive Plan. .............................................................................. 462
5.12    Sources of Cash for Plan Distributions.................................................... 462
5.13    Initial Funding of the Litigation Trust and the Creditors' Trust........................ 463
5.14    Additional Transactions Authorized Under the Plan. ..................................... 463
5.15    Settlement of Claims and Controversies..................................................... 463
5.16    Preservation of Rights of Action and Settlement of Ordinary Litigation
        Claims. .................................................................................................... 464
5.17    FCC Applications. .................................................................................... 464

ARTICLE VI: TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ............................................................................................ 464

6.1     Assumption of Executory Contracts and Unexpired Leases. ............................ 464
6.2     Cure of Defaults of Assumed Executory Contracts and Unexpired Leases. ....... 465
6.3     Rejection of Executory Contracts and Unexpired Leases. ................................ 466
6.4     Rejection Damages Bar Date. ................................................................... 466
6.5     Compensation and Benefit Programs. ......................................................... 466
6.6     Collective Bargaining Agreements. ............................................................ 466
6.7     Post-Petition Contracts and Leases. .......................................................... 467
6.8     Termination of ESOP. .............................................................................. 467
6.9     Insurance Policies. ................................................................................... 467

ARTICLE VII: PROVISIONS GOVERNING DISTRIBUTIONS.......................................... 468

7.1     General.................................................................................................... 468
7.2     Distributions for Certain Claims. .............................................................. 468
7.3     Special Provisions Governing Distributions to Holders of Senior Loan
        Claims and Senior Loan Guaranty Claims. ................................................. 470
7.4     Interest on Claims..................................................................................... 471
7.5     Distributions by Disbursing Agent............................................................. 471
7.6     Delivery of Distributions and Undeliverable or Unclaimed Distributions......... 471
7.7     Record Date for Distributions. .................................................................. 472
7.8     Allocation of Plan Distributions Between Principal and Interest. .................... 473
7.9     Means of Cash Payment. .......................................................................... 473
7.10    Withholding and Reporting Requirements. .................................................. 473
7.11    Setoffs..................................................................................................... 474
7.12    Fractional Shares. .................................................................................... 474
7.13    De Minimis Distributions. ......................................................................... 475
7.14    Special Provision Regarding Unimpaired Claims.......................................... 475
7.15    Subordination. ......................................................................................... 475

ARTICLE VIII: PROVISIONS FOR RESOLVING  DISPUTED CLAIMS AND
            DISPUTED INTERESTS ...................................................................... 475

    8.1    Objections to and Estimation of Claims. ........................................ 475
    8.2    Payments and Distributions on Disputed, Contingent and Unliquidated
           Claims and Interests and on Claims for Which Proofs of Claim are Filed......... 476

ARTICLE IX: PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS .................... 476

    9.1    Payment of Step One Proponents' Professional Fees and Expenses ................. 476
    9.2    Bar Date for Payment or Reimbursement of Professional Fees and
           Expenses and Claims for Substantial Contribution. ........................................ 476

ARTICLE X: CONFIRMATION AND CONSUMMATION OF THE PLAN ........................ 477

    10.1   Conditions to Effective Date ............................................................. 477
    10.2   Waiver of Conditions. ....................................................................... 479
    10.3   Consequences if Confirmation Order is Vacated. ............................... 479

ARTICLE XI: INJUNCTIONS, RELEASES AND DISCHARGE ................................... 479

    11.1   Discharge. ....................................................................................... 479
    11.2   Discharge Injunction. ....................................................................... 480
    11.3   Releases. .......................................................................................... 480
    11.4   Bar Order. ........................................................................................ 484
    11.5   Disallowed Claims And Disallowed Interests. ................................... 485
    11.6   Exculpation. ..................................................................................... 485
    11.7   Corporate Indemnities. ..................................................................... 486
    11.8   Term of Bankruptcy Injunction or Stays. .......................................... 486
    11.9   Sharing Provision Dispute. ............................................................... 486

ARTICLE XII: RETENTION OF JURISDICTION .................................................... 486

    12.1   Retention of Jurisdiction. .................................................................. 486

ARTICLE XIII: LITIGATION TRUST ................................................................. 488

    13.1   Establishment of Trust. ..................................................................... 488
    13.2   Litigation Trust Assets. ..................................................................... 489
    13.3   Litigation Trustee. ............................................................................ 490
    13.4   Dissolution. ...................................................................................... 494
    13.5   Funding the Litigation Trust. ............................................................ 494

ARTICLE XIV: CREDITORS' TRUST ................................................................. 494

    14.1   Disclaimer of Disclaimed State Law Avoidance Claims. ................... 494
    14.2   Establishment of Creditors' Trust. .................................................... 495
    14.3   Creditors' Trust Assets. ..................................................................... 495

14.4    Creditors' Trustee. ................................................................ 496
14.5    Dissolution. ........................................................................ 499
14.6    Funding the Creditors' Trust. ................................................... 499

ARTICLE XV: MISCELLANEOUS .................................................... 4100

15.1    Surrender of Instruments. ...................................................... 4100
15.2    Creditors Committee. ........................................................... 4100
15.3    Post-Confirmation Date Retention of Professionals. ..................... 4100
15.4    Effectuating Documents and Further Transactions. ....................... 4100
15.5    Exemption from Transfer Taxes. ............................................. 4100
15.6    Paid-in Capital of Corporate Reorganized Debtors....................... 4101
15.7    Payment of Statutory Fees. .................................................... 4101
15.8    Amendment or Modification of this Plan. ................................... 4101
15.9    Severability of Plan Provisions. .............................................. 4102
15.10   Successors and Assigns. ........................................................ 4102
15.11   Revocation, Withdrawal or Non-Consummation.......................... 4102
15.12   Notice.............................................................................. 4102
15.13   Governing Law................................................................... 4104
15.14   Tax Reporting and Compliance. .............................................. 4104
15.15   Exhibits and Appendices. ...................................................... 4104
15.16   Reservation of Rights. .......................................................... 4104
15.17   Notice of the Effective Date. ................................................. 4104
15.18   Debtors' Cooperation .......................................................... 4105

## APPENDICES AND EXHIBITS

| | |
|---|---|
| Appendix A | Filed Subsidiary Debtors |
| Appendix B | Subsidiary Non-Debtors |
| Appendix C | Collective Bargaining Agreements |
| Exhibit 1.1.122 | Terms of Intercompany Claims Settlement |
| Exhibit 1.1.141 | New Warrant Agreement |
| Exhibit 1.1.151 | Terms of New Warrant Agreement |
| Exhibit 1.1.192 | Individuals Excluded from Released Step Two Stockholder Parties |
| Exhibit 5.2 | Restructuring Transactions |
| Exhibit 5.3.1(1) | Certificate of Incorporation of Reorganized Tribune |
| Exhibit 5.3.1(2) | By-Laws of Reorganized Tribune |
| Exhibit 5.3.1(3) | Registration Rights Agreement |
| Exhibit 5.3.2(1) | Officers of Reorganized Tribune |
| Exhibit 5.3.2(2) | Directors of Reorganized Tribune |
| Exhibit 5.3.3 | Directors, Managers, and Officers of Reorganized Debtors Other Than Reorganized Tribune |
| Exhibit 5.6 | Terms of New Senior Secured Term Loan |
| Exhibit 5.10 | Terms of Exit Facility |
| Exhibit 5.13 | Terms of Trusts' Loan Agreement |
| Exhibit 5.15.3 | Terms of Retiree Claimant Settlement Agreement |
| Exhibit 6.3 | Rejected Executory Contracts and Unexpired Leases |
| Exhibit 13.1 | Litigation Trust Agreement |
| Exhibit 14.1 | Creditors' Trust Agreement |

# INTRODUCTION

The Step One Lender Plan is premised on remaining faithful to the Examiner's Report and its determinations regarding the LBO-Related Causes of Action. To achieve this without requiring creditors to wait years for the conclusion of complex litigation, the Step One Lender Plan preserves only those claims determined by the Examiner to be "highly likely" to succeed – the Step Two-LBO Related Causes of Action.

In consideration for the release of LBO Related Causes of Action against the Step One Lenders, which the Examiner determined were highly unlikely to have rendered Tribune and is subsidiaries insolvent, the Step One Lender Plan provides that, subject to class votes in favor of the Step One Lender Plan (as noted below), there will be significant recoveries to the Debtors' creditors from distributions that would have otherwise been paid to Step One Lenders under the Bankruptcy Code. Thus, in addition to the opportunity to participate in substantial additional distributions as a result of the prosecution rather than settlement of the Step Two LBO-Related Causes of Action, the Step One Lender Plan provides for the following Effective Date "gift" recoveries:

- Senior Noteholders: a $300 million cash distribution to Senior Noteholders that accept the Plan (if class rejects, holders receive a 4.8% cash recovery)

- Other Parent Claims: a cash payment to Holders that accept the Plan equal to 25.83% of their Allowed Claims (if class rejects, holders receive a 4.8% cash recovery)

- General Unsecured Creditors of Filed Subsidiary Debtors: a cash payment to Holders that accept the Plan equal to the lesser of (a) 100% of their Allowed Claims or (b) their Pro Rata share of $225 million (if class rejects, cap is reduced to $150 million)

The Step One Lender Plan also honors the rights of Step One Lenders under the Senior Loan Agreement by preserving the right to adjudicate the Sharing Provision Dispute rather than predetermining it against the Step One Lenders. In doing so, the Step One Lender Plan provides Step One Lenders with the opportunity to recover at least 70.70% and up to 94.51% if *either* the Step Two LBO-Related Causes of Action and the interpretation of the Sharing Provisions are resolved in favor of Step One Lenders *or* the Sharing Provision Dispute results in the disallowance or subordination of the claims of Step Two Lenders.

By using the Examiner's Report as the guiding principle, the Step One Lender Plan provides the Debtors, their creditors and their employees with a middle of the road approach to emerging from bankruptcy as expeditiously as possible. While it does not *guarantee* any one creditor constituency the best recovery, it offers those who support the Step One Lender Plan a significant recovery without further delay and the opportunity for additional significant recoveries depending on the resolution of the litigated Step Two LBO-Related Causes of Action.

**ARTICLE I:  DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS**

1.1    <u>Definitions</u>.

As used herein, capitalized terms shall have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1.1    <u>Administrative Expense Claim</u> means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years ending on or after the Petition Date or commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (b) all compensation for legal, financial, advisory, accounting and other professional services and reimbursement of expenses incurred during the Chapter 11 Cases Allowed by the Bankruptcy Court; (c) any indebtedness or obligation incurred or assumed by the Debtors during the Chapter 11 Cases pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement; (d) any payment to cure a default on an assumed executory contract or unexpired lease; (e) post-petition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate; or (1) any fees and charges assessed against the Debtors' Estates under section 1930, chapter 123, of title 28 of the United States Code.

1.1.2    <u>Advisor</u> means any Persons who acted as advisors to a Tribune Entity or to any of its officers, directors, or any special or independent committee of its Board of Directors with respect to any matter arising from or related to the leveraged buy-out of Tribune that occurred in 2007, <u>provided</u> that the Step Two Arrangers shall not be deemed to have been Advisors with respect to actions they took solely in their capacities as agents, arrangers or lenders under the Senior Loan Agreement, Bridge Loan Agreement or related guarantees.

1.1.3    <u>Advisor Claims</u> means any and all LBO-Related Causes of Action that the Tribune Entities or the Debtors' Estates may have or are entitled to assert on behalf of their respective Estates against any Person related to such Person's conduct as Advisor.

1.1.4    <u>Affiliate</u> shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code, and when used with reference to any Debtor, shall include, but not be limited to, each of the other Debtors.

1.1.5  Allowed means, with respect to a Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest (a) that is evidenced by a Proof of Claim or Interest and is not listed as disputed, contingent or unliquidated on the pertinent Debtor's schedules and as to which no objection or request for estimation has been filed on or before any objection deadline set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) that is listed on the pertinent Debtor's schedules but is not listed as disputed, contingent or unliquidated, that is not otherwise subject to an objection and as for which no contrary or superseding Proof of Claim or Interest has been filed, (c) as to which any objection has been settled, waived, withdrawn or overruled by a Final Order; or (d) that is expressly allowed (i) by a Final Order, (ii) pursuant to the terms of the Claims Settlement Order, (iii) solely with respect to those Claims that are not pre-petition Claims and are not required under applicable bankruptcy law to be allowed pursuant to an order of the Bankruptcy Court, by an agreement between the Holder of such Claim and the pertinent Debtor or Reorganized Debtor pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement that, unless de minimis in nature, has been provided to and has not been objected to in writing by the Proponents, or (iv) pursuant to the terms of this Plan. For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff, subordination, and any other defenses.

1.1.6  Assigned Senior Loan Guaranty Claims has the meaning set forth in Section 11.35 11.3.5 of this Plan.

1.1.7  Available Cash means all bank Cash balances that are immediately available for disbursement reduced by the value of (a) any funds held in accounts that are restricted in their use, including, but not limited to, Cash held as collateral for issued letters of credit, Cash held in escrow accounts, Cash held for collateral in respect of utility deposits, and Cash held by Multimedia Insurance Company, a Non-Guarantor Non-Debtor and (b) up to $5,000,000 held in bank accounts that are not part of the Debtors' centralized cash management system.

1.1.8  Average Distributable Cash means the average of the Available Cash balance of all of the Tribune Entities at the close of business on each of the four Fridays (or the immediately preceding Business Day if any such Friday is not a Business Day) immediately preceding the Effective Date.

1.1.9  Ballot means the document for accepting or rejecting the Plan in the form approved by the Bankruptcy Court.

1.1.10  Bankruptcy Code means title 11 of the United States Code, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.11  <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the District of Delaware.

1.1.12  <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.13  <u>Bridge Lenders</u> means the lenders from time to time party to the Bridge Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.1.14  <u>Bridge Loan Agent</u> means Wells Fargo Bank, N.A. as administrative agent, and its Affiliates and Related Persons of such entities (but excluding the Former Bridge Loan Agent), and any successor administrative agent, under the Bridge Loan Agreement.

1.1.15  <u>Bridge Loan Agreement</u> means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the Former Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time.

1.1.16  <u>Bridge Loan Arrangers</u> means any Syndication Agent, Documentation Agent, Arranger, Bookrunner or other party serving a similar purpose under the Bridge Loan Agreement.

1.1.17  <u>Bridge Loan Claim</u> means a Claim arising under the Bridge Loan Agreement.

1.1.18  <u>Bridge Loan Distribution Amount</u> means, after the final determination of the allowance of the Bridge Loan Claims, an amount equal to the lesser of (a)(i) the amount of the Allowed Bridge Loan Claims divided by $1,619,507,000 times (ii) the Bridge Loan Reserve; and (b) the Bridge Loan Reserve.

1.1.19  <u>Bridge Loan Guaranty Agreement</u> means that certain Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Former Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.20  <u>Bridge Loan Guaranty Claim</u> means a Claim arising under Bridge Loan Guaranty Agreement.

1.1.21  <u>Bridge Loan Reserve</u> means an amount of Cash equal to $77,819,000, or such other amount as may be determined by the Bankruptcy Court, funded out of the Distributable Cash Pool.

1.1.22  <u>Business Day</u> means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.1.23  <u>By-Laws</u> means the amended and restated by-laws of Reorganized Tribune, in substantially the form of <u>Exhibit 5.3.1(2)</u> to be filed with the Plan Supplement.

1.1.24  <u>Cash</u> means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

1.1.25  <u>Certificate of Incorporation</u> means the amended and restated certificate of incorporation of Reorganized Tribune, in substantially the form of <u>Exhibit 5.3.1(1)</u> to be filed with the Plan Supplement.

1.1.26  <u>Chapter 11 Cases</u> means the voluntary cases commenced on the Petition Date by the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and the voluntary cases, if any, commenced by any of the Subsidiary Non-Debtors under chapter 11 of the Bankruptcy Code.

1.1.27  <u>Claim</u> means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.1.28  <u>Claims Settlement Order</u> means the Order Granting Debtors (I) Limited Waiver of Requirements of Local Rule 3007-1(f) and (II) Authority to Settle Disputed Claims, as entered on November 25, 2009 [D.I. 2657], as the same may be amended, modified or supplemented from time to time.

1.1.29  <u>Class</u> means a category of Claims or Interests set forth in <u>Article III</u> of this Plan, as such term is used and described in section 1122 and section 1123(a)(1) of the Bankruptcy Code.

1.1.30  <u>Class 1C(i) Creditors' Trust Interests</u> means beneficial interests in the Creditors' Trust granted to Holders of Allowed Class 1C(i) Claims who do not opt out of making the assignment in <u>Section 14.3.1</u> of this Plan, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; <u>provided</u>, <u>however,</u> that in no event shall any Holder of an Allowed Class 1C(i) Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.31  <u>Class 1C(i) Litigation Trust Interests</u> means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1C(i) Claims, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; <u>provided</u>, <u>however,</u> that in no event shall any Holder of an Allowed Class 1C(i) Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.32  <u>Class 1C(ii) Creditors' Trust Interests</u> means beneficial interests in the Creditors' Trust granted to Holders of Allowed Class 1C(ii) Claims who do not opt

out of making the assignment in Section 14.3.1 of this Plan, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; provided, however, that in no event shall any Holder of an Allowed Class 1C(ii) Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.33  Class 1C(ii) Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1C(ii) Claims, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; provided, however, that in no event shall any Holder of an Allowed Class 1C(ii) Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.34  Class 1D Creditors' Trust Interests means beneficial interests in the Creditors' Trust granted to Holders of Allowed Class 1D Claims who do not opt out of making the assignment in Section 14.3.1 of this Plan, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; provided, however, that in no event shall any Holder of an Allowed Class 1D Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim

1.1.35  Class 1D Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1D Claims, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; provided, however, that in no event shall any Holder of an Allowed Class 1D Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.36  Class 1E Creditors' Trust Interests means beneficial interests in the Creditors' Trust granted to Holders of Allowed Class 1E Claims who do not opt out of making the assignment in Section 14.3.1 of this Plan, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; provided, however, that in no event shall any Holder of an Allowed Class 1 E Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.37  Class 1E Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1E Claims, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; provided, however, that in no event shall any Holder of an Allowed Class 1E Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.38  Class 1F Creditors' Trust Interests means beneficial interests in the Creditors' Trust granted to Holders of Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.7(c)(i)(B) or Section 3.2.7(c)(ii) and who do not opt out of making the assignment in Section 14.3.1 of this Plan, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; provided, however, that in no event shall any Holder of an Allowed Class 1F Claim

be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.39  <u>Class 1F Litigation Trust Interests</u> means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1F Claims the Holders of which elect the treatment set forth in <u>Section 3.2.7(c)(i)(B)</u> or <u>Section 3.2.7(c)(ii)(B)</u> , which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; <u>provided</u>, <u>however</u>, that in no event shall any Holder of an Allowed Class 1F Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.40  <u>Class 1I Creditors' Trust Interests</u> means beneficial interests in the Creditors' Trust granted to Holders of Allowed Class 1I Claims who do not opt out of making the assignment in <u>Section 14.3.1</u> of this Plan, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; <u>provided</u> <u>further</u>, that in no event shall any Holder of an Allowed Class 1I Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.41  <u>Class 1I Litigation Trust Interests</u> means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1I Claims, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; <u>provided</u> that until (a) the Holders of Allowed Senior Noteholder Claims, and (b) the Holders of any other Allowed Claims that are entitled to share in the Parent Trust Distribution and to the benefit of the contractual subordination of the EGI-TRB LLC Notes receive payment in full of the Allowed amount of such Holders' Claims, all distributions that would otherwise be made on account of Allowed EGI-TRB LLC Notes Claims shall be turned over to such Holders; <u>provided</u> <u>further</u>, that in no event shall any Holder of an Allowed Class 1I Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.42  <u>Class 1J Creditors' Trust Interests</u> means beneficial interests in the Creditors' Trust granted to Holders of Allowed Class 1J Claims who do not opt out of making the assignment in <u>Section 14.3.1</u> of this Plan, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; <u>provided</u> that until (a) the Holders of Allowed Senior Noteholder Claims, and (b) the Holders of any other Allowed Claims that are entitled to share in the Parent Trust Distribution and are entitled to the benefit of the contractual subordination of the PHONES Notes receive payment in full of the Allowed amount of such Holders' Claims, all distributions that would otherwise be made on account of Allowed PHONES Notes Claims shall be turned over to such Holders; <u>provided</u> <u>further</u>, that in no event shall any Holder of an Allowed Class 1J Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

1.1.43  <u>Class 1J Litigation Trust Interests</u> means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1J Claims, which shall entitle such Holder, on a Pro Rata basis, to a share of the Parent Trust Distribution; <u>provided</u> that until (a) the Holders of Allowed Senior Noteholder Claims, Claims, and (b) the

Holders of any other Allowed Claims that are entitled to share in the Parent Trust Distribution and are entitled to the benefit of the contractual subordination of the PHONES Notes receive payment in full of the Allowed amount of such Holders' Claims, all distributions that would otherwise be made on account of Allowed PHONES Notes Claims shall be turned over to such Holders; provided further, that in no event shall any Holder of an Allowed Class 1J Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim.

     1.1.44  Collective Bargaining Agreement(s) means, individually or collectively, the collective bargaining agreements listed on Appendix C hereto.

     1.1.45  Communications Act means the Communications Act of 1934, as amended, or any other successor federal statute, and the rules and regulations of the FCC promulgated thereunder.

     1.1.46  Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

     1.1.47  Confirmation Hearing means the hearing held by the Bankruptcy Court on confirmation of this Plan, as such hearing may be continued from time to time.

     1.1.48  Confirmation Order means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

     1.1.49  Convenience Claim means a Claim against Tribune that would otherwise be a General Unsecured Claim that is (a) in an amount equal to or less than $1,000 or (b) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; provided, however, that where any portion(s) of a single Claim has been transferred on or after April 12, 2010, any transferred portion(s) shall continue to be treated together with such Claim as a single Claim for purposes of the Convenience Class Election and determining whether such Claim qualifies as a Convenience Claim.

     1.1.50  Convenience Class Election means an irrevocable election made on the Ballot by the Holder of a Claim against Tribune that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000.

     1.1.51  Creditors' Committee means the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

     1.1.52  Creditors' Trust means that certain trust created pursuant to the Plan and governed by the Creditors' Trust Agreement, to be administered by the Creditors' Trustee, all as more particularly set forth in Article XIV of the Plan and the Creditors' Trust Agreement.

     1.1.53  Creditors' Trust Advisory Board means the advisory board, consisting of members of the Creditors' Committee who are beneficiaries of Creditors' Trust

8

Interests, established pursuant to the Creditors' Trust Agreement that shall (i) appoint the Creditors' Trustee, (ii) participate in the management of the Creditors' Trust, and (iii) perform various other duties under the Creditors' Trust Agreement.

1.1.54 <u>Creditors' Trust Agreement</u> means that certain trust agreement, substantially in the form of <u>Exhibit 14.1</u> filed as a supplement prior to the Confirmation Hearing, which agreement shall govern the Creditors' Trust and which shall provide for the distribution of Net Creditors' Trust Proceeds to the Creditors' Trust Beneficiaries in accordance with the terms of this Plan and the assumption of the setoff obligations as provided in <u>Section 7.11.2</u> of this Plan; <u>provided</u> that in the event of any conflict between the terms of the Creditors' Trust Agreement and the terms of this Plan, this Plan shall control.

1.1.55 <u>Creditors' Trust Assets</u> means the Transferred State Law Avoidance Claims and any proceeds therefrom and any interest and earnings on such proceeds.

1.1.56 <u>Creditors' Trust Beneficiaries</u> means the holders of the Creditors' Trust Interests.

1.1.57 <u>Creditors' Trust Indemnified Parties</u> has the meaning set forth in <u>Section 14.4.7</u> of this Plan.

1.1.58 <u>Creditors' Trust Interests</u> means the Class 1C(i) Creditors' Trust Interests, Class 1C(ii) Creditors' Trust Interests, Class 1D Creditors' Trust Interests, Class 1E Creditors' Trust Interests, Class 1F Creditors' Trust Interests, Class 1I Creditors' Trust Interests, and Class 1J Creditors' Trust Interests.

1.1.59 <u>Creditors' Trustee</u> means the trustee to serve pursuant to <u>Article XIV</u> of this Plan and under the Creditors' Trust Agreement.

1.1.60 <u>CT Confidentiality and Common Interest Agreement</u> means the confidentiality and common interest agreement to be entered into between the Reorganized Debtors and the Creditors' Trust governing the use of confidential information or material provided to the Creditors' Trust.

1.1.61 <u>CT Reserve</u> means any reserve established by the Creditors' Trustee on account of Disputed Claims held by any Creditors' Trust Beneficiary that, if Allowed, would entitle such Creditors' Trust Beneficiary to a distribution of Net Creditors' Trust Proceeds.

1.1.62 <u>CT Tax Items</u> has the meaning set forth in <u>Section 14.3.2</u> of this Plan.

1.1.63 <u>Customer Program</u> means any of the Debtors' customer programs and practices as to which the Debtors were authorized, in their sole discretion and in the ordinary course of business, to honor and perform all obligations in respect thereof by the Order Authorizing, But Not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs

and Practices in the Ordinary Course of Business, which was signed by the Bankruptcy Court on December 10, 2008 [D.I. 50].

1.1.64  Debtor(s) means, individually or collectively, the debtors and debtors in possession identified in footnote 1 hereto, and shall also include any Subsidiary Non-Debtor that files a chapter 11 petition for relief prior to the Confirmation Date.

1.1.65  Debtor Released Claims has the meaning set forth in Section 11.3.1 of this Plan.

1.1.66  Defined Benefit Plan means a single-employer plan within the meaning of section 4001(a)(15) of the Employee Retirement Income Security Act of 1974, as amended.

1.1.67  DIP Facility means the financing facility and letter of credit facility entered into by the Debtors pursuant to the DIP Facility Agreements.

1.1.68  DIP Facility Agent means Barclays Bank PLC, as administrative agent and letter of credit agent under the DIP Facility Agreements.

1.1.69  DIP Facility Agreements means collectively, as each may be amended, supplemented or otherwise modified from time to time, (a) that certain Amended and Restated Receivables Loan Agreement among Tribune, Tribune Receivables, LLC, the DIP Facility Agent, and the DIP Facility Lenders, (b) that certain Amended and Restated Receivables Purchase Agreement among Tribune Receivables, LLC, Tribune and the other Originators (as defined therein), (c) that certain Amended and Restated Servicing Agreement among Tribune Receivables, LLC, Tribune and the other Originators (as defined therein), (d) that certain Amended and Restated Guaranty Security Agreement among Tribune, the other Debtors, and the DIP Facility Agent, (e) that certain Letter of Credit Agreement among the DIP Facility Agent, certain DIP Facility Lenders and the Debtors, and (f) that certain Payout and Termination Agreement, dated as of March 1, 2010, among Tribune Receivables, LLC, Tribune, certain subsidiaries of Tribune party thereto, and Barclays Bank PLC, as administrative agent.

1.1.70  DIP Facility Claims means all Claims held by the DIP Facility Agent or the DIP Facility Lenders pursuant to the DIP Facility Agreements and the Final DIP Order.

1.1.71  DIP Facility Lenders means the lenders from time to time party to the DIP Facility Agreements, including any applicable assignees and participants thereof.

1.1.72  Disallowed Claim means all or such part of a Claim that is disallowed by a Final Order.

1.1.73  Disbursing Agent means any entity in its capacity as a disbursing agent under Section 7.5 of this Plan.

1.1.74  <u>Discharge Injunction</u> means the injunction described in section 1141 of the Bankruptcy Code and contained in <u>Section 11.2</u> of this Plan.

1.1.75  <u>Disclaimed State Law Avoidance Claims</u> means any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that the Debtors or the Debtors' Estates could assert pursuant to section 544(b) of the Bankruptcy Code against Step One Selling Stockholders and Step Two Selling Stockholders, solely with respect to funds received in their capacities as such; <u>provided</u>, <u>however,</u> that Disclaimed State Law Avoidance Claims shall not include (i) any claims for intentional fraudulent conveyance ~~or any other claims asserted in~~and (ii) any and all LBO-Related Causes of Action arising under state fraudulent conveyance law set forth in count eighteen of the amended complaint filed by the Creditors' Committee ~~on November 1, 2010 (the "Committee Complaint")~~ in the lawsuit entitled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC).  For the avoidance of doubt, Disclaimed State Law Avoidance Claims shall not include any LBO-Related Causes of Action arising under state fraudulent conveyance law against any Released Parties.

1.1.76  <u>Disclosure Statement</u> means that certain general and specific disclosure statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.1.77  <u>Disputed Claim</u> means any portion of a Claim (a) that is neither an Allowed Claim nor a Disallowed Claim, (b) that is listed as disputed, contingent or unliquidated on the Debtors' schedules or that is otherwise subject to an objection, (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors have, or any party in interest entitled to do so has, interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order, or (d) that is subject to challenge by the Litigation Trust pursuant to this Plan.

1.1.78  <u>Disputed Parent Distribution Procedure</u> has the meaning set forth in <u>Section 7.2.1(b)</u>.

1.1.79  <u>Distributable Cash Pool</u> means an amount in Cash equal to (i) if the Average Distributable Cash is more than $25 million greater than the Effective Date Cash, the Effective Date Cash plus $25 million, or (ii) if the Average Distributable Cash is more than $25 million less than the Effective Date Cash, the Effective Date Cash less $25 million, or (iii) if the Average Distributable Cash is within $25 million higher or lower than the Effective Date Cash, the Average Distributable Cash.

11

1.1.80  Distribution Date means any of the Initial Distribution Date, the Quarterly Distribution Date and the Final Distribution Date, but in no event a date prior to the Effective Date.

1.1.81  Distribution Record Date means the Confirmation Date or such other date as may be designated in the Confirmation Order.

1.1.82  DTC means The Depository Trust Company.

1.1.83  Effective Date means the first Business Day on which all of the conditions to the Effective Date specified in Section 10.1 of this Plan have been satisfied or waived in accordance with Section 10.2 of this Plan.

1.1.84  Effective Date Cash means an amount in Cash equal to the Available Cash balance of all of the Tribune Entities at the close of business on the Friday immediately preceding the Effective Date (or the immediately preceding Business Day if any such Friday is not a Business Day).

1.1.85  EGI-TRB LLC Noteholder means a Holder of EGI-TRB LLC Notes.

1.1.86  EGI-TRB LLC Notes means those certain promissory notes in the aggregate principal amount of $225 million issued by Tribune in favor of EGI-TRB LLC and certain direct and indirect assignees of EGI-TRB LLC.

1.1.87  EGI-TRB LLC Notes Claim means all Claims held by the EGI-TRB LLC Noteholders pursuant to the EGI-TRB LLC Notes.

1.1.88  EGI-TRB LLC Warrant means those certain 15-year warrants issued to EGI-TRB LLC and certain assignees evidencing rights to purchase 43,478,261 shares in the aggregate (subject to adjustment) of Old Common Stock.

1.1.89  Employee Benefit Claim means any Claim arising under or in connection with an assumed Employee Benefit Plan.

1.1.90  Employee Benefit Plan means any employment, compensation, tax-qualified or non-tax qualified Pension Plan, Defined Benefit Plan, Multiemployer Plan, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, expense reimbursement, dependent care, retirement, savings, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other benefit plan or any individual contract or agreement that has not been rejected or terminated prior to the Confirmation Date for the benefit of the directors, officers or employees (whether salaried or hourly) of the applicable Debtor, or maintained by any Debtor for employees of non-Debtor direct or indirect subsidiaries of a Debtor, and any retiree benefit program of the applicable Debtor included in the protections of section 1114 of the Bankruptcy Code, in all cases that has been in existence and has accrued to a specific person before or on the Petition Date or has been approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, plan or program, provided that any of the

foregoing that specifically applies to any of the top twenty (20) officers of Tribune and its wholly-owned subsidiaries (determined by salary and bonus payments earned with respect to the most recently completed fiscal year) and does not have broad application to employees other than such officers, must have been disclosed to and approved by the Step One Proponents to constitute an "Employee Benefit Plan"; provided further, that the definition of "Employee Benefit Plan" excludes Non-Qualified Former Employee Benefit Plans and the ESOP.

1.1.91  Equity Incentive Plan means an equity incentive plan pertaining to the Reorganized Debtors described in Section 5.11 of this Plan.

1.1.92  ESOP means, individually or collectively, the Tribune Employee Stock Ownership Plan and the Tribune Employee Stock Ownership Trust and any related documents and agreements, as the context implies.

1.1.93  Estate(s) means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.1.94  Estate Amount Percentage means the quotient of an Estate Distribution divided by the respective Gift Distribution.

1.1.95  Estate Distribution(s) means the initial cash amount distributable in each of a General Unsecured Claim Distribution, Other Parent Claim Distribution and Senior Noteholder Distribution.

1.1.96  Exhibit means an exhibit annexed to this Plan.

1.1.97  Exit Facility means a new revolving credit facility, if any, as described in Exhibit 5.10 to be filed with the Plan Supplement, providing for loans and other extensions of credit in an aggregate amount up to $300 million, with a letter of credit sub-facility of up to $100 million, which may be entered into by Reorganized Tribune and certain of the other Reorganized Debtors and U.S. Subsidiary Non-Debtors on the Effective Date.

1.1.98  Exit Facility Credit Agreement means the definitive agreement relating to the Exit Facility.

1.1.99  Face Amount means (a) when used in reference to a Disputed Claim, (i) the full stated amount claimed by the Holder of such Claim in any Proof of Claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, (ii) if no such claim is filed in accordance with clause (i) above, the full stated amount listed on the pertinent Debtor's schedules as disputed, contingent or unliquidated if no contrary or superseding Proof of Claim or an objection to the Claim has been filed, or (iii) if no stated amount is included in the Proof of Claim or the pertinent Debtor's schedules with respect to a disputed, contingent or unliquidated claim, then an amount determined by the pertinent Debtor, and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

1.1.100  FCC means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

1.1.101  FCC Applications means, collectively, each application filed with the FCC in connection with this Plan, including those filed in connection with the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and any other FCC applications necessary to complete the Restructuring Transactions.

1.1.102  FCC Approval means an action or actions by the FCC (including any action or actions taken by the FCC's staff pursuant to delegated authority and regardless of whether any action or actions may be subject to further administrative or judicial review) on the FCC Applications granting any consent of the FCC necessary to consummate the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and/or otherwise necessary to implement this Plan.

1.1.103  FCC Licenses means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

1.1.104  Filed Subsidiary Debtors means, individually or collectively, the Debtors listed on Appendix A hereto.

1.1.105  Final DIP Order means the Final Order Pursuant to Sections 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 365 of the Bankruptcy Code (1) Authorizing the Debtors to Guarantee an Amended Securitization Facility and For Certain Debtors to Continue Selling Receivables and Related Rights Pursuant Thereto, (2) Authorizing the Debtors to Enter Into a Letter of Credit Facility, (3) Modifying the Automatic Stay and (4) Granting Other Related Relief, as entered on January 15, 2009 [D.I. 233], as the same has been and may be amended, modified or supplemented from time to time, together with any modifications and amendments thereto, including, without limitation, the Order Authorizing Debtors to Amend Letter of Credit Facility Pursuant to Sections 105, 362(d), 363(b)(1), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code and Granting Other Related Relief, as entered on March 22, 2010 [D.I. 3808].

1.1.106  Final Distribution Date means a date selected by the Reorganized Debtors that is no later than thirty (30) days after the date that all Disputed Claims in the applicable Class(es) shall have been Allowed or Disallowed.

1.1.107  Final Order means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or on the docket of any other court of competent jurisdiction), which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari

or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

1.1.108  Foreign Ownership Certification means the certification of aggregate foreign voting interests and aggregate foreign equity interests that each Holder of a Claim that is eligible to receive New Common Stock under this Plan must provide.

1.1.109  Former Bridge Loan Agent means Merrill Lynch Capital Corporation as former administrative agent under the Bridge Loan Agreement.

1.1.110  General Unsecured Claim means any Claim against the Debtors that is not an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Step One Senior Loan Claim, a Step Two Senior Loan Claim (subject to Resolution of the Sharing Provision Dispute),  a Bridge Loan Claim, a Senior Noteholder Claim, a Convenience Claim, an EGI-TRB LLC Notes Claim, a PHONES Notes Claim, an Employee Benefit Claim, an Intercompany Claim, a Securities Litigation Claim, a Step One Senior Loan Guaranty Claim, a Step Two Senior Loan Guaranty Claims (subject to Resolution of the Sharing Provision Dispute) or a Bridge Loan Guaranty Claim and shall not include Disallowed Claims or Claims that are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise.

1.1.111  Gift Amount means the difference between a Gift Distribution and the respective Estate Distribution.

1.1.112  Gift Amount Percentage means the quotient of the Gift Amount divided by the Gift Distribution.

1.1.113  Gift Distribution(s) means the initial cash amount distributable in each of a Subsidiary GUC Gift Distribution, Other Parent Claim Gift Distribution and Senior Noteholder Gift Distribution.

1.1.114  Global Contract Motion means a motion seeking the assumption or rejection of unassumed or unrejected executory contracts and unexpired leases of the Debtors, which motion may be filed with the Bankruptcy Court and heard at the Confirmation Hearing.

1.1.115  Guarantor Debtors means those Debtors listed on Appendix A hereto as "Filed Subsidiary Debtors".

1.1.116  Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Subsidiary Non-Debtors".

1.1.117  Holder means a Person holding a Claim or Interest.

1.1.118  Holder Released Claims has the meaning set forth in Section 11.3.2 of this Plan.

1.1.119  Impaired means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.1.120  Incremental Senior Loans means the "Incremental Term Advances" or "Incremental Term Borrowings" as defined in the Senior Loan Agreement.

1.1.121  Indemnity, Subrogation and Contribution Agreements means (a) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule I thereto, and the Former Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time, and (b) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.122  Indentures means the Senior Notes Indentures and the PHONES Notes Indenture.

1.1.123  Indenture Trustees means the Senior Notes Indenture Trustees and the PHONES Notes Indenture Trustee.

1.1.124  Initial Distribution Date means a date selected by the Reorganized Debtors that is as soon as practicable following the Effective Date and is in no event later than thirty (30) days after the Effective Date.

1.1.125  Initial Report has the meaning set forth in Section 9.2 hereto.

1.1.126  Intercompany Claims means all prepetition Claims against any of the Debtors held by another Debtor or a non-Debtor Affiliate.

1.1.127  Intercompany Claims Settlement means the settlement and compromise respecting Intercompany Claims on the terms set forth in Exhibit 1.1.122 to be filed with the Plan Supplement.

1.1.128  Interest means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including, but not limited to, any Tribune Interest and Interest in a Subsidiary Debtor.

1.1.129  <u>Law Debenture</u> means Law Debenture Trust Company of New York, not personally but solely in its capacity as successor indenture trustee under that certain Indenture, dated as of March 19, 1996, as amended, restated or otherwise modified from time to time, between Tribune and Law Debenture Trust Company of New York.

1.1.130  <u>LBO-Related Causes of Action</u> means any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance powers or rights, liabilities of any nature whatsoever, and legal or equitable remedies that the Tribune Entities or the Debtors' Estates may have or are entitled to assert on behalf of their respective Estates (whether or not asserted) under any provision of the Bankruptcy Code or any applicable nonbankruptcy law including, against any Person arising from the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

1.1.131  <u>Lien</u> means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

1.1.132  <u>Litigation Trust</u> means the trust created pursuant to the Litigation Trust Agreement on the Effective Date in accordance with this Plan, the Confirmation Order and the Litigation Trust Agreement.

1.1.133  <u>Litigation Trust Advisory Board</u> means a board established pursuant to <u>Article XIII</u> of this Plan to advise, assist and supervise the Litigation Trustee in the administration of the Litigation Trust pursuant to the Litigation Trust Agreement.

1.1.134  <u>Litigation Trust Agreement</u> means the Litigation Trust Agreement to be dated as of the Effective Date establishing the terms and conditions of the Litigation Trust, on substantially the terms described in <u>Exhibit 13.1</u> to be filed as part of the Plan Supplement, including, without limitation,  the assumption of the setoff obligations as provided in <u>Section 7.11.2</u> of this Plan; <u>provided</u> that in the event of any conflict between the terms of the Litigation Trust Agreement and the terms of this Plan, this Plan shall control.

1.1.135  <u>Litigation Trust Assets</u> means all Preserved Causes of Action, including any proceeds therefrom, and any interest and earnings on such proceeds; <u>provided</u>, <u>however,</u> Litigation Trust Assets shall exclude Disclaimed State Law Avoidance Claims and Step Two-LBO Related Causes of Action (other than disgorgement claims) to avoid, disallow or subordinate Step Two Senior Loan Claims and/or Step Two Senior Loan Guaranty Claims, including any proceeds therefrom, and any interest and earnings on such proceeds.

1.1.136  Litigation Trust Beneficiaries means the holders of Litigation Trust Interests.

1.1.137  Litigation Trust Indemnified Parties has the meaning set forth in Section 13.3.7 of this Plan.

1.1.138  Litigation Trust Interests means the Class 1C(i) Litigation Trust Interests, Class 1C(ii) Litigation Trust Interests, Class 1D Litigation Trust Interests, Class 1E Litigation Trust Interests, Class 1F Litigation Trust Interests, Class 1I Litigation Trust Interests, and Class 1J Litigation Trust Interests.

1.1.139  Litigation Trustee means the trustee to serve pursuant to Article XIII of the Plan and under the Litigation Trust Agreement.

1.1.140  Loan Agents means the Senior Loan Agent and the Bridge Loan Agent.

1.1.141  Loan Agreements means the Senior Loan Agreement and the Bridge Loan Agreement.

1.1.142  Loan Guaranty Agreements means the Senior Loan Guaranty Agreement, the Bridge Loan Guaranty Agreement and the Indemnity, Subrogation and Contribution Agreements.

1.1.143  Loan Guaranty Claims means the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims.

1.1.144  LT Confidentiality and Common Interest Agreement means the confidentiality and common interest agreement to be entered into between the Reorganized Debtors and the Litigation Trust governing the use of confidential information or material provided to the Litigation Trust.

1.1.145  LT Reserve means any reserve established by the Litigation Trustee on account of Disputed Claims held by any Litigation Trust Beneficiary that, if Allowed, would entitle such Litigation Trust Beneficiary to a distribution of Net Litigation Trust Proceeds.

1.1.146  LT Tax Items has the meaning set forth in Section ~~13.2.2~~13.3.2 of this Plan.

1.1.147  Media Ownership Certification means the certification of other media investments and holdings, and any other information that the Debtors deem reasonably necessary for purposes of the FCC Applications and/or FCC Approval, including, without limitation, on FCC qualifications to hold an attributable interest in the Reorganized Debtors under FCC rules and policies that each Holder that is entitled to receive New Common Stock under this Plan may be required to provide.

1.1.148  Morgan Stanley Claims means all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, and including any and all rights, claims and actions (including avoidance actions arising under chapter 5 of the Bankruptcy Code) that Tribune or any of its Affiliates may have against MSCS.  Morgan Stanley Claims include but are not limited to rights, claims and actions arising from or related to (a) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS, (b) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, and (c) any advisory engagement or potential advisory engagement of, and/or advice given by, or information or analyses withheld, MSCS, including but not limited to (i) services provided by MSCS as an Advisor, and (ii) the agreement between Tribune and MSCS dated as of November 30, 2008, regardless of whether such rights, claims and actions may be asserted pursuant to the Bankruptcy Code or any other applicable law.  For avoidance of doubt, rights, claims and actions arising from or related to (a)-(c) in the preceding sentence are Preserved Causes of Action and are not released pursuant to this Plan or the Confirmation Order.

1.1.149  MSCS means Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities, including, without limitation, Morgan Stanley & Co, Inc.

1.1.150  Multiemployer Plan means a plan (i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and (iii) which satisfies such other requirements contained in regulations promulgated by the United States Department of Labor.

1.1.151  Net Creditors' Trust Proceeds means the proceeds received by the Creditors' Trust from the pursuit of any Transferred State Law Avoidance Claims less, without duplication, (a) the amount of any fees and expenses incurred by the Creditors' Trust in pursuing the Transferred State Law Avoidance Claims, administering the Creditors' Trust, managing the Creditors' Trust Assets and making distributions on account of Creditors' Trust Interests; (b) such amounts as the Creditors' Trustee determines should be held as a reserve to pay fees and expenses anticipated to be incurred in the future for the purposes set forth in (a) above; and (c) amounts held in the CT Reserves.

1.1.152  Net Litigation Trust Proceeds means the proceeds received by the Litigation Trust from the pursuit of any Litigation Trust Assets less, without duplication, (a) the amount of any fees and expenses incurred by the Litigation Trust in pursuing the Litigation Trust Assets and the Step Two LBO-Related Causes of Action to avoid, disallow or subordinate Step Two Senior Loan Claims and/or Step Two Senior Loan Guaranty Claims, administering the Litigation Trust, managing the Litigation Trust Assets and making distributions on account of Litigation Trust

Interests; (b) such amounts as the Litigation Trustee determines should be held as a reserve to pay fees and expenses anticipated to be incurred in the future for the purposes set forth in (a) above; and (c) amounts held in the LT Reserves.

1.1.153   New Class A Common Stock means the Class A Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.154   New Class B Common Stock means the Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.155   New Common Stock means, collectively, the New Class A Common Stock and the New Class B Common Stock; provided that, under the circumstances set forth in Section 5.4.2 of this Plan, certain Holders of Claims that would otherwise be entitled to receive New Class A Common Stock or New Class B Common Stock may instead receive New Warrants.

1.1.156   New Senior Secured Term Loan means the new senior secured term loan in an aggregate principal amount of not more than the lesser of (a) $1.1 billion or (b) two times the Debtors' trailing twelve month operating cash flow excluding minority equity interests (each as described and defined in the New Senior Secured Term Loan Agreement) as of the end of the fiscal quarter most recently ended prior to the Effective Date; which, subject to the terms of Section 5.6 of this Plan, may be issued on the Effective Date by Reorganized Tribune pursuant to the New Senior Secured Term Loan Agreement, or may be replaced in whole or in part with a distribution of Cash pursuant to and in accordance with Section 5.6.2 of this Plan.

1.1.157   New Senior Secured Term Loan Agreement means the loan agreement among Reorganized Tribune, as borrower, the other Reorganized Debtors and U.S. Subsidiary Non-Debtors as provided in and subject to Section 5.6 of this Plan (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), as guarantors, the administrative agent party thereto, and the Holders of Claims entitled to receive the New Senior Secured Term Loan under this Plan, which shall contain terms substantially as set forth in Exhibit 5.6 and filed with the Plan Supplement.

1.1.158   New Warrant Agreement means the warrant agreement with substantially the terms set forth in Exhibit 1.1.151 to be filed with the Plan Supplement.

1.1.159  New Warrants means the warrants to purchase New Class A Common Stock or New Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan.

1.1.160  New York State Action means that certain lawsuit commenced by certain Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims, on October 29, 2010, against JPMorgan Chase Bank, N.A., Merrill Lynch Capital Corporation, Citicorp North America, Inc., and Bank of America, N.A., in the Supreme Court of the State of New York, County of New York, Index #  651884-2010.

1.1.161  Non-Guarantor Debtors means those Debtors listed on Appendix A hereto as "Non-Guarantor Debtors".

1.1.162  Non-Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Non-Guarantor Non-Debtors".

1.1.163  Non-Qualified Former Employee Benefit Plan means any of the Debtors' non-tax qualified Pension Plans and individual agreements providing for retirement compensation, or deferred compensation arrangements of the applicable Debtor covering an individual who was not an employee, consultant or director of the applicable Debtor as of the Effective Date.

1.1.164  Old Common Stock means the issued and outstanding common stock of Tribune as of the Petition Date.

1.1.165  Ordinary Litigation Claims means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown that any Debtor or Estate may hold against any Person as of the Petition Date; provided, however, Ordinary Litigation Claims shall not include (a) any claim, right of action, suit or proceeding that has been settled on or prior to the Effective Date, (b) the Released Step One LBO-Related Causes of Action, (c) other claims, rights of action, suits or proceedings waived or released pursuant to Article XI of this Plan and (d) the Preserved Causes of Action.

1.1.166  Other Parent Claim Distribution has the meaning set forth in Section 3.2.7(c)(ii) hereto.

1.1.167  Other Parent Claim Gift Distribution has the meaning set forth in Section 3.2.7(c)(i) hereto.

1.1.168  Other Parent Claims means General Unsecured Claims against Tribune (and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans, but does not include Convenience Claims).

1.1.169  Other Parent Claims Reserve means one or more reserves of Cash established for the benefit of Allowed Other Parent Claims pursuant to Section 7.2.1(a) of this Plan.

1.1.170  Other Secured Claim means a Secured Claim, other than an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Senior Loan Claim (other than a right to setoff) or a Senior Noteholder Claim (other than a right to setoff).

1.1.171  Parent Trust Distribution means one hundred percent (100%) of the Net Creditors' Trust Proceeds plus 100% of the Net Litigation Trust Proceeds, less the Trusts Loan Preference, in each case to be distributed Pro-Rata among the Holders of Allowed Claims in Classes 1C(i), 1C(ii), 1D, 1E, 1I and 1J and Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.7(c)(i)(B) or 3.2.7(c)(ii); provided however, such distributions are subject to the applicable elections, subordination and other provisions as set forth in the applicable Creditors' Trust Interest and Litigation Trust Interest for each such Class in Sections 1.1.30 through 1.1.43, respectively, and all governing documents.

1.1.172  Pension Plan means an employee pension benefit plan within the meaning of section (2)(A) of the Employee Retirement Income Security Act of 1974, as amended, but excludes Multiemployer Plans.

1.1.173  Person means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.1.174  Petition Date means (i) for Tribune and for all Debtors listed on Appendix A to this Plan other than Tribune CNLBC, LLC, December 8, 2008, the date on which such Debtors commenced their Chapter 11 Cases, (ii) for Tribune CNLBC, LLC, October 12, 2009, the date on which such Debtor commenced its Chapter 11 Case, and (iii) with respect to the Subsidiary Non-Debtors, the date on which any such Subsidiary Non-Debtor commences its Chapter 11 Case, if any.

1.1.175  PHONES Notes means the issued and outstanding notes under the PHONES Notes Indenture.

1.1.176  PHONES Notes Claim means a Claim arising under or evidenced by the PHONES Notes Indenture and related documents, except any claim made by Wilmington Trust Company, as successor indenture trustee, for reasonable compensation for services under the PHONES Notes Indenture or for the reimbursement of reasonable expenses, disbursements, and advances incurred or made by Wilmington Trust Company in accordance with any provision of the PHONES Notes Indenture, only to the extent that the Bankruptcy Court determines that any such claim should not be a PHONES Notes Claim and should instead be

classified as and afforded the treatment provided to a General Unsecured Claim against Tribune.

1.1.177  <u>PHONES Notes Indenture</u> means that certain Indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.178  <u>PHONES Notes Indenture Trustee</u> means the indenture trustee under the PHONES Notes Indenture.

1.1.179  <u>Plan or Step One Lender Plan</u> means this chapter 11 plan of reorganization for the Debtors in the Chapter 11 Cases and the Non-Guarantor Non-Debtors, if any, that become Debtors with the written approval of the Proponents and the Prepackaged Plan for the Guarantor Non-Debtors, if any, that become Debtors, including Exhibits and all supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.1.180  <u>Plan Supplement</u> means the supplement to this Plan filed with the Bankruptcy Court not later than fifteen (15) calendar days prior to the deadline established for objecting to confirmation of this Plan, in form and substance acceptable to the Proponents.

1.1.181  <u>Pledge Agreement</u> means that certain Pledge Agreement, dated as of June 4, 2007, between Tribune and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.182  <u>Prepackaged Plan</u> means this Plan for the Guarantor Non-Debtors, if any, that become Debtors.

1.1.183  <u>Preserved Causes of Action</u> means (a) any and all Step Two LBO-Related Causes of Action that the Tribune Entities or the Debtors' Estates may have or are entitled to assert on behalf of their respective Estates (whether or not asserted) under any provision of the Bankruptcy Code or any applicable nonbankruptcy law including, without limitation, any and all claims under chapter 5 of the Bankruptcy Code; (b) Advisor Claims; (c) Morgan Stanley Claims; (d) objections, claims, and causes of action for avoidance and disallowance of Bridge Loan Claims and Bridge Loan Guaranty Claims; and (e) Disclaimed State Law Avoidance Claims; <u>provided</u>, <u>however</u>, that Preserved Causes of Action shall not include any claims, causes of action, suits or proceedings that have been released or settled on or prior to the Effective Date.

1.1.184  <u>Priority Non-Tax Claims</u> means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.1.185  <u>Priority Tax Claim</u> means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.1.186  <u>Proof of Claim or Proof of Interest</u> means the proof of claim or proof of interest, respectively, that must be filed by a Holder of a Claim or Interest by the date(s) designated by the Bankruptcy Court as the last date(s) for filing proofs of claim or interests against the Debtors, or as is otherwise permitted to be filed against any of the Debtors pursuant to a Final Order of the Bankruptcy Court.

1.1.187  <u>Proponents or Step One Proponents</u> means the undersigned Holders of Step One Senior Loan Claims, each in its capacity as a Holder of Step One Senior Loan Claims, or as a general partner or manager of an entity that is a Holder of same, and as a proponent of this Plan; <u>provided, however</u>, that where this Plan provides for any approval, waiver, modification, or action by the "Proponents", such approval or waiver may be given or modification or action may be taken by Holders of a majority in principal amount of the Step One Senior Loan Claims held by them, or by counsel on behalf of such majority.

1.1.188  <u>Pro Rata</u> means that proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such Class except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such multiple Classes, or in reference to a specific type of Claim, in which case Pro Rata means the proportion that an Allowed Claim of such type bears to the aggregate amount of all Allowed Claims of such type.

1.1.189  <u>Quarterly Distribution Date</u> means fifteen (15) calendar days after the conclusion of the calendar quarters ending in March, June, September and December.

1.1.190  <u>Reinstated or Reinstatement</u> means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default whether or not such default occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than a Debtor or an insider) for any actual pecuniary

24

loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

1.1.191  Related Person means, with respect to any Person, such Person's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former members, partners, shareholders, equity-holders, officers, directors, employees, managers, trustees, trust beneficiaries, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, or other representatives, nominees or investment managers, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, trustees, trust beneficiaries, shareholders, partners, employees, members and professionals).

1.1.192  Released Claims means the Debtor Released Claims and the Holder Released Claims, as such terms are defined in Sections 11.3.1 and 11.3.2 respectively.

1.1.193  Released Parties means, except as otherwise provided in Sections 11.3.1, 11.3.3 and 11.3.6 of this Plan, each of (a) the Debtors, their non-Debtor Affiliates, including the Subsidiary Non-Debtors, and the Reorganized Debtors; (b) the current and former Holders of Step One Senior Loan Claims and Holders of Step One Senior Loan Guaranty Claims in all capacities except in their capacities, if any, as (i) Step Two Selling Stockholders, or (ii) Holders of Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims, (iii) Advisors, Senior Loan Agents and Senior Loan Arrangers, solely with respect to the Step Two Transactions; (c) each of the following, solely in their capacities as such: (i) the Creditors' Committee, (ii) the present and former members of the Creditors' Committee, (iii) the Released Step Two Stockholder Parties, (iv) the Step One Proponents, (v) the Step One Selling Stockholders, (vi) the Senior Loan Agents, but solely with respect to the Step One Transactions, (vii) the Senior Loan Arrangers, but solely with respect to the Step One Transactions, and (viii) the Advisors, but solely with respect to the Step One Transactions; and (d) Related Persons of Released Parties listed in this paragraph to the extent a claim arises from the Related Person's relationship to one of the foregoing "Released Parties" and the release is not for a Step Two LBO-Related Cause of Action.  Notwithstanding anything to the contrary in this definition, none of the following, in their capacities as such, shall be Released Parties with respect to the Step Two LBO-Related Causes of Action or the Morgan Stanley Claims:  (a) Related Persons of the Debtors, (b) Advisors, (c) Step Two Selling Stockholders, (d) MSCS, (e) EGI-TRB LLC, (f) Samuel Zell, (g) Valuation Research Corporation, (h) Senior Loan Arrangers, (i) Senior Loan Agents and (j) current and former Holders of Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims.

1.1.194  Released Step One LBO-Related Causes of Action means any and all Step One LBO-Related Causes of Action that belong to or could be asserted by the

Tribune Entities, the Debtors' Estates or any other Person that is deemed to have given a release pursuant to Section 11.3 of this Plan against the Released Parties.

1.1.195  Released Step Two Stockholder Parties means (a) any Person that redeemed shares of common stock of Tribune held through the Tribune Company 401(k) Savings Plan (f/k/a Tribune Company 401(k) Savings and Profit Sharing Plan) in connection with the Step Two Transactions, with the exception of those Persons, and subject to the circumstances, listed on Exhibit 1.1.192 hereto to be filed with the Plan Supplement, (b) any Person employed by the Debtors on October 22, 2010 and that remains employed by the Debtors as of the Effective Date with respect to the first $100,000 of Cash received from the redemption of common stock, stock equivalents or options of Tribune in connection with the Step Two Transactions, with the exception of those Persons, and subject to the circumstances, listed on Exhibit 1.1.192 hereto to be filed with the Plan Supplement, (c) the Retiree Claimants or other Holders of Claims arising from Non-Qualified Former Employee Benefit Plans that elect to receive the treatment set forth in Section 3.2.7(c)(i)(A) of this Plan, and (d) the Retiree Claimants or other Holders of Claims arising from Non-Qualified Former Employee Benefit Plans that elect to receive the treatment set forth in Section 3.2.7(c)(i)(B) or Section 3.2.7(c)(ii) of this Plan, solely with respect to the first $100,000 of Cash received from the redemption of common stock, stock equivalents or options of Tribune in connection with the Step Two Transactions.

1.1.196  Remaining Bridge Loan Reserve means an amount equal to the Bridge Loan Reserve minus the Bridge Loan Distribution Amount.

1.1.197  Remaining Distributable Cash means an amount in Cash equal to (a) the Distributable Cash Pool less (b) the sum of (i) $325 million, (ii) the amount of Cash required for the Bridge Loan Reserve, (iii) the amount of Cash to be distributed to or reserved for the Holders of Allowed Senior Noteholder Claims pursuant to Section 3.2.6, (iv) the amount of Cash to be distributed to or reserved for the Holders of Allowed Other Parent Claims pursuant to Section 3.2.7, (v) the amount of Cash to be distributed to or reserved for the Holders of Allowed Convenience Claims pursuant to Section 3.2.8, (vi) the amount of Cash to be distributed to or reserved for the Holders of Allowed General Unsecured Claims pursuant to Section 3.3.6, (vii) the amount of Cash necessary to fund the Trusts' Loan, and (viii) the amount of Cash estimated by the Proponents to be required to be distributed to or reserved for Holders of Allowed Administrative Expense Claims (including fees paid pursuant to Section 9.1 of this Plan, any fees and expenses associated with the Exit Facility or any new indebtedness under Section 5.6 of this Plan, and cure costs required to be paid by the Debtors but excluding post-petition payables arising and paid in the ordinary course of business), Priority Tax Claims estimated to be payable at or in connection with the Effective Date, DIP Facility Claims, Priority Non-Tax Claims, Claims arising from Employee Benefit Plans continuing with current employees, and Cash required to be posted to cash collateralize outstanding letters of credit.

1.1.198  Reorganized Debtors means Reorganized Tribune and the other reorganized Debtors or any successors thereto by merger, consolidation or otherwise,

on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan (including, without limitation, the Restructuring Transactions).

1.1.199  Reorganized Tribune means reorganized Tribune or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan.

1.1.200  Resolved or Resolution means as determined by Final Order or binding settlement approved as provided for in this Plan.

1.1.201  Restructuring Transactions means those transactions or other actions (including, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions) that one or more of the applicable Debtors or Reorganized Debtors may enter into or undertake on, prior to, or after the Effective Date outside the ordinary course of business of such Debtors or Reorganized Debtors in accordance with Section 5.2 hereof and as shall be set forth in the Plan Supplement.

1.1.202  Retiree Claimants means those Holders of Claims under Non-Qualified Former Employee Benefit Plans that are parties to the Retiree Claimant Settlement Agreement.

1.1.203  Retiree Claimant Settlement Agreement means that certain settlement agreement by and among Tribune and certain Retiree Claimants attached hereto as Exhibit 5.15.3.

1.1.204  Secured Claim means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral (i) as set forth in this Plan, (ii) as agreed to by the Holder of such Claim and the Debtors, which agreement is approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

1.1.205  Securities Litigation Claim means any Claim against any of the Debtors, except any Claim that survives confirmation and effectiveness of this Plan pursuant to Section 11.6, (i) arising from the rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws or the Employee Retirement Income Security Act of 1974 (unless there has been a judicial determination by Final Order that any such Claim is not subject to subordination under section 510(b) of the Bankruptcy Code), including, without limitation, any Claim against any of the Debtors asserted by the United States Department of Labor, or for misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of

the Bankruptcy Code, (iv) asserted by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims, or (vi) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer, purchase, or sale of securities.

1.1.206  Senior Lenders means the lenders from time to time party to the Senior Loan Agreement as lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.1.207  Senior Loan Agent means JPMorgan Chase Bank, N.A. as administrative agent under the Senior Loan Agreement.

1.1.208  Senior Loan Agreement means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, the Senior Loan Agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) to the extent enforceable, those certain Increase Joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.209  Senior Loan Arrangers means any Syndication Agent, Documentation Agent, Arranger, or Bookrunner under the Senior Loan Agreement.

1.1.210  Senior Loan Claim means a Claim arising under the Senior Loan Agreement, other than a Senior Lender Fee/Expense Claim, and any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement, provided, however, that to the extent a Senior Loan Claim is a Step Two Senior Loan Claim, such Senior Loan Claim is subject to the Sharing Provision Dispute.

1.1.211  Senior Loan Claims Distribution means 2.50% of the Remaining Distributable Cash, 2.50% of the New Senior Secured Term Loan and 2.50% of the New Common Stock (subject to dilution by the Equity Incentive Plan), in each case subject to increase based upon whether any or all of the Gift Distributions are made and whether the Step Two-LBO Related Causes of Action against Holders of Step Two Senior Loan Claims are successful.

1.1.212  Senior Loan Guaranty Agreement means the Guarantee Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.213  Senior Loan Guaranty Claim means a Step One Senior Loan Guaranty Claim (including, without limitation, the guaranty of the Swap Claim) and a Step

Two Senior Loan Guaranty Claim subject to Resolution of the Sharing Provision Dispute.

1.1.214  Senior Loan Guaranty Claim Assignee means Reorganized Tribune or a designee of Reorganized Tribune, in each case vested with full standing and authority to hold and enforce any and all rights, claims, causes of action, obligations, and remedies in respect of Assigned Senior Loan Guaranty Claims against the Guarantor Non-Debtors and to hold and enforce any and all rights of subordination in respect of the Bridge Loan Guaranty Agreement.

1.1.215  Senior Noteholder Distribution has the meaning set forth in Section 3.2.6(c)(ii) hereto.

1.1.216  Senior Noteholder Gift Distribution has the meaning set forth in Section 3.2.6(c)(i) hereto.

1.1.217  Senior Notes means the eight series of notes issued and outstanding under the Senior Notes Indentures.

1.1.218  Senior Noteholder(s) means, individually or collectively, the Holder(s) of a Senior Noteholder Claim(s).

1.1.219  Senior Noteholder Claims means all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement.

1.1.220  Senior Notes Indenture(s) means, individually or collectively:  (a) that certain Indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (b) that certain Indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (c) that certain Indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (d) that certain Indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.221  Senior Notes Indenture Trustee(s) means, individually or collectively, the indenture trustees under the Senior Notes Indentures as of the Effective Date

1.1.222  Settlement has the meaning set forth in Section 5.15.1 hereto.

1.1.223  Sharing Provision means the ratable distribution and sharing provisions of the Senior Loan Agreement (including, without limitation Sections 2.13 and 2.15 thereof).

1.1.224  Sharing Provision Dispute means the intercreditor dispute between the Holders of Step One Senior Loan Claims (other than Holders of Swap Claims), the Holders of Step One Senior Loan Guaranty Claims (other than Holders of Swap Claims), the Holders of Step Two Senior Loan Claims and the Holders of Step Two Senior Loan Guaranty Claims as to whether the Sharing Provisions apply or are otherwise enforceable under the terms of the Senior Loan Agreement and under the circumstances of the Step Two LBO-Related Causes of Action, including, but not limited to, in the event that (i) the Step Two Senior Loan Claims and/or the Step Two Senior Loan Guaranty Claims (a) are not allowed, (b) are not contractually entitled to sharing, and/or (c) are avoided; and/or (ii) the Senior Loan Agent and/or the Senior Loan Arrangers are determined by Final Order to have acted in bad faith, negligently or inequitably, as such dispute may be Resolved by the Bankruptcy Court and/or in the New York State Action.  For the avoidance of doubt, the Holders of Swap Claims are not subject to the Sharing Provision Dispute.

1.1.225  Sharing Provision Reserve means a reserve consisting of the Sharing Provision Reserve Amount.

1.1.226  Sharing Provision Reserve Agreement means the Sharing Provision Reserve Agreement to be dated as of the Effective Date and to be filed with the Plan Supplement establishing the terms and conditions of the Sharing Provision Reserve.

1.1.227  Sharing Provision Reserve Amount means the distribution Holders of Step Two Senior Loan Claims and Holders of Step Two Senior Loan Guaranty Claims would otherwise receive if their Claims were Allowed in full and Sharing Provision Dispute is Resolved fully in favor of the Holders of such claims.

1.1.228  Step One Proponents' Professionals means the law firms retained by the Step One Proponents as listed on this Step One Lender Plan and any other professionals (including financial advisors and experts) retained by them in connection with the Chapter 11 Cases.

1.1.229  Step One Proponents' Professionals' Fees and Expenses means the fees, costs and expenses incurred by the Step One Proponents' Professionals in connection with the Chapter 11 cases.

1.1.230  Step One LBO-Related Causes of Action means any and all claims, causes of action, avoidance powers or rights, and legal or equitable remedies against any Person arising from any transaction related to the purchase by Tribune of its common stock on or about June 4, 2007 and any financing incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law and regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies are known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, now existing or hereafter arising, in law, equity, or otherwise. For the avoidance of doubt, "Step One LBO-Related Causes of Action"

exclude (a) the Step Two LBO-Related Causes of Action; and (b) the Morgan Stanley Claims.

1.1.231  Step One Selling Stockholders means those beneficial owners of issued and outstanding common stock of Tribune whose shares of common stock were redeemed for Cash pursuant to the Step One Transactions solely in their capacity as a recipient of payments with respect to such redemption.

1.1.232  Step One Senior Loan Claim means (i) a Claim arising under the Senior Loan Agreement, or a Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement and (ii) a Swap Claim, and in each case excluding any Claim that is a Step Two Senior Loan Claim.

1.1.233  Step One Senior Loan Guaranty Claim means a Claim arising under the Senior Loan Guaranty Agreement, including, without limitation, the guaranty of the Swap Claim, but excluding any Claim that qualifies as a Step Two Senior Loan Guaranty Claim.

1.1.234  Step Two Arrangers means the Senior Loan Agent, the Former Bridge Loan Agent, the Senior Loan Arrangers, the Bridge Loan Arrangers, each in their capacity as agents and arrangers of the Incremental Senior Loans and the Bridge Loans.

1.1.235  Step Two LBO-Related Causes of Action means any and all claims, causes of action, avoidance powers or rights, and legal or equitable remedies against any Person based upon, arising out of, or related to any transaction related to the merger and related transactions involving Tribune on or about December 20, 2007 or any financing incurred in connection with any such transaction (including repayment of such financing following such transaction), regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law and regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies are known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, now existing or hereafter arising, in law, equity or otherwise.  For avoidance of doubt, this includes all Estate claims against the Step Two Arrangers but not Released Step Two Selling Stockholder Parties.

1.1.236  Step Two Senior Loan Claim means a Claim arising under the Senior Loan Agreement or the Pledge Agreement in respect of "Incremental Term Borrowings" as defined in the Senior Loan Agreement, subject to Resolution of the Sharing Provision Dispute.

1.1.237  Step Two Senior Loan Guaranty Claim means a Claim arising under the Senior Loan Guaranty Agreement in respect of "Incremental Term Borrowings" as defined in the Senior Loan Agreement, subject to Resolution of the Sharing Provision Dispute.

1.1.238  <u>Step Two Selling Stockholders</u> means those beneficial owners of issued and outstanding common stock of Tribune whose shares of common stock were redeemed for Cash pursuant to the Step Two Transactions solely in their capacity as a recipient of payments with respect to such redemption; <u>provided, however</u>, that Step Two Selling Stockholders shall not include the Released Step Two Stockholder Parties.

1.1.239  <u>Step Two Transactions</u> means (a) the merger that was consummated on or about December 20, 2007 of Tribune with and into Tesop Corporation pursuant to that certain Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune, GreatBanc Trust Company, Tesop Corporation, and EGI-TRB, L.L.C. with Tribune surviving the merger and becoming a wholly-owned subsidiary of the ESOP, including the distributions that were made to Step Two Selling Stockholders pursuant to the merger, (b) the execution, delivery and performance of the Bridge Loan Agreement, and (c) the making of additional advances of $2.105 billion under the tranche B facility of the Senior Loan Agreement or as a new tranche of term loans under the Senior Loan Agreement.

1.1.240  <u>Subsidiary Debtors</u> means, individually or collectively, the Filed Subsidiary Debtors, and such Subsidiary Non-Debtors, if any, that become Debtors prior to the Confirmation Date.

1.1.241  <u>Subsidiary GUC Gift Distribution</u> has the meaning set forth in <u>Section 3.3.6(b)(ii)</u> of this Plan.

1.1.242  <u>Subsidiary GUC Distribution</u> has the meaning set forth in <u>Section 3.3.6(b)(i)</u> of this Plan.

1.1.243  <u>Subsidiary Non-Debtors</u> means those entities listed on Appendix B hereto.

1.1.244  <u>Swap Claim</u> means any Claim asserted under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune.

1.1.245  <u>Transferred State Law Avoidance Claims</u> has the meaning set forth in <u>Section 14.3.1</u> of this Plan.

1.1.246  <u>Tribune</u> means Tribune Company, a Debtor in the Chapter 11 Cases.

1.1.247  <u>Tribune Entities</u> means, collectively, the Debtors and the Subsidiary Non-Debtors.

1.1.248  <u>Tribune Interest</u> means any shares of Old Common Stock, preferred stock or other instrument evidencing an ownership interest in Tribune, whether or not transferable, and any options, warrants (including, without limitation, the EGI-TRB LLC Warrants), calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised stock options, unvested common stock, unvested preferred stock or

any other agreements of any character related to the Old Common Stock, but does not include the Securities Litigation Claims.

1.1.249  <u>Trusts' Loan</u> means a new delayed draw term loan in an aggregate principal amount of $20 million to be made by Reorganized Tribune to the Litigation Trust and the Creditors' Trust, and for which the Litigation Trust and the Creditors' Trust shall be jointly and severally liable pursuant to the terms of the Trusts' Loan Agreement.

1.1.250  <u>Trusts' Loan Agreement</u> means the loan agreement for the Trusts' Loan between Reorganized Tribune, as lender, and the Litigation Trust and the Creditors' Trust, as borrowers, as provided in and subject to <u>Section 5.13</u> of this Plan, which shall contain terms and conditions to be agreed upon by Tribune, the Creditors' Committee and the Step One Proponents including, (a) the Trusts shall be prohibited from reborrowing the principal amount thereof, and (b) the Trusts shall not make any distributions on account of Litigation Trust Interests or Creditors' Trust Interests until the Trusts' Loan has been repaid in full in accordance with the terms of the Trusts' Loan Agreement and the commitments thereunder shall have terminated.

1.1.251  <u>Trusts Loan Preference</u> means one hundred percent (100%) of the Net Creditors' Trust Proceeds and one hundred percent (100%) of the Net Litigation Trust Proceeds to be applied to repay the Trusts' Loan in accordance with the terms of the Trusts' Loan Agreement until the Trusts' Loan has been satisfied in full in accordance with the terms of the Trusts' Loan Agreement.

1.1.252  <u>Unimpaired</u> means with respect to a Claim or Interest that such Claim or Interest is not Impaired including, without limitation, as a result of being Reinstated under this Plan.

1.1.253  <u>Voting Deadline</u> means the deadline established by the Bankruptcy Court for returning Ballots.

1.2  <u>Rules of Interpretation</u>.

For purposes of this Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document attached as an Exhibit to this Plan being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document, schedule or Exhibit filed or to be filed means such document, schedule or Exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to a Person as a Holder of a Claim or Interest includes that Person's successors and assigns; (e) all references in this Plan to Sections, Articles and Appendices are references to Sections, Articles and Appendices of or to this Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a

whole and not to any particular Section, subsection or clause contained in this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to Section 15.13 and the provisions of any contract, certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (j) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

1.3    Computation of Time.

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day shall be deemed to have been completed or to have occurred as of the required date.

1.4    Exhibits and Plan Supplement.

All Exhibits, as well as the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits and Plan Supplement shall be timely filed in accordance with this Plan.  Holders of Claims and Interests may obtain a copy of the filed Exhibits and Plan Supplement upon written request to the Proponents.  Upon their filing, the Exhibits and Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the Exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

1.5    Deemed Acts.

Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of this Plan and the Confirmation Order.

## ARTICLE II:  TREATMENT OF
## ADMINISTRATIVE AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

2.1  DIP Facility Claims.

On or as soon as reasonably practicable after the Effective Date, in full satisfaction, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Reorganized Debtors shall pay Allowed DIP Facility Claims in full in Cash.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall be, at Reorganized Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof, or (iv) otherwise deemed to be subject to reimbursement pursuant to the terms and conditions of the Exit Facility.

2.2  Administrative Expense Claims.

Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, in full satisfaction, release and discharge of and in exchange for each Allowed Administrative Expense Claim, except to the extent that any Holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided for in the Plan, each Holder of an Allowed Administrative Expense Claim shall receive payment in full, in Cash, on the later of:  (i) the Effective Date if due on or before that date, (ii) the date upon which such Administrative Expense Claim becomes an Allowed Claim, (iii) with respect to Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business during these Chapter 11 Cases, or assumed by the Debtors during these Chapter 11 Cases, such time as such Allowed Administrative Expense Claims are due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, or (iv) such other date as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Reorganized Debtors.

2.3  Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive either, at the sole option of the Reorganized Debtors, (a) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, (b) except as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, which installment payments shall commence after such Priority Tax Claim becomes an Allowed Claim, or (c) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors.

## ARTICLE III:  CLASSIFICATION AND
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1   Summary of Classification and Treatment of Classified Claims and Interests.

    3.1.1   General.

    (a)   Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  In no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim.

    (b)   This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  For purposes of brevity and convenience, the classification and treatment of Claims and Interests has been set forth in three groups:  (i) Tribune (Debtor 1), (ii) Filed Subsidiary Debtors (Debtors 2 through 111) and (iii) any Guarantor Non-Debtors that become Debtors and participate in the Prepackaged Plan.

    3.1.2   Identification of Classes Against Tribune (Debtor 1).  The following chart assigns a letter to each Class against Tribune for purposes of identifying each separate Class:

| Class | Claim Or Interest |
|:-----:|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C(i) | Step One Senior Loan Claims |
| C(ii) | Step Two Senior Loan Claims |
| D | Bridge Loan Claims |
| E | Senior Noteholder Claims |
| F | Other Parent Claims |
| G | Convenience Claims |

| Class | Claim Or Interest |
|-------|-------------------|
| I | EGI-TRB LLC Notes Claims |
| J | PHONES Notes Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Tribune Interests |

3.1.3  Identification of Classes Against Filed Subsidiary Debtors (Debtors 2 through 111).  The following chart assigns a letter to each Class against the Filed Subsidiary Debtors for purposes of identifying each separate Class:

| Class | Claim Or Interest |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C(i) | Step One Senior Loan Guaranty Claims |
| C(ii) | Step Two Senior Loan Guaranty Claims |
| D | Bridge Loan Guaranty Claims |
| E | General Unsecured Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Interests in Filed Subsidiary Debtors |

3.2  <u>Classification and Treatment of Claims Against and Interests in Tribune Company (Debtor 1)</u>.

3.2.1  <u>Class 1A – Priority Non-Tax Claims</u>.

(a)  Classification:  Class 1A consists of all Priority Non-Tax Claims against Tribune.

(b)  Treatment:  Each Holder of an Allowed Priority Non-Tax Claim against Tribune shall have its Claim Reinstated.

(c)  Voting:  Allowed Claims in Class IA are Unimpaired, and the Holders of Class 1A Claims are conclusively deemed to have accepted the Plan pursuant to

section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class IA Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1A Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Article VIII.

3.2.2   Class 1B – Other Secured Claims.

(a)   Classification:  Class 1B consists of all Other Secured Claims against Tribune.

(b)   Treatment:  Each Holder of an Allowed Other Secured Claim against Tribune shall have its Claim Reinstated.

(c)   Voting:  Allowed Claims in Class 1B are Unimpaired, and the Holders of Class 1B Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1B Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1B Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Article VIII.

3.2.3   Class 1C(i) – Step One Senior Loan Claims.

(a)   Classification:  Class 1C(i) consists of all Step One Senior Loan Claims against Tribune.

(b)   Allowance:  The Step One Senior Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement and the Pledge Agreement in respect of Step One Senior Loan Claims, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date in respect of Step One Senior Loan Claims, and neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.  The Swap Claim shall be Allowed against Tribune in the amount of $150,948,822.

(c)   Treatment:  On or as soon as practicable after the applicable Distribution Date, together with other distributions provided for in this Plan, in full satisfaction, release and discharge of and in exchange for Allowed Step One Senior Loan Claims against Tribune, subject to Section 5.4.2 herein, the Step One Proponents' Professionals' Fees and Expenses shall be paid in full and, thereafter, each Holder of an Allowed Step One Senior Loan Claim against Tribune shall receive (i) a Pro Rata share of the Senior Loan Claims Distribution, (ii) a Pro Rata share of the Remaining Bridge Loan Reserve based on their deficiency claim after distributions have been made from each of the Debtors' estates, (iii) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of this Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Step One Senior Loan Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of this Plan, of the Class 1C(i) Creditors' Trust Interests, (iv) a Pro

Rata share of the Class 1C(i) Litigation Trust Interests, and (v) the applicable portion of the Sharing Provision Reserve Amount to the extent that the Sharing Provision Dispute and/or the Step Two LBO-Related Causes of Action are Resolved against the Holders of Step Two Senior Loan Claims.  For the avoidance of doubt, the Step One Senior Loan Claims shall share in recoveries, if any, from the Step Two LBO-Related Causes of Action.  All such distributions shall be made by the Disbursing Agent Pro Rata directly to the Holders of the Step One Senior Loan Claims; provided however, that the Sharing Provision Reserve Amount shall be deposited with the Sharing Provision Reserve pending Resolution of the Sharing Provision Dispute and the Step Two LBO-Related Causes of Action against the Holders of Step Two Senior Loan Claims and/or Step Two Senior Loan Guaranty Claims.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

(d)   Voting:  Claims in Class 1C(i) are Impaired, and Holders of Class 1C(i) Claims are entitled to vote to accept or reject the Plan.

3.2.4   Class 1C(ii) - Step Two Senior Loan Claims.

(a) Classification:  Class1C(ii) consists of all Step Two Senior Loan Claims against Tribune.

(b) Allowance:  The Step Two Senior Loan Claims are subject to challenge by the Litigation Trust pursuant to Article XIII hereof and/or the New York State Action.

(c) Treatment:  Holders of Class 1C(ii) Claims shall receive no distribution unless and until the Sharing Provision Dispute and/or the Step Two LBO-Related Causes of Action are Resolved in favor of Holders of the Step Two Senior Loan Claims, whereupon the applicable portion of the Sharing Provision Reserve shall be released and distributed Pro Rata to the Holders of Allowed Class 1C(ii) Claims in accordance with such Resolution.

(d) Voting: Claims in Class 1C(ii) are Impaired, and Holders of Class I(C)(ii) Claims are entitled to vote to accept or reject the Plan.

3.2.5   Class 1D — Bridge Loan Claims.

(a)   Classification:  Class 1D consists of all Bridge Loan Claims against Tribune.

(b)   Allowance:  Bridge Loan Claims against Tribune shall be subject to challenge by the Litigation Trust pursuant to Article XIII hereof.

(c)   Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, release and discharge of and in exchange for Allowed Bridge Loan Claims against Tribune, each Holder of an Allowed Bridge Loan Claim against Tribune shall receive (i) a Pro Rata share of the Bridge Loan Distribution Amount, (ii) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of this Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Bridge Loan Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of this Plan, of the Class 1D Creditors' Trust Interests, and (iii) a Pro Rata share of the Class 1D Litigation Trust Interests.

(d)   Voting:  Claims in Class ID are Impaired, and Holders of Class ID Claims are entitled to vote to accept or reject the Plan.

3.2.6   Class 1E — Senior Noteholder Claims.

(a)   Classification:  Class 1E consists of all Senior Noteholder Claims against Tribune.

(b)   Allowance:  The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77 less any Senior Noteholder Claims held by MSCS.  The Senior Noteholder Claims owned by MSCS shall be subject to challenge by the Litigation Trust pursuant to Article XIII herein.  The Senior Noteholder Claims shall not be subject to reduction, disallowance, subordination, set off or counterclaim (other than the Senior Noteholder Claims of MSCS with respect to the Morgan Stanley Claims).

(c)   Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, each Holder of an Allowed Senior Noteholder Claim shall receive either:

(i)   Senior Noteholder Gift Distribution: if Holders of Class 1C(i) Claims (Step One Senior Loan Claims) and Class 1E Claims (Senior Noteholder Claims), respectively, vote as a Class to accept the Step One Lender Plan, (A) a Pro Rata share of $300,000,000 in Cash (paid out of the Distributable Cash Pool), (B) a Pro Rata share of the Remaining Bridge Loan Reserve based on their deficiency claim after distributions have been made from each of the Debtors' estates, (C) a Pro Rata share of the Class 1E Litigation Trust Interests, and (D) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of this Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Senior Noteholder Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of this Plan, of the Class 1E Creditors' Trust Interests (the

40

"Senior Noteholder Gift Distribution"). If the Senior Noteholder Claims held by MSCS are disallowed, the consideration that would otherwise be distributed to MSCS on account of its Senior Noteholder Claims shall instead be distributed Pro Rata to the other Holders of Allowed Senior Noteholder Claims; or

(ii)   Senior Noteholder Distribution: if Holders of Class 1C(i) Claims (Step One Senior Loan Claims) or Class 1E Claims (Senior Noteholder Claims), respectively, vote as a Class to reject the Step One Lender Plan, (A) an amount of Cash equal to 4.8% (paid out of the Distributable Cash Pool) of the aggregate amount in U.S. dollars of such Holder's Allowed Senior Noteholder Claim; (B) a Pro Rata share of the Remaining Bridge Loan Reserve based on their deficiency claim after distributions have been made from each of the Debtors' estates, (C) a Pro Rata share of the Class 1E Litigation Trust Interests, and (D) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of this Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Senior Noteholder Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of this Plan, of the Class 1E Creditors' Trust Interests (the "Senior Noteholder Distribution"). If the Senior Noteholder Claims held by MSCS are disallowed, the consideration that would otherwise be distributed to MSCS on account of its Senior Noteholder Claims shall instead be distributed in accordance with the Disputed Parent Claim Distribution Procedure.

(d)   Voting:  Claims in Class 1E are Impaired, and Holders of Class 1E Claims are entitled to vote to accept or reject the Plan.

3.2.7   Class 1F — Other Parent Claims.

(a)   Classification:  Class 1F consists of all Other Parent Claims against Tribune.

(b)   Allowance:  The Claims of the Retiree Claimants shall be Allowed in accordance with the Retiree Claims Settlement.  Additional Other Parent Claims shall be subject to allowance, disallowance, or offset under the applicable provisions of this Plan, including, but not limited to, Article VIII and Section 7.11.

(c)   Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, release and discharge of and in exchange for Allowed Other Parent Claims against Tribune, each Holder of an Allowed Other Parent Claim shall receive either:

(i)   Other Parent Claim Gift Distribution: if Holders of Class 1C(i) Claims (Step One Senior Loan Claims) and Class 1F Claims (Other Parent Claims), respectively, vote as a Class to accept the Step One Lender Plan (the "Other Parent Claim Gift Distribution"),

41

(A)   Option 1:  (y) an amount of Cash (paid out of the Distributable Cash Pool) equal to 25.83% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim; and (z) a Pro Rata share of the Remaining Bridge Loan Reserve based on their deficiency claim after distributions have been made from each of the Debtors' estates, or

(B)   Option 2:  (w) an amount of Cash (paid out of the Distributable Cash Pool) equal to 23.38% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim; (x) a Pro Rata share of the Remaining Bridge Loan Reserve based on their deficiency claim after distributions have been made from each of the Debtors' estates; (y) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of this Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Other Parent Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of this Plan and that elect the treatment set forth in this Section 3.2.7(c)(ii), of the Class 1F Creditors' Trust Interests; and (z) a Pro Rata share, calculated based upon the aggregate amount of Allowed Other Parent Claims the Holders of which elect the treatment set forth in this Section 3.2.7(c)(ii), of the Class 1F Creditors' Trust Interests, of the Class 1F Litigation Trust Interests.

(ii)   Other Parent Claim Distribution: if Holders of Class 1C(i) Claims (Step One Senior Loan Claims) or Class 1F Claims (Other Parent Claims), respectively, vote as a Class to reject the Step One Lender Plan, (A) an amount of Cash equal to 4.80% (paid out of the Distributable Cash Pool) of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim; (B) a Pro Rata share of the Remaining Bridge Loan Reserve based on their deficiency claim after distributions have been made from each of the Debtors' estates; (C) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of this Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed Other Parent Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of this Plan and that elect the treatment set forth in this Section 3.2.7(c)(ii), of the Class 1F Creditors' Trust Interests; and (D) a Pro Rata share, calculated based upon the aggregate amount of Allowed Other Parent Claims the Holders of which elect the treatment set forth in this Section 3.2.7(c)(ii), of the Class 1F Creditors' Trust Interests, of the Class 1F Litigation Trust Interests. (the "Other Parent Claim Distribution").

Each Holder of an Allowed Other Parent Claim voting to accept the Step One Lender Plan may, on such Holder's Ballot, elect the treatment specified in Section 3.2.7(c)(i)(A) or Section 3.2.7(c)(i)(B).  Each Holder of an Allowed Other Parent Claim that has not submitted a Ballot, has submitted a Ballot but failed to elect a treatment set forth in this Section 3.2.7(c), or that has voted to reject the Step One Lender Plan shall be deemed to have elected the treatment specified in Section 3.2.7(c)(i)(B) with respect to its Allowed Other Parent Claim.  Each Holder of an

Allowed Other Parent Claim that has voted in favor of the Step One Lender Plan shall be deemed to have elected the treatment specified in <u>Section 3.2.7(c)(i)(B)</u> with respect to its Allowed Other Parent Claim unless, on such Holder's Ballot, such Holder elects instead to receive the treatment specified in <u>Section 3.2.7(c)(i)(A)</u>.

(d)  Voting:  Claims in Class 1F are Impaired, and Holders of Class 1F Claims are entitled to vote to accept or reject the Plan.

3.2.8  <u>Class 1G – Convenience Claims</u>.

(a)  Classification:  Class 1G consists of all Convenience Claims against Tribune.

(b)  Treatment:  In full satisfaction, release and discharge of and in exchange for Allowed Convenience Claims against Tribune, on or as soon as practicable after the applicable Distribution Date, each Holder of an Allowed Convenience Claim against Tribune shall receive payment in full in Cash on account of such Claim; <u>provided</u>, <u>however</u>, that, subject to <u>Section 7.4</u> of this Plan, post-petition interest shall not be paid to any Holder on any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.

(c)  Voting:  Allowed Claims in Class 1G are Unimpaired, and the Holders of Class 1G Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1G Claims are not entitled to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, that all Class 1G Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, <u>Article VIII</u>.

3.2.9  <u>Class 1I – EGI-TRB LLC Notes Claims</u>.

(a)  Classification:  Class 1I consists of all EGI-TRB LLC Notes Claims against Tribune.

(b)  Allowance:  EGI-TRB LLC Notes Claims against Tribune shall be subject to challenge by the Litigation Trust.

(c)  Treatment:  On or as soon as practicable after the applicable Distribution Date, together with other distributions provided for in this Plan, in full satisfaction, release and discharge of and in exchange for Allowed EGI-TRB LLC Notes Claims against Tribune, each Holder of an Allowed EGI-TRB LLC Notes Claim against Tribune shall receive (i) a Pro Rata share of the Class 1I Litigation Trust Interests and (ii) if such Holder has not opted out of making the assignment provided in <u>Section 14.3.1</u> of this Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed EGI-TRB LLC Notes Claims the Holders of which do not opt out of making the assignment provided in <u>Section 14.3.1</u> of this Plan, of the Class 1I Creditors' Trust Interests.

43

(d)   Voting:  Claims in Class 1I are Impaired, and Holders of Class 1I Claims are entitled to vote to accept or reject the Plan.

3.2.10   Class 1J – PHONES Notes Claims.

(a)   Classification:  Class 1J consists of all PHONES Notes Claims against Tribune.

(b)   Allowance:  The PHONES Notes Claims shall together be deemed Allowed in the amount determined by the Bankruptcy Court.  The PHONES Notes Claims shall not be subject to reduction, disallowance, subordination (other than as set forth in the PHONES Notes Indenture), set off or counterclaim.

(c)   Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, release and discharge of and in exchange for Allowed PHONES Notes Claims against Tribune, each Holder of an Allowed PHONES Notes Claim shall receive (i) a Pro Rata share of the Class 1J Litigation Trust Interests and (ii) if such Holder has not opted out of making the assignment provided in Section 14.3.1 of this Plan, a Pro Rata share, calculated based upon the aggregate amount of Allowed PHONES Notes Claims the Holders of which do not opt out of making the assignment provided in Section 14.3.1 of this Plan, of the Class 1J Creditors' Trust Interests.

(d)   Voting:  Claims in Class 1J are Impaired, and Holders of Class 1J Claims are entitled to vote to accept or reject the Plan.

3.2.11   Class 1K — Intercompany Claims.

(a)   Classification:  Class 1K consists of all Intercompany Claims against Tribune.

(b)   Treatment:  In full satisfaction, release and discharge of and in exchange for Intercompany Claims against Tribune, except as otherwise provided herein, Holders of Intercompany Claims against shall receive the treatment afforded to them in the Intercompany Claims Settlement.

(c)   Voting:  Claims in Class 1K are Impaired and Holders of Class 1K Claims 1K Claims are entitled to vote to accept or reject the Plan.

3.2.12   Class 1L — Securities Litigation Claims.

(a)   Classification:  Class 1L consists of all Securities Litigation Claims against Tribune.

(b)   Treatment:  On the Effective Date, all Securities Litigation Claims against Tribune shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Securities Litigation Claims.

44

(c)  Voting:  Claims in Class 1L are Impaired.  Holders of Claims in Class IL are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

### 3.2.13  Class 1M — Tribune Interests.

(a)  Classification:  Class 1M consists of all Tribune Interests in Tribune.

(b)  Treatment:  On the Effective Date, all Tribune Interests in Tribune shall be extinguished and Holders of such Interests shall not receive or retain any property under the Plan on account of such Tribune Interests.

(c)  Voting:  Interests in Class 1M are Impaired.  Holders of Interests in Class 1M are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

## 3.3  Classification and Treatment of Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2 through 111).

### 3.3.1  Classes 2A through 111A – Priority Non-Tax Claims.

(a)  Classification:  Classes 2A through 111A consist of all Priority Non-Tax Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)  Treatment:  Each Holder of an Allowed Priority Non-Tax Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

(c)  Voting:  Allowed Claims in Classes 2A through 111A are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2A through 111A are not entitled to vote to accept or reject this Plan; provided, however, that all Claims in Classes 2A through 111A shall be subject to allowance or disallowance in whole or in part under the applicable provisions of this Plan, including, but not limited to, Article VIII.

### 3.3.2  Classes 2B through 111B – Other Secured Claims.

(a)  Classification:  Classes 2B through 111B consist of all Other Secured Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)  Treatment:  Each Holder of an Allowed Other Secured Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

(c)   Voting:  Allowed Claims in Classes 2B through 111B are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2B through 111B are not entitled to vote to accept or reject this Plan; provided, however, that all Claims in Classes 2B through 111B shall be subject to allowance or disallowance in whole or in part under the applicable provisions of this Plan, including, but not limited to, Article VIII.

    3.3.3   Classes 50C(i) through 111C(i) — Step One Senior Loan Guaranty Claims.

    (a)   Classification:  Classes 50C(i) through 111C(i) consist of all Step One Senior Loan Guaranty Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

    (b)   Allowance:  The Step One Senior Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Guaranty Agreement in respect of Step One Senior Loan Guaranty Claims, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Guaranty Agreement as of the Petition Date in respect of Step One Senior Loan Guaranty Claims, plus, to the extent allowable under the Bankruptcy Code, all postpetition interest and other amounts due and owing under the Senior Loan Guaranty Agreement from and after the Petition Date with respect of Step One Senior Loan Claims, and neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.

    (c)   Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, release and discharge of and in exchange for Allowed Step One Senior Loan Guaranty Claims against the Guarantor Debtors, subject to Section 5.4.2, each Holder of a Step One Allowed Senior Loan Guaranty Claim against a Guarantor Debtor shall receive a Pro Rata share of:

        (i)   97.50% of the New Senior Secured Term Loan;

        (ii)   97.50% of the Remaining Distributable Cash; and

        (iii)  97.50% of the New Common Stock.

The foregoing allocations of New Senior Secured Term Loans, Remaining Distributable Cash and New Common Stock are, in each case, subject to decrease based upon whether any or all of the Gift Distributions are made and whether the Step Two-LBO Related Causes of Action against Holders of Step Two Senior Loan Guaranty Claims are successful.  The distributions payable to the Holder(s) of the Swap Claim and the Step One Senior Loan Guaranty Claims shall be paid directly to each such Holder by the Disbursing Agent in accordance with Section 7.3 of this Plan; provided however, that the Sharing Provision Reserve Amount shall be deposited with the Sharing Provision Reserve pending Resolution of the Sharing Provision Dispute and/or the Step Two LBO-Related Causes of Action against the Step Two Senior Loan Guaranty Claims.

In addition, such creditors shall receive the applicable portion of the Sharing Provision Reserve Amount to the extent that the Sharing Provision Dispute and/or the Step Two LBO-Related Causes of Action are Resolved against the Holders of Step Two Senior Loan Guaranty Claims. All New Common Stock held by the Sharing Provision Reserve shall be held in a manner acceptable to the FCC.

(d)  Voting:  Claims in Classes 50C(i) through 111C(i) are Impaired, and Holders of Claims in Classes 50C(i) through 111C(i) are entitled to vote to accept or reject the Plan of the relevant Debtors.

3.3.4  Classes 50C(ii) through 111C(ii) — Step Two Senior Loan Guaranty Claims.

(a) Classification: Classes 50C(ii) through 111C(ii)  consist of all of the Step Two Senior Loan Guaranty Claims against the relevant Guarantor Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b) Allowance: The Step Two Senior Loan Guaranty Claims are subject to challenge by the Litigation Trust pursuant to Article XIII hereof and/or the New York State Action.

(c) Treatment:  Holders of Class 50C(ii) - 111C(ii) Claims shall receive no distribution unless and until the Sharing Provision Dispute and/or the Step Two LBO-Related Causes of Action are Resolved in favor of Holders of Step Two Senior Loan Guaranty Claims, whereupon the applicable portion of the Sharing Provision  Reserve shall be released and distributed Pro Rata to the Holders of Allowed Class 50C(ii) - 111C(ii) Claims in accordance with such Resolution.

(d) Voting: Claims in Classes 50C(ii) through 111C(ii) are Impaired, and the Holders of Claims in Classes 50C(ii) through 111C(ii) are entitled to vote to accept or reject the Plan.

3.3.5  Classes 50D through 111D — Bridge Loan Guaranty Claims.

(a)  Classification:  Classes 50D through 111D consist of all Bridge Loan Guaranty Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)  Allowance:  Bridge Loan Guaranty Claims may be challenged by an Estate representative on or prior to the Effective Date and subsequently shall be subject to challenge by the Litigation Trust pursuant to Article XIII hereof.

(c)  Treatment:  In accordance with Section 7.3, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Remaining Distributable Cash and (iii) the New Common Stock that would otherwise be made

on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed as follows: (a) on account of the Step One Senior Loan Guaranty Claims, as provided for in Section 3.3.3 with regard to Claims in Classes 50C(i) through 111C(i) directly to the Holders of Step One Senior Loan Guaranty Claims, and to the Sharing Provision Reserve; and, (b) as provided for in Section 3.3.4 with regard to Claims in Classes 50C(ii) through 111C(ii), on account of the Step Two Senior Loan Claims, there shall not be any distribution until resolution of such disputed Claims. Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against the Guarantor Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Bridge Loan Guaranty Claims.

(d)  Voting:  Claims in Class 50D through 111D are Impaired, and Holders of Claims in Classes 50D through 111D are entitled to vote to accept or reject the Plan.

3.3.6  Classes 2E through 111E – General Unsecured Claims.

(a)  Classification:  Classes 2E through 111E consist of all General Unsecured Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)  Treatment:  On or as soon as reasonably practicable after the applicable Distribution Date, each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive either:

(i)  if Holders of Classes 50(c)(i) through 111C(i) Claims (Step One Senior Loan Guaranty Claims) and Classes 2E through 111E Claims (General Unsecured Claims), respectively, vote as a Class to accept the Step One Lender Plan, an amount of Cash (paid out of the Distributable Cash Pool) equal to the lesser of (i) 100% of such Holders' Allowed General Unsecured Claim Against a Filed Subsidiary Debtor and (ii) a Pro Rata Share of (x) $225,000,000 *plus* (y) an amount equal to the aggregate amount of Allowed General Unsecured Claims against a Filed Subsidiary Debtor arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim; provided, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim (the "Subsidiary GUC Gift Distribution"); or

(ii)  if Holders of Classes 50(c)(i) through 111C(i) Claims (Step One Senior Loan Guaranty Claims) or Classes 2E through 111E Claims (General Unsecured Claims), respectively, vote as a Class to reject the Step One Lender Plan, each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive an amount of Cash (paid out of the Distributable Cash Pool) equal to the lesser of (i) 100% of such Holders' Allowed General Unsecured Claim Against a Filed Subsidiary Debtor or (ii) a Pro Rata share of (x) $150,000,000; *plus* (y) an amount equal to the aggregate

48

amount of Allowed General Unsecured Claims against a Filed Subsidiary Debtor arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim; provided, however, that post-petition interest shall not accrue or be paid on any General Unsecured Claim (the "Subsidiary GUC Distribution").

(c)   Voting:  Claims in Classes 2E through 111E are Impaired, and Holders of Claims in Classes 2E through 111E are entitled to vote to accept or reject the Plan against the relevant Debtors.

### 3.3.7   Classes 2K through 111K – Intercompany Claims.

(a)   Classification:  Classes 2K through 111K consist of all Intercompany Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)   Treatment:  In full satisfaction, release and discharge of and in exchange for Intercompany Claims against Filed Subsidiary Debtors, except as otherwise provided herein, Holders of Intercompany Claims shall receive the treatment afforded to them in the Intercompany Claims Settlement.

(c)   Voting:  Claims in Classes 2K through 111K are Impaired, and are entitled to vote to accept or reject the Plan against the relevant Debtors.

### 3.3.8   Classes 2L through 111L – Securities Litigation Claims.

(a)   Classification:  Classes 2L through 111 L consist of all Securities Litigation Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)   Treatment:  On the Effective Date, all Securities Litigation Claims against Filed Subsidiary Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under this Plan on account of such Securities Litigation Claims.

(c)   Voting:  Claims in Classes 2L through 111L are Impaired.  Holders of Claims in Classes 2L through 111 L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

### 3.3.9   Classes 2M through 111M – Interests in Filed Subsidiary Debtors.

(a)   Classification:  Classes 2M through 111M consist of all Interests in the Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)   Treatment:  Subject to Section 5.2 of this Plan, each Holder of an Allowed Interest in the Filed Subsidiary Debtors shall have its Interest Reinstated.  Allowed Interests in each Filed Subsidiary Debtor shall be Reinstated for administrative convenience and (1) in the case of the Guarantor Debtors, for the ultimate benefit of the Holders of Senior Loan Guaranty Claims against such Guarantor Debtors and (2) in the case of the Non-Guarantor Debtors, in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain Cash distributions to the Holders of Allowed Claims against such Non-Guarantor Debtors.

(c)   Voting:  Allowed Interests in Classes 2M through 111M are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Interests in Classes 2M through 111M are not entitled to vote to accept or reject the Plan.

3.4   Prepackaged Plans for and Treatment of Claims Against and Interests in Guarantor Non-Debtors, if Any, That Become Debtors.

3.4.1   Prepackaged Plan.  This Plan constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence Chapter 11 Cases.  For any Guarantor Non-Debtor that commences a Chapter 11 Case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth in Section 3.3 above for the Filed Subsidiary Debtors.

3.4.2   Unimpaired Claims and Interests.  Except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated.  In addition, except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the relevant Prepackaged Plan.  All executory contracts and unexpired leases of the Guarantor Non-Debtors that become Debtors shall be assumed and shall be fully enforceable in accordance with their terms.  Joint venture agreements, stockholder agreements, limited liability company agreements, limited liability partnership agreements, limited partnership agreements, general partnership agreements, affiliate agreements, and any other agreements or arrangements related to the foregoing shall continue in accordance with their terms and shall remain in full force and effect and the parties' rights thereunder shall not be modified by the relevant Prepackaged Plan.

3.4.3   Loan Guaranty Claims.

(a)   Step One Senior Loan Guaranty Claims.  In full satisfaction, release and discharge of and in exchange for Allowed Step One Senior Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors, each Holder of an Allowed

50

Step One Senior Loan Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.3.3 and the guaranties described in Section 5.6 and shall not be entitled to receive any other or further distributions or guaranties.  Step One Senior Loan Guaranty Claims are Impaired, and Holders of Step One Senior Loan Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan.  Votes cast by Holders of Step One Senior Loan Guaranty Claims in Classes 50C(i) through 111C (i) shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors.

(b)  Step Two Senior Loan Guaranty Claims.  In full satisfaction, release and discharge of and in exchange for Allowed Step Two Senior Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors, each Holder of an Allowed Step Two Senior Loan Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.3.4, if any, and the guaranties described in Section 5.6 and shall not be entitled to receive any other or further distributions or guaranties.  Step Two Senior Loan Guaranty Claims are Impaired, and Holders of Step Two Senior Loan Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan.  Votes cast by Holders of Step Two Senior Loan Guaranty Claims in Classes 50C(ii) through 111C (ii) shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors.

(c)  Bridge Loan Guaranty Claims.  In accordance with Section 7.3, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the New Senior Secured Term Loan, (ii) the Remaining Distributable Cash and (iii) the New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed as follows: (a) on account of the Step One Senior Loan Guaranty Claims, as provided for in Section 3.3.3 with regard to Claims in Classes 50C(i) through 111C(i) directly to the Holders of Step One Senior Loan Guaranty Claims, and, (b) as provided for in Section 3.3.4 with regard to Claims in Classes 50C(ii) through 111C(ii), on account of the Step Two Senior Loan Guaranty Claims, there shall not be any distribution until Resolution of the Sharing Provision Dispute and/or Step Two LBO-Related Causes of Action against Step Two Senior Loan Guaranty Claims.  Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims.  Bridge Loan Guaranty Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan

3.4.4  Intercompany Claims.  In full satisfaction, release and discharge of and in exchange for Allowed Intercompany Claims against Guarantor Non-Debtors that become Debtors, all Intercompany Claims against a Guarantor Non-Debtor that becomes a Debtor shall receive the treatment set forth in the Intercompany Claims

Settlement and shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.  Intercompany Claims are Impaired and Holders of Intercompany Claims are entitled to vote to accept or reject the relevant Prepackaged Plan.  Votes cast by Holders of Intercompany Claims in Classes 2K through 111K shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors.

   3.4.5  <u>Securities Litigation Claims</u>.  On the Effective Date, all Securities Litigation Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Securities Litigation Claims.  Securities Litigation Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan.

## ARTICLE IV:  ACCEPTANCE OR REJECTION OF PLAN

4.1 <u>Impaired Classes of Claims and Interests Entitled to Vote</u>.

Holders of Claims or Interests in each Impaired Class of Claims or Interests that receive or retain property pursuant to this Plan shall be entitled to vote to accept or reject this Plan.

4.2 <u>Acceptance by an Impaired Class of Claims</u>.

Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept such Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

4.3 <u>Presumed Acceptances by Unimpaired Classes</u>.

Classes of Claims or Interests designated as Unimpaired are conclusively presumed to have voted to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code, and the votes of the Holders of such Claims or Interests will not be solicited.

4.4 <u>Presumed Rejection of the Plan</u>.

Impaired Classes of Claims or Interests that do not receive or retain property under the Plan are conclusively presumed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and the votes of Holders of such Claims or Interests will not be solicited.

4.5 <u>Confirmability and Severability of this Plan</u>.

   4.5.1  <u>Consensual Confirmation</u>.  The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor.  Therefore, notwithstanding the combination of the separate plans of

reorganization of all Debtors in this joint plan of reorganization for purposes of, among other things, economy and efficiency, this Plan shall be deemed a separate chapter 11 plan for each such Debtor.

4.5.2  <u>Cramdown</u>.  With respect to any Impaired Class of Claims or Interests that fails to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Classes, in which case or cases, the Plan shall constitute a motion for such relief.

4.5.3  <u>Reservation of Rights</u>.  Subject to <u>Section 15.8</u> of this Plan, the Proponents reserve the right to modify or withdraw this Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Plan as it applies to any particular Debtor is not confirmed.  In addition, and also subject to <u>Section 15.8</u> of this Plan, should this Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of this Plan to the contrary, the Proponents reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw this Plan in its entirety or in part.

## ARTICLE V:  MEANS FOR IMPLEMENTATION OF THE PLAN

5.1  <u>Non-Substantive Consolidation</u>.

Although the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate, <u>provided</u> that, to the extent of any insufficiency, funds may be advanced to the relevant Debtors by the Estate of Tribune or any of the Subsidiary Debtors at the option of the advancing Debtor, as applicable.  Except as specifically set forth herein, nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.  A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes including, but not limited to, voting and distribution; <u>provided</u>, <u>however</u>, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim.  Notwithstanding anything to the contrary in this Plan, the Reinstated Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

5.2  <u>Restructuring Transactions</u>.

On or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions.  The actions to effect the Restructuring

Transactions may include, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions.  The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors.  In each case in which the surviving, resulting or acquiring person in any such Restructuring Transaction is a successor to a Debtor or Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Debtor or Reorganized Debtor pursuant to this Plan to pay or otherwise satisfy the Allowed Claims against such Debtor or Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Debtor or Reorganized Debtor will perform such obligations.  Implementation of the Restructuring Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in this Plan.  Exhibit 5.2, to be filed with the Plan Supplement, shall set forth a description of the Restructuring Transactions.  On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in this Section 5.2.  The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order.  To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC shall have been obtained.

   5.3   Corporate Governance, Directors, Officers and Corporate Action.

      5.3.1   Certificate of Incorporation; By-Laws; Limited Liability Company Agreement; Limited Liability Partnership Agreement.  On the Effective Date, the Certificate of Incorporation and By-Laws substantially in the forms attached as Exhibit 5.3.1(1) and Exhibit 5.3.1(2), respectively, to be filed with the Plan Supplement, shall go into effect.  Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities.  Additionally, the Certificate of

Incorporation shall contain director and officer liability exculpation and indemnity provisions to the fullest extent permitted under Delaware law applicable to directors and officers serving from and after the Effective Date.  To the extent the summary description in this Plan conflicts with the terms of the Certificate of Incorporation or the By-Laws, the terms of such documents shall govern.  The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of this Plan (including, without limitation, Section 5.2) and the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law.  In addition, on the Effective Date, Reorganized Tribune, the Step One Proponents and holders of more than 10% of the New Common Stock of Reorganized Tribune as of the Effective Date shall enter into a registration rights agreement substantially in the form set forth in Exhibit 5.3.1(3), which shall be filed prior to the commencement of the Confirmation Hearing.

     5.3.2   Directors and Officers of Reorganized Tribune.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial officers of Reorganized Tribune shall be the persons identified in Exhibit 5.3.2(1), to be filed no later than five days before the commencement of the Confirmation Hearing, which shall be acceptable to the Proponents.  On the Effective Date, the board of directors of Reorganized Tribune shall have seven (7) members, including the chief executive officer of Reorganized Tribune, consistent with the provisions of Section 5.5 of this Plan.  All members of the initial board of directors of Reorganized Tribune will be in compliance with all applicable requirements of the Communications Act and the FCC's rules.  As set forth in the Certificate of Incorporation, (i) Oaktree shall have the sole right to designate one member of the initial board of directors of Reorganized Tribune; (ii) Angelo Gordon shall have the sole right to designate one member of the initial board of directors of Reorganized Tribune; and (iii) Step One Proponents shall have the sole right to jointly designate four members of the initial board of directors of Reorganized Tribune; and in each case of (i) through (iii), such members shall be subject to re-election based on a shareholder vote pursuant to the terms of the Certificate of Incorporation and applicable law.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, each of the above appointments will be disclosed in Exhibit 5.3.2(2), to be filed no later than five days before the commencement of the Confirmation Hearing, the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Tribune and to the extent such person is an insider (as defined in section 101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for such person.  Each such director and officer of Reorganized Tribune shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation and applicable law.  Each member of the current board of directors of Tribune will be deemed to have resigned on the Effective Date unless identified in Exhibit 5.3.2(2) as continuing on the board of directors of Reorganized Tribune.

5.3.3  Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune.  Except as set forth in Exhibit 5.2, from and after the Effective Date, each Reorganized Debtor shall retain its equity interest in any other Reorganized Debtor.  The initial boards of directors or managers and officers of the Reorganized Debtors other than Reorganized Tribune shall be as set forth in Exhibit 5.3.3, to be filed to be filed no later than five days before the commencement of the Confirmation Hearing.

5.3.4  Corporate Action.  The adoption of the Certificate of Incorporation or similar constituent documents, the adoption of the By-Laws, the selection of directors and officers for Reorganized Tribune, and all other actions contemplated by this Plan shall be authorized and approved in all respects (subject to the provisions of this Plan) by the Confirmation Order.  All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders, directors, or managers of the Debtors or the Reorganized Debtors.  On the Effective Date, as applicable, the appropriate officers of the Debtors and/or the Reorganized Debtors and members of the boards of directors or managers of the Debtors and/or Reorganized Debtors are authorized and directed to issue, execute and deliver, and cause the Reorganized Debtors to perform, the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of the Debtors and/or Reorganized Debtors.

5.4   Issuance and Distribution of New Securities and Related Matters.

5.4.1  Issuance of New Securities.  On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to this Plan without further act or action under applicable law, regulation, order or rule.  Except as otherwise provided in this Plan, including as specifically provided in Section 5.4.2 hereof, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Proponents of its desire to receive instead such New Class B Common Stock by the date announced by the Proponents in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing.  The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1), to be filed with the Plan Supplement, sets forth the rights and preferences of the New Common Stock.  The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock.  To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares.  The New Warrant

Agreement substantially in the form of Exhibit 1.1.141 hereto, to be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants. The issuance of the New Common Stock and the New Warrants and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of this Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

5.4.2    Distribution of New Common Stock and New Warrants.

(a)    Foreign Ownership Certification.  Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to this Plan will be required (1) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (2) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of the Proponents, confirm the absence of any changes. Notwithstanding anything else to the contrary in this Plan, any such Holder that fails to provide (i) the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, (ii) an amended Foreign Ownership Certification if one is required, (iii) a Foreign Ownership Certification that is reasonably satisfactory to the Proponents or (iv) a timely confirmation, if required, that its foreign ownership and voting rights percentages have not changed, may be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants as set forth in Section 5.4.2(c).

(b)    Media Ownership Certification.  Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to this Plan may be required to provide a Media Ownership Certification by the deadline established by the Bankruptcy Court, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder.  Any such Holder that fails to provide the Media Ownership Certification by the deadline established by the Bankruptcy Court or that does not do so to the reasonable satisfaction of the Proponents may be allocated New Class B Common Stock in lieu of New Class A Common Stock as set forth in Section 5.4.2(d) at the discretion of the Proponents.

(c)    Foreign-Owned or Controlled Entities.  Notwithstanding anything else to the contrary in this Plan, Reorganized Tribune shall issue (i) New Warrants in lieu of New Common Stock, (ii) New Common Stock or (iii) a combination of New Warrants and New Common Stock (in lieu of only New Common Stock or only New Warrants), to any Holder of a Claim that is eligible to receive New Common Stock

under this Plan and that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with Section 5.4.2(a) herein), is (or is deemed to be pursuant to Section 5.4.2(a)) more than twenty five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to section 310(b) of the Communications Act. Such issuance of New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock to such Holders shall be pursuant to an allocation mechanism to be determined by the Proponents or Reorganized Tribune that, based on the aggregated results of the Foreign Ownership Certifications, ensures compliance with section 310(b) of the Communications Act.

(d)    Entities with Conflicting Media Interests.  Reorganized Tribune, in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock to any Holder of a Claim that is eligible to receive a distribution of New Common Stock under this Plan to ensure that such Holder will hold, in the aggregate (including with entities under common ownership or control) less than five percent (5%) of the voting rights of Reorganized Tribune, if Reorganized Tribune determines, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with Section 5.4.2(b) herein), that such Holder has other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to this Plan.

(e)    Holders of Five Percent (5%) or More of New Class A Common Stock.  If any Holder of a Claim is eligible under this Plan to receive New Class A Common Stock such that, upon the Effective Date or such other deadline established by the Bankruptcy Court, such Holder would receive five percent (5%) or more of the shares of New Class A Common Stock (for any reason, including, but not limited to, as a result of the distribution of New Warrants or the distribution of New Class B Common Stock in lieu of New Class A Common Stock in accordance with Sections 5.4.2(c) or 5.4.2(d)), and such ownership has not been disclosed in the FCC Applications and approved by the FCC, then Reorganized Tribune shall be entitled to issue to such Holder as many shares of New Class B Common Stock in lieu of shares of New Class A Common Stock as Reorganized Tribune deems necessary to ensure compliance with the Communications Act or the FCC's rules and/or to avoid substantial delay in obtaining the FCC Approval.

(f)    Distributions.  On or as soon as reasonably practicable after the applicable Distribution Date, all of the shares of the New Common Stock and New Warrants to which any Holder of a Claim shall become entitled pursuant to this Plan shall be transferred by delivery of one or more certificates representing such shares as described herein or issued in the name of such Holder or DTC or its nominee or nominees in accordance with DTC's book-entry exchange procedures, as contemplated by Section 7.7.2, subject to the terms and conditions of this Plan.  In the period after the Effective Date and pending distribution of the New Common Stock to any Holder of an Allowed Claim entitled to receive such distribution, such

Holder shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such Holder's New Common Stock (including receiving any proceeds of any permitted transfer of such New Common Stock), and to exercise all other rights in respect of the New Common Stock (so that such Holder shall be deemed for tax purposes to be the owner of the New Common Stock issued in the name of such Holder).

5.5    Reporting Requirements Under Securities Exchange Act of 1934 and Listing of New Class A Common Stock on Securities Exchange or Quotation System.

Reorganized Tribune shall use its reasonable best efforts to become a reporting company under section 12 of the Securities Exchange Act of 1934, as amended, as promptly as practicable after the Effective Date and shall maintain all necessary staff, operations and practices in order to be a public reporting company.  In addition, Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the New York Stock Exchange or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so.  Persons receiving distributions of New Class A Common Stock, by accepting such distributions, will have agreed to cooperate with Reorganized Tribune's reasonable requests to assist Reorganized Tribune in its efforts to list the New Class A Common Stock on the New York Stock Exchange or for quotation in the NASDAQ stock market, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized Tribune who satisfy the independence and other requirements of the New York Stock Exchange or for quotation in the NASDAQ stock market, as applicable.

5.6    New Senior Secured Term Loan Agreement.

5.6.1  Subject to the terms of this Section 5.6, if the Step One Proponents and the Debtors have not elected to have the Reorganized Debtors replace the New Senior Secured Term Loan in its entirety with distributions of Cash, on the Effective Date, (a) Reorganized Tribune, as borrower, (b) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Step One Proponents in consultation with the Debtors), as guarantors, (c) the administrative agent party thereto, and (d) the Holders of Claims receiving a distribution of the New Senior Secured Term Loan under this Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement.  If issued, the New Senior Secured Term Loan shall (i) be guaranteed by the U.S. subsidiaries of Reorganized Tribune (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Step One Proponents in consultation with the Debtors) (ii) be secured by certain assets of Reorganized Tribune and the guarantors thereof subject to specified exceptions and customary intercreditor arrangements, (iii) have interest payable in Cash quarterly, (iv) have principal payable in Cash quarterly, with the unpaid balance payable on the final maturity date thereof, (v) mature on the fifth

anniversary of the Effective Date, (vi) include usual and customary affirmative and negative covenants for term loan facilities of this type and (vii) be repayable by Reorganized Tribune at any time prior to scheduled maturity without premium or penalty.  The New Senior Secured Term Loan Agreement shall contain terms as set forth in <u>Exhibit 5.6</u> to be filed with the Plan Supplement.

     5.6.2  To the extent that replacement financing is available on commercially reasonable terms, the Step One Proponents and the Debtors may elect to have the Reorganized Debtors distribute Cash in the amount of all or part of the initial principal amount of the New Senior Secured Term Loan in lieu of all or such part of the New Senior Secured Term Loan to Holders of Allowed Claims receiving the New Senior Secured Term Loan under this Plan.  If the Step One Proponents and the Debtors so elect, the relevant Reorganized Debtors, as applicable, are hereby authorized, without any requirement of further action by the security holders or directors of the Debtors or Reorganized Debtors, to make such repayment including through the issuance of new indebtedness; <u>provided</u>, <u>however</u>, that any such Cash distribution shall be distributed Pro Rata to Holders of Allowed Claims that otherwise would have received the New Senior Secured Term Loan.

    5.7   <u>Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors</u>.

    Subject to <u>Section 5.2</u>, after the Effective Date, the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of this Plan.  Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Debtors and their Estates, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with this Plan (but excluding the Preserved Causes of Action), shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

    5.8   <u>Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests</u>.

     5.8.1  Except as otherwise provided for herein, as of the Effective Date, all (a) Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, notes issued

under the Loan Agreements, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds (with the exception of surety bonds outstanding), indentures (including the Indentures), stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under this Plan shall be cancelled, and (b) all amounts owed by and the obligations of the Debtors under any agreements, credit agreements, guaranty agreements, stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, indentures (including the Indentures) or certificates of designation governing the Loan Claims, Loan Guaranty Claims, Senior Notes, Swap Claim, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims against or Interests in a Debtor that are Impaired under the Plan shall be discharged.  In addition, as of the Effective Date, all Old Common Stock and other Tribune Interests that have been authorized to be issued but that have not been issued shall be deemed cancelled and extinguished without any further action of any party.  Notwithstanding anything to the contrary herein, the obligations of parties to the Loan Agreements and the Loan Guaranty Agreements that are not Reorganized Debtors or Subsidiary Non-Debtors shall not be discharged or limited in any way.

     5.8.2  Notwithstanding the foregoing provisions of this <u>Section 5.8</u> and anything contained elsewhere in this Plan, but subject to <u>Section 5.8.1</u>, (x) the Indentures shall continue in effect solely to the extent necessary to allow the Reorganized Debtors and the Indenture Trustees to make distributions pursuant to the Plan under the respective Indentures and for the applicable Indenture Trustee to perform such other functions with respect thereto and assert any rights preserved under subsection (z) of this <u>Section 5.8.2</u>; (y) the Loan Agreements shall continue in effect (i) until the Resolution of the Sharing Provision Dispute, (ii) to the extent necessary to allow the Reorganized Debtors and the Disbursing Agent to make distributions pursuant to the Plan and perform such other functions in connection with this Plan as the applicable Loan Agent shall deem reasonably necessary or appropriate, and (iii) for all purposes with respect to Assigned Senior Loan Guaranty Claims (if any); and (z) nothing herein shall waive, release, or impair any rights, claims or interests, if any, that any Indenture Trustee may have under the applicable Indenture or otherwise or that any other party acting in a representative capacity may have (subject to the limitations imposed pursuant to <u>Section 7.3.2</u>) to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder to the Holders of Claims for which such party is a representative, whether such rights, claims or interests are in the nature of a charging lien or otherwise, all of which rights, claims and interests expressly are preserved.  Except as otherwise provided herein, upon cancellation of the applicable Indenture, the respective Indenture Trustee shall be relieved of any obligations as Indenture Trustee under such Indenture.  Except as expressly provided in this Plan, neither the Debtors nor the Reorganized Debtors shall have any obligations to any Indenture Trustee or Loan Agent for any fees, costs or expenses.  The applicable Loan Agents shall each

fully cooperate with the Disbursing Agent and provide all information and other assistance required by the Disbursing Agent to make the distributions under the Plan.

5.8.3  Notwithstanding any other provision of this Plan, the indemnification or guaranty obligations of the Debtors contained in (A) that certain Indemnity Agreement between CSC Holdings, Inc., NMG Holdings, Inc. and Tribune dated July 29, 2008; (B) that certain Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Credit Agreement Loans (as defined therein) and the Private Placement Notes (as defined therein); and (C) that certain Subordinated Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Loans (as defined therein) shall continue in full force and effect.

5.9  <u>Cancellation of Liens and Guaranties</u>.

Except as otherwise provided in this Plan, on the Effective Date, any Lien securing any Secured Claim (other than a Lien securing any Other Secured Claim that is Reinstated pursuant to this Plan) shall be deemed released and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).  In addition, it is a condition to the release, cancellation and extinguishment of the Senior Loan Guaranty Claims against the Guarantor Non-Debtors that all Bridge Loan Guaranty Claims shall be concurrently released, extinguished and cancelled.  The consummation of this Plan shall effect and constitute a full and final release, extinguishment and cancellation of any and all Senior Loan Guaranty Claims and any and all Bridge Loan Guaranty Claims against Guarantor Non-Debtors.

5.10  <u>Exit Facility</u>.

On the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

5.11  <u>Equity Incentive Plan</u>.

At the discretion of the Board of Directors of Reorganized Tribune, after the Effective Date the Reorganized Debtors may adopt an Equity Incentive Plan for the purpose of granting awards over time to directors, officers and employees of Reorganized Tribune and the other Reorganized Debtors.  Stock awarded pursuant to the Equity Incentive Plan shall not exceed five percent (5%) of the New Common Stock on a fully diluted basis.

5.12 <u>Sources of Cash for Plan Distributions</u>.

Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to this Plan may be obtained from existing Cash balances, the operations of the Debtors or the Reorganized Debtors, sales of assets or the Exit Facility.  Subject to <u>Section 5.1</u>, the Reorganized Debtors may also make such payments using Cash received from their Affiliates through the Reorganized Debtors' consolidated cash management systems.

5.13 <u>Initial Funding of the Litigation Trust and the Creditors' Trust</u>.

On the Effective Date, Reorganized Tribune, as lender, and the Litigation Trust and the Creditors' Trust, as borrowers, shall become parties to the Trusts' Loan Agreement, substantially in the form annexed hereto as <u>Exhibit 5.13</u>, both jointly and severally liable for the full repayment of the Trusts' Loan.  The Trusts' Loan Agreement shall provide for a delayed draw term loan in the aggregate principal amount of $20 million, which shall contain terms and conditions to be agreed upon by the Proponents, including, (a) the Trusts shall be prohibited from reborrowing the principal amount thereof, and (b) the Trusts shall not make any distributions on account of Litigation Trust Interests or Creditors' Trust Interests until the Trusts' Loan has been repaid in full in accordance with the terms of the Trusts' Loan Agreement and the commitments thereunder shall have terminated.

5.14 <u>Additional Transactions Authorized Under the Plan</u>.

On or prior to the Effective Date, the Debtors, with the consent of the Proponents, shall be authorized to take any such actions as may be necessary or appropriate to have Claims or Interests Reinstated or render Claims or Interests Unimpaired to the extent provided herein.  On the Effective Date, the Agents are authorized and directed to take such actions as are necessary or appropriate to effect all transactions specified or referred to in or provided for under this Plan.

5.15 <u>Settlement of Claims and Controversies</u>.

5.15.1 <u>Settlement Under the Plan</u>. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Released Claims against the Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve such compromise and settlement, to release all of the Released Claims belonging to the Tribune Entities, the Debtors' Estates and any other Person that is deemed to have given a release pursuant to <u>Section 11.2</u> of this Plan against each and every and all Released Parties (the "<u>Settlement</u>").  Distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Settlement.  Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Settlement and the Bankruptcy Court's finding that the Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

5.15.2    Intercompany Claims Settlement Under the Plan.  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the Plan implements and incorporates by reference the Intercompany Claims Settlement, and the Plan constitutes a request to authorize and approve the compromise and settlement of all Intercompany Claims pursuant to the Intercompany Claims Settlement.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Intercompany Claims Settlement and the Bankruptcy Court's finding that the Intercompany Claims Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

5.15.3    Implementation of Retiree Claimant Settlement.  Pursuant to Bankruptcy Rule 9019, the Plan implements and incorporates by reference the terms of the Retiree Claimant Settlement Agreement, which is attached hereto as Exhibit 5.15.3, including, without limitation, the allowance of the Claims of certain Retiree Claimants.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

5.16  Preservation of Rights of Action and Settlement of Ordinary Litigation Claims.

Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with this Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Debtors and their Estates shall retain the Ordinary Litigation Claims.  The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Ordinary Litigation Claims or any other claims, rights of action, suits or proceedings that any Debtor or Estate may hold against any Person.

5.17  FCC Applications.

The Debtors, the Senior Lenders and any other Holders of Claims that are eligible to receive New Common Stock shall use their best efforts to cooperate in diligently pursuing and in taking all reasonable steps necessary to obtain the requisite FCC Approvals and shall provide such additional documents or information as are reasonably requested by the Debtors or the Proponents or that the Debtors or the Proponents reasonably deem necessary for the FCC's review of such applications.

## ARTICLE VI:  TREATMENT OF
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1   Assumption of Executory Contracts and Unexpired Leases.

6.1.1  On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 hereto or is set forth on Exhibit 6.3, to be filed with the Plan Supplement, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to this Article VI shall revert in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of this Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

6.1.2  Subject to the terms of Article VI and Section 6.1.1 herein and except for any Customer Program otherwise designated on Exhibit 6.3, all refund and subscriber credit programs or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective as of the Effective Date and the proposed cure amount with respect to each shall be zero dollars.  Nothing contained in this Section 6.1.2 shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person.  Except with respect to any Customer Programs included on Exhibit 6.3 to be filed with the Plan Supplement, as a result of the deemed assumption of the Debtors' refund, subscriber credit and other obligations under the Customer Programs to subscribers and former subscribers pursuant to this Section 6.1.2, all Proofs of Claim on account of or in respect of any such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court, and the Debtors' Claims Agent shall be authorized as of the Effective Date to expunge such Proofs of Claim from the claims register.

6.2   Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The proposed cure amount for any executory contract or unexpired lease that is assumed pursuant to this Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court as part of the Plan Supplement or other pleading approved by the Step One Proponents and the Debtors.  Any monetary amounts by which each executory contract and

unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed conditionally assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

     6.3   Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 to be filed with the Plan Supplement, shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract or lease listed on Exhibit 6.3 shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.  The Debtors reserve their right to amend Exhibit 6.3 to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto.  Listing a contract or lease on Exhibit 6.3 shall not constitute an admission by a Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

     6.4   Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

     6.5   Compensation and Benefit Programs.

Except as set forth in Article II.F.3 of the specific portion of the Disclosure Statement and such other Employee Benefit Plans as may be disclosed in the Plan Supplement, the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify or terminate any such Employee Benefit Plan either prior to or after the Effective Date.

6.6   Collective Bargaining Agreements.

Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order.  Upon the Effective Date, with respect to any Collective Bargaining Agreement entered into by the Debtors that has expired by its terms, the rights and obligations, if any, of the Reorganized Debtors with respect to such expired agreement shall not be affected by the Confirmation Order, and the Reorganized Debtors shall continue to have the same rights and obligations with respect to any such expired agreement as the Debtors had immediately prior to the entry of the Confirmation Order and any such rights and obligations of the Reorganized Debtors under any such expired agreement shall continue to be determined in accordance with applicable federal labor law.

6.7   Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by such Debtors to the Reorganized Debtors, including any successor to any Debtor or Reorganized Debtor after giving effect to the Restructuring Transactions, on the Effective Date.

6.8   Termination of ESOP.

Upon the Effective Date, the ESOP shall be deemed terminated in accordance with its terms, and the amount of unpaid principal and interest remaining on the ESOP Note dated April 1, 2007 shall be forgiven pursuant to section 6.3 of the ESOP Loan Agreement by and between Tribune and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust dated April 1, 2007.  In connection with Tribune's forgiveness of the balance due under the ESOP Note, the Proponents will seek, in their sole discretion, (1) confirmation that Tribune has a right under the ESOP Plan and ESOP Note to forgive the ESOP's obligations; (2) confirmation that Tribune's forgiveness of any post-petition payments due from the ESOP in connection with the ESOP Note, including, without limitation, the payment due on or about April 1, 2009, was in compliance with the ESOP Note and ESOP Plan and satisfied Tribune's obligations, if any, under the ESOP Plan to make a contribution to the ESOP during the relevant time period; (3) a determination of the amount of the balance of the ESOP Note being forgiven, the value of any obligations of the ESOP owed to Tribune under the ESOP Note, and the legal effect of the forgiveness of the ESOP Note.  Approval of this Plan is not conditioned upon these determinations, but these determinations may be sought in connection with this Plan.

6.9   Insurance Policies.

Insurance policies issued to, or insurance agreements entered into by, any of the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or

officers' conduct) shall continue in effect after the Effective Date.  To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement.  To the extent that the Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Proponents reserve the right to seek the rejection of such insurance policy or agreement or other available relief.

### ARTICLE VII:  PROVISIONS GOVERNING DISTRIBUTIONS

7.1  General.

Unless the Holder of an Allowed Claim or Allowed Interest against any of the Debtors and the Reorganized Debtors agree to a different distribution date or except as otherwise provided herein or as ordered by the Bankruptcy Court, (1) distributions to be made on account of Claims or Interests that are Allowed as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable and (2) distributions to be made on account of Claims or Interests that become Allowed after the Effective Date shall be made on the succeeding Quarterly Distribution Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

7.2  Distributions for Certain Claims.

7.2.1  Distributions to Holders of Other Parent Claims.

(a)  Other Parent Claims Reserve.  On or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Other Parent Claims Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed Other Parent Claims after the Effective Date.  The amount of Cash contributed to the Other Parent Claims Reserve(s) shall be equal to the amount of Cash necessary to satisfy the distributions required to be made pursuant to this Plan based upon (i) whether Class 1F Claims are entitled to receive the Other Parent Claim Gift Distribution in accordance with Section 3.2.7(c) and (ii) the Face Amount of Disputed Other Parent Claims that may be entitled to receive a distribution of Cash if such Disputed Claims are subsequently Allowed Other Parent Claims.

(b)  Distributions On Account of Disputed Claims Once Allowed.  On each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Cash, in accordance with the terms of the Plan, from the Other Parent Claims Reserve(s) to each Holder of a Disputed Claim that has become an Allowed Other Parent Claim

during the preceding calendar quarter and that is entitled to receive such a distribution.  On or as soon as practicable after the Final Distribution Date, after distributions are made to Holders of Disputed Claims that have become Allowed Other Parent Claims during the preceding calendar quarter, any Cash remaining in the Other Parent Claims Reserve(s) shall be distributed Pro Rata to the Holders of Allowed Senior Noteholder Claims entitled to receive a distribution under Section 3.2.6 of this Plan, Holders of Allowed Other Parent Claims entitled to receive a distribution under Section 3.2.7 of this Plan, Holders of Allowed Step One Senior Loan Claims entitled to receive a distribution under Section 3.2.3 of this Plan, Holders of Allowed Step Two Senior Loan Claims entitled to receive a distribution under Section 3.2.4 of this Plan, and Holders of Allowed Bridge Loan Claims entitled to receive a distribution under Section 3.2.5 of this Plan; provided, however, if Holders of Allowed Other Parent Claims are entitled to receive the Other Parent Claim Gift Distribution, (a) Holders of Step One Senior Loan Claims shall be entitled to receive a Pro Rata amount equal to the Gift Amount Percentage of such remaining Cash plus a Pro Rata amount equal to the Estate Amount Percentage and (b) Holders of Allowed Senior Noteholder Claims, Allowed Other Parent Claims, Allowed Step Two Senior Loan Claims and Allowed Bridge Loan Claims, shall only be entitled to receive a Pro Rata amount equal to the Estate Amount Percentage of such remaining Cash (the "Disputed Parent Claim Distribution Procedure").

    7.2.2  Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors.

    (a)  Subsidiary GUC Reserve.  If pursuant to Section 3.3.6(b) of this Plan, Holders of Allowed Claims in Classes 2E through 111E shall receive their Pro Rata share of $150 million, in the case of entitlement only to the Subsidiary GUC Distribution, $225 million, in the case of entitlement to the Subsidiary GUC Gift Distribution, or any other amount, rather than receiving payment in full in Cash, on or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Subsidiary GUC Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed General Unsecured Claims against a Filed Subsidiary Debtor after the Effective Date.  The amount of Cash contributed to the Subsidiary GUC Reserve(s) shall be equal to the amount of Cash necessary to satisfy the distributions required to be made pursuant to this Plan based upon (i) whether Classes 2E through 111E  are entitled to receive the General Unsecured Gift Distribution in accordance with Section 3.3.6(b) and (ii) the Face Amount of Disputed Claims that may be entitled to receive a distribution of Cash if such Disputed Claims are subsequently Allowed General Unsecured Claims against such Debtors.

    (b)  Distributions On Account of Disputed Claims Once Allowed.  If one or more Subsidiary GUC Reserves are established, on each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Cash, in accordance with the terms of this Plan, from the Subsidiary GUC Reserve(s) to each Holder of a Disputed Claim that has become an Allowed General Unsecured Claim against a Filed Subsidiary Debtor during the preceding calendar quarter and that is entitled to

receive such a distribution.  In addition, in the event that Holders of Allowed General Unsecured Claims against the Filed Subsidiary Debtors are only entitled to receive the Subsidiary GUC Distribution (and not the Subsidiary GUC Gift Distribution) on the first and third Quarterly Distribution Dates of each calendar year, the Debtors shall make additional interim distributions from any excess Cash in the Subsidiary GUC Reserve(s) to such Holders of Allowed General Unsecured Claims if the Reorganized Debtors determine, in their sole discretion, that (1) the amount of such excess Cash equals or exceeds ten percent of the aggregate Face Amount of such Allowed General Unsecured Claims against Filed Subsidiary Debtors and (2) the aggregate amount of Cash held in the Subsidiary GUC Reserve(s) after such distribution will equal or exceed the maximum amount that the Reorganized Debtors reasonably estimate is required to satisfy any remaining Disputed Claims that subsequently become Allowed General Unsecured Claims against such Filed Subsidiary Debtors after such Distribution Date.  On or as soon as practicable after the Final Distribution Date, after initial distributions are made to Holders of Disputed Claims that have become Allowed General Unsecured Claim against a Filed Subsidiary Debtor during the preceding calendar quarter, in the event that Holders of Allowed General Unsecured Claims against Filed Subsidiary Debtors are only entitled to receive the Subsidiary GUC Distribution and Holders of such Allowed Claims have not been paid in full, any Cash remaining in the Subsidiary GUC Reserve(s) shall be distributed Pro Rata to such Holders; provided, however, that no Holder of an Allowed General Unsecured Claims shall receive more than payment in full of the principal amount of such Claim and no Holder of an Allowed General Unsecured Claim shall receive post-petition interest.  If there is any Cash remaining in the Subsidiary GUC Reserve(s) after the foregoing distributions, such Cash shall be distributed Pro Rata to Holders of Allowed Step One Senior Loan Guaranty Claims entitled to receive a distribution under Section 3.3.3, Holders of Allowed Step Two Senior Loan Guaranty Claims entitled to receive a distribution under Section 3.3.4, and Holders of Allowed Bridge Loan Guaranty Claims entitled to receive a distribution under Section 3.3.5; provided, however, if Holders of Allowed General Unsecured Claims against Filed Subsidiary Debtors are entitled to receive the Subsidiary GUC Gift Distribution, (a) Holders of Step One Senior Loan Guaranty Claims shall be entitled to receive a Pro Rata amount equal to the Gift Amount Percentage of such remaining Cash plus a Pro Rata amount equal to the Estate Amount Percentage and (b) Holders of Step Two Senior Loan Guaranty Claims and Holders Bridge Loan Guaranty Claims shall only be entitled to receive a Pro Rata amount equal to the Estate Amount Percentage of such remaining cash.

7.3    Special Provisions Governing Distributions to Holders of Senior Loan Claims and Senior Loan Guaranty Claims.

7.3.1    General.  Other than as specifically set forth in this Plan, distributions made on account of Allowed Senior Loan Claims and Senior Loan Guaranty Claims shall be made Pro-Rata by the Disbursing Agent directly to the Holders of Allowed Step One Senior Loan Claims, Holders of Allowed Step One Senior Loan Guaranty Claims and the Sharing Provision Reserve.  In order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all

distributions that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall be distributed Pro-Rata to the Holders of Allowed Step One Senior Loan Guaranty Claims and the Sharing Provision Reserve, and no distribution shall be provided to Holders of Allowed Bridge Loan Guaranty Claims.

       7.3.2      <u>Sharing Provision Reserve</u>.  On the Effective Date, the Sharing Provision Reserve shall be created and established pursuant to the Sharing Provision Reserve Agreement.  All Step Two-LBO Related Causes of Action to avoid, disallow or subordinate the Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims shall be transferred to the Sharing Provision Reserve, provided that the Litigation Trustee shall have the authority and responsibility to prosecute such actions, subject to the Sharing Provision Reserve Agreement.  The Sharing Provision Reserve shall hold the Sharing Provision Reserve Amount until the Sharing Provision Dispute is Resolved and/or the Resolution of the Step Two LBO-Related Causes of Action against Holders of Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims.  Upon the Resolution of the Sharing Provision Dispute and/or Resolution of the Step Two LBO-Related Causes of Action against Holders of Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims, the Sharing Provision Reserve will be distributed in accordance with the Sharing Provision Reserve Agreement.  For the avoidance of doubt, the Holders of Swap Claims will not be subject to the Sharing Provision Dispute or the Sharing Provisions.

7.4   <u>Interest on Claims</u>.

     Except as otherwise specifically provided for in this Plan (including, without limitation, <u>Section 3.4.3</u> of this Plan), the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the Final DIP Order), or required by applicable bankruptcy law, post-petition interest shall not be paid on any Claims, and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued for federal income tax purposes.  Any post-petition interest that has been accrued for federal income tax purposes shall be cancelled as of the Effective Date.

7.5   <u>Distributions by Disbursing Agent</u>.

       7.5.1  Other than as specifically set forth in this Plan, the Disbursing Agent shall make all distributions required to be made under the Plan.  The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to act as the Disbursing Agent or to assist in or make the distributions required by this Plan.

       7.5.2  Other than as specifically set forth in this Plan, the distributions to be made on account of Senior Noteholder Claims shall be made in accordance with the terms of the particular Indenture or in accordance with this Plan where such Indenture is silent.

7.6   <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>.

       7.6.1  <u>Delivery of Distributions in General</u>.  Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such

addresses are superseded by Proofs of Claim or transfers of claim filed pursuant to Bankruptcy Rule 3001.

### 7.6.2 Undeliverable and Unclaimed Distributions.

(a) General.  The Reorganized Debtors and the Disbursing Agent shall have no duty to make distributions to any Holder of an Allowed Claim with an undeliverable address as determined by any undeliverable or returned notice to the Debtors since the commencement of the Chapter 11 Cases unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address prior to the Distribution Record Date.  If the distribution to any Holder of an Allowed Claim or Interest is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address.

(b) Non-Negotiated Check Voucher Distributions.  Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) calendar days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 90-calendar-day period.  After such date, such Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

(c) Failure to Claim Undeliverable Distributions.  Except as otherwise expressly provided in this Plan, any Holder of an Allowed Claim or Interest that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property.  In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Any New Common Stock or New Warrants held for distribution on account of such Claim shall be canceled and of no further force or effect.  Nothing contained in this Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim or Interest.

## 7.7 Record Date for Distributions.

7.7.1  With the exception of Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim or Interest that occurs after the close of business

on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims or Interests (including Holders of Claims and Interests that become Allowed after the Distribution Record Date) that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date.  With the exception of the Senior Noteholder Claims, the Reorganized Debtors and the Disbursing Agent shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

7.7.2  Unless otherwise set forth in the Confirmation Order, the Proponents shall not establish a record date for distributions to Holders of Senior Noteholder Claims or PHONES Notes Claims.  Distributions to Holders of such Claims held through DTC shall be made by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply.  In connection with such book-entry exchange, the Reorganized Debtors will provide rate information to each Indenture Trustee, which such Indenture Trustee shall convey to DTC to effect distributions on a Pro Rata basis as provided under this Plan with respect to such Claims upon which such Indenture Trustee acts as trustee.  Subject to Section 7.5.2 of this Plan, distributions of Cash to Holders of Allowed Senior Noteholder Claims or Allowed PHONES Notes Claims shall be made to the applicable Indenture Trustees, which, in turn, shall make such distributions to the applicable Holders either through DTC or, in the case of Claims held directly by the Holder thereof, through the applicable Indenture Trustee subject to the respective rights, claims and interests, if any, that the Indenture Trustees may have under the applicable Indentures or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise.  Distributions of other consideration to Holders of Senior Noteholder Claims or PHONES Notes Claims shall be made by the Disbursing Agent either through DTC or, in the case of Claims held directly by the Holder thereof, through the Disbursing Agent upon surrender or deemed surrender of such Holder's Senior Notes or PHONES Notes except as otherwise provided in this Plan.

7.8    Allocation of Plan Distributions Between Principal and Interest.

Except as otherwise expressly provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.9    Means of Cash Payment.

Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on, (b) automated clearing house

transfer from, or (c) wire transfer from a bank selected by the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.10  <u>Withholding and Reporting Requirements</u>.

In connection with this Plan and all distributions hereunder, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (b) no distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.  Nothing in the preceding sentence shall affect distributions under this Plan to the Senior Loan Agent, the Bridge Loan Agent, the Senior Notes Indenture Trustees or the Holders of Allowed Loan Claims, Loan Guaranty Claims or Senior Noteholder Claims.

7.11  <u>Setoffs</u>.

7.11.1  The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim (other than Allowed Claims in Classes 1C and 50C through 111 C, which under no circumstances shall be subject to set off) the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; <u>provided</u>, <u>however</u>, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

7.11.2  To the extent that any Person has either an Allowed Other Parent Claim against Tribune or an Allowed General Unsecured Claim against any of the Filed Subsidiary Debtors, in each case for indemnification, reimbursement, or contribution arising from or relating to the assertion of any claim or cause of action by the Litigation Trust, the Creditors' Trust, the Litigation Trustee or the Creditors' Trustee against such Person or any of its Related Persons, such Allowed Claim shall be setoff against any recovery by the Litigation Trust or the Creditors' Trust, as the case may be, against such Person.  For the purposes of this <u>Section 7.11.2</u>, "setoff against" shall mean that the Litigation Trust or the Creditors' Trust, as the case may be, shall either use Litigation Trust Assets or Creditors' Trust assets to pay such Claim or shall take

actions necessary to cause the release or waiver of such Claim. The Litigation Trust and the Creditors' Trust shall be authorized to object to the allowance of, and entitled to assert any claim, counterclaim, or defense of the Debtors to, any such indemnification, reimbursement, or contribution claim.

7.12 <u>Fractional Shares</u>.

No fractional shares of New Common Stock or New Warrants shall be distributed. Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New Common Stock or New Warrant or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New Common Stock or New Warrant. The total number of shares of New Common Stock or New Warrants to be distributed pursuant to this Plan shall be adjusted as necessary to account for the rounding provided for herein.

7.13 <u>De Minimis Distributions</u>.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.

7.14 <u>Special Provision Regarding Unimpaired Claims</u>.

Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

7.15 <u>Subordination</u>.

The distributions and treatments provided to Claims and Interests under this Plan take into account and/or conform to the relative priority and rights of such Claims and Interests under any applicable subordination and turnover provisions in any applicable contracts, including, without limitation, the PHONES Notes Indenture and the EGI-TRB LLC Notes, and nothing in this Plan shall be deemed to impair, diminish, eliminate or otherwise adversely affect the rights or remedies of beneficiaries (including, for the avoidance of doubt, their respective Indenture Trustees and Agents, as applicable) of any such contractual subordination and turnover provisions.

## ARTICLE VIII: PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS

8.1 <u>Objections to and Estimation of Claims</u>.

After the Effective Date, only the Reorganized Debtors and, solely to the extent provided in this Plan, the Litigation Trustee on behalf of the Litigation Trust may object to the allowance of any Claim or Administrative Expense Claim; <u>provided</u> that nothing contained in this Plan shall restrict or otherwise prohibit the Proponents from taking actions in connection with the Sharing

Provision Dispute.  After the Effective Date, the Reorganized Debtors or the Litigation Trustee shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court, and the Litigation Trustee on behalf of the Litigation Trust shall have the power and authority to allow or settle and compromise Claims as provided in <u>Article XIII</u> of this Plan.  In addition, the Reorganized Debtors or the Litigation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors and/or the Litigation Trustee shall serve and file any objections to Claims and Interests as soon as practicable, but in no event later than (a) two hundred ten (210) days after the Effective Date or (b) such later date as may be determined by the Bankruptcy Court upon a motion which may be made without further notice or hearing.

8.2    <u>Payments and Distributions on Disputed, Contingent and Unliquidated Claims and Interests and on Claims for Which Proofs of Claim are Filed</u>.

Except as provided herein, no partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim or Interest, or with respect to any Claim for which a Proof of Claim has been filed, until the resolution of such disputes or estimation or liquidation of such claims by settlement or by Final Order.  On the next Distribution Date after a disputed, contingent or unliquidated Claim or Interest becomes an Allowed Claim or Interest in an amount certain, the Holder of such Allowed Claim or Interest will receive all payments and distributions to which such Holder is then entitled under this Plan.

## ARTICLE IX:  PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS

9.1    <u>Payment of Step One Proponents' Professional Fees and Expenses</u>

Promptly upon the Effective Date, Reorganized Tribune shall pay the reasonable and documented fees and expenses of the Step One Proponents Professionals by reimbursement to the Step One Proponents and direct payment to the Step One Proponents Professionals, as applicable.

9.2    <u>Bar Date for Payment or Reimbursement of Professional Fees and Expenses and Claims for Substantial Contribution</u>.

Except as provided in <u>Section 9.1</u> of this Plan, all final requests for compensation or reimbursement of the fees of any professional employed pursuant to sections 327 or 1103 of the Bankruptcy Code or otherwise in the Chapter 11 Cases, including any Claims for making a substantial contribution under section 503(b)(4) of the Bankruptcy Code,  and the expenses of members of the Creditors' Committee must be filed and served on the Reorganized Debtors and their counsel, together with the Bankruptcy Court-appointed fee examiner, and the Office of the United States Trustee, not later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such professionals or other entities for compensation or reimbursement of expenses must be filed and served on the parties specified above in this <u>Section 9.2 </u>and the requesting professional or other entity not later than

twenty (20) days after the date on which the applicable application for compensation or reimbursement was served; provided, however, that the following protocol shall apply to the fee examiner previously appointed by the Bankruptcy Court in the Chapter 11 Cases in lieu of such twenty (20) day objection deadline:

(i)    applicants shall submit all final requests for compensation or reimbursement of fees and expenses, and any responses provided for below, in the format required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the Guidelines of the Office of the United States Trustee, and applicable orders of the Bankruptcy Court;

(ii)    if the fee examiner has any questions for any applicant, the fee examiner may communicate such questions in writing to the applicant in an initial report (an "Initial Report") within thirty (30) days after the date on which the applicable application for compensation or reimbursement was served on the fee examiner;

(iii)    any applicant who receives such an Initial Report and wishes to respond thereto shall respond within twenty (20) days after the date of the Initial Report;

(iv)    within thirty (30) days after the date on which any response to an Initial Report is served on the fee examiner (or, if no such response is served, within thirty (30) days after the deadline for serving such Initial Report has passed), the fee examiner shall file with the Court a final report with respect to each such application for compensation or reimbursement; and

(v)    within fifteen (15) days after the date of the final report, the subject applicant may file with the Court a response to such final report.

Notwithstanding the foregoing, the fee examiner and a professional may agree to extend any of the time periods set forth in items (ii) through (v) above with respect to any application filed by such professional.  In addition, notwithstanding the foregoing provisions of this Section 9.2, those professionals retained by the Debtors pursuant to that certain Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business entered by the Bankruptcy Court on January 15, 2009 [D.I. 227] shall continue to be compensated in accordance with the provisions of such Order, and shall not be subject to the final application procedures set forth in this Section 9.2.

## ARTICLE X:  CONFIRMATION AND CONSUMMATION OF THE PLAN

10.1 Conditions to Effective Date.

10.1.1  This Plan shall not become effective and the Effective Date shall not occur unless and until the Proponents concur that all of following conditions shall have been satisfied or waived in accordance with Section 10.2:

(a)  The Confirmation Order confirming this Plan, as this Plan may have been modified in accordance with the terms hereof, shall conform to this Plan in all respects and shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Proponents.

(b)   The Confirmation Order shall authorize and approve the Intercompany Claims Settlement in all respects and shall not modify the Intercompany Claims Settlement in any way or sever any component of the Intercompany Claims Settlement.

(c)   The Certificate of Incorporation and By-Laws and any amended certificates or articles of incorporation, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents of the other Debtors, as necessary and in form and substance satisfactory to the Proponents, shall have been adopted and filed with the applicable authorities of the relevant jurisdictions and shall become effective on the Effective Date in accordance with such jurisdictions' laws except to the extent that any such governing documents shall be adopted or filed after the Effective Date in connection with the Restructuring Transactions.

(d)   All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained in form and substance satisfactory to the Proponents or shall have occurred, including, if determined to be necessary by the Proponents in their discretion, a ruling from the Internal Revenue Service that the Litigation Trust and/or Creditors' Trust qualifies and will be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations, unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

(e)   The board of directors of Reorganized Tribune shall have been selected and shall have expressed a willingness to serve on the board of directors of Reorganized Tribune.

(f)   All other documents and agreements necessary to implement this Plan on the Effective Date shall have been executed and delivered in form and substance satisfactory to the Proponents and all other actions required to be taken in connection with the Effective Date shall have occurred.

(g)   All consents, approvals and waivers from the FCC that are necessary or that the Proponents deem appropriate to consummate the transactions contemplated herein and to continue the operation of the Debtors' ownership structure shall have been obtained in form and substance satisfactory to the Proponents.

(h)   The Litigation Trustee shall have executed the Litigation Trust Agreement.

(i)   The Creditors' Trustee shall have executed the Creditors' Trust Agreement.

(j)   The Sharing Provision Reserve Agreement shall have been executed by the Reorganized Debtors.

(k)   The Confirmation Order shall include the language set forth in <u>Section 11.3</u> of this Plan.

(l)   The Step One Proponents shall have determined, in their sole discretion, that the aggregate amount of Allowed Other Parent Claims shall not exceed $400,000,000, excluding (i) Allowed Other Parent Claims against Tribune for indemnification, reimbursement, or contribution arising from or relating to the assertion of any Preserved Cause of Action by the Litigation Trust or the Creditors' Trust; (ii) Allowed Other Parent Claims asserted by the PBGC as a result of termination of any Pension Plan; and (iii) Allowed Other Parent Claims arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim.

(m)   On the Effective Date all of the claims and causes of action asserted in the Committee Complaint, which shall include the Released Claims and the Preserved Causes of Action except for Disclaimed State Law Causes of Action, shall remain pending, and shall not have been dismissed or withdrawn, except to the extent expressly provided in the Plan or except for any such claims and causes of action that have been settled prior to the Effective Date.

10.2  <u>Waiver of Conditions</u>.

~~Except for the conditions set forth in Sections 10.1.1(c) and 10.1.1(k) (which may not be waived, modified or amended), each of the remaining~~<u>Each of the</u> conditions set forth in <u>Section 10.1.1</u> may be waived in whole or in part solely by agreement in writing of Step One Proponents without the need for notice or a hearing; <u>provided</u>, <u>however</u>, that the Step One Proponents may not waive any condition the waiver of which is proscribed by law.

10.3  <u>Consequences if Confirmation Order is Vacated</u>.

If the Confirmation Order is vacated, (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for herein shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases of personal property shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

### ARTICLE XI:  INJUNCTIONS, RELEASES AND DISCHARGE

11.1  <u>Discharge</u>.

(a)As of the Effective Date, except as provided in this Plan, the distributions and rights afforded under this Plan and the treatment of Claims and Interests under this Plan shall be in exchange for, and in complete discharge of, all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in Tribune.  Except as otherwise specifically provided in this Plan, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled.  Accordingly, except as otherwise provided in this Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective

Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (x) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (y) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code (or is otherwise Resolved), or (z) the Holder of a Claim based on such debt has accepted the Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Plan.  In addition, confirmation of the Plan shall, as of the Effective Date, authorize the release of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors.

(b)As of the Effective Date, except as provided in this Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, debts, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date and from asserting against the Guarantor Non-Debtors any Senior Loan Guaranty Claims or Bridge Loan Guaranty Claims.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.

11.2 <u>Discharge Injunction</u>.

Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of this Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights:  (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of this Plan.

11.3 <u>Releases</u>.

11.3.1 <u>Releases by Debtors and Estates</u>.  Except for the Preserved Causes of Action, on the Effective Date and effective simultaneously with the effectiveness of

this Plan, the Reorganized Debtors on their own behalf and as representatives of their respective Estates and any Person seeking to exercise the rights of the Debtors' Estates (including, without limitation, any successor to the Debtors, the Litigation Trustee on behalf of the Litigation Trust, the Creditors' Trustee on behalf of the Creditors' Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), release unconditionally and hereby cause the Subsidiary Non-Debtors to release unconditionally, and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the Released Step One LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement or the Restructuring Transactions (the "Debtor Released Claims"). Except as the Debtors may otherwise provide prior to the Confirmation Date, the releases contained in this Section shall not apply to or otherwise affect the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the Released Step One LBO-Related Causes of Action. On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Step One Senior Loan Guaranty Claim against the Guarantor Non-Debtors, and the other Released Parties a release of scope equivalent to the release provided by the Debtors hereunder in consideration for the Guarantor Non-Debtor Release contemplated hereby.

11.3.2  <u>Releases by Holders of Claims and Interests</u>.  Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each Person (a) that has voted to accept the Plan ~~or is deemed to have accepted the Plan~~ and has not opted out from granting the releases in this <u>Section 11.3.2</u>, (b) that has voted to reject the Plan but has opted to grant the releases in this <u>Section 11.3.2</u>, ~~or (e~~<u>(c) that is deemed to accept the Plan and has been provided an opportunity but has not opted out of granting the releases in this Section 11.3.2, or (d</u>) who otherwise agrees to provide the releases set forth in this <u>Section 11.3.2</u>, shall be deemed to have unconditionally released each and all of the current and former Holders of Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the Step One LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim),

81

whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Released Claims"); provided, however, that nothing in this Section 11.3.2 shall be construed as a release of the Preserved Causes of Action or any Claims against non-Debtors arising under the Employee Retirement Income Security Act of 1974 held or assertable by the United States Department of Labor or any participant, beneficiary or fiduciary of any ESOP or any other ERISA-covered plan against ERISA-covered plan fiduciaries; provided further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts or acted as agent or indenture trustee that are not themselves Released Parties; provided further that no agent, arranger or indenture trustee shall be deemed to have released any lenders or noteholders for which it acts or acted as agent or indenture trustee from any obligations under the relevant instruments.  Furthermore, notwithstanding the foregoing and except as provided in Section 11.3.5 hereof with respect to the Guarantor Non-Debtors, such release, waiver and discharge shall not operate as a release, waiver or discharge of any contractual obligation of any non-Debtor party due to any other non-Debtor party.

11.3.3  Failure To Grant Release.  Any Holder of a Claim or Interest that has timely submitted to the Debtors or filed with the Court a Ballot or an election form pursuant to Section 11.3.2(c) opting not to grant the releases set forth in Section 11.3.2 shall not receive the benefit of the releases set forth in Section 11.3.2 (even if for any reason otherwise entitled).

11.3.4  Injunction Related to Releases.  Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan are permanently enjoined from taking any of the following actions on account of or based upon the Released Claims:  (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of this Plan.

11.3.5  Release of Guarantor Non-Debtors from Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims.  All Holders of Senior Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be

unconditionally relieved from any liability to the Senior Lenders on account of the Senior Loan Guaranty Claims; provided that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of this Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Step One Proponents, as of the Effective Date, of each of the Holders of Step One Senior Loan Guaranty Claims of and from any and all Debtor Released Claims, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of this Plan. Pursuant to Bankruptcy Rule 9019 and/or 11 U.S.C. § 1123(b)(3), the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Guarantor Non-Debtor Release and adequate factual findings that the Guarantor Non-Debtor Release is:  (1) fair, equitable and reasonable; (2) necessary and essential to the Debtors' successful reorganization; (3) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors; (4) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (5) consistent with public policy and due process principles.  Notwithstanding the foregoing, in the event that the Guarantor Non-Debtor Release set forth in this Section 11.3.5 does not become or remain effective for any reason whatsoever, all Senior Loan Guaranty Claims against the Guarantor Non-Debtors and any and all rights of subordination in respect of the Bridge Loan Guaranty Agreement (the "Assigned Senior Loan Guaranty Claims") shall and shall be deemed to have been assigned and transferred as of the Effective Date by the Senior Lenders and the Senior Loan Agent to the Senior Loan Guaranty Claim Assignee.

11.3.6  Preserved Causes of Action.  The Preserved Causes of Action are expressly preserved and shall not be subject to the releases set forth in Section 11.3.1 or 11.3.2 of this Plan; provided, that the Preserved Causes of Action shall be subject to the provisions of Section 11.3 of this Plan.  In addition, any claims, rights or causes of action related to setoffs against amounts owing to the Debtors are expressly preserved and are not subject to the releases set forth in this Plan; provided that, except as set forth in Section 7.11.2, in no event shall the Debtors or the Disbursing Agent setoff against any distributions under this Plan to Holders of Allowed Claims in Classes 1C(i), 1D and 50C(i) through 111C(i) (other than any distributions to MSCS with respect to the Morgan Stanley Claims).

11.3.7  Non-release of Certain Defined Benefit Plans.  Notwithstanding anything to the contrary herein, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Plan (including this Section 11.2), the entry of

the Confirmation Order or the Chapter 11 Cases.  Notwithstanding anything to the contrary herein, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the Employee Retirement Income Security Act of 1974, as amended, the controlled group members.

11.4 <u>Bar Order</u>.

The Confirmation Order shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, and subject to <u>Section 10.2</u> of this Plan, shall be a condition to the Effective Date):

"ORDERED that all (i) Released Parties; (ii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under Section 1126(0-(g) of the Bankruptcy Code; and (iii) any other Persons that hold, have held or may hold a Claim or other debt or liability, or an Interest or other right of an equity holder, against, in or relating to any of the Debtors or their respective estate (collectively, the "<u>Barred Persons</u>"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Barred Person is the liability of the Barred Person to the Plaintiff (as defined below)), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims or the Preserved Causes of Actions, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "<u>Barred Claims</u>").  If a court or tribunal determines that Barred Claims exist that would have given rise to liability of any Released Party to a Barred Person but for this Order, the Barred Persons are also entitled to the judgment reduction provisions set forth herein.  This Order (the "<u>Bar Order</u>") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further

ORDERED that in the event any Person asserting a Preserved Cause of Action (a "<u>Plaintiff</u>") obtains a judgment or arbitration award (a "Judgment") against any Barred Person with respect to one or more Preserved Causes of Action based upon, arising from, or related to the facts, allegations, or transactions underlying any Released Claims, then the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained.  Such court or tribunal shall determine whether the Judgment gives rise to Barred Claims on which Released Parties would have been liable to the Barred Persons in the absence of this Bar Order.  If the court or tribunal so determines, it shall reduce such Judgment against such Barred Person in an amount equal to (a) the amount of the Judgment against any such Barred Person times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties that would have been liable on a Barred Claim in the absence of this Bar Order.  In the event that Judgment shall be entered against any Barred Person without a prior or concurrent determination

as to the existence of a Barred Claim and the Released Party's liability on such Barred Claim in the absence of this Bar Order (and, in the event of such a determination, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and it is further

ORDERED that nothing herein shall prejudice or operate to preclude the rights of any Barred Person to assert claims, other than Barred Claims, against any party. For the avoidance of doubt, the provisions of this Bar Order, including the judgment reduction provisions set forth herein, shall not apply to (i) any contractual indemnity; (ii) any claim for which a court determines joint liability does not exist as a matter of law, equity or fact as between any Barred Person and any Released Party; or (iii) any claims for non-contractual indemnity or contribution asserted with respect to claims or causes of action that are brought by any Person other than (a) the Litigation Trust; (b) the Creditor Trust; (c) any Person asserting a claim on behalf of the Debtors' estates; or (d) any Person asserting a Preserved Cause of Action; and it is further

ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement; and it is further

ORDERED that this Court shall retain continuing jurisdiction with respect to all matters concerning this Bar Order."

11.5  <u>Disallowed Claims And Disallowed Interests</u>.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

11.6  <u>Exculpation</u>.

To the fullest extent permitted under applicable law, none of the Proponents and none of the Related Persons to Proponents, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including this Plan, pursuit of confirmation of any plans of reorganization, including this Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Specific

Disclosure Document, the General Disclosure Document, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order).  Any of the Proponents shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

    11.7  Corporate Indemnities.

        11.7.1  Prepetition Indemnification and Reimbursement Obligations.  For purposes of this Plan, the respective obligations of Tribune and the other Debtors to indemnify and reimburse any Persons who are or were directors, officers or employees of the Debtors on or after the Petition Date, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, but excluding any obligations of Tribune and the other Debtors to any Person in respect of any such indemnification or reimbursement related to, based upon, or in connection with any LBO-Related Causes of Action arising prior to the Petition Date, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date.

        11.7.2  Director and Officer and Fiduciary Liability Insurance.  In accordance with the authority granted under the Order Authorizing Tribune Company to Purchase Tail Coverage Respecting the Debtors' Existing Directors and Officers and Fiduciary Liability Insurance Policies Pursuant to Section 363(b) of the Bankruptcy Code [D.I. 3190], the Debtors may in their discretion purchase "Tail Coverage" as defined in the motion with respect to such order.

    11.8  Term of Bankruptcy Injunction or Stays.

    All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

    11.9  Sharing Provision Dispute.

    Nothing contained herein shall (i) enjoin, prohibit or otherwise restrict the Step One Proponents from prosecuting the Sharing Provision Dispute or (ii) release, waive, or relinquish the Proponent's rights, claims and causes of action with respect to the Sharing Provision Dispute, including, but not limited to, the New York State Action.

## ARTICLE XII:  RETENTION OF JURISDICTION

12.1 Retention of Jurisdiction.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

12.1.1  allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

12.1.2  resolve any matters related to the rejection, assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

12.1.3  ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

12.1.4  decide or resolve any motions, adversary proceedings, contested or litigated matters, the Preserved Causes of Action (excluding Disclaimed State Law Avoidance Claims) and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

12.1.5  enter such orders as may be necessary or appropriate to implement, enforce, or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

12.1.6  resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

12.1.7  approve any modification of this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or enter any order in aid of Confirmation pursuant to section 1142 of the

Bankruptcy Code, in such manner as may be necessary or appropriate to consummate this Plan;

12.1.8  hear and determine all applications for compensation and reimbursement of expenses of professionals under this Plan or under sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to the order of the Bankruptcy Court; provided, however, that the professional fees and expenses of the Reorganized Debtors, incurred after the Effective Date, including counsel fees, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

12.1.9  hear and determine any dispute concerning the compromise by and between the Holders of Senior Loan Guaranty Claims against the Guarantor Non-Debtors, the Loan Agents and the Guarantor Non-Debtors, and the Loan Agents' release of all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims against the Guarantor Non-Debtors;

12.1.10  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

12.1.11  hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

12.1.12  hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

12.1.13  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

12.1.14  hear determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement (excluding the Creditors' Trust Agreement), or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

12.1.15  enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

12.1.16  hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

12.1.17  hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code;

12.1.18  hear and determine all matters arising under the Litigation Trust Agreement or relating to the Litigation Trust; and

12.1.19  enter an order closing the Chapter 11 Cases.

## ARTICLE XIII:  LITIGATION TRUST

13.1 Establishment of Trust.

On the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purposes of pursuing the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims, administering the Litigation Trust Assets and making all distributions on account of Litigation Trust Interests as provided for under the Plan.  The Litigation Trust is intended to qualify as a liquidating trust pursuant to Regulations section 301.7701-4(d).  Except as expressly provided in Section 5.13 with respect to the Trusts' Loan, none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the Litigation Trust.  The Litigation Trust Agreement shall be substantially in the form of Exhibit 13.1 hereto, which shall be filed prior to the Confirmation Hearing.

13.2 Litigation Trust Assets.

13.2.1  On the Effective Date, in accordance with Section 1141 of the Bankruptcy Code, all of the Litigation Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the Litigation Trust Assets, shall automatically vest in the Litigation Trust, free and clear of all Claims and Interests for the benefit of the Litigation Trust Beneficiaries.

13.2.2  The transfer of the Litigation Trust Assets to the Litigation Trust shall be made for the benefit and on behalf of the Litigation Trust Beneficiaries.  For federal income tax purposes, the Litigation Trust Beneficiaries will be treated as grantors, deemed owners and beneficiaries of the Litigation Trust.  Subject to the terms of the Litigation Trust Agreement, promptly after the Effective Date, the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, will determine the fair market value as of the Effective Date of all Litigation Trust Assets transferred to the Litigation Trust, and such determined fair market value shall be used by the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries for all U.S. federal income tax purposes, including for determining tax basis and gain or loss.  The Litigation Trustee shall file federal income tax returns for the Litigation Trust as a grantor trust under IRC Section 671 and United States Treasury Regulation Section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss, deductions and credits ("LT Tax Items").  The holders of Litigation Trust Interests shall report such LT Tax Items on their federal income tax returns and pay any resulting federal income tax liability.  Upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the applicable Estates' rights, title and interest in the Litigation Trust Assets and the Debtors shall have no further interest in or with respect to the Litigation Trust Assets.

13.2.3  The Litigation Trustee may establish one or more LT Reserves on account of Disputed Claims the Holders of which would be entitled to Litigation Trust Interests were such Disputed Claims ultimately Allowed.  The amount held back in the LT Reserve(s) shall be equal to the amount necessary to satisfy the distributions to which the Holders of the relevant Disputed Claims would be entitled if all such Disputed Claims were to be subsequently Allowed.  The Litigation Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Reserve(s) as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the LT Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the LT Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise Resolved.  The Litigation Trust Beneficiaries shall be bound by such election, if made by the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

13.3  <u>Litigation Trustee</u>.

13.3.1  The Litigation Trust shall be managed and operated by the Litigation Trustee.  The Litigation Trust Advisory Board shall have the functions, duties and rights provided in the Litigation Trust Agreement.  No other Litigation Trust Beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust, except as may be set forth in the Litigation Trust Agreement with respect to the repayment of the Step Two Arranger Litigation Trust Preference.  The initial members of the Litigation Trust Advisory Board shall be selected as follows: three members by Proponents, one by Aurelius Capital Management LP or its designee and one by the Creditors' Committee, with each member identified in the Plan Supplement.

13.3.2  The responsibilities of the Litigation Trustee shall include, but shall not be limited to:  (a) prosecuting through judgment and/or settling the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims and any defense asserted by the Litigation Trust in connection with any counterclaim or cross claim asserted against the Litigation Trust; (b) at least annually, calculating and making distributions required under the Plan to be made from the Litigation Trust Assets; (c) filing all required tax returns, and paying obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (d) otherwise administering the Litigation Trust; (e) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Reorganized Debtors), and providing annual reports to the Litigation Trust Beneficiaries, with respect to (i) the prosecution and resolution of the pursuing the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims and (ii) expenditures, receipts, and distributions of the Litigation Trust; and (iii) such other responsibilities as may be vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and

proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee shall maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to Litigation Trust Beneficiaries contemplated or effectuated under the Plan.

13.3.3  The Litigation Trust, acting through the Litigation Trustee, shall be authorized to exercise and perform the rights, powers, and duties held by the Estate with respect to the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims, including, without limitation, the authority under Section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, supervise, manage or liquidate the Debtors, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims. Notwithstanding anything to the contrary herein or in the Confirmation Order, certain acts of or by the Litigation Trust or the Litigation Trustee are and shall remain subject to the consent of the Litigation Trust Advisory Board pursuant to the terms of the Litigation Trust Agreement.

13.3.4  The Litigation Trustee upon the written consent of the Litigation Trust Advisory Board may, without any further approval from the Bankruptcy Court: (a) invest the Litigation Trust Assets in short term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as treasury bills, and withdraw funds of the Litigation Trust, make distributions, incur obligations for reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash, and pay taxes and other obligations owed by the Litigation Trust from funds held by the Litigation Trustee in accordance with the Plan; (b) evaluate and determine strategy with respect to the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims, and to prosecute, compromise, release, abandon and/or settle the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims on behalf of the Litigation Trust; (c) liquidate any remaining Litigation Trust Assets, and provide for the distributions therefrom in accordance with the provisions of the Plan; (d) otherwise administer the Litigation Trust, except as set forth in the Litigation Trust Agreement with respect to the repayment of the Step Two Arranger Litigation Trust Preference; and (e) exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust; provided that in no event shall the Litigation Trustee be authorized to take any action to pursue any Released Claims. The Litigation Trustee, acting on behalf of the Litigation Trust, shall agree to comply with, and shall not take any actions inconsistent with, the Bar Order as set forth in Section 11.3. The Litigation Trustee, on behalf of the Litigation Trust and upon the prior written consent of the Litigation Trust Advisory Board, may pursue, not pursue, and/or settle any and all Litigation Trust Assets, and the Litigation Trustee shall have no liability whatsoever for the outcome of that decision, except in the event that there is a Final Order

determining that the Litigation Trustee committed fraud, self-dealing, intentional misrepresentation, gross negligence, or willful misconduct. In connection with the administration of the Litigation Trust, the Litigation Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of the provisions of the Plan relating to the Litigation Trust, within the bounds of the Plan and applicable law.

13.3.5  Upon the prior written consent of the Litigation Trust Advisory Board, the Litigation Trustee may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist her or him in fulfilling her or his obligations under the Litigation Trust Agreement and this Plan, and on whatever fee arrangement she or he deems appropriate, including, without limitation, contingency fee arrangements. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. All such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Assets or the Trusts' Loan. The Reorganized Debtors shall have no liability therefor, except for the making of the Trusts' Loan pursuant to Section 5.13 of this Plan, and the Litigation Trust Beneficiaries shall have no liability therefor.

13.3.6  In addition to reimbursement for actual out-of-pocket expenses incurred by the Litigation Trustee, the Litigation Trustee shall be entitled to receive reasonable compensation for services rendered on behalf of the Litigation Trust on terms to be set forth in the Litigation Trust Agreement. All such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Assets. The Reorganized Debtors shall have no liability therefor.

13.3.7  The Litigation Trustee or any successor Litigation Trustee appointed pursuant to the Plan may be removed as Litigation Trustee (i) without cause by the Litigation Trust Advisory Board, or (ii) for cause pursuant to the terms and conditions set forth in the Litigation Trust Agreement upon order of the Bankruptcy Court upon motion of any holder of a Litigation Trust Interest that has not received payment in full plus interest as specified in this Plan. For purposes of this provision, cause shall mean fraud, self-dealing, intentional misrepresentation, gross negligence, or willful misconduct. In addition, the Litigation Trustee may resign with thirty (30) days' notice served on the Litigation Trust Beneficiaries and filed with the Bankruptcy Court. In the event that the Litigation Trustee is removed, resigns, or otherwise ceases to serve as Litigation Trustee, the Litigation Trust Advisory Board shall appoint a successor Litigation Trustee. Any successor Litigation Trustee shall be subject to the same qualifications and shall have the same rights, powers, duties, and discretion, and otherwise be in the same position, as the originally named Litigation Trustee. References herein to the Litigation Trustee shall be deemed to refer to the successor Litigation Trustee acting hereunder.

13.3.8  From and after the Effective Date, the Litigation Trustee, the members of the Litigation Trust Advisory Board and each of their respective Related Persons

(collectively, the "Litigation Trust Indemnified Parties" and each a "Litigation Trust Indemnified Party") shall be, and hereby are, indemnified by the Litigation Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Litigation Trust Indemnified Party's good faith exercise of what such Litigation Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Trust Indemnified Party reasonably understands to be its duties conferred by the Litigation Trust Agreement, the Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims, on and after the Effective Date. The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to (a) the Litigation Trust Agreement; (b) the services to be rendered pursuant to the Litigation Trust Agreement; (c) any document or information, whether verbal or written, referred to herein or supplied to the Litigation Trustee; or (d) proceedings by or on behalf of any creditor. The Litigation Trust shall, on demand, advance or pay promptly out of the Litigation Trust Assets, on behalf of each Litigation Trust Indemnified Party, reasonable attorneys' fees and other expenses and disbursements to which such Litigation Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; provided, however, that any Litigation Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Litigation Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Litigation Trust Indemnified Party. In any matter covered by the first two sentences of this subsection, any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Litigation Trustee, at the Litigation Trust's expense, subject to the foregoing terms and conditions. In addition, the Litigation Trust shall purchase fiduciary liability insurance for the benefit of the Litigation Trustee and the Litigation Trust Advisory Board.

13.3.9  To effectively investigate, prosecute, compromise, and/or settle the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims on behalf of the Litigation Trust, the Litigation Trustee and its counsel and representatives may require reasonable access to the Debtors' and Reorganized Debtors' documents and information relating to the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims and, in such event, must be able to exchange such information with the Reorganized Debtors on a confidential basis and in common interest without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Accordingly, on the Effective Date, the Reorganized Debtors and the Litigation Trustee shall enter into the LT Confidentiality and Common Interest Agreement providing for reasonable access to, at the Litigation

Trust's own expense, copies of the Debtors' and Reorganized Debtors' records and information relating to the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims, including, without limitation, electronic records or documents.

13.3.10  The Reorganized Debtors shall preserve all records and documents (including all electronic records or documents) related to the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims for a period of five (5) years after the Effective Date or, if any Transferred Cause of Action has been asserted in a pending action, then until such later time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved; provided, however, that nothing herein shall or shall be deemed to expand the scope of documents available, and/or require production of work product, to the Litigation Trust, that would not otherwise have been available to the Debtors or be available to the Reorganized Debtors.  The Litigation Trust shall reimburse the Reorganized Debtors for all reasonable out of pocket costs incurred (including for legal fees, travel accommodations, electronic discovery and other forensic investigation and analysis or courier and mail service) in performing their obligations under this Section 13.3.9 or in otherwise supporting the Litigation Trust to the extent such support is required by the Litigation Trust Agreement or is otherwise requested and provided under the LT Confidentiality and Common Interest Agreement.  The Litigation Trust shall provide reimbursement for all reasonable out of pocket costs incurred within 30 days of receipt of an appropriately detailed written invoice.

13.3.11  The duties, responsibilities, and powers of the Litigation Trustee shall terminate in accordance with the terms of the Litigation Trust Agreement after all of the Preserved Causes of Action other than the Disclaimed State Law Avoidance Claims have been liquidated and after all proceeds of the Litigation Trust Assets have been distributed to the Litigation Trust Beneficiaries.

13.4  Dissolution.

The Litigation Trust will be dissolved no later than five (5) years from the Effective Date; provided, however, that the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation Trust for a finite period if (i) such extension is necessary to the purpose of the Litigation Trust, (ii) the Litigation Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Litigation Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable.  Upon dissolution of the Litigation Trust, any remaining Cash on hand and other assets will be distributed to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

13.5  Funding the Litigation Trust.

The Litigation Trust will receive initial funding as set forth in Section 5.13.

## ARTICLE XIV:  CREDITORS' TRUST

14.1 <u>Disclaimer of Disclaimed State Law Avoidance Claims</u>.

On the Effective Date and subject to <u>Section 14.3.1</u>, the Debtors will disclaim all rights to pursue or prosecute the Disclaimed State Law Avoidance Claims such that any and all rights to pursue such Disclaimed State Law Avoidance Claims shall revert to those entities who could have pursued such Disclaimed State Law Avoidance Claims prior to the Petition Date; <u>provided</u>, that in no event shall any Released Claims be disclaimed.  Out of an abundance of caution, the Confirmation Order shall provide that the automatic stay is lifted to permit the Creditors' Trustee and other Holders of Claims who have "opted out" of the transfer of Disclaimed State Law Avoidance Claims to the Creditors Trust pursuant to <u>Section 14.3.1</u> to pursue such Disclaimed State Law Avoidance Claims.

14.2 <u>Establishment of Creditors' Trust</u>.

On the Effective Date, the Creditors' Trust shall be established pursuant to the Creditors' Trust Agreement for the purposes of administering the Creditors' Trust Assets and making all distributions to the ~~Holders of~~ Creditors' Trust ~~Interests~~<u>Beneficiaries</u> as provided for under the Plan.  The Creditors' Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Section 301.7701-4(d).  Except as expressly provided in <u>Section 5.13</u> with respect to the Trusts' Loan, none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the Creditors' Trust.  The Creditors' Trust Agreement shall be substantially in the form of <u>Exhibit 14.1</u> hereto, which shall be filed prior to the Confirmation Hearing.

14.3 <u>Creditors' Trust Assets</u>.

14.3.1  As of the Effective Date, all Holders of Step One Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, EGI-TRB LLC Notes Claims and PHONES Notes Claims shall be deemed to transfer any Disclaimed State Law Avoidance Claims that they may have to the Creditors' Trust, unless such Person has expressly elected to "opt out" of such assignment in accordance with procedures approved by the Bankruptcy Court (such transferred claims, collectively, the "<u>Transferred State Law Avoidance Claims</u>").  The Confirmation Order shall provide for the deemed assignment of Transferred State Law Avoidance Claims to the Creditors' Trust.

14.3.2  The transfer of the Creditors' Trust Assets to the Creditors' Trust shall be made for the benefit and on behalf of the Creditors' Trust Beneficiaries.  For federal income tax purposes, the Creditors' Trust Beneficiaries will be treated as grantors, deemed owners and beneficiaries of the Creditors' Trust.  Subject to the terms of the Creditors' Trust Agreement, promptly after the Effective Date, the Creditors Trustee, in consultation with the Creditors' Trust Advisory Board, will determine the fair market value as of the Effective Date of all Creditors' Trust Assets transferred to the Creditors' Trust, and such determined fair market value shall be used by the Creditors' Trust, the Creditors' Trustee, and the Creditors' Trust Beneficiaries for all U.S. federal

income tax purposes, including for determining tax basis and gain or loss.  The Creditors' Trustee shall file federal income tax returns for the Creditors' Trust as a grantor trust under IRC Section 671 and United States Treasury Regulation Section 1.671-4 and report, but not pay tax on, the Creditors' Trust's tax items of income, gain, loss, deductions and credits ("CT Tax Items").  The holders of Creditors' Trust Interests shall report such CT Tax Items on their federal income tax returns and pay any resulting federal income tax liability.

14.3.3  The Creditors' Trustee may establish one or more CT Reserves on account of Disputed Claims the Holders of which would be entitled to Creditors' Trust Interests were such disputed Claims ultimately Allowed.  The amount held back in the CT Reserve(s) shall be equal to the amount necessary to satisfy the distributions to which the Holders of the relevant Disputed Claims would be entitled if all such Disputed Claims were to be subsequently Allowed.  The Creditors' Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the CT Reserve(s) as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the CT Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the CT Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise Resolved.  The Creditors' Trust Beneficiaries shall be bound by such election, if made by the Creditors' Trustee, in consultation with the Creditors' Trust Advisory Board, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

14.4  Creditors' Trustee.

14.4.1  The Creditors' Trust shall be managed and operated by the Creditors' Trustee.  The Creditors' Trust Advisory Board shall have the functions, duties and rights provided in the Creditors' Trust Agreement.  No other Creditors' Trust Beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the Creditors' Trust.  The initial members of the Creditors' Trust Advisory Board shall be the members of the Creditors' Committee.

14.4.2  The responsibilities of the Creditors' Trustee shall include, but shall not be limited to:  (a) prosecuting through judgment and/or settling the Transferred State Law Avoidance Claims and any defense asserted by the Creditors' Trust in connection with any counterclaim or cross claim asserted against the Creditors' Trust; (b) at least annually, calculating and making distributions to Creditors' Trust Beneficiaries, as required under the Plan to be made from the Creditors' Trust Assets; (c) filing all required tax returns, and paying obligations on behalf of the Creditors' Trust from the Creditors' Trust Assets; (d) otherwise administering the Creditors' Trust; (e) providing quarterly reports to the Creditors' Trust Beneficiaries, with respect to (i) the prosecution and resolution of the Transferred State Law Avoidance Claims and (ii) expenditures, receipts, and distributions of the Creditors' Trust; and (f) such other

responsibilities as may be vested in the Creditors' Trustee pursuant to the Creditors' Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Creditors' Trust.  The Creditors' Trustee shall maintain good and sufficient books and records of account relating to the Creditors' Trust Assets, the management thereof, all transactions undertaken by the Creditors' Trustee, all expenses incurred by or on behalf of the Creditors' Trustee, and all distributions to Creditors' Trust Beneficiaries contemplated or effectuated under the Plan.

14.4.3  The Creditors' Trustee upon the written consent of the Creditors' Trust Advisory Board may, without any further approval from the Bankruptcy Court:  (a) invest the Creditors' Trust Assets in short term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as treasury bills, and withdraw funds of the Creditors' Trust, make distributions, incur obligations for reasonable and necessary expenses in liquidating and converting the Creditors' Trust Assets to Cash, and pay taxes and other obligations owed by the Creditors' Trust from funds held by the Creditors' Trustee in accordance with the Plan; (b) evaluate and determine strategy with respect to the Transferred State Law Avoidance Claims, and to prosecute, compromise, release, abandon and/or settle the Transferred State Law Avoidance Claims on behalf of the Creditors Trust; (c) liquidate any remaining Creditors' Trust Assets, and provide for the distributions therefrom in accordance with the provisions of the Plan; (d) otherwise administer the Creditors' Trust; and (e) exercise such other powers and authority as may be vested in or assumed by the Creditors' Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Creditors' Trust; provided that in no event shall the Creditors' Trustee be authorized to take any action to pursue any Released Claims.  The Creditor' Trustee, acting on behalf of the Creditors' Trust, shall agree to comply with, and shall not take any actions inconsistent with, the Bar Order as set forth in Section 11.3.  The Creditors' Trustee, on behalf of the Creditors' Trust and upon the prior written consent of the Creditors' Trust Advisory Board, may pursue, not pursue, and/or settle any and all Transferred State Law Avoidance Claims, and the Creditors' Trustee shall have no liability whatsoever for the outcome of that decision, except in the event that there is a Final Order determining that the Creditors' Trustee committed fraud, self-dealing, intentional misrepresentation, gross negligence, or willful misconduct.  In connection with the administration of the Creditors' Trust, the Creditors' Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of the provisions of the Plan relating to the Creditors' Trust, within the bounds of the Plan and applicable law.

14.4.4  Upon the prior written consent of the Creditors' Trust Advisory Board, the Creditors' Trustee may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist her or him in fulfilling her or his obligations under the Creditors' Trust Agreement and this Plan, and on whatever fee arrangement she or he deems appropriate, including, without limitation, contingency fee arrangements. Professionals engaged by the Creditors' Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement

of actual out-of-pocket expenses incurred.  All such compensation and reimbursement shall be paid from the Creditors' Trust with the Creditors' Trust Assets or the Trusts' Loan.  The Reorganized Debtors shall have no liability therefor, except for the making of the Trusts' Loan pursuant to Section 5.13 of this Plan, and the Creditors' Trust Beneficiaries shall have no liability therefor.

14.4.5  In addition to reimbursement for actual out-of-pocket expenses incurred by the Creditors' Trustee, the Creditors' Trustee shall be entitled to receive reasonable compensation for services rendered on behalf of the Creditors' Trust on terms to be set forth in the Creditors' Trust Agreement.  All such compensation and reimbursement shall be paid from the Creditors' Trust with the Creditors' Trust Assets.  The Reorganized Debtors shall have no liability therefor.

14.4.6  The Creditors' Trustee or any successor Creditors' Trustee appointed pursuant to the Plan may be removed as Creditors' Trustee (i) without cause by the Creditors' Trust Advisory Board, or (ii) for cause pursuant to the terms and conditions set forth in the Creditors' Trust Agreement upon order of the Bankruptcy Court upon motion of any holder of a Creditors' Trust Interest that has not received payment in full plus interest as specified in this Plan.  For purposes of this provision, cause shall mean fraud, self-dealing, intentional misrepresentation, gross negligence, or willful misconduct.  In addition, the Creditors' Trustee may resign with thirty (30) days' notice served on the Creditors' Trust Beneficiaries and filed with the Bankruptcy Court.  In the event that the Creditors' Trustee is removed, resigns, or otherwise ceases to serve as Creditors' Trustee, the Creditors' Trust Advisory Board shall appoint a successor Creditors' Trustee.  Any successor Creditors' Trustee shall be subject to the same qualifications and shall have the same rights, powers, duties, and discretion, and otherwise be in the same position, as the originally named Creditors' Trustee.  References herein to the Creditors' Trustee shall be deemed to refer to the successor Creditors' Trustee acting hereunder.

14.4.7  From and after the Effective Date, the Creditors' Trustee, the members of the Creditors' Trust Advisory Board and each of their respective Related Persons (collectively, the "Creditors' Trust Indemnified Parties" and each a "Creditors' Trust Indemnified Party") shall be, and hereby are, indemnified by the Creditors' Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Creditors' Trust Indemnified Party's good faith exercise of what such Creditors' Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Creditors' Trust Indemnified Party reasonably understands to be its duties conferred by the Creditors' Trust Agreement, the Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the Transferred State Law Avoidance Claims, on and after the Effective Date.  The foregoing indemnification shall also extend to matters directly

98

or indirectly in connection with, arising out of, based on, or in any way related to (a) the Creditors' Trust Agreement; (b) the services to be rendered pursuant to the Creditors' Trust Agreement; (c) any document or information, whether verbal or written, referred to herein or supplied to the Creditors' Trustee; or (d) proceedings by or on behalf of any creditor.  The Creditors' Trust shall, on demand, advance or pay promptly out of the Creditors' Trust Assets, on behalf of each Creditors' Trust Indemnified Party, reasonable attorneys' fees and other expenses and disbursements to which such Creditors' Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; provided, however, that any Creditors' Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Creditors' Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Creditors' Trust Indemnified Party.  In any matter covered by the first two sentences of this subsection, any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Creditors' Trustee, at the Creditors' Trust's expense, subject to the foregoing terms and conditions.  In addition, the Creditors' Trust shall purchase fiduciary liability insurance for the benefit of the Creditors' Trustee and the Creditors' Trust Advisory Board.

14.4.8  The Reorganized Debtors shall preserve all records and documents (including all electronic records or documents) related to the Transferred State Law Avoidance Claims for a period of five (5) years after the Effective Date or, if any Transferred State Law Avoidance Claim has been asserted in a pending action, then until such later time as the Creditors' Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved; provided, however, that nothing herein shall or shall be deemed to expand the scope of documents available, and/or require production of work product, to the Creditors' Trust, that would not otherwise have been available to the Debtors or be available to the Reorganized Debtors.  The Creditors' Trust shall reimburse the Reorganized Debtors for all reasonable out of pocket costs incurred (including for legal fees, travel accommodations, electronic discovery and other forensic investigation and analysis or courier and mail service) in performing their obligations under this Section 14.4.8 or in otherwise supporting the Creditors' Trust to the extent such support is required by the Creditors' Trust Agreement or is otherwise requested and provided under the CT Confidentiality and Common Interest Agreement.  The Creditors' Trust shall provide reimbursement for all reasonable out of pocket costs incurred within 30 days of receipt of an appropriately detailed written invoice.

14.4.9  The duties, responsibilities, and powers of the Creditors' Trustee shall terminate in accordance with the terms of the Creditors' Trust Agreement after all of the Creditors' Trust Assets have been liquidated and after all proceeds therefore have been distributed to the Creditors' Trust Beneficiaries.

14.5 Dissolution.

The Creditors' Trust will be dissolved no later than five (5) years from the Effective Date; provided, however, that the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Creditors' Trust for a finite period if (i) such extension is necessary to the purpose of the ~~Litigation~~Creditors' Trust, (ii) the Creditors' Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the ~~Litigation~~Creditors' Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the ~~Litigation~~Creditors' Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable. Upon dissolution of the ~~Litigation~~Creditors' Trust, any remaining Cash on hand and other assets will be distributed to the ~~Litigation~~Creditors' Trust Beneficiaries in accordance with the ~~Litigation~~Creditors' Trust Agreement.

14.6 Funding the Creditors' Trust.

The Creditors' Trust will receive initial funding as set forth in Section 5.13.

## ARTICLE XV:  MISCELLANEOUS

15.1 Surrender of Instruments.

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of any of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by this Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate this Plan; provided, however, that if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the Debtors or the applicable Indenture Trustee for such note, debenture or other evidence of indebtedness may waive the requirement of surrender.  Except as otherwise provided in this Section 15.1, in the Reorganized Debtors' sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement (without any bond), in form and substance reasonably satisfactory to the Reorganized Debtors, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such note, debenture or other evidence of indebtedness thereof.

15.2 Creditors Committee.

The appointment of the Creditors Committee shall terminate on the Effective Date, except that the Creditors Committee shall continue in existence after the Effective Date for the sole purpose of preparing and prosecuting applications for the payment of fees and reimbursement of expenses.

15.3 <u>Post-Confirmation Date Retention of Professionals</u>.

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

15.4 <u>Effectuating Documents and Further Transactions</u>.

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

15.5 <u>Exemption from Transfer Taxes</u>.

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes, debentures or equity securities under this Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under this Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

15.6 <u>Paid-in Capital of Corporate Reorganized Debtors</u>.

On the Effective Date, after all other transactions necessary to effect this Plan have been consummated, the Paid-in Capital, as such term is defined in section 1.80(j) of the Illinois Business Corporation Act of 1983, 805 ILCS 5/1.01, et seq. (the "<u>BCA</u>"), of each corporate Reorganized Debtor shall, pursuant to Section 9.20(a)(2) of the BCA, be reduced to the following amounts (such reduced amounts to be referred to individually and collectively as the "~~Article XIII~~ Paid-in Capital Amount" and "~~Article XIII~~ Paid-in Capital Amounts," respectively):  (i) in the case of Reorganized Tribune its Paid-in Capital shall be reduced to the aggregate par value, if any, of Reorganized Tribune's issued and outstanding shares of capital stock plus such amount as is recorded on Reorganized Tribune's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles, and (ii) in the case of each other corporate Reorganized Debtor its Paid-in Capital shall be reduced to the aggregate par value, if any, of each such other Reorganized Debtor's issued and outstanding shares of capital stock plus such amount as is recorded on each such other Reorganized Debtor's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles.  The amount required to reduce the Paid-in Capital of each corporate Reorganized Debtor to its ~~Article XIII~~ Paid-in Capital Amount shall be treated as a reduction in Paid-in Capital under Section 9.20(a)(2) of the BCA.  Any capital of each corporate Reorganized Debtor remaining in excess of its ~~Article XIII~~ Paid-in Capital Amount shall not be treated as

Paid-in Capital for purposes of the BCA.  For purposes of this <u>Section 15.6</u>, the term "corporate" refers to a corporation as defined in Sections 1.80(a) or (b) of the BCA.

15.7  <u>Payment of Statutory Fees</u>.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

15.8  <u>Amendment or Modification of this Plan</u>.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code and other applicable provisions of this Plan, ~~including, without limitation, Section 13.9 of this Plan,~~ the Proponents may alter, amend or modify this Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan, but only by a writing evincing the agreement of all Proponents to do so.  A Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

15.9  <u>Severability of Plan Provisions</u>.

If any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Proponents will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

15.10  <u>Successors and Assigns</u>.

This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

15.11  <u>Revocation, Withdrawal or Non-Consummation</u>.

Each of the Proponents reserve the right to revoke or withdraw its support for this Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Proponents revoke or withdraw this Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with

respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.  If the Plan is revoked or withdrawn prior to the Effective Date, all parties' rights are hereby reserved with regard to the LBO-Related Causes of Action.

15.12    <u>Notice</u>.

To be effective, all notices, requests and demands to or upon the Debtors or the Reorganized Debtors shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or electronic transmission, when received and telephonically confirmed, addressed as follows:

**Debtors or Reorganized Debtors:**

Tribune Company
435 Michigan Avenue
Chicago, Illinois  60611
Facsimile:  (312) 222-4206
Attn:  Chief Legal Officer

*With a copy to:*

**Counsel to the Debtors and Reorganized Debtors:**

| | |
|---|---|
| Sidley Austin LLP | Cole Schotz Meisel Forman & Leonard, P.A. |
| One South Dearborn Street | 500 Delaware Avenue, Suite 1410 |
| Chicago, Illinois  60603 | Wilmington, Delaware  19801 |
| Facsimile:  (312) 853-7036 | Facsimile:  (302) 652-3117 |
| Attn:  Jessica C.K. Boelter | Attn:  J. Kate Stickles |

*And, if prior to the Effective Date, to the following additional parties:*

**Counsel to the Official Committee of Unsecured Creditors:**

| | |
|---|---|
| Chadbourne & Parke LLP | Landis Rath & Cobb LLP |
| 30 Rockefeller Plaza | 919 Market Street, Suite 1800 |
| New York, New York  10112 | Wilmington, Delaware  19801 |
| Fax (212) 541-5369 | Fax:  (302) 467-4450 |
| Attn:  David M. Le May | Attn:  Adam G. Landis |

**Counsel to the Step One Proponents:**

Derek C. Abbott
Daniel B. Butz
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 18th floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

~~Howard J. Kaplan~~Evan D. Flaschen
~~Johnny Yeh~~
~~Deana Davidian~~
~~ARKIN KAPLAN RICE LLP~~
~~590 Madison Avenue, 35th Floor~~
~~New York, NY 10022~~
Daniel S. Connolly
Andrew Schoulder
BRACEWELL & GIULIANI LLP
225 Asylum Street, Suite 2600
Hartford, CT 06103
Telephone: ~~212.333.0200~~860.947.9000
Facsimile: ~~212.333.2350~~860.246.3201

~~Adam H. Friedman~~Howard J. Kaplan
~~Steve Wolosky~~
~~Fredrick J. Levy~~
~~OLSHAN GRUNDMAN FROME ROSENZWEIG~~
~~& WOLOSKY LLP~~
Johnny Yeh
Deana Davidian
ARKIN KAPLAN RICE LLP
~~Park~~590 Madison Avenue ~~Tower~~, 35th Floor
~~65 East 55th Street~~
New York, NY 10022
Telephone: ~~212.451.2300~~212.333.0200
Facsimile: ~~212.451.2222~~212.333.2350

~~Evan D. Flaschen~~
~~Daniel S. Connolly~~
~~Andrew Schoulder~~
~~BRACEWELL & GIULIANI LLP~~
~~225 Asylum Street, Suite 2600~~
~~Hartford, CT 06103~~
~~Telephone: 860.947.9000~~
~~Facsimile: 860.246.3201~~

15.13   <u>Governing Law</u>.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other Federal law is applicable, or to the extent that an exhibit or schedule to this Plan or the relevant document provide otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

15.14   <u>Tax Reporting and Compliance</u>.

The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of any of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

15.15    <u>Exhibits and Appendices</u>.

All Exhibits and appendices to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

15.16    <u>Reservation of Rights</u>.

Except as expressly set forth herein, this Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  The filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by the Debtors in furtherance of seeking confirmation of this Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

15.17    <u>Notice of the Effective Date</u>.

On or before ten (10) Business Days after occurrence of the Effective Date, the Reorganized Debtors shall mail or cause to be mailed to all holders of Claims and Interests a Notice that informs such holders of (a) entry of the Confirmation Order; (b) the occurrence of the Effective Date; (c) the assumption and rejection of executory contracts and unexpired leases pursuant to this Plan, as well as the deadline for the filing of Claims arising from such rejection; (d) the deadline established under this Plan for the filing Claims pursuant to <u>Section 9.2</u>; (e) the procedures for requesting notice of the matters with respect to this Plan; (f) the procedures for changing an address of record pursuant to <u>Section 7.6.2</u> of this Plan; and (g) such other matters as the Reorganized Debtor deems to be appropriate.

15.18    <u>Debtors' Cooperation</u>

The Debtors' shall fully cooperate with the Step One Proponents to implement this Step One Lender Plan.

| | |
|---|---|
| Alden Global Capital | Greywolf Capital Management LP |
| Allen Investment Management LLC | Newstart Factors, Inc. |
| Arrowgrass Distressed Opportunities Fund Limited | Normandy Hill Capital LP |
| Arrowgrass Masterfund Ltd. | OCP Investment Trust |
| Blue Mountain Capital Management, LLC | Onex Debt Opportunity Fund |
| CFIP Master Fund, Ltd. | Scoggin Capital |
| Citadel Securities | Seneca Capital, LP |
| Cooperstown Capital Management LLC | Waterstone Capital Management |
| ECO Management | Soros Fund Management |

By and through their undersigned counsel.

Dated:  December 1,7, 2010          MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Derek C. Abbott
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: 302.658.9200
Facsimile: 302.658.3989

ARKIN KAPLAN RICE LLP
Howard Kaplan
Johnny Yeh
Deana Davidian
590 Madison Avenue, 35th Floor
New York, NY  10022
Telephone: 212.333.0200
Facsimile: 212.333.2350

OLSHAN GRUNDMAN FROME ROSENZWEIG
& WOLOSKY LLP
Adam Friedman
Steve Wolosky
Fredrick Levy
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone: 212.451.2300
Facsimile: 212.451.2222

BRACEWELL & GIULIANI LLP

BRACEWELL & GIULIANI LLP
Evan Flaschen
Daniel Connolly
Andrew Schoulder
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, CT 06103-1516
Telephone:  860-256-8537
Facsimile:  860-760-6310

ARKIN KAPLAN RICE LLP
Howard Kaplan
Johnny Yeh
Deana Davidian
590 Madison Avenue, 35th Floor
New York, NY  10022
Telephone: 212.333.0200
Facsimile: 212.333.2350

*Counsel to the Step One Proponents*

Document comparison by Workshare Professional on Tuesday, December 07, 2010 4:14:54 PM

| Input: | |
|---|---|
| Document 1 ID | file:////bp.bracepatt.com/firm/NewYork/Users/schoaj/Desktop/Tribune - SOCAL First Amended Plan.doc |
| Description | Tribune - SOCAL First Amended Plan |
| Document 2 ID | PowerDocs://NEWYORK/64140/8 |
| Description | NEWYORK-#64140-v8-Tribune_SOCAL_first_amended_plan |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 202 |
| Deletions | 210 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 412 |