## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| TRIBUNE COMPANY, et al.,[1] | ) | Case No. 08-13141 (KJC) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY KING STREET ACQUISITION COMPANY, L.L.C., KING STREET CAPITAL, L.P. AND MARATHON ASSET MANAGEMENT, L.P.

Dated:  December 7, 2010

WHITE & CASE LLP
Thomas E Lauria, Esq.
David Hille, Esq.
Andrew Hammond, Esq.
Scott Greissman, Esq.
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200

FOX ROTHSCHILD LLP
Jeffrey M. Schlerf, Esq. (No. 3047)
Eric M. Sutty, Esq. (No. 4007)
Jay Strock, Esq. (No. 4965)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington, DE 19801
Telephone:  (302) 654-7444

Attorneys for the Proponents

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc (5510); Baltimore Newspaper Networks, Inc (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc (4014); KPLR, Inc. (7943); KSWB Inc (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## TABLE OF CONTENTS

ARTICLE 1    DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS ............................3

    1.1    Definitions.............................................................................................3
    1.2    Rules of Interpretation .......................................................................33
    1.3    Computation of Time ..........................................................................34
    1.4    Exhibits ...............................................................................................34
    1.5    Deemed Acts .......................................................................................34

ARTICLE 2    TREATMENT OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS .........34

    2.1    DIP Facility Claims..............................................................................35
    2.2    Administrative Expense Claims...........................................................35
    2.3    Priority Tax Claims .............................................................................35

ARTICLE 3    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND
               INTERESTS ...................................................................................................36

    3.1    Summary of Classification and Treatment of Classified Claims and Interests......36
    3.2    Classification and Treatment of Claims Against and Interests in Tribune
          Company (Debtor 1) .................................................................................37
    3.3    Classification and Treatment of Claims Against and Interests in Non-
          Guarantor Debtors (Debtors 2 through 49).............................................46
    3.4    Classification and Treatment of Claims Against and Interests in Guarantor
          Debtors (Debtors 50 through 111) ..........................................................48
    3.5    Prepackaged Plans for and Treatment of Claims Against and Interests in
          Subsidiary Non-Debtors that Become Debtors.......................................54

ARTICLE 4    ACCEPTANCE OR REJECTION OF BRIDGE LENDER PLAN......................55

    4.1    Impaired Classes of Claims and Interests Entitled to Vote ....................55
    4.2    Acceptance by an Impaired Class of Claims ..........................................55
    4.3    Deemed Acceptance by Holders of Intercompany Claims ....................55
    4.4    Presumed Acceptances by Unimpaired Classes.....................................55
    4.5    Presumed Rejection of the Bridge Lender Plan .....................................55
    4.6    Confirmability and Severability of the Bridge Lender Plan ...................56

ARTICLE 5    MEANS FOR IMPLEMENTATION OF THE BRIDGE LENDER PLAN..........56

    5.1    Non-Substantive Consolidation ............................................................56
    5.2    Restructuring Transactions....................................................................57
    5.3    Corporate Governance, Directors, Officers and Corporate Action........58
    5.4    Issuance and Distribution of New Securities and Related Matters.........60
    5.5    Reporting Requirements Under the Securities Exchange Act of 1934 and
          Listing of New Class A Common Stock on the Securities Exchange or
          Quotation System .....................................................................................64
    5.6    New Senior Secured Term Loan Agreement..........................................64
    5.7    Continued Corporate Existence and Vesting of Certain Assets in the
          Reorganized Debtors................................................................................65
    5.8    Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge
          Agreement, Notes Issued Under the Loan Agreements, Senior Notes,

|  |  | Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests | 66 |
| 5.9 | Cancellation of Liens and Guaranties | 67 |
| 5.10 | Exit Facility | 67 |
| 5.11 | Equity Incentive Plan | 67 |
| 5.12 | Sources of Cash for Initial Bridge Lender Plan Distributions | 68 |
| 5.13 | Additional Transactions Authorized Under the Bridge Lender Plan | 68 |
| 5.14 | Put Option | 68 |
| 5.15 | Settlement of Claims and Controversies | 69 |
| 5.16 | Preservation of Rights of Action and Settlement of Litigation Claims | 73 |
| 5.17 | FCC Applications | 73 |
| 5.18 | Litigation Trust | 73 |
| 5.19 | Creditors' Trust. | 77 |

**ARTICLE 6    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 83**

| 6.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 83 |
| 6.2 | Cure of Defaults of Assumed Executory Contracts and Unexpired Leases | 84 |
| 6.3 | Assumption of Executory Contracts and Unexpired Leases | 84 |
| 6.4 | Rejection Damages Bar Date | 85 |
| 6.5 | Compensation and Benefit Programs | 85 |
| 6.6 | Collective Bargaining Agreements | 85 |
| 6.7 | Postpetition Contracts and Leases | 86 |
| 6.8 | Termination of ESOP | 86 |
| 6.9 | Insurance Policies. | 86 |

**ARTICLE 7    PROVISIONS GOVERNING DISTRIBUTIONS ... 87**

| 7.1 | General | 87 |
| 7.2 | Disputed Claims Reserves | 87 |
| 7.3 | Special Provisions Governing Distributions to Holders of Senior Loan Claims and Senior Loan Guaranty Claims | 88 |
| 7.4 | Interest on Claims | 89 |
| 7.5 | Distributions by Disbursing Agent/Distribution Trustee/Creditors' Trustee | 89 |
| 7.6 | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 89 |
| 7.7 | Record Date for Distributions | 90 |
| 7.8 | Allocation of Bridge Lender Plan Distributions Between Principal and Interest | 91 |
| 7.9 | Means of Cash Payment | 91 |
| 7.10 | Withholding and Reporting Requirements | 91 |
| 7.11 | Setoffs | 93 |
| 7.12 | Fractional Shares/Fractional Distribution Trust Interests/Fractional Creditors' Trust Interests | 93 |
| 7.13 | *De Minimis* Distributions | 93 |
| 7.14 | Special Provision Regarding Unimpaired Claims | 93 |
| 7.15 | Subordination | 94 |
| 7.16 | Distribution Trust | 94 |

MIAMI 889648 (2K)

ARTICLE 8    PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED
INTERESTS ...............................................................................................100

    8.1    Objections to and Estimation of Claims ...............................................................100
    8.2    Payments and Distributions on Disputed, Contingent and Unliquidated
        Claims and Interests and on Claims for Which Proofs of Claim are Filed ..........101

ARTICLE 9    PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS ......................101

    9.1    Payment of Proponents Fee/Expense Claims .......................................................101
    9.2    Bar Date for Payment or Reimbursement of Professional Fees and Expenses
        and Claims for Substantial Contribution..............................................................101

ARTICLE 10    CONFIRMATION AND CONSUMMATION OF THE BRIDGE LENDER
PLAN ......................................................................................................102

    10.1    Conditions to Effective Date..............................................................................103
    10.2    Waiver of Conditions ........................................................................................104
    10.3    Consequences if Confirmation Order is Vacated ................................................104

ARTICLE 11    INJUNCTIONS, RELEASES AND DISCHARGE .........................................104

    11.1    Discharge ..........................................................................................................104
    11.2    Releases.............................................................................................................105
    11.3    Obligations of the Guarantor Non-Debtors as a Condition to the Release of
        Guarantor Non-Debtors from Loan Guaranty Claims and Bridge Loan
        Guaranty Claims ................................................................................................107
    11.4    Disallowed Claims and Disallowed Interests .....................................................107
    11.5    Term of Bankruptcy Injunction or Stays............................................................108
    11.6    Exculpation .......................................................................................................108

ARTICLE 12    RETENTION/RELEASE OF JURISDICTION .............................................108

    12.1    Retention of Jurisdiction ...................................................................................108
    12.2    Release of Jurisdiction ......................................................................................110

ARTICLE 13    MISCELLANEOUS ...................................................................................110

    13.1    Surrender of Instruments...................................................................................110
    13.2    Creditors' Committee.........................................................................................111
    13.3    Post-Confirmation Date Retention of Professionals ...........................................111
    13.4    Effectuating Documents and Further Transactions..............................................111
    13.5    Exemption from Transfer Taxes.........................................................................111
    13.6    Paid-in Capital of Corporate Reorganized Debtors ............................................112
    13.7    Payment of Statutory Fees .................................................................................112
    13.8    Amendment or Modification of the Bridge Lender Plan .....................................112
    13.9    Withdrawal of Proponents .................................................................................112
    13.10    Severability of Bridge Lender Plan Provisions...................................................113
    13.11    Successors and Assigns......................................................................................113
    13.12    Revocation, Withdrawal or Non-Consummation................................................113
    13.13    Notice................................................................................................................113
    13.14    Governing Law ..................................................................................................114
    13.15    Tax Reporting and Compliance .........................................................................114

iv

13.16   Reservation of Rights.........................................................................................115

13.17   Notice of the Effective Date ...............................................................................115

MIAMI 889648 (2K)

## INTRODUCTION[2]

King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., on behalf of certain funds and managed accounts, in their capacity as Bridge Loan Lenders, hereby propose the following joint plan of reorganization for the resolution of all outstanding Claims[3] against and Interests in all of the Debtors in their reorganization cases under chapter 11 of the Bankruptcy Code.

Reference is made to the General Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, businesses, properties and operations. Reference is made to the Bridge Lender Specific Disclosure Statement for a discussion of risk factors specific to the Bridge Lender Plan, a summary and analysis of the Bridge Lender Plan and certain related matters. The Proponents reserve the right to alter, amend, modify, revoke or withdraw the Bridge Lender Plan prior to its substantial consummation in accordance with the terms hereof, the Confirmation Order, and the Bankruptcy Code.

The Bridge Lender Plan provides each LBO Lender constituency (i.e., the Step One Lenders, the Step Two Lenders and the Bridge Loan Lenders) with the opportunity to participate in a settlement that would resolve such litigation against it. The Bridge Lender Plan provides the opportunity for a consensual resolution of several critical and fact-intensive litigation issues, but confirmation and effectiveness of the Bridge Lender Plan are not conditioned upon such resolution. Thus, the Bridge Lender Plan provides the opportunity for a truly consensual settlement of the LBO-Related Causes of Action against the LBO Lenders, while allowing any or all unresolved Litigation Trust Causes of Action, as well as State Law Avoidance Claims and D&O Claims, to proceed post-Confirmation.

The Plan Settlements are severable and one or more may be accepted separately by the applicable constituencies and approved by the Bankruptcy Court. The Step One Lender Settlement provides the Step One Lenders with a recovery of (i) $4.389 billion of total distributable enterprise value ("DEV") and (ii) 25% of the Trust Interests (to be shared Pro Rata with the Step Two Lenders if the Step Two Lender Settlement is approved). The Step One Lender Settlement also provides for the Senior Noteholders to recover $600 million in Cash and 50% of the Trust Interests, for the PHONES Noteholders to receive $40 million in Cash and 20% of the Trust Interests, and for distributions to other creditor parties as described more fully in Section 5.15(a) below. If the Step One Lender Settlement is approved and the Step Two Lender Settlement is not approved, the Step Two Lenders will receive the recovery as provided in the Trust structure.

---

[2]     The description of the Bridge Lender Plan contained in the Introduction is qualified in its entirety by the operative provisions of the Bridge Lender Plan that follow. To the extent there is any inconsistency between the description of the Bridge Lender Plan in the Introduction and the operative provisions, the operative provisions shall control.

[3]     Capitalized terms used, but not defined in the Introduction, shall have the meanings ascribed to such terms in Article 1 of the Bridge Lender Plan.

The Step Two Lender Settlement provides the Step Two Lenders with a recovery of (i) $950 million of DEV and (ii) if the Step One Lender Settlement is approved, 25% of the Trust Interests (to be shared Pro Rata with the Step One Lenders but only if the Step One Lender Settlement is approved). In addition to any recoveries provided under the Step One Lender Settlement (if accepted and approved) or the Trust structure (if the Step One Lender Settlement is not accepted and approved), the Step Two Lender Settlement provides for a distribution of $309 million to the Step One Lenders, $150 million to the Senior Noteholders, $35 million to the PHONES Noteholders, and $12 million to the Holders of Other Parent Claims. If the Step Two Lender Settlement is approved and the Step One Lender Settlement is not approved, Step One Lenders will receive the recovery as provided in the Trust structure. No additional recovery is provided to the Bridge Loan Lenders if the Step Two Lender Settlement is approved.

The Bridge Loan Lender Settlement provides for a recovery for the Bridge Loan Lenders of $125 million and, if the Step One Lender Settlement is not accepted and approved, 5% of the Creditors' Trust Interests. The Original Bridge Loan Lenders would receive, in lieu of such distributions, releases of all claims that the Estates and the other Bridge Loan Lenders may have against the Original Bridge Loan Lenders (solely in their capacity as Original Bridge Loan Lenders).

If one or more Plan Settlements are not accepted by the applicable LBO Lender constituencies and approved by the Bankruptcy Court, the Bridge Lender Plan provides that the associated litigation related to the Leveraged ESOP Transaction will be preserved and, following the Effective Date, will be prosecuted by a multi-trust structure comprised of the Litigation Trust and the Creditors' Trust,[4] while still providing a substantial distribution of the Debtors' total DEV upon the Debtors' emergence from chapter 11.

As a result of the alternative Plan Settlement/Trust structure, the Bridge Lender Plan will be able to go effective expeditiously and with fewer conditions and with resolution of fewer

---

[4]     The causes of action that may be prosecuted by the Trusts include, among other things, litigation regarding, among other things, (i) the avoidability of the indebtedness incurred by the Debtors in connection with the Leveraged ESOP Transaction, (ii) whether recipients of pre-Effective Date payments in respect of the debt incurred pursuant to the Leveraged ESOP Transaction will be required to disgorge such payments, (iii) whether the shareholders that had their stock redeemed in connection with the Leveraged ESOP Transaction will be required to disgorge such payments, (iv) claims against the Debtors' officers and directors, (v) claims against Sam Zell and his Affiliates, (vi) to the extent not determined prior to the Effective Date, the enforceability of the Bridge Loan Subordination Provision, (vii) to the extent not determined prior to the Effective Date, the enforceability of the Intercompany Claims Subordination Provision and the allocation of value between Tribune, on the one hand, and the Guarantor Subsidiaries, on the other hand, (viii) to the extent not determined prior to the Effective Date, the PHONES Notes Claims Resolution, (ix) to the extent not determined prior to the Effective Date, the Senior Loan Claim Sharing Resolution, (x) to the extent not determined prior to the Effective Date, the appropriate treatment of Intercompany Claims, (xi) the Morgan Stanley Claims, which arise from, among other things, the Debtors' retention of MSCS, a certain swap transaction and the disposition of certain notes, bonds and other indebtedness held by MSCS; (xii) Intercompany Claims Avoidance Actions; (xiii) all claims and Estate causes of action under chapter 5 of the Bankruptcy Code that are not Abandoned Claims (the foregoing, together with any other causes of action that may be prosecuted by the Litigation Trust and the Creditors' Trust, are referred to as the "Trust Causes of Action"). To the extent any Trust Causes of Action are commenced prior to the Effective Date, control over the prosecution of such causes of action will be transferred to the Litigation Trust or the Creditors' Trust, as applicable, on the Effective Date pursuant to the terms of the Bridge Lender Plan.

MIAMI 889648 (2K)

issues than the other plans of reorganization that have been proposed in the Debtors' Chapter 11 Cases.

## ARTICLE 1    DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS

1.1    <u>Definitions</u>.

As used herein, capitalized terms shall have the meanings set forth below.  Any term that is not otherwise defined in the Bridge Lender Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1.1    <u>Abandoned Claims</u> means the claims and causes of action against shareholders of Tribune whose stock in Tribune was redeemed in connection with the Leveraged ESOP Transactions, which claims shall be prosecuted as contemplated by the Creditors' Trust.

1.1.2    <u>Administrative Expense Claim</u> means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under sections 328, 330, 363, 364(c)(l), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (i) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years ending on or after the Petition Date or commencing after the Petition Date, but excluding Claims related to tax periods, or portions thereof, ending on or before the Petition Date; (ii) all compensation for legal, financial, advisory, accounting and other professional services and reimbursement of expenses of professionals retained by the Debtors or the Creditors' Committee incurred during the Chapter 11 Cases and Allowed by the Bankruptcy Court; (iii) any indebtedness or obligation incurred or assumed by the Debtors during the Chapter 11 Cases pursuant to an agreement which was approved or otherwise permitted by a Final Order or is an ordinary course agreement; (iv) any payment to cure a default on an assumed executory contract or unexpired lease; (v) postpetition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate; or (vi) any fees and charges assessed against the Debtors' Estates under section 1930, chapter 123, of title 28 of the United States Code.

1.1.3    <u>Affiliate</u> means an "affiliate," as defined in section 101(2) of the Bankruptcy Code, and when used with reference to any Debtor, shall include, but not be limited to, each of the other Debtors and Subsidiary Non-Debtors.

1.1.4    <u>Allowed</u> means, with respect to a Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest (i) that is evidenced by a Proof of Claim or Interest and is not listed as disputed, contingent or unliquidated on the pertinent Debtor's schedules or in the Bridge Lender Plan and as to which no objection or request for estimation has been filed on or before any objection deadline set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court, (ii) that is listed on the pertinent Debtor's schedules but is not listed as disputed, contingent or unliquidated, that is not otherwise subject to an objection and as for which no contrary or superseding Proof of Claim or Interest

3

has been filed, (iii) as to which any objection has been settled, waived, withdrawn or overruled by a Final Order, or (iv) that is expressly allowed (a) by a Final Order, (b) pursuant to the terms of the Claims Settlement Order, (c) solely with respect to those Claims that are not prepetition Claims and are not required under applicable bankruptcy law to be allowed pursuant to an order of the Bankruptcy Court, by an agreement between the Holder of such Claim and the pertinent Debtor or Reorganized Debtor pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement that, unless *de minimis* in nature, has been provided to and has not been objected to in writing by the Proponents, or (d) pursuant to the terms of the Bridge Lender Plan regardless of whether an objection is pending or subsequently brought against such Claim or Interest. For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff, subordination, and any other defenses.

 1.1.5 Available Cash means all Cash balances of the Tribune Entities that are immediately available for disbursement, reduced by the value of any funds held in accounts that are restricted in their use, including, but not limited to, Cash held as collateral for issued letters of credit, Cash held in escrow accounts, Cash held for collateral in respect of utility deposits, and Cash held by Multimedia Insurance Company, a Non-Guarantor Non-Debtor. For the avoidance of doubt, Available Cash includes any Cash held by Tribune CNLBC, LLC.

 1.1.6 Average Distributable Cash means the average of the Available Cash balance of all of the Tribune Entities at the close of business on each of the four Fridays (or the immediately preceding Business Day if any such Friday is not a Business Day) immediately preceding the Effective Date.

 1.1.7 Ballot means the applicable document for accepting or rejecting the Bridge Lender Plan in the form approved by the Bankruptcy Court.

 1.1.8 Bankruptcy Code means title 11 of the United States Code, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

 1.1.9 Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware.

 1.1.10 Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

 1.1.11 Bridge Lender Plan means this chapter 11 plan of reorganization for the Debtors in the Chapter 11 Cases and the Prepackaged Plan for the Subsidiary Non-Debtors that become Debtors, if any, including exhibits and all supplements and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

4

1.1.12     Bridge Lender Specific Disclosure Statement means that portion of the Joint Disclosure Statement related specifically to the Bridge Lender Plan.

1.1.13     Bridge Loan Agent means Wells Fargo Bank, N.A. solely as administrative agent under the Bridge Loan Agreement and not in its individual capacity.

1.1.14     Bridge Loan Agreement means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Loan Lenders, the Former Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time.

1.1.15     Bridge Loan Claim means a Claim arising under the Bridge Loan Agreement.

1.1.16     Bridge Loan Guaranty Agreement means the Guaranty Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Former Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.17     Bridge Loan Guaranty Claim means a Claim arising under the Bridge Loan Guaranty Agreement.

1.1.18     Bridge Loan Lender Claims means the Bridge Loan Claims and Bridge Loan Guaranty Claims.

1.1.19     Bridge Loan Lender Parties means each Bridge Loan Lender, the Bridge Loan Agent and each of their respective directors, officers, employees, agents, representatives and attorneys.

1.1.20     Bridge Loan Lender Parties Release means the release of the Bridge Loan Lender Parties (but not the Original Bridge Loan Lenders in their capacity as such) from the Estates in respect of all LBO-Related Causes of Action related to, or arising in connection with, the Bridge Loan Agreement, as set forth in Section 11.2.2(c).

1.1.21     Bridge Loan Lender Settlement means the proposed settlement between the Debtors and the Bridge Loan Lenders described in Section 5.15(c) of the Bridge Lender Plan.

1.1.22     Bridge Loan Lenders means the lenders from time to time party to the Bridge Loan Agreement as lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.1.23     Bridge Loan Subordination Provision means Section 3 of the Bridge Loan Guaranty Agreement, which purportedly subordinates payment of the Bridge Loan Guaranty Claims to payment of the Senior Loan Guaranty Claims.

1.1.24     Business Day means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

MIAMI 889648 (2K)

1.1.25    By-Laws means the amended and restated by-laws of Reorganized Tribune, in substantially the form of Exhibit 5.3.1(2) to be filed with the Debtor/Committee/Lender Plan Supplement.

1.1.26    Cash means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

1.1.27    Certificate of Incorporation means the amended and restated certificate of incorporation of Reorganized Tribune, in substantially the form of Exhibit 5.3.1(1) to be filed with the Debtor/Committee/Lender Plan Supplement.

1.1.28    Chapter 11 Cases means the voluntary cases commenced on the Petition Date by the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and the cases, if any, commenced by any of the Subsidiary Non-Debtors under chapter 11 of the Bankruptcy Code.

1.1.29    Claim means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.1.30    Claims Agent means Epiq Bankruptcy Solutions, LLC.

1.1.31    Claims Purchase means the purchase by the Claims Purchaser of the Put Claims in the event the applicable Put Option is consummated.

1.1.32    Claims Purchase Agent means the agent responsible for (i) distributing the Claims Purchase Funds to the Holders of Put Claims and (ii) transferring the Put Claims to the Claims Purchaser in the event the applicable Put Option is consummated.

1.1.33    Claims Purchase Agreement means that certain claims purchasing agreement to be entered into by the Claims Purchase Agent and the Claims Purchaser and acceptable to the Proponents in form and substance.

1.1.34    Claims Purchase Funds means the Other Guarantor Debtor Claims Purchase Funds and the Other Parent Claims Purchase Funds.

1.1.35    Claims Purchase Price means the aggregate purchase price for all Put Claims.

1.1.36    Claims Purchase Price Caps means the Other Parent Claims Purchase Price Cap and Other Guarantor Debtor Claims Purchase Price Cap.

1.1.37    Claims Purchaser means the entities managed by Aurelius Capital Management, LP and/or otherwise designated by Aurelius Capital Management, LP that may choose, at their sole option, to provide the Claims Purchase Funds for the Claims Purchase.

1.1.38    Claims Settlement Order means the Order Granting Debtors (I) Limited Waiver of Requirements of Local Rule 3007-1(f) and (II) Authority to Settle Disputed Claims, as entered on November 25, 2009 [D.I. 2657], as the same may be amended, modified or supplemented from time to time.

6

1.1.39    <u>Class</u> means a category of Claims or Interests set forth in Article 3 of the Bridge Lender Plan, as such term is used and described in section 1122 and section 1123(a)(l) of the Bankruptcy Code.

1.1.40    <u>Class [   ] Creditors' Trust Interests</u> means the applicable series of Creditors' Trust Interests allocable to each eligible Class, entitling the holders of such series of Creditors' Trust Interests to distributions (if any) from the Creditors' Trust in accordance with the terms of the Creditors' Trust Agreement, the Creditors' Trust Distribution Orders, the Bridge Lender Plan and the Senior Loan Claim Sharing Resolution.  For the avoidance of doubt, each Holder of a given Class of Creditors' Trust Interests shall receive Pro Rata distributions on account of such Class of Creditors' Trust Interests.

1.1.41    <u>Class [   ] Distribution Trust Interests</u> means the applicable series of Distribution Trust Interests allocable to each applicable Class entitling the holders of such series of Distribution Trust Interests to distributions (if any) from the Distribution Trust (including proceeds of the Litigation Trust Causes of Action) in accordance with the terms of the Distribution Trust Agreement, the Litigation Distribution Orders, the Bridge Lender Plan and the Senior Loan Claim Sharing Resolution.

1.1.42    <u>Collective Bargaining Agreement(s)</u> means, individually or collectively, the collective bargaining agreements listed on <u>Appendix C</u> to the Debtor/Committee/Lender Plan.

1.1.43    <u>Communications Act</u> means the Communications Act of 1934, as amended, or any other successor federal statute, and the rules and regulations of the FCC promulgated thereunder.

1.1.44    <u>Confirmation</u> means the entry of the Confirmation Order on the docket of the Debtors' Chapter 11 Cases.

1.1.45    <u>Confirmation Date</u> means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket for the Chapter 11 Cases.

1.1.46    <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court on confirmation of the Bridge Lender Plan, as such hearing may be continued from time to time.

1.1.47    <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming the Bridge Lender Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.48    <u>Creditor</u> means the Holder of a Claim against a Debtor or a Subsidiary Non-Debtor that becomes a Debtor.

1.1.49    <u>Creditors' Committee</u> means the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.1.50    <u>Creditors' Committee Directors, Officers, Employees and Shareholders Complaint</u> means the complaint filed in the Bankruptcy Court by the Creditors' Committee on

7

November 1, 2010, adversary case no. 10-54010, against certain directors, officers, employees and shareholders of the Debtors, as such complaint may be amended from time to time.

      1.1.51     Creditors' Committee LBO Lender Complaint means the complaint filed in the Bankruptcy Court by the Creditors' Committee on November 1, 2010, adversary case no. 10-53963, against JPMorgan Chase Bank, N.A., individually and as administrative agent, Merrill Lynch Capital Corporation, individually and as Administrative Agent, Wells Fargo Bank, N.A., as administrative agent, J.P. Morgan Securities Inc., Citicorp North America, Inc., individually and as Administrative Agent, Citigroup Global Markets, Inc., Bank of America, N.A., Banc of America Securities, LLC, The 2006 Bank Debt Lenders, LBO Lender Disgorgement Defendants, Does 1-100, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P. and Alden Global Distressed Opportunities Fund, L.P., Barclays Bank, PLC, LaSalle Bank, N.A., Sumitomo Mitsui Banking Corporation, as such complaint may be amended from time to time.

      1.1.52     Creditors' Trust means the trust created pursuant to the Creditors' Trust Agreement on the Effective Date in accordance with the terms of the Bridge Lender Plan, the Confirmation Order and the Creditors' Trust Agreement, which shall prosecute the State Law Avoidance Claims and the D&O Claims and distribute the proceeds thereof to the holders of Creditors' Trust Interests in accordance with the terms of the Creditors' Trust Agreement, the Creditors' Trust Distribution Orders and the Senior Loan Claim Sharing Resolution.

      1.1.53     Creditors' Trust Advisory Board means the advisory board established pursuant to the Creditors' Trust Agreement and the Bridge Lender Plan, which shall initially consist of three members to be disclosed in the Debtor/Committee/Lender Plan Supplement identified and acceptable to the Proponents. The Creditors' Trust Advisory Board shall, among other things, direct the Creditors' Trustee and have sole authority (subject to Bankruptcy Court approval, where applicable) to make decisions regarding actions to be undertaken by the Creditors' Trustee.

      1.1.54     Creditors' Trust Agreement means the creditors' trust agreement to be dated as of the Effective Date establishing the terms and conditions of the Creditors' Trust, which shall be in form and substance acceptable to the Proponents.

      1.1.55     Creditors' Trust Assets means the State Law Avoidance Claims, the D&O Claims, and any proceeds therefrom and any interest and earnings on such proceeds.

      1.1.56     Creditors' Trust Beneficiaries means holders of Creditors' Trust Interests.

      1.1.57     Creditors' Trust Distribution Orders means one or more orders of the applicable state court(s) determining, among other things, the entitlement of each series of Creditors' Trust Interests to distributions from the Creditors' Trust based on the resolution of the State Law Avoidance Claims.

      1.1.58     Creditors' Trust Indemnified Party shall have the meaning set forth in Section 5.19.14 of the Bridge Lender Plan.

      1.1.59     Creditors' Trust Initial Funding means a loan in such amount as determined by the Distribution Trust Advisory Board, from the Distribution Trust to the Creditors' Trust,

MIAMI 889648 (2K)

which will be repaid in full from the proceeds of the State Law Avoidance Claims prior to the Creditors' Trust Beneficiaries receipt of any payment on account of their Creditors' Trust Interests.

    1.1.60    Creditors' Trust Interests means the aggregate beneficial interests in the Creditors' Trust entitling the holders of such interests to receive their share, if any, of distributions from the Creditors' Trust in accordance with the terms of the Creditors' Trust Agreement, the Creditors' Trust Distribution Orders and the Senior Loan Claim Sharing Resolution.

    1.1.61    Creditors' Trustee means the trustee of the Creditors' Trust identified and acceptable to the Proponents and disclosed in the Creditors' Trust Agreement.

    1.1.62    CT Reserves means any reserve established by the Creditors' Trust on account of Disputed Claims held by any Creditors' Trust Beneficiary that, if Allowed, would entitle such Creditors' Trust Beneficiary to a distribution from the Net Creditors' Trust Proceeds.

    1.1.63    CT Tax Items has the meaning set forth in Section 5.19.11 of the Bridge Lender Plan.

    1.1.64    Customer Program means any of the Debtors' customer programs and practices as to which the Debtors were authorized, in their sole discretion and in the ordinary course of business, to honor and perform all obligations in respect thereof by the Order Authorizing, But Not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business, which was signed by the Bankruptcy Court on December 10, 2008 [D.I. 50].

    1.1.65    D&O Claims has the meaning set forth in the Introduction.

    1.1.66    Debtor(s) means, individually or collectively, the debtors and debtors in possession identified in footnote 1 hereto, and shall also include any Subsidiary Non-Debtor that files a chapter 11 petition for relief prior to the Confirmation Date.

    1.1.67    Debtor/Committee/Lender Plan means the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries proposed by the Debtors, the Creditors' Committee, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P., and JPMorgan Chase Bank N.A. [D.I. 6089], which was filed on October 22, 2010, including all exhibits, supplements, appendices and schedules thereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms thereof.

    1.1.68    Debtor/Committee/Lender Plan Supplement means the supplement to the Debtor/Committee/Lender Plan to be filed with the Bankruptcy Court no later than fifteen (15) calendar days prior to the deadline established for objecting to confirmation of the Debtor/Committee/Lender Plan.

MIAMI 889648 (2K)

1.1.69    Defined Benefit Plan means a single-employer plan within the meaning of section 4001(a)(15) of the Employee Retirement Income Security Act of 1974, as amended.

1.1.70    DEV means the total distributable enterprise value of the Debtors as described in the Introduction and determined by the Bankruptcy Court in connection with Confirmation. For the avoidance of doubt, the DEV shall not include the value of any proceeds resulting from the prosecution or settlement of the Litigation Trust Causes of Action or any Creditors' Trust Assets.

1.1.71    DIP Facility means the financing facility and letter of credit facility entered into by the Debtors pursuant to the DIP Facility Agreements.

1.1.72    DIP Facility Agent means Barclays Bank PLC, as administrative agent and letter of credit agent under the DIP Facility Agreements.

1.1.73    DIP Facility Agreements means collectively, as each may be amended, supplemented or otherwise modified from time to time, (i) that certain Amended and Restated Receivables Loan Agreement among Tribune, Tribune Receivables, LLC, the DIP Facility Agent, and the DIP Facility Lenders, (ii) that certain Amended and Restated Receivables Purchase Agreement among Tribune Receivables, LLC, Tribune and the other Originators (as defined therein), (iii) that certain Amended and Restated Servicing Agreement among Tribune Receivables, LLC, Tribune and the other Originators (as defined therein), (iv) that certain Amended and Restated Guaranty Security Agreement among Tribune, the other Debtors, and the DIP Facility Agent, (v) that certain Letter of Credit Agreement among the DIP Facility Agent, certain DIP Facility Lenders and the Debtors and (vi) that certain Payout and Termination Agreement, dated as of March 1, 2010, among Tribune Receivables, LLC, Tribune, certain subsidiaries of Tribune party thereto, and Barclays Bank PLC, as administrative agent.

1.1.74    DIP Facility Claims means all Claims held by the DIP Facility Agent and the DIP Facility Lenders pursuant to the DIP Facility Agreements and the Final DIP Order.

1.1.75    DIP Facility Lenders means the lenders from time to time party to the DIP Facility Agreements, including any applicable assignees and participants thereof.

1.1.76    Disallowed means, with respect to a Claim or Interest, all or such part of a Claim or Interest that is disallowed by a Final Order.

1.1.77    Disbursing Agent means any entity in its capacity as a disbursing agent under Section 7.5 of the Bridge Lender Plan.

1.1.78    Disputed means, with respect to a Claim or Interest, all or such part of a Claim or Interest (i) that is neither Allowed nor Disallowed, (ii) that is listed as disputed, contingent or unliquidated on the Debtors' schedules or is otherwise subject to an objection, (iii) for which a Proof of Claim or Proof of Interest has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors have, or any party in interest entitled to do so has, interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order, (iv) that is subject to challenge by the Litigation Trust pursuant to the Bridge Lender Plan regardless of whether

10

such Claim or Interest is provisionally Allowed for purposes of receiving Initial Distributions, Distribution Trust Interests and/or Creditors' Trust Interests, or (v) that is disputed pursuant to the Bridge Lender Plan.

1.1.79    Disputed Claims Reserves means the Disputed Other Guarantor Debtor Claims Reserve, Disputed Other Non-Guarantor Debtor Claims Reserve and Disputed Other Parent Claims Reserve.

1.1.80    Disputed Other Guarantor Debtor Claims Reserve means the reserve established pursuant to Section 7.2 of the Bridge Lender Plan for distributions to Holders of Disputed Other Guarantor Debtor Claims that become Allowed Other Guarantor Debtor Claims after the Effective Date.

1.1.81    Disputed Other Non-Guarantor Debtor Claims Reserve means the reserve established pursuant to Section 7.2 of the Bridge Lender Plan for distributions to Holders of Disputed Other Non-Guarantor Debtor Claims that become Allowed Other Non-Guarantor Debtor Claims after the Effective Date.

1.1.82    Disputed Other Parent Claims Reserve means the reserve established pursuant to Section 7.2 of the Bridge Lender Plan for distributions to Holders of Disputed Other Parent Claims that become Allowed Other Parent Claims after the Effective Date.

1.1.83    Distributable Cash means an amount in Cash equal to (i) the Distributable Cash Pool less (ii) the sum of (a) $325 million, (b) the Distribution Trust Initial Funding, and (c) the amount of Cash estimated by the Debtors to be required to be distributed to Holders of Allowed Administrative Expense Claims (including fees paid pursuant to Section 9.1 of the Bridge Lender Plan, any fees and expenses associated with the Exit Facility or any new indebtedness under Section 5.6 of the Bridge Lender Plan, and cure costs required to be paid by the Debtors but excluding postpetition payables arising and paid in the ordinary course of business), Priority Tax Claims estimated to be payable at or in connection with the Effective Date, DIP Facility Claims, Priority Non-Tax Claims, the amount of Cash estimated by the Debtors to be required to be distributed to Holders of Allowed Other Non-Guarantor Debtor Claims (to the extent of the value of the applicable Non-Guarantor Debtor), the amount of Cash estimated by the Debtors to be necessary to pay the Cash portion of the Initial Distributions to the Holders of Allowed Other Guarantor Debtor Claims, Claims arising from Employee Benefit Plans continuing with current employees, and Cash required to be posted to collateralize outstanding letters of credit.

1.1.84    Distributable Cash Pool means an amount in Cash equal to (i) if the Average Distributable Cash is more than $25 million greater than the Effective Date Cash, the Effective Date Cash plus $25 million, (ii) if the Average Distributable Cash is more than $25 million less than the Effective Date Cash, the Effective Date Cash less $25 million, or (iii) if the Average Distributable Cash is within $25 million higher or lower than the Effective Date Cash, the Average Distributable Cash.

11

1.1.85    Distribution Date means any of the Initial Distribution Date, the Quarterly Distribution Date and the Final Distribution Date, but in no event a date prior to the Effective Date.

1.1.86    Distribution Record Date means the Confirmation Date or such other date as may be designated in the Confirmation Order.

1.1.87    Distribution Trust means the trust created pursuant to the Distribution Trust Agreement on the Effective Date in accordance with the terms of the Bridge Lender Plan, the Confirmation Order and the Distribution Trust Agreement, which shall distribute the Distribution Trust Reserve and the proceeds of the Litigation Trust Causes of Action to the applicable holders of Distribution Trust Interests in accordance with the terms of the Distribution Trust Agreement, the Litigation Distribution Orders, the Bridge Lender Plan and the Senior Loan Claim Sharing Resolution.

1.1.88    Distribution Trust Advisory Board means the advisory board established pursuant to the Distribution Trust Agreement and the Bridge Lender Plan.  The Distribution Trust Advisory Board shall, among other things, direct the Distribution Trustee and have sole authority (subject to Bankruptcy Court approval, where applicable) to make decisions regarding actions to be undertaken by the Distribution Trustee.

1.1.89    Distribution Trust Agreement means the distribution trust agreement to be dated as of the Effective Date establishing the terms and conditions of the Distribution Trust, which shall be in form and substance acceptable to the Proponents.

1.1.90    Distribution Trust Assets means the Distribution Trust Reserve and proceeds of the Litigation Trust Causes of Action.

1.1.91    Distribution Trust Indemnified Party has the meaning set forth in Section 7.16.11 of the Bridge Lender Plan.

1.1.92    Distribution Trust Initial Funding means the $40 million contribution made on the Effective Date from the Reorganized Debtors to the Distribution Trust.

1.1.93    Distribution Trust Interests means the beneficial interests in the Distribution Trust entitling the Holders of such interests to receive their share, if any, of distributions from the Distribution Trust in accordance with the terms of the Distribution Trust Agreement, the Litigation Distribution Orders and the Senior Loan Claim Sharing Resolution.

1.1.94    Distribution Trust Reserve means the reserve containing the Non-LBO Debt Reserve DEV and the LBO Debt Reserve DEV, in the form of New Common Stock, New Warrants, New Senior Secured Term Loan and Distributable Cash, that was not distributed in the Initial Distributions.

1.1.95    Distribution Trustee means the trustee of the Distribution Trust identified and acceptable to the Proponents and disclosed in the Distribution Trust Agreement.

1.1.96    DTC means The Depository Trust Company.

12

1.1.97    Effective Date means the first Business Day on which all of the conditions to the Effective Date specified in Section 10.1 of the Bridge Lender Plan have been satisfied or waived in accordance with Section 10.2 of the Bridge Lender Plan.

1.1.98    Effective Date Cash means an amount in Cash equal to the Available Cash balance of all of the Tribune Entities at the close of business on the Friday immediately preceding the Effective Date (or the immediately preceding Business Day if any such Friday is not a Business Day).

1.1.99    EGI-TRB LLC Noteholder means a Holder of EGI-TRB LLC Notes.

1.1.100    EGI-TRB LLC Notes means those certain promissory notes in the aggregate principal amount of $225 million issued by Tribune in favor of EGI-TRB, LLC and certain direct and indirect assignees of EGI-TRB, LLC.

1.1.101    EGI-TRB LLC Notes Claims means all Claims held by the EGI-TRB LLC Noteholders pursuant to the EGI-TRB LLC Notes.

1.1.102    EGI-TRB LLC Warrants means those certain 15-year warrants issued to EGI-TRB, LLC and certain assignees evidencing rights to purchase 43,478,261 shares in the aggregate (subject to adjustment) of Old Common Stock.

1.1.103    Employee Benefit Claim means any Claim arising under or in connection with an assumed Employee Benefit Plan.

1.1.104    Employee Benefit Plan means any employment, compensation, tax-qualified or non-tax qualified Pension Plan, Defined Benefit Plan, Multiemployer Plan, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, expense reimbursement, retirement, savings, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other benefit plan, or any individual contract or agreement that has not been rejected or terminated prior to the Confirmation Date for the benefit of the directors, officers or employees (whether salaried or hourly) of the applicable Debtor, or maintained by any Debtor for employees of non-Debtor direct or indirect subsidiaries of a Debtor, and any retiree benefit program of the applicable Debtor included in the protections of section 1114 of the Bankruptcy Code, in all cases that has been in existence and has accrued to a specific person before or on the Petition Date or has been approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, plan or program; provided, however, that any of the foregoing that specifically applies to any of the top twenty (20) officers of Tribune and its wholly owned subsidiaries (determined by salary and bonus payments earned with respect to the most recently completed fiscal year) and does not have broad application to employees other than such officers, must have been disclosed to and approved by the Proponents to constitute an "Employee Benefit Plan"; provided further, that the definition of "Employee Benefit Plan" excludes Non-Qualified Former Employee Benefit Plans and the ESOP.

1.1.105    Equity Incentive Plan means an equity incentive plan pertaining to the Reorganized Debtors described in Section 5.11 of the Bridge Lender Plan.

13

MIAMI 8896-18 (2K)

1.1.106    ESOP means, individually or collectively, the ESOP Plan and the ESOP Trust and any related documents and agreements, as the context implies.

1.1.107    ESOP Loan Agreement means that certain ESOP Loan Agreement, dated as of April 1, 2007, by and between Tribune and the ESOP Trustee.

1.1.108    ESOP Note means that ESOP Note, dated as of April 1, 2007, made by the ESOP Trustee on behalf of the ESOP Trust in favor of Tribune in the principal amount of $250 million, to be repaid by the ESOP over the 30-year life of the loan through its use of annual contributions from Tribune to the ESOP and/or distributions paid on the shares of Tribune common stock held by the ESOP Trust.

1.1.109    ESOP Plan means that certain Tribune Employee Stock Ownership Bridge Lender Plan formed during the first quarter of 2007 with an effective date as of January 1, 2007.

1.1.110    ESOP Trust means that certain Tribune Employee Stock Ownership Trust, dated as of April 1, 2007, with an effective date as of February 7, 2007, by and between Tribune and the ESOP Trustee.

1.1.111    ESOP Trustee means GreatBanc Trust Company in its capacity as trustee of the ESOP Trust.

1.1.112    Estate(s) means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.1.113    Examiner means Kenneth N. Klee, appointed by the Bankruptcy Court as examiner on May 11, 2010.

1.1.114    Examiner's Report means the report regarding, among other things, the LBO-Related Causes of Action issued by the Examiner on August 3, 2010.

1.1.115    Exit Facility means a new revolving credit facility, if any, as described in Exhibit 5.10 to be filed with the Debtor/Committee/Lender Plan Supplement, which may be entered into by Reorganized Tribune and certain of the other Reorganized Debtors and Subsidiary Non-Debtors on the Effective Date.

1.1.116    Exit Facility Credit Agreement means the definitive agreement relating to the Exit Facility.

1.1.117    Face Amount means (i) when used in reference to a Disputed Claim, (a) the full stated amount claimed by the Holder of such Claim in any Proof of Claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, (b) if no such claim is filed in accordance with clause (a) above, the full stated amount listed on the pertinent Debtor's schedules as disputed, contingent or unliquidated if no contrary or superseding Proof of Claim or an objection to the Claim has been filed, or (c) if no stated amount is included in the Proof of Claim or the pertinent Debtor's schedules with respect to a disputed, contingent or unliquidated claim, then an amount

14

determined by the pertinent Debtor, and (ii) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

     1.1.118   FCC means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

     1.1.119   FCC Applications means, collectively, each application to be filed with the FCC in connection with the Bridge Lender Plan or amendment to a pending application with the FCC to make such application applicable to the Bridge Lender Plan, including those filed in connection with the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and any other FCC applications necessary to complete the Restructuring Transactions.

     1.1.120   FCC Approval means an action or actions by the FCC (including any action or actions taken by the FCC's staff pursuant to delegated authority and regardless of whether any action or actions may be subject to further administrative or judicial review) on the FCC Applications granting any consent of the FCC necessary to consummate the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and/or otherwise necessary to implement the Bridge Lender Plan.

     1.1.121   FCC Licenses means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

     1.1.122   Filed Subsidiary Debtors means, individually or collectively, the Guarantor Debtors and the Non-Guarantor Debtors.

     1.1.123   Final DIP Order means the Final Order Pursuant to Sections 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 365 of the Bankruptcy Code (1) Authorizing the Debtors to Guarantee an Amended Securitization Facility and For Certain Debtors to Continue Selling Receivables and Related Rights Pursuant Thereto, (2) Authorizing the Debtors to Enter Into a Letter of Credit Facility, (3) Modifying the Automatic Stay and (4) Granting Other Related Relief, as entered on January 15, 2009 [D.I. 233], as the same has been and may be amended, modified or supplemented from time to time, together with any modifications and amendments thereto, including, without limitation, the Order Authorizing Debtors to Amend Letter of Credit Facility Pursuant to Sections 105, 362(d), 363(b)(1), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code and Granting Other Related Relief, as entered on March 22, 2010 [D.I. 3808].

     1.1.124   Final Distribution Date means a date selected by the Distribution Trustee or Reorganized Debtors, as applicable, that is no later than thirty (30) days after the date that all Disputed Claims in the applicable Class(es) shall have been Allowed or Disallowed and all of the Litigation Trust Causes of Action shall have been resolved by a Final Order.

     1.1.125   Final Order means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or on the docket of any other court of competent jurisdiction), which has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition

15

for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order

     1.1.126     Foreign Ownership Certification means the certification of aggregate foreign voting interests and aggregate foreign equity interests that each Holder of a Claim that is eligible to receive New Common Stock under the Bridge Lender Plan must provide.

     1.1.127     Former Bridge Loan Agent means Merrill Lynch Capital Corporation as former administrative agent under the Bridge Loan Agreement.

     1.1.128     General Disclosure Statement means that portion of the Joint Disclosure Statement containing general information about the Debtors customarily included in a disclosure statement pertaining to, among other things, the Debtors' businesses, properties, prepetition liabilities, claims and events during the Chapter 11 Cases.

     1.1.129     General Unsecured Claim means any Claim against the Debtors that is not an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Senior Loan Claim, a Bridge Loan Claim, a Senior Noteholder Claim, an EGI-TRB LLC Notes Claim, a PHONES Notes Claim, a PHONES Notes Exchange Claim, an Employee Benefit Claim, an Intercompany Claim, a Subordinated Securities Claim, a Senior Loan Guaranty Claim or a Bridge Loan Guaranty Claim and shall not include Disallowed Claims or Claims that are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Bridge Lender Plan or otherwise.

     1.1.130     Global Contract Motion means a motion seeking the assumption or rejection of unassumed or unrejected executory contracts and unexpired leases of the Debtors, which motion may be filed with the Bankruptcy Court and heard at the Confirmation Hearing.

     1.1.131     Guarantor Debtors means those Debtors listed on Appendix A hereto as "Guarantor Debtors."

     1.1.132     Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Guarantor Non-Debtors."

     1.1.133     Guarantor Non-Debtor Release means the release of the Guarantor Non-Debtors from Loan Guaranty Claims.

     1.1.134     Guarantor Subsidiaries means, collectively, the Guarantor Debtors and Guarantor Non-Debtors.

16

1.1.135    Holder means a Person holding a Claim, Interest or Trust Interest.

1.1.136    Impaired means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.1.137    Indemnity, Subrogation and Contribution Agreements means (i) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule 1 thereto, and the Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time, and (ii) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule 1 thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.138    Indenture Trustees means the Senior Notes Indenture Trustees and the PHONES Notes Indenture Trustee.

1.1.139    Indentures means the Senior Notes Indentures and the PHONES Notes Indenture.

1.1.140    Initial Distribution Date means a date selected by the Reorganized Debtors and acceptable to the Proponents that is as soon as practicable following the Effective Date and is in no event later than thirty (30) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

1.1.141    Initial Distributions means the distributions to be made on the Initial Distribution Date, or as soon thereafter as practicable, to the Step One Lenders, Step Two Lenders (to the extent applicable based upon the Senior Loan Claim Sharing Resolution), Bridge Loan Lenders (to the extent applicable), Senior Noteholders, Holders of Other Parent Claims, Holders of Other Guarantor Debtor Claims and Holders of Other Non-Guarantor Debtor Claims pursuant to the terms of the Bridge Lender Plan.

1.1.142    Initial Report has the meaning set forth in Section 9.2 hereto.

1.1.143    Intercompany Claims means all prepetition Claims against any of the Debtors held by another Debtor or a non-Debtor Affiliate.

1.1.144    Intercompany Claims Avoidance Actions means causes of action arising under chapter 5 of the Bankruptcy Code that any Debtor may have against any other Debtor or Subsidiary Non-Debtor or any causes of action that any Debtor may have against any other Debtor or Subsidiary Non-Debtor to recharacterize, avoid, subordinate or disallow a Claim that any Debtor or Subsidiary Non-Debtor has against such Debtor.

1.1.145    Intercompany Claims Subordination Provision means Section 7 of the Bridge Loan Guaranty Agreement, which subordinates to payment in full of the Bridge Loan Guaranty Claims, payment of Intercompany Claims owed by Tribune to any of the Guarantor Subsidiaries.

1.1.146    Interest means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any

17

option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including, but not limited to, any Tribune Interest and Interest in a Subsidiary Debtor.

      1.1.147    IRC means the Internal Revenue Code of 1986, as amended.

      1.1.148    IRS means the Internal Revenue Service of the United States Department of Treasury.

      1.1.149    Joint Disclosure Statement means that certain disclosure document relating to each of the competing plans of reorganization for the Debtors for which the votes of Holders of Claims will be solicited, which shall, among other things, include the General Disclosure Statement and the Bridge Lender Specific Disclosure Statement including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

      1.1.150    LBO Debt means any and all debt of Tribune and its subsidiaries arising out of or otherwise associated with the Senior Loan Agreement, Bridge Loan Agreement or EGI-TRB LLC Notes.

      1.1.151    LBO Debt Reserve DEV means all DEV remaining in the Remaining Consideration Pool after accounting for the Non-LBO Debt Reserve DEV.

      1.1.152    LBO Lenders means, as applicable, the Step One Lenders, Step Two Lenders, Bridge Loan Lenders and EGI-TRB LLC Noteholders.

      1.1.153    LBO-Related Causes of Action means any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance powers or rights, liabilities of any nature whatsoever, and legal and equitable remedy against any Person based upon, arising out of, or related to any transaction related to the merger and related transactions involving the Leveraged ESOP Transaction, and any financing committed to, incurred or repaid in connection therewith (including the incurrence of any fees, expenses, and obligations associated with any such financing), the repayment of any such financing (either partially or in full), and any proceeds of such financing or other amounts related to the Leveraged ESOP Transaction paid to shareholders, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law and regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies are known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, now existing or hereafter arising, in law, equity or otherwise and regardless of whether any distributions are made on account of any Claims arising in connection with the Leveraged ESOP Transaction under the Bridge Lender Plan, all of which such claims, causes of action, avoidance powers and rights shall survive Confirmation and effectiveness of the Bridge Lender Plan.  A non-exclusive list of the LBO-Related Causes of Action and related defendants shall be included in the Debtors/LBO Lender Plan Supplement.  For the avoidance of doubt, LBO-Related Causes of Action shall include all Claims and causes of action asserted in the Creditors' Committee Director, Officer and

18

Shareholder Complaint and the Creditors' Committee LBO Lender Complaint (as such may be amended) filed by the Creditors' Committee pursuant to the Standing Order (other than Abandoned Claims).

1.1.154    Leveraged ESOP Transaction means the merger and related transactions that resulted in the leveraged buyout of Tribune that occurred in two steps in 2007.

1.1.155    Lien means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

1.1.156    Litigation Claims means all claims, rights of action, suits or proceedings, whether in-law or in equity, whether known or unknown that any Debtor or Estate may hold against any Person as of the Petition Date; provided, however, that Litigation Claims shall not include (i) any claim, right of action, suit or proceeding that has been settled on or prior to the Confirmation Date, (ii) the Litigation Trust Causes of Action, (iii) the State Law Avoidance Claims or (iv) the Intercompany Claims Avoidance Actions.

1.1.157    Litigation Distribution Orders means one or more Final Orders determining, among other things, the entitlement of each series of Distribution Trust Interests to distributions, if any, from the Distribution Trust based on the resolution of the Litigation Trust Causes of Action and the Senior Loan Claim Sharing Resolution.

1.1.158    Litigation Trust means the trust created pursuant to the Litigation Trust Agreement on the Effective Date in accordance with the Bridge Lender Plan, the Confirmation Order and the Litigation Trust Agreement to pursue the Litigation Trust Causes of Action and resolve Disputed Claims related to the Litigation Trust Causes of Action.

1.1.159    Litigation Trust Advisory Board means the advisory board established pursuant to the Litigation Trust Agreement and the Bridge Lender Plan, which shall initially consist of three members to be disclosed and acceptable to the Proponents. The Litigation Trust Advisory Board shall direct the Litigation Trustee and have sole authority to propose and cause the Litigation Trust to enter into settlements (subject to Bankruptcy Court approval, as applicable) with respect to Litigation Trust Causes of Action.

1.1.160    Litigation Trust Agreement means the litigation trust agreement to be dated as of the Effective Date establishing the terms and conditions of the Litigation Trust, which shall be in form and substance acceptable to the Proponents.

1.1.161    Litigation Trust Causes of Action means the LBO-Related Causes of Action, the Morgan Stanley Claims, all claims and causes of action against Sam Zell and his Affiliates, all other claims and causes of action belonging to the Estates in any way related to the Leveraged ESOP Transaction, Intercompany Claims Avoidance Actions and all claims and causes of action under chapter 5 of the Bankruptcy Code. For the avoidance of doubt, Litigation Trust Causes of Action shall not include the State Law Avoidance Claims or the D&O Claims.

1.1.162    Litigation Trust Indemnified Party has the meaning set forth in Section 5.18.10 of the Bridge Lender Plan.

19

1.1.163     Litigation Trustee means the trustee of the Litigation Trust identified and acceptable to the Proponents and disclosed in the Litigation Trust Agreement.

1.1.164     Loan Agents means the Senior Loan Agent and the Bridge Loan Agent.

1.1.165     Loan Agreements means the Senior Loan Agreement and the Bridge Loan Agreement.

1.1.166     Loan Claims means the Senior Loan Claims and the Bridge Loan Claims.

1.1.167     Loan Guaranty Agreements means the Senior Loan Guaranty Agreement, the Bridge Loan Guaranty Agreement and the Indemnity, Subrogation and Contribution Agreements.

1.1.168     Loan Guaranty Claims means the Step One Senior Loan Guaranty Claims, Step Two Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims.

1.1.169     Media Ownership Certification means the certification of other media investments and holdings, and any other information that the Debtors or Proponents deem reasonably necessary for purposes of the FCC Applications and/or FCC Approval, including, without limitation, on FCC qualifications to hold an attributable interest in the Reorganized Debtors under FCC rules and policies that each Holder that is entitled to receive New Common Stock under the Bridge Lender Plan may be required to provide.

1.1.170     Morgan Stanley Claims means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, and including any and all rights, claims and actions (including avoidance actions arising under chapter 5 of the Bankruptcy Code) that Tribune or any of its Affiliates may have against MSCS. Morgan Stanley Claims include, but are not limited to, rights, claims and actions arising from or related to (i) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS, (ii) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, or (iii) any advisory engagement or potential advisory engagement of, and/or advice given by, or information or analyses withheld by MSCS, including but not limited to (x) services provided by MSCS as an advisor to the Debtors, and (y) the agreement between Tribune and MSCS dated as of November 30, 2008, regardless of whether such rights, claims and actions may be asserted pursuant to the Bankruptcy Code or any other applicable law. For avoidance of doubt, rights, claims and actions arising from or related to (i)-(iii) in the preceding sentence are LBO-Related Causes of Action and are not released pursuant to the Plan or the Confirmation Order.

1.1.171     MSCS means Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities, including, without limitation, Morgan Stanley & Co., Inc.

1.1.172     Multiemployer Plan means a plan (i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and

20

(iii) which satisfies such other requirements contained in regulations promulgated by the United States Department of Labor.

1.1.173    Net Creditors' Trust Proceeds means the sum of all recoveries obtained in connection with the prosecution of the State Law Avoidance Claims after repayment of the Creditors' Trust Initial Funding, other financing sources, to the extent applicable, and the satisfaction of all costs and expenses of the Creditors' Trust (including the costs and expenses of the Creditors' Trustee and the employees, professionals, advisors and consultants retained by the Creditors' Trustee or the Creditors' Trust).

1.1.174    New Class A Common Stock means the Class A Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, the Bridge Lender Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.175    New Class B Common Stock means the Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, the Bridge Lender Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.176    New Class C Common Stock means the single share of Class C Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, the Bridge Lender Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation; provided, however, that such New Class C Common Stock shall be distributed to the Distribution Trust on the Effective Date and provide that the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, shall have the right to appoint two members to the board of directors of Reorganized Tribune so long as the Distribution Trust has not been wound down and dissolved.

1.1.177    New Common Stock means, collectively, the New Class A Common Stock, the New Class B Common Stock and the New Class C Common Stock; provided, however, that (i), under the circumstances set forth in Section 5.4.2 of the Bridge Lender Plan, certain Holders of Claims that would otherwise be entitled to receive New Class A Common Stock or New Class B Common Stock may instead receive New Warrants and (ii) only the Distribution Trust shall be entitled to own New Class C Common Stock.

1.1.178    New Senior Secured Term Loan means the new senior secured term loan in an aggregate principal amount of not more than the lesser of (a) $1.1 billion or (b) two times the Debtors' trailing twelve month operating cash flow excluding minority equity interests (each as described and defined in the New Senior Secured Term Loan Agreement) as of the end of the fiscal quarter most recently ended prior to the Effective Date; which, subject to the terms of Section 5.6 of the Bridge Lender Plan, may be issued on the Effective Date by Reorganized Tribune pursuant to the New Senior Secured Term Loan Agreement, or may be replaced in

21

whole or in part with a distribution of Cash pursuant to and in accordance with Section 5.6 of the Bridge Lender Plan.

1.1.179    New Senior Secured Term Loan Agreement means the loan agreement among Reorganized Tribune, as borrower, the other Reorganized Debtors and U.S. Subsidiary Non-Debtors as provided in and subject to Section 5.6 of the Bridge Lender Plan (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), as guarantors, the administrative agent party thereto, and the Holders of Claims entitled to receive the New Senior Secured Term Loan under the Bridge Lender Plan, which shall contain terms substantially as set forth in Exhibit 5.6 to be filed with the Debtor/Committee/Lender Plan Supplement, and which shall otherwise be acceptable to the Proponents in form and substance.

1.1.180    New Warrant Agreement means the warrant agreement with substantially the terms set forth in Exhibit 1.1.154 to be filed with the Debtor/Committee/Lender Plan Supplement, and which shall otherwise be acceptable to the Proponents in form and substance.

1.1.181    New Warrants means the warrants to purchase New Class A Common Stock or New Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, the Bridge Lender Plan.

1.1.182    Non-Contribution Election means the election presented to certain Classes of Claims against Tribune on the applicable Ballot whereby Creditors in such Classes can elect not to contribute their State Law Avoidance Claims to the Creditors' Trust.

1.1.183    Non-Guarantor Debtors means those Debtors listed on Appendix A hereto as "Non-Guarantor Debtors."

1.1.184    Non-Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Non-Guarantor Non-Debtors."

1.1.185    Non-LBO Debt Reserve DEV means that portion of the DEV which shall consist of a Pro Rata amount of Distributable Cash, New Common Stock and New Senior Secured Term Loan sufficient to pay all Pre-LBO Debt in full after taking into account Initial Distributions to Holders of Senior Noteholder Claims, Other Parent Claims, Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims, which is to be held in reserve by the Distribution Trust.

1.1.186    Non-Qualified Former Employee Benefit Plan means any of the Debtors' non-tax qualified Pension Plans and individual agreements providing for retirement compensation, or deferred compensation arrangements of the applicable Debtor covering an individual who was not an employee, consultant or director of the applicable Debtor as of the Petition Date.

1.1.187    Old Common Stock means the issued and outstanding common stock of Tribune as of the Petition Date.

1.1.188    Original Bridge Loan Lenders means JPMorgan Chase Bank. N.A., Citicorp North America, Inc., Merrill Lynch Capital Corporation and Bank of America, N.A.

22

1.1.189    Original Bridge Loan Lenders Release means the release of the Original Bridge Loan Lenders from the Estates and the other Bridge Loan Lenders in respect of all LBO-Related Causes of Action related to, or arising in connection with, the Bridge Loan Agreement and the sale or disposition of the Bridge Loans and rights and obligations thereunder.

1.1.190    Other Guarantor Debtor Claims means the General Unsecured Claims against the Guarantor Debtors and any Claim against a Guarantor Debtor by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, to the extent that the Bankruptcy Court determines that the ESOP and/or any present or former participants in the ESOP in their capacity as such has an Allowed Claim against a Guarantor Debtor.

1.1.191    Other Guarantor Debtor Claims Initial Distribution means Cash equal to 8% of each Holder's Allowed Other Guarantor Debtor Claim.

1.1.192    Other Guarantor Debtor Claims Purchase Price means, subject to the Claims Purchase Price Cap, Cash in an amount equal to 25% of the amount of the applicable Allowed Other Guarantor Debtor Claims.

1.1.193    Other Guarantor Debtor Claims Purchase Funds means an amount of Cash equal to the lesser of (a) the Other Guarantor Debtor Claims Purchase Price Cap or (b) 25% of the aggregate amount of Allowed Other Guarantor Debtor Claims that exercised and are eligible, under the terms and conditions of the Bridge Lender Plan, to exercise the Other Guarantor Debtor Claims Put Option, which will be used to pay applicable Holders of Allowed Claims electing the Other Guarantor Debtor Claims Put Option, as applicable.

1.1.194    Other Guarantor Debtor Claims Purchase Price Cap means $20.75 million, the maximum aggregate amount of the Other Guarantor Debtor Claims Purchase Price paid for Other Guarantor Debtor Put Claims unless otherwise increased in the sole discretion of the Claims Purchaser. To the extent the aggregate consideration necessary to purchase Other Guarantor Debtor Put Claims exceeds the Other Guarantor Debtor Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Guarantor Debtor Put Claims in the applicable Class, rounded to the nearest whole dollar, at the Other Guarantor Debtor Purchase Price and the remaining portion of the applicable Other Guarantor Debtor Put Claims shall receive their Pro Rata share of the Initial Distribution and Distribution Trust Interests on account of such remaining amount of the applicable Other Guarantor Debtor Put Claims.

1.1.195    Other Guarantor Debtor Claims Put Election means the election by a Holder of an Other Guarantor Debtor Claim that is Allowed as of the Voting Deadline, on its Ballot, to participate in the Other Guarantor Debtor Claims Put Option.

1.1.196    Other Guarantor Debtor Claims Put Option means the option presented to the Holders of Other Guarantor Debtor Claims that are Allowed as of the Voting Deadline to sell such Allowed Claims to the Claims Purchaser in exchange for the Other Guarantor Debtor Claims Purchase Price, which Claims Purchase shall be commenced only in the event that (i) the applicable Other Guarantor Debtor Claims Class votes to accept the Bridge Lender Plan, (ii) such particular Holder of the Other Guarantor Debtor Claim makes the Other Guarantor Debtor Claims Put Election on its Ballot, and (iii) the Claims Purchaser consents to the contribution of

23

Claims Purchase Funds. For the avoidance of doubt, the Other Guarantor Debtor Claims Put Option shall only be exercisable by Holders whose Other Guarantor Debtor Claims are Allowed as of the Voting Deadline.

1.1.197    Other Guarantor Debtor Put Claims means the Other Guarantor Debtor Claims, the Holders of which made the Other Guarantor Debtor Claims Put Election on their respective Ballots.

1.1.198    Other Non-Guarantor Debtor Claims means the General Unsecured Claims against the Non-Guarantor Debtors and any Claim against a Non-Guarantor Debtor by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, to the extent that the Bankruptcy Court determines that the ESOP and/or any present or former participants in the ESOP in their capacity as such has an Allowed Claim against a Non-Guarantor Debtor.

1.1.199    Other Parent Claims means General Unsecured Claims against Tribune (and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans).

1.1.200    Other Parent Claims Initial Distribution means a Pro Rata share of the Parent Consideration equal to the amount of Allowed Other Parent Claims divided by the mid-point estimated amount of all Allowed Claims against Tribune in the event all LBO-Related Causes of Action were unsuccessful.

1.1.201    Other Parent Claims Purchase Funds means an amount of Cash equal to the lesser of (a) the Other Parent Claims Purchase Price Cap or (b) 15% of the amount of aggregate Allowed Other Parent Claims that exercised and are eligible, under the terms and conditions of the Bridge Lender Plan, to exercise the Other Parent Claims Put Option which will be used to pay applicable Holders of Allowed Claims electing the Other Parent Claims Put Option.

1.1.202    Other Parent Claims Purchase Price means, subject to the Claims Purchase Price Cap, Cash in an amount equal to 15% of the amount of the applicable Allowed Other Parent Claims.

1.1.203    Other Parent Claims Purchase Price Cap means $24.25 million, the maximum aggregate amount of the Other Parent Claims Purchase Price paid for Other Parent Put Claims unless otherwise increased in the sole discretion of the Claims Purchaser. To the extent the aggregate consideration necessary to purchase the Other Parent Put Claims exceeds the Other Parent Claims Purchase Price Cap, the Claims Purchaser will purchase a Pro Rata share of the Other Parent Put Claims, rounded to the nearest whole dollar, at the Other Parent Claims Purchase Price and the remaining share of the Other Parent Put Claims shall receive their Pro Rata portion of the Initial Distribution, Distribution Trust Interests and Creditors' Trust Interests on account of such remaining amount of the Other Parent Put Claims.

1.1.204    Other Parent Claims Put Election means the election of a Holder of an Other Parent Claim that is Allowed as of the Voting Deadline on its Ballot to participate in the Other Parent Claims Put Option.

24

1.1.205    Other Parent Claims Put Option means the option presented to the Holders of Other Parent Claims that are Allowed as of the Voting Deadline to sell such Claims to the Claims Purchaser in exchange for the Other Parent Claims Purchase Price of the Allowed amount of such Claims, which Claims Purchase shall be commenced only in the event that (i) the Other Parent Claims Class votes to accept the Bridge Lender Plan, (ii) such particular Holder of the Allowed Other Parent Claim makes the Other Parent Claims Put Election on its Ballot, and (iii) such particular Holder does not make the Non-Contribution Election on its Ballot. For the avoidance of doubt, the Other Parent Claims Put Option shall only be exercisable by Holders whose Other Parent Claims are Allowed as of the Voting Deadline.

1.1.206    Other Parent Put Claims means the Other Parent Claims, the Holders of which made the Other Parent Claims Put Election (and did not make the Non-Contribution Election) on their respective Ballots.

1.1.207    Other Secured Claim means a Secured Claim, other than an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Senior Loan or a Senior Noteholder Claim.

1.1.208    Parent Claims Minimum Distribution Percentage means, without taking into account the subordination provisions of the PHONES Notes and the EGI-TRB LLC Notes, and subject to any Plan Settlement which is approved by the Bankruptcy Court, the resulting estimated percentage recovery that each Holder of an Allowed Senior Noteholder Claim, Other Parent Claim, PHONES Notes Claim, EGI-TRB LLC Notes Claim and Subordinated Securities Claim arising out of Pre-LBO Debt would receive on account of its Allowed Claim at Tribune if all LBO-Related Causes of Action were unsuccessful and the mid-point estimates of Allowed Other Parent Claims is utilized. The Parent Claims Minimum Distribution Percentage is determined by multiplying the Parent Distributable Enterprise Value Percentage by the DEV and dividing the resulting product by the estimated amount of Allowed Claims against Tribune (other than Intercompany Claims) as if all LBO-Related Causes of Action were unsuccessful.

1.1.209    Parent Consideration means a percentage of the New Common Stock, a percentage of the New Senior Secured Term Loan and a percentage of the Distributable Cash in each case equal to the Parent Distributable Enterprise Value Percentage.

1.1.210    Parent Distributable Enterprise Value Percentage means the percentage of the DEV allocable to Tribune for purposes of the Bridge Lender Plan, which percentage shall be determined by the Bankruptcy Court in connection with Confirmation.

1.1.211    Pension Plan means an employee pension benefit plan within the meaning of section (2)(A) of the Employee Retirement Income Security Act of 1974, as amended, but excludes Multiemployer Plans.

1.1.212    Person means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

MIAMI 889648 (2K)

1.1.213    Petition Date means (i) for Tribune and for all Debtors listed on Appendix A hereto other than Tribune CNLBC, LLC, December 8, 2008, the date on which such Debtors commenced their Chapter 11 Cases, (ii) for Tribune CNLBC, LLC, October 12, 2009, the date on which such Debtor commenced its Chapter 11 Case, and (iii) with respect to the Subsidiary Non-Debtors, the date on which any such Subsidiary Non-Debtor commences its Chapter 11 Case, if any.

1.1.214    PHONES Noteholder means a Holder of PHONES Notes.

1.1.215    PHONES Notes means the issued and outstanding notes under the PHONES Notes Indenture.

1.1.216    PHONES Notes Claim means a Claim arising under or evidenced by the PHONES Notes Indenture and related documents, other than PHONES Notes Exchange Claims, to the extent the Bankruptcy Court determines that PHONES Notes Exchange Claims are subordinated in right of payment to PHONES Notes Claims or are General Unsecured Claims.

1.1.217    PHONES Notes Claims Resolution means the determination by a Final Order regarding the classification of the PHONES Notes Exchange Claims and the Allowed aggregate amount of PHONES Notes Exchange Claims.

1.1.218    PHONES Notes Exchange Claim means any Claim arising out of the exercise of exchange rights pursuant to the PHONES Notes Indenture, the distributions on account of which shall be subject to the subordination provisions in the PHONES Notes Indenture and the PHONES Notes Claims Resolution.

1.1.219    PHONES Notes Indenture means that certain Indenture, dated as of April 1, 1999, between Tribune and Bank of Montreal Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.220    PHONES Notes Indenture Trustee means the indenture trustee under the PHONES Notes Indenture.

1.1.221    Plan Settlements means the Step One Lender Settlement, the Step Two Lender Settlement and the Bridge Loan Lender Settlement.

1.1.222    Pledge Agreement means the Pledge Agreement, dated as of June 4, 2007, between Tribune and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.223    Postpetition Interest means interest on a Claim accrued after the Petition Date.

1.1.224    Pre-LBO Debt means any and all obligations of Tribune and the Filed Subsidiary Debtors arising out of or otherwise associated with the Senior Notes Indentures, the PHONES Notes Indenture (including all PHONES Notes Exchange Claims), the Other Parent Claims, the Other Guarantor Debtor Claims and the Other Non-Guarantor Debtor Claims.

26

1.1.225   <u>Prepackaged Plan</u> means the Bridge Lender Plan for the Subsidiary Non-Debtors, if any, that become Debtors.

1.1.226   <u>Priority Non-Tax Claim</u> means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.1.227   <u>Priority Tax Claim</u> means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.1.228   <u>Pro Rata</u> means that proportion that a Claim or Interest in a particular Class bears to the aggregate amount of all Claims or Interests in such Class except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that a Claim or Interest in a particular Class bears to the aggregate amount of all Claims or Interests in such multiple Classes, or in reference to a specific type of Claim, in which case Pro Rata means the proportion that a Claim of such type bears to the aggregate amount of all Claims of such type.  For the avoidance of doubt, (i) when referencing Pro Rata amounts of Creditors' Trust Interests, such determination shall be made based on the proportion that a Claim bears to the aggregate amount of Claims in such Class not making the Non-Contribution Election and (ii) New Class C Common Stock may only be issued to the Distribution Trust.

1.1.229   <u>Proof of Claim</u> or <u>Proof of Interest</u> means the proof of claim or proof of interest, respectively, that must be filed by a Holder of a Claim or Interest by the date(s) designated by the Bankruptcy Court as the last date(s) for filing proofs of claim or interests against the Debtors, or as is otherwise permitted to be filed against any of the Debtors pursuant to a Final Order of the Bankruptcy Court.

1.1.230   <u>Proponents</u> means King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., on behalf of certain funds and managed accounts, which are the proponents of this Bridge Lender Plan within the meaning of section 1129 of the Bankruptcy Code.

1.1.231   <u>Put Claims</u> means the Other Parent Put Claims and the Other Guarantor Debtor Put Claims.

1.1.232   <u>Put Options</u> means, collectively, the Other Parent Claims Put Option and the Other Guarantor Debtor Claims Put Option.

1.1.233   <u>Quarterly Distribution Date</u> means fifteen (15) calendar days after the conclusion of the calendar quarters ending in March, June, September and December.

1.1.234   <u>Reinstate</u> or <u>Reinstated</u> means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (a) curing any such default whether or not such default occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the

27

Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (b) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (c) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (d) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(l)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than a Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (e) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

1.1.235    Related Person means, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former members, partners, shareholders, equity-holders, officers, directors, employees, managers, trustees, trust beneficiaries, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, or other representatives, nominees or investment managers for beneficial owner(s) of the Senior Notes and PHONES Notes, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, trustees, trust beneficiaries, shareholders, partners, employees, members and professionals).

1.1.236    Remaining Consideration Pool means the aggregate amount of Parent Consideration and Subsidiary Consideration remaining after allocating for Initial Distributions to the Senior Noteholders, Holders of Other Parent Claims, Holders of Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims.

1.1.237    Reorganized Debtors means Reorganized Tribune and the other reorganized Debtors or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Bridge Lender Plan (including, without limitation, the Restructuring Transactions).

1.1.238    Reorganized Tribune means reorganized Tribune or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Bridge Lender Plan.

1.1.239    Restructuring Transactions means those transactions or other actions (including, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions) that one or more of the applicable Debtors or Reorganized Debtors may enter into or undertake after the Confirmation Date but on, prior to, or after the Effective Date outside the ordinary course of business of such Debtors or Reorganized Debtors in accordance with Section 5.2 hereof and as shall be set forth in the Debtor/Committee/Lender Plan Supplement, and which shall otherwise be acceptable to the Proponents in form and substance.

28

1.1.240    Secured Claim means a Claim (i) secured by a Lien on collateral to the extent of the value of such collateral (a) as set forth in the Bridge Lender Plan, (b) as agreed to by the Holder of such Claim and the Debtors (with the consent of the Proponents), which agreement is approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

1.1.241    Senior Lenders means the Step One Lenders and the Step Two Lenders.

1.1.242    Senior Loan Agent means JPMorgan Chase Bank, N.A. as administrative agent, and any successor administrative agent, under the Senior Loan Agreement.

1.1.243    Senior Loan Agreement means, collectively, (i) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, the Senior Loan Agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (ii) those certain Increase Joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.244    Senior Loan Claim means a Step One Senior Loan Claim or a Step Two Senior Loan Claim.

1.1.245    Senior Loan Claim Sharing Resolution means the determination by a Final Order regarding the enforceability of the sharing provisions of the Senior Loan Agreement (including, without limitation, Sections 2.13 and 2.15 thereof).

1.1.246    Senior Loan Guaranty Agreement means the Guaranty Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.247    Senior Loan Guaranty Claim means a Step One Senior Loan Guaranty Claim or a Step Two Senior Loan Guaranty Claim.

1.1.248    Senior Noteholder Claims means all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement.

1.1.249    Senior Noteholder(s) means, individually or collectively, the Holder(s) of a Senior Noteholder Claim(s).

1.1.250    Senior Noteholder Initial Distribution means the Parent Claims Minimum Distribution Percentage of Senior Noteholder Claims plus the Senior Noteholder Claims' allocable share of the Initial Distributions that would otherwise be distributed to the Holders of PHONES Notes Claims and EGI-TRB LLC Notes Claims pursuant to the subordination provisions of the PHONES Notes and EGI-TRB LLC Notes Indentures respectively; less that

MIAMI 889648 (2K)

amount of Distributable Cash allocable to the Senior Noteholder Initial Distribution necessary to ensure that Holders of Allowed Other Non-Guarantor Debtor Claims are paid in full, in Cash.

      1.1.251    Senior Notes means the eight series of notes issued and outstanding under the Senior Notes Indentures.

      1.1.252    Senior Notes Indenture(s) means, individually or collectively:

      (a)    that certain Indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time;

      (b)    that certain Indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time;

      (c)    that certain Indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and

      (d)    that certain Indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

      1.1.253    Senior Notes Indenture Trustee(s) means, individually or collectively, the indenture trustees under the Senior Notes Indentures as of the Effective Date.

      1.1.254    Standing Order means the Order Granting the Creditors' Committee's Standing Motions [D.I. 6150] dated October 27, 2010.

      1.1.255    State Law Avoidance Claims means the claims, causes of action, avoidance powers or rights, and legal or equitable remedies of any Person not making the Non-Contribution Election arising under state fraudulent conveyance law against shareholders in Tribune whose stock was redeemed in connection with the Leveraged ESOP Transactions including, without limitation, in respect of the Abandoned Claims.

      1.1.256    Step One Lender means a Holder of a Step One Senior Loan Claim or Step One Senior Loan Guaranty Claim.

      1.1.257    Step One Lender Claims means the Step One Senior Loan Claims and Step One Senior Loan Guaranty Claims.

      1.1.258    Step One Lender Initial Distribution means, subject to any Plan Settlement approved by the Bankruptcy Court, a Pro Rata share of the LBO Debt Reserve DEV equal to the amount of Step One Lender Claims divided by the aggregate amount of all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Claims, which shall consist of a Pro Rata amount of New Common Stock, New Senior Secured Term Loan and Distributable Cash.

MIAMI 889648 (2K)

1.1.259    Step One Lender Parties means each Step One Lender, and each of their respective directors, officers, employees, agents, representatives and attorneys.

1.1.260    Step One Lender Settlement means the proposed settlement between the Debtors and the Step One Lenders described in Section 5.15(a) of the Bridge Lender Plan.

1.1.261    Step One Senior Loan Claim means a Claim arising under the Senior Loan Agreement, or a Claim of the Step One Lenders or the Senior Loan Agent arising under the Pledge Agreement, in each case including any Swap Claim but excluding any Claim that is a Step Two Senior Loan Claim.

1.1.262    Step One Senior Loan Guaranty Claim means a Claim arising under the Senior Loan Guaranty Agreement, including, without limitation, the guaranty of the Swap Claim, but excluding any Claim that qualifies as a Step Two Senior Loan Guaranty Claim.

1.1.263    Step One Senior Loans means the loans under the Senior Loan Agreement and the Pledge Agreement, in each case excluding any Step Two Senior Loans.

1.1.264    Step Two Lender means a Holder of a Step Two Senior Loan Claim or Step Two Senior Loan Guaranty Claim.

1.1.265    Step Two Lender Claims means the Step Two Senior Loan Claims and Step Two Senior Loan Guaranty Claims.

1.1.266    Step Two Lender Initial Distribution means, subject to any Plan Settlement approved by the Bankruptcy Court, a Pro Rata share of the LBO Debt Reserve DEV equal to the amount of Step Two Lender Claims divided by the aggregate amount of all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims, which shall consist of a Pro Rata amount of the New Common Stock, New Senior Secured Term Loan and Distributable Cash; provided, however, that the Step Two Lender Initial Distribution shall only be made in the event that the Senior Loan Claim Sharing Resolution finds that the sharing provisions of the Senior Loan Agreement (including, without limitation, Sections 2.13 and 2.15 thereof) are enforceable regardless of whether Step Two Lender Claims are avoided.

1.1.267    Step Two Lender Parties means each Step Two Lender, and each of their respective directors, officers, employees, agents, representatives and attorneys.

1.1.268    Step Two Lender Settlement means the proposed settlement between the Debtors and the Step Two Lenders described in Section 5.15(b) of the Bridge Lender Plan.

1.1.269    Step Two Senior Loan Claim means a Claim arising under the Senior Loan Agreement or the Pledge Agreement in respect of "Incremental Term Borrowings" as defined in the Senior Loan Agreement.

1.1.270    Step Two Senior Loan Guaranty Claim means a Claim arising under the Senior Loan Guaranty Agreement in respect of "Incremental Term Borrowings" as defined in the Senior Loan Agreement.

31

1.1.271    Step Two Senior Loans means the loans under the Senior Loan Agreement and the Pledge Agreement solely with respect to "Incremental Term Borrowings" as defined in the Senior Loan Agreement.

1.1.272    Subordinated Securities Claim means any Claim against Tribune, except any Claim that survives confirmation and effectiveness of the Bridge Lender Plan pursuant to Section 11.1, subject to subordination under section 510(b) of the Bankruptcy Code, including, without limitation, any Claim (i) arising from the rescission of a purchase or sale of shares, notes or any other securities of Tribune or an Affiliate of Tribune, (ii) for damages arising from the purchase or sale of any such security, or (iii) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims.  For the avoidance of doubt, Subordinated Securities Claims include any Claim asserted against Tribune by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such and PHONES Notes Exchange Claims to the extent the Bankruptcy Court determines that such Claims are different from and subordinated in right of payment to the PHONES Notes Claims pursuant to the PHONES Notes Claims Resolution.

1.1.273    Subsidiaries means all Subsidiary Debtors and Subsidiary Non-Debtors.

1.1.274    Subsidiary Consideration means a percentage of the New Common Stock, a percentage of the New Senior Secured Term Loan and a percentage of the Distributable Cash in each case equal to the Subsidiary Distributable Enterprise Value Percentage.

1.1.275    Subsidiary Debtors means, individually or collectively, the Filed Subsidiary Debtors, and such Subsidiary Non-Debtors, if any, that become Debtors prior to the Confirmation Date.

1.1.276    Subsidiary Distributable Enterprise Value Percentage means the percentage of the DEV allocable to the Subsidiaries (on a consolidated basis), which percentage shall be determined by the Bankruptcy Court in connection with Confirmation.

1.1.277    Subsidiary Non-Debtors means those entities listed on Appendix B hereto.

1.1.278    Swap Claim means any Claims asserted under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune.

1.1.279    Tax Authority means any federal, state, local, or foreign government, or agency, instrumentality, or employee thereof, or court, or other body (if any) charged with the administration of any law relating to Taxes.

1.1.280    Tax Regulations means the regulations promulgated under title 26 of the United States Code.

1.1.281    Tax Return means any return, declaration, form, election letter, report, statement, estimate, information return, or other information filed or required to be filed with respect to any Taxes, including any schedule or attachment thereto or amendment thereof.

MIAMI 889648 (2K)

1.1.282    Taxes means all (a) federal, state, local, or foreign taxes, including, without limitation, all net income, alternative minimum, net worth or gross receipts, capital, value added, franchise, profits, and estimated taxes, and (b) interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority or paid in connection with any item described in clause (a) hereof.

1.1.283    Tribune means Tribune Company, a Debtor in the Chapter 11 Cases.

1.1.284    Tribune Entities means, collectively, the Debtors and the Subsidiary Non-Debtors.

1.1.285    Tribune Interest means any shares of Old Common Stock, preferred stock or other instrument evidencing an ownership interest in Tribune, whether or not transferable, and any options, warrants (including, without limitation, the EGI-TRB LLC Warrants), calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised stock options, unvested common stock, unvested preferred stock or any other agreements of any character related to the Old Common Stock, but does not include the Subordinated Securities Claims.

1.1.286    Trust Causes of Action has the meaning set forth in the Introduction.

1.1.287    Trust Interests means, as applicable, the Distribution Trust Interests and the Creditors' Trust Interests.

1.1.288    Trusts means, as applicable, the Litigation Trust, the Creditors' Trust and/or the Distribution Trust.

1.1.289    Unimpaired means with respect to a Claim or Interest that such Claim or Interest is not Impaired including, without limitation, as a result of being Reinstated under the Bridge Lender Plan.

1.1.290    Voting Deadline means the deadline established by the Bankruptcy Court for returning Ballots.

1.1.291    Voting Record Date means the date established as the voting record date in the order approving the Joint Disclosure Statement.

1.2    Rules of Interpretation.

For purposes of the Bridge Lender Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Bridge Lender Plan, any reference in the Bridge Lender Plan to a contract, instrument, release, or other agreement being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Bridge Lender Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to the Bridge Lender Plan; (d) any reference to a Person as a Holder of a Claim or Interest includes that Person's successors and assigns; (e) all references in the Bridge

33

Lender Plan to Sections and Articles are references to Sections and Articles of or to the Bridge Lender Plan, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Bridge Lender Plan as a whole and not to any particular Section, subsection or clause contained in the Bridge Lender Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Bridge Lender Plan; (h) subject to Section 13.14 and the provisions of any contract, certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements, instruments, releases, or other agreements or documents entered into in connection with the Bridge Lender Plan, the rights and obligations arising under the Bridge Lender Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (j) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

1.3     Computation of Time.

        In computing any period of time prescribed or allowed by the Bridge Lender Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under the Bridge Lender Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day shall be deemed to have been completed or to have occurred as of the required date.

1.4     Exhibits.

        All exhibits referenced in the Bridge Lender Plan may be incorporated into and be a part of the Bridge Lender Plan as if set forth in full herein.  Upon their filing, the exhibits may be inspected in the office of the Clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

1.5     Deemed Acts.

        Whenever an act or event is expressed under the Bridge Lender Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Bridge Lender Plan and the Confirmation Order.

**ARTICLE 2     TREATMENT OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS**

        In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article 3.

34

2.1   DIP Facility Claims.

On or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Reorganized Debtors shall pay Allowed DIP Facility Claims in full in Cash. In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall be, at Reorganized Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof, or (iv) otherwise deemed to be subject to reimbursement pursuant to the terms and conditions of the Exit Facility.

2.2   Administrative Expense Claims.

Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Administrative Expense Claim, except to the extent that any Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, or as otherwise provided for in the Bridge Lender Plan, each Holder of an Allowed Administrative Expense Claim shall receive payment in full, in Cash, on the later of: (i) the Effective Date if due on or before that date, (ii) the date upon which such Administrative Expense Claim becomes an Allowed Claim, (iii) with respect to Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business during the Chapter 11 Cases, or assumed by the Debtors during the Chapter 11 Cases, such time as such Allowed Administrative Expense Claims are due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, or (iv) such other date as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Reorganized Debtors.

2.3   Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive either, at the sole option of the Reorganized Debtors (a) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, (b) except as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending not later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, which installment payments shall commence after such Priority Tax Claim becomes an Allowed Claim, or (c) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors.

## ARTICLE 3    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1    <u>Summary of Classification and Treatment of Classified Claims and Interests</u>.

3.1.1    <u>General</u>.

(a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to the Bridge Lender Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

(b)    The Bridge Lender Plan constitutes a separate chapter 11 Bridge Lender Plan of reorganization for each Debtor. For purposes of brevity and convenience, the classification and treatment of Claims and Interests has been set forth in four groups: (i) Tribune (Debtor 1); (ii) the Non-Guarantor Debtors (Debtors 2 through 49); (iii) the Guarantor Debtors (Debtors 50-111), and (iv) any Subsidiary Non-Debtors that become Debtors and participate in the Prepackaged Plan.

3.1.2    <u>Identification of Classes Against Tribune (Debtor 1)</u>. The following chart assigns a letter to each Class of Claims against and Interests in Tribune for purposes of identifying each separate Class:

| <u>CLASS</u> | <u>CLAIM OR INTEREST</u> |
|---|---|
| 1A | Priority Non-Tax Claims |
| 1B | Other Secured Claims |
| 1C | Step One Senior Loan Claims |
| 1D | Step Two Senior Loan Claims |
| 1E | Bridge Loan Claims |
| 1F | Senior Noteholder Claims |
| 1G | Other Parent Claims |
| 1H | EGI-TRB LLC Notes Claims |
| 1I | PHONES Notes Claims |
| 1J | Intercompany Claims |
| 1K | Subordinated Securities Claims |
| 1L | Tribune Interests |

36

3.1.3    Identification of Classes Against Non-Guarantor Debtors (Debtors 2 through 49). The following chart assigns a letter to each Class of Claims against and Interests in the Non-Guarantor Debtors for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| 2A-49A | Priority Non-Tax Claims |
| 2B-49B | Other Secured Claims |
| 2C-49C | Other Non-Guarantor Debtor Claims |
| 2D-49D | Intercompany Claims |
| 2E-49E | Interests in Non-Guarantor Debtors |

3.1.4    Identification of Classes Against Guarantor Debtors (Debtors 50 through 111). The following chart assigns a letter to each Class of Claims against and Interests in the Guarantor Debtors for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| 50A-111A | Priority Non-Tax Claims |
| 50B-111B | Other Secured Claims |
| 50C-111C | Step One Senior Loan Guaranty Claims |
| 50D-111D | Step Two Senior Loan Guaranty Claims |
| 50E-111E | Bridge Loan Guaranty Claims |
| 50F-111F | Other Guarantor Debtor Claims |
| 50G-111G | Intercompany Claims |
| 50H-111H | Interests in Guarantor Debtors |

3.2    Classification and Treatment of Claims Against and Interests in Tribune Company (Debtor 1).

3.2.1    Class 1A - Priority Non-Tax Claims.

(a)    Classification:  Class 1A consists of all Priority Non-Tax Claims against Tribune.

(b)    Treatment:  Each Holder of an Allowed Priority Non-Tax Claim against Tribune shall have its Claim Reinstated.

(c)    Voting:  Allowed Claims in Class 1A are Unimpaired, and the Holders of Class 1A Claims are conclusively deemed to have accepted the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1A Claims are not entitled to vote to accept or reject the Bridge Lender Plan; provided, however, that all Class 1A Claims

shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

    3.2.2    Class 1B - Other Secured Claims.

    (a)    Classification: Class 1B consists of all Other Secured Claims against Tribune.

    (b)    Treatment: Each Holder of an Allowed Other Secured Claim against Tribune shall have its Claim Reinstated.

    (c)    Voting: Allowed Claims in Class 1B are Unimpaired, and the Holders of Class 1B Claims are conclusively deemed to have accepted the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1B Claims are not entitled to vote to accept or reject the Bridge Lender Plan; provided, however, that all Class 1B Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

    3.2.3    Class 1C – Step One Senior Loan Claims.

    (a)    Classification: Class 1C consists of all Step One Senior Loan Claims against Tribune.

    (b)    Allowance: If the Holders of Step One Senior Loan Claims vote to accept the Bridge Lender Plan and elect on the Ballot to participate in the Step One Lender Settlement, and the Step One Lender Settlement is approved by the Bankruptcy Court, the Step One Senior Loan Claims shall be Allowed Claims against Tribune in the aggregate amount of $6.617 billion. If not, the Step One Senior Loan Claims shall be deemed provisionally Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement in respect of Step One Senior Loan Claims, including the full amount of principal, interest, and all other amounts (including fees and expenses) due and owing under the Senior Loan Agreement and the Pledge Agreement (as of the Petition Date) in respect of Step One Senior Loan Claims and the Swap Claim solely for purposes of determining the amount of LBO Debt Reserve DEV that will be distributed to Holders of Step One Senior Loan Claims in accordance with Section 3.2.3(c) and Section 3.4.3(c) and for no other purposes, and shall be Disputed Claims for all other purposes under the Bridge Lender Plan, remaining subject to reduction, disallowance, subordination, set off, counterclaim, or avoidance, and shall be subject to challenge by the Litigation Trust pursuant to Section 5.18 hereof.

    (c)    Treatment: On or as soon as practicable after the applicable Distribution Date, each Holder of a Step One Senior Loan Claim against Tribune shall receive either:

        (x) the treatment provided to it under the applicable Plan Settlements (if accepted and approved by the Bankruptcy Court); or

(y) if the applicable Plan Settlements are not accepted and approved by the Bankruptcy Court, (i) its Pro Rata share of the Step One Lender Initial Distribution, (ii) its Pro Rata Share of the Class 1C Distribution Trust Interests, and (iii) to the extent such Holder of a Step One Senior Loan Claim has not made the Non-Contribution Election, its Pro Rata Share of Class 1C Creditors' Trust Interests.  For the avoidance of doubt, (i) the Step One Lender Initial Distribution shall be made on account of each Holder's Step One Senior Loan Claim and Step One Senior Loan Guaranty Claim, and ultimate allocation of such distribution among Tribune and the Guarantor Debtors shall be in proportion to the allocation of DEV among Tribune and the Guarantor Debtors as provided herein and (ii) Initial Distributions to Step One Lenders will not be subject to disgorgement regardless of the final resolution of the Litigation Trust Causes of Action. Notwithstanding anything contained in the Bridge Lender Plan, all current and former Holders of Step One Senior Loan Claims and all Loan Agents and advisors that received payments in respect of such Claims or in connection with the incurrence of obligations in respect of the Leveraged ESOP Transactions by the Debtors prior to the Effective Date (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action.

(d)     Voting: Claims in Class 1C are Impaired, and Holders of Class 1C Claims are entitled to vote to accept or reject the Bridge Lender Plan.

### 3.2.4   Class 1D - Step Two Senior Loan Claims.

(a)     Classification:  Class 1D consists of all Step Two Senior Loan Claims against Tribune.

(b)     Allowance:  If the Holders of Step Two Senior Loan Claims vote to accept the Bridge Lender Plan and elect on the Ballot to participate in the Step Two Lender Settlement, and the Step Two Lender Settlement is approved by the Bankruptcy Court, the Step Two Senior Loan Claims shall be Allowed Claims against Tribune in the aggregate amount of $2.105 billion.  If not, the Step Two Senior Loan Claims shall be deemed provisionally Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement in respect of Step Two Senior Loan Claims, including the full amount of principal, interest, and all other amounts (including fees and expenses) due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date in respect of "Incremental Borrowings" as defined in the Senior Loan Agreement solely to the extent that the Senior Loan Claim Sharing Resolution provides that the sharing provisions of the Senior Loan Agreement apply regardless of whether Step Two Lender Claims are avoided and only for purposes of determining the amount of LBO Debt Reserve DEV that will be distributed to Holders of Step Two Lender Claims in accordance with Section 3.2.4(c) and Section 3.4.4(c) and

MIAMI 889648 (2K)

for no other purposes, and shall be Disputed Claims for all other purposes under the Bridge Lender Plan remaining subject to reduction, disallowance, subordination, set off, counterclaim, or avoidance and shall be subject to challenge by the Litigation Trust pursuant to Section 5.18 hereof.

(c)     Treatment: On or as soon as practicable after the applicable Distribution Date, each Holder of a Step Two Senior Loan Claim shall receive either:

(x) the treatment provided to it under the applicable Plan Settlements (if accepted and approved by the Bankruptcy Court); or

(y) if the Step Two Lender Settlement is not accepted and approved by the Bankruptcy Court, (i) its Pro Rata share of the Class 1D Distribution Trust Interests, (ii) to the extent such Holder of a Step Two Senior Loan Claim has not made the Non-Contribution Election, its Pro Rata Share of Class 1D Creditors' Trust Interests, and (iii) only in the event the Senior Loan Claim Sharing Resolution provides that the sharing provisions of the Senior Loan Agreement are enforceable regardless of whether Step Two Lender Claims are avoided, its Pro Rata share of the Step Two Lender Initial Distribution.  For the avoidance of doubt, (i) the Step Two Lender Initial Distribution shall be made on account of each Holder's Step Two Senior Loan Claim and Step Two Senior Loan Guaranty Claim, and ultimate allocation of such distribution among Tribune and the Guarantor Debtors shall be in proportion to the allocation of DEV among Tribune and the Guarantor Debtors as provided herein and (ii) to the extent Initial Distributions are made to the Step Two Lenders pursuant to the Senior Loan Claim Sharing Resolution, such Initial Distributions will not be subject to disgorgement regardless of the final resolution of the Litigation Trust Causes of Action. Notwithstanding anything contained in the Bridge Lender Plan, all current and former Holders of Step Two Senior Loan Claims and all Loan Agents and advisors that received payments in respect of such Claims or in connection with the incurrence of obligations in respect of the Leveraged ESOP Transactions by the Debtors prior to the Effective Date (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action.

(d)     Voting:  Claims in Class 1D are Impaired, and Holders of Class 1D Claims are entitled to vote to accept or reject the Bridge Lender Plan.

40

3.2.5    <u>Class 1E - Bridge Loan Claims</u>.

(a)    Classification: Class 1E consists of all Bridge Loan Claims against Tribune.

(b)    Allowance: If the Holders of Bridge Loan Claims vote to accept the Bridge Lender Plan and elect on the Ballot to accept the Bridge Loan Lender Settlement, and such Plan Settlement is approved by the Bankruptcy Court, the Bridge Loan Claims shall be Allowed Claims against Tribune in the aggregate amount of $1.62 billion.  If not, the Bridge Loan Claims shall be Disputed Claims and shall be subject to challenge by the Litigation Trust pursuant to Section 5.18 hereof.

(c)    Treatment: On or as soon as practicable after the applicable Distribution Date, each Holder of a Bridge Loan Claim shall receive either:

> (x) the treatment provided to it under the Bridge Loan Lender Settlement (if accepted and approved by the Bankruptcy Court), provided that, in such case, the Original Bridge Loan Lenders shall receive the Original Bridge Loan Lenders Release in lieu of participating in any applicable Plan Settlement recovery; or

> (y) if the Bridge Loan Lender Settlement is not accepted and approved by the Bankruptcy Court, (i) its Pro Rata share of the Class 1E Distribution Trust Interests and (ii) to the extent such Holder of a Bridge Loan Claim has not made the Non-Contribution Election, its Pro Rata Share of Class 1E Creditors' Trust Interests.

(d)    Voting: Claims in Class 1E are Impaired, and Holders of Class 1E Claims are entitled to vote to accept or reject the Bridge Lender Plan.

3.2.6    <u>Class 1F - Senior Noteholder Claims</u>.

(a)    Classification: Class 1F consists of all Senior Noteholder Claims against Tribune.

(b)    Allowance: The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77, and shall not be subject to reduction, disallowance, subordination, set off or counterclaim.

(c)    Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, each Holder of an Allowed Senior Noteholder Claim shall receive either:

> (x) the treatment provided to it under the applicable Plan Settlements (if accepted and approved by the Bankruptcy Court); or

41

(y) if the applicable Plan Settlements are not accepted and approved by the Bankruptcy Court, its Pro Rata share of (i) the Senior Noteholder Initial Distribution, (ii) the Class 1F Distribution Trust Interests, and (iii) to the extent such Senior Noteholder has not made the Non-Contribution Election, its Pro Rata Share of Class 1F Creditors' Trust Interests.

(d)     Voting: Claims in Class 1F are Impaired, and Holders of Class 1F Claims are entitled to vote to accept or reject the Bridge Lender Plan.

### 3.2.7     Class 1G - Other Parent Claims.

(a)     Classification: Class 1G consists of all Other Parent Claims against Tribune.

(b)     Allowance: Other Parent Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

(c)     Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Parent Claims against Tribune, each Holder of an Allowed Other Parent Claim shall receive either:

(x) the treatment provided to it under the applicable Plan Settlements (if accepted and approved by the Bankruptcy Court); or

(y) if the applicable Plan Settlements are not accepted and approved by the Bankruptcy Court, its Pro Rata share of (i) the Other Parent Claims Initial Distribution, (ii) the Class 1G Distribution Trust Interests, and (iii) to the extent such Holder of an Other Parent Claim has not made the Non-Contribution Election, the Class 1G Creditors' Trust Interests; provided, however, that to the extent the Other Parent Claims Class votes to accept the Bridge Lender Plan and such Holder of an Other Parent Claim that is Allowed on the Voting Deadline exercises the Other Parent Claims Put Option on its Ballot and does not make the Non-Contribution Election, subject to the Other Parent Claims Purchase Price Cap, such Holder shall receive the Other Parent Claims Purchase Price in exchange for its Allowed Claim and the Claims Purchaser, in its capacity as transferee of such Allowed Other Parent Claim, shall receive the Pro Rata share allocable to such Claim of the Other Parent Claims Initial Distribution, the Class 1G Distribution Trust Interests and the Class 1G Creditors' Trust Interests. For the avoidance of doubt, the Other Parent Claims Put

MIAMI 889648 (2K)

Option shall only be exercisable by Holders whose Other Parent Claims are allowed as of the Voting Deadline.

(d)     Voting:  Claims in Class 1G are Impaired, and Holders of Class 1G Claims are entitled to vote to accept or reject the Bridge Lender Plan.

3.2.8     Class 1H - EGI-TRB LLC Notes Claims.

(a)     Classification:  Class 1H consists of all EGI-TRB LLC Notes Claims against Tribune.

(b)     Allowance:  EGI-TRB LLC Notes Claims against Tribune shall be deemed Disputed Claims for all purposes under the Bridge Lender Plan and subject to objection by the Litigation Trust pursuant to Section 5.18 of the Bridge Lender Plan.

(c)     Treatment:  On or as soon as practicable after the applicable Distribution Date, each Holder of an EGI-TRB LLC Notes Claim against Tribune shall receive its Pro Rata shares of (i) the Tribune Class 1H Distribution Trust Interests, and (ii) to the extent such Holder of a EGI-TRB LLC Notes Claim has not made the Non-Contribution Election, the Class 1H Creditors' Trust Interests.  All distributions that would otherwise go to Holders of EGI-TRB LLC Notes Claims on account of (i) the Parent Claims Minimum Distribution Percentage of EGI-TRB LLC Notes Claims (i.e., Initial Distributions in respect of the EGI-TRB LLC Notes Claims) and (ii) Class 1H Distribution Trust Interests will be distributed pursuant to the subordination provisions of the EGI-TRB LLC Notes Pro Rata to (x) the Holders of Senior Noteholder Claims and (y) the other potential beneficiaries of the EGI-TRB LLC Notes subordination pending a determination of the allowance of the Claims of such potential beneficiaries and the enforceability of the subordination provisions vis-à-vis avoided or equitably subordinated debt (pending such determination, the allocable share of such distributions shall be deposited in the Distribution Trust Reserve).  The distributions in respect of the Class 1H Creditors' Trust Interests will be distributed in accordance with the subordination provisions of the EGI-TRB LLC Notes Indenture to the extent that such provisions are deemed applicable pursuant to the Creditors' Trust Distribution Orders, such that in the event such subordination provisions are deemed to be applicable, distributions on account of the Class 1H Creditors' Trust Interests will be distributed pursuant to the subordination provisions of the EGI-TRB LLC Notes Pro Rata to (i) the Holders of Senior Noteholder Claims, and (ii) the other potential beneficiaries of the EGI-TRB LLC Notes subordination, upon a determination of the Allowance of the Claims of such potential beneficiaries and the enforceability of the subordination provisions vis-à-vis avoided or equitably subordinated debt (pending such determination, the allocable share of such distributions shall be deposited in the Distribution Trust Reserve or CT Reserve). Notwithstanding anything contained in the Bridge Lender Plan, all current and former Holders of EGI-TRB LLC Notes Claims and advisors that received payments in respect of such Claims or in connection with the incurrence of obligations in respect of the Leveraged ESOP Transactions by the Debtors prior to the Effective Date (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action.

43

(d)     Voting: Claims in Class 1H are Impaired, and Holders of Class 1H Claims are entitled to vote to accept or reject the Bridge Lender Plan.

### 3.2.9     Class 11 - PHONES Notes Claims.

(a)     Classification: Class 11 consists of all PHONES Notes Claims against Tribune.

(b)     Allowance: If the Step One Lender Settlement is accepted by the applicable Classes, and the Step One Lender Settlement is approved by the Bankruptcy Court, the PHONES Notes Claims shall be Allowed Claims against Tribune in the aggregate amount of $761 million. If not, the PHONES Notes Claims shall be deemed Allowed in the aggregate amount determined by the Bankruptcy Court pursuant to the PHONES Notes Claims Resolution. Except as determined by the PHONES Notes Claims Resolution, the PHONES Notes Claims shall not be subject to reduction, disallowance, subordination (other than as set forth in the PHONES Notes Indenture), setoff or counterclaim.

(c)     Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed PHONES Notes Claims against Tribune, each Holder of (i) an Allowed PHONES Notes Claim and (ii) to the extent so determined by the PHONES Notes Claim Resolution, an Allowed PHONES Notes Exchange Claim shall receive either:

> (x) the treatment provided to them under the applicable Plan Settlements (if accepted and approved by the Bankruptcy Court); or

> (y) if the applicable Plan Settlements are not accepted and approved by the Bankruptcy Court, (i) its Pro Rata share of the Class 11 Distribution Trust Interests, and (ii) to the extent such Holder of a PHONES Notes Claim or PHONES Notes Exchange Claim, as applicable, has not made the Non-Contribution Election, its Pro Rata Share of Class 11 Creditors' Trust Interests. All distributions that would otherwise go to Holders of PHONES Notes Claims on account of (i) the Parent Claims Minimum Distribution Percentage of PHONES Notes Claims (i.e., initial distributions in respect of the PHONES Notes Claims) and (ii) Class 11 Distribution Trust Interests will be distributed pursuant to the subordination provisions of the PHONES Notes, Pro Rata to (x) the Holders of Senior Noteholder Claims and (y) the other potential beneficiaries of the PHONES Notes subordination, upon a determination of the allowance of the Claims of such potential beneficiaries and the enforceability of the subordination provisions vis-à-vis avoided or equitably subordinated debt (pending such determination, the allocable share of such distributions shall be deposited in the Distribution Trust Reserve. The distributions in respect of the Class 11 Creditors' Trust Interests will be distributed

44

in accordance with the subordination provisions of the PHONES Notes Indenture to the extent that such provisions are deemed applicable pursuant to the Creditors' Trust Distribution Orders, such that in the event such subordination provisions are deemed to be applicable, distributions on account of the Class 1I Creditors' Trust Interests will be distributed pursuant to the subordination provisions of the PHONES Notes, Pro Rata to (i) the Holders of Senior Noteholder Claims and (ii) the other potential beneficiaries of the PHONES Notes subordination, upon a determination of the Allowance of the Claims of such potential beneficiaries and the enforceability of the subordination provisions vis-à-vis avoided or equitably subordinated debt (pending such determination, the allocable share of such distributions shall be deposited in the Distribution Trust Reserve or CT Reserve).

(d)     Voting: Claims in Class 1I are Impaired, and Holders of Class 1I Claims are entitled to vote to accept or reject the Bridge Lender Plan.

3.2.10     Class 1J - Intercompany Claims.

(a)     Classification: Class 1J consists of all Intercompany Claims against Tribune.

(b)     Treatment: In connection with the Plan Settlements, the Intercompany Claims shall be Allowed Claims against Tribune in the aggregate amount of $31.329 billion (subject to enforcement of the Intercompany Claims Subordination Provision); provided that if the Intercompany Claims Subordination Provision is not enforced by the Bankruptcy Court, all Intercompany Claims shall be subject to adjudication at Confirmation; provided further that the Intercompany Claims may otherwise be Reinstated, discharged or otherwise satisfied in accordance with the terms of the Confirmation Order and/or the Litigation Distribution Orders as required by the applicable Trust structure.

(c)     Voting: Claims in Class 1J are Unimpaired, and thus, pursuant to Section 4.3 of the Bridge Lender Plan, Holders of Claims in Class 1J will be deemed to accept the Bridge Lender Plan and are, therefore, not entitled to vote to accept or reject the Bridge Lender Plan.

3.2.11     Class 1K – Subordinated Securities Claims.

(a)     Classification: Class 1K consists of all Subordinated Securities Claims against Tribune.

(b)     Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of, and in exchange for, Subordinated Securities Claims against Tribune, each Holder of an Allowed Subordinated Securities Claim against Tribune shall receive (i) its Pro Rata share of the Class 1K Distribution Trust Interests, and (ii) to the extent such Subordinated Securities Claim Holder has not made the Non-Contribution Election, its Pro Rata Share of Class 1K Creditors' Trust Interests.  All

45

distributions that would otherwise go to Holders of Allowed Subordinated Securities Claims on account of their Distribution Trust Interests and Creditors' Trust Interests will be distributed Pro Rata to Holders of Allowed Claims in Classes 1A-1I, subject to the allowance of such Holders' Claims and applicable subordination provisions governing such Claims until such Holders' Claims are paid in full.

(c)     Voting:  Claims in Class 1K are Impaired, and Holders of Claims in Class 1K are entitled to vote to accept or reject the Bridge Lender Plan.

3.2.12     Class 1L - Tribune Interests.

(a)     Classification:  Class 1L consists of all Tribune Interests.

(b)     Treatment:  On the Effective Date, all Tribune Interests shall be extinguished and Holders of such Tribune Interests shall not receive or retain any property under the Bridge Lender Plan on account of such Tribune Interests.

(c)     Voting:  Interests in Class 1L are Impaired. Holders of Tribune Interests in Class 1L are conclusively deemed to have rejected the Bridge Lender Plan and are not entitled to vote to accept or reject the Bridge Lender Plan.

3.3     Classification and Treatment of Claims Against and Interests in Non-Guarantor Debtors (Debtors 2 through 49).

3.3.1     Classes 2A through 49A - Priority Non-Tax Claims.

(a)     Classification:  Classes 2A through 49A consist of all Priority Non-Tax Claims against the relevant Non-Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  Each Holder of an Allowed Priority Non-Tax Claim against a Non-Guarantor Debtor shall have such Claim Reinstated.

(c)     Voting:  Allowed Claims in Classes 2A through 49A are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2A through 49A are not entitled to vote to accept or reject the Bridge Lender Plan; provided, however, that all Claims in Classes 2A through 49A shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

3.3.2     Classes 2B through 49B - Other Secured Claims.

(a)     Classification:  Classes 2B through 49B consist of all Other Secured Claims against the relevant Non-Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

46

(b)     Treatment: Each Holder of an Allowed Other Secured Claim against a Non-Guarantor Debtor shall have such Claim Reinstated.

(c)     Voting: Allowed Claims in Classes 2B through 49B are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Classes 2B through 49B are not entitled to vote to accept or reject the Bridge Lender Plan; provided, however, that all Claims in Classes 2B through 49B shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

3.3.3     Classes 2C through 49C – Other Non-Guarantor Debtor Claims.

(a)     Classification: Classes 2C through 49C consist of all Other Non-Guarantor Debtor Claims against the relevant Non-Guarantor Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Allowance: Other Non-Guarantor Debtor Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

(c)     Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Non-Guarantor Debtor Claims against the Non-Guarantor Debtors, each Holder of an Allowed Other Non-Guarantor Debtor Claim shall receive payment in Cash, in full to be paid out of the Distributable Cash Pool at each such Non-Guarantor Debtor. To the extent that there is not enough value at any particular Non-Guarantor Debtor to pay such Debtor's Allowed Other Non-Guarantor Debtor Claims in full such Allowed Other Non-Guarantor Debtor Claims will be paid from the Cash portion of the Senior Noteholder Initial Distribution.

(d)     Voting: Claims in Classes 2C through 49C are Unimpaired, and Holders of Claims in Classes 2C through 49C will be deemed to accept the Bridge Lender Plan.

3.3.4     Classes 2D through 49D - Intercompany Claims.

(a)     Classification: Classes 2D through 49D consist of all Intercompany Claims against the relevant Non-Guarantor Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment: In connection with the Plan Settlements, the Intercompany Claims shall be Allowed Claims against the relevant Non-Guarantor Debtors in the aggregate amount of $22.274 billion (subject to enforcement of the Intercompany Claims Subordination Provision); provided that if the Intercompany Claims Subordination Provision is not enforced by the Bankruptcy Court, all Intercompany Claims shall be subject to adjudication at Confirmation; provided further that the Intercompany Claims may otherwise be Reinstated, discharged or otherwise satisfied in accordance with the terms of the Confirmation Order and/or the Litigation Distribution Orders as required by the applicable Trust structure.

47

(c)      Voting: Claims in Classes 2D through 49D are Unimpaired, and thus, pursuant to Section 4.3 of the Bridge Lender Plan, Holders of Claims in Classes 2D through 49D will be deemed to accept the Bridge Lender Plan and are, therefore, not entitled to vote to accept or reject the Bridge Lender Plan.

### 3.3.5      Classes 2E through 49E - Interests in Non-Guarantor Debtors.

(a)      Classification: Classes 2E through 49E consist of all Interests in the Non-Guarantor Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)      Treatment: Subject to Section 5.2 of the Bridge Lender Plan, each Holder of an Allowed Interest in the Non-Guarantor Debtors shall have its Interest Reinstated for administrative convenience.

(c)      Voting: Allowed Interests in Classes 2E through 49E are conclusively deemed to have accepted the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Interests in Classes 2E through 49E are not entitled to vote to accept or reject the Bridge Lender Plan.

### 3.4      Classification and Treatment of Claims Against and Interests in Guarantor Debtors (Debtors 50 through 111).

### 3.4.1      Classes 50A through 111A - Priority Non-Tax Claims.

(a)      Classification: Classes 50A through 111A consist of all Priority Non-Tax Claims against the relevant Guarantor Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)      Treatment: Each Holder of an Allowed Priority Non-Tax Claim against a Guarantor Debtor shall have such Claim Reinstated.

(c)      Voting: Allowed Claims in Classes 50A through 111A are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Classes 50A through 111A are not entitled to vote to accept or reject the Bridge Lender Plan; provided, however, that all Claims in Classes 50A through 111A shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

### 3.4.2      Classes 50B through 111B - Other Secured Claims.

(a)      Classification: Classes 50B through 111B consist of all Other Secured Claims against the relevant Guarantor Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)      Treatment: Each Holder of an Allowed Other Secured Claim against a Guarantor Debtor shall have such Claim Reinstated.

48

(c)     Voting: Allowed Claims in Classes 50B through 111B are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Classes 50B through 111B are not entitled to vote to accept or reject the Bridge Lender Plan; provided, however, that all Claims in Classes 50B through 111B shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

3.4.3     Classes 50C through 111C – Step One Senior Loan Guaranty Claims.

(a)     Classification: Classes 50C through 111C consist of all Step One Senior Loan Guaranty Claims against the relevant Guarantor Debtors. The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Allowance: If the Holders of Step One Senior Loan Guaranty Claims vote to accept the Bridge Lender Plan and elect on the Ballot to participate in the Step One Lender Settlement, and the Step One Lender Settlement is approved by the Bankruptcy Court, the Step One Senior Loan Guaranty Claims shall be Allowed Claims against the relevant Guarantor Debtors in the aggregate amount of $6.617 billion. If not, the Step One Senior Loan Guaranty Claims shall be deemed provisionally Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement (as of the Petition Date) in respect of Step One Senior Loan Guaranty Claims, including the full amount of principal, interest, and all other amounts (including fees and expenses) due and owing under the Senior Loan Agreement and the Pledge Agreement in respect of Step One Senior Loan Guaranty Claims and the Swap Claim solely for purposes of determining the amount of LBO Debt Reserve DEV that will be distributed to Holders of Step One Senior Loan Guaranty Claims in accordance with Section 3.2.3(c) and Section 3.4.3(c) and for no other purposes, and shall be Disputed Claims for all other purposes under the Bridge Lender Plan remaining subject to reduction, disallowance, subordination, set off, counterclaim, or avoidance and shall be subject to challenge by the Litigation Trust pursuant to Section 5.18 hereof.

(c)     Treatment: On or as soon as practicable after the applicable Distribution Date, each Holder of a Step One Senior Loan Guaranty Claim shall receive either:

(x) the treatment provided to it under the applicable Plan Settlements (if accepted and approved by the Bankruptcy Court); or

(y) if the applicable Plan Settlements are not accepted and approved by the Bankruptcy Court, its Pro Rata share of (i) the Step One Lender Initial Distribution, and (ii) the Class 50C-111C Distribution Trust Interests, as applicable. For the avoidance of doubt, (i) the Step One Lender Initial Distribution shall be made on account of each Holder's Step One Senior Loan Claim and Step One Senior Loan Guaranty Claim, and ultimate allocation of such distribution among Tribune and the Guarantor Debtors shall be in proportion to the allocation of DEV among Tribune and the

49

Guarantor Debtors as provided herein and (ii) Initial Distributions to Step One Lenders will not be subject to disgorgement regardless of the final resolution of the Litigation Trust Causes of Action. Notwithstanding anything contained in the Bridge Lender Plan, all current and former Holders of Step One Senior Loan Guaranty Claims and all Loan Agents and advisors that received payments in respect of such Claims or in connection with the incurrence of obligations in respect of the Leveraged ESOP Transactions by the Debtors prior to the Effective Date (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action.

(d)    Voting:  Claims in Classes 50C through 111C are Impaired, and Holders of Claims in Classes 50C through 111C are entitled to vote to accept or reject the Bridge Lender Plan against the relevant Debtors.

### 3.4.4    Classes 50D through 111D – Step Two Senior Loan Guaranty Claims.

(a)    Classification:  Classes 50D through 111D consist of all Step Two Senior Loan Guaranty Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)    Allowance:  If the Holders of Step Two Loan Guaranty Claims vote to accept the Bridge Lender Plan and elect on the Ballot to participate in the Step Two Lender Settlement, and the Step Two Lender Settlement is approved by the Bankruptcy Court, the Step Two Senior Loan Guaranty Claims shall be Allowed Claims against the relevant Guarantor Debtors in the aggregate amount of $2.105 billion.  If not, the Step Two Senior Loan Guaranty Claims shall be deemed provisionally Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement in respect of Step Two Senior Loan Guaranty Claims, including the full amount of principal, interest, and all other amounts (including fees and expenses) due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date in respect of "Incremental Borrowings" as defined in the Senior Loan Agreement solely to the extent that the Senior Loan Claim Sharing Resolution provides that the sharing provisions of the Senior Loan Agreement apply regardless of whether Step Two Lender Claims are avoided and only for purposes of determining the amount of LBO Debt Reserve DEV that will be distributed to Holders of Step Two Lender Claims in accordance with Section 3.2.4(c) and Section 3.4.4(c) and for no other purposes, and shall be Disputed Claims for all other purposes under the Bridge Lender Plan remaining subject to reduction, disallowance, subordination, set off, counterclaim, or avoidance and shall be subject to challenge by the Litigation Trust pursuant to Section 5.18 hereof.

(c)    Treatment:  On or as soon as practicable after the applicable Distribution Date, each Holder of a Step Two Senior Loan Guaranty Claim shall receive either:

50

(x) the treatment provided to it under the applicable Plan Settlements (if accepted and approved by the Bankruptcy Court); or

(y) if the Step Two Lender Settlement is not accepted and approved by the Bankruptcy Court, its Pro Rata share of (i) the Class 50D – 111D Distribution Trust Interests, as applicable and (ii) only in the event the Senior Loan Claims Resolution determines that the sharing provisions of the Senior Loan Agreement are enforceable regardless of whether Step Two Lender Claims are avoided, the Step Two Lender Initial Distribution.  For the avoidance of doubt, (i) Step Two Lender Initial Distributions shall be made on account of each Holder's Step Two Senior Loan Claim and Step Two Senior Loan Guaranty Claim, and ultimate allocation of such distributions among Tribune and the Guarantor Debtors shall be in proportion to the allocation of DEV among Tribune and the Guarantor Debtors as provided herein and (ii) to the extent Initial Distributions are made to the Step Two Lenders pursuant to the Senior Loan Claim Sharing Resolution, such Initial Distributions will not be subject to disgorgement regardless of the final resolution of the Litigation Trust Causes of Action. Notwithstanding anything contained in the Bridge Lender Plan, all current and former Holders of Step Two Senior Loan Guaranty Claims and all Loan Agents and advisors that received payments in respect of such Claims or in connection with the incurrence of obligations in respect of the Leveraged ESOP Transactions by the Debtors prior to the Effective Date (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action.

(d)     Voting:  Claims in Classes 50D through 111D are Impaired, and Holders of Claims in Classes 50D through 111D are entitled to vote to accept or reject the Bridge Lender Plan against the relevant Debtors.

3.4.5     Classes 50E through 111E - Bridge Loan Guaranty Claims.

(a)     Classification: Classes 50E through 111E consist of all Bridge Loan Guaranty Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Allowance: If the Holders of Bridge Loan Guaranty Claims vote to accept the Bridge Lender Plan and elect on the Ballot to participate in the Bridge Loan Lender Settlement, and the Bridge Loan Lender Settlement is approved by the Bankruptcy Court, the Bridge Loan Guaranty Claims shall be Allowed Claims against the relevant Guarantor Debtors in the aggregate amount of $1.62 billion.  If not, the Bridge Loan Guaranty Claims shall be deemed

51

Disputed Claims for all purposes under the Bridge Lender Plan and subject to challenge by the Litigation Trust pursuant to Section 5.18 hereof.

(c)     Treatment:  On or as soon as practicable after the applicable Distribution Date, each Holder of a Bridge Loan Guaranty Claim against a Guarantor Debtor shall receive either:

(x) the treatment provided to it under the Bridge Loan Lender Settlement (if accepted and approved by the Bankruptcy Court); or

(y) if the Bridge Loan Lender Settlement is not accepted and approved by the Bankruptcy Court, its Pro Rata shares of the Class 50E – 111E Distribution Trust Interests, as applicable.

(d)     Voting:  Claims in Class 50E through 111E are Impaired, and Holders of Claims in Classes 50E through 111E are entitled to vote to accept or reject the Bridge Lender Plan against the relevant Debtors.

### 3.4.6     Classes 50F through 111F – Other Guarantor Debtor Claims.

(a)     Classification:  Classes 50F through 111F consist of all Other Guarantor Debtor Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Allowance:  Other Guarantor Debtor Claims shall be subject to Allowance or Disallowance in whole or in part under the applicable provisions of the Bridge Lender Plan, including, but not limited to, Article 8.

(c)     Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Guarantor Debtor Claims against the Guarantor Debtors, each Holder of an Allowed Other Guarantor Debtor Claim shall receive either:

(x) the treatment provided to it under the applicable Plan Settlements (if accepted approved by the Bankruptcy Court); or

(y) if the applicable Plan Settlements are not accepted and approved by the Bankruptcy Court, its Pro Rata share of (i) the Other Guarantor Debtor Claims Initial Distribution, and (ii) the Class 50F through 111F Distribution Trust Interests, as applicable; provided, however, that to the extent the applicable Other Guarantor Debtor Claims Class votes to accept the Bridge Lender Plan and such Holder of an Other Guarantor Debtor Claim that is Allowed as of the Voting Deadline exercises the Other Guarantor Debtor Claims Put Option on its Ballot, subject to the Other Guarantor Debtor Purchase Price Cap, such Holder shall receive the Other Guarantor Claim Purchase Price in exchange for its Allowed Other Guarantor Debtor Claim and the Claims Purchaser,

52

in its capacity as transferee of such Other Guarantor Debtor Claim, shall receive the Pro Rata share allocable to such Claim of the Other Guarantor Debtor Claims Initial Distribution and the Class 50F through 111F Distribution Trust Interests, as applicable. For the avoidance of doubt, the Other Guarantor Debtor Claims Put Option shall only be exercisable by Holders whose Other Guarantor Debtor Claims are Allowed as of the Voting Deadline.

(d)     Voting:  Claims in Classes 50F through 111F are Impaired, and Holders of Claims in Classes 50F through 111F are entitled to vote to accept or reject the Bridge Lender Plan against the relevant Debtors.

3.4.7     Classes 50G through 111G - Intercompany Claims.

(a)     Classification:  Classes 50G through 111G consist of all Intercompany Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  In connection with the Plan Settlements, the Intercompany Claims shall be Allowed Claims against the relevant Guarantor Debtors in the aggregate amount of $25.268 billion (subject to enforcement of the Intercompany Claims Subordination Provision); provided that if the Intercompany Claims Subordination Provision is not enforced by the Bankruptcy Court, all Intercompany Claims shall be subject to adjudication at Confirmation; provided further that the Intercompany Claims may otherwise be Reinstated, discharged or otherwise satisfied in accordance with the terms of the Confirmation Order and/or the Litigation Distribution Orders as required by the applicable Trust structure.

(c)     Voting:  Claims in Classes 50G through 111G are Unimpaired, and thus, pursuant to Section 4.3 of the Bridge Lender Plan, Holders of Claims in Classes 50G through 111G will be deemed to accept the Bridge Lender Plan and are, therefore, not entitled to vote to accept or reject the Bridge Lender Plan.

3.4.8     Classes 50H through 111H - Interests in Guarantor Debtors.

(a)     Classification:  Classes 50I through 111I consist of all Interests in the Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  Subject to Section 5.2 of the Bridge Lender Plan, each Holder of an Allowed Interest in the Guarantor Debtors shall have its Interest Reinstated for administrative convenience.

(c)     Voting:  Allowed Interests in Classes 50I through 111I are conclusively deemed to have accepted the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Interests in Classes 50I through 111I are not entitled to vote to accept or reject the Bridge Lender Plan.

53

3.5     Prepackaged Plans for and Treatment of Claims Against and Interests in Subsidiary Non-Debtors that Become Debtors.

  3.5.1  Prepackaged Plan. The Bridge Lender Plan constitutes a Prepackaged Plan for the Subsidiary Non-Debtors, if any, that commence Chapter 11 Cases. For any Subsidiary Non-Debtor that commences a Chapter 11 Case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth in Section 3.3 or 3.4, as applicable above for the Guarantor Debtors or Non-Guarantor Debtors.

  3.5.2  Unimpaired Claims and Interests. Except for Loan Guaranty Claims (to the extent applicable) and Intercompany Claims, each Holder of an Allowed Claim against or Interest in a Subsidiary Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated. In addition, except for Loan Guaranty Claims (to the extent applicable), Allowed Claims against and Interests in any Subsidiary Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the relevant Prepackaged Plan. All executory contracts and unexpired leases of the Subsidiary Non-Debtors that become Debtors shall be deemed assumed unless expressly rejected in accordance with Section 6. Joint venture agreements, stockholder agreements, limited liability company agreements, limited liability partnership agreements, limited partnership agreements, general partnership agreements and any other agreements or arrangements related to the foregoing shall continue in accordance with their terms and shall remain in full force and effect and the parties' rights thereunder shall not be modified by the relevant Prepackaged Plan.

  3.5.3  Loan Guaranty Claims.

    (a)  Step One Senior Loan Guaranty Claims. On the applicable Distribution Date, each Holder of a Step One Senior Loan Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.4.3 and shall not be entitled to receive any other or further distributions. The Step One Senior Loan Guaranty Claims are Impaired, and, to the extent Holders of Step One Senior Loan Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan, votes cast by Holders of Step One Senior Loan Guaranty Claims in Classes 50C through 111C shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors that become Debtors, if any. All Step One Senior Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be deemed Disputed Claims for all purposes related to the Bridge Lender Plan.

    (b)  Step Two Senior Loan Guaranty Claims. On the applicable Distribution Date, each Holder of a Step Two Senior Loan Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.4.4 and shall not be entitled to receive any other or further distributions. The Step Two Senior Loan Guaranty Claims are Impaired, and, to the extent Holders of Step Two Senior Loan Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan, votes cast by Holders of Step Two Senior Loan Guaranty Claims in Classes 50D through 111D shall be counted as votes cast on the relevant Prepackaged Plan prepared on

54

behalf of the relevant Guarantor Non-Debtors that become Debtors, if any.  All Step Two Senior Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be deemed Disputed Claims for all purposes related to the Bridge Lender Plan.

(c)    Bridge Loan Guaranty Claims.  On the Applicable Distribution Date, each Holder of a Bridge Loan Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.4.5 and shall not be entitled to receive any other or further distributions.  The Bridge Loan Guaranty Claims are Impaired, and, to the extent Holders of Bridge Loan Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan, votes cast by Holders of Bridge Loan Guaranty Claims in Classes 50E through 111E shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors that become Debtors, if any.  All Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be deemed Disputed Claims for all purposes related to the Bridge Lender Plan.

## ARTICLE 4    ACCEPTANCE OR REJECTION OF BRIDGE LENDER PLAN

4.1    Impaired Classes of Claims and Interests Entitled to Vote.

Holders of an Allowed Claim as of the Voting Record Date in Classes 1C, 1D, 1E, 1F, 1G, 1H, 1I, 1K, 50C-111C, 50D-111D, 50E-111E and 50F-111F shall be entitled to vote to accept or reject the Bridge Lender Plan.

4.2    Acceptance by an Impaired Class of Claims

Pursuant to section 1126(c) of the Bankruptcy Code, a voting Impaired Class of Claims shall have accepted the Bridge Lender Plan if, after excluding any Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept such Bridge Lender Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Bridge Lender Plan.

4.3    Deemed Acceptance by Holders of Intercompany Claims.

The Bridge Lender Plan provides that the Holders of Intercompany Claims are deemed to accept because their Claims are Allowed and Unimpaired.  Accordingly, votes on the Bridge Lender Plan shall not be solicited from the Holders of such Claims.

4.4    Presumed Acceptances by Unimpaired Classes.

Classes of Claims or Interests designated as Unimpaired are conclusively presumed to have voted to accept the Bridge Lender Plan pursuant to section 1126(f) of the Bankruptcy Code, and the votes of the Holders of such Claims or Interests will not be solicited.

4.5    Presumed Rejection of the Bridge Lender Plan.

Impaired Classes of Claims or Interests that do not receive or retain property under the Bridge Lender Plan are conclusively presumed to have voted to reject the Bridge Lender Plan

55

pursuant to section 1126(g) of the Bankruptcy Code, and the votes of Holders of such Claims or Interests will not be solicited.

4.6     Confirmability and Severability of the Bridge Lender Plan.

   4.6.1     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Bridge Lender Plan by an Impaired Class of Claims. The Proponents shall seek Confirmation of the Bridge Lender Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

   4.6.2     Cramdown. With respect to any Impaired Class of Claims or Interests that fails to accept the Bridge Lender Plan in accordance with section 1129(a) of the Bankruptcy Code, the Proponents request that the Bankruptcy Court confirm the Bridge Lender Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Classes, in which case or cases, the Bridge Lender Plan shall constitute a motion for such relief.

   4.6.3     Reservation of Rights. Subject to Section 13.9 of the Bridge Lender Plan, the Proponents reserve the right to modify or withdraw the Bridge Lender Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Bridge Lender Plan as it applies to any particular Debtor is not confirmed. In addition, and also subject to Section 13.9 of the Bridge Lender Plan, should the Bridge Lender Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Bridge Lender Plan to the contrary, the Proponents reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw the Bridge Lender Plan in its entirety or in part.

## ARTICLE 5     MEANS FOR IMPLEMENTATION OF THE BRIDGE LENDER PLAN

5.1     Non-Substantive Consolidation.

   Although the Bridge Lender Plan is presented as a joint plan of reorganization, the Bridge Lender Plan does not provide for the substantive consolidation of the Debtors' Estates and, on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Allowed Claims held against one Debtor will be deemed satisfied solely from the Cash and assets of such Debtor and its Estate, provided, however, that, to the extent of any insufficiency, funds may be advanced to the relevant Debtors by the Estate of Tribune or any of the Subsidiary Debtors at the option of the Proponents, as applicable. Except as specifically set forth herein, nothing in the Bridge Lender Plan or the Joint Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor. A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for voting purposes. No Claim will receive value in excess of 100% of the Allowed amount of such Claim. Notwithstanding anything to the contrary in the Bridge Lender Plan, the Claims and Interests that are Reinstated and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Bridge Lender Plan, the Chapter 11 Cases, or otherwise.

56

5.2     Restructuring Transactions.

After the Confirmation Date and on or prior to the Effective Date, any Debtor (with the consent of the Proponents) and, after the Effective Date, any Reorganized Debtor may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor (and as acceptable to the Proponents) or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions. The actions to effect the Restructuring Transactions may include, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors (and as acceptable to the Proponents) or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors. In each case in which the surviving, resulting or acquiring Person in any such Restructuring Transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring Person will perform the obligations of the applicable Reorganized Debtor pursuant to the Bridge Lender Plan to pay or otherwise satisfy the Claims against such Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations. Implementation of the Restructuring Transactions shall not affect any distributions, discharges, releases or injunctions set forth in the Bridge Lender Plan. Exhibit 5.2, to be filed with the Debtor/Committee/Lender Plan Supplement, shall set forth a description of the Restructuring Transactions; provided, however, that the Proponents shall be able to make any modifications to such Exhibit and file such modified Exhibit with the Bankruptcy Court if deemed necessary in the Proponents' sole discretion. On or prior to, or as soon as practicable after, the Effective Date, the Debtors (and as acceptable to the Proponents) or the Reorganized Debtors, as applicable, may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 5.2 of the Bridge Lender Plan. The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order. To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC

57

shall have been obtained. No Restructuring Transaction shall adversely affect the prosecution or investigation of the Litigation Trust Causes of Action and/or the State Law Avoidance Claims.

5.3     Corporate Governance, Directors, Officers and Corporate Action.

5.3.1     Certificate of Incorporation; By-Laws; Limited Liability Company Agreement; Limited Liability Partnership Agreement. On the Effective Date, the Certificate of Incorporation and By-Laws, substantially in the forms attached as Exhibit 5.3.1(1) and Exhibit 5.3.1(2), respectively, to be filed with the Debtor/Committee/Lender Plan Supplement, shall go into effect. Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities. To the extent the summary description in the Bridge Lender Plan conflicts with the terms of the Certificate of Incorporation or the By-Laws, the terms of the Bridge Lender Plan shall govern. The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of the Bridge Lender Plan (including, without limitation, Section 5.2) and the Bankruptcy Code. Additionally, any director and officer liability exculpation or indemnity provisions contained in the Certificate of Incorporation shall not apply to claims and causes of action arising out of acts or omissions of officers or directors prior to the Effective Date or any acts or omissions of officers or directors that interfere with or adversely affect the prosecution or investigation of the Litigation Trust Causes of Action or State Law Avoidance Claims. The Reorganized Debtors' certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, shall obligate the Reorganized Debtors and their officers, directors and employees to (i) cooperate in all respects with the prosecution and investigation of the Litigation Trust Causes of Action and the State Law Avoidance Claims and (ii) not take or omit from taking any action that could interfere with or adversely affect the investigation or prosecution of the Litigation Trust Causes of Action or State Law Avoidance Claims. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law; provided, however, that no amendment of the aforementioned documents may be made that limits the obligations of the Reorganized Debtors and their officers, directors and employees to cooperate in all respects with the prosecution and investigation of the Litigation Trust Causes of Action and the State Law Avoidance Claims or could interfere with or adversely affect the investigation or prosecution of the Litigation Trust Causes of Action or State Law Avoidance Claims; provided, further, that to the extent any amendment of the aforementioned documents affects the value of, or otherwise impacts, the Distribution Trust Reserve, Reorganized Tribune shall be required to obtain Bankruptcy Court approval prior to the adoption of the proposed amendment or restatement. In addition, on the Effective Date, Reorganized Tribune, the Distribution Trust and holders of more than 10% of the New Common Stock of Reorganized Tribune as of the Effective Date shall enter into a registration rights agreement substantially in the form set forth in Exhibit 5.3.1(3), which shall be filed with the Debtor/Committee/Lender Plan Supplement.

58

5.3.2     Directors and Officers of Reorganized Tribune.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial directors and officers of Reorganized Tribune shall be the persons identified in Exhibit 5.3.2(1) and Exhibit 5.3.2(2), respectively, to the Debtor/Committee/Lender Plan, to be filed no later than five days before the commencement of the Confirmation Hearing. The board of directors of Reorganized Tribune shall have seven (7) members, one of which will be the chief executive officer of Reorganized Tribune (to the extent the position is not vacant). The process for selecting the remaining members of the board of directors of Reorganized Tribune shall be acceptable to the Proponents.  All members of the initial board of directors of Reorganized Tribune will be in compliance with all applicable requirements of the Communications Act and the FCC's rules.  Three members of the initial board of directors of Reorganized Tribune (including the chief executive officer of Reorganized Tribune, to the extent the position is not vacant) shall serve for a one-year term, two members of the initial board of directors of Reorganized Tribune shall serve for a two-year term and two members of the initial board of directors of Reorganized Tribune shall serve for a three-year term, and in each case be subject to re-election based on a shareholder vote pursuant to the terms of the Certificate of Incorporation and applicable law.  Notwithstanding anything contained herein, until the termination or dissolution of the Distribution Trust, the Distribution Trustee, at the direction of the Distribution Trust Advisory Board shall have the right, pursuant to the terms of the New Class C Common Stock, to appoint two members to the board of directors of Reorganized Tribune, which directors shall be independent directors under applicable SEC rules and regulations.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, Exhibit 5.3.2 to the Debtor/Committee/Lender Plan, to be filed no later than five days before the commencement of the Confirmation Hearing, shall disclose the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Tribune (to the extent known) and to the extent such person is an insider (as defined in section 101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for such person.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation and applicable law.  Each member of the current board of directors of Tribune will be deemed to have resigned on the Effective Date unless identified in Exhibit 5.3.2(1) to the Debtor/Committee/Lender Plan as continuing on the board of directors of Reorganized Tribune.  The officers and directors of Reorganized Tribune shall be required to (i) cooperate in all respects with the prosecution and investigation of the Litigation Trust Causes of Action and the State Law Avoidance Claims and (ii) not take or omit from taking any action that could interfere with or adversely affect the investigation or prosecution of the Litigation Trust Causes of Action or State Law Avoidance Claims.

5.3.3     Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune.  Except as set forth in Exhibit 5.3.3 to the Debtor/Committee/Lender Plan, from and after the Effective Date, each Reorganized Debtor shall retain its equity interest in any other Reorganized Debtor.  The initial boards of directors or managers of the Reorganized Debtors other than Reorganized Tribune shall be as set forth in Exhibit 5.3.3 to be filed no later than five days before the commencement of the Confirmation Hearing.  The initial officers of Reorganized Tribune shall be the persons identified in Exhibit 5.3.2(1) to the Debtor/Committee/Lender Plan; provided, however, that the Proponents shall be able to make any modifications to such Exhibit and file such modified Exhibit with the Bankruptcy Court at

59

any time prior to the commencement of the Confirmation Hearing if deemed necessary in the Proponents' sole discretion.

      5.3.4      Corporate Action. The adoption of the Certificate of Incorporation or similar constituent documents, the adoption of the By-Laws, the selection of directors and officers for Reorganized Tribune, and all other actions contemplated by the Bridge Lender Plan shall be authorized and approved in all respects (subject to the provisions of the Bridge Lender Plan) by the Confirmation Order. All matters provided for in the Bridge Lender Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Bridge Lender Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, as applicable, the appropriate officers of the Debtors and/or the Reorganized Debtors and members of the boards of directors or managers of the Debtors and/or Reorganized Debtors are authorized and directed to issue, execute and deliver, and cause the Reorganized Debtors to perform, the agreements, documents, securities and instruments contemplated by the Bridge Lender Plan in the name of and on behalf of the Debtors and/or Reorganized Debtors.

5.4      Issuance and Distribution of New Securities and Related Matters.

      5.4.1      Issuance of New Securities. On, or as promptly as reasonably practicable after, the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Bridge Lender Plan without further act or action under applicable law, regulation, order or rule. On the Effective Date, the Distribution Trust, for purposes of funding the Distribution Trust Reserve, will receive the New Class C Common Stock, and the New Warrants. Except as otherwise provided in the Bridge Lender Plan, including as specifically provided in Section 5.4.2 hereof, each Holder of a Claim to receive a distribution of New Common Stock pursuant to the Bridge Lender Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock or New Warrants if such Holder informs the Debtors and the Proponents of its desire to receive such New Class B Common Stock or New Warrants by the date announced by the Proponents in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing. On the Effective Date, Reorganized Tribune shall issue one share of New Class C Common Stock to the Distribution Trust. Reorganized Tribune shall not issue any other shares of New Class C Common Stock at any time without the prior written consent of the Distribution Trust, such consent to be in the sole discretion of the Distribution Trust. The New Class C Common Stock shall not be subject to optional redemption. On the date on which the Distribution Trust is dissolved or otherwise wound down, Reorganized Tribune shall redeem the outstanding share of New Class C Common Stock at a price of $1.00 per share. As the sole holder of New Class C Common Stock, the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, shall have the right to elect two members of the board of directors of Reorganized Tribune. New Class C Common Stock may not be transferred without the approval of the board of directors of Reorganized Tribune. Without the consent or approval of the Distribution Trust (such consent to be in the sole discretion of the Distribution Trust),

60

Reorganized Tribune will not directly or indirectly, by way of merger, consolidation, operation of law or otherwise: (i) alter or change the rights, preferences or privileges of the New Class C Common Stock; (ii) take any action, including amending Reorganized Tribune's Certificate of Incorporation or Bylaws that would adversely affect the rights, preferences or privileges of the New Class C Common Stock; (iii) increase or decrease the authorized number of shares of New Class C Common Stock; or (iv) increase or decrease the authorized size of Reorganized Tribune's board of directors. The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) to be filed with the Debtor/Committee/Lender Plan Supplement, sets forth the rights and preferences of the New Common Stock. The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock. To the extent the shares of New Class A Common Stock, New Class B Common Stock or New Class C Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares. The New Warrant Agreement, substantially in the form of Exhibit 1.1.154 to be filed with the Debtor/Committee/Lender Plan Supplement, sets forth the rights of the holders of the New Warrants. The issuance of the New Common Stock and the New Warrants, including the issuance of New Common Stock upon any exercise of the New Warrants, and the distribution thereof under the Bridge Lender Plan and through the Distribution Trust, as applicable, shall be exempt from registration under applicable securities laws pursuant to section 1145 of the Bankruptcy Code. The Distribution Trust shall be deemed a "successor to the debtor" for purposes of section 1145 of the Bankruptcy Code and not necessarily for any other purpose. Beneficial interests in the Distribution Trust and the Creditors' Trust either (1) are not "securities" within the meaning of the federal and state securities laws or (2) shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Bridge Lender Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

    5.4.2    <u>Distribution of New Common Stock and New Warrants.</u>

        (a)    <u>Foreign Ownership Certification.</u> Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Bridge Lender Plan will be required (1) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (2) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of Reorganized Tribune, the Distribution Trustee or the Proponents, confirm the absence of any changes. Notwithstanding anything else to the contrary in the Bridge Lender Plan, any such Holder that fails to provide (i) the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, (ii) an amended Foreign Ownership Certification if one is required, (iii) a Foreign Ownership Certification that is reasonably satisfactory to Reorganized Tribune, the Distribution Trustee or the Proponents, as applicable, or (iv) a timely confirmation, if required, that its foreign ownership and voting rights percentages have not changed, may be deemed to be an entity that is foreign-owned and controlled for purposes of

61

determining the allocation of New Common Stock and New Warrants as set forth in Section 5.4.2(c).

(b)      Media Ownership Certification. Each Holder of a Claim to receive a distribution of New Common Stock pursuant to the Bridge Lender Plan may be required to provide a Media Ownership Certification by the deadline established by the Bankruptcy Court, in accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder. Any such Holder that fails to provide the Media Ownership Certification by the deadline established by the Bankruptcy Court or that does not do so to the reasonable satisfaction of the Debtors or the Proponents may be allocated New Class B Common Stock in lieu of New Class A Common Stock as set forth in Section 5.4.2(d) at the discretion of the Debtors or the Proponents.

(c)      Foreign-Owned or Controlled Entities. Notwithstanding anything else to the contrary in the Bridge Lender Plan, Reorganized Tribune shall issue (i) New Warrants in lieu of New Common Stock, (ii) New Common Stock or (iii) a combination of New Warrants and New Common Stock (in lieu of only New Common Stock or only New Warrants), to any Holder of a Claim to receive New Common Stock under the Bridge Lender Plan and that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with Section 5.4.2(a) herein), is (or is deemed to be pursuant to Section 5.4.2(a)) more than twenty five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to section 310(b) of the Communications Act. Such issuance of New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock to such Holders shall be pursuant to an allocation mechanism to be determined by Reorganized Tribune that, based on the aggregated results of the Foreign Ownership Certification, ensures compliance with section 310(b) of the Communications Act.

(d)      Entities with Conflicting Media Interests. Reorganized Tribune, in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock to any Holder of a Claim that is eligible to receive a distribution of New Common Stock under the Bridge Lender Plan to ensure that such Holder will hold, in the aggregate (including with entities under common ownership or control) less than five percent (5%) of the voting rights of Reorganized Tribune, if Reorganized Tribune determines, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with Section 5.4.2(b) herein), that such Holder has other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would receive pursuant to the Bridge Lender Plan; provided, however, that to the extent a Holder of a Claim has been approved by the FCC as a party to the FCC Applications, Reorganized Tribune shall not be entitled to issue shares of New Class B Common Stock to such Holder of a Claim at emergence without its express consent unless the issuance of New Class A Common Stock to a Holder of a Claim would result in a violation of the Communications Act or the FCC's rules or unless such Holder of a Claim has failed to comply with or satisfy any conditions imposed by the FCC as part of the FCC Approval or any commitment made in the FCC Applications, in which case Reorganized Tribune may issue shares of New Class B Common Stock to such Holder of a Claim only to the minimum extent necessary to cure such violation or non-compliance. Notwithstanding the foregoing, the Debtors

MIAMI 889648 (2K)

will not request any waivers of the Communications Act or the FCC's rules in or regarding the FCC Applications to accommodate separate media interests held by a Holder of a Claim independent of its interest in Reorganized Tribune.

(e)    Holders of Five Percent (5%) or More of New Class A Common Stock. If any Holder of a Claim is to receive New Class A Common Stock such that, upon the Effective Date, any subsequent Distribution Date, or such other deadline established by the Bankruptcy Court, such Holder would receive five percent (5%) or more of the shares of New Class A Common Stock (for any reason, including, but not limited to, as a result of distributions from the Distribution Trust or the distribution of New Warrants or the distribution of New Class B Common Stock in lieu of New Class A Common Stock in accordance with Sections 5.4.2(c) or 5.4.2(d), and such Holder has not provided the Media Ownership Certification in accordance with Section 5.4.2(b) herein or such ownership has not been disclosed in the FCC Applications and approved by the FCC, then Reorganized Tribune shall be entitled to issue to such Holder, and cause the Distribution Trustee to exchange New Class A Common Stock otherwise distributable to such Holder, as many shares of New Class B Common Stock in lieu of shares of New Class A Common Stock as Reorganized Tribune deems necessary to ensure compliance with the Communications Act or the FCC's rules and/or to avoid substantial delay in obtaining the FCC Approval.

(f)    Distributions. On or as soon as reasonably practicable after the applicable Distribution Date, all of the shares of the New Common Stock and New Warrants, as applicable, to which any Holder of a Claim shall become entitled pursuant to the Bridge Lender Plan or Litigation Distribution Orders shall be transferred by the Distribution Agent or the Distribution Trust, as applicable, by delivery of one or more certificates representing such securities as described herein or issued in the name of such Holder or DTC or its nominee or nominees in accordance with DTC's book-entry exchange procedures, as contemplated by Section 7.7.2, subject to the terms and conditions of the Bridge Lender Plan and the Litigation Distribution Orders, as applicable. In the period after the Effective Date and pending distribution of the New Common Stock to any Holder of an Allowed Claim entitled to receive such distribution, such Holder shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such Holder's New Common Stock (including receiving any proceeds of any permitted transfer of such New Common Stock), and to exercise all other rights in respect of the New Common Stock (so that such Holder shall be deemed for tax purposes to be the owner of the New Common Stock issued in the name of such Holder).

(g)    Distribution of New Common Stock and New Warrants by Distribution Trustee. Holders of Distribution Trust Interests entitled to receive distributions from the Distribution Trust in the form of New Common Stock or New Warrants shall elect the form of security to be received in accordance with procedures to be set forth in the Distribution Trust Agreement. Prior to exchanging any New Warrants for New Common Stock for distribution from the Distribution Trust Reserve to the holder of a Distribution Trust Interest entitled to receive such distribution, the Distribution Trustee shall require the holder of the Distribution Trust Interest to submit a Foreign Ownership Certification or to confirm the absence of any changes to a Foreign Ownership Certification previously submitted. Any holder that fails to submit a Foreign Ownership Certification or to confirm the absence of any changes to a previously submitted certification shall be deemed to be an entity that is foreign-owned and

63

controlled.  The Distribution Trustee shall consult with Reorganized Tribune to ensure that the form of distribution is consistent with the requirements of Section 5.4.2(c) of the Bridge Lender Plan, and, to the extent necessary to ensure that Reorganized Tribune complies with Section 310(b) of the Communications Act, the Distribution Trustee shall distribute New Warrants to applicable holders of Distribution Trust Interests receiving a distribution.  Prior to distributing any New Common Stock from the Distribution Trust Reserve to a Holder of a Distribution Trust Interest entitled to receive such distribution, the Distribution Trustee shall require the holder of the Distribution Trust Interest to submit a Media Ownership Certification.  The Distribution Trustee shall consult with Reorganized Tribune to determine, whether, based on the Media Ownership Certification submitted, a Holder is qualified to hold an attributable interest in Reorganized Tribune in accordance with FCC Rules.  The Distribution Trustee shall insure that any holder that fails to submit a Media Ownership Certification or that is not qualified to hold an attributable interest in Reorganized Tribune will not hold, in the aggregate, five percent (5%) or more of the voting rights of Reorganized Tribune.  To the extent any such Holder would, as a result of a distribution from the Distribution Trust, hold five percent (5%) or more of the New Class A Common Stock, Reorganized Tribune may exchange the New Class A Common Stock otherwise distributable to such Holder from the Distribution Trust to such Holder for New Class B Common Stock.  Without obtaining the prior consent of the FCC, the Distribution Trustee shall not implement any distribution to the Holders of Distribution Trust Interests that would result in a transfer of control of Reorganized Tribune that would require FCC consent.

5.5    Reporting Requirements Under the Securities Exchange Act of 1934 and Listing of New Class A Common Stock on the Securities Exchange or Quotation System.

Reorganized Tribune shall use its reasonable best efforts to become a reporting company under section 12 of the Securities Exchange Act of 1934, as amended, as promptly as practicable after the Effective Date and shall maintain all necessary staff, operations and practices in order to be a public reporting company.  In addition, Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the New York Stock Exchange or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so.  Persons receiving distributions of New Class A Common Stock, by accepting such distributions, will have agreed to cooperate with Reorganized Tribune's reasonable requests to assist Reorganized Tribune in its efforts to list the New Class A Common Stock on the New York Stock Exchange or for quotation in the NASDAQ stock market, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized Tribune who satisfy the independence and other requirements of the New York Stock Exchange or for quotation in the NASDAQ stock market, as applicable.

5.6    New Senior Secured Term Loan Agreement.

5.6.1    Subject to the terms of this Section 5.6, on the Effective Date, (a) Reorganized Tribune, as borrower, (b) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), as guarantors, (c) the administrative agent party thereto, (d) the Distribution Trust, and (e) the Holders of Claims receiving a distribution of the New Senior Secured Term Loan under the Bridge Lender Plan

64

shall become parties to, and be bound by the terms of, the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement. If issued, the New Senior Secured Term Loan shall (i) be guaranteed by the U.S. subsidiaries of Reorganized Tribune (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), (ii) be secured by certain assets of Reorganized Tribune and the guarantors thereof subject to specified exceptions and customary intercreditor arrangements, (iii) have interest payable in Cash quarterly, (iv) have principal payable in Cash quarterly, with the unpaid balance payable on the final maturity date thereof, (v) mature on the fifth anniversary of the Effective Date, (vi) include usual and customary affirmative and negative covenants for term loan facilities of this type and (vii) be repayable by Reorganized Tribune at any time prior to scheduled maturity without premium or penalty. The New Senior Secured Term Loan Agreement shall contain terms substantially as set forth in Exhibit 5.6 to be filed with the Debtor/Committee/Lender Plan Supplement, which shall otherwise be acceptable to the Proponents in form and substance.

   5.6.2  To the extent that replacement financing is available on commercially reasonable terms, the Reorganized Debtors may distribute Cash in the amount of all or part of the initial principal amount of the New Senior Secured Term Loan in lieu of all or such part of the New Senior Secured Term Loan to Holders of Claims receiving the New Senior Secured Term Loan under the Bridge Lender Plan and the Distribution Trust, as applicable. The relevant Reorganized Debtors, as applicable, are hereby authorized, without any requirement of further action by the security holders or directors of the Debtors or Reorganized Debtors, to make such repayment including through the issuance of new indebtedness; provided, however, that any such Cash distribution shall be distributed Pro Rata to Holders of Claims that otherwise would have received the New Senior Secured Term Loan and the Distribution Trust, as applicable.

5.7 Continued Corporate Existence and Vesting of Certain Assets in the Reorganized Debtors.

   Subject to Section 5.2, after the Effective Date, the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of the Bridge Lender Plan. Except as otherwise provided in the Bridge Lender Plan, on and after the Effective Date, all property of the Estates, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Bridge Lender Plan, but excluding the Litigation Trust Causes of Action, State Law Avoidance Claims and the Intercompany Avoidance Actions shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims (but not the Litigation Trust Causes of Action, any Claims related to Litigation Trust Causes of Action, State Law Avoidance Claims or any Claims related to the State Law Avoidance Claims) without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than

restrictions expressly imposed by the Bridge Lender Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court. The officers, directors and employees of the Reorganized Debtors shall be required to cooperate in all respects with the prosecution and investigation of the Litigation Trust Causes of Action and the State Law Avoidance Claims and may not take any actions or omit to take any actions contrary thereto.

5.8    Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests.

    5.8.1    Except as otherwise provided for herein, as of the Effective Date, (a) all Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, notes issued under the Loan Agreements, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds (with the exception of surety bonds outstanding), indentures (including the Indentures), stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under the Bridge Lender Plan shall be cancelled, and (b) all amounts owed by and the obligations of the Debtors under any agreements, credit agreements, guaranty agreements, stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, indentures (including the Indentures) or certificates of designation governing the Loan Claims, Loan Guaranty Claims, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims against or Interests in a Debtor that are Impaired under the Bridge Lender Plan shall be discharged. Notwithstanding anything to the contrary herein, the obligations of parties to the Loan Agreements and the Loan Guaranty Agreements that are not Reorganized Debtors or Subsidiary Non-Debtors shall not be discharged or limited in any way.

    5.8.2    Notwithstanding the foregoing provisions of Section 5.8 and anything contained elsewhere in the Bridge Lender Plan, but subject to Section 5.8.1, (x) the Indentures shall continue in effect solely to the extent necessary to allow the Reorganized Debtors, the Distribution Trustee, the Claims Purchase Agent, the Disbursing Agent and the Indenture Trustees, as applicable, to make distributions pursuant to the Bridge Lender Plan under the respective Indentures and for the applicable Indenture Trustee to perform such other functions with respect thereto and assert any rights preserved under subsection (z) of Section 5.8.2; (y) the Loan Agreements (including, without limitation, the intercreditor provisions described in Section 7.3 of the Bridge Lender Plan) shall continue in effect solely to the extent necessary to allow the Reorganized Debtors, Distribution Trust or the Disbursing Agent, as applicable, to make distributions, subject to the Senior Loan Claim Sharing Resolution, pursuant to the Bridge Lender Plan on account of the Loan Claims and Loan Guaranty Claims under the respective Loan Agreements and Loan Guaranty Agreements; and (z) nothing herein shall waive, release, or impair any rights, claims or interests, if any, that an Indenture Trustee may have under the applicable Indenture or otherwise to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any

66

distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise, all of which rights, claims and interests expressly are preserved. Except as otherwise provided herein, upon cancellation of the applicable Indenture, the respective Indenture Trustee shall be relieved of any obligations as Indenture Trustee under such Indenture. Except as expressly provided in the Bridge Lender Plan, none of the Debtors, the Reorganized Debtors, the Distribution Trust or the Distribution Trustee shall have any obligations to any Indenture Trustee or Loan Agent for any fees, costs or expenses.

5.9    Cancellation of Liens and Guaranties.

Except as otherwise provided in the Bridge Lender Plan, on the Effective Date, any Lien securing any Secured Claim (other than a Lien securing any Other Secured Claim that is Reinstated pursuant to the Bridge Lender Plan) shall be deemed released and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be). In addition, it is a condition to the release, cancellation and extinguishment of the Senior Loan Guaranty Claims against the Guarantor Non-Debtors that all Bridge Loan Guaranty Claims shall be concurrently released, extinguished and cancelled. The consummation of the Bridge Lender Plan shall effect and constitute a full and final release, extinguishment and cancellation of any and all Senior Loan Guaranty Claims and any and all Bridge Loan Guaranty Claims against Guarantor Non-Debtors.

5.10    Exit Facility.

On the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

5.11    Equity Incentive Plan.

At the discretion of the board of directors of Reorganized Tribune, after the Effective Date, the Reorganized Debtors may adopt an Equity Incentive Plan for the purpose of granting awards over time to directors, officers and employees of Reorganized Tribune and the other Reorganized Debtors. Stock awarded pursuant to the Equity Incentive Plan shall not exceed five percent (5%) of the New Common Stock on a fully diluted basis. Notwithstanding anything set forth herein or in the Confirmation Order, any New Common Stock that, under the Equity Incentive Plan, would otherwise be granted to any officer, director or employee of the Reorganized Debtors that was named as a defendant in the Creditors' Committee Director, Officer and Shareholder Complaint shall instead be placed in trust pending the resolution of the causes of action against such person set forth in such complaint.

MIAMI 889648 (2K)

5.12    Sources of Cash for Initial Bridge Lender Plan Distributions.

Except as otherwise provided in the Bridge Lender Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Bridge Lender Plan (other than Cash payments in respect of proceeds from the Litigation Trust Causes of Action and the State Law Avoidance Claims) may be obtained from existing Cash balances, the operations of the Debtors or the Reorganized Debtors, sales of assets or the Exit Facility. Subject to Section 5.1, the Reorganized Debtors may also make such payments using Cash received from their Affiliates through the Reorganized Debtors' consolidated cash management systems.

5.13    Additional Transactions Authorized Under the Bridge Lender Plan.

On or prior to the Effective Date, the Debtors, with the consent of the Proponents, shall be authorized to take any such actions as may be necessary or appropriate to have Claims or Interests Reinstated or render Claims or Interests Unimpaired to the extent provided herein; provided, however, that the Debtors shall not be authorized to take such actions with respect to any Claim related to the Leveraged ESOP Transaction or any Claim of an insider, Affiliate or Related Person to any Debtor. On the Effective Date, the Loan Agents are authorized and directed to take such actions as are necessary or appropriate to effect all transactions specified or referred to in or provided for under the Bridge Lender Plan.

5.14    Put Option.

5.14.1    General. The Bridge Lender Plan provides for, among other things, an election by the Other Parent Claim Holders and Other Guarantor Debtor Claim Holders whose Claims are Allowed as of the Voting Deadline, to transfer their Other Parent Claims and Other Guarantor Debtor Claims, including the right to receive Initial Distributions, Distribution Trust Interests and, if applicable, Creditors' Trust Interests to the Claims Purchaser in exchange for a Cash payment from the Claims Purchaser on, or as soon as practicable after, the Initial Distribution Date; provided, however, that the Claims Purchase shall only be consummated if (a) the Class such Put Claim is classified in under the Bridge Lender Plan has voted to accept the Bridge Lender Plan, (b) such Holder of the Put Claim (x) made the Other Parent Claim Put Election or Other Guarantor Debtor Claim Put Election on its Ballot, as applicable and (y) has not made the Non-Contribution Election, to the extent applicable, and (c) Aurelius Capital Management, LP or its designee chooses to act as Claims Purchaser. If conditions precedent for the Claims Purchase are satisfied, each Holder, subject to the respective Claims Purchase Price Cap, of an Other Parent Claim or Other Guarantor Debtor Claim that is Allowed as of the Voting Deadline and elects the applicable Put Option will receive its share of the Other Parent Claims Purchase Funds and Other Guarantor Debtor Claims Purchase Funds, respectively, and the consideration such Holder would have received under the Bridge Lender Plan had it not elected the Put Option shall be distributed to the Claims Purchaser; provided, however, that to the extent the Other Parent Put Claims and/or Other Guarantor Debtor Put Claims exceed the Other Parent Claims Purchase Cap or Other Guarantor Debtor Claims Purchase Cap, as applicable, and the applicable Claims Purchase Cap is not increased, the Claims Purchaser shall not succeed to the rights of Holders of Put Claims to receive that portion of Initial Distributions, Distribution Trust Interests, and, if applicable, Creditors' Trust Interests, on account of that portion of such Holder's Put Claim that is not being purchased.

68

5.14.2    Claims Purchase Funding.  In the event the Other Parent Claims Purchase is initiated pursuant to the terms of the Bridge Lender Plan, the Claims Purchase Agent shall, as promptly as practicable following entry of the Confirmation Order, but in no event later than two (2) Business Days following the entry of the Confirmation Order, notify the Claims Purchaser of (i) the principal amount of Other Parent Claims that it will purchase and (ii) the Other Parent Claims Purchase Price; provided, however, that in no event shall the Other Parent Claims Purchase Price exceed the Other Parent Claims Purchase Price Cap, unless otherwise agreed to by the Claims Purchaser in its sole discretion.

In the event the Other Guarantor Debtor Claims Purchase is initiated pursuant to the terms of the Bridge Lender Plan, the Claims Purchase Agent shall, as promptly as practicable following entry of the Confirmation Order, but in no event later than two (2) business days following the entry of the Confirmation Order, notify the Claims Purchaser of (i) the principal amount of Other Guarantor Debtor Claims that it will purchase and (ii) the Other Guarantor Debtor Claims Purchase Price; provided, however, that in no event shall the Other Guarantor Debtor Claims Purchase Price exceed the Other Guarantor Debtor Claims Purchase Price Cap unless otherwise agreed to by the Claims Purchaser in its sole discretion.

The Claims Purchase Funds shall be held in an escrow account, or similarly segregated account(s), which shall be separate and apart from the Claims Purchase Agent's general operating funds and any other funds which may be subject to any Lien or any cash collateral agreements and which segregated account(s) shall be maintained for the purpose of holding the funds necessary to administer and satisfy the Claims Purchase.

5.14.3    Claims Purchase Agent.  If Aurelius Capital Management, LP or its designee chooses to act as the Claims Purchaser, then on the Initial Distribution Date or as soon thereafter as is practicable, the Claims Purchase Funds shall be tendered by the Claims Purchase Agent in exchange for the Put Claims, and the Claims Purchase Agent shall discharge such duties in accordance with the Bridge Lender Plan and subject to the Claims Purchase Agreement.  The reasonable fees and expenses of the Claims Purchase Agent (including fees and expenses of outside counsel) shall be Allowed Administrative Expense Claims.

5.14.4    Timing of Transactions.  The Claims Purchase and the transfer of the Put Claims to the Claims Purchaser shall occur contemporaneously with the Initial Distributions that are made to the applicable Class of Claims.

5.14.5    Manner of Claims Purchase and Delivery of Payment.  Unless otherwise specified herein, any payment in Cash to be made by the Claims Purchase Agent shall be made, at the election of the Claims Purchase Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  The provisions in Sections 7.5 and 7.6 of the Bridge Lender Plan shall govern the delivery of payments made in connection with the Claims Purchase.

5.15    Settlement of Claims and Controversies.

The Bridge Lender Plan constitutes a request to authorize and approve the Plan Settlements set forth in this Section 5.15.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Bridge Lender Plan, of the Plan

69

Settlements (in each case, subject to the applicable lender class voting to accept the Bridge Lender Plan) and the Bankruptcy Court's finding that the Plan Settlements are in the best interests of the Debtors, the Reorganized Debtors, their respective Estates and the Holders of Claims and Interests, and are fair, equitable and reasonable.

The terms of each of the Plan Settlements are described below.

(a)    Proposed Step One Lender Settlement.  If the applicable Classes of Step One Lenders vote to accept the Bridge Lender Plan and elect on the Ballot to participate in the Step One Lender Settlement, the Bridge Lender Plan will implement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 the following Step One Lender Settlement between and among the Debtors' Estates and the Step One Lender Parties.

    (i)    Treatment of Step One Lenders' Claims.

        (A)    The Step One Lender Claims shall be Allowed against Tribune and the Filed Subsidiary Debtors in the aggregate amount of $6.617 billion, and in respect thereof the Step One Lenders shall receive $4.389 billion of DEV;

        (B)    The Step One Lender Parties (but only in their capacity as Step One Lender Parties) shall be released from all LBO-Related Causes of Action; provided that such release shall not include any LBO-Related Causes of Action (1) with respect to any Step Two Senior Loan, (2) arising from any Person's conduct as an arranger or advisor with respect to the Leveraged ESOP Transactions or (3) arising from any payment made in respect of a Step One Senior Loan to a party who is not a current Step One Lender;

        (C)    The Step One Lenders shall retain all of their rights and remedies against any non-settling Senior Lenders; and

        (D)    Each Step One Lender shall be entitled to its Pro Rata share (together with the Step Two Lenders if the Step Two Lenders Classes vote to accept the Bridge Lender Plan and elect to participate in the Step Two Lender Settlement) of 25% of the Trust Interests.

    (ii)    Treatment of Other Claims.

        (A)    Allowed Other Parent Claims against Tribune shall receive a Pro Rata share of (a) $55 million in Cash, and (b) 5% of the Trust Interests;

        (B)    Allowed Other Guarantor Debtor Claims against the Filed Subsidiary Debtors (estimated at $85 million) shall be paid in Cash in full;

70

(C)    Each Senior Noteholder shall receive a Pro Rata share of (a) $600 million in Cash, and (b) 50% of the Trust Interests; and

(D)    The obligations owed in respect of the PHONES Notes shall be Allowed against Tribune in the amount of $761 million and each holder of PHONES Notes shall receive a Pro Rata share of (a) $40 million in Cash, and (b) 20% of the Trust Interests.

(iii)    <u>Residual Value/Step Two Senior Loan Claims</u>.  Unless the Classes of Step Two Lenders vote to accept the Bridge Lender Plan and elect to participate in the Step Two Lender Settlement and the Classes of Bridge Loan Lenders vote to accept the Plan and participate in the Bridge Loan Lender Settlement (in which case, substantially all DEV will have been distributed), the remaining DEV (estimated at $1.581 billion) after the foregoing payments and distributions shall be transferred to the Distribution Trust and shall be distributed in connection with the post-confirmation resolution of LBO-Related Causes of Action as provided in the Bridge Lender Plan and the Distribution Trust Agreement.

(b)    <u>Proposed Step Two Lender Settlement</u>.  If the Classes of Step Two Lenders vote to accept the Bridge Lender Plan and elect to participate in the Step Two Lender Settlement, the Bridge Lender Plan will implement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 the following Step Two Lender Settlement between and among the Debtors' Estates and the Step Two Lender Parties.

(i)    <u>Treatment of Step Two Lenders' Claims</u>.

(A)    The Step Two Lender Claims shall be Allowed against Tribune and the Filed Subsidiary Debtors in the aggregate amount of $2.105 billion, and in respect thereof the Step Two Lenders shall receive $950 million of DEV;

(B)    The Step Two Lender Parties (but only in their capacity as Step Two Lender Parties) shall be released from all LBO-Related Causes of Action; provided that such release shall not include any LBO-Related Causes of Action (1) with respect to any Step One Senior Loan, (2) arising from any Person's conduct as an arranger or advisor with respect to the Leveraged ESOP Transactions or (3) arising from any payment made in respect of a Step Two Senior Loan to a party who is not a current Step Two Lender;

(C)    The Step Two Lenders shall retain all of their rights and remedies against any non-settling Senior Lenders; and

(D)    Each Step Two Lender shall be entitled to its Pro Rata share (together with the Step One Lenders but only if the Step One Lender Settlement is approved) of 25% of the Trust Interests.

71

(ii)    <u>Treatment of Other Claims</u>.  The Step Two Lender Settlement provides that the Step One Lenders shall receive $309 million of DEV, the Senior Noteholders shall receive $150 million, the PHONES Noteholders shall receive $35 million, and the Holders of Other Parent Claims shall receive $12 million.  In addition to such recoveries, the foregoing creditor constituencies shall also receive:

    (A)    If the Step One Lender Settlement is accepted and approved, the recoveries provided to them pursuant to the Step One Lender Settlement; or

    (B)    If the Step One Lender Settlement is not accepted and approved, the recoveries that they would otherwise receive under the Trust structure.

(iii)    <u>Residual Value/Step One Senior Loan Claims</u>.  Unless the Step One Lender Settlement and Bridge Loan Lender Settlement are accepted and approved (in which case, substantially all DEV will have been distributed), the remaining DEV (estimated at $5.294 billion) after the foregoing payments and distributions shall be transferred to the Distribution Trust and shall be distributed as ordered by the Bankruptcy Court in connection with the post-confirmation resolution of LBO-Related Causes of Action and the Step One Lenders' Claims.

(c)    <u>Proposed Bridge Loan Lender Settlement</u>.  If the applicable Classes of Bridge Loan Lenders vote to accept the Bridge Lender Plan and elect to participate in the Bridge Loan Lender Settlement, the Bridge Lender Plan will implement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 the following Bridge Loan Lender Settlement between and among the Debtors' Estates and the Bridge Loan Lender Parties.

(i)    The Bridge Loan Lender Claims shall be Allowed against Tribune and the Filed Subsidiary Debtors in the aggregate amount of $1.62 billion.

(ii)    If the Step One Lender Settlement is accepted and approved, the Bridge Loan Lenders shall receive $125 million of DEV in Cash.

(iii)    If the Step One Lender Settlement is not accepted and approved and the Bridge Loan Lender Settlement is approved on a stand-alone basis, the Bridge Loan Lenders shall receive $125 million in Cash and 5% of the Creditors' Trust Interests.

(iv)    In either case, and in lieu of participating in any recovery under the Bridge Lender Plan, the Original Bridge Loan Lenders (but solely in their capacity as such) shall receive the Original Bridge Loan Lenders Release.

5.16    Preservation of Rights of Action and Settlement of Litigation Claims.

Except as otherwise provided in the Bridge Lender Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Bridge Lender Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims (which for the avoidance of doubt, shall not include (i) the Litigation Trust Causes of Action, which the Litigation Trust shall have exclusive authority to enforce, sue on, settle or compromise, (ii) the State Law Avoidance Claims and D&O Claims, which the Creditors' Trust shall have exclusive authority to enforce, sue on, settle or compromise and (iii) the Intercompany Claim Avoidance Actions. Notwithstanding the foregoing, the Bankruptcy Court reserves the right to determine, after the Effective Date, whether the Litigation Trust has standing to propose settlements with respect to the Senior Loan Claim Sharing Resolution or the enforceability of the Bridge Loan Subordination Provision.

5.17    FCC Applications.

The pending FCC Applications shall be amended as promptly as practicable to reflect the Bridge Lender Plan and the Bridge Lender Specific Disclosure Statement, and the Debtors shall be required to prepare and file such amended FCC Applications. The Debtors, the Senior Lenders and any other Holders of Claims receiving New Common Stock shall use their best efforts to cooperate in diligently pursuing and in taking all reasonable steps necessary to obtain the requisite FCC Approvals and shall provide such additional documents or information as are reasonably requested by the Debtors or the Proponents or that the Debtors or the Proponents reasonably deem necessary for the FCC's review of such applications.

5.18    Litigation Trust.

5.18.1    Creation and Purpose of the Litigation Trust.  On the Effective Date, the Litigation Trust shall be created and established pursuant to the Litigation Trust Agreement. Following the Effective Date, the Litigation Trust shall have sole responsibility for the pursuit and resolution of all the Litigation Trust Causes of Action (other than the Senior Loan Claims Sharing Resolution and the applicability of the Bridge Loan Subordination Provision), regardless of whether such causes of action were commenced by the Creditors' Committee or another party prior to the Effective Date. The Litigation Trust shall not continue or engage in the conduct of a trade or business, and no part of the assets of the Litigation Trust or the proceeds, revenue or income therefrom shall be used or disposed of by the Litigation Trustee in the furtherance of any business. The Litigation Trustee shall be under an obligation to make continuing efforts to timely prosecute the Litigation Trust Causes of Action and not unduly prolong the duration of the Litigation Trust.

5.18.2    Transfers to the Litigation Trust.  On the Effective Date, the Debtors and the Estates shall and shall be deemed to have transferred and assigned all Litigation Trust Causes of Action to the Litigation Trust free and clear of all Claims and Liens.  Such transfer and assignment shall be made pursuant to the terms of the Bridge Lender Plan and, accordingly, to the fullest extent permitted by law, shall be exempt from all stamp taxes and similar taxes within

73

the meaning of section 1146(a) of the Bankruptcy Code. On the Effective Date, the Litigation Trust shall succeed to all rights of the Debtors and the Creditors' Committee with respect to the Litigation Trust Causes of Action and all assets and information of the Debtors necessary to investigate, prosecute, protect and conserve all Litigation Trust Causes of Action including, without limitation, control over (including the rights to waive) all attorney/client privileges, work product privileges, accountant/client privileges and any other evidentiary privileges related to the Litigation Trust Causes of Action that, prior to the Effective Date, belonged to the Debtors pursuant to applicable federal and state law. The Litigation Trust shall have the exclusive power, on behalf and in the name of the Estates, to prosecute, defend, compromise, settle, and otherwise deal with all Litigation Trust Causes of Action subject to the restrictions in the Bridge Lender Plan and the Litigation Trust Agreement.

5.18.3    The Litigation Trust Advisory Board. The Litigation Trust will be governed by the Litigation Trust Advisory Board and managed by the Litigation Trustee, subject to the provisions of the Bridge Lender Plan, the Confirmation Order and the Litigation Trust Agreement. The Litigation Trust Advisory Board initially will be a three-member board acceptable and identified to the Proponents. The Litigation Trust Agreement shall govern compensation of Litigation Trust Advisory Board members and changes in the composition of the Litigation Trust Advisory Board after the Effective Date and other matters related to the role, responsibilities and governance of the Litigation Trust Advisory Board. Members of the Litigation Trust Advisory Board shall have fiduciary duties to Holders of Distribution Trust Interests in the same manner that members of an official committee of creditors appointed pursuant to section 1102 of the Bankruptcy Code have fiduciary duties to the creditor constituents represented by such committee; provided, that the Litigation Trust Advisory Board shall not owe fiduciary obligations to any defendants of Litigation Trust Causes of Action in their capacities as such, it being the intent of such fiduciary duties to ensure that the Litigation Trust Advisory Board's obligations are to maximize the value of the assets of the Litigation Trust, including the Litigation Trust Causes of Action.

5.18.4    The Litigation Trustee. The Litigation Trustee will be the exclusive trustee of the Litigation Trust Causes of Action for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Litigation Trustee shall have fiduciary duties to Holders of Distribution Trust Interests in the same manner that members of an official committee of creditors appointed pursuant to section 1102 of the Bankruptcy Code have fiduciary duties to the creditor constituents represented by such committee; provided, that the Litigation Trust Advisory Board shall not owe fiduciary obligations to any defendants of Litigation Trust Causes of Action in their capacities as such, it being the intent of such fiduciary duties to ensure that the Litigation Trust Advisory Board's obligations are to maximize the value of the assets of the Litigation Trust, including the Litigation Trust Causes of Action. A Person identified and acceptable to the Proponents initially shall serve as the Litigation Trustee; provided, however, that the Litigation Trustee shall not be a member of the Litigation Trust Advisory Board. The Litigation Trustee shall be compensated from the Distribution Trust Initial Funding and other sources as provided for in the Litigation Trust Agreement. The Litigation Trust Agreement shall specify the terms and conditions of such compensation, as well as provide the manner in which the Litigation Trustee may be removed and, in the event the Litigation Trustee dies, is removed, or resigns for any reason, how the Litigation Trust Advisory Board shall designate a successor.

MIAMI 889648 (2K)

5.18.5    Responsibilities. The responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include: (i) the receipt, management, supervision, and protection of the Litigation Trust Causes of Action on behalf of and for the benefit of holders of the Distribution Trust Interests; (ii) investigation, analysis, prosecution, and if necessary and appropriate, compromise of the Litigation Trust Causes of Action, including any objections to Claims included therein; (iii) filing all required tax returns and paying taxes and all other obligations of the Litigation Trust; and (iv) such other responsibilities as may be vested in the Litigation Trustee pursuant the Bridge Lender Plan, the Litigation Trust Agreement and orders of the Bankruptcy Court.

5.18.6    Powers. The powers of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the power to: (i) pay taxes and other obligations owed by the Litigation Trust or incurred by the Litigation Trustee; (ii) engage and compensate from the Distribution Trust Initial Funding and, to the extent provided for in the Litigation Trust Agreement, other sources, consultants, agents, employees and professional persons to assist the Litigation Trustee with respect to the Litigation Trustee's responsibilities; (iii) object to, compromise, and settle Litigation Trust Causes of Action subject to the Litigation Trust Advisory Board's approval (and Bankruptcy Court approval, if applicable); (iv) commence and/or pursue any and all actions involving Litigation Trust Causes of Action that could arise or be asserted at any time, unless otherwise waived or relinquished in the Bridge Lender Plan; and (v) act and implement the Bridge Lender Plan, the Litigation Trust Agreement, and orders of the Bankruptcy Court. The Litigation Trustee shall exercise such powers in accordance with the provisions of the Bridge Lender Plan and the Litigation Trust Agreement which shall provide that the Litigation Trustee must obtain the prior approval of the Litigation Trust Advisory Board on the matters described in the Litigation Trust Agreement.

5.18.7    Litigation Trust Funding. On and after the Effective Date, the Litigation Trust shall be funded by the Distribution Trust with proceeds of the Distribution Trust Initial Funding and with other sources as identified in the Litigation Trust Agreement.

5.18.8    Bankruptcy Court Approval. Notwithstanding anything to the contrary in Section 5.18 of the Bridge Lender Plan, the Litigation Trust may not consummate or implement any compromise or other transaction involving Litigation Trust Causes of Action or Disputed Claims where the stated face amount in controversy exceeds $1,000,000, or involving Claims of any amount asserted by members of the Litigation Trust Advisory Board, unless and until the Bankruptcy Court authorizes and approves such compromise or other transaction upon motion by the Litigation Trustee. The Litigation Trustee shall provide notice of and the opportunity for a hearing on all such motions to all entities who request notice of such matters in the manner prescribed in the notice of the Effective Date to be mailed pursuant to Section 13.17 of the Bridge Lender Plan.

5.18.9    Compensation. In addition to reimbursement for the actual reasonable and necessary expenses incurred, the Litigation Trustee, and any employees, agents, consultants, or professionals engaged or retained by the Litigation Trustee, shall be entitled to reasonable compensation from the Distribution Trust Initial Funding and other sources as set forth in the Litigation Trust Agreement for services rendered in connection with performance of the duties of the Litigation Trustee as set forth above and may be paid without any requirement to seek

75

Bankruptcy Court approval of such compensation. With respect to any agents, consultants, employees engaged and professionals retained by the Litigation Trust and the Litigation Trustee, such compensation shall be in an amount and on such terms as may be agreed to by the Litigation Trustee and such agents, consultants, employees or professionals with the written consent of the Litigation Trust Advisory Board and may be paid without any requirement to seek Bankruptcy Court approval of such compensation, it being understood that the Reorganized Debtors shall have no obligation to pay any such compensation.

      5.18.10    Indemnification. From and after the Effective Date, the Litigation Trustee, the members of the Litigation Trust Advisory Board and each of their respective Related Persons (each a "Litigation Trust Indemnified Party") shall be, and hereby are, indemnified by the Litigation Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Litigation Trust Indemnified Party's good faith exercise of what such Litigation Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Trust Indemnified Party reasonably understands to be its duties conferred by the Litigation Trust Agreement, the Bridge Lender Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Bridge Lender Plan (including, without limitation, the Litigation Distribution Orders and any Final Order relating to the Senior Loan Claim Sharing Resolution) applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the Litigation Trust Causes of Action, on and after the Effective Date. The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to (a) the Litigation Trust Agreement; (b) the services to be rendered pursuant to the Litigation Trust Agreement; (c) any document or information, whether verbal or written, referred to herein or supplied to the Litigation Trustee; or (d) proceedings by or on behalf of any creditor. The Distribution Trust shall, on demand, advance or pay promptly out of the Distribution Trust Initial Funding, other sources as set forth in the Litigation Trust Agreement or proceeds of the Litigation Trust Causes of Action, on behalf of each Litigation Trust Indemnified Party, reasonable attorneys' fees and other expenses and disbursements to which such Litigation Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; provided, however, that any Litigation Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Litigation Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Litigation Trust Indemnified Party. In any matter covered by the first two sentences of this subsection, any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Distribution Trustee, at the Distribution Trust's expense, subject to the foregoing terms and conditions. In addition, the Litigation Trust shall purchase fiduciary liability insurance for the benefit of the Litigation Trustee and the Litigation Trust Advisory Board.

      5.18.11    Termination. The duties, responsibilities and powers of the Litigation Trustee shall terminate after all Litigation Trust Causes of Action are fully resolved and the proceeds

thereof have been distributed on the Final Distribution Date in accordance with the Bridge Lender Plan and the Litigation Trust Agreement. The Litigation Trust shall terminate no later than five years from the Effective Date. However, if warranted by the facts and circumstances provided for in the Bridge Lender Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Litigation Trust, the term of Litigation Trust may be extended for a finite period based on the particular circumstances at issue. Each such extension must be approved by the Bankruptcy Court within six months of the beginning of the extended term with notice thereof to all of the beneficiaries of the Litigation Trust.

5.18.12    Federal Income Tax Treatment of the Litigation Trust. The Litigation Trust will be treated as a sub trust of the Distribution Trust for U.S. federal income tax purposes. To the extent the Litigation Trust is treated separately from the Distribution Trust, the Litigation Trust will be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations. The provisions of Section 7.16.13 of the Bridge Lender Plan are incorporated by this Section 5.18.12 to apply to the Litigation Trust in the same manner they apply to the Distribution Trust.

5.18.13    Litigation Trust Beneficiaries. The Distribution Trust and the holders of Distribution Trust Interests shall be the beneficiaries of the Litigation Trust.

5.18.14    Reorganized Debtors' Cooperation. The Reorganized Debtors and each employee, officer and director of the Reorganized Debtors shall be required to cooperate in all reasonable respects with the Litigation Trustee's prosecution of the Litigation Trust Causes of Action and shall not take any action or omit from taking any action that could interfere with the investigation or prosecution of the Litigation Trust Causes of Action. The Litigation Trustee shall have the right to seek relief from the Bankruptcy Court, including seeking an order of contempt of the Confirmation Order, if, in the Litigation Trustee's judgment, the Reorganized Debtors or any employee, officer or director of the Reorganized Debtors fails to cooperate in accordance with the provisions of this Section.

5.18.15    Document Retention. The Reorganized Debtors shall preserve all records and documents (including all electronic records or documents) related to the Litigation Trust Causes of Action for a period of five (5) years after the Effective Date, or if any Litigation Trust Cause of Action has been asserted in a pending action, then until such later time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved. The Litigation Trustee shall be permitted to use all such records and documents in connection with the investigation and prosecution of the Litigation Trust Causes of Action. The Debtors and the Reorganized Debtors shall not be permitted to invoke any privilege, including, but not limited to, attorney/client privileges, work product privileges, accountant/client privileges or any other evidentiary privileges to prevent the Litigation Trustee from using such records and documents for the purpose of investigating or prosecuting the Litigation Trust Causes of Action.

5.19    Creditors' Trust.

5.19.1    Creation and Purpose of the Creditors' Trust. On the Effective Date, the Creditors' Trust shall be created and established pursuant to the Creditors' Trust Agreement for

the purposes of administering the Creditors' Trust Assets and making all distributions to the Holders of Creditors' Trust Interests as provided for under the Bridge Lender Plan and the Creditors' Trust Distribution Orders. The Creditors' Trust shall not continue or engage in the conduct of a trade or business, and no part of the Creditors' Trust Assets or the proceeds, revenue or income therefrom shall be used or disposed of by the Creditors' Trustee in the furtherance of any business. The Creditors' Trust is intended to qualify as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). Except as expressly provided in Section 5.19.8 with respect to the Creditors' Trust Initial Funding, none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the Creditors' Trust. The Creditors' Trust Agreement shall be acceptable to the Proponents and shall be filed prior to the Confirmation Hearing.

5.19.2    Transfers to the Creditors' Trust. On the Effective Date, the Abandoned Claims, to the extent commenced, shall be discontinued by the Debtors, the Creditors' Committee and/or the Estates without prejudice and the Debtors shall be deemed to have abandoned, pursuant to section 554 of the Bankruptcy Code, any and all right to further pursue the Abandoned Claims. Upon the effectiveness of the aforesaid discontinuance and abandonment, each Holder of Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims and Subordinated Securities Claims not making the Non-Contribution Election, shall contribute to the Creditors' Trust any and all State Law Avoidance Claims. The Creditors' Trust shall be authorized to prosecute the State Law Avoidance Claims that are contributed to the Creditors' Trust for the benefit of Creditors' Trust Beneficiaries who contribute State Law Avoidance Claims to the Creditors' Trust, who shall receive any recoveries on account of the State Law Avoidance Claims transferred to the Creditors' Trust, which recoveries shall be distributed to Creditors' Trust Beneficiaries in accordance with the Creditors' Trust Agreement, the Creditors' Trust Distribution Orders, the Bridge Lender Plan and the Senior Loan Claim Sharing Resolution.

5.19.3    Creditors' Trust Assets. The transfer of the Creditors' Trust Assets to the Creditors' Trust shall be made for the benefit and on behalf of the Creditors' Trust Beneficiaries. To the extent that any Creditors' Trust Assets cannot be transferred to the Creditors' Trust because of a restriction on transferability under applicable law, such Creditors' Trust Assets shall be deemed to have been retained by the Creditors' Trust Beneficiary, and the Creditors' Trust shall be deemed to have been designated as a representative of such Creditors' Trust Beneficiary to enforce and pursue such Creditors' Trust Assets on behalf of such Creditors' Trust Beneficiary.

5.19.4    The Creditors' Trust Advisory Board. The Creditors' Trust will be governed by the Creditors' Trust Advisory Board and managed by the Creditors' Trustee subject to the provisions of the Bridge Lender Plan, the Confirmation Order and the Creditors' Trust Agreement. The Creditors' Trust Advisory Board initially will be a three-member board acceptable and identified to the Proponents. The Creditors' Trust Advisory Board shall have the functions, duties and rights provided in the Creditors' Trust Agreement. No other Creditors' Trust Beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the Creditors' Trust. The Creditors' Trust Agreement shall govern compensation of the Creditors' Trust Advisory Board members and changes in the composition

78

of the Creditors' Trust Advisory Board after the Effective Date and other matters related to the role, responsibilities and governance of the Creditors' Trust Advisory Board. Members of the Creditors' Trust Advisory Board shall have fiduciary duties to Holders of Creditors' Trust Interests in the same manner that members of an official committee of creditors appointed pursuant to section 1102 of the Bankruptcy Code have fiduciary duties to the creditor constituents represented by such committee; provided, that the Creditors' Trust Advisory Board shall not owe fiduciary obligations to any defendants of State Law Avoidance Claims in their capacities as such, it being the intent of such fiduciary duties to ensure that the Creditors' Trust Advisory Board's obligations are to maximize the value of the assets of the Creditors' Trust, including the State Law Avoidance Claims.

5.19.5    The Creditors' Trustee. The Creditors' Trustee will be the exclusive trustee of the Creditors' Trust Assets for the purposes of 31 U.S.C. § 3713(b). The Creditors' Trustee shall have fiduciary duties to Holders of Creditors' Trust Interests in the same manner that members of an official committee of creditors appointed pursuant to section 1102 of the Bankruptcy Code have fiduciary duties to the creditor constituents represented by such committee; provided, that the Creditors' Trust Advisory Board shall not owe fiduciary obligations to any defendants of State Law Avoidance Claims in their capacities as such, it being the intent of such fiduciary duties to ensure that the Creditors' Trust Advisory Board's obligations are to maximize the value of the assets of the Creditors' Trust, including the State Law Avoidance Claims. A Person identified and acceptable to the Proponents initially shall serve as the Creditors' Trustee; provided, however, that the Creditors' Trustee shall not be a member of the Creditors' Trust Advisory Board or a holder of a Creditors' Trust Interest. The Creditors' Trustee shall be compensated from the Creditors' Trust Initial Funding and other sources as set forth in the Creditors' Trust Agreement and, to the extent provided for in the Creditors' Trust Agreement, the Distribution Trust Reserve, and the Creditors' Trust Agreement shall specify the terms and conditions of such compensation, as well as provide the manner in which the Creditors' Trustee may be removed and, in the event the Creditors' Trustee dies, is removed, or resigns for any reason, how the Creditors' Trust Advisory Board shall designate a successor.

5.19.6    Responsibilities. The responsibilities of the Creditors' Trustee shall be specified in the Creditors' Trust Agreement and shall include: (i) the receipt, management, supervision, and protection of the Creditors' Trust Assets on behalf of and for the benefit of Creditors' Trust Beneficiaries; (ii) investigation, analysis, prosecution, and if necessary and appropriate, compromise of the State Law Avoidance Claims, including any objection to Claims included therein and any defense asserted by the Creditors' Trust in connection with any counterclaim or cross claim asserted against the Creditors' Trust; (iii) filing all required tax returns and paying taxes and all other obligations of the Creditors' Trust; (iv) making distributions from the proceeds of the State Law Avoidance Claims to the holders of Creditors' Trust Interests in accordance with the terms of the Creditors' Trust Distribution Orders; and (v) such other responsibilities as may be vested in the Creditors' Trustee pursuant to the Bridge Lender Plan, the Creditors' Trust Agreement and the Confirmation Order.

5.19.7    Powers. The powers of the Creditors' Trustee shall be specified in the Creditors' Trust Agreement and shall include the power to: (i) pay taxes and other obligations owed by the Creditors' Trust or incurred by the Creditors' Trustee; (ii) engage and compensate from the Creditors' Trust Initial Funding, other sources as set forth in the Creditors' Trust

79

Agreement and the proceeds of the State Law Avoidance Claims, consultants, agents, employees and professional persons to assist the Creditors' Trustee with respect to the Creditors' Trustee's responsibilities; (iii) object to, compromise, and settle State Law Avoidance Claims subject to the Creditors' Trust Advisory Board's approval (and state court approval, as applicable); (iv) commence and/or pursue any and all actions involving State Law Avoidance Claims that could arise or be asserted at any time, unless otherwise waived or relinquished in the Bridge Lender Plan; (v) make distributions from the proceeds of the State Law Avoidance Claims to the holders of Creditors' Trust Interests in accordance with the terms of the Creditors' Trust Distribution Orders and the Creditors' Trust Agreement; and (vi) act and implement the Bridge Lender Plan, the Creditors' Trust Agreement, and orders of the state court(s) adjudicating the State Law Avoidance Claims.  The Creditors' Trustee shall exercise such powers in accordance with the provisions of the Bridge Lender Plan and the Creditors' Trust Agreement which shall provide that the Creditors' Trustee must obtain the prior approval of the Creditors' Trust Advisory Board on the matters described in the Creditors' Trust Agreement.

      5.19.8    Creditors' Trust Funding.  On and after the Effective Date, the Creditors' Trust shall be funded with the proceeds of the Creditors' Trust Initial Funding and the proceeds of the State Law Avoidance Claims and other sources as set forth in the Creditors' Trust Agreement.  The Creditors' Trust Initial Funding and any other funding received by the Creditors' Trust shall be repaid in full from the proceeds of the State Law Avoidance Claims prior to any distributions to Creditors' Trust Beneficiaries.

      5.19.9    Transfer Taxes.  Any transfer of the Creditors' Trust Assets to the Creditors' Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax to the extent permitted under section 1146(a) of the Bankruptcy Code.

      5.19.10    Compensation.  In addition to reimbursement for actual reasonable and necessary out-of-pocket expenses incurred, the Creditors' Trustee, and any employees, agents, consultants, or professionals engaged or retained by the Creditors' Trustee, shall be entitled to reasonable compensation from the Creditors' Trust Initial Funding, and to the extent provided for in the Creditors' Trust Agreement, proceeds from the State Law Avoidance Claims and/or other sources as set forth in the Creditors' Trust Agreement for services rendered in connection with the performance of the duties of the Creditors' Trustee as set forth above and in the Creditors' Trust Agreement and may be paid without any requirement to seek Bankruptcy Court approval of such compensation.

      5.19.11    Federal Tax Treatment of the Creditors' Trust.  As stated in the Creditors' Trust Agreement, the Creditors' Trust (i) will be established for the sole purpose of taking title to, protecting, conserving and distributing any recoveries from the State Law Avoidance Claims for the Creditors' Trust Beneficiaries, in accordance with Tax Regulations section 301.7701-4(a), with no objective to continue or engage in the conduct of a trade or business and (ii) is intended to qualify as a grantor trust for U.S. federal income tax purposes.  In general, a grantor trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a pass-through entity.  The Creditors' Trust Agreement will require all parties (i) to treat the transfer of the Creditors' Trust Assets to the Creditors' Trust as a transfer of such assets directly from the Creditors' Trust Beneficiaries to the Creditors' Trust, and (ii) consistent herewith, to treat the Creditors' Trust as a grantor trust of which the Creditors' Trust Beneficiaries are the owners and

MIAMI 889648 (2K)

grantors. For federal income tax purposes, the Creditors' Trust Beneficiaries will be treated as grantors, deemed owners and beneficiaries of the Creditors' Trust. Subject to the terms of the Creditors' Trust Agreement, promptly after the Effective Date, the Creditors' Trustee, in consultation with the Creditors' Trust Advisory Board, will determine the fair market value as of the Effective Date of all Creditors' Trust Assets transferred to the Creditors' Trust, and such determined fair market value shall be used by the Creditors' Trust, the Creditors' Trustee, and the Creditors' Trust Beneficiaries for all U.S. federal income tax purposes, including for determining tax basis and gain or loss. The Creditors' Trustee shall file federal income tax returns for the Creditors' Trust as a grantor trust under Tax Regulations section 1.671-4 and report, but not pay tax on, the Creditors' Trust's tax items of income, gain, loss, deductions and credits ("CT Tax Items"). The holders of Creditors' Trust Interests shall report such CT Tax Items on their federal income tax returns and pay any resulting federal income tax liability.

5.19.12     The CT Reserves. The Creditors' Trustee may establish one or more CT Reserves on account of Disputed Claims held by Creditors' Trust Beneficiaries. The amount of Net Creditors' Trust Proceeds held back in the CT Reserve(s) shall be equal to the amount of Net Creditors' Trust Proceeds necessary to satisfy the distributions to which the Creditors' Trust Beneficiaries holding Disputed Claims would be entitled if all such Disputed Claims were to be subsequently Allowed. The Creditors' Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Regulations section 1.468B-9 to treat the CT Reserve(s) as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the CT Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the CT Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise resolved. The Creditors' Trust Beneficiaries shall be bound by such election, if made by the Creditors' Trustee, in consultation with the Creditors' Trust Advisory Board, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

5.19.13     Creditors' Trust Interests. The Creditors' Trust Interests will not be represented by certificates. The Creditors' Trust Interests will be transferable in accordance with applicable law. Holders of Creditors' Trust Interests shall be the beneficiaries of the Creditors' Trust. The Creditors' Trust Agreement shall provide that each Class of Creditors' Trust Interests shall entitle the holders thereof to receive Pro Rata distributions on account of such Class of Creditors' Trust Interests.

5.19.14     Indemnification. From and after the Effective Date, the Creditors' Trustee, the members of the Creditors' Trust Advisory Board and each of their respective Related Persons (collectively, the "Creditors' Trust Indemnified Parties" and each a "Creditors' Trust Indemnified Party") shall be, and hereby are, indemnified by the Creditors' Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Creditors' Trust Indemnified Party's good faith exercise of what such Creditors' Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Creditors' Trust Indemnified Party reasonably understands to be its duties conferred by the Creditors' Trust Agreement, the Bridge

81

Lender Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Bridge Lender Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a final non-appealable order of the applicable state court to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the State Law Avoidance Claims, on and after the Effective Date. The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) the Creditors' Trust Agreement; (ii) the services to be rendered pursuant to the Creditors' Trust Agreement; (iii) any document or information, whether verbal or written, referred to herein or supplied to the Creditors' Trustee; or (iv) proceedings by or on behalf of any creditor. The Creditors' Trust shall, on demand, advance or pay promptly out of the Creditors' Trust Initial Funding, other financing sources as set forth in the Creditors' Trust Agreement and, to the extent provided for in the Creditors' Trust Agreement, the proceeds of the State Law Avoidance Claims, on behalf of each Creditors' Trust Indemnified Party, reasonable attorneys' fees and other expenses and disbursements to which such Creditors' Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; provided, however, that any Creditors' Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Creditors' Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Creditors' Trust Indemnified Party. In any matter covered by the first two sentences of this subsection, any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Creditors' Trustee, at the Creditors' Trust's expense, subject to the foregoing terms and conditions. In addition, the Creditors' Trust shall purchase fiduciary liability insurance for the benefit of the Creditors' Trustee and the Creditors' Trust Advisory Board.

5.19.15    Termination of the Creditors' Trustee's Duties. The duties, responsibilities and powers of the Creditors' Trustee shall terminate after all State Law Avoidance Claims are fully resolved and the proceeds thereof have been distributed in accordance with the Creditors' Trust Agreement and the Creditors' Trust Distribution Orders. The Creditors' Trust shall terminate no later than five years from the Effective Date. However, if warranted by the facts and circumstances that an extension is necessary for the purpose of the Creditors' Trust, the term of the Creditors' Trust may be extended for a finite period if (i) such extension is necessary to the purpose of the Creditors' Trust, (ii) the Creditors' Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Creditors' Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is noticed to the Creditors' Trust Beneficiaries within the six (6) month period prior to the Creditors' Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable. Upon dissolution of the Creditors' Trust, any remaining Cash on hand and other assets will be distributed to the Creditors' Trust Beneficiaries in accordance with the Creditors' Trust Distribution Orders.

5.19.16    Reorganized Debtors' Cooperation. The Reorganized Debtors and each employee, officer and director of the Reorganized Debtors shall be required to cooperate in all reasonable respects with the Creditors' Trustee's prosecution of the State Law Avoidance Claims and shall not take any action or omit from taking an action that could interfere with the

82

investigation or prosecution of the Litigation Trust Causes of Action. The Creditors' Trustee shall have the right to seek relief from the Bankruptcy Court, including seeking an order of contempt of the Confirmation Order, if, in the Creditors' Trustee's judgment, the Reorganized Debtors or any employee, officer or director of the Reorganized Debtors fails to cooperate in accordance with the provisions of this Section.

     5.19.17   Document Retention. The Reorganized Debtors shall preserve (at their cost) all records and documents (including all electronic records or documents) related to the State Law Avoidance Claims for a period of five (5) years after the Effective Date, or if any State Law Avoidance Claim has been asserted in a pending action, then until such later time as the Creditors' Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved. The Creditors' Trustee shall be permitted to use all such records and documents in connection with the investigation and prosecution of the State Law Avoidance Claims.

## ARTICLE 6    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 6.1    Assumption and Rejection of Executory Contracts and Unexpired Leases.

     6.1.1   On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease, (v) is a prepetition obligation to indemnify any target of any Litigation Trust Causes of Action, (vi) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.3 hereto or is set forth on Exhibit 6.3 to be filed with the Debtor/Committee/Lender Plan Supplement or (vii) is an executory contract or unexpired lease that is set forth on Exhibit 6.3 of the Debtor/Committee/Lender Plan; provided, however, that the Proponents may make modifications, including the addition or removal of executory contracts or unexpired leases on Exhibit 6.3 of the Debtor/Committee/Lender Plan Supplement, between the date hereof and Confirmation as deemed necessary in the sole discretion of the Proponents. In the event the Proponents make any alterations to Exhibit 6.3 of the Debtor/Committee/Lender Plan Supplement, the Proponents shall file such amended list with the Bankruptcy Court and such amended list shall supersede and replace Exhibit 6.3 of the Debtor/Committee/Lender Plan Supplement for any and all purposes relating to the Bridge Lender Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to this Article 6 shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of the Bridge Lender Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

MIAMI 889648 (2K)

6.1.2    Subject to the terms of Article 8 and Section 6.1.1 herein and except for any Customer Program otherwise designated on Exhibit 6.3 to be filed with the Debtor/Committee/Lender Plan Supplement, all refund and subscriber credit programs or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective as of the Effective Date and the proposed cure amount with respect to each shall be zero dollars. Nothing contained in this Section 6.1.2 shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person. Except with respect to any Customer Programs included on such Exhibit 6.3, as a result of the deemed assumption of the Debtors' refund, subscriber credit and other obligations under the Customer Programs to subscribers and former subscribers pursuant to this Section 6.1.2, all Proofs of Claim on account of or in respect of any such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court, and the Debtors' Claims Agent shall be authorized as of the Effective Date to expunge such Proofs of Claim from the claims register.

6.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The proposed cure amount for any executory contract or unexpired lease that is assumed pursuant to the Bridge Lender Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court as part of the Debtor/Committee/Lender Plan Supplement; provided, however, that the Proponents may make modifications to any such list filed in connection with the Debtor/Committee/Lender Plan, or may file their own schedule of cure amounts, between the date such list is filed and Confirmation, as deemed necessary in the sole discretion of the Proponents. In the event the Proponents make any alterations to such schedule or file a separate schedule in connection with the Bridge Lender Plan, the Proponents shall file such amended schedule with the Bankruptcy Court and such schedule shall supersede and replace any similar filing made in connection with the Debtor/Committee/Lender Plan for any and all purposes relating to the Bridge Lender Plan. Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed conditionally assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

6.3    Assumption of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease other than those listed on Exhibit 6.3 to the Debtor/Committee/Lender Plan Supplement shall be assumed pursuant to section 365 of the Bankruptcy Code, and only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. As it relates to the Bridge Lender Plan, the

84

Debtors (with the consent of the Proponents) and the Proponents reserve their rights to amend Exhibit 6.3 to the Debtor/Committee/Lender Plan Supplement, as applicable, to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto at any time prior to the Confirmation Hearing. Listing a contract or lease on Exhibit 6.3 of the Debtor/Committee/Lender Plan Supplement or the Assumption Schedule shall not constitute an admission by a Debtor, a Reorganized Debtor or the Proponents that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

6.4    Rejection Damages Bar Date.

        If the rejection by a Debtor, pursuant to the Bridge Lender Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

6.5    Compensation and Benefit Programs.

        Except as set forth in Article III.C.6-III.C. 11 of the General Disclosure Statement and such other Employee Benefit Plans as may be disclosed in the Debtor/Committee/Lender Plan Supplement, the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Bridge Lender Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify or terminate any such Employee Benefit Plan either prior to or after the Effective Date; provided further that any bonuses or equity-based compensation for any officer, director or employee that has been named as a defendant in the Creditors' Committee Directors, Officers, Employees and Shareholders Complaint shall not receive such bonuses and/or equity-based compensation and such bonuses and/or equity-based compensation shall instead be placed in trust pending the resolution of the causes of action set forth in the Creditors' Committee Directors, Officers, Employees and Shareholders Complaint.  For the avoidance of doubt, nothing contained in the Bridge Lender Plan or in any postpetition or assumed contract shall obligate the Reorganized Debtors to indemnify or exculpate any director, officer or employee of the Tribune Entities in connection with any claims or causes of action brought against such parties and the Reorganized Debtors shall be prohibited from indemnifying or exculpating any current, former of future director, officer or employee of the Tribune Entities or any other Person in connection with any of the Litigation Trust Causes of Action or State Law Avoidance Claims.

6.6    Collective Bargaining Agreements.

        Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute

85

the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order. Upon the Effective Date, with respect to any Collective Bargaining Agreement entered into by the Debtors that has expired by its terms, the rights and obligations, if any, of the Reorganized Debtors with respect to such expired agreement shall not be affected by the Confirmation Order, and the Reorganized Debtors shall continue to have the same rights and obligations with respect to any such expired agreement as the Debtors had immediately prior to the entry of the Confirmation Order and any such rights and obligations of the Reorganized Debtors under any such expired agreement shall continue to be determined in accordance with applicable federal labor law.

6.7     Postpetition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by such Debtors to the Reorganized Debtors, including any successor to any Reorganized Debtor after giving effect to the Restructuring Transactions, on the Effective Date. For the avoidance of doubt, nothing contained in the Bridge Lender Plan or in any postpetition or assumed contract shall obligate the Reorganized Debtors to indemnify or exculpate any director, officer or employee of the Tribune Entities in connection with any claims or causes of action brought against such parties and the Reorganized Debtors shall be prohibited from indemnifying or exculpating any current, former or future director, officer or employee of the Tribune Entities or any other Person in connection with any of the Litigation Trust Causes of Action or State Law Avoidance Claims.

6.8     Termination of ESOP.

Upon the Effective Date, the ESOP shall be deemed terminated in accordance with its terms, and the amount of unpaid principal and interest remaining on the ESOP Note shall be forgiven pursuant to section 6.3 of the ESOP Loan Agreement by and between Tribune and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust dated April 1, 2007. In connection with Tribune's forgiveness of the balance due under the ESOP Note, the Debtors will seek, in their sole discretion, (1) confirmation that Tribune has a right under the ESOP Plan and ESOP Note to forgive the ESOP's obligations; (2) confirmation that Tribune's forgiveness of any postpetition payments due from the ESOP in connection with the ESOP Note, including, without limitation, the payment due on or about April 1, 2009, was in compliance with the ESOP Note and ESOP Plan and satisfied Tribune's obligations, if any, under the ESOP Plan to make a contribution to the ESOP during the relevant time period; and (3) a determination of the amount of the balance of the ESOP Note being forgiven, the value of any obligations of the ESOP owed to Tribune under the ESOP Note, and the legal effect of the forgiveness of the ESOP Note. Approval of the Bridge Lender Plan is not conditioned upon these determinations, but these determinations may be sought in connection with the Bridge Lender Plan.

6.9     Insurance Policies.

Insurance policies issued to, or insurance agreements entered into by, any of the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or

86

officers' conduct) shall continue in effect after the Effective Date. To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary in the Bridge Lender Plan, the Bridge Lender Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement. To the extent that the Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Proponents reserve the right to seek the rejection of such insurance policy or agreement or other available relief.

## ARTICLE 7    PROVISIONS GOVERNING DISTRIBUTIONS

7.1    General.

Initial distributions to Holders of Allowed Claims shall be made as soon as practicable on or after the Effective Date. Initial distributions of New Common Stock, the New Senior Secured Term Loan, Distributable Cash, Cash, Distribution Trust Interests and Creditors' Trust Interests shall be made by the Reorganized Debtors, the Disbursing Agent, the Distribution Trustee, the Creditors' Trustee or the Claims Purchasing Agent, as applicable. Unless the Holder of an Allowed Claim or Allowed Interest against any of the Debtors and the Reorganized Debtors agrees to a different distribution date or except as otherwise provided herein or as ordered by the Bankruptcy Court (1) distributions to be made on account of Claims or Interests that are Allowed as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable and (2) distributions to be made on account of Claims or Interests that become Allowed after the Effective Date shall be made on the succeeding Quarterly Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Bridge Lender Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

7.2    Disputed Claims Reserves.

7.2.1    Distributions to Holders of Disputed Other Parent Claims, Disputed Other Guarantor Debtor Claims and Disputed Other Non-Guarantor Debtor Claims.

(a)    Disputed Other Parent Claims Reserve. On or as soon as practicable after the Effective Date, the Distribution Trust shall establish a Disputed Other Parent Claims Reserve to make distributions to Holders of Other Parent Claims that are Disputed Claims that become Allowed Other Parent Claims after the Effective Date. The amount of Parent Consideration, Distribution Trust Interests and, to the extent applicable, Creditors' Trust Interests contributed to the Disputed Other Parent Claims Reserve shall be equal to the amount necessary to satisfy the Initial Distributions and distribute Distribution Trust Interests and, as applicable, Creditors' Trust Interests required to be made pursuant to the Bridge Lender Plan based upon the

87

Face Amount of the Disputed Other Parent Claims that may be entitled to receive distributions if such Disputed Claims are subsequently Allowed Other Parent Claims.

(b)    Disputed Other Guarantor Debtor Claims Reserve.  On or as soon as practicable after the Effective Date, the Distribution Trust shall establish a Disputed Other Guarantor Debtor Claims Reserve to make distributions to Holders of Other Guarantor Debtor Claims that are Disputed Claims that become Allowed Other Guarantor Debtor Claims after the Effective Date.  The amount of Cash and Distribution Trust Interests contributed to the Disputed Other Guarantor Debtor Claims Reserve shall be equal to the amount necessary to satisfy the Initial Distributions and distribute Distribution Trust Interests required to be made pursuant to the Bridge Lender Plan based upon the Face Amount of the Disputed Other Guarantor Debtor Claims that may be entitled to receive distributions if such Disputed Claims are subsequently Allowed Guarantor Debtor Claims.

(c)    Disputed Other Non-Guarantor Debtor Claims Reserve.  On or as soon as practicable after the Effective Date, the Distribution Trust shall establish a Disputed Other Non-Guarantor Debtor Claims Reserve to make distributions to Holders of Other Non-Guarantor Debtor Claims that are Disputed Claims that become Allowed Other Non-Guarantor Debtor Claims after the Effective Date.  The amount of Cash contributed to the Disputed Other Non-Guarantor Debtor Claims Reserve shall be equal to the amount necessary to satisfy the distributions required to be made pursuant to the Bridge Lender Plan based upon the Face Amount of the Disputed Other Non-Guarantor Debtor Claims that may be entitled to receive distributions if such Disputed Claims are subsequently Allowed Non-Guarantor Debtor Claims.

(d)    Distributions On Account of Disputed Claims Once Allowed.  On each Quarterly Distribution Date, the Distribution Trustee shall make distributions of consideration that would have been distributed on the Initial Distribution Date to the Holders of Disputed Claims that become Allowed Claims during the preceding calendar quarter.  On or as soon as practicable after the Final Distribution Date, after distributions are made to Holders of Disputed Claims that have become Allowed Claims during the preceding calendar quarter, any consideration remaining in the Disputed Claims Reserves shall be transferred to the Distribution Trust Reserve to be distributed in accordance with the terms of the Litigation Distribution Orders.  Any distributions on account of Distribution Trust Interests and, if applicable, Creditors' Trust Interests that would have been made to Holders of Disputed Claims that become Allowed Claims shall be made by the Distribution Trustee and, if applicable, the Creditors' Trustee in accordance with the terms of the Bridge Lender Plan, the Distribution Trust Agreement, the Creditors' Trust Agreement, the Litigation Distribution Orders and the Creditors' Trust Distribution Orders.

7.3    Special Provisions Governing Distributions to Holders of Senior Loan Claims and Senior Loan Guaranty Claims.

Initial Distributions made on account of Senior Loan Claims and Senior Loan Guaranty Claims shall be made by the Disbursing Agent directly to the Holders of such Claims in accordance with the Senior Loan Claim Sharing Resolution and shall not be made by the Senior Loan Agent.  The Loan Agents shall take all actions reasonably requested by the Disbursing

Agent to identify the names and addresses of Holders of Allowed Loan Claims and Allowed Loan Guaranty Claims.

7.4    Interest on Claims.

Except as otherwise specifically provided for in the Bridge Lender Plan, the Litigation Distribution Orders, the Creditors' Trust Distribution Orders, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the Final DIP Order), or required by applicable bankruptcy law, Postpetition Interest shall not be paid on any Claims, and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued for federal income tax purposes.

7.5    Distributions by Disbursing Agent/Distribution Trustee/Creditors' Trustee.

7.5.1    Other than as specifically set forth in the Bridge Lender Plan, the Disbursing Agent, Distribution Trustee or Creditors' Trustee shall make all distributions required to be made under the Bridge Lender Plan. At the sole discretion of the Proponents, the Reorganized Debtors may act as Disbursing Agent or the Proponents may, in their sole discretion, determine that the Estates shall employ or contract with other entities to act as the Disbursing Agent or to assist in or make the distributions required by the Bridge Lender Plan.

7.5.2    Other than as specifically set forth in the Bridge Lender Plan, the distributions to be made on account of Senior Noteholder Claims and PHONES Notes Claims shall be made in accordance with the terms of the particular Indenture or in accordance with the Bridge Lender Plan where such Indenture is silent.

7.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

7.6.1    Delivery of Distributions in General.  Distributions to Holders of Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by Proofs of Claim or transfers of claim filed pursuant to Bankruptcy Rule 3001.

7.6.2    Undeliverable and Unclaimed Distributions.

(a)    General.  The Reorganized Debtors, the Disbursing Agent, the Claims Purchase Agent, the Distribution Trustee, or the Creditors' Trustee as applicable, shall have no duty to make distributions to any Holder of a Claim with an undeliverable address as determined by any undeliverable or returned notice to the Debtors, the Disbursing Agent, the Distribution Trustee, the Creditors' Trustee or Claims Purchase Agent since the commencement of the Chapter 11 Cases unless and until the Reorganized Debtors, the Distribution Trustee, the Creditors' Trustee, the Claims Purchase Agent or Disbursing Agent, as applicable, are notified in writing of such Holder's then-current address prior to the Distribution Record Date. If the distribution to any Holder of a Claim is returned to the Reorganized Debtors, Distribution Trustee, Creditors' Trustee, Claims Purchase Agent or Disbursing Agent, as applicable, as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors, Distribution Trustee, Creditors' Trustee, Claims Purchase Agent or Disbursing Agent, as applicable, are notified in writing of such Holder's then-current address.

89

(b)    Non-Negotiated Check Voucher Distributions.  Checks issued pursuant to the Bridge Lender Plan shall be null and void if not negotiated within ninety (90) calendar days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Reorganized Debtors, Disbursing Agent, Claims Purchase Agent, Distribution Trustee or Creditors' Trustee, as applicable, by the Holder of the relevant Claim, Distribution Trust Interest or Creditors' Trust Interest within the 90-calendar-day period.  After such date, the right to any such distribution (and any claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Distribution Trust or Creditors' Trust, as applicable, for distribution in accordance with the terms of the Litigation Distribution Orders, or Creditors' Trust Distribution Orders, as applicable, notwithstanding any federal or state escheat laws to the contrary.

(c)    Failure to Claim Undeliverable Distributions.  Except as otherwise expressly provided in the Bridge Lender Plan, any Holder of a Claim that does not assert a claim pursuant to the Bridge Lender Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors, their Estates, the Reorganized Debtors, their property or the Distribution Trustee, the Distribution Trust, the Creditors' Trustee, the Creditors' Trust, the Claims Purchase Agent or any of their respective property.  In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall revest in the Distribution Trust in accordance with the terms of the Litigation Distribution Orders free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Nothing contained in the Bridge Lender Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors, or the Distribution Trustee, the Creditors' Trustee or the Claims Purchase Agent, to attempt to locate any Holder of a Claim.

7.7    Record Date for Distributions.

7.7.1    With the exception of Senior Noteholder Claims, PHONES Notes Claims, PHONES Notes Exchange Claims and Put Claims, the Reorganized Debtors, the Distribution Trustee, the Creditors' Trustee and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  With the exception of the Senior Noteholder Claims, PHONES Notes Claims, PHONES Notes Exchange Claims and Put Claims, the Reorganized Debtors, the Distribution Trustee, the Creditors' Trustee and the Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Bridge Lender Plan with only those record Holders stated on the official claims register as of the close of business on the Distribution Record Date.

7.7.2    Unless otherwise set forth in the Confirmation Order, the Proponents shall not establish a record date for distributions to Holders of Senior Noteholder Claims or PHONES Notes Claims.  Distributions to Holders of such Claims held through DTC shall be made by

90

means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply. In connection with such book-entry exchange, the Reorganized Debtors, the Distribution Trustee or the Creditors' Trustee will provide information to each Indenture Trustee, which such Indenture Trustee shall convey to DTC to effect distributions on a Pro Rata basis as provided under the Bridge Lender Plan with respect to such Claims upon which such Indenture Trustee acts as trustee. Subject to Section 7.5.2 of the Bridge Lender Plan, distributions of Cash to Holders of Allowed Senior Noteholder Claims or Allowed PHONES Notes Claims shall be made by Reorganized Tribune, the Disbursing Agent, the Distribution Trustee or the Creditors' Trustee to the applicable Indenture Trustees, which, in turn, shall make such distributions to the applicable Holders either through DTC or, in the case of Claims held directly by the Holder thereof, through the applicable Indenture Trustee subject to the respective rights, claims and interests, if any, that the Indenture Trustees may have under the applicable Indentures or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. Distributions of other consideration to Holders of Senior Noteholder Claims or PHONES Notes Claims shall be made by the Disbursing Agent, the Distribution Trustee or the Creditors' Trustee either through DTC or, in the case of Claims held directly by the Holder thereof, through the Disbursing Agent, the Distribution Trustee or the Creditors' Trustee upon surrender or deemed surrender of such Holder's Senior Notes or PHONES Notes except as otherwise provided in the Bridge Lender Plan.

7.8    Allocation of Bridge Lender Plan Distributions Between Principal and Interest.

Except as otherwise expressly provided in the Bridge Lender Plan, to the extent that any Allowed Claim entitled to a distribution under the Bridge Lender Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.9    Means of Cash Payment.

Payments of Cash made pursuant to the Bridge Lender Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, Disbursing Agent, the Distribution Trustee or the Creditors' Trustee, as applicable, by (a) checks drawn on, (b) automated clearing house transfers from, or (c) wire transfers from a bank selected by the Reorganized Debtors, Disbursing Agent, the Distribution Trustee or the Creditors' Trustee, as applicable. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, Disbursing Agent, the Distribution Trustee or the Creditors' Trustee, as applicable in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

7.10    Withholding and Reporting Requirements.

7.10.1    In connection with the Bridge Lender Plan and all distributions hereunder, the Reorganized Debtors, the Disbursing Agent, the Distribution Trustee or the Creditors' Trustee,

MIAMI 889648 (2K)

as applicable, shall comply with all withholding and reporting requirements imposed by any Tax Authority. The Reorganized Debtors, the Disbursing Agent, the Distribution Trustee and the Creditors' Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Bridge Lender Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Bridge Lender Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Bridge Lender Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors or Distribution Trustee, as applicable, for the payment and satisfaction of such tax obligations. Nothing in the preceding sentence shall affect distributions under the Bridge Lender Plan to the Distribution Trust, Indenture Trustees or the Holders of Allowed Senior Loan Claims, Senior Loan Guaranty Claims, Senior Noteholder Claims or PHONES Notes Claims.

7.10.2    All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. In order to receive distributions under the Bridge Lender Plan, all holders of Distribution Trust Interests and Creditors' Trust Interests will need to identify themselves to the Distribution Trustee, the Creditors' Trustee or the Disbursing Agent, as applicable, and provide tax information and the specifics of their holdings, to the extent the Distribution Trustee or the Creditors' Trustee, as applicable, deems appropriate. This identification requirement may, in certain cases, extend to Holders who hold their securities in street name. The Distribution Trustee, the Creditors' Trustee or the Disbursing Agent, as applicable, may refuse to make a distribution to any Holder of an Allowed Claim, Distribution Trust Interest or Creditors' Trust Interest that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a Holder of an Allowed Claim, Distribution Trust Interest, or Creditors' Trust Interest, the Distribution Trustee, the Creditors' Trustee or the Disbursing Agent, as applicable, shall make such distribution to which the Holder of the Distribution Trust Interest, Creditors' Trust Interest or Allowed Claim, as applicable, is entitled, without interest; and, provided further that, if the Distribution Trustee, the Creditors' Trustee or the Disbursing Agent, as applicable, fails to withhold in respect of amounts received or distributable with respect to any such Holder and the Distribution Trustee, the Creditors' Trustee or the Disbursing Agent, as applicable, is later held liable for the amount of such withholding, such Holder shall reimburse the Distribution Trustee, the Creditors' Trustee or the Disbursing Agent, as applicable, for such liability.

7.10.3    All amounts withheld and paid to the appropriate Tax Authority shall be treated as amounts distributed to such Holders of an Allowed Claim, Distribution Trust Interests or Creditors' Trust Interests for all purposes of the Bridge Lender Plan, the Distribution Trust Agreement and the Creditors' Trust Agreement as applicable.

7.10.4    Notwithstanding any other provision of the Bridge Lender Plan, (i) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Bridge Lender Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax

92

obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (ii) no distribution shall be made to or on behalf of such Holder pursuant to the Bridge Lender Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors, Distribution Trustee, Creditors' Trustee or the Disbursing Agent, as applicable, for the payment and satisfaction of such tax obligations. Nothing in the preceding sentence shall affect distributions under the Bridge Lender Plan to the Distribution Trust, Creditors' Trust, Indenture Trustees or the Holders of Allowed Senior Loan Claims, Senior Loan Guaranty Claims, Senior Noteholder Claims or PHONES Notes Claims.

7.11    Setoffs.

The Reorganized Debtors, the Distribution Trustee or the Creditors' Trustee, as applicable, may, pursuant to section 553 of the Bankruptcy Code or other applicable bankruptcy or nonbankruptcy laws, but shall not be required to, set off against any Claim the payments or other distributions to be made pursuant to the Bridge Lender Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors, the Reorganized Debtors, the Litigation Trust or the Creditors' Trust, as applicable, may have against the Holder of such Claim or respecting such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors, the Litigation Trustee or the Creditors' Trustee of any such claim that the Debtors, the Reorganized Debtors, the Litigation Trust or the Creditors' Trust, as applicable, may have against such Holder.

7.12    Fractional Shares/Fractional Distribution Trust Interests/Fractional Creditors' Trust Interests.

No fractional shares of New Common Stock or New Warrants or fractional Distribution Trust Interests or fractional Creditors' Trust Interests shall be distributed. Where a fractional share, warrant, Distribution Trust Interest or Creditors' Trust Interest would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New Common Stock or New Warrant or whole Distribution Trust Interest or Creditors' Trust Interest or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New Common Stock, or New Warrant, or whole Distribution Trust Interest or Creditors' Trust Interest. The total number of shares of New Common Stock or New Warrants and number of Distribution Trust Interests or Creditors' Trust Interests to be distributed pursuant to the Bridge Lender Plan shall be adjusted as necessary to account for the rounding provided for herein.

7.13    *De Minimis* Distributions.

No distributions shall be made on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.

7.14    Special Provision Regarding Unimpaired Claims.

Except as otherwise explicitly provided in the Bridge Lender Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with

93

respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

7.15    Subordination.

Except as contemplated by the applicable Plan Settlements (if accepted and approved by the Bankruptcy Court) and the Senior Loan Claim Sharing Resolution, Litigation Distribution Orders and Creditors' Trust Distribution Orders, the Plan is not intended to and does not affect the relative priority and rights of Claims and Interests under any applicable subordination and turnover provisions in any applicable contracts, and subject to the applicable Plan Settlement and Senior Loan Claim Sharing Resolution, Litigation Distribution Orders, Creditors' Trust Distribution Orders, nothing in the Bridge Lender Plan shall be deemed to impair, diminish, eliminate, endorse or otherwise affect the rights or remedies (adversely or otherwise) of beneficiaries (including, for the avoidance of doubt, their respective Indenture Trustees and Loan Agents, as applicable) of any such contractual subordination and turnover provisions.

7.16    Distribution Trust.

7.16.1    Creation and Purpose of the Distribution Trust.  On the Effective Date, the Distribution Trust shall be created and established pursuant to the Distribution Trust Agreement. Following the Effective Date, the Distribution Trust shall have sole responsibility for distributions to the holders of Distribution Trust Interests from the Distribution Trust Reserve and proceeds of Litigation Trust Causes of Action.  The Distribution Trust shall not continue or engage in the conduct of a trade or business, and no part of the assets of the Distribution Trust or the proceeds, revenue or income therefrom shall be used or disposed of by the Distribution Trustee in the furtherance of any business.  The Distribution Trustee shall be under an obligation to make continuing efforts to distribute the Distribution Trust Reserve and proceeds of the Litigation Trust Causes of Action timely in accordance with the Distribution Trust Agreement, the Bridge Lender Plan and the Litigation Distribution Orders, and not unduly prolong the duration of the Distribution Trust.

7.16.2    Distribution Trust Initial Funding.  On the Effective Date, the Reorganized Debtors shall make a contribution of $40 million to the Distribution Trust; provided, however, that any portion of the Distribution Trust Initial Funding that is not used to fund the Distribution Trust and Litigation Trust or Creditors' Trust (as determined in the sole discretion of the Distribution Trust Advisory Board and Litigation Trust Advisory Boards) will revert back to the Reorganized Debtors..

7.16.3    Transfers to the Distribution Trust.  On the Effective Date, the Debtors and the Estates shall and shall be deemed to have transferred and assigned to the Distribution Trust the Distribution Trust Reserve free and clear of all Claims and Liens.  From and after the Effective Date, pursuant to the terms of the Litigation Distribution Orders, any proceeds from Litigation Trust Causes of Action received by the Litigation Trust shall be transferred by the Litigation Trust to the Distribution Trust free and clear of all Claims and Liens.  Such transfers and assignments shall be made pursuant to the terms of the Bridge Lender Plan and, accordingly, to the fullest extent permitted by law, shall be exempt from all stamp taxes and similar taxes within the meaning of section 1146(a) of the Bankruptcy Code.

MIAMI 889648 (2K)

7.16.4    The Distribution Trust Advisory Board. The Distribution Trust will be governed by the Distribution Trust Advisory Board and managed by the Distribution Trustee, subject to the provisions of the Bridge Lender Plan, the Litigation Distribution Orders, the Confirmation Order, and the Distribution Trust Agreement. The Distribution Trust Advisory Board initially will be a three-member board acceptable and identified to the Proponents. The Distribution Trust Agreement shall govern compensation of Distribution Trust Advisory Board members and changes in the composition of the Distribution Trust Advisory Board after the Effective Date and other matters related to the role, responsibilities and governance of the Distribution Trust Advisory Board. Members of the Distribution Trust Advisory Board shall have fiduciary duties to Holders of Distribution Trust Interests in the same manner that members of an official committee of creditors appointed pursuant to section 1102 of the Bankruptcy Code have fiduciary duties to the creditor constituents represented by such committee.

7.16.5    The Distribution Trustee. The Distribution Trustee will be the exclusive trustee of the Distribution Trust for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Distribution Trustee shall have fiduciary duties to Holders of Distribution Trust Interests in the same manner that members of an official committee of creditors appointed pursuant to section 1102 of the Bankruptcy Code have fiduciary duties to the creditor constituents represented by such committee. The Person designated to serve as the Distribution Trustee shall be acceptable to the Proponents; provided, however, that the Distribution Trustee shall not be a member of the Distribution Trust Advisory Board. The designation of the Distribution Trustee shall be subject to final appointment by the Bankruptcy Court upon entry of the Confirmation Order. The Distribution Trustee shall be compensated from the Distribution Trust Initial Funding and other sources as provided for in the Distribution Trust Agreement. The Distribution Trust Agreement shall specify the terms and conditions of such compensation, as well as provide the manner in which the Distribution Trustee may be removed.

7.16.6    Responsibilities. The responsibilities of the Distribution Trustee shall be specified in the Distribution Trust Agreement and shall include (i) the receipt, management, supervision, and protection of the Distribution Trust Reserve, Disputed Claims Reserves and the proceeds of the Litigation Trust Causes of Action upon its receipt of same on behalf of and for the benefit of holders of the Distribution Trust Interests; (ii) calculation and implementation of all distributions to be made to holders of Distribution Trust Interests; (iii) filing all required tax returns and paying taxes and all other obligations of the Distribution Trust; and (iv) such other responsibilities as may be vested in the Distribution Trustee pursuant the Bridge Lender Plan, the Distribution Trust Agreement, and orders of the Bankruptcy Court.

7.16.7    Powers. The powers of the Distribution Trustee shall be specified in the Distribution Trust Agreement and shall include the power to: (i) invest funds; (ii) make distributions from the Distribution Trust Reserve and the proceeds of Litigation Trust Causes of Action in accordance with the terms of the Bridge Lender Plan, the Distribution Trust Agreement and the Litigation Distribution Orders; (iii) pay taxes and other obligations owed by the Distribution Trust or incurred by the Distribution Trust; (iv) engage and compensate from the Distribution Trust Initial Funding and other sources as provided for in the Distribution Trust Agreement, consultants, agents, employees and professional persons to assist the Distribution

95

Trustee with respect to the Distribution Trustee's responsibilities; (v) sell assets in the Distribution Trust Reserve at the direction of the Distribution Trust Advisory Board and subject to an order of the Bankruptcy Court; and (vii) act and implement the Bridge Lender Plan, the Distribution Trust Agreement, and orders of the Bankruptcy Court. The Distribution Trustee shall exercise such powers in accordance with the provisions of the Bridge Lender Plan, the Litigation Distribution Orders and the Distribution Trust Agreement which shall provide that the Distribution Trustee must obtain the prior approval of the Distribution Trust Advisory Board on the matters described in the Distribution Trust Agreement.

7.16.8    Bankruptcy Court Approval. Notwithstanding anything to the contrary in the Bridge Lender Plan, the Distribution Trust may not consummate or implement any transaction involving Distribution Trust Reserve with respect to any asset valued at over $1,000,000 unless and until the Bankruptcy Court authorizes and approves such transaction upon motion by the Distribution Trustee. The Distribution Trustee shall provide notice of and the opportunity for a hearing on all such motions to all entities who request notice of such matters in the manner prescribed in the Notice of the Effective Date to be mailed pursuant to Section 13.17 of the Bridge Lender Plan.

7.16.9    Compensation. In addition to reimbursement for the actual, reasonable and necessary expenses incurred, the Distribution Trustee, and any employees, agents, consultants, or professionals engaged or retained by the Distribution Trustee, shall be entitled to reasonable compensation from the Distribution Trust Initial Funding and other sources as set forth in the Distribution Trust Agreement for services rendered in connection with performance of the duties of the Distribution Trustee as set forth above. With respect to any agents, consultants, and employees engaged and professionals retained by the Distribution Trust and the Distribution Trustee, such compensation shall be in an amount and on such terms as may be agreed to by the Distribution Trustee and such agents, consultants, and employees or professionals with the written consent of the Distribution Trust Advisory Board and may be paid without further order of the Bankruptcy Court, it being understood that the Reorganized Debtors shall have no obligation to pay any such compensation.

7.16.10    Termination. The duties, responsibilities and powers of the Distribution Trustee shall terminate after all Litigation Trust Causes of Action are fully resolved and the Distribution Trust Reserve and proceeds of the Litigation Trust Causes of Action have been distributed on the Final Distribution Date in accordance with the Bridge Lender Plan, the Litigation Distribution Orders and the Distribution Trust Agreement. The Distribution Trust shall terminate no later than five years from the Effective Date. However, if warranted by the facts and circumstances provided for in the Bridge Lender Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Distribution Trust, the term of the Distribution Trust may be extended for a finite period based on the particular circumstances at issue. Each such extension must be approved by the Bankruptcy Court within six months of the beginning of the extended term with notice thereof to all of the beneficiaries of the Distribution Trust.

7.16.11    Indemnification. From and after the Effective Date, the Distribution Trustee, the members of the Distribution Trust Advisory Board and each of their respective Related Persons (each a "Distribution Trust Indemnified Party") shall be, and hereby are, indemnified by

96

the Distribution Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Distribution Trust Indemnified Party's good faith exercise of what such Distribution Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Distribution Trust Indemnified Party reasonably understands to be its duties conferred by the Distribution Trust Agreement, the Bridge Lender Plan, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Bridge Lender Plan (including, without limitation, the Litigation Distribution Orders and any Final Order relating to the Senior Loan Claim Sharing Resolution) applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to its own fraud, self-dealing, intentional misrepresentation, or willful misconduct) on and after the Effective Date. The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to (a) the Distribution Trust Agreement; (b) the services to be rendered pursuant to the Distribution Trust Agreement; (c) any document or information, whether verbal or written, referred to herein or supplied to the Distribution Trustee; or (d) proceedings by or on behalf of any creditor. The Distribution Trust shall, on demand, advance or pay promptly out of proceeds of the Litigation Trust Causes of Action, on behalf of each Distribution Trust Indemnified Party, reasonable attorneys' fees and other expenses and disbursements to which such Distribution Trust Indemnified Party would be entitled pursuant to the foregoing indemnification obligation; provided, however, that any Distribution Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines that such Distribution Trust Indemnified Party is not entitled to indemnification hereunder due to the fraud, self-dealing, intentional misrepresentation, or willful misconduct of such Distribution Trust Indemnified Party. In any matter covered by the first two sentences of this subsection, any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Distribution Trustee, at the Distribution Trust's expense, subject to the foregoing terms and conditions. In addition, the Distribution Trust shall purchase fiduciary liability insurance for the benefit of the Distribution Trustee and the Distribution Trust Advisory Board.

7.16.12    Distribution Trust Interests. The Distribution Trust Interests will not be represented by certificates. The Distribution Trust Interests will be transferable in accordance with applicable law. Holders of Distribution Trust Interests shall be the beneficiaries of the Distribution Trust.

7.16.13    Tax Treatment of the Distribution Trust.

(a)    Distribution Trust Assets Treated as Owned by Creditors. For all U.S. federal income tax purposes, all parties (including, without limitation, the Reorganized Debtors, the Distribution Trustee, and the holders of Distribution Trust Interests) shall treat the transfer of the Distribution Trust Assets to the Distribution Trust as (1) a transfer of the Distribution Trust Assets (subject to any obligations relating to those assets) directly to the holders of the Distribution Trust Interests and, to the extent Distribution Trust Assets are allocable to Disputed Claims, to the Distribution Trust Reserve, followed by (2) the transfer by such beneficiaries to the Distribution Trust of the Distribution Trust Assets (other than the Distribution Trust Assets

allocable to the Distribution Trust Reserve) in exchange for Distribution Trust Interests. Accordingly, the holders of the Distribution Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Distribution Trust Assets (other than such Distribution Trust Assets as are allocable to the Distribution Trust Reserve, discussed below). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(b)    Tax Reporting.

(i)    The Distribution Trustee shall file Tax Returns for the Distribution Trust treating the Distribution Trust as a grantor trust pursuant to Tax Regulations section 1.671-4(a) and in accordance with this Section 7.16.13. The Distribution Trustee also will annually send to each holder of a Distribution Trust Interest a separate statement regarding the receipts and expenditures of the Distribution Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Distribution Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Distribution Trust that is required by any governmental unit.

(ii)    The Distribution Trustee will in good faith value all Distribution Trust Assets as soon as practicable following (and as of) the Effective Date, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Distribution Trust (including, without limitation, the Reorganized Debtors, the Distribution Trustee, and holders of the Litigation Trusts Interests) for all U.S. federal income tax purposes.

(iii)    Allocations of Distribution Trust taxable income among the holders of the Distribution Trust Interests (other than taxable income allocable to the Distribution Trust Reserve) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Distribution Trust had distributed all its assets to the holders of the Distribution Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Distribution Trust. Similarly, taxable loss of the Distribution Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Distribution Trust Assets. The tax book value of the Distribution Trust Assets for

98

purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Tax Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Distribution Trustee of a private letter ruling if the Distribution Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Distribution Trustee), the Distribution Trustee shall (A) timely elect to treat any Distribution Claims Reserve (as described in Section 7.2 as a "disputed ownership fund" governed by Tax Regulations section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Distribution Trustee, the Reorganized Debtors, and the holders of the Distribution Trust Interests) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

(v)    The Distribution Trustee shall be responsible for payment, out of the Distribution Trust Assets, of any Taxes imposed on the trust or its assets, including the Distribution Trust Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Distribution Trust Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such Taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Distribution Trustee as a result of the resolution of such Disputed Claims.

(vi)    The Distribution Trustee may request an expedited determination of Taxes of the Distribution Trust, including the Distribution Trust Reserve, or the Debtors under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the Distribution Trust or the Debtors for all taxable periods through the dissolution of the Distribution Trust.

(c)    Dissolution. The Distribution Trustee and the Distribution Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Distribution Trust Assets have been distributed pursuant to the Bridge Lender Plan and the Distribution Trust Agreement, (ii) the Distribution Trustee, with the consent of the Distribution Trust Advisory Board, determines that the administration of any remaining Distribution Trust Assets is not likely to yield sufficient additional Distribution Trust proceeds to justify further pursuit, or (iii) all distributions required to be made by the Distribution Trustee under the Bridge Lender Plan and the Distribution Trust Agreement have been made; provided, however, in no event shall the

99

Distribution Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth (5th) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Distribution Trustee and the Distribution Trust Advisory Board that any further extension would not adversely affect the status of the trust as a Distribution Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Distribution Trust Assets. If at any time the Distribution Trustee determines, in reliance upon such professionals as the Distribution Trustee may retain, that the expense of administering the Distribution Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Distribution Trust, the Distribution Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Distribution Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Reorganized Debtors, the Distribution Trust, and any insider of the Distribution Trustee, and (iii) dissolve the Distribution Trust.

## ARTICLE 8    PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS

### 8.1    Objections to and Estimation of Claims.

(a)    After the Effective Date, except as provided in Section 8.1(b) below, the Reorganized Debtors shall have the sole authority to object to the allowance of any Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim and Other Secured Claim, and the Litigation Trustee shall have the sole authority to object to the allowance of any other Claim. After the Effective Date, except as provided in Section 8.1(b) below, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim and Other Secured Claim, and the Litigation Trustee shall be accorded the power and authority to allow or settle and compromise any other Claim, in each case, without notice to any other party, or approval of, or notice to the Bankruptcy Court. In addition, except as provided in Section 8.1(b) below, the Litigation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim (other than an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim or Other Secured Claim) pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim; provided, however, that the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim or Other Secured Claim; provided further that prior to the Effective Date, the Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code. Except as provided in Section 8.1(b) below, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors or Litigation Trustee, as applicable, shall serve and file any objections to Claims and Interests as soon as practicable, but in no event later than (i) two hundred ten (210) days after the Effective Date, or (ii) such later date as may be determined

100

by the Bankruptcy Court upon a motion which may be made without further notice or hearing. For the avoidance of doubt, the Claims Settlement Order shall not apply to the Reorganized Debtors or the Litigation Trustee, and shall no longer be of any force or effect on or after the Effective Date.

(b)    After the Effective Date, and notwithstanding the provisions of Section 8.1.(a) of the Bridge Lender Plan, or any other provision of the Bridge Lender Plan or the Confirmation Order, only the Litigation Trustee may object to the allowance of any Claim or Administrative Expense Claim of Holders that are the subject of Litigation Trust Causes of Action. After the Effective Date, for Claims related to the Litigation Trust Causes of Action, the Litigation Trustee, with the consent of the Litigation Trust Advisory Board, shall be accorded sole power and authority to allow or settle and compromise any such Claim and after notice and approval of the Bankruptcy Court.

8.2    Payments and Distributions on Disputed, Contingent and Unliquidated Claims and Interests and on Claims for Which Proofs of Claim are Filed.

Except as provided herein for Initial Distributions to Step One Lenders and Step Two Lenders, if applicable in Sections 3.2.3(c), 3.2.4(c), 3.4.3(c) and 3.4.4(c), respectively, and distributions of Distribution Trust Interests to Holders of Disputed Claims in Classes 1D, 1E, 1G, 50D – 111D and 50E – 111E, no partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim or Interest until the resolution of such disputes or estimation or liquidation of such Claims by settlement or by Final Order. On the next Distribution Date after a disputed, contingent or unliquidated Claim or Interest becomes an Allowed Claim or Interest in an amount certain, the Holder of such Allowed Claim or Interest will receive all payments and distributions to which such Holder is then entitled under the Bridge Lender Plan.

## ARTICLE 9    PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS

9.1    Payment of Proponents Fee/Expense Claims.

Promptly upon the Effective Date, Reorganized Tribune shall reimburse the Proponents for their reasonable and documented out-of-pocket expenses and the reasonable and documented fees, costs and expenses of the counsel, local counsel and financial advisors of the Proponents, incurred in connection with the Chapter 11 Cases on or after the Petition Date through the Effective Date, without need for the filing of any application with the Bankruptcy Court and/or the Bankruptcy Court's review and approval of the same.

9.2    Bar Date for Payment or Reimbursement of Professional Fees and Expenses and Claims for Substantial Contribution.

Except as provided in Section 9.1 of the Bridge Lender Plan, all final requests for compensation or reimbursement of the fees of any professional employed pursuant to sections 327 or 1103 of the Bankruptcy Code or otherwise in the Chapter 11 Cases, including any Claims for making a substantial contribution under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and their counsel, together with the Bankruptcy Court-appointed fee examiner, and the Office of the United States Trustee, not later than

MIAMI 889648 (2K)

sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such professionals or other entities for compensation or reimbursement of expenses must be filed and served on the parties specified above in this Section 9.2 and the requesting professional or other entity not later than twenty (20) days after the date on which the applicable application for compensation or reimbursement was served; provided, however, that the following protocol shall apply to the fee examiner previously appointed by the Bankruptcy Court in the Chapter 11 Cases in lieu of such twenty (20) day objection deadline:

(a)     applicants shall submit all final requests for compensation or reimbursement of fees and expenses, and any responses provided for below, in the format required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the Guidelines of the Office of the United States Trustee, and applicable orders of the Bankruptcy Court;

(b)     if the fee examiner has any questions for any applicant, the fee examiner may communicate such questions in writing to the applicant in an initial report (an "Initial Report") within thirty (30) days after the date on which the applicable application for compensation or reimbursement was served on the fee examiner;

(c)     any applicant who receives such an Initial Report and wishes to respond thereto shall respond within twenty (20) days after the date of the Initial Report;

(d)     within thirty (30) days after the date on which any response to an Initial Report is served on the fee examiner (or, if no such response is served, within thirty (30) days after the deadline for serving such Initial Report has passed), the fee examiner shall file with the Court a final report with respect to each such application for compensation or reimbursement; and

(e)     within fifteen (15) days after the date of the final report, the subject applicant may file with the Court a response to such final report.

Notwithstanding the foregoing, the fee examiner and a professional may agree to extend any of the time periods set forth in items (b) through (e) above with respect to any application filed by such professional. In addition, notwithstanding the foregoing provisions of this Section 9.2, those professionals retained by the Debtors pursuant to that certain Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business entered by the Bankruptcy Court on January 15, 2009 [D.I. 227] shall continue to be compensated in accordance with the provisions of such Order, and shall not be subject to the final application procedures set forth in this Section 9.2.

## ARTICLE 10   CONFIRMATION AND CONSUMMATION OF THE BRIDGE LENDER PLAN

MIAMI 889648 (2K)

10.1    Conditions to Effective Date.

The Bridge Lender Plan shall not become effective and the Effective Date shall not occur unless and until the Proponents concur that all of the following conditions shall have been satisfied or waived in accordance with Section 10.2:

(a)    The Confirmation Order confirming the Bridge Lender Plan, as the Bridge Lender Plan may have been modified in accordance with the terms hereof, shall conform to the Bridge Lender Plan in all respects and shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Proponents in their sole discretion.

(b)    The Certificate of Incorporation and By-Laws and any amended certificates or articles of incorporation, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents of the other Debtors, as necessary and in form and substance satisfactory to the Proponents in their sole discretion, shall have been adopted and filed with the applicable authorities of the relevant jurisdictions and shall become effective on the Effective Date in accordance with such jurisdictions' laws except to the extent that any such governing documents shall be adopted or filed after the Effective Date in connection with the Restructuring Transactions.

(c)    All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Bridge Lender Plan on the Effective Date shall have been obtained in form and substance satisfactory to the Proponents in their sole discretion or shall have occurred, including, if determined to be necessary by the Proponents in their sole discretion, a ruling from the Internal Revenue Service that the Litigation Trust, Distribution Trust and/or Creditors' Trust qualifies and will be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations or as a "grantor trust" within the meaning of Tax Code Section 671 of the Tax Regulations, unless failure to do so will not have a material adverse effect on the Reorganized Debtors as determined solely by the Proponents.

(d)    The board of directors of Reorganized Tribune shall have been selected and shall have expressed a willingness to serve on the board of directors of Reorganized Tribune.

(e)    All other documents and agreements (including the Litigation Trust Agreement, the Distribution Trust Agreement, the Creditors' Trust Agreement and the Claims Purchase Agreement) necessary to implement the Bridge Lender Plan on the Effective Date shall have been executed and delivered in form and substance satisfactory to the Proponents in their sole discretion and all other actions required to be taken in connection with the Effective Date shall have occurred.

(f)    All consents, approvals and waivers from the FCC that are necessary or that the Proponents deem appropriate to consummate the transactions contemplated herein and to continue the operation of the Debtors' businesses and ownership structure shall have been obtained in form and substance satisfactory to the Proponents in their sole discretion.

MIAMI 889648 (2K)

(g)     The Litigation Trustee shall have executed the Litigation Trust Agreement.

(h)     The Distribution Trustee shall have executed the Distribution Trust Agreement.

(i)     The Creditors' Trustee shall have executed the Creditors' Trust Agreement.

(j)     The Claims Purchase Agent shall have executed the Claims Purchase Agreement.

(k)     The Internal Revenue Service shall have issued a ruling, in form and substance satisfactory to the Proponents in their sole discretion, to the effect that the Litigation Trust, Distribution Trust and Creditors' Trust each qualify and will be treated as "liquidating trusts" within the meaning of Section 301.7701-4(d) of the Tax Regulations.

10.2    Waiver of Conditions.

Each of the conditions set forth in Section 10.1.1 (other than 10.1(a)) may be waived in whole or in part solely by the Proponents.

10.3    Consequences if Confirmation Order is Vacated.

If the Confirmation Order is vacated, (a) the Bridge Lender Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for herein shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases of personal property shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

## ARTICLE 11   INJUNCTIONS, RELEASES AND DISCHARGE

11.1    Discharge.

11.1.1     Discharge of Claims and Termination of Interests.

(a)     As of the Effective Date, except as provided in the Bridge Lender Plan, the distributions and rights afforded under the Bridge Lender Plan and the treatment of Claims and Interests under the Bridge Lender Plan shall be in exchange for, and in complete discharge of, all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in Tribune. Accordingly, except as otherwise provided in the Bridge Lender Plan or the Confirmation Order, confirmation of the Bridge Lender Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (x) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (y) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code (or is otherwise resolved), or (z) the Holder of a Claim

104

based on such debt has accepted the Bridge Lender Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Bridge Lender Plan. In addition, confirmation of the Bridge Lender Plan shall, as of the Effective Date, authorize the release of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors.

(b)    As of the Effective Date, except as provided in the Bridge Lender Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, debts, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date and from asserting against the Guarantor Non-Debtors any Senior Loan Guaranty Claims or Bridge Loan Guaranty Claims. In accordance with the foregoing, except as provided in the Bridge Lender Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.

11.1.2    Discharge Injunction. Except as provided in the Bridge Lender Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Bridge Lender Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Bridge Lender Plan.

11.2    Releases.

11.2.1    Release of Guarantor Non-Debtors from Loan Guaranty Claims. All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Loan Lenders on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent, the Former Bridge Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims; provided that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a

105

guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in the Bridge Lender Plan and (ii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in the Bridge Lender Plan, which upon entry of the Confirmation Order, the Debtors shall be obligated to ensure occurs. Pursuant to Bankruptcy Rule 9019 and/or 11 U.S.C § 1123(b)(3), the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of these good faith settlements and compromises of the claims released by the Guarantor Non-Debtor Release and adequate factual findings that the Guarantor Non-Debtor Release is: (1) fair, equitable and reasonable; (2) necessary and essential to the Debtors' successful reorganization; (3) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors and the Loan Agents; (4) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (5) consistent with public policy and due process principles.

 11.2.2 <u>Releases by Debtors and Estates</u>. On the Effective Date and effective simultaneously with the effectiveness of this Bridge Lender Plan, the Reorganized Debtors on their own behalf and as representatives of their respective Estates, unconditionally grant and hereby cause the Subsidiary Non-Debtors to unconditionally grant the following releases:

 (a) If the Step One Lender Settlement is accepted and approved by the Bankruptcy Court, the Step One Lender Parties (but only in their capacity as Step One Lender Parties) shall be released from all LBO-Related Causes of Action (including related disgorgement claims); provided that such release shall not include any LBO-Related Causes of Action (1) with respect to any Step Two Senior Loan (unless the Step Two Lender Settlement is accepted and approved), (2) arising from any Person's conduct as an agent, arranger or advisor with respect to the Leveraged ESOP Transactions or (3) arising from any payment made in respect of a Step One Senior Loan to a party who is not a current Step One Lender;

 (b) If the Step Two Lender Settlement is accepted and approved by the Bankruptcy Court, the Step Two Lender Parties (but only in their capacity as Step Two Lender Parties) shall be released from all LBO-Related Causes of Action (including related disgorgement claims); provided that such release shall not include any LBO-Related Causes of Action (1) with respect to any Step One Senior Loan (unless the Step One Lender Settlement is accepted and approved), (2) arising from any Person's conduct as an agent, arranger or advisor with respect to the Leveraged ESOP Transactions or (3) arising from any payment made in respect of a Step Two Senior Loan to a party who is not a current Step Two Lender; and

 (c) If the Bridge Loan Lender Settlement is accepted and approved by the Bankruptcy Court, the Bridge Loan Lender Parties (but only in their capacity as Bridge Loan Lender Parties and not the Original Bridge Loan Lenders) shall be released from all LBO-Related Causes of Action (including related disgorgement claims); provided that such release shall not include any LBO-Related Causes of Action (1) with respect to any Step One Senior Loan or Step Two Senior Loan (unless, as the case may be, the Step One Lender Settlement and the Step Two Lender Settlement are accepted and approved), (2) arising from any Person's conduct as an arranger or advisor with respect to the Leveraged ESOP Transactions or (3) arising from any payment made in respect of a Bridge Loan Lender Claim to a party who is not a current Bridge Loan Lender.

MIAMI 889648 (2K)

(d)     Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of these good faith settlements and compromises of the claims released in this Section 11.2.2 and adequate factual findings that such releases are: (1) fair, equitable and reasonable; (2) necessary and essential to the Debtors' successful reorganization; (3) in exchange for good and valuable consideration provided by the released parties; (4) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (5) consistent with public policy and due process principles.

11.2.3     Original Bridge Loan Lenders Release.  If the Bridge Loan Lender Settlement is accepted and approved by the Bankruptcy Court, the Reorganized Debtors, their respective Estates, the Subsidiary Non-Debtors and all Bridge Loan Lenders other than the Original Bridge Loan Lenders shall be deemed on the Effective Date to have granted the Original Bridge Loan Lenders Release and the Original Bridge Loan Lenders shall be unconditionally relieved from any liability to such releasing parties from all LBO-Related Causes of Action (including related disgorgement claims) related to, or arising in connection with, the Bridge Loan Agreement and the sale or disposition of the Bridge Loans and rights and obligations thereunder.

11.2.4     Non-Release of Certain Defined Benefit Plans.  Notwithstanding anything to the contrary herein, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Bridge Lender Plan (including Section 11.2.2), the entry of the Confirmation Order or the Chapter 11 Cases.  Notwithstanding anything to the contrary herein, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the Employee Retirement Income Security Act of 1974, as amended, the controlled group members.

11.3     Obligations of the Guarantor Non-Debtors as a Condition to the Release of Guarantor Non-Debtors from Loan Guaranty Claims and Bridge Loan Guaranty Claims,

Pursuant to Section 5.6 of the Bridge Lender Plan, and as consideration for the Guarantor Non-Debtor Release, the Guarantor Non-Debtors will each (i) execute a guaranty under the New Senior Secured Term Loan and (ii) grant Liens on certain of their property.

11.4     Disallowed Claims and Disallowed Interests.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a Disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall

nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages against the Debtors.

11.5    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

11.6    Exculpation

To the fullest extent permitted by law, none of the Proponents nor any of their respective Related Persons shall have any liability to any person or entity for acts or omissions in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including the Bridge Lender Plan, pursuit of confirmation or implementation of any plans of reorganization, including the Bridge Lender Plan, the property to be distributed under the Bridge Lender Plan, the Bridge Lender Specific Disclosure Statement, Restructuring Transactions, releases and injunctions under the Bridge Lender Plan.

## ARTICLE 12    RETENTION/RELEASE OF JURISDICTION

12.1    Retention of Jurisdiction.

Except to the extent set forth in Section 12.2, pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Bridge Lender Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

12.1.1    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

12.1.2    resolve any matters related to the rejection, assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

12.1.3    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Bridge Lender Plan and the Litigation Distribution Orders;

12.1.4    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

12.1.5    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Bridge Lender Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Bridge Lender Plan, the Joint Disclosure Statement or the Confirmation Order;

12.1.6    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Bridge Lender Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Bridge Lender Plan, or any entity's rights arising from or obligations incurred in connection with the Bridge Lender Plan or such documents;

12.1.7    approve any modification of the Bridge Lender Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Bridge Lender Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Bridge Lender Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Bridge Lender Plan or the Confirmation Order, or enter any order in aid of Confirmation pursuant to section 1142 of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Bridge Lender Plan;

12.1.8    hear and determine all applications for compensation and reimbursement of expenses of professionals under the Bridge Lender Plan or under sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to the order of the Bankruptcy Court; provided, however, that the professional fees and expenses of the Reorganized Debtors, including the fees and expenses of the Proponents, incurred after the Effective Date, including counsel and advisor fees, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

12.1.9    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Bridge Lender Plan or the Confirmation Order;

12.1.10    resolve all ambiguities between the Litigation Trust Agreement and the Bridge Lender Plan;

12.1.11    resolve all ambiguities between the Distribution Trust Agreement and the Bridge Lender Plan;

12.1.12    resolve any matters related to the Litigation Trust;

12.1.13    resolve any matters related to the Distribution Trust;

MIAMI 889648 (2K)

12.1.14   hear and determine all Litigation Trust Causes of Action;

12.1.15   hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

12.1.16   hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

12.1.17   enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Bridge Lender Plan are enjoined or stayed;

12.1.18   enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

12.1.19   hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

12.1.20   resolve any other matters that may arise in connection with or relating to the Bridge Lender Plan or the Joint Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Bridge Lender Plan or the Joint Disclosure Statement other than the Creditors' Trust Agreement;

12.1.21   hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

12.1.22   enter orders closing the Chapter 11 Cases.

12.2   Release of Jurisdiction.

Upon the occurrence of the Effective Date, the Bankruptcy Court shall release and not retain any jurisdiction with respect to the Creditors' Trust or the Creditors' Trust Assets including, without limitation, the prosecution, settlement, or resolution of the State Law Avoidance Claims.

## ARTICLE 13   MISCELLANEOUS

13.1   Surrender of Instruments.

As a condition to participation under the Bridge Lender Plan, the Holder of a note, debenture or other evidence of indebtedness of any of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Bridge Lender Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Bridge Lender Plan; provided, however, that if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held

110

in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the Debtors or the applicable Indenture Trustee for such note, debenture or other evidence of indebtedness shall waive the requirement of surrender. Except as otherwise provided in this Section 13.1, in the Reorganized Debtors' sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement (without any bond), in form and substance reasonably satisfactory to the Reorganized Debtors, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such note, debenture or other evidence of indebtedness thereof.

13.2    Creditors' Committee.

The appointment of the Creditors' Committee shall terminate on the Effective Date, except that the Creditors' Committee shall continue in existence after the Effective Date for the sole purpose of preparing and prosecuting applications for the payment of fees and reimbursement of expenses.

13.3    Post-Confirmation Date Retention of Professionals.

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors, the Litigation Trust, the Distribution Trust and the Creditors' Trust comply with sections 327 through 331 or 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors, the Litigation Trust, the Distribution Trust and the Creditors' Trust will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

13.4    Effectuating Documents and Further Transactions.

Each of the Debtors, the Reorganized Debtors, the Litigation Trustee, the Distribution Trustee and the Creditors' Trustee is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Bridge Lender Plan and any notes or securities issued pursuant to the Bridge Lender Plan.

13.5    Exemption from Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code: (a) the issuance, transfer or exchange of notes, debentures or equity securities under the Bridge Lender Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under the Bridge Lender Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

MIAMI 889648 (2K)

13.6    Paid-in Capital of Corporate Reorganized Debtors.

On the Effective Date, after all other transactions necessary to effect the Bridge Lender Plan have been consummated, the Paid-in Capital, as such term is defined in section 1.80(j) of the Illinois Business Corporation Act of 1983, 805 ILCS 5/1.01, et seq. (the "BCA"), of each corporate Reorganized Debtor shall, pursuant to Section 9.20(a)(2) of the BCA, be reduced to the following amounts (such reduced amounts to be referred to as the "Reduced Paid-in Capital Amounts"): (i) in the case of Reorganized Tribune its Paid-in Capital shall be reduced to the aggregate par value, if any, of Reorganized Tribune's issued and outstanding shares of capital stock plus such amount as is recorded on Reorganized Tribune's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles, and (ii) in the case of each other corporate Reorganized Debtor, its Paid-in Capital shall be reduced to the aggregate par value, if any, of each such other Reorganized Debtor's issued and outstanding shares of capital stock plus such amount as is recorded on each such other Reorganized Debtor's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles. The amount required to reduce the Paid-in Capital of each corporate Reorganized Debtor to its Reduced Paid-in Capital Amount shall be treated as a reduction in Paid-in Capital under Section 9.20(a)(2) of the BCA. Any capital of each corporate Reorganized Debtor remaining in excess of its Reduced Paid-in Capital Amount shall not be treated as Paid-in Capital for purposes of the BCA. For purposes of this Section 13.6, the term "corporate" refers to a corporation as defined in Sections 1.80(a) or (b) of the BCA.

13.7    Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

13.8    Amendment or Modification of the Bridge Lender Plan.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code and other applicable provisions of the Bridge Lender Plan, including, without limitation, Section 13.9 of the Bridge Lender Plan, the Proponents may alter, amend or modify the Bridge Lender Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Bridge Lender Plan. A Holder of a Claim or Interest that has accepted the Bridge Lender Plan shall be deemed to have accepted the Bridge Lender Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

13.9    Withdrawal of Proponents.

Other than pursuant to a written agreement to the contrary, any Proponent may withdraw as a Proponent of the Bridge Lender Plan and the remaining Proponent(s) may continue to prosecute the Bridge Lender Plan notwithstanding such withdrawal.

MIAMI 880648 (2K)

13.10  Severability of Bridge Lender Plan Provisions.

If any term or provision of the Bridge Lender Plan, including any Plan Settlement or component thereof, is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Proponents will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Bridge Lender Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Bridge Lender Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.11  Successors and Assigns.

The Bridge Lender Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors. The rights, benefits and obligations of any entity named or referred to in the Bridge Lender Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

13.12  Revocation, Withdrawal or Non-Consummation.

The Proponents reserve the right to revoke or withdraw the Bridge Lender Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Proponents revoke or withdraw the Bridge Lender Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors (a) the Bridge Lender Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Bridge Lender Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Bridge Lender Plan, and any document or agreement executed pursuant to the Bridge Lender Plan shall be deemed null and void and (c) nothing contained in the Bridge Lender Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

13.13  Notice.

To be effective, all notices, requests and demands to or upon the Debtors, the Reorganized Debtors or the Proponents shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or electronic transmission, when received and telephonically confirmed, addressed as follows:

MIAMI 889648 (2K)

**Debtors/Reorganized Debtors:**
Tribune Company
435 Michigan Avenue
Chicago, IL 60611
Facsimile: (312) 222-4206
Attn: Chief Legal Officer

*With a copy to:*

**Counsel to the Debtors:**

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Facsimile: (312) 853-7036
Attn: Jessica C.K. Boelter

Cole Schotz Meisel Forman & Leonard, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Facsimile: (302) 652-3117
Attn: J. Kate Stickles

*And, if prior to the Effective Date:*

**Counsel to the Proponents:**

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Facsimile: (212) 819-8113
Attn: Thomas E Lauria and Scott Greissman

Fox Rothschild LLP
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington DE 19801
Facsimile: (302) 656-8920
Attn: Jeffrey M. Schlerf

13.14   Governing Law.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other Federal law is applicable, or to the extent that an exhibit or schedule to the Bridge Lender Plan or the relevant document provides otherwise, the rights and obligations arising under the Bridge Lender Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction; provided, however, that the law applicable in connection with the Litigation Trust Causes of Action and State Law Avoidance Claims shall be determined by the applicable court adjudicating such causes of action.

13.15   Tax Reporting and Compliance.

The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of any of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

MIAMI 889648 (2K)

13.16   Reservation of Rights.

Except as expressly set forth herein, the Bridge Lender Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order. The filing of the Bridge Lender Plan, any statement or provision contained in the Bridge Lender Plan, or the taking of any action by the Debtors or the Proponents in furtherance of seeking confirmation of the Bridge Lender Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors or the Proponents with respect to the Holders of Claims and Interests.

13.17   Notice of the Effective Date.

On or before ten (10) Business Days after occurrence of the Effective Date, the Reorganized Debtors shall mail or cause to be mailed to all Holders of Claims and Interests a Notice that informs such Holders of (a) entry of the Confirmation Order, (b) the occurrence of the Effective Date, (c) the assumption and rejection of executory contracts and unexpired leases pursuant to the Bridge Lender Plan, as well as the deadline for the filing of Claims arising from such rejection, (d) the deadline established under the Bridge Lender Plan for the filing of Administrative Expense Claims, (e) the procedures for requesting notice of the matters subject to Sections 5.18.8 and 7.16.8 of the Bridge Lender Plan and other matters, (f) the procedures for changing an address of record pursuant to Section 7.6.2 of the Bridge Lender Plan and (g) such other matters as the Reorganized Debtors deem to be appropriate.

Dated:  December 7, 2010

MIAMI 889648 (2K)

Date: December 7, 2010

KING STREET ACQUISITION COMPANY, L.L.C.

By: King Street Capital Management, L.P.

    Its Manager

By: _____
    Name: Jay Ryan
    Title: Chief Financial Officer

Date: December 7, 2010

> KING STREET CAPITAL, L.P.
>
> By: King Street Capital Management, L.P.
>
>   Its Investment Manager
>
>
> By: _____
>   Name: Jay Ryan
>   Title: Chief Financial Officer

Date: December 7, 2010

MARATHON ASSET MANAGEMENT, L.P., on
behalf of certain funds and managed accounts

By: _____
      Name:    LOUIS T. HANOVER
      Title:   AUTHORIZED SIGNATORY

**Appendix A**
**Filed Subsidiary Debtors**

I.    **Non-Guarantor Debtors**

| Debtor Number | Debtor Name |
|---|---|
| 2. | 435 Production Company |
| 3. | Baltimore Newspaper Networks, Inc. |
| 4. | Candle Holdings Corporation |
| 5. | Channel 20, Inc. |
| 6. | Chicago Avenue Construction Company |
| 7. | Chicago River Production Company |
| 8. | Chicago Tribune Newspapers, Inc. |
| 9. | Chicago Tribune Press Service, Inc. |
| 10. | ChicagoLand Microwave Licensee, Inc. |
| 11. | Direct Mail Associates, Inc. |
| 12. | ForSaleByOwner.com Referral Services, LLC |
| 13. | Fortify Holdings Corporation |
| 14. | GreenCo, Inc. |
| 15. | Heart & Crown Advertising, Inc. |
| 16. | Hoy, LLC |
| 17. | InsertCo, Inc. |
| 18. | JuliusAir Company II, LLC |
| 19. | JuliusAir Company, LLC |
| 20. | Los Angeles Times International, Ltd. |
| 21. | Los Angeles Times Newspapers, Inc. |
| 22. | Magic T Music Publishing Company |
| 23. | NBBF, LLC |
| 24. | Neocomm, Inc. |
| 25. | Newscom Services, Inc. |
| 26. | Newspaper Readers Agency, Inc. |
| 27. | North Michigan Production Company |
| 28. | North Orange Avenue Properties, Inc. |
| 29. | Oak Brook Productions, Inc. |
| 30. | Publishers Forest Products Co. of Washington |
| 31. | Sentinel Communications News Ventures, Inc. |
| 32. | Shepard's Inc. |

| Debtor Number | Debtor Name |
|---|---|
| 33. | Signs of Distinction, Inc. |
| 34. | The Other Company LLC |
| 35. | Times Mirror Land and Timber Company |
| 36. | Times Mirror Payroll Processing Company, Inc. |
| 37. | Times Mirror Services Company, Inc. |
| 38. | Towering T Music Publishing Company |
| 39. | Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. |
| 40. | Tribune Entertainment Production Company |
| 41. | Tribune Finance Service Center, Inc. |
| 42. | Tribune License, Inc. |
| 43. | Tribune Network Holdings Company |
| 44. | Tribune Publishing Company |
| 45. | ValuMail, Inc. |
| 46. | Virginia Community Shoppers, LLC |
| 47. | WATL, LLC |
| 48. | WCWN LLC |
| 49. | WLVI Inc. |

## II.   Guarantor Debtors

| Debtor Number | Debtor Name |
|---|---|
| 50. | 5800 Sunset Productions Inc. |
| 51. | California Community News Corporation |
| 52. | Channel 39, Inc. |
| 53. | Channel 40, Inc. |
| 54. | Chicago Tribune Company |
| 55. | Chicagoland Publishing Company |
| 56. | Chicagoland Television News, Inc. |
| 57. | Courant Specialty Products, Inc. |
| 58. | Distribution Systems of America, Inc. |
| 59. | Eagle New Media Investments, LLC |
| 60. | Eagle Publishing Investments, LLC |
| 61. | forsalebyowner.com corp. |

MIAMI 889648 (2K)

| Debtor Number | Debtor Name |
|:---:|:---|
| 62. | Forum Publishing Group, Inc. |
| 63. | Gold Coast Publications, Inc. |
| 64. | Homeowners Realty, Inc. |
| 65. | Homestead Publishing Company |
| 66. | Hoy Publications, LLC |
| 67. | Internet Foreclosure Service, Inc. |
| 68. | KIAH Inc. |
| 69. | KPLR, Inc. |
| 70. | KSWB Inc. |
| 71. | KTLA Inc. |
| 72. | KWGN Inc. |
| 73. | Los Angeles Times Communications LLC |
| 74. | New Mass. Media, Inc. |
| 75. | Orlando Sentinel Communications Company |
| 76. | Patuxent Publishing Company |
| 77. | Southern Connecticut Newspapers, Inc. |
| 78. | Star Community Publishing Group, LLC |
| 79. | Stemweb, Inc. |
| 80. | Sun-Sentinel Company |
| 81. | The Baltimore Sun Company |
| 82. | The Daily Press, Inc. |
| 83. | The Hartford Courant Company |
| 84. | The Morning Call, Inc. |
| 85. | TMLH 2, Inc. |
| 86. | TMLS I, Inc. |
| 87. | TMS Entertainment Guides, Inc. |
| 88. | Tower Distribution Company |
| 89. | Tribune Broadcast Holdings, Inc. |
| 90. | Tribune Broadcasting Company |
| 91. | Tribune Broadcasting Holdco, LLC |
| 92. | Tribune California Properties, Inc. |
| 93. | Tribune CNLBC, LLC |
| 94. | Tribune Direct Marketing, Inc. |
| 95. | Tribune Entertainment Company |
| 96. | Tribune Finance LLC |

MIAMI 889648 (2K)

| Debtor Number | Debtor Name |
|---|---|
| 97. | Tribune Los Angeles, Inc. |
| 98. | Tribune Manhattan Newspaper Holdings, Inc. |
| 99. | Tribune Media Net, Inc. |
| 100. | Tribune Media Services, Inc. |
| 101. | Tribune New York Newspaper Holdings, LLC |
| 102. | Tribune NM, Inc. |
| 103. | Tribune Television Company |
| 104. | Tribune Television Holdings, Inc. |
| 105. | Tribune Television New Orleans, Inc. |
| 106. | Tribune Television Northwest, Inc. |
| 107. | Virginia Gazette Companies, LLC |
| 108. | WDCW Broadcasting, Inc. |
| 109. | WGN Continental Broadcasting Company |
| 110. | WPIX, Inc. |
| 111. | WTXX Inc. |

MIAMI 889648 (2K)

**Appendix B**
**Subsidiary Non-Debtors**

## III.    Non-Guarantor Non-Debtors

| ENTITY NAME |
| --- |
| Multimedia Insurance Company |
| Fairfax Media, Incorporated |
| Professional Education Publishers International (Africa) Pty. Ltd. |
| TMS Entertainment Guides Canada Corp. |
| Tribune DB, LLC |
| Tribune DQ, LLC |
| Tribune Employee Lease Company LLC |
| Tribune Hong Kong, Ltd. |
| Tribune Media Services, BV |
| Tribune Receivables, LLC |
| Tribune Sports Network Holdings, LLC |
| Tribune Technology LLC |
| Tribune WFPT, LLC |

## IV.    Guarantor Non-Debtors

| ENTITY NAME |
| --- |
| Tribune (FN) Cable Ventures, Inc. |
| Tribune Interactive, Inc. |
| Tribune ND, Inc. |
| Tribune National Marketing Company |

5