## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| | Jointly Administered |
| Debtors. | |

### AMENDED SPECIFIC DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY KING STREET ACQUISITION COMPANY, L.L.C., KING STREET CAPITAL, L.P. AND MARATHON ASSET MANAGEMENT, L.P.

Dated:  December 7, 2010

WHITE & CASE LLP
Thomas E Lauria, Esq.
David Hille, Esq.
Andrew Hammond, Esq.
Scott Greissman, Esq.
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200

FOX ROTHSCHILD LLP
Jeffrey M. Schlerf, Esq. (No. 3047)
Eric M. Sutty, Esq. (No. 4007)
Jay Strock, Esq. (No. 4965)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington, DE 19801
Telephone:  (302) 654-7444

Attorneys for the Proponents

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE BRIDGE LENDER PLAN.  THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  SOLICITATION OF ACCEPTANCE OR REJECTION OF THE BRIDGE LENDER PLAN MAY OCCUR ONLY AFTER THE BANKRUPTCY COURT APPROVES THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT.**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the following page.

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................... 1

A.   PARTIES ENTITLED TO VOTE ON THE BRIDGE LENDER PLAN ............................ 4

B.   GENERAL OVERVIEW .................................................................................... 5

II.  OVERVIEW OF THE ALTERNATIVE PLAN SETTLEMENT AND TRUST
     STRUCTURES ............................................................................................... 6

A.   PROPOSED BRIDGE LENDER PLAN TREATMENT AND ESTIMATED RECOVERIES .. 8

     1.   Proposed Plan Settlements ................................................................... 8

     2.   Description of Trust Structure ............................................................ 17

B.   CERTAIN OTHER KEY BRIDGE LENDER PLAN PROVISIONS ............................. 22

     1.   Treatment of Executory Contracts and Unexpired Leases ................. 22

     2.   Restructuring Transactions ................................................................ 23

     3.   Compensation and Benefit Programs.................................................. 23

     4.   Injunctions, Releases and Discharge.................................................. 23

C.   ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND RELATED MATTERS .. 25

III. DESCRIPTION OF DEBT AND NEW CAPITAL STRUCTURE OF THE
     DEBTORS .................................................................................................. 28

A.   NEW SENIOR SECURED TERM LOAN AGREEMENT ........................................ 28

B.   DESCRIPTION OF EXIT FACILITY ................................................................. 28

C.   DESCRIPTION OF CAPITAL STOCK ............................................................... 28

IV.  BEST INTERESTS TEST AND THE DEBTORS' LIQUIDATION ANALYSIS .... 28

V.   RISK FACTORS .......................................................................................... 29

A.   CERTAIN RISK FACTORS SPECIFIC TO THE BRIDGE LENDER PLAN .................. 30

     1.   Length of Litigation .......................................................................... 30

     2.   Outcome of Litigation Trust Causes of Action and State Law
          Avoidance Claims.............................................................................. 30

     3.   Determination of Senior Loan Claim Sharing Resolution.................. 30

     4.   Determination of PHONES Notes Claims Resolution......................... 30

     5.   Assumptions Regarding DEV and Allocation of DEV........................ 30

     6.   Claims Purchase Price Caps............................................................... 31

     7.   FCC Related Considerations and Risks Respecting the Debtors'
          Businesses......................................................................................... 31

     8.   Other Risks Related to Trust Structure .............................................. 31

**TABLE OF CONTENTS CONT'D**

**Page**

| | | | | |
|---|---|---|---|---|
| | B. | | RISKS TO CREDITORS WHO WILL RECEIVE SECURITIES | 32 |
| | C. | | ADDITIONAL FACTORS TO BE CONSIDERED | 35 |
| | | 1. | The Proponents Have No Duty to Update | 35 |
| | | 2. | No Representations Outside the Joint Disclosure Statement | 35 |
| | | 3. | Proponents Can Withdraw the Bridge Lender Plan | 35 |
| | | 4. | No Legal or Tax Advice Is Provided to You by the Bridge Lender Specific Disclosure Statement | 35 |
| | | 5. | No Admission Made | 35 |
| | | 6. | A Liquid Trading Market for the Trust Interests is Unlikely to Develop | 36 |
| VI. | | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE BRIDGE LENDER PLAN | 36 |
| | A. | | CONTINUATION OF THE CHAPTER 11 CASES | 36 |
| | B. | | APPROVAL OF A COMPETING PLAN | 36 |
| | C. | | LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11 | 36 |
| VII. | | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE BRIDGE LENDER PLAN | 37 |
| | D. | | FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS | 38 |
| | | 1. | Termination of Subchapter S Corporation Status | 38 |
| | | 2. | Cancellation of Debt and Reduction of Tax Attributes | 39 |
| | E. | | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS | 40 |
| | | 1. | Consequences to Holders of Certain Claims and Interests | 40 |
| | | 2. | Consequences to U.S. Holders of Tribune Interests | 42 |
| | F. | | CONSEQUENCES OF HOLDING EXCHANGED CONSIDERATION | 43 |
| | | 1. | Ownership and Disposition of the New Senior Secured Term Loan | 43 |
| | | 2. | Ownership and Disposition of New Common Stock and/or New Warrants | 44 |
| | | 3. | Tax Treatment of the Distribution Trust and Holders of Distribution Trust Interests | 45 |
| | | 4. | Tax Treatment of the Creditors' Trust and Holders of Creditors' Trust Interests | 47 |
| | | 5. | Tax Treatment of Trust Reserves | 48 |

**TABLE OF CONTENTS CONT'D**

|  |  | 6. | Limitations on Capital Losses | 48 |
|---|---|---|---|---|
|  | G. |  | ADDITIONAL CONSIDERATIONS | 49 |
|  |  | 1. | Accrued but Unpaid Interest | 49 |
|  |  | 2. | Market Discount | 49 |
|  | H. |  | NON-U.S. HOLDERS | 50 |
|  |  | 1. | General Consequences to Non-U.S. Holders | 50 |
|  | I. |  | INFORMATION REPORTING AND BACKUP WITHHOLDING | 51 |
|  | J. |  | FEDERAL INCOME TAX TREATMENT OF DISPUTED CLAIMS RESERVES | 52 |
|  | K. |  | IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE | 53 |
| VII. |  |  | CONCLUSION AND RECOMMENDATION | 54 |

# I.    INTRODUCTION

On October 29, 2010, King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., on behalf of certain funds and managed accounts, in their capacity as Bridge Loan Lenders (collectively, the "Proponents") filed a joint plan of reorganization for the resolution of all outstanding Claims[2] against and Interests in all of the Debtors in their reorganization cases under chapter 11 of the Bankruptcy Code (as the same may be amended from time to time, the "Bridge Lender Plan") with the Bankruptcy Court. A copy of the Bridge Lender Plan is attached hereto as Exhibit A. The Bridge Lender Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Bridge Lender Plan also constitutes a Prepackaged Plan for any Guarantor Non-Debtors for which the commencement of a chapter 11 case becomes necessary or appropriate to conclude the restructuring provided under the Bridge Lender Plan.

The Proponents submit this Bridge Lender Specific Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in each of the Debtors in connection with (i) the solicitation of acceptances of the Bridge Lender Plan and (ii) the hearing to consider confirmation of the Bridge Lender Plan, currently scheduled for March 7, 2011 at 10:00 a.m. (prevailing Eastern Time) but subject to continuance from time to time. The purpose of this Bridge Lender Specific Disclosure Statement is to describe the Bridge Lender Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to creditors who will have the right to vote on the Bridge Lender Plan so that they can make an informed decision in doing so. Creditors who have the right to vote on the Bridge Lender Plan are advised and encouraged to read in their entirety (i) the Bridge Lender Plan, (ii) this Bridge Lender Specific Disclosure Statement, and (iii) the General Disclosure Statement (which contains, among other things, information concerning the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases).

**THE PROPONENTS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE BRIDGE LENDER PLAN TO VOTE TO ACCEPT THE BRIDGE LENDER PLAN.**

THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT SUMMARIZES CERTAIN KEY INFORMATION CONTAINED IN THE BRIDGE LENDER PLAN AND DOES NOT CONTAIN A DISCUSSION OF OR INCORPORATE ALL TERMS OF THE BRIDGE LENDER PLAN. STATEMENTS IN THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ENTIRE BRIDGE LENDER PLAN AND SCHEDULES ATTACHED TO THE BRIDGE LENDER PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE

---

[2]    Capitalized terms used, but not defined, herein shall have the meanings ascribed to such terms in Article I of the Bridge Lender Plan.

BRIDGE LENDER PLAN DESCRIBED IN THIS BRIDGE LENDER SPECIFIC
DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE BRIDGE
LENDER PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY
COURT DOES CONFIRM THE BRIDGE LENDER PLAN, HOWEVER, IT WILL THEN
BIND ALL CLAIM AND INTEREST HOLDERS.

THE PROPONENTS RESERVE THE RIGHT TO MODIFY OR WITHDRAW THE
BRIDGE LENDER PLAN IN ITS ENTIRETY OR IN PART, FOR ANY REASON. IN
ADDITION, SHOULD THE BRIDGE LENDER PLAN, WITH REGARD TO ANY
INDIVIDUAL DEBTOR, FAIL TO BE ACCEPTED BY THE REQUISITE NUMBER AND
AMOUNT OF CLAIMS AND INTERESTS VOTING, AS REQUIRED TO SATISFY
SECTION 1129 OF THE BANKRUPTCY CODE, THE PROPONENTS RESERVE THE
RIGHT TO RECLASSIFY CLAIMS OR INTERESTS OR OTHERWISE AMEND, MODIFY
OR WITHDRAW THE BRIDGE LENDER PLAN IN ITS ENTIRETY OR IN PART.

THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT HAS BEEN
PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE
AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT
IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-
BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION. THIS BRIDGE
LENDER SPECIFIC DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR
DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR
ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR
ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE
ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS BRIDGE
LENDER SPECIFIC DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN
OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR
CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS BRIDGE LENDER
SPECIFIC DISCLOSURE STATEMENT AND THE BRIDGE LENDER PLAN IN LIGHT OF
THE PURPOSE FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS BRIDGE LENDER SPECIFIC
DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION,
VALUATION, THE ALLOCATION OF VALUE AMONG THE DEBTORS AND THEIR
NON-DEBTOR AFFILIATES, ILLUSTRATIVE CREDITOR RECOVERIES AND OTHER
FORWARD-LOOKING STATEMENTS, ARE BASED, AT LEAST IN PART, ON
ESTIMATES AND ASSUMPTIONS OBTAINED DIRECTLY FROM THE DEBTORS, AS
SET FORTH IN THE GENERAL DISCLOSURE STATEMENT. THERE CAN BE NO
ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL
OUTCOMES. MOREOVER, THE PROPONENTS RESERVE ALL OF THEIR RESPECTIVE
RIGHTS TO ASSERT AT CONFIRMATION THAT THE VALUATION AND
ALLOCATION OF VALUE MAY BE DIFFERENT THAN AS SET FORTH IN THE
GENERAL DISCLOSURE STATEMENT. FORWARD-LOOKING STATEMENTS ARE
PROVIDED IN OR ADOPTED BY THIS BRIDGE LENDER SPECIFIC DISCLOSURE
STATEMENT PURSUANT TO THE SAFE HARBOR PROVIDED UNDER THE PRIVATE
SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN

THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN AND IN THE GENERAL DISCLOSURE STATEMENT.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, BUT NOT LIMITED TO, RISKS ASSOCIATED WITH (I) FUTURE FINANCIAL RESULTS AND LIQUIDITY, INCLUDING THE ABILITY TO FINANCE OPERATIONS IN THE NORMAL COURSE, (II) VARIOUS FACTORS THAT MAY AFFECT THE VALUE OF THE NEW COMMON STOCK TO BE ISSUED UNDER THE BRIDGE LENDER PLAN, (III) THE RELATIONSHIPS WITH AND PAYMENT TERMS PROVIDED BY TRADE CREDITORS, (IV) ADDITIONAL FINANCING REQUIREMENTS POST-RESTRUCTURING, (V) FUTURE DISPOSITIONS AND ACQUISITIONS, (VI) THE EFFECT OF COMPETITIVE PRODUCTS, SERVICES OR PRICING BY COMPETITORS, (VII) CHANGES TO THE COSTS OF COMMODITIES AND RAW MATERIALS, (VIII) THE PROPOSED RESTRUCTURING AND COSTS ASSOCIATED THEREWITH, (IX) THE ABILITY TO OBTAIN RELIEF FROM THE BANKRUPTCY COURT TO FACILITATE THE SMOOTH OPERATION UNDER CHAPTER 11, (X) THE CONFIRMATION AND CONSUMMATION OF THE BRIDGE LENDER PLAN AND (XI) EACH OF THE OTHER RISKS IDENTIFIED IN THE GENERAL DISCLOSURE STATEMENT AND THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE PROPONENTS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS, THE PROPONENTS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE BRIDGE LENDER PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS IN THESE CHAPTER 11 CASES.

THE STATEMENTS CONTAINED IN THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN AND THE DELIVERY OF THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. CREDITORS ENTITLED TO VOTE ON THE BRIDGE LENDER PLAN SHOULD CAREFULLY READ THE GENERAL DISCLOSURE STATEMENT AND THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT IN

THEIR ENTIRETY, INCLUDING THE BRIDGE LENDER PLAN, PRIOR TO VOTING ON THE BRIDGE LENDER PLAN OR ANY OF THE COMPETING PLANS.

### A.    Parties Entitled to Vote on the Bridge Lender Plan

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by a plan, but who will receive no distribution under the plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code.

The following summary chart sets forth the Classes that are entitled to vote on the Bridge Lender Plan:

| Class | Description |
|---|---|
| 1C | Step One Senior Loan Claims |
| 1D | Step Two Senior Loan Claims |
| 1E | Bridge Loan Claims |
| 1F | Senior Noteholder Claims |
| 1G | Other Parent Claims |
| 1H | EGI-TRB LLC Notes Claims |
| 1I | PHONES Notes Claims |
| 1K[3] | Subordinated Securities Claims |
| 50C-111C | Step One Senior Loan Guaranty Claims |
| 50D-111D | Step Two Senior Loan Guaranty Claims |
| 50E-111E | Bridge Loan Guaranty Claims |
| 50F-111F | Other Guarantor Debtor Claims |

Please refer to Article III of the Bridge Lender Plan for a detailed description of the classification of Claims against and Interests in the Debtors under the Bridge Lender Plan. A list

---

[3]    Under the Bridge Lender Plan, any Claims against the Debtors by or on behalf of the ESOP or any present or form participants in the ESOP (in their capacity as such) is treated as a Subordinated Securities Claim against Tribune (Class 1K); provided, however, that, in the event the Bankruptcy Court determines that the ESOP or any present or former participants in the ESOP (in their capacity as such) has an Allowed Claim against a Guarantor Debtor or Non-Guarantor Debtor, such Allowed Claim shall constitute an Other Guarantor Debtor Claim or an Other Non-Guarantor Debtor Claim, as applicable, against each Filed Subsidiary Debtor.

of the Debtors and the number corresponding to each Debtor for classification purposes is included as Appendix A to the Bridge Lender Plan.

Detailed instructions for completing the ballot included in the package containing this Bridge Lender Specific Disclosure Statement are set forth in Article IX of the General Disclosure Statement.

## B.    General Overview

The Bridge Lender Plan creates numerous "Classes" of Claims and Interests. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Bridge Lender Plan, but are treated separately as unclassified Claims.

The Bridge Lender Plan provides specific treatment for each Class of Claims and Interests. Only Holders of Allowed Claims and Allowed Interests are entitled to vote on and receive distributions under the Bridge Lender Plan. For purposes of the Bridge Lender Plan, the term "Allowed" means, with respect to a Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest (i) that is evidenced by a Proof of Claim or Interest and is not listed as disputed, contingent or unliquidated on the pertinent Debtor's schedules or in the Bridge Lender Plan and as to which no objection or request for estimation has been filed on or before any objection deadline set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court, (ii) that is listed on the pertinent Debtor's schedules but is not listed as disputed, contingent or unliquidated, that is not otherwise subject to an objection and as for which no contrary or superseding Proof of Claim or Interest has been filed, (iii) as to which any objection has been settled, waived, withdrawn or overruled by a Final Order, or (iv) that is expressly allowed (a) by a Final Order, (b) pursuant to the terms of the Claims Settlement Order, (c) solely with respect to those Claims that are not prepetition Claims and are not required under applicable bankruptcy law to be allowed pursuant to an order of the Bankruptcy Court, by an agreement between the Holder of such Claim and the pertinent Debtor or Reorganized Debtor pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement that, unless *de minimis* in nature, has been provided to and has not been objected to in writing by the Proponents, or (d) pursuant to the terms of the Bridge Lender Plan regardless of whether an objection is pending or subsequently brought against such Claim or Interest. For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff, subordination and any other defenses.

Unless otherwise provided in the Bridge Lender Plan or the Confirmation Order, the treatment of any Claim or Interest under the Bridge Lender Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

## II.    OVERVIEW OF THE ALTERNATIVE PLAN SETTLEMENT AND TRUST STRUCTURES

The Bridge Lender Plan described herein constitutes a separate plan of reorganization for each Debtor, and, to the extent they commence chapter 11 cases prior to the Confirmation Date, a prepackaged plan of reorganization for the Guarantor Non-Debtors.

The Bridge Lender Plan provides each LBO Lender constituency (i.e., the Step One Lenders, the Step Two Lenders and the Bridge Loan Lenders) with the opportunity to participate in a settlement that would resolve such litigation against it. Other than certain Holders of Bridge Loan Lender Claims, no LBO Lender constituency has yet conveyed its support for these settlements, but the Proponents encourage them to accept what the Proponents believe to be fair resolutions of the LBO-Related Causes of Action. The Bridge Lender Plan provides the opportunity for a consensual resolution of several critical and fact-intensive litigation issues, but confirmation and effectiveness of the Bridge Lender Plan are not conditioned upon such resolution. Thus, the Bridge Lender Plan provides the opportunity for a truly consensual settlement of the LBO-Related Causes of Action against the LBO Lenders, while allowing any or all unresolved Litigation Trust Causes of Action, as well as State Law Avoidance Claims and D&O Claims, to proceed post-Confirmation. The proposed Plan Settlements are described in Section 5.15 of the Bridge Lender Plan.

If one or more Plan Settlements are not accepted by the applicable LBO Lender constituencies and approved by the Bankruptcy Court, the Bridge Lender Plan provides that the associated litigation related to the Leveraged ESOP Transaction will be preserved and, following the Effective Date, will be prosecuted by a multi-trust structure comprised of the Litigation Trust and the Creditors' Trust,[4] while still providing a substantial distribution of the Debtors' total DEV upon the Debtors' emergence from chapter 11.

---

[4]     The causes of action that may be prosecuted by the Trusts include, among other things, litigation regarding (i) the avoidability of the indebtedness incurred by the Debtors in connection with the Leveraged ESOP Transaction, (ii) whether recipients of pre-Effective Date payments in respect of the debt incurred pursuant to the Leveraged ESOP Transaction will be required to disgorge such payments, (iii) whether the shareholders that had their stock redeemed in connection with the Leveraged ESOP Transaction will be required to disgorge such payments, (iv) claims against the Debtors' officers and directors, (v) claims against Sam Zell and his Affiliates, (vi) to the extent not determined prior to the Effective Date, the enforceability of the Bridge Loan Subordination Provision, (vii) to the extent not determined prior to the Effective Date, the enforceability of the Intercompany Claims Subordination Provision and the allocation of value between Tribune, on the one hand, and the Guarantor Subsidiaries, on the other hand, (viii) to the extent not determined prior to the Effective Date, the PHONES Notes Claims Resolution, (ix) to the extent not determined prior to the Effective Date, the Senior Loan Claim Sharing Resolution, (x) to the extent not determined prior to the Effective Date, the appropriate treatment of Intercompany Claims, (xi) the Morgan Stanley Claims, which arise from, among other things, the Debtors' retention of MSCS, a certain swap transaction and the disposition of certain notes, bonds and other indebtedness held by MSCS; (xii) Intercompany Claims Avoidance Actions; (xiii) all claims and Estate causes of action under chapter 5 of the Bankruptcy Code that are not Abandoned Claims (the foregoing, together with any other causes of action that may be prosecuted by the Litigation Trust and the Creditors' Trust, are referred to as the "Trust Causes of Action"). To the extent any Trust Causes of Action are commenced prior to the Effective Date, control over the prosecution of such causes of action will be

(footnote cont'd)

The Proponents believe that the alternative Plan Settlement/Trust structure is preferable to the other reorganization structures proposed in the various competing plans filed in the Debtors' Chapter 11 Cases. First, it is far preferable to the one-sided "settlement" in the Debtor/Committee/Lender Plan, which is proposed by the Debtors (who are admittedly conflicted in bringing the LBO-Related Causes of Action) and various defendants of those claims. It appears that no holders of Pre-LBO Debt have agreed to the so-called settlement in the Debtor/Committee/Lender Plan. Moreover, the Proponents believe the Debtor/Committee/Lender Plan selectively and intentionally ignores legal issues and potential litigation outcomes which would be beneficial to the Bridge Loan Lenders, is otherwise unfair in critical respects and is unconfirmable.

Further, the Plan Settlements provide the opportunity for constituencies to more fairly resolve the LBO-Related Causes of Action against them and avoid extensive post-Confirmation litigation. However, in either case, the Bridge Lender Plan will be able to go effective expeditiously and with fewer conditions than other plans of reorganization that have been proposed in the Debtors' Chapter 11 Cases.

The Plan Settlements are, to varying extents, predicated on the Debtors having total DEV of $6.75 billion (with $5.825 billion, or 86.3%, allocated to the Filed Subsidiary Debtors and the remaining $925 million, or 13.7%, allocated to Tribune).[5] Under the Trust structure, total DEV and allocation of DEV among the Debtors will be determined at Confirmation.

Finally, under either the Plan Settlements or the Trust structure, all Allowed Administrative Expense Claims, Allowed DIP Facility Claims, and Allowed Priority Tax Claims against Tribune will be paid in full; all Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and Interests in the Guarantor Debtors and Non-Guarantor Debtors will be Reinstated; all Intercompany Claims will be Allowed (subject to the resolution thereof outlined in Section II.A.1.d.ii.(7)); and there will be no recovery on account of the Tribune Interests.

---

transferred to the Litigation Trust or the Creditors' Trust, as applicable, on the Effective Date pursuant to the terms of the Bridge Lender Plan.

[5]     This allocation is premised upon, among other things, the Allowance of all Intercompany Claims and the enforcement of the Intercompany Claims Subordination Provision. If the Intercompany Claims Subordination Provision is not enforced, then the Proponents reserve the right to challenge Intercompany Claims at Confirmation. The Proponents further reserve their rights to assert that the DEV should be different than $6.75 billion or that the allocation of the DEV among Tribune and the Subsidiaries should be different than the allocation set forth in the Debtor/Committee/Lender Plan. The Trust structure allows for the determination of total DEV and allocation thereof to be made at Confirmation.

## A.      Proposed Bridge Lender Plan Treatment and Estimated Recoveries[6]

Set forth below, in respect of both the Plan Settlement and Trust structures, are summary charts of the treatment of and the recovery estimates for Holders of Allowed Claims and Interests under the Bridge Lender Plan. Also set forth below is a more detailed explanation of each Bridge Lender Plan structure's terms, elements and conditions.

### 1.      Proposed Plan Settlements

The Bridge Lender Plan provides that the LBO Lender constituencies (Step One Lenders, Step Two Lenders and Bridge Loan Lenders) may accept certain Plan Settlements, thus giving each of them the opportunity to resolve their claims and the LBO-Related Causes of Action against them in connection with Confirmation. A consensual resolution will be achieved if all the Plan Settlements are approved by the LBO Lenders. If no Plan Settlements are approved, the Trust structure would be fully implemented. The Plan Settlements are severable and one or more may be accepted separately by the applicable constituencies and approved by the Bankruptcy Court.

---

[6]      The projections of estimated recoveries are only estimates and may be subject to a number of variables, including, without limitation, the amount of allowed claims in any particular Class. Any estimates of Claims or Interests in this Bridge Lender Specific Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Bridge Lender Specific Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Bridge Lender Plan depends upon the ability of the Proponents to obtain confirmation of the Bridge Lender Plan and meet the conditions to confirmation and effectiveness of the Bridge Lender Plan, as discussed in this Bridge Lender Specific Disclosure Statement. Accordingly, the recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Bridge Lender Specific Disclosure Statement and the Bridge Lender Plan for a complete description of the classification and treatment of Allowed Claims against and Interests under the Bridge Lender Plan.

a)    Summary Chart of Plan Settlement Recoveries

| | Step One Lenders | Step Two Lenders | Senior Noteholders | PHONES Noteholders | Other Parent Claims | Other Guarantor Debtor Claims |
|---|---|---|---|---|---|---|
| **Step One Lender Settlement** | Estimated Recovery Percentage on Effective Date: At least 66.3% (71.0% if the Step One Lender Settlement is also approved)<br><br>Form of Recovery:<br>• $4.389 billion of DEV<br>• 25% of the Trust Interests (to be shared pro rata with the Step Two Lenders if the Step Two Lender Settlement is approved)<br><br>See Section 5.15(a)(i) of the Bridge Lender Plan. | See Step Two Lender Settlement. | Estimated Recovery Percentage on Effective Date: At least 46.8% (58.5% if Step Two Lender Settlement is also approved)<br><br>Form of Recovery:<br>• $600 million in Cash<br>• 50% of the Trust Interests<br><br>See Section 5.15(a)(ii)(C) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 5.3% (9.9% if the Step Two Lender Settlement is also approved)<br><br>Form of Recovery:<br>• $40 million in Cash<br>• 20% of the Trust Interests<br><br>See Section 5.15(a)(ii)(D) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 48.2% (58.8% if the Step Two Lender Settlement is also approved)<br><br>Form of Recovery:<br>• $55 million in Cash<br>• 5% of the Trust Interests<br><br>See Section 5.15(a)(ii)(A) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: 100%<br><br>Form of Recovery:<br>Paid in full in Cash (approximately $85 million).<br><br>See Section 5.15(a)(ii)(B) of the Bridge Lender Plan. |
| **Step Two Lender Settlement** | Estimated Recovery Percentage on Effective Date: At least 4.7% (71.0% if the Step One Lender Settlement is also approved)<br><br>Form of Recovery:<br>$309 million of DEV<br><br>See Section 5.15(b)(ii) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 45.1%<br><br>Form of Recovery:<br>• $950 million of DEV<br>• 25% of the Trust Interests (if the Step One Lender Settlement is also approved and in such case to be shared pro rata with the Step One Lenders)<br><br>See Section 5.15(b)(i) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 11.7% (58.5% if Step One Lender Settlement is also approved)<br><br>Form of Recovery:<br>$150 million in Cash<br><br>See Section 5.15(b)(ii) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 4.6% (9.9% if the Step One Lender Settlement is also approved)<br><br>Form of Recovery:<br>$35 million in Cash<br><br>See Section 5.15(b)(ii) of the Bridge Lender Plan. | Estimated Recovery Percentage on Effective Date: At least 10.5% (58.8% if the Step One Lender Settlement is also approved)<br><br>Form of Recovery:<br>$12 million in Cash<br><br>See Section 5.15(b)(ii) of the Bridge Lender Plan. | No additional recovery. |
| **Bridge Loan Lender Settlement** | • If the Step One Lender Settlement is approved: the Bridge Loan Lenders will receive an estimated recovery percentage on the Effective Date of 7.7% in the form of $125 million in Cash.<br><br>• If the Step One Lender Settlement is not approved and the Bridge Loan Lender Settlement is approved on a standalone basis: the Bridge Loan Lenders will receive an estimated recovery percentage on the Effective Date of at least 7.7% in the form of $125 million in Cash, and 5% of the Creditors' Trust Interests.<br><br>• In either case, the Original Bridge Loan Lenders will forgo Cash and Trust recoveries in exchange for releases [7] | | | | | |

---

[7]    This percentage recovery estimate does not take into account Claims held by Original Bridge Loan Lenders. The percentage recovery for the Bridge Loan Lenders increases to the extent cash distributions are not made in respect of the Claims of the Original Bridge Lenders.

This settlement chart indicates the Effective Date recoveries only if the applicable Plan Settlements described therein are approved. In the event any or all Plan Settlements are not accepted by the applicable Creditor classes and approved by the Bankruptcy Court, the Trust structure will take effect with respect to such Creditor classes, who will receive Initial Distributions on the Effective Date consistent with the Noteholder Plan (as defined in the Bridge Lender Responsive Statement), adjusted based on the allocation of value as between Tribune and the Guarantor Subsidiaries determined by the Bankruptcy Court at Confirmation.

b)      Description of Plan Settlements

The Plan Settlements are set forth in detail in Section 5.15 of the Bridge Lender Plan and reference is made thereto for the full terms and conditions thereof. The Bridge Lender Plan includes proposed settlements between and among the Debtors' estates and the Step One Lenders, the Step Two Lenders and the Bridge Loan Lenders regarding LBO-Related Causes of Action against them (in each case, subject to the applicable LBO Lender Class voting to accept the Bridge Lender Plan).

i)      Step One Lender Settlement

The Step One Lender Settlement provides the Step One Lenders with a recovery of (i) $4.389 billion of DEV and (ii) 25% of the Trust Interests (to be shared Pro Rata with the Step Two Lenders if the Step Two Lender Settlement is approved). The Step One Lender Settlement also provides for the Senior Noteholders to recover $600 million in Cash and 50% of the Trust Interests, for the PHONES Noteholders to receive $40 million in Cash and 20% of the Trust Interests, and for distributions to other creditor parties as described more fully in Section 5.15(a) of the Bridge Lender Plan. If the Step One Lender Settlement is approved and the Step Two Lender Settlement is not approved, the Step Two Lenders will receive the recovery as provided in the Trust structure.

ii)     Step Two Lender Settlement

The Step Two Lender Settlement provides the Step Two Lenders with a recovery of (i) $950 million of DEV and (ii) if the Step One Lender Settlement is approved, 25% of the Trust Interests (to be shared Pro Rata with the Step One Lenders but only if the Step One Lender Settlement is approved). In addition to any recoveries provided under the Step One Lender Settlement (if accepted and approved) or the Trust structure (if the Step One Lender Settlement is not accepted and approved), the Step Two Lender Settlement provides for a distribution of $309 million to the Step One Lenders, $150 million to the Senior Noteholders, $35 million to the PHONES Noteholders, and $12 million to the Holders of Other Parent Claims. If the Step Two Lender Settlement is approved and the Step One Lender Settlement is not approved, the Step One Lenders will receive the recovery as provided in the Trust structure. No additional recovery is provided to the Bridge Loan Lenders if the Step Two Lender Settlement is approved.

iii)    Bridge Loan Lender Settlement

If the Step One Lender Settlement is accepted and approved, the Bridge Lender Plan provides a recovery for the Bridge Loan Lenders (other than the Original Bridge Loan Lenders) of $125 million in Cash. If the Bridge Loan Lender Settlement is approved on a standalone basis (i.e. without approval of the Step One Lender Settlement), the Bridge Lender Plan provides for (i) a recovery for the Bridge Loan Lenders (other than the Original Bridge Loan Lenders) of $125 million and 5% of the Creditors' Trust Interests and (ii) a recovery for all other creditor constituencies as provided in the Trust structure. In either case, the Original Bridge Loan Lenders will receive releases from the Estates and the other Bridge Loan Lenders in lieu of such recoveries.

c)    Releases Pursuant to Plan Settlements

i)    Releases by Debtors and Debtors' Estates

On the Effective Date and effective simultaneously with the effectiveness of the Bridge Lender Plan, the Reorganized Debtors on their own behalf and as representatives of their respective Estates, unconditionally grant and cause the Subsidiary Non-Debtors to unconditionally grant the following releases:

- If the Step One Lender Settlement is accepted and approved by the Bankruptcy Court, the Step One Lender Parties (but only in their capacity as Step One Lender Parties) shall be released from all LBO-Related Causes of Action (including disgorgement claims); provided that such release shall not include any LBO-Related Causes of Action (1) with respect to any Step Two Senior Loan (unless the Step Two Lender Settlement is accepted and approved), (2) arising from any Person's conduct as an agent, arranger or advisor with respect to the Leveraged ESOP Transactions or (3) arising from any payment made in respect of a Step One Senior Loan to a party who is not a current Step One Lender;

- If the Step Two Lender Settlement is accepted and approved by the Bankruptcy Court, the Step Two Lender Parties (but only in their capacity as Step Two Lender Parties) shall be released from all LBO-Related Causes of Action (including disgorgement claims); provided that such release shall not include any LBO-Related Causes of Action (1) with respect to any Step One Senior Loan (unless the Step One Lender Settlement is accepted and approved), (2) arising from any Person's conduct as an agent, arranger or advisor with respect to the Leveraged ESOP Transactions or (3) arising from any payment made in respect of a Step Two Senior Loan to a party who is not a current Step Two Lender; and

- If the Bridge Loan Lender Settlement is accepted and approved by the Bankruptcy Court, the Bridge Loan Lender Parties (but only in their capacity as Bridge Loan Lender Parties and not the Original Bridge Loan Lenders) shall be released from all LBO-Related Causes of Action (including disgorgement claims); provided that such release shall not include any LBO-Related Causes of Action (1) with respect to any Step One Senior Loan or Step Two Senior Loan

(unless, as the case may be, the Step One Lender Settlement and the Step Two Lender Settlement are accepted and approved), (2) arising from any Person's conduct as an arranger or advisor with respect to the Leveraged ESOP Transactions or (3) arising from any payment made in respect of a Bridge Loan Lender Claim to a party who is not a current Bridge Loan Lender.

ii)      Original Bridge Loan Lenders Release

If the Bridge Loan Lender Settlement is accepted and approved by the Bankruptcy Court, the Reorganized Debtors, their respective Estates, the Subsidiary Non-Debtors and all Bridge Loan Lenders other than the Original Bridge Loan Lenders shall be deemed on the Effective Date to have granted the Original Bridge Loan Lenders Release and the Original Bridge Loan Lenders shall be unconditionally relieved from any liability to such releasing parties from all LBO-Related Causes of Action  (including disgorgement claims) related to, or arising in connection with, the Bridge Loan Agreement and the sale or disposition of the Bridge Loans and rights and obligations thereunder.

d)      The Reasonableness of the Plan Settlements

The Proponents believe that the Plan Settlements are fair and reasonable and in the best interests of the Estates.  If accepted, the Plan Settlements will achieve a truly fair and consensual settlement, avoiding protracted post-Confirmation litigation and providing recoveries for each constituency that are reasonable and appropriate in light of, among other things, the Examiner's Report and his assessment of the range of potential recoveries set forth therein.

i)      Examiner's Report

As discussed in Articles VII.B and VII.C of the General Disclosure Statement, the Examiner was appointed in these Chapter 11 Cases to assess the viability of the various LBO-Related Causes of Action and issued a report which analyzed the potential resolution of various legal and factual issues embedded therein.  In his report, the Examiner also assigned a range of recoveries for various constituencies which relate to the potential outcomes of the LBO-Related Causes of Action.

The range of recoveries for each constituency in the Examiner's Report is as follows:

| Constituency | Range of Recoveries[8] |
|---|---|
| Senior Loan Claims | $4.671 billion (case 6) – $7.013 billion (case 5) |
| Bridge Loan Lender Claims | $0 (cases 7 & 8) – $278.61 million (case 6) |
| Senior Noteholder Claims | $95.1 million (case 2) – $1.306 billion (case 6) |
| PHONES Notes Claims | $0 (cases 2-5, 7) – $772.36 million (case 6) |
| EGI-TRB LLC Notes Claims | $0 (all cases but 6) – $59.87 million (case 6) |
| General Unsecured Claims | $10.29 million (case 2) – $202.33 million (case 6) |

While all parties certainly may take issue with various findings or conclusions in the Examiner's Report, at the very least, it is clear from the Examiner's Report that there is a wide range of potential outcomes of the LBO-Related Causes of Action. These include complete failure of the claims seeking to avoid both step one and step two of the Leveraged ESOP Transaction ("Step One" and "Step Two", respectively), resulting in the Senior Loan Claims and the Bridge Loan Claims being allowed in full and a complete victory for the plaintiffs that would result in both steps being found to be fraudulent transfers with respect to both Tribune and the Guarantor Subsidiaries. There are numerous other potential permutations and variables that could affect the range that the Examiner did not explore.

            ii)      Bases for Plan Settlement Treatments

            (1)      Bridge Loan Lenders

The Bridge Lender Plan provides that, if the Bridge Loan Lender Settlement and the Step One Lender Settlement are approved, the Holders of Bridge Loan Lender Claims (other than the Original Bridge Loan Lenders) will receive $125 million, which is approximately 7.7%[9] of their Claims. If the Bridge Loan Lender Settlement is approved on a standalone basis (i.e., without approval of the Step One Lender Settlement), the Holders of Bridge Loan Lender Claims (other than the Original Bridge Loan Lenders) will receive $125 million, which is an estimated 7.7% of their Claims, and 5% of Creditors' Trust Interests.

---

[8]      These estimated recoveries are based on the Debtors' previous total enterprise value for the Debtors of $6.1 billion. Since the Examiner's Report was issued, the Debtors have increased the total enterprise value for the Debtors to $6.75 billion. All such additional value is allocated by the Debtors to the Guarantor Subsidiaries. If accepted, this only impacts the range of recovery for the Senior Loan Claims.

[9]      See note 6.

The proposed Bridge Loan Lender recovery is fair for a number of reasons. First, the Bridge Loan Lenders are uniquely situated in that they are the only LBO Lender defendants to LBO-Related Causes of Action for whom recoveries in a scenario where Step One is avoided (up to approximately $700 million) are likely to exceed amounts that would be recovered if the Leveraged ESOP Transaction is not avoided as a fraudulent conveyance ($77 million to approximately $144 million, depending on, among other things, resolution of Intercompany Claims). This recovery results from the avoidance of the significant Step One Senior Loan Guaranty Claims and preservation of Claims of the LBO Lenders generally for the value provided to the Debtors at Step Two. This possibility was specifically recognized in case 6 of the Examiner's recovery scenarios.

Moreover, given their purported subordination at the subsidiary level and the magnitude of Intercompany Claims payable by Guarantor Subsidiaries, the Bridge Loan Lenders have significant incentive most others do not have to litigate over the valuation of each Guarantor Debtor as well as the validity of Intercompany Claims. In constructing his recovery scenarios, the Examiner presumed an allocation of value, proposed by the Debtors, among Tribune, on the one hand, and the Guarantor Debtors, on the other hand, predicated on, among other things, the treatment of Intercompany Claims. As set forth in subparagraph (7) below, the Proponents believe that the Debtors, by strategically "resolving" Intercompany Claims in favor of the Guarantor Debtors, have intentionally redirected value from Tribune, where the Bridge Loan Claims are indisputably *pari passu*, to the Guarantor Debtors, where the Senior Lenders claim first recovery on almost all of the Debtors' operating assets. The Proponents believe that the issues relating to these disputes are complex, have essentially been swept under the rug by the Debtors during these Chapter 11 Cases, and must be resolved or otherwise litigated to conclusion.

Notably, the Debtor/Committee/Lender Plan conveniently ignores the Bridge Loan Lenders' upside range of recoveries. In fact, the Proponents believe the "base case" scenarios, (i) if the LBO Lenders' Claims are not avoided or (ii) in the event of a full avoidance of both Step One and Step Two are, in each case, substantially higher than the recoveries outlined in the Examiner's Report, and perhaps as high as approximately $700 million.

The Proponents believe the recovery provided in the Plan Settlements is fair and appropriately reflects a balance among the Bridge Loan Lender recoveries in the case of avoidance of Step Two (*de minimis* recoveries); no fraudulent conveyance ($77 million to approximately $144 million); and avoidance of Step One of the Leveraged ESOP Transaction scenarios (up to approximately $700 million). Furthermore, the Bridge Loan Lender Settlement removes a significant potential litigation burden and complexity going forward with respect to any matters pursued by the litigation trust (which are unique to the Bridge Loan Lenders), including (i) challenging of the Bridge Loan Subordination Provision; (ii) seeking to enforce the Intercompany Claims Subordination Provision and/or litigating billions of dollars of Intercompany Claims and (iii) potentially bringing causes of action directly against Original Bridge Loan Lenders. In sum, the Bridge Loan Lenders are effectively settling at the low end of their range of outcomes and for what amounts to approximately 1.85% of the DEV.

Finally, if the Bridge Loan Lender Settlement is approved, the Original Bridge Loan Lenders will receive releases from the Estates and the other Bridge Loan Lenders in lieu of

recoveries under the Bridge Lender Plan. The Bridge Loan Lenders (other than the Original Bridge Loan Lenders) have meaningful potential causes of action against the Original Bridge Loan Lenders in connection with, among other things, the arrangement of Step Two and the syndication of debt under the Bridge Loan Agreement, as well as their related misconduct and nondisclosures. The releases to be granted to the Original Bridge Loan Lenders pursuant to the Bridge Loan Lender Settlement are significant relative to the distribution the Original Bridge Loan Lenders are being required to forgo. Moreover, it should be noted that the Debtors' original and now defunct plan of reorganization, which had the support of JPMorgan Chase Bank, N.A. and other Original Bridge Loan Lenders, provided the Original Bridge Loan Lenders with an estimated 0.44% recovery in exchange for releases.

(2)     Step One Lenders

If the Step One Lender Settlement is approved, the Bridge Lender Plan provides the Holders of Step One Lender Claims with $4.389 billion, which is approximately 66.3% of their Claims. The Step One Lender Settlement, if approved, also provides the Step One Lenders with 25% of the Trust Interests (to be shared on a Pro Rata basis with the Step Two Lenders if the Step Two Lender Settlement is approved). Also, if the Step Two Lender Settlement is approved, the Bridge Lender Plan provides the Holders of Step One Lender Claims with an additional $309 million in Cash, which is approximately 4.7% of their total Claims.

The Proponents believe that these recoveries are fair and reasonable given, among other things, the likelihoods ascribed by the Examiner to certain potential outcomes of the LBO-Related Causes of Action. In particular, the Examiner concluded that it is somewhat unlikely (although an exceedingly close call) that a court would hold that, if a court were to collapse Step One and Step Two or treat Step Two as a liability for solvency purposes at Step One, Tribune and the Guarantor Subsidiaries were rendered insolvent.

(3)     Step Two Lenders

If the Step Two Lender Settlement is approved, the Step Two Lenders will receive $950 million, which is approximately 45.1% of their Claims. The Step Two Lenders will also receive 25% of the Trust Interests to be shared on a Pro Rata basis with the Step One Lenders if the Step One Lender Settlement is approved.

The Proponents believe that these recoveries are extremely fair given, among other things, the likelihoods ascribed by the Examiner to certain potential outcomes of the LBO-Related Causes of Action. In particular, the Examiner concluded that (1) it is somewhat likely that a court would hold that Step Two was an intentional fraudulent conveyance, (2) it is highly likely that a court would hold that Tribune was rendered insolvent and left without adequate capital after giving effect to Step Two and (3) it is reasonably likely that a court would hold that the Guarantor Subsidiaries were rendered insolvent and left without adequate capital after giving effect to Step Two.

(4)     Senior Noteholders

If the Step One Lender Settlement is approved, the Bridge Lender Plan provides the Senior Noteholders with (i) a total of $600 million in Cash, which is an estimated 46.8% of their

total Claims and (ii) 50% of the Trust Interests, which allows for substantial potential additional recoveries. Additionally, if the Step Two Lender Settlement is approved, the Bridge Lender Plan provides the Senior Noteholders with $150 million in Cash, which is approximately 11.7% of their total Claims.

The Proponents believe that these are very substantial recoveries and are eminently fair given, among other things, the likelihoods ascribed by the Examiner to certain potential outcomes of the LBO-Related Causes of Action. In particular, the Examiner concluded that: (1) it is reasonably likely that a court would hold that Step One was not an fraudulent conveyance (intentional or constructive); (2) it is somewhat unlikely that a court would collapse Step One and Step Two in evaluating the LBO-Related Causes of Action; and (3) it is reasonably unlikely that a court would hold that Step One left Tribune and the Guarantor Subsidiaries without adequate capital, even taking Step Two into account.

(5)     PHONES Noteholders

If the Step One Lender Settlement is approved, the Bridge Lender Plan provides the PHONES Noteholders with (i) $40 million in Cash, which is approximately 5.3% of their Claims, and (ii) 20% of the Trust Interests. Additionally, if the Step Two Lender Settlement is approved, the Bridge Lender Plan provides the PHONES Noteholders with $35 million in Cash, which is approximately 4.6% of their Claims.

Considering the Examiner's conclusions discussed above, the fact that the PHONES Noteholders would only receive a recovery in a full fraudulent conveyance scenario due to the contractual subordination of the PHONES Noteholders, the Proponents believe that the recovery offered to the PHONES Noteholders under the Step One Lender Settlement is fair and reasonable.

(6)     General Unsecured Claims

If the Step One Lender Settlement is approved, the Bridge Lender Plan provides the Holders of Other Parent Claims with (i) $55 million in Cash, which is approximately 48.2% of their Claims, and (ii) 5% of the Trust Interests. Additionally, if the Step Two Lender Settlement is approved, the Bridge Lender Plan provides the Holders of Other Parent Claims with $12 million in Cash, which is approximately 10.5% of their Claims. If the Step One Lender Settlement is approved, the Bridge Lender Plan provides the Holders of Other Guarantor Debtor Claims with payment in full in Cash. The Proponents believe these recoveries are entirely fair in light of, among other things, the priority of these claims and the conclusions reached in the Examiner's Report.

(7)     Intercompany Claims

It appears that, as of the Petition Date, hundreds of thousands of claims existed among the Debtors and their affiliates totalling approximately $84 billion. The allocation of DEV between Tribune, on the one hand, and the Guarantor Debtors, on the other hand, is directly related to the Debtors' so-called "resolution" of these Intercompany Claims. This resolution has not been fully disclosed by the Debtors and the Proponents intend to take extensive discovery in this regard. However, the Proponents believe that the resolution and associated allocation of

DEV was strategic, and specifically designed to favor the Guarantor Debtors so as to enhance the recovery of the Senior Lenders in these Chapter 11 Cases.

At this juncture, the Proponents believe an appropriate resolution would be to simply Allow all Intercompany Claims. The Intercompany Claims Subordination Provision in the Bridge Loan Guaranty Agreement states that "any indebtedness of [Tribune] now or hereafter held by any Guarantor is hereby subordinated in right of payment to the prior payment in full in cash of the Guaranteed Obligations . . ." The Proponents believe that this provision indisputably requires that no payments may be made by Tribune to any of the Guarantor Subsidiaries on account of Intercompany Claims until the Bridge Loan Claims are repaid in full in Cash. Thus, if all Intercompany Claims are Allowed, the Guarantor Debtors are indebted to Tribune on account of aggregate Intercompany Claims in excess of $1.4 billion. Further, Guarantor Debtors are indebted to Non-Guarantor Debtors, including Tribune Finance Service Center LLC, on account of aggregate Intercompany Claims in excess of $17 billion. Once the foregoing is taken into account (and subject to further information and analysis obtained in connection with discovery), without remitting value from Tribune to the Guarantor Debtors on account of Intercompany Claims owed by Tribune (because it is prohibited by the Intercompany Claims Subordination Provision), the value distributed by Tribune to Allowed Claims, other than Intercompany Claims, increases from $564 million to $1.041 billion. This would result in a materially higher recovery for the Holders of Bridge Loan Lender Claims because such claims are *pari passu* at Tribune. In such case, the baseline recovery for the Bridge Loan Lenders (i.e., if the Leveraged ESOP Transaction is not avoided) would be approximately $144 million. Notably, the Plan Settlements require only $925 million of DEV to be attributed to Tribune.

**If the Intercompany Claims Subordination Provision is not enforced, then the Proponents reserve the right to challenge Intercompany Claims at Confirmation.**

2.    Description of Trust Structure[10]

If one or more Plan Settlements are not accepted by the applicable creditor constituencies and approved by the Bankruptcy Court, the Trust structure will take effect with respect to such constituencies, who will receive Initial Distributions on the Effective Date consistent with the Noteholder Plan, adjusted based on the allocation of value as between Tribune and the Guarantor Subsidiaries determined by the Bankruptcy Court at Confirmation.

Under the Bridge Lender Plan, three distinct trusts will be created on the Effective Date: (i) a Litigation Trust; (ii) a Distribution Trust; and (iii) a Creditors' Trust. The Trusts are structured such that the Litigation Trust is a sub-trust of the Distribution Trust, while the Creditors' Trust is an unrelated entity.

---

[10]    In all respects, the Trust structure is subject to acceptance and approval by the Bankruptcy Court of one or more Plan Settlements.

The Litigation Trust will be created in order to prosecute the Litigation Trust Causes of Action, which will be transferred from the Debtors' Estates to the Litigation Trust on the Effective Date of the Bridge Lender Plan, along with all of the rights of the Debtors and the Creditors' Committee with respect to the Litigation Trust Causes of Action necessary to protect, conserve, and liquidate all Litigation Trust Causes of Action as quickly as reasonably practicable, including, without limitation, control over (including the right to waive) all attorney/client privileges, work product privileges, accountant/client privileges and any other evidentiary privileges relating to the Litigation Trust Causes of Action that, prior to the Effective Date, belonged to the Debtors pursuant to applicable federal and state law.

When Litigation Trust Causes of Action are resolved by the Litigation Trust pursuant to either a settlement or litigation, any net recoveries obtained by the Litigation Trust in connection therewith will be transferred to the Distribution Trust for distribution to Holders of Distribution Trust Interests in accordance with the terms of the Distribution Trust Agreement and the Litigation Distribution Orders. The distribution of proceeds to Holders of Distribution Trust Interests from the Litigation Trust Causes of Action and other value held in the Distribution Trust will be determined by the Bankruptcy Court or such other court of competent jurisdiction based on the outcome of the Litigation Trust Causes of Action. Accordingly, the Distribution Trust's role will be, among other things, to (i) hold all DEV remaining on the Effective Date of the Bridge Lender Plan after Initial Distributions and distributions pursuant to any applicable Plan Settlements have been made, and until a resolution of the Litigation Trust Causes of Action is reached, (ii) receive the proceeds of the Litigation Trust Causes of Action and (iii) make distributions to Holders of Distribution Trust Interests in accordance with the terms of the Litigation Distribution Orders (which orders will provide for the allocation of distributions among the Holders of Distribution Trust Interests based on, among other things, the resolution (by settlement or litigation) of the applicable Litigation Trust Causes of Action).

The Creditors' Trust will be created on the Effective Date and have dual functions. First, it will function as a litigation trust with respect to the State Law Avoidance Claims and certain other claims, which consist of claims and causes of action fundamentally different and distinct from those that will be prosecuted by the Litigation Trust. Second, and unlike the Litigation Trust, the Creditors' Trust will directly make distributions of the proceeds recovered in connection with the State Law Avoidance Claims and D&O Claims to Holders of Creditors' Trust Interests. The Creditors' Trust Interests and the Creditors' Trust Distribution Orders will govern the relative rights and priorities of distributions made on account of the State Law Avoidance Claims. Each Holder of Claims against Tribune will be deemed to have transferred, on the Effective Date, any right it may possess to bring the State Law Avoidance Claims and D&O Claims to the Creditors' Trust in exchange for Creditors' Trust Interests unless such Holder has elected, on the applicable Ballot, not make such contribution (the "Non-Contribution Election"). State Law Avoidance Claims include, but are not limited to: (i) claims; (ii) causes of action; (iii) avoidance powers or rights; and (iv) legal or equitable remedies against the shareholders in Tribune whose stock was redeemed in connection with the leveraged buyout.

Each Trust will be governed by its own three-member trust advisory board and managed by a trustee. The initial funding for the Distribution Trust will be obtained through a contribution from the Debtors of $40 million in Cash. The Distribution Trust will use a portion of such funding to provide the initial funding for the Litigation Trust. Any portion of the

Distribution Trust Initial Funding that has not been utilized prior to the wind-up of the Distribution Trust will revert back to the Reorganized Debtors and will, under no circumstances, be distributed to the Holders of Distribution Trust Interests or become part of the Distribution Trust Reserve. The initial funding for the Creditors' Trust will be obtained through interest free loans from the Distribution Trust. Each of the Trusts will have the authority to use proceeds from its assets and obtain from other sources additional financing, if necessary, in each case as set forth in the applicable trust agreement.

a)   Initial Distributions under the Trust Structure

Except for certain initial Cash distributions, subject to approval of any Plan Settlements, Initial Distributions to all Classes of Impaired Claims entitled to an Initial Distribution will be comprised of a "strip" of consideration consisting of a Pro Rata share of: (i) New Common Stock and/or New Warrants; (ii) the New Senior Secured Term Loan; and (iii) Cash.

After Initial Distributions are made, the remaining DEV will be placed into the Distribution Trust and reserved for distribution to Creditors pending the determination of the Litigation Trust Causes of Action and, if not determined in connection with Confirmation, the Senior Loan Claim Sharing Resolution and the PHONES Notes Claims Resolution. In addition to providing for a substantial portion of the Debtors' DEV to be distributed to Creditors on the Effective Date, or as soon thereafter as practicable, subject to any Plan Settlements, the Trust structure also avoids any possibility that Initial Distributions will be subject to disgorgement based on the outcome of the Litigation Trust Causes of Action or, to the extent not determined prior to the Effective Date, the Senior Loan Claim Sharing Resolution, since Initial Distributions are generally based upon the minimum distribution each Class would be entitled to receive regardless of the outcome of the Trust Causes of Action and the allocation of the DEV among Tribune and the Subsidiaries as set forth in the Debtor/Committee/Lender Plan.[11]

To calculate the Initial Distributions and potential future distributions under the Trust structure, the Bridge Lender Plan provides that the Bankruptcy Court will determine the total DEV for the Tribune Entities in connection with the Confirmation Hearing. The Bankruptcy Court will also determine, in connection with the Confirmation Hearing, the allocation of the DEV among Tribune and the Subsidiaries (on a consolidated basis), which may include allocations based on the value of Intercompany Claims. The Proponents believe that the DEV and the ultimate allocation of DEV determined by the Bankruptcy Court may differ from the total DEV contained in the Debtor/Committee/Lender Plan and the allocation of value contained in the Debtor/Committee/Lender Plan and accordingly, Initial Distributions shall be based on

---

[11]   Notwithstanding anything contained in the Bridge Lender Plan, subject to any Plan Settlements, under the Trust structure all current and former Holders of Loan Claims and all Loan Agents and advisors that received payments in respect of such Claims or in connection with the incurrence of obligations of the Debtors prior to the Effective Date (whether on account of principal, interest, fees, expenses or otherwise) may be required to disgorge such amounts based on the final resolution of the Litigation Trust Causes of Action.

such DEV and the allocation of such DEV among Tribune and the Subsidiaries (on a consolidated basis) as is determined by the Bankruptcy Court in connection with Confirmation.[12]

Under the Bridge Lender Plan, subject to any Plan Settlement approved by the Bankruptcy Court, the following Holders of Impaired Claims will receive Initial Distributions: (i) Step One Lenders; (ii) Senior Noteholders; (iii) Holders of Other Parent Claims; (iv) Holders of Other Guarantor Debtor Claims; and (v) Holders of Other Non-Guarantor Debtor Claims. Additionally, Step Two Lenders may receive Initial Distributions, but only in the event that the Bankruptcy Court determines that the sharing provisions of the Senior Loan Agreement are enforceable regardless of whether Step Two Senior Loan Claims or Step Two Senior Loan Guaranty Claims are avoided. Furthermore, the Bridge Loan Lenders may receive Initial Distributions, but only in the event that the Bankruptcy Court determines that the Bridge Loan Subordination Provision is unenforceable. Certain Creditors, including Bridge Loan Lenders, PHONES Noteholders, EGI-TRB LLC Noteholders and Holders of Subordinated Securities Claims will not receive an Initial Distribution under the Bridge Lender Plan.

For the purpose of calculating the Initial Distributions at Tribune, subject to any Plan Settlement approved by the Bankruptcy Court, the Parent Consideration will, in the first instance, be divided Pro Rata among all Impaired Classes of Claims at Tribune. For the avoidance of doubt, all such Classes (i.e., Step One Senior Loan Claims, Step Two Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims, Other Parent Claims and Subordinated Securities Claims) will be treated *pari passu* for purposes of allocating the Initial Distributions, without regard to any subordination provisions in the applicable credit documents or under applicable law or any potential claims for, among other things, avoidance or subordination.

Each Holder of an Allowed Other Non-Guarantor Debtor Claim will receive under the Trust structure payment in full in Cash on account of its Allowed Claim at the same time as all other Initial Distributions.

After the Initial Distributions on account of Senior Noteholder Claims (including a Pro Rata share of the distributions that would be allocable in respect of the PHONES Notes Claims and EGI-TRB LLC Notes Claims but for the subordination provisions contained in the applicable credit documents), Other Parent Claims, Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims are accounted for, and subject to any Plan Settlement approved by the Bankruptcy Court, and in order to ensure that DEV sufficient to satisfy all remaining Pre-LBO Debt Claims in full will be available for distribution in the event the LBO Debt is avoided, all remaining DEV will be deemed consolidated into one pool of DEV (the "Remaining Consideration Pool"). From the Remaining Consideration Pool, an amount of DEV sufficient to

---

[12]    The Proponents reserve their rights, in connection with Initial Distributions under the Trust structure, to assert that the DEV should be different than $6.75 billion or that the allocation of the DEV among Tribune and the Subsidiaries should be different than the allocation set forth in the Debtor/Committee/Lender Plan.    The determination of total DEV and allocation thereof will be addressed at Confirmation.

compensate all Pre-LBO Debt Claims (i.e., all Senior Noteholder Claims, PHONES Notes Claims (including PHONES Notes Exchange Claims that are classified as PHONES Notes Claims), Other Parent Claims, Other Guarantor Debtor Claims and Subordinated Securities Claims arising from Pre-LBO Debt, if any, in full, after giving effect to the Initial Distributions discussed above, will be placed into the Distribution Trust Reserve (such amount referred to herein as the "Non-LBO Debt Reserve DEV"). After reservation of the Non-LBO Debt Reserve DEV, all remaining DEV in the Remaining Consideration Pool (the "LBO Debt Reserve DEV") will be allocated, on a Pro Rata basis, and without regard to the subordination provisions in the applicable credit documents or any potential claims for, among others, avoidance or subordination, among the Step One Lender Claims, the Step Two Lender Claims and the Bridge Loan Lender Claims.

Holders of Step One Lender Claims will receive under the Trust structure an Initial Distribution equal to their Pro Rata share of the LBO Debt Reserve DEV (i.e., their own worst-case recovery if all LBO-Related Causes of Action were successful). Additionally, in the event that the Senior Loan Claim Sharing Resolution enforces the sharing provisions of the Senior Loan Agreement, Holders of Step Two Lender Claims will also receive under the Trust structure their Pro Rata share of the LBO Debt Reserve DEV. The Pro Rata share of the LBO Debt Reserve DEV in respect of (i) the Bridge Loan Lender Claims and (ii) if the sharing provisions of the Senior Loan Agreement are found not to apply (or the Court defers consideration of the Senior Loan Claim Sharing Resolution), the Step Two Lender Claims, will be transferred to the Distribution Trust Reserve, in each case for ultimate distribution in accordance with the Litigation Distribution Orders.

For the avoidance of doubt, Initial Distributions to LBO Lenders, to the extent applicable, will be on account of their Senior Loan Claims against both Tribune and the Guarantor Debtors, with the ultimate allocation of such distribution among Tribune and the Guarantor Debtors determined in connection with the Litigation Distribution Orders and will not be subject to disgorgement.

b)    Distributions of Distribution Trust Interests and Creditors' Trust Interests

In addition to the Initial Distributions set forth above, the Trust structure provides that most Creditors will also receive interests in the Distribution Trust and, in some circumstances, interests in the Creditors' Trust. Each type of Trust Interest provides the Holder thereof with separate and distinct rights, and future distributions (if any) to all Creditors will be based upon their Trust Interests. Whether a Class receives distributions on account of its Trust Interests will depend, among other things, on the final resolution of the Trust Causes of Action, as well as upon the Senior Loan Claim Sharing Resolution.

The Distribution Trust Interests shall, subject to the approval of any Plan Settlements, determine the future distributions of the Distribution Trust Reserve, as well as the proceeds of the Litigation Trust Causes of Action, in accordance with the Litigation Distribution Orders, the Senior Loan Claim Sharing Resolution and the PHONES Notes Claim Resolution. All Classes of Impaired Claims shall, subject to the approval of any Plan Settlements, be eligible to receive Distribution Trust Interests; provided, however, that, to the extent applicable, subject to the

Claims Purchase Price Caps, Holders of Other Parent Claims and Other Guarantor Debtor Claims that elect the Other Parent Claims Put Option or Other Guarantor Debtor Claims Put Option, respectively (and if applicable), shall not be entitled to receive Distribution Trust Interests as such Distribution Trust Interests will, instead, be distributed to the Claims Purchaser.

Under the Bridge Lender Plan, Aurelius or its designee has the option to act as Claims Purchaser. If Aurelius does not act as Claims Purchaser, or designate a party to act as Claims Purchaser, the Put Option will not be available.

Similarly, subject to the approval of any Plan Settlements, the Creditors' Trust Interests will determine the future distributions of the proceeds of the State Law Avoidance Claims and claims and causes of action against the Debtors' officers and directors (the "D&O Claims"), in accordance with the Creditors' Trust Distribution Orders, the Senior Loan Claim Sharing Resolution and the PHONES Notes Claim Resolution. Holders of Step One Senior Loan Claims, Step Two Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims, Other Parent Claims and Subordinated Securities Claims that do not make the Non-Contribution Election shall, subject to the approval of any Plan Settlements, receive a Pro Rata share of Creditors' Trust Interests allocable to their Class, calculated according to the amount of Creditors in such Class that so elect. Notwithstanding the foregoing, subject to the Other Parent Claims Purchase Price Cap, Holders of Other Parent Claims that elect the Other Parent Claims Put Option shall not be entitled to receive Creditors' Trust Interests if the Claims Purchase is consummated and such Creditors' Trust Interests will, instead, be distributed to the Claims Purchaser.

## B.    Certain Other Key Bridge Lender Plan Provisions

### 1.    Treatment of Executory Contracts and Unexpired Leases

Under section 365 of the Bankruptcy Code, the Debtors have the right, subject to Bankruptcy Court approval, to assume or reject executory contracts and unexpired leases to which the Debtors are a party. If a Debtor rejects an executory contract or unexpired lease that it entered into prior to the Petition Date, such contract or lease will be treated as if it were breached by the applicable Debtor(s) on the date immediately preceding the Petition Date, and the other party to the agreement may assert a claim for damages incurred as a result of the rejection, which will be treated as a prepetition unsecured claim pursuant to section 365(g) of the Bankruptcy Code. In the case of the rejection of unemployment agreements and real property leases, damages are subject to certain limitations imposed by sections 365 and 502 of the Bankruptcy Code.

Reference is made to Section 6.1 of the Bridge Lender Plan for a description of the assumption, rejection and cure obligations specified in the Bridge Lender Plan. Reference is made to Section 6.2 of the Bridge Lender Plan for a description of the cure of defaults of assumed executory contract and unexpired leases specified in the Bridge Lender Plan. Reference is made to Section 6.3 of the Bridge Lender Plan for a description of the assumption of executory contracts and unexpired leases specified in the Bridge Lender Plan. If necessary, the Proponents will provide supplemental disclosure in these regards based on information provided by the Debtors or other third parties.

If the rejection by a Debtor, pursuant to the Bridge Lender Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

        2.       Restructuring Transactions

Reference is made to the disclosure statement filed in connection with the Debtor/Committee/Lender Plan (the "Debtor/Committee/Lender Specific Disclosure Statement") for a description of the restructuring transactions under the Bridge Lender Plan. If necessary, the Proponents will provide supplemental disclosure in this regard based on information provided by the Debtors or other third parties.

        3.       Compensation and Benefit Programs

Reference is made to the Debtor/Committee/Lender Specific Disclosure Statement for a description of the treatment of compensation and benefit programs under the Bridge Lender Plan. If necessary, the Proponents will provide supplemental disclosure in this regard based on information provided by the Debtors or other third parties.

        4.       Injunctions, Releases and Discharge

             a)       Discharge of Claims and Termination of Interests

As of the Effective Date, except as provided in the Bridge Lender Plan, the distributions and rights afforded under the Bridge Lender Plan and the treatment of Claims and Interests under the Bridge Lender Plan shall be in exchange for, and in complete discharge of, all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in Tribune. Accordingly, except as otherwise provided in the Bridge Lender Plan or the Confirmation Order, confirmation of the Bridge Lender Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (x) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (y) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code (or is otherwise resolved), or (z) the Holder of a Claim based on such debt has accepted the Bridge Lender Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Bridge Lender Plan.  In addition, confirmation of the Bridge Lender Plan shall, as of the Effective Date, authorize the release of the Senior Loan Guaranty Claims and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors.

As of the Effective Date, except as provided in the Bridge Lender Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, debts, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date and from asserting against the Guarantor Non-Debtors any Senior Loan Guaranty Claims or Bridge Loan Guaranty Claims.  In accordance with the

foregoing, except as provided in the Bridge Lender Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim

b)     Discharge Injunction

Except as provided in the Bridge Lender Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Bridge Lender Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights:  (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of the Bridge Lender Plan.

c)     Releases

The following shall apply in addition to any other releases under the Bridge Lender Plan:

i)     Release of Guarantor Non-Debtors from Loan Guaranty Claims

All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Loan Lenders on account of the Senior Loan Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Loan Guaranty Claims and Bridge Loan Guaranty Claims. Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of these good faith settlements and compromises of the claims released by the Guarantor Non-Debtor Release and adequate factual findings that the Guarantor Non-Debtor Release is:  (1) fair, equitable and reasonable; (2) necessary and essential to the Debtors' successful reorganization; (3) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors and the Loan Agents; (4) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (5) consistent with public policy and due process principles.

ii)    Non-Release of Certain Defined Benefit Plans

Notwithstanding anything to the contrary herein, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Bridge Lender Plan (including Section 11.2.2 of the Bridge Lender Plan), the entry of the Confirmation Order or the Chapter 11 Cases. Notwithstanding anything to the contrary herein, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the Employee Retirement Income Security Act of 1974, as amended, the controlled group members.

d)    Exculpation

The Bridge Lender Plan provides that, to the fullest extent permitted by law, none of the Proponents nor any of their respective Related Persons shall have any liability to any person or entity for acts or omissions in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including the Bridge Lender Plan, pursuit of confirmation or implementation of any plans of reorganization, including the Bridge Lender Plan, the property to be distributed under the Bridge Lender Plan, the Bridge Lender Specific Disclosure Statement, Restructuring Transactions, releases and injunctions under the Bridge Lender Plan.

## C.    Issuance and Distribution of New Securities and Related Matters

1.    Issuance of New Securities.

On, or as promptly as reasonably practicable after, the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Bridge Lender Plan without further act or action under applicable law, regulation, order or rule.

On the Effective Date, the Distribution Trust, for purposes of funding the Distribution Trust Reserve, will receive New Warrants and one share of New Class C Common Stock. Reorganized Tribune shall not issue any other shares of New Class C Common Stock at any time without the prior written consent of the Distribution Trust, such consent to be in the sole discretion of the Distribution Trust. The New Class C Common Stock shall not be subject to optional redemption. On the date on which the Distribution Trust is dissolved or otherwise wound down, Reorganized Tribune shall redeem the outstanding share of New Class C Common Stock at a price of $1.00 per share. As the sole holder of New Class C Common Stock, the

Distribution Trust, through the Distribution Trust Advisory Board, shall have the right to elect two members of the board of directors of Reorganized Tribune. New Class C Common Stock may not be transferred without the approval of the board of directors of Reorganized Tribune. Without the consent or approval of the Distribution Trust (such consent to be in the sole discretion of the Distribution Trust), Reorganized Tribune will not directly or indirectly, by way of merger, consolidation, operation of law or otherwise: (i) alter or change the rights, preferences or privileges of the New Class C Common Stock; (ii) take any action, including amending Reorganized Tribune's Certificate of Incorporation or Bylaws that would adversely affect the rights, preferences or privileges of the New Class C Common Stock; (iii) increase or decrease the authorized number of shares of New Class C Common Stock; or (iv) increase or decrease the authorized size of Reorganized Tribune's board of directors.

Except as otherwise provided in the Bridge Lender Plan, including as specifically provided in Section 5.4.2 of the Bridge Lender Plan, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Bridge Lender Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock or New Warrants if such Holder informs the Debtor and the Proponents of its desire to receive instead such New Class B Common Stock or New Warrants by the date announced by the Proponents in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing. The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1) to be filed with the Debtor/Committee/Lender Plan Supplement, sets forth the rights and preferences of the New Common Stock. The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock. To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares. The New Warrant Agreement substantially in the form of Exhibit 1.1.154 to be filed with the Debtor/Committee/Lender Plan Supplement, sets forth the rights of the holders of the New Warrants. The issuance of the New Common Stock and the New Warrants, including the issuance of New Common Stock upon exercise of the New Warrants, and the distribution thereof under the Bridge Lender Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Bridge Lender Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

2.      Distribution of New Common Stock and New Warrants.

If the Effective Date occurs, on the Effective Date, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Bridge Lender Plan without further act or action under applicable law, regulation, order or rule. New Class A Common stock will have voting rights consistent with standard voting common stock. New Class B Common Stock will have more limited voting rights and is designed to be non-attributable under the

FCC's rules. New Warrants can be exercised for the purchase of either Class A Common Stock or Class B Common Stock, at the option of the holder thereof.

Specifically, holders of New Class B Common Stock will be entitled to vote as a separate class on any amendment, repeal, or modification of any provision of the Certificate of Incorporation for Reorganized Tribune that adversely affects the rights of the New Class B Common Stock in a manner different from the rights of the New Class A Common Stock. In addition, the holders of New Class B Common Stock will be entitled to vote together with holders of the New Class A Common Stock on the following non-ordinary course transactions to the extent that these matters are submitted to a vote of the holders of New Class A Common Stock: (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the New Class A Common Stock or New Class B Common Stock as to dividends or liquidation preference, including with respect to an increase in the number of New Class A Common Stock or New Class B Common Stock; (ii) any amendment to the Certificate of Incorporation or the Bylaws of Reorganized Tribune; (iii) any amendment to any stockholders or comparable agreement; (iv) any sale, lease, or other disposition of all or substantially all of the assets of Reorganized Tribune through one or more transactions; (v) any recapitalization, reorganization, share exchange, consolidation or merger of Reorganized Tribune or its capital stock; (vi) any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of Reorganized Tribune, including any stock option or stock incentive plan; (vii) any redemption, purchase or other acquisition by Reorganized Tribune of any of its capital stock (except for purchases from employees upon termination of employment); and (viii) any liquidation, dissolution, distribution of assets or winding-up of Reorganized Tribune.

Each Holder of a Claim that is entitled to receive a distribution of New Common Stock and/or New Warrants pursuant to the Bridge Lender Plan will be required to demonstrate to the Proponents' satisfaction that the issuance of New Common Stock to such Holder would not impair the ability of the Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC Applications necessary to implement the Bridge Lender Plan. Applicable FCC ownership requirements and restrictions, which are discussed in more detail in Section II.G.3 of the Debtor/Committee/Lender Specific Disclosure Statement, include (i) FCC broadcast multiple ownership and cross-ownership restrictions, and (ii) restrictions in Section 310(b) of the Communications Act on the direct or indirect ownership or control of broadcast licensees by non-U.S. persons.

Notwithstanding anything contained herein, the Distribution Trustee will not, absent the prior consent of the FCC, implement any distribution to the Holders of Distribution Trust Interests that would result in a transfer of control of Reorganized Tribune that would require FCC consent.

### III.   DESCRIPTION OF DEBT AND NEW CAPITAL STRUCTURE OF THE DEBTORS

#### A.   New Senior Secured Term Loan Agreement

Reference is made to the Debtor/Committee/Lender Specific Disclosure Statement for a description of the New Senior Secured Term Loan Agreement.  If necessary, the Proponents will provide supplemental disclosure in this regard based on information provided by the Debtors or other third parties.

#### B.   Description of Exit Facility

Reference is made to the Debtor/Committee/Lender Specific Disclosure Statement for a description of the Exit Facility.  If necessary, the Proponents will provide supplemental disclosure in this regard based on information provided by the Debtors or other third parties.

#### C.   Description of Capital Stock

The Bridge Lender Plan provides that on, or as promptly as reasonably practicable after, the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to the Bridge Lender Plan without further act or action under applicable law, regulation, order or rule.  The powers, preferences and rights, as well as certain limitations, qualifications and restrictions associated with the New Common Stock shall be set forth in their entirety in the Certificate of Incorporation of Reorganized Tribune a form of which will be filed with the Debtor/Committee/Lender Plan Supplement as Exhibit 5.3.1(1) to the Debtor/Committee/Lender Plan.  The terms of the New Warrants shall be set forth in their entirety in the New Warrant Agreement, a form of which will be filed with the Debtor/Committee/Lender Plan Supplement as Exhibit 1.1.154 to the Debtor/Committee/Lender Plan.

### IV.   BEST INTERESTS TEST AND THE DEBTORS' LIQUIDATION ANALYSIS

As discussed in Section X.B.4 of the General Disclosure Statement, the "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of an Impaired Claim or Impaired Interest receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation.  The Debtors, with the assistance of their advisors, have prepared a hypothetical liquidation analysis, attached as Exhibit D to the General Disclosure Statement (the "Liquidation Analysis"), which details, among other things, the estimated hypothetical recovery range for holders of Claims against and Interests in the Debtors in a chapter 7 liquidation.  If necessary, the Proponents will provide supplemental disclosure in this regard based on information provided by the Debtors or other third parties.

To demonstrate that the proposed Bridge Lender Plan satisfies the "best interests" test, the charts below compare the estimated recovery of each Impaired Class of Claims under the Bridge Lender Plan against the high end of the hypothetical recovery range set forth in the Liquidation Analysis for such Claims in a chapter 7 liquidation.

($ in 000's)

| Claims | Estimated Allowed Claims & Bridge Claim | | Liquidation Analysis (High Values) | | Estimated Bridge Lender Plan Recovery[1] | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | | | Recovery $ | Recovery % | Recovery $ | Recovery % | Recovery $ (Liquidation vs. Bridge Lender Plan) | |
| Senior Lenders | $ | 8,722,140 | $ 3,743,009 | 42.91% | $ 5,648,000 | 64.8% | $ | (1,905,000) |
| Bridge Loan Lenders | | 1,619,507 | 19,544 | 1.21% | 125,000 | 7.7% | | (105,456) |
| Senior Noteholder | | 1,283,056 | 15,484 | 1.21% | 750,000 | 58.5% | | (734,516) |
| PHONES Notes | | 760,881 | - | 0.00% | 75,000 | 9.9% | | (75,000) |
| EGI-TRB LLC Notes | | 235,300 | - | 0.00% | 0 | 0% | | (0) |
| Other Parent | | 113,794 | 3,195 | 1.21% | 67,000 | 58.8% | | (63,805) |
| Other Guarantor Debtor | | 85,000 | 2,041 | 2.40% | 85,000 | 100% | | (82,959) |
| Total | $ | 12,970,627 | $ 3,783,273 | | $ 6,750,000 | | $ | (2,966,727) |

Notes to Table:
1.   Based upon the acceptance of the Step One Lender Settlement, the Step Two Lender Settlement and the Bridge Loan Lender
     Settlement, but does not include any proceeds from the Litigation Trust or Creditors' Trust. Resolution of any causes of action by the
     Litigation or Creditors' Trust may impact the ultimate recovery received on account of the various Claims.

This chart indicates the Effective Date recoveries only if the applicable Plan Settlements described therein are approved. If one or more Plan Settlements are not accepted by the applicable creditor constituencies and approved by the Bankruptcy Court, the Trust structure will take effect with respect to such constituencies, who will receive Initial Distributions on the Effective Date consistent with the Noteholder Plan, adjusted based on the allocation of value as between Tribune and the Guarantor Subsidiaries determined by the Bankruptcy Court at Confirmation.

Under the Plan Settlements, all non-subordinated prepetition Claims recover substantially more than under a hypothetical liquidation; therefore, the Proponents believe that the "best interests" of creditors test is satisfied.

The Liquidation Analysis does not consider recoveries from potential Claims arising from the Leveraged ESOP Transactions. As explained herein, the Bridge Lender Plan provides for the settlement of certain Claims related the Leveraged ESOP Transactions (subject to Bankruptcy Court approval of the Bridge Lender Plan) and for certain other Claims related to the Leveraged ESOP Transactions (or all of them if no Plan Settlement is accepted) to be assigned to the Trusts. In either event, it is assumed that the recoveries from these Claims would be substantially similar in either a reorganization or a liquidation and thus not change the conclusion regarding the "best interests" test.

## V.   RISK FACTORS

THE IMPLEMENTATION OF THE BRIDGE LENDER PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE BRIDGE LENDER PLAN, HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS ENTITLED TO VOTE ON THE BRIDGE LENDER PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE IN THE BRIDGE LENDER PLAN), PRIOR TO VOTING TO ACCEPT OR REJECT THE BRIDGE LENDER PLAN. THESE SPECIFIC

RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISK INVOLVED IN CONNECTION WITH THE BRIDGE LENDER PLAN AND THEIR IMPLEMENTATION, OR ALTERNATIVES TO THE BRIDGE LENDER PLAN. FOR ADDITIONAL RISK FACTORS PLEASE SEE ARTICLE XII OF THE GENERAL DISCLOSURE STATEMENT ENTITLED "GENERAL RISK FACTORS."

### A.     Certain Risk Factors Specific to the Bridge Lender Plan

1.     Length of Litigation

The Litigation Trust Causes of Action and State Law Avoidance Claims are complex and fact intensive in nature. It is difficult to estimate the length of time it will take to settle or reach a judgment regarding the Trust Causes of Action and, therefore, difficult to estimate how long it will be before Holders of Trust Interests will receive recoveries on account of the Trust Causes of Action.

2.     Outcome of Litigation Trust Causes of Action and State Law Avoidance Claims

Although the Proponents believe, based on their own review of the Litigation Trust Causes of Action and the State Law Avoidance Claims, and also based upon the Examiner's Report filed in the Chapter 11 Cases, that the Litigation Trust Causes of Action and State Law Avoidance Actions will be successful and yield substantial additional recoveries for non-LBO Lender Creditors and, potentially, even the LBO Lenders, the assumed outcomes are speculative in nature and cannot be guaranteed. Even in light of a positive result, it is impossible to determine the amount of additional recovery Holders of Trust Interests would receive on account of a settlement or judgment regarding the Litigation Trust Causes of Action and the State Law Avoidance Claims.

3.     Determination of Senior Loan Claim Sharing Resolution

The approval of the Step One Lender Settlement and the Step Two Lender Settlement, or if the Step One Lender Settlement or Step Two Lender Settlement is not approved, the Initial Distributions to be provided to Step One Lenders and/or Step Two Lenders, may require adjudication of the Senior Loan Claim Sharing Resolution at Confirmation.

4.     Determination of PHONES Notes Claims Resolution

Payments to PHONES Noteholders under the Plan Settlements or, if the applicable Plan Settlements are not approved, under the Trust structure, may require adjudication of the PHONES Notes Claims Resolution at Confirmation.

5.     Assumptions Regarding DEV and Allocation of DEV

The Plan Settlements are predicated on an allocation of value as between Tribune and the Guarantor Subsidiaries set forth in the Bridge Lender Plan. This allocation is based on certain information provided by the Debtors in connection with the Examiner's Report or otherwise.

The Proponents believe that the Debtors have more information regarding allocation of value, including in respect of Intercompany Claims, which will be filed or revealed in discovery. There is a risk that, ultimately, the Bankruptcy Court would not accept the allocation of value as set forth in the Bridge Lender Plan to the extent required for approval of the Plan Settlements.

6.      Claims Purchase Price Caps

The Cash amounts paid pursuant to the Other Parent Claims Put Option and the Other Guarantor Debtor Claims Put Option are capped at an aggregate amount of $45.00 million, consisting of the Other Parent Claims Purchase Price Cap of $24.25 million and the Other Guarantor Debtor Claims Purchase Price Cap of $20.75 million. Based on the Debtors' estimates of Allowed Other Parent Claims and Allowed Other Guarantor Claims, the Proponents believe that the Claims Purchase Price Caps will be sufficient to pay the Claims Purchase Price for all Other Parent Claims and Other Guarantor Debtor Claims electing the Put Option; however, until the Voting Deadline and a review of all Ballots is conducted, it is not possible for the Proponents to ensure that the Claims Purchase Price Cap will be sufficient to pay for all Put Claims. Accordingly, there is a risk that despite making the Other Parent Claims Put Election or Other Guarantor Debtor Claims Put Election on the applicable Ballot, such Holder's Claim may not be purchased in full and such Holder may, instead, receive the applicable portion of the Claims Purchase Price (i.e., in the Cash of Other Parent Claims, 15% and in the Case of Other Guarantor Debtor Claims, 25%) for only a portion of its Other Parent Put Claim or Other Guarantor Debtor Put Claim, as applicable, and may receive Initial Distributions, Distribution Trust Interests and, in the Case of the Other Parent Claims, Creditors' Trust Interests, for the remaining portion of such Claim.

7.      FCC Related Considerations and Risks Respecting the Debtors'
        Businesses

Reference is made to the Debtor/Committee/Lender Specific Disclosure Statement for a summary description of the FCC matters pertaining to a plan of reorganization in these Chapter 11 Cases and the risk factors associated therewith. If necessary, the Proponents will provide supplemental disclosure in respect of this issue based on information provided by the Debtors or other third parties.

8.      Other Risks Related to Trust Structure

To the extent Plan Settlements are not approved, the Bridge Lender Plan reverts to the Trust structure, which is similar to the structure described in the Noteholder Plan and, in such case, is subject to similar risks as set forth in the specific disclosure statement in respect of the Noteholder Plan.

**B.     Risks to Creditors Who Will Receive Securities**

The ultimate recoveries under the Bridge Lender Plan to Holders of Claims that receive shares of New Common Stock or New Warrants to purchase shares of New Common Stock pursuant to the Bridge Lender Plan will depend on the realizable value of the shares of New Common Stock. Shares of New Common Stock are subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Bridge Lender Plan, each Holder of Claims that are to be satisfied in whole or part through a distribution of New Common Stock should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Bridge Lender Plan.

1.     The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants

No established market exists for the New Common Stock or New Warrants and there can be no assurance that an active market for the shares of the New Common Stock or New Warrants will develop, nor can any assurance be given as to the prices at which such securities might be traded. Although Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market, there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. If a trading market does not develop or is not maintained, holders of shares of the New Common Stock and New Warrants may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Bridge Lender Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, the Reorganized Debtors' performance and investor expectations thereof. In addition, some persons who receive shares of the New Common Stock and/or the New Warrants may prefer to liquidate their investment in the near term rather than hold such securities on a long-term basis. Accordingly, any market for such securities may be volatile, at least for an initial period following the Effective Date, and may be depressed until the market has had time to absorb any such sales and to observe the Reorganized Debtors' performance.

2.     Lack of Dividends May Adversely Affect Liquidity of the New Common Stock

The Debtors currently do not anticipate that cash dividends or other distributions will be made with respect to the New Common Stock in the foreseeable future. In addition, covenants in certain debt instruments to which the Reorganized Debtors will be a party may restrict their ability to pay dividends and make certain other payments. Further, such restrictions on dividends may have an adverse impact on the market demand for the New Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Bridge Lender Plan.

3.     Future Sales or Issuances of Equity, Including Issuances in Respect of
New Warrants to Purchase New Class A Common Stock, May Depress the
Stock Price of the New Common Stock

If holders of New Common Stock sell substantial amounts of New Common
Stock or Reorganized Tribune issues substantial additional amounts of its equity securities, or
there is a belief that such sales or issuances could occur, the market price of the New Common
Stock could decline significantly. Reorganized Tribune may issue New Warrants to purchase
shares of New Class A Common Stock in certain circumstances. If Holders who receive New
Warrants in connection with the implementation of the Bridge Lender Plan exercise such
warrants and purchase a significant number of shares of New Class A Common Stock, the
market price of the New Class A Common Stock may be adversely affected. In addition, any
new issuances of equity securities by Reorganized Tribune including as a result of warrant
exercises, may be dilutive to existing stockholders of Reorganized Tribune.

4.     The Limited Voting Rights of the New Class B Common Stock and the
Lack of Voting Rights of the New Warrants Could Impact their
Attractiveness to Investors and, as a Result, their Market Value

In certain circumstances, Reorganized Tribune may issue shares of New Class B
Common Stock and/or New Warrants. The New Class A Common Stock and New Class B
Common Stock generally provide identical economic rights, but holders of the New Class B
Common Stock have limited voting rights, including that such holders have no right to vote in
the election of directors. The holders of the New Warrants have no voting rights. The difference
in voting rights of the New Class A Common Stock on the one hand, and New Class B Common
Stock and New Warrants on the other hand, could diminish the value of the New Class B
Common Stock and the New Warrants to the extent that investors or potential future purchasers
of the New Class B Common Stock or the New Warrants ascribe value to the superior voting
rights of the New Class A Common Stock. The Certificate of Incorporation of Reorganized
Tribune, which will be filed with the Debtor/Committee/Lender Plan Supplement as Exhibit
5.3.1(1) to the Debtor/Committee/Lender Plan, contains more information about the rights and
limitations associated with the New Class B Common Stock. In addition, the New Warrant
Agreement, which will be filed with the Debtor/Committee/Lender Plan Supplement as Exhibit
1.1.154 to the Debtor/Committee/Lender Plan, contains more information about the rights and
limitations associated with the New Warrants.

5.     Certain Holders May be Restricted in Their Ability to Transfer or Sell
Their Securities

To the extent that New Common Stock, New Warrants or any other securities are
issued under the Bridge Lender Plan and are covered by section 1145(a)(1) of the Bankruptcy
Code, they may be resold by the holders thereof without registration unless the holder is an
"underwriter" with respect to such securities. Resales by Persons who receive New Common
Stock or New Warrants pursuant to the Bridge Lender Plan that are deemed to be "underwriters"
as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of
the Bankruptcy Code from registration under the Securities Act of 1933, as amended (the
"Securities Act") or other applicable law. Such Persons would be permitted to sell such New

Common Stock or New Warrants without registration if they are able to comply with the provisions of rule 144 under the Securities Act.

Reorganized Tribune will use its reasonable best efforts to list, as promptly as practicable after the Effective Date, the New Class A Common Stock for trading on the NYSE or for quotation in the NASDAQ stock market but will have no liability if it is unable to do so. As noted above (see "The Lack of an Established Market for the Securities May Adversely Affect the Liquidity of the New Common Stock and the New Warrants"), there can be no assurance that the listing or quotation of the New Class A Common Stock will be accepted or that an active or liquid trading market will develop for the New Class A Common Stock. Efforts to list the New Class A Common Stock, if successful, would include registering the New Class A Common Stock under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Registration under the Exchange Act is a separate process from registration under the Securities Act and would not be sufficient to permit resales by persons who receive New Common Stock or New Warrants pursuant to the Bridge Lender Plan and who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code. Reorganized Tribune has no current plans to list the New Class B Common Stock on the NYSE or for quotation on the NASDAQ stock market or to register the New Class B Common Stock or New Warrants under the Securities Act, the Exchange Act or under equivalent state securities laws such that the recipients of the New Class B Common Stock or New Warrants would be able to resell their securities pursuant to an effective registration statement.

The Certificate of Incorporation contains restrictions on stockholders' ability to transfer New Common Stock and New Warrants designed to ensure compliance with the FCC broadcast multiple ownership and cross-ownership rules and the limitations on foreign ownership or control of FCC broadcast licenses imposed by the Communications Act. Furthermore, certificates for shares of New Common Stock and certificates for New Warrants may bear a legend restricting the sale, transfer, assignment, conversion or other disposal of such securities.

6.    Impact of Timing on Value of New Common Stock/New Warrants

The length of litigation of the Litigation Trust Causes of Action may have a negative impact on the value of New Common Stock and New Warrants eventually distributed to Creditors based on the Litigation Distribution Orders. Due to the need for a resolution regarding the Senior Loan Claim Sharing Resolution and PHONES Notes Claims Resolution prior to making distributions to certain Classes on account of both their Litigation Trust Interests and Creditors' Trust Interests and, further, due to the need for a resolution on certain of the Litigation Trust Causes of Action to determine which parties are entitled to receive the DEV in the Distribution Trust Reserve, the value of the New Common Stock portion of the DEV may increase or decrease if the equity value of Tribune increases or decreases over the course of such time. Accordingly, it cannot be guaranteed that the DEV held in the Distribution Trust Reserve will not decrease between the time of Confirmation and ultimate distributions to Creditors from the Distribution Trust Reserve and, therefore, Creditors might receive New Common Stock and/or New Warrants that have lower values than they had on the Confirmation Date. Conversely, the DEV held in the Distribution Trust Reserve may appreciate between the time of Confirmation and ultimate distributions to Creditors from the Distribution Trust Reserve, in

which case Creditors entitled to receive distributions from the Distribution Trust Reserve will be permitted to receive and retain New Common Stock and/or New Warrants that have a higher value than ascribed to such New Common Stock or New Warrants on the Confirmation Date.

### C.     Additional Factors to Be Considered

1.     The Proponents Have No Duty to Update

The statements contained in the Bridge Lender Specific Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of the Bridge Lender Specific Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Proponents have no duty to update the Bridge Lender Specific Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.     No Representations Outside the Joint Disclosure Statement

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Bridge Lender Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Joint Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Bridge Lender Plan that are other than as contained in, or included with, the Bridge Lender Specific Disclosure Statement should not be relied upon by you in arriving at your decision.

3.     Proponents Can Withdraw the Bridge Lender Plan

Under the Bridge Lender Plan, the Proponents can withdraw the Bridge Lender Plan with respect to any Debtors and proceed with Confirmation of the Bridge Lender Plan with respect to the other Debtors.

4.     No Legal or Tax Advice Is Provided to You by the Bridge Lender Specific Disclosure Statement

The contents of the Bridge Lender Specific Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest. The Bridge Lender Specific Disclosure Statement is not legal advice to you. The Bridge Lender Specific Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Bridge Lender Plan or object to Confirmation of the Bridge Lender Plan.

5.     No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Bridge Lender Plan on the Debtors or on Holders of Claims or Interests.

6.      A Liquid Trading Market for the Trust Interests is Unlikely to Develop

A liquid trading market for the Trust Interests is unlikely to develop. As of the Effective Date, the Trust Interests are not expected to be listed for trading on any stock exchange or trading system. Consequently, the trading liquidity of the Trust Interests may be limited as of the Effective Date.

## VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE BRIDGE LENDER PLAN

If the Bridge Lender Plan is not confirmed, the alternatives include (i) continuation of the Chapter 11 Cases, (ii) approval of a competing plan of reorganization, or (iii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### A.      Continuation of the Chapter 11 Cases

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases. If the Debtors remain in chapter 11 for an extended period of time, they could have difficulty operating with the high costs, operating financing and the eroding confidence of their employees, customers and trade vendors.

In addition, if the Debtors fail to settle outstanding Claims through the Bridge Lender Plan, litigation of certain Claims may be required, which litigation may take years to resolve, be burdensome and expensive, prolong the Chapter 11 Cases, and have a detrimental impact on the Debtors' businesses and enterprise value.

### B.      Approval of a Competing Plan

The Proponents believe that the Bridge Lender Plan provides the best option for restructuring the Debtors. Please refer to the Proponents' Responsive Statement included in Volume III of the Joint Disclosure Statement (the "Bridge Responsive Statement") for a detailed discussion of the Proponents' views regarding the inferiority of other competing plans.

### C.      Liquidation under Chapter 7 or Chapter 11

If the Bridge Lender Plan or another plan of reorganization is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to liquidate the assets of the Debtors. The Debtors believe that in a liquidation under chapter 7 additional administrative expenses involved in the appointment of a trustee and professionals to assist such trustee, along with expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. In addition, the Proponents believe that the Liquidation Analysis attached as Exhibit D to the General Disclosure Statement is speculative as it is necessarily premised upon assumptions and estimates. As such, the

Liquidation Analysis can give no assurance as to the value which would be realized in chapter 7 liquidation. Further, as demonstrated in Article IV above, the Proponents believe that recoveries to creditors in a chapter 7 liquidation would be substantially lower than those provided pursuant to the Bridge Lender Plan.

The Debtors could also be liquidated under a chapter 11 plan of reorganization. In a chapter 11 liquidation, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7 and a trustee would not be required. Thus, chapter 11 liquidation might result in larger recoveries than in chapter 7 liquidation; however, the delay in distributions could result in lower present values being received and higher administrative costs.

## VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE BRIDGE LENDER PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Bridge Lender Plan to Holders of Claims and Interests and the Debtors. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations (the "Tax Regulations") promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as available and in effect on the date of this Bridge Lender Specific Disclosure Statement. All of the foregoing is subject to change, possibly with retroactive effect, or differing interpretations which could affect the tax consequences described herein. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. Events occurring after the date of this Bridge Lender Specific Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Bridge Lender Plan.

For purposes of the following discussion, a "United States Person" is any individual who is a citizen or resident of the United States, or any entity (i) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, including the District of Columbia (ii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (iii) that is a trust (a) the administration over which a United States court can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control or (b) that has elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes), the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "U.S. Holder" means a beneficial owner of a Claim or Interest that is a United States Person. A "Non-U.S. Holder" means a beneficial owner of a Claim or Interest that is a Non-United States Person.

Generally, this discussion does not apply to Holders of Claims and Interests that are not United States Persons, but a brief discussion of the general consequences to Non-U.S. Holders is included in this discussion. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such Holders in light of their individual circumstances. This discussion does not address tax issues with respect to the Swap Claim. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities or currencies, including those that mark to market, insurance companies, financial institutions, grantor trusts, tax-exempt organizations, small business investment companies, real estate investment trusts, regulated investment companies, persons that have a functional currency other than the U.S. dollar, certain former citizens and long term residents of the United States, and persons that will hold an equity interest or a security in a Debtor as part of a position in a straddle or as part of a hedging, conversion or integrated transaction for U.S. federal income tax purposes). In addition, this summary does not address estate, gift, alternative minimum tax, foreign, state, or local tax consequences of the Bridge Lender Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE BRIDGE LENDER PLAN.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE BRIDGE LENDER SPECIFIC DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

*     *     *     *

**D.      Federal Income Tax Consequences to the Debtors**

1.      Termination of Subchapter S Corporation Status

On March 13, 2008, Tribune filed an election to be treated as a subchapter S corporation under the IRC, which election became effective as of the beginning of its 2008 fiscal year. Tribune also elected to treat nearly all of its subsidiaries as qualified subchapter S subsidiaries.

Subject to certain limitations (such as the built-in gains tax applicable to Tribune's net unrealized gains as of the beginning of the 2008 fiscal year that are recognized in the subsequent ten taxable years), Tribune and its subsidiaries are not currently subject to corporate level federal income tax. Instead, the income of Tribune and its subsidiaries is required to be reported by its stockholders. The ESOP, which, as of the Petition Date, was the sole stockholder of Tribune, does not pay taxes on the income that is passed through to it because the ESOP is an employee benefit plan that qualifies for favorable tax treatment under Section 401(a) of the IRC. Although most states in which Tribune and its subsidiaries operate recognize the subchapter S corporation status, some impose taxes at a reduced rate.

As a result of the implementation of the Bridge Lender Plan, Tribune will no longer be eligible to be treated as a subchapter S corporation beginning on the Effective Date. Accordingly, Reorganized Tribune will be subject to entity-level tax on all of its income and gains beginning on the Effective Date at corporate income tax rates. As described below, Reorganized Tribune is expected to have limited tax attributes available to offset such income and gains.

2.    Cancellation of Debt and Reduction of Tax Attributes

As a result of the Bridge Lender Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt ("COD") income upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of Cash paid and the fair market value of any other consideration, including stock and warrants of the Reorganized Debtors, given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as a price for the exclusion of COD income under the foregoing rule, Section 108 of the IRC requires the debtor to reduce its tax attributes by the amount of COD income which it excluded from gross income. Any reduction in tax attributes in respect of COD incurred does not occur until the end of the taxable year after such attributes have been applied. As a general rule, tax attributes will be reduced in the following order: (i) net operating losses ("NOLs"); (ii) most tax credits; (iii) capital loss carryovers; (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (v) foreign tax credits. A debtor with COD income may elect first to reduce the basis of its depreciable assets under IRC Section 108(b)(5).

The Proponents expect that the Debtors will realize substantial COD income as a result of the implementation of the Bridge Lender Plan. The precise amount of COD income will depend on, among other things, the fair market value of New Common Stock and New Warrants, which cannot be known with certainty until after the Effective Date. Pursuant to Section 108 of the IRC, this COD income will not be included in the Debtors' taxable income, but the Debtors will be required to reduce their tax attributes after calculating the tax for the taxable year of discharge.

As a subchapter S corporation, Tribune does not currently have any NOLs or other significant tax attributes other than tax basis in assets. Although the projected COD income may exceed the Debtors' aggregate tax basis in assets, the Debtors will not be required to reduce such basis below their total liabilities after the discharge.

### E.    Federal Income Tax Consequences to Holders of Claims and Interests

        1.    Consequences to Holders of Certain Claims and Interests

The U.S. federal income tax consequences of the transactions contemplated by the Bridge Lender Plan to U.S. Holders of Claims and Interests will depend upon a number of factors. The U.S. federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Bridge Lender Plan and the distributions provided for thereby will depend upon, among other things: (i) the manner in which a U.S. Holder acquired a Claim; (ii) the length of time the Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (v) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (vi) the method of tax accounting of the U.S. Holder; (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes; (viii) whether the Claim is a capital asset in the hands of the U.S. Holder; and (ix) whether a Holder is required to turn over property pursuant to a subordination provision in a particular note (in which case the Holder generally will not be treated for federal income tax purposes as having received the property).

To the extent that a Holder receives Distribution Trust Interests, such Holder should review "Tax Treatment of the Distribution Trust and Holders of Distribution Trust Interests" and "Tax Treatment of Trust Reserves." To the extent that a Holder receives Creditors' Trust Interests, such Holder should review "Tax Treatment of the Creditors' Trust and Holders of Creditors' Trust Interests" and "Tax Treatment of Trust Reserves."

Unless the exchange of a U.S. Holder's Claim for the various forms of consideration hereunder qualifies as a tax-free "recapitalization" under the federal income tax laws (as described in more detail below), each U.S. Holder of Claims generally will realize gain or loss equal to the difference between the adjusted tax basis in its surrendered Claim (other than any tax basis in any State Law Avoidance Claims), determined immediately prior to the Effective Date, and the sum of (i) the fair market value of any New Common Stock and/or New Warrants received, (ii) any Cash received, (iii) the "issue price" of any New Senior Secured Term Loan received, (iv) the value of any Creditors' Trust Interests received (to the extent not allocable to amounts received in exchange for State Law Avoidance Claims), and (v) the value of any Distribution Trust Interests received (in each case (i)-(v), to the extent such amounts received are not allocable to accrued interest, in which case such amounts will be taxed as such as further described below). Holders receiving Creditors' Trust Interests generally will not recognize gain or loss upon receipt of the Creditors' Trust Interests in exchange for the Holders' State Law Avoidance Claims.

If the exchange does not qualify as a tax-free "recapitalization", a U.S. Holder's initial tax basis in its New Common Stock and its New Warrants will equal their respective fair market

values as of the Effective Date. A U.S. Holder's tax basis in its New Senior Secured Term Loan will equal the issue price of the New Senior Secured Term Loan on the Effective Date. A U.S. Holder's tax basis in the Distribution Trust Interests generally should equal their fair market value as of the Effective Date. A U.S. Holder's holding period in such assets will commence on the day after the Effective Date. A U.S. Holder generally will have a carryover basis in the Creditors' Trust Interests. However, Holders receiving Creditors' Trusts Interests in addition to other consideration received pursuant to the Bridge Lender Plan should allocate their basis among all other consideration received pursuant to the Bridge Lender Plan. With this basis allocation, Holders should use the relative fair market value of the Creditors' Trust Interests to allocate basis between the Creditors' Trust Interests and other consideration received.

If the exchange of a U.S. Holders Claim for the various forms of consideration hereunder qualifies as a tax-free "recapitalization" under the federal income tax laws, the taxation of the exchange, the tax basis and the holding period of the property received generally will be different than if the exchange does not qualify as a tax-free "recapitalization." Whether or not the exchange qualifies as a tax-free "recapitalization" with respect to a particular Holder of a Claim depends, in whole or in part, on (A) whether (i) the Claim exchanged and (ii) the New Senior Secured Term Loan received each constitute a "security" for U.S. federal income tax purposes and (B) whether the Holder receives New Common Stock and/or New Warrants. The Holders of such Claims are urged to consult with their own tax advisors as to whether their Claims and the New Senior Secured Term Loan should be treated as securities for U.S. federal income tax purposes and the consequences of a tax-free "recapitalization" with respect to the surrender of their Claims. Notably, the term "security" is not defined in the IRC or in the Tax Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

If the exchange of the Claim is a tax-free "recapitalization" and the New Senior Secured Term Loan is a "security" for U.S. federal income tax purposes, a U.S. Holder of such a Claim who realizes gain on the exchange will be required to recognize such gain equal to the lesser of: (i) the amount of gain realized on the exchange and (ii) the amount of Cash and the value of the Distribution Trust Interests received as part of the exchange. A U.S. Holder's tax basis in the New Senior Secured Term Loan and the New Common Stock and/or New Warrants received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the amount of Cash and the value of the Distribution Trust Interests received as part of the exchange. Such basis will be allocated between the New Senior Secured Term Loan and the New Common Stock and/or New

Warrants received in proportion to their relative fair market values. A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date. A U.S. Holder's holding period in the New Senior Secured Term Loan and the New Common Stock and/or New Warrants will include the holding period in its surrendered Claim. A U.S. Holder's holding period for the Distribution Trust Interests should begin on the day following the Effective Date.

If the exchange of the Claim is a tax-free "recapitalization" and the New Senior Secured Term Loan is not a "security" for U.S. federal income tax purposes, a U.S. Holder of such a Claim who realizes gain on the exchange will be required to recognize such gain equal to the lesser of: (i) the amount of gain realized on the exchange and (ii) the sum of (a) the amount of Cash received, (b) the value of the Distribution Trust Interests received as part of the exchange and (c) the issue price of the New Senior Secured Term Loan received as part of the exchange. A U.S. Holder's tax basis in the New Common Stock and/or New Warrants received in exchange for its Claim will equal its allocable adjusted tax basis in its Claim, increased by the amount of gain recognized on the exchange, if any, and reduced by the sum of (i) the amount of Cash (ii) the value of the Distribution Trust Interests and (iii) the issue price of the New Senior Secured Term Loan received as part of the exchange. Such basis will be allocated between the New Common Stock and/or New Warrants received in proportion to their relative fair market values. A U.S. Holder's tax basis in the Distribution Trust Interests received should equal their fair market value as of the Effective Date. A U.S. Holder's tax basis in its New Senior Secured Term Loan will equal the issue price of the New Senior Secured Term Loan on the Effective Date. A U.S. Holder's holding period in the New Common Stock and/or New Warrants will include the holding period in its Claim surrendered. In this case, however, a U.S. Holder's holding period in the New Senior Secured Term Loan and the Distribution Trust Interests would begin on the day following the Effective Date.

If the exchange of the Claim constitutes a tax-free "recapitalization" for U.S. federal income tax purposes, a U.S. Holder of such a Claim who realizes a loss on the exchange generally will not be permitted to recognize such loss, except to the extent of any loss attributable to accrued but unpaid interest with respect to such Claim.

It is plausible that a Holder could treat the exchange of its Claim as provided under the Bridge Lender Plan as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred. The U.S. federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

2.      Consequences to U.S. Holders of Tribune Interests

Pursuant to the Bridge Lender Plan, all Tribune Interests will be extinguished, and U.S. Holders of Tribune Interests will receive nothing in exchange for such Tribune Interests. As a result, each U.S. Holder of Tribune Interests generally will recognize a loss equal to the U.S. Holder's adjusted tax basis in such Tribune Interests extinguished under the Bridge Lender Plan, except to the extent that such U.S. Holder previously claimed a loss with respect to such Tribune Interests under its regular method of accounting. However, U.S. Holders of Tribune Interests are urged to consult with their own tax advisors regarding their own specific situation and tax

consequences. Generally, such loss, if any, would be a capital loss (which capital loss would be long-term capital loss to the extent that the Holder has held the debt instrument underlying its claim for more than one year) if the Claim is a capital asset in the Holder's hands.

F.     **Consequences of Holding Exchanged Consideration**

1.     Ownership and Disposition of the New Senior Secured Term Loan

a)     Certain Federal Income Tax Consequences of the New Senior Secured Term Loan

If a substantial amount of the New Senior Secured Term Loan is publicly traded, its issue price generally is expected to equal its fair market value, determined as of the first date on which a substantial amount of the New Senior Secured Term Loan is issued. If the New Senior Secured Term Loan is not publicly traded, its issue price will depend on whether a substantial amount of the New Senior Secured Term Loan is issued for debt instruments (that give rise to a U.S. Holder's Claim) that are publicly traded, in which case the issue price of the New Senior Secured Term Loan generally is expected to equal the portion of the fair market value, determined as of the issue date, of the debt instruments giving rise to the U.S. Holder's Claim that is surrendered and allocable to the New Senior Secured Term Loan. For purposes of the preceding sentence, the issue date generally is the first date on which a substantial amount of the New Senior Secured Term Loan is issued for the debt instruments that give rise to a U.S. Holder's Claim. Otherwise, assuming that New Senior Secured Term Loan has an interest rate that equals or exceeds the applicable federal rate, the issue price of the New Senior Secured Term Loan generally is expected to equal its stated redemption price at maturity. For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 60 day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange, quoted on an interdealer quotation system sponsored by a national securities association or listed on certain foreign exchanges or boards or trade designated by the Tax Regulations or the Commissioner of the Internal Revenue Service (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) if, in certain circumstances, price quotations are readily available from dealers, brokers or traders.

A U.S. Holder who receives the New Senior Secured Term Loan generally will be required to include stated interest on the New Senior Secured Term Loan in income in accordance with U.S. Holder's regular method of tax accounting. In addition, if the New Senior Secured Term Loan is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes, a U.S. Holder of the New Senior Secured Term Loan will be required to include in income the amount of such original issue discount over the term of the New Senior Secured Term Loan based on the constant yield method. In such a case, a U.S. Holder will be required to include amounts in income before they are received. A U.S. Holder's tax basis in the New Senior Secured Term Loan will be increased by the amount of original issue discount

included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to the New Senior Secured Term Loan.

b)     Sale or Other Disposition of New Senior Secured Term Loan

Upon the sale, exchange or retirement of the New Senior Secured Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference, if any, between (i) the amount realized on the sale, exchange or retirement (other than accrued but unpaid interest which will be taxable as such) and (ii) the U.S. Holder's adjusted tax basis in the New Senior Secured Term Loan. The adjusted tax basis in the New Senior Secured Term Loan generally initially will equal its issue price on the Effective Date. Any such gain or loss will be capital gain or loss, except for gain recharacterized as ordinary income to the extent of any accrued market discount or any market discount carried over pursuant to a tax-free or other reorganization for other property. If the U.S. Holder is a noncorporate U.S. holder, the maximum marginal U.S. federal income tax rate applicable to the gain generally will be lower than the maximum marginal U.S. federal income tax rate applicable to ordinary income (other than certain dividends) if such U.S. Holder's holding period for the New Senior Secured Term Loan exceeds one year (i.e., such gain is long-term capital gain). Any gain or loss realized on the sale, exchange or retirement of the New Senior Secured Term Loan generally will be treated as U.S. source gain or loss, as the case may be. The deductibility of capital losses is subject to limitations (as discussed further below).

2.     Ownership and Disposition of New Common Stock and/or New Warrants

a)     Dividends on New Common Stock

Distributions made with respect to New Common Stock received under the Bridge Lender Plan generally will be treated as dividends to a U.S. Holder to the extent of current and accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles at the end of the tax year of the distribution. To the extent the distributions exceed the current and accumulated earnings and profits, the excess will be treated first as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the New Common Stock, and thereafter as capital gain. Corporate holders generally will be entitled to claim the dividends received deduction with respect to dividends paid on New Common Stock, subject to applicable restrictions, including satisfaction of applicable holding period requirements.

b)     Sale or Other Disposition of New Common Stock

Upon the sale or other disposition of New Common Stock received under the Bridge Lender Plan, a U.S. Holder generally will recognize capital gain or loss equal to the difference between (i) the amount of Cash and the fair market value of any property received upon the sale or other disposition and (ii) the U.S. Holder's adjusted tax basis in the New Common Stock. Such capital gain or loss will be long-term if the U.S. Holder's holding period in respect of such New Common Stock is more than one year. The deductibility of capital losses is subject to limitations (as discussed further below).

c)      Tax Treatment of New Warrants

In general, a U.S. Holder of a New Warrant will recognize gain or loss upon the sale of the New Warrant in an amount equal to the difference between the amount realized on the sale and such Holder's adjusted tax basis in the New Warrant. Gain or loss attributable to the sale of a New Warrant generally will be capital gain or loss.

In general, a Holder should not recognize gain or loss on the payment of cash to exercise a New Warrant. It is not clear, though, whether the New Warrant can be exercised on a "cashless" basis. Although, the U.S. federal income tax consequences of the exercise of a New Warrant on a cashless basis are not entirely clear, there is a reasonable basis for a Holder to claim that under the U.S. federal income tax law, a Holder may treat the receipt of New Common Stock upon the cashless exercise of a New Warrant as a tax-free "recapitalization" for U.S. federal income tax purposes. Consistent with this treatment as a tax-free "recapitalization," a U.S. Holder would not recognize any gain or loss in respect of the receipt of its New Common Stock pursuant to the cashless exercise, a U.S. Holder's tax basis in the New Common Stock received upon the exercise of a New Warrant should equal such Holder's tax basis in the New Warrant exercised and the holding period for the New Common Stock received upon the exercise of a New Warrant should include such Holder's holding period for the New Warrant. Due to the absence of authority on the U.S. federal income tax treatment of the exercise of warrants on a cashless basis, though, there can be no assurance that the IRS or a court would take a similar position as described above. Accordingly, U.S. Holders should consult their tax advisors concerning the possible tax consequences of the cashless exercise of the New Warrants.

If a Holder exercises the New Warrant for a cash payment of the exercise price, a U.S. Holder's tax basis in the New Common Stock received upon the exercise of a New Warrant should equal such Holder's tax basis in the New Warrant exercised plus the exercise price paid by the Holder. It is not clear whether the exercise of a New Warrant for a cash payment equal to the exercise price should be treated as a purchase of the entirety of the New Common Stock received or as a purchase of only a portion of the New Common Stock worth the cash paid, with the rest of the New Common Stock treated as received pursuant to a recapitalization with consequences described in the preceding paragraph. If such exercise were treated as a purchase of the entirety of the New Common Stock received, a U.S. Holder's holding period for the New Common Stock would commence upon the day following the date the New Warrant is exercised (or possibly on the date of exercise). U.S. Holders should consult their tax advisors regarding the tax consequences of exercise of a New Warrant by payment of the exercise price.

3.      Tax Treatment of the Distribution Trust and Holders of Distribution Trust Interests

a)      Classification of the Distribution Trust

The Distribution Trust (of which the Litigation Trust is a sub-trust) is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" *(i.e.,* a pass-through type entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a

liquidating trust under a chapter 11 plan. The Distribution Trust has been structured with the intention of complying with such general criteria. Pursuant to the Bridge Lender Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Distribution Trustee, and the Holders of Distribution Trust Interests) are required to treat, for U.S. federal income tax purposes, the Distribution Trust as a grantor trust of which the Holders of Distribution Trust Interests are the owners and grantors. The following discussion assumes that the Distribution Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Distribution Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Distribution Trust, the U.S. federal income tax consequences to the Distribution Trust, the Holders of Distribution Trust Interests and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Distribution Trust).

> b)   General Tax Reporting by the Distribution Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Distribution Trustee, and the Holders of Distribution Trust Interests) must treat the transfer of the Distribution Trust Assets to the Distribution Trust in accordance with the terms of the Bridge Lender Plan. Pursuant to the Bridge Lender Plan, the Distribution Trust Assets are treated, for U.S. federal income tax purposes, as having been transferred (excluding assets set aside in Trust Reserves on account of Disputed Claims if such Trust Reserves are subject to entity-level tax, as discussed below), subject to any obligations relating to those assets, directly to the Holders of the respective Claims in satisfaction of their Claims (with each Holder receiving an undivided interest in such assets in accord with their economic interests in such assets), followed by the transfer by the Holders to the Distribution Trust of such assets in exchange for Distribution Trust Interests. Accordingly, all parties must treat the Distribution Trust as a grantor trust of which the Holders of Distribution Trust Interests are the owners and grantors, and treat the Holders of Distribution Trust Interests as the direct owners of an undivided interest in the Distribution Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.

Pursuant to the Bridge Lender Plan, the Distribution Trustee shall provide a good faith valuation of the Litigation Trust Causes of Action as soon as practicable following the Effective Date (that comprise part of the Distribution Trust Assets), and the Distribution Trustee will in good faith value the remaining Distribution Trust Assets. All parties to the Distribution Trust (including, without limitation, the Debtors, the Distribution Trustee and the Holders of Distribution Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

In computing its taxable income, each Holder of Distribution Trust Interests will be required to include its pro rata share of the income, gain, loss and deduction of the Distribution Trust on its tax return each year. Taxable income or loss allocated to a Holder of a Distribution Trust Asset will be treated as income or loss with respect to such Holder's undivided interest in the Distribution Trust Assets, and *not* as income or loss with respect to its prior Allowed Claim.

The character of any income and the character and ability to use any loss will depend on the particular situation of the Holder.

The U.S. federal income tax obligations of a Holder with respect to its Distribution Trust Interests are not dependent on the Distribution Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Distribution Trust income even if the Distribution Trust does not make a concurrent distribution to the Holder. In general, a distribution of Cash by the Distribution Trust will not be separately taxable to a Holder of Distribution Trust Interests since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Distribution Trust).

The Distribution Trustee will file with the IRS Tax Returns for the Distribution Trust as a grantor trust pursuant to Tax Regulations section 1.671-4(a). The Distribution Trustee will send annually to each Holder of a Distribution Trust Interest a separate statement regarding the receipts and expenditures of the Distribution Trust as relevant for U.S. federal income tax purposes and will instruct all such Holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

              4.      Tax Treatment of the Creditors' Trust and Holders of Creditors' Trust Interests

                    a)      Classification of the Creditors' Trust

The Creditors' Trust is intended to qualify as, and the discussion below assumes that the Creditors' Trust will be respected as, a grantor trust for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a disregarded pass-through entity. No ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Creditors' Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences to the Creditors' Trust, the Creditors' Trust Beneficiaries and the Debtors could vary significantly from those discussed herein, including with respect to the potential for an entity level tax on the Creditors' Trust's income.

In Revenue Procedure 94-45, the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. In general, the Creditors' Trust has been structured with the intention of complying with the criteria of Revenue Procedure 94-45. Pursuant to the Bridge Lender Plan, and in conformity with Revenue Procedure 94-45, all parties are required to treat, for U.S. federal income tax purposes, the Creditors' Trust as a grantor trust of which the Creditor Trust Beneficiaries are the owners and grantors. For U.S. federal income tax purposes, all parties (including the Debtors, the Creditors' Trustee and the Creditors' Trust Beneficiaries) must treat the transfer of the Creditor Trust Assets as a transfer of such assets directly by the Creditors' Trust Beneficiaries to the Creditors' Trust. Subject to the terms of the Creditors' Trust Agreement, and the powers of any advisory

-47-

board established thereunder, the Creditors' Trustee will determine the fair market value of the Creditors' Trust Assets as soon as possible after the Effective Date, and the Creditors' Trust Beneficiaries and the Creditors' Trustee must consistently use this valuation for all U.S. federal income tax purposes.

                b)      General Tax Reporting by the Creditors' Trust and Beneficiaries

Assuming the Creditors' Trust qualifies as a grantor trust, the U.S. federal income tax consequences of the Creditors' Trust and the Creditors' Trust Beneficiaries generally should be similar to those described above with respect to the Distribution Trust and the Holders of Distribution Trust Interests (other than the Reorganized Debtors); provided, that the grantor trust may report gain or loss based on the value of the property upon formation of the Creditors' Trust and, since the basis of a Creditors' Trust Beneficiary may be greater or less than such amount, the gain or loss recognized by any Creditors' Trust Beneficiary may need to be adjusted to reflect the corresponding difference in basis. The Creditors' Trustee will file with the IRS tax returns for the Creditors' Trust treating such trust as a grantor trust pursuant to Tax Regulations section 1.671-4(a). Such trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction or credit, and will instruct the holder to report such items on its U.S. federal income tax return or to forward the appropriate information to the beneficial owners with instructions to report such items on their U.S. federal income tax returns.

                5.      Tax Treatment of Trust Reserves

Pursuant to the Bridge Lender Plan, the Distribution Trustee or the Creditors' Trustee may hold the assets of one or more Trusts allocable to, or retained on account of, Claims that are Disputed, as determined from time to time, separately from other assets of the Trusts (a "Trust Reserve"). The Distribution Trustee or the Creditors' Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), make an election to treat a Trust Reserve as a "disputed ownership fund" within the meaning of Tax Regulations section 1.468B-9. In addition, all parties must report consistently with such treatment.

Under section 468B(g) of the IRC, amounts earned in an escrow account, settlement fund or similar fund generally are subject to tax on a current basis, as the amounts are earned. A disputed ownership fund generally is treated as a corporation but is taxed as either a "qualified settlement fund" or a corporation depending on the nature of the assets held by the disputed ownership fund.

                6.      Limitations on Capital Losses

A Holder of a Claim who recognizes a capital loss as a result of the distributions under the Bridge Lender Plan will be subject to limits on the use of such capital loss. For a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains. A non-corporate holder may carry over unused capital losses and apply them against future capital

gains and a portion of their ordinary income for an unlimited number of years. For corporate
holders, capital losses may only be used to offset capital gains. A corporate holder that has more
capital losses than may be used in a tax year may carry back unused capital losses to the three
taxable years preceding the capital loss year, but may carry over unused capital losses for the
five taxable years following the capital loss year.

### G.   Additional Considerations

1.   Accrued but Unpaid Interest

To the extent that any amount received by a Holder of a surrendered Allowed Claim
under the Bridge Lender Plan is attributable to accrued but unpaid interest and such amount has
not previously been included in the Holder's gross income, such amount should be taxable to the
Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may
be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless
debts) to the extent that any accrued interest on the debt instruments constituting such Claim was
previously included in the Holder's gross income but was not paid in full by the Debtors. Such
loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed
Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed
Claim is unclear. Certain Tax Regulations generally treat a payment under a debt instrument
first as a payment of accrued and untaxed interest and then as a payment of principal.
Application of this rule to a final payment on a debt instrument being discharged at a discount in
bankruptcy is unclear. Pursuant to the Bridge Lender Plan, distributions in respect of Allowed
Claims shall be allocated first to the principal amount of such Claims (as determined for federal
income tax purposes) and then, to the extent the consideration exceeds the principal amount of
the Claims, to any portion of such Claims for accrued but unpaid interest. However, the
provisions of the Bridge Lender Plan are not binding on the IRS or a court with respect to the
appropriate tax treatment for creditors.

2.   Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some
or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed
Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of
"market discount" on the debt constituting the surrendered Allowed Claim. In general, a debt
instrument is considered to have been acquired with "market discount" if its stated redemption
price at maturity (or in the case of a debt obligation having original issue discount, its revised
issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt
obligation in the holder's hands immediately after its acquisition (any such excess, "market
discount").

Any gain recognized by a Holder on the taxable disposition (determined as described
above) of debts that it acquired with market discount should be treated as ordinary income to the
extent of the market discount that accrued thereon while such debts were considered to be held
by the Holder (unless the Holder elected to include market discount in income as it accrued). To

-49-

the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

### H.   Non-U.S. Holders

        1.      General Consequences to Non-U.S. Holders

A Holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Bridge Lender Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

        a)      Non-U.S. Holders of Distribution Trust Interests and Creditors' Trust Interests

The Distribution Trustee and Creditors' Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Non-U.S. Holders of Distribution Trust Interests or Creditors' Trust Interests, the Distribution Trustee or Creditors' Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). Significantly, as discussed above, a Holder of Distribution Trust Interests or Creditors' Trust Interests is treated for federal income tax purposes as holding an undivided interest in the underlying assets of the Distribution Trust or Creditors' Trust. Accordingly, the Distribution Trustee or Creditors' Trustee will treat any amounts received by the Distribution Trust or the Creditors' Trust, the economic benefit of which inures to a Holder of Distribution Trust Interests or Creditors' Trust Interests on the basis described above with respect to the allocation of taxable income as received by the beneficiary in respect of the underlying asset, and *not* in respect of its Allowed Claim. Absent the receipt of a ruling from the IRS or an opinion of counsel (that is satisfactory to the Distribution Trustee or Creditors' Trustee) that no withholding is required, the Distribution Trustee or Creditors' Trustee will likely withhold with respect to such ordinary income.

        b)      Non-U.S. Holders of New Common Stock

If a Non-U.S. Holder receives New Common Stock under the Bridge Lender Plan, dividends made with respect to the New Common stock will be subject to withholding up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

c)      Non-U.S. Holders of New Senior Secured Term Loan

Subject to the discussion below concerning backup withholding, payments of interest on the New Senior Secured Term Loan to a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax, if the Non-U.S. Holder:

   i)      does not own, actually or constructively, for U.S. federal income tax purposes, ten percent (10%) or more of the total combined voting power of all classes of the voting stock of the company that is the applicable borrower;

   ii)     is not, for U.S. federal income tax purposes, a "controlled foreign corporation" related, directly or indirectly, to the company through stock ownership under applicable rules of the IRC;

   iii)    is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC; and

   iv)     in each case, the certification requirement, as described below, is fulfilled with respect to the beneficial owner of the New Senior Secured Term Loan.

The certification requirement referred to above generally will be fulfilled if the Non-U.S. Holder provides to the company or its paying agent an IRS Form W-8BEN (or successor form), signed under penalties of perjury, which includes the Non-U.S. Holder's name and address and a certification as to the Non-U.S. Holder's non-U.S. status.  Other methods might be available to satisfy the certification requirements described above, depending on a Non-U.S. Holder's particular circumstances.

In general, the gross amount of payments of interest that do not qualify for the exception from withholding described above will be subject to U.S. withholding tax at a rate of thirty percent (30%) unless (i) the Non-U.S. Holder provides a properly completed IRS Form W-8BEN (or successor form) claiming an exemption from or reduction in withholding under an applicable tax treaty or (ii) such interest is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business and the Non-U.S. Holder provides a properly completed IRS Form W-8ECI (or successor form).

As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Bridge Lender Plan does not generally address the consequences to Non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Bridge Lender Plan, including owning an interest in the Distribution Trust.

## I.      Information Reporting and Backup Withholding

All distributions to Holders of Claims under the Bridge Lender Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income

tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, as discussed above under "General Consequences to Non-U.S. Holders," a Holder of a Distribution Trust Interest or Creditors' Trust Interest that is a *not* a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. A Non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Bridge Lender Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Bridge Lender Plan does not generally address the consequences to Non-U.S. holders of Allowed Claims.

Under legislation recently enacted into law, certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied. Payments subject to such requirements generally include dividends on and the gross proceeds of dispositions of New Common Stock and/or New Warrants and likely include distributions by the Distribution Trust. These requirements are different from, and in addition to, the withholding tax requirements described above under "General Consequences to Non-U.S. Holders." Non-U.S. holders should consult their tax advisor concerning the application of this legislation to their particular circumstances.

## J.    Federal Income Tax Treatment of Disputed Claims Reserves

Reorganized Tribune may establish one or more Disputed Claims reserves ("Reserves") to make distributions to Holders of Disputed Claims that become Allowed Claims after the Effective Date. Distributions from each such Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed and on or as practicable after the Final Distribution Date, after distributions have been made to Holders of Disputed Claims that have become Allowed Claims during the preceding calendar quarter, any consideration remaining in the Reserves shall be transferred to the Distribution Trust to be distributed in accordance with certain orders.

Holders of Disputed Claims should note the tax treatment of such Reserves is unclear, especially in light of the uncertainty of treating the Litigation Trust and Distribution Trust as one trust, and should consult their own tax advisors.

## K.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE BRIDGE LENDER PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE BRIDGE LENDER PLAN.

## VII.    CONCLUSION AND RECOMMENDATION

The Proponents believe that confirmation of the Bridge Lender Plan is preferable to the alternatives because the Proponents believe it is fairest, most confirmable and provides the greatest opportunity for Holders of Claims against and Interests in any of the Debtors to resolve all issues and avoid extensive delays and increased administrative expenses.

**Accordingly, the Proponents urge all Holders of Claims entitled to vote on the Bridge Lender Plan to vote to accept the Bridge Lender Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Eastern Time) on January 28, 2011.**

Dated:  December 7, 2010

Date: December 7, 2010

KING STREET ACQUISITION COMPANY,
L.L.C.

By: King Street Capital Management, L.P.

    Its Manager

By: _____
    Name: Jay Ryan
    Title: Chief Financial Officer

Date: December 7, 2010

KING STREET CAPITAL, L.P.

By: King Street Capital Management, L.P.

    Its Investment Manager

By: _____
    Name: Jay Ryan
    Title: Chief Financial Officer

Date: December 7, 2010

MARATHON ASSET MANAGEMENT, L.P., on
behalf of certain funds and managed accounts

By: _____
    Name:   LOUIS T. HANOVER
    Title:   AUTHORIZED SIGNATORY