## EXHIBIT A

**Amendment #1 to the 2010 Audit Engagement Letter**

# PRICEWATERHOUSECOOPERS 🅾

PricewaterhouseCoopers LLP
One North Wacker
Chicago, IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001
pwc.com

**Amendment # 1 to Existing Engagement Letter**

October 19, 2010

Mr. William A. Osborn
Director, Audit Committee Chair of Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

Dear Mr. Osborn:

This letter reflects our agreement to amend our engagement letter of May 5, 2010 with Tribune Company (the "Company") in the following respects. Incremental services performed to assess the conclusions reached in the report filed with the Bankruptcy Court by Kenneth H. Klee, Examiner.

As discussed and as a result of this change, our incremental fee will be based on the time required by our professionals to complete the additional services. Our fees for these services will be based on the following agreed upon hourly rates:

| Personnel | Hourly Billing Rate |
|---|---|
| Partner | $650 |
| Director/Senior Manager | $450 |

All other provisions of our engagement letter of May 5, 2010 with the Company remain unchanged.

If you have any questions regarding this amendment, please discuss them with William T. England at (312) 298-2806. If the services and terms outlined in this amendment to the engagement letter are acceptable, please sign one copy of this amendment in the space provided and return it to me. You may return the signed copy by hand, mail, air courier or by facsimile to my attention at (312) 298-6842, or attached to an email as a pdf, jpeg or similar file type sent to me at william.t.england@us.pwc.com.

Very truly yours,

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP

# PRICEWATERHOUSE COOPERS

The services and terms as set forth in this letter are agreed to.

Tribune Company by and through its Audit Committee

By:

William A. Osborn
Audit Committee Chair

10/19/10
(Date)

2

## EXHIBIT B

**Employee Benefit Plans Audit Engagement Letter**

# PRICEWATERHOUSECOOPERS 🅐

---

PricewaterhouseCoopers LLP
One North Wacker
Chicago IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001

May 5, 2010

Mr. Jack Rodden
Treasurer
Tribune Company
435 North Michigan Avenue
Chicago, IL 60604

Dear Mr. Rodden:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of the benefit plans listed in Attachment A ("the Plans").

Service and related report

For each of the Plans listed in Attachment A, we will perform a limited-scope audit of the statement of net assets available for benefits at December 31, 2009 and the statement of changes in net assets available for benefits and for the year then ending. Our limited-scope audit also will address the supplemental information required by the Employee Retirement Income Security Act of 1974 ("ERISA"). Because of the significance of the limitations on the scope of our audit described in the following section with respect to the information certified by The Northern Trust Company (the "Trustee") that we will not audit, we will be unable to, and we will not, express an opinion on the Plans' financial statements and supplementary schedules taken as a whole. We will, however, provide you with our report expressing our opinion on whether the form and content of the information included in each Plan's financial statements and supplemental schedules, other than that derived from the information certified by the Trustee, are presented in compliance with the Department of Labor's (DoL) rules and regulations for reporting and disclosure under ERISA. If for any reason relating to the affairs or management of any individual Plan we are unable to complete the audit, we may decline to issue a report for that Plan as a result of this engagement.

Our responsibilities and limitations

As permitted by 29 CFR 2520.103-8 of the DoL's rules and regulations for reporting and disclosure under ERISA, you have instructed us not to perform, and we will not perform, any auditing procedures with respect to the statements and information relating to each Plan's investments certified by the Trustee, except for comparing such information with the related information included in each Plan's financial statements and supplementary schedules. We have been informed by you that the Trustee holds each Plan's investment assets and executes investment transactions. The form and content of the information included in each Plan's financial statements, other than that derived from the information certified by the Trustee, will be audited by us in accordance with auditing standards generally accepted in the United States. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.



**Mr. Jack Rodden**
**Tribune Company**
**Page 2**

The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements and supplemental information, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

We will consider each Plan's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements and supplementary schedules. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies and material weaknesses relating to internal control over financial reporting identified during our audits will be communicated to you. All deficiencies in internal control (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) relating to internal control over financial reporting identified while performing our work will be communicated to management of the Plans.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Absolute assurance is not attainable due to the nature of audit evidence and the characteristics of fraud. Our audits will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. An audit is based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested, and the nature, timing, extent and results of the tests to be performed. An audit is, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with auditing standards generally accepted in the United States may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, including prohibited transactions with parties in interest and other violations of ERISA rules and regulations, if present, will be detected. However, we will communicate to you, as appropriate, any such matters identified during our limited-scope audit.

We will perform certain procedures directed at considering each Plan's compliance with Internal Revenue Code requirements for tax-exempt status, including inspecting the latest tax determination letter from the Internal Revenue Service (IRS). As we perform our audits, we will be aware of the possibility that events affecting each Plan's tax status may have occurred. Similarly, we will be aware of the possibility that events affecting each Plan's compliance with the requirements of ERISA may have occurred. These procedures do not constitute an examination or review for the purpose of determining compliance with the Internal Revenue Code or ERISA. However, any instances of tax or ERISA non-compliance identified during our audits will be communicated to you.

We also are responsible for determining that the Plans' oversight entity and Plans' sponsor is informed about certain other matters related to the conduct of the audits, including (i) any disagreements with management about matters that could be significant to the Plans' financial statements or our report



Mr. Jack Rodden
Tribune Company
Page 3

thereon; (ii) any serious difficulties encountered in performing the audits; (iii) information relating to our independence with respect to the Plans; and (iv) other matters related to the Plans' financial statements including its accounting policies and practices; and (v) all significant deficiencies and material weaknesses identified during the audits, as previously mentioned. Lastly, we are responsible for ensuring that the Plans' oversight entity receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control or operational matters.

The audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed or matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

Management's responsibilities

Management of each Plan is responsible for the financial statements and supplemental information referred to above. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements the safeguarding of assets, the proper recording of transactions in the accounting records and for reporting financial information in conformity with accounting principles generally accepted in the United States. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the plan involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the plans received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole and (ii) notifying us of all material weaknesses, including other significant deficiencies, in the design or operation of the Plan's internal control over financial reporting that are reasonably likely to adversely affect the Plans' ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible for identifying and ensuring that each Plan complies with the laws and regulations applicable to its activities.
As part of management's responsibility for the financial statements and the effectiveness of its internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the original accounting records and related information and plan personnel to whom we may direct inquiries. As required by auditing standards generally accepted in the United States, we will make specific inquiries of management and others about the representations embodied in the financial statements and supplemental information and the effectiveness of internal control over financial reporting. Auditing standards generally accepted in the United States also require that we obtain written representations covering the audited financial statements and supplemental information from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements and the supplemental information.



**Mr. Jack Rodden**
**Tribune Company**
**Page 4**

Management agrees to obtain a certification from the Trustee for each Plan as of the date of the financial statements and for the year then ended that the information provided by them is complete and accurate. Management agrees to furnish such certification to us.

<u>Other documents</u>

Auditing standards generally accepted in the United States require that we read any annual report (or similar document) that contains our audit report. Our engagement does not include preparation of each Plan's 2009 Form 5500 for filing with the IRS and DoL. We will, however, read the Form 5500 prior to filing and consider whether the information in the Form 5500, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. Management agrees for this purpose to provide us with the final draft Form 5500 before it is filed with the IRS and DoL. These procedures are not sufficient, nor are they intended, to ensure that the Plan's Form 5500 is completely and accurately prepared. We assume no obligation to perform procedures to corroborate such other information as part of our audits.

<u>Release and indemnification</u>

Because of the importance of oral and written management representations to an effective audit, the Plans release and indemnify PricewaterhouseCoopers LLP and its personnel from any and all claims, liabilities, costs and expenses attributable to any knowing misrepresentation by management.

In no event shall PricewaterhouseCoopers LLP be liable to the Plans, whether a claim be in tort, contract or otherwise, for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers LLP's services provided under this engagement letter, except to the extent finally determined to have resulted from the willful misconduct or fraudulent behavior of PricewaterhouseCoopers LLP relating to such services.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Plans and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

<u>Timing and fees</u>

Completion of our work is subject to, among other things, 1) appropriate cooperation from each Plan's personnel including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Plans are unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete the audits.

Our fee estimates are based on the time required by the individuals assigned to the engagement. We estimate our fees for this limited-scope audit engagement will be $161,000, subject to the terms and



Mr. Jack Rodden
Tribune Company
Page 5

conditions above.  Our fees will be billed as outlined in Attachment A. We also will advise you should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill the Company for our reasonable out-of-pocket expenses.

Invoices rendered are due and payable upon receipt.

Other matters

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs.  Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms.  In the course of providing the services herein, we may, in our discretion, draw on the resources of and subcontract to other PricewaterhouseCoopers firms, or to PricewaterhouseCoopers LLP subsidiaries or other subcontractors outside the United States.  You agree that we may provide any information we receive in connection with this engagement to such other PricewaterhouseCoopers firms, subsidiaries and subcontractors for the purpose of providing the services set forth in this engagement letter and/or for internal administrative and regulatory compliance purposes.  Unless another PricewaterhouseCoopers firm is contracted by you or a group entity to provide any of the services which are the subject of this engagement letter, provision of the services remains the responsibility of PricewaterhouseCoopers LLP alone.  You agree that neither you nor any group entity will bring any claim, whether in contract, tort (including negligence) or otherwise against any other PricewaterhouseCoopers firm in respect of this engagement letter or in connection with the services herein.

Any additional services that you may request and we agree to provide will be the subject of separate agreements.

We may be requested to make certain working papers available to the DoL pursuant to authority given to it by law or regulation.  If requested, access to such working papers will be provided under the supervision of PricewaterhouseCoopers LLP personnel.  Furthermore, upon request, we may provide photocopies of selected working papers to the DoL.  We will mark all information as confidential and maintain control over the duplication of all such information.  However, the DoL may intend, or decide, to distribute the photocopies or information contained therein to others, including other governmental agencies.  You will be billed for additional fees as a result of the aforementioned work.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for you, you will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer this engagement letter or any rights, obligations, claims or proceeds from claims against PricewaterhouseCoopers LLP



Mr. Jack Rodden
Tribune Company
Page 6

arising under this engagement letter to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision. Any assignment or transfer by the Company in violation of this paragraph shall be void and invalid.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

We are pleased to have the opportunity to provide services to the Tribune Company. If you have any questions about this letter, please discuss them with Robert Farr at (312) 298-2919 or Heather Vasilenko at (312) 298-3430. If the services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to me. You may return the signed copy by hand, by mail, by air courier, by facsimile to Heather Vasilenko's attention at (813) 375-8874, or attached to an email as a pdf, jpeg or similar file type sent to Heather Vasilenko at heather.vasilenko@us.pwc.com.

Very truly yours,

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP

cc: *Tribune Company Employee Benefits Committee*
    *Brian Litman, Tribune Company Controller*

The services and terms as set forth in this letter are agreed to.

Tribune Company Cash Balance Pension Plan
Tribune Company Hourly Pension Plan
Baltimore Sun Company Employees' Retirement Plan
Tribune Company Benefit Program

By:    *Jack Rodden*
       Jack Rodden
       Treasurer, Tribune Company

       8-23-10
       Date



Mr. Jack Rodden
Tribune Company
Page 7

**Attachment A**

| Employee Benefit Plan Name | Total Fee | June 2010 | July 2010 | August 2010 |
|---|---|---|---|---|
| Tribune Company Cash Balance Pension Plan | $37,000 | $13,000 | $13,000 | $11,000 |
| Tribune Company Hourly Pension Plan | 30,000 | 10,000 | 10,000 | 10,000 |
| Baltimore Sun Company Employees' Retirement Plan | 34,000 | 12,000 | 12,000 | 10,000 |
| Tribune Company Benefit Program | 60,000 | | 30,000 | 30,000 |

# EXHIBIT C

**Plan Audit Engagement Letter**



**PRICEWATERHOUSECOOPERS** 🄫

PricewaterhouseCoopers LLP
One North Wacker
Chicago IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001

May 5, 2010

Mr. Jack Rodden
Treasurer
Tribune Company
435 North Michigan Avenue
Chicago, IL 60604

Dear Mr. Rodden:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of the Tribune Employee Stock Ownership Plan ("the Plan").

Service and related report

We will audit the Plan's statement of net assets available for benefits at December 31, 2009 and the statement of changes in net assets available for benefits for the year then ending. Upon completion of our audit, we will provide you with our audit report on the financial statements referred to above. Our audit and the related report also will address the supplemental information required by the Employee Retirement Income Security Act of 1974 ("ERISA"). If for any reason relating to the affairs or management of the Plan we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

Our responsibilities and limitations

The objective of a financial statement audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with auditing standards generally accepted in the United States. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements and supplemental information, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

We will consider the Plan's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements and supplementary information. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, all significant deficiencies and material weaknesses relating to internal control over financial reporting identified during our audit will be communicated in writing to the Plan oversight entity and management of the Plan. All deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) relating to



Mr. Jack Rodden
Tribune Company
Page 2

internal control over financial reporting identified while performing our work will be communicated to management of the Plan.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Absolute assurance is not attainable due to the nature of audit evidence and the characteristics of fraud. Our audit will not include a detailed audit of transactions, such as would be necessary to identify errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. An audit is based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. An audit is, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, an audit designed and executed in accordance with auditing standards generally accepted in the United States may not detect a material fraud. Characteristics of fraud include (i) concealment through collusion among management, employees, or third parties; (ii) withheld, misrepresented, or falsified documentation; and (iii) the ability of management to override or instruct others to override what otherwise appears to be effective controls. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, including prohibited transactions with parties in interest and other violations of ERISA rules and regulations, if present, will be detected. However, we will communicate to you the Plan oversight entity, Plan Administrator, and management of the Plan, as appropriate, any such matters identified during our audit.

We will perform certain procedures directed at considering the Plan's compliance with Internal Revenue Code requirements for tax-exempt status, including inspecting the Plan's latest tax determination letter from the Internal Revenue Service (IRS). As we perform our audit, we will be aware of the possibility that events affecting the Plan's tax status may have occurred. Similarly, we will be aware of the possibility that events affecting the Plan's compliance with the requirements of ERISA may have occurred. These procedures do not constitute an examination or review for the purpose of determining compliance with the Internal Revenue Code or ERISA. However, any instances of tax or ERISA non-compliance identified during our audit will be communicated to you.

We also are responsible for determining that the Plan oversight entity and Plan sponsor is informed about certain other matters related to the conduct of the audit, including (i) any disagreements with management about matters that could be significant to the Plan's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the Plan; and (iv) other matters related to the Plan's financial statements including its accounting policies and practices; and (v) all significant deficiencies and material weaknesses identified during the audit, as previously mentioned. Lastly, we are responsible for ensuring that the Plan oversight entity receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control or operational matters.

The audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not



be specifically addressed or matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

Management's responsibilities

The Plan's management is responsible for the financial statements and supplemental information referred to above. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the plan involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the plan received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all material weaknesses, including other significant deficiencies, in the design or operation of the Plan's internal control over financial reporting that are reasonably likely to adversely affect the Plan's ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible for identifying and ensuring that the Plan complies with the laws and regulations applicable to its activities.

As part of management's responsibility for the financial statements and the effectiveness of its internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Plan's original accounting records and related information and plan personnel to whom we may direct inquiries. As required by auditing standards generally accepted in the United States, we will make specific inquiries of management and others about the representations embodied in the financial statements and supplemental information and the effectiveness of internal control over financial reporting. Auditing standards generally accepted in the United States also require that we obtain written representations covering the audited financial statements and supplemental information from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements and the supplemental information.

Other documents

Auditing standards generally accepted in the United States require that we read any annual report (or similar document) that contains our audit report. Our engagement does not include preparation of the Plan's 2009 Form 5500 for filing with the IRS and Department of Labor ("DoL"). We will, however, read the Form 5500 prior to filing and consider whether the information in the Form 5500, including the manner of its presentation, is materially inconsistent with information appearing in the financial



Mr. Jack Rodden
Tribune Company
Page 4

statements.  Management agrees for this purpose to provide us with the final draft Form 5500 before it is filed with the IRS and DoL.  These procedures are not sufficient, nor are they intended, to ensure that the Plan's Form 5500 is completely and accurately prepared.  We assume no obligation to perform procedures to corroborate such other information as part of our audit.

Release and indemnification

Because of the importance of oral and written management representations to an effective audit, the Plan releases and indemnifies PricewaterhouseCoopers LLP and its personnel from any and all claims, liabilities, costs and expenses attributable to any knowing misrepresentation by management.

In no event shall PricewaterhouseCoopers LLP be liable to the Plan, whether a claim be in tort, contract or otherwise, for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers LLP's services provided under this engagement letter, except to the extent finally determined to have resulted from the willful misconduct or fraudulent behavior of PricewaterhouseCoopers LLP relating to such services.

In the event that our report is subsequently included in a filing with the Securities and Exchange Commission (unless our report is included as a result of Rule 3-05 or Rule 3-14 of Regulation S-X), we and the Company hereby agree that the preceding two paragraphs in this "Release and Indemnification" section of this letter and any paragraphs covering the same issues in our previous engagement letters for previously issued reports included in the filing will be null and void and will no longer confer any rights or obligations on the parties. Such engagement letters will be deemed to be amended accordingly at the time of such filing, without further action by either party.  Any letters so amended will remain in full force and effect unless otherwise amended by the parties.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Plan and PricewaterhouseCoopers LLP agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Plan's personnel including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters.  When and if for any reason the Plan is unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

Our fee estimates are based on the time required by the individuals assigned to the engagement.  We estimate our fees for this audit engagement will be $10,000, subject to the terms and conditions above. We will advise you should any other circumstances arise which may cause actual time to exceed that estimate.



Mr. Jack Rodden
Tribune Company
Page 5

We also will bill the Company for our reasonable out-of-pocket expenses and our internal per ticket charges for booking travel. Our internal per ticket travel charge is an allocation of estimated costs of running our travel department in a manner to maximize cost savings and minimize total costs.

Invoices rendered are due and payable upon receipt.

We may use temporary contract staff to perform certain tasks on your engagement and will bill for that time at the rate that corresponds to PwC staff providing a similar level of service. Upon request, we will be happy to provide details on the training, supervision and billing arrangements we use in connection with these professionals.

<u>Other matters</u>

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

PricewaterhouseCoopers LLP is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms. In the course of providing the services herein, we may, in our discretion, draw on the resources of and subcontract to other PricewaterhouseCoopers firms or to PricewaterhouseCoopers LLP subsidiaries or other subcontractors outside the United States. You agree that we may provide any information we receive in connection with this engagement to such other PricewaterhouseCoopers firms, subsidiaries and subcontractors for the purpose of providing the services set forth in this engagement letter and/or for internal administrative and regulatory compliance purposes. Unless another PricewaterhouseCoopers firm is contracted by you or a group entity to provide any of the services which are the subject of this engagement letter, provision of the services remains the responsibility of PricewaterhouseCoopers LLP alone. You agree that neither you nor any group entity will bring any claim, whether in contract, tort (including negligence) or otherwise against any other PricewaterhouseCoopers firm in respect of this engagement letter or in connection with the services herein. In the event that our report is subsequently included in a filing with the Securities and Exchange Commission (unless our report is included as a result of Rule 3-05 or Rule 3-14 of Regulation S-X), for independence purposes we and the Company hereby agree that the immediately preceding sentence will be null and void and will no longer confer any rights or obligations on the parties. This letter will be deemed to be amended accordingly at the time of such filing, without further action by either party. The amended letter will remain in full force and effect unless otherwise amended by the parties.

Any additional services that may be requested and we agree to provide will be the subject of separate written agreements.

We may be requested to make certain working papers available to the DoL pursuant to authority given to it by law or regulation. If requested, access to such working papers will be provided under the supervision of PricewaterhouseCoopers LLP personnel. Furthermore, upon request, we may provide photocopies of selected working papers to the DoL. We will mark all information as confidential and maintain control over the duplication of all such information. However, the DoL may intend, or decide,



Mr. Jack Rodden
Tribune Company
Page 6

to distribute the photocopies or information contained therein to others, including other governmental agencies.  You will be billed for additional fees as a result of the aforementioned work.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Plan, the Plan will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer this engagement letter or any rights, obligations, claims or proceeds from claims against PricewaterhouseCoopers LLP arising under this engagement letter to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision.  Any assignment or transfer by the Company in violation of this paragraph shall be void and invalid.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter.  It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral.  The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

\*    \*    \*    \*    \*

We are pleased to have the opportunity to provide services to the Tribune Company.  If you have any questions about this letter, please discuss them with Robert Farr at (312) 298-2919 or Heather Vasilenko at (312) 298-3430.  If the services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to me.  You may return the signed copy by hand, by mail, by air courier, by facsimile to Heather Vasilenko's attention at (813) 375-8874, or attached to an email as a pdf, jpeg or similar file type sent to Heather Vasilenko at heather.vasilenko@us.pwc.com.

Very truly yours,

PricewaterhouseCoopers LLP

cc:  *Tribune Company Employee Benefits Committee*
     *Brian Litman, Tribune Company Controller*



**Mr. Jack Rodden**
**Tribune Company**
**Page 7**

The services and terms as set forth in this letter are agreed to.

Tribune Employee Stock Ownership Plan

By:  _Jack Rodden_
     Jack Rodden
     Treasurer, Tribune Company

_8 – 23 – 10_
Date

# **EXHIBIT D**

**Employee Benefit Plan Filings Engagement Letter**



PricewaterhouseCoopers LLP
One North Wacker
Chicago, IL 60606
Telephone (312) 298 2000
Facsimile (312) 298 2001
www.pwc.com

May 17, 2010

Mr. Jack Rodden
Vice President and Treasurer
Tribune Company
435 North Michigan Avenue
Chicago, IL 60611

**Re:    Tribune Company Employee Benefit Plan Filings**

Dear Mr. Rodden:

This letter is to confirm we will provide certain services to Tribune Company and subsidiaries ("Tribune" or "you") in connection with the annual employee benefit plan filing requirements for Tribune Company. This engagement letter sets forth an understanding of the nature and scope of the services to be performed and the fees we will charge for the services, and outline the responsibilities of PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PwC" "we" or "us") and Tribune Company necessary to ensure that PwC's professional services are performed to achieve mutually agreed upon objectives.

**Summary of Services**

Our services will include the preparation of the 2009 Forms 5500 (Annual Return/Report of Employee Benefit Plan) and certain other consultations for the Plan ("Services"). The attached chart lists the plans and filings that we understand to be covered by our Services, as of the date of this letter.

Our Services will include:

* Overall coordination assistance related to the completion of the filings;

* Preparation of a data request for all required filings and monitoring of the progress of the data accumulation;

* On-site review of the accumulated data, including discussions and resolution of certain issues regarding the data;

* Preparation of all required requests for extension of time to file the returns (Form 5558);

* Preparation of the Forms 5500 and other filings for the plans;

* Coordination of the necessary steps with the PricewaterhouseCoopers audit team;

* Certain coordination and review related to filings prepared by other service providers or Tribune



Company entities;

- Coordination of the electronic filing of the Forms 5500 with the Department of Labor;

- Preparation of a Summary Annual Report for distribution to participants and beneficiaries for each plans (where applicable); and

- Review and discussion of technical and other issues that arise during our project.

In preparing the Forms 5500, PricewaterhouseCoopers will be relying upon data, representations and other information provided by Tribune Company, the plan administrator, recordkeeper and/or other plan agents and vendors. The Form 5500 requires signature, under penalty of perjury, by the plan administrator, affirming that the return/report and accompanying schedules, statements and attachments are true, correct and complete to the best of his or her knowledge and belief. The plan administrator is responsible for understanding and agreeing with the various amounts, computations and statements presented in the Form 5500 before filing with the regulatory authorities.

If the scope of the engagement changes, or you request additional services that are not within the scope of this agreement, we will notify you that those services are out-of-scope and additional fees will be incurred at our hourly rates. If we anticipate that the additional fees will exceed $5,000, we will also provide you with a fee estimate and request your approval before proceeding. Finally, if the scope of the work is unrelated to this engagement, or there is a significant departure from the existing engagement, we will provide you with a scope of services description which will incorporate the terms of this agreement for your approval and signature.

**Electronic Filing**

The Department of Labor ("DOL") requires the electronic filing of the Form 5500 for plan years that begin on or after January 1, 2009, as well as for delinquent and amended Forms 5500 for prior years (with certain exceptions for 2008 Forms 5500). PwC will prepare the Form 5500 using DOL-approved software, and you agree to provide PwC with the appropriate contact information for the individual(s) that you have designated to review, sign, and file the return with the DOL. You are responsible for complying with the DOL's requirements for electronically signing the return, including obtaining a credential, and taking the necessary steps to electronically file the return with the DOL. You agree to accept responsibility for any notifications received regarding the Form 5500, and to notify PwC of any notifications and decide with PwC who is responsible for taking remedial action.

**Service Provider Information (Schedule C)**

The 2009 Form 5500 Schedule C (Service Provider Information) includes additional disclosures related to compensation paid to service providers of the plan, including direct compensation, indirect compensation and non-monetary compensation arrangements. Additional information is required to be disclosed regarding the service providers that receive such fees, and the fee amounts or formulas for calculating the fees. The additional disclosures pertain to fees that may be imbedded within certain investment arrangements or are part of bundled service arrangements.

The new Schedule C disclosures reflect the Department of Labor's effort to encourage plan sponsors and fiduciaries to identify all of the fees that are paid from plan assets. Plan sponsors are also required to maintain documentation related to certain expense arrangements. Our preparation of the Form 5500 includes the preparation of Schedule C. However, while our data request will include a general request for indirect expense information, the data request cannot identify the actual indirect expense arrangements that may exist within a plan or other entity. Additional assistance to identify all



of the expense arrangements related to a plan (primarily indirect expense arrangements) is outside of the scope of the Form 5500 preparation.

**Additional Services**

From time to time, you may request PwC to provide services outside the scope of these Form 5500 preparation services that may not be significant enough to require a separate agreement ("Additional Services"). Subject to our acceptance, PwC will provide Additional Services necessary to respond to matters presented to PwC by you, or matters PwC brings to your attention for which you agree PwC should provide assistance. The following illustrates the nature of the Additional Services intended to be covered by this agreement:

- **Additional assistance related to data**

    In the event that you require additional assistance related to the accumulation and review of data required for the Form 5500, outside of our usual procedures for requesting and monitoring of data, we can provide any additional assistance deemed to be necessary. This additional assistance may relate to the service provider information that is required to be maintained by the plan sponsor and reported on Schedule C of the Form 5500.

- **Recurring consulting services**

    We will provide advice, answers to questions and/or opinions on tax planning or reporting matters, including research, discussions, preparation of memoranda, and attendance at meetings relating to such matters, as mutually determined to be necessary.

- **Matters involving tax authorities**

    We will provide advice and/or assistance with respect to matters involving the Department of Labor (DOL) or Internal Revenue Service ("IRS") or other tax and regulatory authorities on an as-needed or as-requested basis.

These examples are not meant to limit the Additional Services we may provide to you under the terms of this agreement. We will keep you fully apprised of the nature of any Additional Services we are providing under this agreement. All related periodic billings (see discussion below) will describe the Additional Services rendered during the period.

**Other PricewaterhouseCoopers Firms**

PwC is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of PwC, the "Other PwC Firms"). While performing the Services hereunder, PwC may, in its discretion, draw on the resources of a subcontract to its subsidiaries and/or the Other PwC Firms (each a "PwC Firm Subcontractor"). You agree that PwC may provide information PwC receives in connection with this engagement letter, including your entire tax return information, to its subsidiaries and/or the Other PwC Firm(s) located outside the United States to perform the Services and/or for internal administrative and regulatory compliance purposes.

We will be solely responsible for the provision of the Services (including those performed by each PwC Firm Subcontractor) and no Other PwC Firm shall have any liability or obligations arising out of this engagement letter. Consequently, you agree (a) to bring any claim or other legal proceeding of any nature arising from the Services against us and not against any PwC Firm Subcontractors or their or PwC's respective partners, principals or employees (collectively the "Beneficiaries") and (b) ensure or



procure that your subsidiaries and affiliates will not assert any such claim or other legal proceeding against us or the Beneficiaries. If any of your subsidiaries and affiliates receive Services under this engagement letter, you agree to provide a copy of this engagement letter to such entities, and you will notify them that although PwC Firm Subcontractors may interact with them, the delivery of Services under this engagement letter is governed by the terms of this engagement letter (including the liability limitations herein), and they should notify you of any disputes or potential claims arising from the Services.

By entering into this engagement letter you are binding your subsidiaries and affiliates to the extent that you have authority to do so. We disclaim any contractual or other responsibility or duty of care to any other subsidiaries or affiliates. While we are entering into this engagement letter on our own behalf, this section is intended for the benefit of each PwC Firm Subcontractor that provides services under this engagement letter.

**Other Subcontractors**

We may engage subcontractors, other than Other PwC Firms, to perform services in connection with this engagement. You agree that we may subcontract any of the Services hereunder provided that we shall be responsible for the fulfillment of our obligations under this engagement letter. You acknowledge that we may disclose your information, including your entire tax return information, to such subcontractor involved in the provision of the Services, including any subcontractor located outside of the United States.

Upon request, we will be happy to provide details on the supervision and billing arrangements we use in connection with these professionals.

**Consents to Disclose Client Information**

You authorize PwC to participate in discussions with and to disclose your information, including your tax return information, to your agents, representatives, administrators or professional advisors (including accountants, attorneys, financial and other professional advisors), their respective officers, directors or employees, and other parties as you may direct.

You have the ability to request a more limited disclosure than that authorized by the Other PricewaterhouseCoopers Firms, Other Subcontractors and Consents to Disclose Client Information provisions of this engagement letter, as you may direct. This consent is valid until the later of three years following receipt of your information or completion of the Services covered by this engagement letter.

**Ownership and Use**

We are providing these Services and deliverables solely for your use and benefit and pursuant to a client relationship exclusively with you. We disclaim any contractual or other responsibility or duty of care to others based upon these Services or upon any deliverables or advice we provide.

You will own all tangible written material prepared for and delivered to you under this engagement letter, except as follows: we own our working papers, preexisting materials and any general skills, know-how, processes, or other intellectual property (including a non-client specific version of any deliverables) which we may have discovered or created as a result of the Services. You have a nonexclusive, non-transferable license to use such materials included in the deliverables for your own use as part of such deliverables.



In addition to deliverables, we may develop software or electronic materials (including spreadsheets, documents, databases and other tools) to assist us with an engagement. If we make these available to you, they are provided "as is" and your use of these materials is at your own risk.

**Our Responsibilities**

We will perform the Services in accordance with, as applicable, the Statements on Standards for Consulting Services, or the Statements on Standards for Tax Services established by the American Institute of Certified Public Accountants. Accordingly, we will not provide an audit or attest opinion or other form of assurance, and we will not verify or audit any information provided to us.

**Your Responsibilities**

You have agreed to provide us with any assistance necessary to perform the services discussed above. We expect that you will provide timely, accurate and complete information and reasonable assistance, and we will perform the engagement on that basis.

You are responsible for all management functions and decisions relating to this engagement, including evaluating and accepting the adequacy of the scope of the Services in addressing your needs. You are also responsible for the results achieved from using any Services or deliverables, and it is your responsibility to establish and maintain internal controls. You will designate a competent member of your management to oversee the Services.

**Fees and Expenses**

Our fee is based on the time required by our professionals to complete the engagement. Individual hourly rates vary according to the experience and skill required. We estimate that our fees for this engagement will not exceed $140,000.

We also will bill you for our reasonable out-of-pocket expenses and our internal per ticket charges for booking travel. Our internal per ticket travel charge is an allocation of estimated costs of running our travel department in a manner to maximize cost savings. You agree to reimburse us for sales, use or value added tax, if applicable, which will be included in the invoices for Services or at a later date if it is determined that such taxes should have been collected.

The amount of our fee is based on the assumption that we will receive the information and assistance as detailed throughout this agreement. In the event we believe an additional fee is required as the result of the failure of you to meet any of these requests or for any other reason, we will inform you promptly.

**Payment Schedule**

Our standard practice is to render our invoices on a monthly basis. Payment of our invoices is due on presentation and expected to be received within 60 days of the invoice date.

**Termination and Dispute Resolution**

Either party may terminate the Services by giving notice to that effect. Any unresolved dispute relating in any way to the Services or this engagement letter shall be resolved by arbitration. The arbitration will be conducted in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution then in effect. The arbitration will be conducted before a panel of three arbitrators. The arbitration panel shall have no power to award non-monetary or



equitable relief of any sort. It shall also have no power to award damages inconsistent with the Limitations on Liability provisions below. You accept and acknowledge that any demand for arbitration arising from or in connection with the Services must be issued within one year from the date you became aware or should reasonably have become aware of the facts that give rise to our alleged liability and in any event no later than two years after any such cause of action accrued.·

This engagement letter and any dispute relating to the Services will be governed by and construed, interpreted and enforced in accordance with the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that would require the laws of another jurisdiction to apply.

## Limitations on Liability

Except to the extent finally determined to have resulted from our gross negligence or intentional misconduct, our aggregate liability for all claims, losses, liability or damages in connection with this engagement letter or the Services, whether as a result of breach of contract, tort (including negligence) or otherwise, regardless of the theory of liability asserted, is limited to no more than the total amount of annual fees paid to us for the particular Service giving rise to the liability under this engagement letter. In addition, we will not be liable in any event for lost profits, consequential, indirect, punitive, exemplary or special damages. Also, we shall have no liability to you arising from or relating to any third party hardware, software, information or materials selected or supplied by you.

## Indemnification

You agree to indemnify and hold us and each PwC Firm Subcontractor and our respective partners, principals and employees harmless from and against any and all third party claims resulting from any of the Services or deliverables under this engagement letter, except to the extent determined to have resulted from our gross negligence or intentional misconduct relating to such Services and/or deliverables.

## Regulatory Matters

Notwithstanding anything to the contrary in this Agreement, you have no obligation of confidentiality with respect to any materials, advice or portions of Deliverables to the extent they concern the tax structure or tax treatment of any transaction.

## Other Written Advice

Based on our discussions, it is anticipated that the written advice PwC provides during the course of this engagement will be Other Written Advice as defined by Circular 230. Accordingly, unless otherwise prohibited or we agree to issue a Covered Opinion as defined by Circular 230, our written advice may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed. Our advice will contain any other disclosures required by Circular 230.

## Tax Return Disclosure and Tax Advisor Listing Requirements

Certain federal and state regulations require taxpayers to disclose their participation in certain reportable transactions to the taxing authorities. You shall advise PwC if you determine that any matter covered by this engagement letter is a reportable transaction that is required to be disclosed. Certain federal and state regulations also require PwC to submit information returns and maintain lists of certain client engagements if PwC is a material advisor to clients that have participated in a



reportable transaction. Therefore, if PwC determines, after consultation with you, that you have participated in a transaction causing PwC to have a registration and/or list maintenance obligation, PwC will place your name and other required information on a list. PwC will contact you if PwC is required to provide your name to the U.S. Internal Revenue Service or any state in connection with any matter under this engagement letter.

**PCAOB Rule 3522**

You have represented to us, and by signing this engagement letter, confirm that no other advisor providing advice or assistance with respect to the subject matter of this engagement letter has imposed any conditions of confidentiality, as defined by Public Company Accounting Oversight Board ("PCAOB") Rule 3522.  In addition, you agree that if, after we begin providing services covered by this engagement letter any other advisor imposes conditions of confidentiality with respect to the matter that is subject to this engagement letter, you will notify us immediately so that we can cease all work in order to avoid any impairment to independence under PCAOB Rule 3522.

**Federal (Internal Revenue Code Section 6694) and State Preparer Standards**

Federal law and certain state laws impose obligations on tax return preparers with respect to a position reported on a tax return or claim for refund that does not meet certain standards regarding levels of confidence.  If during the course of this engagement we identify a position that does not meet these standards, we will advise you about your penalty exposure and whether you can avoid penalty through disclosure. If we are preparing the return or claim for refund and it is concluded that disclosure is required, we will prepare the disclosure and provide it to you.

Our work may require consultation with a PwC subject matter specialist to reach and document the level of technical support for the position. We will discuss with you any additional fees that may be incurred as a result of complying with these requirements.

**Other Matters**

No party to this engagement letter may assign or transfer this engagement letter, or any rights, obligations, claims or proceeds from claims arising under it, without the prior written consent of the other party, and any assignment without such consent shall be void and invalid.  If any provision of this engagement letter is found to be unenforceable, the remainder of this engagement letter shall be enforced to the extent permitted by law. If we perform the Services prior to both parties executing this engagement letter, this engagement letter shall be effective as of the date we began the Services.

This engagement letter supersedes any prior understandings, proposals or agreements with respect to the Services, and any changes must be agreed to in writing.

PwC is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs.  Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

\*    \*    \*    \*    \*

 **PRICEWATERHOUSECOOPERS**

May 17, 2010
Mr. Jack Rodden
Page 8 of 8

If you have any questions about the contents of this letter, please contact Chris King at 312 298-2231.

Yours very truly,

PricewaterhouseCoopers LLP

By: _Paul Perry_____

Paul C. Perry, Partner

If the Services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to:

Christopher J. King
PricewaterhouseCoopers LLP
One North Wacker Drive
Chicago, IL 60606

**ACKNOWLEDGED AND AGREED:**

**Tribune Company**

Signature of client official: _J Rodden_____

Please print name: _Jack Rodden_____

Title: _VP / Treasurer_____

Date: _6 - 28 - 10_____

### TRIBUNE COMPANY
### 2009 FORMS 5500 AND RELATED FILINGS
As of 5/17/2010

| Plan Name | EIN | PN | 2009 Filing | 2009 Audit Required |
|---|---|---|---|---|
| Tribune Company Hourly Pension Plan | 36-1880355 | 002 | 5500 | Yes |
| Tribune Company 401(k) Savings Plan | 36-1880355 | 003 | 5500 | Yes |
| Tribune Company Defined Contribution Retirement Plan | 36-1880355 | 006 | 5500 | Yes |
| Tribune Company Cash Balance Pension Plan | 36-1880355 | 007 | 5500 | Yes |
| Times Mirror Savings Plus Plan (short year - final) | 36-1880355 | 009 | 5500 | Yes |
| Tribune Company ESOP | 36-1880355 | 015 | 5500 | Yes |
| | | | | |
| Tribune Company Master Trust for Pensions | 36-1880355 | 201 | 5500 (DFE) | N/A |
| Stable Value Fund Master Trust | 36-1880355 | 205 | 5500 (DFE) | N/A |
| Tribune Company Master Retirement Savings Trust | 36-1880355 | 207 | 5500 (DFE) | N/A |
| | | | | |
| Tribune Company Benefit Program | 36-1880355 | 502 | 5500 | Yes |
| Tribune Company LTD Plan | 36-1880355 | 503 | 5500 | Yes |
| Tribune Company Business AD&D Plan | 36-1880355 | 506 | 5500 | No |
| Tribune Company Employee Assistance Program | 36-1880355 | 560 | 5500 | No |
| | | | | |
| Chicago Tribune Co. Voluntary Group Accident Plan | 36-2643437 | 505 | No filing* | No |
| Baltimore Sun Employees' Retirement Plan | 95-4066880 | 001 | 5500 | Yes |
| | | | | |
| Master Trust for Pension Plans | 36-2944700 | N/A | 990-T | N/A |
| Master Trust for Pension Plans | 36-2944700 | N/A | IL-990-T | N/A |
| Trust for Welfare Plans - VEBA | 36-3002676 | N/A | 990 | N/A |
| Various 2009 Tribune Company Severance Plans** | Various | Various | 5500 | N/A |

\* Unfunded welfare plans with fewer than 100 participants as of the beginning of the plan year (Jan. 1) have no filing requirement.

\*\* The status of all severance plans should be further reviewed (including any new severance plans for 2009).