## RESPONSIVE STATEMENT OF PROPONENTS OF THE NOTEHOLDER PLAN

**The Court has reviewed and approved the Joint Disclosure Statement and the Specific Disclosure Statements filed by the proponents of the four proposed plans, and has determined that they comply with Bankruptcy Code section 1125.  Although the Court has also reviewed the Responsive Statements filed by the plan proponents, and resolved certain disputes among the parties in connection with such statements, the Responsive Statements are not a substitute for the respective disclosure statements, nor have the Responsive Statements been subject to the Bankruptcy Court's standard for approval of a disclosure statement.  While the Court has allowed inclusion of the Responsive Statements in this solicitation package, it has not endorsed the contents of any Responsive Statements.**

**To:**  **All Holders of Claims Against Tribune Company and its Debtor Subsidiaries (collectively, the "Debtors") Entitled to Vote on the Noteholder Plan, Debtor/Committee/Lender Plan, Step One Lender Plan and Bridge Lender Plan**

**From:**  **Aurelius Capital Management, LP ("Aurelius"), Deutsche Bank Trust Company Americas ("Deutsche Bank"), Law Debenture Trust Company of New York ("Law Debenture") and Wilmington Trust Company ("Wilmington Trust," and with Aurelius, Deutsche Bank and Law Debenture, collectively as the proponents of the Noteholder Plan, the "Proponents")**

**Re:**  **Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Aurelius, on Behalf of its Managed Entities, Deutsche Bank, in its Capacity as Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust, in its Capacity as Successor Indenture Trustee for the PHONES Notes (the "Noteholder Plan") accompanied by a PURPLE Ballot.**

  **Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "Debtor/Committee/Lender Plan") accompanied by a BLUE Ballot.**

  **Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (the "Step One Lender Plan") accompanied by a YELLOW Ballot.**

  **Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (the "Bridge Lender Plan") accompanied by a GREEN ballot.**

**Date:**  **December 9, 2010**

*AS A CREDITOR OF THE TRIBUNE DEBTORS, YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT EACH OF THE PLANS LISTED ABOVE. AURELIUS, DEUTSCHE BANK, LAW DEBENTURE AND WILMINGTON TRUST RECOMMEND THAT YOU VOTE TO ACCEPT THE NOTEHOLDER PLAN ON THE PURPLE BALLOT.*

*IT IS IMPORTANT FOR YOU TO KNOW THAT YOU CAN VOTE TO ACCEPT MORE THAN ONE PLAN. BY VOTING TO ACCEPT A PLAN, YOU ARE INDICATING THAT YOU WILL SUPPORT THAT PLAN IF THE BANKRUPTCY COURT APPROVES IT. THE BANKRUPTCY COURT WILL NOT APPROVE MORE THAN ONE PLAN, AND IS NOT REQUIRED TO APPROVE ANY OF THE PLANS.*

This letter is part of a solicitation package that contains, among other things, copies of each of the four proposed plans of reorganization listed above (collectively, the "**Plans**"), specific disclosure statements describing each of the Plans, a general disclosure statement describing the Debtors' businesses, properties, liabilities, claims and events during the Chapter 11 cases, and ballots for voting to accept or reject each of the Plans. As a creditor of the Debtors, you are entitled to vote to accept or reject each of the Plans, and you may vote to accept (or reject) more than one Plan.

Aurelius, one of the co-proponents of the Noteholder Plan, is the largest holder of Tribune's Senior Notes and one of the largest holders of Tribune's exchangeable subordinated notes known as PHONES Notes.[1] The Senior Notes and the PHONES Notes– often referred to as the "Pre-LBO Bonds" – were issued prior to the 2007 leveraged buyout transaction (the "**LBO**") that saddled the Debtors with approximately $8.0 billion in additional debt – but provided Tribune and its subsidiaries with no benefit of any kind – and swiftly led to Tribune's bankruptcy. Joining Aurelius as co-proponents of the Noteholder Plan are Deutsche Bank, Law Debenture Trust Company of New York and Wilmington Trust, all three indenture trustees for the Pre-LBO Bonds.

The primary issue in these bankruptcy cases is, and always has been, how estate claims and causes of action arising out of the LBO should be treated in a plan of reorganization. Resolution of this question is a necessary precondition to the Debtors' emergence from bankruptcy, as it will determine how the Debtors' value will be distributed among its creditors and, thus, drastically impact creditor recoveries. The Noteholder Plan is the **only** Plan that provides all creditors with a level playing field, by providing that only distributions that would be made regardless of the outcome of the LBO-related causes of action will be made upon confirmation, and allowing the remaining distributions to be determined post-confirmation through litigation of the LBO-related causes of action by conflict free litigation trusts.

---

[1] Entities managed by Aurelius Capital Management, LP beneficially own Senior Notes with a face value of approximately $657.7 million and PHONES Notes with a face value of approximately $165.9 million (assuming an Original Principal Amount (as defined in the PHONES Notes Indenture) of $157.00 per PHONES Note).

In sharp contrast, the Debtor/Committee/Lender Plan proposed by the Debtors, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), Oaktree Capital Management, L.P. ("**Oaktree**"), Angelo, Gordon & Co., L.P. ("**Angelo Gordon**"), and JPMorgan Chase Bank, N.A. ("**JPMorgan**") includes a piecemeal settlement of certain of the LBO-related causes of action for grossly inadequate consideration, and, in certain instances, no consideration at all.  If approved, the settlements contained in the Debtor/Committee/Lender Plan, including settlements to shield JPMorgan, who served as the Senior Agent for the LBO debt and who holds a large portion of the LBO debt, and Angelo Gordon and Oaktree, two of the largest holders of the LBO debt, from LBO-related liabilities, will deprive pre-LBO creditors of billions of dollars in distributions which the Proponents believe would likely be awarded if the lawsuits are allowed to proceed in due course.  The Step One Lender Plan and the Bridge Lender Plan are premised on similar settlements, designed, again, to benefit the parties proposing the Plans at the expense of the Debtors' pre-LBO creditors.

Given its reserve structure, the Proponents believe that the Noteholder Plan is the least conditional, and most likely Plan to be approved by the Bankruptcy Court.  Conversely, the Debtor/Committee/Lender Plan, the Step One Lender Plan, and the Bridge Lender Plan all require Court approval of, among other things, the hotly-contested settlements embodied therein and, thus, face significant, if not impossible, hurdles to confirmation.  Accordingly, while the Debtor/Committee/Lender Plan, the Step One Lender Plan, and the Bridge Lender Plan purport to offer larger initial recoveries for certain creditor constituencies than the initial recoveries provided by the Noteholder Plan, the Proponents believe it is unlikely that these Plans will be approved by the Bankruptcy Court and, thus, unlikely that such recoveries will ever be realized.  Even if you intend to vote in favor of a competing Plan purporting to promise you a larger initial recovery than the Noteholder Plan, we urge you to also vote in favor of the Noteholder Plan.  In the event that there is no Plan that is approved by both creditors *and* the Bankruptcy Court, these chapter 11 cases will continue to languish unresolved while the parties endeavor to formulate a plan that is both confirmable and acceptable to creditors.  The Noteholder Plan is the only Plan that prevents this outcome, by providing for a confirmable structure for distributions to creditors that will bring these chapter 11 cases to their conclusion.

I.      **The Appropriate Resolution Of The LBO-Related Causes of Action Has Always Been The Linchpin Of These Bankruptcy Cases**

a.    **The LBO**

On April 1, 2007, the board of directors of Tribune approved the LBO, which was orchestrated by certain of Tribune's largest shareholders and Samuel Zell, in concert with Tribune's directors and management team.  The LBO was structured in two principal and interrelated steps.  "Step One" involved the purchase by Tribune's employee stock ownership plan (the "ESOP") of shares of Tribune common stock and the consummation by Tribune of a cash tender offer for nearly 50% of its outstanding common stock.  "Step Two" was completed through Tribune cashing out its remaining stockholders and merging with a Delaware corporation that was wholly-owned by the ESOP, with Tribune surviving the merger.  As a result of the LBO, the Debtors were saddled with in excess of $10.7 billion of loans financed by various banking entities, including JPMorgan, Merrill Lynch & Co., Citicorp North America, Inc., Bank of America N.A., and Barclays Bank, PLC, pursuant to advice given by the

investment banking arms of some of these same banks. These banking entities received more than $200 million in fees and expenses for arranging this ruinous debt. The banks and others involved in the LBO imposed the risk of these loans on Tribune's existing bondholders, who were now structurally subordinated to more than $10.3 billion in senior bank debt that was guaranteed by the Debtors' operating subsidiaries, and required to share the value of Tribune with the holders of this additional debt.

### b.  The Chapter 11 Cases and the Appointment of The Examiner

The amount of debt incurred in connection with the LBO foreseeably left the Tribune entities unable to withstand the economic downturn that had begun to ravage the media industry even before the LBO was completed. Buried in debt, and facing a future of looming maturities and crushing interest payments, the Debtors filed for chapter 11 protection on December 8, 2008, less than one year after the LBO was fully consummated.

On August 26, 2009, Law Debenture and Wilmington Trust sought Bankruptcy Court approval to conduct discovery relating to the LBO-related causes of action. Law Debenture argued that disabling conflicts precluded the Creditors' Committee from adequately representing the interests of the Debtors' pre-LBO bondholders. Wilmington Trust noted that two of the primary lenders that funded the LBO are members of the Creditors' Committee, and that both of them, JPMorgan and Merrill Lynch,[2] are clients of the Creditors' Committee's lead counsel, Chadbourne & Parke LLP. On January 13, 2010, Wilmington Trust once again raised concerns about the Creditors' Committee's ability to adequately represent pre-LBO creditor interests, when it requested the appointment of an examiner to investigate potential LBO-related claims.

The Bankruptcy Court granted Wilmington Trust's request on April 20, 2010, over the objections of the Debtors, the Creditors' Committee, agents and arrangers of the LBO debt J.P. Morgan, Merrill Lynch Capital Corporation, Citicorp North America, Inc., Citigroup Global Markets Inc., Banc of America Securities LLC, and Bank Of America, N.A., an ad hoc group of former employees of the Times Mirror Company, and an ad hoc group of LBO lenders led by Oaktree. Kenneth Klee was appointed as Examiner to, among other things, "evaluate whether there are potential claims and causes of action held by the Debtors' estates in connection with the [LBO] . . . and whether there are potential defenses which may be asserted against such potential claims and causes of action." Following an exhaustive investigation that included the review of more than 3 million pages of documents and 38 interviews, the Examiner submitted a comprehensive report spanning more than 1,200 pages. The Examiner's report identified dozens of legal issues regarding the potential LBO-related claims and defenses, and opined on each issue using a range of qualitative probabilities from "highly likely" to "highly unlikely," with steps in between. Among other things, the Examiner concluded that it is "highly likely" that the loans and resulting repayment obligations extended as part of Step Two of the LBO constituted avoidable fraudulent conveyances at Tribune, "reasonably likely" that Step Two of the LBO constituted a fraudulent conveyance at the Debtor subsidiaries, and "somewhat likely" that the Tribune entities committed intentional fraud at Step Two of the LBO. While the Examiner found that the Step One loans were less vulnerable than the Step Two loans, he found that Tribune has

---

[2] Merrill Lynch has since resigned from the Committee.

viable causes of action against the Step One lenders under each of four alternative definitions of fraudulent conveyance, and that the Step One lenders also face serious risk of having their claims equitably subordinated or disallowed.

### c.    Mediation and the Commencement of the Competing Plan Process

On September 1, 2010, at the Debtors' request, the Bankruptcy Court appointed the Honorable Kevin Gross, Bankruptcy Judge for the Bankruptcy Court for the District of Delaware, to conduct a non-binding mediation concerning the terms of a potential plan of reorganization for Tribune and its affiliated Debtors.  On October 12, 2010, a mediator's report was issued that attached a term sheet supported by Oaktree, Angelo Gordon, the Debtors, JPMorgan, as a senior lender and agent under the senior loan agreements, and the Creditors' Committee  (the "**LBO Lender Term Sheet**").  The LBO Lender Term Sheet contained settlements with respect to both the Step One and Step Two LBO-related causes of action and, ultimately, formed the basis for the Debtor/Committee/Lender Plan filed on October 22, 2010. Pursuant to the Debtor/Committee/Lender Plan, the LBO lenders are foregoing only $401 million in potential plan distributions, in exchange for the release of $8.7 billion of avoidance claims concerning Step One senior loans (approximately $6.6 billion) and Step Two senior loans (approximately $2.1 billion), and more than $1.8 billion in Step One disgorgement claims.[3] Astonishingly, this $401 million in "settlement consideration" is only $73 million more than the Debtors, Oaktree and Angelo Gordon previously proposed to settle only Step One avoidance and disgorgement claims.  Accordingly, $2.1 billion in Step Two debt avoidance claims are being settled for only $73 million, all of which is going to other general unsecured creditors (excluding holders of senior notes and PHONES notes).  The Proponents believe that this "settlement," pursuant to which general unsecured creditors receive an additional $73 million in recoveries, was done to heavily influence the Committee's support for, and their agreement to become a co-proponent of, the Debtor/Committee/Lender Plan.  To illustrate, of the five members of the Committee who are neither an LBO Lender nor a representative of the pre-LBO notes, four will have their claims paid in full or reinstated under the Debtor/Committee/Lender Plan.

The Debtor/Committee/Lender Plan also releases all former shareholders, who were paid approximately $4.3 billion at Step One of the LBO, and certain shareholders who were cashed out at Step Two of the LBO, for no consideration at all. In addition, the Debtor/Committee/Lender Plan settles the Step Two Lenders' approximately $318 million of Step Two disgorgement liability for only an additional $120 million.  Accordingly, the Debtor/Committee/Lender Plan settles claims for approximately $8.7 billion in avoidable debt and $2.2 billion in potential disgorgement, and releases more than $4.3 billion in potential disgorgement claims against shareholders, all for aggregate settlement consideration of a mere $521 million.

Recognizing that the Debtor/Committee/Lender Plan did not achieve a consensus among the Debtors' various creditor constituencies, the Bankruptcy Court set forth procedures for a competing plan process, as embodied in the Bankruptcy Court order dated October 18, 2010.

---

[3] Disgorgement amounts referenced herein do not include pre-judgment interest, which would increase the amount awarded upon successful prosecution of the disgorgement claims.

Pursuant to such order, on October 29, 2010, the Noteholder Plan, Step One Plan and Bridge Lender Plan were filed with the Bankruptcy Court.

## II.     The Debtor/Committee/Lender Plan Is Unconfirmable

The Debtor/Committee/Lender Plan is subject to a number of conditions and flaws that the Proponents believe render it unconfirmable as a matter of law, making it essential that you vote for the Noteholder Plan, regardless of how you vote on the Debtor/Committee/Lender Plan. Specifically:

- **The Debtor/Committee/Lender Plan requires Bankruptcy Court approval of highly contentious, and legally questionable, settlements that forego valuable causes of action for grossly disproportionate consideration**. To cite but one example, the Debtor/Committee/Lender Plan cannot be confirmed unless the LBO-related settlements, which purport to settle the Debtors' more than $10.9 billion worth of LBO-related causes of action against the Step One and Step Two LBO Lenders for only $521 million, are approved by the Bankruptcy Court. In an effort to support this grossly disproportionate settlement amount, the proponents of the Debtor/Committee/Lender Plan disingenuously assert that $521 million is less than the recovery provided to non-LBO creditors in all but one of six recovery scenarios annexed to the Examiner's Report. The proponents of the Debtor/Committee/Lender Plan fail to disclose, however, that the recovery scenarios annexed to the Examiner's Report represent only a handful of the myriad potential outcomes the Examiner found could result from prosecution of the LBO-related causes of action, and bear no relation to the Examiner's conclusions regarding which of these or the other possible scenarios is more likely to occur.[4] For example, although the Examiner found that it is *at least "reasonably likely"* that the Step Two debt will be avoided *in its entirety*, only three of the six recovery scenarios cited by the Debtor/Committee/Lender Plan proponents include this assumption. Similarly, two of the six scenarios are predicated on an element the Examiner found to be "highly *un*likely," and two are predicated on an element the Examiner found to be "reasonably *un*likely." Moreover, although the Examiner found that there is a 50% chance that the Step One Lenders will not be able to "benefit from avoidance of payments made and obligations incurred in the Step Two LBO transactions," *none* of the recovery scenarios relied upon by the Debtor/Committee/Lender Plan proponents to support the LBO-related settlement account for that possibility, which could result in pre-LBO creditors receiving a full recovery on account of their claims**.** In sum, the Proponents believe it is highly questionable whether the LBO-related settlements will meet the standard for Bankruptcy Court approval – a threshold the Bankruptcy Court has already cautioned is "not a give me" [sic] – given the astounding disparity between the potential value of the claims being settled and the consideration being paid in exchange for the settlement.

---

[4] The Examiner explicitly stated that "[t]he Recovery Scenarios only address the effect of fraudulent transfer actions on creditor recoveries and do not consider the potential effect of preferences, equitable subordination, equitable disallowance, or common law claim recoveries. These claims are evaluated in the Report but the Recovery Scenarios do not take into account the potential effect on recoveries resulting from these possible remedies, claims and causes of action."

- **The Debtor/Committee/Lender Plan grants sweeping releases in exchange for woefully inadequate consideration, and in certain instances no consideration at all.** Courts in the Third Circuit, including the Bankruptcy Court, consider a number of factors in determining whether third party releases granted by a debtor constitute a reasonable exercise of a debtor's business judgment, including whether the non-debtor receiving the release has made a substantial contribution of assets to the reorganization. Here, notwithstanding the grossly inadequate consideration being provided by the LBO lenders in connection with the LBO-related settlements, the Debtor/Committee/Lender Plan grants (i) full releases to the Step One lenders in their capacities as such, and (ii) releases to the Step Two lenders with respect to the avoidability of their claims against the Debtors. Moreover, for no additional consideration, the Debtor/Committee/Lender Plan provides full releases to the Step One agents and arrangers in their capacity as such, notwithstanding that they received approximately $134 million in fees and expenses from the Debtors prior to the commencement of these cases. The Debtor/Committee/Lender Plan also releases the Step Two and Bridge lenders, agents and arrangers for disgorgement liability associated with approximately $318 million of payments in principal, interest, fees and expenses for consideration of only $120 million. And, to exacerbate the unfairness of the proposed LBO-related settlements, the Debtor/Committee/Lender Plan releases all former shareholders who were cashed out at Step One of the LBO, and certain shareholders who were cashed out at Step Two of the LBO, for no consideration at all. While the releases relating to Step Two shareholders are subject to certain limitations and apply only with respect to the first $100,000 of LBO proceeds received by such shareholders, the Debtor/Committee/Lender Specific Disclosure Statement does not disclose the magnitude of claims against the released Step Two shareholders and, therefore, the financial impact of the releases and the limitations thereon cannot be determined. The Proponents believe that the foregoing releases constitute a waste of estate assets that cannot stand under well-settled law.

- **The Debtor/Committee/Lender Plan prejudices the beneficiaries of the preserved LBO-related causes of action through a so-called "Bar Order" that purports to reduce any LBO-related judgment obtained by the trusts by the amount of liability that could have been apportioned against the settling defendants but for the LBO-related settlements.** While this provision is clearly in the best interest of the settling defendants, it is highly unfair to the parties whose recoveries are dependent on the success or failure of these causes of action, and will be vigorously opposed at the confirmation hearing.

- **The Debtor/Committee/Lender Plan classifies the swap claim at Tribune as an "Other Parent Claim" (i.e., a general unsecured claim), while classifying an identical claim at the subsidiary debtors as a Senior Loan Guaranty Claim.** This gerrymandered classification results in an inflated recovery for the holder of the swap claim (which, upon information and belief, is Oaktree), to the detriment of other creditors at Tribune.

IF THE BANKRUPTCY COURT DISAGREES WITH THE PROPONENTS OF THE DEBTOR/COMMITTEE/LENDER PLAN WITH REGARD TO ANY ONE OF THESE HIGHLY CONTENTIOUS ISSUES AND OTHER SETTLEMENTS CONTAINED IN THE DEBTOR/COMMITTEE/LENDER PLAN, SUCH PLAN WILL, BY ITS EXPRESS TERMS, FAIL.

### III.    The Step One Lender Plan And Bridge Lender Plan Are Also Unconfirmable

#### a.  The Step One Lender Plan

The Step One Lender Plan suffers from many of the same infirmities as the Debtor/Committee/Lender Plan and is equally unconfirmable.  While the Step One Lender Plan does not propose a settlement of the payments made in connection with the Step Two portion of the LBO transaction, the Step One Lender Plan purports to settle all of the potential claims against the Step One Lenders, including claims for equitable subordination or disallowance, for only $290 million, and is otherwise substantially similar to the Debtor/Committee/Lender Plan. The confirmability of the Step One Lender Plan is further compromised by the fact that it not supported by any pre-LBO creditor, or any other LBO creditor, the Debtors or the Creditors' Committee.

#### b.  The Bridge Lender Plan

The Bridge Lender Plan proposes three settlements that purport to settle the LBO-related causes of action against Step One lenders, Step Two lenders and Bridge lenders.  Like the settlements embodied in the Debtor/Committee/Lender Plan, the consideration to be paid in exchange for these settlements is grossly inadequate, given the value and merits of the LBO-related causes of action. If the Bridge Lender Plan settlements are not approved, the Bridge Lender Plan reverts to a structure that is substantially similar to the Noteholder Plan.  As with the Step One Lender Plan, the confirmability of the Bridge Lender Plan is further compromised by the fact that it is not supported by any pre-LBO creditor, or any other LBO creditor, the Debtors or the Creditors' Committee.

### IV.    The Noteholder Plan Is The Only Proposed Plan That Is Confirmable

In stark contrast to the other competing Plans, the Proponents believe that the Noteholder Plan is the only proposed Plan that has a high likelihood of being confirmed.  The Noteholder Plan provides for substantial recoveries on the effective date of the Plan, while still preserving all creditors' rights to receive the portion of the Debtors' value to which they are ultimately determined to be entitled.  Accordingly, the Noteholder Plan does not contain releases of any of the parties that participated in the LBO, nor does it presuppose the amounts to which the non-LBO creditors may be entitled.  As a result, the only conditions to confirmation of the Noteholder Plan, in addition to approval by the Bankruptcy Court, are (i) that the trust documents are executed and the trusts are established, (ii) that certain standard corporate documents are adopted and filed, and (iii) that certain consents, authorizations, certifications and approvals necessary to implement the Noteholder Plan are obtained.

IN SUM, THE PROPONENTS BELIEVE THAT THE NOTEHOLDER PLAN IS THE ONLY PLAN THAT IS CONFIRMABLE AND REPRESENTS A REALISTIC OPPORTUNITY FOR (I) THE DEBTORS TO EMERGE FROM CHAPTER 11 QUICKLY AND RELIABLY, (II) INITIAL DISTRIBUTIONS TO BE MADE TO CREDITORS AND (III) THE TRUSTS TO BE ESTABLISHED TO PURSUE ALL PRESERVED AND STATE LAW CAUSES OF ACTION.  ACCORDINGLY, WE RECOMMEND THAT YOU VOTE IN FAVOR OF THE NOTEHOLDER PLAN ON THE PURPLE BALLOT, REGARDLESS OF WHETHER YOU VOTE TO ACCEPT OR REJECT THE OTHER COMPETING PLANS.