## CREDITORS' COMMITTEE'S RESPONSIVE STATEMENT

The Court has reviewed and approved the Joint Disclosure Statement and the Specific Disclosure Statements filed by the proponents of the four proposed plans, and has determined that they comply with Bankruptcy Code §1125. Although the Court has also reviewed the Responsive Statements filed by the plan proponents, and resolved certain disputes among the parties in connection with such statements, the Responsive Statements are not a substitute for the respective disclosure statements, nor have the Responsive Statements been subject to the Bankruptcy Code's standard for approval of a disclosure statement. While the Court has allowed inclusion of the Responsive Statements in this solicitation package, it has not endorsed the contents of any Responsive Statement.

# Responsive Statement of the Creditors' Committee to the Competing Plans

## THE DEBTOR/COMMITTEE/LENDER PLAN IS THE BEST OPTION FOR GENERAL UNSECURED CREDITORS

The Creditors' Committee supports, and encourages unsecured creditors of Tribune and its Subsidiaries to vote **for**, the Plan filed by the Creditors' Committee, the Debtors, Angelo Gordon, Oaktree and JPMorgan (the "Debtor/Committee/Lender Plan") and to vote **against** the three competing plans (the "Competing Plans") filed by: (i) Aurelius Capital Management, LP, the Indenture Trustee for certain series of the Senior Notes and the Indenture Trustee for the PHONES Notes (the "Noteholder Plan"); (ii) King Street Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P. in their capacity as Bridge Loan Lenders (the "Bridge Plan"); and (iii) certain holders of Step One Loan Claims (the "Step One Plan").

### A. *Recommendation for Voting on Competing Plans*

Subsequent to the filing of the Competing Plans, on November 4, 2010, the Creditors' Committee held a meeting with its professionals to discuss and carefully consider each of the Competing Plans and the proposed treatment of general unsecured creditors under each of the plans. Following an extensive review, the Creditors' Committee formally voted to restate its support for the Debtor/Committee/Lender Plan and to oppose each of the Competing Plans.[1]

**Because the Debtor/Committee/Lender Plan provides general unsecured creditors with substantially greater initial recoveries and more certainty than the Competing Plans, and for the other reasons described below, the Creditors' Committee recommends that general unsecured creditors vote to:**

> *ACCEPT* the *Debtor/Committee/Lender Plan on the BLUE BALLOT* included with the plan solicitation materials and indicate that it is the creditors' preferred plan; and
>
> *REJECT* each of the *Noteholder Plan* (*PURPLE BALLOT*), the *Bridge Plan* (*GREEN BALLOT*), and the *Step One Plan* (*YELLOW BALLOT*)

---

[1] Two members of the Creditors' Committee, Wilmington Trust Company and Deutsche Bank Trust Company Americas, which are Indenture Trustees with respect to the PHONES Notes and certain series of the Senior Notes, respectively, are co-proponents of the Noteholder Plan.

### B. *Why the Debtor/Committee/Lender Plan is the Best Plan for General Unsecured Creditors*

In stark contrast to the Competing Plans, the Debtor/Committee/Lender Plan provides non-LBO, general unsecured creditors ("Non-LBO Creditors") with significant and fixed recoveries[2] immediately upon effectiveness of the plan. Those recoveries are not subject to the risks, costs and delays inherent in litigation of the LBO-Related Causes of Action. Below is a chart comparing the initial distributions to creditors upon the Debtors' emergence from bankruptcy under the Debtor/Committee/Lender Plan versus the Competing Plans.

| Initial Distributions (Percentage Recoveries) – Not Contingent On Litigation Recoveries | | | | |
|---|---|---|---|---|
| **Class/Claims** | **Debtor/Committee/ Lender Plan (Blue Ballot)** | **Noteholder Plan[3] (Purple Ballot)** | **Bridge Plan[3] (Green Ballot)[4]** | **Step One Plan[3] (Yellow Ballot)** |
| "Step One" Senior Loans | Parent: 1.09%<br>Subs: 69.95%<br>Total: 71.03% | 34.20% | 34.20% | Parent: .84%<br>Subs: 69.86%<br>Total: 70.70% |
| "Step Two" Senior Loans | Parent: 1.09%<br>Subs: 69.95%<br>Total: 71.03% | 0.00% | 0.00% | 0.00% |
| Bridge Loans | 0.00% | 0.00% | 0.00% | 0.00% |

---

[2] The initial distribution to holders of PHONES Notes Claims is subject to contractual subordination and will be subject to turnover to those holders who are entitled to the benefits of such subordination as provided in, and subject to any limitations set forth in, the Debtor/Committee/Lender Plan. The EGI-TRB LLC Notes Claims are subject to challenge under the Debtor/Committee/Lender Plan. Accordingly, it is not anticipated that those claims will receive an initial distribution under the Debtor/Committee/Lender Plan. To the extent distributions are made on account of the EGI-TRB LLC Notes Claims, those distributions are also subject to contractual subordination and will be subject to turnover to those holders who are entitled to the benefits of such subordination as provided in, and subject to any limitations set forth in, the Debtor/Committee/Lender Plan.

[3] Assumes that litigation over "sharing provisions" of Senior Loan Agreement has not resulted in a final, non-appealable judgment before effectiveness of the plan but that the Bankruptcy Court nevertheless permits distributions in respect of "Step One" claims. Also assumes that litigation over allowed amount of PHONES Notes Claims has not resulted in a final, non-appealable judgment by effectiveness of the plan.

[4] Although the Bridge Plan on its face provides an option for various settlements that would, if accepted by the relevant parties, potentially result in greater distributions to certain creditors of Tribune as of the Effective Date, the Bridge Plan is not conditioned upon the implementation of these settlements and the Creditors' Committee believes the ability to consummate these settlements is highly unlikely (see below).

| Initial Distributions (Percentage Recoveries) – Not Contingent On Litigation Recoveries ||||| 
|---|---|---|---|---|
| Class/Claims | Debtor/Committee/ Lender Plan (Blue Ballot) | Noteholder Plan[3] (Purple Ballot) | Bridge Plan[3] (Green Ballot)[4] | Step One Plan[3] (Yellow Ballot) |
| Senior Notes | 32.73% | 4.80% | 4.80% | 4.8%[5] or 23.38% |
| Other Parent Claims (Trade) | 35.18% or 32.73%[6] | 4.3% or 15%[7] | 4.43% | 4.8%[5] or (25.83% or 23.38%)[6] |
| Claims Against Subs (Trade) | 100% | 8.00% or 25%[7] | 8.00% | 100% |
| PHONES Notes | 0.00% | 0.00% | 0.00% | 0.00% |

The settlement of the LBO-Related Causes of Action embodied in the Debtor/Committee/Lender Plan results in Non-LBO Creditors receiving cash recoveries totaling approximately $598 million, plus a share of recoveries obtained from the resolution of causes of action to be assigned to a Litigation Trust and a Creditors' Trust (together, the "Trusts"). This $598 million is available for distribution immediately upon plan effectiveness and is not contingent on future litigation events.

Of the $598 million in total cash recoveries, $521 million is being provided to settle certain claims against LBO Creditors. Specifically, holders of Senior Loan Claims will relinquish approximately $401 million in cash to which they would otherwise be entitled if their claims were allowed in full and without reduction. That cash consideration will be distributed to the holders of Senior Noteholder Claims and other unsecured creditors of Tribune and the Tribune Subsidiary Debtors. Additionally, the Debtor/Committee/Lender Plan provides for a "Step Two/Disgorgement Settlement" against Step Two parties, including current and former Senior Lenders, Bridge Lenders and Step Two Arrangers who received payments prior to the

---

[5] If class rejects.

[6] Depends on individual creditor election between receiving a higher all cash distribution or a slightly smaller cash distribution plus interests in the Litigation Trust.

[7] If the class of Other Parent Claims or the class of General Unsecured Claims against the Guarantor Debtors votes to accept the Noteholder Plan and that plan is confirmed, individual holders in such accepting classes may, subject to certain dollar caps, elect to "put" or sell their claims to an entity designated by Aurelius for higher distributions on the Effective Date of the Plan (which will be the only distributions those electing creditors will receive). More particularly, under such circumstances, holders of Other Parent Claims may elect to receive a distribution equal to 15% of their allowed claim, rather than 4.3%, and holders of General Unsecured Claims against the Guarantor Debtors may elect to receive a distribution equal to 25% of their allowed claim, rather than 8%.

Petition Date, which will result in an additional $120 million of cash consideration being distributed to the holders of Senior Noteholder Claims.

At the same time, the Debtor/Committee/Lender Plan provides additional upside to Non-LBO Creditors, by preserving certain LBO-Related Causes of Action, which will be assigned to the Trusts, and providing for an allocation of trust proceeds that is favorable to the Non-LBO Parent Creditors. Specifically, the first $90 million of Trust recoveries[8] will be distributed to Non-LBO Creditors and, after repayment of the $20 million loan from Tribune to fund the Trusts, 65% of any additional Trust proceeds will be distributed to the Non-LBO Creditors (the "Parent GUC Trust Preference"). For illustrative purposes only, assuming that Trust recoveries total $200 million, Non-LBO Creditors would receive $148.5 million (the first $90 million, plus 65% of the net remaining proceeds after repayment of the Tribune loan), while Senior Lenders would receive $31.5 million (35% of the net remaining proceeds after repayment of the Tribune loan).

Based on the settlement embodied in the Debtor/Committee/Lender Plan, Non-LBO Creditors of Tribune and the Subsidiaries will receive significant and certain initial distributions upon effectiveness of the Debtor/Committee/Lender Plan. Specifically, each general unsecured creditor of Tribune will receive either a cash payment equal to **35.18%** of its allowed claim amount or a cash payment equal to **32.73%** of its allowed claim amount, plus interests in the Trusts. General unsecured creditors of the Subsidiary Debtors are expected to receive a **100%** recovery in cash. And Senior Noteholders are expected to receive an approximate recovery of **32.73%** of their claims, which includes $420 million in cash, plus interests in the Trusts.

C.   *The Settlement Embodied in the Debtor/Committee/Lender Plan is Fair and Reasonable*

The settlement embodied in the Debtor/Committee/Lender Plan was the result of intense, good faith, and arm's length negotiations that took place before the Honorable Kevin Gross, the mediator appointed by the Bankruptcy Court and a sitting judge of the United States Bankruptcy Court for the District of Delaware. The Creditors' Committee believes that the settlement in the Debtor/Committee/Lender Plan is highly beneficial to Non-LBO Creditors and provides significant and immediate recoveries without the risks, costs and time delay inherent in litigation of the LBO-Related Causes of Action.

---

[8]   Excluding 90% of the proceeds of disgorgement claims against the Non-Settling Step Two Payees to the extent necessary to repay any portion of the Step Two/Disgorgement Settlement (the $120 million) backstopped by the Step Two Arrangers (which amount will not be greater than $18 million).

## THE DEBTOR/COMMITTEE/LENDER PLAN IS
## A BETTER OPTION THAN THE NOTEHOLDER PLAN

*A.     The Noteholder Plan Provides for Lower Initial Distributions
and is Fraught with Unacceptable Litigation Risk*

The Noteholder Plan is significantly less favorable to general unsecured creditors than the Debtor/Committee/Lender Plan because the vast majority of anticipated recoveries under the Noteholder Plan are fraught with risk since they are dependent on the successful prosecution or settlement of the LBO-Related Causes of Action. Initial distributions to creditors are much lower than those under the Debtor/Committee/Lender Plan. As described in the Disclosure Statement accompanying the Debtor/Committee/Lender Plan, there are a wide range of potential outcomes with respect to the LBO-Related Causes of Action, from complete failure with respect to both Step One and Step Two to complete victory. The Examiner's Report analyzed the recoveries to the Non-LBO Creditors with respect to claims against the Lenders in six different scenarios.[9] Only one of the six scenarios, the complete victory scenario, results in Non-LBO Creditors recovering more than the $598 million which they will receive under the Debtor/Committee/Lender Plan ($521 million of which is incremental settlement value and $77 million of which is "base case" value, assuming no litigation recoveries). In the other five scenarios, the incremental recoveries to Non-LBO Creditors resulting from the LBO-Related Causes of Action range from $0 (complete loss) to approximately $205 million to $244 million (fraudulent transfer for Tribune at both Step One and Step Two, but only at Step Two for guarantor subsidiaries).

The wide range of potential litigation outcomes with respect to the LBO-Related Causes of Action drives the wide range of potential creditor recoveries under the Noteholder Plan. For example, under the Noteholder Plan: (i) general unsecured creditors of Tribune (Other Parent Claims) may recover between 4.3% and 100%; (ii) general unsecured creditors at the non-guaranty Subsidiary Debtors (Other Guarantor Debtor Claims) may recover between 8% and 100%; and (iii) Senior Noteholders may recover between 4.8% and 100%.

The only absolute and assured recoveries to Non-LBO Creditors under the Noteholder Plan are the lowest recoveries set forth above (*i.e.*, 4.3% to holders of Other Parent Claims, 8% to holders of Other Guarantor Debtor Claims and 4.8% to holders of Senior Noteholders Claims). Any additional recoveries are dependent on the successful prosecution or settlement of the LBO-Related Causes of Action. Although the best case scenarios under the Noteholder Plan yield full recovery to general unsecured creditors, the Creditors' Committee believes that these scenarios

---

[9]   The Examiner includes two additional scenarios, cases 7 and 8, which are variants on the Examiner's case 3 (Step Two fraudulent transfer at Tribune and guarantor subsidiaries). Cases 7 and 8 add disgorgement proceeds from actions against Step Two selling stockholders. These disgorgement claims are fully preserved and will be transferred to the Trusts under the Debtor/Committee/Lender Plan.

5

are fraught with risk and do not provide Non-LBO Creditors with any certainty of achieving the distributions provided in the Debtor/Committee/Lender Plan. Notably, the proponents of the Noteholder Plan give holders of Other Parent Claims the option to "put," or cash out, their claims for a 15% recovery, while holders of Other Guarantor Debtor Claims have the option to cash out their claims for a 25% recovery, in each case subject to certain dollar caps and to acceptance of the Noteholder Plan by the affected class and to confirmation of that plan.[10] Aurelius has plainly stated its strong belief that the LBO-Related Causes of Action will assuredly yield very large recoveries. So the low amounts it is offering for Other Parent Claims and Other Guarantor Debtor Claims would cause a predicament for other unsecured creditors who do not have the resources, risk tolerance, or desire to wait years for an uncertain and risk-fraught recovery. It is important to note that these "cash out" recoveries are significantly less than the percentage recoveries of 35.18% and 100% to these same classes, respectively, under the Debtor/Committee/Lender Plan.

The Noteholder Plan should be unattractive to holders of unsecured claims at the Debtor Subsidiary level who fall within the class of Other Guarantor Debtor Claims. Under the Noteholder Plan, these creditors will receive an initial distribution of only 8%, with an option to cash out at 25%, subject to certain dollar caps provided in that plan. Only in certain scenarios where litigation is successful would creditors in this class receive a full 100% recovery, and that would likely only occur, if at all, after significant delay in resolving the litigation. In contrast, under the Debtor/Committee/Lender Plan, general unsecured creditors of the Debtor Subsidiaries are expected to recover 100% of their allowed claims (assuming, as expected, that allowed claims against the Debtor Subsidiaries do not exceed $150 million) on or shortly after the Effective Date of the Debtor/Committee/Lender Plan. Thus, general unsecured creditors of the Debtor Subsidiaries under the Debtor/Committee/Lender Plan will automatically receive what they would receive only in a best case scenario under the Noteholder Plan.

### B.  *Recommendation to Reject the Noteholder Plan*

In short, the Noteholder Plan is fraught with uncertainty and the attenuating risks, costs and delay of complex litigation arising from the LBO-Related Causes of Action. By contrast, the Debtor/Committee/Lender Plan provides very significant initial distributions, while also providing upside to general unsecured creditors through preservation of certain LBO-Related Causes of Action. Accordingly, the Creditors' Committee recommends that general unsecured creditors vote against the Noteholder Plan by checking the box in the **purple ballot** to "reject" the plan.

---

[10] There may be a dispute at the confirmation hearing as to whether the "put option" concept embodied in the Noteholder Plan is permissible, and the Creditors' Committee expressly reserves its rights with respect thereto.

# THE DEBTOR/COMMITTEE/LENDER PLAN IS
# A BETTER OPTION THAN THE BRIDGE PLAN

*A.    The Bridge Plan Is Entirely Illusory Because
the Settlements It Advertises Will Never Take Place*

The Creditors' Committee also believes the Bridge Plan's proposed treatment of Non-LBO Creditors is much less favorable than the treatment provided to Non-LBO Creditors in the Debtor/Committee/Lender Plan. While the Bridge Plan advertises upfront payments in amounts exceeding those offered in the Debtor/Committee/Lender Plan, those payments are contingent upon the Senior Lenders agreeing to receive significantly lower distributions than they would receive under the Debtor/Committee/Lender Plan or the Step One Plan. In essence, the Bridge Plan would only deliver the advertised recoveries if the Senior Lenders were to agree to fund settlements far in excess of those they have indicated any willingness to fund during all previous negotiations. The likelihood of the Senior Lenders agreeing to these alternative reduced recoveries is minimal. Accordingly, the actual initial distributions to Non-LBO Creditors will be minimal and similar to those offered under the Noteholder Plan.

The Bridge Plan is based on the Noteholder Plan which, as noted above, contemplates full litigation of the LBO-Related Causes of Action pursuant to a two trust structure. The Bridge Plan then layers on top of that construct three possible settlements -- a Step One Lenders' settlement, a Step Two Lenders' settlement and a Bridge Lenders' settlement. As part of the solicitation process, the Step One Lenders, Step Two Lenders and Bridge Lenders each will have the opportunity to vote to accept or reject the proposed settlements. The settlements are severable, meaning that even if the Step One Lenders and Step Two Lenders were to vote against their respective settlements contained within the Bridge Plan, the Bridge Lenders could still vote in favor of their settlement, entitling them to releases from the LBO-Related Causes of Action and an upfront cash payment of $125 million. Under the Debtor/Committee/Lender Plan, the Bridge Lenders are not entitled to any value until the LBO-Related Causes of Action are resolved, and the Bridge Lenders are instead potential targets of the Litigation Trust.

As noted above, the Non-LBO Creditors' recoveries under the Bridge Plan are contingent upon the agreement of the Senior Lenders to accept their respective settlements. At a minimum, the Step One Settlement has to be approved for the Non-LBO Creditors to yield any meaningful upfront recoveries. At this time, neither the Step One Lenders nor the Step Two Lenders have agreed to the settlements and the Creditors' Committee believes the chances they will ever do so are remote, as they would have to agree to receive lower distributions than what they would be entitled to under the Debtor/Committee/Lender Plan. The additional value promised to the Non-LBO Creditors under the Bridge Plan depends mainly on the agreement of the Step Two Lenders to accept lower recoveries than those they would receive under the Debtor/Committee/Lender Plan. Under the proposed Step Two Settlement under the Bridge Plan, the Step Two Lenders would receive approximately $500 million less than under the Debtor/Committee/Lender Plan. The Creditors' Committee believes it unlikely that the Step Two Lenders (a subset of which are co-proponents of the Debtor/Committee/Lender Plan) will vote in favor of this settlement, and without their approval, the additional value to Non-LBO Creditors disappears. Moreover, without the Step Two Settlement, Step One Lenders would receive less value than they would

receive under the Debtor/Committee/Lender Plan, making it equally unlikely that the Step One Lenders will vote in favor of the settlement.

Accordingly, the only constituency likely to vote in favor of the Bridge Plan is the Bridge Lenders. Without approval of the Step One Settlement, the Non-LBO Creditors receive much less favorable treatment under the Bridge Plan than under the Debtor/Committee/Lender Plan. Indeed, if the Bridge "settlement" is approved, the Non-LBO Creditors receive even **worse** treatment than they would receive under the Noteholder Plan because not only would the LBO-Related Causes of Action against the Bridge Lenders be released, the Bridge Lenders would in fact be paid more than they would be entitled to even if their claims were fully allowed.[11] For these reasons, the Bridge Plan offers no benefit to Non-LBO Creditors, and in fact could treat them even worse than the Noteholder Plan.

*B.     Recommendation to Reject the Bridge Plan*

In its most likely form (*i.e.,* without a Step One Settlement and Step Two Settlement), the Bridge Plan looks like the Noteholder Plan except that the Bridge Lenders propose to release themselves from LBO-related litigation risk, give themselves $125 million in Cash as an initial distribution, and retain a 5% interest in the Creditors' Trust. Unlike under the Debtor/Committee/Lender Plan, the Non-LBO Creditors have no certainty at this point of meaningful upfront recoveries under the Bridge Plan. Accordingly, the Creditors' Committee recommends that general unsecured creditors vote against the Bridge Plan by checking the box in the **green ballot** to **"reject"** the plan.


## THE DEBTOR/COMMITTEE/LENDER PLAN IS A BETTER OPTION THAN THE STEP ONE PLAN

*A.     The Step One Plan Creates Litigation Risk and Provides Less Value to Non-LBO Creditors*

The Step One Plan provides significantly worse treatment for unsecured creditors of Tribune than does the Debtor/Committee/Lender Plan. The Step One Plan proponents characterize their plan as a "gifting plan," where value is allegedly allocated from the Step One Lenders to each of the classes of Non-LBO Creditors. However, the "gift" distribution to each class of Non-LBO Creditors only comes into effect if both the Step One Lenders and such class

---

[11]   The proponents of the Bridge Plan do not agree with this statement and have alleged that, if the Bridge Loan Claims are allowed, then under certain circumstances the Bridge Lenders would be entitled to recover amounts in excess of $125 million.

of Non-LBO Creditors vote to accept the Step One Plan.[12] And absent approval of the plan by the requisite classes, the distributions to Non-LBO Creditors of Tribune are negligible and similar to the distributions under the Noteholder Plan (*i.e.*, Senior Noteholder Claims and Other Parent Claims against Tribune would receive only a 4.8% recovery). In sum, the Step One Plan is deficient in many respects, including:

- The Step One Plan provides much lower initial recoveries for Senior Noteholders and holders of Other Parent Claims, even assuming that the "gifting" distributions are made to these Non-LBO Creditors;

- The Step One Plan eliminates the favorable priority and allocation of Trust proceeds afforded to Non-LBO Creditors under the Debtor/Committee/Lender Plan;

- The Step One Plan undoes the Step Two/Disgorgement Settlement, creating litigation risk;

- The Step One Plan contemplates a risky litigation scenario under which the Step One LBO-Related Causes of Action are released while the Step Two LBO-Related Causes of Action are prosecuted;

- The Step One LBO-Related Causes of Action are released <u>even if</u> the Non-LBO Creditors do not vote to the accept the Step One Plan and the Step One Lenders do not provide the "gift" distributions to the Non-LBO Creditors;[13] and

- Finally, if the Non-LBO Creditors do vote to accept the gift distributions, only the Holders of Step One Senior Loan Claims, Step One Senior Loan Guaranty Claims and Swap Claims receive any benefit from successful Step Two LBO-Related Causes of Action to avoid, disallow or subordinate Step Two Claims.[14]

While the Step One Plan seems similar in most respects to the Debtor/Committee/Lender Plan, it reallocates value given to the Non-LBO Creditors under the Debtor/Committee/Lender

---

[12] A particular "gift" distribution is contingent upon the acceptance of the applicable class and the Step One Lenders. For example, the Senior Noteholder Claims class could receive the "gift" distribution if it and the Step One Lenders voted to accept the Step One Plan, even if the Other Parent Claims class voted to reject the Step One Plan. See also footnote 13 for more information.

[13] The Step One Lenders assert that, even though not technically qualifying as a "gift distribution" under the Step One Plan, the Step One Lenders are still providing "gifts" to the various Non-LBO Creditor classes even if such classes reject the Step One Plan, notwithstanding the fact that the Non-LBO Creditors would then be entitled only to the significantly reduced recoveries noted in the above chart. Please refer to the Step One Disclosure Statement for the Step One Lenders' explanation of why they believe these reduced recoveries still qualify as "gifts". The Committee disagrees with the Step One Lenders' explanation on this issue.

[14] Subject to resolution of the litigation over "sharing provisions" of Senior Loan Agreement.

Plan to the Step One Lenders, providing for smaller and more uncertain recoveries for the Non-LBO Creditors under the Step One Plan.

Under the Step One Plan, no class, other than the Step One Lenders (and possibly the Step Two Lenders if they are completely victorious in the litigation of their claims), receives more than it would under the Debtor/Committee/Lender Plan. While the Step One Lenders may argue that unsecured creditors may benefit from the additional claims to be contributed to the Trusts against the Step Two Lenders, the Step One Plan does not provide for the Parent GUC Trust Preference (*i.e.*, the mechanism by which Senior Noteholders and electing Other Parent Claims are afforded a $90 million priority in the Trust distributions). Accordingly, the Step One Lenders share pro rata in any recoveries, dramatically diluting any potential litigation recoveries to Non-LBO Creditors. Moreover, the Step One Lenders may argue that holders of unsecured claims at the Subsidiary Debtor level would receive more favorable treatment under the Step One Plan than under the Debtor/Committee Lender Plan because the cap on distributions would increase from $150 million to $225 million (but only if such class of unsecured claims and the Step One Lenders vote to accept the Step One Plan). However, this alleged benefit is, in all likelihood, illusory as the Debtors estimate that the amount of allowed claims against the Subsidiary Debtors will not exceed $150 million. Thus, it is unlikely that the increased cap under the Step One Plan would actually result in providing general unsecured creditors at the Subsidiary Debtor level with more than they receive under the Debtor/Committee/Lender Plan.

In addition, recoveries against the Step Two Lenders would be dependent on successfully prosecuting or settlement of the LBO-Related Causes of Action. As described above, a successful resolution of these claims is far from certain and is fraught with risk. Additionally, from a litigation strategy standpoint, the Creditors' Committee has serious concerns with a bifurcated settlement involving only Step One claims. Bifurcating Step One and Step Two claims fails to take into account that a challenge of the Step Two transaction is not only based on conduct relating to Step Two, but on conduct that occurred in conjunction with Step One. Accordingly, any release of the Step One LBO-Related Causes of Action may impair the Trusts' ability to pursue claims that may be brought with respect to Step Two.

### B.     *Recommendation to Reject the Step One Plan*

In sum, the Step One Plan benefits only one constituency, the Step One Lenders, while subjecting all other classes to lesser distributions and more uncertain recoveries. Accordingly, the Creditors' Committee recommends that general unsecured creditors vote against the Step One Plan by checking the box in the **yellow ballot** to **"reject"** the plan.

Respectfully,

**THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TRIBUNE COMPANY, ET AL.**
Warner Bros. Television, solely in its capacity as
Co-Chair of the Creditors' Committee and not in its individual capacity

_____
Wayne M. Smith
Vice President