IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRIBUNE COMPANY, et al. | ) | Case No. 08-13141 (KJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Re: Docket Nos. 6433, 6726 |
| | ) | |
| | ) | **Hearing date:** December 15, 2010 at 10:00 a.m. (ET) |
| | ) | |

**REPLY TO OPPOSITION TO MOTION OF OAKTREE CAPITAL
MANAGEMENT, L.P., AND ANGELO, GORDON & CO., L.P., FOR AN
ORDER DISQUALIFYING AKIN GUMP STRAUSS HAUER & FELD LLP
FROM REPRESENTING AURELIUS CAPITAL MANAGEMENT LP**

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ............................................................................1

II.   AKIN GUMP IS ABSOLUTELY PROHIBITED FROM REPRESENTING
      AURELIUS NOTWITHSTANDING ANY ALLEGED WAIVER............................4

III.  NEITHER OAKTREE NOR ANGELO GORDON
      "WAIVED" THE CONFLICT ...........................................................................11

      A.    Oaktree Never Agreed To Waive Any Conflict. ..................................11

      B.    Angelo Gordon Never Agreed To Waive Any Conflict. ........................13

      C.    Akin Gump's Attempt To Construct A Waiver From A Patchwork Quilt
            Of Disputed Conversations And Email Snippets Highlights The Complete
            Absence Of Consent ......................................................................16

IV.   AKIN GUMP'S PRIOR REPRESENTATION OF CENTERBRIDGE
      IS IRRELEVANT AND DOES NOT EXCUSE AKIN GUMP'S
      UNETHICAL CONDUCT ...............................................................................17

V.    OAKTREE AND ANGELO GORDON DID NOT "DELAY"
      IN OBJECTING TO THE ADVERSE REPRESENTATION ...................................20

      A.    There Was No Delay........................................................................20

      B.    Professional Courtesy Cannot Be Deemed A Waiver ...........................23

VI.   DISQUALIFICATION IS THE ONLY REMEDY FOR AKIN GUMP'S
      UNETHICAL CONDUCT ...............................................................................24

VII.  CONCLUSION ............................................................................................28

## TABLE OF AUTHORITIES

Page

**Cases**

*Boston Scientific Corp. v. Johnson & Johnson, Inc.,*
    647 F. Supp. 369 (D. Del. 2009)..................................................... 27

*Brotherhood Ry. Carmen of U.S. and Canada v. Delpro Co.,*
    549 F. Supp. 780 (D. Del. 1982)..................................................... 28

*City of Kalamazoo v. Michigan Disposal Serv. Corp.,*
    125 F. Supp. 2d 219 (W.D. Mich. 2000) ........................................ 20

*Conley v. Chaffinch,* 431 F. Supp. 2d 494 (D. Del. 2006)..................... 22

*Elonex v. Apple Computer, Inc.,*
    142 F. Supp. 2d 579 (D. Del. 2001)............................................ 19, 27

*In re Corn Derivatives Antitrust Litigation,*
    748 F.2d 157 (3d Cir. 1984) ........................................................... 26

*In re Meridian Auto. Systems-Composite Operations, Inc.,*
    340 B.R. 740 (D. Del. 2006) ......................................................... 22

*International Business Mach. Corp. v. Levin,*
    579 F.2d 271 (3d Cir. 1978) ............................................................. 4

*Jack Eckerd Corp. v. Dart Group Corp.,*
    621 F. Supp. 725 (1985) ............................................................... 26

*Kabi Pharmacia AB v. Alcon Surgical, Inc.,*
    803 F. Supp. 957 (D. Del. 1992)........................................ 7, 19, 25, 26

*Liberate Technologies LLC v. Worldgate Communications, Inc.,*
    133 F. Supp. 2d 357 (D. Del. 2001)............................................... 22

*Madukwe v. Delaware State University,*
    552 F. Supp. 2d 452 (D. Del. 2008)........................................... 22, 25

*Official Committee Of Unsecured Creditors v. JPMorgan Chase Bank, N.A., et al.,*
    Adv. Pro. No. 10-53963-KJC ........................................................ 8

*Raymond Professional Group, Inc. v. William Pope Co.,*
    400 B.R. 624 (Bankr. N.D. Ill. 2009) ......................................... 21, 22

*Richardson v. Hamilton Int'l Corp.,*
    469 F.2d 1382 (3d Cir. 1972) ......................................................... 27

TABLE OF AUTHORITIES (CONT.)

Page

*Talecris Biotherapeutics, Inc. v. Baxter, Int'l, Inc.*,
  491 F. Supp. 2d 510 (D. Del. 2007).......................................................................... 24

*United States v. Miller*,
  624 F.2d 1198 (3d Cir.1980) ..................................................................................... 24

*Wyeth v. Abbott Laboratories*,
  692 F. Supp. 2d 453 (D.N.J. 2010) ............................................................................ 27

**Rules**

ABA Model Rules of Prof'l Conduct
  Rule 1.7.................................................................................................................. *passim*

ABA Model Rules of Prof'l Conduct
  Rule 1.9.................................................................................................................. 22, 25

ABA Model Rules of Prof'l Conduct
  Rule 4.2....................................................................................................................... 13

## I.   PRELIMINARY STATEMENT

Disqualification of counsel is a serious matter, and Oaktree and Angelo Gordon do not proceed lightly here. Unfortunately, as the Opposition itself makes crystal clear, Akin Gump has abandoned Oaktree and Angelo Gordon in favor of a new, more lucrative engagement that now pits Akin Gump directly against them. Akin Gump did so without ever receiving a waiver of its duties of loyalty. As a consequence, Akin Gump left Oaktree and Angelo Gordon with no choice but to demand disqualification in order to ensure that their own lawyers remain faithful to them in this hotly-contested and critically-important matter.

In opposing disqualification, Akin Gump first asserts that there actually is no direct conflict here, and hence that Oaktree and Angelo Gordon could have provided a waiver to Akin Gump if they had been asked (they were not and did not), because Akin Gump's new client (Aurelius) is not actually asserting a "claim" against its existing clients (Oaktree and Angelo Gordon). As shown below, this is nonsense. The Court is well aware of Aurelius' view – advanced by Akin Gump itself – that Oaktree and Angelo Gordon "face a serious risk of having their claims disallowed or subordinated and of being required to return hundreds of millions of dollars previously paid to them by Tribune."[1] Aurelius – through Akin Gump – has been the most vocal proponent of those claims and – through Akin Gump – has inserted itself into every aspect of the litigation now commenced against Oaktree and Angelo Gordon.

Also nonsense is the suggestion that Akin Gump's representation of Oaktree and Angelo Gordon somehow involves a different matter than the claims that Akin Gump is pursuing on behalf of Aurelius against Oaktree and Angelo Gordon. To the contrary, the advice given by Akin Gump to Oaktree and Angelo Gordon is directly related to and intimately intertwined with the adverse matters that Akin Gump is now pursuing for Aurelius against Oaktree and Angelo Gordon.

---

[1]   Docket No. 6679.

Akin Gump next claims that Oaktree and Angelo Gordon somehow waived Akin Gump's conflict and authorized it to represent an avowed adversary in the very same proceeding in which Akin Gump represents them. This type of conflict, however, cannot be waived. Moreover, close scrutiny of Akin Gump's pleadings reveals that (a) Akin Gump never asked for the waiver it now says was given; (b) Akin Gump never disclosed to Oaktree or Angelo Gordon what was at stake in connection with its desired representation of Aurelius; (c) despite knowing full well that Oaktree and Angelo Gordon were represented by both outside and in house counsel, Akin Gump specifically avoided those lawyers while trying to influence Oaktree and Angelo Gordon principals into unknowingly agreeing to the desired waiver; and (d) most importantly, Akin Gump never received the "informed consent, confirmed in writing" that would be necessary under the ethical rules if a waiver was even possible under these circumstances (it is not).

Indeed, the best that Akin Gump can muster is to attempt to cobble together an alleged "waiver" from snippets of several conversations (Akin Gump's recollection of which is disputed, as shown by the declaration accompanying this Reply) and from out-of-context email remarks. There simply is no document that memorializes the waiver allegedly given by Oaktree and Angelo Gordon. This clearly indicates that (a) no specific request for a waiver or consent was ever made, and (b) there never was any occasion where Akin Gump provided Oaktree and Angelo Gordon the information with which to make an informed decision. This alleged patchwork "consent" – procured in violation of ethical rules forbidding communication with represented parties – is the very antithesis of "informed consent, confirmed in writing".

At the core, Akin Gump basically contends that its right to undertake a lucrative new representation of Aurelius trumps any professional responsibilities Akin Gump has to Oaktree and Angelo Gordon.[2] The ethical duties and rules applicable here are not so malleable or lightly

---

[2]    Akin Gump asserts that it has billed an astonishing *5,800 hours* of time since informing Angelo Gordon of its representation of Aurelius in late September 2010. Opp. at 24 n.10. This is equivalent to ten Akin Gump lawyers billing 250 hours a month for the 2.3 months that have elapsed since then. Akin Gump's representation of Aurelius may have begun even *before* notification to Oaktree and Angelo Gordon, and it certainly began without any consent.

discarded, notwithstanding Akin Gump's cavalier attitude toward them. Simply put, the rules are intended to benefit clients, not lawyers, and the rules should be interpreted to advance this overriding purpose.

Specifically, when faced with a request by one's lawyer for a waiver of the rules (especially in situations where a waiver would benefit the lawyer and possibly harm the client), a client is entitled to an opportunity to understand the whole situation and to be informed of its rights before waiving any of them. To start, this means that clients are entitled to a clear and unambiguous request for a waiver or consent. Common sense indicates that when a client is asked directly to waive a set of important rights it is informed that it possesses, the client will pay attention and understand that it needs to follow procedures applicable to such situations (such as seeking guidance from internal or outside counsel). On the other hand, a lawyer's statement that the lawyer will do something for the client (like establish an ethical wall to benefit the client) – which is all that Akin Gump can point to here – does not and cannot be expected to trigger the same kind of scrutiny or response, and thus cannot possibly generate the requisite level of "informed consent, confirmed in writing."

The rules therefore forbid what Akin Gump has attempted to do here. Akin Gump has failed in its duty of undivided loyalty to its clients, and utterly disregarded both the fact and appearance of impropriety. It has sought to strong arm its own clients into relinquishing their legal rights. And it has announced its intention to continue the prohibited, adverse representation of Aurelius and its pursuit of claims and positions adverse to the interests of its preexisting clients in this bankruptcy proceeding.

Disqualification is the only way to prevent Akin Gump's continued and steadfast violation of the ethical rules. Indeed, it is telling that in 36 pages of objection Akin Gump cannot cite a single instance in which a court permitted a law firm to continue with a concurrent adverse representation of clients in the same proceeding. As far as Oaktree and Angelo Gordon are aware, no such authority exists.

Akin Gump's ethical violations simply cannot be permitted and, under the standards enunciated by the Third Circuit, disqualification must be ordered under these circumstances:

> An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public. . . . The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety. Indeed, the courts have gone so far as to suggest that doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification.

*International Business Mach. Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978) (citations omitted).

## II.   AKIN GUMP IS ABSOLUTELY PROHIBITED FROM REPRESENTING AURELIUS NOTWITHSTANDING ANY ALLEGED WAIVER

As it must, Akin Gump concedes the existence of a concurrent conflict of interest under Model Rule 1.7[3] and agrees that, while a client may waive a concurrent conflict of interest in certain circumstances,[4] Rule 1.7(b)(3) absolutely prohibits a lawyer from undertaking a representation that "involve[s] the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal," even if the clients purport to consent to such representation. MODEL RULES OF PROF'L CONDUCT R. 1.7(b)(3).

---

[3]   Akin Gump postures that "it is not entirely clear that [its] representation in this case is in fact 'directly adverse' to movants," and then goes on to "assume for present purposes that [its] representation constitutes a 'concurrent conflict of interest' within the meaning of Rule 1.7(a)." Opp. at 9. Akin Gump's assumption is, of course, correct or this concession would not have been made.

[4]   Contrary to Akin Gump's insinuation, Opp. at 19 n.4, Oaktree and Angelo Gordon strongly contest that those circumstances exist here, even if the conflict at issue was of the type that is subject to a waiver (it is not). In particular, Oaktree and Angelo Gordon disagree that, as required by Rule 1.7(b)(1), Akin Gump somehow could "provide competent and diligent representation to each affected client" under the circumstances of this case.

Akin Gump attempts to avoid Rule 1.7(b)(3)'s unequivocal prohibition by claiming that the dueling Aurelius/Oaktree/Angelo Gordon representations do not involve "the same tribunal" (Opp. at 10-11) and do not involve "the assertion of a claim by one client against another client" (Opp. at 11-13). Akin Gump is wrong on both accounts.

A.    **The Dueling Akin Gump Representations Involve "The Same Litigation Or Other Proceeding Before A Tribunal".**

As to the first point, Akin Gump proceeds from a mangled reading of Rule 1.7(b)(3), contending that the Rule only prohibits concurrent representations before "***the same tribunal***" and that Akin Gump's admitted conflict "arises from Akin Gump's representation of movants in one tribunal (the FCC) and its representation of Aurelius in an entirely different tribunal (this Court)."[5] The words "the same tribunal", however, do not appear in the Rule, which prohibits "the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal." The Rule is directed to "the same litigation or other proceeding," not the "same tribunal".

Of course, both this Court and the FCC are "tribunals," and this "proceeding" involves inextricably intertwined matters pending before both this Court and the FCC. As shown in the Motion, the FCC issues and proceedings are central to any proposed restructuring of Tribune and directly relate to and impact these bankruptcy cases.[6] It is simply false to claim that the matters on which Akin Gump advises Oaktree and Angelo Gordon are "tangential" to the bankruptcy cases (or, vice versa, that the bankruptcy cases are "tangential" to the FCC proceedings).[7] Given the nature of Tribune's business, the matters could not exist independent of each other, and it is an artificial construct to claim that they are separate and distinct. Akin Gump long ago admitted as much when it recommended to Angelo Gordon that Akin Gump bankruptcy attorneys review

---

[5]    Opp. at 10.

[6]    *See* Motion ¶¶ 9-15; Liang Decl. ¶¶ 3-6.

[7]    Opp. at 10.

its FCC advice to ensure that the strategies it had developed for Angelo Gordon would work "from a bankruptcy law perspective."[8]

In any event, Akin Gump's representation of Angelo Gordon and Oaktree, on one hand, and Aurelius, on the other, do occur before the same tribunal – this Court. Despite its protestations to the contrary, Akin Gump in fact serves as counsel to Oaktree and Angelo Gordon in these bankruptcy cases. Not only has the extensive FCC-related advice that Akin Gump rendered to Oaktree and Angelo Gordon been key in developing positions taken and to be taken by them before this Court, Akin Gump has provided advice with respect to, drafted portions of, and commented on numerous critical "bankruptcy documents", including –

- The General Disclosure Statement recently approved by the Court;
- The Debtor/Committee/Lender Plan;
- The Specific Disclosure Statement for the Debtor/Committee/Lender Plan;
- The Oaktree and Angelo Gordon Responsive Statement;
- The Debtors' Responsive Statement;
- The Noteholder Plan proposed by Aurelius, which was drafted by Akin Gump;
- The Specific Disclosure Statement for the Noteholder Plan proposed by Aurelius, which also was drafted by Akin Gump;
- The Noteholder and Aurelius Responsive Statements, also drafted by Akin Gump;
- The Bridge Plan, Specific Disclosure Statement, and Responsive Statement;
- The Step One Plan, Specific Disclosure Statement, and Responsive Statement;
- The Debtors' objection to the disclosure statements filed with respect to the competing plans, including the Noteholder Plan proposed by Aurelius and drafted by Akin Gump;
- The Debtors' reply in support of their motion for approval of solicitation procedures; and
- The proposed order approving the Disclosure Statements and solicitation procedures.

---

[8]    Baiera Decl. ¶ 8 and Ex. A.

Akin Gump also has interfaced extensively with the Debtors' counsel and counsel for the JPMorgan with respect to such matters. This advice is active and ongoing, with Akin Gump continuing to act on behalf of Oaktree and Angelo Gordon as recently as this week.

Much of Akin Gump's advice in this regard is set forth in privileged, attorney-client communications that cannot be disclosed, and Oaktree and Angelo Gordon should not be compelled to waive privilege with their own attorneys as the price for preventing those attorneys from improperly pursuing claims against them.[9] However, if Akin Gump disputes the scope of the advice that it itself continues to provide, Oaktree and Angelo Gordon will submit examples of Akin Gump's work product to the Court for an *in camera* review, subject to the retention of the privilege.

Further, the fact that the Akin Gump attorneys representing Oaktree and Angelo Gordon do not appear as attorneys of record before this Court is irrelevant. The relationship governed by Rule 1.7 applies equally to attorneys acting as "advisors" to a client, even where they never appear in a particular action. *See, e.g., Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957, 962 (D. Del. 1992) ("The Rules of Professional Conduct recognize that an attorney can fulfill many functions, including that of advisor."). Akin Gump notably cites nothing to the contrary.

Thus, Akin Gump simply cannot escape the fact that the legal services being provided to Oaktree and Angelo Gordon by Akin Gump attorneys relate directly to and are provided in connection with central reorganization issues before this Court, *i.e.*, in the "same proceeding" before the same tribunal as that in which Akin Gump now also purports to represent Aurelius.

---

[9]   The fact that privileged information (which could be utilized against them by Aurelius) might need to be disclosed in order to compel Akin Gump to comply with its duty of loyalty simply highlights the untenable position in which Oaktree and Angelo Gordon find themselves as a result of Akin Gump's ethical breaches.

B.     **Akin Gump's Representation Of Aurelius Involves The Assertion Of Claims Against Angelo Gordon And Oaktree.**

Akin Gump alternatively disputes the application of Rule 1.7(b)(3) by arguing that its representation of Aurelius "does not involve the assertion of a claim by one client against another client."[10] Akin Gump analogizes this to a situation in which a lawyer represents more than one creditor in a reorganization case, noting that such situations "generally do not pit creditor against creditor in a direct manner" and typically "are not directly adversarial in the sense of one client facing off against another, each being represented by the same firm."[11]

As the Court knows, however, these cases surely do not present that sort of benign situation. To the contrary, Akin Gump's new client (Aurelius) is hellbent on pursuing (or, at the least, ensuring the prosecution of) claims directly against Oaktree and Angelo Gordon. In fact, there is now a multi-billion dollar adversary proceeding commenced against the so-called "LBO Lenders", in which Oaktree and Angelo Gordon are named defendants.[12]

While the Official Committee of Unsecured Creditors currently is the nominal plaintiff in that action, Aurelius clearly is an adversary on the "other side of the v." (to use Akin Gump's terminology). The Committee has settled with Oaktree and Angelo Gordon; Aurelius has not. Akin Gump, in fact, has stated in Court that the action brought by the Committee "is a lawsuit primarily for [the] benefit" of the so-called "pre-LBO" creditors (of which Aurelius claims to be the largest).[13] Indeed, Aurelius was so concerned about how the Committee proposed to assert claims against Oaktree and Angelo Gordon that it requested that the Court direct the Committee to consult with Akin Gump regarding allegations in the complaint, going so far as to demand that the Committee be "directed to work in good faith with the representatives of the five parties

---

[10]   Opp. at 11 ("[A]ny conflict is still subject to consent under rule 1.7(b)(3) because no client has in fact brought any 'claim . . . against another client' in this case.").

[11]   Opp. at 11-12 (quotations omitted).

[12]   *Official Committee Of Unsecured Creditors v. JPMorgan Chase Bank, N.A., et al.*, Adv. Pro. No. 10-53963-KJC.

[13]   Transcript of hearing held on October 22, 2010 ("10/22 Tr."), excerpts of which are attached as *Exhibit A*, at 64:6-8 ("it is Aurelius' view supported by the pre-LBO holders that this is a lawsuit primarily for their benefit").

listed, Aurelius, Wilmington Trust, Deutsche Bank, Law Debenture and Wells Fargo, to modify and amend the draft complaints to ensure maximum recovery for the underlying claims."[14] Akin Gump led the charge in this respect.

Furthermore, Aurelius's proposed plan of reorganization (drafted by Akin Gump) places the claims against Oaktree and Angelo Gordon into a litigation trust that will be governed by a board of three members, two of which will be selected by Aurelius (represented by Akin Gump), and a litigation trustee appointed by Aurelius (represented by Akin Gump).[15]

It is clear that, given Akin Gump's agitation for and active involvement in the fashioning of claims against Oaktree and Angelo Gordon, and the degree of control that Aurelius has retained for itself in pursuing the claims under its plan, Aurelius effectively believes that it is and should be the plaintiff in pursuing claims against Oaktree and Angelo Gordon.  In other words, to use Akin Gump's phraseology, Akin Gump's "two clients effectively stand on the opposite sides of the 'v'."[16] Akin Gump recognized as much just this week when, during the hearing on plan solicitation procedures, Mr. Zensky observed that "[w]e have a real live adversary proceeding on file with thirteen counts in it against JPMorgan and the banks and Angelo Gordon and Oaktree and the holders of the debt."[17] This is positively astounding coming from the very lawyers who represent Oaktree and Angelo Gordon in the same proceedings in which that statement was made.

---

[14]   10/22 Tr. at 47:13-48:3 (emphasis added).

[15]   *Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By Aurelius Capital Management, LP, On Behalf Of Its Managed Entities, Deutsche Bank Trust Company Americas, In Its Capacity As Successor Indenture Trustee For Certain Series Of Senior Notes, Law Debenture Trust Company Of New York, In Its Capacity As Successor Indenture Trustee For Certain Series Of Senior Notes And Wilmington Trust Company, In Its Capacity As Successor Indenture Trustee For The PHONES Notes* [Docket No. 7127] at § 5.17.3

[16]   Opp. at 12.

[17]   Transcript of hearing held on December 6, 2010, excerpts of which are attached as *Exhibit B*, at 108:7-9.

Moreover, Aurelius's claims against Oaktree are not limited to the assertion of the so-called LBO-Related Causes of Action.  Akin Gump has made it clear that its new client Aurelius intends to directly challenge the classification and treatment of the "Swap Claim", which is held by Akin Gump's other client Oaktree.  Indeed, in Aurelius' responsive statement (which was drafted by Akin Gump), Aurelius makes its intentions clear:

> The Debtor/Committee/Lender Plan classifies the swap claim at Tribune as an "Other Parent Claim" (i.e., a general unsecured claim), while classifying an identical claim at the subsidiary debtors as a Senior Loan Guaranty Claim.  This gerrymandered classification results in an inflated recovery for the holder of the swap claim (which, upon information and belief, is *Oaktree*), to the detriment of other creditors at Tribune.[18]

The Swap Claim was also the source of Aurelius' objection (drafted by Akin Gump) to the disclosure statement for the plan of reorganization proposed by Oaktree and Angelo Gordon, where Akin Gump wrote:

> The Treatment of the Swap Claim:  The classification of the Swap Claim under the Debtor/Committee/LBO Lender Plan appears to be gerrymandered to provide an increased recovery on account of such Claim.  The Swap Claim, which is owned by *Oaktree*, should be classified with the Senior Loan Claims at Tribune and the Senior Loan Guaranty Claims at the Subsidiary Debtors, as it was when the Debtors' filed their initial plan in April . . . .  This inappropriate classification will result in an inflated recovery of over 100% to *Oaktree* on account of the Swap Claim, to the detriment of other creditors at Tribune.[19]

Thus, Akin Gump's suggestion that Aurelius is not directly adverse to Oaktree and Angelo Gordon in these cases simply does not pass the straight face test.  Akin Gump's attempted representation of Aurelius in those matters directly adverse to Oaktree and Angelo

---

[18]   *Revised Responsive Statement By Aurelius Capital Management, LP, Deutsche Bank Trust Company Americas, Law Debenture Trust Company Of New York, And Wilmington Trust Company* [Docket No. 7079] at 8 (emphasis added).

[19]   *Omnibus Objection Of The Pre-LBO Debtholder Plan Proponents To (I) The Disclosure Statements For The Competing Plans And (II) The Responsive Statements Filed By The Proponents Of The Competing Plans* [Docket No. 6466] at 15 (emphasis added).

Gordon is expressly prohibited by Rule 1.7(b)(3) and is a conflict that could not have been waived by Oaktree and Angelo Gordon even if they had desired to do so (which, as described below, they assuredly did not).

## III.   NEITHER OAKTREE NOR ANGELO GORDON "WAIVED" THE CONFLICT

Even if, notwithstanding the foregoing, Akin Gump's conflict of interest theoretically was waivable pursuant to Rule 1.7(b), Akin Gump has completely failed in meeting its burden to demonstrate that it obtained consent to the conflicted engagement, much less "an informed consent, confirmed in writing," from Oaktree and Angelo Gordon.

Had Akin Gump in fact obtained "informed consent, confirmed in writing," it could meet its burden by simply producing the written confirmation of each of Oaktree and Angelo Gordon to this Court. Akin Gump's failure to do so speaks volumes. Because it is unable to point to any definite written consent by Oaktree or Angelo Gordon, Akin Gump is left to attempt to cobble together an incomplete, cherry-picked selection of email communications and telephone conversations that it now claims to embody client consent (despite the fact that, at the time, even Akin Gump recognized that such communications did not constitute consent). As set forth below, *none* of the emails or conversations expressed consent to the representation or a waiver of Akin Gump's inherent conflicts. Indeed, Akin Gump simply ignores the numerous written notifications it received plainly stating that Oaktree and Angelo Gordon *did not agree* to waive the conflict.

### A.   Oaktree Never Agreed To Waive Any Conflict.

Akin Gump provides no evidence that Oaktree ever agreed to waive any conflict, let alone gave the informed consent in writing required by Rule 1.7. Indeed, Mr. Golden's declaration reflects that he never spoke to Oaktree about this issue. Instead, Mr. Golden's sole basis for claiming that Oaktree consented to Akin Gump's representation of Aurelius rests on the

shoulders of a single email between Oaktree and Tom Davidson, the Akin Gump lawyer representing Oaktree in connection with the Tribune matters.[20]

That email, sent on October 13, 2010, more than three weeks *after* Akin Gump apparently began to represent Aurelius, does not even mention a waiver or consent to the Akin Gump/Aurelius conflict and says *nothing* about a consent or waiver by Oaktree; it merely responds to an email from Mr. Davidson discussing an ethical wall.  In fact, Mr. Davidson, the Akin Gump attorney who communicated with Oaktree, was well aware that Oaktree had *not* agreed to waive any conflict.  To wit, on October 15, 2010 – two days *after* the communication that Akin Gump *now* claims to embody Oaktree's "informed consent, confirmed in writing," Mr. Davidson emailed Mr. Liang at Oaktree, asking, "I just want to close the loop to be sure that the Aurelius conflict consent is acceptable to Oaktree?",[21] a question that obviously would not have been asked had Mr. Davidson believed that Oaktree already had consented to Akin Gump's duel representation.  Mr. Liang never answered Mr. Davidson's inquiry affirmatively.

To the contrary, four days later, on October 19, 2010, Oaktree's outside counsel, Mr. Bennett of HBD, sent an email to Mr. Golden stating that neither Oaktree nor Angelo Gordon "has agreed to waive or not to assert any of the conflicts Akin Gump has in representing adversaries of either of them."[22]  Finally, to leave no doubt, on November 4, 2010, Mr. Liang responded to Mr. Davidson's inquiry and confirmed Mr. Bennett's statements, explaining that, "[a]s Bruce [Bennett] has informed Danny on our behalf, *the Aurelius conflict is not acceptable to Oaktree, and we do not waive the conflict.*"[23]

---

[20]  Golden Decl. ¶ 24 and Ex. 10.

[21]  *Id.*

[22]  Golden Decl. Ex.. 13 (October 19, 2010 email).

[23]  Liang Decl. ¶¶ 7-8 and Ex. A (emphasis added).  Conveniently, Akin Gump failed to attach this responding email to the Golden Decl.

### B.    Angelo Gordon Never Agreed To Waive Any Conflict.

Similarly, Angelo Gordon also never agreed to waive Akin Gump's conflict or to consent

to the Aurelius engagement. In its Opposition, Akin Gump asserts that Mr. Golden understood,

based on a *phone call* with an Angelo Gordon *business person*, that Angelo Gordon agreed to

waive the conflict.[24] However, the record reflects that this understanding was incorrect *and* that

Mr. Golden was so informed on multiple occasions.

Specifically, Mr. Golden asserts that he contacted Thomas Fuller, an Angelo Gordon

principal, to discuss a waiver on September 20, 2010.[25] Mr. Golden was well aware at the time

that Angelo Gordon had both in-house and outside counsel (HBD and WilmerHale) representing

it in this matter, and it was improper for Mr. Golden to contact a principal he knew to be

represented by counsel to discuss an adversarial matter.[26] In any event, Mr. Fuller's

conversation with Mr. Golden lasted no more than two minutes (likely less). In the conversation,

Mr. Golden did not disclose any risks associated with Akin Gump's representation of Aurelius.[27]

Further, although Mr. Golden surely knew that a business person such as Mr. Fuller could not

have assessed the legal implications associated with Akin Gump's proposed adverse

representation or otherwise waived Angelo Gordon's legal rights, Mr. Golden did not advise Mr.

Fuller that he should discuss this matter with Angelo Gordon's lawyers.[28]

Mr. Golden also did not provide Mr. Fuller with the information that Angelo Gordon

would have needed to give informed consent. He did not indicate any specific adverse positions

that Aurelius might take and, in particular, he did not inform Mr. Fuller that Aurelius intended to

file a plan of reorganization in direct competition with the plan supported by Angelo Gordon; he

did not inform Mr. Fuller that Aurelius intended to take positions with respect to FCC matters

that would be contrary to those taken by Angelo Gordon and that might have the effect of

---

[24]    Golden Decl. ¶ 22.

[25]    *Id.*

[26]    *See e.g.*, MODEL RULES OF PROF'L CONDUCT R. 4.2.

[27]    Reply Decl. of Thomas Fuller ("Fuller Decl.") ¶¶ 3-4; Golden Decl., ¶ 22.

[28]    Fuller Decl. ¶ 3.

delaying Tribune's emergence from bankruptcy; and he did not inform Mr. Fuller that Aurelius

supported the prosecution of claims directly against Angelo Gordon and intended to advocate

that such claims be vigorously pursued, either by Aurelius or by representatives of the Tribune

bankruptcy estate, directly against Angelo Gordon.[29]

In any event, as Mr. Fuller's declaration makes clear, *Mr. Fuller did not agree to a*

*waiver on behalf of Angelo Gordon*.[30]  If Mr. Golden assumed from the conversation with Mr.

Fuller that Angelo Gordon had agreed to waive any conflict, he was mistaken.  Notably, Mr.

Golden never asked that Angelo Gordon confirm its purported consent in writing, as he was

required to do pursuant to Rule 1.7.[31]  In any event, Mr. Golden's apparent misapprehension was

short-lived.  On October 19, 2010, Oaktree's outside counsel, Mr. Bennett of HBD, sent an email

to Mr. Golden stating that neither Oaktree nor Angelo Gordon "has agreed to waive or not to

assert any of the conflicts Akin Gump has in representing adversaries of either of them."[32]

That same day, Mr. Golden admits that he had another improper phone call directly with

Mr. Fuller, without involvement of counsel, about this contested issue.[33]  In that call, Mr. Golden

again raised Akin Gump's representation of Aurelius and pressed Mr. Fuller to indicate whether

Angelo Gordon had objections to the conflicting engagement.[34]  Mr. Golden provided no

additional information to Mr. Fuller, and again no agreement was reached.[35]  Rather, Mr. Fuller

reiterated to Mr. Golden that a waiver would be given only if there was no real conflict.[36]  Later

that day, Mr. Golden emailed Mr. Fuller (another improper communication) and forwarded Mr.

---

[29]  Fuller Decl. ¶ 3.

[30]  Fuller Decl. ¶ 4.

[31]  Rule 1.7(b)(4) requires that "each affected client give[] informed consent, *confirmed in writing*" (emphasis added).

[32]  Golden Decl. Ex. 13 (October 19, 2010 email).

[33]  Golden Decl. ¶ 31.

[34]  Fuller Decl. ¶ 5.

[35]  *Id.*

[36]  Fuller Decl. ¶ 6.

Bennett's email to him, once again with no notice to HBD or Angelo Gordon's other counsel.[37] Mr. Fuller responded that he would need to call Angelo Gordon's counsel, thus making clear that involvement of counsel was required before Angelo Gordon could make such a critical legal decision.[38]

The following day, on October 20, 2010, Mr. Golden had yet another call with Mr. Fuller and, for the first time, Angelo Gordon's in-house counsel, Mr. D. Forest Wolfe.  In that call, which Akin Gump does not even mention in its Opposition, Mr. Wolfe told Mr. Golden that it was inappropriate and improper for him to discuss an issue on which Akin Gump and Aurelius were adverse to Angelo Gordon with a principal rather than with counsel.  Mr. Wolfe and Mr. Fuller also expressed their objections to any assertion by Aurelius of positions contrary to those taken by or on behalf of Angelo Gordon at the FCC.  They then informed Mr. Golden that they would consider the issue but *did not agree to waive any conflict*.[39]

Accordingly, there is absolutely no evidence other than Mr. Golden's unfounded assumption based on one brief phone call that Angelo Gordon ever gave consent to the adverse representation.  As Angelo Gordon repeatedly advised Mr. Golden that his assumption was in error, there simply was no consent here.

Moreover, Akin Gump effectively concedes that Angelo Gordon was not in a position to give "informed consent" on September 20, 2010, the date on which Akin Gump claims that it raised the issue with Mr. Fuller.  Indeed, Akin Gump asserts that Angelo Gordon and Oaktree should have known, based on Mr. Golden's remarks at an October 4, 2010 hearing (*two weeks later*), that Aurelius planned to file a competing plan.[40]  Akin Gump thus concedes that Angelo Gordon would have been unaware of this critical fact at the time Mr. Fuller purportedly verbally "consented to" the adverse representation on September 20, 2010.  Nor could Angelo Gordon

---

[37]  *Id.*

[38]  *Id.*

[39]  *Id.*

[40]  Golden Decl. ¶ 26.

have known that Aurelius intended to pursue claims directly against them utilizing Akin Gump – that information was first disclosed by letter dated October 16, 2010, when Akin Gump sent a remarkable "litigation hold" letter to Oaktree and Angelo Gordon indicating that it intended to take discovery from Oaktree and Angelo Gordon on behalf of Aurelius.[41]

Akin Gump thus has not met and cannot meet its burden of demonstrating consent, much less informed consent, confirmed in writing, by Angelo Gordon to the adverse Aurelius representation.

### C.   Akin Gump's Attempt To Construct A Waiver From A Patchwork Quilt Of Disputed Conversations And Email Snippets Highlights The Complete Absence Of Consent.

As noted above, Akin Gump cannot point to a single writing that memorializes a consent from Oaktree or Angelo Gordon to the Aurelius representation.  At best, Akin Gump musters only disputed, unrecorded conversations and out-of-context emails.  Akin Gump essentially asks the Court to connect the dots and construct a waiver from the few morsels of "evidence" it has been able to assemble.[42]

This is highly significant.  Akin Gump's inability to point to any single document in which Oaktree or Angelo Gordon clearly and explicitly provided their consent to Akin Gump's new engagement, undertaken in violation of applicable ethical rules, makes two things clear.  First, no clear and unambiguous request for a waiver or consent was ever made.  Surely, if such a request had been made Akin Gump would have informed the Court about it.  Second, there never was any occasion on which Akin Gump provided Oaktree and Angelo Gordon with a complete statement of the implications of whatever waiver or consent might have been requested.

---

[41]   Baiera Decl. ¶ 10, Ex. B.

[42]   Remarkably, Akin Gump asserts that this alleged patchwork waiver operates as a consent "to *any* conflict of interest arising from Akin Gump's representation of Aurelius."  Opp. At 2 (emphasis added).  Taken to its logical extreme, Aurelius could decide to take over for the Committee as plaintiff in the pending lawsuit against Oaktree and Angelo Gordon and Akin Gump would be free to represent Aurelius in bringing claims against them.  Preposterous!

Akin Gump thus has not identified any moment in time in which it actually told Oaktree and Angelo Gordon exactly what it wanted (consent) and informed them of the consequences of its request (adversity with a notoriously litigious entity represented by the same counsel who could wind up simultaneously taking a position on behalf of Oaktree and Angelo Gordon and a different and potentially opposite position on behalf of Aurelius).

As a consequence, even accepting as true everything in Mr. Golden's declaration (testimony contracted by Mr. Fuller's declaration), there simply is no evidence on which to conclude that either of Oaktree or Angelo Gordon ever consented to Akin Gump's conflicting Aurelius engagement, much less gave the informed consent required by law. On this record, therefore, the Court must conclude that no consent was given here, and the Motion should be granted on that basis alone.[43]

## IV.    AKIN GUMP'S PRIOR REPRESENTATION OF CENTERBRIDGE IS IRRELEVANT AND DOES NOT EXCUSE AKIN GUMP'S UNETHICAL CONDUCT

In an effort to obscure its ethical violation and failure to obtain consent from either Oaktree or Angelo Gordon, Akin Gump devotes much of its Opposition to a discussion of its prior representation of an unrelated third party, Centerbridge Credit Advisors ("Centerbridge"). In the process, Akin Gump confuses and conflates dates and communications relevant to that prior representation with the recent Aurelius retention.

Akin Gump's representation of Centerbridge is irrelevant to the issues here. It does not justify the prohibited, concurrent conflict of interest that has resulted from Akin Gump's representation of Aurelius nor does it have any bearing on the unfounded allegation that Oaktree

---

[43]    If, notwithstanding the foregoing, the Court believes that an evidentiary hearing on this matter is necessary, Oaktree and Angelo Gordon will schedule one at the Court's earliest possible convenience. In this regard, however, Oaktree and Angelo Gordon agree with Akin Gump that "[t]here is simply no reason to embark on that path, and every good reason not to." Opp. at 19.

and Angelo Gordon consented to the Aurelius conflict well over a year after Akin Gump started representing Centerbridge.

The first point of note is that Akin Gump undertook the Centerbridge representation in August 2009.[44] That representation had nothing whatsoever to do with Aurelius. Indeed, at that time and through September 2010, Aurelius was represented by separate counsel in these bankruptcy cases.[45] There is nothing in the Centerbridge representation that reflects consent by Oaktree or Angelo Gordon to a future, unknown and hypothetical representation of a different adversary, and Akin Gump concedes that neither Oaktree nor Angelo Gordon was informed of or asked to consent to such a hypothetical representation a year before Akin Gump actually began representing Aurelius.

While irrelevant to the underlying question here, Akin Gump's Centerbridge representation does establish one thing – Akin Gump's pattern of disregarding professional responsibilities to Oaktree and Angelo Gordon. In particular, as with the new Aurelius representation, Akin Gump never actually sought or obtained Oaktree's consent to the Centerbridge representation, even though it was expected that Centerbridge might take positions adverse to Oaktree.[46] Instead, upon becoming aware of the Centerbridge representation, Oaktree was forced to raise the issue with Akin Gump – meaning that the lawyer (Akin Gump) put its own client (Oaktree) in the remarkable position of having to ask the lawyer about a conflicting engagement the lawyer had undertaken without notice to the client.[47] And even then, instead of obtaining informed written consent, Akin Gump merely informed Oaktree that an ethical wall was in place, but no consent to or waiver of any conflicts was provided.[48] While Oaktree ultimately not to object to the Centerbridge representation, its failure to press the point at the

---

[44]  Golden Decl. ¶ 3.

[45]  *See* Motion ¶ 16.

[46]  Golden Decl. ¶ 7, Ex. 10.

[47]  *Id.*

[48]  Golden Decl. ¶¶ 6-7, Ex. 10.

time certainly was not, and could not have been, a waiver of conflicts with respect to the

Aurelius representation, which did not commence until a year later.

Similarly, while Mr. Golden asserts that Angelo Gordon waived any conflict related to

the Centerbridge representation in "Fall 2009," this alleged waiver was not obtained "prior to

undertaking" the representation as required by the professional rules. *Kabi Pharmacia*, 803 F.

Supp. at 963 ("Morgan & Finnegan was required to consult with and obtain consent from both

Alcon and Pharmacia *prior to undertaking representation* of Alcon.") (emphasis added)

(citations omitted). And, since Akin Gump failed to obtain confirmation "in writing" of the

Centerbridge waiver, as required by Rule 1.7(b)(4), the scope of Akin Gump's disclosure or the

alleged consent are unknown. What is known, however, is that Akin Gump did not inform

Angelo Gordon in the Fall of 2009 or anytime thereafter that a waiver as to Centerbridge would

be construed to be a waiver for a future representation of Aurelius commenced a year later.

In short, even if Oaktree or Angelo Gordon did waive objections to the Centerbridge

representation, that waiver certainly does not apply to Akin Gump's subsequent representation of

Aurelius, and Akin Gump does not even attempt to claim that it informed Oaktree or Angelo

Gordon that failure to object to the Centerbridge representation later would be deemed to be a

consent to other, undisclosed and unknown future conflicts.[49]

In any event, Akin Gump would be flat wrong if it tried to claim that consent to the

Centerbridge representation somehow encompassed consent to a representation of Aurelius a

year in the future. While "prospective waivers" are permitted in limited circumstances, "[a]

prospective waiver should identify the potential opposing party, the nature of the likely subject

matter in dispute, and permit the client to appreciate the potential effect of the waiver." *Elonex

v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 582-83 (D. Del. 2001). Put another way, "[t]he

goal should be for the client to be able to recognize the legal implications and possible effects of

---

[49]    Indeed, it would be preposterous to suggest that Oaktree or Angelo Gordon could have
predicted that Aurelius, which was actively represented by other counsel, would attempt to
retain Akin Gump over a year later, much less given "informed consent" to such an
undisclosed, adverse representation.

the representation at the time the waiver is signed." *City of Kalamazoo v. Michigan Disposal Serv. Corp.*, 125 F. Supp. 2d 219, 243 (W.D. Mich. 2000). Akin Gump did not know, much less disclose, that it would attempt to undertake a future Aurelius representation. Akin Gump did not and could not have "identified the potential opposing party [and] the nature of the likely subject matter in dispute" or otherwise "permit the client to appreciate the potential effect of the waiver."

And, if Oaktree and Angelo Gordon had been informed of the potential Aurelius engagement, they would have objected as they do now. As noted in the Motion, Aurelius is a highly litigious organization that regularly stakes out unreasonable and adversarial positions in an effort to extract unjustified recoveries from other stakeholders. Aurelius' actions in this case prove this point. No rational client would want their own lawyers having to take instruction from Aurelius in adverse, related matters, where Aurelius intended to assert positions contrary to their own on key issues, and Oaktree and Angelo Gordon would not have given their consent to Akin Gump doing so.

## V.    OAKTREE AND ANGELO GORDON DID NOT "DELAY" IN OBJECTING TO THE ADVERSE REPRESENTATION

Akin Gump also argues that Oaktree and Angelo Gordon waived any right to object to its breach of the duty of loyalty by "delaying" in bringing the Motion, to the effect that Oaktree and Angelo Gordon somehow waived the right to contest Akin Gump's unethical conduct.[50]

Akin Gump is wrong factually and legally. For one thing, Akin Gump was promptly informed of the objection of both Oaktree and Angelo Gordon to its representation of Aurelius. For another, even delay would not avoid disqualification where, as here, the adverse representation involves related issues and the same proceeding.

### A.    There Was No Delay.

Akin Gump's assertion that Oaktree and Angelo Gordon "delayed" in voicing their oppositions to the Aurelius representation and bringing the Motion is frankly absurd. Angelo

---

[50]   Opp. at 19-25.

Gordon was first notified of the proposed representation in late September 2010.[51] Even Mr.
Golden agrees that Angelo Gordon did not agree at that time to waive any conflict.[52] At most,
Angelo Gordon agreed to consider the request and, when it learned of and considered all of the
facts, declined to provide consent to the representation. Oaktree was first informed of the
adverse representation by email dated October 13, 2010,[53] and like Angelo Gordon Oaktree
declined to give its consent.

As established above, Oaktree and Angelo Gordon voiced their objection to the adverse
representation promptly, and Akin Gump was notified in writing that there was no consent on
October 19, 2010, a mere three weeks after the first communication with Angelo Gordon and just
six days after the first communication to Oaktree, and then on several occasions thereafter. After
failing in their efforts to convince Akin Gump to comply with its ethical obligations, Oaktree and
Angelo Gordon promptly filed the underlying Motion on November 12, 2010. Akin cannot point
to any authority where an objection or motion brought in such a short time frame was viewed as
a "delay."[54]

Indeed, the cases cited by Akin Gump confirm that there has been no undue delay or
waiver here. Akin Gump relies heavily on *Raymond Professional Group, Inc. v. William Pope
Co.*, 400 B.R. 624 (Bankr. N.D. Ill. 2009). The court in that case, however, merely affirmed that
motions to disqualify "should be made with reasonable promptness after a party discovers the

---

[51]  Golden Decl. ¶ 21.

[52]  *Id.*

[53]  Liang Decl. ¶ 7; Golden Decl. ¶ 24.

[54]  Akin Gump attempts to obscure this fact by again referring to and conflating the separate
Centerbridge representation. The Aurelius representation was first considered and raised in
late September 2010; nonetheless Akin Gump argues that Oaktree and Angelo Gordon had
"*more than a year* to mull over the potential consequences of concurrent representation in
this case." Opp. at 17 (emphasis in original). Obviously, Oaktree and Angelo Gordon could
not have brought a motion to disqualify Akin Gump from representing Aurelius before Akin
Gump ever undertook the representation in the first place. That Akin Gump would make
such a deliberately false statement and preposterous assertion, particularly about its own
clients, is disturbing and serves only to highlight the conflicts inherent in its attempt to
represent adverse parties in these bankruptcy cases.

facts which [led] to the motion." *Id.* at 638 (citations and internal quotation marks omitted). Oaktree and Angelo Gordon did precisely that. In *Raymond*, disqualification was denied because the court found that, in fact, there was no former attorney-client relationship at all and, in any event, a delay of *four to seven years* in seeking to disqualify the alleged former attorney was unreasonable. *Id.* That hardly supports a claim of unreasonable delay here.

*Madukwe v. Delaware State University*, 552 F. Supp. 2d 452 (D. Del. 2008), also cited by Akin Gump, is contrary to Akin Gump's position. In that case, the court *denied* the claim of waiver and ordered that a client's former attorney be disqualified for violation of Rule 1.9, even while acknowledging that the client filed its disqualification motion *over a year after learning of the conflict* and that disqualification would prejudice the attorney's new clients. *Id.* at 463-66.

The other two cases cited by Akin Gump are simply inapposite. *Conley v. Chaffinch*, 431 F. Supp. 2d 494 (D. Del. 2006), involved a challenge to a client's former (not concurrent) attorney. The court found that a delay of *over nine months* from the time the former attorney filed the suit against the former client reflected a waiver. And, in *Liberate Technologies LLC v. Worldgate Communications, Inc.*, 133 F. Supp. 2d 357 (D. Del. 2001), unlike here, the client had authorized the lawyer to proceed with the potential conflict.

None of these cases support the allegation that there was any delay, much less waiver, here. Rather, the cases involved delays of many months or years. Here, Oaktree and Angelo Gordon promptly, and within a reasonable time for consideration, objected to Akin Gump's new engagement and then filed the Motion when Akin Gump refused to withdraw.

Perhaps more to the point, Akin Gump has not cited a single case in which a concurrent, adverse representation in violation of Rule 1.7 was excused based on a delay in seeking disqualification, and it is unfathomable that a court would permit a prohibited concurrent representation even if there were delay. This is illustrated by *In re Meridian Auto. Systems-Composite Operations, Inc.*, 340 B.R. 740 (D. Del. 2006), in which the court rejected a claim that the moving party had waived the right to seek to disqualify its former lawyers "by waiting to

file its motion *eight months* after learning that [the conflicted counsel] refused to withdraw." *Id.* at 749 (emphasis added). The court stated:

> The Court is more concerned with [the conflicted firm's] conduct than Stanfield's alleged motive in bringing this motion. The Court's supervision of the ethical conduct of attorneys practicing before it is designed to protect the public interest and not merely the interest of the particular moving party.

*Id.* at 749-750 (citations and internal quotation marks omitted). The court further held, in a statement equally applicable here, that "[g]iven Stanfield's continued insistence that there was a conflict, [the firm] could not have believed that Stanfield waived the conflict." *Id.* at 750.

In short, there is no authority for the claim of any delay by Oaktree or Angelo Gordon, who did not waive the right to seek disqualification for Akin Gump's ongoing violation of its ethical duties to them.

### B.   Professional Courtesy Cannot Be Deemed A Waiver.

Finally, Akin Gump attempts to take advantage of Oaktree and Angelo Gordon's professionalism in claiming a "waiver" based on delay. First, because Angelo Gordon agreed to consider a limited waiver so long as the Aurelius representation did not involve positions adverse to it, Akin Gump argues that Angelo Gordon should be precluded from objecting to the ethical violation. Of course, Angelo Gordon cannot be deemed to have waived its legal rights simply because it considered whether to accede to Akin Gump's unethical, conflicting Aurelius engagement. Similarly, Akin Gump attempts to use Oaktree's questions about establishing an ethical wall as a "gotcha" that somehow establishes Oaktree's consent, when there is nothing that indicates that Oaktree did not have independent concerns and objections to the new Akin Gump engagement of an adversary (which, of course, it did, as subsequently explained to Akin Gump). In any event, as even Akin Gump admits, a client is entitled to a "reasonable opportunity" to fully consider a request for a waiver.[55]

---

[55]   Opp. at 17.

Akin Gump next asserts that Oaktree and Angelo Gordon somehow "waived" their right to object by serving their Motion on regular notice, rather than seeking to shorten time and expedite the hearing.[56] This is specious. Akin Gump was notified in advance that the Motion would be filed and has been aware of the lack of client consent from the time the topic was first raised. If Oaktree and Angelo Gordon had requested an expedited hearing, Akin Gump almost certainly would have objected and complained that they were improperly trying to rush to judgment. If Akin Gump wanted an earlier hearing, it could have asked for one. It did not do so and instead chose to utilize the full time to prepare its Opposition. It can hardly fault its own clients for giving it the opportunity to do so.

## VI.    DISQUALIFICATION IS THE ONLY REMEDY FOR AKIN GUMP'S UNETHICAL CONDUCT

Akin Gump violated Rule 1.7 by undertaking a concurrent representation of Aurelius that is directly adverse to the interests of Oaktree and Angelo Gordon, its long-time and preexisting clients. Akin Gump expresses no contrition for this violation and, more importantly, steadfastly asserts that it is entitled to continue with the conflicted representations.

In order to stop the ongoing harm to Oaktree and Angelo Gordon from the continuation of Akin Gump's improper representation, this Court must utilize its power to disqualify. *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980) (court has power to disqualify attorneys for violation of the Model Rules); *see also Talecris Biotherapeutics, Inc. v. Baxter, Int'l, Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007) (disqualification warranted where moving party clearly shows that "continued representation would be impermissible") (internal quotation marks and citations omitted); *Conley v. Chaffinch*, 431 F. Supp. 2d 494, 496 (D. Del. 2006) (same).

---

[56] Opp. at 24.

Akin Gump argues that disqualification should be denied because disqualification somehow would prejudice Aurelius.[57]  It is hardly credible that Aurelius, which has been represented by other counsel throughout these cases, will face prejudice by the withdrawal of a firm that had represented it for only a few weeks before an objection to the conflicts were raised, especially where Akin Gump (and hence Aurelius) knew almost immediately that the representation was improper.[58]  Aurelius has plenty of lawyers at its disposal (including numerous firms that have appeared on its behalf in these cases), and it is not plausible that it will be prejudiced in any significant way by the disqualification of a law firm that knew it could not proceed with the representation.  Moreover, any prejudice would be caused solely by Akin Gump's decision to proceed with a representation when it knew the conflict had not been and could not be waived.[59]

More importantly, even actual prejudice will not justify denial of a motion to disqualify where an impermissible violation of the ethical rules barring adverse representation will otherwise continue.  This was explained in *Madukwe*, where the District Court disqualified a former attorney under Rule 1.9, despite acknowledging that "disqualification would prejudice Plaintiffs," who had been represented by the conflicted counsel for *over a year and a half*. *Madukwe*, 552 F. Supp. 2d at 464.  Although the court regretted that the disqualification "works a financial or other hardship on Plaintiffs," disqualification was required because the former client "*has a right to be treated in accordance with the Model Rules of Professional Conduct.*

---

[57]  Opp. at 30-33.

[58]  In fact, Aurelius candidly acknowledges that its desire to retain Akin Gump is related to its desire to take advantage of work performed for, and presumably paid for by, Centerbridge. Opp. at 31.  The desire to retain conflicted counsel simply to take advantage of its work product generated for another client is not "prejudice," nor is it a legal justification for retaining conflicted counsel.

[59]  As explained above, Akin Gump was required to obtain consent "prior to undertaking" the adverse representation. *Kabi Pharmacia*, 803 F. Supp. at 963.  Akin Gump failed to do so, and cannot use its decision to proceed with a prohibited representation despite its failure to obtain prior consent as a basis to claim prejudice.  Even if the few weeks of Akin Gump representation of Aurelius can somehow be deemed prejudicial, that prejudice was entirely of Akin Gump's own making.

*The public and the Court, too, have expectations for attorney conduct, embodied in the Model Rules. These can, and must, be enforced." Id.* at 466 (emphasis added).

Similarly, the District Court in *Kabi Pharmacia* granted a motion to disqualify based on a violation of Rule 1.7, and rejected a claim that prejudice precluded disqualification even where the motion to disqualify was brought after the law firm in question had represented the client "for nearly one year and discovery is nearing completion." *Kabi Pharmacia*, 803 F. Supp. at 964.

The other cases cited by Akin Gump reflect that a balancing test, even if it were applicable, would not preclude disqualification here. In *In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 162 (3d Cir. 1984), for example, the court disqualified an attorney who took a position on appeal that was contrary to the interests of one former client, despite the prejudice to the current client arising from its interests in "retaining chosen counsel who has extensive familiarity with the factual and legal issues involved, and in avoiding the time and expense required to adequately familiarize a new attorney with the matter." In *Jack Eckerd Corp. v. Dart Group Corp.*, 621 F. Supp. 725, 733-734 (1985), the court granted disqualification and rejected claims of prejudice in a situation similar to that here:  the opposing party had been represented by two large and distinguished law firms in addition to conflicted firm, which had been aware of the potential conflict and the objection to it since the early days of the representation and therefore had the opportunity to mitigate the effects of disqualification.

Akin Gump also suggests that this Court should permit its continued violation of Rule 1.7 and the prohibited, adverse representation, and instead direct that an ethical wall be put in place and that the FCC issues and any discovery on Aurelius' adverse claims against Oaktree and Angelo Gordon be conducted by another firm.[60]  These measures, of course, do nothing to preclude the continued violation of Akin Gump's ethical obligations to its clients – most notably

---

[60]  Opp. at 33-36.

its duty of loyalty to Oaktree and Angelo Gordon; only disqualification will accomplish the required compliance here.

Indeed, if a law firm could avoid compliance with Rule 1.7 and disqualification from adverse representations simply by creating an "ethical wall," there would be no need to obtain a client's consent to an adverse representation, nor any circumstance where a conflict could not be waived. Such a conclusion is directly contrary to the provisions of Rule 1.7.[61]

The unrelated cases cited by Akin Gump simply do not stand for the proposition that an ethical wall can substitute for disqualification, as each involved conflicts respecting unrelated matters. *Elonex*, 142 F. Supp. 2d at 583-584 (court denied Apple's motion to disqualify where it found that Apple, after being fully conformed, had consented to the adverse representation, and where the concurrent representation was as local counsel to Apple "in an unrelated Massachusetts suit.");[62] *Boston Scientific Corp. v. Johnson & Johnson, Inc.*, 647 F. Supp. 2d 369, 374 (D. Del. 2009) (disqualification for violation of Rule 1.7 was denied where the adverse representation was in "unrelated matters.").[63]

---

[61]   Even if relevant (it is not), Akin Gump's claim that an ethical wall was always in place is doubtful. The January 10, 2010 email attached as Ex. A to the Baiera declaration demonstrates that FCC counsel at Akin Gump were certainly unaware of any such wall. Specifically, Akin Gump attorney Phil Marchesiello proposed to Angelo Gordon that Akin Gump's bankruptcy counsel review the FCC issues and advice provided in connection with the Tribune bankruptcy proceeding; he could not have proposed sharing such information if an ethical wall had been in place.

Akin Gump attempts to detract from this irrefutable evidence by claiming that it has been improperly accused of sharing confidential information. Whether Akin Gump bankruptcy counsel actually reviewed the FCC advice is irrelevant; what is relevant is that the Akin Gump bankruptcy counsel had access to that information (or, at the least, that the Akin Gump lawyers working for Angelo Gordon thought that the Akin Gump bankruptcy lawyers had such access). *See, e.g., Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382, 1385 (3d Cir. 1972) (disqualification of a former attorney warranted where the representation is so closely connected that "confidences might be involved.").

[62]   The Court also found that Elonex would be extremely prejudiced by disqualification of the counsel that had represented it for over five years in connection with the complex technology and issue. None of the factors considered by the court are present here.

[63]   Akin Gump also relies on a New Jersey case, *Wyeth v. Abbott Laboratories*, 692 F. Supp. 2d 453 (D.N.J. 2010), a companion case to *Boston Scientific* that raised the identical issue. As in *Boston Scientific*, the court denied disqualification after finding that "the substance of the two matters are completely unrelated." *Id.* at 459.

Where the adverse, concurrent representation in violation of Rule 1.7, as here, involves related matters, disqualification is the only remedy that can rectify the ethical violation. Akin Gump cannot cite a single case denying disqualification under such circumstances, much less circumstances as in this case where the concurrent adverse representation is not only related but occurs in the same proceeding. Disqualification is required under these circumstances to prevent the continued violation of Akin Gump's ethical obligations to Oaktree and Angelo Gordon.[64]

## VII.    CONCLUSION

Akin Gump cannot so cavalierly avoid its duty of loyalty to its long time clients. Oaktree and Angelo Gordon are well within their rights to insist that Akin Gump comply with that duty and refrain from engaging in a prohibited, adverse representation. Their request that this Court require Akin Gump to comply with ethical obligations put in place to protect clients, as well as public confidence it the legal system, can hardly be deemed "tactical" as asserted by Akin Gump.[65] Akin Gump's refusal to even acknowledge its duties to Oaktree and Angelo Gordon is exemplified by this scurrilous and unfounded assertion against its own clients before this Court.

There is not a single court that has permitted a law firm to continue a prohibited, concurrent representation in violation of Rule 1.7 where the representations involve related

---

[64] Akin Gump's Opposition demonstrates that, in connection with undertaking a prohibited representation, Akin Gump disregarded its professional obligations in numerous other respects, including its failure to seek a waiver prior to commencing the Aurelius representation, its persistent communications with Angelo Gordon business personnel on disputed matters, its deliberate attempts to avoid consideration of the issue by Angelo Gordon's counsel, and its allegations against its own clients in its Opposition which, in fact, are unsupported by the evidence it provides. This further reflects that disqualification is the only remedy that will protect Oaktree and Angelo Gordon.

[65] Akin Gump argues that the Motion was brought for tactical reasons to "deprive opposing parties of their counsel of choice." Opp. at 1 (quoting *Brotherhood Ry. Carmen of U.S. and Canada v. Delpro Co.*, 549 F. Supp. 780, 786 (D. Del. 1982)). Akin Gump ignores the fact that an opposing party has no right to representation by a conflicted counsel representing its opponent, regardless of its "choice." The case cited by Akin Gump involved a motion to disqualify based on a claim that the opposing party's lawyer might be called as a witness. It provides no support for a claim that the desire to insure the loyalty of one's own counsel by preventing a prohibited adverse representation can be deemed "tactical."

issues, much less in connection with the same proceeding.  Akin Gump's request that this Court

be the first to do so should be rejected

Dated:  December 10, 2010                    YOUNG CONAWAY STARGATT & TAYLOR, LLP


                                             /s/ Robert S. Brady
                                             Robert S. Brady (No. 2847)
                                             M. Blake Cleary (No. 3614)
                                             The Brandywine Building – 17th Floor
                                             1000 West Street, Post Office Box 391
                                             Wilmington, Delaware 19899 0391
                                             Telephone: (302) 571-6600
                                             Telecopier: (302) 571-1253

                                                      - and -

                                             HENNIGAN, BENNETT & DORMAN LLP

                                             Bruce Bennett
                                             James O. Johnston
                                             865 South Figueroa Street, Suite 2900
                                             Los Angeles, California 90017
                                             Telephone:  (213) 694-1200
                                             Telecopier:  (213) 694-1234

                                             *Counsel to Oaktree Capital Management L.P., and
                                             Angelo, Gordon & Co., L.P.,*

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | ) |
|  | ) Chapter 11 |
|  | ) |
| TRIBUNE COMPANY, et al., | ) Case No. 08-13141 (KJC) |
|  | ) |
|  | ) Courtroom 5 |
|  | ) 824 Market Street |
| Debtors. | ) Wilmington, Delaware |

October 22, 2010
2:05 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                    Sidley Austin LLP
                                BY: JAMES CONLAN, ESQ.
                                BY: KEVIN LANTRY, ESQ.
                                BY: JAMES BENDERNAGEL, JR., ESQ.
                                One South Dearborn
                                Chicago, IL 60603
                                (213) 896-6022

                                Cole, Schotz, Meisel, Forman &
                                Leonard, PA
                                BY:  NORMAN PERNICK, ESQ.
                                1000 North West Street
                                Suite 1200
                                Wilmington, DE 19801
                                (302) 652-3131

ECRO:                           AL LUGANO

Transcription Service:          DIAZ DATA SERVICES
                                331 Schuylkill Street
                                Harrisburg, Pennsylvania 17110
                                (717) 233-6664
                                www.diazdata.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service

1          Are there any other objections that haven't been

2   articulated?  Oh --

3          MR. VAIL:  Yes, this is Andrew Vail.  May I address

4   the Court, Your Honor, by telephone?

5          THE COURT:  Go ahead.

6          MR. VAIL:  Good afternoon, Your Honor.  I represent

7   EGI-TRB, EGI and Mr. Zell, and I don't object to the UCC's

8   motion for standing.  However, to the extent that the UCC seeks

9   to immediately commence litigation and to take discovery, I do

10  object.  It was my understanding that there would be no

11  litigation during the mediation and here, with pending

12  mediation, there's no valid purpose served by the UCC running

13  to file its complaints.

14          The complaints allegations against my client are

15  unfounded and contrary to the conclusions and findings of the

16  examiner.  I'd ask that they do not go forward with filing the

17  complaints until the mediation has been concluded.  That is my

18  objection, Your Honor.

19          THE COURT:  All right.  Thank you.  Anyone else?

20          MR. GOLDEN:  Your Honor, until -- it was a very

21  difficult session, in the sense that we didn't have enough

22  drafts, they weren't blacklined, so until Mr. Bush tells --

23  answers the Court's question about what was agreed to, I won't

24  know in fact whether there are any other objections.

25          THE COURT:  All right.  Let's do that now then.

1          MR. BUSH:  All right.  And with Your Honor's

2   indulgence, since we were in two separate sessions, I might ask

3   my partner, Mr. Sottile, to ride shotgun with me here because

4   there may be changes on this draft that were agreed to in his

5   session and not in mine and I want to make sure I describe

6   things -- or we collectively describe things accurately.

7          THE COURT:  All right.

8          MR. SOTTILE:  Thank you, Your Honor.

9          MR. BUSH:  On Page 2, the second ordered paragraph

10  would be struck.

11         On Page 3, the term "objecting parties" in the

12  fourth line, would be changed to Aurelius, Wilmington Trust,

13  Deutsche Bank, Law Debenture and Wells Fargo.

14         THE COURT:  Law Debenture and?

15         MR. BUSH:  Wells Fargo.

16         THE COURT:  Thank you.

17         MR. BUSH:  The date, April 1st, 2010 should be 2011.

18  It's down about two-thirds of the way in the second -- in the

19  ordered paragraph.

20     (Counsel confer)

21         MR. BUSH:  Then in the second line on Page, what is

22  that, 3 -- no.

23         MR. SOTTILE:  Four.

24         MR. BUSH:  Page 4, sorry, the words "or further

25  order of this Court" would be struck.

1          THE COURT:  I'm sorry, where?

2          MR. BUSH:  The second line --

3          THE COURT:  The second line, okay.

4          MR. BUSH:  -- "or further order of this Court" would

5   be struck.

6          Four lines after that, at the end of the

7   parenthetical, it would say "And comma" -- let's see, this one

8   is actually a little complicated --

9          MR. SOTTILE:  Your Honor, it would be "Comma,

10  motions to intervene and motions regarding settlements

11  consistent with the terms of this order."  We would then

12  strike, Your Honor, what is currently Subsection B in the

13  following sentence, which starts "Enter into settlements."  B

14  would be stricken in its entirety, making the following two

15  subsections B and C instead of C and D.

16          THE COURT:  Okay.

17          MR. SOTTILE:  As Mr. Bush indicated earlier, Your

18  Honor, there was a typographical error in the next-to-the-last

19  paragraph, "Ordered that during the pendency of the stay, no

20  defendant to the avoidance" should be replaced with LBO, which

21  is the defined term used in the order.

22          THE COURT:  Okay.

23          MR. SOTTILE:  The final paragraph of the order as it

24  now stands, Your Honor, would be revised, which is the

25  paragraph that begins, "Ordered that the stay may be lifted by

1  the Court".  We would strike starting with, "For good cause

2  shown" and replace that language with the following language:

3  "For any cause deemed sufficient by the Court" and then it

4  would pick up again, "After notice and a hearing with an

5  opportunity for oral" -- insert the word interested parties --

6  and strike the words, "To the LBO actions".

7            Finally, Your Honor, there would be one additional

8  ordered paragraph, which is simply intended to confirm that the

9  order doesn't affect the rights of other parties, with respect

10  to potential settlements.  It would read as follows:

11            "Ordered that nothing in this order shall affect the

12            rights, if any, of other parties to propose

13            settlements subject to this Court's approval."

14            THE COURT:  Okay.

15            MR. BUSH:  One other addition, which we skipped

16  over, Your Honor, is on -- also on Page 4, right after the

17  letter A in the middle of the carryover paragraph.  Insert the

18  words "consistent with bankruptcy rules, amend" -- then it

19  would go on, "amend the complaints in the LBO actions."

20            THE COURT:  All right.  Mr. Golden, let me start

21  with you.

22            MR. GOLDEN:  Okay.  Your Honor, I think given those

23  changes, but in fairness I think everybody needs an opportunity

24  to see it in writing and have an opportunity to review it, but

25  given those changes as I heard from Mr. Sottile and from Mr.

1   Bush, I think Aurelius only has one remaining problem, which

2   Mr. Bush highlighted.

3           On Page -- at the top of Page 3 of the committee's

4   draft, about three lines down from the top in the middle, it

5   says, "And in making such amendments or modifications, the

6   committee will consider suggestions of the objecting parties."

7   So we've agreed already to take out the reference to objecting

8   parties, obviously we didn't want the defendants giving the

9   plaintiffs' counsel suggestions on the language for the

10  complaint.  "To ensure that the claims of the debtors' estates

11  are preserved consistent with the interest of creditors in the

12  overall judgment of the committee's professionals."

13          So unfortunately, Your Honor, this highlights a

14  pervading notion throughout this Court, which is -- or this

15  case, which is the level of the trust that parties have with

16  one another at this point and that's unfortunate.  We tried to

17  give them alternative language, which we thought was neutral,

18  and I'll read it to the Court, so the proposed substitute

19  language would be,

20              "And in making such amendments or modifications, the

21              committee will" -- I'm sorry, "the committee is

22              hereby directed" -- I know that they don't like the

23              word directed, but -- "is hereby directed to work in

24              good faith with the representatives of the five

25              parties listed, Aurelius, Wilmington Trust, Deutsche

1      Bank, Law Debenture and Wells Fargo, to modify and

2      amend the draft complaints to ensure maximum

3      recovery for the underlying claims."

4          We think that's a perfectly neutral permutation.   It

5   solves our problem because we're only looking for, as the

6   beneficiaries of these lawsuits, to maximize recoveries and it

7   takes out this notion that committee professionals can tip the

8   scales one way or the other as to the right standard for taking

9   or not taking proposed amendments.

10         We would ask the Court to direct the debtors to

11  include our alternative language.  We think it's, as I say,

12  neutral, it's protective of the proposed beneficiaries of this

13  lawsuit.  And with that, we have no further comments on the

14  draft as proposed to be amended.

15         THE COURT:  Thank you.

16         MR. STARK:  Good afternoon, Your Honor.  Robert

17  Stark from Brown Rudnick on behalf of Wilmington Trust.  We

18  join in that request.  I have a little bit of an expansive

19  rationale -- expanded rationale as to why we support it.  I

20  think the thinking right now is let's get these causes of

21  actions commenced stayed, but we want to be sure that we've

22  covered all bases, including all defendants that we think

23  should be named, have been named, all counts that need to be

24  included in the complaint, within the nucleus, so that we don't

25  blow statutes of limitations inappropriately.

63

1   to do.  We can't simply be puppets taking direction from all

2   the parties that have a view.  All we really can do is take

3   their views into consideration and make our own judgment.

4          And I think the protection here for people who

5   disagree with us is to come by to the Court and complain, and

6   they will have time to do that given the schedule in which we

7   plan to file.

8          THE COURT:  And everyone seems to know where to

9   find me.

10         MR. BANDERNAGEL:  They seem to, yes.  And on the

11  settlement point, I think Mr. Bandernagel really did hit the

12  nail on the head.  This -- and with the addition to the order,

13  that makes clear that other parties have the ability to

14  propose settlements and to bring them to the attention of the

15  Court.  This doesn't cut anybody off, and what it really does

16  -- our agreement does, it prevents the debtor -- this is our

17  view of it.  This is a good thing for us.  It prevented the

18  debtor from trying to settle the open claims around us.

19  Debtor wanted to have that view.  We gave up getting a

20  decision from your court and whether we would have the

21  exclusive authority to do that.   But in return, the debtor

22  can't do it without us.  So we thought that was a good thing.

23         And I think that's it, Your Honor.

24         THE COURT:  Does anyone else wish to be heard?

25         MR. GOLDEN:  Your Honor, on the point about the

1  correct standard that the committee professional should employ

2  when consulting with other parties, this is a very unique

3  situation.  This is a lawsuit that's going to be brought now

4  in order to stop a tolling of limitations.  But presumably,

5  one plan versus another plan and maybe no plan will ultimately

6  be confirmed by the Court.  But it is Aurelius' view supported

7  by the pre-LBO holders that this is a lawsuit primarily for

8  their benefit.

9          Given that fact, and given the fact that they

10  believe at the end of the competing plan process, the pre-LBO

11  supported plan construct will be the one confirmed by the

12  Court, we think that we are and should have the rights at this

13  point to at least consult and make sure that the committee's

14  professional, who is not, very frankly, our articulated

15  spokesperson who we would want to be ultimately bringing these

16  lawsuits.

17          So to protect ourselves in this kind of unique

18  situation, all we were asking for was to give the committee

19  and its professionals a direction to consult in good faith.  I

20  think, given the posture, the uniqueness of this case, that's

21  not very much to ask for in order to protect these claims.

22          THE COURT:  Well, I'm going to solve that problem

23  for you.

24          MR. GOLDEN:  Thank you, Your Honor.

-25          THE COURT:  And here's how I'm going to do it.

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al., | ) Case No. 08-13141 (KJC) |
| | ) |
| | ) Courtroom 5 |
| | ) 824 Market Street |
| _____Debtors.\_\_\_\_\_ ) | Wilmington, Delaware |

December 6, 2010
2:00 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                    Sidley Austin LLP
                                BY: JAMES CONLAN, ESQ.
                                BY: KEVIN LANTRY, ESQ.
                                BY: JAMES BENDERNAGEL, JR., ESQ.
                                BY: KENNETH P. KANSA, ESQ.
                                One South Dearborn
                                Chicago, IL 60603
                                (213) 896-6022

                                Cole, Schotz, Meisel, Forman &
                                Leonard, PA
                                BY:  NORMAN PERNICK, ESQ.
                                1000 North West Street
                                Suite 1200
                                Wilmington, DE 19801
                                (302) 652-3131

ECRO:                           AL LUGANO

Transcription Service:          DIAZ DATA SERVICES
                                331 Schuylkill Street
                                Harrisburg, Pennsylvania 17110
                                (717) 233-6664

Proceedings recorded by electronic sound recording; transcript
produced by transcription service

1          (Laughter)

2          MR. ZENSKY:   It was a carefully thought out word,

3    Your Honor.

4          So, Your Honor, from -- from our perspective the

5    debtors and the committee have stepped over the line on

6    their fiduciary obligations to the creditors as a whole.

7    They're taking sides here.   They're trying to shield

8    JPMorgan and the other banks that did the deal from ever

9    having to give a deposition on the merits of this case, not

10   to get ready for a full trial.

11         If you were going to try this fraudulent transfer

12   case, it would be a thirty, forty-day trial.   There would be

13   fifty depositions just on the merits of the claim, and Mr.

14   Kaminetzky completely misstates our position on the number

15   of depositions and I'll get to that later.   You know, if --

16   if they thought this was a fair settlement, they should be

17   in favor -- and by "they" I mean the debtors and the

18   committee, Your Honor -- as the estate fiduciaries in a full

19   and open process to make sure you have the comfort and

20   enough factual background with witnesses in that witness

21   chair so that you can say, yes.   This is in the best

22   interest of the estate and it's fair and equitable to the

23   people objecting to the settlement.

24         But they're trying to do the opposite.   They're

25   telling you, don't let us have any discovery.   Don't let us

1   have any depositions at all.  Let's have a hearing with no

2   fact testimony whatsoever -- and I'll explain that in a

3   moment -- and just hope that you'll bless the settlement.

4   And I don't think that's what 9019 stands for, Your Honor.

5            Now the issues -- well, let me touch on one other

6   point.

7            I think their position would be wrong, you know,

8   in any case, in a garden variety case, but I would like you

9   to think about the context in which this is happening.  You

10  saw the reference in our papers to Mr. Shapiro's deposition.

11  Mr. Shapiro is the chairman of the special committee that

12  they set up to what we thought at the time, based on reading

13  the resolution, was take control over the settlement process

14  after the examiner report came out to take out of the

15  equation the debtors' insiders who did the deal and the

16  debtors' counsel, Sidley, who did the deal for the debtors

17  and have a separate entity of people not involved and

18  separate law firm counsel them.

19           So we were shocked when the testimony came out

20  that that's not really the way Mr. Shapiro saw his role and

21  it was not to supplant the debtors in the terms of

22  negotiating hard for the beneficiaries of the litigation.

23  It was just a kind of let's hope that the people come

24  together and get a settlement, and it's not my job to really

1    think about whether it's fair or better to litigate than

2    settle because the Court's going to think about that.

3            So the special committee says the Court's going

4    to think about it and then the debtors say, tie my hands

5    behind my back so I can't litigate the issue before you.

6    So, you know, they're talking past each other and trying to,

7    you know, squish us in the middle, obviously.

8            The second problem, Your Honor, is that we now

9    have not one, but two instances of spoliation by the members

10   of the board of directors of this company during the time

11   period that the settlement is being negotiated.  You saw the

12   references in our paper to Mr. Shapiro just cavalierly

13   discarding and shredding everything he got about the

14   settlement process while it was going on, and they knew that

15   the settlement was going to be challenged by Aurelius and

16   the other non-LBO lenders.  Their own emails say that.  They

17   say, we've got to set this up.  We've got to be ready for

18   Aurelius.  That's back in September before he starts

19   shredding his documents, and then if you saw the 2004 filed

20   on Friday by the debtors.

21           Now Mr. Michaels took his -- he's the -- was the

22   chairman of the board, and he went off on his way.  He took

23   his laptop and he fried it, erased everything on it.  So now

24   we have two members of the board of the directors who have

25   destroyed their documents, and this is the context in which

1    they're saying we should have no discovery in a five-day

2    hearing and don't worry about it.   It will be a fair trial.

3            So the issues -- I did digress and I'll move on,

4    Your Honor.

5            9019 requires you to have a factual hearing and

6    here we're not talking about claims in the abstract anymore.

7    We have a real live adversary proceeding on file with

8    thirteen counts in it against JPMorgan and the banks and

9    Angelo Gordon and Oaktree and the holders of the debt, and

10   that's what the debtors want to release and that's what you

11   have to assess for the 9019 piece of this at the hearing.

12           So I know Your Honor is familiar with the claims,

13   but let me take it down one issue and think about the issues

14   that you will have to think about to determine the

15   likelihood of success on the merits.

16           So for starters you're going to have to think

17   about, for example, what projections were the right

18   projections that should have been used at the time of Step

19   One, at the time of Step Two, to properly assess the

20   solvency of the company:   Should Step Two debt be included

21   in Step One; utilizing reasonable projections, does the

22   company pass all the solvency tests at the time of Step One

23   and at the time of Step Two.

24           Now more important or more to the point of

25   present purposes, what was the debtors' knowledge and intent