# **EXHIBIT A**

**[Sur-Reply]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al. | ) Case No. 08-13141 (KJC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Re: Docket Nos. 6433, 6726** |
| | ) |
| | ) **Hearing date: December 15, 2010 at 10:00 a.m. (ET)** |
| | ) |
| _____ | ) |

## SUR-REPLY TO MOTION OF OAKTREE CAPITAL MANAGEMENT, L.P., AND ANGELO, GORDON & CO., L.P., FOR AN ORDER DISQUALIFYING AKIN GUMP STRAUSS HAUER & FELD LLP FROM REPRESENTING AURELIUS CAPITAL MANAGEMENT LP

### PRELIMINARY STATEMENT

Movants' reply, though long on rhetoric,[1] falls well short of justifying the extraordinary remedy of disqualification.  In particular:

- The concurrent representation in this case is plainly subject to consent under Rule 1.7(b)(3) because it "does not involve the assertion of a *claim* by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal" (emphasis added).  Movants' contrary view misapprehends the meaning of "claim," and, if credited, would render Subsection 1.7(b)(3) superfluous;

- The record sufficiently evidences the clients' informed consent.  Movants' contrary view insists on a degree of formality that the law does not require;

- The record likewise confirms that the disqualification motion has been advanced for tactical advantage, not to protect the values embodied by Rule 1.7.  Movants focus exclusively on the *length* of delay—and miscalculate even that factor—while overlooking an array of additional factors that warrant a finding of waiver.

---

[1] See, *e.g.*, Reply Br. 1 ("this is nonsense"); *id.* ("Also nonsense"); *id.* at 4 n.3 ("Akin postures"); *id.* at 8 ("Aurelius is hellbent on pursuing"); *id.* at 16 n.42 ("Preposterous!"); *id.* at 17 (describing Aurelius as "a notoriously litigious entity"); *id.* at 20 ("Aurelius is a highly litigious organization that regularly stakes out unreasonable and adversarial positions in an effort to extract unjustified recoveries from other stakeholders"); *id.* ("frankly absurd"); *id.* at 21 n.54 ("deliberately false statement and preposterous assertion"); *id.* at 24 ("specious"); *id.* at 28 ("scurrilous").

But movants especially misdirect the eye in attempting to cabin this Court's discretion, even assuming there were a violation of Rule 1.7. They insist, for example, that no court has *ever* declined to order disqualification in cases of concurrent representations involving "related issues." As we show below, that is simply not so. More generally, Rule 1.7—no less than other, comparable rules regarding lawyer-client representations—is subject to the broad, equitable discretion of the courts. It is scarcely surprising, then, that every federal court in the Third Circuit to address the issue has made abundantly clear that "motions to disqualify are generally disfavored," *Conley* v. *Chaffinch*, 431 F. Supp. 2d 494, 496 (D. Del. 2006), and thus that "disqualification never is automatic" but rather lies within the sound discretion of the trial court. *United States* v. *Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980); *Jackson* v. *Rohn & Haas Co.*, 366 Fed. Appx. 342, 347 (3d Cir. 2010); *Hovsons, Inc.* v. *Secretary of Interior*, 711 F.2d 1208 (3d Cir. 1983); *IBM* v. *Levin*, 579 F.2d 271, 279 (3d Cir. 1978); *Boston Scientific Corp.* v. *Johnson & Johnson Inc.*, 647 F. Supp. 2d 369, 373 (D. Del. 2009); *Talecris Biotherapeutics, Inc.* v. *Baxter Int'l Inc.*, 491 F.Supp.2d 510, 513 (D. Del. 2007); *In re Muma Services, Inc.*, 286 B.R. 583, 587 (Bankr. D. Del. 2002); *Elonex I.P. Holdings, Ltd* v. *Apple Computer, Inc.*, 142 F. Supp. 2d 579 (D. Del. 2001). The Delaware state courts agree: "[A] mere showing that a law firm violated the Rules of Professional Conduct is not sufficient to warrant disqualification. Instead, [the court] must determine whether allowing [the firm] to continue its representation . . . will affect the fair and efficient administration of justice." *Rohm & Haas* v. *Dow Chemical*, 2009 WL 445609 (Del. Ch. 2009).

These broad equitable powers recognize that lawyers—and clients—are imperfect, and that rules and legal doctrines must take account of all the facts and circumstances. Could Akin have secured consent more promptly than it did? Doubtless so. Could the written confirmations

have been more precise? Indeed they could have been—and perhaps should have been. But when all is said and done, the purposes of Rule 1.7 were honored. And the equities invariably considered by the courts—the prejudice to the parties of continued representation, the stage and complexity of the underlying proceedings, the existence of an ethical wall, the absence of any improperly shared confidences or secrets—strongly counsel against disqualification. The motion should therefore be denied.

## ARGUMENT

1.   *Movants misinterpret Subsection 1.7(b)(3)'s "claim" requirement.* Subsection 1.7(b)(3) permits consent to a concurrent representation unless, among other things, the adverse representation involves "the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal." Movants fundamentally misconstrue this critical language.

In particular, they devote most of their discussion to the litigation arising from the failed LBO. This is, indeed, a "claim," so it is scarcely surprising that movants feature it so prominently. But movants' reliance on the LBO claim is flawed at every turn. To begin with, the avoidance action was actually—not "nominally"—brought *by the Committee*, and Aurelius is therefore not a plaintiff in that action. In any event, Akin Gump is not "representing" the claimant in the action; the Committee is represented by an entirely different law firm, Zuckerman Spaeder LLP. *See* Docket No. 6, Adv. Pro. No. 10-53963. Subsection 1.7(b)(3) bars dual representation only where "the *representation* . . . [involves] the assertion of a claim by one client against another client *represented by the lawyer in the same litigation*." Even if Aurelius were somehow deemed an unnamed party to the avoidance action, Akin Gump clearly is not representing one client against another in that litigation.

3

Drawing elsewhere from their quiver, movants assert that "Akin Gump has made it clear that its new client Aurelius intends to directly challenge the classification and treatment of the 'Swap Claim'" held by Oaktree.  Reply Br. 10.  It is true that Aurelius has objected to the way that the Debtor/Committee/Lender Plan has classified the swap claim; as the filings cited by movants show, it did so in the context of its Responsive Statement to the competing reorganization plans.  But in sharp contrast to the LBO lawsuit, this dispute regarding the virtues of competing plans—as we explained at greater length in our opposition brief (at 11–13)—is simply not a "claim" within the meaning of Subsection 1.7(b)(3).

At bottom, movants' construction of Subsection 1.7(b)(3) would render that provision duplicative of Subsection 1.7(a), and thus entirely redundant.  Movants seem to believe that, because Akin Gump represents Aurelius in matters "directly adverse" to Oaktree and Angelo Gordon, that representation necessarily falls outside the scope of permissible consent under Subsection 1.7(b)(3).  But surely that proves too much.  Direct adversity is the very *definition* of concurrent representation under Subsection 1.7(a)(1); as that subsection states, a concurrent conflict of interest exists if "the representation of one client will be directly adverse to another client."   Only then does Subsection 1.7(b) come into play—permitting a subset of "directly adverse" representations to go forward subject to consent.

2.   *Movants provided informed consent to the alleged conflict of interest.*  Movants maintain that their consent (if any) was ill informed because Akin Gump never "actually told Oaktree and Angelo Gordon exactly what it wanted (consent) and informed them of the consequences of its request (adversity with a notoriously litigious entity represented by the same counsel who could wind up simultaneously taking a position on behalf of Oaktree and Angelo Gordon and a different and potentially opposite position on behalf of Aurelius)."  Reply Br. 17.

They also dispute that there was a sufficient written memorialization of consent under Subsection 1.7(b)(4).  The record does not bear out these assertions.

*First*, Akin Gump clearly stated, on numerous occasions, that it sought movants' consent. That is made abundantly clear by Thomas Fuller's own declaration submitted in support of movants' reply brief.  There, Mr. Fuller states that Daniel Golden called him on September 20, 2010, specifically to "express[] Akin Gump's *desire to represent Aurelius in the Tribune Bankruptcy case.*"  Fuller Decl. ¶ 3 (emphasis added).   As for Oaktree, it is difficult to interpret Tom Davidson's October 13, 2010, email to Emily Alexander (Ex. 10) as something *other* than a request for consent to the Aurelius representation.

*Second*, movants' argument that they failed to appreciate that dual representation would result in "adversity with a notoriously litigious entity" is hard to square with the record.  The declarations and supporting exhibits—which movants do not dispute—demonstrate that Oaktree and Angelo Gordon believed both that Aurelius was "litigious," Ex. 10 (Liang email); Golden Decl. ¶ 22 (Fuller conversation), and that Aurelius might take contrary positions to those of movants, *see* Ex. 10; Golden Decl. ¶ 22.[2]   Indeed, if some of movants' more florid prose is to

---

[2] Movants are wrong to insinuate (Reply Br. 13–14, 28 n.64) that there was anything improper about Mr. Golden contacting Mr. Fuller directly to discuss Angelo Gordon's waiver.  Movants suggest that, because Mr. Fuller is a business person, Model Rule 4.2 somehow required Mr. Golden to contact Angelo Gordon's inside or outside bankruptcy counsel.  But, as movants repeatedly (and correctly) observe, Angelo Gordon is a client of Akin Gump's. As a result, Rule 4.2—which is found in the Part of the Model Rules captioned "Transactions With Persons Other Than Clients"—simply has nothing to say about Akin Gump's communications with Angelo Gordon.  The rules that are actually at issue here, by contrast, expressly contemplate that a lawyer will discuss with his client the risks associated with a conflict of interest.  *See* Model Rule of Professional Conduct 1.0(e) (defining "informed consent" to mean an agreement reached "after *the lawyer has communicated* adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct) (emphasis added). Moreover, by and large, "courts have generally not found that consultation with an independent lawyer is a prerequisite for finding valid consent."  RICHARD E. FLAMM, LAWYER DISQUALIFICATION: CONFLICTS OF INTEREST AND OTHER BASES, § 20.4, at 306 (2003); *see, e.g., Aetna Cas. & Sur. Co.* v. *United States*, 570 F.2d 1197, 1201–02 (4th Cir. 1978); *Welch* v. *Paicos*, 26 F. Supp. 2d 244, 248 (D. Mass. 1998).  Nor, as a factual matter, was there anything out of the ordinary about the discussions between Mr. Golden and Mr. Fuller: Mr. Golden has spoken directly with Mr. Fuller about legal matters on numerous occasions prior to the events at issue here, and he has in fact received consents to conflicts directly from Mr. Fuller.  Golden Suppl. Decl. ¶ 8.

be credited—and there is, in fact, no basis for crediting it—Aurelius is ostensibly a "notoriously litigious entity" (Reply Br. 17) that "regularly stakes out unreasonable and adversarial positions (Reply Br. 20). If we are to take movants at their word, it is hard to see how these sophisticated movants, represented at all times by sophisticated separate counsel, could have missed the news.

What is more, movants overlook the course of conduct that strongly suggests informed consent in this case. As early as January 28, 2010, movants asked Akin Gump to put an ethical wall in place between the communications lawyers representing Angelo Gordon and Oaktree and the bankruptcy attorneys representing Centerbridge in this Court. When Akin Gump commenced its representation of Aurelius movants asked only that the ethical wall erected during the Centerbridge representation remain in place (and that Aurelius refrain from seeking to disqualify Akin Gump as movants' FCC counsel). The fact that movants asked for an ethical wall confirms that movants were aware of the potential conflict (and any adverse consequences).

Indeed, the very fact that movants sought, and accepted, an ethical wall *itself* constitutes consent to dual representation. That is the clear lesson of this Court's opinion in *Kaiser Group Int'l, Inc.* v. *Nova Hut*, 272 B.R. 846 (Bankr. D. Del. 2002). In *In re Kaiser*, the defendant in an adversary proceeding brought by chapter 11 debtors moved to disqualify the law firm (Wilmer, Cutler & Pickering) representing the debtors on the ground that the representation violated both Rule 1.7 and Rule 1.9. After noting that a "court should disqualify an attorney only when the facts of a particular case warrant disqualification as an appropriate means of enforcing the applicable rule," the court concluded that it needn't even determine whether a conflict existed because the movant had waived any conflict "through its request for a Chinese wall" between those lawyers representing the movants and those representing the debtors. *Id.* at 850, 851–52. The Court explained:

Wilmer does not assert that it sought out a waiver at any time. As a result, there was no direct "consultation" as required by Rules 1.7 and 1.9. However, as of April 20, 2001, the date of the [movant's] request for the Chinese Wall, the [movants] . . . were fully aware of the adversary filed against them on April 8, 2001. As of April 20, 2001 there was nothing more to be disclosed. . . . *The waiver by the IFC occurred when the IFC requested the Chinese Wall and Wilmer established the wall* without any further objection from the IFC on April 23, 2001.

*Id.* at 852 (emphasis added).

That leaves just the question of the formality of the writing. Movants do not dispute our contention (Opposition Br. 14) that the writing requirement does not require excessive formality; and although they carp about the ostensible "cherry picked selection of email communications," Reply Br. 11, they never suggest that the rules require any greater degree of precision than such electronic communications. Oaktree's request for an ethical wall is in writing, as reflected in the October 13-15, 2010, exchange between Emily Alexander, Ken Liang, and Tom Davidson (Ex. 10), and Thomas Fuller's written exchange with Daniel Golden on October 20 (Ex. 14) is also sufficient—though we acknowledge that it doubtless could (and perhaps should) have been more precise.

3. *Movants' waiver is evidenced not just by the length of their delay, but by their tactics.* Movants' position on waiver rests on a misconception of the basic chronology—but more importantly, on the tactical significance of that chronology.

*First*, movants suggest (Reply Br. 21) that they were unaware of Akin Gump's representation of Aurelius until October 13, 2010. Not so. As early as September 17, 2010, Mr. Golden alerted Angelo Gordon of the Aurelius representation and requested consent. Golden Decl. ¶ 21. Three days later, Mr. Golden secured such consent from Mr. Fuller. *Id.* at ¶ 22; *see also* Golden Suppl. Decl. ¶ 4. Less than a week later, on September 26 and 27, 2010, Phil Dublin attended a court-ordered mediation "on behalf of Aurelius." Golden Decl. ¶ 20. Counsel to both Angelo Gordon and Oaktree were present at that mediation, and they were therefore on notice of

Akin Gump's representation of Aurelius since at least that date.  Nevertheless, movants made no

objection to that representation until October 19 (Ex. 13), and did not file the present

disqualification motion until November 12, 2010.    They then scheduled this hearing for a full

month later—all told, some three months after first learning of the adverse representation of

Aurelius.

    *Second*, the length of delay is only one among several considerations that bear on the

question of waiver.   *See Conley* v. *Chaffinch*, 431 F. Supp. 2d 494, 498 (D. Del. 2006)

(enunciating waiver factors).   Indeed, courts have recognized that length of delay is not even the

*dominant* factor in determining whether a movant has waived its right to seek disqualification:

> Although the length of the delay in bringing a motion to disqualify is obviously
> important, *it is not dispositive*.  In making the equitable determination regarding waiver,
> it is also appropriate to consider such factors as when the movant learned of the conflict;
> whether the movant was represented by counsel during the delay; why the delay
> occurred, and *in particular whether the motion was delayed for tactical reasons*; and
> whether disqualification would result in prejudice to the nonmoving party.

*Employers Ins. of Wausau* v. *Albert D. Seeno Const. Co.*, 692 F. Supp. 1150 (N. D. Cal. 1988)

(emphasis added); see *Georgia Baptist Health Care System* v. *Hanafi*, 559 S.E.2d 746, 748 (Ga.

App. 2002) (same).

    As noted in Akin Gump's opposition (at 19–25), movants waived their right to object not

just by delaying this motion for months but, more tellingly, by first waiting to see which way the

wind was blowing.  *See Conley* 431 F. Supp. 2d at 499–500 (plaintiff waived right to seek

disqualification notwithstanding the fact that it was not for several months that she came to

appreciate the tactical downsides of facing her former lawyer).  Specifically, movants made no

objection to Akin Gump's representation of Aurelius until after Akin Gump (1) stated its

intention to file a competing reorganization plan on behalf of Aurelius; (2) received a favorable

decision from this Court on several scheduling disputes; and (3) emailed litigation hold letters to

movants. Opposition Br. 22. And even then, movants did not file their motion to disqualify until after Akin Gump declined to accept movants' onerous limitations on its representation of Aurelius in this Court (and on Lerman Senter's representation of Aurelius regarding FCC issues). In other words, it is the *timing* and exploitation of the disqualification motion—not just the absolute length of delay—that counsel a finding of waiver.

*Finally*, movants assert there is not a "single case in which a concurrent, adverse representation in violation of Rule 1.7 was excused based on a delay in seeking disqualification, and it is unfathomable that a court would permit a prohibited concurrent representation even if there were delay." Reply Br. 22. In fact, numerous courts—including this Bankruptcy Court— have either found or assumed a concurrent conflict of interest under Rule 1.7 and yet denied disqualification on waiver grounds. *See In re Kaiser Group Intern., Inc.*, 272 B.R. 846, 852 (Bankr. D. Del. 2002): *In re Muma Services, Inc.*, 286 B.R. 583 (Bankr. D. Del. 2002); *Coffeyville Resources Refining & Marketing* v. *Liberty Surplus Ins. Corp.*, 261 F.R.D. 58 (D. Kan. 2009); *Flying J Inc.* v. *TA Operating Corp.*, 2008 WL 648545 (D. Utah 2008); *Great Am. Ins. Co.* v. *General Contractors & Constr. Management, Inc.*, 2008 WL 1994857 (S.D. Fla. 2008); *In re Odum*, 2008 WL 7874259 (Bankr. N.D. Ga. 2008); *International Ins. Co.* v. *City of Chicago Heights*, 643 N.E.2d 1305 (Ill. App. Dist.1994); *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099 (D.N.J.1993): *Employers Ins. of Wausau* v. *Albert D. Seeno Const. Co.*, 692 F. Supp. 1150 (N.D. Cal.1988).

4.    *This Court has plenary authority to deny disqualification even if Akin Gump's representation violates Rule 1.7.* Movants recognize—at least by their silence—that courts enjoy abundant authority (indeed, an *obligation*) to select a less drastic alternative to disqualification where, as here, one is readily at hand. *See* Opposition Br. 25–36. Movants insist, however, that

"[t]here is *not a single court* that has permitted a law firm to continue a prohibited, concurrent representation in violation of rule 1.7 where the representations involve related issues, much less in connection with the same proceeding." Reply Br. 28–29 (emphasis added). Even if the question before this Court required finding a case on all fours, movants would be mistaken.

*In Re The Leslie Fay Companies*, 175 B.R. 525 (Bankr. S.D.N.Y 1994), illustrates the point. That case involved a motion to disqualify Weil, Gotshal & Manges, which concurrently represented the debtor and the debtor's Auditing Committee in related aspects of a single chapter 11 bankruptcy proceeding. The Creditors' Committee challenged that representation on the ground that Weil Gotshal was not disinterested as required by 11 U.S.C. § 327(a). The Bankruptcy Court concluded that Weil Gotshal had ongoing legal relationships with several potential targets of the Auditing Committee's investigation—including creditors and other entities with interests materially adverse to the debtors. The Court further determined that the law firm violated Federal Rule of Bankruptcy Procedure 2014 by failing to disclose its connection to those entities. Despite those conclusions, however, the court declined to disqualify Weil Gotshal from the case.

The court explained that it had "wide discretion in [its] selection of an appropriate remedy," and that courts are generally reluctant to "separate a client from his or her chosen attorney." *Id.* at 538. Here, the court observed, the case had been ongoing for 20 months; accordingly, forcing the debtor to find new counsel would impose significant costs. Seeking to "reconcile the twin concerns of preserving the integrity of the bankruptcy process and the viability of the reorganization case," the court held that Weil Gotshal could "see the case through to reorganization and may finish those contested matters and adversary proceedings in which it is presently engaged." *Id.* at 529. In short, notwithstanding the violations of *statutory* ethics rules

more stringent than the Model Rules, the court permitted Weil Gotshal to continue its representation of the debtor in the reorganization proceedings.

*Leslie Fay* is not just an outlier. Other courts have similarly denied disqualification motions notwithstanding concurrent representation in related proceedings. Thus, for example, in *Pfizer* v. *Stryker Corp.*, 256 F. Supp. 2d 224 (S.D.N.Y 2003), Pfizer and Stryker had agreed to cooperate on the defense of product liability claims in connection with medical devices manufactured by a Pfizer subsidiary purchased by Stryker. To that end, Pfizer's long-time counsel represented both companies in a series of product liability actions. While those actions were ongoing, however, Pfizer sued Stryker on a related matter using the same law firm that was currently defending Stryker in the product liability cases. Stryker filed a motion to disqualify the law firm. The court rejected that motion on the ground that Stryker failed to demonstrate that the firm's "involvement in this case involves any material risk to the accuracy or integrity of the Court's adjudicative function" or that it would result in any "diminution in the vigor of [its] representation." *Id.* at 227 (alteration in original*). See also Goodman v. Goodman*, 267 S.W.3d 783 (Mo. App. 2008) (holding that regardless of whether dual representation of a husband and wife in a divorce action constituted a violation of Rule 1.7 or 1.9, disqualification was unwarranted because "such a conflict did not clearly call in question the fair or efficient administration of justice") (internal quotations omitted).

These decisions reflect the commonsense notion that concurrent representations on related matters, no less than other conflicts of interest under Rule 1.7 or 1.9, require courts to assess whether "disqualification is an appropriate means of enforcing the applicable disciplinary rule." *United States* v. *Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980).[3] And in exercising that

---

[3] Indeed, all of the waiver cases cited above (*see supra*, page 9) are essentially cases in which a court has declined to disqualify a law firm despite a concurrent conflict of interest. Both the waiver and disqualification inquiries, after

broad discretion, courts consider the facts on the ground, not simply the formalities of the rules.

As the district court explained in denying disqualification in *SWS Financial Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392, 1400 (N.D. Ill. 1992):

> The sanction of disqualification foists substantial costs upon innocent third parties. The innocent client . . . may suffer delay, inconvenience and expense and will be deprived of its choice of counsel. When disqualification is granted, sometimes the new attorney may find it difficult to master fully the subtle legal and factual nuances of a complex case (like this one), actually impairing the adversarial process.

This is clearly such a case. Although movants marginalize the consequences to Aurelius of losing Akin Gump as its counsel of choice, they do not quarrel with the facts on the ground:

- Akin Gump has been working on the Tribune matter for almost one and one-half years (Golden Decl. ¶ 3);

- Since September 2010, Akin Gump has devoted more than 5,800 hours to its representation of Aurelius (*id.* ¶ 43);

- Akin Gump developed and drafted the Noteholder Plan filed on October 29 (*id.*);

- Akin Gump has been active in intense litigation prosecuting the Noteholder Plan and opposing the competing plans, including filing the Responsive Statement, Objections to the Disclosure Statement of Competing Plans, Objections to Voting and Solicitation Procedures, and the proposed Case Management Order, as well as briefing and arguing these issues before this Court (*id.* ¶ 44-50);

- Akin Gump has already served document requests on a dozen parties in preparation for the confirmation hearing (*id.* ¶ 51);

- Aurelius faces a confirmation hearing currently scheduled for March 7, 2011 (*id.*);

- In the less than three months before the confirmation hearing, Aurelius's counsel will need to propound and respond to written discovery, take and defend several dozen depositions, and engage in extensive expert discovery (*id.*).

The impact to Aurelius of losing Akin Gump at this juncture of this fast-moving, complex chapter 11 proceeding would be extreme.

---

all, are equitable inquiries that look to the prejudice to the nonmoving party. Thus, while the waiver inquiry focuses more particularly on the tactical use of the disqualification motion, courts that deem such motions waived are essentially making the equitable determination that disqualification is unwarranted in light of the particular circumstances at hand.

By contrast, the prejudice to movants is virtually nonexistent. Akin Gump has put an ethical wall in place to allay any concerns that its bankruptcy attorneys would have access to confidential information obtained by movants' FCC counsel, and it has agreed not to depose movants so as to avoid even the appearance of an adversarial posture. The balance of the equities weighs heavily against disqualification. The motion to disqualify should therefore be denied.

Dated:  December 14, 2010

Respectfully submitted,

William P. Bowden (#2553)
Amanda M. Winfree (#4615)
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

Lawrence S. Robbins (admitted *pro hac vice*)
Michael L. Waldman (admitted *pro hac vice*)
Daniel N. Lerman (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER
& SAUBER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
(202) 775-4500

*Counsel for Akin Gump Strauss Hauer & Feld LLP*