# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Related to Docket No. 7141** |

## NOTICE OF FILING SENIOR LENDERS' RESPONSIVE STATEMENT

**PLEASE TAKE NOTICE** that, attached hereto is a blackline version of the Senior Lenders' Responsive Statement. The revisions were necessitated by the Notice of Withdrawal of (A) First Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims, (B) Specific Disclosure Statement for First Amended Plan of Reorganization, and (C) Responsive Statement by Certain Holders of Step One Senior Loan Claims [Docket No. 7190].

Dated: December 16, 2010

| | |
|---|---|
| DAVIS POLK & WARDWELL LLP<br>Donald S. Bernstein<br>Damian Schaible<br>450 Lexington Avenue<br>New York, New York 10017<br>Telephone: (212) 450-4500 | RICHARDS, LAYTON & FINGER, P.A.<br><br>/s/ Drew G. Sloan<br>Mark D. Collins (No. 2981)<br>Robert J. Stearn, Jr. (No. 2915)<br>Drew G. Sloan (No. 5069)<br>920 N. King Street<br>Wilmington, DE 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651 7701 |

Counsel for JPMorgan Chase Bank, N.A.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

RLF1 3736990v. 1

WILMER CUTLER PICKERING
HALE & DORR LLP
Andrew N. Goldman
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800

Counsel for Angelo, Gordon & Co., L.P.

| | |
|---|---|
| HENNIGAN, BENNETT & DORMAN LLP<br>Bruce Bennett<br>James O. Johnston<br>Joshua M. Mester<br>865 South Figueroa Street, Suite 2900<br>Los Angeles, CA 90017<br>Telephone: (213) 694-1200 | YOUNG CONAWAY<br>STARGATT & TAYLOR, LLP<br><br>/s/   *Robert S. Brady*<br>Robert S. Brady (No. 2847)<br>M. Blake Cleary (No. 3614)<br>The Brandywine Building – 17th Floor<br>1000 West Street, Post Office Box 391<br>Wilmington, DE 19899<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253 |

Counsel for Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.

# SENIOR LENDERS' RESPONSIVE STATEMENT

The Court has reviewed and approved the Joint Disclosure Statement and the Specific Disclosure Statements filed by the proponents of the ~~four~~three proposed plans, and has determined that they comply with Bankruptcy Code §1125. Although the Court has also reviewed the Responsive Statements filed by the plan proponents, and resolved certain disputes among the parties in connection with such statements, the Responsive Statements are not a substitute for the respective disclosure statements, nor have the Responsive Statements been subject to the Bankruptcy Code's standard for approval of a disclosure statement. While the Court has allowed inclusion of the Responsive Statements in this solicitation package, it has not endorsed the contents of any Responsive Statement.

| *Senior Lender Responsive Statement – For Holders Of Tribune Senior Loan Claims* |

This Statement is prepared by Angelo, Gordon & Co., L.P., Oaktree Capital Management, L.P., and JPMorgan Chase Bank, N.A. (the "Senior Lender Proponents"), who collectively hold over $3.38 billion of Senior Loan Claims, for their fellow holders of Senior Loan Claims (the "Senior Lenders").

The Senior Lender Proponents, along with the Debtors and the Official Committee of Unsecured Creditors, are co-proponents of a Joint Plan of Reorganization for Tribune Company and its subsidiaries (the "Debtor/Committee/Lender Plan"). *The Senior Lender Proponents recommend that all Senior Lenders vote in favor of the Debtor/Committee/Lender Plan and against the ~~three~~two competing plans of reorganization* in the Tribune bankruptcy cases (collectively, the "Competing Plans"): (1) the plan filed by Aurelius Capital Management, LP and others (the "Noteholder Plan"); and (2) the plan filed by King Street Capital, L.P., and Marathon Asset Management, L.P. (the "Bridge Plan")~~; and (3) the plan filed by certain holders of so-called "Step-One Senior Loan Claims" (the "Step One Plan")~~. This Statement is intended to assist Senior Lenders in comparing the recoveries under and risks presented by the Debtor/Committee/Lender Plan to the recoveries and risks associated with the Competing Plans. The Debtors and the Creditors' Committee have prepared accompanying separate Statements, directed to other constituencies in the bankruptcy cases, with respect to the Competing Plans.

The Debtor/Committee/Lender Plan provides Senior Lenders and other creditors with substantial immediate distributions upon plan effectiveness. In contrast, the ~~three~~ Competing Plans provide for negligible (if any) initial distributions to creditors and force creditors to wait potentially years for even the prospect of material payment. The Debtor/Committee/Lender Plan achieves this by resolving many of the so-called "LBO-Related Causes of Action" that have caused the Tribune Debtors to remain mired in bankruptcy for more than two years, through a compromise approved by the Debtors and the Creditors' Committee and endorsed by the Honorable Kevin Gross, who was appointed as mediator in the Tribune bankruptcy cases. While the Senior Lender Proponents believe that the LBO-Related Causes of Action resolved by the Debtor/Committee/Lender Plan do not have merit, they recognize the risk inherent in any litigation of this complexity and magnitude and, perhaps more importantly, the substantial costs and delay attendant upon such litigation. In light of those risks, and under the circumstances of the Tribune bankruptcy cases, the Senior Lender Proponents believe that the Debtor/Committee/Lender Plan is fair and reasonable from the perspective of Senior Lenders and all other creditors.

As shown below, Senior Lenders fare materially worse under each of the ~~other three~~ Competing Plans. Unlike the Debtor/Committee/Lender Plan, the Competing Plans likely would subject Senior Lenders and all other creditors to years of delay and substantial additional cost and risk before material distributions, if any, can be made. To ensure a clear path to immediate recovery, the Senior Lenders must support the Debtor/Committee/Lender Plan and, just as importantly, vote against the Competing Plans.

**The Senior Lender Proponents accordingly urge all Senior Lenders to vote to:**

> *ACCEPT the Debtor/Committee/Lender Plan on the BLUE BALLOT*
> included with the plan solicitation materials, indicating that the
> Debtor/Committee/Lender Plan is the preferred plan; and
>
> *REJECT each of the Noteholder Plan (PURPLE BALLOT),*
> and the *Bridge Plan (GREEN BALLOT)*~~, and
> the Step One Plan (YELLOW BALLOT)~~

| Comparison Of Initial Distributions Under The Plans |
|---|

A primary advantage of the Debtor/Committee/Lender Plan is that it provides for substantial distributions to creditors *immediately* upon becoming effective. In contrast, the ~~three~~two Competing Plans provide negligible (if any) initial distributions to creditors (including the Senior Lenders). They instead compel creditors to wait what is likely to be years while the LBO-Related Causes of Action and other issues are litigated and appeals are exhausted before potentially receiving all distributions on their claims, while putting creditors at risk of never receiving material distributions at all. As that litigation easily could take five years or longer, creditors contemplating voting for any of the Competing Plans must be prepared to wait a half a decade for their distributions, all while risking further erosion in the value of Tribune (and thus their recoveries) and assuming the risk that the protracted litigation ultimately will not result in any additional distributions at all.

The following chart compares the initial distributions under the Debtor/Committee/Lender Plan with (i) each creditor constituency's "natural recovery" (the recovery that would be received if all claims against the estates were allowed and the LBO-Related Causes of Action yielded no recoveries) and (ii) the initial distributions that would be made under the various Competing Plans. This shows that the Debtor/Committee/Lender Plan provides Senior Lenders, and indeed virtually all creditors, substantially greater distributions upon effectiveness than any of the Competing Plans.

| Initial Distributions – Not Contingent On Litigation Recoveries | | | | | |
|---|---|---|---|---|---|
| Class/<br>Claims<br>(ballot color) | Debtor/~~Comm~~Com<br>mittee/<br>Lender Plan<br>(blue ballot) | Natural<br>Recovery | Noteholder<br>Plan[1]<br>(purple ballot) | Bridge<br>Plan[1]<br>(green ballot) | ~~Step One Plan[1]~~<br>~~(yellow ballot)~~ |
| "Step One"<br>Senior<br>Loans | Parent: 1.09%<br>Subs: 69.95%<br>Total: *71.03%* | Parent: 4.81%<br>Subs: 70.90%<br>Total: 75.71% | *34.20%* | *34.20%* | ~~Parent: 0.84%~~<br>~~Subs: 69.86%~~<br>~~Total: 70.70%~~ |
| "Step Two"<br>Senior<br>Loans | Parent: 1.09%<br>Subs: 69.95%<br>Total: *71.03%* | Parent: 4.81%<br>Subs: 70.90%<br>Total: 75.71% | *0.00%* | *0.00%* | ~~0.00%~~ |
| Bridge<br>Loans | 0.00% | 4.81% | 0.00% | 0.00% | ~~0.00%~~ |
| Senior<br>Notes | 32.73% | 4.81% | 4.80% | 4.80% | ~~4.8%[2] or 23.38%~~ |

---

[1] Assumes that litigation over "sharing provisions" of Senior Loan Agreement has not resulted in a final judgment before effectiveness of the plan but that the Bankruptcy Court nevertheless permits distributions in respect of "Step One" claims. If the Bankruptcy Court did not permit such distributions, initial distributions to all Senior Lenders would be *0.00%*. Also assumes that litigation over allowed amount of PHONES Notes Claims has not resulted in a final, non-appealable judgment by effectiveness of the plan and that illusory Bridge Plan "settlements" (see below) are not approved. ~~For Step One Plan, except where otherwise indicated, assumes that classes receiving "gift" distributions vote to accept the plan.~~

[2] ~~If class rejects.~~

-2-

| Initial Distributions – Not Contingent On Litigation Recoveries | | | | | |
|---|---|---|---|---|---|
| Class/ Claims (ballot color) | Debtor/~~Comm.~~ Com mittee/ Lender Plan (blue ballot) | Natural Recovery | Noteholder Plan¹ (purple ballot) | Bridge Plan¹ (green ballot) | ~~Step One Plan¹ (yellow ballot)~~ |
| Other Parent Claims (Trade) | 35.18% or 32.73%³ | 4.81% | 4.30% | 4.30% | ~~4.8%² or (25.83% or 23.38%)³~~ |
| Claims Against Guarantors | 100% | 2.61% | 8.00% | 8.00% | ~~100%~~ |
| PHONES Notes | 0.00% | 0.00% | 0.00% | 0.00% | ~~0.00%~~ |

### *The Noteholder Plan Promises Delay And Destruction Of Value*

The Noteholder Plan is proposed by creditors whose natural recovery in these cases is less than 5 cents on the dollar in case of the Senior Notes and $0 for the PHONES Notes, and their respective indenture trustees.

Through the Noteholder Plan, those creditors attempt to achieve greater recoveries by using funds rightfully belonging to the Senior Lenders to pursue "bet the farm" litigation. The Noteholder Plan requires that up to 65% of the Debtors' $6.75 billion of distributable enterprise value (called "DEV" in the Noteholder Plan) be set aside and not distributed until resolution of the LBO-Related Causes of Action and related matters, no matter how frivolous or untenable. Although the Noteholder Plan is presented as a fallback option with no obstacles to confirmation, its proponents gloss over or ignore numerous issues that would in fact have to be litigated to conclusion in order to confirm the Noteholder Plan, including valuation, the propriety of the size and contents of the proposed reserves, control over and operation of the Litigation Trust, and the proposed corporate governance of the Reorganized Debtors. Even if the Noteholder Plan could be confirmed, to receive even the minimal distributions it would provide, certain creditors also would have to litigate additional issues, including the allowed amount of the PHONES Notes, subordination of the PHONES Notes, intercompany claims and the allocation of value among the Debtors, and the "sharing" provisions of the Senior Loan Agreement.

At bottom, the Noteholder Plan imposes extraordinary time value and administrative expenses, as well as market risks, on creditors of the bankruptcy estates. The contemplated litigation may take five years or longer and may cost tens of millions of dollars. In the meantime, a huge portion of Tribune's enterprise value will not be distributed to the Senior Lenders or anyone else, the ability of Tribune to operate its business and raise new capital may be impaired, and Tribune's interactions with the FCC may be complicated. Because much of the withheld value will take the form of New Common Stock in the Reorganized Tribune, the delay alone could be extremely harmful because it will deprive creditors of any ability to sell the stock regardless of movements in share price or changes in market value. As the proponents of the Noteholder Plan admit, due to fluctuations in the performance of the Tribune business and economic conditions as a whole, "it cannot be guaranteed that the DEV held in the Distribution Trust Reserves will not decrease between the time of Confirmation and ultimate distributions to Creditors from the Distribution Trust Reserves and, therefore, Creditors might receive New Common Stock and/or New Warrants that have lower values than they had on the Confirmation Date."

---

3   Depends on creditor election between Option 1 and Option 2.

At the same time, the Distribution Trust holding the reserved value – which will be controlled by the Noteholder Plan proponents – would be entitled to appoint two of the seven members of the Board of Directors of Reorganized Tribune. This gives an entity with no direct economic stake in the enterprise (albeit one charged with fiduciary duties to the holders of interests in the Distribution Trust) substantial influence over the operations of Tribune for the foreseeable future.

Adding insult to injury, the proponents of the Noteholder Plan would have Senior Lenders – who will be, under all conceivable litigation scenarios, the majority owners of Reorganized Tribune – pay for this litigation through a $40 million initial outright grant of funds to the Litigation Trust (with the Litigation Trust able to use future recoveries to fund additional litigation even after that $40 million in seed money runs out). In other words, Senior Lenders would be forced to pay for the litigation commenced against them and all other parties.

Because the Noteholder Plan requires Senior Lenders to spend $40 million to fund endless litigation over questionable claims, subjects the Senior Lenders and other creditors to unjustifiable costs and risks, and likely delays material distributions for years, *all Senior Lenders unequivocally should vote NO on the Noteholder Plan by voting REJECT on their PURPLE BALLOTS*.

## The Bridge Plan Is Illusory

The Bridge Plan is proposed by holders of Bridge Loan Claims. As indebtedness that is expressly subordinated to all Senior Loan Guaranty Claims against the Guarantor Debtors (which represent more than 90% of Tribune's enterprise value), the Bridge Loan Claims are entitled to a minimal recovery – at best – under all plausible litigation scenarios.

In an effort to escape their precarious position, the proponents of the Bridge Plan have crafted a plan premised around a series of self-serving "settlements" that have no prospect of acceptance or approval and thus are completely illusory. Specifically, the Bridge Plan provides for (a) a "Step One Lender Settlement" that would divert *$695 million* in value from Senior Lenders to other creditors of Tribune (including holders of Senior Notes, PHONES Notes, and Other Parent Claims), plus 75% of all recoveries on LBO-Related Causes of Action to be pursued by the Litigation Trust; (b) a "Step Two Lender Settlement" that would divert an additional *$197 million* to such other Tribune creditors; and (c) a "Bridge Loan Lender Settlement" that would serve no purpose but to guarantee Bridge Lenders $125 million in cash, which actually would give Bridge Lenders a recovery substantially *higher* than their entitlements even if the Bridge Loan Claims were allowed in full (based on the enterprise value and allocation described in the General Disclosure Statement). If those "settlements" are not accepted by the relevant constituencies and approved by the Bankruptcy Court, as they almost certainly will not be, the Bridge Plan reverts to the Noteholder Plan, with more than half of Tribune's distributable enterprise value being held back for the foreseeable future.

These "settlements" are illusory because not a single constituency has accepted or will accept them, aside from the Bridge Lenders themselves, who would be receiving a gift from other creditors. No estate representative (neither the Debtors nor the Creditors' Committee) negotiated the settlements or supports them. Nor were the settlements negotiated with or supported by the Senior Lenders. Accordingly, unlike the compromises embodied in the Debtor/Committee/Lender Plan – which were negotiated at arms' length with estate representatives charged with pursuing the actual causes of action at issue and endorsed by the mediator appointed by the Bankruptcy Court – the Bridge Plan "settlements" are self-serving proposals with no support from any relevant party. Because the Bridge Lenders have no authority to unilaterally implement these schemes that are the cornerstones of their plan, the "settlements" almost certainly will fail, and the Bridge Plan will revert to the Noteholder Plan with its minimal distributions and excessive cost, delay, and risk.

Accordingly, *all Senior Lenders unequivocally should vote NO on the Bridge Plan by voting REJECT on their GREEN BALLOTS*.

---

*The Step One Plan Is Unconfirmable*

The Step One Plan is proposed by certain holders of so-called Step One Senior Loan Claims (*i.e.*, Senior Loan Claims other than those in respect of "Incremental Term Borrowings" under the Senior Loan Agreement). It is premised on a blanket waiver and release of the LBO-Related Causes of Action relating to Step One Senior Loan Claims (and not the Step-Two Senior Loan Claims), coupled with a so-called "gift" by holders of Step One Senior Loan Claims to other classes of claims (Senior Notes, Other Parent Claims, and General Unsecured Claims against Filed Subsidiary Debtors) if, but only if, such classes vote to accept the Step One Plan. It leaves the remaining LBO-Related Causes of Action for post-bankruptcy litigation.

Notably, the Step One Plan does not provide for a settlement of the Step One LBO-Related Causes of Action. Instead, it would require adjudication of those causes of action and a determination by the Bankruptcy Court that they are meritless or worthless. In other words, before the Debtors could emerge from bankruptcy and before any Senior Lenders could receive a penny of value, a trial on the Step One LBO-Related Causes of Action would be required. In stark contrast, the Debtor/Committee/Lender Plan provides hundreds of millions of dollars of value as part of the settlement of such claims and would require the Bankruptcy Court only to consider the reasonableness and propriety of the settlement.

The Step One Plan also would provide no incremental recoveries on account of the Step Two LBO-Related Causes of Action to avoid, disallow or subordinate Step Two Senior Loan Claims to the classes of Senior Notes, Other Parent Claims or General Unsecured Claims against Filed Subsidiary Debtors that receive the proposed "gift" distributions. When one contrasts this with the settlement value provided to these constituencies by the Debtor/Committee/Lender Plan, it is simply inconceivable that the Bankruptcy Court would opt to confirm the Step One Plan. Indeed, it appears that the Step One Plan is motivated primarily by a desire to siphon Senior Lender votes away from the Debtor/Committee/Lender Plan rather than any realistic expectation that the Step One Plan might be confirmed.

Further, like the Noteholder Plan and the Bridge Plan, the Step One Plan would hold distributions to Senior Lenders hostage to litigation over the "sharing provisions" of the Senior Loan Agreement, which the Senior Lender Proponents believe provide for holders of Step Two claims to share in distributions made in respect of Step One claims even if Step Two claims are avoided or unenforceable against the Tribune Debtors. The proponents of the Step One Plan assert that those sharing provisions are unenforceable and should be invalidated. That position will be hotly contested, resulting in litigation that, despite its low likelihood of success, could take years to resolve through a final, non-appealable judgment. Until such litigation is resolved, holders of Step Two claims would receive no distributions and it is very possible that the Bankruptcy Court could order that *all* distributions to Senior Lenders (including Step One claims) be reserved and withheld, meaning that Senior Lenders could be forced to wait years before receiving any distribution whatsoever from the bankruptcy estates. Moreover, by advocating for nullification of the sharing provisions and attacking some of the Senior Loan Claims (the Step Two claims), the proponents of the Step One Plan (who, according to their own filings, hold a small fraction of the Senior Loan Claims) undermine the position that the LBO-Related Causes of Action against the Senior Lenders have no merit and thus jeopardize recoveries of all Senior Lenders.

In all events, the Step One Plan contemplates that massive amounts of New Common Stock will be reserved, and not distributed, during the time (possibly many years) it will take the litigation

-5-

~~to conclude, possibly depressing the market value of the New Common Stock that is distributed and harming the very holders of Step One claims that the Step One Plan purports to benefit. In contrast, the Debtor/Committee/Lender Plan provides for the *allowance* of all Senior Loan Claims (both Step One claims *and* Step Two claims), meaning that there is no further risk of avoidance and no litigation or dispute over any aspect of the Senior Loan Claims. As described above, this enables Senior Lenders to receive substantial immediate distributions from the bankruptcy estates, including distributions of substantially all of the New Common Stock, thus eliminating value depressing reserves, and clearly is a superior option, not only for holders of Step Two claims but for all Senior Lenders.~~

~~Senior Lenders (whether holding claims arising from Step One, Step Two or both) should not allow themselves to be fooled by the Step One Plan's siren song — it is fatally flawed, unconfirmable and would only serve to expose the Senior Lenders to significant attack and additional delay before receipt of any value. For the foregoing reasons, the Step One Plan is not in the interests of any Senior Lender, including those lenders who hold Step One claims. A Step One Senior Lender who votes against the Debtor/Committee/Lender Plan and in favor of the unconfirmable Step One Plan only makes it less likely the Debtor/Committee/Lender Plan will receive the requisite votes to be confirmed and thus increases the likelihood that distributions will be withheld from Step One Lenders until litigation over the LBO-Related Causes of Action is completely resolved.~~

~~*Accordingly, all Senior Lenders unequivocally should vote NO on the Step One Plan by voting REJECT on their YELLOW BALLOTS.*~~

Respectfully,

Angelo, Gordon & Co., L.P.
Oaktree Capital Management, L.P.
JPMorgan Chase Bank, N.A.