**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ---------------------------------------------------------- | : | Chapter 11 |
| In re: | : | |
| | : | |
| TRIBUNE COMPANY, *et al.*, | : | Case No. 08-13141 (KJC) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | **Objections Due: Jan. 19, 2011 at 4:00 p.m. (ET)** |
| ---------------------------------------------------------- | : | **Hearing Date: Jan. 21, 2011 at 10:00 a.m. (ET)** |

**AURELIUS CAPITAL MANAGEMENT LP'S
MOTION TO COMPEL JPMORGAN TO
PRODUCE DOCUMENTS PURSUANT TO BANKRUPTCY RULES 9014 AND
7037 AND FEDERAL RULE OF CIVIL PROCEDURE 37**

Aurelius Capital Management, LP, on behalf of its managed entities (collectively "Aurelius"), hereby respectfully submits this motion (the "Motion"), pursuant to Rules 9014 and 7037 of the Federal Rules of Bankruptcy Procedure and Rule 37 of the Federal Rules of Civil Procedure, to compel plan proponent JPMorgan Chase & Co. ("JPMorgan") to produce documents. In support of its Motion, Aurelius respectfully states as follows:

**PRELIMINARY STATEMENT**

Because Tribune holds licenses issued by the Federal Communications Commission (the "FCC") for television and radio broadcast stations, any plan of reorganization confirmed by this Court will be subject to the further consent of the FCC. If a particular plan contains elements that could affect the FCC approval process – for instance by making it more difficult for Tribune to obtain waivers of FCC ownership rules that are necessary for it to continue to hold combinations of newspapers and television stations in seven markets – then those facts could be relevant to the feasibility of the plan and therefore to whether it should be confirmed by the Court. Accordingly, in its Second Request, Aurelius directed requests to JPMorgan for

production of documents and communications that are specifically tailored to elicit information about whether JPMorgan holds other media interests that would delay or prevent FCC approval of its plan of reorganization.  JPMorgan has refused categorically to respond to these precisely targeted requests.  Either JPMorgan has no interest in other media companies – in which case JPMorgan may respond "none."  Or – as Aurelius suspects – JPMorgan has other media interests that will create issues with obtaining FCC approval of its plan.  The Court should require JPMorgan to disclose which is the case.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105(a) and Rule 37 of the Federal Rules of Civil Procedure ("FRCP"), as made applicable to these Chapter 11 Cases by Rules 9014 and 7037 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A.     The Bankruptcy History

2.      On December 8, 2008 (the "Petition Date"), Tribune Company (with its debtor subsidiaries, "Tribune," or the "Debtors") and over 100 affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.      The Debtors have remained in possession of their respective properties and have continued to operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On December 18, 2008, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Committee").

5.      On December 9, 2010, the Court entered an *Order (I) Approving General Disclosure Statement and Specific Disclosure Statements; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plans of Reorganization; (III) Approving Forms of Ballots, Master Ballots and Related Instructions; (IV) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (V) Fixing Voting Record Date; (VI) Establishing Notice and Objection Procedures in Respect of Confirmation; (VII) Setting Confirmation Schedule and Establishing Parameters on Confirmation-Related Discovery; (VIII) Establishing New Deadline for Return of Media Ownership Certifications; (IX) Authorizing Expansion of Balloting and Tabulation Agents Retention and Allocation of Costs of Same; and (X) Granting Related Relief* (the "Solicitation Order"). The Solicitation Order was modified on December 16, 2010 [Docket No. 7215].

6.      Following the entry of the Solicitation Order (as amended), solicitation commenced with respect to the three competing plans  (collectively the "Plans") being considered as follows:

- Joint Plan of Reorganization for the Debtors proposed by Aurelius Capital Management, LP, on behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes (the "Noteholder Plan"), dated December 9, 2010;

- Joint Plan of Reorganization proposed by the Debtors, the Creditors' Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "Debtors/Committee/Lender Plan"), dated December 8, 2010; and

- Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (the "Bridge Lender Plan"), dated December 7, 2010.

7.     On December 20, 2010, the Court entered a Discovery and Scheduling Order for Plan Confirmation, scheduling the confirmation hearing to begin on March 7, 2011 ("CMO") [Docket No. 7239].

8.     Paragraph 14 of the CMO provides, in pertinent part, that "[w]ith respect to any discovery dispute that may arise, the Parties to the dispute(s) shall meet and confer within (3) business days of any Party's request for such a meet and confer conference."

9.     While the remainder of paragraph 14 provided for a mechanism to bring unresolved disputes to the Court's attention, during a telephonic hearing on January 10, 2011, the Court instructed that in light of the limited time available prior to the commencement of the confirmation hearing, the parties should initiate motion practice to resolve any remaining disputes. (See Hrg. Trans., dated January 10, 2011, at 34, Ex. A).

### B.     The Parties' Meet and Confer Efforts

10.     On December 17, 2010, Aurelius served its second request for the production of document requests (the "Requests") on JPMorgan, a proponent of the Debtors/Committee/Lender Plan.  The Requests call for (i) documents relating to JPMorgan's ownership interests in broadcast and newspaper publishing entities (collectively, "Media Entities"), (ii) documents relating to JPMorgan's claims that it is exempt from certain FCC rules, and (iii) documents relating to the FCC approval process.  (See Aurelius's Discovery Requests, Ex. B at Nos. 1-12).  JPMorgan's interests in other Media Entities and JPMorgan's requests for exemption from certain FCC rules could affect the ability of Tribune to obtain timely FCC approval of a confirmed plan.  Accordingly, the Requests are specifically tailored to obtain

evidence about whether the Debtors/Committee/Lender Plan is feasible. This evidence is necessary in order for the Court to determine whether the Debtors/Committee/Lender Plan is confirmable.

11.    On January 3, 2011, the parties met and conferred. (*See* Declaration of Sally Buckman ("Buckman Decl."), ¶ 4). JPMorgan objected to providing any documents in response to Aurelius's Requests, claiming that because the Requests concerned matters to be decided by the FCC, they were not relevant to the confirmation hearing. Aurelius disagreed and explained that the requested documents were relevant to the confirmability of the Debtors/Committee/Lender Plan.

12.    On January 4, 2011, JPMorgan served its objections and responses to the Requests (the "Objections"). (*See* JPMorgan's Objections, Ex. C). JPMorgan refused to produce any of the requested documents.

13.    Following receipt of JPMorgan's Objections, Aurelius requested to meet and confer to avoid unnecessary motion practice and bridge the parties' differences. By letter dated January 10, 2011, Aurelius addressed JPMorgan's Objections. (*See* January 10, 2011 letter, Ex. D).

14.    On January 12, 2011, Aurelius and JPMorgan met and conferred regarding the discovery disputes. (*See* Buckman Decl., ¶ 8). Aurelius reiterated its view that the Requests are directly relevant to the feasibility of the Debtors/Committee/Lender Plan and relate to issues concerning the FCC approval process that are addressed in that Plan and the Debtors/Committee/Lender Disclosure Statement ("Debtors' Disclosure Statement"). Aurelius explained that if JPMorgan withdrew its general objections to producing the requested documents, Aurelius would discuss narrowing some of the Requests and specific search terms.

JPMorgan refused to waver on its general objections and stated that it was not willing to perform specific searches aimed at obtaining documents responsive to the Requests.

15.    Because the parties have been unable to resolve their discovery disputes after several unsuccessful meet and confer conferences, Aurelius moves this Court to compel JPMorgan to produce documents set forth in the Requests.

## ARGUMENT

### I.    Legal Standards

16.    Rules 9014 and 7026 of the Federal Rules of Bankruptcy Procedure dictate that Federal Rule of Civil Procedure 26 applies in contested matters in bankruptcy court.  Rule 26 provides that "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1).  In the Third Circuit, "it is well recognized that the federal rules allow broad and liberal discovery."  *Pacitti v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999) (holding that it was an abuse of discretion to deny plaintiff's relevant discovery requests); *see also Falkenberg Capital Corp. v. Dakota Cellular*, 1998 U.S. Dist. LEXIS 13456, at *12 (D. Del. 1998) (finding it "axiomatic that the discovery rules . . . be construed liberally in favor of the party seeking discovery") (internal citations omitted); *Marshall v. Elec. Hose & Rubber Co.*, 68 F.R.D. 287, 295 (D. Del. 1975) "discovery will be permitted unless it is clear that the information sought can have no possible bearing upon the subject matter of the action") (internal citations omitted).  Further, in the context of a bankruptcy proceeding, "wide-ranging" discovery has been permitted and is encouraged in preparation for a confirmation hearing.  *See In re Int'l Wireless Commc'ns Holdings, Inc.*, 1999 Bankr. LEXIS 1853, at *8 (Bankr. D. Del. Mar. 26, 1999); *see also In re Molina*, 420 B.R. 825, 831 (Bankr. D. N.M. 2009) ("[A] court might well deny for bad faith confirmation of a plan of a debtor who refuses to comply with legitimate discovery requests, on the grounds that the debtor's conduct

directly contravenes the overarching principles of transparency and disclosure that inhere in the bankruptcy process.").

17.     Rules 9014 and 7037 of the Federal Rules of Bankruptcy Procedure instruct that Fed. R. Civ. P. 37 governs motions to compel discovery in contested proceedings in bankruptcy court. Rule 37 of the Federal Rules of Civil Procedure contemplates motions to compel where parties fail to meet their discovery obligations. Parties will prevail on their motions to compel where they complied with the federal rules in furnishing their discovery requests, and the responding party was deficient in its response. *See, e.g., SWIMC, Inc. v. Hy-Tech Thermal Solutions, LLC*, 2009 U.S. Dist. LEXIS 53528, at *6-9 (D. Del. 2009) (granting motion to compel response to interrogatories and document requests); *Marshall*, 68 F.R.D. at 295 (compelling discovery where it was merely "conceivable that it might have a bearing upon the subject matter of this action").

## II.     Aurelius Is Entitled To FCC-Related Discovery from JPMorgan

### A.     The FCC-Related Requests Are Directly Relevant to the Confirmation Hearing

18.     JPMorgan improperly refuses to produce any documents or communications relating to (i) its direct or indirect interest in other Media Entities, (ii) the corporate/management structure of the Media Entities in which it has an interest, (iii) its position that its officers and directors are exempt from attribution under the FCC's ownership rules and (iv) the potential effect of these matters on the applications that Tribune will submit to the FCC for approval of any confirmed Plan. (*See* Ex. C, Objections to Request Nos. 1-12). JPMorgan claims that these requests circumvent the procedures for objecting to the qualifications of a party before the FCC "and they are neither relevant to the subject matter of the confirmation hearing nor reasonably

calculated to lead to the discovery of admissible evidence." (*Id.*). Nothing could be further from the truth.

19.    Debtors themselves, who are co-proponents with JPMorgan of the Debtors/Committee/Lender Plan, have acknowledged the relevancy of FCC-related discovery by requesting FCC-related documents from Aurelius and its counsel. Unlike JPMorgan, Aurelius and its counsel have agreed to produce non-privileged documents in their possession, custody or control responsive to these requests. (*See* Responses and Objections to Debtors' First Request for Production of Documents to Aurelius Capital Management, LP (Requests No. 38 and 44), Ex. E, at 5).

### 1.    The FCC-Related Requests Relate to the Feasibility of the Plan

20.    The Debtors/Committee/Lender Plan cannot be confirmed unless it satisfies the feasibility requirement under Section 1129(a)(11) of the Bankruptcy Code. *See In re Cont'l Airlines*, 91 F.3d 553, 563 (3d Cir. 1996); *see also In re The Leslie Fay Cos.*, 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997) (holding that the Bankruptcy Court is required to determine whether a plan is workable and has a reasonable likelihood of success); *In re G-1 Holdings, Inc.*, 420 B.R. 216, 267 (D.N.J. 2009), (citing *In re Am. Family Enters.*, 256 B.R. 377, 404 (D.N.J. 2000); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D.N.J. 2000) ("Although the standards for determining feasibility are not rigorous, . . . the Bankruptcy Court is obligated to independently evaluate the plan and determine whether it offers a reasonable probability of success . . . ."). The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against visionary or speculative plans. *See In re Congoleum Corp.*, 362 B.R. 198, 203 (Bankr.

8

D.N.J. 2007); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374,

1382 (9th Cir. 1985).

21.     A bankruptcy court, in evaluating the feasibility of a plan, will consider whether

the plan proponents will have any impediments to obtaining the necessary regulatory approvals

for the reorganized debtor. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 154 (Bankr. D.N.J.

2010) ("To establish the feasibility of their plan, . . . the proponents of the AHC/Debtor Plan

must also show that the new owners of the Reorganized Debtors will not face material hurdles to

achieve the necessary regulatory approvals from the New Jersey Casino Commission . . . . The

Beal/Icahn parties argue that there is substantial uncertainty about whether the AHC members

will obtain licensure, or waiver of licensure or qualification requirements, from the Casino

Control Commission."); *Sound Radio, Inc. v. WNJR Radio 1430*, 93 B.R. 849, 857 (Bankr. D.

N.J. 1988) (in assessing whether the plan was feasible the court evaluated whether the necessary

approvals from the FCC could be timely obtained); *In re Cajun Elec. Power Coop.*, 230 B.R.

715, 747 (Bankr. M.D. La. 1999) (same for approvals from the Federal Energy Regulatory

Commission).

22.     As the Debtors concede in their disclosure statement – because the Debtors'

business operations are subject to the regulation of the FCC – "their emergence from bankruptcy

will require the consent of the FCC." (*See* Debtors' Disclosure Statement at 38). The FCC-

related discovery directed at JPMorgan seeks evidence for purposes of determining the prospects

of success before the FCC of the Debtors/Committee/Lender Plan.

23.     As way of background, the FCC, in processing the Debtors' applications, will

consider, among other things, whether the parties receiving new common stock and/or new

warrants under the plan (*i.e.* JPMorgan) will comply with the FCC-related ownership

requirements and restrictions and whether these ownership interests will impair the ability of the reorganized debtors (the "<u>Reorganized Debtors</u>" or "<u>Reorganized Tribune</u>") to obtain the FCC approval necessary to implement the plan. (*See* Debtors' Disclosure Statement at 43). For example, if the proponents of the Plan owned competing newspapers and television stations in the same markets as Tribune, it would be futile for the Court to confirm the Plan, because it would not be approved by the FCC.

24.     More than literal compliance with the FCC's ownership rules is relevant to this case. Tribune is seeking waivers of several of the FCC's broadcast multiple and cross-ownership rules to permit continued ownership of combinations of television stations and daily newspapers or more than one television station in various markets. (*See* Joint Disclosure Statement at 38-39). [1] The waivers that Tribune has requested are controversial and have been opposed by a coalition of public interest groups. (*See* Debtors' Disclosure Statement at 51-52). Presumably because of the contentiousness of Tribune's FCC waiver requests, the proponents of the Debtors/Committee/Lender Plan claim that "[n]o waivers will be sought and no special showing will be submitted to accommodate separate media interests of prospective stockholders independent of their interests in the Reorganized Debtors." (Debtors' Disclosure Statement at 41).

25.     Thus, if proponents of the Debtors/Committee/Lender Plan have substantial interests in competing media in the same markets as Tribune, then it may be futile for the Court to confirm the Plan, because the FCC may not grant Tribune the necessary waivers to continue to own the otherwise prohibited combinations of newspapers and television stations. Indeed, any substantial delay in the FCC approval process that may be caused by JPMorgan's interests in other Media Entities is relevant to the feasibility of the Debtors/Committee/Lender Plan.

---

[1] These markets include: New York, Los Angeles, Chicago, Miami, Indianapolis and Hartford-New Haven.

### 2.   JPMorgan's Other Media Interests May Affect the FCC Approval Process

26.   Aurelius has requested documents from JPMorgan on FCC matters to determine whether JPMorgan's role in the Debtors/Committee/Lender Plan will, using the standards in Debtors/Committee/Lender Plan, (i) require a waiver from the FCC, (ii) require a special showing to the FCC or (iii) impede the grant of the FCC Applications. Aurelius's FCC-related Requests therefore, under the terms of the Debtors/Committee/Lender Plan itself, directly relate to the feasibility of the timely implementation of the Plan.

27.   The applications currently pending before the FCC (the "FCC Application") provide that JPMorgan will hold more than five percent (5%) of the voting stock and therefore will have an attributable interest[2] in Reorganized Tribune. (*See* Excerpt from Pending Tribune Application Filed with the FCC, dated August 2010, Ex. F). Also, the Debtors/Committee/Lender Plan provides that JPMorgan "shall have the sole right to designate one member of the initial board of directors of Reorganized Tribune" and that "Oaktree, Angelo Gordon and JPMorgan shall have the right to jointly designate two members of the initial board of directors of Reorganized Tribune by majority consent of Oaktree, Angelo Gordon and JPMorgan (each of whom shall have one vote)." (Debtors/Committee/Lender Plan at 48). JPMorgan's right to designate a director, standing alone, will cause it to have an attributable

---

[2]   As the proponents of the Debtors/Committee/Lender Plan explain in their Disclosure Statement, the FCC's multiple ownership and cross-ownership rules prohibit the common ownership of "attributable interests" in certain combinations of broadcast and other media properties. (Debtors' Disclosure Statement at 40). The FCC has adopted certain rules for determining whether an ownership, debt, positional or other interest is "attributable." 47 C.F.R. § 73.3555 Note 2. The purpose of the attribution rules, however, is "to identify the interests or relationships to licensees that confer on their holders a degree of influence or control such that the holders have a realistic potential to affect the programming decisions of licensees or other core operating functions." *Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, 14 FCC Rcd 12559, 12560 (1999). Therefore, the FCC "retain[s] the discretion to review individual cases that present unusual issues on a case-by-case basis where it would serve the public interest to conduct such a review." *Id.* at 12581.

interest in Tribune.  *See Telemundo Communications Group, Inc.*, 17 FCC Rcd 6958, 6972-73 ¶ 39 (2002).

28.    By virtue of JPMorgan having an attributable interest in Tribune, ownership or other interests that JPMorgan may have in other Media Entities may create issues under the FCC's multiple ownership and cross-ownership rules.  Even more importantly, JPMorgan's interests in other Media Entities may affect the FCC's decision on whether to grant waivers of the ownership rules to Tribune necessary in order for it to continue to own newspaper and broadcast combinations in seven markets.

### a.    Cross-Ownership Between Tribune and NBC

29.    In fact, the FCC Application already contains two "special showings" relating to JPMorgan.[3]  The portion of the FCC Application concerning JPMorgan contains a "showing" that no officer and director of JPMorgan Chase Bank, N.A. or its parent, JPMorgan Chase & Co. "will perform duties or responsibilities related to [JPMorgan's] investment in Reorganized Tribune," JPMorgan submits that "the executive officers and directors of [JPMorgan] should be deemed not to hold attributable interests in Reorganized Tribune."  (*See* Excerpt from Pending Tribune Application Filed with the FCC, dated August 2010, Ex. G).  There is a glaring omission in the FCC Application.  JPMorgan has not disclosed in the FCC Application that one of its directors, Stephen Burke, is an officer and director of the largest cable television company in the U.S., Comcast, which by the time of the confirmation hearing likely will have acquired a controlling interest in NBC Universal.  (*See* Excerpts from JPMorgan Website Pertaining to

---

[3] Although Debtors' Disclosure Statement provides that "no special showing will be submitted to accommodate separate media interests of prospective stockholders independent of their interests in the Reorganized Debtors," Debtors/Committee/Lender Plan Proponents have not taken steps to remove JPMorgan.  To the contrary, the Debtors/Committee/Lender Plan provides that JPMorgan will designate a director of Tribune, which would cause JPMorgan to hold an attributable interest in Tribune even if its voting stock interests were reduced.

Director Stephen Burke; Press Release, Comcast, Comcast and GE Name Steve Burke Chief
Executive Officer of NBC Universal (September 26, 2010), Ex. H).

30.    The overlap between NBC and Tribune is massive.[4]  (*See* NBC Television Station
Ownership, Ex. I).  The FCC's rules would prohibit such a cross-interest, which is why
JPMorgan must make a "special showing."  Aurelius has requested documents relating to this
special showing by JPMorgan. (*See* Request Nos. 9-12).  Yet JPMorgan refuses to produce any
documents related to its showing.

### b.    Cross-Ownership Between Tribune and Gannett

31.    JPMorgan has also disclosed to the FCC that it owns more than ten percent (10%)
of the stock of Gannett Company, Inc. (*See* JPMorgan's Disclosure to FCC of Interests in
Gannett, Ex. J).  JPMorgan takes the position that the ten percent (10%) voting interest is not
attributable because of a special FCC rule for investment companies.  (*See id.*).

32.    Aurelius has requested documents related to JPMorgan's claim to entitlement to
this exception, particularly whether an affiliate of JPMorgan provides investment advice to the
investment company. (*See* Request No. 7).  This request is relevant because under the FCC's
attribution rules, investment advisors are subject to the lower five percent (5%) attribution
benchmark. *Review of the Commission's Regulations Governing Attribution of Broadcast and
Cable/MDS Interests*, 14 FCC Rcd 12559, 12571-72 (1999) (rejecting a request to apply the
higher attribution threshold to investment advisors).  JPMorgan is keenly aware that its interest
in Gannett is problematic, as it has committed to the FCC to reduce its voting interest in Tribune
to below five percent (5%) if necessary. (*See* Ex. J at n. 8).  JPMorgan has not, however, offered

---

[4]    NBC's television station ownership in Tribune markets includes: New York (two TV stations); Los
Angeles (two TV stations); Chicago (two TV stations); Philadelphia (one TV station); Dallas (two TV stations);
Washington (one TV station); Houston (one TV station); Miami (two TV stations); Denver (two TV stations); and
Hartford (one TV station).

to relinquish its right to designate a director.  And JPMorgan refuses to produce any documents relating to its interest in Gannett.

c. **Potential Cross-Ownership between
Tribune and Freedom Communications**

33.     Aurelius does not know the extent of JPMorgan's interests in other broadcast stations and newspapers.  But available evidence suggests that these interests (i) are significant and that they may require a waiver from the FCC, (ii) may require a special showing to the FCC, or (iii) may impede the grant of the FCC Application.

34.     According to articles from several publications, including *Chicago Tribune, Orange County Register, Orange County Business Journal* and *TVNewsCheck*, JPMorgan may hold interests in Freedom Communications.  (*See* Jennifer Saba and Tom Hals, *Freedom Comms Evaluating Bids for TVs, Newspapers*, Reuters, November 19, 2010, Ex. K; Michael Oneal, *When Bankers Start the Pre$$es*, Chicago Tribune, June 6, 2010, § C, at 1, Ex. K; Mary Ann Milbourn, *Register's Owner Exits Bankruptcy*, Orange County Register, May 1, 2010, Business, at D, Ex. K; Murray Coleman, *Distressed Investor Grabs Stake in Register Parent*, Orange County Business Journal, April 4, 2010, Ex. K; Price Colman, *Freedom Seeking $500 Million for TV Group*, TVNewsCheck, November 17, 2010, Ex. K).  The articles indicate that JPMorgan acquired an interest in Freedom Communications when it emerged from bankruptcy in April 2010.

35.     Freedom Communications, like Tribune, is a broadcast/newspaper company that operates television stations or publishes newspapers in some of the same markets as Tribune. Freedom Communications owns the following newspapers and television stations that are published or operate in Tribune markets:

- The *Orange County Register*, which is a daily newspaper in the Los Angeles, California, market, where Tribune is requesting a waiver of the FCC's broadcast/newspaper cross-ownership rule. (*See* Ex. K).

- A *television* station in West Palm Beach, Florida, which serves the same area as Tribune's *South Florida Sun Sentinel*. (*See* Joint Disclosure Statement at 11). Tribune is seeking a waiver of the FCC's broadcast/newspaper cross-ownership rule in order to retain the *South Florida Sun Sentinel* and its Miami television station.

- A *television* station in the Grand Rapids-Kalamazoo-Battle Creek, Michigan, market, where Tribune also owns a television station. (*See* Ex. K). An attributable ownership interest in both television stations is not permitted under the FCC's rules. 47 C.F.R. § 73.3555(b); *see also* Debtors' Disclosure Statement at 42.

36.     Of significance, JPMorgan's interest in Freedom Communications *has not been disclosed to the FCC in the FCC Application*. To the contrary, Tribune has represented to the FCC that the Freedom Communications' *Orange County Register* is an independently owned newspaper that competes with Tribune in the Los Angeles market. (*See* Excerpts from Waiver Request in Pending Tribune Application Filed with the FCC, Ex. L).

37.     JPMorgan has refused to comply with Aurelius's Requests for documents and communications relating to any interest in Freedom Communications.

### d.    Potential Cross-Ownership Between Tribune and Journal Register

38.     Attached at Exhibit M are articles/blog postings indicating that JPMorgan acquired a significant interest in, perhaps control of, the Journal Register Co., as it emerged from bankruptcy in August 2009. (*See* Doug Page, *JP Morgan: Our Next Big Media Player?*, Newspapers & Technology, April 19, 2010, Ex. M; Doug Page, *Jamie Dimon to the Rescue. Or Maybe Not*, Newspapers & Technology, October 30, 2009, Ex. M; Ajay Kamalakaran, *U.S. Publisher Journal Register Emerges from Bankruptcy*, Reuters, August 11, 2009, Ex. M). Journal Register Co. publishes newspapers in Tribune markets, including the Hartford-New

Haven market and the Philadelphia market.  (*See Journal Register Company*, Wikipedia,

http://en.wikipedia.org/wiki/Journal_Register_Company (last visited Dec. 30, 2010), Ex. N).

JPMorgan's interest in the Journal Register's newspapers in these markets may conflict with its

proposed interest in Tribune under the FCC's broadcast-newspaper cross-interest rule.  An

interest in the Journal Register's *New Haven Register* would be particularly problematic, because

Tribune has asserted in the FCC Application, where it seeks a waiver of both the FCC's

broadcast-newspaper cross-ownership rule and the FCC's rule prohibiting the ownership of two

television stations in that market, that Tribune's newspaper and television stations face "strong

competition" from the *New Haven Register*.  (*See* Excerpts from Waiver Request in Pending

Tribune Application Filed with the FCC, Ex. O).

39.      These are only a few examples – gleaned from public records – of how

JPMorgan's interests in other Media Entities may impact the ability to obtain timely FCC

approval and therefore the confirmability of the plan.  The documents in JPMorgan's possession

may shed even greater light on its FCC-related ownership issues and therefore must be produced.

**B.      Aurelius Cannot Obtain The Requested FCC
        Information From Public Sources And Is Entitled
        To Test The Veracity Of JPMorgan's Contentions**

40.      JPMorgan has also refused to produce information pertaining to the FCC-related

Requests on the grounds that they seek information that is publicly available.  The information is

not publicly available as witnessed by JPMorgan's own objection that it is confidential and

private.  (*See* Objections Nos. 2, 4 & 5).

41.      In order to address potential FCC issues, each Plan requires any potential holder

of five percent (5%) or more of the voting stock of Reorganized Tribune to submit a Media

Ownership Certification ("Certification").  The Certification is supposed to contain information

about such holder and its affiliates to establish that the issuance of voting stock to such holder

would not result in a violation of law, impair the qualifications of Reorganized Tribune to hold

FCC broadcast licenses, or impede the grant of any FCC Applications. (*See, e.g.*, Debtors'

Disclosure Statement at 43). JPMorgan also contends that the information requested will be

provided in the Certification to be submitted by January 16, 2011. (*See* Objections Nos. 1-8).

42.     As an initial matter, because the Certification may not contain all of the

information that is relevant to the FCC application process, particularly the waivers that Tribune

has requested, and any information omitted from the Certification may not be publicly available,

Aurelius is entitled to obtain this information from JPMorgan. The Certification is not subject to

strict scrutiny and only contains the responsive information JPMorgan is willing to provide.

43.     The Requests at issue are intended to obtain the underlying documents supporting

the statements contained in the Certification. In the absence of such information, Aurelius has

no way of testing the veracity of the statements contained in the Certification, or obtaining the

necessary information to determine whether the plan is feasible. *See Lowther v. Insley (In re*

*Insley)*, 322 B.R. 272, 276 (Bankr. W.D. Pa. 2005) (allowing discovery where the plaintiff

questioned the veracity of the debtor's statements regarding financial matters); *Shapiro v. Nu-*

*West*, No. 15442, 1998 Del. Ch. LEXIS 190, at *15 (Del. Ch. Oct. 1, 1998) (ordering the plaintiff

to respond to the defendant corporation's interrogatory requests, explaining that the defendant

need not accept the plaintiff's answer to the requests as true and "should have the opportunity to

test its veracity" and therefore "is entitled to the discovery requested in order to verify the truth"

of the plaintiff's answer).

44.     As discussed above, because JPMorgan has not fully disclosed its substantial

interests in Media Entities to the FCC, Aurelius cannot rely upon JPMorgan's representation that

its interests will not impact the FCC approval process. Given that JPMorgan is a party that is the

sole source possessing this highly relevant information, it should be compelled to comply with the FCC-related Requests.

45.    In any event, the Certification will not contain information relating to JPMorgan's requests for exemption from certain FCC attribution rules.  Aurelius' Requests Nos. 9-12 seek documents and communications relating to JPMorgan's requests for exemption.  JPMorgan is the sole source of this information and should be compelled to comply with these Requests.

### C.    This Court Should Reject JPMorgan's Additional Objections for Withholding Relevant Information

46.    As a last ditch effort to withhold material and relevant information that is necessary for the Court to decide whether the proposed plan can be confirmed, JPMorgan essentially claims such information is unnecessary because compliance with ownership rules has been effectively waived by Aurelius.  In particular, JPMorgan claims a waiver has resulted because the Noteholders Plan incorporates the same procedures as the Debtors/Committee/Lender Plan to ensure compliance with FCC ownership rules.  That certainly is not the case.  First, the Debtors/Committee/Lender Plan provides that JPMorgan specifically will have the right to designate an initial director of Reorganized Tribune.  (*See* First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed By the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P. and JPMorgan Chase Bank, N.A., at 48).  The Noteholder Plan does not.  Second – unlike the Noteholders – the Debtors/Committee/Lenders apparently intend, based on the pending FCC Application, for JPMorgan to hold an attributable interest in Reorganized Tribune, notwithstanding that JPMorgan's interest will require "special showings" to the FCC. (*See* Ex. F).

47.     Lastly, JPMorgan objects to producing certain FCC-related documents, citing

concerns that they contain confidential or private information.  (*See* Objections Nos. 2, 4 & 5).

However, because the exchange of confidential information is protected by the Document

Depository Order in place in this case, JPMorgan's concern is not justified.   Third Circuit courts

regularly hold that the existence of a valid confidentiality agreement obviates the need for a

protective order for confidential information.  *See, e.g., Hart v. Nationwide Mut. Fire Ins. Co.*,

No. 07-678, 2010 U.S. Dist. LEXIS 73193, at *12 (D. Del. July 20, 2010) ("entry of a protective

order is not warranted in light of the Stipulated Confidentiality Order"); *Koch Materials Co. v.

Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 121 (D.N.J. 2002) (finding that "[a]ny confidentiality

concerns have been met by the confidentiality order currently in place," the court ordered party

claiming confidentiality to review its files for responsive information).

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, Aurelius respectfully requests that the

Court enter an order (i) compelling JPMorgan to search for and produce relevant documents, and

(ii) granting such other and further relief as may be just and proper.


Dated: January 14, 2011
       Wilmington, Delaware

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
Tel: (302) 654-1888
Fax: (302) 654-2067

*and*

Meredith S. Senter, Jr.
Sally A. Buckman
LERMAN SENTER, PLLC
2000 K Street NW
Suite 600
Washington, DC 20006
Tel: (202) 429-8970

*Counsel for Aurelius Capital Management, LP*