# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------- X

In re:                  :

TRIBUNE COMPANY, et al.,    :

                       :

                       :

          Debtors.    :

---------------------------------------------------- X

Chapter 11 Cases
**Case No. 08-13141 (KJC)**
**(Jointly Administered)**

Objection Deadline: January 19, 2011 at 4:00 p.m. (ET)
Hearing Date: January 21, 2011 at 10:00 a.m. (ET)

## NOTEHOLDER PLAN PROPONENTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INFORMATION FROM THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS AND OTHER PARTIES OR, ALTERNATIVELY, FOR AN ORDER OF PRECLUSION RESPECTING CERTAIN ISSUES AND MEMORANDUM OF LAW IN SUPPORT THEREOF

The Noteholder Plan Proponents,[1] by and through their undersigned counsel, hereby submit this motion (the "Motion"), pursuant to Rules 26(b), 34 and 37 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rules 7026, 7034 and 7037 of the Federal Rules of Bankruptcy Procedure, and the Case Management Order entered in this case (the "CMO"), for entry of an order (1) compelling certain parties-in-interest in the above-captioned cases to search for and to produce documents responsive to discovery requests made by the Noteholder Plan Proponents;[2] (2) alternatively, for an order of preclusion respecting

---

[1] The Noteholder Plan Proponents are Aurelius Capital Management, LP, on behalf of its managed entities (collectively, "Aurelius"), Law Debenture Trust Company of New York, as successor indenture trustee under that certain Indenture dated March 19, 1996 between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A., for the 6.61% Debentures due 2027 and the 7 1/4 % Debentures due 2096 ("Law Debenture"), Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee under certain indentures by and between Tribune ("DBTCA"), and Wilmington Trust Company, in its capacity as successor indenture trustee for the PHONES Notes ("Wilmington Trust").

[2] For the avoidance of doubt, although the Motion addresses global discovery objections common to all parties-in-interest, Akin Gump Strauss Hauer & Feld, LLP has not conducted any negotiations with Angelo or Oaktree on any party-specific objections. Kasowitz, Benson, Torres & Friedman LLP has issued all discovery requests to Angelo and Oaktree and has conducted negotiations with Angelo, Oaktree and their respective counsel.

certain issues described herein; and (3) for other related relief. In support of the Motion, the Noteholder Plan Proponents respectfully state as follows:

## **INTRODUCTION**

The Debtor/Committee/Lender Plan Proponents seek to shield from discovery the alleged settlement negotiations and other events that led to the settlement they propose (the "Proposed LBO Settlement")[3] and that is embodied in the Debtor/Committee/Lender Plan, including all information relating to the crucial question of whether the Proposed LBO Settlement is the product of arm's-length bargaining — except, of course, for the information that the Debtor/Committee/Lender Plan Proponents believe will help their case. The Debtor/Committee/Lender Plan Proponents' position is contrary to settled law and would hobble the Court's ability to perform the analysis required under Bankruptcy Rule 9019 and Bankrputcy Code Section 1123. The Debtor/Committee/Lender Plan Proponents should be required to provide discovery into these crucial areas without further delay.

Alleged settlement negotiations that resulted in the Proposed LBO Settlement are highly relevant to whether the Proposed LBO Settlement should be approved under Bankruptcy Rule 9019 and the Debtor/Committee/Lender Plan should be confirmed pursuant to Bankruptcy Code section 1129. *See, e.g., In re Exide Techs.*, 303 B.R. 48, 67-68, 71 (2003) (criteria for approving settlement in the context of a proposed plan includes "the extent to which [it] is truly the product of 'arms-length' bargaining, and not of fraud or collusion"); *In re Adelphia Commc'ns*, 327 B.R. 143, 165 (S.D.N.Y. 2005) (in analyzing proposed settlement under Rule 9019, arms-length

---

[3] The "Debtor/Committee/Lender Plan" is the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo"), and JPMorgan Chase Bank, N.A. ("JPMorgan") (collectively, the "Debtor/Committee/Lender Plan Proponents"), filed December 10, 2010, and any amendments thereto.

bargaining is a relevant consideration — one which the court would give great weight to "if [it] ever thought it had not been satisfied"); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Gerber, J.), January 7, 2010 Tr. at 14-15 (directing discovery of settlement communications between debtors and senior lenders, even after the date a settlement in principal was reached, because "I need to have total comfort that the settlement [of fraudulent transfer claims] was at arms' length and wasn't collusive. And communications between the debtors and [senior lenders] at any time . . . are at least potentially relevant" in 9019 proceeding).[4]

The vigor with which the estate fiduciaries pursued a favorable resolution throughout the course of the case is also relevant to whether a proposed settlement is "fair and equitable." *See, e.g., Exide*, 303 B.R. at 71 (citing absence of arms-length bargaining as a reason to reject the proposed settlement); *In re Spansion, Inc.*, No. 09-10690(KJC), 2009 WL 1531788, at *7 (Bankr. D. Del. June 2, 2009) (rejecting settlement where, inter alia, the person negotiating for the debtor failed to obtain legal advice regarding the strength of the subject claims before agreeing to a settlement). *Cf. Dacotah Marketing and Research, L.L.C. v Versatility, Inc.*, 21 F. Supp 2d 570, 577-78 (E.D. Va. 1998) ("In arms' length negotiations, plaintiffs attempt to obtain as much as possible and defendants seek to pay as little as possible"; collusion occurs when arms length negotiations break down).

Consequently, courts that have approved settlements under Rule 9019 over the objection of creditors frequently are presented with the panoply of details of the negotiations that resulted in the settlement *See, e.g., Adelphia*, 327 B.R. at 150-56, 167; *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 505-07, 520 (D. Del. 2010).

---

[4] A true and correct copy of the *Lyondell* transcript is included in the Appendix as Exhibit 1.

Bankruptcy Code section 1129(a)(3) provides that a plan cannot be confirmed unless it has been proposed "in good faith and not by any means prohibited by law." *See* 11 U.S.C. 1129(a)(3); *In re PWS Holdings Corp.*, 228 F.3d 224, 242 (3d Cir. 2000). Although the Bankruptcy Code does not specifically define the term "good faith," courts in the Third Circuit have found that the requirement is satisfied where (i) the plan fosters a result consistent with the Bankruptcy Code's objectives, (ii) the plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, and/or (iii) there has been fundamental fairness in dealing with creditors. *See In re Lernout & Hauspie Speech Prods. N.V.*, 208 B.R. 672, 675 (Bankr. D. Del. 2004); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 237 (Bankr. D. Del. 2000).

A determination of whether the good faith standard has been met includes a review of the totality of the circumstances surrounding the plan and of the process followed in negotiating the plan. *See, e.g., In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001); *In Re AbitibiBowater*, No. 09-11296 (KJC), 2010 WL 4823839 at *4 (Bankr. D. Del. Nov 22, 2010). The Debtor/Committee/Lender Plan Proponents explicitly concede that an assessment of the process is relevant. (Ex. 2 at 4, *citing In Re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964 at *11 (Bankr. D. Del. April 29, 2010). In fact, in *In re ACandS, Inc.*, 311 B.R. 36, 42-43 (D Del. 2004), the Court rejected a proposed plan as not having been proposed in good faith as required by section 1129(a)(3) based on evidence concerning the manner in which the plan was negotiated and drafted.

Nowhere in their letter to the Court of January 11, 2011 do the Debtor/Committee/Lender Plan Proponents dispute that (i) the purported arm's-length nature of the Debtors' and

Committee's relationship with the LBO defendants, (ii) the settlement negotiations that produced the Proposed LBO Settlement at issue, or (iii) the purported vigor with which the estate fiduciaries pursued a favorable settlement resolution are relevant to a determination of the fairness and equity of the Debtor/Committee/Lender Plan.[5]

Accordingly, the Noteholder Plan Proponents have sought in discovery, *inter alia*, documents and communications relating to the parties' discussions concerning the strength of claims arising from the leveraged buyout of Tribune in 2007 (the "LBO Related Causes of Action"), negotiations respecting the Proposed LBO Settlement through the filing of and amendments to the Debtor/Committee/Lender Plan, negotiations that resulted in the Debtors' original proposed plan of reorganization filed with the Court on April 12, 2010 (the "April Plan") and any other negotiations or discussions concerning the potential resolution of the LBO-Related Causes of Action during the course of the case (collectively, "Settlement Discovery").

Among the legions of objections interposed by the Debtor/Committee/Lender Plan Proponents to the Noteholder Plan Proponents' discovery (the Debtors alone served 80 pages of objections to the Noteholder Plan Proponents' document requests) are three broad objections designed to limit drastically the scope of discovery into this area, and thereby prevent the Noteholder Plan Proponents and this Court from fairly examining whether the Proposed LBO Settlement was the product of arm's-length bargaining, whether there is any basis to find fraud or collusion, and whether the Debtor/Committee/Lender Plan generally has been proposed in good faith. The third objection also will materially impede, without any basis whatsoever, discovery relating to the merits of the underlying claims that are contemplated to be settled pursuant to the Proposed LBO Settlement. The three objections are:

---

[5] A true and correct copy of the letter submitted to the Court by the Debtor/Committee/Lender Plan Proponents on January 11, 2011 is included in the Appendix as Exhibit 2.

(1) unsupported contentions that the negotiations respecting the Proposed LBO Settlement, as embodied in the Debtor/Committee/Lender Plan, are protected by a purported common interest privilege;

(2) objections based on the Mediation Order and Document Depository Order; and

(3) objections, without any basis, to producing documents respecting any topics whatsoever generated between the Petition Date and December 15, 2009.

Every proponent and supporter of the Debtor/Committee/Lender Plan has locked arms on these objections and the resolution will apply to all. These issues are discussed separately below.

## THE PARTIES HAVE MET AND CONFERRED CONCERNING THE OBJECTIONS OF THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS

On December 3, 2010, Aurelius served the Debtors with document requests relating to plan confirmation matters, and served other parties with similar requests shortly thereafter.[6] The Noteholder Plan Proponents had sought to commence confirmation discovery earlier, following the initial filing of competing proposed plans, but the Debtor/Committee/Lender Plan Proponents refused to do so before the Court ruled on the Debtors' motion "Setting Confirmation Schedule and Establishing Parameters of Confirmation-Related Discovery" (the "Contours Motion"), which was heard on December 6, 2010.

The Debtors served their responses and objections (the "Responses and Objections") on December 17, 2010.[7] All other parties who were served with document requests from the Noteholder Plan Proponents, including all of the proponents of the Debtor/Committee/Lender Plan, all other banks involved in the LBO transaction, and all other Credit Agreement Lenders,[8]

---

[6] Aurelius's First Set and Second Set of Document Requests to Debtors, dated December 3, 2010, is included in the Appendix as Exhibit 3.

[7] The Debtors' Responses and Objections to Aurelius's First and Second Set of Document Requests is included in the Appendix as Exhibit 4.

[8] The "Credit Agreement Lenders" are the lenders and agents to that certain $8.028 Billion Credit Agreement, dated as of May 17, 2007, by and among Tribune, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, the lenders named therein, and others, as the same as been amended, restated, modified or supplemented.

followed the lead of the Debtors regarding the three objections referenced above.[9]

The Noteholder Plan Proponents have made good faith attempts to resolve each of these "global" objections, and have had numerous meet and confer sessions with the applicable parties in interest pursuant to Paragraph 35 of the CMO, exchanged multiple drafts of written proposals and/or stipulations (without prejudice to the parties' ability to seek broader relief in the event Court intervention was necessary), and followed up with an innumerable amount of correspondence before reaching an impasse. For instance, in an effort to reach agreement on the common interest privilege objection, the Noteholder Plan Proponents first circulated a draft stipulation on the common interest privilege on December 28, 2010 to all parties and participated in multiple meet and confer calls (the last of which occurred on Tuesday, January 11). The same approach was taken with regard to the Mediation Order and Document Depository Order, where negotiations began even earlier. In addition to the group meet and confers, there have been many party-specific meet and confer calls with each of the Debtor/Committee/Lender Plan Proponents, as well as other parties, on individual discussions of search terms and methodology, specific objections and privilege protocols. Unfortunately, these discussions produced little or no movement on the key issues. For example, the Debtor/Committee/Lender Plan proponents have not moved one iota from their overbroad assertions of common interest first set forth in their objections, while the Noteholder Plan Proponents have moved miles to try to accommodate their counterparts. Those meet and confers further confirmed the refusal by the Debtors, Committee, JPMorgan and other parties to produce responsive documents from the 2009 period. These

---

[9] Responses and Objections to First Requests for the Production of Documents of Aurelius Capital Management, LP to Debtors. *See also* Responses and Objections to First Requests for the Production of Documents of Aurelius Capital Management, LP to JPMorgan Chase Bank N.A. (Ex. 5); Responses and Objections to First Requests for the production of Documents of Aurelius Capital Management, LP to the Unofficial Committee of Creditors (Ex. 6); Responses and Objections of Citigroup Inc. to Subpoena of Aurelius Capital Management, L.P.; Bank of America's Responses and Objections to Aurelius Capital Management, L.P.'s Request for Production of Documents.

objections concern substantial and important aspects of the discovery sought by the Noteholder Plan Proponents regarding the Proposed LBO Settlement and the details of the negotiations that resulted in the settlement.

## ARGUMENT

The Noteholder Plan Proponents are entitled to discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). "It is well recognized that the federal rules allow broad and liberal discovery." *Pacitti v. Macy's East, Inc.*, 193 F.3d 766, 777-78 (3d Cir. 1999); see also *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000) ("[A]ll relevant material is discoverable unless an applicable evidentiary privilege is asserted."); *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 39 (D. Del. 1993) ("[D]iscovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action.") (internal quotation omitted).

**I.    The Debtor/Committee/Lender Plan Proponents' Claims Of A Common Interest Privilege Respecting The Negotiation And Drafting Of Their Plan Is Legally Unsupported, As Are The Debtor/Committee/Lender Plan Proponents' Claims Of Other Alleged Common Interest Privileges**

**A.    Nature of the Dispute**

The Debtors and the Committee are wholly adverse to the Credit Agreement Lenders in every conceivable aspect relating to the LBO-Related Causes of Action. The Debtors' estates are the plaintiffs, and as such are obligated to seek to maximize recoveries from the lenders. The Committee, which requested (and subsequently was granted) standing to prosecute those claims on behalf of the Debtors, as a consequence of the Debtors' admitted conflicts of interest and inability to prosecute the claims themselves, also has a duty to maximize recoveries. The prime targets of the LBO-Related Causes of Action are the Credit Agreement Lenders — including the Debtors' co-proponents — who face billions of dollars of exposure; needless to say, the lenders

8

are interested in paying as little as possible (and only then on the most favorable terms) to extricate themselves from the damage caused by the LBO.

As explained below — and as explicitly determined by The Honorable Robert E. Gerber in *In re Lyondell* — that legal adversity between the parties remains to this day and will remain until such time as the Court, if ever, approves the Proposed LBO Settlement. The most that can be said is that the Debtor/Committee/Lender Plan Proponents now share a common *commercial interest* in having the Proposed LBO Settlement approved, *e.g.*, they will each enjoy certain commercial benefits if the settlement is approved, but that does **not** create a common *legal* interest respecting the litigation or settlement or constitute any basis to withhold discovery.

Nevertheless, the Debtor/Committee/Lender Plan Proponents have objected to and refuse to provide any discovery concerning any aspect of the Proposed LBO Settlement and Debtor/Committee/Lender Plan, including any negotiations concerning the actual Debtor/Committee/Lender Plan or accompanying Disclosure Statement, from and after the date that certain term sheets were agreed to. Specifically, on September 28, 2010, Oaktree, Angelo and the Debtors allegedly agreed to a one and a half page term sheet (the "September Term Sheet") for a joint plan that would propose to settle certain claims arising of Step One of the LBO transaction alone, preserving claims relating to Step Two for post-emergence resolution. (*See* Ex. 7.) On the basis of the September Term Sheet alone, the Debtors, Angelo and Oaktree have claimed a "common interest privilege" and refused to produce any communications among them from and after September 27, 2010. (*See* Ex. 4 at ¶ 2.)

On October 12, 2010, all of the Debtor/Committee/Lender Plan Proponents allegedly agreed to a four-page term sheet (the "October Term Sheet", and together with the September Term Sheet, the "Term Sheets") for a joint plan that would propose to settle all claims against the

lenders including, *inter alia*, all claims arising out of Step Two as well. (*See* Ex. 8.) On the basis of the October Term Sheet alone, all of the Debtor/Committee/Lender Plan Proponents claimed a "common interest privilege" and refused to produce any communications among them from and after October 12, 2010. (*See* Ex. 4 at ¶ 2.)

That legal adversity between the Debtors and the Committee, on the one hand, and the Credit Agreement Lenders, on the other hand, was not cured by the Term Sheets; in fact even after the Terms Sheets were signed, material business terms were left open for further negotiation. On October 22, 2010 the Debtor/Committee/Lender Plan Proponents filed their initial proposed Joint Plan of Reorganization consisting of 96 pages and exhibits; that proposed Plan was amended in material part several times up to and including the version of the Debtor/Committee/Lender Plan filed on December 10, 2010. A comparison of the Debtor/Committee/Lender Plan with the Term Sheets reveals ongoing adverse negotiations, by parties all separately represented.

At no time did the Debtor/Committee/Lender Plan Proponents enter into any written settlement agreement; rather, the proposed settlement of the LBO-Related Causes of Action is simply embodied in the Debtor/Committee/Lender Plan. Nor did the Debtors or Committee ever enter a written "common interest" or "joint defense" agreement with JP Morgan, Angelo or Oaktree in connection with the proposed Debtor/Committee/Lender Plan.

Following the assertion of these "common interest" objections to discovery, the parties met and conferred at length. In the interest of compromise and moving discovery along, the Noteholder Plan Proponents indicated that they would consent to some limited assertions of common interest by the Debtor/Committee/Lender Plan Proponents (but not based on the Term Sheets); the parties thereafter exchanged multiple drafts of proposed stipulations seeking to

document various categories of allegedly cognizable common interest relationships that would affect the discovery taken by all parties in connection with the Confirmation Hearing. (*See* Ex. 9 for a compilation of the various proposals).

In some respects (but unrelated to the issue summarized above), the parties have substantially reached agreement on certain other common interest privileges (though differences in the wording remain). However, it is clear that an impasse exists with respect to several major issues and that the Debtor/Committee/Lender Plan Proponents are seeking to withhold — far more information than the law of "common interest privilege" permits. Accordingly, the Noteholder Plan Proponents ask the Court to overrule the Debtor/Committee/Lender Plan's common interest objection and compel production consistent with the Noteholder Plan Proponents' Proposal, which is annexed hereto as Exhibit 10.

## B. The Debtor/Committee/Lender Plan Proponents bear the burden of establishing their claimed common <u>legal</u> interest

Federal law recognizes a limited "common interest privilege," also known as the "community-of-interest privilege," which was developed to allow attorneys representing different clients with similar legal interests to share information without having to disclose it to others. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363-65 (3d Cir. 2007); *In re Leslie Controls, Inc.*, 437 B.R. 493, 497 (D. Del. 2010); *United States v. LeCroy*, 348 F. Supp. 2d 375, 381 (E.D. Pa. 2005). The common interest privilege "is not itself an evidentiary privilege," but a limited exception to the general rule that disclosure to third parties constitutes a waiver of the underlying privilege. *In re Total Containment, Inc.*, No. 04-13144BIF, 2007 WL 1775364, at *6 (Bankr. E.D. Pa. June 18, 2007); *see also Teleglobe*, 493 F.3d at 364 ("[T]he common-interest privilege is an exception to the disclosure rule. . . ."); *Leslie Controls*, 437 B.R. at 496 (The common interest doctrine "expands the reach of the attorney-client privilege and work product

doctrine by providing that, under certain circumstance, the sharing of privileged communications with third parties does not constitute a waiver of the privilege. Thus, the doctrine is only applicable if an underlying privilege has been established."); *Nidec Corp. v. Victor Co. of Japan*, No. C-05-0686 SBA (EMC), 2007 WL 1994171, at *2 (N.D. Cal. July 5, 2007) ("The joint defense and common interest doctrines are not privileges in and of themselves. Rather, they constitute exceptions to the rule on waiver where communications are disclosed to third parties . . . The common interest privilege . . . comes into play only if the communication at issue is privileged in the first instance.").

The parties seeking to invoke the common interest privilege bear the burden of establishing that (i) the underlying communications or information they seek to withhold are protected by the attorney-client privilege or work product doctrine, (ii) that the parties "share at least a substantially similar legal interest," (iii) the underlying privileged communication or information concerns that shared legal interest and (iv) the communication or information was shared among attorneys for members of the community of interest in order to coordinate legal strategy. *See Teleglobe*, 493 F.3d at 364-65; Paul R. Rice, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § I.B (2d ed. 1999). The common interest rule is narrowly construed in this Circuit in order to prevent abuse. *See Teleglobe*, 493 F.3d at 365.

C.    **The Debtor/Committee/Lender Plan Proponents erroneously assert that they share a common <u>legal</u> interest**

As noted above, the Debtor/Committee/Lender Plan Proponents contend that a legally cognizable common interest privilege respecting the Proposed LBO Settlement and Debtor/Committee/Lender Plan arose between Angelo, Oaktree and the Debtors as of the September Term Sheet, and between all of the Debtor/Committee/Lender Plan Proponents as of

12

October 12, 2010.  Essentially they claim a common legal interest based on an agreement in principal.  They are wrong.

In *In re Lyondell Chemical Company*, Judge Gerber was confronted with — and flatly rejected — the identical claim of common interest alleged here by the Debtor/Committee/Lender Plan Proponents.  (*See* Ex. 1 at 9.)  There, as here, the lenders who financed a challenged leveraged buyout, including Merrill Lynch and Citibank, were defendants in an adversary proceeding brought by the Official Committee of Unsecured Creditors, which alleged (among other things) fraudulent conveyance claims.  After the lenders reached a settlement in principal with the debtors, which debtors' counsel described to the Court, the creditors' committee and various other creditors sought discovery in connection with the debtors' motion for approval of the settlement pursuant to Rule 9019, including documents, drafts and communications concerning the subsequent negotiations of the settlement agreement itself and the debtors' Rule 9019 motion papers.

In opposition to the discovery, the lenders and the debtors argued that all communications among the debtors and settling parties once an agreement in principal was reached on the evening of December 23, 2009 were protected by a common interest privilege.  (*See* Ex. 11 at 2. (Letter from counsel to Creditors' Committee to Judge Gerber, dated January 6, 2010, summarizing the pending discovery disputes)).

Judge Gerber flatly rejected the argument that the debtors and lenders in that case could cloak any such communications with a common interest privilege, holding:

> Gentlemen, the objection to the production of the communications between the debtors and the [lenders] after December 3rd [the date the settlement in principal was reached] is overruled and the debtors will produce any communications of that character. . . .
>
> As far as common interest goes, until and unless I approve this settlement, the estate, now represented by the debtors or on whose

> behalf the debtors propose to settle, and the financing party
> defendants are adverse. And if and to the extent that the debtor
> find it in its -- to its convenience to be making a settlement with
> the [lenders], which will be determined to be either appropriate or
> inappropriate after the hearing, that is not in the nature of
> defending a common interest, but it's achieving your private
> commercial objectives.

(*See* Ex. 1 at 14:15 – 15:17.) Later in the hearing (in response to the comments of attorneys from

Davis Polk & Wardwell on behalf of Citibank) the Court confirmed that even *after* the Debtors

and lenders executed a *formal written settlement agreement* memorializing the earlier settlement

in principal (subject of course to court approval), no cognizable common interest arose that

would protect ongoing communications, including joint preparations for the Rule 9019 hearing

itself. (*See id* at 75:19-78:25) Said the Court:

> Frankly, I don't much care about any institutional concerns in
> protecting communications between people who were and still are
> legally adverse who have decided to settle a controversy if I
> ultimately approve it, but who will once more be in an adversarial
> position if I don't. The debtor and [the LBO Lenders] should
> assume, if they want to caucus with each other, if they want to say
> anything, that their communications are not protected in the event
> there is any further need for examining them.

(*See id.* at 78:1-:11). Here, as in *Lyondell*, the LBO lenders can share no common legal interest

with the parties who are suing them while those claims are threatened or pending. Unless and

until the settlement is approved, those parties remain directly adverse to each other. *Id.*; *see also*

*In re Project Orange Assocs., LLC,* 431 B.R. 363, 372 (Bankr. S.D.N.Y. 2010) ("The Stipulation,

by its own terms, is not effective until this Court reviews the Stipulation in accordance with

Federal Rule of Bankruptcy Procedure 9019 and approves the settlement. Until then, no

settlement exists and GE remains directly adverse to Project Orange."). Accordingly, as a matter

of law the Debtor/Committee/Lender Plan Proponents' claims of a common legal interest

privilege should be overruled.

Even if the Court were to disagree with the *Lyondell* ruling, and find that at some point a legally cognizable common legal interest arose between the Debtor/Committee/Lender Plan Proponents in advance of the Court's approval of the Proposed LBO Settlement, no common legal interest could exist before the final terms of the Debtor/Committee/Lender Plan were agreed to and filed with the Court. Here, as noted, there is no settlement agreement, and at least until the filing of the First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. on November 23, 2010, material negotiations were still underway and being worked out in the Plan itself. Thus, communications between the Debtor/Committee/Lender Plan Proponents in this time frame could easily be relevant and material to arms length bargaining, collusion, and good faith.

For example, the October Term Sheet was premised on a Distributable Enterprise Value ("DEV") of $6.1 billion. Yet, the Debtor/Committee/Lender Plan is premised on DEV of $6.75 billion. Thus, negotiations continued and material terms were changed following the filing of the October Term Sheet. Even more pointedly, the total recovery to the Noteholders remained flat despite the increase in distributable value, which increased the Noteholders' natural waterfall recoveries. This means that settlement consideration to the Noteholders actually declined between the October Term Sheet and the Debtor/Committee/Lender Plan. Thus, someone was minding the store and continuing to negotiate, at least on the lender side of the table. Many other items now in the Debtor/Committee/Lender Plan were first negotiated and developed following the October Term Sheet, which was silent as to, *inter alia*, any release of Step Two selling shareholders, the ownership and treatment of the Debtors' preference actions, totaling in excess

15

of $280 million; any Intercompany Settlement, the allocation of value between Tribune and its subsidiaries.[10]

That parties negotiating the definitive terms of an agreement are adverse, even after a term sheet has been agreed to, can hardly be deemed a surprising proposition. Indeed, JPMorgan litigated and lost this issue in a major securities case. *See In re JP Morgan Chase & Co. Sec. Litig.*, 2007 WL 2363311, at * 5 (N.D. Ill. 2007). There, JPM argued that it "maintained a community of interest [with a merging corporation] both before and after their merger agreement was signed," and that communications between the two entities during this "merger period" should be protected by the common interest privilege. *Id.* The Court disagreed:

> The Court is not convinced that the pre-merger documents shared between JP Morgan and Bank One remains protected by the attorney-client privilege and the common interest doctrine. Fundamentally, the Court does not understand how Bank One and JP Morgan can be said to share a common legal interest prior to their signing the merger. Prior to the merger, these organizations stood on opposite sides of a business transaction. From a business standpoint and from a legal standpoint, the merger parties' interests stood opposed to each other. . . . At most, the companies had a similar business interest, in that each desired the merger negotiations to come to fruition. But even if JP Morgan and Bank One had a similar business interest, a common legal interest is required, and the Court cannot conclude from the existence of a common business interest that the parties' legal interests were identical.

*Id.* Indeed, the differing legal interests within the Debtor/Committee/Lender Plan Proponent group is borne out by the fact that each entity had its own independent counsel represent it in the negotiation and drafting of the Debtor/Committee/Lender Plan, and to this day are represented by separate counsel. (*See id.*)

---

[10] The notion that any sort of common interest arose after the September Term Sheet is equally flawed as negotiations between Angelo, Oaktree and the Debtors continued. In addition to the issues left open by the October Term Sheet, after the September Term Sheet the Retiree Settlement was incorporated, the treatment of parent and subsidiary GUCs changed and references to releases and a Bar Order were added. In fact, Angelo and Oaktree likely sought releases for any Step Two holdings they add as well.

In the interest of compromise, the Noteholder Plan Proponents agreed to recognize a common interest relationship (to protect *appropriate* common interest communications, as discussed in the next section) between the co-proponents of each competing plan commencing as of November 23, 2010, when the parties' respective final or near final plans were filed. (*See* Ex. 10 at ¶ C.1.) As there is no legal basis to find a common interest privilege between the Debtor/Committee/Lender Plan Proponents that would immunize from discovery their settlement and plan negotiations and related communications and discussions before that date, the Noteholder Plan Proponents request that the Court enter the common interest proposal submitted as Exhibit 10.[11]

### D.     The Debtor/Committee/Lender Plan Proponents' common interest proposal misstates the scope of communications protected by the common interest privilege

In addition to the Debtor/Committee/Lender Plan Proponents' erroneous position as to the existence of a claimed common interest relationship between and amongst them based on the October Term Sheet, they have withheld documents from production based on a sweeping legally incorrect, interpretation of the rule that would cover communications between the parties themselves, rather than counsel.

The Noteholder Proposed Common Interest Stipulation and Order properly defines a "Common Interest Communication" as oral, written or electronic communications between and among counsel, or non-testifying advisors, for two or more different parties within a valid common interest relationship. (*See* Ex. 10 at A.4.) The Noteholder Plan Proponents also have

---

[11] Consistent with their treatment of the current proposed plans and plan proponents, the Noteholder Plan Proponents have agreed with the Debtor/Committee/Lender Plan Proponents and other parties' requests to recognize a common interest relationship between the proponents and supporters of the Joint Plan of Reorganization for Tribune Company and its Subsidiaries, filed April 12, 2010 (the "April Plan") between the date the April Plan was actually filed and the date one of its supporters gave notice that it was terminating the associated plan support agreement. (*See* Ex. 10 at C.2.) The timeframe for this common interest relationship is not presently disputed.

specified that communications between counsel can be provided or copied to their respective clients without forfeiting common interest protection, but that the communications generated by the clients themselves to other parties or other counsel would not constitute a Common Interest Communication. (*See id.*). The Noteholder Proposal (as defined herein) is fully consistent with governing law and common sense and should be adopted.

The Debtor/Committee/Lender Plan Proponents, in contrast, seek to shield communications *between and among the parties themselves (e.g., the clients)* who are adverse to one another, provided one or more attorneys were in the room, on the phone or in the email exchange. (*See* Ex 10 at A.4.). The Debtor/Committee/Lender Plan Proponents may go so far as asserting that Common Interest Communications may include — and thus prohibit discovery of — direct communications among separately represented principals, even if the communications were made outside the presence of counsel and were not made at the direction of counsel. Additionally, when viewed in connection with the Credit Agreement Lenders' assertion of a common interest relationship concerning the defense of LBO-Related Causes of Action or discussions concerning the merits of such claims (*see* Ex. 10 at C.4), or the interpretation or application of the Credit Agreement (*see id.* at C.3), the Debtor/Committee/Lender Plan Proponents' effort to withhold communications *involving principals* is unprecedented.[12]

This untenable position has been categorically rejected by the Third Circuit, which has held that in order for the common interest rule to apply "the communication must be shared with

---

[12] The Merrill Lynch discovery objections takes this position to the extreme, purporting to claim the following common interest privilege: "During all relevant time periods covered by the Subpoena Requests, all communications and documents shared, between and among Merrill Lynch and other lenders, arrangers and syndication agents under the $8,028,000,000 Credit Agreement dated May 17, 2007 and under the $1,600,000,000 Senior Unsecured Interim Loan Agreement dated December 20, 2007 including, without limitation, Citigroup Global Markets Inc., JPMorgan Chase Bank N.A., and Bank of America, N.A., or their respective in-house and outside counsel and advisors, concerning legal advice or strategy, on the grounds that such communications have been protected from disclosure under a common-interest privilege among those entities." (*See* Ex. 15.)

the *attorney* of the member of the community of interest." *In re Teleglobe Commc'ns Corp.*, 493

F.3d at 364. (emphasis added). As explained by the Court in *Teleglobe*:

> The requirement that the clients' separate attorneys share information **(and not the clients themselves)** derives from the community-of-interest privilege's roots in the old joint-defense privilege, which (to repeat) was developed to allow attorneys to coordinate their clients' criminal defense strategies. Because the common-interest privilege is an exception to the disclosure rule, which exists to prevent abuse, the privilege should not be used as a post hoc justification for a client's impermissible disclosures. **The attorney-sharing requirement helps prevent abuse by ensuring that the common-interest privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate legal strategies.**

*Id.* (emphasis added). Every court in the Third Circuit to consider the issue after *Teleglobe* has

reached the same conclusion. *See, e.g., Cooper Health System v. Virtua Health, Inc.*, 259 F.R.D.

208, 214 -215 (D.N.J. 2009) ("[T]he privilege does not extend to communications between non-

attorneys who simply have a joint interest."); *Warren Distrib. Co. v. InBev USA L.L.C.*, 2008 WL

4371763, at *2 (D.N.J. 2008) ("In order for the privilege to apply the communication must be

shared with the attorney of the member of the community of interest."); *La. Mun. Police Emps.*

*Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 309 (D.N.J. 2008) ("As articulated by the Third

Circuit, the privilege protects communications made between attorneys when all members of the

community share a 'common legal interest' in the shared communication.") (citing *Telegobe* and

Paul Rice, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 4:35 (2007)).[13]

The Debtor/Committee/Lender Plan Proponents can be expected to rely on cases from

outside of the Third Circuit and from state courts which have held that communications among

---

[13] *Carl Zeiss Vision Intern. Gmbh v. Signet Armorlite Inc.*, 2009 WL 4642388, at * 7 (S.D. Cal. 2009) ("Furthermore, the employees of the respective entities shared in the communications, not the attorneys. Thus, the employees of Micro Optics are third parties, and as a result, communications received by these employees are stripped of the attorney-client privilege.") (citing *Teleglobe*); *In re Outsidewall Tire Litigation*, 2010 WL 2696643, at *2 (E.D.Va. 2010) ("As the communication here in issue was not made to or from an attorney, it is not privileged, and thus the common interest rule does not apply.") (citing *Teleglobe*; *In re Grand Jury Subpoenas 89-3 & 89-4*, 902 F.2d 244, 249 (4th Cir. 1990); *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)).

separately represented clients may be protected by the common interest privilege in certain circumstances. *See In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990); *Zitzka v. Vill. of Westmont*, 2009 U.S. Dist. LEXIS 41081 (N.D. Ill. May 13, 2009); *IBJ Whitehall Bank & Trust Co. v. Cory & Assocs.*, 1999 U.S. Dist. LEXIS 12440, *6 (N.D. Ill. Aug. 10, 1999). Although there is not yet a consensus on this issue outside the Third Circuit, these cases are not consistent with the great weight of federal authority on the common interest privilege. *See* Paul Rice, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 4:35 & n.45 (2007) (collecting numerous cases across jurisdictions limiting the common interest privilege to attorney communications). As noted by Professor Rice, although "it might be possible for individual clients to communicate among themselves so that their collective attempt to obtain more informed assistance from the attorneys could be more successful, it seems a highly probable scenario for individuals who are separately represented."

Expanding the common interest rule to cover *client* communications thus invites abuse – a point made clear by even the cases which have allowed such direct client communications to be covered. In *IBJ Whitehall Bank & Trust*, for example, the court held that client–to–client communications may be covered by the common interest privilege, but found, after conducting an in camera review, that the vast majority of communications withheld on the basis of the common interest privilege actually reflected general business discussions, and therefore had to be produced. *See* 1999 U.S. Dist. LEXIS 12440 at * 7-9 (also noting "the practical fact that privilege assertions for communications that do not involve counsel as an author or recipient are more likely to be challenged and thus more likely to be subjected to an in camera review"). In any event, this issue is largely academic because the contours of the common interest privilege

have now been clearly defined by the Third Circuit, and the requirement that the clients' separate attorneys share information is settled federal common law in this circuit.

As there is no legal basis to utilize the Debtor/Committee/Lender Plan Proponents' overly expansive definition of a Common Interest Communication, the Noteholder Plan Proponents request that the Court enter the common interest proposal submitted as Exhibit 10.[14]

## II. The Debtor/Committee/Lender Plan Proponents Are Improperly Withholding Production of Relevant Discovery Material Pursuant To The Mediation Orders

### A. Nature of the Dispute

The second categorical objection to providing the Noteholder Plan Proponents with Settlement Discovery is based on the Document Depository Order,[15] the Mediation Order[16] and Federal Rule of Evidence 408. (Exs. 12 and 13.) The Document Depository Order, entered December 7, 2009, provides that any oral or written communications made in connection with efforts to settle the LBO-Related Causes of Actionand designated as a "Settlement Communication" may not be disclosed outside of settlement discussions and may not be introduced at trial. (Ex. 12 at 5.) The Mediation Order, entered September 1, 2010, provides that all discussions by the Mediation parties relating to the Mediation, and all correspondence, offers,

---

[14] The Noteholder Plan Proponents and Debtor/Committee/Lender Plan Proponents have several additional differences in their respective common interest proposals. These issues include, *inter alia*, the timing and characterization of any common interest between counsel to different Credit Agreement Lenders or Bridge Lenders, the Committee's assertion that there is no common interest privilege that would protect its discussions with the Noteholder Plan Proponents concerning the merits or potential settlement of the LBO-Related Causes of Action at any time, the Committee's assertion that communications between individual Committee members or between individual Committee members and Committee counsel can be withheld based on any number of undefined alleged common interests, and the Debtor/Committee/Lender Plan Proponents' claim that they share a common interest with the Debtors in respect to the Retiree Settlement and ownership of the pending preference claims. The resolution of these matters are best left for discussion in Court or between the parties following the Court's determination of the two main issues discussed above.

[15] Order (I) Authorizing the Debtors to Establish a Document Depository and Directing the Committee to Deliver Certain Documents to the Depository and (II) Establishing Settlement Negotiation Protections, dated Dec. 15, 2009, [Dkt. # 2858].

[16] Order Appointing Mediator, dated Sept. 1, 2010 [Dkt. # 5591]. All capitalized terms herein relating to the Mediation are set forth in the Mediation Order.

and counteroffers produced for or as a result of the Mediation, shall not be admissible for any purpose in any judicial proceeding. (Ex. 13 at ¶7.)[17]

The Noteholder Plan Proponents have proposed (the "<u>Noteholder Proposal</u>") that the parties provide full non-privileged discovery concerning settlement and settlement negotiations except for private written or oral communications with the Mediator (*e.g.*, communications solely between one party/one constituency and the Mediator such as Mediation Statements, or private meetings or conversations with the Mediator). (Ex. 14.)[18]

The Debtor/Committee/Lender Plan Proponents assert that the Document Depository Order (covering the period prior to September 1, 2010) can be waived. (*See* Ex. 12, Letter of Sidley Austin, LLP, counsel to Debtors, to the Court, dated Jan. 11, 2011, at 3 and their proposed protocol attached thereto.)[19] However, the Debtor/Committee/Lender Plan Proponents assert that, pursuant to the Mediation Order, documents and information relevant to settlement and settlement negotiations should remain wholly *precluded* from discovery if (a) any such communication was exchanged on any day in which a Mediation session occurred, whether or not the communications was with the Mediator or even made in the presence of (or provided to) the Mediator; whether or not the communication was even between the parties attending that day's mediation session; and whether or not the communication even occurred in Delaware. (Ex. 13 at 3.) The Debtor/Committee/Lender Plan Proponents further assert that documents and

---

[17] Prior to the Noteholder Plan Proponents' letter to the Court on this issue dated January 7, 2011 (Ex. 14), the parties met and conferred on several occasions regarding this issue and exchanged various proposed draft stipulations. The Debtors' letter in response, dated January 11, 2010, omits any reference to the parties' conversations on this subject or the draft stipulation provided by the Noteholder Plan Proponents in advance of their letter. Any suggestion that there was not a full and open meet and confer on this issue is incorrect.

[18] Additionally, materials properly protected from disclosure by the attorney-client privilege, work product privilege or a valid common interest privilege (*e.g.*, communications between counsel to two Credit Agreement Lenders discussing how much to offer) would remain protected.

[19] A true and correct copy of the letter submitted to the Court by Sidley Austin, LLP, counsel to Debtors, dated Jan. 11, 2011, is included in the Appendix as Exhibit 2.

communications exchanged between the parties on *any other day* (after September 1, 2010) should also be immune from discovery if they reflect discussions, offers, counter-offers, or agreements occurring on a mediation date.[20]

Needless to say, there is a tension between the literal application of the Mediation Order and Document Depository Order on the one hand, and the requirements of Bankruptcy Rule 9019 and Bankruptcy Code section 1129(a)(3), which require the Debtor/Committee/Lender Plan Proponents to establish that the Proposed LBO Settlement was negotiated totally at arm's-length and free from collusion or fraud, and that the Debtor/Committee Lender Plan has been proposed in good faith, on the other hand. Clearly, there is a paramount need for transparency in the Court's assessment of the Proposed LBO Settlement and release of the estates' single largest asset. The Debtor/Committee/Lender Plan Proponents tacitly concede the existence of this tension as well, given their own request that the Court (a) allow some discovery (albeit highly circumscribed) and admissibility at the hearing of information of documents and information otherwise covered by the terms of the Mediation Order, and (b) allow unlimited discovery and admissibility of documents and information covered by the terms of the Document Depository Order. (Ex. 12 at 3-4 (asking court to adopt proposal that would "narrow the scope of the protections offered by the Mediation Order").)

Any limited disclosure of the negotiations resulting in the Proposed LBO Settlement as requested by the Debtor/Committee/Lender Plan Proponents is patently unfair and should be rejected. The Debtor/Committee/Lender Plan Proponents' proposal is also patently ironic, and does more to obscure than reveal the full story, in that it asks the Court to (a) revise the Mediation Order ever so slightly, so that limited documents and communications arising after

---

[20] At the same time, as discussed in Section I, *supra*, the Debtor/Committee/Lender Plan Proponents assert that no communications between them of any nature whatsoever, including communications between non-lawyers, after

September 1, 2010 — the very period when the Proposed LBO Settlement now at issue was negotiated — can be discovered and used at trial, but (b) to rescind outright the protections of the Document Depository Order in their entirety, so that discussions concerning the April Plan can be fully discovered and used at trial.

### B. The Debtor/Committee/Lender Plan Proponents have put (and intend to put) the Mediation "at issue"

The Court should reject the Debtor/Committee/Lender Plan Proponents' discovery objections because it is undeniable that they have put the mediation and the negotiations resulting in the Proposed LBO Settlement "at issue" in these proceedings. For example, the Debtor/Committee/Lender Plan Proponents' Specific Disclosure Statement asserts that the Proposed LBO Settlement is fair and reasonable because it was the product of mediation "and was brokered by and with the support of the [Mediator]." [Dkt. # 6091 at 17.] The Senior Lender Responsive Statement asserts that the compromises embodied in the Debtor/Committee/Lender Plan were negotiated at arm's-length and were endorsed by the Mediator. [*See* Dkt. #6690 at Attachment C(1), pg. 4.] Similarly, the Debtor/Committee/Lender Plan Proponents' pleadings submitted in connection with the recent Contours Motion expressly argued that the Proposed LBO Settlement was "the product of an unimpeachable arms-length negotiation overseen and endorsed by the Mediator." [Dkt. #6255 at 44.] Needless to say, where a party puts a matter it issue, it must provide full and fair discovery to its adversary, notwithstanding a privilege or immunity that would otherwise insulate the information from discovery. *See, e.g., Livingstone v. North Belle Vernon Borough*, 91 F.3d 515, 536-37 (3d Cir. 1996). It is clear that the Debtor/Committee/Lender Plan Proponents have put the Mediation and conduct of the negotiations at issue in these proceedings and, therefore, may not rely on the

---

October 12, 2010 should be discoverable based on an alleged "common interest" privilege.

Mediation Order, Document Depository Order, or Federal Rule of Evidence 408 to block discovery.

**C.     This Court should permit substantial discovery of the Proposed LBO Settlement and settlement negotiations**

Even if the Debtor/Committee/Lender Plan Proponents have not put the Mediation and conduct of the negotiations "at issue" such that the objections are waived in their entirety, the Noteholder Proposal strikes the right balance between a litigant's legitimate expectations of confidentiality in connection with negotiating a settlement and plan of reorganization subject to Court approval, and the Noteholder Plan Proponents' rights to test the Debtor/Committee/Lender Plan Proponents' assertion that the Proposed LBO Settlement was properly negotiated at arm's-length and free from collusion or fraud, and should therefore be approved by the Court.

In the first instance, the Noteholder Proposal leaves intact the Mediation Order insofar as it applies to any oral or written communication between just the Mediator and one party or similarly situated parties (*e.g.,* just the Credit Agreement Lenders). Obviously, this would tend to be the most likely setting for any candid admissions by a party as to problems with its claims or defenses.

Equally significant, the Noteholder Plan Proponents do not seek discovery of documents and information allegedly covered by the Mediation Order and Document Depository Order to obtain admissions from the LBO lenders to prove liability on the merits of the LBO-Related Causes of Action (should the settlement be rejected), or to provide additional evidence that the LBO-Related Causes of Action have a high probability of succeeding. Rather, the Noteholder Plan Proponents seek such discovery to assess (and challenge) the alleged arm's-length nature of the negotiations and the degree to which the Debtors and the Committee properly acquitted themselves as estate fiduciaries seeking to maximize the recoveries to be made available to the

non-LBO lenders.[21] Given the purpose of the discovery, the Debtor/Committee/Lender Plan Proponents will not be prejudiced by disclosure — assuming, of course, that the Proposed LBO Settlement was properly negotiated.

Third, the Noteholder Proposal accords with the fact that it is the Debtor/Committee/Lender Plan Proponents who are seeking the approval of the Proposed LBO Settlement — and the associated financial benefits if it is approved — and who bear the burden of proof on all matters respecting its approval. Moreover, given that the importance of "arm's-length bargaining" is settled law pursuant to Bankruptcy Rule 9019, the Debtor/Committee/Lender Plan Proponents knew when they were negotiating the Proposed LBO Settlement that they would ultimately need to provide the Court with the facts respecting the negotiations. *Cf. In re Gen. Motors*, 594 F.2d at 1124 n.20.

In contrast to the Noteholder Proposal, the Debtor/Committee/Lender Plan Proponents improperly stack the deck in their favor at the expense of transparency and the plan objectors' ability to exercise fairly their rights to oppose confirmation of the Proposed LBO Settlement and Debtor/Committee/Lender Plan. Further, the highly circumscribed discovery that the Debtor/Committee/Lender Plan Proponents have proposed would improperly allow them to use the Mediation Order as a "sword" and "shield." *See, e.g., Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1426 n.12 (3d Cir. 1991) (if partial waiver of otherwise privileged materials would disadvantage the other party by allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject); *United States v. Antolini*, 271 Fed. App'x. 268, 270-71 (3d Cir. 2008) (same).

---

[21] As such, any objection based on Federal Rule of Evidence 408 would be erroneous. Rule 408 addresses admissibility, not discoverability, and allows the admission of settlement negotiations for all purposes except to prove liability. *See In re Gen. Motors*, 594 F.2d 1106, 1124 n.20 (7th Cir. 1979).

Clearly, the limited disclosure suggested by the Debtor/Committee/Lender Plan Proponents would unfairly allow them to try to establish — through evidence of their choosing — that the Debtors and/or Committee engaged in arm's-length bargaining, while refusing to allow inquiry into discussions and negotiations which could cast doubt on the matter. Indeed, it would allow the Debtor/Committee/Lender Plan Proponents to withhold from discovery — and withhold from this Court — a blatantly collusive communication between one of the lenders and any of the Debtors' directors or officers involved in the discussions, or any of the individual Committee members, in order to gain their approval for the Proposed LBO Settlement, if it was exchanged on a "Mediation day" or reflected a discussion or offer made on a Mediation day.

Accordingly, even assuming the Court does not find that the Debtor/Committee/Lender Plan Proponents have put the negotiations at issue, they have a binary choice. Their first choice is to voluntarily provide discovery to the full extent proposed by the Noteholder Plan Proponents (which leaves intact critical aspects of the Mediation Order, Document Depository Order and Rule 408), so that all parties are free to discover and offer at trial any relevant evidence bearing on whether the Proposed LBO Settlement is the product of arm's-length bargaining, and not of fraud or collusion, and is otherwise fair and equitable.

The Debtor/Committee/Lender Plan Proponents no doubt will contend that the Proposed LBO Settlement was negotiated with the protections afforded by the Mediation Order in mind. But the Document Depository Order and Mediation Order were not intended to — and legally could not — modify the legal standard by which the Proposed LBO Settlement is to be assessed. *See In re RFE Indus., Inc.*, 283 F.3d 159, 163 (3d Cir. 2002) (prior order of Bankruptcy Court could not narrow its power to properly consider, and, if warranted, reject a proposed settlement under Rule 9019).

Alternatively, to the extent the Debtor/Committee/Lender Plan Proponents are unwilling to waive such objections and provide Settlement Discovery, the Court should preclude them from offering any evidence at trial respecting the Mediation, including the alleged endorsement of the Mediator, or otherwise seeking to show that the Proposed LBO Settlement was the product of arm's-length bargaining, and not of fraud or collusion. *See, e.g., Mobil Oil Corp. v. Amoco Chems. Corp.*, 779 F.Supp. 1429, 1485 n. 43 (D. Del. 1991) (granting motion in limine to preclude use at trial of evidence for which party had asserted privilege for "failure to clearly waive the privilege before the close of discovery"); *see also* Fed. R. Bankr. P. 7037 (referencing Fed. R. Civ. P. 37(b)(2)(A)(ii)). What they may not do, however, is provide limited disclosure into these matters and then submit evidence and argue at the hearing that the Debtors and Committee negotiated vigorously and at arm's-length, and that the Proposed LBO Settlement is free of collusion.

Nor can the Debtor/Committee/Lender Plan Proponents rely on the mere fact that the Proposed LBO Settlement allegedly was reached during a mediation to prove that the Debtors and Committee bargained vigorously and at arm's-length to maximize recoveries. A mediator has no duty to ensure that any party bargains hard enough or issues appropriate demands (or low enough offers). To the contrary, a mediator's only objective is to produce a settlement that the parties will accept, and from that perspective the *less aggressively one or both parties approach the negotiation, the better. See Kakani v. Oracle Corp.*, 2007 WL 1793774, at *11 (N.D. Cal. 2007) (rejecting class action settlement resulting from mediation; "a mediator is paid to help the immediate parties reach a deal. Mediators do not adjudicate the merits. They are masters in the art of what is negotiable. It matters little to the mediator whether a deal is collusive so long as a

deal is reached. Such a mediator has no fiduciary duty to anyone, much less those not at the table").

In their letter to this Court of January 11, 2011, Debtor/Committee/Lender Plan Proponents rely on *In re RDM Sports Group, Inc.*, 277 B.R. 415 (N.D Ga. 2002) and *Sheldone v. Pa. Tpk. Comm'n*, 104 F. Supp 2d 511 (W.D. Pa. 2000) as support for the enforcement of mediation confidentiality. (*See* Ex. 2.) But neither *RDM* nor *Sheldone* involved either a proposed settlement under Bankruptcy Rule 9019 or a proposed plan of reorganization. Further, in neither case was the *process* by which a settlement was negotiated alleged to be relevant.

D.     **Local Rule 9019-5(d) does not support the Debtor/Committee/Lender Plan Proponents' Position**

In the Debtors' letter to the Court, dated January 11, 2011 (responding to the Noteholder Plan Proponents' Letter of January 7, 2011), the Debtors invoke Local Rule 9019-5(d) as a basis to oppose the Settlement Discovery, even though their written objections to the Settlement Discovery make no such reference. (*See* Ex. 2.)

However, the Local Rules themselves cannot narrow, modify or overrule the Bankruptcy Code or any Bankruptcy Rule. *See* Local Rule 1001-1(b) ("These Local Rules shall be followed insofar as they are not inconsistent with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure"). Further, Local Rule 1001-1(c) states that the application of any rule "may be modified by the Court in the interests of justice." Thus, the Local Rules provide no additional support for the Debtor/Committee/Lender Plan Proponents' position, and are no impediment to the Court (a) finding that the Debtor/Committee/Lender Plan Proponents have put the Mediation at issue and thus relinquished any protections afforded by the Mediation Order or Local Rule, (b) modifying the Local Rule to permit the Settlement Discovery requested herein even in the absence of an at-issue waiver, or (c) entering an order precluding the

Debtor/Committee/Lender Plan Proponents from offering evidence of or arguing that the Settlement was negotiated at arm's-length and was free of fraud and collusion.

In fact, for the Debtor/Committee/Lender Plan Proponents to allow discovery on certain days and of certain documents of their choosing exchanged during the time the Mediation was pending is no more or less consistent with Local Rule 9019-5(d) than the Noteholder Proposal.

III.    **The Noteholder Plan Proponents are entitled to discovery relevant material during the period between the Petition Date and December 15, 2009.**

The Debtor/Committee/Lender Plan Proponents have refused to produce any discovery of any kind between the Petition Date and December 15, 2009 *(i.e.,* the first year of the Debtors' Bankruptcy Case). *(See, e.g.,* Ex. 4.)  Significantly, this is a time frame where *no discovery* has previously been taken; no one contends or can contend that they are being asked to go back and re-review materials that have already been searched or produced.

During this time frame, the Noteholder Plan Proponents' discovery is appropriately focused on documents, communications and potential admissions relevant to the merits of the underlying LBO-Related Causes of Action, the parties' perception of the strength of and potential liability associated with those claims, any initial discussions of potential settlements or plans of reorganization, and any communications or conduct between or among the Debtors, Committee and the Credit Agreement Lenders that would provide insight into any collusion or lack of an arm's-length relationship between the parties now promoting the Proposed LBO Settlement.

Conversely, the Noteholder Plan Proponents are not pressing for documents concerning plan issues unrelated to the Proposed LBO Settlement, such as the alleged consolidated Distributable Enterprise Value or alleged Intercompany Settlement, during this earlier time frame in 2009.  *(See, e.g.,* Ex. 3.)

As noted, one object of this discovery relates to the merits of the underlying claims the Debtors seek to settle. No one contends that this is not fair subject matter for discovery. By way of example, and not limitation, the Debtor/Committee/Lender Plan Proponents nevertheless would have the Court determine that the following hypothetical emails or documents *are* discoverable if they occurred in 2010 (the second year of the bankruptcy) or, at least for some at least for some of their co-proponents, if they were created during 2007 or 2008 (just prior to or subsequent to the transaction closing), but *are not* discoverable if they were created in 2009 *for no other reason than the date*:

- an internal email by the top JPMorgan business person involved in the Tribune credit agreements concluding that Valuation Resource Corporation ("VRC") (the Debtors' solvency advisor) intentionally lied or was grossly negligent with respect the solvency opinions delivered in connection with the LBO, and that JPMorgan as an institution should therefore no longer accept any solvency opinions from VRC.

- An internal Merrill Lynch review of the transaction and Tribune's rapid slide into bankruptcy determining that Tribune was in fact insolvent at the time of closing and that Step Two never should have been funded.

- An internal Oaktree valuation of Tribune in 2009, revealing its views as to the appropriate assumptions and methodology for valuing the Debtors, which assumptions and methodologies support the approach taken by the Noteholder Plan Proponents' solvency expert.

- An internal email from the top Bank of America business person involved in extending the loan to Tribune conceding that Tribune's demise was entirely foreseeable and reminding the other three lead banks that this was the precise scenario they discussed back in December 2007.

An internal discussion between the Debtors' senior officers who structured the transaction (*e.g.*, Chandler Bigelow) proposing the deletion of key documents before being produced to the Document Depository.[22] A second object of the Noteholder Plan Proponents' discovery, as

---

[22] Given the Examiner's findings relating to intentional fraud by the Debtors at Step Two, coupled with their lack of proper document preservation, lack of proper litigation hold procedures, and admitted spoliation by at least two senior members of management (Randy Michaels and Mark Shapiro), discovery of information during the first year

noted, relates to whether any conflicts, collusion, or lack of appropriate zeal in seeking

recoveries for the non-LBO lenders has tainted the Proposed LBO Settlement or

Debtor/Committee/Lender Plan. Indeed, even on the eve of the Mediation, the Committee filed

pleadings contending that the Debtors were conflicted and should have no role whatsoever in

seeking to settle the LBO-Related Causes of Action, yet here we are with a Debtor-sponsored

settlement. No one can deny that conflicts, collusion and the nature of the settlement

negotiations is an appropriate area for settlement and confirmation discovery. Nevertheless, the

Debtor/Committee/Lender Plan Proponents would have this Court determine that the following

hypothetical emails or documents *are* discoverable if they occurred after December 15, 2009, but

not before, *for no other reason than the date:*

- An email from Debtors' counsel — who represented Tribune in connection with the very financing at issue — suggesting answers to likely deposition questions to JPMorgan's or VRC's attorneys.

- An email from one Credit Agreement Lender to another advising that they have been assured that counsel to the Committee will go easy on the lenders and settle for a *de minimus* amount at the appropriate time.

- An email from the Committee to JPMorgan's counsel providing advance notice of the documents that would be used and questions that would be asked at the depositions of two key JPMorgan senior employees.

- An email from Debtors' counsel assuring counsel to the Credit Agreement Lenders that the Debtors would seek to derail or defer the Committee's standing to pursue claims and would at a minimum fight to retain settlement authority to keep the Committee in check.

- Documents from the lead banks discussing potential settlement ranges far in excess of the amounts now proposed by the Debtors.

---

after the Petition Date reflecting whether the same individuals sought to cover up their misconduct is entirely appropriate.

Finally, it could be that in the earlier stages of the case the Debtors took a far more aggressive stance with the Credit Agreement Lenders with respect to their liability to the estate or potential plan structures; if so, the Noteholder Plan Proponents certainly would be entitled to know that and to pursue discovery as to what changed, particularly in the wake of the Examiner Report. Thus discovery of documents and communications from December 2008 to December 2009 could reveal, for example:

- an email from the Debtors' Chief Restructuring Officer to the Committee advising that a reserve plan was completely appropriate and feasible and that all avoidance litigation could await determination post-emergence, or

- an email from Debtors' counsel to the lenders asserting that the value associated with any avoided guarantees at the Tribune subsidiary level would flow up to the parent to satisfy the claims of non-LBO lenders.

It is hardly inconceivable that in the immediate wake of a business failure on the scale of Tribune that the key persons involved in the transaction might assess what went wrong or engage in some degree of finger-pointing. Indeed, the Committee's investigation into the LBO began during the Spring of 2009, and various depositions were noticed and conducted before December 15, 2009. Surely the parties-in-interest could have begun discussing the evidence being produced and potential claims associated with the Committee's investigation. Nor is it inconceivable that during the first year of the bankruptcy case the key players might begin to discuss potential settlement or plan structures.

Whether discovery turns up documents such as those detailed above remains to be seen, but there is no basis whatsoever to refuse to engage in any discovery from December 2008 to December 2009. Theoretically, of course, discovery could end up supporting confirmation of the Debtor/Committee/Lender Plan — but then the Debtor/Committee/Lender Plan Proponents would not be so adamantly opposed to the Noteholder Plan Proponents' requests.

Were the current proceeding strictly limited to pure plan confirmation matters (*i.e.,* the application of section 1129) and were there no claims of conflict and bad faith, one might be able to contend that discovery covering December 2008 to December 2009 would be of marginal relevance. But, of course, that is not this case here: the Debtors are seeking the Court's approval for a settlement — paying pennies on the dollar — of a pending adversary proceeding asserting claims that could make the non-LBO holders 100 percent whole, if the claims are allowed to proceed. Further, the claims of the Noteholder Plan Proponents respecting conflicts, and the process by which the Proposed LBO Settlement arose, are front and center. Accordingly, the Court should overrule the objections to discovery from December 2008 to December 2009 and direct production from all relevant custodians.

## CONCLUSION

**WHEREFORE**, for all the foregoing reasons, the Noteholder Plan Proponents request that this Court enter an order, substantially in the form attached hereto as Exhibit 15, directing the appropriate party-in-interest promptly to produce all non-privileged information responsive to the Noteholder Plan Proponents' discovery requests.

New York, New York
January 14, 2010

**ASHBY & GEDDES, P.A.**

By: */s/ Amanda M. Winfree*
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Daniel H. Golden
David M. Zensky
Abid Qureshi
Nancy Chung
Brian T. Carney
One Bryant Park
New York, New York 10036
(212) 872-1000

*Counsel to Aurelius Capital Management, LP*

**BIFFERATO GENTILOTTI**

*/s/ Garvan F. McDaniel*
Garvan F. McDaniel
800 N. King St., Plaza Level
Wilmington, DE 19801
(302) 429-1900

- and -

David S. Rosner
Andrew K. Glenn
Sheron Korpus
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Co-Counsel for Law Debenture Trust
Company of New York*


**SULLIVAN HAZELTINE ALLINSON
LLC**

*/s/ William D. Sullivan*
William D. Sullivan (Del. Bar No. 2820)
Elihu E. Allinson (Del. Bar No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Telephone:  (302) 428-8191
Facsimile: (302) 428-4195

 -and-

**BROWN RUDNICK LLP**
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Katherine S. Bromberg
Seven Times Square
New York, New York 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801

*Counsel to Wilmington Trust Company, as Successor Indenture Trustee for the $1.2 Billion Exchangeable Subordinated Debentures Due 2029, Generally Referred to as the PHONES*

**McCARTER & ENGLISH, LLP**

<u>/s/ James J. Freebery</u>
James J. Freebery (I.D. No. 3498)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

-and-

Steven Beckelman
100 Mulberry Street
Gateway Four
Newark, New Jersey 07102
(973) 622-4444

*Counsel to Deutsche Bank Trust Company Americas*