# EXHIBIT 4

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

865 SOUTH FIGUEROA STREET

SUITE 2900

LOS ANGELES, CALIFORNIA 90017

TELEPHONE (213) 694-1200
FACSIMILE (213) 694-1234

DIRECT PHONE (213) 694-1030
JOHNSTONJ@HBDLAWYERS.COM

January 7, 2011

Honorable Kevin J. Carey
Chief United States Bankruptcy Judge
United States Bankruptcy Court for the
    District of Delaware
824 Market Street, Fifth Floor
Wilmington, Delaware  19801

> **Re:**  *In re Tribune Company*, *et al.,* **Case No. 08-13141 (KJC)**

Dear Judge Carey:

I write to request the Court's resolution of a dispute regarding twelve subpoenas (the "Subpoenas") issued by Law Debenture Trust Company of New York ("Law Debenture") to certain of our clients (the "Non-Proponent Clients") in connection with plan confirmation discovery now underway in the Tribune chapter 11 cases.[1]

As explained below, the Non-Proponent Clients are not (and never have been) proponents of any plan of reorganization, are not expected to be involved in the confirmation process in any way (other than voting), and did not attend the Tribune mediation or any of the settlement negotiations leading up to it.  Notwithstanding this, Law Debenture has issued a 30-page Subpoena to each of them, seeking production of an astonishing eighty-nine (89) categories of documents.[2]  Because the Subpoenas impose an undue and unnecessary burden on the Non-Proponent Clients, and are not reasonably calculated to lead to the discovery of admissible evidence, we request that the Court quash them.

## Background

As the Court is aware, this firm represents Oaktree Capital Management, L.P., and Angelo, Gordon & Co., L.P., who are co-proponents, with the Tribune debtors and the Official Committee, of a proposed plan of reorganization on which votes are currently being solicited.

Law Debenture is the indenture trustee for various issuances of Tribune Senior Notes and a co-proponent, with Aurelius Capital Management LP and others, of a different plan of reorganization on which votes also are being solicited.  In that capacity, Law Debenture recently served expansive document requests on Oaktree and Angelo Gordon, seeking production of

---

[1]    Those clients are listed on *Exhibit A*.

[2]    The Subpoenas are virtually identical.  A representative copy is attached as *Exhibit B*.

# Hennigan, Bennett & Dorman llp

Honorable Kevin J. Carey
January 7, 2011
Page 2

ninety-six (96) categories of documents.  Oaktree and Angelo Gordon have responded to those requests and, subject to certain outstanding objections, will soon begin producing documents.[3]

Apparently not satisfied with discovery from plan proponents and their counsel, Law Debenture also served the Subpoenas on the Non-Proponent Clients.  Like Oaktree and Angelo Gordon, the Non-Proponent Clients currently are represented by this firm.  Unlike Oaktree and Angelo Gordon, however, the Non-Proponent Clients are not proponents of a plan and will not play any role in connection with confirmation other than voting.  And unlike Oaktree and Angelo Gordon, the Non-Proponent Clients did not attend the Tribune mediation or participate in the pertinent settlement negotiations.  Indeed, the only material the Non-Proponent Clients are likely to have with respect to the proposed settlement of any claims would originate from public sources or be privileged communications from this firm.

## **The Subpoenas**

The Subpoenas are staggeringly broad and seek almost all of the same categories of documents as those sought from Oaktree and Angelo Gordon.

For example, there are dozens of requests for documents relating to any "Relationship" between and among various parties and entities, with "Relationship" defined to include "any prior, current or prospective personal professional, business or other relationship . . . at any time within the past ten years."[4]  Law Debenture thus seeks to have the Non-Proponent Clients search their files for any connection within the last ten years between and among a loosely-defined group that easily includes hundreds of people and entities.

The balance of the requests concern such things as the so-called "LBO-Related Causes of Action" and proposed settlements of them (which the Non-Proponent Clients did not negotiate)[5]; terms, impact, confirmation, and proponents of various plans of reorganization (which the Non-Proponent Clients did not propose)[6]; communications regarding mediation (which the Non-Proponent Clients did not attend)[7]; and various irrelevant matters[8] and matters as to which the Non-Proponent Clients could not possibly have responsive information not otherwise readily available to Law Debenture.[9]

---

[3]    Aurelius served similar requests on dozens of other parties.  Due to the conflicts of Aurelius' current lead counsel, Law Debenture apparently is acting in Aurelius' stead with respect to discovery from Oaktree, Angelo Gordon, and the Non-Proponent Clients.  JPMorgan recently submitted a letter to the Court describing concerns, also largely applicable here, regarding the breadth and scope of the Aurelius requests.

[4]    *See, e.g.*, Requests 1 through 22, 24, 59, 60, 72 and definition of "Relationship"

[5]    *See, e.g.*, Requests 23, 31, 35, 36, 37, 39 through 42, 44 through 49, 52, 55 through 58, 65, and 68.

[6]    *See, e.g.*, Requests 25, 26, 29, 30, 50, 51, 53, 54, 61 through 64, 66, 67, 69, 70, and 73 through 87.

[7]    Request 71.

[8]    *See, e.g.,* Requests 32 and 43.

[9]    *See, e.g.,* Requests 27, 28 33, 34, 38, 88, and 89.

HENNIGAN, BENNETT & DORMAN LLP

Honorable Kevin J. Carey
January 7, 2011
Page 3

        In the meet and confer process, counsel for Law Debenture insisted that this discovery
was proper because the Non-Proponent Clients had appeared, been "involved" and "taken
positions" in the bankruptcy cases and were listed on briefs submitted by this firm to the
Examiner.  We disagree and, given this impasse, have no choice but to seek the intervention of
the Court pursuant to Paragraph 14 of the Discovery and Scheduling Order entered on
December 20, 2010 [D.I. 7235].  Law Debenture's counsel has requested that we do so now in
order that these matters may be resolved expeditiously.

<u>**Grounds For Quashing The Subpoenas**</u>

        The Subpoenas are an assault on outsiders to the confirmation process, who apparently
have been targeted for discovery solely because they share counsel with Oaktree and Angelo
Gordon.  Because they seek information not reasonably calculated to lead to the discovery of
admissible evidence, and because they impose undue burden and expense, they must be quashed.

        Discovery is permitted only where "reasonably calculated to lead to . . . admissible
evidence" and where its "burden or expense . . . [does not] outweigh[] its likely benefit."  Fed. R.
Civ. P. 26(b).  In particular, a "party or attorney responsible for issuing and serving a subpoena
must take reasonable steps to avoid imposing undue burden or expense on a person subject to the
subpoena."  Fed. R. Civ. P. 45(c).  When a subpoena "subjects a person to undue burden," the
Court must quash it.  *Id.*

        Factors that courts consider in determining whether a subpoena imposes an undue burden
include:  (i) relevance (or lack thereof); (ii) need for the requested documents; (iii) breadth of the
request; (iv) the time period covered by it; (v) the particularity with which documents are
described; and (vi) the burden imposed.  *E.g., In re Automotive Refinishing Paint Antitrust Lit.,*
229 F.R.D. 482, 495 (E.D. Pa. 2005); *Cash Today of Tex., Inc. v. Greenberg,* 2002 U.S. Dist.
LEXIS 20694, at *13 (D. Del. Oct. 23, 2002).  Each weighs in favor of quashing the Subpoenas.

        *First*, the documents requested of the Non-Proponent Clients are of little or no relevance
to plan confirmation, and Law Debenture cannot demonstrate a need for those documents.  The
Non-Proponent Clients played no role in the settlement process, the mediation, or formulation of
any plan.  The mere fact that they have appeared in the cases is insufficient justification for
subjecting them to the Subpoenas.[10]

        *Second*, the breadth of the requests thrust upon strangers to the plan process is outrageous
– eighty-nine (89) separate requests that cover the waterfront of the settlement and plan
formulation process and that, with only a few exceptions, replicate requests made of plan
proponents and parties who have been actively involved in the process.

        *Third*, the time period covered by the requests is ridiculous.  The requests regarding
"Relationships" among parties, many of whom are third parties, concern connections over *ten*

---

[10]    Taken to its logical conclusion, Law Debenture's argument to the contrary would mean that every one of
        the more than 100 entities who have filed "Notices of Appearance" in these cases could be subject to
        discovery in connection with plan confirmation.

HENNIGAN, BENNETT & DORMAN LLP

Honorable Kevin J. Carey
January 7, 2011
Page 4

*years.* The time period covered by the balance of the requests (starting January 1, 2007) predates the Tribune bankruptcy and could not conceivably be targeted to obtain information relevant to settlement and plan confirmation issues.

*Fourth,* many of the requests are vague and general. For example, in addition to covering far-reaching "Relationships" spanning ten years, the Subpoenas request "[a]ll Documents and Communications relating to any co-proponent of the Noteholder Plan,"[11] a request that would seemingly cover documents and communications having nothing at all to do with Tribune.

*Finally,* the burden foisted upon the Non-Proponent Clients is immense. While Law Debenture asserts that there is no burden if (as surely is the case) there are few responsive documents, this misses the point. The burden is in the search, not the production. If forced to proceed, the Non-Proponent Clients would have to incur a great deal of time and expense responding to the Subpoenas, likely involving a multitude of costly and time-consuming searches of electronic documents and requiring extensive and expensive review by counsel. This is inappropriate, as the First Circuit noted in a similar context:

> Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.

*In re Cusumano,* 162 F.3d 708, 717 (1st Cir. 1998); *see also Cash Today,* 2002 U.S. Dist. LEXIS 20694, at *13 ("In this undue burden inquiry, nonparties are afforded 'special protection.'"). While they are creditors of Tribune, the Non-Proponent Clients are clearly strangers to the contested plan confirmation matters before the Court. Accordingly, the Court should give special weight to the tremendous burden Law Debenture attempts to heave upon them.

In the end, the Subpoenas appear to have been issued for no reason other than that their counsel, our firm, also represents two co-proponents of a plan. Given the breadth of the documents being requested and the near certainty that little, if any, non-privileged relevant information will be produced, the Subpoenas impose an undue burden on the Non-Proponent Clients and should be quashed.

We are prepared to address this issue in a telephonic conference or hearing if you so desire. I appreciate Your Honor's consideration.

Sincerely

James Johnston

---

[11]  Request 50.

# Exhibit A

**Non-Proponent Clients**

1.      Anchorage Advisors, L.L.C.

2.      Avenue Investments, LP, *et al.*

3.      Canyon Capital Advisors, LLC

4.      Contrarian Funds LLC

5.      CVI GVF (Lux) Master S.a.r.l.

6.      Franklin Floating Rate Master Series, *et al.*

7.      Golden Tree Asset Management, LP, *et al.*

8.      Knighthead Master Fund, L.P.

9.      Luxor Capital Group, LP

10.     Mason Capital Management, LLC

11.     Thracia LLC

12.     Värde Investment Partners, L.P.

Subpoenas also were issued to additional clients, Goldman Sachs Loan Partners, Special Situations Investing Group, Inc., and Viking Global Equities LP, who are separately represented for purposes of the Subpoenas.

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------X
In re:                                    :
                                          :    Chapter 11 Cases
                                          :    Case No. 08-13141 (KJC)
                                          :    (Jointly Administered)
TRIBUNE COMPANY, et al,                   :    (Bankr. D. Del.)
                                          :
                                          :
                        Debtors.          :
------------------------------------------------X
```

## SUBPOENA IN A BANKRUPTCY CASE

To:   Anchorage Advisors, L.L.C.
      610 Broadway, 6th Floor
      New York, NY 10012

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling.  Production of documents in lieu of appearance is acceptable.

**SEE SCHEDULE A**

| Place | Kasowitz, Benson, Torres & Friedman LLP<br>1633 Broadway<br>New York, NY 10019 | :Date and Time<br>:SEE SCHEDULE A<br>: |
|---|---|---|

ISSUING OFFICER SIGNATURE AND TITLE

                                          Date:  December 22, 2010

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Paul J. Burgo, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
E-mail: pburgo@kasowitz.com
Attorneys for Law Debenture Trust Company of New York

B256 (Form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| **SERVED** |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2007, made applicable in cases under the Bankruptcy Code by Rule 9016, Federal Rules of Bankruptcy Procedure:

(c) Protecting a Person Subject to a Subpoena.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) Duties in Responding to a Subpoena.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A

Pursuant to Federal Rule of Bankruptcy Procedure 9016 and Federal Rule of Civil Procedure 45, Law Debenture Trust Company of New York ("Law Debenture"), by its undersigned attorneys, requests that Anchorage Advisors, L.L.C. ("Anchorage" as defined herein) produce the documents and things described herein for inspection and copying at the offices of Kasowitz, Benson, Torres & Friedman, LLP, located at 1633 Broadway, New York, New York 10019 pursuant to a case management order or scheduling order to be entered by the Court, or in the absence of any such order within thirty days of service of this Request:

## REQUESTS FOR PRODUCTION

1.      All Documents and Communications relating to any Relationship between Anchorage and Tribune.

2.      All Documents and Communications relating to any Relationship between any of the Anchorage Individuals and Tribune.

3.      All Documents and Communications relating to any Relationship between Anchorage and any of the Tribune Individuals.

4.      All Documents and Communications relating to any Relationship between any of the Anchorage Individuals and any of the Tribune Individuals.

5.      All Documents and Communications relating to any Relationship between Anchorage and any of the Settling Parties.

6.      All Documents and Communications relating to any Relationship between any of the Anchorage Individuals and any of the Settling Parties.

7.      All Documents and Communications relating to any Relationship between Tribune and any of the Settling Parties.

3

8.      All Documents and Communications relating to any Relationship between any Tribune Individuals and any of the Settling Parties.

9.      All Documents and Communications relating to any Relationship between any Special Committee Individuals and any of the Settling Parties.

10.     All Documents and Communications relating to any Relationship between any Special Committee Individuals and Anchorage.

11.     All Documents and Communications relating to any Relationship between any Special Committee Individuals and any Anchorage Individuals.

12.     All Documents and Communications relating to any Relationship between any Special Committee Individuals and any of the Committee Individuals.

13.     All Documents and Communications relating to any Relationship between any Special Committee Individuals and Tribune.

14.     All Documents and Communications relating to any Relationship between any Special Committee Individuals and any of the Tribune Individuals.

15.     All Documents and Communications relating to any Relationship between any Committee Individuals or individual members of the Committee, on the one hand, and Anchorage, on the other hand.

16.     All Documents and Communications relating to any Relationship between any Committee Individuals or individual members of the Committee, on the one hand, and any of the Anchorage Individuals, on the other hand.

17.     All Documents and Communications relating to any Relationship between any Committee Individuals or individual members of the Committee, on the one hand, and any of the Settling Parties, on the other hand.

18.     All Documents and Communications relating to any Relationship between any Committee Individuals and any of the Tribune Individuals.

19.     All Documents and Communications relating to any Relationship between and among, on the one hand, Don Liebentritt, and on the other hand (i) Zell; (ii) any Special Committee Individuals; (iii) any Committee Individuals; (iv) any Tribune Individuals and/or (v) any Settling Party.

20.     All Documents and Communications relating to any Relationship between and among, on the one hand, Anchorage, and on the other hand (i) Zell; (ii) any Special Committee Individuals; (iii) any Committee Individuals; (iv) any Tribune Individuals and/or (v) any Settling Party.

21.     All Documents and Communications relating to any Relationship between and among, on the one hand, any of the Anchorage Individuals, and on the other hand (i) Zell; (ii) any Special Committee Individuals; (iii) any Committee Individuals; (iv) any Tribune Individuals and/or (v) any Settling Party.

22.     All Documents and Communications relating to any Relationship between and among, on the one hand, Zell, and on the other hand (i) any Special Committee Individuals; (ii) any Committee Individuals; and/or (iii) any Settling Party.

23.     All Documents and Communications regarding any conflict or potential conflict of interest relating to participation in Settlement Analysis or the Settlement Process by any Person (including any board of directors or subcommittee thereof, and any lawyer, law firm or other Professional), and all Documents and Communications regarding any efforts, discussion or consideration of efforts to waive, mitigate, limit or eliminate any such conflict or potential conflict of interest.

24.    All Documents and Communications relating to whether any of the Tribune Individuals, Special Committee Individuals or Committee Individuals were Step One Selling Shareholders.

25.    All Documents and Communications relating to whether Anchorage or any of the Anchorage Individuals would receive a release of liability in any capacity pursuant to the Proposed LBO Settlement, the Debtor/Committee/Lender Plan or any Other Potential Settlement.

26.    All Documents and Communications relating to whether any of the Tribune Individuals, Special Committee Individuals or Committee Individuals would receive a release of liability in any capacity pursuant to the Proposed LBO Settlement, the Debtor/Committee/Lender Plan or any Other Potential Settlement.

27.    All Documents and Communications relating to any compensation, bonus or other form of remuneration payable to any individual officers, directors, partners, employees, members, or managers of any of the Settling Parties in connection with a successful reorganization of Debtors or the resolution of disputes with any or all of the Settling Parties.

28.    All Documents and Communications relating to any compensation, bonus or other form of remuneration payable to any Tribune Individual or Special Committee Individual in connection with a successful reorganization of Debtors or the resolution of disputes with any or all of the Settling Parties.

29.    All Documents and Communications relating to any need or desire of Anchorage or any of the Anchorage Individuals to resolve any of the LBO-Related Causes of Action in connection with, or as a condition to (i) any exit financing for Debtors and/or (ii) Debtors' ability generally to exit bankruptcy.

30.     All Documents and Communications relating to any need or desire of Debtors to resolve any of the LBO-Related Causes of Action in connection with, or as a condition to (i) any exit financing for Debtors and/or (ii) Debtors' ability generally to exit bankruptcy.

31.     All Documents and Communications relating to any requested or proposed release of liability for (i) any of the Settling Parties or (ii) any other Potential LBO Liability Party.

32.     Copies of any engagement letters with any Professional retained by or on behalf of Anchorage, to the extent not previously filed with the Court, and all bills, invoices and time records submitted by such Professionals, to the extent that such material refers or relates to Settlement Analysis, the Settlement Process, and/or the negotiation or drafting of one or more of the Plans.

33.     All Documents and Communications relating to the continued employment or affiliation of any Tribune Individual, including but not limited to any Documents or Communications expressing or relating to the views of Anchorage or any of the Settling Parties concerning such continued employment or affiliation.

34.     All Documents and Communications relating to the decision to make Don Liebentritt Debtors' Chief Restructuring Officer, including but not limited to any discussion relating to whether Liebentritt's continuing role as general counsel for Debtors created the appearance of a conflict of interest.

35.     All Documents and Communications relating to any Settlement Analysis.

36.     All Documents and Communications relating to Settlement Analysis that were provided to, or received from, any Potential LBO Liability Party or other third party.

37.     All Documents and Communications relating to the Settlement Process.

38.      All Documents and Communications relating to the preservation or obligation to preserve Documents and Communications in connection with the LBO, the Debtors' Bankruptcy, the LBO-Related Causes of Action, the Plans, Settlement Analysis, Settlement Process and the Confirmation Hearing, including but not limited to (i) any document retention policy in effect during any part of the period from January 1, 2007 to the present, (ii) any litigation hold notice, or similar notice to retain documents, and (iii) steps taken or considered to be taken in connection with preserving such Documents and Communications.

39.      Documents sufficient to identify all claims made or threatened by any Person arising from or relating to the LBO, and, with respect to such claims, all related demand letters or other correspondence and all pleadings (other than the Complaints), discovery requests, objections and responses to discovery requests, deposition and hearing transcripts, decisions and orders, settlement discussions and settlements.

40.      All Documents and Communications relating to the right and/or standing, vel non, of Anchorage, the Debtors or any other Person to settle or propose a settlement of the LBO-Related Causes of Action.

41.      All Documents and Communications relating to any presentations made by, on behalf of or to the Special Committee or any member of the Special Committee relating to the Settlement Process or Settlement Analysis.

42.      All Documents and Communications related to Tribune exchanged between and among Anchorage and (i) Tribune, (ii) the Special Committee, (iii) any of the Settling Parties, and/or (ii) any Potential LBO Liability Party, from December 20, 2007 to the present.

43.      All Documents and Communications relating to the consideration and selection of Professionals to consult with, advise or represent Anchorage, whether or not ultimately retained.

8

44.      All Documents and Communications relating to any involvement by Tribune in Settlement Analysis or the Settlement Process, including but not limited to all Communications with any Tribune Individual.

45.      All Documents and Communications relating to any involvement by Anchorage in Settlement Analysis or the Settlement Process.

46.      All Documents and Communications relating to the Proposed LBO Settlement, including but not limited to, all Documents relating to the negotiation of the Proposed LBO Settlement or any part thereof, all drafts of the Proposed LBO Settlement (or any part thereof), and all Documents reviewed, relied on or considered by any Person in deciding whether or not to agree to or support the Proposed LBO Settlement.

47.      All Documents and Communications relating to the April Proposed Settlement, including but not limited to, all Documents relating to the negotiation of the April Proposed Settlement or any part thereof, all drafts of the April Proposed Settlement (or any part thereof), and all Documents reviewed, relied on or considered by any Person in deciding whether or not to agree to or support the April Proposed Settlement.

48.      All Documents and Communications relating to any Other Potential Settlement, including but not limited to, all Documents relating to the negotiation of any Other Potential Settlement or any part thereof, all drafts of any Other Potential Settlement (or any part thereof), and all Documents reviewed, relied on or considered by any Person in deciding whether or not to agree to or support such Other Potential Settlement.

49.      All Documents or Communications relating to discussions or negotiations with any co-proponent of the Noteholder Plan regarding Settlement Analysis, the Settlement Process, or any of the Plans.

50.      All Documents and Communications relating to any co-proponent of the Noteholder Plan.

51.      All Documents and Communications relating to any objection to any aspect of the Noteholder Plan.

52.      All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of any claim, counterclaim, cross-claim, or third-party claim for indemnification, contribution, or otherwise, relating to the LBO-Related Causes of Action.

53.      All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of the value of the Preserved Causes of Action.

54.      All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of the potential impact of the bar order contained in the Proposed LBO Settlement and/or Debtor/Committee/Lender Plan on the value of the Preserved Causes of Action.

55.      All Documents and Communications relating to the Examiner or the development of the Examiner's Report, including all interviews by, or Communications with, the Examiner.

56.      All Documents and Communications relating to the Examiner's Report, including but not limited to any discussions, analyses, critiques or evaluations of the conclusions or calculations set forth in the Examiner's Report or any of the evidence contained or referred to therein, and any follow-up investigation or analysis of any Person(s) discussed in the Examiner's Report.

57.      All Documents and Communications requested by but not produced to the Examiner.

58.    All Communications or notes relating to Communications with the Examiner.

59.    To the extent not contained within the Document Depository, all Documents or Communications relating to the purchase, sale, assignment, or other acquisition or disposition by any of (a) the Tribune Individuals, (b) the Special Committee Individuals, (c) the Committee Individuals, (d) the Settling Parties, or (e) Anchorage of any interest in the Senior Notes, PHONES Notes, Senior Loans or Bridge Loans, including, but not limited to, any Documents and Communications relating to the instruments by which such Person purchased, sold, assigned, or otherwise acquired or disposed of any interest in the LBO Lender Debt.

60.    To the extent not contained within the Document Depository, all Documents and Communications relating to the purchase, sale, assignment, or other acquisition or disposition by any of the Tribune Individuals or Anchorage of any other economic interest in or tied to Tribune, including, but not limited to, any debt or equity interests, swaps, derivatives, or options.

61.    All Documents and Communications relating to the Reorganized Value Analysis, the Enterprise Value, or the Equity Value (as each of those terms are defined and used in the Joint Disclosure Statement), including, but not limited to, the allocation of Enterprise Value or Equity Value as between the various Debtor entities, all business plans, projections, forecasts, market reports, financial information and any other Documents and Communications relating to the valuation of Debtors and/or allocation of value between and among the Debtors generated on or after January 1, 2010.

62.    All Documents and Communications relating to the actual or potential recoveries by or distributions to holders of the LBO Lender Debt pursuant to the Debtor/Committee/Lender Plan or any other actual or proposed plan of reorganization.

63.    All Documents and Communications relating to the actual or potential recoveries by or distributions to holders of the Senior Notes or the PHONES Notes pursuant to the Debtor/Committee/Lender Plan or any other actual or proposed plan of reorganization.

64.    All Documents relating to the projected valuation and capitalization of the Debtors post-bankruptcy, including Documents relating to leverage, liquidity, and pro-forma cap structure.

65.    All Documents and Communications relating to the LBO Standing Motions (as defined in the Joint Disclosure Statement), including any of the draft complaints filed or circulated by the Committee.

66.    All Documents and Communications relating to the Debtor/Committee/Lender Plan and Specific Disclosure Statement (as defined in the Joint Disclosure Statement) relating to the Debtor/Committee/Lender Plan, and all Documents and Communications relating to any drafts thereof.

67.    All Documents and Communications relating to the Joint Disclosure Statement or any drafts of the Joint Disclosure Statement.

68.    All drafts of any Rule 9019 Motion relating to the Proposed LBO Settlement, and all Documents and Communications relating to any such drafts.

69.    All Documents and Communications relating to any confirmation brief relating to the Debtor/Committee/Lender Plan, and all Documents and Communications relating to any drafts thereof.

70.    All Documents and Communications relating to the proposed confirmation schedule and parameters of confirmation-related discovery, including, but not limited to (i) Documents, Communications and drafts relating to the Debtors' motion to set the confirmation

schedule and establish parameters of confirmation-related discovery, filed with the Court on November 8, 2010; (ii) Documents and Communications relating to the Discovery and Scheduling Order for Plan Confirmation, attached as Exhibit G to the Objection of Aurelius Capital Management, LP To The Debtors' Motion For Entry Of An Order Setting Confirmation Schedule And Establishing Parameters Of Confirmation-Related Discovery, filed with the Court on November 22, 2010; and (iii) Documents and Communications relating to the Black Line Order Proposed by Aurelius and the Order Proposed by the Debtors, attached as Exhibit G to the Omnibus Reply Of Debtors To Objections To Solicitation Motion And In Support Of Entry Of An Order Imposing Reasonable Limitations On Confirmation-Related Discovery And The Confirmation Hearing, filed with the Court on November 24, 2010.

71.      All Communications with the Debtors, Settling Parties and/or other Potential LBO Liability Parties relating to the Mediation or the Mediator.

72.      All Documents and Communications relating to any direct or indirect economic interest in Tribune held by any of the Anchorage Individuals, Tribune Individuals or any of the Settling Parties, including, but not limited to, claims for which any of the Anchorage Individuals, Tribune Individuals or any of the Settling Parties has the ability to control the vote of (either contractually or otherwise), long positions, short positions, swap positions, participations and any other derivative positions, by tranche or series, if applicable, including the date of issuance of such tranche or series, and any short positions or derivative exposure.

73.      All Documents that any of the Settling Parties relied on in determining, or will rely on in arguing, that the Proposed LBO Settlement is in the best interest of the Estate and should be approved and/or that the Debtor/Committee/Lender Plan should be confirmed.

74.     All Documents and Communications upon which any of the Settling Parties intends to rely in connection with the Confirmation Hearing.

75.     All Documents and Communications relating to any potential, proposed, or actual plan(s) of reorganization for the Debtors that have been considered, discussed, or negotiated, including but not limited to the so called "purity plan," any other plan(s) that would put all LBO-Related Causes of Action into trusts for post-emergence resolution, and/or any plan(s) that would establish a reserve for distributions to any of the Settling Parties.

76.     All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of placing Preserved Causes of Action in the Creditors' Trust (as defined on Page 8 of the Debtor/Committee/Lender Plan) or the Litigation Trust (as defined on Page 16 of the Debtor/Committee/Lender Plan).

77.     All Documents and Communications relating to the allocation of any proceeds to be distributed by any of the trusts created by any plan of reorganization for the Debtors.

78.     All Documents and Communications relating to any inter-company claim analysis or evidencing current claims between Debtor entities.

79.     All Documents and Communications relating to the Intercompany Claims Settlement, as that term is used in the Specific Disclosure Statement relating to the Debtor/Committee/Lender Plan.

80.     All Documents and Communications relating to the allowance and treatment of claims of general unsecured creditors of the Debtors and Subsidiary Debtors (as defined in the Debtor/Committee/Lender Plan), including, but not limited to, Documents and Communications relating to how the proposed treatment of such claims changed over time.

81.    All Documents and Communications relating to the retention by the Debtors and their Estates of the Ordinary Litigation Claims (as defined on Page 20 of the Debtor/Committee/Lender Plan), as described in Section 5.16 of the Debtor/Committee/Lender Plan.

82.    All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of the Bridge Loan Reserve (as defined on Page 4 of the Debtor/Committee/Lender Plan).

83.    All Documents and Communications relating to the Swap Claim (as defined by the Debtor/Committee/Lender Plan), including the identity of the past or current holder(s) or owner(s) of such claim, any assessment or review of Debtors' potential liability on the Swap Claim, and the negotiation of its allowance and classification in the Debtor/Committee/Lender Plan.

84.    All Documents and Communications relating to the PHONES Notes, including the identity of the past or current holder(s) or owner(s) of such PHONES Notes, any assessment or review of Debtors potential liability for a greater amount than that allowed for the PHONES Notes Claims (as defined by the Debtor/Committee/Lender Plan), and the negotiation of its allowance and classification of the PHONES Notes Claims in the Debtor/Committee/Lender Plan.

85.    All Documents and Communications relating to the Retiree Claimant Settlement Agreement (as defined by the Debtor/Committee/Lender Plan), including the identity of the past or current Retiree Claimants (as defined by the Debtor/Committee/Lender Plan), any assessment or review of Debtors' potential liability to the Retiree Claimants, and the negotiation and Plan treatment of the Retiree Claimant Settlement Agreement in the Debtor/Committee/Lender Plan.

86.     All Documents and Communications relating to the withdrawal of the Step One Lender Plan.

87.     All Documents and Communications relating to any consideration received by the proponents of the Step One Lender Plan in connection with the withdrawal of the Step One Lender Plan.

88.     All prior document requests or subpoenas received by Anchorage in connection with the above-captioned case or any related adversary proceeding and all subsequent Communications concerning (i) such requests or subpoenas; (ii) any objections or clarifications thereto; or (iii) any subsequent production.

89.     Any and all privilege log(s) created in connection with the above-captioned case, whether or not such privilege log(s) was/were produced to any other party.

## DEFINITIONS

The following additional definitions also apply to these requests:

A.     "Angelo" means (i) Angelo, Gordon & Co, L.P. and its affiliates; (ii) any of its or their officers, directors, partners, employees, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

B.     "April Proposed Settlement" means the settlement of certain LBO-Related Causes of Action proposed by Angelo, Centerbridge Credit Partners, L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Special Credit Partners, L.P., the Law Debenture defendants, and J.P. Morgan Chase Bank, N.A., described in a Settlement Support Agreement dated on or about April 9, 2010 including Exhibit A attached thereto.

C.     "Aurelius" means (i) Aurelius Capital Management, LP, on behalf of its managed entities, and its affiliates; (ii) any of its or their officers, directors, employees, partners, members,

16

or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

D.      "Bank of America" means (i) Bank of America, N.A. and its affiliates; (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

E.      "Board of Directors" means the boards of directors of Tribune and current and former Professionals of the board of directors and/or Tribune.

F.      "Bridge Loans" means the indebtedness issued pursuant to that certain $1.6 Billion Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, by and among, Tribune, as borrower, Merrill Lynch Capital Corporation as administrative agent and the lenders named therein.

G.      "Bridge Lender Plan" means the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., dated October 29, 2010.

H.      "Citicorp" means any or all of (i) Citicorp North America, Inc. and its affiliates; (ii) Citigroup Global Markets, Inc. and its affiliates; (iii) Citibank. N.A. and its affiliates; (iv) Citicorp USA, Inc. and its affiliates; (v) any of its or their officers, directors, partners, members, employees, or managers; (vi) any of its or their board of directors and any committee or subcommittee of any board of directors; and (vii) Professionals of any Person within (i), (ii), (iii), (iv), (v) or (vi) above.

I.      "Committee" means any or all of (i) the Official Committee of Unsecured Creditors in the chapter 11 cases of the above-captioned debtors; (ii) its individual members; (iii)

any entities in which any such individual member serves as an employee, partner or in any employment or agency relationship; and (iv) any Professionals of any Person included in (i), (ii) or (iii) above.

J.       "Committee Individuals" means all Persons within Definition I.(ii) or (iv), and any entity or entities that any such Person directly or indirectly owns or controls.

K.       "Communication" means, without limitation, any exchange or transfer of information or Documents by any means (e.g., whether oral, written, electronic or by other methods), as well as any notes, memorandum, or other record thereof.

L.       "Complaints" means the Third Party Complaint and the Lender Complaint.

M.       "Confirmation Hearing" means the hearing to be held by the Bankruptcy Court on confirmation of a plan of reorganization filed in connection with in the case titled In re Tribune Co., et al., chapter 11 No. 08-13141 (KJC) (Bankr. D. Del.).

N.       "Debtor/Committee/Lender Plan" means the First Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., dated December 8, 2010, along with any amendments thereto and any prior proposed plans of reorganization filed or considered by such parties.

O.       "Document Depository" means the document depository that the Court authorized the Debtors to establish in an Order dated December 15, 2009.

P.       "Documents" means all written, graphic, or printed matter of any kind, however produced or reproduced, including all originals, drafts, working papers and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and all electronic, mechanical, or optical records or representations of any kind or other data

compilations from which information can be obtained, or translated, if necessary, through detection devices into reasonable usable form. The term "Documents" includes, but is not limited to:

a. correspondence, memoranda, notes, calendar or diary entries, statistics, letters, electronic mail, notebooks, telegrams, journals, minutes, agendas, notices, announcements, instructions, charts, schedules, requests, contracts, physical evidence, prospective contracts, agreements, prospective agreements, licenses, prospective licenses, order forms, books, accounts, records, reports, studies, surveys, experiments, analyses, checks, cancelled checks, wire confirmations, statements, receipts, returns, vouchers, statements, credit memoranda, sales slips, promissory notes, summaries, pamphlets, prospectuses, manuals, brochures, announcements, certificates, drawings, plans, inter-office and intraoffice Communications, or offers;

b. notations in any form made of conversations, telephone calls, meetings, negotiations or other Communications;

c. bulletins, circulars, schedules, lists, guides, printed matter (including newspapers, magazines and other publications, articles and clippings therefrom), press releases, computer printouts, teletypes, telecopies, telexes, invoices, ledgers, balance sheets, financial statements or worksheets;

d. electronic, mechanical or optical records or representations of any kind (including tapes, cassettes, discs, hard drives, recordings, voice mail, electronic mail, computer-stored data or material), or transcriptions thereof; and

e. all drafts, alterations, modifications, changes and amendments of any of the foregoing and any material underlying, supporting or used in the preparation of any document.

Q.      "Examiner" means Kenneth N. Klee, appointed in the case titled In re Tribune Co., et al., Chapter 11 No. 08-13141 (KJC) (Bankr. D. Del.) by the Bankruptcy Court for the District of Delaware on May 11, 2010, together with any of his employees, agents or Professionals engaged in any way in the preparation of the Examiner's Report or otherwise involved in the Debtors' bankruptcy case or the LBO-Related Causes of Action.

R.      "Examiner's Report" means the report entitled "Report of Kenneth N. Klee, As Examiner" submitted to the Bankruptcy Court for the District of Delaware by Kenneth N. Klee

19

on July 26, 2010 in the case titled In re Tribune Co., et al., chapter 11 No. 08-13141 (KJC) (Bankr. D. Del.)

S.      "Joint Disclosure Statement" means the Joint Disclosure Statement filed by the Debtors on October 22, 2010, as subsequently modified and approved by the Court.

T.      "JPMorgan" means (i) JPMorgan Chase Bank, N.A. and its affiliates; (ii) any of its or their officers, directors, partners, employees, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

U.      "LBO" means the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007 and the merger and related transactions involving Tribune on or about December 20, 2007.

V.      "LBO Lender Debt" means the Senior Loans and the Bridge Loans.

W.      "LBO-Related Causes of Action" means any and all actual or potential pre-petition, post-petition and/or post-emergence claims, obligations, suits, judgments, damages, debts, rights, causes of action, avoidance powers or rights, liabilities of any nature whatsoever arising from or relating to the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the claims asserted in the Complaints and any and all potential legal or equitable remedies associated with any such claims.

X.      "Lender Complaint" means the complaint filed with the Bankruptcy Court by the Committee on November 1, 2010, naming JP Morgan Chase Bank, N.A., et al., as defendants and bearing index number 10-53963, together with any amendments as may be proposed or permitted to such complaint.

Y.        "Mediation" shall have the meaning ascribed to it in Section VII.D of the Joint Disclosure Statement dated December 8, 2010, and any amendments thereto.

Z.        "Mediator" means the Honorable Kevin Gross, appointed in the case titled In re Tribune Co., et al., chapter 11 No. 08-13141 (KJC) (Bankr. D. Del.) by the Bankruptcy Court for the District of Delaware on September 1, 2010.

AA.        "Merrill Lynch" means (i) Merrill Lynch, Pierce, Fenner & Smith and its affiliates; (ii) Merrill Lynch Capital Corporation and its affiliates; (iii) Merrill Lynch & Co. and its affiliates; (iv) any of its or their officers, directors, partners, members, employees, or managers; (v) any of its or their board of directors and any committee or subcommittee of any board of directors; and (vi) Professionals of any Person within (i), (ii), (iii), (iv) or (v) above.

BB.        "Noteholder Plan" means the Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as the successor indenture trustee for certain series of senior notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of senior notes and Wilmington Trust Company, in its capacity as the successor indenture trustee for the PHONES Notes, dated October 29, 2010.

CC.        "Oaktree" means (i) Oaktree Capital Management, L.P. and its affiliates; (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

21

DD.        "Other Potential Settlement" means any potential settlement of any or all of the LBO Related Causes of Action considered, proposed or discussed at ay time, other than the Proposed LBO Settlement or the April Proposed Settlement.

EE.        "Person" means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

FF.        "PHONES Notes" means the issued and outstanding notes under the indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

GG.        "Plans" means any or all of the Debtor/Committee/Lender Plan, the Noteholder Plan, the Step One Lender Plan, and the Bridge Lender Plan.

HH.        "Potential LBO Liability Party" means the Persons named as defendants in the Complaints, including absent class members, as well as any such Person's current or former officers, directors, employees, partners, members, managers, owners or Professionals.

II.        "Preserved Causes of Action" has the meaning set forth on Page 22 of the Debtor/Committee/Lender Plan.

JJ.        "Professional" means any counsel, consultant, advisor, accountant, testifying expert, non testifying expert, agent, representative or other Person engaged to provide or involved in providing at any time any services relating to the LBO, the LBO-Related Causes of Action, the Plans, the Complaints, the Examiner, the Examiner's Report, Settlement Analysis and/or the Settlement Process.

KK.      "Proposed LBO Settlement" means the proposed settlement of certain LBO-Related Causes of Action as described in the Debtor/Committee/Lender Plan.

LL.      "Relationship" means any prior, current or prospective personal, professional, business or other relationship among any of the Persons specified in the request, including but not limited to any matter with respect to which such persons have done or sought to do business with one another (including commercial, charitable and any other types of matters) or have been recommended or considered for a position or engagement, at any time within the past ten years, provided that Relationship does not include the transactions constituting the LBO itself.

MM.      "Rule 9019 Motion" means a motion filed or to be filed with the bankruptcy court seeking approval of the Proposed LBO Settlement, whether as a separate motion or as part of a motion seeking approval of the Debtor/Committee/Lender Plan.

NN.      "Senior Loans" means the indebtedness issued pursuant to that certain $8.028 Billion Senior Secured Credit Agreement, dated as of May 17, 2007, as amended, with Tribune, as borrower, and JP Morgan Chase, N.A., as administrative agent and financial institutions from time to time party thereto.

OO.      "Senior Notes" means the eight series of notes issued and outstanding under any of the following indentures: (i) the indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (ii) the indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (iii) the indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (iv) the

indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

PP.    "Settlement Analysis" means any analysis, consideration, assessment, review, report, evaluations, recovery scenario, expected value analysis, assertion, tactics, strategy or discussion, whether generated by a Professional or otherwise, relating in any way to (i) the potential strength of any or all of the LBO-Related Causes of Action and/or any defense thereto and/or the likely outcome in connection with the litigation of such matters; (ii) the settlement value of any or all of the LBO-Related Causes of Action, including any decision tree analysis or similar evaluation of estimated recoveries based on a range of potential outcomes of the LBO-Related Causes of Action; (iii) the April Proposed Settlement; (iv) the Proposed LBO Settlement; (v) any Other Potential Settlement; and/or (vi) the potential impact of the LBO-Related Causes of Action on the rights and priorities of any parties in interest in the Debtors' bankruptcy proceedings.

QQ.    "Settlement Process" means any Communication, discussion, meeting, telephone call, negotiation or bargaining, demands or offers between two or more parties relating in any way to (i) the potential strength of any or all of the LBO-Related Causes of Action and/or any defense thereto and likely outcome in connection with the litigation of such matters; (ii) the settlement or settlement value of any or all of the LBO-Related Causes of Action; (iii) the April Proposed Settlement; (iv) the Proposed LBO Settlement; (v) any Other Potential Settlement; and/or (vi) the potential impact of the LBO-Related Causes of Action and/or the settlement thereof on the rights and priorities of any parties in interest in the Debtors' bankruptcy proceedings.

24

RR.        "Settling Parties" means Oaktree, Angelo, JPMorgan, Citicorp, Bank of America, Merrill Lynch, Wells Fargo any other Person that would receive a release under the Proposed LBO Settlement.

SS.        "Special Committee" means (i) the special committee of independent directors formed by Tribune's Board of Directors on or about August 27, 2010; (ii) each of its individual members; (iii) any entities in which any such individual member serves as an employee, partner or in any employment or agency relationship; and (iv) any Professionals of any Person included in (i) — (iii).

TT.        "Special Committee Individuals" means all Persons within Definition SS.(ii) or (iv), and any entity or entities that any such Person directly or indirectly owns or controls.

UU.        "Step One Lender Plan" means the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims, dated October 29, 2010.

VV.        "Step One Selling Shareholders" means the stockholders whose stock in Tribune was redeemed for cash pursuant to the Tender Offer.

WW.        "Tender Offer" means that certain tender offer for 126 million shares of Tribune Common Stock (52% of shares then outstanding) at $34 per share.

XX.        "Third Party Complaint" means the complaint filed with the Bankruptcy Court by the Committee on November 1, 2010, naming Dennis J. Fitzsimmons, et al., as defendants and bearing index number 10-54010, together with any amendments as may be proposed or permitted to such complaint.

YY.        "Tribune" means (i) the entity known as Tribune Company and its direct and indirect subsidiaries, including but not limited to each of the Debtors in the captioned bankruptcy

case; (ii) any of their past, present or future officers, directors, partners, members, employees, or managers; (iii) any past, present or future board of directors, board of managers or similar body and any committee or subcommittee thereof of any Person within (i) above, including but not limited to the Special Committee; and (iv) Professionals of any Person within (i), (ii) or (iii) of this Definition YY.

ZZ.        "Tribune Individual" means any Person within Definition YY.(ii) and/or YY.(iii) and any entity or entities that any such Person directly or indirectly owns or controls.

AAA.        "Wells Fargo" means (i) Wells Fargo Bank, N.A. and its affiliates; (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

BBB.        "Zell" means Sam Zell and any entities affiliated with, and current and former Professionals of, Sam Zell.

CCC.        "Anchorage" means (i) Anchorage Advisors, L.L.C. and its affiliates; (ii) any of its or their officers, directors, partners, employees, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

DDD.        "Anchorage Individual" means any Person within Definition CCC.(ii) and/or CCC.(iii) and any entity or entities that any such Person directly or indirectly owns or controls.

## INSTRUCTIONS

1.        The words "and" and "or" are to be construed both conjunctively and disjunctively. The singular form of a noun or pronoun includes the plural form and vice versa. The word "all" shall also include each of and vice versa.

26

2.      You are requested to produce all responsive Documents in your possession, custody or control, wherever located, including, without limitation, those in the custody of your Professionals and affiliates.

3.      Unless otherwise stated in a specific request herein, the time period covered by the following requests is the period between January 1, 2007, through and including the present.

4.      If any part of the following requests cannot be responded to in full, please respond to the extent possible, specifying the reason(s) for your inability to respond to the remainder and stating whatever information or knowledge you have relating to the portion to which you do not respond.

5.      If there are no Documents responsive to any particular request, please state so in writing.

6.      Where any copy of any Document whose production is sought herein, whether a draft or final version, is not identical to any copy thereof, by reason of alterations, notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies are to be produced separately.

7.      If any Document requested herein was formerly in your possession, custody or control (or that of your Professional) and has been lost or destroyed or otherwise disposed of, you are requested to submit in lieu of any such Document a written statement (i) describing in detail the nature of the Document and its contents, (ii) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (iii) specifying the date on which the Document was prepared or transmitted, and (iv) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

27

8.      Hard copies of all Documents should be produced: in addition, copies of all Documents available electronically should be delivered on a disk, DVD or CD-ROM in a format to be agreed upon by Law Debenture and the producing party. Law Debenture reserves the right to request that Documents be produced in their native format.

9.      To the extent any responding Person intends to employ an electronic search to help locate responsive or potentially Documents, Law Debenture shall require that such Person promptly disclose and come to an agreement with Law Debenture respecting its proposed search terms and methodology, and otherwise comply in full with Rule 7026-3(e) of the Local Rules for the United States Bankruptcy Court, District of Delaware.

10.      A request for any Document shall be deemed to include a request for any and all transmittal sheets, cover letters, exhibits, enclosures, or attachments to such Document, in addition to the Document in its full and unexpurgated form.

11.      Documents should be segregated according to the number of the request to which you are responding or produced in the manner they are kept in the ordinary course of business. Documents attached to each other should not be separated.

12.      Each request for Documents herein includes a request for exact copies of all disks, CDs, DVDs and other removable media containing any information responsive to such request. Electronic records and computerized information should be produced in an intelligible format or together with a sufficient description of the system or program from which each was derived to permit rendering the material legible.

13.      Each request for Documents herein relating in any way to the Proposed LBO Settlement, April Proposed Settlement, any Other Potential Settlement, Settlement Analysis, the Settlement Process, the LBO-Related Causes of Action, and/or Complaints specifically is intended to

request, inter alia, (i) all of the Debtors' and/or Special Committee's internal work product, expert reports, consultant reports, or attorney-client communications and (ii) all such Documents or Communications or other potentially privileged materials exchanged between and among Tribune and the Committee on a confidential or common interest basis that may have been shared with one or more of the Potential LBO Liability Parties.

14.    Notwithstanding anything to the contrary contained herein, Law Debenture does not seek by these requests production of Communications concerning the Mediation exchanged between or among parties to the Mediation during the mediation meeting that occurred on November 17, 2010, to the extent that the Mediator was present for such Communications.

15.    If any privilege is claimed as to any Communication requested or sought to be identified herein:

      A)    State the nature of the privilege of the claim (i.e., attorney/client, work product, etc.);

      B)    State the name of the party claiming privilege and the name of the attorney, if any, with respect to whom the privilege is claimed;

      C)    State the basis for claiming the privilege as to the specific Communication;

      D)    Identify all persons present at any Communication to which privilege is claimed and all persons to whom the subject matter of the Communication was discussed or disclosed; and

      E)    State the date of each such Communication.

16.    If any privilege is claimed as to any Document requested or sought to be identified herein:

      A)    State the nature of the privilege claimed (i.e., attorney/client, work product, etc.);

      B)    State the basis for claiming the privilege as to the specific information or Documents; and

      C)    State the date of such Document; identify the type of Document (i.e., letter, memo, etc.); set forth the subject matter thereof, identify each person who prepared it and each person (if any) who signed it; identify each person to whom it was directed, circulated or shown; identify each person now in possession of the Document; and, for each person identified, indicate whether such person is an attorney.

17.    If Anchorage has asserted any privilege or other protection as a basis for withholding any Documents or Communications from production in connection with any document request or production in the above-captioned case (including, but not limited to, the Documents and Communications described on the bottom of Page 336 and top of Page 337 of the Examiner's Report), and such Documents and/or Communications are not reflected on a privilege log being produced in response to these documents requests, please create and produce a privilege log for those Documents and Communications which includes the information requested in Instructions 15 and/or 16, as applicable.

18.    For the avoidance of doubt, these requests call for the production of complete, unredacted versions of any redacted Documents or Communications that may be contained in the Document Depository. If any privilege is claimed as to any redacted portion of any Document or Communication contained in the Document Depository, please log such redacted material pursuant to Instructions 15-17.

19.    For purposes of each document request, each such request for Documents to be produced by you expressly includes Documents in the possession of your Professionals.

20.    The following document requests are to be deemed continuing in nature. In the event you become aware of or acquire additional information relating or referring to any of the following document requests, such additional information is to be promptly produced.

New York, New York
December 22, 2010

Respectfully submitted,

By: _____

David S. Rosner, Esq.
Andrew K. Glenn, Esq.
Sheron Korpus, Esq.
Paul J. Burgo, Esq.
**Kasowitz, Benson, Torres & Friedman LLP**
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

*Counsel for Law Debenture Trust Company
of New York*

31