# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


|                        |   |                          |
|------------------------|---|--------------------------|
|                        | ) |                          |
| IN RE:                 | ) | Chapter 11               |
|                        | ) |                          |
| TRIBUNE COMPANY, et al., | ) | Case No. 08-13141 (KJC) |
|                        | ) |                          |
|                        | ) | Courtroom 5              |
|                        | ) | 824 Market Street        |
| _____Debtors._____ | ) | Wilmington, Delaware     |

                                   January 10, 2011
                                   2:04 p.m.


TRANSCRIPT OF PROCEEDINGS
TELEPHONIC HEARING
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                    Sidley Austin LLP
                                BY: JAMES CONLAN, ESQ.
                                BY: KEVIN LANTRY, ESQ.
                                BY: JAMES BENDERNAGEL, JR., ESQ.
                                BY: BRYAN KRAKAUER, ESQ.
                                BY: JESSICA BOELTER, ESQ.
                                BY: JAMES DUCAYET, ESQ.
                                BY: JILLIAN LUDWIG, ESQ.
                                BY: DAVID MILES, ESQ.
                                One South Dearborn
                                Chicago, IL 60603
                                (213) 896-6022


ECRO:                           AL LUGANO

Transcription Service:          DIAZ DATA SERVICES
                                331 Schuylkill Street
                                Harrisburg, Pennsylvania 17110
                                (717) 233-6664


Proceedings recorded by electronic sound recording; transcript
produced by transcription service

1    couple of things that Mr. Johnston said that are, quite

2    frankly, just not accurate, if I may very briefly.

3                    THE COURT:  Mr. Korpus, let me ask you to pause for

4    a moment here.

5                    MR. KORPUS:  Yes, sir.

6                    THE COURT:  I have a question for Mr. Johnston and

7    that is, how is it that Law Debenture should be able to test

8    the proposition that there's nothing for them to give because

9    they haven't had involvement?  I mean, how -- isn't that

10   something that a party has the right to test somehow through

11   discovery?

12                   MR. JOHNSTON:  Well, I guess, Your Honor, the

13   question is involvement with what?  In terms of the

14   negotiations with other parties in this case, I think that that

15   can be amply tested by the production of the other parties in

16   the case.  All of the parties who have been negotiating deals

17   since last December are, in fact, targets of discovery requests

18   and are producing.  And so that, I think, answers it through

19   the productions that have been made by other parties.

20                   In terms of involvement in the case, they have

21   correctly pointed out that credit agreement lenders, as a

22   group, have filed certain pleadings and taken certain

23   positions.  Certainly not since Oaktree and Angelo Gordon

24   settled or reached the agreement at the mediation and then went

25   forward as co-proponents.  They have taken positions in the

1  case and those positions are of record, so we struggle with

2  attempting to figure out what else could possibly be relevant

3  here.

4          THE COURT:  Well --

5          MR. KORPUS:  Your Honor, can I give you perhaps some

6  examples?

7          THE COURT:  No, thank you, not at this point.  I'll

8  just leave Mr. Johnston with the following questions:  You

9  know, if it's true that, you know, those from whom the non-

10  proponent parties, we'll call them, are -- from whom discovery

11  is being sought, weren't involved in LBO transactions, aren't

12  plan proponents, didn't negotiate any settlements, didn't

13  participate in the mediation, I just -- it seems to me that if

14  that's all true, there's not much to be gotten from them.  But

15  it seems to me, and this has nothing to do with my view of your

16  credibility, Mr. Johnston, somebody from those clients ought

17  to, in some form, say -- say that and there needs to be some

18  testing of it, but that's all I'll say.

19          I'd like now to move on to Mr. Zensky's letter on

20  behalf of the noteholder plan proponents.

21          MR. ZENSKY:  Your Honor, David Zensky, Akin Gump

22  Strauss Hauer and Feld for Aurelius Capital Management.  Your

23  Honor, I'm happy to discuss any portion of the letter that

24  you'd like.  I would just note for the record that the debtors

25  and their co-proponents time to respond has not yet run.  I'm

1    -- unless the circumstances have changed and other matters

2    tentatively scheduled have been worked out, I'm not going to be

3    in a position to really spend any time on the discovery

4    matters.

5           You know, it would -- in terms of where the hearing

6    date falls, it would be a natural time and date to do it, but

7    my schedule does just not permit it.  So here's what we're

8    going to do, to the extent that the parties -- and I -- to the

9    extent the parties are unable to work out what remaining

10   differences there are, either motions to compel or motions for

11   a protective order or whatever other motions parties need

12   relief on -- need court ordered relief on, should be filed by

13   January 14th at 4:00 p.m. eastern time.  Responses are due by

14   January 19, 4:00 p.m. eastern time.  I will fix a hearing for

15   Friday, January 21st at 10:00.  I hadn't otherwise planned to

16   sit on that day, but I will do that.  And I think it probably

17   would be best if I moved everything that was scheduled now for

18   the 20th to the 21st as well and I'll set aside whatever time

19   is necessary to resolve whatever remaining disputes there are.

20          I do not anticipate, nor do I want replies, but I

21   will, as I normally do, poll the parties at the outset of the

22   hearing whether there have been any further developments since

23   responses are filed to the discovery requests.  Are there any

24   questions?

25          MR. BENDERNAGEL:  I have two questions, Your Honor.

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

*In re:*                                          :    Chapter 11

TRIBUNE COMPANY, *et al.*,[1]                      :    Case Number 08-13141 (KJC)
                                                       (Jointly Administered)

                              Debtors.            :

                                                  :

## REPORT OF KENNETH N. KLEE, AS EXAMINER

### (VOLUME ONE)

### (SUMMARY OF PRINCIPAL CONCLUSIONS, OVERVIEW AND CONDUCT OF THE EXAMINATION, AND FACTUAL BACKGROUND)

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Forify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxnet Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

of the key personnel working with Tribune on behalf of the Merrill Entities, and the department or working group with which each was affiliated, were as follows:

### Leveraged Finance
Todd Kaplan, Chairman, Global Leverage Finance[1091]
David Tuvlin, Managing Director[1092]
### Leveraged Finance Capital Markets
Carl Mayer, Managing Director[1093]
Stephen Paras, Managing Director[1094]
### Investment Banking
Michael Costa, Managing Director[1095]
Michael O'Grady, Managing Director[1096]

Certain Parties contended that notwithstanding the existence of separate legal entities, all of the Merrill Entities should be viewed as a single entity, for among other purposes, determining whether the knowledge and acts of personnel employed by one entity may be attributed to the other entity, and whether, as a consequence thereof, the other entity acted in good faith regarding a particular transaction or transfer.  Proponents of this viewpoint cite as support for this position that, as noted, the October 2005 Merrill retention letters contain inconsistent entity references,

---

[1091] Ex. 307 at 10 (Step One Confidential Information Memorandum).  Todd Kaplan had a longstanding business relationship with the Zell Group.  In his sworn interview with the Examiner, Mr. Kaplan testified that when he started work at Merrill in 1986, one of his first projects was for the Zell Group.  Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 64:22-65:4.  Indeed, the Zell Group offered Mr. Kaplan a job at EGI after the close of the Step Two Transactions, but he "ultimately decided not to [accept the job] and stayed at Merrill Lynch." *Id.* at 65:16-18.  *See also* Examiner's Interview of Samuel Zell, June 14, 2010 ("We made him an offer. I think it was late '08. . . .  We wanted him to come work for us, he ultimately said he was going to do it, then he got hotboxed by the guys at Merrill and he decided not to.").

[1092] Ex. 307 at 10 (Step One Confidential Information Memorandum).  David Tuvlin also is identified as a Vice President of ML&Co.  *See* Ex. 179 at TRB0520889 (Credit Agreement).

[1093] Ex. 307 at 10 (Step One Confidential Information Memorandum).

[1094] *Id.*

[1095] Ex. 24 at 4 (MLPFS Recapitalization Engagement Letter); Ex. 23 at 6 (MLPFS Strategic Transaction Engagement Letter).  Michael Costa also has been identified as a Managing Director for "Mergers and Acquisitions" group.  *See* Ex. 308 at ML-TRIB0382494-0382495 (Costa E-Mail, dated February 14, 2007).

[1096] Ex. 307 at 11 (Step One Confidential Information Memorandum).

> [T]his was as challenging and complex a transaction as I've ever
> worked on.

Despite the sense of accomplishment in early April 2007, by May 2007, the market's lack of interest in the Step One Transactions was evident, and certain Merrill personnel expressed concern that syndication of the debt would be undersubscribed "on an allocable demand basis by a material amount."[1195]  Internal communications among Merrill personnel attributed the problem in sales to be a reflection of the market's uneasiness with the deal itself rather than with market conditions generally.[1196]

After the Credit Agreement was signed on May 17, 2007,[1197] Merrill addressed the issue of the hold and sell levels for their portion of the Step One Financing, as well as the debt covenants.[1198]  Nancy Meadows, of the Loan Execution & Management division, reported:[1199]

> Ultimately, the overall structure for step one changed slightly. . . .
> In terms of covenants, financial covenants include max leverage of
> 6.25X with stepdowns and interest coverage minimum of 1.75x
> with step-up to 2.0x next year.  Also has capex limitation of $210
> million. . . .
>
> The nice thing about this company is that the assets are divisible
> into saleable pieces — very good newspapers in Florida, big
> papers in LA, NY, and Chicago (not doing very well, it's true).  As
> Don said, it's a melting ice cube but not one that disappears right
> away.  I'm not saying we love the credit, and the leverage is high,
> but there is some asset value here.

Also in May 2007, Merrill's attention focused on the valuation opinion required as a condition precedent to closing Step One.  Chandler Bigelow forwarded VRC's draft preliminary

---

[1195] Ex. 356 at ML-TRIB-0390796 (Kaplan E-Mail, dated May 10, 2007).

[1196] *Id.* at ML-TRIB-0390795.

[1197] Ex. 179 (Credit Agreement).

[1198] Ex. 357 (Browning E-Mail, dated May 18, 2007).

[1199] *Id.* at ML-TRIB-0893577.

Banks were aware of the significant possibility that Tribune would be rendered insolvent by the consummation of Step Two.

### (1)    Joint Due Diligence.

On August 23, 2007, the Lead Banks jointly sent Tribune a five-page due diligence outline.[2526] In addition to operational information about Tribune's strategy, markets, and business lines, the Lead Banks sought detailed financial information including:[2527]

- "Overview of 5-year operating model—longer-term expectations,"

- "Quarterly projections through 2009, annually thereafter,"

- "Outline [of] significant differences between the new forecasts and forecasts provided in April 2007,"

- "Rationale for key corporate level operating assumptions and financial drivers, e.g., corporate G&A, etc.,"

- "Rationale for key Publishing segment assumptions for 2H 2007 and 5-year operating model,"

- "[M]arket-by-market . . . quarterly projections through 2009, annually thereafter," and

- "Rationale for key Digital/Interactive segment assumptions for 2H 2007 and 5-year operating model (including quarterly projections through 2009)."

On September 20, 2007, Tribune sent the Lead Banks a five-year consolidated model that included downside scenarios "prepared by Tribune solely in response to your requests."[2528] Mr. Bigelow's cover e-mail noted that "[t]he downside scenarios in the model are not sensitivity cases endorsed or adopted by Tribune management" and "are not to be disclosed to any other

---

[2526] Ex. 998 (Harrison E-Mail, dated August 23, 2007).

[2527] *Id.* at ML-TRIB-0582684-88.

[2528] Ex. 999 (Lewicki E-Mail, dated September 20, 2007). *See also* Ex. 938 (Kurmaniak E-Mail, dated September 14, 2007) (forwarding Chandler Bigelow's e-mail in which he forwarded an earlier version to Citigroup's Rosanne Kurmaniak, who "offer[ed] to help [Tribune] with the preparation of our financial model").

By March 10, 2007, the EGI proposal appeared "dead," at least from the perspective of Mr. Costa, at Merrill.[1157]  Mr. Costa wrote: "Short answer is in light of recent operating performance no comfort in putting the kind of leverage necessary for Zell proposal to work and have board get comfortable with employees owning the equity.  Also numerous issues in the Zell proposal we could not solve."[1158]  Mr. Costa believed that Tribune had concluded that it was not comfortable with the leverage in either the EGI proposal or the self-help proposal.[1159]

The EGI proposal was, however, not dead, and, in fact, staged a come-back.  The Special Committee directed the Financial Advisors and Tribune management to present two fully-developed alternatives to the Special Committee on March 30, 2007.[1160]  The Financial Advisors were further directed to pursue the EGI proposal, but to get "better economic terms and enhance the likelihood of closing."[1161]  The same day, an investment banker at MLPFS circulated a debt covenants analysis among her colleagues on the Merrill team.[1162]

Rosanne Kurmaniak, Ms. Mohr, Mr. Kaplan, and Mr. Costa thereafter worked together on the requested presentation.  On March 20, 2007, Mr. Costa wrote to Ms. Mohr in an e-mail:[1163]

> Think we should take 2 percent decline case out of valuation.  I worry that if you take midpoint of those two cases you are in 30 range and only 10 percent away from Zell.  Seems more powerful to stick with revised mgmt plan, remind board we were closer to low end—and stock has moved this way—so near 20 percent discount to zell.  Plus zell gives you recap plus at incremental cost of spin delay.

---

[1157]  Ex. 338 (Costa E-Mail, dated March 10, 2007).

[1158]  Id.

[1159]  Ex. 339 at FOUN0000002 (Wander E-Mail, dated March 10, 2007).

[1160]  Ex. 327 at 27 (Preliminary Proxy Statement, dated June 1, 2007).

[1161]  Ex. 136 at TRIB-G0008789 (Special Committee Meeting Minutes, dated March 21, 2007).

[1162]  Ex. 340 at ML-TRIB-0619109 (Kim E-Mail, dated March 21, 2007).

[1163]  Ex. 341 at CITI-TRIB-CC 150611 (Mohr E-Mail, dated March 20, 2007).

solvency analysis to Daniel Kazan, who in turn forwarded the document to Michael O'Grady, on

behalf of the Merrill Entities, and to Rosanne Kurmaniak, on behalf of the Citigroup Entities.[1200]

> Only real question I would be interested in your view on is that
> they include a pv of tax savings on phones as a part of the entity
> value.  I can understand the math and the rationale but we've never
> really included that in our valuation. Doesn't swing the outcome,
> just curious.

A colleague responded: "We have included in the sense that it is included in the future

free cash calculations which would be lower but for the Phones tax shield."[1201]  VRC issued its

first solvency opinion on May 9, 2007, stating that Tribune was solvent on the completion of

Step One.[1202]

### (2)    Due Diligence and Evaluations Performed.

As described above, the Merrill Entities and the Citigroup Entities had considerable

access to the books and records of Tribune during the time leading up to the April 1, 2007

Tribune Board meeting.  Additionally, both Merrill and Citigroup personnel met with the Special

Committee on a near-weekly basis and the Tribune Board on a monthly basis.  During each of

these meetings, the parties reviewed Tribune's financials and analyzed the financing, structural,

and other issues related to the strategic alternatives being considered by the Tribune Board.  In

addition, both Merrill and Citigroup participated in direct discussions with parties participating

in the auction process.  Overall, Merrill had significant access to information that was relevant to

their roles.

There is some question, however, whether MLPFS had sufficient time to engage in

comprehensive due diligence of each strategic alternative, given the constantly shifting dynamics

---

[1200] Ex. 358 at ML-TRIB-1052281 (Marcus E-Mail, dated May 7, 2007).

[1201] *Id.*

[1202] Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007). *See also* Report at § III.E.3.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re:* | : | Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | : | Case Number 08-13141 (KJC) (Jointly Administered) |
| Debtors. | : | |
| | : | |

## REPORT OF KENNETH N. KLEE, AS EXAMINER

### (VOLUME TWO)

### (FINDINGS AND CONCLUSIONS CONCERNING QUESTION ONE)

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Book Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Subsidiaries by the additional incurrence of $3.6 billion LBO Lender Debt at the Guarantor

Subsidiary level), sufficient value still would be available from the Guarantor Subsidiaries to

make the LBO Lenders whole even with the Step Two Debt added to the mix. In other words,

whereas Tribune would be rendered insolvent and its creditors and new owner would suffer from

the Step Two Closing, the Guarantor Subsidiary creditors (or which, as discussed at the outset of

the Report, the LBO Lenders hold that vast portion of the claims) would recover in full.

The Investigation revealed that one or more of these scenarios may have served as

possible motivations informing the Lead Banks' actions at Step Two, but the Investigation did

not furnish sufficient proof on which conclusions could be reasonably drawn. Based on the

record adduced through July 25, 2010, the Examiner has not found sufficient evidence to support

a finding that the Lead Banks engaged in the kind of egregious behavior that would justify

equitable subordination or equitable disallowance. In the Examiner's view, the fact that the Lead

Banks had preexisting contractual funding obligations (entered into when the Tribune Entities

probably were solvent) is a significant mitigating factor weighing against equitable subordination

or equitable disallowance based on their acts.[935] The contractual baggage the Lead Banks carried

as they approached Step Two adds nuance and complexity to their actions and makes it difficult

for the Examiner to accept what is essentially the caricature that certain Parties portrayed to the

Examiner of the Lead Banks' actions in the fall of 2007.[936]

The Lead Banks, however, represented by skilled counsel, plainly attempted to clothe as

much of their deliberations as possible on this matter under the umbrella of attorney-client and

---

[935] It should be noted, however, that consistent with the scope of the Investigation, which only includes estate claims or causes of action, the Examiner did not investigate any claims that individual creditors may hold against one or more of the Lead Banks. To be clear, the Examiner is not in any way addressing whether a fact or circumstance that serves to mitigate equitable subordination or equitable disallowance also would serve to mitigate, let alone have any relevance to, any such other potential claim or cause of action.

[936] To be clear, the Examiner finds separately that these circumstances were insufficient to give the Lead Banks a good faith defense under Bankruptcy Code section 548(c). *See* Report § IV.B.7.b.(3).

other privileges.  Moreover, without casting aspersions, in their testimony before the Examiner,

witnesses for the Lead Banks tended to speak from the same script in discussing key events as

well as their activities during the months preceding the Step Two Closing.  One witness

professed to remember little or nothing at all about these events, at least during his sworn

interview, despite documentary evidence suggesting that this witnesses' institution had very clear

views on these matters.[937]  At a minimum, the Examiner greeted portions of the testimony

furnished by witnesses for the Lead Banks with a healthy dose of skepticism.  The Examiner did

not have an opportunity to pursue whether or to what extent the deliberations that the Lead

Banks engaged in during the fall of 2007 actually are protected attorney-client communications

or are really business discussions among principals, masquerading as communications to and

from counsel and financial advisors.  Further, to the extent the Lead Banks assert privilege based

solely on the fact that an attorney was present during a telephone conference or meeting, or was

copied on correspondence, any such assertions are highly suspect.[938]  The Examiner also did not

have an opportunity to interview all of the witnesses who might have shed light on the question

of what the Lead Banks knew and said to one another leading to the Step Two Closing, to the

extent contentions of privilege do not shield those communications.  Further investigation

therefore is merited.[939]

---

[937]  *See* footnotes 760 -761.

[938]  *See Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*, 2010 U.S. Dist. LEXIS 57880 (S.D.
Cal. June 11, 2010) ("communications between corporate officers or employees transacting the general business
of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on
correspondence"); *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's, London*, 176 Misc. 2d 605, 609
(N.Y. Sup. Ct. 1998) ("there is no privilege where the attorney is present at a meeting as 'a mere scrivener' and
there is no consultation for legal advice").  *See generally Fisher v. United States*, 425 U.S. 391, 403 (1976)
("since the privilege has the effect of withholding relevant information from the factfinder, it applies only where
necessary to achieve its purpose.  Accordingly it protects only those disclosures – necessary to obtain informed
legal advice – which might not have been made absent the privilege.").

[939]  The production of documents furnished by BofA, discussed previously, *see* footnote 738, raise questions
regarding whether (1) the redacted sections are, in fact, protected by any privilege that would prevent the use of
such information by the Examiner, and (2) under applicable law, such privilege, if valid, was waived.

# EXHIBIT 3

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X

In re:                                   :
                                         :    **Chapter 11 Cases**
                                         :    **Case No. 08-13141 (KJC)**
**TRIBUNE COMPANY, et al,**              :    **(Jointly Administered)**
                                         :    **(Bankr. D. Del.)**
                                         :
                     Debtors.            :
-------------------------------------------------X

### SUBPOENA IN A BANKRUPTCY CASE

To:     Merrill Lynch, Pierce, Fenner & Smith Inc.
        4 World Financial Center
        250 Vesey Street
        New York, NY 10080

---

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling.  Production of documents in lieu of appearance is acceptable.

**SEE SCHEDULE A**

---

| Place | Kasowitz, Benson, Torres & Friedman LLP | :Date and Time |
|-------|------------------------------------------|----------------|
|       | 1633 Broadway                            | :SEE SCHEDULE A |
|       | New York, NY 10019                       | :              |

---

ISSUING OFFICER SIGNATURE AND TITLE

                                        Date:  December 15, 2010

  /s Paul J. Burgo, Associate
ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Paul J. Burgo, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
E-mail: pburgo@kasowitz.com
Attorneys for Law Debenture Trust Company of New York

B256 (Form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2007, made applicable in cases under the Bankruptcy Code by Rule 9016, Federal Rules of Bankruptcy Procedure:

(c) Protecting a Person Subject to a Subpoena.
   (1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
   (2) Command to Produce Materials or Permit Inspection.
      (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
      (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
         (i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
         (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
   (3) Quashing or Modifying a Subpoena.
      (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
         (i) fails to allow a reasonable time to comply;
         (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
         (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
         (iv) subjects a person to undue burden.
      (B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
         (i) disclosing a trade secret or other confidential research, development, or commercial information;
         (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
         (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
      (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
         (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
         (ii) ensures that the subpoenaed person will be reasonably compensated.

(d) Duties in Responding to a Subpoena.
   (1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
      (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
      (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
      (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
      (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
   (2) Claiming Privilege or Protection.
      (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
         (i) expressly make the claim; and
         (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
      (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A

Pursuant to Federal Rule of Bankruptcy Procedure 9016 and Federal Rule of Civil Procedure 45, Law Debenture Trust Company of New York ("Law Debenture Trust Company"), requests that Merrill Lynch (as defined herein) in the above-captioned case produce the documents and things described herein for inspection and copying at the offices of Kasowitz Benson Torres & Friedman LLP, located at 1633 Broadway, New York, NY 10019, pursuant to a case management order or scheduling order to be entered by the Court, or in the absence of any such order within thirty days of service of this Request:

## REQUESTS FOR PRODUCTION

1.    All Documents and Communications relating to any Relationship between Tribune and any of the Settling Parties.

2.    All Documents and Communications relating to any Relationship between any Tribune Individuals and any of the Settling Parties.

3.    All Documents and Communications relating to any Relationship between any Special Committee Individuals and any of the Settling Parties.

4.    All Documents and Communications relating to any Relationship between any Special Committee Individuals and any of the Committee Individuals.

5.    All Documents and Communications relating to any Relationship between any Special Committee Individuals and Tribune.

6.    All Documents and Communications relating to any Relationship between any Special Committee Individuals and any of the Tribune Individuals.

7.    All Documents and Communications relating to any Relationship between any Committee Individuals or individual members of the Committee, on the one hand, and any of the Settling Parties, on the other hand.

3

8.      All Documents and Communications relating to any Relationship between any Committee Individuals and any of the Tribune Individuals.

9.      All Documents and Communications relating to any Relationship between and among, on the one hand, Don Liebentritt, and on the other hand (i) Zell; (ii) any Special Committee Individuals; (iii) any Committee Individuals; (iv) any Tribune Individuals; and/or (v) any Settling Party.

10.     All Documents and Communications relating to any Relationship between and among, on the one hand, Zell, and on the other hand (i) any Special Committee Individuals; (ii) any Committee Individuals; and/or (iii) any Settling Party.

11.     All Documents and Communications regarding any conflict or potential conflict of interest relating to participation in Settlement Analysis or the Settlement Process by any Person (including any board of directors or subcommittee thereof, and any lawyer, law firm or other Professional), and all Documents and Communications regarding any efforts, discussion or consideration of efforts to waive, mitigate, limit or eliminate any such conflict or potential conflict of interest.

12.     All Documents and Communications relating to whether any of the Tribune Individuals, Special Committee Individuals or Committee Individuals were Step One Selling Shareholders.

13.     All Documents and Communications relating to whether any of the Tribune Individuals, Special Committee Individuals or Committee Individuals would receive a release of liability in any capacity pursuant to the Proposed LBO Settlement, the Debtor/Committee/Lender Plan or any Other Potential Settlement.

14.     All Documents and Communications relating to any compensation, bonus or other form of remuneration payable to any Tribune Individual or Special Committee Individual in

4

connection with a successful reorganization of Debtors or the resolution of disputes with any or all of the Settling Parties.

15.    All Documents and Communications relating to any need or desire of Debtors to resolve any of the LBO-Related Causes of Action in connection with, or as a condition to (i) any exit financing for Debtors and/or (ii) Debtors' ability generally to exit bankruptcy.

16.    All Documents and Communications relating to any requested or proposed release of liability for (i) any of the Settling Parties or (ii) any other Potential LBO Liability Party.

17.    Copies of any engagement letters with any Professional retained by or on behalf of Merrill Lynch, to the extent not previously filed with the Court, and all bills, invoices and time records submitted by such Professionals, to the extent that such material refers or relates to Settlement Analysis, the Settlement Process, and/or the negotiation or drafting of one or more of the Plans.

18.    Copies of any engagement letters with any Professional retained by or on behalf of any of the Settling Parties, to the extent not previously filed with the Court, and all bills, invoices and time records submitted by such Professionals.

19.    All Documents and Communications relating to the continued employment or affiliation of any Tribune Individual, including but not limited to any Documents or Communications expressing or relating to the views of any Settling Parties concerning such continued employment or affiliation.

20.    All Documents and Communications relating to the decision to make Don Liebentritt Debtors' Chief Restructuring Officer, including but not limited to any discussion relating to whether Liebentritt's continuing role as general counsel for Debtors created the appearance of a conflict of interest.

5

21.    All Documents and Communications relating to any Settlement Analysis.

22.    All Documents and Communications relating to Settlement Analysis that were provided to, or received from, any Potential LBO Liability Party or other third party.

23.    All Documents and Communications relating to the Settlement Process.

24.    All Documents and Communications relating to the preservation or obligation to preserve Documents and Communications in connection with the LBO, the Debtors' Bankruptcy, the LBO-Related Causes of Action, the Plans, Settlement Analysis, Settlement Process and the Confirmation Hearing, including but not limited to (i) any document retention policy in effect during any part of the period from January 1, 2007 to the present, (ii) any litigation hold notice, or similar notice to retain documents, and (iii) steps taken or considered to be taken in connection with preserving such Documents and Communications.

25.    Documents sufficient to identify all claims made or threatened by any Person arising from or relating to the LBO, and, with respect to such claims, all related demand letters or other correspondence and all pleadings (other than the Complaints), discovery requests, objections and responses to discovery requests, deposition and hearing transcripts, decisions and orders, settlement discussions and settlements.

26.    All Documents and Communications relating to the right and/or standing, vel non, of the Debtors or any other Person to settle or propose a settlement of the LBO-Related Causes of Action.

27.    All Documents and Communications relating to any presentations made by, on behalf or to the Special Committee or any member of the Special Committee relating to the Settlement Process or Settlement Analysis.

28.    All Documents and Communications related to Tribune exchanged between the Special Committee and (i) any of the Settling Parties, and/or (ii) any Potential LBO Liability Party, from December 20, 2007 to the present.

29.    All Documents and Communications relating to any involvement by Tribune in Settlement Analysis or the Settlement Process, including but not limited to all Communications with any Tribune Individual.

30.    All Documents and Communications relating to the Proposed LBO Settlement, including but not limited to, all Documents relating to the negotiation of the Proposed LBO Settlement or any part thereof, all drafts of the Proposed LBO Settlement (or any part thereof), and all Documents reviewed, relied on or considered by any Person in deciding whether or not to agree to or support the Proposed LBO Settlement.

31.    All Documents and Communications relating to the April Proposed Settlement, including but not limited to, all Documents relating to the negotiation of the April Proposed Settlement or any part thereof, all drafts of the April Proposed Settlement (or any part thereof), and all Documents reviewed, relied on or considered by any Person in deciding whether or not to agree to or support the April Proposed Settlement.

32.    All Documents and Communications relating to any Other Potential Settlement, including but not limited to, all Documents relating to the negotiation of any Other Potential Settlement or any part thereof, all drafts of any Other Potential Settlement (or any part thereof), and all Documents reviewed, relied on or considered by any Person in deciding whether or not to agree to or support such Other Potential Settlement.

33.     All Documents or Communications relating to discussions or negotiations with Aurelius or any co-proponent of the Noteholder Plan regarding Settlement Analysis, the Settlement Process, or any of the Plans.

34.     All Documents and Communications relating to Aurelius or any co-proponent of the Noteholder Plan.

35.     All Documents and Communications relating to any objection to any aspect of the Noteholder Plan.

36.     All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of any claim, counterclaim, cross-claim, or third-party claim for indemnification, contribution, or otherwise, relating to the LBO-Related Causes of Action.

37.     All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of the value of the Preserved Causes of Action.

38.     All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of the potential impact of the bar order contained in the Proposed LBO Settlement and/or Debtor/Committee/Lender Plan on the value of the Preserved Causes of Action.

39.     All Documents and Communications relating to the Examiner or the development of the Examiner's Report, including all interviews by, or Communications with, the Examiner.

40.     All Documents and Communications relating to the Examiner's Report, including but not limited to any discussions, analyses, critiques or evaluations of the conclusions or calculations set forth in the Examiner's Report or any of the evidence contained or referred to therein, and any follow-up investigation or analysis of any Person(s) discussed in the Examiner's Report.

41.     All Documents and Communications requested by but not produced to the Examiner.

42.     All Communications or notes relating to Communications with the Examiner.

43.     To the extent not contained within the Document Depository, all Documents and Communications relating to the LBO or actual or proposed financing thereof, including, but not limited to:

> (i)      any presentations, proposals, term sheets, commitment letters, credit committee memoranda, meeting minutes, reports, summaries, analyses, comments or discussions;

> (ii)     any projections or forecasts of Tribune's (or any Tribune Entity's) financial, cash flow, or operating performance, liquidity, and available capital including sources created between January 1, 2006 and December 31, 2008;

> (iii)    all Tribune Entities' balance sheets, income statements, statements of cash flow, liquidity or capital adequacy analyses, general ledgers or other similar financial report of any kind or nature created between January 1, 2006 and December 31, 2008;

> (iv)    any Documents or Communications relating to the structure of the LBO, including but not limited to the decision to carry out the LBO in two steps;

> (v)     any Documents or Communications relating to the solvency or anticipated or potential solvency of Tribune (or any Tribune Entity) created between January 1, 2007 and December 31, 2008, including, but not limited to, whether as a result of the LBO and the proposed financing thereof, the value of Tribune's (or any Tribune Entity's) assets was/were exceeded by its/their liabilities, whether Tribune (or any Tribune Entity) was/were left with unreasonably small capital, whether the Tribune (or any Tribune Entity) was/were unable to pay its/their debts as they became due, and whether the Step Two Lenders (as defined in the Examiner's Report) should fund the Step Two Transactions; and

> (vi)    the personnel files of all executives and/or management-level individuals involved with the LBO.

44.     All Documents and Communications relating to Murray Devine, including, but not limited to, all reports and Documents created by Murray Devine, all correspondence with Murray Devine and any Documents and Communications reflecting discussions with Murray Devine reflecting the possibility of Murray Devine issuing an opinion respecting Tribune.

45.     To the extent not contained within the Document Depository, all Documents or Communications relating to the purchase, sale, assignment, or other acquisition or disposition by

any of (a) the Tribune Individuals, (b) the Special Committee Individuals, (c) the Committee Individuals or (d) the Settling Parties of any interest in the Senior Notes, PHONES Notes, Senior Loans or Bridge Loans, including, but not limited to, any Documents and Communications relating to the instruments by which such Person purchased, sold, assigned, or otherwise acquired or disposed of any interest in the LBO Lender Debt.

46.    To the extent not contained within the Document Depository, all Documents and Communications relating to the purchase, sale, assignment, or other acquisition or disposition by any of the Tribune Individuals or any of the Settling Parties of any other economic interest in or tied to Tribune, including, but not limited to, any debt or equity interests, swaps, derivatives, or options.

47.    To the extent not contained within the Document Depository, all Documents and Communications relating to the circumstances under which any Settling Party was selected for, or otherwise became involved in any aspect of the LBO, but excluding LBO documents not relating to such circumstances.

48.    All Documents and Communications relating to the Reorganized Value Analysis, the Enterprise Value, or the Equity Value (as each of those terms are defined and used in the General Disclosure Statement), including, but not limited to, the allocation of Enterprise Value or Equity Value as between the various Debtor entities, all business plans, projections, forecasts, market reports, financial information and any other Documents and Communications relating to the valuation of Debtors and/or allocation of value between and among the Debtors generated on or after January 1, 2010.

49.     All Documents and Communications relating to the actual or potential recoveries by or distributions to holders of the Senior Notes or the PHONES Notes pursuant to the Debtor/Committee/Lender Plan or any other actual or proposed plan of reorganization.

50.     All Documents relating to the projected valuation and capitalization of the Debtors post-bankruptcy, including Documents relating to leverage, liquidity, and pro-forma cap structure.

51.     All Documents and Communications relating to the Standing Motion, including any of the draft complaints filed or circulated by the Committee.

52.     All drafts of the Debtor/Committee/Lender Plan and Specific Disclosure Statement relating to the Debtor/Committee/Lender Plan, and all Documents and Communications relating to any such drafts.

53.     All drafts of the Joint Disclosure Statement, and all Documents and Communications relating to any such drafts.

54.     All drafts of any Rule 9019 Motion relating to the Proposed LBO Settlement, and all Documents and Communications relating to any such drafts.

55.     All drafts of any confirmation brief relating to the Debtor/Committee/Lender Plan, and all Documents and Communications relating to any such drafts.

56.     All Documents and Communications relating to the proposed confirmation schedule and parameters of confirmation-related discovery, including, but not limited to (i) Documents, Communications and drafts relating to the Debtors' motion to set the confirmation schedule and establish parameters of confirmation-related discovery, filed with the Court on November 8, 2010; (ii) Documents and Communications relating to the Discovery and Scheduling Order for Plan Confirmation, attached as Exhibit G to the Objection of Aurelius Capital Management, LP To The Debtors' Motion For Entry Of An Order Setting Confirmation Schedule And

11

Establishing Parameters Of Confirmation-Related Discovery, filed with the Court on November 22, 2010; and (iii) Documents and Communications relating to the Black Line Order Proposed by Aurelius and the Order Proposed by the Debtors, attached as Exhibit G to the Omnibus Reply Of Debtors To Objections To Solicitation Motion And In Support Of Entry Of An Order Imposing Reasonable Limitations On Confirmation-Related Discovery And The Confirmation Hearing, filed with the Court on November 24, 2010.

57.    All Communications with the Debtors, Settling Parties and/or other Potential LBO Liability Parties relating to the Mediation or the Mediator.

58.    All Documents and Communications relating to any direct or indirect economic interest in Tribune held by any of the Tribune Individuals or any of the Settling Parties, including, but not limited to, claims for which any of the Tribune Individuals or any of the Settling Parties has the ability to control the vote of (either contractually or otherwise), long positions, short positions, swap positions, participations and any other derivative positions, by tranche or series, if applicable, including the date of issuance of such tranche or series, and any short positions or derivative exposure.

59.    All Documents that Merrill Lynch relied on in determining, or will rely on in arguing, that the Proposed LBO Settlement is in the best interest of the Estate and should be approved and/or that the Debtor/Committee/Lender Plan should be confirmed.

60.    All Documents and Communications upon which Merrill Lynch intends to rely in connection with the Confirmation Hearing.

61.    All Documents and Communications relating to any potential, proposed, or actual plan(s) of reorganization for the Debtors that have been considered, discussed, or negotiated, including but not limited to the so called "purity plan," any other plan(s) that would put all LBO-Related

Causes of Action into trusts for post-emergence resolution, and/or any plan(s) that would establish a reserve for distributions to any of the Settling Parties.

62. All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of placing Preserved Causes of Action in the Creditors' Trust (as defined on Page 8 of the Debtor/Committee/Lender Plan) or the Litigation Trust (as defined on Page 16 of the Debtor/Committee/Lender Plan).

63. All Documents and Communications relating to the allocation of any proceeds to be distributed by any of the trusts created by any plan of reorganization for the Debtors.

64. All Documents and Communications relating to any inter-company claim analysis or evidencing current claims between Debtor entities.

65. All Documents and Communications relating to the Intercompany Claims Settlement, as that term is used in the Specific Disclosure Statement relating to the Debtor/Committee/Lender Plan.

66. All Documents and Communications relating to the allowance and treatment of claims of general unsecured creditors of the Debtors and Subsidiary Debtors (as defined in the Debtor/Committee/Lender Plan), including, but not limited to, Documents and Communications relating to how the proposed treatment of such claims changed over time.

67. All Documents and Communications relating to the retention by the Debtors and their Estates of the Ordinary Litigation Claims (as defined on Page 20 of the Debtor/Committee/Lender Plan), as described in Section 5.16 of the Debtor/Committee/Lender Plan.

68.     All Documents and Communications relating to any discussion, consideration, analysis, review, assessment or evaluation of the Bridge Loan Reserve (as defined on Page 4 of the Debtor/Committee/Lender Plan).

69.     All Documents and Communications relating to the Swap Claim (as defined by the Debtor/Committee/Lender Plan), including the identity of the past or current holder(s) or owner(s) of such claim, any assessment or review of Debtors' potential liability on the Swap Claim, and the negotiation of its allowance and classification in the Debtor/Committee/Lender Plan.

70.     All Documents and Communications relating to the PHONES Notes, including the identity of the past or current holder(s) or owner(s) of such PHONES Notes, any assessment or review of Debtors' potential liability for a greater amount than that allowed for the PHONES Notes Claims (as defined by the Debtor/Committee/Lender Plan), and the negotiation of its allowance and classification of the PHONES Notes Claims in the Debtor/Committee/Lender Plan.

71.     All Documents and Communications relating to the Retiree Claimant Settlement Agreement (as defined by the Debtor/Committee/Lender Plan), including the identity of the past or current Retiree Claimants (as defined by the Debtor/Committee/Lender Plan), any assessment or review of Debtors' potential liability to the Retiree Claimants, and the negotiation and Plan treatment of the Retiree Claimant Settlement Agreement in the Debtor/Committee/Lender Plan.

72.     All prior document requests or subpoenas received by Merrill Lynch in connection with the above-captioned case or any related adversary proceeding and all subsequent Communications concerning (i) such requests or subpoenas; (ii) any objections or clarifications thereto; or (iii) any subsequent production.

73.     Any and all privilege log(s) created in connection with the above-captioned case, whether or not those privilege log(s) was/were produced to any other party.

74.     All Documents and Communications relating to the withdrawal of the Step One Lender Plan.

75.     All Documents and Communications relating to any consideration received by the proponents of the Step One Lender Plan in connection with the withdrawal of the Step One Lender Plan.

## DEFINITIONS

The following additional definitions also apply to these requests:

A.      "Angelo" means (i) Angelo, Gordon & Co, L.P. and its affiliates; (ii) any of its or their officers, directors, partners, employees, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

B.      "April Proposed Settlement" means the settlement of certain LBO-Related Causes of Action proposed by Angelo, Centerbridge Credit Partners, L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Special Credit Partners, L.P., the Law Debenture defendants, and J.P. Morgan Chase Bank, N.A., described in a Settlement Support Agreement dated on or about April 9, 2010 including Exhibit A attached thereto.

C.      "Aurelius" means (i) Aurelius Capital Management, LP, on behalf of its managed entities, and its affiliates; (ii) any of its or their officers, directors, employees, partners, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

15

D.      "Bank of America" means (i) Bank of America, N.A. and its affiliates; (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

E.      "Board of Directors" means the boards of directors of Tribune and current and former Professionals of the board of directors and/or Tribune.

F.      "Bridge Loans" means the indebtedness issued pursuant to that certain $1.6 Billion Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, by and among, Tribune, as borrower, Merrill Lynch Capital Corporation as administrative agent and the lenders named therein.

G.      "Bridge Lender Plan" means the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., dated October 29, 2010.

H.      "Citicorp" means any or all of (i) Citicorp North America, Inc. and its affiliates; (ii) Citigroup Global Markets, Inc. and its affiliates; (iii) Citibank, N.A. and its affiliates; (iv) Citicorp USA, Inc. and its affiliates; (v) any of its or their officers, directors, partners, members, employees, or managers; (vi) any of its or their board of directors and any committee or subcommittee of any board of directors; and (vii) Professionals of any Person within (i), (ii), (iii), (iv), (v) or (vi) above.

I.      "Committee" means any or all of (i) the Official Committee of Unsecured Creditors in the chapter 11 cases of the above-captioned debtors; (ii) its individual members; (iii) any entities in which any such individual member serves as an employee, partner or in any

16

employment or agency relationship; and (iv) any Professionals of any Person included in (i), (ii) or (iii) above.

J.    "Committee Individuals" means all Persons within Definition I.(ii) or (iv), and any entity or entities that any such Person directly or indirectly owns or controls.

K.    "Communication" means, without limitation, any exchange or transfer of information or Documents by any means (*e.g.*, whether oral, written, electronic or by other methods), as well as any notes, memorandum, or other record thereof.

L.    "Complaints" means the Third Party Complaint and the Lender Complaint.

M.    "Confirmation Hearing" means the hearing to be held by the Bankruptcy Court on confirmation of a plan of reorganization filed in connection with in the case titled *In re Tribune Co., et al.*, chapter 11 No. 08-13141 (KJC) (Bankr. D. Del.).

N.    "Debtor/Committee/Lender Plan" means the First Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., dated December 8, 2010, along with any amendments thereto and any prior plans of reorganization filed or considered by such parties.

O.    "Document Depository" means the document depository that the Court authorized the Debtors to establish in an Order dated December 15, 2009.

P.    "Documents" means all written, graphic, or printed matter of any kind, however produced or reproduced, including all originals, drafts, working papers and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and all electronic, mechanical, or optical records or representations of any kind or other data compilations from which information can be obtained, or translated, if necessary, through

17

detection devices into reasonable usable form.  The term "Documents" includes, but is not limited to:

> a.    correspondence, memoranda, notes, calendar or diary entries, statistics, letters, electronic mail, notebooks, telegrams, journals, minutes, agendas, notices, announcements, instructions, charts, schedules, requests, contracts, physical evidence, prospective contracts, agreements, prospective agreements, licenses, prospective licenses, order forms, books, accounts, records, reports, studies, surveys, experiments, analyses, checks, cancelled checks, wire confirmations, statements, receipts, returns, vouchers, statements, credit memoranda, sales slips, promissory notes, summaries, pamphlets, prospectuses, manuals, brochures, announcements, certificates, drawings, plans, inter-office and intraoffice Communications, or offers;

> b.    notations in any form made of conversations, telephone calls, meetings, negotiations or other Communications;

> c.    bulletins, circulars, schedules, lists, guides, printed matter (including newspapers, magazines and other publications, articles and clippings therefrom), press releases, computer printouts, teletypes, telecopies, telexes, invoices, ledgers, balance sheets, financial statements or worksheets;

> d.    electronic, mechanical or optical records or representations of any kind (including tapes, cassettes, discs, hard drives, recordings, voice mail, electronic mail, computer-stored data or material), or transcriptions thereof; and

> e.    all drafts, alterations, modifications, changes and amendments of any of the foregoing and any material underlying, supporting or used in the preparation of any document.

Q.    "Examiner" means Kenneth N. Klee, appointed in the case titled *In re Tribune Co., et al.*, chapter 11 No. 08-13141 (KJC) (Bankr. D. Del.) by the Bankruptcy Court for the District of Delaware on May 11, 2010, together with any of his employees, agents or Professionals engaged in any way in the preparation of the Examiner's Report or otherwise involved in the Debtors' bankruptcy case or the LBO-Related Causes of Action.

R.    "<u>Examiner's Report</u>" means the report entitled "Report of Kenneth N. Klee, As Examiner" submitted to the Bankruptcy Court for the District of Delaware by Kenneth N. Klee on July 26, 2010 in the case titled *In re Tribune Co., et al.*, chapter 11 No. 08-13141 (KJC) (Bankr. D. Del.)

S.    "<u>Joint Disclosure Statement</u>" means the Joint Disclosure Statement filed by the Debtors on October 22, 2010, as subsequently modified and approved by the Court.

T.    "<u>JPMorgan</u>" means (i) JPMorgan Chase Bank, N.A. and its affiliates; (ii) any of its or their officers, directors, partners, employees, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

U.    "<u>LBO</u>" means the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007 and the merger and related transactions involving Tribune on or about December 20, 2007.

V.    "<u>LBO Lender Debt</u>" means the Senior Loans and the Bridge Loans.

W.    "<u>LBO-Related Causes of Action</u>" means any and all actual or potential pre-petition, post-petition and/or post-emergence claims, obligations, suits, judgments, damages, debts, rights, causes of action, avoidance powers or rights, liabilities of any nature whatsoever arising from or relating to the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the claims asserted in the Complaints and any and all potential legal or equitable remedies associated with any such claims.

X.    "<u>Lender Complaint</u>" means the complaint filed with the Bankruptcy Court by the Committee on November 1, 2010, naming JP Morgan Chase Bank, N.A., et al., as defendants

19

and bearing index number 10-53963, together with any amendments as may be proposed or permitted to such complaint.

Y.    "Mediation" shall have the meaning ascribed to it in Section VII.D of the Joint Disclosure Statement dated December 8, 2010, and any amendments thereto.

Z.    "Mediator" means the Honorable Kevin Gross, appointed in the case titled *In re Tribune Co., et al.*, chapter 11 No. 08-13141 (KJC) (Bankr. D. Del.) by the Bankruptcy Court for the District of Delaware on September 1, 2010.

AA.    "Merrill Lynch" means (i) Merrill Lynch, Pierce, Fenner & Smith and its affiliates; (ii) Merrill Lynch Capital Corporation and its affiliates; (iii) Merrill Lynch & Co. and its affiliates; (iv) any of its or their officers, directors, partners, members, employees, or managers; (v) any of its or their board of directors and any committee or subcommittee of any board of directors; and (vi) Professionals of any Person within (i), (ii), (iii), (iv) or (v) above.

BB.    "Murray Devine" means (i) Murray, Devine & Company and its affiliates, and (ii) any of its or their officers, directors, partners, members, employees, or managers.

CC.    "Noteholder Plan" means the Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as the successor indenture trustee for certain series of senior notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of senior notes and Wilmington Trust Company, in its capacity as the successor indenture trustee for the PHONES Notes, dated October 29, 2010.

DD.    "Oaktree" means (i) Oaktree Capital Management, L.P. and its affiliates; (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of its or

their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

EE.    "Other Potential Settlement" means any potential settlement of any or all of the LBO-Related Causes of Action considered, proposed or discussed at any time, other than the Proposed LBO Settlement or the April Proposed Settlement.

FF.    "Petition Date" means December 8, 2008, the date upon which the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

GG.    "Person" means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

HH.    "PHONES Notes" means the issued and outstanding notes under the indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

II.    "Plans" means any or all of the Debtor/Committee/Lender Plan, the Noteholder Plan, the Step One Lender Plan, and the Bridge Lender Plan.

JJ.    "Potential LBO Liability Party" means the Persons named as defendants in the Complaints, including absent class members, as well as any such Person's current or former officers, directors, employees, partners, members, managers, owners or Professionals.

KK.    "Preserved Causes of Action" has the meaning set forth on Page 22 of the Debtor/Committee/Lender Plan.

LL.    "Professional" means any counsel, consultant, advisor, accountant, testifying expert, non-testifying expert, agent, representative or other Person engaged to provide or

21

involved in providing at any time any services relating to the LBO, the LBO-Related Causes of Action, the Plans, the Complaints, the Examiner, the Examiner's Report, Settlement Analysis and/or the Settlement Process.

MM.    "Proposed LBO Settlement" means the proposed settlement of certain LBO-Related Causes of Action as described in the Debtor/Committee/Lender Plan.

NN.    "Relationship" means any prior, current or prospective personal, professional, business or other relationship among any of the Persons specified in the request, including but not limited to any matter with respect to which such persons have done or sought to do business with one another (including commercial, charitable and any other types of matters) or have been recommended or considered for a position or engagement, at any time within the past ten years, provided that Relationship does not include the transactions constituting the LBO itself.

OO.    "Rule 9019 Motion" means a motion filed or to be filed with the bankruptcy court seeking approval of the Proposed LBO Settlement, whether as a separate motion or as part of a motion seeking approval of the Debtor/Committee/Lender Plan.

PP.    "Senior Loans" means the indebtedness issued pursuant to that certain $8.028 Billion Senior Secured Credit Agreement, dated as of May 17, 2007, as amended, with Tribune, as borrower, and JP Morgan Chase, N.A., as administrative agent and financial institutions from time to time party thereto.

QQ.    "Senior Notes" means the eight series of notes issued and outstanding under any of the following indentures:  (i) the indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (ii) the indenture, dated as of March 19, 1996, between Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as

amended, restated or otherwise modified from time to time; (iii) the indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (iv) the indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

RR.    "Settlement Analysis" means any analysis, consideration, assessment, review, report, evaluations, recovery scenario, expected value analysis, assertion, tactics, strategy or discussion, whether generated by a Professional or otherwise, relating in any way to (i) the potential strength of any or all of the LBO-Related Causes of Action and/or any defense thereto and/or the likely outcome in connection with the litigation of such matters; (ii) the settlement value of any or all of the LBO-Related Causes of Action, including any decision tree analysis or similar evaluation of estimated recoveries based on a range of potential outcomes of the LBO-Related Causes of Action; (iii) the April Proposed Settlement; (iv) the Proposed LBO Settlement; (v) any Other Potential Settlement; and/or (vi) the potential impact of the LBO-Related Causes of Action on the rights and priorities of any parties in interest in the Debtors' bankruptcy proceedings.

SS.    "Settlement Process" means any Communication, discussion, meeting, telephone call, negotiation or bargaining, demands or offers between two or more parties relating in any way to (i) the potential strength of any or all of the LBO-Related Causes of Action and/or any defense thereto and likely outcome in connection with the litigation of such matters; (ii) the settlement or settlement value of any or all of the LBO-Related Causes of Action; (iii) the April Proposed Settlement; (iv) the Proposed LBO Settlement; (v) any Other Potential Settlement;

23

and/or (vi) the potential impact of the LBO-Related Causes of Action and/or the settlement thereof on the rights and priorities of any parties in interest in the Debtors' bankruptcy proceedings.

TT.    "Settlement Term Sheet" shall have the meaning ascribed to it in Section VI of the Debtors' Joint Disclosure Statement, filed with the Court on October 20, 2010.

UU.    "Settling Parties" means Oaktree, Angelo, JPMorgan, Citicorp, Bank of America, Merrill Lynch, Wells Fargo any other Person that would receive a release under the Proposed LBO Settlement.

VV.    "Special Committee" means (i) the special committee of independent directors formed by Tribune's Board of Directors on or about August 27, 2010; (ii) each of its individual members; (iii) any entities in which any such individual member serves as an employee, partner or in any employment or agency relationship; and (iv) any Professionals of any Person included in (i) – (iii).

WW.    "Special Committee Individuals" means all Persons within Definition VV.(ii) or (iv), and any entity or entities that any such Person directly or indirectly owns or controls.

XX.    "Step One Lender Plan" means the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims, dated October 29, 2010.

YY.    "Step One Selling Shareholders" means the stockholders whose stock in Tribune was redeemed for cash pursuant to the Tender Offer.

ZZ.    "Tender Offer" means that certain tender offer for 126 million shares of Tribune Common Stock (52% of shares then outstanding) at $34 per share.

AAA.  "Third Party Complaint" means the complaint filed with the Bankruptcy Court by the Committee on November 1, 2010, naming Dennis J. Fitzsimmons, et al., as defendants and bearing index number 10-54010, together with any amendments as may be proposed or permitted to such complaint.

BBB.  "Tribune" means (i) the entity known as Tribune Company and its direct and indirect subsidiaries, including but not limited to each of the Debtors in the captioned bankruptcy case; (ii) any of their past, present or future officers, directors, partners, members, employees, or managers; (iii) any past, present or future board of directors, board of managers or similar body and any committee or subcommittee thereof of any Person within (i) above, including but not limited to the Special Committee; and (iv) Professionals of any Person within (i), (ii) or (iii) of this Definition BBB.

CCC.  "Tribune Entity" means any Person within Definition BBB.(i).

DDD.  "Tribune Individual" means any Person within Definition BBB.(ii) and/or BBB.(iii) and any entity or entities that any such Person directly or indirectly owns or controls.

EEE.  "Trustee Motion" means the "Motion of Aurelius Capital Management, LP, for the Appointment of a Chapter 11 Trustee." [Docket 5680].

FFF.  "Wells Fargo" means (i) Wells Fargo Bank, N.A. and its affiliates; (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

GGG.  "Zell" means Sam Zell and any entities affiliated with, and current and former Professionals of, Sam Zell.

## INSTRUCTIONS

1.     The words "and" and "or" are to be construed both conjunctively and disjunctively.  The singular form of a noun or pronoun includes the plural form and vice versa.  The word "all" shall also include "each of" and vice versa.

2.     You are requested to produce all responsive Documents in your possession, custody or control, wherever located, including, without limitation, those in the custody of your Professionals and affiliates.

3.     Unless otherwise stated in a specific request herein, the time period covered by the following requests is the period between January 1, 2007, through and including the present.

4.     If any part of the following requests cannot be responded to in full, please respond to the extent possible, specifying the reason(s) for your inability to respond to the remainder and stating whatever information or knowledge you have relating to the portion to which you do not respond.

5.     If there are no Documents responsive to any particular request, please state so in writing.

6.     Where any copy of any Document whose production is sought herein, whether a draft or final version, is not identical to any copy thereof, by reason of alterations, notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies are to be produced separately.

7.     If any Document requested herein was formerly in your possession, custody or control (or that of your Professional) and has been lost or destroyed or otherwise disposed of, you are requested to submit in lieu of any such Document a written statement (i) describing in detail the nature of the Document and its contents, (ii) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (iii) specifying the date on which the Document was prepared or transmitted, and (iv) specifying the date on

26

which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

8.    Hard copies of all Documents should be produced; in addition, copies of all Documents available electronically should be delivered on a disk, DVD or CD-ROM in a format to be agreed upon by Law Debenture Trust Company and the producing party.  Law Debenture Trust Company reserves the right to request that Documents be produced in their native format.

9.    To the extent any responding Person intends to employ an electronic search to help locate responsive or potentially Documents, Law Debenture Trust Company shall require that such Person promptly disclose and come to an agreement with Law Debenture Trust Company respecting its proposed search terms and methodology, and otherwise comply in full with Rule 7026-3(e) of the Local Rules for the United States Bankruptcy Court, District of Delaware.

10.    A request for any Document shall be deemed to include a request for any and all transmittal sheets, cover letters, exhibits, enclosures, or attachments to such Document, in addition to the Document in its full and unexpurgated form.

11.    Documents should be segregated according to the number of the request to which you are responding or produced in the manner they are kept in the ordinary course of business. Documents attached to each other should not be separated.

12.    Each request for Documents herein includes a request for exact copies of all disks, CDs, DVDs and other removable media containing any information responsive to such request. Electronic records and computerized information should be produced in an intelligible format or together with a sufficient description of the system or program from which each was derived to permit rendering the material legible.

13.     Each request for Documents herein relating in any way to the Proposed LBO Settlement, April Proposed Settlement, any Other Potential Settlement, Settlement Analysis, the Settlement Process, the LBO-Related Causes of Action, and/or Complaints specifically is intended to request, inter alia, (i) all of the Debtors' and/or Special Committee's internal work product, expert reports, consultant reports, or attorney-client communications and (ii) all such Documents or Communications or other potentially privileged materials exchanged between and among Tribune and the Committee on a confidential or common interest basis that may have been shared with one or more of the Potential LBO Liability Parties.

14.     Notwithstanding anything to the contrary contained herein, Law Debenture Trust Company does not seek by these requests production of Communications concerning the Mediation exchanged between or among parties to the Mediation during the mediation meeting that occurred on November 17, 2010, to the extent that the Mediator was present for such Communications.

15.     If any privilege is claimed as to any Communication requested or sought to be identified herein

        A)  State the nature of the privilege of the claim (i.e., attorney/client, work product, etc.);

        B)  State the name of the party claiming privilege and the name of the attorney, if any, with respect to whom the privilege is claimed;

        C)  State the basis for claiming the privilege as to the specific Communication;

        D)  Identify all persons present at any Communication to which privilege is claimed and all persons to whom the subject matter of the Communication was discussed or disclosed; and

        E)  State the date of each such Communication.

16.     If any privilege is claimed as to any Document requested or sought to be identified herein:

28

A) State the nature of the privilege claimed (i.e., attorney/client, work product, etc.);

B) State the basis for claiming the privilege as to the specific information or Documents; and

C) State the date of such Document; identify the type of Document (i.e., letter, memo, etc.); set forth the subject matter thereof, identify each person who prepared it and each person (if any) who signed it; identify each person to whom it was directed, circulated or shown; identify each person now in possession of the Document; and, for each person identified, indicate whether such person is an attorney.

17.    If Merrill Lynch has asserted any privilege or other protection as a basis for withholding any Documents or Communications from production in connection with any document request or production in the above-captioned case (including, but not limited to, the Documents and Communications described on the bottom of Page 336 and top of Page 337 of the Examiner's Report)—and such Documents and/or Communications are not reflected on a privilege log being produced in response to these documents requests—please create and produce a privilege log for those Documents and Communications which includes the information requested in Instructions 15 and/or 16, as applicable.

18.    For the avoidance of doubt, these requests call for the production of complete, unredacted versions of any redacted Documents or Communications that may be contained in the Document Depository. If any privilege is claimed as to any redacted portion of any Document or Communication contained in the Document Depository, please log such redacted material pursuant to Instructions 15-17.

19.    For purposes of each document request, each such request for Documents to be produced by you expressly includes Documents in the possession of your Professionals.

29

20.    The following document requests are to be deemed continuing in nature.  In the event you become aware of or acquire additional information relating or referring to any of the following document requests, such additional information is to be promptly produced.

New York, New York
December 15, 2010

KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP

By:  ___/s  Paul J. Burgo_____

David S. Rosner
Sheron Korpus
Christine Montenegro
Paul J. Burgo
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700
*Counsel to Law Debenture Trust Company of New York*

30

# EXHIBIT 4

**Paul Burgo**

| | |
|---|---|
| **From:** | Christine Montenegro |
| **Sent:** | Thursday, December 23, 2010 3:38 PM |
| **To:** | mprimoff@kayescholer.com |
| **Cc:** | Paul Burgo |
| **Subject:** | Tribune |

Please let me know if you are available next Monday to engage in a meet and confer session regarding the subpoena we served on Merrill Lynch on behalf of Law Debenture.

Regards,
Christine Montenegro

Christine A. Montenegro
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Tel. (212) 506-1715
Fax (212) 835-5015
CMontenegro@kasowitz.com

1