## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, <u>et al.</u>, | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Related to Docket No. 7527** |

### DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS' OBJECTION TO THE NOTEHOLDER PLAN PROPONENTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INFORMATION FROM THE DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS AND OTHER PARTIES OR, ALTERNATIVELY, FOR AN ORDER OF PRECLUSION RESPECTING CERTAIN ISSUES

# TABLE OF CONTENTS

Page

I.    THE COMPLAINTS OF THE NOTEHOLDER PLAN PROPONENTS CONCERNING THE COMMON INTEREST DOCTRINE ARE MERITLESS ......6

    A.    The Debtor/Committee/Lender Plan Proponents Share A Common Legal Interest In The Confirmation Of The Plan And Communications In Furtherance Of That Interest Are Protected From Disclosure........................7

    B.    Communications Among Parties With A Common Legal Interest Are No Less Protected from Disclosure Than Communications Among Their Lawyers....................................................................................................................13

II.    THE COMPLAINTS OF THE NOTEHOLDER PLAN PROPONENTS CONCERNING THE MEDIATION ORDER ARE MERITLESS............................17

    A.    Background .......................................................................................................17

        1.    Events Preceding And Following The Entry Of The Mediation Order17

        2.    Aurelius' Discovery Requests And Related Meet And Confers ..........19

    B.    The Court Should Deny The Motion Or Enter An Order Modifying The Mediation Order In The Manner Proposed By The Debtor/Committee/Lender Proponent Group. ................................................20

III.    THE COMPLAINTS OF THE NOTEHOLDER PLAN PROPONENTS CONCERNING THE DECEMBER 15, 2009 DISCOVERY START DATE ARE MERITLESS ..........................................................................................................25

    A.    December 15, 2009 Is A Reasonable And Logical Discovery Start Date ........25

    B.    Speculation About "Hypotheticals" Does Not Establish The Relevance Of Documents Created Before December 15, 2009................................................28

    C.    The Confirmation Hearing Is Not A Full-Fledged Trial That Entitles The Noteholder Plan Proponents To Unlimited Discovery ......................................30

46429/0001-7316158v

The Debtor/Committee/Lender Plan Proponents,[1] by and through their undersigned counsel, hereby submit this objection to the Noteholder Plan Proponents' Motion to Compel Production of Documents and Information from the Proponents of the Debtor/Committee/Lender Plan and Other Parties, or, Alternatively, For An Order of Preclusion Respecting Certain Issues (the "Motion") [Docket No. 7527].

## INTRODUCTION

Notwithstanding the overblown rhetoric of the Noteholder Plan Proponents, the Debtor/Committee/Lender Plan Proponents have no desire to limit legitimate discovery requests or otherwise "prevent the Noteholder Plan Proponents and this Court from fairly examining whether the Proposed LBO Settlement was the product of arms'-length bargaining, whether there is any basis to find fraud or collusion, and whether the Debtor/Committee/Lender Plan generally has been proposed in good faith." Motion at 5. To the contrary, as shown below, each of the Debtors, the Committee and the Lenders already has devoted enormous efforts and resources to responding to the Noteholder Plan Proponents' overbroad discovery requests. As a result, hundreds of thousands of pages of relevant, non-privileged materials are being produced, enabling all parties to prepare for the upcoming confirmation hearing. Further, the positions advanced by the Debtor/Committee/Lender Plan Proponents with respect to the common interest privilege, the Mediation Order, and the period from which discoverable materials may be obtained are fully consistent with applicable law and entirely reasonable.

By way of background, on December 3, 2010, the Noteholder Plan Proponents served on the Debtors their first requests for production of documents, consisting of more than 80 separate

---

[1] The Debtor/Committee/Lender Plan Proponents are the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), J.P. Morgan Chase Bank, N.A. ("JPMorgan"), Oaktree Capital Management, LP ("Oaktree"), and Angelo, Gordon & Co., L.P. ("Angelo Gordon" and, together with JPMorgan and Oaktree, the "Lenders").

requests.[2]  In those requests, the Noteholder Plan Proponents sought an incredible array of

materials, including information regarding the "Relationships" among various parties in interest

dating back ten years.  For example, given their expansive definitions and scope, the Noteholder

Plan Proponents' document requests purported to require the Debtors to produce documents

relating to:

> --        any consideration by Oaktree, Angelo Gordon, JPMorgan, Citicorp, Bank of

America, Merrill Lynch or Wells Fargo, among others, to employ *any* Tribune Company or

Special Committee "past, present or future . . . employees" in the last ten years (First Request for

Production of Documents of Aurelius Capital Management, LP, to Debtors, Request No. 1);

> --        any bank accounts that any member of the Special Committee had with

JPMorgan, Citicorp, Bank of America, Merrill Lynch or Wells Fargo, among others, in the last

ten years (*id.*, Request No. 3); and

> --        any subscription to the Chicago Tribune purchased by any Special Committee

member in the last ten years (*id.*, Request No. 5).

In the following weeks, the Noteholder Plan Proponents served similarly overbroad

requests on numerous other parties, including each of the other Debtor/Committee/Lender Plan

Proponents.  All told, as of this date, the Noteholder Plan Proponents have served *more than

1300 pages of document requests* on 46 separate entities.  *See* Letter from Benjamin Kaminetsky,

Davis Polk, to Chief Judge Kevin J. Carey, dated Jan. 4, 2011, Exhibit A.

---

[2] In their brief the Noteholders complain that the Debtor/Committee/Lender Plan Proponents opposed commencing discovery prior to the Disclosure Statement hearing.  Motion at 6.  While that observation is accurate, it does not explain the Noteholders' failure to serve such discovery prior to December 3, nor does it explain why the Noteholders delayed another week or longer in seeking discovery from other parties.

Consistent with the "Case Management Order,"[3] the Debtors and other parties served various objections to the document requests, pointing out that many sought information that is privileged or not reasonably calculated to lead to the discovery of admissible evidence. Among other things, the document requests expressly call for disclosure of privileged communications among the Debtor/Committee/Lender Plan Proponents clearly protected from discovery under the common interest doctrine as well as communications directly relating to the Court-ordered mediation conducted by Judge Gross. The requests also seek production of documents generated during the period from the bankruptcy petition date (December 8, 2008) through December 15, 2009 – a period ending more than nine months before the mediation leading to the Debtor/Committee/Lender Plan and prior to the commencement of *any* settlement negotiations conducted pursuant to the "Depository Order."[4]

Notwithstanding their objections, in response to the requests of the Noteholder Plan Proponents, the Debtor/Committee/Lender Plan Proponents already have produced hundreds of thousands of pages of material, and production is ongoing. Moreover, the Debtor/Committee/Lender Plan Proponents have engaged in dozens of hours of meet and confer sessions with the Noteholder Plan Proponents, individually and collectively, in an effort to resolve or narrow disputes. With respect to the specific matters raised by the Motion, the parties met and conferred over a dozen times and exchanged numerous drafts of potential compromises.

While those meetings have helped to narrow and focus the areas of difference, significant disputes remain. First, the Noteholder Plan Proponents continue to take a position regarding the common interest doctrine that is at odds with controlling precedent and consciously designed to

---

[3] Discovery and Scheduling Order for Plan Confirmation, dated Dec. 20, 2010 [Docket No. 7239].

[4] Order (I) Authorizing the Debtors to Establish a Document Depository and Directing the Committee to Deliver Certain Documents to the Depository and (II) Establishing Settlement Negotiation Protections, dated Dec. 15, 2009, [Docket No. 2858] (attached as Exhibit 1 hereto).

enable the Noteholder Plan Proponents to invade privileged communications among the Debtor/Committee/Lender Plan Proponents respecting approval of their settlement and the Debtor/Committee/Lender Plan into which it has been incorporated.  In this connection, the Noteholder Plan Proponents assert that the Debtor/Committee/Lender Plan Proponents can *never* have a common legal interest that would enable the settling parties to communicate privileged information amongst themselves in furtherance of efforts to obtain approval and consummation of their settlement.  The Noteholder Plan Proponents also claim that, even if a protectable common interest exists (as it assuredly does), it would somehow be destroyed if the relevant communications were initiated by the *parties* with a common interest instead of by their *attorneys*, even where elements of the privilege are otherwise satisfied.  The Noteholder Plan Proponents thus argue, for example, that emails from attorneys on which the Debtor/Committee/Lender Plan Proponents are "carbon copied" may be within the privilege while emails in which those same clients are listed in the "to" or "from" field somehow are not, even if the substance of the communications otherwise were identical.  As shown below, there is nothing to support this absurd position.

Second, the Noteholder Plan Proponents insist that, even though the Debtors and other parties negotiated the Debtor/Committee/Lender Plan and the settlement of the LBO-Related Causes of Action embodied therein under and pursuant to the express protections of the "Mediation Order"[5] entered by this Court, the Debtor/Committee/Lender Plan Proponents must waive the protections of the Mediation Order and disclose the substance of confidential mediation communications, or be precluded from introducing *any* evidence as to the fact and results of the mediation at the confirmation hearing.  Not surprisingly, the Noteholder Plan

---

[5] Order Appointing Mediator, dated Sept. 1, 2010 [Docket No. 5591] (attached as Exhibit 2 hereto).  All capitalized terms herein relating to the mediation are set forth in the Mediation Order.

Proponents are unable to muster any authority for this remarkable position, which is contrary to all governing authority.

Nonetheless, in an effort to put the issue to rest, the Debtor/Committee/Plan Proponents have agreed to a modification of the Mediation Order which will allow production of a wide range of documents and information relating to the mediation – in fact, all documents except for those relating to core mediation communications between a mediation party and Judge Gross, communications between or among mediation parties concerning the mediation which were exchanged in connection with a mediation session convened by Judge Gross, and communications between Judge Gross and the Examiner. That this olive branch – which goes well beyond anything required by the Mediation Order or case law and is more than sufficient to allow the Noteholder Plan Proponents to look for the collusion they claim to suspect – was rejected out of hand reveals the Noteholder Plan Proponents' true motivations here.

Third, the Noteholder Plan Proponents seek settlement and other communications generated as early as the bankruptcy petition date of December 8, 2008, despite the fact that negotiations of the settlement of the LBO-Related Causes of Action that is now embodied in the Debtor/Committee/Lender Plan did not begin until September 2010. In an effort to be as inclusive as reasonably possible, the Debtor/Committee/Lender Plan Proponents have agreed to search for and produce documents generated as early as December 15, 2009, the date of entry of the Depository Order that laid the groundwork for settlement discussions related to *prior* settlement plans.

Dissatisfied with this proposal, the Noteholder Plan Proponents rely on rank speculation and hypotheticals to challenge that discovery start date. However, such speculation is unfounded. As explained below, a December 15, 2009 start date for plan-related discovery is

5

more than sufficient for the Noteholder Plan Proponents to test their theories regarding the

genesis of the settlement embodied in the Debtor/Committee/Lender Plan.

**ARGUMENT**

**I.    THE COMPLAINTS OF THE NOTEHOLDER PLAN PROPONENTS CONCERNING THE COMMON INTEREST DOCTRINE ARE MERITLESS**

A substantial portion of the Motion is devoted to the dispute over application of the

common interest privilege.  It is important at the outset to define the extent of the dispute.[6]

The Noteholder Plan Proponents have attached a common interest "proposal" as

Exhibit 10 to their Motion (the "Noteholder Common Interest Proposal").  The

Debtor/Committee/Lender Plan Proponents have also prepared a common interest proposal (the

"DCL Common Interest Proposal"), which they shared with the Noteholder Plan Proponents

during the meet and confer process.  A blackline comparing the DCL Common Interest Proposal

to the Noteholder Common Interest Proposal is attached as Exhibit 3 hereto.  As the blackline

demonstrates, the two common interest proposals differ in a number of key respects.

Notwithstanding the many differences between the two proposals, however, the

Noteholder Plan Proponents raise only two specific disagreements for the Court to resolve.  First,

the Noteholder Plan Proponents disagree with the position of the Debtor/Committee/Lender Plan

Proponents that the Debtors, Committee and Lenders share a common legal interest that arose on

the date that the Mediator announced that he had brokered a settlement among those parties and

filed a term sheet with the Court.  Motion at 12-17.  Second, the Noteholder Plan Proponents

---

[6] The Noteholder Plan Proponents claim that they "moved miles" during the meet and confer process with respect to the common interest privilege in an effort "to try to accommodate their counterparts."  Motion at 7.  While the parties have narrowed some of their differences, the Noteholder Plan Proponents should not get much credit for modifying their positions given that the initial positions they staked out were patently untenable – such as arguing that there *never* could exist a common interest protecting communications among the various Debtor/Committee/Lender Plan Proponents, meaning that the Debtor/Committee/Lender Plan Proponents would have to disclose even drafts of their confirmation briefs leading up to the confirmation hearing.

6

claim that no common interest privilege applies to any communications initiated by the Debtor/Committee/Lender Plan Proponents themselves – even communications that otherwise would be immune from discovery pursuant to the attorney-client or attorney work product privileges – but instead protects only communications initiated by attorneys or non-testifying financial advisors. Indeed, the Noteholder Plan Proponents bizarrely assert that communications on which clients are "carbon copied" may be within the privilege, while communications in which clients are listed in the "to" or "from" field somehow are not. Motion at 17-21. Each of these contentions is addressed in detail below.[7]

**A.    The Debtor/Committee/Lender Plan Proponents Share A Common Legal Interest In The Confirmation Of The Plan And Communications In Furtherance Of That Interest Are Protected From Disclosure.**

The Noteholder Plan Proponents assert that there can *never* be a protectable common legal interest among the Debtors, Committee and Lenders who are proponents of the Debtor/Committee/Lender Plan, claiming that "legal adversity between the parties remains to this day and will remain until such time as the Court, if ever, approves the Proposed LBO Settlement." Motion at 9; *see id.* at 14 ("[T]he LBO Lenders can share no common legal interest with the parties who are suing them while those claims are threatened or pending. Unless and until the settlement is approved, those parties remain directly adverse to each other.").

Relying almost entirely on the unpublished transcript of a discovery teleconference in the *Lyondell* bankruptcy case from the Southern District of New York, the Noteholder Plan

---

[7] As the Court knows, a party seeking to compel production of documents in the face of a timely asserted objection bears the burden of raising its arguments in a motion to compel. *See Warren Dist. Co. v. InBEV USA L.L.C.*, No. 07-1053 (RBK), 2008 WL 4371763, at *2 (D.N.J. Sept. 18, 2008) (declining to decide whether documents sought in discovery were protected by attorney-client privilege because moving party did not raise challenge to privilege in its motion). Given that the Noteholder Plan Proponents chose to raise only these two issues, and no others, it is axiomatic that those are the only two issues that have been placed before the Court in response to the objections of the Debtor/Committee/Lender Plan Proponents. The Court should therefore reject the "Trojan horse" attempt by the Noteholder Plan Proponents to gain approval for the entirety of their Common Interest Proposal – which is contrary to law in many respects – when they have specifically disputed only two provisions of the DCL Common Interest Proposal in their Motion.

7

Proponents reason that the Debtor/Committee/Lender Plan Proponents may share a common "commercial" interest in seeing their plan approved, but do not share any common "legal" interest in that result. This argument is both illogical and unsupportable under the law of this jurisdiction.

The law is clear that parties who share a common legal interest and who exchange otherwise privileged communications with each other in furtherance of that common interest may do so under the protection of the common interest privilege. *In re Leslie Controls, Inc.*, 437 B.R. 493, 496 (Bankr. D. Del. 2010); *see also Rembrandt Techs., L.P. v. Harris Corp.*, C.A. No. 07C-09-059-JRS, 2009 Del. Super. LEXIS 46 (Del. Super. Ct. Feb. 12, 2009). To invoke the common interest privilege, a party must establish the following elements: "(1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege has not otherwise been waived." *Leslie Controls*, 437 B.R. at 496.

Importantly, the common legal interest among the parties need not be identical so long as it is substantially similar. *La. Municipal Police Employees Retirement Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 309 (D.N.J. 2008); *Rembrandt*, 2009 Del. Super. LEXIS 46, at *25-26. "The common interest privilege does not require a complete unity of interests among the participants . . . and applies even where the parties' interests are adverse in substantial respects." *In re Mortgage & Realty Trust*, 212 B.R. 649 (Bankr. C.D. Cal. 1997); *see also Sealed Air Corp.*, 253 F.R.D. at 310 (rejecting argument that parties adverse during a business transaction could not share a common legal interest).

There can be no question that parties to a settlement or proponents of a plan of reorganization share a common legal interest in gaining court approval of the plan and settlement

46429/0001-7316158v

pursuant to section 1129 of the Bankruptcy Code and Rule 9019 of the Federal Rules of

Bankruptcy Procedure. Although the Noteholder Plan Proponents cite to the unpublished

*Lyondell* teleconference to support their position, *Leslie Controls* – a recent, post-*Lyondell*,

published opinion by the Bankruptcy Court for the District of Delaware – is directly on point and

contrary to the position of the Noteholder Plan Proponents.

In *Leslie Controls*, the debtor shared privileged information with an ad hoc committee of

unsecured asbestos claimants and the future claimants' representative as part of negotiations

toward a plan of reorganization. 437 B.R. at 496. The three parties ultimately reached

agreement and filed a plan of reorganization over the objection of various insurance companies

(the "Insurers"). Like the Noteholder Plan Proponents here, the Insurers in *Leslie Controls*

argued that "the parties shared, at most, a common commercial interest as opposed to a legal

interest," 437 B.R. at 498, because the debtor and creditors – parties adverse to one another –

could never share a common legal interest. *Compare* Motion at 16 *and Leslie Controls*, 437 B.R.

at 498, 501. The Bankruptcy Court soundly rejected this position, and held that the

communications were protected from disclosure. *Id.* at 503. So long as those communications

related to a "common legal interest against their 'common enemy,'" they were protected. *Id.* at

502. In *Leslie Controls*, the "common enemy" of the plan proponents was the Insurers, and

communications among the proponents – even before the filing of a plan of reorganization –

were protected under the common interest doctrine. *Id.*[8]

---

[8] *See also 330 Acquisition Co. v. Regency Savings Bank, FSB*, 2003 WL 25516150 (Sup. Ct. N.Y. Co. Jul. 11, 2003) (affirming special referee's finding that plaintiff creditor shared "common interest" with non-party debtor where they "may have gone from adversaries to allies with a common legal interest as they tried to fend off challenges to the reorganization plan"), *aff'd* 12 A.D.3d 214, 214 (1st Dep't 2004) ("Supreme Court properly exercised its discretion, based on its realistic appreciation of the nonparty's interlocking relationship with plaintiff, in finding that the communications between plaintiff and the nonparty were subject to the attorney-client common interest privilege. This was properly based on the special referee's finding of their common legal interest, even with respect to pre-bankruptcy communications, despite the fact that they were debtor and creditor.") (internal citations omitted).

Similarly here, the proponents of the Debtor/Committee/Lender Plan share a "common legal interest" – approval of the Debtor/Committee/Lender Plan and the settlement upon which it is premised – "against their common enemy" – the proponents of the Noteholder Plan, who seek to defeat the Debtor/Committee/Lender Plan. The Debtors, Committee and Lenders all resolved to become proponents of a common plan of reorganization on October 12, 2010, when the Mediator determined that a final settlement had been reached and filed the October Term Sheet;[9] from that point forward, those parties have worked collaboratively as part of a common legal strategy to document a plan that will withstand the challenges of the Noteholder Plan Proponents and be approved by the Court, and to oppose any competing plans. While the parties continued to discuss and craft the specific provisions that would comprise the lengthy plan of reorganization and disclosure statement, with respect to the LBO-Related Causes of Action – the matter as to which these parties were adverse – the October Term Sheet filed by the Mediator contained all of the material terms necessary to document the Debtor/Committee/Lender Plan.[10]

No doubt aware of *Leslie Controls* (though, curiously, the decision merits only a passing reference in their brief), the Noteholder Plan Proponents apparently recognize that this Court might "disagree with the *Lyondell* ruling, and find that at some point a legally cognizable common legal interest arose between the Debtor/Committee/Lender Plan Proponents." Motion at 15.[11] But the Noteholder Plan Proponents wrongly propose that the common interest period

---

[9] Likewise, the Debtors, Oaktree and Angelo Gordon resolved to settle the LBO-Related Causes of Action and become proponents of a common plan with the Mediator's filing of the first Term Sheet reflecting the agreement among them on September 27, 2010. Accordingly, the Debtors, Oaktree and Angelo Gordon share a common legal interest with respect to that settlement from and after September 27, 2010.

[10] To be sure, the Debtors, Committee and Lenders also share a common "commercial" interest with respect to their plan, but "[t]he fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing" the common interest. *In re Teleglobe Communications Corp*, 493 F.3d 345, 365 (3d Cir. 2007) (citation omitted).

[11] To the extent the *Lyondell* teleconference transcript is inconsistent with *Leslie Controls*, the *Leslie Controls* decision is plainly the more persuasive authority for this Court. It also is worth noting that Akin Gump, as counsel

would only begin on November 23, 2010, the date that the final amended

Debtor/Committee/Lender Plan was filed.[12]  This makes no sense.  The decision by Judge Gross

to publicly report that a settlement had been reached and to file the Term Sheets with the Court

was not a trivial matter.  It is indicative of the definitive nature of the settlements, and reveals

that the settlements announced by the Term Sheets were not tentative agreements scribbled on

the back of an envelope.  Rather, the Term Sheets represented the product of Judge Gross's

efforts and his decision to file the Term Sheets with the Court cannot be taken lightly.[13]

---

to a senior lender party in *Lyondell*, urged Judge Gerber to find that a common interest existed between the defendant lenders and the debtors – the opposite position it is advocating to this Court in this Motion.  In addition, while the Noteholder Plan Proponents place much reliance on *Lyondell* for purposes of this Motion, the Noteholder Plan Proponents have repeatedly urged this Court to depart from *Lyondell* precedents with respect to other issues, such as the appropriate scope of confirmation-related discovery.

[12] The Noteholder Plan Proponents argue that because the October Term Sheet referred to a Distributable Enterprise Value ("DEV") of $6.1 billion while the final plan referred to a DEV of $6.75 billion, it must be that "negotiations continued and material terms were changed following the filing of the October Term Sheet."  Motion at 15.  But the DEV is not a "negotiated" term – it is simply an estimate provided by the Debtors' professionals (in this case, Lazard) as to the valuation of the Debtors.  Any change in the DEV from the October Term Sheet to the current version of the Debtor/Committee/Lender Plan has nothing to do with any negotiation of "material terms" of the settlement announced by the Mediator.  Likewise, other provisions that appear in the Debtor/Committee/Lender Plan reflect the proponent parties' efforts to craft a plan of reorganization that contained all of the necessary provisions and is confirmable; the settlement of the LBO-Related Causes of Action, however, was definitively settled by the October Term Sheet filed by the Mediator.  Ironically, the changes to the Debtor/Committee/Lender Plan after the October 22, 2010 filing were mainly designed to address objections raised by the Noteholder Plan Proponents, and were not indicative of any further "negotiations" among the settling parties.  The suggestion that efforts of the Debtor/Committee/Lender Plan Proponents to respond to objections raised by the Noteholder Plan Proponents somehow destroyed the common interest otherwise shared by the Debtor/Committee/Lender Plan Proponents reveals the untenable nature of the Noteholder Plan Proponents' argument.

[13] If, notwithstanding the foregoing, the Court determines that the filing of the October Term Sheet somehow was not sufficiently definitive to give rise to such common legal interest, the proper "start date" for the common interest period would be October 22, 2010, the date on which the Debtor/Committee/Lender Plan Proponents filed a fully developed plan of reorganization reflecting all of the terms contained in the Term Sheet.

Indeed, when convenient to their own interests, the Noteholder Plan Proponents endorse just such a date for the commencement of the common interest relationship among plan proponents.  Specifically, in an effort to protect communications among proponents of the plan of reorganization filed in April (the "April Plan") – one of whom (Centerbridge) was represented by Akin Gump, which now serves as counsel to Aurelius – the Noteholder Plan Proponents agree that April 12, 2010 – the date on which the April Plan was *first* filed – is the date on which a common interest arose among proponents of that plan, and not any later date on which an amended plan was filed.  Akin Gump, which then represented Centerbridge Partners L.P. ("Centerbridge"), a proponent of the April Plan, understandably used a more expansive common interest period for the April Plan to protect its own communications from that period – taking a position with respect to the common interest period comparable to that taken by the Debtors, Committee and Lenders here.  There is of course no basis to distinguish between the two plans in this regard.

11

Finally, the Noteholder Plan Proponents cite a decision from the Northern District of Illinois – their only other authority besides the unpublished *Lyondell* teleconference transcript – for the proposition that "parties negotiating the definitive terms of an agreement are adverse, even after a term sheet has been agreed to." Motion at 16, citing *In Re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 2363311, at *5 (N.D. Ill. 2007). The Noteholder Plan Proponents, however, do not reveal that Judge Sontchi considered and *expressly rejected* that holding in *Leslie Controls. See Leslie Controls*, 437 B.R. 501-02 (stating that cases such as *In re JPMorgan Chase* "are not universal" and "that the imposition of a black-line rule is inappropriate"). In any event, the *JPMorgan* court ultimately held that a common interest privilege *did* exist between J.P. Morgan and Bank One after the "parties had reached an agreement on the terms of the deal." 2007 WL 2363311, at *5. After that point, they "shared the goal of ensuring the merger was approved" by shareholders, without which the agreement was left without effect. *Id.*

The same holds true here. The Debtor/Committee/Lender Plan Proponents reached agreement on terms resolving their adverse interests by October 12, 2010, when the Mediator announced their negotiated settlement and filed the October Term Sheet (and certainly no later than October 22, 2010, when the plan embodying that settlement was filed with the Court). Thereafter, the parties worked cooperatively towards the common goal of seeking this Court's approval of their negotiated resolution, including by making revisions to their plan to address objections raised by the Noteholder Plan Proponents.

In sum, there simply can be no question that a common legal interest arose between the Debtors, Committee and Lenders once those parties agreed, pursuant to an agreement brokered by the Mediator, to settle the LBO-Related Causes of Action and that, as a consequence,

46429/0001-7316158v

privileged communications in furtherance of that common interest from and after the date of settlement do not become discoverable simply because they are shared among the parties to the settlement.

**B.      Communications Among Parties With A Common Legal Interest Are No Less Protected from Disclosure Than Communications Among Their Lawyers.**

In their other disagreement with the Debtor/Committee/Lender Common Interest Proposal, the Noteholder Plan Proponents argue that only communications between lawyers or advisers are protected under the common interest privilege, and that all "communications generated by the clients themselves to other parties or other counsel" are *per se* not protected. Thus, for example, the Noteholder Plan Proponents agree that the common interest privilege applies to e-mails sent by attorneys, even where clients are listed in the "cc" field, but then insist that there is no privilege applicable to emails in which clients are listed in the "to" or "from" field, even where the substance of the communication information is identical to a protected communication that lists the client in the "cc" field.

The common interest privilege assuredly does not stand or fall on such hyper-technical nitpicking.  The relevant inquiry is not whether the people engaging in communications have a law degree or whether a particular party is listed in the "to" field instead of the "cc" field of an email.  Rather, the appropriate inquiry is whether the subject matter of the communications at issue would be protected by the attorney-client or work product privileges but for their disclosure to a party within the common interest.

The DCL Common Interest Proposal therefore sets forth the correct definition of a common interest communication:

> Common Interest Communications" means oral, written or electronic communications, draft pleadings, briefs, plans, disclosure statements or other correspondence exchanged solely between or among parties within a Common

> Interest Relationship that, if only exchanged between or among a single party, its counsel and/or advisors, would have been protected from discovery by any applicable attorney-client privileges or work product protections.

DCL Common Interest Proposal, ¶ A.4, attached as Exhibit 4.  This formulation – not the one

proposed by the Noteholder Plan Proponents – parallels the weight of the law governing

common interest and protects the Debtor/Committee/Lender Plan Proponents' legitimate

expectations that they would not waive the attorney-client privilege when they communicated

with each other regarding the advice of their lawyers, or solicited information permitting them to

seek legal advice, or communicated at the direction of counsel.

As Judge Sontchi explained in *Leslie Controls*, the common interest doctrine applies to

"information sharing *among clients* with different attorneys" and "applies whenever the

communication is made in order to facilitate the rendition of legal services to each of the clients

involved in the conference."  437 B.R. at 496 (emphasis added).  Indeed, numerous federal

courts have recognized that the common interest privilege is not limited to communications

between and among counsel to parties sharing a common interest.  *See In re Grand Jury*

*Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) (noting that "persons who share a common interest

in litigation should be able to communicate with their respective attorneys *and with each other* to

more effectively prosecute or defend their claims.") (emphasis added); *Zitzka v. Vill. of*

*Westmont*, 2009 U.S. Dist. LEXIS 41081 (N.D. Ill. May 13, 2009) ("Importantly for our

purposes here, the common interest doctrine may apply in certain circumstances to

communications between two non lawyers who are both covered by the common interest.");

*BASF AG v. Reilly Indus., Inc.*, 224 F.R.D. 438, 443 (S.D. Ind. 2004) (rejecting argument that

common interest between defendant and Proctor & Gamble was commercial, not legal, and

holding that communication between non-lawyer employees of both companies did not waive

work product protection); *IBJ Whitehall Bank & Trust Co. v. Cory & Assocs.*, C.A. No. 97 C

14

5827, 1999 U.S. Dist. LEXIS 12440 (N.D. Ill. Aug. 10, 1999) (rejecting the argument that communications were not privileged because they were between non-attorneys).[14]

As the Noteholder Plan Proponents point out, the Third Circuit has noted in *dicta* that "[s]haring the communication directly with a member of the community may destroy the privilege." *Teleglobe*, 493 F.3d at 364. But *Teleglobe* does not mandate a different result here. Aside from its status as dicta and the express qualification ("*may* destroy the privilege"), *Teleglobe* purported to interpret Delaware law, not federal common law. *Id.* at 358; *see Net2Phone, Inc. v. Ebay, Inc.,* No. 06-2469 (KSH), 2008 U.S. Dist. LEXIS 50451, at * 31 (D.N.J. June 26, 2008) (noting that *Teleglobe* "court applied Delaware state law, rather than Federal common law"). Yet, subsequent Delaware cases have disagreed with *Teleglobe* and expressly held that the common interest privilege extends to communications among clients.

Specifically, in *Rembrandt*, 2009 Del. Super. LEXIS 46, at *25, the defendant in a patent litigation moved to compel documents that had been withheld by Rembrandt, the plaintiff patent-holder. The documents at issue were communications between Rembrandt and its strategic partner with respect to enforcement of certain patents, and involved communications between representatives of each entity as well as communications with counsel. *Rembrandt*, 2009 Del. Super. LEXIS 46, at *11. The movant argued, as the Noteholder Plan Proponents have done here, that the common interest doctrine could not apply "because many of the challenged communications were shared directly between community members, instead of through their

---

[14] This is not a remarkable proposition. Remembering that the common interest privilege is an extension of the attorney-client privilege, communications between two clients who share a common legal interest are directly analogous to communications between two non-lawyer employees of the same company about matters as to which they intend to seek legal advice or discussions about counsel's advice. *See, e.g., WebXchange Inc. v. Dell Inc.*, 264 F.R.D. 123, 126 (D. Del. 2010) (finding communications with other employees "in their employment capacities" or where necessary to assist in obtaining legal advice not a waiver of privilege); *AT&T Corp. v. Microsoft Corp.*, No. 02-0164 MHP (JL), 2003 U.S. Dist. LEXIS 8710, at *8 (N.D. Cal. Apr. 18, 2003) (citing *Upjohn v. U.S.*, 449 U.S. 383, 394-95 (1981)); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 518 (D. Conn. 1976) ("A privileged communication should not lose its protection if an executive relays legal advice to another").

respective attorneys." *Id.* at *27.  Although the court acknowledged that some courts have indicated that "in certain circumstances" such direct communications "may" destroy the privilege (i.e., *Teleglobe*), the court held that these communications were privileged.  The court noted:

> In the absence of any reason to impose a restriction on communications between members of the community of interest, it seems unnecessarily burdensome to require that the "decision makers" within the community of interest cannot communicate with each other regarding legal advice they received from their attorneys, but must instead funnel those communications through attorneys.

*Id.* at *28 (internal marks omitted). [15]

The policy concerns highlighted by the *Rembrandt* court apply equally if not more strongly to the bankruptcy context, where (as here) multiple parties with otherwise divergent interests may share a common legal interest in achieving confirmation of a plan that addresses and resolves various disputes among the parties.  Accordingly, there is no reason to artificially limit the ambit of the common interest privilege exclusively to communications among attorneys.  Indeed, doing so would only increase the expenses of administration of the bankruptcy case (by forcing all communications to be funneled through lawyers, many of whom are paid by the bankruptcy estate) for no discernible reason whatsoever.  If a communication would otherwise be privileged, it is a common interest communication and is protected.  If it is not privileged, it is not protected.  The Noteholder Plan Proponents' position is unfounded logically and legally, and should be rejected.

---

[15] Most of the subsequent Third Circuit cases that the Noteholder Plan Proponents cite (Motion at 19) simply reference *Teleglobe* generally and go on to decide the privilege issues at hand on entirely different grounds.  *See Cooper Health Sys. v. Virtua Health, Inc.*, 259 F.R.D. 208, 214 (D.N.J. 2009) (finding no common interest because there was no underlying attorney-client or work product protection); *Warren Dist. Co. v. InBev USA L.L.C.*, No. 07-1053 (RBK), 2008 WL 4371763, at *3 (D.N.J. Sept. 18, 2008) (finding documents did not have to be produced because they were not relevant).

16

II.     **THE COMPLAINTS OF THE NOTEHOLDER PLAN PROPONENTS CONCERNING THE MEDIATION ORDER ARE MERITLESS**

      A.     <u>Background</u>

           1.     **Events Preceding And Following The Entry Of The Mediation Order**

In December 2009, in order to ensure a full and frank dialogue with respect to the LBO-Related Causes of Action, the Debtors moved for entry of an order authorizing them to establish and maintain a centralized document depository and establishing certain settlement negotiation protections.  On December 15, 2009, the Court entered the Depository Order broadly providing, among other things, that all written and oral communications between and among the "Negotiating Parties" in connection with discussions of the Leveraged ESOP Transactions "shall be deemed confidential," may not be "used" or "disclosed" except in connection with "settlement discussions" and "may not be introduced at any trial or hearing or deposition."  Exhibit 1 at 5. Following entry of that Order, the Debtors and a number of parties engaged in lengthy negotiations which ultimately resulted in a proposed settlement of the LBO-Related Causes of Action, which in turn was embodied in the April Plan.  In mid-April 2010, the Court approved a schedule for the confirmation hearing on the April Plan.

At or around the same time, the Court granted a motion filed by Wilmington Trust for the appointment of an Examiner to investigate the LBO-Related Causes of Action, and the Examiner's Report was publicly filed in early August 2010.  Following release of the Examiner's Report, the parties to the settlement embodied in the April Plan engaged in further discussions and the April Plan ultimately was abandoned.

The Debtors then sought appointment of a mediator to assist in connection with the formulation and proposal of a confirmable plan of reorganization.  On September 1, 2010, after substantial negotiations among the parties (including the Noteholder Plan Proponents) regarding

the appropriate form of order, the Court entered the Mediation Order, which appointed the Honorable Kevin Gross as mediator. Consistent with Local Rule 9019-5(d)(i), which broadly prohibits disclosure of "any oral or written information disclosed by the parties or by witnesses in the course of the mediation,"[16] the Mediation Order explicitly provides that certain discussions, information and material relating to the mediation "are strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceeding." In particular, the Order protects (a) all "discussions among the Mediating Parties in relation to the Mediation, including discussions with or in the presence of the Mediator"; (b) all "documents or information provided to the Mediator or the Mediation Parties in the course of the Mediation"; (c) "correspondence, draft resolutions, offers and counteroffers produced for or as a result of the Mediation" and (d) "communications between the Mediator and the Examiner or the Examiner's Professionals." Exhibit 2 at 5.

Following entry of the Mediation Order, the Debtors and various parties – including the Noteholder Plan Proponents – participated in several days of mediation under the auspices of Judge Gross. The mediation process ultimately resulted in the settlement of the LBO-Related Causes of Action that is now embodied in the Debtor/Committee/Lender Plan.

---

[16] Local Rule 9019-5(d)(i) provides that the mediator and the participants in mediation "are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation." The rule further provides that "[n]o person may rely on or introduce" in any arbitral, judicial or other proceeding any "evidence pertaining to any aspect of the mediation effort ," including but not limited to: "(A) views expressed or suggestions made by a party with respect to a possible settlement of the dispute; (B) the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator; (C) proposals made or views expressed by the mediator; (D) statements or admissions made by a party in the course of the mediation; and (E) documents prepared for the purpose of, in the course of, or pursuant to the mediation." The local rule also makes clear that, "without limiting the foregoing, Rule 408 of the Federal Rules of Evidence, any applicable federal or state statute, rule, common law or judicial precedent relating to the privileged nature of settlement discussions, mediations or other alternative dispute resolution procedures shall apply."

### 2.    Aurelius' Discovery Requests And Related Meet And Confers

Pursuant to the terms of the Case Management Order, Aurelius Capital Management (acting on behalf of the Noteholder Plan Proponents)[17] served wide ranging discovery, including discovery of the materials expressly protected from discovery by the Depository Order and the Mediation Order.  The Noteholder Plan Proponents have insisted that, notwithstanding the terms of the Depository Order, the Mediation Order and Local Rule 9019-5(d)(i), the Debtor/Committee/Lender Plan Proponents must either waive the protections afforded by the Local Rule and these Orders, or be precluded from offering any evidence at trial respecting the mediation, including the Mediator's endorsement of the settlement or otherwise demonstrating that the Debtor/Committee/Lender Plan was the product of arms-length bargaining.[18]

The Debtors, Committee, and Lenders, of course, dispute any suggestion of fraud, collusion, or lack of good faith by their conduct in reaching a settlement in a mediation conducted under the auspices of a respected bankruptcy judge appointed by order of this Court.[19] The Debtors, Committee, and Lenders also note that nothing supports the Noteholder Plan Proponents' bald assertion that the Mediation Order only protects "private written or oral communications with the Mediator (e.g., communications solely between one party/one constituency and the Mediator such as Mediation Statements, or private meeting or conversations with the Mediator)."  Motion at 22.

---

[17] Due to conflicts of interest of Akin Gump, Aurelius' current counsel, Law Debenture Trust Corporation served virtually-identical requests on Oaktree, Angelo Gordon, and other parties with whom Akin Gump is conflicted.

[18] Current counsel for Aurelius, Akin Gump, has taken a dramatically inconsistent position on this issue in responding to discovery of Centerbridge, a former settling party and proponent of the April Plan.  Purportedly "at the direction of Centerbridge," Akin Gump has objected to requests for "Settlement Materials," protected under the Depository Order.  Responses and Objections to Debtors' Subpoena to Produce Documents, Information or Objects Directed to Akin Gump Strauss Hauer & Feld LLP, dated Jan. 12, 2011.

[19] The Motion includes a variety of gratuitous and baseless insinuations as to the motives and good faith of various parties, including Debtors' Management, the Special Committee and the Committee.  Motion at 27.  The Debtor/Committee/Lender Plan Proponents take strong exception to these statements and will address them at the confirmation hearing.

Nevertheless, in an effort to reach closure with respect to the protections afforded by the Depository and Mediation Orders, the Debtors offered to withdraw their objections based on the Depository Order and Rule 408 of the Federal Rules of Evidence and to narrow the scope of the protections afforded by the Mediation Order and Local Rule 9019-5 so that only the following documents and/or communications would be protected from discovery documents or information:

- written or oral communications between a "Mediation Party" and Judge Gross;

- written or oral communications between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day (*i.e.*, a day on which Judge Gross convened a Mediation Session among two or more Mediation Parties);

- written or oral communications reflecting the substance of any discussions between or among Mediation Parties on a Mediation Day or documenting any offers or counter-offers exchanged or agreements reached on a Mediation Day; and

- written or oral communications between Judge Gross and the Examiner or the Examiner's professionals concerning the Mediation.

*See* Ex. 5 hereto.  As made clear by the Motion, the Noteholder Plan Proponents rejected this proposal.

> **B.    The Court Should Deny The Motion Or Enter An Order Modifying The Mediation Order In The Manner Proposed By The Debtor/Committee/Lender Proponent Group.**

The Court should reject the Noteholder Plan Proponents' attempt to eviscerate the Mediation Order.  Alternatively, the Court should resolve the Motion by entering an order modifying the Mediation Order in the manner proposed by the Debtors.  This proposal provides the Noteholder Plan Proponents with more than adequate discovery to assess whether the settlement embodied in the Debtor/Committee/Lender Plan satisfies the requirements of

20

Bankruptcy Code, while at the same time preserving and enforcing the core policy of

confidentiality underlying Court-ordered mediation.

The Noteholder Plan Proponents set up a false dichotomy, wrongly framing the issue as a

"binary choice" between full disclosure of everything that happened in mediation, on one hand,

and no disclosure coupled with no ability to reference mediation in connection with plan

confirmation, on the other. Motion at 27. Specifically, in the world according to the Noteholder

Plan Proponents, whenever plan proponents seek confirmation of a plan embodying a settlement

resulting from mediation, the proponents place "at issue" the substance of all confidential

communications that took place during the mediation. As a result, the Noteholder Plan

Proponents reason, such parties either must "voluntarily waive" the protections afforded to

mediation discussion by the Local Rules and the Court's prior Orders or be precluded from

offering *any* evidence at trial respecting the fact or results of the mediation in order to establish

the good faith nature of the settlement and proposed plan.

This argument is meritless. Section 1129(a)(3) of the Bankruptcy Code requires that a

plan, including one embodying the settlement of claims, be "proposed in good faith and not by

any means required by law." As this Court has recently reiterated, "for purposes of determining

good faith, 'the important point of inquiry is the Plan itself and whether such Plan will fairly

achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re

Abitibibowater, Inc.,* 2010 WL 4823839 at *5 (Bankr. D. Del. Nov. 22, 2010) (quoting *In re PBS

Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000), in turn quoting *In re Abbotts Dairies of

Pennsylvania, Inc.,* 788 F.2d 143, 150 n.5 (3d Cir. 2000)); *see also In re MCorp Financial, Inc.*,

160 B.R. 941, 961 (S.D. Tex. 1993) ("[A] plan must be proposed in good faith, and the faith of

the proposal is ascertained from the objective consequences of the plan, not the moral

consciousness of the various proponents").

As a result, by proposing a plan which is the product of mediation, what the proponents

put in issue is "the plan itself and whether the plan will fairly achieve a result consistent with the

objectives and purposes of the Bankruptcy Code," and not the substance of otherwise protected

confidential mediation communications undertaken in reliance on the explicit protection of court

orders and local rules.[20]

To the extent the inquiry under Section 1129(a)(3) also requires some examination of the

process leading to the formulation of the Plan and settlement, here that "process" evidence would

include such facts as the appointment of the mediator, the parties participating in the mediation,

the number and dates of the mediation sessions, the results of the mediation, and whether the

mediator has endorsed the results of the mediation.  Examination of this *process,* however, does

not and need not entail examination of the *substance* of protected mediation communications.

The fallacy of the argument made by the Noteholder Plan Proponents is underscored by

their inability to cite a single case that permitted discovery of the substance of confidential

mediation communications or in which "process" evidence was precluded because parties

declined to "voluntarily waive" the protections of applicable Local Rules or court orders

forbidding disclosure of the substance of confidential mediation communications.  Equally

telling is the inability of the Noteholder Plan Proponents to cite a single case supporting the

proposition that bankruptcy plan proponents who engage in mediation under the protections of

---

[20] The Noteholder Plan Proponents cite *In re RFE Indus., Inc.,* 283 F.3d 159, 163 (3d Cir. 2002), to suggest that the Debtor/Committee/Lender Plan Proponents could not have had a reasonable expectation that their communications would be protected. *RFE* stands for no such proposition.  In *RFE,* the court simply held that a language of a dismissal order entered by the bankruptcy court in connection with a settlement should be construed broadly to include the power of the court to later disapprove the settlement.  283 F.3d at 163.  The case had nothing to do with discovery, mediation or reliance on express protections from discovery provided by a court order or Local Rule.

Local Rules and court orders somehow "kn[o]w" that they will be required to waive the

protections and to introduce evidence of the substance of the confidential communications at the

confirmation hearing or necessarily fail to carry their burden of showing good faith.  Motion

at 26.

In fact, the weakness of the Noteholder Plan Proponents' argument is highlighted by the

fact that the only supporting authority they can muster is a "*cf.*" citation to a footnote in a

Magnuson-Moss Act case (*In re General Motors*, 594 F.2d 1106, 1124 n.20 (7th Cir. 1979)); a

"*see, e.g.,*" citation to a footnote in a patent case (*Mobil Oil Corp. v. Amoco Chems. Corp.*, 779

F. Supp. 1429, 1485 n.43 (D. Del. 1991)); and cites to "sword and shield" language in the

footnote of a tort case (*Westinghouse Elec. Corp. v. Republic of Phillipines*, 951 F.2d 1414, 1426

n.12 (3d Cir. 1991)) and in an unpublished criminal case (*United States v. Antolini*, 271 Fed.

App'x. 268, 270-71 (3d Cir. 2008)).  *See* Motion at 26-28.

The Debtor/Committee/Lender Plan Proponents' proposal goes well beyond that to which

the Noteholder Plan Proponents are entitled under the Mediation Order or governing case law

and provides them ample means to assess and challenge the *bona fides* of the

Debtor/Committee/Lender Plan.  The discovery permitted under the proposal is not "highly

circumscribed" or "patently unfair."  Motion at 23.  To the contrary, it permits discovery of (i)

communications relating to the negotiation and abandonment of the April Plan, (ii)

communications which occurred prior to the mediation, and (iii) most communications between

the Mediation Parties that occurred outside the presence of the Mediator on a day that is not a

Mediation Day.  Putting aside the astonishing statement that "it matters little" to Judge Gross

"whether [the] deal is collusive" as well as the reckless implication that Judge Gross could have

been party to a fraud, *see* Motion at 28, it simply strains credulity to suggest that supposed

23

evidence of collusion or bad faith would be found only in the limited communications protected from disclosure under the Debtor/Committee/Lender Plan Proponents' proposal.

The Debtor/Committee/Lender Plan Proponents' proposal also accommodates and respects the strong policy in favor of the confidentiality of court ordered mediation in federal bankruptcy proceedings. *See, e.g., I.L.G.W.U. Nat'l Ret. Fund v. Cuddlecoat, Inc.,* 2002 U.S. Dist. LEXIS 2993, *12 (S.D.N.Y. 2002); *In re Student Finance Corp.,* 2007 U.S. Dist. LEXIS 95882 (D. Del. 2007); *see also The Chester Cty. Hosp. v. Independence Blue Cross,* No. 02-2746, 2003 WL 25905471, at *5 (E.D. Pa. Nov. 7, 2003) (noting that "almost all fifty states have elected to protect confidential mediation proceedings to facilitate settlement of cases"); *Cassel v. Superior Court (Wasserman, Comden, Casselman & Pearson),* No. S178914, 2011 WL 102710, at *1 (Cal. Jan. 13, 2011) (under California law, anything said in mediation is confidential and cannot be used in litigation later).

In fact, it is only by enforcing the confidentiality provisions of this Court's mediation rules and orders, thereby giving effect to the reasonable expectations of the parties, that the Court can further this policy. *See In re RDM Sports Group,* 277 B.R. 415, 419 (Bankr. N.D. Ga. 2002). There can be little doubt that, if parties were required to disclose the contents of core mediation communications or otherwise be precluded from presenting evidence as to the process and result of mediation, parties would be loath to engage in mediation, thereby undermining the utility and vitality of the process. *See Sheldone v. Penn Turnpke Comm'n,* 104 F. Supp. 2d 511, 513-14, 517 (W.D. Pa. 2000) (because mediation is rooted "in the imperative need for confidence and trust", failing to afford confidentiality "would surely destroy the effectiveness" of the program).

24

III.    **THE COMPLAINTS OF THE NOTEHOLDER PLAN PROPONENTS CONCERNING THE DECEMBER 15, 2009 DISCOVERY START DATE ARE MERITLESS**

The Debtor/Committee/Lender Plan Proponents have agreed to produce documents regarding negotiations and the settlement process reaching all the way back to December 15, 2009, the date on which the Depository Order was entered. This, however, is not enough for the Noteholder Plan Proponents, who seek discovery of all communications and other materials dating to the bankruptcy petition date of December 8, 2008, more than two years ago. Motion at 30-34.

The Noteholder Plan Proponents assert that the objection "to producing documents . . . generated between the Petition Date and December 15, 2009" is supposedly "without any basis." (Motion at 6.) To the contrary, the use of December 15, 2009 as the beginning of the timeframe relevant to the Noteholder Plan Proponents' document requests is entirely reasonable and logical given the history of these proceedings and the matters that will be at issue in the confirmation hearing.

A.    **December 15, 2009 Is A Reasonable And Logical Discovery Start Date**

The use of December 15, 2009 as the beginning of the period for collection and production of documents relating to bankruptcy negotiations is reasonable and, if anything, over-inclusive. Under this logical and sensible discovery start date, the Noteholder Plan Proponents will receive all responsive communications to which they are entitled – even under their inapt and self-serving "hardly inconceivable" relevance standard (*see* Motion at 33) – and the Court will be fully equipped to test the reasonableness and *bona fides* of the Debtor/Committee/Lender Plan and the proposed settlement embodied in it with discovery materials created from and after December 15, 2009. Indeed, nothing even theoretically relevant to the Court's assessment of the Plan and proposed settlement will be shielded or limited by a start date of December 15, 2009.

25

This is because all events relevant to the negotiation and settlement of the LBO-Related Causes of Action happened *after* the Court entered the Depository Order on December 15, 2009. Specifically, considering events by looking backward in time, the Debtor/Committee/Lender Plan that is the target of the Noteholder Plan Proponent discovery requests was filed on October 22, 2010 (*ten months after* entry of the Depository Order), and was the product of the Court-ordered mediation that commenced on September 26, 2010 (*nine months after* entry of the Depository Order). The Court appointed the Mediator on September 1, 2010 (*eight months after* entry of the Depository Order) to "assist the parties in resolving disputes in connection with the formulation and proposal of a confirmable plan of reorganization" [Docket No. 5591] in the aftermath of the filing of the Examiner's Report on July 26, 2010 and the subsequent abandonment of the April Plan (*seven months after* entry of the Depository Order).

The Debtor/Committee/Lender Plan Proponents defensibly could have selected a discovery start date linked to the negotiation of the Debtor/Committee/Lender Plan, discussions that were precipitated by issuance of the Examiner's Report (*i.e.*, sometime in September 2010). Yet, in an effort to make all conceivably relevant documents available, the Debtor/Committee/Lender Plan Proponents instead opted to review and produce documents extending back to a much earlier period – namely, those documents created on or after December 15, 2009, nearly eight months *before* the abandonment of the April Plan and the beginning of the negotiations that led to the Debtor/Committee/Lender Plan.

The December 15, 2009 date is the earliest possible date for the start of responsive discovery because it was on that date that the Court entered the Depository Order which, *inter alia*, provided for confidentiality and other necessary preconditions for the commencement of material discussions among the parties concerning possible plans of reorganization. In fact, no

26

material settlement negotiations respecting the LBO-Related Causes of Action took place before the Depository Order was entered.

The appropriateness of a December 2009 discovery start date is shown not just by this history but also by the positions previously taken by parties with respect to the April Plan, including positions taken by Law Debenture and Wilmington Trust, both of which are Noteholder Plan Proponents, and Centerbridge, the predecessor-in-interest of Aurelius. In connection with discovery over the April Plan, all proponents of the April Plan produced documents regarding settlement negotiations dating back to December 15, 2009 – a period of about four months. This shorter period – acknowledged by all to be adequate at the time – demonstrates that the twelve month period (dating back to the same start date) to which the Debtor/Committee/Lender Plan Proponents have agreed is more than reasonable. Indeed, Centerbridge itself has acknowledged that documents generated before December 2009 could not possibly be relevant to plan confirmation hearing issues. (See Letter from Nancy Chung, Akin Gump to Michael Russano, Davis Polk, dated January 10, 2011 at 2.)

In sum, the December 15, 2009 discovery start date is both fair and reasonable. To date, as a direct result of the generous discovery period to which it has agreed, the Debtors, Committee and Lenders collectively have reviewed and produced hundreds of thousands of pages of documents relating to the discussions and negotiations occurring from December 15, 2009 – a compilation and review process easily costing hundreds of thousands of dollars. Notwithstanding this already-massive production, the Noteholder Plan Proponents demand that the Debtor/Committee/Lender Plan Proponents *double* the period of time covered by their document review.

27

This demand poses an undue and excess burden on the Debtor/Committee/Lender Plan Proponents, particularly in light of the rapidly-approaching confirmation hearing.    More importantly, as shown below, the demand to expand the production period is premised solely on (i) rank speculation and wishful thinking about the existence of purely "hypothetical" documents that the Noteholder Plan Proponents conjecture could possibly pre-date December 15, 2009, and (ii) a misguided belief that the plan confirmation hearing should be conducted as a full-fledged trial preceded by unfettered discovery.  Neither of these grounds justifies the requested relief.

## B.    Speculation About "Hypotheticals" Does Not Establish The Relevance Of Documents Created Before December 15, 2009

Unable to identify any *facts* even remotely suggesting that purportedly relevant documents were created before December 15, 2009, the Noteholder Plan Proponents instead invent a series of "hypothetical emails or documents" that they speculate possibly *could* have been created prior to that date and then demand broad, burdensome discovery to see if their imaginings might actually have any basis in reality.  Motion at 31-33.[21]  Simply put, the Noteholder Plan Proponents' speculation about *hypothetical* documents does not undermine the reasonableness of the December 15, 2009 date tied to *actual* events in this case.

Notably, the Noteholder Plan Proponents have not offered any reason (compelling or otherwise) to believe that *any* of these "hypothetical" documents exist.  More to the point, it is inconceivable that actual (as opposed to imagined) documents relevant to confirmation of the

---

[21] In their apparent effort to manufacture even conjectural evidence supporting their theories of "collusion or lack of an arm's length relationship" among the Debtor/Committee/Lender Plan Proponents, the Noteholder Plan Proponents' cross the line from unfounded speculation to outrageous and inappropriate insinuation of misconduct. *See e.g.*, Motion at 30, 32 (speculating that there might exist: "[a]n email from Debtors' counsel . . . suggesting answers to likely deposition questions to JPMorgan's or VRC's attorneys"; "[a]n email from the Committee to JPMorgan's counsel providing advance notice of the documents that would be used and the questions that would be asked at the depositions of two key JPMorgan senior employees"; and "[a]n email from one Credit Agreement Lender . . . advising that they have been assured that counsel to the Committee will go easy on the lenders and settle for a *de minimus* [sic] amount at the appropriate time").  Such wild imaginings do not constitute a legitimate basis for discovery.

Debtor/Committee/Lender Plan were created eight months or longer before the negotiations that led to that plan had even begun.  The Noteholder Plan Proponents' desperate quest to discover such "hypothetical emails or documents" constitutes the very definition of a fishing expedition and the speculative relevance of *made-up* "documents" cannot justify the *actual* burdens of additional discovery that the Noteholder Plan Proponents seek to impose on the Debtor/Committee/Lender Plan Proponents.

In similarly exaggerated rhetoric, the Noteholder Plan Proponents also assert that a December 15, 2009, discovery start date "will materially impede . . . discovery relating to the merits of the underlying claims that are contemplated to be settled pursuant to the Proposed LBO Settlement."  Motion at 5, 31.  This is nonsense.  All of the potential claims addressed in the proposed settlement arose from the leveraged buyout transaction that was consummated in *December 2007*.  Documents created by any of the Debtor/Committee/Lender Plan Proponents (three of whom – Oaktree, Angelo Gordon, and the Committee – had nothing whatsoever to do with the Leveraged ESOP Transactions) between the December 8, 2008 petition date and December 15, 2009 are unlikely to have any relevance to the merits of those potential claims.  Indeed, the "hypothetical" documents conjured up by the Noteholder Plan Proponents (which, again, have no basis in reality) only serve to demonstrate the implausibility of their unfounded theory that documents created more than a year after consummation of the Transactions would likely be relevant to the assessment of possible claims arising out of them.  Motion at 31.

Moreover, the Noteholder Plan Proponents also studiously ignore that discovery respecting the merits of the LBO-Related Claims is already well-trodden ground.  The parties-in-interest previously have produced more than four million pages of documents in response to document requests concerning those very same claims.  Those documents have long been

available to the Noteholder Plan Proponents in the Document Depository established pursuant to the Depository Order. Those documents and the subject matters they encompass were laboriously investigated by and comprehensively addressed by the Examiner. The Noteholder Plan Proponents have failed to demonstrate that anything would be gained by retreading this same ground, and certainly have not shown that any such incremental gain would be commensurate with the substantial burden and expense to the bankruptcy estates entailed by compliance with their overreaching demands.

### C.    The Confirmation Hearing Is Not A Full-Fledged Trial That Entitles The Noteholder Plan Proponents To Unlimited Discovery

The Noteholder Plan Proponents' overbroad and disproportionate discovery time period also is inconsistent with the appropriate scale of the plan confirmation process. Bankruptcy courts have rejected efforts to turn the confirmation hearing into a "mini-trial," instead choosing to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *See In re Best Prods. Co.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994); *see also In re Spansion, Inc.*, 2009 Bankr. LEXIS 1283, at *22 (Bankr. D. Del. June 2, 2009) (Carey, J.) ("[T]he Court's task is not to decide issues of law or fact raised by the objections but rather to canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.") (quotation marks omitted).

As a supposed license for extravagant discovery, the Noteholder Plan Proponents point to section 1129(a)(3) of the Bankruptcy Code, which provides that a plan of reorganization must be "proposed in good faith and not by any means forbidden by law." Motion at 4. Nothing in section 1129(a)(3), however, provides any basis for discovery respecting the good faith nature of a plan reaching back eight months or longer before the time period in which negotiations regarding the plan had begun. In fact, as explained above, "[t]he Third Circuit has recognized

30

that, for purposes of determining good faith, '*the important point of inquiry is the plan itself* and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *See Abitibibowater*, 2010 WL 4823839 at \*5 (Bankr. D. Del. Nov. 22, 2010) (Carey, J.) (quoting *PWS Holding Corp.*, 228 F.3d at 242) (emphasis added). Immoderate discovery related to a proposed settlement simply cannot be justified merely by invoking the talisman of "bad faith" (let alone by alleging egregious and baseless innuendo). *See In re Washington Mutual, Inc.*, 2011 Bankr. LEXIS 56, at \*129 (Bankr. D. Del. Jan. 7, 2011) ("More than mere innuendo and speculation is needed to establish a lack of good faith.").

In sum, the Noteholder Plan Proponents have failed to offer anything more than fanciful, self-serving speculation to support their bald accusations of "collusion" and "bad faith" among the Debtor/Committee/Lender Plan Proponents. They should be precluded from conducting a fishing expedition for irrelevant documents created long before negotiations concerning the Debtor/Committee/Lender Plan had even commenced.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

46429/0001-7316158v

Dated: Wilmington, Delaware
      January 19, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin Lantry
James W. Ducayet
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

SIDLEY AUSTIN LLP
James F. Bendernagel
Ronald S. Flagg
David M. Miles
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

*/s/ Patrick J. Reilley*
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

Counsel for Debtors and Debtors in Possession

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
Thomas J. McCormack
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

LANDIS RATH & COBB LLP

*/s/ Daniel B. Rath*
Adam G. Landis (No. 3407)
Daniel B. Rath (No. 3022)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

Counsel for the Official Committee of Unsecured Creditors

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 778-1800

32

46429/0001-7316158v

Facsimile: (202) 822-8106

Special Counsel to the Official Committee of Unsecured Creditors

Benjamin S. Kaminetzky  
Elliot Moskowitz  
Michael Russano  
DAVIS POLK & WARDWELL LLP  
450 Lexington Avenue  
New York, New York  10022  
Telephone: (212) 450-4500  

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Robert J. Stearn*  
Mark D. Collins (No. 2981)  
Robert J. Stearn, Jr. (No. 2915)  
Drew G. Sloan (No. 5069)  
One Rodney Square  
P.O. Box 551  
Wilmington, Delaware  19899  
Telephone: (302) 651-7700  

Counsel for JPMorgan Chase Bank, N.A.

WILMER CUTLER PICKERING  
HALE & DORR LLP  
Andrew N. Goldman  
399 Park Avenue  
New York, NY 10022  
Telephone: (212) 230-8800  

Counsel for Angelo, Gordon & Co., L.P.

HENNIGAN, BENNETT & DORMAN LLP  
Bruce Bennett  
James O. Johnston  
Joshua M. Mester  
865 South Figueroa Street, Suite 2900  
Los Angeles, CA 90017  
Telephone: (213) 694-1200  

YOUNG CONAWAY  
STARGATT & TAYLOR, LLP

*/s/ M. Blake Cleary*  
Robert S. Brady (No. 2847)  
M. Blake Cleary (No. 3614)  
The Brandywine Building – 17th Floor  
1000 West Street, Post Office Box 391  
Wilmington, DE 19899  
Telephone: (302) 571-6600  
Facsimile: (302) 571-1253  

Counsel for Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.

46429/0001-7316158v

33

46429/0001-7316158v