IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------  x
                                                  :   Chapter 11
In re:                                            :
                                                  :   Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                          :
                                                  :   (Jointly Administered)
       Debtors.                                   :
                                                  :   Re: Docket No. 7512
                                                  :
------------------------------------------------  x
```

## JPMORGAN CHASE & CO.'S OBJECTION TO AURELIUS CAPITAL MANAGEMENT'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

JPMorgan Chase & Co. ("JPMorgan") hereby submits this Objection to the Motion of Aurelius Capital Management ("Aurelius") to compel JPMorgan to produce documents responsive to Aurelius' Second Request for the Production of Documents to JPMorgan (the "FCC Requests").[1]

## I.    INTRODUCTION

1.    Further to its strategy of attempting to mire these cases in costly and time-consuming discovery disputes in order to try to gain negotiating leverage, Aurelius improperly seeks to invoke this Court's civil discovery process to obtain documents that could possibly be relevant only in proceedings before the Federal Communications Commission (the "FCC" or "Commission"). Aurelius seeks this information ostensibly to explore the "feasibility" of the

---

[1] Aside from the FCC Requests, Aurelius and other parties have propounded more than 1,300 pages of discovery requests in connection with the confirmation hearing. Those requests are the subject of separate motions to compel and responses thereto.

Debtor/Committee/Lender Plan.[2]  It asserts that such information is relevant to JPMorgan's

proposed holding of a "cognizable" or "attributable" ownership interest in Tribune's broadcast

licenses post-emergence—a standard addressed in detail by the FCC's rules.  47 C.F.R.

§ 73.3555 Notes 1-3.

      2.      The FCC, however, already is examining these issues in a proceeding to consider

applications submitted by Tribune on April 28, 2010.  These applications—on forms requiring

information that is specified by the FCC itself—include information regarding all media holdings

of JPMorgan that are relevant to the consideration of the applications under FCC rules, and will

be amended as appropriate pursuant to those rules.

      3.      In addition, JPMorgan has now submitted its Media Ownership Certification as

required by the Debtor/Committee/Lender Plan, the Noteholder Plan, and this Court's

Solicitation Order, and the Debtors have provided a copy to Aurelius.  As explained more fully

below, the Media Ownership Certification process is specifically designed to address all of the

types of interests that the FCC considers relevant under its rules and policies, and Aurelius' own

Plan includes the very same process.  Aurelius thus seeks information that, by definition, the

FCC has not deemed relevant to its consideration of the pending applications.

      4.      Provided with all information relevant to the issues before the FCC, Aurelius

insists that it must nonetheless obtain discovery of all "media interests" possibly held by

JPMorgan in case JPMorgan was mistaken (or lying) in supplying this information to the Debtors

for the FCC Applications.  But Aurelius is plainly not entitled to discovery on this speculative

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Joint Disclosure Statement [Docket # 7232, Ex. 1] and/or the Disclosure Statement associated with the Debtor/Committee/Lender Plan [Docket # 7136].

basis.  Moreover, if Aurelius had legitimate concerns that JPMorgan was providing incorrect

information to the FCC, Aurelius could have petitioned the FCC to deny the applications, and

continues to have the right to otherwise object to the qualifications of proposed attributable

parties (including JPMorgan) or communicate with the FCC on an *ex parte* basis.  *See* 47 U.S.C.

§ 309(b), (d); 47 C.F.R. §§ 1.1206, 73.3584, 73.3587.[3]  Aurelius has not to date done so.

5.      Stripped of these arguments, Aurelius' true motivation becomes clear.  Aurelius

plainly is seeking to use the discovery tools of the bankruptcy court to obtain information that it

will eventually use to oppose, or at a minimum seek to delay, Tribune's FCC Applications that

are pending before the FCC.  This it cannot do.

6.      In sum, the materials sought by the FCC Requests are either irrelevant to the FCC

proceeding or duplicative of information already provided in the FCC Applications and

separately to Aurelius through the Media Ownership Certification process.  There is an

established process through which Aurelius may raise any legitimate concerns it may have

regarding JPMorgan's qualifications to hold media interests—it is the pending proceeding before

the FCC, and not the proceedings before this Court.  Aurelius should not be permitted to impose

further onerous discovery upon JPMorgan to satisfy its curiosity or to invoke this Court's

authority to obtain information for use in another forum and thus sidestep the FCC's well-

established procedures and infringe upon its exclusive jurisdiction.

## II.    **ARGUMENT**

7.      Only discovery that is relevant to a party's claims or defenses and "reasonably

---

[3] *See also* Public Notice, *Media Bureau Announces Filing Of Applications For Consent To Assignment Of Broadcast Station Licenses By Tribune And Its Subsidiary Companies And Permit-But-Disclose Ex Parte Status For The Proceeding*, DA 10-840 (May 13, 2010), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-10-840A1.doc (last visited Jan. 19, 2011).

3

calculated to lead to the discovery of admissible evidence" is permitted. *See* Fed. R. Bankr. P. 7026; Fed. R. Civ. P. 26(b)(1). Aurelius bears the burden to demonstrate why the information that it seeks is relevant to its claims or defenses. *See Alexander v. FBI*, 186 F.R.D. 154, 159 (D.D.C. 1999) ("the proponent of a motion to compel discovery bears the initial burden of proving that the information sought is relevant"); *Trader v. Fiat Distribs., Inc.*, No. 76-249, 1981 U.S. Dist. LEXIS 17802, at *5 (D. Del. Jan. 16, 1981) (denying motion to compel because "[t]hey have not met their burden of showing the relevancy" of the requested information). In addition, discovery may be limited where the burden or expense of the proposed discovery outweighs its likely benefit, or where the discovery sought is duplicative, or can be obtained from a less burdensome source. Fed. R. Civ. P. 26(b)(2)(C); *see also Johnson v. Geico Cas. Co.*, 269 F.R.D. 406, 415 (D. Del. 2010).

8.      Here, Aurelius has failed to demonstrate that the information sought is relevant. As the sole justification for its broad FCC Requests, Aurelius argues that the documents it seeks will help it evaluate whether JPMorgan's media interests might prevent the Debtor/Committee/Lender Plan from obtaining FCC approval, and that the possibility that the FCC will delay or reject the FCC Applications is thus relevant to the "feasibility" of the Debtor/Committee/Lender Plan. *See* Mot. at 1; *id.* ¶¶ 10, 18-39.

9.      As set forth below, Aurelius is wrong for at least three reasons. <u>First</u>, all of the information that is conceivably relevant to the FCC approval process is being and will be produced to Aurelius during the Media Ownership Certification process that is built into all of the competing Plans and/or in the FCC Applications. The FCC's rules clearly lay out what is and is not relevant to the precise question that Aurelius purports to seek discovery to evaluate.

4

Bankruptcy court discovery is completely unnecessary in light of the parallel process that is ongoing before the FCC, an agency with exclusive jurisdiction over its affairs. If Aurelius believes the FCC should request more or different information, the proper means of seeking redress would be to exercise its right to appear before the FCC, as one of its co-proponents (the indenture trustee for Aurelius' recently-purchased PHONES position) already has done. Second, the "feasibility" argument is a red herring given that the Noteholder Plan contains the same mechanism for gathering information relevant to the FCC process as the Debtor/Committee/Lender Plan. Third, to the extent the true motivation behind Aurelius' FCC Requests is to seek information that Aurelius may use to oppose the FCC Applications in the proceeding that is pending before the FCC, that is a grossly improper purpose for discovery in this Court and an attempt to circumvent the FCC's procedures for considering and determining compliance with its media ownership rules.

A.    **The Media Ownership Certification Process That Is Included In Each Of The Competing Plans Renders The Information Sought In The FCC Requests Both Unnecessary And Irrelevant To Confirmability**

10.    Aurelius' FCC requests are improper because any information relevant to whether the Debtor/Committee/Lender Plan will obtain FCC approval is either available to Aurelius through the Media Ownership Certification process, which is included in all of the competing Plans, or is publicly available in the pending FCC Applications.

11.    The Media Ownership Certification process was designed to address all of the types of interests that the FCC considers relevant under its rules and policies.[4] Having now

---

[4] As reflected in the Media Ownership Certification form, the FCC considers the following to be attributable for purposes of its media ownership rules: (1) direct ownership or sole proprietorships; (2) official positions; (3) directorships; (4) voting stock interests of 5% or more in corporations; (5) any interests in a partnership (including limited partnership interests) or limited liability company ("LLC"); and (6) any equity

received JPMorgan's certification, Aurelius already has all of the information necessary to interpose an objection to confirmation based upon its argument regarding JPMorgan's proposed attributable interest in Tribune post-emergence.  In particular, the Media Ownership Certification form requires information about, among other things:

> (i) the legal status of the entity submitting the form (*i.e.*, individual, corporation, general or limited partnership, LLC, etc.);
>
> (ii) interests in any AM, FM, or television broadcast station licensed by the FCC or in any broadcast application pending before the FCC that meet the FCC's threshold for attributable interests;
>
> (iii) interests in any entity that provides programming for more than 15% of the weekly broadcast hours of any radio or TV station, sells more than 15% of the weekly advertising time of any radio station, or manages any AM, FM, or TV station;
>
> (iv) interests in any daily newspaper that meet the FCC's threshold for attribution;
>
> (v) information regarding the extent to which the organizational documents of any party submitting a Media Ownership Certification contain provisions designed to "insulate" the limited partners or members from attribution;
>
> (vi) information regarding the media holdings of family members of any individual submitting a Media Ownership Certification form;
>
> (vii) particular types of adverse findings by courts or administrative agencies that the FCC considers relevant to the "character qualifications" of a party to hold an attributable interest in a broadcast license;
>
> (viii) the existence of certain FCC proceedings involving character issues; and
>
> (ix) whether the entity submitting the form has been denied federal benefits as a result of a conviction for possession or distribution of controlled substances pursuant to the Anti-Drug Abuse Act of 1988 (21 U.S.C. § 862).

12.    As Aurelius recognizes, only "substantial interests in competing media in the

---

(whether voting or nonvoting) and/or debt interest in a corporation, partnership, or limited liability company which, separately or in combination with any other interest(s) held, represents more than 33% of the total asset value (all equity plus debt) of the entity in question. *See* 47 C.F.R. § 73.3555 Note 2; *see also* Mot. ¶ 27 note 2.

same markets [in which] Tribune" owns broadcast stations and/or newspapers, Mot. ¶ 25, would be relevant to the FCC's evaluation of whether an entity's holding of an attributable interest in Tribune would comport with the FCC's ownership rules or impact the propriety of granting the waivers of those rules that Tribune has requested. The Media Ownership Certification form, which hews to the FCC's rules and standards for attribution, thus provides all of the information that may be relevant to the FCC's analysis.

13. Similarly, the FCC Applications that have been filed contain substantially the same information regarding the media interests of JPMorgan and its ability to hold an attributable interest in Tribune post-emergence consistent with FCC rules and policies.[5] The FCC Applications also contain hundreds of pages of information relevant to the waivers that Tribune has requested.

14. The FCC Applications were submitted on forms created by the FCC itself in furtherance of its statutory obligation to consider whether, in the context of a license assignment or transfer, "the public interest, convenience, and necessity will be served" by a grant. 47 U.S.C. § 310(d); *see also id.* § 308(b) (requiring FCC to ensure that its "applications . . . set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant"). To the extent the FCC has not sought the information contained in the FCC Requests, whether through these forms or through separate requests, the information is by definition irrelevant to the FCC.

15. Aurelius' claim that the FCC Requests legitimately seek information *in addition*

---

[5] The FCC Applications, of course, contain all manner of detail concerning issues relevant to the FCC's rules and policies. Indeed, just one of the applications consists of more than 350 pages of material. In order to avoid burdening the Court with unnecessary paper, and because they are publicly available on the FCC's website, full copies of the FCC Applications are not being filed in the Bankruptcy docket but will be furnished on request.

RLF1 3779720v. 1

*to* what is already required in the FCC Applications is tantamount to a suggestion that the FCC

has violated its own statutory mandate by failing to request adequate detail in its own application

forms. Moreover, should the FCC determine in the course of its review that additional

information is necessary to assess compliance with its rules, it can and will request such

information. *See id.* § 308(b) ("The Commission, at any time after the filing of such original

application . . . may require from an applicant or licensee further written statements of fact to

enable it to determine whether such original application should be granted or denied").

16.     To the extent Aurelius now asserts that the Media Ownership Certification

process does not adequately address issues relating to whether the post-emergence ownership

structure proposed by the Debtor/Committee/Lender Plan comports with the FCC's rules, it has

forfeited that argument. Aurelius represented during litigation concerning this Court's

Solicitation Order that it had "no objection" to the use of Media Ownership Certifications to

determine FCC compliance and argued that the form of Media Ownership Certification should

be "the same form that the Debtors prepared in connection with the Prior Solicitation Order."

[Docket # 6513, ¶¶ 1-2]. The Solicitation Order approved the Media Ownership Certification

process [Docket # 7126, ¶ 46], which the Debtors had made clear was designed to "permit the

Debtors to comply with certain regulations for broadcast businesses set by the" FCC [Docket #

6255, ¶ 59]. Having asked the Court to approve the use of that form—and having received such

relief—Aurelius cannot now complain that the information requested in the form is insufficient.

17.     Moreover, it is clear that issues regarding compliance with the FCC's media

ownership rules are properly subject to resolution by the FCC, and only by the FCC. The FCC

has statutory jurisdiction to evaluate license transfers and assignments, and the exclusive

8

jurisdiction to review such FCC decisions lies in the United States Court of Appeals for the

District of Columbia Circuit. 47 U.S.C. §§ 310(d), 402(b). Aurelius and its FCC counsel—

which propounded the FCC Requests—should not be permitted to end-run the FCC proceedings

and procedures thereto by seeking discovery under this Court's auspices that they could not seek

before the FCC. In any event, to the extent Aurelius takes issue with the FCC's procedures or

the FCC Applications, it is free to appear in the FCC proceeding to make those points. But

Aurelius has failed to take that step, choosing to bring its FCC-related disputes to this Court

instead.[6]

**B.    All of the Plans Are Equally "Feasible" With Respect to FCC Issues Since They All Contain the Same FCC Procedures and Contingencies**

18.    Aurelius' "feasibility" argument also falls flat because each of the competing

plans of reorganization—*including the Aurelius-sponsored Noteholder Plan*—specifies FCC

approval as a condition precedent to Tribune's emergence from bankruptcy. [Docket # 7136,

§ 10.1.1(i) at 72; Docket # 7127, § 10.1.1(f) at 111; Docket # 7089, § 10.1(f) at 103.] The

Noteholder Plan also incorporates procedures materially identical to those in the

Debtor/Committee/Lender Plan for identifying those parties which may hold attributable

interests in Reorganized Tribune and for obtaining other information necessary for the FCC

---

[6] In contrast to Aurelius' attempt to circumvent the FCC Proceedings, at least one significant party to the Bankruptcy Proceedings, Aurelius' co-Plan Proponent, Wilmington Trust Company of New York, has very much availed itself of the FCC process to raise FCC-related disputes by filing a Petition to Deny and communicating with the FCC on an *ex parte* basis. *See, e.g.*, Petition to Deny of Wilmington Trust Company, MB Docket No. 10-104 (June 14, 2010), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=7020505050 (last visited Jan. 19, 2011); Reply to Opposition to Petition to Deny, filed by Wilmington Trust Company, MB Docket No. 10-104 (July 12, 2010), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=7020522316 (last visited Jan. 19, 2011); Request for Leave to Supplement Its Petition to Deny and Supplement to Petition to Deny of Wilmington Trust Company, MB Docket No. 10-104 (Aug, 5. 2010), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=7020654210 (last visited Jan. 19, 2011); Notice of Ex Parte Presentation of Wilmington Trust Company, MB Docket No. 10-104 (Aug. 5, 2010), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=7020659051 (last visited Jan. 19, 2011); Notice of Ex Parte Presentation of Wilmington Trust Company, MB Docket No. 10-104 (Sept. 24, 2010), *available at* http://fjallfoss.fcc.gov/ecfs/document/view?id=7020913681 (last visited Jan. 19, 2011).

application process. Both Plans call for the submission of the same Media Ownership

Certifications in furtherance of this process, and allow the Debtors and proponents of competing

plans to request further information that is reasonably necessary for purposes of the FCC

Applications and/or FCC Approval. [Docket # 7232, Ex. 1 at 73-74; *see* Docket # 7136, §§

1.1.143 at 17, 5.4.2 at 50-51; Docket # 7127, §§ 1.1.159 at 31-32, 5.4.2 at 71-73].

19.     Aurelius' attempt to justify the FCC Requests based on the fact that JPMorgan

will be an attributable party under the Debtor/Committee/Lender Plan but not under the

Noteholder Plan, *see* Mot. ¶¶ 27, 46, is a red herring.[7] Aurelius places particular emphasis on the

board designation right afforded to JPMorgan under the Debtor/Committee/Lender Plan. *See*

Mot. ¶¶ 27, 32, 46. But the presence of this right does not justify the FCC Requests. The

Debtors are treating JPMorgan as an attributable party under their Plan, and it does not matter

from an FCC standpoint whether that attributable status flows from stock ownership exceeding

5%, board designation rights, or some combination of the two. Thus, all information necessary

for Aurelius to evaluate JPMorgan's potential attributable interest in Tribune has been, and will

continue to be, supplied in the FCC Applications and/or through the Media Ownership

Certification process. Further, information regarding the operation of the provision affording

JPMorgan board designation rights is present on the face of the Plan and Aurelius has not

provided—and cannot provide—any reason why a response to the FCC Requests is necessary to

---

[7] JPMorgan notes that Aurelius' present position that JPMorgan will not hold an attributable interest under
the Noteholder Plan is inconsistent with Aurelius' prior representation to the Court that "[e]ach of the Plans propose
a similar ownership and governance structure for Reorganized Tribune for FCC purposes." [Docket # 6513, ¶ 5].
Similarly, by asking this Court to require the Debtors to identify Potential 5% Holders to the proponents of the other
Plans--relief which the Court granted in the Solicitation Order--Aurelius at least strongly suggested that it had
reason to believe that the universe of Potential 5% Holders was the same under any of the Plans. [Docket # 6513,
¶ 2]. JPMorgan will reserve for the confirmation hearing its objections to the confirmability of the Noteholder Plan
based on any such position.

allow it to challenge the presence of JPMorgan's right to designate board members. If Aurelius

wishes to object to this provision at the Confirmation Hearing it is of course free to do so, but the

discovery that it is seeking is in no way relevant or necessary to its ability to advance such an

objection. The same is true, of course, of any argument that one Plan or another fails to provide

the Debtors with adequate means to address potential delays in the FCC approval process.

20.    Aurelius' claims that JPMorgan "may" have undisclosed media interests, Mot.

¶ 29, are sheer speculation. For example, Aurelius hypothesizes that there may be impermissible

cross-ownership between Reorganized Tribune and Comcast Corporation/NBC Universal due to

the presence of Stephen Burke, a member of the Comcast Board of Directors, on the JPMorgan

Board. *See id.* ¶¶ 29-30. But both JPMorgan's Media Ownership Certification and the FCC

Applications contain detailed statements identifying Mr. Burke and other members of the Board

of JPMorgan and explaining, consistent with the standards in the FCC's rules, why those

individuals will not be attributable in Reorganized Tribune (and therefore why their other media

interests need not be disclosed).[8] Third parties, including Aurelius, have the ability to raise with

the FCC any issues they may have with JPMorgan's reasoning on this issue.

Aurelius' asserted concerns about JPMorgan's investment in Gannett Company, Inc. are

similarly unfounded and speculative. *See id.* ¶¶ 31-32. In fact, the nature of JPMorgan's

investment in Gannett is already disclosed in great detail in both the FCC Applications, *see* Mot.

Ex. J, and its Media Ownership Certification. As explained fully in both documents, JPMorgan's

---

[8] *See* 47 C.F.R. § 73.33555, Note 2(g). Indeed, this information is attached as an exhibit to Aurelius' own motion. *See* Mot. Ex. G. Despite Aurelius' assertion to the contrary, the statement in the FCC applications regarding the non-attributable status of the JPMorgan Board is not a "special showing" pursuant to the Plans, *e.g.*, *id.* ¶ 26, but one plainly contemplated by the FCC's rules. To the extent that Aurelius disagrees with JPMorgan's analysis of this Plan provision, *id.* ¶ 29, it has all the information needed to raise the issue before this Court. Open-ended discovery, however, is not necessary to resolve this specific question.

investment in Gannett is non-attributable under the FCC's rules and, therefore, JPMorgan will be able to hold both this investment and its proposed interest in Reorganized Tribune without running afoul of the FCC's media ownership rules.[9] Aurelius also emphasizes the non-disclosure of JPMorgan's interests in either Freedom Communications or Journal Register Company in the FCC Applications. Mot. ¶¶ 33-39. There is a simple reason for this omission: JPMorgan does not hold an attributable interest in either company and, therefore, there was no reason to disclose them in the applications.[10] Any suggestion that JPMorgan has falsely or incorrectly provided information to the FCC in the applications or in its Media Ownership Certification is, like Aurelius' other unsupported suggestions of undisclosed interests, nothing more than rank speculation.

### C.    It is Grossly Improper to Seek Discovery in the Bankruptcy Court for Use in the FCC Proceeding

21.    To the extent Aurelius' true motivation for seeking this information is to use it to oppose JPMorgan's inclusion as an attributable party in the Debtors' FCC Applications, that is a grossly improper basis on which to seek discovery in the bankruptcy court. As the U.S. Supreme Court has stated, "when the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978); *cf. Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 57 (D. Pa. 1980) (parties "have no right to use civil

---

[9] JPMorgan's disclosure of its interest in Gannett in the FCC Applications also does not constitute a "special showing," *see* Mot. ¶ 29, under any of the Plans. Again, to the extent that Aurelius may disagree, it is free to raise this concern in its objection to confirmation, but the requested discovery is not necessary to allow it to do so.

[10] Indeed, information publicly available on the FCC's website clearly states that no shareholder of Freedom Communications "will have five percent or more of the Class A shares;" thus, no shareholder, including JPMorgan, currently holds an attributable voting stock interest in the company.

discovery as a pretext for gathering information useful [in] criminal cases").

22.    Moreover, Aurelius' attempt to use the bankruptcy court to obtain information for use in connection with the FCC proceeding also violates the exclusive jurisdiction of the FCC to adjudicate such matters.  As noted *supra*, the FCC retains exclusive jurisdiction to consider and determine compliance with the FCC's media ownership rules.  Aurelius' FCC Requests, which seek the production of information pursuant to the rules of this Court that are potentially relevant only to FCC issues that this Court has no jurisdiction to consider, is a transparent end-run around the FCC's exclusive jurisdiction and its processes, which do not provide for third-party discovery of this nature.

D.    **Aurelius' Additional Sundry Arguments Should Be Rejected**

23.    Aurelius includes several additional, "kitchen-sink" arguments in support of the FCC Requests.  Each of these sundry arguments are meritless.

24.    Aurelius' contention that the FCC Requests are justified on the ground that they are necessary to test the "veracity" of the information reflected in JPMorgan's Media Ownership Certification and/or the FCC Applications is legally unfounded and has no logical limit.  *See* Mot. ¶ 43.  We are aware of no authority that would support a discovery request for the purpose of testing whether an application submitted to an administrative agency was accurate. Unsurprisingly, neither of the cases cited by Aurelius support this limitless proposition.  *In re Insley*, 322 B.R. 272 (Bankr. W.D. Pa. 2005), notes in passing that the party seeking discovery questioned the veracity of a statement made by another party; this case cannot be extended by leaps and bounds to support discovery any time a party suggests someone might have provided inaccurate or incomplete information, *id.* at 276.  And the Delaware Chancery Court's decision

13

in *Shapiro v. Nu-West*, 1998 WL 732891 (Del. Ch. 1998), concerned an alleged failure to respond to specific discovery to which the court had already ordered a response. Needless to say, neither case involved an attempt by a party to look behind applications created by an independent regulatory body charged with evaluating compliance with the legal standards in question. Aurelius has offered no basis to seek this sort of unprecedented discovery. *See Zuk v. Eastern Pa. Psychiatric Inst. of Med. College of Pa.,* 103 F.3d 294, 299 (3d Cir. 1996) ("discovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it; the plaintiff must have some basis in fact for the action.")

25.     Likewise, Aurelius' attempt to justify the FCC Requests by pointing to a few FCC-related document requests propounded by the Debtors should also be rejected. *See* Mot. ¶ 19. The contrast between the discovery sought by the Debtors and the FCC Requests could not be more stark. The few requests propounded by the Debtors are directly relevant to the fundamental question of feasibility: *i.e.*, whether the Noteholder Plan suffers from basic defects that will preclude FCC approval.[11] JPMorgan has *already produced* analogous documents to Aurelius, in response to its extraordinarily broad requests regarding the "April Plan" and "Settlement Plan" periods, as JPMorgan's counsel informed Aurelius' FCC counsel during the meet and confer discussions. In contrast to the information responsive to the Debtors' limited requests, Aurelius' FCC Requests are directed at information that would necessarily involve this Court in second-guessing the FCC's detailed evaluation of compliance with technical rules lying within its exclusive statutory jurisdiction.

---

[11] The Debtors have sought information concerning "the actual or potential effect of the Noteholder Plan on the ability to obtain FCC Approval."

14

26.     Finally, the cases relied upon by Aurelius to suggest that the FCC Requests are necessary for the "feasibility" inquiry are inapposite.  In the only case that Aurelius cites regarding a matter that required FCC approval, the Court's consideration of FCC issues as part of the feasibility inquiry related to the basic structure of competing plans and high-level, fundamental questions relating to whether extensive delay in the FCC process was likely.  *Sound Radio, Inc. v. WJNR Radio 1430*, 93 B.R. 849, 857 (Bankr. D. N.J. 1988).  This type of inquiry is wholly distinguishable from Aurelius' requests, which suggest that it intends to ask the Court to conduct a detailed review of technical FCC rule compliance and to second-guess data set forth in FCC applications signed by the Debtors under penalty of perjury, based on information provided by parties pursuant to a plan process to which all parties agreed and the Court approved.[12]

### E.     Relevance Aside, the FCC Requests Are Extraordinarily Overbroad and Burdensome

27.     Aurelius' FCC Requests are not only irrelevant but also burdensome in the extreme.  Even a cursory review of the FCC requests reveals that they are not "precisely targeted," as Aurelius comically suggests, but rather seem contrived to ensure that JPMorgan must search for and review untold numbers of documents.  For example, Aurelius requests "All Documents and Communications" relating to any "other financial interest" held by JPMorgan, or

---

[12] The other two cases on which Aurelius relies are distinguishable because they do not relate to matters lying within the exclusive statutory jurisdiction of the FCC. In addition, the Court in *In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D. N.J. 2010), merely considered whether information contained in waiver requests already on file with the relevant regulatory authority was sufficient to suggest that regulatory approval would be forthcoming, *id.* at 155-56 (referring to "the amended petition filed" by an applicant for waiver). Moreover, the Court expressly noted that "all that [wa]s required" by the regulatory body at issue was "the submission of a form certification." *Id.* at 156. Here, as discussed above, the FCC Requests seek information that goes far beyond that which is required by the FCC. Similarly, there is nothing in the court's decision to indicate that the court in *In re Cajun Electric Power Cooperative*, 230 B.R. 715 (Bankr. D. La. 1999), considered information that would have been deemed irrelevant by the regulatory body itself. And even if these cases could be construed generally to support a Bankruptcy Court's inquiry into matters within a regulatory agency's special expertise, that still would not support allowing discovery where, as here, all information relevant to the regulatory agency's inquiry has been provided pursuant to plan processes approved by the Court and/or the agency's own information collection procedures.

RLF1 3779720v. 1

any of its "officers, directors, partners [or] employees" in a Broadcasting or Publishing entity. (FCC Requests, Request Nos. 2, 4, 5; FCC Requests, Definitions.)  Taken at face value, the FCC requests call for the production of documents reflecting a single share of stock in a broadcasting or publishing company held by any of JPMorgan's thousands of employees.

28.    Because information potentially relevant to the FCC inquiry has already been provided in the FCC Applications or the Media Ownership certification, the purported benefits to Aurelius from the FCC Requests shrink in comparison to the burden that compliance would impose upon JPMorgan.  Aurelius' motion should be denied on this basis as well.

RLF1 3779720v. 1

III.    **CONCLUSION**

29.    For the foregoing reasons, JPMorgan respectfully requests that the Court deny

Aurelius' Motion to Compel.

Dated: January 19, 2011          Respectfully submitted,
          Wilmington, Delaware

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19899
(302) 651-7700

-and-

Benjamin S. Kaminetzky
Elliot Moskowitz
Michael Russano
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4000

-and-

Richard E. Wiley
James R.W. Bayes
Eve Klindera Reed
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006
(202) 719-7000

*Attorneys for JPMorgan Chase & Co.*

RLF1 3779720v. 1