IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

TRIBUNE COMPANY, et al.,

     Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: Chapter 11

: Case No. 08-13141 (KJC)

: (Jointly Administered)

: **Re: Docket No. 7519**

: **Hearing Date: January 24, 2011 at 11:00 a.m.**

## JPMORGAN CHASE BANK, N.A.'S RESPONSE TO THE NOTEHOLDER PLAN PROPONENTS' MOTION TO COMPEL JPMORGAN TO SEARCH FOR, REVIEW AND PRODUCE DOCUMENTS RESPONSIVE TO AURELIUS' FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS

   JPMorgan Chase Bank, N.A. ("JPMorgan"), hereby submits this objection to the motion

of the Noteholder Plan Proponents to Compel JPMorgan to Search for, Review and Produce

Documents Responsive to Aurelius' First Request for the Production of Documents to JPMorgan

(the "Motion").

### PRELIMINARY STATEMENT

   1.  JPMorgan and its attorneys have made extraordinary efforts to collect, review and

produce documents that are even tangentially relevant to the matters that will be litigated at the

March 7, 2011, confirmation hearing.  In this new age of email archives, custodians and search

terms, however, there will always be the possibility that if you add a few more search terms,

extend the discovery period for a few more weeks or months, and/or throw in a few more

custodians, that another responsive document will turn up.  If the mere suggestion that a more

extensive search could turn up more materials was enough to prevail on a motion to compel,

Aurelius' Motion should be granted. But if that were the discovery standard, no large case would ever go to trial. Instead, it is the Court's role to determine – based on the issues in dispute, the nature of the hearing and the time constraints of the case management order – whether the burden, cost and delay attendant to additional discovery outweighs the possibility that an additional relevant document will be uncovered. In light of the more than reasonable searches that JPMorgan conducted, we are now well beyond this point. If the confirmation hearing is to commence on the March 7, 2011, date set by the Court – or any time in the year 2011 – the Motion must be denied.

2.    The Motion seeks entry of an order to compel JPMorgan to: (i) produce additional documents on top of the thousands of documents that have already been produced in connection with the investigation by the Official Committee of Unsecured Creditors (the "UCC") into the merits of the potential LBO-Related Causes of Action (the "LBO-Merits Discovery"); (ii) produce documents from the period of time prior to entry of the Depository Order on December 15, 2009, and therefore prior to the commencement of any settlement negotiations (the "Pre-12/15/09 Discovery"); (iii) produce additional documents on top of the thousands of documents already produced relating to the now-defunct April Plan for the period of December 15, 2009 through April 13, 2010 (the "April Plan Production"); (iv) produce additional documents on top of the thousands of documents already produced relating to the Debtor/Committee/Lender Plan for the period of April 14, 2010 through December 3, 2010 (the "Settlement Plan Production"); and (v) review and log documents between attorneys at Davis Polk and their clients at JPMorgan that are overwhelmingly likely to be privileged (the "Privilege Log Dispute"). Aurelius requests this discovery not because it is necessary for the confirmation

2

hearing – it is not – but because doing so furthers its goal of miring these Cases in months of needless and costly discovery.

3.      With regard to the first issue, the adequacy of the LBO-Merits Discovery, Aurelius makes scant mention of the extraordinary efforts already undertaken by JPMorgan in response to the year-long UCC investigation into the merits of the potential LBO-Related Causes of Action.  Following negotiations between JPMorgan and the UCC that resulted in a broad search for responsive documents, JPMorgan collected and reviewed, during a 10-month period, more than 340,000 documents, and ultimately produced more than 42,000 documents.

4.      Nonetheless, and despite Aurelius' unfounded statements to the contrary, JPMorgan has engaged in compromise discussions with Aurelius as to whether JPMorgan will agree to supplement its LBO-Merits Production by conducting a limited number of additional searches for a limited number of custodians for the 2007 time period, as well as by conducting additional searches for certain "monitoring" custodians through June 1, 2008.  Since the Motion was filed, JPMorgan has received data that has enabled it to assess the burden of conducting such a supplemental review and, while substantial in that it would require JPMorgan to review an estimated 150,000 pages of documents in two weeks, JPMorgan is prepared to conduct the review in the interests of compromise, transparency, and narrowing the disputed issues before this Court.

5.      To be clear, assuming Aurelius is prepared to stand by its prior proposal, there is no longer any dispute as to discovery relating to the merits of the LBO-Related Causes of Action – the issue about which all parties agree is the central focus of the settlement embodied in the Debtor/Committee/Lender Plan and what is likely to be the primary focus of the confirmation

3

hearing. The only remaining disputes before this Court – as to the Pre-12/15/09 Discovery, the April Plan Production, the Settlement Plan Production, and the Privilege Log Dispute – do not relate to the merits of the potential claims at all, but instead go to the narrow question of whether the mediated settlement embodied in the Debtor/Committee/Lender Plan is the result of a good-faith, arms-length negotiation.

      6.     While the issue of good-faith, arms-length negotiation is a narrow one, Aurelius has indiscriminately served over 45 parties with over 1300 pages of onerous discovery requests. To do even a fraction of what Aurelius demands would result in an enormous and untenable burden on JPMorgan. For example, just to comply with Aurelius' demands with respect to the Settlement Plan Production dispute would require JPMorgan to review over 110,000 documents (an estimated 1,000,000 pages and the equivalent of 400 boxes of documents) in a two-week period. Moreover, this discovery would be in addition to the many thousands of documents that have already been produced by JPMorgan and others in connection with the April Plan and the Debtor/Committee/Lender Plan. As detailed below, that prior discovery was designed to capture the most relevant information; the additional discovery demanded by Aurelius is likely to yield little in the way of additional relevant information, but will surely mire these proceedings in several additional months of discovery. Put simply, in complete disregard of the expedited discovery schedule established by the Court, Aurelius has propounded discovery on JPMorgan as if it were preparing for a 3-month plenary trial on the merits scheduled to begin in March 2012, and not the March 7, 2011, hearing set and repeatedly confirmed by the Court.

      7.     For these and the following reasons, JPMorgan respectfully requests that the Court deny the Motion in its entirety.

4

## FACTUAL BACKGROUND

8.      Aurelius' Motion is replete with factual inaccuracies, misrepresentations and omissions regarding JPMorgan's prior document collection, review and production efforts, the current state of discovery negotiations, and JPMorgan's good-faith efforts in response to Aurelius' unreasonable demands.  In order to accurately frame the dispute, some context is required.

### A.      The LBO-Merits Production

9.      On March 26, 2009, the UCC served broad discovery requests on JPMorgan, as subsequently amended on May 13, 2009, calling for the production of documents regarding all aspects of the 2007 LBO transactions (the "Rule 2004 Requests").

10.      The process of responding to the Rule 2004 Requests began with detailed negotiations with UCC counsel, over a several week period, regarding appropriate search terms and document custodians.  Ultimately JPMorgan collected, reviewed and produced electronic documents from 31 custodians using a comprehensive list of 43 search terms for the time period beginning January 1, 2007, and through the close of the LBO transactions on December 20, 2007.  *See* Declaration of Michael J. Russano, dated January 19, 2011 ("Russano Decl.") Ex. 1 (Memorandum dated December 24, 2010 setting forth JPMorgan and Davis Polk search protocols).  JPMorgan also searched the desk files of then current employees and certain electronic directories.

11.      As a result of these collection efforts, over a ten-month period, JPMorgan reviewed more than 340,000 documents, an effort that required the involvement of more than 50 attorneys.  Ultimately, JPMorgan produced more than 42,000 documents to the Document

Depository (a production that totaled more than a half-million pages), along with a detailed privilege log.[1]

12.     All of the foregoing material was produced to the Document Depository and has been available to Aurelius and its co-proponents for nearly a year.

### B.    The April Plan Production

13.     On May 13, 2010, Aurelius' co-proponent Wilmington Trust served discovery requests (the "Wilmington Trust Requests") in connection with the proposed settlement of the LBO-Related Causes of Action as set forth in the Joint Plan of Reorganization for Tribune Company and its Subsidiaries initially filed on April 12, 2010 (the "April Plan"); Wells Fargo also served discovery requests (the "Bridge Requests" and, collectively with the Wilmington Trust Requests, the "April Plan Requests").

14.     Following extensive meet and confer discussions with Wilmington Trust regarding its responses and objections, JPMorgan began the process of again collecting and reviewing documents.  Specifically, for the time period between December 15, 2009 and April 13, 2010, JPMorgan collected and reviewed all documents from 9 custodians (2 from JPMorgan, 2 from Davis Polk, 3 from FTI Consulting and 2 from Blackstone) that were exchanged between

---

[1] The Noteholder Plan Proponents, quoting the Examiner's Report, suggest that information has been withheld based on improper assertions of attorney-client or other applicable privileges.  Motion at 6.  The Examiner at no time accused JPMorgan of frustrating his examination of the LBO.  Nor did the Examiner specifically identify JPMorgan or cite a single JPMorgan document in his discussion of the attorney-client privilege.  The Examiner noted only that he lacked time "to pursue whether and to what extent the deliberations that the Lead Banks engaged in during the fall of 2007 . . . are protected attorney-client communications" and explicitly declined to "cast[] aspersions" on the Lead Banks' claims of privilege.  *See* Report of Kenneth N. Klee, As Examiner, Vol. 2, pg. 337 (Dkt. No. 5248).  Moreover, JPMorgan's privilege log has been in the Document Depository, and available to the Aurelius and it co-proponents, for nearly a year.

6

any parties at 21 external email "domain" names.[2]  To be clear, no limiting search terms were

used – all such documents were reviewed.  The broad domain name list captured all parties even

remotely likely to have engaged in negotiations regarding the April Plan.  Other supporters of the

settlement embodied in the April Plan – including Akin Gump and its former client Centerbridge

– employed similar search protocols in connection with their productions in response to similar

requests.  For example, Akin Gump, when searching its own internal documents, employed a

start date for production of December 1, 2009.  *See* Russano Decl. Ex. 2 (January 10, 2011 Letter

from N. Chung).

15.    Ultimately, JPMorgan reviewed 6,814 additional documents and produced 1,484

documents, totaling more than 12,000 pages, as well as a privilege log.[3]

16.    JPMorgan completed the April Plan Production on June 3, 2010.  The documents

have been available to all parties via the Document Depository since that time.  Until the instant

dispute, no party – including Wilmington Trust – ever complained about the adequacy of

JPMorgan's production or the sufficiency of its search protocols.

C.    **Settlement Plan Production**

17.    On December 9, 2010, Aurelius served document requests on JPMorgan and

Davis Polk that collectively totaled 148 individual requests, exclusive of subparts (the

---

[2] A domain name refers to the general email address that is associated with a particular email address.  For example, the specific email addresses of "johndoe@davispolk.com" and "janedoe@davispolk.com" both share the same "davispolk.com" domain name.

[3] The Noteholder Plan Proponents note that they reserve their rights to raise issues relating to the privilege log produced in connection with the April Plan Production.  JPMorgan does not understand this reservation.  The privilege log has been available to Aurelius and its co-proponents, including Wilmington Trust to whom the log was produced, for months.  Until January 7, 2011, no party raised any objection to the entries on the privilege log.  Nonetheless, JPMorgan has agreed to engage in meet-and-confer discussions regarding the privilege log, and such discussions are underway.

7

"Document Requests"). The Document Requests are extraordinarily broad and call for the production of documents with respect to every conceivable topic directly or indirectly related to Tribune or the potential LBO-Related Causes of Action. Moreover, over the objection of JPMorgan, Aurelius insisted that the December 20, 2010 Discovery and Scheduling Order for Plan Confirmation (Dkt. No. 7239) (the "CMO") impose a hard deadline on JPMorgan and others to *complete* production of documents within 30 days of service of the requests, or within 15 days of resolution of any dispute. Of course, to have any hope of meeting its obligations under the CMO, JPMorgan immediately began to collect and review documents based on a reasonable search protocol.

18.     To do so, JPMorgan searched the electronic and hard-copy files of the thirteen document custodians most likely to have responsive documents, including custodians from Davis Polk (2), JPMorgan (3), FTI (6) and Blackstone (2). With regard to electronic discovery, JPMorgan identified an extensive list of 50 external email domains, representing all parties even remotely likely to have engaged in negotiations regarding the Debtor/Committee/Lender Plan. While it would have been reasonable for JPMorgan to impose search terms on top of the domain filters, it did not do so in a good-faith effort to conduct the broadest possible search within reason. Because the documents resulting from the domain name search were not limited in any way by search terms, any communications between any of the parties involved in the settlement negotiations relating to any subject were reviewed. JPMorgan also applied 26 search terms to its internal email and to email exchanged between JPMorgan, on the one hand, and any of Davis

Polk, Blackstone and/or FTI, on the other hand.[4]   These were broad terms intended to capture Tribune-related discussions of the LBO (*e.g.,* LBO), major aspects of the settlement plan (*e.g.,* Releases, Plan, Negotiation) and the parties involved (*e.g.,* Aurelius, Oaktree, Angelo Gordon, PHONES).

19.     In all, between December 9, 2010 and January 10, 2011, JPMorgan collected and reviewed more than 22,500 documents, totaling well over 104,000 pages.  On January 10, 2011, 30 days after service of the Document Requests, JPMorgan produced 4,517 additional documents, totaling more than 41,000 pages.

20.     In sum, and to date, in response to various document requests served by the UCC, Wilmington Trust, Wells Fargo and Aurelius in these Cases, JPMorgan has reviewed more than 400,000 documents (estimated at more than 4 million pages), and ultimately produced more than 48,000 documents totaling more than 560,000 pages.

### D.     Aurelius' Unreasonable Discovery Demands and JPMorgan's Good-Faith Efforts to Compromise

21.     As sophisticated parties, and as the parties who insisted on a 30-day hard deadline for production in the CMO, Aurelius and its lawyers at Akin Gump fully understood that upon receipt of its Document Requests on December 9, 2010, JPMorgan would have to mobilize immediately in order to have any hope of completing its production.  Yet Aurelius deliberately waited nine days – nearly a third of the time JPMorgan had to complete production – before sending an email on December 18, 2010, asserting a supposed right to review and approve JPMorgan's "proposed" list of electronic search terms and custodians.  *See* Russano Decl. Ex. 3

---

[4] It appears that the Noteholder Plan Proponents failed to accurately comprehend JPMorgan's December 24, 2010, search protocol memorandum.  In their Motion, they contend that JPMorgan was only willing to run search terms through emails sent outside of JPMorgan.  Motion at 11.

(December 18, 2010 email from D. Newman). JPMorgan immediately responded via letter the next business day that it was willing to engage in a mutual exchange of information, but that it rejected any implication that Aurelius had a right to "approve" at its own leisurely pace a process that was already, of necessity, well underway. *See* Russano Decl. Ex. 4 (December 20, 2010 Letter from E. Moskowitz). Following a meet-and-confer on December 21st, all parties agreed to engage in a mutual exchange of information on December 24th – the proponents of the Debtor/Committee/Lender Plan were prepared to do it sooner; the proponents of the Noteholder Plan were not. On December 24, 2010, JPMorgan provided the Noteholder proponents with a detailed memorandum regarding the search protocols employed for both the completed LBO-Merits Production and April Plan Production, as well as the ongoing Settlement Plan Production.[5] *See* Russano Decl. Ex. 1 (Memorandum dated December 24, 2010 setting forth JPMorgan and Davis Polk search protocols).

22.      Several days later, on December 29, 2010 – just five business days prior to the date JPMorgan was obligated to *complete* its production – Aurelius sent its original email demand to JPMorgan (the "Email Demand"). *See* Russano Decl. Ex. 5 (December 29, 2010

---

[5] Aurelius' suggestion on page 4 of its Motion that JPMorgan was responsible for delay in the exchange of search protocol information is disingenuous in the extreme. As set forth above, Aurelius did not even request such information until December 18th, and JPMorgan complied with all deadlines mutually agreed by the parties. Ironically, Akin Gump failed to comply with its own agreement, and only after repeated verbal and oral demands did it finally provide – on January 10, 2011 – the search protocols that Akin Gump employed on its own behalf in connection with the discovery sought from it in connection with the April Plan. Presumably, Akin Gump's delay is attributable to its reticence to disclose the inconsistencies in its own positions. As set forth in the Debtor/Committee/Lender Plan Proponents' Objection to the Motion to Compel Production of Documents and Information from the Debtor/Committee/Lender Plan Proponents and Other Parties or, Alternatively, For An Order of Preclusion Respecting Certain Issues, although Akin Gump now rails against the December 2009 start date for production in connection with the April Plan, just a few short months ago, Akin Gump took the exact opposite position.

email from N. Chung).  The Email Demand, if followed, would have required JPMorgan to

essentially redo all prior productions.  For example, the Email Demand demanded the following:

- The addition of 96 additional search terms on top of the 43 terms JPMorgan
  originally used for the LBO-Merits Production, even though the LBO-era
  custodians, search terms and time period were painstakingly negotiated with
  the UCC, the party with standing to actually pursue the underlying litigation,
  at a time when the UCC aggressively was investigating the LBO-Related
  Causes of Action and the parties were adverse;

- Use of the same search terms and same custodians for a four-year period,
  starting well before the LBO and continuing without interruption to the
  present; and

- A list of search terms that were absurdly overbroad and demanded, for
  example, that JPMorgan search the files of Donald Bernstein – head of Davis
  Polk's bankruptcy practice – and other Davis Polk bankruptcy lawyers for the
  words "bankrupt" or "bankruptcy" over a four-year period.

23.    JPMorgan did not view the Email Demand as advanced in good-faith and, after

Aurelius refused to withdraw its demand in favor of a reasonable good-faith proposal, JPMorgan

was left with no option but to bring the dispute to this Court's attention.  Tellingly, it was only

after JPMorgan did so that Aurelius "clarified" its initial demand (the "Revised Email Demand").

*See* Russano Decl. Ex. 6 (January 6, 2011 email from N. Chung).  As will be discussed in greater

detail herein, in some areas the Revised Email Demand moderated Aurelius' demands to a

reasonable level, whereas in many others the Revised Email Demand continues to be grossly

unreasonable.

## ARGUMENT

## I.    THE DISCOVERY SOUGHT IS IRRELEVANT, BURDENSOME AND/OR DUPLICATIVE

24.    The scope of permissible discovery is well known.  Only discovery that is

relevant to a party's claims or defenses, and "reasonably calculated to lead to the discovery of

admissible evidence," is permitted under the applicable Federal Rules. *See* Fed. R. Bankr. P.

7026; Fed. R. Civ. P. 26(b)(1).  The Noteholder Plan Proponents must demonstrate to the Court

why the information they seek is relevant to their claims or defenses. *See Alexander v. FBI*, 186

F.R.D. 154, 159 (D.D.C. 1999) (holding that "the proponent of a motion to compel discovery

bears the initial burden of proving that the information sought is relevant."); *Trader v. Fiat*

*Distribs., Inc.*, No. 76-249, 1981 U.S. Dist. LEXIS 17802 at *5 (D. Del. Jan. 16, 1981) (denying

motion to compel because plaintiffs had "not met their burden of showing the relevancy" of the

requested information).

25.     Moreover, discovery may be limited where, as here, the burden or expense of the

proposed discovery outweighs its likely benefit, or where the discovery sought is unreasonably

cumulative or duplicative. *See* Fed. R. Bankr. P. 7026; Fed. R. Civ. P. 26(b)(2)(c); *see also*

*Johnson v. Geico Cas. Co.*, 269 F.R.D. 406, 415 (D. Del. 2010).

26.     The Noteholder Plan Proponents' complaint that JPMorgan's search protocols

were inadequate, and conclusory and speculative assertions that there must be some unidentified

information or documents that have not been produced, are insufficient to support a motion to

compel. *Ford Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. 418, 427 (D. N.J. 2009) ("The

notion that a document production is insufficient based on a belief that documents must exist

simply is not enough to grant a motion to compel that would require Ford to go back to square

one and begin its document collection efforts anew."); *see also Langbord v. U.S. Dep't of the*

*Treasury*, No. 06 Civ. 5315, 2008 U.S. Dist. LEXIS 85533, at 22 (E.D. Pa. 2008) (discovery not

permitted where assertion that discovery sought contained relevant information was "purely

speculative").

### A.    The LBO-Merits Production Was Reasonable and Extensive

27.    As detailed above, the LBO-Merits Production was extensive and comprehensive, and JPMorgan opposes Aurelius' speculative and unsupported assertions to the contrary.

28.    As an initial matter, it is illuminating – and perhaps dispositive – that JPMorgan's collection and review protocol was the result of painstaking negotiations with the UCC, a fiduciary for all unsecured creditors and the party tasked with investigating and prosecuting the potential LBO-Related Causes of Action.[6]    For Aurelius, nearly two years later, to enter the dispute and cast aspersions as to JPMorgan's search methodology, which was unquestionably the result of an adversarial negotiation, is wholly unreasonable. *Cf. United States v. Tomison*, 969 F. Supp. 587, 594 (E.D. Cal. 1997 ("It is of course true that courts often depend upon the adversarial process to reach the correct legal result."). Moreover, in the months since JPMorgan completed its production, the UCC has never once complained or suggested in any way that JPMorgan's extraordinary collection and production efforts were inadequate.

29.    Moreover, the suggestion that Aurelius should not be bound by prior discovery because it was not involved at the time is specious. *See* Motion at 3. As an initial matter, the Motion is expressly brought on behalf of the Noteholder Plan Proponents and, Wilmington Trust, a Noteholder Plan Proponent and a member of the UCC, was certainly involved at the time of the LBO-Merits Production and never once complained. In addition, Aurelius' attempt to portray itself as an uniformed creditor in need of massive amounts of discovery is not well-founded. Aurelius deliberately purchased its position after the Examiner's Report was issued, on the eve

---

[6] At all relevant times, Wilmington Trust was a member of the UCC and is therefore charged with having authorized UCC counsel to negotiate on its behalf and, such counsel having done so, it is inequitable for Wilmington Trust to argue, years later, that JPMorgan should have done more.

13

of Mediation, and it knew exactly what it was buying. To choose to enter these Cases at the 11th hour and then demand that prior discovery must be redone to its satisfaction is patently unreasonable.

30.    With respect to the 2007 time-period, Aurelius has routinely failed to identify any specific area where the LBO-Merits Production was deficient, despite repeated requests to do so. To the contrary, Aurelius has on numerous occasions manifested a surprising level of ignorance as to what is already available to it via the Document Depository, both from JPMorgan and from numerous other parties.[7] Instead, Aurelius' argument boils down to rank speculation about hypothetical documents conjured from thin-air and platitudes such as "we don't know about what you haven't given us." That is plainly inadequate.

31.    With respect to the 2008 time-period, documents created after the LBO closed on December 20, 2007, have no relevance to the merits of potential LBO claims. The fundamental issues underlying the potential LBO-Related Causes of Action center around whether the 2007 LBO transactions constituted fraudulent conveyances – the transactions either were or were not as of June 4, 2007 ("Step One") and December 20, 2007 ("Step Two"), and what happened after that time is not relevant to that issue and would be riddled with impermissible and irrelevant hindsight. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 154-155 (3d Cir. 1996); *Mellon Bank v. Metro Commc'ns.*, 945 F.2d 635, 648 (3d Cir. 1991).

---

[7] For example, the Email Demand suggested that JPMorgan did not include in-house counsel as custodians for the LBO-Merits Production. In reality, as even a basic familiarity with the Document Depository or JPMorgan's extensive privilege log would reveal, documents were collected from Alice Chen, Travis Epes and Scott Campbell, all in-house counsel.

14

32.      JPMorgan does acknowledge, however, that Aurelius' demands with respect to

the LBO-Merits Production is one area where the parties have made considerable progress from

the time of the initial Email Demand.  Aurelius' "clarified" proposal requests that JPMorgan

search for and produce documents from five custodians based on seven additional search terms

for the 2007 period, and also requests that JPMorgan search and produce documents from four

"monitoring" custodians from the December 21, 2007 to June 1, 2008, time period based on the

original 43 search terms, plus the additional seven.  Contrary to Aurelius' knowingly false

statement that JPMorgan has "refused to search for or produce any information from these time

frames," *see* Motion at 8, JPMorgan has repeatedly informed Aurelius that it would run the

searches to determine the number of additional documents that would need to be reviewed, for

any commitment to conduct additional discovery must be measured against the burden of doing

so.

33.      Despite best efforts, JPMorgan was unable to gather that information in advance

of the filing of the Motion.  However, JPMorgan has since gathered such information and

determined that acceptance of Aurelius' "clarified" proposal would require JPMorgan to review

approximately 13,500 additional documents, to log any privileged documents on a document-by-

document basis, and to produce any responsive documents within fifteen days.  *See* Russano

Decl. Ex. 7 (January 9, 2011 email from B. Kaminetzky).  Although reviewing what is likely to

be more than 150,000 pages of documents will result in a substantial, and costly, burden,

JPMorgan is prepared to do so in the interests of compromise and in order narrow the number of

disputes between the parties.

**B.**    **Aurelius' Demand that JPMorgan Produce Settlement-Related Materials Prior to December 15, 2009 Is Unduly Burdensome and Designed to Harass**

34.    JPMorgan stands by its objection that discovery of information prior to December 15, 2009, is both entirely irrelevant and unduly burdensome.  JPMorgan respectfully refers the Court to the Debtor/Committee/Lender Plan Proponents' Objection to the Motion to Compel Production of Documents and Information from the Debtor/Committee/Lender Plan Proponents and Other Parties or, Alternatively, For an Order of Preclusions Respecting Certain Issues for a complete discussion of the issue, but notes the following key points:

- The April Plan has been withdrawn and discovery as to that Plan is irrelevant to the confirmation hearing;

- The April Plan Production was completed 7 months ago; the December 2009 start date for that production was set forth in JPMorgan's Responses and Objections to the April Plan Requests and *no one objected*;  the scope of JPMorgan's production was negotiated at the time with Aurelius' Noteholder Plan co-proponent Wilmington Trust;

- Even assuming, *arguendo*, that the withdrawn April Plan is somehow relevant to the upcoming confirmation hearing, it is very unlikely that there is any material as to that withdrawn Plan prior to December 15, 2009.  That is the date that the Depository Order was entered, which established certain protections regarding the confidentiality of settlement negotiations, and is therefore the earliest date that negotiations as to the April Plan began in earnest; and

- Akin Gump, who at the time represented Centerbridge Partners, a party to the prior settlement, is now taking a completely different position from the one it previously took.  In response to discovery requests targeted at Akin Gump attorneys, Akin Gump refused to produce, and did not produce, any documents from prior to December 2009.

**C.**    **Aurelius' Demands Regarding the April Plan Production are Unreasonable**

35.    As described previously, JPMorgan completed the April Plan Production seven months ago without complaint from any party at the time – including from Wilmington Trust, the party who propounded the discovery and Aurelius' current Noteholder Plan co-proponent.

16

Indeed, some of the same lawyers who were copied on the Email Demand, the first time any

concern was raised, were involved in the original meet-and-confer discussions. *See Ford Motor*

*Co.*, 257 F.R.D. at 424-26 (denying motion to compel on ground that party's "passivity" to its

adversary's production and eight-month delay in raising criticisms "renders its objection

waived"); *Butler v. Benson*, 193 F.R.D. 664, 666 (D. Colo. 2000) (denying motion to compel

production where unexplained delay in seeking court assistance "raises the inference that the

plaintiff is not as concerned with obtaining the documents as he is with . . . [a] strategic

purpose").

   36.  In addition to the Noteholder Plan Proponents' having waived their objections by

failing to raise them in a timely fashion, there is a more fundamental point to be made. Because

the April Plan has been withdrawn and will not be considered at the confirmation hearing,

discovery related to the April Plan is not relevant – or, at most, is only marginally relevant – to

the issues that will be before the Court at confirmation with respect to the

Debtor/Committee/Lender Plan. Accordingly, any additional discovery with respect to the April

Plan on top of the thousands of documents already available to Aurelius cannot be justified.

That is particularly true here, where Aurelius, consistent with its general approach throughout,

has failed to make a reasonable or targeted proposal. Instead, Aurelius argues that JPMorgan

should simply start over and, in lieu of the April Plan Production, conduct new searches going

back to September 1, 2009, through the entire period using an overbroad list of 74 search terms

for 17 custodians (4 from JPMorgan, 4 from Davis Polk, 6 from FTI Consulting and 3 from

Blackstone). Such a request is patently unreasonable.

17

37.     Moreover, assuming, *arguendo*, that negotiations regarding the April Plan have

some minimal relevance to the Debtor/Committee/Lender Plan, the April Plan Production, and

the search protocols employed in connection with that production, were more than adequate. As

Aurelius itself concedes, the reason for discovery related to a proposed settlement in the context

of a confirmation hearing is to test whether the settlement is the result of arms'-length

bargaining, or whether it is the result of collusion amongst the parties. *See, e.g.,* Motion at 13;

Noteholder Plan Proponents' Motion to Compel Production of Documents and Information from

Debtor/Committee/Lender Proponents and Other Parties Or, Alternatively, For an Order of

Preclusion Respecting Certain Issues (Dkt. No. 7527) (the "Noteholder Motion to Compel") at

25.

38.     The best and most efficient method to capture such information is to review the

communications between the negotiating parties. And that is exactly what JPMorgan (and

others) did in connection with the April Plan Production – it reviewed every email exchanged

between the custodians at JPMorgan, Davis Polk, FTI or Blackstone and any third-party with

whom the April Plan might have been negotiated, and it did so *without applying any search

terms*. JPMorgan has repeatedly asked Aurelius to identify any parties that it believes JPMorgan

may have missed, and Aurelius has failed to do so.[8] Nothing more is necessary or required from

JPMorgan, and Aurelius' belated argument that JPMorgan must review tens (and potentially

---

[8] For the first time, the Noteholder Plan Proponents attempt to identify certain groups that were purportedly missing from the list of domain names used to complete the April Plan Production. That attempt falls flat. With respect to the first group – the Credit Agreement Lenders represented by Hennigan Bennet – that group was not a party to, and did not negotiate, the April Plan. Moreover, JPMorgan's domain list did in fact include include henniganbennett.com and hbdlawyers.com. With respect to the second group, a former ad-hoc group of Step One Lenders represented by Bracewell Guiliani and others, that group was not even in existence at the time the April Plan was negotiated. *See* Russano Decl. Ex. 8 (August 24, 2010 Notice of Appearance for Ad Hoc Committee of Step One Senior Lenders).

18

hundreds) of thousands of internal emails is without merit. Indeed, in *In re Lyondell* – a case that

the Noteholder Proponents are fond of citing, but only when it suits them – when the committee

sought discovery as to whether the settlement between the debtors and the financing parties was

collusive, the Court authorized reasonable discovery related to communications between the

debtors and the settling parties, but refused to authorize:

> [D]ocument production or questioning with respect to
> communications or thought processes within any given settling
> defendant or between or amongst any settling defendant and its
> professionals, or the professionals for one settling defendant and
> another settling defendant, or the settling defendants' principals
> themselves. Russano Decl. Ex. 9 (*Lyondell,* December 11, 2009
> Tr. at 138).

39.    Accordingly, the Noteholder Proponents have failed to articulate any reason why

the sweeping discovery they request is relevant or appropriate, and the Motion should be denied.

**D.    Aurelius' Demands Regarding the Settlement Plan Production are Unreasonable**

40.    In spite of the very limited window within which it is obligated to complete

production, JPMorgan has taken a very broad approach in connection with discovery relating to

the Debtor/Committee/Lender Plan. Notwithstanding the fact that the April Plan settlement was

in effect until August 2010 – and that there were no negotiations with respect to the current

settlement until after that time – JPMorgan has voluntarily collected, reviewed and produced

documents dating back to April 2010 and going through December 2010. In so doing, JPMorgan

employed an expansive set of 50 domain names to capture all external communications with any

parties who may have had any involvement in the negotiation of the settlement or preparation of

the Debtor/Committee/Lender Plan – and reviewed each such document without limiting them

19

by search terms.[9]  Once again, those are the documents that are most likely to capture the

information Aurelius professes to want in order to determine whether the settlement was the

result of arms-length negotiation. *See, e.g.,* Motion at 13; Noteholder Motion to Compel at 25.

In addition, anticipating that Aurelius would not be satisfied with a reasonable search of external

emails designed to capture the most responsive material, and cognizant of the fact that it did not

have the time to engage in prolonged debate with Aurelius if a March confirmation is to occur,

JPMorgan voluntarily undertook to review internal JPMorgan documents as well as documents

between JPMorgan and its advisors and professionals at Davis Polk, FTI and/or Blackstone

based on a reasonable list of 26 search terms.  On January 10, 2011, JPMorgan met its

obligations under the CMO and produced the Settlement Plan Production, which contains more

than 41,000 pages of responsive material.

  41. Even before receiving and reviewing the Settlement Plan Production, Aurelius

pre-judged that it was unreasonable and inadequate, and demanded that JPMorgan produce

documents first in accordance with the Email Demand, and later in accordance with the Revised

Email Demand.  Although the Revised Email Demand did reduce Aurelius' original search term

list from 96 to 74 by eliminating certain patently indefensible terms such as "bankrupt" or

"bankruptcy," Aurelius' proposed list remains plainly unreasonable and would result in an

enormous burden for little to no gain.

  42. Nonetheless, in spite of Aurelius' false assertions that JPMorgan has refused to

conduct any reasonable supplemental searches, *see e.g.,* Motion at 2, 4, 8, JPMorgan has not only

been willing to run reasonable searches but, in an effort to engage in a good-faith meet-and-

---

[9] JPMorgan has invited Aurelius to identify any domain names that it believes have been improperly excluded.  Aurelius has been unable to do so.

confer, JPMorgan was willing to run the patently unreasonable searches that continue to be

demanded by Aurelius. On January 7, 2011, immediately following the first meet and confer to

discuss the Revised Email Demand, JPMorgan began the process of collecting – for the time

period between April 14, 2010 and December 3, 2010 – the enormous amounts of data from the

multiple parties identified in the Email Demand. In fact, during the week following that meet

and confer, JPMorgan endeavored to collect and process more than 118 GB of data so that it

could assess the burden of the additional review demanded by Aurelius and be in a position to

continue meaningful discussions.

43.     On Monday, January 10, 2011, JPMorgan provided Aurelius' counsel with a list

of search term hits for JPMorgan and Davis Polk custodians (the only custodians for which data

was then available). *See* Russano Decl. Ex. 10 (January 10, 2011 M. Russano email). The

results, which notably did not yet include FTI or Blackstone, yielded a total of 45,700 documents

(an estimated volume of 410,000 pages) that, pursuant to the CMO, JPMorgan would be required

to review and produce in fifteen days in addition to any other productions that might result from

resolution of other disputes. Since that time, Aurelius has demonstrated no willingness to

consider the removal of particular search terms or to otherwise compromise on its demands. *See*

Russano Decl. Ex. 11 (January 12, 2011 email from M. Russano); Russano Decl. Ex. 12 (January

13, 2011 email from M. Russano); Russano Decl. Ex. 13 (January 14, 2011 email from D.

Newman).

44.     In the days since Aurelius filed the Motion, JPMorgan has received data that

includes information from Blackstone and FTI that it would be required to review should

Aurelius prevail in its demands. Under Aurelius' latest proposal, JPMorgan would be required to

review and produce a minimum of 110,000 documents – an estimated total of 1 million pages, or the astounding equivalent of 400 full boxes – within 15 days.[10]  *See* Russano Decl. Ex. 14 (chart reflecting total number of documents resulting from Aurelius' latest proposal).

45.     To conduct even a fraction of the review demanded by Aurelius, let alone the entire review, would take months and could not be completed anywhere near in time for a March confirmation hearing.  Indeed, if Aurelius' Motion is granted, the confirmation hearing will necessarily need to be delayed – and delayed by several months, not weeks.  This is not lost on the Noteholder Plan Proponents, and is likely the real reason for their unreasonable demands.

46.     Accordingly, for the reasons set forth above, the motion to compel should be denied.

## II.  JPMORGAN SHOULD NOT BE COMPELLED TO REVIEW AND LOG ATTORNEY-CLIENT COMMUNICATIONS THAT ARE OVERWHELMINGLY LIKELY TO BE PRIVILEGED

47.     Aurelius and JPMorgan have engaged in numerous meet-and-confer discussions regarding what documents both parties will be required to review and list on a privilege log.  The parties have reached substantial agreement on the great majority of issues, including which documents need to be logged on a document-by-document basis, which documents need to be reviewed on a category basis, and which documents need not be reviewed at all because they are overwhelmingly likely to be privileged (such as, for example, internal emails between Akin Gump attorneys).

---

[10] In reality, that is only a fraction of what Aurelius demands.  These numbers only capture the April 2010 through December 2010 period – Aurelius would have JPMorgan conduct the same searches, and perform the same review, going back to September 2009, an additional 7 months.

48.     Recognizing that it is possible that not every document between a lawyer and a client will be privileged, the parties have reached a general agreement as to the following: Documents or communications where a lawyer is merely cc'd must be reviewed and logged on a category basis, and documents where a lawyer is in the "to" or "from" field need not be collected or reviewed.  This sensible compromise recognizes that documents to or from an attorney to his or her client in the midst of a contentious dispute are overwhelmingly likely to be privileged, and that the burden of having to review and log such documents far outweighs any possible benefit. The parties agree as to all of the above.

49.     Where JPMorgan and Aurelius disagree is that Aurelius wants to insert an exception to that general rule that would eviscerate the rule – at least as to JPMorgan. Specifically, Aurelius interposes an "exception" to the rule that would require JPMorgan, for the period between April 1, 2010 and November 23, 2010, to review and log all of the emails between any of Donald Bernstein (Davis Polk bankruptcy counsel), Dennis Glazer (Davis Polk litigation counsel), Kevin Kelley (JPMorgan in-house counsel), Pat Daniello (JPMorgan), Miriam Kulnis (JPMorgan) and Ann Kurinskas (JPMorgan).  This "exception" swallows the rule, and would impose on JPMorgan an enormous burden of reviewing tens of thousands of additional documents that are overwhelmingly likely to be privileged.

50.     In the interest of compromise, and in an attempt to again follow the *Lyondell* precedent where lawyer-to-client emails were reviewed for only a handful of days where it was at least possible the lawyer might send his or her client a "mere recitation" of certain key outside events,[11] JPMorgan has proposed that it would agree to review and log on a category basis

---

[11] It is important and illuminating to note that the extremely limited discovery in *Lyondell* into attorney-client communications resulted in only a handful of documents being produced.

documents that were created on the days when mediation occurred. *See* Russano Decl. Ex. 12

(January 13, 2011 email from M. Russano).  JPMorgan believes this is a reasonable and fair

compromise.  In response, rather than suggesting a counterproposal, Aurelius simply stated that

the parties were too far apart and filed its Motion. *See* Russano Decl. Ex. 13 (January 14, 2011

email from D. Newman).[12]

     51.     In addition, the Noteholder Plan Proponents have failed to articulate any

reasonable basis to require JPMorgan to review such documents other than unfounded and

unsubstantiated speculation.  Given the enormous burden that would be associated with such a

request, the fact that the material sought is overwhelmingly likely to be privileged, and in light of

the Noteholder Plan Proponents' inability to articulate a valid reason for their request, JPMorgan

respectfully requests that the Motion be denied.

---

[12] Notably, and ironically, in response to document requests served on them by the Debtors, each of the Noteholder Plan Proponents objects to the collection, review and logging of communications solely between a party and its counsel where counsel is in the "to" or "from" fields and communications solely between outside counsel and advisors where the advisors are in the "to" or "from" fields.  Nevertheless, the Noteholder Proponents seek to require JPMorgan to review those same communications.  There is no explanation for the disparate position the Noteholder Proponents intend to take with the one they seek to impose on JPMorgan.

RLF1 3779699v. 1

## CONCLUSION

52.    For the foregoing reasons, JPMorgan respectfully requests that the Court deny the

Motion and enter the Order Denying the Noteholder Plan Proponents' Motion to Compel

JPMorgan To Search For, Review and Produce Documents Responsive to Aurelius' First

Request for the Production of Documents. *See* Russano Decl. Ex. 15 (JPMorgan Proposed

Order).


Dated: January 19, 2011             Respectfully submitted,
       Wilmington, Delaware

                                    Mark D. Collins (No. 2981)
                                    Robert J. Stearn, Jr. (No. 2915)
                                    Drew G. Sloan (No. 5069)
                                    RICHARDS, LAYTON & FINGER, P.A.
                                    One Rodney Square
                                    P.O. Box 551
                                    Wilmington, Delaware  19899
                                    (302) 651-7700

                                    -and -

                                    Benjamin S. Kaminetzky
                                    Elliot Moskowitz
                                    Michael Russano
                                    DAVIS POLK & WARDWELL LLP
                                    450 Lexington Avenue
                                    New York, New York  10022
                                    (212) 450-4500

                                    *Attorneys for JPMorgan Chase Bank, N.A.*

25