# ATTACHMENT A

*Report of Kenneth N. Klee, as Examiner (Volume Two) [Docket No. 5248]*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re:* | : | Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | : | Case Number 08-13141 (KJC) |
| | | (Jointly Administered) |
| Debtors. | : | |
| | : | |

## REPORT OF KENNETH N. KLEE, AS EXAMINER

### (VOLUME TWO)

### (FINDINGS AND CONCLUSIONS CONCERNING QUESTION ONE)

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Telephone:          (310) 407-4000
Facsimile:          (310) 407-9090

Lee R. Bogdanoff
Martin R. Barash
David A. Fidler
Ronn S. Davids
Jennifer L. Dinkelman

*Counsel to Examiner*

LECG, LLC
201 South Main, Suite 450
Salt Lake City, UT  84111
Telephone:          (801) 364-6233
Facsimile:          (801) 364-6230

F. Wayne Elggren

*Financial Advisor to Examiner*

SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone:          (302) 421-6800
Facsimile:          (302) 421-6813

Mark Minuti
Charles O. Monk, II
Nicholas J. Nastasi
Cathleen M. Devlin

*Delaware Counsel to Examiner*

# TABLE OF CONTENTS

IV. PRINCIPAL FINDINGS AND CONCLUSIONS CONCERNING QUESTION ONE .......... 1

    A.       Overview of the Kinds of Claims at Issue in Question One. ................................... 1

    B.       Fraudulent Transfer Claims. .................................................................. 6

          1.      The Transfers and Obligations Potentially Subject to Avoidance and/or Recovery. ...................................................................... 6

          2.      What Is at Stake in the Fraudulent Transfer Disputes?............................ 10

          3.      Examiner's Conclusions and Explanation Concerning Choice of Law Issues Presented by Fraudulent Transfer Claims............................. 12

          4.      Intentional Fraudulent Transfer Claims. .................................................. 15

               a.      The Legal Standard. .................................................................... 15

               b.      Examiner's Conclusions and Explanation Concerning Intentional Fraudulent Transfer Claims in the Step One Transactions. ............................................................................. 22

               c.      Examiner's Conclusions and Explanation Concerning Intentional Fraudulent Transfer Claims in the Step Two Transactions. ............................................................................. 32

                    (1)    Solvency and Value Received. ......................................... 35

                    (2)    The Refinancing Representation....................................... 36

                          (i)    Attempting to Reconcile the Testimony. .............. 43

                          (ii)    Assessing the Conflicting Testimony. .................. 47

                            (iii)    Did These Events Make a Difference? ................. 50

                    (3)    Information Concerning Out-Year Growth Rate Assumptions and Valuation Implications of Such Assumptions.................................................................... 54

                    (4)    The October 2007 Forecast............................................... 58

                    (5)    The Tribune Board and Special Committee Deliberations. ................................................................... 63

                    (6)    Factors that Mitigate Against the Conclusion that Step Two Constituted an Intentional Fraudulent Transfer and Conclusion. ................................................... 74

5. Constructive Fraudulent Transfer Claims. ................................................. 77

 a. Examiner's General Conclusions. .................................................. 77

 b. Examiner's Conclusions and Explanation Concerning Equivalence of Value Provided at Step One and Step Two—the Question of "Collapse." ................................................ 77

 c. Equivalence of the Value Provided Regarding Specific Transfers and Obligations. ............................................... 90

  (1) Examiner's Conclusions and Explanation Concerning Obligations Incurred to the LBO Lenders to Pay Selling Stockholders at Step One and Step Two. ................................................. 91

  (2) Examiner's Conclusions and Explanation Concerning Obligations Incurred to Repay the 2006 Bank Debt. ....................................................... 92

  (3) Examiner's Conclusions and Explanation Concerning Obligations Incurred in Connection with the Satisfaction of the LATI Intercompany Claims. ............................................................. 93

  (4) Examiner's Conclusions and Explanation Concerning Obligations Incurred on the Revolving Credit Facility, Delayed Draw Facility and under the Credit Agreement and Bridge Facility for Satisfaction of LBO Fees, and for Payment of LBO Fees. ................................................................. 97

  (5) Examiner's Conclusions and Explanation Concerning Payments Made on Account of Advisor Fees. ............................................................... 107

  (6) Examiner's Conclusions and Explanation Concerning Tax Savings, 401(k), and Private Company Status. ............................................................. 110

  (7) Examiner's Conclusions and Explanation Concerning Post-Step One and Step Two Payments on Account of the Credit Agreement and Bridge Credit Agreement. ............................................................ 119

 d. Framing the Solvency and Capital Adequacy Analysis. ............. 127

  (1) Examiner's Conclusions and Explanation Concerning the Relevant Dates for Step One and

Step Two Solvency, Capital Adequacy, and Intention to Pay Debts as They Come Due Analysis...... 128

(2)    Legal Standards Governing Solvency Analysis.............. 129

(3)    Legal Standards Governing Capital Adequacy Analysis......................................................................... 136

(4)    Examiner's Conclusions and Explanation Concerning Whether Solvency and Capital Adequacy Are Measured on an Estate-by-Estate Basis—the Impact of the Subsidiary Guarantees............ 143

    (i)    The Guarantor Subsidiaries................................ 144

    (ii)    Tribune. .............................................................. 154

(5)    Examiner's Conclusions and Explanation Concerning the Role of Intercompany Claims at the Time of the Leveraged ESOP Transactions on Solvency and Capital Adequacy Analysis. ..................... 156

    (i)    Tribune and the Guarantor Subsidiaries. ............ 157

    (ii)    The Guarantor Subsidiaries................................ 157

    (iii)    Tribune. .............................................................. 159

(6)    Examiner's Conclusions and Explanation Concerning the Question of Inclusion of Step Two Debt with Step One Debt for Purposes of Analysis of Solvency, Capital Adequacy, and Intention to Incur Debts Beyond Reasonable Ability to Pay Adequacy Analysis. ...................................................... 160

    (i)    Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Solvency Analysis................................................ 160

    (ii)    Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Capital Adequacy Analysis................................ 183

    (iii)    Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Analysis of Intention to Incur Debts Beyond Reasonable Ability to Pay................................... 187

(7)    Examiner's Conclusions and Explanation Concerning Solvency of Tribune at Step One. ............... 187

(i) Step One:  No Collapse With Step Two. ............ 188

(A) Market Indicia of Solvency. ................................ 188

(B) Balance Sheet Solvency:  The Auction Process and Contemporaneous Valuations. ........ 195

(ii) Step One:  Collapse—Inclusion of Step Two Debt at Step One. .................................................. 201

(8) Examiner's Conclusions and Explanation Concerning Solvency of the Guarantor Subsidiaries at Step One. .................................................................... 207

(9) Examiner's Conclusions and Explanation Concerning Capital Adequacy of Tribune and the Guarantor Subsidiaries at Step One. .............................. 211

(10) Examiner's Conclusions and Explanation Concerning Solvency of Tribune at Step Two. ............... 220

(11) Examiner's Conclusions and Explanation Concerning Solvency of Guarantor Subsidiaries at Step Two. ....................................................................... 226

(12) Examiner's Conclusions and Explanation Concerning Capital Adequacy of Tribune and the Guarantor Subsidiaries at Step Two. .............................. 229

6. Intention to Incur or Belief that the Tribune Entities Would Incur Debts Beyond Their Reasonable Ability to Pay. .................................... 238

a. The Legal Standard. .................................................................... 238

b. Examiner's Conclusions and Explanation Concerning Application to Step One. ............................................................. 239

c. Examiner's Conclusions and Explanation Concerning Application to Step Two. ............................................................. 240

7. Asserted Defenses to Fraudulent Transfer Claims. ................................ 241

a. Defenses Under Bankruptcy Code section 546(e). ..................... 241

(1) Examiner's Conclusions and Explanation Concerning Section 546(e) Defenses. ............................. 241

(2) Examiner's Conclusions and Explanation Concerning the Question of a Section 546(e) "Work-Around." .............................................................. 254

b.      Good Faith Defenses at Step One and Step Two. ........................ 255

     (1)      Bankruptcy Code Section 548—The Legal Standard. ........................................................................ 255

     (2)      Examiner's Conclusions and Explanation Concerning Effect of Good Faith Determination Regarding Credit Agreement Agent and Bridge Agent on Obligations Incurred Under Those Agreements—Whose Good Faith Matters? ................... 260

     (3)      Examiner's Conclusions and Explanation Concerning Good Faith of JPMCB as Credit Agreement Agent at the Time Obligations Incurred at Step One and Step Two. ............................... 264

     (4)      Examiner's Conclusions and Explanation Concerning Good Faith of JPM Entities as Transferee of LBO Fees at Step One and Step Two. ...... 278

     (5)      Examiner's Conclusions and Explanation Concerning Good Faith of MLCC as Bridge Credit Agreement Agent at the Time Obligations Incurred at Step Two. ................................................................. 278

     (6)      Examiner's Conclusions and Explanation Concerning Good Faith of Merrill Entities as Transferee of LBO Fees at Step One and Step Two. ...... 280

     (7)      Examiner's Conclusions and Explanation Concerning Good Faith of Citigroup Entities as Transferee of LBO Fees at Step One and Step Two. ...... 281

     (8)      Examiner's Conclusions and Explanation Concerning Good Faith of BofA Entities as Transferee of LBO Fees at Step One and Step Two. ...... 283

     (9)      Examiner's Conclusions and Explanation Concerning Good Faith of MLPFS and CGMI as Transferees of Advisor Fees at Step One and Step Two. ........................................................................ 284

8.      Legal Questions Concerning Remedies Available in Connection with Avoidance. ........................................................................ 288

     a.      Examiner's Conclusions and Explanation Concerning the Questions of "Standing" and Scope of Avoidance at Guarantor Subsidiary Levels ........................................ 288

     b.      Examiner's Conclusions and Explanation Concerning

        Participation of Creditors Whose Claims, Payments, or
        Liens are Avoided in Creditor Distributions.............................. 298

    c.    Examiner's Conclusions and Explanation Concerning
        Effect of Avoidance on PHONES Subordination....................... 303

    d.    Examiner's Conclusions and Explanation Concerning
        Effect of Avoidance on Subordinated Bridge Subsidiary
        Guarantee. ................................................................................. 307

    e.    Examiner's Conclusions and Explanation Concerning
        Treatment of Intercompany Claims in Avoidance
        Scenarios. ................................................................................. 309

9.    Examiner's Conclusions and Explanation Concerning the
    Economic Effect of Potential Avoidance on Distributions.................... 310

C.    Potential Preference Actions................................................................... 310

1.    Examiner's Conclusions and Explanation Concerning Satisfaction
    of Exchangeable EGI-TRB Note. .......................................................... 311

2.    Examiner's Conclusions and Explanation Concerning Payments on
    Account of Bridge Debt and Credit Agreement Debt............................ 319

3.    Examiner's Conclusions and Explanation Concerning Payments to
    Directors and Officers of Tribune Entities............................................. 321

4.    Examiner's Conclusions and Explanation Concerning
    Intercompany Payments......................................................................... 322

D.    Equitable Subordination/Equitable Disallowance of Specified Claims.............. 323

1.    Generally................................................................................................ 323

    a.    The Effect of Insider or Non-Insider Status................................ 324

2.    Equitable Disallowance. ........................................................................ 327

3.    Application of Legal Standards. ............................................................. 332

    a.    Examiner's Conclusions and Explanation Concerning LBO
        Lender Debt. .............................................................................. 332

    b.    Examiner's Conclusions and Explanation Concerning EGI-
        TRB Note Claims...................................................................... 338

4.    Examiner's Conclusions and Explanation Concerning Equitable
    Disallowance.......................................................................................... 339

E.      Common Law Claims. ..................................................................................... 339

        1.      Examiner's Conclusions and Explanation Concerning Choice of
                Law/Choice of Forum Issues Presented by Common Law Claims. ....... 339

                a.      Breach of Fiduciary Duty........................................................... 340

                b.      Aiding and Abetting Breach of Fiduciary Duty......................... 340

                c.      Unjust Enrichment. .................................................................... 343

                d.      Illegal Corporate Distributions. ................................................ 345

                e.      Professional Malpractice Claims. .............................................. 345

        2.      Breach of Fiduciary Duty.................................................................... 346

                a.      Legal Standard for Breach of Fiduciary Duty Claims. .............. 346

                        (1)     The Business Judgment Rule and the Entire
                                Fairness Doctrine. ........................................................... 347

                        (2)     The Duty of Loyalty Under Delaware Law. ................... 351

                        (3)     The Duty of Disclosure as Part of the Duty of
                                Loyalty Under Delaware Law......................................... 355

                        (4)     The Duty of Care Under Delaware Law. ........................ 356

                        (5)     The Statutory Safe Harbor. ............................................ 358

                b.      Effect of Solvency or Insolvency on Breach of Duty
                        Questions Under Delaware Law. ................................................ 360

                c.      Fiduciary Duties of Directors and Officers of Subsidiaries........ 365

                d.      Legal Analysis of Effect of Indemnification and
                        Exculpation Rights of Directors and Officers on Breach of
                        Duty Claims. .............................................................................. 367

                e.      Examiner's Conclusions and Explanation Concerning
                        Application of Legal Standards to Potential Defendants............ 373

                        (1)     Tribune Directors and Officers at Step One. .................. 374

                        (2)     Guarantor Subsidiary Directors at Step One................... 375

                        (3)     Large Stockholders at Step One..................................... 376

                        (4)     Tribune Directors at Step Two........................................ 379

(5)     Tribune Officers at Step Two. ......................................... 386

(6)     Guarantor Subsidiary Directors at Step Two. ................. 387

(7)     Large Stockholders at Step Two. .................................... 389

3.     Aiding and Abetting Breach of Fiduciary Duty...................................... 390

a.     Legal Standard for Aiding and Abetting Breach of
        Fiduciary Duty. ....................................................................... 390

b.     Legal Standards Governing Potential In Pari Delicto
        Defenses to Aiding and Abetting Claims.................................... 392

c.     Examiner's Conclusions and Explanation Concerning
        Application of Legal Standards to Potential Defendants............ 395

(1)     Large Stockholders. ....................................................... 396

(2)     Lead Banks..................................................................... 396

(3)     Financial Advisors. ........................................................ 396

(4)     Zell Group....................................................................... 397

(5)     VRC. ............................................................................... 397

4.     Unjust Enrichment. .................................................................................. 398

a.     Legal Standard for Unjust Enrichment. ..................................... 398

b.     Potential Preemption Issues. ...................................................... 400

c.     In Pari Delicto as a Defense to an Unjust Enrichment
        Claim........................................................................................... 403

d.     Examiner's Conclusions and Explanation Concerning
        Application of Legal Standards to Potential Defendants............ 404

5.     Illegal Corporate Distributions. ............................................................. 406

a.     Legal Standard for Illegal Corporate Distributions Pursuant
        to the DGCL................................................................................ 406

b.     Potential Preemption Issues. ...................................................... 411

c.     Examiner's Conclusions and Explanation Concerning
        Application of Legal Standards to Potential Defendants............ 411

6.     Professional Malpractice Claims. .......................................................... 414

a.       Legal Standard for Professional Malpractice Claims. ................ 414

b.       Legal Standards Governing In Pari Delicto Defenses to
         Professional Malpractice Claims. ............................................... 416

c.       Effect of Indemnification Rights on Professional
         Malpractice Claims. .................................................................... 420

d.       Examiner's Conclusions and Explanation Concerning
         Application of Legal Standards to VRC. .................................... 421


Annex A:    Discounted Cash Flow Analysis

Annex B:    Recovery Scenarios

Annex C:    Prepetition LBO Lender Payments

# TABLE OF AUTHORITIES

**Page(s)**

## UNITED STATES CONSTITUTION

U.S. CONST. Article VI, cl. 2 ......................................................................................................400

## CASES

### FEDERAL CASES

*A.J. Heel Stone, L.L.C. v. Evisu Int'l, S.R.L.*,
    2006 U.S. Dist. LEXIS 34152 (S.D.N.Y. May 25, 2006).....................................................166

*Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen)*,
    300 F.3d 1097 (9th Cir. 2002) .........................................................................................120

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,
    34 F.3d 800 (9th Cir. 1994) .............................................................................................295

*ACF-Brill Motors Co. v. Comm'r*,
    189 F.2d 704 (3d Cir. 1951)...............................................................................................88

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Adelphia Recovery Trust v. Bank*
    *of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *aff'd*, 2010 WL 2094028 (2d Cir. May 26,
    2010) ...........................................................................................................................331, 332

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    390 B.R. 80 (S.D.N.Y. 2008), *aff'd*, 2010 WL 2094028 (2d Cir. May 26, 2010) .........289, 332

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    624 F. Supp. 2d 292 (S.D.N.Y. 2009)...............................................................................290

*Allegheny Gen. Hosp. v. Philip Morris*,
    228 F.3d 429 (3d Cir. 2000)..............................................................................................400

*Altria Grp. v. Good*,
    129 S. Ct. 538 (2008).................................................................................................400, 401

*Aluminum Mills Corp. v. Citicorp N. Am. Inc. (In re Aluminum Mills Corp.)*,
    132 B.R. 869 (Bankr. N.D. Ill. 1991) .......................................................................... passim

*Am. Classic Voyages, Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages, Co.)*,
    384 B.R. 62 (D. Del. 2008)...............................................................................................134

*Amerada Hess Corp. v. Comm'r*,
    517 F.2d 75 (3d Cir. 1975)................................................................................................204

*Ameriserv Fin. Bank v. Commercebank, N.A.*,
   2009 U.S. Dist. LEXIS 24559 (W.D. Pa. Mar. 26, 2009) ....................................256

*AmeriServe Food Distrib., Inc. v. Transmed Foods, Inc. (In re AmeriServe Food Distrib., Inc.)*,
   315 B.R. 24 (Bankr. D. Del. 2004) ....................................................................313

*Ansel Props., Inc. v. Nutri/System Assocs. (In re Nutri/Sys. Assocs.)*,
   178 B.R. 645 (E.D. Pa. 1995) ..........................................................................324

*Aphton Corp. v. Sonefi Pasteur (In re Aphton Corp.)*,
   423 B.R. 76 (Bankr. D. Del. 2010) ................................................................92, 94

*Argus Mgmt. Group v. GAB Robins, Inc. (In re CVOE Corp.)*,
   327 B.R. 210 (Bankr. D. Del. 2005) ...........................................................121, 126

*Arrow Elecs., Inc. v. Justus (In re Kaypro)*,
   230 B.R. 400 (B.A.P. 9th Cir. 1999)...................................................................132

*ASARCO LLC v. Ams. Mining Corp.*,
   396 B.R. 278 (S.D. Tex. 2008) ......................................................16, 22, 31, 239

*Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*,
   944 F. Supp. 1169 (S.D.N.Y. 1996)...................................................................286

*Astropower Liquidating Trust v. KPMG LLP*,
   2007 U.S. Dist. LEXIS 38222 (D. Del. May 25, 2007)........................................399

*Atl. Cleaners & Dyers, Inc. v. United States*,
   286 U.S. 427 (1932)........................................................................................250

*Atlanta Shipping Corp. v. Chem. Bank*,
   818 F.2d 240 (2d Cir. 1987).....................................................................81, 92, 94

*Balabar-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
   256 B.R. 664 (Bankr. S.D.N.Y. 2000)................................................................103

*Balaber-Strauss v. Murphy (In re Murphy)*,
   331 B.R. 107 (Bankr. S.D.N.Y. 2005)................................................................296

*Bank of Marin v. England*,
   385 U.S. 99 (1966).........................................................................................417

*Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas (In re Epic Capital Corp.)*,
   290 B.R. 514 (Bankr. D. Del. 2003) ...........................................................324, 325

*Barber v. Dunbar (In re Dunbar)*,
   313 B.R. 430 (Bankr. C.D. Ill. 2004)..................................................................247

*Barnhill v. Johnson*,
   503 U.S. 393 (1992)........................................................................................248

*Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.)*,
   187 B.R. 315 (Bankr. C.D. Cal. 1995)..............................................................84

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp.,
   LLC)*,
   396 B.R. 810 (Bankr. S.D.N.Y. 2008)...............................................79, 256, 257

*Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
   397 B.R. 1 (S.D.N.Y. 2007).............................................................................123

*Belfance v. Buonpane (In re Omega Door Co.)*,
   399 B.R. 295 (B.A.P. 6th Cir. 2009)................................................................250

*Bessette v. Avco Fin. Servs., Inc.*,
   230 F.3d 439 (1st Cir. 2000)............................................................................402

*Big V Supermarkets v. Wakefern Food Corp. (In re Big V Holdings)*,
   267 B.R. 71 (Bankr. D. Del. 2001) .............................................................84, 167

*Bohm v. Golden Knitting Mills, Inc. (In re Forman Enters.)*,
   293 B.R. 848 (Bankr. W.D. Pa. 2003) .............................................................317

*Bonded Fin. Servs., Inc., v. European Am. Bank*,
   838 F.2d 890 (7th Cir. 1988) ...........................................................120, 121, 122

*Boyer v. Crown Stock Distrib., Inc. (In re Crown Unlimited Mach., Inc.)*,
   2006 Bankr. LEXIS 4651 (Bankr. N.D. Ind. Oct. 13, 2006) ...........................111

*Boyer v. Crown Stock Distrib., Inc.*,
   587 F.3d 787 (7th Cir. 2009) ..................................................................... passim

*Brandt v. B.A Capital Co. (In re Plassein Int'l Corp.)*,
   366 B.R. 318 (Bankr. D. Del. 2006), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd on other
   grounds*, 590 F.3d 252 (3d Cir. 2009) .........................................................86, 87

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*,
   388 B.R. 46 (D. Del. 2008), *aff'd on other grounds*, 590 F.3d 252 (3d Cir. 2009) ...........86, 87

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*,
   590 F.3d 252 (3d Cir. 2009)......................................................................242, 411

*Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*
   208 B.R. 288 (Bankr. D. Mass. 1997) .....................................................360, 361

*Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*,
   405 B.R. 402 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 64 (D. Del. 2010) .......83, 103

*Braniff Airways v. Exxon Co.*,
   814 F.2d 1030 (5th Cir. 1987) ............................................................312

*Brewer v. Brewer*,
   2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) .....................372, 373, 383

*Brown v. Shell Can., Ltd. (In re Tenn. Chem. Co.)*,
   143 B.R. 468 (Bankr. E.D. Tenn. 1992), *aff'd in part and rev'd in part on other
   grounds*, 112 F.3d 234 (6th Cir. 1997) ...................................................165

*Brown v. Third Nat'l Bank (In re Sherman)*,
   67 F.3d 1348 (8th Cir. 1995) ....................................................... passim

*Brunell v. Fed. Nat'l Mortg. Ass'n (In re Brunell)*,
   47 B.R. 830 (Bankr. E.D. Pa. 1985), *aff'd*, 76 B.R. 64 (E. D. Pa. 1985) ...............82

*Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship. IV*,
   229 F.3d 245 (3d Cir. 2000)...........................................................296, 301

*Burch v. Stylish Move Sportswear Inc. (In re Factory 2-U Stores, Inc.)*,
   2007 Bankr. LEXIS 3140 (Bankr. D. Del. Sept. 11, 2007) ..................................121

*Bus. Commc'ns, Inc. v. Freeman*,
   1994 U.S. Dist. LEXIS 2304 (N.D. Ill. 1994) ............................................414

*Caillouet v. First Bank & Trust (In re Entringer Bakeries Inc.)*,
   548 F.3d 344 (5th Cir. 2008) ...........................................................315

*Cain v. Mappa*,
   142 B.R. 677 (Bankr. D.N.J. 1992) .....................................................312

*Carrieri v. Jobs.com Inc.*,
   393 F.3d 508 (5th Cir. 2004) ..........................................................165

*Casa de Cambio Magapara, S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio
   Magapara)*,
   390 B.R. 595 (Bankr. N.D. Ill. 2008) ..................................................245

*Cent. Va. Cmty. College v. Katz*,
   546 U.S. 356 (2006).....................................................................263

*Centre Ins. Co. v. SNTL Corp. (In re SNTL Corp.)*,
   380 B.R. 204 (B.A.P. 9th Cir. 2007)....................................................292

*Charan Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*,
   399 B.R. 400 (Bankr. D. Del. 2009) ...................................................339

*Chatz v. Bearing Point Inc. (In re Nanovation Techs., Inc.)*,
   364 B.R. 308 (Bankr. N.D. Ill. 2007) ..............................................415, 416

*Chi. Hous. Auth. v. Fed. Sec., Inc.*,
    161 F.3d 485 (7th Cir. 1998) .............................................................................420

*Chorost v. Grand Rapids Factory Showrooms, Inc.*,
    77 F. Supp. 276 (D.N.J. 1948), *aff'd*, 172 F.2d 327 (3d Cir. 1949) ......................256

*Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine,
    Underberg, Manley, Myerson & Casey)*,
    130 F.3d 52 (2d Cir. 1997) ...............................................................120, 122, 123

*Citibank, N.A. v. Smith Jones*,
    17 B.R. 128 (Bankr. D. Minn. 1982) ...................................................................304

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998) ...............................................................................330

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    323 F.3d 228 (3d Cir. 2003) ...............................................................................323

*Claybrook v. Morris (In re Scott Acquisition Corp.)*,
    344 B.R. 283 (Bankr. D. Del. 2006) ...................................................................366

*Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*,
    291 B.R. 314 (D. Del. 2003) .......................................................................95, 324

*Cohen v. KB Mezzanine Fund II LP (In re SubMicron Sys. Corp.)*,
    432 F.3d 448 (3d Cir. 2006) .................................................................................94

*Coleman v. Cmty. Trust Bank (In re Coleman)*,
    426 F.3d 719 (4th Cir. 2005) .............................................................247, 263, 295

*Collins & Aikman Corp. v. Stockman*,
    2009 U.S. Dist. LEXIS 43472 (D. Del. May 20, 2009) .......................................370

*Comer v. U.S. Soc. Sec. Admin. (In re Comer)*,
    386 B.R. 607 (Bankr. W.D. Va. 2008) ...............................................................312

*Comm. of Equity Sec. Holders of Fed.-Mogul Corp. v. Off. Comm. of Unsecured
    Creditors (In re Fed.-Mogul Global, Inc.)*,
    348 F.3d 390 (3d Cir. 2003) ...............................................................................250

*Compton v. Plain Mktg., LP (In re Tri-Union Dev. Corp.)*,
    349 B.R. 145 (Bankr. S.D. Tex. 2006) ...............................................................316

*Congoleum Corp. v. Pergament (In re Congoleum Corp.)*,
    2007 Bankr. LEXIS 4357 (Bankr. D.N.J. Dec. 28, 2007) ............................330, 331

*Conn. Fire Ins. Co. v. Commercial Nat'l Bank*,
    87 F.2d 968 (5th Cir. 1937) .........................................................................17, 261

*Consove v. Cohen (In re Roco Corp.)*,
21 B.R. 429 (B.A.P. 1st Cir. 1982), *aff'd*, 701 F.2d 978 (1st Cir. 1983) ...............................92

*Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*,
385 F. Supp. 2d 449 (D. Del. 2004)................................................................................ passim

*Covey v. Commercial Nat'l Bank*,
960 F.2d 657 (7th Cir. 1992) .....................................................................................248, 250

*Cox v. Zale Delaware, Inc.*,
242 B.R. 444 (N.D. Ill. 1999) ............................................................................................402

*Credit Managers Assoc. v. Fed. Co.*,
629 F. Supp. 175 (C.D. Cal. 1985) .............................................137, 138, 139, 140

*Credit Suisse v. Off. Comm. of Unsecured Creditors (In re Yellowstone Mountain Club, LLC)*,
2009 Bankr. LEXIS 2047 (Bankr. D. Mont. May 13, 2009) .................................................327

*Crowthers McCall Pattern, Inc. v. Lewis*,
129 B.R. 992 (S.D.N.Y. 1991)..................................................................13, 408, 409

*Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*,
275 B.R. 641 (Bankr. M.D. Fla. 2002) ..............................................................................257

*Daley v. Chang (In re Joy Recovery Tech. Corp.)*,
286 B.R. 54 (Bankr. N.D. Ill. 2002) ....................................................................89, 136, 141

*Dallas v. Comm'r*,
92 T.C.M. (CCH) 313 (T.C. 2006) ......................................................................................27

*Dean v. Davis*,
242 U.S. 438 (1917)...........................................................................................................22

*Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*,
250 B.R. 776 (Bankr. S.D. Fla. 2000).................................................................................260

*Dewsnup v. Timm*,
502 U.S. 410 (1992)..........................................................................................................251

*Dobin v. Hill (In re Hill)*,
342 B.R. 183 (Bankr. D.N.J. 2006) ............................................................................. passim

*Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l)*,
97 F. App'x 365 (3d Cir. 2004)...........................................................................................21

*Durso Supermarkets v. D'Urso (In re Durso Supermarkets)*,
193 B.R. 682 (Bankr. S.D.N.Y. 1996)................................................................................130

*EBS Litig. LLC v. Barclays Global Investors, N.A.*,
  304 F.3d 302 (3d Cir. 2002)..................................................................................409

*Elway Co. v. Miller (In re Elrod Holdings Corp.)*,
  394 B.R. 760 (Bankr. D. Del. 2008) ....................................................................242

*Elway Co. v. Miller (In re Elrod Holdings Corp.)*,
  421 B.R. 700 (Bankr. D. Del. 2010) ......................................................................16

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*,
  340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated on other grounds*, 379 B.R. 425
  (S.D.N.Y. 2007) .....................................................................................................80

*Enron Corp. v. Bear, Stearns Int'l, Ltd.*,
  323 B.R. 857 (Bankr. S.D.N.Y 2005) .........................................................251, 403

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
  379 B.R. 425 (S.D.N.Y. 2007)......................................................................262, 324

*Equibank v. Dan-Ver Enterprises, Inc. (In re Dan-Ver Enterprises, Inc.)*,
  86 B.R. 443 (Bankr. W.D. Pa. 1988) ....................................................................329

*Estate of Adams v. Comm'r*,
  83 T.C.M. (CCH) 1421 (T.C. 2002) .......................................................................27

*Estate of Heck v. Comm'r*,
  83 T.C.M. (CCH) 1181 (T.C. 2002) .......................................................................27

*Evvtex Co. v. Hartley Cooper Assoc.*,
  102 F.3d 1327 (2d Cir. 1996)................................................................................261

*ExxonMobil Oil Corp. v. Amex Constr. Co.*,
  2010 U.S. Dist. LEXIS 26343 (N.D. Ill. Mar. 19, 2010)......................................420

*Faitoute Iron & Steel Co. v. City of Asbury Park*,
  316 U.S. 502 (1942)..............................................................................................249

*FCC v. NextWave Commc'ns (In re NextWave Pers. Commc'ns, Inc.)*,
  200 F.3d 43 (2d Cir. 2000)....................................................................................309

*FCC v. NextWave Pers. Commc'ns Inc.*,
  537 U.S. 293 (2003)..............................................................................................163

*FDIC v. Barton*,
  1998 U.S. Dist. LEXIS 5203 (E.D. La. Apr. 8, 1998) ..........................................347

*Feldman v. Chase Home Fin. (In re Image Masters, Inc.)*,
  421 B.R. 164 (Bankr. E.D. Pa. 2009) ...................................................................292

*Ferrari v. Barclay's (In re Morse Tools, Inc.)*,
    148 B.R. 97 (Bankr. D. Mass. 1992) ................................................. 136, 141, 185

*Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*,
    18 F.3d 217 (3d Cir. 1994) ................................................................................. 316

*Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*,
    340 B.R. 266 (Bankr. E.D. Pa. 2006), *aff'd*, 371 B.R. 708 (E. D. Pa. 2007) ................... passim

*First Commodity Traders, Inc. v. Heinold Commodities, Inc.*,
    766 F.2d 1007 (7th Cir. 1985) ........................................................................... 398

*Fisher v. Sellis (In re Lake States Commodities, Inc.)*,
    253 B.R. 866 (Bankr. N.D. Ill. 2000) ................................................................... 16

*Fisher v. United States*,
    425 U.S. 391 (1976) ......................................................................................... 337

*Fitzpatrick v. Cent. Commc'ns & Elecs., Inc. (In re Tenn. Valley Steel Corp.)*,
    203 B.R. 949 (Bankr. E.D. Tenn. 1996) ............................................................... 315

*Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*,
    375 F.3d 51 (1st Cir. 2004) ............................................................................... 296

*Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.)*,
    286 B.R. 546 (Bankr. D. Del. 2002) ............................................................... 82, 166

*Freehling v. Nielson (In re F&C Servs.)*,
    44 B.R. 863 (Bankr. S.D. Fla. 1984) .................................................................... 19

*Frymire v. PaineWebber, Inc.*,
    107 B.R. 506 (E.D. Pa. 1989) ............................................................................ 302

*Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.)*,
    315 F.3d 1192 (9th Cir. 2003) ........................................................................... 316

*Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*,
    338 B.R. 583 (Bankr. S.D.N.Y. 2006) .................................................................. 21

*Gen. Elec. Credit Corp. v. Murphy (In re Rodriguez)*,
    895 F.2d 725 (11th Cir. 1990) ............................................................................ 82

*Gen. Eng'g Corp. v. Martin Marietta Alumina*,
    783 F.2d 352 (3d Cir. 1986) .............................................................................. 292

*Gil v. Maddalena (In re Maddalena)*,
    176 B.R. 551 (Bankr. C.D. Cal. 1995) ................................................................. 79

*Glanz v. RFJ Int'l Corp. (In re Glanz)*,
    205 B.R. 750 (Bankr. D. Md. 1997) ............................................................. 263, 295

*Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing, Ltd.)*,
  385 B.R. 52 (Bankr. S.D.N.Y. 2008) ................................................................................245

*Gouveia v. RDI Grp. (In re Globe Bldg. Materials, Inc.)*,
  484 F.3d 946 (7th Cir. 2007) ........................................................................................318

*Grace v. Bank Leumi Trust Co.*,
  443 F.3d 180 (2d Cir. 2006)...........................................................................................309

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*,
  359 B.R. 510 (Bankr. S.D.N.Y. 2007) ...........................................................................121

*Grede v. McGladrey & Pullen LLP*,
  421 B.R. 879 (N.D. Ill. 2009) .........................................................................417, 418, 419

*Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*,
  238 B.R. 758 (Bankr. N.D. Ill. 1999) ............................................................................322

*Gross v. Comm'r*,
  272 F.3d 333 (6th Cir. 2001) ...........................................................................................27

*H & C P'ship v. Va. Serv. Merchandisers*,
  164 B.R. 527 (E.D. Va. 1994).........................................................................................262

*Hall v. Quigley (In re Hall)*,
  131 B.R. 213 (Bankr. N.D. Fla. 1991) ..........................................................................187

*Halper v. Halper*,
  164 F.3d 830 (3d Cir. 1999)...........................................................................................292

*Harris v. Huff (In re Huff)*,
  160 B.R. 256 (Bankr. M.D. Ga. 1993)...........................................................................297

*Hassett v. Goetzmann (In re CIS Corp.)*,
  195 B.R. 251 (Bankr. S.D.N.Y. 1996) ...........................................................................322

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995).........................................................................81, 84, 166, 257

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944).......................................................................................................302

*Hefferman v. Bass*,
  467 F.3d 596 (7th Cir. 2006) .........................................................................................342

*Hirsch v. Gersten (In re Centennial Textiles)*,
  220 B.R. 165 (Bankr. S.D.N.Y. 1998)...........................................................................119

*Hoffman v. Conn. Dep't of Income Maint.*,
  492 U.S. 96 (1989)..................................................................................247

*Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*,
  2010 U.S. Dist. LEXIS 57880 (S.D. Cal. 2010) ....................................337

*HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.*,
  2009 U.S. Dist. LEXIS 10675 (W.D.N.Y. 2009) ..................................303

*HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*,
  364 F.3d 355 (1st Cir. 2004)..................................................................306

*HSH Nordbank AG New York Branch v. Swerdlow*,
  672 F. Supp. 2d 409 (S.D.N.Y. 2009)....................................................293

*Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.)*,
  182 B.R. 728 (Bankr. W.D. Va. 1995) ..............................315, 317, 321

*Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC)*,
  556 F.3d 247 (4th Cir. 2009) ................................................................245

*In re Ahlswede*,
  516 F.2d 784 (9th Cir. 1975) ................................................................302

*In re Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.)*,
  367 B.R. 500 (Bankr. D. Del. 2007) ......................................................130

*In re Anchorage Marina, Inc.*,
  93 B.R. 686 (Bankr. D.N.D. 1988) .........................................................17

*In re Arrow Air, Inc.*,
  940 F.2d 1463 (11th Cir. 1991) .............................................................319

*In re Asia Global Crossing, Ltd.*,
  333 B.R. 199 (Bankr. S.D.N.Y. 2005)....................248, 250, 251, 299

*In re Bank of New Eng. Corp.*,
  404 B.R. 17 (Bankr. D. Mass. 2009), *aff'd sub nom. HSBC Bank USA v. Bank of N.Y. Trust Co. (In re Bank of New Eng. Corp.)*, 426 B.R. 1 (D. Mass. 2010)..............................306

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
  238 B.R. 25 (Bankr. S.D.N.Y. 1999)......................................................296

*In re Brown*,
  244 B.R. 62 (Bankr. D.N.J. 2000) .........................................................402

*In re Century Elecs. Mfg. Inc.*,
  345 B.R. 33 (Bankr. D. Mass. 2006) ......................................................371

*In re Chodnicki*,
   2008 Bankr. LEXIS 250 (Bankr. D.N.J. Jan. 24, 2008) ...............................................402, 403

*In re Classic Drywall, Inc.*,
   127 B.R. 874 (D. Kan. 1991) .............................................................................................295

*In re Columbia Ribbon Co.*,
   117 F.2d 999 (3d Cir. 1941)...............................................................................................302

*In re Consol. Capital Equities Corp.*,
   143 B.R. 80 (Bankr. N.D. Tex. 1992)..................................................................................145

*In re Crowthers McCall Pattern*,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990)..........................................................................296, 300

*In re Dowell*,
   1998 U.S. Dist. LEXIS 22029 (D.N.J. Aug. 26, 1998).........................................................163

*In re Finn*,
   909 F.2d 903 (6th Cir. 1990) ..............................................................................................316

*In re Forklift LP Corp.*,
   340 B.R. 735 (Bankr. D. Del. 2006) ....................................................................................316

*In re Garden Ridge*,
   323 B.R. 136 (Bankr. D. Del. 2005) ....................................................................................250

*In re Grigoli*,
   151 B.R. 314 (Bankr. E.D.N.Y. 1993)..................................................................................303

*In re H.H. Distribs., L.P.*,
   400 B.R. 44 (Bankr. E.D. Pa. 2009) ....................................................................................157

*In re Haugen Constr. Serv., Inc.*,
   104 B.R. 233 (Bankr. D.N.D. 1989) ....................................................................................254

*In re Hinderliter Indus.*,
   228 B.R. 848 (Bankr. E.D. Tex. 1999) .................................................................................304

*In re Hough*,
   4 B.R. 217 (Bankr. S.D. Cal. 1980) .....................................................................................299

*In re Kaiser Steel Corp.*,
   952 F.2d 1230 (10th Cir. 1991) ...........................................................................................242

*In re Keller Tool Corp.*,
   151 B.R. 912 (Bankr. E.D. Mo. 1993)..................................................................................316

*In re King Res. Co.*,
   528 F.2d 789 (10th Cir. 1976) .............................................................................................306

*In re Kors, Inc.*,
64 B.R. 163 (D. Vt. 1986), *aff'd*, 819 F.2d 19 (2d Cir. 1987)................................305

*In re Kors, Inc.*,
819 F.2d 19 (2d Cir. 1987)................................................................................305

*In re Lafayette Radio Elecs. Corp.*,
7 B.R. 189 (Bankr. E.D.N.Y. 1980)................................................................302

*In re Lehman Bros. Holdings, Inc.*,
2010 Bankr. LEXIS 1260 (Bankr. S.D.N.Y.May 5, 2010)..........................245, 253

*In re Mid-Am. Waste Sys.*,
284 B.R. 53 (Bankr. D. Del. 2002) ..........................................................302, 324

*In re Morse Tool, Inc.*,
108 B.R. 389 (Bankr. D. Mass. 1989) .................................................................24

*In re Newman*,
875 F.2d 668 (8th Cir. 1989) ...........................................................................296

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005)..........................................................29, 144, 291

*In re Pease*,
195 B.R. 431 (Bankr. D. Neb. 1996) ..........................................................270, 292

*In re Pinto Trucking Serv., Inc.*,
93 B.R. 379 (Bankr. E.D. Pa. 1988) ..................................................................16

*In re Process-Manz Press, Inc.*,
236 F. Supp. 333 (N.D. Ill. 1964) ......................................................................20

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)..............................................................................302

*In re R.L. Kelly & Sons, Millers*,
125 B.R. 945 (Bankr. D. Md. 1991) ................................................................148

*In re R-B-Co.*,
59 B.R. 43 (Bankr. W.D. La. 1986)..................................................................254

*In re Revco D.S., Inc.*,
118 B.R. 468 (Bankr. N.D. Ohio 1990)............................................................165

*In re Rowland*,
275 B.R. 209 (Bankr. E.D. Pa. 2002) ..............................................................303

*In re S. Afr. Apartheid Litig.*,
633 F. Supp. 2d. 117 (S.D.N.Y. 2009)..............................................................262

*In re Sandy Ridge Dev. Corp.*,
   881 F.2d 1346 (5th Cir. 1989) ............................................................292

*In re Santoro Excavating, Inc.*,
   32 B.R. 947 (Bankr. S.D.N.Y. 1983).................................................312

*In re Sw. Equip. Rental, Inc.*,
   1992 WL 684872 (E.D. Tenn. July 9, 1992) ...............................89, 166

*In re Taubman Realty Co.*,
   160 B.R. 964 (Bankr. S.D. Ohio 1993)........................................238, 250

*In re Telesphere Commc'ns, Inc.*,
   179 B.R. 544 (Bankr. N.D. Ill. 1994) ................................................255

*In re Texaco Inc.*,
   254 B.R. 536 (Bankr. S.D.N.Y. 2000)........................................110, 163

*In re Time Sales Fin. Corp.*,
   491 F.2d 841 (3d Cir. 1974)................................................................307

*In re V. Savino Oil & Heating Co.*,
   91 B.R. 655 (Bankr. E.D.N.Y. 1988)..................................................254

*In re W.T. Grant Co.*,
   699 F.2d 599 (2d Cir. 1983)..................................................................29

*In re Xonics Photochemical, Inc.*,
   841 F.2d 198 (7th Cir. 1988) ......................................................149, 150

*Interbulk, Ltd. v. Louis Drefus Corp. (In re Interbulk, Ltd.)*,
   240 B.R. 195 (Bankr. S.D.N.Y. 1999)................................................245

*Intercont. Publ'ns, Inc. v. Perry (In re Intercont. Publ'ns, Inc.)*,
   131 B.R. 544 (Bankr. D. Conn. 1991) ................................................322

*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*,
   373 B.R. 283 (Bankr. S.D.N.Y. 2007).......................131, 134, 137, 138

*IRS v. Kaplan (In re Kaplan)*,
   104 F.3d 589 (3d Cir. 1997)................................................................302

*Irving Trust Co. v. State Bankers' Fin. Corp.*,
   40 F.2d 88 (S.D.N.Y. 1930).................................................................262

*J.J. McCaskill Co. v. United States*,
   216 U.S. 504 (1910)................................................................................17

*Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*,
   850 F.2d 342 (8th Cir. 1988) ..............................................................111

*JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*,
    607 F.3d 114 (3d Cir. 2010) (en banc)...........................................................161, 163

*Jimmy Swaggert Ministries v. Hayes (In re Hannover Corp.)*,
    310 F.3d 796 (5th Cir. 2002) ................................................................80, 83, 111

*Jobin v. McKay (In re M&L Bus. Mach. Co.)*,
    84 F.3d 1330 (10th Cir. 1996) .................................................................256, 257

*Jobin v. Ripley (In re M&L Bus. Mach. Co.)*,
    198 B.R. 800 (D. Colo. 1996), *aff'd*, 84 F.3d 1330 (10th Cir. 1996)....................................260

*Jones v. Nat'l Bank (In re Greenbrook Carpet Co.)*,
    722 F.2d 659 (11th Cir. 1984) ...................................................................84, 166

*Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*,
    103 B.R. 610 (Bankr. E.D. Pa. 1989) .........................................................133, 165

*Jumer's Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.)*,
    338 B.R. 344 (C.D. Ill. 2006) .......................................................................111

*Kapila v. Media Buying, Inc. (In re Ameri P.O.S., Inc.)*,
    355 B.R. 876 (Bankr. S.D. Fla. 2006).........................................................315, 321

*Kennedy v. Venrock Assocs.*,
    348 F.3d 584 (7th Cir. 2003) .......................................................................347

*Kilbarr Corp. v. Gen. Servs. Admin. (In re Remington Rand)*,
    836 F.2d 825 (3d Cir. 1998).......................................................................163

*Kingsley v. Wetzel (In re Kingsley)*,
    518 F.3d 874 (11th Cir. 2008) .....................................................................119

*Kipperman v. Onex Corp.*,
    411 B.R. 805 (N.D. Ga. 2009) ...............................................................112, 137

*Kleven v. Household Bank F.S.B.*,
    334 F.3d 638 (7th Cir. 2003) .......................................................................316

*Knippen v. Grochocinski*,
    2007 U.S. Dist. LEXIS 36790 (N.D. Ill. May 18, 2007) ......................................129

*Knutson v. Tredinnick (In re Tredinnick)*,
    264 B.R. 573 (B.A.P. 9th Cir. 2001).................................................................163

*LaSala v. Bordier et Cie*,
    519 F.3d 121 (3d Cir. 2008)........................................................................342

*LaSalle Nat'l Bank v. Perelman*,
    82 F. Supp. 2d 279 (D. Del. 2000)..............................................................399, 405

*Lawrence v. Bonadio, Insero & Co. (In re Interco Sys.),*
   202 B.R. 188 (Bankr. W.D.N.Y. 1996) ................................................................104

*Le Café Crème v. Le Roux (In re Le Café Crème, Ltd.),*
   244 B.R. 221 (Bankr. S.D.N.Y. 2000) ..................................................................13

*Lenoir v. GE Capital Corp. (In re Lenoir),*
   231 B.R. 662 (Bankr. N.D. Ill. 1999) ................................................................402

*Leonard v. First Commercial Mortg. Co. (In re First Alliance, Inc.),*
   228 B.R. 225 (Bankr. S.D.N.Y. 1983) ................................................................122

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.),*
   281 B.R. 535 (Bankr. D. Del. 2002) ..........................................................130, 132

*Liebersohn v. WTAE-TV (In re Pure Weight Loss, Inc.),*
   2009 Bankr. LEXIS 3956 (Bankr. E.D. Pa. Nov. 10, 2009)................................320

*Liquidating Trust of U.S. Wireless Corp. v. Wax (In re U.S. Wireless Corp.),*
   384 B.R. 713 (Bankr. D. Del. 2008) ................................................................402

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),*
   327 B.R. 537 (D. Del. 2005), aff'd, 278 F. App'x 125 (3d Cir. 2008) ............................ passim

*Liquidation Trust v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),*
   278 F. App'x 125 (3d Cir. 2008) ................................................................ passim

*Loranger Mfg. Co. v. PNC Bank (In re Loranger Mfg. Corp.),*
   324 B.R. 575 (Bankr. W.D. Pa. 2005) ..........................................................242, 402

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l Inc.),*
   181 F.3d 505 (3d Cir. 1999)........................................................242, 243, 405, 411

*Lowrey v. Mfrs. Hanover Leasing Corp. (In re Robinson Bros. Drilling),*
   6 F.3d 701 (10th Cir. 1993) ................................................................292

*LTV Steel Co. v. Shalala (In re Chateaugay Corp.),*
   53 F.3d 478 (2d Cir. 1995)................................................................163

*Magten Asset Mgmt. Corp v. Nw. Corp. Debenture Trust Co. (In re Nw. Corp.),*
   313 B.R. 595 (Bankr. D. Del. 2004) ................................................................290

*Mallory v. Citizens Bank (In re First Sec. Mortg. Co.),*
   33 F.3d 42 (10th Cir. 1994) ................................................................120

*Marshall v. Showalter,*
   375 F.2d 529 (10th Cir. 1967) ................................................................129

*Martino v. Edison Worldwide Capital (In re Randy)*,
189 B.R. 425 (Bankr. N.D. Ill. 1995) ..............................................................104

*Matanuska Valley Bank v. Arnold*,
223 F.2d 778 (9th Cir. 1955) ...........................................................................261

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*,
926 F.2d 1248 (1st Cir. 1991) ............................................................................21

*MC Asset Recovery, LLC v. S. Co.*,
2006 U.S. Dist. LEXIS 97034 (N.D. Ga. Dec. 11, 2006)..............................295, 366

*McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*,
334 F.3d 239 (3d Cir. 2003)..............................................................................17

*McNellis v. Raymond*,
420 F.2d 51 (2d Cir. 1970)..............................................................................129

*Md. Cas. Co. v. W.R. Grace & Co.*,
218 F.3d 204 (2d Cir. 2000)............................................................................155

*Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.)*,
95 B.R. 921 (Bankr. W.D. Pa. 1989), *aff'd in part and rev'd in part*, 135 B.R. 15
(W.D. Pa.), *rev'd on other grounds*, 945 F.2d 635 (3d Cir. 1991).......................321

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
945 F.2d 635 (3d Cir. 1991)...................................................................... passim

*Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors (In re R.M.L., Inc.)*,
92 F.3d 139 (3d Cir. 1996)........................................................................ passim

*Merrill v. Abbott (In re Indep. Clearing House Co.)*,
77 B.R. 843 (D. Utah 1987)..............................................................................80

*Mervyn's, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*,
426 B.R. 488 (Bankr. D. Del. 2010) ................................................85, 242, 243

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*,
426 B.R. 96 (Bankr. D. Del. 2010) .......................................................... passim

*Mfrs. & Traders Trust Co. v. Goldman (In re Ollag Constr. Equip. Corp.)*,
578 F.2d 904 (2d Cir. 1978)............................................................144, 145, 155

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995) .......................................................... passim

*Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*,
384 B.R. 66 (Bankr. D. Del. Mar. 20, 2008) .......................................................20

*Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*,
 386 B.R. 37 (Bankr. D. Del. 2008) ......................................................................103, 104, 390

*Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*,
 426 B.R. 106 (Bankr. D. Del. 2010) ...............................................................................314, 315

*Misty Mgmt. Corp. v. Lockwood*,
 539 F.2d 1205 (9th Cir. 1976) ..............................................................................................299

*Moglia v. Universal Auto., Inc. (In re First Nat'l Parts)*,
 2000 U.S. Dist. LEXIS 10420 (N.D. Ill. July 12, 2000).......................................................257

*Montgomery Ward, LLC v. OTC Int'l, LTD. (In re Montgomery Ward, LLC)*,
 348 B.R. 662 (Bankr. D. Del. 2006) .....................................................................................320

*Moody v. Sec. Pac. Bus. Credit, Inc.*
 971 F.2d 1056 (3d Cir. 1992)........................................................................................ passim

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
 127 B.R. 958 (Bankr. W.D. Pa. 1991), *aff'd*, 971 F.2d 1056 (3d Cir. 1992) ...........21, 138, 140

*Moore, Owen, Thomas & Co. v. Coffey*,
 992 F.2d 1439 (6th Cir. 1993) ..............................................................................................292

*Moore v. Bay (In re Sassard & Kimball, Inc.)*,
 284 U.S. 4 (1931)..........................................................................................................5, 296

*Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*,
 2006 Bankr. LEXIS 2490 (Bankr. W.D.N.Y. 2006)...........................................................297

*Morris v. St. John Nat'l Bank (In re Haberman)*,
 516 F.3d 1207 (10th Cir. 2008) ...........................................................................................305

*Morse Operations, Inv. C. v. Goodway Graphics of Va., Inc. (In re Lease-A-Fleet, Inc.)*,
 155 B.R. 666 (Bankr. E.D. Pa. 1993) ..................................................................................133

*Munroe v. Harriman*,
 85 F.2d 493 (2d Cir. 1936).................................................................................................261

*Murphy v. Meritor Savs. Bank (In re O'Day Corp.)*,
 126 B.R. 370 (Bankr. D. Mass. 1991) ........................................................................ passim

*N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*,
 567 F.3d 8 (1st Cir. 2009)...........................................................................................400, 406

*N.Y. Cent. & Hudson River R.R. Co. v. United States*,
 212 U.S. 481 (1909)...............................................................................................................18

*N.Y. City Shoes, Inc. v. Bentley Int'l, Inc. (In re N.Y. City Shoes, Inc.)*,
 880 F.2d 679 (3d Cir. 1989)..........................................................................................318, 319

*Nasr v. Geary*,
   2003 U.S. Dist. LEXIS 13887 (C.D. Cal. June 9, 2003) ....................................................140

*Nelmark v. Helms*,
   2003 U.S. Dist. LEXIS 3664 (N.D. Ill. March 12, 2003)....................................................126

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
   537 F.3d 168 (2d Cir. 2008).........................................................................................87

*NextWave Pers. Commc'ns, Inc. v. FCC (In re NextWave Pers. Commc'ns, Inc.)*,
   235 B.R. 305 (Bankr. S.D.N.Y. 1999), *aff'd*, 241 B.R. 311 (S.D.N.Y. 1999), *rev'd*.
   200 F.3d 43 (2d Cir. 1999)...........................................................................................79

*NMI Sys. v. Pillard (In re NMI Sys., Inc.)*,
   179 B.R. 357 (Bankr. D.D.C. 1995) ................................................................................322

*Nordberg v. Republic Nat'l Bank (In re Chase & Sanborn Corp.)*,
   51 B.R. 739 (Bankr. S.D. Fla. 1985)................................................................................17

*O'Melveny & Myers v. FDIC*,
   512 U.S. 79 (1994)......................................................................................................417

*Off. Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Bldg. Materials Corp. (In re
   G-I Holdings Inc.)*,
   338 B.R. 232 (Bankr. D.N.J. 2006) .................................................................................119

*Off. Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*,
   330 B.R. 67 (Bankr. D. Del. 2005) ..................................................................................15

*Off. Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v.
   PricewaterhouseCoopers, LLP*,
   607 F.3d 346 (3d Cir. 2010)...............................................................................17, 393

*Off. Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp.,
   Inc. (In re Buckhead Am. Corp.)*,
   178 B.R. 956 (D. Del. 1994).......................................................................167, 408, 409

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.
   Chinery*,
   330 F.3d 548 (3d Cir. 2003)........................................................................................290

*Off. Comm. of Unsecured Creditors of Cybergenics Corp.ex rel. Cybergenics Corp. v.
   Chinery (In re Cybergenics Corp.)*,
   226 F.3d 237 (3d Cir. 2000)........................................................................................295

*Off. Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors
   Recovery Corp.)*,
   376 B.R. 442 (Bankr. S.D.N.Y. 2007).....................................................................317, 322

*Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),*
405 B.R. 527 (Bankr. D. Del. 2009) ...........................................................390, 399

*Off. Comm. of Unsecured Creditors of Grand Eagle Cos. v. Asea Brown Boveri, Inc.,*
313 B.R. 219 (N.D. Ohio 2004).........................................................................89

*Off. Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),*
274 B.R. 71 (D. Del. 2002) ........................................................................ passim

*Off. Comm. of Unsecured Creditors of IT Group, Inc. v. Acres of Diamonds, L.P. (In re IT Group, Inc.),*
359 B.R. 97 (Bankr. D. Del. 2006) .................................................................242

*Off. Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements Inc. (In re Midway Games, Inc.),*
2010 Bankr. LEXIS 337 (Bankr. D. Del. Jan. 29, 2010)....................................166

*Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.),*
344 B.R. 340 (W.D. Pa. 2006), *aff'd on other grounds,* 590 F.3d 252 (3d Cir. 2009) .... passim

*Off. Comm. of Unsecured Creditors of R.M.L., Inc. v. Conceria Sabrina, S.P.A. (In re R.M.L., Inc.),*
195 B.R. 602 (Bankr. M.D. Pa. 1996) .............................................................318

*Off. Comm. of Unsecured Creditors of Sunbeam Corp v. Morgan Stanley & Co. Inc. (In re Sunbeam Corp.),*
284 B.R. 355 (Bankr. S.D.N.Y. 2002)............................................81, 98, 103, 332

*Off. Comm. of Unsecured Creditors v. Charleston Forge, Inc. (In re Russell Cave Co.),*
259 B.R. 879 (Bankr. E.D. Ky. 2001)..............................................................315

*Off. Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. ),*
280 B.R. 90 (D. Del. 2002)............................................................................365

*Off. Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.),*
287 B.R. 41 (Bankr. D.N.J. 2002) ...........................................................121, 124

*Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,*
267 F.3d 340 (3d Cir. 2001)..........................................................................417

*Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.),*
343 B.R. 444 (Bankr. S.D.N.Y. 2006)..............................................................367

*Off. Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Microdot, Ins. (In re Valley-Vulcan Mold Co.),*
1994 Bankr. LEXIS 2347 (N.D. Ohio 1994) .....................................................238

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*,
    389 B.R. 357 (D. Del. 2008), *aff'd*, 356 F. App'x 622 (3d Cir. 2009) ...................392, 393, 394

*Ohio Corrugating Co. v DPAC, Inc. (In re Ohio Corrugating Co.)*,
    91 B.R. 430 (Bankr. N.D. Ohio 1988) .................................................................................140

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993)........................................................................................166, 167

*Pa. Dep't of Pub. Welfare v. Davenport*,
    495 U.S. 552 (1990)..................................................................................................................163

*Pa. Emp. Benefit Trust Fund v. Zeneca*,
    2010 U.S. Dist. LEXIS 44413 (D. Del. May 6, 2010)..........................................342, 343, 344

*Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*,
    174 B.R. 557 (Bankr. N.D. Cal. 1994) .................................................................105, 120, 300

*Panos v. Sullivan (In re Sabine, Inc.)*,
    2006 Bankr. LEXIS 381 (Bankr. D. Mass. Feb. 27, 2006)....................................................366

*Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales)*,
    220 B.R. 1005 (B.A.P. 10th Cir. 1998)..................................................................................316

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002), *aff'd*, 60 F. App'x 401 (3d Cir. 2003) .............................. passim

*Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer
    Corp. Ret. Plan 003 (In re Fruehauf Trailer Corp.)*,
    444 F.3d 203 (3d Cir. 2006)............................................................................................. passim

*Pepper v. Litton*,
    308 U.S. 295 (1939)..............................................................................293, 327, 328, 329

*Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*,
    287 B.R. 98 (Bankr. S.D.N.Y. 2002).........................................................................165, 407

*Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009) ...................................................................................16

*Pertuso v. Ford Motor Credit Co.*,
    233 F.3d 417 (6th Cir. 2000) ...............................................................................................402

*Petrakopoulou v. DHR Int'l, Inc.*,
    660 F. Supp. 2d 935 (N.D. Ill. 2009) ...................................................................................399

*Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*,
    560 F. Supp. 1372 (D. Del. 1983), *aff'd in relevant part, vacated in part on other
    grounds*, 842 F.2d 1466 (3d Cir. 1988) .................................................................................344

*PHP Liquidating, LLC v. Robbins,*
291 B.R. 603 (D. Del. 2003), *aff'd sub nom. PHP Liquidating Trust, LLC v. Robbins*
*(In re PHP Healthcare Corp.)*, 128 F. App'x 839 (3d Cir. 2005)..................242, 409, 410, 411

*Pioneer Home Builders, Inc. v. Int'l Bank of Commerce,*
147 B.R. 889 (Bankr. W.D. Tex. 1992)............................................................................136

*Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.),*
107 B.R. 698 (B.A.P. 9th 1988)......................................................................................315

*Plotkin v. Pomona Valley Imports (In re Cohen),*
199 B.R. 709 (B.A.P. 9th Cir. 1996)...............................................................................16

*Pro-Specialties, Inc. v. Thomas Funding Corp.,*
812 F.2d 797 (2d Cir. 1987)............................................................................................293

*Pummill v. Greensfelder, Hemker & Gale, P.C. (In re Richards & Conover Steel, Co.),*
267 B.R. 602 (B.A.P. 8th Cir. 2001)................................................................................108

*Pusey & Jones Co. v. Hanssen,*
261 U.S. 491 (1923)........................................................................................................249

*R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co.,*
789 F.2d 74 (1st Cir. 1986).............................................................................................293

*Radnor Holdings Corp. v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.),*
353 B.R. 820 (Bankr. D. Del. 2006) ........................................................................ passim

*Rake v. Wade,*
508 U.S. 464 (1993)........................................................................................................247

*Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.),*
2000 Bankr. LEXIS 1607 (Bankr. N.D. Tex. July 28, 2000) ................................130

*Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.),*
198 B.R. 365 (Bankr. D. Kan. 1996) ............................................................................315

*Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.),*
216 B.R. 371 (S.D.N.Y. 1998).......................................................................................296

*Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.),*
398 B.R. 761 (Bankr. S.D.N.Y. 2008)............................................................................16

*Ring v. Bergman (In re Bergman),*
293 B.R. 580 (Bankr. W.D.N.Y. 2003) .........................................................................138

*Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.),*
315 B.R. 443 (Bankr. S.D. Ohio 2004)..........................................................................316

*Robinson v. Wangemann*,
  75 F.2d 756 (5th Cir. 1935) .................................................................................92

*Roeder v. Lockwood (In re Lockwood Auto Grp., Inc.)*,
  2010 Bankr. LEXIS 1377 (Bankr. W.D. Pa. May 14, 2010).........................256, 257

*Rosener v. Majestic Mgmt. (In re OODC, LLC)*,
  321 B.R. 128 (Bankr. D. Del. 2005) .............................................................. passim

*Roth Steel Tube Co. v. Comm'r*,
  800 F.2d 625 (6th Cir. 1986) ...............................................................................95

*RTC v. Best Prods. Co. (In re Best Prods. Co.)*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd on other grounds*, 68 F.3d 26 (2d Cir.
  1995) ...........................................................................300, 304, 305, 308

*Rubin v. Mfrs. Hanover Trust Co.*,
  661 F.2d 979 (2d Cir. 1981)..................................................................16, 98, 111

*Salisbury v. Texas Commerce Bank, N.A. (In re WCC Holding Corp.)*,
  171 B.R. 972 (Bankr. N.D. Tex. 1994)...............................................................138

*Satriale v. Key Bank USA (In re Burry)*,
  309 B.R. 130 (Bankr. E.D. Pa. 2004) ...................................................81, 83, 111

*Scharffenberger v. United Creditors Alliance Corp. (In re Allegheny Health, Educ. &
  Research Found.)*,
  292 B.R. 68 (Bankr. W.D. Pa. 2003), *aff'd sub nom. Risk Mgmt. Alts., Inc. v.
  Scharffenberger (In re Allegheny Health Educ. & Research Found.)*, 127 F. App'x 27
  (3d Cir. 2005)..................................................................................................298

*Schnelling v. Crawford (In re James River Coal Co.)*,
  360 B.R. 139 (Bankr. E.D. Va. 2007)...................................................................17

*Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*,
  348 B.R. 234 (Bankr. D. Del. 2005), *aff'd*, 554 F.3d 382 (3d Cir. 2009) .....................323, 325

*Scripomatic Inc. v. United States*,
  555 F.2d 364 (3d Cir. 1977)..................................................................................95

*Sec. Investor Prot. Corp. v. Rossi (In re Cambridge Capital, LLC)*,
  331 B.R. 47 (Bankr. E.D.N.Y. 2005)....................................................................13

*SEC v. Haligiannis*,
  608 F. Supp. 2d 444 (S.D.N.Y. 2009)...................................................................20

*Seippel v. Jenkens & Gilchrist, P.C.*,
  341 F. Supp. 2d 363 (S.D.N.Y. 2004)..................................................................286

*Shapiro v. Wilgus*,
    287 U.S. 348 (1932)...................................................................................15

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005)..........................................................................16

*Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*,
    366 B.R. 476 (Bankr. W.D. Pa. 2007) ........................................................323

*Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield Steel Corp.)*,
    320 B.R. 423 (Bankr. N.D. Okla. 2004) .......................407, 408, 409, 410

*Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.)*,
    2007 Bankr. LEXIS 4004 (Bankr. D. Del. Nov. 20, 2007) ....................256

*Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*,
    329 B.R. 438 (Bankr. D. Del. 2005) ...........................................................325

*Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*,
    96 B.R. 275 (B.A.P. 9th Cir. 1989)..............................................................132

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) .....................................................15, 16

*Slone v. Lassiter (In re Grove-Merritt)*,
    406 B.R. 778 (Bankr. S.D. Ohio 2009)........................................................81

*Smurfit Newsprint Corp. v. Se. Paper Mfg. Co.*,
    368 F.3d 944 (7th Cir. 2004) .............................................................162, 163

*Soule v. Allot (In re Tiger Petroleum Co.)*,
    319 B.R. 225 (Bankr. N.D. Okla. 2004) ....................................................112

*Speco Corp. v. Canton Drop Forge (In re Speco Corp.)*,
    218 B.R. 390 (Bankr. S.D. Ohio 1998)..............................................315, 321

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*,
    295 B.R. 593 (B.A.P. 8th Cir. 2003), *aff'd*, 376 F.3d 819 (8th Cir. 2004) ..........................295

*Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.)*,
    513 F.2d 807 (6th Cir. 1975) ...........................................................409, 410

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*,
    171 F.3d 912 (3d Cir. 1999)...............................................................399, 406

*Stern v. Samuel, Son & Co., Ltd. (In re Longview Aluminum)*,
    2005 Bankr. LEXIS 1312 (Bankr. N.D. Ill. July 14, 2005)....................138

*Stinnett's Pontiac Serv., Inc. v. Comm'r*,
    730 F.2d 634 (11th Cir. 1984) ......................................................................95

*Tavenner v. Smoot (In re Smoot)*,
    265 B.R. 128, (Bankr. E.D. Va. 1999), *aff'd*, 257 F.3d 401 (4th Cir. 2001)..........................80

*Telefest, Inc. v. VU-TV, Inc.*,
    591 F. Supp. 1368 (D.N.J. 1984) .......................................................................................148

*Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*,
    493 F.3d 345 (3d Cir. 2007)..........................................................................340, 362, 363, 366

*Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*,
    392 B.R. 561 (Bankr. D. Del. 2008) ...................................................................................362

*Threadgill v. Armstrong World Indus., Inc.*,
    928 F.2d 1366 (3d Cir. 1991)..............................................................................................402

*Tolliver v. Christina Sch. Dist.*,
    564 F. Supp. 2d 312 (D. Del. 2008)...........................................................................398, 399

*Towers v. U.S. Dep't of Treasury (In re Feiler)*,
    218 B.R. 957 (Bankr. N.D. Cal. 1998), *aff'd*, 218 F.3d 948 (9th Cir. 2000) ........................247

*Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*,
    180 B.R. 389 (Bankr. D. Del. 1994) ...................................................................................132

*Travellers Int'l, AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*,
    134 F.3d 188 (3d Cir. 1998)................................................................................................129

*U.S. Tr. v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*,
    180 F.3d 504 (3d Cir. 1999)................................................................................................315

*Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters.)*,
    617 F. Supp. 2d 700 (S.D. Ohio 2009) ...............................................................................394

*Union Bank v. Wolas*,
    502 U.S. 151 (1991)............................................................................................................320

*United States ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.)*,
    230 F.3d 788 (5th Cir. 2000) ......................................................................................78, 309

*United States v. Gleneagles Inv. Co.*,
    565 F. Supp. 556 (M.D. Pa. 1983), *aff'd in relevant part sub nom. United States v.
    Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986) ............................................. passim

*United States v. Noland*,
    517 U.S. 535 (1996)............................................................................................................302

*United States v. Tabor Court Realty Corp.*,
    803 F.2d 1288 (3d Cir. 1986).......................................................................................... passim

*URSA Minor Ltd. v. AON Fin. Prod.*,
   2000 U.S. Dist. LEXIS 10166 (S.D.N.Y. July 21, 2000) ......................................292

*Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*,
   100 B.R. 127 (Bankr. D. Mass. 1989) ...................................................84, 112, 140

*Verco Indus. v. Spartan Plastics (In re Verco Indus.)*,
   704 F.2d 1134 (9th Cir. 1983) ............................................................................299

*VFB LLC v. Campbell Soup Co.*,
   482 F.3d 624 (3d Cir. 2007)........................................................................ passim

*Vinarov v. Motorola, Inc.*,
   2008 U.S. Dist. LEXIS 25363 (N.D. Ill. Mar. 26, 2008)...............................344, 399

*Vintero Corp. v. Corparacion Venezolana de Fomento ( In re Vintero Corp.)*,
   735 F.2d 740 (2d Cir. 1984).................................................................................166

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*,
   919 F.2d 206 (3d Cir. 1990)..................................................................16, 78, 84, 88

*W.E. Trucker Oil Co. v. First State Bank of Crossett (In re W.E. Tucker Oil Co.)*,
   55 B.R. 78 (Bankr. W.D. Ark. 1985)...................................................................151

*Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.)*,
   416 B.R. 123 (Bankr. D. Del. 2009) ....................................................................318

*Wall v. Comm'r*,
   81 T.C.M. (CCH) 1425 (T.C. 2001) ......................................................................27

*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) ..............................................................................104

*Warsco v. Household Bank F.S.B. (In re Various Cases)*,
   272 B.R. 246 (Bankr. N.D. Ind. 2002)..........................................................316, 317

*Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*,
   161 B.R. 107 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1487 (3d Cir. 1994) ...............324, 325

*Wasserman v. Bressman (In re Bressman)*,
   327 F.3d 229 (3d Cir. 2003).........................................................................14, 255, 256

*Wieboldt Stores Inc. v. Schottenstein*,
   131 B.R. 655 (N.D. Ill. 1991) .............................................................................404

*Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.)*,
   198 B.R. 352 (Bankr. D. Colo. 1996) ..................................................................409

*Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.*,
   475 F. Supp. 693 (D. Nev. 1978)..........................................................................140

*West v. Hsu (In re Advanced Modular Power Sys.),*
    413 B.R. 643 (Bankr. S.D. Tex. 2009) .............................................................300

*Wheeling Pittsburgh Steel v. Keystone Metals Trading (In re Wheeling Pittsburgh Steel),*
    360 B.R. 649 (Bankr. N.D. Ohio 2006) ...........................................................122

*Whiteford Plastics Co. v. Chase Nat'l Bank,*
    179 F.2d 582 (2d Cir. 1950).............................................................................296

*Wieboldt Stores, Inc. v. Schottenstein,*
    94 B.R. 488 (N.D. Ill. 1988) ................................................................16, 17, 84

*Wilen v. Pamrapo Sav. Bank, S.L.A. (In re Bayonne Med. Ctr.),*
    429 B.R. 152 (Bankr. D.N.J. May 26, 2010) ...................................................315

*Williams v. Marla (In re Marla),*
    252 B.R. 743 (B.A.P. 8th Cir. 2000)................................................................111

*Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.),*
    527 F.3d 959 (9th Cir. 2008) ...........................................................................250

*Wright v. Union Cent. Life Ins. Co.,*
    304 U.S. 502 (1938)..........................................................................................249

*Wright v. Vinton Branch of Mountain Trust Bank,*
    300 U.S. 440 (1937)..........................................................................................249

*WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File (In re WRT Energy
    Corp.),*
    282 B.R. 343 (Bankr. W.D. La. 2001) .............................................................239

*Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),*
    124 B.R. 984 (Bankr. S.D. Ohio 1990)............................................................239

*Youthland, Inc. v. Sunshine Girls (In re Youthland, Inc.),*
    160 B.R. 311 (Bankr. S.D. Ohio 1993).............................................................315

*Zilkha Energy Co. v. Leighton,*
    920 F.2d 1520 (10th Cir. 1990) .........................................................................12

## STATE CASES

*Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's, London,*
    176 Misc. 2d 605 (N.Y. Sup. Ct. 1998) ...........................................................337

*Allied Capital Corp. v. GC-Sun Holdings, L.P.,*
    910 A.2d 1020 (Del. Ch. 2006)........................................................................342

*Am. Int'l Grp. v. Greenberg (In re Am. Int'l. Grp. Consol. Deriv. Litig.),*
    976 A.2d 882 (Del. Ch. 2009).....................................................392, 393, 394, 395

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
545 A.2d 1171 (Del. 1988) ............................................................365

*Annan v. Wilmington Trust Co. Tr.*,
559 A.2d 1289 (Del. 1989) ............................................................261

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
650 A.2d 1270 (Del. 1994) ............................................................371

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ........................................................ passim

*AYH Holdings, Inc. v. Avreco, Inc.*,
826 N.E.2d 1111 (Ill. App. Ct. 2005) ..........................................415

*Beal Bank, SSB v. Sandpiper Resort Corp.*,
251 A.D.2d 360 (N.Y. App. Div. 1998) ........................................292

*Beltrone v. Gen. Schuyler & Co.*,
645 N.Y.S.2d 914 (N.Y. App. Div. 1996) .....................................144

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
891 A.2d 150 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) .................................... passim

*Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*,
922 A.2d 1169 (Del. Ch. 2006)......................................................356

*Boyer v. Wilmington Materials, Inc.*,
754 A.2d 881 (Del. Ch. 1999).......................................................359

*Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*,
906 A.2d 27 (Del. 2006) ........................................................ passim

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) .................................................356, 357, 410

*Bull v. Bray*,
26 P. 873 (Cal. 1891) .....................................................................19

*Carson v. Fed. Reserve Bank*,
172 N.E. 475 (N.Y. 1930)...............................................................121

*Case Fin. v. Alden*,
2009 Del. Ch. LEXIS 153 (Del. Ch. Aug. 21, 2009)......................367

*Cede & Co. v. Technicolor, Inc.*,
634 A.2d 345 (Del. 1994) ........................................................ passim

*Childs v. Pinnacle Health Care, LLC*,
926 N.E.2d 807 (Ill. App. Ct. 2010) ............................................414

*Citibank, N.A. v. Chammah*,
  44 V.I. 85 (V.I. Terr. Ct. 2001)................................................................292

*Citron v. Fairchild Camera & Instrument Corp.*,
  569 A.2d 53 (Del. 1989) ..............................................347, 348, 352, 357

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*,
  636 N.E.2d 503 (Ill. 1994)................................................................416

*Ctr. v. Hampton Affiliates, Inc.*,
  488 N.E.2d 828 (N.Y. 1985)................................................................261

*Ctr. for Athletic Med., Ltd. v. Indep. Med. Billers, Inc.*,
  889 N.E.2d 750 (Ill. App. Ct. 2008) .............................403, 404, 417

*Dalton v. Am. Inv. Co.*,
  1981 Del. Ch. LEXIS 647 (Del. Ch. June 4, 1981) .............................347

*Dorocke v. Farrington*,
  193 N.E.2d 593 (Ill. App. Ct. 1963) ................................................16

*Douglass v. Wones*,
  458 N.E.2d 514 (Ill. App. Ct. 1983) .............................................344, 399

*Dubroff v. Wren Holdings LLC*,
  2009 Del. Ch. LEXIS 89 (Del. Ch. May 22, 2009) .....................378, 379

*Eckmar Corp. v. Malchin*,
  297 A.2d 446 (Del. Ch. 1972)................................................................342

*Edelist v. MBNA Am. Bank*,
  790 A.2d 1249 (Del. Super. Ct. 2001) ................................................346

*Emerald Partners v. Berlin*,
  787 A.2d 85 (Del. 2001) ................................................................370

*Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*,
  666 N.E.2d 881 (Ill. App. Ct. 1996) ................................................416

*Flushing Sav. Bank v. Parr*,
  438 N.Y.S.2d 374 (N.Y. App. Div. 1981) ..........................................15

*Francotyp-Postalia AG & Co. v. On Target Tech., Inc.*,
  1998 Del. Ch. LEXIS 234 (Del. Ch. Dec. 24, 1998) .....................362, 382

*Gantler v. Stephens*,
  965 A.2d 695 (Del. 2009) ................................................................347

*Gesoff v. IIC Indus., Inc.*,
  902 A.2d 1130 (Del. Ch. 2006)................................................................372

*Gilbert v. El Paso Co.*,
  490 A.2d 1050 (Del. Ch. 1984)..........................................................................347

*Grace Bros., Ltd. v. UniHolding Corp.*,
  2000 Del. Ch. LEXIS 101 (Del. Ch. July 12, 2000) ............................................367

*Guth v. Loft, Inc.*,
  5 A.2d 503 (Del. 1939) ......................................................................................351

*Hexion Specialty Chems., Inc. v. Huntsman Corp.*,
  965 A.2d 715 (Del. Ch. 2008)............................................................................162

*HMG/Courtland Props., Inc. v. Gray*,
  749 A.2d 94 (Del. Ch. 1999)..............................................................................353

*Holland v. Arthur Andersen & Co.*,
  469 N.E.2d 419 (Ill. App. Ct. 1984) ...................................................................419

*Hoover Indus., Inc. v. Chase*,
  1988 Del. Ch. LEXIS 98 (Del. Ch. July 13, 1988) ..............................................355

*IDT Corp. v. Tyco Group S.A.R.L.*,
  918 N.E.2d 913 (N.Y. 2009)......................................................................162, 163

*In re Am. Int'l Grp., Inc. Consol. Derivative Litig.*,
  976 A.2d 872 (Del. Ch. 2009)..........................................342, 344, 392, 393, 403

*In re Cox Radio, Inc. S'holders Litig.*,
  2010 Del. Ch. LEXIS 102 (Del. Ch. May 6, 2010) ..............................................349

*In re HealthSouth Corp. S'holders Litig.*,
  845 A.2d 1096 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004) ..............393, 394

*In re PNB Holding Co. S'holders Litig.*,
  2006 Del. Ch. LEXIS 158 (Del. Ch. Aug. 18, 2006)....................................378, 379

*Chemical Bank v. First Trust (In re Southeast Banking Corp.)*,
  710 N.E.2d 1083 (N.Y. 1999)............................................................................306

*In re Tele-Commc'ns, Inc. S'holders Litig.*,
  2005 Del. Ch. LEXIS 206 (Del. Ch. Dec. 21, 2005) ....................................349, 355

*In re Topps Co. S'holders Litig.*,
  924 A.2d 951 (Del. Ch. 2007)............................................................................340

*In re Transkaryotic Therapies, Inc.*,
  954 A.2d 346 (Del. Ch. 2008)..................................................................... 391, 392

*In re W. Nat'l Corp. S'holders Litig.*,
  2000 Del. Ch. LEXIS 82 (Del. Ch. May 22, 2000) ..............................................347

*In re Walt Disney Co. Deriv. Litig.*,
825 A.2d 275 (Del. Ch. 2003) *aff'd sub nom. Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27 (Del. 2006) ................................................................................373

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
741 A.2d 377 (Del. Ch. 1999)................................................................................344, 398

*Johnston v. Wolf*,
487 A.2d 1132 (Del. 1985) ............................................................................................408

*Jones v. Chi. HMO Ltd.*,
730 N.E.2d 1119 (Ill. 2000)........................................................................414, 415, 421

*Kahn v. Lynch Commc'ns. Sys., Inc.*,
638 A.2d 1110 (Del. 1994) ....................................................................................347, 350

*Kaplan v. Centex Corp.*,
284 A.2d 119 (Del. Ch. 1971)........................................................................................347

*Kenneke v. First Nat'l Bank*,
382 N.E.2d 309 (Ill. App. Ct. 1978) ..............................................................................399

*King v. First Capital Fin. Servs. Corp.*,
828 N.E.2d 1155 (Ill. 2005).............................................................................................416

*Kinzinger v. Tull*,
770 N.E.2d 246 (Ill. App. Ct. 2002) ..............................................................................415

*Klang v. Smith's Food & Drug Ctrs., Inc.*,
702 A.2d 150 (Del. 1997) ..............................................................406, 407, 410, 413

*Kohls v. Duthie*,
791 A.2d 772 (Del. Ch. 2000)........................................................................................407

*Kronenberg v. Katz*,
872 A.2d 568 (Del. Ch. 2004) ................................................................................342, 344

*Landis v. Sci. Mgmt. Corp.*,
1991 Del. Ch. LEXIS 19 (Del. Ch. Ct. Feb. 15, 1991).........................................343

*Lozosky v. State*,
2001 Ill. Ct. Cl. LEXIS 29 (Ill. Ct. Cl. 2001) .....................................................416

*Lyondell Chem. Co. v. Ryan*,
970 A.2d 235 (Del. 2009) ....................................................................................372, 383

*Malone v. Brincat*,
722 A.2d 5 (Del. 1998) ...................................................................................................391

*Malpiede v. Townson*,
 780 A.2d 1075 (Del. 2001) ..............................................................................390, 391, 392

*MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*,
 845 N.E.2d 22 (Ill. App. Ct. 2006) ......................................................................................414

*McDermott v. City of N.Y.*,
 406 N.E.2d 460 (N.Y. 1980)................................................................................................144

*McMullin v. Beran*,
 765 A.2d 910 (Del. 2000) ............................................................................................ passim

*McPadden v. Sidhu*,
 964 A.2d 1262 (Del. Ch. 2008)............................................................................................371

*McRaith v. BDO Seidman, LLP*,
 909 N.E.2d 310 (Ill. App. Ct. 2009) .............................................................................417, 419

*MF Global, Inc. v. Morgan Fuel & Heating Co.*,
 71 A.D.3d 420 (N.Y. App. Div. 2010) .................................................................................292

*Mfrs. Hanover Trust Co. v. Green*,
 95 A.D.2d 737 (N.Y. App. Div. 1983) .................................................................................292

*Mills Acquisition Co. v. Macmillan, Inc.*,
 559 A.2d 1261 (Del. 1989) .......................................................................................... passim

*Moorman Mfg. Co. v. Nat'l Tank Co.*,
 435 N.E.2d 443 (Ill. 1982)............................................................................................415, 416

*Morris v. Standard Gas & Elec. Co.*,
 63 A.2d 577 (Del. Ch. 1949)................................................................................................407

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
 930 A.2d 92 (Del. 2007) .............................................................................................. passim

*Nemec v. Shrader*,
 991 A.2d 1120 (Del. 2010) ..................................................................................................399

*O'Reilly v. Transworld Healthcare, Inc.*,
 745 A.2d 902 (Del. Ch. 1999).............................................................................................347

*Orman v. Cullman*,
 794 A.2d 5 (Del. Ch. 2002).........................................................................352, 353, 354, 355

*Perry v. Estate of Carpenter*,
 918 N.E.2d 1156 (Ill. App. Ct. 2009) ..................................................................................162

*Prod. Res. Group, L.L.C. v. NCT Group*,
 863 A.2d 772 (Del. Ch. 2004).......................................................................29, 362, 363, 382

*Propp v. Sadacca*,
    175 A.2d 33 (Del. Ch. 1961), *aff'd in relevant part and rev'd in part sub nom. Bennett v. Propp*, 187 A.2d 405 (Del. 1962) ................................................................................410

*Raven Elevator Corp. v. Finkelstein*,
    223 A.D.2d 378 (N.Y. App. Div. 1996) ...........................................................................292

*Roe v. Catholic Charities of the Diocese of Springfield, Ill.*,
    588 N.E.2d 354 (Ill. App. Ct. 1992) ........................................................................414, 415

*Rosenblatt v. Getty Oil Co.*,
    493 A.2d 929 (Del. 1985) ......................................................................................350, 351

*S. Indus., Inc. v. Jeremias*,
    66 A.D.2d 178 (N.Y. App. Div. 1978) ...............................................................................15

*Smith v. Van Gorkom*,
    488 A.2d 858 (Del. 1985) ............................................................................358, 359, 413

*Solomon v. Armstrong*,
    747 A.2d 1098 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) .......................................347

*Stifel Fin. Corp. v. Cochran*,
    809 A.2d 555 (Del. 2002) ...............................................................................................367

*Stone ex rel. AmSouth Bancorp. v. Ritter*,
    911 A.2d 362 (Del. 2006) ......................................................................346, 349, 351, 383

*Territory of U.S. V.I. v. Goldman, Sachs & Co.*,
    937 A.2d 760 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) ...........................................405

*Travelers Indem. Co. v. Lake*,
    594 A.2d 38 (Del. 1991) ................................................................................................341

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del. Ch. 2006), *aff'd sub. nom Trenwick Am. Litig. Trust v. Billett*,
    931 A.2d 438 (Del. 2007) .......................................................................348, 365, 382

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
    906 A.2d 200 (Del. Ch. 2006)......................................................................................... 389

*Unitrin, Inc. v. Am. Gen. Corp.*,
    651 A.2d 1361 (Del. 1995) .............................................................................................348

*Valeant Pharms. Int'l v. Jerney*,
    921 A.2d 732 (Del. Ch. 2007), *appeal dismissed*, 2007 Del. LEXIS 245 (May 30,
    2007) .............................................................................................................................359

*Vine St. Clinic v. HealthLink, Inc.*,
    856 N.E.2d 422 (Ill. 2006) .............................................................................................417

*VonFeldt v. Stifel Fin. Corp.*,
    1999 Del. Ch. LEXIS 131 (Del. Ch. June 11, 1999) .....................................................369, 386

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
    872 A.2d 611 (Del. Ch. 2005)..............................................................................................414

*Waters v. Reingold*,
    663 N.E.2d 126 (Ill. App. Ct. 1996) ....................................................................................416

*Weil v. Morgan Stanley DW Inc.*,
    877 A.2d 1024 (Del. Ch. 2005)............................................................................................345

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) .................................................................................349, 350, 370

*Whitmer v. William Whitmer & Sons, Inc.*,
    99 A. 428 (Del. Ch. 1916)...................................................................................................362

*Williamson v. Cox Commc'ns, Inc.*,
    2006 Del. Ch. LEXIS 111 (Del. Ch. June 5, 2006) .....................................................347, 378

## STATUTES

**FEDERAL**

11 U.S.C. § 101 (2006) ...........................................................................................................250

11 U.S.C. § 101(5) (2006) ......................................................................................................156

11 U.S.C. § 101(5)(A) (2006)..................................................................................................161

11 U.S.C. § 101(5)(A)(12) (2006) ...........................................................................................161

11 U.S.C. § 101(5)(A)(32) (2006) ...........................................................................................161

11 U.S.C. § 101(22) (2006) .....................................................................................................244

11 U.S.C. § 101(22)(A) (2006).................................................................................................244

11 U.S.C. § 101(31)(B) (2006) ..................................................................................................23

11 U.S.C. § 101(31)(B)(i)-(ii) (2006) .......................................................................................321

11 U.S.C. § 101(32)(A) (2006).................................................................................................129

11 U.S.C. § 101(54) (2006) ............................................................................................... passim

11 U.S.C. § 101(54)(D) (2006).................................................................................................244

11 U.S.C. § 323(a) (2006)........................................................................................................290

11 U.S.C. § 361 (2006) ................................................................................................249

11 U.S.C. § 363(f) (2006) .............................................................................................249

11 U.S.C. § 502(b)(1) (2006) ........................................................................................251

11 U.S.C. § 502(d) (2006) ..................................................................................... 298, 299

11 U.S.C. § 502(h) (2006) .....................................................................................296, 298

11 U.S.C. § 502(j) (2006) .............................................................................................329

11 U.S.C. § 506(a)-(b) (2006) .......................................................................................251

11 U.S.C. § 506(d) (2006) ............................................................................................251

11 U.S.C. § 510 (2006) .................................................................................................323

11 U.S.C. § 510(a) (2006) ......................................................................................304, 306

11 U.S.C. § 510(c) (2006) ..................................................................................... passim

11 U.S.C. § 510(c)(1) (2006) ...........................................................................................5

11 U.S.C. § 510(c)(2) (2006) ...........................................................................................5

11 U.S.C. § 541 (2006) .................................................................................................405

11 U.S.C. § 541(a) (2006) .............................................................................................403

11 U.S.C. § 541(a)(1) (2006) ...........................................................................................5

11 U.S.C. § 544 (2006) ................................................................5, 246, 247, 295, 402

11 U.S.C. § 544(a) (2006) ....................................................................................4, 5, 12

11 U.S.C. § 544(a)(1)-(3) (2006) .....................................................................................5

11 U.S.C. § 544(b) (2006) ..................................................................................... passim

11 U.S.C. § 544(b)(1) (2006) .................................................................................247, 290

11 U.S.C. § 546(a) (2006) .............................................................................................241

11 U.S.C. § 546(e) (2006) ..................................................................................... passim

11 U.S.C. § 546(f) (2006) .............................................................................................246

11 U.S.C. § 547 (2006) ......................................................................................248, 253, 312

11 U.S.C. § 547(a)(2) (2006) .................................................................................318, 319

11 U.S.C. § 547(b) (2006) ...........................................................................................311, 313

11 U.S.C. § 547(b)(2) (2006)...........................................................................................322

11 U.S.C. § 547(b)(4)(B) (2006) ..............................................................................313, 321

11 U.S.C. § 547(c)(2) (2006) ...........................................................................................314

11 U.S.C. § 547(c)(4) (2006) ...........................................................................................318

11 U.S.C. § 548 (2006) .......................................................................................................4

11 U.S.C. § 548 (2006) ........................................................................................... passim

11 U.S.C. § 548(a) (2006)....................................................................................... passim

11 U.S.C. § 548(a)(1) (2006) ................................................................................. passim

11 U.S.C. § 548(a)(1)(A) (2006) ........................................................................... passim

11 U.S.C. § 548(a)(1)(B)(i) (2006)................................................................................78, 79

11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III) (2006)....................................................................127

11 U.S.C. § 548(a)(1)(B)(ii)(I) (2006)............................................................................151

11 U.S.C. § 548(a)(1)(B)(ii)(II) (2006) ..........................................................................136

11 U.S.C. § 548(a)(1)(B)(ii)(III) (2006) .........................................................................238

11 U.S.C. § 548(a)(1)(B)(ii)(IV) (2006) .........................................................................127

11 U.S.C. § 548(a)(2) (2006) ......................................................................................78, 81

11 U.S.C. § 548(a)(2)(B)(iii) (2006)...............................................................................187

11 U.S.C. § 548(c) (2006) ........................................................................................ passim

11 U.S.C. § 548(d)(2)(a) (2006) ............................................................................. passim

11 U.S.C. § 550 (2006) ...............................................................................5, 120, 263, 295

11 U.S.C. § 550(a) (2006)...............................................................79, 119, 247, 263, 295

11 U.S.C. § 550(a)(1) (2006) ...................................................................................119, 120

11 U.S.C. § 550(a)(2) (2006) ...........................................................................................120

11 U.S.C. § 550(b)(1) (2006)...........................................................................................255

11 U.S.C. § 550(d) (2006) ...............................................................................................263

11 U.S.C. § 551 (2006) ................................................................................247

11 U.S.C. § 741(7) (2000) ............................................................................245

11 U.S.C. § 741(7)(A) (2006) .......................................................................244

11 U.S.C. § 1109 (2006) ...............................................................................290

15 U.S.C. § 77nnn .......................................................................................118

BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005
§ 907(A)(2), PUB. L. 109-8, 119 STAT. 173 (2005) ...................................244

FINANCIAL NETTING IMPROVEMENTS ACT OF 2006
PUB. L. NO. 109-390, 120 STAT. 2697 (DEC. 12, 2006) ...........................243

**STATE**

DEL. CODE ANN. title 8, § 102(b)(7) (2010) ................................................370

DEL. CODE ANN. title 8, § 102(b)(7) (2010) .............................................370, 371, 410

DEL. CODE ANN. title 8, § 107(b)(7)(iii) (2010) ..........................................410

DEL. CODE ANN. title 8, § 141(a) (2010) ....................................................346

DEL. CODE ANN. title 8, § 141(e) (2010) ...............................................358, 359, 410

DEL. CODE ANN. title 8, § 141(e) (2010) ....................................................358

DEL. CODE ANN. title 8, § 144 (2010) .........................................................353

DEL. CODE ANN. title 8, § 144(a) (2010) ....................................................353

DEL. CODE ANN. title 8, § 144(a)(1)-(2) (2010) ..........................................353

DEL. CODE ANN. title 8, § 144(a)(3) (2010) ................................................353

DEL. CODE ANN. title 8, § 145 (2010) .........................................................367

DEL. CODE ANN. title 8, § 145 (2010) .........................................................367

DEL. CODE ANN. title 8, § 145(a) (2010) ...............................................367, 369

DEL. CODE ANN. title 8, § 145(b) (2010) .............................................367, 368, 369

DEL. CODE ANN. title 8, § 145(c) (2010) ....................................................368

DEL. CODE ANN. title 8, § 145(d) (2010) ....................................................368

DEL. CODE ANN. title 8, § 145(e) (2010) ....................................................368

DEL. CODE ANN. title 8, § 145(f) (2010).....................................................................368

DEL. CODE ANN. title 8, § 145(j) (2010).....................................................................368

DEL. CODE ANN. title 8, § 160 (2010).........................................................................406

DEL. CODE ANN. title 8, § 160 (2010)........................................................... passim

DEL. CODE ANN. title 8, § 160 (2010)...........................................................411, 412, 413

DEL. CODE ANN. title 8, § 160(a)(1) (2010)...........................................................345, 406

DEL. CODE ANN. title 8, § 170(a) (2010) ...................................................................407

DEL. CODE ANN. title 8, § 172 (2010).........................................................................410

DEL. CODE ANN. title 8, § 173 (2010).........................................................................408

DEL. CODE ANN. title 8, § 173 (2010)...........................................................411, 412, 413

DEL. CODE ANN. title 8, § 174 (2010)........................................................... passim

DEL. CODE ANN. title 8, § 174(a) (2010) ...................................................................408

DEL. CODE ANN. title 8, § 174(c) (2010) ...................................................................409

DEL. CODE ANN. title 8, § 1304 (2010).......................................................................86

DEL. CODE ANN. title 8, § 1305 (2010).......................................................................86

N.Y. DEBT. & CRED. LAW § 272 (McKinney 2010)...................................................13

## RULES

**FEDERAL**

Fed. R. Bankr. P. 2014......................................................................................................1

## OTHER AUTHORITIES

**FEDERAL REGULATION**

17 C.F.R. § 210.3-16 (2010)...........................................................................................31

26 C.F.R. § 1.1361-4(a)(2) (2010)..................................................................................31

26 C.F.R. § 1.332-2(b) (2010) .......................................................................................31

**LEGISLATIVE HISTORY**

152 CONG. REC. H7601 (daily ed. Sept. 27, 2006) .....................................................246

152 CONG. REC. H8651 (daily ed. Nov. 15, 2006)........................................................246

H.R. REP. No. 109-648 (2006)
    *reprinted in* 2006 U.S.C.C.A.N. 1585 ........................................................245, 246

H.R. REP. No. 95-595 (1977)
    *reprinted in* 1978 U.S.C.C.A.N. 5787, 6331 ........................................................263

SECONDARY MATERIALS

18B AM. JUR. 2D CORPORATIONS
    § 1680 (2003)........................................................394

BLACK'S LAW DICTIONARY 1104 (8TH ED. 2004)........................................................248

2 COLLIER ON BANKRUPTCY ¶ 101.05........................................................163

5 COLLIER ON BANKRUPTCY ¶ 546.06........................................................245

5 COLLIER ON BANKRUPTCY ¶ 548.01[1]........................................................295

5 COLLIER ON BANKRUPTCY ¶ 548.05........................................................79

1 GERRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES,
    §§ 111, 113 (rev. ed. 1940)........................................................303

GARRARD GLENN, THE LAW OF FRAUDULENT CONVEYANCES (1931)........................247, 249

RESTATEMENT (FIRST) OF RESTITUTION § 3 (1937)........................................................399

RESTATEMENT (FIRST) OF RESTITUTION § 138 (1937)........................................................400

RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 145 (1971)........................................................341

RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 187 (1971)........................................................292

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 221 (1971)........................................................343

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 306 (1971)........................................................340

WILLIAM L. NORTON, III & ROGER G. JONES, NORTON CREDITORS' RIGHTS HANDBOOK
    § 8:8 ........................................................262

1-8 DONALD J. WOLFE & MICHAEL A. PITTINGER, CORPORATE AND COMMERCIAL
    PRACTICE IN DELAWARE COURT OF CHANCERY
    § 8.11 (2005) ........................................................363, 382

JOURNALS, PERIODICALS, AND WEB SITES

DAVID ACKERMAN AND SUSAN E. GOULD, *S Corporation ESOP Valuation Issues* in The
    Handbook of Business Valuation and Intellectual Property Analysis
    141 (Robert F. Reilly and Robert P. Schweihs, eds., 2004) ...........................................28, 113

EDWARD ALTMAN AND EDITH HOTCHKISS, *Corporate Financial Distress and Bankruptcy*
    (3d ed. 2006) ................................................................................................................... A-5

DENNIS K. BERMAN, *How Solvent is Tribune Co.?*,
    WSJ Blogs: Deal Journal, December 6, 2007, *available at* http://blogs.wsj.com/deals/
    2007/12/06/how-solvent-is-tribune-co/; Miles Weiss, *Zell's Tribune LBO Runs Into
    Funds Seeking a Default*, Bloomberg, June 7, 2007, *available at*
    http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home
    &sid=aVxwowcOuoY4 ...............................................................................................1

PEG BRICKLEY, *Tribune Creditors Follow the Money To McCormick Foundation*, WSJ
    Blogs: Bankruptcy Beat, June 11, 2009, *available at*
    http://blogs.wsj.com/bankruptcy/2009/06/11/tribune-creditors-follow-the-money-to-
    mccormick-foundation/?KEYWORDS=tribune+co...................................................1

MICHAEL J. DE LA MERCED & BRIAN STELTER, *Request Seeks Details of Tribune's
    Buyout*, The N.Y. Times, August 27, 2009...............................................................1

ASWATH DAMODARAN, *Investment Valuation* (2d ed. 2002)..................................... A-62

ROGER J. GRABOWSKI, *S Corporation Valuations in the Post-Gross World-Updated*,
    Business Valuation Review, Sept. 2004 .................................................................27

GEORGE B. HAWKINS & MICHAEL A. PASCHALL, *CCH Business Valuation Guide*
    ¶ 1523 (2007) ......................................................................................................27

KERMIT D. LARSON, *Fundamental Accounting Principles*,
    806-08 (12th ed. 1990)........................................................................................155

BRUCE A. MARKELL, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers
    Involving Unreasonably Small Capital*,
    21 Ind. L. Rev. 469, 497 (1988).........................................136, 138, 139, 140, 183

RICHARD PÈREZ-PEÑA, *Sam Zell: A Tough Guy in a Mean Business*,
    The N.Y. Times, April 7, 2008, *available at*
    http://www.nytimes.com/2008/04/07/business/media/07zell.html?_r=1&scp=110
    &sq=zell&st=nyt.......................................................................................................1

SHANNON R. PRATT, ET AL., *Valuing a Business* 343-61 (4th ed. 2000)......................................205

SHANNON P. PRATT & ROGER J. GRABOWSKI, *Cost of Capital* (3d ed. 2008).......................... A-63

SHANNON P. PRATT, ET AL., *Valuing a Business:  The Analysis and Appraisal of Closely
    Held Companies* (4th ed. 2000) ............................................................................. A-3

SHANNON P. PRATT AND ALINA V. NICULITA, *Valuing a Business:  The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008) ......................................................... A-3

SHEPARD, NOTE, *Beyond Moody: A Re-Examination of Unreasonably Small Capital*, 57 Hastings L.J. 891, 892 (2006) ........................................................................................137

RICHARD RAZGAITIS, *Early Stage Technologies:  Valuation and Pricing* (1999) ................... A-65

ROBERT J. STEARN, JR., *Proving Solvency: Defending Preference and Fraudulent Transfer Litigation*, 62 Bus. Lawyer 359, 388-89 (Feb. 2007) ....................................................................138, 140

JOHN E. SULLIVAN III, *Future Creditors and Fraudulent Transfers*:  *When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When a Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 Del. J. Corp. L. 955, 1010-12 (1997) ....................................................................143, 184

TOM R. WECHTER, Selling Chicago Cubs Without Recognizing Any Taxable Gain:  How Chicago Tribune Did It (2009) ..............................................................................................28

MILES WEISS, *Zell's Tribune LBO Runs Into Funds Seeking a Default*, Bloomberg, June 7, 2007, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home &sid=aVxwowcOuoY4 ...........................................................................................................1

TALLY M. WIENER & NICHOLAS B. MALITO, *On the Nature of the Transferred Bankruptcy Claim*, 12 U. Pa. J. Bus. L. 35, 49-51 (2009) .....................................................262

# IV.

## PRINCIPAL FINDINGS AND CONCLUSIONS CONCERNING QUESTION ONE

### A.    Overview of the Kinds of Claims at Issue in Question One.

Both before[2] and after[3] the commencement of the Chapter 11 Cases, attention focused on

the Leveraged ESOP Transactions and whether the Tribune Entities could satisfy the substantial

amount of debt imposed on them in those transactions—matters that are at the heart of Question

One.  As discussed extensively in the Statement of Facts, the Leveraged ESOP Transactions

were implemented in two phases in June and December of 2007, referred to in the Report as

"Step One" and "Step Two," respectively.  These transactions gave rise to the vast majority of

the indebtedness asserted against these estates.  At the most elemental level, the disputes

underlying Question One pit those creditors whose claims arose out of the Leveraged ESOP

Transactions (the LBO Lenders) against the rest of the Tribune Entities' creditors (the Non-LBO

---

[2]    *See, e.g.,* Richard Pèrez-Peña, *Sam Zell: A Tough Guy in a Mean Business*, THE N.Y. TIMES, April 7, 2008, *available at* http://www.nytimes.com/2008/04/07/business/media/07zell.html?_r=1&scp=110 &sq=zell&st=nyt ("Of course, if this house is ablaze, Mr. Zell has supplied much of the kindling. Almost $8 billion of Tribune's debt came from the highly leveraged deal, which he engineered, that took the company private.  That borrowing now looms as the biggest threat to the company . . . ."); Dennis K. Berman, *How Solvent is Tribune Co.?*, WSJ BLOGS: DEAL JOURNAL, December 6, 2007, *available at* http://blogs.wsj.com/deals/ 2007/12/06/how-solvent-is-tribune-co/; Miles Weiss, *Zell's Tribune LBO Runs Into Funds Seeking a Default*, BLOOMBERG, June 7, 2007, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home &sid=aVxwowcOuoY4 ("The leveraged buyout is making Tribune one of the riskiest newspaper companies, according to John Puchalla, a media analyst at Moody's Investors Service in New York.").

[3]    *See, e.g.,* Michael J. de la Merced & Brian Stelter, *Request Seeks Details of Tribune's Buyout*, THE N.Y. TIMES, August 27, 2009 ("[T]he firm is seeking documents related to the leveraged buyout to help prove that the 2007 deal was done despite knowing it could render the company insolvent"); Peg Brickley, *Tribune Creditors Follow the Money To McCormick Foundation*, WSJ BLOGS: BANKRUPTCY BEAT, June 11, 2009, *available at* http://blogs.wsj.com/bankruptcy/2009/06/11/tribune-creditors-follow-the-money-to-mccormick-foundation/?KEYWORDS=tribune+co ("Papers filed Wednesday in a Delaware bankruptcy court don't say exactly why creditors are probing the merger.  However, highly technical portions of the Bankruptcy Code provide that anyone who comes near a company a year before it goes belly-up and walks away richer is going to get banged on like a dinner gong by creditors."); *see also Application of the Official Committee of Unsecured Creditors of Tribune Company, et al., Pursuant to 11 U.S.C. §§ 328 and 1103 and Fed. R. Bankr. P. 2014 for an Order Authorizing the Employment and Retention of Zuckerman Spaeder LLP as Special Counsel Nunc Pro Tunc to August 6, 2009* filed on August 12, 2009 at 3-4 [Docket No. 1953] ("From the inception of these cases, it has been apparent to all parties that a major issue in connection with any proposed plan of reorganization for the Debtors is the investigation and resolution of certain potential claims and causes of action in favor of the Debtors' estates arising from the series of transactions during calendar year 2007.").

Creditors).  It has not been lost on anyone that this entire dispute arises, fundamentally, from the fact that, by all accounts, the Tribune Entities have insufficient value to pay in full all of their indebtedness.[4]  Representatives of the Non-LBO Creditors would note that the Tribune Entities still have sufficient value to repay their Non-LBO Debt, and that it is no coincidence that inclusion of the incremental LBO Lender Debt incurred in the Leveraged ESOP Transactions is what tips the Tribune Entities into insolvency.

The LBO Lender Debt, aggregating approximately $10.19 billion as of the Petition Date, is comprised of the Credit Agreement Debt, totaling about $8.57 billion[5], and the Bridge Debt, totaling about $1.62 billion.  About $7.015 billion of the Credit Agreement Debt was funded in Step One, whereas $2.105 billion of the Credit Agreement Debt (under the Incremental Credit Agreement Facility) and all of the Bridge Debt were funded in Step Two.  The Credit Agreement Debt:  (i) has recourse on an unsecured basis to Tribune as borrower; (ii) is secured by the Stock Pledge; and (iii) is jointly and severally guaranteed on an unsecured basis by the Guarantor

---

[4]    The Court-approved Disclosure Statement states as follows regarding the enterprise value of the Debtors:

> Based on these Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $2.6 to $3.1 billion, with an approximate mid-point estimate of $2.9 billion as of the Assumed Effective Date. Adding the estimated cash balance at the Assumed Effective Date of approximately $1.4 billion and the value of the Other Assets of approximately $1.5 to $2.0 billion (with an approximate mid point value of $1.8 billion) to the Enterprise Value range yields a range of Distributable Value for the Reorganized Debtors from $5.6 billion to $6.6 billion with a mid-point of $6.1 billion.

Disclosure Statement at 131.

None of the Parties challenged these assumptions in their submissions to the Examiner.  Accordingly, the Examiner is relying on the foregoing in the analysis contained in Annex B to Volume Two (Recovery Scenarios).

[5]    This amount is net of principal reductions following the issuance of this indebtedness in the Leveraged ESOP Transactions, plus amounts advanced after the Leveraged ESOP Transactions under the Revolving Credit Facility and the Delayed Draw Facility.  This amount also does not include approximately $150.948 million outstanding under the Swap Documents.  Under the terms of the Credit Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money.  On July 2 and July 3, 2007, Tribune entered into the Swap Documents.  The obligations of Tribune under the Swap Documents do not constitute Credit Agreement Debt, but are guaranteed by the Guarantor Subsidiaries pursuant to the Credit Agreement Subsidiary Guarantee.

Subsidiaries.  The Bridge Debt:  (i) has recourse on an unsecured basis to Tribune as borrower and (ii) is jointly and severally guaranteed on an unsecured basis by the Guarantor Subsidiaries (but, under the Subordinated Bridge Subsidiary Guarantee, the Guarantor Subsidiaries' obligations on the Bridge Debt are contractually subordinated to their obligations on the Credit Agreement Debt).  Although the LBO Lender Debt is pari passu with the other unsecured debt at the Tribune level (except for the PHONES Notes, described below), the LBO Lenders enjoy structural seniority over creditors with recourse only against Tribune because, as part of the Leveraged ESOP Transactions, the Guarantor Subsidiaries (comprising most of the value available from the estates) guaranteed the LBO Lender Debt.  This means that the LBO Lenders, along with the Guarantor Subsidiaries' other unsecured creditors, enjoy primary access to the lion's share of the value from the estates.  The Bridge Debt is inferiorly situated in comparison to the Credit Agreement Debt because the Guarantor Subsidiaries' obligations to repay the Bridge Debt are contractually subordinated to the Credit Agreement Debt under the terms of the guarantees.  As a result, at least on certain avoidance questions, the current holders of the Bridge Debt share more in common with the Non-LBO Creditors than they do with the Credit Agreement Agent and the lenders under that facility.

Poised against all of the LBO Lenders are the Non-LBO Creditors, holding aggregate claims against the Tribune Entities as of the Petition Date of approximately $2.156 billion.  At the Tribune level, this group comprises:  (i) approximately $759 million of indebtedness under the PHONES Notes; (ii) approximately $1.283 billion under the Senior Notes; and (iii) approximately $114 million of remaining indebtedness.[6]  The Senior Notes are contractually

---

[6]    This figure includes approximately $35 million in lease cure amounts.

EGI-TRB, an entity wholly owned by EGI, and 24 other entities, hold the EGI-TRB Notes in the approximate principal amount of $225 million, under which they assert claims of approximately $10 million in unpaid interest.  These amounts are not included in the $2.156 billion tally on Non-LBO Debt of Tribune for purposes

senior to the PHONES Notes and are secured by the Stock Pledge on a pari passu basis with the

LBO Lender Debt.  The PHONES Notes are contractually subordinated to all funded

indebtedness at the Tribune level (in other words, all obligations represented by notes or

indebtedness for borrowed money) and are not secured.  Neither the PHONES Notes nor the

Senior Notes have any recourse to the Guarantor Subsidiaries or their assets.  Finally, Non-LBO

Creditors assert approximately $120 million in indebtedness against the Guarantor Subsidiaries.

These creditors share ratably with the LBO Lender Debt against those entities.

        The lenders under the Credit Agreement and their agent seek to enforce their

nonbankruptcy rights and priorities regarding the Tribune Entities (including their structurally

senior position at the Guarantor Subsidiaries' level) that existed immediately before the

commencement of the Chapter 11 Cases.  In contrast, the Non-LBO Creditors want to adjust

those rights and priorities through the successful prosecution, by or on behalf of the estates, of

potential claims, causes of action, and remedies available under the Bankruptcy Code and

nonbankruptcy law.  The latter claims include actions against Tribune's current and former

fiduciaries who approved and effectuated the Leveraged ESOP Transactions and third parties

who assisted in the Leveraged ESOP Transactions or otherwise facilitated them.

        When a bankruptcy occurs following a highly leveraged transaction—such as the

Leveraged ESOP Transactions at issue here—stakeholders investigate and estate representatives

often assert a cluster of claims and causes of action against various parties that fall into three

broad categories:  first, claims to avoid fraudulent transfers and obligations under Bankruptcy

Code sections 548 and 544(b) and to recover amounts transferred under Bankruptcy

---

of this discussion.  These notes are subordinate and junior in right of payment to all obligations, indebtedness, and other liabilities of Tribune other than those that, by their express terms, rank pari passu or junior to Tribune's obligations under the EGI-TRB Notes and trade payables incurred in the ordinary course of business.

section 550;[7] second, actions to subordinate certain claims to other claims and to cause any liens

securing such claims to be transferred to the estate, pursuant to Bankruptcy Code sections

510(c)(1) and (c)(2);[8] and third, a series of common law claims against parties who effectuated

or participated in the highly leveraged transaction, including claims for breach of fiduciary duty,

aiding and abetting breach of fiduciary duty, unjust enrichment, and recovery of illegal

dividends, pursuant to Bankruptcy Code section 541(a)(1).[9]

     These three categories of claims typically are asserted together, and common facts often

support more than one claim or applicable defense.[10]  Thus, as a general matter, many of the

same facts underlie the questions whether a debtor engaged in a transaction to defraud, hinder, or

delay creditors and whether the debtor's officers or directors breached their fiduciary duties.  By

the same token, and again as a generalization, common facts typically underlie the questions

whether a particular transferee or obligee of an alleged fraudulent transfer acted in good faith and

whether that recipient aided and abetted a debtor-insider's breach of a fiduciary duty.

Nevertheless, the three above-described kinds of claims are legally distinct.  It is conceivable, for

example, that a particular transfer made in conjunction with a highly leveraged transaction is

found to be neither actually nor constructively fraudulent under bankruptcy law, but the

---

[7]    11 U.S.C. §§ 544, 548 and 550 (2006).  A trustee or debtor in possession may use Bankruptcy Code section 544(a) to assert a fraudulent transfer action that would be available to any one of three kinds of hypothetical creditors under other applicable law.  11 U.S.C. § 544(a)(1)-(3) (2006).  Section 544(a), however, only confers on the estate representative the standing of a hypothetical creditor "as of the commencement of the case," *i.e.*, the estate representative may assert only the rights of a creditor who acquired its claim after the Leveraged ESOP Transactions.  Under Bankruptcy Code section 544(b), however, the estate representative can assert the rights of any Tribune creditor in the case, including creditors whose claims arose before the Leveraged ESOP Transaction, to avoid transfers.  11 U.S.C. § 544(b) (2006); *Moore v. Bay (In re Sassard & Kimball, Inc.)*, 284 U.S. 4 (1931).

[8]    11 U.S.C. §§ 510(c)(1) and (c)(2) (2006).

[9]    11 U.S.C. § 541(a)(1) (2006).

[10]    *See Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 542 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008); *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 134 (Bankr. D. Del. 2005); *Murphy v. Meritor Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 372-73 (Bankr. D. Mass. 1991).

fiduciaries responsible for the overall transaction are found to have engaged in grossly imprudent or reckless behavior or self-dealing under applicable nonbankruptcy law governing, for example, breach of fiduciary duty.[11]  Likewise, a particular holder of indebtedness whose claim otherwise survives a fraudulent transfer challenge nevertheless may have engaged in the kind of improper actions meriting equitable subordination.  As a result, and in accordance with the Examiner Order, the Report addresses as independent matters all of the assorted claims (and the relevant defenses) to the extent asserted by the Parties.

**B.      Fraudulent Transfer Claims.**

**1.      The Transfers and Obligations Potentially Subject to Avoidance and/or Recovery.**

The Parties identified to the Examiner the following transfers and obligations incurred that may be subject to avoidance and/or recovery:

**Potential Avoidable Transfers and Obligations**

| **Obligations** | |
|---|---|
| Credit Agreement Debt incurred at Step One | $7,015,000,000 |
| Incremental Credit Agreement Debt at Step Two | $2,105,000,000 |
| Bridge Debt at Step Two | $1,600,000,000 |
| **Total Obligations** | **$10,720,000,000** |
| | |
| **Payments** | |
| **Step One** | |
| **Payments to Selling Stockholders - Step One** | **$4,283,999,988** |

---

[11]     *See Hechinger,* 327 B.R. at 550-52.

| | |
|---|---|
| **Step One Financing Fees, Costs, and Expenses**[12] | |
| JPM Entities | $35,042,750 |
| Merrill Entities | $34,992,750 |
| Citigroup Entities[13] | $32,529,375 |
| BofA Entities | $18,002,625 |
| Barclays[14] | $3,375,000 |
| LaSalle Bank National Association[15] | $2,187,500 |
| Lehman Brothers[16] | $2,187,500 |
| Sumitomo Mitsui Banking Corporation[17] | $2,187,500 |
| | |
| **Other Step One Financing Costs and Expenses**[18] | **$3,585,523** |
| **Total Step One Financing Fees, Costs, and Expenses** | **$134,090,523** |
| | |
| **Step One Tender Offer/Dealer Manager Fees** | |
| Merrill Entities | $460,000 |
| Citigroup Entities | $450,000 |
| BofA Entities | $225,000 |
| JPM Entities | $374,976 |
| All Other Tender Offer Fees | $3,444,274 |

---

[12]  As noted above, the record developed by the Examiner during the course of the Investigation does not resolve the question of whether these non-advisory fees (and fees similarly paid at Step Two) were paid to or for the benefit of the investment banking entities (MLPFS, CGMI, JPMorgan, and BAS), which constituted the "Lead Arrangers" under the Credit Agreement and Bridge Credit Agreement, their lender-affiliates (MLCC, Citicorp, JPMCB, Bank of America, and Banc of America Bridge), which constituted "Initial Lenders" and held other titles under the Credit Agreement and Bridge Credit Agreement, or both.  *See* Report at § III.D.16.

[13]  Of this amount, $3,250,000 was the result of payments made via JPMorgan to all non-Lead Banks.

[14]  Payments made via JPMorgan to all non-Lead Banks.

[15]  Payments made via JPMorgan to all non-Lead Banks.

[16]  Payments made via JPMorgan to all non-Lead Banks.

[17]  Payments made via JPMorgan to all non-Lead Banks.

[18]  Includes the payment of out-of-pocket expenses, legal fees, and various other financing-related costs in connection with Step One.

| | |
|---|---:|
| **Total Step One Tender Offer/Dealer Manager Fees** | **$4,954,250** |
| | |
| **Step One Related Advisor Fees, Costs, and Expenses** | |
| Morgan Stanley[19] | $7,667,704 |
| **Total Step One Related Advisor Fees, Costs, and Expenses** | **$7,667,704** |
| | |
| **All Other Step One Related Fees, Costs, and Expenses[20]** | **$14,173,727** |
| | |
| **Post-Step One / Pre-Step Two** | |
| **Interest and Principal Payments** | |
| Interest Payments on Credit Agreement Debt | $197,610,456 |
| Principal Payments on Credit Agreement Debt | $113,787,500 |
| **Total Interest and Principal Payments** | **$311,397,956** |
| | |
| **Step Two** | |
| **Merger Consideration to Selling Stockholders** | $3,982,119,576 |
| | |
| **Interest and Principal Payments** | |
| Interest Payments on Credit Agreement Debt | $95,740,199 |
| | |
| **Transactions with EGI-TRB, LLC** | |
| Repayment of Exchangeable EGI-TRB Note | $206,418,859 |
| Reimbursement of Expenses incurred by EGI-TRB | $2,500,000 |
| Payment of Merger Consideration to EGI-TRB | $49,999,992 |

---

[19] The payment of these Morgan Stanley Advisor Fees was made on May 9, 2007.  In addition, the Morgan Stanley engagement agreement provided for an upfront fee of $2,500,000, which was paid on November 13, 2006.

[20] "All Other Step One Related Fees, Costs, and Expenses" generally consists of all other amounts (in addition to those otherwise specifically categorized above) which are assumed to be related to Step One based on the fact that they were expensed in either Q1 or Q2 2007.  With the exception of the Wachtell portion of these fees ($600,000) which is known to have been part of a payment made to Wachtell on June 4, 2007, actual payment dates are generally unknown.

| | |
|---|---|
| Issuance of EGI-TRB Note | $(225,000,000) |
| Purchase by EGI-TRB of the Warrant | $(90,000,000) |
| **Net Received from EGI-TRB** | **$(56,081,149)** |
| | |
| **Step Two Financing Fees, Costs, and Expenses** | |
| JPM Entities | $13,767,054 |
| Merrill Entities | $37,883,125 |
| BofA Entities | $6,883,527 |
| Citigroup Entities | $11,472,545 |
| **Other Step Two Financing Fees, Costs, and Expenses[21]** | **$3,436,240** |
| **Total Step Two Financing Fees, Costs, and Expenses** | **$73,442,490** |
| | |
| **Step Two Related Advisor Fees, Costs, and Expenses** | |
| CGMI[22] | $12,837,360 |
| MLPFS[23] | $12,768,422 |
| **Total Step Two Advisor Fees, Costs, and Expenses** | **$25,605,782** |
| | |
| **Other Step Two Related Fees, Costs, and Expenses[24]** | **$21,577,816** |
| | |
| **Post-Step Two** | |
| **Post-Step Two Interest and Principal Payments** | |
| Interest Payments on Credit Agreement Debt | $499,621,384 |

---

[21] Includes the payment of out-of-pocket expenses, legal fees, and various other financing-related costs paid in connection with Step Two.

[22] The payment of these CGMI Advisor Fees was made on January 15, 2008.

[23] The payment of these MLPFS Advisor Fees was made on January 15, 2008.

[24] "All Other Step Two Related Fees, Costs, and Expenses" generally consists of all other amounts (in addition to those otherwise specifically categorized above) which are assumed to be related to Step Two based on the fact that they were expensed in either Q3 or Q4 2007. With the exception of the Wachtell portion of these fees $4,350,000) which is known to have been part of a payment made to Wachtell on December 20, 2007, actual payment dates are generally unknown.

| | |
|---|---|
| Principal Payments on Credit Agreement Debt | $964,387,500 |
| Interest Payments on Bridge Debt | $114,529,555 |
| **Total Post-Step Two Interest and Principal Payments** | **$1,578,538,439** |

## 2.    What Is at Stake in the Fraudulent Transfer Disputes?

Because the LBO Lender Debt dwarfs the other claims against the Tribune Entities and, owing to the Subsidiary Guarantees, occupies a structurally senior position, if this indebtedness is not avoided, subordinated, or disallowed, the holders of those claims would recover most of the value available from the Debtors' bankruptcy estates.  Avoidance of the LBO Lender Debt affords the Non-LBO Creditors an opportunity to unravel its structural seniority at the Guarantor Subsidiaries level, and thereby move to the head of the line.  Thus, among the above-listed potential avoidances and recoveries underlying Question One, the actions to avoid the LBO Lender Debt are the proverbial "main event."

One way to place the issues presented by the claims relating to the LBO Lender Debt into perspective is to envision all of the creditors of these estates (both the LBO Lenders and the Non-LBO Creditors) standing together at the entryway of a very long hallway.  Each creditor brings to that gathering its own legal and contractual rights against the Tribune Entities and against creditors and shareholders.  Not all the Non-LBO Creditors share the same rights.  Most of those creditors do not have recourse to the asset-rich Guarantor Subsidiaries, but others do. The PHONES Notes are contractually subordinated to all other funded indebtedness of Tribune, but not to trade liabilities.  As among the LBO Lenders, the Bridge Debt and the Credit Agreement Debt are not of equal rank at the Guarantor Subsidiaries level.  Thus, creditors arrive at the gathering with a host of inter-creditor rights and arrangements, in addition to differing rights against particular Tribune Entities.  At the far end of the hallway are the distributions creditors will receive on their claims, either under a plan of reorganization in the Chapter 11

Cases or in distributions under chapter 7. As each creditor proceeds from entry to exit, each strives to maximize its own recovery from the distributions at the end, whether directly from a Debtor or pursuant to turnover rights under an inter-creditor agreement. One conclusion appears certain: the total consideration available from the Tribune Entities' businesses and assets is insufficient to enable all creditors to receive payment in full.

To enforce their contractual entitlements against the Tribune Entities and ultimately other creditors—and thereby maximize their overall recovery—the Credit Agreement lenders and their agent must successfully pass through the gauntlet of challenges arising under fraudulent transfer law. Under their worst-case scenario, if they fail to defeat these challenges, their claims would be avoided against each estate and/or subordinated to all of the Non-LBO Debt.[25] Various other outcomes are possible.[26] Avoidance, in turn, could affect enforcement of the contractual subordination of the PHONES Notes at the Tribune level and the Bridge Debt at the Guarantor Subsidiary level.[27] To stop the holders of the LBO Lender Debt from proceeding to the exit with their full bundle of legal and contractual rights against the Tribune Entities intact, the estate representatives not only must satisfy the elements necessary to prove avoidability, but also must overcome defenses that the LBO Lenders would raise.[28] Each element of avoidance, and each defense asserted, in turn, raises discrete issues of fact and law. The ultimate question is whether the Bankruptcy Code avoidance provisions will adjust the priorities and recoveries of creditors when distributions occur in these bankruptcy cases. Not surprisingly, the Parties' perspectives on

---

[25]   The Bridge Facility Lenders and their agent face a more nuanced task: If all of the LBO Lender Debt survives intact, this would prove a largely Pyrrhic victory for the Bridge Facility Lenders because the subordination of their debt to the Credit Agreement Debt at the Guarantor Subsidiaries means that most of the value from the estates would go to satisfy the Credit Agreement Debt.

[26]   *See* Annex B to Volume Two (Recovery Scenarios).

[27]   *See id.*

[28]   This is not to suggest that the estate representative will have the burden of proof on each defense, but rather to make the point that, to prevail, the estate representative essentially must win each battle.

11

the assorted legal and factual questions comprising Question One were driven by how the answers to these questions affect their respective recoveries. As the consequences to the various creditor groups differed widely depending on the answers given, the Examiner had the benefit of a wide divergence of advocacy from the Parties.

The Report turns to the Examiner's substantive analysis of the claims, causes of action, and defenses raised by the Parties in Question One.

> **3.    Examiner's Conclusions and Explanation Concerning Choice of Law Issues Presented by Fraudulent Transfer Claims.**

**<u>Examiner's Conclusions</u>**:

Because all of the transfers and obligations in Question One occurred within two years of the Petition Date, and because the avoidance provisions contained in Bankruptcy Code section 548 are at least as favorable to an estate representative as the provisions of the NY UFCA, the Examiner will only analyze applicable Bankruptcy Code avoidance and recovery provisions.

**<u>Explanation of Examiner's Conclusions</u>**:

The Bankruptcy Code affords an estate representative two potential bases upon which to avoid fraudulent transfers and obligations: actions enumerated in Bankruptcy Code section 548(a)(1) and state law fraudulent transfer actions, the latter of which are applicable in a bankruptcy case due to the trustee's status as a hypothetical lien creditor under Bankruptcy Code section 544(a),[29] and assertion of the rights of an actual unsecured creditor under section 544(b).[30]  All of the transfers and obligations raised by the Parties in Question One occurred

---

[29]    11 U.S.C. §§ 544(a) and 548(a)(1) (2006); *see also Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1522 n.7 (10th Cir. 1990). Because section 544(a) only confers the hypothetical rights of the specified creditors "as of the commencement of the case," it is only of utility to the trustee where a particular state law permits avoidance of a transfer or obligation by a future creditor.

[30]    11 U.S.C. § 544(b) (2006) (stating that a trustee may avoid "any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [Bankruptcy Code section 502].").

within the two year reach-back under Bankruptcy Code section 548(a)(1).[31]  In an effort to focus the Parties on issues that could affect the outcome, the Examiner notified the Parties that he was only interested in their evaluation of choice of law issues that are outcome-determinative.  Two possibilities were raised, only one of which is within the scope of the Investigation.

Certain Parties contended that, whether directly or by analogy, the estates could abandon to individual creditors and/or vest in a creditor trust established under a plan of reorganization the rights to pursue fraudulent transfer claims that might otherwise be insulated from recovery under Bankruptcy Code section 546(e), and argued that choice of law could be outcome determinative on this point.[32]  Relinquishment of the claims allegedly would enable individual creditors to assert state law fraudulent transfer claims to which section 546(e) allegedly would have no application.  As discussed in the Report,[33] the Examiner concludes that this contention is outside the scope of the Investigation and thus the Report does not address this matter.

In addition, one Party argued that if the NY UFCA were to apply to avoidance actions concerning the LBO Lender Debt, an estate representative could take advantage of the provisions of that statute defining "fair consideration" to impose the additional requirement of good faith, meaning that a transfer for approximate equivalent value still may be avoided when the transferee lacks good faith.[34]  That Party provided a brief choice of law analysis supporting the contention that the NY UFCA would apply here, and no other Party presented a contrary analysis

---

[31]    11 U.S.C. § 548(a)(1) (2006).

[32]    11 U.S.C. § 546(e) (2006).

[33]    *See* text accompanying footnote 676.

[34]    N.Y. DEBT. & CRED. LAW § 272 (McKinney 2010); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 997 (S.D.N.Y. 1991) ("Under § 272 of the New York Debtor and Creditor Law, fair consideration for conveyance of property or an obligation may be found only if 'a fair equivalent therefor' is received by the transferor *and* such consideration is given by the transferee in good faith."); *Sec. Investor Prot. Corp. v. Rossi (In re Cambridge Capital, LLC)*, 331 B.R. 47, 63 (Bankr. E.D.N.Y. 2005); *Le Café Crème v. Le Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000).

or challenged this conclusion.  The Examiner, however, does not believe that the possible

application of the NY UFCA is outcome-determinative for the following three reasons:

First, as discussed in another part of the Report,[35] even though the plain language of

Bankruptcy Code section 548(a)(1) (read in conjunction with section 548(c)) entirely defers the

question of transferee or obligee good faith to a defense, under the "totality of circumstances"

test articulated by the Third Circuit Court of Appeals, discussed below, transferee or obligee

good faith is considered in conjunction with the determination of reasonably equivalent value

under section 548(a).  Thus, the Third Circuit's consideration of reasonably equivalent value is

functionally very similar to the question of fair consideration under the NY UFCA.

Second, based on the Examiner's analysis of applicable Third Circuit law under section

548,[36] the Examiner does not believe that a court applying that authority[37] (whether as part of a

"totality of circumstances" analysis or in conjunction with consideration of a section 548(c)

defense) would permit an obligee who conferred less than reasonably equivalent value in

exchange for an obligation and did not act in good faith in connection therewith to enforce any

portion of that obligation.  Such a result is consistent with what would happen under the NY

UFCA.

Finally, the Third Circuit's Court of Appeals adoption of an "objective" test for good faith

under Bankruptcy Code avoidance is no less favorable to an estate representative than the test for

good faith under the NY UFCA.[38]  As a result, it is difficult to envision a circumstance in which

---

[35]   *See* Report at § IV.B.5.b.

[36]   *Id.*

[37]   No Party argued that any of the fraudulent transfer claims addressed in the Report should or would be
commenced in any forum other than one in the Third Circuit.  Consistent with the scope of the Investigation,
therefore, the Examiner has assumed that any such action would be brought in a forum within the Third Circuit.

[38]   *Compare Wasserman v. Bressman (In re Bressman)*, 327 F.3d 229, 236-37 (3d Cir. 2003) ("[S]ome facts
suggest the underlying presence of other facts.  If a transferee possesses knowledge of facts that suggest a
transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that

14

a transferee or obligee in these cases would be found to have acted in good faith under section 548 but not under the NY UFCA.

For these reasons (which may help explain why the Parties devoted so little attention to this issue), the Report does not further consider the application of the NY UFCA and instead solely focuses on avoidance under Bankruptcy Code section 548.

### 4.    Intentional Fraudulent Transfer Claims.

#### a.    The Legal Standard.

Under Bankruptcy Code section 548(a)(1), a transfer can be avoided if the transferor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted . . . ."[39]  The three forms of intent that a transferor may demonstrate—hinder, delay, or defraud—are disjunctive such that satisfaction of  any one is sufficient to render the transaction avoidable.[40]

Generally, an intentional fraudulent transfer requires that the transferor engage in wrongdoing,[41] which must relate to the transfer or obligation that the estate representative seeks

---

the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge.  In such a situation, the transferee is held to have knowledge of the voidability of the transfer.") (quotations and citations omitted), *with S. Indus., Inc. v. Jeremias*, 411 N.Y.S.2d 945, 949 (N.Y. App. Div. 1978) ("[A] person seeking to set aside a conveyance upon the basis of lack of good faith must prove that one or more of the following factors is lacking: (1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others.") (citation omitted).  *See* Report at § IV.B.7.b.

[39]    11 U.S.C. § 548(a)(1)(A) (2006).

[40]    *See Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them.").  Thus, the statute does not require a showing that the debtor placed assets outside of the reach of creditors to support a finding that an intentional fraudulent transfer has occurred.  *Id.*; *see also Flushing Sav. Bank v. Parr*, 438 N.Y.S.2d 374 (N.Y. App. Div. 1981) (same).

[41]    *Off. Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 77 (Bankr. D. Del. 2005) ("[A] claim for actual fraud requires that there be conscious wrong-doing."); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 810 (Bankr. S.D.N.Y. 2005) ("[I]ntentional fraudulent conveyance claims should be relegated to their proper sphere, *i.e.*, where there is a knowing intent on the part of the defendant to damage creditors.").

to avoid.[42]  However, an intentional fraudulent transfer "could, in principle, occur without

genuine fraud."[43]  For example, it is well recognized that "[a] general scheme or plan to strip the

debtor of its assets without regard to the needs of its creditors can support a finding of actual

intent [to defraud]."[44]  A strong inference of fraudulent intent may be established either by

(i) facts demonstrating that the defendant had both the motive and the opportunity to commit

fraud, or (ii) facts that "constitute strong circumstantial evidence of conscious misbehavior or

recklessness."[45]

    To avoid a transfer as intentionally fraudulent, the focus is on the intention and

knowledge of the transferor.[46]  Although the actions of third parties may be considered, those

acts are not imputed to the transferor for purposes of this analysis.  The transferee's knowledge

may be useful in confirming the transferor's intent:  "Where the transferor and transferee have

knowledge of the claims of creditors and know that the creditors cannot be paid and where

---

[42]    *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005)
(finding that repayment was not fraudulent transfer because "[t]he fraud alleged in the complaint relates to the
matter in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of
the proceeds to State Street"); *see also Actrade*, 337 B.R. at 810 ("The fact that Actrade misled its own
shareholders does not prove that Actrade intended to defraud Allou's creditors, let alone participated in such a
fraud.").

[43]    *Plotkin v. Pomona Valley Imports (In re Cohen)*, 199 B.R. 709, 716 (B.A.P. 9th Cir. 1996); *see also Fisher v.
Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871 (Bankr. N.D. Ill. 2000) ("The focus in the
inquiry into actual intent is on the state of mind of the debtor.  Neither malice nor insolvency are required.")
(citations omitted).

[44]    *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 213-14 (3d Cir. 1990); *see also
ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 370-71 (S.D. Tex. 2008) (interpreting Delaware's Uniform
Fraudulent Transfer Act); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 504 (N.D. Ill. 1988) (construing
11 U.S.C. § 548); *Dorocke v. Farrington*, 193 N.E.2d 593, 596 (Ill. App. Ct. 1963) (interpreting fraudulent
transfer statute).

[45]    *Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R.
761, 774 (Bankr. S.D.N.Y. 2008); *see also Pereira v. Grecogas Ltd.*, *(In re Saba Enters., Inc.)*, 421 B.R. 626,
642 (Bankr. S.D.N.Y. 2009).

[46]    *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 995 (2d Cir. 1981); *Elway Co. v. Miller (In re Elrod Holdings
Corp.)*, 421 B.R. 700, 709 (Bankr. D. Del. 2010) ("[T]he central focus of § 548(a) is the debtor's intent . . . .");
*Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006); *Silverman v. Actrade Capital, Inc. (In re
Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005); *In re Pinto Trucking Serv., Inc.*, 93 B.R.
379, 385 (Bankr. E.D. Pa. 1988).

consideration is lacking for the transfer the Court may infer an intent to hinder, delay, or defraud creditors."[47]

In determining whether a corporation had the requisite knowledge and intention, courts look to the knowledge and intention of the corporation's directors, officers, and other agents who act for the corporation.[48]  "[T]he fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation.  This is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of the corporation, or contrary to instructions."[49]  In the fraudulent transfer context, as in other situations involving alleged fraud by a corporation, as a general matter, acts perpetrated by the corporations' agent are ascribed to the corporation.[50]  A corporation is not ascribed the knowledge, intention, or acts of an agent who is acting contrary to the interests of the corporation.  However, even the acts and knowledge of an agent acting adversely to the interests of the principal may be attributed to the principal where the principal receives the benefits of the agent's acts.[51]

---

[47]   *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 580 (M.D. Pa. 1983), *aff'd in relevant part sub nom.*
       *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986); *see also Wieboldt Stores*, 94 B.R. at
       504; *Aluminum Mills Corp. v. Citicorp N. Am. Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 887 (Bankr.
       N.D. Ill. 1991) (denying motion to dismiss intentional fraudulent transfer count and stating that "courts will
       look to whether LBO participants had knowledge of: (1) the true financial condition of the debtor at the time of
       the LBO; and (2) whether the corporate acquisition was to be accomplished via the leveraging of the debtor's
       assets").  This does not mean, however, that an intentional fraudulent transfer claim may be validly asserted
       based solely on the acts and knowledge of the transferee.  The central focus is on the transferor.  *See* footnote
       46.  The Examiner rejects the contrary contention asserted by certain Parties.

[48]   *McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*, 334 F.3d 239, 242-43 (3d Cir. 2003); *Schnelling v.*
       *Crawford (In re James River Coal Co.)*, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007); *In re Anchorage Marina,*
       *Inc.*, 93 B.R. 686, 691 (Bankr. D.N.D. 1988); *Nordberg v. Republic Nat'l Bank (In re Chase & Sanborn Corp.)*,
       51 B.R. 739, 740 (Bankr. S.D. Fla. 1985).

[49]   *In re Personal & Bus. Ins. Agency*, 334 F.3d 239, 242-43 (3d Cir. 2003).

[50]   *J.J. McCaskill Co. v. United States*, 216 U.S. 504, 514-15 (1910).

[51]   *See Off. Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. Pricewaterhouse-*
       *Coopers, LLP*, 607 F.3d 346, 351-53 (3d Cir. 2010); *Conn. Fire Ins. Co. v. Commercial Nat'l Bank*, 87 F.2d
       968, 969 (5th Cir. 1937) ("The transaction of the unfaithful agent may indeed be not binding on his principal in
       the sense that because of fraud the principal can repudiate or rescind it, but if he elects to retain its specific

*United States v. Gleneagles Investment Co.*[52] is the leading case addressing intentional fraudulent transfer in the leveraged buyout context.  In that case, Great American purchased Raymond Group using the proceeds of a loan by IIT.  At the time of the sale, Raymond Group was "on the brink of insolvency," with multi-million dollar liabilities for federal income taxes, trade accounts, pension fund contributions, strip mining obligations, back-filling obligations, and municipal real estate taxes.[53]  In connection with the sale, Raymond Group guaranteed the loan to Great American and pledged its assets as security.  Following the closing, Raymond Group lacked the funds to pay its taxes and routine operating expenses.  Within two months of the transfer, Raymond Group was forced to begin shutting down its operations, and, within six months, it ceased all operations and bankruptcy ensued.[54]

The District Court for the Middle District of Pennsylvania found that Raymond Group had engaged in an intentional fraudulent transfer, holding that "[w]here the transferor and transferee have knowledge of the claims of creditors and know that the creditors cannot be paid and where consideration is lacking for the transfer the Court may infer an intent to hinder, delay, or defraud creditors."[55]  Even though it could not be directly shown that Raymond Group

---

results to the detriment of a third person justice requires that he take the transaction with its actual infirmities . . . .  When authority to do the act is present, every agent fully represents his principal in that act.  And when the act is done by an agent of any class and advantage is claimed under it there can be no question of the authority to do it."); *cf. N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481, 494-95 (1909) ("[T]here is a large class of offenses . . . wherein the crime consists in purposely doing the things prohibited by statute.  In that class of crimes we see no good reason why corporations may not be held responsible for and charged with the knowledge and purposes of their agents, acting within the authority conferred upon them. . . . If it were not so, many offenses might go unpunished and acts be committed in violation of law, where, as in the present case, the statute requires all persons, corporate or private, to refrain from certain practices forbidden in the interest of public policy.") (internal citations omitted).  *See* Report at § IV.B.7.b.(1).

[52] *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556 (M.D. Pa. 1983), *aff'd in relevant part sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1228 (3d Cir. 1986).

[53] *Id.* at 571, 581.

[54] *Id.* at 572.

[55] *Id.* at 581; *see also Aluminum Mills Corp. v. Citicorp N. Am. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 887 (Bankr. N.D. Ill. 1991).

intended to hinder or delay paying creditors, the court deduced a fraudulent intent:  "If the parties could have foreseen the effect on creditors resulting from the assumption of the IIT obligation by the Raymond Group, a company in a serious financial condition, the parties must be deemed to have intended the same."[56]

On appeal, the Third Circuit Court of Appeals declined to approve the "could have foreseen" standard stated by the lower court, but instead endorsed the lower court's alternative finding that "a party is deemed to have intended the *natural consequences of his acts*." [57]  Other courts have similarly focused on the effect of a transfer as indicative of intent:  "When the legal effect of a conveyance is to hinder or delay creditors, the intent [to defraud] will be presumed, regardless of the actual motives of the parties."[58]  In *Moody v. Security Pacific Business Credit*, a later Third Circuit case involving a failed leveraged buyout, the Court of Appeals ruled that because the transferor was "not on the brink of insolvency" at the time of the transfer, it did not necessarily follow that the leveraged buyout would hinder, delay, or defraud creditors and thus there was no fraudulent transfer.[59]

The "natural consequences" analysis represents an effort to determine the transferor's intent in the leveraged buyout context by focusing on the readily discernible consequences of

---

[56]   *Gleneagles,* 565 F. Supp. at 582.

[57]   *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1305 (3d Cir. 1986) (emphasis added); *see also Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1075 (3d Cir. 1992) ("In *Tabor Court Realty Corp.* we relied in part on the principle that 'a party is deemed to have intended the natural consequences of his acts' in upholding the district court's finding of intentional fraud."); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935-36 (S.D.N.Y. 1995) (rejecting argument that actual intent could be inferred if creditor could merely have foreseen the harmful effect of transfer, because such a standard "is incompatible with the concept of actual fraud"); *Bull v. Bray*, 26 P. 873, 876 (Cal. 1891) (ruling, in the context of finding the intent to avoid a fraudulent conveyance, "every man intends the usual and ordinary consequences of his voluntary acts") (internal citation omitted).

[58]   *Freehling v. Nielson (In re F&C Servs.)*, 44 B.R. 863, 869 (Bankr. S.D. Fla. 1984); *see also Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (holding that complaint adequately alleged intentional fraudulent transfer where "Trustee alleges that the Defendants were aware of the creditors' claims and that the LBO would leave the Debtor with too much debt, making it unable to pay those claims").

[59]   971 F.2d 1056, 1075-76 (3d Cir. 1992).

19

such a transaction.  The standard, however, is not precise (indeed it is less a standard than a

characterization of the underlying facts and consequences), and the courts have not put a fine

pencil on the question of what, precisely, the transferor must know or suspect for a court to find

that hindering, delaying, or defrauding creditors is the "natural consequence" of a failed

leveraged buyout transaction.  The relatively straightforward case in favor of finding an

intentional fraudulent transfer in these circumstances arises when the debtor transfers property

when it is not paying its debts or is otherwise insolvent, and the evidence shows that the debtor

knows this to be the case:  the "natural consequence" of the transfer is that creditors are hindered,

delayed, or defrauded.[60]  A more difficult question may arise when the evidence shows that the

debtor was aware of red flags suggesting a *possibility* or *likelihood* of insolvency or inadequacy

of capital, but proceeded with the transaction in any event.  The estate representative plainly

must prove more than that insolvency or bankruptcy were foreseeable at the time of the

leveraged buyout, but it is not clear just how much more must be proven.[61]

---

[60]  *See SEC v. Haligiannis*, 608 F. Supp. 2d 444, 451 (S.D.N.Y. 2009) (avoiding mortgage because "[w]hen
[transferor] executed the mortgage, he almost certainly was aware that he was insolvent (or on the verge of
insolvency), and that his fraud was about to be revealed") (citations omitted); *In re Process-Manz Press, Inc.*,
236 F. Supp. 333, 347 (N.D. Ill. 1964) ("It is elementary that a party is held to intend the natural consequences
of his acts.  Armstrong's arranging for and causing the unwarranted withdrawal of $2,000,000 in working
capital from Manz at a time when Manz was having difficulty paying its debts clearly and conclusively justifies
the Referee's conclusion that the transaction of December 14, 1961 is voidable under § 67, sub. d(2)(d) of the
Bankruptcy Act."), *rev'd on other grounds*, 369 F.2d 513 (7th Cir. 1966); *Miller v. Greenwich Capital Fin.
Prods. (In re Am. Bus. Fin. Servs.)*, 384 B.R. 66, 75 (Bankr. D. Del. 2008); *see also Rosener v. Majestic Mgmt.
(In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (noting the close relationship between the parties
to the transaction, the fact that the LBO occurred outside the ordinary course of the parties' business, and the
fact that the defendant was aware that the LBO would leave the debtor with too much debt); *Murphy v. Meritor
Sav. Bank (In re O' Day Corp.)*, 126 B.R. 370, 411 (Bank. D. Mass 1991) ("At no time during the course of this
case has the Trustee even suggested that the company was anything but healthy prior to the 1987 LBO.  This
distinction alone provides a sufficient reason for this Court to reject an application of the ruling in *Gleneagles* to
the facts of this case."); *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R.
869, 887 (Bankr. N.D. Ill. 1991) (explaining that the lender had direct knowledge that LBO would render debtor
insolvent and agreed to withdraw demand for a solvency letter, an independent accountant's review and fairness
letter).

[61]  "Because of the difficulty in proving intentional fraud, challenges to leveraged buyouts tend to be predicated on
constructive fraud . . . ."  *Moody*, 971 F.2d at 1064.

The problem of determining what a debtor knew and intended is hardly unique to failed leveraged buyouts. Since the English Parliament enacted the Statute of Anne, courts have grappled with the question of how to apply intentional fraudulent transfer statutes. Because "[d]irect evidence of fraudulent intent . . . is often unavailable and courts usually rely on circumstantial evidence, including the circumstances of the transaction, to infer fraudulent intent,"[62] in evaluating the transferor's actions, courts have looked to various "badges of fraud" that include: (1) the relationship between the debtor and the transferee; (2) consideration for conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor; and (6) secrecy or concealment of the transaction.[63]

Although a single badge of fraud is insufficient, it is not necessary for an estate representative to show all of these badges of fraud (or any one in particular) to prove fraudulent intent.[64] "Depending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference."[65] Thus, an intentional fraudulent transfer may occur even when the transferee allegedly imparted fair consideration or

---

[62] *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 550-51 (D. Del. 2005) (citing authorities), *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

[63] *Id.*; *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 990 (Bankr. W.D. Pa. 1991), *aff'd*, 971 F.2d 1056 (3d Cir. 1992).

[64] *See Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1353-54 (8th Cir. 1995) ("The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, 'the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose.'") (internal quotations omitted); *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991) ("The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose.") (citations and internal quotations omitted). *But see Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*, 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (upholding an actual fraud claim under the NY UFCA based on the presence of only one badge: inadequate consideration).

[65] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995); *see also Moody.*, 971 F.2d at 1064; *Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l)*, 97 F. App'x 365, 369 (3d Cir. 2004).

reasonably equivalent value on account of a transfer.[66]  In addition, some courts have looked to other factors in addition to the traditional "badges of fraud" to determine whether a transaction is intentionally fraudulent.[67]

Finally, it bears noting in this Section of the Report that the Examiner concludes that a court is highly likely to "collapse" transactions for purposes of evaluating intentional fraudulent transfer claims when the various factors supporting such a result in a constructive fraudulent transfer context also are present in an intentional fraudulent transfer setting.[68]  Collapse in this context affects questions of defenses available to the transferee or obligee of an intentional fraudulent transfer under Bankruptcy Code section 548(c), discussed in another part of the Report.[69]

> **b.    Examiner's Conclusions and Explanation Concerning Intentional Fraudulent Transfer Claims in the Step One Transactions.**

**<u>Examiner's Conclusions</u>**:

A court is reasonably unlikely to find that the Tribune Entities incurred the obligations and made the transfers in the Step One Transactions with actual intent to hinder, delay, or defraud any entity to which the Tribune Entities were or became, on and after the date that such transfers were made or such obligations were incurred, indebted.[70]

---

[66]    *See, e.g., Dean v. Davis*, 242 U.S. 438, 444-45 (1917) (finding that a mortgage constituted an intentional fraudulent transfer, even where the debtor received the loan proceeds, because the debtor used the loan proceeds with intent to hinder, delay, or defraud creditors).

[67]    *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 370-71 (Bankr. S.D. Tex. 2008).

[68]    *See, e.g., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302, 1304 (3d Cir. 1986) (collapsing transaction and approving lower court's finding of intent to hinder creditors); *id.* at 1297 n.3 ("Although a rational creditor might under certain circumstances consent to a risky but potentially beneficial leveraged buy-out of a nearly insolvent debtor, no reasonable creditor would consent to the intentionally fraudulent conveyance the district court found the transaction to be.  Thus, the application of  fraudulent conveyance law to the instant transaction appears consistent even with Baird and Jackson's analysis.").  *See* Report at § IV.B.5.b.

[69]    11 U.S.C. § 548(c) (2006).  *See* Report at §§ IV.B.5.b. and IV.B.7.b.(1).

[70]    11 U.S.C. § 548(a)(1)(A) (2006).

**Explanation of Examiner's Conclusions**.

The Examiner did not find any direct or "smoking gun" evidence that the Tribune Entities entered into the Step One Transactions with the intention to hinder, delay, or defraud creditors. Nor did the Examiner find sufficiently probative "badges" of fraud at Step One:

(1)    <u>Relationship between the debtor and the transferee</u>.  As discussed in the Report,[71] it is clear that the Selling Stockholders (including Tribune's Large Stockholders and members of Tribune's management and the Tribune Board who held shares) were the principal beneficiaries of the Step One Transactions and received a substantial portion of the consideration received from the advances giving rise to the LBO Lender Debt.  However, the Special Committee and the Tribune Board considered and approved the Leveraged ESOP Transactions, with the active input of the Financial Advisors.  There is no credible evidence, moreover, that the Lead Banks controlled the Tribune Entities or would otherwise qualify as "insiders" within the meaning of the Bankruptcy Code.[72]

(2)    <u>Consideration for conveyance</u>.  As discussed in another part of the Report,[73] the Examiner finds that none of the Tribune Entities received reasonably equivalent value in Step One in exchange for the obligations incurred and payments made.

(3)    <u>Insolvency or indebtedness of the debtors</u>.  As discussed elsewhere in the Report,[74] the Examiner finds it is highly unlikely that a court would find that the Step One Transactions rendered the Tribune Entities insolvent (assuming the Step Two Debt is not included at Step One for solvency purposes).

---

[71]    *See* Report at §§ III.D.16., III.F.8.e., and III.G.4.d.

[72]    11 U.S.C. § 101(31)(B) (2006).

[73]    *See* Report at § IV.B.5.c.

[74]    *See* Report at § IV.B.5.d.(7).

(4)    <u>Amount of the debtor's estate transferred</u>.  Although the Leveraged ESOP

Transactions rendered all of the Tribune Entities liable on the Step One Debt, and

the Stock Pledge was granted in connection therewith, the transactions did not

result in the transfer away of all of the Tribune Entities' assets.

(5)    <u>Reservation of benefits, control, or dominion by the debtors</u>.  This badge is not

relevant to the Leveraged ESOP Transactions.

(6)    <u>Secrecy or concealment of the transaction</u>.  The Step One Transactions were not

secretive or concealed from participants in that transaction or from the public

generally.  The record establishes that Tribune regularly disclosed pertinent

financial performance information in the period leading up to the Step One

Financing Closing Date.[75]  Nor is there any evidence that the Tribune Entities

(through management or others) withheld information underlying Tribune's

projections or other aspects of the transaction or engaged in dishonesty or

wrongdoing in connection with the Step One Transactions.

Although application of the traditional "badges" weigh against the conclusion that an

intentional fraudulent transfer occurred here, certain Parties contended that Step One transfers

and obligations were intentionally fraudulent based on the following allegations:  (i) the Tribune

Entities knew that they could not service and satisfy the massive amount of LBO Lender Debt

incurred, but proceeded with the transactions nonetheless so that the Tribune Entities' insiders

would receive cash bonuses in addition to payments as Selling Stockholders; (ii) driven by these

---

[75]    *See* Ex. 79 (Tribune Press Release, dated May 14, 2007).  *See also* Ex. 55 (Tribune Form 10-Q, filed May 9,
2007); Ex. 891 (Ratings Agency Presentation, dated March, 2007); Ex. 180 at 31-32 (Transcript of Lenders
Meeting, dated April 26, 2007); Ex. 181 (Lenders' Presentation, dated April 26, 2007); Ex. 973 at cover letter
(Tribune Board Notebook, dated May 9, 2007).  To be sure, however, public disclosure alone is not sufficient to
insulate an otherwise intentionally fraudulent transfer from avoidance.  *See, e.g., In re Morse Tool, Inc.*, 108
B.R. 389, 390 (Bankr. D. Mass. 1989).

motivations, the Tribune Entities (acting through their management) procured an unrealistic solvency opinion from VRC and failed to take into account the Tribune Entities' declining financial performance during the first quarter of 2007 and leading up to the closing of Step One; and (iii) the Tribune Entities, acting in conjunction with the LBO Lenders, structured various transactions so as to place all of the risk of failure on Tribune's creditors.  The Examiner did not find these contentions persuasive.

First, the evidence amply demonstrates that before Tribune entered into the Merger Agreement and related agreements on April 1, 2007, Tribune was aware that this was a highly leveraged transaction and that the Tribune Entities had missed their February 2007 projections on an overall basis.[76]  However, as discussed in another part of the Report,[77] the Examiner does not conclude that Tribune unreasonably continued to rely on the February 2007 projections up to and including the closing of Step One.  Some evidence additionally supports the view that the Tribune Entities' management believed that various cost-cutting initiatives then underway would counterbalance the decline in revenues.[78]

Second, it is true that members of Tribune's senior management as well as directors (including Special Committee members) stood to benefit personally from the Leveraged ESOP Transactions:  senior management from cash bonuses and phantom stock awards under the Special Incentive Awards,[79] and both senior management and directors through accelerated restricted and stock options and as Selling Stockholders.[80]  The management cash awards were

---

[76]  *See* Report at §§ III.E.1. and III.D.1.f.

[77]  *See* Report at § IV.B.5.d.(9).

[78]  *See* Ex. 66 at 102:20-104:21 (Rule 2004 Examination of Harry Amsden, December 16, 2009)*; see also* Ex. 180 at 18, 34, and 73 (Transcript of Lenders Meeting, dated April 26, 2007); Report at § III.D.10.a.

[79]  *See* Report at §§ III.F.8.c. and III.F.8.e.

[80]  *See* Report at § III.F.8.e.  All members of the Special Committee tendered shares of Tribune Common Stock in connection with the Tender Offer with the exception of Mr. White.  As neither Mr. White nor Mr. Reyes were

significant.[81]  The Compensation Committee (none of the members of which received Special

Incentive Awards) openly approved and adopted the Special Incentive Awards, precluding any

assertion that the awards were a secret benefit conferred on management.[82]  More generally, the

fact that members of senior management, the Tribune Board, and the Special Committee

personally benefited materially from the Leveraged ESOP Transactions may be reason to

carefully scrutinize their actions and credibility—particularly in the case of senior management

as Step Two approached (and the additional financial benefits that they would receive on the

Step Two Closing became closer to reality)—does not by itself support an inference that these

insiders caused Tribune to perpetrate an intentionally fraudulent transfer at Step One.

Third, the picture that emerges from the record is that, having succeeded in generating a

transaction that was very favorable to the Selling Stockholders and that would satisfy the long-

standing demands of several Large Stockholders, Tribune effectuated a leveraged transaction to

maximize stockholder recovery.  In pursuit of this objective, senior management aggressively

tried to meet the conditions necessary to close Step One, including obtaining a solvency opinion

that would provide a basis for Tribune to certify solvency under the Credit Agreement.[83]

However, although the amount paid to VRC to render its opinions as well as certain assumptions

VRC made in its Step One opinion raise questions,[84] the evidence does not demonstrate

deception by Tribune's senior management or directors at Step One.  Tribune's instruction to

---

members of the Tribune Board upon consummation of the Merger, the Examiner is unable to determine whether
Mr. White or Mr. Reyes owned shares of Tribune Common Stock at the Effective Time of the Merger and
therefore directly benefited from the consummation thereof.

[81]   Two members of Tribune management (Mr. FitzSimons and Mr. Smith) did not participate in the cash bonus
pool.  Ex. 5 at 47 (Tender Offer).  However, Mr. FitzSimons received $15,966,121 (including tax gross-up)
under the Transitional Compensation Plan as a result of the termination of his employment in December 2007.

[82]   Ex. 663 (Compensation Committee Meeting Minutes, dated April 1, 2007).

[83]   Management had to act quickly to engage a firm willing to consider furnishing a solvency opinion.  *See*
Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 111:20-22, 112:1-3.

[84]   *See* Report at § III.E.3.a.

VRC that it should not include the Step Two Debt in determining solvency at Step One probably was correct, whereas the instruction not to consider the Step Two Debt for purposes of other analyses (such as capital adequacy) probably was wrong (the latter evidencing an erroneous conclusion[85] but, the Examiner believes, not actual fraudulent intent).   The Examiner finds perplexing and troubling the provisions contained in VRC's engagement letter requiring that VRC measure fair value as the consideration that would change hands between a willing buyer and a willing seller "both having structures similar to the structure contemplated in the Transactions by the subject entity (an S-Corporation, owned entirely by an ESOP, which receives favorable federal income tax treatment), or another structure resulting in equivalent favorable federal income tax treatment."[86]  But VRC's adherence to this requirement did not affect VRC's Step One solvency opinion.[87]

---

[85]   *See* Report at § IV.B.5.d.(6).(ii).

[86]   Ex. 263 at 3-4 (VRC Solvency Engagement Letter, dated April 11, 2007).

[87]   This provision of VRC's engagement letter became highly relevant at Step Two.  *See* Report at § IV.B.5.d.(10). As support for this provision, one Party cited to the Examiner cases addressing whether it is appropriate to "tax affect" the value of stock in an S-Corporation when that stock is passed to an heir (which would result in a lower valuation of the stock in the heir's hands and hence less tax owing to the Internal Revenue Service resulting form the transfer).  *See generally Gross v. Comm'r*, 272 F.3d 333, 342 (6th Cir. 2001); *Dallas v. Comm'r*, 92 T.C.M. (CCH) 313 (T.C. 2006); *Estate of Adams  v. Comm'r*, 83 T.C.M. (CCH) 1421 (T.C. 2002); *Estate of Heck v. Comm'r*, 83 T.C.M. (CCH) 1181 (T.C. 2002); *Wall v. Comm'r*, 81 T.C.M. (CCH) 1425 (T.C. 2001).  The courts deciding these cases agreed with the position taken by the Internal Revenue Service that the value of that stock is not reduced by the hypothetical corporate tax rate (in other words, the value should not be "tax affected"), implying that an S-Corporation would be valued higher than a C-Corporation, *ceteris parabus*. Academic literature also has addressed the implications of these judicial decisions on S-Corporation valuation issues.  *See, e.g.*, GEORGE B. HAWKINS & MICHAEL A. PASCHALL, CCH BUSINESS VALUATION GUIDE ¶ 1523 (2007); Roger J. Grabowski, *S Corporation Valuations in the Post-Gross World-Updated,* BUSINESS VALUATION REVIEW*,* Sept. 2004.  These cases are inapposite to the Tribune case and therefore furnish no justification for the valuation methodology prescribed in VRC's engagement letter.  They involved circumstances in which the tax advantaged position enjoyed by the old owner was actually passed on to the heir; hence, the question before these courts was whether to value the stock in the heir's hands recognizing that the heir would enjoy the same tax advantage as its predecessor.

Whether a hypothetical buyer of Tribune, however, could construct its own tax avoidance structure would not represent value attributable *to Tribune* (or any other seller for that matter) and should not be counted as an element of its fair market value:

> To review, a common definition of fair market value (which is the litmus test for valuations of privately held stock held by ESOPs), is "the value at which an asset would trade hands between a willing buyer and willing seller, both having access to relevant facts, neither being under compulsion to act."  Generally, this

Fourth, the Examiner did not find credible evidence to support the contention that the

Tribune Entities structured the Leveraged ESOP Transactions to hinder or delay their creditors.

As noted, Tribune's creditors had no recourse to the Guarantor Subsidiaries or contractual

protection against efforts by third party creditors to obtain structural superiority over Tribune's

creditors.  Without more, structuring the funding necessary to make the Leveraged ESOP

Transactions happen by taking advantage of the existing structural subordination of Tribune's

---

definition is interpreted to refer to hypothetical, average buyers and sellers in the marketplace, without regard to special purpose buyers (e.g., strategic buyers) or sellers (e.g. liquidation sellers).

As a result, the definition of fair market value, when considered with respect to the S Corporation ESOP, does not confer value from the ESOP tax structure on the value of the subject stock.  While it is true that the ESOP receives an economic advantage that translates to additional value for the participants, this economic benefit does not confer additional value on the stock itself.  Only another special-purpose buyer (e.g. another S Corporation ESOP) could enjoy the same economic advantage.  Therefore, the economic benefit is not part of the fair market value of the subject stock."

David Ackerman and Susan E. Gould, *S Corporation ESOP Valuation Issues (Chapter 6) in* THE HANDBOOK OF BUSINESS VALUATION AND INTELLECTUAL PROPERTY ANALYSIS 148-49 (Robert F. Reilly and Robert P. Schweihs, eds., 2004).

If this were not the case, then any asset in a seller's hands would have to be valued higher based on the theoretical possibility that a buyer could acquire that asset on a tax-advantaged basis.  Solvency valuation assumes a hypothetical disposition by a willing seller to a willing buyer.  *See* footnotes 387 and 568.  There is no basis to attribute value to the *seller* based on the supposition that a special purpose buyer would acquire the seller or its assets on its own tax advantaged basis:

[A]s discussed above, the analyst should estimate value based only on a hypothetical willing buyer and willing seller (rather than on a special purpose buyer).  As a result, the analyst should not conclude an enhanced fair market value of the corporation stock due solely to the tax exempt status of the ESOP trust. This is because only another S Corporation ESOP (*i.e.* a special purposes buyer) could purchase this enhanced value.

*Id*. at 153.

The Examiner also considered whether the preceding conclusion differs based on the prospect that Tribune might be able to further effectuate one or more dispositions under a leveraged partnership transaction (a structure that apparently was used in the Cubs and Newsday sale transactions), under which Tribune might monetize assets and still obtain the tax avoidance benefit that it would otherwise have to wait ten years to achieve by holding such assets.  *See* Exh. 1119 (TOM R. WECHTER, SELLING CHICAGO CUBS WITHOUT RECOGNIZING ANY TAXABLE GAIN: HOW CHICAGO TRIBUNE DID IT (2009)).  This is not a benefit that is passed on to the buyer, but, rather, if successful permits Tribune to shield the income from the asset monetized as if Tribune held and generated income from the asset.  In this fashion, this benefit is no different for fair market value purposes from the S-Corporation/ESOP structure generally.  Although this structure, to the extent still available, might affect the net consideration remitted to creditors from a disposition of Tribune's assets, it would not affect the fair market value of Tribune's assets, in other words, it would not affect the price paid by a willing buyer for those assets.

creditors simply is not evidence of intent to hinder or delay creditors.[88]  The same is true

regarding the repayment of the 2006 Bank Debt at Step One.  Under the terms of the 2006 Credit

Agreement and 2006 Bridge Credit Agreement, rendering the Guarantor Subsidiaries liable on

the LBO Lender Debt would have been an event of default.  Thus, absent waiver, Step One could

not have happened without repayment of this debt.  There is no evidence pointing to invalidity of

this debt.  Even though lenders holding the 2006 Bank Debt also held the LBO Lender Debt, in

the context of the Leveraged ESOP Transactions, it is neither surprising nor suspicious that the

2006 Bank Debt was repaid and replaced with the Step One Debt.

Fifth, the evidence does not support the contention that the FinanceCo/Holdco

Transactions constituted an effort to hinder or delay Tribune's creditors.  These transactions did

not violate the terms of the Senior Notes or the PHONES Notes.[89]  Indeed, the Senior Notes

received the same security granted under the Credit Agreement in the form of the Stock Pledge

on a ratable and pari passu basis with the Credit Agreement Debt, as required by their

indentures.[90]  Separate from what the applicable indentures permitted or required, the evidence

---

[88]    *See Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1073 n.27 (3d Cir. 1992) (finding that voluntary creditors may be able to protect themselves against harm supposedly caused by leveraged buyout through protections in negotiated credit agreements); *see also In re Owens Corning*, 419 F.3d 195, 212-23 (3d Cir. 2005) ("To begin with, the Banks did the 'deal world' equivalent of 'Lending 101.'  They loaned $2 billion to OCD [the parent] and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt.  What the Banks got in lending lingo was 'structural seniority'–a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors of OCD did not have. This kind of lending occurs every business day.  To undo this bargain is a demanding task."); *Aluminum Mills*, 132 B.R. at 896 ("[A] non-fiduciary may act strategically to protect itself to the potential detriment of others.") (citation omitted); *Prod. Res. Group, L.L.C. v. NCT Group*, 863 A.2d 772, 777, 790 (Del. Ch. 2004) ("Creditors are typically better positioned than stockholders to protect themselves by the simple tool of contracting . . . . Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections.").

[89]    *See Moody*, 971 F.2d at 1073 n.27; *see also In re W.T. Grant Co.*, 699 F.2d 599, 609 (2d Cir. 1983) ("We entirely agree with [the] conclusion that a creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim."); *In re Aluminum Mills Corp.*, 132 B.R. 869, 896 (Bankr. N.D. Ill. 1991) ("[A] non-fiduciary may act strategically to protect itself to the potential detriment of creditors.").

[90]    *See* Ex. 216 (S&P Recovery Report) at TRB 0125760 (noting that existing Senior Notes "will benefit from the security package as the proposed bank facility due to negative pledge covenants in existing bond indentures").

does not support contentions by certain Parties that the FinanceCo/Holdco Transactions were structured to create, in effect, a Maginot Line against Tribune's creditors if the Subsidiary Guarantees subsequently were avoided following a bankruptcy for the Tribune Entities.  There is no reason to believe that FinanceCo or Holdco (as established pursuant to the FinanceCo/Holdco Transactions) would be uniquely immune from avoidance of the Subsidiary Guarantees if bankruptcies were to occur, or that the Tribune Entities or other participants believed that those transactions would provide the Credit Agreement lenders with any special protection from the consequences of avoidance of the Credit Agreement Subsidiary Guarantee.

Instead, as discussed above, the evidence shows that Tribune had a business reason for structuring the FinanceCo/Holdco Transactions.  First, JPM and the other banks attempting to syndicate the Step One Financing required that Tribune provide at least a partially secured facility so the Credit Agreement Debt could be marketed to a broader universe of lenders, such as collateralized debt obligation lenders.[91]  The FinanceCo/Holdco Transactions facilitated the furnishing of some security in respect of the Credit Agreement Debt.  Second, considerations relating to securities reporting requirements appear to have driven the specific structure of the FinanceCo/Holdco Transactions.  As noted, Tribune had not previously prepared financial statements by entity, but rather had historically reported by business segment.[92]  Had Tribune pledged the stock in its existing subsidiaries, which JPM preferred it do,[93] absent a waiver of applicable reporting requirements, Tribune would have been required to prepare audited financial

---

[91]    *See* Ex. 197 (Sell E-Mail, dated March 28, 2007); *see also* Ex. 178 at 29 (Step One Confidential Information Memorandum).

[92]    *See* Ex. 197 (Sell E-Mail, dated March 28, 2007); Ex. 4 at 8-21, 138-142 (Tribune 2007 Form 10-K).

[93]    Jeffrey Sell, former Head of JPM's Special Credits Group, informed the Examiner that "I recall that I considered this baloney- that these guys gave this up for the weekend because some comptroller couldn't give the financial statements. . . .  I wanted the pledge of stock in the subsidiaries.  I probably asked for a lien on the assets and was told no so a pledge on the stock of the subsidiaries was second choice.  Pledge on holding companies was next."  Examiner's Interview of Jeffrey Sell, June 3, 2010.  *See also* Ex. 197 (Sell E-Mail, dated March 28, 2007).

statements for each of the entities giving stock pledges.[94]  The FinanceCo/Holdco Transactions

permitted the Tribune Entities to avoid that result,[95] and, thus, they are not evidence of Tribune's

intent to hinder, delay, or defraud creditors.[96]

    The evidence also does not support a conclusion that the transactions effectuated at or

around the Step One Transactions involving the LATI Notes were done with actual intent to

hinder, delay, or defraud creditors.  The Credit Agreement specified, as a condition to closing,

satisfaction of the intercompany amounts shown on a schedule to the Credit Agreement as

running in favor of LATI.[97]  Although no direct evidence supports this inference, this provision

of the Credit Agreement may have been driven, at least in part, by the fact that Tribune's twenty-

one subsidiaries allegedly obligated on the LATI Notes were Guarantor Subsidiaries under the

Credit Agreement.[98]  As such, the Lead Banks probably desired the elimination of a nearly $4

billion "liability" of Guarantor Subsidiaries to LATI, especially as LATI was *not* a guarantor.

For the Tribune Entities' part, this provision may have been motivated by tax considerations

relating to the S-Corporation/ESOP structure.[99]

    Regardless of any possible motives, it is highly unlikely that these transactions harmed

Tribune or its creditors.[100]  Although the result was that Tribune arguably ended up with a $3.98

billion "liability" to LATI, LATI is a wholly owned subsidiary of Tribune, is not a Guarantor

---

[94]    *See* 17 C.F.R. § 210.3-16 (2010).

[95]    *See* Ex. 200 (Kaplan E-Mail, dated March 21, 2007); Ex. 199 (Chen E-Mail, dated March 30, 2007).

[96]    For this reason, there would be no basis for a court to direct any type of "reverse corporate veil piercing" involving FinanceCo or Holdco due to the lack of any evidence that the FinanceCo/Holdco Transactions were unjust or improper.  *See ASARCO, LLC v. Ams. Mining Corp.*, 396 B.R. 278, 317 (S.D. Tex. 2008).

[97]    Ex. 179 at §§1.01, 3.01(m) and Schedule 1.01(d) (Credit Agreement).

[98]    Ex. 189 at Annex I (Credit Agreement Subsidiary Guarantee).

[99]    *See* 26 C.F.R. §§1.1361-4(a)(2); 1.332-2(b) (2010); *see also* Report at § III.D.13.

[100]    The question addressed here is separate from the question whether certain of the Guarantor Subsidiaries received "value" from these transactions, which the Examiner concludes later in the Report that they did not. *See* Report at § IV.B.5.c.(3).

Subsidiary, and does not appear to have any significant indebtedness of its own.[101]  As a consequence, the value of any "claim" that LATI might hold against Tribune, in effect, is an asset of Tribune and ultimately would be available for the benefit of Tribune's creditors.

Any time a transaction or series of transactions involving affiliated entities involves circular book-entry movements of money, red flags of constructive and possibly intentional fraudulent transfers appear.  The transactions involving FinanceCo, Holdco, and LATI certainly seem suspect at first blush, but examination of the transactions and their impact on creditors reveals no evidence of impropriety.

**c.    Examiner's Conclusions and Explanation Concerning Intentional Fraudulent Transfer Claims in the Step Two Transactions.**

<u>Examiner's Conclusions</u>:

A court is somewhat likely to find that the Tribune Entities incurred the obligations and made the transfers in the Step Two Transactions with actual intent to hinder, delay, or defraud creditors to which the Tribune Entities were or became liable, on and after the date that such transfers were made or such obligations were incurred.

<u>Explanation of Examiner's Conclusions</u>:

The context in which the Tribune Entities incurred and made the Step Two obligations and transfers differed materially from what happened at Step One.  The period leading to Step One was characterized by two distinct phases:  the time preceding the April 1, 2007 Tribune Board approval of the Leveraged ESOP Transaction and Tribune's entry into the Merger Agreement and the time following those events and leading up to the Step One Financing Closing Date.  After these events occurred and during the period leading up to the Step Two

---

[101]    *See* Ex. 6 (Tribune Organization Chart); Ex. 189 at Annex I (Credit Agreement Subsidiary Guarantee); Ex. 206 (LATI Schedules indicating approximately $70,000 of intercompany debt owed by LATI).

32

Financing Closing Date, Tribune's actions were guided by its contractual rights and obligations

principally under the Merger Agreement (and related agreements entered into on April 1, 2007),

the Credit Agreement, and the Step Two Commitment Letter.  The Merger Agreement obligated

Tribune to exercise reasonable best efforts to effectuate the Merger,[102] including to "enforce its

rights under the Financing Commitments."[103]  The Credit Agreement and the Step Two

Commitment Letter (which, together, embodied the financing commitments in effect at the time

of the Step One Financing Closing Date), in turn, authorized Tribune to compel the LBO

Lenders to fund the Step Two Debt if the conditions precedent to that funding otherwise were

satisfied.  The main conditions to the Step Two Closing that Tribune had the power to influence,

if not control their procurement or satisfaction, were the Credit Agreement's and the Step Two

Commitment Letter's requirement of a solvency certificate and solvency representation as a

condition to the Step Two Funding and the Merger Agreement's requirement of a solvency

opinion as a condition to the Merger.[104]  The requirement of solvency as a prerequisite to Step

Two was viewed at the time of Step One as a form of built-in protection for Tribune and the

Tribune Board against the improvident incurrence of the Step Two Debt.[105]  In other words, if

---

[102]  Ex. 151 at §5.6(a) (Merger Agreement).

[103]  *Id.* at §5.11(a) (Merger Agreement).

[104]  *See* Report at §§ III.D.3.b., III.D.10.c.

[105]  *See* Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 20:14-20 ("I think Tribune I believe probably on the advice of Wachtell, Sidley and Skadden, I think the law firms advised the board in order to assure yourselves that you're not over extending the company, you should receive a solvency opinion, so I think it was Tribune that sought the solvency opinion.").  However, Mr. Kenney (Tribune's General Counsel) did not believe that obtaining a solvency opinion was going to present any difficulties.  Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 73:2-9; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 51:19-52:1-3 ("I think as I told you before it was Wachtel [sic] Lipton in step 1 that felt like it was important to have the solvency opinion as a way of protecting the board and the board only and so, you know, as we got into step 2 and there started to be, you know, solvency issues, they were the domain of Steve Rosenblum."); Examiner's Interview of Christina Mohr, June 29, 2010 ("The solvency requirement came from the board to protect itself and the Company.").  Citigroup's Christina Mohr in particular emphasized in her Examiner interview that whereas Tribune and its Financial Advisors had little difficulty with the amount of Step One Debt (particularly given the leveraged recapitalization alternative then under active consideration), this was not true with respect to the indebtedness contemplated at Step Two.  According to Ms. Mohr, there "was a lot of back and forth and

the Step Two Debt would render Tribune insolvent as that term was defined in the transaction

documents, Step Two was not supposed to happen.

The solvency opinion, the solvency certificate, and solvency representation were

inexorably related.  Without a Step Two solvency opinion, there was no reasonable likelihood

that management would give a solvency certificate and represent that Tribune was solvent,[106] and

without that opinion, the Merger could not occur.  Had these items not been obtained and

delivered, the Tribune Entities would not have incurred the Step Two Debt and the Selling

Stockholders would not have received almost $4 billion dollars in payments at Step Two.  Thus,

by design at Step One, a direct causal nexus exists between the obligations incurred and transfers

made at Step Two and the procurement and issuance of the solvency opinion and solvency

certificate and representation.

Not only did Step One and Step Two differ in context, but the difference in consequences

resulting from the two steps was stark.  As discussed in another part of the Report,[107] the

Examiner concludes that there is a high likelihood that the Step Two Transactions rendered

Tribune insolvent and without adequate capital (and a reasonable likelihood that the Step Two

Transactions rendered the Guarantor Subsidiaries insolvent and without adequate capital).  This

is in contrast to the Examiner's conclusions concerning Step One solvency and capital adequacy.

A clear demarcation therefore separates Step One and Step Two:  Before the Step Two Financing

Closing Date, the Tribune Entities' assets and revenue-generating capacity exceeded their

---

tug of war.  It wasn't flip or decided in an hour; it was a lot of soul searching." "People got up some mornings and were comfortable, and other mornings people said that they were uncomfortable with the risk.  It was reflected in the financing; people said it was skinny."  Examiner's Interview of Christina Mohr, June 29, 2010.

[106]  *See* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 135:11-18; Examiner's Sworn Interview of William Osborn, June 24, 2010, at 41:1-7.

[107]  *See* Report at §§ IV.B.5.d.(10)., IV.B.5.d.(11)., IV.B.5.d.(12).

liabilities and the likely demands imposed by creditors for payment of interest and principal when due.  After that date, this no longer was true.

Although insolvency and gross disparity in the consideration given and received are not prerequisites to finding an intentional fraudulent transfer in the way that they are for constructive fraudulent transfers, these are two of the six "badges" of an intentional fraudulent transfer.[108] Both existed at Step Two.  Without question, however, finding an intentional fraudulent transfer cannot rest on a conclusion that insolvency or capital inadequacy "could have been foreseen" on the eve of Step One.[109]  As previously noted, the law in the Third Circuit states that if the "natural consequence" of the debtor's actions is that its creditors will be hindered, delayed, or defrauded, a finding that an intentional fraudulent transfer occurred will follow.[110]  To conclude that an intentional fraudulent transfer occurred at Step Two, it need not be shown that the Tribune Entities set about to hinder, delay, or defraud creditors, only that the Tribune Entities knew that those consequences would follow naturally from their acts.

The Examiner's conclusion that a court is somewhat likely to conclude that the Tribune Entities incurred the obligations and made the transfers in Step Two with actual intent to hinder, delay, or defraud creditors is based on his review of the evidence taken in aggregate, the components of which are addressed below.

### (1)    Solvency and Value Received.

As noted, the Examiner finds in another part of the Report that it is either highly or reasonably likely that a court would conclude that the Step Two Transactions rendered each of the Tribune Entities insolvent and that these entities received far less than reasonably equivalent

---

[108]  *Id.* at § IV.B.4.a.

[109]  *Id.*

[110]  *Id.*

value for the obligations incurred and payments made. These are two badges of fraud. Standing alone, these badges are not sufficient to warrant a finding that an intentional fraudulent transfer occurred at Step Two. If they were, then every constructive fraudulent transfer would qualify as an intentionally fraudulent one. As shown below, however, the Examiner finds that a series of facts under the general rubric of secrecy, concealment, or dishonesty tend to support the conclusion that the Step Two Transactions were intentionally fraudulent transfers.

### (2)    The Refinancing Representation.

During a December 2, 2007 telephone conversation between two members of Tribune's senior financial management (Donald Grenesko and Chandler Bigelow) and Bryan Browning of VRC, Mr. Grenesko and/or Mr. Bigelow reported to Mr. Browning certain statements allegedly made previously by Thomas Whayne of Morgan Stanley to the two of them concerning the question whether Tribune could refinance its indebtedness in 2014.[111] The statements attributed to Mr. Whayne did not relate to just any matter: they involved the condition that VRC's opinion letter committee had imposed as a precondition to authorizing VRC to issue its solvency opinion — namely, a representation that Tribune could refinance its debt in 2014 under a scenario in which much of Tribune's debt would come due and Tribune otherwise would run out of money. Because a favorable solvency opinion was the principal remaining condition to the Step Two Closing, at least from Tribune's perspective, satisfaction of VRC's concerns regarding the refinancing question was the principal remaining issue standing in the way of that closing. The relevant conversations occurred before a scheduled Tribune Board meeting to consider VRC's analysis and just after VRC's opinion letter committee had met and raised the refinancing assumption as a gating issue.

---

[111]    *Id.* at § III.H.3.g.(4).

In their December 2, 2007 conversation with Mr. Browning, Mr. Grenesko and/or Mr. Bigelow told Mr. Browning that Morgan Stanley agreed that Tribune could refinance its debt in a 2014 downside scenario.[112]  VRC then apparently proceeded to rely, in its solvency opinion, on a Tribune representation setting forth management's belief that Tribune could refinance its debt based in part on discussions between Tribune management and Morgan Stanley.  Yet, in his sworn interview Mr. Whayne testified that he never told anyone at Tribune that Morgan Stanley agreed that Tribune's debt could be refinanced when much of it was scheduled to come due and, indeed, specifically refused Mr. Grenesko's and Mr. Bigelow's entreaties to have Morgan Stanley weigh in on that question.[113]  Although Morgan Stanley did furnish Tribune management with precedent debt issuances and leveraged ratios in response to management's request, Mr. Whayne testified that in doing so he was "crystal clear" that Morgan Stanley was not making or offering its own assessment that Tribune could refinance, or agreeing with Tribune's assessment.[114]  Mr. Whayne noted that Mr. Grenesko "was looking for us very actively to help him with the work underlying his solvency [certificate]," including "to do the analysis for him and actually to do the [calculations] . . . to prove that there was equity value."[115]  Mr. Whayne testified that he explained to Mr. Grenesko that Morgan Stanley was willing to do no more than provide information such as "publicly available data around where high yield bond or leverage loans are trading . . . but what we will not do is go beyond that.  So we'll provide you facts, but not

---

[112]    *Id.*  Tribune General Counsel Crane Kenney was also on the call, and VRC's Mose Rucker may have participated, too.  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 256:5-16.  Mr. Kenney testified that he had no recollection of what Morgan Stanley said on this topic.  Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 43:16-44:16, 47:13-19, 48:15-21.

[113]    Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 84:12-87:21.

[114]    *Id.* at 94:17-96:20.

[115]    *Id.* at 95:3-14.

judgments."[116]  Although Mr. Grenesko testified that Morgan Stanley told him that it "would be reasonable to assume that the company could refinance in 2014,"[117] and Mr. Bigelow testified that "they [Morgan Stanley] communicated that it was reasonable for us to believe that we could refinance,"[118] neither of them had any specific recollection of the December 2, 2007 telephone conversation.[119]

The disputed testimony regarding who said what in telephone conversations among Morgan Stanley, Tribune, and VRC held over two years ago, and how Tribune management and VRC used this information to address the refinancing question, are not the beginning and end of the matters adduced in this Investigation relating to these events.  After VRC's opinion letter committee determined to issue VRC's opinion purportedly in reliance on Tribune's representation to VRC concerning refinancing, the Lead Banks posed questions (and then follow-up questions) to Tribune regarding this assumption, and discussions transpired between Tribune and VRC regarding the content of the representation letter that Tribune would issue to VRC concerning refinancing.  Both Tribune's responses to the Lead Banks and its representation letter to VRC concerning Tribune's ability to refinance its debt referred to management's discussions with Morgan Stanley as support for management's view that Tribune could refinance its debt in the downside scenario in 2014.[120]  The record indicates that, on December 12, 2007, Mr. Bigelow

---

[116]  *Id.* at 96:1-13.

[117]  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 100:10-101:4 (including Mr. Grenesko's testimony both before and after the statement excerpted in text).

[118]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 200:7-201:20 (including testimony preceding the portion excerpted in text).  Similarly, at a later point in his sworn interview, Mr. Bigelow characterized management's discussions with Morgan Stanley as having "left us with the impression that it would be reasonable to assume we could refinance."  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 199:5-6, 210:9-15 ("Q.  What I'm asking is, do you have any specific recollection of Morgan Stanley telling you that it would be reasonable to refinance?  A.  Again, I don't recall the conversation, but my present recollection as I sit here today and look at these materials is yes, they did that.").

[119]  *See* Report at § III.H.3.g.(3).

[120]  *Id.* at §§ III.H.3.g.(10) and III.H.3.g.(12).

forwarded to Mr. Whayne an e-mail containing the follow-up questions posed by the Lead Banks including, "does VRC know whether Morgan Stanley understands that Tribune is relying upon its view?"[121]  Mr. Whayne stated to the Examiner that although he does not recall receiving Mr. Bigelow's e-mail with the lenders' follow-up questions, he does not doubt that he did, in fact, receive it.[122]  Based on the Examiner's review of the relevant e-mails and Mr. Whayne's further testimony, however, management never told Morgan Stanley that Tribune's representation letter or VRC's opinion would refer to Morgan Stanley.  Mr. Whayne testified during his interview with the Examiner that he never told Tribune management that Morgan Stanley believed or concurred with any belief that Tribune could refinance indebtedness in the future,[123] and that if Mr. Whayne had seen the representation letter or a draft of it, he would have said "take our name out.  You're not allowed to . . . rely on anything that we said for purposes of this relationship that you have with VRC."[124]  Mr. Whayne stated that it was not until he was shown these documents in his interview with the Examiner that he was made aware of their contents.[125]  Paul Taubman of Morgan Stanley similarly testified that he would have "objected":[126]

> [on] the basis that, first of all, on many, on many bases.  One is I don't know what discussions they're referring to, what information they believe that they received from Morgan Stanley, what analysis was shared with them, what was said and I certainly would not have been comfortable with any, anything we said becoming the basis for a VRC solvency opinion since we had very carefully adhered to the policy that we were not providing these opinions or assisting it.

---

[121]  Ex. 755 at VRC0070618-19 (Rucker E-Mail, dated December 12, 2007).

[122]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 107:22-109:10.  Mr. Whayne stated he had no recollection of reading the e-mail.

[123]  *Id.* at 75:7-80:14.

[124]  *Id.* at 140:1-8.

[125]  Examiner's Interview of Thomas Whayne, June 11, 2010; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 21:3-22:1.

[126]  Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 92:6-16.

Tribune's response to the LBO Lenders and its representation letter on refinancing, and VRC's opinion referring to Tribune's representation, all referred to discussions between management and Morgan Stanley concerning the refinancing question, but did not discuss the contents of those communications.[127]   Those documents stated just enough to create the impression that Tribune's views on this question had the benefit of Morgan Stanley's blessing, without stating so explicitly.   Indeed, several witnesses told the Examiner that they thought Morgan Stanley concurred that Tribune could refinance its debt.[128]

This is no accident:  Mr. Bigelow testified that the Lead Banks' follow-up questions were answered verbally, with no written response.[129]   Tribune furnished verbal responses during a December 17, 2007 conference call with the Lead Banks that included, among others, representatives of Murray Devine, a firm hired by the Lead Banks to "educate" them on solvency

---

[127]   *See* Report at §§ III.H.3.g.(10)., III.H.3.g.(12)., and III.H.3.g.(13).

[128]   Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 240:10-17 ("So if your question is do I think Morgan Stanley told them they can refinance the debt, based upon the representation letters that we received, if I'm correct, unless I'm mistaken, I do think that Morgan Stanley told them that."); Examiner's Interview of Rajesh Kapadia, June 25, 2010 (Q:  "As I read this, [quote from e-mail] it says "if we were to fund stage 2", then the company may well have a great deal of difficulty.  Was there a question? A:  Yes, that is the topic.  I think we had asked this question of the company through their experts they had provided some perspectives on it and I believe the company sought Morgan Stanley or somebody's opinion on the company's ability to refinance debt as it comes to you."); Examiner's Interview of Jeffery Sell, June 3, 2010 ("I think they had relied on expert advice from a third party.  This was part of the solvency opinion and at the end of the day we were satisfied.").  However, in response to the question, "If you had known then before the closing of step 2 that one of Tribune's financial advisors refused to make a representation that Tribune would be able to refinance the debt and instead the company made that representation would that have changed your opinion?," Mr. Sell stated: "Putting the solvency opinion aside, probably not."  *Id*. Daniel Petrik of BofA offered similar testimony.  Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 133:2-16 ("Q:  Would it have mattered whether management had discussions with Morgan Stanley about its ability to refinance or not? A:  Not to me it wouldn't.  Q: Because you were focused on the revolver? A: Yes.  And my relationship was with Tribune I mean, the fact that they got advice from another party or a confirmation from another party is always nice in the same way I ask for audited financial statements, it is an extra set of eyes providing me with an independent validation of their numbers.  In this way it is kind of an independent addition to the Tribune's view.").

[129]   Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 241:4-10.  Mr. Grenesko did not recall the questions or whether any answers were given.  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 143:18-144:20.

matters.[130]  The Murray Devine representative's handwritten notes from that call state:  "Co. has used Morgan Stanley as solvency advisory.  Mgt. believes company is solvent and can service debt."[131]  Notes produced by a JPM attendee on the conference call state:  "VRC is independent & Morgan Stanley to review solvency."[132]  The notes further indicate:  "'Accurate & complete.' -- VRC Report," and directly afterward:  "'MS assumptions & recommendations fair & reasonable in light of fairness opinion.'"  The quotation marks appear to represent what was stated on the call.  Later, the notes state:  "MS will be @ board mtg to answer questions."[133]  The notes indicate that participants on the call included "TRB Team, Citi, Merrill, JPM, Counsel," but do not list Morgan Stanley as an attendee.  Finally, the Merrill Entities produced a document entitled "Tribune Company - Preliminary Draft Board of Directors Presentation" (which Mr. Bigelow circulated in advance of this conference call)[134] during this conference call, with a handwritten notation at the top of the cover page stating:  "Fair and reasonable\ - MS believes this as well."[135]

Given the references to Morgan Stanley and its services and opinions concerning solvency in the above-referenced notes from the December 17, 2007 conference call, which the Examiner discovered late in the Investigation and after the completion of most witness

---

[130]  Ex. 757 (Handwritten Notes of Murray Devine Representative, dated December 17, 2007) (five pages of notes from a conference call with Tribune management addressing Lead Banks' follow-up questions).  Examiner's Interview of Rajesh Kapadia, June 25, 2010 (hiring and role of Murray Devine).

[131]  Ex. 757 at MD000550A (Handwritten Notes of Murray Devine Representative, dated December 17, 2007).  The author of these notes testified that he had no recollection of a statement made at the meeting about Tribune's use of Morgan Stanley for solvency advisory services.  Examiner's Sworn Interview of Thomas Kenny, July 9, 2010, at 50:22-24-51:2-3.  The Examiner was unable to obtain a transcript of this call or ascertain whether one exists.

[132]  Ex. 890 at JPM_00499993 (Handwritten Notes of JPMCB Representative).  The notes are dated December 17, 2006, although from the context it is clear they refer to the December 17, 2007 conference call.

[133]  Id. at JPM_00499996.

[134]  Ex. 886 at JPM_00450061 (Bigelow E-Mail, dated December 17, 2007) (forwarding to Lead Banks VRC's draft December 18, 2007 solvency analysis for "discuss[ion] with you on our call this afternoon").

[135]  Ex. 859 at ML-TRIB-0009950 (VRC Preliminary Solvency Analysis, dated December 18, 2007).

interviews, the Examiner's counsel contacted Morgan Stanley's counsel and asked, in writing, whether anyone from Morgan Stanley was invited to attend the December 17, 2007 conference call or any other call or meeting on or about that date or had any comments regarding the notes prepared by JPM of that call.[136]  Morgan Stanley's counsel responded in writing as follows:[137]

> I am writing on behalf of [Morgan Stanley] in response to your July 12, 2010 email inquiring as to (i) Morgan Stanley's knowledge of a December 17, 2007 conference call or meeting held between Tribune and the [Lead Banks] relating to VRC's solvency opinion, and (ii) Morgan Stanley's understanding of its role in or around December 2007 as it related to providing advice regarding Tribune's solvency.
>
> Mr. Whayne has no recollection of ever being invited to that conference call or meeting, nor was he aware at that time that such a conference call or meeting was going to take place.  As such, given that Mr. Whayne was not a participant at the meeting, he cannot confirm the accuracy or substance of the handwritten notes attached to your [e-mail].

A fair inference from the notes is that Tribune told the Lead Banks that VRC's solvency opinion had Morgan Stanley's blessing in a conference call that Morgan Stanley did not attend. As discussed later in this Section of the Report, this was not the last time that Tribune used views allegedly attributed to Morgan Stanley, but disputed by Mr. Whayne and Mr. Taubman in the course of the Investigation, to endorse VRC's solvency work.

The Examiner invites the reader to review the detailed narrative setting forth these events contained in the Report.[138]  The Examiner's conclusions, based on the record and his participation in the relevant witness interviews, are as follows:  (i) the statements of Mr. Grenesko and/or Mr. Bigelow to Mr. Browning on December 2, 2007 concerning Morgan

---

[136]  Ex. 1043 (Nastasi E-Mail, dated July 12, 2010).

[137]  Ex. 1044 (Letter from Jonathan Polkes, dated July 19, 2010).

[138]  *See* Report at § III.H.3.g.

Stanley's views on the refinancing question were not accurate; (ii) these statements appear to have served as a predicate on which VRC concluded that it would accept Tribune's representation on Tribune's ability to refinance; (iii) the statements contained in Tribune's representation letter to VRC on refinancing referring to management's discussions with Morgan Stanley created a false impression that Morgan Stanley told management it concurred with management's views concerning the refinancing question; (iv) the statements apparently made by Tribune to the Lead Banks concerning Morgan Stanley's involvement in VRC's opinion were false; and (v) the preceding events led directly to VRC's issuance of its Step Two opinion letter, the solvency certificate, the solvency representation, and hence the Step Two Closing.

In drawing these conclusions, the Examiner evaluated the entire record adduced and considered whether the discrepancy in the testimony can be reconciled, if the testimony is irreconcilable, whether there is any basis to conclude that one person's recollection of what happened is more plausible than another's, and whether these events made any difference to whether Step Two ultimately closed.  These considerations are discussed below.

(i)        <b>Attempting to Reconcile the Testimony.</b>

As noted, although Mr. Whayne was emphatic in his testimony to the Examiner that he never told Tribune management that Morgan Stanley agreed that Tribune could refinance its indebtedness in 2014 and had never authorized Tribune to advise VRC of any such thing, Mr. Whayne did testify that in the course of his conversations with management he may have said "that you could refinance it," "with the emphasis on you [*i.e.*, management] could make that assumption, but . . . I never would have said [Morgan Stanley] would make that assumption."[139]

---

[139]    Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 75:17-76:6, 79:5-9; *see also* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 201:18-20 (asserting that Morgan Stanley "communicated that it was reasonable for us to believe that we could refinance"); *Id.* at 199:5-6 (characterizing

In addition, Mr. Whayne did furnish precedent transaction information to management addressing the question of Tribune's ability to refinance its debt.[140]  Mr. Whayne, however, was equally emphatic that in doing so he made it very clear to Tribune personnel that Morgan Stanley was not making its own assessment that Tribune could refinance its debt.[141]  As noted, for their part, neither Mr. Bigelow nor Mr. Grenesko had any specific recollection of their December 2, 2007 conversation with Mr. Whayne, although Mr. Grenesko testified Morgan Stanley had communicated that it would be reasonable to assume that the company could refinance in 2014,[142] and Mr. Bigelow testified that "[Morgan Stanley] communicated that it was reasonable for us to believe that we could refinance."[143]

The Examiner considered whether Mr. Bigelow and Mr. Grenesko could have construed Mr. Whayne's statements to them, and Morgan Stanley's provision of precedent information, as conveying that whereas Morgan Stanley was not in a position to agree with a management position that Tribune could refinance its debt, Morgan Stanley did agree that *management* could reasonably conclude that Tribune could refinance its debt.  The Examiner, however, does not

management's discussions with Morgan Stanley as having "left us with the impression that it would be reasonable to assume we could refinance").

[140]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 91:22-93:18.  During his informal interview with the Examiner, Mr. Whayne noted that it was his personal belief that it was not "an unreasonable assumption at the time" for management to assume Tribune could refinance in 2014 and 2015.  Examiner's Interview of Thomas Whayne, June 11, 2010.  In his sworn testimony, Mr. Whayne expressed the view that the precedent transactions, however, would not support the conclusion that Tribune could refinance its debt in 2014: "Well, because those multiples would, would only have been useful as one of a number of analyses to try to validate whether or not the company was actually solvent at that point in time.  That's --- and that's a snapshot as of that date.  It doesn't have anything to do with whether the company would have a liquidity profile going forward and being able to pay off its debt X years down the road."  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 82:21-83:7.

[141]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 94:17-96:20.

[142]  *See* Report at § III.H.3.g.(3); s*ee also* Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 202:2-203:5; Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 121:4-6 ("I believe there was a call, but I don't specifically remember the details of the call."); *id.* at 121:18-20 ("Q:  What do you recall was told to the VRC people on the telephone call?  A:  I don't recall.").

[143]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 200:7-201:20 (including testimony preceding the portion excerpted in text).

find that this is a plausible explanation for the disparity between what Mr. Whayne testified he told Mr. Bigelow and Mr. Grenesko, what they testified Mr. Whayne said to them, and what they and/or other members of Tribune's senior financial management reported to Mr. Browning regarding Morgan Stanley's position on the refinancing question.  Mr. Browning's notes from his conversation with Tribune management on December 2, 2007 (written after the conversation, using less comprehensive notes that he apparently jotted down during the call) state:  "MS said they believe it would be refinanceable at the levels outlined in the downside case and that would be before any asset sales."[144]  Consistent with his notes, Mr. Browning testified in his sworn interview that:[145]

> We had discussions with management about refinancing and where the sources of refinancing would be, generally speaking.  Then we also had, during those discussions, . . . I think management said, well, Morgan Stanley has told us that we can refinance at those levels even . . . under the downside scenario, they believed they still could refinance the debt. . . .
>
> And then we asked how they knew that or why they thought that, and they said Morgan Stanley has data that would support them being able to do that.  And I think it was a number of comparables or a number of transactions that were out there.  And we asked if they could provide that information to us, which they did.  They provided a schedule of transactions that had high LBO debt.

Although Mr. Browning understood that Morgan Stanley was unwilling to provide a written representation to that effect,[146] the record shows that one or both of Mr. Bigelow or Mr. Grenesko told Mr. Browning that Morgan Stanley agreed that Tribune could refinance its debt.[147]

---

[144] Ex. 748 (Handwritten Notes of Bryan Browning, dated December 2, 2007); Ex. 747 (Handwritten Notes of Bryan Browning, dated December 2, 2007).

[145] Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 214:9-215:12.  *See also Id.* at 289:3-6 ("[W]e felt that what management was telling us that Morgan Stanley said was, in fact, the case.").  When asked "who at the company did you speak with?," Mr. Browning replied:  "I think it was a team of people.  Probably Chandler [Bigelow], maybe Don Grenesko, and maybe Crane Kenney . . . and others.  I'm not sure, but there was a team that we typically talked to when we had conference calls."  *Id.* at 215:21-216:8.

[146] *Id.* at 272:8-273:17.  The Examiner found no evidence that VRC had any reason to disbelieve what senior management told them about Morgan Stanley's position.

[147] As noted above, Tribune General Counsel Crane Kenney was also on the call, but he testified that he had no recollection of what was said.  Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 43:1-44:16, 47:13-19, 48:15-21.  The Examiner found Mr. Kenney to be a credible witness.

45

The statements made to Mr. Browning concerning Morgan Stanley's views were unequivocal.  In contrast, Mr. Whayne credibly told the Examiner that he never said what Mr. Bigelow or Mr. Grenesko reported that he had said to Mr. Browning,[148] specifically refuting contrary testimony read to him in his sworn interview.[149]

As noted, Mr. Bigelow forwarded to Mr. Whayne the e-mail containing the follow-up questions posed by the Lead Banks asking whether Morgan Stanley knew that Tribune is relying on its view concerning refinancing.[150]  This fact undercuts the suggestion that Mr. Bigelow attempted to hide from Mr. Whayne what was said to VRC and the Lead Banks about Morgan Stanley's involvement (although it does not appear that Mr. Whayne had any involvement in responding to the LBO Lenders' follow up questions).[151]  As also noted, however, the record reflects that management never told Morgan Stanley that Tribune's representation letter or VRC's opinion would refer to Morgan Stanley or that VRC's opinion would so state.  Despite having left no reason to doubt what Morgan Stanley's position was on the refinancing question in their conversation with Mr. Browning, the communications generated by Tribune senior financial management afterward referred generically to conversations between Morgan Stanley and management and Morgan Stanley's involvement, without disclosing details.  As observed above, this left the impression that Morgan Stanley was in accord with Tribune's views.  Then, in one of the last communications with the Lead Banks before the Step Two Closing (outside of Morgan

---

[148]    Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 76:7-14. ("Q:  On the call between management and Morgan Stanley earlier this day on December 2nd, did anyone from Morgan Stanley tell Dennis FitzSimons, Don Grenesko or Chandler Bigelow that Morgan Stanley concurred with Tribune that it would be able to refinance its debt even in the downside case? A:  No.").

[149]    *Id.* at 154:6-156:1.

[150]    Ex. 755 at VRC0070618-19 (Rucker E-Mail, dated December 12, 2007).

[151]    *See* Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 110:16-21.

Stanley's presence), Tribune apparently stated that Morgan Stanley had provided solvency advisory services and allegedly made favorable analyses and recommendations concerning VRC's opinion.  As discussed elsewhere in the Report, Morgan Stanley performed no such services or evaluation.[152]

The Examiner finds that the versions of what transpired cannot be reasonably reconciled based on a good faith misunderstanding at the time between Mr. Whayne and the Tribune personnel with whom he interacted, or a good faith misunderstanding of Morgan Stanley's services in connection with VRC's solvency opinion.

### (ii)    Assessing the Conflicting Testimony.

The Examiner considered the fact that, at the time these events transpired, Morgan Stanley was attempting to convince the Special Committee to award Morgan Stanley a discretionary fee in the days preceding the closing of Step Two.[153]  This raises the question whether Morgan Stanley had a motive to help management clear the refinancing hurdle presented by VRC and otherwise evaluate and approve of VRC's solvency work, which in turn would pave the way for the Step Two Closing and possibly additional compensation to Morgan Stanley.  Mr. Whayne testified that Morgan Stanley personnel had no motive to ingratiate themselves with management, noting that Morgan Stanley did not represent Tribune or management.[154]  The Examiner found Mr. Whayne and Mr. Taubman to be credible and their version of the events also was more plausible:  Morgan Stanley would have no reason to interject

---

[152]    *See* Report at § III.H.4.c.(2).(i).

[153]    Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 141:18-142:1-3.

[154]    *Id.* at 144:2-11 ("Management didn't have any standing on whether we were going to be paid a discretionary fee because that's not who we were working for.  Our client was the special committee.  Our letter was to the special committee, and it was Bill Osborn obviously  consulting with other special committee members who would make the decision whether or not it was  appropriate to pay us a discretionary fee.  Nothing to do with management.").

itself in the assumptions underlying VRC's solvency opinion or Tribune's representation to VRC, or even to suggest to Tribune management that it could rely on Morgan Stanley to address VRC's concerns.

On the other hand, albeit in greatly varying degrees, the members of senior financial management involved in these events stood to receive substantial compensation if Step Two closed.[155]  In addition, although Mr. Bigelow testified that he did not have any discussion with the Zell Group regarding his promotion to Chief Financial Officer of Tribune until well after the Step Two Closing,[156] it appears that he had developed a strong, positive working relationship with the Zell Group.[157]  Nils Larsen of EGI gave the Examiner a window into what Mr. Bigelow might have reasonably thought about his future under new Tribune ownership:[158]

> Q.  Did you tell Chandler Bigelow that there would be a place for
>      him in the company after the closing of Step 2?
>
> A.  Whether I told him in those type of words, I think we certainly
>      would have signaled that we thought he was a very talented
>      individual and, you know, somebody who the company would
>      not be better off if he were to leave.

---

[155]  *See* Report at § III.F.8.

[156]  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 36:1-5.

[157]  Before Step One closed, for example, Mr. Bigelow passed on to Nils Larsen a privileged communication from Tribune's counsel.  *See* Ex. 603 (Bigelow E-Mail, dated March 29, 2007); Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 115:10-117:12.  Mr. Bigelow was also first on Mr. Larsen's list of "allies" within Tribune, *see* Ex. 827 (Larsen E-Mail, dated October 5, 2007) (responding with three names — Chandler Bigelow, Crane Kenney, and Dave Eldersveld—to a request for the names of "allies inside Tower" who could be trusted to "drink the Kool Aid"), and Samuel Zell stated during his interview with the Examiner that Mr. Bigelow was "a breath of fresh air in a world of obfuscation."  Examiner's Interview of Samuel Zell, June 14, 2010.

[158]  Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 62:7-22.  Mr. Larsen also expressed admiration for Mr. Kenney.  *Id.* at 63:15-20 ("I did not have any conversations with him with regard to a promotion, you know. Crane again I think was certainly a very talented, you know, individual, and again I think the company would have been better off, you know, with his active services.").  Mr. Larsen, though, expected that Mr. Kenney would not stay with Tribune long term.  *Id.* at 63:21-65:1.  Mr. Grenesko testified that his intention at the time was to stay at Tribune but that he did not have discussions about his future.  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 213:17-214:10.  In contrast, Tribune Chief Executive Officer Dennis FitzSimons was told that he would not be staying on.  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 107:1-8.

Q. Did you personally have discussions with Chandler Bigelow
that you believe at the time would have led Chandler Bigelow
to believe that there would be a place for him in the company
after the closing of Step 2?

A. I'm sure that he would have gotten the sense from
conversations with me that I thought that he was a valuable
member of the team.

As discussed in another part of the Report, in the period following Step One, Tribune's
financial performance declined, as did the price of its stock.  Despite these setbacks, Tribune's
management had generated what can be fairly described as aggressive projections, and VRC had
exhibited a willingness to favorably opine on solvency based on those projections, but subject to
the satisfactory resolution of the refinancing question.  Tribune had procured favorable Step Two
Financing that could not be replicated in the then prevailing market and would be lost if Step
Two did not close,[159] and the prospective new owners wanted Step Two to happen.  Tribune no
longer could use Tribune's two Financial Advisors, MLPFS and CGMI, which had recused
themselves, and Morgan Stanley was not prepared to offer much assistance.[160]  When VRC put
the onus on Tribune management to address VRC's stated concern on refinancing, management
in turn had a strong incentive to try to obtain some cover from an outside advisor.  At that time,
Morgan Stanley was the only advisor within the vicinity of Tribune that was left.  The Examiner

---

[159]   Tribune General Counsel Crane Kenney testified that Tribune retained Quinn Emanuel Urquhart & Sullivan,
LLP in case the Lead Banks attempted to back out of their Step Two commitments.  Examiner's Sworn
Interview of Crane Kenney, July 8, 2010, at 16:18-17:3 ("But between the special committee, you know, the
company, the Chandlers, you know, you had a team of lawyers looking -- lawyers and bankers looking at every
aspect of the deal, and on top of that I remember telling my CEO I want to hire yet another law firm specifically
to make sure if they breach our commitment we have recourse.  That was Quinn [Emanuel].").

[160]   Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 24:10-25:2 ("Well, as we discussed last time,
you know, there were a number of discussions with management, you know, with Mr. Gresenko as well as
Mr. Bigelow where particularly Mr. Gresenko had asked us to help him do a lot of the underlying work and
analysis that was going to be part of his solvency certificate.  We said no, we could not help him with that and,
you know, he didn't like that answer and we had a number of subsequent discussions on that.  I believe
Chandler was part of a lot of those phone calls so he sort of knew, you know, what our position was on that
issue. So, you know, so we certainly had discussions around solvency and we said no."); *see also* Examiner's
Sworn Interview of Paul Taubman, July 1, 2010, at 38:7-14.

believes that, faced with all of these circumstances, Mr. Bigelow and/or Mr. Grenesko in advance of the scheduled December 4, 2007 Tribune Board meeting pushed the envelope beyond what Morgan Stanley had said to them, in order to get past the final major hurdle standing in the way of the Step Two Closing.  Having succeeded in doing so, the persons involved then were able to create the impression that Morgan Stanley agreed that Tribune could successfully refinance its debt by referring to conversations between Morgan Stanley and management.  Two weeks later, Tribune then went further and apparently told the Lead Banks that Morgan Stanley actually had evaluated and concurred with VRC's solvency opinion.

The Examiner's conclusions are reached without the necessity of assessing whether one or more witnesses were not candid in their interviews with respect to these issues.  Presented with Mr. Whayne's rather emphatic and, the Examiner finds, credible testimony concerning what did and did not transpire and the conflicting statements made by one or more members of Tribune's senior financial management to VRC about what he had said, the Examiner attempted to determine what actually happened when those events transpired.  For the above-discussed reasons, it is the Examiner's view that Mr. Whayne's version of events is more plausible and more consistent with the contemporaneous documentary record.

### (iii)    Did These Events Make a Difference?

Finally, the Examiner considered whether these events made any difference to the eventual Step Two Closing.  This inquiry contains two subparts.  First, did statements made to VRC concerning Morgan Stanley's position affect VRC's decision to issue its opinion?  Second, did Tribune make false written responses to the Lead Banks and a false representation letter to VRC referencing discussions with Morgan Stanley concerning refinancing?

The first question is largely a matter of conjecture.  The record shows that VRC wanted management to confer with Morgan Stanley about the refinancing question "[b]ecause [this] was

50

a highly leveraged transaction, and we wanted to make sure that [prospective ability to refinance] was a fair assumption. So we took it very seriously. It [was] something that . . . the committee wanted to make sure . . . was looked at very closely."[161]  Although Mose Rucker testified that VRC probably would have issued its solvency opinion even if Morgan Stanley in fact had not concurred with management's views on this question,[162] both Mr. Rucker and Mr. Browning further testified that had any management dishonesty regarding this matter come to light, this likely would have caused VRC to reevaluate its reliance on what management had told them about this and perhaps other matters.[163]  For reasons discussed in another part of the Report,[164] however, it is exceedingly difficult for the Examiner to understand VRC's actions in the period leading up to the Step Two Closing and issuance of its solvency opinion, and the Examiner does not have a clear picture of VRC's various interactions with management during that time. The Examiner believes that, ultimately, a court need not answer the question "what if." One cannot know what would have happened had the above-described events come to light before the Step Two Closing. What is known is that this was not a tangential episode. It is worth stating again that without the management representation on refinancing satisfactory to VRC, VRC would not issue its opinion.[165]  The events that did unfold lead directly to VRC's issuance of its opinion and to the Step Two Closing.

To address the second question (the truthfulness of Tribune's response to the Lead Banks and Tribune's representation to VRC regarding the refinancing question), it is necessary to focus

---

[161]  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 216:22-217:7.

[162]  *Id.* at 243:18-24 ("Because we rely upon --heavily upon our own analysis, even though we get rep letters from management or we may get rep letters from other parties. At the end of the day, our own analysis has to support those conclusions."). This testimony is consistent with the view expressed by Mr. Sell.

[163]  *Id.* at 305:5-10, 307:2-6 ("So you have to rely upon the veracity of management. And if you find out that you have been lied to, the question becomes: What else have you been lied about.").

[164]  *See* Report at § III.H.3.f.

[165]  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 307:22-25.

on what these documents said as well as the background of the statements.  Tribune's response to

the Lead Banks dated December 7, 2007 stated:[166]

> VRC has assumed that the Company will be able to refinance its
> debts as they become due.  This assumption is based upon a review
> of the forecasted total debt and guaranteed debt leverage ratios at
> the time of the required refinancing, recent leveraged debt
> multiples, and representation from the Company which states that
> based upon recent discussions with Morgan Stanley, the Company
> would be able to refinance debt in its downside forecasts without
> the need for additional asset sales.

Tribune's December 20, 2007 representation letter to VRC stated:[167]

> Based upon (i) management's best understanding of the debt and
> loan capital markets and (ii) management's recent discussions with
> Morgan Stanley, management believes that it is reasonable and
> appropriate for VRC to assume that Tribune, in the downside
> forecast . . . delivered to VRC via email on November 21, 2007
> ("Tribune Downside Forecast"), would be able to refinance (i) any
> outstanding balances of Term Loan B under the Credit Agreement
> dated May 17, 2007, as amended (the "Credit Agreement"), that
> mature in 2014 and (ii) any outstanding balances under the Senior
> Unsecured Interim Loan Agreement to be dated as of the closing
> date (or any notes issued to refinance such facility) that mature in
> 2015, in each case, without the need for any asset sales other than
> those incorporated into the Tribune Downside Forecast.

Both writings referred to discussions with Morgan Stanley, without disclosing what

Morgan Stanley had said.  Tribune's response to the Lead Banks states the basis on which VRC

assumed that the debt could be refinanced and the content of the representation Tribune would

give to VRC.  The Examiner does not have any specific basis to dispute that the statement

represents what VRC believed at the time.  Tribune's representation letter to VRC states that,

based on the two stated predicate assumptions, "management" believes that the refinancing

assumption is reasonable.  Senior financial management certainly had discussions with Morgan

Stanley about this matter and did receive precedent transaction information from Morgan

---

[166]  Ex. 281 at TRB0398562 (Memorandum from Mr. Browning and Mr. Rucker to Mr. Bigelow, dated
December 7, 2007).

[167]  Ex. 739 (Letter from Donald Grenesko to VRC, dated December 20, 2007).

Stanley.  Thus, the statement might be literally correct if, in fact, management based its belief on discussions with Morgan Stanley.  The problem, however, is that the representation letter does not appear to tell the whole truth.  It does not disclose that Morgan Stanley would not opine, formally or informally, on the refinancing question.  If Mr. Whayne's testimony is to be believed, moreover, the letter fails to disclose that Morgan Stanley was asked and refused to ascribe to management's views on the subject of the representation.  The statements apparently made by Tribune to the Lead Banks at the December 17, 2007 conference call concerning Morgan Stanley's alleged involvement in VRC's opinion provide context and raise particular concerns regarding Tribune's honesty in this matter.[168]

The Examiner recognizes that the events described in this Section occurred over a short span of time well over two years ago.  Having conducted lengthy witness interviews involving the participants referred to in this Section and having reviewed the underlying documents, however, the Examiner finds that the evidence adduced shows that Tribune, acting through one or more of its senior financial management members, was not honest in this matter and that these circumstances directly related to the satisfaction of the closing conditions to Step Two.  These circumstances, standing alone, might not be sufficient in the Examiner's view to support a finding of an intentional fraudulent transfer, but, considered in tandem with the other considerations discussed in this Section of the Report, do support such a finding.

Finally, the Examiner appreciates that the above phrase, "one or more senior financial management members," does not identify, by name, who was or might have acted in this fashion. The Examiner chose this phrase carefully.  As discussed in the Report, as required by the

---

[168]   In the context of evaluating the good faith of the Lead Banks for purposes of applying defenses to constructive fraudulent transfer claims, the Examiner also evaluated whether these events furnish a basis for those lenders to assert that they are entitled to good faith defense under Bankruptcy Code section 548(c).  *See* Report at § IV.B.7.b.(3). to §IV.B.7.b.(8).

Bankruptcy Court's order, the Examiner conducted the Investigation on an expedited basis.  It

was not possible to interview (and re-interview) all of the people the Examiner would have, had

he had more time.  Given the compressed time frame, the Examiner simply was not able to

conduct the inquiry necessary to conclusively identify specific individuals as having engaged in

dishonesty.  The Examiner has done his best in the Report to set forth the facts adduced in the

Investigation, but determined that it would be premature to draw conclusions regarding specific

individuals.  The Examiner cautions that the Report's use of the phrase, "one or more senior

financial management members," should not cast a shadow of suspicion on individuals who

acted innocently and in good faith.

(3)    **Information Concerning Out-Year Growth Rate Assumptions and Valuation Implications of Such Assumptions.**

As discussed in greater detail in the Report,[169] Tribune management's October 2007

forecast contained an important and, the Examiner believes, unjustifiable growth rate assumption

for the years 2013 to 2017, by assuming that the consolidated growth rate of 2.4% from 2011

to 2012 (an election year) would be replicated each year from 2013-2017.  The election year-

inspired extrapolation growth rate was replicated for each and every year through 2017, resulting

in a compounding that effectively assumed every year beyond 2012 would be an election year.

Tribune Chief Financial Officer Donald Grenesko acknowledged in his sworn interview that

Tribune applied the assumed growth rate across all of Tribune's business segments.[170]  This

---

[169]    *See* Report at § III.H.3.f.(1).

[170]    Mr. Grenesko testified:  "You have to look at them individually.  You have to look at the growth rates of each individual group, which is just what we did.  I mean we didn't want to just broad brush some growth rate across all of our businesses."  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 191:4-9.  The Examiner responded: "But isn't that what happens when you extrapolate a uniform growth rate for five years? Aren't you broad brushing the growth rate across the businesses?"  Mr. Grenesko answered:  "For -- by group,

54

resulted in a significant increase in the growth rate for the out-years from what was projected in February 2007, under which management projected out-year growth of 0.47% on a consolidated basis (using an extrapolated growth rate from 2010 to 2011).  To place this assumption into further perspective, whereas Tribune was failing to meet its February 2007 projections as 2007 unfolded and the October 2007 projections assumed lower performance in the earlier years from what was projected in February, the October 2007 projections assumed a substantially accelerated growth rate starting in year 2012.

Unlike the out-year projections developed by management in Step One, the Step Two out-year projections figured prominently in VRC's Step Two valuation and were the subject of a separate Tribune representation letter by Tribune (signed by Mr. Grenesko) to VRC on which VRC relied in opining on solvency.[171]  In its Step One analysis, VRC calculated enterprise cash flows for the first five years of the projection period, discounted the results to present value, and added to the present value of the discrete period cash flows the present value of the terminal period value (calculated on the basis of an exit multiple).[172]  In its Step Two analysis, by contrast, VRC calculated enterprise cash flows for the first *ten* years of the projection period, discounted the results to present value, and added to the present value of the discrete period cash

---

yes." *Id.* at 191:10-14.  (In an errata sheet dated July 20, 2010, which is appended to the transcript of Mr. Grenesko's sworn interview, Mr. Grenesko changed a portion of this testimony to add the following point: "Also, the Operating Enterprise Value in 2007 is based upon consolidated operating cash flow growth rates of 2.5% from 2012-2017.  This is below the 3.1% CAGR from 2007-2012 in the October 2007 Operating Plan and below the 3.9% growth from 2011-2012.")  Mr. Grenesko also furnished substantial testimony during his sworn interview regarding Tribune's assumptions on growth, which is addressed in another part of the Report.  *See* Report at § III.H.3.f.(1).  Although one could argue that the February 2007 model contained the opposite flaw (in effect assuming that no election would occur between 2012 and 2016), in fact the 2012 to 2016 forecast contained in the February 2007 model was consistent with Tribune's historical performance.  *See* Report at § III.H.3.f.(1).

[171]  Ex. 739 (Seven letters from Donald Grenesko to VRC, each dated December 20, 2007).  By contrast, the analog management representation letter sent to VRC at Step One makes no mention of extrapolated projections or a longer projection period.  Ex. 250 (Four letters from Donald Grenesko to VRC, each dated May 9, 2007).  *See* Report at § III.H.3.f.(1).

[172]  Ex. 271 at VRC0051430 (Mednik E-Mail, dated May 4, 2007).

flows the present value of the terminal period value (calculated on the basis of an exit multiple).[173]  VRC's methodological shift (which occurred very late in VRC's valuation work) resulted in approximately $613 million in additional incremental value at Step Two.[174]  At a minimum, the fact that VRC required a specific, separate Tribune representation letter underlying this assumption suggests that VRC itself recognized that this assumption merited special attention.  Before the Tribune Board met on December 4, 2010 to consider VRC's opinion, at least one member of senior financial management (but not the Tribune Board) was aware that VRC had revised its analysis to include the extrapolated out-years in reaching its valuation conclusions for Tribune at Step Two.[175]  Yet, the presentation materials furnished to the Tribune Board and Special Committee on December 4 and later that month never mentioned the growth assumptions for the out-years, the role these assumptions play in VRC's solvency opinion, or the fact that Tribune would be making a representation to VRC regarding these projections, and there is no evidence that these matters ever were brought to the attention of the Tribune Board or Special Committee.[176]  Mr. Grenesko testified he had no understanding why a

---

[173]  Ex. 740 at VRC0060998 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis dated December 3, 2007).

[174]  *See* Report at § III.H.3.f.(1).

[175]  Ex. 888 (Bigelow E-Mail, dated December 2, 2007).  Mr. Grenesko initially testified that he had no recollection of this difference.  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 195:8-196:2, 200:4-7.  Later in his interview, documents presented by the Examiner refreshed his recollection, but he indicated that he did not recall whether he was aware of this difference in the December timeframe.  *Id.* at 218:15-219:4.

[176]  *Id.* at 175:16-21, 186:13-18, 187:8-10.  (In an errata sheet dated July 20, 2010, Mr. Grenesko changed portions of his testimony addressing this point.  When asked whether the model presented to the Tribune Board "included the extrapolated growth rates from 2013 to 2017 or was it only a five-year model," Mr. Grenesko originally responded:  "I believe that was just a five-year."  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 175:16-21.  The errata sheet, which is appended to the transcript of Mr. Grenesko's sworn interview, changes the answer to:  "I believe that was just a five-year model in our plan, but I believe VRC's solvency report included projections beyond the initial five years."  Similarly, when asked whether the detailed numbers for years 2013 through 2017 "were [ever] provided to the board in a board meeting," Mr. Grenesko originally responded:  "I don't believe so."  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 186:13-18.  The errata sheet changes the answer to:  "I believe VRC's solvency reports included projections beyond the original five years.").  As discussed in text, however, materials presented to the Tribune Board and the Special Committee did not disclose the out-year growth rate assumptions or their effect on VRC's solvency opinion.

draft version of VRC's analysis provided to him two days before the Tribune Board's December 4, 2007 meeting containing a discounted cash flow valuation analysis showing the assumed out-year growth rate was not presented to the Tribune Board.[177]  Mr. Grenesko also testified that he had no recollection why an e-mail from Mose Rucker to him and others indicated that those materials (described by Mr. Rucker as "our internal review document") would not be shared with the Tribune Board.[178]  (The Examiner did not find any evidence that the out-year growth assumptions accompanying the February 2007 projections were ever presented to the Tribune Board.  As noted, however, the out-year projections did not play any role in VRC's Step One solvency opinion and were not the subject of a Tribune representation letter to VRC at Step One.)

Although the Examiner found no direct evidence that this information was purposely withheld from the Tribune Board or Special Committee in December 2007,[179] the Examiner finds it difficult to accept that the failure to apprise the Tribune Board and Special Committee of this change to the Step One solvency valuation, and to the representation given by Tribune to VRC, was unintentional.[180]

---

[177]  *Id.* at 205:4-207:8; *see also* Ex. 975 (Rucker E-Mail, dated December 2, 2007); Ex. 737 (Presentation Materials, dated December 4, 2007).

[178]  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 206:14-207:8.

[179]  This is not surprising.  Direct evidence rarely is found that a transferor set about to hinder, delay or defraud creditors.  *See Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 550 (D. Del. 2005) ("Direct evidence of fraudulent intent, however, is often unavailable and courts usually rely on circumstantial evidence, including  the circumstances of the transaction, to infer fraudulent intent.") (citing authorities), *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

[180]  In response to the Examiner's question "why wasn't the board presented with a 10-year growth model if that was the model that was being generated for VRC and others?," Mr. Grenesko testified:  "The focus of -- the focus of the group, the focus of management, I think the focus of the board was on the five years.  That's where the real -- the whole bottoms up, this is how we are going to do things.  That's where the whole focus  was." *Id.* at 175:22-176:12.  Mr. Grenesko also acknowledged that VRC was interested in the out-year projections because of the debt maturities in 2014 and 2015.  *Id.* at 176:19-177:1.

### (4)    The October 2007 Forecast.

The Examiner also considered whether the projections produced by Tribune management in October 2007, on which VRC offered its Step Two solvency opinion, support an inference that Tribune perpetrated an intentional fraudulent transfer.  The Examiner appreciates that sometimes management teams exhibit optimism in the expected performance of the businesses they operate or in their own ability to achieve projected results.  Indeed, one of senior management's responsibilities is to carefully evaluate whether members of lower-tier management are being too cautious in their recommendations for forecasted performance.  Mindful that those projections likely will be used to set next year bonus targets, division heads and other personnel might exhibit a downward bias in forecasting expectations for the following year.  Senior management must critically review the input they receive from subordinates, and there is nothing per se improper in making changes to reflect more optimistic assumptions.  More generally, there is nothing nefarious about generating projections, in good faith, that turn out to be too optimistic in retrospect.  Indeed, virtually by definition, in a failed leveraged buyout transaction such as this one, the underlying projections turn out wrong.  For example, the Examiner does not find any impropriety in management's February 2007 projections, even though those numbers turned out to be wrong shortly after they were issued.

The circumstances surrounding the preparation of the October 2007 forecast, however, required that the Examiner investigate management's honesty in the context of Step Two.  As noted, after Step One closed, the Tribune Entities' financial performance deteriorated significantly, both in relation to comparable periods in prior years and in comparison to the February 2007 plan.[181]  The Examiner evaluated whether a fair inference may be drawn that Tribune management improperly "boosted" the projected performance in the October 2007

---

[181]    *See* Report at § III.F.2.

forecast of certain aspects of Tribune's business in order to counteract the effect of Tribune's generally poor 2007 performance and other negative trends.  In this regard, a critical observer would pay particular attention to those aspects of the October 2007 forecast that involve elements of Tribune's business as to which management had greater room to project more growth, either because the particular business segment did not have a lengthy track record or generate a predictable revenue stream or the time period itself was far enough in the future to enable management to posit a positive change in future performance.  The Examiner considered whether two aspects of the October 2007 forecast fit this profile:

First, the revised October forecast (although downwardly revising near term expectations of revenue and operating profitability overall relative to the pre-existing February model) nonetheless contemplated that Tribune would significantly mitigate the effects of the secular declines then affecting the traditional publishing segment (*i.e.,* newspapers and corresponding print advertising), by substantially growing its interactive business.  In fact, the October projections showed that Tribune's interactive business would create significant revenues ahead of what was assumed in the February 2007 projections starting in 2009.[182]  Management's assumptions of robust growth in the interactive division had a significant impact on Tribune's projected profitability and VRC's ultimate solvency opinion at Step Two, accounting for approximately $1.77 billion or 17.4% of VRC's mid-point discounted cash flow valuation.[183]

The Examiner interviewed Timothy Landon, who headed Tribune's interactive division and served as the chief executive officer of Classified Ventures (a start-up venture in which Tribune invested) at the time of the Leveraged ESOP Transactions.  Before showing Mr. Landon Tribune's October 2007 projections, when the Examiner asked Mr. Landon whether he would

---

[182]    *See id.* at § III.H.3.f.(1).

[183]    *See id.* at § III.H.3.f.(3).

have expected the growth rates in interactive to be greater in the February or October 2007

forecast.  Mr. Landon stated that he would have expected the October forecast to be flat or

lower,[184] and acknowledged that interactive performed about 4-5% below plan in 2007.[185]  He

expressed surprise when the Examiner pointed out that Tribune's October forecast assumed

significant increases in growth in interactive after 2009 ahead of what was projected in

February.[186]  David Williams, who was at the time of the Leveraged ESOP Transactions the

president and chief executive officer of Tribune Media Services, Inc., a Tribune subsidiary, told

the Examiner that "interactive revenues are hard to forecast and hard to predict."[187]  Harry

Amsden, Vice President of Finance of Tribune Publishing, described interactive as more

"speculative" than other aspects of Tribune's business.[188]  The Zell Group viewed interactive as

misguided and adding little value to Tribune.[189]  Mr. Grenesko testified that the assumptions

concerning increased spending on the interactive business and increased personnel devoted to

---

[184]  Examiner's Interview of Timothy Landon, June 22, 2010 ("I would have expected that by December we were anticipating a recession, so near term revenue would be less, then some recovery, and the question is what is the slope of that recovery.  I would say that the December model is the same or lower in the abstract.").

[185]  *Id.*

[186]  *Id.* ("I'm disappointed in these numbers.  It's not what I would have expected.  These are the only numbers that I've looked at today that I don't feel good about.  The other ones were ok, even though they might've turned out wrong.  But I don't believe in the logic behind this.  I take responsibility for that.").  Mr. Landon also told the Examiner that an appropriate discount rate to present value of the interactive division's future performance would be double digits, representing a way to quantify mathematically the probability of success on new ventures.  *Id.*  The Examiner found Mr. Landon, who is not currently employed by Tribune, to be a credible witness.

[187]  Examiner's Interview of David Williams, June 18, 2010.  Mr. Williams was a credible witness.

[188]  Examiner's Interview of Harry Amsden, July 2, 2010.  Mr. Amdsen was credible and cooperative.

[189]  Examiner's Interview of Samuel Zell, June 14, 2010 ("As we looked at the interactive side, they were working on a whole bunch of projects that were going to create revenue in 2016.  They didn't know what they were doing.  Other than it was very important.  I think we have gotten rid of most of the people.  And now we're working on projects that produce revenue next week.").  *See also* Examiner's Sworn Interview of Nils Larsen, July 7, 2010, at 57:4-10 ("And, you know, I think the funnel of ideas was narrowed substantially, but, you know, we certainly would not have an aversion to spending capital thoughtfully.  I think our view would be that working on 120 different projects at the same time was not the best use of people's time and effort.").  Mr. Larsen could not recall whether he alerted management to his concerns about management's assumptions concerning interactive.  *Id.* at 57:1-2, 57:11-58:10.

that business supported management's growth assumptions.[190]  Much of the projected growth in interactive, however, came from shifting resources and capital (as opposed to increasing spending on interactive on an absolute basis) into what was referred in the October projections as "internal development" of revenues (which did not figure prominently in Tribune's projections for interactive in the February projections), and, as discussed in another part of the Report, VRC's own internal analysis suggested that Tribune's assumptions regarding this business were unreasonable.[191]

Although the Examiner finds that management's projections regarding the interactive business were aggressive, based on the record adduced he does not conclude that senior financial management at Tribune prepared them in bad faith.  In large measure, as discussed in another part of the Report,[192] the problem, insofar as the interactive business is concerned, involves how the projected revenue stream derived from that business was valued.  Although Bryan Browning and Mose Rucker of VRC testified that they discussed management's assumptions underlying this assumed growth, as also discussed in another part of the Report, VRC applied no greater discount to this revenue,[193] and there is no evidence that they ever brought to management's attention VRC's own concerns regarding the projected growth and revenue assumptions despite expressing them internally.[194]  The result was to attribute an unreasonably large component of the value to the projected interactive business revenue stream, which by nature was speculative and merited a hefty discount for valuation purposes.  Although the Examiner does not have a complete picture of the interactions between VRC and senior financial management at Tribune

---

[190]  Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 170:9-171:4, 172:16-173:2.

[191]  *See* Report at § III.H.3.f.(2).

[192]  *See id.* at § III.H.3.f and Annex A to Volume Two (DCF Valuation Analysis).

[193]  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 94:5-98:6.

[194]  *See* Report at § III.H.3.f.(2).

during this timeframe (particularly in late October through early December, when VRC developed a detailed critical evaluation of management's projections, only to turn around and adopt those projections wholesale),[195] based on the record adduced in the Investigation the Examiner did not find evidence of complicity by management in this aspect of VRC's valuation.

A second area of inquiry involved the unjustifiable assumption contained in the October 2007 forecast concerning Tribune's performance in 2012 to 2017, which, as discussed above, VRC then used to determine solvency at Step Two.[196]  The Examiner's findings concerning the reasonableness of this assumption and the effect of VRC's use of this assumption in its solvency opinion are addressed in detail in other parts of the Report.[197]  The Examiner finds unconvincing the various explanations given to the Examiner by witnesses regarding this assumption, as detailed elsewhere in the Report.[198]  Moreover, although Mr. Browning and Mr. Rucker testified that they discussed management's out-year assumptions,[199] there is no evidence that VRC ever contested management's assumptions directly to management.  As discussed in another part of the Report, other aspects of the October 2007 projections (particularly in Tribune's classified

---

[195]  *See id.* at § IV.E.3.c.(5).  For example, as discussed previously in text, the Examiner was unable to determine what was said between VRC and senior financial management on the question whether the out-year projections, and VRC's use of those projections as a late inning addition to its valuation, would be shared with the Tribune Board.

[196]  It appears that the approach was undertaken at the direction of Chandler Bigelow, who in an e-mail to Rosanne Kurmaniak of Citigroup (the individual responsible for maintaining Tribune's complex projection models), suggests: "How about we make post 2012 revenue /OCF CAGRs the same as the growth assumed in 2012 for both Publishing/Broadcasting?"  Ex. 889 (Bigelow E-Mail, dated September 27, 2007).  In an earlier e-mail, Mr. Bigelow suggested that a reduction in the post 2012 growth assumption would be proper.  Ex. 889 (Bigelow E-Mail, dated September 27, 2007).  Although Ms. Kurmaniak testified that she felt that extrapolating the growth from 2012 to later years was reasonable, she acknowledged that she did not focus on the fact that 2012 was an election year and possibly an outlier.  Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 139:6-14; 140:1-4.  She suggested that if something other than an extrapolation from 2012 were used, adjustments in the out-year projections would have to be made based on the timing of elections and other anticipated occurrences in those years.  *Id.* at 142:20-22-143:1-13.  Mr. Bigelow did not believe CGMI had any involvement in this assumption.  Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 100:11-19. He described the out-year assumptions as being "some extrapolation."  *Id.* at 15-16.

[197]  *See* Report at § III.H.3.f. and Annex A to Volume Two (DCF Valuation Analysis).

[198]  *See* Report at § III.H.3.f. and Annex A to Volume Two (DCF Valuation Analysis).

[199]  Examiner's Sworn Interview of Mose Rucker and Bryan Browning, June 30, 2010, at 118:3-5; 118:24-120:7.

business segment) were unreasonable in light of information available to Tribune and VRC.[200]

Yet, despite reservations expressed internally, VRC simply accepted those projections as the

predicate to its solvency valuation.  The logical inference that the Examiner draws, and certainly

that management could draw from their multi-month interactions with VRC personnel, is that

VRC would accept almost any estimate of future performance that management presented to

VRC.[201]  Although the Investigation uncovered no direct evidence that Tribune's management

was deceitful in the preparation and issuance of this aspect of the October forecast, the Examiner

finds it implausible that members of Tribune's senior financial management believed in good

faith that the out-year growth assumption contained in the October 2007 forecast (or the related

Tribune representation letter) represented a reasonable estimate of Tribune's future performance.

Rather, this assumption bears the earmarks of a conscious effort to counterbalance the decline in

Tribune's 2007 financial performance and other negative trends in Tribune's business, in order to

furnish a (very significant) source of additional value to support a solvency conclusion.

### (5)    The Tribune Board and Special Committee Deliberations.

The record shows that when the baton was handed from Tribune management to the

Tribune Board and Special Committee in December 2007 to consider the question of VRC's

solvency opinion, the directors failed to adequately perform their responsibilities.  To be clear,

the Examiner found no evidence that the Tribune Board or the members of the Special

Committee intentionally engaged in any wrongdoing, but the problem is that the fiduciaries

charged with ultimate responsibility for allowing Step Two to close failed to discharge their

duties to carefully scrutinize the information presented by management and VRC and make an

---

[200]  *See* Report at §§ III.H.3 f.(2)., III.H.3.f.(4)., and Annex A to Volume Two (DCF Valuation Analysis).

[201]  *See* Report at §§ III.E.3.b., III.H.3 f., IV.B.5.d.(9)., and IV.B.5.d.(10).  *See also* Annex A to Volume Two (DCF Valuation Analysis).

informed decision that Step Two was not going to render Tribune insolvent. Indeed, the only

matter for the Tribune Board and Special Committee to take up in the December 2007 timeframe

was whether consummation of Step Two would render Tribune insolvent, but unlike Step One, in

which the Tribune Board's and the Special Committee's respective Financial Advisors actively

evaluated management's projections and VRC's work product, nothing like that happened at Step

Two.[202] Tribune's Financial Advisors were not even advising Tribune at this time.[203] Thus,

unlike the process in which the Financial Advisors evaluated VRC's opinion in the period

between the Tribune Board's April 1, 2007 approval of the Leveraged ESOP Transactions and

the Step One closing, the Tribune Board took up the critical question whether the Step Two

Transactions would render Tribune insolvent without retaining an outside advisor to evaluate

management's projections or VRC's work.[204] Tribune's management likewise did not have a

Financial Advisor to which to turn, causing members of management (including Tribune Chief

Financial Officer Donald Grenesko and Tribune Treasurer Chandler Bigelow) to reach out to the

Special Committee's Financial Advisor (Morgan Stanley) for guidance. Morgan Stanley,

however, was not engaged to provide financial advice to Tribune, and, as previously discussed,

offered relatively little assistance to management.[205]  Management, therefore, was largely

---

[202]  Examiner's Interview of Christina Mohr, June 29, 2010; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 20:6-13 ("Q: But in step 2, because you were not preparing a fairness opinion or any kind of opinion for that matter, you were not asked by the special committee to look at the reasonableness of the assumptions behind the projections? A: Behind the projections, no.").

[203]  *See* Ex. 643 at TRB041566-67 (October 17 Tribune Board Minutes) (referring to CGMI); Examiner's Interview of Michael Costa, June 4, 2010; Examiner's Interview of Christina Mohr, June 29, 2010.

[204]  Tribune General Counsel Crane Kenney expressed the view that retention of an outside advisor in connection with Step Two was unnecessary. Examiner's Sworn Interview of Crane Kenney, July 8, 2010, at 75:15-21 ("We had the financing, and we had the deal. Now it's a whole list of certificates and other things that need to be procured, which are -- in my -- if you're asking my opinion, I don't think we needed a financial adviser to basically tick and tie the last, you know, the elements of the closing."). In light of the record adduced in the Investigation, the Examiner strongly disagrees.

[205]  *See* Report at § III.H.4.c.(2).(i). Morgan Stanley's December 3, 2007 request for a discretionary fee on account of its work at Step Two contains references to Morgan Stanley providing advice and services to "the Company" and "the Company's Management" in connection with financing negotiations with the Lead Banks. Ex. 1048 at

unaided as the Step Two Financing Closing Date approached and the solvency diligence

questions posed by the Lead Banks became more pointed.

Tribune's Special Committee, entrusted to monitor the Leveraged ESOP Transactions,

met once after the Step One Financing Closing Date, on December 18, 2007, to consider the

question of Tribune's solvency and VRC's solvency opinion.[206]  In their presentations to the

Examiner, certain Parties cited to the Examiner the minutes from that meeting as important

evidence that Tribune's directors exercised due care in connection with the Step Two

Transactions, that VRC's Step Two solvency opinion was reasonable, and that the Step Two

Transactions did not constitute an intentional fraudulent transfer.  The minutes prepared by the

Special Committee's outside counsel (set forth in detail elsewhere in the Report)[207] state that

William Osborn, the Chair of the Special Committee, "requested that the representatives of

Morgan Stanley comment on the solvency opinion and the analysis behind it that was just

MS_69131 & MS_69133 (Overview of Morgan Stanley's Role in the Tribune Special Committee Review Process, dated December 3, 2007).  Thomas Whayne of Morgan Stanley testified that "throughout step 1 and step 2 [Morgan Stanley was] representing the special committee," Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 51:9-10, and as part of that representation Morgan Stanley "had been asked to work . . . in this final phase with management because the banks that had been advising primarily management during the first step transaction were no longer willing to serve in that capacity. . . . " *Id.* at 25:6-11.  The record reflects that Morgan Stanley did, in fact, advise the full Tribune Board regarding the Lead Banks' proposal to modify the Step Two Financing.  Ex. 702 (Tribune Board Meeting Minutes, dated November 21, 2007).  There is no evidence, however, that Morgan Stanley undertook representation of Tribune at Step Two, and (given the explicit provisions of Morgan Stanley's engagement letter), it would not have been reasonable for management to have assumed otherwise.  *See* Ex. 25 at MS_00213 (Morgan Stanley Engagement Letter) ("Morgan Stanley will act under this letter agreement as an independent contractor with duties solely to the [Special] Committee.").  *See also* Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 33:8-14 ("Q:  What's your understanding of who Morgan Stanley's client was?  A:  Our client was the special committee.  Q:  And that was your only client in this case?  A:  Yes.");  Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 22:13-22 ("Q:  The special committee was [Morgan Stanley's] client, is that right?  A:  The special committee was the client.  Q:  [W]as Tribune Company the client?  A:  No.  Q:  And was the board in general the client?  A:  No.");  Examiner's Sworn Interview of Donald Grenesko, June 25, 2010, at 57:1-5 ("Q:  Had Morgan Stanley's engagement changed from being financial advisor to the special committee to being financial advisor to the entire board?  A:  I don't believe so, no.").

[206]    Morgan Stanley made presentations to the Tribune Board (the membership of which largely overlapped with the Special Committee) following the Step One Financing Closing Date.  *See, e.g.*, Ex. 643 (Tribune Board Meeting Minutes, dated October 17, 2007); Ex. 727 (Tribune Board Meeting Minutes, dated December 4, 2007); Ex. 726 (Tribune Board Meeting Minutes, dated November 5, 2007); Ex. 702 (Tribune Board Meeting Minutes, dated November 21, 2007).

[207]    *See* Report at § III.G.1.

presented to the Board of Directors by VRC."[208]  The minutes then summarize remarks made by

Thomas Whayne and Paul Taubman of Morgan Stanley, culminating in Morgan Stanley's

conclusion that "VRC's solvency analysis was conservative and that VRC's opinion was

something upon which a director could reasonably rely."[209]  Specifically, Mr. Whayne was

reported to have:[210]

> •      "indicated that the analysis by VRC seemed thorough and appropriate,"
>
> •      "noted [that VRC's] earnings and termination value multiples for the publishing and broadcasting industries [were] consistent (but not identical) with those used by Morgan Stanley as well as Merrill Lynch and Citibank in previous advice to the Board of Directors,"
>
> •      observed that "VRC's selection of precedent transactions and its discounted cash flow analysis used metrics very similar to that previously used by each of the investment banks,"
>
> •      "commented on VRC's analysis of the net present value of [the anticipated S-Corporation/ESOP] tax savings, [including the discount rate],"
>
> •      "commented on VRC's valuation of the PHONES debt and other assets and liabilities of the Company," and
>
> •      "concluded that VRC's solvency analysis was conservative and that VRC's opinion was something upon which a director could reasonably rely."

The minutes reflect that Mr. Taubman next "reiterated the conservative nature of VRC's

analysis," and "stated that the Company has additional value not represented in the VRC

presentation because the Company has a number of different assets and businesses that readily

---

[208]    Ex. 704 at TRB0533007 (Special Committee Meeting Minutes, dated December 18, 2007).

[209]    *Id.*

[210]    *Id.*

could be sold for fair value and that this additional financial [flexibility] is of incremental value

to a company."[211]

Like certain other aspects of the Leveraged ESOP Transactions discussed in the Report,

however, what appears at first blush is not the case on closer inspection:

First, the above excerpted document is not minutes but, rather, *draft* minutes.  The

document is not even accompanied by a signature line, let alone a signature.  Because the Special

Committee never met again and never approved the draft minutes prepared by counsel,[212] no

duly adopted minutes memorializing the Special Committee's proceedings on December 18,

2007 exist.[213]

Second, from the draft and official Tribune Board minutes cited by the Parties, it appears

that the Special Committee met for no more than fifteen minutes.  The minutes of the full

Tribune Board meeting reflect that the Special Committee meeting took place while the full

---

[211]  *Id.*

[212]  Examiner's Interview of Charles Mulaney, June 24, 2010.  The draft minutes prepared by counsel are unsigned, as are the final, duly adopted minutes of prior Special Committee meetings. Ex. 704 (Special Committee Meeting Minutes, dated December 18, 2007).  *See, e.g.*, Ex. 143 (Special Committee Meeting Minutes, dated April 1, 2007).

[213]  The existence of these draft minutes appears to have colored the factual record to a certain degree, with Parties and witnesses repeatedly citing and relying on Morgan Stanley's alleged use of the adjective "conservative."  *See, e.g.,* Examiner's Sworn Interview of William Osborn, June 24, 2010, at 27:1-7 ("Q. Now, when you say they used the word 'conservative,' do you remember them saying that to you, or do you just remember reading that in the minutes?  A.  I don't – one, for me to sit here and say I remember them saying it, I can't remember that.  I did see it in the minutes."); Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 101:7-18 ("Q.  Do you have a specific recollection that [Morgan Stanley] approved VRC's solvency opinion as conservative and appropriate, or is that based on what you read [?]  A. That's what I read [in the] board minutes, yes.  Q.  Aside from what you read in the board minutes, do you have any independent recollection that Morgan Stanley made that claim?  A.  No.").  The potential skewing effect of the draft Special Committee minutes extends to other matters (beyond the alleged "conservative" characterization) as well, as evidenced by correspondence the Examiner's counsel received from counsel for Dennis FitzSimons and Donald Grenesko. Ex. 1118 (Letter from George Dougherty, dated July 15, 2010).  In asserting that "the contemporaneous documents conclusively show that Morgan Stanley was fully aware of Tribune's [refinancing] representation and had numerous opportunities to object to it," counsel relies on the draft December 18, 2007 Special Committee minutes:  "Morgan Stanley's stated opinions that VRC's analysis was 'conservative,' 'thorough,' and 'appropriate' and that the 'VRC Opinion' was something upon which a director could reasonably rely had to be based on, at a minimum, a review of the solvency opinion letter," which referenced management's conversations with Morgan Stanley.  *Id.* at 2.  VRC's Step Two solvency opinion, however, is dated December 20, 2007 — two days *after* the December 18, 2007 Special Committee meeting — and there is no evidence that Morgan Stanley was furnished with a draft of the opinion.

Tribune Board meeting was in recess prior to its 3:00 p.m. adjournment,[214] and the draft minutes state that the Special Committee "convened at 2:45 p.m."[215]

Third, Mr. Whayne and Mr. Taubman told the Examiner that they had never seen the draft minutes before being interviewed by the Examiner, despite the prominent role the two of them allegedly played at the meeting.[216]  Likewise, as noted previously, VRC's opinion was also never provided to Morgan Stanley. [217] (Although, unlike at Step One, VRC's opinion was not filed with the SEC, the Examiner does not believe that the failure to do so violated applicable securities laws.[218])

Fourth, and most importantly, although he did not dispute commenting to the Special Committee regarding the earnings and value multiples and precedent transactions, as well as the discount rate used by VRC in valuing the S-Corporation/ESOP tax benefits and its valuation of the PHONES Notes indebtedness, [219] Mr. Whayne stated in his interviews with the Examiner that neither he nor Mr. Taubman offered any opinion or conclusion concerning the substantive merits

---

[214]  Ex. 11 at TRB0415685-86 (Tribune Board Meeting Minutes, dated December 18, 2007).

[215]  Ex. 704 at TRB0533007 (Special Committee Meeting Minutes, dated December 18, 2007).  The Special Committee meeting was likely even shorter, as the Tribune Board's minutes reflect that the full Tribune Board met in executive session for an undisclosed amount of time immediately prior to the Tribune Board's 3:00 p.m. adjournment.  Ex. 11 at TRB0415686 (Tribune Board Meeting Minutes, dated December 18, 2007).

[216]  Examiner's Interview of Thomas Whayne, June 11, 2010; Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 83:11-17.

[217]  Examiner's Interview of Thomas Whayne, June 11, 2010; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 21:6-24:5; Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 89:2-90:22.  Nor, as noted, was Morgan Stanley given a copy of Mr. Grenesko's refinancing representation letter referencing discussions with Morgan Stanley.  *Id.* at 94:16-95:16; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 138:3-139:22.

[218]  At Tribune's Section 341 meeting held after the Petition Date, the U.S. Trustee's representative asked Mr. Bigelow whether the two VRC solvency opinions were publicly filed.  Mr. Bigelow replied that the first opinion was publicly filed, but the second was not, stating that "to the best of my knowledge we had no obligation to publicly file the second step of the solvency opinion."  Audio Recording of Section 341(a) Meeting of Creditors, January 16, 2009.  Because Step One involved the Tender Offer, Tribune included the first VRC solvency opinion in its public filings with the SEC apparently to meet the requirements of the SEC's Schedule TO and Schedule 13E-3.  Step Two did not involve a tender offer, and the Examiner's analysis is that there does not appear to be any law or regulation that required Tribune to file VRC's Step Two solvency opinion with the SEC.

[219]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 127:13-131:22.

of VRC's solvency opinion, nor did he or Mr. Taubman tell the Special Committee they could reasonably rely on the fact that Tribune would be solvent after Step Two.[220] With regard to the *process* by which VRC reached its conclusions, Mr. Whayne stated that he indicated to the Special Committee that VRC's work "seemed thorough and appropriate" and appeared to be something the Special Committee "could take [a] level of comfort in" in determining that Tribune had satisfied the Merger Agreement's condition precedent of an independent solvency opinion.[221]  According to Mr. Whayne, however, these remarks went *solely* to whether the work done by VRC complied with the solvency opinion condition precedent of the Merger Agreement:[222]

> [W]e were not in any way shape or form speaking to the substance of the solvency opinion. . . .  The board completely understood that we weren't speaking to whether the company was solvent from a substance matter [nor] were we saying whether this opinion was right or wrong.  All we were saying was from a process standpoint of fulfilling the condition the board could rely on the opinion for process not substance.

Mr. Taubman testified that he did not recall whether Mr. Whayne commented to the Special Committee on the reasonableness of VRC's solvency opinion at the Special Committee meeting, and Mr. Taubman was "more than doubtful" that Mr. Whayne characterized VRC's solvency opinion as "conservative."[223]  Both Mr. Whayne and Mr. Taubman disputed that they personally characterized VRC's ultimate opinion as "conservative."[224]  Mr. Taubman did acknowledge that he used the adjective "conservative" or "not aggressive"[225] in addressing "one

---

[220]   Examiner's Interview of Thomas Whayne, June 11, 2010.

[221]   *Id.*

[222]   *Id.*; Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 134:16-137:8.

[223]   Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 83:1-6.

[224]   *See* Report at § III.H.4.c.(2).(ii).

[225]   Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 111:9.

specific aspect of [VRC's] analysis where they could have been more aggressive and they were not and I recall pointing that out to the members of the committee. . . . [VRC] had not assumed that if need be individual assets could be sold piece by piece." [226]  "I said I had a single point to make which is on this one dimension of analysis where one could have assumed a whole host of asset sales at premium values if you went asset by asset, it didn't appear that they had done that." [227]  In fact, this is almost verbatim what the draft minutes report that Mr. Taubman stated, as excerpted above, except for the comment attributed to him that he "reiterated the conservative nature of VRC's opinion," [228] one of the two sound bites from the draft minutes cited by the Parties.  Mr. Whayne offered consistent testimony: [229]

> Just to expound on one thing, you know, consistent with what I said last time the only comment that was made regarding, you know, assumption as part of the analysis that the company was making any asset sales.  So I do remember that Paul made an observation that they could sell asset sales if there was – if they had liquidity issues and that was not part of VRC's analysis, but that addressed liquidity.  So that was something that we discussed last time and I do recall that.  So that is – that – I don't think Paul said that the nature of the analysis – he didn't say the analysis was conservative, but Paul did make the comment that there is additional value not represented in the presentation because the company has assets and business that it could sell if it got into duress.  That there were additional assets – that the VRC analysis did not incorporate any analysis of potential asset sales as a way of dealing with potential liquidity issues and Paul did make the observation that from the standpoint of viewing liquidity issues only was conservative because the company, indeed, did have a number of assets, the Cubs, et cetera, that could be sold if the company needed to raise money.  So as we discussed before, he

---

[226]  *Id.* at 84:16-85:15.

[227]  *Id.* at 109:15-19.

[228]  Ex. 704 at TRB0533007 (Special Committee Meeting Minutes, dated December 18, 2007).

[229]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 130:19-132:8; Examiner's Interview of Thomas Whayne, June 11, 2010 ("I think only thing someone could've heard was that VRC opinion didn't make any assumption around if company hit an air pocket, if it could've sold assets.  I think that's what's being construed as being conservative.  It's consistent on what we said from day 1- asset rich but cash flow challenged given the environment.").

> did make that comment, but it was from the standpoint narrowly of
> the company's ability to deal with any sort of liquidity issues
> that can serve face in the future and not from the standpoint of the core
> valuation or solvency.

Others interviewed by the Examiner who were present during the December 18, 2007 Special Committee meeting had no specific, independent recollection of the term "conservative" being used by Morgan Stanley (although several individuals stated to the Examiner that they had no reason to question the accuracy of the draft Special Committee meeting minutes).[230]  In contrast, Mr. Whayne and Mr. Taubman, the persons who allegedly made these comments, testified specifically that the draft minutes did not accurately represent what they said to the Special Committee.

It is undisputed that Mr. Whayne and Mr. Taubman made brief, oral observations at the December 18, 2007 Special Committee meeting.  The statement in the draft minutes attributing to Mr. Whayne the conclusion "that VRC's solvency analysis was conservative and that VRC's opinion was something upon which a director could reasonably rely,"[231] however, appears to be incorrect.  In the course of vigorously denying that he or Mr. Taubman ever made this statement, Mr. Whayne pointed out that having given written presentations to the Special Committee on previous occasions, but having prepared no such presentation for the December 18, 2007 Special

---

[230]  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 27:1-7 ("Q:  Now, when you say they used the word 'conservative,' do you remember them saying that to you, or do you just remember reading that in the minutes?  A:  I don't -- one, for me to sit here and say I remember them saying it, I can't remember that.  I did see it in the minutes."); Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 101:7-18 ("Q:  Do you have a specific recollection that [Morgan Stanley] approved VRC's solvency opinion as conservative and appropriate, or is that based on what you read[?]  A:  That's what I read [in the] board minutes, yes.  Q:  Aside from what you read in the board minutes, do you have any independent recollection that Morgan Stanley made that claim?  A:  No.").  The author of the draft minutes stated to the Examiner that he believed the word conservative was used, but he has no specific recollection and bases his belief "on how these minutes are prepared."  Examiner's Interview of Charles Mulaney, June 24, 2010.  There is no evidence that the draft Special Committee meeting minutes were prepared prior to the actual meeting (as may have been the case with at least one other set of Tribune minutes).  The Examiner obtained and reviewed Mr. Mulaney's invoice covering this period, and the December 2007 time records of the Special Committee's outside counsel reflect some work by counsel on the minutes the day following the meeting.

[231]  Ex. 704 at TRB0533007 (Special Committee Meeting Minutes, dated December 18, 2007).

Committee meeting and having offered only brief comments, neither he nor Mr. Taubman would have made the kind of definitive statements attributed to them in the minutes.[232]  Considered in the context of what Morgan Stanley was doing in December 2007, the Examiner finds Mr. Whayne's and Mr. Taubman's testimony credible.  The Examiner does not have a sufficient basis, however, to determine why the draft minutes state otherwise and why they were never furnished to Mr. Whayne and Mr. Taubman for review and comment.  Although the Examiner cannot furnish answers to these questions, the Examiner finds that this episode is another instance in which Morgan Stanley's alleged seal of approval of VRC's Step Two solvency opinion does not withstand scrutiny.

Special Committee Chair William Osborn described Morgan Stanley's role with respect to the VRC opinion as "mak[ing] certain that the solvency opinion was appropriate and made sense so that we would have the confidence that . . . we could move forward with the second step,"[233] a characterization with which Mr. Whayne agreed.[234]  This type of evaluation, however, is qualitatively different from the type of evaluation VRC made with respect to Tribune's solvency and capital adequacy.  Morgan Stanley was not asked to, nor did it, undertake or present a comprehensive evaluation of VRC's Step Two solvency opinion.  Moreover, neither Morgan Stanley nor any other Financial Advisor was asked to look at Tribune management's

---

[232]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 134:16-137:8; Examiner's Sworn Interview of Paul Taubman, July 1, 2010, at 82:11-22.

[233]  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 26:11-14.

[234]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 151:1-18.

October 2007 projections,[235] the good faith and reasonableness of which are a foundation of

VRC's solvency analysis.[236]

Juxtaposed against the limited consideration given by the Tribune Special Committee on

December 18, 2007 on the question of solvency (on which the Tribune Board quickly

reconvened and approved VRC's solvency opinion),[237] the facts and circumstances known or

ascertainable by the directors made it imperative that the Tribune Board and the Special

Committee carefully evaluate the opinion delivered by VRC.  They knew or should have known

that:  (i) the Tribune Entities' financial performance had deteriorated appreciably after Step One

and that the Step Two Closing would subject the Tribune Entities to $3.6 billion more debt; (ii)

management's February 2007 projections had missed the mark only shortly after those

projections were issued; (iii) management's October 2007 projections served as the foundation

for VRC's opinion and members of senior management were to receive significant additional

compensation if Step Two closed and might be looking for continued employment under the

auspices of the new owners;[238] (iv) VRC was relying on management's projections as the critical

underpinning of its solvency opinion;[239] (v) VRC had been required in its engagement letter to

use a definition of "fair market value" and "fair saleable value"[240] that was contrary to long-

established principles of sound valuation and that directly affected VRC's solvency conclusions

---

[235]  *Id.* at 151:19-22.

[236]  *See* Ex. 267 at TRB0412757 (VRC Engagement Letter, dated April 11, 2007) (requiring that financial forecasts and projections provided to VRC must "have been prepared in good faith . . . based upon assumptions that, in light of the circumstances under which they are made, are reasonable").

[237]  Ex. 4 (Tribune Board Meeting Minutes, dated December 18, 2007).

[238]  *See* Report at § III.F.8.

[239]  *See id.* at § III.E.3.b.(1).(ii).

[240]  *See id.* at § III.E.3.b.(1).(i).

at Step Two; and (vi) market indicia were strongly suggesting that incurrence of the Step Two Debt would render Tribune insolvent.[241]

All of these circumstances served, or should have served, as red flags to the members of the Tribune Board and Special Committee that they needed to do more to discharge their responsibilities.  Unfortunately, they did not.

> **(6)    Factors that Mitigate Against the Conclusion that Step Two Constituted an Intentional Fraudulent Transfer and Conclusion.**

The Examiner evaluated factual and legal considerations that weigh against the conclusion that the Step Two Transactions were an intentional fraudulent transfer.

First, as noted, nothing in the record suggests that the Tribune Board or the members of the Special Committee knowingly or intentionally committed any fraud or acts of dishonesty. However, as discussed above, there is some reason to conclude that one or more members of Tribune's senior financial management engaged in dishonesty or, at a minimum, were not candid in their dealings with the participants.  As a matter of law, those acts are ascribed to Tribune for fraudulent transfer purposes.[242]  Nevertheless, the Examiner notes that, unlike many other transactions found to be intentionally fraudulent, this is not a case in which the Tribune Board engaged in any kind of foul play.

Second, by all appearances, through and including the closing of the Step Two Transactions, the Zell Group remained eager to proceed with the Step Two Closing.[243]  One

---

[241]   *See id.* at §§ III.H.3.f.(4). and IV.B.5.d.(10).

[242]   *See* text accompanying footnotes 48-51.

[243]   Examiner's Interview of Samuel Zell, June 14, 2010 ("Did we think we bought a great company?  We thought we bought a great opportunity.  What allowed us to do it was the asset base.  We convinced ourselves that the asset base, we had the value of the newspaper and TV stations as a result of 2008, we didn't know it at the time but we thought we had the raw pieces and the bases that's why we agreed to the [Tranche] X.  We were intent on the Cubs, we were convinced we could sell other assets.").

could argue that if the Zell Group, a highly-sophisticated player, still was prepared to go forward and pay the approximate $56 million in net amount it had to put in to make Step Two happen, this furnished tangible evidence that the Step Two Transactions were not going to render Tribune insolvent.  After all, why would Samuel Zell pay *anything* for nothing?  As William Osborn, the Chair of the Special Committee testified in his sworn interview with the Examiner:  "Mr. Zell had made an investment and wanted to proceed with this transaction."[244]  The Examiner finds that this is a factor mitigating against a finding that the Tribune Entities perpetrated an intentional fraudulent transfer at Step Two.

Third, the LBO Lenders advanced $3.6 billion at Step Two despite the fact that the Lead Banks posed questions regarding VRC's valuation work and retained their own outside advisor. That the LBO Lenders funded this money is some evidence supporting an inference that a party other than VRC had reached a favorable conclusion regarding Tribune's solvency.  On balance, however, the Examiner does not find this factor to meaningfully militate against a conclusion that Step Two was an intentionally fraudulent transfer.  As discussed in another part of the Report,[245] the LBO Lenders came to Step Two with contractual baggage resulting from their commitments made at Step One to advance funds in Step Two.  It would have been one thing had Tribune actually gone out and obtained fresh financing for Step Two in the fall of 2007, but what happened was that the LBO Lenders ended up honoring preexisting contractual undertakings.  That the LBO Lenders had made a preexisting commitment to fund was not lost on Tribune.[246]

---

[244]   Examiner's Sworn Interview of William Osborn, June 24, 2010, at 41:19-20.

[245]   *See* Report at §§ IV.B.7.b.(2).-IV.B.7.b.(8).

[246]   *See* Examiner's Sworn Interview of William Osborn, June 24, 2010, at 38:8-18 ("So the issues became mainly around those that were underwriting the transaction, and they were large financial institutions, and generally speaking, if an institution makes a commitment, they normally live by those commitments.  There were some institutions during -- starting in the period of time we're talking about but mainly going into the next year that

The legal question is whether, applying Third Circuit law governing intentional fraudulent transfers, the record supports or falls short of supporting the conclusion that the Step Two Transactions were intentionally fraudulent.  As discussed previously,[247] the law in the Third Circuit furnishes only limited guidance in the leveraged buyout context.  On the one hand, if the evidence shows that the debtor knew that what it was doing would render it insolvent or hinder creditors, a finding that an intentional fraudulent transfer occurred is not difficult to draw.  On the other hand, when the evidence only supports the inference that insolvency or hindrance of creditors was foreseeable, something other than an intentional fraudulent transfer has occurred.[248]  In the Examiner's view, the instances of dishonesty or lack of candor described above are evidence of consciousness that proceeding honestly and with candor would jeopardize the Step Two Closing.  The natural consequence of proceeding in this fashion is that a transaction that should not have happened, did.  It is reasonable to infer from those acts knowledge that hindering, delaying, or defrauding creditors would follow.  Although there is no evidence that the Tribune Board and Special Committee acted with such knowledge, their acquiescence allowed Step Two to close when it should not have and, therefore, their actions are relevant to the intentional fraudulent transfer inquiry.

Although the Examiner recognizes that the facts adduced in the Investigation do not fit the ordinary pattern of an intentional fraudulent transfer, the combination of acts and omissions rises to what appears to be a level of impropriety—when weighed against the natural consequences formulation adopted by the Third Circuit Court of Appeals[249]—leads the Examiner

---

started to back out of transactions.  But I was -- I felt that there were commitments made and the institutions that made those would stand by those commitments.").

[247]  *See* Report at § IV.B.4.a.

[248]  *See id.*

[249]  *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986).

to conclude that a court would be somewhat likely to find an intentional fraudulent transfer at Step Two. To summarize, those factors include that the Step Two Transactions conferred disproportionately unreasonably small consideration on the Tribune Entities and rendered them insolvent and without adequate capital, that one or more participants in the transactions appear to have engaged in acts of dishonesty proximately related to the transfers and obligations at Step Two, and that the fiduciaries charged with overseeing management did not act as a check to prevent this from happening. These were a natural recipe for failure.

### 5.    Constructive Fraudulent Transfer Claims.

#### a.    Examiner's General Conclusions.

Evaluation of whether the transfers and obligations comprising the Leveraged ESOP Transactions may be avoided as constructive fraudulent transfers entails a component-by-component evaluation, set forth below, of the elements of such claims and the defenses.

#### b.    Examiner's Conclusions and Explanation Concerning Equivalence of Value Provided at Step One and Step Two—the Question of "Collapse."

**Examiner's Conclusions:**

It is highly likely that a court would collapse all of the transactions within each of Step One and Step Two for purposes of evaluating the equivalence of the consideration given and received by the estates. This conclusion does not necessarily mean that a court would collapse Step One and Step Two together, or determine that Step Two Debt should be included in the solvency, capital adequacy, or intention to incur debt analysis, which are discussed separately in the Report.[250]

---

[250]    *See* Report at §§ IV.B.5.d.(6).(i)., IV.B.5.d.(6).(iii).

**Explanation of Examiner's Conclusions:**

To establish a constructive fraudulent transfer claim, an estate representative must prove that (i) the debtor transferred an interest in property or incurred an obligation in return for "less than a reasonably equivalent value," and (ii) the debtor was financially unsound at the time of or as a result of the transaction, meaning that the debtor (a) was "insolvent;" (b) had "unreasonably small capital" for any business in which the debtor was or was about to become engaged; or (c) "intended" to incur or "believed" that it would incur debts "beyond the debtor's ability to pay as such debts matured."[251]  The Third Circuit Court of Appeals has adopted a two-step inquiry to determine whether a debtor received reasonably equivalent value in exchange for a transfer or obligation:  First, did the debtor receive *any* value from the transfer?  If a court answers that question in the affirmative, the next inquiry is "whether the debtor got roughly the value that it gave."[252]  The value received and given need not be equal, but a meaningful shortfall in value received will result in a finding that the debtor received less than reasonably equivalent value.[253]  Whether the debtor received reasonably equivalent value is measured from the perspective of creditors.[254]

By its terms, Bankruptcy Code section 548(a)(1)(B)(i) provides for avoidance of an obligation if the debtor received less than reasonably equivalent value in exchange.[255]  Notably,

---

[251]   *See* 11 U.S.C. § 548(a)(2) (2006).

[252]   *Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan 003* (*In re Fruehauf Trailer Corp.*), 444 F.3d 203, 212-13 (3d Cir. 2006); *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 646-47 (3d Cir. 1991).

[253]   *See generally United States ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.)*, 230 F.3d 788, 806 (5th Cir. 2000); *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 213 (3d Cir. 1990).

[254]   *See Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors (In re R.M.L., Inc.),* 92 F.3d 139, 152 (3d Cir. 1996); *see also In re Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 286 (Bankr. E.D. Pa. 2006) (Carey, J., sitting by designation), *aff'd,* 371 B.R. 708 (E. D. Pa. 2007); *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 135 (Bankr. D. Del. 2005).

[255]   11 U.S.C. § 548(a)(1)(B)(i) (2006).

78

unlike Bankruptcy Code sections 548(c) and 550(a),[256] the statute does not limit avoidance *to the extent* the debtor received less than reasonably equivalent value.  Rather, the statute provides for avoidance of the entire obligation *if* the debtor received less than reasonably equivalent value and the other statutory prerequisites are met.  Read in conjunction with Bankruptcy Code section 548(c),[257] section 548(a)(1) provides for avoidance of the entire transfer or obligation incurred, whereas section 548(c) affords the transferee a lien or the right to retain an obligation "to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."[258]  Thus, section 548(c) offers a saving grace for the good faith initial transferee to the extent that party imparted value to the debtor.  Questions of good faith, in turn, should have no place in the threshold determination concerning the equivalence of the value received under section 548(a)(1) and should only be relevant "to the extent" of the value provided pursuant to section 548(c).[259]  Although reasonably equivalent value and good faith are measured as of the time of the transfer or the obligation in question,[260] the two inquiries are considered separately.

---

[256]   11 U.S.C. § 548(c) (2006) ("to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation"); 11 U.S.C. § 550(a) (2006) ("to the extent that a transfer is avoided . . . .").

[257]   11 U.S.C. § 548(c) (2006).

[258]   11 U.S.C. § 548(c) (2006); *see also Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 844 (Bankr. S.D.N.Y. 2008); *NextWave Pers. Commc'ns, Inc. v. FCC (In re NextWave Pers. Commc'ns, Inc.)*, 235 B.R. 305, 309 (Bankr. S.D.N.Y. 1999) ("[T]he appropriate remedy is avoidance of the entire obligation and reinstatement of the obligation to the extent of value given" in good faith), *aff'd*, 241 B.R. 311 (S.D.N.Y. 1999), *rev'd*. 200 F.3d 43 (2d Cir. 1999); *Gil v. Maddalena (In re Maddalena)*, 176 B.R. 551, 553-55 (Bankr. C.D. Cal. 1995).

[259]   5 COLLIER ON BANKRUPTCY ¶ 548.05 (Alan A. Resnick & Henry J. Sommer eds., 16th ed.) ("This definition of value, while derived partly from Section 3 of the Uniform Fraudulent Conveyance Act, substantively revises and departs from the definition contained in former Section 67d(1)(e) of the Bankruptcy Act, which, like section 3 of the UFCA, defined 'fair consideration.'  In a significant change from the 'fair consideration' standard, 'reasonably equivalent value' does not contain a good faith component.") (footnote omitted).

[260]   Focusing on the avoidance of obligations, which figures prominently in the Report, section 548(a)(1) provides for avoidance of an obligation incurred for less than reasonably equivalent value "in exchange for such . . . obligation."  11 U.S.C. § 548(a)(1)(B)(i) (2006).  Section 548(c) permits an obligee of an avoided obligation that takes for value and in good faith to enforce any obligation incurred to the extent such "obligee gave value to the debtor in exchange for such . . . obligation."  *Id.* § 548(c) (2006).  The focus on the equivalency of the value and obligee good faith is at the time of the exchange, as recognized by many cases in the context of avoidance and good faith defenses asserted in connection with transfers.  *See Peltz v. Hatten*, 279 B.R. 710, 737 (D. Del. 2002) ("For purposes of considering reasonable equivalence, the critical date is the date of the transfer

Applying these provisions to the obligations incurred and value received in the Leveraged ESOP Transactions, the appropriate question to ask is whether the Tribune Entities received reasonably equivalent value in exchange for the approximate $7 billion of Credit Agreement Debt the Tribune Entities incurred at Step One, the approximate $2.1 billion of additional Credit Agreement Debt the Tribune Entities incurred at Step Two, and the approximate $1.6 billion of Bridge Debt the Tribune Entities incurred at Step Two.  The Tribune Entities incurred all of the Step One Debt under the Credit Agreement as a single obligation, in exchange for which Tribune became obligated to repay the money advanced and gave the Stock Pledge to secure the Credit Agreement Debt, and the Guarantor Subsidiaries furnished their guarantees.  To the extent Step One is viewed as a single, integrated transaction as a result of collapse, the specific questions for reasonably equivalency purposes are whether the Tribune Entities received any value on account of the obligations incurred under the Credit Agreement and, if so, whether, in aggregate, the Tribune Entities received roughly the value they gave.  If either question is answered in the negative and the preconditions of avoidance are otherwise met, then the obligation would be avoided subject to any good faith defenses that may be asserted to the extent of exchanged value under section 548(c).  The same questions and answers should apply to the Step Two Debt.[261]

---

at issue."), *aff'd*, 60 F. App'x 401 (3d Cir. 2003); *see also Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 861-62 (D. Utah 1987) ("Certainly, if a defendant knew that the debtor was running a Ponzi scheme when he advanced money to the debtor or knew of the debtor's insolvency at the time of the allegedly fraudulent transfer, that knowledge might indicate a lack of good faith."); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180, 207 (Bankr. S.D.N.Y. 2006) ("Courts have found that the transferee does not act in good faith if the transferee had knowledge of the debtor's unfavorable financial condition at the time of the transfer."), *vacated on other grounds*, 379 B.R. 425 (S.D.N.Y. 2007); *Tavenner v. Smoot (In re Smoot)*, 265 B.R. 128, 140 (Bankr. E.D. Va. 1999) ("A person is not a 'good faith transferee' if he has knowledge of the transferor's unfavorable financial condition at the time of the transfer."), *aff'd*, 257 F.3d 401 (4th Cir. 2001).

[261] The question arises whether the LBO Lenders could assert a valid defense under Bankruptcy Code section 548(c) regarding advances for which the Tribune Entities did not receive reasonably equivalent value (such as, for example, payments to the Selling Stockholders) even if the LBO Lenders are determined to have acted in good faith.  Although the section 548(c) defense focuses on the  "value" the transferor gives, *see Jimmy Swaggert Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002), this section cannot be fairly construed to permit a lender in a leveraged buyout transaction, in effect, to revive under section 584(c) a

Certain case law, however, deviates from the preceding approach to questions arising under Bankruptcy Code sections 548(a)(1) and (c) in two ways.  First, in the context of leveraged buyout transactions, some courts suggest that when a lender furnishes value to enable the debtor to pay "legitimate corporate purposes,"[262] the portion of the obligation incurred to that lender to those amounts may not be avoided as a constructive fraudulent transfer.[263]  This means that, in

---

claim that is avoided under section 548(a)(1) for advances for which the debtor did not receive reasonably equivalent value.  First, the plain language of section 548(c) confers a defense on the good faith transferee or obligee only to the extent such entity "*gave value to the debtor* . . . ."  11 U.S.C. § 548(c) (2006) (emphasis added).  *See id.* at 802 ("Received property can be retained 'to the extent' that the 'transferee . . . gave value to the debtor.'") (citation omitted).  By definition, in collapsing each step to look at substance rather than form, the Tribune Entities' incurrence of obligations to the LBO Lenders to fund payments to Selling Stockholders did not constitute value that the Tribune Entities received.  *See* Report at § IV.B.5.c.(1).  Second, in the specific context of a leveraged buyout transaction and the assertion of a section 548(c) defense, the Third Circuit Court of Appeals, in dictum, observed that "the reasonableness of the remedy provided by section 548(a)(2) has been questioned, but noted that "because the fraudulent conveyance laws are intended to protect the debtor's creditors, a lender cannot hide behind the position, although sympathetic, that they have parted with reasonable value."  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991) (citing David Gray Carlson, *Leveraged Buyouts in Bankruptcy*, 20 GA. L. REV. 73 (1985), as making the case that lenders should have good faith defense of section 548(c) despite language requiring lender to have given value to the debtor).  Third, several cases from lower courts within the Third Circuit have noted that the standard for "value" under section 548(c) is the same as the standard for "reasonably equivalent value" under section 548(a).  *See Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203-04 (Bankr. D.N.J. 2006); *Satriale v. Key Bank USA (In re Burry)*, 309 B.R. 130, 136-37 (Bankr. E.D. Pa. 2004); *accord Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778, 810 (Bankr. S.D. Ohio 2009) ("The extent to which a defendant "gives value" for a particular transfer is essentially the flip side of the question of whether the debtor received "reasonably equivalent value" in exchange for the transfer.") (citations omitted).

[262]  *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995).

[263]  *See HBE Leasing*, 48 F.3d at 637 ("[S]ince Petitioners have not even alleged facts that would render improper the portion of the proceeds *not* paid to the Attorneys, the transaction is not fraudulent, at least as it pertains to this much of the second mortgage."); *see also Off. Comm. of Unsecured Creditors of Sunbeam Corp v. Morgan Stanley & Co. Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 371 (Bankr. S.D.N.Y. 2002) ("Where the funds are ultimately used for legitimate corporate purposes, then the transfer is not fraudulent.").  *HBE Leasing* involved an individual who advanced funds to the debtor under two mortgages, the proceeds of which from one were used to repay corporate loans owing to the debtor's insider and from another to pay attorney's fees.  The debtor was a defendant in RICO litigation at the time of the transfers.  The court separately evaluated the use of the proceeds from the two advances.  *HBE Leasing*, 48 F.3d at 637.  Regarding the proceeds from one mortgage used to pay attorney's fees, the court determined that the record supported the conclusion that the services for which the fees were incurred were for bona fide corporate purpose, but remanded the matter to the district court for further consideration whether the transfer constituted an intentional fraud.  *Id.* at 639-40.  When borrowings are used for purposes of paying pre-existing debt, courts that have found that reasonably equivalent value has been furnished presumably do so based on Bankruptcy Code section 548(d)(2)(a), which defines "value" to include the securing or satisfaction of an antecedent debt.  11 U.S.C. § 548(d)(2)(a) (2006).  *See, e.g., Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor.").  This conclusion is correct when an obligation is incurred solely to secure or satisfy a preexisting debt, but cannot be reconciled with section 548(a)(1) requiring avoidance of an obligation where a small portion

theory, a lender that advances funds under a single loan agreement would never have to establish its good faith for the portion of the obligations or transfers that conferred reasonably equivalent value as required under section 548(c), even though in the aggregate that lender provided less than reasonably equivalent value to the debtor in exchange for the obligation incurred. Moreover, whereas the transferee bears the burden of establishing a defense under Bankruptcy Code section 548(c),[264] the estate representative has the burden of proving a lack of reasonably equivalent value.[265]  In *United States v. Tabor Court Realty Corp.*,[266] however, the Third Circuit Court of Appeals rejected such an approach (albeit applying Pennsylvania's fraudulent conveyance law), endorsing the lower court's refusal to parse the consideration given by the lender toward the repayment of a creditor's claim that was guaranteed by the debtor's principal when the majority of the advanced consideration conferred no benefit to the estate.[267]

Second, courts in the Third Circuit consider the good faith of the transferee as a factor in determining reasonably equivalent value under section 548(a)(1) once they determine that a

---

of an obligation is incurred to satisfy or secure a preexisting debt, but most of the obligation is incurred for purposes for which the debtor receives no value or less than reasonably equivalent value.

[264]  *See Hill*, 342 B.R. at 202 ("In order to successfully assert a good faith defense under § 548(c), the burden shifts to the defendant/transferee."); *see also Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546, 572 (Bankr. D. Del. 2002) ("The Trustee bears the burden of proof on all of the issues pertaining to his *prima facie* case with respect to each of his fraudulent conveyance claims while the Defendants bear such burden regarding whether, for purposes of 11 U.S.C. § 548(c) and NYDCL § 278(2), they gave $575 million in good faith.").

[265]  *See Gen. Elec. Credit Corp. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 726 (11th Cir. 1990); *Brunell v. Fed. Nat'l Mortg. Ass'n (In re Brunell)*, 47 B.R. 830, 832 (Bankr. E.D. Pa. 1985) ("However, assuming *arguendo* to the contrary, the debtors, nevertheless, have the burden of proof on the 'reasonably equivalent value' issue."), *aff'd,* 76 B.R. 64 (E. D. Pa. 1985).

[266]  803 F.2d 1288, 1301 (3d Cir. 1986) (finding that of the $2.9 million allegedly paid to the debtor's creditors, $700,000 was used to pay closing costs while the remaining $2.4 million was distributed to stockholders, "the district court's characterization of the transactions as a whole as fraudulent cannot reasonably be disputed").

[267]  In the course of so holding, the court separately found that the lender had not acted in good faith.  *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1296 (3d Cir. 1986).

particular transfer conferred some value on the debtor.[268]  These courts apply this "totality of the circumstances" analysis even though, as noted, section 548 contemplates that questions concerning good faith should only be relevant in the context of a defense under section 548(c).[269] The Examiner considers in the Report the question of good faith as a separate inquiry, recognizing, however, that a court in the Third Circuit is likely to consider the question of good faith in analyzing the presence of reasonably equivalent value.[270]  The Examiner has no reason to believe that consideration by courts in the Third Circuit of good faith in the context of reasonably equivalent value under section 548(a)(1) would yield a different substantive result than if the question of good faith were properly considered only in conjunction with a defense asserted under section 548(c).

Having discussed the somewhat confusing methodologies courts have adopted to evaluate reasonably equivalent value and good faith under the applicable Bankruptcy Code provisions, the Examiner next considers the question whether a court would collapse the transactions within Step One and Step Two for purposes of reasonably equivalent value and intentional fraudulent transfer analyses.  Like other leveraged buyouts, the Leveraged ESOP Transactions were structured such that, as a matter of form, consideration at Step One flowed from the LBO Lenders to Tribune as advances under the Credit Agreement (and, later at Step Two, as advances

---

[268]  *See Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*, 405 B.R. 402, 412 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 64 (D. Del. 2010); *see also Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 213 (3d Cir. 2006).

[269]  Applying the analysis of section 548(c) in *Jimmy Swaggert Ministries v. Heyes (In re Hannover Corp.)*, 310 F.3d 796, 801 (5th Cir. 2002), the court in *Satriale v. Key Bank USA, N.A. (In re Burry)*, 309 B.R. 130, 135-36 (Bankr. E.D. Pa. 2004), held that the standard for "value" that must be imparted to the debtor to assert a defense under that section is synonymous with "reasonably equivalent value." *Accord In re Hill*, 342 B.R. at 203.  If followed by the Third Circuit Court of Appeals, this would mean that there is little, if any, difference between the inquiries presented under section 548(a)(1) and section 548(c), in that both consider the existence of the transferee's good faith and the reasonableness of the value conferred, an observation borne out by the section 548(c) analysis presented in *Burry*.

[270]  *See* Report at § IV.B.7.b.

under the Incremental Credit Agreement Facility and the Bridge Credit Agreement); then immediately from Tribune to the Selling Stockholders and to other parties.  If the analysis began and ended there, no constructive fraudulent transfer claim could be sustained to avoid the LBO Lender Debt or the transfers made because there is no dispute that the lenders did indeed advance amounts to Tribune equal to the obligations that the Tribune Entities incurred.[271]  Nevertheless, in appropriate circumstances, most courts will "collapse" an integrated leveraged buyout transaction for purposes of this analysis, such that the formality of the inflow to the company and immediate outflow to stockholders and other parties is disregarded.[272]  With the benefit of collapse, the lenders are viewed as having remitted the consideration directly to the selling stockholders, in many instances with no corresponding value furnished to the debtor.  In *Tabor Court*,[273] the Third Circuit Court of Appeals described a paradigmatic case for application of the collapse principle in this context: [274]

> McClellan, joined by the amicus, next argues that the district court erred "by collapsing two separate loans into one transaction." . . . The loan arrangement was a two-part process:  the loan proceeds went from IIT to the borrowing Raymond Group companies, which immediately turned the funds over to Great American, which used

---

[271]  One circuit court did (inappropriately) stop there.  *See Jones v. Nat'l Bank (In re Greenbrook Carpet Co.)*, 722 F.2d 659, 660-61 (11th Cir. 1984).  As discussed in the Report, however, most other courts have not followed suit.  *See, e.g., Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635, 646 (3d Cir. 1991) (questioning the Eleventh Circuit's decision in *Greenbrook Carpet*).

[272]  *See Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212-13 (3d Cir. 1986); *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1298, 1302-03 (3d Cir. 1986);  *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 546 (D. Del. 2005) (holding that, when considering collapsing a multi-step transaction, the court should focus "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction"), *aff'd*, 278 F. App'x 125 (3d Cir. 2008); *Big V Supermarkets v. Wakefern Food Corp. (In re Big V Holdings)*, 267 B.R. 71, 92-93 (Bankr. D. Del. 2001) ("Therefore, by 'linking' together all the interdependent steps with legal or business significance rather than taking them in isolation, the result may be based 'on a realistic view of the entire transaction.'").  *See also Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 285-86 (Bankr. E.D. Pa. 2006), *aff'd,* 371 B.R. 708 (E.D. Pa. 2007); *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.)*, 187 B.R. 315, 329 (Bankr. C.D. Cal. 1995); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 136 (Bankr. D. Mass. 1989); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 500-02 (N.D. Ill. 1988).

[273]  803 F.2d 1288, 1302 (3d Cir. 1986).

[274]  *Id.* at 1302 (internal citations omitted); *accord HBE Leasing Corp v. Frank*, 48 F.3d 623, 635-36 (2d Cir. 1995).

the funds for the buy-out.  McClellan contends that the district court erred by not passing on the fairness of the transaction between IIT and the Raymond Group mortgagors.

\* \* \*

The district court's factual findings support its treatment of the IIT-Raymond Group-Great American transaction as a single transaction.  For example, Durkin, president of Great American, solicited financing from IIT for the purchase.  The loan negotiations included representatives of all three parties.  The first closing was aborted by IIT's counsel because of, *inter alia*, concern about "unknown individuals" involved with Great American.  The $7 million loaned by IIT to the borrowing companies was "immediately placed in an escrow account;" "simultaneously" with the receipt of the IIT proceeds, the borrowing companies loaned Great American the cash for the buy-out and received in return "an unsecured note promising to repay the loans to the borrowing companies on the same terms and at the same interest rate as pertained to the loans to the borrowing companies from IIT."

Drawing from *Tabor Court*, courts in the Third Circuit evaluate three principal factors in determining whether collapse is appropriate when faced with transactions such as these:  "First, whether all of the parties involved had knowledge of the multiple transactions.  Second, whether each transaction would have occurred on its own.  And third, whether each transaction was dependent or conditioned on other transactions."[275]

All three of these factors are present at Step One and Step Two.  It is undisputed that the LBO Lenders that funded this indebtedness in both steps had full knowledge regarding the structure of these transactions, the sources and actual uses of funds, and the purposes of those uses.  All the transactions within Step One and Step Two, respectively, closed contemporaneously:  funds came into Tribune's accounts and were wired out immediately to make payments to the Selling Stockholders, the LBO Lenders, and other parties.  In Step One, the repayment of the 2006 Credit Agreement indebtedness only occurred because of the

---

[275]  *Mervyn's, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 497 (Bankr. D. Del. 2010) (internal citations omitted); *see also Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 327 B.R. 537, 547 (D. Del. 2005) ("Each step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent and merge Builder's Square and Hechinger."), *aff'd,* 278 F. App'x 125 (3d Cir. 2008).

financing provided under the Credit Agreement, which was only available because of the

transactions effectuated at Step One.  Payments for LBO Fees and other fees and charges, and, in

the case of Step Two, management bonuses, other fees and charges and, shortly after the Step

Two Financing Closing Date, Advisor Fees, were all made possible because of the closings.

Each transaction comprising Step One was mutually dependent and conditioned on the

occurrence of each other transaction within Step One, and each transaction comprising Step Two

was mutually dependent and conditioned on the occurrence of each other transaction within Step

Two.  In sum, these are prototypical transactions warranting collapse within each step.

      Citing the decision of the District Court for the District of Delaware in *In re Plassein*

*International Corp.*,[276] however, certain Parties contended to the Examiner that courts in the

Third Circuit will only collapse a leveraged buyout transaction when there is evidence of either

bad faith or intent to defraud.  In *Plassein,* the bankruptcy court dismissed constructive

fraudulent conveyance claims brought under sections 1304 and 1305 of the Delaware UFTA and

Bankruptcy Code section 544(b) because a non-debtor made the disputed transfer.[277]  The

bankruptcy court explained that "[t]he Trustee seeks to avoid the implications that [the

transferor] is not a debtor by arguing that the transactions are a single integrated plan and there is

authority to collapse the transaction to determine fraudulent conveyance liability."[278] Thus, the

*Plassein* plaintiff could only avoid the fraudulent transfers if the debtor and non-debtor were

"collapsed" into a single entity under an alter ego or veil-piercing theory that required heightened

---

[276]  *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 388 B.R. 46 (D. Del. 2008), *aff'd on other grounds*, 590 F.3d 252 (3d Cir. 2009) (not discussing collapsing).

[277]  *See Brandt v. B.A Capital Co. (In re Plassein Int'l Corp.)*, 366 B.R. 318, 326 (Bankr. D. Del. 2006), *aff'd,* 388 B.R. 46 (D. Del. 2008), *aff'd on other grounds*, 590 F. 3d 252 (3d Cir. 2009) (not discussing collapsing).

[278]  *Plassein*, 366 B.R. at 326.

intent.[279]  In affirming the bankruptcy court's dismissal of the trustee's complaint, the district

court stated: [280]

> As the Bankruptcy Court noted, courts in this Circuit have
> typically required proof of bad faith or intent to defraud to justify
> collapsing otherwise independent transactions.  In this case, the
> Adversary Complaint does not allege bad faith or intent to defraud,
> and therefore, the Court cannot conclude that the Bankruptcy Court
> erred in dismissing it.

The context in which the question of collapse was posed in *Plassein*—an allegation that

an entity operating with a similar name to the debtor actually should be treated as the debtor for

fraudulent transfer purposes—cried out for evidence of bad faith, fraud, or subterfuge to support

the result the estate representative was seeking.  There is no contention in the Tribune cases that

any third party masqueraded as the Tribune Entities in the Leveraged ESOP Transactions, and, as

a result, the circumstances and legal issues presented in *Plassein* have little relevance to the

current situation.  More importantly, for purposes of considering application of the collapse

principle here, contrary to the *Plassein* court's statement, the standard required to avoid collapse

of a leveraged buyout transaction in the Third Circuit is not lack of bad faith, but lack of

knowledge, as illustrated by the two circuit level opinions cited in *Plassein*.  *Tabor Court*

affirmed the lower court's findings regarding collapse of the transaction at issue because it was

integrated and mutually dependent, and all participants knew what was happening.[281]  Although

---

[279]  *Id.*; *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008) (finding sufficient evidence of fraud, illegality, or unfairness to justify treating the debtor and the non-debtor as a single entity).

[280]  *Plassein Int'l Corp.*, 388 B.R. at 49 (citing *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990); *United States v. Tabor Court Realty*, 803 F.2d 1288 (3d Cir. 1986); *Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 347 (W.D. Pa. 2006), *aff'd on other grounds*, 590 F.3d 252 (3d Cir. 2009).

[281]  *Tabor Court Realty*, 803 F.2d at 1302.  In *Tabor Court Realty*, the Third Circuit Court of Appeals agreed that the district court properly collapsed the steps of an LBO transaction in order to determine fraudulent conveyance liability and stated that the district court "looked beyond the exchange of funds between [the lender] and [the debtors]" because "the two exchanges were part of one integrated transaction."  803 F.2d at 1302; s*ee also Off. Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 274 B.R. at 90-91 (D. Del. 2002) ("Regardless of the various complex structures of leveraged buyouts, which often involve various loans, stock purchases, mergers, and repayment obligations,

*Tabor Court* also approved the lower court's findings that the lender (actually, the lender's predecessor) had not acted in good faith, the Third Circuit Court of Appeals considered lender good faith separately from the issue of collapse, looking to the integrated nature of the transaction and the knowledge of the parties:[282]

> We are satisfied with the district court's conclusion that the funds 'merely passed through the borrowers to Great American.' This necessitates our agreement with the district court's conclusion that, for purposes of determining IIT's knowledge of the use of the proceeds under section 353(a), there was one integral transaction.

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.* involved a foreclosure and resale scheme perpetrated as a subterfuge designed expressly by the participants to freeze out a large unsecured creditor.[283]  The Third Circuit Court of Appeals approved the lower court's findings on collapse, however, again based on the participants' knowledge of the various transactions that made the foreclosure scheme possible:[284]

> Admittedly, [the arguments made against collapsing the transactions] could have some validity where the lender is unaware of the use to which loan proceeds are to be put.  That is not the case here [in Tabor Court].  IIT [the lender] was intimately involved with the formulation of the agreement whereby the proceeds of its loan were funneled into the hands of the purchasers of the stock of a corporation that was near insolvency.  Try as they might to distance themselves from the transaction now, they cannot rewrite history.

At the Delaware District Court level, *Plassein* stands in contrast to the more comprehensive analysis contained in *Hechinger*, which did not require evidence of bad faith or

---

courts have found that a set of transactions may be viewed as one integrated transaction if the transactions 'reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange.'") (citations omitted).

[282]  *Tabor Court Realty*, 803 F.2d at 1302-03.

[283]  919 F.2d 206 (3d Cir. 1990).

[284]  *Id.* at 212-13; s*ee generally ACF-Brill Motors Co. v. Comm'r*, 189 F.2d 704, 707 (3d Cir. 1951) (stating that the question is whether "the steps … [were] so interdependent that the . . . one transaction would have been fruitless without the completion of the series").  The last case cited by *Plassein*, *Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re National Forge Co.)*, 344 B.R. 340 (W.D. Pa. 2006), applied *Tabor Court Realty* and *Voest-Alpine* to collapse various steps of a stock redemption plan into a single "integrated transaction" without any showing of bad faith or intent to defraud.  *Id.* at 347, 349.

knowledge of fraud to collapse.[285] *Plassein* also is inconsistent with the methodology adopted in the Third Circuit to determine reasonably equivalent value, which considers the question of good faith only after it is determined that some value was given to the debtor.[286] The question of collapse goes to the threshold question whether the debtor received some value before the question of good faith is addressed.

In the context of case law in the Third Circuit on the question of collapse, *Plassein* supports the conclusion that collapse is warranted when the evidence reveals an intentional fraudulent transfer or bad faith. The weight of authority in the Third Circuit, however, does not support the further contention that collapse *requires* a showing of bad faith or knowledge of a fraudulent intent. The Examiner finds that it is highly likely a court would collapse the transactions *within* each of Step One and Step Two for purposes of analyzing reasonably

---

[285] *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 327 B.R. 537, 547 (D. Del. 2005) ("[A]ll [of the defendants] knew about the multiple steps of the transaction. Each step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent and merge Builder's Square and Hechinger. Therefore, in evaluating the validity of the Transaction, the court considers it as one transaction."), *aff'd*, 278 F. App'x 125 (3d Cir. 2008). The court in *Rosener v. Majestic Management (In re OODC, LLC)*, 321 B.R. 128, 139 (Bankr. D. Del. 2005), stated:

> The Trustee in this case alleges that the effect of the series of transactions was to transfer assets of the Selling Companies to the Debtor and to impose $40 million in additional secured debt on the enterprise. Nothing was added to benefit the enterprise or the unsecured creditors as a result of the LBO. Therefore, the Trustee asserts that the transaction as a whole is avoidable because it was done with the intent to defraud the unsecured creditors of the Selling Companies (later of the Debtor) and because no consideration was given to the Debtor for incurring the additional secured debt. Undoing the transaction would leave the Selling Companies and their creditors where they began, with all their assets and without the secured debt.

> We agree with the Trustee that there is support for the theories on which his Complaints are founded and the relief requested. Therefore, we find it inappropriate to dismiss the Complaints.

A majority of courts outside the Third Circuit approach the question of collapse similarly and do not require actual fraud or concealment as a condition to collapse. *See Off. Comm. of Unsecured Creditors of Grand Eagle Cos. v. Asea Brown Boveri, Inc.*, 313 B.R. 219, 230 (N.D. Ohio 2004); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co. (In re MFS/Sun Life Trust)*, 910 F. Supp. 913, 934-935 (S.D.N.Y. 1995); *In re Sw. Equip. Rental, Inc.*, 1992 WL 684872, at *14-15 (E.D. Tenn. July 9, 1992); *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 74 (Bankr. N.D. Ill. 2002) ("Courts will eschew appeals to form which obscure the substance of a transaction. Thus, a multilevel transaction will be collapsed and treated as a single transaction in order to determine if there was a fraudulent conveyance.").

[286] *See, e.g., Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 13 (3d Cir. 2006).

equivalent value.  The import of this conclusion is that, in evaluating the consequences of the

Leveraged ESOP Transactions and the value that the Tribune Entities received from these

transactions, a court will look to the actual uses of the advances giving rise to the LBO Lender

Debt (as well as the additional funds used by Tribune) to make the payments to Selling

Stockholders and on account of LBO Fees and other assorted uses.[287]

### c.    Equivalence of the Value Provided Regarding Specific Transfers and Obligations.

This Section evaluates each component of the consideration given and received by the

participants in Step One and Step Two for purposes of assessing reasonably equivalent value

under Bankruptcy Code section 548(a)(1) and defenses under section 548(c).  Based on that

analysis, taken together, and the significant disparity between the value the Tribune Entities

received and the obligations incurred to the LBO Lenders in each of Step One and Step Two, the

Examiner finds it is highly likely a court would conclude that, in the aggregate, the Tribune

Entities received less than reasonably equivalent value in each of Step One and Step Two.[288]

---

[287]  A separate question arises concerning the consideration EGI-TRB paid in exchange for the Exchangeable EGI-TRB Note.  The Exchangeable EGI-TRB Note was issued to EGI-TRB on April 23, 2010, over a month before the Step One Financing Closing Date.  As discussed in another part of the Report, *see* Report at § IV.C.1., Tribune satisfied this note at Step Two when it issued to EGI-TRB the EGI-TRB Note.  Since the issuance of this note preceded the Step One Financing Closing Date by over a month, and the consideration paid for the note thereby was given before the Step One Financing Closing Date, a court might determine that collapse of the Step One Transactions would not extend to the consideration paid by EGI-TRB to Tribune.  On the other hand, because this note was issued as part of the Step One Transactions (a fact that was known to the participants in these transactions) and would not have been issued but for the Leveraged ESOP Transactions, and the consideration paid by EGI-TRB for this note enabled the transactions to proceed, a court might apply the collapse principle and treat this note as one of the transactions effectuated as part of the Step One Transactions for which Tribune received less than reasonably equivalent value.  To the extent the obligations incurred by Tribune on the Exchangeable EGI-Note are avoidable, Tribune's repayment of that obligation at Step Two might be recoverable.

[288]  This conclusion is drawn by comparing the components of reasonably equivalent value that the Debtors received from the LBO Lenders, in the aggregate, in Step One and Step Two, versus the obligations incurred to those creditors.  *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1299 (3d Cir. 1986).  At each of Step One and Step Two, the disparity is enormous.

This Section of the Report considers whether one or more of the Tribune Entities received reasonably equivalent value in exchange for certain specific transfers made at the time of the Leveraged ESOP Transactions or thereafter.  The analysis in this Section assumes *arguendo* that the other prerequisites to avoidance (i.e. insolvency, inadequate capital, or intention to incur debts beyond ability to pay) are otherwise met.  These questions are evaluated separately in the Report.  Also, this Section does not consider the good faith of any particular transferee, which as noted previously is relevant under the "totality of circumstances" for determining reasonably equivalent value in the Third Circuit[289] and defenses under section 548(c).  The Report considers questions of good faith in a separate Section of the Report, which also addresses what the Examiner's findings on good faith mean to questions of reasonably equivalent value and defenses under section 548(c).[290]

> **(1)    Examiner's Conclusions and Explanation Concerning Obligations Incurred to the LBO Lenders to Pay Selling Stockholders at Step One and Step Two.**

<u>**Examiner's Conclusions**</u>:

A court is highly likely to conclude that the LBO Lenders did not confer reasonably equivalent value on Tribune or the Guarantor Subsidiaries in the Step One Transactions or Step Two Transactions for those portions of their advances used to redeem the Selling Stockholders' Common Stock.

<u>**Explanation of Examiner's Conclusions**</u>:

Payments to stockholders to redeem stock are not transfers for which a debtor receives reasonably equivalent value because the debtor's stock is worthless to the debtor as a matter of

---

[289]    *See* Report at §§ IV.B.7.b.(1). and IV.B.5.b.

[290]    *See* Report at §§ IV.B.7.b.(1)-IV.B.7.b.(9).

law.[291]  Thus, no value was conferred on any Tribune Entity for obligations incurred to the LBO

Lenders to make these payments.

> **(2)    Examiner's Conclusions and Explanation Concerning Obligations Incurred to Repay the 2006 Bank Debt.**

**Examiner's Conclusions:**

A court is highly likely to conclude that the lenders under the Credit Agreement

conferred reasonably equivalent value to Tribune, but not to the Guarantor Subsidiaries, in Step

One for amounts borrowed to repay the 2006 Bank Debt.

**Explanation of Examiner's Conclusions**:

Payment of antecedent debt or advances to a debtor actually used by the company to pay

valid debt is for value.[292]  Because the 2006 Bank Debt represented valid antecedent debt, the

repayment of that debt should constitute reasonably equivalent value to Tribune.  Certain Parties

nevertheless argued that Tribune did not receive any "benefit" from the repayment of the 2006

Bank Debt because:  (i) the pre-existing holders of that debt were substantially the same as the

LBO Lenders; (ii) the LBO Lender Debt bore a higher interest rate than the 2006 Bank Debt; and

(iii) the 2006 Bank Debt was not guaranteed, whereas the LBO Lender Debt was.  The question,

however, is not whether repayment of the 2006 Bank Debt *improved* Tribune's position but

whether the repayment constitutes "value" for purposes of the applicable statutes, which it did.

---

[291]  *See Robinson v. Wangemann*, 75 F.2d 756, 757 (5th Cir. 1935) ("The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case.  It is simply a method of distributing a proportion of the assets to the stockholder."); *Consove v. Cohen (In re Roco Corp.)*, 21 B.R. 429, 434 (B.A.P. 1st Cir. 1982) ("Regardless of whether [a stockholder's] ownership interest had any tangible or intangible value to him, the stock was worthless to the corporation."), *aff'd*, 701 F.2d 978 (1st Cir. 1983).

[292]  11 U.S.C. § 548(d)(2)(A) (2006); *see also Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."); *Aphton Corp. v. Sonefi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010) ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.") (footnote omitted).

As noted previously, no evidence was adduced suggesting that the 2006 Bank Debt was invalid. Accordingly (but subject to questions of good faith), the lenders under the Credit Agreement should be entitled to a claim against Tribune equal to the amount repaid.  Because the Credit Agreement lenders advanced the funds to repay this debt, there would be no basis for the Bridge Facility Lenders to benefit from this repayment notwithstanding the contrary contention advanced by one Party.

Because the Guarantor Subsidiaries were not obligated on this debt, however, these entities did not receive reasonably equivalent value from advances that repaid the 2006 Bank debt.[293]

**(3)    Examiner's Conclusions and Explanation Concerning Obligations Incurred in Connection with the Satisfaction of the LATI Intercompany Claims.**

<u>**Examiner's Conclusions**</u>:

A court is highly unlikely to conclude that the Credit Agreement lenders conferred any value on one or more Tribune Entities resulting from the LATI Note transactions effectuated at the Step One Financing Closing Date.

<u>**Explanation of Examiner's Conclusions**</u>:

One Party advocated the position to the Examiner that the satisfaction of the LATI Notes represented reasonably equivalent value to the Debtors.  That Party acknowledged that even if the satisfaction of the LATI Notes could constitute reasonably equivalent value, at most this

---

[293]  *See United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 576-77 (M.D. Pa. 1983), *aff'd in relevant part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986) ("Those guarantors of the ITT loans who were not borrowing companies were, in essence, only secondarily liable on the ITT notes and loans. Nonetheless, despite the contingent nature of their obligations, the guarantees are clearly 'obligations incurred' under the [Uniform Fraudulent Conveyances] Act, and the mortgages collateralizing the guarantees are clearly conveyances. . . . No consideration at all flowed to the guarantors who were not borrowing companies.") (internal citations omitted).

would only represent value to the twenty-one Subsidiary obligors on the LATI Notes, not to any of the other Debtors.  This qualification, however, does not end up making a difference because this extinguishment conferred no value to the twenty-one Subsidiaries either.  As noted previously,[294] the repayment of a valid antecedent debt constitutes reasonably equivalent value for loan obligations incurred,[295] but only if the debt claimed to have been repaid is, in fact, debt.  In analyzing whether an instrument is debt or equity, the Third Circuit Court of Appeals has stated:[296]

> In defining the recharacterization inquiry, courts have adopted a variety of multi-factor tests borrowed from non-bankruptcy case law.  While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry:  the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else.  That intent may be inferred from what the parties said in their contracts, from what they do through their actions and from the economic reality of the surrounding circumstances.

In the years preceding the Leveraged ESOP Transactions, apparently to minimize state income tax liabilities,[297] the LATI Notes were created pursuant to a series of intercompany transactions having no substantive economic effect on the Tribune Entities in general or the entities made parties to the LATI Notes in particular.  Literally, capital flowed in an instant and in a circle from Tribune to LATI, then from LATI to twenty-one of Tribune's Subsidiaries, and

---

[294] *See* Report at § IV.B.5.c.(2).

[295] 11 U.S.C. § 548(d)(2)(A) (2006) ("'Value' means . . . satisfaction . . . of a present or antecedent debt of the debtor . . . ."); *see also Atlanta Shipping Corp.*, 818 F.2d at 249 ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."); *Aphton Corp. v. Sonefi Pasteur (In re Aphton Corp.),* 423 B.R. 76, 89 (Bankr. D. Del. 2010) ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.") (footnote omitted).

[296] *Cohen v. KB Mezzanine Fund II LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 455-56 (3d Cir. 2006); *see also Radnor Holdings Corp. v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) ("[T]he overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a *common sense* evaluation of the facts and circumstances surrounding a transaction . . . .").

[297] *See* Report at § III.D.13.; Examiner's Sworn Interview of Chandler Bigelow, June 17, 2010, at 263:10-22.

finally from these Subsidiaries back to Tribune.[298]  The fact that Tribune memorialized the

intermediate step (i.e., the transfer from LATI to the twenty-one Subsidiaries) in the form of

intercompany notes appears to be the only thing that distinguished that step from the others.[299]

Payments (or journal entries) of interest and principal followed a reverse circular path, again

having no significance other than to memorialize the periodic crediting of the note balances.  The

transactions effectuated on the Step One Financing Closing Date followed that same circular

journey via a series of book entries.  The only consequence of these transactions effectuated at

Step One was to extinguish the LATI Notes—instruments that had no independent meaning in

the first place.

    Any tax motivations driving these transactions, moreover, do not bear on whether the

LATI Notes actually represented indebtedness for fraudulent transfer analysis.  For two reasons,

"common sense"[300] leads to a contrary conclusion.  First, from beginning to end, none of the

dollar amounts circulated through the twenty-one Subsidiaries remained with those recipients.[301]

As noted above, once capital passed from LATI to a Tribune Subsidiary, the Subsidiary

immediately returned it to Tribune.  The transactions bore no resemblance to events that

ordinarily happen when parties act at arm's length.[302]  Second, many if not most of the

transactions relating to the LATI Notes (including the periodic repayment of principal and

---

[298]  *See* Report at § III.D.13.

[299]  *See Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986) (applying a multi-factor test to determine the nature of a claim and considering the name given the instrument as a factor); *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984) (same); *Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 323 (D. Del. 2003) (same).

[300]  *Radnor Holdings Corp.*, 353 B.R. at 838.

[301]  *See* Report at § III.D.13.

[302]  *See Scripomatic Inc. v. United States*, 555 F.2d 364, 368 (3d Cir. 1977) ("The analysis . . . to the debt-equity question may be expressed in terms of two lines of inquiry: assuming the obligation is debt in form, (1) did the form result from an arms'-length relationship, and/or (2) would an outside investor have advanced funds on terms similar to those agreed to by the shareholder.") (citations omitted).

interest) were accomplished via accounting entries:  no actual funds moved at all.[303]  More importantly, the consistent course of dealing demonstrated that Tribune would furnish the amounts necessary to "repay" interest and principal on the LATI Notes, with the money immediately looped back to Tribune.[304]  This was not a case in which any obligor was ever called on to pay so much as a penny from its own resources toward satisfaction of the LATI Notes.[305]  This course of dealing simply does not manifest anything resembling a real economic transaction.  Faced with similar circumstances, the bankruptcy court in *In re O'Day Corp.*[306] concluded "that cancellation of the Intercompany Notes did not provide fair consideration . . . . The Intercompany Notes appeared to have been created only for tax advantages conferred by the mirror subsidiary structures."

The conclusion does not change even if a court were to find that the LATI Notes constituted "debt" the moment before they were extinguished.[307]  From inception to repayment, the obligors on those notes never had to use their own financial wherewithal to repay the LATI Notes.  The capital always came from Tribune to the Subsidiaries and then a like amount from those entities to LATI and back to Tribune.  In other words, this was a "debt" that would always be paid but never have any substance in the real world.  In contrast, the guarantee obligations incurred by those Subsidiaries on the LBO Lender Debt and that replaced the LATI Notes were

---

[303]  *See* Report at § III.D.13.

[304]  *See id.*

[305]  Indeed, although the net effect of unwinding the LATI Notes at the Step One Financing Closing Date was to shift the LATI Note "liability" from the Subsidiaries to Tribune, to the best of the Examiner's knowledge no new intercompany note ever was issued to memorialize this "debt."

[306]  *Murphy v. Meritor Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 394 (Bankr. D. Mass. 1991).

[307]  The Examiner emphasizes that his finding that the LATI Notes do not constitute debt is presented solely in the context of the question of "value" for fraudulent transfer analysis.  The Examiner expresses no opinion, and is not addressing, whether the LATI Notes constitute debt for other purposes.  No Party has raised whether the intercompany liability from Tribune to LATI constitutes debt, and the Examiner similarly expresses no view on that question.

debt in every sense of the word.  There was and never could be any reasonable expectation that

the LBO Lender Debt would lack substance; that the satisfaction of these obligations would be as

simple as merely flipping an inter-company switch and running money back and forth among the

Tribune Entities in a circle; or that the LBO Lenders would act in any manner other than on an

arm's length basis to enforce their full rights of repayment.  The Examiner concludes that it is

highly unlikely that a court would find that replacing the LATI Notes with the LBO Lender Debt

constitutes reasonably equivalent value.

> **(4)    Examiner's Conclusions and Explanation Concerning Obligations Incurred on the Revolving Credit Facility, Delayed Draw Facility and under the Credit Agreement and Bridge Facility for Satisfaction of LBO Fees, and for Payment of LBO Fees.**

**Examiner's Conclusions**:

A court is reasonably likely to conclude that the lenders under the Credit Agreement

conferred reasonably equivalent value to Tribune and the Guarantor Subsidiaries in an amount

equal to amounts drawn on the Revolving Credit Facility and to Tribune only in an amount equal

to amounts drawn on the Delayed Draw Facility.  A court is highly likely to find that the LBO

Lenders conferred some value to Tribune and the Guarantor Subsidiaries for advances used to

pay the LBO Fees.  The amount of that value, however, is difficult to determine.

**Explanation of Examiner's Conclusions**:

Of the approximately $750 million made available under the Revolving Credit Facility at

Step One, approximately $237 million was drawn in a lump sum shortly before the Petition Date

for general corporate purposes for the Tribune Entities under Tribune's centralized cash

management system; Tribune used another approximate $100 million in borrowings under that

facility to obtain letters of credit.[308]  Consistent with the purpose of the Delayed Draw Facility,

Tribune borrowed approximately $193 million to make payments on the Senior Notes maturing

in February, October, and December 2008.  Had Tribune borrowed these funds at the closing of

Step One or Step Two, there would be little question that borrowings for these purposes would

constitute reasonably equivalent value to Tribune.[309]  However, because reasonably equivalent

value is measured at the time an obligation is incurred,[310] the question arises whether the amount

Tribune actually borrowed after the Leveraged ESOP Transactions "counts" toward reasonably

equivalent value at the time of the transfer.  In *Mellon Bank, N.A. v. Metro Communications*,

*Inc.*,[311] the Third Circuit Court of Appeals recognized that "[t]he ability to borrow money has

considerable value in the commercial world."[312]  Thus, a lender confers *some value* to the debtor

by making a credit facility available, even if the debtor does not immediately take advantage of

that opportunity by borrowing the money.[313]  Under Third Circuit authority, discussed below,

however, because the value of any such "indirect benefit" must be measurable, a court will likely

---

[308]  The Examiner understands that about $28 million of those letters of credit have been drawn since the Petition Date.  Accordingly, for purposes of calculating Recovery Scenarios, the Examiner used the actual amount drawn on that Revolving Credit Facility, $265 million.

[309]  *See Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan (In re Sunbeam Corp.)*, 284 B.R. 355, 371-72 (Bankr. S.D.N.Y. 2002) (finding that when the loan proceeds were used to refinance existing indebtedness, those transfers were not fraudulent even if viewed as a single, integrated transaction).

[310]  *See* text accompanying footnote 260 and Report § IV.B.7.b(1).

[311]  945 F.2d 635 (3d Cir. 1991).

[312]  *Id.* at 647.  The court went on to state: "To quantify that value, however, is difficult.  Quantification depends on the business opportunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business."  *Id.* at 645.  *Accord Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors of R.M.L. (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996).

[313]  The Third Circuit Court of Appeals therefore has implicitly rejected the approach suggested in *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir. 1981), that a determination whether a party imparted any value to the debtor is measured at the time each borrowing occurs.  However, the Third Circuit does require that the amount of the value conferred be quantifiable.  *See R.M.L.*, 92 F.3d at 149 (citing *Metro Commcn's*, 945 F.2d at 646).  Contrary to the contention of one Party, the Examiner does not find Bankruptcy Code section 548(d)(2)(A), which says that value does "not include an unperformed promise to furnish support to the debtor or to a relative of the debtor," relevant to this question.  11 U.S.C. § 548(d)(2)(A) (2006).  That Tribune did not borrow the funds at the closing of the Leveraged ESOP Transactions does not mean that the Credit Agreement lenders made an "unperformed promise."  The closing of Step One and the creation of availability under the Credit Agreement constituted a performed promise.

consider the Tribune Entities' actual use of such funds in the months following the Leveraged

ESOP Transactions to make that determination.  The Parties did not devote attention to the

question of which of the Tribune Entities derived value from the borrowing under the Working

Capital Facility shortly before the Petition Date.  Because the Examiner was required to address

this question in developing the Recovery Scenarios, the Examiner prorated this value among

Tribune and the Guarantor Subsidiaries based on the ascribed value of these entities at the time

of the borrowing on the assumption that these funds were available to fund the Tribune Entities'

operations under the centralized cash management system.  Regarding the Delayed Draw

Facility, however, because only Tribune was liable on the Senior Notes, only Tribune received

value from this borrowing to pay this valid antecedent debt of Tribune.

 Turning to the LBO Fees, substantial amounts were paid at the closing of Step One and

Step Two as LBO Fees from the proceeds of advances at Step One under the Credit Agreement

and from proceeds of advances at Step Two under the Credit Agreement and Bridge Facility.  At

each of the closings of Step One and Step Two, Tribune also paid fees to various law firms,

accountants, rating agencies, and other service providers.  Although one Party painted with a

broad brush and suggested that any and all fees paid in connection with these transactions should

be recovered as constructive fraudulent transfers (without identifying the recipients by name),

the Parties principally focused their advocacy on the LBO Fees and the Advisor Fees (the latter

of which are discussed in the next Section of the Report).  As a result, and because of the limited

time available to conduct the Investigation, the Examiner focused solely on the LBO Fees and

the Advisor Fees, which comprise the largest amounts paid.  Analysis of the other fees would

require further order of the Bankruptcy Court to enable the Examiner to supplement the

Investigation and the Report.

To the extent the Tribune Entities received less than reasonably equivalent value in incurring obligations to the Lead Banks to pay the LBO Fees, so the Tribune Entities received less than reasonably equivalent value for paying those fees.[314]  The former relates to the obligation incurred to the LBO Lenders to pay those fees, the latter to the payments actually made to the Lead Banks on account of LBO Fees.  Because the Examiner previously has found that the transactions within Step One and Step Two should be collapsed for purposes of evaluating reasonably equivalent value, *all* of the uses of funds advanced by the LBO Lenders and paid out contemporaneously with the closings must be scrutinized, not just the payments that went to the Selling Stockholders.[315]  There is no dispute that the LBO Lenders that funded these loans knew where the money was going when it was borrowed and paid out to pay LBO Fees.  To the extent those payments conferred no or inadequate value to the Tribune Entities and the other prerequisites to avoidance are met, the payment obligations incurred to the LBO Lenders should be avoidable.  Likewise, payments made to satisfy these avoidable obligations should be avoidable and payments be recoverable from the Lead Bank transferees.

Under applicable Third Circuit authority governing the determination of reasonably equivalent value, the first question is whether the LBO Lenders conferred any value on the Tribune Entities on account of the advances for these purposes.[316]  As discussed in the Report, Tribune and the Guarantor Subsidiaries received some quantifiable value from the advances under the Credit Agreement and the Bridge Facility.  Because Tribune and the Guarantor

---

[314]  *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1301 (3d Cir. 1986).

[315]  *See, e.g.*, *Tabor Court Realty Corp.*, 803 F.2d at 1301 (affirming the lower court's ruling that "the aggregate transaction was fraudulent, notwithstanding the fact that a portion of the loan proceeds was allegedly used to pay existing creditors").  The dissent took issue with this approach and would have held that the plaintiffs could not avoid the transfer of funds to repay creditors, *id.* at 1307-08 (Higginbotham, J., dissenting), but the majority disagreed.  *Id.* at 1300-01.

[316]  *R.M.L.,* 92 F.3d at 149.

Subsidiaries incurred the same obligation in respect of those portions of the advances under the

Credit Agreement and Bridge Facility that conferred value to the Tribune Entities and those that

did not, it follows that the LBO Lenders furnished *some* value to the Tribune Entities on account

of these obligations.

The next question is whether Tribune or the Guarantor Subsidiaries received reasonably

equivalent value in exchange for the obligations incurred to the LBO Lenders to pay the LBO

Fees.  The "totality of circumstances" approach adopted by the Third Circuit Court of Appeals

for purposes of analyzing reasonably equivalent value requires consideration of (i) the fair

market value of the benefit received as a result of the transfer, (ii) the existence of an arm's

length relationship between the debtor and transferee, and (iii) the transferee's good faith.[317]

Significantly, in *R.M.L.*, the Third Circuit Court of Appeal addressed the value conferred in

connection with a lender commitment fee.  The court rejected the contention that the inquiry

begins and ends with a finding that the transferee charged a "market rate" for the value

conferred: [318]

> Mellon Bank insists that the court's findings that:  (1) the fees
> Intershoe paid were in line with market rates; (2) Mellon Bank
> acted in good faith; and (3) for the most part, the parties dealt at
> arm's length, render clearly erroneous its conclusion that Intershoe
> did not receive value that was "reasonably equivalent."  We
> disagree.  As our discussion of "value" should have made clear, . . .
> while the chance of receiving an economic benefit is sufficient to
> constitute "value," the size of the chance is directly correlated with
> the amount of "value" conferred.  *Thus, essential to a proper
> application of the totality of the circumstances test in this case is a
> comparison between the value that was conferred and fees
> Intershoe paid.*

---

[317]  *Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan 003* (*In re Fruehauf Trailer Corp.*), 444 F.3d 203, 213 (3d Cir. 2006); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991); *R.M.L.*, 92 F.3d at 153.

[318]  *R.M.L.*, 92 F.3d at 153-154; *see also Fruehauf*, 444 F.3d at 214 ("[I]ndirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred.") (quoting *Metro Commc'ns*, 945 F.2d at 646).

As the court in *R.M.L.* mentioned, the Third Circuit has found that the "mere expectation" of conferring value may suffice "as long as the expectation was legitimate and reasonable."[319]  The court cautioned in a subsequent case, however, that this rule "yields to common sense:  in those cases where a court has sufficient evidence to conclude, based on a totality of the circumstances, that the benefits to the debtor are minimal and certainly not equivalent to the value of a substantial outlay of assets, the plaintiff need not prove the precise value of the benefit because such a calculation is unnecessary to the court's analysis."[320]

Case law at the circuit level does not provide specific guidance on how a court is to evaluate reasonably equivalent value in the context of obligations incurred to pay advisor or lender fees as part of a leveraged buyout transaction.  Although the Third Circuit clearly requires that the court consider the actual value conferred by the transferee on the estate, it is uncertain what legal significance, if any, is attributed to the fact that the fees were incurred in connection with a leveraged buyout in which the debtor received less than reasonably equivalent value.  In other words, are fees (and lender advances to pay those fees) that would be unassailable in an ordinary setting subject to avoidance and recovery when they are incurred as part of an otherwise constructively fraudulent leveraged buyout transaction?

The Examiner has not found any guidance in the reported case law any jurisdiction on the recovery of fees paid to a lender for making advances to the debtor in a leveraged buyout transaction.  In the context of advisor fees paid in a leveraged buyout transaction, some lower courts in the Third Circuit have ruled in favor of advisors seeking to protect the payment of fees against recovery in these contexts absent a showing that (i) the performance was not worth what the advisor was paid (without reference to the value received by the debtor in the transaction) or

---

[319]  *R.M.L.*, 92 F.3d at 152 (citing *Metro Commc'ns*, 945 F.2d at 647).

[320]  *Freuhauf*, 444 F.3d at 214.

(ii) the fees were outside the range of what is usual and customary.[321]  The paradigmatic example

to disregard the actually or constructively fraudulent context in which a third party renders a

particular service arises when fees are charged by a party who unwittingly renders those services

to a debtor engaged in an intentionally fraudulent scheme, such as, for example, a company that

printed a prospectus for Bernie Madoff or his "company" BMSI.[322]  The service rendered clearly

conferred no *actual* benefit on the estate, but when the charges are commensurate with market

and performed at arm's length, it is difficult to hold the transferee financially responsible for the

underlying fraud.  Based on the above-noted lower court decisions, lender and advisor fees (and

obligations incurred in a leveraged buyout transaction to pay those fees) may be similarly

insulated from recovery, even when they are made as part of a constructively fraudulent

leveraged buyout transaction, as long as the fees are customary and bargained for at arm's

length.[323]

      The Examiner, however, does not believe that the lower court cases are consistent with

the specific inquiry required under the Third Circuit's "totality of circumstances" test concerning

---

[321]  *See Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Co.)*, 327 B.R. 537 (D. Del. 2005) ("Plaintiff has not come forward with any evidence to contradict this expert opinion, nor any evidence that Leonard Green did not perform its management duties or that such performance was not worth what Leonard Green was paid."), *aff'd*, 278 F. App'x 125 (3d Cir. 2008); *Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*, 405 B.R. at 412 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 64 (D. Del. 2010); *Off. Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan (In re Sunbeam Corp.)*, 284 B.R. 355, 372 (Bankr. S.D.N.Y. 2002).  *But see Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*, 386 B.R. 37, 58 (Bankr. D. Del. 2008).  No Party presented evidence to the Examiner that the fees paid at Step One and Step Two to the Financial Advisors or LBO Lenders were outside the ordinary range for a transaction of this size or were not negotiated at arm's length.

[322]  *Balabar-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 680 (Bankr. S.D.N.Y. 2000) ("[T]he Brokers in these cases were hired and paid to produce mortgages or investors.  They produced and thereby gave value, giving rise to a contractual obligation on the part of Churchill to pay the commissions here at issue.  They earned what they were paid fairly and without wrongdoing.  On this ground the Trustee's fraudulent conveyance claims to recover commissions from the Brokers must be dismissed as a matter of law.").  *But see* footnotes 325 and 326.

[323]  405 B.R. at 412.

the fair market value of the *benefit received* in exchange for the transfer.[324]  This inquiry strongly

suggests that the court must evaluate the fees in the context in which they arise and the actual

value the debtor receives from those services, not just whether those amounts were

commensurate with market rates.[325]  Here, a significant disparity existed between the value the

Tribune Entities received in the Leveraged ESOP Transactions and the obligations incurred (with

the clear majority of the consideration flowing from the LBO Lenders to Selling Stockholders in

each of Step One and Step Two).  The LBO Lenders (as well as the Financial Advisors) in the

Leveraged ESOP Transactions, moreover, knew how the Leveraged ESOP Transactions were

structured and where the money was going.  They, therefore, stood in very different shoes than

the purveyor of printing services to Madoff and BMSI.  Faithful application of the totality of

circumstances analysis should require some consideration of the actual value received by the

Tribune Entities on account of the obligations incurred to pay the LBO Fees in the Leveraged

ESOP Transactions.[326]  Indeed, the majority of the LBO Lender advances were for purposes for

which the Tribune Entities received no value for constructive fraudulent transfer purposes, let

alone reasonably equivalent value.  The fees representing compensation to the Lead Banks

---

[324]  *See, e.g., Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991).

[325]  Certain case law outside the Third Circuit supports this view.  *See Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (affirming avoidance of the fees of a broker who helped provide financing to Ponzi scheme, even assuming the broker could satisfy the good faith standard and stating that "[w]e need not draw a conclusion on good faith, however, as his defense would still fail because he did not receive the transfers from RDI in exchange for reasonably equivalent value.  Johnson relies on his broker services to RDI as reasonably equivalent value for the transfers he received"); *Lawrence v. Bonadio, Insero & Co. (In re Interco Sys.),* 202 B.R. 188, 194 (Bankr. W.D.N.Y. 1996) ("[I]f the facts and circumstances indicate that a payment of professional fees or other expenses by a corporation was for services or goods which solely benefitted a third party, whether it be a principal, officer or employee, and had no reasonable, good faith business judgment benefit to the corporation, that payment would be avoidable under section 548 because of a lack of reasonably equivalent value . . . .").

[326]  *See Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*, 386 B.R. 37, 58 (Bankr. D. Del. 2008); *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 441 (Bankr. N.D. Ill. 1995) ("[E]ven if a contract existed here, the services conferred no value and, in fact, enforcing a contract for selling efforts in a Ponzi scheme would only exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate.") (citation and internal quotations omitted).

charged the Tribune Entities for making and arranging those advances cannot possibly be insulated from avoidance just because those fees allegedly were customary or commensurate with market rates.[327]  To conclude otherwise would be to ignore the lack of reasonably equivalent value that the LBO Lenders actually conferred on the Tribune Entities on account of the underlying obligations incurred.

To determine the fair market value of the value of the benefit received from the LBO Lenders for advancing amounts to pay the LBO Fees, a court might prorate the obligations incurred to pay these amounts (and the payments themselves) based on the ratio of the reasonably equivalent value conferred on the Tribune Entities in the Leveraged ESOP Transactions to the total obligations incurred in transactions.  Under this methodology applied to Step One and Tribune, for example—using rough numbers—the ratio of the reasonably equivalent value conferred on Tribune (for rounding purposes, $3 billion) to the aggregate Step One Debt incurred ($7 billion) would be multiplied by the actual obligations incurred in respect of the LBO Fees.  The product would equal the value conferred by the LBO Lenders on account of advances to pay LBO Fees in Step One.  Although one court adopted a proration approach to the question of recovery of interest payments on indebtedness in connection with a fraudulent transfer,[328] the Examiner, however, questions whether this approach is sensible when applied to

---

[327] *See generally Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991) ("The selling shareholders receive direct benefit in the LBO transaction as they are cashed out, usually at a price above the price the shares were trading shortly before the acquisition is announced.  The new purchaser also benefits from the transaction by thereby achieving ownership of the corporation.  The lender is attracted by the higher interest rates and *fees* usually associated with LBOs.  The target corporation, however, receives no direct benefit to offset the greater risk of now operating as a highly leveraged corporation.  As legal scholars have noted, the target firm may not at all reflect the Elizabethan deadbeat, but may in fact wind up as the sacrificial lamb.") (emphasis added).

[328] *Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*, 174 B.R. 557, 599  (Bankr. N.D. Cal. 1994) ("Applying quantum meruit principles to the situation at bar, the Court holds that Spitters should return to PDRA the $19,742.42 that he was paid as interest on the portion of his note which was not exchanged for value.  This amount will be added to the $458,104.45 in unsecured debt subordinated to the claims of all other unsecured creditors.").

the question of the fees at issue here (particularly advisor fees): It proceeds from the untested assumption that had Step One, for example, been a $3 billion transaction as opposed to a $7 billion transaction, the LBO Fees would have been proportionately lower on a dollar for dollar basis (as would the advisor fees).[329]

The Examiner believes that a more analytically sound approach would involve using precedent information from transactions comparable to the aggregate amount of benefit that Tribune and the Guarantor Subsidiaries derived from the Leveraged ESOP Transactions. In the course of the Investigation, however, the Examiner was unable to obtain relevant precedent information that he believes would provide meaningful guidance on this question. Rather than using limited and potentially misleading information on precedent transactions, for purposes of the Recovery Scenarios contained in Annex B to this Volume of the Report, the Examiner prorated the LBO Fees and Advisor Fees using the methodology described at the outset of this paragraph, recognizing that this is only a rough proxy for the amounts that a court might determine are appropriate under the circumstances.

Based on the lack of clarity in the law within the Third Circuit, it is not clear whether a court would adopt even the general analytical framework suggested by the Examiner. Moreover, questions of lender (and in the case of the payments received from those advances, Financial Advisor) good faith, discussed in another part of the Report,[330] undoubtedly would factor into a court's consideration of the totality of the circumstances concerning these questions. The most that the Examiner can conclude, assuming good faith *arguendo*, is that the LBO Lenders

---

[329]  With respect to advisor fees, information adduced in the course of the investigation suggests that financial advisors generally price their fees in varying percentages based on the size of the transaction. Examiner's Interview of Michael Costa, June 4, 2010 (Merrill "had a fee scale depending on size of transaction and depending on whether representing the buyer or seller. . . .Second way is precedent transactions because fees are publicly disclosed; there was database, that we had access to where I could say okay, let me look at all advisor fees paid for recap between $1 billion and $3 billion, and I could use that to determine fees.").

[330]  *See* Report at § IV.B.7.b.

conferred some reasonably equivalent value on Tribune and the Guarantor Subsidiaries in respect of the LBO Fees in an amount less than the amount of the fees incurred.[331]  How much less is unknown.

**(5)**    **Examiner's Conclusions and Explanation Concerning Payments Made on Account of Advisor Fees.**

**Examiner's Conclusions:**

The law in the Third Circuit is sufficiently unclear on the standard for determining the question of the reasonably equivalent value of the payments made on the Advisor Fees such that the Examiner is unable to assess how a court is likely to rule on these payments.  The Examiner leaves this question in equipoise.

**Explanation of Examiner's Conclusions:**

Morgan Stanley received its LBO Advisor Fees on May 9, 2007, after delivering its fairness opinion to the Tribune Board and Special Committee on April 1, 2007.  Tribune, therefore, paid this fee before the Step One Financing Closing Date, not from advances under the Credit Agreement and before Tribune incurred the Step One Debt.  Because these fees were paid when Tribune clearly was solvent, these fees should not be subject to avoidance and recovery.  In contrast, MLPFS and CGMI received their Advisor Fees in January 2008, shortly after the Step

---

[331]    Another question is which estate holds the right to seek to recover these transfers.  The Examiner believes that to the extent these payments were made from the proceeds of advances on LBO Lender Debt at the Step One Financing Closing Date or the Step Two Financing Closing Date, it is somewhat likely that a court would treat Tribune and the Guarantor Subsidiaries as co-transferors in proportion to the relative value of those entities, such that defenses under Bankruptcy Code section 548(c) would be allocated similarly.  Although a court could treat the entity from whose accounts funds were remitted to pay these fees (in this instance Tribune) as the transferor, in light of the integrated nature of the transactions effectuated within Step One and Step Two, and consistent with principles underlying collapse, the Examiner believes a court is more likely to treat both Tribune and the Guarantor Subsidiaries as having transferred these funds at the closings to effectuate these payments, just as Tribune's and the Guarantor Subsidiaries' jointly and severally and all as primary obligors incurred the LBO Lender Debt that made these payments possible.  To the extent, however, that Tribune contributed funds from its own concentration accounts to pay these amounts, the Tribune estate would have the exclusive standing to recover those transfers.

Two Financing Closing Date.  Those payments may be subject to avoidance and recovery by the Tribune estate (which made these payments) depending on the application of the considerations discussed in this Section.  Applying the factors discussed previously as the analysis contained in the Report demonstrates, Tribune received some value in connection with Step One and Step Two.  MLPFS and CGMI therefore conferred some value on those entities in rendering services relating to the Leveraged ESOP Transactions.  To determine how much value these advisors imparted under the "totality of circumstances," the Examiner has examined the three relevant additional factors:

(1)    Arm's length.  There is no evidence to suggest that the MLPFS and CGMI interacted with the Tribune Entities on any basis other than arm's length.

(2)    Good faith.  Questions concerning the good faith of MLPFS and CGMI are addressed elsewhere in the Report.[332]

(3)    Fair Market Value.  This is a key issue, not because the fees charged by MLPFS and CGMI are objectively unreasonable, but because there is a significant issue regarding the quantification of the value received by Tribune as the result of the Leveraged ESOP Transactions.  The fact that third parties, including the Selling Stockholders, were benefited by the Leveraged ESOP Transactions does not render the payments made to MLPFS and CGMI voidable, but such benefits are not properly considered in determining whether the Tribune Entities received fair value.[333]   Additionally, the fees paid may be subject to avoidance and recovery (again subject to questions of good faith), if the Leveraged ESOP Transactions are

---

[332]    *See* Report at § IV.B.7.b.

[333]    *Pummill v. Greensfelder, Hemker & Gale, P.C. (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 612-14 (B.A.P. 8th Cir. 2001), *cited with approval*, *Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 213 (3d Cir. 2006).

avoided in whole or in part.[334]  Assuming, however, that the fees are not automatically validated

because they are consistent with market standards and a fair compensation for the effort of

MLPFS and CGMI, or automatically avoided because the Leveraged ESOP Transactions are

avoided, the Examiner has suggested a general approach to making a determination of the value

conferred by the Leveraged ESOP Transactions.[335]  The Examiner recognizes, however, that a

court may well choose to apply a different method of determining the fair market value of the

benefit received by Tribune.

     A final question arises whether the payments of the Advisor Fees to MLPFS and CGMI

were "for value" for purposes of Bankruptcy Code section 548(d)(2)(A),[336] because the payments

satisfied "antecedent debt" of the Tribune Entities, specifically the contractual obligations that

Tribune undertook in 2006 when Tribune employed these firms.  If such a defense succeeded—

and if the contracts themselves could not be avoided—then any avoidance claims against

MLPFS and CGMI would be determined independently from any determination of the value

conferred on Tribune by the Leveraged ESOP Transactions.  The Examiner finds that it is

reasonably unlikely that a defense premised on satisfaction of an antecedent debt would succeed

because until and unless Step Two closed, Tribune owed no debt and MLPFS and CGMI held no

claim (even a contingent claim).  Specifically, there is no argument, and could be none, that had

---

[334] *See, e.g., Liquidation Trust of Hechinger Inv. Co. . v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008).  *Hechinger* has been cited by certain Parties. The District Court there rejected an attempt to avoid advisory fees—emphasizing the importance of "industry standards" and its determination that the advisor expended a "significant amount of effort" —but based its holding at least in part of the fact that "[b]ecause the court finds the Transaction was not avoidable, the fees paid to Chase are also not avoidable."  327 B.R. at 553 n.24.  Although there is no suggestion that the converse would be true, *i.e.*, if the transaction were avoidable, so are the fees, that is certainly a permissive inference.

[335] *See* Report at §§ IV.B.7.b.(6). to IV.B.7.b.(7).

[336] 11 U.S.C. § 548(d)(2)(A) (1996).

the Step Two Closing not occurred, Tribune would have owed any fee to MLPFS and CGMI.[337]

As such, there was no antecedent debt at the time of the payment of the fees in January 2008.

Likewise, the Examiner does not believe that a court is likely to find that MLPFS and CGMI

hold a defense based on the fact that Tribune paid these firms a month after the Step Two

Financing Closing Date; these fees clearly were paid as part of the Leveraged ESOP

Transactions and, unlike the fee paid to Morgan Stanley, were paid after Tribune incurred the

LBO Lender Debt and rendered insolvent.

>    **(6)    Examiner's Conclusions and Explanation
>            Concerning Tax Savings, 401(k), and Private
>            Company Status.**

**Examiner's Conclusions:**

A court is reasonably likely to conclude that, at Step Two, the Tribune Entities received

some reasonably equivalent value based on the tax savings made possible from the

S-Corporation/ESOP structure and avoidance of annual 401(k) plan contributions.  It is highly

likely that a court would prorate the value derived from tax and annual 401(k) savings among the

Tribune Entities based on the relative value of such entities.  Although the question of how this

value might be allocated between the Credit Agreement Debt and the Bridge Debt presents

interesting and difficult questions, in view of the magnitude of the value conferred, the question

appears to be somewhat academic.  It is highly unlikely that a court would find that, at Step Two,

Tribune and the Guarantor Subsidiaries received reasonably equivalent value on account of

avoidance of their annual public financial statement reporting requirements.

---

[337]    Examiner's Interview of Michael Costa, June 4, 2010; Examiner's Interview of Christina Mohr, June 29, 2010. *See In re Texaco Inc.*, 254 B.R. 536, 560 (Bankr. S.D.N.Y. 2000) ("A legal obligation that does not arise under state law until the 1990's or beyond cannot be mystically converted into a 'contingent' or 'unmatured' 'claim' as of March 23, 1988 because as of that date no 'right to payment' of any kind exists, and there is no 'liability' and no 'debt' that 'arose before' that date."). *See generally* Report at § IV.B.5.d.(6).(i).

**Explanation of Examiner's Conclusions**:

In applying Bankruptcy Code section 548, the Third Circuit Court of Appeals has recognized that a leveraged buyout or other complex corporate transaction may give rise to indirect benefits to the debtor that must be included in the calculation of reasonably equivalent value.[338]  As noted previously, however, to constitute reasonably equivalent value the benefit must be quantifiable.[339]  Moreover, value is to be determined from the perspective of creditors: "Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition."[340]  As Judge Carey noted:  "Because 'the purpose of fraudulent conveyance law is to protect creditors, the determination of value is looked at from the vantage point of the debtor's creditors.  Thus, the inquiry focuses on what did the debtor give up and what did it receive that could benefit creditors.'"[341]

---

[338]  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1999) ("Because Metro did not receive the proceeds of the acquisition loan, it did not receive any direct benefits from extending the guaranty and security interest collateralizing that guaranty.  However, in evaluating whether reasonably equivalent value has been given the debtor under section 548, indirect benefits may also be evaluated.  If the consideration Metro received from the transaction, even though indirect, approximates the value it gave TCI, this can satisfy the terms of the statute."); *see also Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149-50 (3d Cir. 1996); *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 993 (2d Cir. 1981); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995); *Jumer's Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.)*, 338 B.R. 344, 354-55 (C.D. Ill. 2006).  Although these cases arise in the context of the determination of reasonably equivalent value under Bankruptcy Code section 548(a)(1), the analysis would apply with equal force to a defense asserted under section 548(c).  *See, e.g., Satriale v. Key Bank USA, N.A. (In re Burry)*, 309 B.R. 130, 135 (Bankr. E.D. Pa. 2004).

[339]  *Pension Transfer Corp. v. Beneficiaries Under the Third Amend. To Fruehauf Trailer Corp. Ret. Plan 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 213 (3d Cir. 2006).

[340]  *Williams v. Marla (In re Marla)*, 252 B.R. 743, 759-61 (B.A.P. 8th Cir. 2000) (citing 7A Uniform Laws Annotated, Uniform Fraudulent Transfer Act § 3, Comment (1999)), *aff'd*, 267 F.3d 749 (8th Cir. 2001); *see also Jacoway v. Anderson (In re Ozark Rest. Equip. Co.)*, 850 F.2d 342, 344-45 (8th Cir. 1988) ("The concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the market place for the goods transferred.").

[341]  *See Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 286 (Bankr. E.D. Pa. 2006) (citations omitted).  *Accord Jimmy Swaggert Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002); *R.M.L.*, 92 F.3d 139, 150 (3d Cir. 1996); *Mellon Bank*, 945 F.2d at 646 ("The purpose of the [fraudulent transfer law in Bankruptcy Code § 548] is estate preservation; thus, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors."); *Boyer v. Crown Stock Distrib., Inc. (In re Crown Unlimited Mach., Inc.)*, 2006 Bankr. LEXIS 4651, at *19-20 (Bankr. N.D. Ind. Oct. 13, 2006) ("Furthermore, since fraudulent conveyance laws are intended to protect a debtor's creditors, the

Case law outside of the Third Circuit is mixed on the question whether tax savings may qualify as an indirect benefit.[342]  Statements from other cases suggest that "indirect benefits may include the synergistic effects of new corporate relationships."[343]  Although the Third Circuit has not addressed whether tax benefits can constitute value, the law in the Third Circuit does not support the contention advocated by certain Parties that any such value, even if quantifiable, cannot constitute value "given by" the LBO Lenders within the meaning of Bankruptcy Code section 548(c) or value exchanged by those entities within the meaning of section 548(a)(1).[344]  By definition, an "indirect benefit" is conferred *indirectly* by the transferee.

Under Third Circuit law, moreover, the dispositive question is how (and how much) the alleged indirect benefits would translate into something having actual value from a creditor's viewpoint.  At a superficial level, a creditor cannot levy on or sell a tax or pension savings derived by a debtor in its operations; hence, tax benefits and avoidance of pension costs arguably do not constitute value from the perspective of creditors.  However, to the extent the Tribune Entities would reduce their tax bills[345] and avoid incurring 401(k) costs, those savings would

---

transaction is to be evaluated from their perspective, not that of the defendant/transferee."); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 136 (Bankr. D. Mass. 1989) (evaluating "reasonably equivalent value" as used in Bankruptcy Code § 548(a)(2)(A), and making two inquiries: first, whether the debtor, not some third party, received the required value; and second, "unlike the doctrine of consideration in contract law, that value must pass a measurement test").

[342]  *MFS/Sun Life*, 910 F. Supp. at 937-38 (noting that "[t]he tax benefits that a target receives as a consequence of an LBO also constitute an indirect benefit," but finding in that case that "[i]t would be sheer speculation to assume that the tax benefits and economic value of the loan could be reasonably equivalent to the $26.8 million shortfall in consideration"); *see also Kipperman v. Onex Corp.*, 411 B.R. 805, 838 (N.D. Ga. 2009) (stating that in analyzing an LBO, "courts must look beyond the actual money received to the indirect benefits to the debtor. Such benefits may include synergistic effects of new corporate relationships . . . tax benefits, [and] additional access to credit to facilitate new business opportunities ") (citations omitted).  *But see Soule v. Allot (In re Tiger Petroleum Co.)*, 319 B.R. 225, 239 (Bankr. N.D. Okla. 2004) (finding that tax benefits resulting from a transaction are "granted by the tax laws and the taxing authorities" and not by the parties to the transaction).

[343]  *MFS/Sun Life*, 910 F. Supp. at 937; *see also Mellon Bank,* 945 F.2d at 647.

[344]  *See MFS/Sun Life*, 910 F. Supp. at 937; *see also Mellon Bank,* 945 F.2d at 646.

[345]  The Examiner found no evidence that the Tribune Entities were parties to a written tax sharing agreement. Because Tribune would be the taxpayer for federal income tax purposes, an argument could be made that any benefit from the tax savings inured solely to Tribune's benefit.  However, to the extent the tax savings actually

inure to the benefit of the creditors by leaving more money on the table to satisfy their claims. Although no specific case has been found to support this conclusion, the Examiner finds that, consistent with the principles articled by the Third Circuit Court of Appeals on the question of indirect benefits, the tax savings made possible from the S-Corporation/ESOP structure and the avoidance of annual 401(k) plan contributions may qualify as value at Step Two to the extent it can be shown that these savings would benefit creditors by enhancing the value of a Tribune Entity.

The Examiner's financial advisor quantified the value of these benefits. The S-Corporation/ESOP tax benefits arise from the S-Corporation's attribute of "passing-through" corporate earnings directly and proportionally to the stockholders, combined with the fact that the ESOP does not pay taxes on the income it earns through the S-Corporation.[346] These circumstances occurred on the Merger at Step Two. The value of the tax avoidance benefit from the S-Corporation/ESOP structure may be estimated by determining the taxes that would have been paid by Tribune absent this structure, if Tribune remained a going concern. Even an insolvent company can continue to operate. Because the benefit of the structure is equal to the taxes avoided, all the factors that typically bear on the determination of tax liability are relevant to the determination of the value of the tax avoidance benefit. Of primary importance is Tribune's projected taxable income, including the projected income from Tribune's operations, the periodic interest expense associated with Tribune's capital structure, and the depreciation and tax deductible amortization that may be reasonably recognized for purposes of determining

---

resulted in more value remaining within the Tribune Entities for operating purposes and otherwise, it is appropriate to allocate the value attributable to these benefits among those entities proportionate to the value of the benefits conferred. The Examiner notes that this a general proposition, as a specific Debtor-entity that generated no income tax and had a high tax basis would not enjoy any benefit from these savings.

[346] DAVID ACKERMAN AND SUSAN E. GOULD, *S Corporation ESOP Valuation Issues* in THE HANDBOOK OF BUSINESS VALUATION AND INTELLECTUAL PROPERTY ANALYSIS 141 (Robert F. Reilly and Robert P. Schweihs, eds., 2004).

taxable income.  In addition, the treatment of certain income from Tribune's equity investments must be analyzed.[347]

Because the valuation involves income, as opposed to cash, the discount rate used to convert period benefits to present value is critical in determining the value of these benefits. Moreover, because EGI-TRB had the right to acquire a 40% ownership interest in Tribune through its exercise of the Warrant at any time after consummation of the Merger, an assumption regarding when, if ever, EGI-TRB would exercise the Warrant affects the value of the tax savings.  This is because upon exercise of the Warrant, Tribune was required to sell to EGI-TRB a 40% interest in Tribune, which would reduce the tax avoidance benefit to Tribune from the ESOP ownership by a commensurate percentage.  Finally, any tax benefit associated with Tribune's former capital structure or other situation-specific benefits that Tribune enjoyed before the Leveraged ESOP Transactions were consummated, but foregone as a result of the Step Two Closing, should be quantified and netted against the value of the S-Corporation/ESOP tax benefit.

Based on the projected EBITDA set forth in the DCF Valuation Analysis in Annex A to this Volume of the Report, the Examiner's financial advisor deducted net interest expense, as well as depreciation, and amortization, to determine taxable income.[348]  In addition, VRC's corporate tax rate was applied in estimating the tax avoided by Tribune as a result of

---

[347]    For purposes of valuing the S-Corporation/ESOP structure, the Examiner's financial advisor included forecasted equity income only for Tribune's investment in TV Food Network given that: (i) forecasts of taxable income associated with Tribune's other equity investments contained in Tribune's October 2007 projections are deemed highly uncertain and, on a consolidated basis through 2006 and pro forma 2007, had not generated, collectively, any taxable equity income (excluding Comcast SportsNet), and (ii) Comcast SportsNet was anticipated to be sold.  If this projected income stream were included, the value associated with the S-Corporation/ESOP structure tax savings would increase to $884.4 million, holding all else constant, although the Examiner's financial advisor believes it would be appropriate to apply a further discount to that value to account for the risk of achieving the taxable equity income associated with these investments, as forecasted by Tribune.

[348]    Certain other Tribune-specific tax adjustments, as projected by Tribune, were accepted at face value as reasonable (*e.g.*, Section 199 adjustments).

consummating the Step Two Transactions.  The Examiner's financial advisor also adopted VRC's estimation of the interval before EGI-TRB would be expected to exercise the Warrant (15 years) as a model parameter, although this is only an assumption.[349]  The discount rate used to convert estimated avoided cash tax expense to present value is 16%, which is the rate applied by VRC in making its determination of the value of the S-Corporation/ESOP tax benefit.[350]  For purposes of estimating the terminal value of the S-Corporation/ESOP tax avoidance benefit, the Examiner's financial advisor accepted the terminal growth rate of 1% that VRC estimated at 2022.

Based on this analysis, the Examiner's financial advisor determined that a reasonable value for the S-Corporation/ESOP tax avoidance benefit is $482.5 million.  This value is highly sensitive to changes in critical input parameters including, for example, the discount rate applied to estimated period tax (for example, application of a higher estimated required rate of equity return would reduce the value of the benefit), and, as noted, the estimated interval before exercise of the Warrant.  Thus, this is only an estimate.

With respect to the value of the benefit derived from avoidance of Tribune's 401(k) expenses, the Examiner's financial advisor used VRC's estimate of $60 million per year in savings (an estimate that the Examiner's financial advisor does not have any basis to affirm or

---

[349]  If exercise of the Warrant is assumed to occur earlier, the value of the tax benefit to Tribune declines, in that Tribune would be entitled to only its proportional allocation of this benefit thereafter.

[350]  The Examiner's financial advisor believes that a 16% discount rate, which reflects a rate of return to equity (because the tax benefit determination is made based on the assumption that all debt holder periodic claims for interest are satisfied prior to, and in connection with, the determination of taxable income, and therefore before estimation of the cash flow benefits that result from the tax avoidance), is a very conservative estimation of the equity rate of return that may reasonably be applied in this circumstance.  Selection of a 16% discount rate represents a conservative estimate due to the substantial amount of Tribune's post-Merger leverage.  The Examiner notes that, during an exchange of questions and answers put to Tribune from the Lead Banks, the idea of discounting the S-Corporation/ESOP benefits using Mr. Zell's estimated expected rate of equity return of approximately 41% was discussed.  *See* Ex. 1037 (Kapadia E-Mail, dated December 17, 2007); Ex. 1068 (Kapadia E-Mail, dated December 19, 2007).  The Examiner's financial advisor believes that a persuasive case may be made to use such a discount rate if it can reasonably approximate Mr. Zell's (or an equity-based investor's) expected rate of equity return, since the determination of the value of the tax benefit is specific to Tribune and should be estimated with the implications of Tribune's actual post-Step Two capital structure in mind.

refute).  The cost of the annual 401(k) contribution must be adjusted, however, for the related tax

saving that Tribune previously enjoyed.  Based on a 39% tax rate, the net cost of the avoided

401(k) expense is $36.6 million per year.  The Examiner's financial advisor estimated the present

value of this annual savings using a discount rate of 8%,[351] resulting in a present value benefit of

$457.5 million.

Based on the preceding, the collective value of the S-Corporation/ESOP tax savings and

the 401(k) savings is approximately $940.0 million.  The value of these benefits, however, must

then be netted against the benefits foregone by Tribune as a result of the Merger, namely certain

cash tax saving attributes of the PHONES Notes that Tribune enjoyed prior to the closing of Step

Two.  The PHONES Notes tax benefits resulted from Tribune's ability to deduct interest expense

for the purpose of determining taxes, but to defer the actual cash payment of a portion of the

interest until the maturity of the PHONES Notes in 2029.  On the maturity date of the PHONES

Notes, the deferred portion of the interest obligation previously recognized for tax purposes

would become due.  The opportunity to defer cash interest payments until well into the future

benefitted Tribune significantly.  VRC calculated the structure and amount of this periodic

benefit, as well as the final amounts due under the deferral strategy, in its valuation of the

PHONES Notes tax deferral.[352]  The Examiner's financial advisor adopted this analysis for this

purpose.  The discounted present value of this deferral of taxes has been estimated on the basis of

the projected taxable income noted above, and the application of a discount rate of 10%[353]

---

[351]    A discount rate of 8% is appropriate since the benefit of avoiding compensation expense is a benefit to the
corporation as a whole.  Therefore, pre-transaction, industry-based weighted average cost of capital is the
proper rate to use to capitalize the annuity.

[352]    *See* Report at § III.H.3.

[353]    This rate is appropriate because the PHONES Notes benefit is determined after debtholders' return has been
satisfied (post-interest cash tax savings).  Therefore, the appropriate discount rate should reflect a pre-
transaction, industry-based cost of equity.

(reflecting a cost of equity informing the weighted average cost of capital estimated by VRC).

The present value of the PHONES Notes tax deferral asset, as quantified, is $371.9 million.

When the $482.5 million of S-Corporation/ESOP tax savings is added to the 401(k)

savings of $457.5 million, and that sum is netted against the value of the PHONES Notes cash

deferral benefit of $371.9 million that was foregone as a result of the Step Two Transactions, the

net benefit to Tribune resulting from the S-Corporation/ESOP structure is approximately $568.1

million on a present value basis.

Disagreement existed among certain Parties concerning how this value would be

allocated between the Credit Agreement Debt and the Bridge Debt.  There is no question but that

the value that was made available from these savings only occurred because Step Two happened.

Approximately $2.1 billion was advanced under the Incremental Credit Agreement Facility and

about $1.6 billion under the Bridge Credit Agreement at Step Two.  Although it is also true that

Step Two could not have occurred absent Step One (from the advances made under the Credit

Agreement at Step One), the Credit Agreement lenders cannot have it both ways.  It would be

inequitable for the same Step One lenders who argued so vociferously against collapse of Step

One and Step Two to be awarded credit for value that was generated solely at Step Two.  Indeed,

if the Credit Agreement lenders were to be rewarded for all the "good things" that happened at

Step Two, equity would require that they take the bad with the good.  Regardless of the equities,

because value under Bankruptcy Code section 548(c) is the counterbalance to avoidance under

section 548(a)(1), for reasons discussed in another part of the Report,[354] it is the value given *in

connection with* the avoided obligation (in this instance the Step Two LBO Lender Debt) that is

the object of a section 548(c) defense.  Nevertheless, by operation of the Subordinated Bridge

---

[354]    *See* text accompanying footnote 260 and Report at § IV.B.7.b.(1).

Subsidiary Guarantee, to the extent the Credit Agreement Debt is enforced at the Guarantor

Subsidiary level and this value is allocated at that level, this value should be remitted to lenders

under the Credit Agreement until payment in full of the Credit Agreement Debt (plus

postpetition interest whether or not allowed in the Chapter 11 Cases) at the Guarantor Subsidiary

level.  To the extent this value is allocated at the Tribune level, it should be allocated between the

$2.1 billion advanced under the Incremental Credit Agreement Facility at Step Two and the

amounts advanced under the Bridge Agreement.

Finally, certain Parties also asserted that the Leveraged ESOP Transactions, which

resulted in Tribune becoming a private company, permitted Tribune to avoid $20 million

annually in public reporting costs (equal to a present value of $137 million, assuming a savings

over a 10-year period).  This argument does not withstand analysis.  Although after the Merger,

Tribune no longer had publicly traded stock, it continued to have publicly traded bonds, which

subjected the Company to public reporting requirements.[355]  Indeed, even after the Step Two

Financing Closing Date, Tribune continued to file public reports at least until the Chapter 11

Cases were commenced.[356]  Although Tribune conceivably could realize incremental savings by

only having public bonds outstanding, no evidence was adduced to support that supposition.[357]

---

[355]  Trust Indenture Act of 1939 § 314(a), 15 U.S.C. § 77nnn (2006) .

[356]  *See* Ex. 942 (Tribune 10-Q, dated November 10, 2008); Ex. 854 (Tribune 8-K, dated December 11, 2008).

[357]  Although the April 2007 Confidential Information Memorandum refers to this potential savings, it supplies no data or breakdown of how assumed savings was determined.  *See* Ex. 178 at 42-43 (April 2007 Confidential Information Memorandum).

(7)     **Examiner's Conclusions and Explanation Concerning Post-Step One and Step Two Payments on Account of the Credit Agreement and Bridge Credit Agreement.**

**Examiner's Conclusions:**

A court is highly likely to conclude that, to the extent obligations incurred in the Leveraged ESOP Transactions lacked reasonably equivalent value, interest and principal payments made after those transactions but before the Petition Date on account of those obligations likewise were for less than reasonably equivalent value.  It is unclear, however, how a court would rule on the question whether the Credit Agreement Agent or the Bridge Credit Agreement Agent is the initial transferee of the payments on account of the Credit Agreement Debt or Bridge Debt, respectively, for purposes of Bankruptcy Code section 550(a)(1).

**Explanation of Examiner's Conclusions:**

Although little case law addresses what is essentially a "fruit of the poisonous tree" analysis, there is no principled reason to treat the payments on account of obligations any differently from the underlying obligations for purposes of reasonably equivalent value.  On the contrary, if an obligation is avoided as fraudulent transfer, then interest and principal payments made on account of that obligation do not satisfy any valid debt and such payments are not for reasonably equivalent value.  Therefore, the payments can generally be avoided themselves as fraudulent transfers.  What little case law exists is in accord.[358]  It would be necessary, however,

---

[358]  *See Kingsley v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877 (11th Cir. 2008) (stating that section 550(a) is intended to "restore the estate to the financial condition it would have enjoyed if the transfer had not occurred"); *Off. Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Bldg. Materials Corp. (In re G-I Holdings Inc.)*, 338 B.R. 232, 250 (Bankr. D.N.J. 2006) (same) (citations omitted); *Hirsch v. Gersten (In re Centennial Textiles)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (same).

for a court to prorate the portion of the payment attributable to the underlying indebtedness for which Tribune received reasonably equivalent value.[359]

As a separate matter, certain Parties argued that the Credit Agreement Agent is the initial transferee of the post-Leveraged ESOP Transaction payments within the meaning of Bankruptcy Code section 550(a)(1), such that these payments may be recovered from that entity separate and apart from any potential recovery that could be obtained against the Credit Agreement lenders as immediate transferees under section 550(a)(2).  Certain other Parties asserted the contrary view that the Credit Agreement Agent is not an initial transferee but rather just a stakeholder for the movement of funds from Tribune to the lenders.[360]  Resolution of the issue is potentially important because it is practically much easier to seek and obtain recovery from two parties than from dozens or hundreds of individual lenders.  If, however, the Credit Agreement Agent was not a transferee of such payments, then the lenders would be the initial transferees.[361]  Because the Parties devoted their attention principally to the question whether the Credit Agreement Agent is the initial transferee, this Section of the Report focuses principally on that question.

---

[359] *See generally Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*, 174 B.R. 577, 599 (Bankr. N.D. Cal. 1994) (applying *quantum meruit* principles).  Records reviewed by the Examiner's professionals indicate that all such payments came from Tribune concentration accounts.  Thus, Tribune was the transferor for purposes of these payments.  In theory, to the extent cash was swept from a Guarantor Subsidiary to these concentration accounts, such Guarantor Subsidiary should hold a corresponding intercompany claim against Tribune, which intercompany claim would be given effect in connection with the relevant Recovery Scenarios.  Because, as discussed later in the Report, *see* Report at § IV.B.8.d., the Parties did not challenge the Debtors' analysis of the effect of intercompany claims in the Recovery Scenarios, the Examiner did not independently investigate this matter.

[360] *See Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen)*, 300 F.3d 1097, 1106-07 (9th Cir. 2002) (finding debtor's husband was not an initial transferee of a cashier's check made payable to a creditor where the husband had possession of the check but could not legally negotiate the check); *Mallory v. Citizens Bank (In re First Sec. Mortg. Co.)*, 33 F.3d 42, 44 (10th Cir. 1994) (finding bank was not an initial transferee when it received money for deposit); *Bonded Fin. Servs., Inc., v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (finding bank was not an initial transferee where transferor sent bank a check payable to bank's order with note directing bank to deposit check into account of a third party transferor).

[361] *See Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 56 (2d Cir. 1997) ("Numerous courts have recognized the distinction between the initial recipient – that is, the first entity to touch the disputed funds – and the initial transferee under section 550."); *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 103 (Bankr. D. Del. 2010).

However, as noted at the end of this Section, because the relevant provisions of the Credit Agreement and Bridge Credit Agreement are substantially the same, so is the legal analysis and conclusion.

Bankruptcy law has long recognized that a party who receives money or property for the delivery to another should not be considered the transferee for avoidance purposes.[362]  When the transfer in question involves the payment of money, an entity that has no ability "to put the money to [its] own purpose" is not an initial transferee.[363]  In *Bonded Financial Services v. European American Bank*,[364] the Seventh Circuit Court of Appeals held that, unless the recipient of money or property has "dominion and control" over such property, the recipient is not a transferee.  In that case, a currency exchange gave $200,000 to its principal, Michael Ryan, by sending the bank a check with a note to deposit the check into Ryan's account.[365]  The Seventh Circuit affirmed the lower court's holding that the bank was not the initial transferee because it only acted as a financial intermediary:[366]

> [T]he minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes.  When A gives a check to B as agent for C, then C is the "initial transferee;" the agent may be disregarded.

---

[362]  *See, e.g.*, *Carson v. Fed. Reserve Bank*, 172 N.E. 475, 482 (N.Y. 1930) ("The person to be charged with liability, if he has parted before the bankruptcy with title and possession, must have been more than a mere custodian, an intermediary or conduit between the bankrupt and the creditor.  Directly or indirectly he must have had a beneficial interest in the preference to be avoided, the thing to be reclaimed.").

[363]  *See Off. Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*, 287 B.R. 41, 46-47 (Bankr. D.N.J. 2002) (holding administrator of debtor's 401(k) program was not an "initial transferee" when the administrator was "bound by the contract terms" and "distributed the funds in accordance with the contract").  *Accord Bonded Fin. Servs.*, 838 F.2d at 893 ("[T]he minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes."); *see also Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund)*, 359 B.R. 510, 519-20 (Bankr. S.D.N.Y. 2007) (citing courts adopting the *Bonded Financial* test); *Burch v. Stylish Move Sportswear Inc. (In re Factory 2-U Stores, Inc.)*, 2007 Bankr. LEXIS 3140, at *9-10 (Bankr. D. Del. Sept. 11, 2007) (Carey, J.) ("Bankruptcy courts in this district have relied upon the *Bonded Financial* test.") (citations omitted); *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVOE Corp.)*, 327 B.R. 210, 216, 233 (Bankr. D. Del. 2005) (citing *Bonded Financial*).

[364]  *Bonded Fin. Servs.*, 838 F.2d at 893.

[365]  *Id.* at 891.

[366]  *Id.* at 893.

121

The court elaborated that "an entity does not have legal dominion over the money until it is free to invest that money in lottery tickets or uranium stocks."[367]  Examples of entities exercising no dominion over funds may include depository banks, escrow and title companies, and attorneys holding funds in trust in connection with settlements.[368]  In contrast, a circumstance warranting a finding that an entity is a transferee arises when that entity has "'dominion over the money or other asset [and] the right to put the money to [its] own purposes.'"[369]

This test announced by the Seventh Circuit Court of Appeals has been widely-adopted, but sometimes altered.  In *Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*,[370] the Second Circuit Court of Appeals, in approving and applying the *Bonded* test, formulated what it called the "mere conduit test."  The Second Circuit held that an insurance broker that received policy premiums from the law firm and, within several days, issued checks in the same amounts to primary insurers and reinsurers was a "mere conduit" not an initial transferee, noting:[371]

> As Finley Kumble's agent—not American Home's—A&A had no discretion or authority to do anything else but transmit the money, which is just what it did.  Moreover, it is uncontested that the transfer of premium funds is an ordinary and routine financial transaction for an agency in A&A's industry, and that the transfer itself was performed here by A&A in a regular and unexceptionable way.  Despite the existence of a more complex relationship, there can be no question that at that point A&A was

---

[367]  *Id.* at 894.

[368]  *Leonard v. First Commercial Mortg. Co. (In re First Alliance, Inc.)*, 228 B.R. 225, 233 (Bankr. S.D.N.Y. 1983) ("Examples of them include banks, . . . real estate escrow and title companies, . . . securities or investment brokers, . . . and attorneys holding funds in trust in connection with settlements of disputes . . . .") (internal citations omitted).

[369]  *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 103 (Bankr. D. Del 2010) (citing *Bonded Financial*, 838 F.2d at 893, and *Factory 2-U Stores*, 2007 Bankr. LEXIS 3140, at *9-10).

[370]  *Christy v. Alexander & Alexander Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),* 130 F.3d 52 (2d Cir. 1997).  *Accord Wheeling Pittsburgh Steel v. Keystone Metals Trading (In re Wheeling Pittsburgh Steel)*, 360 B.R. 649, 652 (Bankr. N.D. Ohio 2006) ("All indications are that Keystone was simply acting as a payment conduit between Wheeling and its services providers, having no legal right to put the money it received from Wheeling to its own use.").

[371]  *Finley*, 130 F.3d at 59 (citations omitted).

acting only to channel the funds from the premium returns and
Finley Kumble to American Home.

In contrast to the "dominion and control" analysis, which focuses on the entity's control over specified funds, the Second Circuit's formulation of the "mere conduit" test focuses on whether the entity serves as an intermediary between the transferor and a third party.[372] "'Parties that act as conduits and simply facilitate the transfer of funds or property from the debtor to a third party generally are not deemed initial transferees . . . .'"[373]  Thus, the Second Circuit shifted the focus from control over the money on deposit to the alleged transferee's role in moving value from one party to another.

Examining the relevant provisions of the Credit Agreement governing Borrower payments to the Credit Agreement Agent, the Credit Agreement unsurprisingly provides that payments are applied in a very specific way so as to ensure that the lenders who advanced the funds receive interest and principal owing and the borrower appropriately receives credit against the obligations it owes.  Specifically, the Credit Agreement provides for Tribune to repay advances and make prepayments to the Credit Agreement Agent, which receives the payments "for the account" of a particular Credit Agreement lender.[374]  Although the phrase "for the account" is not defined, read in context this means that the payments are credited to the amounts owing to a particular lender.

---

[372] *See Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 34 (S.D.N.Y. 2007) ("Rather than stating that a party is an initial transferee  if it exercises 'dominion and control' over the funds, the Second Circuit's version of the test states that a party is *not* an initial transferee if it was a 'mere conduit' **of** the funds.") (emphasis added).

[373] *Finley*, 130 F.3d at 58 n.3 (quoting *Hooker Atlanta Corp. v. Hocker (In re Hooker Inv., Inc.)*, 155 B.R. 332, 337 (Bankr. S.D.N.Y. 1993)).

[374] Ex. 179 at §§ 2.05(a), 2.05(b), and 2.13(f) (Credit Agreement) (providing that each payment "shall be applied," "shall be allocated," or "shall be made" ratably based on the principal amount owing on a specific tranche of Credit Agreement Debt).  The question concerning the Credit Agreement Agent's status as conduit or transferee would have been easy to answer if the Credit Agreement Agent were the sole holder of the Credit Agreement Debt and had participated its interests to third parties, but that is not how the document or the syndicated transaction was structured.

123

The Credit Agreement, however, falls short of requiring the Credit Agreement Agent to distribute the actual funds it receives to the Credit Agreement lenders.  No escrow or specified account is established to hold those funds pending payment to the lenders.  Rather, the Credit Agreement says that once the Credit Agreement Agent receives payments it "will promptly thereafter cause to be distributed *like* funds relating to the payment of principal or interest, fees or commissions fees [sic] ratably . . . to the Lenders . . . ."[375]  The Credit Agreement further authorizes the Credit Agreement Agent to assume that Tribune has timely made payment, and based thereon, "to cause to be distributed to each lender on such due date *an amount equal to* the amount then due each Lender."[376]  If this assumption proves wrong, the Credit Agreement lender must repay the Credit Agreement Agent the amount received plus interest "at the Federal Funds Rate" for each day until repayment is made.[377]

Thus, although the Credit Agreement specifies how payments are to be credited and what amounts the Credit Agreement Agent is required to remit to the Credit Agreement lenders following its receipt of those payments, the Credit Agreement does not limit the Credit Agreement Agent's rights with respect to the actual funds paid by Tribune.[378]  Although the Credit Agreement Agent receives the funds in its capacity as agent of the lenders, the Credit

---

[375]  *Id.* at § 2.13(a) (emphasis added).

[376]  *Id.* at § 2.13(f).

[377]  *Id.*

[378]  *Off. Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*, 287 B.R. 41, 46-47 (Bankr. D.N.J. 2002) ("GIAC could not exert dominion and control over the funds because it was bound by the contract terms, which granted control to the individual employees participating in the plan.  Moreover, GIAC was not capable of using the funds for its own purposes.  It was obligated to deposit the funds at the direction of the employee participants, and not at its own discretion.").  *See also Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 103 (Bankr. D. Del. 2010) ("[T]he Committee does not plead in the Second Amended Complaint how Bank of America acting as trustee had 'dominion and control' over the funds.  Specifically, the Committee fails to plead how Bank of America has legal title to the Notional Rent funds as opposed to mere physical possession.  Bank of America acted as a financial intermediary and trustee to the Trust.  It received no benefit and under the law of contracts, Bank of America is bound by the terms of the Trust and is therefore no different from a courier or an intermediary on a wire transfer; it held the Notional Rent funds only for the purpose of fulfilling an instruction to make the funds available to a third party.").

Agreement imposes no limits on the Credit Agreement Agent's dominion over or use of the funds.  Rather, the Credit Agreement only obligates the Credit Agreement Agent to pay an amount equal to (i.e., "like funds") the amount received to those lenders and authorizes the Credit Agreement Agent, in effect, to extend credit to those lenders premised on receipt of payment from Tribune.

The question, then, is whether the Credit Agreement Agent would be deemed a transferee when it was free to use the actual funds paid by Tribune as it saw fit, but was obligated to pay to the Credit Agreement lenders an amount equal to those funds.  Application of *Bonded Financial* suggests that the Credit Agreement Agent has "dominion and control" over the actual amounts received from Tribune and therefore should be an initial transferee.  Focusing on the actual funds, the Credit Agreement does not impose any restrictions on the Credit Agreement Agent's use of those funds.  In theory and quite possibly in practice, once Tribune paid principal or interest to the Credit Agreement Agent, the Credit Agreement Agent was free to spend those amounts however it pleased.  Its only duty was to pay a "like" amount to the lenders.  Stated differently, suppose the Credit Agreement Agent became subject to a receivership proceeding the moment after the Credit Agreement Agent received payment from Tribune but before the Credit Agreement Agent paid a like amount to the lenders.  In that posited scenario, there seems little doubt but that (i) as between the Credit Agreement Agent and the lenders, the former would be a debtor and the latter creditors and (ii) Tribune would not be obligated to pay the same amount twice if the lenders were unsuccessful in extracting payment from the Credit Agreement Agent in its receivership proceeding.

On the other hand, focusing on the role played by the Credit Agreement Agent under the "mere conduit" test articulated in *Finley Kumble*, the Credit Agreement plainly obligates the Credit Agreement Agent to pay over to the lenders the same amount it received from Tribune.

The Credit Agreement Agent serves as an intermediary between Tribune and the lenders, much as the insurance broker did between the law firm and the insurance companies in *Finley Kumble*. In *Finley Kumble*, it was apparent that the broker wrote checks to the insurance companies on its own account.  Yet, as a "mere conduit" the broker was not deemed a transferee in connection with the movement of money.  In short, if standard adopted in *Finley Kumble* applies, the Credit Agreement Agent is almost certainly not a transferee, except to the extent it receives funds for its own account.

Although cases from lower courts within the Third Circuit have tended to focus on whether the alleged transferee exercised control over the actual funds transferred,[379] those courts have not addressed a circumstance similar to the one presented here.  Because the Third Circuit Court of Appeals has not spoken on this question and the lower court cases have provided insufficient guidance, the Examiner leaves this question in equipoise.  Although this question certainly is important to the Credit Agreement Agent (albeit the agent holds rights of indemnity) and, as an administrative matter, to a prospective estate representative, its outcome should not affect the Tribune Entities' recovery.  If the LBO Lenders are the initial transferees, the amounts received could be identified and most could be tracked down,[380] and as initial transferees they would be subject to the same liability the Credit Agreement Agent would face if it instead were

---

[379]   *See Nelmark v. Helms*, 2003 U.S. Dist. LEXIS 3664, at *12 (N.D. Ill. March 12, 2003) ("Although the facts here and in *Bonded* and *In re Circuit Alliance, Inc.* are arguably alike in these respects, appellants ignore other parts of the record which were not at issue in the cited cases and would readily distinguish them, for example, that they were the debtor's daughters, thus insiders, and they commingled the debtor's funds with their own funds."); *Mervyn's Holdings*, 426 B.R. at 103; *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVOE Corp.)*, 327 B.R. 210, 217 (Bankr. D. Del. 2005) ("The question of the Defendant's power over the account raises a genuine issue of material fact.  There is conflicting evidence concerning the extent of the Defendant's control over those funds.").

[380]   The Credit Agreement Agent must maintain "a register for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amount of the Advances owing to, each Lender from time to time."  Ex. 179 at § 8.7(d) (Credit Agreement) (register includes "(iii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iv) the amount of any sum received by the Agent for Borrower hereunder and each Lender's share thereof.").

the initial transferee.  Proceeding against each individual transferee, however, obviously would increase the costs of seeking recovery.

Although the Parties focused principally on the Credit Agreement and the Credit Agreement Agent, the issue of the Bridge Credit Agent's status as transferee or conduit was also raised.  As the Bridge Credit Agreement and Credit Agreement are structured similarly, the analysis presented above is no different.[381]

> **d.     Framing the Solvency and Capital Adequacy Analysis.**

Having analyzed questions concerning reasonably equivalent value, the Report turns next to questions concerning solvency, capital adequacy, and intention to pay debts as they come due.

Bankruptcy Code section 548(a) provides that the trustee or debtor in possession may avoid the transfer of an interest in property or any obligation incurred by the debtor made or incurred on or within 2 years of the petition date, if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" *and* at least one of  three disjunctive "insolvency" conditions is satisfied, such that the debtor:

- was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

- was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

- intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. . . . [382]

---

[381]  *See* Ex. 175 at §§ 2.13(a), (e) (Bridge Credit Agreement).

[382]  11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III) (2006).  Bankruptcy Code section 548(a)(1)(B)(ii)(IV), which is not excerpted in the text above, addresses transfers under employment contracts outside the ordinary course of business.  11 U.S.C. § 548(a)(1)(B)(ii)(IV) (2006).

These alternative insolvency-related requirements and the issues they raise in respect of the Leveraged ESOP Transactions are addressed below.

> **(1)** **Examiner's Conclusions and Explanation Concerning the Relevant Dates for Step One and Step Two Solvency, Capital Adequacy, and Intention to Pay Debts as They Come Due Analysis.**

<u>Examiner's Conclusions</u>:

A court is highly likely to conclude that the Step One Financing Closing Date and Step Two Financing Closing Date are the relevant dates for conducting the solvency and capital adequacy analyses of the Tribune Entities.

<u>Explanation of Examiner's Conclusions</u>:

The Examiner previously has concluded that the relevant provisions of Bankruptcy Code section 548 require that reasonably equivalent value and good faith are measured at the same time that obligations are incurred and value allegedly is delivered.[383]  By parity of reasoning, Bankruptcy Code section 548(a)[384] strongly suggests that the Step One Financing Closing Date and Step Two Financing Closing Date are the correct dates to measure solvency and capital adequacy of the Tribune Entities because those are the dates on which the Tribune Entities incurred obligations and made transfers in the form of payments.  Although Tribune executed numerous agreements and undertook certain obligations both on April 1, 2007, when the Tribune Board approved the Leveraged ESOP Transactions, and on May 17, 2007, when Tribune entered into the Credit Agreement, conditions to closing Step One remained outstanding nevertheless, on those dates.  Had these conditions not ultimately been satisfied, the Tribune Entities would not

---

[383]  *See* text accompanying footnote 260 and Report at § IV.B.7.b.(1).

[384]  11 U.S.C. § 548(a)(1) (2006) (The trustee may avoid any *transfer* . . . of an interest of the debtor in property, or any *obligation* . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . .") (emphasis added).

have incurred the obligations and made the transfers that subsequently occurred on the Step One

Financing Closing Date and Step Two Financing Closing Date.[385]  Moreover, had the Tribune

Entities breached a contractual undertaking to proceed with Step One and/or Step Two, they

might have been subject to breach of contract claims, but they would not have incurred the

obligations under the Credit Agreement (and, later, the Bridge Credit Agreement) and made the

transfers effectuated when Step One and Step Two closed.  It is these obligations and transfers

that certain Parties have challenged as fraudulent obligations and transfers.[386]

### (2)    Legal Standards Governing Solvency Analysis.

Under the Bankruptcy Code, an entity is "insolvent . . . [if] the sum of such entity's debts

is greater than all of such entity's property, at a fair valuation."[387]  This test is commonly referred

---

[385]  *See* Report at § IV.B.5.d.(6).(i).

[386]  *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 630 (3d Cir. 2007) ("In light of that conclusion, the court determined both that the spin was not a fraudulent transfer and that, because VFI had been solvent at the time of the spin, it owed no 'fiduciary duty to future creditors of VFI.'") (citation omitted); *McNellis v. Raymond*, 420 F.2d 51, 53 (2d Cir. 1970) ("He found that various essential elements of the trustee's fraudulent conveyance claim had been satisfied, e.g., Donald's insolvency *at the time of his payments to Raymond.*") (emphasis added); *Marshall v. Showalter*, 375 F.2d 529, 531-32 (10th Cir. 1967) ("The final issue to be resolved is whether the creditors must prove appellant's insolvency at the time of the transfer, or whether it is sufficient to prove that he was rendered insolvent by the transfer.  A person is insolvent 'when the present fair salable value of his property is less than the amount required to pay his debts; * * * To come within the provisions of Section 67(d) (2) (a) the transfer is fraudulent if the debtor is insolvent at the time of the transfer, or if he is rendered insolvent as a result of the transfer.  These are alternative provisions.  They are unambiguous.  The District Court correctly construed the law as not requiring a finding of insolvency at the date of the transfer.  The facts and the law support the court's conclusion that appellant's transfer to his wife of all his right, title and interest in the promissory note of the face value of $285,000.00, was made without fair consideration, and that said transfer rendered appellant insolvent.  The act of bankruptcy under [Bankruptcy Act] Section 3(a) (1) occurred upon the transfer within the meaning of [Bankruptcy Act] Section 67(d) (2) (a) on June 1, 1964, within one year prior to September 4, 1964, the date of the creditors' petition for involuntary bankruptcy of appellant.") (footnote omitted); *Knippen v. Grochocinski*, 2007 U.S. Dist. LEXIS 36790, at *14 (N.D. Ill. May 18, 2007) ("Insolvency is determined at the time of the allegedly fraudulent transfer.").

[387]  11 U.S.C. § 101(32)(A) (2006).  The Bankruptcy Code definition of insolvency is similar to those in the UFCA or UFTA.  *See* UFCA at § 2(1) ("A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."); UFTA at § 2(a).  *See Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1068 (3d Cir. 1992).  Although the term "fair valuation" does not expressly connote a hypothetical disposition of the debtor's property, courts have interpreted this term to posit either a going concern or liquidation disposition depending on whether the debtor is operating.  *See, e.g., Travellers Int'l, AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998) ("The cases generally direct us to look at 'market value' rather than 'distress value,' but then also caution that the valuation must be analyzed 'in a realistic framework'

to as a "balance sheet test"—although this label is in some respects a misnomer.  The manner in which it is applied does not necessarily depend on the values set forth on the debtor's balance sheet.[388]  More broadly, the test requires that "[t]he debtor's assets and liabilities are tallied at fair valuation to determine whether the corporation's debts exceed its assets."[389]  This requirement generally is understood to mean that the debtor's assets should be valued on a going concern basis, unless the company's failure was clearly imminent.[390]  Unlike the "unreasonably small capital" test, discussed *infra*, the balance sheet test looks to the debtor's solvency (or insolvency) at a moment in time, as opposed to the debtor's solvency (or insolvency) at a point in the future.[391]

---

considering amounts that can be realized 'in a reasonable time'  assuming a 'willing seller' and a 'willing buyer.'") (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994)); *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535 541 (Bankr. D. Del. 2002) ("Therefore, assets should be valued at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time."); *Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.)*, 2000 Bankr. LEXIS 1607, at *5 (Bankr. N.D. Tex. July 28, 2000) ("For a debtor that is a 'going concern,' the court would 'determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time.'  As a going concern, the debtor would not likely face a forced sale.") (quoting *In re DAK Indus., Inc.,* 170 F.3d 1197, 1200 n.3 (9th Cir. 1999)) (internal citation omitted)*; Durso Supermarkets v. D'Urso (In re Durso Supermarkets),* 193 B.R. 682, 701 (Bankr. S.D.N.Y. 1996).  *See also* footnotes 87 and 568.

[388]  *See Peltz v. Hatten*, 279 B.R. 710, 743 (D. Del. 2002) ("While the inquiry is labeled a 'balance sheet' test, the court's insolvency analysis is not literally limited to or constrained by the debtor's balance sheet."), *aff'd*, 60 F. App'x 401 (3d Cir. 2003).

[389]  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1999).

[390]  *See Moody*, 971 F.2d at 1068; *In re Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages)*, 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("'A business does not have to be thriving in order to receive a going concern valuation.  Before the going concern valuation is to be abandoned, the business must be wholly inoperative, defunct, or dead on its feet.'") (quoting *Fryman v. Century Factors (In re Art Shirt Ltd., Inc.*) 93 B.R. 333, 341 (E.D. Pa. 1988)); *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 288 (Bankr. E.D. Pa. 2006) ("[A] fair valuation of assets contemplates the conversion of assets into cash during a reasonable period of time.").

[391]  *See, e.g. Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794 (7th Cir. 2009) ("The difference between insolvency and 'unreasonably small' assets in the LBO context is the difference between being bankrupt on the day the LBO is consummated and having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable.") (citing *Moody*, 971 F.2d at 1069-70, 1072-73; *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009)).

Traditionally, courts have looked to a variety of valuation methodologies to determine whether the value of a debtor's assets exceed its liabilities for purposes of the "balance sheet" test, including the following: [392]

- Actual Sale Price. The actual sale price methodology looks to the knowledge and due diligence performed by the acquirer of the debtor's assets, including appraisals, projections and the like, to determine whether the price at which the assets were actually sold or transferred is representative of the fair value of those assets.[393]

- Discounted Cash Flow. The discounted cash flow method of valuing a debtor "involves projections of future cash flows . . . and judgments about liquidity and the cost of capital."[394] This analysis looks to determine the value of the debtor based upon the discounted present value of the debtor's projected income. When the court is assessing the probative value of projections prepared at or around the time of the transaction, "the question the Court must decide is not whether [the] projection was correct, for clearly it was not, but whether it was reasonable and prudent when made."[395]

- Market Multiple Approach. "Under this methodology, net revenues and earnings are multiplied by an appropriate range of risk-adjusted multiples to determine the

---

[392]  *See Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) (listing traditional methodologies).

[393]  *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 939 (S.D.N.Y. 1995) ("MAST proceeded with the LBO with full information and without coercion. Furthermore, other bidders expressed interest in purchasing VDAS at prices similar to that ultimately paid."); *see also Moody,* 971 F.2d at 1067 (stating that although there may be other probative evidence, "purchase price may be highly probative of a company's value immediately after a leveraged buyout").

[394]  *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002), *aff'd*, 60 F. App'x 401 (3d Cir. 2003).

[395]  *Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007); *see also MFS/Sun Life*, 910 F. Supp. at 939 ("With the acuity that comes from hindsight, we know that the forecasts were inaccurate: VDAS failed to meet management's expectations. However, given the information that was available to VDAS at the time the Final LBO Projections were made, I find them to have been reasonable.").

company's total enterprise value."[396]  These multiples may be selected, for instance, "by bench marking certain publicly traded companies, using quantitative and qualitative factors."[397]

- Comparable Transactions Approach.  This methodology "examines recent transactions where companies have been bought and sold on the market."[398]  This methodology may be appropriate to value a company for solvency purposes because "it is designed to yield the price the company would carry in the marketplace based on similar transactions."[399]  In order to be effective, however, the sales used in the analysis must truly be comparable and the adjustments must be justified.[400]

- Adjusted Balance Sheet Approach.  This approach starts with a debtor's balance sheet, typically prepared under GAAP, and makes adjustments necessary to reflect the fair value of the assets listed there.  The GAAP value of assets is deemed relevant but is not determinative of their value.[401]  The balance sheet is "only the starting point in the analysis" because, for example, "financial statements prepared in accordance with GAAP do not record assets at fair market value . . . 'property' may include assets not even listed on the balance sheet[, and d]ebts are recorded only to the extent they are known and quantifiable."[402]

---

[396] *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 543 (Bankr. D. Del. 2002) ("The Market Multiple Methodology is an acceptable technique for determining solvency.") (citing additional authorities).

[397] *See, e.g., Lids Corp*, 281 B.R. at 543.

[398] *Id*.

[399] *Id*.

[400] *See id.* (rejecting a comparable transaction analysis that compared a company that had never been profitable against profitable companies, and relied on outdated transactions that were no longer relevant).

[401] *See id.* at 542-43.

[402] *Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 180 B.R. 389, 405 n.22 (Bankr. D. Del. 1994); *see also Arrow Elecs., Inc. v. Justus (In re Kaypro)*, 230 B.R. 400, 413 (B.A.P. 9th Cir. 1999) ("There is no generally accepted accounting principle method for analyzing the insolvency of a company. . . . Although such principles are relevant, they are not controlling in insolvency determinations."); *Sierra Steel,*

In addition, a final approach looks to the markets for publicly traded securities to assess the market value of the debtor as a going concern. In a somewhat recent example of this approach, the Third Circuit Court of Appeals, in *VFB LLC v. Campbell Soup Co.*,[403] affirmed a district court decision that relied on the market capitalization of the debtor to determine that the debtor had received reasonably equivalent value for its leveraged acquisition of assets from a former parent entity. The Court of Appeals rejected appellant's contention that the market for a debtor's equity securities is an unreliable method of assessing value:[404]

> Equity markets allow participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate; fraudulent transfer law cannot rationally be invoked to undermine that function. True, earnings projections "must be tested by an objective standard anchored in [a] company's actual performance," but such a test applies to information about a company's performance available "when [the projection is] made." Market capitalization is a classic example of such an anchored projection, as it reflects all the information that is publicly available about a company at the relevant time of valuation.

Further, the Court of Appeals found that the district court had committed no clear error by deferring to evidence of the debtor's market capitalization over the testimony of several expert witnesses utilizing other methodologies. As the court stated: "Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses."[405] Specifically, the court found that evidence of a $1.1 billion

---

*Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989) (stating that "although GAAP are relevant, they are not controlling in insolvency determinations"); *Morse Operations, Inv. C. Goodway Graphics of Va., Inc. (In re Lease-A-Fleet, Inc.)*, 155 B.R. 666, 679 (Bankr. E.D. Pa. 1993) ("Courts are not required to rely upon GAAP standards when determining the issue of insolvency."); *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R. 610, 623-24 (Bankr. E.D. Pa. 1989) ("While GAAP principles do not control this court's determination of insolvency, we are inclined to accord weight to a company's treatment of its assets and liabilities according to GAAP."). This approach is derivative of the other valuation approaches.

[403]    482 F.3d 624 (3d Cir. 2007).

[404]    *See id.* at 631-33 (citations omitted).

[405]    *Id.* at 633 (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996)) (citing additional authorities); *see also Peltz v. Hatten*, 279 B.R. 710, 737-38 (D. Del. 2002) ("[I]n determining whether a value is objectively reasonable the court gives significant deference to marketplace values. When sophisticated parties make reasoned judgments

market capitalization of the debtor's equity—months after the acquisition and subsequent to the

public disclosure of facts that may have had a negative impact on the value of debtor—was

appropriate evidence that the debtor was solvent at the time of the transaction.  Although not

central to its holding, the court also made several observations about the market for the debtor's

publicly traded debt securities.[406]

It should be noted that shortly after the Court of Appeals' decision in *VFB LLC*, the

District Court for the District of Delaware held that *VFB LLC* did *not* compel application of the

market capitalization approach in the case before it, even though the company's equity securities

were publicly traded.[407]  In *American Classic Voyages, Co. v. JP Morgan Chase Bank (In re*

*American Classic Voyages, Co.),* however, the court did not explain its reliance on traditional

forms of valuation, other than to note that the market information presented to the court actually

was consistent with evidence adduced using those other methods.[408]

Somewhat surprisingly, the Parties devoted relatively little attention addressing the

import of *VFB LLC* to the valuation issues presented in Question One, and even then, only

obliquely.  One Party relied on *VFB LLC* to argue that the auction process that preceded

selection of the Zell Group is compelling evidence that the $34 per share Tender Offer price

---

about the value of assets that are supported by then prevailing marketplace values and by the reasonable
perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to
reevaluate or question those transactions with the benefit of hindsight."), *aff'd*, 60 F. App'x 401 (3d Cir. 2003);
*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007)
("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and
most unbiased measure of fair market value and, when available to the Court, is the preferred standard of
valuation.").

[406]   *See VFB LLC*, 482 F.3d at 628 (noting that debtor successfully issued $200 million in debt to institutional
investors "despite disclosing discouraging financial data for the first nine months of FY1999, declining sales,
limited advertising and product innovation, and other worrisome news"); *id.* at 632-33 (noting that the below
par trading price of unsecured debt in fiscal year 2000 demonstrated that debtor was insolvent at the time,
although it did not prove that debtor was insolvent in fiscal year 1999).

[407]   *See Am. Classic Voyages, Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages, Co.)*, 384 B.R. 62, 65 (D.
Del. 2008).

[408]   *See id.* at 65.

supports the conclusion that Tribune was solvent at Step One.  This argument, however, confuses the market capitalization approach affirmed in *VFB LLC*—which looks to the capitalization of a debtor's equity as reflected in an active, public market for those securities—and the actual sale approach, which looks at the facts and circumstances of a particular transaction to determine if the sale price reached as a result of that process is a reliable indication of solvency.  To the extent the Tender Offer price supports a conclusion on Step One solvency, the use of this data would represent an actual sale approach to valuation.

Another Party cited *VFB LLC* to argue that the price of Tribune's debt securities before Step One and the price of its equity securities before Step Two demonstrate that Tribune was insolvent prior to each of those steps.  Not surprisingly, other Parties challenged the assumptions underlying these contentions, pointing to the trading value of Tribune's Common Stock at other times, the trading value of other debt issuances allegedly supporting a solvency conclusion, and the characteristics of yet other Tribune debt issuances (i.e. coupon, maturity) to explain why those instruments traded at levels above what would be expected if the market had judged Tribune to be insolvent.

Based on his review of the applicable law, the Examiner concludes that a court is reasonably likely to consider relevant evidence of the markets for Tribune's publicly traded securities at relevant times on the question of solvency.  The Examiner does not believe, however, that a court is reasonably likely to view such evidence as conclusively determining the solvency analysis; rather, a court is reasonably likely to consider other valuation metrics, *along with market data*, to reach a conclusion on valuation.  Significantly, despite wide disagreement over valuation issues, no Party advocated to the Examiner a contrary view.

The Report discusses application of the various valuation methodologies to the question of solvency in the Sections that follow.

### (3)    Legal Standards Governing Capital Adequacy Analysis.

The Bankruptcy Code does not define the term "unreasonably small capital" used in

Bankruptcy Code section 548(a)(1)(B)(ii)(II).  Courts generally have described the term as a

financial condition "short of equitable insolvency,"[409] but which leaves the transferor "unable to

generate sufficient profits to sustain operations"[410] so that the transferor "is technically solvent

but doomed to fail."[411]  Thus, the unreasonably small capital test is designed to capture those

situations when a transaction may leave the debtor technically solvent, but with so few assets that

inability to pay debts in the future should have been "reasonably foreseeable."[412]

In *Moody*, the Third Circuit Court of Appeals adopted the approach of *Credit Managers*

*Association of Southern California v. Federal Co.*, and held that "the test for unreasonably small

capital is reasonable foreseeability . . . whether the parties' projections were reasonable."[413]  This

approach does not view the projections in hindsight, but instead determines whether they were

---

[409]  "[E]quitable insolvency" is defined as "the general inability of the corporate debtor to meet its pecuniary liabilities as they mature, by means of either available assets or an honest use of credit."  *VFB LLC*, 482 F.3d at 636; *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995) ("A transfer may be set aside as fraudulent if the transferor, though its assets exceed its liabilities, is rendered unable to pay its debts as they come due.  This forward-looking standard is generally referred to as equitable insolvency.").

[410]  *See Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1070 (2d Cir. 1992); *Fidelity Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 294.

[411]  *See MFS/Sun Life*, 910 F. Supp. at 944 (citing *Moody*, 971 F.2d at 1070 & n.22); *see also Boyer*, 587 F.3d at 792 (finding corporation was left with unreasonably small capital when the transfer left it "with insufficient assets to have a reasonable chance of surviving indefinitely"); *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("[U]nreasonably small capital means something more than insolvency or inability to pay debts as they come due.  Being left without adequate capital would mean that the transaction in issue put [the debtor] on the road to ruin."); *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) ("Although short of technical insolvency, a debtor's unreasonably small capital structure is presumed to lead eventually to insolvency, which is why it serves as grounds for treating the transfer in question as fraudulent vis-à-vis other unsecured creditors."); *Ferrari v. Barclay's (In re Morse Tools, Inc.)*, 148 B.R. 97, 133 (Bankr. D. Mass. 1992) (finding unreasonably small capital where the buyout made it almost certain the company would fail).

[412]  *See* Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 IND. L. REV. 469, 497 (1988) (stating that unreasonably small capital exists when the non-payment of the plaintiff's claim was a reasonably foreseeable effect given, the amount of the transferor's assets and capital remaining, and reasonably foreseeable cash resources).

[413]  *Moody*, 971 F.2d at 1072-73 (citing *Credit Managers Assoc. v. Fed. Co.*, 629 F. Supp. 175 (C.D. Cal. 1985)).

reasonable and prudent at the time they were made.[414]  In evaluating the reasonableness of the

projections, courts give considerable weight to projections developed by management when there

is "substantial evidence presented to show that the [b]usiness [p]lan was prepared in a reasonable

manner, using supportable assumptions and logically consistent computations."[415]  Independent

analysis and vetting of management's projections by independent advisors is also an indicator of

reasonableness.[416]

      Further, the reasonableness of the projections should be measured according to an

objective standard "anchored in the company's actual performance" and should look to data

including "cash flow, net sales, gross profit margins, and net profits and losses."[417]  In addition to

this historical data, courts must "also account for difficulties that are likely to arise, including

interest rate fluctuations and general economic downturns, and otherwise incorporate some

margin for error."[418]  The reasonable foreseeability test has been described as a "fact-based test

of whether the company's cash flow forecasts are reasonable and leave enough margin for error

to account for reasonably foreseeable difficulties" and a "cash flow cushion test."[419]

      Finally, although a company must be adequately capitalized, it does not need resources

sufficient "to withstand any and all setbacks."[420]  In *Moody*, although the court voiced concerns

---

[414] *See, e.g.*, *Credit Managers*, 629 F. Supp. at 186-87 (finding that "[w]ith 20-20 hindsight it is clear that Crescent's cash flows did not work out as projected by GECC" but that the court's focus must not be on "what happened to Crescent, but whether the GECC projections . . . were prudent").

[415] *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 348 (Bankr. S.D.N.Y. 2007) (citing *In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Tex. 2005)).

[416] *Id*.

[417] *Moody*, 971 F.2d at 1073 (citing *Credit Managers*, 629 F. Supp. at 184-86; *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (D. Ga. 2009).

[418] *Moody*, 971 F.2d at 1073 (citations omitted).

[419] *See* Shepard, Note, *Beyond Moody: A Re-Examination of Unreasonably Small Capital*, 57 HASTINGS L.J. 891, 892 (2006) (citations omitted).

[420] *Credit Managers*, 629 F. Supp. at 187; *see also Iridium*, 373 B.R. at 345; *accord Peltz v. Hatten*, 279 B.R. 710, 747 (D. Del. 2002) ("It is clear that USN had its operating challenges, including dealing with its billing and

about the potential for abuse in leveraged buyout scenarios, the court again employed the

approach adopted in *Credit Managers* test, holding "participants in leveraged buyout responsible

. . . when it is reasonably foreseeable that an acquisition will fail, but at the same time takes into

account that businesses fail for all sorts of reasons, and that fraudulent conveyance laws are not a

panacea for all such failures."[421]

    The determination of unreasonably small capital is conducted on a case-by-case basis and

is likely to rely on industry-specific financial information.[422]  Considerable weight often is given

to management's projections or decisions made to enter into transactions.[423]  Courts also consider

a variety of other factors, including the following:

- Historic performance.  Deviation from historical practice can support a finding of
  unreasonably small capital.[424]  In *In re O'Day Corp.*, the court looked at two sets
  of projections that were prepared in connection with the alleged fraudulent

---

collection problems and adjusting its planning and projections as it grew at a rapid rate.  But these challenges were associated with meeting its projected growth rate and the market's expectations, not with all out business failure."), *aff'd*, 60 F. App'x 401 (3d Cir. 2003).

[421]  *Moody*, 971 F.2d at 1073; *see also* Markell, footnote 412, at 506 ("[B]usinesses fail for all sorts of reasons, and . . . fraudulent transfer laws are not a panacea for all such failures.").  Judge Markell's statement has been cited with approval not only in *Moody,* but also in *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009); *Ring v. Bergman (In re Bergman)*, 293 B.R. 580, 584 (Bankr. W.D.N.Y. 2003); and *Salisbury v. Texas Commerce Bank, N.A. (In re WCC Holding Corp.)*, 171 B.R. 972, 986 (Bankr. N.D. Tex. 1994).

[422]  *See* Robert J. Stearn, Jr., *Proving Solvency: Defending Preference and Fraudulent Transfer Litigation*, 62 BUS. LAWYER 359, 388-89 (Feb. 2007) (stating that financial ratios should be evaluated and compared to similar companies) (citations omitted).

[423]  *Iridium*, 373 B.R. at 345, 348; *Credit Managers*, 629 F. Supp. at 183; *see also Stern v. Samuel, Son & Co., Ltd. (In re Longview Aluminum)*, 2005 Bankr. LEXIS 1312, at *21 (Bankr. N.D. Ill. July 14, 2005) (giving weight to the decisions of the debtor's principals who had their own finances and time at stake and had access to substantial professional expertise).

Similarly, weight may be given to market valuations in determining reasonableness.  For example, in *Iridium*, the court discussed the market's optimistic predictions of present and future value for the debtor.  The court continued, "[t]he capital markets synthesized and distilled what all the smart people of the era knew or believed to be true about Iridium.  Given the overwhelming weight of that market evidence, it may be that the burden of proving . . . unreasonably small capital simply could not be met under any circumstances . . . ."  373 B.R. at 352.

[424]  *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 998 (W.D. Pa. 1991) (including the company's historical capital cushion among the more relevant considerations).

transfer.[425]  Before the closing of the leveraged buyout transaction, management received quarterly financial information showing a decrease in gross profit margin and a decline in EBIT.[426]  Because the projections were inconsistent and irreconcilable with the debtor's recent historical financial data as well as its recent financial trends, including worst-case projections that the company would greatly exceed its average performance in the reference period, the court found that they were not reasonable.[427]  The court held that the resulting inability to pay creditors was foreseeable, notwithstanding evidence of several unpredictable intervening events that could have caused the failure, including a stock market crash.[428]  By contrast, in *Moody*, the court rejected the argument that the projections had ignored the most recent historical data, which included a down-turn and a break-even year in the two years preceding the transaction at issue there.[429]  Finding the incorrect projections to have been reasonable when made, even given this recent history, the court noted that the company had enjoyed a pre-tax profit and had a positive cash flow prior to the transaction.[430]

- Availability of Funds.  In determining whether there is adequate capital, courts may also consider "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from *operations*, or cash from secured or unsecured loans over the relevant time period."[431]  Access to credit alone may be

---

[425]  *Meritor v. Murphy Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 404-05 (Bankr. D. Mass. 1991).

[426]  *Id.* at 406.

[427]  *Id.* at 405-07.

[428]  *Id.* at 407.

[429]  *Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1074 (3d Cir. 1992).

[430]  *Id.*; *see also Credit Managers Assoc. v. Fed. Co.*, 629 F. Supp. 175, 185 (C.D. Cal. 1985) (finding projections reasonable even where assumptions regarding collectability of accounts receivable were higher than data for the year prior to the LBO).

[431]  *Moody*, 971 F.2d at 1072 n.24 (citation omitted); *Peltz v. Hatten*, 279 B.R. 710, 726 (D. Del. 2002) (same), *aff'd*, 60 F. App'x 401 (3d Cir. 2003); *see also* Markell, footnote 412, at 501 (arguing that courts should focus on "a business' ability to generate sufficient cash from operations, or to issue debt or equity securities for cash").

sufficient to establish adequate capital.[432]  Further, even if projections show that

the debtor will not have sufficient cash to pay off principal balances on loans or

notes when they come due, courts should take the possibility of refinancing into

account (even for companies experiencing financial and operational difficulty).[433]

Courts may even accept the possibility of asset sales as a means for a company to

raise cash.[434]  However, where no reasonable means of raising funds exists, the

court will find that there was unreasonably small capital.[435]

- Causation.  Although the statutes do not explicitly require that there be a causal
  connection between the transfer and failure to satisfy the creditor claims, courts
  generally require that such causation be shown.  Clearly, the occurrence of a
  calamity, such as a fire or storm, could cause unforeseen difficulties,[436] but courts
  also look to other causes of interruption in business that are at least arguably more
  foreseeable.[437]

- Time Horizon.  Another indication that the transfer did not cause the inadequate
  capitalization is evidence that the company survived for a period (often measured

---

[432] *Moody*, 971 F.2d at 1072 (although the LBO left the debtor with a line of credit as the sole source of operating capital, the court held the debtor was adequately capitalized); *cf. Meritor v. Murphy Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 408 (Bankr. D. Mass. 1991) (holding that the "ability to borrow is not a substitute for operating profits" and that sums available under a revolver, which allowed the company to stay afloat for 22 months after the LBO, did not establish adequate working capital).

[433] *See* Stearn, footnote 422, at 389 (citing *Peltz*, 279 B.R. at 747) (additional citations omitted).

[434] *See Nasr v. Geary*, 2003 U.S. Dist. LEXIS 13887, at *64 (C.D. Cal. June 9, 2003) ("Unreasonably small assets signify an inability to generate enough cash flow from operations *and the sale of assets* to remain financially stable.") (emphasis added); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989).

[435] *See, e.g., Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.*, 475 F. Supp. 693, 697 (D. Nev. 1978) (finding unreasonably small capital where, after taking on a secured loan, the only hope that the company would be able to pay creditors rested on its ability to expand sales, which was rendered impossible by the additional debt service).

[436] *See* Markell, footnote 412, at 504 n.254.

[437] *See, e.g.*, *Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 977-78 (D. W.D. Pa. 1991) (recession and increased competition); *Credit Managers Assoc. v. Fed. Co.*, 629 F. Supp. 175, 184 (C.D. Cal. 1985) (loss of a major customer and labor strike); *Ohio Corrugating Co. v DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988) (industry-wide downturn).

in months) after the allegedly fraudulent transfer and was able to pay creditors

during that time.[438]  In *Boyer v. Crown Stock Distribution, Inc.*,[439] the Seventh

Circuit Court of Appeals addressed this factor in further detail in the context of a

leverage buyout in a manner that the Examiner believes is consistent with the

object of the capital adequacy test, namely to test the debtor's wherewithal to pay

its creditors.  In *Boyer*, the court held that notwithstanding the transferor's

survival for 3½ years after the LBO, the transaction was susceptible to attack:[440]

> Should the acquired company be doomed to go broke after
> and because of the LBO–if the burden of debt created by
> the transaction was so heavy that the corporation had no
> reasonable prospect of surviving–the payment to the
> shareholders by the buyer of the corporation is deemed a
> fraudulent conveyance because in exchange for the money
> the shareholders received they provided no value to the
> corporation but merely increased its debt and by doing so
> pushed it over the brink . . . .
>
> \* \* \*
>
> [N]ew Crown started life almost with no assets at all, for all
> its physical assets were encumbered twice over, and the
> dividend plus new Crown's interest obligations drained the
> company of virtually all its cash.  It was naked to any
> financial storms that might assail it.  So the statutory
> condition for a fraudulent conveyance was satisfied–or so
> at least the bankruptcy judge could and did find without

---

[438]  *See, e.g., Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1074 (3d Cir. 1992) (finding not unreasonably small capital where creditors were paid for twelve months after transaction); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 945 (S.D.N.Y. 1995) (stating that where "the company remained viable so long [*i.e.* for eight months] after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout" and finding failure resulted from rapid emergence of competition, imposition of fees, loss of business, and failure to implement growth and cost-saving strategies); *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266, 299-300 (Bankr. E.D. Pa. 2006) (finding projections reasonable where debtor survived 14 months after LBO); *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("Courts will not find that a company had unreasonably small capital if [it] survives for an extended period after the subject transaction.").

[439]  587 F.3d 787 (7th Cir. 2009) (Posner, J.).

[440]  *Id*. at 792-95; *see also Ferrari v. Barclays Bus. Credit, Inc., 148 B.R. 97, 133 (Bankr. D. Mass. 1992)* (holding projections unsound even when debtor stayed in business for two years because the failure was almost certain from the start); *Murphy v. Meritor Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 408 (Bankr. D. Mass. 1991) (holding that there was unreasonably small capital even when the company stayed in business for 22 months after transaction).

committing a clear error.

> The fact that mistakes by the buyer hastened the company's demise is not a defense.  Whether a transfer was fraudulent when made depends on conditions that existed when it was made, not on what happened later to affect the timing of the company's collapse. . . .  An inadequately capitalized company may be able to stagger along for quite some time, concealing its parlous state or persuading creditors to avoid forcing it into a bankruptcy proceeding in which perhaps only the lawyers will do well.

> The interval was longer than in previous cases, but the defendants are unable to sketch a plausible narrative in which new Crown could have survived indefinitely despite being cash starved as a result of the terms of the LBO that brought it into being. The fact that Smith made mistakes in running the company does not weigh as strongly as the defendants think.  Everyone makes mistakes.  That's one reason why businesses need adequate capital to have a good chance of surviving in the Darwinian jungle that we call the market.

• <u>Additional Factors</u>.  Among the other factors that courts may consider in addition to those discussed above are:  (1) nature of business; (2) stable or volatile income; (3) likelihood of future growth or contraction; (4) current secured and unsecured debts; (5) likelihood of collateral of secured debt to retain, gain, or lose value; (6) likelihood of incurring substantial consensual debt in the future;[441] (7) if transferor is a guarantor, likelihood that primary debtors will default; (8) spending and saving habits; (9) composition of asset portfolio; (10) track record of prior incidents and claims; (11) amount of insurance; (12) type of insurance coverage;

---

[441] *See United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 580 (M.D. Pa. 1983) ("We are also of the opinion that the delivery of the mortgages and guarantee mortgages to IIT occurred when the Raymond Group was engaged or about to engage in a 'business or transaction for which the property remaining in [its] hands after the conveyance is an unreasonably small capital.'  39 Pa. Cons. Stat. § 355.  Both before the November 26, 1973 transaction as well as thereafter, the Raymond Group did not have the capital resources it needed to carry on its business.  *Moreover, Durkin planned to continue selling the surplus lands of the Raymond Group and would therefore incur additional income tax liabilities to the United States.*  The provisions of the Note Purchase and Loan Agreement were such that relatively little, if any, proceeds of the land sales would be available for general creditors.  *Durkin also planned to continue the Raymond Group's coal mining operations and would therefore incur additional liabilities to trade creditors, the Anthracite Health and Welfare Fund, and the Commonwealth for backfilling obligations.*") (emphasis added), *aff'd in relevant part sub nom., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986).

142

and (13) also whether the transferor reasonably discounted the likelihood that certain assets or liabilities would materialize.[442]

> **(4)    Examiner's Conclusions and Explanation Concerning Whether Solvency and Capital Adequacy Are Measured on an Estate-by-Estate Basis—the Impact of the Subsidiary Guarantees.**

<u>Examiner's Conclusions</u>:

A court is highly likely to measure the solvency and capital adequacy of the Tribune Entities on an estate-by-estate basis.  In conducting that analysis, however, it is highly likely that in considering these questions as applied to Tribune and the Guarantor Subsidiaries (either separately or collectively), a court would take into account offsetting assets in the form of rights of contribution, subrogation, and indemnity whether arising under contract or common law.  To the extent, however, that an individual Guarantor Subsidiary was insolvent before incurring the Step One Debt, such entity's estate should be entitled to avoid such obligations.  In the case of Tribune, because it was the ultimate parent of the Guarantor Subsidiaries, to the extent it discharges debt of Guarantor Subsidiaries, Tribune's value would be enhanced (vis-à-vis the increased net worth of the solvent Guarantor Subsidiaries) by the amount of any indebtedness satisfied.

<u>Explanation of Examiner's Conclusions</u>:

Absent a finding of veil piercing, alter ego, or substantive consolidation of the Tribune Entities' respective estates, each Debtor must be considered as a separate entity with separate

---

[442]    *See* John E. Sullivan III, *Future Creditors and Fraudulent Transfers:  When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When a Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 DEL. J. CORP. L. 955, 1010-12 (1997).

assets and liabilities.[443]  As shown below, however, proper evaluation of the solvency and capital

adequacy of the Guarantor Subsidiaries and Tribune requires consideration of the rights of

contribution, subrogation, and indemnity that, in effect, give rise to offsetting assets.

### (i)    The Guarantor Subsidiaries.

The Credit Agreement Subsidiary Guarantee and Subordinated Bridge Subsidiary

Guarantee imposed joint and several liability on the Guarantor Subsidiaries for the LBO Lender

Debt.[444]  As a result, if called upon, any individual Guarantor Subsidiary would be required to

satisfy the full LBO Lender Debt.  The Credit Agreement Subsidiary Guarantee renders each

Guarantor Subsidiary unconditionally and primarily liable for the full amount of the guaranteed

indebtedness.  Thus, the LBO Lenders could proceed in any manner against any Guarantor

Subsidiary for the full amount of the guaranteed indebtedness.  If, however, any individual

Guarantor Subsidiary were required to apply all of its available assets to the satisfaction of this

indebtedness, the paying Guarantor Subsidiary would hold contractual and common law rights of

contribution, subrogation, and indemnity against Tribune and each other.[445]  These rights, in turn,

---

[443]   *See In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) ("Substantive consolidation . . . 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities. . . . The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.'") (citing *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 423 (3d Cir. 2005)).

[444]   *See* Ex. 189 at § 1 (Credit Agreement Subsidiary Guarantee); Ex. 414 at § 1 (Subordinated Bridge Subsidiary Guarantee).

[445]   Of note, each Guarantor Subsidiary's *contractual* contribution, subrogation, and indemnity rights against the other Guarantor Subsidiaries arose at the Step Two Financing Closing Date.  *See* Ex. 7 at § 2 (Credit Agreement Subrogation Subordination Agreement; Ex. 12 at § 2 (Bridge Subrogation Subordination Agreement).  In contrast, the Credit Agreement Subsidiary Guarantee, which was entered into on the Step One Financing Closing Date, only recognizes contribution, subrogation, and indemnity rights against Tribune.  *See* Ex. 189 at § 7 (Credit Agreement Subsidiary Guarantee).  Nonetheless, each Guarantor Subsidiary likely had common law contribution, subrogation, and indemnity rights against each other Guarantor Subsidiary at the Step One Financing Closing Date because of the joint and several nature of the obligations.  *See Mfrs. & Traders Trust Co. v. Goldman (In re Ollag Constr. Equip. Corp.)*, 578 F.2d 904, 908 (2d Cir. 1978) (finding subrogation and contribution rights exist even in the absence of a contractual provision granting such rights); *Beltrone v. Gen. Schuyler & Co.*, 645 N.Y.S.2d 914, 915 (N.Y. App. Div. 1996) (holding under New York law, guarantor who pays more than proportionate share of amount of guarantee is entitled to contribution from co-guarantors); *McDermott v. City of N.Y.*, 406 N.E.2d 460, 462 (N.Y. 1980) ("[W]here payment by one person is compelled,

directly affect conclusions concerning the solvency and capital adequacy of each guarantor, even though each entity is liable for the full amount of the debt.

*In re Ollag Construction Equipment Corp.*[446] illustrates this principle.  There, the Second Circuit Court of Appeals reversed the lower court's conclusion that a debtor was insolvent based on the lower court's failure to consider certain intangible assets of the debtor, namely, the debtor's rights of contribution and subrogation in connection with its guarantee of an affiliate's debt.[447]  The court held that "contingent subrogation and contribution rights must be valued as assets in determining solvency."[448]  The Third Circuit Court of Appeals adopted the same approach in *Mellon Bank, N.A. v. Metro Communications, Inc.*[449]  Applied here, solvency and capital adequacy analysis of each Guarantor Subsidiary must similarly take into account each such entity's contribution, subrogation, and indemnity rights against Tribune and the other Guarantor Subsidiaries.

Viewed in this light, solvency and capital adequacy analysis of the Guarantor Subsidiaries produces the same result whether the Guarantor Subsidiaries are considered liable on the LBO Lender Debt individually or collectively as long as each Guarantor Subsidiary is solvent before the Leveraged ESOP Transactions.  An example (actually adapted from one submission to the Examiner) drives home the point:  Assume that three guarantors, each with an equity value of $150 (excluding the value of contribution rights from other guarantors), jointly,

---

which another should have made . . . a contract to reimburse or indemnify is implied by law.") (citing *Brown v. Rosenbaum*, 41 N.E.2d 77, 81 (N.Y. 1942)).

[446]    578 F.2d 904 (2d Cir. 1978).

[447]    *Id.* at 908.

[448]    *Id.* (citing *Syracuse Eng'g Co. v. Haight*, 97 F.2d 573, 576 (2d Cir. 1938)).

[449]    *See also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991) ("In valuing the cost of Metro's guaranty, the right of contribution of co-guarantors needs to be balanced against the amount of debt for which Metro is liable."); *In re Consol. Capital Equities Corp.*, 143 B.R. 80, 88 (Bankr. N.D. Tex. 1992) (finding liability on a guarantee may be offset by value of rights of contribution).

severally, and unconditionally guarantee a $300 debt.  In analyzing the solvency of each

guarantor, the $300 liability does not render any guarantor insolvent because each guarantor has

an asset in the form of its contribution rights equal to $200 (*i.e.*, $100 from each of the other two

guarantors in the event the first guarantor were required to pay the entire $300 debt).  On a stand-

alone basis, each guarantor has $350 in assets ($150 of equity value plus $200 in contribution

rights) versus $300 in liabilities (the debt) resulting in a solvency cushion of $50 for each

guarantor.  This result is identical if the three guarantors are valued collectively.  In that case, the

guarantors have $450 in combined assets (their collective equity value) versus $300 in collective

liability, resulting in a $150 collective solvency cushion ($50 for each).

A different conclusion regarding individual guarantors might result, however, if the

guarantors each have a different net worth, but each is liable pro rata on the guarantee.  Suppose,

for example, three subsidiaries give a joint and several upstream guarantee of $300.  Pre-

transaction, one subsidiary has $2 of net worth, one has $5 of net worth, and one has $300 of net

worth.  Collectively the subsidiaries are solvent post-transaction.  But if the liability is equally

apportioned because each entity is equally liable on the guarantee (in other words, $100 per

entity), two of the entities would be rendered insolvent.  The Credit Agreement Subrogation

Subordination Agreement and Bridge Subrogation Subordination Agreement, entered into in

conjunction with Step Two, addressed this issue by providing that to the extent a Guarantor

Subsidiary is called on to make a payment on the LBO Lender Debt, the other Guarantor

Subsidiaries "shall indemnify the Claiming Guarantor in an amount equal to such payment, in

each case multiplied by a fraction of which the numerator shall be the net worth  . . . of the

Contributing Guarantor . . . and the denominator shall be the aggregate net worth . . . of all the

Guarantors."[450]  Applying this provision to the above example, the collective net worth of the

three guarantors is $307.  The first guarantor would have to pay 2/307ths of $300 (which is

$1.95, leaving that guarantor solvent by a nickel), the second one has to pay 5/307ths of $300

(which is $4.89, leaving it solvent by 11 cents), and the third one has to pay 300/307ths of $300

(which is slightly over $293, leaving it solvent by $14).  In each case, each subsidiary remains

solvent.  If any one of the subsidiaries had a negative net worth pre-transaction, the provision

would result in none of the remaining subsidiaries being rendered insolvent, provided that the

collective net worth of the solvent subsidiaries exceeds the collective liability of those solvent

subsidiaries.  In other words, the insolvency of any one subsidiary would not render the

remaining entities insolvent if the aggregate net worth of the remaining entities exceeds the

liability.

The Credit Agreement Subrogation Subordination Agreement did not exist at Step One,

meaning that, in theory, if each Guarantor Subsidiary were required to honor its Subsidiary

Guarantee of the Step One Debt on an equal basis (in other words in an amount equal to the Step

One Debt divided by the aggregate number of Guarantor Subsidiaries) at the Step One Financing

Closing Date, any one Guarantor Subsidiary could be rendered insolvent if the inclusion of its

ratable share of Step One Debt, combined with such entity's other liabilities, exceeded its assets.

But if the Guarantor Subsidiaries are solvent collectively based, for example, on a hypothetical

sale of the Tribune Entities as a going concern, it would seem implausible that a court would

ratably allocate the Step One Debt and thereby render individual Guarantor Subsidiaries

insolvent.  In that scenario, a court is more likely to apportion the liability in a manner that

mirrors what the Credit Agreement Subrogation Subordination Agreement and Bridge

---

[450]  *See* Ex. 711 at § 2 (Credit Agreement Subrogation Subordination Agreement); Ex.712 at § 2 (Bridge
Subrogation Subordination Agreement).

Subrogation Subordination Agreement accomplished contractually at Step Two:  in other words, allocate the collective liability among the Guarantor Subsidiaries in an amount equal to the proportion of each entity's net worth to the net worth of all of the Guarantor Subsidiaries.  Such an approach would better represent the actual contribution of each Guarantor Subsidiary to the value derived from the hypothetical sale of the enterprise and generally would be more consistent with *Ollag* and *Mellon Bank,* which require that rights of contribution be "balanced" against the amount of debt for which each guarantor is liable.[451]

Certain Parties nevertheless argued to the Examiner that the contribution, subrogation, and indemnity rights considered in cases such as *Ollag* and *Mellon Bank* are inapposite here. Specifically, these Parties asserted that because these rights are contractually subordinated to the prior payment in full of the LBO Lender Debt, such rights cannot be considered assets of any Guarantor Subsidiary (and consequently included in a solvency or unreasonable capital analysis) until the LBO Lender Debt is first paid in full.  Although these rights indeed are subordinated to the LBO Lender Debt,[452] however, this should not change the outcome of solvency or capital adequacy analysis.  First, as noted, the Guarantor Subsidiaries should be valued collectively for purposes of a solvency and capital adequacy analysis.  Thus, if the Guarantor Subsidiaries are solvent as a group, then the inter-guarantor subordination provisions are of no effect and disappear on the satisfaction of the LBO Lender Debt.  This is another way of saying that this issue merges with the question whether the Guarantor Subsidiaries are solvent collectively.

---

[451]  *See also Mellon Bank*, 945 F.2d at 648.  Although not directly relevant, equitable principles of marshalling also would support such a result.  *See, e.g., Telefest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1382 (D.N.J. 1984) ("It has repeatedly been said that the equitable doctrine of the marshalling of assets rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor who may resort to only one of the funds.") (citations omitted); *In re R.L. Kelly & Sons, Millers*, 125 B.R. 945, 954 (Bankr. D. Md. 1991) (applying marshalling doctrine by analogy to common fund issues).

[452]  *See* Ex. 711 at § 3 (Credit Agreement Subrogation Subordination Agreement); Ex. 712 at § 3 (Bridge Subrogation Subordination Agreement).

Second, the import of the argument that the Guarantor Subsidiaries' contribution, subrogation, and indemnity rights should not be considered due to the subordination of those rights is that each Guarantor Subsidiary's assets must be compared to a liability for the entire LBO Lender Debt, but because the LBO Lender Debt need only be satisfied once, it cannot be the case that each Guarantor Subsidiary will face $11 billion in liability on the LBO Lender Debt resulting in aggregate liabilities in excess of $500 billion.  The aggregate liability is $11 billion, not a multiple of that amount.  The fact that each Guarantor Subsidiary is liable for this debt must be taken into consideration in evaluating the solvency and capital adequacy of each individual Guarantor Subsidiary.  A court should apply the analysis of *Ollag* and *Mellon Bank*, i.e., that the rights of contribution, subrogation, and indemnity of each Guarantor Subsidiary must be included in any solvency and capital adequacy analysis, notwithstanding the existence of subordination provisions in the guarantees.

On the other side of the coin, certain Parties cited in *In re Xonics Photochemical, Inc.*[453] and its progeny for the proposition that the Guarantor Subsidiaries hold *contingent* liabilities which must be "discounted" to take into account the probability that such Guarantor Subsidiary would be called upon to "make good" on its guaranty.  *Xonics* is a famous bankruptcy case authored by a famous jurist.  There, Judge Posner, writing for the Seventh Circuit Court of Appeals, observed that when a company guarantees an affiliate's obligations, the guarantor incurs only a contingent liability.[454]  Recognizing that any contingency involves an assessment of probability, Judge Posner reasoned that liability on a guarantee must be valued based on the

---

[453]   841 F.2d 198 (7th Cir. 1988).

[454]   *Id.* at 200.

likelihood of the contingency coming to pass and therefore discounted "by the probability that the contingency will occur and the liability become real."[455]

The *Xonics* analysis is not relevant to the question considered here.  It is true that in *Xonics*, the court evaluated the debtor's guarantee obligations in assessing whether the debtor was solvent at the time of an allegedly preferential transfer to a creditor; and it is likewise true that this inquiry bears a resemblance to the question of solvency and capital adequacy presented here.  But the specific inquiry in *Xonics* was whether the company was insolvent at the time of the transfer, *not whether the transfer itself rendered the company insolvent*.  It is this second question that must be evaluated, namely, whether the Leveraged ESOP Transactions (and in particular the incurrence of the LBO Lender Debt) rendered Tribune *and* the Guarantor Subsidiaries, as obligors and guarantors on this same massive indebtedness, insolvent or inadequately capitalized.  If this question is answered in the affirmative, absent a fresh capital contribution, there would be no reasonable likelihood that Tribune could meet its obligations on the LBO Lender Debt, and not a likelihood but a certainty that the guarantees would be called.  The converse is true.  In the circumstance presented here, applying *Ollag* and *Mellon Bank* to take into account rights of contribution, subrogation, and indemnity of the Guarantor Subsidiaries against one another and Tribune is all that is required.

In sum, for purposes of solvency and capital adequacy analysis, the liability of the Guarantor Subsidiaries on the LBO Lender Debt should be measured collectively, notwithstanding that each entity is fully liable on that debt, but without applying any "discount."

Nevertheless, if an individual Guarantor Subsidiary were insolvent before it incurred the Step One Debt (after giving effect to intercompany claims, discussed below), the estate

---

[455]    *Id.*

representative of that particular Guarantor Subsidiary should be able to avoid that particular

Subsidiary Guarantee of Step One Debt.[456]  To determine whether any significant Guarantor

Subsidiary was insolvent before the Step One Financing Closing Date, the Examiner analyzed

the net worth of some of such entities before giving effect to the Step One Transactions.  To

perform this analysis, the Examiner's financial advisor isolated certain of the largest Guarantor

Subsidiaries in the Publishing Segment and the Broadcasting Segment, according to the relative

size of their recorded book values of assets:[457]

- Publishing Segment:  Los Angeles Times, Chicago Tribune, Newsday, Eagle New Media, Orlando Sentinel, Sun Sentinel, and Baltimore Sun.

- Broadcasting Segment:  KTLA, WPIX, and Tower Distribution.[458]

In assessing the pre-Step One solvency of these Guarantor Subsidiaries, the Examiner's

financial advisor first compared the recorded book value of each Guarantor Subsidiary's assets to

its recorded liabilities.[459]  The chart below presents the results of this "book basis" comparison

for each of these entities (excluding intercompany balances) based on data as of the end of May

2007, just before the Step One Financing Closing Date:

---

[456]  *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I) (2006) (stating that transfers and obligations are subject to avoidance where transferor "was insolvent on the date that such transfer was made or such obligation was incurred, *or* became insolvent as a result of such transfer or obligation") (emphasis added).  *See generally W.E. Trucker Oil Co. v. First State Bank of Crossett (In re W.E. Tucker Oil Co.)*, 55 B.R. 78, 81 (Bankr. W.D. Ark. 1985) ("The trustee's evidence clearly and unmistakably establishes that the debtor was insolvent before and after the transfers and that after the transfers an unreasonably small amount of capital remained for the debtor to engage in its business.").

[457]  Given the time constraints of the Investigation, the Examiner's financial advisor relied on asset book values to identify and prioritize for evaluation certain of the largest Guarantor Subsidiaries.  Although significant differences may exist between the book value and market value of the assets of these selected Guarantor Subsidiaries, selecting Guarantor Subsidiaries based on market value size would have effectively required the individual fair market valuation of numerous Subsidiaries, an unrealistic expectation given the number of Tribune Subsidiaries.  The Examiner's financial advisor selected Guarantor Subsidiaries based not only on size (*i.e.*, highest book value) but also on the availability of EBITDA information as discussed herein.

[458]  In this analysis, Tower Distribution and WGN Continental Broadcasting are combined.

[459]  The Examiner's financial advisor specifically identified the assets and liabilities associated with intercompany amounts separately.

| TRIBUNE LARGE SUBSIDIARIES w/o I/C - Period 5 (May), 2007 ($000) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Publishing Segment | | | | | | | Broadcasting Segment | | |
| | Los Angeles Times | Chicago Tribune | Newsday | Eagle New Media Invest. | Orlando Sentinel | Sun Sentinel | Baltimore Sun | KTLA | WPIX | Tribune Distribution |
| **Assets** | | | | | | | | | | |
| Cash and Equivalents | $ 78 | $ (4,942) | $ 1,785 | $ 41,768 | $ 1,281 | $ 1,550 | $ 1,060 | $ 1,096 | $ 895 | $ - |
| Accounts Receivable | 93,300 | 77,303 | 42,056 | 1,532 | 22,696 | 32,391 | 29,218 | 27,306 | 41,742 | 7,113 |
| Inventory | 15,235 | 7,226 | 6,354 | 562 | 3,114 | 3,651 | 3,136 | - | - | - |
| Broadcast Rights | - | - | - | - | - | - | - | 58,969 | 68,841 | - |
| Investment in Subs | 903,283 | 17 | 589,664 | 1,451,638 | - | 857 | 386,060 | - | - | - |
| Other | 307,673 | 56,730 | 28,650 | 110 | 17,924 | 15,821 | 7,673 | (1,275) | 10,513 | 293 |
| Net Properties | 434,083 | 307,587 | 177,912 | 1,264 | 75,577 | 113,428 | 148,820 | 10,146 | 13,695 | 10,651 |
| Intangibles | 1,840,072 | 49,324 | 1,003,940 | 36,579 | 11,773 | 10,617 | 617,352 | 285,231 | - | 153,937 |
| **Total** | 3,593,724 | 493,245 | 1,850,361 | 1,533,453 | 132,365 | 178,315 | 1,193,319 | 381,473 | 135,686 | 171,994 |
| **Liabilities** | | | | | | | | | | |
| Broadcast Rights Payable | - | - | - | - | - | - | - | 78,473 | 96,652 | - |
| Long Term Debt | - | - | 2,500 | - | 1,631 | - | - | - | - | 11,130 |
| Accounts Payable | 18,978 | 15,245 | 3,988 | 193 | 4,885 | 7,234 | 4,571 | 1,637 | 2,429 | 166 |
| Deferred Taxes | 246,517 | 58,420 | 47,169 | 11,458 | 20,213 | 61,771 | 37,622 | 30,124 | 9,320 | 35,121 |
| Other Current | 46,817 | 35,509 | 28,823 | 360 | 14,097 | 14,049 | 15,269 | 3,027 | 16,679 | 1,060 |
| Other Long Term | 13,113 | 7,795 | 6,892 | 916 | 1,827 | 2,583 | 5,954 | 3,982 | 6,468 | 161 |
| **Total** | 325,425 | 116,969 | 89,372 | 12,927 | 42,653 | 85,637 | 63,416 | 117,243 | 131,548 | 47,638 |
| **Equity** | $ 3,268,299 | $ 376,276 | $ 1,760,989 | $ 1,520,526 | $ 89,712 | $ 92,678 | $ 1,129,903 | $ 264,230 | $ 4,138 | $ 124,356 |

As shown in the chart above, on a book basis, each selected Guarantor Subsidiary is "book basis" solvent before intercompany receivables and payables are considered.  Book value solvency, of course, is not synonymous with solvency for purposes of fair valuation.[460]  To assess whether a significant disparity exists between book value and fair value of the selected Guarantor Subsidiaries, the Examiner's financial advisor considered the implied values for each such Guarantor Subsidiary using a selected range of EBITDA multiples, which then were applied to each selected Guarantor Subsidiary's estimated EBITDA, based on data compiled by VRC.[461]  In all circumstances, the implied value exceeded each Guarantor Subsidiary's interest-bearing

---

[460]  The proper standard is fair value.  *See* Report at IV.B.5.d.(2).

[461]  *See* Ex. 1070 (LECG Comparison Analysis of Recently Updated Tribune Performance).  For purposes of this analysis, an approximation of the lowest Step Two LTM EBITDA identified by VRC was used.  This is extremely conservative because cohort multiples, as quantified by VRC, declined significantly between VRC's Step One and Step Two analyses.

debt, indicating that each of the above large Guarantor Subsidiaries was solvent before the Step

One closing:

| | Publishing Segment | | | | | | | Broadcasting Segment | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Los Angeles Times | Chicago Tribune | Newsday | Eagle New Media Invest. | Orlando Sentinel | Sun Sentinel | Baltimore Sun | KTLA | WPIX | Tribune Distribution |
| **Assets** | | | | | | | | | | |
| Cash and Equivalents | $ 78 | $ (4,942) | $ 1,785 | $ 41,768 | $ 1,281 | $ 1,550 | $ 1,060 | $ 1,096 | $ 895 | $ - |
| Accounts Receivable | 93,300 | 77,303 | 42,056 | 1,532 | 22,696 | 32,391 | 29,218 | 27,306 | 41,742 | 7,113 |
| Inventory | 15,235 | 7,226 | 6,354 | | 3,114 | 3,651 | 3,136 | - | - | - |
| Broadcast Rights | - | - | - | - | - | - | - | 58,969 | 68,841 | - |
| Investment in Subs | 903,283 | 17 | 589,664 | 1,451,638 | - | 857 | 386,060 | - | - | - |
| Other | 307,673 | 56,730 | 28,650 | 110 | 17,924 | 15,821 | 7,673 | (1,275) | 10,513 | 293 |
| Net Properties | 434,083 | 307,587 | 177,912 | 1,264 | 75,577 | 113,428 | 148,820 | 10,146 | 13,695 | 10,651 |
| Intangibles | 1,840,072 | 49,324 | 1,003,940 | 36,579 | 11,773 | 10,617 | 617,352 | 285,231 | - | 153,937 |
| **Total** | 3,593,724 | 493,245 | 1,850,361 | 1,533,453 | 132,365 | 178,315 | 1,193,319 | 381,473 | 135,686 | 171,994 |
| **Liabilities** | | | | | | | | | | |
| Broadcast Rights Payable | - | - | - | - | - | - | - | 78,473 | 96,652 | - |
| Long Term Debt | - | - | 2,500 | - | 1,631 | - | - | - | - | 11,130 |
| Accounts Payable | 18,978 | 15,245 | 3,988 | 193 | 4,885 | 7,234 | 4,571 | 1,637 | 2,429 | 166 |
| Deferred Taxes | 246,517 | 58,420 | 47,169 | 11,458 | 20,213 | 61,771 | 37,622 | 30,124 | 9,320 | 35,121 |
| Other Current | 46,817 | 35,509 | 28,823 | 360 | 14,097 | 14,049 | 15,269 | 3,027 | 16,679 | 1,060 |
| Other Long Term | 13,113 | 7,795 | 6,892 | 916 | 1,827 | 2,583 | 5,954 | 3,982 | 6,468 | 161 |
| **Total** | 325,425 | 116,969 | 89,372 | 12,927 | 42,653 | 85,637 | 63,416 | 117,243 | 131,548 | 47,638 |
| **Equity** | $ 3,268,299 | $ 376,276 | $ 1,760,989 | $ 1,520,526 | $ 89,712 | $ 92,678 | $ 1,129,903 | $ 264,230 | $ 4,138 | $ 124,356 |
| **2007E EBITDA** | $ 197,000 | $ 205,300 | $ 96,100 | $ 26,600 | $ 60,700 | $ 96,900 | $ 53,600 | $ 40,100 | $ 69,700 | $ 132,800 |
| **Multiple** | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 8 | 8 | 8 |
| **Implied Value** | $ 985,000 | $ 1,026,500 | $ 480,500 | $ 133,000 | $ 303,500 | $ 484,500 | $ 268,000 | $ 320,800 | $ 557,600 | $ 1,062,400 |

TRIBUNE LARGE SUBSIDIARIES w/o I/C - Period 5 (May), 2007 ($000)

Intercompany payables and receivables were then summarized for each selected

Guarantor Subsidiary.  As would be expected, some Guarantor Subsidiaries were net obligors

and others net obligees,[462] but all reflect solvency on a book basis, net of intercompany balances:

---

[462]    The existence of significant intercompany obligations and the collectability of intercompany receivables could affect individual Subsidiary solvency.  However, additional analysis of collectability as to an individual intercompany receivable and an evaluation of the substance of the transactions informing such balances would be necessary to ensure that "due from" and "due to" balances are properly characterized (*e.g.*, that they reflect true obligations and recovery rights versus, for example, equity investments).  This evaluation would require additional investigation.  Regardless, as discussed in another part of the Report (*see* Report at § IV.B.5.d.(7).(ii)), on the Step One Financing Closing Date, both Tribune and the Guarantor Subsidiaries likely were solvent, even after taking into account the Step Two Debt (as contemplated as of that date).  Thus, intercompany balances are assumed to be collectible for purposes of this presentation, although additional investigation would be required to verify this assumption.

| TRIBUNE LARGE SUBSIDIARIES w/o I/C - Period 5 (May), 2007 ($000) | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Publishing Segment | | | | | | | Broadcasting Segment | | |
| | Los Angeles Times | Chicago Tribune | Newsday | Eagle New Media Invest. | Orlando Sentinel | Sun Sentinel | Baltimore Sun | KTLA | WPIX | Tribune Distribution |
| **Assets** | | | | | | | | | | |
| Cash and Equivalents | $ 78 | $ (4,942) | 1,785 | $ 41,768 | $ 1,281 | $ 1,550 | $ 1,060 | $ 1,096 | $ 895 | $ - |
| Accounts Receivable | 93,300 | 77,303 | 42,056 | 1,532 | 22,696 | 32,391 | 29,218 | 27,306 | 41,742 | 7,113 |
| Inventory | 15,235 | 7,226 | 6,354 | 562 | 3,114 | 3,651 | 3,136 | - | - | - |
| Broadcast Rights | - | - | - | - | - | - | - | 58,969 | 68,841 | - |
| Investment in Subs | 903,283 | 17 | 589,664 | 1,451,638 | - | 857 | 386,060 | - | - | - |
| Other | 307,673 | 56,730 | 28,650 | 110 | 17,924 | 15,821 | 7,673 | (1,275) | 10,513 | 293 |
| Net Properties | 434,083 | 307,587 | 177,912 | 1,264 | 75,577 | 113,428 | 148,820 | 10,146 | 13,695 | 10,651 |
| Intangibles | 1,840,072 | 49,324 | 1,003,940 | 36,579 | 11,773 | 10,617 | 617,352 | 285,231 | - | 153,937 |
| Intercompany Receivable | 3,610,854 | 2,509,042 | 1,638,773 | 16,022 | 841,492 | 1,198,677 | 983,467 | 790,242 | 641,904 | 894,991 |
| **Total** | 7,204,578 | 3,002,287 | 3,489,134 | 1,549,475 | 973,857 | 1,376,992 | 2,176,786 | 1,171,715 | 777,590 | 1,066,985 |
| **Liabilities** | | | | | | | | | | |
| Broadcast Rights Payable | - | - | - | - | - | - | - | 78,473 | 96,652 | - |
| Intercompany Payable | 4,972,144 | 2,510,364 | 3,043,499 | - | 777,100 | 1,150,786 | 1,597,265 | 396,020 | 543,170 | 886,186 |
| Long Term Debt | - | - | 2,500 | - | 1,631 | - | - | - | - | 11,130 |
| Accounts Payable | 18,978 | 15,245 | 3,988 | 193 | 4,885 | 7,234 | 4,571 | 1,637 | 2,429 | 166 |
| Deferred Taxes | 246,517 | 58,420 | 47,169 | 11,458 | 20,213 | 61,771 | 37,622 | 30,124 | 9,320 | 35,121 |
| Other Current | 46,817 | 35,509 | 28,823 | 360 | 14,047 | 14,049 | 15,269 | 3,027 | 16,679 | 1,060 |
| Other Long Term | 13,113 | 7,795 | 6,892 | 916 | 1,827 | 2,583 | 5,954 | 3,982 | 6,468 | 161 |
| **Total** | 5,297,569 | 2,627,333 | 3,132,871 | 12,927 | 819,753 | 1,236,423 | 1,660,681 | 513,263 | 674,718 | 933,824 |
| **Equity** | $ 1,907,009 | $ 374,954 | $ 356,263 | $ 1,536,548 | $ 154,104 | $ 140,569 | $ 516,105 | $ 658,452 | $ 102,872 | $ 133,161 |

### (ii)    Tribune.

As noted above, Tribune and the Guarantor Subsidiaries all are liable on the LBO Lender Debt.  However, unlike the Subsidiary Guarantees, which give rise to guarantor contractual rights of contribution, subrogation, and indemnity against Tribune, nothing in these documents (or the Credit Agreement, Subrogation Subordination Agreement, or Bridge Subrogation Subordination Agreement) gives Tribune contractual rights of contribution, subrogation, or indemnity against the Guarantor Subsidiaries.  Moreover, Tribune's liability on the LBO Lender Debt is not contingent (although under the Subsidiary Guarantees, the Subsidiary Guarantors also are primary obligors on the LBO Lender Debt).  Nonetheless, for three reasons, it does not follow that Tribune's liability on the LBO Lender Debt must necessarily be considered on a standalone basis, as opposed to being considered collectively with the Guarantor Subsidiaries in connection with a solvency or capital adequacy analysis.

First, as noted, the Guarantor Subsidiaries are not just sureties.  Each one serves as a "primary obligor" of the LBO Lender Debt.[463]  In this sense, the Guarantor Subsidiaries are no

---

[463]    *See* Ex. 189 at § 1 (Credit Agreement Subsidiary Guarantee);  Ex. 414 at § 1 (Subordinated Bridge Subsidiary Guarantee).

different from Tribune.  Although Tribune is without contractual rights of contribution, subrogation, or indemnity against the Guarantor Subsidiaries, it may separately hold such rights under common law as a co-obligor.[464]  As such, there is no basis to set Tribune apart from each of the Guarantor Subsidiaries regarding the LBO Lender Debt, and the bases for viewing the LBO Lender Debt as an obligation of the Guarantor Subsidiaries separately and collectively applies with equal force to Tribune.

Second, even if Tribune does not hold an asset in the form of a common law right of contribution, subrogation, and indemnity against the Guarantor Subsidiaries,[465] Tribune holds the analog of that very asset.  To the extent Tribune was required to satisfy the LBO Lender Debt, this would reduce the liability of the Guarantor Subsidiaries on such debt, thus increasing solvent Guarantor Subsidiaries' net worth.  Tribune, as the parent entity, would be the beneficiary of that difference.[466]  As such, the mathematical example cited above would yield analogous results in considering Tribune's solvency notwithstanding the absence of any contribution, subrogation, or indemnity rights.[467]

---

[464]  In this regard, there would be no basis to treat Tribune differently from the Guarantor Subsidiaries if they are all primary obligors on the LBO Lender Debt.  *See, e.g.*, *Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 210 (2d Cir. 2000) ("It is also a well-settled principle in the law of contribution that when one party jointly liable on an obligation pays more than its pro rata share, it may compel the co-obligors to contribute their share of the amount paid.") (citing HENRY L. McCLINTOCK, HANDBOOK OF THE PRINCIPLES OF EQUITY, 542 (2d ed. 1948)).

[465]  *See Ollag Constr. Equip. Corp. v. Goldman (In re Ollag Constr. Equip. Corp.)*, 578 F.2d 904, 908 (2d Cir. 1978).

[466]  When reporting separately, a parent that has significant control over a subsidiary will record as an asset its equity interest in a subsidiary.  An increase in the equity of a solvent subsidiary then increases the assets of the parent company.  Ex. 941 (KERMIT D. LARSON, FUNDAMENTAL ACCOUNTING PRINCIPLES, 806-08 (12th ed. 1990)).

[467]  Here, assume that a parent and two wholly owned subsidiary guarantors, each with an equity value of $150 are jointly and severally liable on a $300 debt.  If the parent paid $200 of this debt, the two subsidiary guarantors would be collectively liable for $100, and the residual net worth of the subsidiary guarantors after paying the remainder of the debt would be $200 collectively.  The parent would thus have a $200 asset in the form of the residual net worth of the two subsidiary guarantors.  If instead the parent paid $0 of this debt, the subsidiary guarantors would be collectively liable for $300 and the residual net worth of the subsidiary guarantors after paying off the debt would be $0.  In this case, the parent would also have a $150 asset, this time in the form of its initial equity value.  In both cases, the parent is solvent.

Finally, as noted, it cannot be the case that Tribune's and the Guarantor Subsidiaries' liability for the LBO Lender Debt, even if independent, should be viewed as comprising multiple $11 billion liabilities.  The LBO Lender Debt need only be satisfied once.  To the extent Tribune or a Guarantor Subsidiary partially or fully satisfied this debt, this would reduce the collective liabilities of all of the co-obligors.

The preceding discussion suggests that for purposes of measuring Tribune's and the Guarantor Subsidiaries' solvency and capital adequacy, it is appropriate to consider as offsetting assets the contributions that such entities could enforce, or would benefit from, if one such entity bore a disproportionate share of liability on the LBO Lender Debt.

**(5)    Examiner's Conclusions and Explanation Concerning the Role of Intercompany Claims at the Time of the Leveraged ESOP Transactions on Solvency and Capital Adequacy Analysis.**

**Examiner's Conclusions:**

A court is highly likely to consider valid intercompany claims in a solvency and capital adequacy analysis of Tribune and the Guarantor Subsidiaries.  Under the circumstances presented here, however, intercompany claims should not materially affect the results of such analysis.

**Explanation of Examiner's Conclusions:**

The Bankruptcy Code contains no mandate to treat intercompany claims differently from other claims asserted against a debtor.[468]  As such, the Examiner finds no basis to exclude intercompany claims (to the extent valid) that existed at the time of Step One and Step Two from a solvency or capital adequacy analysis, and these claims should be included as liabilities of

---

[468]    *See* 11 U.S.C. § 101(5) (2006).

Tribune and the Guarantor Subsidiaries to the extent they constituted liabilities.  Nevertheless, for the reasons discussed below, the existence of valid intercompany claims should not affect the ultimate conclusions on solvency or capital adequacy of Tribune and the Guarantor Subsidiaries whether:  (i) Tribune and the Guarantor Subsidiaries are considered on a consolidated basis; (ii) the Guarantor Subsidiaries are considered alone; or (iii) Tribune is considered alone.

### (i)    Tribune and the Guarantor Subsidiaries.

If the solvency and capital adequacy analysis of Tribune and the Guarantor Subsidiaries are considered on a consolidated basis, intercompany claims will have no effect on their collective solvency and capital adequacy.  On a consolidated basis, the intercompany claims between and among Tribune and all of the Guarantor Subsidiaries cancel each other out.  Not unexpectedly, Tribune did not account for intercompany claims in its public financial reporting undoubtedly for this reason.[469]

### (ii)    The Guarantor Subsidiaries.

The effect of intercompany claims on the solvency and capital adequacy of the Guarantor Subsidiaries is somewhat more complicated but yields the same conclusions.  As explained in the preceding Section, for purposes of solvency and capital adequacy analysis, the liability of the Guarantor Subsidiaries on the LBO Lender Debt should be measured collectively.[470]  This conclusion results from, among other things, the fact that each Guarantor Subsidiary held liable on the LBO Lender Debt would have corresponding rights of contribution, subrogation, and indemnity against both Tribune and each of the Guarantor Subsidiaries.  Intercompany claims

---

[469]    *See* Ex. 4 at 87.  The same result applies when, for example, separate estates are substantively consolidated.  *See In re H.H. Distribs., L.P.*, 400 B.R. 44, 53-54 (Bankr. E.D. Pa. 2009).  Viewing them on a consolidated basis nets out the intercompany liabilities.

[470]    *See* Report at § IV.B.5.d.(4).(i).

among the Guarantor Subsidiaries must first be taken into account to determine each such entity's net worth.  That calculation in turn determines the relative amount each entity ultimately will be called on to pay on account of the LBO Lender Debt.  The existence of intercompany claims serves only to determine the net worth of each Guarantor Subsidiary that must be applied to satisfy the LBO Lender Debt.

Viewed in this light, intercompany claims should have little effect, if any, on the ultimate solvency of the Guarantor Subsidiaries.  An example similar to the one in the previous Section of the Report illustrates this point.  Assume three guarantors, A, B, and C each with $200 cash, jointly, severally and unconditionally guarantee a $1,000 debt.  Also assume that C owes A $100.  On a standalone basis, A has $300 in assets ($200 *plus* $100 owed to it by C), B has $200, and C has $100 in assets ($200 of assets *minus* $100 owed to A).  Clearly in this instance, A, B, and C are collectively insolvent (by $400); thus, the existence of an intercompany claim between A and C is not relevant to a solvency or capital adequacy analysis of the guarantors collectively.  Similarly, if A, B, and C jointly, severally and unconditionally guaranteed a $250 debt, the guarantors would be collectively solvent because if any one of them paid this debt, the paying guarantor would nonetheless have sufficient assets in the form of contribution rights to be left solvent, even accounting for the intercompany claim C owed A.  Applying this scenario to the above example, assuming A paid the entire debt, it would have contribution rights against both B and C in the amount of $83.33.  C—the least solvent guarantor—would have nonetheless be left with sufficient assets to remain solvent ($100 - $83.33 = $16.67).[471]

---

[471]   These examples assume that the Guarantor Subsidiaries have comparable net worth.  As discussed in the preceding Section of the Report, however, even if the net worths of the individual Guarantor Subsidiaries differ dramatically, in the context of solvency analysis, a court is likely to apportion the collective liability among the

Next, assume A, B, and C jointly, severally and unconditionally guaranteed a $500 debt. Here, the guarantors would still be collectively solvent.  In this instance, also factored in is the existence of the Credit Agreement Subrogation Subordination Agreement and Bridge Subrogation Subordination Agreement (or in the case of the Step One Debt, principles analogous to these provisions for the solvency determinations at Step One).[472]  The result is that A, B, and C would each be liable on the $500 debt in proportion to their relative net worth *taking into account the intercompany claims*, i.e., A would be liable for $250 (A's $300 net worth is 50% of the group's $600 collective net worth), B would be liable for $166.67 (B's $200 net worth is 33.3% of the group's $600 collective net worth) and C would be liable for $83.33 (C's $100 net worth is 16.6% of the group's $600 collective net worth).

In sum, because the Guarantor Subsidiaries share joint and several liability on the LBO Lender Debt, it is appropriate to value them collectively.  Valued collectively, intercompany claims between the Guarantor Subsidiaries have no effect on the conclusion concerning collective solvency or capital adequacy.

### (iii)    Tribune.

As explained in the previous Section, in evaluating Tribune's solvency and capital adequacy, it is appropriate to consider as offsetting assets of Tribune the contributions of the Guarantor Subsidiaries on the LBO Lender Debt.  For these same reasons, the examples cited

---

Guarantor Subsidiaries on the LBO Lender Debt in an amount equal to the proportion of each entity's net worth to the net worth of all of the Guarantor Subsidiaries.  If, however, a particular Guarantor Subsidiary had a negative net worth after consideration of intercompany claims but before consideration of the liability on the LBO Lender Debt, that entity's estate could avoid the LBO Lender Debt.

[472]    The Examiner has reached no conclusion whether the Credit Agreement Subrogation Subordination Agreement and Bridge Subrogation Subordination Agreement, or the implementation of marshalling, should be applied in the first two scenarios, because this additional factor does not affect the outcome in the first two scenarios.

directly above would apply equally to intercompany claims running between Tribune and the

Guarantor Subsidiaries as they do to intercompany claims running solely among the Guarantor

Subsidiaries, and should not affect a solvency and capital adequacy analysis of Tribune.  In sum,

and for the reasons explained above and in the previous Section, because Tribune and the

Guarantor Subsidiaries share joint and several liability on the LBO Lender Debt, it is appropriate

to take into account their collective resources to satisfy the LBO Lender Debt.  Intercompany

claims running by and against Tribune serve only to help allocate which entity contributes more

to satisfy the LBO Lender Debt.  Viewed in this fashion, intercompany claims between and

among Tribune and the Guarantor Subsidiaries have no material effect on the conclusion

concerning collective solvency or capital adequacy.

> **(6)** **Examiner's Conclusions and Explanation Concerning the Question of Inclusion of Step Two Debt with Step One Debt for Purposes of Analysis of Solvency, Capital Adequacy, and Intention to Incur Debts Beyond Reasonable Ability to Pay Adequacy Analysis.**
>
> **(i)** **Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Solvency Analysis.**

**Examiner's Conclusions**:

Although the question is close, the Examiner concludes that a court is somewhat unlikely

to include the Step Two Debt for purposes of determining solvency at Step One.

**Explanation of Examiner's Conclusions**:

This question contains two subparts:  first, whether the Step Two Debt should be

considered a Step One liability for purposes of evaluating Step One solvency, and, if so, how

much should be included in the Step One solvency measurement; second, if the first inquiry is

answered in the negative, whether the above-discussed collapse doctrine[473] nevertheless should be applied not just to the transactions *within* Step One and Step Two, but *between* Step One and Step Two, to determine Step One solvency.[474]

The answer to the first inquiry is straightforward. The Bankruptcy Code defines (i) the term "insolvency" to mean a financial condition in which "the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation;" (ii) the term "debt" to mean "liability on a claim;" and (iii) the term "claim" to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[475] Thus, to the extent the Step Two Debt constituted a liability at the time of the Step One Financing Closing Date, that debt must be factored into the liability side of the equation for purposes of solvency.

Under the Merger Agreement executed before Step One closed, Tribune was obligated to exercise reasonable best efforts to effectuate the Merger.[476] In particular, the Merger Agreement specifically required Tribune to exercise reasonable best efforts to "enforce its rights under the Financing Commitments."[477] The Credit Agreement (which embodied the financing commitments in effect at the time of the Step One Financing Closing Date) and the Step Two Commitment Letter, in turn, authorized (but did not require) Tribune to compel the LBO Lenders to fund the Step Two Debt, subject to the satisfaction of the conditions precedent to those

---

[473] *See* Report at § IV.B.5.b.

[474] In the course of advocating their respective positions, certain Parties chose to describe Step One and Step Two as "Phase One" and "Phase Two" or the "Recapitalization" and the "Merger." These labels were designed to drive home various contentions on the question of collapse. If the law governing collapse means anything, it is that labels mean nothing. The Examiner chose to use the defined terms "Step One" and "Step Two" because this is actually how the participants referred to them at the time of the Leveraged ESOP Transactions.

[475] *See* 11 U.S.C. § 101 (5)(A), (12), and (32) (2006) (emphasis added); *see also JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 122 (3d Cir. 2010) (en banc).

[476] Ex. 151 at § 5.6(a) (Merger Agreement).

[477] *Id.* at § 5.11(a).

fundings.[478]  The lenders were required to fund at Step Two on satisfaction of the requisite

conditions, which were finite.[479]  In a very real sense, the Credit Agreement and the Step Two

Commitment Letter afforded Tribune the financial means—and the Merger Agreement imposed

on Tribune the contractual obligation to take advantage of the right—to incur that additional

debt.

Although the preceding discussion amply establishes that Tribune had the means to

borrow the money necessary to close Step Two if the other conditions precedent were satisfied,

and Tribune undoubtedly would have faced some liability had it breached those obligations,[480] it

does not follow that Tribune was contingently liable *to the Step Two Lenders* on the Step Two

Debt before Step Two closed.[481]  A simple example illustrates why this is so.  Suppose A agrees

with B that it will purchase B's automobile for $25,000 if A can borrow that amount from A's

bank.  A obtains a commitment from its bank to advance this sum to A if A so requests.  A files

---

[478]  Ex. 179 at § 2.17 (Credit Agreement); Ex. 1010 (Amended Step Two Commitment Letter).

[479]  *See* Report at § III.D.9.b. for a discussion of the closing conditions under the Credit Agreement and the Step Two Commitment Letter.  For example, as discussed later in this Section, the definition of "Company Material Adverse [Event] or Event" was narrowly drawn.  Although Tribune was required to represent that it was "Solvent" (a term that was specifically defined in the Credit Agreement) after giving effect to Step Two, the Credit Agreement specified the manner in which that representation would be confirmed via the delivery of a certificate that relied on VRC's solvency opinion.  *See* Ex. 179 at § 2.17 (Credit Agreement); Ex. 187 (Form of Credit Agreement Solvency Certificate); Ex. 175 at § 3.01(b)(i) (Bridge Credit Agreement); Ex. 709 (Form of Bridge Credit Agreement Solvency Certificate).

[480]  *See Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 749 (Del. Ch. 2008) (finding that party's obligation under merger agreement to use "reasonable best efforts" to obtain financing obligated that party to take any act that "was both commercially reasonable and advisable to enhance the likelihood of consummation of the financing . . . . To the extent that Hexion deliberately chose not to act, but instead pursued another path to *avoid* the consummation of the Financing, Hexion knowingly and intentionally breached this covenant").  Both the Merger Agreement and the EGI-TRB Purchase Agreement contain Delaware choice of law provisions.

[481]  *See Smurfit Newsprint Corp. v. Se. Paper Mfg. Co.*, 368 F.3d 944, 951 (7th Cir. 2004) (stating that conditions precedent "must be literally met or exactly fulfilled or no liability can arise on the promise qualified by such conditions") (citations omitted); *IDT Corp. v. Tyco Group S.A.R.L.*, 918 N.E.2d 913, 916 (N.Y. 2009) ("Although there was a valid settlement agreement in this case, Tyco's obligation to furnish [value] never became enforceable because agreed-upon conditions [precedent] were not met."); *Perry v. Estate of Carpenter*, 918 N.E.2d 1156, 1161 (Ill. App. Ct. 2009) ("It is well settled that where a contract contains a condition precedent, the contract is neither enforceable nor effective until the condition is performed . . . .") (internal quotations and citations omitted).

bankruptcy after entering into its agreement with B and obtaining the bank commitment but

before exercising its right to borrow the funds from the bank.  In this circumstance, there is little

question that at the time of A's bankruptcy B is a creditor of A, but the bank is not; the bank

only made a commitment to A which A might or might not have exercised, and until A did so,

the bank had no right to payment (conditional or otherwise) on account of the amounts A could

borrow.  The bank holds no claim against A, and, similarly, A has no liability to the bank for

those amounts.[482]

 This conclusion derives from the fact that "[t]he plain meaning of a 'right to payment' is

nothing more nor less than an enforceable obligation . . . . "[483]  The Bankruptcy Code's definition

of "claim" is exceedingly broad,[484] and certainly encompasses contingent liabilities, but this does

not transform every future liability into a bankruptcy claim:[485]

---

[482]  *See In re Dowell*, 1998 U.S. Dist. LEXIS 22029, at *16-17 (D.N.J. Aug. 26, 1998) ("The court will not infer an obligation to repay advances absent a contractual agreement, unless the surrounding circumstances require such an inference."); *see also Smurfit Newsprint*, 368 F.3d at 951; *IDT*, 13 N.Y.3d at 214.

[483]  *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990) (emphasis added); *see also LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478 (2d Cir. 1995) ("A claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts.  A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation – 'a right to payment' – under the relevant nonbankruptcy law.") (citing and quoting *In re Nat'l Gypsum Co.*, 139 B.R. 397, 405 (N.D. Tex. 1992)) (internal quotations omitted).

[484]  *See FCC v. NextWave Pers. Commc'ns Inc*., 537 U.S. 293, 302 (2003) ("We have said that 'claim' has 'the broadest available definition.'"); *JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 121 (3d Cir. 2010) (en banc) (overruling the *Frenville* accrual test); *Kilbarr Corp. v. Gen. Servs. Admin. (In re Remington Rand)*, 836 F.2d 825-26, 829 (3d Cir. 1998) (finding that "Congress defined 'claim' in the broadest possible terms" and "unambiguously stated its intent to address all possible legal obligations in defining a bankruptcy claim") (citations omitted).

[485]  2 COLLIER ON BANKRUPTCY ¶ 101.05 (Alan A. Resnick & Henry J. Sommer eds., 16th ed.); *see also Knutson v. Tredinnick (In re Tredinnick),* 264 B.R. 573, 577-76 (B.A.P. 9th Cir. 2001) ("[T]he broad definition of a claim, however, is not boundless. . . . A key phrase in § 101(5)(A) is 'right to payment' and here, Knutson's right, strictly speaking, arose postpetition, given that all the legal services performed by Knutson for the Tredinnicks occurred subsequent to their petition.") (internal citations omitted); *In re Texaco Inc.*, 254 B.R. 536, 559 (Bankr. S.D.N.Y. 2000) ("Simply stated, the basic rule is that claims arising after confirmation from a contractual relationship are not barred by a confirmation order.  It is only where the liability asserted in a claim is based upon a breach of contract that occurred before confirmation that the claim must be filed in the bankruptcy.

However, the broad definition of claim is not boundless.  The fact that an entity may have a claim in the future does not mean that the entity has a claim on the date of the petition.  A person who might be injured in the future due to a manufacturing defect in a product made before bankruptcy does not have a prepetition claim if the person did not have a prepetition relationship with the debtor or the product.  A parent corporation's asserted interest in customer obligations it was to transfer under an operating agreement to its finance subsidiary, a chapter 11 debtor, was not a claim. . . . Retirement advances that may have to be repaid under certain contingencies have been found not to be "claims" where the obligation is dependent on the debtor's choice of future actions.  A *sue* [sic] *sponte* monetary sanctions award that was ordered postpetition in a lawsuit that was filed prepetition, in a case in which no party could have fairly contemplated such an award when the bankruptcy petition was filed, has also been found not to be a prepetition "claim."  Similarly, new or continuing postpetition acts in violation of a statute that the debtor had been violating before filing the petition can give rise to postpetition claims, separate from the prepetition claims based on prepetition violations.

Looking at the circumstances at the time of the closing of Step One, the Step Two Lenders had no claim against Tribune and Tribune had no liability to the Step Two Lenders until Tribune drew funds.  The circumstance was no different in the case of the Guarantor Subsidiaries.  Although the Credit Agreement Subsidiary Guarantee imposed liability on the Guarantor Subsidiaries for any indebtedness incurred by Tribune under the Credit Agreement, including the amounts that might be advanced in connection with Step Two, these entities did not incur any such additional liability until Tribune drew the additional funds under the Credit Agreement.  In other words, insofar as the Step Two funding under the Incremental Credit Agreement Facility was concerned, the Guarantor Subsidiaries were in the same position as Tribune.[486]  Because the Step Two Debt was not a contingent liability at the time of Step One, it

---

Potential claims for liabilities for breach of obligations which might occur after confirmation cannot be filed before confirmation even if they could be anticipated . . . .") ( citations omitted).

[486]  This conclusion should not be confused with the Examiner's earlier conclusion that, under the law in the Third Circuit law, a lender can confer value on a debtor by making a commitment to advance funds even though the debtor does not borrow the money until later.  *See* Report at § IV.B.5.c.(4).  Thus, if a lender provides a funding commitment and, in exchange, receives a fee which an estate representative subsequently seeks to recover, the

is not necessary for the Examiner to evaluate whether a court would include the full amount of

that debt, or something less, for solvency purposes.  The same is true regarding the obligations

imposed under the Merger Agreement to pay the consideration to the Selling Stockholders on the

consummation of the Merger.[487]

The next inquiry is whether it is nevertheless appropriate to collapse Step One and Step

Two for solvency purposes and thereby include the Step Two Debt as a liability at Step One.  In

other words, even though the Step Two Debt was not a liability at Step One, should a court

disregard the two separate steps in favor of viewing them as one transaction for solvency

analysis?  The issue of collapsing Step One and Step Two requires application of the three

above-discussed considerations applied by courts in the Third Circuit:  whether the parties had

---

lender may assert a defense under Bankruptcy Code section 548(c) based on the value the lender imparted to the debtor when the commitment was made.  *See id.* at §§ IV.B.5.c.4. and IV.B.5.c.6.

[487]  Because this consideration was only payable if the Merger occurred, *see* Ex. 151 at § 2.1 (Merger Agreement) ("At the Effective Time, by virtue of the Merger . . . ."), no enforceable right to payment in favor of a Selling Stockholder could exist until the Merger closed.  *See Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 524 (5th Cir. 2004) ("The touchstone of any 'claim' is that there is an 'enforceable obligation' of the debtor or an enforceable 'right to payment' from the debtor."); *see also* Ex. 151 at § 8.10 (Merger Agreement) (third party beneficiary rights conferred as to § 2.1(a), which in turn is conditioned on the occurrence of the Effective Time).  There also is authority to support the further contention that even if the Merger had occurred, stockholders would have had no right to payment unless Tribune were solvent.  *See Carrieri.*, 393 F.3d at 522 ("[T]he rights of shareholders to redeem stock are equity interests because they are not guaranteed the right to payment, as claims are, but rather are dependent on the solvency of the corporation."); *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 287 B.R. 98, 110 (Bankr. S.D.N.Y. 2002) ("Ordinarily, a stock redemption obligation that is conditioned on the issuer's solvency is not considered a liability in determining the issuer's solvency."); *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R. 610, 622-24 (Bankr. E.D. Pa. 1989) (finding stock redemption obligation not "debt" on the debtors' balance sheet for insolvency purposes because "[s]tate law prohibits the redemption of shareholder stock by a corporation that is insolvent"), *aff'd*, 121 B.R. 442 (E.D. Pa. 1989); *see also Brown v. Shell Can. (In re Tenn. Chem. Co.)*, 143 B.R. 468, 473 (Bankr. E.D. Tenn. 1992) ("The court will not count the redemption price as a debt."), *aff'd in part and rev'd in part on other grounds*, 112 F.3d 234 (6th Cir. 1997); *In re Revco D.S., Inc.*, 118 B.R. 468, 474 (Bankr. N.D. Ohio 1990) ("Generally, the rights of shareholders to redeem stock are not guaranteed but are dependent on the financial solvency of the corporation.  Accordingly, the mandatory redemption provision of convertible preferred stock is an interest and not a claim as New York Life asserts.").  Either or both of these principles answers any contention that Tribune's payments to the Selling Stockholders at Step Two constituted the satisfaction of preexisting obligations incurred when Tribune was solvent at the time it entered into the Merger Agreement.  Tribune had no obligation to make these payments unless and until the Merger conditions were satisfied; and if it is established that these transfers were made pursuant to an intentional fraudulent transfer, they may be avoided and recovered.

knowledge of the multiple transactions; whether each transaction would have occurred on its

own; and whether each transaction was dependent or conditioned on the other transaction.[488]

Although the collapse principle typically has been applied for purposes of testing

reasonably equivalent value,[489] there is no principled reason why the collapse principle could not

apply to the question of solvency consistent with the bankruptcy court's broad powers to look to

the substance and disregard the form of a transaction.[490]  Moreover, the fact that the closings of

Step One and Step Two were separated by considerable time should not, by itself, forestall

application of the collapse principle.[491]  It is not beyond the realm of possibility that a planned

interval between the beginning and end of an integrated transaction is just an effort to

camouflage what is in substance a single transaction, nor is a transaction removed per se from

the realm of collapse just because specified conditions must be met in order for a later step to

---

[488] *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 104 (Bankr. D. Del. 2010) (setting forth three-part test).

[489] *See Off. Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge)*, 344 B.R. 340, 347-48 (W.D. Pa. 2006) (stating that the integration or step transaction doctrine "has often been applied in the context of leveraged buyouts" and is typically invoked "for purposes of demonstrating that the insolvent target company did not, in the aggregate, receive fair consideration or reasonably equivalent value for the transfer in question"); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995) (finding that "[i]t is the debtor who must have received value as a result of the transfer.  In the context of an LBO, this issue is determined after 'collapsing' the transaction" in certain circumstances); *Foxmeyer Drug Co. v. GE Capital Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546, 574 (Bankr. D. Del. 2002) ("Integration of the two transfers reveals that the debtor in a paradigmatic scheme [did] not receive reasonably equivalent value . . . ."); *see also Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 792, 795 (7th Cir. 2009); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1296, 1302-03 (3d Cir. 1986); *HBE Leasing Corp. v. Frank*, 48 F.3d 623,659, 635-36 (2d Cir. 1995); *Jones v. Nat'l City Bank of Rome (In re Greenbrook Carpet Co.)*, 722 F.2d 659, 660-61 (11th Cir. 1984) (per curiam).

[490] *See In re Sw. Equip. Rental, Inc.*, 1992 WL 684872, at *14 (E.D. Tenn. July 9, 1992) (collapsing a series of transactions over a three week period "for purposes of determining whether [the debtor] received fair consideration *or was rendered insolvent*" by the transactions) (emphasis added); *see also Vintero Corp. v. Corparacion Venezolana de Fomento ( In re Vintero Corp.)*, 735 F.2d 740, 742 (2d Cir. 1984) ("A bankruptcy court has broad equitable powers which may be invoked to see 'that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'") (quoting *Pepper v. Litton*, 308 U.S. 295, 304-05 (1939)); *Off. Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements Inc. (In re Midway Games, Inc.)*, 2010 Bankr. LEXIS 337, at *41 (Bankr. D. Del. Jan. 29, 2010) (stating that the purpose of recharacterization is to elevate the substance of the transaction over form).

[491] *Orr v. Kinderhill Corp.*, 991 F.2d 31, 33, 35-36 (2d Cir. 1993) (collapsing multiple transactions notwithstanding passage of time between transactions); *A.J. Heel Stone, L.L.C. v. Evisu Int'l, S.R.L.*, 2006 U.S. Dist. LEXIS 34152, at *4, *12 (S.D.N.Y. May 25, 2006) (collapsing series of transactions over the course of several months in fraudulent transfer action).

happen.  It is the substance and meaningfulness, not just the existence, of any such conditions that are dispositive.[492]  One could posit any number of leveraged buyout transactions nominally structured to contain conditions that in fact lack substance.  Consistent with the bankruptcy court's power to elevate substance over form, however, the question is whether a particular condition has substance.

Applying the first of the above noted three-part inquiry courts use to evaluate the appropriateness of collapse, it is undisputed that all relevant parties had knowledge of the multiple transactions.  Thus, the first inquiry favors collapse.  The second inquiry is more of a mixed bag but, on balance, also tends to favor collapse.  On the one hand, Tribune originally considered undertaking a recapitalization that would have been quite similar in effect to the Step One transactions.[493]  Indeed, Step One bore many similarities to the 2006 Leveraged Recapitalization effectuated only the year before.  Thus, it is conceivable that Tribune would have proceeded with a transaction similar to Step One had the Leveraged ESOP Transactions not been proposed.  Moreover, although in theory all of the transactions could have been held in abeyance pending satisfaction of all conditions to the Merger, by design that is not how the

---

[492]  *See generally Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) ("Fraudulent conveyance doctrine . . . is a flexible principle that looks to substance rather than form . . . .") (internal citations and quotations omitted); *Kinderhall*, 991 F.2d at 35 ("[W]here a transfer is only a step in a general plan, the plan must be viewed as a whole with its composite implications."); *Off. Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp., Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 970 (D. Del. 1994) ("Courts which have previously addressed the application of [illegal dividend statutes] to LBO transactions have rejected arguments which concentrate on the form of the transaction rather than its substantive economic effect."); *Big V Supermarkets Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71, 92 (Bankr. D. Del. 2001) ("[B]y linking together all interdependent steps with legal or business significance, rather than taking them in isolation, the result may be based on a realistic view of the entire transaction.") (internal quotation marks omitted).

[493]  *See* Report at § III.D.1. (discussion of the deliberations of the Tribune Board and the Special Committee leading up to Step One); *see also* Ex. 141 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Tribune Board, dated March 30, 2007).

transaction was structured. By design, significant consideration flowed to the Selling

Stockholders at Step One.[494]

On the other hand, the Leveraged ESOP Transactions were formulated and structured so

that, provided all conditions were met, Tribune would become a privately-held company under

new ownership, utilizing the potentially significant tax benefits that would flow from the S-

Corporation/ESOP structure. Without question, the key transaction documents were designed to

enable Tribune to have the financial wherewithal to make Step Two happen after Step One.

Thus, the Credit Agreement explicitly provided for Tribune to have access to an "Incremental

Facility" at Step Two. The Step One Commitment Letter and the Step Two Commitment

Letter—executed at the same time—obligated the parties thereto to provide the requisite

financing to enable Step Two to occur.[495] As noted, the Merger Agreement obligated Tribune to

exercise reasonable best efforts to effectuate the Merger. The Tribune Board approved the

Leveraged ESOP Transactions in their entirety, including both the Step One Transactions and the

Step Two Transactions, on April 1, 2007.[496] A press release issued immediately following the

announcement of the Merger Agreement stated: "With the completion of its strategic review

process, Tribune Company (NYSE:TRB) today announced a transaction which will result in the

company going private . . . . Sam Zell is supporting the transaction with a $315 million

investment. Shareholders will receive their consideration in a two-stage transaction."[497] Tribune

---

[494] Examiner's Interview of Thomas Whayne, June 11, 2010 ("I think it would've been hard for us to recommend going down the path with Zell unless we had the up front distribution that was same level as the recap. I'm comfortable that Chandlers & McCormicks wouldn't have supported it either.").

[495] Ex. 944 (Amended Step One Commitment Letter); Ex. 1010 (Amended Step Two Commitment Letter).

[496] Ex. 146 (Tribune Board Meeting Minutes, dated April 1, 2007).

[497] Ex. 148 (Tribune Press Release, dated April 2, 2007).

also publicly described its detailed financing commitments for the Leveraged ESOP

Transactions, including $4.2 billion committed for Step Two.[498]

Looking at the circumstances at the time of Step One, moreover, it was highly likely that

Step Two would close and therefore that the objectives of the Leveraged ESOP Transactions

would be realized:

First, in the period immediately following the Step One Financing Closing Date  and

therefore most reflective of market sentiment at that time, the Tribune Common Stock traded at a

relatively small discount to the $34 share price,[499] indicative of market optimism that Step Two

would become a reality.

Second, the parties to the Merger Agreement had strong motivations to see that Step Two

would happen.  Among other things, the potential tax benefits from the S-Corporation/ESOP

structure could only be achieved if both Step One and Step Two were completed.[500]  Completion

of only Step One would have left the Company in public hands and left its earnings subject to

federal tax absent the implementation of some other transaction or structure.

Third, Tribune had just completed an auction process.  The fact that approximately 90%

of all outstanding shares of Tribune Common Stock were tendered in the Tender Offer[501] is

---

[498]   Ex. 148 (Tribune Press Release, dated April 2, 2007).

[499]   Ex. 865 at 1 (stock price chart showing average share price of $31.27 in the ten days after the Tender Offer
closed, a price which was approximately 92% of the Tender Offer price).

[500]   Tribune's Treasurer Chandler Bigelow noted the tax benefits that would be conferred.  *See* Examiner's Sworn
Interview of Chandler Bigelow, June 17, 2010, at 135:11-18.  *See also* Ex. 180 at 40-41 (Transcript of Lenders
Meeting, dated April 26, 2007).  Tribune's presentation to the rating agencies similarly emphasized the benefits
of the ESOP-associated tax savings. Ex. 891 at 10 (Tribune Rating Agency Presentation, dated March 2007).
In addition, Mr. Zell was enthusiastic to see Step Two close.  Examiner's Interview of Samuel Zell, June 14,
2010 ( "Did we think we bought a great company?  We thought we bought a great opportunity.  What allowed
us to do it was the asset base.  We convinced ourselves that the asset base, we had the value of the newspaper
and TV stations as a result of 2008, we didn't know it at the time but we thought we had the raw pieces and the
bases that's why we agreed to the [Tranche] X.  We were intent on the Cubs, we were convinced we could sell
other assets.").

[501]   Ex. 225 (Tribune Press Release, dated May 31, 2007).

tangible evidence that most stockholders were satisfied with the results of that process. Although Tribune retained the right to exercise a "fiduciary out" at a relatively modest price ($25 million) if a better offer was forthcoming, the "fiduciary out" provision itself was narrowly tailored and limited Tribune's ability to seek out higher bidders.[502]  Tribune did not have an unconditional right to buy its way out of the Merger Agreement by paying $25 million.  Other than due to a breach of the Merger Agreement by the ESOP or the failure of the Merger to close before the drop-dead date, Tribune's only unilateral right to terminate the Merger Agreement was if it actually accepted a Superior Proposal (in substance, a proposal for a merger or other acquisition of Tribune; an acquisition of 50% or more of the consolidated assets of the Tribune Entities; an acquisition of 50% or more of the outstanding Tribune Common Stock; or a tender offer for more than 50% of the outstanding Tribune Common Stock that the Special Committee or Tribune Board determined in good faith was more favorable to Tribune and its stockholders than the Merger).[503]  If Tribune exercised this Superior Proposal termination right, it had to pay EGI-TRB a $25 million termination fee.  For its part, EGI-TRB could only unilaterally terminate the EGI-TRB Purchase Agreement if Tribune Board's recommendation changed, approval of the Merger was not obtained, the Merger failed to close before the drop-dead date, or Tribune materially breached or failed to perform its obligations under the Merger Agreement, in which case Tribune would have to pay a $25 million termination fee to EGI-TRB.[504]

Fourth, in addition to the fact that 90% of the stockholders at Step One, the Chandler Trusts (holding 20% of the outstanding shares and the single largest stockholder of the

---

[502]  *See* Report at §§ III.D.3.b. and III.D.3.c.

[503]  Ex. 151 at § 7.1 (Merger Agreement).

[504]  Ex. 152 at § 7.1 (EGI-TRB Purchase Agreement).

Company) agreed to vote for the Merger on April 1, 2007.[505]  Stockholders ultimately approved

the Merger at the Company Meeting on August 21, 2007, when approximately 65% of the total

shares outstanding and entitled to vote at the meeting approved the Merger.[506]  Thus, stockholder

approval did not appear to present a serious obstacle to the Step Two Closing.

Fifth, although Section 6.1(g) of the Merger Agreement required as a condition to the

Merger that Tribune have "obtained the Financing on the terms set forth in the Financing

Commitments, or alternative financing on substantially similar terms that are not materially more

onerous than the terms reflected in such Financing Commitments, sufficient to consummate the

Merger and the transactions contemplated by this Agreement,"[507] the Step Two Commitment

Letter was procured and obtained contemporaneously, before the Step One Transactions closed.

The Credit Agreement, entered into at Step One, obligated the Step Two Lenders to advance

funds under the Incremental Credit Agreement Facility if requested by Tribune at the time of

Step Two.

Sixth, the above-noted Commitment Letters (as well as the Credit Agreement) contained

an extremely limited, and in the Examiner's experience, rather unusual material adverse event out

(incorporated by reference from the definition of Company Material Adverse Effect in the

Merger Agreement) that excluded from consideration "changes in general economic or political

conditions or the securities, credit or financial markets in general" and "general changes or

developments in the industries in which the Company and its Subsidiaries operate, including

general changes in law or regulation across such industries" but only "to the extent such facts,

---

[505]    Ex. 5 at 25 (Tender Offer).  On June 7, 2007, however, the Chandler Trusts sold the remainder of the Tribune
Common Stock owned by them following the Tender Offer and therefore did not vote at the Company Meeting.
*See* Report at § III.F.3.

[506]    *See* Report at § III.F.5.

[507]    Ex. 151 at § 6.1(g) (Merger Agreement).

circumstances, events, changes or developments referred to therein have a disproportionate impact on the Company and its Subsidiaries, taken as a whole, relative to other companies in the industries or in the geographic markets in which the Company conducts its businesses after taking into account the size of the Company relative to such other Companies."[508]  Lender personnel recognized that these provisions furnished no practical basis for the Step Two Lenders to refuse to proceed with funding on the Incremental Credit Agreement Facility.[509]

Seventh, although the accuracy of Tribune's representation of solvency at Step Two was a condition to funding of the Incremental Credit Agreement Facility, the Credit Agreement specified the manner in which this representation would be confirmed at the closing in the form of a solvency certificate.  If Tribune presented the requisite solvency certificate, the Credit Agreement lenders (and the Bridge Facility Lenders) would face difficulties were they to refuse to fund at Step Two.  The record shows that the Lead Banks were aware of these dynamics as Step Two approached.[510]

In sum, although Tribune might have gone forward with a transaction very similar to Step One on a stand-alone basis had the Leveraged ESOP Transactions not been available, by the time the April 1, 2007 agreements were in place, Tribune had crafted a comprehensive transaction that

---

[508]  *Id.* at § 3.1.  The Merger Agreement further specified that "[f]or the avoidance of doubt, the parties agree that any decline in the stock price of the Company Common Stock on the New York Stock Exchange or any failure to meet internal or published projections, forecasts or revenue or earning predictions for any period shall not, in and of itself, constitute a Company Material Adverse Event, but the underlying causes of such decline or failure shall be considered to the extent applicable (and subject to the proviso set forth in the immediately preceding sentence) in determining whether there is a Company Material Adverse Event."  *Id.*

[509]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 145: 11-12 ("There was no market MAC unfortunately for everybody involved.").  A draft internal memorandum prepared by JPM in approximately September 2007 stated: "JPMorgan deal team's peer analysis indicates that although Tribune's publishing segment has underperformed its peers in the recent quarter, the entire industry is experiencing very difficult operating environment and deteriorating performance."  Ex. 958 (Tribune Company Financing Memo September 2007).

[510]  Examiner's Interview of Rajesh Kapadia, June 25, 2010 ("We had a legally binding commitment and specific set of conditions that we had to honor.  We could walk away from this, and it would feel good for a day, but that's a legally binding commitment.").  *See also* Report at § III.H.4.

would culminate in the Merger and the replacement of old ownership with new, and that could be fully implemented subject to satisfaction of the conditions precedent to Step Two. Moreover, as of the Step One Financing Closing Date, it was highly likely that Step Two would become a reality. On balance, and in the context of what transpired in the spring of 2007, one cannot say that each of Step One and Step Two would have occurred on its own, and thus, the second factor leans in favor of collapse.

The case for collapse encounters obstacles, however, when confronted with the third inquiry: whether Step One and Step Two, and the transactions effectuated *inter se*, were mutually dependent or conditioned. In the cases in which a court in the Third Circuit has collapsed a leveraged buyout transaction, this factor was present.[511] This is not surprising. The existence of reciprocally-dependent transactions goes to the heart of the question of collapse. This is what allows the court to disregard the intricate moving pieces that lawyers and financial advisors sometimes conjure up to disguise a transaction's substance.

A court might begin the consideration of this third inquiry by observing that although Step Two could not have occurred without Step One, Step One did not depend and was not conditioned on the occurrence of Step Two. Having made that observation, the analysis could end quickly with the conclusion that Step One and Step Two simply were not reciprocally dependent on each other. But the Examiner believes that stopping there would be inconsistent with a court's responsibility to look beneath a transaction's surface until the substance is reached. As a matter of appearance, Step One might not have depended on Step Two, but if the occurrence of both steps were a foregone conclusion, appearances would be deceiving. The evidence shows that participants in the Leveraged ESOP Transactions not only contemplated the

---

[511] *See* Report at § IV.B.5.b.

possibility that Step Two might not happen, they structured the documents so that Step One could stand alone if necessary.  In fact, a fair inference from the events culminating in the acceptance of the Zell Group bid is that the two-step structure enabled stockholders to receive substantial upfront consideration.  The inferior alternative (from the perspective of stockholders at least) would have been to defer everything until all the requisite regulatory approvals could be obtained.  The two-step structure permitted the parties to accomplish as much of the transaction as they could upfront.  Significantly, the Examiner has found no evidence that the phased or two-step structure that resulted from the auction process in Spring 2007 was designed as a subterfuge.

To be sure, had there been a way to structure the transactions so that only one giant step were necessary, the transaction would have been structured accordingly.  It also is evident from the transaction documents and other evidence that (i) Tribune and the Zell Group did their best to ensure that the LBO Lenders were required to fund if the Step Two conditions were met (and to narrow the conditions that had to be satisfied) and (ii) Tribune and the Zell Group did their best vis-à-vis one another to ensure that each would be obligated to work diligently to make Step Two happen.  On the other hand, the participants recognized that because more than one step would be necessary to complete the Leveraged ESOP Transactions, they could not simply afford to make the assumption that Step Two would close.  The relevant documents and circumstances leading up to Step Two amply demonstrate that the participants did not make that blanket assumption.

First, the Credit Agreement did not obligate Tribune to obtain the Step Two Financing and did not make Tribune's failure to obtain that financing an event of default.[512]  Indeed, although the matter is not free from doubt, a court probably would interpret the Credit

---

[512]    The Credit Agreement states: "Borrower may . . . elect to request the establishment of a new term loan commitment on the Second Step Closing Date, which may be additional Tranche B Commitments or commitments to provide a new tranche of term advances . . . ."  Ex. 179 at § 2.17(a) (Credit Agreement).

Agreement as not containing any Tribune representation effective at Step One concerning Tribune's solvency in the future if Step Two were to close.[513]  The Credit Agreement was structured to enable Tribune to obtain the Incremental Credit Agreement Facility funding if Tribune otherwise satisfied the specified closing conditions.  Tribune obtained separate financing commitments for Step Two encompassing what became the Incremental Credit Agreement Facility and the Bridge Facility.[514]

Second, the transaction documentation provided a mechanism for EGI-TRB and the ESOP to sell their Tribune shares through a Tribune-sponsored registration statement if the Merger did not occur.[515]

Third, Tribune's public filings disclosed that Step Two might not close, noting that separate commitments were entered into in connection with each transaction and that Step Two was subject to satisfaction of specified conditions.[516]  Certain of Tribune's directors and officers also testified in the *Garamella* litigation that Step One and Step Two were independent.[517]

---

[513]  Section 4.01(l)(ii) of the Credit Agreement contains a representation regarding Step Two solvency "[u]pon and after consummation of the Second Step Transactions and as of the Second Step Closing Date." *Id.* at § 4.01(l)(ii) (Credit Agreement).  Under the Credit Agreement, all representations and warranties (other than the no material adverse effect representation) were to be correct on the Step One Financing Closing Date. *Id.* at § 3.02(i) (Credit Agreement).  Although it is not clear why this representation was included in the representations made as of the Step One Financing Closing Date, read in context it appears to constitute a representation that would only speak as of the closing of Step Two (if and when Step Two was ready to occur) and was not a representation given at Step One about Tribune's future solvency if and when Step Two occurred. The accuracy of this representation was a condition to funding under the Incremental Credit Agreement Facility under the Credit Agreement, which was tied to the Step Two Closing.  *See* Report at § III.D.11.

[514]  *See* Report at § III.D.9.b.

[515]  *See id.* at § III.D.8.

[516]  *See id.* at §§ III.D.1.f. and III.F.l.b.

[517]  *Garamella* was a class action lawsuit brought by a Tribune stockholder in May 2007 that sought to enjoin Step One of the Leveraged ESOP Transactions on the ground that, among other things, that the $34 per share price was inadequate.  *Garamella* sought a preliminary injunction against the Tender Offer.  In successfully defending against that motion, the defendants in *Garamella* emphasized that the Leveraged ESOP Transactions had been structured in a way to permit stockholders to receive a return of equity through a Tender Offer that was economically similar to the leveraged recapitalization alternative that was also being considered at the time. As the Chairman of the Special Committee testified:

Fourth, the Merger was conditioned on FCC approval, which was not obtained until November 30, 2007,[518] and Major League Baseball approval, which was not obtained until December 17, 2007.[519]

Fifth, the rating agencies and market analysts recognized that the transactions would be effectuated in two steps (although their ratings leading up to and following Step Two included all LBO Lender Debt issued and expected to be issued).[520]

By necessity, obtaining the requisite third party approvals would take time, and, in theory, the passage of time interjected uncertainty into the equation.  There was the possibility that Tribune might slip into insolvency if the massive Step Two Debt were added to the balance sheet.  Thus, the Merger Agreement required a solvency opinion as a condition to the Merger, and the Credit Agreement (and the Step Two Commitment Letter) required a solvency certificate as a condition to funding under the Incremental Credit Agreement Facility.  There was a possibility that the conditions to Step Two might not be met.  Thus, the Credit Agreement gave Tribune the right, but did not impose any obligation, to borrow and did not place Tribune into

---

[The Tender Offer thus offered] the "best of both worlds."  Under both the Tender Offer and the recapitalization plan, Tribune shareholders would receive the economic equivalent of $17.50 in cash (assuming all shareholders participate fully in the Tender Offer).  The Tender Offer thus provides security to shareholders because, even if the [Step Two Transactions] do[] not close as expected, the Company will more or less stand in the same position it would have if Tribune had what was viewed as the next best option.  And in that circumstance, Tribune could still pursue other options such as spin of the [Broadcasting Segment] or a sale of specific assets, such as the Chicago Cubs.

Ex. 210 at Declaration of William A. Osborn at 29 (Briefing and Declarations (and exhibits thereto) filed in *Garamella*).  *See also* Ex. 210 at Declaration of Michael Costa at 280 (Briefing and Declarations (and exhibits thereto) filed in *Garamella*).  ("We pointed out that the economic impact of the first step of the EGI transaction and the leveraged recapitalization were essentially the same to shareholders [which meant] even if the EGI merger was unable to close for some reason, the Company and shareholders would essentially be in the same position as if it had done a leveraged recapitalization  . . . .").  *Id.*

[518]   Ex. 659 (FCC Order, dated November 30, 2007).

[519]   Ex. 661 (Major League Baseball Letter, dated December 17, 2007).

[520]   *See* Report at §§ III.C.2., III.D.15.a., III.D.15.b., III.F.1.a., and III.G.4.f.  Certain analysts also raised questions concerning the likelihood that Step Two would close and in particular regarding FCC approval (although expressing the view that FCC approval probably would be forthcoming).  *See id.* at § III.F.1.a.

default if Step Two failed to occur.  Finally, there was a built-in time lag between the closing of

Step One and the closing of Step Two.  If the time lag extended into 2008, stockholders would

receive a "ticking fee" to compensate for the delay.[521]  Tangible evidence that uncertainty over

closing Step Two was not just a theoretical concern may be deduced from the fact that the

Tribune Common Stock traded at a discount to the Merger price in the months following Step

One.[522]

     Although the preceding militates against collapsing Step One and Step Two, the inquiry

does not end there.  Consistent with the underlying principle that substance must take primacy

over form,[523] collapse might yet be warranted if Step One and Step Two in reality were

reciprocally dependent despite the structure, the outward appearance of the transactional

documents, and the public utterances of Tribune and its directors.

     The question actually is relatively close.  As noted, the Examiner finds that at the time of

Step One and in the days shortly following the Step One Financing Closing Date, it was highly

likely that Step Two would happen.  Tribune had procured comprehensive financing

commitments for Step Two and, under the above-noted restrictive definition embodied in

Company Material Adverse Effect, had limited the circumstances in which a decline in Tribune's

performance alone could jeopardize funding or the Merger.  Although the financing

commitments were conditioned on a solvency certificate as well as the veracity of Tribune's

representation concerning solvency at the proposed Step Two Closing—and thus to the extent

that deterioration in Tribune's operating performance combined with the new Step Two Debt

would render Tribune insolvent, the Step Two Lenders could refuse to fund their Step Two

---

[521]  Ex. 151 at § 2.1(a) (Merger Agreement).

[522]  *See* Report at § III.F.2.d.

[523]  *See, e.g.*, *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302-03 (3d Cir. 1986).

commitments—by design the structure of the lending documents made it difficult for the Step

Two Lenders to refuse to close.  Indeed, the evidence shows that one of the most active of the

Lead Banks, JPM, analyzed the Leveraged ESOP Transactions as a whole, and never sought

internal approval to provide the Step One Financing independent of the Step Two Financing.[524]

The overwhelming stockholder subscription to the Tender Offer combined with the Chandler

Trusts' commitment to support the Merger as the then largest stockholder meant that stockholder

approval was highly likely.  Notwithstanding that consummation of the Merger was conditioned

on  FCC approval of a transfer of control and an extension of the Company's cross-ownership

waivers,[525] the market generally expected that the FCC Order would be granted.[526]  Finally, the

Merger not only would enable Tribune to cash out all of its stockholders, but also to take

advantage of the tax benefits made available only at the Step Two Closing from the

---

[524]  Ex. 289 at 116:3-9 (Kowalczuk Deposition).  Mr. Sell did, however, request and review an analysis "showing just step 1, assuming step 2 never got done."  Ex. 290 at JPM_00260070 (Tonnesen E-Mail, dated March 29, 2007).

[525]  Ex. 151 at § 6.1(c) (Merger Agreement); Ex. 226 at 71-72 (Proxy Statement, dated July 13, 2007).  *See* Examiner's Sworn Interview of William Osborn, June 24, 2010, at 67:20-68:4 ("Q: I'm trying to gauge how confident were you.  Mildly confident, somewhat confident, reasonably confident, highly confident, how high in terms of a scale, how great a likelihood did you think there was in April when you closed Step 1 or in June when you closed Step 1.  A:  I felt very confident.").

[526]  Ex. 178 at 47 (Step One Confidential Information Memorandum); Ex. 626 at 13-14 (Deutsche Bank Rating Upgrade, dated July 1, 2007).  Tribune Chief Executive Officer Dennis FitzSimons, however, testified in his sworn interview that obtaining FCC approval was a matter of concern to him.  Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 65:8-13 ("Q:  You expected the second step to happen as of the April 1st frame, you expected at some point down the line the second step would occur?  A:  Yes, but there were a number of things that had to happen for that [on can] [sic] our. "); *id.* at 66:11-67:1 ("Q:  Had you formed a view about how likely it would be for Step 2 to close before the end of 2007?  A:  No, I don't think I could because there were all those conditions that we had to make happen, hopefully through successful lobbying with legislators as well as the FCC and making our case there, and I was very familiar with that.  The financing, that was something that the banks were going to have to make their decisions on.  So there were still lots of things that had to happen before we knew the second step was going to happen."); *id.* at 127:15-128:3 ("Q: At any point after Step 1  closed in June of 2007, did Tribune not consider—or consider not proceeding with Step 2? . . . A:  No, our intent was to close  the transaction unless—and it was our view that we should seek to overcome the obstacles, the FCC approval.  We did what we could in each of those -- on each of those issues that I mentioned to get the transaction closed because we believed that it was  the best transaction for all involved.").

S-Corporation/ESOP structure.[527]  Thus, there was a business reason and plenty of motivations all around (including management incentives and bonuses keyed to the Step Two closing) to make the Merger happen.

Although supporting the conclusion that the Step Two closing was highly likely, however, the preceding observations do not necessarily lead to the further conclusion that the satisfaction of the conditions to Step Two was a mere formality.  It would have been impossible for anyone at the time of Step One to do more than just place odds on the prospect of FCC approval, a point highlighted by the discussions of this question in certain analyst reports following Step One.[528]  No one was in a position to guarantee that this approval would be forthcoming (and notably, when the FCC Order came, it was accompanied by two vigorous dissents).[529]  Moreover, the state of affairs in May of 2007 could change as time went forward. Although it was virtually impossible for a decline in Tribune's business after Step One to give rise to a Company Material Adverse Effect sufficient to give the Step Two Lenders an out, this did not render a severe decrease in Tribune's financial performance irrelevant to the Step Two Closing.  Depending on the degree of the decline, the prospective addition of the Step Two Debt to a severely deteriorating business (and hence balance sheet) could have caused one or more of the LBO Lenders, the Zell Group, or Tribune to conclude that Step Two could not proceed.  On

---

[527]  *See* Report at § III.H.b.(3).; *see also* Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 94:21-95:2 ("Q. Before we move to that exhibit, just following up on that last answer, if at the front end of the deal you knew that there would be no S corp election, would you have been less willing to enter into the revolver deal? A. Yes.").  However, Mr. Petrik also testified: "The amount of tax benefits were not as great as avoiding the interest on the additional debt in Step 2, that is my recollection."  *Id.* at 144:1-3.

[528]  *See* Report at § III.F.1.a.

[529]  Ex. 943 at JPM_00338376 (Dissenting Statement of Commissioner Michael J. Copps, dated November 30, 2007) ("If this Order were a newspaper, the banner headline would read 'FCC Majority Uses Legal Subterfuge to Push for Total Elimination of Cross-Ownership Ban.'"); *id.* at JPM_00338377 (Dissenting Statement of Commissioner Jonathan S. Adelstein, dated November 30, 2007) ("[T]oday's order is a regulatory hostage taking—a desperate maneuver to use the Tribune transaction as a human shield, while the Commission marches down the treacherous path toward greater media consolidation.  Notwithstanding congressional rebuke and widespread public opposition, this Commission is determined to use any conceivable ploy to achieve its misguided goals.").

this score, the fact that the Tribune Common Stock traded at a discount to the Merger price in the months following Step One provides a measure of market validation that the downside risks were not imaginary.

On the far other end of the spectrum, the relatively modest $25 million break-up fee meant that if Tribune performed beyond expectations in the months after Step One, another party might step forward to compete with the Zell Group.  Although any competing bidder would have had to put together a massive combination of new replacement debt financing and equity contributions to present a Superior Proposal, the Examiner concludes that the $25 million break-up fee did not present a meaningful barrier to entry given the size of the transaction.[530]  Had access to the debt markets not tightened so materially between the time of Step One and Step Two and had the market concluded, contrary to the state of affairs as they unfolded, that the Zell Group had grabbed a bargain, some third party likely would have found a way to put an overbid on the table.  Tribune certainly would have been bound to consider, and quite possibly to accept, a Superior Proposal.[531]

On balance, the Examiner cannot conclude that the conditions to the Step Two Closing were without substance or that a Step Two Closing was assured from the outset to the end.  In this regard, the Examiner believes a court would be constrained by the jurisprudence on the collapse principle, which, read fairly, focuses not on the *probability* that particular elements of a leveraged buyout transaction are reciprocally dependent but on the *fact* that they are actually dependent.  Although some of the closing conditions undoubtedly were, to speak colloquially,

---

[530] *See* Ex. 210 at Declaration of William A. Osborn at 9 (Briefing and Declarations (and exhibits thereto) filed in *Garamella*).  Separate and apart from this evidence, as a relative matter, the break-up fee was small.

[531] Examiner's Interview of Thomas Whayne, June 11, 2010.  Mr. Whayne noted to the Examiner that although an overbidder could have replicated the ESOP structure: "By fall of 2007 there was no debt financing.  He [Zell] had commitment papers he had inked in April of 2007 that by the fall of 2007 just weren't available in the market place so there's no one who could compete with him in terms of ability to raise financing." *Id.*

"in the bag" from day one, this would not be a fair characterization of all of them.  The requirement of FCC consent alone belies painting the transaction with such a broad brush.  Moreover, for the above-discussed reasons, the built-in passage of time added some modicum of uncertainty into satisfaction of certain of the other conditions.  The Examiner finds that against these circumstances, a court would be somewhat unlikely to conclude that the prerequisites established under the applicable law for collapse of Step One and Step Two are met here.

A court would not just have to expand on the existing law to reach that result.  Collapsing Step One and Step Two for solvency purposes would require, in effect, reconstituting the Tribune Entities' balance sheets to add the debt that was incurred in December to what actually was incurred in June.  Although one certainly can make reasonable assumptions, it is not entirely clear how a court would grapple with the Tribune Entities' performance in the intervening months.  In addition, even though the tax benefits generated by the S-Corporation/ESOP structure (which benefits could only be realized following the Step Two Closing) could not be passed on to a purchaser of the Tribune Entities or their assets, would it be equitable or appropriate to disregard this value entirely in a Step One solvency determination in which the Step Two Debt is considered a liability months before that indebtedness actually was added to the balance sheet?  The amount of debt undertaken at Step Two, moreover, turned out to be lower than was planned at Step One.  Would the expected (as opposed to the actual) Step Two Debt be added to the newly-constructed Step One balance sheet?  Messiness and complexity alone are not reasons to detour from a conclusion required by the law, but sometimes they are

probative of whether the law's path leads in that direction in the first place.[532]  The Examiner finds it is somewhat likely that a court would veer away from that path.

A final consideration tips against collapse for solvency purposes:  As discussed, when collapse is applied for reasonably equivalent value analysis in a leveraged buyout context, the fact that the debtor nominally receives proceeds from lender advances for a moment in time is easily disregarded when the money necessarily moves immediately into the selling stockholders' or other participants' hands.  Disregarding where the money was destined to go would elevate form over substance.  But here the reason why the Step Two Debt was not a liability of the Tribune Entities at Step One for solvency purposes does not derive from the elevation of form over substance but, rather, from the very real fact that the Tribune Entities had not, and *could not*, complete the Merger at Step One.  Nor could Tribune's stockholders receive the proceeds from any Step Two advances until the Step Two conditions were met and the Merger closed. The fact that half the Tribune Common Stock remained outstanding following the close of Step One obviously was not a matter of form to those stockholders.  Collapsing Step One and Step Two for solvency purposes, therefore, would entail disregarding not just the form but, in a very tangible way, substantive aspects of the Leveraged ESOP transactions.

Although the question admittedly is close, the Examiner concludes that a court is somewhat unlikely to collapse Step One and Step Two for solvency analysis.

---

[532]  As discussed above, the Examiner grappled with these questions in evaluating Step One solvency in a "collapse" scenario, which the Examiner analyzed in the event that a court were to disagree with the Examiner's conclusions concerning collapse.  *See* Report at § IV.B.5.d.(7).(ii).

          **(ii)**      **Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Capital Adequacy Analysis.**

<u>**Examiner's Conclusions**</u>:

The analysis in the preceding Section concerning collapse also applies to capital adequacy analysis.  In measuring capital adequacy at the time of Step One, however, a court is highly likely to consider all obligations that were reasonably foreseeable at the time of Step One, including those caused by Step Two.

<u>**Explanation for Examiner's Conclusions**</u>:

There is no principled basis on which to distinguish the preceding Section's collapse analysis in considering the question of capital adequacy.  Whereas the absence of a liability on account of the Step Two Debt is dispositive on the question of inclusion of Step Two Debt as a liability for solvency analysis, the answer is different for capital adequacy analysis.  As reflected in the discussion earlier in the Report,[533] solvency and capital adequacy analyses are distinct.  Unlike solvency, unreasonably small capital is not strictly limited to consideration of those liabilities that reside on the balance sheet on the date of measurement.  At its core, "the test for unreasonably small capital is reasonable foreseeability . . . whether the parties' projections were reasonable."[534]  By definition, this entails a forward-looking analysis.  Solvency focuses on the debtor's liabilities at a given moment, whereas capital adequacy focuses on the debtor's ability to

---

[533] *See* Report at §§ IV.B.5.d.(2). and IV.B.5.d.(3).

[534] *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1072-73 (3d Cir. 1992); *see also* Markell, footnote 412, at 497 (stating that unreasonably small capital exists when non-payment of the plaintiff's claim was a reasonably foreseeable effect given the amount of the transferor's assets/capital remaining and reasonably foreseeable cash resources).

meet its obligations over time.  In addressing capital adequacy, therefore, it is necessary to consider liabilities reasonably expected to be incurred over time:[535]

> We are also of the opinion that the delivery of the mortgages and guarantee mortgages to IIT occurred when the Raymond Group was engaged or about to engage in a "business or transaction for which the property remaining in [its] hands after the conveyance is an unreasonably small capital."  39 Pa. Cons. Stat. § 355.  Both before the November 26, 1973 transaction as well as thereafter, the Raymond Group did not have the capital resources it needed to carry on its business.  *Moreover, Durkin planned to continue selling the surplus lands of the Raymond Group and would therefore incur additional income tax liabilities to the United States.*  The provisions of the Note Purchase and Loan Agreement were such that relatively little, if any, proceeds of the land sales would be available for general creditors.  *Durkin also planned to continue the Raymond Group's coal mining operations and would therefore incur additional liabilities to trade creditors, the Anthracite Health and Welfare Fund, and the Commonwealth for backfilling obligations.*

Applied here, in view of the Examiner's conclusion that at the time of Step One, Step Two was highly likely to occur, it is necessary to consider the Tribune Entities' ability at the time of Step One to service and satisfy those Step Two liabilities when they were expected to arise.  This analysis does not assume that all of the Step Two Debt became due and payable at the time of Step One; nor is the evaluation performed with the benefit of hindsight, but, rather, is conducted using an objective test at the time of Step One.  In short, because incurrence of the Step Two Debt was probable at the time of Step One, the Step Two Debt must be considered to properly analyze the Tribune Entities' capital adequacy at Step One.

---

[535] *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 580 (M.D. Pa. 1983) (emphasis added) (citations omitted), *aff'd in relevant part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986); *see also* Ex. 262 at 52:9-53:1 and 60:2-63:9 (Rule 2004 Examination of Bryan Browning, December 4, 2009); John E. Sullivan III, *Future Creditors and Fraudulent Transfers:  When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When a Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 DEL. J. CORP. L. 955, 1010-12 (1997) ("In assessing whether the transferor has reasonably calculated her future obligations . . . the fact finder . . . might include . . . [i]s the transferor likely to incur substantial consensual debt in the future . . . ."); Examiner's Interview of Rajesh Kapadia, June 25, 2010 ("I think the marketplace, the fundamental thing around this deal, in the syndication of Step 1, was $6 billion . . even though we're syndicating $6 billion was the market is looking at it is really $8 billion because it's the second step.").

One Party nevertheless contended to the Examiner that it is inappropriate to consider the Step Two Debt at the time of Step One in view of the requirements under (i) the Merger Agreement for a solvency opinion (which was a condition to the Merger) and (ii) the Credit Agreement for a Tribune solvency certificate and representation of "Solvency"[536] as broadly defined in the Credit Agreement (which was a condition to the Step Two Financing).  This Party essentially argued that, at the time of Step One, creditors and the Tribune Entities knew that Tribune's solvency and capital adequacy would be separately tested as prerequisites to proceeding with Step Two and that, therefore, Step Two could not have occurred if that transaction would have rendered the Tribune Entities insolvent or left them with unreasonably small capital.  Under this view, because Step Two could not happen if its occurrence would render the Tribune Entities inadequately capitalized, inclusion of that debt for purposes of analyzing Step One capital adequacy would be improper.[537]

The problem with this contention is that it conflates what the documents required, what Tribune might have represented under those agreements, and what opinion VRC or someone else might have given at the time of Step Two, with the applicable standard governing capital adequacy.  The representations and opinions actually given to make Step Two happen might be based on a flawed definition of solvency or simply wrong as applied, looking at the circumstances then known at that time but applying an objective test, as the law requires.[538]  As

---

[536]  *See* Report at § III.D.10.c.

[537]  This Party advanced a similar argument on the question of collapse of Step One with Step Two for solvency purposes.  The Examiner finds this argument similarly untenable for the reasons discussed in text.

[538]  *See generally Mellon Bank, N.A. v. Off. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 156 (3d Cir. 1996) ("The bankruptcy court correctly determined that a debtor's creative accounting practices, which have the effect of grossly overstating its financial condition, cannot be the basis of a court's solvency analysis."); *Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 133 (Bankr. D. Mass. 1992) ("Lambert's projections were unreasonable and imprudent; this was discernable from information available before the buyout; and both Lambert and Barclays had reason to be skeptical and to inquire into the assumptions that rendered the projections so unreasonable.").

to the former point, the Credit Agreement and the Bridge Credit Agreement defined "fair value" and "fair market value" for purposes of Step Two solvency as involving a willing seller and willing buyer "*in a transaction having a similar structure*."[539]  This is, in substance, the same flawed definition that VRC agreed to use in its original engagement letter and that governed VRC's Step Two opinion.[540]  Indeed, applying the argument advocated by the above-noted Party to fraudulent transfer analysis generally, if the representations concerning solvency or capital adequacy given by the participants as conditions precedent to the challenged transfer always were accepted after the fact as true, then in theory a transfer that would render a debtor insolvent or without reasonable capital could never occur; and in evaluating these questions a court would be obliged to assume that the transaction never happened.  Although it is possible to draw distinctions between the current situation and other circumstances before the slippery slope leads to such an absurd result, the Examiner finds the argument unavailing when applied here.  The Examiner finds that consistent with the objective nature of the capital adequacy test and that test's focus on the debtor's future prospects at the time of the relevant transfer, a court is reasonably likely to reject the contrary approach advocated by one Party.  Rather, a court is reasonably likely to conclude that because, at the Step One Financing Closing Date, the Tribune Entities were highly likely to incur the Step Two Debt, the Tribune Entities' wherewithal to satisfy that debt must be considered for capital adequacy purposes at Step One.

---

[539]    *See* Ex. 179 at § 1.01 (Credit Agreement) (emphasis added); Ex. 175 at § 101 (Bridge Credit Agreement) (emphasis added).

[540]    *See* Report at § III.E.3.b.(1).(i).

> **(iii)** **Examiner's Conclusions and Explanation Concerning Inclusion of Step Two Debt in Analysis of Intention to Incur Debts Beyond Reasonable Ability to Pay.**

**Examiner's Conclusions**:

The same analysis above concerning the question of collapse also applies to the question of intention to incur debts beyond reasonable ability to pay.  However, like capital adequacy analysis, it is necessary to consider the obligations that were reasonably foreseeable at Step One, including the Step Two Debt in conjunction with the closing of Step Two.

**Explanation of Examiner's Conclusions**:

The plain language of Bankruptcy Code section 548(a)(2)(B)(iii)[541] explicitly requires consideration of obligations that may be incurred in the future.[542]  In other words, unlike solvency but like capital adequacy, this test requires consideration of future liabilities.

> **(7)** **Examiner's Conclusions and Explanation Concerning Solvency of Tribune at Step One.**

**Examiner's Conclusions**:

The Examiner finds that a court is highly likely to find that Tribune was solvent as of, and after giving effect to, the Step One Transactions if the Step Two Debt is not included for purposes of that determination.  The Examiner finds that to the extent that the effects of Step Two (including the Step Two Debt) are considered in connection with Step One solvency, credible assertions could be made that Tribune was insolvent at Step One, but the Examiner

---

[541]   11 U.S.C. § 548(a)(2)(B)(iii) (2006).

[542]   *Id.* ("[i]ntended to incur, *or believed that the debtor would incur*, debts that would be beyond the debtor's ability to pay as such debts matured") (emphasis added); *Hall v. Quigley (In re Hall)*, 131 B.R. 213, 217 (Bankr. N.D. Fla. 1991) ("Provision (B)(iii) does not require that the debtor be insolvent to maintain a fraudulent transfer action.  If the transfer causes the debtor to be unable to meet all his debts at some point in the future it may be avoided pursuant to (B)(i) or (ii).").

concludes that it is somewhat likely (although a very close call) that a court nonetheless would find that Tribune was solvent in that circumstance as well.

**Explanation of Examiner's Conclusions:**

As shown below, market indicia, the Tribune auction process leading to the Tribune Board's approval of the Leveraged ESOP Transactions on April 1, 2007, and the magnitude of solvency reflected in valuations performed in the period leading up to Step One, all support the conclusion that Tribune was solvent at the Step One Financing Closing Date if the Step Two Debt is not included in the determination of solvency.[543]

**(i)      Step One:  No Collapse With Step Two.**

**(A)      Market Indicia of Solvency.**

Before the approval and announcement of the Leveraged ESOP Transactions in April 2007 through the Step One Financing Closing Date, Tribune Common Stock traded publicly in a liquid market.  Tribune reported its financial results in SEC filings and publicly disclosed other information bearing on its financial performance (*e.g.,* press releases).  Because this information informed the trading price of Tribune Common Stock, trading prices of that stock before the Step One Financing Closing Date furnishes relevant market-based information on Step One solvency. Before the announcement of the Leveraged ESOP Transactions on April 2, 2007, however, the trading value of Tribune Common Stock was influenced by Tribune's previous announcement of its evaluation of strategic alternatives for Tribune, thereby potentially biasing trading prices upward.  Likewise, after the announcement of the Leveraged ESOP Transactions on April 2, 2007, the trading price of Tribune Common Stock was upwardly biased in comparison to how it

---

[543]    Although certain Parties advocated the inclusion of a contingent liability at Step One in the amount of the "probability-of-closing" adjusted pro forma Step Two Debt, the Examiner has concluded, as discussed in another part of the Report, that it would be improper to do so.  *See* Report at § IV.B.5.b.

otherwise would have traded.[544] That price (and corresponding equity value), however, would likely be "inflated" due to market expectations of a $34 per share Tender Offer price. Thus, it is necessary to grapple with the potential upward bias in the trading price of Tribune Common Stock before drawing any solvency conclusions using the market capitalization of Tribune Common Stock.

Recognizing that approximately $4.3 billion of the proceeds from the Step One Debt would be used to acquire only a portion of the then-outstanding Tribune Common Stock,[545] a substantial residual equity value remained after giving effect to the Step One Transactions post-closing based on the observed pre-Step One closing trading price of Tribune Common Stock.[546] Because only the equivalent of $17.61 in equity value was being replaced with debt at Step Two,[547] a comparison of that price to prevailing market prices pre-Step One establishes a substantial unadjusted residual equity value of $16.39 per share (*i.e.*, $34.00 - $17.61 = $16.39), or "solvency cushion," after giving effect to the Step One Transactions. The following chart compares both the Tender Offer price and the above-noted $16.39 figure to the prevailing prices of Tribune Common Stock before the Step One Financing Closing Date:

---

[544]    The announcement of Tribune's plan to initiate the Tender Offer at $34 per share, when its stock was trading at a price below $34, would cause the price to increase based on at least some probability of completing such Tender Offer at a price higher than the prevailing price, adjusted for time value of money effects between the date of stock price observance and the expected closing date of the Tender Offer, all other things being equal. *See* Ex. 5 (Tender Offer).

[545]    A portion of the Step One Debt (about $2.8 billion) was used to repay the 2006 Bank Debt. Therefore, only about $4.3 billion of the Step One Debt was available to purchase shares in connection with the Tender Offer. *See* Ex. 628 (Tribune Form 10-Q, filed August 9, 2007).

[546]    Stated differently (and greatly simplified), at a trading price of $34 per share and with approximately 242.8 million shares outstanding, Tribune had an implied equity value of about $8.3 billion ($34 x 242.8 million shares). Therefore, essentially replacing $4.3 billion of equity value with debt would still leave substantial residual equity value of about $4.0 billion.

[547]    The total number of shares of Tribune Common Stock purchased by Tribune, 125,738,955, divided by the number of shares of Tribune Common Stock outstanding, 242,833,053, times the $34 per share Tender Offer price, equals $17.61, which is the equity value per share of the Tribune Common Stock replaced with debt. *See* Ex. 1065 (Calculation of Implied Stock Price).



To address the above-noted possible effect of the upward bias in the trading price of Tribune Common Stock, the Examiner's financial advisor analyzed whether, even assuming that the market assumed a high probability that Step One would close,[548] the resulting probability-adjusted Tribune Common Stock price could credibly support a conclusion that Tribune was insolvent (*i.e.*, that Tribune's stock would have traded below $16.39 per share absent any "inflationary" effects of the Tender Offer price of $34 per share on the trading price of Tribune Common Stock).Because Step One contemplated exchanging indebtedness equal to approximately one-half the equity value implied by a $34 per share price, for Tribune to remain solvent on a market-based basis when approximately half of its stock was redeemed for debt at

---

[548]    This is, in reality, a conservative assumption that would minimize the effects of any upward bias informing observed stock prices.

$34 per share, the minimum pre-Step One price of Tribune Common Stock would be

approximately $16.39 per share (*i.e.*, as long as Tribune's stock was trading above $16.39 per

share, Tribune would be solvent on a market capitalization basis even after adding $4.3 billion of

incremental debt, as happened at Step One).[549]  Using $16.39 per share as a proxy for the pre-

Step One solvency threshold price, the Examiner's financial advisor evaluated the probability

that, absent any extraneous factors affecting the price of the Tribune Common Stock, the trading

values would reasonably have declined below that price.  This analysis considered the trading

price of Tribune Common Stock during periods unaffected by the potential upward bias caused

by market expectations of Tribune pursuing strategic transactions.

For the three months before Tribune's announcement of its intent to pursue strategic

alternatives on September 22, 2006[550] (a period unaffected by announcements relating to

Tribune's consideration of potential stockholder value-enhancing activities which ultimately

resulted in the Tender Offer), Tribune Common Stock traded between a low of $28.23 (on July

27, 2006) and a high of $32.04 per share (on July 11, 2006).[551]  Following Tribune's

announcement of its intention to pursue strategic alternatives, Tribune's stock price appears to

have reacted significantly:[552]

---

[549]  This is simply a variation of the calculation in footnote 546.  At a trading price of $16.39 per share and 242,833,053 shares outstanding, Tribune would have an implied equity value of approximately $4.0 billion. Therefore, if Tribune replaced this equity value with just under $4.0 billion of debt, Tribune would still be balance sheet solvent based on market indicia.

[550]  *See* Ex. 1042 (Tribune Form 8-K, filed September 22, 2006).

[551]  For purposes of this discussion, the Examiner's financial advisor considered the trading prices of Tribune Common Stock between June 21, 2006 and September 21, 2006 (a period of three months).  *See* Ex. 75 (Tribune Stock Prices).

[552]  Again, this is an inferential observation as opposed to an analytical result of, for example, a statistically significant events study.



If, for purposes of this analysis, the entire observed change in price that occurred on the announcement date is assumed to have resulted solely from that announcement (such that, absent the beneficial effects associated therewith, the price of the Tribune Common Stock would have remained at pre-announcement levels), it is possible to assess the likelihood that the price of the Tribune Common Stock would have declined between the announcement date and the Step One Financing Closing Date by an amount necessary to evidence a market-based condition of Tribune insolvency (*i.e.*, a stock price below $16.39). The relevant question, therefore, is whether, before the Step One Financing Closing Date, Tribune Common Stock would have traded to less than $16.39 per share absent the upward bias caused by Tribune's announcement of

its intent to pursue strategic alternatives in September 2006, followed by its April 2007 announcement of the Leveraged ESOP Transactions.

     As shown in the table above, from its low point of $28.23 per share on July 27, 2006, Tribune's stock price would had to have declined by almost $12 per share to reach the above-noted insolvency threshold.  A decline of this magnitude would represent a drop of more than 40% from Tribune Common Stock's lowest pre-announcement trading price during the three-month period before the September 2006 announcement.  Tribune's post-announcement stock price did not exhibit this degree of volatility in response to disclosures concerning Tribune's financial performance, nor, perhaps more significantly, did the stock prices of cohort companies or benchmark indices reflect anywhere near this degree of decline:





Based on the preceding analysis, which the Examiner acknowledges involves various simplifying assumptions, there is no credible basis to conclude that Tribune Common Stock would have traded below the above-noted solvency threshold, even accounting for the upward bias caused by Tribune's announcements of strategic alternatives.

Other market indicia directly support this conclusion.  Tribune's publicly-held bond prices showed little change in response to the announcement of the Leveraged ESOP Transactions on April 2, 2007, despite the fact that those prices should have been influenced by the anticipated closing of Step One (and the incremental senior debt obligations associated therewith) and the possibility that Step Two might also occur, thereby further increasing the amount of senior debt comprising Tribune's capital structure.  Further, by the time of the Step

One Financing Closing Date, rating agency commentary[553] revealed a downgrade of Tribune's corporate debt rating caused by the Merger announcement, a fact that should have placed additional downward pressure on Tribune's bond prices.  In view of the negligible changes in Tribune's bond prices immediately after the April 2, 2007 announcement of the Leveraged ESOP Transactions through the Step One Financing Closing Date, and notwithstanding that bond prices were arguably further downwardly biased to account for the possibility of Step Two Closing (which, as noted, would result in even more debt senior to the bonds), market pricing data for the Tribune bonds corroborates a conclusion that Tribune was solvent at Step One.[554]

> **(B)    Balance Sheet Solvency:  The Auction Process and Contemporaneous Valuations.**

Based on the evidence adduced in the Investigation, the Examiner finds that the auction process that led to the Leveraged ESOP Transactions[555] furnishes additional indicia of solvency at Step One without factoring in the Step Two Debt.  First, as shown above, the $34 per share Tender Offer price represents a valuation substantially greater than the aggregate indebtedness of the Tribune Entities on the Step One Financing Closing Date (without including the Step Two Debt).  Second, the evidence adduced in the Investigation shows that Tribune and its Financial Advisors conducted a multi-month effort culminating in the selection of the EGI proposal. Tribune's consideration of so-called "self-help" alternatives to third-party bids (such as a leveraged recapitalization of Tribune, a spin-off of the Broadcasting Segment and leveraged

---

[553]  *See, e.g.*, Ex. 80 (Standard & Poor's Research Report, dated April 2, 2007); Ex. 216 (Standard & Poor's Recovery Report, dated April 19, 2007); Ex. 1060 (Standard & Poor's Ratings Direct, dated May 18, 2007).

[554]  Certain Parties have asserted that bond prices trading below par evidence insolvency.  This assertion is erroneous because yield differences associated with interest rate changes and returns on comparable risk investments can explain such phenomena.  Here, Tribune's equity prices belie insolvency assertions based solely on observed bond prices trading at discounts to par.

[555]  *See* Report at § III.D.1.

recapitalization of the Publishing Segment, and a leveraged recapitalization combined with a spin-off and sale of the Broadcasting Segment) and communication of those alternatives to bidders, provided an important counterweight to the third-party bids and helped exert pressure on EGI to increase its offer as the process reached conclusion.[556]  Third, the competing third-party bids from Broad/Yucaipa and to a lesser degree, Carlyle, belie any contention that the Zell Group was the "only game in town."  Although it is true that the March 29, 2007 Broad/Yucaipa Proposal was not accompanied by any further documents or financing commitments, the Examiner cannot conclude that this proposal was not serious (and the evidence shows that the Special Committee gave this proposal serious attention).  The frenetic activity that preceded the Tribune Board's acceptance of the EGI proposal resulted in further improvements in EGI's proposal.  Although some participants in the auction process expressed concern that the auction was on the verge of failing or already had failed, these assessments proved premature.  In sum, the Examiner concludes that, contrary to the contention of certain Parties, the auction process furnishes meaningful evidence of contemporaneous valuations in the marketplace pointing toward Step One solvency for Tribune.

Given the substantial positive equity values reached in contemporaneous valuations of Tribune performed at or in connection with the auction process, those valuations would have to have been profoundly flawed for Tribune to have been insolvent.  In the course of its deliberations, the Special Committee considered equity and asset values associated with several alternatives to the Leveraged ESOP Transactions as evaluated by the Financial Advisors.[557]  This process, and the valuation determinations made contemporaneously therewith, tend to corroborate the Tender Offer price and are evidence of Tribune's solvency at Step One (given

---

[556]   Examiner's Interview of Thomas Whayne, June 11, 2010; s*ee also* Report at § III.D.1.e.

[557]   *See* Report at § III.D.1.

that the incremental Step One Debt was incurred to finance a tender for only a portion of

Tribune's then-outstanding shares).  In fact, several other valuation analyses performed in

connection with the evaluation and/or approval of the Leveraged ESOP Transactions, and the

information derived from these analyses, further substantiates Tribune's solvency at Step One.[558]

Although each of these valuation analyses pre-dated the Step One Financing Closing Date and

some were conducted for purposes other than an assessment of solvency per se (*e.g.*, to opine as

to the fairness of transaction consideration or in connection with financing due diligence), they

nonetheless provide meaningful information.

Despite making different assumptions and/or adopting different valuation methodologies,

each of these "contemporaneous voices" evaluating the Leveraged ESOP Transactions before

June 4, 2007 support a conclusion that Tribune was solvent (on a consolidated basis) at the Step

One Financing Closing Date.[559]  The following table sets forth information derived from

valuation analyses conducted by each advisor in the period preceding the Step One Financing

Closing Date:

---

[558]   Ex. 1061 (JPM Project Tower Presentation, dated February 2007); Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007); Ex. 167 (Duff & Phelps Opinion, dated April 1, 2007); Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007); Ex. 141 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007); Ex. 1062 (Blackstone Presentation, dated May 23, 2007).

[559]   Specifically, Morgan Stanley delivered a fairness opinion on April 1, 2007 in connection with its role as Financial Advisor to the Special Committee.  Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007).  Merrill, in its capacity as a Financial Advisor to Tribune, also delivered a fairness opinion on the same date.  Ex. 141 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007).  Duff & Phelps, retained by GreatBanc, and Blackstone, advising the McCormick Foundation, also delivered opinions.  Ex. 167 (Duff & Phelps Opinion, dated April 1, 2007); Ex. 1062 (Blackstone Presentation, dated May 23, 2007).  JPM also conducted analyses bearing on the value of Tribune's assets as a part of its financial evaluation.  Ex. 1061 (JPM Project Tower Presentation, dated February 2007).

| VALUATION COMPARISON ($mm) (1) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | JPMorgan Feb-07 | | Merrill/Citigroup 3/30/2007 | | Morgan Stanley 4/1/2007 (2) | | Duff & Phelps 4/1/2007 | | Blackstone 5/23/2007 | | VRC 5/9/2007 (3) |
| | Low | High | Low | High | Low | High | Low | High | Low | High | Low | High |
| Comparable Companies | n/a | n/a | $ 9,995.6 (4) | $ 11,942.8 (4) | $ 9,957.0 | $ 10,579.0 | n/a | n/a | $ 9,345.7 | $ 10,591.8 | $ 11,335.8 | $ 13,493.8 |
| Precedent Transactions | n/a | n/a | n/a | n/a | $ 9,857.0 | $ 12,346.0 | n/a | n/a | $ 10,657.2 | $ 12,127.3 | $ 11,753.4 | $ 13,493.8 |
| Discounted Cash Flow | $ 10,435.0 | $ 13,113.0 | $ 9,807.1 (4) | $ 10,937.8 (4) | $ 9,733.0 | $ 11,118.0 | n/a | n/a | $ 9,095.9 | $ 10,371.2 | $ 9,830.7 | $ 11,262.6 |
| Sum of the Parts | $ 12,100.0 | $ 14,500.0 | $ 9,681.5 (4) | $ 10,937.8 (4) | $ 9,861.0 | $ 12,351.0 | $ 10,600.0 | $ 11,800.0 | $ 9,602.0 | $ 10,410.0 | $ 11,487.3 | $ 13,972.1 |
| Operating Asset Value ($) | $ 11,267.5 | $ 13,606.5 | $ 9,828.1 | $ 11,440.3 | $ 9,852.0 | $ 11,598.5 | $ 10,600.0 | $ 11,800.0 | $ 9,675.2 | $ 10,875.1 | $ 11,101.8 | $ 13,055.6 |
| | | | | | | | | | | | | |
| Equity/Other Investments | $ 2,500.0 | $ 2,500.0 | $ 1,951.0 | $ 1,951.0 | $ 2,200.0 | $ 2,200.0 | $ 2,020.0 | $ 2,410.0 | $ 1,851.0 | $ 1,938.1 | $ 2,412.0 | $ 2,961.0 |
| Cash | $ 294.0 | $ 294.0 | $ 175.0 | $ 175.0 | $ 185.0 | $ 185.0 | $ 174.7 | $ 174.7 | $ 182.0 | $ 182.0 | $ 182.1 | $ 182.1 |
| PHONES Notes Tax Savings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 382.7 | $ 382.7 |
| Contingent Liabilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (97.1) | $ (97.1) |
| Total Enterprise Value | $ 14,061.5 | $ 16,600.5 | $ 11,954.1 | $ 13,566.3 | $ 12,237.0 | $ 13,983.5 | $ 12,794.7 | $ 14,384.7 | $ 11,708.2 | $ 12,995.2 | $ 13,981.5 | $ 16,484.3 |
| | | | | | | | | | | | | |
| Less: Debt at Close of Step One | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) | $ (9,463.8) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) |
| Implied Step One Residual Equity Value | $ 4,597.7 | $ 7,136.7 | $ 2,490.3 | $ 4,102.5 | $ 2,773.2 | $ 4,519.7 | $ 3,330.9 | $ 4,920.9 | $ 2,244.4 | $ 3,531.4 | $ 4,517.7 | $ 7,020.5 |

(1) General Note: With the exception of VRC, the valuation analyses set forth herein were conducted for reasons other than assessing solvency. Values attributed to certain assets by one advisor may not have been considered by others (e.g., VRC's quantification of the value of deferred tax attributes associated with the PHONES Notes). This comparative presentation is not intended to reflect an opinion regarding the veracity of the specific assets, or the value attributed thereto, by any particular advisor. Rather, the presentation is intended to illustrate the range of values ascribed by each advisor to Tribune's assets on the basis of the particular review conducted without regard to its purpose.

(2) The amounts presented herein were arrived at by examining the underlying valuation analyses conducted by each financial advisor (Ex. 1061 (JPM Project Tower Presentation, dated February 2007); Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007); Ex. 167 (Duff & Phelps Opinion, dated April 1, 2007); Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007); Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007); Ex. 141 (Confidential Discussion Materials Proposed for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007); Ex. 1062 (Blackstone Presentation, dated May 23, 2007))

(3) VRC Operating Asset Value was calculated inclusive of a methodological error, the result of which is an understatement of calculated value in its DCF analysis.

(4) In order to arrive at these equity values, share prices located in the Merrill valuation were multiplied by an assumed 251.25 million shares outstanding. From that amount, Equity/Other Investments was subtracted, as was $5.1 billion in debt.

(5) Operating Asset Value is assumed to be an average of the approaches quantified in each valuation.

(6) Debt at close of Step One is assumed to be VRC's amount of Step One Debt per VRC's May 9, 2007 solvency analysis. See Ex. 273 (Step One Solvency Analysis, dated May 9, 2007).

Although certain assumptions underlying these analyses may be subject to challenge, any realistic adjustments to the values presented would be insufficient to demonstrate that Tribune was insolvent on the Step One Financing Closing Date. The table below shows the degree of "overstatement" in value of each advisor's determination that would be necessary in order for the Step One Debt to consume the residual value of Tribune's equity value implied by each of the Tribune asset values assumed by each advisor (*i.e.*, for Tribune to be insolvent):

| TEV DECLINES FOR BREAKEVEN SOLVENCY AT STEP ONE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | JPMorgan 2/2007 | | Merrill/Citigroup 3/30/2007 | | Morgan Stanley 4/1/2007 | | Duff & Phelps 4/1/2007 | | Blackstone 5/23/2007 | | VRC 5/9/2007 |
| | Low | High | Low | High | Low | High | Low | High | Low | High | Low | High |
| Implied TEV | $ 14,061.5 | $ 16,600.5 | $ 11,954.1 | $ 13,566.3 | $ 12,237.0 | $ 13,983.5 | $ 12,794.7 | $ 14,384.7 | $ 11,708.2 | $ 12,995.2 | $ 13,981.5 | $ 16,484.3 |
| Less Step One Debt | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) | ($ 9,463.8) |
| Implied Equity Value | $ 4,597.7 | $ 7,136.7 | $ 2,490.3 | $ 4,102.5 | $ 2,773.2 | $ 4,519.7 | $ 3,330.9 | $ 4,920.9 | $ 2,244.4 | $ 3,531.4 | $ 4,517.7 | $ 7,020.5 |
| | | | | | | | | | | | | |
| Implied Equity Value as a % of TEV (i.e., Percentage Decline Necessary to Demonstrate Breakeven Solvency) | 32.7% | 43.0% | 20.8% | 30.2% | 22.7% | 32.3% | 26.0% | 34.2% | 19.2% | 27.2% | 32.3% | 42.6% |

In sum, the contemporaneous analyses would have had to been wrong by substantial percentages if Tribune were in fact insolvent. Even though each analysis was prepared before the Step One Financing Closing Date, any decline in value due to market conditions between the

date of each valuation analysis and the Step One Financing Closing Date likely would be

insufficient to support a further adjustment that would tip Tribune into insolvency at Step One.[560]

---

[560]  For example, some of the cohort companies identified by the advisors experienced declines in market
       capitalization between April 2007 and June 4, 2007.  Those declines were modest in comparison to the degree
       of value change necessary to render Tribune insolvent at Step One.



In light of the Examiner's firm conclusion, based on the preceding considerations that Tribune was solvent at the Step One Financing Closing Date if just the Step One Debt is considered, the Examiner did not perform additional quantitative analyses or adjust for the previously-identified deficiencies informing VRC's Step One solvency analyses.  The Examiner finds with a high degree of likelihood that despite containing significant mistakes, as discussed



And, although analyst expectations of Tribune revenue and earnings were declining during this period, the percentage declines in near-term expected EBITDA would be insufficient to support a conclusion of insolvency.

| | 2007 Estimates | | | | 2008 Estimates | | | |
|---|---|---|---|---|---|---|---|---|
| | Revenue | | EBITDA | | Revenue | | EBITDA | |
| | Median | Mean | Median | Mean | Median | Mean | Median | Mean |
| March 31, 2007 | $ 5,367.8 | $ 5,369.0 | $ 1,277.6 | $ 1,255.1 | $ 5,399.6 | $ 5,412.5 | $ 1,237.1 | $ 1,244.5 |
| April 30, 2007 | $ 5,323.0 | $ 5,318.1 | $ 1,211.8 | $ 1,214.1 | $ 5,288.1 | $ 5,327.2 | $ 1,239.6 | $ 1,214.4 |
| May 31, 2007 | $ 5,335.5 | $ 5,323.9 | $ 1,218.4 | $ 1,217.4 | $ 5,304.2 | $ 5,335.4 | $ 1,244.3 | $ 1,219.7 |
| June 30, 2007 | $ 5,248.5 | $ 5,250.4 | $ 1,179.5 | $ 1,180.2 | $ 5,257.6 | $ 5,217.7 | $ 1,164.2 | $ 1,170.5 |

**TRIBUNE IBES ESTIMATES ($mm)**

in another part of the Report,[561] and assuming the Step Two Debt is not added into the mix, VRC's ultimate conclusion that the Step One Transactions would leave Tribune solvent was correct.

### (ii)     Step One:  Collapse—Inclusion of Step Two Debt at Step One.[562]

The inclusion of the financial consequences of the Step Two Transactions to the solvency analysis at Step One requires, as threshold matters, a determination and assessment of the amount of incremental Step Two Debt that should be included in that analysis as well as the potential economic benefits derived from the consummation of the Merger.  Without doubt, including the Step Two Debt in this analysis, if legally appropriate,[563] increases the probability that Tribune was rendered insolvent at Step One.

Regarding the amount of debt that would be included in this scenario, the Examiner finds that it is appropriate to consider the approximately $4.2 billion of additional LBO Lender Debt that, at the time of the Step One Financing Closing Date, was expected to be incurred by Tribune in connection with the Step Two Transactions.  Although this exceeds the amount of debt that Tribune actually incurred at Step Two, using the higher expected amount is consistent with using the Step One Financing Closing Date as the date for valuation.  Using the actual amount incurred at the Step Two Financing Closing Date would violate the fundamental principle that valuation is

---

[561]  *See* Report at § III.E.3.c.

[562]  As explained above, the Examiner has determined that the Step One Financing Closing Date and Step Two Financing Closing Date are the correct dates for assessing the solvency of the Tribune Entities.  *See* Report at § IV.B.5.d.(1).  However, this determination does not readily answer which of those two dates should be used for the solvency assessment in a collapse scenario.  The Examiner believes that, consistent with the underlying principles governing collapse discussed at length on other Sections of the Report, the correct date for assessing solvency in a collapse scenario would be the Step One Financing Closing Date (the date in which the Leveraged ESOP Transactions would be deemed to have occurred under a collapse scenario).

[563]   The Examiner has concluded that it is not legally appropriate to collapse the Step One Transactions and the Step Two Transactions.  *See* Report at § IV.B.5.b.

not a retroactive exercise, but rather, is based on information reasonably available at the relevant moment of valuation.  For the same reason, because the solvency determination is made as of the Step One Financing Closing Date, it is appropriate in this scenario to disregard Tribune's post-Step One financial performance.

As described previously, financial advisors consulting on, or participating in, the Leveraged ESOP Transactions before the Step One Financing Closing Date concluded as follows:[564]

| VALUATION COMPARISON ($mm) (1) | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | JPMorgan 2/2007 | | Merrill/Citigroup 3/30/2007 | | Morgan Stanley 4/1/2007 | | Duff & Phelps 4/1/2007 | | Blackstone 5/23/2007 (2) | | VRC 5/9/2007 (3) | |
| | Low | High | Low | High | Low | High | Low | High | Low | High | Low | High |
| Comparable Companies | n/a | n/a | $ 9,995.6 (4) | $ 11,942.8 (4) | $ 9,957.0 | $ 10,579.0 | n/a | n/a | $ 10,657.2 | $ 12,127.3 | $ 11,733.4 | $ 13,493.8 |
| Precedent Transactions | n/a | n/a | n/a | n/a | $ 9,857.0 | $ 12,346.0 | n/a | n/a | $ 10,657.2 | $ 12,127.3 | $ 11,753.4 | $ 13,493.8 |
| Discounted Cash Flow | $ 10,435.0 | $ 13,113.0 | $ 9,807.1 (4) | $ 11,440.3 (4) | $ 9,733.0 | $ 11,118.0 | n/a | n/a | $ 9,095.9 | $ 10,371.2 | $ 9,830.7 | $ 11,262.6 |
| Sum of the Parts | $ 12,100.0 | $ 14,500.0 | $ 9,683.5 (4) | $ 10,937.8 (4) | $ 9,861.0 | $ 12,351.0 | $ 10,600.0 | $ 11,800.0 | $ 9,402.0 | $ 10,410.0 | $ 11,487.3 | $ 13,972.1 |
| Operating Asset Value (5) | $ 11,267.5 | $ 13,806.5 | $ 9,828.1 | $ 11,440.3 | $ 9,852.0 | $ 11,598.5 | $ 10,600.0 | $ 11,800.0 | $ 9,675.2 | $ 10,875.1 | $ 11,101.8 | $ 13,055.6 |
| | | | | | | | | | | | | |
| Equity/Other Investments | $ 2,500.0 | $ 2,500.0 | $ 1,951.0 | $ 1,951.0 | $ 2,200.0 | $ 2,200.0 | $ 2,020.0 | $ 2,410.0 | $ 1,851.0 | $ 1,938.1 | $ 2,412.0 | $ 2,961.0 |
| Cash | $ 294.0 | $ 294.0 | $ 175.0 | $ 175.0 | $ 185.0 | $ 185.0 | $ 174.7 | $ 174.7 | $ 182.0 | $ 182.0 | $ 182.1 | $ 182.1 |
| PHONES Notes Tax Savings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 382.7 | $ 382.7 |
| Contingent Liabilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (97.1) | $ (97.1) |
| Total Enterprise Value | $ 14,061.5 | $ 16,600.5 | $ 11,954.1 | $ 13,566.3 | $ 12,237.0 | $ 13,983.5 | $ 12,794.7 | $ 14,384.7 | $ 11,708.2 | $ 12,995.2 | $ 13,981.5 | $ 16,484.3 |
| Less: Debt at Close of Step One | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) | $ (9,463.8) (6) |
| Implied Step One Residual Equity Value | $ 4,597.7 | $ 7,136.7 | $ 2,490.3 | $ 4,102.5 | $ 2,773.2 | $ 4,519.7 | $ 3,330.9 | $ 4,920.9 | $ 2,244.4 | $ 3,531.4 | $ 4,517.7 | $ 7,020.5 |

(1) General Note: With the exception of VRC, the valuation analyses set forth herein were conducted for reasons other than assessing solvency.  Values attributed to certain assets by one advisor may not have been considered by others (e.g., VRC's quantification of the value of deferred tax attributes associated with the PHONES Notes).  This comparative presentation is not intended to reflect an opinion regarding the veracity of the specific assets, or the value attributed thereto, by any particular advisor.  Rather, the presentation is intended to illustrate the range of values ascribed by each advisor to Tribune's assets on the basis of the particular review conducted without regard to its purpose.

(2) The amounts presented herein were arrived at by examining the underlying valuation analyses conducted by each financial advisor.  Ex. 1061 (JPM Project Tower Presentation, dated February 2007); Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007); Ex. 167 (Duff & Phelps Opinion, dated April 1, 2007); Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007); Ex. 141 (Confidential Discussion Materials Proposed for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007); Ex. 1062 (Blackstone Presentation, dated May 23, 2007)

(3) VRC Operating Asset Value was calculated inclusive of a methodological error, the result of which is an understatement of calculated value in its DCF analysis.

(4) In order to arrive at these equity values, share prices located in the valuation were multiplied by an assumed 251.25 million shares outstanding.  From that amount, Equity/Other Investments was subtracted, as was $5.1 billion in debt.

(5) Operating Asset Value is assumed to be an average of the approaches quantified in each valuation.

(6) Debt at close of Step One is assumed to be VRC's amount of Step One Debt per VRC's May 9, 2007 solvency analysis.  Ex. 273 (Step One Solvency Analysis, dated May 9, 2007).

Although perhaps overly-simplistic for purposes of drawing conclusions regarding Step One solvency in a "collapse" environment, the introduction of the Step Two Debt, in isolation, causes the "equity cushions" implied by the advisors' analyses to significantly decline or evaporate entirely:

---

[564]  Other economic benefits associated with the closing of the Step Two Transactions were contemplated as well, including the avoidance of Tribune 401(k) cash contributions and the possible avoidance of certain (but not all) SEC filing requirements.  Ex. 242 (Rating Agency Presentation, dated March 2007).

| VALUATION COMPARISON ($mm) (1) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | JPMorgan Feb. 2007 | | Merrill/Citigroup 3/30/2007 | | Morgan Stanley 4/1/2007 (2) | | Duff & Phelps 4/1/2007 | | Blackstone 5/23/2007 (2) | | VRC 5/9/2007 (3) |
| | Low | High | Low | High | Low | High | Low | High | Low | High | Low | High |
| Comparable Companies | n/a | n/a | $ 9,995.6 (4) | $ 11,942.8 (4) | $ 9,957.0 | $ 10,579.0 | n/a | n/a | $ 9,345.7 | $ 10,591.8 | $ 11,335.8 | $ 13,493.8 |
| Precedent Transactions | n/a | n/a | n/a | n/a | n/a | $ 12,346.0 | n/a | n/a | $ 10,657.2 | $ 12,127.3 | $ 11,753.4 | $ 13,493.8 |
| Discounted Cash Flow | $ 10,435.0 | $ 13,113.0 | $ 9,807.1 (4) | $ 11,440.3 (4) | $ 9,733.0 | $ 11,118.0 | $ - | $ - | $ 9,095.9 | $ 10,371.2 | $ 9,830.7 | $ 11,262.6 |
| Sum of the Parts | $ 12,100.0 | $ 14,500.0 | $ 9,681.5 (4) | $ 10,937.8 (4) | $ 9,861.0 | $ 12,351.0 | $ 10,600.0 | $ 11,800.0 | $ 9,602.0 | $ 10,410.0 | $ 11,487.3 | $ 13,972.1 |
| Operating Asset Value (5) | $ 11,267.5 | $ 13,806.5 | $ 9,828.1 | $ 11,440.3 | $ 9,852.0 | $ 11,598.5 | $ 10,600.0 | $ 11,800.0 | $ 9,675.2 | $ 10,875.1 | $ 11,101.8 | $ 13,055.6 |
| | | | | | | | | | | | | |
| Equity/Other Investments | $ 2,500.0 | $ 2,500.0 | $ 1,951.0 | $ 1,951.0 | $ 2,200.0 | $ 2,200.0 | $ 2,020.0 | $ 2,410.0 | $ 1,851.0 | $ 1,938.1 | $ 2,412.0 | $ 2,961.0 |
| Cash | $ 294.0 | $ 294.0 | $ 175.0 | $ 175.0 | $ 185.0 | $ 185.0 | $ 174.7 | $ 174.7 | $ 182.0 | $ 182.0 | $ 182.1 | $ 182.1 |
| PHONES Notes Tax Savings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | (6) $ - | $ - |
| Contingent Liabilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (97.1) | $ (97.1) |
| Total Enterprise Value | $ 14,061.5 | $ 16,600.5 | $ 11,954.1 | $ 13,566.3 | $ 12,237.0 | $ 13,983.5 | $ 12,794.7 | $ 14,384.7 | $ 11,708.2 | $ 12,995.2 | $ 13,598.8 | $ 16,101.6 |
| | | | | | | | | | | | | |
| Less: Debt at Close of Step One | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) | $ (9,463.8) (7) |
| Implied Step One Residual Equity Value | $ 4,597.7 | $ 7,136.7 | $ 2,490.3 | $ 4,102.5 | $ 2,773.2 | $ 4,519.7 | $ 3,330.9 | $ 4,920.9 | $ 2,244.4 | $ 3,531.4 | $ 4,135.0 | $ 6,637.8 |
| | | | | | | | | | | | | |
| Less: Debt at Close of Step Two | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) | $ (4,205.0) |
| Implied Step One Residual Equity Value | $ 392.7 | $ 2,931.7 | $ (1,714.7) | $ (102.5) | $ (1,431.8) | $ 314.7 | $ (874.1) | $ 715.9 | $ (1,960.6) | $ (673.6) | $ (70.0) | $ 2,432.8 |

1) General Note: With the exception of VRC, the valuation analyses set forth herein were conducted for reasons other than assessing solvency.  Values attributed to certain assets by one advisor may not have been considered by others (e.g., VRC's quantification of the value of deferred tax attributes reflected with the PHONES Notes).  This comparative presentation is not intended to reflect an opinion regarding the veracity of the specific assets, or the value attributed thereto, by any particular advisor.  Rather, the presentation is intended to illustrate the range of values ascribed by each advisor to Tribune's assets on the basis of the particular review conducted without regard to solvency.

2) The amounts presented herein were arrived at by examining the underlying valuation analyses conducted by each financial advisor (Ex. 1061 (JPM Project Tower Presentation, dated February 2007); Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007); Ex. 167 (Duff & Phelps Opinion, dated April 1, 2007); Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007); Ex. 141 (Confidential Information Materials Proposed for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007); Ex. 1062 (Blackstone Presentation, dated May 23, 2007)

3) VRC Operating Asset Value was calculated inclusive of a methodological error, the result of which is an understatement of calculated value in its DCF analysis.

4) In order to arrive at these equity values, share prices located in the Merrill valuation were multiplied by an assumed 251.25 million shares outstanding.  From that amount, Equity/Other Investments was subtracted, as was $5.1 billion in debt.

5) Operating Asset Value is assumed to be an average of the approaches quantified in each valuation.

6) Because Tribune would not be subject to taxes upon closing of Step Two, the tax savings of the PHONES Notes would no longer be applicable.

7) Debt at close of Step One is assumed to be VRC's amount of Step One Debt per VRC's May 9, 2007 solvency analysis.  Ex. 273 (Step One Solvency Analysis, dated May 9, 2007).

The proposed S-Corporation/ESOP structure, effective upon the Merger, enabled Tribune to avoid tax on non-gain related earnings following the Step Two Closing.  The value of any such tax savings is of paramount importance in considering solvency in a collapse scenario.  Although the value of those savings depends on assumptions regarding the level of taxable earnings informing each analyst's projections of EBIT as well as specific assumptions informing computations of, for example, discount rates (including costs of debt and equity, and the relative weighting of debt in assumed capital structures, etc.), those expected savings plainly are significant using the range of Tribune pre-tax earnings forecasted by each analyst.[565]  Thus, even in circumstances in which implied Tribune residual equity values turn negative when the Step Two Debt is added as of the Step One Financing Closing Date, the tax savings (if recognized as

---

[565]    For example, VRC estimated the value of the S-Corporation/ESOP tax savings at almost $1.4 billion in its May 17, 2007 analysis, and Duff & Phelps estimated the value as between $977 million and almost $1.2 billion in its "April 1, 2007 Tribune Company ESOP Analysis, Preliminary Draft."  Ex. 283 (VRC Solvency Analysis, dated May 17, 2007); Ex. 1063 (Duff & Phelps Preliminary ESOP Analysis, dated April 1, 2007).

an additional "asset" for solvency assessment purposes) could serve as an important "add-back."[566]

One can argue that, in a scenario in which indebtedness that was not incurred until the Step Two Financing Closing Date is added to Tribune's balance sheet at Step One, it is appropriate to include the tax savings "add-back" in the Step One solvency determination. In other words, Tribune would only incur the Step Two Debt if the Merger occurred, which itself would generate these tax savings that clearly have value.[567] Thus, arguably, inclusion of that value in the solvency determination goes hand in hand with collapse. Based on applicable valuation methodologies, however, the Examiner finds that it is reasonably likely that a court would not include the value associated with Tribune's ability to avoid taxes following Step Two because any such value is unique to the structure of ownership imposed by the Merger, and as such, does not represent a "fair market value" asset of Tribune.[568] In other words, just as it is appropriate to disregard these savings in connection with the Step Two solvency determination,

---

[566]   Certain presentations, for example, did not attribute value to PHONES Notes tax savings (although, arguably, in a "collapse" environment, no such savings would be obtainable), or include a recognition of other "contingent liabilities" that were estimated by management in connection with VRC's Step One solvency opinion. Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007). The presentations set forth herein have not been normalized to account for such differences.

[567]   *See* Report at § IV.B.5.c(6).

[568]   Fair market value is a conversion to cash equivalency that determines the value of an asset (here, Tribune's consolidated portfolio of assets) on the basis of an amount of money that would be exchanged in a hypothetical sale where both the buyer and seller are fully informed and neither is compelled to transact. *See* footnotes 87, 387 (containing substantial discussions regarding this matter). *See also Liquidation Trust v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 278 F. App'x 125, 129-30 (3d Cir. 2008); *Amerada Hess Corp. v. Comm'r*, 517 F.2d 75, 83 (3d Cir. 1975) ("According to the classic formulation, 'fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'") (citations omitted). IRS Revenue Ruling 59-60, for example, defines fair market value as follows:

> Section 20.2031-1(b) of the Estate Tax Regulations (section 81.10 of the Estate Tax Regulations 105) and section 25.2512-1 of the Gift Tax Regulations (section 86.19 of Gift Tax Regulations 108) define fair market value, in effect, as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts. Court decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property.

so must these savings be disregarded even in the "collapse" scenario.  Based on the above-noted contemporaneous valuations, as adjusted, if the value of the S-Corporation/ESOP tax attributes is excluded from consideration, but the contemplated Step Two Debt is included, the dial tends to point toward insolvency as of the Step One Financing Closing Date.

A market-based argument supports this conclusion.  In the period before the Step One Financing Closing Date, Tribune Common Stock traded below the $34 per share Tender Offer price.  This is not unusual in and of itself because most acquisitions of public companies take place at a premium to historical stock prices.[569]  The acquisition of Tribune Common Stock using debt in an amount equivalent to the Tender Offer price, but higher than the actual trading value of Tribune Common Stock, tends to support the view that Tribune was insolvent on a market basis.  Indeed, even though, as discussed previously, Tribune Common Stock undoubtedly exhibited an upward bias based on the prospect of the Merger, the stock nonetheless traded lower than the Tender Offer price.

Two countervailing arguments in ascending order of importance, however, undercut the preceding argument that Tribune was rendered insolvent under a collapse scenario.

First, the trading price of Tribune Common Stock price reflects the price paid to dispose of and acquire minority interests in Tribune, whereas, under the Leveraged ESOP Transactions, Tribune would be sold to a new control owner who would obtain control.  Control premiums, as noted, can cause parties to pay premiums above prevailing trading values.[570]  Thus, the fact that Tribune Common Stock traded somewhat (but not significantly) lower than the Tender Offer

---

[569]  These premiums are referred to as "control premiums," and there is substantial empirical literature devoted to that subject.  *See, e.g.,* SHANNON R. PRATT, ET AL., VALUING A BUSINESS 343-61 (4th ed. 2000).

[570]  *See, e.g.*, Ex. 1064 (Mergerstat Control Premium Study, 4th Quarter 2007).

price during the Step One timeframe would be expected and does not necessarily mean that the equity in Tribune was worth less than $34 in the new owner's hands.[571]

Second, as noted above, Tribune's bond prices[572] exhibited little negative price reaction after the announcement of the Leveraged ESOP Transactions through the Step One Financing Closing Date.[573] The bond market invariably recognized the contemplated S-Corporation/ESOP tax attributes and the cash flow attributes that such savings would have on Tribune's ability to fund capital costs, including debt amortization and the payment of interest obligations (assuming viability). Thus, the bond markets would have implicitly factored that potential benefit into pricing decisions, along with the prospect that Step Two would close. Regardless of what might have influenced the pricing, the bonds certainly did not trade at levels that would be associated with Tribune insolvency.

In sum, if the Step Two Debt is included in determining Tribune's solvency at Step One, the case for insolvency is exceedingly close, although market-based information tends to support a conclusion that Tribune was nonetheless still solvent at Step One. On balance, the Examiner finds that it is somewhat unlikely (but, to emphasize, a very close call) that a court would conclude that Tribune was rendered insolvent at Step One even in a collapse scenario that includes the Step Two Debt.

---

[571]   As the trading value of Tribune Common Stock went lower in the months following the Step One closing, however, this reasoning becomes more tenuous and, ultimately, untenable.

[572]   As noted, the Tribune bonds were junior to the debt contemplated to be incurred in connection with the Leveraged ESOP Transactions.

[573]   The Examiner does note that the Tribune bond prices observed as of the Step One Financing Closing Date could have been upwardly biased, given the potential that the Step Two Closing might not occur, although this probability was likely perceived to be relatively low given that Tribune equity traded at or near the Tender Offer price immediately after the closing of Step One.

(8)  **Examiner's Conclusions and Explanation Concerning Solvency of the Guarantor Subsidiaries at Step One.**

**Examiner's Conclusions:**

The Examiner finds that a court is highly likely to find that the Guarantor Subsidiaries were solvent as of, and after giving effect to, the Step One Transactions if the Step Two Debt is not included for purposes of that determination.  The Examiner finds that to the extent that the effects of Step Two (including the Step Two Debt) are considered in connection with Step One solvency, a court is somewhat more likely to conclude that the Guarantor Subsidiaries nevertheless were solvent when that scenario is applied to Tribune.

**Explanation for the Examiner's Conclusions:**

Considering Tribune's capital structure, because it is highly likely that Tribune was solvent at Step One if the Step Two Debt is not included, it necessarily follows that the Guarantor Subsidiaries were, on a consolidated basis, also solvent at Step One if the Step Two Debt is not included.  Stated simply, if Tribune had sufficient value to satisfy the claims of all its creditors, including the Step One Debt, then such creditors need not look specifically to the Guarantor Subsidiaries to satisfy their claims.

Additional analysis, however, is required if the $4.2 billion of Step Two Debt contemplated at the time of the Step One Financing Closing Date is considered.  As discussed in another part of the Report, the Examiner has concluded that it is appropriate to value the Guarantor Subsidiaries collectively for purposes of the solvency analysis.[574]  To determine the Guarantor Subsidiaries' collective solvency (given that, under a collapse scenario, a case might be made that Tribune was insolvent at Step One),[575] the Examiner first considered Tribune's

---

[574]  *See* Report at § IV.B.5.d.(4).

[575]  *See id.* at § IV.B.5.d.(7).

solvency, independent of the value of its equity in the Guarantor Subsidiaries and its co-liability under the LBO Lender Debt.  If on a stand-alone basis, Tribune had liabilities independent of debts guaranteed by its Subsidiaries greater than the value of its own assets (*i.e.,* assets owned outright by Tribune, or valuable equity ownership interests in non-Guarantor Subsidiaries), then it is possible to isolate Tribune's individual solvency and thereby draw conclusions regarding the collective solvency of the Guarantor Subsidiaries.

Two examples illustrate this methodological approach.  Assume Tribune is insolvent by $100 (after giving effect to the LBO Lender Debt and Tribune's equity in the Guarantor Subsidiaries).  Assume further that Tribune holds assets, independent of its equity ownership interests in the Guarantor Subsidiaries, of $150, but also is obligated on $175 of Tribune-level only debt (in other words, debt having no recourse to the Guarantor Subsidiaries and thus excluding the LBO Lender Debt).  In that case, the net Tribune-only deficit of $25 can be deducted from its concluded insolvency—$100—in order to determine collective insolvency at the Guarantor Subsidiary level, namely $75.  Alternatively, if Tribune were insolvent by $100 (after giving effect to the LBO Lender Debt and Tribune's equity in the Guarantor Subsidiaries), but was insolvent by $50 taking into account solely Tribune-level assets and liabilities, this would mean that $50 of the $100 of Tribune insolvency, after giving effect to the LBO Lender Debt and Tribune's equity in the Guarantor Subsidiaries, translates into $50 of collective insolvency at the Guarantor Subsidiary level.

Applying these examples to Tribune's actual capital structure at the time of Step One, based on analysis prepared by his financial advisor, the Examiner determined that Tribune, independent of the value of its ownership interests in the Guarantor Subsidiaries, held assets

worth approximately $1.231 billion at, or proximate to, the Step One Financing Closing Date.[576]

These assets, and the values associated with each, are summarized in the table below:

| TRIBUNE ASSETS AT JUNE 2007 ($mm) | | |
|---|---|---|
| **Assets** | **June 2007** | **Notes** |
| Cash and Equivalents | $ 109.0 | [1] |
| Chicago Cubs | $ 603.0 | [2] |
| Time Warner Shares | $ 345.0 | [3] |
| Real Estate - Baltimore/St. Louis | $ 41.0 | [4] |
| Investments - Classified Ventures | $ 113.0 | [5] |
| Investments - Legacy.com | $ 6.0 | [5] |
| Equity in Non-Guarantor Subsidiaries | $ 14.0 | [5] |
| | | |
| **Total Assets** | **$ 1,231.0** | |

Notes:

[1] Balance sheet amounts as of month end as indicated.

[2] Ex. 900 (VRC Real Estate FMV Summary).

[3] Shares outstanding at $21.23 at June 2007.

[4] Ex. 899 (Tribune Company Cubs Sale Update).

[5] Value determined from review of valuation consultants' presentations.

---

[576] Certain data limitations precluded a precise determination of Tribune asset value on June 4, 2007.  As such, proxies of value as alternative data for certain assets were considered a reliable estimate.

On the liability side, independent of the LBO Lender Debt, Tribune had Tribune-only indebtedness of approximately $2.372 billion as of the Step One Financing Date:

| TRIBUNE LIABILITIES AT JUNE 2007 ($mm) | | |
| --- | --- | --- |
| Liabilities | June 2007 | Notes |
| Medium - Term Notes | $ 262.6 | [1] |
| Property Financing Obligations | $ 46.2 | [1] |
| 2010 Notes | $ 449.5 | [1] |
| Debentures | $ 716.5 | [1] |
| Other Notes and Obligations | $ 34.1 | [1] |
| PHONES Notes | $ 663.0 | [1] |
| Exchangeable EGI-TRB Note | $ 200.0 | [1] |
| | | |
| **Total Liabilities** | **$ 2,371.9** | |

Notes:
[1] Ex. 4 (Tribune 2007 Form 10-K).

As a result, independent of the LBO Lender Debt and its interest in the Guarantor Subsidiaries, Tribune had liabilities exceeding the value of its assets by approximately $1.14 billion as of the Step One Financing Closing Date:

| TRIBUNE ESTIMATED DISTRIBUTABLE VALUE AT JUNE 2007 ($mm) | | |
| --- | --- | --- |
| | June 2007 | Notes |
| Assets | $ 1,231.0 | |
| Liabilities | $ 2,371.9 | |
| | | |
| Distributable Value (Deficiency) | ($ 1,140.9) | [1] |

Notes:
[1] Excludes the impact of intercompany accounts and LBO Lender Debt.

Taking into account the preceding analysis and the analysis set forth in the preceding Section of the Report (which, as noted, admittedly includes a series of simplifying

assumptions),[577] it is reasonable to infer that Tribune was solvent at Step One (without inclusion of the Step Two Debt) by an amount well in excess of $1.14 billion, if the value attributable to the Guarantor Subsidiaries, net of the LBO Lender Debt, is included.  As a result, the above-calculated $1.14 billion Tribune-only deficiency should not be sufficient to render the Guarantor Subsidiaries (which represent the remainder of the value available, after giving effect to the Step One Debt) insolvent on a collective basis at Step One, if the Step Two Debt is not included in the mix.

As explained in the previous Section,[578] the Examiner found that even if $4.2 billion in (originally contemplated) Step Two Debt were included in the calculation of solvency at Step One, market-based indicia tend to support a conclusion that Tribune was solvent at Step One. The same conclusion applies to the Guarantor Subsidiaries.  Indeed, by parity of reasoning based on the analysis presented above, because Tribune on a standalone basis likely *detracted* from the collective solvency of the Tribune Entities, but Tribune likely was solvent nonetheless in that scenario, the Guarantor Subsidiaries also likely would be solvent (more so) if the contemplated $4.2 billion of Step Two Debt were factored into the calculation of solvency at Step One.

> **(9)    Examiner's Conclusions and Explanation Concerning Capital Adequacy of Tribune and the Guarantor Subsidiaries at Step One.**

**Examiner's Conclusions:**

The Examiner finds that it is reasonably likely that a court would find that each of Tribune and the Guarantor Subsidiaries were left with adequate capital after giving effect to the Step One Transactions.

---

[577]  *See* Report at § IV.B.5.d.(7).

[578]  *See id.*

**Explanation of Examiner's Conclusions:**

In assessing Tribune's capital adequacy at Step One, the Examiner's financial advisor reviewed the May 17, 2007 cash flow projection model developed by VRC, which in turn was based on Tribune's projections.[579]  This model appears to have served as the basis for VRC's opinions regarding Tribune's capital adequacy (as well as Tribune's reasonable ability to pay its debts) in VRC's "bring down" solvency opinion, dated May 24, 2007.[580]  VRC's May 17, 2007 model included both a base case cash flow forecast (based on management's projections) and a stress case scenario designed to assess Tribune's ability to meet its cash requirements (both operational and, financing related) while maintaining compliance with covenants.[581]

Certain Parties contended that reliance on these projections was unreasonable in light of the negative variances between actual results for Tribune after February 2007 but before the Step One Financing Closing Date.  For the first three months of 2007, Tribune's year-to-date actual results approximated the results anticipated in Tribune's February 2007 plan on a consolidated basis.  Although April 2007 (the last month in which Brown Book financial performance data would have been available prior to June 4, 2007) showed negative variances to the 2007 operating plan,[582] in the Examiner's view these variances were not significant enough to justify revision to the 2007 operating plan, which includes a much longer horizon.  Preparation of the

---

[579]  VRC did not include in its projections of cash flows certain cash savings anticipated by management that were incorporated into the projections provided to VRC.  Specifically, although management forecasted operating cash flows that included the expectation of $20 million in annual "Other Expense Reductions" (apparently related to savings anticipated to be derived from taking Tribune private), VRC did not include these savings in "Adjusted EBITDA" in its May 17, 2007 model.  Apart from this difference, all revenue and expense amounts can be reconciled between the VRC May 17, 2007 model and May 14, 2007 projections prepared by management.  *Compare* Ex. 83 (ESOP Transaction Model, dated May 14, 2007) *with* Ex. 1104 (VRC Solvency Analysis, dated May 17, 2007).

[580]  *See* Ex. 269 (VRC Step One Solvency Opinion Bring-Down Letter, dated May 24, 2007).

[581]  Ex. 1104 (VRC Solvency Analysis, dated May 17, 2007).

[582]  *See* Report at § III.C.1.  There is also some evidence that management believed that cost-cutting measures would help reverse negative variances on the revenue side of the business.  *See* footnote 78.

Brown Book for May 2007 likely occurred after the closing of the Step One Transactions, although certain information bearing on May 2007 financial performance was probably known to Tribune management before closing. For example, Tribune prepared and issued weekly "flash" reports reporting advertising revenue and circulation.[583] Although the May "flash" reports would have shown at least some of the negative variance reflected in Tribune's May results, significantly, management's projected 2007 revenue and EBITDA generally was consistent with analyst expectations at the time (and, significantly, Tribune was not providing market guidance).[584] In light of these considerations, applying an objective test to measure capital adequacy based on what was known and ascertainable at the time, the Examiner finds that a court would likely conclude that it would be inappropriate to revise the February 2007 projections based on declines in performance in April and May.

The Examiner's financial advisor adopted the general analytical framework of VRC's capital adequacy assessment model for purposes of this review (including VRC's reliance on management's base case projections), but made certain adjustments to that model:

- The Examiner's financial advisor incorporated into the model the effects of incremental debt contemplated at the Step One Financing Closing Date in connection with Step Two, including $2.105 billion in additional borrowings under the Incremental Credit Agreement Facility, $2.1 billion in borrowings contemplated under the Bridge Facility, and the $225 million subordinated EGI-TRB Note (which would essentially replace the Exchangeable EGI-TRB Note).[585] Interest and principal amortization also were factored into the analysis.

---

[583]  *See, e.g.*, Ex. 66 at 20:14-21:8 (Rule 2004 Examination of Harry Amsden, December 16, 2009).

[584]  *See* Report at § III.C.2.

[585]  As discussed in another part of the Report, ultimately at Step Two the $2.1 billion in expected borrowings under the Bridge Facility were reduced to $1.6 billion at the Step Two Financing Closing Date. *See* Report at § III.A.4.a.(1).

Notably, the VRC May 17, 2007 model does not account for *any* such debt instruments despite the fact that the Exchangeable EGI-TRB Note had already been issued on April 23, 2007.

- Based on a review of the underlying credit agreements, the Examiner's financial advisor conformed the calculations of interest expense, among other changes, to the terms of the Step One Debt.[586]  In addition, consistent with modeling the full implications of the inclusion of the Step Two Debt into the capital adequacy model, the Examiner's financial advisor assumed that Tribune would incur no taxes as a result of the S-Corporation/ESOP structure at the Merger, which, for purposes of the financial advisor's model, was assumed to occur on January 1, 2008.

- It was assumed that Tribune would be able to refinance its senior guaranteed debts as they matured.

- Finally, the Examiner's financial advisor modified certain calculation mechanics associated with the determination of discretionary debt repayments.[587]

As discussed previously, certain financial advisors for participants in the Step One Transactions also performed financial analyses.  In connection with these evaluations, as well as analyses performed by Standard & Poor's,[588] "stress-case" scenarios were created and related downside projections of financial performance were made.  The Examiner's financial advisor used these analyses in assessing Tribune's capital adequacy by incorporating certain downside financial expectations into its capital adequacy assessment model.[589]  Based on these sources,

---

[586]  Adjustments included determining the interest rate margin on the Revolving Credit Facility based on the level of the covenants, setting the interest rate margin on the Tranche X Facility equal to 2.50% for the period between the closing of Step One and the closing of Step Two, and creating an interest rate hedge on $2.5 billion in debt related to the Tranche B Facility (although the Credit Agreement calls for the hedging of interest rate risk, the overall value and implementation of the hedged debt was derived from what appears to be a general assumption by VRC at Step Two).  In addition, the Examiner's financial advisor assumed that Tribune would have letters of credit outstanding on the Revolving Credit Facility totaling approximately $65 million annually.  This amount is derived from a review of average amount of letters of credit held historically by Tribune.

[587]  More specifically, VRC calculated interest expense based on the average of beginning and ending balances associated with each debt instrument, which, in years in which Tribune experienced positive cash flow, often included discretionary prepayments.  Interest expense, however, is also a key component of the determination of cash flow available for discretionary prepayments.  VRC's May 17, 2007 model was structurally modified to calculate interest expense on the basis of averaging beginning and ending balances before any discretionary prepayments were determined.  Ex. 1104 at VRC 0039351-64 (VRC Solvency Analysis, dated May 17, 2007).

[588]  Financial advisors included VRC, Duff & Phelps, Blackstone, and Morgan Stanley.  Standard & Poor's also evaluated Tribune under "downside" conditions.  See Ex. 145 (Morgan Stanley Opinion Letter, dated April 1, 2007); Ex. 167 (Duff & Phelps Opinion, dated April 1, 2007); Ex. 268 (VRC Step One Solvency Opinion, dated May 9, 2007); Ex. 141 (Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune, dated March 30, 2007); Ex. 1062 (Blackstone Presentation, dated May 23, 2007); Ex. 212 (Standard & Poor's Letter, dated March 29, 2007).

[589]  Each advisor's downside assessment was performed over varying time horizons.  The Examiner's financial advisor incorporated these downside expectations into its cash flow model only for the periods for which those

Tribune's capital adequacy was assessed, including the amount of any capital adequacy cushion, or deficit, implied by, and any non-compliance with financial covenants resulting from, the incorporation of each advisor's downside assumptions into the Examiner's financial advisor model.[590]

---

expectations were specifically projected.  For purposes of modeling expectations for periods beyond those specifically identified by the various advisors, the parameters based on the base case expectations contained in the Examiner's financial advisor's model were adopted.

[590]  The capital adequacy "cushion" represents the cash flow available for discretionary prepayments in addition to the availability under the Revolving Credit Facility.  The Examiner recognizes that, as in most circumstances for other companies, Tribune could ostensibly sell assets to attempt to fund capital adequacy deficiencies to the extent such circumstances existed prospectively.  Because of the limited time to conduct the Investigation, the Examiner's financial advisor focused its analysis on Tribune's ability to fund its operational and financial commitments as Tribune's business was structured, as contrasted with a business that would engage in substantial asset dispositions.  Additional investigation would be warranted regarding this possible means of addressing deficiencies in capital.

As shown in the table below, all of these downside scenarios assumed that Tribune's 2007 revenues would be lower than what was assumed in VRC's base case model.  Most of the analysts projected yearly revenues in their respective downside cases in amounts between VRC's base and stress cases (although in its analysis, Blackstone consistently projected annual revenues in amounts exceeding those of VRC's base case): [591]

| STEP ONE STRESS CASE CONSOLIDATED REVENUE COMPARISON ($mm) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **VRC Base Case** | $ 5,357.6 | $ 5,177.8 | $ 5,071.8 | $ 5,137.4 | $ 5,161.5 | $ 5,185.8 | $ 5,210.2 | $ 5,234.7 | $ 5,259.4 | $ 5,284.2 | $ 5,309.2 |
| *% Growth* | | -3.4% | -2.0% | 1.3% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| **VRC Stress Case** | $ 5,357.6 | $ 4,921.6 | $ 4,686.3 | $ 4,584.0 | $ 4,494.2 | $ 4,406.2 | $ 4,320.0 | $ 4,235.6 | $ 4,152.9 | $ 4,072.0 | $ 3,992.6 |
| *% Growth* | | -8.1% | -4.8% | -2.2% | -2.0% | -2.0% | -2.0% | -2.0% | -2.0% | -1.9% | -1.9% |
| **Duff & Phelps Stress Case** | $ 5,299.0 | $ 5,023.5 | $ 4,938.1 | $ 4,864.0 | $ 4,791.0 | $ 4,819.8 | $ 4,848.7 | $ 4,877.8 | $ 4,907.0 | $ 4,936.5 | $ 4,959.8 |
| *% Growth* | | -5.2% | -1.7% | -1.5% | -1.5% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.5% |
| **Blackstone Stress Case** | $ 5,338.0 | $ 5,338.0 | $ 5,268.6 | $ 5,237.0 | $ 5,168.9 | $ 5,193.2 | $ 5,217.7 | $ 5,242.2 | $ 5,267.0 | $ 5,291.9 | $ 5,316.9 |
| *% Growth* | | 0.0% | -1.3% | -0.6% | -1.3% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| **Morgan Stanley Downside Case A** | $ 5,107.0 | $ 5,045.7 | $ 4,954.9 | $ 4,905.3 | $ 4,846.5 | $ 4,869.3 | $ 4,892.2 | $ 4,915.2 | $ 4,938.4 | $ 4,961.8 | $ 4,985.2 |
| *% Growth* | | -1.2% | -1.8% | -1.0% | -1.2% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| **Morgan Stanley Downside Case B** | $ 5,066.0 | $ 4,949.5 | $ 4,840.6 | $ 4,738.9 | $ 4,639.4 | $ 4,661.2 | $ 4,683.2 | $ 4,705.2 | $ 4,727.4 | $ 4,749.8 | $ 4,772.2 |
| *% Growth* | | -2.3% | -2.2% | -2.1% | -2.1% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| **Standard & Poor's Stress Case** | $ 4,952.3 | $ 4,634.2 | $ 4,450.9 | $ 4,508.1 | $ 4,529.5 | $ 4,551.1 | $ 4,572.8 | $ 4,594.6 | $ 4,616.6 | $ 4,638.7 | $ 4,660.9 |
| *% Growth* | | -6.4% | -4.0% | 1.3% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |

As shown in the table below, all of these scenarios also assumed operating margins below those incorporated in the VRC base case model:

| STEP ONE STRESS CASE CONSOLIDATED OPERATING MARGIN COMPARISON (1) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **VRC Base Case** | 25.3% | 26.4% | 26.7% | 27.0% | 26.8% | 26.8% | 26.7% | 26.7% | 26.7% | 26.7% | 26.7% |
| **VRC Stress Case** | 25.3% | 24.1% | 23.4% | 24.2% | 25.9% | 26.5% | 26.5% | 26.5% | 26.5% | 26.5% | 26.5% |
| **Duff & Phelps Stress Case** | 25.4% | 24.4% | 24.4% | 24.2% | 23.3% | 23.3% | 23.2% | 23.2% | 23.2% | 23.2% | 26.7% |
| **Blackstone Stress Case** | 23.7% | 24.2% | 24.4% | 24.5% | 24.2% | 26.8% | 26.8% | 26.7% | 26.7% | 26.7% | 26.7% |
| **Morgan Stanley Downside Case A** | 24.3% | 23.8% | 23.3% | 22.6% | 21.6% | 26.8% | 26.8% | 26.7% | 26.7% | 26.7% | 26.7% |
| **Morgan Stanley Downside Case B** | 23.9% | 23.0% | 21.9% | 21.0% | 19.6% | 26.8% | 26.8% | 26.7% | 26.7% | 26.7% | 26.7% |
| **Standard & Poor's Stress Case** | 25.9% | 25.2% | 23.9% | 26.9% | 26.7% | 26.7% | 26.7% | 26.6% | 26.6% | 26.6% | 26.6% |
| (1) Excludes Corporate Expenses. | | | | | | | | | | | |

---

[591]   In the tables that follow, assumptions that improve Tribune's position vis-à-vis VRC's base case are highlighted in green.  Assumptions less favorable in comparison to VRC base case determinations are highlighted in red.

Because increases in capital expenditures represent dollar-for-dollar decreases in funds available for the payment of expenses and debt principal amortization, capital expenditures and acquisition expenditures affect cash availability.  As shown in the table below, although some advisors projected increased capital expenditures and acquisition expenditures, for reasons that the Examiner's financial advisor cannot determine, others projected lower amounts:

| STEP ONE STRESS CASE CONSOLIDATED CAPITAL EXPENDITURES COMPARISON ($mm) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| VRC Base Case | ($ 149.5) | ($ 169.7) | ($ 124.0) | ($ 123.9) | ($ 123.9) | ($ 124.5) | ($ 125.2) | ($ 125.8) | ($ 126.5) | ($ 127.1) | ($ 127.8) |
| VRC Stress Case | ($ 149.5) | ($ 169.7) | ($ 124.0) | ($ 123.9) | ($ 123.9) | ($ 124.5) | ($ 125.2) | ($ 125.8) | ($ 126.5) | ($ 127.1) | ($ 127.8) |
| Duff & Phelps Stress Case | ($ 149.5) | ($ 150.0) | ($ 127.0) | ($ 126.0) | ($ 126.0) | ($ 126.0) | ($ 127.0) | ($ 128.0) | ($ 129.0) | ($ 129.0) | ($ 127.8) |
| Blackstone Stress Case | ($ 199.0) | ($ 174.0) | ($ 129.0) | ($ 129.0) | ($ 129.0) | ($ 124.5) | ($ 125.2) | ($ 125.8) | ($ 126.5) | ($ 127.1) | ($ 127.8) |
| Morgan Stanley Downside Case A | ($ 171.0) | ($ 276.0) | ($ 76.0) | ($ 74.0) | ($ 74.0) | ($ 124.5) | ($ 125.2) | ($ 125.8) | ($ 126.5) | ($ 127.1) | ($ 127.8) |
| Morgan Stanley Downside Case B | ($ 161.0) | ($ 256.0) | ($ 56.0) | ($ 54.0) | ($ 54.0) | ($ 124.5) | ($ 125.2) | ($ 125.8) | ($ 126.5) | ($ 127.1) | ($ 127.8) |
| Standard & Poor's Stress Case | ($ 100.0) | ($ 90.0) | ($ 90.0) | ($ 123.9) | ($ 123.9) | ($ 124.5) | ($ 125.2) | ($ 125.8) | ($ 126.5) | ($ 127.1) | ($ 127.8) |

| STEP ONE STRESS CASE CONSOLIDATED ACQUISITION EXPENDITURES COMPARISON ($mm) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| VRC Base Case | ($ 50.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) |
| VRC Stress Case | ($ 50.0) | ($ 100.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) |
| Duff & Phelps Stress Case | ($ 50.0) | ($ 225.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 50.0) | ($ 100.0) |
| Blackstone Stress Case | ($ 100.0) | ($ 212.0) | ($ 79.0) | ($ 60.0) | ($ 60.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) |
| Morgan Stanley Downside Case A | ($ 50.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) |
| Morgan Stanley Downside Case B | ($ 50.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) |
| Standard & Poor's Stress Case | ($ 275.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) | ($ 100.0) |

217

The Examiner's financial advisor incorporated into its cash flow model the downside assumptions of the various advisors.  The results of that assessment are shown in the table below. Analytical results indicated only two instances in which stress case assumptions resulted in covenant non-compliance and only one case demonstrating insufficient capital:

| STEP ONE CAPITAL ADEQUACY OVERVIEW | | |
|---|---|---|
| Stress Case | Negative Capital Adequacy Cushion | Covenant Violation |
| VRC | No | No |
| Duff & Phelps | No | No |
| Blackstone | No | No |
| Morgan Stanley Downside A | No | No |
| Morgan Stanley Downside B | No | Yes |
| Standard & Poor's | Yes | Yes |

The stress case assumptions developed by Standard & Poor's, however, were based on aggressive downside assumptions.[592]

_____

[592]  For example, the Standard & Poor's stress case makes aggressive assumptions about Tribune's debt carry costs in its downside case.  Standard & Poor's assumes both that the interest rate margins on each of Tribune's Eurodollar rate advances would increase by 150 basis points and assumes that the LIBOR rate also increases by 150 basis points.  These two assumptions in combination increase cash interest expense dramatically and are the principal drivers of Tribune's resulting capital inadequacy under the Standard & Poor's scenario.  Ex. 212 at ML-TRIB-0431974 (Standard & Poor's Letter, dated March 29, 2007).

Detailed model output is provided below:

| STEP ONE STRESS CASE CAPITAL ADEQUACY CUSHION SUMMARY ($mm) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| VRC Base Case | $ 1,384.4 | $ 1,533.7 | $ 924.1 | $ 592.7 | $ 984.3 | $ 1,150.7 | $ 1,140.9 | $ 1,292.2 | $ 1,056.0 | $ 1,467.1 | $ 1,586.3 |
| VRC Stress Case | $ 1,384.4 | $ 1,356.6 | $ 704.1 | $ 334.6 | $ 511.4 | $ 740.3 | $ 852.1 | $ 898.2 | $ 598.4 | $ 856.9 | $ 993.4 |
| Duff & Phelps Stress Case | $ 1,372.3 | $ 1,287.2 | $ 798.5 | $ 400.5 | $ 529.2 | $ 709.1 | $ 822.5 | $ 943.2 | $ 674.9 | $ 1,043.3 | $ 1,265.2 |
| Blackstone Stress Case | $ 1,161.5 | $ 1,019.2 | $ 393.3 | $ 145.8 | $ 346.7 | $ 683.7 | $ 994.5 | $ 1,130.8 | $ 879.2 | $ 1,275.3 | $ 1,382.6 |
| Morgan Stanley Downside Case A | $ 1,208.3 | $ 1,249.0 | $ 731.1 | $ 309.6 | $ 339.6 | $ 612.2 | $ 854.7 | $ 1,055.0 | $ 795.7 | $ 1,183.6 | $ 1,282.3 |
| Morgan Stanley Downside Case B | $ 1,177.1 | $ 1,205.1 | $ 651.3 | $ 171.1 | $ 64.9 | $ 252.7 | $ 402.4 | $ 670.5 | $ 666.2 | $ 1,037.3 | $ 1,145.0 |
| Standard & Poor's Stress Case | $ 1,051.1 | $ 454.9 | ($ 393.7) | ($ 1,016.6) | ($ 1,177.2) | ($ 1,297.9) | ($ 1,491.9) | ($ 1,577.1) | ($ 1,954.7) | ($ 1,952.2) | ($ 1,890.8) |

Based on the preceding, which includes a variety of downside analyses, the Examiner finds that it is reasonably likely that a court would conclude that the Step One Transactions left Tribune with adequate capital, even factoring in the contemplated Step Two Debt.  A fundamental premise underlying the Examiner's conclusion is that Tribune management's projections developed in February 2007 (as thereafter revised, and ultimately relied on by VRC) should be used for purposes of testing capital adequacy, notwithstanding operating variances from the projected performance in April and (as probably reflected in "flash reports" available to management) May 2007.  For the reasons discussed previously in this Section, the Examiner does not accept the contention advanced by certain Parties that, in view of what was known or ascertainable as of the Step One Financing Closing Date, the February 2007 projections were unreasonable, particularly in comparison to contemporary analyst expectations.  Thus, even

| STEP ONE STRESS CASE GUARANTEED LEVERAGE RATIO SUMMARY | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| VRC Base Case | 7.21 | 6.23 | 6.00 | 5.79 | 5.41 | 4.94 | 4.55 | 4.07 | 3.75 | 3.20 | 2.60 |
| VRC Stress Case | 7.21 | 7.22 | 7.55 | 7.55 | 6.89 | 6.47 | 6.30 | 6.09 | 6.09 | 5.83 | 5.52 |
| Duff & Phelps Stress Case | 7.26 | 7.08 | 6.95 | 7.11 | 7.13 | 6.72 | 6.46 | 6.09 | 5.91 | 5.48 | 4.41 |
| Blackstone Stress Case | 7.84 | 7.27 | 7.07 | 7.06 | 6.87 | 5.94 | 5.61 | 5.20 | 4.95 | 4.47 | 3.95 |
| Morgan Stanley Downside Case A | 7.94 | 7.37 | 7.43 | 7.78 | 7.91 | 6.16 | 5.86 | 5.47 | 5.26 | 4.81 | 4.31 |
| Morgan Stanley Downside Case B | 8.14 | 7.79 | 8.14 | 8.75 | 9.24 | 6.71 | 6.44 | 6.10 | 5.94 | 5.53 | 5.09 |
| Standard & Poor's Stress Case | 7.80 | 8.27 | 8.76 | 7.59 | 7.40 | 7.14 | 6.96 | 6.78 | 6.59 | 6.41 | 6.21 |

| STEP ONE STRESS CASE INTEREST COVERAGE RATIO SUMMARY | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| VRC Base Case | 2.71 | 1.56 | 1.67 | 1.78 | 1.84 | 1.95 | 2.09 | 2.24 | 2.47 | 2.70 | 3.13 |
| VRC Stress Case | 2.71 | 1.37 | 1.36 | 1.42 | 1.50 | 1.57 | 1.60 | 1.63 | 1.68 | 1.71 | 1.81 |
| Duff & Phelps Stress Case | 2.69 | 1.41 | 1.47 | 1.49 | 1.45 | 1.51 | 1.57 | 1.62 | 1.72 | 1.79 | 2.17 |
| Blackstone Stress Case | 2.54 | 1.40 | 1.49 | 1.52 | 1.52 | 1.71 | 1.80 | 1.87 | 2.01 | 2.13 | 2.37 |
| Morgan Stanley Downside Case A | 2.50 | 1.37 | 1.39 | 1.38 | 1.33 | 1.65 | 1.73 | 1.79 | 1.91 | 2.01 | 2.21 |
| Morgan Stanley Downside Case B | 2.44 | 1.30 | 1.28 | 1.25 | 1.16 | 1.54 | 1.60 | 1.65 | 1.73 | 1.80 | 1.95 |
| Standard & Poor's Stress Case | 2.38 | 1.09 | 1.01 | 1.13 | 1.14 | 1.17 | 1.18 | 1.20 | 1.23 | 1.28 | 1.33 |

when the contemplated Step Two Debt is factored into the analysis of capital adequacy, it is reasonably likely that Tribune still had adequate capital at Step One.

With respect to the Guarantor Subsidiaries, because the collective indebtedness of those entities is less than the Tribune-only indebtedness, and because Tribune held few cash generating assets (other than the Chicago Cubs, which Tribune anticipated selling, the proceeds of which were incorporated into the Examiner's cash flow model),[593] the Examiner similarly concludes that it is reasonably likely that the Guarantor Subsidiaries also were adequately capitalized after giving effect to the Step One Transactions, factoring in the contemplated Step Two Debt.

(10)    **Examiner's Conclusions and Explanation Concerning Solvency of Tribune at Step Two.**

**Examiner's Conclusions**:

The Examiner finds that a court is highly likely to conclude that the Step Two Transactions rendered Tribune insolvent.

**Explanation of the Examiner's Conclusions:**

As discussed in another part of the Report, for purposes of assessing solvency, assets are valued at "fair value" as of the valuation date.[594]  As also discussed elsewhere in the Report, VRC used definitions of "fair value" and "fair saleable value" in its Step Two valuation that are at odds with the generally accepted definition of fair market value.[595]  The result was to overstate the solvency of Tribune by including as a component of this value the tax avoidance characteristics of the S-Corporation/ESOP structure.[596]  To assess the effect of this

---

[593]    Regardless, the Examiner notes that there was no prohibition on using cash from assets held solely at Tribune to fund payments on guaranteed debt.

[594]    *See* footnotes 87, 387, and 568.

[595]    *See* Report at §§ III.H.3.e. and IV.B.4.b.

[596]    The Examiner notes that, in connection with VRC's May 2007 solvency opinions, VRC used a traditional fair market value definition in assessing solvency at Step One.

overstatement, the Examiner's financial advisor first restated VRC's concluded range of equity

values to eliminate the (final) value VRC ascribed to the tax savings attributes of the S-

Corporation/ESOP structure:

| Effect of Removing the Value of S-Corporation/ESOP Tax Savings from VRC's December 20, 2007 Solvency Determination ($mm) | | | |
|---|---|---|---|
| | **Low** | **Mid** | **High** |
| **VRC December 20, 2007 Concluded Equity Value** | $    931.6 | $    1,777.2 | $    2,622.8 |
| **VRC Value Ascribed to S-Corp/ESOP Tax Savings** | $    (815.8) | $    (876.0) | $    (936.1) |
| **Revised VRC Equity Value** | $    115.8 | $    901.2 | $    1,686.7 |

This adjustment alone results in near insolvency in the low-case under VRC's Step Two

solvency analysis, and a solvency "cushion" in the mid-case of only approximately 6% of the

total enterprise value of Tribune.[597]  The substantial errors in VRC's calculation of the value of

Tribune's assets (as summarized below, and as discussed and quantified elsewhere in the

Report),[598] however, eliminate any residual equity value that VRC ascribed to Tribune as of

December 20, 2007, and therefore this cushion is illusory.  Each of the problems underlying

VRC's analysis is significant:

- The value VRC ascribed to Tribune's operating assets using the DCF methodology assumed, as a predicate, that the underlying financial projections were reasonable.  Based on the analysis set forth in Annex A to this Volume of the Report, the Examiner concludes that the projections (particularly with respect

---

[597]  Calculated as follows:  $901.2 million equity value divided by $14.565 billion total Tribune enterprise value as determined by VRC.  *See* Ex. 1045 at TRB0293989 (VRC Solvency Analysis, dated December 20, 2007).

[598]  *See* Report at § III.H.3.f.

to excessive revenue and EBITDA growth rates informing those expectations) were not reasonable.[599]

- VRC failed to adjust the value of Tribune's operating assets to account for the significant risk of not achieving the projected growth for the interactive business' revenue and profitability, which growth was a basis for portions of VRC's DCF (in particular) and multiples-based valuations (in part, and to a lesser degree).

- VRC's valuation of Tribune's operating assets using market multiples evidences the use of excessive multiples based on, among other things, the use of multiples derived from clearly non-comparable companies (*e.g.*, The Washington Post), and multiples that were likely significantly inflated due to VRC's use of book values of cohort company non-operating assets to adjust the value of cohort companies in determining multiples.

- VRC likely overstated the value of Tribune's non-operating assets due to VRC's failure to reduce quantified values for applicable discounts, and to adjust base values for the companies in which Tribune held equity ownership interests for size and other differentiating characteristics, among other reasons.

Market-based indicia also support the conclusion that Tribune was rendered insolvent at Step Two. Most notably, the trading price of Tribune Common Stock between Step One and Step Two reflected significant discounts to the Tender Offer price,[600] despite the previously-

---

[599] *See also id.* at § III.H.3.f.(1).

[600] The following chart reflects the trading values of Tribune Common Stock between the Step One Financing Closing Date and the Step Two Financing Closing Date:

discussed built-in upward bias based on the prospect of the Step Two Closing.  Although this fact alone is not dispositive of insolvency, Tribune's publicly traded bond debt also traded at steep discounts to par[601] (and credit default swap pricing on those securities transcended levels of credit default swap pricing for other cohort companies), and Tribune's pre-existing Step One Debt likewise began trading at discounts to par in excess of levels explained by market factors.[602] Both considerations indicate that the difference between the trading prices of Tribune Common Stock and the Tender Offer price could not justifiably be explained merely by a control



The Examiner notes that the trading value of Tribune Common Stock increased to approximate the Tender Offer price as the Step Two Financing Closing Date neared.

[601]  Tribune bonds exhibited additional price erosion in 2008 after Tribune announced fourth quarter and full-year 2007 financial results on March 20, 2008.

[602]  Ex. 761 (Morgan Stanley Discussion Materials, dated November 21, 2007).

223

premium.[603]  Moreover, the discounts in the prices of Tribune's debt instruments suggest a market-based conclusion that Tribune would be unable to satisfy its liabilities and would be rendered insolvent by the addition of the Step Two Debt to the balance sheet.

The Examiner's financial advisor further assessed the question of Tribune's solvency at Step Two by employing the DCF Valuation Analysis in Annex A to this Volume of the Report, using information available at the time of the Step Two Transactions.[604]  The following summarizes the Examiner's principal conclusions based on the DCF Valuation Analysis:

Based on the discounted value of both the discrete period projections of Tribune's cash flow and the discounted value of the terminal value as determined for each of Tribune's legacy (*i.e.,* traditional publishing and broadcasting) and interactive businesses, Tribune's operating assets had a value of $7.799 billion as of December 20, 2007, as shown in the table below:[605]

| PRESENT VALUE AT DECEMBER 20, 2007 | | | |
|---|---|---|---|
| | Interim Period Cash Flow | Terminal Value | Total |
| Value of Tribune's Publishing Segment and Broadcasting Segment Assets (excluding Interactive) | $ 2,356.4 | $ 4,488.8 | $ 6,845.1 |
| Value of Tribune's Interactive Assets | $ 447.6 | $ 506.1 | $ 953.7 |
| **Total Value of Tribune's Operating Assets as of December 20, 2007** | **$ 2,804.0** | **$ 4,994.9** | **$ 7,798.8** |

---

[603]  *See* Report at § III.H.3.f.(4).

[604]  This analysis also enabled the Examiner's financial advisor to approximate a value of the S-Corporation/ESOP tax attributes for purposes of evaluating reasonably equivalent value considerations, and more precisely gauge the degree of solvency (or insolvency) at the Guarantor Subsidiary level.  The Examiner also notes that this alternative valuation analysis was prepared under significant time constraints, and on the basis of a partial review of information available to the Examiner.  With additional time and resources, refinements to this analysis are possible, although the conclusion resulting from this analysis (a finding of insolvency) would be unlikely to change based on such refinements.  In connection with its assessment of Tribune solvency at Step Two, the Examiner's financial advisor, consistent with VRC's general approach, recognized that Tribune's assets were comprised of two distinct components (Tribune's operating assets, including its Publishing Segment and Broadcasting Segment, and Tribune's ownership interests in non-operating asset equity investments).  Those components require separate evaluation.

[605]  For a detailed explanation of the DCF Valuation Analysis performed by the Examiner's financial advisor and the bases for these concluded values, *see* Annex A to Volume Two (DCF Valuation Analysis).

Tribune's equity investments had a value of $3.024 billion at Step Two ($392 million less than the $3.416 billion value determined by VRC).[606]  With respect to the remaining variables bearing on Tribune's solvency at Step Two, the Examiner adopted the same assumptions regarding cash, debt, and identified contingent liabilities as set forth in VRC's December 20, 2007 solvency analysis.[607]

Based on the preceding, as discussed at length in the DCF Valuation Analysis, the Examiner concludes that Tribune was rendered insolvent as a result of the Step Two Transactions by approximately $1.965 billion:

| SOLVENCY CONCLUSION ($ mm) | | |
|---|---|---|
| | December-07 | |
| **Operating Asset Value** | **$7,798.8** | |
| + Equity Investments and Other Assets | $3,024.4 | [1] |
| **Adjusted Enterprise Value** | **$10,823.2** | |
| + Cash | $197.7 | [2] |
| - Debt | ($12,898.8) | [2] |
| - Identified Contingent Liabilities | ($86.8) | [2] |
| **= Solvency/(Insolvency)** | **($1,964.7)** | |

Notes and Sources:

[1]  VRC valued Tribune's equity investments at $3.416 billion. *See* Ex. 1045 (VRC Solvency Analysis, dated December 20, 2007). The Examiner's financial advisor reduced this amount by approximately $392 million to reflect the conclusion that VRC overstated the value ascribed to Career Builder and TV FoodNetwork.

[2]  *See* Ex. 1045 (VRC Solvency Analysis, dated December 20, 2007).  The Examiner's financial advisor has adopted VRC's numbers for cash, debt, and identified contingent liabilities.

---

[606]   As explained in Annex A to Volume Two (DCF Valuation Analysis), this downward adjustment was based on the Examiner's financial advisor's reductions in the value associated with Tribune's investments in CareerBuilder and TV Food Network.

[607]   Ex. 1045 at TRB0293989 (VRC Solvency Analysis, dated December 20, 2007).

Although the above quantifications of Tribune's total enterprise (or total asset) value could be refined based on additional investigation and analysis if the Investigation were not limited in duration, the Examiner finds, on the basis of the analysis conducted through July 25, 2010, that a court is highly likely to conclude that Tribune was rendered insolvent as a result of the Step Two Transactions.

**(11)    Examiner's Conclusions and Explanation Concerning Solvency of Guarantor Subsidiaries at Step Two.**

<u>**Examiner's Conclusions**</u>:

The Examiner finds that a court is reasonably likely to conclude that the Guarantor Subsidiaries were rendered insolvent on a collective basis as a result of the Step Two Transactions.

<u>**Explanation of the Examiner's Conclusions**</u>:

As discussed in connection with the Examiner's analysis of the solvency of the Guarantor Subsidiaries at Step One, Tribune's degree of insolvency can be used to calculate the degree of solvency or insolvency of the Guarantor Subsidiaries.[608]  The following chart shows the Examiner's assessment of Tribune's assets as of the Step Two Financing Closing Date (excluding the value of its ownership interests in the Guarantor Subsidiaries) compared to the Tribune-only debt (*i.e.*, non-LBO Debt):

---

[608]   *See id.* at § IV.B.5.d.(8).

| TRIBUNE ESTIMATED DISTRIBUTABLE VALUE AT DECEMBER 2007 ($mm) | | |
|---|---|---|
| | December 2007 | Notes |
| Assets | $ 1,468.0 | |
| Liabilities | $ 2,256.4 | |
| Distributable Value (Deficiency) | ($ 788.4) | [1] |

Notes
[1] Excludes the impact of intercompany accounts and LBO Lender Debt.

The following chart details the value of certain of Tribune's assets as of the Step Two Financing Closing Date:

| TRIBUNE ASSETS AT DECEMBER 2007 ($mm) | | |
|---|---|---|
| Assets | December 2007 | Notes |
| Cash and Equivalents | $ 179.0 | [1] |
| Chicago Cubs | $ 850.0 | [2] |
| Time Warner Shares | $ 265.0 | [3] |
| Real Estate - Baltimore/St. Louis | $ 41.0 | [4] |
| Investments - Classified Ventures | $ 113.0 | [5] |
| Investments - Legacy.com | $ 6.0 | [5] |
| Equity in Non-Guarantor Subsidiaries | $ 14.0 | [5] |
| **Total Assets** | **$ 1,468.0** | |

Notes
[1] Balance sheet amounts as of month end as indicated.
[2] Ex. 900 (VRC Real Estate FMV Summary).
[3] Shares outstanding at $16.36 at December 2007.
[4] Ex. 899 (Tribune Cubs Sale Update).
[5] Value determined from review of valuation consultants' presentations.

The following chart details the amount of Tribune's non-LBO Debt liabilities as of the Step Two Financing Closing Date:

| TRIBUNE LIABILITIES AT DECEMBER 2007 ($mm) | | |
|---|---|---|
| Liabilities | December 2007 | Notes |
| Medium - Term Notes | $ 262.6 | [1] |
| Property Financing Obligations | $ 35.7 | [1] |
| 2010 Notes | $ 449.6 | [1] |
| Debentures | $ 717.0 | [1] |
| Interest Rate Swaps | $ 119.0 | [1] |
| Other Notes and Obligations | $ 15.1 | [1] |
| PHONES Notes | $ 597.0 | [1] |
| Exchangeable EGI-TRB Note | $ 0.0 | [1] |
| EGI-TRB Note | $ 60.3 | [1] |
| **Total Liabilities** | **$ 2,256.4** | |
| Notes | | |
| [1] Ex. 4 (Tribune 2007 Form 10-K). | | |

Because the magnitude of insolvency attributable to Tribune, based on the preceding Tribune-only analysis (resulting in an approximate $788 million deficiency), is substantially less than the Tribune's aggregate insolvency after giving effect to the LBO Lender Debt and the value attributable to the Guarantor Subsidiaries ($1.965 billion), it follows that the Step Two Transactions rendered the Guarantor Subsidiaries collectively insolvent as well.

Market-based considerations do not alter this conclusion. Although Tribune's public bonds traded at a significant discount to par before the Step Two Financing Closing Date, these bonds still traded at values above zero, from which it is possible to infer a market-based belief that the Guarantor Subsidiaries had some positive net value even taking into account the LBO Lender Debt and were therefore solvent.[609] However, as discussed in another part of the

---

[609]  It should be noted, however, that just prior to the Step Two Financing Closing Date, Tribune's had not yet reported fourth quarter 2007 results (although some, albeit much less comprehensive information, e.g., press releases regarding performance for October and November, had been issued).

Report,[610] other market indicia, such as the difference between the trading price of Tribune

Common Stock and the Tender Offer price and the fact that Tribune's Step One Debt traded at

discounts to par, lead to the opposite conclusion (although it is also possible that certain debt

traded at a discount based on unfavorable pricing factors).  In light of the equivocal inferences

that could be drawn from these various market-based indicia and the significant contrary

evidence that supports a conclusion that the Guarantor Subsidiaries were rendered insolvent at

Step Two, the Examiner finds that it is reasonably likely that the Step Two Transactions rendered

the Guarantor Subsidiaries insolvent on a collective basis.

> **(12)    Examiner's Conclusions and Explanation Concerning Capital Adequacy of Tribune and the Guarantor Subsidiaries at Step Two.**

**Examiner's Conclusions:**

The Examiner finds that:  (i) it is highly likely that a court would conclude that Tribune

was left without adequate capital after giving effect to the Step Two Transactions, and (ii) it is

reasonably likely that a court would conclude that the Guarantor Subsidiaries were left without

adequate capital after giving effect to the Step Two Transactions.

**Explanation of Examiner's Conclusions - Tribune:**

In assessing Tribune's capital adequacy at Step Two, the Examiner's financial advisor

reviewed the December 20, 2007 cash flow projection model developed by VRC, which served

as the basis for VRC's capital adequacy (as well as reasonable ability to pay debts) conclusions

in its Step Two solvency opinion letter dated December 20, 2007.[611]  VRC's model, in turn,

---

[610]   *See* Report at § III.H.3.f.(4); *see also* footnotes 600-602.

[611]   *See* Ex. 913 (VRC Valuation Summary); Ex. 728 (VRC Step Two Solvency Opinion, dated December 20, 2007).  The Examiner notes that, in addition to relying on the results of its financial modeling in rendering its Step Two solvency opinion letter, VRC also explicitly relied on certain management representations regarding Tribune's ability to refinance certain debt.  *Id.* at TRB0294010.

incorporated projected financial information provided by Tribune management.[612]  Although

adopting the general framework used by VRC to assess these matters,[613] in this analysis, like the

Step One capital adequacy analysis discussed in another part of the Report,[614] several significant

changes were made:

- Most importantly, for the reasons discussed in the DCF Valuation Analysis, the Examiner's financial advisor developed cash flow projections using an objective standard of reasonableness based on information known and reasonably ascertainable at the time of the Step Two Financing Closing Date, which also served as the basis for the assessment of capital adequacy at Step Two.

- Tribune's Broadcasting Segment and radio business were combined into a single stand-alone division.

- Adjustments were made to management's projections of cash to be received from equity investments to recognize only forecasted amounts to be received from Tribune's investment in TV Food Network, as this was the only Tribune investment that had been paying cash dividends at the time of Step Two.[615]  As a result, projected cash flows from equity investments (other than those projected for TV Food Network) were eliminated.[616]

- VRC's modeling assumptions regarding Tribune's post-Step Two Closing debt structure were corrected to ensure that the computation of interest coincided properly with the terms of the Credit Agreement and the Bridge Credit Agreement.[617]

---

[612]  Although Tribune management distributed other projection models to VRC, including those issued on September 19, 2007, September 20, 2007, and September 30, 2007 the November 21, 2007 model was the last iteration in this series and, as reflected in its December 20, 2007 solvency opinion letter, was the management projection ultimately relied on by VRC.  *Id.* at TRB0294009; Ex. 721 (Tribune Company Model, last updated November 21, 2007).

[613]  For example, forecasting operating cash flows, scheduling interest and principal repayments according to credit terms, assessing covenant compliance, etc.

[614]  *See* Report at § IV.B.5.d.(9).

[615]  This adjustment was deemed appropriate not only because such treatment was consistent with past Tribune results (*see* Annex A to this Volume of the Report) but also because Mr. Amsden, during his July 16, 2010 interview, indicated that Tribune did not receive equity dividend income from its interactive business equity investments and that such investments generally contemplated equity appreciation as contrasted with current income generation.  Mr. Amsden also observed that profits from interactive business equity investments generally were reinvested in their respective businesses.  Examiner's Interview of Harry Amsden, July 16, 2010.

[616]  The management projections relied on by VRC reflect equity income from the Broadcasting Segment as being derived solely from Tribune's investment in TV Food Network.  All other equity income was presented in a summary-level aggregate amount, without specific attribution to discrete Publishing Segment equity investments.  Publishing Segment equity investments all related to Tribune's interactive business.

[617]  Additional changes to the VRC model included (a) determining the interest rate margin on the Revolving Credit Facility based on the level of the covenant compliance, (b) setting the interest rate margin on the Tranche X Facility equal to 2.50% for the period between the closing of Step One and the closing of Step Two,

- The Examiner extended the capital adequacy model to include periods from 2008 through 2022.[618]

- Finally, as detailed previously in connection with the Examiner's discussion of Tribune's capital adequacy at Step One, certain spreadsheet modifications were made to VRC's model in a manner consistent with the adjustment explained in that Section.[619]

After adjusting the capital adequacy model to incorporate these changes, the Examiner's financial advisor evaluated Tribune's capital adequacy at Step Two by downwardly adjusting certain key operating assumptions (*e.g.*, the level of projected revenues) to determine the effects of those changes on Tribune's ability to meet operational cash needs, comply with debt covenants, and make scheduled principal and interest payments.  (The Examiner considered, but rejected, the contention by certain Parties that the sale of assets would meaningfully contribute to the capital adequacy of Tribune or, for that matter, the Guarantor Subsidiaries.)[620]  The

---

(c) modeling the interest rate on the Bridge Facility based on actual increases (instead of assuming that it would have accrued interest at its maximum interest rate in the first year), and (d) assuming that the proceeds obtained from the financing of $300 million in asset-backed notes securitized by Tribune accounts receivable would go immediately to pay down a portion of the Tranche X Facility.  In addition, based on an assessment of Tribune's use of letters of credit, the Examiner's financial advisor assumed that Tribune would have letters of credit outstanding on the Revolving Credit Facility totaling approximately $65 million annually.  This amount is derived from the average annual amount of letters of credit outstanding historically.  Finally, the Examiner's financial advisor assumed that Tribune would be able to refinance its senior guaranteed debt due in 2014 and 2015 as it matured.

[618]  This was necessary to accommodate certain other analyses undertaken by the Examiner's financial advisor (*e.g.*, in order to value the benefit to Tribune of the S-Corporation/ESOP tax attribute).

[619]  *See* Report at § IV.B.5.d.(9).

[620]  Tribune possessed valuable assets which, in theory, it could sell piecemeal.  Although Tribune management's forecasts generally did not contemplate substantial asset sales, the Examiner considered how asset sales might affect both Tribune's and the Guarantor Subsidiaries' capital adequacy.  As a general matter, asset sales would correspondingly reduce the cash flow contributed by any business segment sold.  Some of these businesses were sources of cash and were therefore accounted for in the cash flow models of both VRC and the Examiner's financial advisor (*e.g.*, TV Food Network).  Others were not.  Selling a dividend-paying asset such as TV Food Network would correspondingly eliminate the periodic cash inflows incorporated into cash flow models by converting a future stream of cash to an upfront one-time payment.  Selling cash producing or non-cash producing assets in a distressed environment (such as to fund an immediate or impending cash deficit) might well result in fire-sale values, and could further trigger tax obligations depending on, for example, gain treatment and transaction structure.  Sales could also adversely affect Tribune's other operating assets to the extent operations (such as CareerBuilder) were interdependent with Tribune.  Finally, the ability to "fill" a capital adequacy deficit depends both on the size of the deficit anticipated and the amount that could be obtained from a sale.  If the capital adequacy deficit exceeds reasonably attainable net sale proceeds, a disposition of such assets would likely prove irrelevant to curing such deficit.

Examiner's financial advisor performed various stress tests against base case expectations of future financial performance.[621]  The table below shows that, under the Examiner's financial advisor's base case, Tribune would be expected to maintain compliance with debt covenants and have ample cash to meet operational and financial commitments:

| EXAMINER'S BASE CASE RESULTS at STEP TWO (TRIBUNE) ($mm) | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Capital Adequacy Cushion | $1,360.7 | $749.1 | $377.0 | $502.8 | $674.0 | $815.9 | $962.5 | $704.2 | $1,071.5 | $1,140.2 | $1,209.9 | $1,286.6 | $1,371.0 | $1,463.4 | $1,564.4 |
| Guaranteed Leverage Ratio | 7.19 | 6.84 | 6.79 | 6.60 | 6.22 | 5.90 | 5.52 | 5.34 | 4.97 | 4.58 | 4.17 | 3.72 | 3.23 | 2.71 | 2.15 |
| Maximum Covenant Ratio | 9.00 | 8.75 | 8.50 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 |
| Interest Coverage Ratio | 1.37 | 1.47 | 1.46 | 1.44 | 1.49 | 1.55 | 1.62 | 1.71 | 1.76 | 1.88 | 2.01 | 2.17 | 2.37 | 2.63 | 2.99 |
| Minimum Covenant Ratio | 1.15 | 1.20 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |

Because the values assigned to non-operating assets may not be sufficient in certain Tribune downside scenarios (*e.g.*, a deficit capital circumstance of more than $2 to $3 billion, as discussed in this Section of the Report), the question whether asset sales would be sufficient to shore up liquidity may be moot.  The prospect of selling assets theoretically is more germane at the Guarantor Subsidiary level, however, because the cash deficit may be smaller, although the consequences of such sales (taxes, disruptions, etc.) would need to be evaluated further.  In addition to the above-discussed considerations, the Examiner finds that asset sales would be highly unlikely to materially improve the capital adequacy of the Guarantor Subsidiaries:

First, because the Credit Agreement and the Bridge Credit Agreement required Tribune and the Guarantor Subsidiaries to use all of the net proceeds from dispositions to prepay LBO Lender Debt, asset sales from non-performing assets generally would not create liquidity for operations.  Mandatory prepayments under the Credit Agreement of the net cash proceeds of sales of assets with an aggregate fair market value in excess of $10 million by Tribune or its Subsidiaries were required to be applied first to the Tranche X Facility, in forward order of maturity, until the $1.5 billion principal amount of the Tranche X Facility was repaid, second to the Tranche B Facility totaling approximately $7.62 billion as of the Step Two Closing (on a pro rata basis among the scheduled amortization payments, unless Tribune elects to apply such prepayments to the next four installment payments scheduled to occur after the date of the prepayment), and third to the Revolving Credit Facility.  Ex. 179 at § 2.10(b)(iv) (Credit Agreement).  Thus, proceeds from asset sales generally were required to prepay principal and did not materially ease the amortization burden imposed on the Tribune Entities.  Although one still could argue that paying down indebtedness would create value against which the Tribune Entities could borrower to fund operations, that was untrue as of Step Two.  As the Examiner previously found, the Step Two Transactions rendered the Tribune Entities insolvent by approximately $1.965 billion.  Thus, the first $1.965 billion of sale proceeds would not create equity against which the Tribune Entities could borrow.

Second, the Tribune Entities operated under a centralized cash management system that combined revenues, which was coordinated through Tribune.  Developing a scenario in which one or more of the Guarantor Subsidiaries would survive by selling off assets, while Tribune and other Guarantor Subsidiaries would operate without sufficient cash to meet their own obligations, is largely a theoretical exercise.

Third, as discussed in the Examiner's analysis of solvency at Step Two, it is highly unlikely that Tribune, and reasonably unlikely that the Guarantor Subsidiaries, could generate sufficient value from their respective (and collective) assets to satisfy their liabilities.  Thus, when all is said and done, asset sales would not be sufficient to permit the Guarantor Subsidiaries (or Tribune) to meet their liabilities.

[621]  The base case projections are the projections developed by the Examiner's financial advisor as discussed in connection with the Step Two solvency analysis described earlier herein.  *See* Report at IV.B.5.d.(10).

The Examiner's financial advisor then applied a downside to this base case.  In considering how, and to what degree, to "stress" the base case, the Examiner's financial advisor considered, among other things, the volatility of Tribune's historical financial performance as well as, to a much lesser degree, downside financial scenarios evaluated by VRC.  Tribune's pre-Step Two financial performance evidenced considerable volatility, and thus downside risk.[622] This risk was exacerbated by secular declines in the publishing industry, maturation of the Broadcasting Segment, and significant uncertainty associated with future growth and profitability for Tribune's interactive business.[623]  The Examiner's financial advisor also reviewed Tribune's actual performance during 2007 in comparison to Tribune's February 2007 forecast.  Through period 11 (*i.e.*, through November 2007), Tribune's Brown Book reflected

---

[622] Normalized 2002 through 2006 results, as reported in Tribune's 2006 10-K, for example, reflected significant volatility in operating profit margin. *See* Report at § III.C.1.

| Annual Operating Profit Change, 2002 - 2006 ($000) | | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006** |
| Total Operating Revenues | $  5,285,277 | $  5,494,416 | $  5,631,431 | $  5,511,283 | $  5,517,708 |
| Total Operating Profit | 1,215,402 | 1,323,688 | 1,187,278 | 1,127,191 | 1,085,010 |
| Operating Profit % | 23.00% | 24.09% | 21.08% | 20.45% | 19.66% |
| Nominal Annual Change | | 1.09 | (3.01) | (0.63) | (0.79) |

Source:
Ex. 14 (Tribune 2006 Form 10-K).

Normalized 2003 through 2007 results, as reported in Tribune's 2007 10-K, also reflected significant volatility in operating profit margins, recognizing that 2007 results were impacted by Merger related costs.

| Annual Operating Profit Change, 2003 - 2007 ($000) | | | | | |
|---|---|---|---|---|---|
|  | **2003** | **2004** | **2005** | **2006** | **2007** |
| Total Operating Revenues | $  5,440,788 | $  5,542,595 | $  5,426,846 | $  5,443,564 | $  5,062,984 |
| Total Operating Profit | 1,316,770 | 1,190,108 | 1,121,259 | 1,084,761 | 633,917 |
| Operating Profit % | 24.20% | 21.47% | 20.66% | 19.93% | 12.52% |
| Nominal Annual Change | | (2.73) | (0.81) | (0.73) | (7.41) |

Source:
Ex. 4 (Tribune 2007 Form 10-K).

[623] *See* Annex A to Volume Two; *see also* Report at § III.C.1.

that Tribune experienced an adverse revenue variance to plan of 5%, and a negative operating profit variance to plan of 8%.[624]

In light of these considerations, the downside case assumed a continuation of the 2007 decline in revenues, at diminishing rates of decline (5.0%, 4.0%, 3.0%, 2.0% and 1.0% through 2012) and flat growth in revenues thereafter.[625]  The Examiner's financial advisor also assumed a 2% nominal EBITDA decline, before corporate expenses, from what was projected in the base case projections, in recognition of the historical volatility in Tribune's operating profitability. This assumption recognized that, at lower levels of revenues, margins would be expected to decline in view of the fixed elements of Tribune's cost structure:[626]

| STEP TWO STRESS CASE REVENUE SUMMARY ($mm) | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Examiner's Base Case | $4,842.2 | $4,878.2 | $4,911.7 | $5,018.1 | $5,075.1 | $5,165.1 | $5,241.1 | $5,310.6 | $5,366.2 | $5,401.1 | $5,420.2 | $5,442.8 | $5,468.8 | $5,498.4 | $5,531.5 | $5,568.2 |
| % Growth | | 0.7% | 0.7% | 2.2% | 1.1% | 1.8% | 1.5% | 1.3% | 1.0% | 0.7% | 0.4% | 0.4% | 0.5% | 0.5% | 0.6% | 0.7% |
| Examiner's Stress Case | $4,842.2 | $4,600.1 | $4,416.1 | $4,283.6 | $4,198.0 | $4,156.0 | $4,156.0 | $4,156.0 | $4,156.0 | $4,156.0 | $4,156.0 | $4,156.0 | $4,156.0 | $4,156.0 | $4,156.0 | $4,156.0 |
| % Growth | | -5.0% | -4.0% | -3.0% | -2.0% | -1.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

| STEP TWO STRESS CASE OPERATING MARGIN SUMMARY (1) | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Examiner's Base Case | 25.1% | 25.6% | 25.9% | 25.7% | 26.1% | 26.4% | 26.8% | 27.1% | 27.4% | 27.6% | 27.8% | 28.0% | 28.2% | 28.4% | 28.6% |
| Examiner's Stress Case | 23.1% | 23.6% | 23.9% | 23.7% | 24.1% | 24.4% | 24.8% | 25.1% | 25.4% | 25.6% | 25.8% | 26.0% | 26.2% | 26.4% | 26.6% |

(1) Excludes Corporate Expenses.

These factors were modeled, in combination, to assess capital adequacy at Step Two. The results of the Examiner's analysis are set forth in the table below, and show that, under these stress conditions, Tribune has insufficient capital:

---

[624]  *See* Report at § III.H.1

[625]  The Examiner notes that these rates of annual revenue decline are not inconsistent with rates of decline considered by various advisors as discussed in the Step One capital adequacy assessment section of the Report. *See* Report at § IV.B.5.d.(9).

[626]  The Examiner's review of Tribune historical financial performance indicated the relationship.  The phenomenon is particularly true with regard to Tribune's Broadcasting Segment.

| EXAMINER'S STRESS CASE RESULTS at STEP TWO (TRIBUNE) ($mm) | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capital Adequacy Cushion | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| | $1,201.5 | $374.4 | ($232.9) | ($444.7) | ($658.1) | ($938.4) | ($1,117.8) | ($1,600.9) | ($1,731.1) | ($1,835.8) | ($1,922.4) | ($1,991.1) | ($2,042.2) | ($2,076.4) | ($2,094.5) |
| Guaranteed Leverage Ratio | 8.32 | 8.43 | 8.82 | 8.93 | 8.78 | 8.57 | 8.36 | 8.17 | 8.00 | 7.85 | 7.70 | 7.55 | 7.40 | 7.26 | 7.11 |
| Maximum Covenant Ratio | 9.00 | 8.75 | 8.50 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 |
| Interest Coverage Ratio | 1.20 | 1.23 | 1.14 | 1.09 | 1.09 | 1.11 | 1.13 | 1.15 | 1.18 | 1.21 | 1.23 | 1.25 | 1.28 | 1.30 | 1.32 |
| Minimum Covenant Ratio | 1.15 | 1.20 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |

As discussed in another part of the Report,[627] VRC prepared an assessment, dated October 29, 2007, of Tribune management's projections provided to VRC in September 2007. This work, which the Examiner previously has noted contained detailed and, in many instances, cogent analyses of Tribune's business and financial prospects, substantiates the analysis performed by the Examiner's financial advisor.[628]  As part of this assessment, VRC ran a variety of valuation scenarios to test the effect that different assumptions of Tribune future performance would have on Tribune value.  The Examiner's financial advisor identified a set of projections, prepared by VRC and labeled "VRC Downside Case," which appear to correspond closely to the downside scenario parameters discussed in memoranda prepared by VRC analysts.[629]  The nominal revenue and EBITDA estimates made by VRC, as reflected in that downside case model, were incorporated into the Examiner's cash flow test model to assess Tribune capital adequacy under stress case conditions considered by VRC in October:

| STEP TWO STRESS CASE REVENUE SUMMARY ($mm) | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Examiner's Base Case | $4,842.2 | $4,878.2 | $4,911.7 | $5,018.1 | $5,075.1 | $5,165.1 | $5,241.1 | $5,310.6 | $5,366.2 | $5,401.1 | $5,420.2 | $5,442.8 | $5,468.8 | $5,498.4 | $5,531.5 | $5,568.2 |
| % Growth | | 0.7% | 0.7% | 2.2% | 1.1% | 1.8% | 1.5% | 1.3% | 1.0% | 0.7% | 0.4% | 0.4% | 0.5% | 0.5% | 0.6% | 0.7% |
| VRC 10/28/2007 Downside | $4,856.7 | $4,688.6 | $4,565.9 | $4,486.7 | $4,433.3 | $4,397.7 | $4,362.8 | $4,328.3 | $4,294.3 | $4,260.9 | $4,228.0 | $4,195.6 | $4,163.7 | $4,132.3 | $4,101.5 | $4,071.1 |
| % Growth | | -3.5% | -2.6% | -1.7% | -1.2% | -0.8% | -0.8% | -0.8% | -0.8% | -0.8% | -0.8% | -0.8% | -0.8% | -0.8% | -0.7% | -0.7% |

---

[627]  See Report at § III.H.3.f.(2).

[628]  For reasons that the Examiner did not have an adequate opportunity to evaluate, as discussed in another part of the Report, VRC abandoned this analysis in favor of adopting, wholesale, Tribune management's projections and performing an untenable capital adequacy analysis.  See Report at § III.H.3.f.(2).

[629]  See Ex. 1004 at VRC0034820-21 and VRC003456-85 (Mednick E-Mail, dated October 31, 2007).

| STEP TWO STRESS CASE OPERATING MARGIN SUMMARY (1) | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Examiner's Base Case | 25.1% | 25.6% | 25.9% | 25.7% | 26.1% | 26.4% | 26.8% | 27.1% | 27.4% | 27.6% | 27.8% | 28.0% | 28.2% | 28.4% | 28.6% |
| VRC 10/28/2007 Downside | 23.6% | 23.9% | 23.4% | 22.8% | 21.9% | 21.9% | 22.0% | 22.0% | 22.0% | 22.1% | 22.1% | 22.2% | 22.2% | 22.3% | 22.3% |
| (1) Excludes Corporate Expenses. | | | | | | | | | | | | | | | |

When those revenue and EBITDA projections are incorporated into the Examiner's financial advisor's capital adequacy model, the results indicate inadequate capitalization as early as 2010, with deepening shortfalls in cash to meet required obligations thereafter. Moreover, by 2010, both the leverage ratio and interest coverage ratios are breached under the assumptions of VRC's downside case.

| VRC OCTOBER 28, 2007 DOWNSIDE CASE RESULTS at STEP TWO (TRIBUNE) ($mm) | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Capital Adequacy Cushion | $ 1,247.0 | $ 472.0 | ($ 100.6) | ($ 298.6) | ($ 554.8) | ($ 897.3) | ($ 1,158.7) | ($ 1,742.0) | ($ 1,987.7) | ($ 2,221.2) | ($ 2,450.1) | ($ 2,674.6) | ($ 2,894.9) | ($ 3,111.6) | ($ 3,325.5) |
| Guaranteed Leverage Ratio | 7.97 | 7.99 | 8.61 | 8.82 | 9.13 | 9.07 | 9.00 | 8.94 | 8.87 | 8.79 | 8.72 | 8.64 | 8.57 | 8.48 | 8.40 |
| Maximum Covenant Ratio | 9.00 | 8.75 | 8.50 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 |
| Interest Coverage Ratio | 1.25 | 1.29 | 1.18 | 1.10 | 1.05 | 1.05 | 1.05 | 1.06 | 1.07 | 1.08 | 1.09 | 1.09 | 1.10 | 1.11 | 1.12 |
| Minimum Covenant Ratio | 1.15 | 1.20 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |

Based on the analysis performed by the Examiner's financial advisor, which is largely corroborated by the preceding downside case analysis performed by VRC but unfortunately not adopted in its final solvency opinion, the Examiner concludes that it is highly likely that a court would find that the Step Two Transactions left Tribune without adequate capital.

**Explanation of Examiner's Conclusions - The Guarantor Subsidiaries**:

The Examiner 's financial advisor next assessed the capital adequacy of the Guarantor Subsidiaries after giving effect to the Step Two Transactions. In structure, the capital adequacy model developed by the Examiner's financial advisor makes the same assumptions as the Tribune-level model, with the following significant difference:

- The model eliminates the requirement to fund principal and interest payments associated with Tribune-only debt, including any discretionary payments associated therewith.[630]

After making this adjustment, the Examiner's financial advisor evaluated the capital adequacy of the Guarantor Subsidiaries by testing the same base case and downside case projection parameters as developed for the Tribune-level analysis discussed above.  The results, presented below, show that although under the Examiner's financial advisor's base case the Guarantor Subsidiaries would be expected to maintain compliance with debt covenants and have ample cash to meet operational and financial commitments, under the downside case the Guarantor Subsidiaries would not.

| EXAMINER'S BASE CASE RESULTS at STEP TWO (GUARANTOR SUBSIDIARIES) ($mm) | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Capital Adequacy Cushion | $ 1,194.6 | $ 695.4 | $ 932.7 | $ 949.3 | $ 1,010.3 | $ 1,078.0 | $ 1,154.5 | $ 1,234.8 | $ 1,315.7 | $ 1,404.4 | $ 1,497.7 | $ 1,600.1 | $ 1,717.2 | $ 1,839.9 | $ 2,000.1 |
| Guaranteed Leverage Ratio | 7.32 | 6.88 | 6.43 | 6.14 | 5.68 | 5.21 | 4.73 | 4.24 | 3.74 | 3.23 | 2.67 | 2.07 | 1.43 | 0.74 | 0.00 |
| Maximum Covenant Ratio | 9.00 | 8.75 | 8.50 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 |
| Interest Coverage Ratio | 1.52 | 1.67 | 1.64 | 1.67 | 1.76 | 1.87 | 2.00 | 2.16 | 2.35 | 2.62 | 2.96 | 3.45 | 4.19 | 5.46 | 9.20 |
| Minimum Covenant Ratio | 1.15 | 1.20 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |

| EXAMINER'S STRESS CASE RESULTS at STEP TWO (GUARANTOR SUBSIDIARIES) ($mm) | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Capital Adequacy Cushion | $ 1,035.4 | $ 320.7 | $ 272.3 | $ 180.8 | $ 81.7 | ($ 12.5) | ($ 98.1) | ($ 167.6) | ($ 221.5) | ($ 250.4) | ($ 261.0) | ($ 253.7) | ($ 228.9) | ($ 187.1) | ($ 129.3) |
| Guaranteed Leverage Ratio | 8.46 | 8.48 | 8.56 | 8.75 | 8.68 | 8.55 | 8.36 | 8.17 | 8.00 | 7.85 | 7.70 | 7.55 | 7.40 | 7.26 | 7.11 |
| Maximum Covenant Ratio | 9.00 | 8.75 | 8.50 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 |
| Interest Coverage Ratio | 1.33 | 1.40 | 1.29 | 1.24 | 1.23 | 1.23 | 1.24 | 1.26 | 1.28 | 1.31 | 1.33 | 1.36 | 1.38 | 1.41 | 1.43 |
| Minimum Covenant Ratio | 1.15 | 1.20 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |

The Examiner's financial advisor then tested the same previously discussed VRC downside model, taking into account Guarantor Subsidiary debt.  The results are as follows:

---

[630]    Such Tribune-only debt includes the EGI-TRB Notes, $300 million in asset-backed notes, the TMCT lease expiring in 2009, the Senior Notes, the PHONES Notes, and certain other notes and obligations.   These liabilities, for purposes of the capital adequacy model, total approximately $2.445 billion in the aggregate.  It should be noted that few of the Tribune-only assets generated meaningful cash flow.  Thus, consideration of the Guarantor Subsidiary capital adequacy did not necessitate adjustments to cash flow.

| VRC OCTOBER 28, 2007 DOWNSIDE CASE RESULTS at STEP TWO (GUARANTOR SUBSIDIARIES) ($mm) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Capital Adequacy Cushion | $ 1,080.8 | $ 418.3 | $ 403.9 | $ 335.9 | $ 205.8 | $ 59.3 | ($ 103.7) | ($ 273.3) | ($ 442.7) | ($ 600.3) | ($ 753.3) | ($ 901.8) | ($ 1,046.2) | ($ 1,187.0) | ($ 1,324.8) |
| | | | | | | | | | | | | | | | |
| Guaranteed Leverage Ratio | 8.11 | 8.04 | 8.25 | 8.50 | 8.91 | 8.99 | 9.00 | 8.94 | 8.87 | 8.79 | 8.72 | 8.64 | 8.57 | 8.48 | 8.40 |
| Maximum Covenant Ratio | 9.00 | 8.75 | 8.50 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 | 8.25 |
| Interest Coverage Ratio | 1.39 | 1.47 | 1.33 | 1.27 | 1.20 | 1.18 | 1.16 | 1.15 | 1.15 | 1.17 | 1.18 | 1.19 | 1.20 | 1.21 | 1.22 |
| Minimum Covenant Ratio | 1.15 | 1.20 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |

Albeit to a lesser degree, as is the case with Tribune, both the downside case developed by the Examiner's financial advisor and the above discussed VRC downside case scenario yield results consistent with the conclusion that the Guarantor Subsidiaries did not have adequate capital.  As a result, the Examiner concludes that it is reasonably likely that a court would find that the Step Two Transactions left the Guarantor Subsidiaries without adequate capital.  As a general matter, the key difference between the Examiner's capital adequacy analysis at Step One and Step Two is the substantial adjustments the Examiner's financial advisor made to Tribune management's October 2007 forecast, the latter of which the Examiner has found was unreasonable.  By contrast, the Examiner did not find Tribune management's February 2007 forecast unreasonable for purposes of testing capital adequacy at Step One.

### 6. Intention to Incur or Belief that the Tribune Entities Would Incur Debts Beyond Their Reasonable Ability to Pay.

#### a. The Legal Standard.

Bankruptcy Code section 548(a)(1)(B)(ii)(III) provides for the avoidance of a transfer or obligation when the debtor "intended to incur or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."[631]  Although several courts have held that this provision requires proof of the debtor's subjective intent or belief that it would incur debts beyond its ability to pay,[632] other courts have inferred the requisite intent from the

---

[631]  11 U.S.C. § 548(a)(1)(B)(ii)(III) (2006).

[632]  *See Off. Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Microdot, Ins. (In re Valley-Vulcan Mold Co.)*, 1994 Bankr. LEXIS 2347, at *13 (N.D. Ohio) (citing *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 1001 (Bankr. S.D. Ohio 1990)); *In re Taubman Realty Co.*, 160 B.R. 964, 986

facts and circumstances regarding the transfer, essentially applying an objective or reasonable person standard.[633]

### b.    Examiner's Conclusions and Explanation Concerning Application to Step One.

**<u>Examiner's Conclusions</u>:**

If a court were to apply a subjective or objective test, a court would be reasonably unlikely to find that the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured at Step One.

**<u>Explanation of Examiner's Conclusions</u>:**

For many of the same reasons discussed in the Report's analysis of the question of intentional fraudulent transfer at Step One,[634] there is insufficient evidence to support a finding that the Tribune Entities entered into Step One subjectively intending not to pay their debts as they matured.  If a court were to apply an objective test, then for all practical purposes the question is whether the Tribune Entities had adequate capital and the answer to that question likely would be the same here.

---

(Bankr. S.D. Ohio 1993) ("This prong . . . requires the court to undergo a subjective, rather than objective inquiry into the party's intent.").

[633]  *See WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File (In re WRT Energy Corp.)*, 282 B.R. 343, 415 (Bankr. W.D. La. 2001) ("While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured."); *Suburban Motorfreight*, 124 B.R. at 1001 (finding stockholders could not have reasonably believed company would have been able to pay debts as they matured).  *See also ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 399 (S.D. Tex. 2008) (applying Delaware fraudulent transfer law).

[634]  *See* Report at § IV.B.4.b.

c.    **Examiner's Conclusions and Explanation Concerning Application to Step Two.**

**<u>Examiner's Conclusions</u>**:

If a court were to apply a subjective test, a court would be somewhat likely to find that the evidence supports the conclusion that at Step Two the Tribune Entities intended to incur or believed they would incur debts beyond their ability to pay as such debts matured.  If a court were to apply an objective test on this question, however, the same answer would be given to this question and the question of capital adequacy at Step Two.

**<u>Explanation for Examiner's Conclusions</u>**:

Applying a subjective test, if a court were to agree with the Examiner's conclusion concerning intentional fraudulent transfer at Step Two, it is somewhat likely that a court would also find that the Tribune Entities believed that they would incur debts beyond their ability to pay as such debts matured.  Largely the same evidence on the question of intentional fraudulent transfer would point in the same direction on this question.  If a court were to apply an objective test, then for all practical purposes the question is whether the Tribune Entities had adequate capital and the answer to that question furnished above likely would be the same here.

### 7.    Asserted Defenses to Fraudulent Transfer Claims.

The Report turns to issues concerning defenses that might be asserted to the above-discussed fraudulent transfer claims.

#### a.    Defenses Under Bankruptcy Code section 546(e).

##### (1)    Examiner's Conclusions and Explanation Concerning Section 546(e) Defenses.

**<u>Examiner's Conclusions</u>**:

A court is highly likely to find that Bankruptcy Code section 546(e)[635] protects payments to the Selling Stockholders on account of their stockholder interests in Tribune under the Leveraged ESOP Transactions, except to the extent the transfers constitute intentional fraudulent transfer.  Whether or not intentional fraudulent transfers are involved, a court is reasonably likely to find, however, that section 546(e) does not protect against avoidance of the obligations incurred under the Credit Agreement or the Stock Pledge, guarantees, or promissory notes given in connection therewith.[636]

**<u>Explanation of Examiner's Conclusions</u>**:

Absent an intentional fraudulent transfer under Bankruptcy Code section 548(a)(1)(A),[637] which is not superseded under section 546(e), the application of the 546(e) defense to the Selling Stockholders on account of payments made under the Leveraged ESOP Transactions is straightforward.  Section 546(e) provides that a "trustee may not avoid a transfer" that is

---

[635]    11 U.S.C. § 546(a) (2006).

[636]    Because the scope of the Investigation is limited to claims and defenses asserted by the Parties, the Report does not address potential 546(e) defenses that might be asserted by other parties with respect to other payments made in the Leveraged ESOP Transactions.  Absent further order of the Bankruptcy Court expanding the scope of the Investigation, the Examiner is not permitted to consider these matters.

[637]    *Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),* 274 B.R. 71, 75 (D. Del. 2002) ("[T]he Committee is correct that section 548(a)(1) claims for intentional fraudulent transfers . . . are exempted from . . . section 546(e). . . .").

"settlement payment" and which is "made by or to (or for the benefit of) commodity broker, forward contract merchant, stock broker, financial institution, financial participant, or securities clearing agency."[638]  The Third Circuit Court of Appeals has held that section 546(e) bars recovery of payments made to selling stockholders in the context of a leveraged buyout transaction.[639]  Courts have held that the term "settlement payment" means "the transfer of cash or securities made to complete a securities transaction" and that the term "made by or to . . . a financial institution" is satisfied by a wire transfer of payment from the debtor's bank account to the selling stockholder. [640]  Courts have applied this defense to bar recovery of payments in a leveraged buyout even from significant selling stockholders, including insiders.[641]

The payments made to the Selling Stockholders in the Leveraged ESOP Transactions were effectuated by wire transfers through a financial institution, and, under applicable Third Circuit law, those transfers likely are insulated from avoidance or recovery absent the successful prosecution of a claim for intentional fraudulent transfer under Bankruptcy Code section 548(a)(1)(A).  Although the court in *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*[642] recently stated that "section 546(e) does not apply to 'collapsed' transactions," that statement would not support a different conclusion regarding the payments made to the Selling Stockholders.  The *Mervyn's* case arose out of a scheme to strip the real

---

[638]  11 U.S.C. § 546(e) (2006).

[639]  *See Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258-59 (3d Cir. 2009); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l Inc.)*, 181 F.3d 505, 514-16 (3d Cir. 1999); *see also PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 606-07 (D. Del. 2003), *aff'd sub nom. PHP Liquidating Trust, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 F. App'x 839 (3d Cir. 2005).  *Accord In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240 (10th Cir. 1991).

[640]  *Resorts Int'l*, 181 F.3d at 515; *see also Off. Comm. of Unsecured Creditors of IT Group, Inc. v. Acres of Diamonds, L.P. (In re IT Group, Inc.)*, 359 B.R. 97, 99-102 (Bankr. D. Del. 2006).

[641]  *See Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 367-70 (W.D. Pa. 2006) (suit against inside stockholders in LBO similar to this case); *Hechinger*, 274 B.R. at 87; *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 394 B.R. 760, 763-64 (Bankr. D. Del. 2008); *Loranger Mfg. Co. v. PNC Bank (In re Loranger Mfg. Corp.),* 324 B.R. 575, 585-86 (Bankr. W.D. Pa. 2005).

[642]  426 B.R. 488, 500 (Bankr. D. Del. 2010).

estate assets out of the debtor, Mervyn's LLC, a wholly owned subsidiary of Target Corporation, and to sell those assets to a group of three private equity firms.  In considering the section 546(e) defense, the bankruptcy court reasoned that the protection afforded by that statutory provision could not be extended to encompass steps not involving settlement payments that had actually inflicted the damage and had driven the debtor into bankruptcy.[643]  In contrast to the facts of that case, any action to recover the payments made to the Selling Stockholders would not be based on an interim conveyance, but on the final and core transaction protected by Section 546(e)–*i.e.*, the payment of funds to stockholders in return for or on account of their securities.  Regardless, the *Mervyn's* court's blanket suggestion that section 546(e) does not apply to collapsed transactions is at odds with the applicable law in the Third Circuit.[644]  In sum, unless the transfers in question are avoided as intentional fraudulent transfers under Bankruptcy Code section 548(a)(1)(A), payments to Selling Stockholders cannot be avoided under the Bankruptcy Code's avoiding powers.

The possible application of section 546(e) to bar constructive fraudulent transfer avoidance of the obligations incurred under the Credit Agreement as well as the Stock Pledge requires a finer analyses.  Because the obligations incurred and security interests granted to the LBO Lenders are not settlement or margin payments, the application of section 546(e) in this instance depends on the amendments to section 546(e) enacted in the Financial Nettings Improvement Act of 2006.  Because of that Act, section 546(e) currently provides:[645]

---

[643]  *Id.* ("Target's attempt to have this Court apply section 546(e) to a single conveyance within the entire transaction is not persuasive.").

[644]  Section 546(e) has been applied on numerous occasions to protect payments to stockholders in LBO cases in which the various transactions might otherwise have been collapsed.  *See In Resorts Int'l*, 181 F.3d at 515 & n.7; *Hechinger*, 274 B.R. at 83-89.

[645]  11 U.S.C. § 546(e) (2006) (changes in emphasis), adopted under Financial Netting Improvements Act of 2006 § 5(b), Pub. L. No. 109-390, 120 Stat. 2697 (Dec. 12, 2006).

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (*or for the benefit of*) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, *or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract*, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

The case for application of expanded section 546(e) as a complete defense to a constructive fraudulent transfer action to avoid the obligations under the Credit Agreement as well as the Stock Pledge requires a demonstration of four elements: (1) the broad definition of "transfer" under Bankruptcy Code section 101(54)(D), which encompasses "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with—(i) property; or (ii) an interest in property,"[646] extends to the obligations incurred under the Credit Agreement, the Stock Pledge, and the guarantees and promissory notes in connection therewith; (2) the Credit Agreement Agent and the other lenders under the Credit Agreement are financial institutions, financial participants and/or stockbrokers for purposes of section 546(e);[647] (3) either or both of the Merger Agreement and the Credit Agreement constituted a "securities contract;"[648]

---

[646]  11 U.S.C. § 101(54)(D) (2006).

[647]  A "financial institution" includes, *inter alia*, "an entity that is a commercial or savings bank . . .; or an investment company registered under the Investment Company Act of 1940." *See* 11 U.S.C. § 101(22) (2006). The term "financial institution" also includes any "customer" of such an institution when the institution is acting as an "agent . . . in connection with a securities contract." *Id.* Similarly, a "financial participant" includes any entity with certain minimum levels of particular kinds of financial activity. *See* 11 U.S.C. § 101(22A) (2006).

[648]  Congress expanded the definition of "securities contract" when it enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") § 907(a)(2), Pub. L. 109-8, 119 Stat. 173 (2005) to include, inter alia, "(i) a contract for the purchase, sale, or loan of a security; . . . (iv) any margin loan; . . . (v) any extension of credit for the clearance or settlement of securities transactions; . . . (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph . . . ; (xi) any . . . other credit enhancement related to any agreement referred to in this subparagraph, including any guarantee . . . ." 11 U.S.C. § 741(7)(A) (2006). Prior to enactment of BAPCPA, the definition of "securities contract" under section 741 was limited to a "contract for the purchase, sale, or loan of a security, including an option for the purchase

and (4) the obligations, the Stock Pledge, and the guarantees and promissory notes in connection therewith all were transfers made "in connection with" a "securities contract."[649]

No reported decision has interpreted revised section 546(e) in the context asserted here. The bankruptcy court in *Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing, Ltd.)*,[650] made passing reference to the amendments, but nothing more. A similar acknowledgment in *Collier* that Congress broadened the scope of section 546(e) is equally unenlightening.[651]    The fact that Congress expanded section 546(e) in certain respects does not answer whether those changes are relevant to the instant dispute.  The legislative history to this amendment is limited and, despite the Parties' vigorous advocacy, does not illuminate the question posed.[652]    Thus, ordinary tools of statutory construction must be deployed to address this question.

---

or sale of a security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any option entered into on a national securities exchange relating to foreign currencies, or the guarantee of any settlement of cash or securities by or to a securities clearing agency."  11 U.S.C. § 741(7) (2000).  The House Report on the legislation enacting these changes furnishes little explanation regarding these changes. The discussion of clause (v) covering "extensions of credit" states the amendment was "intended to confirm that the definition encompasses credit extended for the execution, clearance and settlement of securities transactions, which provide important liquidity to the securities markets."  *See* H.R. Rep. No. 109-648 (2006) *as reprinted in* 2006 U.S.C.C.A.N. 1585, 1589.  Of course, this does not address whether the term was intended to cover a loan made to a borrower to redeem its own publicly held stock, and, on the contrary, the natural reading of the clause suggests a much more narrow construction.

[649]    *Casa de Cambio Magapara, S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Magapara)*, 390 B.R. 595, 597-99 (Bankr. N.D. Ill. 2008) (finding that "prejudgment attachments were obtained 'in connection with' swap agreement"); *Interbulk, Ltd. v. Louis Drefus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ("A natural reading of 'in connection with' suggests a broad meaning similar to 'related to.'") (citations omitted).

[650]    385 B.R. 52, 57 (Bankr. S.D.N.Y. 2008) ("[L]ater amendments to the Code—inapplicable to this transaction but instructive as to what Congress was thinking about—broaden that definition and section 546(e)'s safe harbor . . .").

[651]    5 COLLIER ON BANKRUPTCY ¶ 546.06, at n.14 (Alan A. Resnick & Henry J. Sommers eds., 16th ed.).

[652]    The legislative history stated that this was a "technical and clarifying change[.]" H.R. Rep. No. 109-648, pt. 1, at 6-7 (2006), *as reprinted in* 2006 U.S.C.C.A.N. 1585, 1591-92.  *See Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC*, 556 F.3d 247, 257 (4th Cir. 2009) (noting that the revisions to the definitions as part of the Financial Netting Improvement Act of 2006 were "technical and clarifying changes.").  *See also In re Lehman Bros. Holdings, Inc.*, 2010 Bankr. LEXIS 1260, *25-26 (Bankr. S.D.N.Y. May 5, 2010) (rejecting contention that 2006 amendments eliminated requirement of mutuality from the automatic stay exceptions found in Bankruptcy Code section 362(d) and stating that "[t]he legislative history of FNIA reveals that

For this defense to succeed, each component of the above-summarized argument (i.e., (1) - (4)) must hold up.  If any one does not, the defense fails.  The Examiner finds that the defense does not make it past its first element—that the obligations incurred under the Credit Agreement resulting from the advances of loans by the lenders thereunder constituted a "transfer" within the meaning of the Bankruptcy Code.  The plain language of Bankruptcy Code section 546(e) simply does not protect obligations that are avoidable under sections 544 and 548.  Moreover, although the Bankruptcy Code's definition of "transfer" is indisputably broad, the term does not encompass an "obligation," whether or not embodied in an instrument (e.g., promissory note or loan agreement) delivered to a "stockbroker, financial institution [or] financial participant."

The most cursory reading of the Bankruptcy Code shows that the term "transfer" and "obligation" are not one and the same.  Bankruptcy Code sections 544 and 548, for example, specify two distinct avoidance powers:  the avoidance of a transfer and the avoidance of an

---

Congress intended merely to make "technical changes to the netting and financial provisions" of the Bankruptcy Code to "update the language to reflect current market and regulatory practices" and that "[t]hese technical amendments cannot be read as authority for so fundamental a change in creditor rights") (internal citations omitted).  The general purpose of the 2006 amendments was described as follows:

> H.R. 5585 makes technical changes to the netting and financial contract provisions incorporated by the [2004 Amendments] to update the language to reflect current market and regulatory practices, and help reduce systemic risk in the financial markets by clarifying the treatment of certain financial products in cases of bankruptcy or insolvency.

H.R. Rep. No. 109-648 (2006) *as reprinted in* 2006 U.S.C.C.A.N. 1585, 1591-92.  The legislative history specific to section 546(e) stated that the language was amended to conform to section 546(f).

> Section 5(b) amends Sections 546(e) and 546(f) of the Bankruptcy Code, which protect margin payments and settlement payments, to also protect transfers made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, securities clearing agency, or repo participant, in connection with a securities contract, commodity contract, forward contract, or repurchase agreement.  This amendment conforms the language of Sections 546(e) and 546(f) to the language in 546(g), regarding the protection of transfers in connection with swap agreements.

*Id.* at 8.

Statements from the House floor are not particularly illuminating.  *See* 152 CONG. REC. H7601 (daily ed. Sept. 27, 2006) (statement of Rep. Schultz) ("The primary goal of our legislation is to minimize systemic risks in situations when the procedure for resolving a single insolvency could trigger other failures elsewhere in the market."); 152 CONG. REC. H8651 (daily ed. Nov. 15, 2006) (statement of Rep. Baker) ("[T]here is considerable market uncertainty as to how a bankruptcy . . . would affect market liquidity.  The unwinding of these obligations . . . go[es] to the broader financial marketplace.").

obligation.[653]  If an obligation always were a transfer, the separate references to an obligation in

these sections alone would be a surplusage.[654]  "The fraudulent conveyance essentially has to do

with the consummated effort of the debtor to pass the asset beyond the creditor's reach by means

of creating an alien interest in it."[655]  In contrast, the incurring of an obligation for less than

reasonably equivalent value increases the claims against property in the debtor's hands.  There is

simply no transfer out.  Thus, Bankruptcy Code section 551 provides that an avoided transfer "is

preserved for the benefit of the estate."[656]  There is no reason to "preserve" an avoided obligation

because, by definition, avoidance of an obligation correspondingly reduces the debtor's liabilities

proportionate to the commission of a constructive or actual fraud.[657]  Likewise, Bankruptcy Code

section 550(a) provides that to the extent a transfer is avoided, the estate representative may

recover "the property transferred, or if the court so orders, the value of such property . . . ."[658]

There is nothing to "recover" when an obligation is avoided.

   The cornerstone of a transfer, within the meaning of Bankruptcy Code section 101(54), is

an interest in property, whether in the form of a lien, retention of title, a debtor's equity of

redemption, or otherwise, which is then disposed of in some fashion.[659]  In contrast, an

---

[653]   11 U.S.C. §§ 544(b)(1) and 548(a)(1) (2006).

[654]   *See Rake v. Wade*, 508 U.S. 464, 471 (1993) ("To avoid deny[ing] effect to a part of a statute, we accord significance and effect . . . to every word.") (internal citations omitted); *Hoffman v. Conn. Dep't of Income Maint.*, 492 U.S. 96, 103 (1989) ("It is our duty to give effect, if possible, to every clause and word of a statute. . . .") (citations omitted).

[655]   GARRARD GLENN, THE LAW OF FRAUDULENT CONVEYANCES § 3, at 5 (1931).

[656]   11 U.S.C. § 551 (2006).

[657]   11 U.S.C. § 548(a), (c) (2006).

[658]   11 U.S.C. § 550(a) (2006); *see Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d 719, 726 (4th Cir. 2005) (noting the distinction in context of section 544).

[659]   11 U.S.C. §101(54) (2006); *see also Barber v. Dunbar (In re Dunbar)*, 313 B.R. 430, 435 (Bankr. C.D. Ill. 2004) ("The hallmark of a 'transfer' is a change in the rights of the transferor with respect to the property after the transaction.") (citations omitted); *Towers v. U.S. Dep't of Treasury (In re Feiler)*, 218 B.R. 957, 962 (Bankr. N.D. Cal. 1998) (treating debtor's election to carry forward NOL's as a transfer), *aff'd*, 218 F.3d 948 (9th Cir. 2000).

obligation is a duty imposed by contract, law, or the moral universe.[660]   A right to payment starts

its life as an obligation to pay something to someone else; when that obligation is honored and

funds move from one party's hands to another, a transfer on account of the obligation occurs, but

the fact that an obligation may give rise to a transfer does not make an obligation a transfer.   The

two are very different things.   *Barnhill v. Johnson*[661] illustrates the distinction nicely.   There, a

debtor delivered a check outside the 90-day preference period, but the drawee bank honored the

check during the preference period.   To determine when the transfer occurred for purposes of

Bankruptcy Code section 547, the Court distinguished between a transfer and a right to payment

embodied in a chose in action:[662]

> We acknowledge that § 101(54) adopts an expansive definition of
> transfer, one that includes "every mode . . . absolute or conditional
> . . . of disposing of or parting with property or with an interest in
> property."  *There is thus some force in petitioner's claim that he
> did, in fact, gain something when he received the check.  But at
> most, what petitioner gained was a chose in action against the
> debtor.  Such a right, however, cannot fairly be characterized as a
> conditional right to property," § 101(54), where the property in
> this case is the account maintained with the drawee bank.*  For as
> noted above, until the moment of honor the debtor retains full
> control over disposition of the account and the account remains

---

[660]   *See also Black's Law Dictionary* 1104 (8th ed. 2004) (defining obligation as "anything that a person is bound to do or forbear from doing, whether the duty is imposed by law, contract, promise, social relations, courtesy, kindness, or morality").

[661]   503 U.S. 393 (1992).

[662]   *Id.* at 400-01 (emphasis added).  The bankruptcy court in *In re Asia Global Crossing, Ltd.*, 333 B.R. 199 (Bankr. S.D.N.Y. 2005) fleshed out these principles.  In that case, 360networks prepaid $100 million to GC Bandwidth for "telecommunications capacity"; the debtor, Asia Global, guaranteed GC Bandwidth's performance of its obligations.  *Id.* at 201.  360networks never received the telecommunications capacity and, when Asia Global filed for bankruptcy, it filed a $100 million proof of claim.  *Id.*  Asia Global's trustee objected to the claim pursuant to Bankruptcy Code section 502(d), which disallows the claim of a transferee of an avoidable transfer but does not speak to the obligee of an avoidable obligation.  The court held that section 502(d) was inapplicable:

> Like the check in *Barnhill*, the Guaranty gave 360networks a chose in action against Asia
> Global, conditioned on the default by GC Bandwidth.  It did not grant 360networks any interest
> in or right to Asia Global's property.  As such, it was an "obligation" rather than a "transfer"
> within the meaning of § 101(54).

*Id.* at 203; *see also Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 661 (7th Cir. 1992) ("Although a note or guarantee is not a "transfer" for purposes of 11 U.S.C. § 101(54) . . .  either is an obligation.") (internal citation omitted).

> subject to a variety of actions by third parties.  To treat petitioner's
> nebulous right to bring suit as a "conditional transfer" of the
> property would accomplish a near-limitless explanation of the term
> "conditional."  In the absence of any right against the bank or the
> account, we think the fairer description is that petitioner had
> received no interest in debtor's property, not that his interest was
> "conditional."

A contractual right is a species of an obligation.  Its lineage and the protections to which

a holder of such right is entitled under bankruptcy law are distinct from an interest in property of

the debtor and the rights of a holder of an interest in property of the debtor:[663]

> An unsecured simple contract creditor has, in the absence of
> statute, no substantive right, legal or equitable, in or to the property
> of his debtor. This is true, whatever the nature of the property; and,
> although the debtor is a corporation and insolvent.  The only
> substantive right of a simple contract creditor is to have his debt
> paid in due course.  His adjective right is, ordinarily, at law.  He
> has no right whatsoever in equity until he has exhausted his legal
> remedy.  After execution upon a judgment recovered at law has
> been returned unsatisfied he may proceed in equity by a creditor's
> bill.

When a property interest is involved, in contrast, important constitutional considerations,

not to mention substantive Bankruptcy Code protections, arise and must be addressed.[664]  The

object of a transfer is the disposition of a property interest, not an obligation.  Indeed, the

Bankruptcy Code does not even refer to the holder of an obligation as a "transferee" but rather an

---

[663] *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 497 (1923); *see also Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 509-10 (1942) ("In effect, therefore, the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power.  The only remedy for the enforcement of such a claim is a mandamus to compel the levying of authorized taxes."); GLENN at footnote 655, § 9, at 15-16 ("The relation of debtor and creditor embodies nothing but the right to sue, and the right to defend on the merits.  Until the creditor gets judgment, he has no right to touch or interfere with any of the debtor's assets.") (citations omitted).  *See also* 11 U.S.C. §§ 361, 363(f) (2006).

[664] The limitations, however, are limited indeed.  *See generally Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 518 (1938) ("Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law.  Most property rights are so created and protected.  But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect these property rights, provided the limitations of the due process clause are observed."); *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440, 470 (1937).  On the other hand, the substantive rights afforded under the Bankruptcy Code on account of interests in property are significant.

"obligee."[665]  To label the incurrence of an obligation a "transfer," therefore, is the equivalent of mixing an apple and an orange.

Sometimes, a principle is so basic to the fabric of bankruptcy law that it is difficult to find a case stating the obvious, but on the rare occasion when courts have paused to consider the point, they have recognized that an obligation and transfer are not the same thing.[666] Regrettably, two courts blurred the distinction between these concepts, although the references were passing and the opinions are unlikely to be followed in this context (or any other when the distinction between a transfer and an obligation actually would make a difference).[667]

Because section 546(e) itself contains no other definition of the term "transfer," the logical conclusion is that this term means the same in that section as it does elsewhere in the Bankruptcy Code. [668]  By its terms, therefore, section 546(e) only protects transfers, as defined in

---

[665]  11 U.S.C. § 548(c) (2006).

[666]  *Covey Commercial Nat'l Bank*, 960 F.2d 657, 661 (7th Cir. 1992) ("Although a note or guarantee is not a 'transfer' for purposes of 11 U.S.C. § 101(54), both note and guarantee are obligations (internal citations omitted); *Asia Global Crossing*, 333 B.R. at 204 (stating that a guaranty is a "chose in action" and incurrence of such liability does not constitute a "transfer" within the meaning of Bankruptcy Code section 101(54)); *In re Garden Ridge*, 323 B.R. 136, 141 (Bankr. D. Del. 2005) ("The code does not specifically define 'obligation,' however, the Third Circuit held that 'the most straightforward understanding of an obligation is something that one is legally required to perform under the terms of the lease and that such an obligation arises when one becomes legally obligated to perform.'") (citing *Centerpoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holdings Corp.)*, 268 F.3d 205, 209 (3d Cir. 2001)).  The distinction has been recognized under other federal statutes as well.  *See Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 971-73 (9th Cir. 2008) (applying 12 U.S.C. § 1828(u)(1) to resolve the question whether that statute applied to "obligations" and rejecting such contention).

[667]  *See Belfance v. Buonpane (In re Omega Door Co.)*, 399 B.R. 295, 304 (B.A.P. 6th Cir. 2009) (applying Ohio law and only analogizing to Bankruptcy Code); *In re Taubman*, 160 B.R. 964, 982 (Bankr. S.D. Ohio 1993) (finding that "false profits" payments made by debtor in Ponzi scheme constituted transfers of the debtor's property under the Bankruptcy Code, where by "checks, cashier's check, or by transfer of other property, including real estate conveyances as well as the incurrence of obligations pursuant to promissory notes and agreements").

[668]  *See Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."); *Comm. of Equity Sec. Holders of Fed.-Mogul Corp. v. Off. Comm. of Unsecured Creditors (In re Fed. Mogul-Global, Inc.)*, 348 F.3d 390, 407 (3d Cir. 2003) ("It is well established that 'identical words used in different parts of the same act are intended to have the same meaning.'") (citations omitted).  Although no rule of construction, let alone this one, is dispositive, it would be illogical to assume that Congress intended a different meaning for the term "transfer" in section 546(e) without specifying a different definition of the term in that section.  *See* 11 U.S.C. § 101 (2006) ("In this title the following definitions shall apply . . . .").

the Bankruptcy Code, from the avoidance actions enumerated in that provision.  Moreover, there

is no principled distinction between the delivery of the check in *Barnhill* and the delivery of

promissory notes and guarantees here.  There was no transfer at the time of delivery in *Barnhill*

and thus there is no transfer at the time of delivery of the promissory notes and guarantees here.

Because an obligation is not protected under the plain language of the statute, an action to avoid

an obligation as a fraudulent transfer should remain viable notwithstanding section 546(e).

      This analysis also addresses the status of the Stock Pledge, which of course is a "transfer"

within the meaning of Bankruptcy Code section 101(54).  A security interest, however, is only as

valid as the obligation it secures, and a lien that secures no obligation is a nullity.  Stated

otherwise, an "avoided obligation is rendered unenforceable."[669]  A claim unenforceable against

the debtor and its property therefore cannot be an "allowed claim" or a "secured claim" within

the meaning of the Bankruptcy Code.[670]  The security has no remaining status in the bankruptcy

case.  Thus, although a lien is a form of transfer, as is a payment, the lien's continued validity

depends on the validity of the obligation it secures.  This is in contrast to a settlement payment,

which is fully effectuated when made and, in any event, expressly protected under section

546(e).  Unlike a lien securing an obligation or a promissory note evidencing one, a transfer

constituting a payment is not rendered void if the obligations satisfied by such payment are

avoided:  the transfer itself must be avoided and then recovered.[671]  The Stock Pledge here only

existed to secure the obligations under the Credit Agreement and is meaningless except as

---

[669]   *Asia Global Crossing*, 333 B.R. at 202.

[670]   11 U.S.C. § 502(b)(1) (2006) (a claim is not allowed if it "is unenforceable against the debtor and property of the debtor"); § 506(a)-(b) ("[t]o the extent that an *allowed secured claim* is secured by property, the value of which . . . .") (emphasis added); § 506(d) ("[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void . . . ."); *see also Dewsnup v. Timm*, 502 U.S. 410, 416 (1992).

[671]   *See* 11 U.S.C. § 548(a)(1) (2006) (distinguishing between avoidance of obligations and transfers).  *See also Enron Corp. v. Bear, Stearns Int'l, Ltd.*, 323 B.R. 857, 877 (Bankr. S.D.N.Y 2005) (finding section 546(e) settlement payment defense not available if underlying obligations are void, but distinguishing between a void and voidable obligation).

security for the Credit Agreement Debt.  If the Credit Agreement Debt is avoided, the Stock

Pledge secures nothing.  In sum, section 546(e) affords no protection for the Credit Agreement

Debt or any security, promissory notes, or guarantees given in connection therewith.  A very

different conclusion would follow had section 546(e) been drafted to cover not just transfers but

obligations.

The preceding statutory construction nevertheless may be criticized for rendering the

2006 amendments to section 546(e) *per se* inoperative as applied to transfers in favor of lenders

"in connection with" a leveraged buyout transaction involving a securities transaction, thereby

allegedly violating the very rule of statutory construction used to unravel this defense in the first

place:  namely, that every provision of a statute must be given effect.[672]  So the criticism goes:

avoiding an obligation under section 548 would render the very transfer (*i.e.*, the liens securing

that obligation, and any promissory notes given) a nullity, notwithstanding the protection that

section 546(e) provides and the supremacy of that protection over the avoidance provisions

enumerated in that section.  The Examiner emphatically disagrees with this critique.  Assuming

for the sake of argument that section 546(e) applies to extensions of credit in leveraged buyout

transactions, the conclusion that the statute does not protect avoidable obligations incurred to

those lenders (or liens securing them) does not render the 2006 amendments superfluous.

Applying the plain language, section 546(e) protects a transfer notwithstanding the fact that such

transfer might otherwise be avoidable under the enumerated avoidance provisions, but it offers

no protection for the underlying obligation.  What this means is that if a transfer that is protected

under section 546(e) is made on account of an *unavoidable* obligation, the transfer is sacrosanct.

If not, it is not.

---

[672]    *See* footnote 654.

The following illustration makes the point concretely:  Suppose "in connection with" a leveraged buyout and securities transaction, the lender advancing the funds to cash out existing stockholders successfully insists that the debtor secure both the new advances and the lender's unsecured preexisting debt.  The debtor files bankruptcy within 90 days of the transfer.  The transfer on account of the preexisting debt is avoidable as a preference under Bankruptcy Code section 547, but as long as the *obligation* that was secured is unavoidable—and again provided the other prerequisites to section 546(e) are satisfied—under its plain terms, section 546(e) protects the transfer against avoidance.  Section 546(e) takes primacy over avoidance under section 547, but if that transfer is on account of an avoidable obligation, section 546(e) affords no protection because the transfer is only as valid as the obligation it continues to secure:  if the obligation is avoided, the lien falls on its own accord by application of the avoidance statute, sections 502 and 506, and general nonbankruptcy law.  To the extent the obligations are avoided, therefore, section 546(e) offers no protection.[673]  As the language of section 546(e) is plain and the legislative history gives no reason to deviate from the statute's plain meaning,[674] there is no basis on which to deviate from these conclusions.

The Examiner concludes that it is reasonably unlikely that a court would find that section 546(e) affords the protection that certain of the LBO Lenders assert.  Because the Examiner finds

---

[673]  A separate question arises whether, if the other predicates to application of section 546(e) are met here, payments made to certain LBO Lenders on LBO Fees at the time of the Leveraged ESOP Transactions would be recoverable if the underlying obligations and liens are subsequently avoided.  The Parties did not present, and therefore the Examiner expresses no opinion on, this question.  Instead, the Parties only presented the question whether section 546(e) protects the obligations incurred to the LBO Lenders.

[674]  *In re Lehman Bros. Holdings, Inc.*, 2010 Bankr. LEXIS 1260, at *25-26 (Bankr. S.D.N.Y.  May 5, 2010) (noting the technical nature of the amendments implemented by the act).  The contention of certain Parties that the Congress' intent in the 2006 amendments was to avoid the "systemic risks" faced by financial institutions that make credit extensions for purposes of enabling borrowers to redeem stock, or for other transactions involving settlement payments, is rank speculation.

that element (1) of the above-noted argument is lacking, there is no need to consider the remaining components.

> **(2)     Examiner's Conclusions and Explanation Concerning the Question of a Section 546(e) "Work-Around."**

**Examiner's Conclusions**:

Questions concerning the viability of potential mechanisms whereby individual creditors or a creditor trust may assert causes of action otherwise insulated from recovery under Bankruptcy Code section 546(e) are outside the scope of the Investigation.

**Explanation of Examiner's Conclusions**:

Certain Parties contended that, whether directly or by analogy, the estates could abandon to individual creditors and/or vest in a creditor trust established under a plan of reorganization the rights to pursue fraudulent transfer claims that might otherwise be protected under Bankruptcy Code section 546(e).  Relinquishment of the claims allegedly would enable individual creditors to assert state law fraudulent transfer claims unburdened by section 546(e),[675] whereas establishment of a creditor trust under a plan would allow for a single representative to amalgamate and prosecute these claims.  Certain other Parties argued that these mechanisms could not be accomplished consistent with law.[676]  Because Question One solely encompasses "potential claims and causes of action held by the Debtors' estates" and does not

---

[675] *See generally In re Haugen Constr. Serv., Inc.*, 104 B.R. 233, 240 (Bankr. D.N.D. 1989) (stating that trustee has discretion to utilize remedies provided for in the Bankruptcy Code avoidance provisions and in determining whether to pursue such actions trustee must consider factors such as "the factual and legal merits of the prospective action; the probable value of the recovery to the estate; the probable cost of the action to the estate"); *In re V. Savino Oil & Heating Co.*, 91 B.R. 655, 656 (Bankr. E.D.N.Y. 1988) ("[A] trustee or debtor-in-possession has a substantial degree of prosecutorial discretion to sue or not to sue.").

[676] *See, e.g., In re R-B-Co.*, 59 B.R. 43, 45 (Bankr. W.D. La. 1986) ("The Court does not believe that abandonment can be used, as a means of effecting a transfer of title, even if placed in the Plan of Reorganization.  Under section 554, upon abandonment, the trustee or debtor-in-possession is simply divested of control of the property because it is no longer property of the estate.").

fairly include commenting on what might or might not be included in a plan of reorganization not yet on file, the Examiner refrains from opining on these matters.

### b.    Good Faith Defenses at Step One and Step Two.

#### (1)    Bankruptcy Code Section 548—The Legal Standard.

<u>Examiner's Conclusions</u>:

A court is highly likely to adopt an objective test for good faith under Bankruptcy Code section 548 and measure good faith at the time the Tribune Entities incurred the obligations subject to challenge.

<u>Explanation of Examiner's Conclusions</u>:

Whether considered in the "totality of circumstances," in the determination of reasonably equivalent value under Bankruptcy Code section 548(a)(1), or, more properly, in assessing a defense to avoidance under section 548(c),[677] the good faith of each transferee must be evaluated. Courts have adopted different tests and approaches to measure good faith.[678] Although the Third Circuit Court of Appeals has not specifically addressed the standard in applying section 548, in *Wasserman v. Bressman (In re Bressman)*,[679] a case involving the closely-analogous consideration of good faith under Bankruptcy Code section 550(b)(1),[680] the court endorsed the

---

[677]    *See* Report at § IV.B.5.b.

[678]    *See In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994) ("Moreover, the courts have varied widely in the general approach they have taken in deciding questions of good faith in the context of fraudulent conveyance law."); *Brown v. Third Nat'l Bank (In re Sherman),* 67 F.3d 1348, 1355 (8th Cir. 1996) ("Good faith is not susceptible of a precise definition and is determined on a case-by-case basis.").

[679]    327 F.3d 229 (3d Cir. 2003).

[680]    11 U.S.C. § 550(b)(1) (2006) (defense for subsequent transferee "that takes for value . . . , in good faith, and without knowledge of the voidability of the transfer avoided.").

now widely-accepted standard adopted by the Eighth Circuit Court of Appeals under section

548(c):[681]

> No one supposes that knowledge of voidability means complete
> understanding of the facts and receipt of a lawyer's opinion that
> such a transfer is voidable; some lesser knowledge will do.
> Accordingly, we believe that a transferee has knowledge if he
> knew facts that would lead a reasonable person to believe that the
> property transferred was recoverable.  In this vein, some facts
> suggest the underlying presence of other facts.  If a transferee
> possesses knowledge of facts that suggest a transfer may be
> fraudulent, and further inquiry by the transferee would reveal facts
> sufficient to alert him that the property is recoverable, he cannot sit
> on his heels, thereby preventing a finding that he has knowledge.
> In such a situation, the transferee is held to have knowledge of the
> voidability of the transfer.

Under the "objective" test for measuring good faith, the court determines "what the

transferee knew or should have known 'such that a transferee does not act in good faith when it

has sufficient knowledge to place it on inquiry notice of the voidability of the transfer.'"[682]  "[A]

transferee cannot stick its head in the sand, clinging to its subjective belief while purporting to

---

[681]  327 F.3d at 236-37 (quoting *In re Sherman*, 76 F.3d 1348, 1357 (8th Cir. 1995)) (internal citations and quotations omitted).  *See also Chorost v. Grand Rapids Factory Showrooms, Inc.*, 77 F. Supp. 276, 281 (D.N.J. 1948) (avoiding transfer because "the facts and circumstances of the transaction were sufficient to put the reasonably prudent person on inquiry"), *aff'd*, 172 F.2d 327 (3d Cir. 1949); *Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.)*, 2007 Bankr. LEXIS 4004, at *25 (Bankr. D. Del. Nov. 20, 2007) (stating that the Third Circuit has established that the "[good faith] defense is not available if the transferee has knowledge of facts that would lead a reasonable person to believe that the property was recoverable by a debtor").

[682]  *See Roeder v. Lockwood (In re Lockwood Auto Grp., Inc.)*, 2010 Bankr. LEXIS 1377, at *12-13 (Bankr. W.D. Pa. May 14, 2010) (stating that "good faith is determined according to an objective or 'reasonable person' standard"); *Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 U.S. Dist. LEXIS 24559, at *25-26 (W.D. Pa. Mar. 26, 2009); *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203 (Bankr. D.N.J. 2006) (quoting *In re Burry*, 309 B.R. 130, 136 (Bankr. E.D. Pa. 2004)); *see also Jobin v. McKay (In re M&L Bus. Mach. Co.)*, 84 F.3d 1330, 1334, 1335-36 (10th Cir. 1996) ("The presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment."); *Bayou Accredited Fund, LLC v. Redwood Growth Partners (In re Bayou Grp., LLC)*, 396 B.R. 810, 844-45 (Bankr. S.D.N.Y. 2008) (concluding that federal courts have reached a consensus that "good faith" under the Bankruptcy Code provisions is determined according to an "objective" or "reasonable person" standard and not on the subjective knowledge or belief of the transferee, and that under this standard the courts look to what the transferee objectively 'knew or should have known'").

ignore signs of fraud or insolvency on the part of the transferor."[683]  Thus, in *Brown v. Third National Bank (In re Sherman)*,[684] the court held that "a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency."

"The presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment."[685]  "The rule does not require that the 'red flag' be of such specificity as to put the recipient on 'inquiry notice' of the actual fraud, or embezzlement, or looting, or whatever ultimately proves to be the cause of loss.  It is sufficient if the red flag puts the investor on notice of some potential infirmity in the investment such that a reasonable investor would recognize the need to conduct some investigation."[686]  "In order to prove 'good faith,' that 'diligent investigation' must ameliorate the issues that placed the transferee on inquiry notice in the first place."[687]

---

[683]   *Moglia v. Universal Auto., Inc. (In re First Nat'l Parts)*, 2000 U.S. Dist. LEXIS 10420, at *19 (N.D. Ill. July 12, 2000); *see, also HBE Leasing Corp. v. Frank*, 48 F.3d 635, 637 (2d Cir. 1995) ("Under the circumstances, [transferee's] failure to inquire represented a conscious turning away from the subject.").

[684]   *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995).

[685]   *M & L Bus. Mach. Co.*, 84 F.3d at 1335 (quoting 4 COLLIER ON BANKRUPTCY ¶ 548.07[2] at 548-72 (Lawrence P. King ed., 15th ed. 1996)).  The court in *Jobin* also noted that "a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." *Id.* at 1336 (citing *Sherman*, 67 F.3d at 1355).  Under the objective test, however, the actual knowledge of the transferee is not rendered irrelevant.  *See In re First Nat'l Parts Exch., Inc.*, 2000 U.S. Dist. LEXIS 10420, at *19-25 (N.D. Ill. July 12, 2000) (stating that a good faith analysis should weigh both subjective good faith and the objective basis for that good faith); *Bayou Grp.*, 396 B.R. at 849 ("[T]o disregard objective evidence of the transferee's subjective good faith intent would fundamentally distort the concept of good faith.").

[686]   *Bayou Grp.*, 396 B.R. at 848.

[687]   *Id.* at 846; *see also Lockwood Auto Grp., Inc.*, 2010 Bankr. LEXIS at *12-13 ("[O]nce a transferee is on notice of suspicious circumstances regarding a transfer, it is obliged to conduct a diligent investigation which must 'ameliorate' the issues that placed it on inquiry notice in the first place."); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 660 (Bankr. M.D. Fla. 2002).

As noted previously,[688] the good faith of a transferee or obligee is measured when the transfer is made or the obligation is incurred.  Thus, for example, as discussed in another part of the Report, the Tribune Entities incurred the Step One obligations under the Credit Agreement at the closing of Step One when the funds were advanced and the Step Two obligations under the Incremental Credit Agreement Facility and Bridge Facility at Step Two when those funds were advanced.[689]  These are the obligations that an estate representative would seek to avoid and as to which the respective LBO Lenders assert good faith defenses.

One nevertheless could argue that the Credit Agreement lenders gave value in connection with Step Two when they committed to fund Step Two in the Incremental Credit Agreement Facility (included in the Credit Agreement) executed on May 17, 2007 and that the Bridge Facility Lenders gave value when they similarly committed to fund Step Two in the Step Two Commitment Letter executed on April 5, 2007; and, therefore, good faith in connection with the Step Two advances should be measured at these earlier times and not when the Tribune Entities actually incurred the Step Two Debt in December 2007.  The Examiner disagrees.

First, as the Examiner previously has found on the question of collapse of Step One and Step Two for solvency purposes,[690] the Tribune Entities did not incur any obligation to borrow money under the Incremental Credit Agreement Facility or the Step Two Commitment Letter when those documents were executed in connection with Step One.  Those obligations were incurred when Step Two closed.  If Step One and Step Two were collapsed for solvency purposes, it probably would be appropriate to measure lender good faith in connection with the Step Two Debt at the time of Step One, but the Examiner has found that a court is somewhat

---

[688]  *See* text accompanying footnote 260.

[689]  *See* Report at § IV.B.5.d.(6).(i).

[690]  *See id.*

unlikely to collapse the two steps.  One of the ripple effects from that conclusion is that questions of good faith must be measured at the times the obligations actually were incurred at each of Step One and Step Two respectively.  As discussed previously,[691] the natural construction of Bankruptcy Code sections 548(a)(1) and (c) is that reasonably equivalent value and good faith are measured at the moment when the obligation is incurred and value is allegedly imparted.[692] Because the object of avoidance would be the incurrence of the obligations at Step Two, lender good faith is appropriately measured when the obligations were incurred.

Second, if an estate representative sought to avoid any obligations imposed or transfers made under the Incremental Credit Agreement Facility or under the Step Two Commitment Letter at the time of their execution, lender good faith certainly would be measured at the time of those undertakings.  Thus, for example, had Tribune paid a separate commitment fee to the lenders making the commitments in the Step Two Commitment Letter and were an estate representative seeking to avoid and recover that payment, lender good faith would be measured at the time the value was imparted, i.e., when the Step Two Commitment Letter was executed.[693] But the "main event"[694] here is avoidance of the obligations to the LBO Lenders incurred at Step One and Step Two respectively, and it is the lender good faith at those times that is relevant.

Third, under the terms of the Incremental Credit Agreement Facility and the Step Two Commitment Letter, the lenders were not obligated to honor their commitments until the various conditions precedent specified in those credit agreements were satisfied.  Ignoring those conditions precedent and how the lenders dealt with them as Step Two approached would be to

---

[691] *See* text accompanying footnote 260.

[692] One might be tempted to say in this regard that the LBO Lenders cannot have it both ways, but in fairness, not all of the LBO Lenders argued to the Examiner against collapse of Step One and Step Two.

[693] *See* Report at § IV.B.5.c.(6).

[694] *See id.* at § IV.B.2.

disregard the events that culminated in the Tribune Entities' incurring and the lenders' advancing the Step Two Debt.  It would be nonsensical to render irrelevant for good faith purposes the events that transpired after Step One giving rise to that massive indebtedness—especially when the Tribune Entities did not even incur that debt until Step Two.

This does not mean that the commitments made by the lenders at Step One regarding the Step Two funding are entirely irrelevant to questions of good faith.  The objective test "look[s] at the actions of a reasonably prudent person in the transferee's position."[695]  The Examiner considers the effect of these commitments on the question of good faith below.

The Examiner applies the objective standard in evaluating good faith under Bankruptcy Code section 548.[696]

> **(2)    Examiner's Conclusions and Explanation Concerning Effect of Good Faith Determination Regarding Credit Agreement Agent and Bridge Agent on Obligations Incurred Under Those Agreements—Whose Good Faith Matters?**

**<u>Examiner's Conclusion</u>**:

A court is highly likely to find that any lack of good faith by the Credit Agreement Agent or the Bridge Facility Agent at the time the respective obligations under these facilities were

---

[695]    *Jobin v. Ripley (In re M&L Bus. Mach. Co.)*, 198 B.R. 800 (D. Colo. 1996), *aff'd*, 84 F.3d 1330 (10th Cir. 1996); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776 (Bankr. S.D. Fla. 2000).

[696]    *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), does not compel a different conclusion.  There, in applying Pennsylvania's UFTA, the court noted that "knowledge of insolvency is a rational interpretation of the statutory language of lack of 'good faith.'"  *Id.* at 1295.  The court also approved consideration of other factors, including "1) honest belief in the propriety of the activities in question; 2) no intent to take unconscionable advantage of others; and 3) no intent to, or knowledge of the fact that the activities in question will, hinder, delay, or defraud others."  *Id.* at 1296.  The court approved the lower court's finding of lack of good faith, noting that the court "determined that IIT did not act in good faith because it was aware, first, that the exchange would render Raymond insolvent, and second, that no member of the Raymond Group would receive fair consideration."  *Id.*  As the lower court found that the lender there had actual knowledge of the debtor's insolvency, there was no reason for the appellate court to consider whether the lender acted in bad faith based upon an objective test.  *Id.*

incurred will apply to all claims issued under such facilities, whether those claims are in the hands of original holders or their successors.

**Explanation of Examiner's Conclusion**:

The lenders under the Credit Agreement and the Bridge Facility each appointed their respective agent to take actions on their behalf.[697]  To the extent those agents manifested a lack of good faith for fraudulent transfer purposes, the consequences for those actions do not just begin and end with them.  "[K]nowledge acquired by an agent acting within the scope of the agency is imputed to his principal, and the latter is bound by such knowledge although the information is never actually communicated" to the principal.[698]  The presumption underlying the imputation rule is that "an agent has discharged his duty to disclose to the principal all the material facts coming to [the agent's] knowledge with reference to the subject of his agency."[699]  A principal, moreover, cannot disclaim the actions of its agent if all of the principal's benefits— the obligations and liens that they hold—are critically dependent on the very acts they would like to disclaim.[700]

---

[697]  *See* Ex. 179 at § 7.01 (Credit Agreement); Ex. 175 at § 7.01 (Bridge Credit Agreement).

[698]  *See Ctr. v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985).  Because all credit facilities are governed by New York law, New York agency law applies; s*ee Annan v. Wilmington Trust Co. Tr.*, 559 A.2d 1289, 1293 (Del. 1989) ("Delaware courts will recognize a choice of law provision if the jurisdiction selected bears some material relationship to the transaction.").

[699]  *Hampton Affiliates*, 488 N.E.2d at 829; *see also Evvtex Co. v. Hartley Cooper Assocs.*, 102 F.3d 1327, 1332 (2d Cir. 1996) ("[A]n agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have . . . .") (internal quotation marks and citations omitted).

[700]  *Matanuska Valley Bank v. Arnold*, 223 F.2d 778, 781 (9th Cir. 1955) ("But assuming that Maze was acting adversely to appellant, his principal, his knowledge should nevertheless be imputed to appellant under the sole actor doctrine."); *Conn. Fire Ins. Co. v. Commercial Nat'l Bank*, 87 F.2d 968, 969 (5th Cir. 1937) ("The transaction of the unfaithful agent may indeed be not binding on his principal in the sense that because of fraud the principal can repudiate or rescind it, but if he elects to retain its specific results to the detriment of a third person justice requires that he take the transaction with its actual infirmities. . . . When authority to do the act is present, every agent fully represents his principal in that act.  And when the act is done by an agent of any class and advantage is claimed under it there can be no question of the authority to do it."); *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936) ("The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it.").  But the injustice disappears if

The answer is the same whether the lender is an original holder or a transferee.  Citing *Enron Corp. v. Springfield Associates, LLC (In re Enron Corp.),*[701] one Party asserted that any lack of good faith of the Credit Agreement Agent cannot avoid or disallow the claim of a "good faith" transferee under the Credit Agreement, alleging that they acquired their claims through "purchase" of rights under the Credit Agreement and that lack of good faith is a "personal disability" of the Credit Agreement Agent.  But even assuming the correctness of the *Enron* decision and its distinction between sales and assignments,[702] and even accepting that the relevant transactions were denominated as a "purchase and sale," *Enron* should have no applicability to avoidance of claims and liens as fraudulent obligations and transfers.  *Enron* dealt with the court's ability to equitably subordinate a claim in the hands of a transferee whose transferor had been guilty of inequitable conduct.  The *Enron* court concluded that equitable subordination was a "personal disability,"[703] affixed to the holder of a claim rather than to the claim itself.  But fraudulent transfer (or preference) law is different and operates directly to avoid the underlying obligation or transfer regardless of who holds the claim:[704]

> [A]voidability is an attribute of the transfer rather than of the
> creditor.  Since it is the transfer, not the [creditor], that is avoided,

---

the principal adopts the unauthorized act of his agent in order to retain a benefit for himself.  *See In re S. Afr. Apartheid Litig.*, 633 F. Supp. 2d. 117, 121-22 (S.D.N.Y. 2009) ("The acts of an agent are imputed to the principal if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself.  Even mere acquiescence is sufficient to infer adoption of wrongdoing.") (internal quotations marks and citations omitted); *Irving Trust Co. v. State Bankers' Fin. Corp.*, 40 F.2d 88 (S.D.N.Y. 1930) ("Where an agent engages in a fraudulent transaction of which his principal receives the fruits, the principal, if he insists upon retaining the benefits of the transaction, is chargeable with the knowledge of his agent.").

[701]  379 B.R. 425 (S.D.N.Y. 2007).

[702]  The decision has been criticized.  WILLIAM L. NORTON, III & ROGER G. JONES, NORTON CREDITORS' RIGHTS HANDBOOK § 8:8 ("The court never explains the difference between an assignment and a sale, and the case law does not bear out the distinction."); Tally M. Wiener & Nicholas B. Malito, *On the Nature of the Transferred Bankruptcy Claim*, 12 U. PA. J. BUS. L. 35, 49-51 (2009) (criticizing decision's distinction between sales and assignments).  Moreover, no court has cited the opinion for this distinction or the holding that equitable subordination is a personal disability.

[703]  379 B.R. at 439-40.

[704]  *H & C P'ship v. Va. Serv. Merchandisers*, 164 B.R. 527, 530 n.4 (E.D. Va. 1994) (citing *Levit v. Ingersoll Rand Fin. Corp. (In re Deprizio)*, 874 F.2d 1186, 1195 (7th Cir. 1989)) (internal quotations and citations omitted).

the creditor's only relief from liability or "recoverability" is governed by § 550(a).  Contrary to H & C's assertions, avoidability and recoverability are distinguished by the application of the *Deprizio* rule.  Avoidability of the transfer  is governed by § 547.  Section 550, then, answers the question of from whom the trustee may recover.

As the Supreme Court recognized in the preference context: [705]

> The § 547 determination, standing alone, operates as a mere declaration of avoidance.  That declaration may be all that the trustee wants; for example, if the State has a claim against the bankrupt estate, the avoidance determination operates to bar that claim until the preference is turned over. See § 502(d).  In some cases, though, the trustee, in order to marshal the entirety of the debtor's estate, will need to recover the subject of the transfer pursuant to § 550(a).  A court order mandating turnover of the property, although ancillary to and in furtherance of the court's in rem jurisdiction, might itself involve in personam process.

The fact that a party may be an assignee, "purchaser," or the like of a portion of bank debt may—as *Enron* suggests—affect questions of equitable subordination (depending on the manner in which that debt is transferred and other courts' willingness to adopt the *Enron* holding), but that should have no bearing on avoidance.  That is not to say that good faith of transferees is irrelevant in the fraudulent transfer context.  Far from it.  When avoidance does not suffice under Bankruptcy Code section 548, section 550 comes into play, and issues such as good faith, acquisition for value, and lack of knowledge by the subsequent transferee of the transfer's voidability all are on the table.  Those matters, however, never arise when the underlying transfer is avoided without resort to section 550.[706]

---

[705]  *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 371-72 (2006).

[706]  *See Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d 719, 726 (4th Cir. 2005) ("[N]o recovery [is] necessary; the avoidance itself [is] the meaningful event. . . . Thus, the recovery statute [§ 550] has no application here."); *Glanz v. RFJ Int'l Corp. (In re Glanz)*, 205 B.R. 750, 758 (Bankr. D. Md. 1997) (same); H.R. Rep. No. 95-595 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 6331 ("Section 550 prescribes the liability of a transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee.").  Section 550, on the other hand, expressly addresses who are the proper defendants to a fraudulent transfer cause of action by specifically identifying three different potential types of defendants (initial transferees, beneficiaries, and subsequent [a/k/a mediate or immediate] transferees). *See* 11 U.S.C. §§ 550(a), (d) (2006).

(3)    **Examiner's Conclusions and Explanation Concerning Good Faith of JPMCB as Credit Agreement Agent at the Time Obligations Incurred at Step One and Step Two.**

**Examiner's Conclusions**:

A court is reasonably likely to conclude that JPMCB acted in good faith in connection with the obligations incurred and advances made in the Step One Transactions but did not act in good faith in connection with the obligations incurred and advances made in the Step Two Transactions.

**Explanation of Examiner's Conclusions**:

The evidence supports the conclusion that JPMCB acted in good faith in connection with the Step One Transactions.  First, the Examiner separately has concluded that, absent collapse, it is highly likely that the Step One Transactions did not render the Tribune Entities insolvent or without adequate capital.  Thus, even if the JPMCB were placed on inquiry notice that Step One might render Tribune insolvent or without adequate capital, an inquiry into the actual facts and circumstances would lead a reasonable prospective lender in JPMCB 's position to conclude that the Tribune Entities would not be rendered insolvent.  Second, market-based information available to the JPMCB at the time the Tribune Entities incurred the Step One Debt supported the conclusion that the Step One Transactions would not render the Tribune Entities insolvent.[707] Third, contrary to certain Parties' contentions, the contemporaneous e-mails and analyses generated by JPM personnel do not support the inference that these people knew or reasonably believed that the Step One Transactions would render the Tribune Entities insolvent,[708] nor is there credible evidence that JPMCB improperly was motivated by fee generation or its relationship with Samuel Zell.  Finally, contrary to certain Parties' contentions, there is no

---

[707]  *See* Report at § IV.B.5.d.(7).

[708]  *See id.* at § III.E.4.a.

reasonable basis to conclude that JPMCB (or the other Lead Banks) acted in bad faith regarding

the repayment of the 2006 Bank Debt.  Although it is true that the 2006 Bank Debt did not have

recourse to the Guarantor Subsidiaries, whereas the Credit Agreement Debt did, the aggregate

pre-Step One indebtedness was substantially lower than the total post-Step One Debt at the

Guarantor Subsidiary and Tribune levels.  It is implausible that the lenders who held 2006 Bank

Debt viewed the Credit Agreement Debt as a material improvement in their overall position.

Even if they did, the Examiner finds nothing improper in the repayment of this indebtedness at

Step One.  For reasons discussed elsewhere in the Report,[709] repayment of the 2006 Bank Debt

was required absent waiver and would be expected in a transaction in which mostly the same

lenders made new advances under a transaction that radically changed the Tribune Entities'

capital structure.

  Because the Examiner has found that it is reasonably likely that a court would find that

JPMCB as Credit Agreement Agent acted in good faith in connection with the obligations

incurred and advances made in the Step One Transactions, this means that, even if the

prerequisites to avoidance of the Step One Debt are otherwise met, the Credit Agreement Agent

and the lenders under the Credit Agreement should be entitled to enforce those portions of the

obligations incurred by such Tribune Entity for which such Tribune Entity received reasonably

equivalent value, as discussed previously in the Report.[710]

  The Examiner reaches a different conclusion, however, concerning the good faith of

JPMCB in connection with the Step Two Transactions.  Based on the record, the Examiner

concludes that JPMCB and the other Lead Banks had sufficient knowledge to be placed on

---

[709] *See id.* at § IV.B.4.b.

[710] *See id.* at § IV.B.5.c.

inquiry notice regarding Tribune's possible insolvency as Step Two approached.[711]  Those indicia included, among other things, the highly-leveraged nature of the Leveraged ESOP Transactions (which would be magnified by a Step Two Closing and the addition of the Step Two Debt to the balance sheet),[712] the deterioration in Tribune's operating performance in the months following Step One,[713] the decline in Tribune's Common Stock price as well as certain of its debt instruments during this same period, the tightening in the credit markets during the summer and leading into the fall of 2007, and the difficulties the Lead Banks were facing in syndicating the LBO Lender Debt.  Moreover, the fact that the Lead Banks, acting together through jointly retained counsel, determined in the fall of 2007 to retain Murray Devine, a valuation advisory firm, to assist in the banks' due diligence concerning Tribune's insolvency demonstrates that the question of Tribune's solvency as Step Two approached is tangible evidence that the Lead Banks not only were on inquiry notice, but were inquiring.[714]

---

[711]  *See Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995).

[712]  Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 74:8-11 ("Q:  We have seen very little in the documents that have been provided to suggest that a similar analysis was being done in step one.  Do you recall whether such an analysis was done?  A:  It's highly likely that it wasn't given that the leveraging effects of step one were far less dramatic than step two, which was on top of step one.").  *See also* Ex. 868 (Kaplan E-Mail dated August 11, 2007) ("Idea is not to increase interest (cash is flat at $125 per annum per bond), but to allow increased principal amount to improve noteholders claim in a reorg type analysis."); Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 46: 9-16 (Q:  "What did you mean by 'reorg type analysis?' Are you talking about a bankruptcy reorganization?  A:  Without remembering exactly what I was writing at the time, I must have been referring to some sort of downside event like a bankruptcy reorganization.").

[713]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 76:1-14 ("Q:  Excuse me.  At the end of 2007.  Thank you.  When there is a lot of thought being given to that issue, did it occur to you that advertising revenue was going to be adversely impacted by what was happening in the economic marketplace at the time?  A.  I don't remember exactly what I thought.  It occurred to me that this company was in more trouble than we thought it was when we first signed the deal.  We'd be stupid not to  know that, but I was much more focused on, I mean we were not going to be able to sell the second step debt.  We were going to have to own it.").

[714]  Ex. 969 (Murray Devine Engagement Letter, dated October 1, 2007); Ex. 974 (Kenny E-Mail, dated October 2, 2007) ("Raj from JPM called and would like to have a talk with us on Thursday or Friday morning with a smaller group.  He specifically wants our input on the VRC opinion and presentation and to educate them on valuation methods and how they apply in solvency opinions.  He mentioned discount rate calculations[,] the weightings of methods, etc.").

Under the objective test for good faith, discussed previously,[715] "[i]f a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge.  In such a situation, the transferee is held to have knowledge of the voidability of the transfer."[716]  Having been placed on inquiry notice, therefore, JPMCB and the other Lead Banks not only had a duty to investigate the facts, but are charged with the knowledge that a creditor reasonably would have obtained after due inquiry.[717]  The Examiner finds that had JPMCB and the other Lead Banks conducted that inquiry, they would have reasonably determined that the Step Two Transactions would render Tribune insolvent.  Not only did compelling market indicia lead directly to this conclusion,[718] but more traditional valuation metrics pointed to insolvency as well.[719]  Applying the objective test for good faith, JPMCB and the other Lead Banks should have known that the Step Two Transactions would render Tribune insolvent and, therefore, it is reasonably likely that they cannot be found to have acted in good faith in connection with the Step Two Transactions.  The Examiner, however, considered the actions of JPMCB and the other Lead Banks in the period preceding the Step Two Closing, and evaluated four mitigating factors bearing on good faith:

First, the Examiner considered the fact that JPMCB as well as the other Lead Banks did not make a new credit decision at Step Two, but rather, honored their contractual obligations made at Step One.  There is an element of unfairness in applying the same standard to JPMCB and the other Lead Banks for good faith purposes that would be applied to a lender not operating

---

[715]  *Sherman*, 76 F.3d at 1357 (citations omitted).

[716]  *Id.*

[717]  *See* footnotes 679-687.

[718]  *See* Report at § III.H.3.f.(4).

[719]  *See id.* at § IV.B.5.d.(10).

under a preexisting contractual obligation, but who determines to advance money knowing that

the borrower will be rendered insolvent.  Indeed, a fair inference may be drawn from the

evidence that, had they had the opportunity, JPMCB (and probably most or all of the other LBO

Lenders for that matter) would have gladly declined to fund Step Two.[720]  Although the

Examiner is not without sympathy for the predicament that the Lead Banks found themselves in

at Step Two, the Examiner concludes that this circumstance does not change his conclusion on

good faith conclusion.  Neither JPMCB nor the other Lead Banks made unconditional

commitments under the Step Two Commitment Letter.  Although the Step Two Commitment

Letter did not expressly condition the Lead Banks' Step Two funding obligations under that letter

on Tribune's solvency, those obligations were conditioned on the negotiation, execution, and

delivery of definitive Step Two Financing Documents, in customary form, presumably meaning

that the definitive Step Two Financing Documents would include a solvency requirement

mirroring the solvency requirement embodied in the Credit Agreement entered into by the Lead

Banks at Step One.[721]  The Credit Agreement contained a representation that Tribune would be

"Solvent" (as defined in the Credit Agreement) on consummation of the Step Two

Transactions,[722] the truth of which was a condition to the funding under the Incremental Credit

Agreement Facility.  The Bridge Credit Agreement similarly required the delivery of a solvency

certificate and the accuracy of representations (including the solvency definition).[723]  Thus,

whether or not Tribune delivered a solvency certificate and managed to procure a solvency

---

[720]  *See id.* at § III.H.4; *see also* Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 85:13-15 ("I think it's fair to say it would have been better for us to not close economically, absolutely.").

[721]  Ex. 1010 at 3 and 5 (Amended Step Two Commitment Letter).

[722]  Ex. 179 at § 4.01(1)(l)(ii) (Credit Agreement).

[723]  Ex. 175 at § 3.01(b)(i) and (iv)(A) (Bridge Credit Agreement).

opinion, JPMCB and the other Lead Banks were not obligated to fund if Tribune's solvency representation was false.

As sophisticated lenders, JPMCB and the other Lead Banks undoubtedly were aware that refusing to fund if Tribune presented a solvency opinion, a solvency certificate, and a solvency representation would have lead to litigation and, possibly, the imposition of substantial damages.[724]  The Examiner infers from the record that, as a matter of litigation risk management, the Lead Banks apparently determined that, in order to refuse to fund at Step Two, they would need more than just a belief that Tribune would be rendered insolvent:  The Lead Banks determined to fund rather than fight.  However, the fact that the Lead Banks made what may have made a rational decision from a litigation perspective (if only from the point of view that it is better to risk fraudulent transfer litigation down the line than face immediate breach of contract litigation and the rupturing of lending relationships with Tribune, EGI, and Samuel Zell), should not insulate them from the burden imposed under the objective test for good faith. To benefit from the good faith defense, JPMCB could not advance funds to Tribune if a reasonable creditor would have known that doing so would render Tribune insolvent.  The lenders' own loan documents conditioned their funding obligation on Tribune's solvency and thus these agreements are generally consistent with what the good faith standard requires.  Although, as noted previously,[725] these agreements did contain a definition of "Solvent" at odds with the definition of that term under the law, the Examiner does not believe that the law permits a party,

---

[724]    Although the Credit Agreement contained a waiver of consequential damages, Ex. 179 at § 8.04(b) (Credit Agreement), the allegations of actual damages undoubtedly would have been significant.

[725]    *See* footnotes 87 and 539 and accompanying text.

by private contract, to adopt a standard of solvency at variance with what the law provides, and then apply that standard, in effect, to modify the good faith standard.[726]

Second, the Examiner considered the fact that JPMCB and the other Lead Banks asked and posed follow-up questions to Tribune (and, through Tribune, VRC), requested and obtained information from Tribune regarding its business performance and projections, and, as noted, retained Murray Devine to assist them in connection with these efforts.[727]  Although this evidence shows that JPMCB and the other Lead Banks did not put their collective heads in the sand, the Examiner does not find that their efforts were sufficient to move the Lead Banks into good faith terrain.  Significantly, the Lead Banks did not retain *and never asked* Murray Devine to opine on solvency or to issue a solvency report.[728]  Instead, as set out in its engagement letter, Murray Devine was retained to provide guidance "as to the methodologies and analyses which may be used by *another* firm in preparing a solvency opinion . . . in connection with the Transaction."[729]  This was not an oversight:  The Examiner asked representatives of each of the four Lead Banks whether they asked Murray Devine to assess Tribune's solvency.  Witnesses for all four Lead Banks agreed that Murray Devine was not asked to assess Tribune's solvency, but rather was retained to assist the lenders in understanding VRC's solvency analysis.  JPM's Rajesh Kapadia explained that the banks only "needed to get smarter and . . . educated around the solvency process," but did not want or need a de novo assessment of Tribune's solvency because (according to Mr. Kapadia) the condition precedent to the banks' obligations was the CFO's

---

[726]    *See generally In re Pease*, 195 B.R. 431, 435 (Bankr. D. Neb. 1996) ("I conclude that any attempt by a creditor in a private pre-bankruptcy agreement to opt out of the collective consequences of a debtor's future bankruptcy filing is generally unenforceable.").

[727]    *See* Report at §§ III.H.3.g.(10). and III.H.4.(b).

[728]    *See id.* at § III.H.4.b.(1); *see also* Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 97:4-9.

[729]    Ex. 969 at 1 (Murray Devine Engagement Letter, dated October 1, 2007) (emphasis added); *see also* Ex. 970 (Murray Devine Time Records) (reflecting the relatively narrow scope of work performed by Murray Devine).

certification of solvency—not the lenders' own assessment of solvency.[730]  Todd Kaplan of

MLCC testified that "Murray Devine was asked to give us background as to how . . . solvency

opinions were developed and rendered"—not to actually render a solvency opinion itself.[731]

Similarly, when Citicorp's Julie Persily was asked whether Citicorp "ask[ed] Murray Devine to

advise you whether the second stage closing would render Tribune insolvent," she responded:

"We didn't ask the question that way.  We asked . . . how do you develop a solvency opinion,

what do you look at?"[732]  Daniel Petrik of BofA explained "that [the arrangers] discussed this

internally and viewed that we did not need another solvency opinion, but we wanted to . . .

understand [VRC's] solvency opinion."[733]

    Had the Lead Banks requested and obtained a valuation from Murray Devine or other

qualified third party, and had that valuation tenably shown Tribune solvent, their case for good

faith might have been more tenable.  It is evident from the record, however, that the scope of

Murray Devine's work (indeed its very retention by counsel) was driven by potential litigation

considerations.  Once again, JPMCB and the other Lead Banks may have made a rational

decision from the perspective of litigation management to limit what Murray Devine was asked

to do.  But for the same reason noted above, that decision does insulate them from the

requirements of good faith.  Indeed, viewed through the prism of good faith, the limitations

---

[730]   Examiner's Interview of Rajesh Kapadia, June 25, 2010.

[731]   Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 101:13-102:20; *see also id.* at 97:17-21 ("Murray Devine was brought in as an expert in the field of delivering solvency opinions, and that expertise was our attempt to learn more about how solvency opinions were developed and rendered."); *id.* at 104:2-105:11 ("[I]f we as a lending group in the August, September, October time frame had decided gee, it would be nice to have a solvency opinion, that was too late [because] we didn't have any ability to garner access to the company for a solvency expert to render an opinion.").

[732]   Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 167:4-13.

[733]   Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 146:15-18.  *See also id.* at 145:5-8 ("[T]he underwriters talked about whether we need someone to help us understand, someone that would be more of an expert to help us understand VRC's work.").

imposed on Murray Devine's work has more in common with willful blindness than the kind of due diligence sufficient to meet the good faith standard.[734]

Third, the Examiner considered information adduced concerning discussions among the Lead Banks during this timeframe as well an analyses produced from JPM's files, and the files of Merrill, Citigroup, and BofA, containing various internal solvency analyses performed by those institutions in November and December of 2007.[735]  Notes that Mr. Petrik of BofA took from a December 14, 2007 conference call among the Lead Banks are illuminating not only as to what the Lead Banks were thinking about during that timeframe, but also some of their views on the question of solvency.[736]  Mr. Petrik's notes, which are reproduced verbatim in another Section of the Report,[737] appear to set forth the views at the time of each of the Lead Banks on the question whether to fund at Step Two:

---

[734]  The record supports the inference that VRC's work was viewed skeptically even at the end.  Notes from a December 17, 2007 conference call among the Lead Banks reference the following statement by a Citgroup representative on the call: "S Corp savings WRONG but still +hv PHONES."  Ex. 890 (Handwritten Notes of JPMCB Representative).

[735]  *See* Report at §§ III.H.4.b.(2).-III.H.4.b.(5).

[736]  Ex. 959 at BOA-TRB-0001201 (Petrik Handwritten Notes, dated December 14, 2007).

[737]  *See* Report at § III.H.4.b.(1).

Word Product

| 12/14/07 | | - UW call |
| | | - Need VRC info today and discuss Monday |
| | | - If D date - change entries to NYS to Employees |

Chris    JPM    - Not 100% final but leaning
                   Going ahead and funding
                   Risk greater if do not fund

      MRL    - Not 100% but leaning to not fund
              - Reasonable that not a solvent company
              - Not planning on being lone wolf

Julie    Citi    - Numerous and not significant to not fund
              - More risk if end up in bankruptcy
              - Focus on understanding risk of not funding
              - Not yet landed  -

| | BofA | - Tom Briggin | Bill Bower |
| | | - Lynn S. | Dan Kelly |
| | | Rajin, Dan P., | [illegible] |

If in good faith - good defense

The Examiner became aware of the contents of Mr. Petrik's notes after all Lead Bank

interviews had concluded, shortly before the deadline for filing the Report.[738]  Accordingly, the

---

[738]  On or about June 10, 2010, the Examiner's financial advisor, LECG, received a letter from Sidley Austin, LLP, counsel for the Debtors, enclosing a disk containing 474 documents (13,233 pages) produced by Bank of America and BAS.  Sidley Austin, LLP, advised LECG that this disk was produced in response to document requests propounded on Bank of America and BAS by WFB and Wilmington Trust.  On or about June 17, 2010, these documents were uploaded and available for review through a database accessible only to the Examiner and those working on his behalf in this Investigation.

Included within this production were some handwritten pages with the words "Word Product" written at the top.  To the best of the Examiner's knowledge, the late evening of July 13, 2010 is the first time that anyone working on his behalf accessed the pages of the production that contained these notations.  On July 14, 2010, at 6:26 pm ET, counsel for the Examiner sent a letter via e-mail to counsel for BofA advising him of the existence of these pages and asking BofA to advise: (1) the identity of the author of these pages; (2) whether the disclosure of these documents was inadvertent; and (3) whether BofA deems these pages confidential.  On July 15, 2010, at 11:13 am ET, counsel for BofA responded that these pages were written by BofA banker Daniel Petrik, that these pages were inadvertently produced, and requested that the Examiner return the pages or certify their destruction and not reference them in any way.  On July 15, 2010 at 11:28 am ET, counsel for the Examiner spoke with counsel for counsel for BofA telephonically at which time counsel for BofA confirmed that a document bearing Bates number BOA-TRB-0001201, which contains a handwritten notation "Word Product" was not attorney work product.  Counsel for BofA also confirmed that he had spoken with Mr. Petrik and that,

273

Examiner was not able to question the participants about the information contained in those notes or confront witnesses with inconsistencies between these notes and their prior (in some instances sworn) statements to the Examiner.  The question presented in this Section of the Report solely is whether JPMCB and the other Lead Banks are entitled to a good faith defense for purposes of the fraudulent transfer statute.  Whether these entities acted in bad faith and, if so, whether their actions would justify equitable subordination of the LBO Debt, are questions addressed in another part of the Report.[739]

The internal analyses of solvency prepared by JPM and the other Lead Banks provide additional backdrop against which the Lead Banks approached the question of funding.  Interestingly, JPM did not provide any e-mail correspondence or any memoranda accompanying these internal valuation analyses.  Indeed, the Examiner did not find a single e-mail referencing these analyses.[740]  The latest of these, dated December 18, 2007, calculates Tribune's net equity value under a range of "stress," "low," "mid," and "high" valuations.[741]  This analysis suggests Tribune is insolvent only under a "stress" case, is barely solvent under a "low" case, and is substantially solvent under the "mid" and "high" cases.  As discussed in more detail elsewhere in

---

to the best of his recollection, there were no attorneys present during the telephone conversation which is reflected in Mr. Petrik's handwritten notes on the document bearing Bates number BOA-TRB-0001201.  Nevertheless, counsel for BofA advised that BofA viewed this document as attorney-client privileged because the speakers in the telephone conversation reflected in Mr. Petrik's notes were communicating attorney-client privileged information.  At 1:30 pm ET, counsel for the Examiner telephoned counsel for BofA and asked him to reconsider BofA's assertion of attorney-client privilege with respect to this document and requested that BofA allow the Examiner to cite the document in the Report.  At 6:27 pm ET, counsel for BofA informed counsel for the Examiner that BofA would provide the Examiner with a fully unredacted version of BOA-TRB-0001201 and that the Examiner could use the information in the document in the Report free of any assertion of privilege or confidentiality.  BofA maintained that portions of the rest of the production are privileged and were inadvertently produced.  BofA thereupon produced redacted versions of the documents included in this production.  *See* footnote 939.

[739]    *See* Report at § IV.D.3.a.

[740]    *See id.* at § III.H.4.b.(2).

[741]    *See id.*

the Report,[742] relatively modest adjustments in this analysis (such as eliminating the net present value of the anticipated S-Corporation/ESOP tax savings and removing the upward bias caused by high comparable transactions valuations) result in insolvency by a small margin in the mid case and a large margin in the low and stress cases, and solvency only in the high case.  It is also notable that JPM appears to have added a fourth case—the "stress" case—at precisely the point that its various internal analyses began showing insolvency in the low case.  As discussed in another part of the Report,[743] although the Examiner is not able to determine the order in which each analysis bearing the same date was prepared, the overall trend of the analyses from December 10, 2007 to December 18, 2007 appears to suggest that projected insolvency in the low case led JPM to add a fourth case (the stress case) to reflect the insolvency scenario, with modifications to the low case such that it once again reflected solvency (albeit thin).

When questioned about these internal analyses during his interview with the Examiner, Mr. Kapadia could not recall the intended audience for which they were prepared, but he believed the analyses were merely a continuation of JPM's Step Two solvency diligence.[744]  Mr. Kapadia stated that he did not believe JPM's diligence in the week prior to the Step Two Financing Closing Date was shared with senior executives such as James Lee or Jamie Dimon, nor did Mr. Kapadia believe that JPM was using these internal solvency analyses to make a final decision whether to close.[745]  To the contrary, and generally consistent with the view apparently expressed by JPM on the December 14, 2007 lender conference call that the "risk [was] greater if [the banks] do not fund,"[746] albeit with far different spin, Mr. Kapadia indicated that "in practice,

---

[742]  *See id.*

[743]  *See id.*

[744]  Examiner's Interview of Rajesh Kapadia, June 25, 2010.

[745]  *Id.*

[746]  Ex. 959 at BOA-TRB-0001201 (Petrik Handwritten Notes, dated December 14, 2007).

people don't go up to the 11th hour and not close the deal.  This is not like we're . . . diligencing to get out of the deal."[747]

For their part, as discussed further below, the analyses performed by Merrill, Citigroup, and BofA show insolvency under various posited scenarios,[748] and are consistent with the sentiment expressed by Merrill on the December 14, 2007 lender conference call.[749]  Whether or not any of the analyses prepared by the Lead Banks in the period shortly before the Step Two Closing represented the views of these institutions on valuation, the evidence is abundant that these institutions knew or had reason to know that the case for insolvency was, to say the least, closer than VRC had opined.  Particularly in light of witness testimony that their institutions did not have the in-house capacity to perform a solvency valuation,[750] at a minimum these analyses support the conclusion that the Lead Banks should have retained their own outside solvency expert if they wished to make the case for good faith under these circumstances.

Fourth, the Examiner considered the events described earlier in the Report[751] regarding statements by Tribune to JPMCB and the other Lead Banks concerning Morgan Stanley's involvement in Tribune's representation that it would be able to refinance its debt when it came due and in evaluating VRC's solvency opinion.  As discussed previously, among other things, it appears that during a December 17, 2007 conference call involving Tribune and the Lead Banks (but apparently not Morgan Stanley), the Lead Banks were told that Morgan Stanley had

---

[747]  Examiner's Interview of Rajesh Kapadia, June 25, 2010.

[748]  *See* Report at §§ III.H.4.b.(2)., III.H.4.b.(4)., and III.H.4.b.(5).

[749]  Ex. 959 at BOA-TRB-0001201 (Petrik Handwritten Notes, dated December 14, 2007).

[750]  Examiner's Interview of Rajesh Kapadia, June 25, 2010; Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 34:17-21 ("I would say that beginning, again, if I could use in August as generalized around that time frame, we at Merrill Lynch realized that we had essentially no in-house solvency expertise at all.").

[751]  *See* Report at §§ III.H.3.g.(10) and IV.C.2.

reviewed VRC's opinion and determined that it was fair and reasonable.[752]  The Examiner finds

that the statements, which appear to have been made by Tribune to the Lead Banks, as well as

Tribune's statements regarding Morgan Stanley's role in the refinancing representation and in

VRC's solvency opinion, mitigate somewhat against a finding that JPMCB and the other Lead

Banks failed to act in good faith in connection with the Step Two Transactions.  These

statements did furnish some basis for the Lead Banks to accept Tribune's solvency certificates

and representations, and made it incrementally more difficult for JPMCB and the other Lead

Banks to contest Tribune's position regarding insolvency.  On the other hand, the record does not

indicate that the Lead Banks ever contacted Morgan Stanley directly,[753] and Tribune never

produced to the banks any analysis purporting to substantiate the views ascribed to Morgan

Stanley.  Moreover, the record supports the inference that the Lead Banks funded based on their

own assessment of their litigation exposure if they did not fund, taking into account their

contractual obligations and the litigation risks, not what was said on that call.  Although the

statements made on the December 17, 2007 conference call should not be condoned, and as

discussed in another part of the Report, tend to support the conclusion that Tribune acted at Step

Two with intent to hinder, delay, or defraud creditors, they do not, for purposes of applying

Bankruptcy Code section 548(c), overcome the contrary evidence pointing to JPMCB's and the

other Lead Banks' lack of good faith.

Because the Examiner finds, following due consideration of various mitigating factors,

that it is reasonably likely that a court would find that JPMCB as Credit Agreement Agent did

not act in good faith in connection with the obligations incurred and advances made in the Step

---

[752]   Ex. 890 (Handwritten Notes of JPMCB Representative).

[753]   Mr. Kapadia had no recollection whether he ever spoke to Morgan Stanley about its involvement in the refinancing representation.  Examiner's Interview of Rajesh Kapadia, June 25, 2010.

Two Transactions, the Credit Agreement Agent and the lenders under the Credit Agreement should not be entitled to enforce any portion of the obligations incurred at Step Two under the good faith defense.[754]

**(4)    Examiner's Conclusions and Explanation Concerning Good Faith of JPM Entities as Transferee of LBO Fees at Step One and Step Two.**

The Examiner finds no basis to vary the conclusions reached above concerning JPMCB's actions as Credit Agreement Agent from the actions of the JPM Entities as recipients of LBO Fees at both steps.  As a result, the Examiner finds that it is reasonably likely that the JPM Entities acted in good faith in Step One but not in Step Two, and that they should be entitled to the good faith defense as to some portion of the LBO Fees paid at Step One but not at Step Two.

**(5)    Examiner's Conclusions and Explanation Concerning Good Faith of MLCC as Bridge Credit Agreement Agent at the Time Obligations Incurred at Step Two.**

For reasons very similar to the Examiner's rationale for his conclusion concerning JPMCB as Credit Agreement Agent, the Examiner finds that it is reasonably likely that a court would conclude that MLCC did not act in good faith as Bridge Credit Agreement Agent in connection with the obligations incurred and advances made in the Step Two Transactions.

As noted above and discussed at length in another part of the Report,[755] the Lead Banks (including the Merrill Entities) acted essentially in concert in their efforts to address VRC's solvency analysis and the question of solvency in general.  The Examiner finds no basis to reach any different good faith conclusions concerning MLCC, as Bridge Credit Agreement Agent, than he did regarding JPMCB as Credit Agreement Agent at Step Two.  As discussed elsewhere in the

---

[754]    *See* Report at § IV.B.5.b. and footnote 848.

[755]    *See id.* at § III.H.4.

Report, [756] Merrill's own internal analyses generally showed that Tribune would be rendered

insolvent at Step Two in "mid" and "low" cases.  Todd Kaplan, the Chairman of Global Leverage

Finance at Merrill, testified, however, that "this is not a Merrill Lynch valuation analysis.  This

is, as I recall and as I look at it today, our attempt to understand how VRC was developing their

work and providing an opinion to the Company to satisfy the closing condition."[757] Mr. Kaplan

repeatedly disclaimed knowledge about the calculations and assumptions underlying these

analyses, and testified that he would not consider any of them to be "a Merrill Lynch Valuation

analysis"[758]—notwithstanding that each is printed on Merrill stationary and bears the title

"Valuation Analysis of Tribune Company."  Mr. Kaplan further testified that he could not recall

whether he or any of the other bankers working on the transaction had reservations about

closing:[759]

> Q.    Did you have any reservations at that time about closing
>        step two?
>
> A.    I don't recall.  My particular feelings were I do know that
>        we were working hard to ascertain whether or not the
>        transaction was going to close, but beyond that I don't
>        recall what my particular feelings were at that time.
>
> Q.    Were you having discussions at that time . . . with the other
>        lenders?
>
> A.    Yes.
>
> Q.    Did any of the other lenders express to you that they had
>        reservations about closing step two?
>
> A.    I don't recall.

---

[756]  *See id.* at § III.H.4.b.(3).

[757]  Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 155:2-7.

[758]  *Id.* at 155:2-3.

[759]  *Id.* at 40:15-41:7.

Mr. Kaplan's lack of recollection aside, the documentary evidence reflects Merrill's concern that Tribune would be rendered insolvent at Step Two.[760]  As noted above, handwritten notes of the lender call that took place six days before Step Two closed appear to reflect Merrill's belief that Tribune was "not a solvent company," but that Merrill was "not planning on being [the] lone wolf" that did not close.[761]  Merrill was on the same inquiry notice as JPMBC and is charged with the same knowledge as JPMCB under the objective test for insolvency, and, for the reasons discussed above in reference to JPMCB, the Examiner concludes is not entitled to a good faith defense.

Because the Examiner has found that it is reasonably likely that a court would find that MLCC, as Bridge Credit Agreement Agent, did not act in good faith in connection with the Step Two Transactions, the Bridge Credit Agreement Agent and the lenders under the Bridge Credit Agreement should not be entitled to enforce any portion of the obligations incurred at Step Two under the good faith defense.

> **(6)    Examiner's Conclusions and Explanation Concerning Good Faith of Merrill Entities as Transferee of LBO Fees at Step One and Step Two.**

Regarding the LBO Fees paid to the Merrill Entities at Step One, for reasons similar to the Examiner's conclusions concerning the good faith of JPMCB and MLCC as agents at Step

---

[760]  On July 16, 2010, the Examiner's counsel received from Merrill's counsel what purports to be a "corrected" transcript of Mr. Kaplan's July 8, 2010 sworn interview with the Examiner, containing numerous multi-paragraph additions to the sworn testimony Mr. Kaplan gave on July 8.  Ex. 976 (Letter from Jane W. Parver, dated July 16, 2010).  Beyond the fact that these extensive additions are different in kind from every other errata sheet submitted in connection with the Examiner's sworn interviews, and appear to contradict Mr. Kaplan's sworn testimony that he had no recollection of key events, documents, and circumstances, the Examiner notes that Mr. Kaplan's "corrected" transcript was sent one day after the Examiner's counsel notified counsel to BofA (whom the Examiner understands contacted counsel for the other Lead Banks) that the Examiner was in possession of the handwritten notes described in the text, Ex. 959 at BOA-TRB-0001201 (Petrik Handwritten Notes, dated December 14, 2007), discussed in the Report.  The Examiner makes the "corrected transcript" part of the record of the Investigation, but does not accord it any weight.

[761]  Ex. 959 at BOA-TRB-0001201 (Petrik Handwritten Notes, dated December 14, 2007).  The above-excerpted portion of Mr. Kaplan's testimony is not credible, nor were other aspects of Mr. Kaplan's sworn interview.

One, the Examiner finds that it is reasonably likely that a court would find that the Merrill

Entities acted in good faith in its capacity as transferee of LBO Fees at Step One.  Merrill

appears to have made a credit decision to provide financing for the Zell bid based on its analysis

of this credit's characteristics as Step One approached.[762]  Although Merrill had been involved in

transactions with Mr. Zell in prior years and Mr. Kaplan had done business with Mr. Zell since

1986 (and was offered a job by Mr. Zell in March 2008),[763] the Examiner found nothing to

suggest that Merrill participated as a lender for any reasons other than to profit in that capacity.

Regarding the LBO Fees paid to Merrill at Step Two, however, the Examiner finds no

basis to vary the conclusions reached above concerning MLCC's actions as Bridge Credit

Agreement Agent from the actions of the Merrill Entities as recipients of LBO Fees at Step Two,

and, therefore, finds that it is reasonably likely that a court would conclude that the Merrill

Entities did not act in good faith in connection with Step Two.

> **(7)**     **Examiner's Conclusions and Explanation Concerning Good Faith of Citigroup Entities as Transferee of LBO Fees at Step One and Step Two.**

Regarding the LBO Fees paid to the Citigroup Entities at Step One, for reasons similar to

the Examiner's conclusions generally regarding lender good faith at Step One, the Examiner

finds that it is reasonably likely that a court would conclude that the Citigroup Entities acted in

good faith in their capacity as transferee of LBO Fees at Step One.  The Examiner, again, found

no basis to conclude that the Citigroup Entities had any motive other than to generate profit in

their capacities as lenders to Tribune.[764]

---

[762] *See* Report at § III.E.4.b.

[763] Examiner's Sworn Interview of Todd Kaplan, July 8, 2010, at 64:22-66:13.

[764] *See* Report at § III.E.4.c.

Regarding the LBO Fees paid to the Citigroup Entities at Step Two, however, the Examiner likewise finds no basis to vary, as to the Citigroup Entities, from the conclusions reached above concerning the good faith of the JPM Entities and the Merrill Entities as recipients of LBO Fees at Step Two.  Julie Persily, Managing Director, Head of North America Leveraged Finance at Citigroup, testified that the various analyses prepared by Citigroup in the late fall of 2007 represented a "bust case or a breaking case," and did not represent Citigroup's views on fair market value. [765]  Whether or not this is plausible, however, at a minimum, these analyses demonstrate that Citigroup was on inquiry notice concerning Tribune's insolvency.  Indeed, as discussed in the Report,[766] two days before the lender conference call on which Ms. Persily apparently expressed the view that it might be less problematic "to not fund" rather than risk a Tribune bankruptcy,[767] Citicorp apparently attempted to retain its own outside advisor to assess Tribune's solvency, but did not end up doing so.  Considered in light of the other indicia of insolvency, discussed above, and for the reasons discussed above in reference to JPM and Merrill, the Examiner believes that a court is reasonably likely to conclude that the Citigroup Entities did not act in good faith in connection with Step Two.

---

[765]    Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 192:1-14; 201:20-21.  Ms. Persily testified that the fact that certain of the cases showed negative equity did not mean that Tribune was insolvent.  *Id.* at 196:20-197:11 (Q:  And why do you draw a distinction between negative equity and not necessarily insolvent?  A: Because there are very many solvent companies that have negative equity and as we learned through this process there are a lot of ways to value solvency and one of them is ability to meet commitments when they become due in the near term one year, two years out and this company had a very big revolver and it had a lot of asset sales, assets which we knew there was third party interest in and so we believed that this company was going to have access to liquidity for quite some time.").

[766]    *See* Report at § III.H.4.b.(4).

[767]    Ex. 959 at BOA-TRB-0001201 (Petrik Handwritten Notes, dated December 14, 2007).

(8)    **Examiner's Conclusions and Explanation Concerning Good Faith of BofA Entities as Transferee of LBO Fees at Step One and Step Two.**

Regarding the LBO Fees paid to the BofA Entities at Step One, for reasons similar to the Examiner's conclusions generally regarding other lender good faith at Step One, the Examiner finds that it is reasonably likely that a court would conclude that the BofA Entities acted in good faith in their capacity as transferee of LBO Fees at Step One.  Daniel Petrik (the Credit Products Officer on the transaction for BofA)[768] testified candidly that, although the funding opportunity offered BofA in the spring of 2007 failed to meet five of the ten criteria used by the bank to make credit decisions, the bank determined to proceed because of its ongoing relationship with Samuel Zell, the Tribune name and brand, and the "overall return on the risk."[769]  BofA performed due diligence before making its financing commitment.[770]  The Examiner finds no plausible evidence of bad faith.

Regarding the LBO Fees paid to the BofA Entities at Step Two, however, the Examiner finds no basis to vary, as to the BofA Entities, from the conclusions reached above concerning the good faith of the JPM Entities, the Merrill Entities, and the Citigroup Entities as recipients of LBO Fees at Step Two.  Although Mr. Petrik testified that BofA prepared enterprise valuation analyses for Tribune's broadcasting and publishing businesses after Step One, he did not recall what those analyses showed. [771]  When asked whether "Bank of America [had] done an internal analysis [in the fall of 2007] to determine whether Tribune's assets exceeded its liabilities," Mr.

---

[768]   Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 19:18-20:2.  *See also id.* at 23:8-11 ("I stayed very involved through closing of Step 2 [and] I am also now responsible for monitoring the revolving line of credit and the relative risk to our institution.").

[769]   *Id.* at 64:13-65:18.

[770]   *See* Report at § III.E.4.d.(1) and III.E.4.d.(5).; Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 83:22-85:17.

[771]   Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 103:3-105:7.

Petrik responded:  "I don't think so."[772]  BofA's Leveraged Finance Screening Committee did,

however, receive at least two updates from the deal team prior to the Step Two Financing

Closing Date:  on August 3, 2007[773] and December 13, 2007.[774]  These memoranda listed an

"enterprise value" for Tribune that was apparently based on work done by the bank's Enterprise

Valuation Group, and encompassed only Tribune's operating assets.[775]  The calculated enterprise

values on August 3, 2007 and December 13, 2007 were $8.2 billion and $12.3 billion,

respectively.[776]  Total debt following Step Two was estimated on both dates to be $12.233

billion, which of course was substantially below the actual amount of debt Tribune was left with

on the close of Step Two.[777]

In light of the indicia of insolvency then available to BofA and the other Lead Banks,

discussed above, and for the reasons discussed above in reference to JPM, the Examiner believes

that a court is reasonably likely to conclude that the BofA Entities did not act in good faith in

connection with Step Two.

**(9)     Examiner's Conclusions and Explanation Concerning Good Faith of MLPFS and CGMI as Transferees of Advisor Fees at Step One and Step Two.**

**<u>Examiner's Conclusions</u>**:

A court is somewhat likely to conclude that both MLPFS and CGMI acted in good faith

in connection with the payments made to them as Advisor Fees in connection with the Leveraged

---

[772] *Id.* at 146:19-22.  *See also id.* at 124:2-9.

[773] Ex. 927 (Leveraged Finance Committee Update Memo, dated August 3, 2007).

[774] *Id.*; Ex.  966 (Leveraged Finance Committee Update Memo, dated December 13, 2007).

[775] Examiner's Sworn Interview of Daniel Petrik, July 8, 2010, at 103:8-105:1.

[776] Ex. 927 at BOA-TRB-0013163 (Leveraged Finance Committee Update Memo, dated August 3, 2007); Ex. 966 at BOA-TRB-0007609 (Leveraged Finance Committee Update Memo, dated December 13, 2007).

[777] Ex. 927 at BOA-TRB-0013164 (Leveraged Finance Committee Update Memo, dated August 3, 2007); Ex. 966 at BOA-TRB-0007611 (Leveraged Finance Committee Update Memo, dated December 13, 2007).

ESOP Transactions, although the question is closer regarding payments made following the Step Two Transactions to CGMI.

**<u>Explanation of Examiner's Conclusions</u>**:

The Examiner found no credible evidence that either MLPFS or CGMI lacked good faith in connection with the Step One Transactions.  Both MLPFS and CGMI were actively engaged in working with the Tribune Board and its other advisors from at least October 2005 and October 2006, respectively.[778]  During their involvement and prior to the close of Step One, both MLPFS and CGMI questioned the VRC opinion and obtained what they believed were satisfactory answers.[779]  Notably, while engaged, the advisors even outlined the appropriate methodology—involving sales of assets (e.g., the Chicago Cubs, Tribune Tower) whose retention was not justified by their earnings—that could improve Tribune's liquidity.[780]

The conclusion at Step Two is not as obvious, but is probably the same.  As contemplated in the letters engaging MLPFS and CGMI,[781] lending affiliates of these two advisors participated in financing the Leveraged ESOP Transactions.  Between the close of Step One and Step Two, the credit markets began to tighten with the consequence that, as discussed above, the terms on which other Merrill and Citigroup Entities agreed to extend financing had become advantageous

---

[778]    MLPFS' familiarity with Tribune went back at least to 2000, although its retention for what became the Leveraged ESOP Transactions occurred by letter agreement dated October 17, 2005.  Examiner's Interview of Michael Costa, June 4, 2010.  There is no evidence of involvement by CGMI prior to September 21, 2006, as noted in its engagement letter dated October 27, 2006.  Ex. 360 at 5 (CGMI Engagement Letter, dated Oct. 27, 2006).

The question of the good faith of MLPFS and CGMI at Step One is addressed here only because Tribune did make some relatively small payments at Step One to those entities in their capacities as Financial Advisors to Tribune.

[779]    Examiner's Interview of Christina Mohr, June 29, 2010.

[780]    *Id.*

[781]    Ex. 24 at 4 (MLPFS Engagement Letter, dated Oct. 17, 2005); Ex. 360 at 4 (CGMI Engagement Letter, dated Oct. 27, 2006).

to Tribune but disadvantageous to the lenders.[782]  To address the fact that MLPFS and CGMI might have a conflict (insofar as it could be in the best interests of their lending affiliates if MLPFS and CGMI recommended against closing Step Two), MLPFS and CGMI ceased providing advisory services in connection with the Leveraged ESOP Transactions.[783]  There is no evidence that MLPFS or CGMI engineered their departure for any improper purpose, and neither the existence of conflicting roles or the cessation of activities by MLPFS or CGMI constituted a breach of any duty owed to the Tribune Entities.[784]  Although both MLPFS and CGMI were aware that Tribune's performance had weakened and that the market for leveraged loans had tightened,[785] and although there is evidence that their respective lending affiliates had serious questions concerning Tribune's solvency,[786] there is no evidence that either MLPFS or CGMI knew that Step Two would leave the Tribune Entities insolvent or undercapitalized.[787]

The record does indicate that, as of late November 2007, CGMI (which had maintained the financial model used by Tribune to develop its projections) assisted Tribune management in updating its financial model with the assistance of junior CGMI personnel.[788]  This assistance

---

[782]  Examiner's Interview of Christina Mohr, June 29, 2010; Examiner's Interview of Michael Costa, June 4, 2010.

[783]  Examiner's Interview of Michael Costa, June 4, 2010.  *Cf.* Examiner's Interview of Christina Mohr, June 29, 2010.

[784]  The engagement letters, as noted, contemplated conflicting roles.  Moreover, the advisors expressly disclaimed any fiduciary relationship.  Ex. 24 at 3 (MLPFS Engagement Letter, dated Oct. 17, 2005); Ex. 360 at 4 (CGMI Engagement Letter, dated Oct. 27, 2006).  Those disclaimers are valid under applicable (New York) law.  *See Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004); *Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 944 F. Supp. 1169, 1178-79 (S.D.N.Y. 1996) (validating disclaimer and further holding that where sophisticated "parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances").

[785]  Examiner's Interview of Christina Mohr, June 29, 2010; Examiner's Interview of Michael Costa, June 4, 2010.

[786]  *See* Report at § III.H.4.b.(1), III.H.4.b.(3), and III.H.4.b.(4).

[787]  Examiner's Interview of Christina Mohr, June 29, 2010; Examiner's Interview of Michael Costa, June 4, 2010.

[788]  Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010, at 56-57; 113-14; Ex. 972 (Persily E-Mail, dated June 11, 2007).

appears to have been primarily administrative,[789] although from time to time senior financial management did ask the individual at CGMI assisting on this task for her reactions to the reasonableness of certain assumptions underlying the projections.[790] This involvement might cause a court to conclude that CGMI was on inquiry notice regarding the reasonableness of Tribune's projections and hence possible insolvency. However, CGMI had no input (or apparent knowledge) regarding how VRC used management's projections to develop its solvency opinion and had no involvement in evaluating that opinion.

On balance, the Examiner concludes that it is reasonably likely that a court would find that MLPFS and CGMI acted in good faith, although the conclusion is more tenuous as to CGMI given its (albeit limited) participation in management's forecast. The Examiner recognizes, however, that if, in contrast to the Examiner's conclusions,[791] a court were to view the Citigroup Entities and the Merrill Entities respectively as essentially one entity for purposes of all good faith determinations, a court likely would reach a contrary conclusion and hold that any lack of good faith attributable to the Citigroup Entities or the Merrill Entities applies to all fees paid and obligations incurred collectively to those respective entities.

The Examiner acknowledges that his conclusions regarding the good faith of MLPFS and CGMI as Financial Advisors might seem at odds with his conclusions concerning JPMCB and MLCC as agents under their respective credit facilities and the JPM Entities, the Citigroup Entities, and the Merrill Entities as recipients of LBO Fees. The Examiner believes, however, that a court is reasonably likely to draw a distinction between the former and the latter because

---

[789] Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010 at 60, 64; Ex. 971 (Kurmaniak E-Mail, dated Sept. 19, 2007).

[790] Examiner's Sworn Interview of Rosanne Kurmaniak, July 7, 2010 at 133:1-139:2; *see also* Ex. 889 (E-Mail exchange between Ms. Kurmaniak, Mr. Bigelow and others, dated September 27, 2007).

[791] *See* Report at §§ III.E.4.b. and III.E.4.c.

MLPFS and CGMI recused themselves from financial advisory services, and, therefore, those entities did not have any reason to evaluate VRC's opinion or the question of Tribune's Step Two solvency generally.  By contrast, for the reasons discussed above, JPMCB and MLCC as agents stood in different positions and approached Step Two with different contractual rights.  Although the Examiner acknowledges that a court may be less inclined to draw distinctions between the financial advisory arms of the Merrill and Citigroup Entities than the Examiner has,[792] for the reasons set forth in the Report, on balance the Examiner believes these distinctions are appropriate under the circumstances.

Because the Examiner has concluded that it is reasonably likely that a court would find that MLPFS and CGMI acted in good faith at the time of the close of both the Step One and Step Two Transactions, this means that if the Tribune Entities received reasonably equivalent value for the services rendered by MLPFS and CGMI, as discussed previously in the Report,[793] the Advisory Fees would not be avoidable or recoverable (and, to the extent the Tribune Entities received reasonably equivalent value, MLPFS and CGMI would be entitled to enforce their claims under Bankruptcy Code section 548(c)).

   8.    **Legal Questions Concerning Remedies Available in Connection with Avoidance.**

      a.    **Examiner's Conclusions and Explanation Concerning the Questions of "Standing" and Scope of Avoidance at Guarantor Subsidiary Levels.**

**Examiner's Conclusions**:

The Examiner concludes that it is highly likely that a court will find that each Guarantor Subsidiary that is a Debtor in the Chapter 11 Cases has standing to bring avoidance actions to

---

[792]    *See id.* at §§ III.E.4.b., III.E.4.c., and III.H.4.c.(1).

[793]    *See id.* at § IV.B.5.c(5).

avoid the obligations incurred to the LBO Lenders.  To the extent a Guarantor Subsidiary unjustifiably fails to bring such action, a creditor or an official creditors' committee in such entity's case would be eligible to seek leave and obtain authority to bring such action on behalf of the estate.  The Examiner concludes that a court is reasonably likely to find that if the estate representatives for Tribune *and* the Guarantor Subsidiaries were to successfully avoid the LBO Lender Debt, the value available from avoidance at the Guarantor Subsidiary estates would not be limited just to the satisfaction of the Non-LBO Debt at those levels.

**Explanation of Examiner's Conclusions**:

The Parties presented extensive argument on the question of whether Tribune's creditors would have "standing" to seek avoidance of the obligations incurred by the Guarantor Subsidiaries to the LBO Lenders, much of it keying off of the district court's decision in *Adelphia Recovery Trust v. Bank of America, N.A.*[794]  *Adelphia* involved claims for fraudulent transfer that were asserted by a recovery trust created under a confirmed plan of reorganization. The trust sought to avoid and recover liens and obligations of certain Adelphia subsidiaries; the defendants argued that the trust could not bring claims because the creditors of the Adelphia subsidiaries that made the transfers were paid in full under the plan of reorganization.[795] Applying the principle that "a party does not have standing to sue where the party is not able to allege an injury that is likely to be addressed by the relief sought,"[796] the *Adelphia* court held that neither the former subsidiary's creditors nor the trust constituted an "injured party" for standing purposes.  In the current case, there should be little question that Tribune's creditors are without standing to avoid fraudulent transfers of the Guarantor Subsidiaries.  Absent substantive

---

[794] *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 94 (S.D.N.Y. 2008), *aff'd*, 2010 WL 2094028 (2d Cir. May 26, 2010).

[795] *Id.* at 92.

[796] *Id.* at 95.

consolidation, alter ego, or piercing of the corporate veil of all the Guarantor Subsidiaries (none of which has been alleged, let alone shown here), Tribune's creditors have no such standing in the Guarantor Subsidiaries' cases.[797]

Ultimately, however, the question of standing to bring avoidance actions at the Guarantor Subsidiary levels is not substantial.  As debtors in possession, the Guarantor Subsidiaries not only have the right but the exclusive standing to bring avoidance actions on behalf of their respective estates.[798]  To the extent a Guarantor Subsidiary unjustifiably fails to commence such actions, any one of several candidates clearly having standing might seek leave to act as the representative of those estates.  The UCC was appointed in each Chapter 11 Case and therefore is a party in interest in each case.[799]  The Guarantor Subsidiaries also have their own Non-LBO Creditors.  Finally, a creditor or creditor representative at Tribune might seek leave to be vested with authority to act as a representative of the Tribune estate with respect to its ownership interests in FinanceCo and Holdco for purposes of exercising Tribune's rights as stockholder of those entities, both to cause them and the Guarantor Subsidiaries to bring avoidance actions.  In *Adelphia*, unlike here, because a plan of reorganization had been confirmed, none of these avenues was available.[800]

---

[797] *See, e.g., Magten Asset Mgmt. Corp v. Nw. Corp. Debenture Trust Co. (In re Nw. Corp.)*, 313 B.R. 595, 602 (Bankr. D. Del. 2004).

[798] *See, e.g.*, 11 U.S.C. §§ 323(a), 544(b)(1), and 548(a)(1) (2006).

[799] *See Notice of Appointment of Comm. of Unsecured Creditors* [Docket No. 101]; *see also* 11 U.S.C. § 1109 (2006); *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 580 (3d Cir. 2003) (en banc) ("[B]ankruptcy courts can authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of the estate.").

[800] The bankruptcy court in *Adelphia* previously granted standing to the creditors' committee to pursue avoidance actions at the subsidiary level.  It was only after the confirmed plan resulted in the payment in full of the subsidiary debtors' creditors and the release of the avoidance claims in question that the court found a lack of standing.  *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 332-33 (S.D.N.Y. 2009) (contrasting surviving fraudulent conveyance claim with those dismissed for lack of standing as not subject to a release).

Separate from the question of who might have standing to bring avoidance actions at the Guarantor Subsidiary levels is the more consequential question whether, if fraudulent transfer actions were successfully prosecuted at the Guarantor Subsidiary level, avoidance would inure to the benefit of Tribune's creditors who have no recourse to those entities under nonbankruptcy law.  This result could occur if the LBO Lender Debt were avoided under Bankruptcy Code section 548, thereby effectively rendering the Guarantor Subsidiaries solvent and Tribune's interests in these entities highly valuable, after satisfaction of the Non-LBO Creditor liabilities. Avoidance of the LBO Lender Debt at Tribune in turn could allow Tribune's Non-LBO Creditors to receive payment in full from that newly-solvent estate.

It is important to appreciate that this question arises only in a scenario in which avoidance occurs at the Guarantor Subsidiaries' estates.  Absent piercing of the corporate veil, alter ego, or substantive consolidation,[801] avoidance at Tribune but not the Guarantor Subsidiary estate would leave the lion's share of the value from those estates for the LBO Lenders whose claims would remain valid and enforceable at the Guarantor Subsidiary levels; that value would never be available to Tribune's creditors.  This result follows from the provisions of the Subsidiary Guarantees which, among other things, specify that the obligation to pay "shall not be subject to any defense . . . , setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise."[802]  Under New York law (which the Guarantee Agreement selects as its governing

---

[801]  *See, e.g.*, *In re Owens Corning*, 419 F.3d 195, 215 n.27 (3d Cir. 2005) ("[S]ubstantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve . . . a "free pass" to spare Debtors or any other group from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet hard to show.  If the Banks are so vulnerable to the fraudulent transfer challenges Debtors have teed up (but have not swung at for so long), then the game should be played to a finish in that arena. . . . If the bondholders have a valid claim, they need to prove it in the District Court and not use their allegations as a means to gerrymander consolidation of the estates.") (footnote omitted).

[802]  *See* Report at §§ III.D.10.d. and III.G.3.d.  Each Guarantor Subsidiary serves as "primary obligor and not merely as surety."

law),[803] the guarantees therefore are enforceable as independent obligations of the Guarantor

Subsidiaries even if the underlying loan obligations are not enforceable for any reason, including

the insolvency of the primary obligor.[804]  This principle remains true and the guarantees remain

enforceable even if Tribune Company's obligations under the Credit Agreement are avoided as

fraudulent conveyances or otherwise.[805]  Contrary to the contention of certain Parties, this

conclusion is not tantamount to permitting parties to "opt out" of the fraudulent transfer law.[806]

---

[803]  In the Third Circuit, a forum selection clause will be enforced unless (1) the clause is a result of fraud or overreaching, (2) some strong local public policy would be violated if the clause is enforced, or (3) the opponent to the enforcement of such a clause would be forced to litigate in a jurisdiction that would be so seriously inconvenient to the opponent that it would be unreasonable.  *Gen. Eng'g Corp. v. Martin Marietta Alumina*, 783 F.2d 352, 358 (3d Cir. 1986); RESTATEMENT (SECOND) OF CONFLICTS OF LAW, § 187 (1971). Thus, in *Citibank, N.A. v. Chammah*, 44 V.I. 85, 93 (V.I. Terr. Ct. 2001), the court applied New York law to enforce a provision of a guarantee that provided "the obligations of Guarantor hereunder are direct, unconditional and completely independent of the obligations of the Borrower."

[804]  *See MF Global, Inc. v. Morgan Fuel & Heating Co.*, 896 N.Y.S.2d 326, 327 (N.Y. App. Div. 2010) ("The guaranties were unconditional and barred any defenses to the obligation they guarantied, so, although executed as part of the same transaction, they were intended to entail completely separate obligations.") (internal citations omitted); *Beal Bank, SSB v. Sandpiper Resort Corp.*, 674 N.Y.S.2d 83, 34 (N.Y. App. Div. 1998) ("[B]y the unqualified language contained in the guarantees, the guarantees are enforceable even if the principal escapes liability.") (citations omitted); *Raven Elevator Corp. v. Finkelstein*, 636 N.Y.S.2d 292, 293 (N.Y. App. Div. 1996) ("[L]iability of the guarantor may be broader than and exceed the scope of that of the principal where the guarantee, which is a separate undertaking, is, by its unqualified language, enforceable against the guarantor."); *Mfrs. Hanover Trust Co. v. Green*, 474 N.Y.S.2d 474, 475-76 (N.Y. App. Div. 1983) (holding that where guarantee states that it is enforceable even if underlying obligation invalid, irregular or unenforceable, guarantee is enforceable even if underlying obligation not enforceable against primary obligor); *see also Halper v. Halper*, 164 F.3d 830, 843 (3d Cir. 1999) (noting support for "proposition that unconditional guarantees that extend a guarantor's responsibility beyond that of the primary obligor are enforceable").

[805]  *See Lowrey v. Mfrs. Hanover Leasing Corp. (In re Robinson Bros. Drilling)*, 6 F.3d 701, 704 (10th Cir. 1993) ("[C]ourts have recognized, without regard to any special guaranty language, that guarantors must make good on their guaranties following avoidance of payments previously made by their principal debtors."); *Feldman v. Chase Home Fin. (In re Image Masters, Inc.)*, 421 B.R. 164, 189 (Bankr. E.D. Pa. 2009) (citing *In re Coutee*, 984 F.2d 138, 141 (5th Cir. 1993), for the proposition that "avoidance of debtor's payment to bank on note did not extinguish a third party's guaranty of the note and the guarantor was liable to the bank on the guaranty"); *see also Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1449 (6th Cir. 1993) (finding that debtor's discharge did not affect guarantor's obligation to creditor); *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1351 (5th Cir. 1989) (holding that discharge does not release non-debtor guarantors); *Centre Ins. Co. v. SNTL Corp. (In re SNTL Corp.)*, 380 B.R. 204, 213 (B.A.P. 9th Cir. 2007) ("[T]he return of a preferential payment by a creditor generally revives the liability of a guarantor."); *see also URSA Minor Ltd. v. AON Fin. Prod.*, 2000 U.S. Dist. LEXIS 10166, at *22-23 (S.D.N.Y. July 21, 2000) ("The Court finds that AFP has an obligation to pay irrespective of the Bond's potential invalidity or unenforceability with respect to GSIS . . . . [E]ven if GSIS could properly allege that the Bond was void ab initio, AFP's waiver would still apply.").

[806]  *In re Pease*, 195 B.R. 431, 435 (Bankr. D. Neb. 1996) ("I conclude that any attempt by a creditor in a private pre-bankruptcy agreement to opt out of the collective consequences of a debtor's future bankruptcy filing is generally unenforceable.").

Rather, it recognizes that fraudulent transfer law has its limitations.[807]  Moreover, contrary to the contention of another Party, general principles governing exoneration of a surety when the principal obligor is discharged have no bearing on the Subsidiary Guarantees, which remain enforceable absent avoidance.[808]

Nevertheless, it is possible to consider a scenario in which estate representatives for each and every Debtor successfully avoid the obligations incurred to the LBO Lenders in the Leveraged ESOP Transactions (in other words, all of the LBO Lender Debt); and those lenders manage to enforce only a portion of their obligations against each estate under the good faith defense asserted under Bankruptcy Code section 548(c) (or in the context of the Court's determination of reasonably equivalent value under section 548(a)(1)).  To be clear, based on the Examiner's other findings in the Report, the Examiner does not believe that it is reasonably likely that a court would find that the Step One Transactions are avoidable as intentional or constructive fraudulent transfers.  Because the Examiner recognizes that a court might disagree with these conclusions and the Parties have raised this issue, the Examiner considered whether, if all of the estates avoided the LBO Lender Debt, avoidance at the Guarantor Subsidiary levels would solely inure to the benefit of Non-LBO Creditors of the Guarantor Subsidiaries, with the remainder of the consideration going to satisfy the LBO Lender Debt.

---

[807]  To a great degree, principles of equitable subordination were developed to reach just results where the formalities of fraudulent transfer law would yield injustice.  *See, e.g., Pepper v. Litton*, 308 U.S. 295 (1939).

[808]  *Pro-Specialties, Inc. v. Thomas Funding Corp.*, 812 F.2d 797, 799 (2d Cir. 1987), does not compel a different conclusion.  The court there held "on the facts before us, the district court could not have found a guarantee without first finding the principal debtor liable on the principal obligation."  812 F.2d at 799.  The court then noted that, "[e]xcept in situations not applicable here, the general rule is that the guarantor is not liable unless the principal is bound."  *Id.*  For the reasons discussed above, this situation is not applicable here.  Likewise, the court in *HSH Nordbank AG New York Branch v. Swerdlow*, 672 F. Supp. 2d 409, 418-19 (S.D.N.Y. 2009), actually enforced the guarantee there in the face of a contention that the underlying obligation had been discharged, noting that "advance consent provisions in a guaranty may render the guarantor liable even after a release of the principal borrower or modifications of the underlying loan."  *See also R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co.*, 789 F.2d 74, 78 (1st Cir. 1986) ("If, however, Ohio Casualty's suretyship was unconditional, it would be liable regardless of its principal's liability, unless it could raise an equitable defense.").

The Leveraged ESOP Transactions did not just involve Tribune or its assets alone; by design, the balance sheets of all of the Tribune Entities were changed.  Tribune and the Guarantor Subsidiaries incurred the LBO Lender Debt at the same time—Tribune as borrower and the Guarantor Subsidiaries as guarantors and all of them as primary obligors—on the same underlying obligations to the LBO Lenders.  The value that had been available to Tribune's creditors in the form of equity in the Guarantor Subsidiaries before the Leveraged ESOP Transactions was diluted by the Stock Pledge and the joint and several guarantees given by the Guarantor Subsidiaries in those transactions.  In a scenario in which avoidance occurs by every estate as a constructive fraudulent transfer, by definition the court would find that all of those entities were rendered insolvent or left with unreasonably small capital at the same moment in time as a result of incurrence of the same underlying debt incurred in the same transactions.  As the factors supporting collapse of the transactions within Step One and Step Two are no different for Tribune than the Guarantor Subsidiaries, the court would issue the same rulings concerning the appropriateness of collapse for all the Tribune Entities.  In a scenario in which the LBO Lender Debt is found to be avoidable as to every debtor, would a court turn on a dime and allow the LBO Lenders—on account of their avoided obligations —to mop up all of the value left over after payment of the Guarantor Subsidiary creditors but before that value could find its way to Tribune's creditors?

The Examiner submits that to posit such a scenario is to answer the question posed.  In the Examiner's view, it would be implausible for a court to find that avoidance is required as to each and every Debtor, only to reverse that avoidance for a moment in time to allow the LBO Lenders to recover the value from Guarantor Subsidiaries on account of their avoided obligations.  Nothing in the language of Bankruptcy Code section 548 would support such a result.  The statute provides for the avoidance of an obligation that is found constructively

fraudulent.[809]  Avoidance renders that obligation unenforceable. [810]  Avoidance under section

548 is distinguished from an action to recover property transferred or its value under Bankruptcy

Code section 550(a), which, by its terms, only allows for recoveries "for the benefit of the

estate."[811]  No similar limitation is found in section 548 avoidance.  Indeed, there is even

authority under section 550 permitting recovery beyond that which is necessary to pay creditors

in full.[812]  It is true that the Third Circuit Court of Appeals endorsed the fundamental principal

that "[t]he use of [the avoidance power] for the benefit of creditors is at the heart of the

avoidance powers."[813]  Of similar import is the Court of Appeal's statement that "the purpose of

fraudulent conveyance law is to make available to creditors those assets of the debtor that are

---

[809]  11 U.S.C. § 548(a)(1) (2006).

[810]  *See Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d. 719, 726 (4th Cir. 2005) ("Under the facts found
by the bankruptcy court, the plain language of § 544 provides that Debtor 'may avoid' the deeds of trust . . . .
The ruling of the bankruptcy court that the deeds of trust remain in effect as between Debtor and the Bank
clearly infringes Debtor's right, unambiguously conferred by the Code, to nullify the grant of the deeds.  We
therefore hold that the bankruptcy court erred in limiting Debtor's ability to avoid the deeds of trust.");
*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 606 (B.A.P. 8th Cir. 2003) ("In enacting section 544(b),
Congress expressly rejected limiting the estate's recovery to the amount of a particular creditor's claims."), *aff'd*,
376 F.3d 819 (8th Cir. 2004); *Glanz v. RJF Int'l. Corp. (In re Glanz)*, 205 B.R. 750, 757-58 (Bankr. D. Md.
1997) ("Section 548 imposes no requirement that an avoidance action be brought only under circumstances
where the avoidance will result in a benefit to the bankruptcy estate.").

Although the court in *Coleman* viewed with suspicion the suggestion that the debtor in that case would benefit
individually from avoidance, *Coleman*, 426 F.3d. at 726, the Fourth Circuit's construction of section 544 in that
context is without ambiguity.

[811]  11 U.S.C. § 550(a) (2006).  *MC Asset Recovery, LLC v. S. Co.*, 2006 U.S. Dist. LEXIS 97034, at *20 (N.D. Ga.
Dec. 11, 2006) ("[A] trustee who brings an action to avoid and recover a fraudulent transfer may avoid and
recover it in its entirety, even when the value of the transfer exceeds the value of all allowed claims of
unsecured creditors"); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.01[1] (Alan A. Resnick & Henry J. Sommer
eds., 16th ed.) ("[I]f the transaction is fraudulent within the rule set forth in section 548, the trustee may avoid it
in its entirety.").  *See also In re Coleman*, 426 F.3d at 726.

[812]  *See Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 797-98 (7th Cir. 2009); *Acequia, Inc. v. Clinton (In re
Acequia, Inc.)*, 34 F.3d 800, 811-12 (9th Cir. 1994); *In re Classic Drywall, Inc.*, 127 B.R. 874, 876 (D. Kan.
1991) ("[S]ection 550(a) . . . restore[s] the estate [as] if the transfer had not occurred."); *Glanz*, 205 B.R. at 758
("Notwithstanding this fact, a debtor's power to avoid transfers pursuant to § 544(a) is not unrestricted, and
equitable principles may be applied to bar a lien avoidance action where the avoidance does not accrue to the
benefit of creditors but instead creates a windfall for the debtor.").

[813]  *Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237,
244 (3d Cir. 2000).

rightfully a part of the bankruptcy estate, even if they have been transferred away."[814]  But these statements are truisms with which few courts could disagree.  The Third Circuit Court of Appeals has not addressed directly the question whether avoidance under section 548 is subject to a limitation on the scope of avoidance or that any such limitation would support limiting the effect of avoidance in these circumstances.  The Examiner concludes that the statutory language largely answers the question posed and does not support the limitation advocated by certain Parties.

Admittedly, some courts have imposed such a limitation, principally, but not exclusively, when the avoidance would inure to the benefit of an equity holder or would extend beyond the damages suffered by creditors.[815]  But Tribune's ownership interest in the Guarantor Subsidiaries is several steps removed from the interests of Tribune's current equity holders in Tribune.  Allowing the value derived from avoidance to flow from the Guarantor Subsidiaries to the Tribune estate (and then to Tribune's creditors) is not of the same tenor as allowing acquiring

---

[814]  *Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship. IV*, 229 F.3d 245, 250 (3d Cir. 2000).  The court went on to state that "[w]hen recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer."  229 F.3d at 250.  This latter statement is based on the plain language of section 544(b) codifying the Supreme Court's holding in *Moore v. Bay*, 284 U.S. 4 (1931).

[815]  *See Balaber-Strauss v. Murphy (In re Murphy)*, 331 B.R. 107, 121 (Bankr. S.D.N.Y. 2005) (noting that avoidance under section 548 is limited to the extent necessary to satisfy allowed prepetition and administrative claims; *i.e.* those "*legally* harmed by a [transfer]"); *In re Crowthers McCall Pattern*, 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990) ("It is settled that even where the obligation is avoided, that avoidance would be only for the benefit of creditors and the obligation would still stand ahead of equity.").  *Accord In re Newman*, 875 F.2d 668, 670-71 (8th Cir. 1989) (finding that no avoidance action may proceed with respect to the transfer of partnership property in the individual chapter 7 case of one of the partners); *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582, 584 (2d Cir. 1950); *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 376 (S.D.N.Y. 1998).

One Party asserted that Bankruptcy Code section 502(h) embodies the "principle" that a creditor is entitled to enforce an obligation as against the estate, citing, *e.g.*, *Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 62 (1st Cir. 2004) ("[W]hen grounds for avoidance are found, however, a creditor . . . becomes entitled to pursue whatever claim it may have had in the avoided sum against the debtor") and *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 55 (Bankr. S.D.N.Y. 1999) ("So strong is [the principle that avoidance powers can only be exercised for the benefit of creditors] that a transfer, avoidable as fraudulent by a creditor, is considered valid as between a grantor and grantee").  As discussed in another part of the Report, *see* Report at § IV.B.8.b., however, section 502(h) has no application to avoidance of obligations, and an obligee's right to enforce an obligation is governed exclusively by Bankruptcy Code section 548(c).

stockholders in a leveraged buyout transaction to benefit from avoidance of the very debt they procured to make the transaction possible.  Although it is true that Tribune's creditors did not bargain as a matter of nonbankruptcy law for recourse to the Guarantor Subsidiaries, it is hard to fathom that a court would permit the lenders whose debt would be avoided to enforce their structural seniority in this avoidance scenario.  The so-called "participant bar" cases—arguably standing for the proposition that a trustee cannot assert an avoidance action when recovery would only benefit creditors or other parties who *expressly consented* to or participated in the transaction in question[816]—have little to do with the circumstance presented here.  In the posited scenario, the fact that the Leveraged ESOP Transactions involved all of the Tribune Entities and rendered them all insolvent or unreasonably capitalized at the same time would have consequences.  The Examiner finds it reasonably unlikely that a court would allow the LBO Lenders to recover ahead of Tribune's creditors from the Guarantor Subsidiaries in the posited scenario.

---

[816] In *Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*, 2006 Bankr. LEXIS 2490, at *10 (Bankr. W.D.N.Y. Aug. 28, 2006), the court stated that "on equitable grounds, this Court would not make a finding of avoidance and recovery, when the only entity that would benefit from that avoidance and recovery would be, [one] which specifically approved the . . . transaction in writing and benefited from the transaction . . . .".  This statement was dictum at best, however, as the court also denied leave to amend the complaint in question (an inherently discretionary question) because the amendment would not relate back to the original complaint.  *Id.*  In *Harris v. Huff (In re Huff)*, 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993), the court applied long-standing jurisprudence under Bankruptcy Code section 544(b):

> The general rule is that section 544(b) confers upon the trustee no greater rights of avoidance than the creditor himself would have if he were asserting invalidity on his own behalf.  Consequently, if the creditor is deemed estopped to recover upon his claim, or is barred from recovery because of the running of a statute of limitations prior to the commencement of the case, the trustee is likewise rendered impotent."

The court observed also (not controversially) that:  "A transaction that is voidable by a single, actual unsecured creditor may be avoided in its entirety, regardless of the size of the creditor's claim." *Id.*

> **b.      Examiner's Conclusions and Explanation Concerning Participation of Creditors Whose Claims, Payments, or Liens are Avoided in Creditor Distributions.**

**Examiner's Conclusions**:

To the extent a transferee of an avoided transfer pays the amount avoided or turns over such property, the transferee will be entitled to assert a claim against the estate to which the funds are paid or returned equal to the non-constructively fraudulent claim.  To the extent, however, an obligee's claim is avoided, a court is reasonably likely only to permit participation of such a claim, if at all, in distributions from the estate to the extent the claim is supported by reasonably equivalent value or Non-LBO Creditor claims are paid in full plus postpetition interest.  It is reasonably likely that if Step Two Debt, but not Step One Debt, is avoided, absent an otherwise applicable basis to subordinate or disallow the Step One Debt or assert rights of unjust enrichment, the Step One Debt would participate in distributions from the estates in accordance with applicable nonbankruptcy priorities, although a question exists whether the Step One Debt would participate in any recoveries of payments made in connection with avoidance of the Step Two Transactions.

**Explanation of Examiner's Conclusions**:

Bankruptcy Code section 502(d)[817] provides that a transferee may not participate as a creditor unless and until such transferee pays the amount of or returns the avoidable transfer to the estate.[818]  Case law teaches that, on satisfaction of this precondition, a transferee of an avoided transfer "should be allowed to prove whatever claim it would have had in the absence of

---

[817]    11 U.S.C. § 502(d) (2006).

[818]    *Scharffenberger v. United Creditors Alliance Corp. (In re Allegheny Health, Educ. & Research Found.)*, 292 B.R. 68, 74 (Bankr. W.D. Pa. 2003), *aff'd sub nom., Risk Mgmt. Alts., Inc. v. Scharffenberger (In re Allegheny Health Educ. & Research Found.)*, 127 F. App'x 27 (3d Cir. 2005).  Similarly, by its terms, this provision does not allow a claim in favor of the holder of an avoided transfer but conditions any participation in distributions from the estate on such payment or return.  *See* 11 U.S.C. § 502(h) (2006).

its fraudulent behavior."[819]  Applied here, to the extent the transferee of an avoidable transfer restores the estate on account of the constructively fraudulent transfer, the transferee may assert an allowed claim equal to the non-constructively fraudulent portion of its claim.[820]

Section 502(d) applies only to the avoidance of transfers, not obligations.[821]  An obligee's entitlement to enforce its claim against the estate is governed exclusively by Bankruptcy Code section 548(c).[822]  To the extent a claim cannot be enforced under section 548(c), there is no basis under any other applicable Bankruptcy Code provision to enforce that claim against the bankruptcy estate.[823]  It would be nonsensical, moreover, to apply section 548(c)—with the object of fixing the portion of the claim that may be enforced and the portion that may not—only to turn around and allow the constructively fraudulent portion of the avoided claim. Nevertheless, the bankruptcy court in *Best Products* suggested in dictum that there may be room to afford a lender that acted in good faith in a leveraged buyout transaction the right to participate in bankruptcy dividends beyond the amount of the obligation conferring reasonably equivalent value:  "There is respectable commentary to the effect that LBO lenders should have a

---

[819]  *Misty Mgmt. Corp. v. Lockwood*, 539 F.2d 1205, 1214 (9th Cir. 1976) ("[A] transferee guilty of fraudulent behavior may nevertheless prove a claim against the bankrupt estate, once he returns the fraudulently conveyed property to the estate.  A rule to the contrary would allow the estate to recover the voidable conveyance and to retain whatever consideration it had paid therefor.  Such a result would clearly be inequitable.") (internal citations omitted); *accord Verco Indus. v. Spartan Plastics (In re Verco Indus.)*, 704 F.2d 1134, 1139 (9th Cir. 1983).

[820]  *See In re Hough*, 4 B.R. 217, 219 (Bankr. S.D. Cal. 1980) ("Thus, that Court held that the transferee should be allowed to prove whatever claim it would have had in the absence of its fraudulent behavior.  [T]his Court has concluded that Claimant gave no consideration for the transfer by the bankrupt of the Full Moon liquor license to her.  Therefore, she has no claim against the estate.").

[821]  *In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005).  Likewise, section 502(h) is inapposite.

[822]  11 U.S.C. § 548(c) (2006).

[823]  *See Murphy v. Meritor Savs. Bank (In re O'Day Corp.)*, 126 B.R. 370, 411 (Bankr. D. Mass. 1991) ("In fact, Meritor contends that, should the Court sustain the Trustee's fraudulent conveyance action, it would remain as an unsecured creditor.  Consequently, the Bank takes the position that, as a creditor of the estate with a proof of claim on file, it is entitled to its *pro rata* distribution of the estate's assets unless an objection to Meritor's proof of claim is filed and sustained by the Court or, alternatively, its claim is equitably subordinated under section 510 of the Bankruptcy Code.  The Court disagrees.  The language of the UFCA and the Bankruptcy Code supports the position taken by the Trustee.").

claim for all the consideration with which they have parted.  Invalidation seems particularly draconian in a legitimate LBO because the creditors actually parted with value."[824]  The court went on, however, to suggest that a contrary result might well be appropriate even as a matter of equity jurisprudence—and that the most one could conclude from the case law was that a lender holds an unsecured claim to the extent it gave reasonably equivalent value: [825]

> On the other hand, if the underlying fraudulent transfer statute (such as DCL § 273) provides for the avoidance as fraudulent of an obligation incurred, it could be argued fairly persuasively that so much of the obligation which the debtor incurred as was not supported by consideration *to the debtor,* ought be avoidable. *Cf. McColley v. Rosenberg (In re Candor Diamond Corp.),* 76 B.R. 342 (Bankr. S.D.N.Y. 1987) (under section 548 of the Bankruptcy Code, where consideration for transfers which left debtor insolvent was paid to debtor's principal and his family, rather than to the debtor, the debtor's transfers were made for less than a reasonably equivalent value and were avoidable); *accord* 1 *Glenn* § 286 at 481.

The relatively few other courts to actually confront the question of the treatment of the constructively fraudulent portion of a creditor's claim have suggested that equitable subordination of the claim of the obligee on an avoided transfer to other creditor claims might be an appropriate remedy as a means of enabling innocent creditors to be made whole from the constructively fraudulent transfer.[826]

---

[824]  *RTC v. Best Prods. Co. (In re Best Prods. Co.),* 168 B.R. 35, 59 (Bankr. S.D.N.Y. 1994) (citation omitted), *aff'd on other grounds,* 68 F.3d 26 (2d Cir. 1995).  Thus, the court noted: "But this much is unassailable: to the extent that the lenders gave consideration to the debtor, such as here, in the form of working capital which the Banks gave to Best at the time of the merger, the lenders would have a claim which would be allowable so long as they satisfied the judgment arising out of the fraudulent transfer action."  *Id.* at 58 (footnote omitted).

[825]  *Id.*

[826]  *See West v. Hsu (In re Advanced Modular Power Sys.),* 413 B.R. 643, 677 (Bankr. S.D. Tex. 2009) (concluding that a trustee could both avoid transfers to insiders and subordinate their resulting claims; "In sum, because all three prongs of the Fifth Circuit's [*Mobile Steel*] test are met, this Court will not allow the Defendants to benefit from their inequitable conduct at the expense of AMPS's creditors.  Therefore, any claims the Defendants may have for monies recovered by the Trustee are subordinate to both the Trustee's claims and any other creditor's claim against the estate."); *Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency),* 174 B.R. 557, 598 (Bankr. N.D. Cal. 1994); *In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990).  *But see generally Boyer v. Crown Stock Distrib., Inc.,* 587 F.3d 787, 797 (7th Cir. 2009) ("But as far as we can tell, should all the unsecured creditors of new Crown be paid in full the only other potential claimants to any surplus money in its estate will be the original shareholders.  The LBO was fraudulent only

The preceding discussion addresses what happens when a claim is avoided.  Additional issues arise when a creditor holds one claim that is avoided and another claim that is not.  A straightforward application of the relevant Bankruptcy Code provisions makes it abundantly clear that barring equitable subordination, disallowance, or principles of unjust enrichment, if the Step Two Debt but not the Step One Debt is unavoidable, the Step One Debt would be entitled to participate in distributions from the estates in accordance with their nonbankruptcy priorities.  Contrary to the contention advanced by one Party to the Examiner, Bankruptcy Code sections 502(d) and (h) provide no basis to disallow Step One Debt based on avoidance of Step Two Debt.  As noted, these Bankruptcy Code provisions do not apply to avoidance of claims.

An argument nevertheless may be advanced that a court should prohibit the holders of the Step One Debt from participating in any *recoveries* of payments made in connection with *avoidance* of the Step Two Transactions until the Non-LBO Creditors holding claims against the particular Debtor-entities are paid in full.  These are the same creditors (or their successors) who indeed participated in, funded, and made possible the Step Two Transactions.  Thus, so the argument goes, it would be inequitable for those entities to benefit from avoidance of payments made and obligations incurred in the Step Two Transactions while non-LBO Creditors holding claims against the same estates remain unpaid.  Although this argument may be appealing as an equitable matter, it is generally understood that an estate representative may bring actions to avoid and recover transfers for the benefit of creditors who might not have any right to bring those actions on their own accord.[827]  Absent a basis to equitably subordinate the Step One Debt

---

with respect to the unsecured creditors.  If and when they are paid in full, the wrong committed by the shareholders will have been righted and there will be no reason to deny their claims to whatever money is left over.").

[827] *See Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'shp IV*, 229 F.3d 245, 250-51 (3d Cir. 2000) (applying Bankruptcy Code section 544(b); "When recovery is sought under section 544(b) of the

consistent with the standards governing equitable subordination discussed later in the Report,[828]

it is difficult to find a doctrinal basis that would support barring that debt from participating in

avoidance recoveries.[829]

The doctrine of equitable estoppel, however, may furnish such a basis, even if the

standards governing equitable subordination are not otherwise met.[830]  As one bankruptcy court

noted:  "[S]ince this Court inherently possesses the powers of equity, it may employ the

equitable estoppel doctrine in a manner not inconsistent with the Code."[831]  But, equitable

estoppel is at best an imperfect fit, as that doctrine typically requires some form of representation

from the party against whom estoppel is sought in favor of the party seeking estoppel, with some

---

Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.").

[828] *See* Report at § IV.D.1.  Although equitable subordination is not a static concept, affording courts flexibility to fashion remedies as new fact patterns emerge, *see United States v. Noland*, 517 U.S. 535, 540 (1996) ("[T]he adoption in § 510(c) of 'principles of equitable subordination' permits a court to make exceptions to a general rule when justified by particular facts, *cf. Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."), the Examiner has not found any equitable subordination case that would support the result discussed in the Report.  Moreover, "[e]quitable subordination is remedial not penal."  *In re Mid-Am. Waste Sys.*, 284 B.R. 53, 72 (Bankr. D. Del. 2002).  *See also In re Ahlswede*, 516 F.2d 784, 788 (9th Cir. 1975) ("A supposed inequity resulting when an innocent party in good faith asserts a legally valid claim will not [support disallowance or subordination of a claim].") (citation omitted); *In re Columbia Ribbon Co.*, 117 F.2d 999, 1002 (3d Cir. 1941) ("It does not hold that the court may set up a sub-classification of claims within a class given equal priority by the Bankruptcy Act and fix an order of priority for the sub-classes according to its theory of equity.").

[829] In *In re PWS Holding Corp.*, 228 F.3d 224, 240 (3d Cir. 2000), the Third Circuit Court of Appeals referenced an examiner's report issued in that case (under seal) in which the examiner opinioned that "there was some likelihood that the Banks and the subordinated noteholders, as participants in the leveraged recapitalization, would be estopped from recovering on the claims."  The Third Circuit, however, did not expressly endorse the examiner's opinions.

[830] *See IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589, 601 at n.27 (3d Cir. 1997) ("The traditional elements of equitable estoppel are: '(1) the party to be estopped must have known the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe it was so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the other party's conduct to his injury.'") (citing *In re Jones,* 181 B.R. 538, 543 (D. Kan. 1995); *Penny v. Giuffrida*, 897 F.2d 1543, 1545-46 (10th Cir. 1990)).

[831] *In re Lafayette Radio Elecs. Corp.*, 7 B.R. 189, 193 (Bankr. E.D.N.Y. 1980) (citing *Pepper v. Litton*, 308 U.S. 295, (1939)); *see also Frymire v. PaineWebber, Inc.*, 107 B.R. 506, 511 (E.D. Pa. 1989) (stating that equitable estoppel "is a defense used to preclude a person from denying or asserting a claim") (citation and internal quotation marks omitted).

courts requiring a false representation.[832]  In the current case, the LBO Lenders did not make any representations to the Non-LBO Creditors.[833]

Because the law is not clear, the Examiner leaves this question in equipoise.  The Recovery Scenarios contained in Annex B to this Volume of the Report, however, illustrate in one scenario (Case 8) the results if a court were to prohibit the Step One Debt from sharing in recoveries from avoidance of the Step Two Debt.[834]  (That scenario also posits that the LBO Lenders are not entitled to enforce any portion of the Step Two Debt.)

c.       <strong>Examiner's Conclusions and Explanation Concerning Effect of Avoidance on PHONES Subordination.</strong>

<u>**Examiner's Conclusions**</u>:

To the extent the LBO Lender Debt is not avoided (or if avoided, to the extent enforced under Bankruptcy Code section 548(c)), the LBO Lenders will be entitled to recover value at the Guarantor Subsidiary level and enforce their rights under the PHONES Subordination at the Tribune level with respect to distributions from the Tribune estate.  Although not entirely clear, the Examiner concludes that a court is reasonably likely to hold that the PHONES Subordination would not extend to LBO Lender Debt that is avoided at the Tribune level.

---

[832]  *See In re Rowland*, 275 B.R. 209, 217 (Bankr. E.D. Pa. 2002) (finding equitable estoppel requires "a representation of material fact was made to the party") (citation omitted); *In re Grigoli*, 151 B.R. 314, 321 (Bankr. E.D.N.Y. 1993) ("Equitable estoppel may be invoked only if the following elements are present: (1) conduct which amounts to a false representation, (2) reliance on the conduct of the party to be estopped, and (3) a detrimental change of position based on the conduct.").

[833]  The doctrine of ratification may provide an alternative source.  *See generally HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.,* 2009 U.S. Dist. LEXIS 10675,  at *18 (W.D.N.Y. Feb. 12, 2009); 1 GERRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES, §§ 111, 113 (rev. ed. 1940) ("'Ratification results when a party to a voidable contract accepts benefits flowing from the contract, or remains silent, or acquiesces in contract for any considerable length of time after he has had opportunity to annul or void the contract.").  The Examiner, however, has not found cases applying this doctrine in the context considered here.

[834]  Arguments similar to the ones discussed in text can be advanced regarding any participation by the holders of the EGI-TRB Notes in any recoveries from avoidance actions.  The Examiner likewise leaves this question in equipoise.

**Explanation of Examiner's Conclusions**:

Bankruptcy Code section 510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law."[835]  To the extent the LBO Lender Debt is not avoided (or if avoided, to the extent enforced under Bankruptcy Code section 548(c)), the LBO Lenders will be entitled to recover value at the Guarantor Subsidiary level and enforce their rights under the PHONES Subordination at the Tribune level regarding distributions from the Tribune estate.  By its terms, Bankruptcy Code section 548(c) permits enforcement of a claim to the extent the prerequisites of that section are satisfied.  The PHONES Subordination would apply at the Tribune level to the extent the LBO Lender Debt remains valid against Tribune or a particular Guarantor Subsidiary estate.

The more difficult question is whether, to the extent the LBO Lender Debt is avoided at the Tribune level, the PHONES Subordination continues with respect to the avoided portions of the LBO Lender Debt.  In other words, could the LBO Lenders turn around and recover on their avoided claims any distributions from the estate on the PHONES Notes?[836]  No case law has been found answering this specific question in an analogous setting.  The closest is *In re Best Products Co.*,[837] discussed previously, in which certain parties objected to a settlement that resolved and allowed the claim of a fraudulent transfer target; the bankruptcy court's approval of the settlement meant that the lender's claim was senior to the claim of the subordinated creditor

---

[835]   11 U.S.C. § 510(a) (2006); *see also In re Hinderliter Indus.*, 228 B.R. 848, 853 (Bankr. E.D. Tex. 1999) ("[J]unior creditors should be prevented from receiving funds where they have 'explicitly' agreed not to accept them.") (internal citations omitted); *Citibank, N.A. v. Smith Jones*, 17 B.R. 128, 131 (Bankr. D. Minn. 1982) (holding subordination agreement enforced postpetition in favor of holder of bank debt).

[836]   The Examiner is required to address this question because it was raised by Parties, and the answer affects the Recovery Scenarios set forth in Annex B to Volume Two.

[837]   168 B.R. 35, 39 (Bankr. S.D.N.Y. 1994), *aff'd on other grounds*, 68 F.3d 26 (2d Cir. 1995).

under the party's subordination agreement.  Faced with an objection to enforcement of the subordination provision, the court noted that even if the settlement had not been approved, the lender still would have held a substantial senior unsecured claim that would have survived avoidance.[838]  Although the court intimated that, under the subordination provisions at issue, the lender's claims would be senior notwithstanding avoidance (noting that the subordinated creditor had presented no case for equitable subornation), it is not clear from the opinion what the subordination provision actually said.  Moreover, because the specific question presented was whether the lender's allowed claim under the settlement constituted senior indebtedness, and not whether the lender would hold a senior claim if its claims were entirely avoided, at most the court's comments concerning the operation of the subordination agreement were dicta.

It is well established that avoidance of an obligation does not empower the trustee to step into the shoes of that creditor's seniority rights under a contractual subordination.[839]  Moreover, notwithstanding avoidance of an obligation, "[t]he subordination agreement, which provided underpinning for the Bank's loan, should be enforced in the distribution of the proceeds of the trustee's sale according to the terms of the parties who made the agreement."[840]  Applying this principle, a court might conclude that avoidance of the LBO Lender Debt at the Tribune level simply has no bearing on the operation of the PHONES Subordination and that, accordingly, the LBO Lenders may continue to enforce that subordination notwithstanding the avoidance of the LBO Lender Debt by the Tribune estate.  The problem with this conclusion, however, is that it

---

[838]  *Id.* at 70.

[839]  *See Morris v. St. John Nat'l Bank (In re Haberman)*, 516 F.3d 1207, 1211-12 (10th Cir. 2008); *In re Kors, Inc.*, 819 F.2d 19, 23-24 (2d Cir. 1987) ("At the same time, the Bank's rights with respect to its unperfected security interest on Kors' collateral were separate and distinct from its rights under the subordination agreement among the lenders.  Therefore, the trustee, acting under §§ 544(a)(1) and 551 obtained only those rights and powers derived from the unperfected security interest against Kors in the collateral and did not acquire the rights of the Bank under the subordination agreement. Consequently, the bankruptcy court should have enforced the subordination agreement according to the terms of the parties to that agreement.") (citation omitted).

[840]  *In re Kors, Inc.*, 64 B.R. 163, 170 (D. Vt. 1986), *aff'd*, 819 F.2d 19 (2d Cir. 1987).

*assumes* that the PHONES Subordination extends to the LBO Lender Debt even if that indebtedness is avoided, and does not consider what the PHONES Indenture actually says.

Subordination agreements are enforceable in bankruptcy only to the extent they are enforceable under "applicable nonbankruptcy law."[841]  Because the PHONES Indenture is governed by New York law, a court is likely to apply New York principles of contract interpretation to interpret the PHONES Indenture.  The definitions of "Indebtedness" and "Senior Indebtedness" in the PHONES Indenture do not by their terms expressly subordinate the PHONES Notes to debt that is avoided in a Tribune bankruptcy.  In fact, the PHONES Indenture's only reference to bankruptcy in the definition of Senior Indebtedness is the statement that postpetition interest is only included as Senior Indebtedness if and to the extent allowed by a bankruptcy court.[842]  Although the Examiner has found no authority directly addressing this question, the Examiner concludes that, based on the New York Court of Appeals decision on certification in *Chemical Bank v. First Trust (In re Southeast Banking Corp.)*,[843] a New York court likely would require specific language in the PHONES Subordination to alert the holders that Senior Indebtedness includes debt that is avoided in a bankruptcy proceeding.[844]  That explicit language is missing from the PHONES Indenture, and, as a result, a court is reasonably likely to conclude that the PHONES Subordination does not extend to avoided debt.  This

---

[841]  11 U.S.C. § 510(a) (2006).

[842]  Ex. 49 at § 14.01 (PHONES Indenture).

[843]  710 N.E.2d 1083 (1999).

[844]  *Id.* at 1087; *see also In re King Res. Co.*, 528 F.2d 789, 791 (10th Cir. 1976); *In re Bank of New Eng. Corp.*, 404 B.R. 17, 39 (Bankr. D. Mass. 2009), *aff'd sub nom. HSBC Bank USA v. Bank of N.Y. Trust Co. (In re Bank of New Eng. Corp.)*, 426 B.R. 1 (D. Mass. 2010).  *But see HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*, 364 F.3d 355, 365-67 (1st Cir. 2004) (disagreeing with the holding of *Chemical Bank v. First Trust (In re Southwest Banking Corp.)*, 710 N.E.2d 1083, 1084-88 (N.Y. 1999), and instead holding that New York law does not require specific language in a subordination agreement to alert the holders of subordinated debt that senior creditors will receive postpetition interest in a bankruptcy case before the holders of the junior debt receive principal).

construction is consistent with controlling precedent from the Third Circuit Court of Appeals

applying the "Rule of Explicitness,"[845] which presents an analogous issue.

> ### d. Examiner's Conclusions and Explanation Concerning Effect of Avoidance on Subordinated Bridge Subsidiary Guarantee.

**<u>Examiner's Conclusions</u>**:

To the extent the Credit Agreement Debt and Bridge Debt are not avoided (or if avoided,

to the extent enforced under Bankruptcy Code section 548(c)) at the Guarantor Subsidiary levels,

the subordination provisions of the Subordinated Bridge Subsidiary Guarantee will remain in

effect and govern distributions from the Guarantor Subsidiary estates.  It is reasonably likely that

to the extent those obligations are avoided and are not enforced under section 548(c) at the

Guarantor Subsidiary levels and the Stock Pledge is avoided, such avoidance would avoid, and

thereby render inoperative the subordination provisions of the Subordinated Bridge Subsidiary

Guarantee, such that any value distributed by Tribune (including amounts available to Tribune as

a result of the remittance of value from the Guarantor Subsidiaries to Tribune resulting from

avoidance of the LBO Lender Debt) would be ratably distributed between the Credit Agreement

Debt and the Bridge Debt.  However, in connection with fashioning remedies resulting from

avoidance, a court is reasonably likely to adjust this result if Non-LBO Creditors are made

whole.

**<u>Explanation of Examiner's Conclusions</u>**:

There would be no basis to relieve the Bridge Facility Lenders of the subordination

provisions contained in the Subordinated Bridge Subsidiary Guarantee to the extent the Credit

---

[845]  *In re Time Sales Fin. Corp.*, 491 F.2d 841, 844 (3d Cir. 1974).  Although additional potential bases were presented to the Examiner going to the question whether the PHONES Subordination remains enforceable based on actions by the LBO Lenders allegedly not taken in good faith (*see generally* PHONES Indenture § 14.09), these contentions are outside the purview of the Investigation because they involve inter-creditor contentions and claims and not estate actions.

Agreement Debt remains valid at the Guarantor Subsidiary levels.[846]  To the extent the Credit Agreement Debt and the Bridge Debt are avoided by the Guarantor Subsidiary estates, however, a more complex question arises concerning the effect of such avoidance on the subordination provisions of the Subordinated Bridge Subsidiary Guarantee.  Had the Credit Agreement Agent and the Bridge Credit Agreement Agent entered into a contractual subordination agreement dealing with this question and specifying that, as between the Credit Agreement Debt and the Bridge Debt, the subordination provisions would survive avoidance and govern the distribution of any value derived from the Guarantor Subsidiaries, such a contract undeniably would be enforced,[847] but the Subordinated Bridge Subsidiary Guarantee entered into between each Guarantor Subsidiary and the Bridge Credit Agreement solely governs the scope of that subordination.  No contractual subordination agreement exists between the Bridge Credit Agreement Agent and the Credit Agreement Agents, and, in fact, the Bridge Debt and Credit Agreement Debt are pari passu at Tribune (although the Credit Agreement Debt is secured by the Stock Pledge).  Although the Subordinated Guarantee provides that its terms survive nullification of Tribune's obligations, nothing in the Subordinated Bridge Subsidiary Guarantee could bulletproof those guarantees against avoidance by a Guarantor Subsidiary's bankruptcy estate.  As a result, if the LBO Lender Debt is avoided by a Guarantor Subsidiary—such that the Credit Agreement Subsidiary Guarantee and the Subordinated Bridge Subsidiary Guarantee are no longer enforceable against that entity and no distributions from that estate on account of those guarantees will occur—the subordination contained in the Subordinated Bridge Subsidiary

---

[846]   *See In re Best Prods.*, 168 B.R. 35, 70 (Bankr. S.D.N.Y. 1994) ("[I]n the event the LBO were to be deemed fraudulent, the Banks would be left with a substantial claim . . . . Thus, . . . a debt would still be due and owing to the Banks under the most favorable litigation scenario from [the debtor]'s viewpoint, as a result of which the claims of the [junior creditors] would be [and remain] subordinated to those of the Banks.").

[847]   *See* Report at § IV.B.8.c.

Guarantee likewise should fall away.[848]  Stated differently, if the obligations of the Guarantor Subsidiaries under both of these guarantees are avoided, there would be nothing to which the subordination contained in the Subordinated Bridge Subsidiary Guarantee could extend.

The Examiner concludes, however, that notwithstanding the preceding discussion, in connection with fashioning remedies resulting from avoidance at the Guarantor Subsidiary levels when Non-LBO Creditors are made whole, a court is reasonably likely to adjust the distributions so that the relative pre-avoidance priorities between the Credit Agreement Debt and Bridge Debt are honored regarding that portion of the value available that is attributable to the Guarantor Subsidiaries.  It would seem inequitable to allow the holders of the Bridge Debt to, in effect, benefit from avoidance of their own debt at the Guarantor Subsidiaries; thus, as between the Credit Agreement Debt and Bridge Debt, a court should enforce the prepetition arrangements to which those holders agreed once all *other* creditors are paid in full plus interest.  The Examiner recognizes, however, that no case law addresses this question.

>        e.        **Examiner's Conclusions and Explanation Concerning Treatment of Intercompany Claims in Avoidance Scenarios.**

The Examiner has reviewed the Parties' submissions regarding intercompany claims existing as of the Petition Date.  Based on this review, the Examiner has determined that no Party has challenged the analysis prepared by the Debtors regarding the likely percentage range of

---

[848]  *See generally Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir. 2006) ("The proper remedy in a fraudulent conveyance claim is to rescind, or set aside, the allegedly fraudulent transfer, and cause the transferee to return the transferred property to the transferor.").  It is important to point out, however, that avoidance and rescission are not synonymous.  *See, e.g., United States ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.),* 230 F.3d 788, 796 n. 14 (5th Cir. 2000) ("Avoidance differs considerably from rescission. Rescission unwinds the transaction and restores the status quo ante, whereas avoidance allows a debtor to retain the benefit of its bargain while rewriting the debtor's obligations under that bargain.").  *See also FCC v. NextWave Commc'ns (In re NextWave Pers. Commc'ns, Inc.),* 200 F.3d 43, 49 n.6 (2d Cir. 2000).  Bankruptcy Code section 548(c) provides the sole statutory basis for an obligee to enforce an obligation that otherwise would be avoided. 11 U.S.C. § 548(c) (2006).  *See* Report at §§ IV.B.5.b., IV.B.5.c.  In this fashion, section 548(c) affords an obligee or transferee to rescind the effect of avoidance subject to compliance with the limitations imposed under that section.

intercompany claims that would be allowed for purposes of determining recoveries to creditors in various avoidance scenarios.[849]  Because Question One is limited to claims and defenses asserted by the Parties, the Examiner has not independently analyzed the validity of such claims, which represent hundreds of thousands of individual transactions over the Debtors' history.[850] The Examiner uses the Debtors' analysis of intercompany claims supplied to the Examiner in the analysis of Recovery Scenarios contained in Annex B to this Volume of the Report.

9.    **Examiner's Conclusions and Explanation Concerning the Economic Effect of Potential Avoidance on Distributions.**

With the assistance of his financial advisor, the Examiner has prepared the Recovery Scenarios in Annex B to this Volume of the Report.  Readers are directed to the notes accompanying that analysis for the underlying assumptions.

C.    **Potential Preference Actions.**

Certain Parties contended that one or more of the Tribune Entities may recover as preferential transfers payments and other transfers made in connection with and following the Leveraged ESOP Transactions.  The potential preferential transfers identified by the Parties include (i) satisfaction of the Exchangeable EGI-TRB Note, (ii) payments made to the LBO Lenders within the ninety-day period before the Petition Date, (iii) payments made to directors and officers of the Tribune Entities within one year before the Petition Date, and (iv) transfers between and among Tribune and its subsidiaries within one year before the Petition Date.

The Parties devoted little analysis to these issues.  Indeed, no Party attempted to demonstrate that each of the substantive elements necessary to recover a preferential transfer

---

[849]    *See* Ex. 1071 (Debtors' Assumptions re Intercompany Claims); Ex. 1072 (Debtors' Analysis of Recovery Scenarios).

[850]    *See* Ex. 1071 (Debtors' Assumptions re Intercompany Claims).

could be satisfied with respect to the transactions.[851]   The Examiner considers these matters

below.

        **1.**       **Examiner's Conclusions and Explanation Concerning Satisfaction of Exchangeable EGI-TRB Note.**

**<u>Examiner's Conclusions</u>:**

It is unclear whether satisfaction of the Exchangeable EGI-TRB Note constitutes a

preferential transfer.  Even if, however, satisfaction of the Exchangeable EGI-TRB Note

qualifies as a preferential transfer, it is reasonably likely that a court would find that the

transaction is subject to an ordinary course of business defense, but it is unclear whether a court

would find that the transaction is subject to a new value defense.

**<u>Explanation of Examiner's Conclusions</u>:**

The EGI-TRB Purchase Agreement provided for Tribune's issuance of two unsecured

subordinated promissory notes:  the Exchangeable EGI-TRB Note and the Initial EGI-TRB Note,

which EGI-TRB agreed to purchase subject to the satisfaction of certain terms and conditions.

On April 23, 2007, over one month before the Step One Financing Closing Date, EGI-TRB

acquired the Exchangeable EGI-TRB Note for $200,000,000 in consideration as specified in the

EGI-TRB Purchase Agreement.  The Exchangeable EGI-TRB Note was an unsecured

subordinated promissory note that was exchangeable into Tribune Common Stock and due and

payable immediately prior to consummation of the Merger.

---

[851]  Bankruptcy Code section 547(b) provides that a trustee or debtor in possession may avoid the transfer of an interest of the debtor in property (i) to or for the benefit of a creditor; (ii) for or on account of an antecedent debt owed by the debtor to the creditor before such transfer was made; (iii) made while the debtor was insolvent; (v) on or within ninety days before the date of the filing of the petition or between ninety days and one year before the date of the filing of the petition if made to an insider; and (vi) that enables the creditor to receive more than would be received as a distribution in a hypothetical Chapter 7 liquidation had the transfer not been made.  *See* 11 U.S.C. § 547(b) (2006).

On December 20, 2007, in connection with consummation of the Merger, EGI-TRB purchased the Initial EGI-TRB Note in a transaction under which the Exchangeable EGI-TRB Note was satisfied and EGI-TRB advanced additional sums to Tribune.  In this subsequent transaction, Tribune did not make cash transfers to EGI-TRB to satisfy the Exchangeable EGI-TRB Note.  Rather, the outstanding amount of the Exchangeable EGI-TRB Note of $206,418,859.46 was netted against the face amount of the Initial EGI-TRB Note of $225,000,000, and additional sums owed between the parties[852] were similarly netted against each other.[853]

It is possible for a court to analyze and treat the Exchangeable EGI-TRB Note and Initial EGI-TRB Note in two distinct ways, each of which in turn affects whether the transaction may have resulted in an avoidable preference.  First, a court might find that the Exchangeable EGI-TRB Note and Initial EGI-TRB Note were substantively the same obligation created pursuant to

---

[852]  At the time of the transaction, EGI-TRB owed a net debt of $56,081,148.54 to Tribune.  Tribune was obligated to EGI-TRB for (i) outstanding amounts owed under the Exchangeable EGI-TRB Note of $206,418,859.46, (ii) Merger Consideration owed to EGI-TRB on account of its ownership of Tribune Common Stock in the amount of $49,999,992, and (iii) reimbursement of expenses incurred by EGI-TRB under the EGI-TRB Purchase Agreement in the amount of $2,500,000.  EGI-TRB in turn was obligated to Tribune for (i) the purchase price of the Initial EGI-TRB Note in the amount of $225,000,000 and (ii) the purchase price of the Warrant in the amount of $90,000,000.  *See* Ex. 714 at 4 (Step Two Flow of Funds Memorandum).

[853]  The netting transactions may qualify as setoffs under Bankruptcy Code section 553.  If treated as setoffs, the transactions are not subject to recovery as preferential transfers but are instead governed by Bankruptcy Code section 553.  *See, e.g., Braniff Airways v. Exxon Co.*, 814 F.2d 1030, 1034 (5th Cir. 1987) ("When § 553 is determined to be applicable, § 547 cannot thereafter be utilized to undo its effect.  The enactment of § 553 was an expression of the Congressional intent sanctioning the exercise of setoff as a permissible preference under certain circumstances."); *Comer v. U.S. Soc. Sec. Admin. (In re Comer)*, 386 B.R. 607, 608-609 (Bankr. W.D. Va. 2008) ("In order for there to be a preferential transfer under 11 U.S.C. § 547(b), there is a requirement of a pre-petition 'transfer' of an interest of the debtor in property.  Transfer is a term of art which is defined in 11 U.S.C. § 101(54).  The term 'setoff' is omitted from the definition of transfer in 11 U.S.C. § 101(54).  The legislative history to 11 U.S.C. § 101(54) explains the omission in clear terms:  inclusion of 'setoff is deleted.  The effect is that a 'setoff' is not subject to being set aside as a preferential 'transfer' but will be subject to special rules.'") (internal citations omitted); *Cain v. Mappa*, 142 B.R. 677, 686 (Bankr. D.N.J. 1992) ("When a setoff right is being asserted, § 553 rather than § 547 governs the creditor's rights.") (citing *Lee v. Schweiker*, 739 F.2d 870, 873 (3d Cir. 1984)); *In re Santoro Excavating, Inc.*, 32 B.R. 947, 950 (Bankr. S.D.N.Y. 1983) ("By equating setoff with secured claims, the Code recognizes that a permitted setoff is, in effect, an allowed preference.").  The Examiner evaluates whether satisfaction of the Exchangeable EGI-TRB Note was a preferential transfer in the event a court were to find that the netting transactions were not setoffs.  The Parties have not raised, and the Examiner has not analyzed, whether the netting transactions were recoupments, and if so, the possible impact on the preference analysis.

the transaction initiating and culminating in the Merger.  Under the EGI-TRB Purchase

Agreement, Tribune was obligated to repay the Exchangeable EGI-TRB Note and replace it with

the Initial EGI-TRB Note when the Merger occurred.  Once that condition was satisfied, the

Initial EGI-TRB Note functioned identically to an amended and restated version of the

Exchangeable EGI-TRB Note, albeit extending the maturity date and increasing the principal

amount by $25,000,000 (representing the additional consideration due from EGI-TRB).  Tribune

did not transfer any cash to EGI-TRB when the Exchangeable EGI-TRB Note was satisfied and

the Initial EGI-TRB Note was issued.  If a court were to view the Initial EGI-TRB Note as a de

facto amendment to the Exchangeable EGI-TRB Note under which EGI-TRB made a subsequent

advance of $25,000,000 pursuant to the EGI-TRB Purchase Agreement, it would follow that

issuance of the Initial EGI-TRB Note did not result in any transfer during the one-year reach-

back period applicable to transfers to insiders.[854]  Moreover, because the replacement of the

Exchangeable EGI-TRB Note with the Initial EGI-TRB Note did not deplete or diminish

Tribune's available assets, a court might view the transaction as not involving the transfer of an

interest of Tribune in property that could be subject to recovery as a preference.[855]

---

[854]  *See* 11 U.S.C. § 547(b)(4)(B) (2006).  Certain Parties have assumed that EGI-TRB would qualify as an insider of Tribune.  The Warrant purchased by EGI-TRB would permit it to buy 43,478,261 shares of Tribune Common Stock (subject to anti-dilution adjustments), but EGI-TRB had not exercised the Warrant.  *See* Ex. 157 at § 1(a) and (b) (Warrant).  However, Samuel Zell was appointed to the Tribune Board on May 9, 2007.  *See* Ex. 4 at 46 (Tribune 2007 Form 10-K).

[855]  Although the Bankruptcy Code does not expressly mention depletion of the estate as an element of a preferential transfer, some courts have read this requirement into the law.  *See, e.g., AmeriServe Food Distrib., Inc. v. Transmed Foods, Inc. (In re AmeriServe Food Distrib., Inc.)*, 315 B.R. 24, 29 (Bankr. D. Del. 2004) ("Section 547(b) requires, inter alia, that the property transferred by the debtor be an 'interest of the debtor in property.'  The Supreme Court has interpreted this to be 'property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.'  In determining whether a transfer was 'an interest of the debtor in property,' courts apply the 'diminution of estate doctrine,' under which a transfer of an interest of the debtor occurs when a transfer 'diminishes directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one.'") (internal citations omitted).

Second, a court might view the Initial EGI-TRB Note as a separate and distinct instrument from the Exchangeable EGI-TRB Note.  There is no question that Tribune issued separate promissory notes representing the Exchangeable EGI-TRB Note and, subsequently, the Initial EGI-TRB Note.  Although cash was not exchanged when Tribune satisfied the Exchangeable EGI-TRB Notes in connection with the Merger, the Exchangeable EGI-TRB Note did represent an obligation that Tribune was required to repay.  Had the Merger not occurred, the Exchangeable EGI-TRB Note would never have been replaced by the Initial EGI-TRB Note. Viewed in this manner, when Tribune satisfied the Exchangeable EGI-TRB Note during the one-year reach-back period applicable to transfers to insiders, a transfer occurred on account of an antecedent debt, thereby giving rise to a prima facie preferential transfer.

Nevertheless, even if a court were to view the satisfaction of the Exchangeable EGI-TRB Note as a preferential transfer, it is reasonably likely that even in this circumstance any such transfer would be protected from avoidance under the ordinary course of business defense.  The ordinary course of business defense permits a creditor to retain an otherwise avoidable preference if the transfer was made in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and creditor and the transfer was either (i) made in the ordinary course of business of the parties or (ii) made according to ordinary business terms.[856]  In evaluating whether the transfer was in payment of a debt incurred in the ordinary course of business of the debtor and creditor, courts typically consider the circumstances related to the debt, including whether it was incurred in a normal arms-length commercial transaction

---

[856]  *See* 11 U.S.C. § 547(c)(2) (2006); *see also Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 110 (Bankr. D. Del. 2010) ("Under 11 U.S.C. § 547(c)(2), the 'ordinary course of business exception' permits a creditor to retain transfers made by a debtor to a creditor during the ninety days before the petition date if:  (1) such transfers were made for a debt incurred in the 'ordinary course of business' of the parties; and either (2) the transfers were made in the 'ordinary course of business' of the parties; or (3) the transfers were made in accordance with 'ordinary business terms.'").

conducted between the parties[857] or in the routine operation of the business of the debtor and creditor.[858] To establish whether a transfer was made in the ordinary course of business of the debtor and creditor, courts analyze the course of dealing between the parties and the circumstances of the particular transfers to determine if they are consistent with prior practices.[859] When the course of dealing between the debtor and creditor is limited, the court

---

[857] *See, e.g., Kapila v. Media Buying, Inc. (In re Ameri P.O.S., Inc.)*, 355 B.R. 876, 883 (Bankr. S.D. Fla. 2006) ("Typically, this inquiry requires the Court to determine whether there is anything unusual about the transactions underlying the preferential payment.  Courts have examined the following factors in making this determination (i) was the debt typical and (ii) was it incurred at arms length in the marketplace.") (internal citation omitted); *Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995) ("[C]ourts generally are interested in whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace, or whether it was incurred as an insider arrangement with a closely-held entity."); *see also Caillouet v. First Bank & Trust (In re Entringer Bakeries Inc.)*, 548 F.3d 344, 352 (5th Cir. 2008) (affirming finding that loan was not made in ordinary course of business of lender when made on non-conforming basis and terms inconsistent with lending policies); *Speco Corp. v. Canton Drop Forge (In re Speco Corp.)*, 218 B.R. 390, 398 (Bankr. S.D. Ohio 1998) ("In contrast, a debt will be considered not incurred in the ordinary course of business if creation of the debt is atypical, fraudulent, or not consistent with an arms-length commercial transaction.").

[858] *See, e.g., Elrod Holdings*, 426 B.R. at 111 (analyzing businesses of debtor and creditor to determine whether debt incurred in ordinary course of business); *Wilen v. Pamrapo Sav. Bank, S.L.A. (In re Bayonne Med. Ctr.)*, 429 B.R. 152, 188 (Bankr. D.N.J. 2010) ("The preamble requirement of § 547(c)(2) focuses on the *debt* for which the challenged transfer was payment.  In this case, the inquiry is whether the credit line loan was provided by the bank in the ordinary course of its business, and so undertaken by the [debtor]."); *Off. Comm. of Unsecured Creditors v. Charleston Forge, Inc. (In re Russell Cave Co.)*, 259 B.R. 879, 882 (Bankr. E.D. Ky. 2001) (establishing that transfer is in payment of debt incurred in ordinary course of business "is demonstrated relatively easily by a showing that each party was engaged in its usual business when the debt was incurred and the transfer took place"); *Youthland, Inc. v. Sunshine Girls (In re Youthland, Inc.)*, 160 B.R. 311, 314 (Bankr. S.D. Ohio 1993) ("The first element of § 547(c)(2) requires an examination of the debts incurred for which the transfers were payment for the normality of such incurrences in each party's business operations generally."); *Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.)*, 107 B.R. 698, 702 (B.A.P. 9th 1988) ("Courts have consistently held that the section was intended to protect *ordinary trade credit* transactions, and not those outside the normal course of either the debtor's or creditor's business.").  *But see Fitzpatrick v. Cent. Commc'ns & Elecs., Inc. (In re Tenn. Valley Steel Corp.)*, 203 B.R. 949, (Bankr. E.D. Tenn. 1996) ("This analysis . . . looks to whether the debt was incurred in the ordinary course of business between the parties, as opposed to a determination of whether the debt was incurred in the ordinary course of each party's business, as viewed separate from their dealings with one another.  As such, this court will apply the approach that looks to whether the debt was incurred in the ordinary course of business *between* the parties."); *Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.)*, 198 B.R. 365, 373 (Bankr. D. Kan. 1996) ("It is a subjective test.  Even if the creditor is not a traditional lender, if the transaction was ordinary as between this particular debtor and creditor, then it was in the ordinary course of their business.").

[859] *See, e.g., U.S. Tr. v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999) ("[T]he determination of what is 'in the ordinary course of business' is subjective, calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor.  Factors such as timing, the amount and manner in which a transaction was paid are considered relevant."); *Elrod Holdings*, 426 B.R. at 111 ("To make this determination, courts consider factors such as:  (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to

may instead rely on the terms of the agreement to establish the ordinary course of business

between the parties.[860]  A transfer may be made on ordinary business terms when it is consistent

with the range of terms prevailing in the relevant industry of the debtor and creditor.[861]

Although the transaction giving rise to the repayment of the Exchangeable EGI-TRB

Note was a one-time event for both Tribune and EGI-TRB, this does not necessarily mean that it

was outside the ordinary course of business.[862]  Because the prior course of dealing between

---

have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.") (citing *In re Forklift LP Corp.*, 340 B.R. 735, 738-39 (Bankr. D. Del. 2006)).

[860]  *See, e.g., Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 643 (7th Cir. 2003) ("In some instances, and this is one, the ordinary course of business may be established by the terms of the parties' agreement, until that agreement is somehow or other modified by actual performance.  In the absence of modifying behavior, we see no reason why we should not look to the terms of the parties' agreement in order to determine their ordinary course of business."); *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales)*, 220 B.R. 1005, 1021 (B.A.P. 10th Cir. 1998) ("In the absence of any prior transactions, courts typically look to see if the debtor complied with the payment terms of its contract."); *Warsco v. Household Bank F.S.B. (In re Various Cases)*, 272 B.R. 246, 251-252 (Bankr. N.D. Ind. 2002) ("Nonetheless, in the absence of such a history, there seems to be no good reason not to look to the terms of the parties' agreement in order to determine their ordinary course of business."); *In re Keller Tool Corp.*, 151 B.R. 912, 914 (Bankr. E.D. Mo. 1993) ("When, as here, the record has established that the Debtor and the Defendant had no business dealings prior to the transaction that is the subject of this proceeding, the Court may look to the parties' ordinary course of dealings in other business transactions.  Initially, however, the Court must examine the course of business dealings between the Debtor and the Defendant as it may be established by the documents and other evidence that appear from the record.") (internal citation omitted).

[861]  *See, e.g., Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 224-26 (3d Cir. 1994); *Forklift*, 340 B.R. at 738-39 ("[T]he creditor is not required to prove rigorous definitions of either the industry or the credit standards within that industry.  The creditor must establish, however, a 'range of terms' on which 'firms similar in some general way to the creditor' deal.  The court, therefore, is directed to make three inquiries in this regard.  First, the court must consider 'the range of terms on which firms comparable to [the creditor] on some level provide credit to firms comparable to the debtor on some level.'  Second, the court must consider 'the length of the parties' relationship predating the debtor's insolvency to estimate the size of the customized window surrounding the industry norm which was established in the first step.'  Finally, the court inquires 'whether the relationship remained relatively stable leading into and throughout the insolvency period.'") (quoting *Molded Acoustical Prods.*, 18 F.3d at 227-28) (internal citations omitted); *see also Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.)*, 315 F.3d 1192, 1198 (9th Cir. 2003) ("Only a transaction that is so unusual or uncommon 'as to render it an aberration in the relevant industry,' falls outside the broad range of terms encompassed by the meaning of 'ordinary business terms.'") (internal citation omitted).  The Parties have not suggested that the transaction could qualify as a transfer made on ordinary business terms in the industry of Tribune and EGI-TRB.

[862]  *See, e.g., In re Finn*, 909 F.2d 903, 908 (6th Cir. 1990) ("Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time.  We hold that . . . a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer."); *Compton v. Plain Mktg., LP (In re Tri-Union Dev. Corp.)*, 349 B.R. 145, 150 (Bankr. S.D. Tex. 2006) ("[A] singular event may be ordinary for the purposes of § 547(c)(2)(B)."); *Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 315 B.R. 443, 458 (Bankr. S.D. Ohio 2004) ("[A]n appropriate ordinary course

Tribune and EGI-TRB also was limited, the terms of the Exchangeable EGI-TRB Note are the most relevant consideration when determining whether an ordinary course of business defense may be asserted.[863]  Here, the Exchangeable EGI-TRB Note was due and payable immediately before consummation of the Merger.  At the time of the transaction, Tribune and EGI-TRB complied with the requirements of the Exchangeable EGI-TRB Note, and the obligation was satisfied in accordance with its terms; moreover, there is no evidence that anything unusual occurred between the parties in connection with the transaction.[864]  As a result, a court is reasonably likely to find that these circumstances support a conclusion that any transfer made to satisfy the Exchangeable EGI-TRB Note qualifies for an ordinary course of business defense.

Certain Parties have also suggested that EGI-TRB provided "new value" in connection with the transaction that could shield any transfer from avoidance.  Under the new value defense,

---

analysis requires a recognition that a variety of events in the course of the parties' business history may be found ordinary, even though these events never occurred in the parties' history."); *Bohm v. Golden Knitting Mills, Inc. (In re Forman Enters.)*, 293 B.R. 848, 857 (Bankr. W.D. Pa. 2003) ("A first-time transaction between a debtor and a creditor in certain circumstances may qualify as an ordinary course transaction . . . ."); *Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995) ("[A] first time transaction is no less susceptible of qualifying for the ordinary course of business exception than a transaction that has occurred frequently in the past.").  *But see Off. Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 462 (Bankr. S.D.N.Y. 2007) ("Therefore, it appears for a 'first time' transfer to qualify for application of the defense, it should be a type that could have been a 'recurring, customary trade transaction' had the parties continued their business relationship—not a single isolated transaction that would never have been repeated in any case.").

[863]  As noted below, although there is some authority for the proposition that debt arising from a leveraged buyout is not incurred in the ordinary course of business, the Examiner believes it is appropriate to consider the circumstances under which the debt was incurred and related criteria, including whether the transaction was conducted at arms-length.  In this case, there is no evidence indicating that the transaction between Tribune and EGI-TRB was conducted at less than arms-length.

[864]  *See, e.g., Forman Enters.*, 293 B.R. at 858 (following suggestion of other courts that "we should examine the conduct of the parties to determine whether either of them did anything unusual or extraordinary with respect to the transfer made in payment of the underlying debt.  If nothing unusual or untoward occurred, there is no good reason to conclude that the transfer was out of the ordinary."); *Warsco v. Household Bank F.S.B. (In re Various Cases)*, 272 B.R. 246, 252 (Bankr. N.D. Ind. 2002) ("Each transaction at issue, including the first-time transactions between [the creditor] and a particular debtor, was conducted strictly in accordance with the terms of the parties' written agreement.  This included the timing and the manner in which [the creditor] applied the funds from each debtors' account to the loan balance.  Consequently, the court concludes that even the first-time transactions were ordinary as between the parties.").

transfers are not avoidable when a creditor extends new value[865] to or for the benefit of the

debtor after receiving the transfer, such new value is not secured by an unavoidable security

interest, and such new value has not been repaid with an otherwise unavoidable transfer.[866]

Applied here, when Tribune paid the Exchangeable EGI-TRB Note, EGI-TRB in turn advanced

to Tribune a greater amount under the Initial EGI-TRB Note that was never repaid,[867] thereby

potentially giving rise to a new value defense.[868]

    A court, however, may well conclude that EGI-TRB did not advance new value to

Tribune because EGI-TRB already was contractually obligated to purchase the Initial EGI-TRB

Note months before the transaction,[869] and the simultaneous effect of the transaction did not

---

[865]  The term "new value" is defined to include "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation."  11 U.S.C. § 547(a)(2) (2006).

[866]  *See* 11 U.S.C. § 547(c)(4) (2006).  *See also N.Y. City Shoes, Inc. v. Bentley Int'l, Inc. (In re N.Y. City Shoes, Inc.)*, 880 F.2d 679, 680 (3d Cir. 1989) ("The three requirements of section 547(c)(4) are well established.  First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b).  Second, *after* receiving the preferential transfer, the preferred creditor must advance 'new value' to the debtor on an unsecured basis.  Third, the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition.").  The third element of the new value defense as stated by the Third Circuit Court of Appeals should not be interpreted broadly to preclude "full compensation" per se, but only to circumstances in which the new value has been repaid with an otherwise unavoidable transfer.  *See, e.g., Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.)*, 416 B.R. 123, 129 (Bankr. D. Del. 2009) ("A creditor who raises the § 547(c)(4) defense has the burden of proving that:  '(1) new value was extended after the preferential payment sought to be avoided, (2) the new value is not secured with an otherwise unavoidable security interest and (3) the new value has not been repaid *with an otherwise unavoidable transfer.*'") (quoting *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1093 n.2 (5th Cir. 1994)).

[867]  *See, e.g., Off. Comm. of Unsecured Creditors v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.)*, 353 B.R. 820, 848 (Bankr. D. Del. 2006) ("A creditor provides new value when it makes a loan to the debtor.").

[868]  *See, e.g., Off. Comm. of Unsecured Creditors of R.M.L., Inc. v. Conceria Sabrina, S.P.A. (In re R.M.L., Inc.)*, 195 B.R. 602, 616 (Bankr. M.D. Pa. 1996) ("In order to calculate the amount of new value to be applied against preferential payments, most courts apply a 'subsequent advance' method of calculation.  The method 'looks at the 90-day preference period and calculates the difference between the total preferences and the total advances, provided that each advance is used to offset only prior (although not necessarily immediately prior) preferences.'") (quoting *In re Meredith Manor, Inc.*, 902 F.2d 257, 259 (4th Cir. 1990)).

[869]  *See, e.g., Gouveia v. RDI Grp. (In re Globe Bldg. Materials, Inc.)*, 484 F.3d 946, 950 (7th Cir. 2007) (holding that performance of existing contractual obligation does not constitute new value).

actually result in a *subsequent* advance of new value to Tribune.[870]  Under Bankruptcy Code

section 547(a)(2), "new value" includes "new credit," but does not include "an obligation

substituted for an existing obligation."[871]  Between these two views, the Examiner concludes that

a court is reasonably likely to find that new value was not advanced because EGI-TRB

performed its preexisting contractual obligation to purchase the Initial EGI-TRB Note and,

alternatively, largely substituted an obligation for an existing obligation.

>    **2.    Examiner's Conclusions and Explanation Concerning Payments on Account of Bridge Debt and Credit Agreement Debt.**

**Examiner's Conclusions:**

To the extent that payments to the LBO Lenders on account of the Bridge Debt and

Credit Agreement Debt qualified as preferential transfers, it is reasonably likely that a court

would find that the payments could be subject to an ordinary course of business defense, except

to the extent that the underlying Bridge Debt and Credit Agreement Debt are avoided as

fraudulent transfers.

---

[870]  *See, e.g., N.Y. City Shoes, Inc.*, 880 F.2d at 680 (3d Cir. 1989) ("[A]fter receiving the preferential transfer, the preferred creditor must advance 'new value' to the debtor on an unsecured basis.").  Viewed in this fashion, the transfer might instead be shielded from avoidance as a contemporaneous exchange of new value.  "Under Bankruptcy Code Section 547(c)(1), a transfer is not a preference if it was '(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange.'"  *Off. Comm. of Unsecured Creditors v. Tennenbaum Capital Partners (In re Radnor Holdings Corp.)*, 353 B.R. 820, 847-48 (Bankr. D. Del. 2006).  In certain circumstances, the advance of credit to satisfy existing debts may qualify as a contemporaneous exchange of new value.  *See, e.g., In re Arrow Air, Inc.*, 940 F.2d 1463, 1466 (11th Cir. 1991) ("As we have indicated in the past, that a transfer from debtor to creditor is payment of a pre-existing debt does not automatically preclude the transfer from also being a contemporaneous exchange for new value.  And, under appropriate circumstances, the new value exchanged for the transfer or payment may take the form of new credit.  Therefore, it is not impossible, as a matter of law, that an extension of new credit by [a creditor] to [a debtor] could have constituted 'new value.'") (internal citations omitted); *Radnor Holdings Corp.*, 353 B.R. at 847-48 ("Even if some of the new value is used by a debtor to pay pre-existing debt, the transfer falls within the four corners of 11 U.S.C. § 547(c)(1) if the amount transferred to the debtor exceeds the amount repaid on pre-existing debt.").  As noted, however, a court could conclude that EGI-TRB's performance of the preexisting contractual obligation to purchase the Initial EGI-TRB Note was not intended by the parties to be a contemporaneous exchange for new value and did not constitute new value.

[871]  11 U.S.C. § 547(a)(2) (2006).

**<u>Explanation of Examiner's Conclusions</u>**:

Payments on indebtedness such as the LBO Lender Debt may also qualify as ordinary course of business transactions[872] when made in a manner consistent with the terms of the underlying agreements and prior practice between the parties.

The Examiner, with the assistance of his financial advisors, has analyzed the payments made by Tribune on account of the Credit Agreement Debt and the Bridge Debt for the period from December 2007 through the Petition Date by identifying the relevant payment due dates, payment receipt dates, and payment sources and methods.  A schedule of that information is attached as Annex C to this Volume of the Report.  As reflected therein, during the ninety-day period before the Petition Date, as demonstrated in the foregoing table, Tribune paid approximately $141,130,270 on account of the Credit Agreement Debt and approximately $34,570,444 on account of the Bridge Debt.  Comparing the payments made during the preference period to preceding periods, the payment history is generally consistent and does not demonstrate any material deviation in payment dates, sources, methods or amounts.  Similar to previous practice, the payments made by Tribune during the preference period ranged between two days before and four days after their respective due dates under the Bridge Credit Agreement and Credit Agreement, with the majority of payments being made when due.  There was no evidence that payments were accelerated or delayed or otherwise made in a manner inconsistent with the terms of the Bridge Credit Agreement and Credit Agreement or prior practice of the parties.[873]

---

[872]  *See, e.g., Union Bank v. Wolas*, 502 U.S. 151, 162 (1991) ("[P]ayments on long-term debt, as well as payments on short-term debt, may qualify for the ordinary course of business exception.").

[873]  *See, e.g., Liebersohn v. WTAE-TV (In re Pure Weight Loss, Inc.)*, No. 08-10315, 2009 Bankr. LEXIS 3956, at *14-*15 (Bankr. E.D. Pa. Nov. 10, 2009) ("An important indicator to determine ordinary course of business is whether the timing of the preference period payments was consistent with the timing of similar payments during the pre-preference period."); *Montgomery Ward, LLC v. OTC Int'l, LTD. (In re Montgomery Ward, LLC)*, 348

In light of the foregoing circumstances, the Examiner concludes that a court is reasonably likely to find that payments to the LBO Lenders that otherwise constitute preferential transfers would be subject to an ordinary course of business defense, except to the extent that the underlying Bridge Debt and Credit Agreement Debt are avoided as fraudulent transfers. Although one court has suggested that indebtedness incurred in connection with a leveraged buyout transaction is ineligible for an ordinary course of business defense,[874] the Examiner believes that a narrow focus on the purpose of the debt is inappropriate and inconsistent with the approach taken by the majority of courts that properly considers the circumstances under which the debt was incurred and related factors.[875]

### 3. Examiner's Conclusions and Explanation Concerning Payments to Directors and Officers of Tribune Entities.

Certain Parties noted that bonuses, deferred compensation, retention, severance, and change in control payments made to directors and officers of the Tribune Entities during the one-year period prior to the Petition Date[876] could potentially qualify as preferential transfers. Depending on the circumstances, these payments may or may not qualify as preferences and

---

B.R. 662, 673-74 (Bankr. D. Del. 2006) ("Determining whether the disputed transaction is consistent with the course of dealing between the respective parties is an inherently factual analysis.  The Defendant must establish a 'baseline of dealing' so that the court may compare the transfers made during the preference period with the parties' prior course of dealings.") (internal citation omitted).

[874] *See, e.g., Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.)*, 95 B.R. 921, 931 (Bankr. W.D. Pa. 1989) (stating that "the LBO/stock purchase loan is highly extraordinary in nature and no company's borrowing to allow for the purchase of its own stock could ever be considered part of the ordinary course of its business"), *aff'd in part and rev'd in part*, 135 B.R. 15 (W.D. Pa.), *rev'd on other grounds*, 945 F.2d 635 (3d Cir. 1991).  Notably, the court in *Metro Communications* also concluded that the leveraged buyout was a fraudulent transfer, so it is not surprising the court held that the related indebtedness was incurred outside the ordinary course of business.  95 B.R. at 934.  *See also Speco Corp. v. Canton Drop Forge (In re Speco Corp.)*, 218 B.R. 390, 398 (Bankr. S.D. Ohio 1998) ("In contrast, a debt will be considered not incurred in the ordinary course of business if creation of the debt is atypical, fraudulent, or not consistent with an arms-length commercial transaction.").

[875] *See, e.g., Kapila v. Media Buying, Inc. (In re Ameri P.O.S., Inc.)*, 355 B.R. 876, 882-884 (Bankr. S.D. Fla. 2006); *Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995).

[876] To the extent they weighed in on this question, the Parties have treated this group as "insiders" of the Tribune Entities.  *See* 11 U.S.C. §§ 101(31)(B)(i)-(ii) and 547(b)(4)(B) (2006).  The Examiner therefore did not investigate this question.

could also be subject to an ordinary course of business defense that would make them unavoidable.[877]  These issues were only briefly mentioned and insufficiently developed by the Parties, and a thorough analysis would require a detailed review of multiple payments to more than two hundred individuals.  The time period of the Investigation and available resources did not permit the Examiner an opportunity to examine and analyze these transfers and reach a definitive conclusion.

### 4.    Examiner's Conclusions and Explanation Concerning Intercompany Payments.

Another Party suggested that Tribune may hold preferential transfer claims against its subsidiaries arising from intercompany transactions, but did not submit any analysis or evidence to support the allegation.  To properly analyze these issues and reach a conclusion regarding the viability of any such claims, including applicable defenses such as an ordinary course of business defense, would demand an examination of the many thousands of transactions occurring among Tribune and more than one hundred subsidiaries over a one-year period, and require substantial efforts and months to complete.  Moreover, the Examiner would have to determine the nature of the intercompany obligations.  Only if the intercompany obligations are debts will a preference action be implicated.[878]  Payments on account of equity investments, such as capital infusions or contributions, may implicate fraudulent transfers but would not constitute potential preferential

---

[877]    *See, e.g., Off. Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 462-63 (Bankr. S.D.N.Y. 2007) (holding that severance payments did not qualify for ordinary course of business defense); *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*, 238 B.R. 758, 775 (Bankr. N.D. Ill. 1999) (holding that bonus payments did not qualify for ordinary course of business defense and noting that "[a] bonus by its very nature is something out of the ordinary"); *Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 257 (Bankr. S.D.N.Y. 1996) (holding that bonus payments did not qualify for ordinary course of business defense); *Intercont. Publ'ns, Inc. v. Perry (In re Intercont. Publ'ns, Inc.)*, 131 B.R. 544, 550 (Bankr. D. Conn. 1991) (holding that severance payments did not qualify for ordinary course of business defense).  *But see NMI Sys. v. Pillard (In re NMI Sys., Inc.)*, 179 B.R. 357, 372-74 (Bankr. D.D.C. 1995) (holding that bonus payments qualified for ordinary course of business defense).

[878]    *See* 11 U.S.C. § 547(b)(2) (2006) (preferential transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made").

transfers.  The Examiner was unable to investigate these matters given the limited time in which to conduct the Investigation.

### D.    Equitable Subordination/Equitable Disallowance of Specified Claims.

### 1.    Generally.

Bankruptcy Code section 510(c) provides that a court may:[879]

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

In *Benjamin v. Diamond (In re Mobile Steel Company)*, the Fifth Circuit Court of Appeals formulated a three-factor test that has been followed by courts across the country:  (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code.[880]  Equitable subordination permits claims to be equitably subordinated to other claims, and interests subordinated to other interests, but does not authorize the subordination of claims to interests.[881]  Moreover, although courts have not required that the inequitable conduct warranting subordination of a creditor's claim be related to the acquisition or

---

[879]    11 U.S.C. § 510(c) (2006).  *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003).

[880]    *See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 145 (Bankr. D. Del. 2005) (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)).

[881]    *See, e.g., See Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.) (Schubert II)*, 554 F.3d 382, 390, 392, 414 (3d Cir. 2009); *Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*, 366 B.R. 476, 504 (Bankr. W.D. Pa. 2007) (concluding that section 510(c) only authorizes the subordination of claims to other claims or interests to other interests, but does not allow subordination of claims to interests) (citing *Acropolis Enters., Inc. v. CR Amusements, LLC (In re C.R. Amusements LLC)*, 259 B.R. 523, 529 (Bankr. D.R.I. 2001)).

It appears that no published cases address whether Bankruptcy Code section 510(c) can be used to override a contractual subordination agreement under section 510(a), but the text of the statute seems to suggest such a possibility.  The precise language of section 510(c) provides that "*[n]otwithstanding* subsections (a) and (b)" of section 510 of the statute, a court may equitably subordinate a claim. 11 U.S.C. § 510(c) (2006) (emphasis added).

assertion of that claim,[882] courts have cautioned that equitable subordination is an "extraordinary measure" which should not be lightly invoked.[883]

### a.    The Effect of Insider or Non-Insider Status.

In determining whether a claimant has engaged in "inequitable conduct" under the *Mobile Steel* formulation, a key preliminary inquiry is whether the claimant was an "insider" in relation to the debtor at the time of the conduct in question.[884]  If the claimant is determined to be an insider, once the trustee initially demonstrates "material evidence of unfair conduct" by the claimant, the burden of proof shifts to the claimant to establish "the fairness of his transactions with the debtor;" if the claimant fails to carry that burden, its claim will be equitably subordinated.[885]  Courts have recognized three categories of "unfair conduct" by insiders that may constitute "inequitable conduct" under the *Mobile Steel* test:  (i) fraud, illegality, or breach of fiduciary duties; (ii) undercapitalization; and (iii) a claimant's use of the debtor as a mere instrumentality or alter ego.[886]  In assessing whether a creditor is an insider, courts examine

---

[882]  *See, e.g.*, *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002) (citing *Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.),* 926 F.2d 1458, 1467 n.14 1991 (5th Cir. 1991)).  A separate question is whether a court may equitably subordinate a claim in the hands of a transferee when the transferee did not engage in wrong-doing.  *See Enron Corp. v. Springfield Assocs., LLC (In re Enron Corp.)*, 379 B.R. 425, 427-28 (S.D.N.Y. 2007).  The decision in *Enron* is discussed in another part of the Report in the context of avoidance. *See* Report at § IV.B.7.b.(2).  It is unclear whether the holding will be followed in the equitable subordination context.  The Examiner draws no conclusions in this regard, and notes only that the equation is unsettled.

[883]  *See Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas (In re Epic Capital Corp.)*, 290 B.R. 514, 525 (Bankr. D. Del. 2003) (citing *MB Ltd. P'ship v. Nutri/Sys. (In re Nutri/Sys., Inc.)*, 169 B.R. 854, 865 (Bankr. E.D. Pa. 1994)), *aff'd*, 178 B.R. 645 (E.D. Pa. 1995); *see also Cohen v. KB Mezzanine Fund II (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 327, 329 (D. Del. 2003) (stating that equitable subordination is a "drastic" and "unusual" remedy), *aff'd*, 432 F.3d 448 (3d Cir. 2006).

[884]  *See In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 69-70 (citing *Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1360 (1st Cir. 1992)); *see also Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 118 (E.D. Pa. 1993) (observing that courts differentiate between insider and non-insider claims in applying equitable subordination principles), *aff'd*, 37 F.3d 1487 (3d Cir. 1994); *Epic Capital Corp.*, 290 B.R. at 524 (same).

[885]  *Ansel Props., Inc. v. Nutri/System Assocs. (In re Nutri/Sys. Assocs.)*, 178 B.R. 645, 657 (E.D. Pa. 1995) (citing *In re N & D Props., Inc.*, 799 F.2d 726, 731 (11th Cir. 1986)).

[886]  *M. Paolella & Sons*, 161 B.R. at 117-18; *Mid-Am. Waste*, 284 B.R. at 70.

whether the creditor:  (i) had greater ability to assert control than other creditors; (ii) made

management decisions for the debtor; (iii) directed work performance; or (iv) directed payment

of the debtor's expenses.[887]  In this regard, the courts look for day-to-day control rather than

monitoring activities or exertion of influence regarding financial transactions in which the

creditor has a direct stake.[888]

    If the claimant is not an insider or a fiduciary, the movant must demonstrate, with

particularity, "gross" or "egregious" conduct by the claimant that is tantamount to "fraud,

spoliation or overreaching" in order to satisfy the first prong of the *Mobile Steel* test.[889]  In *In re*

*Aluminum Mills Corp.*, for example, the court held that the allegation that a lender made a loan

that it knew would result in insolvency and then acted strategically to maximize its own benefits

was insufficient, without more, to demonstrate egregious misconduct on the part of the lender.[890]

Although courts have rarely subordinated non-insider claims, the annals of bankruptcy law

include instances in which courts have done so when presented with egregious creditor

---

[887]  *Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.) (Schubert I)*, 348 B.R. 234, 279 (Bankr. D. Del. 2005) (citing *ABC Elec. Serv. Inc. v. Rondout Elec., Inc. (In re ABC Elec. Serv. Inc.)*, 190 B.R. 672, 675 (Bankr. M.D. Fla. 1995)), *aff'd in part, mod. in part*, 554 F.3d 382 (3d Cir. 2009); *see also M. Paolella & Sons*, 161 B.R. at 118-19 (concluding that creditor was not an insider because it did not participate in the debtor's management, determine its operating decisions, or have any presence on its board); *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 895 (Bankr. N.D. Ill. 1991) (holding that lender was an insider when lender had a security interest in 85% of debtor's stock, controlled a variety of key business decisions, and used its control to keep the debtor in business while the debtor was insolvent).

[888]  *Schubert I*, 348 B.R. at 279; *Off. Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 840-41 (Bankr. D. Del. 2006).

[889]  *See Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 448 (Bankr. D. Del. 2005) (finding that debtors had sufficiently alleged facts showing fraud where lender had collaborated on eve of debtors' insolvency to enter into an assignment agreement without any consideration given to debtors); *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis (In re Epic Capital Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del. 2003).

[890]  *Aluminum Mills*, 132 B.R. at 896 (citing *In re Dry Wall Supply, Inc.*, 111 B.R. 933, 938-39 (D. Colo. 1990) ("In this case, the trustee simply alleges that Chase's predecessor knew or should have known that the loan transaction would render Dry Wall Supply, Inc. insolvent and that it was made without adequate consideration. There simply is no allegation or evidence that Chase committed gross misconduct by financing the leveraged buy-out of Dry Wall Supply, Inc.").  Nonetheless, the court still held that the lender's claim could be equitably subordinated because the lender:  (1) assumed the position of a fiduciary; (2) acted strategically to protect itself to the detriment of the debtor and unsecured creditors; and (3) engaged in fraud and overreaching, which in turn led to breaches of fiduciary duties.  *Id.* at 896.  *See also Radnor Holdings Corp.*, 353 B.R. at 840-41.

misconduct.  In *Rosener v. Majestic Management, Inc. (In re OODC, LLC)*,[891] for example, the bankruptcy court concluded that a trustee had alleged sufficient facts to support claims against non-insider banks for actual and constructive fraud and aiding and abetting breach of fiduciary duty.  The trustee alleged that the banks:  (1) knowingly facilitated the removal of at least $40 million in assets of the debtor at a time when the debtor was insolvent; (2) knowingly and recklessly disregarded the debtor's insolvency; (3) knowingly and recklessly intended to hinder, delay, or defraud the debtor's creditors; (4) knowingly or recklessly disregarded the fact that a leveraged buyout would force the debtor into bankruptcy; and (5) knowingly and recklessly disregarded the cumulative impact of these transactions on the debtor's unsecured creditors.  The court explained that, if proven, these allegations would provide the basis for a finding of egregious misconduct, which could warrant equitable subordination of the banks' claims.[892]

In *Murphy v. Meritor Savings Bank (In re O'Day Corp.)*,[893] the court equitably subordinated a non-insider lender's claims arising out of a failed leveraged buyout when:  (1) the bank's financial projections were unreasonable; (2) the bank gave "little weight" to indications showing declines in company earnings leading up to the leveraged buyout; (3) the bank had full access to the debtor's records, facilities, and management; (4) there was a widely-recognized decline in the debtor's industry; (5) the bank proceeded with the loan even though the company did not own assets that comprised a significant portion of the collateral it sought; and (6) the bank engaged in egregious behavior after the transaction closed to improve its position at the expense of creditors.

---

[891]   321 B.R. 128 (Bankr. D. Del. 2005).

[892]   *Id.* at 146.

[893]   *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 376, 380-81, 405-06, 412 (Bankr. D. Mass. 1991).  Although the court characterized some of the trustee's allegations as "overstated," *id.* at 412, including directing the debtor to cease vendor payments, the court noted among other things that the bank's actions were "tantamount to overreaching." *Id.*

Finally, in *Credit Suisse v. Official Committee of Unsecured Creditors (In re Yellowstone Mountain Club, LLC)*,[894] the court found that the secured lender had devised a "loan scheme whereby it encouraged developers of high-end residential resorts . . . to take unnecessary loans." It made loans to the debtor that were passed directly to a principal shareholder and subsidiaries for purposes outside the scope of the debtor's business.  The court observed that despite various "red flags" concerning the debtor's financial condition, the lender granted the debtor a substantial loan because "it was driven by the fees it was extracting from the loans it was selling, and letting the chips fall where they may."[895]  Having "lined its pockets on the backs of the unsecured creditors," the lender's conduct was so far overreaching and self-serving so as to shock the court's conscience.[896]  Concluding that the lender "turned a blind eye" to the debtor's financial records and could not have believed that the debtor could service such an increased debt load in light of its historical financial performance, the court held that equitable subordination of the lender's claim was appropriate.[897]

This triad of cases is illustrative of the level of egregious behavior that would justify equitable subordination of non-insider claims.  In short, the behavior must be genuinely egregious.

### 2.    Equitable Disallowance.

In *Pepper v. Litton,*[898] the Supreme Court embraced both equitable subordination and equitable disallowance as permissible remedies when the equities of a given case justify their

---

[894]    *Credit Suisse v. Off. Comm. of Unsecured Creditors (In re Yellowstone Mountain Club, LLC)*, 2009 Bankr. LEXIS 2047, at *15-16 (Bankr. D. Mont. May 13, 2009).

[895]    *Id.* at *31.

[896]    *Id.*

[897]    *Id.* at *29, *32-*33.

[898]    308 U.S. 295 (1939).

invocation.[899]   The issue in *Pepper* was whether a bankruptcy court could disallow (either as a secured or general unsecured claim) a judgment obtained by the dominant and controlling stockholder of a bankrupt corporation.[900]   The defendant, the controlling stockholder of a "one-man" corporation, caused his corporation to confess judgment in his favor for allegedly unpaid salary at a time when that corporation faced financial difficulties.[901]   The shareholder executed on his judgment and levied on property that he in turn sold to another corporation he controlled.[902]   Thereafter, his corporation filed for bankruptcy.   In holding that the lower court properly disallowed the shareholder's claim, the Court noted that, for many purposes, "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."[903]   Among the powers granted to bankruptcy courts as courts of equity is the allowance and disallowance of claims, and thus, "a bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence."[904]   The Court explained that, particularly in cases when the claim sought to be allowed accrues to the benefit of an officer, director, or stockholder, claims have been disallowed or subordinated when the courts were satisfied that the allowance of the claims would not be fair

---

[899]   *Id.* at 305 ("[A] claim which has been allowed may be later 'rejected in whole or in part, according to the equities of the case . . . .'") (quotation omitted).

[900]   *Id.* at 298.

[901]   *Id.* at 297.

[902]   *Id.* at 297-98.

[903]   *Id.* at 304.

[904]   *Id.* at 305 & 307-08 ("In the exercise of its equitable jurisdiction, the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate.").

or equitable to creditors.[905]   Because the shareholder had engaged in a "planned and fraudulent scheme," disallowance of the shareholder's claim was warranted.[906]

Although *Pepper* is venerable authority that a court's equity powers include the power to disallow a claim on equitable bases, the question presented under the Bankruptcy Code is whether equitable disallowance contravenes the provisions of Bankruptcy Code section 510(c), which, as noted, specifies that equitable subordination entails adjusting priorities *among* creditors, but not *between* creditors and shareholders. [907]   In the years since *Pepper*, courts in the Third Circuit have addressed this question but have not answered it.   In *Equibank v. Dan-Ver Enterprises, Inc. (In re Dan-Ver Enterprises, Inc.)*, a judgment creditor filed an adversary complaint, claiming that judgments held by several individuals should be equitably subordinated to its own claim under Bankruptcy Code section 510(c).[908]   In determining whether equitable subordination was appropriate, the United States Bankruptcy Court for the Western District of Pennsylvania explained that certain loans granted by the individuals were made to the debtor's CEO and president, and not to the debtor's estate.[909]  Rather than subordinating such claims, the bankruptcy court, relying on the principles set forth in *Pepper*, disallowed the claims in their entirety.[910]

More recently, in *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, the Third Circuit Court of Appeals considered the question whether the

---

[905]   *Id.* at 308-09.

[906]   *Id.* at 301, 302 & 312-13.

[907]   On the other hand, Bankruptcy Code section 502(j), like section 57(k) of the Bankruptcy Act, provides statutory authority to disallow a claim based on the "equities of the case."   11 U.S.C. § 502(j) (2006) ("A reconsidered claim may be allowed or disallowed according to the equities of the case.").

[908]   86 B.R. 443, 450 (Bankr. W.D. Pa. 1988).

[909]   *Id.*

[910]   *Id.* at 451-52.

claims of a creditor stemming from a leveraged buyout could be equitably subordinated in light of evidence that the creditor surreptitiously purchased outstanding notes before the plan confirmation date to obtain a "blocking position" in the proposed reorganization.[911]  The court held that the creditor's claims could be equitably subordinated because the notes were purchased: (1) for the dual purpose of making a profit and influencing the reorganization in its own self-interest; (2) with the benefit of non-public information acquired as a fiduciary; and (3) without disclosure of the purchasing plans to the bankruptcy court, the debtor's board, the official committee of unsecured creditors, or the selling noteholders.[912]  In so holding, the court noted the district court's view that it lacked authority to fashion a "disallowance remedy."[913]  Commenting that it "d[id] not endorse that conclusion," the court explained that the rationale of *Pepper* suggests that under pre-Bankruptcy Code law, a bankruptcy court was authorized to disallow a portion of a fiduciary's claim when the disallowance would produce an equitable result.[914]  The court found it unnecessary, however, to resolve whether equitable "disallowance" remains an available remedy under the Bankruptcy Code.[915]

Later, in *Congoleum Corp. v. Pergament (In re Congoleum Corp.)*, the issue of equitable disallowance was again raised when a debtor sought to avoid as preferential transfers and postpetition transfers liens and security interests granted to asbestos claimants.[916]  On previous occasions, the debtor had entered into agreements to settle asbestos claims asserted against it by assigning to the claimants certain unidentified insurance proceeds or granting security interests in

---

[911]  160 F.3d 982, 985 (3d Cir. 1998).

[912]  *Id.* at 987.

[913]  *Id.* at 991 n.7.

[914]  *Id.*

[915]  *Id.*

[916]  2007 Bankr. LEXIS 4357, at *6 (Bankr. D.N.J. Dec. 28, 2007).

certain insurance policy collateral.[917]  The debtor sought to equitably disallow the settled claims

under Bankruptcy Code section 510(c), arguing that this provision allows for equitable

disallowance of claims under principles of equitable subordination.[918]  The New Jersey

Bankruptcy Court disagreed, explaining that equitable subordination and equitable disallowance

are "two distinct concepts," and section 510(c) deals solely with equitable subordination.[919]

Indeed, "[w]hile equitable disallowance is a means by which a claim may be invalidated,

equitable subordination focuses on altering the order of payment of a claim, which in turn

presupposes that a valid claim already exists."[920]  The court referred to the Third Circuit's

discussion of equitable disallowance in *Citicorp Venture Capital Ltd.* and concluded that it

remains unclear whether equitable disallowance may be raised under section 510(c).[921]  The

court addressed appropriate treatment of the asbestos claimants' claims under principles of

equitable subordination.[922]  Whether or not equitable disallowance is available within the Third

---

[917]  *Id.* at *3 & *4.

[918]  *Id.* at *32.

[919]  *Id.* at *32, *33 ("To allow equitable disallowance under the guise of equitable subordination would be contradictory.").

[920]  *Id.* at *32-33.

[921]  *Id.* at *33-34.

[922]  *Id.* at *33-34.  The courts of the Second Circuit have also considered the viability of equitable disallowance as a remedy in bankruptcy proceedings.  In *Adelphia Communications Corp.*, the bankruptcy court discussed equitable disallowance as a remedy, finding that disallowance "would be permissible in those extreme instances – perhaps very rare – where it is necessary as a remedy." *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *aff'd*, 2010 WL 2094028 (2d Cir. May 26, 2010).  In *Adelphia Communications Corp.*, the creditors' committee and equity committee asserted claims against lenders and investment banks, seeking to equitably subordinate and/or disallow the lenders' claims because the lenders had aided and abetted management in breaching its fiduciary duties and allowing constructively fraudulent transfers. *Adelphia Commc'ns Corp.*, 365 B.R. at 73.  The court reasoned that although Bankruptcy Code section 510(c) expressly authorizes equitable subordination but does not likewise authorize equitable disallowance, it was not in a position to conclude that Congress intended to foreclose the possibility of disallowance in light of *Pepper* and its progeny. *Id.* at 73.  The court also emphasized that subordination and disallowance were linked by an "or" no less than five times in the *Pepper* decision, showing that the Court perceived the remedies to be separate, distinct, and uniquely available. *Id.*  Thus, although disallowance was "plainly" a "more draconian" remedy, it would be appropriate in "just a few" situations, and might be proper only when it represents the "most measured means" to correct the claimed inequity. *Id.*  The court agreed that equitable disallowance was

---

Circuit, this remedy requires creditor misbehavior at least as repugnant as that which would

warrant equitable subordination

### 3.    Application of Legal Standards.

#### a.    Examiner's Conclusions and Explanation Concerning LBO Lender Debt.

**Examiner's Conclusions:**  Based on the evidence adduced in the Investigation, a court is

somewhat unlikely to exercise its equitable discretion to subordinate the claims of the LBO

Lenders in the Chapter 11 Cases pursuant to Bankruptcy Code section 510(c).  However, for the

reasons discussed below, the Examiner believes that additional investigation is warranted.

**Explanation of Examiner's Conclusions**:

Because the Lead Banks were not insiders of the Tribune Entities, they enjoy the benefit

of the heightened standard required to equitably subordinate their claims.[923]  Although the

Examiner has found that it is reasonably likely that a court would find that the Lead Banks did

not act in good faith for purposes of applying that defense to avoidance of the Step Two Debt,[924]

lack of good faith for fraudulent transfer purposes is not synonymous with the kind of egregious

behavior meriting equitable subordination.  The question is whether the Lead Banks crossed the

line into egregious behavior that would justify equitable subornation or equitable disallowance of

the LBO Lender Debt.

---

permissible under *Pepper*, and that the allegations in the complaint before it might support the equitable disallowance of the lenders' claims, if proven.  *Id.*  On appeal, the United States District Court for the Southern District of New York agreed with the bankruptcy court's conclusion that equitable disallowance was permissible under *Pepper*, noting that *Pepper* endorsed the use of equitable disallowance, not on the basis of any statutory language, but as an unspoken tenet of a bankruptcy court exercising its powers of equity.  *Adelphia Recovery Trust*, 390 B.R. at 76; *see also Off. Comm. of Unsecured Creditors v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 369 n.3 (Bankr. S.D.N.Y. 2002) (declining to address the issue of the continued viability of equitable disallowance post-Bankruptcy Code, but observing that, to the extent equitable disallowance would apply, such disallowance would be based on the same equitable principles as equitable subordination).

[923]    *See* Report at § IV.D.1.a.

[924]    *See id.* at §§ IV.B.7.b.(2)–IV.B.7.b.(8).

Certain of the Parties pointed the Examiner to excerpts from the tens of thousands of documents generated or e-mails sent during the Leveraged ESOP Transactions allegedly supporting an inference that one or more of the Lead Banks acted improperly.  The Examiner investigated and addresses as a factual matter in Volume One of the Report the allegations of wrongdoing levied by certain Parties against one or more of the Lead Banks.[925]  The Examiner encourages the reader to review that narrative discussion.  The Lead Banks came to the Leveraged ESOP Transactions with varying motivations, including to earn large fees, to foster relationships with the Zell Group and Tribune, and to deploy capital in the form of loans from which they hoped to profit by holding the loans for their own account or through syndication.  More often than not, particularly as they relate to the Step One Transactions, the e-mails and documents cited by the Parties contained more smoke than fire.  The record is clear that the lender-participants knew that the LBO Lender Debt would benefit from the structural seniority afforded by the Subsidiary Guarantees.[926]  The corresponding result is that Tribune's creditors were structurally disadvantaged, but there was nothing per se improper about exploiting an opportunity presented by the Tribune Entities' capital structure and the absence of contractual prohibitions against the incurrence of debt at the Guarantor Subsidiary levels.[927]  Likewise, there is plenty of evidence that one or more of the Lead Banks were concerned, before Step One, about the amount of leverage in the Zell transaction and, before Step Two, about the deterioration in

---

[925]  *See id.* at §§ III.E.4. and III.H.4.

[926]  Examiner's Sworn Interview of Julie Persily, July 8, 2010, at 31:18-22-32:1 ("[M]eaning that one could layer as much debt as they want -- the PHONEs did not have protection in their document to prevent layering debt above them.  Q: Okay.  A: Which is unusual.").

[927]  *See* footnote 88 and accompanying text.

Tribune's operating performance and the corresponding level of leverage. [928]   Healthy skepticism

followed by due diligence is not a ground to equitably subordinate the Lead Bank's claims.

On the other hand, if the evidence showed that the Lead Banks knew that Step Two

would render Tribune insolvent, but they proceeded to fund anyway, a case could be made for

equitable subordination (and possibly equitable disallowance) not just of the Step Two Debt but,

possibly, some or all of the remainder of the LBO Lender Debt.[929]   There is evidence to suggest

that the Lead Banks did not believe that VRC's solvency opinion was valid, but were mindful

that even if VRC were wrong, the structural seniority enjoyed by the LBO Lenders over certain

of Tribune's creditors afforded them a cushion.  Thus, notes from a December 17, 2007

conference call among the Lead Banks reference a statement by a Citigroup representative,

apparently in relation to VRC's solvency opinion:  "S Corp savings WRONG but still +hv

PHONES."[930]   The internal valuation analyses prepared individually in-house by the Lead Banks

in the November-December 2007 timeframe, discussed in another section of the Report, [931]

suggest, in varying degrees, knowledge by those institutions that the Step Two Closing would

render Tribune insolvent or very close to it.  The notes taken by Daniel Petrik of BofA, also

discussed elsewhere in the Report,[932] attribute to Merrill Lynch the view, expressed to the other

Lead Banks three days before the Step Two Closing, that Merrill was leaning against funding

and it was "[r]easonable that [Tribune was] not a solvent company."[933]   The notes certainly

---

[928]   *See* Report at §§ III.E.4. and III.H.4.

[929]   As discussed previously, equitable subordination does not require that the actions giving rise to subordination relate to the creditor's acquisition of its particular claim.  *See* Report at § IV.D.1.

[930]   Ex. 890 (Handwritten Notes of JPMCB Representative).  One might also be able to draw this inference from the various valuation analyses performed by certain LBO Lenders in December 2007.  *See* Report at § III.H.4.b.

[931]   *See* Report at § III.H.4.b.

[932]   *Id.* at § III.H.4.b.(1).

[933]   Ex. 959 at BOA-TRB-0001201 (Petrik Handwritten Notes, dated December 14, 2007).

reflect that the Lead Banks were keenly focused on understanding "risk" if the banks did and did not fund.[934]

Although, as noted, there was no impropriety per se in taking advantage of the opportunity presented by the failure of Tribune's creditors to obtain recourse against the Guarantor Subsidiaries' assets, there would be something wrong if those institutions proceeded with the Step Two funding knowing that this would render Tribune insolvent.  But why might the Lead Banks do that?  At a superficial level, it would seem illogical that the Lead Banks would ever do that, but closer reflection suggests otherwise.  Perhaps the Lead Banks determined, despite what they might have believed amongst themselves, that they simply could not prove that Tribune would be rendered insolvent, and that it was better to fund Step Two and risk bankruptcy litigation down the line than stain their reputations by not funding, rupture lending relationships with Tribune, EGI and Samuel Zell, and face a substantial lawsuit from Tribune and others right away.  It is also possible that the Lead Banks concluded that the solvency question was close, but not sufficiently close to permit them to refuse to honor their contractual funding commitments, and that the S-Corporation/ESOP structure, combined with the Tribune Entities' catalogue of trophy assets and Mr. Zell's acumen, might enable the Tribune Entities to squeak by.  Or perhaps they concluded that even if Step Two would render the Tribune Entities insolvent, sufficient value would be available at the Guarantor Subsidiaries, combined with their senior position in relation to the PHONES Notes, to make the banks whole, or close to it, while creditors and stakeholders would suffer the consequences.  Or, more likely, perhaps they concluded that although incurrence of the Step Two Debt very likely would render Tribune insolvent (by mopping up the lion's share of Tribune's equity in the Guarantor

---

[934] *Id.*

Subsidiaries by the additional incurrence of $3.6 billion LBO Lender Debt at the Guarantor

Subsidiary level), sufficient value still would be available from the Guarantor Subsidiaries to

make the LBO Lenders whole even with the Step Two Debt added to the mix.  In other words,

whereas Tribune would be rendered insolvent and its creditors and new owner would suffer from

the Step Two Closing, the Guarantor Subsidiary creditors (or which, as discussed at the outset of

the Report, the LBO Lenders hold that vast portion of the claims) would recover in full.

The Investigation revealed that one or more of these scenarios may have served as

possible motivations informing the Lead Banks' actions at Step Two, but the Investigation did

not furnish sufficient proof on which conclusions could be reasonably drawn.  Based on the

record adduced through July 25, 2010, the Examiner has not found sufficient evidence to support

a finding that the Lead Banks engaged in the kind of egregious behavior that would justify

equitable subordination or equitable disallowance.  In the Examiner's view, the fact that the Lead

Banks had preexisting contractual funding obligations (entered into when the Tribune Entities

probably were solvent) is a significant mitigating factor weighing against equitable subordination

or equitable disallowance based on their acts.[935]  The contractual baggage the Lead Banks carried

as they approached Step Two adds nuance and complexity to their actions and makes it difficult

for the Examiner to accept what is essentially the caricature that certain Parties portrayed to the

Examiner of the Lead Banks' actions in the fall of 2007.[936]

The Lead Banks, however, represented by skilled counsel, plainly attempted to clothe as

much of their deliberations as possible on this matter under the umbrella of attorney-client and

---

[935]   It should be noted, however, that consistent with the scope of the Investigation, which only includes estate claims or causes of action, the Examiner did not investigate any claims that individual creditors may hold against one or more of the Lead Banks.  To be clear, the Examiner is not in any way addressing whether a fact or circumstance that serves to mitigate equitable subordination or equitable disallowance also would serve to mitigate, let alone have any relevance to, any such other potential claim or cause of action.

[936]   To be clear, the Examiner finds separately that these circumstances were insufficient to give the Lead Banks a good faith defense under Bankruptcy Code section 548(c).  *See* Report § IV.B.7.b.(3).

other privileges.  Moreover, without casting aspersions, in their testimony before the Examiner,

witnesses for the Lead Banks tended to speak from the same script in discussing key events as

well as their activities during the months preceding the Step Two Closing.  One witness

professed to remember little or nothing at all about these events, at least during his sworn

interview, despite documentary evidence suggesting that this witnesses' institution had very clear

views on these matters.[937]  At a minimum, the Examiner greeted portions of the testimony

furnished by witnesses for the Lead Banks with a healthy dose of skepticism.  The Examiner did

not have an opportunity to pursue whether or to what extent the deliberations that the Lead

Banks engaged in during the fall of 2007 actually are protected attorney-client communications

or are really business discussions among principals, masquerading as communications to and

from counsel and financial advisors.  Further, to the extent the Lead Banks assert privilege based

solely on the fact that an attorney was present during a telephone conference or meeting, or was

copied on correspondence, any such assertions are highly suspect.[938]  The Examiner also did not

have an opportunity to interview all of the witnesses who might have shed light on the question

of what the Lead Banks knew and said to one another leading to the Step Two Closing, to the

extent contentions of privilege do not shield those communications.  Further investigation

therefore is merited.[939]

---

[937]  *See* footnotes 760 -761.

[938]  *See Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*, 2010 U.S. Dist. LEXIS 57880 (S.D.
Cal. June 11, 2010) ("communications between corporate officers or employees transacting the general business
of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on
correspondence"); *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's, London*, 176 Misc. 2d 605, 609
(N.Y. Sup. Ct. 1998) ("there is no privilege where the attorney is present at a meeting as 'a mere scrivener' and
there is no consultation for legal advice").  *See generally Fisher v. United States*, 425 U.S. 391, 403 (1976)
("since the privilege has the effect of withholding relevant information from the factfinder, it applies only where
necessary to achieve its purpose.  Accordingly it protects only those disclosures – necessary to obtain informed
legal advice – which might not have been made absent the privilege.").

[939]  The production of documents furnished by BofA, discussed previously, *see* footnote 738, raise questions
regarding whether (1) the redacted sections are, in fact, protected by any privilege that would prevent the use of
such information by the Examiner, and (2) under applicable law, such privilege, if valid, was waived.

The Examiner acknowledges that if a court disagrees with his conclusions and finds cause for equitable subordination or equitable disallowance, or if new evidence supports such a finding, a court would have to grapple with the questions whether the acts of the Lead Banks may be attributed to all LBO Lenders for equitable subordination purposes and whether trading of LBO Lender Debt both before and after the Chapter 11 Cases gives rise to defenses to equitable subordination in the transferees' hands.  The Examiner leaves those matters in equipoise.[940]

### b.    Examiner's Conclusions and Explanation Concerning EGI-TRB Note Claims.

**Examiner's Conclusions**:  A court is reasonably unlikely to exercise its equitable discretion to subordinate the EGI claims in the Chapter 11 Cases pursuant to Bankruptcy Code section 510(c).

**Explanation of Examiner's Conclusions**:

The Examiner did not find any plausible basis in the record to justify equitable subordination of the EGI-TRB Notes, which is contractually subordinated to most indebtedness in any event.  The Zell Group proposed an aggressive, highly-leveraged transaction that failed and ended up in bankruptcy.  EGI lost a lot of money.  These are not grounds to equitably subordinate the EGI-TRB Notes beyond their already broad contractual subordination.

---

Nevertheless, the Examiner's review of this production occurred at a time when these questions could not have been answered within the deadline set by the Bankruptcy Court for the filing of the Report.

Similarly, on or about July 13, 2010, counsel to JPM notified the Examiner that JPM had inadvertently produced certain records that are purportedly protected by the attorney/client privilege.  JPM supplied the Examiner with redacted versions of those documents and asked the Examiner to return or destroy the unredacted versions of the same records.  The JPM redacted records raise the same issues as Mr. Petrik's handwritten notes.  For the very same reason, the Examiner did not raise these issues with the Court before filing his Report.

In light of the passage of the deadline for filing the Report, absent further order of the Court the Examiner currently does not intend to pursue these matters.

[940]  *See* Report at § IV.B.7.b.(2).; s*ee also* footnote 882.

4.    **Examiner's Conclusions and Explanation Concerning Equitable Disallowance.**

**Examiner's Conclusions**:  A court is reasonably unlikely to equitably disallow the claims of EGI under the EGI-TRB Notes and is somewhat unlikely to equitably disallow the LBO Lender Debt based on any actions by the Lead Banks in connection with the Step  Two Transactions.

**Explanation of Examiner's Conclusions**:

The Examiner reaches these conclusions for the same reasons as his conclusions on the question of equitable subordination.

E.    **Common Law Claims.**

1.    **Examiner's Conclusions and Explanation Concerning Choice of Law/Choice of Forum Issues Presented by Common Law Claims.**

**Examiner's Conclusions**:

As a threshold matter in evaluating the various common law claims and defenses asserted by the Parties, the Examiner determined the law applicable to each claim.  The Examiner applied the choice of law rules of the State of Delaware, as the forum state,[941] and also considered any choice of law arguments raised by the Parties.  The Examiner's conclusions regarding the law applicable to each common law claim are set forth below.[942]

---

[941]    *See Charan Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*, 399 B.R. 400, 414 n.4 (Bankr. D. Del. 2009) (*citing Pickett v. Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.)*, 304 B.R. 101, 106 (Bankr. D. Del. 2004), *aff'd*, 233 F. App'x 115 (3d Cir. 2007)).

[942]    No Party argued that any of the common law claims addressed in the Report should or would be commenced in a forum other than the Bankruptcy Court.  Consistent with the scope of the Investigation, therefore, the Examiner assumes that any such claims would be brought in that court.

**Explanation of Examiner's Conclusions:**

### a.    Breach of Fiduciary Duty.

The Examiner concludes that a court is highly likely to apply Delaware law in evaluating any claim for breach of fiduciary duty.[943]  By incorporating in Delaware, an entity submits to the application of Delaware law for the governance of the corporation's internal affairs, including the nature and scope of the fiduciary duties owed by the corporation's directors and officers.[944] Tribune is a Delaware corporation with its corporate headquarters located in Illinois.[945] Delaware law, therefore, governs the fiduciary duties of the Company's officers, directors and controlling shareholders.[946]  Delaware law likewise governs the fiduciary duties of the officers and directors of those Subsidiary Guarantors incorporated in Delaware.[947]

### b.    Aiding and Abetting Breach of Fiduciary Duty.

In evaluating any claim for aiding and abetting breach of fiduciary duty, the Examiner concludes that a court is highly likely to apply Delaware law, with additional reference to the law

---

[943]    Certain Parties contended that breach of fiduciary duty claims can be asserted against the officers and directors of Tribune, the officers and directors of the Subsidiary Guarantors, the Large Stockholders, and the Zell Group. All Parties applied Delaware law in their analyses of breach of fiduciary duty claims without addressing whether another state's law could or should apply.

[944]    *See Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 386 (3d Cir. 2007) ("Under the internal affairs doctrine, anyone controlling a Delaware corporation is subject to Delaware law on fiduciary obligations to the corporation and other relevant stakeholders."); *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 960 (Del. Ch. 2007) (Strine, V.C.) (explaining that the law of fiduciary obligations is one of the most important ways a state regulates a corporation's internal affairs); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 306 (1971).

[945]    Ex. 4 at 1 (Tribune 2007 Form 10-K).

[946]    *See Topps Co. S'holders Litig.*, 924 A.2d at 959-60 (describing Delaware's "compelling public policy interest" in regulating the internal affairs of Delaware corporations by establishing the parameters of the fiduciary duties of directors).

[947]    Although several Parties noted the possibility of claims for breach of fiduciary duty against officers and directors of Subsidiary Guarantors, the only director of a Subsidiary Guarantor actually identified as a potential target of such a claim was David Williams, who served as a director of TMS Entertainment Guides, Inc. and Tribune Media Services, Inc. at the closing of Step One and Step Two.  *See* Ex. 967 (Subsidiary Board Member Chart).  TMS Entertainment Guides, Inc. and Tribune Media Services, Inc. are both incorporated in Delaware.

of Illinois.[948]  Delaware has adopted the "most significant relationship" test set forth in the

Restatement (Second) of Conflict of Laws for analyzing the law applicable to tort claims.[949]  The

most significant relationship test provides that "[t]he rights and liabilities of the parties with

respect to an issue in tort are determined by the local law of the state which, with respect to that

issue, has the most significant relationship to the occurrence and the parties."[950]  In making this

evaluation, a court must take into account:[951]

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and
>
> (d) the place where the relationship, if any, between the parties is centered.

Here, the Tribune Board often convened in person in Chicago, Illinois, with the Financial

Advisors in attendance.[952]  The Company's headquarters also are located in Illinois, and various

---

[948] The Parties argued that claims for aiding and abetting breach of fiduciary duty can be asserted against the Large Stockholders, the LBO Lenders, the Financial Advisors, the Zell Group, and the officers and directors of Tribune and the Subsidiary Guarantors. Most of the Parties applied Delaware law in their analyses of aiding and abetting breach of fiduciary duty claims without addressing whether another state's law could or should apply. Two Parties, in their reply briefs, cited to authorities in multiple jurisdictions but did not address choice of law.

[949] *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46-47 (Del. 1991) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 145 (1971)).  In adopting the Restatement, the *Travelers* court overruled the law of Delaware which, to that point, had utilized the *lex loci delicti* rule.  *Travelers Indem. Co.*, 594 A.2d at 46-47.

[950] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1) (1971).  When there is no statutory directive, the factors relevant to the choice of the applicable rule of law include:  (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied.  *Id.* § 6(2).

[951] *Travelers Indem. Co.*, 594 A.2d at 47; *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971).  These contacts are to be evaluated according to their relative importance with respect to the particular matter at issue.

[952] *See* Ex. 93 at TRB0434048 (Tribune Board Meeting Minutes, dated September 21, 2006) (reflecting meeting held at Tribune Tower); Ex. 94 at TRB0434065 (Tribune Board Meeting Minutes, dated October 18, 2006) (same); Ex. 246 at TRB0434077 (Tribune Board Meeting Minutes, dated December 12, 2006) (same); Ex. 67 at TRB0415614 (Tribune Board Meeting Minutes, dated February 13, 2007) (same); Ex. 643 at TRB0415663 (Tribune Board Meeting Minutes, October 17, 2007) (same); Ex. 727 at TRB0415676 (Tribune Board Meeting

events relating to the Leveraged ESOP Transactions transpired in Illinois.[953]  On this basis, one

Party suggested that Illinois law should govern an aiding and abetting fiduciary duty claim.  The

relevant contacts point to Delaware and Illinois, but do not weigh heavily in favor of applying

the law of either jurisdiction.[954]  The Examiner need not decide this issue, however, because the

elements of aiding and abetting breach of fiduciary duty are substantially similar under Delaware

and Illinois law.[955]  In these circumstances, when there is no actual conflict between the laws of

the different jurisdictions, a choice of law analysis under Delaware's most significant relationship

test is unnecessary.[956]  Instead, the Examiner may apply the law of the forum state[957] or refer to

---

Minutes, dated December 4, 2007) (same); Ex. 11 at TRB0415683 (Tribune Board Meeting Minutes, dated December 18, 2007) (same).

[953]  *See* Ex. 4 at 1 (Tribune 2007 Form 10-K); *see also* Report at §§ III.A.1 and III.D.16.

[954]  *See LaSala v. Bordier et Cie*, 519 F.3d 121, 130-32 (3d Cir. 2008) (holding, under Delaware law, that a complaint sufficiently alleged harm to a Delaware corporation in Delaware arising from an alleged breach of the duty of loyalty by the corporation's directors that led to bankruptcy).  No Party argued for the application of New York law to aiding and abetting breach of fiduciary duty claims, and, as such, the Examiner did not evaluate whether New York law should apply.  *See In re Am. Int'l Grp., Inc. Consol. Derivative Litig.*, 976 A.2d 872, 882 & n.17 (Del. Ch. 2009) (applying Delaware law, as the law of the forum state, when the parties "tacitly concede[d] that Delaware law is applicable" by failing to brief the issue whether another state's law should apply).

[955]  *Compare Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038-39 (Del. Ch. 2006) (observing that a plaintiff pleading an aiding and abetting breach of fiduciary duty claim must prove "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the nonfiduciary") (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995)), *with Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (stating, in evaluating viability of aiding and abetting breach of fiduciary duty claim, that "[u]nder Illinois law, to state a claim for aiding and abetting, one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation") (*citing Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003)).

[956]  *See Kronenberg v. Katz*, 872 A.2d 568, 589 (Del. Ch. 2004) ("Where the choice of law would not influence the outcome, the court may avoid making a choice.") (footnote omitted); *see also Pa. Emp. Benefit Trust Fund v. Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *12-14 (D. Del. May 6, 2010) (collecting cases concluding that if no actual conflict exists upon examination of competing laws proposed by the parties, there is a "false conflict" and no choice of law analysis is necessary).

[957]  *See Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *46 n.9 (noting that defaulting to the law of the home forum in the event of a false conflict "is another way of stating that applying the law of the foreign jurisdiction is unnecessary as the substance of the law is consistent with the home forum"); *cf. Eckmar Corp. v. Malchin*, 297 A.2d 446, 449 (Del. Ch. 1972) (choosing to apply Delaware law, as the law of the forum, where defendant argued that New York law should apply but "made no record showing that New York law is any different than our own").

the laws of both states interchangeably in addressing the Parties' claims of aiding and abetting breach of fiduciary duty.[958]

### c.    Unjust Enrichment.

In evaluating any claim for unjust enrichment, the Examiner concludes that a court is highly like to apply Delaware law, with additional reference to the law of Illinois.[959]  Delaware courts use the most significant relationship test to determine the law applicable to restitution claims.[960]  In the context of such a claim, the courts evaluate contacts including (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship; (b) the place where the benefit or enrichment was received; (c) the place where the act conferring the benefit or enrichment was done; (d) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (e) the place where a physical thing, such as land or chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.[961]

Certain Parties asserted that based upon this analysis, Illinois law should apply.  As in the case of aiding and abetting claims, however, the relevant contacts point to the application of

---

[958]   *See Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *44-*46 (collecting cases holding that when a "false conflict" exists, the court is free to refer to the laws of the competing jurisdictions interchangeably).

[959]   Certain Parties that addressed the choice of law issue with respect to an unjust enrichment claim argued that Illinois law should apply.  Other Parties contended that a choice of law analysis was unnecessary because unjust enrichment claims are preempted.

[960]   *See Landis v. Sci. Mgmt. Corp.*, 1991 Del. Ch. LEXIS 19, at *8 (Del. Ch. Ct. Feb. 15, 1991) ("The first step in the analysis of the unjust enrichment claim is to determine the appropriate choice of law.  Delaware follows the 'most significant relationship' test of the Restatement (Second) of Conflict of Laws § 221 (1971) to determine the law applicable to unjust enrichment claims.") (citing *Hurst v. Gen. Dynamics Corp.*, 583 A.2d 1334, 1338 (Del. Ch. 1990)).

[961]   RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 221 (1971).  These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Delaware and Illinois law, with neither jurisdiction heavily favored.[962]  In any event, the

Examiner need not decide this issue because the elements of unjust enrichment are substantially

similar under Delaware and Illinois law.[963]  Because there is no actual conflict between the laws

of the different jurisdictions, a choice of law analysis under Delaware's most significant

relationship test is unnecessary.[964]  Instead, as with the aiding and abetting claims, the Examiner

concludes that a court is highly likely to apply Delaware law[965] or refer to the laws of Delaware

and Illinois interchangeably in considering the Parties' unjust enrichment claims.[966]

---

[962] No Party proposed that New York law should apply to unjust enrichment claims.  The Examiner, therefore, did not evaluate the application of New York law.  *See In re Am. Int'l Group, Inc. Consol. Derivative Litig.*, 976 A.2d 872, 882 & n.17 (Del. Ch. 2009).

[963] *Compare Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 145 (Bankr. D. Del. 2005) ("To support a claim for unjust enrichment, the plaintiff must establish that the defendant received a benefit, that the defendant was aware of the benefit, and that the benefit was accepted by the defendant under circumstances that would make the acceptance inequitable without payment for its value."), *and Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (stating that unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience") (quotations & citations omitted), *with Vinarov v. Motorola, Inc.*, 2008 U.S. Dist. LEXIS 25363, at *39 (N.D. Ill. Mar. 26, 2008) ("The essential elements of a claim for unjust enrichment include plaintiff conferring a benefit on defendant, defendant accepting that benefit, and circumstances where defendant's retention of the benefit 'violates fundamental principles of justice, equity, and good conscience.'") (quoting *Johnson v. Gudmundsson*, 35 F.3d 1104, 1114 (7th Cir. 1994), *and Douglass v. Wones*, 458 N.E.2d 514, 521 (Ill. App. Ct. 1983) (stating that unjust enrichment consists of the "unjust retention of a benefit . . . by one party to the detriment of another party, against the fundamental principles of justice, equity, and good conscience") (citation omitted).

[964] Indeed, the one Party that argued that Illinois law should apply acknowledged that the relevant principles underlying the doctrine of unjust enrichment are the same under Delaware and Illinois law.  *See also Kronenberg*, 872 A.2d at 589; *see also Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *12-14.  *Cf. Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*, 560 F. Supp. 1372, 1379-83 (D. Del. 1983) (applying "most significant relationship" test to determine law applicable to unjust enrichment claim where actual conflict existed between the laws of New York and Ecuador), *aff'd in relevant part, vacated in part on other grounds*, 842 F.2d 1466, 1473 (3d Cir. 1988).

[965] *See Zeneca*, 2010 U.S. Dist. LEXIS 44413, at *12-14.

[966] *See id* at *46 n.9.

### d.    Illegal Corporate Distributions.

In evaluating any claim arising under the Delaware General Corporation Law, the Examiner concludes that it is highly likely (if not certain) that a court will, by definition, apply Delaware law.[967]

### e.    Professional Malpractice Claims.

In evaluating a professional malpractice claim, the Examiner concludes that it is highly likely a court will apply the law of Illinois.[968]

Under Delaware choice of law principles, when parties have designated in their contract the law applicable to disputes under that contract, such a provision "must be respected as long as the law selected 'bears some material relationship to the transaction.'"[969] "When the fact of Delaware incorporation has no bearing on the parties' relationship, and they have agreed to a broad choice of law provision that logically governs the claims brought before a Delaware court and that selects another state's law to govern," a Delaware court must apply the law selected in the parties' agreement.[970]

The VRC engagement letter selected Illinois law as the governing law for "[t]his agreement and any claim related directly or indirectly to this agreement (including any claim concerning advice provided pursuant to this agreement) . . . ."[971]  No Party argued that the fact of

---

[967]    *See* DEL. CODE ANN. tit. 8, § 160(a)(1) (2010).  Certain of the Parties raised statutory claims under the Delaware General Corporation Law challenging the legality of Tribune's purchase or redemption of its own stock or payment of dividends as illegal corporate distributions.

[968]    According to one of the Parties, the Debtors have a strong claim against VRC under Illinois law for negligence or professional malpractice arising from VRC's work on its solvency opinions.  Another Party briefly addressed the possibility of professional malpractice claims against VRC or other advisors to the Company, citing cases in the federal district courts of Texas and New York, but did not address the question of which state's law should apply.

[969]    *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032 (Del. Ch. 2005) (quoting *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1293 (Del. 1989)).

[970]    *Weil*, 877 A.2d at 1035.

[971]    Ex. 267 at Ex. 1 (VRC Solvency Engagement Letter, dated April 11, 2007).

the Company's Delaware incorporation bears on the contractual relationship between Tribune

and VRC.  Likewise, no Party disputed the efficacy of the choice of law provision in the VRC

engagement letter.[972]  Moreover, the Examiner finds that the choice of law provision in the VRC

engagement letter is framed in terms that are sufficiently broad to encompass a claim of

professional malpractice against VRC.[973]  Thus, the Examiner will apply Illinois law to evaluate

potential professional malpractice claims against VRC.

### 2.    Breach of Fiduciary Duty.

#### a.    Legal Standard for Breach of Fiduciary Duty Claims.

It is a fundamental principle of Delaware law that the business and affairs of a

corporation are managed by or under the direction of its board of directors.[974]  With this power

comes "certain fundamental fiduciary obligations to the corporation and its shareholders."[975]  In

their management of the corporation, "directors are charged with an unyielding fiduciary duty to

protect the interests of the corporation and to act in the best interests of its shareholders."[976]  The

appropriate discharge of this obligation will "depend[] upon the specific context that gives

occasion to the board's exercise of its business judgment."[977]  The fiduciary duties of directors

---

[972] *See Edelist v. MBNA Am. Bank*, 790 A.2d 1249, 1255-56 (Del. Super. Ct. 2001) (analyzing "most significant relationship" factors when plaintiff disputed the effectiveness of a choice of law provision in defendant's credit card agreement, and concluding that choice of law clause was effective).

[973] Ex. 267 at Ex. 1 (VRC Solvency Engagement Letter, dated April 11, 2007).

[974] *See* DEL. CODE ANN. tit. 8, § 141(a) (2010) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."); *see also Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 366 (Del. 2006); *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000) (citations omitted).

[975] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (footnote omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) [hereinafter, *Brehm I*].

[976] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1994); *see also N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (stating that "fiduciary duties of the directors of a Delaware corporation are unremitting").

[977] *McMullin*, 765 A.2d at 918.

extend even after they resign from the board of directors,[978] and can compel them to oppose a

transaction, even when there is a slight conflict of interest.[979]

Officers of Delaware corporations owe fiduciary duties identical to those of directors.[980]

Moreover, fiduciary duties extend to any shareholder who exercises "a 'dominant' position and/or

actually 'controlled' the corporation's conduct."[981] Thus, a shareholder who owns a majority

interest in, or exercises control over the business and affairs of, the corporation owes fiduciary

duties to minority shareholders.[982]

> **(1)    The Business Judgment Rule and the Entire Fairness Doctrine.**

The business judgment rule embodies the "presumption that in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

---

[978]    *FDIC v. Barton*, 1998 U.S. Dist. LEXIS 5203, at *19-22 (E.D. La. Apr. 8, 1998).

[979]    *Dalton v. Am. Inv. Co.*, 1981 Del. Ch. LEXIS 647, at *2-7 (Del. Ch. June 4, 1981).

[980]    *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

[981]    *See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 142 (Bankr. D. Del. 2005).  The concepts of "dominance" and "control" are given their "ordinary meaning," and, "at a minimum . . . imply (in actual exercise) a direction of corporate conduct in such a way as to comport with the wishes or interest of the corporation (or persons) doing the controlling."  *Id.* (quotations & citation omitted).

[982]    *See Kahn v. Lynch Commc'ns. Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994).  Generally, a shareholder who owns less than 50% of a corporation's outstanding stock does not, without more, owe fiduciary duties.  *See Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) (citing *Osofsky v. J. Ray McDermott & Co.*, 725 F.2d 1057 (2d Cir. 1984)).  Rather, "[f]or a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporat[e] conduct."  *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989); *see also Kahn*, 638 A.2d at 1114-15 (46% shareholder found to be controlling on the basis of several facts, including that shareholder designated directors to five of the eleven board seats); *Solomon v. Armstrong*, 747 A.2d 1098, 1117 n.61 (Del. Ch. 1999) (stating that domination requires "literal control of corporate conduct"), *aff'd*, 746 A.2d 277 (Del. 2000); *Kaplan v. Centex Corp.*, 284 A.2d 119, 122 (Del. Ch. 1971); *see also In re W. Nat'l Corp. S'holders Litig.*, 2000 Del. Ch. LEXIS 82, at *25 (Del. Ch. May 22, 2000) (finding a shareholder to be non-controlling on the basis of several factors, including that none of the shareholder's "managers, employees, agents, or even nominees sat on [the allegedly controlled entity's] board of directors"); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 913 (Del. Ch. 1999) (finding a 49% shareholder to be a controlling shareholder on the basis of several facts, including that two of the four directors of the controlled entities had conflicts of interest in the challenged transaction).  In this regard, courts have held that designation of directors to the board of directors or entering into business agreements with an investee is not sufficient shareholder conduct, without more, to trigger a finding of "controlling" status; it is likewise insufficient to allege that shareholders were part of a "controlling group" because they had "parallel interests."  *See Williamson v. Cox Commc'ns, Inc.*, 2006 Del. Ch. LEXIS 111, at *23 (Del. Ch. June 5, 2006) (citing *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 550-51 (Del. Ch. 2003)); *see also Kennedy v. Venrock Assocs.*, 348 F.3d 584, 590-91 (7th Cir. 2003).

belief that the action taken was in the best interests of the company."[983]  This presumption

attaches to "a director-approved transaction within a board's conferred or apparent authority in

the absence of any evidence of 'fraud, bad faith, or self-dealing in the usual sense of personal

profit or betterment.'"[984]  The presumption strongly favors the actions taken by directors, such

that a court will not "substitute its judgment for that of the board if the [board's] decision can be

attributed to any rational business purpose."[985]  Instead, when the business judgment rule's

presumption applies, "a corporate officer or director is not legally responsible to the corporation

for losses that may be suffered as a result of a decision that an officer made or that directors

authorized in good faith."[986]  The rule thus achieves two salutary ends:  it avoids judicial

intervention "into a management role for which [the courts] were neither trained nor competent,"

and it shields entrepreneurial and even risky decisions, provided those decisions were made with

due care and in good faith.[987]

---

[983]  *McMullin*, 765 A.2d at 916 (quotations & citations omitted); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[984]  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1994) (citation omitted); *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989) (citations omitted).

[985]  *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995) (quoting *Unocal Corp. v. Mesa Petrol. Co.*, 493 A.2d 946, 954 (Del. 1985)); *see also Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 549 (D. Del. 2005) *aff'd*, 278 F. App'x 125 (3d Cir. 2008).  One way to show that a decision cannot "be attributed to any rational business purpose" is to establish waste.  *See Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 73-74 (Del. 2006) [hereinafter *Brehm II*].  Waste is rarely found in Delaware, however, as the standard imposes the heavy burden to demonstrate "the rare, unconscionable case where directors irrationally squander or give away corporate assets."  *Id.* at 74 (quotations & citations omitted).  In these Chapter 11 Cases, no Party has alleged waste.

[986]  *See Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 458 (D. Del. 2004) (quotations & citations omitted); *see also Cede & Co.*, 634 A.2d at 361 (noting that when business judgment rule attaches, "our courts will not second-guess these business judgments").

[987]  *See Edgecomb*, 385 F. Supp. 2d at 458; *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 (Del. Ch. 2006) ("The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit."), *aff'd sub. nom Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007); *McMullin*, 765 A.2d at 916 ("The business judgment rule . . . combines a judicial acknowledgement of the managerial prerogatives that are vested in the directors of a Delaware corporation by statute with a judicial recognition that the directors are acting as fiduciaries in discharging their statutory responsibilities to the corporation and its shareholders.") (citations omitted); *Cede & Co.*, 634 A.2d at 360 ("The rule operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation."); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("The business judgment rule is an acknowledgement of the managerial prerogatives of Delaware directors . . . .").

The presumption erected by the business judgment rule is rebuttable.  The burden of rebuttal lies initially with the contesting plaintiff who must demonstrate that the directors, in reaching the decision under attack, "breached any one of the triads of their fiduciary duty – good faith, loyalty or due care."[988]  If the contesting plaintiff is unable to carry this burden, "the business judgment rule attaches to protect corporate officers and directors and the decisions they make."[989]  Conversely, if the plaintiff succeeds in carrying this burden, the business judgment rule presumption falls away[990] and "the burden shifts to the defendant directors, the proponents of the challenged transaction, to prove to the trier of fact the 'entire fairness' of the transaction to the shareholder plaintiff."[991]

"Entire fairness" is an "unflinching" inquiry[992] that requires the contested transaction to be a product of both fair dealing and fair price.[993]  Fair dealing embraces "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and

---

[988] *Cede & Co.*, 634 A.2d at 361; *accord Brehm II*, 906 A.2d at 52; *McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000); *Aronson*, 473 A.2d at 812.  Note, however, that the Supreme Court of Delaware has since instructed that the first component of this triad, the duty of good faith, is subsumed under the duty of loyalty.  *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006).  *See* Report at § IV.E.2.a.(2).

[989] *Cede & Co.*, 634 A.2d at 361; *see McMullin*, 765 A.2d at 917 (noting that if it attaches, the rule "operates to protect the individual director-defendants from personal liability for making the board decision at issue") (citation omitted).

[990] Successfully rebutting the business judgment rule presumption "does not create *per se* liability on the part of the directors."  *McMullin*, 765 A.2d at 917 (emphasis added).  It merely shifts the burden back to the directors to substantively defend their actions.  *Id.*

[991] *Cede & Co.*, 634 A.2d at 361; *accord Brehm II*, 906 A.2d at 52; *McMullin*, 765 A.2d at 917.  Note that the use of a special committee can operate to shift the burden of proving entire fairness back onto the plaintiff or accusing party.  *See In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 Del. Ch. LEXIS 206, at *33 (Del. Ch. Dec. 21, 2005).  The party accused of breaching a fiduciary duty must, however, show that the special committee "was truly independent, fully informed, and had the freedom to negotiate at arm's length."  *Id.* at *33.  *Accord In re Cox Radio, Inc. S'holders Litig.*, 2010 Del. Ch. LEXIS 102, at *43 (Del. Ch. May 6, 2010) (same).  If this test cannot be met, then the burden will not shift and will remain with the party accused of breaching a fiduciary duty.  *See In re Tele-Commc'ns., Inc. S'holders Litig.*, 2005 Del. Ch. LEXIS 206, at *33.

[992] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[993] *Cede & Co.*, 634 A.2d at 361; *Weinberger*, 457 A.2d at 711; *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 549 (D. Del. 2005) *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

how the approvals of the directors and the stockholders were obtained."[994]  Fair price

encompasses "the economic and financial considerations of the proposed [transaction], including

all relevant factors:  assets, market value, earnings, future prospects, and any other elements that

affect the intrinsic or inherent value of a company's stock."[995]  Although implicating two

different concepts (fair dealing and fair price), the entire fairness inquiry is "not a bifurcated one"

but instead "[a]ll aspects of the issue must be examined as a whole since the question is one of

entire fairness."[996]  When the transaction at issue involves the sale of the corporation, the

directors must establish that "the price offered was the highest value reasonably available under

the circumstances,"[997] though there is "no single blueprint" for accomplishing that end.[998]

     The "entire fairness" standard also applies when examining the propriety of a transaction

involving a dominating or controlling shareholder.[999]  The initial burden of establishing entire

fairness rests upon the dominating or controlling shareholder who stands on both sides of the

transaction.[1000]  Approval of the transaction by an independent committee of directors or an

informed majority of minority shareholders, however, shifts the burden of proof on the issue of

fairness away from the dominating or controlling shareholder to the party challenging the

transaction.[1001]  Even when such a transaction receives the informed approval of a majority of

---

[994]  *Weinberger*, 457 A.2d at 711.

[995]  *Id.* (citations omitted).

[996]  *Id.*

[997]  *Cede & Co.*, 634 A.2d at 361; *see McMullin v. Beran*, 765 A.2d 910, 918 (Del. 2000) (describing the directors' fiduciary obligation "to *seek* the best value reasonably available to the stockholders when the *board* is engaged in the process of selling the corporation") (emphasis in original).

[998]  *McMullin*, 765 A.2d at 918 (citations omitted).

[999]  *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (citing *Weinberger*, 457 A.2d at 710-11); *see also Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985).

[1000]  *Kahn*, 638 A.2d at 1114.

[1001]  *See Rosenblatt*, 493 A.2d at 937-38.

minority shareholders or an independent committee of disinterested directors, however, an entire

fairness analysis is the only proper standard of judicial review.[1002]

### (2)    The Duty of Loyalty Under Delaware Law.

As noted above, Delaware law recognizes a "triad" of fiduciary duties:  (1) good faith;

(2) loyalty; and (3) care.[1003]  Only the second and third of these, however, may lead directly to

liability if breached.  The duty of good faith is subsumed in the duty of loyalty, and a breach of

good faith is ordinarily redressed as a violation of the fiduciary's duty of loyalty.[1004]  A breach of

these fiduciary duties is pivotal in framing the proper evaluation of liability claims against a

corporation's directors and officers because, as noted above, such a breach by a director or

officer rebuts the presumption of the business judgment rule, thereby subjecting the challenged

action to an entire fairness review.[1005]

The contours of and rationale underlying the duty of loyalty are articulated in the seminal

case of *Guth v. Loft, Inc.*[1006] in an oft-quoted passage:[1007]

> Corporate officers and directors are not permitted to use their
> position of trust and confidence to further their private
> interests. . . .  A public policy, existing through the years, and
> derived from a profound knowledge of human characteristics and

---

[1002]  *See Rosenblatt*, 493 A.2d at 937-38.

[1003]  *Cede & Co.*, 634 A.2d at 361 (citations omitted); *see also Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 327 B.R. 537, 549 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

[1004]  *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006); *see also Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 n.9 (D. Del. 2004) (holding that the duty of good faith and the duty of loyalty "are identical").  The Supreme Court of Delaware explained this composition:  "although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty.  Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly."  *Stone*, 911 A.2d at 370 (citations omitted).

[1005]  *See Cede & Co.*, 634 A.2d at 361 (citations omitted); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 173 n.138 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006).

[1006]  5 A.2d 503 (Del. 1939).

[1007]  *Loft*, 5 A.2d at 510 (quoted in *Cede & Co.*, 634 A.2d at 361).

> motives, has established a rule that demands of a corporate officer
> or director, peremptorily and inexorably, the most scrupulous
> observance of his duty, not only affirmatively to protect the
> interests of the corporation committed to his charge, but also to
> refrain from doing anything that would work injury to the
> corporation, or to deprive it of profit or advantage which his skill
> and ability might properly bring to it, or to enable it to make the
> reasonable and lawful exercise of its powers.  The rule that
> requires an undivided and unselfish loyalty to the corporation
> demands that there shall be no conflict between duty and self-
> interest.

In short, the duty of loyalty "mandates that the best interest of the corporation and its
shareholders takes precedence over any interest possessed by a director, officer or controlling
shareholder and not shared by the stockholders generally."[1008]

In determining whether the business judgment rule attaches, the Delaware courts may

conduct two inquiries into directorial loyalty:  testing whether the directors or officers were

interested[1009] and testing whether they lacked independence.[1010]  If interest or non-independence

is present, that decision-maker's actions will not receive the presumption of the business

judgment rule and are voidable.[1011]

A director is considered interested if he or she appears on both sides of the transaction or

if he or she "expect[s] to derive any personal financial benefit from it in the sense of self-dealing,

as opposed to a benefit which devolves upon the corporation or all stockholders generally."[1012]

Absent self-dealing, however, a benefit received by a director that is not equally received by

shareholders is not alone sufficient to establish that the director was interested.[1013]  Rather, the

---

[1008] *Cede & Co*, 634 A.2d at 361 (citations omitted); *see also Continuing Creditors' Comm. of Star Telecommc'ns, Inc.*, 385 F. Supp. 2d at 460.

[1009] *See Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *see also Benihana of Tokyo, Inc.*, 891 A.2d at 174.

[1010] *See Aronson*, 473 A.2d at 812.

[1011] *See Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002).

[1012] *Aronson*, 473 A.2d at 812 (citations omitted); *see also Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 (D. Del. 2004); *Hechinger*, 327 B.R. at 549; *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (citations omitted); *Cede & Co.*, 634 A.2d at 362.

[1013] *Orman*, 794 A.2d at 23.

benefit must be material to the particular challenged director.[1014]  A benefit is material if it "was

significant enough '*in the context of the director's economic circumstances*, as to have made it

improbable that the director could perform [his or her] fiduciary duties to the . . . shareholders

without being influenced by [his or her] overriding personal interest.'"[1015]

Even if a director or officer is interested, however, DGCL section 144(a) establishes a

statutory safe harbor.  This section provides that a corporation's contracts and transactions will

not be made void or voidable just because they were consummated with participation by an

interested director or officer, as long as:  (1) the material facts regarding the director's or officer's

interest or relationship are disclosed to or known by the board, and the board's actions are

ratified, in good faith, by a majority of the disinterested directors; or (2) the material facts

regarding the director's or officer's interest or relationship are disclosed to or known by the

shareholders who then ratify, in good faith, the board's actions.[1016]  A failure to meet either of the

prongs of the statutory safe harbor will render the transaction void or voidable, unless the

interested director or officer can show that the transaction was entirely fair.[1017]  Establishing that

a given transaction complies with DGCL section 144 "only means that the [transaction] is not

---

[1014]  *Orman*, 794 A.2d at 23 (citing *Cede & Co.*, 634 A.2d at 363); *see also Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.* ), 327 B.R. 537, 549 (D. Del. 2005) *aff'd*, 278 F. App'x 125 (3d Cir. 2008).

[1015]  *Orman*, 794 A.2d at 23 (citations omitted; emphasis in original).

[1016]  DEL. CODE ANN. tit. 8, § 144(a)(1)-(2) (2010).

[1017]  DEL. CODE ANN. tit. 8, § 144(a)(3) (2010) (providing that, in the absence of informed ratification by either disinterested directors or shareholders, the transaction is not void or voidable if it "is fair as to the corporation as of the time it is authorized, approved or ratified"); *see also Benihana of Tokyo, Inc.*, 891 A.2d at 173 (citations omitted); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 114 (Del. Ch. 1999) (citing *Cede & Co.*, 634 A.2d at 366 n.34).

void or voidable *solely* because of the conflict of interest."[1018]  Indeed, a director or officer might still be held liable for a breach of his or her fiduciary duties.[1019]

The second duty of loyalty inquiry—independence—contemplates that "a director's decision [must be] based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[1020]  An extraneous consideration or influence is present when the challenged director is controlled by another person or corporation.[1021]  To prove that a director is controlled, a party must assert "facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'"[1022]  This can be shown by proving "'that the directors are 'beholden' to [the controlling person] or so under their influence that their discretion would be sterilized.'"[1023]  A necessary threshold prerequisite for any such showing is "that the supposedly dominating person actually is interested in the transaction in question."[1024]

---

[1018] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 185 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) (emphasis in original).

[1019] *Id.*

[1020] *Aronson*, 473 A.2d at 816 ("While directors may confer, debate, and resolve their differences through compromise, or by reasonable reliance upon the expertise of their colleagues and other qualified persons, the end result, nonetheless, must be that each director has brought his or her own informed business judgment to bear with specificity upon the corporate merits of the issues without regard for or succumbing to influences which convert an otherwise valid business decision into a faithless act."); *see also Orman*, 794 A.2d at 24 (citation omitted).

[1021] *Orman*, 794 A.2d at 24.

[1022] *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) (citation omitted); *see also Orman*, 794 A.2d at 24 (citation omitted).

[1023] *Orman*, 794 A.2d at 24 (citations omitted).

[1024] *See Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004).

When analyzing an allegation that a director is either interested or lacks independence, the appropriate standard is that of a subjective actual person.[1025]  Whether a director is interested or lacks independence must be viewed in light of each particular director's circumstances.[1026]

Notably, proving a breach of the duty of loyalty by one director is not sufficient.  Rather, in order to overcome the business judgment rule in favor of an entire fairness review, a party asserting a breach must allege "facts which, if accepted as true, establish that the *board* was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders."[1027]  To prove that the board was interested or lacked independence, a challenging party "must allege facts as to the interest and lack of independence of the *individual members* of that board."[1028]  The party asserting a breach of loyalty must show that a majority of the board of directors had a financial interest in the transaction or were dominated or controlled by a materially-interested director.[1029]

### (3)    The Duty of Disclosure as Part of the Duty of Loyalty Under Delaware Law.

Under certain circumstances, the duty of loyalty includes a duty of disclosure.[1030]  This duty does not require disclosure of every known fact about a transaction in which the corporation

---

[1025]  *See In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 Del. Ch. LEXIS 206, at *31 (citations omitted); *Orman*, 794 A.2d at 24 (citations omitted); *see also McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (citations omitted); *Cede & Co. v. Technicolor*, 634 A.2d 345, 364 n.31 (Del. 1993).

[1026]  *Orman*, 794 A.2d at 24 (citations omitted).

[1027]  *Id.* at 22 (citations omitted); *see also Edgecomb, Inc.*, 385 F. Supp. 2d at 460.

[1028]  *Orman*, 794 A.2d at 22.

[1029]  *Id.*  Such a showing may not always be required.  A breach of the duty of loyalty can be established by showing material interest on the part of less than a majority of directors if an interested director failed to disclose his or her interest to the board and, if they had been aware of such an interest, the other board members would have considered that interest a significant fact in evaluating the transaction.  *Id.* at 22-23.

[1030]  *Hoover Indus., Inc. v. Chase*, No. 9276, 1988 Del. Ch. LEXIS 98, at *6-*7 (Del. Ch. July 13, 1988).

is engaged, but rather involves situations in which the director is personally engaged in a transaction that is "harmful to the corporation, but beneficial to the director."[1031]  Moreover, for the duty to disclose to arise, the director must have "clear knowledge of the information at issue."[1032]  Indeed, in the context of a leveraged buyout transaction, to apply any standard less stringent would unnecessarily expose the participants in such a transaction, "where directors or officers of the seller often emerge as directors and officers of the surviving corporation, to subsequent litigation based on mere speculation that a defendant should have known of some transaction planned by the new company within a few years after the sale, and that the transaction would turn out badly."[1033]

### (4)    The Duty of Care Under Delaware Law.

Under Delaware law, the fiduciary duty of care requires officers and directors, when making business decisions, to consider "all material information reasonably available."[1034]  Failure to meet the duty of care can expose directors to resulting damages, subject to any exculpation the corporation has conferred on directors in its charter.[1035]  Such exculpation will not protect officers.[1036]

---

[1031]  *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006) (citation omitted), *overruled in part on other grounds by N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007).

[1032]  *Id.* at 1185 (citations omitted).

[1033]  *Id*.

[1034]  *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  This does not impose upon the board the obligation to be informed of every fact.  Rather, it "is responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the [b]oard's reasonable reach."  *Brehm I*, 746 A.2d at 259.

[1035]  *See* Report at § IV.E.2.d.

[1036]  *See id.*

Once informed, the officers and directors must act with requisite care in the discharge of their duties.[1037]  This obligation that directors "act on an informed basis . . . forms the duty of care element of the business judgment rule."[1038]  A court will not find a breach of the duty of care "unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner before voting as a board upon a transaction as significant as a proposed merger or sale of the company."[1039]  Nor is the required "due care" of the substantive variety:  "Courts do not measure, weigh or quantify directors' judgments.  We do not even decide if they are reasonable in this context.  Due care in the decision-making context is *process* due care only."[1040]  Like the duty of loyalty, a party alleging a breach of the duty of care must show that a majority of the directors failed to exercise due care.[1041]

Negligence alone by the officers and directors will not suffice to prove a breach of the duty of care.[1042]  Rather, the officers' and directors' processes must be grossly negligent.[1043]  Under Delaware law, gross negligence is defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of

---

[1037] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del. 1994) (citation omitted); *Aronson*, 473 A.2d at 812.

[1038] *Cede & Co.*, 634 A.2d at 367.

[1039] *Id.* at 368 (citation omitted).

[1040] *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) [hereinafter, Brehm I] (citations omitted).  Notwithstanding the sweeping nature of this pronouncement, there is a glimpse of "substantive" due care at the far margins of sensibility.  *Id.*  ("Irrationality is the outer limit of the business judgment rule.  Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule.").

[1041] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) (finding no duty of care violation where disinterested, independent directors met and discussed the challenged transaction, considered objections and alternatives, and only then, by a disinterested vote comprising a majority of the board, voted to approve the transaction).

[1042] *Brehm I*, 746 A.2d at 259.

[1043] *McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000); *Brehm I*, 746 A.2d at 259; *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989); *Aronson v. Lewis*, 473 A.2d 805, 812-13 (Del. 1984); *see Benihana of Tokyo, Inc.*, 891 A.2d at 192 ("Because duty of care violations are actionable only if the directors acted with gross negligence . . . such violations are rarely found.").

reason."[1044]  Proof of grossly negligent conduct that breaches a fiduciary's duty of care would rebut the business judgment rule presumption,[1045] and compel an entire fairness review as described above.[1046]

### (5)    The Statutory Safe Harbor.

In endeavoring to discharge their duty of care, "directors are fully protected in relying in good faith on reports made by officers"[1047] and other experts.  Indeed, by statute, Delaware law provides directors with a safe harbor when relying on data presented to them:[1048]

> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

This statute does not, however, permit directors or members of committees designated by the directors to rely blindly on data presented.[1049]  Inherent in this statutory safe harbor is "the presumption that the information provided is both accurate and complete."[1050]  To ensure that presumption is warranted, the directors are bound to make a reasonable inquiry.[1051]  A failure to

---

[1044] *Benihana of Tokyo, Inc.*, 891 A.2d at 192 (citation omitted).

[1045] *See McMullin*, 765 A.2d at 921-22; *Benihana of Tokyo, Inc.*, 891 A.2d at 192.  Examples of grossly negligent conduct include, but are not limited to, a failure to ask questions to determine if an opinion was made on a sound basis, and when a board is rushed into decision making.  *See Smith v. Van Gorkom*, 488 A.2d 858, 877-78 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009).

[1046] *McMullin*, 765 A.2d at 917.

[1047] *Van Gorkom*, 488 A.2d at 874-75 (citation omitted).

[1048] DEL. CODE ANN. tit. 8, § 141(e) (2010).

[1049] *See Van Gorkom*, 488 A.2d at 875 ("[F]or a report to enjoy the status conferred by § 141(e), it must be pertinent to the subject matter upon which a board is called to act, and otherwise be entitled to good faith, not blind, reliance.").

[1050] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283-84 (Del. 1989).

[1051] *Van Gorkom*, 488 A.2d at 875; *see also Mills Acquisition Co.*, 559 A.2d at 1283-84 (Del. 1989) ("[D]ecisions of a board based upon [reliance on] data will not be disturbed when made in the proper exercise of business

do so will destroy any safe harbor available under this statute.[1052]  This is particularly true when the board is interested in a challenged transaction:  DGCL section 141(e) does not provide an absolute defense to an interested-party transaction.[1053]

In *Valeant Pharmaceuticals International v. Jerney*, Valeant's former director and president was held liable for approving cash bonuses to the Valeant's former CEO and several other members of the board (including himself).[1054]  Although the president admitted that he had an interest in the bonus transaction, he claimed good faith reliance on a compensation expert's report.[1055]  The court found that the report was a *factor*, but was not determinative of the entire fairness inquiry.  The court noted the report was based on flawed assumptions and the expert was hand selected by management without appropriate inquiry by the board; thus, it was unreasonable for the board to rely on the report.[1056]

---

judgment.  However, when a board is deceived by those who will gain from such misconduct, the protections girding the decision itself vanish.").

[1052] *See Van Gorkom*, 488 A.2d at 877-78 ("Under § 141(e), the directors were entitled to rely upon their chairman's opinion of value and adequacy, provided that such opinion was reached on a sound basis.  Here, the issue is whether the directors informed themselves as to all information that was reasonably available to them.  Had they done so, they would have learned of the source and derivation of the . . . price and could not reasonably have relied thereupon in good faith. . . .  [T]he record compels the conclusion that . . . the Board lacked valuation information adequate to reach an informed business judgment. . . ."); *see also Mills Acquisition Co.*, 559 A.2d at 1284 ("Decisions made on [the basis of profit-motivated deception] are voidable at the behest of innocent parties to whom a fiduciary duty was owed and breached, and whose interests were thereby materially and adversely affected.").

[1053] *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 751 (Del. Ch. 2007), *appeal dismissed*, 2007 Del. LEXIS 245 (May 30, 2007).

[1054] 921 A.2d 732 at 735-36.

[1055] *Id.* at 751.

[1056] *Id.*; *see also Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 910-11 (Del. Ch. 1999) (holding that directors' reliance on the advice of an attorney Manning that transaction was fair cannot shield them from liability arising out of the unfairness of the transaction because "they had no reason to believe that his firm had been selected with reasonable care by or on behalf of the corporation.") (citing DEL. CODE ANN. tit. 8, § 141(e)).

### b. Effect of Solvency or Insolvency on Breach of Duty Questions Under Delaware Law.

In Delaware, "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms" that define the specific debtor-creditor relationship.[1057]  Indeed, Delaware law recognizes no directorial fiduciary duty owed directly to the corporation's creditors, whether during solvency, a "zone of insolvency," or in insolvency.[1058]  Of course, creditors of an insolvent corporation retain the right — framed for the benefit of the corporation — to initiate and prosecute derivative claims against the corporation's directors for breaching their fiduciary duties.[1059]

At least one Party, relying on the Massachusetts bankruptcy court's opinion in *Brandt v. Hicks, Muse & Co. (In re Healthco International, Inc.)*,[1060] argued that a *direct* fiduciary duty to creditors should nonetheless be recognized when the directors' challenged conduct leaves the corporation with "unreasonably small capital" that is just short of insolvency.  The court in *Brandt* had indeed recognized such a duty, reasoning that:  "A distribution to stockholders which renders the corporation insolvent, or leaves it with unreasonably small capital, threatens the very existence of the corporation.  This is prejudicial to all its constituencies, including creditors,

---

[1057] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007) (internal citations and quotations omitted).

[1058] *Gheewalla*, 930 A.2d at 98-103; *id.* at 99 ("While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights."); *id.* at 100-01 ("[A]n otherwise solvent corporation operating in the zone of insolvency is one in most need of effective and proactive leadership – as well as the ability to negotiate in good faith with its creditors – goals which would likely be significantly undermined by the prospect of individual liability arising from the pursuit of direct claims by creditors.") (citation omitted).

[1059] *Id.* at 101-03.

[1060] 208 B.R. 288 (Bankr. D. Mass. 1997).

employees, and stockholders retaining an ownership interest."[1061]  Whatever merit the *Brandt*

opinion may possess, however, it does not comport with current Delaware law.

In *Brandt*, the target directors voted to approve a leveraged buyout that produced

significant revenue for shareholders but ultimately led to the corporation's bankruptcy by causing

severe cash shortfalls and loan defaults.[1062]  In bankruptcy, the trustee pursued breach of

fiduciary duty claims against the directors, arguing that the shareholder distributions in the LBO,

in which the voting directors participated, mortally imperiled the corporation in violation of the

directors' fiduciary duties.[1063]  The directors moved for summary judgment on the trustee's claim

against them, arguing that "their sole obligation in connection with the LBO was to attempt to

maximize the consideration passing to [the corporation's] shareholders," and as such, they

enjoyed protection under the business judgment rule.[1064]

In denying the directors' motion for summary judgment, the United States Bankruptcy

Court for the District of Massachusetts reasoned:[1065]

> Normally, what is good for a corporation's stockholders is good for
> the corporation.  But that was hardly true here if the Trustee
> establishes the LBO left [the corporation] insolvent or with
> unreasonably small capital.  When a transaction renders a
> corporation insolvent, or brings it to the brink of insolvency, the
> rights of creditors become paramount.

---

[1061]  *Id.* at 301.

[1062]  *Id.* at 298-99.

[1063]  *Id.* at 299-300.

[1064]  *Id.* at 300.

[1065]  *Id.* at 300 & 301.  The bankruptcy court acknowledged that the LBO may not have rendered the corporation
"insolvent" under a strict bankruptcy law definition.  *Id.* at 302.  Nevertheless, the court reasoned that the
creditors' fiduciary breach claim remained viable because saddling a corporation with "unreasonably small
capital" was as actionable as leaving it facially insolvent:  "[A] transaction leaves a company with unreasonably
small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency.
This is similar to the concept of negligence, which is conduct that creates an unreasonable risk of harm to
another's person or property."  *Id.*  The court explained that judging whether "unreasonably small capital" has
resulted "typically depends upon the reasonableness of the parties' cash flow projections."  *Id.*  (footnotes
omitted).  "To be reasonable, the projections must leave some margin for error."  *Id.* (footnotes omitted).

* * *

> Requiring directors to look out for the interests of creditors as well
> as stockholders involves no irreconcilable conflict . . . .  It is
> merely an incident of the fiduciary obligations owed by directors to
> their corporation.  A distribution to stockholders which renders the
> corporation insolvent, or leaves it with unreasonably small capital,
> threatens the very existence of the corporation.  This is prejudicial
> to all its constituencies, including creditors, employees, and
> stockholders retaining an ownership interest.  Surely it is not
> asking too much of directors that they honor their obligations of
> loyalty and care to avoid the corporation's destruction.

Under Delaware law, a corporation is insolvent if it has:  "1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or 2) an inability to meet maturing obligations as they fall due in the ordinary course of business."[1066]  Notably, balance sheet insolvency (the first of these two tests) ordinarily will not constitute legal "insolvency" under Delaware law if it appears that the company has a reasonable prospect of continuing its operations.[1067]  As one court explained:[1068]

> It is all too common, especially in the world of start-up
> companies . . ., for a Delaware corporation to operate with
> liabilities in excess of its assets for that condition to be the sole
> indicia of insolvency.  Defining insolvency to be when a
> company's liabilities exceed its assets ignores the realities of the
> business world in which corporations incur significant debt in
> order to seize business opportunities.

---

[1066] *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004) (citations and quotation marks omitted); *see also Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 384 (3d Cir. 2007); *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 392 B.R. 561, 599 (Bankr. D. Del. 2008) (justifying and following Third Circuit's arguably "narrow" formulation of the insolvency test based on *Prod. Res. Group. L.L.C.* case); *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 98 (Del. 2007) (citing solvency test articulated in *Prod. Res. Group, LLC* decision).

[1067] *See Whitmer v. William Whitmer & Sons, Inc.*, 99 A. 428, 430 (Del. Ch. 1916) ("An excess of liabilities over assets may constitute insolvency, unless it appear that there is a reasonable prospect that the business could be successfully continued notwithstanding the deficiency of assets."); *Francotyp-Postalia AG & Co. v. On Target Tech., Inc.*, 1998 Del. Ch. LEXIS 234, at *17 (Del. Ch. Dec. 24, 1998) (stating that the test "based on liabilities in excess of assets requires the additional element that there be no reasonable prospect that the business can be continued in the face of that condition, suggesting that liabilities in excess of assets, alone, does not constitute insolvency.").

[1068] *Francotyp-Postalia AG & Co.*, 1998 Del. Ch. LEXIS 234, at *16.

Conversely, "[a]t least when combined with other indicia of insolvency . . . a significant excess of liabilities over assets still will constitute evidence of insolvency."[1069]

The amorphous limits of a "zone of insolvency" in Delaware—and the scope of any purported fiduciary duties owed directly to creditors by directors of a corporation operating in it—have been the subject of extensive discourse by courts and commentators alike over the years.[1070]  A decade after *Brandt* was decided, the Supreme Court of Delaware finally had occasion to consider whether creditors are owed fiduciary duties by a corporation's directors, either at the time the company is teetering precariously on the precipice of insolvency or, later, when incontestable insolvency arrives.  In *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*,[1071] the court declared in no uncertain terms that direct fiduciary duties are not owed to creditors in either situation.[1072]  Explicitly addressing the Court of Chancery's dictum that there could be a set of exceptional facts "in which the directors [of an actually insolvent corporation] display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary

---

[1069] *See* 1-8 Donald J. Wolfe & Michael A. Pittinger, CORPORATE AND COMMERCIAL PRACTICE IN DELAWARE COURT OF CHANCERY § 8.11 (2005); *see, e.g.*, *Prod. Res. Grp., L.L.C.*, 863 A.2d at 782-84 (concluding that a creditor had alleged sufficient facts to support a reasonable inference of insolvency because, among other things, the corporation had liabilities that exceeded its assets by five times, had negative net tangible assets and a working capital deficit that exceeded the corporation's aggregate revenue for the prior five years, and had "consistently racked up huge annual operating losses.").

[1070] *Teleglobe Commc'ns Corp.*, 493 F.3d at 356 n.9, 384 (describing zone of insolvency as "amorphous," "ill-defined," and "hazy"); *Gheewalla*, 930 A.2d at 99 nn.27 & 28; *Prod. Res. Group, L.L.C.*, 863 A.2d at 789 n.56 (noting definitional challenges created by the "zone of insolvency" concept).

[1071] 930 A.2d 92 (Del. 2007).

[1072] *Id.* at 98-103.  The Supreme Court in *Gheewalla* embraced many thoughts articulated by Vice Chancellor Strine in his opinion in *Production Resources Group, L.L.C. v. NCT Group, Inc.*  There, Vice Chancellor Strine had explained his hesitation in engrafting a fiduciary duty in the so-called "zone of insolvency": "I doubt the wisdom of a judicial endeavor to second-guess good-faith director conduct in the so-called zone.  Although it is easy to posit extreme hypotheticals involving directors putting cash in slot machines, the real world is more likely to generate situations when directors face a difficult choice between pursuit of a plausible, but risky, business strategy that might increase the firm's value to the level that equity holders will receive value, and another course guaranteeing no return for equity but preservation of value for creditors.  Absent self-dealing or other evidence of bad faith, by what measure is a court fairly to critique the choice made through an award of damages?"  *Prod. Res. Group, L.L.C.*, 863 A.2d at 790 n.57.

duty claim by that creditor,"[1073] the Delaware Supreme Court foreclosed that possibility:  "We think not.  While there may well be a basis for a direct claim arising out of contract or tort, our holding today precludes a direct claim arising out of a purported breach of a fiduciary duty owed to that creditor by the directors of an insolvent corporation."[1074]

Although *Gheewalla* addressed these issues as related to officers and directors,[1075] no Delaware court appears to have expressly considered whether creditors of an insolvent corporation may bring derivative actions for breach of fiduciary duty against controlling shareholders.  In *Official Committee of Unsecured Creditors v. Fleet Retail Financial Group (In re Hechinger Investment Co.)*,[1076] however, the Delaware District Court noted in dictum, albeit pre-*Gheewalla*, that it is likely that such a cause of action would be recognized by Delaware law.[1077]  The court began its analysis by noting that "[a]t the moment a corporation becomes insolvent . . . the insolvency triggers fiduciary duties for directors for the benefit of creditors."[1078]  The court "assumed," therefore, that in insolvency, controlling shareholders owe the same fiduciary duties as directors,[1079] and declined to dismiss fiduciary duty claims against certain shareholders.[1080]

---

[1073]  *Gheewalla*, 930 A.2d at 102 n.43 (quoting *Prod. Res. Group*, 863 A.2d at 798) (alteration in original).

[1074]  *Id.*

[1075]  *Id.* at 101.

[1076]  274 B.R. 71 (D. Del. 2002).

[1077]  *Id.* at 89.

[1078]  *Id.* at 89 (citing *Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 787 (Del Ch. 1992)).  The court stated that this is because when a corporation enters the zone of insolvency, the creditors, and not just the shareholders, are residual risk bearers whose recovery is dependent upon business decisions of the directors.  In other words, in an insolvency situation, the directors can be said to be "playing with the creditors money."  *Id.*

[1079]  *Id.* (citing *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613 (Del. Ch. Dec. 30, 1991)).

[1080]  *Id.* at 91.

Thereafter, the court was asked to certify to the Supreme Court of Delaware the question whether controlling shareholders may be liable to creditors for breach of fiduciary duty.[1081]  The court again acknowledged that it was a "novel question" because "[a]lthough Delaware courts have held that directors of a corporation may owe fiduciary duties to creditors when the corporation is insolvent, no Delaware court has expressly extended that duty to controlling or majority shareholders."[1082]  The court declined to certify the question, however, because resolution of the question would not affect the course of the case as it then existed.[1083]  Thus, the courts have not squarely addressed whether controlling shareholders may be held liable to creditors for breach of fiduciary duty through a derivative action under Delaware law.

### c.    Fiduciary Duties of Directors and Officers of Subsidiaries.

Generally, "in a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."[1084]  Thus, when authorizing a transaction that has already been authorized at the parent level, a subsidiary's board has "no duty to replicate the deliberative process of [the parent's] board of directors."[1085, 1086]

> There is no sound basis to hold that the boards of wholly-owned subsidiaries must engage in their own parallel merger consideration processes, thereby . . . spreading the powerful procedural mandate of [*Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985)] and its progeny to every level of the corporate family.

---

[1081]  *Off. Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. ),* 280 B.R. 90 (D. Del. 2002).

[1082]  *Id.* at 94.

[1083]  *Id.* ("No matter what the Delaware Supreme Court decides about whether these defendants may be liable under Count II, it is undisputed that they will remain in the case as potentially liable under the same set of facts as directors under Count I.").

[1084]  *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) (citations omitted); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200 (Del. Ch. 2006).

[1085]  *Trenwick Am. Litig. Trust,* 906 A.2d at 201.

[1086]  *Id.* (footnote omitted).

> Delaware law does not embrace the concept that a director of a
> wholly-owned subsidiary owes a duty to second-guess the business
> judgment of its parent corporation when following and supporting
> the parent's strategy would not violate any legal obligation the
> subsidiary owes to another.

This general rule is based on the assumption that a corporation's primary interest is in maximizing its economic value, but the only interest of a wholly-owned subsidiary is in serving its parent.[1087]

The Third Circuit Court of Appeals and several of the lower courts in the Third Circuit and elsewhere, however, have recognized that this general rule gives way when there is a minority interest in the subsidiary or when the subsidiary is insolvent:[1088]

> If the subsidiary is not wholly owned, however, in the interest of
> protecting minority shareholders we revert to requiring that
> whoever controls the subsidiary seek to maximize its economic
> value with requisite care and loyalty. . . . Similarly, if the
> subsidiary is insolvent, we require the same in the interest of
> protecting the subsidiary's creditors.

"[U]pon insolvency directors of a wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors."[1089]  As a result, a lower court in the Third Circuit may hold a director of a subsidiary liable for breach of fiduciary duties if the director did not exercise business judgment in good faith or breached his or her duty of loyalty.  This is particularly

---

[1087] *Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 367 (3d Cir. 2007).

[1088] *Teleglobe Commc'ns*, 493 F.3d at 367 (citing *Trenwick Am. Litig. Trust*, 906 A.2d at 204 n.96 and *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007)).  *Accord VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007) (holding that, under New Jersey corporate law "[d]irectors normally owe no duty to corporate creditors, but when the corporation becomes insolvent the creditors' investment is at risk, and the directors should manage the corporation in their interests as well as that of the shareholders"); *MC Asset Recovery, LLC v. S. Co.*, 2006 U.S. Dist. LEXIS 97034, at *30-31 (N.D. Ga. Dec. 11, 2006) (refusing to dismiss complaint against parent corporation for aiding and abetting a breach of the fiduciary duty by subsidiary's directors); *Panos v. Sullivan (In re Sabine, Inc.)*, 2006 Bankr. LEXIS 381, at *24 (Bankr. D. Mass. Feb. 27, 2006) (refusing to dismiss a complaint alleging that director breached fiduciary duties by allowing subsidiary to engage in transactions that were harmful to the subsidiary); *Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283, 286 (Bankr. D. Del. 2006) ("In my view, Delaware law would recognize that the directors and officers of an insolvent wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors.").

[1089] *Scott Acquisition Corp.*, 344 B.R. 283, 286 (Bankr. D. Del. 2006).

relevant if the director serves on the boards of both the parent company and the subsidiary and, at a time the subsidiary was insolvent, approves a transaction that favors the parent at the expense of the subsidiary.[1090]

### d.    Legal Analysis of Effect of Indemnification and Exculpation Rights of Directors and Officers on Breach of Duty Claims.

The Delaware legislature has enacted a tiered indemnification structure for its corporations in DGCL section 145.[1091]  The structure "promote[s] the desirable end that corporate officials will resist what they consider unjustified suits and claims" with the confidence that the expenses incurred in that resistance will be indemnified by the corporation.[1092]  The Supreme Court of Delaware has instructed that the corporate indemnification statute "should be broadly interpreted to further the goals it was enacted to achieve," and that "an over literal reading" of its provisions should be "eschew[ed]" when those goals would be disserved.[1093]

DGCL section 145 divides the corporate indemnification right into several categories. First, Delaware corporations may grant indemnity against actions brought by third parties.[1094]

---

[1090] *Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 473-74 (Bankr. S.D.N.Y. 2006) ("Any situation where a wholly-owned and controlled subsidiary enters the zone of insolvency obviously requires all responsible parties to act with the utmost care and responsibility."); *Case Fin. v. Alden*, 2009 Del. Ch. LEXIS 153, at *21 (Del. Ch. Aug. 21, 2009) ("Alden was an officer and director of Case Financial, a Delaware corporation.  Thus, independent of Case Financial's status as a shareholder of Case Capital, Alden owed duties directly to Case Financial as a director and officer.  In these specific circumstances, Case Financial has standing to sue Alden directly for those breaches of the fiduciary duties he owes directly to Case Financial arising out of his position at Case Financial.  Thus, I do not find that Case Financial can sue directly on the basis that Case Financial, as a shareholder of Case Capital, can make out a direct claim against Alden, as a director or officer of Case Capital.  Rather, I do so on the basis that Alden owed Case Financial duties as a director and officer of Case Financial.") (citation omitted); *Grace Bros., Ltd. v. UniHolding Corp.*, 2000 Del. Ch. LEXIS 101, at *40 (Del. Ch. July 12, 2000) ("To the extent that members of the parent board are on the subsidiary board or have knowledge of proposed action at the subsidiary level that is detrimental to the parent, they have a fiduciary duty, as part of their management responsibilities, to act in the best interests of the parent and its stockholders.").

[1091] DEL. CODE ANN. tit. 8, § 145 (2010).

[1092] *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002) (citation omitted).

[1093] *Id.* (citation omitted).

[1094] DEL. CODE ANN. tit. 8, § 145(a) & (b) (2010). This includes an "action, suit or proceeding" that is "civil, criminal, administrative or investigative," and whether "threatened, pending or completed." *Id.*

Such indemnification may be granted to current and former corporate directors, officers, employees, or agents, and may encompass "expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred" in the defense.[1095]  Although generally permissive, the right to an indemnification of "expenses" (including attorneys' fees) is obligatory if the corporate director, officer, employee, or agent "has been successful on the merits or otherwise."[1096]

Second, Delaware corporations may grant indemnity against actions brought by, or to vindicate the rights of, the corporation itself.[1097]  As in the first category, this indemnification may be granted to present and former corporate directors, officers, employees, or agents, but encompasses only "expenses" (including attorneys' fees).[1098]  This indemnification also requires that the indemnitee meet the same two requisites — that he or she "acted in good faith," and "in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."[1099]  Likewise, indemnification of expenses is obligatory if the indemnitee prevails in his or her defense.[1100]  But unlike in the first category, a defeat in court categorically dooms any access to indemnification, unless the forum tribunal or the Court of Chancery expressly rules otherwise.[1101]

---

[1095] *Id.* § 145(j).  Unless expressly provided otherwise, these indemnification rights persist even after the indemnitee leaves his or her position with the corporation, and "inure[s] to the benefit of the heirs, executors and administrators of such a person."  *Id.* § 145(j).

[1096] *Id.* § 145(c).  Even before an indemnitee learns whether he or she is victorious, the corporation may grant the indemnitee an advancement of the qualifying expenses (but only on the condition that the advanced expenses be reimbursed if it is later determined that indemnification was not appropriate).  *Id.* § 145(e).

[1097] *Id.* § 145(b).

[1098] *Id.*

[1099] *Id.* § 145(b).  As with the first category, these assessments must be made by express determination.  *See id.* § 145(d).

[1100] *Id.* § 145(c).

[1101] *Id.* § 145(b) ("[N]o indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of

Third, Delaware corporations may provide for indemnity through non-statutory vehicles, such as by "bylaw, agreement, vote of stockholders or disinterested directors or otherwise . . . ."[1102] These non-statutory mechanisms do not, however, excuse the statutory prerequisites for corporate indemnification.[1103] Rather, when a corporation "undertakes to adopt a bylaw" that prospectively commits the corporation to indemnifying corporate personnel, "the good faith requirement survives."[1104] Indeed, Delaware corporations "lack the power to indemnify a party who did not act in good faith or in the best interests of the corporation."[1105] Nevertheless, there remains a meaningful benefit to the indemnitee who receives such a prospective commitment of indemnification — the burden of proving the statutory prerequisites (good faith and proceeding in the interests of the corporation) shifts to the corporation.[1106]

Tribune's Amended and Restated Certificate of Incorporation includes an indemnification provision drafted to provide the maximum support allowed by the DGCL:[1107]

> Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter, a "proceeding"), by reason of the fact that he or she or a person of whom he or she is the legal representative, is or was a director or officer of the corporation or is or was serving at the request of the corporation as a director or officer of another corporation or of a partnership, joint venture, trust or any other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is alleged action in an official capacity as a director, or officer or in any other capacity while serving as a

---

Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to immunity for such expenses of which the Court of Chancery or such other court shall deem proper.").

[1102] *Id.* § 145(f) (2010).

[1103] *VonFeldt v. Stifel Fin. Corp.*, No. 15688, 1999 Del. Ch. LEXIS 131, at *7 (Del. Ch. June 11, 1999).

[1104] *Id.* at *7 (citation omitted).

[1105] *Id.*

[1106] *Id.* at *10 ("[T]o overcome this self-imposed, mandatory obligation on [the corporation's] part, [the corporation] must demonstrate to this Court why it should not be required to indemnify [the officer or director].").

[1107] Ex. 968 at 5 (Amended and Restated Certificate of Incorporation of Tribune Company, dated June 12, 2000).

> director or officer, shall be indemnified and held harmless by the
> corporation to the fullest extent authorized by the Delaware
> General Corporation Law. . . . against all expense, liability and loss
> (including attorneys' fees, judgments, fines, ERISA excise taxes or
> penalties and amounts paid or to be paid in settlement) reasonably
> incurred or suffered by such person in connection therewith . . . .

The Delaware legislature additionally has provided a statutory template for exculpation clauses protecting directors of Delaware corporations, codified at DGCL section 102(b)(7), which "eliminate[] or limit[] the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director . . . ."[1108] Such provisions cannot, however, eliminate or limit the liability of a director:[1109]

> (i) For any breach of the director's duty of loyalty to the
> corporation or its stockholders; (ii) for acts or omissions not in
> good faith or which involve intentional misconduct or a knowing
> violation of the law; (iii) under § 174 of this title; or (iv) for any
> transaction from which the director derived an improper personal
> benefit.

Thus, although a section 102(b)(7) provision in a corporation's charter will exculpate director defendants from paying monetary damages that are exclusively attributable to a violation of the duty of care, Delaware law does not permit exculpation for breaches of the duty of loyalty, including the duty of disclosure.[1110] The protection of a section 102(b)(7) exculpatory clause may only be invoked by director defendants when "the factual basis for a claim *solely* implicates a violation of the duty of care."[1111]

---

[1108] DEL. CODE ANN. tit. 8, § 102(b)(7) (2010). This provision is among the enumerated set of provisions that the statute allows (but does not require) a Delaware corporation to include in its certificate of incorporation. *See id.* § 102(b) (2010).

[1109] *Id.* § 102(b)(7) (2010).

[1110] *Emerald Partners v. Berlin*, 787 A.2d 85, 91-92, 96 (Del. 2001); *see Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (recognizing that "[t]here is no 'safe harbor' for such divided loyalties in Delaware"); *see also Collins & Aikman Corp. v. Stockman*, No. 97-265, 2009 U.S. Dist. LEXIS 43472, at *63-*65 (D. Del. May 20, 2009).

[1111] *Collins & Aikman Corp.*, 2009 U.S. Dist. LEXIS 43472, at *64 (quoting *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-24 (Del. 1999)) (concluding that because "here, the Complaint alleges violations of the duty of loyalty as well as the duty of care, the duty of care claims against the individual director defendants may not be dismissed at this stage of the proceedings on the basis of [the company's] § 102(b)(7) exculpatory provision").

Tribune's Amended and Restated Certificate of Incorporation includes an exculpation provision drafted in accordance with the foregoing DGCL provisions:[1112]

> TWELFTH:  No person who is or was a director of the corporation shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except that, unless otherwise permitted under applicable laws, this paragraph shall not eliminate or limit liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

DGCL 102(b)(7) and the exculpatory clauses it authorizes are subject to two limitations. First, by their explicit terms, DGCL section 102(b)(7) and the above-quoted exculpatory clause only allow exculpation of directors, not officers.  When an officer is serving as a director, the exculpatory clause only applies to exempt monetary liability for acts as a director; liability for breaches of duty as an officer is not exculpated.[1113]

Second, the exculpatory clause does not exculpate a director's liability for acts not taken in good faith.  The "good faith" referred to in DGCL section 102(b)(7) is the same as the fiduciary duty to act in good faith.[1114]  According to the Delaware Supreme Court:[1115]

> The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty, in the narrow sense that I have discussed them above, but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders.  A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation,

---

[1112] Ex. 968 at 5 (Amended and Restated Certificate of Incorporation of Tribune Company dated June 12, 2000).

[1113] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994); *McPadden v. Sidhu*, 964 A.2d 1262, 1275-76 (Del. Ch. 2008); a*ccord In re Century Elecs. Mfg. Inc.*, 345 B.R. 33, 36 (Bankr. D. Mass. 2006) (holding that DGCL 102(b)(7) "does not shield officers who are also directors from breach of fiduciary duty claims arising from their acts taken as officers").  *But see Continuing Creditors Comm. of Star Telecommc'ns, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 464 (D. Del. 2004) (holding that an exculpatory provision barred claims against directors and officers).

[1114] *Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 66 (Del. 2006).

[1115] *Eisner*, 906 A.2d at 67 (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)).

>where the fiduciary acts with the intent to violate applicable
>positive law, or where the fiduciary intentionally fails to act in the
>face of a known duty to act, demonstrating a conscious disregard
>for his duties.

In a transaction context, an "extreme set of facts" is required to sustain a breach of good

faith claim premised on the allegation that disinterested directors intentionally disregarded their

duties.[1116]  Only if officers and directors "knowingly and completely fail to undertake their

responsibilities" do they breach the duty of good faith.[1117]  Under this standard, the Delaware

Supreme Court held that it was not a breach of the duty of good faith for a board to approve a

$13 billion cash merger in one week, during which time the directors met for a total of only

seven hours to consider the matter and did not seriously press the bidder for a better price or

conduct a limited market check.[1118]

Courts applying the good faith standard have looked to whether directors took any

intentional acts that are contrary to their known duties.  Thus, courts have held that a plaintiff

appropriately alleges breach of fiduciary duties when it alleges that directors favored one bidder

over others.[1119]  In *Gesoff v. IIC Industries, Inc.*, the Delaware Chancery court held that bad faith

may be found when directors have "acted with conscious disregard or made decisions with

knowledge that they lacked material information."[1120]  Few Delaware cases attempt to define

precisely what conduct reaches the level of actionable bad faith, but there is at least agreement

that "adopting a 'we don't care about the risks' attitude concerning a material corporate decision"

---

[1116] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).

[1117] *Id.* at 243-44.

[1118] *Id.* at 241.

[1119] *Brewer v. Brewer*, 2010 U.S. Dist. LEXIS 60863, at * 51-52 (C.D. Cal. June 17, 2010) (applying Delaware law); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989) ("When presumably well-intentioned outside directors remove themselves from the design and execution of an auction, then what occurred here, given the human temptations left unchecked, was virtually inevitable.").

[1120] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1165 (Del. Ch. 2006).

constitutes bad faith.[1121]  Moreover, placing undue reliance on receiving information from a

party with an interest in the transaction can, in some circumstances, be bad faith.[1122]

> ### e.    Examiner's Conclusions and Explanation Concerning Application of Legal Standards to Potential Defendants.

**<u>Examiner's Conclusions</u>**:

A court is reasonably unlikely to conclude that claims for breach of fiduciary duty could

be sustained against the Tribune Entities' officers and directors and/or the Large Stockholders in

connection with the Step One Transactions.  A court is somewhat unlikely to conclude that

claims for breach of fiduciary duty could be sustained against the Tribune Board at Step Two,

but is reasonably likely to conclude that claims for breach of fiduciary duty could be sustained

against one or more members of Tribune's senior financial management in connection with the

Step Two Transactions.  A court is reasonably unlikely to conclude that claims for breach of

fiduciary duty could be sustained against the Large Stockholders at Step Two.  The Examiner

leaves in equipoise whether the directors of the Guarantor Subsidiaries breached their fiduciary

duties at Step Two.

---

[1121]  *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003) (finding bad faith claim properly alleged where factual allegations, if true, implied that "the defendant directors knew that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss") (emphasis in original) *aff'd sub nom. Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27 (Del. 2006).

[1122]  *See Brown v. Brewer*, 2010 U.S. Dist. LEXIS 60863, at *51-52 (C.D. Cal. June 17, 2010) (holding that board acted in bad faith by relying on self-interested CEO to get most of their information); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989) (finding that directors were not in good faith because "[w]hen presumably well-intentioned outside directors remove themselves from the design and execution of an auction, then what occurred here, given the human temptations left unchecked, was virtually inevitable.").

**Explanation of Examiner's Conclusions**:

        **(1)      Tribune Directors and Officers at Step One.**

For reasons very similar to the Examiner's conclusions concerning intentional fraudulent transfer claims at Step One,[1123] the Examiner finds no credible basis to conclude that (i) the Tribune Entities' directors breached their fiduciary duties in approving the Leveraged ESOP Transactions on April 1, 2007 or proceeding with Step One on the Step One Financing Closing Date, or (ii) the Tribune Entities' management breached their fiduciary duties in connection with these transactions. The Examiner concludes in another part of the Report that (i) it is highly likely that the Tribune Entities remained solvent after giving effect to the Step One Transactions if the Step Two Debt is not included in the calculation for solvency purposes, (ii) it is somewhat likely that a court would not "collapse" Step One and Step Two together for solvency purposes, and (iii) even if a court were to "collapse" Step One and Step Two, it is a close question whether the Tribune Entities were rendered insolvent at the Step One Financing Closing Date on that basis.[1124]

Absent insolvency, there is no viable basis to conclude that any breach of fiduciary duty occurred at Step One because the directors and officers of a solvent corporation owe their fiduciary duties to shareholders and the corporation. As previously discussed, even if the Step One Transactions placed the Tribune Entities into a "zone of insolvency," that would be insufficient under Delaware law to give rise to fiduciary duties to creditors. Although the Examiner appreciates that a court might disagree with the Examiner's conclusions concerning Step One solvency (and in particular the Examiner's conclusion on the question of collapse of

---

[1123]  *See* Report at § IV.B.4.b.

[1124]  *See id.* at § IV.B.5.d.(7).

Step One and Step Two), the Examiner does not find that the record adduced in the Investigation supports the conclusion that the Tribune Entities' directors and officers breached a fiduciary duty in connection with the Step One Transactions.  The record demonstrates that Tribune's determination to enter into Leveraged ESOP Transactions was made with the active input of its independent Financial Advisors.  Although some of their work (particularly relating to VRC's solvency opinion) occurred after the Tribune Board approved the Leveraged ESOP transactions on April 1, 2007, the record shows that the Financial Advisors were actively engaged after that time and before the Step One closing in evaluating VRC's solvency opinion and management's projections.  The directors had a sufficient basis to approve the Leveraged ESOP Transactions and then cause Tribune to proceed with the Step One closing.  The Examiner finds no credible evidence at Step One that the directors or officers breached any of the triad of fiduciary duties under Delaware law.  In light of these conclusions, the Examiner believes that it is reasonably unlikely that a court would conclude that Tribune Entities' directors and officers breached fiduciary duties to creditors in connection with these transactions at Step One.  Stated succinctly, although the Leveraged ESOP Transactions turned out badly for creditors, it cannot be reasonably said that Step One was the product of a breach of fiduciary duty by the directors or officers.

### (2)    Guarantor Subsidiary Directors at Step One.

Based on the Examiner's conclusions regarding solvency at Step One, the Examiner does not find any credible basis to conclude that the Guarantor Subsidiary officers and directors breached their fiduciary duties in connection with the Step One Transactions.  If, however, a court were to disagree with the Examiner's conclusions regarding solvency at Step One, for the reasons discussed in the Examiner's consideration of whether the directors of the Guarantor

Subsidiaries breached their fiduciary duties at Step Two, a serious question exists whether those directors also breached their fiduciary duties at Step One.

### (3)    Large Stockholders at Step One.

Based on the Examiner's conclusions regarding solvency at Step One, the Examiner does not find any credible basis to conclude that the Large Stockholders breached any fiduciary duties in connection with the Step One Transactions.  Notwithstanding the contentions of certain Parties, the Examiner does not believe that the Large Stockholders would be considered controlling shareholders of Tribune owing fiduciary duties to Tribune, its stockholders, or its creditors.  Even if the Large Stockholders could be deemed to have owed fiduciary duties, the record does not support the contention that the Large Stockholders breached any such duties by any form of improper influence or control over the processes or direction that culminated in Tribune's entry into the Leveraged ESOP Transactions in the spring of 2007.[1125]

Before the Tender Offer at Step One, the Chandler Trusts held approximately 20.25% of the total shares of Tribune Common Stock then outstanding, and the McCormick Foundation held approximately 13.00%, for a collective total of 33.25%.[1126]  The Large Stockholders thus did not, either individually or collectively, own 50% or more of the outstanding shares of Tribune Common Stock.  For the Large Stockholders to be considered controlling shareholders vested with fiduciary duties under Delaware law, then, the Large Stockholders would need to have exercised actual control of the business and affairs of Tribune in conjunction with the Step One Transactions.

---

[1125] *See id.* at § III.E.5.

[1126] Ex. 5 at 101-104 (Tender Offer).

The record does not reflect any such actual control or direction of Tribune's conduct by the Large Stockholders.  Although the nominees of the Chandler Trusts held three of the eleven seats on the Tribune Board until their resignations on June 4, 2007[1127] and Tribune Chief Executive Officer Dennis FitzSimons, a director of the McCormick Foundation, also sat on the Tribune Board,[1128] each of these Tribune Board members were excluded from the Special Committee.[1129]  Additionally, the evidence does not support the conclusion that either the Chandler Trusts or the McCormick Foundation otherwise controlled or improperly influenced the decisions of the Special Committee at Step One.  Furthermore, the representatives of the Chandler Trusts on the Tribune Board abstained from voting to approve the Leveraged ESOP Transactions.[1130]  Mr. FitzSimons likewise recused himself from the McCormick Foundation's review and consideration of the Tender Offer.[1131]  Thus, the Large Stockholders did not, either individually or collectively, control a majority of the seats on the Tribune Board or control the Special Committee.  Nor did the activities of the Large Stockholders regarding the Step One Transactions, as detailed in another part of the Report the Report, otherwise demonstrate domination, direction, or actual control over Tribune's conduct by either of the Large Stockholders.[1132]

Certain Parties argued that the interests, influence, and power of the Large Stockholders should be considered in the aggregate, and the Large Stockholders should be treated as a single, essentially monolithic, controlling shareholder owing fiduciary duties.  As noted above,

---

[1127] *Id.* at 97.

[1128] Ex. 7 at 9-11 (2007 Tribune Proxy); Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010, at 10:9-12:14.

[1129] *See* Report at § III.D.1.a.

[1130] Ex. 146 at 1 (Tribune Board Meeting Minutes, dated April 1, 2007).

[1131] Examiner's Sworn Interview of Dennis FitzSimons, June 25, 2010 at 18:21-19:1.

[1132] *See* Report at §§ III.E.5.a and III.E.5.b.

Delaware law recognizes that multiple minority shareholders, who are not able to exert control over a corporation independently, can collectively form a coalition or "control group" when those shareholders "are connected in some legally significant way — *e.g.*, by contract, common ownership, agreement, or other arrangement — to work together toward a shared goal."[1133]  In such circumstance in which the shareholders have more than mere "parallel interests" and are "tied together in some legally significant way," controlling shareholder status may be conferred upon the control group, triggering fiduciary duties.[1134]  This test is difficult to meet under Delaware law, however, and even shareholders with "very potent clout have been deemed, in thoughtful decisions, to fall short of the mark."[1135]

Here, the evidence in the record fails to establish that the Large Stockholders should be accorded controlling shareholder status with concomitant fiduciary duties.  As detailed in another part of the Report in the Report, even if the Large Stockholders shared a common interest in maximizing the value of their Tribune holdings, to the Examiner's knowledge, they did not form any sort of coalition by contract, common ownership, agreement, or any other arrangement in connection with Step One, and indeed, at times their interests diverged in material respects.[1136]  Absent any such legally significant connection or bond between them, as minority shareholders, the Large Stockholders owed no fiduciary duties to Tribune or its stockholders and had every

---

[1133] *Dubroff v. Wren Holdings LLC*, 2009 Del. Ch. LEXIS 89 at *12 (Del. Ch. May 22, 2009).

[1134] *Id.* at *12, *17; *Williamson v. Fox Commc'ns, Inc.*, 2006 Del. Ch. LEXIS 111, at *23 (Del. Ch. June 5, 2009).

[1135] *In re PNB Holding Co. S'holders Litig.*, 2006 Del. Ch. LEXIS 158, at *31-32 (Del. Ch. Aug. 18, 2006) (citations omitted).  As noted by the court in *PNB Holding Co.*, this test "exists to allow the law to impose fiduciary obligations on stockholders who, although lacking a clear majority, have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control."  *Id.* at *31.

[1136] *See* Report at §§ III.E.5.b.(1).

right to act and vote in their own financial self-interests in connection with the Step One Transactions.[1137]

Finally, as noted above, even if the Large Stockholders could be considered to have owed fiduciary duties to Tribune, its stockholders, or its creditors, the record is insufficient to establish any breach of such duties.[1138]

### (4)    Tribune Directors at Step Two.

As was the case in the Examiner's consideration of intentional fraudulent transfer at Step Two,[1139] it is important to frame the breach of fiduciary duty questions arising out of the Step Two Transactions.  Following the Step One Financing Closing Date, Tribune's actions were informed by its contractual rights and obligations—principally under the Merger Agreement (and related agreements entered into on April 1, 2007), the Credit Agreement, and the Step Two Commitment Letter.  The Merger Agreement obligated Tribune to exercise reasonable best efforts to effectuate the Merger,[1140] including to "enforce its rights under the Financing Commitments."[1141]  The Credit Agreement (which embodied the financing commitments in effect at the time of the Step One Financing Closing Date) and the Step Two Commitment Letter, in turn, authorized Tribune to compel the LBO Lenders to fund the Step Two Debt if the conditions precedent to that funding otherwise were satisfied.  The main condition to the Step

---

[1137]  *Dubroff*, 2009 Del. Ch. LEXIS 89, at *12; *see PNB Holding Co.*, 2006 Del. Ch. LEXIS 158, at *10 (observing, in rejecting contention that group of shareholder-directors together formed a unified controlling shareholder, that "[g]lomming share-owning directors together into one undifferentiated mass with a single hypothetical brain would result in an unprincipled Frankensteinian version of the already debatable 800-pound gorilla theory of the controlling stockholder that animates the *Lynch* line of reasoning") (discussing *Kahn v. Lynch Comms. Sys., Inc.*, 638 A.2d 1110 (Del. 1994)).

[1138]  *See* Report at § III.E.5.

[1139]  *See id.* at § IV.B.4.c.

[1140]  Ex. 151 at § 5.6(a) (Merger Agreement).

[1141]  *Id.* at § 5.11(a).

Two closing that Tribune had the power to influence, if not control, was the procurement or delivery of a solvency certificate and solvency representation. The solvency opinion, the solvency certificate, and the solvency representation were inexorably related. Without a Step Two solvency opinion, there was no reasonable likelihood that Tribune management would give a solvency certificate or represent that Tribune would be solvent,[1142] and without that certificate and representation, the Merger could not occur. Had the solvency opinion, solvency certificate, and solvency representation not been given, the Tribune Entities would not have incurred the Step Two Debt (an act which the Examiner has found to a high degree of likelihood rendered the Tribune Entities insolvent).

In light of these predicates, the question presented to the Tribune Board after Step One was *not* whether to approve the Leveraged ESOP Transactions. Tribune did not begin the period after Step One on a clean slate: the Tribune Board had already approved the Leveraged ESOP Transactions on April 1, 2007, and, as noted, Tribune was subject to various continuing contractual undertakings afterward. Moreover, for the reasons discussed above, Tribune's entry into these agreements was not the product of a breach of fiduciary duty to creditors. Tribune could not, consistent with its undertakings under the Merger Agreement and related agreements, simply abandon Step Two if it determined that proceeding to the Step Two Closing was not a "good idea." There is little question that between April 1 and December 20, 2007, the Zell Group still wanted to proceed with Step Two and that EGI would fully enforce its contractual rights under the relevant agreements.[1143] The questions presented to Tribune following Step

---

[1142] *See* Examiner's Sworn Interview of Chandler Bigelow, June 18, 2010, at 135:11-18; Examiner's Sworn Interview of William A. Osborn, June 24, 2010, at 41:1-7.

[1143] Examiner's Interview of Samuel Zell, June 14, 2010 ("Did we think we bought a great company? We thought we bought a great opportunity. What allowed us to do it was the asset base. We convinced ourselves that the asset base, we had the value of the newspaper and TV stations as a result of 2008, we didn't know it at the time

One, therefore, were whether Tribune could certify solvency and make the solvency representation required under the Credit Agreement and the Bridge Credit Agreement and whether Tribune would be solvent after giving effect to the Step Two Transactions as required under the Merger Agreement. It is the actions of the directors and officers in connection with these critical, threshold conditions to the Step Two Transactions that are the focus of the Examiner's breach of fiduciary analysis at Step Two. The actions of these fiduciaries in this regard could not have been any more consequential: had Tribune not certified solvency, verified the accuracy of the solvency representation, or obtained and accepted the VRC solvency opinion, Tribune would not have incurred over $3.6 billion in additional indebtedness and would not have been rendered insolvent.

As discussed in another part of the Report, the Examiner finds that it is it is highly likely that Tribune and reasonably likely that the Guarantor Subsidiaries were rendered insolvent and without adequate capital at Step Two.[1144] Although the formulation of the standard for insolvency under Delaware law appears to be more taxing than the Bankruptcy Code definition,[1145] in light of the Examiner's findings concerning Tribune's insolvency and capital adequacy for Bankruptcy Code purposes at Step Two, the Examiner believes that it is at least reasonably likely that a court would find that Tribune was rendered insolvent under Delaware law as well. Tribune was not rendered marginally insolvent at Step Two, and the Examiner's findings concerning capital inadequacy at Step Two furnishes "other indicia of insolvency" that

---

but we thought we had the raw pieces and the bases that's why we agreed to the [Tranche] X. We were intent on the Cubs, we were convinced we could sell other assets.").

[1144]  *See* Report at §§ IV.B.5.d.(10).-IV.B.5.d.(12).

[1145]  See footnote 1066.

Delaware law apparently requires.[1146]  Tribune was not a start-up company, which the Delaware courts recognize sometimes embark on their corporate existence with fewer assets than liabilities.[1147]  Because the Step Two Transactions rendered Tribune insolvent, the shift of fiduciary duties contemplated under Delaware law in favor of creditors occurred when Tribune's directors took the actions, the natural consequences of which caused Tribune's insolvency.[1148] "Consequently, the creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties."[1149]

For the reasons discussed elsewhere in the Report in detail, the Examiner believes that Tribune's directors failed to adequately perform their responsibilities at Step Two. [1150]  However, although the question is close, the Examiner concludes that it is somewhat unlikely that a court would find that Tribune's outside directors breached those duties in connection with the Step Two Transactions, under the standards of Delaware law governing breach of fiduciary duty.

First, although the directors stood to benefit from the Step Two Closing in their capacity as Selling Stockholders, this was a benefit that devolved on Tribune's stockholders generally and thus cannot serve as the basis for a breach of this duty.[1151]  The benefit itself also was disclosed. The Examiner did not find any evidence that the directors were beholden to any other party or

---

[1146]  DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, 1-8 CORPORATE AND COMMERCIAL PRACTICE IN DELAWARE COURT OF CHANCERY § 8.11 (2005).  *See also Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004) (citing inability to meet maturing obligations as they fall due in the ordinary course as an independent basis to conclude that a corporation was insolvent).

[1147]  *Francotyp-Postalia AG & Co. v. On Target Tech., Inc.*, 1998 Del. Ch. LEXIS 234, at *16 (Del. Ch. Dec. 24, 1998).

[1148]  *See N. Am. Catholic Ed. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007); *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 n.96 (Del. Ch. 2006) ("If the firm is insolvent, its residual claimants are the creditors and it is for their benefit that the directors must now manage the firm.  A purposeful fraudulent transfer to stockholders who are 'out of the money' is obviously inconsistent with the best interest of creditors, the firm's new residual claimants.").

[1149]  *Gheewalla*, 930 A.2d at 101.

[1150]  *See* Report at § IV.B.4.c.(5).

[1151]  *See id.* at § IV.E.2.a.(2).

otherwise failed to act independently.[1152]  Thus, there is no basis to conclude that the directors breached these elements of the duty of loyalty.

Second, in light of the exculpatory provisions contained in Tribune's Amended and Restated Certificate of Incorporation, discussed in another part of the Report,[1153] Tribune's directors are insulated from any liability except for acts not taken in good faith.  As discussed previously, a showing of a lack of good faith under Delaware law generally requires an intentional or knowing failure to act.[1154]  There is some authority under the rubric of good faith that the failure of directors to perform their monitoring function may be so egregious as to support a conclusion that the directors consciously abdicated their responsibilities.[1155]  Delaware law further provides, however, that "simple inattention or failure to be informed of all facts material to the decision" does not constitute bad faith.[1156]

As discussed in another part of the Report,[1157] the Examiner finds that the scrutiny given to VRC's solvency opinion and management's October 2007 projections on which VRC relied was woefully inadequate.  On the one hand, the Tribune Board did meet twice in December 2007 (and the Special Committee once) to consider VRC's work, and the Special Committee did receive some, albeit brief, input from Morgan Stanley (although, as the Examiner found

---

[1152] *See id.*

[1153] *See id.* at § IV.E.2.d.

[1154] *See* footnotes 1114-1119.  Under Delaware law, as noted previously, the duty of good faith is subsumed in the duty of loyalty.  *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006).

[1155] *See Brewer v. Brewer*, 2010 U.S. Dist. LEXIS 60863 at 51-52 (C.D. Cal. June 17, 2010) (applying Delaware law); *Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 66 (Del. 2006) ("Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision.  To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed.").

[1156] *Eisner*, 906 A.2d at 66; *see also Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 241 (Del. 2009).

[1157] *See* Report at § IV.B.4.c.(5).

elsewhere in the Report, the draft minutes of that meeting do not accurately reflect all of what Morgan Stanley said).[1158]  William Osborn, the Chair of the Special Committee, testified that Morgan Stanley was "asked to make certain that the solvency opinion was appropriate and made sense so that we would have the confidence that, you know, that we could move forward with the second step,"[1159]—a characterization with which Thomas Whayne of Morgan Stanley agreed.[1160] On the other hand, as the Examiner has noted in another part of the Report,[1161] that kind of assessment is qualitatively different from the kind of evaluation VRC made of Tribune's solvency and capital adequacy.  Mr. Whayne felt it was clear that "all the special committee members understood that Morgan Stanley was not providing a solvency opinion or judgments around solvency,"[1162] although he acknowledged that it was possible (though in his view not appropriate) that members might have thought otherwise.[1163]  Moreover, neither Morgan Stanley nor any other outside advisor was asked to evaluate Tribune management's October 2007 financial projections,[1164] the good faith and reasonableness of which are a foundation of VRC's solvency analysis.

In light of above-noted standard under Delaware law governing good faith, however, based on the record adduced in the Investigation, and recognizing that the Examiner did not have an opportunity to interview each director and all of the various advisors involved in the Step Two

---

[1158]  *See id.* at § III.H.2.

[1159]  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 26:11-14.

[1160]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 151:1-18.  Mr. Osborn testified that he believed Morgan Stanley "had to give another fairness opinion at the end of the transaction."  Examiner's Sworn Interview of William Osborn, June 24, 2010, at 23:11-12.  He did not specifically recall whether Morgan Stanley was asked to evaluate VRC's Step Two solvency opinion.  *Id.* at 27:22-28:1-4.

[1161]  *See* Report at § IV.H.4.c.(2).

[1162]  Examiner's Sworn Interview of Thomas Whayne, July 2, 2010, at 136:7-9.

[1163]  *Id.* 135:22-137:8.

[1164]  *Id.* at 151:19-22.

Transactions, the Examiner finds it somewhat unlikely that a court would conclude that the

directors' actions rose to the level of a conscious abdication or intentional dereliction of their

duties.[1165]  Although, as discussed in another part of the Report, the record shows that Mr.

Whayne never told the Special Committee that he had concluded that VRC's solvency analysis

was conservative and that VRC's opinion was something on which a director could reasonably

rely,[1166] it is undisputed that Mr. Whayne and Mr. Taubman did make brief comments to the

Special Committee principally about VRC's methodology:  the comments were positive, as far as

they went.  In addition, as noted above, the Tribune Board was cognizant that the Zell Group still

wished to proceed with the transaction (which would require that EGI pay additional

consideration) and that the LBO Lenders had conducted some due diligence and determined to

proceed with the Step Two funding (albeit driven by preexisting contractual commitments).

Although the Examiner acknowledges that reasonable people could disagree, and the record

evidence of "deliberations" by the Tribune Board is very thin, based on the record adduced in the

Investigation and what the Examiner takes to be a relatively low threshold to satisfy the

requirement of good faith under Delaware law, the Examiner cannot conclude that the Tribune

---

[1165]  The Examiner wishes to note that his conclusions in this Section of the Report concerning director liability exclude Tribune Chief Executive Officer Dennis FitzSimons, who also served on the Tribune Board.  Although in his capacity as a director Mr. FitzSimons is entitled to the benefit of the exculpatory provisions contained in Tribune's Amended and Restated Certificate of Incorporation, as a member of senior management and insider member of the Tribune Board, Mr. FitzSimons knew more than the other directors and therefore application of the above-discussed standard for good faith may yield a different result as to him.  As discussed in another part of the Report at § IV.B.4.c., the Examiner has raised questions regarding the honesty of the efforts of senior financial management in preparing the October 2007 projections, in advising the Tribune Board and Special Committee of aspects of VRC's opinion, and in procuring the Step Two solvency opinion.  In light of the compressed time frame of the Investigation, however, the Examiner was unable to draw conclusions regarding which specific members of senior management were responsible for these matters.  Based on the record, it would be premature for the Examiner to draw specific conclusions about Mr. FitzSimons.  The Examiner sincerely wishes he had had more time to investigate this matter and reach conclusions.  To be clear, the Examiner has not drawn any conclusion about whether Mr. FitzSimons engaged in dishonesty, and to the extent anyone in the future suggests otherwise, the Examiner directs parties to this footnote.

[1166]  *See* Report at § IV.B.4.c.(5).

directors' failure to perform their monitoring function was so egregious as to support a conclusion that they consciously abdicated their responsibilities under Delaware law.

In sum, the Examiner believes that although the Tribune Board and Special Committee certainly did not do what was expected of them at Step Two, a court is somewhat unlikely to conclude that the directors breached their fiduciary duties at Step Two.

### (5)    Tribune Officers at Step Two.

Unlike Tribune's directors, Tribune's officers are not protected by the exculpation provisions in Tribune's Amended and Restated Certificate of Incorporation.[1167]  As a result, to the extent a Tribune officer engaged in gross negligence or recklessness, for purposes of applying the duty of care, those acts are measured under the entire fairness standard.[1168] Moreover, any indemnification afforded by Tribune to its officers cannot cover acts not taken in good faith or in the best interests of the corporation.[1169]  As discussed in another part of the Report,[1170] the Examiner believes that the record adduced indicates that one or more members of Tribune's senior financial management were not honest or candid in connection with key aspects of the Step Two Transactions, and that these circumstances led proximately to the Step Two Closing, to the detriment of Tribune's creditors.  These acts go well beyond gross negligence or recklessness but enter into the terrain reserved for intentional misconduct.  Based on the acts of dishonesty or lack of candor in the record, it is reasonably likely that a court would find that such

---

[1167]  *See id.* at § IV.E.2.d.

[1168]  *See* text accompanying footnotes 1042-1046.

[1169]  *VonFeldt v. Stifel Fin. Corp.*, 1999 Del. Ch. LEXIS 131, at *7 (Del. Ch. June 11, 1999).

[1170]  *See* Report at § IV.B.4.c.

individual or individuals also breached their fiduciary duties during this time frame, whether it be the duty of care or loyalty.[1171]

As the Examiner emphasized in his discussion of intentional fraudulent transfer issues at Step Two, however, the Examiner's conclusions are based on the Investigation conducted to date. As also previously noted, the Examiner chose the phrase "one or more senior financial management members" carefully.[1172]  Additional investigation is warranted and would be required to determine the acts of specific members of senior financial management to determine individual culpability.

### (6)    Guarantor Subsidiary Directors at Step Two.

The activities undertaken by the Subsidiary Directors in connection with the Step Two Transactions present unique issues.  The Guarantor Subsidiaries were not parties to the Merger Agreement or the related agreements entered into in the spring of 2007 giving rise to the Leveraged ESOP Transactions.  Thus, those entities had no say in whether Tribune consummated the Merger or the related agreements with the Zell Group and others at Step Two. Moreover, the Subsidiary Guarantee entered into by the Guarantor Subsidiaries imposed liability on those entities for any indebtedness incurred by Tribune under the Credit Agreement, including the amounts that might be advanced in connection with Step Two.  When Tribune borrowed under the Incremental Credit Agreement Facility at Step Two, the Guarantor Subsidiaries automatically became primarily liable on that indebtedness.  On the other hand, the Guarantor Subsidiaries affirmatively undertook liability on the Bridge Debt at Step Two when they

---

[1171] Because the Parties did not raise the question of what recovery might be available if a director or officer were found to have violated a fiduciary duty, the Report does not consider this question.

[1172] *See* Report at § IV.B.4.c.(2).(iii).

executed the Subordinated Bridge Facility Guarantee dated as of December 20, 2007.  Had the
Guarantor Subsidiaries refused to execute that guarantee, Step Two could not have closed.

There were several reasons for the directors of the Guarantor Subsidiaries to question
whether entering into the Subordinated Bridge Facility Guarantee was appropriate.  In addition to
the fact that Step Two rendered the Guarantor Subsidiaries insolvent, those entities derived little
direct benefit from the Step Two Transactions, other than the incremental benefit associated with
effectuation of the S-Corporation/ESOP structure at the Step Two Closing.  Timothy Landon,
who served as a director of Tribune Interactive, Inc., stated during his interview with the
Examiner that he viewed his role as a director as "perfunctory" and was not a matter of particular
focus."[1173]  David Williams, a director of Tribune Media Services, Inc., stated during his
interview with the Examiner that he relied on Tribune management, whom he viewed as "very
conservative people," and his own knowledge of Tribune, in determining to execute the
Subsidiary Guarantee for that entity.[1174]  The Guarantor Subsidiaries did not hold any board
meetings to consider the execution of the guarantees.  Instead, at Step One, the Guarantor
Subsidiaries authorized the Credit Agreement Subsidiary Guarantee by unanimous written
consent of the respective Subsidiary Boards (or sole or managing member, as applicable).  At
Step Two, the Guarantor Subsidiaries authorized the Subordinated Bridge Subsidiary Guarantee
by unanimous written consent of the respective Subsidiary Boards (or sole or managing member,
as applicable).

The question whether the Guarantor Subsidiary directors breached their fiduciary duties
to their respective Guarantor Subsidiaries by failing to convene and consider whether to cause

---

[1173]  Examiner's Interview of Timothy Landon, June 22, 2010 ("Anytime you're a director, it's your fiduciary
responsibility to shareholders.  In this case, my fiduciary responsibility was to Tribune, so I was watching their
money.").

[1174]  Examiner's Interview of David Williams, June 18, 2010.

the Guarantor Subsidiaries to execute the Subordinated Bridge Subsidiary Guarantee, and thereby allow Step Two to close, is relatively close.  On the one hand, as noted previously, it is well-established under Delaware law that directors of a subsidiary owe "no duty to replicate the deliberative process of [the parent's] board of directors."[1175]  Yet, this rule is based on the assumption that the only interest of a subsidiary is to serve its parent, which should give way when a subsidiary is rendered insolvent.[1176]  Nevertheless, one could argue that even in the context of an insolvency, a subsidiary is not required to replicate the parent's deliberation if the parent has approved the transaction in a manner consistent with the interests of both parent and subsidiary creditors.  Here, as discussed above, by a very thin reed, the Tribune directors did not breach their fiduciary duties and did engage in some modicum of a deliberative process at Step Two.  To the extent this deliberation was sufficient to insulate Tribune's directors from liability, arguably this could protect the Guarantor Subsidiaries' directors.  On the other hand, the Subsidiary Boards did not engage in *any* deliberative process or business judgment for that matter.

The Examiner leaves this question in equipoise but notes that the actions of the fiduciaries who executed the Subsidiary Guarantee on behalf of the Guarantor Subsidiaries were troubling.

### (7)    Large Stockholders at Step Two.

The Examiner found no evidence that the remaining Large Stockholders breached any fiduciary duties in connection with the Step Two Transactions.

---

[1175] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 200, 201 (Del. Ch. 2006).

[1176] *See* Report at § IV.E.2.c.

The Tender Offer reduced the holdings of the Chandler Trusts to approximately 17% of the total shares of Tribune Common Stock then outstanding, and the holdings of the McCormick Foundation to approximately 10% of the total shares then outstanding.[1177]  Thereafter, on June 7, 2007, the Chandler Trusts sold the remainder of their shares of Tribune Common Stock through a block trade underwritten by Goldman Sachs.[1178]  Accordingly, the Chandler Trusts effectively divested themselves of any interest in Tribune prior to the consummation of the Step Two Transactions.  Further, given the McCormick Foundation's reduced stockholdings and minimal role in the Step Two Transactions, which was limited to deliberating on and then voting in favor of the Merger,[1179] the McCormick Foundation cannot be deemed a controlling shareholder at Step Two under Delaware law.  As such, neither of the Large Stockholders owed any fiduciary duties to Tribune, its stockholders, or its creditors at Step Two.

### 3.    Aiding and Abetting Breach of Fiduciary Duty.

#### a.    Legal Standard for Aiding and Abetting Breach of Fiduciary Duty.

Delaware law recognizes that third parties may be liable for aiding and abetting a corporate fiduciary's breach of duty to the corporation's shareholders.[1180]  To establish such a claim, the proponent must demonstrate four elements:  "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty . . ., (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[1181]  Some courts have

---

[1177]  Ex. 577 at 27 (Tribune Form 10-Q, filed May 8, 2008); Ex. 554 (Tribune Press Release, dated June 4, 2007); Ex. 578 at 4 (McCormick Foundation Schedule 13D, filed May 31, 2007).

[1178]  Ex. 10 at Exhibit 1.1 (Tribune Form 8-K, filed June 5, 2007); Ex. 4 at 46 (Tribune 2007 Form 10-K); Ex. 577 at 27 (Tribune Form 10-Q, filed May 8, 2008).

[1179]  *See* Report at § III.H.5.

[1180]  *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[1181]  *Malpiede*, 780 A.2d at 1096 (quotations & citations omitted); *see also Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 543-44

further elaborated that, to be liable for aiding and abetting a breach of fiduciary duty, the defendant must give "substantial assistance or encouragement to the fiduciary's wrongful conduct."[1182]

The first two elements of this test set the obvious predicates for a cognizable aiding and abetting claim—without a fiduciary's breach of duty, there can of course be no claim for aiding and abetting such a breach.[1183]  Typically, the primary, predicate violator of a duty will be a fiduciary and the aider and abettor will be a non-fiduciary, but this alignment is not essential in most jurisdictions.  Rather, an actor who, though otherwise a fiduciary, possessed no obligation of trust extending to the specific wrongdoing at issue, may be liable for aiding and abetting another fiduciary whose obligations of trust were implicated and breached.[1184]  Standing to assert an aiding and abetting claim is also required.  A bankruptcy trustee possesses standing to assert a breach of fiduciary duty claim against its own officers and directors and the right to assert aiding and abetting claims against third parties for helping to facilitate those fiduciary breaches.[1185]

The third element of "knowing participation" in a breach of fiduciary duty compels that "the third party act with the knowledge that the conduct advocated or assisted" constitutes a fiduciary breach.[1186]  The Delaware courts have recognized a broad spectrum of conduct as satisfying this standard.  For example, the courts have held that "arm's-length negotiations are

---

(Bankr. D. Del. 2009); *Miller v. McCown De Leeuw & Co. (In re Brown Schs.)*, 386 B.R. 394, 402 (Bankr. D. Del. 2007); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 370 (Del. Ch. 2008).

[1182]  *See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 144 (Bankr. D. Del. 2005) (citations omitted).

[1183]  *See Malone v. Brincat*, 722 A.2d 5, 14-15 (Del. 1998) (citation omitted).

[1184]  *See Brown Schs.*, 368 B.R. at 402-03.

[1185]  *See OODC, LLC*, 321 B.R. at 143 (rejecting argument that "because a debtor cannot sue itself for breach of fiduciary duties . . . [it] should not be able to sue a third party for aiding and abetting a breach of fiduciary duty").

[1186]  *Malpiede*, 780 A.2d at 1097 (citations omitted); *see also Transkaryotic Therapies, Inc.*, 954 A.2d at 371-72.

inconsistent with participation in a fiduciary breach,"[1187] but, a bidder may be liable for aiding

and abetting by "attempt[ing] to create or exploit conflicts of interest in the board" or by

"conspir[ing] in or agree[ing] to the fiduciary breach."[1188] Likewise, if a bidder "offer[s] [to the

fiduciary [a] side deal in order to induce the fiduciary to breach or ignore his duty," aiding and

abetting liability may be imposed.[1189]

The fourth element requires the proponent of an aiding and abetting claim to demonstrate

damages that were proximately caused by "the concerted action of the fiduciary and the non-

fiduciary."[1190]

> **b.     Legal Standards Governing Potential In Pari Delicto Defenses to Aiding and Abetting Claims.**

Delaware, like most American jurisdictions, recognizes the in pari delicto doctrine in the

context of aiding and abetting claims.[1191] Delaware construes the doctrine to mean that "'a party

is barred from recovering damages if his losses are substantially caused by activities the law

forbade him to engage in.'"[1192] In applying in pari delicto, the Delaware courts reject a cramped,

literal reading of this "equal fault" principle that would obligate the court to discern "which of

the parties acted with the guiltiest mind;" instead, the doctrine "simply requires the court to

determine that each party acted with scienter in the sense that it was a knowing and substantial

---

[1187] *Malpiede*, 780 A.2d at 1098 (citing Court of Chancery rationale) (citation omitted); *see also id.* at 1097 (holding that "a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting"). *Accord Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 278 F. App'x 125, 130 (3d Cir. 2008).

[1188] *Malpiede*, 780 A.2d at 1097-98 (citations omitted).

[1189] *Transkaryotic Therapies, Inc.*, 954 A.2d at 372.

[1190] *Id.* at 373 (quotations & citations omitted).

[1191] *In re Am. Int'l Grp. Consol. Deriv. Litig.*, 976 A.2d 872, 882 (Del. Ch. 2009).

[1192] *Am. Int'l Grp.*, 976 A.2d at 883 (citation and quotation marks omitted); *see also OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 389 B.R. 357, 365 (D. Del. 2008) (stating that "a plaintiff's recovery may be barred by his own wrongful conduct") (quoting *Pinter v. Dahl*, 486 U.S. 622, 632 (1988)), *aff'd*, 356 F. App'x 622 (3d Cir. 2009).

participant in the wrongful scheme."[1193]  The in pari delicto defense may apply to estate

representatives that are asserting causes of action held by the bankruptcy corporation on the

petition date (as opposed to avoidance actions) because the estate representative "stand[s] in the

shoes" of a potentially-wrongdoing debtor.[1194]

In pari delicto is imported from equity jurisprudence and, as such, is subject to various

exceptions that preclude its application.[1195]  For example, the doctrine might not apply when the

illegal acts were the result of duress, when an illegal arrangement is "intrinsically unequal," or

when "important countervailing interests of public policy" so counsel.[1196]  Recently, the Third

Circuit Court of Appeals has held that, under Pennsylvania law, imputation under the in pari

delicto defense "is unavailable relative to an auditor which has not dealt materially in good faith

with the client-principal . . . ."[1197]  The two more familiar exceptions in Delaware are, however,

the "insider" exception and the "adverse interest" exception.[1198]

The "insider" exception permits claims against corporate insiders, notwithstanding the in

pari delicto doctrine.[1199]  It is based on the well-recognized principle that "[a]n exception to the

general rule that the knowledge of an officer or agent will be imputed to the corporation arises

---

[1193]  *Am. Int'l Grp.*, 976 A.2d at 884; *see also id.* ("To go further and distinguish, for example, among willing foot
soldiers, consiglieres, and the ultimate crime boss is to engage in precisely the type of summing up among co-
conspirators that the doctrine of *in pari delicto* is intended to obviate.").

[1194]  *Oakwood Homes*, 389 B.R. at 365.

[1195]  *See Off. Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v.
PricewaterhouseCoopers, LLP ("Allegheny")*, 607 F.3d 346, 354 (3d Cir. 2010) (citations omitted).

[1196]  *See Am. Int'l Grp.*, 976 A.2d at 883 (citations omitted); *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d
1096, 1108 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004).

[1197]  *Allegheny*, 2010 U.S. App. LEXIS 10920, at *19-20 (citing *Off. Comm. of Unsecured Creditors of Allegheny
Health Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, 989 A.2d 313, 339 (Pa. 2010)).  The "good
faith" limitation on the in pari delicto defense has not yet been applied outside the context of auditors and, by its
terms, is only an application of Pennsylvania law.  However, other courts may analogize the decisions of the
Third Circuit and the Pennsylvania Supreme Court to other contexts.

[1198]  *Oakwood Homes*, 389 B.R. at 365; *Am. Int'l Grp.*, 976 A.2d at 891 (citations omitted).

[1199]  *Oakwood Homes*, 389 B.R. at 365.

when an officer . . . is acting in a transaction in which he is personally or adversely interested or is engaged in the perpetration of an independent fraudulent transaction, where the knowledge relates to such transaction and it would be to his interest to conceal it."[1200]  It is well recognized that estate representatives can sue the debtor's insiders for their wrongful acts, notwithstanding that the debtor previously acted through those insiders.[1201]  However, the insider exception has been rarely (if ever) applied outside the context of officers, directors, or other agents of the corporation, and the Third Circuit Court of Appeals has rejected the argument that a bank could be an "insider" for purposes of the insider exception, even if it were an insider under the Bankruptcy Code.[1202]

The second, and more common, exception to the in pari delicto doctrine allows claims against parties with an "adverse interest" to the corporation.[1203]  This exception provides that "a corporation [may] sue its co-conspirators when the corporate agent responsible for the wrongdoing was acting solely to advance his own personal financial interest, rather than that of the corporation itself."[1204]  In such a circumstance, the law recognizes that the corporation is more victim than conspirator, notwithstanding that it may remain liable to innocent third parties.[1205]  For this exception to apply, it is not enough to show that the fiduciary was acting

---

[1200]  18B AM. JUR. 2D CORPORATIONS § 1680 (2003); *see also In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1107-08 (Del. Ch. 2003) ("The reality that HealthSouth itself might be liable to third-parties due to the failure of its managers (under Scrushy's supervision) to prepare materially accurate financial statements does not mean that HealthSouth has no right to seek recompense from those managers for the harm they caused it.") (citation omitted).

[1201]  *Unencumbered Assets, Trust v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters.)*, 617 F. Supp. 2d 700, 712 (S.D. Ohio 2009) (collecting cases).

[1202]  *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 356 F. App'x 622, 628 (3d Cir. 2009).

[1203]  *Am. Int'l Grp. v. Greenberg (In re Am. Int'l. Grp. Consol. Deriv. Litig.)*, 976 A.2d 882, 891 (Del. Ch. 2009) (citations omitted).

[1204]  *Id.* at 891 (citations omitted).

[1205]  *See id.*

with the third party for his or her benefit; instead, the fiduciary must be shown to have acted to harm the corporation.[1206]  Put another way, there must be a "total abandonment of the corporation's interests."[1207]

c.    Examiner's Conclusions and Explanation Concerning Application of Legal Standards to Potential Defendants.

**Examiner's Conclusions**:

The existence of a breach of fiduciary duty is a fundamental prerequisite to any claim for aiding and abetting a fiduciary's breach.  As set forth elsewhere in the Report, the Examiner finds no credible basis to conclude that Tribune's officers or directors, the Guarantor Subsidiary officers or directors, or the Large Stockholders breached any fiduciary duties in conjunction with the Step One Transactions.[1208]  In view of these conclusions, a court is highly unlikely to conclude that any claims for aiding and abetting breach of fiduciary duty could be sustained based on the conduct of any potential defendants at Step One.  As such, the Examiner's discussion of potential aiding and abetting claims below focuses on Step Two.

As detailed below, the Examiner concludes that it is reasonably unlikely that a court would conclude that an aiding and abetting claim could be sustained against the Large Stockholders, the Leads Banks, the Financial Advisors, or the Zell Group arising from the Step Two Transactions.  (The Examiner's conclusion concerning regarding the Zell Group is subject to a caveat, described below.)  The Examiner leaves in equipoise the question whether a claim for aiding and abetting breach of fiduciary duty could be sustained against VRC.

---

[1206] *See id.*

[1207] *Id.*

[1208] *See* Report at § IV.E.2.e.

395

**Explanation of Examiner's Conclusions**:

### (1)    Large Stockholders.

The Examiner finds no credible evidence to support the conclusion that the Large Stockholders aided and abetted a breach of any fiduciary duties in connection with the Leveraged ESOP Transactions.  As described in another part of the Report, before consummation of the Step Two Transactions, the Chandler Trusts divested themselves of any interest in Tribune,[1209] and the McCormick Foundation played a minimal role in the Step Two Transactions.[1210]  The record contains no evidence of "knowing participation" by the McCormick Foundation giving rise to a claim of aiding and abetting a breach of fiduciary duty at Step Two.

### (2)    Lead Banks.

The Examiner finds no credible evidence to support the conclusion that the Lead Banks aided and abetted a breach of any fiduciary duties in connection with the Leveraged ESOP Transactions.  The evidence adduced in the Investigation does not suggest any nexus between the conduct of the Lead Banks and the conduct of any member of Tribune's senior financial management at Step Two that would be sufficient to demonstrate assistance, encouragement, or advocacy of a potential breach of fiduciary duty by such persons.

### (3)    Financial Advisors.

The Examiner likewise finds no credible evidence to support the conclusion that the Financial Advisors aided and abetted a breach of any fiduciary duties in connection with the Leveraged ESOP Transactions.  As described elsewhere in the Report, the bankers from MLPFS

---

[1209]  Ex. 10 at Exhibit 1.1 (Tribune Form 8-K, filed June 5, 2007); Ex. 4 at 46 (Tribune 2007 Form 10-K); Ex. 577 at 27 (Tribune Form 10-Q, filed May 8, 2008).

[1210]  *See* Report at § III.H.5.

and CGMI stepped away from advising Tribune after Step One based on their lending conflicts, and the record does not support the conclusion that Morgan Stanley knowingly assisted, encouraged, or advocated a breach of duty.

### (4)    Zell Group.

Based on the record adduced thus far, the Examiner did not find a sufficient basis to conclude that the Zell Group aided and abetted a breach of any fiduciary duties in connection with the Leveraged ESOP Transactions.  The Examiner notes, however, that with the benefit of more time, he would have further investigated the interactions between personnel at the Zell Group and Tribune's senior financial management in relation to the October 2007 projections and the senior financial management's interactions with the Zell Group and VRC.  The Examiner is not, by this caveat, casting a shadow of suspicion over the Zell Group personnel, but, rather, just noting that his inquiry into these matters remains incomplete.

### (5)    VRC.

As detailed in another part of the Report, VRC's solvency analyses at Step Two contained faulty assumptions and methodological errors.[1211]  Although the Investigation adduced no direct evidence of "knowing participation" by VRC in potential breaches of fiduciary duty by Tribune's senior financial management in connection with the Step Two Transactions, the compressed timetable of the Investigation rendered the Examiner unable to fully investigate VRC's actions in the summer and fall of 2007.  The Examiner likewise did not have an opportunity to fully investigate VRC's actions in the fall of 2007, particularly after VRC generated a compelling and comprehensive critique of management's October 2007 forecast (only to accept management's projections without change), as well as in weeks leading up to the Tribune Board and Special

---

[1211] *See id.* at § III.H.3.

Committee meetings in December 2007.  The Examiner also does not have a complete picture of the interactions between VRC and Tribune senior financial management personnel during this period.  Finally, the Examiner has been unable to form a view whether VRC personnel crossed the line into knowing misconduct.[1212]  Although it is conceivable that VRC may be entitled to assert an in pari delicto defense based on the actions of one or more of Tribune's senior financial officers, without answers to the preceding questions it is not possible to evaluate this possible defense.  For these reasons, the evidence adduced through July 25, 2010 is not sufficient to support a conclusion regarding a potential aiding and abetting claim against VRC at Step Two.  Accordingly, the Examiner leaves this question in equipoise.

### 4.    Unjust Enrichment.

#### a.    Legal Standard for Unjust Enrichment.

Under Delaware law, unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience."[1213]  A claim of unjust enrichment is a "quasi-contract theory of recovery to remedy the absence of a formal contract."[1214]  The elements of unjust enrichment are:  "1) an enrichment, 2) an impoverishment, 3) a relation between the enrichment

---

[1212]  *See id.* at §§ III.E.3. (Step One) and III.H.3 (Step Two).

[1213]  *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (quotations and citations omitted); *see also Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 145 (Bankr. D. Del. 2005) ("To support a claim for unjust enrichment, the plaintiff must establish that the defendant received a benefit, that the defendant was aware of the benefit, and that the benefit was accepted by the defendant under circumstances that would make the acceptance inequitable without payment for its value.") (citations omitted).

[1214]  *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315 (D. Del. 2008) (citations omitted); *see also First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) (*citing LaThrop v. Bell Fed. Savs. & Loan Ass'n*, 370 N.E.2d 188, 195 (Ill. 1977)).

and the impoverishment, 4) the absence of justification and 5) the absence of a remedy provided by law."[1215]

Unjust enrichment is typically invoked in a quasi-contractual setting, when a plaintiff seeks to recover from a defendant for a benefit conferred under an unconsummated or void contract or when the defendant is not lawfully entitled to retain a benefit which it has received.[1216]  In that context, "the existence of an express, enforceable contract that controls the parties' relationship will defeat unjust enrichment claims."[1217]  An unjust enrichment claim may be stated, however, "when the validity of the contract is in doubt or uncertain," when the express contract does not govern exclusively the obligations or rights of the parties, or when the subject matter of the unjust enrichment claim is distinct from the subject matter of the parties' contract.[1218]

An unjust enrichment claim also may be stated based on certain tortious conduct that benefits the tortfeasor.[1219]  For example, it is well recognized that "a fiduciary who has acquired

---

[1215] *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 294-95 (D. Del. 2000) (citing *Jackson*, 741 A.2d at 393-94); *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010); *see also Vinarov v. Motorola, Inc.*, 2008 U.S. Dist. LEXIS 25363, at *39 (N.D. Ill. Mar. 26, 2008) *aff'd*, 323 F. App'x 472 (7th Cir. 2009) ; *Douglass v. Wones*, 458 N.E.2d 514, 521 (Ill. App. Ct. 1983); *Kenneke v. First Nat'l Bank*, 382 N.E.2d 309, 310-11 (Ill. App. Ct. 1978). With respect to the last element – the absence of a remedy at law – the Supreme Court of Delaware has held that there can be no cause of action for unjust enrichment unless without it "the plaintiffs will have no remedy to recover the benefit of which they were wrongfully deprived."  *Nemec*, 991 A.2d at 1130.

[1216] *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 936 (3d Cir. 1999).

[1217] *Tolliver*, 564 F. Supp. 2d at 315; *see also Off. Comm. of Unsecured Creditors of Fedders N. Am. Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 552 (Bankr. D. Del. 2009) ("Whether asserted under the law of Delaware, New Jersey, or New York, the authorities are clear that a claim for unjust enrichment will be dismissed if the complaint alleges an express, enforceable contract that controls the parties' relationship."); *Astropower Liquidating Trust v. KPMG LLP*, 2007 U.S. Dist. LEXIS 38222, at *18-19 (D. Del. May 25, 2007) ("Claims for unjust enrichment must be dismissed when the complaint alleges that an express, enforceable contract controls the parties' relationship . . . .").

[1218] *Tolliver*, 564 F. Supp. 2d at 315-16; *Petrakopoulou v. DHR Int'l, Inc.*, 660 F. Supp. 2d 935, 940 (N.D. Ill. 2009).

[1219] *Steamfitters Local Union No. 420*, 171 F.3d at 936 ("In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)."). RESTATEMENT (FIRST) OF RESTITUTION § 3 (1937).

a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary"[1220]

and "[a] third person who has colluded with a fiduciary in committing a breach of duty, and who

obtained a benefit therefrom, is under a duty of restitution to the beneficiary."[1221]   However, a

defendant must prove all of the elements of the underlying tort to attack the benefits received

under a theory of unjust enrichment.[1222]   Moreover, not all torts give rise to an unjust enrichment

claim.

### b.    Potential Preemption Issues.

Even if a given set of facts supports an actionable unjust enrichment claim under

Delaware common law, it is conceivable that such a claim in the context of a bankruptcy

proceeding might be preempted by the "settlement payment" defense established by Bankruptcy

Code section 546(e).[1223]   Under the Supremacy Clause of the United States Constitution, state

laws that interfere with or are contrary to federal law are preempted and without effect.[1224]

When there is no statutory language that explicitly preempts state law, implied preemption may

be found under two circumstances:  conflict preemption and field preemption.[1225]

---

[1220]   RESTATEMENT (FIRST) OF RESTITUTION § 138(1) (1937).

[1221]   *Id.* § 138(2) (1937); *Rosener v. Majestic Mgmt. Inc. (In re OODC, LLC)*, 321 B.R. 128, 144-45 (Bankr. D. Del. 2005).

[1222]   *Allegheny Gen. Hosp. v. Philip Morris*, 228 F.3d 429, 447 (3d Cir. 2000); *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 n.3 (1st Cir. 2009).

[1223]   11 U.S.C. § 546(e) (2006).  As detailed in another part of the Report, section 546(e) provides, in relevant part, that notwithstanding certain enumerated code sections, "the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title."  *Id.*  Section 548(a)(1)(A) pertains to transfers within two years prior to filing the petition for bankruptcy.  *See* 11 U.S.C. § 548(a)(1)(A); Report at § IV.B.7.a.

[1224]   U.S. CONST. art. VI, cl. 2; *see Altria Grp. v. Good*, 129 S. Ct. 538, 543 (2008).

[1225]   *See Off. Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Invest. Co.)*, 274 B.R. 71, 96 (D. Del. 2002); *see also Altria Grp.*, 129 S. Ct. at 543 ("Pre-emptive intent may also be inferred if the scope of [a federal] statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.").

In *Official Committee of Unsecured Creditors v. Fleet Retail Financial Group (In re Hechinger Investment Co.)*,[1226] the United States District Court for the District of Delaware examined whether an unsecured creditors' committee's unjust enrichment claim, in the context of a failed leveraged buyout, was preempted by Bankruptcy Code section 546(e) and concluded that the claim was preempted based on both conflict and field preemption. Conflict preemption occurs when federal and state law directly conflict and cannot coexist, either because compliance with both is a "physical impossibility" or there is an "inevitable collision" between the two regulatory schemes.[1227] Field preemption exists when a federal regulatory scheme is "sufficiently comprehensive" to allow a reasonable inference that Congress "left no room" for supplementary state regulation.[1228]

Evaluating conflict preemption first, the court in *Hechinger* noted that the remedies sought by the committee pursuant to its unjust enrichment and fraudulent transfer claims were the same—to avoid the transactions and recover payments made in exchange for the tender of Hechinger shares by Hechinger shareholders.[1229] Having already determined that Bankruptcy Code section 546(e) barred the committee from recovering payments made to shareholders based on a fraudulent transfer claim,[1230] the court concluded that allowing an unjust enrichment claim would enable the committee to circumvent section 546(e) and frustrate the purpose of the settlement payment defense.[1231] Thus, the court determined that "[b]ecause the Committee's

---

[1226] *Hechinger*, 274 B.R. at 95-97 (citation omitted).

[1227] *Id.*

[1228] *Id.* at 96 (*citing Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)); *see also Altria Grp., Inc. v. Good*, 129 S. Ct. at 543.

[1229] *Hechinger*, 274 B.R. at 96.

[1230] *See id.* at 87-88.

[1231] *Id.* at 96.

unjust enrichment claim effectively acts as a section 544 fraudulent conveyance claim, it directly

conflicts with the remedial exemption set forth in Code section 546(e)" and is preempted.[1232]

Next, analyzing field preemption, the court in *Hechinger* observed that the Bankruptcy

Code, and section 544 in particular, provides an exclusive and comprehensive framework for

addressing claims seeking to avoid transfers made more than one year[1233] before bankruptcy.  In

this way, by "providing and circumscribing the remedies for the conduct alleged, Congress

necessarily intended to displace inconsistent state law claims and remedies."[1234]  Thus, the court

held that the Bankruptcy Code "preempts the field" and precludes an unjust enrichment claim as

a supplemental state law remedy.[1235]  Accordingly, the court dismissed the committee's unjust

enrichment claim.[1236]

In the Third Circuit, "the decision of a district court is not binding on a bankruptcy

court . . . ."[1237]  Decisions by a district court judge, however, are entitled to substantial deference

in the bankruptcy court, particularly when any appeal from the bankruptcy court would go to the

---

[1232] *Id.* at 96.  *But see Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.)*, 324 B.R. 575, 582 (Bankr. W.D. Pa. 2005) (finding that section 546(e) is applicable but refusing to dismiss claim for unjust enrichment.").

[1233] *Hechinger*, 274 B.R. at 97.  Bankruptcy Code Section 548(a)(1)(A) was amended in 2005, subsequent to the issuance of the *Hechinger* decision, to permit avoidance of transfers made two years prior to the filing of the bankruptcy petition.  *See* 11 U.S.C. § 548(a)(1)(A) (2006).

[1234] *Hechinger*, 274 B.R. at 97.

[1235] *Id.*

[1236] *Id.*  The First Circuit and Sixth Circuit Courts of Appeals, among other federal courts, have likewise applied field preemption to conclude that the Bankruptcy Code is sufficiently comprehensive as to preempt virtually all alternative mechanisms for remedying violations of the Code and all state law claims alleging misconduct in bankruptcy proceedings, including unjust enrichment claims.  *See Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425-26 (6th Cir. 2000) (holding that state law unjust enrichment claims are preempted by the "pervasive nature of Congress' bankruptcy regulation" through the Bankruptcy Code); *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447-48 (1st Cir. 2000) (affirming district court's holding that state law cause of action for unjust enrichment is preempted by the Bankruptcy Code); *see also Cox v. Zale Delaware, Inc.*, 242 B.R. 444, 449-50 (N.D. Ill. 1999) (rejecting plaintiff's unjust enrichment claim on basis that "the federal bankruptcy law occupies the field; there is simply no room for the state cause of action"); *Lenoir v. GE Capital Corp. (In re Lenoir)*, 231 B.R. 662, 675 (Bankr. N.D. Ill. 1999).

[1237] *Liquidating Trust of U.S. Wireless Corp. v. Wax (In re U.S. Wireless Corp.)*, 384 B.R. 713, 723 n.94 (Bankr. D. Del. 2008); *see also In re Chodnicki*, 2008 Bankr. LEXIS 250 at *11-12 (Bankr. D.N.J. Jan. 24, 2008); *In re Brown*, 244 B.R. 62, 64 (Bankr. D.N.J. 2000); *cf. Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("[T]here is no such thing as 'the law of the district.'").

district court.[1238]  Notwithstanding this deference, under different factual circumstances, one

Delaware bankruptcy court concluded that an unjust enrichment claim is not preempted.  In

*Rosener v. Majestic Management, Inc. (In re OODC, LLC)*,[1239] the bankruptcy court refused to

dismiss well–pled, unjust enrichment claims because the settlement payment defense of section

546(e) did not apply, and thus, there was no conflict with federal law in allowing the unjust

enrichment claims to go forward.[1240]  Although the holding in *In re OODC, LLC* is inconsistent

with a finding that the Bankruptcy Code field preempts a state law claim for unjust enrichment,

the decision did not address field preemption.  In the Examiner's view, however, the bankruptcy

court's holding is consistent with the plain meaning of the Bankruptcy Code:  Bankruptcy Code

section 546(e), by its terms, only limits avoiding powers, not choses in action that are property of

the estate under Bankruptcy Code section 541(a).  Thus, the Examiner leaves the question of

preemption of unjust enrichment claims in equipoise.

            **c.**      **In Pari Delicto as a Defense to an Unjust Enrichment Claim.**

A claim for unjust enrichment may also be barred when the plaintiff or its successor is in

pari delicto.[1241]  As discussed in greater depth above, under this doctrine a party is foreclosed

from recovering damages if its losses are substantially caused by activities from which it was

legally forbidden to engage.[1242]  Also as discussed above,[1243] however, there would be no in pari

---

[1238]  *See Chodnicki*, 2008 Bankr. LEXIS 250 at *12.

[1239]  321 B.R. 128 (Bankr. D. Del. 2005).

[1240]  *OODC*, 321 B.R. at 144-45; *accord, Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 876 (Bankr. S.D.N.Y. 2005).

[1241]  *See In re Am. Int'l Group, Inc. Consol. Deriv. Litig.*, 976 A.2d 873, 883 (Del. Ch. 2009).

[1242]  The doctrine of in pari delicto is more commonly utilized as a defense to claims for aiding and abetting breach of fiduciary duty.  That said, at least one court has concluded that a plaintiff's unjust enrichment claim was barred by in pari delicto when the plaintiff and defendant had entered into an illegal contract.  *See Ctr. for Athletic Med., Ltd. v. Indep. Med. Billers, Inc.*, 889 N.E.2d 750, 759-60 (Ill. App. Ct. 2008).  In reaching this conclusion, the court noted that "[t]he law will not aid either party to an illegal act, but will leave them without remedy as against each other, with the caveat that they are of equal knowledge, willfulness and wrongful intent,

delicto defense to an unjust enrichment claim against directors or officers of Tribune, if a court were to apply the "insider exception" to the in pari delicto defense.

> **d.    Examiner's Conclusions and Explanation Concerning Application of Legal Standards to Potential Defendants.**

**Examiner's Conclusions**:

The Examiner concludes that, notwithstanding the deference accorded a Delaware district court opinion,[1244] it is unclear whether a Delaware bankruptcy court would follow *Hechinger* and hold that any such claims against the LBO Lenders and the Selling Shareholders are preempted by the Bankruptcy Code (including section 546(e) specifically, when applicable).[1245] Regardless, the Examiner concludes that it is reasonably unlikely a court would conclude that any such claims, even if not preempted, are meritorious.

**Explanation of Examiner's Conclusions**:

Although certain of the Parties argued that the court's ruling in *Hechinger* is determinative, one Party argued that under Illinois precedent, the settlement payment defense does not bar an unjust enrichment claim, citing *Weiboldt Stores v. Schottenstein*.[1246]  The *Weiboldt* case examined section 546(e) and the legislative history thereof, and concluded that the defense was categorically inapplicable to payments to stockholders in a leveraged buyout.[1247] This conclusion was, however, specifically rejected by the Third Circuit Court of Appeals in

---

or *in pari delicto*." *Ctr. for Athletic Med.,* 889 N.E.2d at 759-60 (citations and quotation marks omitted).  *See* Report at § IV.E.3.b.

[1243]  *See* footnotes 1199-1201 and accompanying text.

[1244]  It is possible that, applying the plain meaning of the Bankruptcy Code, the Third Circuit Court of Appeals would eschew the *Hechinger* court's holding.

[1245]  Given the Examiner's conclusion that unjust enrichment claims are preempted, the potential application of the in pari delicto defense to the unjust enrichment claims raised by the Parties is not discussed further herein.

[1246]  131 B.R. 655, 663-65 (N.D. Ill. 1991).

[1247]  *Wieboldt*, 131 B.R. at 665.

*Lowenschuss v. Resorts International, Inc. (In re Resorts International, Inc.).*[1248]  Nevertheless, the application of the 546(e) defense to a trustee's avoiding power says nothing about the trustee's pursuit of a chose in action under Bankruptcy Code section 541.  Notwithstanding the Delaware district court's analysis in *Hechinger* that unjust enrichment claims based on potentially-voidable transfers or obligations are preempted by the Bankruptcy Code generally, and specifically by section 546(e), when applicable, a bankruptcy court in the District of Delaware has concluded otherwise on an unjust enrichment claim.  Thus, the Examiner leaves the question of preemption in equipoise.

Leaving the question of preemption aside, although certain Parties suggested that Tribune holds unjust enrichment claims against the LBO Lenders and the Selling Stockholders, respectively, for the value conferred on those entities resulting from the LBO Lender Debt and the payments of principal and interest on the LBO Lender Debt, and the redemptions payments to the Selling Stockholders, those Parties cited little authority or substantiation for this contention.  With respect to payments to Selling Stockholders, Delaware law appears to hold that dividends or redemptions may not be recovered under an unjust enrichment theory when the recipients did not engage in wrongdoing or otherwise tortious behavior.[1249]  With respect to payments made and obligations incurred to the LBO Lenders, absent facts justifying avoidance of obligations or transfers or demonstrable wrongdoing such as tortious acts, it is difficult to envision how the fourth element of unjust enrichment, "the absence of justification," could be met, and a court following Third Circuit law is reasonably likely to hold that when the underlying behavior is not tortious.

---

[1248]  181 F.3d 505 (3d Cir. 1999).

[1249]  *See LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 294-95 (D. Del. 2000); *Territory of U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008).

Ultimately, as another Party pointed out, unjust enrichment is largely derivative of other causes of action. To the extent unjust enrichment is asserted against parties who allegedly breached their fiduciary duties to Tribune or aided and abetted the breach of fiduciary duties to Tribune, the analysis of the unjust enrichment claims would be very similar to the analysis of the underlying breach of fiduciary duty or aiding and abetting claims; only the remedy would differ.[1250]  The factual difficulties in establishing breach of fiduciary duty or aiding and abetting breach of fiduciary duty would apply to an unjust enrichment claim based on the same facts.  In sum, unjust enrichment does not add meaningfully to the analytical equation already extant under the rubric of aiding and abetting or breach of fiduciary duty.

### 5.    Illegal Corporate Distributions.

#### a.    Legal Standard for Illegal Corporate Distributions Pursuant to the DGCL.

Pursuant to the DGCL, a Delaware corporation may purchase, redeem, or otherwise acquire its own shares.[1251]  This authority is limited, however, by DGCL section 160(a), which prohibits a corporation from purchasing or redeeming its own shares of stock "when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation . . . ."[1252]  A stock purchase or redemption impairs capital "if the funds used in the repurchase exceed the amount of the corporation's 'surplus'. . . ."[1253]

---

[1250]  *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 936 (3d Cir. 1999); *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 n.3 (1st Cir. 2009).

[1251]  *See* DEL. CODE ANN. tit. 8, § 160 (2010).

[1252]  DEL. CODE ANN. tit. 8, § 160(a)(1) (2010); *see Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del. 1997).

[1253]  *Klang*, 702 A.2d at 153 (internal citation omitted).  "Surplus" is defined by DGCL section 154 to mean the excess of net assets over the par value of the corporation's issued stock.  *Klang*, 702 A.2d at 153 (citing DEL. CODE ANN. tit. 8, § 154).

Consequently, to conduct a lawful stock purchase or redemption, the net assets of the corporation

must exceed its total liabilities.[1254]

In determining surplus, however, the corporation is not bound by its balance sheets.[1255]

The DGCL recognizes that unrealized appreciation or depreciation, for example, may render a

corporation's books misleading.  Thus, in assessing conformity with section 160, courts permit a

corporation "to revalue properly its assets and liabilities to show a surplus."[1256]  Typically, courts

defer to a board's determination of surplus, unless "a plaintiff can show that the directors 'failed

to fulfill their duty to evaluate the assets on the basis of acceptable data and by standards which

they are entitled to believe reasonably reflect present values.'"[1257]  Thus, the few cases that have

addressed this question have suggested that absent a showing of bad faith or fraud, the courts

will defer to the judgment of the directors in determining the existence of a surplus and will not

second guess them.[1258]

A Delaware corporation also is authorized, pursuant to DGCL section 170, to declare and

pay dividends on shares of its capital stock out of its surplus, or, if there is no surplus, out of its

net profits either for the fiscal year in which the dividend is declared or in the preceding year.[1259]

---

[1254]  *See Kohls v. Duthie*, 791 A.2d 772, 784 (Del. Ch. 2000); *see also Pereira v. Dow Chem. Co.* (*In re Trace Int'l Holdings, Inc.*), 287 B.R. 98, 107-08 (Bankr. S.D.N.Y. 2002), *vacated on other grounds*, 2009 U.S. Dist. LEXIS 55168 (S.D.N.Y. June 25, 2009).

[1255]  *Klang*, 702 A.2d at 154.

[1256]  *Id.*; *see also Sheffield Steel Corp. v. HMK Enters., Inc.* (*In re Sheffield Steel Corp.*), 320 B.R. 423, 449-50 (Bankr. N.D. Okla. 2004) (quoting *Morris v. Standard Gas & Elec. Co.*, 63 A.2d 577, 582 (Del. Ch. 1949)).  In *Sheffield Steel*, the record failed to establish that the board had acted with care by engaging qualified professionals to determine capital adequacy before declaring a dividend.

[1257]  *Klang*, 702 A.2d at 155-56 (quoting *Morris*, 63 A.2d at 582).

[1258]  *Id. at* 156; *Morris*, 63 A.2d at 585 (". . . I am persuaded that this court cannot substitute either plaintiff's or its own opinion of value for that reached by the directors where there is no charge of fraud or bad faith.").

[1259]  DEL. CODE ANN. tit. 8, § 170(a) (2010).  The statute provides, in relevant part:

  (a) The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock, or to its members if the corporation is a nonstock corporation, either (1) out of its surplus, as defined in and computed in accordance with §§ 154 and 244 of this title, or (2) in case there shall be no such

Any payment of dividends *except* out of surplus or net profits is prohibited specifically by DGCL section 173.[1260]

When a corporation has conducted an unlawful stock purchase or redemption or made an unlawful payment of dividends in contravention of the relevant DGCL provisions, the directors of the corporation may be subject to personal liability.[1261]  Specifically, DGCL section 174 prescribes that a director who willfully or negligently violates DGCL sections 160 or 173 "shall be jointly and severally liable . . .  to the corporation, and to its creditors in the event of its dissolution or [insolvency]."[1262]  The purpose of section 174 is to protect those who relied upon the stated capital of the corporation in extending credit, because "when the corporation impairs that capital by an illegal redemption of stock, it depletes the creditors' 'trust fund' and seriously jeopardizes their means to recover their debts."[1263]

Courts have specifically recognized the viability of claims based on DGCL section 174 in the leveraged buyout context,[1264] and have concluded that elements of such transactions may constitute unlawful distributions subjecting a director to personal liability.[1265]

---

surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.

[1260] DEL. CODE ANN. tit. 8, § 173 (2010).  The fundamental premise underlying these DGCL sections is that capital constitutes, in essence, a trust fund available for payment of corporate debt, which has priority over the rights of equity holders.  *See Sheffield Steel*, 320 B.R. at 448.

[1261] DEL. CODE ANN. tit. 8, § 174(a) (2010).

[1262] *Johnston v. Wolf*, 487 A.2d 1132, 1136 (Del. 1985) (citing Del. Code tit. 8, § 174(a)) (emphasis omitted). Section 174(a) allows a claim to be brought "at any time within 6 years after paying [an] unlawful dividend or after [an] unlawful stock purchase or redemption. . . ."  DEL. CODE ANN. tit. 8, § 174(a) (2010).  Dissenting or absent directors may be absolved of liability if they caused their dissent to be entered on the corporate books and records at the proceeding or immediately thereafter.  DEL. CODE ANN. tit. 8, § 174(a) (2010).

[1263] *Johnston*, 487 A.2d at 1134-35 (internal citation omitted).  *See generally Sheffield Steel*, 320 B.R. at 448.

[1264] *See, e.g., Off.  Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 969-74 (D. Del. 1994) (denying directors' motion to dismiss illegal corporate distributions claim premised upon corporate subsidiary's financing of leveraged buyout); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1000-01 (S.D.N.Y. 1991) (denying motion to dismiss claim against directors based upon DGCL sections 160 or 173 in leveraged buyout context, noting that "the economic substance of the transactions in question brings them within the purview of the relevant sections of the [DGCL]").

Although section 174 does not expressly authorize a cause of action against stockholder recipients of allegedly illegal corporate distributions, courts in the Third Circuit and elsewhere have interpreted Delaware law to recognize a cause of action against stockholders to recover the distributions paid to them.[1266] For example, in *PHP Liquidating, LLC v. Robbins*,[1267] the United States District Court for the District of Delaware considered the viability of creditors' claims against stockholders arising from an allegedly unlawful stock distribution in violation of DGCL section 160.[1268] Noting that DGCL section 174(c) specifically entitles directors who are found liable for unlawful stock redemptions to be subrogated to the rights of the corporation against stockholders who received payments with knowledge of facts indicating that they were unlawful, the court in *PHP Liquidating, LLC* concluded that stockholders could be held liable under section 174 — but only if the stockholders acted in bad faith.[1269] Although other courts addressing similar claims alleged against shareholders likewise have recognized notice of the unlawful nature of the payment or bad faith as prerequisites, other courts have not imposed this requirement.[1270]

---

[1265] *See Buckhead Am.*, 178 B.R. at 969-74; *Crowthers*, 129 B.R. at 1000-01.

[1266] *PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 609 (D. Del. 2003) (recognizing that principle, but denying relief because claim was brought by assignee of individual creditors, and not the corporation, and because of failure to allege knowledge that stock redemption was unlawful or was received in bad faith), *aff'd*, 128 F. App'x 839 (3d Cir. 2005); *Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield Steel Corp.)*, 320 B.R. 405, 415 (Bankr. N.D. Okla. 2004) (applying Delaware law); *Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 198 B.R. 352, 364-65 (Bankr. D. Colo. 1996) (applying Delaware law); *cf. Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.)*, 513 F.2d 807, 813 (6th Cir. 1975) (applying Delaware law).

[1267] 291 B.R. 603 (D. Del. 2003).

[1268] *PHP Liquidating,* 291 B.R. at 608.

[1269] *PHP Liquidating,* 291 B.R. at 608.  In the absence of any allegation of bad faith, the court concluded that the stockholders had redeemed their stock in good faith and denied the creditors' claim.  *Id.* at 609.

[1270] *See, e.g., EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 307 (3d Cir. 2002) (noting that directors "could recover from the recipients of the dividend only if the recipients had been aware of the impropriety in issuing the dividend"); *Sheffield Steel*, 320 B.R. at 415 (noting that "[i]t is not clear to the Court whether bad faith is an element of the claim which must be alleged, or good faith is an affirmative defense, which need not be pleaded," but concluding that "the Court will assume that some element of knowledge of [the corporation's] financial condition, actual or imputed, on the part of a shareholder, is required to state a claim"); *Integra Realty*, 198 B.R. at 365 (recognizing implied cause of action against stockholders to recover illegal

It bears noting that conduct that exposes a director to potential liability pursuant to DGCL

section 174 may also subject the director to liability for breach of fiduciary duty.[1271]  For

instance, a director may be charged with a breach of fiduciary duty for failing to appropriately

discharge fiduciary duties in determining whether the corporation has a surplus.[1272]  Directors

are, however, entitled to the protection of a statutory safe harbor for reliance in good faith on

valuation reports pursuant to section 172.[1273]  Section 172 provides that:[1274]

> A member of the board of directors, or a member of any committee
> designated by the board of directors, shall be fully protected in
> relying in good faith upon . . . such information, opinions, reports
> or statements presented to the corporation by any of its officers or
> employees, or committees of the board of directors, or by any other
> person as to matters the director reasonably believes are within
> such other person's professional or expert competence and who has
> been selected with reasonable care by or on behalf of the
> corporation, as to the value and amount of the assets, liabilities
> and/or net profits of the corporation or any other facts pertinent to
> the existence and amount of surplus or other funds from which
> dividends might properly be declared and paid, or with which the
> corporation's stock might properly be purchased or redeemed.

---

dividends paid, if stockholders had knowledge of illegality); *cf. Stanley v. Brock (In re Kettle Fried Chicken of Am., Inc.)*, 513 F.2d 807, 812 (6th Cir. 1975) (holding that DGCL section 160 affords a remedy for creditors against "innocent shareholders who have sold stock to the corporation in good faith and without knowledge that the capital of the corporate was impaired at the time of the sale," on basis that when "the corporate act is illegal, the shareholder's lack of knowledge of the illegality cannot be controlling").  Notably, the court in *PHP Liquidating* expressly rejected the court's recognition in *Kettle Fried Chicken* of an implied remedy against shareholders arising under DGCL section 160, as opposed to section 174, characterizing it as "unpersuasive" and "contrary to Delaware's statutory scheme."  *See PHP Liquidating,* 291 B.R. at 609.

[1271]  *See Brehm v. Eisener*, 746 A.2d 244, 264 (Del. 2000) (noting that failure to exercise "substantive due care" is "foreign to the business judgment rule"); *Propp v. Sadacca*, 175 A.2d 33, 38 (Del. Ch. 1961) (holding that chairman was not entitled to rely on business judgment rule in defending stock redemption made for the purpose of retaining control while corporation was in financial difficulty), *aff'd in relevant part and rev'd in part sub nom., Bennett v. Propp*, 187 A.2d 405 (Del. 1962).

[1272]  *Klang*, 702 A.2d at 156-57.

[1273]  *Id.* at 156 n.12.  This safe harbor is analogous to that provided by DGCL section 141(e) in the context of a breach of fiduciary duty analysis, pursuant to which directors are entitled to rely on data provided to the board. *See* Report at § IV.E.2.a.(5).

[1274]  DEL. CODE ANN. tit. 8, § 172 (2010); *see Klang*, 702 A.2d at 152 ("Directors have reasonable latitude to depart from the balance sheet to calculate surplus, so long as they evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark as to constitute actual or constructive fraud."); *see also Sheffield Steel*, 320 B.R. at 449.  Notably, exculpation of directors from section 174 liability by means of a charter provision is specifically prohibited by DGCL section 102(b)(7).  DEL. CODE ANN. tit. 8, § 107(b)(7)(iii) (2010).

### b.    Potential Preemption Issues.

Illegal corporate distribution claims pursuant to the DGCL, like unjust enrichment claims

pursuant to Delaware common law,[1275] might be vulnerable to federal preemption in the

bankruptcy context.  As discussed above, courts of the Third Circuit have interpreted the

"settlement payment" defense set forth in Bankruptcy Code section 546(e) broadly, beyond the

scope of its plain meaning.[1276]  Consistent with this reading, at least one court has held that

section 546(e) acts to bar claims for illegal corporate distributions pursuant to DGCL sections

160 and 173.[1277]  For reasons discussed above, the Examiner leaves the question of preemption

in equipoise.

### c.    Examiner's Conclusions and Explanation Concerning Application of Legal Standards to Potential Defendants.

__Examiner's Conclusions__:  A court is reasonably unlikely to find that a claim for illegal

corporate distributions pursuant to the relevant provisions of the DGCL could be sustained

against Tribune's directors based on the Step One Transactions, and is somewhat unlikely to find

that such a claim could be sustained against Tribune's directors based on the Step Two

Transactions.

---

[1275]  *See* Report at § IV.E.4.b.

[1276]  *See, e.g., Brandt v. B.A. Capital Co., L.P. (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258-59 (3d Cir. 2009) (following *Resorts International* in holding that transfer of acquisition proceeds paid for privately-traded shares in leveraged buyout transaction through financial institution was insulated under Bankruptcy Code section 546(e) as settlement payment); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 514-16 (3d Cir. 1999) (concluding that transfer of stock sale proceeds in leveraged buyout transaction from transfer agent to broker for the account of the selling stockholder, without involvement of clearing agency, constituted "settlement payment").  *See* Report at § IV.E.4.b.

[1277]  *Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 351-68, 380-81 (W.D. Pa. 2006) (examining cases interpreting section 546(e), including *Resorts International* and *Hechinger*, in holding that settlement payment defense precluded prosecution of directors under DGCL sections 160 and 173 for unlawful distributions of payments that were settled though a financial institution, financial participant, or securities clearing agency).  *But see PHP Liquidating*, 291 B.R. at 607 (rejecting argument that Bankruptcy Code section 546(e) barred creditors' claims against stockholders based on DGCL section 160).

**Explanation of Examiner's Conclusions**:

Certain Parties argued that Tribune violated DGCL sections 160 and 173 by making payments to Selling Stockholders pursuant to the Tender Offer and Merger components of the Leveraged LBO Transactions, such that the Tribune Board, having authorized these payments, should be held jointly and severally liable to the corporation for willful or negligent violation of these provisions pursuant to DGCL section 174.

The Selling Stockholders received approximately $4.284 billion in connection with the Tender Offer at Step One.[1278]  As detailed in another part of the Report, the record adduced in this Investigation likely fails to establish that the Tender Offer occurred at a time when Tribune's capital was impaired, or that the Tender Offer caused an impairment of Tribune's capital.[1279] Absent this prerequisite, a claim pursuant to DGCL sections 160 and 173 arise from Tribune's payments to the Selling Stockholders in connection with the Tender Offer.  Even if insolvency could be demonstrated in hindsight, a court would be reasonably likely to find that the Tribune Board is entitled to the protection of DGCL section 172.  As described above, this safe harbor provision shields the Tribune Board from exposure pursuant to DGCL section 174 to the extent that, in approving the Tender Offer, it relied in good faith on information, opinions, reports, or statements regarding Tribune's finances presented by officers, employees, committees, or any other persons, selected with reasonable care, concerning matters reasonably believed to be within the professional or expert competence of those persons.  The evidence in the record reflects that the Tribune Board relied in good faith on the information provided to it by the Special Committee and its Financial Advisors in deciding to authorize the Tender Offer.[1280]

---

[1278]  *See* Report at § IV.B.1.

[1279]  *See id.* at § IV.B.5.d.(8)-IV.B.5.d.(9).

[1280]  *See id.* at § III.D.1.f. and III.D.1.g.

The Selling Stockholders also received approximately $3.982 billion in Merger Consideration in connection with Step Two.[1281]  As discussed in another part of the Report, the Examiner concludes that it is highly likely that Tribune and reasonably likely that the Guarantor Subsidiaries were rendered insolvent at Step Two.[1282]  As a result, a claim against Tribune's directors pursuant to DGCL sections 160 and 173 could potentially arise from Tribune's payment of the Merger Consideration at Step Two unless their good faith reliance on solvency analyses presented to them triggers the protection of the safe harbor provision of DGCL section 172.

As described elsewhere in the Report, the record adduced in this Investigation indicates that the Tribune Board failed to carefully scrutinize information presented by Tribune management and by VRC in order to evaluate the risk that closing on the Step Two Transactions would render Tribune insolvent.[1283]  If the Tribune Board relied blindly on flawed or inaccurate data or projections presented to it without making any reasonable inquiry into the soundness of this information, a question would arise as to whether the Tribune Board is protected from liability under DGCL section 174 by the safe harbor provision.[1284]  Here, however, as discussed previously, the record reflects at least some modicum of inquiry and evaluation by the Tribune Board, and probably falls short of supporting any finding of conscious abdication of responsibility or intentional wrongdoing in the Tribune Board's deliberations at Step Two.[1285]

---

[1281]  *See id.* at § IV.B.1.

[1282]  *See id.* at §§ IV.B.5.d.(10), IV.B.5.d.(11).

[1283]  *See id.* at § IV.B.4.c.(5).

[1284]  *See Klang*, 702 A.2d at 152; *see also Van Gorkom*, 488 A.2d at 875-88; *Mills Acquisition*, 559 A.2d at 1283-84.

[1285]  *See* Report at §§ IV.E.2.e.(4), IV.E.2.e.(5).

6.    **Professional Malpractice Claims.**[1286]

a.    **Legal Standard for Professional Malpractice Claims.**

Illinois defines "malpractice" generally as "[a]n instance of negligence or incompetence on the part of a professional."[1287]  Under Illinois law, the elements of a cause of action for professional malpractice are the same as the elements necessary to establish a negligence case: "the existence of a relationship between the professional and client, a duty arising from that relationship, a breach of that duty, causation, and damages resulting from that breach."[1288]  In such cases, the duty coincides with the elevated position the law assigns to professionals:  "In . . . a professional negligence case, the standard of care required of a defendant is to act as would an 'ordinarily careful professional.'  Pursuant to this standard of care, professionals are expected to use the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances."[1289]  To establish a malpractice cause of action in Illinois, a plaintiff must use an expert witness to establish both "(1) the standard of care expected of the

---

[1286] The Parties only raised a potential professional malpractice claim against VRC for alleged negligence in its preparation of the solvency opinions.  Somewhat surprisingly, no Party advocated any malpractice claims against other participants in the Leveraged ESOP Transactions.  Thus, the Examiner did not evaluate the merits of any professional malpractice claims against any entities other than VRC.

[1287] *Childs v. Pinnacle Health Care, LLC*, 926 N.E.2d 807, 819-20 (Ill. App. Ct. 2010); *see also Roe v. Catholic Charities of the Diocese of Springfield, Ill.*, 588 N.E.2d 354, 363 (Ill. App. Ct. 1992) ("'Malpractice' is defined . . . as '[a]ny professional misconduct, unreasonable lack of skill or fidelity in professional or fiduciary duties, evil practice, or illegal or immoral conduct.'") (quoting BLACK'S LAW DICTIONARY 1111 (4th rev. ed. 1968)).

[1288] *Bus. Commc'ns, Inc. v. Freeman*, 1994 U.S. Dist. LEXIS 2304, at *10 (N.D. Ill. Mar. 2, 1994) (evaluating claim of malpractice in performance of accounting services under Illinois law); *see also MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006) (same); *Catholic Charities of Springfield*, 588 N.E.2d at 363 (addressing claim of social worker malpractice under Illinois law); *cf. Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 630 (Del. Ch. 2005) (citing substantially identical elements for claim of professional malpractice under Delaware law), *aff'd in part and rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006).

[1289] *Jones v. Chi. HMO Ltd.*, 730 N.E.2d 1119, 1130 (Ill. 2000) (citations omitted); *cf. Wal-Mart Stores*, 872 A.2d at 630 n.89 (stating that "'professionals' are held to a higher standard of care").

professional and (2) [that] the professional's deviation from the standard caused the plaintiff's injury."[1290]

Under Illinois law, the duty of care exists when the litigants "stand in such a relationship to one another that the law imposes upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff."[1291]  Whether such a duty is owed is a question of law.[1292]  In making that assessment, the court must examine the foreseeability, likelihood, and gravity of the harm or injury; the magnitude of the burden of guarding against the harm or injury and the consequences of imposing such a burden; and the utility of the challenged conduct.[1293]

In evaluating the viability of a professional malpractice claim under Illinois law when the parties' relationship is based on a contract, the court must consider Illinois' version of the economic loss doctrine, known as the "*Moorman* doctrine."[1294]  Under this doctrine, when a claimant's only incurred loss is economic,[1295] the claimant generally is limited to contract damages, "even if the defendant's alleged conduct [would otherwise have] constituted a tort as

---

[1290] *Kinzinger v. Tull*, 770 N.E.2d 246, 253 (Ill. App. Ct. 2002) (noting standard for "professional malpractice cases"); *see also Chi. HMO Ltd.*, 730 N.E.2d at 1130 (stating that "[t]he rationale for requiring expert testimony is that a lay juror is not skilled in the profession and thus is not equipped to determine what constitutes reasonable care in professional conduct without the help of expert testimony," although exceptions exist where the expert's behavior is "so grossly negligent" or the proper behavior "so common that a lay juror could readily appraise it").

[1291] *AYH Holdings, Inc. v. Avreco, Inc.*, 826 N.E.2d 1111, 1125 (Ill. App. Ct. 2005) (quotations and citations omitted).

[1292] *See Chi. HMO Ltd.*, 730 N.E.2d at 1134 ("Whether a duty exists is a question of law to be determined by the court.") (citation omitted); *AYH Holdings, Inc.*, 826 N.E.2d at 1125 (same effect); *Catholic Charities of Springfield*, 225 Ill. App. 3d at 533, 588 N.E.2d at 363 (same effect).

[1293] *See AYH Holdings,* 826 N.E.2d at 1125-26 (citations omitted); *Catholic Charities of Springfield*, 588 N.E.2d at 363 (citation omitted); *see also Chi. HMO Ltd.*, 730 N.E.2d at 1134 (listing factors in context of medical malpractice against health maintenance organization).

[1294] *Chatz v. Bearing Point Inc. (In re Nanovation Techs., Inc.)*, 364 B.R. 308, 343 (Bankr. N.D. Ill. 2007) (discussing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (1982)).

[1295] The Illinois Supreme Court defined "economic loss" to encompass "'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits – without any claim of personal injury or damage to other property . . .' as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" *Moorman*, 435 N.E.2d at 449 (citations omitted).

well as a breach of contract."[1296]  Nevertheless, the *Moorman* doctrine does not apply to prevent

recovery in tort when the defendant has either made (1) intentionally false representations, or (2)

negligent misrepresentations and "is in the business of supplying information for the guidance of

others in their business transactions."[1297]  This latter exception, known as the "business

professional exception" to the *Moorman* doctrine, removes the economic loss bar from

professional malpractice actions against attorneys, accountants, and business consultants.[1298]  As

such, a professional malpractice claim against such professionals may, under Illinois law, "be

couched in either contract or tort law."[1299]

> **b.    Legal Standards Governing In Pari Delicto Defenses to Professional Malpractice Claims.**

Illinois law recognizes the doctrine of in pari delicto.[1300]  As applied in Illinois, in pari

delicto dictates that, when opposing litigants are "of equal knowledge, willfulness and wrongful

intent" as respects an illegal act, "the law will not aid either party" but will instead "leave them

---

[1296]  *Nanovation Techs.,* 364 B.R. at 343.  In *Moorman*, the Illinois Supreme Court had reasoned that "[w]hen the defect is of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality so that it is fit for ordinary use, contract, rather than tort, law provides the appropriate set of rules for recovery."  *Moorman*, 435 N.E.2d at 451.

[1297]  *Nanovation Techs.,* 364 B.R. at 343; *Moorman*, 435 N.E.2d at 452.

[1298]  *Nanovation Techs.,* 364 B.R. at 343-44 (finding the "business professional exception" to the *Moorman* doctrine applicable to permit professional negligence claim against KPMG for performance of stock valuation services) (citations omitted); *see also Congregation of the Passion*, 636 N.E.2d 503, 512-15 (Ill. 1994) (in assessing whether the economic loss doctrine bars tort recovery against accountants, "[w]e find that it does not"); *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 666 N.E.2d 881, 885 (Ill. App. Ct. 1996) ("[T]he *Moorman* doctrine does not bar recovery for economic losses for professional malpractice actions against accountants."); *Waters v. Reingold*, 663 N.E.2d 126, 135 (Ill. App. Ct. 1996) (same), *overruled on other grounds by Niccum v. Botti, Marinaccio, DeSalvo & Tameling, Ltd.*, 694 N.E.2d 562 (Ill. 1998); *Lozosky v. State*, 2001 Ill. Ct. Cl. LEXIS 29, at *14 n.2 (Ill. Ct. Cl. July 19, 2001) (observing that Illinois Supreme Court "'has seen fit to continue a piecemeal approach to applying the *Moorman* doctrine to professional malpractice of architects and . . . engineers but not to attorneys or accountants'") (citation omitted).

[1299]  *Waters*, 663 N.E.2d at 135.

[1300]  *King v. First Capital Fin. Servs. Corp.*, 828 N.E.2d 1155, 1173 (Ill. 2005).

Case 08-13141-BLS   Doc 7562-1   Filed 01/19/11   Page 469 of 590

without remedy as against each other."[1301]   In identifying an entity's status for purposes of in pari delicto, the doctrine borrows the familiar tenet that "[s]ince corporations act through their officers, the actions of the officers are . . . imputed to the corporation."[1302]  Thus, when a corporate officer commits a fraud, for example, that fraud is imputed back to the officer's corporation — provided the fraud was committed in the course of employment and for the corporation's benefit.[1303]  If so imputed, the officer's wrongful conduct triggers in pari delicto and, in turn, defeats any claim by the corporation against defendants complicit in the wrongdoing.[1304]  If that corporation has entered bankruptcy, the trustee steps into the corporation's shoes, and normally succeeds to the rights of (and becomes exposed to the defenses against) the corporation.[1305]

Two recent decisions have examined the in pari delicto doctrine under Illinois law in circumstances instructive on the doctrine's application here.[1306]  Both cases confronted the doctrine in a professional malpractice context asserted against a corporation's auditors and

---

[1301]  *Vine St. Clinic v. HealthLink, Inc.*, 856 N.E.2d 422, 436 (Ill. 2006) (citations omitted); *Ctr. for Athletic Med., Ltd. v. Indep. Med. Billers, Inc.*, 889 N.E.2d 750, 759-60 (Ill. App. Ct. 2008).

[1302]  *Grede v. McGladrey & Pullen LLP*, 421 B.R. 879, 885 (N.D. Ill. 2009); *see also McRaith v. BDO Seidman, LLP*, 909 N.E.2d 310, 331 (Ill. App. Ct. 2009) ("Generally, the knowledge and conduct of agents are imputed to their principals.").

[1303]  *See Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3d Cir. 2001).

[1304]  *See R.F. Lafferty & Co.*, 267 F.3d at 355 ("If wrongdoing is imputed, then the *in pari delicto* doctrine comes into play and bars a suit.").

[1305]  *See Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition."); *Grede*, 421 B.R. at 885 ("The essential principle of bankruptcy law is that the trustee stands in the exact place of the debtor.").

[1306]  Illinois law would govern the application of the *in pari delicto* defense, because the cause of action for malpractice would be under Illinois law.  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 90 (1994) (Stevens, J., concurring) ("Because state law provides the basis for respondent FDIC's claim, that law also governs both the elements of the cause of action and its defenses.").

considered whether the alleged fraud of corporate officers must be imputed against, respectively, a bankruptcy trustee and the liquidator of insolvent insurance companies.[1307]

In *Grede v. McGladrey & Pullen LLP*, the United States District Court for the Northern District of Illinois found "a clear consensus" in the case law that bankruptcy trustees are not insulated from the assertion of the in pari delicto defense and do not possess a sort of "innocent successor" antidote to the doctrine's effect.[1308]  Nevertheless, although lacking a broad categorical insulation from the doctrine, the court observed that bankruptcy trustees still retain the ability to defeat in pari delicto if the corporate officers' fraud "was not perpetrated for the benefit of the debtor corporation, but rather only for the benefit of the wrongdoers . . . ."[1309]  The court emphasized, however, that this "adverse interest exception" applies only "when the corporate officers act entirely for their own interests and the actions do not benefit the corporation."[1310]

The court explained the narrow scope of the exception as follows:[1311]

> The reason one must carefully examine what benefit accrued to the corporation is that corporate officers, even in the most upright enterprises, can always be said, in some meaningful sense, to act for their own interests, particularly when those officers own all or a very large piece of the business and control it.  The adverse interest exception swallows the rule if all that is required to invoke it is a secondary, or indirect benefit of keeping the enterprise alive to preserve their jobs or increase the paper value of their ownership shares.

Having established these governing principles, the court still denied the auditors' motion to dismiss the trustee's malpractice claim on in pari delicto grounds, citing the uncertainty on the

---

[1307] *Grede*, 421 B.R. at 884 (assessing doctrine's applicability against bankruptcy trustee); *McRaith*, 909 N.E.2d at 331 (assessing doctrine's applicability against liquidator of insolvent insurers).

[1308] *Id*. at 885 (collecting cases).

[1309] *Id*. at 885-86.

[1310] *Id*. at 886.

[1311] *Id*.

undeveloped record whether the benefits alleged to have befallen the corporate debtor were truly

"meaningful" or merely "illusory."[1312]

The in pari delicto defense met with even less success before the Appellate Court of

Illinois in *McRaith v. BDO Seidman, LLP*.[1313]  In that case, the director of the Illinois Division of

Insurance, as liquidator of an insolvent insurance company, sued BDO Siedman for malpractice

in its audit of the insurance company and BDO Seidman asserted in the in pari delicto defense

based on the fraud of the insurance company's principal.[1314]  The director asserted that in pari

delicto should not apply to him as liquidator of the insurance company and that, in any event, the

adverse interest exception would apply.[1315]  As in *Grede*, the court recognized the existence of

the adverse interest exception and found that the director has alleged facts that would trigger the

exception.[1316]  However, the court further held:[1317]

> In the instant case, the *in pari delicto* doctrine cannot apply
> because the Liquidator, by statutory definition, is not the
> wrongdoer; rather, he serves to protect the insurance industry and
> the public interest by ensuring the victims of the misconduct can
> recover monies entitled to them.  To equate the Liquidator with
> Engle under *in pari delicto* is illogical and unavailing. . . . [¶]
> Accordingly, we find as a matter of first impression that the

---

[1312] *Id.* at 888-89.  That said, the court was not especially bullish on the trustee's chances of ultimately defeating in pari delicto as the record matured.  *See id.* at 888 ("I would rate [the trustee's] potential success to be less than certain.").  Indeed, the court noted the apparent soundness of the complaint's allegations of benefits to the corporation from the claimed fraud:  "Its apparent success attracted clients and capital, reduced debt, increased income from investments and increased trading gains allowed to [the corporation's] own account. . . .  [T]he benefit was of limited duration.  *But that is enough.*"  *Id.* at 886 (emphasis added).

[1313] 909 N.E.2d 310 (Ill. App. Ct. 2009).

[1314] *Id.* at 314.

[1315] *Id.* at 329.

[1316] *Id.* at 331 ("An exception to this [officer-action-imputed-to-corporation] rule exists where the agent's interests are adverse to the principal."); *see also id.* at 332 ("'[W]hen a corporate officer or agent engages in fraudulent conduct for the distinctly private purpose of lining his own pockets at his corporation's expense, it is unlawful, as well as illogical, to impute the agent's guilty knowledge or disloyal, predatory conduct to his corporate principal.'" (quoting *Reider v. Arthur Andersen, LLP*, 784 A.2d 464, 470 (Conn. Super. Ct. 2001)).

[1317] 909 N.E.2d 310, 336 (Ill. App. Ct. 2009).  *But see Holland v. Arthur Andersen & Co.*, 469 N.E.2d 419, 424 (Ill. App. Ct. 1984) (holding that *in pari delicto* barred action because "liquidation trustee may only pursue those claims which belong to the estate of the debtor corporation").

imputation defense is inapplicable against the Liquidator.

> **c.**   **Effect of Indemnification Rights on Professional Malpractice Claims.**

Under Illinois law, an indemnity contract that is clear, explicit, and unambiguous must be enforced as written.[1318]   A contract that agrees to indemnify a negligent actor from its own negligence falls within this general rule and, under Illinois law, must be enforced.[1319]   In fact, enforcement of an indemnification against willful misconduct is not always foreclosed.[1320] Likewise, when an agreement includes a clause imposing a limitation on damages, such a clause is enforceable under Illinois law as long as the limitation is expressly stated and no public policy bar exists.[1321]

In connection with Tribune's engagement of VRC to prepare the solvency opinions, Tribune executed an Indemnification Agreement in favor of VRC.[1322]   In the Indemnification Agreement, Tribune agreed that:[1323]

> [N]o Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or the Company's equity holders or creditors related to, arising out of or in connection with VRC's engagement except to the extent that any loss, claim, damage or liability is found . . . to have resulted primarily from such Indemnified Person's bad faith, willful misconduct or gross negligence.

The Indemnification Agreement also included a limitation on damages, stating that:[1324]

---

[1318]   *See Chi. Hous. Auth. v. Fed. Sec., Inc.*, 161 F.3d 485, 487-88 (7th Cir. 1998).

[1319]   *See id.* at 487-88 (noting that such indemnification need not be accomplished by "specific reference," if an indemnity against negligence is a "fair and reasonable interpretation based upon a consideration of all of its language and provisions") (citations omitted).

[1320]   *See id.* at 488, 489 (although such indemnification is "as a general rule" against public policy, "[w]e see nothing in the general Illinois rule against contracts to indemnify someone for the consequences of its intentional or negligent acts that would preclude enforcement of a contract requiring the primary wrongdoer to bear the financial burden of its actions.") (citations omitted).

[1321]   *See ExxonMobil Oil Corp. v. Amex Constr. Co.*, 2010 U.S. Dist. LEXIS 26343, at *71-72 (N.D. Ill. Mar. 19, 2010).

[1322]   *See* Ex. 263 (Solvency Engagement Letter with attached Indemnification Agreement between the Company and VRC, dated April 11, 2007).

[1323]   *Id*. (Indemnification Agreement).

> The Company agrees that in the event of any claim brought by the Company against VRC relating to the Engagement Letter, VRC's liability to the Company shall be limited to the total amount of fees paid by the Company to VRC under the Engagement Letter.  This limitation of liability shall not apply to any damages determined to have resulted from VRC's bad faith, gross negligence or willful misconduct.

### d.    Examiner's Conclusions and Explanation Concerning Application of Legal Standards to VRC.

**Examiner's Conclusions:**  The Examiner leaves in equipoise the question whether a professional malpractice claim could be sustained against VRC.

### Explanation of Examiner's Conclusions:

As described in detail in another part of the Report, VRC's Step One and Step Two opinions contained  faulty assumptions and methodological errors.[1325]  A court evaluating a professional malpractice claim against VRC under Illinois law would require expert testimony regarding both the standard of care to which VRC must be held, and whether VRC's conduct deviated from that standard of care.[1326]  Because of the compressed timetable of the Investigation, the Examiner was unable to devote sufficient resources to formulate a conclusion whether VRC committed malpractice.  Moreover, for the reasons discussed in the Examiner's analysis of a potential aiding and abetting claim against VRC, the Examiner did not have an opportunity to fully investigate various questions relating to VRC's actions during the Step Two timeframe.  As a result, the Examiner is unable to reach conclusions on these matters based on the record adduced to date.[1327]

---

[1324]   *See id.*

[1325]   *See* Report at §§ III.E.3.c.(4) (Step One) and III.H.3.f (Step Two).

[1326]   *See Jones v. Chicago HMO Ltd. of Ill.*, 730 N.E.2d 1119, 1130 (Ill. 2000).

[1327]   Readers are advised that in the course of the final quality control review performed by the Examiner's financial advisor shortly before issuance of the Report, the Examiner's financial advisor determined to make the following revisions to the computation of the S-Corporation/ESOP tax avoidance benefit discussed in the Report at § IV.B.5.c.(6).  The value of this benefit was reduced as a result of adjusting certain interim period revenue growth rates used in the calculation of this benefit to conform to growth rates used in other projections

developed by the Examiner's financial advisor.  The Examiner's financial advisor also adjusted the projected annual interest expense for purposes of calculating the tax avoidance benefit to conform to the interest expense calculated in other projections developed by the Examiner's financial advisor.  Finally, the Examiner's financial advisor determined to revise the calculation of estimated state tax for deduction in the determination of factual taxable income to comport with management's and VRC's assumed 2% state tax rate.  On an overall basis, these three adjustments increased the value of the S-Corporation/ESOP tax avoidance benefit from the $482.5 million to $488.6 million.  In addition, as part of the same final review, in connection with the DCF Valuation Analysis discussed in the Report at § IV.B.5.d.(10). and Annex A to Volume Two, the Examiner's financial advisor determined that the amount of corporate expense projected for purposes of determining the enterprise value of Tribune was modestly under-quantified.  In addition, the Examiner's financial adviser determined that the amount of Tribune's annual capital expenditure investment was, for purposes of calculating Tribune's enterprise value, underestimated for the Publishing Segment in 2012.  Adjusting these two model parameters resulted in an increase in enterprise value of $24.9 million, from $7,798.8 million to $7,823.7 million (0.3%).  The Examiner's financial advisor did not have sufficient time before issuance of the Report to run these changes through the various models underlying the financial analysis contained in the Report.  The impact of these changes are not material to the Examiner's conclusions reached in the Report.

# ANNEX A

# DISCOUNTED CASH FLOW ANALYSIS

This Annex first discusses certain valuation methodologies and the relevance and applicability of those methods to establishing a value for Tribune at the Step Two Financing Closing Date. In particular, the Examiner's financial advisor discusses why the use of a DCF approach to valuing Tribune's operating assets is, in this case, preferable to other market-based approaches to valuation. This Annex then discusses: (a) the DCF valuation model prepared by the Examiner's financial advisor, (b) the approach to, and development of interim period projections of revenues and EBITDA, or operating cash flow, for each of the Publishing Segment and the Broadcasting Segment, (c) the manner in which these forecasts of EBITDA were converted to cash flow, by taking into account, for example, expected capital expenditures, (d) the development and selection of long-term growth rates for each of the Publishing Segment and Broadcasting Segment, as well as Tribune's nascent interactive business, as those expectations would apply for periods subsequent to the interim period cash flow projections discussed above, (e) the selection of discount rates that the Examiner's financial advisor used to convert forecasted cash flows (including both discrete period and long-term, or perpetuity cash flow expectations) to present value, for purposes of establishing a value of Tribune's operating assets at the Step Two Closing Date, and (f) the value of Tribune's non-operating assets.

### A.    Valuation of Tribune's Operating Assets.

### 1.    Methodological Overview.

The Examiner's financial advisor valued Tribune's operating assets at the Step Two Financing Closing Date by first determining whether market-based valuation methodologies commonly considered in connection with performing business valuations were likely to lead to credible indications of the value of Tribune's operating assets, recognizing that such approaches to valuation can lead to invalid valuation conclusions absent sufficiently similar "cohort" (or comparable) companies or transactions from which performance metrics (*e.g.*, EBITDA multiples) can reasonably be applied to the valuation subject (in this case, Tribune). Comparability was assessed by reviewing cohort companies identified by Tribune, VRC and various financial advisors in the events culminating in the Leveraged ESOP Transactions.[1] For several reasons, the Examiner's financial advisors concluded that less meaningful valuation conclusions would be derived from the use of such market-based methodologies than would be derived from using a DCF approach.

---

[1]    *See* Report at § III.H.3.

The Examiner's financial advisor considered, for example, that market multiples quantified by VRC at Step Two demonstrated significant variability[2] with respect to both companies identified as comparable to the Publishing Segment and the Broadcasting Segment.[3]

---

[2]    This variability, in Examiner's financial advisor's opinion, was partially the result of VRC's selected cohorts not being sufficiently comparable to Tribune to allow for meaningful valuation conclusions to be determined on the basis of multiples derived from the cohort companies.

[3]    The table below summarizes, for example, the LTM EBITDA multiples quantified by VRC as part of its Step Two analyses, for identified companies that VRC believed to be comparable to the Publishing Segment.



**VRC's Publishing Trading Multiples**
**(at Step Two)**

*Source:* Ex. 742 at VRC0063398 (VRC Draft Solvency Analysis, dated November 30, 2007).

The table reflects that multiples can also be upwardly or downwardly biased due to the inclusion of "outlier" statistics, as well as the inclusion of non-comparable companies' multiples as part of the cohort company identification and selection process.  Valuation results could differ, for example, by nearly 100% by selecting one multiple (10x for The Washington Post) versus another (5.1x for McClatchy).

Tribune's identified Broadcasting Segment cohorts as selected by VRC also exhibited significant variability.

Significant variability, in turn, limited the reliability of valuation results predicated on those methods: [4]

> The extent to which the valuation multiples are tightly clustered or widely dispersed tends to indicate the extent to which the market tends to focus on that particular multiple in pricing stock in the particular industry.  For this reason, when analyzing the guideline companies, the analyst may want to calculate not only measures of central tendency (such as mean and median), but also measures of dispersion (such as standard deviation and coefficient of variation).

> Generally, the lower the dispersion of the valuation multiples, the greater the weight the analyst might consider according to that

---

**VRC Publishing Comparable Transaction Multiples
(at Step Two)**



*Source:* Ex. 742 at VRC0063400 (VRC Draft Solvency Analysis, dated November 30, 2007).

Transaction multiples can also result in unreliable valuation conclusions.

> In theory, the M&A market is the true reflection of current interaction between willing sellers and willing buyers.  In the real world, however, this is rarely the case.  Corporations are not yellow pencils, quickly stacked and easily matched; it is difficult to make true comparisons of complex situations – in one way or another virtually every M&A sale can be considered special or extraordinary.  Furthermore, the M&A market often evinces aberrations – companies selling too low when suffering distressed conditions and companies selling too high when faddish or foolish buyers are over-eager to acquire.

> SHANNON P. PRATT, VALUING A BUSINESS 265 (4th Ed. 2000).

[4]    SHANNON P. PRATT, VALUING A BUSINESS 291 (5th Ed. 2007).

> multiple.  In some cases, the guideline company table may lead the
> analyst to conclude that the valuation multiples based on some
> particular financial fundamental are so widely dispersed that those
> multiples have no usefulness as guidance to value.

Because quantitative adjustments necessary to normalize for differentiating
characteristics are difficult to accurately estimate (and were, as discussed previously herein, not
quantified accurately by VRC at Step Two),[5] the Examiner's financial advisor determined to give
little weight to valuation results derived using multiple-based valuation methodologies, but
instead focused on establishing a value for Tribune's assets based on the use of a DCF
methodology.

---

[5]  VRC (and others) established cohort company multiples by determining operating asset enterprise values for
such companies and expressing those values as multiples of, for example, each company's LTM EBITDA.  To
calculate operating asset enterprise values, VRC first determined an overall value for each company (inclusive
of the value of non-operating assets such as equity ownership interests of the type owned by Tribune).  This was
accomplished by adding to observed equity values (based on shares outstanding multiplied by observed stock
prices) the recorded value of each company's net debt from respective SEC filings.  These concluded total
enterprise values for each cohort were then reduced by the recorded "book value" of each company's investment
in non-operating assets, when applicable.  The resulting "value" of *operating* assets was then expressed as a
multiple of, for example, LTM EBITDA.  By adjusting total values for the cohorts by the book value of non-
operating asset equity investments, multiples were likely significantly overstated, because the market value of
such assets would be expected to be at least as much as the recorded book value.  Multiples so calculated were
then applied to Tribune performance metrics (e.g., LTM EBITDA) to value Tribune's operating assets.

An example illustrates the point.  In a hypothetical in which a cohort company (which earned $10,000,000 in
LTM EBITDA) has an enterprise value of $110,000,000, while owning non-operating assets worth $30,000,000
(but recorded at book value of $10,000,000), very different multiples results will be calculated depending on
whether the adjustment necessary to calculate an *operating* asset valuation multiple is done at market value
versus book value.  In this hypothetical example, the book basis EBITDA multiple overstates value by 25% (8x
v. 10x).

|  | Book Adj. | Fair Value Adj. |
|---|---|---|
| Total Enterprise Value | $ 110,000,000 | $ 110,000,000 |
| Adjustment to Revenue Non- | | |
| Operating Asset Value | $ (10,000,000) | $ (30,000,000) |
| Operating Asset Value | $ 100,000,000 | $ 80,000,000 |
| LTM EBITDA | $ 10,000,000 | $ 10,000,000 |
| LTM EBITDA Multiples | 10X | 8X |

B.    **DCF Valuation of Tribune's Operating Assets**

1.    **Overview**

Because DCF valuation conclusions principally depend on forecasts of future cash flow for discrete periods, assumptions on terminal value (*i.e.*, timing and use of exit multiples or perpetuity growth rate methodologies), and selection of an appropriate weighted average cost(s) of capital (or "discount rate(s)"), or a range of discount rates, the Examiner's financial advisor focused its investigation on these important components of the DCF model inputs.[6]

In conducting a DCF valuation of Tribune's operating assets, the Examiner's financial advisor initially obtained projections prepared by Tribune management, including those provided to, and relied upon by, VRC as the basis for its valuation of Tribune. The Examiner's financial advisor noted, whenever possible, Tribune's rationale (to the extent ascertainable) underlying the projections, expectations of value, and salability of non-core assets, and other relevant cash flow projection parameters.[7] These components then were evaluated for reasonableness. This assessment, in turn, included review and evaluation of: (a) Tribune's near-term and longer term historical financial performance (by business unit when feasible), (b) the process undertaken by Tribune management to develop the projections (including February 2007, April 2007 (the basis for VRC's May 2007 solvency opinion model), and November 2007 (the basis for VRC's December 2007 solvency opinion model) iterations of those projections), (c) the expectations of Tribune's future performance held by analysts reporting on Tribune, (d) relevant market trends and expectations of future performance related thereto, a review of the record in this case (including depositions transcripts, sworn interview transcripts and interview notes), and (e) the valuation impact and significance of certain specific changes in the scope of, and key growth assumptions informing the projections.[8]

---

[6]    DCF is a forward looking approach that estimates firm value as the discounted value of expected future cash flows. As such, it is sensitive to a number of assumptions used to derive the cash flows or discount rates. In contrast to the relative valuation models, however, this approach requires that the analyst be explicit about these important assumptions. DCF models are considered by some commentators to be the most useful measure of intrinsic value. EDWARD ALTMAN AND EDITH HOTCHKISS, CORPORATE FINANCIAL DISTRESS AND BANKRUPTCY 109 (3rd Ed. 2006).

[7]    A comparison of Tribune's projections as relied upon by VRC for its May 2007 and December 2007 solvency opinions is particularly illuminating, particularly with regard to the reasonableness of the December 2007 projections of cash flows. These cash flows were used to inform both the market and discounted cash flow valuation method models used by VRC in connection with the rendering of its Step Two solvency opinion, as discussed herein, particularly given Tribune's adverse performance against its February 2007 plan.

[8]    In addition to reviewing management's projection models (including, among others, those presented to the Tribune Board in February 2007 and October 2007), the Examiner's financial advisor reviewed certain comparative analyses of projections undertaken by VRC as part of its due diligence. The Examiner's financial advisor also conducted independent research in order to evaluate the reasonableness of the revenue and operating cash flow expectations informing Tribune management's and VRC's projections of Tribune operating performance. In connection with such efforts, the Examiner's financial advisor evaluated the expectations of the general market and Tribune-specific performance espoused by certain publishing and broadcasting investment analysts that were following Tribune through the date of the Step Two Financing Closing Date.

As of December 20, 2007, most of Tribune's businesses were mature, with little prospect for significant future growth or improved profitability relative to prior performance or beyond industry-wide expectations for similarly situated businesses.  As a result, the Examiner's financial advisor evaluated the reasonableness of certain contemplated revenue and profitability enhancement effects of "transformative" changes identified by Tribune management during the course of 2007.  As part of its strategic plan underlying its projections in the fall of 2007, however, Tribune management assumed that Tribune's interactive business would be a significant source of growth.  Because the forecasted growth and profitability characteristics of Tribune's interactive business, as envisioned by Tribune management, are distinguishable from Tribune's traditional and more mature lines of business (the print advertising and circulation components of the Publishing Segment and the Broadcasting Segment), and because management's interactive business revenue growth and profitability expectations were much more aggressive, and much less certain in terms of realization (and therefore exhibited a very differentiable risk profile in relation to Tribune's other businesses),[9] as part of its independent DCF valuation exercise, the Examiner's financial advisor elected to segregate that component of Tribune's business from its other business segments for forecasting and discounting purposes.

On the basis of a review and assessment of management's projections, Tribune's historical financial performance, VRC's analytical work, and industry and analyst expectations, the Examiner's financial advisor developed independent projections of expected revenue and EBITDA performance for Tribune's legacy publishing, and broadcasting and entertainment segments over a five-year discrete period projection horizon (given the relatively mature nature of these businesses).  The Examiner's financial advisor also developed a ten-year projection of interactive business revenue and EBITDA expectations (given the less mature and more aggressive growth and profitability outlook for this business).  For purposes of its DCF analysis, the Examiner's financial advisor then considered terminal values for each business segment.  For reasons articulated below, these independently developed projections, considered reasonable by the Examiner's financial advisor, are less optimistic than those prepared by Tribune and relied on by VRC for its Step Two solvency opinion.[10]

---

Of particular note, the Examiner identified an October 2007 VRC assessment of Tribune's revenue and expense growth rate assumptions informing Tribune's then-existing projections.  The details of that assessment were memorialized in a late October 2007 internal VRC memorandum which, according to Bryan Browning of VRC, was the result of a routine procedure whereby analysts assisting him on valuation projects memorialized their work.  The Examiner's financial advisor, in developing independent projections, considered VRC's commentary on the reasonableness of management's projections as contained in that memorandum, as well.  *See* Report at § III.H.3.

[9]    The relative risk and uncertainty of projections of interactive financial performance was specifically acknowledged by Mr. Landon and Mr. Zell, among others, during their interviews conducted by the Examiner.  Examiner's Interview of Samuel Zell, June 14, 2010; Examiner's Interview of Timothy Landon, June 22, 2010.

[10]    The Examiner notes that the revenue and expense projections (and resultant EBITDA forecasts) developed by his financial advisor are sometimes more consistent with alternative projection parameters discussed in a VRC October 2007 critique of management's projections.  This fact, in the Examiner's view, adds to the credibility of the revised expectations as developed by the Examiner's financial advisor.

The Examiner also recognizes that valuation analysis involves the use of judgment.  Although the Examiner believes that the projections developed by management and relied on by VRC for purposes of rendering its Step

C.    **Publishing Segment.**

1.    **DCF Model Assumptions.**

In a comprehensive review of the status of the newspaper industry dated December 11, 2007, [11] Credit Suisse analysts John Klim and Jim Kim assessed and reported on the factors then influencing expected performance of a group of newspaper companies for which they provided coverage.[12]  The report contains numerous references to, and discussion of, the "secular decline" then facing the newspaper industry.  In one such discussion, the analysts summarized the fundamental factors contributing to the secular decline effecting the industry as follows:[13]

> In the analog world of yesteryear, significant fixed costs associated with producing news on a daily basis insulated newspapers from new entrants. These barriers to entry afforded newspapers the dominant position in the local media market, allowing publishers to push ad rates well above the rate of inflation while driving healthy returns for investors.

> Times have certainly changed and the benefits that accompanied the industry's once quasi-monopolistic operating environment are rapidly being torn away by disruptive, new competitors. Technology has lowered production and distribution costs, expanded the domain of potential delivery channels, and empowered consumers.

The shift in consumer preferences described by the analysts is evidenced by the declining number of, and circulation related to, newspapers:

---

Two solvency opinion are excessively optimistic, the Examiner acknowledges that reasonable analysts can disagree.  The Examiner believes that the alternative projections discussed herein, and valuation conclusions that result therefrom, are reasonable and appropriate.  On the basis of such expectations, the Examiner concludes that a court would reasonably find that Tribune was insolvent at Step Two.  If contested, the ultimate resolution of those issues would, of course, be the subject of expert and fact witness testimony.  The Examiner further believes that market indicia would also be a factor considered by a court on the question of solvency and that information derived therefrom is likely to be considered corroborative (if not dispositive) of insolvency at Step Two as well.

[11]    Ex. 1082 (Credit Suisse Newspaper Sector Report, dated December 11, 2007).

[12]    Credit Suisse coverage had been initiated for Gannet, The New York Times, Belo Corp., Journal Communications, Lee Enterprises, McClatchy, Media General, and Scripps.

[13]    *Id*. at VRC0007341.

| | | | | NUMBER OF DAILY NEWSPAPERS | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Daily | | | | | | Sunday | |
| Year | Morning | Evening | Total Newspapers | Morning Circulation (000) | Evening Circulation (000) | Total (000) | % Change | Total Newspapers | Total Circulation (000) | % Change |
| 2000 | 766 | 727 | 1,480 | 46,772 | 9,000 | 55,773 | -0.35% | 917 | 59,421 | |
| 2001 | 776 | 704 | 1,468 | 46,821 | 8,756 | 55,578 | -0.35% | 913 | 59,090 | -0.56% |
| 2002 | 777 | 692 | 1,457 | 46,617 | 8,568 | 55,186 | -0.71% | 913 | 58,780 | -0.52% |
| 2003 | 787 | 680 | 1,456 | 46,930 | 8,255 | 55,185 | 0.00% | 917 | 58,495 | -0.48% |
| 2004 | 814 | 653 | 1,457 | 46,887 | 7,738 | 54,626 | -1.01% | 915 | 57,754 | -1.27% |
| 2005 | 817 | 645 | 1,452 | 46,122 | 7,222 | 53,345 | -2.35% | 914 | 55,270 | -4.30% |
| 2006 | 833 | 614 | 1,437 | 45,441 | 6,888 | 52,329 | -1.90% | 907 | 53,179 | -3.78% |
| 2007 | 867 | 565 | 1,422 | 44,548 | 6,194 | 50,742 | -3.03% | 907 | 51,246 | -3.63% |
| 2008 | 872 | 546 | 1,408 | 42,757 | 5,840 | 48,597 | -4.23% | 902 | 49,115 | -4.16% |

**Source:** http://www.naa.org/trendsandnumbers/total-paid-circulation.aspx.

Credit Suisse credited declining circulation to customer defections to other forms of information delivery, and posed the critical question of newspaper survival.[14]

> However, it is important to note that it is consumers that are choosing to bypass the traditional forms of media—technology, in the form of new distribution platforms, is just the enabler. . . . The pertinent question as it relates to newspapers (and all traditional media for that matter) is how will they deal with the accelerating structural shifts to media consumption habits?

The task facing newspapers, according to Credit Suisse, was nothing short of complete transformation.[15]  That newspapers were facing a secular decline in their ability to reach an audience through the distribution of newspapers and that advertisers were shifting their advertising dollars to other media are clearly, however, predominant undercurrents in many analyst's assessments of the newspaper publishing industry, and Tribune in particular, well before the announcement of the Merger.[16]

---

[14]    *Id*. at VRC0007341.  It is important when reviewing the historical financial performance of Tribune's print advertising sub-segments (i.e., retail, national and classified advertising, and "other") in relation to its circulation, to understand that the economic growth enjoyed as a result of, for example, the housing bubble, likely masked, to some degree, the detrimental economic impact on newspapers of the secular decline evidenced by contracting newspaper circulation. If circulation is declining as a result of a shift in customer demand away from newspapers as a news and information delivery mechanism (due to demographics or other reasons), advertisers will quite reasonably migrate toward the media replacing the increasingly outmoded newspaper.

However, in economic boom times (which characterized the 2002-2006 period), the financial impact of this negative trend may not be fully manifest because so many advertising dollars are expended in the market. When the boom ends however, and, depending upon the existence and severity of any economic swing the other way, the secular trend likely is again masked because advertisers are pulling more from their newspaper advertising budget than would be the case based solely on a migration toward other media.  As a result of this "masking" phenomenon, it is difficult to specifically isolate and segregate secular impacts from cyclical elements of growth or decline based solely on a review of Tribune's historical performance.

[15]    "Newspapers must ultimately transform themselves from lumbering dinosaurs into nimbler, multiplatform information providers capable of reaching customers in print, online, or by mobile download." *Id*.

[16]    For example, on August 1, 2006, Wachovia Securities analyst John Janedis observed:

Ratings agencies also recognized the challenging newspaper environment.  On December 20, 2007, Fitch cited "meaningful secular headwinds" faced by newspaper publishers, as it lowered Tribune's issuer default rating, as well as the ratings on Tribune's unsecured and secured debt.[17]

TRB's circulation revenue growth has consistently underperformed the industry over the past several years. While some of the decline is attributable to overall secular trends, a large portion is due to steps the company took last year to cut back its "other paid" circulation. With the reduction of "other paid" largely out of the way and easier comps in 2006, we expect the declines in circ revenue to improve in 2007.

The secular trend affecting newspaper publishers and its disproportionate effect on the Tribune Company are reflected in the year-over-year percentage changes in circulation revenue through 2005.  Wachovia's expectation of the continuation of this secular trend is reflected in their expectations for the percentage changes in circulation revenue that would be realized in 2006 and 2007 by Tribune and the industry.  Note that although the Wachovia analysts expected "the declines in circ revenue to improve" in 2007, this improvement meant a one-tenth percentage point smaller decline than in 2006 for the industry.  A table from the Wachovia report is replicated below:

| YEAR/YEAR % CHANGE IN CIRCULATION REVENUE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DJ (US WSJ print only) | MNI | TRB | NYT | SSP | GCI | LEE | JRC | Wachovia Universe | Industry | Difference |
| 2001 | -6.4% | -4.0% | 1.0% | NA | 2.6% | -1.7% | -1.1% | NA | -1.6% | 2.3% | -1.3% |
| 2002 | -2.8% | -1.4% | 1.1% | NA | -0.9% | -0.2% | -0.6% | 0.4% | -0.6% | 2.3% | -1.2% |
| 2003 | -3.2% | -0.3% | -1.1% | 7.3% | -1.9% | 0.5% | -0.2% | -1.4% | 0.0% | 1.8% | -2.9% |
| 2004 | -1.1% | 0.6% | -3.0% | -0.2% | -3.5% | 1.5% | -0.3% | -1.3% | -0.9% | -2.1% | -0.9% |
| 2005 | 0.1% | -2.5% | -7.4% | -1.1% | -2.0% | -0.5% | -2.2% | -2.5% | -2.3% | -3.3% | -4.1% |
| 2006E | -0.5% | -1.8% | -3.3% | 1.2% | -3.0% | 2.8% | -1.0% | -4.8% | -1.3% | -2.4% | -0.9% |
| 2007E | -0.5% | -2.2% | -2.5% | -1.2% | -1.0% | 0.0% | -1.3% | -1.0% | -1.2% | -2.4% | -0.2% |

Source: Tribune reports, Newspaper Association of America (NAA), and Wachovia Capital Markets LLC estimates.

Other analysts held similar views through the period up to, and including, the Step Two Financing Closing Date.  *See, e.g.*, Ex. 1083 at 3 (Morgan Stanley Analyst Report, dated September 26, 2006); Ex. 1084 at 1 (Morgan Stanley Analyst Report, dated October 22, 2006); Ex. 1085 at 1 (Prudential Equity, LLL Analyst Report, dated January 17, 2007); Ex. 1086 at 1 (JPMorgan Analyst Report, dated March 26, 2007); Ex. 1100 at 1 (Bear Stearns Research Report, dated April 2, 2007); Ex. 1087 at 2 (A.G. Edward Analyst Report, dated April 3, 2007); Ex. 627 at 3 (Lehman Change of Earnings Forecast, dated August 14, 2007); Ex. 1088 at 1 (Wachovia Securities Analyst Report, dated December 24, 2007).

[17]  As reflected in their report, Fitch downgraded Tribune to the following ratings:

    --Issuer Default Rating (IDR) to 'B-' from 'B+'.

    --Senior secured revolving credit facility to 'B/RR3' from 'BB/RR2'.

    --Senior unsecured notes to 'CCC/RR6' from 'B-/RR6'.

    --Subordinated exchangeable debentures due 2029 to 'CCC-/RR6' from 'CCC+/RR6'.

    --Senior unsecured bridge loan 'CCC/RR6'.

Ex. 719 (Fitch Press Release, dated December 20, 2007).

Fitch further observed:

    Fitch's ratings reflect the significant debt burden the transaction places on the company's balance sheet while its revenue and cash flow have been declining. Fitch believes newspapers and broadcast affiliates (particularly in large markets where there is more competition for advertising dollars) face

Furthermore, in an industry outlook report dated December 2007, IBISWorld Research also summarized the secular nature of the decline in the newspaper industry, noting:[18]

> The proportion of the adult population in the United States that reads newspapers has been in long-term decline, and this has had a negative impact on the demand for printed newspaper advertising. An expected continuation of this trend would impact both newspaper circulation and advertising revenue going forward.

Secular declines were also evidenced by annual print advertising revenue declines heading into 2008:

| ADVERTISING CATEGORIES | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2007 ($mm) | | | | | | | |
| | 2007 | 2006 | $ Change | % Change | % Secular Change | % of Ad Decline | Rate of Secular Decline |
| National | $ 7,005 | $ 7,505 | ($ 500) | (6.7%) | (10.0%) | (11.4%) | (0.7%) |
| Retail | $ 21,018 | $ 22,121 | ($ 1,103) | (5.0%) | (15.0%) | (25.1%) | (0.7%) |
| Classified | $ 14,186 | $ 16,986 | ($ 2,800) | (16.5%) | (47.5%) | (63.6%) | (7.8%) |
| Newspaper Print Total | $ 42,209 | $ 46,611 | ($ 4,402) | (9.4%) | (35.1%) | (100.0%) | N/A |

Source: Research Dept., Newspaper Association of America, and Credit Suisse for % secular change.

The Examiner's financial advisor considered contrary views. For example, notwithstanding the broadly acknowledged secular decline characterizing the newspaper industry, the Credit Suisse analysts nonetheless espoused an optimistic view for newspapers, observing that "newspapers will adapt and survive in the new media paradigm." The analysts also quantified factors contributing to observed declines.[19]

---

meaningful secular headwinds that could lead to more cash flow volatility in the future. With fixed-charge coverage estimated to be below 1.3 times (x), there is very little room to endure a cyclical downturn. In addition, the rating continues to reflect volatile newsprint prices and the threat of emerging technologies on the economics of the pure-play broadcasting affiliate business. These concerns are balanced somewhat by the quality and geographic diversity of the company's assets as well as the success of several of the company's on-line investments. Also, the company's assets are separable from the company and provide some capacity to potentially postpone financial distress.

The Negative Outlook reflects Fitch's belief that there are significant secular pressures facing newspapers and broadcast affiliate industries, as advertising dollars are being redirected toward the emerging mediums to the detriment of traditional media. Both businesses face the risk of margin compression as these revenue pressures are coupled with cost structures that are fixed or contain elements that are largely outside of management's control. There is a limited margin of safety around the bank facility covenant thresholds to endure these threats in a cyclical downturn.

Ex. 719 (Fitch Press Release, dated December 20, 2007).

[18]  Ex. 1089 (IBIS World Industry Input, Newspaper Publications in the US, dated December 4, 2007).

[19]  Ex. 1082 at VRC0007341 and VRC0007342−VRC0007354 (Credit Suisse Newspaper Sector Report, dated December 11, 2007). The Credit Suisse analysts cited three reasons for their optimism (a) "The recent downturn in print newspaper advertising is more cyclical than secular. . . .", (b) "Organic online revenue growth

It is not entirely clear from their report what specific analysis was conducted by Credit Suisse in estimating the rates of secular decline. However, the analysis does clearly indicate that at least some amount of negative growth associated with secular changes in the industry was informing all three major print advertising revenue categories. Based on the preceding, the Examiner's financial advisors made the following estimates of secular decline (based upon full year end 2007 results):

| | ADVERTISING CATEGORIES | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | National | | Retail | | Classified | | Newspaper Print Total | | Newspaper Online Total | | Combined Newspaper Print and Online Total | |
| | $ Millions | % Change | $ Millions | % Change | $ Millions | % Change | $ Millions | % Change | $ Millions | % Change | $ Millions | % Change |
| 2004 | 8,083 | 3.7% | 22,012 | 3.1% | 16,608 | 5.1% | 46,703 | 3.9% | 1,541 | 26.7% | 48,244 | 4.5% |
| 2005 | 7,910 | -2.2% | 22,187 | 0.8% | 17,312 | 4.2% | 47,408 | 1.5% | 2,027 | 31.5% | 49,435 | 2.5% |
| 2006 | 7,505 | -5.1% | 22,121 | -0.3% | 16,986 | -1.9% | 46,611 | -1.7% | 2,664 | 31.4% | 49,275 | -0.3% |
| 2007 | 7,005 | -6.7% | 21,018 | -5.0% | 14,186 | -16.5% | 42,209 | -9.4% | 3,166 | 18.8% | 45,375 | -7.9% |
| 2008 | 5,996 | -14.4% | 18,769 | -10.7% | 9,975 | -29.7% | 34,740 | -17.7% | 3,109 | -1.8% | 37,848 | -16.6% |
| 2009 | 4,424 | -26.2% | 14,218 | -24.2% | 6,179 | -38.1% | 24,821 | -28.6% | 2,743 | -11.8% | 27,564 | -27.2% |

**Source:** http://www.naa.org/trendandnumbers/advertising-expenditures.aspx.

## 2.    Overview of Tribune's Publishing Segment Revenues

With respect to the historical financial performance of Tribune's Publishing Segment, the Examiner's financial advisor used available detailed financial performance data contained in Tribune's monthly 2007 Brown Books indicating actual financial performance not only for the

---

should continue to trend in the 15-20% range for the foreseeable future. . . .", and (c) "Inorganic online revenue growth from launching new products and M&A activity." Interestingly, their optimism largely centered on interactive-type growth opportunities, not enhancements in traditional newspaper circulation or advertising. Credit Suisse explained the cyclical and secular customer behaviors driving the 2007 downturn in print advertising's three principal segments "national," "retail," and "classified" as follows (based upon year-to-date September 30, 2007 data):

- Retail – 49.4% of newspaper print advertising; down 4.6% year-to-date; we estimate 85% of the decline is due to cyclical factors such as (1) residential investment declining; 92) home supplied, furniture, and building material expenditure declining; and (3) financial service providers facing profitability issues; we estimate 15% of the decline is due to secular factors such as (1) retail consolidation; (2) ad-spend shifting to non-traditional media; and (3) the growing presence of online retailing.

- National – 17% of newspaper print advertising; down 4.6% year-to-date; we estimate 90% of the decline is due to cyclical factors such as (1) foreign and domestic auto manufacturers reacting to slowing auto demand; and (2) airline profitability coming under pressure due to rising energy prices; we estimate that 10% old the decline is due to secular factors such as auto manufacturers, airlines and telecom providers shifting ad-spend away from traditional media.

- Classified – 33.5% of newspaper print advertising; down 15.6% year to date; we estimate 50% of the decline within the automotive vertical is due to cyclical factors; we estimate 85% of the decline within real estate vertical is due to cyclical factors; we estimate that 15% of the decline within the help wanted vertical is due to cyclical factors.

Publishing Segment in the aggregate, but also for its individual segments and sub-segments (both with and without contribution of the interactive business to reported revenues).

Because Tribune's interactive business revenues and profitability combine advertising revenues generated by all three legacy categories of print advertising – retail, national, and classified (as well as some from "other"), Tribune internally reported financial results for its Publishing Segment sub-segments under two formats: one presenting segment results inclusive of the contributions of the interactive business, and one showing the interactive business on a stand-alone basis. The following table compares 2006 with 2007 revenue results on both these two bases: [20]

| PUBLISHING SEGMENT REVENUE ($mm) | | | | |
|---|---|---|---|---|
| | FY 2006A | FY 2006A | FY 2007A | FY 2007A |
| Segment | Interactive Allocated | Interactive Not Allocated | Interactive Allocated | Interactive Not Allocated |
| **Print Advertising** | | | | |
| Retail Advertising | $ 1,327.1 | $ 1,304.1 | $ 1,247.8 | $ 1,219.9 |
| National Advertising | $ 730.0 | $ 714.4 | $ 686.5 | $ 663.8 |
| Classified Advertising | | | | |
| *Recruitment* | $ 346.2 | $ 238.0 | $ 280.9 | $ 176.3 |
| *Real Estate* | $ 375.9 | $ 341.2 | $ 285.0 | $ 243.3 |
| *Auto* | $ 261.8 | $ 222.3 | $ 228.8 | $ 177.4 |
| *Other* | $ 153.9 | $ 149.0 | $ 132.0 | $ 127.5 |
| **Total Print Advertising** | **$ 3,195.0** | **$ 2,969.0** | **$ 2,861.0** | **$ 2,608.2** |
| | | | | |
| **Circulation** | $ 567.3 | $ 567.3 | $ 526.5 | $ 526.5 |
| **Other** | $ 256.1 | $ 255.1 | $ 277.0 | $ 275.6 |
| **Interactive** | $ 0.0 | $ 227.0 | $ 0.0 | $ 254.2 |
| | | | | |
| **Total Publishing Segment** | **$ 4,018.4** | **$ 4,018.4** | **$ 3,664.6** | **$ 3,664.6** |

Source: Ex. 642 (Brown Book for Period 12, 2007).

In the monthly 2007 Brown Books, Tribune also presented "forecasted" 2007 Publishing Segment financial performance based upon the annual operating plan approved by the Tribune Board in February 2007.  Apparently, Tribune did not present its plan performance for its legacy print advertising segments on a basis that excluded revenues and profitability for the interactive business.  Based on disclosure of 2007 interactive business plan revenues as set forth in the Brown Books, however, the Examiner's financial advisor calculated retail, national, and classified advertising revenue projections, exclusive of interactive business plan revenue projections.  Comparisons of 2007 actual and 2007 planned advertising revenues, therefore, have

---

[20]    The monthly 2007 Brown Books contained comparative data for the prior year.  As such, 2006 information was also available.  *See, e.g.,* Ex. 637 (Brown Book for Period 7, 2007).

been made on the basis of both inclusion and exclusive of interactive business revenue for each of Tribune's print advertising segments.

### a.    Retail Print Advertising Revenue.

The retail sub-segment of the Publishing Segment was the largest of Tribune's three print advertising categories. In 2006, it comprised approximately 42% of Tribune's total print advertising revenue, inclusive of interactive revenue (and approximately 44% of print advertising revenues, excluding interactive). Year 2007 Tribune retail advertising revenues were down by approximately 6% from 2006 levels, on both the basis of inclusion and exclusion of allocated interactive revenue. Revenues for both years were concentrated in four markets:

| RETAIL REVENUE INCL. INTERACTIVE ($mm) | | | |
|---|---|---|---|
| Revenue | 2006A | 2007A | % |
| Los Angeles | $ 338.6 | $ 314.8 | -7.0% |
| Chicago | $ 322.9 | $ 314.8 | -2.5% |
| Newsday | $ 206.3 | $ 183.8 | -10.9% |
| South Florida | $ 132.8 | $ 122.9 | -7.5% |
| Subtotal | $ 1,000.7 | $ 936.3 | -6.4% |
| Retail Total | $ 1,327.1 | $ 1,247.8 | -6.0% |
| % of Retail Total | 75.4% | 75.0% | |

Source: Ex. 642 (Brown Book for Period 12, 2007).

The actual 2007 retail advertising revenue decline was significantly in excess of the decline budgeted for by Tribune in connection with its February 2007 plan,[21] although the plan contemplated modest growth above 2006 actual results:

---

[21]    Because retail interactive business advertising revenue did not figure heavily as a source of overall retail advertising, the 2007 retail plan revenues with and without the interactive business are quite close ($1,337 million and $1,308 million, respectively), and the deviation from the 2007 plan, exclusive of the interactive business (presented in the table below) is not appreciably different from the deviation observed from plan for retail inclusive of interactive business revenue (($1,219.9 million – $1,308.0 million) / $1,308.0 million = (6.7%)).

| RETAIL REVENUE INCL. INTERACTIVE ($mm) | | | |
|---|---|---|---|
| Revenue | 2006A | 2007 Plan | % |
| Los Angeles | $ 338.6 | $ 350.2 | 3.4% |
| Chicago | $ 322.9 | $ 323.5 | 0.2% |
| Newsday | $ 206.3 | $ 195.1 | -5.5% |
| South Florida | $ 132.8 | $ 133.8 | 0.7% |
| Subtotal | $ 1,000.7 | $ 1,002.4 | 0.2% |
| Retail Total | $ 1,327.1 | $ 1,337.0 | 0.7% |
| % of Retail Total | 75.4% | 75.0% | |

Source: Ex. 642 (Brown Book for Period 12, 2007).

| RETAIL REVENUE EXCL. INTERACTIVE ($mm) | | | |
|---|---|---|---|
| Revenue | 2007A | 2007 Plan | % Variance to Plan |
| Retail Total | $ 1,219.9 | $ 1,308.0 | -6.7% |

Source: Ex. 642 (Brown Book for Period 12, 2007).

As previously discussed, given adverse 2007 monthly performance against its February 2007 plan, Tribune prepared revised revenue and operating cash flow projections toward the end of September 2007, presented that forecast to the Tribune Board in October 2007, and made no modifications to that forecast in the nearly three months between September 30, 2007 (when Tribune apparently provided the projections to VRC), and December 20, 2007, the date of VRC's Step Two solvency opinion. However, during that interval, and based on VRC's due diligence and related analysis, VRC apparently prepared its own set of projections, dated October 29, 2007, indicating fairly decisive departures from Tribune's forecast, almost always downward.[22] The October 29, 2007 VRC projections, as well as certain other projection information,[23] are summarized in the table below, as it pertains to Tribune's retail advertising revenues:

---

[22]   Through July 25, 2010, the Examiner has located only one additional set of VRC-prepared projections. Ex. 1090 (Tribune Case Valuation Projections). These December 20, 2007 forecasts show modest upward adjustments from October 29, 2007 levels but, generally speaking, remained below Tribune's projections. Based on the Examiner's review through July 25, 2010, the only other source for contemporaneous projections of Tribune's future performance that were detailed enough to allow for comparison at the sub-segment print advertising level, appears to have been projections authored by Craig Huber of Lehman Brothers. The Examiner noted that Mr. Huber was a "pessimistic" sell-side Tribune analyst.

[23]   As discussed in connection with the Examiner's evaluation VRC's Step One and Step Two solvency opinions, Tribune prepared detailed projection models (often referred to as "ESOP transaction" models at Step One, or "Tribune Company" models at Step Two) at various points throughout 2007. In connection with the issuance of its Step Two opinion letter dated December 20, 2007, VRC specifically identified an iteration of these models,

| RETAIL PUBLISHING ASSUMPTION COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Actual | | Projected | | | | |
| Revenue Assumptions - Base Case | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| **Tribune October 28, 2007 Analysis** | $ 1,304.1 | $ 1,219.9 | $ 1,231.5 | $ 1,237.2 | $ 1,242.5 | $ 1,255.5 | $ 1,267.4 |
| *Growth Rate* | | -6.5% | 1.0% | 0.5% | 0.4% | 1.0% | 0.9% |
| **VRC October 29, 2007 Analysis** | $ 1,304.1 | $ 1,219.9 | $ 1,214.4 | $ 1,202.3 | $ 1,199.3 | $ 1,196.3 | $ 1,193.3 |
| *Growth Rate* | | -6.5% | -0.5% | -1.0% | -0.2% | -0.3% | -0.3% |
| **VRC December 20, 2007 Analysis (Internal)** | $ 1,304.1 | $ 1,219.9 | $ 1,218.7 | $ 1,227.9 | $ 1,237.1 | $ 1,246.4 | $ 1,255.7 |
| *Growth Rate* | | -6.5% | -0.1% | 0.8% | 0.7% | 0.8% | 0.7% |
| **VRC December 20, 2007 Analysis (Opinion)** | $ 1,304.1 | $ 1,219.9 | $ 1,231.5 | $ 1,237.2 | $ 1,242.5 | $ 1,255.5 | $ 1,267.4 |
| *Growth Rate* | | -6.5% | 1.0% | 0.5% | 0.4% | 1.0% | 0.9% |
| **Lehman Brothers (Craig A. Huber - 10/3/07) [2]** | $ 1,327.2 | $ 1,253.9 | $ 1,216.3 | $ 1,185.9 | N/A | N/A | N/A |
| *Growth Rate* | | -5.5% | -3.0% | -2.5% | | | |
| **Lehman Brothers (Craig A. Huber - 11/16/07) [2]** | $ 1,328.0 | $ 1,244.8 | $ 1,207.5 | $ 1,177.3 | N/A | N/A | N/A |
| *Growth Rate* | | -6.3% | -3.0% | -2.5% | | | |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).

[2] Unlike Tribune and VRC, Lehman Brothers presents its segment projections inclusive of interactive business revenues.

the "model_negotiated_proposal_november21_2007.xls", as the management forecast model which VRC relied on for purposes of rendering VRC's Step Two solvency opinion.

This model corresponds with earlier versions of management's Step Two projections, and can be traced to a Tribune prepared projection model dated as early as September 30, 2007. This model, in turn, can be traced to projections dated October 28, 2007, which were the subject of a VRC "internal assessment" as memorialized in an October 29, 2007 VRC e-mail, and attached memoranda.

In connection with the issuance of its December 20, 2007 solvency opinion, VRC apparently prepared an additional assessment of the same Tribune projections that had remained unmodified by Tribune since the preparation of the September 30, 2007 model. Of note, these management projections (and the various iterations thereof) correspond with the five-year summary level projection presented to, and discussed with, the Tribune Board at its October 17, 2007 meeting.

As referred to in the table above, the "Tribune October 28, 2007 Analysis" refers to the projections originally developed by management on or before September 30, 2007, that remained unchanged through the Step Two Financing Closing Date, and were the subject of VRC's October 29, 2007 assessment memorandum. The "VRC October 29, 2007 Analysis" refers to VRC's alternative projection assumptions as set forth in that memorandum. The "VRC December 20, 2007 Analysis (Internal)" refers to an alternative set of forecasting assumptions set forth by VRC in a memorandum of that date.

In Tribune's "Five-Year Financial Outlook" dated October 2007 (the plan presented to the Tribune Board in October 2007), the basis for Tribune's retail advertising revenue projections were explained:[24]

> Retail will recover slightly in 2008 and experience low single digit growth through 2012.
>
> • Our major retail accounts will be flat in 2008 and grow slightly in 2009 to 2012.
>
> • This trend is tied to preprint and circulation declines.
>
> • Local retail should be slightly positive in 2008 to 2012.

Little if any direct support for these assertions has been located.[25] The assertions made by Tribune in connection with the October 2007 plan do, however, correspond with the projections provided to VRC in September 2007.  It should be noted that VRC personnel had meetings with Tribune department heads early in September 2007 to initiate VRC's assessment of Tribune's projections, and, by the end of October 2007, VRC apparently had prepared its own forecast of revenues, which have been, with respect to retail print advertising, recapitulated in the table above.  The VRC analysis also presented a pro forma estimate of 2007 results.

It is clear that, based on its October 29, 2007 assessment of Tribune's then-existing projections, VRC believed that forecasts of Tribune's future retail advertising revenue should reflect an element of negative growth to account for the industry's secular decline.[26]

---

[24]    Ex. 657 (Tribune Five-Year Financial Outlook).

[25]    During his sworn statement with the Examiner, Mr. Grenesko provided some insight into the differences between the February 2007 and September 2007 projections prepared by Tribune, but he did not provide specifics with regard to how the sub-segments were expected to perform.  Rather he spoke of the projections in terms of Tribune's revenue channels (ROP, Preprint and Targeted Print).  Mr. Grenesko stated:

> And I think we laid things out very succinctly in the five-year operating report that I think you all have received that we presented to the board and to the lenders and to VRC and to the rating agencies in the -- September and October of 2007, and that goes into a lot of detail as to what the -- what the publishing group had come up with, so you're correct in that we viewed the print side as continuing to trend down, and in fact I believe for the traditional ROP, this is the advertising that you see in the newspaper, we actually lowered the advertising rates going forward, the advertising growth going forward, so those revenues were trending down even more than what we had in February.  Preprints, I think we also took those revenues down so that was on again on -- these are the inserts that you receive in the daily newspapers a couple times during the week and also on Sundays, so we had some growth in there in the early part of the year, took that kind of to be sort of flat.  On the targeted print side, this is our free dailies, this would be like AM New York, and this would be the Red Eye here in Chicago. The group felt that they could really expand what we were doing in those two particular areas and also with our Spanish language newspaper called [Hoy!], and they were also looking at trying to come up with other targeted publications, something for perhaps like sports or working mothers, things of that nature, so that was the targeted piece that went up.

Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 169:16-171:4.

[26]    In its October 29, 2007 memorandum, VRC observed, in pertinent part:

Ultimately, for purposes of its October 29, 2007 analysis, VRC determined to project revenues for retail print advertising using negative growth rates falling between Tribune's projected growth rates and those of Lehman Brothers, primarily because "VRC has taken a conservative approach in its base case and have assumed that retail adv would not revert back to flat or positive results."[27]  The negative growth rates for out years (*i.e.*, 2010 through 2012) ranging between (0.2%) and (0.3%) are conservative in comparison to those implied in Credit Suisse' analysis (0.75%).[28]

The Examiner's financial advisor believes that, as of December 20, 2007, a projected negative 0.5% long term growth rate expectation was reasonable, given that declining circulation due to secular deterioration of the newspaper industry (clearly evident from a review of Tribune's historical industry circulation performance as well as a review of the projections of both Tribune and VRC) should reasonably have been anticipated.  For the near term projection of retail advertising revenues, the Examiner's financial advisor considers VRC's initial estimation of the nominal amount of retail revenue decline for 2008 and 2009 to be reasonable, given the additional deterioration experienced by Tribune during the fourth quarter 2007[29] and the full year 6% revenue decline in 2007 as discussed earlier herein.

---

3.      Although management has implemented a number of innovative initiatives that may slow the rate of decline in retail adv., VRC believes that a more conservative [test] would be to keep retail adv. Less than zero, particularly, given the expected growth in interactive advertising, and the overall expected decrease in circulation for newspapers.

a.      Management in their base case reflect these incremental changes and new offerings. VRC's more conservative case attempts to incorporate the overall trend which is that fewer people are reading newspapers which has [led to] decline in newspaper readership over the last few years. As a result, advertisers may be less inclined to advertise in them because of "fewer eye balls." Also price per thousand may be lower because newspapers [are not] viewed positively.

b.      Management has also indicated that insert advertisers are being more selective in how they spend their advertising dollar. Management has indicated that many are delaying advertising runs and selectively choosing to run ads during holiday or special shopping seasons.

Ex. 1004 (Mednik E-Mail, dated October 31, 2007).

[27]    *Id*. at VRC0034774.

[28]    In rendering its Step Two solvency opinion, VRC nonetheless adopted management's projections.

[29]    Ex. 1091 (Tribune Company Summary of Revenues and Newspaper Advertising Volume, dated December 30, 2007).

| RETAIL PUBLISHING PROJECTION COMPARISON EXCL. INTERACTIVE ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| VRC December 20, 2007 Analysis (Opinion) | $ 1,304.1 | $ 1,219.9 | $ 1,231.5 | $ 1,237.2 | $ 1,242.5 | $ 1,255.5 | $ 1,267.4 |
| *Growth Rate* | | -6.5% | 1.0% | 0.5% | 0.4% | 1.0% | 0.9% |
| | | | | | | | |
| Examiner's Projections | $ 1,304.1 | $ 1,219.9 | $ 1,214.4 | $ 1,202.3 | $ 1,196.2 | $ 1,190.3 | $ 1,184.3 |
| *Growth Rate* | | -6.5% | -0.5% | -1.0% | -0.5% | -0.5% | -0.5% |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).

b.    **National Print Advertising Revenue.**

The National advertising component was the smallest of Tribune's three print advertising categories, comprising approximately 22.8 % of total 2006 print advertising revenues (inclusive of the interactive business).  National print advertising revenues, inclusive of the beneficial contributions of the interactive business, declined by approximately 6.0% during 2007 in relation to the prior year.  However, 2007 national "print-only" advertising revenues were down, year-over-year, more significantly, declining by approximately 7.1%.[30]

| NATIONAL REVENUE ($mm) | | | |
|---|---|---|---|
| Revenue | 2006A | 2007A | % |
| National Total (incl. interactive business) | $ 730.0 | $ 686.5 | -6.0% |
| National Total (excl. interactive business) | $ 714.4 | $ 663.8 | -7.1% |

Source: Ex. 642 (Brown Book for Period 12, 2007).

---

[30]    For purposes of this calculation, the Examiner's financial advisor eliminated interactive business revenues from the total national advertising revenues.

Even with the financially beneficial impact of interactive revenues incorporated into planned revenues, the decline budgeted for national advertising by Tribune in connection with its February 2007 Tribune Board-approved plan is apparent:[31]

| NATIONAL REVENUE INCL. INTERACTIVE ($mm) | | | |
|---|---|---|---|
| Revenue | 2006A | 2007 Plan | % |
| Los Angeles | $ 290.9 | $ 288.1 | -1.0% |
| Chicago | $ 171.3 | $ 165.4 | -3.5% |
| Newsday | $ 80.5 | $ 80.8 | 0.4% |
| South Florida | $ 59.3 | $ 60.9 | 2.8% |
| Subtotal | $ 602.0 | $ 595.2 | -1.1% |
| National Total | $ 730.0 | $ 719.4 | -1.5% |
| % of National Total | 82.5% | 82.7% | |

Source: Ex. 642 (Brown Book for Period 12, 2007).

---

[31] When the anticipated positive financial influence of the interactive business is removed from the 2007 plan projected national advertising revenue, and the result is compared to the actual national advertising revenue reported for 2007 (exclusive of interactive), it is clear that national advertising (exclusive of the interactive business) performed marginally worse against plan (exclusive of the interactive business) than when compared on the basis of actual to plan inclusive of interactive (($663.8 million - $699.1 million) / $699.1 million = (5.1%)).

| NATIONAL REVENUE EXCL. INTERACTIVE ($mm) | | | |
|---|---|---|---|
| Revenue | 2007A | 2007 Plan | % Variance to Plan |
| National Total | $ 663.8 | $ 699.1 | -5.1% |

Source: Ex. 642 (Brown Book for Period 12, 2007).

Actual results for 2007, reflecting total revenue of $686.5 million (including interactive revenue), were far short of the expectations held in February 2007 ($719.4 million), reflecting an unfavorable variance to plan of 4.6%.

In Tribune's revised "Five-Year Financial Outlook," presented to the board in October 2007, Tribune's updated national advertising revenue projections were explained:[32]

- National will be up slightly in 2008 and grow moderately in 2009 to 2012.

- Print advertising will decline slightly each year with all the growth coming from interactive during 2008 to 2012.

In his sworn statement, Mr. Grenesko indicated generally that run-of-press (or "ROP") advertising was forecast by Tribune to decline.[33]  This makes sense when advertisers are migrating to alternative media as circulation declines.  The above-referenced bullet point observation contained in the October 2007 Tribune Board materials is consistent with the negative growth projected for this sub-segment of print advertising.

A comparison of the differing growth expectations contemplated by management, VRC, and Lehman Brothers sell-side analyst Craig Huber[34] is set forth in the table below:

| NATIONAL PUBLISHING ASSUMPTION COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Actual | | Projected | | | | |
| Revenue Assumptions - Base Case | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Tribune October 28, 2007 Analysis | $ 714.4 | $ 663.8 | $ 651.6 | $ 636.1 | $ 620.1 | $ 611.1 | $ 598.7 |
| Growth Rate | | -7.1% | -1.8% | -2.4% | -2.5% | -1.5% | -2.0% |
| VRC October 29, 2007 Analysis | $ 714.4 | $ 663.8 | $ 648.4 | $ 639.7 | $ 623.6 | $ 614.6 | $ 602.1 |
| Growth Rate | | -7.1% | -2.3% | -1.3% | -2.5% | -1.4% | -2.0% |
| VRC December 20, 2007 Analysis (Internal) | $ 714.4 | $ 663.8 | $ 650.1 | $ 634.5 | $ 618.5 | $ 609.6 | $ 597.2 |
| Growth Rate | | -7.1% | -2.1% | -2.4% | -2.5% | -1.4% | -2.0% |
| VRC December 20, 2007 Analysis (Opinion) | $ 714.4 | $ 663.8 | $ 651.6 | $ 636.1 | $ 620.1 | $ 611.1 | $ 598.7 |
| Growth Rate | | -7.1% | -1.8% | -2.4% | -2.5% | -1.5% | -2.0% |
| Lehman Brothers (Craig A. Huber - 10/3/07) [2] | $ 729.8 | $ 670.5 | $ 637.0 | $ 614.7 | N/A | N/A | N/A |
| Growth Rate | | -8.1% | -5.0% | -3.5% | | | |
| Lehman Brothers (Craig A. Huber - 11/16/07) [2] | $ 730.0 | $ 682.0 | $ 647.9 | $ 625.2 | N/A | N/A | N/A |
| Growth Rate | | -6.6% | -5.0% | -3.5% | | | |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).

[2] Unlike Tribune and VRC, Lehman Brothers presents its segment projections inclusive of interactive business revenues.

---

[32]    Ex. 657 (Tribune Five-Year Financial Outlook).

[33]    Examiner's Sworn Interview of Donald Grenesko, July 8, 2010, at 169:16-170:8.

[34]    Again, Mr. Huber was reputedly one of, if not the most pessimistic sell-side analyst following Tribune at the time.

Mose Rucker of VRC made the following observations in his analysis of Tribune's forecasts of future national advertising revenue as memorialized in VRC's internal assumptions memorandum, dated October 29, 2007:[35]

1.    National ADV has historically been the weakest growth segment of the Company's business.

2.    VRC's analysis will attempt to test this on a consistent basis.

   a.    The Company is expecting (-5.0% in '07) to (-2.0% in '12).

      i.    VRC would assume that a more conservative base case beginning in '08 (-2.0%), '09 (-1.3%) to '12 (-00%) us (sic) unreasonable for the base case. VRC's analysis has lower growth rates beginning in '08 and attempts to adjust to market share losses to interactive.

   b.    National Adv would be more negatively impacted by declines in circulation and growth in internet. Newspaper's share of advertising dollars has decreased. '04 to '05 (-8bps). From '05 to '06 sector lost 123 bps.

   c.    Lehman estimates '08 (-5.0% in national ad) in recession and '09 (-3.5%). Note Lehman does not segregate interactive.

Irrespective of these observations, for purposes of its internally developed October 29, 2007 projections, VRC determined to project revenues for national print advertising using negative growth rates closely coinciding with Tribune's projected growth rates.[36]  Because the projected rates are acknowledged to be related to the expected influence of the secular decline in Tribune's industry, the negative rates projected by Tribune and VRC inform the rate determination as indicated below:

---

[35]    Ex. 1004 at VRC0034776-78 (Mednik E-Mail, dated October 31, 2007).  When discussing growth rates in the October 29, 2007 memorandum, VRC is discussing those rates in the context of a comparison to Tribune's pro forma 2007 expectations.  Because certain information presented in this Annex A to Volume Two is presented in terms of actual 2007 results, percentage growth rates may not agree as between VRC's discussed rates and those calculated based on actual results.

[36]    VRC, seemingly anomalously, projected a negative growth rate in 2009 of (1.3%) in its October 29, 2007 internal memorandum, but reverted back to Tribune's (2.4%) rate of negative growth for 2009 in its December 20, 2007 analysis.  See Ex. 1004 (Mednik E-Mail, dated October 31, 2007); Ex. 1045 (VRC Solvency Analysis, dated December 20, 2007).

| NATIONAL PUBLISHING PROJECTION COMPARISON EXCL. INTERACTIVE ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| VRC December 20, 2007 Analysis (Opinion) | $ 714.4 | $ 663.8 | $ 651.6 | $ 636.1 | $ 620.1 | $ 611.1 | $ 598.7 |
| Growth Rate | | -7.1% | -1.8% | -2.4% | -2.5% | -1.5% | -2.0% |
| Examiner's Projections | $ 714.4 | $ 663.8 | $ 651.6 | $ 636.1 | $ 620.1 | $ 611.1 | $ 598.7 |
| Growth Rate | | -7.1% | -1.8% | -2.4% | -2.5% | -1.5% | -2.0% |

[1] 2006 and 2007 actuals (excluding interactive business), see Ex. 642 (Brown Book for Period 12, 2007).

In considering the reasonableness of adopting Tribune's projection of growth rates for this sub-segment of Publishing Segment advertising revenues, the Examiner's financial advisor noted that the rate of revenue decline observed between 2006 and 2007 for the print-only portion of those revenues (negative 7.1%) was largely consistent with the observed rate of decline in circulation revenues over the same period of comparison (negative 7.2% as discussed later herein). Because the expected rates of circulation decline forecasted by Tribune for 2008 through 2012 (as incorporated into the October 2007 five-year plan) are consistent in both direction and magnitude with the growth rates projected for national retail (print only) advertising revenue, the Examiner's financial advisor deems the selected growth rates reasonable, if not conservative.[37]

---

[37] The projected rates of circulation decline are actually slightly more pronounced than the projected rates of decline adopted by the Examiner here. As such, even greater rates of decline than those selected by the Examiner might arguably be justified.

c.        **Classified Print Advertising Revenue.**

Excluding the interactive business, the classified sub-segment of Publishing Segment comprised approximately 32% of Tribune's total 2006 print advertising revenues.[38]  The rate of revenue decline experienced in "print-only" classified advertising was substantial between 2006 and 2007,[39] and significantly exceeded the rate of decline in circulation revenues observed over a comparable period.

---

[38]    Ex. 740 at VRC0063427 (VRC Preliminary Solvency Analysis, dated November 30, 2007).

[39]    As has been discussed, the reporting of sub-segment revenues for Tribune's print advertising categories typically was done inclusive of revenues generated from the on-line advertising interactive business. Wherever possible, on the basis of additional financial data obtained, the Examiner's financial advisor attempted to separate the interactive business component from this consolidated presentation.

Including the interactive business, classified revenues declined by approximately 18.6% in 2007, from approximately $1.138 billion in 2006 to $926.7 million in 2007.  This decline was far in excess of the decline anticipated by management when the Tribune Board approved the 2007 plan in February 2007.  Because of data constraints, the table below presents classified revenue on an actual 2006 and 2007 plan basis inclusive of interactive business classified advertising revenues:

| CLASSIFIED REVENUE INCL. INTERACTIVE ($mm) | | | |
|---|---|---|---|
| **Revenue** | **2006A** | **2007 Plan** | **%** |
| Los Angeles | $ 275.1 | $ 248.1 | -9.8% |
| Chicago | $ 207.4 | $ 201.2 | -3.0% |
| Newsday | $ 160.0 | $ 153.4 | -4.1% |
| South Florida | $ 151.5 | $ 130.3 | -14.0% |
| Subtotal | $ 794.1 | $ 733.0 | -7.7% |
| Classified Total | $ 1,137.8 | $ 1,061.9 | -6.7% |
| % of Classified Total | 69.8% | 69.0% | |

Source: Ex. 642 (Brown Book for Period 12, 2007).

When the interactive business is removed from the projected 2007 plan revenues, classified revenue, inclusive of the interactive business, and compared with 2007 actual classified revenue, without the interactive business, the resulting decline is substantial.

| CLASSIFIED REVENUE EXCL. INTERACTIVE ($mm) | | | |
|---|---|---|---|
| Revenue | 2006A | 2007A | % |
| Los Angeles | $ 228.3 | $ 168.7 | -26.1% |
| Chicago | $ 167.6 | $ 125.6 | -25.1% |
| Newsday | $ 142.0 | $ 127.0 | -10.5% |
| South Florida | $ 134.2 | $ 87.5 | -34.8% |
| Subtotal | $ 672.1 | $ 508.8 | -24.3% |
| Classified Total | $ 950.5 | $ 724.5 | -23.8% |
| % of Classified Total | 70.7% | 70.2% | |

Source: Ex. 642 (Brown Book for Period 12, 2007).

The substantial losses in classified advertising revenues between 2006 and 2007 were principally attributed to continued weakness in real estate advertising in Florida, losses in automotive advertising, and declining recruiting advertising revenues for on-line job services.[40]

When management revised its projections in connection with the development of the five-year plan presented to the Tribune Board in October 2007, continued weakness in classified advertising was expected to span all segments of the classified group including recruitment, real estate, auto, and other. According to the October 2007 plan, "Classified will be down 7% in 2008 as print declines in recruitment, real estate and auto will continue with a modest recovery in real estate assumed in 2009 and 2010, mostly in Florida. Moderate growth, all coming from online, will occur through 2012."[41]  The 7% estimated decline referred to in connection with the assumptions informing the October 2007 plan corresponds to an approximately 18.6% observed decline as between actual 2007 and 2006 results presented on a comparable basis (i.e., including interactive).  Clearly, by the end of 2007, when the dramatic unanticipated decline in classified advertising revenue was manifest, the degree of over-optimism informing the October 2007 plan should have been, in the Examiner's financial advisor's opinion, obvious.  Despite evidence of the significant detrimental effects of the loss of advertising dollars associated with real estate, automotive and classified advertising due to, at least, in part, alternative advertising vehicles, Tribune expected classified print advertising revenues to decline considerably less significantly than previously observed in the near-term, and to largely be eliminated thereafter.

---

[40]    Ex. 1004 at VRC0034779 (Mednik E-Mail, dated October 31, 2007).

[41]    Ex. 657 (Tribune Five-Year Financial Outlook).

The table below contrasts the projections developed by VRC at various times with projections developed by Lehman Brothers' Craig Huber (who prepared detailed sub-segment level projections of operating performance for Tribune[42]) as well as Tribune's original forecast (which was the basis for the October 2007 plan presented to the Tribune Board, but which is shown in the table in the context of its recapitulation by VRC at October 29, 2007 within the context of the VRC memorandum of the same date):

| CLASSIFIED PUBLISHING ASSUMPTION COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Actual | | Projected | | | | |
| Revenue Assumptions - Base Case | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| **Tribune October 28, 2007 Analysis** | $ 950.5 | $ 724.5 | $ 650.5 | $ 637.2 | $ 625.1 | $ 604.5 | $ 579.8 |
| *Growth Rate* | | -23.8% | -10.2% | -2.0% | -1.9% | -3.3% | -4.1% |
| **VRC October 29, 2007 Analysis** | $ 950.5 | $ 724.5 | $ 621.0 | $ 591.5 | $ 575.2 | $ 559.4 | $ 544.0 |
| *Growth Rate* | | -23.8% | -14.3% | -4.8% | -2.8% | -2.7% | -2.8% |
| **VRC December 20, 2007 Analysis (Internal)** | $ 950.5 | $ 724.5 | $ 630.2 | $ 614.5 | $ 599.1 | $ 579.4 | $ 555.6 |
| *Growth Rate* | | -23.8% | -13.0% | -2.5% | -2.5% | -3.3% | -4.1% |
| **VRC December 20, 2007 Analysis (Opinion)** | $ 950.5 | $ 724.5 | $ 650.5 | $ 637.2 | $ 625.1 | $ 604.5 | $ 579.8 |
| *Growth Rate* | | -23.8% | -10.2% | -2.0% | -1.9% | -3.3% | -4.1% |
| **Lehman Brothers (Craig A. Huber - 10/3/07) [2]** | $ 1,161.5 | $ 946.0 | $ 827.6 | $ 765.6 | N/A | N/A | N/A |
| *Growth Rate* | | -18.6% | -12.5% | -7.5% | | | |
| **Lehman Brothers (Craig A. Huber - 11/16/07) [2]** | $ 1,156.2 | $ 946.2 | $ 827.9 | $ 765.8 | N/A | N/A | N/A |
| *Growth Rate* | | -18.2% | -12.5% | -7.5% | | | |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).
[2] Unlike Tribune and VRC, Lehman Brothers presents its segment projections inclusive of interactive business revenues.

---

[42]   Mr. Huber's projections of the sub-segment publishing categories include the positive growth and margin influence of Tribune's interactive business.

For purposes of its October 29, 2007 memorandum, VRC determined to project revenues for classified print advertising using negative growth rates exceeding Tribune's projected rate of decline for 2008 and 2009, but VRC moderated the rates of declining growth in the remaining years in comparison to Tribune's projections.  The Examiner's financial advisor believes that, given the susceptibility of this particular class of print advertising to the growing reliance of customers on internet-based services (which, as discussed below, is a factor incorporated in a significant way into the expectations of operating performance forecast for the interactive business), the most reasonable expectations with which to project declining classified revenues should have been based on the most negative rates of growth identified by VRC during its review of Tribune's projection models:

| CLASSIFIED PUBLISHING PROJECTION COMPARISON EXCL. INTERACTIVE ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| VRC December 20, 2007 Analysis (Opinion) | $ 950.5 | $ 724.5 | $ 650.5 | $ 637.2 | $ 625.1 | $ 604.5 | $ 579.8 |
| *Growth Rate* | | -23.8% | -10.2% | -2.0% | -1.9% | -3.3% | -4.1% |
| | | | | | | | |
| Examiner's Projections | $ 950.5 | $ 724.5 | $ 620.9 | $ 591.1 | $ 574.6 | $ 555.6 | $ 532.8 |
| *Growth Rate* | | -23.8% | -14.3% | -4.8% | -2.8% | -3.3% | -4.1% |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).

The Examiner's financial advisor believes this assumption to be highly conservative, in that the rates of decline forecasted for the near term are significantly less than the observed rate of decline in print advertising revenues occurring between 2006 and 2007, and because later year rates of projected decline are only modestly in excess of the rates of circulation decline contemplated by management in its October 2007 plan.

### d.        "Other" Publishing Revenue.

In Tribune's 2007 Form 10-K, the businesses comprising Tribune's "Other" Publishing Segment category was described as follows: [43]

> Primarily includes revenues from advertising placement services; the syndication of columns, features, information and comics to newspapers; commercial operations; delivery of other publications; direct mail operations; cable television news programming; distribution of entertainment listings; and other publishing related activities.

The Publishing Segment's "Other" category was a focus of Tribune's near term growth for the Publishing Segment because of certain newly identified (and partially actually realized) opportunities to deploy its excess production and delivery capacity profitably.

The opportunity to leverage Tribune's logistical capacity was described in Tribune's October 2007 plan: [44]

---

[43]    Ex. 4 at 9 (Tribune 2007 Form 10-K).

[44]    Ex. 657 (Tribune Five-Year Financial Outlook).

> In the third quarter of 2007, Chicago Tribune signed an agreement
> with the Sun-Times Media Group to take over the home delivery
> of their publications. This commercial delivery arrangement will
> yield $30 million of revenue and $8 million of operating cash flow
> in 2008.

Longer term, Tribune expected significant growth in its other businesses.  Management contemplated that:[45]

> New commercial delivery agreements, like the Sun-Times
> arrangement, along with growth in direct mail, commercial
> printing and higher revenues at Tribune Media Services, will
> increase other revenues by 17% in 2008 an about 6% to 7% per
> year thereafter.

Temporally proximate to the October 2007 Tribune Board meeting, a September 2007 document entitled "Transforming Tribune Publishing & Interactive" (which was apparently provided to the Lead Banks on October 1, 2007), identified opportunities for growth in businesses comprising the Publishing Segment's "Other" category.  One of the three areas of contemplated Tribune success in meeting the "competitive challenges facing the newspaper industry," included "[o]ptimization of current operations (maximizing manufacturing productively, increasing news sharing efforts, consolidation of operations, outsourcing)."[46]  Later in the presentation to the Lead Banks, Tribune recounted its plans to:[47]

- • Take advantage of our local print and distribution infrastructures wherever possible.

  - • Chicago Tribune/Sun Times distribution deal

  - • Others under discussion

    - • Los Angeles Times/LANG/Orange County Register

    - • Baltimore Sun/Washington Post

    - • Sun-Sentinel/Palm Beach Post/Miami Herald

This effort by Tribune to provide contract printing and delivery requirements of its competitors and, presumably, other national newspapers currently outsourcing their production and delivery needs, is the "flip side of the coin" discussed by Credit Suisse in its Industry Report. In that report, Credit Suisse argued that:[48]

---

[45]  *Id*.

[46]  Ex. 1092 (Transforming Tribune Publishing & Interactive, dated October 1, 2007).

[47]  *Id*.

[48]  Ex. 1082 (Credit Suisse Newspaper Sector Report, dated December 11, 2007).

> From a longer term operational standpoint, newspaper
> managements must continue to explore a wide range of tactics to
> boost efficiency and offset potential print audience declines.
> Reducing exposure to traditional print production and distribution
> through outsourcing and in-market cross media partnerships offer
> potential savings as news content consumption continues to shift
> toward the digital platform.

At his sworn interview with the Examiner, Mr. Grenesko observed the particular elements of growth anticipated for the Publishing Segment's Other category of businesses: [49]

> And then the final thing that I think there's another -- there's
> another line for revenues, and here we were getting into a lot more
> in terms of trying to work with other newspaper companies, so we
> were—made a concerted effort to work within all of our Tribune
> newspapers, for example, sharing content across all of our
> newspapers for book reviews, you don't need book reviewers in
> every market.  You can use one and that's usually pretty good for
> all of our newspapers, but then with other newspaper companies,
> we were looking at how can we reduce our costs going forward.
> So, for example, we had come up with a plan and actually had
> signed a deal with the Sun-Times for home subscriptions, so here,
> we were going to deliver the Sun-Times and they wouldn't have to
> have that whole fleet of cars and all the distributors for home
> delivery, so that was a significant improvement both in revenues
> and in cash flow to the Tribune Company and to the Chicago
> Tribune.  In addition, we were looking at other types of deals like
> that in our other markets, so, for example, in Baltimore, they were
> talking to the Washington Post about similar type of home delivery
> opportunities and also joint printing.  LA Times was talking to the
> Orange County Register, and in our south Florida paper they were
> talking to the Miami Herald, same types of situations, so when you
> put all of these together, that's why there was a change in the
> growth rates in publishing in the fall of year compared to the
> beginning part of year.

Between early 2007 and the October 2007 Tribune Board meeting, Tribune had recognized an incremental opportunity to redeploy its excess logistics capacity in connection with its Sun-Times delivery contract.  It contemplated being able to do the same thing prospectively with other regional capacity as well.  The key to understanding the potential for longer term opportunities that contracts like the Sun-Times contract represent, however, is that the overcapacity that Tribune was able to deploy had its roots in the secular shift away from newspapers.  More and more capacity would become available as the shift away from print to digital media continued.

Tribune may reasonably have expected to be able to compete effectively with the other large print and distribution systems across the country to obtain and retain a share of a diminishing market for newspaper production and delivery.  However, any efforts to do so would

---

[49]    Examiner's Sworn Interview with Donald Grenesko, July 8, 2010, at 172:3-173:14.

be in competition with other newspaper companies which would be anticipated to have similarly increasing unused capacity of varying vintages.

Although not an area discussed in memorandum form, VRC prepared projections of Tribune's revenue performance as presented in VRC's October 29, 2009 model, which downwardly revised the very significant growth rates proposed by Tribune management, even taking into account the newly executed $30 million contract with the Sun Times:

| OTHER PUBLISHING ASSUMPTION COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Actual | | Projected | | | | |
| Revenue Assumptions - Base Case | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Tribune October 28, 2007 Analysis | $ 255.1 | $ 275.6 | $ 317.1 | $ 339.7 | $ 364.7 | $ 388.1 | $ 411.2 |
| *Growth Rate* | | 8.0% | 15.1% | 7.1% | 7.4% | 6.4% | 6.0% |
| VRC October 29, 2007 Analysis | $ 255.1 | $ 275.6 | $ 297.6 | $ 312.5 | $ 328.1 | $ 344.5 | $ 361.8 |
| *Growth Rate* | | 8.0% | 8.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| VRC December 20, 2007 Analysis (Internal) | $ 255.1 | $ 275.6 | $ 305.7 | $ 324.1 | $ 343.5 | $ 361.6 | $ 380.6 |
| *Growth Rate* | | 8.0% | 10.9% | 6.0% | 6.0% | 5.3% | 5.3% |
| VRC December 20, 2007 Analysis (Opinion) | $ 255.1 | $ 275.6 | $ 317.1 | $ 339.7 | $ 364.7 | $ 388.1 | $ 411.2 |
| *Growth Rate* | | 8.0% | 15.1% | 7.1% | 7.4% | 6.4% | 6.0% |
| Lehman Brothers (Craig A. Huber - 10/3/07) [2] | $ 256.5 | $ 263.4 | $ 269.9 | $ 276.7 | N/A | N/A | N/A |
| *Growth Rate* | | 2.7% | 2.5% | 2.5% | | | |
| Lehman Brothers (Craig A. Huber - 11/16/07) [2] | $ 256.4 | $ 267.8 | $ 274.5 | $ 281.3 | N/A | N/A | N/A |
| *Growth Rate* | | 4.4% | 2.5% | 2.5% | | | |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).
[2] Unlike Tribune and VRC, Lehman Brothers presents its segment projections inclusive of interactive business revenues.

In its projections, Tribune asserted sizable growth for 2008 and beyond.  The Examiner's financial advisor understands that the Sun-Times contract was anticipated to add about $30 million to revenue in 2008. Therefore, the Examiner's financial advisor endorses VRC's (internal) December 20, 2007 model growth of 10.9% for purposes of projecting 2008 revenues because that rate conservatively captures the expected $30 million benefit.

The Examiner's financial advisor believes, however, that competitive factors, along with the general decline of the legacy print newspaper market, would thereafter curtail exceptional growth over the interim period.  Therefore, the Examiner's financial advisor has projected more moderate growth, declining to 1.0% by 2012, to conservatively reflect optimism for this "Other" component of the Publishing Segment, despite its ties to the declining print newspaper business, and excess capacity that those declines would invariably be expected to create:

| OTHER PUBLISHING PROJECTION COMPARISON EXCL. INTERACTIVE ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| VRC December 20, 2007 Analysis (Opinion) | $ 255.1 | $ 275.6 | $ 317.1 | $ 339.7 | $ 364.7 | $ 388.1 | $ 411.2 |
| *Growth Rate* | | 8.0% | 15.1% | 7.1% | 7.4% | 6.4% | 6.0% |
| | | | | | | | |
| Examiner's Projections | $ 255.1 | $ 275.6 | $ 305.7 | $ 324.0 | $ 340.2 | $ 350.5 | $ 354.0 |
| *Growth Rate* | | 8.0% | 10.9% | 6.0% | 5.0% | 3.0% | 1.0% |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).

### 3.    Circulation Revenue.

As has been discussed, Tribune's circulation revenues had been declining, and were expected to continue to decline, in concert with historically observed and generally anticipated declining circulation numbers. Year-over-year, 2006 to 2007 declines ranged between approximately 5.0% to nearly 9.0% across the four largest Tribune newspaper markets:

| CIRCULATION REVENUE ($mm) | | | |
|---|---|---|---|
| Revenue | 2006A | 2007A | % |
| Los Angeles | $ 168.5 | $ 153.5 | -8.9% |
| Chicago | $ 118.1 | $ 111.2 | -5.9% |
| Newsday | $ 84.3 | $ 78.3 | -7.1% |
| South Florida | $ 33.1 | $ 31.5 | -4.8% |
| Subtotal | $ 404.0 | $ 374.5 | -7.3% |
| Circulation Total | $ 567.3 | $ 526.5 | -7.2% |
| % of Circulation Total | 71.2% | 71.1% | |

Source: Ex. 642 (Brown Book for Period 12, 2007).

Tribune's projected circulation revenues appear to acknowledge and reflect declining print newspaper readership, a direct manifestation of the secular decline in the industry. There is near unanimity among Tribune, VRC and Mr. Huber with respect to Tribune's prospects as to circulation revenues in the near term. The Examiner's financial advisor finds no reason to substantively modify Tribune's projections as a result:

| CIRCULATION PUBLISHING ASSUMPTION COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Actual | | Projected | | | | |
| Revenue Assumptions - Base Case | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Tribune October 28, 2007 Analysis | $ 567.3 | $ 526.5 | $ 511.1 | $ 495.4 | $ 479.9 | $ 464.6 | $ 449.8 |
| *Growth Rate* | | -7.2% | -2.9% | -3.1% | -3.1% | -3.2% | -3.2% |
| VRC October 29, 2007 Analysis | $ 567.3 | $ 526.5 | $ 509.1 | $ 492.8 | $ 477.1 | $ 461.8 | $ 447.1 |
| *Growth Rate* | | -7.2% | -3.3% | -3.2% | -3.2% | -3.2% | -3.2% |
| VRC December 20, 2007 Analysis (Internal) | $ 567.3 | $ 526.5 | $ 509.1 | $ 492.8 | $ 477.1 | $ 461.8 | $ 447.1 |
| *Growth Rate* | | -7.2% | -3.3% | -3.2% | -3.2% | -3.2% | -3.2% |
| VRC December 20, 2007 Analysis (Opinion) | $ 567.3 | $ 526.5 | $ 511.1 | $ 495.4 | $ 479.9 | $ 464.6 | $ 449.8 |
| *Growth Rate* | | -7.2% | -2.9% | -3.1% | -3.1% | -3.2% | -3.2% |
| Lehman Brothers (Craig A. Huber - 10/3/07) [2] | $ 568.9 | $ 526.3 | $ 505.2 | $ 490.1 | N/A | N/A | N/A |
| *Growth Rate* | | -7.5% | -4.0% | -3.0% | | | |
| Lehman Brothers (Craig A. Huber - 11/16/07) [2] | $ 568.9 | $ 526.2 | $ 502.6 | $ 485.0 | N/A | N/A | N/A |
| *Growth Rate* | | -7.5% | -4.5% | -3.5% | | | |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).
[2] Unlike Tribune and VRC, Lehman Brothers presents its segment projections inclusive of interactive business revenues.

The Examiner's financial advisor projected Tribune's circulation revenues as follows:

| CIRCULATION PUBLISHING PROJECTION COMPARISON EXCL. INTERACTIVE ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| VRC December 20, 2007 Analysis (Opinion) | $ 567.3 | $ 526.5 | $ 511.1 | $ 495.4 | $ 479.9 | $ 464.6 | $ 449.8 |
| *Growth Rate* | | -7.2% | -2.9% | -3.1% | -3.1% | -3.2% | -3.2% |
| Examiner's Projections | $ 567.3 | $ 526.5 | $ 511.1 | $ 495.4 | $ 479.9 | $ 464.6 | $ 449.8 |
| *Growth Rate* | | -7.2% | -2.9% | -3.1% | -3.1% | -3.2% | -3.2% |

[1] 2006 and 2007 actuals (excluding interactive business), *see* Ex. 642 (Brown Book for Period 12, 2007).

## 4.    Overall Publishing Segment Margin.

The Examiner's financial advisor reviewed historical margins for the Publishing Segment as context for assessing the margins projected by Tribune and VRC:

| TRIBUNE PUBLISHING SEGMENT SUMMARY ($000) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Publishing | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Operating Revenue | $ 1,472,823 | $ 1,536,684 | $ 1,621,347 | $ 3,485,277 | $ 3,903,431 | $ 3,940,478 | $ 4,036,920 | $ 4,129,850 | $ 4,096,850 | $ 4,092,562 |
| *Growth Rate* | | 4.3% | 5.5% | 115.0% | 12.0% | 0.9% | 2.4% | 2.3% | -0.8% | -0.1% |
| Operating Expenses | $ 1,118,238 | $ 1,159,547 | $ 1,227,035 | $ 2,836,951 | $ 3,392,827 | $ 3,089,097 | $ 3,151,614 | $ 3,272,600 | $ 3,285,435 | $ 3,317,774 |
| EBITDA | $ 428,362 | $ 456,831 | $ 484,164 | $ 897,682 | $ 830,783 | $ 1,025,487 | $ 1,061,589 | $ 1,036,279 | $ 986,232 | $ 949,051 |
| *EBITDA Margin* | 29.1% | 29.7% | 29.9% | 25.8% | 21.3% | 26.0% | 26.3% | 25.1% | 24.1% | 23.2% |
| *Growth Rate* | | 6.6% | 6.0% | 85.4% | -7.5% | 23.4% | 3.5% | -2.4% | -4.8% | -3.8% |

Notes/Source:
Ex. 742 at VRC0063427 (VRC Preliminary Solvency Analysis, dated November 30, 2007).
The record includes historical results for Tribune that show slight discrepancies from the numbers reported above. *See* Ex. 1101 at VRC0003371-0003548 (Litman e-mail, dated September 26, 2007).

The Examiner's financial advisor notes that VRC, in its October 29, 2007 valuation model, projected margins that were below those projected by Tribune for the Publishing

Segment.  Such downward adjustments were not explained in the VRC accompanying memoranda:[50]

| PUBLISHING SEGMENT OPERATING MARGIN COMPARISON | | | | | | |
|---|---|---|---|---|---|---|
| | FY 2007PF | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Tribune October 28, 2007 Analysis | 22.2% | 21.4% | 21.7% | 22.0% | 22.3% | 22.5% |
| VRC October 29, 2007 Analysis | 22.2% | 20.7% | 21.0% | 21.2% | 21.6% | 21.9% |

Because the Examiner's financial advisor segregated the interactive business from the rest of the Publishing Segment in order to quantify the value of cash flows of the interactive business separately, an adjustment to remove the beneficial impact of the higher margin contribution of the interactive business to overall Publishing Segment margins is necessary for projecting Publishing Segment cash flows to be discounted to present value in applying a DCF valuation methodology.  The table below presents forecasted Publishing Segment margins, normalized to adjust for the removal of the influence of the contribution of the interactive business to the Publishing Segment margin:[51]

| PUBLISHING SEGMENT OCF MARGIN (Adjusted to eliminate OCF of interactive business) ($mm) | | | | | |
|---|---|---|---|---|---|
| Operating Cash Flow Assumptions - Base Case | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Projected Publishing OCF | $ 786.1 | $ 814.2 | $ 844.2 | $ 874.8 | $ 906.3 |
| *OCF Margin* | 21.4% | 21.7% | 22.0% | 22.3% | 22.5% |
| Projected Interactive Revenue | $ 318.0 | $ 406.3 | $ 507.9 | $ 603.8 | $ 712.5 |
| *Growth Rate* | 21.4% | 27.8% | 25.0% | 18.9% | 18.0% |
| Estimated Interactive OCF | $ 126.6 | $ 160.1 | $ 203.7 | $ 242.7 | $ 287.9 |
| *OCF Margin* | 39.8% | 39.4% | 40.1% | 40.2% | 40.4% |
| Resulting Publishing OCF | $ 659.5 | $ 654.1 | $ 640.5 | $ 632.1 | $ 618.5 |
| *OCF Margin* | 19.6% | 19.6% | 19.2% | 19.0% | 18.7% |

---

[50]    Ex. 1004 (Mednik E-Mail, dated October 31, 2007).  It is possible that VRC believed that a downward revision to the overall Publishing Segment margins was necessary because VRC downwardly revised the estimated growth in their projection of the interactive business (a sub-segment of the Publishing Segment with higher profitability than the others).

[51]    Tribune's forecasted interactive business operating cash flow (EBITDA) margin was derived based on revenue and operating cash flow projections contained in the Step Two interactive business model.  Ex. 956 (Tribune Interactive 2006-2012 Projections).  Mr. Amsden has represented that this was the relevant interactive business model that ultimately informed the five-Year October 2007 projections presented to the Tribune Board.  Examiner's Interview of Harry Amsden, July 16, 2010.  The resulting operating cash flow margin was applied to Tribune's Step Two interactive business revenue projections, as contained in the Tribune October 28, 2007 analysis, in order to compute annual interactive-specific EBITDA projections, which were then subtracted from respective consolidated Publishing Segment forecasted EBITDA as projected in that model, so as to isolate Tribune's implied Publishing Segment cash flow operating margin exclusive of the interactive business.  Ex. 1004 at VRC0034787 (Mednik E-Mail, dated October 31, 2007).  Although there are minor reconcilable discrepancies between the revenue projections in the Step Two interactive model and those in the Tribune October 28, 2007 analysis, the Examiner's financial advisor believes that this calculation is a reasonable proxy for the Publishing Segment operating cash flow margin excluding the interactive business, given the insufficiency of projection detail for the interactive business.

The Examiner's financial advisor has used the resulting adjusted Publishing Segment margins (ranging from 19.6% in 2008 to 18.7% in 2012) to estimate operating cash flows associated with the revenues projected for each of the divisions of the Publishing Segment, including the sub-segments of print advertising.

> **5.    Consolidated Publishing Segment Projection of Revenues and Operating Cash Flow.**

Based on the analyses described herein with respect to each of Tribune's publishing sub-segments,[52] the Examiner's financial advisor revised management's projections of revenue from that which VRC relied on for purposes of its Step Two solvency opinion, for the discrete period projection horizon of 2008 through 2012, resulting in the following projections of revenue and EBITDA:

| EXAMINER'S PUBLISHING SEGMENT REVENUE PROJECTIONS EXCL. INTERACTIVE ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| **Publishing Revenue** | **2007A** | **2008** | **2009** | **2010** | **2011** | **2012** |
| **Retail** | $ 1,219.9 | $ 1,214.4 | $ 1,202.3 | $ 1,196.2 | $ 1,190.3 | $ 1,184.3 |
| *Growth Rate* | | -0.5% | -1.0% | -0.5% | -0.5% | -0.5% |
| **National** | $ 663.8 | $ 651.6 | $ 636.1 | $ 620.1 | $ 611.1 | $ 598.7 |
| *Growth Rate* | | -1.8% | -2.4% | -2.5% | -1.5% | -2.0% |
| **Classified** | $ 724.5 | $ 620.9 | $ 591.1 | $ 574.6 | $ 555.6 | $ 532.8 |
| *Growth Rate* | | -14.3% | -4.8% | -2.8% | -3.3% | -4.1% |
| **Circulation** | $ 526.5 | $ 511.1 | $ 495.4 | $ 479.9 | $ 464.6 | $ 449.8 |
| *Growth Rate* | | -2.9% | -3.1% | -3.1% | -3.2% | -3.2% |
| **Other** | $ 275.6 | $ 305.7 | $ 324.0 | $ 340.2 | $ 350.5 | $ 354.0 |
| *Growth Rate* | | 10.9% | 6.0% | 5.0% | 3.0% | 1.0% |
| **Total (excl. interactive)** | $ 3,410.4 | $ 3,303.7 | $ 3,248.9 | $ 3,211.0 | $ 3,172.1 | $ 3,119.6 |

---

[52]    Excluding the interactive business, which is addressed separately herein.

| EXAMINER'S PUBLISHING ASSUMPTIONS EXCL. INTERACTIVE ($mm) | | | | | |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** |
| **Publishing Revenue Projections** | $ 3,303.7 | $ 3,248.9 | $ 3,211.0 | $ 3,172.2 | $ 3,119.6 |
| **Publishing OCF [1]** | $ 648.1 | $ 635.1 | $ 617.3 | $ 603.5 | $ 583.5 |
| *Growth Rate* | | *-2.0%* | *-2.8%* | *-2.2%* | *-3.3%* |
| *OCF Margin* | *19.6%* | *19.6%* | *19.2%* | *19.0%* | *18.7%* |
| [1] Excludes corporate expense allocation. | | | | | |

When compared to revenue expectations informing VRC's Step Two solvency opinion, the Examiner's financial advisor downwardly revised Publishing Segment revenue expectations as follows:

| PUBLISHING SEGMENT PROJECTION COMPARISON EXCL. INTERACTIVE ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| Revenue | 2007A | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Examiner** | $ 3,410.4 | $ 3,303.7 | $ 3,248.9 | $ 3,211.0 | $ 3,172.2 | $ 3,119.6 |
| *Growth Rate* | | *-3.1%* | *-1.7%* | *-1.2%* | *-1.2%* | *-1.7%* |
| **VRC December 20, 2007 Analysis** | $ 3,430.7 | $ 3,361.9 | $ 3,345.7 | $ 3,332.4 | $ 3,323.8 | $ 3,306.8 |
| *Growth Rate* | | *-2.0%* | *-0.5%* | *-0.4%* | *-0.3%* | *-0.5%* |
| **Difference** | ($ 20.3) | ($ 58.2) | ($ 96.8) | ($ 121.4) | ($ 151.7) | ($ 187.2) |
| *% Difference* | *-0.6%* | *-1.8%* | *-3.0%* | *-3.8%* | *-4.8%* | *-6.0%* |

###    D.    Broadcasting Segment.

####        1.    DCF Model Assumptions.

At the end of 2007, Tribune's Broadcasting Segment, inclusive of the Chicago Cubs,[53] accounted for approximately 28% of Tribune's consolidated operating revenues.[54]  Tribune's Broadcasting Segment assets included CW Television network affiliates located in major metropolitan areas (including Chicago, New York, Los Angeles, and several other cities), as well as Fox Network and MyNetwork TV affiliates in various U.S. cities.  Its assets also included ownership of a single radio station, WGN-AM, based in Chicago, and Tribune Entertainment, a company which distributed its own, as well as licensed, programming.  Although comprising a smaller percentage of Tribune's revenue, Tribune's Broadcasting Segment was significantly more

---

[53]   Management anticipated selling the Chicago Cubs.  Accordingly, in connection with projections of prospective financial performance for the Broadcasting Segment, management "normalized" its financial forecasts to eliminate the revenue and EBITDA contributions of its ownership interest in the Chicago Cubs.  Due to an expectation of selling the Chicago Cubs, the discussion of historical and forecasted performance of the Broadcasting Segment focuses on Tribune's other Broadcasting Segment assets.

[54]   Ex. 4 at 15 (Tribune 2007 Form 10-K).

profitable than Tribune's Publishing Segment, earning operating margins of approximately 27.5% and 25.55% during 2006 and 2007, respectively[55] (inclusive of the Chicago Cubs, which contributed margins lower than those earned by the consolidated Broadcasting Segment).

Between 2003 and 2007, Broadcasting Segment revenues ranged between approximately $1.4 and $1.5 billion annually, reflecting year-over-prior-year increases in election years (2004 and 2006) and decreases in year-over-prior-year results in non-election years.  The low point during this period occurred in 2007, with Tribune reporting approximately $1.398 billion in revenues (an approximately 1.9% decrease from the $1.425 billion in revenues reported for 2006, despite the fact that 2006 results contained 53 weeks of data in contrast to 52 weeks in 2007).

## 2.    Discussion and Projections Related to Broadcasting Segment Revenue and Profitability.

Against the backdrop of Tribune's historical financial performance and adverse performance during 2007 in relation to its February 2007 operating plan, management revised its forecast in Fall 2007 and presented a revised five-year outlook to the Tribune Board in October 2007.  The revised outlook contemplated modest downward adjustments to earlier revenue expectations, particularly because the February 2007 projections included forecasts of revenue for the Tribune Entertainment business, which, for purposes of management's October 2007 projections, were excluded from forecasted revenues due to a contemplated sale of those operations.[56]  Both projections excluded the Chicago Cubs:[57]

| BROADCASTING SEGMENT PROJECTION COMPARISON ($ mm) | | | | | |
|---|---|---|---|---|---|
|  | 2008E | 2009E | 2010E | 2011E | 2012E |
| **Revenue:** | | | | | |
| February, 2007 Projections | $    1,293 | $    1,297 | $    1,339 | $    1,338 | $    1,336 |
| October, 2007 Projections | 1,257 | 1,264 | 1,307 | 1,317 | 1,352 |
| Difference | $    37 | $    33 | $    32 | $    21 | $    (16) |
| *% Difference* | 2.82% | 2.54% | 2.39% | 1.57% | -1.20% |

**Sources:**
Ex. 71 (ESOP Transaction Model - Revised Operating Plan Case, dated February 8, 2007); Ex. 657 at TRB0252894 (Tribune Five-Year Financial Outlook).

---

[55]   *Id.*

[56]   The February 2007 projection model support does not allow for a segregation of amounts projected for Tribune Entertainment, although other evidence reviewed by the Examiner indicates that Tribune Entertainment had historically contributed approximately $20 million in annual revenues.  *See* Ex. 242 at TRB0094597 and TRB0094581 (Rating Agency Presentation, dated March 2007).

[57]   The Chicago Cubs had been identified as a Tribune asset being held out for sale.

The revised October 2007 plan presented to the Tribune Board contained additional detail regarding the composition of, and growth rates anticipated to be achieved for the primary sub-segments of Tribune's Broadcasting Segment, although the presentation of that data did not contain annual detail.[58]

| BROADCASTING SEGMENT GROUP FINANCIAL OUTLOOK - BASE CASE ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| | 52 wks 2006 | 2007 | 2008 | 2012 | '07 - '08 | '07 - '12 CAGR |
| **Operating Revenue** | | | | | | |
| TV Stations | $ 1,014 | $ 980 | $ 1,068 | $ 1,141 | 8.9% | 3.1% |
| Superstation | $ 145 | $ 143 | $ 145 | $ 167 | 1.6% | 3.1% |
| Radio | $ 41 | $ 38 | $ 41 | $ 44 | 8.7% | 3.1% |
| Group Office/Other | $ 1 | $ 3 | $ 2 | $ 0 | | |
| **Total Revenue** | **$ 1,201** | **$ 1,164** | **$ 1,256** | **$ 1,352** | **7.9%** | **3.0%** |
| | | | | | | |
| **Operating Expenses** | | | | | | |
| TV Stations | $ 709 | $ 704 | $ 722 | $ 768 | 2.5% | 1.8% |
| Superstation | $ 52 | $ 49 | $ 54 | $ 64 | 9.6% | 5.3% |
| Radio | $ 27 | $ 26 | $ 27 | $ 30 | 4.4% | 3.0% |
| Group Office/Other | $ 0 | $ 1 | $ 5 | $ 6 | | |
| **Total Expenses** | **$ 788** | **$ 780** | **$ 808** | **$ 868** | **3.5%** | **2.1%** |
| | | | | | | |
| **Operating Cash Flow** | | | | | | |
| TV Stations | $ 305 | $ 276 | $ 345 | $ 372 | 25.1% | 6.2% |
| Superstation | $ 93 | $ 94 | $ 91 | $ 103 | -2.6% | 1.9% |
| Radio | $ 14 | $ 12 | $ 14 | $ 14 | 17.8% | 3.1% |
| Group Office/Other | $ 2 | $ 2 | ($ 2) | ($ 5) | | |
| **Total Operating Cash Flow** | **$ 414** | **$ 384** | **$ 448** | **$ 484** | **17.0%** | **4.8%** |

Management provided a written explanation of the principal assumptions underlying the revenue and expense growth rates used in developing the above summarized forecast. The materials shared with the Tribune Board contained the following observations with regard to those assumptions:[59]

- Television spot market, excluding political, grows 2.3% in 2008 and 1.1% annually in 2008 to 2012.

- Political advertising continues to be robust resulting in total market revenue growth of 6% to 7% in even years and declines of 4% to 5% in odd years.

- Tribune's share of political revenue increases to an average 6.4%, up from 6.1%, due to improved local news ratings

---

[58]    Ex. 657 (Tribune Five Year Financial Outlook). The Tribune Board presentation truncated the presentation of these sub-segment details so that only the first and fifth years of Tribune's projection were shown, along with the resulting five-year compound annual growth rates. A *consolidated* presentation of the overall Broadcasting Segment forecast was, however, detailed for each year of the five-year projection horizon.

[59]    *Id.*

and expanded local news broadcasts. Political revenue is expected to be $31.5 million in 2008, approximately 3% of total advertising revenue.

• Tribune stations' gross advertising revenue increases 9.9% in 2008, in line with industry consensus for spot television growth of 9% to 10%. Gross advertising revenue averages 1.6% annual growth thereafter.

• Tribune stations' aggregate revenue share increases three-tenths of a share point in 2008 to 13.2% and averages 13.6% in 2008 to 2012. Revenue share increases are driven primarily by improved audience shares in prime (CW and Fox) and new syndicated programming in access and late-fringe (*Two and a Half Men* and *Family Guy*).

In addition, management indicated that WGN operating revenues were projected to increase 2% in 2008, and 3.5% annually thereafter, "primarily due to increased distribution fees as Verizon and AT&T rollout their national video services."[60]

Management's projections also contemplated cost increases, although the annual rates of cost increase were significantly less than the rates of projected annual revenue growth. Broadly speaking, Tribune management forecasted significant revenue growth with an even more significant improvement in operating cash flow over the projection period.[61]

---

[60]  *Id.*

[61]  The 2008 growth rates estimated by management in the October 2007 plan were based on calculations reflecting management's estimate of full year 2007 results at a time when only partial year results were known. Because subsequent comparisons of 2008 projected performance are made against actual 2007 results, growth rates and comparative statistics may differ.

The Examiner's financial advisor observed that Tribune's actual 2007 operating margins declined significantly in 2007 in relation to 2006 (both in terms of actual full year reported results and as contemplated by management in the October plan, in which 2007 results were presented on a pro forma basis). The Examiner's financial advisor investigated the reasons for this declining performance. This evaluation was deemed important by the Examiner's financial advisor, in significant part, because management expected to be able to mitigate this observed decline prospectively, in that forecasted 2008 operating cash flow was contemplated to increase by approximately 16% above 2007 (pro forma) levels, despite an expectation that 2008 revenues would (on a relative bases) experience more modest growth, and because margins for the remainder of management's projection horizon (*i.e.*, for 2009 through 2012) were forecasted to exceed the expected 2007 margins, on a percentage of revenue basis.

The Investigation revealed that 2007 results (pro forma and actual) were negatively affected by certain non-recurring charges, which had a depressing effect on operating profit and EBITDA margins and would therefore not be anticipated to occur prospectively. Tribune's 2007 Form 10-K contained both a presentation of quantitative differences in operating profits as between 2006 and 2007 (reflected in the table below), as well as an explanation of the decline.

The following table (replicated from information contained in materials prepared by Duff & Phelps) places the October 2007 projected Broadcasting Segment operating performance into a longer term historical perspective and reflects actual 2007 operating performance.  The amounts shown were normalized to omit the operating performance of the Chicago Cubs, and the amounts reflect EBITDA (as opposed to operating profit):[62]

| TRIBUNE 2007 FORM 10-K ($ mm) | | | | | |
|---|---|---|---|---|---|
| | | 2007 | | 2006 | % Change 07 - 06 |
| **Operating Revenues** | | | | | |
| Television | $ | 1,136 | $ | 1,178 | -4% |
| Radio/Entertainment | $ | 262 | $ | 247 | 6% |
| Total Operating Revenues | $ | 1,398 | $ | 1,425 | -2% |
| **Operating Expenses** | | | | | |
| Television | $ | 814 | $ | 820 | -1% |
| Radio/Entertainment | $ | 227 | $ | 213 | 6% |
| Total Operating Expenses | $ | 1,041 | $ | 1,033 | 1% |
| **Operating Profit** | | | | | |
| Television | $ | 322 | $ | 358 | -10% |
| Radio/Entertainment | $ | 35 | $ | 34 | 5% |
| Total Operating Profit | $ | 357 | $ | 392 | -9% |

The Examiner notes that Tribune's 2007 Form 10-K reported segment results on a GAAP basis, and discussed segment results in terms of operating profit inclusive of non-cash charges.  Thus, amounts discussed will not comport with, for example, non-GAAP EBITDA, or other "operating cash flow" statistics discussed elsewhere herein.

In Tribune's 2007 Form 10-K, the reported 9% decline in 2007 operating profit in relation to 2006 was nonetheless discussed.

Operating profit for broadcasting and entertainment decreased 9%, or $35 million, in 2007.  Operating profit for 2007 was reduced by a $12 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007, a charge of $6 million for the write-down of program assets at Tribune Entertainment, and a $3 million charge related to the Company's new management equity incentive plan.  Television operating profit declined 10%, or $36 million, in 2007 due to lower revenues and higher compensation costs, partially offset by lower programming expenses. Radio/entertainment operating profit increased 5%, or $1 million, due to higher revenues at the Chicago Cubs, partially offset by lower revenues at WGN Radio and the $6 million write-down of Tribune Entertainment program assets.

Ex. 4 (Tribune 2007 Form 10-K).

Thus, some of the observed decline in operating profit was attributable to non-cash charges (e.g., a charge for non-cash stock based compensation and an asset write-down), and certain other one-time cash expenses (i.e., payments made in connection with the Merger) that would be non-recurring prospectively.  Other reasons for profitability declines arguably could be systemic (e.g., higher compensation costs) to Tribune.

[62]   The Examiner has assumed the accuracy of this information without independent verification.

| BROADCASTING SEGMENT OPERATING PERFORMANCE W/O CHICAGO CUBS ($mm) | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007PF | 2008E | 2009E | 2010E | 2011E | 2012E | 2013E | 2014E | 2015E | 2016E | 2017E |
| Operating Revenue | $1,218 | $1,309 | $1,335 | $1,245 | $1,222 | $1,194 | $1,257 | $1,264 | $1,307 | $1,317 | $1,352 | $1,387 | $1,424 | $1,461 | $1,500 | $1,539 |
| *Growth Rate* | | 7.5% | 2.0% | -6.7% | -1.8% | -2.3% | 5.3% | 0.6% | 3.4% | 0.8% | 2.7% | 2.6% | 2.7% | 2.6% | 2.7% | 2.6% |
| Operating Expenses | $726 | $774 | $775 | $793 | $805 | $797 | $808 | $800 | $827 | $852 | $868 | $891 | $914 | $938 | $963 | $988 |
| EBITDA | $491 | $535 | $560 | $452 | $417 | $397 | $448 | $464 | $479 | $465 | $484 | $497 | $510 | $523 | $537 | $551 |
| *EBITDA Margin* | 40.3% | 40.9% | 41.9% | 36.3% | 34.1% | 33.2% | 35.6% | 36.7% | 36.6% | 35.3% | 35.8% | 35.8% | 35.8% | 35.8% | 35.8% | 35.8% |
| *Growth Rate* | | 9.0% | 4.7% | -19.3% | -7.7% | -4.8% | 12.8% | 3.6% | 3.2% | -2.9% | 4.1% | 2.7% | 2.6% | 2.5% | 2.7% | 2.6% |

Source: Ex. 1102 at D-2 (Duff & Phelps Appendices to Valuation Analysis, dated December 31, 2007).

What is very clear from the table is that management forecasted a dramatic improvement in revenue for 2008 in relation to the then existing pro forma expectation for 2007, and an even more significant improvement in 2008 forecasted EBITDA. Based on a review of the above-summarized historical performance and observations made by VRC analysts charged with investigating Tribune's Broadcasting Segment, changes in levels of revenue would reasonably be anticipated to have a significant impact on operating cash flow margins, because so much of the Broadcasting Segment's cost structure is only modestly variable within relevant ranges.[63] Therefore, increases (or decreases) in Broadcasting Segment revenue would be expected to result in significantly improved (or reduced) margins. This phenomenon is also is evident from a review of the operating cash flow performance summarized above, when, for example, between 2005 and 2007 (a period when revenue declined approximately $51 million, from $1.245 billion to $1.194 billion) Tribune's operating margin declined from 36.3% to 33.2%.

In a memo to the file memorializing VRC's April 17, 2007 discussion with Tribune management and summarizing VRC's research and assessment of Tribune's Broadcasting Segment projections, VRC analyst Doug Peterson provided a list of telling industry observations.[64]

1. 'For traditional local media operators, we believe a new mantra has emerged: innovate or die' (S&P).

2. Increased broadband penetration in households and wireless substitution has caused the need for television content to be available through the Internet, mobile phone, MP3 players, game consoles and other portable media devises.

3. Several leading media companies are streaming free, ad-supported, full episodes of hit prime-time shows across various media platforms.

---

[63] In a summary of his conversation with Tribune personnel dated April 17, 2007, VRC analyst Ron Ewing noted that Tribune personnel represented to him that a "3% dip in revenue converts to about a 10% to 15% dip in cash flow." Ex. 1093 at VRC003765 (VRC Memorandum Summarizing Broadcast Management Interview of April 17, 2007).

[64] Ex. 1094 at VRC0037569-70 (VRC Memorandum Reviewing and Commenting on Broadcast Management Interview of April 17, 2007).

4.      Operating profit margins on incremental online advertising are high and will contribute nicely to profitability once infrastructure costs of online platforms are covered.

5.      The 2006-2007 upfront selling season for the major networks – ABC, CBS, FOX, NBC, UPN and WB (UPN and WB became CW in Sept. 2006) – finished with combined sales down 1% to 2% versus the prior year. This marked the third consecutive year-to-year decline in upfront advertising sales.

      a.      Cable rose 3% to 4%

      b.      A major TV advertiser – J&J – decided to sit out the upfront selling season negotiations.

6.      With the continuation of media fragmentation, a greater portion of traditional ad budgets is expected to shift to the Internet and other emerging platforms. Broadcast networks are including multi-platform pitches.

7.      CBS's UPN network and Time Warner's WB network merged on September 18, 2006, to launch the CW network. By combining their schedules and program lineups, the new network is expected to become a stronger network with greater market coverage and audience size. This is expected to increase the networks pull with advertisers.

8.      News Corp. launched My Network TV, but this network has not done well.

9.      The mature television and radio broadcasting subsector faces disruptive technologies and increased regulatory surveillance . . . .

Although the provenance of the observations contained in the VRC memo cannot be ascertained (save the "innovate or die" admonition), the many warnings and cautionary observations contained therein overwhelm the few positives.  All positives speak, at best, about largely temporary and highly volatile benefits associated with recent share gains and improved product offerings.  At worst, the warnings resemble the litany of woes ascribed to the Publishing Segment.  The common threads running through much of the list are the maturity of the market and the increasing risk as other, more cost effective, useful, or desirable platforms for media advertising are developed.

In contrast to the recitation of challenges and risks, Mr. Peterson's memo also included Tribune management's observations regarding factors tending to mitigate, at least temporarily, some of the concerns facing Tribune and the industry.  In particular, in rebuttal to negatively interpreting Tribune's and the industry's recent downward revenue and profitability trends,

Tribune management argued that the recent performance was misleading for projection purposes since:[65]

> Historical performance did not include the CW network, but rather the WB network, which … had stale programming and had increased competition from UPN. Combining the best programming of WB and UPN provides a stronger platform.

Broadcasting Segment management also pointed to the expectation that "the CW network will generate superior ratings performance and advertising than the WB given the stronger programming and the elimination of a broadcast network, the latter of which will result in a decline in supply of broadcast TV advertising options in explaining the rationale for the expected revenue growth then contemplated."[66]

In addition, Tribune management apparently blamed the introduction, by Nielson, of Local People Meters ("LPMs") for negative Tribune ratings.  According to management:[67]

> LPMs have been attributed to about a 3% loss in revenues after introduction to a market. Their strongest demographic—18 to 34 or younger—are less inclined to perform the tasks need to be properly accounted for actual viewership. As a result, ratings measures were impacted significantly.

While apparently admitting the *appearance* of optimism in the then-existing Tribune forecast, management explained that revenues were "projected to grow at a 3.0% CAGR from 2006 to 2010," and that such projections were not unreasonable when factoring election and Olympic year spending.[68]

With regard to rapidly increasing margins associated with projected revenue growth, Mr. Peterson noted that:[69]

> According to management, their expense projections have closely tracked actual performance in years past. As a result, they have a high degree of confidence in these expense projections which, coupled with their detailed revenue projections, give them a high degree of confidence in their OCF projections.

The question of the variability of the Broadcasting Segment's cost structure was further addressed in a memorandum prepared by Ron Ewing, a VRC analyst who also participated in the April 17, 2007 discussion with management.  In the memo, he recounts management's observation that, in a recession scenario, "[r]evenue can be expected to drop from 3% to 5%;

---

[65]   *Id* at VRC0037568.

[66]   *Id*.

[67]   *Id*.

[68]   *Id*.

[69]   *Id*.

some of the lost revenue can be offset in cost." [70]   The observation implicitly recognizes that costs are relatively fixed in nature, since only *some* of the lost revenue can be offset through cost reductions.[71]   Moreover, elsewhere in the memo, VRC observes that management numerically confirmed the notion of low variability of costs: "[a] 3% dip in revenue converts to about a 10% to 15% dip in cash flow…."[72]

In a VRC memorandum dated October 29, 2007, commenting on management's revised October 2007 projections, VRC's Leonid Mednik observed the following with respect to management's forecast of 2008 revenue and the substantial rate of revenue growth anticipated therein:[73]

> VRC believes that a revenue growth rate of 7.9% is overestimated. The base case growth rate is considerably higher than the five year CAGR of 1.9% or the long term (1998 through 2006) CAGR of 3.9%. Although the Broadcasting unit should benefit from additional political ad spending the company's largest stations are located in markets that do not expect significant increases.
>
> Additionally, the average analyst estimate of growth for the year is 3.8%. This is considerably lower than what the Company is projecting for 2008. Some of these analysts' projections may not include the recent success of CW shows and as such additional credit should be given to the Company.
>
> VRC believes a more appropriate growth rate should be the midpoint of the Company's projected growth rate and the average analyst estimate. Therefore, VRC believes an appropriate growth rate is 5.8%.

---

[70]   *Id.* at VRC0037565.

[71]   *Id.*

[72]   *Id*.

[73]   Ex. 1004 at VRC0034758 (Mednik E-Mail, dated October 31, 2007).

Mr. Mednik's observations regarding management's expectation of revenue growth for 2008 were based upon a pro forma estimate of 2007 performance, and therefore do not capture all the data that were available as of December 20, 2007, the date of VRC's Step Two solvency opinion. The table below reflects Tribune's projections as Mr. Mednik saw them in late October 2007.

| BROADCASTING SEGMENT ASSUMPTION COMPARISON ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| Revenue Assumptions - Base Case | FY 2007PF | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Tribune October 28, 2007 Analysis | $ 1,164.1 | $ 1,256.5 | $ 1,264.1 | $ 1,306.6 | $ 1,317.2 | $ 1,351.8 |
| *Growth Rate* | -4.7% | 7.9% | 0.6% | 3.4% | 0.8% | 2.6% |

In the following table, the Examiner's financial advisor presents *actual* 2007 Broadcasting Segment revenue results as well as recalculated growth rates implied by management's 2008 projection of revenue.

| BROADCASTING SEGMENT ASSUMPTION COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Actual | | Projected | | | | |
| Revenue Assumptions - Base Case | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Tribune October 28, 2007 Analysis | $ 1,223.1 | $ 1,177.6 | $ 1,256.5 | $ 1,264.1 | $ 1,306.6 | $ 1,317.2 | $ 1,351.8 |
| *Growth Rate* | | -3.7% | 6.7% | 0.6% | 3.4% | 0.8% | 2.6% |

[1] 2006 and 2007, *see* Ex. 642 (Brown Book for Period 12, 2007).

The Broadcasting Segment's improved performance in the later months of 2007 resulted in actual revenues in excess of those estimated earlier in the year and relied on by VRC in making its judgment about the reasonableness of the growth rates to apply to 2007 revenues in order to project 2008 revenues. As a result, the growth implied by management's 2008 revenue projection reflects an expected 6.7% increase, lower than the 7.9% originally calculated. The Examiner's financial advisor is inclined to accept, as reasonable, management's projection of revenue for 2008 ($1.2565 billion) based on the detailed nature of management's rationale for near term revenue improvement, despite the apparent optimism with regard to the success of the new programming as well as the prospects for CW on which they are founded.

Regarding the remaining interim periods of the projection horizon (2009 through 2012), Tribune management projected revenue according to expectations not only of systemic growth in base revenues, but also taking into account expectations of the revenue enhancing effects of incremental political advertising spending during election years. Practically speaking, management's approach to establishing the timing of revenues is superior to the conceptually adequate application of a compound period growth rate that smoothes revenues, because it more accurately confines period cash flows to the periods in which they are specifically expected to be produced.

The Examiner's financial advisor finds, however, that management's projected revenue growth of between 0.6% (2009) and 0.8% (2011) is unreasonable in that it appears that, from a historical perspective, Tribune experienced *declining* growth in years following election years

2005 (6.7%) and 2007 (3.7%).  The Report therefore assumes no growth in revenues in the years following election years:

| BROADCASTING SEGMENT PROJECTION COMPARISON ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revenue | FY 2006A [1] | FY 2007A [1] | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| VRC December 20, 2007 Analysis | $ 1,223.1 | $ 1,177.6 | $ 1,256.5 | $ 1,264.1 | $ 1,306.6 | $ 1,317.2 | $ 1,351.8 |
| *Growth Rate* | | -3.7% | 6.7% | 0.6% | 3.4% | 0.8% | 2.6% |
| Examiner's Projections | $ 1,223.1 | $ 1,177.6 | $ 1,256.5 | $ 1,256.5 | $ 1,299.2 | $ 1,299.2 | $ 1,333.0 |
| *Growth Rate* | | -3.7% | 6.7% | 0.0% | 3.4% | 0.0% | 2.6% |

[1] 2006 and 2007 actuals, *see* Ex. 642 (Brown Book for Period 12, 2007).

VRC's Shakespeare James prepared a memo, dated October 29, 2007, addressing the expense assumptions for the Broadcasting Segment that informed management's forecasted operating cash flow margins. In the memorandum, he noted:[74]

> VRC (Base Case Analysis): VRC has noted that the Company has historically achieved an average expense ratio of 69.7% over the last ten years. However, the Company is projecting margins of 64.3% for 2008, 63.3% for 2009, 63.3% for 2010, 64.7% for 2011, and 64.2% for 2012. This difference is due to the costs savings the Company is hoping to achieve in implementing new technology.
>
> VRC has assumed a margin at the midpoint of the base case and the historical 10 year average to conservatively reflect achieving only a part of the planned $200 million dollars in cost savings that the company hopes to achieve in 2007 and 2008. VRC has derived an expense ratio of 65.2% for 2008, 64.7% for 2009, 64.7% for 2010, 65.4% for 2011 and 65.1% for 2012.

In view of the historical EBITDA margin performance, and the low cost variability over relevant revenue ranges, the Examiner's financial advisor finds that the adjustments proposed by VRC are inconsistent with reasonable expectations of improving margin performance in circumstances of projected revenue growth.  The Examiner's financial advisor, therefore, has adopted management's October 2007 projections of EBITDA margin for purposes of calculating operating cash flows for the Broadcasting Segment.

On the basis of the discussion contained herein, the Examiner's financial advisor projected the following revenue for the Broadcasting Segment for the interim period projection horizon 2008 through 2012:

| BROADCASTING SEGMENT REVENUE ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| Revenue | FY 2007A | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Examiner's Projections | $ 1,177.6 | $ 1,256.5 | $ 1,256.5 | $ 1,299.2 | $ 1,299.2 | $ 1,333.0 |

---

[74]    *Id.*

As reflected in the table below, the Examiner's financial advisor developed projections of Broadcasting Segment revenues for purposes of the DCF Valuation Analysis which were not substantially dissimilar from management's October 2007 projections on which VRC's analysis relied:

| BROADCASTING SEGMENT PROJECTION COMPARISON ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| Revenue | FY 2007A | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Examiner's Projections | $ 1,177.6 | $ 1,256.5 | $ 1,256.5 | $ 1,299.2 | $ 1,299.2 | $ 1,333.0 |
| VRC December 20, 2007 Analysis | $ 1,177.6 | $ 1,256.5 | $ 1,264.1 | $ 1,306.6 | $ 1,317.2 | $ 1,351.8 |
| Difference | $ 0.0 | $ 0.0 | ($ 7.6) | ($ 7.4) | ($ 18.0) | ($ 18.8) |
| % Difference | 0.0% | 0.0% | -0.6% | -0.6% | -1.4% | -1.4% |

Those projections translate into EBITDA expectations as follows:

| BROADCASTING SEGMENT OCF ($mm) | | | | | |
|---|---|---|---|---|---|
| OCF | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Examiner's Projections | $ 448.5 | $ 461.1 | $ 476.5 | $ 458.7 | $ 477.1 |
| Margin: | 35.7% | 36.7% | 36.7% | 35.3% | 35.8% |

As would be expected, the Examiner's financial advisor projected EBITDA amounts largely consistent with those that Tribune anticipated:

| BROADCASTING SEGMENT PROJECTION COMPARISON ($mm) | | | | | |
|---|---|---|---|---|---|
| OCF | FY 2008E | FY 2009E | FY 2010E | FY 2011E | FY 2012E |
| Examiner's Projections | $ 448.5 | $ 461.1 | $ 476.5 | $ 458.7 | $ 477.1 |
| VRC December 20, 2007 Analysis | $ 448.5 | $ 463.9 | $ 479.3 | $ 465.0 | $ 483.8 |
| Difference | ($ 0.0) | ($ 2.8) | ($ 2.7) | ($ 6.3) | ($ 6.7) |
| % Difference | 0.0% | -0.6% | -0.6% | -1.4% | -1.4% |

E.    **Interactive Business.**

1.    **DCF Model Assumptions.**

Tribune's interactive business is part of its Publishing Segment.  As is the case for Tribune's traditional newspaper publishing business, advertising is the primary source of revenue for the interactive business, and these revenues are incorporated into reported advertising revenues for the Publishing Segment both internally,[75] as well as externally.  Tribune's interactive business includes web sites associated with each of Tribune's newspapers, as well as Tribune's ownership interests in CareerBuilder (an online recruiting company), Classified Ventures (a network of automotive and real estate classified advertising websites), ShopLocal (which provides search-based interactive retail promotions), Topix.net (an online news and information aggregation website) and Metromix (a network of local online entertainment guides targeting young adults), although Tribune does not consolidate financial results for its equity ownership interests in these companies for financial statement presentation purposes.

Revenues for Tribune's interactive business were growing rapidly in years prior to 2007, and continued to grow during 2007, despite softness in Tribunes' traditional Publishing Segment print advertising and circulation revenue during the year.  In 2005, interactive business revenues approximated $176 million.  In 2006, interactive business revenues increased to approximately $225 million, up approximately 28% year-over-year.  In 2007, interactive business revenues grew to approximately $252 million, reflective of continuing growth, albeit at a slower 12% rate, year-over-year.[76]

The interactive business represented a high-growth component of Tribune's expected future performance as reflected in the projections relied on by VRC in connection with the issuance of its Step One solvency opinions in May 2007, as well as the projections relied on by VRC in issuing its December 20, 2007 Step Two solvency opinion.  Harry Amsden, who coordinated the development of Tribune's five-year model (which became the basis for VRC's May 2007 DCF valuation of Tribune), indicated that the interactive business developed its own five-year plan, which was incorporated into Tribune's projection model without modification.[77]  This fact was confirmed during the Examiner's interview of Timothy Landon, the CEO of Tribune's interactive business from 2004 through early 2008.[78]

---

[75]   Tribune does, in connection with monthly Brown Book reporting, present financial information in a manner such that interactive results can be separately identified.

[76]   Ex. 4 at 63 (Tribune 2007 Form 10-K).

[77]   Ex. 66 at 27:12-15 and 58:5-12 (2004 Examination of Harry Amsden, December 16, 2009); *see also* Ex. 952 at TRB0468697 (Tribune Publishing 5-Year Model Preparation).

[78]   Examiner's Interview of Timothy Landon, June 22, 2010.  VRC's May 2007 DCF model, and the related underlying management projections, did not separately present projected performance for the interactive business**.**  The Examiner, however, obtained from Mr. Amsden an early version of the interactive model (estimated by Mr. Amsden to be from December 2006).  Based on Mr. Amsden's representation and a comparison of that model's forecasted revenues to the projected interactive revenues contained in an April 2007 Tribune presentation to the lenders, that model appears to be a reasonable proxy for the final five-year "interactive plan" alluded to by Mr. Amsden at his Rule 2004 examination.  Ex. 66 (Rule 2004 Examination of

Harry Amsden, December 16, 2009).  In the model, operating cash flows are projected for "TI core revenue" and interactive "investment revenue" as follows:

| LATE DECEMBER 2006 MODEL OF INTERACTIVE REVENUES ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| | Growth | 2007 | 2008 | 2009 | 2010 | 2011 |
| **TI Core Revenue** | 12% | $ 273 | $ 311 | $ 353 | $ 391 | $ 424 |
| **Investment Revenue #1** | 25% | 8 | 9 | 11 | 14 | 17 |
| **Investment Revenue #2** | 25% | | 10 | 13 | 16 | 20 |
| **Investment Revenue #3** | 25% | | - | 10 | 13 | 16 |
| **Investment Revenue #4** | 25% | | - | - | 10 | 13 |
| **Investment Revenue #5** | 25% | | - | - | - | 10 |
| Total Revenue | | $ 281 | $ 330 | $ 387 | $ 443 | $ 499 |
| | | | 17% | 17% | 15% | 13% |

Source:
Ex. 1073 (Print Interactive Splits).

Ex. 1095 (Tribune Interactive Model, dated approximately December 2006).

Although the "core" revenues related to established lines of internet-based advertising business that were projected to grow at an annual rate of 12%, the revenue forecast for "investment" was apparently an estimation of revenues related to investment opportunities that Tribune had not yet identified.  These revenues were projected to grow at annual rates of 25%.

In his explanation of the changes that occurred in management's approach to projecting the financial performance of the interactive business between the closing of Step One and Step Two, Mr. Amsden supplied a reconciliation of the two models for review by the Examiner.  Ex. 1066 (Interactive Step One and Step Two Comparison).  That reconciliation is represented below:

| TRIBUNE PUBLISHING COMPARISON OF INTERACTIVE MODELS STEP ONE V. STEP TWO ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | **2008** | **2009** | **2010** | **2011** |
| **Interactive Revenues:** | | | | | | |
| *Step One Model Detail:* | | | | | | |
| Core revenue | A | $273 | $311 | $353 | $391 | $424 |
| Investment revenue | B | 8 | 19 | 34 | 52 | 75 |
| Total interactive revenues | C | $281 | $330 | $387 | $443 | $499 |
| | | | | | | |
| *Step Two Model Detail:* | | | | | | |
| Existing Business | D | $262 | $278 | $310 | $343 | $381 |
| Internal Development | E | 0 | 31 | 75 | 123 | 157 |
| Acquisitions | F | 0 | 5 | 19 | 38 | 62 |
| Total interactive revenues | G | $262 | $314 | $404 | $504 | $600 |
| Less: Internal Development | | $0 | ($31) | ($75) | ($123) | ($157) |
| Adjusted interactive revenues | | $262 | $283 | $329 | $381 | $443 |
| | | | | | | |
| *Differences Between Models:* | | | | | | |
| Core/existing business line | D-A | ($11) | ($33) | ($43) | ($48) | ($43) |
| Investment/acquisition line | F-B | ($8) | ($14) | ($15) | ($14) | ($13) |
| Internal Development | E | $0 | $31 | $75 | $123 | $157 |
| Differences in revenue between models | | ($19) | ($16) | $17 | $61 | $101 |

Source:
Ex. 1066 (Interactive Step One and Step Two Comparison).

On the basis of the foregoing, the difference between projected revenues at Step One and at Step Two for the period 2007 through 2011 appears to be the result of Tribune reducing its expectations of revenue generation associated with its existing interactive business and other prospective acquisitions and investments in favor of introducing expectations of revenues associated with new products and services resulting from Tribune's own "internal development" of new revenue-generating products and services.  When asked about the origin of the revenue expectations associated with interactive "internal development" (accounting for a net increase in projected revenues in 2011, for example, of approximately $101 million), Mr. Amsden indicated that Tribune's "transformative change" effort initiated prior to the Step One Financing Closing Date was the impetus for management's conclusion that Tribune needed to focus on interactive product development internally in contrast to its funding of externally developed products and services through investments in, for example, joint ventures.  Examiner's Interview of Harry Amsden, July 16, 2010.

With respect to the impact of adding substantial incremental internally-developed revenue to projected interactive operating cash flow between Step One and Step Two, Mr. Amsden shared the comparison restated below:

| INTERACTIVE OPERATING CASH FLOW COMPARISON - STEP ONE V. STEP TWO MODEL ($mm) | | | | | | |
|---|---|---|---|---|---|---|
| | **52 Week** | | | | | |
| | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| **Interactive Operating Cash Flow** | | | | | | |
| Step 1 Model | $124 | $145 | $161 | $190 | $218 | $247 |
| Step 2 Model | 126 | 121 | 125 | 159 | 202 | 241 |
| Difference | $2 | ($24) | ($36) | ($31) | ($16) | ($6) |
| **Source:** | | | | | | |
| Ex. 1066 (Interactive Step One and Step Two Comparison). | | | | | | |

Ex. 1066 (Interactive Step One and Step Two Comparison).

The comparison shows that, as a result of substituting revenues from internal development (having lower margins) for revenues associated with existing interactive businesses and planned acquisitions between Step One and Step Two, operating cash flow was actually reduced between the Step One and Step Two interactive business models over the interim projection period.

It is important to note, however, that the benefit from introducing the cash flows related to the "internal development" efforts newly initiated between Steps One and Step Two came as a result of reallocation of investment capital away from Tribune's joint venture investment strategy (as distinguished from its interactive business acquisitions strategy).  Interestingly, the reallocation of capital to the interactive business's newly formulated "internal development" efforts came without any loss of Tribune value normally associated with projected cash flow.  Rather, because (for cash flow projection purposes) Tribune treated its joint venture investments as investments that would grow in value through capital appreciation rather than in terms of periodic cash flow distributed to Tribune, the negative impact on Tribune's value appears to have been negligible.

When asked how the negative impact on Tribune could be gauged, Mr. Amsden explained that the impact could be seen through the elimination of the projected profit expected to be retained by the future joint venture equity investments that Tribune would now have to forgo in favor of investment in the "internal development" of interactive products and services.  Examiner's Interview of Harry Amsden, July 16, 2010.  The reallocated investment capital is contrasted with the projected equity value forgone in the table below:

Ultimately, the projection model relied on by VRC for purposes of its Step Two solvency opinion separately identified projected interactive business revenues, although the projection model did not specifically identify projected EBITDA associated therewith.  The Tribune projections relied on by VRC in connection with the issuance of its Step Two solvency opinion reflected an anticipation of significant growth in interactive business revenues, although such expectations were upwardly revised from Step One projections for purposes of the management forecast relied on by VRC for its Step Two solvency analysis.  The Step Two projections forecasted interactive revenues growing from approximately $262 million in 2007, to more than $600 million by 2011, and $708 million by 2012, reflecting a five year compound annual growth rate of approximately 22%.

A comparison of the interactive revenues informing VRC's May 2007 and December 2007 DCF models is set forth in the following table:

| PROJECTED NOMINAL RETURN ON FORGONE EQUITY INVESTMENTS ($mm) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2005 Actual | | 2006 Proj (52 wks) | | 2007 | | 2008 | | 2009 | | 2010 | | 2011 | |
| **Tribune Share of Entity Profit** | | | | | | | | | | | | | | |
| CareerBuilder | $ | (15) | $ | (8) | $ | 4 | $ | 11 | $ | 21 | $ | 32 | $ | 43 |
| Classified Ventures | | (2) | | 0 | | 1 | | 6 | | 8 | | 11 | | 14 |
| ShopLocal | | (5) | | (11) | | (9) | | (6) | | - | | 4 | | 6 |
| Topix.com | | (1) | | (2) | | (3) | | (1) | | - | | 1 | | 2 |
| Open Networks | | - | | - | | (3) | | (4) | | (1) | | 2 | | 3 |
| Other | | (1) | | 1 | | 0 | | 1 | | 2 | | 4 | | 9 |
| **Subtotal** | $ | (22) | $ | (21) | $ | (11) | $ | 5 | $ | 30 | $ | 54 | $ | 77 |
| | | | | | | | | | | | | | | |
| Step One Joint Venture Funding | | | | | $ | 33 | $ | 33 | $ | 33 | $ | 33 | $ | 33 |
| Step Two Joint Venture Funding | | | | | | 24 | | 4 | | 6 | | 2 | | - |
| Invested Capital Reallocated to "Internal Development" | | | | | $ | 9 | $ | 29 | $ | 27 | $ | 31 | $ | 33 |

**Source:**
Ex. 1066 (Interactive Step One and Step Two Comparison).
Ex. 1073 (Print Interactive Splits).

In sum, it appears that between Step One and Step Two, management downwardly revised its expectations with regard to revenues expected from existing and acquired lines of the interactive business, but added newly developed projections of revenues from "internal development" efforts. Capital for the newly identified development projects would come from the reallocation of investment capital slated in Step One for investment in joint venture projects.  Moreover, the lost benefits associated with the reallocation away from its joint ventures were negligible because little equity value was expected from such investments during the interim projection period, and the benefits were entirely non-cash in nature in any event.  Examiner's Interview of Harry Amsden, July 16, 2010.

| INTERACTIVE ADVERTISING REVENUE PROJECTIONS ($mm) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Revenue Projections | 2006A [c] | 2007P | 2008P | 2009P | 2010P | 2011P | 2012P | CAGR |
| May 2007 Interactive Advertising Projections [a] | 227.0 | 273.0 | 322.0 | 376.0 | 435.0 | 500.0 | N/A | 16.3% |
| *May 2007 Projections Growth Rate* | | 20.3% | 17.9% | 16.8% | 15.7% | 14.9% | | |
| December 2007 Projections [b] | 227.0 | 262.0 | 318.0 | 406.3 | 507.9 | 603.8 | 712.5 | 22.2% |
| *December 2007 Projections Growth Rate* | | 15.4% | 21.4% | 27.8% | 25.0% | 18.9% | 18.0% | |
| Change in Same Year Interactive Advertising Projections | | -4.0% | -1.2% | 8.1% | 16.8% | 20.8% | N/A | |

Sources:
[a] Ex. 242 (Rating Agency Presentation, dated March 2007).
[b] Ex. 913 at VRC0019336 (Valuation Summary).
[c] Ex. 642 (Brown Book for Period 12, 2007).

The juxtaposition of projected revenues for 2008 through 2011 from VRC's December 2007 model with projected revenues for the same years apparently informing VRC's May 2007 DCF model (as based on management projections and the ratings agency presentation at that time), indicate a modest downward revision followed by substantial "improvement" in amounts projected in subsequent years. As shown in the above table, by 2011, VRC's December 2007 DCF model was based on projected levels of interactive revenue exceeding the May 2007 projection by more than 20%.

Evidence reviewed by the Examiner's financial advisor contains a five-year projection of operating cash flow performance for Tribune's interactive business that compares, within close tolerances at the revenue line, to the December 2007 projections for the interactive business.[79] This stand-alone model indicates substantial expected operating cash flow margins for each element of the interactive business. In addition, the model specifies performance expectations for four elements of the interactive business, including the "Existing Business," "Internal Development," "Acquisitions," and "Equity" investment components.[80] Notably, the interactive business' "Equity Investment" value, for purposes of VRC's solvency test, is addressed through the valuation of the Tribune Entities' ownership interests in such investments as stand-alone investments and, therefore, outside of the DCF projected operating cash flows. Thus, the cash flow expectations related to these investments are not addressed in the context of Tribune's interactive business. As discussed below, however, the annual cash flows expected from Tribune's equity investments were used to project cash flow for VRC's "Cash Flow Test" purposes, because the assets were not designated by Tribune or VRC as assets held for sale.

The stand-alone interactive business projection model reflects the following expectations:[81]

---

[79]   *See* Ex. 956 (Tribune Interactive 2006-2012 Projections).

[80]   *Id*. at VRC0026119.

[81]   *Id*.

| TRIBUNE INTERACTIVE BUSINESS ($mm) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 5-Year CAGR |
| **Revenue** | | | | | | | | |
| Existing Business | $ 227.0 | $ 262.0 | $ 278.0 | $ 310.0 | $ 343.0 | $ 381.0 | $ 424.0 | 10% |
| *Growth* | | 15% | 6% | 12% | 11% | 11% | 11% | |
| Internal Development | $ 0.0 | $ 0.0 | $ 31.0 | $ 75.0 | $ 123.0 | $ 157.0 | $ 195.0 | |
| Acquisitions | $ 0.0 | $ 0.0 | $ 5.0 | $ 19.0 | $ 38.0 | $ 62.0 | $ 89.0 | |
| **Total Revenue** | **$ 227.0** | **$ 262.0** | **$ 314.0** | **$ 404.0** | **$ 504.0** | **$ 600.0** | **$ 708.0** | **22%** |
| *Growth* | | | 20% | 29% | 25% | 19% | 18% | |
| | | | | | | | | |
| **Operating Cash Flow** | | | | | | | | |
| Existing Business | $ 126.0 | $ 131.0 | $ 131.0 | $ 144.0 | $ 159.0 | $ 178.0 | $ 200.0 | 9% |
| *Growth* | | 4% | 0% | 10% | 10% | 12% | 12% | |
| Internal Development | $ 0.0 | ($ 10.0) | ($ 8.0) | $ 11.0 | $ 34.0 | $ 47.0 | $ 60.0 | |
| Acquisitions | $ 0.0 | $ 0.0 | $ 1.0 | $ 4.0 | $ 9.0 | $ 16.0 | $ 26.0 | |
| **Total Operating Cash Flow** | **$ 126.0** | **$ 121.0** | **$ 125.0** | **$ 159.0** | **$ 202.0** | **$ 241.0** | **$ 286.0** | **19%** |
| *Growth* | | -4% | 3% | 27% | 27% | 19% | 19% | |
| | | | | | | | | |
| **Operating Margin** | | | | | | | | |
| *Existing Business* | 55% | 50% | 47% | 46% | 46% | 47% | 47% | -1% |
| *Total Business* | 55% | 46% | 40% | 39% | 40% | 40% | 40% | -3% |

*Source:* Ex. 956 (Tribune Interactive 2006-2012 Projections).

Tribune's "existing business" segment revenue was projected to grow at a five-year compound annual growth rate of approximately 10% and was comprised of two sub-segments: "classified" and "non-classified." The "non-classified" online advertising revenue portion (which accounted for only approximately 20% of total existing business revenue in 2007), was projected to grow at a 4% compound annual growth rate over the five year projection period. "Classified" online advertising, however, was projected to grow at a five-year compound annual growth rate of approximately 11%. Notably, the "Recruitment" portion of "classified" online advertising, which was, according to the model, expected to represent approximately 52% of total "classified" revenue in 2007, was projected to grow at only a 3% compound annual growth rate over five years, representing only approximately 36% of "classified" online advertising revenue by 2012. The "Recruitment" element of Tribune's existing interactive business was apparently driven by sales to existing advertisers through an "up-sale" process, whereby Tribune offered advertisers the opportunity to advertise in their newspapers' online editions for an incremental fee. Up-sale revenue was expected to be very high margin revenue for the interactive business, because little incremental cost was involved with placing customers' ads in the online version of Tribune's newspapers. According to notes to the Tribune interactive stand-alone model, "Recruitment" revenues were expected to stagnate due to "lower print up sales [and] higher online only" sales.[82] Because "recruitment" revenue was expected to flatten, most of the growth in "classified" online advertising was expected to be driven by automotive online advertising and real estate online advertising.[83] As projected in the interactive stand-alone model, the interactive business' overall profitability was anticipated to be significant:

[82]   *Id.*

[83]   *Id.* at VRC0026119-21.

| TRIBUNE INTERACTIVE BUSINESS ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
| **Existing Business** | | | | | | | |
| Revenue | $ 227.0 | $ 262.0 | $ 278.0 | $ 310.0 | $ 343.0 | $ 381.0 | $ 424.0 |
| *Operating Cash Flow Margin* | *55.5%* | *50.0%* | *47.1%* | *46.5%* | *46.4%* | *46.7%* | *47.2%* |
| **Internal Development** | | | | | | | |
| Revenue | $ 0.0 | $ 0.0 | $ 31.0 | $ 75.0 | $ 123.0 | $ 157.0 | $ 195.0 |
| *Operating Cash Flow Margin* | *0.0%* | *n/a* | *-25.8%* | *14.7%* | *27.6%* | *29.9%* | *30.8%* |
| **Acquisitions** | | | | | | | |
| Revenue | $ 0.0 | $ 0.0 | $ 5.0 | $ 19.0 | $ 38.0 | $ 62.0 | $ 89.0 |
| *Operating Cash Flow Margin* | *0.0%* | *0.0%* | *20.0%* | *21.1%* | *23.7%* | *25.8%* | *29.2%* |

*Source:* Ex. 956 (Tribune Interactive 2006-2012 Projections).

Furthermore, the established component of Tribune's interactive business in 2007 was not expected to fuel all of the interactive business' projected significant growth over the projection period. In fact, by the end of the projection period in 2012, existing business revenues were expected to contribute only approximately 60% of total interactive business revenue. This means that a significant portion of the interactive business' revenue growth over the projection period was expected to come from new internal development and acquisitions.

Tribune's "Five-Year Financial Outlook," presented at the October 17, 2007 Tribune Board meeting, described Tribune's plans to transition its business to interactive:[84]

- The mix of ad revenue from 2007 to 2012 moves more toward interactive and targeted print as we transform the company to a more diversified business that is less dependent on core newspaper revenues. . . .

- Interactive revenue is projected to grow 22% annually from 2007 to 2012. Declines in recruitment revenues due to lower combined print/online ads will be mostly offset by growth in online retail and national [advertising]. The launch of interactive real estate, aggressive product development, at both TI Central and LA, as well as the rollout of other new products will contribute to growth. Planned interactive acquisitions are expected to contribute 3% to the annual revenue growth.

---

[84]    Ex. 657 (Tribune Five-Year Financial Outlook).

According to notes contained in the interactive business stand-alone model, and as discussed above, "internal development" growth was expected to come from "Central and LATI product development," based on substantial capital investment and additional hirings, while revenues projected for the interactive business' "acquisitions" component were linked to additional cash investments in new opportunities that apparently had not been specifically identified at the time of the projections.[85]  The interactive business' stand-alone model indicates a consistent investment in new acquisitions of $50 million per year beginning in 2008, indicating that no specific acquisitions had been identified at the time the projections were developed.[86] When asked at his Rule 2004 examination if he could recall specifically any of the areas that the interactive business expected to "get into over this five year period," Mr. Amsden indicated that he could recall a few things including "expanding [Tribune's] presence in online real estate and obviously also looking at possible areas in shopping or search."[87]

In connection with VRC's October 29, 2007 assessment of Tribune's projections, VRC analyst Mose Rucker proposed significant downward revisions to the revenues projected by Tribune for the interactive business.

| INTERACTIVE REVENUE COMPARISON OF TRIBUNE AND VRC OCTOBER MODELS ($mm) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Interactive Revenues | 2007P | 2008 | 2009 | 2010 | 2011 | 2012 | |
| Tribune October 28, 2007 Analysis [1] | $    262 | $    318 | $    406 | $    508 | $    604 | $    713 | |
| *Growth* | | *21.4%* | *27.8%* | *25.0%* | *18.9%* | *18.0%* | |
| VRC October 29, 2007 Analysis [2] | $    262 | $    309 | $    358 | $    408 | $    461 | $    521 | |
| *Growth* | | *17.9%* | *15.9%* | *13.9%* | *13.0%* | *13.0%* | |
| **Difference** | $    - | $    9 | $    48 | $    100 | $    143 | $    192 | |
| *% Difference* | *0.0%* | *2.9%* | *11.9%* | *19.7%* | *23.7%* | *26.9%* | |
| [1] Ex. 1004 at VRC0034787 (Mednik E-Mail, dated October 31, 2007). | | | | | | | |
| [2] Ex. 1004 at VRC0034798 (Mednik E-Mail, dated October 31, 2007). | | | | | | | |

Mr. Rucker made the following observations with respect to his assessment of the financial prospects of Tribune's interactive business:[88]

> Given that the interactive business is approximately $225 mm and highly competitive. [sic] It is highly likely that the rate of growth will continue to decline.
>
> a.      in many respects, interactive has been the beneficiary of the decline in newspaper advertising.
>
> b.      Many of the Company's competitors and industry

---

[85]    Ex. 956 at VRC0026119 (Tribune Interactive 2006-2012 Projections).

[86]    *Id*.

[87]    Ex. 66 at 68:23-69:7 (Rule 2004 Examination of Harry Amsden, December 16, 2009).

[88]    Ex. 1004 at VRC0034784-85 (Mednik E-Mail, dated October 31, 2007).

participants are pursuing the same strategies as TRB in the online
adv. Market. Thus, although the industry as a whole will continue
to grow it is likely that individual participants growth rates will
decline.

      c.     Additionally, the interactive business will continue
to benefit from the decline in TRB's core newspaper business.

The downward revisions were made by VRC, despite acknowledgment of potentially
mitigating factors, which, according to Mr. Rucker included, "the amount of capital that TRB is
anticipating on investing in the interactive segment," and the fact that "management has been
very positive on Metro Mix new offering."[89]

Nevertheless, in connection with its October 29, 2007 assessment, VRC determined to
downwardly adjust the revenue growth rates projected by Tribune based on  "the risks associated
with growing the Company's interactive business…" and the competitiveness of the business, as
well as Oppenheimer and Credit Suisse estimates of industry growth, both of which were below
management's projected rates of growth.[90]

The Examiner's financial advisor notes that in discussions about Tribune's interactive
business with Tribune management, the notion that Tribune's interactive business was riskier
than Tribune's other businesses was readily acknowledged.  Moreover, both Mr. Landon and Mr.
Amsden indicated that the projections upon which VRC built its DCF valuation model, in so far
as the interactive business was concerned, included expectations of future financial performance
for highly speculative and uncertain endeavors, with a significant probability of failure.[91]

The projected revenues related to the interactive business's "internal development" effort
would only be realized in the aftermath of significant incremental capital investment and was
based upon ideas and concepts that, at the time of the projections, remained unidentified in all
but the most general way.  Moreover, the acquisitions contemplated in the interactive business
model were largely speculative in that no specific investment had been contemplated and the
returns related thereto were developed on only the most generic of valuation assumptions.[92]  The
speculation informing the projections developed by management is therefore substantial.  As a
result, the risk associated with achieving the revenue and cash flows projected by Tribune is
considerably higher than the risk associated with projecting financial performance for Tribune's
other, well-established business units.

For this reason, the Examiner's financial advisor has determined to value Tribune's
interactive business in isolation from Tribune's other businesses.  This has been done by

---

[89]   *Id.* at VRC0034785.

[90]   *Id.* at VRC0034784.

[91]   Examiner's Interview of Timothy Landon, June 22, 2010; Examiner's Interview of Harry Amsden, July 2, 2010.

[92]   During his interview with the Examiner, Mr. Amsden indicated the application of generic investment margins to
the interactive acquisition amounts.  *Id.*

removing the unadjusted revenue amounts specifically identified by Tribune and VRC as relating to the interactive business from Tribune's projected revenues.  To estimate the operating cash flow associated with these forecasted revenues, the Examiner's financial advisor relied on the EBITDA projections contained in the stand-alone projection model for the interactive business discussed in detail herein.

In addition, it is noted that, for purposes of the valuation of Tribune's interactive business, an additional five years of interim period projections are incorporated into the model to provide for a reasonable declination of revenue growth into steady state.  The resulting revenue and operating cash flows are presented below:

| EXAMINER'S INTERACTIVE BUSINESS PROJECTIONS ($mm) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008P | 2009P | 2010P | 2011P | 2012P | 2013P | 2014P | 2015P | 2016P | 2017P |
| **Revenue** | $ 318.0 | $ 406.3 | $ 507.9 | $ 603.8 | $ 712.5 | $ 819.3 | $ 917.7 | $ 1,000.2 | $ 1,060.3 | $ 1,102.7 |
| *% Growth* | | *27.8%* | *25.0%* | *18.9%* | *18.0%* | *15.0%* | *12.0%* | *9.0%* | *6.0%* | *4.0%* |
| **EBITDA** | $ 126.6 | $ 159.9 | $ 203.5 | $ 242.5 | $ 287.8 | $ 327.7 | $ 367.1 | $ 400.1 | $ 424.1 | $ 441.1 |
| *% Margin* | *39.8%* | *39.4%* | *40.1%* | *40.2%* | *40.4%* | *40.0%* | *40.0%* | *40.0%* | *40.0%* | *40.0%* |

## F.    Summary of Forecasted Revenue and EBITDA

On a consolidated basis, the projections of revenue and EBITDA, when contrasted with Tribune's October 2007 projections (relied upon by VRC in its Step Two solvency analysis) over the 2008 through 2012 projection horizon, reflect downward adjustments, mostly attributable to different assumptions regarding growth in Tribune's traditional (*i.e.*, non-interactive) publishing business:

| EXAMINER VS. TRIBUNE/VRC REVENUE PROJECTION COMPARISON ($mm) | | | | | |
|---|---|---|---|---|---|
| **Consolidated Revenues (Incl. Interactive)** | **2008** | **2009** | **2010** | **2011** | **2012** |
| **Examiner** | $ 4,878.2 | $ 4,911.7 | $ 5,018.1 | $ 5,075.1 | $ 5,165.1 |
| **VRC December 20, 2007 Analysis** | $ 4,936.4 | $ 5,016.1 | $ 5,146.8 | $ 5,244.8 | $ 5,371.1 |
| **Difference** | $    (58.2) | $   (104.4) | $   (128.7) | $   (169.7) | $   (206.0) |

Differences in expected EBITDA contribution are also apparent:

| EXAMINER VS. TRIBUNE/VRC EBITDA PROJECTION COMPARISON ($mm) | | | | | |
|---|---|---|---|---|---|
| **Consolidated EBITDA (Incl. Interactive)** | **2008** | **2009** | **2010** | **2011** | **2012** |
| **Examiner** | $ 1,178.8 | $ 1,211.7 | $ 1,251.7 | $ 1,258.5 | $ 1,301.4 |
| **VRC December 20, 2007 Analysis** | $ 1,193.3 | $ 1,236.8 | $ 1,282.1 | $ 1,298.6 | $ 1,348.8 |
| **Difference** | $    (14.5) | $    (25.1) | $    (30.4) | $    (40.1) | $    (47.4) |

G.    **Conversion of Interim Period Projected EBITDA  to Cash Flow for Discounting Purposes.**

Forecasts of discrete period EBITDA account for only a portion of an enterprise's expectation of cash availability.  Accordingly, certain adjustments are required to convert EBITDA (or *operating* cash flow) to cash flow for discounting purposes.  These adjustments relate to taxes on earnings (a use of cash), capital expenditures (a use of cash) and changes in working capital (either a source, or use of cash, depending on circumstances).[93]

In order to convert EBITDA to cash flow, the following adjustments are generally required.  First, depreciation and amortization expense (not deducted when calculating EBITDA) is deducted from EBITDA in order to calculate taxable income, or EBIT.  Taxes, calculated by multiplying the applicable tax rate times EBIT, are then deducted from EBITDA.  The amount of depreciation and amortization expense is then added back to the after tax amount determined above, in recognition of the fact that depreciation and amortization, although sheltering income for tax purposes, are not cash expenditures (but are rather an accounting convention).  Next, capital expenditures, a use of cash, are deducted, and net investments in working capital are added (or subtracted) as circumstances dictate. The net cash flow so determined is the cash flow discounted to present value in a DCF-based valuation analysis.

Because projections of EBITDA were developed separately for the Publishing Segment, the Broadcasting Segment, and Tribune's interactive business, adjustments to EBITDA necessary to convert EBITDA to cash flow for discounting purposes was undertaken as described below.

1.    **Corporate Expense and Other Costs.**

The Examiner's financial advisor reduced forecasted EBITDA to deduct expenses associated with corporate operations not accounted for in the forecasted EBITDA amounts determined above.  Corporate expenses have been estimated at 0.91% of forecasted revenue. This percentage was established based upon observed relationships over a six year interval of analysis.[94]

---

[93]    In the extant circumstances, an additional adjustment was required.  Because Tribune incurs certain corporate expenses not attributable to segment financial results, these expenses need to be deducted from forecasted segment EBITDA when determining cash flows for discounting purposes.

[94]    By contrast, for purposes of its DCF model, VRC projected corporate expenses at a static and constant $41.3 million per year over its entire projection horizon. VRC, however, made an additional adjustment in its determination of period cash flows.  For valuation purposes, VRC deducted $10 million annually in connection with the line item "severance."  According to Tribune's 2007 Form 10-K, Tribune incurred "$40 million of severance and related expenses for the elimination of approximately 700 positions, a $33 million charge for accelerated stock-based compensation expense and certain one-time compensation payments resulting from completion of the Leveraged ESOP Transactions in December 2007."  Ex. 4 at 59 (Tribune 2007 Form 10-K). In addition, Tribune disclosed that "Publishing operating profit in 2006 reflected $15 million of stock-based compensation expense, a $20 million charge for severance and other payments associated with the new union

A-56

| ANALYSIS OF TRIBUNE CORPORATE EXPENSES (1997 - 2006) ($000) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Total Consolidated Revenues | $ 2,502,418 | $ 2,657,453 | $ 2,876,022 | $ 4,850,023 | $ 5,161,900 | $ 5,285,277 | $ 5,494,416 | $ 5,631,431 | $ 5,511,283 | $ 5,517,708 |
| Corporate Expenses | $ 32,016 | $ 32,674 | $ 36,795 | $ 59,240 | $ 39,056 | $ 43,383 | $ 51,292 | $ 50,583 | $ 50,412 | $ 61,550 |
| Corporate Expense as % of Revenue | 1.3% | 1.2% | 1.3% | 1.2% | 0.8% | 0.8% | 0.9% | 0.9% | 0.9% | 1.1% |

|  |  |  |
|---|---|---|
| Average: | 1997 - 2006 | 1.04% |
| Average: | 2001 - 2006 | 0.91% |

Source: Nominal figures from Ex. 740 at VRC0061026 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).

### 2.    Tax Expense (Depreciation and Amortization).

Forecasted EBITDA was impacted by applying the corporate tax rate employed by VRC in its DCF analysis (39%) to forecasted EBITDA (after deduction of corporate expenses) by reducing that amount by annual estimates of depreciation and amortization. The resulting tax expense was deducted from forecasted EBITDA.  Then, the depreciation and amortization amount was added back to determine after tax cash flow.

Annual depreciation and amortization amounts used by the Examiner's financial advisor to determine taxable income were based on estimated annual depreciation and amortization expense projected by Tribune (as relied upon by VRC in its Step Two solvency analysis), as allocated among the interactive business, the Publishing Segment (excluding the interactive business), and the Broadcasting Segment.

The same calculation of after-tax cash flow performed for the Publishing Segment (excluding the interactive business) and Broadcasting Segment was performed for the interactive business.  Operating cash flow (adjusted for corporate expense for the interactive business) was reduced by an appropriate amount of depreciation and amortization calculated, based on depreciation schedules developed by the Examiner's financial advisor that are specific to the interactive business.

The Examiner's financial advisor applied a 39% corporate rate of taxation to the resulting amount, and the resulting tax expense was deducted to determine after-tax income for the interactive business.  Then, the depreciation and amortization amount originally deducted was added back to after-tax income in order to calculate after-tax cash flow from operations.[95]

---

contracts at *Newsday*, $8 million of severance expense for the elimination of approximately 300 positions. . . ." *Id.* at 60.

The Examiner's financial advisor believes that, in circumstances of secular decline in which Tribune finds itself with respect to its legacy print business, it is not unreasonable to assume that costs associated with downsizing and rationalization of resources will recur with regularity.  The Examiner's financial advisor, therefore, has included a deduction of severance costs in the calculation of period cash flows.  No similar costs were deducted in arriving at free cash flows for the interactive business.

[95]    Appropriate depreciation and amortization amounts for the interactive business were estimated by the Examiner's financial advisor based upon assumptions including straight line depreciation of new investment over a five year depreciation horizon and the capital investments scheduled according to the structure of the

### 3.    Working Capital

The Examiner's financial advisor considered an adjustment to forecasted EBITDA associated with incremental investments in working capital necessary to determine cash flow. These kinds of adjustments are typically made in recognition of the fact that, under circumstances of growth, companies typically have increasing amounts of earned revenue tied up in receivables, or other forms of current assets, net of current liabilities.

The Examiner's financial advisor has determined to make no adjustment to period cash flows related to incremental investments in working capital investment with respect to the consolidated Tribune business (other than the interactive business), because the revenues projected for Tribune over the interim period projection horizon are neither growing nor declining in any appreciable way.  This means that no incremental or additional cash will become "unavailable" as a result of, for example, increasing accounts receivable balances.

| REVENUE GROWTH RATES | | | | | |
|---|---|---|---|---|---|
| | 2008P | 2009P | 2010P | 2011P | 2012P |
| **Consolidated (Ex. Interactive Business)** | -0.6% | -1.2% | 0.1% | -0.9% | -0.4% |
| **Interactive Business** | 25.1% | 27.8% | 25.0% | 18.9% | 18.0% |

With respect to the valuation of the interactive business, however, the significant growth in revenues projected over the interim projection period would almost certainly require some degree of additional investment in working capital. Nevertheless, the Examiner's financial advisor has determined not to estimate such incremental investment.  This results in a conservative estimation of the value of the interactive business because additional working capital investment would reduce cash flows discounted to present value.

### 4.    Capital Expenditures.

The Examiner's financial advisor deducted the capital expenditures expected to be made by Tribune, as reflected in its October 2007 projections, from forecasted interim period cash flows.[96]

---

Step Two interactive business model. Ex. 956 (Tribune Interactive 2006-2012 Projections); Ex. 1066 (Interactive Step One and Step Two Comparison).

[96]    VRC assumed a constant rate of capital asset investment in the projections for the publishing (without interactive) and broadcasting businesses.  Although it is an inappropriate assumption for purposes of VRC's analysis (because growth in revenues was projected in the models VRC relied upon in its study), a projection of maintenance levels of capital investment is appropriate under the circumstances of the Examiner's financial advisor's projection due to an expectation of *de minimis* growth in projected revenues.

The Examiner's financial advisor deducted the amounts designated by Tribune as required capital investment within the Step Two interactive business model from projected period cash flows for the interactive business.

   5.    **Conclusion.**

The tables below present the interim period calculations made to convert period operating cash flows to free cash flows for Tribune's interactive business, as well as Tribune's consolidated publishing businesses (excluding the interactive business) for purposes of the DCF methodology.

| CONVERSION OF CONSOLIDATED EBITDA TO CASH FLOW ($mm) | | | | | |
|---|---|---|---|---|---|
| | 2008P | 2009P | 2010P | 2011P | 2012P |
| Operating Cash Flow | $ 1,096.6 | $ 1,096.5 | $ 1,093.8 | $ 1,062.2 | $ 1,060.6 |
| Less: Corporate Expenses | 41.5 | 41.0 | 41.0 | 40.7 | 40.5 |
| Adjusted EBITDA | 1,055.1 | 1,055.5 | 1,052.8 | 1,021.5 | 1,020.1 |
| Depreciation & Amortization | 233.7 | 237.7 | 237.7 | 237.7 | 237.7 |
| Less: Interactive Depreciation & Amortization | 13.0 | 24.5 | 42.0 | 60.5 | 80.0 |
| Adjusted Depreciation & Amortization | $ 220.7 | $ 213.2 | $ 195.7 | $ 177.2 | $ 157.7 |
| | | | | | |
| Pre-Tax Income | $ 834.4 | $ 842.3 | $ 857.1 | $ 844.3 | $ 862.4 |
| Cash Taxes (39%) | 325.4 | 328.5 | 334.3 | 329.3 | 336.3 |
| After-Tax Income | $ 509.0 | $ 513.8 | $ 522.8 | $ 515.0 | $ 526.1 |
| | | | | | |
| Adjusted Depreciation & Amortization | $ 220.7 | $ 213.2 | $ 195.7 | $ 177.2 | $ 157.7 |
| Net Change in Working Capital | - | - | - | - | - |
| Severance Payments | (10.0) | (10.0) | (10.0) | (10.0) | (10.0) |
| Capital Expenditures | (132.2) | (128.3) | (128.5) | (128.5) | (137.7) |
| Enterprise Cash Flow | $ 587.5 | $ 588.7 | $ 580.0 | $ 553.7 | $ 536.1 |

| CONVERSION OF INTERACTIVE BUSINESS EBITDA TO CASH FLOW ($mm) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008P | 2009P | 2010P | 2011P | 2012P | 2013P | 2014P | 2015P | 2016P | 2017P |
| Operating Cash Flow | $ 126.6 | $ 159.9 | $ 203.5 | $ 242.5 | $ 287.8 | $ 327.7 | $ 367.1 | $ 400.1 | $ 424.1 | $ 441.1 |
| Less: Corporate Expenses | 2.9 | 3.7 | 4.6 | 5.5 | 6.5 | 7.5 | 8.4 | 9.1 | 9.7 | 10.0 |
| Adjusted EBITDA | 123.7 | 156.2 | 198.9 | 237.0 | 281.3 | 320.2 | 358.8 | 391.0 | 414.5 | 431.1 |
| Depreciation & Amortization | 13.0 | 24.5 | 42.0 | 60.5 | 80.0 | 92.0 | 95.5 | 98.0 | 99.5 | 100.0 |
| | | | | | | | | | | |
| Pre-Tax Income | $ 110.7 | $ 131.7 | $ 156.9 | $ 176.5 | $ 201.3 | $ 228.2 | $ 263.3 | $ 293.0 | $ 315.0 | $ 331.1 |
| Cash Taxes (39%) | 43.2 | 51.4 | 61.2 | 68.8 | 78.5 | 89.0 | 102.7 | 114.3 | 122.8 | 129.1 |
| After-Tax Income | $ 67.5 | $ 80.3 | $ 95.7 | $ 107.7 | $ 122.8 | $ 139.2 | $ 160.6 | $ 178.7 | $ 192.1 | $ 202.0 |
| | | | | | | | | | | |
| Depreciation & Amortization | $ 13.0 | $ 24.5 | $ 42.0 | $ 60.5 | $ 80.0 | $ 92.0 | $ 95.5 | $ 98.0 | $ 99.5 | $ 100.0 |
| Net Change in Working Capital | - | - | - | - | - | - | - | - | - | - |
| Capital Expenditures | (80.0) | (85.0) | (90.0) | (95.0) | (100.0) | (100.0) | (100.0) | (100.0) | (100.0) | (100.0) |
| Enterprise Cash Flow | $ 0.5 | $ 19.8 | $ 47.7 | $ 73.2 | $ 102.8 | $ 131.2 | $ 156.1 | $ 176.7 | $ 191.6 | $ 202.0 |

   **H.    Evaluation and Selection of Long-Term Expected Growth Rates.**

After developing projections of discrete period cash flows based on the above-described projection parameters, the Examiner's financial advisor next evaluated long-term growth rates to be applied to financial forecasts for both the interactive and traditional business components of Tribune, after 2012 (in the case of the Publishing Segment (excluding the interactive business) and Broadcasting Segment) and after 2017 (with respect to the interactive business).

Although differences between expectations regarding the level of EBITDA forecasted to be earned over a period of discretely projected financial results (*e.g.*, five or ten years) will clearly have valuation implications (*e.g.*, lower forecasted cash flows translate into lower values when discounted to present value at a consistent discount rate), the importance of selected terminal period growth rates (used to calculate a terminal value that, when added to the present value of discretely forecasted annual cash flows, establishes a total enterprise or asset value) cannot be overemphasized. Because, in many circumstances, the terminal value represents the vast majority of an enterprise's value, and because assumptions regarding perpetuity growth rates are highly significant to that determination, perpetuity growth rates need to be carefully assessed for reasonableness when performing a valuation analysis. [97]

Accordingly, in developing a reasonable expectation of terminal period (or perpetuity) growth rates, it is critically important to properly evaluate the long-term financial prospects of the firm being valued at the end of the interim projection period. This is not a difficult set of considerations to manage when considering the legacy publishing and broadcasting businesses of Tribune.

As has been discussed in detail, Tribune's legacy print advertising and circulation business had been declining, through the Step Two Financing Closing Date, and they were almost universally expected to continue to experience a slow decline due to secular shifts in consumer preferences, resulting in the migration of consumers toward other media delivery alternatives. The projections for this segment of Tribune's business, in accordance with the estimates developed by the Examiner's financial advisor, reflect a modest decline in revenues on a Publishing Segment consolidated basis over time. The projected interim period revenue and operating cash flows, as well as corresponding related rates of negative growth projected by the Examiner's financial advisor, are shown in the following table:

---

[97] A simple example illustrates the point by applying the generally accepted Gordon Growth valuation methodology to determining terminal values. At an assumed baseline forecast of $100 in cash flow and a 10% discount rate, the sensitivity of valuation conclusions to differing growth rate assumptions can be illustrated as follows:

At an assumed 2% growth rate, a terminal value of $1,250 is established as:

$$\frac{100}{.10 - .02}$$

At a zero percent growth rate, a terminal value of $1,000 is calculated as:

$$\frac{100}{.10 - 0}$$

Accordingly, a change of 2% in the expectation of long-term growth rates results in a 20% difference in enterprise value (before further discounting that value to present value for the number of periods of discretely projected cash flows that occur before the terminal value is realized).

| EXAMINER'S PUBLISHING REVENUE AND OCF (EXCLUDING INTERACTIVE) ($mm) | | | | | |
|---|---|---|---|---|---|
| | 2008P | 2009P | 2010P | 2011P | 2012P |
| Revenue | $ 3,303.7 | $ 3,248.9 | $ 3,211.0 | $ 3,172.1 | $ 3,119.6 |
| Revenue Growth | -3.1% | -1.7% | -1.2% | -1.2% | -1.7% |
| Operating Cash Flow | $ 648.1 | $ 635.1 | $ 617.3 | $ 603.5 | $ 583.5 |
| Operating Cash Flow Growth | | -2.0% | -2.8% | -2.2% | -3.3% |

On the other hand, the Broadcasting Segment competed in a market that appeared, as of the Step Two Financing Closing Date, to be on the cusp of a similar downward trend in growth. Despite this sobering prospect, as acknowledged by VRC analysts, Tribune management strongly advocated optimism in their projections and VRC relied upon these Tribune management projections. Nonetheless, the Examiner's financial advisor largely used Tribune's projections of operating cash flows for this segment. As a result, the revenues and cash flows projected for the business unit reflect modest, and lumpy,[98] upward growth.

When combined, the two competing trends tend to offset one another at both the projected revenue and EBITDA levels.

| EXAMINER'S CONSOLIDATED REVENUE AND OCF (EXCLUDING INTERACTIVE) ($mm) | | | | | |
|---|---|---|---|---|---|
| | 2008P | 2009P | 2010P | 2011P | 2012P |
| Revenue | $ 4,560.2 | $ 4,505.4 | $ 4,510.2 | $ 4,471.3 | $ 4,452.6 |
| Revenue Growth | -0.6% | -1.2% | 0.1% | -0.9% | -0.4% |
| Operating Cash Flow | $ 1,096.6 | $ 1,096.5 | $ 1,093.8 | $ 1,062.2 | $ 1,060.6 |
| Operating Cash Growth | | 0.0% | -0.2% | -2.9% | -0.2% |

For purposes of this analysis, the Examiner's financial advisor selected a terminal period growth rate based on a weighted average of the revenue growth rates informing the Publishing Segment (excluding the interactive business) and Broadcasting Segment. The growth rate for the Publishing Segment is the 2012 revenue weighted growth rate based on all five of its segments (retail, national, classified, circulation and other) of -1.63%. The growth rate observed for the Broadcasting Segment is the four year compound annual growth rate (accounting for the cyclicality in growth rates resulting from the influence of alternating election years) calculated from 2008 to 2012 of 1.49%.[99]

---

[98]   Political spending influences associated with election years explain this phenomenon in large part.

[99]   The four year CAGR for the Broadcasting Segment was calculated as follows:

| BROADCASTING SEGMENT 4-YEAR CAGR | | |
|---|---|---|
| 2008P | 2012P | CAGR |
| Revenue | $ 1,256.5 | $ 1,333.0 | 1.49% |

When these revenue growth rates are averaged on the basis of relative 2012 Publishing Segment and Broadcasting Segment free cash flows, the result is a terminal period weighted average growth rate of -0.10%. The Examiner's financial advisor thus stabilized the long-term growth rate at zero. It is believed that this growth rate an appropriate rate for use in the calculation of terminal period value.[100]

The Examiner's financial advisor also determined an appropriate terminal period growth rate for purposes of calculating a terminal period value for the interactive business. This quantification was done separately as a result of the decision to evaluate the interactive business on a stand-alone basis and was, therefore, based on the substantially different revenue and EBITDA growth expectations characterizing the interactive business. As mentioned in the discussion of the estimation of revenue and operating cash flow parameters for the interactive business, the Examiner's financial advisor extended the interim period of analysis to ten years in order to more appropriately gradually reduce the interactive business growth over time, as would be expected.

In connection with making those projections, the growth in revenue forecast for the final period of the interim period model (2017) was estimated at 4.0%. This final interim period growth rate is an appropriate, if conservative, rate with which to inform a terminal period valuation of the interactive business because it is likely consistent with the upper limit of an expected riskless rate of return (real rate + rate of inflation) which, for example, Professor Aswath Damodaran indicates is reasonable when estimating terminal values for companies.[101]

I.     Discount Rate Selection

Next, the Examiner's financial advisor determined appropriate weighted average costs of capital, or discount rates, to be applied to forecasted cash flows. Because the Examiner's financial advisor believes that the risks attendant to Tribune's emerging interactive business are highly differentiable from its traditional business segments (publishing and broadcasting),

---

[100]   In his book, INVESTMENT VALUATION, Professor Damodaran discusses selection of an appropriate terminal period growth rate in the context of application of a stable growth model for determining the terminal value for a company. Although the stable growth rate cannot exceed the growth rate of the economy in which it a firm operates, it can be lower. There is nothing that prevents one from assuming that mature firms will become a smaller part of the economy and it may, in fact, be the more reasonable assumption to make. ASWATH DAMODARAN, INVESTMENT VALUATION 304-05 (2d Ed. 2002).

[101]   "The fact that a stable growth rate is constant forever, however, puts strong constraints on how high it can be. Since no firm can grow forever at a rate higher that the growth rate of the economy in which it operates, the constant growth rate cannot be greater than the overall growth rate of the economy . . . Setting the stable growth rate to be less than or equal to the growth rate of the economy is not only the consistent thing to do but it also ensures that the growth rate will be less than the discount rate. . . . In the long term, the real riskless rate will converge on the real growth rate of the economy, and the nominal riskless rate will approach the nominal growth rate of the economy.  In fact, a simple rule of thumb on the stable growth rate is that it generally should not exceed the riskless rate used in the valuation."  Id. at 305-06.  VRC used a riskless growth rate (risk-free rate) of 4.5% in determining the cost of equity for purposes of estimating a cost of capital for Tribune. This riskless rate is consistent with the yield on the 20-year constant maturity treasury bond (4.50%) at December 20, 2007.

substantially different discount rates were applied when discounting projected cash flows to present value for each.

For purposes of calculating the present value of Tribune's operating assets as of December 20, 2007, the Examiner's financial advisor discounted both the forecasted interim period cash flows and determined terminal values for the Publishing Segment (excluding the interactive business) and the Broadcasting Segment at 8.0%. For purposes of calculating the present value of Tribune's interactive business cash flows, the Examiner's financial advisor adopted a 15.0% discount rate. The justification for use of these selected rates is described below.

For purposes of discounting non-interactive projected cash flow to present value, the mid-point of VRC's concluded consolidated Tribune weighted average cost of capital (7.5% to 8.5%) was adopted.

This rate was deemed reasonable based on the consideration of several factors, including a review of VRC work papers corresponding to its determination of an applicable weighted average cost of capital for Tribune, which arguably reflected the adoption of assumptions causing its determination of a weighted average cost of capital (WACC) range to be downwardly influenced.

In its computation of a range of WACCs, VRC used a standard Capital Asset Pricing Model (CAPM) approach to quantify Tribune's cost of equity. VRC looked to cohort firms it determined to be comparable to Tribune to gather relevant CAPM inputs. Based on information from the cohort group, VRC obtained estimates for "beta" and capital structure weighting.[102] Using these estimates, VRC quantified a cost of equity of 9.2%. In addition, VRC estimated a pre-tax cost of debt to be 6.4% for the cohort group. VRC then applied these two estimates to the cohort average equity and debt weightings to arrive at a determination of an 8.0% WACC.

The CAPM approach used by VRC to quantify its estimated cost of equity is not, in and of itself, problematic. The CAPM is well regarded by valuation practitioners as a reasonable methodology for computing a firm's cost of equity. Rather, VRC's WACC is likely downwardly influenced as a result of the specific variables that informed its analysis. For example, VRC relied on an equity risk premium of 5.5% in computing its WACC. Although the basis for this estimate is not explicitly noted by VRC, other contemporaneous sources indicate a significantly higher estimate of the equity risk premium. Morningstar (formerly known as Ibbotson, and a recognized source for this type of data), for example, concludes a long-term equity risk premium estimate to be 7.1%.[103] Here, if one were to replace VRC's 5.5% equity risk premium with this

---

[102]    VRC obtained the levered beta for each cohort firm which it then delevered using the particular debt weighting, equity weighting, and tax rate for each individual firm. VRC then relevered the delevered beta using the average industry capital structure.

[103]    *See* Morningstar's SBBI 2007 Valuation Yearbook at 262. It should be noted that some practitioners, including Shannon Pratt and Roger Grabowski, have stated they feel that using Ibbotson/Morningstar's data over the entire data series (back to 1926) "likely overstate expected returns." SHANNON PRATT AND ROGER GRABOWSKI, COST OF CAPITAL 641 (2008). Nonetheless, other authoritative sources, including Ibbotson/Morningstar, have noted that it is wholly appropriate, and in fact preferred, to consider the entire data series.

figure, the resultant WACC conclusion would increase by approximately 1%, from 8.0% to 9.0%,[104] holding all else constant.

In addition, VRC did not incorporate any size premium in its cost of equity determination.  Based on Ibbotson/ Morningstar data, VRC could have justifiably also included a size premium ranging from 0.65% to 0.85% to reflect the higher historical returns associated with investments in firms of comparable size to Tribune (as of December 31, 2006).[105]

The Examiner's financial advisor also considered that VRC did not modify its selected range of discount rates between the issuance of its Step One and Step Two solvency opinions, despite Tribune's actual performance below its February 2007 plan.  This fact, which was partially the manifestation of continuing secular declines in the industry in excess of those contemplated by the projections, likely increased Tribune's risk profile between the Step One Financing Closing Date and the Step Two Financing Closing Date.

The Examiner's financial advisor determined to increase the discount rate applicable to the interactive business cash flow forecast from the rate applied by VRC to the consolidated business (7.5% to 8.5%) based on an evaluation of the risks associated with both achieving the cash flows projected in connection with existing lines of the interactive business, as well as the more uncertain expectations of revenue and profitability to be engendered by management's contemplated "transformative" development of new products and services, and the acquisition of new and emerging businesses.  In making this evaluation, the Examiner's financial advisor considered that company personnel explicitly acknowledged the significant degree of risk attendant to the levels of projected revenue and profitability contemplated for Tribune's interactive business.  For example, Mr. Landon described the riskiness of Tribune's interactive

---

Some analysts estimate the expected equity risk premium using a shorter, more recent time period on the basis that recent events are more likely to be repeated in the near future; furthermore, they believe that the 1920s, 1930s and 1940s contain too many unusual events. This view is suspect because all periods contain "unusual" events.  Some of the most unusual events of this century took place quite recently, including the inflation of the 1970s and early 1980s, the October 1987 stock market crash, the collapse of the high-yield bond market, the major contraction and consolidation of the thrift industry, the collapse of the Soviet Union, the development of the European Economic Community – all of these happened in the last 20 year . . . the 78 year period starting in 1926 is representative of what can happen. . . . Restricting attention to a shorter historical period underestimates the amount of change that could occur in a long future period. . . . Investors probably expect "unusual" events to occur from time to time, and their return expectations reflect this.

Ibbotson Associates' Stocks, Bonds, Bills and Inflation Valuation 2004 Yearbook at 76-77.

[104]  Calculated as follows:  7.1% - 5.5% = 1.6% x 67.4% equity weighting per VRC = increase of 1.08%.  VRC's concluded WACC = 8.0% + 1.0% = 9.0%.

[105]  *See* Morningstar's SBBI 2007 Valuation Yearbook at 262.  Here, Ibbotson/Morningstar presents the excess returns associated with the different size deciles (as measured by equity market capitalization).  Based on Tribune's pre-Step Two Closing market capitalization, it would fall into the second or third size decile reflecting a potential incremental premium of 0.65% to 0.81%.

business as generally consistent with the riskiness of start-up companies with expectations of significant revenue growth and operating margins that may not be realized.[106]

      In chapter 7 of "*Early Stage Technologies – Valuation and Pricing*," Richard Razgaitis discusses discount and hurdle rates[107] used by technology investors to evaluate potential investments, and summarizes his experience with "buyer's general perceptions of the required rate of return, or the associated risk, of commercializing …technology."[108]  The following excerpt comes from an exhibit in Mr. Razgaitis' book, tying certain risk attributes (on two dimensions of risk) that typically inform technology investments to hurdle rates used in technology license negotiations.

| Characterization of Risk | Approximate Risk Adjusted Hurdle Rate |
|---|---|
| Very low risk, such as incorporating a new but well-understood technology into making a product presently made and sold in response to existing demand. | 15-20%; discernibly above the corporation's goals for return on investment to its shareholders. |
| Low risk, such as making a product with new features using well-understood technology into a presently served and understood customer segment with evidence of demand for features | 20-30% |
| Moderate risk, such as making a new product using well-understood technology to a customer segment presently served by other products made by the corporation and with evidence of demand for such a new product. | 25-35% |

---

[106]  Examiner's Interview of Timothy Landon, June 22, 2010.

[107]  "Hurdle rates" are the rates of return required by investors to incent them to invest in a particular project or business. The hurdle rate is determined by investors based upon the level of perceived risk associated with the cash flow projections for the investment.

[108]  RICHARD RAZGAITIS, EARLY STAGE TECHNOLOGIES—VALUATION AND PRICING 131 (1999).

| Characterization of Risk | Approximate Risk Adjusted Hurdle Rate |
|---|---|
| High-risk, such as making a new product using a not well understood technology and marketing it to an existing segment of a well-understood technology to a new market segment. | 35-45% |

It is apparent that, with respect to the acquisitions and internal development strategies of Tribune's interactive business, significant rates of discount attach. New products that leverage the success of antecedent technologies (e.g., the recruitment business models like CareerBuilder.com which launch platforms related to travel, lifestyle and other components of the old line newspaper information set), seem to fit in Mr. Razgaitis' "moderate risk" category of business characteristics: "[M]aking a new product using well understood technology to a customer segment presently served by other products made by the corporation and with evidence of demand for such a product."

The Examiner's financial advisor determined to apply a discount rate of 15% to the cash flows projected for the interactive business because of the blend of the established business and speculative start-up characteristics that the interactive business possesses. The Examiner's financial advisor believes that a discount rate of 15% is conservative given the parallels between the nature of the businesses, potential products, and new services, on which a significant portion of  projected cash flows are based, and the characteristics of moderate risk businesses described by Mr. Razgaitis.[109]

### J.    Conclusion Regarding the Value of Non-Operating Assets at Step Two.

As of December 20, 2007, VRC ascribed a value to Tribune's equity investments and other non-operating assets of $3.416 billion.[110]  Of this amount, $2.144 billion was ascribed to Tribune's equity investments.[111]  The Examiner's financial advisor determined that approximately

---

[109]    *Id*.  In addition, it should be noted that Duff and Phelps developed a DCF value for Classified Ventures, an established internet-based business owned in part by Tribune.  In estimating value, Duff and Phelps applied a range of discount rates of between 12.25% and 14.25%. The Examiner's financial advisor concludes that such rates properly reflect the floor of the range of reasonable discount rates to apply to the interactive business, because a significant portion of its future projected revenues and profitability is based on the achievement of speculative cash flows undefined as to source, or origin.

[110]    According to VRC, this amount included (in addition to its determined value of Tribune's equity investments) the after tax value of potential real estate sales, the value of the Time Warner stock associated with the PHONES Notes, and (although not explicitly stated) the anticipated after-tax proceeds associated with the contemplated sale of the Chicago Cubs and Comcast SportsNet.

[111]    *See* Ex. 740 at VRC0061008 (VRC Internal Review Document, Tribune Company Preliminary Solvency Analysis, dated December 3, 2007).  The amount reflects the mid-range value of Tribune's ownership interest in its equity investments.

88% of that value was ascribed by VRC to Tribune's 31.3% ownership interest in TV Food Network and its 40.8% interest in CareerBuilder, with the remainder corresponding to VRC's determined value of Tribune's other equity ownership interests.[112]  Based on this concentration of value, the Examiner's financial advisor evaluated VRC's basis for establishing values for these two investments, and made adjustments to VRC's determined values as necessary and appropriate for each.  VRC used both DCF and multiples-based approaches to value TV Food Network and CareerBuilder.  Based on the Examiner's financial advisor's review of VRC work papers supporting its valuation of Tribune's ownership interest in both TV Food Network and CareerBuilder, the following errors were noted and corrected:

      1.      VRC failed to incorporate (despite a justifiable need to have done so) size premiums into its cost of equity calculations[113] when estimating discount rates used by VRC to value Tribune's equity ownership interests using a DCF methodology.  This error resulted in VRC using unreasonably low discount rates in its calculation of DCF values for both CareerBuilder and TV Food Network, resulting in overstated values for both these investments.

      2.      VRC arguably used unreasonably low equity risk premiums in computing costs of equity as part of its discount rate determination, thereby further understating the discount rate used in its DCF models resulting in an additional overstatement in the value conclusions for both CareerBuilder and TV Food Network.[114]

---

[112]   *See id.* ($1.151 billion TV Food Network + $743 million CareerBuilder)/($2.144 billion total) = 88.3%.

[113]   *See* Ex. 1096 at VRC0022174 (TV Food Network Valuation); Ex. 1097 (CareerBuilder Market Multiple Method Valuation).

[114]   Specifically, VRC utilized an equity risk premium of 5.5% in computing its cost of equity for both CareerBuilder and TV Food Network.  The Morningstar SBBI 2007 Valuation Yearbook notes the "Long-horizon expected equity risk premium" to be 7.1%.  *See* Morningstar's SBBI 2007 Valuation Yearbook at 262. Morningstar discusses some of the controversy associated with estimating the equity risk premium.  The controversy, in part, stems from the selection of the interval of analysis over which to compute on average equity risk premium.  "Since the expected equity risk premium must be estimated, there is much controversy regarding how the estimation should be conducted…The range of equity risk premium estimates used in practice is surprisingly large.  Using a low equity risk premium as opposed to a high estimate can have a significant impact on the estimated value of a stream of cash flows." Morningstar's SBBI 2007 Valuation Yearbook at 71.  With respect to the issue of interval selection, Morningstar advocates using the longer-term equity risk premium.  "The 81-year period starting with 1926 is representative of what can happen: it includes high and low returns, volatile and quite markets, war and peace, inflation and deflation, and prosperity and depression.  Restricting attention to a shorter historical period underestimates the amount of change that could occur in a long future period.  Finally, because historical event-types (not specific events) tend to repeat themselves, long-run capital market return studies can reveal a great deal about the future.  Investors probably expect 'unusual' events to occur from time to time, and their return expectations reflect this." Morningstar's SBBI 2007 Valuation Yearbook at pages 82-83.

3.      VRC relied on an EBITDA exit multiple to quantify the terminal values for both CareerBuilder and TV Food Network in connection with determining its DCF values for each.  For VRC's calculation of CareerBuilder's terminal value, the exit multiple it used (13.0x EBITDA) implied an unreasonably high terminal growth rate approximating 9%, significantly overstating the value of CareerBuilder calculated by VRC. [115]

4.      VRC used a risk free rate of 5% in estimating a discount rate for both CareerBuilder and TV Food Network.  This risk free rate is *overstated*, thus underestimating value conclusions for both CareerBuilder and TV Food Network.[116]

5.      In connection with its valuation of TV Food Network and CareerBuilder using multiples-based valuation approaches (both trading and transaction) VRC relied on multiples that were calculated using metrics of non-comparable cohort firms or transactions, resulting in over quantifications of value ascribed to CareerBuilder and TV Food Network.[117]

---

[115]    The implied terminal growth rate informing VRC's terminal value calculation for TV Food Network was approximately 4%, a more reasonable value.

The inability of a firm to grow into perpetuity at a rate faster than the economy is noted by Professor Aswath Damodaran in his book, *Investment Valuation* at 305:  "The fact that the stable growth rate is constant forever, however, puts strong constraints on how high it can be.  Since no firm can grow forever at a rate higher than the growth rate of the economy in which it operates, the constant growth rate cannot be greater than the overall growth rate of the economy."

[116]    The risk free rate (as measured by the yield on the 20-year constant maturity Treasury) as of December 20, 2007 was 4.5%.  See http://www.federalreserve.gov/releases/h15/data/Business_day/H15_TCMNOM_Y20.txt

[117]    For example, at Step Two, VRC looked to Amazon.com, Ebay, Google, IAC/Interactive Corp., Monster Worldwide, Yahoo, and Dice Holdings, Inc. to help inform the revenue multiples it applied to CareerBuilder's LTM, CFY, and NFY revenues.  Ex. 1099 at VRC0022185 (VRC CareerBuilder Valuation).  Most of these firms identified by VRC are substantially larger and more diversified than CareerBuilder (Google had, according to VRC, an enterprise value of $199.8 billion while Ebay had an enterprise value of $45.0 billion. *See id.* at VRC0022182.  Although the Examiner notes that VRC stated that it is "[f]ocused primarily on the Monster.com" for purposes of its Step One valuation Ex. 1098 at VRC0024370 (VRC Valuation, Preliminary Draft) and seemingly its Step Two valuation, the range of revenue multiples used by VRC in its quantification at Step Two was nonetheless influenced by the inclusion of these other firms.  For example, at Step Two, VRC used a range of revenue multiples from 2x to 4.20x despite the fact that VRC's computed multiples for Monster ranged from 2.6x to 3.4x.  *Id.* at VRC0022185.

In its Step Two valuation of CareerBuilder, VRC noted in its work papers "Multiples lower compared to prior valuation (half a turn on low end and full for high end) since monster is down from 4.6x to 3.4x.  We realize our company is better than MNST in terms of business model, but still our company's normalized expected EBITDA margins are quite lower than MNST.  Also lower multiple is justified by the % of overall value increase . . . ."  Ex. 1090 at VRC0019336_EI_NATIVES.XLS (Tribune Base Case Valuation Projections).  *See also* Ex. 1099 at VRC0022186 (VRC CareerBuilder Valuation).  In its Step Two valuation of CareerBuilder,

After adjusting to correct for these differences, the value VRC ascribed to CareerBuilder declines from $1.821 billion to approximately $1.205 billion, a decrease of approximately 33%. This reduced the value of Tribune's ownership interest in CareerBuilder from $743 million to approximately $492 million, a decline of $251 million.[118]  Similarly, the value associated with TV Food Network also declined from $3.679 billion to $3.227 billion, a decrease of approximately 12.2%.  This reduced the value of Tribune's ownership interest in TV Food Network from $1.151 billion to $1.010 billion, a decline of approximately $141 million.

Based on the foregoing, the Examiner's financial advisor reaches the following overall conclusions with respect to Tribune's solvency at the Step Two Financing Closing Date:[119]

---

VRC used revenue multiples ranging from 2.99x to 4.20x, despite the fact that VRC's analysis showed revenue multiples for Monster ranging from 2.6x to 3.4x.  *Id.* at VRC0022185.  A review of Bloomberg data indicates that the LTM revenue multiple for Monster (as of 9/30/07) was approximately 2.86x, well below the range of figures relied upon by VRC for purposes of its valuation.

In valuing TV Food Network, VRC utilized a discounted cash flow valuation approach as well as comparable transaction multiples.  For its transaction analysis, VRC evaluated three transactions from which it quantified EBITA (not EBITDA) and revenue multiples.  VRC then applied these multiples to TV Food Network's operating statistics to determine a range of values.  Ex. 1096 at VRC0022172 (TV Food Network Valuation).  It is unclear why VRC elected to use EBITA as opposed to EBITDA.  It is also unclear why VRC elected to only look at only three transactions, particularly when the transactions had such a wide range of dispersion.  Of the three transactions reviewed by VRC, the revenue multiples ranged from 3.9x to 8.5x and the EBITDA multiples from 14.8x to 27.7x.  With such a wide range of values, VRC could have ascribed virtually almost any value to TV Food Network it chose.  Based on this wide dispersion, the frequent strategic underpinnings of such transactions, and other observations noted below, the Examiner's financial advisor has afforded VRC's comparable transaction method low relative weight in comparison to the discounted cash flow method. Furthermore, it appears that VRC applied its NFY EBITA multiple to the wrong TV Food Network statistic, thereby overstating value (VRC computed a NFY EBITA statistic of $273.1 million in its DCF model but chose to use an NFY EBITA value of $288.3 million to in its transaction multiple).

[118]  It is worth noting that a string of e-mails on December 4, 2007 between VRC employees Alpesh Patel and Bryan Browning appear to call into question the underlying accuracy of VRC's valuation of CareerBuilder:

"Bryan, how'd the meeting go?  Question regarding Deerfield has the deal closed?" (E-Mail from Alpesh Patel) "Good and I'm not sure.  I will call you in a little while." (E-Mail response from Bryan Browning)  "Bryan, you got cut off.  I didn't hear the last 30 secs of what you said."  (E-Mail from Alpesh Patel) "How did you know it was 30 seconds?"  (E-Mail response from Bryan Browning) "*My judgment for time is as accurate as CareerBuilder's value*.  haha"  (E-Mail from Alpesh Patel).  "Of course" (E-Mail response from Bryan Browning).

Ex. 1069 (Patel E-Mail, dated December 5, 2007) (emphasis added).

Tribune sold a 10% stake in CareerBuilder to Gannett in September 2008 for $135 million.  Ex. 1067 (Gannett Press Release, dated September 3, 2008).  Although ostensibly this transaction would value 100% of CareerBuilder at $1.35 billion, Gannett's acquisition of Tribune's 10% stake afforded the firm a 50.8% controlling interest in CareerBuilder.  As such, this transaction does not seem inconsistent with the value ascribed by the Examiner's financial advisor, due to the control attributes gained by Gannett in its purchase.

[119]  Readers are advised that in the course of its final quality control review performed by the Examiner's financial advisor shortly before issuance of the Report the Examiner's financial advisor determined that, in connection with the DCF Valuation Analysis discussed as herein and in the Report at § IV.B.5.d.(10), the amount of corporate expense projected for purposes of determining the enterprise value of Tribune was modestly under-quantified.  In addition, the Examiner's financial advisor determined that the amount of Tribune's annual capital expenditure investment was, for purposes of calculating Tribune's enterprise value, underestimated for the Publishing Segment in 2012.  Adjusting these two model parameters resulted in an increase in enterprise value

| SOLVENCY CONCLUSION ($ mm) | | |
|---|---|---|
| | **December-07** | |
| **Operating Asset Value** | **$7,798.8** | |
| + Equity Investments and Other Assets | $3,024.4 | [1] |
| **Adjusted Enterprise Value** | **$10,823.2** | |
| + Cash | $197.7 | [2] |
| - Debt | ($12,898.8) | [2] |
| - Identified Contingent Liabilities | ($86.8) | [2] |
| **= Solvency/(Insolvency)** | **($1,964.7)** | |

Notes and Sources:

[1]  VRC valued Tribune's equity investments at $3.416 billion. *See* Ex. 1045 (VRC Solvency Analysis, dated December 20, 2007). The Examiner's financial advisor reduced this amount by approximately $392 million to reflect the conclusion that VRC overstated the value ascribed to Career Builder and TV FoodNetwork.

[2]  *See* Ex. 1045 (VRC Solvency Analysis, dated December 20, 2007).  The Examiner's financial advisor has adopted VRC's numbers for cash, debt, and identified contingent liabilities.

Based on the Examiner's financial advisor's preceding DCF and equity investment value conclusions, it is worth noting that even if one were to accept *all* of the other value conclusions and methodologies[120] set forth in VRC's December 20, 2007 solvency analysis (with the exception of attributing value to the S-Corporation/ESOP tax attribute, which the Examiner concludes is incorrect),[121] it would still be the case that Tribune was insolvent at the Step Two Financing Closing Date in both the low- and mid-range cases, and that in the high-case Tribune

---

of $24.9 million, from $7,798.8 million to $7,823.7 million (0.3%).  *See also* Report at § IV.B.5.d.(10).  The Examiner's financial advisor did not have sufficient time before issuance of the Report to run these changes through the various models underlying the financial analysis contained in the Report.  These changes are not material to the Examiner's conclusions reached in the Report.

[120]  As noted earlier in this Annex A, the Examiner's financial advisor has concluded that the use of market-based valuation methodologies (*e.g.*, EBITDA multiples) would result in less meaningful valuation conclusions in Tribune's case.  The Examiner's financial advisor has therefore not included these market-based valuation methodologies in its solvency analysis.

[121]  *See* Report at § IV.B.5.d.(10).

had a solvency "cushion" of only approximately 2.1% of its total calculated enterprise value.[122] This is demonstrated in the chart below:

| VALUATION SUMMARY ($ mm) [1] | | | |
|---|---|---|---|
| Valuation Method | Low | Mid | High |
| Comparable Companies | $ 9,248.1 | $ 9,865.3 | $ 10,482.5 |
| Comparable Transactions | $ 10,782.0 | $ 11,081.5 | $ 11,381.0 |
| Discounted Cash Flow | $ 7,798.8 | $ 7,798.8 | $ 7,798.8 |
| Sum of Business Segments | $ 9,316.8 | $ 9,909.7 | $ 10,502.5 |
| **Average Operating Asset Value** | **$ 9,286.4** | **$ 9,663.8** | **$ 10,041.2** |
| + Equity Investments and Other Assets | $ 3,024.4 | $ 3,024.4 | $ 3,024.4 |
| + NPV of S-Corp-ESOP Tax Savings | $ 0.0 | $ 0.0 | $ 0.0 |
| **Adjusted Enterprise Value** | **$ 12,310.8** | **$ 12,688.2** | **$ 13,065.6** |
| + Cash | $ 197.7 | $ 197.7 | $ 197.7 |
| - Debt | ($ 12,898.8) | ($ 12,898.8) | ($ 12,898.8) |
| - Identified Contingent Liabilities | ($ 86.8) | ($ 86.8) | ($ 86.8) |
| **Equity Value** | **($ 477.1)** | **($ 99.7)** | **$ 277.7** |
| **% of Enterprise Value** | **-3.9%** | **-0.8%** | **2.1%** |
| [1] Examiner's financial advisor's modifications to VRC's December 20, 2007 solvency analysis appear in red. *See* Ex. 1045 at 7 (VRC Solvency Analysis, dated December 20, 2007). | | | |

___

[122]    Calculated as follows: $277.7 million equity value divided by $13,065.6 billion total Tribune enterprise value in the high case.

**ANNEX B**

**RECOVERY SCENARIOS**

**Summary of Principal Assumptions**

A.       **Background.**

       The Recovery Scenarios evaluate and quantify recoveries to the estates of the Tribune Entities according to eight different cases ("Cases," or individually, "Case"), described in detail below.  The results of the Recovery Scenarios flow from three primary quantifications: (1) the initial distributable value available to satisfy claims (in other words, the estimated value of the Tribune Entities); (2) the disgorgement proceeds (as a result of, for example, principal and interest payments on avoided debt), and (3) the allowed claims (and inversely, claims that are avoided).[1]

       The Recovery Scenarios only address the effect of fraudulent transfer actions on creditor recoveries and do not consider the potential effect of preferences, equitable subordination, equitable disallowance, or common law claim recoveries.  These claims are evaluated in the Report but the Recovery Scenarios do not take into account the potential effect on recoveries resulting from these possible remedies, claims and causes of action.

B.       **Initial Distributable Value.**

       The initial distributable value serves as the starting point for each of the scenarios and represents the amount available, setting aside any disgorgement proceeds, to satisfy creditor claims.  As noted in the Report, the Examiner used distributable value for the Tribune Entities of $6.325 billion (or $6.1 billion after considering repayment of the $225 million debtor in possession financing facility), representing the amount estimated in the Debtors' court-approved disclosure statement.  The initial distributable value is the same for each Case considered.

C.       **Recoveries of Avoidable Transfers.**

       The disgorgement analysis quantifies the estimated proceeds flowing into one or more estates[2] resulting from the recovery of: (i) principal and interest payments on avoided LBO

---

[1]    As used in the Recovery Scenarios, "allowed debt" or "shielded debt" refers to the portion of any debt for which a valid claim still exists pursuant to the terms and priorities afforded by the governing agreement after considering the effect of any fraudulent transfer assumptions.  "Avoided" or "avoidable" debt is the portion of debt which becomes, in effect, subordinated in right of recovery to all other claims, plus interest, as a result of avoidance.  These terms are for ease of reference, and are not intended to connote strict legal definitions or principles.

[2]    As a legal and technical matter, because each estate holds separate rights to pursue recovery of avoidable transfers, recoveries would flow into the estate entitled to such recovery.  In view of the time constraints associated with the development of the Recovery Scenarios, the model developed by the Examiner's financial advisor assumes that all such recoveries are received at the Tribune level.  The Examiner's financial advisor does not believe that the effect of this simplifying assumption is materially different from the perspective of

Lender Debt, (ii) avoided LBO Fees and Advisor Fees, and (iii) other potential recoveries (including recovery of payments from Selling Stockholders). Disgorgement represents additional funds available to satisfy creditor claims. In each of the Cases, the Examiner's financial advisor first identified the total amount of potential disgorgement from each relevant transferee (*e.g.*, the total amount subject to avoidance). The Examiner's financial advisor then evaluated potential offsets to that avoidance resulting from any value conferred to Tribune and/or the Guarantor Subsidiaries as a result of borrowings made on account of incurred debt.

The Recovery Scenarios assumed a 5% discount on both Step One and Step Two net disgorgement of payments of principal and interest on LBO Lender Debt due to potential collectability issues. As discussed in the Report, it is unclear whether the Credit Agreement Agent or the Bridge Agreement Agent are the initial transferees of these transfers or whether an estate representative would be required to seek recovery from each individual LBO Lender that received payments.

The Recovery Scenarios further assume a 5% cost of recovery (legal, advisory fees, costs) for each dollar recovered.

The attached schedule "Calculation of Disgorgement by Case" shows the detailed calculation of total disgorgement at Step One and/or Step Two for each Case, net of any offsets considered.

### D.    Avoided Debt and/or Payments.

Avoided debt and/or payments represent, as to any particular creditor whose claim is subject to avoidance or who is required to disgorge payments received, the total amount of debt avoided and payments disgorged by each creditor as a result of the fraudulent transfer assumptions specified in a particular Case. The amount is based on the difference between the total Petition Date claim of each creditor whose claim may be subject to avoidance and the allowed claim that such creditor is determined to hold in any given scenario, plus any other amounts that are assumed disgorged by that creditor. Thus, for example, with respect to the Credit Agreement Debt, in any scenario in which such debt is subject to avoidance, total avoided claims consist of the difference between the Petition Date claim amount ($8.722 billion) and the allowable portion of the Credit Agreement Debt after giving effect to avoidance and enforcement under Bankruptcy Code section 548(c),[3] along with any net principal and interest payments disgorged.[4]

The calculation of total avoided claims by creditor and by Case are presented in the attached schedule "Calculation of the Avoidance of Claims at Tribune and the Guarantor Subsidiaries by Case."

---

creditor recoveries than would be the case if recoveries flowed into Tribune or the Guarantor Subsidiaries separately.

[3]    11 U.S.C. § 548(c) (1996).

[4]    This illustrative example excludes consideration of potential LBO Fees which the LBO Lenders might be entitled to recover.

B-2

### E.    Allowed Debt.

Allowed debt consists of the portions of any claim which are determined to have conferred value on Tribune and/or the Guarantor Subsidiaries by a holder who is found to have acted in good faith under Bankruptcy Code section 548(c), and which, therefore, constitutes an allowed claim.  (Cases 7 and 8, as discussed below, posit that the holders of claims that are avoided are found not to have acted in good faith).  Any principal and interest payments made after the Leveraged ESOP Transactions on the portion of a claim that is enforced under Bankruptcy Code section 548(c) likewise are shielded from recovery.  In addition, the portion of the of LBO Fees for which an LBO Lender conferred value is shielded from recovery, as is the obligation incurred to pay such fees.

For purposes of the Recovery Scenarios, based on the analysis contained in the Report, obligations incurred on account of Credit Agreement Debt are assumed to have conferred value on one or more Tribune Entities and therefore constitute allowed debt at Step One to the extent the Credit Agreement Agent acted in good faith at Step One:

- Repayment of the 2006 Credit Agreement Debt from the $7.015 billion of Credit Agreement Debt (Tranche B and Tranche X) funded at the Step One Financing Closing Date - $2.534 billion.  This value was conferred on Tribune only.

- Amounts advanced under the Delayed Draw Facility after the Step One Financing Closing Date - $193 million.  This value was conferred on Tribune only.

- Amounts advanced under the Working Capital Facility (including drawn letters of credit) after the Step One Financing Closing Date - $265.3 million.  The Working Capital Facility conferred value on both Tribune and the Guarantor Subsidiaries. This value was allocated across those entities on a pro-rata basis.[5]

- LBO Fees at Step One were "resized" on a pro-rata basis based on the value conferred by the Step One Debt (repayment of the 2006 Credit Agreement Debt and the Working Capital and Delayed Draw Facilities) - $57.7 million.[6]  This amount "offsets" the disgorgement of LBO Fees resulting from the avoidance of the Credit Agreement Debt.  The full amount of these "resized" fees was funded from advances under the Credit Agreement at Step One.

- As discussed in the Report, no Advisor Fees are considered avoidable at Step One.  (Expenses paid to Financial Advisors at Step One are excluded from this analysis).[7]

---

[5]    However, in cases assuming a Step One fraudulent transfer at Tribune but not at the Guarantor Subsidiaries, no net disgorgement is calculated related to the Working Capital Facility.

[6]    For purposes of the Recovery Scenarios, only LBO Fees associated directly with the Step One Debt (including the Tranche B Facility, Tranche X Facility, Delayed Draw Facility, and Working Capital Facility) and the Administrative Agent fee of $50,000 paid to the JPM Entities are being considered (totaling $130.505 million). Other fees, costs, and expenses paid in connection with Step One (approximately $3.586 million) have not been considered and would not materially affect the analyses.

[7]    With regard to Advisor Fees, the Examiner has considered only amounts paid to Morgan Stanley, MLPF&S and CGMI, which specifically performed transaction advisory services.  All other amounts which could potentially

For purposes of the Recovery Scenarios, based on the analysis contained in the Report, obligations incurred on account of the Incremental Credit Agreement Facility and the Bridge Credit Agreement for the purposes specified below are assumed to have conferred value on one or more Tribune Entities and therefore constitute allowed debt at Step Two to the extent the Credit Agreement Agent and/or the Bridge Credit Agreement Agent acted in good faith at Step Two:

- Assumed value of the 401(k) and the S-Corporation/ESOP structure, $457.5 million and $482.5 million, respectively, minus the value of the PHONES Notes cash deferral benefit that was foregone as a result of the Step Two Transactions, $371.9 million, equals a total of $568.1 million. This value was allocated between the Incremental Credit Agreement Debt ($2.1 billion) and the Bridge Debt ($1.6 billion) on the basis of their relative proportion to all Step Two Debt. The value was then further allocated ratably between Tribune and the Guarantor Subsidiaries based on their respective asset values. By operation of the Subordinated Bridge Subsidiary Guarantee, to the extent the Credit Agreement Debt is enforced at the Guarantor Subsidiary level, distributions on the Bridge Debt are remitted to the Credit Agreement Debt.

- LBO Fees were "resized" on a pro-rata basis based on the value conferred at Step Two on account of the Step Two Debt (*i.e.*, the 401(k) and S-Corporation/ESOP benefits), $10.7 million.[8] Of this amount, $5.2 million relates to the Incremental Credit Agreement Debt and $5.5 million to the Bridge Debt. Each of these assumed benefits is further allocated ratably between Tribune and the Guarantor Subsidiaries. This amount serves as an offset to the disgorgement of LBO Fees. Of the "resized" amount, 93% is assumed to have been funded ratably by the Incremental Credit Agreement Debt and the Bridge Debt at Step Two. The 93% allocation results from the fact that not all of the payments made at Step Two were funded from the Step Two Debt, but rather, a combination of cash from Tribune and the Step Two Debt.

  The "resizing" of Advisor Fees was performed in three steps. The total amount of Advisor Fees was computed and divided by the full amount of Credit Agreement Debt and Bridge Debt to determine the overall actual fee percentage. This percentage was then applied to the overall level of Step One and Step Two allowed debt to determine overall "resized" Advisor Fees estimated on the basis of aggregate value conferred. These fees were then allocated between Step One and Step Two ratably on the basis of the actual fees paid proximate to Step One (to Morgan Stanley) and the actual fees paid after Step Two (CGMI and

---

be considered have been included in the categories "All Other Step One Related Fees and Expenses" and "All Other Step Two Related Fees and Expenses," which, as discussed in the Report, have not been considered herein. Only Morgan Stanley received a payment at Step One, whereas payments to MLPF&S and CGMI were not made until after the closing of Step Two. However, because the fees paid to Morgan Stanley were paid before the Step One Financing Closing Date, it is assumed that these fees will not be recoverable.

[8]    For purposes of the Recovery Scenarios, only Step Two LBO Fees associated directly with the Step Two Debt (including the Incremental Credit Agreement Facility and the Bridge Debt Facility) and the Administrative Agent fee of $50,000 paid to the Merrill Entities are considered. Other fees and expenses incurred and paid in connection with Step Twos (approximately $3.436 million) were not considered and would not materially affect the analyses.

MLPF&S).  The portion of "resized" Advisor Fees attributable to Step Two were then allocated ratably between Tribune and the Guarantor Subsidiaries and used to "offset" related disgorgement.

## F.    Other General Assumptions.

### 1.    LBO Lender/Financial Advisor Good Faith.

Recoveries from LBO Lenders and Financial Advisors are adjusted based on whether the agent or recipient of LBO Fees are determined to have acted in good faith.  The Case assumptions indicate when good faith is assumed to have been present and when it is not.

### 2.    Recoveries from Selling Stockholders.

When the scenarios assume an intentional fraudulent transfer at Step Two in Cases 7 and 8, recoveries are assumed from Selling Stockholders.  Recovery is estimated at approximately one-third of total payments made to Selling Stockholders at Step Two.  This is only intended to show the possible effect of recoveries from Selling Stockholders .  The Examiner's financial advisor has not performed any investigation regarding collectability of these payments.

### 3.    EGI-TRB Notes.

As discussed in the Report, the issues presented by these notes are complex.  The scenarios assume that if Step One is avoided as a fraudulent transfer, the EGI-TRB Notes would be viewed as the functional replacement of the EGI-TRB Exchangeable Note issued at Step One. The analysis assumes a 25% probability that the note would be enforced in such circumstances. In all Cases where Step One transactions are not avoided, these notes are treated as valid, except in Case 8.

### 4.    PHONES Notes.

In accordance with the conclusions reached in the Report, to the extent the LBO Lender Debt is avoided at Tribune, the PHONES Subordination should not extend LBO Lender Debt cannot recover out of the dividend available to the holders of the PHONES Notes. The LBO Lender Debt may do so, however, to the extent such claims are enforced based on good faith and value imparted at the Tribune level.

### 5.    Swap Documents.

Under the terms of the Credit Agreement, Tribune was required to enter into hedge arrangements to offset a percentage of its interest rate exposure under the Credit Agreement and other debt with respect to borrowed money.  On July 2 and July 3, 2007, Tribune entered into the Swap Documents.  The obligations of Tribune under the Swap Documents do not constitute Credit Agreement Debt, but are guaranteed by the Guarantor Subsidiaries pursuant to the Credit

Agreement Subsidiary Guarantee.[9]  Although the Examiner recognizes that the matter is not free from doubt, the Examiner believes that it is reasonably likely a court would find that the obligations resulting from termination of the Swap Documents are not avoidable in accordance with Bankruptcy Code section 560.[10]  Thus, the Examiner's financial advisor assumes that these claims would remain valid obligations of Tribune and the Guarantor Subsidiaries notwithstanding any avoidance of the LBO Lender Debt.

### 6.    Intercompany Accounts.

All scenarios assume the consolidation of intercompany balances for Tribune, Tribune Finance Services Center and Tribune Publishing.  As indicated in the Report, the Parties did not contest and the Examiner did not investigate the analyses of intercompany claims furnished by the Debtors to the Parties.  Accordingly, each Case uses and then shows the "high" and "low" intercompany balance scenarios prepared by the Debtors.

Consistent with the Debtors' analysis, the Examiner has also assumed that the approximately $368.8 million in cash transferred to Chicago Tribune Company and WGN Continental Broadcasting Company, Tribune CNLBC, and Tribune Interactive, Inc. immediately before the Petition Date is returned to Tribune and available for distribution to Tribune's creditors.

### 7.    Other Assumptions Contained in Recovery Scenarios.

The following are additional assumptions made in the Recovery Scenarios:

- All claims at Tribune recover *pari passu* from Tribune-level distributions, although distributions on the PHONES Notes and the EGI-TRB Notes are subordinated to all other borrowed money.  For simplicity, the recovery model assumes subordination to other general unsecured claims, although in fact the recoveries are only subordinated to claims for borrowed money.  The Examiner's financial advisor estimates that the economic impact of this assumption should not be significant, but the model is not technically accurate in this regard.

- Bridge Debt is subordinated to Credit Agreement Debt at the Guarantor Subsidiaries pursuant to the Subordinated Bridge Subsidiary Guarantee.  In any circumstance in which recoveries on avoided debt are assumed, but are sufficient to pay in full plus interest Non-LBO Debt of a particular Guarantor Subsidiary estate, the Recovery Scenarios in turn assume that a court will enforce the prebankruptcy priorities as between the Bridge Debt and the Credit Agreement Debt with respect to recoveries from a particular Guarantor Subsidiary.

- All payments to the Guarantor Subsidiaries on account of intercompany obligations owing from Tribune or a sister subsidiary are applied to satisfy the allowed portion of the Credit Agreement Debt and allowed trade claims at the

---

[9]    Although the swaps do not constitute Credit Agreement Debt, the total Credit Agreement Debt as presented in the schedules associated with the Recovery Scenarios does include the swaps to reflect the fact that the swaps are assumed subject to the Subsidiary Guarantees.  No avoidance is assumed for the swaps in any scenario.

[10]    *See Thrifty Oil Co. v. Bank of Am. Nat'l Trust and Sav. Ass'n*, 322 F.3d 1039 (9th Cir. 2002) (passim).

Guarantor Subsidiary level.  Although trade claims at the Guarantor Subsidiaries would be entitled to share in these recoveries, as a simplifying assumption the model did not consider this impact.  The Examiner's financial advisor does not believe this simplifying assumption materially affects the results.

- All allowed claims are paid in full, including interest at the Federal judgment rate effective on the Petition Date,[11] before any recoveries are remitted on account of any avoided claims.

- In circumstances in which there is a Step One fraudulent transfer at Tribune but not the Guarantor Subsidiaries, disgorgement of payments made by Tribune are only offset (when relevant) by the value received by Tribune directly.  To the extent value was conferred on the Guarantor Subsidiaries, and that creditor conferring that value has recourse to the Guarantor Subsidiaries, an unsecured claim at the Guarantor Subsidiary arises in an amount equal to the amount foregone at the Tribune level.

### G.    Recovery Scenario Cases Considered:

#### 1.    Case 1:  No Fraudulent Transfer.

Case 1 assumes that there are no recoverable fraudulent transfers with respect to the Step One Transactions or the Step Two Transactions.  This case may be viewed as a base case showing what happens if all nonbankruptcy entitlements are enforced and no avoidance occurs.

#### 2.    Case 2:  Step Two Fraudulent Transfer at Tribune Only.[12]

Case 2 assumes that both Tribune and the Guarantor Subsidiaries are solvent and adequately capitalized at Step One, the Guarantor Subsidiaries are solvent and adequately capitalized at Step Two, but Tribune is insolvent or inadequately capitalized at Step One.

#### 3.    Case 3: Step Two Fraudulent Transfer at Tribune and the Guarantor Subsidiaries.

Case 3 assumes that both Tribune and the Guarantor Subsidiaries are solvent at Step One; but that both Tribune and the Guarantor Subsidiaries are insolvent or inadequately capitalized at Step Two.

#### 4.    Case 4:  Step One and Step Two Fraudulent Transfer at Tribune Only.

Case 4 assumes that Tribune is insolvent or inadequately capitalized at both Step One and Step Two, but that the Guarantor Subsidiaries are solvent at both steps.

---

[11]    The applicable average interest rate for one-year constant maturity U.S. Treasuries for the week ended December 5, 2008 is 0.69%.  Interest is assumed through July 1, 2011 (the assumed date of distribution).

[12]    All but Cases 7 and 8 assume that the LBO Lenders are entitled to enforce some portion of the LBO Lender Debt under Bankruptcy Code section 548(c).

5.      **Case 5:  Step One Fraudulent Transfer at Tribune; Step Two Fraudulent Transfer at Tribune and the Guarantor Subsidiaries.**

Case 5 assumes Tribune is insolvent or inadequately capitalized at Step One, but the Guarantor Subsidiaries are solvent and adequately capitalized at Step One, and both Tribune and the Guarantor Subsidiaries are assumed to be insolvent or inadequately capitalized at Step Two.

6.      **Case 6:  Step One Fraudulent Transfer at Both Tribune and the Guarantor Subsidiaries; Step Two Fraudulent Transfer at Tribune and the Guarantor Subsidiaries.**

Case 6 assumes that both Tribune and the Guarantor Subsidiaries are insolvent and inadequately capitalized at both Step One and Step Two.

7.      **Case 7:  No Step One Fraudulent Transfer; Intentional Fraudulent Transfer at Step Two.**[13]

Case 7 shows what might happen to recoveries if the Step Two Transactions are avoided as an intentional fraudulent transfer at the Tribune and Guarantor Subsidiary levels but no avoidance occurs at Step One.  In this Case, the estate representative may pursue recovery against the Selling Stockholders, who collectively received $3.92 billion at Step Two. Depending on collectability (a matter which, as noted, the Examiner's financial advisor did not investigate), this could result in significant value available to creditors.  No avoidance of the Step One Transactions occur in this Case.  This Case also assumes that no portion of the Step Two Debt is enforced under Bankruptcy Code section 548(c).

8.      **Case 8:  No Step One Fraudulent Transfer; Intentional Fraudulent Transfer at Step Two.**

This Case also assumes that the Step Two Transactions are avoided as an intentional fraudulent transfer at the Tribune and Guarantor Subsidiary levels but no avoidance occurs at Step One.  As discussed in the Report, the Examiner considered the possibility that a court may determine that, under equitable estoppel other theory, the LBO Lender may not be entitled to share in recoveries on Step One Debt from Step Two avoidance and recoveries, even though the Step One Debt is not avoided.  The Report leaves this question in equipoise.  This Case, however, considers the effect of this assumption on recoveries.  In addition, this Case assumes that that no portion of the Step Two Debt is enforced under Bankruptcy Code section 548(c). Significantly, this Case assumes that the Phones Note Subordination would not apply as to those recoveries in which a court determines that the Step One Debt is not entitled to share.  It is conceivable that even if a court were to prohibit the Step One Debt from participating in Step

---

[13]     There are multiple other permutations of Cases 7 and 8; however, these scenarios are designed to illustrate the effect of these two outcomes based on the assumptions set forth herein.

Two avoidance and recoveries, a court nonetheless may interpret the subordination provisions of the PHONES Notes to require turnover of such amounts in favor of the Step One Debt.

**Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered**
**Recovery Analysis ($000's)**

**Case 1 (Base Case) - Low Intercompany Balances**

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | - |
| Total Disgorgement | | | | - |
| **Total Distributable Value** | | | | $ 6,325,000 |

### Recovery Analysis

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt (Guarantor Subsidiaries) | LBO Debt — Bridge Debt (Non-Guarantor Subsidiaries) | Senior Notes | Non-LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | Avoided Payments — LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step One | Advisor Fees Step Two | Selling Stockholders Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | |
| Tribune | $  - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $  - | $  - | $  - | $  - | $  - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** 0.69% | | | | | | | | | | | | | | |
| Tribune | $  - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $  - | $  - | $  - | $  - | $  - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | |
| Tribune | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | |
| Tribune | $  - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $  - | $  - | $  - | $  - | $  - | $ 12,732,668 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 8,722,140 | 1,619,507 | - | - | - | 66,966 | 12,189 | - | - | - | - | - | 10,455,756 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | |
| Tribune | $  - | $ 654,056 | $ 81,682 | $ 64,731 | $  - | $  - | $ 444 | $ 5,297 | $  - | $  - | $  - | $  - | $  - | $ 806,211 |
| Guarantor Subsidiaries | 34,954 | 5,256,913 | 0 | - | - | - | 1,186 | 100 | - | - | - | - | - | 5,293,154 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 589 | - | - | - | - | - | - | 225,635 |
| **Total Recoveries** | 260,000 | 5,910,969 | 81,683 | 64,731 | - | - | 2,219 | 5,397 | - | - | - | - | - | 6,325,000 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 7.5% | 5.0% | 5.0% | 0.0% | 0.0% | 5.0% | 5.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 66.6% | 5.0% | 5.0% | - | - | 1.8% | 0.8% | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | - | - | - | - | - | 10.1% | - | | | | | | |
| ***Total [Inc. Interest]*** | 100.0% | 66.6% | 5.0% | 5.0% | 0.0% | 0.0% | 2.7% | 4.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 47.5% |

Notes:

[1] See accompanying Summary of Principal Assumptions.

[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered
Recovery Analysis ($000's)

Case 1 (Base Case) - Low Intercompany Balances

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | - |
| Total Disgorgement | | | | - |
| **Total Distributable Value** | | | | **$ 6,325,000** |

**Fraudulent Transfer Assumptions:**

Step One - Tribune No Fraudulent Transfer
Step One - Guarantor Subs No Fraudulent Transfer
Step Two - Tribune No Fraudulent Transfer
Step Two - Guarantor Subs No Fraudulent Transfer

| | Priority Debt | | LBO Debt | | | Non - LBO Debt | | | | | Avoided Payments to / for | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Liabs (Net of Admin Lease Cure) | Former Employee Claims | LBO Fees | | Advisor Fees | | Selling Stockholders | | Total | |
| | | | | | | | | | Step One | Step Two | Step Two | Step Two | Step Two | | | |

**Total Allowed Debt Recoveries:**

*Initial Calculated Recoveries (IDV and Disgorgement)*

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 405,547 | $ 75,305 | $ 59,679 | $ 35,284 | $ 10,940 | $ 409 | $ 4,884 | $ - | $ - | $ - | $ - | $ - | $ - | $ 592,048 |
| Guarantor Subsidiaries | 34,954 | 4,433,678 | 823,235 | - | - | - | 1,186 | 100 | | | | | - | | 5,293,154 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 589 | - | | | | | - | | 225,635 |
| Total | 260,000 | 4,839,225 | 898,541 | 59,679 | 35,284 | 10,940 | 2,185 | 4,983 | | | | | | | 6,110,837 |

*Adjustments / Reallocations of Value*

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PHONES Notes & EGI-TRB Note Subordination | - | 34,346 | 6,377 | 5,052 | (35,284) | (10,940) | 35 | 413 | | | | | | | (0) |
| Guarantor Subsidiaries Subordination | - | 214,163 | - | - | - | - | - | - | | | | | | | 214,163 |
| Bridge Subsidiary Guarantee Subordination | - | 823,235 | (823,235) | - | - | - | - | - | | | | | | | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | | | | | | | - |
| Total Adjustments | - | 1,071,744 | (816,858) | 5,052 | (35,284) | (10,940) | 35 | 413 | | | | | | | 214,163 |

**Total Recoveries on Allowed Debt**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | - | 654,056 | 81,682 | 64,731 | - | - | 444 | 5,297 | | | | | | | 806,211 |
| Guarantor Subsidiaries | 34,954 | 5,256,913 | 0 | - | - | - | 1,186 | 100 | | | | | - | | 5,293,154 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 589 | - | | | | | - | | 225,635 |
| **Total Recoveries on Allowed Debt** | **260,000** | **5,910,969** | **81,683** | **64,731** | **-** | **-** | **2,219** | **5,397** | | | | | | | **6,325,000** |

**Total Recoveries on Avoided Debt/Payments**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | | | | | - | | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | | | | | - | | - |
| Total | - | - | - | - | - | - | - | - | | | | | | | - |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | | | | | | | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | | | | | | | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | | | | | | | - |
| Total Adjustments | - | - | - | - | - | - | - | - | | | | | | | - |

**Total Recoveries on Avoided Debt/Payments**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | - | - | - | - | - | - | - | - | | | | | - | | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | | | | | - | | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | | | | | - | | - |
| **Total Recoveries on Avoided Debt/Payments** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | | | | | | | **-** |

B-11

Case Summary - Case 1

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered
Recovery Analysis ($000's)

Case 1 (Base Case) - High Intercompany Balances

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | - |
| Total Disgorgement | | | | - |
| **Total Distributable Value** | | | | **$ 6,325,000** |

### Main Recovery Table

| Fraudulent Transfer Assumptions: | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Non-LBO Debt — Senior Notes | Non-LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | Avoided Payments — LBO Fees Step One | Avoided Payments — LBO Fees Step Two | Avoided Payments — Advisor Fees Step One | Avoided Payments — Advisor Fees Step Two | Avoided Payments — Selling Stockholders Step One | Avoided Payments — Selling Stockholders Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |

**Initial Claims (Exc. Intercompany):**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | - | 13,077,669 |

**Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):**

| | 0.69% | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | - | 13,305,448 |

**Avoided Debt / Recovered Payments:**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

**Remaining Net Allowed Debt:**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 66,966 | 12,189 | - | - | - | - | - | - | 10,455,756 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |

**Total Recoveries (All Claims):**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 670,355 | $ 74,036 | $ 58,670 | $ - | $ - | $ 402 | $ 4,801 | $ - | $ - | $ - | $ - | $ - | $ - | $ 808,264 |
| Guarantor Subsidiaries | 34,954 | 5,254,863 | 0 | - | - | - | 1,184 | 99 | - | - | - | - | - | - | 5,291,101 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 589 | - | - | - | - | - | - | - | 225,635 |
| **Total Recoveries** | **260,000** | **5,925,218** | **74,036** | **58,670** | **-** | **-** | **2,176** | **4,900** | | | | | | | **6,325,000** |

**Recovery % of Initial Claim [2]**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune [Exc. Interest] | | 7.7% | 4.6% | 4.6% | 0.0% | 0.0% | 4.6% | 4.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 6.3% |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 66.7% | | | | | 1.8% | 0.8% | | | | | | | 8.3% |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 10.1% | | | | | | | | |
| **Total [Inc. Interest]** | **100.0%** | **66.7%** | **4.5%** | **4.5%** | **0.0%** | **0.0%** | **2.6%** | **4.1%** | **0.0%** | **0.0%** | **0.0%** | **0.0%** | **0.0%** | **0.0%** | **47.5%** |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered

Case 1 (Base Case) - High Intercompany Balances

Recovery Analysis ($000's)

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | - | | | - |
| Step Two Disgorgement | | | | - |
| Total Disgorgement | | | | - |
| Total Distributable Value | | | | $ 6,325,000 |

| | Priority Debt | LBO Debt | | | Non - LBO Debt | | | Former | Avoided Payments to / for | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Trade & Lease Claims (Net of Admin Lease Cure) | Employee Claims | LBO Fees | | Advisor Fees | Selling Stockholders | |
| Fraudulent Transfer Assumptions: | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | | | Step One | Step Two | Step Two | Step Two | Total |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | |
| Tribune | $ - | $ 367,584 | $ 68,255 | $ 54,090 | $ 31,981 | $ 9,916 | $ 371 | $ 4,427 | $ - | $ - | $ - | $ - | $ 536,624 |
| Guarantor Subsidiaries | 34,954 | 4,431,949 | 822,914 | - | - | - | 1,184 | 99 | - | - | - | - | 5,291,101 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 589 | - | - | - | - | - | 225,635 |
| Total | 260,000 | 4,799,533 | 891,170 | 54,090 | 31,981 | 9,916 | 2,144 | 4,526 | - | - | - | - | 6,053,360 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | | 31,131 | 5,780 | 4,579 | (31,981) | (9,916) | 31 | 375 | | | | | 0 |
| Guarantor Subsidiaries Subordination | | 271,640 | - | - | - | - | - | - | | | | | 271,640 |
| Bridge Subsidiary Guarantee Subordination | | 822,914 | (822,914) | - | - | - | - | - | | | | | - |
| Post Petition Interest | | - | - | - | - | - | - | - | | | | | - |
| Total Adjustments | - | 1,125,685 | (817,134) | 4,579 | (31,981) | (9,916) | 31 | 375 | - | - | - | - | 271,640 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | |
| Tribune | $ - | $ 670,355 | $ 74,036 | $ 58,670 | $ - | $ - | $ 402 | $ 4,801 | $ - | $ - | $ - | $ - | $ 808,264 |
| Guarantor Subsidiaries | 34,954 | 5,254,863 | 0 | - | - | - | 1,184 | 99 | - | - | - | - | 5,291,101 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 589 | - | - | - | - | - | 225,635 |
| Total Recoveries on Allowed Debt | 260,000 | 5,925,218 | 74,036 | 58,670 | - | - | 2,176 | 4,900 | - | - | - | - | 6,325,000 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | | - | - | - | - | - | - | - | | | | | - |
| Guarantor Subsidiaries Subordination | | - | - | - | - | - | - | - | | | | | - |
| Subordinated Bridge Subsidiary Guarantee | | - | - | - | - | - | - | - | | | | | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Recoveries on Avoided Debt/Payments | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered
Recovery Analysis (5000's)
Case 2 - Low Intercompany Balances

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 249,872 |
| Total Disgorgement | | | | 249,872 |
| **Total Distributable Value** | | | | $ 6,574,872 |

| | Priority Debt | LBO Debt | | | Non-LBO Debt | | | | Avoided Payments to / for | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LBO Fees | | Advisor Fees | Selling Stockholders | |
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Step One | Step Two | Step Two | Step Two | Total |
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | | | | | | 66,966 | 12,189 | | | | | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | | | | | | 5,845 | | | | | | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | | | | | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | 0.69% | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | | | | | | 68,156 | 12,406 | | | | | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | | | | | | 5,949 | | | | | | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | | | | | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,180,713 | $ 1,691,618 | $ - | $ - | $ - | $ - | $ - | $ - | $ 8,039 | $ 24,388 | $ - | $ 3,904,758 |
| Guarantor Subsidiaries | - | | | | | | | | | | | | - |
| Non-Guarantor Subsidiaries | - | | | | | | | | | | | | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,665,531 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 9,090,934 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 6,850,172 | 1,730,111 | | | | 66,966 | 12,189 | | | | | 10,694,392 |
| Non-Guarantor Subsidiaries | 225,046 | | | | | | 5,845 | | | | | | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | |
| Tribune | $ - | $ 898,503 | $ 2,884 | $ 107,092 | $ - | $ - | $ 734 | $ 8,764 | $ - | $ - | $ - | $ - | $ 1,017,977 |
| Guarantor Subsidiaries | 34,954 | 5,295,032 | (0) | | | | 1,173 | 100 | | | | | 5,331,258 |
| Non-Guarantor Subsidiaries | 225,046 | | | | | | 591 | | | | | | 225,637 |
| **Total Recoveries** | 260,000 | 6,199,536 | 2,883 | 107,092 | | | 2,498 | 8,864 | | | | | 6,574,872 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | | 10.3% | 0.2% | 8.3% | 0.0% | 0.0% | 8.3% | 8.3% | | 0.0% | 0.0% | 0.0% | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 1.8% | | | | | 1.8% | 0.8% | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 10.1% | | | | | | |
| **Total [Inc. Interest]** | 100.0% | 69.8% | 0.2% | 8.2% | 0.0% | 0.0% | 3.0% | 7.4% | | 0.0% | 0.0% | 0.0% | 49.4% |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered
Recovery Analysis ($000's)

Case Summary - Case 2

Case 2 - Low Intercompany Balances

| Calculation of Distributable Value for Case | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | - | - |
| Step Two Disgorgement | | | 249,872 | 249,872 |
| Total Disgorgement | | | 249,872 | 249,872 |
| Total Distributable Value | | | | $ 6,574,872 |

| Fraudulent Transfer Assumptions: | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Non-LBO Debt — Senior Notes | Non-LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Avoided Payments — LBO Fees — Step One | Avoided Payments — LBO Fees — Step Two | Avoided Payments — Advisor Fees — Step Two | Avoided Payments — Selling Stockholders — Step Two | Total | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | | |
| Tribune | $ 260,000 | $ 495,375 | $ 2,570 | $ 95,384 | $ 56,396 | $ 17,486 | $ 654 | $ 7,806 | $ - | $ - | $ - | $ - | $ - | $ 675,671 |
| Guarantor Subsidiaries | 34,954 | 4,429,176 | 865,856 | - | - | - | 1,173 | 100 | - | - | - | - | - | 5,331,258 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 591 | - | - | - | - | - | - | 225,637 |
| Total | 260,000 | 4,924,551 | 868,426 | 95,384 | 56,396 | 17,486 | 2,417 | 7,906 | - | - | - | - | - | 6,232,566 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 60,822 | 314 | 11,708 | (56,396) | (17,486) | 80 | 958 | - | - | - | - | - | 0 |
| Guarantor Subsidiaries Subordination | - | 342,306 | - | - | - | - | - | - | - | - | - | - | - | 342,306 |
| Bridge Subsidiary Guarantee Subordination | - | 865,856 | (865,856) | - | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 1,268,985 | (865,542) | 11,708 | (56,396) | (17,486) | 80 | 958 | - | - | - | - | - | 342,306 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | | |
| Tribune | - | 898,503 | 2,884 | 107,092 | 0 | 0 | 734 | 8,764 | - | - | - | - | - | 1,017,977 |
| Guarantor Subsidiaries | 34,954 | 5,295,032 | (0) | - | - | - | 1,173 | 100 | - | - | - | - | - | 5,331,258 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 591 | - | - | - | - | - | - | 225,637 |
| Total Recoveries on Allowed Debt | 260,000 | 6,193,536 | 2,883 | 107,092 | 0 | 0 | 2,498 | 8,864 | - | - | - | - | - | 6,574,872 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Recoveries on Avoided Debt/Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered

Recovery Analysis (5000's)

Case Summary - Case 2

**Case 2 - High Intercompany Balances**

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 249,872 |
| Total Disgorgement | | | | 249,872 |
| **Total Distributable Value** | | | | $ 6,574,872 |

| | Priority Debt | | LBO Debt | | | Non - LBO Debt | | | | | Avoided Payments to / for | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fraudulent Transfer Assumptions: | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | LBO Fees | | Advisor Fees | | Selling Stockholders | | Total |
| | | | | | | | | | | Step One | Step Two | Step One | Step Two | Step One | Step Two | |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | 0.69% | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,180,713 | $ 1,691,618 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 8,039 | $ - | $ 24,388 | $ - | $ 3,904,758 |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,665,531 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 9,090,934 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 8,850,172 | 1,730,111 | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 10,694,392 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 919,277 | $ 2,559 | $ 95,095 | $ - | $ - | $ 652 | $ 7,782 | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,025,365 |
| Guarantor Subsidiaries | 34,954 | 5,287,649 | (0) | - | - | - | 1,169 | 99 | - | - | - | - | - | - | 5,323,871 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 590 | - | - | - | - | - | - | - | 225,637 |
| **Total Recoveries** | 260,000 | 6,206,926 | 2,559 | 95,095 | - | - | 2,411 | 7,881 | - | - | - | - | - | - | 6,574,872 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 10.5% | 0.2% | 7.4% | 0.0% | 0.0% | 7.4% | 7.4% | | 0.0% | | 0.0% | | 0.0% | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 69.9% | - | - | - | - | 1.7% | 0.8% | | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | - | - | - | - | - | 10.1% | - | | | | | | | |
| **Total [Inc. Interest]** | 100.0% | 69.9% | 0.2% | 7.3% | 0.0% | 0.0% | 2.9% | 6.6% | | 0.0% | | 0.0% | | 0.0% | 49.4% |

Notes:

[1] See accompanying Summary of Principal Assumptions.

[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

B-16

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered
Recovery Analysis ($000's)

Case Summary - Case 2

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 249,872 |
| Total Disgorgement | | | | 249,872 |
| Total Distributable Value | | | | $ 6,574,872 |

**Case 2 - High Intercompany Balances**

| | Priority Debt Allowed DIP & Admin | LBO Debt Credit Agreement Debt | LBO Debt Bridge Debt | Senior Notes | Non-LBO Debt PHONES Notes | Non-LBO Debt EGI-TRB Notes | Non-LBO Debt Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Avoided Payments LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step Two | Selling Stockholders Step Two | All Claims Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | |
| Tribune | $ - | $ 439,896 | $ 2,280 | $ 84,698 | $ 50,080 | $ 15,528 | $ 580 | $ 6,931 | $ - | $ - | $ - | $ - | $ 599,995 |
| Guarantor Subsidiaries | 34,954 | 4,423,001 | 864,648 | - | - | - | 1,169 | 99 | - | - | - | - | 5,323,871 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 590 | - | - | - | - | - | 225,637 |
| Total | 260,000 | 4,862,897 | 866,928 | 84,698 | 50,080 | 15,528 | 2,340 | 7,030 | - | - | - | - | 6,149,502 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 54,011 | 279 | 10,397 | (50,080) | (15,528) | 71 | 851 | - | - | - | - | 0 |
| Guarantor Subsidiaries Subordination | - | 425,371 | - | - | - | - | - | - | - | - | - | - | 425,371 |
| Bridge Subsidiary Guarantee Subordination | - | 864,648 | (864,648) | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 1,344,030 | (864,369) | 10,397 | (50,080) | (15,528) | 71 | 851 | - | - | - | - | 425,371 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | |
| Tribune | - | 919,277 | 2,559 | 95,095 | 0 | 0 | 652 | 7,782 | - | - | - | - | 1,025,365 |
| Guarantor Subsidiaries | 34,954 | 5,287,649 | (0) | - | - | - | 1,169 | 99 | - | - | - | - | 5,323,871 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 590 | - | - | - | - | - | 225,637 |
| Total Recoveries on Allowed Debt | 260,000 | 6,206,926 | 2,559 | 95,095 | 0 | 0 | 2,411 | 7,881 | - | - | - | - | 6,574,872 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Recoveries on Avoided Debt/Payments | - | - | - | - | - | - | - | - | - | - | - | - | - |

Case Summary - Case 3

**Tribune Company, et al, Chapter 11 Case No. 08-13141 (KTC), Jointly Administered**

**Recovery Analysis (5000's)**

**Case 3 - Low Intercompany Balances**

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 298,543 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | $ 6,623,543 |
| **Total Distributable Value** | | | | |

### Main Recovery Matrix

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Senior Notes | PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | Avoided Payments — LBO Fees Step One | Avoided Payments — LBO Fees Step Two | Avoided Payments — Advisor Fees Step One | Avoided Payments — Advisor Fees Step Two | Avoided Payments — Selling Stockholders Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | | 0.69% | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,180,713 | $ 1,691,618 | $ - | $ - | $ - | $ - | $ - | $ - | $ 59,272 | $ - | $ 24,388 | $ - | $ 3,955,991 |
| Guarantor Subsidiaries | - | 1,924,435 | 1,491,404 | - | - | - | - | - | - | - | - | - | - | 3,415,839 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,665,531 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ 9,090,934 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 6,921,809 | 234,596 | - | - | - | 66,966 | 12,189 | - | - | - | - | - | 7,270,513 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 945,949 | $ 3,025 | $ 112,814 | $ - | $ - | $ 773 | $ 9,232 | $ - | $ - | $ - | $ - | $ - | $ 1,071,793 |
| Guarantor Subsidiaries | 34,954 | 5,289,303 | 0 | - | - | - | 1,707 | 146 | - | - | - | - | - | 5,326,111 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 593 | - | - | - | - | - | - | 225,639 |
| **Total Recoveries** | 260,000 | 6,235,252 | 3,025 | 112,814 | - | - | 3,074 | 9,378 | - | - | - | - | - | 6,623,543 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | | 10.8% | 0.2% | 8.8% | 0.0% | 0.0% | 8.8% | 8.8% | | 0.0% | | 0.0% | | 0.0% |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 70.2% | | | | | 2.5% | 1.2% | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 10.1% | | | | | | | |
| *Total [Inc. Interest]* | *100.0%* | *70.2%* | *0.2%* | *8.6%* | *0.0%* | *0.0%* | *3.7%* | *7.9%* | | | | | | *49.8%* |

Notes:

[1] See accompanying Summary of Principal Assumptions.

[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims.  Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KTC), Jointly Administered

Case Summary - Case 3

Recovery Analysis ($000's)

Case 3 - Low Intercompany Balances

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 298,543 |
| **Total Distributable Value** | | | | $ 6,623,543 |

| Fraudulent Transfer Assumptions: | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | LBO Debt — Senior Notes | Non-LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | Avoided Payments to / for — LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step Two | Selling Stockholders Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | |
| Tribune | $ 260,000 | $ 521,530 | $ 2,694 | $ 100,488 | $ 59,375 | $ 18,410 | $ 689 | $ 8,224 | $ - | $ - | $ - | $ - | $ 711,410 |
| Guarantor Subsidiaries | 34,954 | 5,115,913 | 173,390 | - | - | - | 1,707 | 146 | - | - | - | - | 5,326,111 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 593 | - | - | - | - | - | 225,639 |
| Total | 260,000 | 5,637,443 | 176,084 | 100,488 | 59,375 | 18,410 | 2,989 | 8,370 | - | - | - | - | 6,263,159 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 64,035 | 330 | 12,326 | (59,375) | (18,410) | 84 | 1,009 | - | - | - | - | 0 |
| Guarantor Subsidiaries Subordination | - | 360,384 | - | - | - | - | - | - | - | - | - | - | 360,384 |
| Bridge Subsidiary Guarantee Subordination | - | 173,390 | (173,390) | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 597,809 | (173,060) | 12,326 | (59,375) | (18,410) | 84 | 1,009 | - | - | - | - | 360,384 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | |
| Tribune | - | 945,949 | 3,025 | 112,814 | - | - | 773 | 9,232 | - | - | - | - | 1,071,793 |
| Guarantor Subsidiaries | 34,954 | 5,289,303 | 0 | - | - | - | 1,707 | 146 | - | - | - | - | 5,326,111 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 593 | - | - | - | - | - | 225,639 |
| **Total Recoveries on Allowed Debt** | 260,000 | 6,235,252 | 3,025 | 112,814 | - | - | 3,074 | 9,378 | - | - | - | - | 6,623,543 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered

Recovery Analysis (5000's)

Case 3 - High Intercompany Balances

Case Summary - Case 3

| Calculation of Distributable Value for Case | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 298,543 |
| Total Distributable Value | | | | $ 6,623,543 |

| | Priority Debt | LBO Debt | | Senior Notes | Non - LBO Debt | | | | | Avoided Payments to / for | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fraudulent Transfer Assumptions: | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step Two | Selling Stockholders Step Two | | | Total |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | | | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | | | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | | | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | | | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | 0.69% | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | | | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | | | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | | | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | | | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,180,713 | $ 1,691,618 | $ - | $ - | $ - | $ - | $ - | $ - | $ 59,272 | $ 24,388 | $ - | | | $ 3,955,991 |
| Guarantor Subsidiaries | - | 1,924,435 | 1,491,404 | - | - | - | - | - | - | - | - | - | | | 3,415,839 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | | | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,665,531 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | | | $ 9,090,934 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 6,921,809 | 234,596 | - | - | - | 66,966 | 12,189 | - | - | - | - | | | 7,270,513 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | | | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 966,238 | $ 2,681 | $ 100,005 | $ - | $ - | $ 685 | $ 8,184 | $ - | $ - | $ - | $ - | | | $ 1,077,793 |
| Guarantor Subsidiaries | 34,954 | 5,283,312 | (0) | - | - | - | 1,701 | 145 | - | - | - | - | | | 5,320,111 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 592 | - | - | - | - | - | | | 225,638 |
| **Total Recoveries** | 260,000 | 6,249,549 | 2,681 | 100,005 | - | - | 2,979 | 8,329 | - | - | - | - | | | 6,623,543 |
| *Recovery % of Initial Claim [2]* | | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 11.1% | 0.2% | 7.8% | 0.0% | 0.0% | 7.8% | 7.8% | | 0.0% | 0.0% | 0.0% | | | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 2.5% | 1.2% | | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 10.1% | | | | | | | | |
| **Total [Inc. Interest]** | 100.0% | 70.4% | 0.2% | 7.7% | 0.0% | 0.0% | 3.6% | 7.0% | | 0.0% | 0.0% | | | | 49.8% |

Notes:

[1] See accompanying Summary of Principal Assumptions.

[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered
Recovery Analysis ($000's)

Case Summary - Case 3

**Case 3 - High Intercompany Balances**

| Calculation of Distributable Value for Case | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 298,543 |
| **Total Distributable Value** | | | | $ 6,623,543 |

| Fraudulent Transfer Assumptions: | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Non-LBO Debt — Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Avoided Payments — LBO Fees — Step One | LBO Fees — Step Two | Advisor Fees — Step Two | Selling Stockholders — Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | |
| Tribune | $ 260,000 | $ 462,364 | $ 2,388 | $ 89,077 | $ 52,639 | $ 16,322 | $ 611 | $ 7,290 | $ - | $ - | $ - | $ - | $ 630,691 |
| Guarantor Subsidiaries | 34,954 | 5,110,118 | 173,194 | - | - | - | 1,701 | 145 | - | - | - | - | 5,320,112 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 592 | - | - | - | - | - | 225,638 |
| Total | 260,000 | 5,572,482 | 175,582 | 89,077 | 52,639 | 16,322 | 2,904 | 7,434 | - | - | - | - | 6,176,440 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 56,771 | 293 | 10,928 | (52,639) | (16,322) | 75 | 894 | - | - | - | - | 0 |
| Guarantor Subsidiaries Subordination | - | 447,103 | - | - | - | - | - | - | - | - | - | - | 447,103 |
| Bridge Subsidiary Guarantee Subordination | - | 173,194 | (173,194) | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 677,068 | (172,901) | 10,928 | (52,639) | (16,322) | 75 | 894 | - | - | - | - | 447,103 |
| Total Recoveries on Allowed Debt | | | | | | | | | | | | | |
| Tribune | - | 966,238 | 2,681 | 100,005 | - | - | 685 | 8,184 | - | - | - | - | 1,077,793 |
| Guarantor Subsidiaries | 34,954 | 5,283,312 | (0) | - | - | - | 1,701 | 145 | - | - | - | - | 5,320,111 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 592 | - | - | - | - | - | 225,638 |
| **Total Recoveries on Allowed Debt** | 260,000 | 6,249,549 | 2,681 | 100,005 | - | - | 2,979 | 8,329 | - | - | - | - | 6,623,543 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KTC), Jointly Administered
Recovery Analysis ($000's)

Case Summary - Case 4

## Case 4 - Low Intercompany Balances

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 249,872 |
| Total Disgorgement | | | | 1,177,001 |
| Total Distributable Value | | | | $ 7,502,001 |

### Main Recovery Table

| | Priority Debt: Allowed DIP & Admin | LBO Debt: Credit Agreement Debt | LBO Debt: Bridge Debt | Non-LBO Debt: Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step One | Advisor Fees Step Two | Selling Stockholders Step One | Selling Stockholders Step Two | All Claims Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** 0.69% | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,840,907 | $ 1,691,618 | $ - | $ - | $ 176,475 | $ - | $ - | $ 72,841 | $ 8,039 | $ - | $ 24,388 | $ - | $ - | $ 8,814,269 |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,908,420 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 58,825 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,157,347 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 9,757,367 | 1,730,111 | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 11,601,587 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 1,482,376 | $ 7,559 | $ 280,400 | $ - | $ - | $ 1,922 | $ 22,947 | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,795,204 |
| Guarantor Subsidiaries | 34,954 | 5,444,946 | 0 | - | - | - | 1,149 | 104 | - | - | - | - | - | - | 5,481,153 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 598 | - | - | - | - | - | - | - | 225,644 |
| Total Recoveries | 260,000 | 6,927,322 | 7,560 | 280,400 | - | - | 3,668 | 23,051 | - | - | - | - | - | - | 7,502,001 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | | 17.0% | 0.5% | 21.9% | 0.0% | 0.0% | 21.9% | 21.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | | 0.5% | | | | 1.7% | 1.7% | | | | | | | 0.9% |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 10.2% | | | | | | | | 10.2% |
| Total [Inc. Interest] | 100.0% | 78.0% | 0.5% | 21.5% | 0.0% | 0.0% | 4.4% | 19.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 56.4% |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

B-22

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KTC), Jointly Administered

Case 4 - Low Intercompany Balances

Recovery Analysis ($000's)

Case Summary - Case 4

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 249,872 |
| Total Disgorgement | | | | 1,177,001 |
| Total Distributable Value | | | | $ 7,502,001 |

| | Priority Debt | LBO Debt | | | Non - LBO Debt | | | | Avoided Payments to / for | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LBO Fees | | Advisor Fees | Selling Stockholders | |
| Fraudulent Transfer Assumptions: | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Step One | Step Two | Step Two | Step Two | Total |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | |
| Tribune | $ - | $ 534,792 | $ 6,368 | $ 235,953 | $ 139,519 | $ 10,815 | $ 1,617 | $ 19,309 | $ - | $ - | $ - | $ - | $ 948,374 |
| Guarantor Subsidiaries | 34,954 | 4,624,891 | 820,055 | - | - | - | 1,149 | 104 | - | - | - | - | 5,481,153 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 598 | - | - | - | - | - | 225,644 |
| Total | 260,000 | 5,159,683 | 826,423 | 235,953 | 139,519 | 10,815 | 3,364 | 19,413 | - | - | - | - | 6,655,171 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 100,753 | 1,191 | 44,448 | (139,519) | (10,815) | 305 | 3,637 | - | - | - | - | 0 |
| Guarantor Subsidiaries Subordination | - | 846,830 | (820,055) | - | - | - | - | - | - | - | - | - | 846,830 |
| Bridge Subsidiary Guarantee Subordination | - | 820,055 | (820,055) | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 1,767,639 | (818,864) | 44,448 | (139,519) | (10,815) | 305 | 3,637 | - | - | - | - | 846,830 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | |
| Tribune | - | 1,482,376 | 7,559 | 280,400 | 0 | 0 | 1,922 | 22,947 | - | - | - | - | 1,795,204 |
| Guarantor Subsidiaries | 34,954 | 5,444,946 | 0 | - | - | - | 1,149 | 104 | - | - | - | - | 5,481,153 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 598 | - | - | - | - | - | 225,644 |
| **Total Recoveries on Allowed Debt** | 260,000 | 6,927,322 | 7,560 | 280,400 | 0 | 0 | 3,668 | 23,051 | - | - | - | - | 7,502,001 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered

Case Summary - Case 4

Recovery Analysis ($000's)

Case 4 - High Intercompany Balances

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 249,872 |
| Total Disgorgement | | | | 1,177,001 |
| **Total Distributable Value** | | | | $ 7,502,001 |

| | Priority Debt | LBO Debt | | Non-LBO Debt | | | | | Avoided Payments to / for | | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LBO Fees | | Advisor Fees | | Selling Stockholders | | |
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Step One | Step Two | Step One | Step Two | Step One | Step Two | Total |
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | 0.69% | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,840,907 | $ 1,691,618 | $ - | $ - | $ 176,475 | $ - | $ - | 72,841 | 8,039 | $ - | 24,388 | $ - | $ - | $ 8,814,269 |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,908,420 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 58,825 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,157,347 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 9,757,367 | 1,730,111 | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 11,601,587 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 1,559,078 | $ 6,466 | $ 240,118 | $ - | $ - | $ 1,646 | $ 19,650 | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,826,958 |
| Guarantor Subsidiaries | 34,954 | 5,413,208 | 0 | - | - | - | 1,137 | 102 | - | - | - | - | - | - | 5,449,400 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 596 | - | - | - | - | - | - | - | 225,642 |
| **Total Recoveries** | 260,000 | 6,972,286 | 6,466 | 240,118 | - | - | 3,379 | 19,752 | - | - | - | - | - | - | 7,502,001 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 17.9% | 0.4% | 18.7% | 0.0% | 0.0% | 18.7% | 18.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 17.9% |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 78.5% | | | | | 1.7% | 0.8% | | | | | | | 78.5% |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 10.2% | | | | | | | | 10.2% |
| ***Total [Inc. Interest]*** | 100.0% | 78.5% | 0.4% | 18.4% | 0.0% | 0.0% | 4.1% | 16.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 56.4% |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

B-24

**Case 4 - High Intercompany Balances**

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 249,872 |
| Total Disgorgement | | | | 1,177,001 |
| Total Distributable Value | | | | $ 7,502,001 |

### Main Recovery Table

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Senior Notes | Non-LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step One | Advisor Fees Step Two | Selling Stockholders Step One | Selling Stockholders Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 457,966 | $ 5,446 | $ 202,055 | $ 119,480 | $ 9,262 | $ 1,385 | $ 16,535 | $ - | $ - | $ - | $ - | $ - | $ - | $ 812,128 |
| Guarantor Subsidiaries | 34,954 | 4,597,933 | 815,275 | - | - | - | 1,137 | 102 | - | - | - | - | - | - | 5,449,400 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 596 | - | - | - | - | - | - | - | 225,642 |
| Total | 260,000 | 5,055,899 | 820,721 | 202,055 | 119,480 | 9,262 | 3,118 | 16,637 | - | - | - | - | - | - | 6,487,171 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination — Tribune | | 86,282 | 1,020 | 38,063 | (119,480) | (9,262) | 261 | 3,115 | | | | | | | 0 |
| Guarantor Subsidiaries Subordination | | 1,014,830 | | - | - | - | - | - | | | | | | | 1,014,830 |
| Bridge Subsidiary Guarantee Subordination | | 815,275 | (815,275) | - | - | - | - | - | | | | | | | - |
| Post Petition Interest | | - | - | - | - | - | - | - | | | | | | | - |
| Total Adjustments | | 1,916,387 | (814,255) | 38,063 | (119,480) | (9,262) | 261 | 3,115 | | | | | | | 1,014,830 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | | | |
| Tribune | - | 1,559,078 | 6,466 | 240,118 | 0 | 0 | 1,646 | 19,650 | - | - | - | - | - | - | 1,826,958 |
| Guarantor Subsidiaries | 34,954 | 5,413,208 | 0 | - | - | - | 1,137 | 102 | - | - | - | - | - | - | 5,449,400 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 596 | - | - | - | - | - | - | - | 225,642 |
| Total Recoveries on Allowed Debt | 260,000 | 6,972,286 | 6,466 | 240,118 | 0 | 0 | 3,379 | 19,752 | - | - | - | - | - | - | 7,502,001 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Recoveries on Avoided Debt/Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KTC), Jointly Administered

Case Summary - Case 5

Recovery Analysis ($000's)

## Case 5 - Low Intercompany Balances

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 1,225,672 |
| **Total Distributable Value** | | | | **$ 7,550,672** |

| | Priority Debt | LBO Debt | | Senior Notes | Non-LBO Debt | | | | Avoided Payments to / for | | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step One | Advisor Fees Step Two | Selling Stockholders Step One | Selling Stockholders Step Two | Total |
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | | 0.69% | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,840,907 | $ 1,691,618 | $ - | $ - | $ 176,475 | $ - | $ - | 72,841 | $ - | $ - | 59,272 | $ - | 24,388 | $ 8,865,501 |
| Guarantor Subsidiaries | - | 1,924,435 | 1,491,404 | - | - | - | - | - | - | - | - | - | - | - | 3,415,839 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,908,420 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 58,825 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,157,347 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 7,824,892 | 234,596 | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 8,173,597 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 1,524,586 | $ 7,745 | $ 288,505 | $ - | $ - | $ 1,977 | $ 23,610 | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,846,373 |
| Guarantor Subsidiaries | 34,954 | 5,441,917 | (0) | - | - | - | 1,632 | 149 | - | - | - | - | - | - | 5,478,652 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 600 | - | - | - | - | - | - | - | 225,646 |
| **Total Recoveries** | 260,000 | 6,966,453 | 7,744 | 288,505 | - | - | 4,210 | 23,759 | - | - | - | - | - | - | 7,550,672 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 17.5% | 0.5% | 22.5% | 0.0% | 0.0% | 22.5% | 22.5% | 0.0% | | 0.0% | | 0.0% | | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 78.5% | 0.5% | | | | 2.4% | 1.2% | | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 10.3% | | | | | | | | |
| **Total [Inc. Interest]** | 100.0% | 78.5% | 0.5% | 22.1% | 0.0% | 0.0% | 5.1% | 19.9% | 0.0% | | 0.0% | | 0.0% | | 56.7% |

Notes:

[1] See accompanying Summary of Principal Assumptions.

[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KTC), Jointly Administered

Case Summary - Case 5

Recovery Analysis ($000's)

Case 5 - Low Intercompany Balances

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 1,225,672 |
| Total Distributable Value | | | | $ 7,550,672 |

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Senior Notes | Non-LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Avoided Payments — LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step Two | Selling Stockholders Step Two | Selling Stockholders Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | | |
| Tribune | $ - | $ 550,001 | $ 6,520 | $ 242,793 | $ 143,489 | $ 11,123 | $ 1,664 | $ 19,869 | $ - | $ - | $ - | $ - | $ - | $ 975,459 |
| Guarantor Subsidiaries | 34,954 | 5,283,513 | 158,404 | - | - | - | 1,632 | 149 | - | - | - | - | - | 5,478,652 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 600 | - | - | - | - | - | - | 225,646 |
| Total | 260,000 | 5,833,514 | 164,923 | 242,793 | 143,489 | 11,123 | 3,896 | 20,018 | - | - | - | - | - | 6,679,757 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 103,620 | 1,225 | 45,712 | (143,489) | (11,123) | 313 | 3,741 | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | 870,915 | - | - | - | - | - | - | - | - | - | - | - | 870,915 |
| Bridge Subsidiary Guarantee Subordination | - | 158,404 | (158,404) | - | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 1,132,939 | (157,179) | 45,712 | (143,489) | (11,123) | 313 | 3,741 | - | - | - | - | - | 870,915 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 1,524,536 | $ 7,745 | $ 288,505 | $ 0 | $ 0 | $ 1,977 | $ 23,610 | $ - | $ - | $ - | $ - | $ - | $ 1,846,373 |
| Guarantor Subsidiaries | 34,954 | 5,441,917 | (0) | - | - | - | 1,632 | 149 | - | - | - | - | - | 5,478,652 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 600 | - | - | - | - | - | - | 225,646 |
| Total Recoveries on Allowed Debt | 260,000 | 6,966,453 | 7,744 | 288,505 | 0 | 0 | 4,210 | 23,759 | - | - | - | - | - | 7,550,672 |
| **Total Recoveries on Avoided Debt/Payments:** | | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Recoveries on Avoided Debt/Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KJC), Jointly Administered
Recovery Analysis (5000's)

Case 5 - High Intercompany Balances

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 1,225,672 |
| **Total Distributable Value** | | | | **$ 7,550,672** |

### Fraudulent Transfer Assumptions:

Step One - Tribune Fraudulent Transfer
Step One - Guarantor Subs No Fraudulent Transfer
Step Two - Tribune Fraudulent Transfer
Step Two - Guarantor Subs Fraudulent Transfer

| | Priority Debt | LBO Debt | | | Non - LBO Debt | | | | Avoided Payments to / for | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | LBO Fees Step One | LBO Fees Step Two | Advisor Fees Step Two | Selling Stockholders Step Two | Total |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | 13,077,669 |
| | 0.69% | | | | | | | | | | | | |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,840,907 | $ 1,691,618 | $ - | $ - | $ 176,475 | $ - | $ - | 72,841 | 59,272 | 24,388 | $ - | $ 8,865,501 |
| Guarantor Subsidiaries | - | 1,924,435 | 1,491,404 | - | - | - | - | - | - | - | - | - | 3,415,839 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,908,420 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 58,825 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 5,157,347 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 7,824,892 | 234,596 | - | - | - | 66,966 | 12,189 | - | - | - | - | 8,173,597 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | |
| Tribune | $ - | $ 1,601,948 | $ 6,623 | $ 246,817 | $ - | $ - | $ 1,692 | $ 20,198 | $ - | $ - | $ - | $ - | $ 1,877,278 |
| Guarantor Subsidiaries | 34,954 | 5,411,037 | 0 | - | - | - | 1,613 | 145 | - | - | - | - | 5,447,749 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 598 | - | - | - | - | - | 225,644 |
| **Total Recoveries** | 260,000 | 7,012,985 | 6,624 | 246,817 | - | - | 3,903 | 20,344 | - | - | - | - | 7,550,672 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 18.4% | 0.4% | 19.2% | 0.0% | 0.0% | 19.2% | 19.2% | 0.0% | 0.0% | 0.0% | | 18.9% |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 79.0% | 0.4% | | | | 2.4% | 1.2% | | | | | 79.0% |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 10.2% | 1.2% | | | | | 100.0% |
| **Total [Inc. Interest]** | 100.0% | 79.0% | 0.4% | 18.9% | 0.0% | 0.0% | 4.7% | 17.1% | 0.0% | 0.0% | 0.0% | 0.0% | 56.7% |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

B-28

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered

Case Summary - Case 5

## Case 5 - High Intercompany Balances
### Recovery Analysis ($000's)

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 1,225,672 |
| **Total Distributable Value** | | | | **$ 7,550,672** |

| | Priority Debt | LBO Debt | | Non - LBO Debt | | | | | Avoided Payments to / for | | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LBO Fees | | Advisor Fees | | Selling Stockholders | | |
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Step One | Step Two | Step One | Step Two | Step One | Step Two | Total |
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 470,556 | $ 5,575 | $ 207,706 | $ 122,766 | $ 9,516 | $ 1,424 | $ 16,998 | $ - | $ - | $ - | $ - | $ - | $ - | $ 834,541 |
| Guarantor Subsidiaries | 34,954 | 5,253,533 | 157,504 | - | - | - | 1,613 | 145 | - | - | - | - | - | - | 5,447,749 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 598 | - | - | - | - | - | - | - | 225,644 |
| Total | 260,000 | 5,724,089 | 163,080 | 207,706 | 122,766 | 9,516 | 3,635 | 17,143 | - | - | - | - | - | - | 6,507,935 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | | 88,655 | 1,048 | 39,111 | (122,766) | (9,516) | 268 | 3,201 | | | | | | | (0) |
| Guarantor Subsidiaries Subordination | | 1,042,737 | - | - | - | - | - | - | | | | | | | 1,042,737 |
| Bridge Subsidiary Guarantee Subordination | | 157,504 | (157,504) | - | - | - | - | - | | | | | | | - |
| Post Petition Interest | | - | - | - | - | - | - | - | | | | | | | - |
| Total Adjustments | | 1,288,896 | (156,456) | 39,111 | (122,766) | (9,516) | 268 | 3,201 | | | | | | | 1,042,737 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | | | |
| Tribune | - | 1,601,948 | 6,623 | 246,817 | 0 | 0 | 1,692 | 20,198 | - | - | - | - | - | - | 1,877,278 |
| Guarantor Subsidiaries | 34,954 | 5,411,037 | 0 | - | - | - | 1,613 | 145 | - | - | - | - | - | - | 5,447,749 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 598 | - | - | - | - | - | - | - | 225,644 |
| **Total Recoveries on Allowed Debt** | 260,000 | 7,012,985 | 6,624 | 246,817 | 0 | 0 | 3,903 | 20,344 | - | - | - | - | - | - | 7,550,672 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | | - | - | - | - | - | - | - | | | | | | | - |
| Guarantor Subsidiaries Subordination | | - | - | - | - | - | - | - | | | | | | | - |
| Subordinated Bridge Subsidiary Guarantee | | - | - | - | - | - | - | - | | | | | | | - |
| Total Adjustments | | - | - | - | - | - | - | - | | | | | | | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered
Recovery Analysis ($000's)

Case 6 - Low Intercompany Balances

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 1,225,672 |
| **Total Distributable Value** | | | | **$ 7,550,672** |

| | Priority Debt | LBO Debt | | | Non - LBO Debt | | | | Avoided Payments to / for | | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LBO Fees | | Advisor Fees | | Selling Stockholders | | |
| | Allowed DIP & Admin | Guarantor Subsidiaries Credit Agreement Debt | Non-Guarantor Subsidiaries Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Step One | Step Two | Step One | Step Two | Step One | Step Two | Total |
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | 0.69% | | | | | | | | | | | | | |
| Step One - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,840,907 | $ 1,691,618 | $ - | $ - | $ 176,475 | $ - | $ - | $ 72,841 | $ 59,272 | $ - | $ 24,388 | $ - | $ - | $ 8,865,501 |
| Guarantor Subsidiaries | - | 9,037,918 | 1,491,404 | - | - | - | - | - | - | - | - | - | - | - | 10,529,322 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,908,420 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 58,825 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,157,347 |
| Guarantor Subsidiaries (Inc. Guarantees) | - | 711,410 | 234,596 | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 1,060,114 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,979,737 | $ 39,847 | $ 1,305,857 | $ 772,357 | $ 59,870 | $ 8,950 | $ 106,866 | $ 205 | $ 167 | $ - | $ 69 | $ - | $ - | $ 5,273,924 |
| Guarantor Subsidiaries | 34,954 | 1,691,472 | 238,765 | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 2,045,753 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| **Total Recoveries** | **260,000** | **4,671,209** | **278,612** | **1,305,857** | **772,357** | **59,870** | **83,055** | **119,272** | **205** | **167** | **-** | **69** | **-** | **-** | **7,550,672** |
| **Recovery % of Initial Claim [2]:** | | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 34.2% | 2.5% | 101.8% | 101.8% | 25.4% | 101.8% | 101.8% | 0.3% | 0.3% | | 0.3% | | | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 52.6% | 16.9% | | | | 101.8% | 101.8% | | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 100.0% | | | | | | | | |
| *Total [Inc. Interest]* | *100.0%* | *52.6%* | *16.9%* | *100.0%* | *100.0%* | *25.0%* | *100.0%* | *100.0%* | *0.0%* | *0.0%* | | *0.0%* | | | *56.7%* |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered

Recovery Analysis ($000's)

Case 6 - Low Intercompany Balances

## Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 1,225,672 |
| **Total Distributable Value** | | | | $ 7,550,672 |

| | Priority Debt | LBO Debt | | | Non-LBO Debt | | | | Avoided Payments to / for | | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LBO Fees | | Advisor Fees | | Selling Stockholders | | |
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Step One | Step Two | Step One | Step Two | Step One | Step Two | Total |
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs Fraudulent Transfer | 34,954 | | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | 225,046 | | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | 260,000 | 1,773,898 | 265,964 | 1,170,598 | 1,058,763 | 82,072 | 80,834 | 107,986 | | | | | | | 4,800,115 |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 1,062,489 | $ 31,663 | $ 1,170,598 | $ 1,058,763 | $ 82,072 | $ 8,040 | $ 95,758 | $ 205 | $ - | $ - | $ 167 | $ - | $ 69 | $ 3,509,384 |
| Guarantor Subsidiaries | 34,954 | 711,410 | 234,301 | - | - | - | 66,869 | 12,228 | - | - | - | - | - | - | 1,059,761 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,925 | - | - | - | - | - | - | - | 230,971 |
| Total | 260,000 | 1,773,898 | 265,964 | 1,170,598 | 1,058,763 | 82,072 | 80,834 | 107,986 | - | - | - | - | - | - | 4,800,115 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | | 197,694 | 3,013 | 112,458 | (299,892) | (23,247) | 771 | 9,203 | | | | | | | (0) |
| Guarantor Subsidiaries Subordination | | 1,648,238 | - | - | - | - | - | - | | | | | | | 1,648,238 |
| Bridge Subsidiary Guarantee Subordination | | - | - | - | - | - | - | - | | | | | | | - |
| Post Petition Interest | | 64,327 | 4,780 | 22,801 | 13,486 | 1,045 | 1,450 | 2,083 | | | | | | | 109,971 |
| Total Adjustments | | 1,910,258 | 7,793 | 135,258 | (286,406) | (22,201) | 2,221 | 11,286 | | | | | | | 1,758,209 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | | | |
| Tribune | - | 2,960,105 | 34,993 | 1,305,857 | 772,357 | 59,870 | 8,950 | 106,866 | 205 | - | - | 167 | - | 69 | 5,248,997 |
| Guarantor Subsidiaries | 34,954 | 724,052 | 238,765 | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 1,078,332 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| **Total Recoveries on Allowed Debt** | 260,000 | 3,684,157 | 273,757 | 1,305,857 | 772,357 | 59,870 | 83,055 | 119,272 | - | - | - | - | - | - | 6,558,324 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 19,234 | $ 4,756 | $ - | $ - | $ 496 | $ - | $ - | $ 205 | $ - | $ - | $ 167 | $ - | $ 69 | $ 24,927 |
| Guarantor Subsidiaries | - | 967,421 | - | - | - | - | - | - | - | - | - | - | - | - | 967,421 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | 986,655 | 4,756 | - | - | 496 | - | - | 205 | - | - | 167 | - | 69 | 992,348 |
| PHONES Notes & EGI-TRB Note Subordination | | 398 | 98 | - | - | (496) | - | - | | | | | | | (0) |
| Guarantor Subsidiaries Subordination | | - | - | - | - | - | - | - | | | | | | | - |
| Subordinated Bridge Subsidiary Guarantee | | - | - | - | - | - | - | - | | | | | | | - |
| Total Adjustments | | 398 | 98 | - | - | (496) | - | - | | | | | | | (0) |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | | |
| Tribune | - | 19,632 | 4,855 | - | - | - | - | - | 205 | - | - | 167 | - | 69 | 24,927 |
| Guarantor Subsidiaries | - | 967,421 | - | - | - | - | - | - | - | - | - | - | - | - | 967,421 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | - | 987,053 | 4,855 | - | - | - | - | - | 205 | - | - | 167 | - | 69 | 992,348 |

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered

Recovery Analysis ($000's)

Case 6 - High Intercompany Balances

Case Summary - Case 6

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 1,225,672 |
| **Total Distributable Value** | | | | **$ 7,550,672** |

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Non-LBO Debt — Senior Notes | Non-LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | Avoided — LBO Fees Step One | Avoided — LBO Fees Step Two | Avoided — Advisor Fees Step Two | Avoided — Selling Stockholders Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | |
| Step One - Tribune Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Tribune Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Guarantor Subs Fraudulent Transfer | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | 13,077,669 |
| | | 0.69% | | | | | | | | | | | |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,840,907 | $ 1,691,618 | $ - | $ - | $ 176,475 | $ - | $ - | $ 72,841 | $ 59,272 | $ 24,388 | $ - | $ 8,865,501 |
| Guarantor Subsidiaries | - | 9,037,918 | 1,491,404 | - | - | - | - | - | - | - | - | - | 10,529,322 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,908,420 | $ 34,382 | $ 1,283,056 | $ 758,871 | $ 58,825 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 5,157,347 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 711,410 | 234,596 | - | - | - | 66,966 | 12,189 | - | - | - | - | 1,060,114 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,976,579 | $ 39,066 | $ 1,305,857 | $ 772,357 | $ 59,870 | $ 8,950 | $ 106,866 | $ 172 | $ 140 | $ 58 | $ - | $ 5,269,914 |
| Guarantor Subsidiaries | 34,954 | 1,695,482 | 238,765 | - | - | - | 68,156 | 12,406 | - | - | - | - | 2,049,762 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | 230,995 |
| **Total Recoveries** | 260,000 | 4,672,061 | 277,831 | 1,305,857 | 772,357 | 59,870 | 83,055 | 119,272 | 172 | 140 | 58 | - | 7,550,672 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | | 34.1% | 2.4% | 101.8% | | 25.4% | 101.8% | 101.8% | 0.2% | 0.2% | 0.2% | 0.0% | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 101.8% | 101.8% | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 101.8% | | | | | | |
| **Total [Inc. Interest]** | 100.0% | 52.6% | 16.9% | 100.0% | 100.0% | 25.0% | 100.0% | 100.0% | 0.2% | 0.2% | 0.2% | 0.0% | 56.7% |

B-32

Notes:

[1] See accompanying Summary of Principal Assumptions.

[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KJC), Jointly Administered
Recovery Analysis (5000's)

Case Summary - Case 6

## Case 6 - High Intercompany Balances

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | 927,128 |
| Step Two Disgorgement | | | | 298,543 |
| Total Disgorgement | | | | 1,225,672 |
| **Total Distributable Value** | | | | **$ 7,550,672** |

### Fraudulent Transfer Assumptions:
Step One - Tribune Fraudulent Transfer
Step One - Guarantor Subs Fraudulent Transfer
Step Two - Tribune Fraudulent Transfer
Step Two - Guarantor Subs Fraudulent Transfer

### Total Allowed Debt Recoveries:

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | LBO Debt — Senior Notes | LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | Avoided Payments — LBO Fees — Step One | Avoided Payments — LBO Fees — Step Two | Avoided Payments — Advisor Fees — Step Two | Avoided Payments — Selling Stockholders — Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | |
| Tribune | | $ 869,566 | $ 32,414 | $ 1,196,388 | $ 1,000,654 | $ 77,567 | $ 8,243 | $ 97,907 | $ 172 | $ 140 | $ 58 | $ - | $ 3,282,738 |
| Guarantor Subsidiaries | 34,954 | 711,410 | 234,241 | - | - | - | 66,843 | 12,190 | - | - | - | - | 1,059,637 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,925 | - | - | - | - | - | 230,971 |
| Total | 260,000 | 1,580,975 | 266,655 | 1,196,388 | 1,000,654 | 77,567 | 81,011 | 110,096 | 172 | 140 | 58 | - | 4,573,346 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | | | | | | | | | | | | | |
| Tribune | | 163,847 | 2,322 | 86,668 | (241,782) | (18,742) | 594 | 7,093 | | | | | (0) |
| Guarantor Subsidiaries Subordination | | | | | | | | | | | | | |
| Guarantor Subsidiaries | | 1,875,007 | - | - | - | - | - | - | | | | | 1,875,007 |
| Bridge Subsidiary Guarantee Subordination | | | | | | | | | | | | | |
| Post Petition Interest | | 64,327 | 4,780 | 22,801 | 13,486 | 1,045 | 1,450 | 2,083 | | | | | 109,971 |
| Total Adjustments | | 2,103,181 | 7,102 | 109,469 | (228,297) | (17,697) | 2,044 | 9,175 | | | | | 1,984,976 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | |
| Tribune | | 2,960,105 | 34,993 | 1,305,857 | 772,357 | 59,870 | 8,950 | 106,866 | 172 | 140 | 58 | - | 5,248,997 |
| Guarantor Subsidiaries | 34,954 | 724,052 | 238,765 | - | - | - | 68,156 | 12,406 | - | - | - | - | 1,078,332 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | 230,995 |
| **Total Recoveries on Allowed Debt** | 260,000 | 3,684,157 | 273,757 | 1,305,857 | 772,357 | 59,870 | 83,055 | 119,272 | 172 | 140 | 58 | - | 6,558,324 |

### Total Recoveries on Avoided Debt/Payments

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | LBO Debt — Senior Notes | LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | Avoided Payments — LBO Fees — Step One | Avoided Payments — LBO Fees — Step Two | Avoided Payments — Advisor Fees — Step Two | Avoided Payments — Selling Stockholders — Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | | $ 16,140 | $ 3,991 | | | $ 416 | | | $ 172 | $ 140 | $ 58 | $ - | $ 20,917 |
| Guarantor Subsidiaries | | 971,430 | - | | | - | | | - | - | - | - | 971,430 |
| Non-Guarantor Subsidiaries | | - | - | | | - | | | - | - | - | - | - |
| Total | | 987,571 | 3,991 | | | 416 | | | 172 | 140 | 58 | - | 992,348 |
| PHONES Notes & EGI-TRB Note Subordination | | | | | | | | | | | | | |
| Tribune | | 334 | 83 | | | (416) | | | | | | | 0 |
| Guarantor Subsidiaries Subordination | | | | | | | | | | | | | |
| Subordinated Bridge Subsidiary Guarantee | | | | | | | | | | | | | |
| Total Adjustments | | 334 | 83 | | | (416) | | | | | | | 0 |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | | 16,474 | 4,074 | | | - | | | 172 | 140 | 58 | - | 20,917 |
| Guarantor Subsidiaries | | 971,430 | - | | | - | | | - | - | - | - | 971,430 |
| Non-Guarantor Subsidiaries | | - | - | | | - | | | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | 987,905 | 4,074 | | | - | | | 172 | 140 | 58 | - | 992,348 |

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KTC), Jointly Administered
Recovery Analysis (5000's)

Case Summary - Case 7

## Case 7 - Low Intercompany Balances

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 1,575,640 |
| Total Disgorgement | | | | 1,575,640 |
| **Total Distributable Value** | | | | **$ 7,900,640** |

**Fraudulent Transfer Assumptions:**

Step One - Tribune No Fraudulent Transfer
Step One - Guarantor Subs No Fraudulent Transfer
Step Two - Intentional Fraudulent Transfer

| | Priority Debt | LBO Debt | | Non - LBO Debt | | | | | Avoided Payments to / for | | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | LBO Fees | | Advisor Fees | | Selling Stockholders | | Total |
| | | | | | | | | | Step One | Step Two | Step One | Step Two | Step Two | | |

**Initial Claims (Exc. Intercompany):**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | | 13,077,669 |

**Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):**   0.69%

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | | 13,305,448 |

**Avoided Debt / Recovered Payments:**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ - | $ 1,728,310 | $ - | $ - | $ - | $ - | $ - | $ - | $ 70,006 | $ - | $ 25,606 | $ 1,327,373 | | $ 5,379,039 |
| Guarantor Subsidiaries | - | 2,227,744 | 1,728,310 | - | - | - | - | - | - | - | - | - | - | | 3,956,054 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | | - |

**Remaining Net Allowed Debt:**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 6,621,176 | $ - | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | | $ 9,012,197 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 6,621,176 | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | | 6,735,285 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | | 230,891 |

**Total Recoveries (All Claims):**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 1,723,786 | $ - | $ 893,212 | $ - | $ - | $ 6,122 | $ 73,097 | $ - | $ - | $ - | $ - | $ - | | $ 2,696,217 |
| Guarantor Subsidiaries | 34,954 | 4,897,390 | - | - | - | - | 37,097 | 6,573 | - | - | - | - | - | | 4,976,013 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 3,364 | - | - | - | - | - | - | | 228,410 |
| **Total Recoveries** | 260,000 | 6,621,176 | - | 893,212 | - | - | 46,582 | 79,670 | - | - | - | - | - | | 7,900,640 |

**Recovery % of Initial Claim [2]**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune [Exc. Interest] | 100.0% | 19.8% | 0.0% | 69.6% | 0.0% | 0.0% | 69.6% | 69.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 74.6% | 0.0% | | | | 55.4% | 53.9% | | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 57.5% | | | | | | | | |
| **Total [Inc. Interest]** | 100.0% | 74.6% | 0.0% | 68.4% | 0.0% | 0.0% | 56.1% | 66.8% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 59.4% |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

B-34

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KJC), Jointly Administered
Recovery Analysis ($000's)

Case Summary - Case 7

Case 7 - Low Intercompany Balances

| Calculation of Distributable Value for Case | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 1,575,640 |
| Total Disgorgement | | | | 1,575,640 |
| Total Distributable Value | | | | $ 7,900,640 |

| | Priority Debt | LBO Debt | | | Non - LBO Debt | | | Former Employee Claims | Avoided Payments to / for | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | | LBO Fees | | Advisor Fees | Selling Stockholders | Total |
| Fraudulent Transfer Assumptions: | | | | | | | | | Step One | Step Two | Step Two | Step Two | |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Intentional Fraudulent Transfer | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | |
| Tribune | $ - | $ 950,723 | $ - | $ 764,398 | $ 196,310 | $ 60,869 | $ 5,239 | $ 62,555 | $ - | $ - | $ - | $ - | $ 2,040,094 |
| Guarantor Subsidiaries | 34,954 | 4,897,390 | - | - | - | - | 37,097 | 6,573 | - | - | - | - | 4,976,013 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 3,364 | - | - | - | - | - | 228,410 |
| Total | 260,000 | 5,848,113 | - | 764,398 | 196,310 | 60,869 | 45,699 | 69,128 | - | - | - | - | 7,244,517 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 116,941 | - | 128,814 | (196,310) | (60,869) | 883 | 10,542 | - | - | - | - | 0 |
| Guarantor Subsidiaries Subordination | - | 656,123 | - | - | - | - | - | - | - | - | - | - | 656,123 |
| Bridge Subsidiary Guarantee Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 773,064 | - | 128,814 | (196,310) | (60,869) | 883 | 10,542 | - | - | - | - | 656,123 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | |
| Tribune | $ - | $ 1,723,786 | $ - | $ 893,212 | $ - | $ - | $ 6,122 | $ 73,097 | $ - | $ - | $ - | $ - | $ 2,696,217 |
| Guarantor Subsidiaries | 34,954 | 4,897,390 | - | - | - | - | 37,097 | 6,573 | - | - | - | - | 4,976,013 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 3,364 | - | - | - | - | - | 228,410 |
| Total Recoveries on Allowed Debt | 260,000 | 6,621,176 | - | 893,212 | - | - | 46,582 | 79,670 | - | - | - | - | 7,900,640 |
| **Total Recoveries on Avoided Debt/Payments:** | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Recoveries on Avoided Debt/Payments | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered

Case Summary - Case 7

**Case 7 - High Intercompany Balances**
**Recovery Analysis ($000's)**

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 1,575,640 |
| Total Disgorgement | | | | 1,575,640 |
| **Total Distributable Value** | | | | **$ 7,900,640** |

| | Priority Debt | LBO Debt | | Non - LBO Debt | | | | | Avoided Payments to / for | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LBO Fees | | Advisor Fees | | Selling Stockholders | |
| Fraudulent Transfer Assumptions: | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Step One | Step Two | Step One | Step Two | Step Two | Total |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | |
| Step Two - Intentional Fraudulent Transfer | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** | | 0.69% | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,227,744 | $ 1,728,310 | $ - | $ - | $ - | $ - | $ - | $ - | $ 70,006 | $ - | $ 25,606 | $ 1,327,373 | $ 5,379,039 |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | 2,227,744 | 1,728,310 | - | - | - | - | - | - | - | - | - | - | 3,556,054 |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,621,176 | $ - | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ 9,012,197 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 6,621,176 | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | 6,735,285 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | |
| Tribune | $ - | $ 1,736,410 | $ - | $ 891,271 | $ - | $ - | $ 6,108 | $ 72,938 | $ - | $ - | $ - | $ - | $ - | $ 2,706,727 |
| Guarantor Subsidiaries | 34,954 | 4,884,766 | - | - | - | - | 38,767 | 6,888 | - | - | - | - | - | 4,965,374 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 3,492 | - | - | - | - | - | - | 228,538 |
| **Total Recoveries** | 260,000 | 6,621,176 | - | 891,271 | - | - | 48,367 | 79,826 | - | - | - | - | - | 7,900,640 |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 19.9% | 0.0% | 69.5% | 0.0% | 0.0% | 69.5% | 69.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 57.9% | 56.5% | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 59.7% | | | | | | | |
| **Total [Inc. Interest]** | 100.0% | 74.6% | 0.0% | 68.3% | 0.0% | 0.0% | 58.2% | 66.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | **59.4%** |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

Case Summary - Case 7

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KTC), Jointly Administered
Recovery Analysis ($000's)

Case 7 - High Intercompany Balances

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 1,575,640 |
| Total Disgorgement | | | | 1,575,640 |
| Total Distributable Value | | | | $ 7,900,640 |

| | Priority Debt | LBO Debt | | Non - LBO Debt | | | | | Avoided Payments to / for | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | LBO Fees | | Advisor Fees | Selling Stockholders | |
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Step One | Step Two | Step Two | Step Two | Total |
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Intentional Fraudulent Transfer | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | |
| Tribune | $ - | $ 840,612 | $ - | $ 776,066 | $ 175,298 | $ 54,354 | $ 5,319 | $ 63,510 | $ - | $ - | $ - | $ - | $ 1,915,158 |
| Guarantor Subsidiaries | 34,954 | 4,884,766 | - | - | - | - | 38,767 | 6,888 | - | - | - | - | 4,965,374 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 3,492 | - | - | - | - | - | 228,538 |
| Total | 260,000 | 5,725,378 | - | 776,066 | 175,298 | 54,354 | 47,577 | 70,398 | - | - | - | - | 7,109,071 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 104,229 | - | 115,205 | (175,298) | (54,354) | 790 | 9,428 | - | - | - | - | 791,569 |
| Guarantor Subsidiaries Subordination | - | 791,569 | - | - | - | - | - | - | - | - | - | - | 791,569 |
| Bridge Subsidiary Guarantee Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 895,798 | - | 115,205 | (175,298) | (54,354) | 790 | 9,428 | - | - | - | - | 791,569 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | |
| Tribune | - | 1,736,410 | - | 891,271 | 0 | 0 | 6,108 | 72,938 | - | - | - | - | 2,706,727 |
| Guarantor Subsidiaries | 34,954 | 4,884,766 | - | - | - | - | 38,767 | 6,888 | - | - | - | - | 4,965,374 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 3,492 | - | - | - | - | - | 228,538 |
| **Total Recoveries on Allowed Debt** | 260,000 | 6,621,176 | - | 891,271 | 0 | 0 | 48,367 | 79,826 | - | - | - | - | 7,900,640 |
| **Total Recoveries on Avoided Debt/Payments:** | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KJC), Jointly Administered

**Case 8 - Low Intercompany Balances**

Recovery Analysis ($000's)

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 1,575,640 |
| Total Disgorgement | | | | 1,575,640 |
| **Total Distributable Value** | | | | **$ 7,900,640** |

### Main Recovery Analysis

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Non-LBO Debt — Senior Notes | Non-LBO Debt — PHONES Notes | Non-LBO Debt — EGI-TRB Notes | Non-LBO Debt — Trade & Lease Claims (Net of Admin Lease Cure) | Non-LBO Debt — Former Employee Claims | Avoided — LBO Fees Step One | Avoided — LBO Fees Step Two | Avoided — Advisor Fees Step One | Avoided — Advisor Fees Step Two | Avoided — Selling Stockholders Step One | Avoided — Selling Stockholders Step Two | All Claims Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fraudulent Transfer Assumptions:** | | | | | | | | | | | | | | | |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Intentional Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Initial Claims (Exc. Intercompany):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | - | - | 13,077,669 |
| **Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):** 0.69% | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | - | - | - | - | - | 68,156 | 12,406 | - | - | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | - | - | 13,305,448 |
| **Avoided Debt / Recovered Payments:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 2,227,744 | $ 1,728,310 | $ - | $ - | $ - | $ - | $ - | $ - | $ 70,006 | $ - | $ 25,606 | $ - | $ 1,327,373 | $ 5,379,039 |
| Guarantor Subsidiaries | - | 2,227,744 | 1,728,310 | - | - | - | - | - | - | - | - | - | - | - | 3,956,054 |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Remaining Net Allowed Debt:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 6,621,176 | $ - | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 9,012,197 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 6,621,176 | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 6,735,285 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| **Total Recoveries (All Claims):** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 699,653 | $ - | $ 1,283,056 | $ 279,514 | $ - | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,376,016 |
| Guarantor Subsidiaries | 34,954 | 5,179,623 | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 5,293,732 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| **Total Recoveries** | **260,000** | **5,879,276** | **-** | **1,283,056** | **279,514** | **-** | **81,605** | **117,189** | **-** | **-** | **-** | **-** | **-** | **-** | **7,900,640** |
| **Recovery % of Initial Claim [2]** | | | | | | | | | | | | | | | |
| Tribune [Exc. Interest] | 100.0% | 8.0% | 0.0% | 100.0% | 36.8% | 0.0% | 100.0% | 100.0% | | 0.0% | | 0.0% | | 0.0% | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | 66.2% | | | | | 100.0% | 100.0% | | | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 100.0% | | | | | | | | |
| **Total [Inc. Interest]** | 100.0% | 66.2% | 0.0% | 98.3% | 36.2% | 0.0% | 98.3% | 98.3% | | 0.0% | | 0.0% | | 0.0% | **59.4%** |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

B-38

Case 8 - Low Intercompany Balances
Recovery Analysis ($000's)

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 1,575,640 |
| Total Disgorgement | | | | 1,575,640 |
| Total Distributable Value | | | | $ 7,900,640 |

| Fraudulent Transfer Assumptions: | Priority Debt | LBO Debt | | Non - LBO Debt | | | | | Avoided Payments to / for | | | | | | All Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Allowed DIP & Admin | Credit Agreement Debt | Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | LBO Fees Step One | Step Two | Advisor Fees Step One | Step Two | Selling Stockholders Step One | Step Two | Total |
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | | | |
| Step Two - Intentional Fraudulent Transfer | | | | | | | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | | | | | | | |
| Tribune | $ - | $ 384,493 | $ - | $ 1,091,925 | $ 521,606 | $ 13,664 | $ 7,484 | $ 89,359 | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,108,531 |
| Guarantor Subsidiaries | 34,954 | 5,179,623 | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 5,293,732 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| Total | 260,000 | 5,564,117 | - | 1,091,925 | 521,606 | 13,664 | 80,295 | 101,548 | - | - | - | - | - | - | 7,663,154 |
| *Adjustments / Reallocations of Value* | | | | | | | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | - | 47,674 | - | 191,131 | (242,092) | (13,664) | 1,310 | 15,641 | - | - | - | - | - | - | 0 |
| Guarantor Subsidiaries Subordination | - | 267,486 | - | - | - | - | - | - | - | - | - | - | - | - | 267,486 |
| Bridge Subsidiary Guarantee Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Post Petition Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | 315,160 | - | 191,131 | (242,092) | (13,664) | 1,310 | 15,641 | - | - | - | - | - | - | 267,486 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | | | | | | | |
| Tribune | - | 699,653 | - | 1,283,056 | 279,514 | - | 8,794 | 105,000 | - | - | - | - | - | - | 2,376,016 |
| Guarantor Subsidiaries | 34,954 | 5,179,623 | - | - | - | - | 66,966 | 12,189 | - | - | - | - | - | - | 5,293,732 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | - | - | 230,891 |
| **Total Recoveries on Allowed Debt** | 260,000 | 5,879,276 | - | 1,283,056 | 279,514 | - | 81,605 | 117,189 | - | - | - | - | - | - | 7,900,640 |
| **Total Recoveries on Avoided Debt/Payments:** | | | | | | | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subordinated Bridge Subsidiary Guarantee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Guarantor Subsidiaries | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

Tribune Company, et al, Chapter 11 Case No. 08-13141 (KJC), Jointly Administered

Case Summary - Case 8

Recovery Analysis ($000's)

Case 8 - High Intercompany Balances

### Calculation of Distributable Value for Case

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Initial Distributable Value | | | | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 1,575,640 |
| Total Disgorgement | | | | 1,575,640 |
| **Total Distributable Value** | | | | **$ 7,900,640** |

| Fraudulent Transfer Assumptions: | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Non-LBO Debt — Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | Avoided Payments to / for — LBO Fees — Step One | Step Two | Advisor Fees — Step Two | Selling Stockholders — Step Two | All Claims — Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | | | | | |
| Step Two - Intentional Fraudulent Transfer | | 0.69% | | | | | | | | | | | |

**Initial Claims (Exc. Intercompany):**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 8,722,140 | $ 1,619,507 | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 12,732,668 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | | | | | | 66,966 | 12,189 | - | - | - | - | 114,110 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | 230,891 |
| Total Claims | 260,001 | 8,722,140 | 1,619,507 | 1,283,056 | 758,871 | 235,300 | 81,605 | 117,189 | - | - | - | - | 13,077,669 |

**Initial Claims Plus Interest to 7/1/2011 (Exc. Intercompany):**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 8,877,139 | $ 1,648,287 | $ 1,305,857 | $ 772,357 | $ 239,482 | $ 8,950 | $ 106,866 | $ - | $ - | $ - | $ - | $ 12,958,937 |
| Guarantor Subsidiaries (Exc. Guarantees) | 34,955 | | | | | | 68,156 | 12,406 | - | - | - | - | 115,516 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,949 | - | - | - | - | - | 230,995 |
| Total Claims | 260,001 | 8,877,139 | 1,648,287 | 1,305,857 | 772,357 | 239,482 | 83,055 | 119,272 | - | - | - | - | 13,305,448 |

**Avoided Debt / Recovered Payments:**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 2,227,744 | $ 1,728,310 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 70,006 | $ 25,606 | $ 1,327,373 | $ 5,379,039 |
| Guarantor Subsidiaries | | 2,227,744 | 1,728,310 | - | - | - | - | - | - | - | - | - | - | 3,956,054 |
| Non-Guarantor Subsidiaries | | - | - | - | - | - | - | - | - | - | - | - | - | - |

**Remaining Net Avoided Debt:**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 6,621,176 | $ - | $ 1,283,056 | $ 758,871 | $ 235,300 | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 9,012,197 |
| Guarantor Subsidiaries (Inc. Guarantees) | 34,954 | 6,621,176 | - | - | - | - | 66,966 | 12,189 | - | - | - | - | 6,735,285 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | 230,891 |

**Total Recoveries (All Claims):**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune | $ - | $ 713,954 | $ - | $ 1,283,056 | $ 259,677 | $ - | $ 8,794 | $ 105,000 | $ - | $ - | $ - | $ - | $ 2,370,479 |
| Guarantor Subsidiaries | 34,954 | 5,185,160 | - | - | - | - | 66,966 | 12,189 | - | - | - | - | 5,299,269 |
| Non-Guarantor Subsidiaries | 225,046 | - | - | - | - | - | 5,845 | - | - | - | - | - | 230,891 |
| **Total Recoveries** | **260,000** | **5,899,114** | **-** | **1,283,056** | **259,677** | **-** | **81,605** | **117,189** | | | | | **7,900,640** |

*Recovery % of Initial Claim [2]*

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribune [Exc. Interest] | 100.0% | 8.2% | 0.0% | 100.0% | 34.2% | 0.0% | 100.0% | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 100.0% | 100.0% | | | | | |
| Non-Guarantor Subsidiaries [Exc. Interest] | 100.0% | | | | | | 100.0% | | | | | | |
| **Total [Inc. Interest]** | **100.0%** | **66.5%** | **0.0%** | **98.3%** | **33.6%** | **0.0%** | **98.3%** | **98.3%** | **0.0%** | **0.0%** | **0.0%** | **0.0%** | **59.4%** |

Notes:
[1] See accompanying Summary of Principal Assumptions.
[2] Total Recovery Percentage does not include distributions to subordinated avoidance claims. Recovery percentages for subordinated avoidance claims are calculated as a percentage of Avoided Payments.

B-40

Tribune Company, et al., Chapter 11 Case No. 08-13141 (KTC), Jointly Administered

Case 8 - High Intercompany Balances

Recovery Analysis ($000's)

Case Summary - Case 8

**Calculation of Distributable Value for Case**

| | Tribune | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Total |
|---|---|---|---|---|
| Initial Distributable Value | $ 572,841 | $ 5,068,767 | $ 683,392 | $ 6,325,000 |
| Step One Disgorgement | | | | - |
| Step Two Disgorgement | | | | 1,575,640 |
| Total Disgorgement | | | | 1,575,640 |
| Total Distributable Value | | | | $ 7,900,640 |

**Fraudulent Transfer Assumptions:**

| | Priority Debt — Allowed DIP & Admin | LBO Debt — Credit Agreement Debt | LBO Debt — Bridge Debt | Senior Notes | PHONES Notes | EGI-TRB Notes | Trade & Lease Claims (Net of Admin Lease Cure) | Former Employee Claims | All Claims Total |
|---|---|---|---|---|---|---|---|---|---|
| Step One - Tribune No Fraudulent Transfer | | | | | | | | | |
| Step One - Guarantor Subs No Fraudulent Transfer | | | | | | | | | |
| Step Two - Intentional Fraudulent Transfer | | | | | | | | | |
| **Total Allowed Debt Recoveries:** | | | | | | | | | |
| *Initial Calculated Recoveries (IDV and Disgorgement)* | | | | | | | | | |
| Tribune | $ - | $ 340,382 | $ - | $ 1,124,032 | $ 462,913 | $ 12,096 | $ 7,704 | $ 91,986 | $ 2,039,113 |
| Guarantor Subsidiaries | 34,954 | 5,185,160 | | | | | 66,966 | 12,189 | 5,299,269 |
| Non-Guarantor Subsidiaries | 225,046 | | | | | | 5,845 | | 230,891 |
| Total | 260,000 | 5,525,543 | | 1,124,032 | 462,913 | 12,096 | 80,515 | 104,175 | 7,569,273 |
| *Adjustments / Reallocations of Value* | | | | | | | | | |
| PHONES Notes & EGI-TRB Note Subordination | | 42,205 | | 159,024 | (203,236) | (12,096) | 1,090 | 13,014 | (0) |
| Guarantor Subsidiaries Subordination | | 331,367 | | | | | | | 331,367 |
| Bridge Subsidiary Guarantee Subordination | | | | | | | | | |
| Post Petition Interest | | | | | | | | | |
| Total Adjustments | | 373,571 | | 159,024 | (203,236) | (12,096) | 1,090 | 13,014 | 331,367 |
| **Total Recoveries on Allowed Debt** | | | | | | | | | |
| Tribune | | 713,954 | | 1,283,056 | 259,677 | | 8,794 | 105,000 | 2,370,479 |
| Guarantor Subsidiaries | 34,954 | 5,185,160 | | | | | 66,966 | 12,189 | 5,299,269 |
| Non-Guarantor Subsidiaries | 225,046 | | | | | | 5,845 | | 230,891 |
| Total Recoveries on Allowed Debt | 260,000 | 5,899,114 | | 1,283,056 | 259,677 | | 81,605 | 117,189 | 7,900,640 |
| **Total Recoveries on Avoided Debt/Payments:** | | | | | | | | | |
| Tribune | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Guarantor Subsidiaries | - | - | | | | | - | - | - |
| Non-Guarantor Subsidiaries | - | | | | | | - | | - |
| Total | - | - | | - | - | - | - | - | - |
| PHONES Notes & EGI-TRB Note Subordination | | - | | - | - | - | - | - | - |
| Guarantor Subsidiaries Subordination | | - | | | | | | | - |
| Subordinated Bridge Subsidiary Guarantee | | - | | | | | | | - |
| Total Adjustments | | - | | - | - | - | - | - | - |
| **Total Recoveries on Avoided Debt/Payments** | | | | | | | | | |
| Tribune | - | - | - | - | - | - | - | - | - |
| Guarantor Subsidiaries | - | - | | | | | - | - | - |
| Non-Guarantor Subsidiaries | - | | | | | | - | | - |
| Total Recoveries on Avoided Debt/Payments | - | - | | - | - | - | - | - | - |

ANNEX C

| | | Days (Late) | | | | Credit Agreement |
|---|---|---|---|---|---|---|
| Date Due (1) | Date Paid (2) | Early | Amount (3) | Facility | Purpose | Reference |
| 6/29/2007 | 6/29/2007 | - | $ 100,000,000 | Term X | Principal | Section 2.10 (b) |
| 6/29/2007 | 6/29/2007 | - | 543,077 | Term X | Interest | Section 2.10 (b) |
| 7/2/2007 | 7/2/2007 | - | 281,250 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| | 7/5/2007 | | 39,513,383 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 7/5/2007 | 7/5/2007 | - | 9,427,818 | Term X | Interest | Section 2.07.(a)(ii) |
| 9/30/2007 | 9/28/2007 | 2 | 272,150 | Term B - Step 1 | Interest | Section 2.06 (b) |
| 9/30/2007 | 9/28/2007 | 2 | 13,787,500 | Term B - Step 1 | Principal | Section 2.06 (b) |
| 10/1/2007 | 10/1/2007 | - | 156,250 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 10/1/2007 | 10/1/2007 | - | 159,705 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 10/1/2007 | 10/1/2007 | - | 9,975 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 10/1/2007 | 10/1/2007 | - | 9,937 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 10/1/2007 | 10/1/2007 | - | 29,792 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 10/1/2007 | 10/1/2007 | - | 19,069 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 10/1/2007 | 10/1/2007 | - | 324,067 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 10/1/2007 | 10/1/2007 | - | 190,350 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 10/1/2007 | 10/1/2007 | - | 67,452 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 1,063 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 13,365 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 51,333 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 55,947 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 2,458 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 2,542 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 990 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 24,744 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 1,667 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 48,231 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 85,342 | Revolver | LOC Commission | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 2,811 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 44 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 557 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 2,139 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 2,331 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 102 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 106 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 41 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 1,031 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 69 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 2,010 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/1/2007 | 10/1/2007 | - | 3,556 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 10/5/2007 | 10/5/2007 | - | 108,587,822 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 10/5/2007 | 10/5/2007 | - | 8,942,527 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 10/5/2007 | 10/5/2007 | - | 28,121,333 | Term X | Interest | Section 2.07.(a)(ii) |
| 9/30/2007 | 10/16/2007 | (16) | 652,021 | Delayed Draw | Unutilized - Fee | Section 2 04.(a) |
| | 12/20/2007 | | 95,740,199 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 12/28/2007 | 12/28/2007 | - | 24,235 | Term B - Step 1 | Interest | Section 2.06 (b) |
| 12/28/2007 | 12/28/2007 | - | 9,250 | Term B - Step 2 | Interest | Section 2.06 (b) |
| 12/28/2007 | 12/28/2007 | - | 13,787,500 | Term B - Step 1 | Principal | Section 2.06 (b) |
| 12/28/2007 | 12/28/2007 | - | 5,262,500 | Term B - Step 2 | Principal | Section 2.06 (b) |
| 1/2/2008 | 1/2/2008 | - | 504,083 | Delayed Draw | Unutilized - Fee | Section 2 04.(a) |
| 1/2/2008 | 1/2/2008 | - | 428,287 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 1/2/2008 | 1/2/2008 | - | 249,834 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 1/2/2008 | 1/2/2008 | - | 114,210 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 1/2/2008 | 1/2/2008 | - | 39,420 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 854 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 10,024 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 41,250 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 44,957 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 1,875 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 1,875 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 825 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 19,884 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 3,750 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 28,187 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 49,875 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 27,448 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 595 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 6,980 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 28,722 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 31,304 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 1,306 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 1,306 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 574 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 13,845 | Revolver | LOC Commission | Section 2.04 (b) |

**PREPETITION LBO LENDER PAYMENTS**

| | | PREPETITION LBO LENDER PAYMENTS | | | |
|---|---|---|---|---|---|
| | | Days (Late) | | | Credit Agreement |
| Date Due (1) | Date Paid (2) | Early | Amount (3) | Facility | Purpose | Reference |
| 1/2/2008 | 1/2/2008 | - | 2,611 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 19,626 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 34,728 | Revolver | LOC Commission | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 3,358 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 73 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 854 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 3,514 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 3,830 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 160 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 160 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 1,694 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 70 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 319 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 2,401 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/2/2008 | 1/2/2008 | - | 4,249 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 1/7/2008 | 1/7/2008 | - | 22,887,083 | Term X | Interest | Section 2.07.(a)(ii) |
| 1/7/2008 | 1/7/2008 | - | 3,730,417 | Term X | Interest | Section 2.07.(a)(ii) |
| 1/7/2008 | 1/7/2008 | - | 1,865,208 | Term X | Interest | Section 2.07.(a)(ii) |
| 1/23/2008 | 1/23/2008 | - | 53,836 | Term B | Breakage | Section 8.04.(c) |
| 3/20/2008 | 3/20/2008 | - | 9,645,674 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 3/20/2008 | 3/20/2008 | - | 4,822,837 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 3/20/2008 | 3/20/2008 | - | 95,251,028 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 3/20/2008 | 3/20/2008 | - | 3,690,872 | Term B - Step 2 | Interest | Section 2 07.(a)(i) |
| 3/20/2008 | 3/20/2008 | - | 1,845,436 | Term B - Step 2 | Interest | Section 2.07.(a)(i) |
| 3/20/2008 | 3/20/2008 | - | 36,447,360 | Term B - Step 2 | Interest | Section 2 07.(a)(i) |
| 3/20/2008 | 3/20/2008 | - | 5,027,333 | Snr. Bridge | Interest | Section 2.07.(a)(ii) |
| 3/20/2008 | 3/20/2008 | - | 33,096,611 | Snr. Bridge | Interest | Section 2.07.(a)(ii) |
| 3/30/2008 | 3/28/2008 | 2 | 607 | Delayed Draw | Interest | Section 2.06 (b) |
| 3/30/2008 | 3/28/2008 | 2 | 62,500 | Delayed Draw | Principal | Section 2.06 (b) |
| 3/28/2008 | 3/28/2008 | - | 16,980 | Term B - Step 1 | Interest | Section 2.06 (b) |
| 3/28/2008 | 3/28/2008 | - | 6,481 | Term B - Step 2 | Interest | Section 2.06 (b) |
| 3/28/2008 | 3/28/2008 | - | 13,787,500 | Term B - Step 1 | Principal | Section 2.06 (b) |
| 3/28/2008 | 3/28/2008 | - | 5,262,500 | Term B - Step 2 | Principal | Section 2.06 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 169,854 | Delayed Draw | Unutilized - Fee | Section 2 04.(a) |
| 4/1/2008 | 4/2/2008 | (1) | 297,500 | Delayed Draw | Unutilized - Fee | Section 2 04.(a) |
| 4/1/2008 | 4/2/2008 | (1) | 866,092 | Revolver | Unutilized - Fee | Section 2 04.(a) |
| 4/1/2008 | 4/2/2008 | (1) | 50,808 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 1,101 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 12,920 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 53,167 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 57,945 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 2,417 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 2,417 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 1,063 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 25,628 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 4,833 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 36,330 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 64,283 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 3,504 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 76 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 891 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 3,667 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 3,996 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 167 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 167 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 73 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 1,767 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 333 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 2,505 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 4,433 | Revolver | LOC Commission | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 3,322 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 72 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 845 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 3,476 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 3,788 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 158 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 158 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 70 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 1,675 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 316 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 2,375 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/1/2008 | 4/2/2008 | (1) | 4,202 | Revolver | LOC Issuer fee | Section 2.04 (b) |
| 4/7/2008 | 4/7/2008 | - | 26,174,507 | Term X | Interest | Section 2.07.(a)(ii) |
| 5/1/2008 | 5/1/2008 | - | 242,036 | Delayed Draw | Utilized - Interest | Section 2.07.(a)(ii) |
| 5/1/2008 | 5/1/2008 | - | 146,950 | Delayed Draw | Utilized - Interest | Section 2.07.(a)(ii) |

| | | Days (Late) | | | | Credit Agreement |
|---|---|---|---|---|---|---|
| Date Due (1) | Date Paid (2) | Early | Amount (3) | Facility | Purpose | Reference |
| 6/20/2008 | 6/20/2008 | - | 6,740,943 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 6/20/2008 | 6/20/2008 | - | 70,779,898 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 6/20/2008 | 6/20/2008 | - | 2,579,406 | Term B - Step 2 | Interest | Section 2.07.(a)(ii) |
| 6/20/2008 | 6/20/2008 | - | 27,083,768 | Term B - Step 2 | Interest | Section 2.07.(a)(ii) |
| 6/20/2008 | 6/20/2008 | - | 30,837,909 | Snr. Bridge | Interest | Section 2.07.(a)(ii) |
| 6/30/2008 | 6/27/2008 | 3 | 581 | Delayed Draw | Interest | Section 2.07.(a)(i) |
| 6/30/2008 | 6/27/2008 | 3 | 62,500 | Delayed Draw | Principal | Section 2.07.(a)(i) |
| 6/27/2008 | 6/27/2008 | - | 14,696 | Term B - Step 1 | Interest | Section 2.06.(b) |
| 6/27/2008 | 6/27/2008 | - | 5,609 | Term B - Step 2 | Interest | Section 2.06.(b) |
| 6/27/2008 | 6/27/2008 | - | 13,787,500 | Term B - Step 1 | Principal | Section 2.06.(b) |
| 6/27/2008 | 6/27/2008 | - | 5,262,500 | Term B - Step 2 | Principal | Section 2.06.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 451,208 | Delayed Draw | Unutilized - Fee | Section 2.04.(a) |
| 7/1/2008 | 7/3/2008 | (2) | 76,140 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 7/1/2008 | 7/3/2008 | (2) | 287,515 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 7/1/2008 | 7/3/2008 | (2) | 200,677 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 7/1/2008 | 7/3/2008 | (2) | 38,113 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 7/1/2008 | 7/3/2008 | (2) | 276,059 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 7/1/2008 | 7/3/2008 | (2) | 8,867 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 34,833 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 22,750 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 79,716 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 1,727 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 20,270 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 40,000 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 90,914 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 3,792 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 3,792 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 1,668 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 40,209 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 7,583 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 1,517 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 57,000 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 58,952 | Revolver | LOC Commission | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 369 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 1,451 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 948 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 3,322 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 72 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 845 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 1,667 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 3,788 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 158 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 158 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 70 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 1,675 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 316 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 63 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 2,375 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 7/1/2008 | 7/3/2008 | (2) | 2,456 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| | 7/3/2008 | | 2,890,363 | Term X | Interest | Section 2.10.(b) |
| | 7/3/2008 | | 218,350,000 | Term X | Principal | Section 2.10.(b) |
| 7/7/2008 | 7/7/2008 | - | 16,361,011 | Term X | Interest | Section 2.07.(a)(ii) |
| 7/21/2008 | 7/21/2008 | - | 25,773,264 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 7/21/2008 | 7/21/2008 | - | 9,862,144 | Term B - Step 2 | Interest | Section 2.07.(a)(ii) |
| 7/21/2008 | 7/21/2008 | - | 10,997,257 | Snr. Bridge | Interest | Section 2.07.(a)(ii) |
| 8/1/2008 | 8/1/2008 | - | 231,303 | Delayed Draw | Utilized - Interest | Section 2.07.(a)(ii) |
| 8/1/2008 | 8/1/2008 | - | 142,028 | Delayed Draw | Utilized - Interest | Section 2.07.(a)(ii) |
| | 8/1/2008 | | 2,267,102 | Term X | Interest | Section 2.10.(b) |
| | 8/1/2008 | | 589,150,000 | Term X | Principal | Section 2.10.(b) |
| 8/15/2008 | 8/15/2008 | - | 26,455 | Term X | Breakage | Section 8.04.(c) |
| | 9/5/2008 | | 309,771 | Term X | Interest | Section 2.10.(b) |
| | 9/5/2008 | | 433,680 | Term X | Interest | Section 2.10.(b) |
| | 9/5/2008 | | 80,500,000 | Term X | Principal | Section 2.10.(b) |

PREPETITION LBO LENDER PAYMENTS

**PREPETITION LBO LENDER PAYMENTS**

| Date Due (1) | Date Paid (2) | Days (Late) Early | Amount (3) | Facility | Purpose | Credit Agreement Reference |
|---|---|---|---|---|---|---|
| | | | **START OF 90 DAYS BEFORE PETITION DATE** | | | |
| 9/30/2008 | 9/26/2008 | 4 | 564 | Delayed Draw | Interest | Section 2.06.(b) |
| 9/30/2008 | 9/26/2008 | 4 | 62,500 | Delayed Draw | Principal | Section 2.06.(b) |
| 9/26/2008 | 9/26/2008 | - | 148,476 | Term B - Step 1 | Interest | Section 2.06.(b) |
| 9/26/2008 | 9/26/2008 | - | 56,671 | Term B - Step 2 | Interest | Section 2.06.(b) |
| 9/26/2008 | 9/26/2008 | - | 13,787,500 | Term B - Step 1 | Principal | Section 2.06.(b) |
| 9/26/2008 | 9/26/2008 | - | 5,262,500 | Term B - Step 2 | Principal | Section 2.06.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 456,167 | Delayed Draw | Unutilized - Fee | Section 2.04.(a) |
| 10/1/2008 | 10/3/2008 | (2) | 409,328 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 10/1/2008 | 10/3/2008 | (2) | 72,638 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 10/1/2008 | 10/3/2008 | (2) | 63,598 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 10/1/2008 | 10/3/2008 | (2) | 298,903 | Revolver | Unutilized - Fee | Section 2.04.(a) |
| 10/1/2008 | 10/3/2008 | (2) | 11,583 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 73,750 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 80,592 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 1,746 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 7,533 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 46,750 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 91,913 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 3,833 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 3,833 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 1,687 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 40,651 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 7,667 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 4,983 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 57,626 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 65,344 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 126,593 | Revolver | LOC Commission | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 483 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 3,073 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 3,358 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 73 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 314 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 1,948 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 3,830 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 160 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 160 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 70 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 1,694 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 319 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 208 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 2,401 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 2,723 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/1/2008 | 10/3/2008 | (2) | 5,275 | Revolver | LOC Issuer fee | Section 2.04.(b) |
| 10/7/2008 | 10/7/2008 | - | 1,536,542 | Term X | Interest | Section 2.07.(a)(ii) |
| 10/7/2008 | 10/7/2008 | - | 3,191,991 | Term X | Interest | Section 2.07.(a)(ii) |
| 10/7/2008 | 10/7/2008 | - | 2,521,884 | Term X | Interest | Section 2.07.(a)(ii) |
| 10/21/2008 | 10/21/2008 | - | 223,888 | Delayed Draw | Utilized - Interest | Section 2.07.(a)(ii) |
| 10/21/2008 | 10/21/2008 | - | 99,950 | Delayed Draw | Utilized - Interest | Section 2.07.(a)(ii) |
| 10/21/2008 | 10/21/2008 | - | 58,647,853 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 10/21/2008 | 10/21/2008 | - | 21,883,527 | Term B - Step 1 | Interest | Section 2.07.(a)(ii) |
| 10/21/2008 | 10/21/2008 | - | 22,441,754 | Term B - Step 2 | Interest | Section 2.07.(a)(i) |
| 10/21/2008 | 10/21/2008 | - | 8,373,789 | Term B - Step 2 | Interest | Section 2.07.(a)(ii) |
| 10/21/2008 | 10/21/2008 | - | 22,464,944 | Snr. Bridge | Interest | Section 2.07.(a)(ii) |
| 10/21/2008 | 10/21/2008 | - | 12,105,500 | Snr. Bridge | Interest | Section 2.07.(a)(ii) |
| 10/30/2008 | 10/30/2008 | - | 938,525 | Delayed Draw | Unutilized - Fee | Section 2.04.(a) |

Notes:

(1) The payment due dates were established by reference to (a) the applicable payment due dates required under the Credit Agreement or Bridge Credit Agreement or (b) Tribune's election of the Interest Period payment due date as permitted under the Credit Agreement. Requests for additional information concerning the due dates for certain payments were outstanding at the time of submission of the Report, but the timing of such payments should not materially impact analysis of the regularity of payments made to the LBO Lenders.
(2) All payments were made by Tribune by wire transfer.  Payment dates have been traced to bank statements that reflect the date the wire transfers were sent.
(3) Individual payment amounts may represent a portion of a larger single payment made on the same date