# **ATTACHMENT B**

*Exhibit 281 to Examiner Report*



MEMORANDUM

**TO:**    CHANDLER BIGELOW

**FROM:**    BRYAN BROWNING
           CHAD RUCKER

**SUBJECT:** RESPONSE TO QUESTIONS FROM LENDERS

**DATE:**    12/7/2007

**CC:**

Valuation Research Corporation ("VRC") makes no representation or warranty express or implied as to the accuracy or completeness of any information provided in this memorandum, information received from Tribune Company ("Tribune" or the "Company"), or information obtained by any other source that is disclosed herein. The responses to the questions were prepared by VRC based on information provided to VRC by the Company. It is intended exclusively for the benefit and internal use of the Company, J.P. Morgan Securities Inc. ("JPMorgan"), JPMorgan Chase Bank, N.A. ("JPMCB"), Merrill Lynch Capital Corporation ("Merrill Lynch"), Citigroup Global Markets Inc. ("CGMI") on behalf of Citigroup, Bank of America, N.A. ("Bank of America") and Banc of America Securities LLC ("BAS"). **This Memorandum is not intended to be a representation of Tribune's or any other company's solvency to JPMorgan, JPMCB, Merrill Lynch Capital Corporation, Merrill Lynch, CGMI on behalf of Citigroup, Bank of America, Banc of America Securities LLC ("BAS") or any other person.** These responses may be based, in whole or in part, on projections or forecasts of future events. A forecast, by its nature, is speculative and includes estimates and assumptions which may differ. Actual results may, and frequently do, differ from those projected or forecast. Those differences may be material. Items which could impact actual results include, but are not limited to, unforeseen micro or macro economic developments, business or industry events, personnel changes, casualty losses, or the inability of the Company to implement plans or programs. These responses may contain certain statements which are or could be considered to be forward-looking statements. Such statements are not guarantees of future performance and involve risks and uncertainties which are not possible to predict. These responses are incomplete without reference to, and should be viewed solely in conjunction with VRC's final written Solvency Opinion ("Solvency Opinion" or the "Opinion"). The information in these responses reflects conditions and our views as of the date of this memorandum, all of which may be subject to change. We undertake no obligation to update or provide any revisions to these responses to reflect events, circumstances or changes that occur after the date these responses were prepared. In preparing these responses, VRC has relied upon and assumed, without independent verification, the accuracy and completeness of

Valuation Research Corporation    500 Fifth Avenue New York, NY 10110    Phone 212.983.3370    valuationresearch.com

EXHIBIT

Browning  4
12/4/09  LS

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0398553

all information available from public sources, from the Company or which was otherwise provided to us.  VRC did not audit or verify the data provided by the Company or any other data reviewed in connection with the preparation of these responses.  **VRC makes no representation or warranty regarding any actions the Company, JPMorgan, JPMCB, Merrill Lynch Capital Corporation, Merrill Lynch, CGMI on behalf of Citigroup, Bank of America' Banc of America Securities LLC ("BAS") or any other person may take in reliance on or in reference to matters presented in these responses.**  These responses may not be copied, reproduced, disseminated, quoted or referred to in any presentation, agreement or document without our prior written consent.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0398554

### Tribune Co. — Step 2 Solvency Valuation Questions

*1) Summarize preliminary conclusions, nature of due diligence investigation and scope of review.*

VRC's preliminary conclusion is that immediately after and giving effect to the consummation of the second step ("Step Two") of the merger transaction (the "Step Two Transactions"), Tribune is solvent. More specifically, VRC's preliminary conclusions are (i) that immediately after and giving effect to the consummation of the Step Two Transactions, each of the Fair Value (as defined below) and Present Fair Saleable Value (as defined below) of the aggregate assets (including goodwill) of Tribune will exceed its liabilities (including the Stated Liabilities, the Identified Contingent Liabilities and the New Financing (as defined in VRC's Solvency Opinion), (ii) that immediately after and giving effect to the consummation of the Step Two Transactions, Tribune will be able to pay its debts (including the Stated Liabilities, the Identified Contingent Liabilities (as defined in VRC's Solvency Opinion), (iii) that immediately after and giving effect to the consummation of the Step Two Transactions, Tribune Does Not Have Unreasonably Small Capital (as defined in VRC's Solvency Opinion).

Fair Value and Present Fair Saleable Value have been modified to consider the tax benefits of the Company achieving S-Corp ESOP status. Fair Value is the amount at which the aggregate or total assets of Tribune (including goodwill) would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act, and, for purposes of the Step Two Opinion (the "Opinion"), having structures similar to the structure contemplated in the Step Two Transactions by Tribune (an S-Corporation, owned entirely by an ESOP, which receives favorable federal income tax treatment or another structure resulting in equivalent favorable federal income tax treatment).

Present Fair Saleable Value is the amount that may be realized by a willing seller from a willing buyer if Tribune's aggregate or total assets (including goodwill) are sold with reasonable promptness, and, for purposes of the Opinion, having a structure similar to the structure contemplated in the Step Two Transactions by Tribune (an S-Corporation, owned entirely by an ESOP, which receives favorable federal income tax treatment or another structure resulting in equivalent favorable federal income tax treatment).

VRC performed due diligence and its scope of review used standards that were customary and based upon the specific facts and circumstances associated with providing the Solvency Opinion. VRC's due diligence and scope of review included but was not limited to the following: (i) multiple meetings with Tribune's senior management in which VRC and management discussed the company's historical and current financial performance and future prospects for

3

Tribune's businesses; (ii) review of the Company's financial forecast and assumptions underlying those forecasts; (iii) review of Wall Street research and industry reports for the company and its competitors; (iv) review of the Company's interim financial and operating results; and (v) review of the Company's filings with the Securities and Exchange Commission.

The Company did not place any restrictions on VRC's access to information that was necessary to complete the Opinion, and the Company did not place any restrictions on the scope of the analysis that VRC performed.

2) *Provide detail on the comparable transactions used in the analyses including:*
   a. *The underlying business and business mix of the target companies?*
   b. *Was the target public or private?*
   c. *What where the dates of the transactions?*

The attached Schedule A provides descriptions of the public companies considered. The attached Schedule B provides descriptions of transaction comparable companies.

3) *What comparable public companies were used in the analyses?*

See Schedule A.

4) *Explain the sum of individual assets method and underlying assumptions.*

In the sum of business segments analysis, VRC separately valued Tribune's publishing and broadcasting operating businesses individually. The operating units were valued using comparable company, comparable transaction, and discounted cash flow methodologies. Concluded multiples for Publishing's LTM to 2009 EBITDA ranged from 6.7x to 7.9x, and concluded multiples for Broadcasting's LTM to 2009 EBITDA ranged from 9.5x to 12.4x. The estimated enterprise value of each business segment were aggregated and then the capitalized value of corporate expenses was subtracted to compute the sum of business segment enterprise value ranges. The sum of business segment enterprise values ranged from $9.7 billion to $10.8 billion.

5) *Explain the weighting given to the different valuation approaches, if any. Was any weighting different as between Step 1 and Step 2?*

In its solvency analysis, VRC has weighted each of its valuation approaches (comparable companies, comparable transactions, and discounted cash flow, and sum of business segments) equally in both Step One and Step Two Opinion analyses.

4

6) *Discuss the methods and assumptions used in the discounted cash flow analysis:*

    a. *What is the discount rate (WACC) used?*

VRC used weighted average cost of capital ("WACC") discount rates between 6.5% and 8.5% in its discounted cash flow ("DCF") valuation analyses. In the tax savings analysis, VRC used equity discount rates that ranged from 9.0% to 11.0%.

    b. *Are cash flows discounted at a single WACC or different discount rates for each year?*

Cash flows are discounted at a single rate using mid-year conventions in all DCF analyses.

    c. *What is the assumed capital structure? What is the cost of debt (pre-tax or post-tax) assumed? Is the current market cost of debt considered in the analysis.*

The following capital structure and interest rates were used in VRC's analysis to determine the WACC.

In the DCF analyses, VRC used a market capital structure which were estimated as a percent of total capital. VRC used debt to total capital that ranged from 40.1% to 59.3% of total capital and equity to total capital that ranged from 40.7% to 59.9% of total capital.

A pre-tax market cost of debt of Libor plus 200 bps was used in VRC's analysis. This estimate was based upon current market conditions.

    d. *What is the cost of equity? Please outline methodology, assumptions and sources for inputs.*

The cost of equity was determined by using the capital asset pricing model. VRC estimated the beta by re-levering a composite of unlevered betas of comparable companies. These concluded results were compared to cost of equity estimates from Bloomberg and Morningstar. The cost of equity used in VRC's DCF analyses ranges from 9.7% to 10.6%.

    e. *Discuss methodology used to calculate terminal year value.*

The terminal year values were determined using an exit multiple of EBITDA. The exit multiple was estimated from current multiples of

5

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

comparable companies and validated using the Gordon growth model. The multiples reflect potential growth from expected internal funded initiatives.

    f. *In the discounted cash flow analysis, what assumptions were used in the terminal value calculation (i.e., growth rate, capital structure, exit multiple, etc.) and support for the assumptions?*

VRC used EBITDA exit multiples that ranged from 5.7x to 10.5x in its analyses which implies perpetuity growth rates of -1.3%% to 1.9% in its enterprise value DCF analyses. Current comparable company multiples, comparable transactions, and management forecasts provide support for the exit multiples in the DCF analyses.

7) *Discuss whether methods and principles employed in solvency analysis are consistent between Step 1 and Step 2. Discuss any general changes in assumptions and outlook that were considered in the Step 2 analysis as compared with the Step 1 analysis.*

The same general methodologies were applied in the Step One and Step Two analyses. Significant changes between Step One and Step Two analyses consisted of tax savings, the excess value of real estate which could be sold, and increase in the expected after tax proceeds from selling the Cubs. The Step One tax savings related to the tax benefits associated with the PHONES liability. The Step Two tax savings, related to the favorable S-Corp ESOP tax structure. The PHONES tax savings were excluded in the Step Two analysis to avoid double counting. The Cubs expected after-tax proceeds was increased to $850 million in Step Two.

8) *How are taxes treated in the analysis? As the Company will not be a federal taxpayer as a result of the S Corp election, does the discounted cash flow analysis take this into consideration, and if so, how?*

As part of the valuation tests, VRC considered that as an S-Corp ESOP, Tribune will not pay federal income taxes. The Company has provided VRC with an estimate of the future tax savings for through 2017. VRC has extrapolated these tax savings to 2022 by applying similar growth rates and margins that Tribune provided for 2017. These tax savings were discounted to present value. VRC assumed that in year fifteen and beyond, that the Company would receive 60% of the projected tax savings after EGI TRB, L.L.C ("Zell Group") exercises its warrants to acquire 40% of Tribune's equity interest. The net present value of the S-Corp ESOP tax savings are estimated to be $1.7 billion to $2.3 billion. The operating enterprise valuation DCF analyses did not consider the S-Corp ESOP tax savings.

6

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

9) *Have current market conditions and marketability of the Company's assets been considered in the analysis? How do market condition factors differ for analyses of Fair Value (commercially reasonable time period) and Present Fair Value (reasonable promptness)?*

VRC's analysis treats Fair Value and Present Fair Saleable Value (both as defined in VRC's Solvency Opinion) the same. As previously outlined, these value indications were developed using commonly accepted valuation methodology See question 1.

The current market conditions have been considered in determining the operating enterprise values of both the Company and its business segments. The valuation multiples of comparable companies implicitly provide indications of current market conditions. The comparable transactions implicitly provide potential marketability of the Company's assets.

10) *Discuss the following issues concerning equity investments:*
   a. *Considering the Company has minority ownership in many of its equity investments, how has the marketability of these equity investments been considered?*

VRC reviewed and valued each of the Company's equity investments. A relatively small number of the Company's principal equity investments comprise a substantial percentage of the aggregate value of Tribune's equity investments. The markets in which the principal equity investments operate are generally robust and would likely attract a larger number of potential buyers.

VRC did not apply minority or marketability discounts to these equity investments because i) the principal equity investments are in attractive market segments that are growing, and VRC believes that there would be significant demand for the Company's minority interests in these investments; and ii) Tribune is generally able to elect board of director members for its principal equity investments. Microsoft's recent minority interest investment in Careerbuilder supports VRC's valuation conclusion for Tribune's interest.

   b. *Explain the methodology in valuing unconsolidated investments. Are these added to values calculated by the four stated valuation methods or already part of the calculation?*

Generally, VRC used either cost, comparable companies, comparable transactions, or DCF analyses to value the equity investments. The methodology used was dependent upon the amount of information that

7

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

was made available to VRC. The estimated values of the equity investments are $1.9 billion to $2.3 billion.

The operating enterprise value estimates exclude the value of the equity investments and related investment income.

   c. *When adding back the equity investments to the operating values, was the related income from these investments excluded from the EBITDA?*

The operating income of the equity investments were excluded from EBITDA that was used to determine the operating enterprise value of Company.

   d. *Depending on how much is owned of the equity investments and whether they are public or private, are discounts for minority interest and marketability applicable?*

See answer to question 10.

*11) Was the value of any excess real estate considered in the valuation?*

Tribune provided VRC with an estimate of the value for excess real estate that could be potentially sold. VRC added the estimated after-tax value of the excess real estate to determine Tribune's adjusted enterprise value.

*12) What is considered the acceptable range of excess capital in the capitalization test? What is considered to be the acceptable range of equity cushion? Is book value of equity considered in the analysis?*

The first test of assets exceeding liabilities ranged from $1.4 billion to $3.6 billion. Next VRC considered other qualitative and quantitative factors including cash flow capacity and downside sensitivity testing to satisfy the test of adequate capital.

Considering all of these factors, VRC believes its conclusions reflect acceptable ranges of equity cushion. It is, however, dependent upon the benefits of the S-Corp ESOP tax savings.

*13) Was a company specific or market capital structure used to calculate the levered cost of equity? If a market capital structure was used, was a market cost of debt applicable for that capital structure used or was the Company's specific cost of debt used?*

See question 6.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0398560

*14) Has $1.4bn of tranche flex to bonds been considered in the analysis (cap rate at 12.5%)?*

With the new funding structure of the Step Two Transactions, interest rates and the debt capital structure changed and the $1.4 billion tranche of flex is no longer applicable. VRC's analysis assumed the following debt capital structure and associated rates.

| Tranche | Proceeds | Leverage[1] | Rate |
|---|---|---|---|
| Revolving Credit Facility ($750mm) | $0.0 | 0.0x | L+300 |
| Incremental Term Loan B | $2,105.0 | 1.6 | L+300 |
| Bridge Note | $1,600.1 | 1.2 | 15.250% |
| Existing Bank Debt | $6,462.4 | 4.9 | |
| Existing Notes | $1,798.9 | 1.4 | |
| PHONES | $996.7 | 0.8 | 2.000% |
| **Total Debt** | **$12,963.1** | **9.8x** | |
| Zell PIK Notes | $225.0 | 0.2 | 4.804% |
| **Adjusted Total Debt** | **$13,188.1** | **10.0x** | |

[1] *Leverage ratios are based on pro forma 2007 projected EBITDA. The pro forma EBITDA includes cash equity income, the Cubs and Comcast, and excludes interest income and stock based compensation.*

*15) How was the beta developed?*

See question 6.

*16) What was the market risk premium used in the calculation of the cost of equity? Was a size risk premium considered?*

Generally a 5.5% equity risk premium was used. This equity risk premium is supported by an equity risk premium study by Roger Grabowski. An additional 100 basis point premium was added to the consolidated company and publishing segment cost of equities based upon industry cost of capital analyses by Morningstar.

*17) How are guarantees and contingent liabilities taken into account in the analysis? How are the PHONES liabilities valued? How are other long-term liabilities, such as deferred taxes, analyzed?*

An estimate of $996.7 million of net PHONES liabilities are assumed in VRC's analysis. This amount reflects the total $1.2 billion PHONES liability less the equity value of the Time Warner stock that Tribune has set aside to settle the PHONES liability. This $996.7 million is held constant in VRC's analysis.

9

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0398561

Management has identified approximately $86.8 million of Identified Contingent Liabilities (as defined in VRC's Solvency Opinion).

The PHONES liability is included as debt for the company. Both the PHONES liability and Identified Contingent Liabilities are subtracted from adjusted enterprise value.

Also see question 7.

*18) What is the assumption for the Company's ability to refinance debts as they become due and how is the assumption established?*

VRC has assumed that the Company will be able to refinance its debts as they become due. This assumption is based upon a review of the forecasted total debt and guaranteed debt leverage ratios at the time of the required refinancing, recent leveraged debt multiples, and representation from the Company which states that based upon recent discussions with Morgan Stanley, the Company would be able to refinance debt in its downside forecasts without the need for additional asset sales.

*19) What downside cases were considered?  What were the relevant assumptions to the downside case and how did it affect overall analyses?*

The downside case was provided by Tribune management.  The principal assumptions of the downside case are:

- **Key Corporate Assumptions:**

  Discretionary acquisition expenditures are projected to be $50 million in fiscal years 2008 through 2013.

- **Key Publishing Assumptions:**

  **Total Revenues:** 4.9% decline in fiscal year 2008, 3.6% decline in 2009, 2.8% decline in 2010, 2.7% decline in 2011, and 2.5% decline for 2012 and beyond.

  **EBITDA Margins:** 20.7% in fiscal year 2008, 19.8% in year 2009, 19.5% in year 2010, 19.4% in 2011, and 19.4% for 2012 and beyond.

- **Key Broadcasting Assumptions:**

  **Total Revenues:** 1.9% increase in fiscal year 2008, 1.6% decline in 2009, 2.7% increase in 2010, 0.8% decline in 2011, and 2.1% increase for 2012 and beyond.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0398562

**EBITDA Margins:** 32.6% in fiscal year 2008, 33.3% in 2009, 34.0% in 2010, 31.3% in 2011, and 31.4% for 2012 and beyond.

    a. *Were financial covenants met in downside cases?  If not, which ones were tripped?*

No financial covenants were tripped in the downside case.

    b. *In the downside cases, did the Company have revolver capacity to fund its operating capital needs?*

In the downside case the Company maintains adequate revolver capacity. The largest projected outstanding balances on the revolver in the downside case being approximately $333 million in 2010 and $197 million in 2015.

20) Discuss differences from recent research published by equity analysts and rating agency (Lehman, Deutsche Bank, Merrill, S&P)?  Were these reports relevant to the analysis?

As part of its analysis both VRC and the Company reviewed recent Wall Street research reports.  VRC compared the research reports with actual Tribune performance for the third quarter 2007.  The Company's cash flow results were generally favorable relative to the expectations of research analyst.

The rating agency research has been considered but does not change the economics of the Transaction to Tribune.

11

# Schedule A

Source of Schedule A is Factset.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# Comparable Company Descriptions - Publishing

**Gannett Company Inc**                    **Ticker:**    **GCI**

Gannett Co., Inc. operates as a news and information company primarily in the United States and the United Kingdom. The company operates in two segments, Newspaper Publishing and Broadcasting. The Newspaper Publishing segment publishes 90 daily newspapers, approximately 1,000 nondaily publications in the United States and Guam, as well as publishes approximately 300 titles in the United Kingdom. This segment also includes commercial printing, newswire, and marketing and data services, as well as PointRoll, an Internet advertisement service and Planet Discover, a provider of local, integrated online search, and advertising technology. The Broadcasting segment owns and operates 23 television stations that reach approximately 20.1 million households in the United States. This segment also includes Captivate Network, a national news and entertainment network that deliver programming and full-motion video advertising through video screens located in elevators of office towers and select hotels in North America. In addition, Gannett operates Web sites that offer news, entertainment, and advertising content in text and video format. It has strategic business relationships with online investee companies, including CareerBuilder, LLC; Classified Ventures; ShopLocal, Inc.; and Topix.net. The company was founded in 1906 and is headquartered in McLean, Virginia.

**Washington Post**                    **Ticker:**    **WPO**

The Washington Post Company, together with its subsidiaries, operates as a diversified media and education company in the United States and internationally. It operates in five segments: Education, Newspaper Publishing, Television Broadcasting, Magazine Publishing, and Cable Television. The Education segment provides a range of educational services for children, students, and professionals. It offers test preparation services for college and graduate school entrance exams; education and career services to business people and other professionals; and multimedia learning and private tutoring to children, and educational resources to parents. This segment also provides higher education services, which include fixed-facility colleges that offer bachelor's degree, associate's degree, and diploma programs primarily in the fields of healthcare, business, paralegal studies, information technology, criminal justice, and fashion and design; and online post-secondary and career programs. The Newspaper Publishing segment engages in the publication of newspapers in the Washington, D.C. area and Everett, Washington; newsprint warehousing and recycling facilities; and the electronic media publishing primarily washingtonpost.com. The Television broadcasting segment owns six VHF television stations serving the Detroit, Houston, Miami, San Antonio, Orlando, and Jacksonville television markets. The Magazine Publishing segment involves in the publication of weekly news magazine, Newsweek, which has one domestic and three international editions; and Arthur Frommer's Budget Travel magazine. The Cable Television segment offers basic cable, digital cable, pay television, cable modem, telephony, and other services to subscribers in midwestern, western, and southern states. The company was founded in 1877 and is based in Washington, District of Columbia.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# Comparable Company Descriptions - Publishing

**Mcclatchy Co Holding**                                   **Ticker:    MNI**

The McClatchy Company operates as a newspaper company in the United States. Its newspapers include The Miami Herald, The Sacramento Bee, the (Fort Worth) Star-Telegram, The Kansas City Star, The Charlotte Observer, and The (Raleigh) News & Observer. As of December 31, 2006, the company had 31 daily newspapers and approximately 50 non-dailies located in 29 markets across the country. In addition, McClatchy has a network of internet assets, including local Web sites in each of its daily newspaper markets, offering users information, news, advertising, e-commerce, and other services. It also owns and operates McClatchy Interactive, an interactive operation that provides Web sites with content, publishing tools, and software development; and Real Cities, an advertising network of local news Web sites. The McClatchy Company was founded in 1860 and is headquartered in Sacramento, California.

**New York Times Co**                                      **Ticker:    NYT**

The New York Times Company operates as a diversified media company in the United States. It operates through three segments: News Media, About.com, and Broadcast Media. The News Media segment comprises The New York Times Media Group consisting of The New York Times; NYTimes.com; and the International Herald Tribune; IHT.com, a newspaper distributor in the New York City metropolitan area; news, photo, and graphics services, as well as news and features syndication; and two New York City radio stations, WQXR-FM and WQEW-AM. This segment also comprises the New England Media Group, which includes The Boston Globe, Boston.com, and the Worcester Telegram & Gazette; and the Regional Media Group consisting of 14 daily newspapers in Alabama, California, Florida, Louisiana, North Carolina, and South Carolina, as well as related print and digital businesses. The About.com segment operates as an online source for information and advice on various topics. The Broadcast Media segment operates various television stations serving Virginia, Tennessee, Oklahoma, Pennsylvania, Iowa, Alabama, and Arkansas. The New York Times Company also has ownership interests in one newsprint mill and one mill producing supercalendered paper. It has a strategic alliance with Monster Worldwide, Inc. The company was founded in 1896 and is headquartered in New York, New York.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# Comparable Company Descriptions - Publishing

**Lee Enterprises**                                                    Ticker:        LEE

Lee Enterprises, Incorporated publishes daily newspapers, and weekly classified and specialty publications in the United States. It offers approximately 56 daily newspapers in 23 states; and 300 weekly classified and specialty publications. The company also provides online services, including Web sites supporting its daily newspapers and other publications, as well as offers advertising services. In addition, it provides online infrastructure for 1000 daily and weekly newspapers, and shoppers; and has minority investments in two Internet service companies, which provide integrated online classified solutions for the newspaper industry, integrate online editorial content, and provide transactional and promotional opportunities. The company has a strategic alliance with Yahoo!, Inc. Lee Enterprises was founded in 1890 and is based in Davenport, Iowa.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0398567

# Comparable Company Descriptions – Broadcasting

Gray Television Inc (Ordinary)                    Ticker:    GTN

Gray Television, Inc. operates as a television broadcasting company in the United States. The company offers services, such as production of commercials and tower rentals. As of December 31, 2006, the company owned 36 television stations, including 17 CBS affiliated, 10 NBC affiliated, 8 ABC affiliated, and 1 affiliated with FOX serving 30 television markets. In addition, Gray operated 36 digital second channels, including 1 affiliated with ABC, 5 affiliated with FOX, 7 affiliated with CW, and 15 affiliated with MyNet, as well as 6 local news/weather channels, and 2 independent channels in its existing markets. Gray Television, Inc. was founded in 1897 and is headquartered in Atlanta, Georgia.

Nexstar Broadcasting Group Inc                    Ticker:    NXST

Nexstar Broadcasting Group, Inc., a television broadcasting company, engages in the acquisition, development, and operation of television stations in medium-sized markets in the United States. The company owned, operated, programmed, or provided sales and other services to 49 television stations affiliated with the NBC, ABC, CBS, Fox, MyNetworkTV, or The CW television networks. It serves stations located in New York, Pennsylvania, Illinois, Indiana, Missouri, Texas, Louisiana, Arkansas, Alabama, Montana, and Maryland. As of December 31, 2006, the company owned and operated 32 stations, and provided sales or other services to an additional 17 stations that are owned by Mission and other entities. Nexstar Broadcasting Group, Inc. was founded in 1996 and is based in Irving, Texas.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0398568

# Comparable Company Descriptions - Broadcasting

Sinclair Broadcast Grp CS                    Ticker:    SBGI

Sinclair Broadcast Group, Inc., a television broadcasting company, engages in the ownership and provision of programming, operating, and sales services to television stations in the United States. Sinclair Broadcast Group broadcasts free over-the-air programming, including network provided programs, news produced locally, local sporting events, and syndicated entertainment programs. The company was founded in 1952 and is based in Hunt Valley, Maryland.

Lin Tv Corp                                  Ticker:    tvl

LIN TV Corp., together with its subsidiaries, engages in the ownership and operation of television stations in the United States and Puerto Rico. It provides over-the-air broadcasts of its programming to communities, it is licensed to serve. The company provides daily local news coverage, public service announcements, and political advertising time. As of March 13, 2007, it owned and operated 31 television stations in 18 markets. The company, formerly known as Ranger Equity Holdings Corporation, was founded in 1997. LIN TV Corp. is headquartered in Providence, Rhode Island.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# Comparable Company Descriptions - Broadcasting

**Hearst-Argyle Television**                    **Ticker:**    **HTV**

Hearst-Argyle Television, Inc., together with its subsidiaries, engages in the ownership and operation of network-affiliated television stations in the United States. It provides free over-the-air programming to its television viewing audiences. The company offers programs produced by networks, such as ABC's Grey's Anatomy, NBC's Law and Order, and CBS' Crime Scene Investigation, and special event programs comprising The Academy Awards, the Olympics, and the Super Bowl; local news, weather, sports, and entertainment; and The Oprah Winfrey Show and Entertainment Tonight. Its stations also provide public service announcements and political coverage, as well as sponsor community service projects and other public initiatives. As of December 31, 2006, Hearst-Argyle owned approximately 26 television stations; and managed 3 television stations, including WMOR-TV, WPBF(TV), and KCWE(TV), as well as 2 radio stations, which include WBAL(AM) and WIYY(FM). The company was founded in 1994 and is headquartered in New York, New York. Hearst-Argyle Television, Inc. is a subsidiary of The Hearst Corporation.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# Comparable Company Descriptions - Consolidated

**Ew Scripps Co**                     **Ticker:**    **SSP**

The E. W. Scripps Company, through its subsidiaries, operates as a media company that provides content and advertising services via the Internet. It operates through four segments: Scripps Networks, Newspapers, Broadcast Television, and Interactive Media. The Scripps Networks segment operates national television networks, including HGTV, Food Network, DIY Network, Fine Living, and Great American Country. The segment also provides video-on-demand and broadband services. The Newspapers segment operates daily and community newspapers in the United States. It also owns and operates Scripps Media Center, as well as operates Internet sites, offering users information, comprehensive news, advertising, e-commerce, and other services. The Broadcast Television segment operates ABC-affiliated stations. The Interactive Media segment offers online comparison shopping services. It operates a comparison shopping service that helps consumers find products offered for sale on the Web by online retailers, as well as operates an online comparison service that helps consumers compare prices and purchase various essential home services. The company also offers BizRate, which is a consumer feedback network that collects consumer reviews of stores and products. The E. W. Scripps Company also offers other services, including syndication and licensing of news features and comics. The company was founded in 1878 and is based in Cincinnati, Ohio.

**Belo Corp.**                     **Ticker:**    **BLC**

Belo Corp. and its subsidiaries engage in television broadcasting, cable news, newspaper publishing, and interactive media businesses in the United States. It operates in two segments, Television Group and Newspaper Group. The Television Group segment sells airtime to local, regional, and national advertisers for advertising and broadcasting of news, entertainment, and other programming through Belo's television stations, cable news operations, and related Web sites. As of March 5, 2007, it owned 20 television stations and 7 cable news channels, managed 1 television station through a local marketing agreement, and operated approximately 30 Web sites. This segment provides local news through cable news channels in partnership with Cox Communications and others in New Orleans, Louisiana; Phoenix, Arizona; and Hampton/Norfolk, Virginia. The Newspaper Group publishes and sells four daily newspapers comprising The Dallas Morning News, The Providence Journal, The Press-Enterprise, and the Denton Record-Chronicle to distributors and individual subscribers with local, state, national, and international news. It provides advertising space in published issues of its newspapers and on the its Web sites. This segment also publishes specialty publications targeting young adults and operates commercial printing business. Belo Corp. also participates in various interactive alliances and offers a range of Internet-based products. The company was founded in 1842 and is headquartered in Dallas, Texas.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0398571

# Comparable Company Descriptions - Consolidated

**Media General Inc**                     **Ticker:**      **MEG**

Media General, Inc., a communications company, provides news, information, and entertainment through various channels in the United States. It operates in three segments: Publishing, Broadcast, and Interactive Media. Publishing segment offers daily and Sunday newspapers in Virginia, North Carolina, South Carolina, Alabama, and Florida. As of December 31, 2006, this segment owned 25 daily community newspapers; and approximately 150 other publications. Broadcast segment operates network-affiliated broadcast television stations. As of above date, this segment operated 23 network-affiliated television stations. Interactive Media segment primarily provides online news, information, and entertainment. As of the above date, the segment comprised of approximately 75 interactive enterprises, as well as minority investments in 2 companies. The company has strategic alliance with Yahoo, Inc. to deliver classified advertising to consumers. Media General was founded in 1879 and is headquartered in Richmond, Virginia.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# Schedule B

Source of Schedule A is Factset.

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0398573

# Comparable Transaction Descriptions – Broadcasting

Acquirer:  BBT Fund LP                                1/4/2007
Target:    The New York Times Co.

**Merger Synopsis**

Private equity firm Oak Hill Capital Management Inc acquired the assets and activities of The New York Times Co's Broadcast Media Group for US$575 million. The Broadcast Media Group consists of the following stations: WHO-TV in Des Moines, Iowa; KFSM-TV in Ft. Smith, Arkansas; WHNT-TV in Huntsville, Alabama; WREG-TV in Memphis, Tennessee; WQAD-TV in Moline, Illinois; WTKR-TV in Norfolk, Virginia; KFOR-TV in Oklahoma City, Oklahoma; KAUT-TV in Oklahoma City, Oklahoma and WNEP-TV in Scranton, Pennsylvania.

Acquirer:  Media General, Inc.                        4/6/2006
Target:    NBC Universal, Inc.

**Merger Synopsis**

Media General Inc, a multimedia company, acquired four NBC Universal Inc owned and operated television stations in a cash transaction valued at approximately $600 million. The NBC stations are WNCN in Raleigh, North Carolina #29; WCMH in Columbus, Ohio #32; WVTM in Birmingham, Alabama #40 and WJAR in Providence, Rhode Island #51. All four stations are ranked among the top three in their respective markets. Three of the markets are state capitals and all four are major university communities. Media General intends to finance the transaction using existing capacity under a $1 billion bank facility, $100 million of new public debt and approximately $150 million in proceeds from asset sales. Media General expects that the acquisition will immediately increase free cash flow, add approximately $10 million in non-cash amortization and depreciation expense to their annual income statement and result in a net transaction value, reduced by the present value of the expected tax savings, of approximately $450 million.

Acquirer:  Univision Communications, Inc. /Private Group/   6/27/2006
Target:    Univision Communications, Inc.

**Merger Synopsis**

A group including Madison Dearborn Partners, Providence Equity Partners Inc, Texas Pacific Group LLC, Thomas H Lee Partners, and Saban Capital Group Inc acquired Univision Communications Inc for $9.1 billion in cash plus the assumption of approximately $1.4 billion in debt. The investment group acquired Univision Communications Inc for $36.25 per share in cash. Univision Communications Inc is the leading Spanish-language media company in the United States with industry-leading market share in its television, radio, music, and online businesses.

Acquirer:  Hearst-Argyle Television, Inc.              5/8/2006
Target:    Emmis Communications Corp.

**Merger Synopsis**

Hearst-Argyle Television Inc has acquired WKCF-TV in Orlando, Florida from Emmis Communications for $217.5 million in cash. Hearst-Argyle owns and operates Orlando's NBC-affiliate and local news station WESH-TV. The acquisition of WKCF adds a television duopoly in the nation's 20th largest television market. An affiliate with The WB Network, WKCF will become and CW affiliate when that new network launches in September 2006. With the transaction's completion, Hearst-Argyle has formed duopolies in five of its seven largest markets: Boston, Sacramento, Kansas City, Missouri, Orlando and Baltimore, where the company has a radio/television combination. Emmis will continue to own 50% of the "The Daily Buzz," a syndicated weekday news

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

# Comparable Transaction Descriptions - Broadcasting

Acquirer:    Raycom Media, Inc.                          8/25/2005
Target:      The Liberty Corp.

Merger Synopsis

Raycom Media Inc acquired Liberty Corp for US$868.5 million in cash. Raycom Media Inc agreed to pay US$47.35 in cash for every Liberty Corp share held. Liberty Corp operates 15 network affiliated television stations, and Raycom Media Inc owns and operates 37 television stations. Raycom Media Inc is acquiring Liberty Corp to expand into new markets.

Acquirer:    Journal Communications, Inc.                8/22/2005
Target:      Emmis Communications Corp.

Merger Synopsis

Journal Communications Inc acquired the assets of three television stations from Emmis Communications Corp for approximately US$235 million. The television stations are WFTX-TV (Ch. 4, Fox affiliate) in Fort Myers, Florida, KMTV-TV (Ch. 3, CBS affiliate) in Omaha, Nebraska, and KGUN-TV (Ch. 9, ABC affiliate) in Tucson, Arizona. In two other separate transactions, LIN TV Corp signed an agreement to acquire five television stations while Gray Television Inc signed an agreement to acquire one television stations from Emmis Communications Corp.

Acquirer:    LIN TV Corp.                                8/22/2005
Target:      Emmis Communications Corp.

Merger Synopsis

LIN TV Corp acquired the assets of five television stations from Emmis Communications Corp for approximately US$260 million. The five television stations are WALA-TV (Ch. 10, Fox affiliate) in Mobile Alabama, WBPG-TV (Ch. 55, WB affiliate) in Pensacola, Florida, WTHI-TV (Ch. 10, CBS affiliate) in Terre Haute, Indiana, WLUK-TV (Ch. 11, Fox affiliate) in Green Bay, Wisconsin, and KRQE-TV (Ch. 13, CBS affiliate) in Albuquerque, New Mexico, plus regional satellite stations. In two other separate transactions, Journal Communications Inc signed an agreement to acquire three television stations and Gray Television Inc signed an agreement to acquire one television stations from Emmis Communications Corp.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# Comparable Transaction Descriptions - Publishing

6/26/2006

Acquirer: Wilkes-Barre Publishing Co., Inc.
Target: The McClatchy Co.

Merger Synopsis

Wilkes-Barre Publishing Co Inc, a firm formed by Richard L. Connor, local Wilkes-Barre Investors, and HM Capital Partners LLC, acquired the Times Leader, a newspaper publisher, and certain associated publications from The McClatchy Co for approximately $64.5 million in cash. Times Leader is currently owned by Knight Ridder Inc, which is to be acquired by The McClatchy Co.

5/23/2006

Acquirer: Philadelphia Media Holdings LLC
Target: The McClatchy Co.

Merger Synopsis

Philadelphia Media Holdings LLC, an acquisition vehicle led by Bruce Toll, co-founder of Toll Brothers Inc, and advertising executive Brian Tierney, acquired Philadelphia Newspapers Inc, which holds the assets of The Philadelphia Inquirer the Philadelphia Daily News, two Philadelphia newspapers, and related media assets from The McClatchy Co for approximately US$515 million in cash, plus the assumption of approximately US$47 million in pension liabilities. The two Philadelphia newspapers are part of the acquisition of Knight Ridder by McClatchy Co.

4/20/2006

Acquirer: MediaNews Group, Inc. / The Hearst Corp.
Target: The McClatchy Co.

Merger Synopsis

MediaNews Group Inc, headed by media mogul William Dean Singleton, acquired three Knight Ridder Inc newspapers in California and one in Minnesota for approximately $1 billion. The transaction coincides with the pending deal between McClatchy Co and Knight Ridder Inc announced in March 2006 for McClatchy to acquire Knight Ridder for approximately $4.5 billion. As part of the deal between McClatchy and Knight Ridder, McClatchy intends to unload 12 papers and retain 20 papers to become the second-largest US newspaper chain behind Gannet Co. The offer from MediaNews could provide a significant boost for McClatchy whose stock dropped 17% since March 13, 2006, thereby reducing the value of its $4.5

3/13/2006

Acquirer: The McClatchy Co.
Target: Knight Ridder, Inc.

Merger Synopsis

The McClatchy Co acquired Knight Ridder Inc for approximately US$4.1 billion in cash and stock, plus the assumption of approximately US$2 billion in debt. Under the terms of the agreement, Knight Ridder shareholders will receive US$40 per share in cash and a fixed fraction of 0.5118 of a Class A McClatchy share, which represents a total per share consideration of US$67.25 based upon the closing stock price of McClatchy on March 10, 2006. As a result of the transaction, McClatchy Co will have approximately 54.9 million Class A shares outstanding and about 26.2 million Class B shares. The McClatchy Co will operate 32 daily newspapers and about 50 non-dailies after the planned sale of 12 Knight Ridder papers.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

# Comparable Transaction Descriptions - Publishing

Acquirer: Lee Enterprises, Inc.          1/30/2005
Target: Pulitzer, Inc.

Merger Synopsis
Lee Enterprises Inc acquired Pulitzer Inc for approximately US$1.4 billion in cash, plus the assumption of $300 million in debt. Under the terms of agreement, Lee Enterprises Inc paid US$64 cash per share for each Pulitzer Inc share outstanding. Pulitzer Inc operates 14 daily newspapers. Lee Enterprises Inc also operates more than 100 weekly newspapers, shoppers, and niche publications. As a result of the transaction, the combined company, Pulitzer will represent about 39% of the revenue and 34% of the daily circulation. The combining 2004 calendar results, Lee's revenue will rise by more than US$440 million, to US$1.14 billion. Upon completion of the transaction, Pulitzer Inc will become a wholly owned subsidiary of Lee Enterprises Inc. Additionally, the acquisition of Pulitzer Inc will add approximately 4,000 employees to Lee Enterprises Inc, bringing the total of Lee Enterprises Inc's employees to approximately 10,700 people.

Acquirer: News Corp.          5/1/2007
Target: Dow Jones & Co., Inc.

Merger Synopsis
News Corp entered into a definitive agreement to acquire Dow Jones & Co Inc for approximately US$5.2 billion in cash or a combination of cash and stock. Under the terms of the agreement, the shareholders of Dow Jones & Co Inc will receive US$60 per share in cash or a combination of cash and stock from News Corp Ltd for all of their outstanding shares of common stock and Class B common stock, which represents a 65% premium from the last trading price of US$36.33 on April 30, 2007 and a 4.5% premium from the last trading price of US$57.38 on July 31, 2007. The initial unsolicited offer was made by News Corp on May 1, 2007. Dow Jones & Co Inc, based in New York, New York, is a leading publisher and provider of financial information and news. The company received a proposal letter from an investment group led by MySpace founder Brad Greenspan offering to acquire approximately 25% of the company on June 19, 2007. The transaction is expected to close in the fourth calendar quarter of 2007.

Acquirer: Quebecor, Inc.          5/31/2007
Target: Osprey Media Income Fund

Merger Synopsis
Quebecor Media Inc, a subsidiary of Quebecor Inc, acquired Osprey Media Income Fund for approximately CAD414.4 million (US$391.7 million) in cash. Quebecor-Media Inc acquired each share at approximately CAD8.5 in cash, an increase from CAD7.3. The offer price represents a 4.8% premium of the close of Osprey Media Income Fund on May 31, 2007. The transaction has an enterprise value of CAD516.9 million (US$483.5 million). The acquisition complements Quebecor Media Inc's services. Osprey Media Income Fund publishes daily and non-daily newspapers, magazines and specialty publications.

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0398577