## **ATTACHMENT D**

*Transcript of Interview of Rosanne Kurmaniak (Citibank) (without Exhibits)*

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

No. 08-13141 (KJC)

(CONFIDENTIAL TRANSCRIPT)

----------------------------------------x

IN RE:

TRIBUNE COMPANY, et al.

----------------------------------------x

DEPOSITION OF:  ROSANNE KURMANIAK

Wednesday, July 7, 2010

New York, New York

Reported in stenotype by:

Rich Germosen, CCR, CRCR, RPR, CRR, CLR

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

2

1          Deposition of ROSANNE KURMANIAK, taken in the

2    above-entitled matter before RICH GERMOSEN,

3    Certified Court Reporter, (License No.

4    30XI00184700), Certified Realtime Court Reporter-NJ,

5    (License No. 30XR00016800), NCRA Registered

6    Professional Reporter, NCRA Certified Realtime

7    Reporter, Certified LiveNote Reporter, and a Notary

8    Public within and for the States of New York and New

9    Jersey, taken at the offices of PAUL, WEISS,

10   RIFKIND, WHARTON & GARRISON, L.L.P., 1285 Avenue of

11   the Americas, New York, New York  10019, on

12   Wednesday, July 7, 2010, commencing at 11:06 a.m.

13

14

15

16

17

18

19

20

21

22

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                             New York, NY

                                                                      3

1    A P P E A R A N C E S:

2    SAUL EWING, L.L.P.

3    BY:  CAITLIN M. PICCARELLO, ESQ.

4        -and-

5    BY:  CHRISTOPHER R. HALL, ESQ.

6    Centre Square West

7    1500 Market Street

8    38th Floor

9    Philadelphia, Pennsylvania  19102-2186

10   (215) 972.8445 / (215) 972.4170 (FAX)

11   cpiccarello@saul.com

12   chall@saul.com

13   Attorneys for The Examiner

14

15   SAUL EWING, L.L.P.

16   BY:  CHARLES O. MONK, II, ESQ.

17   Lockwood Place

18   500 East Pratt Street

19   Baltimore, Maryland  21202

20   (410) 332.8668 / (410) 332.8870 (FAX)

21   cmonk@saul.com

22   Attorneys for The Examiner

4

1   A P P E A R A N C E S:

2

3   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

4   BY:  ANDREW C. GORDON, ESQ.

5        -and-

6   BY:  STUART McPHAIL, ESQ.

7   1285 Avenue of the Americas

8   New York, New York  10019

9   (212) 373.3789 / (212) 492.0789 (FAX)

10  agordon@paulweiss.com

11  smcphail@paulweiss.com

12  Attorneys for Citigroup Global Markets and

13  Rosanne Kurmaniak

14

15  ALSO PRESENT:

16  KENNETH N. KLEE, ESQ., Examiner, (via video

17  teleconference)

18

19

20

21

22

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

5

1                          I N D E X

2    WITNESS                              EXAMINATION

3    ROSANNE KURMANIAK

4      BY MR. MONK                        15

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Kurmaniak, Rosanne        CONFIDENTIAL                July 7, 2010
                          New York, NY

---

6

1                        E X H I B I T S

2     DESCRIPTION                           PAGE

3     (Exhibit 1 for                        20

4      identification, multi-page

5      document bearing Bates stamps

6      CITI-TRIB-CC00023361 through

7      CITI-TRIB-CC00023496.)

8

9      (Exhibit 2 for                       33

10      identification, multi-page

11      document bearing Bates stamps

12      CITI-TRIB-CC00023501 through

13      CITI-TRIB-CC00023590.)

14

15      (Exhibit 3 for                       59

16      identification, one-page

17      document bearing Bates stamp

18      CITI-TRIB-CC00094742.)

19

20

21

22

7

1              E X H I B I T S   (CONT'D.)

2    DESCRIPTION                      PAGE

3    (Exhibit 4 for                    74

4     identification, multi-page

5     document bearing Bates stamps

6     CITI-TRIB-CC 00038428 through

7     CITI-TRIB-CC 00038430.)

8

9    (Exhibit 5 for                    81

10    identification, multi-page

11    document bearing Bates stamps

12    CITI-TRIB-CC 00171977 through

13    CITI-TRIB-CC 00172025.)

14

15   (Exhibit 6 for                    84

16    identification, multi-page

17    document bearing Bates stamps

18    CITI-TRIB-CC 00103592 through

19    CITI-TRIB-CC 00103601.)

20

21

22

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

8

1                       E X H I B I T S   (CONT'D.)

2       DESCRIPTION                        PAGE

3       (Exhibit 7 for                      100

4        identification, multi-page

5        document bearing Bates stamps

6        TRB0147215 through

7        TRB0147296.)

8

9       (Exhibit 8 for                      108

10       identification, double-sided

11       document bearing Bates stamps

12       CITI-TRIB-CC 00133755 and

13       CITI-TRIB-CC 00133756.)

14

15      (Exhibit 9 for                      112

16       identification, one-page

17       document bearing Bates stamp

18       CITI-TRIB-CC 00160830.)

19

20

21

22

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

9

1                      E X H I B I T S   (CONT'D.)

2      DESCRIPTION                        PAGE

3      (Exhibit 10 for                    120

4       identification, one-page

5       document bearing Bates stamp

6       CITI-TRIB-CC 00029566.)

7

8      (Exhibit 11 for                    124

9       identification, one-page

10      document bearing Bates stamp

11      CITI-TRIB-CC 00124068.)

12

13     (Exhibit 12 for                    132

14      identification, one-page

15      document bearing Bates stamp

16      CITI-TRIB-CC 00146365.)

17

18     (Exhibit 13 for                    147

19      identification, double-sided

20      document bearing Bates stamps

21      CITI-TRIB-CC 00087734 and

22      CITI-TRIB-CC 00087735.)

10

1              E X H I B I T S  (CONT'D.)

2    DESCRIPTION                        PAGE

3    (Exhibit 14 for                    151

4     identification, multi-page

5     document bearing Bates stamps

6     CITI-TRIB-CC 00023666 through

7     CITI-TRIB-CC 00023682.)

8

9    **original exhibits retained by CAITLIN M.

10   PICCARELLO of SAUL EWING, L.L.P.

11

12   (exhibit index concluded)

13

14

15

16

17

18

19

20

21

22

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

11

1       PRODUCTION OF DOCUMENTS AND/OR INFORMATION

2                         Page Line

3                           (none)

4

5

6       DIRECTION TO WITNESS NOT TO ANSWER

7                         Page Line

8                           (none)

9

10

11      QUESTIONS MARKED FOR LATER RULING

12                        Page Line

13                          (none)

14

15

16

17

18

19

20

21

22

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

12

1          IT IS HEREBY STIPULATED AND AGREED, by

2     and between the attorneys for the respective parties

3     herein, that filing and sealing be and the same are

4     hereby waived.

5          IT IS FURTHER STIPULATED AND AGREED

6     that all objections, except as to the form of the

7     question, shall be preserved to the time of trial.

8          IT IS FURTHER STIPULATED AND AGREED

9     that the within deposition may be signed and sworn

10    to before any officer authorized to administer an

11    oath, with the same force and effect as if signed

12    and sworn to before the officer before whom the

13    within deposition was taken.

14

15

16

17

18

19

20

21

22

13

<sup>1</sup>                    P R O C E E D I N G S

<sup>2</sup>               MR. MONK:  Ken, you want to do your

<sup>3</sup>     introduction?

<sup>4</sup>               MR. KLEE:  Yes.

<sup>5</sup>               Rosie, I'm Ken Klee.  I'm the

<sup>6</sup>     appointed examiner in the Tribune cases and I

<sup>7</sup>     thank you for making yourself available today for

<sup>8</sup>     this examination.

<sup>9</sup>               It's very important for us to be

<sup>10</sup>    able to gather information to prepare our report

<sup>11</sup>    on the 2007 leverage ESOP transaction and that's

<sup>12</sup>    the particular question we're here to discuss with

<sup>13</sup>    you today.  This is not a deposition.  It is a

<sup>14</sup>    sworn examination.  You will, you are under oath,

<sup>15</sup>    but we will not be just having one person ask you

<sup>16</sup>    questions.  We're looking for the truth and so

<sup>17</sup>    your lawyers if they know the answers can chime in

<sup>18</sup>    and try to help us out and this will enable us to

<sup>19</sup>    do our report.  So for the most part my counsel

<sup>20</sup>    Charlie Monk will be the one asking you questions,

<sup>21</sup>    but Caitlin Piccarello or Chris Hall or myself can

<sup>22</sup>    also ask questions.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

14

1                    THE WITNESS:  Okay.

2                    MR. MONK:  Okay?

3                    MR. GORDON:  Ken, if you don't mind

4      I just want to put on the record I want to thank

5      you all again for working with us in terms of

6      scheduling.  I appreciate your accommodating my

7      schedule today.  I appreciate it.

8                    MR. MONK:  It's our hope and desire

9      and goal to complete this in the allotted two and

10     a half hours and so we don't have to trouble

11     Ms. Kurmaniak for more time and try to deal with a

12     difficult schedule we've been given by the Court

13     here to complete this process.

14                    MR. KLEE:  And just so you know in

15     terms of that timing what we're going to do is

16     we're going to ask that the transcript be given to

17     you after it's done and you'll have a few days to

18     sign and return it.  You can correct any errors in

19     it.  Your lawyers will preserve all their

20     objections to any form of questions and substance

21     that we ask.  They need not make objections on

22     this record and we will ask that you keep the

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
New York, NY

15

1  substance of this examination confidential because

2  we are still talking to other witnesses who we

3  want to have fresh access to.

4                    THE WITNESS:  Okay.

5                    MR. MONK:  Okay?

6                    THE WITNESS:  Thank you.

7                    (Whereupon, the court reporter

8  administers the oath to the witness.)

9

10  R O S A N N E   K U R M A N I A K,

11  conducting business at Citigroup Global Markets,

12  Inc., 388 Greenwich Street, New York, New York

13  10013, having been first duly sworn or affirmed by

14  a Notary Public within and for the States of New

15  York and New Jersey, was examined and testified as

16  follows:

17  EXAMINATION BY MR. MONK:

18          Q.     Have you ever been deposed before?

19          **A.     First time.**

20          Q.     All right.

21                    So the only thing you've got to

22  remember in this process is this handsome

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

16

1   gentleman at the far end of the table has got to

2   take down what you and I say and if we talk over

3   one another he can only take down what one person

4   is saying at a time.  All right?

5        **A.     (Indicating.)**

6        Q.     So please and remember that he

7   takes down what he hears, not what he sees.  So

8   when you say yes by shaking your head, that

9   doesn't show up in the transcript.

10       **A.     Okay.**

11       Q.     Okay?

12            If you don't understand a question

13  or I've confused you in some way with what I've

14  asked or anybody does just say I don't

15  understand.  Can you, you know, ask that one

16  again and we'll try to do that.

17       **A.     Okay.**

18       Q.     Our goal here is to have a meeting

19  of the minds for you to understand what I'm

20  asking and for you to give me your best answer,

21  all right?

22       **A.     Okay.**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

17

1           Q.      All right.

2                   Let's just start a little bit with

3    tell us about yourself.  What's your background?

4    Begin at the hard part, how old are you?

5           **A.      I am thirty-three years old,**

6    **almost thirty-four.**

7           Q.      Okay.

8           **A.      I've been with Citi since I**

9    **graduated from undergraduate business school in**

10   **1998 and I have -- I did not go back to business**

11   **school so I essentially started with Citi in '98**

12   **and have grown up with the firm analyst,**

13   **associate, vice-president, director and almost**

14   **managing director.**

15          Q.      Okay.

16                  So at the time of this

17   transaction, the Tribune transaction you were a

18   vice-president?

19          **A.      Correct.**

20          Q.      And now you've been promoted from

21   vice-president to director?

22          **A.      Correct.**

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
New York, NY

18

1          Q.      Is that correct?

2          **A.      Correct.**

3          Q.      And I think you gave us the list,

4    but director, the next step after director is

5    managing director?

6          **A.      Correct.**

7          Q.      Correct?

8          **A.      Yes.**

9          Q.      All right.

10                 In your time have you always been

11   in the mergers and acquisitions area?

12         **A.      I have not.  I started as an**

13   **analyst in another coverage group in industrials.**

14   **I moved to media and telecom when I was an**

15   **associate.  I did primarily telecom within the**

16   **combined media and telecom group.  At the end of**

17   **my associate years I switched from media and**

18   **telecom over to M and A, but I continued to**

19   **specialize or focus in media and telecom.  I**

20   **would say that the majority of my time, majority**

21   **meaning ninety percent probably is spent on**

22   **telecom clients and every once in awhile, for**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

19

1    example, on Tribune I cross over to media just

2    because it's the role.  At the time Christina was

3    looking for a vice-president who could fill the

4    role that she was looking for.

5              Q.      And Christina, we're talking about

6    Christina Mohr, is that correct?

7              A.      Yes.

8              Q.      And Christina was the managing

9    director who was the principal on this

10   engagement?

11             A.      Correct.

12             Q.      Is that correct?

13             A.      Yes.

14             Q.      And you were her Number 2 person

15   if you would?

16             A.      Correct.

17             Q.      All right.

18                     And at various points in times you

19   had other people who were associates or analysts

20   that worked for you in connection with this

21   project?

22             A.      That's correct.

Kurmaniak, Rosanne        CONFIDENTIAL                July 7, 2010
                          New York, NY

                                                              20

1            Q.      Is that right?

2            **A.      Yes.**

3            Q.      All right.

4                    We're going to turn to tab 4.

5                    MS. PICCARELLO:  Would you mark

6       that as Kurmaniak 1.

7                    COURT REPORTER:  (Complies.)

8                    MR. GORDON:  What is our protocol?

9                    MR. MONK:  We're going to give you

10      the documents.

11                   MR. GORDON:  We're going to return

12      them.

13                   MR. MONK:  We're going to return

14      them when we finish.

15                   MR. GORDON:  Okay.

16                   MS. PICCARELLO:  Here is one for

17      each of you.  He'll give you one in just a second.

18                   (Whereupon, multi-page document

19      bearing Bates stamps CITI-TRIB-CC00023361 through

20      CITI-TRIB-CC00023496, is received and marked as

21      Kurmaniak Exhibit 1 for Identification.)

22                   COURT REPORTER:  Number 1.

21

1          MR. MONK:  All right.

2

3  BY MR. MONK:

4          Q.    So this document --

5          **A.    I should look at this?**

6          Q.    That's the one you should look at.

7  That one is for your lawyer.

8          **A.    Okay.**

9          Q.    The document we've marked as

10  Exhibit Number 1 I believe are your handwritten

11  notes.

12          Can you tell us, first thing can

13  you identify them?

14          **A.    (Reviews.)**

15          Q.    Do they look like your handwritten

16  notes?

17          **A.    Yes, they are.**

18          Q.    Okay.

19          Is it your practice to use a

20  spiral bound notebook and keep notes in a spiral

21  bound notebook when you're working on an

22  assignment?

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
New York, NY

22

1          A.      I do keep a spiral bound notebook.

2    My spiral bound notebook has -- it's essentially

3    cataloged by date and so if I work on multiple

4    transactions at a certain time there might be one

5    transaction, then another transaction, then

6    another transaction.

7          Q.      Okay.

8          A.      At the end of the transaction or

9    at the end of my spiral bound notebook I tear

10   them out and I organize them according to deal

11   and then I put them in a file folder.

12         Q.      Okay.

13                 So can you tell us from looking at

14   tab 4 --

15         A.      Uh-huh.

16         Q.      -- you know, essentially are these

17   your notes from your spiral bound notebook for at

18   least some stage of the Tribune assignment?

19         A.      Would you like me to look at every

20   page or just generally?

21         Q.      Take as much time as you want,

22   but, you know, this is really just -- all I'm

23

1    trying to get an idea of is one, are they your

2    notes and two, roughly the time frame involved

3    here.  And then I'm going to ask you to look at a

4    particular page after you've given me your --

5         **A.      Okay.**

6              MR. GORDON:  Go to the end.  This

7    question is does it relate to the Tribune deal as

8    your --

9              THE WITNESS:  I thought he asked

10   for the time period.

11             MR. GORDON:  No, I think he said

12   for a portion, at least a portion.

13             THE WITNESS:  Oh, okay.

14        **A.      These are my notes.**

15

16   BY MR. MONK:

17        Q.      Okay.

18        **A.      They are related to the Tribune**

19   **deal for a portion of the time that I worked on**

20   **it.**

21        Q.      All right.

22              And am I correct in understanding

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

24

1    it's the early portion of the time that you

2    worked on the deal?

3              **A.      Yes.**

4              Q.      All right.

5                      And just so we're all on the same

6    area, your involvement with the Tribune deal

7    began when the special committee was formed and

8    Citi was hired which would have been sometime in

9    the fall of 2006, is that correct?

10             **A.      That's correct.**

11             Q.      And the early assignments I think

12   we've learned from Christina Mohr were involved

13   learning about the company and working on

14   marketing the company and the deal begins to

15   coalesce around Zell and the self-help

16   alternative in March, February, March of 2007?

17             **A.      That's correct.**

18             Q.      Just so we --

19             **A.      Yep, we had run -- we'd been hired**

20   **as you said in the fall.  We had run a Zell side**

21   **process which had involved other bidders.  It**

22   **looks like my notes encapsulate that portion of**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

25

1    the process.

2              Q.      Right.

3              A.      And then the Zell proposal came in

4    and we began evaluating that I think it was

5    February, March time frame.

6              Q.      All right.

7                      Would you look at the document

8    that's got a Bates number, they're numbered in

9    the lower right-hand corner.  We call those Bates

10   numbers even though we don't use Bates numbering

11   machines anymore to put numbers on pages and

12   it's, the last three digits are 369.

13             A.      369.  Okay.

14             Q.      All right.

15                     The first thing can you just look

16   at the notes and tell me, you know, what are you

17   taking notes of at that point in time?  Is this a

18   conversation with somebody?  And the particular

19   one I'm interested in is right in the middle of

20   the page with the last -- that's Bates labeled

21   last three digits are 369 --

22             A.      Uh-huh.

Kurmaniak, Rosanne       CONFIDENTIAL              July 7, 2010
                         New York, NY

26

1          Q.      -- Pat is trying to calc E & P.

2    Will something from gap.

3          **A.      Uh-huh.**

4          Q.      Do you see that?

5          **A.      Uh-huh.**

6          Q.      Would you read those for us and

7    tell us what your shorthand is describing there,

8    please.

9          **A.      I don't see a date on this so it's**

10   **difficult for me to know exactly what it came**

11   **from, where it came from.**

12         Q.      Okay.  You might --

13                 MS. PICCARELLO:  Here, I can give

14   it to her.

15         Q.      Turn to the, turn to the first

16   page of the notes, if you will, the very first

17   page.  The one that's 361 on the bottom.

18         **A.      Uh-huh.  Yes.**

19         Q.      All right.

20                 This looks to me like meeting,

21   notes of a meeting?

22         **A.      Well, this particular page were**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

27

1    the attendees were a buyer group.

2            Q.     Okay.

3                   And when you say a buyer group,

4    meaning a buyer group meeting?

5            A.     Correct.

6            Q.     Okay.

7            A.     So this particular group the

8    meeting was conducted in Los Angeles and there

9    was a large --

10                  MR. GORDON:  What is it for?

11                  THE WITNESS:  Sorry?

12                  MR. GORDON:  What group is it for?

13                  THE WITNESS:  This was the

14   Chandlers.

15

16   BY MR. MONK:

17           Q.     Right, the Chandler trust?

18           A.     Yeah.

19           Q.     Okay.

20           A.     So these were the attendees from

21   the Chandler trust.

22           Q.     All right.

28

1                Then --

2          A.      I don't think that the proceeding

3     pages are actually -- it's not a continuous set

4     of notes.

5          Q.      Okay.

6          A.      So -- because it moves on to --

7     look at some of the notes from Broad Yucaipa

8     which was another bidder at the time.  Broad

9     Yucaipa was another bidder group at the time.

10    And then I believe this particular page moves

11    into some of my internal notes which would have

12    been from a call that we were, we would have

13    discussed, we would have discussed the mechanics

14    of the transaction.

15         Q.      All right.

16                And this is, the pages say 3

17    ending in 368 and 369?

18         A.      To me that's what it looks like.

19         Q.      Okay.

20         A.      So if we go in particular to the

21    clause that you had pointed out to me Pat is the

22    tax person at Tribune or was the tax person at

29

1      the time.

2              Q.      Okay.

3              A.      E and P refers to earnings and

4      profits and I think what it's just noting is that

5      how he was going to derive it which is from a gap

6      shareholders equity account.  At the time we were

7      trying to estimate the tax basis of the

8      company --

9              Q.      Uh-huh.

10             A.      -- for various alternatives as we

11     were evaluating a potential spin, other

12     transactions and one of the key components of

13     that is to look at the calculation of the basis.

14             Q.      Okay.

15             A.      So this particular sentence would

16     be in reference to Pat, just making a note that

17     that was a follow-up that Pat was going to

18     calculate that for us.

19             Q.      Okay.

20                     Down below it says needs solvency

21     opinion.  Will take two to three weeks.

22                     Can you tell us what that refers

Kurmaniak, Rosanne          CONFIDENTIAL              July 7, 2010
                              New York, NY

                                                                    30

1    to?

2           A.      I think that was just a note that

3    it was, we noted that it was needed for the

4    transaction.

5           Q.      For any one of the transactions or

6    the particular --

7           A.      I can't tell from my notes.

8           Q.      All right.

9                   Then it says, paren, personal

10   liability to directors.

11          A.      (Indicating.)

12          Q.      What does that note refer to?

13          A.      I don't know.

14          Q.      Let me -- do you remember there

15   being a discussion that the directors would want

16   a solvency opinion before doing a leveraged

17   buyout transaction so that they would avoid

18   personal liability?

19          A.      I don't remember a conversation

20   like that.  It must have been -- sometimes I take

21   notes on if a lawyer said something that, you

22   know, it's a, it is just a concept, it's not

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

31

1    **necessarily the case that it was tied to a**

2    **conversation.**

3             Q.      Okay.

4                     Can you as you sit here today say

5    that there was a lawyer involved in this

6    particular transaction?

7             **A.      What kind of lawyer?**

8             Q.      Any kind of lawyer, was there a

9    lawyer involved in this transaction?

10            **A.      Yes.**

11            Q.      Okay.

12                    And who was involved in that

13   particular discussion if you can recall?

14            **A.      I can't recall.**

15            Q.      All right.

16                    And you don't know whether that's

17   a lawyer for the Tribune or for somebody who is

18   making an offer or whatever?

19            **A.      (Indicating.)**

20            Q.      Okay.

21                    Most important needs to be plus by

22   one dollar.

32

1          **A.        (Indicating.)**

2          Q.        What does that refer to?

3          **A.        Well, the solvency, in order to**

4    **pass a solvency test you need to be solvent.**

5    **This was, again, likely notes although, again, I**

6    **don't have the context of knowing where this came**

7    **from, but to pass a solvency test you need to be**

8    **positive by one dollar.**

9          Q.        Okay.

10               And the last line there need A

11   dash L above the dividend?

12         **A.        Assets liabilities should be**

13   **greater than the dividend.**

14         Q.        Okay.

15               Had you been involved in an LBO

16   transaction before this Tribune transaction?

17         **A.        Not that I can recall.**

18         Q.        All right.

19               Was this the first time that you

20   were involved in a -- in the board of a client

21   company seeking a solvency opinion as part of a

22   deal?

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

33

1        **A.      Yes.**

2        Q.      Okay.

3                MR. MONK:  Anything else on that?

4                MS. PICCARELLO:  No.

5                MR. MONK:  All right.

6    BY MR. MONK:

7        Q.      Let me get you to turn to while

8    we're on the subject of notes I want to -- I've

9    got another set of handwritten notes I'd like you

10   to help us to decipher.

11       **A.      Okay.**

12               MR. MONK:  In our volume, Ken, it's

13   Number 73.

14               MS. PICCARELLO:  (Indicating.)

15               COURT REPORTER:  (Complies.)

16               (Whereupon, multi-page document

17   bearing Bates stamps CITI-TRIB-CC00023501 through

18   CITI-TRIB-CC00023590, is received and marked as

19   Kurmaniak Exhibit 2 for Identification.)

20               COURT REPORTER:  Number 2.

21               MR. GORDON:  What do you want me to

22   do with this?

34

1          MR. MONK:  Just pile them there.

2     We'll give them back to the court reporter at the

3     end.

4          All right.

5

6     BY MR. MONK:

7          Q.     Here again, familiarize yourself

8     with the document Exhibit Number 2.

9          **A.     (Reviews.)**

10         Q.     And let me know whether these are

11    your handwritten notes at another stage in the

12    transaction.

13         **A.     Can I ask a question?**

14         Q.     Sure.

15         **A.     Why are they broken up into two?**

16    **Is that just how you received them?**

17         Q.     There are somewhere around three

18    million records in this case.

19         **A.     Okay.  I just didn't know if it**

20    **was -- if there was a reason why one was in one**

21    **pile and another was in another pile.**

22         Q.     No reason.  It's 3 o'clock in the

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

---

                                                                35

1    morning for Caitlin over here.

2          **A.     Okay.  I got it.  Yes, these are**

3    **my notes.**

4                   **It's just numbered.**

5                   MR. GORDON:  There are pages in

6    between that for whatever reason whether they were

7    blank or whatever, it might have been the way we

8    produced the documents.

9                   THE WITNESS:  Okay.

10                  MR. GORDON:  I don't want poor

11   Caitlin to take all the blame.

12         **A.     No, sometimes I have different**

13   **clumps of notes I organize them in my own way so.**

14

15   BY MR. MONK:

16         Q.     Right.

17         **A.     Would you just like the same**

18   **confirmation?**

19         Q.     Yes.

20         **A.     These are my notes.**

21         Q.     These are your notes, right?

22         **A.     (Indicating.)**

---

                    Henderson Legal Services, Inc.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

                                                                    36

1          Q.      Turn to the last page of this

2     group.

3                  MR. GORDON:  The last?

4          Q.      Which would be Bates Number 590 is

5     the last three digits.

6          **A.      Okay.**

7          Q.      Right?

8                  By looking at that page and maybe

9     the couple of pages before that can you give us a

10    sense of when in the history of this transaction

11    this might have been just so we can --

12         **A.      You're going to laugh when I tell**

13    **you this, this to me looks like notes from we**

14    **were asked to make a presentation to the M & A**

15    **group about the transaction after it was**

16    **announced.  So it was --**

17         Q.      Okay.

18         **A.      I just was preparing what I was**

19    **going to say.**

20         Q.      Okay.

21                 The M & A group at Citi?

22         **A.      Yes.**

Henderson Legal Services, Inc.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

                                                                  37

1          Q.      So it was an internal here is a

2    big deal that we worked on and let me tell you

3    about the deal kind of a discussion?

4          **A.      Correct.**

5          Q.      Right?

6          **A.      Yes.**

7          Q.      And that would have been after

8    April the 1st when it was announced?

9          **A.      When the first announcement**

10   **occurred, correct.**

11         Q.      Okay.  Good.  All right.

12                 Let me ask you to turn if I could

13   to page last four digits in the Bates Number 525.

14   Actually look at 524 first.

15         **A.      (Reviews.)**

16                 **524, the first thing I see on the**

17   **page is LA Recycler.**

18         Q.      Correct.

19         **A.      Okay.**

20         Q.      And then there is a note that says

21   Zell, right?

22         **A.      Uh-huh.**

                                                         38

1        Q.      Now, is this a -- what are these

2   notes?  Let me ask it that way.  I'm really

3   looking at those two pages together so take a

4   look at both pages if you would, please.

5        **A.      To be honest I can't really tell**

6   **at what point in the transaction that was.**

7        Q.      Okay.

8            Do you see the note that says

9   difficulty maintaining our model based on the

10  updated information which is on Page 524 in the

11  middle of the page?

12       **A.      I see it, yes.**

13       Q.      Can you tell us what that, that

14  notation refers to?

15       **A.      I can't really.**

16       Q.      Okay.

17           MR. KLEE:  I'm sorry, I didn't hear

18  that response.

19           THE WITNESS:  I just -- there is

20  not enough context for me to know where it came

21  from.

22           MR. MONK:  All right.

39

¹        **A.      I mean it references here to Broad**

²    **Yucaipa.  It could have been something a bidder**

³    **said about their -- it could have been anything.**

⁴

⁵    BY MR. MONK:

⁶        Q.    All right.

⁷            When you -- when it's -- the

⁸    model, when you use, when I use the note or

⁹    mention the model, what does that refer to in

¹⁰    your mind?  What is the model?

¹¹        **A.    Are you asking me based on the**

¹²    **words on this page or are you asking me --**

¹³        Q.    I'm asking you --

¹⁴        **A.    -- a general question?**

¹⁵        Q.    -- a general question as you

¹⁶    worked on this transaction, what was the model?

¹⁷        **A.    So we had an Excel model that was**

¹⁸    **a working model, income statement, balance sheet,**

¹⁹    **cash flow, debt schedule and it had input from**

²⁰    **the company with various scenarios of projections**

²¹    **or other assumptions that the company asked us to**

²²    **run for them.**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                             New York, NY

40

1          Q.      Okay.

2          A.      **So the model was run by Citi with**

3    **guidance from Christina and other people on our**

4    **transaction team as well as guidance primarily**

5    **from the company about what the underlying**

6    **assumptions of the model should be.**

7          Q.      All right.  Did you build the

8    model yourself?

9          A.      **I did not build the model myself.**

10         Q.      Were you responsible for the

11   supervision of the model?

12         A.      **I was.  Yes, I was.**

13         Q.      Okay.

14                 And I guess at some point in time

15   you actually did go in and make changes to the

16   model physically?

17         A.      **Me personally?**

18         Q.      Yes.

19         A.      **I don't think I would have done**

20   **that.  I would have asked either my associate or**

21   **analyst to make a change, but I would, oftentimes**

22   **I would ask them to send me the Excel.  I would**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

41

1    open it up.  I would look at it.  I might direct

2    them to say I'd change this or I'd change that.

3    Some of that might be the format.  Some of that

4    might be the calculation.  Some of that might be,

5    you know, anything that the client directed me to

6    do based on my conversations with them.

7            Q.      All right.

8                    In working with the client, and

9    we're going to talk about timing here because I

10   think that role changed a little bit over time

11   maybe, but -- well, let me back up.

12                   Fall of 2006 when you first got,

13   when Citi is first engaged, you and Christina are

14   going to work on this together, was there a

15   decision made that Citi should build a model that

16   could be used for purposes of the engagement?

17           A.      Could you be clear about the

18   decision?  I mean are you asking me whether the

19   client asked for it or whether Christina and I

20   used our judgment?  I'm not sure.

21           Q.      Well, I actually am asking that

22   question.  Did the client ask for it or did you

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
New York, NY

42

1    and Christina use your judgment to say, you know,

2    we're going to have to build a model here?

3                    MR. GORDON:  I think he's just

4    asking you for your general recollection of for

5    the background of how there came to be a model?

6                    THE WITNESS:  Right.

7        **A.      Well, we always run a model in**

8    **these types of transactions.  I don't recall**

9    **whether the client asked us or whether Christina**

10   **and I used our judgment, but we typically do this**

11   **when we have a transaction like this.**

12

13   BY MR. MONK:

14        Q.      Sure.

15       **A.      So, you know, exactly how it**

16   **evolved from whether we and I started it or**

17   **Christina and I started it or the client asked**

18   **for it, I can't recall, but eventually it became**

19   **the working model which means it was shared with**

20   **the company and it was shared with Merrill Lynch.**

21       Q.      All right.

22                    And you get comments from Merrill

Kurmaniak, Rosanne         CONFIDENTIAL                July 7, 2010
                            New York, NY

43

1   Lynch on the model as well as from the company?

2          **A.      Correct.**

3          Q.      Okay.

4                  And as time went on the model was

5   added to and changed and enhanced to be useful in

6   connection with the transaction?

7          **A.      Correct.**

8          Q.      Am I correct?

9          **A.      Yes.**

10         Q.      Okay.

11                 February of 2007 the board adopts

12  management's revised projections?

13         **A.      (Indicating.)**

14         Q.      Did someone working for you or at

15  your direction enhance the model by inputting the

16  revised projections that the company had recently

17  adopted?

18         **A.      The word enhanced to me, I don't**

19  **know what that means, but someone at the company**

20  **would have been, would have taken an Excel**

21  **spreadsheet with their projections, given them to**

22  **me and I would have worked with my team to**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

44

1   incorporate those projections into our model.

2          Q.     Okay.   I didn't mean to throw us

3   off point.

4          A.     Yeah, I'm trying to be clear.

5   Usually when a change was made to the model it

6   was at the direction of the client and in this

7   particular case because there were new

8   projections they would give them to us and we

9   would respond to it.

10         Q.     What was your role in deciding

11  whether some information was added to the model

12  or whether you or whether you thought it was

13  appropriate to make the changes that the client

14  was suggesting?

15         A.     It depends on the circumstance and

16  what was provided to me.   I'll distinguish sort

17  of two different things.

18                There were times where, for

19  example, if the share account wasn't right

20  because they had done share purchases in the last

21  month, Chandler would call me.   He would actually

22  tell me that the share account wasn't right.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                           New York, NY

45

1    We'd change it and we'd move on --

2          Q.      Right.

3          A.      -- because I would note the facts.

4    We'd just change it.  We'd do it.

5                Another circumstance like you just

6    mentioned where they sent us a new set of

7    projections, that's something that we would have

8    a discussion about that would involve a broader

9    group, you know, it wouldn't just be that they

10   would send me the projections, I would input them

11   and they would send them back.  Usually, you

12   know, it was sent to Christina, myself, Merrill

13   Lynch and then we'd have a discussion about, you

14   know, what did you send us, why did you change

15   them, things like that.

16         Q.      Okay.

17                So -- and when you said we would

18   have a discussion, who does the we refer to?

19         A.      It would be Christina and my deal

20   team on Citi, at Citi, Michael Costa and the

21   Merrill Lynch team, anyone who was involved from

22   their side and then generally it was Chandler

46

1    **Bigelow, Don Grenesko, the working team at**

2    **Tribune.**

3            Q.      Okay.  If you look at Page 525.

4            **A.      Uh-huh.**

5            Q.      There is a couple of notes I

6    wanted to ask you about.

7            **A.      Uh-huh.**

8            Q.      Interactive looks to me at the top

9    of the page looks like up twenty-two percent?

10           **A.      Uh-huh.**

11           Q.      Do you know what that refers to?

12           **A.      I can't tell you exactly.  It**

13   **looks to be a note about what the actual**

14   **performance might have been for interactive.**

15           Q.      Okay.

16                   And interactive was a unit I

17   guess -- well, what was interactive?

18           **A.      Tribune owned a number of**

19   **investments in various Internet companies, for**

20   **example, Career Builder, topics.net, things that**

21   **were Internet related primarily related to**

22   **publishing, those were categorized into their own**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

47

1   **set of financials which was labeled as**

2   **interactive.**

3          Q.      Okay.

4                  And then a little further down

5   that page projections dash, correct me if I'm

6   reading your handwriting, which is excellent by

7   the way, projections dash we were relatively

8   comfortable with old projections, quote, it's

9   going to get pretty skinny, unquote.

10                 To what does that refer?

11         **A.      Honestly I can't recall.  I mean I**

12  **think we've talked about the context of this is,**

13  **these pages are hard for me to understand where**

14  **the spell --**

15                 MR. GORDON:  Do you know if you go

16  to 522 who Rustic and Goldman were?

17                 THE WITNESS:  This is Rustic Canyon

18  is one of the Chandlers.  It's the name of the

19  entity for one of the -- the Chandler group was

20  several people that were involved with that

21  transaction one of which was Rustic Canyon and

22  Goldman was advising them I believe.  This looks

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

48

1   like it's just recalling various bidders that were

2   in the process at the time.

3

4   BY MR. MONK:

5           Q.      There is a date if you go to Page

6   527 up in the left-hand side of the top of the

7   page there is a date February 9th, '07.

8           **A.      (Reviews.)**

9           Q.      Do you see that?

10          **A.      Uh-huh.**

11          Q.      Does that help at all place any of

12  this in your mind?

13          **A.      Look, I mean if it's going in**

14  **order then this would be notes from -- just the**

15  **context would suggest that we were, in February**

16  **we were talking with multiple bidders at the time**

17  **there is a reconciliation or bullets to various**

18  **bidders that were participating in the process at**

19  **the time.  So if they're going in the order of**

20  **which I submitted the notes which I don't know**

21  **then it would be in the February time frame and**

22  **during the time frame that we were not working**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

49

1    **exclusively with Zell, but talking with several**

2    **parties.**

3            Q.      Right.  That's what I thought too,

4    but as you sit here today you can't reconstruct

5    that by looking at the notes I gather?

6                    MR. GORDON:  Not to get in the way,

7    but I'm pretty sure that's how we produced them.

8                    MR. MONK:  I would assume that it

9    was as well.

10                   MR. GORDON:  Yeah.

11

12   BY MR. MONK:

13           Q.      So with counsel's representation

14   and our colloquy here, does that help you at all

15   in any way in sort of placing what's being

16   discussed there and why it says it's going to get

17   pretty skinny?

18           **A.      To be honest, not really.  I mean**

19   **it provides a better context, but --**

20           Q.      Did you consider the LBO

21   transaction involving Sam Zell a skinny

22   transaction?

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

50

1      A.      I think that's a broad question.

2      Q.      It is.

3      A.      You're sort of taking it from here

4  and then making it a very broad question so there

5  is a number of ways that you can look at.

6      Q.      I'm not trying to play games.

7      A.      No, no, no, I'm just kind of

8  asking are you asking me whether about the

9  projections?  Are you asking me about the

10 transaction, about the structure, about the debt?

11 There are so many pieces to that that --

12     Q.      Right.

13             Well, when we discussed this with

14 Christina she expressed to us the view that it

15 was tight I think was the word she used.

16             MR. GORDON:  But doable.

17     Q.      But doable.  Tight but doable.  I

18 heard it many times.  And I was wondering whether

19 skinny was the word that you used for the tight

20 but doable concept?

21     A.      Well, we're sort of jumping around

22 here because this is in February and that

51

1    transaction didn't even exist at this point in

2    time.

3          Q.      Right.

4          A.      So if you want my opinion I'll

5    tell you, but it's not in any way related to

6    these notes.

7          Q.      Okay.  Fair enough.

8          A.      I agree with Christina.  I think

9    it was a tight transaction.  There was positive

10   cash flow in this transaction when we, you know,

11   eventually when we got to the point where we were

12   analyzing the cash flows, we looked at the cash

13   flows of this transaction.  We looked at the cash

14   flows of other transactions.  At the end we were

15   comparing it to a recapitalization of the company

16   and of the broadcasting unit.  The cash flows of

17   this transaction, the one that was eventually

18   consummated versus that transaction were

19   relatively the same.  They were within a tight

20   bound of each other and, you know, I agree with

21   the notion that you put forth that Christina

22   said, it was a tight transaction, but, you know,

52

1    **we had comfort in the numbers.**

2          Q.      Right.

3                  Certainly as of April 1st when the

4    Citi's advice which you were working on was

5    presented to the board?

6          **A.      Correct.**

7          Q.      Correct?

8          **A.      Yes.**

9          Q.      Did you still have comfort in the

10   numbers in December of 2007?

11         **A.      I wasn't involved in December of**

12   **2007.**

13         Q.      Okay.

14                 You were involved in the fall of

15   2007, is that correct?

16                 MR. GORDON:  I don't mean to split

17   hairs, but I think there would be a difference

18   between her involvement with the company and her

19   involvement with the transaction.

20                 MR. MONK:  Correct.  And I was

21   going to explore that.  I was trying to get a time

22   frame.

53

1            MR. GORDON:  Yes.

2            MR. MONK:  I gathered from her last

3   answer that in the December time frame she had no

4   involvement?

5        A.    That's correct.  So let me back up

6   two steps.

7            One is I am in the M & A group and

8   I always partner with someone who is in the

9   coverage group.  What that means for what I'm

10  about to tell you is that I don't typically get

11  involved with financing, that's a broad concept,

12  but with the financing of transaction unless it's

13  related to the merger itself.

14

15  BY MR. MONK:

16        Q.    Okay.

17        A.    Functionally what that means is if

18  our company goes through a credit approval

19  process, if our group, you know, prepares a memo

20  that analyzes the credit of a particular

21  transaction or a particular company, I am not

22  involved in that.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

                                                                    54

1           Q.      All right.

2           A.      The industry group, in this case

3    it would have been media and telecom would have

4    gone through that.

5           Q.      Right, and who would those -- what

6    would be the names of those people?

7           A.      I don't have the names.  They

8    would be in the memos that were submitted.

9           Q.      Okay.

10          A.      So my name goes on the memo

11   because I'm associated with a transaction, but I

12   don't typically prepare a credit memo.

13          Q.      Right.

14          A.      And I'm not the person that's

15   sponsoring the credit.  If I'm on a call it's

16   because I'm giving facts or context about the

17   merger or, you know, the transaction itself.

18                  One of my other roles as you've

19   talked about is, as we've talked about is to help

20   prepare the model, work with the company to make

21   sure it's accurate, work with the company to make

22   sure that they're comfortable with the

55

1   construction of it and the output of it.  So when

2   the transaction was announced we'd obviously

3   spend a significant amount of time with the

4   client building the model, making sure it was

5   accurate, correct, all of those things.

6                   After it was announced there was

7   still work to be done on the financing and so we

8   continued to help the client maintain that model

9   so that they could for their own internal

10  purposes if they were talking about let's call it

11  a five percent interest rate or whatever it was,

12  they'd ask us to change the interest rate, we'd

13  type in five percent and we'd resend it back to

14  them so that they could see what the output was.

15                  So between April when we announced

16  the deal and call it whatever, maybe it was

17  August or something like that, we were working

18  with Chandler running various, you know, it could

19  be anything from, you know, very simple change

20  the interest rate to five percent and just

21  sending it back to him, that was my primary role

22  and I was not involved with the financing process

56

1    as being a lender in this transaction.

2             Q.      Okay.

3             A.      It was more like a favor to

4    Chandler because we had the expertise in running

5    the model.

6             Q.      Right.

7             A.      And the mechanics of the model.

8             Q.      I'm trying to go from -- just to

9    go back to my prior question, I think you said I

10   wasn't involved in December.

11            A.      Uh-huh.

12            Q.      You were involved in the period

13   October, September -- August, October and

14   September, those three months you were involved,

15   correct?

16            A.      In 2007?

17            Q.      2007.

18            A.      I'm not sure that we -- I don't

19   remember it extending -- at a certain point we

20   transitioned the model back to Chandler.

21            Q.      Okay.

22            A.      We gave it back to him so I don't

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

                                                                  57

 1    **remember if that was September, October or**

 2    **November, but at a certain point we kind of said**

 3    **why don't you run your own models and we gave it**

 4    **back to them.**

 5              Q.      All right.

 6              So we're going to look at some

 7    E-mails to try to place all that in time.

 8              **A.      Yeah.**

 9              Q.      You know, I think maybe our time

10    is a little off in our description.

11              **A.      Yeah.**

12              Q.      But we'll look at that together.

13              MR. GORDON:  I just asked her if it

14    was in quote whether that meant those were her

15    thoughts or somebody else was saying it.

16              MR. MONK:  Yes.

17              MR. GORDON:  I just -- because I

18    just think the record should be clear when we say

19    when it's, quote, difficulty maintaining our model

20    blah, blah, blah, I don't want the inference to be

21    that that's what --

22              THE WITNESS:  That I said it.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                             New York, NY

                                                                    58

1                    MR. GORDON:   That that's what Rosie

2      is saying.

3                    THE WITNESS:   When I --

4

5      BY MR. MONK:

6          Q.    So your personal habit is when you

7      put quotes around it you're literally quoting

8      what somebody else is saying?

9          **A.    What someone else said, yes.**

10         Q.    Okay.   Good.

11                   As we read the notes we'll look at

12     that.

13                   THE WITNESS:   Thank you.

14         Q.    Do you know who actually was

15     saying it's going to get pretty skinny?

16         **A.    I don't.   Honestly this looks like**

17     **my notes from, you know, various buyer groups so**

18     **a buyer could have said this, the company could**

19     **have said this.**

20         Q.    Okay.   All right.

21                   MR. GORDON:   I just want to make

22     sure we didn't.   Tight but doable I'll take.

59

1              MR. MONK:  All right.  Let's keep

2    moving here.

3              Do tab 37.

4

5    BY MR. MONK:

6         Q.    We'll do tab 37 which we will mark

7    as Exhibit Number 3.

8              MS. PICCARELLO:  (Indicating.)

9              COURT REPORTER:  (Complies.)

10             (Whereupon, one-page document

11   bearing Bates stamp CITI-TRIB-CC00094742, is

12   received and marked as Kurmaniak Exhibit 3 for

13   Identification.)

14             COURT REPORTER:  Number 3.

15             THE WITNESS:  Thank you.

16             MR. MONK:  All right.

17        **A.     (Reviews.)**

18

19   BY MR. MONK:

20        Q.    The first thing take a look at it.

21   Tell me when you're ready to talk.

22        **A.     Okay.**

60

1          Q.      All right.

2                  So let's just talk a little bit

3      about the document.

4                  Who is Jeffrey Roth?

5          **A.      Jeffrey Roth is an analyst that**

6      **works with me on my team.**

7          Q.      Okay.

8          **A.      He is physically in the**

9      **communications group, media and telecom.**

10         Q.      All right.  In --

11         **A.      Or was.**

12         Q.      In September of 2007 he was

13     working for you in connection with this

14     transaction?

15         **A.      Can I just be clear?**

16         Q.      Sure.

17         **A.      In connection with this**

18     **transaction, my viewpoint is that I stopped**

19     **working on this transaction in April.  I**

20     **continued to help run the models for the client**

21     **past that date.**

22         Q.      Right.  Okay.

Kurmaniak, Rosanne            CONFIDENTIAL                    July 7, 2010
                            New York, NY

61

1              A.      So when you say in connection with

2        this transaction, it's a little -- if I say

3        correct it's not really correct.

4              Q.      All right.

5                      And when you say April you're

6        referring to sort of the first closing of the

7        transaction?

8              A.      Correct.

9              Q.      Is that correct?

10             A.      Uh-huh.

11             Q.      So even though the board approved

12       it on April the 1st, it really doesn't close

13       until about June the 4th I think?

14             A.      Correct.

15             Q.      So you were working sort of

16       through that early June period on this and then,

17       then in your mind your assignment to advise the

18       company which is what you were assigned to do

19       stopped, is that right?

20             A.      That's correct.

21             Q.      And then any involvement after

22       that was as done as an accommodation to Chandler

62

1    Bigelow and the client, is that -- am I correct

2    in understanding your role after that?

3              **A.      I think that's correct.**

4              Q.      Okay.

5              In --

6              MR. KLEE:  Let me interrupt,

7    please.

8              Her testimony was that she stopped

9    working on the transaction in April.  You just

10   said that she worked on it through June 4th.  I'd

11   like to get her words when she stopped working on

12   the transaction.

13             THE WITNESS:  The transaction was

14   announced in April.  Typically what I do is I'll

15   also -- for example, in this circumstance there

16   was a proxy.  The proxy was produced post the

17   announcement, so I continued to work on a

18   transaction until we've done all the work related

19   to it, but the majority of the work comes before

20   the board makes its decision to enter into the

21   transaction.  So if I had to allocate my time I'd

22   say the majority of it was spent prior to April,

Kurmaniak, Rosanne           CONFIDENTIAL                July 7, 2010
                              New York, NY

63

1    but if there was work that, you know, follow-up

2    work between announcement and closing that was

3    required of me, for example, filing of the

4    proxies, helping with the rating agencies, things

5    like that, I would also do that as well.

6    BY MR. MONK:

7           Q.     And you say will --

8                  MR. KLEE:  Thank you.

9           Q.     Just to follow up with Ken's

10   question, you say would also, do you remember in

11   connection with this transaction doing that kind

12   of work after April the 1st?

13          **A.     Yes.**

14          Q.     All right.

15                 Now, this document that you're

16   looking at which is Kurmaniak number 3 --

17          **A.     Uh-huh.**

18          Q.     -- is a September 19th E-mail

19   chain 2007 and I'd like to get an idea of what,

20   what your recollection is of what this is about,

21   please.

22          **A.     What it looks like to me is again**

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

64

1    as I'd explained we were helping the company run

2    the models for him for Chandler.  As part of that

3    we would design certain output pages that could

4    be used to show other pages.  One of them was a

5    calculation of where -- of how to get to, for

6    example, a metric that was used or going to be

7    used as part of measuring whether the covenants

8    were, you know, showing what the output of, for

9    example, back to EBITDA would be which ended up

10   being a covenant in the bank agreement.  So we

11   would generate the model with an output that has

12   the projections, the resulting metrics, debt to

13   EBITDA.

14          Q.      Uh-huh.

15          A.      EBITDA, the interest.  That output

16   would then be sent to the various constituencies

17   that need it, in this case VRC and the banks.

18          Q.      Okay.

19          A.      So there was working mechanics and

20   then there were output pages in the model that we

21   were running.

22          Q.      Right.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

65

1                        So just to take that bottom half

2    of the E-mail first, Jeffrey Roth is an, is an

3    analyst --

4            **A.        Yes.**

5            Q.        -- working with you at the time?

6            **A.        Yes.**

7            Q.        Correct?

8            **A.        Correct.**

9            Q.        We know who Chandler Bigelow is.

10   Naomi Sachs works for Chandler Bigelow, is that

11   correct?

12           **A.        Yes.**

13           Q.        At Tribune?

14           **A.        Yes.**

15           Q.        And what was her title?  Do you

16   know what her title was at Tribune?

17           **A.        I do not.**

18           Q.        Okay.

19                      Did she work on the model or

20   provide data?  Was she that level or was she a

21   management level person?  Do you know?

22           **A.        She worked on the model and**

66

1    **provided data.**

2          Q.      Okay.

3                  I know who Kurmaniak is.  Udi

4    Zuckerman?

5          **A.      Udi was an associate that was**

6    **working on my team.**

7          Q.      All right.  At that time worked in

8    connection with --

9          **A.      The model.**

10         Q.      -- the model?

11         **A.      Yes.**

12         Q.      Michael Scardigli?

13         **A.      Michael was another analyst on the**

14   **project working on the model at the time of**

15   **this --**

16         Q.      All right.

17         **A.      -- E-mail.**

18         Q.      Now, the top E-mail involves all

19   of those same people?

20         **A.      Uh-huh.**

21         Q.      And it's from Chandler and he

22   says:  I'm having a change of heart on the output

67

1    pages.  I think we should include them in the

2    model file that we plan to electronically send to

3    VRC and the banks tomorrow morning.  This is

4    addressed to Jeffrey Roth and Naomi Sachs.

5                    Jeffrey Roth works for you at the

6    time?

7            A.      **Correct.**

8            Q.      Correct?

9            A.      **Yes.**

10           Q.      You respond to this E-mail at the

11   top.

12                   Why do you respond to the E-mail

13   addressed to your analyst?

14           A.      **This isn't a hard question.  Are**

15   **you asking me why I would respond instead of my**

16   **analyst or are you just asking me what I mean by**

17   **what I say?**

18           Q.      Yeah.

19                   Now, why are you responding

20   instead of your analyst?

21           A.      **Oh, sometimes I do that.**

22           Q.      Okay.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

68

1          **A.        This is a different topic related**

2     **to the timing of when he needed the pages by.**

3          Q.     So were you --

4                 MS. PICCARELLO:  We can't hear you,

5     Ken.

6                 MR. KLEE:  I have a follow-up

7     question to ask.

8                 THE WITNESS:  Uh-huh.

9                 MR. KLEE:  I turned it off.  I

10    didn't want the feedback which we were getting.

11                The follow-up question is it looks

12    like in the bottom E-mail that Jeffrey Roth is

13    saying that he's asking whether Chandler wants the

14    various cases toggled through and then Chandler

15    Bigelow answers by saying:  I would still like to

16    exclude the other worksheets and the two operating

17    scenarios.

18                Do you understand this to mean that

19    Chandler Bigelow is making a determination not to

20    provide a toggled model that has all three

21    scenarios, but only the base case scenario?

22                THE WITNESS:  No, I interpret this

Kurmaniak, Rosanne        CONFIDENTIAL              July 7, 2010
New York, NY

69

1    to be that he's just making a decision of what

2    output pages to show to the various people.  I

3    don't look at this and say he was excluding

4    certain information.  This looks like a

5    discussion --

6                    MR. KLEE:  What does the

7    parenthetical mean and the two operating

8    scenarios?

9                    THE WITNESS:  I don't know.

10                   MR. KLEE:  Well, let's go back to

11   Mr. Roth's E-mail when he says:  Please let us

12   know if you would like us to send you the various

13   cases toggled through.

14                   What does it mean to send cases

15   toggled through?

16                   THE WITNESS:  So in the model there

17   was -- when -- when we like to functionally switch

18   from one case to another case to another case so,

19   for example, in the proxy there were various

20   scenarios that the company had given us and those

21   scenarios were minus two percent revenue growth

22   for publishing, zero percent revenue growth for

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

70

1    broadcasting.  There was a second case that I

2    thought was minus three and minus one or something

3    like that.  So functionally when we build a model

4    so that we don't have to retype the numbers every

5    single time we create what's called a toggle.

6    That toggle is assigned, is referencing to when

7    you want to change the case you create a little

8    formula that says if this toggle is set to Number

9    1 I'll run this case and all those numbers will

10   run through the model.

11                If the toggle is set to Number 2 it

12   substitutes the first set of projections for the

13   second set of projections.  So the word toggle is

14   referring to changing the cases and, you know,

15   being able to switch them back and forth.

16                I just -- from this E-mail I don't

17   have the context to know what cases those actually

18   were.

19

20   BY MR. MONK:

21        Q.    Reference --

22                MR. KLEE:  But whatever cases they

71

1    were, Mr. Roth is asking whether the model should

2    be sent with the various cases toggled through and

3    how do you interpret Chandler Bigelow's response

4    to his question?

5                    THE WITNESS:  I -- to be honest I

6    don't have an interpretation.

7                    MR. KLEE:  Okay.  That's fine.

8                    MR. GORDON:  Off the record.

9                    (Whereupon, a discussion is held

10   off the record.)

11                   MR. GORDON:  Let's go back on the

12   record.

13                   THE WITNESS:  So we were just

14   discussing, at this point in time Chandler was

15   asking us to do a lot of different things.  It

16   could have been the gamut of change the interest

17   rate, change the shares, change the leverage,

18   change the debts, it could have been any number of

19   changes or operating scenarios.  So if I read the

20   sentence literally it says he doesn't want to

21   include -- there were a number of sheets within

22   the model that were backup that he didn't want to

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

72

1   include all that detail when he was sending it to

2   other people and that, you know, the two operating

3   scenarios that were contained within the model, he

4   just didn't want to share with other people.  I

5   just -- I'm struggling with I don't remember what

6   these operating scenarios were.  It could have

7   been anything from a different set of projections

8   to five percent instead of six percent and

9   sometimes he would just say, you know, I'd just

10  like to see what it looks like if I did this or

11  that.  So it just was so broad of -- the requests

12  were so broad at the time that we can read the

13  sentence literally and say he doesn't want to send

14  the sheets and these operating scenarios out

15  because they were too detailed or whatever the

16  reason was, but I just don't recall what it was.

17               MR. MONK:  Okay.

18

19  BY MR. MONK:

20        Q.     Do you recall that he was

21  consulting with you and seeking your advice as to

22  whether he should send out sheets with other

Henderson Legal Services, Inc.

Kurmaniak, Rosanne        CONFIDENTIAL                July 7, 2010
New York, NY

73

1    scenarios in them?

2          **A.      No.**

3          Q.      Okay.

4                During that period of time were

5    you giving him advice regarding what should be

6    included in the model or what should not be

7    included in the model?

8                MR. GORDON:  Her personally or the

9    Citigroup?

10               MR. MONK:  Well, her personally and

11   then we can expand it to Citi.

12         **A.      No.**

13

14   BY MR. MONK:

15         Q.      What's the answer to the larger

16   question, was anybody in your group or on your

17   side of the wall if I could describe it that way

18   at Citi giving advice to Chandler Bigelow or Don

19   Grenesko about what they should include in their

20   model as they were working through this time

21   period in September of 2007, these various

22   scenarios?

Kurmaniak, Rosanne        CONFIDENTIAL              July 7, 2010
                          New York, NY

74

1            **A.      It's possible that they could have**

2    **been, that they could have.   If they were I was**

3    **not involved in it.**

4            Q.     Okay.

5                   And nobody mentioned to you that

6    they were doing that?

7            **A.      Correct.**

8            Q.     Correct?  Okay.

9                   I'm going to back up a little bit.

10   I'm going to go back to March 27th.  So I'm going

11   to show you what we'll mark as Exhibit Number 4.

12                  MS. PICCARELLO:  (Indicating.)

13                  COURT REPORTER:  (Complies.)

14                  (Whereupon, multi-page document

15   bearing Bates stamps CITI-TRIB-CC 00038428

16   through CITI-TRIB-CC 00038430, is received and

17   marked as Kurmaniak Exhibit 4 for

18   Identification.)

19                  COURT REPORTER:  Number 4.

20                  MR. KLEE:  Which tab?

21                  MR. MONK:  Tab 10, Ken.  I'm sorry.

22   All right.

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

75

1          **A.          (Reviews.)**

2

3     BY MR. MONK:

4          Q.     So we've established who Scardigli

5     is and this is addressed -- it's an E-mail from

6     Michael to Christina in which you're copied and

7     the subject is diligence materials.

8          **A.          Yes.**

9          Q.     Are you with me?

10         **A.          Yes.**

11         Q.     And if you -- and then I guess if

12    you turn to the next page can you tell me what

13    these diligence material are?

14         **A.          Yes.  When -- these were financial**

15    **output sheets that were provided by Tribune.**

16         Q.     Okay.  And the timing here is

17    March 27th, that's right before the rating

18    agencies issued their private letter I guess it's

19    the phrase that's used, am I correct?

20         **A.          Correct.**

21         Q.     All right.

22                So were these materials collected

76

1    in connection with that process?  Were you

2    helping with the process of getting the rating

3    agencies private letters out, providing

4    information, that kind of thing?

5              A.     Yes.

6              Q.     Okay.  Would you turn to --

7                     THE WITNESS:  This is the writing

8    for that?

9                     MR. GORDON:  I don't know.

10                    MR. MONK:  I don't know.

11

12    BY MR. MONK:

13             Q.     Was this related to that?

14             A.     I don't, I don't see from what

15    you've given me that that was in any way related

16    to rating agencies.

17             Q.     Okay.

18             A.     It might have been coincidental.

19             Q.     It may have happened at that same

20    point in time.

21             A.     Right.

22             Q.     But this may or may not be related

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

77

1    to it.  All right.

2              So am I correct in understanding

3    that Page 429 and 430 are materials provided to

4    Citi your group from the company?

5         A.      Correct.

6         Q.      Correct?  Okay.

7              What is the company's, what is

8    this information?  What are they providing to

9    you?  Describe it for me, please.

10        A.      They are providing the five-year

11   projections for their business units, publishing

12   and broadcasting and entertainment.  So they're

13   providing us with the financial detail that would

14   eventually get flowed into a model that we were

15   using that would generate our -- a more

16   detailed -- we'd run it through a debt schedule,

17   an interest calculation schedule, things of that

18   nature.

19              So we would usually -- generally

20   when we were sent these things from the client,

21   we would type in, you know, publishing revenues

22   at 4025, 3946.  We'd enter those numbers into our

78

1    **model.  We'd enter in the operating cash**

2    **expenses, the operating cash flow, all these**

3    **would be inputted into our model and it would**

4    **generate a set of financials for the company.**

5            Q.      All right.

6                    Now, just help me interpret the

7    document for a second if you would.

8                    Under operating revenues

9    publishing obviously 2006 by this point in time

10   February, March of 2007 is a known number.

11   That's actual publishing revenues?

12           **A.      Uh-huh.**

13           Q.      Correct?

14           **A.      Correct.**

15           Q.      And 2007 would be an estimated

16   number?

17           **A.      Correct.**

18           Q.      Correct?  And that's true through

19   2011.  Those are the company's current estimates

20   that they're providing to you --

21           **A.      Correct.**

22           Q.      -- for those years for publishing?

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
New York, NY

79

1          **A.      And then on the upper right-hand**

2     **corner this was the summary of the scenario they**

3     **were running which was the publishing ad revenue**

4     **was declining by two percent.  That's in**

5     **reference to the projected periods and the**

6     **broadcasting and entertainment operating cash**

7     **flow OCF was flat.**

8          Q.      Okay.

9                  So this was the company providing

10    you with two different -- with a case here?

11         **A.      With a case, right.**

12         Q.      And in this particular case the

13    publishing revenues are down two percent in each

14    of the '06 to '10, '07 to '11 and '06 to '11,

15    correct?

16         **A.      Correct.**

17         Q.      Okay.

18                 Capital expenditures on that page,

19    it lists publishing capital expenditures for 2006

20    at a hundred and seventy-three million dollars,

21    correct?

22         **A.      Yes.**

80

1          Q.       And then it projects capital

2    expenditures for 2007 at a hundred and forty

3    million and then provides capital expenditures

4    for each of the following three years declining

5    from the one forty to one twenty and then down to

6    one hundred?

7          **A.       Yes.**

8          Q.       And then it stays at one hundred?

9          **A.       Yes.**

10         Q.       Do you have knowledge about what

11   these capital expenditures involved?  What was

12   the company making capital expenditures in

13   regard?

14         **A.       I don't have knowledge of that.**

15         Q.       Okay.

16                  Was there a discussion about

17   investing in interactive businesses that you

18   recall during this period of time in any way?

19         **A.       No.**

20         Q.       Okay.

21                  MR. GORDON:  No, there wasn't or

22   no, you don't recall?

81

1              THE WITNESS:  I don't recall

2    discussions regarding investments in interactive.

3              MR. GORDON:  Okay.  All right.

4              MR. MONK:  Turn to tab 11, Ken.

5              MS. PICCARELLO:  (Indicating.)

6              (Whereupon, multi-page document

7    bearing Bates stamps CITI-TRIB-CC 00171977

8    through CITI-TRIB-CC 00172025, is received and

9    marked as Kurmaniak Exhibit 5 for

10   Identification.)

11             COURT REPORTER:  Number 5.

12             THE WITNESS:  Thank you.

13             MR. MONK:  All right.

14        **A.     (Reviews.)**

15

16   BY MR. MONK:

17        Q.     So this is now May the 5th of

18   2007?

19        **A.     Uh-huh.**

20        Q.     An E-mail from you to Christina

21   and other people forwarding preliminary solvency

22   analysis.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

82

1               Do you recall these events

2     relating, that are being related in this E-mail?

3          A.    Can I look at it?

4          Q.    Sure, please.  Look at the whole

5     document.

6               MR. KLEE:  Did you mark this as

7     Kurmaniak 5?

8               MR. MONK:  Yes.

9          A.    Yes, I do recall this.

10

11    BY MR. MONK:

12         Q.    Okay.  What do you recall?

13         A.    There were two solvency firms that

14    were hired in connection with the transaction.

15    This is VRC.  The other one was Duff & Phelps.

16               With respect to VRC, I only recall

17    receiving it, may be looking at it.  I don't

18    recall doing a lot with this.

19         Q.    All right.

20               Did you provide to VRC the model

21    that Citi had prepared up to that point in time

22    in connection with the transaction?

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

83

1        **A.        I don't recall whether I did it or**

2   **Chandler did it.   I do know that it was given to**

3   **VRC.**

4        Q.        And when you say it, the model

5   that was prepared under your direction was the

6   model that was given to VRC?

7        **A.        Correct.**

8        Q.        Correct?   Okay.

9                  Now, let's just go ahead and look

10  at tab 12 which we'll mark as --

11                 MS. PICCARELLO:   6.

12                 MR. MONK:  -- Number 6.

13                 MR. GORDON:  Can I just make sure

14  she said --

15                 MR. MONK:  Sure.

16                 MR. GORDON:  You said Duff & Phelps

17  related to this transaction, was it this

18  transaction or the re-- this can be off the

19  record.

20                 (Whereupon, a discussion is held

21  off the record.)

22                 MR. GORDON:  Let's go back on the

Henderson Legal Services, Inc.

84

1    record.

2                        COURT REPORTER:  Number 6.

3                        (Whereupon, multi-page document

4    bearing Bates stamps CITI-TRIB-CC 00103592

5    through CITI-TRIB-CC 00103601, is received and

6    marked as Kurmaniak Exhibit 6 for

7    Identification.)

8

9    BY MR. MONK:

10            Q.     Would you take a look at Number 6

11   and see whether you can recognize the handwriting

12   on the attachment for me, please?

13            **A.     (Reviews.)**

14                     MR. KLEE:  Which tab is this?

15                     MR. MONK:  It's tab 12.

16            **A.     This is my handwriting.  This is**

17   **my handwriting.**

18

19   BY MR. MONK:

20            Q.     All right.

21                     And this is your handwriting

22   commenting on the VRC draft, is that correct?

Kurmaniak, Rosanne        CONFIDENTIAL              July 7, 2010
                            New York, NY

85

1          **A.       Correct.**

2          Q.       Having seen that does that refresh

3    your recollection as to what involvement you had

4    in connection with the VRC draft solvency opinion

5    at Stage 1?

6          **A.       Yes, I mean they gave us a draft**

7    **which you see in this E-mail.**

8          Q.       They VRC when you're referring

9    to --

10         **A.       So Kurmaniak Exhibit 5 is an**

11   **E-mail where the preliminary report was provided**

12   **from Chandler to Dan Kazan and Dan Kazan had**

13   **forwarded to it myself, to Michael O'Grady and**

14   **c.c.'ed Chandler.  So that preliminary report was**

15   **received from the company and given to myself and**

16   **Merrill Lynch and then this top E-mail is me**

17   **passing it along to the rest of my team**

18   **internally.**

19         Q.       All right.

20         **A.       The request came from the company**

21   **to review it.  That's the first sentence for your**

22   **review.  Sorry, I was just telling my team to**

Kurmaniak, Rosanne        CONFIDENTIAL              July 7, 2010
New York, NY

86

1   review it.

2              We were asked by Chandler to take

3   a look at it and give any comments that we had.

4   My -- the second document which is Kurmaniak

5   Exhibit 6 reflects the comments that I had to the

6   document once I had received it and reviewed it.

7        Q.     All right.

8              And who did you send those

9   comments to?

10       A.     I sent them to Chandler and Dan

11  Kazan.

12       Q.     All right.

13             And did you have any direct

14  communications at this point in time with anyone

15  from VRC?

16       A.     Honestly I remember having direct

17  communications with Duff & Phelps.  Those direct

18  communications were for me to walk them through

19  the model, the mechanics of it and how to use it.

20       Q.     All right.

21       A.     And so I may have had a similar

22  type of conversation with VRC.  So, you know, we

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

87

1    did the model.  It would have gotten passed over

2    to them.  They would have looked at it, reviewed

3    it and if they had any questions about it mostly

4    this was related to the mechanics of the model,

5    how do I run it, how do I switch the toggles, why

6    is this here, why is that there, things like

7    that, we would get on the phone with them.  We

8    would answer those questions and then they would

9    go and do their work.  So my interaction was

10   limited to mechanics and not what you'd be

11   referring to which is my opinion is X, my opinion

12   is Y.

13        Q.    Just let me ask the questions.

14   You don't know what I'm referring to.

15        **A.    Sorry.**

16        Q.    So I really -- my question was did

17   you have any interaction with VRC.  You answered

18   the question by saying, you know, I may have had.

19             As you sit here today do you have

20   a recollection that you actually did have those

21   kinds, the kinds of conversations that you

22   referred to with the VRC people?

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

88

1            **A.        Honestly I don't.**

2            Q.        Okay.

3            **A.        I recall Duff & Phelps.  I don't**

4    **recall VRC.**

5            Q.        All right.

6                      If you look at Number 5 for a

7    second and you go to Page 995, Bates Number 995

8    the last three digits.

9            **A.        In Number 5, right?**

10           Q.        In Number 5, yes.

11           **A.        995?**

12           Q.        Yes.

13                     MR. GORDON:  I think we're looking

14   at maybe two different documents.  Which one are

15   you in?  I think you might be in the wrong --

16                     THE WITNESS:  I thought he said 5.

17                     MR. GORDON:  Right.  So 995.

18

19   BY MR. MONK:

20           Q.        It's the original VRC draft.

21           **A.        Yeah.**

22                     MR. GORDON:  I'm with you now.

Henderson Legal Services, Inc.

Kurmaniak, Rosanne          CONFIDENTIAL              July 7, 2010
                            New York, NY

89

1          Q.      It's Page 18 of the preliminary

2    draft and I think the last four digits are 995,

3    but my eyes aren't great.

4          **A.      Uh-huh.**

5          Q.      All right?  Are you with me?

6          **A.      Yes.**

7          Q.      All right.

8                  The first thing I notice that the

9    sensitivity cash flow test which is on this page

10   runs out through 2013, is that correct?

11         **A.      Correct.**

12         Q.      And, in fact, all of the

13   evaluations in this first VRC solvency analysis

14   are through 2013.

15                 Do you want to just look and if

16   you turn to Page 989, for instance, this base

17   cash, base case cash flow test.

18         **A.      Yes.  It looks to be that way,**

19   **yes.**

20         Q.      Right.

21                 So I just would like to get your

22   understanding that in VRC's first analysis they

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

90

1    were relying upon five-year projections alone and

2    not looking beyond five years for the company, is

3    that correct?

4          **A.     I don't know what they were**

5    **relying upon.  I only see that on the page it**

6    **goes to 2013.**

7          Q.     Okay.

8                 Based upon any of the work that

9    you did in connection with it, do you have any

10   understanding as to whether they were looking at

11   five years or ten-year projections?

12         **A.     I do not.**

13         Q.     Do you --

14         **A.     I do not have an understanding --**

15   **I do not know what they did or didn't do.**

16         Q.     Do you -- in preparing the model

17   with the company and working with Chandler

18   Bigelow for the first stage, do you recall

19   working on the projections for the second

20   five-year period?

21         **A.     I don't.  They were in the model,**

22   **but I don't recall how we, how we derived them.**

Kurmaniak, Rosanne         CONFIDENTIAL                July 7, 2010
                            New York, NY

91

1          Q.      All right.

2                  The comments on Exhibit 6, were

3     they prepared in conjunction with others on your

4     team or were these your own comments?

5          **A.      I believe these were my own**

6     **comments.**

7          Q.      Did you form a view as to the

8     adequacy of VRC's work when you undertook this

9     review at Stage 1?

10         **A.      I did not.**

11         Q.      Did you share your comments

12    regarding VRC's draft with anyone outside of the

13    M & A team?

14         **A.      I did not.**

15         Q.      There were people from Citi --

16                 MR. KLEE:  I'm sorry, Charlie, I'm

17    having a problem hearing the witness' answers.  I

18    didn't hear the answer to the question did she

19    have a view on the adequacy of VRC's work or did

20    she share her comments.

21                 MR. GORDON:  I think the answer was

22    the same for both.  I did not is what she said.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

92

1              MR. KLEE:  Thank you.

2              THE WITNESS:  Correct.

3

4    BY MR. MONK:

5         Q.     You're very soft spoken.

6         **A.     I hear you.  I have trouble with**

7    **taxi drivers too.**

8         Q.     There was a Citi team that was

9    working on the financing for the Stage 1

10   transaction, correct?

11        **A.     Correct.**

12        Q.     Did you discuss with the Citi team

13   working on the financing at Stage 1 any aspects

14   or any comments about the VRC solvency analysis

15   at Stage 1?

16        **A.     I did not.**

17        Q.     Did anyone from that team ask your

18   comments or advice regarding the VRC solvency

19   analysis at Stage 1?

20        **A.     No, they did not.**

21        Q.     If you look at Number 5 --

22        **A.     Uh-huh, the other exhibit?**

Kurmaniak, Rosanne          CONFIDENTIAL                  July 7, 2010
                             New York, NY

93

1          Q.     Is that the may -- for some reason
2    I didn't write that --
3                 MR. HALL:  Number 6.
4          Q.     I'm sorry.  I'm actually asking
5    you to look at Number 6.
6          **A.     Okay.**
7          Q.     If you look at Number 6 you gave
8    your comments to Chandler Bigelow, correct?
9          **A.     Correct.**
10         Q.     Do you know whether Chandler
11   Bigelow forwarded those comments on to anyone?
12         **A.     I do not know whether he did or**
13   **didn't.**
14         Q.     Did you ever hear back from anyone
15   at VRC about your comments, did they raise any
16   questions with you possibly about your comments?
17         **A.     No.**
18         Q.     Okay.
19                MR. GORDON:  Is this a good time to
20   take like a two-second bathroom break?
21                MR. MONK:  Yes.  Perfect.
22                (Whereupon, a short recess is

94

1   taken.)

2                    MR. MONK:  Let's go back on the

3   record.

4

5   BY MR. MONK:

6         Q.    I'd like to turn to Exhibit Number

7   6, please.

8         **A.     Okay.**

9         Q.     And would you look at the E-mail

10  string working from the bottom up.  This is the

11  E-mail from you to Chandler and Daniel Kazan,

12  right?

13        **A.     (Indicating.)**

14        Q.     Subject EBITDA numbers.

15               Do you recall doing any analysis

16  of the EBITDA numbers in the VRC opinion?  Or

17  draft that you were looking at?

18        **A.     What I would have done is I would**

19  **have looked at the numbers that VRC produced and**

20  **check them with the numbers in our own model to**

21  **make sure that the two were consistent.**

22        Q.     All right.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

                                                                95

1          A.      So because we had sent them a

2     model I wanted to make sure that what -- that

3     they properly were using our model correctly.

4          Q.     All right.

5          A.      So, for example, there is -- in

6     this particular case there is EBITDA and adjusted

7     EBITDA.

8                  Adjusted EBITDA included an add

9     back for the equity investments.  So I would have

10    looked at -- I did look at the VRC report to make

11    sure that when they were looking at EBITDA they

12    appropriately captured the equity investments.

13         Q.     All right.

14         A.      So my primary focus when I was

15    looking through their report was mechanically

16    were they capturing the right numbers.

17         Q.     All right.

18                Do you recall that Chandler got

19    back to you with respect to the question you were

20    raising at the bottom, in this bottom E-mail?

21         A.      I don't recall whether he did or

22    didn't.  I don't.

Kurmaniak, Rosanne         CONFIDENTIAL              July 7, 2010
                            New York, NY

96

1        Q.      Was it your concern that VRC use

2    correct numbers out of your model in preparing

3    the solvency opinion?

4        **A.      Yes.  I wanted to make sure that**

5    **the model that I gave them, they were using it**

6    **properly.  If they were running the management**

7    **case that they appropriately understood the model**

8    **and they were reflecting it in their own models.**

9        Q.      All right.

10               Now, this, this is your review of

11   the draft?

12       **A.      Correct.**

13       Q.      Referring to Exhibit Number 6

14   here?

15       **A.      Correct.**

16       Q.      Do you remember reviewing the

17   final VRC analysis at Stage 1?

18       **A.      No, I don't.**

19               MR. GORDON:  You don't remember or

20   you didn't do it?

21               THE WITNESS:  I don't remember.

22               MR. KLEE:  I have a couple of

97

1    follow-up questions, please.

2                    THE WITNESS:  Sure.

3                    MR. KLEE:  Looking at Kurmaniak 6

4    at the bottom E-mail dated May 7th, 2007, this is

5    right around the time of the first VRC opinion

6    which I think is rendered on May 9th, 2007, you

7    say here:  I'm worried that they are mixing some

8    numbers up.

9                    What was your specific concern with

10   that comment?

11                   MR. GORDON:  If you want to flip

12   through and look at the comments.

13                   THE WITNESS:  Yeah.

14                   It looks like based on my E-mail

15   that I was trying to do a calculation of what the

16   LTM EBITDA was and I was worried that they weren't

17   calculating it properly.  For example, on the page

18   that has the last three digits 594, on the upper

19   right-hand corner I've made some markings here

20   about the LTM EBITDA, the calendar year EBITDA and

21   the next fiscal year EBITDA that's the first three

22   lines there.  I have questions about whether

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                             New York, NY

98

1   they're using 3/31/07 or 12/31/06.  I have

2   questions about whether they were including

3   sixty-four million of cash flow.  I think that was

4   related to either Cubs or Comcast, one of the

5   equity investments.  So again there is a

6   reconciliation between EBITDA and adjusted EBITDA

7   and adjusted EBITDA you need to include certain

8   cash flow items and so, you know, I was trying to

9   help reconcile some of the numbers that VRC is

10  using versus some of the numbers that we were

11  using in our own calculations of these same

12  numbers.

13          MR. KLEE:  And what was the

14  particular worry that you had?

15          THE WITNESS:  That their, VRC's

16  number wasn't matching our own number for that

17  same, you know, if they were looking at LTM EBITDA

18  and they were getting 1336, my concern was that we

19  were getting a different number call it 1330 or

20  1335.  So my review was mechanical review of for

21  the numbers that I calculate is VRC calculating in

22  the same way and are we coming to the same

99

1    numbers?

2                    MR. KLEE:  Did you have a worry

3    that what VRC was doing was wrong?

4                    THE WITNESS:  No, other than to say

5    if I thought that they should have included

6    sixty-four million of cash flow then that's the

7    comment that I made and I made a comment here

8    there was sixty-four million of cash flow in 2006.

9    So I would go back and I would say I think you

10   should include the sixty-four million.

11                   So there might be a number or two

12   where I was worried that they might be not

13   calculating it right.  I didn't have a worry that

14   VRC was doing things wrong.

15                   MR. KLEE:  Go ahead, Charlie.

16                   MR. MONK:  I'd like you to look at

17   tab 14, Ken.

18                   MS. PICCARELLO:  (Indicating.)

19                   Mark this as 7, please.

20                   MR. MONK:  Which we're going to

21   mark as Exhibit Number 7?

22                   MS. PICCARELLO:  Yeah.

Kurmaniak, Rosanne         CONFIDENTIAL                    July 7, 2010
New York, NY

100

1                    (Whereupon, multi-page document

2       bearing Bates stamps TRB0147215 through

3       TRB0147296, is received and marked as Kurmaniak

4       Exhibit 7 for Identification.)

5                    COURT REPORTER:  Number 7.

6                    MR. KLEE:  Is this 15?

7                    MR. MONK:  14.

8                    MS. PICCARELLO:  14.

9                    MR. KLEE:  Thank you.

10           **A.       (Reviews.)**

11

12      BY MR. MONK:

13           Q.       This is an E-mail from Naomi Sachs

14      which we established earlier works for Chandler

15      at Tribune --

16           **A.       Uh-huh.**

17           Q.       -- to you and Michael O'Grady.

18           **A.       Uh-huh.**

19           Q.       And who is Michael O'Grady at

20      Merrill Lynch?

21           **A.       Michael O'Grady was the managing**

22      **director in the Chicago office.**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

                                                                      101

 1          Q.      Copied to Dan Kazan and Chandler

 2     Bigelow.

 3                  Do you remember receiving this

 4     E-mail?

 5          **A.      I don't remember receiving it.**

 6          Q.      All right.

 7                  In time it follows I believe, this

 8     is your E-mail Number 5 was on Saturday, May the

 9     5th and this is Monday, May the 7th?

10          **A.      Uh-huh.**

11          Q.      And so Naomi is getting back to

12     you and saying:  Looking through the E-mails

13     below I did ask them earlier today about the cash

14     equity income.  They were confused with some of

15     the numbers.  I think they were pulling an '07

16     number from the model that backed out the Cubs

17     Comcast income in one place.

18          **A.      Uh-huh.**

19          Q.      We are confirming the numbers with

20     them.  They were also waiting for an LTN cash

21     equity income number, Naomi.

22                  Now, she attaches to that E-mail

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                           New York, NY

                                                                    102

1    which she sent to you the spreadsheet which

2    provides more detail.

3              **A.       The attachment looks to be the**

4    **model, the model that we're all talking about.**

5              Q.       Okay.  So the attachment is your

6    model?

7              **A.       Correct.**

8              Q.       Is that correct?

9              **A.       It looks like that, yes.**

10             Q.       Okay.  Good.

11             **A.       Yeah.**

12             Q.       All right.

13                      Now, on Number 7 in the E-mail in

14   the top --

15             **A.       Uh-huh.**

16             Q.       -- the third E-mail down is an

17   E-mail from you to Michael O'Grady, Chandler and

18   Dan with additional comments by you regarding the

19   numbers?

20             **A.       Uh-huh.**

21             Q.       Can you tell us what you're

22   commenting about there, please, and why.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

103

1          A.      It looks to be the case that VRC

2    had a set of projections that they developed on

3    their own and I was comparing their set of

4    projections to what's referred to here, referred

5    to here as the management case which would have

6    been Tribune's projections of, you know, based on

7    management projections and another case that

8    management had developed which was a down two

9    percent case.

10              These are generally referring to I

11   think down two percent with a minus two percent

12   revenue on publishing, but the E-mail is

13   generally just saying here is the old projections

14   and based on what I see in this valuation report

15   they've developed their own set of projections

16   which, you know, compares their CAGR and your

17   CAGR and so I'm just giving you an FYI this is

18   how their case turns out relative to your own two

19   cases.

20          Q.      But did you get any explanation as

21   to why VRC had chosen a different downside CAGR

22   percentage than management had chosen?

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

104

1          **A.      I did not.**

2          Q.      Did you inquire of anybody as to

3    why they had chosen, you brought it to Chandler's

4    attention, did you inquire why they were using a

5    different downside than management was using?

6          **A.      Well, I mean in this case it says**

7    **calc'ed the management case OCF to have a**

8    **positive CAGR which is plus one point seven and**

9    **the down two percent case to have a three point,**

10   **minus three point six and then I'm making a note**

11   **that their projections fall somewhere in between.**

12         Q.      Right.

13         **A.      So there is this case and this**

14   **case and then VRC is in the middle.  So I don't,**

15   **I don't think that there would have been a reason**

16   **to inquire further about it.  I was just making a**

17   **note that it seems to fall in between the two**

18   **cases.**

19         Q.      Okay.

20                 Do you have any idea why VRC would

21   choose not to follow management's downside case

22   and strike a downside case someplace in the

105

1   middle as you described it?

2        A.     I didn't.  We just -- I didn't

3   have a dialogue with VRC.

4        Q.     As you sit here today do you know

5   what the implication of that would be from the

6   solvency perspective?

7        A.     Of them choosing a different set

8   of projections?

9        Q.     Right, not as draconian as

10  management's downside?

11       A.     I mean there is two cases here and

12  one is better than a case that management

13  projected and one is worse than a management

14  case.  So it seemed to fall in the middle.  I

15  understand what you're asking me which is they

16  produced a report, a solvency report that was

17  based on a certain, their set of projections that

18  were different than management.

19       Q.     Right.  Why would they do that?

20  Do you know?

21       A.     So that they could sensitize the

22  projections.

Kurmaniak, Rosanne        CONFIDENTIAL              July 7, 2010
                          New York, NY

                                                              106

1           Q.      Okay.

2                   Do you know whether it would be

3    easier or -- let me try it again.

4                   Is it more likely the company

5    would be insolvent in the case that VRC chose,

6    the downside case that VRC chose or the downside

7    case that management chose?

8           **A.      If VRC's projections came in lower**

9    **than the company's projections then they would**

10   **have less cash flow than management projected.**

11          Q.      Okay.

12                  And did VRC's projections come in

13   below management's projections, downside

14   projections?

15                  MR. GORDON:  You might be

16   talking -- I think you're talking about the

17   management case and I think he's talking about the

18   downside case.

19          **A.      But this E-mail suggests that they**

20   **came in the middle of those two so --**

21          Q.      Between management's case and

22   management's downside case?

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

                                                                    107

1              **A.      Correct.**

2              Q.      Correct.  So VRC did not go down

3      for its downside as low as management went?

4              **A.      Correct.**

5              Q.      Correct?

6              **A.      Yes.**

7              Q.      All right.

8                      So it would be in the downside

9      case since management went lower VRC chose for

10     whatever reason not to go all the way down there?

11             **A.      Correct.**

12             Q.      Correct?

13             **A.      Yes.**

14             Q.      Okay.  Enough of that.

15                     MR. MONK:  Any follow-up on that,

16     Ken?

17                     MR. KLEE:  No.

18                     MR. MONK:  All right.  I want to

19     turn to tab 17, please.

20                     MS. PICCARELLO:  (Indicating.)

21                     COURT REPORTER:  (Complies.)

22                     MR. MONK:  And we will mark this as

108

1    Exhibit Number 8.

2                    (Whereupon, double-sided document

3    bearing Bates stamps CITI-TRIB-CC 00133755 and

4    CITI-TRIB-CC 00133756, is received and marked as

5    Kurmaniak Exhibit 8 for Identification.)

6                    COURT REPORTER:   Number 8.

7                    THE WITNESS:   Thank you.

8

9    BY MR. MONK:

10            Q.      Do you want to take a minute to

11   read that, please?

12            **A.      (Reviews.)**

13                    MS. PICCARELLO:  Would you mark

14   this one as 9?

15                    COURT REPORTER:  (Complies.)

16

17   BY MR. MONK:

18            Q.      So start at the bottom.

19            **A.      Yes.**

20            Q.      Let's work our way up if that's

21   okay.

22                    So the first E-mail is an E-mail

109

1   from Scardigli to Christina Mohr and you're one

2   of the people who was a recipient as well setting

3   up a conference call, correct?

4        **A.        Uh-huh.**

5        Q.        All right.

6                  And then the following E-mail is

7   from Julie Persily to Scardigli with a bunch of

8   question marks what model, why a call she says.

9        **A.        Uh-huh.**

10       Q.        Do you have any recollection --

11  let me stop right there.

12                 Do you remember this discussion

13  taking place in or about June 11th, 2007 by

14  E-mail?

15       **A.        I don't.**

16       Q.        All right.

17                 The next E-mail is from Scardigli

18  to Persily.  You're not copied on this, but

19  you're copied on one above, so you may have seen

20  it on or about then, and Scardigli says:  I was

21  surprised as well.  Chandler would like to

22  discuss Exhibit H from the credit agreement and

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

110

1  modeling out in detail projected discretionary

2  FCF which is free cash flow, correct?

3          A.        Correct.

4          Q.        By the definition set forth in the

5  agreement.  His feeling is that the agreement is

6  very complex and our current model does not have

7  these capabilities.  John, am I missing

8  something?

9                Who is John?  That's John?

10         A.        Apostolides which is the other

11 person that's c.c.'ed in these E-mails.

12         Q.        And what role does he have?

13         A.        He was an associate.

14         Q.        All right.

15                So does that additional E-mail

16 reflect any, you know, refresh your recollection

17 in any way regarding this conversation?

18         A.        I don't -- the exact E-mail chain

19 I don't recall, however.  What it's referencing

20 to is the calculation of cash flow and the credit

21 agreement was very specific about what's included

22 and what's not included.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                             New York, NY

111

1          Q.      Right.

2          A.      So in our model we would do a

3    basic calculation of what free cash flow was

4    which is generally EBITDA minus taxes, interest,

5    CapEx and other items.

6          Q.      Uh-huh.

7          A.      That had always been our

8    calculation as we were working through the model

9    and that's a common understanding; however, once

10   you go into a credit agreement it can be more

11   specific about what line items are included and

12   what line items are not included.  So, for

13   example, I would generally just say interest

14   expense, but in the credit agreement it will say

15   interest from X, Y and Z debt or it includes

16   interest income and interest expense and you have

17   to add them together, something like that so our

18   model was very general.  The credit agreement was

19   very specific.  So it looked like Chandler was

20   asking us, you know, eventually to sort of build

21   out the model so that he could specifically

22   calculate discretionary free cash flow per the

112

1   **credit agreement.**

2          Q.     All right.

3                 We're going to turn to tab 74 and

4   I'll get you to look at that at the same time.

5          **A.     Okay.**

6                 COURT REPORTER:  Number 9.

7                 (Whereupon, one-page document

8   bearing Bates stamp CITI-TRIB-CC 00160830, is

9   received and marked as Kurmaniak Exhibit 9 for

10  Identification.)

11                MR. MONK:  This will be Number 9.

12

13  BY MR. MONK:

14         Q.     So this is the same day.

15         **A.     (Reviews.)**

16         Q.     Have you had a chance to read

17  Exhibit Number 9?

18         **A.     I'm just reading.**

19         Q.     Take a moment.

20         **A.     Okay.**

21         Q.     So having looked at Exhibit Number

22  9 --

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

                                                                    113

1              A.        Uh-huh.

2              Q.        -- do you recall, does that

3     refresh your recollection regarding what was

4     being discussed regarding the model here in any

5     way?

6              A.        This is going back to the question

7     about what assistance we were providing to the

8     company --

9              Q.        Right.

10             A.        -- sort of post this April, May,

11    June time period --

12             Q.        Right.

13             A.        -- and the fact that my role was

14    effectively sort of done and we were running this

15    model because it was an accommodation to the

16    client and because, you know, because we had

17    historically built it and we knew the

18    functionality and all of that and so the line of

19    questioning was as we began to transition into

20    the financing role whether we should be

21    continuing to do that for the clients and in

22    particular this discussion is about okay, if

114

1    these numbers are going to be used, generally

2    when companies provide numbers to their banks it

3    should be done by them and so if it was really

4    coming from me to the company and then over to

5    the other banks, you know, do we, do I as an

6    M & A person want to be held liable if I

7    calculate it wrong when really it's the company's

8    model and the company's numbers.

9              Q.      Right.

10             A.      And so I think we were just having

11   a discussion about what the right way to handle

12   that was and how to transition from me as the

13   M & A advisor running a model for a client to,

14   you know, a client eventually running the model

15   for purposes of giving numbers for the banks.

16             Q.      Right.

17                    And were you concerned about it at

18   the time that you would -- if you were going to

19   make these changes as an accommodation to the

20   client that you were essentially doing the

21   client's work as opposed to that could eventually

22   get you into some trouble?

115

1        A.        I'd say I raised it as a concern

2    because I don't -- you know, before I do

3    something I just want to make sure that it's the

4    right thing to do and it was at that stage where

5    it seemed like it was the right time to ask the

6    question of should I be doing this or should the

7    company be doing that?  So, you know, I think

8    this is a line of questioning of me asking a more

9    senior person just sort of raising my hand and

10   saying, hey, you know, can we talk about this

11   issue so that I am doing the right thing now as

12   opposed to getting in trouble for it later and I

13   don't even know if I was, if it was, if I -- I

14   guess what I was doing was saying I don't know if

15   this is an issue or not, but I want to raise it

16   to you so that you can make a judgment as to

17   whether it is or it isn't.

18        Q.        All right.

19                  And why are you communicating that

20   to, having this communication with Julie Persily

21   as opposed to Christina Mohr who was the managing

22   director that you were reporting to in connection

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

116

1    with the Tribune matter?

2        **A.      I'm raising it to both Julie and**

3    **Michael.  Michael was also -- Michael is a**

4    **coverage person for Tribune.  Michael was also**

5    **someone that I had regular interaction with**

6    **throughout the M & A process.**

7                 MR. GORDON:  If I can just jump in

8    I think although Christina might dispute it in

9    terms of hierarchy, her and the Canmann as we call

10   him at Citi are on an equal footing.

11                 THE WITNESS:  Yeah.

12                 MR. MONK:  Okay.

13                 MR. GORDON:  In terms of their

14   seniority.  So that's not to say your question is

15   an invalid one which is why didn't you go to

16   Christina, but in terms of going to pay

17   superior --

18                 MR. MONK:  She was going to someone

19   in the -- in the mergers and acquisition world it

20   was a superior?

21                 THE WITNESS:  Yeah, I mean Michael

22   isn't in M & A.  He's not in that group.  He was

117

1    residing in Chicago and he was viewed as the

2    coverage officer for Tribune, but he was

3    effectively my superior on this transaction.  Or

4    he was my superior on the transaction.

5                    MR. GORDON:  Just so you

6    understand, Michael is in Chicago and because he's

7    in Chicago he's considered to have a relationship

8    with Tribune which is also there.  Christina is in

9    the M & A group and she is probably the one in all

10   fairness doing all the work.  It's sort of like a

11   law firm with the relationship partner and then

12   you have people who are the real partners on the

13   matter.  Hopefully Michael won't read this

14   transcript or anything like that, but that's in

15   terms of the seniority that Michael would be

16   viewed as the relationship guy whereas Christina

17   would be viewed as the person on this particular

18   deal who was the relationship partner.

19                    MR. KLEE:  And as I understand it

20   Julie Persily was on the lender side?

21                    THE WITNESS:  Yeah.

22                    MR. KLEE:  Why were you sending

Kurmaniak, Rosanne        CONFIDENTIAL        July 7, 2010
New York, NY

118

1    this E-mail to her?

2                    THE WITNESS:  Correct.

3                    I'm sorry, did you ask why I was

4    sending it to her?

5                    MR. KLEE:  Yes.

6                    THE WITNESS:  Julie had been

7    involved with us from earlier stages in the

8    process.  Julie had been involved when we were

9    coming up with the staple financing aspect of the

10   transaction earlier in the January, February,

11   March time frame so I'd had a lot of interaction

12   with her and she was my contact in terms of

13   questions on leveraged finance and so there wasn't

14   this bright line during that time period that

15   someone, you know, told me specifically you can't

16   talk to Julie anymore or you can only say certain

17   things to Julie.  I knew that it was okay with the

18   company that I was talking with Julie and I knew

19   that she was, you know, she was my advisor in

20   terms of leverage finance aspects.  So she seemed

21   like the right person to be asking this type of

22   question to.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
New York, NY

119

1              MR. MONK:  Okay.

2              MR. KLEE:  Did there come a time

3    when somebody told you that you could no longer

4    talk to Julie when there was a brighter line?

5              THE WITNESS:  I don't -- there -- I

6    don't think there was a brighter line, but again,

7    my role faded over time and so I don't -- there

8    wasn't a need because I sort of over, you know,

9    past June, July, August I just wouldn't have been

10   as involved in the transaction because I wasn't

11   part of the financing aspect of it.

12             MR. KLEE:  Thank you.

13             THE WITNESS:  Sure.

14             MR. MONK:  Let's go to, we're going

15   to go to tab 21, Ken, which we'll mark as Exhibit

16   Number 9.

17             COURT REPORTER:  Number 10.

18             MR. KLEE:  Didn't you already mark

19   an Exhibit 9?

20             MR. MONK:  Yeah, I did.  Number 10.

21   The court reporter just corrected me.

22             MS. PICCARELLO:  There you go.

Kurmaniak, Rosanne          CONFIDENTIAL                  July 7, 2010
                            New York, NY

                                                                120

1                    (Whereupon, one-page document

2       bearing Bates stamp CITI-TRIB-CC 00029566, is

3       received and marked as Kurmaniak Exhibit 10 for

4       Identification.)

5                    COURT REPORTER:  Number 10.

6                    THE WITNESS:  Thank you.

7            **A.      Okay.**

8

9       BY MR. MONK:

10           Q.      All right.

11                   So let's work our way from the

12      bottom up.

13           **A.      Uh-huh.**

14           Q.      Chandler to the Canmann.  We will

15      have our meeting tomorrow in Tribune Tower 3 p.m.

16      on the 6th floor.  Please ask for me at the

17      security desk.

18           **A.      I think this is referring to a**

19      **meeting that Chandler held with all the banks.**

20           Q.      All right.

21                   Then Canmann responds to Christina

22      Mohr, Julie Persily, Tim Dilworth and you --

Kurmaniak, Rosanne         CONFIDENTIAL              July 7, 2010
New York, NY

121

1          A.       Uh-huh.

2          Q.       -- I guess he forwards that E-mail

3     on, right?

4          A.       Correct.

5          Q.       And then you say at the E-mail at

6     the top, excuse me, I missed an E-mail in the

7     middle, Tim Dilworth says do you have a revised

8     model or can you update based on today's call?

9     We are having an internal meeting next Thursday

10    to discuss what's going on at Tribune.

11         A.       Uh-huh.

12         Q.       What role is, let's start with Tim

13    Dilworth.  What role does he have?

14         A.       Tim Dilworth, I don't remember his

15    title at the time.  I think it was director, but

16    he works for Julie Persily.

17         Q.       Okay.

18                  So he's on the other side of the,

19    he's on the finance, leverage finance side?

20         A.       Correct.

21         Q.       As opposed to the M & A side which

22    is where you are, correct?

122

1          **A.        Correct.**

2          Q.      All right.

3                  And you send then an E-mail to

4    Christina saying somewhat reluctant to share with

5    leverage, lev fin which I guess is leverage

6    finance, right?

7          **A.        Correct.**

8          Q.      The case we developed based on the

9    company's revised 2007 for 2008 to 2011, what do

10   you think?

11         **A.        Uh-huh.**

12         Q.      Why did you send that E-mail?

13         **A.        Because it looks like Tim was**

14   **asking me can you send me some numbers and we've**

15   **talked about this line and I usually went to**

16   **Christina when something rang a bell and said**

17   **maybe I should check with someone first before**

18   **sending things to someone who is working on**

19   **another aspect of this deal.**

20         Q.      All right.

21                 And do you recall getting response

22   to this E-mail from Christina?

123

1          **A.       I don't.**

2          Q.       Do you recall sending to Tim the

3     updated model?

4          **A.       I don't recall.**

5          Q.       Do you recall that you were

6     assisting the company as an accommodation I think

7     it's your testimony in this time period with

8     updating the model?

9          **A.       Yes, I was.  I do recall that.**

10         Q.       Okay.

11                   MR. GORDON:  I can tell you we have

12    seen no evidence, Charlie, that the model was sent

13    to lev fin.

14                   MR. MONK:  Okay.

15                   MR. GORDON:  And I hope it wasn't

16    because that would have been a violation of the

17    law that should have been in place.

18                   MR. MONK:  Correct.

19                   MS. PICCARELLO:  (Indicating.)

20                   MR. MONK:  So we're going to show

21    you what we're going to mark as --

22                   MS. PICCARELLO:  11.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

124

1                     MR. MONK:  Number 11.

2                     COURT REPORTER:  (Complies.)

3                     MS. PICCARELLO:  It's tab 22, Ken.

4                     (Whereupon, one-page document

5        bearing Bates stamp CITI-TRIB-CC 00124068, is

6        received and marked as Kurmaniak Exhibit 11 for

7        Identification.)

8                     COURT REPORTER:  Number 11.

9             **A.        (Reviews.)**

10

11       BY MR. MONK:

12            Q.     And the E-mail at the top is the

13       one that I think is the potential response here.

14            **A.      Uh-huh.**

15            Q.     Do you recall sending this E-mail?

16            **A.      I don't.**

17            Q.     Do you recall talking to Christina

18       Mohr about it before you sent it?

19            **A.      I don't recall.  I can only assume**

20       **that I did.**

21            Q.     And when you said we don't have

22       and prob won't get a new one from the company,

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

125

1   but we can work on taking some guesses post the

2   call today, at the time did you have a working

3   model from the company?

4          **A.     I did.**

5          Q.     So it was incorrect when you said

6   to Tim Dilworth we don't have, is that correct?

7          **A.     Well, he's asking if we have a**

8   **revised model.   He's not asking if I have a**

9   **model.**

10         Q.     Okay.

11                So your answer is you don't have a

12   revised model?

13         **A.     Correct.**

14         Q.     All right.

15                After the call that's referenced

16   there, did you have a discussion regarding the

17   information that was provided as you suggested in

18   your E-mail?

19         **A.     What information would that be?**

20   **So I said we don't have and probably won't get a**

21   **new one.**

22         Q.     But we can work on taking some

Kurmaniak, Rosanne         CONFIDENTIAL                July 7, 2010
                            New York, NY

126

1    guesses post the call today.

2              I guess my question is did you

3    work on taking some guesses post the call today?

4         A.    **I can't remember whether I did or**

5    **didn't.**

6         Q.    Do you remember having any

7    conversation with Tim Dilworth about any, any

8    such revisions or new information about the

9    company at that time?

10        **A.    I don't.**

11             MR. GORDON:  Charlie, if I can step

12   in because I think this is an important issue, at

13   least from our perspective, I want to make sure

14   everybody is clear on how this all works.

15             The wall is intended to work from

16   the M & A group to lev fin.  There is nothing that

17   stops lev fin from asking Rosie, and I think

18   she'll tell you this, to do the model with this

19   assumption, with that assumption, with this

20   assumption and that happens.  So I just want to

21   make sure when Rosie is saying we can work on

22   taking some guesses post the call today, you know,

127

1    there would be nothing that the wall would stop

2    lev fin from calling up Rosie and saying, hey,

3    look, the company said X could you run the model

4    and that would happen.  The wall is sort of one

5    directional.

6              MR. MONK:  Yeah.  So I guess what

7    I'm trying to understand is Rosie has been running

8    the model for the company?

9              MR. GORDON:  (Indicating.)

10             MR. MONK:  What I'm hearing you say

11   and let me ask Rosie because she's the witness

12   here.

13

14   BY MR. MONK:

15        Q.    Did you provide the model and any

16   of the work that you did on the model for the

17   company to leverage finance during this period

18   beginning in August and running until whenever

19   you stopped working on the model in 2007?

20        A.    Well, remember we're working on

21   the model to give it to Chandler so that he can

22   give it to all the banks.  So there is a circular

Kurmaniak, Rosanne               CONFIDENTIAL                    July 7, 2010
                                  New York, NY

128

1  line in that Tim is receiving, Tim Dilworth who

2  is being referenced in this E-mail, he's

3  receiving things that my team is doing on that

4  model.  So if he gets it and he says I have a

5  question, how did you calc this number or that

6  number, I can talk to him and I can tell him how

7  that number was calculated or, you know, I can

8  help him understand what he's received from the

9  company.

10       Q.      Right.  And did you do that?

11       A.      Yes.

12       Q.      And what about did you provide to

13  him things that the company had said let's not

14  provide to the banks?

15       A.      No.

16       Q.      Did you tell him that the company

17  had told you let's not provide this model to the

18  banks or this downside case to the banks?

19       A.      I don't remember saying that, no.

20       Q.      In any of the downside cases that

21  you ran for the company, do you recall that the

22  company was rendered insolvent by the Stage 2

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                             New York, NY

                                                                  129

1   debt?

2           A.      Say that one more time.  I want to

3   make sure I understand it.

4           Q.      In any of the downside cases

5   Chandler had you running a number of different

6   cases during this period August through whenever

7   you stopped, I don't think we've established when

8   we stopped yet, but whatever we stopped in 2007 I

9   think we have established that Chandler had you

10  running a number of cases including several

11  different iterations of downside cases.

12          A.      Right.

13          Q.      Correct?

14          A.      Yes.

15          Q.      In any of those downside cases was

16  the company rendered insolvent by taking on the

17  Stage 2 debt?

18          A.      Not that I recall, although by

19  insolvent you mean they ran out of cash flow or

20  just -- not that I remember, but I just want to

21  make sure I'm answering it properly.

22          Q.      Either they ran out of cash flow

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                             New York, NY

                                                                    130

1    or their liabilities exceeded their assets?

2            **A.      No.**

3            Q.      Okay.

4                    Other than questions from Tim to

5    you about the model after the company had

6    presented the model to the banks, did you ever

7    personally give the model to the leverage finance

8    people and said, you know, have at it, write your

9    own toggles, I'm tired of doing this work,

10   anything like that?

11           **A.      Leverage finance doesn't -- their**

12   **role isn't to run models.  Their role is to look**

13   **at the models, interpret them and try to**

14   **formulate their views off of them.  So I wouldn't**

15   **have given them a model and said here, go ahead**

16   **and run with it.  That's just not what they do.**

17           Q.      So if -- I gather then if they had

18   downside scenarios that they wanted you to run

19   questions about the model, they would have given

20   you the data, said, you know, run a down five

21   percent case hypothetically?

22           **A.      That's right.**

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

131

1          Q.      And then you would have done that

2     for them and then provided them the answers?

3          **A.      That's right.**

4          Q.      Right?

5                  And in providing them the answers

6     would you have given them the model itself or a

7     spreadsheet output?  How did you communicate back

8     to them the results of the work that you were

9     doing for Tim and leverage finance?

10         **A.      As part of this model you saw some**

11    **references to it earlier there was a set of**

12    **standardized pages that were output pages.  Those**

13    **output pages would have the leverage.  They would**

14    **have the interest coverage.  They would have the**

15    **cash flow, the total debt, the cash balance, the**

16    **metrics that were important for that team to look**

17    **at and so it would be most likely that if they**

18    **asked me to run something I would just return to**

19    **them the metrics that were most important to them**

20    **which were, which were already contained on that**

21    **output page.**

22         Q.      All right.

132

1          **A.       I don't recall doing a separate**

2   **analysis for them that they wanted to do**

3   **themselves.**

4          Q.    Okay.

5                MR. KLEE:  Is this interview going

6   to end in five minutes or so?

7                MR. MONK:  Actually we've been told

8   that we can go until --

9                MR. GORDON:  1:45, but then I have

10  to turn into a pumpkin because I have to be in

11  court.  I can check with the witness about other

12  times she has available to continue it if you're

13  not done.

14               MR. MONK:  I'm going to turn to tab

15  71.

16               MR. KLEE:  Okay.  Thank you.

17               MS. PICCARELLO:  (Indicating.)

18               COURT REPORTER:  (Complies.)

19               (Whereupon, one-page document

20  bearing Bates stamp CITI-TRIB-CC 00146365, is

21  received and marked as Kurmaniak Exhibit 12 for

22  Identification.)

133

1              COURT REPORTER:   Number 12.

2         A.        So we were having -- we thought it

3    might be helpful to point out that I did have a

4    dialogue with the company about leverage

5    finance -- about if leverage finance was asking

6    me to do anything.  So if they were asking me to

7    do something I would have gone back to this

8    company and/or Christina or Canmann and said, you

9    know, FYI this is what we're doing just so that

10   we kept them informed of anything that our

11   leverage finance group was doing.

12              So I guess what I'm saying is the

13   company had the right to say whether I could or

14   couldn't talk to my leverage finance team about

15   it.

16

17   BY MR. MONK:

18        Q.     All right.  And you did that in

19   every instance?

20        A.        I can't recall every instance, but

21   they would have done that, yes.

22        Q.     All right.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                             New York, NY

                                                              134

1              So it would have been your

2    practice to do so, but as you sit here today you

3    can't be absolutely certain that you did it in

4    every instance?

5          A.      Right.

6          Q.      All right.

7              You have in front of you what we

8    marked as Number 12.

9          A.      Uh-huh.

10         Q.      And this is a series of E-mails in

11   September of 2007, September 27th of 2007, and

12   let's begin at the bottom.

13         A.      Okay.

14         Q.      The first is an E-mail from

15   Chandler to you copied to Naomi.  No subject.

16   Simply saying we probably ought to take down the

17   assumed CAGRs in the post 2012 years.  I will get

18   back to you, thanks, Chandler.

19         A.      Uh-huh.

20         Q.      Do you know what that refers to?

21         A.      It looks like that, it looks like

22   he's referring to the projections after 2012.  I

Kurmaniak, Rosanne         CONFIDENTIAL              July 7, 2010
                          New York, NY

135

1   can't -- I can only see from revenue and

2   operating cash flow that's referenced above, but

3   essentially we were having a discussion about,

4   you know, as we had before there is a set of

5   five-year projections and then we have to make

6   some assumptions about after those five years

7   what the projections would look like.

8          Q.     Right.

9          A.     And so it looks like we're having

10  a conversation about what the assumed growth rate

11  should be for revenue and operating cash flow

12  after 2012.

13              Do I recall this particular

14  conversation?  No.  We had these kinds of

15  conversations five times a day.

16         Q.     Okay.

17              Do you recall that in the Stage

18  2 -- do you recall ever learning that in the

19  Stage 2 financing VRC was going to rely on

20  projections out ten years versus I think we

21  looked earlier at their projections in the first

22  stage and at least the ones we looked at relied

136

1    upon five years of projections.

2              Do you recall any discussion about

3    that change in VRC's approach?

4         **A.      No, I do not recall that.**

5         Q.     Okay.

6              This first E-mail in the chain is

7    clearly the working in the second five-year

8    projection period, correct?  That's the

9    reference?

10        **A.      After 2012.**

11        Q.     All right.

12        **A.      Yep.**

13        Q.     Now, you said to Chandler okay,

14   meaning okay, yeah, I'm waiting to hear from you?

15        **A.      I'm waiting to hear from you.**

16        Q.     I'm waiting to hear back from you?

17        **A.      Yes.**

18        Q.     And then the next E-mail is

19   Chandler later that day at 4 o'clock in the

20   afternoon, we start out with it looks like at

21   3:16 in Chicago and you respond I'm guessing that

22   must be from New York at 3:11 because you

Kurmaniak, Rosanne        CONFIDENTIAL              July 7, 2010
                          New York, NY

137

1    couldn't respond before he sent it.

2         A.        Uh-huh.

3         Q.        And then at 4:24 in the afternoon

4    he responds to you and he says how about we make

5    post 2012 revenue operating cash flow CAGRs the

6    same as the growth assumed in 2012 for both

7    publishing and broadcasting.

8         A.        (Indicating.)

9         Q.        Do you have any idea why he made

10   that comment and statement to you?

11             It's got a question mark so he

12   actually appears to be asking a question, but

13   let's begin with did you treat it as a question?

14        A.        They had a company prepared plan

15   for 2000 through 2012 and so somebody has to make

16   a judgment as to what's going to happen post that

17   period because nothing was officially endorsed or

18   provided to us or by the company.  So someone had

19   to make a judgment about what those revenue and

20   operating cash flow growth rates were going to

21   look like.  In this case it was Chandler.  That's

22   who I talked to every day about all this and so I

138

1   think he's just giving us guidance and it's a

2   common practice to say okay, in the last, in the

3   five-year why don't we just assume that the

4   business grows at the same pace or performs at

5   the same pace as it did in the last year that

6   we've officially projected it.  So that's a

7   common practice.  It's a common assumption that

8   we use which is just to say we don't really know

9   what it's going to be in five years, but our best

10  guess would be that it's going to perform at the

11  same as it did in the five, you know, in the last

12  year that we actually did an official projection

13  for.

14              And, look, from time to time

15  Chandler would come to me and say, hey, does that

16  sound reasonable?  And I'd say yes or no, it

17  doesn't sound reasonable and so it looks like

18  that's what this E-mail chain is.

19          Q.      All right.

20              And so what was your response?

21  Did you think it was reasonable to use that

22  approach?

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

                                                                    139

1             A.      Yes.

2             Q.      All right.

3             A.      As I said, I mean we commonly do

4      that in other transactions in other

5      circumstances.

6             Q.      Did you make any judgment as

7      someone who had some experience in the media area

8      as well as the telecom area as to whether 2012

9      was an outlier year in any way in terms of

10     revenue for the company?

11            A.      I didn't -- I don't remember 2012

12     as being an outlier year.  I mean in broadcasting

13     from time to time there tends to be political

14     years and non-political years.  There can be an

15     Olympic year or not an Olympic year.

16            Q.      Right.

17            A.      So from time to time I might look

18     at it and say, you know, maybe we should adjust

19     for X, Y or Z, but generally I feel comfortable

20     saying growing at the last year.  That it's

21     something that I would do frequently.

22            Q.      All right.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

140

1            So as you sit here today do you

2     have any reason to believe that 2012 was an

3     outlier year in any way?

4            **A.     No.**

5            Q.     Okay.

6                  MR. GORDON:  I assume by that

7     question you mean not given what she knows now

8     because the projections obviously --

9                  MR. MONK:  Right.

10                 MR. GORDON:  You mean like at the

11    time?

12                 MR. MONK:  Yeah.  I guess let me

13    rephrase the question.

14

15    BY MR. MONK:

16           Q.     In 2007 when he was asking you

17    this, when he was making this suggestion, let's

18    just use the 2012 and carry it forward --

19           **A.     Right.**

20           Q.     Well, I'll ask it more bluntly.

21                 Were you aware that 2012 was an

22    election year and that might generate

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                             New York, NY

141

1    inordinately large revenue for a publishing and

2    broadcasting company?

3          A.      **What's 2012, is 2012 an election**

4    **year?**

5          Q.      I believe it is.

6          A.      **I guess it was.  If it was it**

7    **didn't occur to me at the time.**

8          Q.      Okay.

9                  Assuming it was an election

10   year --

11         A.      **It's documented to be so.  I get**

12   **it.**

13         Q.      -- would it have been appropriate

14   to use the revenue in an election year for a

15   broadcasting and publishing company to project

16   out over the remaining five years for revenue

17   growth?

18         A.      **Look, you could say that 2012 was**

19   **an inflated year because of extra revenue from**

20   **broadcasting, however, you have to remember**

21   **though that there are going to be other election**

22   **years post 2012 as well.  So if you were going to**

Kurmaniak, Rosanne        CONFIDENTIAL                July 7, 2010
New York, NY

142

1    start making those adjustments you'd also want to

2    adjust 2012.  You'd probably want to adjust 2014.

3    That's not a presidential election, but it's

4    probably also, you know, another kind of election

5    with they got revenue from, you'd adjust 2016.

6    you'd have to come up with, you know, and you'd

7    have to come up with a different growth rate

8    every year in order to accommodate for that and

9    so, you know, you'd have to make some judgments

10   about specific years as opposed to applying a

11   different growth rate.  So could I say that I

12   would go back and adjust to take out some of the

13   political years?  Yes, but then that might

14   understate it a little bit more and you might

15   want to go back and add some more revenue in for

16   other political years.  So the absolute question

17   is could you adjust political revenues out of the

18   broadcasting for 2012?  Yes, but it's not the

19   only change that I would have made.

20        Q.      What other changes would you have

21   made?

22        A.      I mean I'm just saying that the

Kurmaniak, Rosanne          CONFIDENTIAL                  July 7, 2010
New York, NY

143

1    methodology would be that you'd have to be more

2    precise about every single year and you'd have to

3    model out -- I mean there are other impacts such

4    as, you know, political, cable, they got revenue

5    when they had the Super Bowl, you know, things

6    like that, every year you need to go back and

7    say, okay, what revenue am I going to incorporate

8    in that year to account for these specific

9    impacts and because we didn't have a five-year

10   projection model going out that far, you know,

11   the easiest way to do it is just to apply a

12   revenue growth rate and the revenue growth rate

13   assumption is a subjective one.

14              MR. KLEE:  I have a follow-up

15   question if I might.

16              THE WITNESS:  Sure.

17              MR. KLEE:  The very first E-mail at

18   the bottom of the page says:  We probably ought to

19   take down the assumed CAGRs in the post 2012

20   years.

21              What did you understand that to

22   mean?

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

144

1                    THE WITNESS:  That was coming from

2       Chandler and going to me.  So I took it to mean

3       that a CAGR is a compounded annual growth rate.

4       That means the revenues were or cash flows were

5       growing at a certain rate and that Chandler was

6       making a judgment that he wanted to take it let's

7       call it from ten percent as an example down to

8       seven percent or five percent.

9                    So I took that to mean he wanted to

10      make an adjustment to the projections that were in

11      the model that we've been using.

12                   MR. KLEE:  And you respond okay.

13      So you were in accord with his assumption that you

14      probably ought to take down the assumed CAGRs in

15      the most 2012 years?

16                   THE WITNESS:  I responded okay

17      because he was telling me that he was going to

18      give me direction and so I was communicating back

19      to him that I would make the change once he gave

20      it to me.  I don't think that's a consent or a

21      lack of consent to his suggestion that we take

22      down the CAGRs.  I think it was an acknowledgment

Kurmaniak, Rosanne          CONFIDENTIAL               July 7, 2010
                          New York, NY

145

1    that that's something that he wanted to do.

2                    MR. KLEE:  I see.

3                    So as you sit here today putting

4    yourself back into the September 27th, 2007 time

5    frame, do you think it's more reasonable to take

6    down the assumed CAGRs in the post 2012 years or

7    alternatively to make post 2012 revenue CAGRs and

8    OCF and CAGRs the same as the growth assumed in

9    2012 for both publishing and broadcasting?

10                   THE WITNESS:  Well, it looks like

11   that's what we did do.  It looks like it was

12   higher than 2012 and we brought it down to the

13   2012 levels.  Just reading from the E-mail it

14   looks like the CAGRs were higher than 2012 and

15   that he wanted to make them equal to 2012.

16                   MR. KLEE:  And you don't remember

17   what the CAGRs were that he wanted to take down?

18                   THE WITNESS:  I don't.

19                   MR. KLEE:  Thank you.

20                   THE WITNESS:  I mean I can only

21   read the E-mail here which suggests that he wanted

22   to take down revenue and operating cash flow for

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

146

1   both publishing and broadcasting.

2

3   BY MR. MONK:

4        Q.     Even though VRC used five-year

5   projections in its first model in its first

6   solvency analysis, the company had, in fact, done

7   some work beyond five years prior at that point

8   in time in early in 2007.

9             Do you recall anything about that

10  at all?  Do you recall what their growth

11  assumptions were in that, for that second

12  five-year period early in 2007?

13       A.     You said the company had done some

14  work -- I mean the projections that we received

15  were only in the five-year projections.  I'm not

16  sure what -- I don't recall being sent a set of

17  ten-year projections from the company.  What we

18  would have done is had a ten-year -- we would

19  have taken the five-year projections, would put

20  them in the model and then we'd do something as

21  was suggested here where we'd say okay, let's

22  hold the margins flat and grow the revenue at the

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

147

1    same rate as the previous years.

2               So I don't recall there being a

3    set of projections that I received from Chandler

4    or anyone else at the company that was a full

5    ten-year set of projections.  I mean if there is

6    some work that you want to show me, I can look at

7    it and see whether it's something that jogs my

8    memory, but I remember receiving a five-year set

9    of projections from the company.

10          Q.     Okay.

11                 And do you recall that this in

12   September of 2007 was --

13                 Strike that.  I've got a timing

14   issue so 44.

15                 MS. PICCARELLO:  (Indicating.)

16                 MR. MONK:  Would you turn to tab

17   44, Ken, and we're going to mark this as Number

18   13.

19                 COURT REPORTER:  (Complies.)

20                 (Whereupon, double-sided document

21   bearing Bates stamps CITI-TRIB-CC 00087734 and

22   CITI-TRIB-CC 00087735, is received and marked as

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
                            New York, NY

148

1    Kurmaniak Exhibit 13 for Identification.)

2                COURT REPORTER:  Number 13.

3                MR. MONK:  Uh-huh.

4

5    BY MR. MONK:

6        Q.    This is October 2nd, 2007.

7        **A.    (Reviews.)**

8        Q.    And this is Number 13.

9                MR. MONK:  Right?

10               MS. PICCARELLO:  (Indicating.)

11

12   BY MR. MONK:

13       Q.    Now, just on October 1st there was

14   a presentation at Tribune.

15       **A.    Uh-huh.**

16       Q.    Do you recall being present for

17   that?

18       **A.    No.**

19       Q.    Do you see at the top of this page

20   Tribune conference call at 11 a.m. tomorrow if

21   you can just listen in I will be in a meeting for

22   Mr. Canmann to you?

149

1          **A.      Yes.**

2          Q.      Do you recall listening in on this

3   conversation?

4          **A.      Not this particular conversation,**

5   **but from time to time Michael would ask me to**

6   **listen in to calls if he couldn't be part of**

7   **them.**

8          Q.      Just a couple of more questions

9   because my time is short here.

10         **A.      Sure.**

11         Q.      There was a meeting at Tribune on

12  October the 1st in which the company presented

13  its new yet again revised projection for 2007.

14         **A.      Uh-huh.**

15         Q.      Murray Divine was present.

16                 Do you recall Murray Divine being

17  present for that discussion?

18         **A.      No, I do not.**

19         Q.      Do you know who Murray Divine is?

20         **A.      No, I don't.**

21         Q.      Were you involved in any of the

22  discussions regarding the hiring of Murray

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
New York, NY

150

1    Divine?

2          **A.        No.**

3          Q.        By the banks?

4          **A.        I'm not aware of any --**

5          Q.        Okay.

6          **A.        -- discussions.**

7          Q.        Do you recall anything at all

8    about this conference call at 11 o'clock on

9    October the 2nd as a follow-up to the Murray

10   Divine meeting?

11         **A.        I don't.**

12         Q.        Or the Tribune presentation on

13   October the 1st?

14         **A.        I do not.**

15         Q.        Okay.

16               MR. MONK:  Let's do this.

17               The last exhibit is a document,

18   what do we call this?

19               MS. PICCARELLO:  78.

20         Q.        This is tab 78 which will be

21   Number 14?

22               MS. PICCARELLO:  Yes.

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

151

1                    (Whereupon, multi-page document

2       bearing Bates stamps CITI-TRIB-CC 00023666

3       through CITI-TRIB-CC 00023682, is received and

4       marked as Kurmaniak Exhibit 14 for

5       Identification.)

6                    COURT REPORTER:  Number 14.

7              **A.      (Reviews.)**

8

9       BY MR. MONK:

10             Q.      This is, the legend at the top

11      says confidential discussion materials regarding

12      Project Tower.

13             **A.      Uh-huh.**

14             Q.      Project Tower of course is the

15      Tribune, correct?

16             **A.      Correct.**

17             Q.      This is a Citi document.  It's

18      produced.  It's got a Citi Bates label on it.

19                    Do you recognize this document?

20      Have you seen it before?

21             **A.      Wait, I'm sorry, where do you see**

22      **the Citi Bates label?**

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

                                                              152

1          Q.       Lower right-hand corner.

2                   MR. HALL:  That's lawyer stuff.

3    You don't have to worry about it.

4          **A.       Oh, it's produced by Citi?**

5          Q.       Correct.

6          **A.       You're not suggesting that what**

7    **was in this document was generated by Citi?**

8          Q.       I don't know.

9          **A.       Okay.**

10         Q.       I want you to answer those

11   questions for me.

12         **A.       Oh, okay.  This doesn't look like**

13   **something that was produced by Citi, but --**

14                  MR. GORDON:  I think she's using

15   produced in a calculational sense.

16                  MR. MONK:  Right.

17         **A.       Right, by produced I mean I would**

18   **have done work that resulted in the output of**

19   **this and this document does not look familiar to**

20   **me.**

21

22   BY MR. MONK:

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                            New York, NY

153

1          Q.    All right.

2                Do you have any idea who did

3    produce, who created, we should use that word,

4    created this document?

5          **A.    I don't know.**

6          Q.    This document is a valuation

7    comparison, that's at least what it describes

8    itself to be, and the first column is valuation

9    using Citi pro formas.

10         **A.    (Reviews.)**

11         Q.    Do you see that?

12         **A.    I do.**

13         Q.    And the second column is valuation

14   using Citi valuation, excuse me, somebody else

15   could read this for me, please.

16               MR. HALL:  Citi valuation using

17   management projections.

18         Q.    And there is a management base

19   case and a management downside case and then

20   there is a VRC column, midpoint and low.

21         **A.    (Indicating.)**

22         Q.    Do you see that?

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                            New York, NY

154

1          **A.      I do see it.**

2          Q.      Do you recall any discussion with

3    anyone at Citi regarding this type of an analysis

4    even if you haven't seen this particular

5    analysis?

6          **A.      I don't.**

7          Q.      Do you recognize the handwriting

8    on this document?

9          **A.      It's not mine.  No, I don't.**

10         Q.      Do you know whether Murray Divine

11   did any work for Citi in particular in preparing

12   an analysis like this?

13         **A.      The first I've heard of Murray**

14   **Divine is today.**

15         Q.      All right.

16         **A.      What's the date of this document**

17   **by the way?  Or you're going to ask me that**

18   **question?**

19         Q.      The only thing we're aware of is

20   if you look at Footnote 1 --

21         **A.      Oh, it says at least December 4th,**

22   **2007 if not later.**

155

1          Q.      Correct.

2          **A.      Based on the latest valuation**

3     **dated December 4th to Tribune Board of Directors.**

4          Q.      Do you recall when you stopped

5     preparing models for the company?

6          **A.      I don't.  I recall going to the**

7     **client.  I recall sitting with them for a day,**

8     **walking through the mechanics of it, walking them**

9     **through how to change toggles, how to sell**

10    **assets, how to change interest rates.  We**

11    **conducted a session with Chandler and with some**

12    **of Chandler's staff to do that.  It had to have**

13    **been sort of late in the '07 -- I mean I'm just**

14    **going from the E-mails.  I was still doing stuff**

15    **in October.  I remember I thought it was the late**

16    **summer time period, but it was, it was before the**

17    **end of the year, you know, that we transitioned**

18    **the model over.  We gave them the Excel file and**

19    **then we spent a day walking them through**

20    **essentially how to work it.**

21         Q.      All right.

22                 And whenever that was done then

156

1    you stopped -- then I gather you stopped updating

2    the model at that point?

3              A.      Yeah.

4              Q.      Were there any further questions

5    from the client about the model after that or was

6    that pretty much the end of your involvement?

7              A.      **That was, it was the end of my**

8    **involvement.  Again, I wasn't involved in the**

9    **other, in the financing aspects of it.  I was**

10   **really kind of functionally, you know, if we**

11   **weren't running it we didn't otherwise have a lot**

12   **of interaction.**

13             Q.      Did anyone from leverage finance

14   get in touch with you and ask you once you had

15   stopped your involvement with the company to

16   assist leverage finance in analyzing the

17   company's numbers prior to closing?

18             A.      **No, they did not.**

19             Q.      Do you know whether anybody

20   working for you, any of the associates or

21   analysts that had helped you with the model, were

22   they called upon by anybody in leverage finance

157

1    to do any work prior to the time the transaction

2    closed?

3          A.    I mean the short answer is no, but

4    I guess just with the context of I wouldn't

5    necessarily know because I physically sit on a

6    different floor than some of the people that were

7    working on the transaction.  Is it possible that

8    Michael or Tim Dilworth or somebody could have

9    called someone?

10         Q.    Right.

11         A.    He might have, but not that I'm

12   aware of.

13         Q.    But you weren't involved in that

14   if they did?

15         A.    Correct.

16         Q.    Were you involved in any

17   discussions whatsoever from the time you handed

18   the model off to the company to the time the

19   transaction closed regarding the solvency of the

20   company or the financial, the financials of

21   Tribune that you can recall today?

22         A.    Would that, that -- when you say

158

1    discussions, with whom would that be?  At Citi

2    or --

3           Q.     With anybody at Citi?

4           A.     Anybody?  Honestly, no.  Our job

5    was so focused on just running the model for

6    Chandler that the work that I was doing was

7    talking with Chandler and Naomi and the other

8    people on the team to just, you know, run

9    assumptions, different numbers, different --

10          Q.     But all that happened prior to the

11   time you turned the model over to them?

12          A.     Right.

13          Q.     Correct?

14          A.     Right.  Sorry --

15          Q.     My question was limited to that

16   period after you turned the model over --

17          A.     Oh, yeah, no.

18          Q.     -- to the time the transaction

19   closed on December 20th, did you have any

20   communication with anybody at Citi regarding the

21   solvency of the company, updating of the model,

22   toggle, choices, anything at all?

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                             New York, NY

159

1          **A.      No, I did not.  I didn't have**
2     **those conversations.**
3          Q.      Okay.
4               We're just trying to get a time
5     when you turned the model over if we can be more
6     precise and I know you went to a ball game with
7     Chandler.
8          **A.      Yeah.**
9          Q.      Do you recall going to the ball
10    game?  Was it before or after you went to the
11    ballpark?
12         **A.      Do you want to see the picture of**
13    **me throwing the first pitch?  I did throw the**
14    **first pitch.**
15               MR. HALL:  Wow.
16         **A.      That was -- I'm known as the shy**
17    **girl, so everyone thought it would be really**
18    **funny if, you know, Rosie is standing out there**
19    **on the pitcher's mound.**
20               **I want to say that that was**
21    **September, early September that we went to the**
22    **Cubs game.**

Kurmaniak, Rosanne          CONFIDENTIAL                     July 7, 2010
                            New York, NY

160

1          Q.      I think it's October the 6th.

2                  MR. HALL:  If the Cubs made it that

3     far.

4          Q.      So did you turn the model over

5     after that time?

6          **A.      Yes.**

7          Q.      Okay.

8          **A.      It was after that.**

9          Q.      All right.

10                 MR. MONK:  Anything else?

11                 MR. HALL:  Any idea how these

12    numbers, how this document was prepared?

13                 MR. MONK:  Number 14?

14                 THE WITNESS:  How was prepared?  Do

15    you want me to just make a guess?

16                 MR. HALL:  Yes.

17                 THE WITNESS:  We, we have what's

18    called ERM in our organization.  I don't know what

19    it stands for, but it's like a workout group.

20                 MR. GORDON:  E-R-M?

21                 THE WITNESS:  E-R-M.

22                 It's when companies go bankrupt or

Kurmaniak, Rosanne          CONFIDENTIAL                July 7, 2010
                              New York, NY

161

1    troubled loans they take over, so if we've already

2    lent to a client and it's a troubled loan then it

3    goes into ERM and then ERM does their own analysis

4    of what the valuation of the company is, you know,

5    what the cash flows are.  They'll do, sometimes

6    they do do analyses like that.

7              My best guess is that this came,

8    could have come from them and they do their own

9    independent analyses of these things just to

10   figure out, you know, what's the value of their

11   asset essentially which is their hold on the loan.

12

13   BY MR. MONK:

14        Q.    And why do you think it came from

15   them?

16        **A.    I don't know.  I mean because it's**

17   **labeled Citi, so it's referencing something that**

18   **Citi did.  That's only my best guess based on**

19   **what's in here, that they would have done an**

20   **analysis of, they would have done an asset**

21   **valuation and they would have done a DCF.  I know**

22   **that's what they typically do in these**

162

1   situations.  They do a DCF.  They do a multiples

2   based analysis.  They do a cash flow analysis.

3   They do everything that would essentially value a

4   company in order to do a valuation of their debt

5   piece that they hold.

6        Q.    All right.

7              So your best guess is that --

8        A.    Best guess --

9        Q.    -- it could have been produced by

10  them?

11       A.    Yes.

12       Q.    You don't know for sure one way or

13  the other I gather?

14       A.    (Indicating.)

15       Q.    And you don't know when they

16  prepared it?

17       A.    That's correct.

18       Q.    If, in fact, they did prepare

19  it --

20       A.    Correct.

21       Q.    -- you don't know when they

22  prepared it?  All right.

Kurmaniak, Rosanne        CONFIDENTIAL                 July 7, 2010
                          New York, NY

                                                              163

1                    MR. GORDON:  Charlie, I can tell

2     you that Julie Persily doesn't know who prepared

3     it and we are working to try to figure out who did

4     prepare it and if you guys are open to it when we

5     do we will explain it to you in full.

6                    MR. MONK:  Sure.  We would

7     certainly be interested in knowing the answer to

8     those questions.

9                    MR. GORDON:  I'm sure you would.

10    We would too.

11                   MR. MONK:  All right.

12                   Ken, that's all I have.

13                   MR. KLEE:  Yeah, we're done.

14                   MR. MONK:  Thank you so much.  We

15    appreciate it.

16                   THE WITNESS:  You're welcome.

17                   MS. PICCARELLO:  Off the record.

18                   MR. GORDON:  We can go off the

19    record.

20                   (Time noted:  1:55 p.m.)

21

22

164

```
 1

 2

 3

 4

 5

 6

 7                        _____

 8                        ROSANNE KURMANIAK

 9

10    Subscribed and sworn to before me

11    this _____ day of _____ 2010.

12

13    _____

14    /

15    /

16

17

18

19

20

21

22
```

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                              New York, NY

165

1                     C E R T I F I C A T E

2     STATE OF _____)

3                              ) :ss.

4     COUNTY OF _____)

5                  I, RICH GERMOSEN, a Certified Court
      Reporter, (License No. 30XI00184700), New Jersey
6     Certified Realtime Court Reporter, (License No.
      30XR00016800), NCRA Registered Professional
7     Reporter, NCRA Certified Realtime Reporter,
      Certified LiveNote Reporter, and Notary Public
8     within and for the States of New York and New
      Jersey, do hereby certify:
9                  That ROSANNE KURMANIAK, the witness
      whose deposition is hereinbefore set forth, having
10    been duly sworn by a Notary Public of the States of
      New York and New Jersey, and that such deposition is
11    a true record of the testimony of said witness.
                   I further certify that I am not related
12    to any of the parties to this action by blood or
      marriage, and that I am in no way interested in the
13    outcome of this matter.

14                 IN WITNESS WHEREOF, I have hereunto set

15    my hand this____day of_____ 2010.

16

17    _____

18    RICH GERMOSEN, CCR, CRCR, RPR, CRR, CLR

19    LICENSE NO. 30XI00184700

20

21

22

Henderson Legal Services, Inc.

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

1

**A**

**able** 13:10 70:15
**above-entitled**
  2:2
**absolute** 142:16
**absolutely** 134:3
**access** 15:3
**accommodate**
  142:8
**accommodating**
  14:6
**accommodation**
  61:22 113:15
  114:19 123:6
**accord** 144:13
**account** 29:6
  44:19,22 143:8
**accurate** 54:21
  55:5
**acknowledgm...**
  144:22
**acquisition**
  116:19
**acquisitions**
  18:11
**action** 165:12
**actual** 46:13
  78:11
**ad** 79:3
**add** 95:8 111:17
  142:15
**added** 43:5
  44:11
**additional**
  102:18 110:15
**addressed** 67:4
  67:13 75:5
**adequacy** 91:8
  91:19
**adjust** 139:18
  142:2,2,5,12
  142:17
**adjusted** 95:6,8

98:6,7
**adjustment**
  144:10
**adjustments**
  142:1
**administer**
  12:10
**administers**
  15:8
**adopted** 43:17
**adopts** 43:11
**advice** 52:4
  72:21 73:5,18
  92:18
**advise** 61:17
**advising** 47:22
**advisor** 114:13
  118:19
**affirmed** 15:13
**afternoon**
  136:20 137:3
**agencies** 63:4
  75:18 76:3,16
**agordon@pa...**
  4:10
**agree** 51:8,20
**AGREED** 12:1
  12:5,8
**agreement**
  64:10 109:22
  110:5,5,21
  111:10,14,18
  112:1
**ahead** 83:9
  99:15 130:15
**al** 1:7
**allocate** 62:21
**allotted** 14:9
**alternative**
  24:16
**alternatively**
  145:7
**alternatives**

29:10
**Americas** 2:11
  4:7
**amount** 55:3
**analyses** 161:6,9
**analysis** 81:22
  89:13,22 92:14
  92:19 94:15
  96:17 132:2
  146:6 154:3,5
  154:12 161:3
  161:20 162:2,2
**analyst** 17:12
  18:13 40:21
  60:5 65:3
  66:13 67:13,16
  67:20
**analysts** 19:19
  156:21
**analyzes** 53:20
**analyzing** 51:12
  156:16
**ANDREW** 4:4
**and/or** 11:1
  133:8
**Angeles** 27:8
**announced**
  36:16 37:8
  55:2,6,15
  62:14
**announcement**
  37:9 62:17
  63:2
**annual** 144:3
**answer** 11:6
  16:20 53:3
  73:15 87:8
  91:18,21
  125:11 152:10
  157:3 163:7
**answered** 87:17
**answering**
  129:21

**answers** 13:17
  68:15 91:17
  131:2,5
**anybody** 16:14
  73:16 104:2
  156:19,22
  158:3,4,20
**anymore** 25:11
  118:16
**Apostolides**
  110:10
**appears** 137:12
**apply** 143:11
**applying** 142:10
**appointed** 13:6
**appreciate** 14:6
  14:7 163:15
**approach** 136:3
  138:22
**appropriate**
  44:13 141:13
**appropriately**
  95:12 96:7
**approval** 53:18
**approved** 61:11
**April** 37:8 52:3
  55:15 60:19
  61:5,12 62:9
  62:14,22 63:12
  113:10
**area** 18:11 24:6
  139:7,8
**asked** 16:14
  23:9 36:14
  39:21 40:20
  41:19 42:9,17
  57:13 86:2
  131:18
**asking** 13:20
  16:20 39:11,12
  39:13 41:18,21
  42:4 50:8,8,9
  67:15,16 68:13

71:1,15 93:4
  105:15 111:20
  115:8 118:21
  122:14 125:7,8
  126:17 133:5,6
  137:12 140:16
**aspect** 118:9
  119:11 122:19
**aspects** 92:13
  118:20 156:9
**asset** 161:11,20
**assets** 32:12
  130:1 155:10
**assigned** 61:18
  70:6
**assignment**
  21:22 22:18
  61:17
**assignments**
  24:11
**assist** 156:16
**assistance** 113:7
**assisting** 123:6
**associate** 17:13
  18:15,17 40:20
  66:5 110:13
**associated** 54:11
**associates** 19:19
  156:20
**assume** 49:8
  124:19 138:3
  140:6
**assumed** 134:17
  135:10 137:6
  143:19 144:14
  145:6,8
**Assuming** 141:9
**assumption**
  126:19,19,20
  138:7 143:13
  144:13
**assumptions**
  39:21 40:6

135:6 146:11
158:9
**attaches** 101:22
**attachment**
84:12 102:3,5
**attendees** 27:1
27:20
**attention** 104:4
**attorneys** 3:13
3:22 4:12 12:2
**August** 55:17
56:13 119:9
127:18 129:6
**authorized**
12:10
**available** 13:7
132:12
**Avenue** 2:10 4:7
**avoid** 30:17
**aware** 140:21
150:4 154:19
157:12
**awhile** 18:22
**a.m** 2:12 148:20

——————
**B**
**B** 6:1 7:1 8:1 9:1
10:1
**back** 17:10 34:2
41:11 45:11
53:5 55:13,21
56:9,20,22
57:4 64:9
69:10 70:15
71:11 74:9,10
83:22 93:14
94:2 95:9,19
99:9 101:11
113:6 131:7
133:7 134:18
136:16 142:12
142:15 143:6
144:18 145:4

**backed** 101:16
**background**
17:3 42:5
**backup** 71:22
**balance** 39:18
131:15
**ball** 159:6,9
**ballpark** 159:11
**Baltimore** 3:19
**bank** 64:10
**bankrupt**
160:22
**banks** 64:17
67:3 114:2,5
114:15 120:19
127:22 128:14
128:18,18
130:6 150:3
**base** 68:21
89:16,17
153:18
**based** 38:9
39:11 41:6
90:8 97:14
103:6,14
105:17 121:8
122:8 155:2
161:18 162:2
**basic** 111:3
**basis** 29:7,13
**Bates** 6:5,11,17
7:5,11,17 8:5
8:11,17 9:5,10
9:15,20 10:5
20:19 25:8,9
25:10,20 33:17
36:4 37:13
59:11 74:15
81:7 84:4 88:7
100:2 108:3
112:8 120:2
124:5 132:20
147:21 151:2

151:18,22
**bathroom** 93:20
**bearing** 6:5,11
6:17 7:5,11,17
8:5,11,17 9:5
9:10,15,20
10:5 20:19
33:17 59:11
74:15 81:7
84:4 100:2
108:3 112:8
120:2 124:5
132:20 147:21
151:2
**began** 24:7 25:4
113:19
**beginning**
127:18
**begins** 24:14
**believe** 21:10
28:10 47:22
91:5 101:7
140:2 141:5
**bell** 122:16
**best** 16:20 138:9
161:7,18 162:7
162:8
**better** 49:19
105:12
**beyond** 90:2
146:7
**bidder** 28:8,9
39:2
**bidders** 24:21
48:1,16,18
**big** 37:2
**Bigelow** 46:1
62:1 65:9,10
68:15,19 73:18
90:18 93:8,11
101:2
**Bigelow's** 71:3
**bit** 17:2 41:10

60:2 74:9
142:14
**blah** 57:20,20
57:20
**blame** 35:11
**blank** 35:7
**blood** 165:12
**bluntly** 140:20
**board** 32:20
43:11 52:5
61:11 62:20
155:3
**bottom** 26:17
65:1 68:12
94:10 95:20,20
97:4 108:18
120:12 134:12
143:18
**bound** 21:20,21
22:1,2,9,17
51:20
**Bowl** 143:5
**break** 93:20
**bright** 118:14
**brighter** 119:4,6
**broad** 28:7,8
39:1 50:1,4
53:11 72:11,12
**broadcasting**
51:16 70:1
77:12 79:6
137:7 139:12
141:2,15,20
142:18 145:9
146:1
**broader** 45:8
**broken** 34:15
**brought** 104:3
145:12
**build** 40:7,9
41:15 42:2
70:3 111:20
**Builder** 46:20

**building** 55:4
**built** 113:17
**bullets** 48:17
**bunch** 109:7
**business** 15:11
17:9,10 77:11
138:4
**businesses**
80:17
**buyer** 27:1,3,4
58:17,18
**buyout** 30:17

——————
**C**
**C** 3:1 4:1,4 13:1
165:1,1
**cable** 143:4
**CAGR** 103:16
103:17,21
104:8 144:3
**CAGRs** 134:17
137:5 143:19
144:14,22
145:6,7,8,14
145:17
**Caitlin** 3:3 10:9
13:21 35:1,11
**calc** 26:1 128:5
**calculate** 29:18
98:21 111:22
114:7
**calculated** 128:7
**calculating**
97:17 98:21
99:13
**calculation**
29:13 41:4
64:5 77:17
97:15 110:20
111:3,8
**calculational**
152:15
**calculations**

98:11
calc'ed 104:7
calendar 97:20
call 25:9 28:12
    44:21 54:15
    55:10,16 98:19
    109:3,8 116:9
    121:8 125:2,15
    126:1,3,22
    144:7 148:20
    150:8,18
called 70:5
    156:22 157:9
    160:18
calling 127:2
calls 149:6
Canmann 116:9
    120:14,21
    133:8 148:22
Canyon 47:17
    47:21
capabilities
    110:7
CapEx 111:5
capital 79:18,19
    80:1,3,11,12
captured 95:12
capturing 95:16
Career 46:20
carry 140:18
case 31:1 34:18
    44:7 54:2
    64:17 68:21
    69:18,18,18
    70:1,7,9 79:10
    79:11,12 89:17
    95:6 96:7
    103:1,5,7,9,18
    104:6,7,9,13
    104:14,21,22
    105:12,14
    106:5,6,7,17
    106:18,21,22

107:9 122:8
128:18 130:21
137:21 153:19
153:19
cases 13:6 68:14
    69:13,14 70:14
    70:17,22 71:2
    103:19 104:18
    105:11 128:20
    129:4,6,10,11
    129:15
cash 39:19
    51:10,12,12,13
    51:16 78:1,2
    79:6 89:9,17
    89:17 98:3,8
    99:6,8 101:13
    101:20 106:10
    110:2,20 111:3
    111:22 129:19
    129:22 131:15
    131:15 135:2
    135:11 137:5
    137:20 144:4
    145:22 161:5
    162:2
cataloged 22:3
categorized
    46:22
CCR 1:21
    165:18
Centre 3:6
certain 22:4
    56:19 57:2
    64:3 69:4 98:7
    105:17 118:16
    134:3 144:5
certainly 52:3
    163:7
Certified 2:3,4,6
    2:7 165:5,6,7,7
certify 165:8,11
chain 63:19

110:18 136:6
138:18
chall@saul.com
    3:12
chance 112:16
Chandler 27:17
    27:21 44:21
    45:22 47:19
    55:18 56:4,20
    61:22 64:2
    65:9,10 66:21
    68:13,14,19
    71:3,14 73:18
    83:2 85:12,14
    86:2,10 90:17
    93:8,10 94:11
    95:18 100:14
    101:1 102:17
    109:21 111:19
    120:14,19
    127:21 129:5,9
    134:15,18
    136:13,19
    137:21 138:15
    144:2,5 147:3
    155:11 158:6,7
    159:7
Chandlers
    27:14 47:18
Chandler's
    104:3 155:12
change 40:21
    41:2,2 44:5
    45:1,4,14
    55:12,19 66:22
    70:7 71:16,17
    71:17,18 136:3
    142:19 144:19
    155:9,10
changed 41:10
    43:5
changes 40:15
    44:13 71:19

114:19 142:20
changing 70:14
CHARLES 3:16
Charlie 13:20
    91:16 99:15
    123:12 126:11
    163:1
check 94:20
    122:17 132:11
Chicago 100:22
    117:1,6,7
    136:21
chime 13:17
choices 158:22
choose 104:21
choosing 105:7
chose 106:5,6,7
    107:9
chosen 103:21
    103:22 104:3
Chris 13:21
Christina 19:2,5
    19:6,8 24:12
    40:3 41:13,19
    42:1,9,17
    45:12,19 50:14
    51:8,21 75:6
    81:20 109:1
    115:21 116:8
    116:16 117:8
    117:16 120:21
    122:4,16,22
    124:17 133:8
CHRISTOPH...
    3:5
circular 127:22
circumstance
    44:15 45:5
    62:15
circumstances
    139:5
Citi 17:8,11
    24:8 36:21

40:2 41:13,15
45:20,20 73:11
73:18 77:4
82:21 91:15
92:8,12 116:10
151:17,18,22
152:4,7,13
153:9,14,16
154:3,11 158:1
158:3,20
161:17,18
Citigroup 4:12
    15:11 73:9
Citi's 52:4
CITI-TRIB-CC
    7:6,7,12,13,18
    7:19 8:12,13
    8:18 9:6,11,16
    9:21,22 10:6,7
    74:15,16 81:7
    81:8 84:4,5
    108:3,4 112:8
    120:2 124:5
    132:20 147:21
    147:22 151:2,3
CITI-TRIB-C...
    6:6 20:19
CITI-TRIB-C...
    6:7 20:20
CITI-TRIB-C...
    6:12 33:17
CITI-TRIB-C...
    6:13 33:18
CITI-TRIB-C...
    6:18 59:11
clause 28:21
clear 41:17 44:4
    57:18 60:15
    126:14
clearly 136:7
client 32:20 41:5
    41:8,19,22
    42:9,17 44:6

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

4

44:13 55:4,8
60:20 62:1
77:20 113:16
114:13,14,20
155:7 156:5
161:2
**clients** 18:22
113:21
**client's** 114:21
**close** 61:12
**closed** 157:2,19
158:19
**closing** 61:6
63:2 156:17
**CLR** 1:21
165:18
**clumps** 35:13
**cmonk@saul....**
3:21
**coalesce** 24:15
**coincidental**
76:18
**collected** 75:22
**colloquy** 49:14
**column** 153:8
153:13,20
**combined** 18:16
**Comcast** 98:4
101:17
**come** 106:12
119:2 138:15
142:6,7 161:8
**comes** 62:19
**comfort** 52:1,9
**comfortable**
47:8 54:22
139:19
**coming** 98:22
114:4 118:9
144:1
**commencing**
2:12
**comment** 97:10

99:7,7 137:10
**commenting**
84:22 102:22
**comments** 42:22
86:3,5,9 91:2,4
91:6,11,20
92:14,18 93:8
93:11,15,16
97:12 102:18
**committee** 24:7
**common** 111:9
138:2,7,7
**commonly**
139:3
**communicate**
131:7
**communicating**
115:19 144:18
**communication**
115:20 158:20
**communicatio...**
60:9 86:14,17
86:18
**companies**
46:19 114:2
160:22
**company** 1:7
24:13,14 29:8
32:21 39:20,21
40:5 42:20
43:1,16,19
51:15 52:18
53:18,21 54:20
54:21 58:18
61:18 64:1
69:20 77:4
78:4 79:9
80:12 85:15,20
90:2,17 106:4
113:8 114:4
115:7 118:18
123:6 124:22
125:3 126:9

127:3,8,17
128:9,13,16,21
128:22 129:16
130:5 133:4,8
133:13 137:14
137:18 139:10
141:2,15 146:6
146:13,17
147:4,9 149:12
155:5 156:15
157:18,20
158:21 161:4
162:4
**company's** 77:7
78:19 106:9
114:7,8 122:9
156:17
**compares**
103:16
**comparing**
51:15 103:3
**comparison**
153:7
**complete** 14:9
14:13
**complex** 110:6
**Complies** 20:7
33:15 59:9
74:13 107:21
108:15 124:2
132:18 147:19
**components**
29:12
**compounded**
144:3
**concept** 30:22
50:20 53:11
**concern** 96:1
97:9 98:18
115:1
**concerned**
114:17
**concluded** 10:12

**conducted** 27:8
155:11
**conducting**
15:11
**conference**
109:3 148:20
150:8
**confidential** 1:4
15:1 151:11
**confirmation**
35:18
**confirming**
101:19
**confused** 16:13
101:14
**conjunction**
91:3
**connection**
19:20 43:6
60:13,17 61:1
63:11 66:8
76:1 82:14,22
85:4 90:9
115:22
**consent** 144:20
144:21
**consider** 49:20
**considered**
117:7
**consistent** 94:21
**constituencies**
64:16
**construction**
55:1
**consulting**
72:21
**consummated**
51:18
**contact** 118:12
**contained** 72:3
131:20
**context** 32:6
38:20 47:12

48:15 49:19
54:16 70:17
157:4
**continue** 132:12
**continued** 18:18
55:8 60:20
62:17
**continuing**
113:21
**continuous** 28:3
**CONT'D** 7:1
8:1 9:1 10:1
**conversation**
25:18 30:19
31:2 86:22
110:17 126:7
135:10,14
149:3,4
**conversations**
41:6 87:21
135:15 159:2
**copied** 75:6
101:1 109:18
109:19 134:15
**corner** 25:9 79:2
97:19 152:1
**correct** 14:18
17:19,22 18:1
18:2,6,7 19:6
19:11,12,16,22
23:22 24:9,10
24:17 27:5
37:4,10,18
43:2,7,8 47:5
52:6,7,15,20
53:5 55:5
56:15 61:3,3,8
61:9,14,20
62:1,3 65:7,8
65:11 67:7,8
74:7,8 75:19
75:20 77:2,5,6
78:13,14,17,18

78:21 79:15,16
79:21 83:7,8
84:22 85:1
89:10,11 90:3
92:2,10,11
93:8,9 96:2,12
96:15 102:7,8
107:1,2,4,5,11
107:12 109:3
110:2,3 118:2
121:4,20,22
122:1,7 123:18
125:6,13
129:13 136:8
151:15,16
152:5 155:1
157:15 158:13
162:17,20
**corrected**
119:21
**correctly** 95:3
**Costa** 45:20
**counsel** 13:19
**counsel's** 49:13
**COUNTY** 165:4
**couple** 36:9 46:5
96:22 149:8
**course** 151:14
**court** 1:1 2:3,4
14:12 15:7
20:7,22 33:15
33:20 34:2
59:9,14 74:13
74:19 81:11
84:2 100:5
107:21 108:6
108:15 112:6
119:17,21
120:5 124:2,8
132:11,18
133:1 147:19
148:2 151:6
165:5,6

**covenant** 64:10
**covenants** 64:7
**coverage** 18:13
53:9 116:4
117:2 131:14
**cpiccarello@s...**
3:11
**CRCR** 1:21
165:18
**create** 70:5,7
**created** 153:3,4
**credit** 53:18,20
54:12,15
109:22 110:20
111:10,14,18
112:1
**cross** 19:1
**CRR** 1:21
165:18
**Cubs** 98:4
101:16 159:22
160:2
**current** 78:19
110:6
**c.c** 85:14 110:11

———— **D** ————

**D** 5:1 13:1
**Dan** 85:12,12
86:10 101:1
102:18
**Daniel** 94:11
**dash** 32:11 47:5
47:7
**data** 65:20 66:1
130:20
**date** 22:3 26:9
48:5,7 60:21
154:16
**dated** 97:4
155:3
**day** 112:14
135:15 136:19

137:22 155:7
155:19 164:11
165:15
**days** 14:17
**DCF** 161:21
162:1
**deal** 14:11 22:10
23:7,19 24:2,6
24:14 32:22
37:2,3 45:19
55:16 117:18
122:19
**debt** 39:19
50:10 64:12
77:16 111:15
129:1,17
131:15 162:4
**debts** 71:18
**December** 52:10
52:11 53:3
56:10 154:21
155:3 158:19
**deciding** 44:10
**decipher** 33:10
**decision** 41:15
41:18 62:20
69:1
**declining** 79:4
80:4
**definition** 110:4
**DELAWARE**
1:2
**depends** 44:15
**deposed** 15:18
**deposition** 1:14
2:1 12:9,13
13:13 165:9,10
**derive** 29:5
**derived** 90:22
**describe** 73:17
77:9
**described** 105:1
**describes** 153:7

**describing** 26:7
**description** 6:2
7:2 8:2 9:2
10:2 57:10
**design** 64:3
**desire** 14:8
**desk** 120:17
**detail** 72:1
77:13 102:2
110:1
**detailed** 72:15
77:16
**determination**
68:19
**developed** 103:2
103:8,15 122:8
**dialogue** 105:3
133:4
**difference** 52:17
**different** 35:12
44:17 68:1
71:15 72:7
79:10 88:14
98:19 103:21
104:5 105:7,18
129:5,11 142:7
142:11 157:6
158:9,9
**difficult** 14:12
26:10
**difficulty** 38:9
57:19
**digits** 25:12,21
36:5 37:13
88:8 89:2
97:18
**diligence** 75:7
75:13
**Dilworth** 120:22
121:7,13,14
125:6 126:7
128:1 157:8
**direct** 41:1

86:13,16,17
**directed** 41:5
**direction** 11:6
43:15 44:6
83:5 144:18
**directional**
127:5
**director** 17:13
17:14,21 18:4
18:4,5 19:9
100:22 115:22
121:15
**directors** 30:10
30:15 155:3
**discretionary**
110:1 111:22
**discuss** 13:12
92:12 109:22
121:10
**discussed** 28:13
28:13 49:16
50:13 113:4
**discussing** 71:14
**discussion** 30:15
31:13 37:3
45:8,13,18
69:5 71:9
80:16 83:20
109:12 113:22
114:11 125:16
135:3 136:2
149:17 151:11
154:2
**discussions** 81:2
149:22 150:6
157:17 158:1
**dispute** 116:8
**distinguish**
44:16
**DISTRICT** 1:1
1:2
**dividend** 32:11
32:13

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

6

| | | | | |
|---|---|---|---|---|
| **Divine** 149:15 | **double-sided** | 94:16 95:6,7,8 | 4:4,6,16 | **Excel** 39:17 |
| 149:16,19 | 8:10 9:19 | 95:11 97:16,20 | **essentially** | 40:22 43:20 |
| 150:1,10 | 108:2 147:20 | 97:20,21 98:6 | 17:11 22:2,16 | 155:18 |
| 154:10,14 | **downside** | 98:6,7,17 | 114:20 135:3 | **excellent** 47:6 |
| **doable** 50:16,17 | 103:21 104:5 | 111:4 | 155:20 161:11 | **exclude** 68:16 |
| 50:17,20 58:22 | 104:21,22 | **ed** 85:14 110:11 | 162:3 | **excluding** 69:3 |
| **document** 6:5 | 105:10 106:6,6 | **effect** 12:11 | **established** 75:4 | **exclusively** 49:1 |
| 6:11,17 7:5,11 | 106:13,18,22 | **effectively** | 100:14 129:7,9 | **excuse** 121:6 |
| 7:17 8:5,11,17 | 107:3,8 128:18 | 113:14 117:3 | **estimate** 29:7 | 153:14 |
| 9:5,10,15,20 | 128:20 129:4 | **either** 40:20 | **estimated** 78:15 | **exhibit** 6:3,9,15 |
| 10:5 20:18 | 129:11,15 | 98:4 129:22 | **estimates** 78:19 | 7:3,9,15 8:3,9 |
| 21:4,9 25:7 | 130:18 153:19 | **election** 140:22 | **et** 1:7 | 8:15 9:3,8,13 |
| 33:16 34:8 | **draconian** 105:9 | 141:3,9,14,21 | **evaluating** 25:4 | 9:18 10:3,12 |
| 59:10 60:3 | **draft** 84:22 85:4 | 142:3,4 | 29:11 | 20:21 21:10 |
| 63:15 74:14 | 85:6 88:20 | **electronically** | **evaluations** | 33:19 34:8 |
| 78:7 81:6 82:5 | 89:2 91:12 | 67:2 | 89:13 | 59:7,12 74:11 |
| 84:3 86:4,6 | 94:17 96:11 | **enable** 13:18 | **events** 82:1 | 74:17 81:9 |
| 100:1 108:2 | **drivers** 92:7 | **encapsulate** | **eventually** | 84:6 85:10 |
| 112:7 120:1 | **Duff** 82:15 | 24:22 | 42:18 51:11,15 | 86:5 91:2 |
| 124:4 132:19 | 83:16 86:17 | **ended** 64:9 | 77:14 111:20 | 92:22 94:6 |
| 147:20 150:17 | 88:3 | **endorsed** | 114:14,21 | 96:13 99:21 |
| 151:1,17,19 | **duly** 15:13 | 137:17 | **everybody** | 100:4 108:1,5 |
| 152:7,19 153:4 | 165:10 | **engaged** 41:13 | 126:14 | 109:22 112:9 |
| 153:6 154:8,16 | | **engagement** | **evidence** 123:12 | 112:17,21 |
| 160:12 | **E** | 19:10 41:16 | **evolved** 42:16 | 119:15,19 |
| **documented** | **E** 3:1,1 4:1,1 5:1 | **enhance** 43:15 | **EWING** 3:2,15 | 120:3 124:6 |
| 141:11 | 6:1 7:1 8:1 9:1 | **enhanced** 43:5 | 10:10 | 132:21 148:1 |
| **documents** 11:1 | 10:1 13:1,1 | 43:18 | **exact** 110:18 | 150:17 151:4 |
| 20:10 35:8 | 15:10 26:1 | **enter** 62:20 | **exactly** 26:10 | **exhibits** 10:9 |
| 88:14 | 29:3 165:1,1 | 77:22 78:1 | 42:15 46:12 | **exist** 51:1 |
| **doing** 30:16 | **earlier** 100:14 | **entertainment** | **examination** 5:2 | **expand** 73:11 |
| 63:11 74:6 | 101:13 118:7 | 77:12 79:6 | 13:8,14 15:1 | **expenditures** |
| 82:18 94:15 | 118:10 131:11 | **entity** 47:19 | 15:17 | 79:18,19 80:2 |
| 99:3,14 114:20 | 135:21 | **equal** 116:10 | **examined** 15:15 | 80:3,11,12 |
| 115:6,7,11,14 | **early** 24:1,11 | 145:15 | **examiner** 3:13 | **expense** 111:14 |
| 117:10 128:3 | 61:16 146:8,12 | **equity** 29:6 95:9 | 3:22 4:16 13:6 | 111:16 |
| 130:9 131:9 | 159:21 | 95:12 98:5 | **example** 19:1 | **expenses** 78:2 |
| 132:1 133:9,11 | **earnings** 29:3 | 101:14,21 | 44:19 46:20 | **experience** |
| 155:14 158:6 | **easier** 106:3 | **ERM** 160:18 | 62:15 63:3 | 139:7 |
| **dollar** 31:22 | **easiest** 143:11 | 161:3,3 | 64:6,9 69:19 | **expertise** 56:4 |
| 32:8 | **East** 3:18 | **errors** 14:18 | 95:5 97:17 | **explain** 163:5 |
| **dollars** 79:20 | **EBITDA** 64:9 | **ESOP** 13:11 | 111:13 144:7 | **explained** 64:1 |
| **Don** 46:1 73:18 | 64:13,15 94:14 | **ESQ** 3:3,5,16 | **exceeded** 130:1 | **explanation** |

103:20
**explore** 52:21
**expressed** 50:14
**extending** 56:19
**extra** 141:19
**eyes** 89:3
**E-mail** 63:18
  65:2 66:17,18
  67:10,12 68:12
  69:11 70:16
  75:5 81:20
  82:2 85:7,11
  85:16 94:9,11
  95:20 97:4,14
  100:13 101:4,8
  101:22 102:13
  102:16,17
  103:12 106:19
  108:22,22
  109:6,14,17
  110:15,18
  118:1 121:2,5
  121:6 122:3,12
  122:22 124:12
  124:15 125:18
  128:2 134:14
  136:6,18
  138:18 143:17
  145:13,21
**E-mails** 57:7
  101:12 110:11
  134:10 155:14
**E-R-M** 160:20
  160:21

────── F ──────
**F** 165:1
**fact** 89:12
  113:13 146:6
  162:18
**facts** 45:3 54:16
**faded** 119:7
**Fair** 51:7

**fairness** 117:10
**fall** 24:9,20
  41:12 52:14
  104:11,17
  105:14
**familiar** 152:19
**familiarize** 34:7
**far** 16:1 143:10
  160:3
**favor** 56:3
**FAX** 3:10,20 4:9
**FCF** 110:2
**February** 24:16
  25:5 43:11
  48:7,15,21
  50:22 78:10
  118:10
**feedback** 68:10
**feel** 139:19
**feeling** 110:5
**figure** 161:10
  163:3
**file** 22:11 67:2
  155:18
**filing** 12:3 63:3
**fill** 19:3
**fin** 122:5 123:13
  126:16,17
  127:2
**final** 96:17
**finance** 118:13
  118:20 121:19
  121:19 122:6
  127:17 130:7
  130:11 131:9
  133:5,5,11,14
  156:13,16,22
**financial** 75:14
  77:13 157:20
**financials** 47:1
  78:4 157:20
**financing** 53:11
  53:12 55:7,22

92:9,13 113:20
  118:9 119:11
  135:19 156:9
**fine** 71:7
**finish** 20:14
**firm** 17:12
  117:11
**firms** 82:13
**first** 15:13,19
  21:12 25:15
  26:15,16 32:19
  37:9,14,16
  41:12,13 59:20
  61:6 65:2
  70:12 85:21
  89:8,13,22
  90:18 97:5,21
  108:22 122:17
  134:14 135:21
  136:6 143:17
  146:5,5 153:8
  154:13 159:13
  159:14
**fiscal** 97:21
**five** 55:11,13,20
  72:8 90:2,11
  130:20 132:6
  135:6,15 136:1
  138:9,11
  141:16 144:8
  146:7
**five-year** 77:10
  90:1,20 135:5
  136:7 138:3
  143:9 146:4,12
  146:15,19
  147:8
**flat** 79:7 146:22
**flip** 97:11
**floor** 3:8 120:16
  157:6
**flow** 39:19 51:10
  78:2 79:7 89:9

89:17 98:3,8
  99:6,8 106:10
  110:2,20 111:3
  111:22 129:19
  129:22 131:15
  135:2,11 137:5
  137:20 145:22
  162:2
**flowed** 77:14
**flows** 51:12,13
  51:14,16 144:4
  161:5
**focus** 18:19
  95:14
**focused** 158:5
**folder** 22:11
**follow** 63:9
  104:21
**following** 80:4
  109:6
**follows** 15:16
  101:7
**follow-up** 29:17
  63:1 68:6,11
  97:1 107:15
  143:14 150:9
**footing** 116:10
**Footnote** 154:20
**force** 12:11
**form** 12:6 14:20
  91:7
**formas** 153:9
**format** 41:3
**formed** 24:7
**formula** 70:8
**formulate**
  130:14
**forth** 51:21
  70:15 110:4
  165:9
**forty** 80:2,5
**forward** 140:18
**forwarded**

85:13 93:11
**forwarding**
  81:21
**forwards** 121:2
**four** 37:13 89:2
**frame** 23:2 25:5
  48:21,22 52:22
  53:3 118:11
  145:5
**free** 110:2 111:3
  111:22
**frequently**
  139:21
**fresh** 15:3
**front** 134:7
**full** 147:4 163:5
**functionality**
  113:18
**functionally**
  53:17 69:17
  70:3 156:10
**funny** 159:18
**further** 12:5,8
  47:4 104:16
  156:4 165:11
**FYI** 103:17
  133:9

────── G ──────
**G** 13:1
**game** 159:6,10
  159:22
**games** 50:6
**gamut** 71:16
**gap** 26:2 29:5
**GARRISON**
  2:10 4:3
**gather** 13:10
  49:5 130:17
  156:1 162:13
**gathered** 53:2
**general** 39:14
  39:15 42:4

Kurmaniak, Rosanne    CONFIDENTIAL    July 7, 2010
New York, NY

8

111:18
**generally** 22:20
45:22 77:19
103:10,13
111:4,13 114:1
139:19
**generate** 64:11
77:15 78:4
140:22
**generated** 152:7
**gentleman** 16:1
**Germosen** 1:21
2:2 165:5,18
**getting** 68:10
76:2 98:18,19
101:11 115:12
122:21
**girl** 159:17
**give** 16:20 20:9
20:17 26:13
34:2 36:9 44:8
86:3 127:21,22
130:7 144:18
**given** 14:12,16
23:4 43:21
69:20 76:15
83:2,6 85:15
130:15,19
131:6 140:7
**giving** 54:16
73:5,18 103:17
114:15 138:1
**Global** 4:12
15:11
**go** 17:10 23:6
28:20 40:15
47:15 48:5
56:8,9 69:10
71:11 74:10
83:9,22 87:9
88:7 94:2 99:9
99:15 107:2,10
111:10 116:15

119:14,15,22
130:15 132:8
142:12,15
143:6 160:22
163:18
**goal** 14:9 16:18
**goes** 53:18 54:10
90:6 161:3
**going** 14:15,16
20:4,9,11,13
23:3 29:5,17
36:12,19 41:9
41:14 42:2
47:9 48:13,19
49:16 52:21
57:6 58:15
64:6 74:9,10
74:10 99:20
**gotten** 87:1
**graduated** 17:9
**great** 89:3
**greater** 32:13
**Greenwich**
15:12
**Gresesko** 46:1
73:19
**group** 18:13,16
27:1,3,4,7,12
28:9 36:2,15
36:21 45:9
47:19 53:7,9
53:19 54:2
60:9 73:16
77:4 116:22
117:9 126:16
133:11 160:19
**groups** 58:17
**grow** 146:22
**growing** 139:20
144:5
**grown** 17:12
**grows** 138:4
**growth** 69:21,22
135:10 137:6

49:6,10 50:16
52:16 53:1
57:13,17 58:1
58:21 71:8,11
73:8 76:9
80:21 81:3
83:13,16,22
88:13,17,22
91:21 93:19
96:19 97:11
106:15 116:7
116:13 117:5
123:11,15
126:11 127:9
132:9 140:6,10
152:14 160:20
163:1,9,18
**gotten** 87:1
**graduated** 17:9
**great** 89:3
**greater** 32:13

137:20 141:17
142:7,11
143:12,12
144:3 145:8
146:10
**guess** 40:14
46:17 75:11,18
115:14 121:2
122:5 126:2
127:6 133:12
138:10 140:12
141:6 157:4
160:15 161:7
161:18 162:7,8
**guesses** 125:1
126:1,3,22
**guessing** 136:21
**guidance** 40:3,4
138:1
**guy** 117:16
**guys** 163:4

────────

**H**

**H** 6:1 7:1 8:1 9:1
10:1 109:22
**habit** 58:6
**hairs** 52:17
**half** 14:10 65:1
**Hall** 3:5 13:21
93:3 152:2
153:16 159:15
160:2,11,16
**hand** 115:9
165:15
**handed** 157:17
**handle** 114:11
**handsome** 15:22
**handwriting**
47:6 84:11,16
84:17,21 154:7
**handwritten**
21:10,15 33:9
34:11

**happen** 127:4
137:16
**happened** 76:19
158:10
**happens** 126:20
**hard** 17:4 47:13
67:14
**head** 16:8
**hear** 38:17 68:4
91:18 92:6
93:14 136:14
136:15,16
**heard** 50:18
154:13
**hearing** 91:17
127:10
**hears** 16:7
**heart** 66:22
**held** 71:9 83:20
114:6 120:19
**help** 13:18 33:10
48:11 49:14
54:19 55:8
60:20 78:6
98:9 128:8
**helped** 156:21
**helpful** 133:3
**helping** 63:4
64:1 76:2
**hereinbefore**
165:9
**hereunto** 165:14
**hey** 115:10
127:2 138:15
**He'll** 20:17
**hierarchy** 116:9
**higher** 145:12
145:14
**hired** 24:8,19
82:14
**hiring** 149:22
**historically**
113:17

Henderson Legal Services, Inc.

**history** 36:10
**hold** 146:22
  161:11 162:5
**honest** 38:5
  49:18 71:5
**Honestly** 47:11
  58:16 86:16
  88:1 158:4
**hope** 14:8
  123:15
**Hopefully**
  117:13
**hours** 14:10
**hundred** 79:20
  80:2,6,8
**hypothetically**
  130:21

———————
          **I**
**idea** 23:1 63:19
  104:20 137:9
  153:2 160:11
**identification**
  6:4,10,16 7:4
  7:10,16 8:4,10
  8:16 9:4,9,14
  9:19 10:4
  20:21 33:19
  59:13 74:18
  81:10 84:7
  100:4 108:5
  112:10 120:4
  124:7 132:22
  148:1 151:5
**identify** 21:13
**II** 3:16
**impacts** 143:3,9
**implication**
  105:5
**important** 13:9
  31:21 126:12
  131:16,19
**include** 67:1

71:21 72:1
73:19 98:7
99:10
**included** 73:6,7
95:8 99:5
110:21,22
111:11,12
**includes** 111:15
**including** 98:2
129:10
**income** 39:18
101:14,17,21
111:16
**incorporate**
44:1 143:7
**incorrect** 125:5
**independent**
161:9
**index** 10:12
**Indicating** 16:5
30:11 31:19
32:1 33:14
35:22 43:13
59:8 74:12
81:5 94:13
99:18 107:20
123:19 127:9
132:17 137:8
147:15 148:10
153:21 162:14
**industrials**
18:13
**industry** 54:2
**inference** 57:20
**inflated** 141:19
**information**
11:1 13:10
38:10 44:11
69:4 76:4 77:8
125:17,19
126:8
**informed**
133:10

**inordinately**
141:1
**input** 39:19
45:10
**inputted** 78:3
**inputting** 43:15
**inquire** 104:2,4
104:16
**insolvent** 106:5
128:22 129:16
129:19
**instance** 89:16
133:19,20
134:4
**intended** 126:15
**interaction** 87:9
87:17 116:5
118:11 156:12
**interactive** 46:8
46:14,16,17
47:2 80:17
81:2
**interest** 55:11
55:12,20 64:15
71:16 77:17
111:4,13,15,16
111:16 131:14
155:10
**interested** 25:19
163:7 165:12
**internal** 28:11
37:1 55:9
121:9
**internally** 85:18
**Internet** 46:19
46:21
**interpret** 68:22
71:3 78:6
130:13
**interpretation**
71:6
**interrupt** 62:6
**interview** 132:5

**introduction**
13:3
**invalid** 116:15
**investing** 80:17
**investments**
46:19 81:2
95:9,12 98:5
**involve** 45:8
**involved** 23:2
24:12,21 31:5
31:9,12 32:15
32:20 45:21
47:20 52:11,14
53:11,22 55:22
56:10,12,14
74:3 80:11
118:7,8 119:10
149:21 156:8
157:13,16
**involvement**
24:6 52:18,19
53:4 61:21
85:3 156:6,8
156:15
**involves** 66:18
**involving** 49:21
**issue** 115:11,15
126:12 147:14
**issued** 75:18
**items** 98:8 111:5
111:11,12
**iterations**
129:11

———————
          **J**
**January** 118:10
**Jeffrey** 60:4,5
65:2 67:4,5
68:12
**Jersey** 2:9 15:15
165:5,8,10
**job** 158:4
**jogs** 147:7

**John** 110:7,9,9
**judgment** 41:20
42:1,10 115:16
137:16,19
139:6 144:6
**judgments**
142:9
**Julie** 109:7
115:20 116:2
117:20 118:6,8
118:16,17,18
119:4 120:22
121:16 163:2
**July** 1:15 2:12
119:9
**jump** 116:7
**jumping** 50:21
**June** 61:13,16
62:10 109:13
113:11 119:9

———————
          **K**
**K** 15:10,10
**Kazan** 85:12,12
86:11 94:11
101:1
**keep** 14:22
21:20 22:1
59:1
**Ken** 13:2,5 14:3
33:12 68:5
74:21 81:4
99:17 107:16
119:15 124:3
147:17 163:12
**KENNETH**
4:16
**Ken's** 63:9
**kept** 133:10
**key** 29:12
**kind** 31:7,8 37:3
50:7 57:2
63:11 76:4

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

10

142:4 156:10
**kinds** 87:21,21
135:14
**KJC** 1:3
**Klee** 4:16 13:4,5
14:14 38:17
62:6 63:8 68:6
68:9 69:6,10
70:22 71:7
74:20 82:6
84:14 91:16
92:1 96:22
97:3 98:13
99:2,15 100:6
100:9 107:17
117:19,22
118:5 119:2,12
119:18 132:5
132:16 143:14
143:17 144:12
145:2,16,19
163:13
**knew** 113:17
118:17,18
**know** 13:17
14:14 16:15
22:16,22 25:16
26:10 30:13,22
31:16 34:10,19
38:20 41:5
42:1,15 43:19
45:9,12,14
46:11 47:15
48:20 51:10,20
51:22 53:19
54:17 55:18,19
57:9 58:14,17
63:1 64:8 65:9
65:16,21 66:3
69:9,12 70:14
70:17 72:2,9
76:9,10 77:21
83:2 86:22

87:14,18 90:4
90:15 93:10,12
98:8,17 103:6
103:16 105:4
105:20 106:2
110:16 111:20
113:16 114:5
114:14 115:2,7
115:10,13,14
118:15,19
119:8 126:22
128:7 130:8,20
133:9 134:20
135:4 138:8,11
139:18 142:4,6
142:9 143:4,5
143:10 149:19
152:8 153:5
154:10 155:17
156:10,19
157:5 158:8
159:6,18
160:18 161:4
161:10,16,21
162:12,15,21
163:2
**knowing** 32:6
163:7
**knowledge**
80:10,14
**known** 78:10
159:16
**knows** 140:7
**Kurmaniak**
1:14 2:1 4:13
5:3 14:11 20:6
20:21 33:19
59:12 63:16
66:3 74:17
81:9 82:7 84:6
85:10 86:4
97:3 100:3
108:5 112:9

120:3 124:6
132:21 148:1
151:4 164:8
165:9

———— **L** ————
**L** 32:11
**LA** 37:17
**label** 151:18,22
**labeled** 25:20
47:1 161:17
**lack** 144:21
**large** 27:9 141:1
**larger** 73:15
**late** 155:13,15
**latest** 155:2
**laugh** 36:12
**law** 117:11
123:17
**lawyer** 21:7
30:21 31:5,7,8
31:9,17 152:2
**lawyers** 13:17
14:19
**LBO** 32:15
49:20
**learned** 24:12
**learning** 24:13
135:18
**left-hand** 48:6
**legend** 151:10
**lender** 56:1
117:20
**lent** 161:2
**letter** 75:18
**letters** 76:3
**let's** 17:2 55:10
59:1 60:2
69:10 71:11
83:9,22 94:2
108:20 119:14
120:11 121:12
128:13,17

134:12 137:13
140:17 144:6
146:21 150:16
**lev** 122:5 123:13
126:16,17
127:2
**level** 65:20,21
**levels** 145:13
**leverage** 13:11
71:17 118:20
121:19 122:5,5
127:17 130:7
130:11 131:9
131:13 133:4,5
133:11,14
156:13,16,22
**leveraged** 30:16
118:13
**liabilities** 32:12
130:1
**liability** 30:10
30:18
**liable** 114:6
**License** 2:3,5
165:5,6,19
**limited** 87:10
158:15
**line** 11:2,7,12
32:10 111:11
111:12 113:18
115:8 118:14
119:4,6 122:15
128:1
**lines** 97:22
**list** 18:3
**listen** 148:21
149:6
**listening** 149:2
**lists** 79:19
**literally** 58:7
71:20 72:13
**little** 17:2 41:10
47:4 57:10

60:2 61:2 70:7
74:9 142:14
**LiveNote** 2:7
165:7
**loan** 161:2,11
**loans** 161:1
**Lockwood** 3:17
**longer** 119:3
**look** 21:5,6,15
22:19 23:3
25:7,15 28:7
29:13 37:14
38:4 41:1 46:3
48:13 50:5
57:6,12 58:11
59:20 69:3
82:3,4 83:9
84:10 86:3
88:6 89:15
92:21 93:5,7
94:9 95:10
97:12 99:16
112:4 127:3
130:12 131:16
135:7 137:21
138:14 139:17
141:18 147:6
152:12,19
154:20
**looked** 51:12,13
87:2 94:19
95:10 111:19
112:21 135:21
135:22
**looking** 13:16
19:3,4 22:13
36:8 38:3 49:5
63:16 82:17
88:13 90:2,10
94:17 95:11,15
97:3 98:17
101:12
**looks** 24:22

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

11

26:20 28:18
36:13 46:8,9
46:13 47:22
58:16 63:22
68:11 69:4
72:10 89:18
97:14 102:3,9
103:1 122:13
134:21,21
135:9 136:20
138:17 145:10
145:11,14
**Los** 27:8
**lot** 71:15 82:18
118:11 156:11
**low** 107:3
153:20
**lower** 25:9
106:8 107:9
152:1
**LTM** 97:16,20
98:17
**LTN** 101:20
**Lynch** 42:20
43:1 45:13,21
85:16 100:20
**L.L.P** 2:10 3:2
3:15 10:10

_____
        **M**
**M** 3:3 10:9
15:10 18:18
36:14,21 53:7
91:13 114:6,13
116:6,22 117:9
121:21 126:16
**machines** 25:11
**maintain** 55:8
**maintaining**
38:9 57:19
**majority** 18:20
18:20 62:19,22
**making** 13:7

29:16 31:18
50:4 55:4
68:19 69:1
80:12 104:10
104:16 140:17
142:1 144:6
**management**
65:21 96:6
103:5,7,8,22
104:5,7 105:12
105:13,18
106:7,10,17
107:3,9 153:17
153:18,19
**management's**
43:12 104:21
105:10 106:13
106:21,22
**managing** 17:14
18:5 19:8
100:21 115:21
**March** 24:16,16
25:5 74:10
75:17 78:10
118:11
**margins** 146:22
**mark** 20:5 59:6
74:11 82:6
83:10 99:19,21
107:22 108:13
119:15,18
123:21 137:11
147:17
**marked** 11:11
20:20 21:9
33:18 59:12
74:17 81:9
84:6 100:3
108:4 112:9
120:3 124:6
132:21 134:8
147:22 151:4
**Market** 3:7

**marketing**
24:14
**Markets** 4:12
15:11
**markings** 97:19
**marks** 109:8
**marriage**
165:12
**Maryland** 3:19
**matching** 98:16
**material** 75:13
**materials** 75:7
75:22 77:3
151:11
**matter** 2:2
116:1 117:13
165:13
**McPHAIL** 4:6
**mean** 39:1 41:18
44:2 47:11
48:13 49:18
52:16 67:16
68:18 69:7,14
85:6 104:6
105:11 116:21
129:19 139:3
139:12 140:7
140:10 142:22
143:3,22 144:2
144:9 145:20
146:14 147:5
152:17 155:13
157:3 161:16
**meaning** 18:21
27:4 136:14
**means** 42:19
43:19 53:9,17
144:4
**meant** 57:14
**measuring** 64:7
**mechanical**
98:20
**mechanically**

95:15
**mechanics**
28:13 56:7
64:19 86:19
87:4,10 155:8
**media** 18:14,16
18:17,19 19:1
54:3 60:9
139:7
**meeting** 16:18
26:20,21 27:4
27:8 120:15,19
121:9 148:21
149:11 150:10
**memo** 53:19
54:10,12
**memory** 147:8
**memos** 54:8
**mention** 39:9
**mentioned** 45:6
74:5
**merger** 53:13
54:17
**mergers** 18:11
116:19
**Merrill** 42:20,22
45:12,21 85:16
100:20
**methodology**
143:1
**metric** 64:6
**metrics** 64:12
131:16,19
**Michael** 45:20
66:12,13 75:6
85:13 100:17
100:19,21
102:17 116:3,3
116:3,4,21
117:6,13,15
149:5 157:8
**middle** 25:19
38:11 104:14

105:1,14
106:20 121:7
**midpoint**
153:20
**million** 34:18
79:20 80:3
98:3 99:6,8,10
**mind** 14:3 39:10
48:12 61:17
**minds** 16:19
**mine** 154:9
**minus** 69:21
70:2,2 103:11
104:10 111:4
**minute** 108:10
**minutes** 132:6
**missed** 121:6
**missing** 110:7
**mixing** 97:7
**model** 38:9 39:8
39:9,10,16,17
39:18 40:2,6,8
40:9,11,16
41:15 42:2,5,7
42:19 43:1,4
43:15 44:1,5
44:11 54:20
55:4,8 56:5,7
56:20 57:19
64:11,20 65:19
65:22 66:9,10
66:14 67:2
68:20 69:16
70:3,10 71:1
71:22 72:3
73:6,7,20
77:14 78:1,3
82:20 83:4,6
86:19 87:1,4
90:16,21 94:20
95:2,3 96:2,5,7
101:16 102:4,4
102:6 109:8

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

12

110:6 111:2,8
111:18,21
113:4,15 114:8
114:13,14
121:8 123:3,8
123:12 125:3,8
125:9,12
126:18 127:3,8
127:15,16,19
127:21 128:4
128:17 130:5,6
130:7,15,19
131:6,10 143:3
143:10 144:11
146:5,20
155:18 156:2,5
156:21 157:18
158:5,11,16,21
159:5 160:4
**modeling** 110:1
**models** 57:3
60:20 64:2
96:8 130:12,13
155:5
**Mohr** 19:6
24:12 109:1
115:21 120:22
124:18
**moment** 112:19
**Monday** 101:9
**Monk** 3:16 5:4
13:2,20 14:2,8
15:5,17 20:9
20:13 21:1,3
23:16 27:16
33:3,5,6,12
34:1,6 35:15
38:22 39:5
42:13 48:4
49:8,12 52:20
53:2,15 57:16
58:5 59:1,5,16
59:19 63:6

70:20 72:17,19
73:10,14 74:21
75:3 76:10,12
81:4,13,16
82:8,11 83:12
83:15 84:9,15
84:19 88:19
92:4 93:21
94:2,5 99:16
99:20 100:7,12
107:15,18,22
108:9,17
112:11,13
116:12,18
119:1,14,20
120:9 123:14
123:18,20
124:1,11 127:6
127:10,14
132:7,14
133:17 140:9
140:12,15
146:3 147:16
148:3,5,9,12
150:16 151:9
152:16,22
160:10,13
161:13 163:6
163:11,14
**month** 44:21
**months** 56:14
**morning** 35:1
67:3
**mound** 159:19
**move** 45:1
**moved** 18:14
**moves** 28:6,10
**moving** 59:2
**multiple** 22:3
48:16
**multiples** 162:1
**multi-page** 6:4
6:10 7:4,10,16

8:4 10:4 20:18
33:16 74:14
81:6 84:3
100:1 151:1
**Murray** 149:15
149:16,19,22
150:9 154:10
154:13

_____
**N**

**N** 3:1 4:1,16 5:1
13:1 15:10,10
15:10
**name** 47:18
54:10
**names** 54:6,7
**Naomi** 65:10
67:4 100:13
101:11,21
134:15 158:7
**nature** 77:18
**NCRA** 2:5,6
165:6,7
**necessarily** 31:1
157:5
**need** 14:21 32:4
32:7,10 64:17
98:7 119:8
143:6
**needed** 30:3
68:2
**needs** 29:20
31:21
**new** 1:16,16 2:8
2:8,11,11 4:8,8
15:12,12,14,15
44:7 45:6
124:22 125:21
126:8 136:22
149:13 165:5,8
165:8,10,10
**ninety** 18:21
**non-political**

139:14
**Notary** 2:7
15:14 165:7,10
**notation** 38:14
**note** 29:16 30:2
30:12 37:20
38:8 39:8 45:3
46:13 104:10
104:17
**notebook** 21:20
21:21 22:1,2,9
22:17
**noted** 30:3
163:20
**notes** 21:11,16
21:20 22:17
23:2,14 24:22
25:16,17 26:16
26:21 28:4,7
28:11 30:7,21
32:5 33:8,9
34:11 35:3,13
35:20,21 36:13
38:2 46:5
48:14,20 49:5
51:6 58:11,17
**notice** 89:8
**noting** 29:4
**notion** 51:21
**November** 57:2
**number** 19:14
20:22 21:10
25:8 33:13,20
34:8 36:4
37:13 46:18
50:5 59:7,14
63:16 70:8,11
71:18,21 74:11
74:19 78:10,16
81:11 83:12
84:2,10 88:6,7
88:9,10 92:21
93:3,5,7 94:6

96:13 98:16,16
98:19 99:11,21
100:5 101:8,16
101:21 102:13
108:1,6 112:6
112:11,17,21
119:16,17,20
120:5 124:1,8
128:5,6,7
129:5,10 133:1
134:8 147:17
148:2,8 150:21
151:6 160:13
**numbered** 25:8
35:4
**numbering**
25:10
**numbers** 25:10
25:11 52:1,10
70:4,9 77:22
94:14,16,19,20
95:16 96:2
97:8 98:9,10
98:12,21 99:1
101:15,19
102:19 114:1,2
114:8,15
122:14 156:17
158:9 160:12

_____
**O**

**O** 3:16 13:1
15:10
**oath** 12:11
13:14 15:8
**objections** 12:6
14:20,21
**obviously** 55:2
78:9 140:8
**occur** 141:7
**occurred** 37:10
**OCF** 79:7 104:7
145:8

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
                           New York, NY

13

**October** 56:13
56:13 57:1
148:6,13
149:12 150:9
150:13 155:15
160:1
**offer** 31:18
**office** 100:22
**officer** 12:10,12
117:2
**offices** 2:9
**official** 138:12
**officially** 137:17
138:6
**oftentimes**
40:21
**Oh** 23:13 67:21
152:4,12
154:21 158:17
**okay** 14:1,2 15:4
15:5 16:10,11
16:17,22 17:7
17:15 20:15
21:8,18 22:7
22:12 23:5,13
23:17 25:1
26:12 27:2,6
27:19 28:5,19
29:2,14,19
31:3,11,20
32:9,14 33:2
33:11 34:19
35:2,9 36:6,17
36:20 37:11,19
38:7,16 40:1
40:13 43:3,10
44:2 45:16
46:3,15 47:3
51:7 52:13
53:16 54:9
56:2,21 58:10
58:20 59:22
60:7,22 62:4

64:18 65:18
66:2 67:22
71:7 72:17
73:3 74:4,8
75:16 76:6,17
77:6 79:8,17
80:15,20 81:3
82:12 83:8
88:2 90:7 93:6
93:18 94:8
102:5,10
104:19 106:1
106:11 107:14
108:21 112:5
112:20 113:22
116:12 118:17
119:1 120:7
121:17 123:10
123:14 125:10
130:3 132:4,16
134:13 135:16
136:5,13,14
138:2 140:5
141:8 143:7
144:12,16
146:21 147:10
150:5,15 152:9
152:12 159:3
160:7
**old** 17:4,5 47:8
103:13
**Olympic** 139:15
139:15
**once** 18:22 86:6
111:9 144:19
156:14
**ones** 135:22
**one-page** 6:16
8:16 9:4,9,14
59:10 112:7
120:1 124:4
132:19
**open** 41:1 163:4

**operating** 68:16
69:7 71:19
72:2,6,14 78:1
78:2,8 79:6
135:2,11 137:5
137:20 145:22
**opinion** 29:21
30:16 32:21
51:4 85:4
87:11,11 94:16
96:3 97:5
**opposed** 114:21
115:12,21
121:21 142:10
**order** 32:3
48:14,19 142:8
162:4
**organization**
160:18
**organize** 22:10
35:13
**original** 10:9
88:20
**ought** 134:16
143:18 144:14
**outcome** 165:13
**outlier** 139:9,12
140:3
**output** 55:1,14
64:3,8,11,15
64:20 66:22
69:2 75:15
131:7,12,13,21
152:18
**outside** 91:12
**owned** 46:18
**o'clock** 34:22
136:19 150:8
**O'Grady** 85:13
100:17,19,21
102:17

_____
**P**

**P** 3:1,1 4:1,1
13:1 26:1 29:3
**pace** 138:4,5
**page** 6:2 7:2 8:2
9:2 10:2 11:2,7
11:12 22:20
23:4 25:20
26:16,17,22
28:10 36:1,8
37:13,17 38:10
38:11 39:12
46:3,9 47:5
48:5,7 75:12
77:3 79:18
88:7 89:1,9,16
90:5 97:17
131:21 143:18
148:19
**pages** 25:11
28:3,16 35:5
36:9 38:3,4
47:13 64:3,4
64:20 67:1
68:2 69:2
131:12,12,13
**paren** 30:9
**parenthetical**
69:7
**part** 13:19 17:4
32:21 64:2,7
119:11 131:10
149:6
**participating**
48:18
**particular** 13:12
23:4 25:18
26:22 27:7
28:10,20 29:15
30:6 31:6,13
44:7 53:20,21
79:12 95:6
98:14 113:22
117:17 135:13

149:4 154:4,11
**parties** 12:2
49:2 165:12
**partner** 53:8
117:11,18
**partners** 117:12
**pass** 32:4,7
**passed** 87:1
**passing** 85:17
**Pat** 26:1 28:21
29:16,17
**PAUL** 2:9 4:3
**pay** 116:16
**Pennsylvania**
3:9
**people** 19:19
40:3 47:20
54:6 66:19
69:2 72:2,4
81:21 87:22
91:15 109:2
117:12 130:8
157:6 158:8
**percent** 18:21
46:9 55:11,13
55:20 69:21,22
72:8,8 79:4,13
103:9,11,11
104:9 130:21
144:7,8,8
**percentage**
103:22
**Perfect** 93:21
**perform** 138:10
**performance**
46:14
**performs** 138:4
**period** 23:10
56:12 61:16
73:4,21 80:18
90:20 113:11
118:14 123:7
127:17 129:6

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

14

136:8 137:17
146:12 155:16
158:16
**periods** 79:5
**Persily** 109:7,18
115:20 117:20
120:22 121:16
163:2
**person** 13:15
16:3 19:14
28:22,22 54:14
65:21 110:11
114:6 115:9
116:4 117:17
118:21
**personal** 30:9
30:18 58:6
**personally**
40:17 73:8,10
130:7
**perspective**
105:6 126:13
**Phelps** 82:15
83:16 86:17
88:3
**Philadelphia**
3:9
**phone** 87:7
**phrase** 75:19
**physically** 40:16
60:8 157:5
**Piccarello** 3:3
10:10 13:21
20:5,16 26:13
33:4,14 59:8
68:4 74:12
81:5 83:11
99:18,22 100:8
107:20 108:13
119:22 123:19
123:22 124:3
132:17 147:15
148:10 150:19

150:22 163:17
**picture** 159:12
**piece** 162:5
**pieces** 50:11
**pile** 34:1,21,21
**pitch** 159:13,14
**pitcher's** 159:19
**place** 3:17 48:11
57:7 101:17
109:13 123:17
**placing** 49:15
**plan** 67:2
137:14
**play** 50:6
**please** 16:6 26:8
38:4 62:7
63:21 69:11
77:9 82:4
84:12 94:7
97:1 99:19
102:22 107:19
108:11 120:16
153:15
**plus** 31:21 104:8
**point** 25:17 38:6
40:14 44:3
51:1,11 56:19
57:2 71:14
76:20 78:9
82:21 86:14
104:8,9,10
133:3 146:7
156:2
**pointed** 28:21
**points** 19:18
**political** 139:13
142:13,16,17
143:4
**poor** 35:10
**portion** 23:12
23:12,19 24:1
24:22
**positive** 32:8

51:9 104:8
**possible** 74:1
157:7
**possibly** 93:16
**post** 62:16
113:10 125:1
126:1,3,22
134:17 137:5
137:16 141:22
143:19 145:6,7
**potential** 29:11
124:13
**practice** 21:19
134:2 138:2,7
**Pratt** 3:18
**precise** 143:2
159:6
**preliminary**
81:21 85:11,14
89:1
**prepare** 13:10
54:12,20
162:18 163:4
**prepared** 82:21
83:5 91:3
137:14 160:12
160:14 162:16
162:22 163:2
**prepares** 53:19
**preparing** 36:18
90:16 96:2
154:11 155:5
**present** 4:15
148:16 149:15
149:17
**presentation**
36:14 148:14
150:12
**presented** 52:5
130:6 149:12
**preserve** 14:19
**preserved** 12:7
**presidential**

142:3
**pretty** 47:9 49:7
49:17 58:15
156:6
**previous** 147:1
**primarily** 18:15
40:4 46:21
**primary** 55:21
95:14
**principal** 19:9
**prior** 56:9 62:22
146:7 156:17
157:1 158:10
**private** 75:18
76:3
**pro** 153:9
**prob** 124:22
**probably** 18:21
117:9 125:20
134:16 142:2,4
143:18 144:14
**problem** 91:17
**proceeding** 28:2
**process** 14:13
15:22 24:21
25:1 48:2,18
53:19 55:22
76:1,2 116:6
118:8
**produce** 153:3
**produced** 35:8
49:7 62:16
94:19 105:16
151:18 152:4
152:13,15,17
162:9
**PRODUCTION**
11:1
**Professional** 2:6
165:6
**profits** 29:4
**project** 19:21
66:14 141:15

151:12,14
**projected** 79:5
105:13 106:10
110:1 138:6
**projection**
136:8 138:12
143:10 149:13
**projections**
39:20 43:12,16
43:21 44:1,8
45:7,10 47:5,7
47:8 50:9
64:12 70:12,13
72:7 77:11
90:1,11,19
103:2,4,6,7,13
103:15 104:11
105:8,17,22
106:8,9,12,13
106:14 134:22
135:5,7,20,21
136:1 140:8
144:10 146:5
146:14,15,17
146:19 147:3,5
147:9 153:17
**projects** 80:1
**promoted** 17:20
**properly** 95:3
96:6 97:17
129:21
**proposal** 25:3
**protocol** 20:8
**provide** 65:20
68:20 82:20
114:2 127:15
128:12,14,17
**provided** 44:16
66:1 75:15
77:3 85:11
125:17 131:2
137:18
**provides** 49:19

80:3 102:2
**providing** 76:3
77:8,10,13
78:20 79:9
113:7 131:5
**proxies** 63:4
**proxy** 62:16,16
69:19
**Public** 2:8 15:14
165:7,10
**publishing**
46:22 69:22
77:11,21 78:9
78:11,22 79:3
79:13,19
103:12 137:7
141:1,15 145:9
146:1
**pulling** 101:15
**pumpkin**
132:10
**purchases** 44:20
**purposes** 41:16
55:10 114:15
**put** 14:4 22:11
25:11 51:21
58:7 146:19
**putting** 145:3
**p.m** 120:15
163:20

**Q**

**question** 12:7
13:12 16:12
23:7 34:13
39:14,15 41:22
50:1,4 56:9
63:10 67:14
68:7,11 71:4
73:16 87:16,18
91:18 95:19
109:8 113:6
115:6 116:14

118:22 126:2
128:5 137:11
137:12,13
140:7,13
142:16 143:15
154:18 158:15
**questioning**
113:19 115:8
**questions** 11:11
13:16,20,22
14:20 87:3,8
87:13 93:16
97:1,22 98:2
118:13 130:4
130:19 149:8
152:11 156:4
163:8
**quote** 47:8
57:14,19
**quotes** 58:7
**quoting** 58:7

**R**

**R** 3:1,5 4:1 13:1
15:10,10 165:1
**raise** 93:15
115:15
**raised** 115:1
**raising** 95:20
115:9 116:2
**ran** 128:21
129:19,22
**rang** 122:16
**rate** 55:11,12,20
71:17 135:10
142:7,11
143:12,12
144:3,5 147:1
**rates** 137:20
155:10
**rating** 63:4
75:17 76:2,16
**read** 26:6 58:11

71:19 72:12
108:11 112:16
117:13 145:21
153:15
**reading** 47:6
112:18 145:13
**ready** 59:21
**real** 117:12
**really** 22:22
38:2,5,15
49:18 61:3,12
87:16 114:3,7
138:8 156:10
159:17
**Realtime** 2:4,6
165:6,7
**reason** 34:20,22
35:6 72:16
93:1 104:15
107:10 140:2
**reasonable**
138:16,17,21
145:5
**recall** 31:13,14
32:17 42:8,18
47:11 72:16,20
80:18,22 81:1
82:1,9,12,16
82:18 83:1
88:3,4 90:18
90:22 94:15
95:18,21
110:19 113:2
122:21 123:2,4
123:5,9 124:15
124:17,19
128:21 129:18
132:1 133:20
135:13,17,18
136:2,4 146:9
146:10,16
147:2,11
148:16 149:2

149:16 150:7
154:2 155:4,6
155:7 157:21
159:9
**recalling** 48:1
**recapitalization**
51:15
**received** 20:20
33:18 34:16
59:12 74:16
81:8 84:5
85:15 86:6
100:3 108:4
112:9 120:3
124:6 128:8
132:21 146:14
147:3,22 151:3
**receiving** 82:17
101:3,5 128:1
128:3 147:8
**recess** 93:22
**recipient** 109:2
**recognize** 84:11
151:19 154:7
**recollection**
42:4 63:20
85:3 87:20
109:10 110:16
113:3
**reconcile** 98:9
**reconciliation**
48:17 98:6
**reconstruct**
49:4
**record** 14:4,22
57:18 71:8,10
71:12 83:19,21
84:1 94:3
163:17,19
165:11
**records** 34:18
**Recycler** 37:17
**refer** 30:12 32:2

39:9 45:18
47:10
**reference** 29:16
70:21 79:5
136:9
**referenced**
125:15 128:2
135:2
**references** 39:1
131:11
**referencing**
70:6 110:19
161:17
**referred** 87:22
103:4,4
**referring** 61:6
70:14 85:8
87:11,14 96:13
103:10 120:18
134:22
**refers** 29:3,22
38:14 46:11
134:20
**reflect** 110:16
**reflecting** 96:8
**reflects** 96:2
**refresh** 85:2
110:16 113:3
**regard** 80:13
**regarding** 73:5
81:2 91:12
92:18 102:18
110:17 113:3,4
125:16 149:22
151:11 154:3
157:19 158:20
**Registered** 2:5
165:6
**regular** 116:5
**relate** 23:7
**related** 23:18
46:21,21 51:5
53:13 62:18

68:1 76:13,15
76:22 82:2
83:17 87:4
98:4 165:11
**relating** 82:2
**relationship**
  117:7,11,16,18
**relative** 103:18
**relatively** 47:7
  51:19
**relied** 135:22
**reluctant** 122:4
**rely** 135:19
**relying** 90:1,5
**remaining**
  141:16
**remember**
  15:22 16:6
  30:14,19 56:19
  57:1 63:10
  72:5 86:16
  96:16,19,21
  101:3,5 109:12
  121:14 126:4,6
  127:20 128:19
  129:20 139:11
  141:20 145:16
  147:8 155:15
**rendered** 97:6
  128:22 129:16
**rephrase** 140:13
**report** 13:10,19
  85:11,14 95:10
  95:15 103:14
  105:16,16
**Reported** 1:20
**reporter** 2:3,6,7
  2:7 15:7 20:7
  20:22 33:15,20
  34:2 59:9,14
  74:13,19 81:11
  84:2 100:5
  107:21 108:6

108:15 112:6
119:17,21
120:5 124:2,8
132:18 133:1
147:19 148:2
151:6 165:5,6
165:7,7,7
**Reporter-NJ**
  2:4
**reporting**
  115:22
**representation**
  49:13
**request** 85:20
**requests** 72:11
**required** 63:3
**resend** 55:13
**residing** 117:1
**respect** 82:16
  95:19
**respective** 12:2
**respond** 44:9
  67:10,12,15
  136:21 137:1
  144:12
**responded**
  144:16
**responding**
  67:19
**responds** 120:21
  137:4
**response** 38:18
  71:3 122:21
  124:13 138:20
**responsible**
  40:10
**rest** 85:17
**resulted** 152:18
**resulting** 64:12
**results** 131:8
**retained** 10:9
**return** 14:18
  20:11,13

131:18
**retype** 70:4
**revenue** 69:21
  69:22 79:3
  103:12 135:1
  135:11 137:5
  137:19 139:10
  141:1,14,16,19
  142:5,15 143:4
  143:7,12,12
  145:7,22
  146:22
**revenues** 77:21
  78:8,11 79:13
  142:17 144:4
**review** 85:21,22
  86:1 91:9
  96:10 98:20,20
**reviewed** 86:6
  87:2
**reviewing** 96:16
**Reviews** 21:14
  34:9 37:15
  48:8 59:17
  75:1 81:14
  84:13 100:10
  108:12 112:15
  124:9 148:7
  151:7 153:10
**revised** 43:12,16
  121:7 122:9
  125:8,12
  149:13
**revisions** 126:8
**Rich** 1:21 2:2
  165:5,18
**RIFKIND** 2:10
  4:3
**right** 15:20 16:4
  16:21 17:1
  18:9 19:17
  20:1,3 21:1
  23:21 24:4

25:2,6,14,19
26:19 27:17,22
28:15 30:8
31:15 32:18
33:5 34:4
35:16,21 36:7
37:5,11,21
38:22 39:6
40:7 41:7 42:6
42:21 44:19,22
45:2 49:3
50:12 51:3
52:2 54:1,5,13
56:6 57:5
58:20 59:1,16
60:1,10,22
61:4,19 63:14
64:22 66:7,16
74:22 75:17,21
76:21 77:1
78:5 79:11
81:3,13 82:19
84:20 85:19
86:7,12,20
88:5,9,17 89:5
89:7,20 91:1
94:12,22 95:4
95:13,16,17
96:9 97:5
99:13 101:6
102:12 104:12
105:9,19 107:7
107:18 109:5
109:11,16
110:14 111:1
112:2 113:9,12
114:9,11,16
115:4,5,11,18
118:21 120:10
120:20 121:3
122:2,6,20
125:14 128:10
129:12 130:22

131:3,4,22
133:13,18,22
134:5,6 135:8
136:11 138:19
139:2,16,22
140:9,19 148:9
152:16,17
153:1 154:15
155:21 157:10
158:12,14
160:9 162:6,22
163:11
**right-hand** 25:9
  79:1 97:19
  152:1
**role** 19:2,4
  41:10 44:10
  55:21 62:2
  110:12 113:13
  113:20 119:7
  121:12,13
  130:12,12
**roles** 54:18
**Rosanne** 1:14
  2:1 4:13 5:3
  164:8 165:9
**Rosie** 13:5 58:1
  126:17,21
  127:2,7,11
  159:18
**Roth** 60:4,5
  65:2 67:4,5
  68:12 71:1
**Roth's** 69:11
**roughly** 23:2
**RPR** 1:21
  165:18
**RULING** 11:11
**run** 24:19,20
  39:22 40:2
  42:7 57:3
  60:20 64:1
  70:9,10 77:16

87:5 127:3
130:12,16,18
130:20 131:18
158:8
**running** 55:18
56:4 64:21
79:3 96:6
113:14 114:13
114:14 127:7
127:18 129:5
129:10 156:11
158:5
**runs** 89:10
**Rustic** 47:16,17
47:21

---

**S**

**S** 3:1 4:1 6:1 7:1
8:1 9:1 10:1
13:1 15:10
**Sachs** 65:10
67:4 100:13
**Sam** 49:21
**Saturday** 101:8
**SAUL** 3:2,15
10:10
**saw** 131:10
**saying** 16:4
57:15 58:2,8
58:15 68:13,15
87:18 101:12
103:13 115:10
115:14 122:4
126:21 127:2
128:19 133:12
134:16 139:20
142:22
**says** 29:20 30:9
37:20 38:8
49:16 66:22
69:11 70:8
71:20 104:6
109:8,20 121:7

128:4 137:4
143:18 151:11
154:21
**Scardigli** 66:12
75:4 109:1,7
109:17,20
**scenario** 68:21
79:2
**scenarios** 39:20
68:17,21 69:8
69:20,21 71:19
72:3,6,14 73:1
73:22 130:18
**schedule** 14:7
14:12 39:19
77:16,17
**scheduling** 14:6
**school** 17:9,11
**sealing** 12:3
**second** 20:17
70:1,13 78:7
86:4 88:7
90:19 136:7
146:11 153:13
**security** 120:17
**see** 26:4,9 37:16
38:8,12 48:9
55:14 72:10
76:14 84:11
85:7 90:5
103:14 135:1
145:2 147:7
148:19 151:21
153:11,22
154:1 159:12
**seeking** 32:21
72:21
**seen** 85:2 109:19
123:12 151:20
154:4
**sees** 16:7
**self-help** 24:15
**sell** 155:9

**send** 40:22
45:10,11,14
67:2 69:12,14
72:13,22 86:8
122:3,12,14
**sending** 55:21
72:1 117:22
118:4 122:18
123:2 124:15
**senior** 115:9
**seniority** 116:14
117:15
**sense** 36:10
152:15
**sensitivity** 89:9
**sensitize** 105:21
**sent** 45:6,12
64:16 71:2
77:20 86:10
95:1 102:1
123:12 124:18
137:1 146:16
**sentence** 29:15
71:20 72:13
85:21
**separate** 132:1
**September**
56:13,14 57:1
60:12 63:18
73:21 134:11
134:11 145:4
147:12 159:21
159:21
**series** 134:10
**session** 155:11
**set** 28:3 33:9
45:6 47:1 70:8
70:11,12,13
72:7 78:4
103:2,3,15
105:7,17 110:4
131:11 135:4
146:16 147:3,5

147:8 165:9,14
**setting** 109:2
**seven** 104:8
144:8
**seventy-three**
79:20
**shaking** 16:8
**share** 44:19,20
44:22 72:4
91:11,20 122:4
**shared** 42:19,20
**shareholders**
29:6
**shares** 71:17
**sheet** 39:18
**sheets** 71:21
72:14,22 75:15
**she'll** 126:18
**short** 93:22
149:9 157:3
**shorthand** 26:7
**show** 16:9 64:4
69:2 74:11
123:20 147:6
**showing** 64:8
**shy** 159:16
**side** 24:20 45:22
48:6 73:17
117:20 121:18
121:19,21
**sign** 14:18
**signed** 12:9,11
**significant** 55:3
**similar** 86:21
**simple** 55:19
**Simply** 134:16
**single** 70:5
143:2
**sit** 31:4 49:4
87:19 105:4
134:2 140:1
145:3 157:5
**sitting** 155:7

**situations** 162:1
**six** 72:8 104:10
**sixty-four** 98:3
99:6,8,10
**skinny** 47:9
49:17,21 50:19
58:15
**smcphail@pa...**
4:11
**soft** 92:5
**solvency** 29:20
30:16 32:3,4,7
32:21 81:21
82:13 85:4
89:13 92:14,18
96:3 105:6,16
146:6 157:19
158:21
**solvent** 32:4
**somebody** 25:18
31:17 57:15
58:8 119:3
137:15 153:14
157:8
**someplace**
104:22
**somewhat** 122:4
**sorry** 27:11
38:17 74:21
85:22 87:15
91:16 93:4
118:3 151:21
158:14
**sort** 44:16 49:15
50:3,21 61:6
61:15 111:20
113:10,14
115:9 117:10
119:8 127:4
155:13
**sound** 138:16,17
**special** 24:7
**specialize** 18:19

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

18

specific 97:9
  110:21 111:11
  111:19 142:10
  143:8
specifically
  111:21 118:15
spell 47:14
spend 55:3
spent 18:21
  62:22 155:19
spin 29:11
spiral 21:20,20
  22:1,2,9,17
split 52:16
spoken 92:5
sponsoring
  54:15
spreadsheet
  43:21 102:1
  131:7
Square 3:6
ss 165:3
staff 155:12
stage 22:18
  34:11 85:5
  90:18 91:9
  92:9,13,15,19
  96:17 115:4
  128:22 129:17
  135:17,19,22
stages 118:7
stamp 6:17 8:17
  9:5,10,15
  59:11 112:8
  120:2 124:5
  132:20
stamps 6:5,11
  7:5,11,17 8:5
  8:11 9:20 10:5
  20:19 33:17
  74:15 81:7
  84:4 100:2
  108:3 147:21

151:2
standardized
  131:12
standing 159:18
stands 160:19
staple 118:9
start 17:2
  108:18 121:12
  136:20 142:1
started 17:11
  18:12 42:16,17
STATE 165:2
statement 39:18
  137:10
States 1:1 2:8
  15:14 165:8,10
stays 80:8
stenotype 1:20
step 18:4 126:11
steps 53:6
STIPULATED
  12:1,5,8
stop 109:11
  127:1
stopped 60:18
  61:19 62:8,11
  127:19 129:7,8
  129:8 155:4
  156:1,1,15
stops 126:17
Street 3:7,18
  15:12
strike 104:22
  147:13
string 94:10
structure 50:10
struggling 72:5
STUART 4:6
stuff 152:2
  155:14
subject 33:8
  75:7 94:14
  134:15

subjective
  143:13
submitted 48:20
  54:8
Subscribed
  164:10
substance 14:20
  15:1
substitutes
  70:12
suggest 48:15
suggested
  125:17 146:21
suggesting
  44:14 152:6
suggestion
  140:17 144:21
suggests 106:19
  145:21
summary 79:2
summer 155:16
Super 143:5
superior 116:17
  116:20 117:3,4
supervision
  40:11
sure 34:14 41:20
  42:14 49:7
  54:21,22 55:4
  56:18 58:22
  60:16 82:4
  83:13,15 94:21
  95:2,11 96:4
  97:2 115:3
  119:13 126:13
  126:21 129:3
  129:21 143:16
  146:16 149:10
  162:12 163:6,9
surprised
  109:21
switch 69:17
  70:15 87:5

switched 18:17
sworn 12:9,12
  13:14 15:13
  164:10 165:10

———— T ————
T 6:1 7:1 8:1 9:1
  10:1 165:1,1
tab 20:4 22:14
  59:3,6 74:20
  74:21 81:4
  83:10 84:14,15
  99:17 107:19
  112:3 119:15
  124:3 132:14
  147:16 150:20
table 16:1
take 16:2,3
  22:21 29:21
  30:20 35:11
  38:3 58:22
  59:20 65:1
  84:10 86:2
  93:20 108:10
  112:19 134:16
  142:12 143:19
  144:6,14,21
  145:5,17,22
  161:1
taken 2:1,9
  12:13 43:20
  94:1 146:19
takes 16:7
talk 16:2 41:9
  59:21 60:2
  115:10 118:16
  119:4 128:6
  133:14
talked 47:12
  54:19,19
  122:15 137:22
talking 15:2
  19:5 48:16

49:1 55:10
  102:4 106:16
  106:16,17
  118:18 124:17
  158:7
tax 28:22,22
  29:7
taxes 111:4
taxi 92:7
team 40:4 43:22
  45:20,21 46:1
  60:6 66:6
  85:17,22 91:4
  91:13 92:8,12
  92:17 128:3
  131:16 133:14
  158:8
tear 22:9
telecom 18:14
  18:15,16,18,19
  18:22 54:3
  60:9 139:8
teleconference
  4:17
tell 17:3 21:12
  22:13 25:16
  26:7 29:22
  30:7 36:12
  37:2 38:5,13
  44:22 46:12
  51:5 53:10
  59:21 75:12
  102:21 123:11
  126:18 128:6
  128:16 163:1
telling 85:22
  144:17
ten 135:20 144:7
tends 139:13
ten-year 90:11
  146:17,18
  147:5
terms 14:5,15

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

19

116:9,13,16
117:15 118:12
118:20 139:9
**test** 32:4,7 89:9
 89:17
**testified** 15:15
**testimony** 62:8
 123:7 165:11
**thank** 13:7 14:4
 15:6 58:13
 59:15 63:8
 81:12 92:1
 100:9 108:7
 119:12 120:6
 132:16 145:19
 163:14
**thanks** 134:18
**they'd** 55:12
**thing** 15:21
 21:12 25:15
 37:16 59:20
 76:4 89:8
 115:4,11
 154:19
**things** 44:17
 45:15 46:20
 55:5 63:4
 71:15 77:17,20
 87:6 99:14
 118:17 122:18
 128:3,13 143:5
 161:9
**think** 18:3 23:11
 24:11 25:4
 28:2 29:4 30:2
 40:19 41:10
 42:3 47:12
 50:1,15 51:8
 52:17 56:9
 57:9,18 61:13
 62:3 67:1
 88:13,15 89:2
 91:21 97:6

98:3 99:9
101:15 103:11
104:15 106:16
106:17 114:10
115:7 116:8
119:6 120:18
121:15 122:10
123:6 124:13
126:12,17
129:7,9 135:20
138:1,21
144:20,22
145:5 152:14
160:1 161:14
**third** 102:16
**thirty-four** 17:6
**thirty-three**
 17:5
**thought** 23:9
 44:12 49:3
 70:2 88:16
 99:5 133:2
 155:15 159:17
**thoughts** 57:15
**three** 25:12,21
 29:21 34:17
 36:5 56:14
 68:20 70:2
 80:4 88:8
 97:18,21 104:9
 104:10
**throw** 44:2
 159:13
**throwing**
 159:13
**Thursday** 121:9
**tied** 31:1
**tight** 50:15,17
 50:19 51:9,19
 51:22 58:22
**Tim** 120:22
 121:7,12,14
 122:13 123:2

125:6 126:7
128:1,1 130:4
131:9 157:8
**time** 12:7 14:11
 15:19 16:4
 17:16 18:10,20
 19:2 22:4,21
 23:2,10,19
 24:1 25:5,17
 28:8,9 29:1,6
 32:19 40:14
 41:10 43:4
 48:2,16,19,21
 48:22 51:2
 52:21 53:3
 55:3 57:7,9
 62:21 65:5
 66:7,14 67:6
 70:5 71:14
 72:12 73:4,20
 76:20 78:9
 80:18 82:21
 86:14 93:19
 97:5 101:7
 112:4 113:11
 114:18 115:5
 118:11,14
 119:2,7 121:15
 123:7 125:2
 126:9 129:2
 138:14,14
 139:13,13,17
 139:17 140:11
 141:7 145:4
 146:8 149:5,5
 149:9 155:16
 157:1,17,18
 158:11,18
 159:4 160:5
 163:20
**times** 19:18
 44:18 50:18
 132:12 135:15

**timing** 14:15
 41:9 68:2
 75:16 147:13
**tired** 130:9
**title** 65:15,16
 121:15
**today** 13:7,13
 14:7 31:4 49:4
 87:19 101:13
 105:4 125:2
 126:1,3,22
 134:2 140:1
 145:3 154:14
 157:21
**today's** 121:8
**toggle** 70:5,6,8
 70:11,13
 158:22
**toggled** 68:14,20
 69:13,15 71:2
**toggles** 87:5
 130:9 155:9
**told** 118:15
 119:3 128:17
 132:7
**tomorrow** 67:3
 120:15 148:20
**top** 46:8 48:6
 66:18 67:11
 85:16 102:14
 121:6 124:12
 148:19 151:10
**topic** 68:1
**topics.net** 46:20
**total** 131:15
**touch** 156:14
**Tower** 120:15
 151:12,14
**transaction**
 13:11 17:17,17
 22:5,5,6,8
 28:14 30:4,17
 31:6,9 32:16

32:16 34:12
36:10,15 38:6
39:16 40:4
42:11 43:6
47:21 49:21,22
50:10 51:1,9
51:10,13,17,18
51:22 52:19
53:12,21 54:11
54:17 55:2
56:1 60:14,18
60:19 61:2,7
62:9,12,13,18
62:21 63:11
82:14,22 83:17
83:18 92:10
117:3,4 118:10
119:10 157:1,7
157:19 158:18
**transactions**
 22:4 29:12
 30:5 42:8
 51:14 139:4
**transcript** 1:4
 14:16 16:9
 117:14
**transition**
 113:19 114:12
**transitioned**
 56:20 155:17
**TRB0147215**
 8:6 100:2
**TRB0147296**
 8:7 100:3
**treat** 137:13
**trial** 12:7
**Tribune** 1:7
 13:6 17:17
 19:1 22:18
 23:7,18 24:6
 28:22 31:17
 32:16 46:2,18
 65:13,16 75:15

Henderson Legal Services, Inc.

Kurmaniak, Rosanne          CONFIDENTIAL                    July 7, 2010
                           New York, NY

20

100:15 116:1,4
117:2,8 120:15
121:10 148:14
148:20 149:11
150:12 151:15
155:3 157:21
**Tribune's** 103:6
**trouble** 14:10
92:6 114:22
115:12
**troubled** 161:1
161:2
**true** 78:18
165:11
**trust** 27:17,21
**truth** 13:16
**try** 13:18 14:11
16:16 57:7
106:3 130:13
163:3
**trying** 23:1 26:1
29:7 44:4 50:6
52:21 56:8
97:15 98:8
127:7 159:4
**turn** 20:4 26:15
26:15 33:7
36:1 37:12
75:12 76:6
81:4 89:16
94:6 107:19
112:3 132:10
132:14 147:16
160:4
**turned** 68:9
158:11,16
159:5
**turns** 103:18
**twenty** 80:5
**twenty-two** 46:9
**two** 14:9 23:2
29:21 34:15
38:3 44:17

53:6 68:16
69:7,21 72:2
79:4,10,13
82:13 88:14
94:21 99:11
103:8,11,11,18
104:9,17
105:11 106:20
**two-second**
93:20
**type** 55:13 77:21
86:22 118:21
154:3
**types** 42:8
**typically** 42:10
53:10 54:12
62:14 161:22

───── U ─────
**U** 15:10
**Udi** 66:3,5
**Uh-huh** 22:15
25:22 26:3,5
26:18 29:9
37:22 46:4,7
46:10 48:10
56:11 61:10
63:17 64:14
66:20 68:8
78:12 81:19
89:4 92:22
100:16,18
101:10,18
102:15,20
109:4,9 111:6
113:1 120:13
121:1,11
122:11 124:14
134:9,19 137:2
148:3,15
149:14 151:13
**undergraduate**
17:9

**underlying** 40:5
**understand**
16:12,15,19
47:13 68:18
105:15 117:6
117:19 127:7
128:8 129:3
143:21
**understanding**
23:22 62:2
77:2 89:22
90:10,14 111:9
**understate**
142:14
**understood** 96:7
**undertook** 91:8
**unit** 46:16 51:16
**UNITED** 1:1
**units** 77:11
**unquote** 47:9
**update** 121:8
**updated** 38:10
123:3
**updating** 123:8
156:1 158:21
**upper** 79:1
97:18
**use** 21:19 25:10
39:8,8 42:1
86:19 96:1
138:8,21
140:18 141:14
153:3
**useful** 43:5
**usually** 44:5
45:11 77:19
122:15

───── V ─────
**valuation**
103:14 153:6,8
153:13,14,16
155:2 161:4,21

162:4
**value** 161:10
162:3
**various** 19:18
29:10 39:20
46:19 48:1,17
55:18 58:17
64:16 68:14
69:2,12,19
71:2 73:21
**versus** 51:18
98:10 135:20
**vice-president**
17:13,18,21
19:3
**video** 4:16
**view** 50:14 91:7
91:19
**viewed** 117:1,16
117:17
**viewpoint** 60:18
**views** 130:14
**violation** 123:16
**volume** 33:12
**VRC** 64:17 67:3
82:15,16,20
83:3,6 84:22
85:4,8 86:15
86:22 87:17,22
88:4,20 89:13
92:14,18 93:15
94:16,19 95:10
96:1,17 97:5
98:9,21 99:3
99:14 103:1,21
104:14,20
105:3 106:5,6
107:2,9 135:19
146:4 153:20
**VRC's** 89:22
91:8,12,19
98:15 106:8,12
136:3

───── W ─────
**Wait** 151:21
**waiting** 101:20
136:14,15,16
**waived** 12:4
**walk** 86:18
**walking** 155:8,8
155:19
**wall** 73:17
126:15 127:1,4
**want** 13:2 14:4
14:4 15:3
22:21 30:15
33:8,21 35:10
51:4 57:20
58:21 68:10
70:7 71:20,22
72:4,13 89:15
97:11 107:18
108:10 114:6
115:3,15
126:13,20
129:2,20 142:1
142:2,15 147:6
152:10 159:12
159:20 160:15
**wanted** 46:6
95:2 96:4
130:18 132:2
144:6,9 145:1
145:15,17,21
**wants** 68:13
**wasn't** 44:19,22
52:11 56:10
80:21 98:16
118:13 119:8
119:10 123:15
156:8
**way** 16:13 35:7
35:13 38:2
47:7 49:6,15
51:5 73:17
76:15 80:18

Henderson Legal Services, Inc.

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

21

89:18 98:22
107:10 108:20
110:17 113:5
114:11 120:11
139:9 140:3
143:11 154:17
162:12 165:12
**ways** 50:5
**Wednesday**
1:15 2:12
**weeks** 29:21
**WEISS** 2:9 4:3
**welcome** 163:16
**went** 43:4 107:3
107:9 122:15
159:6,10,21
**weren't** 97:16
156:11 157:13
**West** 3:6
**we'll** 16:16 34:2
57:12 58:11
59:6 74:11
83:10 119:15
**we're** 13:12,16
14:15,16 19:5
20:4,9,11,13
24:5 33:8 41:9
42:2 50:21
57:6 88:13
99:20 102:4
112:3 119:14
123:20,21
127:20 133:9
135:9 147:17
154:19 159:4
163:13
**we've** 14:12
21:9 24:12
47:12 54:19
62:18 75:4
122:14 129:7
132:7 138:6
144:11 161:1

**WHARTON**
2:10 4:3
**whatsoever**
157:17
**WHEREOF**
165:14
**witness** 5:2 11:6
14:1 15:4,6,8
23:9,13 27:11
27:13 35:9
38:19 42:6
47:17 57:22
58:3,13 59:15
62:13 68:8,22
69:9,16 71:5
71:13 76:7
81:1,12 88:16
91:17 92:2
96:21 97:2,13
98:15 99:4
108:7 116:11
116:21 117:21
118:2,6 119:5
119:13 120:6
127:11 132:11
143:16 144:1
144:16 145:10
145:18,20
160:14,17,21
163:16 165:9
165:11,14
**witnesses** 15:2
**wondering**
50:18
**word** 43:18
50:15,19 70:13
153:3
**words** 39:12
62:11
**work** 22:3 41:14
54:20,21 55:7
62:17,18,19
63:1,2,12

65:19 87:9
90:8 91:8,19
108:20 114:21
117:10 120:11
125:1,22 126:3
126:15,21
127:16 130:9
131:8 146:7,14
147:6 152:18
154:11 155:20
157:1 158:6
**worked** 19:20
23:19 24:2
37:2 39:16
43:22 62:10
65:22 66:7
**working** 14:5
21:21 24:13
39:18 41:8
42:19 43:14
46:1 48:22
52:4 55:17
60:13,19 61:15
62:9,11 64:19
65:5 66:6,14
73:20 90:17,19
92:9,13 94:10
111:8 122:18
125:2 127:19
127:20 136:7
156:20 157:7
163:3
**workout** 160:19
**works** 60:6
65:10 67:5
100:14 121:16
126:14
**worksheets**
68:16
**world** 116:19
**worried** 97:7,16
99:12
**worry** 98:14

99:2,13 152:3
**worse** 105:13
**wouldn't** 45:9
119:9 130:14
157:4
**Wow** 159:15
**write** 93:2 130:8
**writing** 76:7
**wrong** 88:15
99:3,14 114:7

——————
**X**
**x** 1:5,8 5:1 6:1
7:1 8:1 9:1
10:1 87:11
111:15 127:3
139:19

——————
**Y**
**Y** 87:12 111:15
139:19
**yeah** 27:18 44:4
49:10 57:8,11
67:18 88:21
97:13 99:22
102:11 116:11
116:21 117:21
119:20 127:6
136:14 140:12
156:3 158:17
159:8 163:13
**year** 97:20,21
138:5,12 139:9
139:12,15,15
139:20 140:3
140:22 141:4
141:10,14,19
142:8 143:2,6
143:8 155:17
**years** 17:5 18:17
78:22 80:4
90:2,11 134:17
135:6,20 136:1

138:9 139:14
139:14 141:16
141:22 142:10
142:13,16
143:20 144:15
145:6 146:7
147:1
**Yep** 24:19
136:12
**York** 1:16,16
2:8,11,11 4:8,8
15:12,12,15
136:22 165:8
165:10
**Yucaipa** 28:7,9
39:2

——————
**Z**
**Z** 111:15 139:19
**Zell** 24:15,20
25:3 37:21
49:1,21
**zero** 69:22
**Zuckerman**
66:4

——————
**0**
**00023666** 10:6
151:2
**00023682** 10:7
151:3
**00029566** 9:6
120:2
**00038428** 7:6
74:15
**00038430** 7:7
74:16
**00087734** 9:21
147:21
**00087735** 9:22
147:22
**00103592** 7:18
84:4

Kurmaniak, Rosanne          **CONFIDENTIAL**          July 7, 2010
New York, NY

**00103601** 7:19
84:5
**00124068** 9:11
124:5
**00133755** 8:12
108:3
**00133756** 8:13
108:4
**00146365** 9:16
132:20
**00160830** 8:18
112:8
**00171977** 7:12
81:7
**00172025** 7:13
81:8
**06** 79:14,14
**07** 48:7 79:14
101:15 155:13
**08-13141** 1:3

---
**1**
---
**1** 6:3 20:6,21,22
21:10 70:9
85:5 91:9 92:9
92:13,15,19
96:17 154:20
**1st** 37:8 52:3
61:12 63:12
148:13 149:12
150:13
**1:45** 132:9
**1:55** 163:20
**10** 9:3 74:21
79:14 119:17
119:20 120:3,5
**100** 8:3
**10013** 15:13
**10019** 2:11 4:8
**108** 8:9
**11** 9:8 79:14,14
81:4 123:22
124:1,6,8

148:20 150:8
**11th** 109:13
**11:06** 2:12
**112** 8:15
**12** 9:13 83:10
84:15 132:21
133:1 134:8
**12/31/06** 98:1
**120** 9:3
**124** 9:8
**1285** 2:10 4:7
**13** 9:18 147:18
148:1,2,8
**132** 9:13
**1330** 98:19
**1335** 98:20
**1336** 98:18
**14** 10:3 99:17
100:7,8 150:21
151:4,6 160:13
**147** 9:18
**15** 5:4 100:6
**1500** 3:7
**151** 10:3
**17** 107:19
**18** 89:1
**19th** 63:18
**19102-2186** 3:9
**1998** 17:10

---
**2**
---
**2** 6:9 19:14
33:19,20 34:8
70:11 128:22
129:17 135:18
135:19
**2nd** 148:6 150:9
**20** 6:3
**20th** 158:19
**2000** 137:15
**2006** 24:9 41:12
78:9 79:19
99:8

**2007** 13:11
24:16 43:11
52:10,12,15
56:16,17 60:12
63:19 73:21
78:10,15 80:2
81:18 97:4,6
109:13 122:9
127:19 129:8
134:11,11
140:16 145:4
146:8,12
147:12 148:6
149:13 154:22
**2008** 122:9
**2010** 1:15 2:12
164:11 165:15
**2011** 78:19
122:9
**2012** 134:17,22
135:12 136:10
137:5,6,15
139:8,11 140:2
140:18,21
141:3,3,18,22
142:2,18
143:19 144:15
145:6,7,9,12
145:13,14,15
**2013** 89:10,14
90:6
**2014** 142:2
**2016** 142:5
**21** 119:15
**212** 4:9,9
**21202** 3:19
**215** 3:10,10
**22** 124:3
**27th** 74:10
75:17 134:11
145:4

---
**3**
---

**3** 6:15 28:16
34:22 59:7,12
59:14 63:16
120:15
**3/31/07** 98:1
**3:11** 136:22
**3:16** 136:21
**30X100184700**
2:4 165:5,19
**30XR00016800**
2:5 165:6
**33** 6:9
**332.8668** 3:20
**332.8870** 3:20
**361** 26:17
**368** 28:17
**369** 25:12,13,21
28:17
**37** 59:3,6
**373.3789** 4:9
**38th** 3:8
**388** 15:12
**3946** 77:22

---
**4**
---
**4** 7:3 20:4 22:14
74:11,17,19
136:19
**4th** 61:13 62:10
154:21 155:3
**4:24** 137:3
**4025** 77:22
**410** 3:20,20
**429** 77:3
**430** 77:3
**44** 147:14,17
**492.0789** 4:9

---
**5**
---
**5** 7:9 81:9,11
82:7 85:10
88:6,9,10,16
92:21 101:8

**5th** 81:17 101:9
**500** 3:18
**522** 47:16
**524** 37:14,16
38:10
**525** 37:13 46:3
**527** 48:6
**59** 6:15
**590** 36:4
**594** 97:18

---
**6**
---
**6** 7:15 83:11,12
84:2,6,10 86:5
91:2 93:3,5,7
94:7 96:13
97:3
**6th** 120:16
160:1

---
**7**
---
**7** 1:15 2:12 8:3
99:19,21 100:4
100:5 102:13
**7th** 97:4 101:9
**71** 132:15
**73** 33:13
**74** 7:3 112:3
**78** 150:19,20

---
**8**
---
**8** 8:9 108:1,5,6
**81** 7:9
**84** 7:15

---
**9**
---
**9** 8:15 108:14
112:6,9,11,17
112:22 119:16
119:19
**9th** 48:7 97:6
**972.4170** 3:10
**972.8445** 3:10
**98** 17:11

Henderson Legal Services, Inc.

Kurmaniak, Rosanne          CONFIDENTIAL          July 7, 2010
New York, NY

23

**989** 89:16
**995** 88:7,7,11,17
89:2