# **ATTACHMENT E**

*Transcript of Interview of Moses Rucker and Bryan Browning (VRC) (without Exhibits)*

1

1

2    IN THE UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

4    CHAPTER 11 - Case No. 08-13141 (KJC)

5    (Jointly Administered)

6    - - - - - - - - - - - - - - - - - -x

7    In re:

8    Tribune Company, et al.,

9              Debtors.

10   - - - - - - - - - - - - - - - - - -x

11                     250 Park Avenue

12                     New York, New York

13                     June 30, 2010

14                     2:00 p.m.

15

16      CONFIDENTIAL INTERVIEW UNDER OATH OF

17              MOSES RUCHER

18                 -AND-

19             BRYAN BROWNING

20

21          *      *      *

22

23

24

25

2

1

2   APPEARANCES:

3

4   EXAMINERS fOR TRIBUNE CHAPTER 11:

5   KLEE, TUCHIN, BOGDANOFF & STERN, LLP

6        1999 Avenue of the Stars

7        39th Floor

8        Los Angeles, California 90067

9   BY:  KENNETH N. KLEE, ESQ., Examiner

10

11   SAUL EWING, LLP

12        Center Square West

13        1500 Market Street

14        38th Floor

15        Philadelphia, Pennsylvania 19102-2186

16   BY:  NICHOLAS J. NASTASI, ESQ.

17        CHARLES O. MONK, II, ESQ.

18        CAITLIN PICARELLO, Associate

19

20   FOR VRC AND WITNESSES:

21   WINSTON & STRAWN, LLP

22        200 Park Avenue

23        New York, New York 10166-4193

24   BY:  DAVID NEIER, ESQ.

25

3

1      June 30, 2010

2         B R Y A N   B R O W N I N G ,

3   having been first duly sworn by a

4   Notary Public of the State of New

5   York, upon being examined, testified

6   as follows:

7         M O S E   R U C H E R , having

8   been first duly sworn by a Notary

9   Public of the State of New York, upon

10  being examined, testified as follows:

11        MR. KLEE:  Please state your

12  names for the record.

13        MR. BROWNING:  Bryan

14  Browning, B-r-y-a-n, B-r-o-w-n-i-n-g.

15        MR. RUCHER:  Mose Rucher,

16  III, and I am referred to as Chad.

17        MR. KLEE:  And is it all

18  right if we call you Bryan and Chad

19  today?

20        MR. BROWNING:  Yes.

21        MR. RUCHER:  Yes.

22        MR. KLEE:  Thank you for

23  making yourselves available.

24        I am Ken Klee, and I am the

25  appointed examiner in the Tribune

4

1          June 30, 2010

2      Chapter 11 case.  I have been charged

3      with doing an investigation over a

4      seventy-day period, which hopefully

5      will be increased to eighty-five days

6      soon, to look into three questions,

7      only one of which concerns you, and

8      that has to do with the 2007 leverage

9      ESOP transaction involving Tribune and

10     Mr. Zell, EGI.

11          This is not a deposition.  It

12     is a confidential interview.  Our

13     purpose is to gather information.  And

14     we have placed you under oath because

15     we have had some important testimony

16     come up in the case, and we want to

17     make sure we have an accurate

18     transcript of what you have to say.

19          With that, I am going to ask

20     my counsel to ask you questions.  I

21     may ask you questions, as well.

22          If you need a break or you

23     don't understand anything, feel free.

24     And because we are interested in

25     getting the truth and the information,

5

1           June 30, 2010

2       either one or both of you can answer,

3       just don't speak over each other.

4             MR. BROWNING:  Okay.

5             MR. NASTASI:  Okay, Mr.

6       Rucher and Mr. Browning.  My name is

7       Nick Nastasi.  I am one of the

8       attorneys representing the examiner's

9       investigation here.  I am going to be

10      asking most of the questions today.  I

11      am joined here with my partner,

12      Charlie Monk, who may periodically ask

13      a follow-up question, the Examiner, of

14      course, may ask a question or two, as

15      follow-up or for clarification

16      purposes.  Also, Caitlin Piccarello is

17      here, who is an associate in our

18      office, and if she needs some

19      clarification, she may ask questions,

20      as well.  But primarily, I am going to

21      be asking questions.  So we are going

22      to do our best, to the extent there

23      will be other people asking questions,

24      do it in a way that is manageable and

25      allows you to answer the questions

6

1          June 30, 2010

2     clearly.

3          If at any time you want to

4     take a break or consult with your

5     counsel or for any other reason you

6     want to take a break, just let us

7     know.

8          Okay?

9          MR. BROWNING:  Okay.

10         MR. NASTASI:  Also, in the

11    interest of saving everybody's time,

12    we have reviewed -- both of you were

13    deposed in these bankruptcy cases.  We

14    don't intend to ask you the same

15    answers.

16         MR. NEIER:  Well, don't ask

17    him answers.  Ask him questions.

18         MR. NASTASI:  We don't intend

19    to ask you the same questions.  And we

20    are assuming that the answers you gave

21    in those depositions were truthful.

22         I am going to ask you now,

23    and I will start with Mr. Rucher, have

24    you had an opportunity to look at your

25    transcript at any time since you were

7

1        June 30, 2010

2    deposed?

3            MR. RUCHER:  Yes.

4            MR. NASTASI:  Is there

5    anything in the transcript that you

6    want to clarify or modify in any way?

7            MR. RUCHER:  No, just some of

8    the spellings in the transcript.

9            MR. NASTASI:  But for the

10    most part, you are comfortable that

11    the answers you gave were transcribed

12    correctly?

13            MR. RUCHER:  Yes.

14            MR. NEIER:  Not really

15    transcribed correctly, but the meaning

16    is pretty clear?

17            MR. RUCHER:  Yes.

18            MR. NASTASI:  I will ask the

19    same of you, Mr. Browning, you have

20    had a chance to review your testimony

21    that you gave in the bankruptcy case?

22            MR. BROWNING:  Yes.

23            MR. NASTASI:  Do you believe

24    we are able to rely on the answers you

25    gave to that deposition?

8

1       June 30, 2010

2              MR. BROWNING:  Generally.

3              MR. NASTASI:  Yes, generally?

4              MR. BROWNING:  Yes.  There is

5       nothing significant.

6              MR. NASTASI:  Is there

7       anything in your deposition that you

8       want to point out to us that you

9       think -- in order for us to conduct

10      our investigation -- we should know

11      about, any change or modification?

12             MR. BROWNING:  Not that I can

13      think of.

14             MR. NASTASI:  Thank you.

15             Having done that, now, our

16      focus today is going to be on the --

17      briefly the opinion that was given

18      with respect to the Step 1 of the 2007

19      leverage buyout of the Tribune

20      Company, and then -- very quickly --

21      we are going to move into and spend

22      most of our time on the Step 2 opinion

23      and issues related to that.  That is

24      where our focus is right now, just to

25      let you know.

9

1    June 30, 2010

2         MR. BROWNING:  Okay.

3         MR. NASTASI:  Why don't I

4    start with Mr. Browning.

5         Mr. Browning, just an

6    open-ended question:  Sitting here

7    today, can you think of any

8    significant changes in methodology

9    between the opinion you or VRC

10   delivered with respect to Step 1 as

11   opposed to Step 2?  In reaching your

12   opinions, can you think of anything

13   that's changed significantly from a

14   methodology standpoint of how you

15   calculated the discounted cash flow

16   analysis?

17        MR. BROWNING:  Right.  Right.

18   As far as the approaches to determine

19   the business enterprise value, the

20   methodology, I think, was very

21   consistent.  The approaches were the

22   same approaches we used between the

23   Step 1 and the Step 2.  And so nothing

24   significantly different.  Nothing

25   different at all other than the

10

1        June 30, 2010

2    variables used.

3            MR. NASTASI:  And, Mr.

4    Rucher, would you agree with that, or

5    do you have anything to add to that

6    answer?

7            MR. RUCHER:  I would take

8    from more of a technical standpoint,

9    there were some things that changed

10   from Step 1 to Step 2, because the

11   transactions, the tax structure of the

12   company changed.

13           So some of your approaches or

14   methodologies are going to be

15   different from Step 1 to Step 2.  In

16   particular, in Step 1, you had the

17   phone securities which had an embedded

18   tax benefit in there that was included

19   in Step 1, but was not included in

20   Step 2 because they were -- because

21   they were different, and you didn't

22   want to double count those.

23           As we went through this

24   process of getting more information

25   and processing that information and

11

1      June 30, 2010

2      learning more about the company --

3      because this was a long-term

4      assignment, we worked on this for

5      months -- another thing that we looked

6      at, in addition to the tax benefits,

7      we also looked at, particularly, for

8      Step 2, we looked at -- we made

9      changes in like what the discount rate

10     that was used and we also learned a

11     little bit more about the phones

12     security as we went through and did

13     Step 2.  And those things changed from

14     Step 1 to Step -- to the Step 2

15     process.  When we did the Step 1

16     process, we valued the phones at

17     the -- at the face amount of the phone

18     security less the value of the Time

19     Warner stock.  And then when we went

20     to Step 2, we looked at -- we got more

21     information on that.  And those

22     discussions began early on in the

23     process, when we were talking about

24     what was the best way to handle the

25     phones.  And then when we looked at

12

1    June 30, 2010

2    the phones in Step 2, we ultimately

3    concluded that the way that the

4    company valued these liabilities for

5    GAAP purposes, that that was the

6    appropriate way to look at the phone

7    securities.  So there was some changes

8    throughout that process.

9            MR. NASTASI:  Thank you.

10           And I am going to turn to the

11   opinion soon, and I am speaking

12   specifically with respect to the

13   opinion rendered as to Step 1 of the

14   transaction.

15           As to that transaction, how,

16   if at all, did you use management's

17   revenue projections, consolidated

18   revenue projections?  And for how far

19   out, how far did those projections go

20   in the years they were used?

21           MR. NEIER:  Are you asking?

22           MR. NASTASI:  In Step 1.

23           MR. NEIER:  Which one do you

24   want to ask?

25           MR. NASTASI:  I'm sorry, Mr.

13

1      June 30, 2010

2      Rucher, the question is with respect

3      to the Step 1 opinion.  How, if at

4      all, did you use management's

5      consolidated revenue projections in

6      reaching your opinion?

7           And if you did, the second

8      part of the question is:  How far out

9      did you use management's projections

10     of revenue?

11          MR. RUCHER:  If I'm -- if I'm

12     not mistaken, I think that the length

13     of time that the projections were --

14     or the period of time for the

15     projections, particularly for the base

16     case, I think that management provided

17     us with the same set of years.  And I

18     do not -- and to the best of my

19     recollection, I don't think that that

20     period changed, but, you know, I would

21     have to look at the documents to be

22     certain.  But I don't think, to the

23     best of my recollection, that they

24     gave us five-year projections in one

25     instance and twenty-year projections

14

1          June 30, 2010

2      in the other.  Unless for one piece,

3      and that might have been for the piece

4      dealing with the phone securities,

5      because they went out to like 2028,

6      something like that.  So I think that

7      the time period changed, if that's

8      your question, if I'm understanding

9      your question correctly.

10             MR. NASTASI:  Can we go off

11      the record a second?

12             [Discussion held off the

13      record.]

14             (VRC Exhibit 1 was marked for

15      identification, as of this date.)

16             MR. NASTASI:  I am putting

17      before both Mr. Rucher and Mr.

18      Browning what has been marked as VRC

19      1.

20             Gentlemen, please take as

21      much time as you need to review the

22      document.

23             I believe this is the

24      solvency opinion dated May 9th, 2007,

25      and the related slide deck that was

15

1        June 30, 2010

2     presented to the Board of Directors on

3     that day.

4          MR. NEIER:  Just so you know,

5     this is not the opinion.  This is just

6     the slide deck.

7          MR. BROWNING:  The opinion is

8     in the back.

9          MS. PICCARELLO:  Is it copied

10    on the back?  Okay.

11         MR. NASTASI:  So the record

12    is clear, the first page is an e-mail

13    from Mr. Browning dated May 8th, 2007.

14    The attachment is entitled, Tribune

15    Step 1 Solvency Analysis Final Draft.

16    It appears that the slide deck that I

17    was referring to is Bates labeled VRC

18    60919 through VRC 60941, and that the

19    solvency opinion is Bates labeled VRC

20    60942 through VRC 60948.

21         Do you see that, Mr.

22    Browning?

23         MR. BROWNING:  Yes.

24         MR. NASTASI:  And do you

25    agree with that, Mr. Rucher?

16

1        June 30, 2010

2            MR. RUCHER:  Do I see it?

3            MR. NASTASI:  Do you see that

4    this document contains both a slide

5    deck and the solvency opinion that VRC

6    rendered with respect to Step 1 on

7    May 9, 2007?

8            MR. RUCHER:  Yes.

9            But if I may add something?

10           MR. NASTASI:  Please.

11           MR. RUCHER:  I am not

12   certain, based upon this e-mail, that

13   this was the actual one that was

14   presented.  And the reason that I say

15   that is when we got to Chicago -- and

16   I can't remember whether it was for

17   Step 1 or for Step 2 -- we made some

18   changes.  I think we might have made

19   some -- some tweaks to it, and it may

20   have been different when we got to

21   Chicago.

22           So just based upon this

23   e-mail where it says, "see you

24   tomorrow," I'm not a hundred percent

25   certain that this is the absolute

17

1          June 30, 2010

2     final one that was presented to the

3     board.

4          MR. NASTASI:  How could we

5     determine which one is the final one?

6          MR. BROWNING:  I think this

7     is the final one, but I'm not certain.

8          MR. NASTASI:  Okay.

9          MR. BROWNING:  There were

10    some exchanges, but I'm not sure that

11    was -- I think that was --

12          MR. RUCHER:  I don't know if

13    that was for Step 2 or Step 1.  I'm

14    just not certain.

15          MR. NASTASI:  As we are going

16    through it --

17          MR. MONK:  There is a revised

18    version that's dated like

19    December 20th for Step 2.  Is that

20    what you are thinking about?

21          MR. BROWNING:  It could be --

22          MR. RUCHER:  I don't know.  I

23    just remember one of the board

24    presentations, when we got to Chicago,

25    in our Chicago office, we made some

18

1    June 30, 2010

2    changes.  And I don't know if it was

3    for Step 1 or Step 2.  I only mention

4    this because I saw "see you tomorrow."

5              MR. BROWNING:  It is

6    immaterial here, if there are, I

7    think.

8              MR. RUCHER:  I would agree

9    with that?

10             MR. NASTASI:  If you would,

11   please, gentlemen, turn to page 12 of

12   the slide deck which is VRC 60930.

13             Can you tell, by looking at

14   this page -- I see it has adjusted

15   EBITDA there.  It doesn't have the

16   revenue broken out.

17             Can you tell by looking at

18   this what projections from management

19   you used, and how far out the years

20   went?  Can you tell from looking at

21   this, or do you need to look at work

22   papers to determine that?

23             MR. BROWNING:  Is it for both

24   of us?

25             MR. NASTASI:  Mr. Rucher.

19

1          June 30, 2010

2     Let's start with Mr. Rucher.

3          MR. RUCHER:  It looks like we

4     used from 2007 projected period to

5     2013 projected period.

6          MR. NASTASI:  And Mr. Rucher,

7     were those projections actual

8     projections that were provided by

9     management all the way through 2013,

10    or were the out years extrapolated in

11    some other way?

12          You know what I mean by "out

13    years"?  Beyond five years.

14          MR. RUCHER:  I can't recall

15    off of the top of my head, but if you

16    look at the opinion letter, if we

17    extrapolated out for a particular

18    time, I think it would reference it in

19    the opinion letter.

20          MR. NASTASI:  Well, let's

21    turn to the letter and see.

22          MR. BROWNING:  It doesn't say

23    in here specifically.  I think the

24    best way to do this would be to look

25    at the actual model that they

20

1          June 30, 2010

2     provided.

3               (VRC Exhibit 2 was marked for

4     identification, as of this date.)

5               MR. NASTASI:  I may have the

6     model that you are referring to.  I

7     will show you that.  I was trying to

8     start with the opinion, because it is

9     your document and it is a final

10    document, so.

11              MR. BROWNING:  Right.  Yeah.

12              MR. NASTASI:  We will

13    definitely get there.

14              MR. BROWNING:  Okay.

15              MR. RUCHER:  I can't tell.

16              MR. NASTASI:  From the

17    opinion?

18              MR. RUCHER:  No, sir, I

19    can't.

20              MR. NASTASI:  So we will try

21    to look at other documents.

22              MR. KLEE:  Mr. Browning, what

23    is your best recollection?

24              MR. BROWNING:  My

25    recollection is that it was a forecast

21

1          June 30, 2010

2      and that was used up to that point.

3      So I believe it is a forecast through

4      2013.  That's my recollection.

5              MR. NASTASI:  Thank you.

6                  In this opinion, do you

7      recall, in the first step opinion,

8      whether or not you used comparable

9      company EBITDA multiples in any of

10     your analysis, Mr. Browning?

11             MR. BROWNING:  Yes, we did.

12             MR. NASTASI:  Do you remember

13     what companies you used?

14             MR. BROWNING:  I'd have to

15     look at the documents specifically.

16             MR. NASTASI:  Can you tell me

17     whether or not it appears in the

18     opinion letter or the slide deck?

19             MR. BROWNING:  I don't

20     believe there are the -- the actual

21     comparables are in either the

22     summarized -- in the slide deck or the

23     summarized schedule.

24             MR. NASTASI:  Can you point

25     those summarized schedules out for me,

22

1           June 30, 2010

2      please?

3              MR. BROWNING:  No.  I am

4      saying they are not in --

5              MR. NASTASI:  So they don't

6      appear in the slide deck or the

7      opinion?

8              MR. BROWNING:  No.

9              MR. NASTASI:  And you agree

10     with that, Mr. Rucher?

11             MR. RUCHER:  Yes.

12             MR. NASTASI:  Thank you.

13             I am going to show you what

14     has been marked as VRC 2.  This

15     appears to be a preliminary draft of a

16     slide deck.  It is dated the same time

17     period.  It is attached to an e-mail

18     from Mr. Rucher that appears to be

19     circulated only internally at VRC.

20             And I am wondering whether,

21     in looking at this document, it would

22     refresh your recollection, one, as to

23     what the comparable companies were

24     that were used in your analysis, and,

25     two, the previous question, in which I

23

1        June 30, 2010

2    asked -- all right, one at a time.  So

3    let's stick with the companies, since

4    we were on that topic.

5         Does this document help

6    refresh your recollection as to which

7    comparable companies were used in your

8    analysis with respect to Step 1?

9         MR. BROWNING:  Yes.

10         MR. NASTASI:  And could you

11    please --

12         MR. MONK:  Give us a page

13    number, tell us where you are looking.

14         MR. NASTASI:  Give us a page

15    number, and tell us how it refreshes

16    your recollection.

17         MR. BROWNING:  Yes.  Page 24

18    is one of the pages.

19         MR. NASTASI:  Okay.

20         MR. BROWNING:  Let's see.

21    Page 27 is another.  These are the

22    primary ones, I believe.  I believe

23    those are the primary pages.

24         MR. NASTASI:  And so will you

25    please identify for me, if you can,

24

1          June 30, 2010

2     the comparable companies in the

3     publishing industry that were used in

4     your analysis with respect to Step 1?

5          MR. BROWNING:  And this is

6     for me again?

7          MR. MONK:  Sure.

8          MR. NASTASI:  Yes, please.

9          MR. BROWNING:  Ew Scripps Co,

10    McClatchy Holdings or Co Holdings, New

11    York Times, Belo Corp and Media

12    General.

13         MR. NASTASI:  Mr. Browning,

14    you are reading from VRC 38684, that

15    page; is that correct?

16         MR. BROWNING:  That's

17    correct.

18         MR. NASTASI:  How did you

19    determine that those were the

20    appropriate companies to use in this

21    analysis?

22         MR. BROWNING:  Chad, do you

23    want to answer -- well, I'll answer,

24    and then Chad can add to it.

25         MR. NASTASI:  Certainly.

25

1          June 30, 2010

2              MR. BROWNING:  We typically

3      go through a search for companies by

4      industry.  We try to match up size and

5      match up financial metrics and so

6      forth that are a good representative

7      of that industry or comparable to the

8      subject company.  So we go through a

9      search to determine this.

10             MR. NASTASI:  Mr. Rucher,

11     would you agree with that, or do you

12     want to modify it or add to it in any

13     way?

14             MR. RUCHER:  Typically we

15     will use a database called FactSet,

16     and we will use that database --

17     that's a financial database that's

18     used by a lot of Wall Street banking

19     firms.  We will use that database to

20     look up companies based on SIC code or

21     industry, in general, companies that

22     participate or compete within the same

23     space as, you know, the company that's

24     being valued.  And that's the way that

25     we normally will get that -- we'll

26

1          June 30, 2010

2     look at our subject company, what

3     industry it participates in, and we'll

4     select a group of companies that are

5     somewhat similar or comparable to that

6     subject company.

7          And we will also typically

8     look at other industry publications or

9     industry data to help us go through

10    and select that list of companies

11    to -- you know, for comparable

12    transactions.  With respect to the --

13    the comparable companies, I'm sorry.

14          With respect to the

15    comparable transactions, that's also a

16    database within FactSet.  It's called

17    MergerStat.  And we will go through

18    and we will do a search of all

19    comparable transactions in which data

20    or multiples exist for comparable

21    transactions within a particular

22    space.

23          MR. NASTASI:  And do you

24    recall doing both of those searches,

25    the search that you described with

27

1           June 30, 2010
2      respect to comparable companies and
3      the second search with respect to the
4      comparable transactions, with respect
5      to Step 1 for Tribune?  Do you recall
6      doing those or having someone do those
7      on your behalf?
8           MR. RUCHER:  Yes.
9           MR. NASTASI:  Did anyone
10     outside -- other than the databases,
11     the resources that you just described,
12     did anyone outside of VRC participate
13     in the decision of which comparable
14     companies to use in the Step 1
15     analysis?
16          MR. RUCHER:  To the best of
17     my recollection, I do not recall
18     anyone at least participating in the
19     selection.  Typically, a company will
20     give you some suggestions of companies
21     that are comparable to them.  Both the
22     ultimate decision of which companies
23     to include or exclude, we make those
24     decisions.  They may give some input,
25     but ultimately, we make those

28

1           June 30, 2010

2      decisions on which comps to use.

3           MR. NASTASI:  Would you agree

4      with that, Mr. Browning?

5           MR. BROWNING:  Yes, I would

6      agree.

7           In fact, it's a very common

8      practice, when we conduct a valuation,

9      to ask our clients who they feel are

10     most comparable to them.  We present

11     those questions to them to help

12     select.

13          MR. KLEE:  In these

14     particular cases, did anyone from

15     Tribune Company ask either of you to

16     include or suggest that you include

17     other companies into the comparable

18     companies list other than those that

19     appear on page VRC 38684?

20          MR. BROWNING:  I don't recall

21     that.

22          MR. RUCHER:  I don't recall

23     fully, but normally in these types of

24     situations, people will always have

25     their opinions of which companies

1          June 30, 2010

2     should be included or excluded.  For

3     this particular set, I cannot recall a

4     specific conversation about the comps.

5     But I would say in 99 percent of these

6     solvency opinion transactions, a

7     company is going to have some

8     suggestions of who to include or who,

9     you know, who to exclude.  But we

10    ultimately decide whether or not we

11    think it makes sense or not.

12            MR. NASTASI:  And --

13            MR. KLEE:  Suppose that

14    someone from Tribune, Don Grenesko or

15    Chandler Bigelow, had called up and

16    said, Chad, I really think you ought

17    to include the Washington Post in here

18    as a comparable.

19            What would your response be?

20            MR. RUCHER:  We'll look at

21    it.

22            MR. KLEE:  And then you would

23    go and you would look to see if that

24    was a comparable company and make your

25    own decision?

30

1      June 30, 2010

2           MR. RUCHER:  Yes.  We will

3      see if it makes sense.

4           MR. KLEE:  Mr. Browning?

5           MR. BROWNING:  I agree.

6           MR. KLEE:  Mr. Rucher, do you

7      recall ever looking to see whether the

8      Washington Post was a comparable

9      company to Tribune?

10          MR. RUCHER:  I don't recall

11     specifically.  But given the size of

12     the Washington Post and the area that

13     it participates, I would imagine

14     that's one that came up, but I don't

15     remember specifically in Step 1

16     reviewing the Washington Post.

17          MR. NEIER:  I think he is

18     asking you if somebody asked you to

19     put it in, not just whether you

20     reviewed it.

21          MR. RUCHER:  Oh, oh, I don't

22     recall.

23          MR. KLEE:  Mr. Browning?

24          MR. BROWNING:  I don't

25     recall, but it certainly could have

31

1           June 30, 2010

2    happened.  There were probably

3    discussions like that throughout the

4    process.

5           MR. NEIER:  You know, this is

6    an important subject for you.  I think

7    it was pretty clear from the other

8    depositions that there is a staff of

9    analysts that typically go through the

10   comps.  It's not generally the top

11   guys.  So if you want, we will make

12   inquiries.

13          MR. NASTASI:  We will see at

14   the end of the interview if it's

15   necessary.

16          MR. MONK:  Thank you.

17          MR. NASTASI:  But, thank you,

18   we appreciate it.

19          Let's stay with the same

20   document, VRC2.  I would like you to

21   turn to page 32.

22          MR. MONK:  In Stage 1, you

23   are just doing comparable companies,

24   you are not doing it by segment.

25          Was there a reason -- do you

32

1        June 30, 2010

2    follow what I am saying?  You don't do

3    a publishing segment and a

4    broadcasting segment.  Is there a

5    reason why you chose not to do

6    comparables in publishing and

7    broadcasting separately in Stage 1?

8          MR. BROWNING:  Go ahead,

9    Chad.

10          MR. RUCHER:  Well, I think in

11    this process, as you start to learn

12    more and more about the company, what

13    we did was, as we stayed with this

14    company for a longer period of time,

15    we were able to determine how

16    significant the broadcasting sector

17    was for the company.  And, also, that

18    some of the dynamics impacting the

19    newspaper print was a little bit

20    different from the broadcasting

21    sector.  So as we went through the

22    process going from Step 1 to Step 2,

23    we deemed it -- we said, you know, we

24    think we can get a more reasonable

25    answer by looking at these two

33

1        June 30, 2010

2    businesses separately:  Looking at the

3    broadcasting piece separately from

4    the -- from the newspaper segment.

5    Because the broadcasting piece was

6    experiencing some different dynamics

7    than the newspaper.

8            MR. MONK:  When you say

9    "dynamics," can you be a little more

10   explicit?  What do you mean by that,

11   "dynamics"?

12           MR. RUCHER:  Well, the

13   newspaper industry was experiencing

14   some decline in that segment; whereas,

15   you had the broadcasting segment that

16   was a lot more stable than that.

17           MR. MONK:  Stable in its

18   revenue stream?

19           MR. RUCHER:  Well, more

20   stable in its cash flows than the

21   newspaper segment.

22           And so, as we went through

23   this process, we concluded that it was

24   more appropriate to look at the EBITDA

25   of the broadcasting segment, look at

34

1        June 30, 2010

2        the EBITDA of the newspaper segment,

3        and let's try to value the companies

4        based upon those individual

5        businesses.

6               MR. MONK:  Okay.  Thank you.

7               MR. NASTASI:  Looking at the

8        same document, we are on VRC2, if you

9        would refer to pages 32 and 36.  I'm

10       interested in the revenue numbers and

11       the percentage growth rows on both

12       those pages.  They appear to be

13       substantially the same with the

14       exception that page 36 has an

15       additional year, 2013.

16               Do you see that?

17               MR. RUCHER:  Mm-hm.

18               MR. NASTASI:  Where do those

19       revenue comes come from, do you know,

20       Mr. Rucher?

21               MR. RUCHER:  I think through

22       2012, the numbers came from the

23       company.  I do not know about 2013.  I

24       would have to look at the company's

25       model to see if that was an

35

1        June 30, 2010

2    extrapolated number or if that was a

3    number that was provided by the

4    company.  But in general, the revenue

5    numbers, the projections were provided

6    by management.

7          MR. KLEE:  Did you make any

8    independent inquiry to determine the

9    reasonableness of management's

10   assumptions?

11         MR. RUCHER:  Yes, we did.  We

12   looked at several different things

13   throughout the process.  We looked at

14   things by -- we looked back at

15   historical data.  Somewhere in the

16   record there are files where we go

17   back and we look at publishing revenue

18   trends for different classes of

19   advertising.  We look at Wall Street

20   research reports to see what they are

21   projecting for different segments on

22   different companies.  So we looked at

23   not only this particular company; we

24   looked at Wall Street analyst research

25   reports for different companies.  And

36

1          June 30, 2010

2     we also looked at historical trends in

3     advertising for different segments of

4     the newspaper advertising industry.

5     So we looked at historical and we

6     looked at research reports.  We looked

7     at industry stats.  So we looked at a

8     number of different things.  And a lot

9     of that stuff should be in the record.

10          MR. KLEE:  And in this case,

11     did you look at the revenue

12     projections on page 32, which is VRC

13     38692, and conclude that these revenue

14     projections were reasonable?

15          MR. RUCHER:  To the best of

16     my recollection, based upon going

17     back, looking at those things, I think

18     we did conclude that management's

19     forecast was reasonable.

20          MR. KLEE:  Now, I notice that

21     2012 is an election year, yet the

22     projected growth rate in revenues is

23     flat compared to 2011.

24          Mr. Rucher, would you expect

25     the revenue from publishing to

37

1          June 30, 2010

2     increase in 2012, or do you think it

3     is reasonable to project the same

4     growth rate?

5              MR. RUCHER:  I remember

6     having -- we had a lot of

7     conversations with the company about

8     the election year and election year

9     impacts on revenue.  I cannot remember

10    the specific details, but I do

11    remember that we spent a lot of times,

12    in two meetings, with the heads of

13    most of the major papers, and speaking

14    with Chandler Bigelow, talking about

15    the election year impacts on revenue.

16    And I cannot recall, you know, what we

17    ultimately concluded there, but I do

18    know that we had a lot of discussions

19    about election year impacts on

20    revenue.

21             MR. KLEE:  Would the election

22    year impact on revenue only take place

23    during the election year?

24             MR. RUCHER:  Sometimes it

25    would take place, you know, previous

38

1       June 30, 2010

2       to that.  You know, there would be

3       some spending previous.

4             MR. KLEE:  The year before

5       the election?

6             MR. RUCHER:  I don't recall

7       exactly, but, you know, this is an

8       election year cycle.  So it would have

9       some kind of impact on revenue.  It

10      wouldn't all happen in one year, but

11      you would see some kind of cyclical

12      impact on revenue.

13            MR. KLEE:  Mr. Browning?

14            MR. BROWNING:  Yes, I

15      generally agree with that.

16            I think a couple of things --

17      why only 5 percent, because these are

18      consolidated revenues, so it's got

19      publishing, broadcasting, I believe,

20      included in it.  So broadcasting could

21      be going through a different cycle

22      than publishing.  There was a lot of

23      factors.

24            So I don't know -- you had a

25      couple of segments that were expected

39

June 30, 2010

1
2   to grow substantially.  The
3   interactive, for example, was supposed
4   to grow a lot for publishing, I
5   believe.  And then we had others that
6   could be going through cycles.  So I
7   don't know whether the 5 percent has
8   got some ups and downs or -- or what,
9   but we'd have to go back and look.
10          MR. KLEE:  Thank you.
11          MR. RUCHER:  But we did have
12   extensive conversations --
13   particularly when we were doing the
14   opinion in 2007, one of the things we
15   were talking about is what was going
16   to be the impact on revenue for the
17   Obama/McCain election.  So those were
18   things that we definitely spent a lot
19   of time talking about, those revenue
20   impacts.
21          MR. KLEE:  So that might
22   account, in part, for a bump in 2008,
23   but I guess the industry was in
24   decline, so there's actually a
25   negative growth in 2008.  And then

40

1           June 30, 2010

2     there's small growth in 2009, after

3     the election.

4           MR. BROWNING:  Right.  There

5     could be a number of -- it could be

6     that interactive is growing.  It could

7     be that coming out of the recession,

8     there was an expectation coming out of

9     the recession.  I can't remember all

10    of the factors specifically.  But

11    there's a lot of data that goes into

12    each of these segments that roll up

13    into this consolidated --

14          MR. RUCHER:  If I am

15    recalling correctly, we have, in our

16    documents, a financial model or a

17    buildup.  And that buildup, if it's

18    not based on a region for newspapers,

19    it may be built up by individual

20    newspaper with a revenue target.  I'm

21    certain that there is a schedule in

22    the exhibits, and maybe in there,

23    where we go through the buildup.  We

24    didn't just look at things from a

25    top-down analysis.  We actually looked

41

1          June 30, 2010

2     at it -- looking at the individual

3     building up.

4          So we have a pretty detailed

5     document in the files, somewhere, I'm

6     quite sure it's in there, it may be

7     among the documents you have.

8          MR. NASTASI:  And the

9     documents you are referring to are the

10    detailed projections that were

11    provided to you by management; it is

12    not something that VRC created?

13          MR. RUCHER:  No, it's not

14    something VRC created, but we did go

15    down and look at it.

16          MR. NASTASI:  I understand

17    you looked at it, but what you are

18    looking at are projections at a

19    detailed level that management

20    provided to VRC; is that right?

21          MR. RUCHER:  Yes.  Yes.

22          MR. KLEE:  I want you to go

23    back to 2007, and just ask this

24    general question:  Would you have

25    expected projections for future growth

42

1      June 30, 2010

2      rates to be more optimistic, about the

3      same, or more pessimistic in

4      December 2007 than in May 2007, Mr.

5      Browning?

6           MR. BROWNING:  I would say

7      that given the information that we

8      collected and reviewed between those

9      two periods, I would say, generally

10     speaking, some segments were going to

11     be less optimistic.  Maybe a couple

12     others would be a little bit more

13     pessimistic, but slightly less

14     optimistic.

15           MR. KLEE:  Mr. Rucher?

16           MR. RUCHER:  I would agree

17     that we would probably consider things

18     to be a little less optimistic.  But

19     also one thing to keep in mind is

20     there is a general thought that

21     advertising over time, that it would

22     kind of revert back or become stronger

23     over time.

24           MR. NASTASI:  And can you

25     explain how -- first of all, where did

43

1          June 30, 2010

2     you get that information from?  Who

3     was saying that advertising would come

4     back?

5          MR. RUCHER:  It was just

6     discussions -- it was discussions with

7     the company, with the management.

8          MR. NASTASI:  And did they

9     explain how they believed that was

10    going to occur?

11         MR. RUCHER:  I don't remember

12    all the details, the specific details,

13    but I know that we had a lot of

14    discussions about projections and what

15    would happen over a long period of

16    time.

17         MR. NASTASI:  Did anyone from

18    management explain -- and I will get

19    to you, Mr. Browning, I just have to

20    finish Mr. Rucher.

21         Mr. Rucher, did anyone from

22    management explain to you how they

23    believed they would be able to capture

24    these advertising revenues sometime in

25    the future?

44

1          June 30, 2010

2              MR. RUCHER:  Yes, we had

3      extensive sessions, two all-day

4      sessions with the heads of, I think,

5      every major company, every major

6      paper, division at the company.  And

7      we went through and we discussed some

8      of the initiatives that they were

9      putting in place, that they thought

10     would allow them to recapture those

11     markets.  So we had very extensive due

12     diligence meetings with almost every

13     major head of divisions at the

14     company.

15             MR. NASTASI:  And when did

16     these meetings occur?

17             MR. RUCHER:  I don't remember

18     exactly when they occurred, but there

19     were two.  One was probably before

20     Step 1 due diligence process, and the

21     second one was before Step 2 of the

22     due diligence process.  So we had very

23     extensive meetings.

24             MR. NASTASI:  That's helpful.

25     Thank you.

45

1        June 30, 2010

2            Mr. Browning, I can tell that

3        you have something to say on this

4        topic, so please tell us what you have

5        to say.

6            MR. BROWNING:  I think, as

7        far as how they thought that the

8        advertising would come back, at the

9        time -- and I think this is both true

10       during the Step 1 and during the Step

11       2 -- the real estate market had seen

12       declines, and automotive, too.  Not to

13       the extent that those two happened

14       since that time, but they had

15       declines.  And given the history of

16       what had happened in those market

17       segments, real estate and automotive,

18       the expectation was that those things

19       would recover.  Florida was an area

20       that they had a fair amount of

21       newspaper exposure to.  And so that

22       was an area that they believed would

23       recover.  And they were expecting that

24       to recover fairly soon or short-term.

25            The same thing with

46

1       June 30, 2010

2       automotive.  And those are, obviously,

3       automotive and real estate, as you

4       know, in publishing are two pretty

5       significant segments for -- for

6       newspapers.

7               MR. NASTASI:  Thank you.

8               Can you tell, from looking at

9       VRC 2, how many years of management's

10      projected revenues were used in your

11      analysis?

12              MR. MONK:  We are still on

13      Stage 1?

14              MR. NASTASI:  We are still on

15      Stage 1, and Step 1.

16              And one of the reasons I am

17      asking, is that page 32 has the

18      discounted cash flow method and it

19      goes out to 2012.  And the financial

20      summary on page 26 goes out to 2013.

21      And maybe you can't tell from this

22      document, but I wondered if you could.

23              Mr. Rucher?

24              MR. RUCHER:  Okay.

25              MR. NASTASI:  You appear to

47

1        June 30, 2010

2        be ready, so you get to go first.

3              MR. RUCHER:  Okay.  If your

4        question is why did we use 2012 for

5        the DCF analysis when we have

6        projections for 2013, the general

7        answer here is that typically when you

8        do a DCF analysis you will typically

9        do a five-year or ten-year DCF

10       analysis.  And for -- it looks like to

11       me, for our DCF valuation, we just

12       simply did a five-year DCF analysis.

13             MR. NASTASI:  With respect to

14       Step 1?

15             MR. RUCHER:  Yes, sir, for

16       the DCF valuation.

17             MR. NASTASI:  Is there any

18       other way in Step 1 that you would

19       have used management's projected

20       revenues?

21             MR. RUCHER:  I don't

22       understand the question.

23             MR. NASTASI:  So besides the

24       DCF, what other analysis did you do to

25       determine the company was solvent in

48

1          June 30, 2010

2      Step 1?

3              MR. RUCHER:  You mean what

4      other tests that we do or what other

5      valuation methodologies?  Because

6      there are three different tests,

7      generally, of solvency.  There is a

8      balance sheet test, a cash flow test

9      and an unreasonably small capital

10     test.  And for our analysis, we used

11     management's projections for all three

12     of those tests.

13             In addition, we also

14     supplement, and particularly on the

15     cash flow test and the downside

16     sensitivity test, we also developed

17     some of our own analysis that were

18     separate from management in the

19     downside scenarios.

20             MR. NASTASI:  And that is

21     just in the sensitivity case?

22             MR. RUCHER:  Yes.  If I

23     understood your question correctly, I

24     don't know if that was what you

25     were --

49

1           June 30, 2010

2                MR. NEIER:  He also asked

3      about the methodology.

4                MR. RUCHER:  Would you like

5      to discuss --

6                MR. NASTASI:  Please.

7                MR. RUCHER:  Okay.  The first

8      approach that we used --

9                MR. NASTASI:  Do you want to

10     refer us to a page?

11               MR. RUCHER:  Why don't we go

12     to page 9.

13               MR. NASTASI:  Page 9 of VRC2?

14               MR. RUCHER:  Yes.

15               MR. NASTASI:  Okay.

16               MR. RUCHER:  Well, in

17     general, this right here is a draft,

18     but I will discuss in general the

19     approaches that we used.

20               We used a comparable

21     companies approach.  And typically,

22     with a comparable companies approach,

23     we would go out and look at multiples

24     of comparable companies and you would

25     select an appropriate multiple and

50

1          June 30, 2010

2       apply that multiple to projections

3       that were given by management.  That

4       was the comparable companies approach.

5       So that's one way that we used that.

6            Also with comparable

7       transactions, you will look at M&A

8       transactions, see what kind of

9       multiples were paid and you will apply

10      that multiple to some kind of

11      projection.  Typically, it's either an

12      LTM or one-year-out type look for the

13      comparable transactions approach.

14            Our discounted cash flow,

15      which we saw from the previous page.

16      Here, we also, because there were

17      separate businesses, we also looked at

18      this and we what is called a sum of

19      individual assets.  And that's where

20      we valued different assets of the

21      business.  We took the business and we

22      disaggregated and we applied a DCF, a

23      comparable companies and comparable

24      transactions approach, I think, to all

25      three -- all three approaches to each

51

1        June 30, 2010

2     division and we added those back up to

3     get a sum of the individual assets

4     approach.

5             MR. MONK:  When you say "each

6     division," are you referring to other

7     than publishing and broadcasting,

8     that's the two sort of major company

9     segments, or did you get more granular

10    than that?

11            MR. BROWNING:  I think that

12    was it, broadcasting and publishing.

13            MR. RUCHER:  If you look at

14    page -- it was broadcasting and

15    publishing, to my knowledge.

16            MR. NASTASI:  And VRC 2 is a

17    draft.  And it is being circulated

18    internally.

19            Can you explain for me, Mr.

20    Browning, there appears to be a lot

21    more information in detail in this

22    draft that is circulated on May 3rd

23    than what's ultimately presented to

24    the board on May 9th.

25            Can you explain to me why

52

1           June 30, 2010

2       that is and why there is what appears

3       to be more of a summary in the board

4       deck that's presented?

5               MR. BROWNING:  Yeah, I think

6       what we tried to do was give the

7       highlights of our analysis because we

8       explained a lot.  We decided in the

9       board presentation to give a summary

10      as opposed to all the detail behind

11      the analysis.  So that's -- that was

12      the reason.  Just to summarize it.

13              MR. NASTASI:  And is the

14      detail that appears in VRC 2 or

15      something similar to it presented

16      internally at VRC to the committee

17      that would prove the opinion?

18              MR. BROWNING:  That's

19      correct.

20              MR. RUCHER:  If I might add?

21              MR. NASTASI:  Please.

22              MR. RUCHER:  For what's

23      approved by the committee for VRC 2 is

24      actually more detailed.  It's a much

25      more detailed analysis.

53

1       June 30, 2010

2             MR. BROWNING:  There is a lot

3       more detail.

4             MR. NASTASI:  I have that.  I

5       was looking for something similar to

6       the first step transaction.  We will

7       get there.  And I am assuming it

8       doesn't exist.  And VRC 2 is what was

9       presented to the committee, is that

10      right, or something similar to it?

11            MR. RUCHER:  A draft -- this

12      VRC 2 is an early draft that probably

13      was presented to the committee.  But I

14      don't think it was the ultimate one

15      that was signed off by the committee.

16      I think this was an earlier draft of

17      this VRC 2.

18            MR. MONK:  How could we tell?

19            MR. RUCHER:  Excuse me, sir.

20            MR. MONK:  How would you

21      tell?

22            MR. RUCHER:  One way I can

23      see this is an early draft is the

24      weightings of the different

25      approaches.  Because when we presented

54

1              June 30, 2010

2     to the committee, the committee

3     thought that it was -- it was more

4     reasonable to do it where we weighted

5     each approach equally as opposed to

6     applying weightings to, you know --

7              MR. MONK:  And when you talk

8     about weightings, just so we are clear

9     on the record, here, you are talking

10    about page 9 of the document where the

11    valuation method weightings are

12    listed, comparable companies were

13    25 percent, I think, in the chart,

14    correct?

15             MR. RUCHER:  Yes, sir.

16             MR. MONK:  And comparable

17    transactions were 10 percent and so

18    forth.

19             MR. BROWNING:  Yes.

20             MR. RUCHER:  Yes, sir.

21             MR. MONK:  Did anybody ask

22    you to limit the amount of time or the

23    scope of your presentation when you

24    made a presentation to the company?

25    You know, you only have ten minutes to

55

1           June 30, 2010

2    make this presentation, so cut it

3    down?  Anything like that?  Yes?  Mr.

4    Browning?

5           MR. BROWNING:  Yeah, I think

6    we had discussions with management at

7    Tribune to -- to get in more of a

8    summary form.  There was no intention

9    to mislead or exclude, but there were

10   discussions to make sure we had an

11   efficient presentation.

12           MR. KLEE:  And who were those

13   discussions with?

14           MR. BROWNING:  I think,

15   probably, I would say discussions --

16   probably Chandler was involved in

17   that, Chandler Bigelow was probably

18   involved in those discussions.  Maybe

19   Mark Hianik was -- could have been

20   involved in that.  There could have

21   been other people.  I don't know --

22   and I'm speculating on that, but

23   that's --

24           MR. MONK:  That is your best

25   recollection at this point in time?

56

1        June 30, 2010

2                MR. BROWNING:  Yes.

3                MR. MONK:  Let me just follow

4        up on that.

5                Was Chandler Bigelow sort of

6        your principal contact with the

7        company during this process?

8                MR. BROWNING:  He was

9        probably our principal contact.  There

10       were many others, but, you know, we

11       didn't have to go through Chandler to

12       talk to other people.

13               MR. MONK:  No, I wasn't

14       suggesting that, but you mostly dealt

15       with Chandler; is that correct?

16               MR. BROWNING:  I would say

17       that's correct.

18               MR. RUCHER:  Yes, that's

19       correct, but we were provided access

20       to other people, but Chandler was

21       typically the point person.

22               MR. MONK:  He was the point

23       person, fine.

24               Now, in terms of the board

25       presentation, itself, did anybody

57

1      June 30, 2010

2      suggest to you that you take out the

3      comparable companies from the slide

4      deck when you put your final

5      presentation to the board together?

6           MR. BROWNING:  They could

7      have.  There was -- again, only from a

8      standpoint of efficiency as opposed to

9      anything else.  There was nothing that

10     said don't do this because we are

11     mis- -- or would suggest something

12     differently.  Not that I know.

13          MR. RUCHER:  No.

14          MR. MONK:  Did you provide a

15     draft of your first stage presentation

16     to Chandler for his review before you

17     presented it to the board?

18          MR. BROWNING:  I believe we

19     did.

20          MR. MONK:  And did you get

21     comments back from him?

22          MR. BROWNING:  I believe we

23     did.

24          MR. MONK:  And did you accept

25     the recommendations that he made to

58

1              June 30, 2010

2        you in that regard?

3                MR. BROWNING:  I think,

4        generally, we did.  I mean, again, I

5        don't know for sure, because -- we

6        were really looking at what, from the

7        board's standpoint, what would they be

8        looking for.

9                MR. RUCHER:  I am certain we

10       presented something before to

11       Chandler.  I'm certain we sent

12       something out.  We may have even sent

13       an earlier version like this with the

14       weighting out to Chandler.  But if we

15       accepted all of his comments or so, I

16       don't -- I don't recall if we accepted

17       all of his comments, or if he even had

18       any comments on it.

19                MR. MONK:  But as you sit

20       here today -- that was my follow-up

21       question, so maybe you have already

22       answered it.

23                Let's try:  As you sit here

24       today, do you recall, in particular,

25       any comment that Chandler made that

59

1          June 30, 2010

2     was of concern to you in any way?  Did

3     he suggest something that you felt

4     uncomfortable about making a change?

5               MR. BROWNING:  I'd say no.

6               MR. RUCHER:  No.

7               MR. NASTASI:  In either Step

8     1 or Step 2.

9               MR. BROWNING:  Right.

10              MR. NASTASI:  That's right?

11              MR. RUCHER:  No, I mean,

12     nothing -- nothing strikes me --

13     nothing strikes me.

14              The only thing, I think, that

15     comes to my mind is from the beginning

16     there was discussion on how to treat

17     the phones.  That's all -- that was

18     the discussion internally with us.

19     "Internally" -- I mean, discussions

20     with Chandler, because they had

21     complex securities.  So that was the

22     only thing.  You know, what's the

23     appropriate way to handle the phones.

24              MR. BROWNING:  There were

25     tensions.  Clearly, they were thinking

60

1           June 30, 2010

2       that values should be higher than

3       maybe we had at times or something

4       different, and, you know, we wrestled

5       with those things, but we didn't

6       change our values because they thought

7       they were higher or something like

8       that.  But, you know, they had their

9       views on --

10          MR. NASTASI:  Was that

11      tension more acute, Mr. Browning, at

12      Step 1 or Step 2, or was it the same?

13          MR. BROWNING:  That's a good

14      question.  I guess I would say they

15      were generally consistent, tensions,

16      but just because of the intensity

17      of -- you know, as things were getting

18      closer to closing, there were a lot of

19      things going on, a lot of moving parts

20      going on.  So to say more acute, I'm

21      not sure exactly what you mean by

22      that, but --

23          MR. NASTASI:  Were the

24      tensions greater at Step 2, the

25      tensions that you described, that

61

1        June 30, 2010

2     management thought the values should

3     be higher, different, or other similar

4     tensions, were they greater in Step 1

5     than they were in Step 2?

6            MR. BROWNING:  I'm not

7     certain.  I couldn't say -- I would

8     say that's a possibility that they

9     were more intense, but not to a point

10    where we were uncomfortable or

11    anything like that.

12            MR. MONK:  I'm confused.

13    Greater at Step 1 or greater at Step

14    2?

15            MR. BROWNING:  I would say

16    that as you got closer to the Step 2

17    closing, they were probably

18    intensified.

19            MR. MONK:  Right.  That's

20    what I --

21            MR. BROWNING:  Again, not

22    from a standpoint that we were

23    uncomfortable.  It was just that there

24    were a lot of moving parts, and we

25    wanted to make sure we got it right.

62

1          June 30, 2010

2              MR. MONK:  When you say lots

3      of moving parts, can you just name the

4      moving parts that were of concern to

5      you at the time of this Stage 2

6      closing?

7              MR. BROWNING:  Well, moving

8      parts or moving parts that concern are

9      two different things.

10             You know, the issues of --

11     Chad had mentioned -- the phones --

12             MR. MONK:  How that was to be

13     treated?

14             MR. BROWNING:  How it was to

15     be treated.

16             We were getting questions

17     from the bank, the lenders.

18             MR. MONK:  Right.

19             MR. BROWNING:  And we were

20     looking at those questions and

21     addressing those questions.  We were

22     continuing to update all our valuation

23     analyses.  So what I mean that is

24     moving parts.

25             There was, from the beginning

63

1          June 30, 2010

2     of the project to the end of the

3     project, there was ongoing dialogue

4     with management.  So I can't really

5     say -- really, I can't really say

6     that -- you know, there wasn't

7     something that meant, you do this or

8     you do that.  It was more of a lot of

9     things were trying to get done and

10    management was giving input as we were

11    going through it.

12              MR. MONK:  Mr. Rucher,

13    anything you want to add to that?

14              MR. RUCHER:  I would

15    characterize -- I don't know if I

16    necessarily -- the one thing, when you

17    say "tensions," I don't know if

18    necessarily -- I wouldn't characterize

19    it as tension between VRC and the

20    management.

21              I think things that were

22    different were, number one, the equity

23    markets had gotten a little bit

24    weaker.  So those are things that you

25    have to take into consideration, the

64

1       June 30, 2010

2       overall valuations had changed.  In

3       some instances, Tribune's business had

4       gotten a little bit worse, so those

5       things you had to take into

6       consideration.  And number three,

7       there was more debt going on, coming

8       onto the balance sheet for Step 2.  So

9       particularly, with your balance sheet

10      test, your cushion was lower.  So

11      those are all things that you have to

12      take into consideration with this

13      valuation.

14              So I don't know -- so I

15      wouldn't characterize it, necessarily,

16      as tensions.  I would say that there

17      were several things that were

18      happening, particularly things that

19      were macroeconomic that were happening

20      that was making -- that was making the

21      cushion that you had smaller.

22              So those are things that you

23      have to take into account when you are

24      going from Step 1 to Step 2.  You have

25      less debt in Step 1, so you have a

65

1          June 30, 2010

2     look at larger equity cushion.  So you

3     just want to make sure that you are

4     taking all these factors into account,

5     trying to get to the best possible

6     answer at that particular time given

7     the information that you had.

8          MR. BROWNING:  And I will add

9     to that.  You know, when I say there

10    was tensions, I don't mean -- what I

11    mean by that is that's a normal -- for

12    us, that's a normal part of the

13    process.  We receive data, we discuss

14    it.  Management will have a view.  We

15    may not agree with that view or we are

16    trying to be objective and independent

17    to assess that data.  And so that's

18    what I mean.

19          MR. NASTASI:  Can you think

20    of any views in particular that

21    management had that VRC disagreed with

22    at either Step 1 or Step 2?  Do any

23    stand out in your mind?

24          Mr. Browning, first.

25          MR. BROWNING:  The only

66

1        June 30, 2010

2    thing -- something that popped in my

3    head was the actual -- I don't know

4    during the process or in Step 1 or in

5    Step 2, there were some views that the

6    multiples should be higher than we

7    selected.  It wasn't significantly

8    higher, or whatever, but it was that

9    they should be slightly higher.  We

10   didn't agree with that.  That's one of

11   the things that I recall.

12            MR. NASTASI:  When you say

13   you didn't agree, you didn't succumb

14   to that pressure, and you kept the

15   multiples that you used?

16            MR. BROWNING:  That's

17   correct.

18            MR. NASTASI:  Mr. Rucher,

19   first of all, would you agree that

20   that was a view of management, that

21   multiples should be higher?

22            MR. RUCHER:  I can't recall

23   on that particular topic.

24            But in general, management

25   always, you know, will have a view

67

1          June 30, 2010

2      that will differ from yours.  And you

3      just have to ultimately make the best

4      call that you can given the facts and

5      circumstances.  It is rare that you

6      are going to agree on everything.

7              But one thing that I would

8      stress is that we do not take

9      management's forecast and operate in a

10     strict vacuum and say management gave

11     us this and this is the answer.  We do

12     testing around everything that

13     management gives us.  And, in

14     particular here, even though they are

15     not included in the board materials

16     that we give, in our own internal work

17     files, we developed a downside

18     sensitivity case that was worse than

19     management's downside sensitivity

20     case.  We've had a recession case that

21     was worse.  And these were pretty

22     draconian downside tests that we

23     thought -- that we felt comfortable

24     that would never be hit.  But what

25     happened after, you know, 2008, I

68

1          June 30, 2010

2     mean, we had what I called the

3     hundred-year flood, where things

4     happened that I don't think almost

5     anybody could foresee.

6          But we have, in our files,

7     and I think you may have copies of

8     those, we have a VRC downside case, a

9     VRC recession case, where we do

10    very -- you know, very severe downside

11    testing.

12          So we generally assume that

13    management gives us the best estimate

14    that they can get.  And then we do

15    testing around it, downside

16    sensitivity testing, to see if the

17    company is still solvent.  And in our

18    analysis in both Step 1 and in Step 2,

19    we did the downside testing.  And in

20    all cases, we exceeded those

21    requirements.  The cushion was

22    smaller, but the company was still

23    able to meet the requirements of the

24    debt.

25          And those exist in the record

69

1        June 30, 2010

2     somewhere.  I don't have -- I don't

3     know if you have them, but we

4     definitely have those files.

5              MR. NASTASI:  Thank you.

6              MR. BROWNING:  And I just

7     want to add, when I talk about, for

8     example, the issue of multiples.  The

9     reason why they say it, is because

10    they had transactions that they

11    believed supported those higher

12    values.  We felt that -- whether it

13    was to be conservative or whatever it

14    was -- we felt that we needed to use

15    the multiples that we came up with.

16    But it wasn't like they were just

17    trying to pump it up.  It was just --

18    they had transactions that they

19    referred to that they felt were the

20    ones to use.  So that's what I --

21             MR. KLEE:  Do you recall

22    whether Univision was one of those

23    transactions?

24             MR. BROWNING:  I don't.

25             MR. KLEE:  Mr. Rucher, do you

70

1          June 30, 2010

2     recall?

3               MR. RUCHER:  I do not -- I do

4     not recall, to be honest with you.

5               And I will look here and see

6     if we have Univision.  It looks like

7     Univision was included in our

8     comparable transactions.

9               MR. MONK:  Was included?

10              MR. RUCHER:  In our

11    comparable transactions.  It is one of

12    the companies in the comparable

13    transaction.

14              MR. NASTASI:  Can you just

15    read the Bates label that you are

16    referring to?

17              MR. RUCHER:  VRC 0038687.  It

18    is on line 2.

19              MR. NASTASI:  Thank you.

20              (VRC Exhibit 3 was marked for

21    identification, as of this date.)

22              MR. KLEE:  So you included

23    Univision as one of the comparable

24    transaction multiples on this page,

25    38687, page 27 of the slide deck.  But

71

1          June 30, 2010

2      this is the maximum EBITDA multiple in

3      the set; is that correct?

4          MR. RUCHER:  Yes, sir.

5          MR. BROWNING:  Yes, it looks

6      like it.

7          MR. KLEE:  But if you had

8      considered this to be an outlier, you

9      would have simply taken it out of the

10     set; is that right?

11         MR. BROWNING:  If we thought

12     it was an outlier?  If we thought it

13     wasn't appropriate?

14         MR. KLEE:  Right.

15         MR. BROWNING:  Yeah, I would

16     say so.  The reason why I think it is

17     in there is twofold:  One, it's a

18     fairly recent transaction, and we try

19     to get a fairly comprehensive look.  I

20     don't want to speculate too much,

21     because probably Chad and Leonid

22     Mednik were involved in selecting

23     those.

24         MR. KLEE:  Mr. Rucher?

25         MR. RUCHER:  If I might add,

72

1          June 30, 2010

2      even if something is an outlier, it

3      may still stay in the set.  If you

4      notice, we just don't look at just a

5      simple mean.  We just don't look at a

6      simple mean.  We will look at the

7      mean, and we also look at the median.

8      And the median will, oftentimes, take

9      out those outliers.

10              So we don't just look at it

11      just as a simple average.  We look at

12      the mean, the median.  We also take

13      into account the max -- the minimum

14      and the max in this.  So even though

15      something may be an outlier, you may

16      not necessarily always take it out of

17      your comp set, but you will look at

18      other statistics that will -- that may

19      pull it out of that outlier.

20              MR. KLEE:  Did management

21      suggest to you any comparable

22      transactions with EBITDA multiples

23      above 16.9 times that you excluded

24      from the set?

25              MR. RUCHER:  I don't know,

73

1           June 30, 2010

2       sir.  I can't recall.

3               MR. BROWNING:  Could you ask

4       the question again?  I didn't fully

5       understand the question.

6               MR. KLEE:  Well, you had

7       testified earlier, I believe, that

8       management had suggested some

9       comparable company transactions that

10      you chose not to put in the set.

11              MR. BROWNING:  No.

12              MR. NEIER:  I think they

13      were --

14              MR. BROWNING:  No.  That's

15      not -- you misheard me.

16              MR. NEIER:  Company

17      comparables, not transactions.

18              MR. KLEE:  Oh, company

19      comparables.

20              MR. BROWNING:  And what I was

21      suggesting was that overall, our

22      concluded multiple, they might have

23      felt that that should be maybe a tick

24      higher or whatever because of certain

25      transactions.

74

1          June 30, 2010

2              Now, this Univision is

3      nothing like -- that I recall being

4      brought up at all.  It's just one of

5      those companies in the data set.  But

6      I don't think anybody ever said it

7      should be higher than Univision or

8      anything like that that I recall.  And

9      so I am just saying -- and you know, I

10     can be even wrong on my -- when I say

11     it came into my mind, that is just one

12     of the things I remember.  But it

13     could have been not even a significant

14     issue.  It may have just been a

15     discussion.  But it wasn't like we

16     were at ten times and they believed it

17     should be sixteen.  I don't believe

18     anything like that.

19             We didn't exclude anything or

20     include anything, that I recall,

21     because management said to do so.

22             MR. RUCHER:  If I might add,

23     when you are doing these valuations,

24     you have two different comparable

25     approaches:  One, the comparable

75

1                  June 30, 2010

2        companies, and the way that some

3        people look at these comparable

4        companies is to say this is the way it

5        is trading on the stock market for,

6        this is what is representing a

7        minority interest that is publicly

8        traded, a liquid minority interest in

9        a company.  Then you look at the

10       comparable transactions and what

11       people will typically say for

12       comparable transactions is that that

13       represents a controlled premium, what

14       somebody was willing to pay for the

15       entire company.

16            And so that's why we use two

17       different approaches.  A comparable

18       companies approach to look at similar

19       publicly-traded companies that are on

20       the Stock Exchange.  And then control

21       transactions, where someone paid a

22       premium to acquire either a control

23       position in the company or a hundred

24       percent of the company.

25            MR. KLEE:  And is it

76

1        June 30, 2010

2        appropriate to weight those

3        methodologies equally?

4            MR. RUCHER:  Yes.  In my

5        view, it is.  And the reason why is

6        when you are doing a solvency

7        analysis, instead of looking at a

8        specific point of value, you are

9        looking at a range of values.  You

10       look at your low, your mid and your

11       high range.  And by using these three

12       or four approaches that we used here,

13       it gave us a range of values for a

14       company.

15           MR. KLEE:  Mr. Rucher, how

16       many solvency opinions have you done

17       in your career, roughly?

18           MR. RUCHER:  I don't know how

19       many solvency opinions I have done,

20       but I would say I've probably -- on

21       dollar volume, I think it would be

22       tough to find somebody in the country

23       that has done more solvency opinions

24       on a dollar volume basis than me.

25       I've probably done, I'd say -- if I

77

```
 1              June 30, 2010
 2       had to say volume, dollar volume,
 3       probably $40 or $50 billion.  I've
 4       done a lot of solvency opinions.
 5              MR. KLEE:  More than fifty?
 6              MR. RUCHER:  I don't think I
 7       have done more than fifty.
 8              MR. KLEE:  Mr. Browning, how
 9       about you?
10              MR. BROWNING:  I have done
11       more than fifty, i believe.
12              MR. KLEE:  How many solvency
13       opinions have you done in your career,
14       approximately?
15              MR. BROWNING:  Maybe seven or
16       eight or nine a year.  See, the
17       thing -- I get involved in a lot of
18       them from a review standpoint.  So
19       maybe ten a year for fifteen years,
20       something like that.
21              MR. KLEE:  So somewhere over
22       a hundred?
23              MR. BROWNING:  Maybe.
24              MR. KLEE:  In those years of
25       experience for both of you, have the
```

78

1        June 30, 2010

2        other solvency opinions you have

3        worked on equally weighted the

4        different methodologies, or have they

5        had different weightings for

6        methodologies?

7                MR. BROWNING:  My answer will

8        be yes to both.  We've seen -- I've

9        seen some that are weighted and some

10       that are not.

11               MR. KLEE:  And is it more

12       typical to equally weight the four

13       methodologies, or to have a relative

14       weighting based on some methods being

15       more important or more entitled to

16       weight than others?

17               MR. BROWNING:  I would say it

18       is more typical to average them, to

19       look at them equally.

20               MR. KLEE:  And, Mr. Rucher,

21       in your experience?

22               MR. RUCHER:  To the best of

23       my recollection, I don't think I've

24       ever done a solvency opinion where you

25       have -- where you haven't looked at

79

1        June 30, 2010

2        all evaluation methodologies equally

3        to determine a range of values.

4              MR. KLEE:  Then why, in the

5        draft of your first solvency opinion,

6        did you have the equal weighting and a

7        disproportional evaluation on the

8        discounted cash flow method?

9              MR. RUCHER:  I can explain

10       that one, too, from my perspective.

11             MR. KLEE:  Please.

12             MR. RUCHER:  When Bryan was

13       new to the New York office from

14       Milwaukee, and when we first sat down,

15       we had sat down and had a discussion

16       and he said, well, we want to try

17       something new, look at some new things

18       in our solvency opinions.  Let's try

19       some of our traditional valuation

20       approaches where we may have some

21       weightings in there.  And that was

22       some of the things that we took into

23       account when we did this first draft.

24             I think this was the first

25       solvency opinion that we actually did

80

1           June 30, 2010

2      when you came into the New York

3      office, if I'm not mistaken, Bryan.

4           MR. BROWNING:  It wasn't the

5      first, but it was one of the first.

6           MR. NASTASI:  I want to put

7      before you what has been marked as VRC 3. :14

8      ask each of you to look at VRC 3.

9           For the record, it is Bates

10      labeled VRC 8 through VRC 54.

11           My first question is going to

12      be:  Can either one of you identify

13      what this document is?

14           MR. RUCHER:  Yes, I can.

15      This looks like a printout of the Zelo

16      model, the Tribune model, this is what

17      this looks like.

18           MR. NASTASI:  And what was

19      the purpose of VRC receiving Tribune's

20      model?

21           MR. RUCHER:  This represented

22      the management's forecast.

23           MR. NASTASI:  And how did VRC

24      use this model?

25           MR. RUCHER:  I don't know if

81

1      June 30, 2010

2      I understand your question.

3              MR. NASTASI:  Well, the data

4      in the model, what did you do with it,

5      if anything?

6              MR. RUCHER:  What we did was

7      we took this model and we used this as

8      a base for us building our own

9      financial model.  So we built our own

10     financial model using inputs from this

11     model so that we would have a model

12     that we could do and run sensitivities

13     on.

14             But this represented

15     management's base case.  And it may

16     also have a toggle in here for their

17     downside analysis.

18             MR. NASTASI:  If you would,

19     please turn to pages VRC 45 and 46.

20             Beginning on page 45, does

21     the line that's entitled "PF

22     Publishing," under the heading,

23     "Revenue," does that represent

24     management's forecast for the

25     publishing revenues as of February 8,

82

1          June 30, 2010

2     '07?

3               MR. BROWNING:  I think this

4     was updated to June 9th.

5               MR. NASTASI:  Well, there is

6     a last updated notation on the first

7     page that says June 9, '09.  That may

8     just be when it was printed out from

9     your computers.

10              MR. BROWNING:  You are right,

11    yes, that's probably right.

12              MR. NASTASI:  If you wanted

13    to take some time, I think, in looking

14    at page 46, you will see a similar

15    line for PF B&E, which is broadcasting

16    and entertainment.  And if you add up

17    the revenue numbers for publishing and

18    broadcasting and entertainment from

19    2008 to 2012 or 2013, you can compare

20    those consolidated revenue numbers to

21    the numbers in VRC 2.

22              And please take your time to

23    do that and confirm for me, if you

24    would, if these revenue projections

25    are the same ones that are used in VRC 2.

83

1        June 30, 2010

2              We can take a couple of

3     minutes to do that.

4              MR. RUCHER:  Can I go get my

5     calculator?

6              MR. NASTASI:  Absolutely.

7              MR. KLEE:  Why don't we take

8     a break.  Off the record.

9              [A recess was taken.]

10             MR. NASTASI:  Gentlemen,

11    let's do it one at a time.

12             Mr. Browning, have you had an

13    opportunity to look at management's

14    revenue projections for both

15    publishing and broadcasting and

16    entertainment, as well as any

17    consolidated revenue projections, in

18    VRC 3?

19             My first question is have you

20    had an opportunity to look at those

21    projections in VRC 3?

22             MR. BROWNING:  Yes.

23             MR. NASTASI:  Have you had an

24    opportunity to compare those

25    projections to the revenue projections

84

1      June 30, 2010

2      that appear on both page 32 and page

3      36 of VRC 2?

4           MR. BROWNING:  Yes.

5           MR. NASTASI:  And does it

6      appear to you, sir, that the revenue

7      projections that management provided

8      to VRC in the exhibit that has been

9      marked as VRC 3 were, in fact, the

10     revenue projections that were used in

11     VRC's analysis in rendering its

12     opinion with respect to Step 1?

13          MR. BROWNING:  I reviewed it

14     from a consolidated, I didn't add up

15     each one, but the consolidated revenue

16     in VRC 3 appears to match those in VRC

17     2.

18          MR. NASTASI:  And Mr. Rucher,

19     have you had an opportunity to do the

20     same?

21          MR. RUCHER:  Yes.

22          MR. NASTASI:  And do you also

23     agree that it appears that the revenue

24     projections in VRC 3 are the revenue

25     projections provided to VRC by

85

1        June 30, 2010

2        management that were used in VRC's

3        analysis in rendering its Step 1

4        solvency opinion?

5              MR. RUCHER:  Yes.

6              If there were any differences

7        at all in revenue, I would think they

8        were immaterial.  There may have been

9        some small tweaks --

10              MR. NASTASI:  You would think

11        that they were immaterial or --

12              MR. RUCHER:  I'm sorry, they

13        were not material.  But they would be

14        substantially the same numbers.

15              MR. NASTASI:  If you would,

16        Mr. Rucher and Mr. Browning, please

17        turn to page VRC 45 of VRC 3.

18              I just want to focus on the

19        publishing revenues that are projected

20        by management on this page.  I

21        believe, Mr. Rucher, you testified

22        earlier, that in your discounted cash

23        flow analysis for Step 1, VRC used

24        five years of projections,

25        consolidated projections; is that

86

1        June 30, 2010

2    right?

3            MR. RUCHER:  Yes.

4            MR. NASTASI:  And so

5    obviously part of this consolidated

6    revenue would have been publishing

7    revenues for five years?

8            MR. RUCHER:  Yes.

9            MR. NASTASI:  And can you

10   identify, would that have been years

11   2008, 2009, 2010, 2011 and 2012?

12           MR. RUCHER:  2012, yes.

13           MR. NASTASI:  I believe you

14   also testified that when you received

15   these projections, you had meetings

16   with the heads of the major business

17   units within Tribune and looked at in

18   more detail how the -- all of the

19   projections, including the revenue

20   projections, were developed by

21   management; is that right?

22           MR. RUCHER:  Yes.

23           MR. NASTASI:  And do you

24   remember whether those detailed

25   projections went beyond five years?

87

1              June 30, 2010

2                   MR. RUCHER:  I don't recall.

3                   MR. NASTASI:  Do you remember

4         that the detailed projections with

5         respect to Step 1 included detail for

6         at least five years?

7                   MR. RUCHER:  I don't recall.

8         I would have to look at the files.

9                   MR. NASTASI:  And, Mr.

10        Browning, do you have any recollection

11        as to whether management developed

12        detailed projections for at least five

13        years with respect to Step 1?

14                  MR. BROWNING:  I believe this

15        is management's.  So VRC 3 is

16        management's projections.

17                  MR. NASTASI:  It is.  I am

18        speaking to the detail.  Well, do you

19        know how those numbers were populated

20        in this model?

21                  MR. BROWNING:  Not

22        specifically, but maybe I didn't

23        understand the question.

24                  MR. NASTASI:  I asked Mr.

25        Rucher, because he had testified

88

1          June 30, 2010

2     earlier that he attended meetings with

3     particular business heads in which the

4     detail was gone over and how these

5     projections were developed.

6              MR. BROWNING:  Right.

7              MR. NASTASI:  I asked him how

8     far out those detailed projections

9     went as opposed to applying the growth

10     rate or some other way of projecting

11     out revenue.  I am just speaking to

12     the detail.

13              MR. BROWNING:  Right.  Right.

14              MR. NASTASI:  I am asking if

15     you recall if the detailed projections

16     went out to at least five years, is my

17     first question?

18              MR. BROWNING:  No, I don't

19     recall that.

20              MR. RUCHER:  But there is a

21     document in the record which shows

22     that buildup.

23              MR. NASTASI:  What buildup?

24              MR. BROWNING:  Of how they

25     determined the revenue.  It was either

89

1           June 30, 2010

2      by region or by paper, but there was a

3      detailed buildup that's in the record

4      that was presented.

5           MR. NASTASI:  And it would be

6      in VRC's file, a copy of it?

7           MR. RUCHER:  I'm quite sure

8      we produced a copy of a detailed

9      buildup.  There is something in the

10     files.  I just don't have it in front

11     of me.

12          MR. NASTASI:  I understand.

13          And just so I understand,

14     what I am looking for, I should be

15     able to determine how far out in years

16     those detailed projections for

17     management went, right?

18          MR. RUCHER:  Yes.

19          MR. MONK:  As you sit here

20     today, do you have any recollection of

21     discussing with management their

22     estimates for the five-out years?  At

23     the end of this ten-year model, that

24     is VRC 3, I guess my question is:  Do

25     you remember discussing the five-out

90

1          June 30, 2010

2     years with management when you were

3     preparing your opinion for the first

4     stage, Mr. Rucher?

5               MR. RUCHER:  I do remember

6     having those discussions, but the

7     detail of those discussions, I just

8     don't remember all the details, but I

9     know for sure that we discussed all of

10    the projections with management, you

11    know, what they were basing those

12    assumptions on, and those types of

13    things.

14              As I said before, we had a

15    one-day meeting with the heads of all

16    the major newspapers, the head of the

17    publishing -- the broadcasting sector

18    and the heads of the major television

19    stations within that sector.  So we

20    did have very detailed meetings on

21    those projections.

22              MR. KLEE:  And were you

23    comfortable with them, the best you

24    can recall?

25              MR. RUCHER:  Yes, we did.

91

1    June 30, 2010

2    There was nothing that came to our

3    attention.  That the forecasts were

4    reasonable.  And management portrayed

5    them as being reasonable, yes.

6         MR. KLEE:  So if you look at

7    page VRC 46.  This is the one that has

8    the broadcasting entertainment

9    revenue.  Do you see on the top line,

10   it says there, "B&E standalone."

11        MR. RUCHER:  Did you say 47?

12        MR. KLEE:  46.  Top line.

13        MR. RUCHER:  Mm-hm.

14        MR. KLEE:  Can you tell me

15   what is happening to projected

16   broadcasting and entertainment revenue

17   from 2010 through 2017?

18        MR. RUCHER:  It looks to me

19   to be relatively flat, slightly

20   declining.

21        MR. KLEE:  Flat and slightly

22   declining.

23        Mr. Browning, would you agree

24   with that?

25        MR. BROWNING:  Yes.

92

1        June 30, 2010

2             MR. KLEE:  And those

3    projections were reasonable, as far as

4    you were concerned?

5             MR. BROWNING:  Yes.

6             MR. KLEE:  Mr. Rucher?

7             MR. RUCHER:  Yes, based upon

8    management's representation and the

9    conversations that he had.

10            MR. BROWNING:  I mean, we are

11   a little disadvantaged, because we

12   can't break it up right now as to what

13   was included in the total B&E revenue.

14   So I would have to -- but we were made

15   comfortable, yes.  We were comfortable

16   with the forecast.

17            MR. KLEE:  And just for

18   completeness, if you turn to page VRC

19   45, and you look at the top line with

20   the publishing standalone, it looks

21   like during the same period that there

22   is an increase in revenue, but it

23   looks like a fairly slight increase in

24   growth, maybe less than 1 percent.

25            Is that about right, Mr.

93

1          June 30, 2010

2     Rucher or Mr. Browning?

3              MR. BROWNING:  Yeah, I don't

4     know what the percentage is, but I

5     think that's -- that sounds about

6     right.

7              MR. KLEE:  Well, let's just

8     do the math, just for fun.  If we look

9     at the growth rate between 2016 and

10    2017, you have got a difference there

11    of 32.

12             MR. BROWNING:  Right.

13             MR. KLEE:  What percent would

14    that be based on the 2016 earnings of

15    4246?  Would that be less than

16    1 percent?

17             MR. BROWNING:  Yes.  Slightly

18    less than 1 percent.  Of revenue, you

19    said.  You said revenues, right?

20             MR. KLEE:  Of revenue.

21             MR. RUCHER:  It's .7.

22             MR. KLEE: .7 maybe even .73,

23    something like that.

24             MR. RUCHER:  Right.

25             MR. KLEE:  And did you think

94

1          June 30, 2010
2     that these growth rates were
3     reasonable?
4          MR. BROWNING:  Yes.
5          MR. RUCHER:  Again, if I
6     might add, to the best of my
7     recollection here, some of this growth
8     was -- some of the decline in the
9     newspaper was thought to be that they
10    were going -- they were pursuing a new
11    strategy, their interactive strategy.
12    And that growth in their online
13    segment was contributing to some of
14    that.  They were investing, if I'm not
15    mistaken -- they were anticipating on
16    investing about $250 million a year in
17    their interactive segment, or a
18    significant amount of money, I don't
19    remember the exact number.  But that
20    was going to be -- hopefully that was
21    going to be somewhat of a growth
22    engine in the publishing sector.
23         MR. KLEE:  And do you
24    remember, roughly, what percentage of
25    revenues the interactive business was?

95

1        June 30, 2010

2            MR. BROWNING:  I don't

3        recall.  It was a fairly small

4        percentage initially, and expected

5        to -- I don't recall, but I'll say

6        something like probably less than

7        10 percent.

8            MR. KLEE:  Mr. Rucher?

9            MR. RUCHER:  It was

10       relatively small, but it was a segment

11       that was -- that one of the gentleman,

12       I remember, is Dan Kazan, if I am

13       pronouncing his name correctly, was

14       actively involved in.  And then there

15       was another gentleman who was heading

16       that group up.

17           MR. MONK:  Len?

18           MR. RUCHER:  I don't remember

19       his name.  But I do know we spent a

20       lot of time talking to them about the

21       growth strategy of that interactive

22       sector.  And they thought that given

23       some of the secular trends that were

24       going on in the newspaper industry,

25       that they would be able to leverage

96

1           June 30, 2010

2      their interactive piece to get some

3      growth there.

4           MR. KLEE:  And what did you

5      think?  Did you agree with their

6      optimism in that regard?

7           MR. RUCHER:  I can't recall

8      whether we -- whether we discounted --

9      discounted that management could

10     achieve what they were anticipating

11     that they could achieve.  We did know

12     that they had had some pretty

13     significant successes or things that

14     they had invested in, like Auto Trader

15     and a Career Builder, that they had --

16     you know, they had some real successes

17     there.

18          So I don't recall whether we

19     said this is not attainable or

20     anything like that.  I think

21     ultimately we concluded that what

22     management was telling us seemed to be

23     reasonable, particularly given that

24     they had a pretty successful track

25     record in investing in some real

97

1      June 30, 2010

2      winners in the online sector.

3           MR. KLEE:  In terms of the

4      riskiness of management achieving

5      those revenues, would the Internet

6      startup businesses be more risky or

7      less risky than the broadcasting

8      projections and the publishing

9      projections?  Mr. Browning?

10          MR. BROWNING:  I think -- I

11     think you would have to say they are

12     more risky.

13          But I think what their

14     enthusiasm -- when you say that,

15     because I think their enthusiasm was

16     that they would grow substantially

17     more than what the projections stated.

18     And so, you know, the first thing we

19     would say is we think we are

20     conservative because we think it's

21     going to grow even -- much higher than

22     what we've got forecasted.

23          So some of that risk is

24     already mitigated in the fact that

25     they tempered down there what they

98

1    June 30, 2010
2    actually thought they could achieve.
3         But all in all, I think that
4    the forecast of interactive did
5    contribute to the total growth here
6    that you see.
7         MR. MONK:  While we are on
8    page VRC 3, page 45, I think you were
9    indicating that the Capex could be as
10   high as $250 million a year.  But am I
11   correct in reading this page 45, that
12   the Capex forecast there is a hundred
13   million dollars a year that they
14   intended to invest in this area,
15   roughly, over the ten-year period?
16        MR. RUCHER:  If I might add,
17   you have to be careful when you say
18   the Capex, because I'm not certain --
19   sometimes when you are building a
20   business, sometimes those things will
21   run through an expense line and not
22   necessarily be running totally through
23   Capex.  So I don't remember the exact
24   number.  But for some reason, I seem
25   to recall that the total investment

99

1           June 30, 2010

2      that they were going to be doing was

3      about two hundred, $250 million in

4      this sector.  And I do not know

5      whether all of it went through the

6      Capex line.  Looking at this number,

7      it is indicated to me that it probably

8      didn't all go through the Capex line.

9      Some of it that they considered

10     investment might be running through

11     the expense line.

12          MR. MONK:  And when you asked

13     them about their modeling, you tested

14     that and you said, gee, there's only

15     $100 million in Capex, where's the

16     other $140 million, that's an expense

17     item up here someplace, $150 million,

18     that's an expense item in publishing?

19     Is that what you are suggesting to us?

20          If we went to them, they

21     would say there's $150 million of

22     expenses in publishing that's really

23     Capex expense that we're hiding in

24     publishing as opposed to displaying

25     Capex?

100

1      June 30, 2010

2            Help me understand,

3      gentlemen.  It seems out of line to

4      me.

5            MR. BROWNING:  Well, one of

6      them is -- you know, the difference

7      between Capex and what Chad was

8      referring to, one is expense and the

9      other is capitalized, right?  And so

10     depending on if they thought it was a

11     period expense where that would then

12     go into the operating expenses and the

13     Capex would actually be capitalized,

14     that hundred million dollars, I

15     believe, if I recall, they felt that

16     50 million of it is maintenance

17     capital expenditures and 50 million is

18     growth capital expenditures for those

19     two, if I recall that.

20            Because I think -- Chad, you

21     probably have this remembered more

22     than I do, but I think in some of

23     these, they felt that if they had to

24     cut back in downside scenario, they

25     could cut back in $50 million in

101

1        June 30, 2010

2   Capex.  Maybe that's the entire

3   company.  I can't remember.  That's my

4   recollection.

5            MR. RUCHER:  I can't recall

6   all the details, but I know for sure

7   that -- I can't recall the specific

8   numbers, but I know for sure that

9   interactive was a major growth area of

10  the company where they were going to

11  be committing significant resources

12  there and trying to leverage their

13  existing newspaper assets to get some

14  of that online revenue.

15            The specific numbers of how

16  much was Capex or expenses or the

17  exact dollar amount, I'm -- I'm

18  guessing on that.  I don't know the

19  specific number.  I know that there

20  is -- somewhere in the documents there

21  is a breakout of, you know, what is

22  for interactive.

23            MR. MONK:  I don't want to

24  belabor this point when we have other

25  things to cover --

102

1    June 30, 2010

2         MR. NEIER:  Look, from a

3    common perspective, an investment is

4    not all going to be Capex, right?  If

5    I invest money in something, it's not

6    all going to Capex, from a common

7    person's perspective, right?

8         MR. MONK:  Right, but this

9    company was going to be highly

10   leveraged, free cash flow to invest in

11   new ventures was going to be very

12   limited.

13        So an assumption that builds

14   a big growth curve into a particular

15   market segment where the cash is dear

16   and not very available, has to be

17   questioned.

18        And I'm trying to get an idea

19   of whether your testing around this

20   was logical, what the underpinnings of

21   it were, and why you thought that that

22   growth curve was appropriate if the

23   capital investment -- which is

24   expressed where it says Capex here --

25   it is a lot less than the 250 million

103

1        June 30, 2010

2     than your recollection was?  Did it

3     change from the beginning when you

4     first began discussing it to the end?

5          MR. BROWNING:  I'm sorry, I

6     didn't catch -- is that something you

7     said, Chad?

8          MR. RUCHER:  I said I thought

9     it might have been 250.  But I know

10    the number was -- it was a significant

11    number that they were going to be

12    investing.  The exact amount I don't

13    know.  I don't know -- but from a cash

14    flow perspective, excluding taxes,

15    from a cash flow perspective, once

16    again, excluding taxes, whether this

17    expense or Capex, it doesn't make a

18    difference.  It's still going to have

19    the same impact on cash flow.

20          MR. MONK:  Sure.  Cash is

21    cash.

22          MR. RUCHER:  Yes.  So

23    excluding taxes.  For taxes it will be

24    a little different because you have a

25    depreciation, and that depreciation

104

1          June 30, 2010

2      will have an impact on it.  But given

3      this company was going to become an

4      ESOP S Corp, it wasn't going to be

5      really paying taxes except for state

6      taxes.  Whether it's the expense or

7      Capex is not a material item, in my

8      view.

9              MR. MONK:  Okay.

10             MR. BROWNING:  I think what I

11     recall when we had those interviews, a

12     fair amount of the groundwork had

13     already been laid in terms of these

14     interactive subsidiaries or entities,

15     whatever they were, had already

16     been -- much had been -- and I would

17     agree with Chad.  Some of it is

18     capital expenditure, but I would

19     capitalize, be it software

20     development, whatever it is that they

21     had.  And the other was purely

22     expense, the labor associated with

23     what part were expensed in the cash

24     flow.

25             But we spent a fair amount of

105

1        June 30, 2010

2     time talking about that, if they had

3     enough to generate those kind of

4     growth rates.

5            MR. NASTASI:  In spite of my

6     promise as a lawyer that we would

7     spend very little time on Step 1 --

8     that tells you something about a

9     lawyer's promise -- we are ready to

10    move on to topics relating to Step 2.

11           I just wanted to sum up,

12    because I think it is going to be

13    related to some of my questions with

14    respect to Step 2, what my

15    understanding is so far.

16           What I understand is that in

17    VRC 3, there appear revenue numbers

18    that are projections that were

19    provided to VRC by management at

20    Tribune that the first five years of

21    those projected revenue numbers were

22    used by VRC in its discounted cash

23    flow analysis in rendering its Step 1

24    solvency opinion.

25           Do I have that correct so

106

1          June 30, 2010

2     far?

3               MR. BROWNING:  I believe

4     that's correct.

5               MR. NASTASI:  And Mr. Rucher?

6               MR. RUCHER:  Yes.

7               MR. NASTASI:  Before we turn

8     to the actual document, I want to

9     know, and I will ask Mr. Rucher first:

10    Do you recall the revenue projections

11    changing, management's revenue

12    projections changing, from Step 1 to

13    Step 2?

14               MR. RUCHER:  I don't know if

15    specifically the revenue projections

16    changed, but I do think throughout the

17    process we got revised models where

18    things did change throughout the

19    step -- between Step 1 and Step 2.  We

20    did get revised -- revised forecasts.

21               MR. NASTASI:  What about the

22    EBITDA?  Do you know whether or not

23    that changed with respect to

24    management's projections, between Step

25    1 and Step 2?

1      June 30, 2010

2          MR. RUCHER:  I would have to

3      look at the -- compare them.

4          MR. NASTASI:  And you will.

5      I just want to see whether, without

6      looking at the documents, it was

7      something that stuck out in your mind.

8          Mr. Browning, same question

9      to you.

10         MR. BROWNING:  Yes.  I

11     believe that they changed and they

12     changed regularly.  Not every day, but

13     they changed when new information

14     was -- they felt new information was

15     pertinent.

16         And I think -- again, without

17     looking at the document, I think the

18     projections got more conservative or

19     lowered later, generally speaking.

20         MR. NASTASI:  Generally

21     speaking, you would expect the revenue

22     projections and the EBITDA projections

23     to be lower at Step 2 than they were

24     at Step 1?

25         MR. BROWNING:  Yeah, yeah.  I

108

1          June 30, 2010

2     think so, but --

3               (VRC Exhibit 4 was marked for

4     identification, as of this date.)

5               MR. NASTASI:  Messrs.

6     Browning and Rucher, I am going to

7     place before you what was marked as

8     VRC 4.  It's entitled Tribune Company

9     Model, Last Updated December 6, 2007,

10    11:00 a.m.

11              Take as much time as you

12    would like to look at it.  Again, I am

13    interested in the management

14    projections in the management case, I

15    believe, which appear on page VRC

16    20702.

17              MR. RUCHER:  Might I direct

18    you to another page?

19              MR. NASTASI:  Please.

20              MR. RUCHER:  Might it be VRC

21    20745?

22              [Discussion held off the

23    record.]

24              MR. NASTASI:  Mr. Rucher and

25    Browning, have you had an opportunity

109

1          June 30, 2010

2     to review VRC 4?

3              MR. BROWNING:  Yes.

4              MR. NASTASI:  And have you

5     had an opportunity to look at page

6     27072?

7              MR. RUCHER:  Yes.

8              MR. NASTASI:  For the

9     purposes of my questions for now, this

10    page is entitled "Management Case"; is

11    that right?  Is that at the top of the

12    legend there, it says "Management

13    Case"?

14             MR. RUCHER:  Yes.

15             MR. NASTASI:  And there

16    appears that there are revenue

17    projections on this page for both

18    publishing and broadcasting; is that

19    right?

20             MR. RUCHER:  Yes.

21             MR. NASTASI:  And those

22    revenue projections go from the year

23    2007 out to 2017; is that right?

24             MR. RUCHER:  Yes.

25             MR. BROWNING:  No -- 17?

110

1          June 30, 2010

2     I've got a 2012 here.  Oh, I'm sorry.

3     For total, yes.

4          MR. NASTASI:  Do you see that

5     the total projections go from the year

6     2007 to the year 2017; is that right,

7     Mr. Browning?

8          MR. BROWNING:  For total

9     revenue.

10          MR. NASTASI:  The detailed

11     revenue on this page only appears for

12     the years 2007 through 2012; is that

13     right?

14          MR. BROWNING:  That's what it

15     looks like, yes.

16          MR. NASTASI:  And Mr. Rucher,

17     would you agree?

18          MR. RUCHER:  Yes.

19          MR. NASTASI:  If you would,

20     please, take out VRC 3, and turn to

21     page 45 and 46.

22          Let's begin, I would like to

23     compare the revenue line at PF

24     Publishing on page VRC 45 of the

25     exhibit that has been marked as VRC 3

111

1      June 30, 2010

2      to the total publishing revenues line

3      by year on page VRC 27072 of the

4      exhibit that has been marked as VRC 4.

5           So if we look at the total

6      revenue in VRC -- for publishing in

7      VRC 3 for the year 2007, it is $3.946'

8      billion; is that right?

9           MR. RUCHER:  Yes.

10          MR. NASTASI:  And in VRC 4,

11     the corresponding revenue number is

12     actually lower, and it is $3.713

13     billion; is that right?

14          MR. BROWNING:  That's what it

15     looks like.

16          MR. NASTASI:  So at least

17     with respect to 2007, it appears that

18     the management case between Step 1 and

19     Step 2 projected lower revenues for

20     2007; is that right?

21          MR. BROWNING:  Yes.

22          MR. KLEE:  And did you

23     believe that to be reasonable?

24          MR. BROWNING:  I'm sorry, the

25     projection itself to be lower?

112

1      June 30, 2010

2           MR. KLEE:  Yes.

3           MR. BROWNING:  Yes.  I would

4      say yes, that we believed it to be

5      reasonable, given what had happened --

6      information that was received during

7      the interim period.

8           MR. KLEE:  And what

9      information was that?

10          MR. BROWNING:  We actually

11     received quarterly financial

12     information -- or maybe even monthly.

13     We received industry information or

14     research in the industry information,

15     other types of documents.

16          MR. KLEE:  And what was

17     happening both within Tribune and

18     within the industry to publishing

19     revenues in the fall of 2007?

20          MR. BROWNING:  I think within

21     Tribune, I think revenues were

22     declining.  Within the industry, I

23     think that's -- I'm speculating there,

24     but I think that's -- also other

25     industry participants were also

113

1       June 30, 2010

2    experiencing declines.

3          MR. KLEE:  Mr. Rucher?

4          MR. RUCHER:  Yes, they were

5    declining.

6          Tribune produced an internal

7    book that they gave us called the

8    Brown Book, which was a very detailed

9    analysis on all of their business

10   lines.  And I can't -- I don't recall

11   if this was produced on a monthly

12   basis or a quarterly basis.  And this

13   was information that we were given in

14   the Step 2 process that showed that

15   things were declining in the latter

16   part of 2007.

17         MR. KLEE:  So you agreed the

18   reduced revenue projection was

19   reasonable?

20         MR. RUCHER:  Yes.

21         MR. NASTASI:  Similarly, if

22   you compare the 2008 projections from

23   VRC 3 to VRC 4 with respect to

24   publishing, VRC has a total revenue

25   for publishing in 2008 projected at

114

1        June 30, 2010

2    3.969 billion, and VRC 4 is projected

3    lower at 3.680 billion.

4             Do you see that?

5             MR. RUCHER:  Yes.

6             MR. NASTASI:  And, again,

7    that is consistent with your

8    understanding of what was happening in

9    the industry at the time?

10            MR. BROWNING:  Yes.

11            MR. NASTASI:  And you agreed

12   with that change in projection that

13   management had made at that time?

14            MR. BROWNING:  Yes.

15            MR. KLEE:  Did you find it to

16   be reasonable?

17            MR. BROWNING:  Yes.  I think

18   we were -- I think what -- we were in

19   constant dialogue regarding the

20   forecast and so forth.  And when we

21   get them, we talk to them about it.

22   And we talked to them about it, what

23   their actual performance was and the

24   projections.

25            But we wouldn't -- if --

115

1              June 30, 2010

2         having that information that we had,

3         their historical performance, the

4         industry information.  If they hadn't

5         adjusted the forecast, then we would

6         think there's something wrong here.

7         But they made adjustments in step

8         with, what we believed, was what was

9         happening in the industry.

10              MR. KLEE:  So if they had

11         increased the forecast, you would have

12         gone to them and said what are you

13         doing, this doesn't jive with what's

14         going on in the industry and with your

15         numbers?

16              MR. BROWNING:  Exactly.

17              MR. KLEE:  Mr. Rucher?

18              MR. RUCHER:  Yes.  The one

19         area where I think they did increase

20         the forecast was with the interactive

21         piece.  And if you looked at what was

22         going on in the interactive and the

23         online advertising, that area was

24         growing.  So they did consider some

25         growth in that interactive piece of

116

1           June 30, 2010

2       their business while they considered

3       that their existing newspaper business

4       during that period would be declining.

5              MR. NASTASI:  But the overall

6       projections, as we are seeing here,

7       were lower?

8              MR. RUCHER:  Yes.

9              MR. NASTASI:  And I am not

10      going to read all the numbers, but

11      would you agree with me that,

12      similarly, 2009's projections were

13      lowered for publishing when you are

14      comparing VRC 3 and VRC 4?

15             MR. RUCHER:  Yes, sir.

16             MR. NASTASI:  And same with

17      2010?

18             MR. RUCHER:  Yes, sir.

19             MR. NASTASI:  And 2011?

20             MR. RUCHER:  Yes, sir.

21             MR. BROWNING:  Yes.

22             MR. NASTASI:  And 2012?

23             MR. RUCHER:  Yes, sir.

24             MR. NASTASI:  Now, in looking

25      at VRC 4, there are detailed

1    June 30, 2010

2    projection numbers for different

3    segments within publishing through

4    2012, and there don't appear any on

5    this page -- the same details don't

6    appear for the years 2013 to 2017.

7         Does that refresh your

8    recollection as to how far out

9    management's detailed projections

10   went?

11        MR. RUCHER:  Yes.

12        MR. NASTASI:  And tell us:

13   How far out did management's

14   projections go?

15        MR. RUCHER:  They went out to

16   2012.

17        MR. BROWNING:  The detailed

18   ones.

19        MR. NASTASI:  The detailed

20   ones, right.

21        And staying with VRC 4, do

22   you know how management calculated the

23   years 2013 through 2017?  Because

24   there are total revenue projections

25   there for publishing.  How were those

118

1           June 30, 2010

2       calculated?

3               MR. RUCHER:  What it appears

4       to me is that they might have applied

5       some type of growth rate after 2012.

6               MR. NASTASI:  And how can you

7       tell that?

8               MR. RUCHER:  Just looking at

9       the two things -- just looking at the

10      way the projections are set up here,

11      and also looking at typically what

12      will happen when you do solvency

13      opinions.  Because the farther you go

14      out, the more difficult it becomes to

15      do things on a

16      line-item-by-line-item-basis.  And

17      typically, you will see five-year and

18      three-year projections and then growth

19      rates applied after that period.

20              MR. NASTASI:  And, in your

21      experience, is there an appropriate

22      way or ways to come up with that

23      growth rate?

24              MR. RUCHER:  Typically what

25      people will look at is they will look

119

1          June 30, 2010

2     at their industry versus some type of

3     GDP type growth rate.  How will we

4     grow compared to a 3 percent kind of

5     standard GDP rate.

6              And so typically what will

7     happen is say we are growing slower

8     than GDP, so we might apply some

9     growth rate that is lower than GDP.

10    Typically, that is what will happen

11    with, I would say, 80 to 90 percent of

12    the companies that we deal with.

13    There will be some kind of GDP plus or

14    GDP minus growths.

15         MR. NASTASI:  And in your

16    experience, that would be an

17    appropriate way of determining the

18    growth rate for the out years?

19         MR. RUCHER:  Typically, it's

20    the only thing that you really have

21    when you start getting out into those

22    outer years.  It becomes much more

23    difficult to forecast with certainty.

24    Whereas, you know, that, on average,

25    if you look at the U.S. GDP growth

120

1          June 30, 2010

2     rate, even though now people are

3     saying it's going to be growing lower

4     than 3 percent out, typically, you

5     will look at your industry and say,

6     okay, we are a GDP plus or GDP minus

7     type company.

8          MR. NASTASI:  Have you seen

9     growth rates determined in any other

10    way other than in reference to a GDP?

11         MR. RUCHER:  Yes.

12         MR. NASTASI:  And what are

13    the other ways?

14         MR. RUCHER:  If you don't

15    have a -- say for instance if you have

16    an industry that may be a mason

17    industry or an industry without a long

18    track record, you may just look at

19    more recent-type growth rates and then

20    pick a haircut on those growth rates

21    and say we will grow that on the outer

22    years.

23         MR. NASTASI:  What do you

24    mean by "more recent-type growth

25    rates"?

121

1          June 30, 2010

2               MR. RUCHER:  Like say, for

3          instance if you have --

4               MR. BROWNING:  You mean where

5          you don't have a history?

6               MR. RUCHER:  Yeah, you don't

7          have a long-term history.

8               MR. NASTASI:  Do we have that

9          here with Tribune?

10              MR. RUCHER:  You don't have

11         that with the majority parts in their

12         business, but you do have that with

13         one segment, which is the interactive

14         segment.

15              MR. BROWNING:  You mean --

16              MR. NASTASI:  But overall,

17         how would you, in your experience, if

18         you were advising me that I had to

19         come up with a growth rate here, what

20         would you tell me to do?

21              MR. RUCHER:  Look at the

22         historical growth rates and look at

23         some kind of GDP minus or GDP plus

24         approach.

25              MR. KLEE:  For this

122

1        June 30, 2010

2        particular business, would you use GDP

3        minus or GDP plus?

4             MR. RUCHER:  For the

5        publishing sector?  I would probably

6        be at -- the one thing that makes it a

7        little bit tricky is that you have the

8        interactive sector in there.  But I

9        think in general, if I was just

10        excluding the interactive piece, I

11        would be probably a GDP minus type

12        business.

13             MR. KLEE:  What about for

14        broadcasting?

15             MR. RUCHER:  Broadcasting was

16        not experiencing the same level of

17        stress that the newspaper sector was.

18        Even though it is experiencing some

19        competition from Cable, broadcasting

20        becomes a little bit -- but I would

21        also say probably GDP or GDP are

22        slightly modest type -- GDP --

23        probably closer to GDP -- definitely.

24             If you had to ask me which

25        one did I think, excluding the

123

1          June 30, 2010

2     interactive business, was going to

3     grow faster, I would say broadcasting.

4          MR. KLEE:  And then for

5     interactive, you would do GDP plus or

6     minus?

7          MR. RUCHER:  No.  If you look

8     at the interactive business -- and I

9     did some research on this when we were

10    doing this -- the interactive sector

11    had been growing very fast.  I think

12    the growth rates -- totally

13    speculating here, but they were high

14    growth rates.  If they were growth

15    rates in excess of 20 percent, I

16    wouldn't be surprised.  And that piece

17    of the business, I would probably take

18    some kind of haircut to recent growth

19    trends on that one.

20         MR. KLEE:  Because you

21    wouldn't expect that type of growth to

22    persist through 2013 and 2017?

23         MR. RUCHER:  Well, it may

24    persist through 2013, but not at the

25    same levels.  It's not going to be

124

1              June 30, 2010

2         at -- if you grow to 35 percent, it's

3         not likely that you are going to grow

4         at 35 percent through 2017.

5              MR. KLEE:  Would there be a

6         reduced rate of growth?

7              MR. RUCHER:  I would think

8         so.

9              MR. KLEE:  Mr. Browning?

10             MR. BROWNING:  What I would

11        say to answer, first of all, the

12        questions about publishing and

13        broadcasting, I would say generally

14        speaking, I would look at historical

15        performance, I would look at what the

16        industry is being projected, and I

17        don't know how long that projection is

18        oftentimes.

19             But when you get out that

20        far, Chad's right, you are at a point

21        where GDP is really just price growth,

22        right?  So what you have in many

23        companies, you are going to have

24        pricing growth plus real growth of

25        expansion.  But in this case, I think

125

1          June 30, 2010

2      you probably have pricing growth

3      offset by some declines in real

4      advertising revenue or whatever it

5      might be.

6              So I think that Chad's right

7      in that I would be -- for publishing

8      below GDP or something close to that,

9      but not growing faster than that.  And

10     I would be -- broadcasting might be at

11     GDP.  Interactive, that could -- you

12     know, that's -- you've got starting

13     from a very small base, so you are

14     going to have -- you should have

15     significant growth initially and then

16     increase at a decreasing rate over

17     time.  What that is specifically, I

18     don't know, but you look at the

19     Googles of the world and so forth, and

20     they are still expecting to -- they

21     have been around for ten years,

22     fifteen years, and they are still

23     expected to grow long beyond GDP, so

24     it's hard to say.

25              MR. NASTASI:  Some of this

126

1        June 30, 2010

2        information may have been included in

3        what you just said, so I just want to

4        make sure the record is clear:  If you

5        were advising the company on how to

6        come up with an appropriate growth

7        rate, let's start with publishing, in

8        or around December 2007, for the out

9        years beyond 2012, what would you

10       advise the company to do?

11            MR. BROWNING:  Pretty much

12       what I just said, but I would say when

13       you get in the out years, it's more as

14       Chad said, it's more difficult to get

15       on the individual basis.  You kind of

16       see how, on a consolidated basis, for

17       that segment, how it's expected to

18       perform.  And then I would probably

19       apply a growth rate to the

20       consolidated what they did.  What that

21       growth rate is depends on what we

22       think the maturity of that industry

23       segment would be.  So that's what I

24       would say.

25            MR. NASTASI:  Would it ever

127

1        June 30, 2010

2    be appropriate to develop a growth

3    rate by simply looking at the

4    difference between years four and five

5    in the actual detailed projections,

6    and applying that percentage

7    difference as the growth rate going

8    forward?

9         MR. BROWNING:  So between

10   four and five?

11        MR. NASTASI:  So that if it

12   went up, there would be a growth rate

13   increase; if it went down, there would

14   be a decrease.

15        Would that ever be

16   appropriate, Mr. Browning, to try to

17   determine an appropriate growth rate

18   in making projections that it would go

19   into a solvency analysis or may go

20   into a solvency analysis?

21        MR. BROWNING:  I would say

22   the answer to that is yes, it may be

23   appropriate.  There's -- you know,

24   there's never one way to do

25   forecasting in every circumstance.

128

1          June 30, 2010

2              MR. NASTASI:  Do you think it

3      would be appropriate in this case?

4              So we are looking at VRC 4 at

5      page VRC 2072.  If management

6      developed the revenue projections for

7      publishing in years 2013, 2014, 2015,

8      2016 and 2017, by simply applying a

9      multiple that's equal to --

10             MR. BROWNING:  A growth rate?

11             MR. NASTASI:  A growth rate,

12     sorry.  That's equal to the delta

13     between years 2011 and 2012, would

14     that be appropriate in this case?

15             MR. BROWNING:  I'm not -- it

16     may be appropriate.

17             MR. NASTASI:  Based on what

18     you know about what was happening in

19     the industry, what was happening with

20     this company, what was happening with

21     the economy and the markets at the

22     time.  This is dated December 6th,

23     2007.  Would it have been appropriate

24     to apply a growth rate in that regard?

25             MR. BROWNING:  Yeah, knowing

129

1          June 30, 2010

2     what -- having what we knew and

3     assuming that we don't -- you know,

4     there's nothing out here that would

5     change that, you know, they may be

6     counting on that interactive will

7     continue to grow out higher than --

8     offset something declined or whatever

9     it is in the other segments --

10         MR. NASTASI:  I'm not asking

11    what management might have done.  I'm

12    asking whether you think it's

13    appropriate to do that given

14    everything that you knew.  And I know

15    it's limited to what you knew.

16         MR. BROWNING:  I'm not sure I

17    can answer that without digging more

18    into the detail.  But I would say

19    that's certainly a way to look at it.

20         MR. KLEE:  Mr. Rucher?

21         MR. RUCHER:  I just did a

22    quick calculation.  It looks like that

23    growth rate is about 2.3 percent,

24    which is a GDP modest count, after you

25    assume 4 percent was a standard GDP

130

1          June 30, 2010

2     growth rate.

3              Given what was anticipated to

4     happen in their interactive division,

5     it would not -- you couldn't say that

6     that would be an unreasonable approach

7     in my opinion.

8              MR. KLEE:  Would it be

9     unreasonable if the publishing

10    revenues in 2012 took into account the

11    presidential election in that year and

12    therefore caused a higher delta

13    between 2011 and 2012 than you would

14    have in non-presidential years?

15             MR. RUCHER:  I think that

16    could be something that you would have

17    to take a look at, yes, absolutely.

18             MR. KLEE:  Mr. Browning?

19             MR. BROWNING:  Yeah, I'd look

20    at it, too.

21             I mean, I'm not sure I know

22    the answer to that without looking

23    more.  There could be other cycles in

24    there --

25             MR. NASTASI:  I guess the

131

1          June 30, 2010

2     question is:  If part of the delta is

3     explained by a presidential election

4     year in 2012, wouldn't you agree that

5     you would have to make an adjustment

6     in that growth rate for the years in

7     which -- the years following in which

8     there is no presidential election?

9     Wouldn't you have to make an

10    adjustment downward to account for

11    that?

12              MR. KLEE:  Except for 2016.

13              MR. NASTASI:  Right.

14              MR. BROWNING:  I mean, that's

15    the point, is that you are going to

16    have cycles after that.  I don't

17    know -- the answer -- I think -- my

18    answer is I would really have to think

19    about that and look at it, but it

20    certainly could be the case.

21              MR. NASTASI:  Please, MR.

22    Rucher?

23              MR. RUCHER:  If I just look

24    at from 2011 to 2010, that growth rate

25    is about 2.3 percent also.  So I guess

132

1      June 30, 2010

2      my question is, I'm not certain that

3      in 2012, whether or not management's

4      forecast is substantially higher

5      because of the presidential election,

6      just with the data that I have here.

7      I'm not certain.  But if I just look

8      at 2011 to 2010, it's about

9      2.3 percent.

10          MR. NASTASI:  I would like

11     you to do one more thing.  I would

12     like you to go back to VRC 3, and I

13     would like you to do a similar

14     analysis that you had just done with

15     respect to the growth rates for the

16     out years on page VRC 45, and tell me

17     what the growth rate is.  We are going

18     to go off the record.

19          MR. RUCHER:  For publishing?

20          MR. NASTASI:  Yes, for

21     publishing.  VRC 3, page 45, you have

22     projections going all the way out to

23     2017, very similar in format to VRC 4.

24     I want you to calculate the growth

25     rate for the years beyond 2012, and

133

1        June 30, 2010

2     tell me what that is.

3            We will take a break and go

4     off the record.

5            [A recess was taken.]

6            MR. NASTASI:  Gentlemen, have

7     you had a chance to take a look at the

8     growth rate for the years 2013 through

9     2017 for the PF Publishing objective

10    revenues in Exhibit VRC 3 at page VRC

11    45?

12            MR. RUCHER:  Yes.

13            MR. BROWNING:  Yes.

14            MR. NASTASI:  And, Mr.

15    Rucher, what does the growth rate

16    appear to be for those years?

17            MR. RUCHER:  .7 percent.

18            MR. NASTASI:  And is that

19    growth rate equivalent to the delta

20    between the years 2011, 2012 on that

21    page?

22            MR. RUCHER:  Yes.

23            MR. NASTASI:  And, Mr.

24    Browning, would you agree?

25            MR. NEIER:  Just so

134

1    June 30, 2010

2    everybody's clear, when you say

3    ".7 percent," you are rounding a

4    little bit from your calculator,

5    correct?

6              MR. RUCHER:  Yes.

7              MR. NASTASI:  Roughly

8    .7 percent?

9              MR. RUCHER:  Yes.

10             MR. NASTASI:  First of all,

11   when you were doing your work at Step

12   2 for the Tribune Company, was it

13   called to your attention or did you in

14   some other way become aware of the

15   difference in growth rate for the out

16   years between management's projections

17   before Step 1 and management's

18   projections before Step 2?

19             MR. RUCHER:  Typically, our

20   analysis, whether it is in the

21   internal analysis or the one to the

22   board, we will have the revenue growth

23   rates in there.  So if you look at

24   page 32 in VRC 2, you can see we have

25   the growth rates in there.

135

1        June 30, 2010

2            So we are always aware of the

3        differences in growth rate because

4        those are one of the things that we

5        try.

6            MR. NASTASI:  Actually, that

7        is a good segue --

8            MR. KLEE:  Before you go on.

9            Mr. Browning, were you aware

10       of the differences of the growth rates

11       between Step 1 and Step 2?

12           MR. BROWNING:  I can't say

13       specifically I was, because what we

14       were really focusing on was, at the

15       time, the plan that we were looking

16       at.  So I may have been aware of it.

17       I can't specifically say I was.

18           MR. MONK:  I think we

19       established earlier that in your first

20       stage solvency review and analysis,

21       you looked at five years as opposed to

22       a ten-year management plan.

23           MR. NEIER:  They looked at

24       or --

25           MR. MONK:  They relied upon.

136

1           June 30, 2010

2               MR. BROWNING:  We used in our

3       forecast.

4               MR. MONK:  Used in your

5       forecast, okay.

6               And did you change that for

7       Stage 2?

8               MR. BROWNING:  I don't

9       believe so.

10              MR. RUCHER:  One thing please

11      don't confuse is I don't know if you

12      are talking about for the DCF analysis

13      when you say we looked at five years,

14      because we did the five-year DCF.

15      Now, for our cash flow test and those

16      kinds of things, I would have to look

17      at those, but we may have looked past

18      that five-year period.

19              MR. MONK:  Okay.

20              MR. RUCHER:  So I just want

21      to say for the balance sheet test

22      versus the cash flow test, we may have

23      looked at past five years, but I'm not

24      certain.

25              MR. MONK:  We are going to

137

1    June 30, 2010

2    get to look at it, so --

3            MR. NASTASI:  Can you mark

4    this, please?

5            (VRC Exhibit 5 and 6 were

6    marked for identification, as of this

7    date.)

8            MR. NASTASI:  Gentlemen, I

9    have placed before you two exhibits.

10   The first has been marked VRC 5.  The

11   first page is an e-mail from Mr.

12   Mednik to Mr. Browning and Mr. Rucher

13   is CCd the subject matter is internal

14   review documents.  It is followed by

15   several pages of a slide deck that is

16   entitled internal review document.

17   The exhibit in total is Bates labeled

18   VRC 60865 through VRC 60917.

19           Please take as much time as

20   you need to review the document, and

21   let me know when you have had enough

22   time.

23           MR. NEIER:  It is a 45 page

24   document, so --

25           MR. NASTASI:  Well, the

138

1          June 30, 2010

2     second document I have placed in front

3     of you has been marked VRC 6.  It is a

4     one-page e-mail from Mr. Bigelow to

5     Mr. Rucher, saying "thanks," and

6     beneath that is an earlier e-mail from

7     Mr. Rucher to Mr. Bigelow and Mr.

8     Grenesko and CCing Mr. Browning.  And

9     the Bates label is VRC 7070.

10          Do you have both of those

11    documents in front of you, gentlemen?

12          MR. RUCHER:  Yes.

13          MR. NASTASI:  My first

14    question is:  What is VRC 5?

15          MR. RUCHER:  It looks like

16    our detailed internal review document

17    that we did internally for VRC and the

18    VRC committee.

19          MR. NASTASI:  Would you agree

20    with that, Mr. Browning?

21          MR. BROWNING:  Right.  Yes.

22    For Step 2.

23          MR. NASTASI:  For Step 2,

24    right.

25          And the e-mail transmittal is

139

1           June 30, 2010

2       dated December 2, 2007, and the slide

3       deck also has the same date,

4       December 2, 2007; is that right?

5               MR. BROWNING:  Yes.

6               MR. NASTASI:  Is that one of

7       the days in which you met with the VRC

8       committee to get approval to give the

9       second step solvency opinion -- or the

10      preliminary Step 2 solvency opinion to

11      the Tribune board?

12              MR. BROWNING:  I believe so.

13              MR. NASTASI:  And you agree

14      with that, Mr. Rucher?

15              MR. RUCHER:  Yes.

16              Ask the question again, I'm

17      sorry.

18              MR. NASTASI:  Sure.  My

19      question is, Mr. Rucher:  Was there a

20      committee meeting on December 2, 2007,

21      during which VRC received approval

22      from its committee to give its

23      preliminary solvency opinion to the

24      Tribune board?

25              MR. RUCHER:  I'm not certain

140

1          June 30, 2010

2     that it occurred on December 2nd.  I

3     know there was one, but I don't know

4     exactly what date that occurred.

5              MR. BROWNING:  The date

6     says -- I think I can tell you.  There

7     were a number of internal reviews.

8     This one, December 2nd, was probably

9     after we had reviewed it a couple of

10    times internally.  But then the

11    committee gave -- my recollection is,

12    given this e-mail trail, that the

13    committee agreed to let us provide it

14    to the Tribune at that point.

15             MR. RUCHER:  Given the time

16    differential, one was sent out at

17    8:14.  It looks like I sent this other

18    one at 6:21.

19             MR. NASTASI:  6:21 p.m.?

20             MR. RUCHER:  Yes.

21             MR. NASTASI:  And we may come

22    back to that to pin that down, because

23    I think there are other documents that

24    show there was a meeting on that day

25    or around that day.

141

1        June 30, 2010

2            MR. BROWNING:  Right.

3            MR. NEIER:  On Sunday?

4            MR. NASTASI:  I believe there

5        was.  I believe there was one on

6        Saturday and Sunday.

7            MR. BROWNING:  There was.

8        Saturday and Sunday.

9            MR. NASTASI:  And Mr.

10       Browning agrees; is that right?

11           MR. BROWNING:  Yes.

12           MR. NASTASI:  Let's look at

13       VRC 5.  I want to turn to page 14,

14       which is Bates labeled VRC 60879.

15           Mr. Rucher, what does that

16       page display?

17           MR. RUCHER:  It displays the

18       cash flow analysis.

19           MR. NASTASI:  And in terms of

20       your approach in the cash flow

21       analysis, how is this approach

22       different from the approach you took,

23       if at all, in the Step 1 solvency?

24           MR. RUCHER:  It looks like

25       this is using a ten-year DCF as

142

1          June 30, 2010

2     opposed to the five-year that we used

3     before.

4          MR. NASTASI:  Do you recall

5     making that change?

6          MR. RUCHER:  Not really.

7          MR. NASTASI:  Do you have any

8     idea as to why that change was made?

9          MR. RUCHER:  Not off the top

10    of my head, I don't know why.

11         MR. NASTASI:  Did anyone from

12    management ask you to make that

13    change?

14         MR. RUCHER:  To the best of

15    my knowledge, no.

16         MR. NASTASI:  Did you attempt

17    to do it under a five-year model

18    first?

19         MR. RUCHER:  I do not

20    think -- you know what?  This is what

21    I -- what I think would have happened:

22    We had taken up these models, so if we

23    had in Step 1 originally used a

24    five-year DCF when we updated things,

25    that five-year DCF still would have

143

1       June 30, 2010

2       been hooked up.

3               To the best of my

4       recollection, I think that because we

5       had been provided a longer DCF, I

6       think I told Leonid Mednik to change

7       to the ten-year DCF because we had a

8       longer projected period, but I cannot

9       recollect exactly.

10              MR. NASTASI:  How were the

11      projections longer?  If you look back

12      at VRC 3 and VRC 4, both projections

13      go out to 2017.

14              MR. RUCHER:  I agree.

15              MR. NASTASI:  What changed

16      that would have caused you to go to a

17      ten-year?

18              MR. RUCHER:  I just think

19      when we did Step 1, I think we did a

20      five-year forecast -- a five-year DCF

21      because that's typically what we'll do

22      in our DCF analysis.  And I think in

23      between the process, I looked at this

24      closer and made a determination that

25      we should go out to a ten-year DCF

144

1        June 30, 2010

2   because we had projections through to

3   2017.

4           MR. NASTASI:  You would agree

5   with me that the first five-year

6   projections were lower between Step 1

7   and Step 2 -- let me restate that

8   question.

9           You would agree with me that

10  management's projections for the first

11  five years were decreased by

12  management between Step 1 and Step 2.

13          Do you agree with that?

14          MR. RUCHER:  Yes.

15          MR. NASTASI:  Did you run the

16  five-year model with the new lower

17  numbers and find that the company

18  would not be solvent under that

19  analysis?

20          MR. RUCHER:  No.  And one

21  thing I want to stress is that between

22  Step 1 and Step 2, we checked our DCF

23  analysis and realized that in Step 1,

24  we had an error in our DCF model.  So

25  we went through and looked at

145

1          June 30, 2010

2     everything again.

3               What happened in our Step 1

4     DCF is our Step 1 DCF was actually

5     lower than it should have been because

6     we were not -- our cash taxes in that

7     DCF were higher than they should have

8     been, which means you lowered your

9     free cash flow.  So once we

10    discovered -- somewhere when we were

11    double checking the numbers, we

12    discovered there was an error there.

13    So our DCF in Step 1 was, in fact,

14    lower than it should have been.

15    Because if your cash taxes are too

16    high, your cash is low.

17               And so we went back through

18    and looked at everything, double

19    checked everything, and I think at

20    that point when we were checking

21    through this, made the determination

22    that, hey, we should probably go to a

23    ten-year DCF.  So that's a very

24    important thing.  And I think it's in

25    one of the files, one of the notes to

146

1          June 30, 2010

2     the board, that we found a mistake in

3     our DCF analysis.  In fact, our DCF

4     value in Step 1 was much lower than it

5     should have been.

6          MR. KLEE:  Did you find any

7     other errors in your Step 1 analysis

8     when you reviewed it, material errors?

9          MR. RUCHER:  I can't recall

10    off the top of my head, but I do know

11    that that was one that I was

12    particularly embarrassed about, that

13    we had made a calculation error there

14    by making our cash taxes too high.

15          MR. KLEE:  Mr. Browning, do

16    you recall any errors in the Step 1

17    analysis, other than what Mr. Rucher

18    has testified to?

19          MR. BROWNING:  I don't think

20    so.  I recall in our initial versions

21    we had included -- I think we had

22    included the S Corp tax savings

23    initially, but we took those out

24    before we reported to the board.  So I

25    think that is the only thing I can

147

1      June 30, 2010

2      think of that is material.

3            MR. RUCHER:  And there were

4      some other changes that we discussed,

5      such as the phones or things that we

6      made some changes on.  But remember,

7      the Step 1 piece only included the tax

8      savings from the phones.  And the Step

9      2 included the tax savings from the

10     ESOP S Corp.

11           MR. KLEE:  Mr. Browning, do

12     you have something you wanted to

13     comment on?

14           MR. BROWNING:  It's kind of

15     getting off track from the original

16     question about the five-year versus

17     ten-year.

18           MR. NASTASI:  I was going to

19     come back to you and ask you.

20           MR. BROWNING:  Okay.

21           MR. NASTASI:  Mr. Browning,

22     please tell us:  What do you know, if

23     anything, about the genesis of going

24     from a five-year discounted cash flow

25     analysis in Step 1 to a ten-year in

148

1          June 30, 2010

2     Step 2, as appears on page VRC 60879

3     of VRC 5?

4          MR. BROWNING:  So I think

5     this is -- I don't recall any -- there

6     was no discussion that I recall that

7     said, hey, let's move this from a

8     five-year to a ten-year.  I think it

9     was probably a natural thought process

10    as we went through it to say it makes

11    more sense to look at it by ten-year.

12         We did -- we may have looked

13    at it both ways, but I don't think the

14    outcome would be material whether it

15    was five-year or ten-year.  I don't

16    know for sure.  But there was never an

17    intention to say the five-year doesn't

18    work, let's make it the ten-year.  It

19    was a natural, just, evolution of the

20    process of the methodology that I

21    recall.

22         MR. RUCHER:  And if I might

23    add, with a DCF, in your end year, you

24    have a terminal growth rate or

25    terminal multiple that's supplied.

149

1        June 30, 2010

2        And so, you know, that's an important

3        factor, you know, in your DCF, in your

4        overall DCF value.

5              So the mere fact that you

6        switched from a five to a ten, with

7        that terminal value, it doesn't

8        necessarily mean you are going to get

9        a substantially different -- different

10       answer.

11             MR. NASTASI:  Would it make a

12       difference in your year six through

13       ten in Step 1 had a growth rate of

14       .7 percent and in Step 2 had a growth

15       rate between year six and ten of

16       2.4 percent?

17             MR. RUCHER:  It depends on

18       what the terminal value is.

19             MR. MONK:  Can you calculate

20       the terminal value for Step 1?  Do you

21       know what the terminal value was for

22       Step 1?

23             MR. RUCHER:  If you turn to

24       page 32 of VRC 2.

25             MR. NASTASI:  This is Bates

150

1          June 30, 2010

2     labeled VRC 38692?

3          MR. RUCHER:  Yes.  Do you see

4     in the box where it says "PV of

5     terminal value," it's not the exact

6     value, but it's the present value of

7     terminal value?  Do you see in the

8     middle it says 7.3 billion?

9          MR. MONK:  Yes.

10          MR. NASTASI:  Yes.

11          MR. RUCHER:  And if you look

12     at Exhibit -- VRC 0060879.

13          MR. NEIER:  In VRC 5?

14          MR. NASTASI:  Yes.

15          MR. RUCHER:  Do you see where

16     it says PV of terminal value -- I am

17     just giving you the midpoint one -- is

18     5.4 billion.

19          MR. NASTASI:  Yes.

20          MR. RUCHER:  So it was lower

21     in the VRC 5 with terminal value.

22     That's the present value.  That's not

23     exactly the terminal value.  That's

24     the present value of the terminal

25     value.

151

1        June 30, 2010

2            MR. MONK:  So in answer to my

3        question -- you haven't told me what

4        the terminal value was.  What you

5        suggested is that you used a lower

6        terminal value in Step 2 than in Step

7        1 because the discounted cash flow

8        result was a lower number in Step 2

9        than in Step 1?

10           MR. RUCHER:  The present

11       value of the terminal value.  Do you

12       understand what I'm --

13           MR. KLEE:  That would almost

14       have to be the case.  Because the

15       terminal value in Step 1 is being done

16       in year six, and the terminal value in

17       Step 2 is being done in year eleven;

18       isn't that right?

19           MR. RUCHER:  Mm-hm.  But your

20       present value of that is lower.

21           MR. KLEE:  Sure.  And would

22       almost have to be unless you had

23       really strange numbers happening.

24           MR. BROWNING:  Right.  Right.

25           MR. RUCHER:  Right.

152

1      June 30, 2010

2           MR. KLEE:  Off the record.

3           [Discussion held off the

4      record.]

5           MR. KLEE:  With all due

6      respect, I don't think the present

7      value of the number really answers the

8      question as to the difference in the

9      terminal value.  In one place, you are

10     present valuing it from a point

11     five years out.  At another time, you

12     are present valuing it from a place

13     that's ten years out, correct?

14          MR. RUCHER:  To a certain

15     extent.  If we were to apply a

16     five-year DCF here, there is a

17     chance that -- because you are

18     discounting -- just like you said,

19     just because you are discounting it

20     from a shorter period of time, that

21     terminal value could have been higher

22     than what we have in our terminal

23     value here.

24          So I guess the best approach

25     is to look at it and say what is the

153

1        June 30, 2010

2     overall DCF value.  Because what we

3     are doing here is we are kind of

4     separating the two, the cash flow

5     stream from the terminal value stream.

6     And the best way I think to look at a

7     DCF is to look at the aggregate value.

8          MR. KLEE:  Exactly.  We

9     should do that and we will ask you to

10    perform those valuations in just a few

11    minutes, perhaps off the record.

12          My question to you is this:

13    In light of what had happened to

14    Tribune's revenues and to the economy

15    in general to the publishing industry,

16    would it have made sense to have a

17    higher terminal value at Step 2 than

18    you had at Step 1 on a present value

19    basis, if you were taking it from

20    comparable periods?

21          MR. RUCHER:  I think, if I

22    understand your question correctly, I

23    think given the decline in Tribune's

24    business, you would have ended up

25    with -- without doing a calculation, I

154

1          June 30, 2010

2      think you would have ended up with a

3      lower overall terminal value, I think.

4           MR. KLEE:  At Step 2?

5           MR. RUCHER:  I think, yes.

6           MR. KLEE:  So do I.  Now what

7      we should do is actually run the

8      numbers and find out what happened.  I

9      don't know.

10          MR. RUCHER:  If I look at

11     between Step 1 and Step 2, if I look

12     at my enterprise value range based

13     upon the DCF --

14          MR. NASTASI:  I'm sorry, Mr.

15     Rucher, can you just let the court

16     reporter know which pages you are

17     comparing so the record is clear?

18          MR. RUCHER:  VRC 006879.

19          MR. NEIER:  In Exhibit 5.

20          MR. RUCHER:  And VRC 0038692.

21          And if I look at our DCF

22     values based upon that on a

23     consolidated basis, in Step 1, we had

24     a DCF range total enterprise value

25     range of 9.3 to 10.7 billion.  And if

155

1        June 30, 2010

2    I go to Step 2, we had an enterprise

3    value range of 8.3 billion to

4    9.7 billion.

5            So that's approximately

6    almost a billion dollars lower.

7            MR. KLEE:  And that's what

8    you would have expected?

9            MR. RUCHER:  Yes.

10           MR. NASTASI:  Now, you are on

11   both those pages.  Please stay on

12   those two pages, and look at the

13   growth rates in revenue.

14           So in Step 1, let's look at

15   between years 2011 to 2012.  You have

16   a .5 percent growth rate in revenue at

17   Step 1 at VRC 38692; is that right?

18           MR. RUCHER:  In 2012, yes,

19   sir, .5 percent.

20           MR. NASTASI:  And VRC 5, at

21   page VRC 60879, looking at the same

22   time period, you have a 2.4 percent

23   growth in revenue; is that right?

24           MR. RUCHER:  Yes, sir.

25           MR. NASTASI:  At the time

156

1           June 30, 2010

2       that VRC created VRC 5, and populated

3       that field with that 2.4 percent

4       number, did you have a discussion with

5       anyone as to what accounted for the

6       difference in growth rates between

7       Step 1 and Step 2 for that time

8       period?

9            MR. RUCHER:  Oh, I'm certain

10      that we had discussions with them

11      related to that.  The specifics of

12      those conversations, I can't recall.

13            MR. NASTASI:  What do you

14      recall?

15            MR. RUCHER:  I'm fairly

16      certain that we had those discussions.

17      Particularly in our all-hands meeting

18      and with conversations with Chandler

19      Bigelow.

20            MR. NASTASI:  Do you believe

21      you had discussions with Chandler

22      Bigelow with respect to that change in

23      growth rate?

24            MR. RUCHER:  I'm fairly

25      certain that we did.

157

1      June 30, 2010

2              MR. NASTASI:  Do you recall

3      having conversations with Don Grenesko

4      with respect to that change in growth

5      rate?

6              MR. RUCHER:  Don Grenesko in

7      the meetings with us on the all-hands

8      meeting also.

9              MR. NASTASI:  So yes?

10             MR. RUCHER:  Yes.

11             MR. NASTASI:  Anybody else

12     from management that you recall having

13     these discussions with?

14             MR. RUCHER:  We talked to, as

15     I said before, every -- the head of

16     every major, single -- every single

17     business of the company with

18     discussions about the financial

19     projections and their reasonableness.

20             I mean --

21             MR. NASTASI:  I am just

22     talking about this particular change

23     in growth rate for total revenue.

24             Would you have had those

25     discussions with each of the

158

1          June 30, 2010

2     individual business heads for total

3     revenue?

4          MR. RUCHER:  But when we got

5     there, we talked about overall the

6     company, we talked about the company

7     on a consolidated basis, we talked

8     about the company when things were

9     sent in this Brown Book.  For the

10    individual heads, of course, there is

11    a rollup there, so you would, you

12    know -- it would be somewhat implicit

13    that you are having a discussion

14    about -- you know, about the growth

15    rates overall because you are talking

16    to all these different heads.

17         MR. NASTASI:  I want to ask a

18    couple more specifics, though.

19         So you already identified

20    that you believe you had discussions

21    about this change in growth rate with

22    Chandler Bigelow, with Don Grenesko --

23    at least Don Grenesko was present.

24         What about Crane Kenney,

25    would he have been present at any of

159

1        June 30, 2010

2     these meetings?  General counsel.

3          MR. RUCHER:  I'm not certain

4     that Crane -- on the all-hands

5     meeting, Crane was definitely there,

6     because I think at the time, Crane had

7     stepped over and was going to take

8     over control of the Cubs.  So he was

9     definitely at the all-hands, what I

10    termed the all-hands meeting.  If he

11    was on the individual calls where we

12    were talking about the finance, I

13    don't -- I'm not certain that Crane

14    would have been on those -- on those

15    calls.

16          In fact, my interaction with

17    Crane was, for the most part, limited

18    to those two situations.  We might

19    have talked about the engagement

20    letter and the opinion letter.  And

21    when we attended the Cubs game.

22          So from the best of my

23    knowledge -- and Bryan, you may know

24    differently -- we didn't have a

25    significant amount of interaction to

160

1              June 30, 2010

2      the same level we had with the other

3      people that -- with Crane that we had

4      with other people.

5              MR. NASTASI:  And, again, I

6      am just asking right now about

7      discussions that you recall with

8      regard to the change in the growth

9      rate between Step 1 and Step 2.  And,

10     in particular, the change between

11     .5 percent to 2.4 percent.

12              I am going to ask you about

13     another person.  Do you recall having

14     those discussions with Dennis

15     FitzSimons, the former CEO of Tribune?

16              MR. RUCHER:  Dennis was at

17     the all-hands meeting --

18              MR. BROWNING:  The initial

19     one.

20              MR. RUCHER:  He was at both

21     of them, actually.

22              MR. BROWNING:  Was he?

23              MR. RUCHER:  Yes.

24              MR. NASTASI:  So your

25     recollection is that part of the

161

1          June 30, 2010

2     discussions that occurred at the

3     all-hands meeting related to the

4     change in the growth rate for the

5     projected revenue; is that right?

6          MR. RUCHER:  We dug down and

7     talked about each -- how each one of

8     the businesses was performing and how

9     each one of the businesses was going

10    to perform in the future.

11         MR. NASTASI:  And so those

12    discussions would have included, in

13    addition to all the detail, a

14    discussion about the change in the

15    growth rate?

16         MR. RUCHER:  I don't know for

17    sure if we said, you know, there was a

18    change in the growth rate from Step 1

19    to Step 2, but we did discuss the

20    growth rates or the revenue

21    projections in those meetings.

22         MR. NASTASI:  What do you

23    recall about the discussions that you

24    had?  I know you said you don't recall

25    the specifics, but I want to exhaust

162

1          June 30, 2010

2      your recollection completely.

3              What do you recall, if

4      anything, about the discussions you

5      had with Tribune management in

6      relation to the change in revenue

7      growth from .5 percent at Step 1 to

8      2.4 percent at Step 2?

9              MR. RUCHER:  The general --

10     my general recollection was because

11     things were in a slight decline now or

12     they were declining now, that

13     management would anticipate that in

14     the outer years, that as the economy

15     recovered and things recovered, that

16     there would be higher growth rates.

17             MR. NASTASI:  And did VRC

18     believe that that was a reasonable

19     assumption?

20             MR. RUCHER:  We concluded

21     that it was reasonable.

22             MR. KLEE:  On what basis?

23             MR. RUCHER:  Well, two

24     things.  One is, once again, we went

25     back and we looked at, historically,

163

1           June 30, 2010

2      trends in the industry, what had

3      happened to advertising revenue

4      dollars over time.  And when you would

5      look at -- when you would look at the

6      charts or the things that are

7      definitely in the record when we went

8      back and looked, we pulled up industry

9      statistics, is that whenever there

10     were kind of declines in the

11     publishing industry or advertising

12     revenues, you would see that over time

13     that they would get back to what I

14     would call parody.  And then, you

15     know, if you are kind of in that

16     trough region, that if you look at the

17     growth rates, those growth rates were

18     higher than what you would normally

19     see on kind of a standardized year.

20          I have some charts in the

21     exhibits where we look at advertising

22     by segment that we got from industry

23     publications.  And you could see what

24     happened to things in the -- in the

25     publishing industry with respect to

164

1          June 30, 2010

2     when there were recessions and how

3     things recovered.  And typically you

4     would see after a recession, a growth

5     would increase, it would be higher

6     than it was previous session, because

7     you would get back to some kind of

8     normalized period.

9          MR. KLEE:  Mr. Browning, what

10    do you think about all this?

11         MR. BROWNING:  I think that

12    what Chad just said about the growth,

13    between the first analysis and the

14    forecast in the second analysis or the

15    Step 2, the industry was hit harder

16    than they originally projected, right?

17    And so I think it was management's

18    belief -- and I'm a little bit

19    speculating until I go back to my

20    notes -- but that because it was more

21    severe than what they originally

22    anticipated, that they would be able

23    to come back from that.

24         And so, therefore, the growth

25    rate in the second one would be higher

165

1    June 30, 2010

2    than the first one just from a

3    recovery standpoint.

4         Now, whether or not that's

5    exactly correct, I don't know, but

6    that's -- that certainly was one of

7    the things that I think is a

8    possibility.

9         MR. RUCHER:  We discussed

10   that.

11        MR. KLEE:  That might be

12   reasonable in the year after the

13   recovery, after the recession, 2009,

14   2010.

15        Is it reasonable to

16   extrapolate that in the future years?

17        MR. BROWNING:  Well, that's a

18   good question.

19        I think that -- I think that

20   the management believed that there was

21   this base cash flow that was sort of a

22   core base cash flow that they could

23   achieve.  They were below that.  They

24   hadn't gotten back to that.  And so

25   that's part of it, as well, is to get

166

1          June 30, 2010

2     back to that base cash flow.

3              And so whether or not that

4     was two years out or five years out, I

5     don't know, but there was sort of this

6     sustained cash flow level.

7              MR. KLEE:  What I am looking

8     at is this:  I am looking at a .7

9     growth rate in May that you testified

10    as reasonable, Mr. Rucher testified as

11    reasonable.  I am now looking at a

12    tripling of that growth rate in

13    December, after the business has

14    declined and the industry has

15    declined, at least on the publishing

16    side.  And I don't understand, under

17    those circumstances, how it is

18    reasonable to justify a more than

19    tripling of the growth rate for the

20    out years?

21             MR. BROWNING:  Well, you

22    asked us if it was reasonable at .7.

23    Of course, we think that's

24    conservative, right?  So that's why we

25    said it was reasonable.  Now, whether

167

1          June 30, 2010

2      2.4, 2.5 percent is reasonable, after

3      we had our discussion with management,

4      we believed it was reasonable.

5              MR. KLEE:  And what did they

6      say to you in those discussions?

7              MR. BROWNING:  Specifically,

8      I can't recall, to tell you.

9              MR. KLEE:  Mr. Rucher?

10             MR. RUCHER:  As I said

11     before, the one thing that I do

12     remember in particular is that because

13     we had a larger decline and because

14     things were lower in these particular

15     years, we thought when they came out,

16     they would be able to grow much

17     faster.  And also, one of the things

18     that they also stressed was that, you

19     know, we really think that in these

20     outer years, our online or interactive

21     business will be generating

22     significantly to our overall bottom

23     line.

24             MR. NASTASI:  Isn't that

25     highly speculative?

168

1        June 30, 2010

2            MR. RUCHER:  I mean, any time

3        you have a -- what I would call a

4        small business going up to a larger

5        business, is certainly a riskier

6        revenue stream.

7            MR. KLEE:  Mr. Rucher, let me

8        ask you this:  In doing your diligence

9        and reviewing the recovery and

10       advertising revenues after recession,

11       going back and looking at this

12       historically, you did that work,

13       right?

14           MR. RUCHER:  Yes, sir.

15           MR. KLEE:  And in doing that,

16       did the increased flow in advertising

17       revenues persist past a few years?

18       Was it a straight line upward

19       trajectory for seven years, or was it

20       a recovery for a few years that tended

21       to dampen out?

22           MR. RUCHER:  Off the top of

23       my head, without looking at my notes,

24       I can't -- I can't answer that.  But I

25       do know, in general, after the

169

1          June 30, 2010

2      recovery period -- and I don't know --

3      and without looking at the notes, I

4      don't know.  I don't know if it was a

5      three or three-year kind of

6      phenomenon, but there was higher

7      growth rates in those years after a

8      decline.

9              MR. KLEE:  We are going off

10     here.

11              Do you have your notes with

12     you here?

13              MR. RUCHER:  No, I don't,

14     sir.

15              MR. NASTASI:  Do you have

16     them at all?

17              MR. RUCHER:  I don't have

18     them.  I know we produced everything.

19     And there is a memo to the file.  I

20     think when we talk about advertising

21     rates and we go back to the publishing

22     industry, I'm certain that that's in

23     there.

24              MR. NASTASI:  Could we

25     trouble you to locate that document

170

1          June 30, 2010

2     for us in the next two days?

3          MR. RUCHER:  I will try to

4     locate it, but the question is I don't

5     even know if we have these documents

6     anymore that we produced.

7          MR. KLEE:  I would personally

8     appreciate it if you could find those

9     notes.  This is very important to us.

10    It's an important part of our viewing

11    of the data.

12         MR. NEIER:  Both of the

13    witnesses have handwritten notes, and

14    there are some memos to the file.  You

15    know, personally, I can't understand

16    how they used the system here, but

17    there is a paralegal who can figure

18    this out using the system.  We will

19    try and identify those to you.

20         MR. NASTASI:  Great.  Thank

21    you.

22         MR. MONK:  Can I just ask one

23    follow-up question --

24         MR. KLEE:  I think Mr.

25    Browning had something he was going to

171

1        June 30, 2010

2   say.

3           MR. MONK:  Oh, sorry.

4           MR. BROWNING:  I guess this

5   is a question more than is a

6   statement, but is your concern that --

7   because what I am trying to get at is,

8   is your concern using the five-year

9   forecast versus a ten-year forecast?

10          MR. NASTASI:  We will get to

11  the questions in a second.

12          MR. BROWNING:  Okay.

13          MR. MONK:  So there was a

14  pretty well-established secular

15  decline in the publishing business

16  that is in the literature and was

17  being discussed and the analysts are

18  talking about it and, in fact, that's

19  what the whole management's case for

20  interactive was all about, right?

21  Advertising revenue and the publishing

22  business is going down and we are

23  going to find a way to capture that

24  revenue through interactive, correct?

25  Isn't that management's case?

172

1           June 30, 2010

2       Publishing is going down, they are

3       going to capture that revenue,

4       interactive, take advantage of our

5       content in publishing and turn that

6       into some value on the interactive

7       side?  Right, you must have heard that

8       discussion.

9           MR. RUCHER:  Yes.

10          MR. MONK:  So my question is:

11      And 70 percent of the revenue of this

12      business comes from the publishing

13      side, correct?  Yes?

14          MR. BROWNING:  Something like

15      that, yes.

16          MR. MONK:  Okay.  So if there

17      is sort of a base case,

18      well-recognized, all the analysts are

19      talking about, about a secular decline

20      over time, how is it reasonable to

21      assume a constant -- actually three

22      times the growth rate over a constant

23      period of time for seven more years in

24      the model?

25          What analysis were you doing

173

1          June 30, 2010

2     to try to get yourself comfortable

3     with that confluence of the events?

4          MR. KLEE:  Mr. Browning?

5          MR. BROWNING:  Well, I think

6     what we had -- Chad explained earlier.

7     We went through each of the entities,

8     each of the newspapers, specifically,

9     talked to their heads, what are they

10    expecting to do, and got that

11    information.  We also then -- we also,

12    you know, looking at interactive, what

13    that is expected to do, offsetting

14    some of the declines, if you will, the

15    real declines, reduction of newspaper

16    subscribers and so forth.  And so

17    offsetting those.

18          That's really, we went

19    through all of those things.

20    Beyond -- I can't tell you, you know,

21    the 2.4 versus the .7, I can't tell

22    you until we get that information, but

23    we spent a lot of time looking at

24    that.  Every time we received

25    financial information, we would be on

174

1          June 30, 2010

2     the phone and talk to them, have a

3     conference call and talked to them

4     about it.

5              But absolutely we understood

6     that.  In fact, if you look at our --

7     Chad mentioned this, but we had -- we

8     used base case, but we also had their

9     downside case, we had our VRC downside

10    case and we had a recession case that

11    we made ourselves.  So we were much

12    more aggressive downward in looking at

13    that.

14              MR. MONK:  Just to follow up.

15    If there is a secular decline over

16    time and you are studying prior

17    revenue rebound after prior cycles,

18    right?  Which, as I gather, is what

19    Mr. Rucher was saying earlier, you

20    went back and looked at prior cycles

21    and said, gee, revenue rebounds, after

22    the cycle, that's been a typical model

23    in the publishing business, so I can

24    get comfortable with the idea that

25    even if we are going in at the end of

175

1          June 30, 2010

2     a cycle here, we are going to have a

3     decline in revenue on the rebound.

4     How did you modify that analysis by

5     the fact that you were facing this

6     secular decline?

7              And was all the answer really

8     interactive was going to pick up --

9              MR. BROWNING:  No, I'm not

10    saying that.  That was not the only

11    answer.  There were other related --

12    again, I prefer to answer the question

13    by going back to notes and so forth.

14              MR. MONK:  Sure.

15              MR. BROWNING:  I don't know

16    the answer specifically.

17              MR. KLEE:  Mr. Rucher?

18              MR. RUCHER:  One other thing

19    that we gave a lot of consideration

20    also, is that, you know, you had a new

21    potential owner coming into this

22    business who was anticipating on,

23    number one, cost reductions, but

24    number two, running the business a

25    little bit more -- running the

176

1          June 30, 2010

2     business a little bit differently, so

3     that you would capture those revenue

4     opportunities.

5              And, if I might add this,

6     hopefully this is not too much.  I

7     have been doing this for a long time,

8     working for companies.  When I went to

9     the first Tribune board meeting, I

10    mean, when I say -- I have never seen

11    a board more conservative than that

12    boardroom.  I mean, it was extremely

13    conservative.  And I have been doing

14    this probably fifteen to twenty years.

15    And when I went there, I mean, it was

16    a situation where the most formal

17    board meeting I had ever been into in

18    my life.  But then, with the new

19    management team, you could tell that

20    things probably needed to be shaken up

21    a bit.  But then after the initial

22    transaction, you start to see the

23    management team shake up a little bit,

24    it was probably one of the most

25    informal board meetings that I had

177

1          June 30, 2010

2    ever been to, because you saw a

3    completely kind of new vibe in the

4    room that, hey, we are going to go out

5    there and really change the way that

6    we operate this business.

7              And that was something that

8    was done that we took into

9    consideration.  It was -- it was a

10   subjective thing, but I could sense

11   that from just -- from just the way

12   operating in the boardroom.  Things

13   are going to be operated differently.

14             I think one thing that also

15   to keep into consideration is, you

16   know, you use the best information

17   that you have at the time.  And, you

18   know, things after the transaction

19   closed, I mean things happened that I

20   don't think any one of us could have

21   foreseen happening.  I call it the

22   hundred-year flood or whatever.  And I

23   will tell you, I wish I could have

24   foreseen it, I would probably be a

25   very rich man now, instead of working.

178

1        June 30, 2010

2    But those are things that we take into

3    consideration.  Those subjective

4    things where you can see the business

5    was going to be operated differently.

6         MR. KLEE:  Did you talk to

7    either Mr. Zell or Mr. Larson about

8    what their plans were for the business

9    in December of 2007?

10        MR. RUCHER:  We did speak

11   to -- Mr. Zell was at one of the

12   meetings that we had.  I can't

13   remember which one, but we did have

14   conversations with him about, you

15   know, some of the things they were to

16   do differently.

17        MR. KLEE:  Did you ask him

18   about interactive, and what his plans

19   were for interactive?

20        MR. RUCHER:  I think we

21   touched on that, some of the things.

22        MR. KLEE:  What did he tell

23   you?

24        MR. RUCHER:  I can't recall

25   specifically.

1          June 30, 2010

2              MR. BROWNING:  I actually

3      don't remember Mr. Zell talking to us

4      specifically about interactive.

5              What I recall is when we

6      talked about what Mr. Zell was

7      planning on doing, he had a number of

8      ideas that he was formulating.  And

9      not a lot of it was to interactive.  I

10     think it was more toward, you know, we

11     are going to leverage off his

12     knowledge of real estate and how they

13     were going to do some things with the

14     real estate.  I think the tower, what

15     they were going to do with the tower

16     and so forth.  But I don't know

17     specifically.

18             I know his staff was

19     regularly involved with the management

20     staff at Tribune to try and formulate

21     those ideas, but I don't know

22     specifically.

23             MR. KLEE:  By "his staff," do

24     you mean Mills Larson or someone else?

25             MR. BROWNING:  Zell.  It

180

1       June 30, 2010

2       could be -- you know, the names escape

3       me at this point.

4              MR. KLEE:  Did anything he

5       say to you influence your solvency

6       opinion or your analysis or your

7       assessment of management's

8       projections?

9              MR. BROWNING:  Again, I don't

10      remember anything that he said that

11      would have an effect on us except

12      for -- at one point there was a

13      discussion about what other things can

14      they do, can Tribune do, that's not

15      including projections that are

16      incremental to what is forecasted.

17      And that's when we started talking

18      about those things.

19             I believe most of the -- I

20      believe that most of the initial --

21      the forecast certainly in Step 1 and

22      mostly in Step 2 were primarily by the

23      Tribune management.

24             MR. KLEE:  Mr. Rucher?

25             MR. RUCHER:  To the best of

181

1          June 30, 2010

2      my recollection, they were done by

3      Tribune management.

4          And the only thing I would

5      say, you know, when you say could have

6      influenced our analysis, would be,

7      hey, things are going to be run

8      differently.  We are going to run this

9      business better.  We are going to run

10     it more efficiently.  We are going to

11     run it like the business should have

12     been run.

13          MR. KLEE:  Would it have

14     affected your analysis if Sam Zell

15     told you that he wasn't going to spend

16     anything on interactive because he

17     didn't believe in spending a hundred

18     million dollars in startup ventures

19     that would produce no positive cash

20     flow for five years?

21          Mr. Rucher, would that have

22     affected your analysis?

23          MR. RUCHER:  If they were not

24     going to spend -- of course it would

25     have affected the analysis, because

182

1          June 30, 2010

2     some of that growth was being offset

3     by interactive.

4          MR. MONK:  You are talking

5     about the decline was being offset.

6          MR. RUCHER:  So that is

7     something you have to take into

8     consideration.

9          We were never, I think, to

10    the best of my recollection, told that

11    money would not be spent on

12    interactive.

13         MR. KLEE:  Did you ask?

14         MR. BROWNING:  Did we ask if

15    they wouldn't be?

16         MR. KLEE:  Did you ask Mr.

17    Zell if he was going to spend that

18    money on interactive?

19         MR. RUCHER:  I don't think we

20    asked them specifically that question.

21         You know, management had told

22    us that, and management had

23    represented to us that what the

24    forecast -- how they were going to

25    operate the business, so that's what

183

1          June 30, 2010

2    we relied upon.  I don't know if we

3    asked that question specifically of

4    Sam.

5          MR. KLEE:  Mr. Browning?

6          MR. BROWNING:  I don't

7    believe we had those discussions with

8    Mr. Zell.  I believe, again, the

9    discussions -- and I don't even know

10   if it was Mr. Zell specifically or

11   other representatives.  But I believe

12   it was more strategic questions

13   that -- or issues that we were

14   discussing.  Not the forecast, itself.

15   I believe management came up with a

16   forecast.  They rep to that forecast

17   that this is what they're going to

18   spend.

19          MR. MONK:  When you say

20   "management," you mean existing

21   management?

22          MR. BROWNING:  Tribune

23   management, exactly.

24          MR. MONK:  Not Mr. Zell or

25   Mr. Larson?

184

1              June 30, 2010

2              MR. BROWNING:  That's right.

3        Right.

4              MR. NASTASI:  Mr. Rucher, a

5        moment ago you said that after Step 1,

6        the vibe changed, the board meetings

7        were different, there was a new vibe

8        that they were going to change this

9        company and change this industry.

10             Is that --

11             MR. RUCHER:  I got a sense of

12       a new energy.

13             MR. NASTASI:  Okay, a new

14       energy.

15             Who led that charge?  Where

16       was that energy coming from?

17             MR. RUCHER:  I think -- in my

18       view -- this is totally me

19       speculating.

20             MR. NASTASI:  In your view.

21             MR. RUCHER:  In my view, I

22       saw the change once Sam Zell came into

23       the boardroom.  He came into the

24       boardroom with a completely

25       different -- I think a different

185

1          June 30, 2010

2     attitude, a more positive attitude

3     that, hey, we are going to win and I'm

4     not going to lose.

5               I noticed one thing in

6     particular.  Like I said, the board

7     meetings were initially very, very

8     stuffy.  When Sam Zell came in, he

9     came in with a shirt and blue jeans.

10    So I felt a new vibe.

11              I don't know if you got that

12    sense, Bryan, but I sensed a new, we

13    are going to conquer the world.

14              MR. NASTASI:  Were there

15    people in management that seemed to go

16    along with that new vibe more than

17    others?  Were any members of

18    management resistant to that new vibe

19    that you could observe?

20              MR. RUCHER:  That's pretty

21    difficult for me to tell in a meeting

22    like that.

23              MR. NASTASI:  Okay.

24              MR. RUCHER:  That would be

25    total speculation on my part.  But you

186

1              June 30, 2010

2       could just -- it's hard to explain,

3       but you know it -- you just felt the

4       difference.

5              MR. NASTASI:  Okay.

6              Let's turn back to VRC 5.

7       Now I want to go to page 10 that is

8       Bates labeled VRC 60875.

9              This is a list of comparable

10      company EBITDA multiples; is that

11      right?

12             MR. RUCHER:  Yes, sir.

13             MR. NASTASI:  There is both

14      publishing and broadcasting; is that

15      right?

16             MR. RUCHER:  Yes, sir.

17             MR. NASTASI:  If you look

18      back at VRC 2 at page 24, VRC 38684,

19      you will see the list of --

20             MR. NEIER:  Hold on.

21             MR. NASTASI:  Take your time.

22             MR. NEIER:  We just have to

23      find the right document.

24             MR. NASTASI:  Take your time.

25             MR. BROWNING:  What is it?

187

1        June 30, 2010

2            MR. NASTASI:  It is VRC 2 at

3        page 24 of the slide deck, Bates

4        labeled VRC 38684.

5            I want to compare the

6        comparable company multiples in what

7        appears to be the Step 1 analysis

8        versus the Step 2 analysis.

9            Mr. Rucher, for publishing,

10       at Step 2, there are different

11       comparable companies that were used in

12       the analysis than Step 1; is that

13       right?

14           MR. RUCHER:  Yes.

15           MR. NASTASI:  What accounts

16       for the difference?

17           MR. RUCHER:  The one thing

18       you have to take in consideration,

19       when we did our Step 1 valuation, we

20       looked at, for comparable companies,

21       we applied that multiple to the entire

22       consolidated companies multiple.  And

23       I think when we went back and we look

24       at for Step 2 what we are going to

25       value the company at looking at

188

1          June 30, 2010

2     publishing and broadcasting

3     separately, we went back and reviewed

4     our list of comps and tried to

5     determine a better set of comps, if we

6     were going to look at things just on a

7     publishing basis and a broadcasting

8     basis.

9              MR. NASTASI:  And I noticed

10    at Step 2, on page 10, Bates labeled

11    VRC 60875, the Washington Post is one

12    of the publishing comparable

13    companies; is that right?

14             MR. RUCHER:  Yes.

15             MR. NASTASI:  And that was

16    not one of the comparable companies

17    used in Step 1; is that right?

18             MR. RUCHER:  Yes.

19             MR. NASTASI:  Why was that

20    change made?

21             MR. RUCHER:  I can't recall

22    specifically why.

23             MR. NASTASI:  Do you recall

24    whether or not -- well, can you recall

25    generally why?

189

1      June 30, 2010

2           MR. RUCHER:  I can't recall

3      specifically why the Washington Post

4      was added.

5           MR. KLEE:  Did management ask

6      you to add it?

7           MR. RUCHER:  I can't recall

8      whether management asked us to take a

9      look at Washington Post or not, to the

10     best of my recollection, I just don't

11     know.

12          MR. KLEE:  Do you recall how

13     you concluded that the Washington Post

14     was a comparable company?

15          MR. RUCHER:  I can't recall

16     the specific details of how we

17     determined the Washington Post was a

18     comparable company.

19           But I know in general the

20     process that we go through in

21     selecting comparable companies and it

22     was a similar-type process that we

23     went through in Step 1, except for

24     that we realized here that for Step 2,

25     where we were going to be valuing

190

1          June 30, 2010

2     radio and publishing -- not radio, I'm

3     sorry, broadcasting and publishing

4     separately.

5               MR. KLEE:  So you viewed

6     Washington Post as a publishing

7     comparable company?

8               MR. RUCHER:  Based upon this,

9     it looks like we concluded that they

10    were comparable.

11              MR. KLEE:  Do you know the

12    revenue flow of the Washington Post,

13    what percentage of their revenue is

14    from publishing as opposed to other

15    areas?

16              MR. RUCHER:  Off the top of

17    my head, no, I cannot say off the top

18    of my head, but I do know that they

19    have some other significant businesses

20    in their operation that are not

21    related to publishing.  I do know that

22    for a fact, they do have some

23    significant businesses.

24              MR. NASTASI:  Like what?

25              MR. RUCHER:  If I'm not

191

1          June 30, 2010

2     mistaken, they own Kaplan, I think,

3     which is a study aid company.

4          MR. BROWNING:  Education.

5          MR. RUCHER:  And if I'm also

6     not mistaken, I think they also have a

7     Cable or some Cable interests in there

8     also.

9          MR. MONK:  And you would

10    agree with us that their multiples as

11    reflected there are significantly

12    different -- materially different --

13    let's use the right word -- materially

14    different than the multiples from the

15    other companies that you asserted

16    comparables?

17         MR. RUCHER:  They are higher.

18    But once again, the thing I want to

19    make sure is clear:  When you look at

20    comparable companies, you are not

21    simply taking an automatic average or

22    whatever.  You are looking at several

23    things when you look at these

24    comparable companies.  You are looking

25    at the max, min, the mean, median, you

192

1      June 30, 2010

2      are looking at margins, you are

3      looking at growth rate.

4              So there are several things

5      you are taking into consideration.

6              MR. KLEE:  Putting the

7      Washington Post into the mix here

8      would do what to the mean?

9              MR. RUCHER:  It would raise

10     the mean, but it may not have the same

11     type of impact on the median.

12             MR. NASTASI:  Let's take one

13     at a time.

14             Let's say you eliminate the

15     Washington Post from here.  What

16     happens to the max?

17             MR. RUCHER:  The max becomes

18     7.

19             MR. NASTASI:  What happens to

20     the median, if you eliminate the

21     Washington Post?

22             MR. RUCHER:  I will tell you

23     as soon as I find my calculator.

24             MR. NASTASI:  Median.  You

25     don't need the calculator for median.

193

1        June 30, 2010

2              MR. RUCHER:  It becomes -- it

3      becomes 6.5 or 6.2.

4              It doesn't change

5      substantially from where it is at now.

6              MR. NASTASI:  What happens to

7      the mean if you eliminate the

8      Washington Post from this list?  And

9      that you do need a calculator for, I

10     assume.

11             MR. BROWNING:  Can I answer

12     that?

13             MR. NASTASI:  Sure, Mr.

14     Browning.

15             MR. BROWNING:  It goes down,

16     I think.

17             MR. NASTASI:  It goes down?

18             MR. BROWNING:  Yes.

19             MR. KLEE:  Off the record.

20             [Discussion held off the

21     record.]

22             MR. NASTASI:  We are back on

23     the record, and I am going to re-ask

24     Mr. Rucher:  If you eliminate the

25     Washington Post, how would the median

194

1        June 30, 2010

2     change?

3            MR. RUCHER:  For the current

4     fiscal year, the median would change

5     from 7.2 -- oh, the median would

6     change from 6.5 to 6.35.

7            MR. NASTASI:  Now I am going

8     to ask you for the first time, I

9     believe, how would the mean change for

10     the current fiscal year if you

11     eliminate the Washington Post in this

12     analysis?

13            MR. RUCHER:  The mean would

14     change to 6.27 from 7.2.

15            MR. NASTASI:  Thank you.

16            Also, I would like to compare

17     the multiples --

18            MR. MONK:  Before you go

19     there, Mr. Browning, did you have

20     something you wanted to add to that?

21            MR. BROWNING:  I did.

22            You had asked a question

23     about if we were asked to put the New

24     York Times in.

25            MR. MONK:  You mean the

195

1           June 30, 2010

2    Washington Post.

3           MR. BROWNING:  I'm sorry, the

4    Washington Post.  I think this needs

5    some clarification from Step 1 to Step

6    2.  I think what you are seeing in the

7    Step 1 is just the consolidated

8    analysis for Tribune Company.  And if

9    you look at -- and so that's just

10   whatever companies those are.

11          If you look at the same

12   consolidated analysis in Step 2, it's

13   the same companies, I think.

14          MR. NASTASI:  Where is that?

15          MR. BROWNING:  I don't know.

16   I saw it here somewhere.  Page --

17          MR. NASTASI:  11?

18          MR. BROWNING:  Yes, I think

19   page 11.  I think there's only three

20   versus four, but there may be a reason

21   for that, just because the data wasn't

22   available or it wasn't -- but I

23   don't -- so what you are looking at

24   is, I believe -- and I think we talked

25   about this earlier -- but I think we

196

1           June 30, 2010

2      had done a segment analysis in Step 1

3      just as we did in Step 2.  And for

4      some reason, it's not in that packet.

5      But I don't know if it's even been

6      added at that point.  I think it might

7      have been included in Step 1 versus --

8      relative to Step 2.

9           So I don't know for sure.  We

10     can go back and look --

11          MR. NASTASI:  How are these

12     multiples in Step 2 used?  Can you

13     show me where they are used?

14          MR. BROWNING:  Yes.

15          MR. NASTASI:  And whether you

16     are using the consolidated ones versus

17     the --

18          MR. BROWNING:  Yes.  In Step

19     2.

20          MR. NASTASI:  So we are on

21     VRC 5, right?

22          MR. BROWNING:  Correct.

23     Right.

24          On page -- these pages are

25     all --

197

1        June 30, 2010

2              MR. NASTASI:  Take your time.

3              MR. BROWNING:  So if you go

4        to publishing page 17 or 882, I think

5        that is.

6              MR. NASTASI:  Yes.

7              MR. BROWNING:  If you look at

8        the multiples that we selected for the

9        company are 6 to 6.5 as a range.

10              MR. NASTASI:  That is for

11        publishing, though.

12              MR. BROWNING:  That's for

13        publishing.

14              MR. NASTASI:  You are using

15        segments here, not consolidated.

16              MR. BROWNING:  In this

17        particular case.  But those

18        comparables that you are looking at,

19        that you talked about the Washington

20        Post, that comes from the publishing

21        comparable set.

22              MR. NASTASI:  Just so I can

23        clarify, the multiples used on page 17

24        come from page 10; is that right?

25              MR. BROWNING:  Page 10 and

198

1          June 30, 2010

2      the first part of that.

3              MR. NASTASI:  The first

4      block.

5              MR. BROWNING:  So 6 to 6.5 is

6      right in the median or the mean or

7      whatever, but it doesn't -- you know,

8      if it has some influence, it has a

9      little bit of influence, but it's

10     certainly within the range of the

11     comparables that are there other than

12     the Washington Post.

13             MR. NASTASI:  Okay.

14             MR. BROWNING:  That's how

15     that is being utilized.  And that's

16     probably no different than what we did

17     for Step 1.  I would have to go verify

18     that, but certainly we looked at the

19     Washington Post and said, hey, that's

20     clearly not -- clearly you are not

21     going to be in a multiple like that.

22             MR. RUCHER:  If you look at

23     page 9 and you look at the

24     consolidated company, and by

25     "consolidated," meaning if you are

199

1          June 30, 2010

2     going to value publishing and

3     broadcasting together, look at page 9

4     and the multiples that are selected

5     there, and you go to page 11, and you

6     see the consolidated comparable

7     companies which are Ew Scripps, Belo

8     and Media General, and then you can

9     see we used what we call a weighted

10    consolidated multiples.  Assuming, I

11    can't tell for certain, but that

12    weighting was based upon the EBITDA

13    contribution of the individual

14    segments.  Or it was weighted with

15    consolidated comparables in the

16    individual companies.

17          When we look at comparables

18    for publishing, on page 17, even

19    though Washington Post might have had

20    a high multiple, you can see the

21    multiples that we applied were 6 to

22    6.5.

23          Do you see what I'm saying?

24          MR. NASTASI:  Yes.

25          MR. RUCHER:  So that's why I

200

1          June 30, 2010

2     am saying even though you may have an

3     outlier in there, you may factor that

4     outlier out when you select your

5     multiple.

6               MR. BROWNING:  Right.

7               MR. RUCHER:  And here, that

8     was something that we -- you know,

9     looking at the multiples that we

10    applied, 6 to 6.5, based upon the

11    other comparables, even if you exclude

12    Washington Post, seem reasonable.

13              MR. NASTASI:  I understand.

14    Thank you.

15              MR. RUCHER:  And if I might

16    add something else?

17              MR. NEIER:  Let them talk.

18              MR. KLEE:  What do you have

19    to add?

20              MR. RUCHER:  I was just going

21    to add, we applied, because there was

22    relatively low growth rate or a

23    slightly declining growth rate in

24    EBITDA, we assume that we added this 6

25    to 6.5 each one that we used in our

201

1            June 30, 2010

2     EBITDA multiple.  So I just want to

3     make sure that when we selected that

4     multiple, we applied from the LTM

5     through 2008 to the projected.

6            MR. NASTASI:  And where are

7     you seeing that?

8            MR. RUCHER:  On page VRC

9     0060882.

10            MR. KLEE:  Why don't we take

11     a break at this point?

12            MR. NASTASI:  Before we take

13     a break, can you read the footnote --

14     sorry -- at page 17, and tell me

15     whether or not that refresh your

16     recollection as to what multiples were

17     used from which companies?

18            MR. RUCHER:  "VRC applied

19     comparable company multiples to the

20     publishing segment that were

21     principally based upon the median

22     implied multiples of Gannet,

23     McClatchy, New York Times and Lee

24     Enterprises.  VRC made adjustments to

25     these observed median multiples to

202

1          June 30, 2010

2     reflect Tribune's ability to raise

3     publishing margins to those of

4     comparable companies; Tribune's

5     exposure to the Florida market which

6     has declining classified advertising

7     revenues; and slightly higher

8     projected EBITDA growth rates in

9     2009."

10          MR. NASTASI:  So what does

11     that footnote tell you about how you

12     determined the EBITDA multiples for

13     comparable companies?

14          MR. RUCHER:  It looks to me,

15     from looking at this, is that it looks

16     like when we selected our multiples,

17     we didn't really factor in the

18     Washington Post because it's not

19     stated here.

20          MR. NASTASI:  Thank you.

21          Now we can take a break.

22          Off the record.

23          [A recess was taken.]

24          (VRC Exhibit 7 through 15

25     were marked for identification, as of

203

1          June 30, 2010

2     this date.)

3             MR. NASTASI:  In the interest

4     of saving time, I pre-marked several

5     exhibits.  They are going to appear to

6     be out of order, but we will get to

7     all of them.  I am actually starting

8     with VRC 15.

9             I am placing before you what

10    has been marked as VRC 15.  This is

11    the slide deck that was presented at

12    the December 18, 2007, board meeting.

13    I believe both of you were present at

14    that board meeting.

15            Do you recall that?

16            MR. BROWNING:  Yes.

17            MR. NASTASI:  And this is, in

18    fact, the slide deck that you

19    presented to the board on that day?

20    As best as you can tell.

21            MR. BROWNING:  Yes.

22            MR. NEIER:  Would it say

23    this?

24            MR. BROWNING:  I don't know

25    if it would say preliminary, but it

204

1          June 30, 2010

2     might have been one of the --

3          MR. RUCHER:  I am not sure

4     this is the one that was presented to

5     the board.

6          MR. NEIER:  There is a

7     December 20th.

8          MR. NASTASI:  No, I know, but

9     the board made its decision on

10    December 18th, so it could not have

11    seen the December 20th when it made

12    its decision.

13          It is entitled Preliminary

14    Solvency Analysis.

15          MR. BROWNING:  Yes.

16          MR. NASTASI:  But to the best

17    of your recollection, is this

18    substantially similar to the one that

19    was presented to the board on

20    December 18th?

21          MR. BROWNING:  I believe so.

22          MR. NASTASI:  Mr. Rucher.

23          MR. RUCHER:  I'm not certain,

24    but I believe so.

25          MR. NASTASI:  Page 5 of this

205

1          June 30, 2010

2     document, labeled VRC 109242.  There

3     are four key assumptions on that page.

4          Were those four key

5     assumptions the same four key

6     assumptions that were presented to the

7     board on December 18, 2007?

8          MR. BROWNING:  I'm sorry?

9          MR. NASTASI:  Well, Mr.

10    Rucher is not certain if this is the

11    exact document.  So with respect to

12    this page, do you remember these being

13    four key assumptions that were

14    presented to the board in relation to

15    your Step 2 solvency opinion on

16    December 18, 2007?

17         MR. RUCHER:  I would answer

18    this a little bit differently.  Were

19    these four key assumptions in the

20    solvency analysis, yes.  Were they

21    presented to the board, I'm not

22    certain that we presented these exact

23    four, but were they -- were they four

24    key assumptions in our analysis, the

25    answer is yes.

206

1        June 30, 2010

2            MR. NASTASI:  Was there a

3    slide in the slide deck that was

4    presented to the board that contained

5    key assumptions?

6            MR. RUCHER:  I'm not certain.

7            MR. NASTASI:  How about you,

8    Mr. Browning, do you know?

9            MR. BROWNING:  Yes, they were

10   included in this, as far as I know.

11           MR. NASTASI:  They were

12   included?

13           MR. BROWNING:  As far as I

14   know.

15           MR. NASTASI:  How about, if I

16   asked you specifically, the key

17   assumption that the company can

18   refinance guaranteed debt after the

19   expiration of the credit agreement.

20           Was that one of the key

21   assumptions that was presented to the

22   board on December 18, 2007, in

23   relation to your Step 2 solvency

24   opinion?

25           MR. BROWNING:  Yes.

207

1    June 30, 2010

2         MR. MONK:  Can you tell us

3    why?  Why was it a key assumption?

4         MR. BROWNING:  Because in a

5    typical LBO transaction, the debt is

6    provided in a way that it will not be

7    completely repaid at the time the

8    credit agreement expires.  And,

9    therefore, normal, customary procedure

10   is to refinance that debt at that

11   point in time when it does expire.

12   And so we wanted to make sure, because

13   if at that point in time -- that they

14   had the wherewithal based on the

15   forecast to make that -- to make that

16   assumption and be able to refinance

17   the debt in order to continue to

18   operate in a normal fashion.

19         MR. NASTASI:  And, Mr.

20   Rucher, would you agree with that?

21         MR. RUCHER:  Yes.  Because if

22   you have debt outstanding, when it

23   matures, you either have one or two

24   options:  You either have to pay off

25   the debt with existing cash proceeds,

208

1      June 30, 2010

2   or you have to refinance it.

3             MR. NASTASI:  And your

4   analysis, they wouldn't have the

5   existing cash proceeds based on

6   projections in order to do that; is

7   that correct?

8             MR. BROWNING:  Correct.

9             MR. RUCHER:  Yes.

10            MR. NASTASI:  So in this

11  case, the only option would be to

12  refinance, at that time; is that

13  right?

14            MR. RUCHER:  Based upon the

15  projections that management gave us,

16  unless there were some asset sales or

17  something like that, where they

18  brought in cash, but based upon the

19  way management anticipated that they

20  would operate the business under the

21  base case or the downside scenario, it

22  would have to be refinanced.

23            MR. NASTASI:  Mr. Rucher, how

24  was VRC able to make this assumption?

25            MR. RUCHER:  Well, there are

209

1          June 30, 2010

2     two things -- maybe more than two

3     things -- the things that we did in

4     this process in determining whether or

5     not it is reasonable to assume that

6     management would be able to refinance

7     the debt.  Number one, we looked at

8     the debt levels in those outer years.

9     We also looked at the convenance and

10    how much cushion was available on the

11    convenance at that time.  One

12    additional thing that we also did was

13    we received a representation letter

14    from management, that based upon

15    management's assumptions and

16    management's discussions with Morgan

17    Stanley, if management would be able

18    to refinance those debts when they

19    matured, if they believed it was

20    reasonable.

21          MR. KLEE:  Can we have the

22    court reporter read that answer back?

23          [The requested portion of the

24    record was read.]

25          MR. NASTASI:  Did you have

210

1          June 30, 2010

2     discussions with management with

3     respect to its analysis, management's

4     analysis as to whether or not it would

5     be reasonable to assume it could

6     refinance its debt some time in the

7     future when it became due?

8          MR. RUCHER:  You mean what

9     particular analysis management did, or

10    if we had discussions --

11         MR. NASTASI:  Did you have

12    discussions with them about that?  You

13    said you had a rep.  I'm asking

14    whether you had discussions with them.

15         MR. RUCHER:  Yes, we did have

16    discussions.

17         MR. NASTASI:  Tell me about

18    those discussions.

19         MR. RUCHER:  Well, those

20    discussions -- you know, management

21    based those discussions, I guess,

22    based on their own internal analysis.

23    We didn't look specifically at their

24    separate analysis except for what they

25    provided to us in the financial

211

1        June 30, 2010

2        forecast.  But management did indicate

3        that they had also had --

4              MR. MONK:  When you say

5        "management" here, can you tell us who

6        it is, please?

7              MR. RUCHER:  The

8        conversations I had were with Chandler

9        Bigelow related to this.

10             MR. MONK:  Okay.

11             MR. RUCHER:  That based upon

12       the discussions that they had and also

13       the discussions that they had with

14       Morgan Stanley, because Morgan Stanley

15       was providing, I guess, a special

16       advisor to the board, that Morgan

17       Stanley also believed that the debt

18       could be refinanced.

19             MR. NASTASI:  Did you speak

20       with anyone at Morgan Stanley about

21       that?

22             MR. RUCHER:  No.

23             MR. NASTASI:  Did you ask to

24       speak with anyone at Morgan Stanley

25       about that?

212

1        June 30, 2010

2            MR. RUCHER:  To the best of

3        my recollection, the answer was no.

4            MR. NASTASI:  The answer as

5        to whether or not you asked to speak

6        to them is no?

7            MR. RUCHER:  I think, to the

8        best of my recollection, I think we

9        did -- I did not ask to speak to

10       anyone at Morgan Stanley.

11           MR. NASTASI:  Thank you.

12           Did you rely on management's

13       representation that it believed it

14       could refinance its debt and that it

15       had had discussions with its advisor,

16       Morgan Stanley, in that regard, and

17       Morgan Stanley agreed with the

18       company's assumptions that it could

19       refinance its debt?

20           MR. RUCHER:  Yes, we relied

21       upon.  We have a written

22       representation letter in the files to

23       that also.

24           MR. NASTASI:  Mr. Browning,

25       do you have a recollection as to how

213

1          June 30, 2010

2     the company was able to make this

3     assumption on page 5 of VRC --

4               MR. BROWNING:  How we were

5     able to make this assumption?

6               MR. NASTASI:  -- 15?

7               The fourth key assumption on

8     page 5 of VRC 15 that states:

9     "Assumes that company can refinance

10    guaranteed debt after the expiration

11    of the credit agreements."

12              Can you please explain to us

13    how VRC was able to assume that the

14    company could do that?

15              MR. BROWNING:  Again --

16              MR. NEIER:  Honestly, I think

17    that's a little bit misleading, but I

18    think Bryan can answer the question.

19              MR. NASTASI:  I am happy

20    to --

21              MR. KLEE:  Let me rephrase

22    it.

23              You have listened to Mr.

24    Rucher's answers to the previous

25    questions.  Give us your answers.

214

1      June 30, 2010

2          MR. BROWNING:  Okay.  Okay.

3      We did do that.  We tested -- which we

4      normally would do -- is test the debt

5      levels, the interest levels relative

6      to interest coverage, how leveraged

7      the debt was relative to EBITDA, those

8      types of things.

9          So we looked at those things.

10     We had discussions with management

11     about refinancing and where the

12     sources of refinancing would be,

13     generally speaking.

14         Then we also had, during

15     those discussions, we had, I

16     believe -- I think management said,

17     well, Morgan Stanley has told us that

18     we can refinance at those levels

19     even -- and a downside scenario, under

20     the downside scenario, they believed

21     they still could refinance the debt.

22         MR. NASTASI:  Who is "they"?

23         MR. BROWNING:  The company

24     could.  Could refinance the debt even

25     under a downside scenario.

215

1          June 30, 2010

2               And then we asked how they

3     knew that or why they thought that,

4     and they said Morgan Stanley has data

5     that would support them being able to

6     do that.  And I think it was a number

7     of comparables or a number of

8     transactions that were out there.  And

9     we asked if they could provide that

10    information to us, which they did.

11    They provided a schedule of

12    transactions that had high LBO debt.

13    And so they provided that information.

14               And I think we had asked them

15    to -- all our conversations were

16    through the company talking to Morgan

17    Stanley.  We never had a direct

18    conversation.  But they provided that

19    information probably the next day or

20    something like that.

21               MR. KLEE:  And who at the

22    company did you speak with?

23               MR. BROWNING:  I think it was

24    a team of people.  Probably Chandler,

25    maybe Don Grenesko, and maybe Crane

216

1       June 30, 2010

2       Kenney might have been on that and --

3       and others.  I'm not sure, but there

4       was a team that we typically talked to

5       when we had conference calls.  I could

6       be speculating.  It may not have been

7       all of those people.  I'm just

8       speculating.

9           But -- so -- so it was -- but

10      we insisted, as we always do, that the

11      company provide us a rep that they

12      believe they have the ability to

13      refinance the debt when it becomes

14      mature.

15          MR. KLEE:  But you went

16      beyond that in this case and asked

17      that they also have discussions with

18      Morgan Stanley.

19          MR. BROWNING:  Correct.

20          MR. KLEE:  Why did you do

21      that?

22          MR. BROWNING:  Because it was

23      a highly leveraged transaction, and we

24      wanted to make sure that that was a

25      fair assumption.  So we took it very

217

1        June 30, 2010

2     seriously.  It wasn't something

3     that -- and I have to tell you also

4     that when I took this to the -- when

5     we took it to the committee, the

6     committee wanted to make sure that

7     aspect was looked at very closely.

8          MR. KLEE:  If the company had

9     come back to you and said Morgan

10    Stanley can't opine on our ability to

11    refinance the debt, would that have

12    affected your ability to issue your

13    opinion?

14          MR. BROWNING:  I don't think

15    so, because we -- you know, our

16    opinion was to the Board of Directors.

17    We needed that rep from the people

18    that were making those projections.

19    And so I don't think that having

20    Morgan Stanley representing it -- oh,

21    sure, it would have been nice to have

22    that, but it wouldn't have been

23    critical to our opinion.

24          MR. KLEE:  So as long as the

25    management rep -- even if they came

218

1          June 30, 2010

2     back to you and they said we've asked

3     Morgan Stanley, Morgan Stanley can't

4     give the rep, but we think we could

5     refinance it, would you still have

6     issued your opinion?

7          MR. BROWNING:  Oh, boy, I

8     don't know -- I would say I think so,

9     but if they would have said -- what we

10    heard from Morgan Stanley was not only

11    could they refinance --

12         MR. NASTASI:  Wait.  When you

13    heard from who.  You said --

14         MR. BROWNING:  From the

15    company.  From the company.

16         MR. NASTASI:  When you heard

17    what Morgan Stanley said --

18         MR. BROWNING:  Correct, was

19    that they could --

20         MR. NASTASI:  -- according to

21    the company?

22         MR. BROWNING:  Right.  Was

23    that they could refinance.

24         MR. NASTASI:  They could.

25         MR. BROWNING:  Could.  And

219

1        June 30, 2010

2        that they would supply that data to do

3        so.

4                MR. KLEE:  Mr. Rucher, let me

5        ask you the same questions.

6                If the company had told you,

7        we asked Morgan Stanley, they could

8        not tell us that they could refinance,

9        but we think we can refinance, would

10       that have affected your ability to

11       give the solvency opinion?

12               MR. RUCHER:  It would have

13       been something that I would have taken

14       into consideration very, very

15       carefully.  And if they would have

16       said -- if they were able to come back

17       and say that Morgan Stanley said there

18       is no way that we can refinance this,

19       for me, it would have been something

20       that I would have taken seriously

21       because they are in the capital

22       markets buying and selling debts

23       securities, issuing debt securities.

24       If they were to come back and say they

25       couldn't refinance it, I would say

220

1          June 30, 2010

2          that that would have a very, very --

3          for me, it would make issuing an

4          opinion much tougher.

5                  MR. NASTASI:  Let me ask you

6          it a slightly different way.  Let's

7          say they came back and said Morgan

8          Stanley says that it's not in the

9          business of opining that way.  They

10         can't say -- they are not saying they

11         don't believe the company can

12         refinance.  They are saying, we are

13         not allowed to give an opinion in that

14         regard because it's not within the

15         scope of what we do, so we can't tell

16         you one way or the other, and they

17         won't participate in that discussion.

18         So they are not saying we don't think

19         it will happen.  They are simply

20         saying they cannot give an opinion.

21                 MR. RUCHER:  You mean a

22         written opinion?

23                 MR. NASTASI:  Or they can't

24         even have a discussion about it.  They

25         say, management is going to have to

221

1          June 30, 2010

2      give that to you on their own.  We

3      can't participate in advising the

4      board as to whether it is reasonable

5      to assume to refinance.

6          MR. RUCHER:  That would have

7      less of an impact -- it would be much

8      different from what Ken said, where

9      they said they can't refinance it.  If

10     someone were to come to us and we are

11     not in the -- let's say, for instance,

12     somebody else was giving a solvency

13     opinion and they were coming to us to

14     rep that something can be refinanced,

15     if we are not advising on that

16     particular transaction, I am fairly

17     certain that we probably would say, we

18     wouldn't give a written opinion or

19     something to that effect because we

20     are not advising on that particular

21     transaction.  That would have less of

22     an impact.

23          And to be honest with you,

24     knowing the way that the investment

25     banks work with respect to solvency

222

1          June 30, 2010

2          opinions and how they typically will

3          not issue solvency opinions, I would

4          say I would not be surprised if they

5          would say we will not opine on that

6          particular issue as far as giving a

7          written opinion.  We might say that we

8          think it can be refinanced, but we are

9          not prepared to write a written

10         opinion saying it can be refinanced,

11         because that may be almost equivalent

12         to a solvency opinion because we know

13         they don't participate in that sector

14         of the business.

15              MR. KLEE:  But in this case,

16         to make the record clear,

17         management -- and by that it is either

18         Chandler Bigelow or Don Grenesko or

19         Crane Kenney or some combination --

20         told you that Morgan Stanley said debt

21         could be refinanced?

22              MR. RUCHER:  Yes, sir.  We

23         have a written rep letter, I think, to

24         that effect.  It's in the record.

25              MR. KLEE:  And that

223

1          June 30, 2010

2     management's opinion that the debt

3     could be refinanced was based upon

4     those discussions?

5          MR. RUCHER:  I don't know if

6     they were based directly upon those

7     discussions, but management did say

8     they had those discussions with Morgan

9     Stanley.

10          MR. KLEE:  Mr. Browning?  Do

11     you recall?

12          MR. BROWNING:  I recall

13     having the discussions about

14     refinancing.

15          And I can't tell you all the

16     reasons why management said that they

17     would have the ability to refinance,

18     but they gave us a rep to say that.

19     And I know one of the factors was

20     their discussion with Morgan Stanley.

21          MR. NASTASI:  Well, let's get

22     into some of the documents, because I

23     want to understand how this developed.

24     I have a guess, from looking at the

25     documents, but the best source of

224

1          June 30, 2010

2     understanding how this occurred is to

3     show you the documents and get your

4     best recollection.

5              I am going to show you what

6     has been marked as VRC  7.  I believe

7     these are Mr. Browning's notes.  If I

8     am wrong, please let me know.

9              MR. BROWNING:  That's

10     correct.

11             MR. NASTASI:  That's correct

12     I'm wrong, or that's correct they are

13     your notes?

14             MR. BROWNING:  That's

15     correct, these are my notes.

16             MR. NASTASI:  So these are

17     notes that you took during a committee

18     meeting at VRC; is that correct?

19             MR. BROWNING:  I think it was

20     probably post.

21             MR. NASTASI:  After the

22     committee meeting?

23             MR. BROWNING:  Yes.

24             MR. NASTASI:  You took some

25     notes to remind yourself what

225

1           June 30, 2010

2    occurred?

3           MR. BROWNING:  To make sure

4    we were documenting.

5           MR. NASTASI:  Can you read

6    those notes into the record?

7           MR. BROWNING:  Either -- met

8    again to address outstanding issues

9    with committee.  Significant time was

10   spent on the assumption of

11   refinancing.  Committee asked for more

12   data to look at and consider potential

13   asset sales.

14          MR. NEIER:  And just above

15   that, it says, Committee Meeting,

16   December 1, 2007.

17          MR. BROWNING:  Right.

18          MR. NASTASI:  You wrote a

19   note to yourself, significant time was

20   spent on the assumption of

21   refinancing.

22          Do you see that?

23          MR. BROWNING:  Yup.

24          MR. NASTASI:  What do you

25   remember from that meeting and those

226

1           June 30, 2010

2      discussions?

3              MR. BROWNING:  I think I

4      remember -- and typically it was three

5      or four people that are involved in

6      the committee other than those that

7      are --

8              MR. MONK:  Presenting.

9              MR. BROWNING:  -- completing

10      the project.

11              But the committee was looking

12      at -- you know, we had our base case

13      forecast.  We had in the analysis, the

14      base case forecast.  We had a downside

15      forecast.  And looking at both of

16      those, they wanted to make sure that

17      those -- because of the size of the

18      debt, that those were -- they felt

19      that was one of the key issues in the

20      solvency opinion overall and wanted to

21      make sure that we were satisfied that

22      that's a fair assumption.

23              MR. MONK:  That the refinance

24      was one of the key assumptions in the

25      solvency opinion?

227

1      June 30, 2010

2           MR. BROWNING:  Is a key

3      assumption, yes.

4           MR. NASTASI:  Had you gotten

5      a commitment from management about

6      their rep at this time in that regard?

7           MR. BROWNING:  I don't know

8      if we had gotten it.  I'm sure we had

9      discussed it with them.  Because in --

10     typical solvency opinions, we will

11     have those discussions fairly early

12     on, what kinds of things that we need

13     them to rep to, like the forecast and

14     so forth.  So I would expect that we

15     had discussions with them.

16           MR. NASTASI:  Mr. Rucher,

17     were you present at this meeting?

18           MR. RUCHER:  The 12/1

19     committee meeting?  I'm certain I was.

20           MR. NASTASI:  Do you remember

21     that significant time was spent on the

22     assumption of refinancing?

23           MR. RUCHER:  To the best of

24     my knowledge, because all these

25     meetings are starting to run together,

228

1          June 30, 2010

2     I cannot separate in my mind which

3     meeting was 12/1 versus other

4     meetings.

5               MR. NASTASI:  Sure.

6               MR. RUCHER:  If the question

7     is throughout the committee process if

8     refinancing was a major discussion

9     topic, absolutely, yes, it was.

10              MR. NASTASI:  Mr. Rucher, did

11    the committee ask your team to get a

12    rep from management that it believed

13    it could refinance its debt?

14              MR. RUCHER:  I don't know if

15    the committee asked us for that, or if

16    we determined on our own, but I know

17    for sure throughout the process, it

18    was something to say, you know what,

19    we need to ask management for a rep on

20    this refinancing.  I don't know if it

21    was a directive from the committee or

22    something that we discussed.

23              MR. BROWNING:  It could have

24    been the committee, I'm not sure.

25              MR. NASTASI:  Let me show you

229

1          June 30, 2010

2     what has been marked as VRC 8.  These

3     are two e-mails, one is redacted.

4     They are internal to Tribune.  I am

5     interested in the chronologically

6     earlier e-mail from Mr. Bigelow that

7     is not redacted that is dated

8     December 1st at 8:52 p.m., I believe.

9     The subject is VRC.

10            Take your time to read that.

11     My questions --

12            MR. BROWNING:  I'm sorry,

13     what number?

14            MR. NASTASI:  Sorry?

15            MR. BROWNING:  The whole

16     thing you want us to read?

17            MR. NASTASI:  I am just

18     pointing out that it is actually two

19     e-mails.  The top e-mail is entirely

20     redacted, so I don't have any

21     questions about that since we can't

22     read it.

23            MR. BROWNING:  Okay.

24            MR. NASTASI:  So I just want

25     you to focus on the e-mail from Mr.

230

1          June 30, 2010

2     Bigelow to Mr. Grenesko, CCing Crane

3     Kenney, Dennis FitzSimons.  It is sent

4     Saturday, December 1st at 8:52 p.m., I

5     believe.  The subject is VRC.

6          MR. BROWNING:  Okay.

7          MR. NASTASI:  Mr. Rucher, let

8     me start with you, because this e-mail

9     purports to describe a conversation

10    Mr. Bigelow had with you, I believe,

11    because he says in part of it, I just

12    spoke to Chad, VRC has three issues or

13    concerns.

14          Do you see that?

15          MR. RUCHER:  Yes.

16          MR. NASTASI:  Do you recall

17    having a discussion similar to the one

18    that is being described by Mr. Bigelow

19    in and around that time?

20          MR. RUCHER:  I can't recall

21    that specific discussion, but I know

22    that we had discussions on these

23    topics.  I can't recall that specific

24    discussion, though.

25          MR. NASTASI:  Can you tell

231

1           June 30, 2010

2    whether or not, giving the time of

3    this e-mail, whether this e-mail

4    occurred before or after the committee

5    meeting that is described in Mr.

6    Browning's notes of VRC 7?

7           MR. NEIER:  6:52 Chicago

8    time, probably.

9           MR. RUCHER:  I don't know

10   what time it occurred.

11          MR. BROWNING:  It's 8 o'clock

12   at night, right?

13          MR. NEIER:  Sorry, 8 o'clock.

14          MR. NASTASI:  8 o'clock at

15   night.  I don't know if you had it at

16   regular business hours -- I mean, it's

17   on a Saturday, so it could have been

18   any time.  I am wondering if you can

19   tell?

20          MR. RUCHER:  I can, sir.

21          MR. NASTASI:  All right.

22          Mr. Browning, do you recall

23   this telephone conversation?

24          MR. BROWNING:  I'm not sure

25   if I recall this conversation, but I

232

1           June 30, 2010

2      assume it was after this committee

3      meeting.

4           MR. NASTASI:  Why do you

5      assume that?

6           MR. BROWNING:  Because I

7      think I remember the committee meeting

8      more as during the day.  During the

9      day.

10          MR. NASTASI:  Mr. Bigelow

11     writes, "VRC is concerned about

12     refinancing risk with our new debt in

13     2014.  They want us to rep that it is

14     reasonable to assume that we will be

15     able refinance the new debt in 2014

16     even in the downside.  They would like

17     our rep to indicate that we have

18     conferred with one of our financial

19     advisors and that our advisor concurs

20     with this assumption."

21          Do you see that, Mr. Rucher?

22          MR. RUCHER:  Yes, sir.

23          MR. NASTASI:  Do you recall

24     ever telling Mr. Bigelow that -- let's

25     take it one thing at a time.  That VRC

233

1         June 30, 2010

2     was concerned about the refinancing

3     risk of the new debt in 2014?

4          MR. RUCHER:  I do remember

5     having those discussions in general.

6          MR. NASTASI:  Do you recall

7     stating that VRC wanted -- to Mr.

8     Bigelow -- that VRC wanted a rep about

9     the ability to refinance new debt in

10    2014, and that the rep should include

11    or indicate that management had

12    conferred with one of their financial

13    advisors?

14          MR. RUCHER:  Yes.

15          MR. NASTASI:  So you remember

16    requesting that of management?

17          MR. RUCHER:  Yes, I do

18    remember saying that.  In addition, we

19    wanted to make sure that management

20    was comfortable with that, but also we

21    wanted, since they had outside

22    advisors, to confer or talk to their

23    outside advisors and make sure that

24    it's reasonable.

25          MR. NASTASI:  So having made

234

1        June 30, 2010

2        that request, if they came back and

3        said Morgan Stanley's refusing to

4        participate in these discussions

5        because it's not what they do, how

6        would you have reacted to that, as

7        best you can tell?

8            MR. RUCHER:  I think in that

9        instance, we would have just relied

10       upon our internal analysis and

11       management's representation.

12           MR. NASTASI:  From your

13       experience with the committee at VRC,

14       do you think the committee would have

15       approved the opinion under those

16       circumstances?

17           MR. RUCHER:  Totally

18       speculating, totally speculating,

19       given that most of the major

20       investment banks will not participate

21       in solvency opinions, I think the

22       committee would have probably -- would

23       have probably thought that, you

24       know -- you know, that they are not

25       surprised that the investment bank

235

1          June 30, 2010

2     would not have those discussions with

3     management because they don't do

4     solvency opinions.

5               MR. NASTASI:  Right, and I

6     understand that.

7               My question is a little bit

8     different, and I realize you are

9     speculating and you are not speaking

10    on behalf of VRC; you are speaking on

11    your own experience in your individual

12    capacity.  That is the premise of my

13    question.

14              Based on your experience with

15    VRC and the committees that you have

16    dealt with, do you think the committee

17    that was responsible for approving

18    this second step solvency opinion

19    would have approved it if Morgan

20    Stanley had come back after your

21    request and said -- or if management

22    had come back after your request and

23    said, our advisor, Morgan Stanley,

24    will not participate in these

25    discussions because it's not what they

236

1         June 30, 2010

2    do because they are an investment

3    bank?

4         Do you think the committee

5    would have, nevertheless, if

6    everything else remained the same,

7    approved the issuance of the solvency

8    opinion?

9         MR. BROWNING:  And we got the

10   rep letter from management?

11        MR. NASTASI:  Without Morgan

12   Stanley's involvement.

13        MR. RUCHER:  I think they

14   would have.  They would have just made

15   us probably dig back in the analysis

16   again, but I think, ultimately, the

17   committee would have approved it.

18        MR. NASTASI:  What do you

19   mean "dig back in the analysis."

20        MR. RUCHER:  They would have

21   questioned, made us go back and say,

22   let's go back and look at this

23   analysis again, they may have a couple

24   of questions.  But I think all things

25   equal, I think the committee would

237

1        June 30, 2010

2    have approved that.

3            MR. KLEE:  I don't think we

4    covered the third part of the

5    sentence:  "And that our advisor

6    concurs with this assumption."

7            Do you remember asking

8    Chandler Bigelow or anybody else to

9    get an indication that the financial

10   advisor concurs with the refinancing

11   assumption?

12           MR. RUCHER:  Not those

13   specific terms of concur.  I think

14   that the way that I termed it or

15   phrased it to Chandler Bigelow is we

16   would want the financial advisor to

17   agree that it is reasonable to assume

18   that this debt could be refinanced.  I

19   don't know about confers -- I don't

20   think I used the word "confers."  I

21   think more I would have used the term

22   that it is reasonable to assume that

23   it can be refinanced.

24           MR. KLEE:  Now, Mr. Browning?

25           MR. NASTASI:  Mr. Browning,

238

1          June 30, 2010

2     all else being equal, if management

3     had come back to VRC and said, we

4     posed your request to Morgan Stanley,

5     and Morgan Stanley is refusing to

6     participate in any way in discussions

7     relating to our ability to refinance,

8     it is not what they do, so all we can

9     give you is our rep without their

10    participation, based on your

11    experience with VRC and with the

12    committees at VRC and with this

13    committee, in particular, do you think

14    that the committee would have,

15    nevertheless -- absent a rep involving

16    Morgan Stanley or their name, would

17    have nevertheless permitted VRC to

18    issue the solvency opinion in Step 2?

19         MR. BROWNING:  I think they

20    would have permitted.

21         MR. NASTASI:  Why?

22         MR. BROWNING:  I think, first

23    of all, having Morgan Stanley say we

24    won't participate is a neutral answer

25    as opposed to a negative answer, we

239

1          June 30, 2010

2    just don't do it.  That's what I think

3    you are stating there.

4          MR. NASTASI:  Yes.

5          MR. BROWNING:  It's a neutral

6    answer.  So I don't think the

7    committee would take that as a

8    negative.  They would consider what

9    Chad said about investment bankers and

10   whatever.

11          And we, actually, would not

12   be -- I think we were surprised that

13   they -- we were not surprised that

14   they would not rep to it.

15          MR. KLEE:  Let's distinguish

16   here between giving a written

17   representation and concurring with --

18          MR. BROWNING:  Right.

19          MR. KLEE:  -- what management

20   is assuming.

21          As you sit here today, do you

22   believe that Morgan Stanley told

23   management that they concurred with

24   the financing representation that

25   management made?

240

1      June 30, 2010

2          MR. BROWNING:  I do.

3          MR. KLEE:  And, Mr. Rucher?

4          MR. RUCHER:  Yes, I do.  I

5      think, to the best of my

6      recollection -- I would have to look

7      at the files -- I think we have a rep

8      letter that says based upon the

9      discussions with Morgan Stanley.

10         So if your question is do I

11     think that Morgan Stanley told them

12     they can refinance this debt, based

13     upon the representation letters that

14     we received, if I'm correct, unless

15     I'm mistaken, I would say yes, I do

16     think that Morgan Stanley told them

17     that.

18         MR. KLEE:  And that's

19     separate and apart from any comparable

20     company information Morgan Stanley

21     might have given to the company or to

22     you?

23         The concurrence --

24         MR. NEIER:  Can I suggest the

25     words?  It's "in addition to," not

241

1        June 30, 2010

2        "separate and apart."

3              MR. KLEE:  Yes.

4              MR. BROWNING:  Yeah, I mean,

5        I certainly think that, you know, our

6        discussions were this with the

7        company, if I remember correctly, as

8        they felt they could -- this is,

9        again, management speaking.  But they

10       got information from Morgan Stanley,

11       their opinion from Morgan Stanley that

12       they would be able to refinance, not

13       only at the base case levels, but also

14       under a downside scenario.  And -- and

15       then it was either us asking the

16       question, well, why do they think

17       that, and they said, well, because

18       they've got transactions that support

19       that, and they will send those over.

20             So that's what I think

21       happened.  So we never had any

22       indication that they were being

23       negative, not even neutral.  I think

24       that we felt that they had a -- they

25       were giving an indication that it was

242

1          June 30, 2010

2    a positive assumption.

3              MR. NASTASI:  Mr. Rucher, so

4    you have had considerable experience

5    in developing solvency opinions, as

6    you discussed, over many years.  And

7    in that regard, you have dealt with

8    many investment banks.

9              You have already described

10   that investment banks typically won't

11   get involved in these type of things

12   that relate to solvency opinions.

13             So tell me, if it wasn't

14   absolute, an absolute requirement to

15   get Morgan Stanley's involvement in

16   some way, why did you ask for it?

17             MR. RUCHER:  I think the

18   reason that we -- that we asked for it

19   is a way of getting additional comfort

20   to see if our assumptions were -- were

21   reasonable.

22             So it was just a way of

23   getting additional -- additional

24   comfort to ask for it.

25             MR. NASTASI:  But you knew

243

1        June 30, 2010

2   you weren't likely to get that

3   comfort, right?

4        MR. RUCHER:  That doesn't

5   mean you don't ask for it.

6        MR. NASTASI:  I understand.

7            And it wasn't, based on what

8   you are telling me now, it wasn't an

9   absolute requirement, right?

10       MR. RUCHER:  Yes.

11       MR. NASTASI:  And you think,

12  sitting here today, that, you know,

13  you can't speak for the committee,

14  that you believe that you would have

15  nevertheless, without it, been able to

16  get a solvency opinion or approval to

17  issue the solvency opinion, right?

18       MR. RUCHER:  Yes.  Because we

19  rely upon -- heavily upon our own

20  analysis, even though we get rep

21  letters from management or we may get

22  rep letters from other parties.  At

23  the end of the day, our own analysis

24  has to support those conclusions.

25       MR. KLEE:  And what was your

244

1          June 30, 2010

2     analysis that the debt in this case

3     could be refinanced in 2014?

4          MR. RUCHER:  We looked at the

5     debt levels in 2014.  We looked at --

6     we had a list of comparable

7     transactions.  There was a list of

8     debt transactions that's out there,

9     and we looked at those debt levels

10    versus what the projected debt levels

11    would be in 2014.  We looked at the

12    covenants.  We looked at the cushion

13    of the -- of the covenants versus the

14    coverage ratios or debt levels, and

15    based upon, that we were able to get

16    comfort that that debt would be able

17    to be refinanced.

18          MR. KLEE:  What were the debt

19    levels in 2014?

20          MR. RUCHER:  I can tell you

21    based upon the base case covenant

22    analysis.

23          MR. NASTASI:  VRC 5.

24          MR. RUCHER:  VRC 0060900.

25    That the projected guaranteed debt to

245

1          June 30, 2010

2     covenant EBITDA in 2014 in the base

3     case was 4.31 times.  And that's on

4     that page, VRC 0060900.

5          MR. KLEE:  What was the base

6     amount of the debt that had to be

7     refinanced in 2014?

8          MR. BROWNING:  It looks like

9     6.2.

10         MR. KLEE:  Mr. Browning?

11         MR. BROWNING:  I'm sorry, is

12    that the number, Chad?

13         MR. RUCHER:  Looks like it

14    was $6.2 billion that had to be repaid

15    in 2014.

16         MR. KLEE:  And what is the

17    relevance of the comparable market

18    transactions in 2007 to the ability to

19    refinance $6 billion of debt in 2014?

20         MR. RUCHER:  Repeat the

21    question again?

22         MR. KLEE:  Reporter, please

23    read back the question.

24         [The requested portion of the

25    record was read.]

246

1    June 30, 2010

2        MR. RUCHER:  You said the

3    comparable market transactions or

4    comparable market company multiples?

5        MR. NASTASI:  Transactions.

6        MR. RUCHER:  I am confused

7    which ones you are referring to.

8        MR. KLEE:  What did Morgan

9    Stanley supply you with?

10       MR. RUCHER:  Oh, they

11   supplied us with a list of deals that

12   had been done and what leverage ratios

13   for EBITDA.

14       MR. KLEE:  And what is the

15   relevance of those deals and leverage

16   ratios in 2007 to a refinancing of $6

17   billion of debt in 2014?

18       MR. RUCHER:  It gives you an

19   indication of how much leverage in

20   today's market you can put on a

21   company.  So you would have to make an

22   assumption that things would stay

23   equivalent or some range in 2014.

24       MR. KLEE:  Is that a

25   reasonable assumption?

247

1        June 30, 2010

2            MR. RUCHER:  Yes, because

3        that's -- truthfully, when you look at

4        these things, typically, that's the

5        only data that you have, is current

6        data, because you are projecting out.

7            MR. KLEE:  Is that the

8        assumption that you made?

9            MR. RUCHER:  About -- for the

10       Morgan Stanley?

11            MR. KLEE:  Yes.

12            MR. RUCHER:  So there are

13       things you take into consideration.

14       So you take into consideration that

15       kind of data, what things are levered

16       at.  You also take into consideration

17       what the enterprise values of

18       companies are in today's market to see

19       if, when you get ready to refinance

20       things in 2014, how much enterprise

21       cushion you have.

22            MR. KLEE:  Did you take

23       account of any future data?

24            MR. RUCHER:  Future?

25            MR. KLEE:  Data in the year

248

1           June 30, 2010

2       2014?

3               MR. RUCHER:  When you say

4       "future data," what types of future

5       data?

6               MR. KLEE:  Well, for example,

7       did you consider the amount of debt

8       that was maturing in the market in

9       2014?

10              MR. NEIER:  Honestly, we all

11      know it's big today, but in 2007, how

12      would you know what debt had matured

13      in 2014?

14              MR. RUCHER:  I don't know if

15      we took that into consideration.

16              MR. KLEE:  Do you know, Mr.

17      Browning?

18              MR. BROWNING:  I don't know

19      that answer.  Frankly, I don't think

20      we looked at that specifically.

21              What you really want to look

22      at is -- two things.  One is the

23      comparables help us determine in a

24      normal market, is it reasonable to

25      make that assumption.  And so if you

249

1          June 30, 2010

2     look at in that industry -- and these

3     weren't just transaction -- I don't

4     believe.  In 2007, they were several

5     years apart, right?  So it's a period

6     of years.  So you are trying to see

7     what its normal level of transaction

8     multiples or multiples associated with

9     debt.

10          That's one thing.  So that

11    gives us -- in a sense, it passed that

12    sort of smell test, if you will.

13          The second thing is, in our

14    discussions with management, they

15    indicated that all of the lenders

16    going into this transaction had the

17    idea, had the plan, the notion that

18    they would be refinancing this debt in

19    2014.  It's part of -- the

20    anticipation is:  We will lend this

21    money.  We don't really expect it to

22    be paid in full in 2014 except,

23    unless, somebody else takes us out of

24    the loan.

25          But what we understood was

250

1        June 30, 2010

2     that they go in this transaction

3     anticipating that this will be

4     refinancing, the transaction.  And in

5     a sense it's at this level now and its

6     anticipated to be at lower leverage in

7     2014, it's a generally reasonable

8     assumption to make.

9          MR. RUCHER:  And if I could

10    just clarify?  Now that I think about

11    this a little bit more, if we

12    anticipated how much debt would be

13    coming due by all of the companies in

14    the U.S. or in the world in 2014, if

15    we took that into consideration, no,

16    we didn't.  That's not something that,

17    specifically, we pulled up that data.

18          MR. KLEE:  Would that have

19    any impact on the ability to refinance

20    debt?

21          MR. RUCHER:  It potentially

22    could.

23          MR. KLEE:  Mr. Browning, do

24    you have anything you want to add?

25          MR. BROWNING:  No.  I think

251

1      June 30, 2010

2      that's become a double-edged sword,

3      because I think if there is a lot of

4      debt being traded, it actually, sort

5      of, enhances the marketplace.  So

6      there is more participation and so

7      forth.

8           It's when you get into times

9      like we had in 2008, early 2009, where

10     nobody was lending, that's when you

11     have sort of this credit crunch.  I

12     think if there is an active market, I

13     don't know -- I don't know about it

14     all coming due in 2014, if that would

15     be a problem, but -- but I don't think

16     that -- I don't think that's as much a

17     concern as their specific debt and

18     their specific ability to refinance

19     that.

20          So I guess I don't have an

21     opinion on the overall debt market at

22     that point, because I don't think I

23     looked.

24          MR. RUCHER:  But one of the

25     things that I can say what we saw,

252

1          June 30, 2010

2     quite a phenomenon earlier this year,

3     when a lot of debt was getting repaid

4     this year, a lot of debt came due.  It

5     actually sparked the market, because a

6     lot of the CLOs that was getting

7     repaid the money for a debt that was

8     maturing, they had to actually go out

9     in the market and buy new debt

10    because, you know, they had this money

11    to match.

12          So it can -- as Bryan kind of

13    said, it can be a double-edged sword

14    with a lot of debt maturing.  It could

15    also create some -- I wouldn't call it

16    artificial demand, but increase a

17    demand for new debt, which we saw

18    earlier this year in the debt market.

19    We saw a tremendous demand for new

20    debt.  A lot of that was because debt

21    was matured, the CLOs were getting

22    paid off, and they had to go put this

23    money back to work.

24          MR. NEIER:  I don't think

25    anybody in 2007 could know what debt

253

1      June 30, 2010

2    was maturing in 2014, because they

3    were all closing transactions in 2007.

4    And it wasn't until those transactions

5    closed that somebody could say, wow,

6    there is debt maturing in 2014.

7         MR. NASTASI:  Let's get back

8    to this Chandler/Bigelow e-mail, which

9    is VRC 8.

10        It makes reference to a VRC

11   committee meeting scheduled for the

12   next day, December 2nd, at 11:30 a.m.

13        Do you see that?

14        MR. RUCHER:  Yes.

15        MR. NASTASI:  Do you have any

16   reason to believe that the committee

17   meeting on December 2nd occurred at

18   any other time other than 11:30 a.m.

19   Chicago time?

20        MR. RUCHER:  I don't know why

21   we would have had it on Chicago time,

22   since most of the people were working

23   on the east coast.

24        MR. BROWNING:  We probably

25   converted it.

254

1          June 30, 2010

2          MR. NASTASI:  It could have

3     been 12:30.

4          Do you have any reason to

5     believe it was some other time?

6          MR. RUCHER:  It could have

7     been.

8          MR. NASTASI:  Do you have any

9     reason to believe?

10         MR. RUCHER:  No.

11         MR. NEIER:  Any reason to

12    disagree, that's what he is asking.

13         MR. NASTASI:  How about you?

14         MR. BROWNING:  No.

15         MR. NASTASI:  I am going to

16    show you what has been marked as VRC

17    12 and VRC 13.  I believe these are

18    both Mr. Browning's notes he was asked

19    about in his deposition that relate to

20    one telephone call.

21         Is that right, Mr. Browning?

22         MR. BROWNING:  That's in my

23    deposition?

24         MR. NASTASI:  Yes.

25         MR. BROWNING:  I don't

255

1          June 30, 2010

2     know -- I may have been asked about

3     this, yes.  Yeah, I guess --

4          MR. NASTASI:  Are these two

5     separate sets of notes that relate to

6     one telephone call that you had?

7          MR. BROWNING:  Yes.

8          MR. NASTASI:  Just explain

9     briefly for us why you have two sets

10    for one phone call.

11         MR. BROWNING:  Because I

12    probably rewrote my notes.

13         MR. NASTASI:  Can you tell

14    which is which?

15         MR. BROWNING:  Yeah.  This

16    would have been the first.

17         MR. NASTASI:  Can you read

18    the exhibit?

19         MR. BROWNING:  I'm sorry.

20    Exhibit 13 would have been first.  And

21    then Exhibit 12 would have been my

22    rewritten notes, I believe.

23         MR. NASTASI:  So Exhibit 13

24    were your contemporaneous notes.  And

25    then after the call, you rewrote the

256

1      June 30, 2010

2      notes as what now appears as

3      Exhibit 12?

4              MR. BROWNING:  Yes.

5              MR. NASTASI:  Chad, were you

6      on this call, as well?

7              MR. RUCHER:  From the notes,

8      it looks like I was.

9              MR. NASTASI:  Do you recall

10     being on a call with Don Grenesko,

11     Chandler Bigelow, Crane Kenney and Mr.

12     Browning on December 2nd, 2007?

13             MR. RUCHER:  I can't recall

14     specifically that -- you know, we get

15     so many calls.  I can't recall that

16     specific date.

17             MR. NASTASI:  Mr. Browning,

18     these notes purport to describe a

19     telephone call that you had with Mr.

20     Grenesko, Mr. Bigelow and Crane

21     Kenney.  And part of that discussion

22     related to this representation of

23     refinancability of debt; is that

24     right?

25             MR. BROWNING:  Yes.

257

1        June 30, 2010

2              MR. NASTASI:  In fact, if you

3        look at Exhibit 12, the paragraph that

4        is labeled one, could you read that

5        paragraph to us, please?

6              MR. BROWNING:  "Tribune

7        talked to Morgan Stanley and they

8        looked at the downside case provided

9        to VRC.  Morgan Stanley said that they

10       believe it would be refinancable at

11       levels outlined in the downside case

12       and that would be before any asset

13       sales."

14             MR. NASTASI:  So you are

15       having this discussion on a Sunday.

16             Can you tell whether or not

17       this discussion occurred prior to your

18       scheduled committee meeting?  I mean,

19       I am assuming this occurred prior to

20       the meeting, you are trying to get

21       this information so that you can

22       present it to the committee.

23             Can you tell whether or not

24       that's true?

25             MR. BROWNING:  I'm assuming

258

1          June 30, 2010

2     that's true, but I can't say for sure.

3               MR. NASTASI:  Mr. Rucher, do

4     you have anything to add to that?

5               MR. RUCHER:  I can't tell for

6     sure the timing of the meeting.

7               MR. KLEE:  I just want to

8     clarify paragraph one, Mr. Browning,

9     when it says, "Morgan Stanley said

10    that they believe it would be

11    refinancable at the levels outlined in

12    the downside case and that would be

13    before any asset sales."

14               Is that something Morgan

15    Stanley said on the phone, or

16    something that somebody from the

17    company told you Morgan Stanley said?

18               MR. BROWNING:  I believe it

19    was the company saying that Morgan

20    Stanley said that, because I don't

21    believe we talked to Morgan Stanley.

22               MR. NASTASI:  Looking at

23    paragraph two on VRC 12.  It uses the

24    words "they believed."

25               Do you know whether or not

259

1            June 30, 2010

2       that was the company making that

3       statement over the phone, or whether

4       they are referring to Morgan Stanley

5       there as well?

6            MR. BROWNING:  I'm

7       speculating, but I'm assuming that

8       that was Morgan Stanley explaining it

9       to the company.

10           MR. NASTASI:  And I

11      understand you are speculating, but

12      would your answer be the same with

13      respect to paragraph three, where the

14      pronoun "they" is used as well?

15           MR. BROWNING:  That I'm not

16      sure.  I'm not sure.

17           MR. NASTASI:  Do you believe

18      that the information conveyed on this

19      call to VRC was then at some later

20      point presented to the committee at

21      VRC and contributed to the committee's

22      decision to approve this solvency

23      opinion?

24           MR. BROWNING:  I believe

25      that -- I'll say that I would -- my

260

1           June 30, 2010

2    belief is that it was presented to the

3    committee.

4           MR. NASTASI:  Right.

5           MR. BROWNING:  Beyond that is

6    speculation as to whether they would

7    have approved it had we not had this

8    information or not.

9           MR. NASTASI:  And I am asking

10   you a slightly different question:  Do

11   you think that it contributed to their

12   decision to approve it?

13          MR. BROWNING:  I suspect it

14   did.  Gave them comfort, any way.

15          MR. NASTASI:  Gave them

16   comfort?

17          Mr. Rucher, would you agree

18   or disagree with that?

19          MR. RUCHER:  I think it was a

20   factor that was taken into

21   consideration, definitely.

22          MR. NASTASI:  And you agree

23   that this information that was

24   conveyed on this call was presented to

25   the committee of VRC?

261

1      June 30, 2010

2          MR. RUCHER:  In some fashion,

3      it was certainly presented to -- to --

4      to the committee.

5          MR. NASTASI:  I show you what

6      has been marked as VRC 9.  This is a

7      Morgan Stanley document labeled MS

8      93539.  It is an internal e-mail to

9      Morgan Stanley.

10         I am not going to ask you

11     about, you know, who sent this e-mail

12     or why or anything like that, because

13     nobody from VRC is copied on it.  I

14     want to use it to see if it refreshes

15     either of your recollections as to

16     what was occurring in and around that

17     time, because it purports to describe

18     conversations between management and

19     VRC.

20         So take your time to read it,

21     and then I will have some specific

22     questions.

23         [Pause.]

24         MR. NASTASI:  Have you had a

25     chance to read that, gentlemen?

262

1        June 30, 2010

2              MR. RUCHER:  Yes.

3              MR. NASTASI:  In the first

4        paragraph, Mr. Whayne from Morgan

5        Stanley writes:  "Charlie and I just

6        finished a call with Dennis, Don and

7        Chandler, who wanted to give us an

8        update on the VRC process.  VRC is

9        scheduled to present to the TRB board

10       on Tuesday with regards to their

11       solvency analysis, and are having

12       their final internal committee meeting

13       at noon today."

14              Do you see that?

15              MR. BROWNING:  Mm-hm.

16              MR. NASTASI:  And although

17       the timing is not exact, the

18       approximate timing is consistent with

19       your recollection of when that meeting

20       likely occurred on that day,

21       December 2nd; is that right, Mr.

22       Browning?

23              MR. BROWNING:  Yes.

24              MR. NASTASI:  The next

25       sentence reads:  "They called the

263

1        June 30, 2010

2        company on Friday to discuss some

3        committee pushback that they have

4        received thus far."

5              Mr. Rucher, did you call

6        anyone at Tribune in the days leading

7        up to Sunday, December 2, 2007, and

8        described pushback that your team was

9        getting from the VRC committee with

10       regard to the solvency?

11             MR. RUCHER:  I don't recall

12       whether or not I called anyone at the

13       company.  But if the question was what

14       pushbacks areas of concerns, those

15       would be the same areas that we talked

16       about before.  So --

17             MR. NASTASI:  So what are

18       they, just briefly?

19             MR. RUCHER:  Well, the

20       refinancing was certainly one.  And

21       there were some issues related to --

22       we wanted to make sure since tax

23       savings was an important piece of the

24       overall opinion here, we wanted to

25       make sure that there was not going to

264

1           June 30, 2010

2     be some transaction by Zell that would

3     cause some tax leakage or would cause

4     the company to have more cash flow

5     because then they'd have to pay Sam

6     Zell's taxes.  So those were some of

7     the things that were discussed with

8     the committee.

9           MR. NASTASI:  So you would

10    describe in and around that time that

11    the committee was giving pushback with

12    respect to the company's ability to

13    refinance its debt when it came due,

14    and the tax issues that you have just

15    described; is that right?

16          MR. RUCHER:  Well, I don't

17    know -- when you say "pushback," I

18    don't know if it was pushback, per se,

19    but it was things that they were

20    questioning me very, very intensely

21    and looking at very, very closely.

22          MR. NASTASI:  Mr. Browning,

23    before we move on, do you remember the

24    committee giving any pushback in and

25    around that time with respect to the

265

1          June 30, 2010

2     company's ability to refinance its

3     debt?

4          MR. BROWNING:  You know, the

5     nomenclature there, "pushback," I

6     think it's a fair way to describe it

7     because, you know, in all our opinions

8     we would have the committee take a

9     serious look at all of the issues

10    associated with the solvency opinion.

11    They are not rubber stamping the deal.

12    They are looking at it very seriously.

13    So when they see an area that they

14    think is important to address, they

15    want more information here.  So

16    whether that was -- I wouldn't

17    describe it as something -- the

18    pushback is, go get -- support this

19    better, get more information so we can

20    support your assumption.  So that's

21    what I would say.

22          MR. NASTASI:  The next

23    paragraph reads:  "First they

24    requested a TRB management rep to the

25    effect that it is reasonable to assume

266

1        June 30, 2010

2        that the debt can be refinanced in

3        2014, and that the financial

4        projections have been prepared by

5        management in good faith."

6                Do you see that?

7                MR. BROWNING:  Mm-hm.

8                MR. NASTASI:  Are those two

9        things, Mr. Browning, that you asked

10       management to do in and around that

11       time?

12               MR. BROWNING:  It could have

13       been there for the rep -- for the

14       refinancing rep, but certainly the

15       forecast rep, we would have asked

16       prior to that, I think.  I think we

17       were still waiting for those things,

18       to tell you the truth.  I don't know

19       if that would have been the first time

20       for the refinancing or not.

21               MR. NASTASI:  Okay, but

22       certainly you --

23               MR. BROWNING:  But we did ask

24       for it.

25               MR. NASTASI:  -- wanted both

267

1                  June 30, 2010
2       those things?
3               MR. BROWNING:  Yes.
4               MR. NASTASI:  And you agree
5       with that, Mr. Rucher?
6               MR. RUCHER:  Yes.
7               MR. NASTASI:  And then it
8       says:  "VRC also asked management to
9       discuss this issue with advisors."
10              Do you see that?
11              MR. RUCHER:  Yes.
12              MR. BROWNING:  Yes.
13              MR. NASTASI:  Is there any
14      mention in this e-mail that VRC
15      requested that the company's advisors
16      concur with that assumption that they
17      could refinance in 2014?
18              Do you see that in here?
19              MR. RUCHER:  I don't see that
20      in here.
21              MR. BROWNING:  Well, I think
22      the issue, when it says, VRC also
23      asked management to discuss this issue
24      with their advisors, that was the
25      implication.

268

1          June 30, 2010

2              MR. NASTASI:  I want to show

3       you what has been marked as VRC 10 and

4       VRC 11.  And if you just turn your

5       attention to VRC 10 for the moment.

6       The first e-mail, chronologically, in

7       VRC 10 is from Bigelow to FitzSimons,

8       Grenesko and Crane Kenney on

9       December 2nd.

10             Do you see that?

11             MR. RUCHER:  You are on VRC

12      11?

13             MR. NASTASI:  No, 10.

14             MR. KLEE:  Just read the

15      bottom of the page, VRC 10.

16             MR. NASTASI:  The e-mail

17      reads:  "Just heard from VRC.  They

18      have met and given us the green light

19      subject to the rep letter on the REFI

20      and they would like Morgan Stanley to

21      search for 5 precedent transactions

22      where companies with our projected

23      capital structure were able to issue

24      the debt."

25             Do you see that?

269

1        June 30, 2010

2            MR. BROWNING:  Yes.

3            MR. NASTASI:  Further down,

4        it says:  "VRC would also like to see

5        if Morgan Stanley would be willing to

6        send VRC a letter on our ability to

7        refi.  VRC realizes this is unlikely,

8        but would like us to ask."

9            Do you see that?

10           MR. BROWNING:  Yes.

11           MR. NASTASI:  Mr. Rucher,

12       when you ultimately got the rep letter

13       with respect to the refinancability,

14       do you recall that Morgan Stanley's

15       name appeared in that rep letter?

16           MR. RUCHER:  To the best of

17       my recollection, I think it did.

18           MR. NASTASI:  Were you

19       surprised when you saw that?

20           MR. RUCHER:  I wasn't

21       surprised that its name is in there,

22       because the language, I think, said

23       based upon its discussions with Morgan

24       Stanley.

25           MR. NASTASI:  So it didn't

270

1        June 30, 2010

2    surprise you --

3            MR. RUCHER:  Well, what would

4    have surprised me more is if Morgan

5    Stanley would have rep'd to it.  But I

6    think saying we had a conversation

7    based upon management's discussions

8    with Morgan Stanley, I don't know if

9    that necessarily surprised me.

10            MR. KLEE:  Who drafted that

11    language into the rep letter?  Do you

12    recall?  Did it come from VRC, or did

13    it come from the company?

14            MR. RUCHER:  I think that

15    language -- the end language we might

16    have looked at and said we don't feel

17    comfortable with something in there,

18    but I think that the crux of the

19    letter, the core of the letter came

20    from Morgan Stanley.  It may have came

21    from Crane Kenney.

22            MR. NASTASI:  From Morgan

23    Stanley?

24            MR. RUCHER:  Sorry, not

25    Morgan Stanley.  Tribune.

271

1          June 30, 2010

2              MR. NASTASI:  Let's look at

3      VRC 11.  I just want to touch on this

4      one briefly.

5              You see here that Mr. Whayne

6      is asked by Chandler Bigelow if they

7      are willing to give a rep with respect

8      to the refinancability of the debt in

9      2014.  And Mr. Whayne writes that

10     Morgan Stanley is unable to give that

11     rep.

12             Do you see that?

13             MR. RUCHER:  Yes.

14             MR. NASTASI:  Does that

15     surprise you, seeing that?

16             MR. RUCHER:  Not -- not

17     really.

18             MR. NASTASI:  Have you seen

19     this e-mail before today?

20             MR. RUCHER:  No.

21             MR. NASTASI:  Did anyone from

22     the company tell you that Morgan

23     Stanley was unable to give a

24     representation as to the

25     refinancability of the debt?

272

1      June 30, 2010
2           MR. RUCHER:  I do not recall.
3      We may have had a phone call where
4      Chandler may have conveyed that they
5      couldn't give a rep, but I just don't
6      recall a specific conversation, to be
7      honest with you.
8           MR. KLEE:  To be clear on the
9      record, their inability to give a rep
10      or a written representation is
11      different from their statement to
12      management that they support the
13      refinancability of the debt.
14           MR. BROWNING:  I agree.
15           MR. KLEE:  Explain, Mr.
16      Browning.
17           MR. BROWNING:  Well, I think
18      it is different because, you know, one
19      is it's our professional experience
20      that they will be able to refinance.
21      Another is taking out a whole level of
22      liability, maybe, that they're not
23      being -- that -- I don't know, but I
24      just think that -- I can understand
25      why they wouldn't rep on that

273

1            June 30, 2010

2    situation.

3            MR. KLEE:  And as you sit

4    here today, you believe that they did

5    the former, but not the latter.  You

6    believe that they said that based on

7    their experience, they can refinance,

8    but they wouldn't give a written

9    opinion to that effect?

10           MR. BROWNING:  That's what my

11   understanding is.

12           MR. KLEE:  Is that your

13   understanding too, Mr. Rucher?

14           MR. RUCHER:  Yes.  That they

15   had some type of verbal conversation

16   about it, but they would not deliver a

17   written rep.

18           MR. BROWNING:  Is this

19   redacted, or is it I just can't read

20   it?

21           MR. NASTASI:  It's actually

22   highlighted in the computer.  So when

23   it gets printed out, it is difficult

24   to read.

25           MR. BROWNING:  It's sort of

274

1        June 30, 2010

2        redacted, if it was, but --

3            (VRC Exhibit 16 through 18

4        were marked for identification, as of

5        this date.)

6            MR. NASTASI:  I show you what

7        has been marked as VRC 16.  I believe

8        that VRC 16 is a document prepared by

9        VRC that contains answers to specific

10       questions posed by the lenders in the

11       LBO transaction for Tribune to VRC

12       leading up to VRC's second step

13       solvency opinion.

14            Is that correct, Mr. Rucher?

15            MR. RUCHER:  Yes.

16            MR. NASTASI:  Who prepared

17       the answers to these questions, Mr.

18       Rucher?

19            MR. RUCHER:  I think the

20       solvency opinion team provided the --

21       prepared the answers along with the

22       analysts, myself and Bryan, provided

23       answers to this.

24            MR. NASTASI:  One of the

25       questions, question 18 on page 10 is:

```
 1              June 30, 2010
 2         "What is the assumption for the
 3    Company's ability to refinance debts
 4    as they become due and how is the
 5    assumption established?"
 6              And VRC's answer is:  "VRC
 7    has assumed that the Company will be
 8    able to refinance its debts as they
 9    become due.  This assumption is based
10    upon a review of the forecasted total
11    debt and guaranteed debt leverage
12    ratios at the time of the required
13    refinancing, recent leveraged debt
14    multiples, and represent from the
15    Company which states that based upon
16    recent discussions with Morgan
17    Stanley, the Company would be able to
18    refinance debt in its downside
19    forecasts without the need for
20    additional asset sales."
21              Do you see that?
22              MR. RUCHER:  Yes.
23              MR. NASTASI:  Who prepared
24    that answer, do you know?
25              MR. RUCHER:  More than
```

276

1          June 30, 2010

2     likely, I probably wrote that answer.

3          MR. NASTASI:  And with

4     respect to the line that reads,

5     "representation from the Company which

6     states that based upon recent

7     discussions with Morgan Stanley, the

8     Company would be able to refinance

9     debt in its downside forecasts without

10    the need for additional asset sales,"

11    where did you get the information in

12    order to answer this question in that

13    way?

14         MR. RUCHER:  I think at this

15    particular time -- and I am not a

16    hundred percent certain it was based

17    principally upon verbal conversations

18    that we had had -- I do not think --

19         MR. NASTASI:  With?

20         MR. RUCHER:  With --

21    principally with Chandler Bigelow.

22         MR. NASTASI:  Were any of the

23    discussions in the presence of or with

24    Morgan Stanley?

25         MR. RUCHER:  No.

277

1          June 30, 2010

2               MR. NASTASI:  So principally

3      with Chandler Bigelow, or with other

4      folks from management?

5               MR. RUCHER:  Yes.

6               MR. NASTASI:  Let's look at

7      VRC 17.  This appears to be a second

8      set of questions from the same banks.

9      The first page is actually an e-mail

10     transmitting it from Mr. Rucher to Mr.

11     Mednik.  And in this case, these are

12     just the questions.  There don't

13     appear to be answers.

14               Did VRC ever --

15               MR. NEIER:  Hold on a second.

16     Oh, the Bates number is cut off.

17     Okay.  Sorry.

18               MR. NASTASI:  Mr. Rucher, do

19     you have VRC 17 in front of you?

20               MR. RUCHER:  Yes, sir.

21               MR. NASTASI:  These are

22     questions from the same banks leading

23     up to the Step 2 solvency opinion that

24     VRC provided to Tribune; is that

25     right?

278

1          June 30, 2010

2              MR. RUCHER:  Yes, sir.

3              MR. NASTASI:  Were answers

4      ever provided to the banks by VRC to

5      these questions?

6              MR. RUCHER:  To the best of

7      my recollection, I do not think that

8      we provided specific answers on these

9      or written answers or anything like

10     that.

11             MR. NASTASI:  Did you provide

12     any kind of answers to these questions

13     to the banks either directly or

14     indirectly?

15             MR. RUCHER:  To the best of

16     my knowledge, no, we did not provide

17     any -- any answers.  We definitely

18     read the questions and actually took

19     some of the things into consideration

20     in our analysis, but I don't know if

21     we specifically provided any

22     additional questions.

23             MR. NASTASI:  Answers, you

24     mean.

25             MR. KLEE:  Did you provide

279

1      June 30, 2010

2      any answers to the company to give

3      with respect to these questions?

4           MR. RUCHER:  I know that we

5      discussed them verbally, but I don't

6      know if we provided any -- I'm fairly

7      certain we didn't provide written

8      explanations, but I am quite sure that

9      we discussed -- I'm not quite sure.

10     I'm certain that we discussed these --

11     these questions with the company,

12     because some things we took into

13     account in our analysis.

14          MR. NASTASI:  And were those

15     discussions primarily with Chandler

16     Bigelow again?

17          MR. RUCHER:  I can't recall

18     specifically.  I know that the

19     majority of the conversations that we

20     had, the majority of those

21     conversations that I had were with

22     Chandler Bigelow.

23          MR. NASTASI:  And did anyone

24     from management instruct you not to

25     provide written answers to these

280

1        June 30, 2010

2    questions?

3            MR. RUCHER:  I don't -- I

4    don't recall.  I don't think so.  I

5    think we -- I think we might have

6    discussed whether or not we should

7    provide written responses, but I don't

8    know if anyone instructed us not to

9    provide it.

10           MR. NASTASI:  Did anyone say,

11   hey, we are running out of time, I

12   don't want to go through these

13   exercises anymore, let's not provide

14   answers or something to that effect?

15           MR. RUCHER:  There might have

16   been discussion like that, but I don't

17   recall if we had a conversation.

18           MR. NASTASI:  Did Chandler

19   Bigelow discourage you from providing

20   written answers to these questions?

21           MR. RUCHER:  I don't think

22   so.  I mean, I don't know.  I don't

23   think so.

24           MR. NASTASI:  Mr. Browning,

25   do you recall any answers, verbal or

281

1        June 30, 2010

2    written, being provided to the company

3    in response to these questions that

4    appear in VRC 17?

5            MR. BROWNING:  I think what

6    we did was we got -- we had a call to

7    discuss the issues and whether we felt

8    that we considered these in our

9    analysis, we reflected those.

10           MR. NASTASI:  Who was on the

11   call?

12           MR. BROWNING:  Oh, I don't

13   recall.

14           MR. NASTASI:  Was Morgan

15   Stanley on the call?

16           MR. BROWNING:  No, I don't

17   believe so.

18           MR. NASTASI:  Was the call

19   strictly between folks from management

20   of Tribune and VRC?

21           MR. BROWNING:  And VRC, yeah.

22           MR. NEIER:  Maybe you should

23   ask him whether they ever had any

24   direct communications with the

25   lenders?

282

1          June 30, 2010

2              MR. NASTASI:  Did you ever

3      have any direct communications with

4      the lenders, Mr. Browning?

5              MR. BROWNING:  I don't

6      believe so, no.

7              MR. NASTASI:  No?

8              Mr. Rucher?

9              MR. RUCHER:  No.

10             MR. MONK:  Can I ask a

11     follow-up question about this

12     paragraph two that runs from the

13     bottom of one page to the top of the

14     next page regarding the refi rep?

15             The last sentence there says:

16     "To what extent did VRC consider

17     current market conditions relevant to

18     this analysis?"

19             Did you give consideration to

20     current market conditions?  And by

21     that, I presume -- correct me if I'm

22     wrong, here -- that this is December

23     of 2007, LBO transactions are being

24     busted in the marketplace, there's

25     lots of turmoil, Merrill Lynch has

283

1          June 30, 2010

2     been downgraded, lots of things are

3     starting to happen in the financial

4     press.  I think that's what they are

5     referring to.

6          I first ask the question:  Is

7     that your assumption when you read

8     this, that that's what they were

9     referring to?

10         MR. BROWNING:  I guess what

11    I -- they probably are referring to

12    what was going on in the marketplace

13    with -- with financing in general,

14    debt levels and the credit markets, in

15    general.

16         But I would say to the extent

17    that we're looking at it from a

18    current position, but we're also

19    looking into the future 2014, we --

20    you have to kind of make an

21    assumption -- well, not kind of.  You

22    make an assumption that things will be

23    generally on a normal basis in 2014.

24    And so the transactions that we looked

25    at, under a normal basis, that's where

284

1       June 30, 2010

2    we made the assumption.

3           I don't think it is even

4    relevant to say:  2007, how does that

5    affect 2014?  You have to kind of look

6    at what the normalized market levels

7    or the normalized transaction levels

8    are, where they are going to be as far

9    as their debt levels, their covenant

10   and so forth, and will they have the

11   ability to refinance at that point.  I

12   think that's the answer.

13          MR. KLEE:  That is what I

14   don't understand, because it seems to

15   me you are saying here, 2007

16   conditions are irrelevant to what is

17   going to happen in 2014.  But before,

18   when we looked at the multiples for

19   the comparable transactions, you were

20   relying on those multiples to what you

21   can refinance in 2014 based on similar

22   leverage.  So why is it okay?

23          MR. BROWNING:  Go ahead and

24   say that again?  Are you talking

25   about -- could you ask -- I'm sorry,

285

1       June 30, 2010

2       could you ask it again?  I just want

3       to make sure I understood.

4              MR. KLEE:  It seems to me

5       that you were relying on 2007

6       conditions for some things, but not

7       other things.

8              MR. BROWNING:  Well, I think

9       specifically to the refinancing, we

10      have to consider what -- we are trying

11      to put ourselves in what could be the

12      scenario in 2014, right?  And so you

13      are looking at transactions -- not

14      just from 2007, you are looking at a

15      group of transactions that, for in

16      this industry, what the levels were,

17      the multiples were.  And that's what

18      you are relying on.

19             I mean, it would be -- I

20      guess you could try to look at a

21      longer period or whatever, but we were

22      just asking -- we were asking for that

23      information to support our conclusion.

24      I guess relative to the specific

25      conditions, market conditions relevant

286

1          June 30, 2010

2     to this analysis, the issue there

3     isn't -- they are not refinancing

4     currently in those market conditions.

5     So it's kind of a -- I'm not sure I

6     know even how to necessarily answer it

7     here without -- but -- but the answer,

8     we were aware of the market conditions

9     at the time when we gave the opinion.

10    So it wasn't like that was in a

11    vacuum.

12          MR. KLEE:  Mr. Rucher, do you

13    have anything to add to this?

14          MR. RUCHER:  I agree.

15          The one thing that I will say

16    is some of the things that were taken

17    into account for the current market

18    conditions are valuations or things

19    that you are doing at this particular

20    time.  With the refinancing

21    transactions, you know, the question

22    you have to ask yourself is will the

23    debt markets -- will the things that

24    are impacting the debt market right

25    now, will the debt markets be exactly

287

1          June 30, 2010

2     the same in 2014.  So you have to kind

3     of make some kind of judgment on that.

4          And as I said before, we look

5     at things like current market

6     multiples for the companies.  And

7     those current market multiples were

8     somewhat depressed at that particular

9     time.  And you look out at 2014, and

10    you say, even if the debt multiples

11    were depressed now, in looking out at

12    2014, would there -- after you repaid

13    some of that debt, would there be

14    enough cushion to be able to refinance

15    that debt.

16          Those were some of the things

17    that you have to do.  So some of these

18    things are valuation issues with

19    respect to like the balance sheet

20    test, which you have to take into

21    account current conditions there.  You

22    are absolutely required to take those

23    things into account, because you are

24    doing a balance sheet test of a

25    specific date.  But with the

288

1          June 30, 2010

2     refinancing, the question becomes --

3     you know, you have to make some kind

4     of judgements about what the debt

5     markets will look like in 2014.  So

6     it's almost like a little bit of a

7     crystal ball approach.

8          MR. MONK:  Two follow-up

9     questions, if I could.

10          When you read this, these

11     questions that the banks were -- this

12     first set of follow-up questions that

13     the banks presented, were you

14     concerned that maybe there had been

15     some mistake of communication

16     regarding what Morgan Stanley's

17     position was?  Because they are

18     expressing some skepticism.  They are

19     asking:  Did you actually talk to

20     Morgan Stanley?  Are you sure?  That

21     is the nature of these questions.  Did

22     that run through your mind at all,

23     that maybe there was some sort of

24     communication problem about what

25     Morgan Stanley's position actually

289

1           June 30, 2010

2       was?

3           MR. BROWNING:  I think we

4       felt that what management was telling

5       us that Morgan Stanley said was, in

6       fact, the case.  And so --

7           MR. MONK:  Did you ask

8       management, you know, they are asking

9       about that, maybe I should just talk

10      to Morgan Stanley, would that be all

11      right with you?

12          MR. BROWNING:  Yeah, I don't

13      think we asked that question, but I

14      could be wrong.  I think --

15          MR. MONK:  Do you remember

16      Chandler telling you that you couldn't

17      talk to Morgan Stanley?

18          MR. BROWNING:  No.

19          MR. MONK:  Or anybody else?

20          MR. BROWNING:  I don't think

21      so, but I think the conversation may

22      have been something like, no, that is

23      what they said, or something like

24      that.  I don't know, but I don't

25      recall --

290

1        June 30, 2010

2            MR. NASTASI:  When these

3        questions were discussed, you are

4        saying --

5            MR. BROWNING:  That's right,

6        yeah.  But I don't recall them saying,

7        no, you can't talk to Morgan Stanley.

8            MR. RUCHER:  But the other

9        thing is, once again, we were getting

10       a written representation letter from

11       the company.

12           MR. NASTASI:  Right.  I

13       understand.

14           MR. RUCHER:  So you have to

15       assume that if they are giving you a

16       written representation letter, any

17       reasonable person would assume that

18       that's the truth.

19           MR. MONK:  One more question

20       about this subject.

21           Part of what you were

22       assuming in connection with the

23       refinancability of the company was the

24       debt would have been paid down to

25       lower levels by 2014, correct?

291

1       June 30, 2010

2            MR. BROWNING:  Yes.

3            MR. MONK:  And part of that

4       debt paydown would have been at the

5       consequence of selling assets, in

6       particular, the Cubs and one other

7       significant asset.

8            MR. NASTASI:  Career Builder.

9            MR. BROWNING:  Comcast.

10           MR. MONK:  Comcast, correct?

11           MR. BROWNING:  Yes.

12           MR. MONK:  Did you give

13      consideration to the difficulty in

14      selling those two assets as a

15      consequence of the current market

16      conditions that were attained and

17      existing in December of 2007?

18           In order to sell those

19      assets, they had to be financed.  Did

20      you give consideration to the ability

21      of the marketplace to absorb the debt

22      that would have been associated with

23      selling those assets in December of

24      2007?

25           MR. BROWNING:  Yeah, I think

292

1          June 30, 2010

2     we did.  I mean, I think -- we had

3     lots of discussions regarding the

4     viability of selling those assets.

5     And I believe when the deal closed,

6     they were expecting to still close,

7     sell the Cubs -- and whether it was

8     with Comcast or not.  By the end -- I

9     will say by the end of the first

10    quarter or something like that, it was

11    that expectation.

12            So we did consider that.  We

13    believed that that was the case.

14            MR. RUCHER:  We had

15    indications there was a tremendous

16    amount of interest in those assets.

17    And that there was also even some

18    interest from the state, if I'm not

19    mistaken, of Illinois, to acquire part

20    of Wrigley Field.  That there was a

21    significant amount of interest from

22    multiple parties, and those multiple

23    parties with wherewithal to get those

24    transactions closed.

25            MR. KLEE:  I have a

293

1          June 30, 2010

2     follow-up --

3               MR. NEIER:  Me, too.

4               MR. KLEE:  Then you can do

5     your follow-up.

6               It says here:  "Does VRC know

7     whether Morgan Stanley understands

8     that Tribune is relying upon its

9     view?"

10              What was the answer to that

11    question?  Do you recall?

12              MR. BROWNING:  I think they

13    knew.  I am assuming they knew that we

14    were, because we had their name in the

15    rep.  I believe they did.

16              MR. KLEE:  Did someone from

17    management tell you that, or was that

18    just your belief?

19              MR. BROWNING:  I can't recall

20    that.  It may have been my belief, but

21    they may have said that, as well.

22              MR. KLEE:  Mr. Rucher?

23              MR. RUCHER:  We wouldn't know

24    what Morgan Stanley understood because

25    we never had conversations with Morgan

294

1        June 30, 2010

2    Stanley.

3            MR. KLEE:  But when you saw

4    this question propounded to you by the

5    banks, did you ask management whether

6    Morgan Stanley understood that Tribune

7    is relying on its view?

8            MR. RUCHER:  I don't know, in

9    particular, if we asked that.

10           Once again, we are going back

11   to the rep letter.  Management's

12   providing us with a rep letter, then

13   one would assume -- I think any

14   reasonable person would assume that,

15   you know, since Morgan Stanley was

16   advising the company, that everyone

17   understood that if they were going to

18   provide a rep letter with that in

19   there, that they would be relied upon.

20           MR. NASTASI:  And I

21   understand that if you get a rep

22   letter that has Morgan Stanley's name

23   in it, you assume that Morgan Stanley

24   is aware that their name is being used

25   in that rep letter, right?

295

1        June 30, 2010

2            MR. RUCHER:  I would assume

3        so, or -- I mean, I would assume so

4        because Morgan Stanley was a special

5        advisor to the committee.

6            MR. NASTASI:  Right.  Okay.

7            So let's mark this.

8            (VRC Exhibit 19 was marked

9        for identification, as of this date.)

10           MR. NASTASI:  Mr. Rucher and

11       Mr. Browning, I am presenting you with

12       what has been marked VRC 19.  I

13       believe this is the final rep letter

14       we have been referring to.

15           Mr. Rucher, is that correct?

16           MR. RUCHER:  I think so, sir.

17           MR. NASTASI:  Based upon (i)

18       management's best understanding of the

19       debt and loan capital markets and (ii)

20       management's recent discussions with

21       Morgan Stanley, management believes

22       that it is reasonable and appropriate

23       for VRC to assume that Tribune, in the

24       downside forecast described in the

25       Excel file entitled

296

1       June 30, 2010

2       'model_negotiated_proposal_november21_

3       2007.xls' delivered to VRC via e-mail

4       on November 21, 2007, ('Tribune

5       Downside Forecast'), would be able to

6       refinance (i) any outstanding balances

7       of Term Loan B."

8              And then it continues to

9       describe the debts that could be

10      refinanced.

11             Is that --

12             MR. NEIER:  That mature in

13      2014.

14             MR. NASTASI:  That mature in

15      2014.

16             Do you see that?

17             MR. RUCHER:  Yes, sir.

18             MR. NASTASI:  Did you believe

19      at the time that Morgan Stanley knew

20      that its name was being used in this

21      rep letter?

22             MR. RUCHER:  To be honest

23      with you, I don't know if -- I don't

24      know if I -- if I knew Morgan Stanley

25      knew this or not.  I mean, to be

297

1        June 30, 2010

2    honest with you, I just --

3            MR. NASTASI:  Let me ask it a

4    different way.

5            I have already asked the both

6    of you if you believe the committee

7    would have come out differently if

8    Morgan Stanley simply said:  We can't

9    participate in this discussion.  I am

10   asking a slightly different question.

11           Let me ask you a foundational

12   question:  Both of you received drafts

13   of this rep letter leading up to this;

14   is that right?

15           MR. RUCHER:  Yes.

16           MR. BROWNING:  It's probably

17   likely.

18           MR. NASTASI:  And there are

19   drafts that had Morgan Stanley's name

20   in those drafts as well; is that

21   right?

22           MR. RUCHER:  Yes, sir.  I'm

23   assuming.  I am speculating.

24           MR. NASTASI:  I have the

25   documents I can show you.  In the

298

1           June 30, 2010

2      interest of time, I will make that

3      representation to you.

4           If, before the transaction

5      closed, Morgan Stanley called you up

6      and said, wait a minute, we never had

7      any discussions with management and

8      told them, number one, that it was

9      reasonable to assume they could

10     refinance their debt, we talked about

11     it, we told them we couldn't

12     participate, and, number two, we

13     certainly never gave them permission

14     to put our name in the rep letter.

15     That's different than you learning

16     upfront that they wouldn't

17     participate, because now you have an

18     instance where management is making a

19     representation to you about Morgan

20     Stanley, and later, but before the

21     transactions closes, Morgan Stanley is

22     saying, we never said that;

23     management's telling you this and it's

24     not true.

25           Would you have had to report

299

1          June 30, 2010

2     such a scenario to the committee?

3               MR. RUCHER:  Absolutely, I

4     think so.

5               MR. NASTASI:  And how do you

6     think that would have affected the

7     committee's ability to -- would it

8     give you permission to render a

9     solvency opinion again?

10              MR. RUCHER:  Repeat your

11     statement again.

12              MR. NASTASI:  Let's say,

13     rather than upfront -- my scenario

14     before earlier today was -- the

15     question is:  If Morgan Stanley called

16     you up and said, we understand

17     management is representing they had

18     discussions with us with respect to

19     Tribune's ability to refinance this

20     debt in 2014.  We never had those

21     discussions.  We refuse to have them

22     because we don't do that.  And we

23     never gave permission to have our name

24     in a rep letter.  We understand that

25     they're trying to do that.  We didn't

300

1           June 30, 2010

2    give that permission.

3           What did you do?  What would

4    you have done?

5           MR. RUCHER:  I would be

6    totally speculating.  I don't know

7    what I would have done.

8           MR. NASTASI:  Would you have

9    reported that to the committee of VRC?

10          MR. RUCHER:  Yes.

11          MR. KLEE:  Would you have

12   called Chandler Bigelow?

13          MR. RUCHER:  Yes.

14          MR. KLEE:  Mr. Browning, what

15   would you have done?

16          MR. BROWNING:  Probably both

17   those things.

18          But I would ask the question

19   back, are you saying -- if Morgan

20   Stanley called me up and said that,

21   are you saying that you disagree with

22   that, that you would not provide -- or

23   you do not believe that they could be

24   refinancing?  That would be the

25   question back to them.

301

1       June 30, 2010

2              MR. KLEE:  And they would say

3       we are not in that business, we won't

4       one way or another.

5              MR. NASTASI:  But the

6       difference is you now know that

7       management has done something,

8       according to Morgan Stanley, that was

9       dishonest.

10             MR. KLEE:  Misrepresenting.

11             MR. NASTASI:  That is

12      misrepresenting a discussion and

13      permission to have their name in a rep

14      letter.  That's the difference.

15             Does that difference affect

16      VRC's ability to issue a solvency

17      opinion based on all of the things

18      that VRC is relying on from

19      management?

20             MR. BROWNING:  Well,

21      certainly credibility is important,

22      right?  But, you know, what we knew is

23      what we knew.  And the thing -- the

24      other thing I am saying here,

25      management's recent discussions with

302

1           June 30, 2010

2       Morgan Stanley.  To me, that says

3       exactly what's in my notes.  That's

4       what I'm thinking that means --

5               MR. NASTASI:  Right.

6               MR. BROWNING:  -- is that

7       they said they could refinance this

8       thing in a downside scenario, and that

9       they would give us data to support

10      future refinancing.  That's what I --

11      what I took from those discussions.

12      It wasn't anything more than that.

13              MR. NASTASI:  Okay.

14              MR. KLEE:  The question is:

15      What if, on December 20th, before you

16      delivered the final VRC solvency

17      opinion, you find out that you were

18      lied to?  That, in fact, management

19      told you those things, and you

20      believed them, but that Morgan Stanley

21      never said those things to management,

22      never authorized its name to be used

23      in the rep letter?

24              MR. BROWNING:  I understand.

25      You know, it's a good -- it's a

303

1       June 30, 2010

2     question that I would certainly take

3     that into consideration along with

4     everything else.  And whether we would

5     have been able to render the opinion

6     or not, I don't know.  But we would

7     have taken it to the committee and we

8     would have -- do the other points

9     associated with the refinancing stand

10    on their own merit?  And if we could

11    still write that opinion, I don't

12    know.

13          MR. NEIER:  I have got two

14    follow-up questions, but if you permit

15    me right now?

16          MR. KLEE:  Absolutely.  Go

17    ahead.

18          MR. NASTASI:  Please.

19          MR. NEIER:  There are two

20    ways of interpreting your question, so

21    I think it is better to separate them

22    out.

23          MR. KLEE:  Please.

24          MR. NEIER:  So Bryan, if

25    Morgan Stanley called you up and said

304

1          June 30, 2010

2     they disavowed this letter because

3     they never gave permission for Tribune

4     to mention Morgan Stanley, okay, what

5     would you have done in that case?

6     They just said, we don't want our name

7     in there, we have nothing to do with

8     this, period.

9          Would that have made a

10    difference in whether -- you would

11    bring it to the committee, maybe, but

12    would it have made a difference in

13    your view in issuing the opinion?

14         MR. BROWNING:  If I still

15    believed that Morgan Stanley made

16    those statements without it being in

17    the letter, I would say we would most

18    likely write the opinion.

19         MR. NEIER:  And then if

20    Morgan Stanley called you up and said,

21    we disavow this letter; we never had

22    these discussions with the company.

23    We told the company we wouldn't

24    discuss this subject with the company.

25    Would it have been different?

305

1          June 30, 2010

2               MR. BROWNING:  That's

3      certainly a different -- a different

4      statement.  I don't think --

5               MR. NEIER:  To put it in

6      Ken's words, you were lied to.  It

7      wasn't a question of simply saying, we

8      don't want our name in the letter --

9               MR. BROWNING:  It would be

10     troubling, clearly.

11               MR. NASTASI:  Sitting here

12     today, can you say for certain that

13     under that hypothetical that we have

14     given you, VRC would have been able to

15     issue a solvency opinion?

16               MR. BROWNING:  Again, I would

17     want to see if the -- the other things

18     that we looked at, the other things

19     that were done regarding the

20     refinancing -- I mean, the data is the

21     data.  We received that from them.  It

22     tells what -- it's a -- it's a good

23     point of data.

24               And so we have no -- the fact

25     that we received data from the Morgan

306

1          June 30, 2010

2     Stanley, or at least through Morgan

3     Stanley, gave us the assumption that

4     they did have those discussions,

5     right?  And so we'd have to look at

6     the fact pattern.  And I can't say a

7     hundred percent certain that that

8     would be the only -- it certainly

9     would be something that we would have

10    gone to the committee, discussed

11    seriously, and then decided if we

12    could still render the opinion.

13          MR. RUCHER:  If I may?

14          MR. KLEE:  Go ahead, Mr.

15    Rucher.

16          MR. RUCHER:  One of the

17    things and not just specific to here,

18    but any assignment, if you find a

19    situation where you have been lied to,

20    the question becomes, can you trust,

21    you know -- what can you trust what

22    management has told you?  Because, you

23    know, management knows their business

24    better than we do.  They are in there

25    pulling the levers and making things

307

1      June 30, 2010

2      happen.  So you have to rely upon the

3      veracity of management.  And if you

4      find out that you have been lied to,

5      the question becomes:  What else have

6      you been lied to about?

7           MR. KLEE:  Including,

8      perhaps, the projections?

9           MR. RUCHER:  Well, it raises

10      a question -- I mean, it raises that

11      question.

12           MR. NASTASI:  Without any rep

13      letter at all, whether it looked like

14      VRC 19 or some other version of it,

15      could you have issued your solvency

16      opinion for the second step?

17           MR. BROWNING:  Without a rep

18      letter?

19           MR. NASTASI:  Without any rep

20      letter with regard to the

21      refinancability of the debt?

22           MR. BROWNING:  I think we

23      would have probably -- that's a good

24      question.  I think we probably would

25      have insisted on it.

308

1      June 30, 2010

2           MR. NASTASI:  You believe you

3      needed a rep letter with respect to

4      the refinancability of the debt in

5      2014 in order to issue your solvency

6      opinion.

7           MR. BROWNING:  Yeah, I think

8      so.  I'm not saying for certain that

9      we would not have written it, but we

10     wanted it, clearly.

11          MR. NASTASI:  Do you agree

12     with that, Mr. Rucher?

13          MR. RUCHER:  Yes.  I think we

14     definitely would want it.  When we do

15     these opinions, because we rely so

16     much upon management, we request

17     several different rep letters.  And

18     unless we have assurance for those rep

19     letters that we are going to get those

20     rep letters, we will not typically

21     move forward with the opinion.

22          MR. BROWNING:  But --

23          MR. NASTASI:  Sorry, Mr.

24     Browning?

25          MR. BROWNING:  Go ahead.

309

1       June 30, 2010

2           MR. NASTASI:  Did Tribune

3       management have a specialized

4       understanding of the debt and loan

5       capital markets?

6           MR. BROWNING:  A specialized?

7           MR. NASTASI:  Yes.  Was there

8       something peculiar about Tribune's

9       management that would put them in a

10      position to have a better

11      understanding of the debt and loan

12      capital markets than management of

13      some other public company?

14          MR. RUCHER:  I'll --

15      typically, the management of large

16      companies like this, they are in

17      constant communications with their

18      investment bankers updating them on

19      the capital markets.  So they will

20      tend to be very up to date on what's

21      happening in the capital markets.

22          You have a host of these

23      large investment banks that are out

24      there vying for the business, that are

25      constantly updating management.  They

310

1          June 30, 2010

2     are getting calls from the capital

3     markets desk.  So from my experience,

4     CFOs of these companies are pretty

5     well-informed on what's happening in

6     capital markets.

7          MR. NASTASI:  So now that we

8     have established you likely would have

9     needed a rep letter, we have raised

10    the question as to whether or not

11    Morgan Stanley could have been

12    involved in that at all.

13         So let's look at this rep

14    letter and remove that clause that

15    relates to Morgan Stanley so that it

16    reads:  "Based upon management's best

17    understanding of the debt and loan

18    capital markets, management believes

19    that it is reasonable."

20         So let's assume that that is

21    the rep letter that you get.  Would

22    that be sufficient for -- and I know

23    you are speculating, and you are

24    looking back in time.  But based upon

25    your experience and understanding of

311

1          June 30, 2010

2      the company, Mr. Browning, do you

3      believe you would be able to issue the

4      same solvency opinion with a rep

5      letter that is modified in that way?

6              MR. BROWNING:  I'm going to

7      say I -- what I'm assuming there is

8      that when you say -- its understanding

9      is different than its experience,

10     because I think when you say its

11     experience, they are experts in the

12     capital markets.  We would have

13     assumed that they learned -- just as

14     Chad just said -- that it came from

15     their advisors.

16             MR. NASTASI:  Morgan Stanley?

17             MR. BROWNING:  Well,

18     whomever.  Whomever they were working

19     with, their advisors.  So I am

20     speculating, but I would say we

21     probably would have written the

22     opinion without Morgan Stanley's name

23     specifically in there, but I can't say

24     that for sure.

25             MR. NASTASI:  But in reading

312

1          June 30, 2010

2    this, sitting here today, you even

3    believe that first clause, whether it

4    is Morgan Stanley or some other

5    advisor, would include management

6    conferring with one of its advisors?

7    Is that what you are saying?

8          MR. BROWNING:  Again, it's

9    understanding of the capital markets.

10          MR. NASTASI:  I understand

11    where you are reading, but I want to

12    get your understanding of the rep

13    letter.

14          MR. BROWNING:  Now we're

15    getting real speculation.  I am

16    assuming that -- I don't assume that

17    they are experts in capital markets.

18    I am assuming that they have learned

19    and understand them from their

20    advisors.

21          MR. NASTASI:  Mr. Rucher,

22    same question with respect to whether

23    you think VRC could have issued the

24    solvency opinion with a modified rep

25    letter that takes out that second

313

1              June 30, 2010

2      clause that includes Morgan Stanley's

3      name.

4              MR. RUCHER:  All other things

5      equal, I think yes.

6              MR. KLEE:  I have just two

7      short questions about the board

8      meeting --

9              MR. NASTASI:  I have one

10      more.

11              I show you VRC 18.  These

12      appear to be a third set of questions

13      from the banks.  Really, with respect

14      to both of you, I just want to know

15      whether you either saw those questions

16      or had them conveyed to you?

17              MR. BROWNING:  I think I had

18      seen them subsequent to -- I think I

19      have seen them recently.

20              MR. NASTASI:  Did you see

21      them in and around or prior to issuing

22      your solvency opinion?

23              MR. BROWNING:  I don't

24      believe so.

25              MR. RUCHER:  I -- to the best

314

1           June 30, 2010

2      of my knowledge, I think we saw them

3      before we issued the solvency opinion.

4           MR. BROWNING:  We did?

5           MR. NASTASI:  And were

6      answers provided?

7           MR. RUCHER:  I don't think

8      any answers were provided.

9           MR. KLEE:  Orally or in

10     writing?

11          MR. RUCHER:  We may have

12     discussed this with the company, but I

13     am fairly certain that we didn't

14     provide written answers.

15          MR. NEIER:  You know, these

16     questions are kind of insulting in

17     some way, especially number four, so I

18     don't think there was a great reaction

19     to it.

20          MR. KLEE:  What did you think

21     the banks were doing with these

22     questions?

23          MR. RUCHER:  Want me to take

24     that one?

25          MR. BROWNING:  I suspect that

315

1          June 30, 2010

2     they were -- they were looking at

3     these questions to, number one, make

4     sure that they were -- that the

5     analyses were done correctly.  And,

6     two, they may have had incentive to

7     try to get out of the deal, because

8     they were going to lose some of their

9     value as soon as the transaction

10    closed, because of favorable

11    financing.

12          MR. KLEE:  Did you have any

13    discussions with anybody at the

14    company that the banks were trying to

15    get out of the deal or that they were

16    concerned about the banks not funding?

17          MR. BROWNING:  I would say

18    that there was discussions relating to

19    the banks, but I don't know if I would

20    say getting out of the deal.  I don't

21    think that was -- I think there was

22    some discussion at some point of -- of

23    making some adjustments and so forth,

24    but I don't remember getting out of

25    the deal, no.

316

1          June 30, 2010

2              MR. RUCHER:  I remember one

3      discussion with Chandler, and I don't

4      remember all the details, that there

5      might have been some concern that the

6      banks might not actually fund the

7      transaction.

8              MR. KLEE:  And when would

9      this discussion have taken place?

10             MR. RUCHER:  I think it was

11     the day of closing, the day before

12     closing or something like that.  I do

13     remember having some conversation

14     about that, that the banks might not

15     fund it.

16             MR. NASTASI:  The Examiner

17     has some questions about the

18     December 18th board meeting, and I

19     have marked the minutes from that

20     meeting as VRC 14.

21             MR. KLEE:  Mr. Browning, did

22     you attend the December 18th meeting

23     of the Board of Directors of Tribune

24     Company?

25             MR. BROWNING:  Yes, I believe

317

1          June 30, 2010

2     I did.

3          MR. KLEE:  And, Mr. Rucher,

4     did you attend the December 18th

5     meeting of the Board of Directors?

6          MR. RUCHER:  Yes.

7          MR. KLEE:  And did you stay

8     for the entire meeting?

9          MR. RUCHER:  No.

10          MR. KLEE:  When did you

11    leave?

12          MR. RUCHER:  Well, there was

13    a meeting before I think we had

14    earlier on the 18th, and that was the

15    meeting that they also met with Morgan

16    Stanley before us, which I remember

17    seeing the Morgan Stanley people

18    before the meeting and just

19    introducing ourselves to that extent.

20          And then after the meeting,

21    you know, we may have came and done

22    our presentation and was questioned by

23    the board.  But I think that the board

24    remained after we left.

25          MR. NASTASI:  If I may, let

318

1     June 30, 2010

2     me just give you my understanding of

3     what happened.  It may refresh your

4     recollection.  If it doesn't, that's

5     fine.  If you look at the minutes, I

6     think you can see it as well.

7          It looks like, according to

8     the minutes and others that have

9     spoken with us, that there was a

10    presentation by VRC, that the board

11    then recessed and a Special Committee,

12    which is the board without Mr. Zell

13    and without Mr. FitzSimons at this

14    time.  It was the rest of the board,

15    the independent board, if you will.

16    They meet separately with Morgan

17    Stanley, and discuss VRC's solvency

18    opinion.  They then reconvene the full

19    board, and the full board then

20    approves the merger agreement.  That's

21    what the minutes reflect.

22          So I don't know if that

23    refreshes your recollection as --

24          MR. RUCHER:  Well, I know

25    that there was a separate meeting with

319

1         June 30, 2010

2    Morgan Stanley.  It was Paul Taubman

3    and another gentleman.

4              MR. KLEE:  And your

5    recollection is it was before the

6    board meeting?

7              MR. RUCHER:  I don't know if

8    it was before the board meeting or

9    before we went in or after.  But I do

10   remember separately that Paul Taubman

11   and another gentleman went into this

12   Special Committee meeting room where

13   we weren't present.

14             MR. KLEE:  And you met with

15   the board after that?

16             MR. RUCHER:  I don't know if

17   we met with the board after that,

18   separately or not.  I just don't

19   recall all of the details.  But I do

20   know that we had a meeting with the

21   board and they -- and they wanted to

22   question us separately to make sure

23   that we were -- that we had gotten

24   everything we needed from management,

25   that we were not unduly influenced by

320

1         June 30, 2010

2    management.

3              MR. KLEE:  Was that done in

4    an executive session of the board?

5              MR. RUCHER:  I don't know,

6    sir.

7              MR. KLEE:  How long, if you

8    can remember, did the Special

9    Committee meeting take?  How long were

10   they in that meeting while you were

11   waiting?

12             MR. RUCHER:  I don't recall,

13   sir.

14             MR. KLEE:  Do you recall?

15             MR. BROWNING:  I don't

16   recall.  I recall giving our

17   presentation, and then I don't know

18   about the Special Committee.

19             MR. KLEE:  When you gave your

20   presentation, was it to the entire

21   board, or was it to a more select

22   group?

23             MR. BROWNING:  I want to say

24   this was the entire board, but I could

25   be wrong on that.

321

1        June 30, 2010

2            MR. NASTASI:  Was Sam Zell

3    there?

4            MR. BROWNING:  I think he was

5    there by -- by phone, if I'm not

6    mistaken.

7            You know, there were three --

8    I think there were three board

9    meetings where we gave presentations,

10   so I'm not sure which one Sam -- I

11   mean, which one he was personally

12   there for or not.

13           MR. KLEE:  If you look at

14   page 3 of VRC 14, you will see there

15   is a paragraph that says, "Solvency

16   Presentations."  And it says:  Messrs.

17   Browning and Rucher of VRC next

18   reviewed its solvency analysis with

19   the Board."

20           Does that refresh your

21   recollection that on December 18th

22   you, in fact, reviewed your solvency

23   analysis with the board?

24           MR. BROWNING:  Yes.

25           MR. KLEE:  It also says that:

322

1          June 30, 2010

2     "Management confirmed its belief that

3     VRC's analysis and the underlying

4     assumptions and projections are

5     reasonable, if not conservative."

6          Do you remember management

7     saying that your projections were

8     reasonable, if not conservative?

9          MR. BROWNING:  In this

10     meeting?

11          MR. KLEE:  Yes.

12          MR. BROWNING:  No.

13          MR. KLEE:  Do you remember

14     that, Mr. Rucher?

15          MR. RUCHER:  I don't recall.

16     I don't recall that, sir.

17          MR. BROWNING:  I think --

18     what I remember is us giving the

19     presentation.  I don't remember

20     management giving any kind of

21     commentary about our presentation.

22     They thanked us for giving it.  And

23     that's what I recall.

24          MR. MONK:  And did the board

25     ask you questions --

323

1    June 30, 2010

2              MR. BROWNING:  Yes.

3              MR. MONK:  -- during your

4    presentation?

5              MR. BROWNING:  Yes.

6              MR. MONK:  And it was over,

7    they said thank you very much,

8    gentlemen, you can leave, and you left

9    after your presentation was over?

10             MR. BROWNING:  I think that's

11   right.

12             MR. KLEE:  And did you, in

13   fact, confirm your opinion that your

14   solvency opinion was a result of your

15   independent professional advice

16   without improper influence of

17   management?

18             MR. BROWNING:  Yes.

19             MR. RUCHER:  Yes.

20             MR. KLEE:  It then says at

21   the bottom of that paragraph:

22   "Thereupon, the Board recessed and the

23   Special Committee met with its counsel

24   and financial advisors."

25             Does that refresh your

324

1          June 30, 2010

2     recollection that the meeting of the

3     Special Committee was after your

4     presentation, or do you still not

5     recall, which is okay?

6          MR. RUCHER:  I don't recall

7     if we went in there first or after.

8     All I know is that this Special

9     Committee had a separate meeting.  We

10    saw them go in there with -- like I

11    said, Paul Taubman and I don't know

12    the other gentleman.  And I just can't

13    recall whether they did it before our

14    presentation or after.

15         MR. KLEE:  That is fair.

16         And you don't remember how

17    long they were in there?

18         MR. RUCHER:  No, sir, I don't

19    know exactly.

20         MR. KLEE:  Mr. Browning?

21         MR. BROWNING:  No, I don't

22    think so.

23         MR. KLEE:  Meaning you don't

24    recall?

25         MR. BROWNING:  No, I don't

325

1          June 30, 2010

2    recall.

3              MR. NEIER:  Or even if they

4    were asked to stay around.

5              MR. BROWNING:  We weren't

6    asked to stay around, so we wouldn't

7    have known.

8              MR. MONK:  So you left?

9              MR. BROWNING:  I think so.

10             MR. RUCHER:  But I do think

11   that the reason they were meeting with

12   the Special Committee was to talk

13   about whether or not Morgan Stanley --

14   you know, what Morgan Stanley thought

15   about our analysis.  That's my

16   assumption of why those two gentlemen

17   were there.

18             MR. KLEE:  So you weren't

19   there, then, for the final vote to go

20   ahead and approve the merger in

21   reliance and good faith upon your

22   opinion?

23             MR. BROWNING:  I don't

24   believe so.

25             MR. KLEE:  Mr. Rucher?

326

1          June 30, 2010

2              MR. RUCHER:  I don't recall,

3      sir.  I don't recall.

4              MR. KLEE:  Go ahead.

5              MR. MONK:  No, I think that

6      was my question.

7              MR. KLEE:  I have no further

8      questions.

9              MR. NASTASI:  I have no

10     further questions.

11             MR. NEIER:  I only have one

12     follow-up question to this refinancing

13     thing.

14             Do you have VRC 12 in front

15     of you, your handwritten notes, Bryan?

16             MR. BROWNING:  Yes.

17             MR. NEIER:  So if you can

18     look at the back side of VRC 12, that

19     is the one stamped VRC 0025807.

20             MR. BROWNING:  Mm-hm.

21             MR. NEIER:  You say:

22     "Tribune also looked at the fact that

23     three years after the guaranteed debt

24     comes due.  It will --".  And then I

25     can't read the rest.

327

1          June 30, 2010

2               Can you read the rest at the

3     top of the page?

4               MR. NASTASI:  "The lenders"?

5               MR. MONK:  "The lenders"?

6               MR. BROWNING:  Yeah.  "The

7     lenders will be most likely

8     considering the S Corp's structure and

9     the significant benefit of waiting

10    three more years."

11              MR. NEIER:  What are you

12    talking about there?

13              MR. BROWNING:  What I am

14    talking about there is under the S Corp ta41

15    structure, at a certain point in time,

16    like ten years -- I believe it is ten

17    years out, they will no longer have to

18    pay a tax on the sale of an asset,

19    there will not be a capital gain tax

20    on the sale of assets.  And one of the

21    beliefs that management had is that

22    the lenders would be very interested

23    in refinancing in order to get those

24    cash flow benefits later on for three

25    or four years later after -- after the

328

1          June 30, 2010

2     2014.

3              MR. NEIER:  So the debt

4     closes at 2007.  There has to be a

5     refinancing in 2014.  Then three years

6     after that is 2017 --

7              MR. BROWNING:  Right.

8              MR. NEIER:  -- ten years

9     after?

10             MR. BROWNING:  Right.

11             MR. NEIER:  And so the

12    lenders would have an incentive to

13    refinance to get to 2017 for some

14    reason?

15             MR. BROWNING:  Yes.

16             MR. NEIER:  Because?

17             MR. BROWNING:  Because he

18    don't have to pay the tax on the sale

19    of assets.

20             MR. KLEE:  Because Tribune?

21             MR. NEIER:  Because Tribune

22    would not have to pay the tax?

23             MR. BROWNING:  That's right.

24    That's correct.

25             MR. NEIER:  And if Tribune

329

1        June 30, 2010

2     does not have to pay the tax, why does

3     that make refinancing a more likely

4     scenario in your view?

5          MR. BROWNING:  It frees up

6     cash flow in order to support the

7     repayment of debt, of course.

8          MR. RUCHER:  Some of these

9     assets had very -- Tribune's been

10    around for a long time.  Some of these

11    assets have very low tax basis.  So at

12    that point, it would be reasonable to

13    assume we will get you over this hump

14    because we can sell these things and

15    not have to pay the capital sales tax.

16          MR. KLEE:  Due to the stepped

17    up basis?

18          MR. RUCHER:  Yes.  Or -- I

19    don't know if it was a stepped up

20    basis, but elimination of that capital

21    gains tax.

22          MR. BROWNING:  The conversion

23    from C to S, and the embedded capital

24    gains, embedded basis.

25          MR. KLEE:  I don't think we

330

1          June 30, 2010

2      can leave the record with a tax

3      question at the end.

4          So Nick?

5          MR. NASTASI:  At any time

6      throughout your work for Tribune

7      Company and given what you have

8      learned about Tribune to date, do you

9      have reason to believe that Tribune's

10     projections that were provided to VRC

11     in connection with VRC's work in

12     issuing both solvency opinions were

13     unreasonable at the time?

14         MR. BROWNING:  I believe at

15     the time that -- and, frankly, I still

16     believe this now, is that management

17     was giving us what they believed were

18     their forecasts what they believed

19     could be achieved.  I don't believe

20     there was any attempt -- at least in

21     my opinion -- and, you know, we are

22     paid to look at management or look at

23     companies that give us that to discern

24     whether or not these things are right

25     or not.  And discern if somebody is

331

1        June 30, 2010

2    telling us a story or not.  And at the

3    time, I believe that they thought

4    those forecasts were achievable and I

5    do believe that they thought they were

6    conservative.  But -- and so -- and so

7    no, I think they were reasonable.

8            MR. NASTASI:  And you believe

9    that sitting here today, too --

10           MR. BROWNING:  Yes.

11           MR. NASTASI:  -- that they

12   believed that back then?

13           MR. BROWNING:  Yes.

14           MR. NASTASI:  Mr. Rucher?

15           MR. RUCHER:  I think at the

16   time that management was giving, us

17   based upon everything that was

18   represented to us and our discussions

19   with management, they were giving us

20   their best indication at the time.

21           That question is a little bit

22   difficult to answer because since that

23   time, we have had some intervening

24   events with the credit crises that no

25   one, I think, could have anticipated.

332

1        June 30, 2010

2        And once the credit crisis happened, I

3        believe, without government

4        intervention, probably every major

5        company in the country would have

6        failed in the interim.

7            If you look at the newspaper

8        industry, many companies that did not

9        even do deals, they were harmed by the

10       credit crisis.  You had automobile

11       dealers which were a significant piece

12       of the overall advertising market.

13           And, particularly, with the

14       advertising market, you have two sets

15       of advertisers.  One, you have your

16       foreign car manufactures, and then you

17       have the U.S.  The newspapers are more

18       dependant upon the U.S. automobile

19       dealers.  And at the point when the

20       credit crisis happened, when they

21       couldn't finance cars, why would they

22       be advertising for people to come

23       there and get a loan?  They are going

24       to come there, but you can't finance

25       them.  The best thing is to conserve

333

1          June 30, 2010

2     cash.

3               I call that the hundred-year

4     flood.  And I think without government

5     intervention, I think all of us would

6     be in pretty bad shape right about

7     now.  And I think it particularly hurt

8     the newspaper industry.

9               At the time we did the

10    opinion, the real estate market was

11    being hurt.  We had taken that into

12    consideration.  But I don't think

13    anyone would have ever thought there

14    would have been a situation where you

15    could have had a Merrill Lynch, Morgan

16    Stanley, Goldman Sachs, almost every

17    major financial firm in the country on

18    the verge of bankruptcy.

19              MR. KLEE:  Let me ask you a

20    question:  In your long history of

21    doing solvency opinions -- we will do

22    Mr. Browning, first -- you have done

23    100 to 150 solvency opinions, how many

24    times have you or your firm been

25    engaged where you have been asked to

334

1          June 30, 2010

2     render a solvency opinion where you

3     have been unable to give one?

4          MR. BROWNING:  I don't know.

5     I would say a handful, something like

6     that.

7          But -- and that needs

8     explanation, because often, if we get

9     named, it is because we have already

10    done preliminary work to say that we

11    think we can get there before we start

12    it.  And so -- and we have had to have

13    them make changes.  We have had to

14    have them -- we've turned them down.

15    We've -- but, I'd say a handful.

16          MR. KLEE:  How about for you,

17    Mr. Rucher?

18          MR. RUCHER:  With me,

19    typically, it will be either a

20    turndown of opinion, we won't take the

21    opinion on in the beginning because we

22    said we don't think it is solvent.  Or

23    we will ask for changes.

24          With respect to being engaged

25    to deliver a solvency opinion where we

335

1              June 30, 2010

2         have not been able to deliver one,

3         I've had one instance where we were

4         engaged by a company.  And once we got

5         through and we did the analysis, we

6         told them the company was not solvent

7         and couldn't go forward.  But we never

8         issued an opinion.  We simply just did

9         not go forward.

10             MR. KLEE:  Sort of like when

11        they ask you to be an expert and you

12        can't give them what you want to hear?

13             MR. BROWNING:  Right.

14        Exactly.  Turn those down, too.

15             MR. KLEE:  Nick, did you have

16        anything?

17             MR. NASTASI:  Nothing.  I

18        think you did it perfectly.

19

20             [Continued on the next page to

21        allow for signature line and jurat.]

22

23

24

25

336

1          June 30, 2010
2              MR. KLEE:  Gentlemen, thank
3      you so much.  We really appreciate
4      your time here and your testimony.  It
5      is valuable to our investigation.
6      Thank you.
7              [TIME NOTED:  7:57 p.m.]
8
9

_____
10   MOSES RUCHER
              _____
11            Subscribed and sworn to
              before me this _____
12            day of _____,
              2010.
13
              _____
14            Notary Public
15
16
_____
17   BRYAN BROWNING
              _____
18            Subscribed and sworn to
19            before me this _____
              day of _____,
20            2010.
21            _____
              Notary Public
22
23
24
25

337

1       June 30, 2010
2         E X H I B I T S
3

VRC            DESCRIPTION              PAGE
4
Exhibit 1    VRC 0060918-0060948     14
5
Exhibit 2    VRC 0038660-0038708     19
6
Exhibit 3    VRC 0000008-0000054     70
7
Exhibit 4    VRC 0027037-0027092     107
8
Exhibit 5    VRC 0060865-0060917     136
9
Exhibit 6    VRC 0007070             136
10
Exhibit 7    VRC 0027364             202
11
Exhibit 8    TRB 0448465             202
12
Exhibit 9    MS_93539                202
13
Exhibit 10   TRB 071578              202
14
Exhibit 11   MS_97062                202
15
Exhibit 12   VRC 0025806-0025807     202
16
Exhibit 13   VRC 0025484-0025486     202
17
Exhibit 14   TRB 0415683-0415686     202
18
Exhibit 15   VRC 0109238-0109259     202
19
Exhibit 16   TRB 0274988-0398577     273
20
Exhibit 17   VRC 0070611-0070613     273
21
Exhibit 18   TRB 0288269             273
22
Exhibit 19   TRB 0450706             294
23
24
25

338

1

2                    CERTIFICATION

3                    I, JAMIE ANN STANTON, a

4   Notary Public, do here hereby certify

5   that the foregoing witnesses, MOSE RUCHER

6   and BRYAN BROWNING, were duly sworn on

7   the date indicated, and that the

8   foregoing is a true and accurate

9   transcription of my stenographic notes.

10                   I further certify that I am

11  not employed by nor related to any

12  parties to this action.

13

14

15  _____

16    JAMIE ANN STANTON

17

              *     *     *

18

19

20

21

22

23

24

25

339

1                    **ERRATA SHEET**
                **VERITEXT REPORTING COMPANY**
2                     **1-800-727-6396**
3    200 OLD COUNTRY ROAD              1250 BROADWAY
     MINEOLA, NEW YORK 11501           NEW YORK, NEW YORK 10018
4
     NAME OF CASE:  In re:  Tribune Company, et al.
5    DATE OF DEPOSITION:  June 30, 2010
     NAME OF INTERVIEWEES:  MOSE RUCHER and BRYAN BROWNING
6
     PAGE LINE (S)          CHANGE              REASON
7
     ___/ ____/ _____/_____
8
     ___/ ____/ _____/_____
9
     ___/ ____/ _____/_____
10
     ___/ ____/ _____/_____
11
     ___/ ____/ _____/_____
12
     ___/ ____/ _____/_____
13
     ___/ ____/ _____/_____
14
     ___/ ____/ _____/_____
15
     ___/ ____/ _____/_____
16
     ___/ ____/ _____/_____
17
     ___/ ____/ _____/_____
18
     ___/ ____/ _____/_____
19
     ___/ ____/ _____/_____
20
21
22   _____        _____
     MOSE RUCHER                BRYAN BROWNING
23
     SUBSCRIBED AND SWORN TO BEFORE ME
24   THIS _____ DAY OF _____, 20__.
25   _____        _____