## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Related to Dkt. No. 7517** |

## DEBTORS' MEMORANDUM OF LAW IN OPPOSITION TO THE NOTEHOLDER PLAN PROPONENTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INFORMATION BASED ON THE CRIME-FRAUD EXCEPTION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.    THE MOTION DOES NOT SEEK EVIDENCE THAT IS RELEVANT TO THE
      CONFIRMATION HEARING. ................................................................................ 2

II.   THE NOTEHOLDER PLAN PROPONENTS HAVE NOT SATISFIED THE
      ELEMENTS OF CRIME-FRAUD EXCEPTION. ................................................... 3

      A.    The Noteholder Plan Proponents Misstate the Standard for Determining
            Whether Conduct Constitutes a "Crime" or "Fraud" Within the Meaning of
            the Crime-Fraud Exception. ....................................................................... 5

      B.    The Examiner's Opinions and Report Do Not Establish the Existence of a
            "Fraud." ...................................................................................................... 6

            1.    The Examiner's Opinions Regarding The Ten-Year Projections
                  Contained in the October 2007 Revised Forecast Do Not Establish A
                  "Fraud." ............................................................................................ 8

            2.    The Examiner's Opinions Regarding the 2014 Refinancing
                  Representation Do Not Establish A "Fraud." .................................. 10

      C.    The Noteholder Plan Proponents Fail To Satisfy the "In Furtherance"
            Element. ..................................................................................................... 14

III.  THE NOTEHOLDER PLAN PROPONENTS SEEK TO USE THE STIPULATION
      FOR IMPROPER PURPOSES. ............................................................................... 17

CONCLUSION ............................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Haines v. Liggett Group Inc.,*
    975 F.2d 81 (3d Cir. 1992)..................................................................................4

*In re Andrews,*
    186 B.R. 219 (Bankr. E.D. Va. 1995).................................................................6

*In re Economou,*
    362 B.R. 893 (Bankr. N.D. Ill. 2007) ................................................................6

*In re Enron Corp.,*
    349 B.R. 115 (Bankr. S.D.N.Y. 2006)............................................................6, 8

*In re Grand Jury Investigation,*
    445 F.3d 266 (3d Cir. 2006)..........................................................3, 4, 15

*In re Grand Jury Subpoena,*
    223 F.3d ........................................................................................4, 14, 16

*In re Grand Jury Subpoena,*
    419 F.3d 329 (5th Cir. 2005) ...........................................................................17

*In re MarketXT Holdings Corp.,*
    No. 04-12078, 2009 WL 7216076 (Bankr. S.D.N.Y. Mar. 4, 2009) ...........6, 16, 17

*In re OODC, LLC,*
    321 B.R. 128 (D. Del. 2005)..............................................................................7

*In re Sealed Case,*
    754 F.2d 395 (D.C. Cir. 1985) .........................................................................15

*In re Subpoena Duces Tecum,*
    798 F.2d 32 (2d Cir. 1986)...............................................................................15

*In re Warner,*
    87 B.R. 199,201 (Bankr. M.D. Fla. 1988) ........................................................6

*Kupitz v. Wolf,*
    845 F.2d 842 (9th Cir. 1988) .............................................................................7

*nVidia Corp. v. U.S. Bankruptcy Court for the Northern Dist. of Calif.,*
    No. C 06-MC-80195, 2006 WL 3734297 (N.D. Cal. Dec. 15, 2006) ................4, 16

*Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman,*
    342 B.R. 416 (S.D.N.Y. 2006)....................................................................4, 16, 17

*Prudential Ins. Co. of America v. Massaro,*
   No. 97-2022, 2000 WL 1176541 (D.N.J. Aug, 11, 2000) ......................................15

*Robinson v. Countrywide Home Loans, Inc.,*
   No. 08-1563, 2010 WL 4737816 (W.D. Pa. Nov. 10, 2010)...................................4, 5, 14, 16

*S.E.C. v. Teo,*
   No. 04-1815, 2009 WL 1684467 (D.N.J. June 12, 2009).......................................15

*U.S. v. Doe,*
   429 F.3d 450 (3d Cir. 2005)...............................................................................4, 5

*United States v. Gleneagles Inv. Co.,*
   565 F. Supp. 556 (M.D. Pa. 1983), *aff'd in pertinent part sub nom., United States v.*
   *Tabor Court Realty Co.,* 803 F.2d 1288 (3rd Cir. 1986) ............................................7

*United States v. Zolin,*
   491 U.S. 554 (1989).......................................................................................3, 5, 16

*Upjohn Co. v. United States,*
   449 U.S. 383 (1981).........................................................................................3

*Voest-Alpine Trading USA Corporation v. Vantage Steel Corporation,*
   919 F.2d 206 (3rd Cir. 1990) ...............................................................................7

*Ward v. Succession of Freeman,*
   854 F.2d 780 (5th Cir. 1988) ...............................................................................7

## STATUTES

Section 548(a)(1)(A) of the Bankruptcy Code...............................................................5

Debtors respectfully submit this Memorandum of Law in Opposition to the Noteholder Plan Proponents' Motion To Compel Production Of Documents And Information Based On The Crime-Fraud Exception ("Motion"). For the reasons set forth below, the Motion should be denied.

## INTRODUCTION

The Noteholder Plan Proponents' attempt to invade the Debtors' attorney-client privilege under the guise of the "crime-fraud" exception is nothing more than a sideshow, calculated not to obtain relevant evidence but instead to provide yet another platform for Aurelius and its co-Plan Proponents to cast aspersions on Debtors and their Directors and Officers. The Noteholder Plan Proponents make no effort to identify any privileged communications that were purportedly "in furtherance" of any crime or fraud. Instead, they use their Motion as an opportunity to characterize – inaccurately – the opinions of the Examiner, Kenneth N. Klee, which they wrongly claim provide "overwhelming" evidence to support application of the crime-fraud exception here. (Noteholder Mem. at 2, 7). Moreover, in direct contravention of Third Circuit caselaw, the Noteholder Plan Proponents also seek a wholesale application of the crime-fraud exception to virtually all attorney-client communications in connection with Step Two of the LBO Transaction. The Noteholder Plan Proponents cite no authority for such a wholesale derogation of the privilege.

As described below, the evidence that the Noteholder Plan Proponents seek to elicit has little or no bearing on the upcoming confirmation hearing, and the Motion should be denied on this ground alone. Moreover, the Noteholder Plan Proponents misstate both the legal standard to be applied, and the nature of the "evidence" that purportedly supports the Motion. As to the law, given the fundamental nature of the attorney-client privilege, the Third Circuit has long held that the crime-fraud exception is to be narrowly construed. And the concept of "fraud" has a specific

meaning in this context – it requires a showing of a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment. The Noteholder Plan Proponents do not meet their burden of establishing these elements. Instead, they overstate and mischaracterize the Examiner's opinions, and the record on which those opinions were purportedly based. For instance, there is simply no evidence that the Tribune Board of Directors or Special Committee engaged in any wrongful conduct, and the Examiner went out of his way to make clear he was not suggesting otherwise. Likewise, the record does not suggest that any of the purported misstatements by certain Tribune Officers were material or that any party relied upon them to their detriment. Indeed, there is substantial doubt as to whether there were any misstatements at all.

The Noteholder Plan Proponents also do not point to any legal communications that were purportedly provided "in furtherance" of the alleged "fraud." Nor do they offer any justification whatsoever for applying the crime-fraud exception to *all* privileged communications involving Step Two of the LBO Transaction, regardless of whether those communications related to any purportedly "fraudulent" aspect, as the Noteholder Plan Proponents appear to be advocating. Finally, the Noteholder Plan Proponents seek to misuse the Stipulation between the parties regarding the use of the Examiner's Report, and they misconstrue the significance of the Debtors' stipulations.

The Motion should be denied.

## ARGUMENT

## I.    THE MOTION DOES NOT SEEK EVIDENCE THAT IS RELEVANT TO THE CONFIRMATION HEARING.

As a preliminary matter, and to put the Motion into proper context, there is a threshold question as to whether any of the privileged communications sought by the Motion would be

relevant to the matters that must be determined at the March 7, 2011 Confirmation Hearing. No

potential claims against Debtors' Directors, Officers or employees, claims against Debtors'

former shareholders, or claims against Debtors' advisors, including VRC, Merrill Lynch, Citi

and Morgan Stanley, are being compromised under *any* of the Plans. Instead, such claims are

being placed into litigation trusts and will prosecuted at some point in the future. To be sure, the

Debtors/Committee/Lender Plan does provide for a compromise of potential claims against the

Lenders in connection with Step Two. But even under the Examiner's analysis, these Lenders

face far greater exposure under theories of constructive, rather than intentional, fraudulent

conveyance. As such, any *additional* exposure to the Lenders as a result of a potential finding of

intentional, rather than constructive, fraudulent conveyance would likely be marginal. In short,

although the Debtors vigorously oppose the Motion for all of the reasons discussed below, this is

an issue best left for another day. The Motion should therefore be denied on this ground alone.

## II.    THE NOTEHOLDER PLAN PROPONENTS HAVE NOT SATISFIED THE ELEMENTS OF CRIME-FRAUD EXCEPTION.

Should the Court nevertheless decide to resolve the Motion on its merits, it should

likewise be denied. The Supreme Court has described the attorney-client privilege as the "oldest

of the privileges for confidential communications known." *Upjohn Co. v. United States,* 449

U.S. 383, 397, 389 (1981). "[C]ourts long have viewed [the privilege's] central concern as one

`to encourage full and frank communication between attorneys and their clients and there by

promote broader public interests in the observance of law and administration of justice.'" *United*

*States v. Zolin,* 491 U.S. 554, 562 (1989) (quoting *Upjohn,* 449 U.S. at 389).

In light of the importance of the privilege, the Third Circuit has long emphasized the

limited nature of the crime-fraud exception, which applies "only when the legal advice 'gives

direction for the commission of future fraud or crime.'" *In re Grand Jury Subpoena,* 223 F.3d,

3

213, 217 (3d Cir. 2000) (*quoting Haines v. Liggett Group Inc.*, 975 F.2d 81, 90 (3d Cir. 1992);

*see also In re Grand Jury Investigation*, 445 F.3d 266, 274 (3d Cir. 2006). As the Third Circuit

has explained, documents and other communications within the scope of the attorney-client

privilege "are 'zealously protected,'" *Haines,* 975 F.2d at 90 (*quoting* 8 Charles Alan Wright &

Arthur R. Miller, Federal Practice and Procedure § 2017 (3rd ed. 1970)), and courts must weigh

the desire to prevent serious abuses against the protection of the "ancient and valuable privilege"

between attorney and client. *See U.S. v. Doe*, 429 F.3d 450, 453 (3d Cir. 2005). Given these

core principles, courts in this Circuit and elsewhere have therefore stressed that the exception is

to be narrowly construed and applied. *See, e.g., Robinson v. Countrywide Home Loans, Inc.*, No.

08-1563, 2010 WL 4737816, at *3 (W.D. Pa. Nov. 16, 2010) ("the crime-fraud exception is

limited, with a 'precise focus'") (citation omitted); *see also nVidia Corp. v. U.S. Bankruptcy

Court for the Northern Dist. of Calif.*, No. C 06-MC-80195, 2006 WL 3734297, at *6 (N.D. Cal.

Dec. 15, 2006) (crime-fraud exception is "very limited.") (quotation marks and citation omitted);

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416, 427

(S.D.N.Y. 2006) (describing crime-fraud as a "limited exception.").

It is also clear that in invoking the crime-fraud exception, the burden is on the party

seeking to invade the privilege to establish two elements: "(1) the client was committing or

intending to commit a fraud or crime, and (2) the attorney-client communications were in

furtherance of that alleged crime or fraud." *In re Grand Jury Subpoena*, 223 F.3d at 217

(internal citations omitted). In addition, there must be a close relationship between the alleged

crime or fraud and the legal advice sought. *See, e.g., Robinson,* 2010 WL 4737816, at *3. As

the Third Circuit has explained, "[o]nly when a client knowingly seeks legal counsel to further a

continuing or future crime does the crime-fraud exception apply." *Doe,* 429 F.3d at 454; *see also*

*Zolin*, 491 U.S. at 563 (attorney-client privilege does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime) (quotation marks and citation omitted). The Noteholder Plan Proponents plainly do not satisfy either element.

A.    **The Noteholder Plan Proponents Misstate the Standard for Determining Whether Conduct Constitutes a "Crime" or "Fraud" Within the Meaning of the Crime-Fraud Exception.**

The Noteholder Plan Proponents do not (and cannot) contend that the Examiner's Report suggests that any crime was committed, or that any party in this case sought legal advice for purposes of committing a crime. Instead, the Noteholder Plan Proponents seek to invoke the "fraud" portion of the "crime-fraud" exception, relying on the Examiner's opinion that it was "somewhat likely" that Step Two constituted an "intentional fraudulent conveyance" under Section 548(a)(1)(A) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(A).

But as the Examiner recognized, despite its title, a "fraudulent conveyance" under Section 548(a)(1)(A) encompasses a wide variety of conduct, not all of which constitutes "fraud" in the traditional sense. *See* Report of Kenneth N. Klee, Vol. II, at 15 ("Examiner Report") ("The three forms of intent that a transferor may demonstrate [to prove an intentional fraudulent transfer]—hinder, delay, or defraud—are disjunctive such that satisfaction of any one is sufficient to render the transaction avoidable.") (attached as Attachment A to Declaration of James W. Ducayet). This Court, too, has suggested that the phrase "fraudulent conveyance" has long broadly referred to actions that may not constitute "fraud" as that concept is commonly understood. *See* Transcript of Hearing at 51-52, *In re Tribune Co.* (July 29, 2010) [Dkt. No. 5241].[2]

---

[2] The Noteholder Plan Proponents' own cases illustrate the kind of egregious conduct that must be established for this exception to apply. *See, e.g., In re MarketXT Holdings Corp.*, No. 04-12078, 2009 WL 7216076, at *4 (Bankr. S.D.N.Y. Mar. 4, 2009) (finding "blatant" fraud in the form of falsified transaction documents, which the Court noted "may also be a crime") (cited at Noteholder Mem. at 4, 7);

As such, for purposes of analyzing the crime-fraud exception to the attorney-client privilege, the Court may not simply rely on labels. Instead, the Court must closely scrutinize the evidence to determine whether the Noteholder Plan Proponents have satisfied their burden of showing the existence of "fraudulent" conduct, *i.e.*, "a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *In re Enron Corp.*, 349 B.R. 115, 127 (Bankr. S.D.N.Y. 2006) (quoting Black's Law Dictionary 670 (7th ed. 1999)) (*cited* at Noteholder Mem. at 5). As discussed below, the Noteholder Plan Proponents have not carried this burden, particularly the requirement that that the misrepresented fact "induce another to act to his or her detriment."

**B.    The Examiner's Opinions and Report Do Not Establish the Existence of a "Fraud."**

In support of the Motion, the Noteholder Plan Proponents rely almost exclusively on the Examiner Report. However, that is not sufficient to satisfy the Noteholder Plan Proponents' burden of establishing each of the elements of a fraud, much less provide the "overwhelming" evidence they claim. In this regard, it is noteworthy that the Examiner acknowledged that his theory of intentional fraudulent conveyance is significantly different than the typical case. (*See* Examiner Report, Vol. II, 76) ("The Examiner recognizes that the facts adduced in the Investigation to not fit the ordinary patterns of an intentional fraudulent transfer."). And indeed, most reported cases of intentional fraudulent conveyance in the LBO context involve egregious

---

*In re Economou*, 362 B.R. 893, 898 (Bankr. N.D. Ill. 2007) (exception applied based on undisputed evidence that counsel assisted the improper transfer of assets) (cited at Noteholder Mem. at 5); *In re Andrews*, 186 B.R. 219, 221-24 (Bankr. E.D. Va. 1995) (attorney consulted on three fraudulent transfers made within a year of bankruptcy, one coming a month after large judgments were entered against the debtor and another immediately after the Court refused to set the judgments aside) (cited at Noteholder Mem. at 5); *In re Warner*, 87 B.R. 199,201 (Bankr. M.D. Fla. 1988) (undisputed evidence that debtor transferred millions of dollars from attorney's trust account to him and his family) (cited at Noteholder Mem. at 5, 6).

fact patterns from which it was obvious that the purpose of the transaction was to defraud creditors. *See, e.g., Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990); *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 573 (M.D. Pa. 1983), *aff'd in pertinent part sub nom., United States v. Tabor Court Realty Co.*, 803 F.2d 1288 (3d Cir. 1986); *In re OODC, LLC*, 321 B.R. 128 (D. Del. 2005). *See also Kupitz v. Wolf*, 845 F.2d 842, 847 (9th Cir. 1988). As the Examiner's comment acknowledges, these cases simply bear no resemblance to the situation here.

The Noteholder Plan Proponents also significantly exaggerate and misstate the Examiner's opinions, and ignore the Examiner's many qualifications and caveats to those opinions. For instance, the Examiner was very clear that he did not believe that the Tribune Board of Directors or the Special Committee had engaged in any intentional misconduct. As the Examiner explained, "nothing in the record suggests that the Tribune Board or the members of the Special Committee knowingly or intentionally committed any fraud or acts of dishonesty." (*See* Examiner's Report, Vol. II, 74) As such, "unlike many other transactions found to be intentionally fraudulent, this is not a case in which the Tribune Board engaged in any kind of foul play." (*Id.*; *see also id.* at 63-64, 382-86) (Examiner "did not find any evidence that the directors were beholden to any other party or otherwise failed to act independently" and could not "conclude that ...[they] consciously abdicated their responsibilities under Delaware law."). There is thus no basis for application of the crime-fraud exception under these circumstances. *See, e.g., Ward v. Succession of Freeman*, 854 F.2d 780, 790 (5th Cir. 1988) ("Mere allegations of [breach of fiduciary duty] are not . . . sufficient to break the [attorney-client] privilege" under the crime-fraud exception.) (citation omitted).

7

In addition, with respect to Tribune Officers, the Examiner declined to identify any specific member of what he referred to as "Senior Financial Management" as having engaged in acts of dishonesty, noting that "[g]iven the compressed time frame, the Examiner simply was not able to conduct the inquiry necessary to conclusively identify specific individuals as having engaged in dishonesty." (Examiner Report, Vol. II, 54, *see also id.* at 387 (noting that "[a]dditional investigation is warranted and would be required to determine the acts of specific members of senior financial management to determine individual culpability")).  These sorts of tentative and inconclusive opinions – which Debtors vigorously contest – are not sufficient to establish the elements of a "fraud" – *i.e.*, that any Tribune Officer acted with the intent to deceive or mislead; that any of the purported "misstatements" were material; or that they induced any party to act to their detriment. *See Enron.*, 349 B.R. at 127.

1.     **The Examiner's Opinions Regarding The Ten-Year Projections Contained in the October 2007 Revised Forecast Do Not Establish A "Fraud."**

The Noteholder Plan Proponents rely upon the Examiner's opinions with respect to a set of ten-year projections provided to the Company's independent outside solvency firm, Valuation Research Corporation ("VRC') in connection with VRC's solvency work relating to Step Two of the LBO transaction.  In particular, the Examiner opined that the October 2007 forecast contained an improper "out-year growth assumption" with respect to years 2013-17.  But contrary to the Noteholder Plan Proponents' characterization, the Examiner specifically acknowledged that he had "uncovered no direct evidence that Tribune's management was deceitful in the preparation and issuance of this aspect of the October forecast." (Examiner Report, Vol. II, 63).  Likewise, the Examiner noted that there was "no direct evidence that this information was purposely withheld from the Tribune Board or Special Committee in December 2007." (*Id.* Vol. II, 57).  Instead, in both cases, the Examiner relied on his own intuition, stating

that he found it "implausible" that Tribune management had believed these assumptions in good faith, and found it "difficult to accept" that the failure to provide information was "unintentional." (*Id.*, Vol. II, 57, 63).

This is a far cry from the showing of intentional fraudulent conduct necessary to invoke the crime-fraud exception discussed above. (*See* pp. 3-6, *supra*). As those cases make clear, the hallmark for a "fraud" for purposes of the crime-fraud exception is evidence of a conscious intent to defraud or deceive, materiality, and detrimental reliance. The Examiner did not identify any evidence that any party relied on these growth forecasts or that they were material to the issue of solvency. Notwithstanding the LBO Lenders' close scrutiny of VRC's work, none of them ever raised this issue or sought to call it into question. (*See* Examiner Report, Exs. 281, 755) (attached as Attachments B and C to Declaration of James W. Ducayet). Given the Examiner's observation that the Lenders were highly motivated to find reasons not to close on Step Two, and given that the Lenders had retained their own solvency firm, Murray Devine, by that time, (*id.*, Vol. II, 75, 266), the fact that not a single question was ever raised about these out-year growth forecasts simply underscores their overall lack of materiality to the LBO Transactions.[3]

Moreover, the evidence adduced by the Examiner casts serious doubt on any implication that any Tribune Officer lacked a good faith belief that the methodology for preparing these out-year forecasts was proper. For instance, the only evidence that the Examiner cites regarding the adjustment to the growth rate is an email from the Company to Citibank on September 27, 2007,

---

[3] The Examiner claimed that, as else being equal, use of ten-year projections at Step Two instead of five-year projections added $613 million to the value of the Company. (Examiner Report, Vol. II, 56). But this figure is misleading. The discounted cash flow calculation was only one fourth of VRC's overall valuation; as such, the ultimate impact of this difference is only about $150 million, or well within any of the equity cushions in VRC's analysis.

9

long before VRC had formulated its conclusions with respect to Step Two. (Examiner Report, Vol. II, p. 62 & n. 196; Ex. 889). Notably, Citibank agreed that using the 2012 growth rate as a benchmark to project future growth rates was reasonable and reflected a common approach to computing projections. (*Id.*, Vol. II, 62 & n. 196; Kurmaniak Interview., pp. 137-139 (attached as Attachment D to Declaration of James W. Ducayet). There is also no evidence linking the Company to the decision by VRC to change its discounted cash flow analysis from 5 years to 10 years. That decision was made in the late November 2007 time frame, long after the 2013-2017 growth factor was put into place. (*See* Examiner Report, Vol. I, 529 n. 2298).[4] These allegations cannot support application of the "crime-fraud" exception to the attorney-client privilege.

> **2.    The Examiner's Opinions Regarding the 2014 Refinancing Representation Do Not Establish A "Fraud."**

The Noteholder Plan Proponents also rely heavily on the circumstances surrounding one of the numerous management representation letters furnished to VRC in connection with its Step Two solvency opinion. This particular representation letter stated, in pertinent part, that

> Based on (i) management's best understanding of the debt and loan capital markets and (ii) management's recent discussions with Morgan Stanley, management believes that it is reasonable and appropriate for VRC to assume, that Tribune, in the downside forecast...[would be able refinance its obligations as they came due in 2014 and 2015.]

(Examiner Report, Vol. I, 588). The actual record adduced by the Examiner, however, does not support the opinion that any member of Tribune management either acted with an intent to defraud or deceive, or that anyone, in fact, relied on these purported statements.

As a preliminary matter, there is simply no dispute that the representation letter was accurate: Management did, in fact, discuss this issue with Morgan Stanley, and Morgan Stanley

---

[4] In addition, as the Examiner notes, the ten year projections used in connection with Step One used 2011 growth rates (a non-election year), thus arguable understating the projections, further evidence that this was most likely an oversight (at most) and not intentional. (Examiner Report, Vol. II, 55.)

provided the Company with precedent transaction information to assist it in its analysis. (*Id.* Vol. II, 37, 44.) Moreover, the Examiner does not point to any evidence that the Company believed that Tribune would not be able to refinance its debt in 2014.[5] To the contrary, even Morgan Stanley's representative told the Examiner in an untranscribed interview that he personally believed that the representation was not unreasonable, (*id.* Vol. II, 44, n. 140)[6] and later testified under oath that he may have told the Company that it would be reasonable *for the Company* to make the representation, even if Morgan Stanley was unwilling to do so. (*Id.* Vol. II, 43).

The Examiner also identified statements that were purportedly made to VRC and to the LBO Lenders characterizing Morgan Stanley's views as to the Company's ability to refinance. But the only evidence for such statements were certain handwritten notes. With respect to the conversations with VRC, the Examiner relies heavily on his own interpretation of VRC's notes of a December 2, 2007 telephone conference setting forth what Tribune purportedly told VRC they had been told by Morgan Stanley. However, the notes were not taken contemporaneously with the telephone call and the author (Bryan Browning of VRC) could not verify they were accurate. (Examiner Report, Vol. II, 45; VRC Interview at 258-59 (attached as Attachment E to Declaration of James W. Ducayet).) Indeed, the notes are triple hearsay (a statement by VRC about a statement by the Company about a statement by Morgan Stanley), *see* Fed. R. Evid. 802, yet the Examiner did not discount or even acknowledge their limited evidentiary value.

---

[5] In this connection, it is important to note that the Company's view that it would be able to refinance its debt in 2014 was based, in part, on the fact that the refinancing would take place seven years in the future, and only three years prior to the expiration of the ten year restriction relating to the ability of the ESOP to dispose of assets in a tax-efficient manner.

[6] The Examiner did not ask this question to Mr. Whayne when he was interviewed a second time under oath. Debtors were not permitted to participate or attend this interview, and therefore were not able to probe into Mr. Whayne's recollection or opinions on this issue.

46429/0001-7316247v

The Examiner also relies on snippets from various notes regarding statements about Morgan Stanley purportedly made during a December 17, 2007 conference call with the LBO Lenders. But these statements are not attributed to specific individuals. And the only person who the Examiner interviewed on this topic had no recollection of the conversation. (Examiner Report, Vol. II, 41 & n. 131). Moreover, the Examiner specifically noted that he had received these notes very late in his investigation and was unable to depose other participants in these meetings. (*Id.*, Vol. II, 41-42).[7] It is noteworthy that the Company sent an email to Morgan Stanley making reference to the questions being asked by the lenders about Morgan Stanley's role. While the Examiner identified this email, he simply noted Mr. Whayne's testimony that he had not read it. (Vol. II, 38-39 & n. 122). But this is a *non sequitur*. The fact that the email was sent to Morgan Stanley is inconsistent with the notion that the Company was attempting to mischaracterize Morgan Stanley's role.

Even more significantly, there is also no evidence that VRC or the LBO Lenders ever relied on the reference in the representation to Morgan Stanley. As to VRC, the Examiner concluded that Tribune misled VRC by tacitly implying Morgan Stanley had "blessed" the refinancing assumption. (*Id.* Vol. II, 40.) However, the record is clear that VRC had asked for an explicit representation from Morgan Stanley and was told that it would *not* be provided. (*Id.* Vol. II, 46) Accordingly, any purported reliance by VRC on any supported tacit blessing would have been unreasonable. Nor did VRC rely on any such purported blessing. In fact, the record shows that VRC anticipated that Morgan Stanley would *not* provide written confirmation that Morgan Stanley believed Tribune could refinance in 2014. (*See* VRC Interview, 221-22.). And

---

[7] The Examiner makes much of the fact that Morgan Stanley was purportedly not invited to this meeting, (Vol. I, 42), missing the fact that there was nothing to stop any of the participants from contacting Morgan Stanley directly to ask them the nature of Morgan Stanley's involvement.

VRC testified that it probably would have issued the solvency opinion even if it had learned that Morgan Stanley did not concur with Management's representation. (*Id.* at 236.)[8]

As to the LBO Lenders, despite the close scrutiny given to VRC's work, and despite having been informed of the management representation regarding refinancing, none of the LBO Lenders ever questioned whether the refinancing representation was itself reasonable. Moreover, not one of the LBO Lenders indicated that they relied on management's statements regarding Morgan Stanley in deciding to proceed with the Step Two financing. To the contrary, representatives of two of the largest LBO Lenders, JPMorgan (Jeffrey Sell) and Bank of American (Daniel Petrik), testified that it would not have mattered to them whether Morgan Stanley had refused to represent that the Company would have been able to refinance. (*Id.*, Vol. II, 40 n. 128.).[9]

Lastly, it is worth noting that the Examiner's opinions fundamentally rested on the Examiner's assessments of credibility; in particular, his determination that Morgan Stanley's version of events was more credible than that presented by those affiliated with Tribune. (Examiner Report, Vol. II, 50.) Putting aside that this issue involved events that occurred over the span of a few days nearly three years earlier, the simple fact is that this was not an adversarial process. No other party was permitted to attend these interviews and, as a consequence, Mr.

---

[8] While VRC's representatives testified that any evidence of "management dishonesty" would need to be considered and taken into account when issuing VRC's solvency opinion, this testimony was provided in response to a hypothetical question posed by the Examiner as to what VRC would have done if Morgan Stanley had told VRC *that there had been no conversation at all* on the topic of refinancing. (Examiner Report Vol. II, 51; VRC Interview, 304.) As noted above, that hypothetical is contrary to the facts the Examiner himself developed.

[9] The Noteholder Plan Proponents repeat the Examiner's odd claim that the Company should have retained a separate independent outside financial advisor to have overseen the work of its outside independent solvency firm. (Noteholder Mem. 11.) Neither the Examiner nor the Noteholder Plan Proponents offer any precedent for such a novel arrangement.

13

Whayne or Mr. Taubman were not subject to cross-examination.[10]  Further, as Debtors have

previously noted, (*see* Debtors' Objection To The Motion Of Aurelius Capital Management, LP,

For The Appointment Of A Chapter 11 Trustee, at ¶ 36) [Dkt. 5890], in assessing credibility, the

Examiner did not take into consideration certain evidence relating to Morgan Stanley's

involvement in the Step Two LBO Transaction as well as its possible motivations in testifying in

the manner that it did.  In addition, the Examiner's opinions were reached without taking into

account the fact that Morgan Stanley has been named as a defendant in one of the Complaints

filed by the Committee of Unsecured Creditors in connection with these very matters.  *See* Dkt.

6202.

> **C.**  **The Noteholder Plan Proponents Fail To Satisfy the "In Furtherance" Element.**

The Motion also fails because the Noteholder Plan Proponents have not established that

any "attorney-client communications were *in furtherance* of [the] alleged crime or fraud."  *In re*

*Grand Jury Subpoena*, 223 F.3d 213 at 217 (citations omitted) (emphasis added); *see also*

*Robinson*., 2010 WL 4737816, at *3 ("[T]he exception applies only when a communication is

made with an intent to further a future unlawful act.") (citation omitted).  Indeed, the Noteholder

Plan Proponents repeatedly misstate this standard, asserting that they only need to establish

"some reasonable relationship and temporal proximity between the alleged fraudulent activity

and the communications with counsel." (Noteholder's Mot. at 6, 12.)

That is not the law.  In fact, the Third Circuit has expressly rejected this argument.  *In re*

*Grand Jury Investigation*, 445 F.3d at 279.  Instead, the "in furtherance" element requires "a

---

[10] Aurelius has indicated that it intends to take the depositions of various individuals relevant to this issue, including Mr. Whayne of Morgan Stanley.  As such, this Motion is, at a minimum, premature – Debtors should have an opportunity to develop the record to provide the Court with additional evidence in opposition to the Motion.

14

specific nexus between the supposed fraud and the attorney consultation for the exception to

exist." *See, e.g., Prudential Ins. Co. of America v. Massaro*, No. 97-2022, 2000 WL 1176541, at

*10 (D.N.J. Aug, 11, 2000) (citation omitted); *see also In re Subpoena Duces Tecum*, 798 F.2d

32, 34 (2d Cir. 1986) ("The exception applies only when there is probable cause to believe that

the communications with counsel were intended in some way to facilitate or to conceal the

criminal activity.") (citation omitted); *S.E.C. v. Teo*, No. 04-1815, 2009 WL 1684467, at *14

(D.N.J. June 12, 2009) ("[E]ven if a temporal connection existed, based on the content of all

these documents, the Court is satisfied that the documents contain nothing that would create a

logical nexus between the communications and Teo's subsequent actions."). Mere "temporal

proximity of events" is not sufficient. *See, e.g., In re Sealed Case*, 754 F.2d 395, 402 (D.C. Cir.

1985) ("'[M]ere coincidence in time,' without more, cannot support the invocation of the

exception.").

The Noteholder Plan Proponents fail to satisfy this element in two respects. *First*, they

fail to identify any privileged communications made "in furtherance" of any purported fraud

identified above, or that these are matters as to which legal advice likely would have been

provided.  Thus, for instance, with the respect to the ten year projections discussed above, it is

hard to imagine that any lawyer could have furnished legal advice "giv[ing] direction," *In re

Grand Jury Subpoena*, 223 F.3d at 217, as to the growth forecasts.  And none of the testimony

taken by the Examiner regarding this issue suggests otherwise.  Likewise, the Noteholder Plan

Proponents do not identify any communications "for the purpose of getting advice," *Zolin*, 491

U.S. at 563, as to the purported conversations between Tribune Senior Financial Management

and VRC or between Tribune Senior Financial Management and any of the Lenders.  Nothing in

the Examiner Report suggests that any such communications occurred, notwithstanding the fact

15

that the Examiner interviewed two of the most senior Tribune lawyers involved in the LBO

Transaction, Crane Kenney, the Company's General Counsel, and Mark Hianik, the Company's

Assistant General Counsel, (Examiner Report, Vol. I, 34, 36), and Debtors did not seek to

interpose a privilege with respect to any of the questions posed by the Examiner.

*Second*, the scope of what the Noteholder Plan Proponents claim is subject to the crime-

fraud exception ranges far beyond any legal advice that might have been sought in connection

with the specific fraudulent conduct alleged. Instead, the Noteholder Plan Proponents appear to

be claiming that *all* privileged communications relating to Step Two are unprotected, regardless

of the timing, subject matter, or the identity of the individuals who had such communications.

(Noteholder Mem. 15.) The Noteholder Plan Proponents cite no caselaw to support such a broad

application of the crime-fraud exception. That is hardly surprising; such an approach would

eviscerate the "in furtherance" element, and would be flatly inconsistent with the caselaw

holding that the exception is to be applied narrowly. *See, e.g., Robinson,* 2010 WL 4737816, at

*3; *nVidia,* 2006 WL 3734297, at *6; *Asbestos Claimants,* 342 B.R. at 427.[11]

---

[11] Once again, the Noteholder Plan Proponents' own cases illustrate this point. For instance, the Court in *In re MarketXT,* 2009 WL 7216076, at *2-5 (cited at Noteholders Mem. at 4,7) invoked the exception for documents relating to a law firm apparently retained to assist the client in falsifying documents. *Id.* at *2-5. This included tax advice used by the client, without the firm's knowledge, to evade a court order. *Id.* at *6. The Court also found that the exception applied to advice sought from a sole practitioner, where there was "ample" evidence that he was used "as a vehicle for the commission of a fraud." *Id.* at *7. However, the Court expressly found that the doctrine did not apply to other privileged communications in connection with other matters or aspects of the case, such as the client's defense against the fraudulent conveyance claims or the law firm's retention of a business consultant. *Id.* at *6-7. In so doing, the Court rejected the suggestion that application of the crime-fraud exception with respect one set of communications made "in furtherance" of a fraud necessarily means that any other communications lose their privileged status. *Id.* at *6 (citing 24 A. Wright and W. Graham, Federal Practice and Procedure § 5501, 499-500, n. 52 (1986)); *see also In re Grand Jury Subpoena,* 419 F.3d 329, 343 (5th Cir. 2005) ("[T]he proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents in furtherance of the contemplated or ongoing criminal or fraudulent conduct."); Note, *The Future of Crime or Tort Exception to Communications Privileges,* 77 HARV. L. REV. 730, 733 (1964) ("[W]here an underlying professional relationship exists in which the attorney performs normal legal

16

III.    **THE NOTEHOLDER PLAN PROPONENTS SEEK TO USE THE STIPULATION FOR IMPROPER PURPOSES.**

In addition to mischaracterizing the Examiner's opinions and Report and applying the wrong legal standard, the Noteholder Plan Proponents clearly seek to use the Stipulation Regarding Use of Examiner Report at the Confirmation Hearing ("Examiner Stipulation")[Dkt No. 7423] for a much broader purpose than intended. By its title and its plain terms, the Examiner Stipulation applies "only to the Confirmation Hearing" (*id.* at ¶ 5), and the parties stipulated only that the Examiner's opinions would be admissible to the same extent as the opinions testified to by an expert "in connection with the Confirmation Hearing" (*Id.* at ¶ 2). The Noteholder Plan Proponents appear to be seeking to use the Examiner Report for far broader purposes – *i.e.,* to establish that the Debtors are entitled to no attorney-client privilege or work product protection with respect to any documents or communications related to Step Two *for any purpose.*

The use of the parties' designations of the Examiner's Report for this broader purpose is simply not proper under the Examiner Stipulation.[12] This is particularly true given the limited

---

services for his client, an illegal request or hidden illicit purpose opens up only communications related to that purpose.").

[12] Moreover, the Noteholder Plan Proponents assert that the parties agreed that all of the "historical facts" on which the Examiner relied in reaching his opinions "will be admissible for all purposes, including the truth of the matter asserted and will be presumed to be correct, unless disputed." (Noteholder Mem. at 14.) That is false. The vast preponderance of the historical facts in the Examiner's Report – including the "facts" cited in the Motion – are nothing more than quotes, citations and paraphrases from emails, depositions, interviews, analysts reports or other documents. And Paragraph 2.b. of the Examiner Stipulation – a provision nowhere mentioned in the Noteholder Plan Proponents' Motion – makes clear that the parties did *not* stipulate that such statements are admissible for their underlying truth:

> For the avoidance of doubt . . . any statements cited or quoted by the Examiner that are contained in analysts reports, rating agency reports, newspaper articles, emails, other documents, or deposition or interview testimony shall be admissible to show that such statements were made, but shall not be admissible for the underlying truth of such statements, solely as a result of this Stipulation.

46429/0001-7316247v

relevance that these materials have as to the issues to be decided at the confirmation hearing, as

discussed above.

## CONCLUSION

For all of the reasons set forth above, the Motion should be denied.

Dated: Wilmington, Delaware
      January 19, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
James B. Bendernagel, Jr.
James W. Ducayet
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

-and-

NOVACK AND MACEY LLP
Stephen Novack
Donald A. Tarkington
100 North Riverside Plaza
Chicago, IL  60606-1501
Telephone: (312) 419-6900
Facsimile: (312) 419-6928

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

-7316247v