**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, *et al.*,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**MOTION OF CAPTION COLORADO, L.L.C. FOR ALLOWANCE**
**OF ADMINISTRATIVE EXPENSE CLAIM**

Caption Colorado, L.L.C. ("Caption Colorado"), by and through its undersigned counsel, hereby moves pursuant to 11 U.S.C. § 503(b) for allowance of an administrative expense claim (the "Motion"). In support of the Motion, Caption Colorado respectfully states the following:

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxnet Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

**JURISDICTION AND VENUE**

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

2.  On December 8, 2008 (the "Petition Date"), Tribune Company and certain of its affiliates (together, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). On December 10, 2008, the Court entered an order providing for the joint administration of the Debtors' Chapter 11 cases.

**A.   Caption Colorado's Pre-petition Relationship with the Debtors**

3.  Prior to the Petition Date, Tribune Company or its subsidiaries ("Tribune") and Caption Colorado were parties to that certain Agreement, dated as of January 3, 2000, for closed captioning services of live programs to certain television stations (the "Stations") owned and operated by Tribune (as amended, the "Captioning Agreement"). A copy of the Captioning Agreement, including all renewals and amendments, is attached hereto as **Exhibit A**.

4.  Paragraph E.2 of the Captioning Agreement provides: "Unless earlier terminated in accordance with its terms, this Agreement shall automatically renew for successive twelve (12) month periods, unless Tribune, the Stations (with respect to any one or more Stations) or Caption Colorado, at least ninety (90) days before the end of the Initial Term or before the end of any extension period described herein, provides written notice to the other party of its intent to terminate this Agreement." Renewal and Amendment No.2 to Captioning Agreement, p. 4, ¶ 8.

The Initial Term of the Captioning Agreement began on January 3, 2000 and terminated on December 31, 2010. *Id.* at p. 4, ¶ 7. The Captioning Agreement, as amended, further provides:

> Beginning on January 1, 2007, and on every 12 month anniversary date thereafter during the term hereof, all of the rates charged to Stations hereunder shall be increased by two percent (2%). The rates charged for any twelve (12) month automatic extension of the Agreement after the Initial Term shall be equal to the rates in effect immediately prior to the commencement of the twelve (12) month extension period, increased by two percent (2%)."

*Id.* at p. 5, ¶ 11.

5. As of the Petition Date, the Debtors owed Caption Colorado $191,855.74 for unpaid services rendered pursuant to the Captioning Agreement.[2] As set forth in the Declaration of R.T. Polumbus (the "Polumbus Declaration") filed contemporaneously with this Motion, since the Petition Date, Caption Colorado has continued to provide the Stations with closed captioning services pursuant to the Captioning Agreement. Polumbus Declaration, ¶ 5. The Debtors have timely paid for these post-petition services on an on-going basis. *Id.* at ¶ 5.

**B.   Debtors' Post-petition Breach of the Captioning Agreement**

6. In order to prevent the Captioning Agreement from renewing automatically, Tribune would have had to deliver a written notice of its intent to terminate the Captioning Agreement by personal service or by registered or certified mail to Caption Colorado. Paragraph F.4 of the Captioning Agreement states:

> Any notices to Caption Colorado or to Stations required or permitted under this Agreement shall be given in writing, either by personal service or by registered or certified mail, postage prepaid, duly addressed to its chief executive officer or equivalent employee at its then principal place of business. For the purpose of determining compliance with any time limit established by this Agreement, a

---

[2]   On May 1, 2009, Caption Colorado timely filed proofs of claim asserting unsecured claims in the total amount of $191,855.74. Claim Nos. 2186 - 2201. These proofs of claim subsequently were sold to Sonar Credit Partners, LLC. Docket Nos. 6004-05, 6007-21, 6023-29. Caption Colorado expressly reserves all its rights to file new claims.

>notice shall be deemed given at the time of postmark date or, in the case of personal service, at the time service is made.

Captioning Agreement, p. 4, ¶ F.4.

7. Caption Colorado did not receive written notice from either Tribune or any of the Stations at least ninety days prior to December 31, 2010 (the end of the Initial Term) apprising Caption Colorado of Tribune's or any of the Stations' intent to terminate the Captioning Agreement at the end of the Initial Term. Polumbus Declaration, ¶ 6. Thus, pursuant to its terms, the Captioning Agreement automatically renewed on October 1, 2010, and, at that time, the term of the Captioning Agreement was extended through December 31, 2011. Renewal and Amendment No.2 to Captioning Agreement, p. 4, ¶ 8; Polumbus Declaration, ¶ 7. In addition, the rates charged pursuant to the Captioning Agreement increased two percent as of January 1, 2011. Renewal and Amendment No.2 to Captioning Agreement, p. 5, ¶ 11.

8. After the Captioning Agreement automatically renewed, the Debtors breached the Captioning Agreement by ceasing to accept services from Caption Colorado as of January 1, 2011. Polumbus Declaration, ¶¶ 12, 16.

9. On December 22, 2010, in response to a voicemail received from Steven Charlier ("Charlier"), Tribune's Senior Vice President, News & Operations, earlier that day, John Irwin ("Irwin"), Caption Colorado's Senior Vice President, Sales & Marketing, sent an e-mail to Charlier affirming that the Captioning Agreement had renewed automatically:

>[Caption Colorado's] current contract with Tribune was automatically extended through 12/31/11 by its own terms, approximately 80 days ago. [Caption Colorado] did not receive written notification from [Tribune] of [Tribune's] intent not to renew as required by the contract. [Caption Colorado] need[s] to make sure that [Tribune] understand[s] that [Caption Colorado] fully expect[s] to continue as Tribune's captioning provider for the television stations through 2011, under the renewal provisions of [the Captioning Agreement].

E-mail from John Irwin to Steven Charlier dated Dec. 22, 2010, attached hereto as **Exhibit B**; Polumbus Declaration ¶¶ 8-9.

10.     On December 23, 2010, Caption Colorado and Tribune held a conference call to discuss the Captioning Agreement. During the conference call, Tribune alleged that it had sent a written notice to Caption Colorado apprising Caption Colorado of Tribune's intent to terminate the Captioning Agreement at the end of the Initial Term. In response, during the call, Caption Colorado requested that Tribune provide a copy or other evidence of the alleged written notice and Tribune indicated that it would do so. Polumbus Declaration ¶¶ 10-11.

11.     Tribune did not send Caption Colorado a copy or other evidence of the alleged written notice following the conference call. Instead, on December 26, 2010, Irwin received an email from Charlier confirming that Tribune would no longer be using Caption Colorado's services after December 31, 2010, and again claiming that Tribune had provided Caption Colorado with written notice of its intent not to renew the Captioning Agreement: "[Tribune has] given [Caption Colorado] both verbal and written notice of [its] intent to terminate the agreement at its expiration on 12/31/10. . . . Tribune Broadcasting will no longer be using Caption Colorado's services after December 31, 2010." E-mail from Steven Charlier to John Irwin dated Dec. 26, 2010, attached hereto as **Exhibit C**; Polumbus Declaration, ¶ 12.

12.     In response, on December 28, 2010, R.T. Polumbus ("Polumbus"), Caption Colorado's President and Chief Executive Officer, sent a letter by registered mail to Charlier at Tribune stating that notwithstanding the fact that the Captioning Agreement legally had been extended through December 31, 2011, Charlier had notified Caption Colorado to terminate services as of December 31, 2010, thereby causing Tribune and the Stations to breach the Captioning Agreement. The letter further stated that Caption Colorado would be terminating

-5-

services as of December 31, 2010 pursuant to Charlier's instructions and that "Caption Colorado is ready, willing, and able to fulfill its contractual obligations and is ceasing captioning only to minimize the damages Tribune and/or the Stations will have to pay Caption Colorado." Letter from R.T. Polumbus to Steven Charlier dated Dec. 28, 2010. This letter was distributed by e-mail the same day to all of the Stations impacted. A copy of this e-mail and letter are attached hereto as **Exhibit D**. *See also* Polumbus Declaration, ¶ 13.

13. On December 29, 2010, Irwin and Polumbus received an e-mail from Charlier in which he referenced the December 28, 2010 letter and stated that "Tribune Broadcasting accepts your offer to 'cease all captioning services to all Tribune stations as of 11:59 PM December 31, 2010.'" E-mail from Steven Charlier to John Irwin and R.T. Polumbus dated Dec. 29, 2010, attached hereto as **Exhibit E**. This e-mail also reasserted that Tribune had provided Caption Colorado with written notice of its intent to terminate the Captioning Agreement on December 31, 2010. *Id.*; *see also* Polumbus Declaration, ¶ 14.

14. Approximately an hour after receiving Charlier's e-mail, Polumbus sent a return e-mail to Charlier clarifying that "Caption Colorado did not 'offer to terminate services to all Tribune stations as of 11:59 PM December 31, 2010,'" as Charlier's e-mail had implied. E-mail from R.T. Polumbus to Steven Charlier dated Dec. 29, 2010, attached hereto as **Exhibit F**. Rather, Polumbus' e-mail reiterated the content of Caption Colorado's December 28, 2010 letter: "[Caption Colorado's] action to terminate services is in response to your written demand to do so. . . . [Caption Colorado] is taking this action as an accommodation to Tribune to help mitigate the damages Tribune will have to pay to Caption Colorado as a result of its breach of contract." *Id.* In addition, Polumbus' e-mail confirmed that Caption Colorado had never received any form of written notice from Tribune or anyone else of Tribune's intent to terminate the Captioning

Agreement on December 31, 2010, and again requested that Tribune provide a copy or evidence of the alleged written notice apprising Caption Colorado of Tribune's intent to terminate the Captioning Agreement on December 31, 2010. *Id.*; *see also* Polumbus Declaration, ¶ 15.

15. As of January 1, 2011, the Debtors have ceased accepting closed captioning services from Caption Colorado. Polumbus Declaration, ¶ 16.

16. On January 7, 2011, shortly after Caption Colorado indicated that it would be taking legal action in response to Tribune's breach of the Captioning Agreement, Polumbus received an email from Charlier affirming that Tribune believed that it "has no further legal obligations to [Caption Colorado]." E-mail from Steven Charlier to R.T. Polumbus dated Jan. 7, 2011. Attached to the e-mail was an unsigned letter allegedly delivered to Caption Colorado on April 27, 2010, and purportedly terminating the Captioning Agreement as of the end of the Initial Term. In his e-mail, Charlier represented that his assistant had delivered the alleged letter to Caption Colorado on or about April 27, 2010, and that his assistant, at the time, had verified receipt of the alleged letter by Caption Colorado. Charlier did not indicate how the alleged notice was sent, how receipt was verified, or with whom receipt was verified at Caption Colorado. *Id.* A copy of this e-mail and the attached unsigned letter are attached hereto as **Exhibit G**. *See also* Polumbus Declaration, ¶ 17.

17. Caption Colorado did not receive the letter dated April 27, 2010 that was attached to Charlier's e-mail of January 7, 2011, and did not receive any other written notification of Tribune's or any of the Stations' intention to breach the Captioning Agreement at the end of the Initial Term. Polumbus Declaration, ¶¶ 6, 18. None of Caption Colorado's employees ever talked with anyone from Tribune verifying receipt of the alleged letter dated April 27, 2010, nor did any of Caption Colorado's employees ever sign any receipt of certified or registered mail or

any other type of acknowledge or receipt of the alleged letter. *Id.* at ¶ 18. Rather, Caption Colorado first became aware of Tribune's possible intention to terminate the Captioning Agreement on December 22, 2010, when Charlier left a voicemail for Irwin that suggested that Tribune did not understand that the Captioning Agreement had automatically renewed. *See* Exhibit B; Polumbus Declaration, ¶ 8. That chain of correspondence resulted in the Debtors breaching the automatically-renewed Captioning Agreement by ceasing to accept services from Caption Colorado as of January 1, 2011. Polumbus Declaration, ¶¶ 12, 16.

18. Accordingly, as the evidence will show, Caption Colorado is entitled to damages as a result of the Debtors' breach of the Captioning Agreement in the total amount of $1,313,449 plus costs, including, without limitation, reasonable attorney's fees. Polumbus Declaration, ¶ 19.

## RELIEF REQUESTED

19. By this Motion, Caption Colorado requests that the Court enter an order allowing it an administrative expense claim for its damages on account of Tribune's breach of the Captioning Agreement in the total amount of $1,313,449 plus costs, including, without limitation, reasonable attorney's fees, as permitted by 11 U.S.C. § 503(b)(1)(A).

## BASIS FOR RELIEF

20. In pertinent part, Section 503(b)(1)(A) of the Bankruptcy Code provides: "After notice and a hearing, there shall be allowed administrative expenses . . . including—(1) (A) the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A).

21. Courts hold that "[t]o establish an administrative expense claim [under Section 503(b)(1)(A)], there must be (1) a post-petition transaction between the claimant and the estate and (2) a benefit to the estate." *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005). *See also In re Grand Union Co.*, 266 B.R. 621, 625 (Bankr. D. N.J. 2001)

(articulating the two-part test as: "First, the claim must arise from a transaction with the debtor-in-possession.  Second, when the claim is based on a contract between the debtor and the claimant, a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business").

22.     The "benefit" part of the test evaluates whether a particular expense was "necessary" to preserve the estate.  *Id.* at 626.  Courts have held that "benefit" includes the purchase of goods and services that a debtor does not use in full.  *See, e.g.*, *id.* (holding that Chapter 11 debtors' obligation to warehouse business for the full costs of storing merchandise that the debtors needed to have on hand to operate post-petition was entitled to priority as an administrative expense even though only a portion of the inventory stored at the warehouse was delivered to the debtors' stores); *In re Curry Printers, Inc.*, 135 B.R. 564, 584 (Bankr. N.D. Ind. 1991) (holding that lessor of rental equipment was entitled to the "reasonable rental value" of the equipment regardless of how much the debtor used the equipment).

23.     In addition, the Supreme Court of the United States has held that claims that do not necessarily "benefit" a debtor's estate nevertheless are allowable as administrative expense claims.  In *Reading Co. v. Brown*, 391 U.S. 471 (1968), the Supreme Court stated that fundamental fairness required the allowance of administrative expense claims for damages arising from the post-petition actions of a debtor because such damages were "actual and necessary costs" of administration:  "'[A]ctual and necessary costs' should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *Id.* at 483.  Courts have applied *Reading* to a debtorr-in-possession's violations of law which injure others, intentional misconduct by a debtor-in-

possession, and interest accrued post-petition on sales tax receipts that a debtor-in-possession held in trust for a state, among other applications. *See, e.g.*, *In re Al Copeland Enters., Inc.*, 991 F.2d 233 (5th Cir. 1993); *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir. 1985). The Third Circuit has recognized that *Reading* applies under the Bankruptcy Code. *See Women First Healthcare*, 332 B.R. at 123.

24. *Collier on Bankruptcy* succinctly summarizes the reasoning behind *Reading* and its subsequent applications:

> Damages or compensatory penalties arising from the postpetition operation of the business of the estate may well be seen as "necessary" for the estate's preservation. This is because a decision to continue business operations postpetition is made to preserve the going concern value of the estate for the benefit of prepetition creditors, and the possibility of the estate incurring damages and compensatory penalties as a result of its operations is a foreseeable risk of that decision.

COLLIER ON BANKRUPTCY ¶ 503.06[3][c][iii] (15th ed. rev. 2010).

25. Here, as an initial matter, the Captioning Agreement automatically renewed pursuant to its provisions. This automatic renewal resulted in a continuation of the original Captioning Agreement and bound the Debtors to the Captioning Agreement through December 31, 2011. *See, e.g.*, *In re IMG Healthcare, LLC*, 2008 Bankr. LEXIS 2092 (Bankr. E.D. La. July 8, 2008) (holding that a pre-petition contract that renewed automatically post-petition resulted in a continuation of the pre-petition contract through the end of the renewal term); *In re Country Club Estates*, 227 B.R. 565 (Bankr. S.D. Fla. 1998) (same).

26. Further, the Captioning Agreement is an executory contract: there are service and payment obligations owing under the Captioning Agreement because of its automatic renewal. *See, e.g.*, *Enter. Energy Corp. v. United States (In re Columbia Gas Sys.)*, 50 F.3d 233, 239 (3d Cir. 1995) (" [An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to

complete performance would constitute a material breach excusing performance of the other." (quoting *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989)) (internal quotations omitted)).

27. Consequently, the post-petition services due and the payment therefor owing pursuant to the automatically renewed Captioning Agreement constitute a post-petition transaction between Caption Colorado and the Debtors. Moreover, the Debtors' actions in ceasing to accept the closed captioning services that Caption Colorado is to provide pursuant to the Captioning Agreement constituted a post-petition transaction. Accordingly, part one of the Section 503(b)(1)(A) administrative expense claim test is satisfied.

28. Part two of the test also is satisfied. By allowing the Captioning Agreement to renew according to its terms, the Debtors bound the estates to continued performance under the renewed Captioning Agreement. As evident by the Debtors' timely post-petition payments to Caption Colorado on account of the services rendered post-petition by Caption Colorado to the Stations, the services provided pursuant to the Captioning Agreement are necessary to the Debtors' business. By subsequently breaching the renewed Captioning Agreement, the Debtors incurred a cost "incident to operation of a business." *Reading*, 391 U.S. at 483.

29. Thus, the Debtors are liable for Caption Colorado's damages on account of the breach of the Captioning Agreement. Through the automatic renewal of the Captioning Agreement, the Debtors purchased services necessary for the estates' preservation as a going concern which the Debtors have decided not to use in full. In addition, by breaching the Captioning Agreement, the Debtors injured Caption Colorado. When the Captioning Agreement renewed, the Debtors assumed the risk of liability arising from their actions pursuant to the

Captioning Agreement. Now that the Debtors have voluntarily elected to breach the Captioning Agreement, they must pay Caption Colorado on account of that breach.

30. In addition, Paragraph D.5 of the Captioning Agreement provides:

> In the event either party hereto initiates any action or proceeding to collect any amounts due, or to enforce any rights under this Agreement, then in addition to any other remedies available to it in law or equity, such party shall be entitled to recover all of its costs . . . incurred in connection with any such action, including its reasonable attorney's fees as part of the courts judgment.

Captioning Agreement, p. 3, ¶ D.5. Thus, Caption Colorado is entitled to reasonable attorney's fees. Accordingly, pursuant to Section 503(b)(1)(A), Caption Colorado is entitled to an administrative expense claim for its damages in the total amount of $1,313,449 plus costs, including, without limitation, reasonable attorney's fees.

## RESERVATION OF RIGHTS

31. Caption Colorado expressly reserves all its rights to assert additional claims against any of the Debtors and to modify, supplement, or amend this or any other claim.

## NOTICE

32. Notice of this Motion has been given to the following parties: (a) the Debtors, (b) counsel to the Debtors; (c) the Office of United States Trustee for the District of Delaware; and (d) counsel for the Official Committee of Unsecured Creditors. In light of the relief requested herein, Caption Colorado submits that no other or further notice is required.

## NO PRIOR REQUEST

33. No prior motion for the relief requested herein has been made to this or any other court.

[Remainder of page intentionally left blank.]

**WHEREFORE**, Caption Colorado requests that the Court enter an Order (i) allowing Caption Colorado an administrative expense claim pursuant to Section 503(b)(1)(A) of the Bankruptcy Code in the total amount of $1,313,449 plus costs, including, without limitation, reasonable attorney's fees; and (ii) granting such other relief as the Court deems just and proper.

Dated:  January 26, 2011
       Wilmington, Delaware

Respectfully submitted,

DORSEY & WHITNEY (DELAWARE) LLP

 /s/ Eric Lopez Schnabel
Eric Lopez Schnabel (DE # 3672)
Robert W. Mallard (DE # 4279)
300 Delaware Avenue, Suite 1010
Wilmington, DE 19801
Tel: (302) 425-7171
Fax: (302) 425-7177

and

Katherine A. Constantine (MN # 123341)
Steven D. Bell (CO # 22419)
Pamela Foohey (MN # 389566)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402
Tel: (612) 340-3600
Fax: (612) 340-2643

*Counsel for Caption Colorado, L.L.C.*