IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------X
In re:                                  :        Chapter 11 Cases
                                        :        Case No. 08-13141 (KJC)
TRIBUNE COMPANY, et al.,                :        (Jointly Administered)
                                        :
                                        :
                    Debtors.            :
-------------------------------------------------------X
```

**THE NOTEHOLDER PLAN PROPONENTS' REPLY MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND INFORMATION
BASED ON THE CRIME-FRAUD EXCEPTION**

i

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT ........................................................................................................................... 3

I.    The Documents Sought in the Motion Are Relevant ........................................................ 3

II.   The Crime-Fraud Exception Applies Where there is Prima Facie Evidence of an
      Intentional Fraudulent Transfer .................................................................................... 4

III.  Tribune's Counsel Provided Services in Furtherance of the Intentional Fraudulent
      Transfer .......................................................................................................................... 8

IV.   The Evidence Adduced by the Examiner May Be Used in Support of this Motion ......... 19

CONCLUSION ........................................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Diamant v. Sheldon L. Pollack Corp.,*
216 B.R. 589 (Bankr. S.D. Tex. 1995) ................................................................... 5, 6

*Haines v. Liggett Group Inc.,* 975 F.2d 81 (3d Cir. 1992) ...................................... 4

*In re Andrews,*
186 B.R. 219 (Bankr.. E.D. Va. 1995) ........................................................ 4, 5, 6, 19

*In re Berkley and Co., Inc.,*
629 F.2d 548 (8th Cir. 1980) ................................................................................ 19

*In re Campbell,*
248 B.R. 435 (Bankr. M.D. Fla. 2000) ................................................................. 4, 6

*In re Economou,*
362 B.R. 893 (Bankr. N.D. Ill. 2007) .................................................................... 5, 6

*In re Enron Corp.,*
349 B.R. 115 (Bankr.S.D.N.Y. 2006) ...................................................................... 7

*In re S. Textile Knitters, Inc.,*
1999 WL 33485637 (Bankr. D.S.C. Aug. 2, 1999) ............................................... 4, 6

*In re Warner,*
87 B.R. 199 (Bankr. M.D. Fla. 1988) .................................................................... 5, 6

*In re: Grand Jury Investigation,*
445 F.3d 266 (3d Cir. 2006) ................................................................................ 2, 19

*Moody v. Sec. Pac. Bus. Credit, Inc.,*
127 B.R. 958 (Bankr. W.D. Pa. 1991), *aff'd,* 971 F.2d 1056 (3d Cir. 1992) ........... 5

*Off. Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.),*
330 B.R. 67 (Bankr. D. Del. 2005) ........................................................................... 5

*Pereira v. Grecogas Ltd.(In re Saba Enters., Inc.),*
421 B.R. 626 (Bankr. S.D.N.Y. 2009) ...................................................................... 5

*Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.(In re Musicland Holding Corp.),*
398 B.R. 761 (Bankr. S.D.N.Y. 2008) ...................................................................... 5

iii

*Silverman v. Actrade Capital, Inc.(In re Actrade Fin. Techs., Ltd.),*
  337 B.R. 791 (Bankr. S.D.N.Y. 2005) ..................................................................... 5

*United States v. Under Seal (In re Grand Jury Subpoena),*
  884 F.2d 124 (4th Cir. 1989)................................................................................ 19

*U.S. v. Doe,* 429 F.3d 450 (3d Cir. 2005) ................................................................. 4

**OTHER AUTHORITIES**

Bankruptcy Rule 9019.................................................................................................. 4

Rules 7026, 7034 and 7037 of the Federal Rules of Bankruptcy Procedure ................................... 1

Rules 26(b), 34 and 37 of the Federal Rules of Civil Procedure ................................... 1

The proponents of the Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By Aurelius Capital Management, LP, On Behalf Of Its Managed Entities (collectively, "Aurelius"), Deutsche Bank Trust Company Americas ("DBTCA"), In Its Capacity As Successor Indenture Trustee For Certain Series Of Senior Notes, Law Debenture Trust Company Of New York, In Its Capacity As Successor Indenture Trustee For Certain Series of Senior Notes ("Law Debenture"), And Wilmington Trust Company, In Its Capacity As Successor Indenture Trustee For The PHONES Notes ("Wilmington Trust") [Docket No. 7127] (the "Noteholder Plan Proponents"),[1] by and through their undersigned counsel, hereby submit this reply memorandum of law in further support of their motion (the "Motion"), pursuant to Rules 26(b), 34 and 37 of the Federal Rules of Civil Procedure, made applicable to this contested matter by Rules 7026, 7034 and 7037 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Case Management Order entered in these cases (the "CMO"), for entry of an order compelling production of documents and communications related to Step Two of the LBO transactions that have been withheld from production by the Debtors based on the attorney-client privilege or work product doctrine.  In support of the Motion, the Noteholder Plan Proponents respectfully state as follows:

## PRELIMINARY STATEMENT

Since the filing of the Motion, the Debtors produced a revised privilege log which for the first time provided details regarding the role of Tribune's counsel in the months leading up to

---

[1] The Noteholder Plan Proponents are Aurelius Capital Management, LP, on behalf of its managed entities (collectively, "Aurelius"), Law Debenture Trust Company of New York, as successor indenture trustee under that certain Indenture dated March 19, 1996 between Tribune Company (successor to The Times Mirror Company) and Citibank, N.A., for the 6.61% Debentures due 2027 and the 7 1/4 % Debentures due 2096 ("Law Debenture"), Wilmington Trust Company, in its capacity as Successor Indenture Trustee for the PHONES Notes ("Wilmington Trust"), and Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee under certain indentures by and between Tribune ("DBTCA").

1

closing of the 2007 LBO Transactions. In light of that development, the parties determined to delay the hearing on the Motion and to the meet and confer in an attempt to narrow their dispute. As a result of that process, the Noteholder Plan Proponents are now limiting the relief sought by the Motion, and at this time are seeking an order compelling only the production of certain documents and communications listed on the Debtors' privilege log which relate to Tribune's projections or forecasts or the procurement of the VRC solvency opinion at Step Two of the LBO Transaction. Specifically, the Noteholder Plan Proponents seek the production of 79 documents, all dated between September 13, 2007 and the closing of Step Two on December 20, 2007.

The Debtors do not dispute that the crime-fraud exception to the attorney-client privilege and work product doctrine is well established in this and every other Circuit, that the crime-fraud exception applies with full force in bankruptcy cases – including in cases involving fraudulent transfers – or that the party seeking to invoke the crime fraud exception is required only to make a *prima facie* showing of fraud, a burden that the Third Circuit has characterized as "not a particularly heavy one." *In re: Grand Jury Investigation*, 445 F.3d 266, 274 (3d Cir. 2006). The Debtors also do not attempt to refute the evidence marshaled by the Examiner in support of his conclusion that a court is "somewhat likely" to find Step Two of the LBO Transaction to have been an intentionally fraudulent transfer.

Instead, the Debtors rely upon four principal and equally flawed arguments. First, the Debtors suggest that the documents sought by the Motion are not "relevant" to the issues that this Court must determine at confirmation. These documents, however, relate directly to the very transaction that is the subject of the settlement being adjudicated in connection with confirmation, and were presumably logged by the Debtors only because they were responsive to discovery requests. Next, the Debtors argue that the crime-fraud exception is inapplicable in this case

2

because the Motion, though based on evidence of an intentional fraudulent transfer, does not establish a *prima facie* case of common law fraud. This argument is without any legal support – in order to invoke the crime-fraud doctrine in the intentionally fraudulent transfer context, the burden on the movant is to demonstrate *prima facie* evidence of an intentional fraudulent transfer, not common law fraud. The Debtors do not point to a single case that provides otherwise. Third, the Debtors argue that the Motion fails to articulate a sufficient nexus between the privileged communications and the alleged intentional fraudulent transfer at Step Two. The amended privilege log produced by the Debtors, however, contains descriptions of the documents that make clear that counsel was centrally involved in communications surrounding those very aspects of the transaction the Examiner found to be marred by "secrecy, concealment, or dishonesty." Finally, the Debtors suggest that the Noteholder Plan Proponents seek to misuse the parties' stipulation regarding the admissibility of the Examiner's conclusions and of the evidence adduced by the Examiner. This argument is dispelled by the terms of the stipulation itself, and is in any event misplaced because the Noteholder Plan Proponents may satisfy their burden with evidence not ordinarily admissible at trial.

## ARGUMENT

I.    **The Documents Sought in the Motion Are Relevant**

The Debtors argue that this Motion is a "sideshow" and that it is not calculated to obtain relevant evidence. (Memorandum of Law in Opposition to the Noteholder Plan Proponents' Motion to Compel Production of Documents and Information Based on the Crime-Fraud Exception ("Opposition") at 1, 3 [Docket No. 7554]). This argument is baseless, and belied by the fact that the Debtors have included communications and documents sought by this Motion on a Privilege Log produced in connection with confirmation discovery – which includes *only* documents and communications which are relevant and responsive to the parties' confirmation-

3

related discovery requests.  The likelihood of success of potential intentional fraudulent transfer

claims arising out of the LBO Transactions is relevant to the Court's consideration of whether the

Debtors' proposed settlement is reasonable under Bankruptcy Rule 9019.  Indeed, the parties

have engaged in and are currently in the midst of significant confirmation-related discovery on

this issue (a process which has been impeded by the Debtor/Committee/Lender Plan Proponents'

assertions of privilege with respect to thousands of relevant documents and communications

relating to the LBO transactions.  In light of the strong evidence of an intentional fraudulent

transfer adduced by the Examiner, and (as discussed below) the clear involvement of Tribune's

counsel in facilitating that fraudulent transfer, the Debtors should not be permitted to use the

attorney-client privilege or work product doctrine to shield these relevant documents and

communications from discovery.

## II.      The Crime-Fraud Exception Applies Where there is *Prima Facie* Evidence of an Intentional Fraudulent Transfer

The Debtors cannot dispute that the crime-fraud exception applies with full force in

bankruptcy proceedings when there is *prima facie* evidence that the Debtors carried out a fraud.[2]

Instead, the Debtors argue – based on a fundamental misreading of the law – that the crime-fraud

exception only applies where there is evidence of common law fraud, as opposed to an

intentional fraudulent transfer.  The Debtors' argument is unsupportable.  Every court in the

United States to consider the issue has held that crime-fraud exception applies where a movant

---

[2] The Debtors do not dispute that all that is required to overcome the applicable privilege or work product protection is a *prima facie* showing of fraud and a showing that the communications were used or sought in furtherance of the fraud.  *See, e.g., U.S. v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005).  The Debtors also do not dispute that even if a movant is unable to make a *prima facie* showing of fraud, the movant is entitled to *in camera* of the relevant documents and communications upon a showing "that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  *Haines v. Liggett Group Inc.*, 975 F.2d 81 (3d Cir. 1992) ("[T]he decision to engage in in camera review implicates a much more lenient standard of proof than the determination to apply the crime/fraud exception, as the intrusion on the asserted privilege is minimal.").  Here, because the Noteholder Plan Proponents have already made a *prima facie* showing sufficient to invoke the crime-fraud exception, *in camera* review of the challenged documents is unnecessary.

makes a *prima facie* showing of an intentional fraudulent transfer – without requiring that the

movant also produce evidence in support of the elements of a common law fraud claim. *See, e.g.,*

*In re Andrews*, 186 B.R. 219, 222 (Bankr.. E.D. Va. 1995) ("The crime/fraud exception applies to

fraudulent transfers in the bankruptcy context."); *see also In re Campbell*, 248 B.R. 435, 440

(Bankr. M.D. Fla. 2000); *In re S. Textile Knitters, Inc.*, 1999 WL 33485637, at *3 (Bankr. D.S.C.

Aug. 2, 1999); *In re Economou*,  362 B.R. 893, 898 (Bankr. N.D. Ill. 2007); *Diamant v. Sheldon*

*L. Pollack Corp.*, 216 B.R. 589, 592 (Bankr. S.D. Tex. 1995).

It is axiomatic that "a fraud upon creditors consists in the intention by the Debtor to

prevent his creditors from recovering their just debts by withdrawing property from their reach."

*Diamant v. Sheldon L. Pollack Corp.*, 216 B.R. at 592; *In re Andrews*, 186 B.R. at 223; *In re*

*Warner*, 87 B.R. 199, 203 (Bankr. M.D. Fla. 1988).  Common law fraud elements such as a

material misrepresentation and reliance are not necessary to prove such a fraud on creditors, but

an intentional fraudulent transfer generally "requires that there be conscious wrong-doing." *Off.*

*Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 70

(Bankr. D. Del. 2005); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337

B.R. 791, 811 (Bankr. S.D.N.Y. 2005) ("[I]ntentional fraudulent conveyance claims should be

relegated to their proper sphere, i.e., where there is a knowing intent on the part of the defendant

to damage creditors.").   A strong inference of such conscious wrongdoing can be established

either by (i) facts demonstrating that the defendant had both the motive and the opportunity to

commit fraud, or (ii) facts that "constitute strong circumstantial evidence of conscious

misbehavior or recklessness." *Responsible Pers. of Musicland Holding Corp. v. Best Buy Co. (In*

*re Musicland Holding Corp.)*, 398 B.R. 761, 776 (Bankr. S.D.N.Y. 2008); *see also Pereira v.*

*Grecogas Ltd., (In re Saba Enters., Inc.)*, 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009).   In

determining whether circumstantial evidence of an intentional fraudulent transfer exists, courts

typically look for certain well-defined badges or indicia of fraud to infer fraudulent intent, such

as inadequate consideration for the conveyance, the insolvency or indebtedness of the debtor, and

the secrecy or concealment of the transaction. *See, e.g., Moody v. Sec. Pac. Bus. Credit, Inc.*,

127 B.R. 958, 990 (Bankr. W.D. Pa. 1991), *aff'd,* 971 F.2d 1056 (3d Cir. 1992). Similarly, in

determining whether the crime-fraud exception applies in a case involving an alleged intentional

fraudulent transfer, courts consider whether the movant made *a prima facie* showing of an

intentional fraudulent transfer based on evidence of one or more badges of fraud. *See, e.g., In re

Andrews*, 186 B.R. at 225 ("[T]he badges of fraud are enough to establish a *prima facie case* of

fraud which excepts the communications from the attorney-client privilege."); *see also, In re

Economou*,  362 B.R. at 898 ("The crime-fraud exception applies herein. There is sufficient

information to support a prima facie showing that [debtor and his wife] committed fraud by

transferring [the debtor's] asset while a mortgage default existed for which the asset could be

sought."); *In re Campbell*, 248 B.R. at 440 ("While the Court makes no findings as to Debtor's

intent at this point, the Court does find that First Union raises sufficient inference that these

transfers may have been fraudulent. Debtor's counsel presented argument in attempt to negate

traditional badges of fraud. However, the Court finds First Union's factual showing sufficient to

invoke the crime-fraud exception to the attorney-client privilege."); *In re S. Textile Knitters, Inc.*,

1999 WL 33485637, at *2 ("In order to circumvent the attorney/client privilege on the basis of

fraud, the Trustee must make a prima facie case by demonstrating one or more "badges of fraud"

is present."); *Diamant v. Sheldon L. Pollack Corp.*, 216 B.R. at 592 ("A fraud upon creditors

consists in the intention by the Debtor to prevent his creditors from recovering their just debts by

withdrawing property from their reach. This intention can be found by the existence of certain

6

indicia or badges of fraud. . . . Although movant has not yet proven the requisite intent in regard

to the various transactions, he has 'at least raised the inference that the transfers may have been

fraudulent' which is sufficient to establish *a prima facie* case."); *In re Warner*, 87 B.R. at 202

("Because proof of actual intent is often unavailable through direct evidence, courts have

traditionally relied upon certain well-defined badges or indicia of fraud to presume fraudulent

intent. . . . Although the Committee has not yet proven debtor's intent in regard to the various

transactions, it has at least raised the inference that the transfers may have been fraudulent. . . .

Accordingly, the Court concludes that the Committee has made a prima facie showing sufficient

enough to call into play the 'fraud' exception to the attorney-client privilege and is entitled to

have those documents which might be construed as evidence of a fraudulent intent produced.").

Not one reported case which has discussed whether the crime-fraud exception applies in

the context of an alleged fraudulent transfer has required evidence of common law fraud in

addition to evidence of an intentional fraudulent transfer. Indeed, the only case cited by the

Debtors in support of their argument that a movant must present evidence of common law fraud

elements is inapposite because it did not involve an alleged fraudulent transfer. *See In re Enron*

*Corp.*, 349 B.R. 115 (Bankr.S.D.N.Y. 2006). In that case, an Enron entity initiated an adversary

proceeding against a surety seeking payment of a bond, and the surety alleged that it was it was

fraudulently induced to issue a bond. In that context, the court stated the definition of fraud

applicable in that case – and then concluded on the facts before it that a prima facie showing had

been made that a fraud may have taken place. *Id.* at 127. The facts of that case are plainly

inapplicable here.

Here, the Examiner found (and the Debtors' do not dispute that the Examiner found) that

(i) there is a high likelihood that the Step Two Transactions rendered Tribune insolvent and

without adequate capital, (ii) there was a gross disparity in the consideration given and received

in connection with Step Two of the LBO Transaction, and (iii) the actions of Tribune's

management in the time period leading up to the closing of Step Two were marred by a pattern of

"secrecy, concealment, or dishonesty."[3]  Based on these badges of fraud, the Examiner concluded

that it is more likely than not that Tribune, acting though its senior management, consciously

carried out a fraud on its pre-LBO creditors at Step Two of the LBO Transaction.  This evidence

more than satisfies the Noteholder Plan Proponents' burden of presenting *prima facie* evidence of

an intentional fraudulent transfer.[4]

### III.    Tribune's Counsel Provided Services in Furtherance of the Intentional Fraudulent Transfer

On January 17, 2010, the Debtors produced an amended privilege log (the "Privilege

Log") which – for the first time – provided appropriate detail into the role of Tribune's counsel in

the time period leading up to the closing of Step Two of the LBO Transaction.[5]  The Privilege

---

[3] Report of Kenneth N. Klee, Volume 2 at 35-36.

[4] Even if evidence in support of the elements of common law fraud were necessary to invoke the crime-fraud exception in this case, the evidence adduced by the Examiner would satisfy these elements.  Indeed, the Examiner found significant evidence that Tribune (acting through its senior management including Messrs. Biglow and Grensko) misled (among others) VRC and the banks by presenting inaccurate and misleading projections, and by presenting misleading information regarding Morgan Stanley's role in the process.  Report of Kenneth N. Klee, Volume 2 at 42-43, 54, 63.  The Examiner also found that VRC and the banks, as well as the Tribune Board and Special Committee relied on these misrepresentations and material omissions, and that Step Two would not have closed but for the fraudulent actions of Tribune's management.  For example, the Examiner found that (i) "VRC's Step Two analysis relied on revised October 2007 projections that did not, in the Examiner's view, reasonably represent Tribune's likely future financial performance following the Merger," (ii) "VRC's reliance on the EBITDA estimates derived from those projections bears directly on VRC's valuation and capital adequacy conclusions," (iii) "[b]ecause VRC adopted these assumptions without adjustment in its Step Two opinion, this significantly (and upwardly) affected VRC's Step Two valuation conclusions by approximately $613 million," and that (iv) "[a]s a result, because both VRC's Step Two valuation analysis (in part), and its cash flow tests (in full) were ultimately predicated on management's October 2007 projections containing the flaws discussed above. . . VRC's valuation conclusions were improperly upwardly biased."  *Id.* Vol. 1 at 514-15, 527, 543-44.  The Examiner also found that "without the management representation on refinancing satisfactory to VRC, VRC would not issue its opinion.  The events that did unfold lead directly to VRC's issuance of its opinion and to the Step Two Closing." *Id.* Vol. 2 at 51.

[5] A copy of the Privilege Log is attached as Exhibit A.  A chart identifying the 79 selected privileged log entries sought by this Motion is attached as Exhibit B.  The Debtors' Privilege Log does not purport to identify all communications and information withheld by the Debtors, but only those withheld communications and information which are dated before the close of Step Two and relate to one or more of the following categories:  (i) "Projections

Log makes clear that Tribune's counsel advised management in connection with virtually every aspect of the transaction, and conclusively dispels any argument that Tribune's counsel did not assist management "in furtherance" of the intentional fraudulent transfer at Step Two of the LBO Transaction.[6]

As described in the Opening Brief, the Examiner's finding that Tribune's management engaged in a fraud on creditors in the period leading up to the closing of Step Two of the LBO Transaction was based in large part on evidence of management's actions in procuring a solvency opinion which was required for the consummation of the transaction, including evidence of inaccurate and misleading projections provided by management to Tribune's solvency expert ("VRC"), evidence that Tribune's management mislead VRC and the Lead Banks regarding Morgan Stanley's views on whether Company would be able to refinance its debt upon maturity, and evidence that Tribune's management concealed this information from Tribune's Board of Directors and Special Committee.[7]   The Privilege Log reveals that Tribune's counsel was involved in communications concerning each of these aspects of this intentional fraudulent transfer, including by participating in virtually every major meeting and call during which Tribune's management provided materially misleading information to the banks, VRC and the board of directors, by providing advice concerning the misleading projections and financial

---

or Forecasts," (ii) "Financial Reports," (iii) "LBO Structure," (iv) "Anticipated Solvency," and (v) "Proceeding with LBO."

[6] The Noteholder Plan Proponents do not argue that Tribune's attorneys were aware of or knowing participants in the intentional fraudulent transfer, nor do they need to.  As described in the Opening Brief, courts in the Third Circuit and elsewhere are unanimous in holding that the crime-fraud exception can apply even where the attorney has no knowledge of the crime or fraud and takes no affirmative step in furtherance of such crime or fraud. Thus, "[t]he crime-fraud exception does not require that the attorney have participated, even unwittingly, in the client's criminal activity." *In re Grand Jury Proceedings*, 445 F.3d 266, 278 n.4 (3d Cir. 2006).

[7] The requirement that the consummation of the Step Two transactions be conditioned on the receipt of a satisfactory solvency opinion was itself conceived of by Tribune's counsel (primarily Steve Rosenblum of Wachtell, Lipton, Rosen and Katz ("Wachtell")), "as a mechanism to protect the board."  Report of Kenneth N. Klee, Volume 1 n. 428; *id.* Vol. 2 n. 105.

information fed by Tribune's management to VRC and the Lead Banks,[8] and by editing and advising management in connection with the representation letters and solvency certificates that were essential to carrying out the intentional fraudulent transfer. For example:

•    In the days preceding a major due diligence meeting with VRC on September 19 and 20, 2007, Chandler Bigelow, Tribune's Vice President and Treasurer during the LBO period, exchanged a series of e-mails with Tribune's in-house counsel relating to "Anticipated Solvency" which purportedly requested "legal advice regarding providing materials to VRC" and "legal advice regarding handouts prepared for upcoming meetings with VRC."[9] The due diligence meeting was attended by Tribune's General Counsel and Assistant General Counsel.[10] On September 20, 2007, Chandler Bigelow exchanged additional purportedly privileged emails with Tribune's counsel "requesting legal advice regarding communications with VRC relating to projection models."[11] As described in detail in the Examiner's Report, these projection models were materially false and misleading.[12]

•    Shortly before a September 26, 2007 meeting with the lenders participating in the Step Two Financing, at which Tribune's management provided information regarding, among other things the 2007 third and fourth quarter projections, 2007 projected cash flow summary and revised long term financial projections, management consulted with counsel, and specifically requested "legal advice regarding communications with Step Two lenders relating to VRC

---

[8] The Debtors argued that "with respect to the ten year projections . . . it is hard to imagine that any lawyer could have furnished legal advice "giv[ing] direction" as to growth forecasts." (Opposition at 15). The Debtors' own Privilege Log shows otherwise. 16 of the 79 documents sought by this motion relate directly to the Debtors' projections of forecasts. *See* Privilege Log Entries 52, 56, 119, 242, 300, 302, 307, 310, 324, 329, 348, 350-51, 610, 617, 821.

[9] Privilege Log Entries 634-35.

[10] Report of Kenneth N. Klee, Exhibit 228 at 1.

[11] Privilege Log Entries 347-48, 350-51.

[12] Report of Kenneth N. Klee, Volume 2, at 58-63.

solvency analysis."[13]  Two days later, Chandler Bigelow again requested "legal advice regarding

legal implications of VRC solvency opinions."[14]  Tribune then held another meeting with the

banks on October 1, 2007, "during which it provided information regarding the updated model

for the Publishing Segment and the Broadcasting."[15]

- After the Lead Banks engaged Murray Devine in early October 2007 to assist

them in evaluating Tribune's possible insolvency as Step Two, management's concern (and

communications with counsel) regarding the solvency opinion apparently intensified.  Over the

course of the following days, Tribune's management and counsel exchanged numerous emails

requesting or providing legal advice regarding "solvency analysis,"[16] as well as emails

requesting legal advice "regarding Murray Devine and Tribune solvency analysis" and providing

legal advice "regarding bank's engagement of Murray Devine."[17]

- On October 16, 2007 – one day before the next Tribune Board Meeting –

Chandler Bigelow exchanged seven e-mails with counsel with the subject line "VRC Rep

Letters," which are each described as requesting or providing "legal advice regarding draft VRC

Representation Letters."[18]  On the day of the October 17, 2007 Board Meeting, Tribune's counsel

provided certain members of management with "legal advice regarding solvency analysis and

disclosure of solvency opinions."[19]  At the October 17, 2007 Board Meeting, management

provided the board with a Board book containing a section devoted to the ongoing VRC

---

[13] Privilege Log Entries 346, 349, 352.  Each of these communications relate to "Anticipated Solvency."

[14] Privilege Log Entry 534.

[15] Report of Kenneth N. Klee, Volume 1, at 425-26.

[16] Privilege Log Entries 212, 239, 274, 532, 577, 601, 607, 623, 678.

[17] Privilege Log Entries 577, 583.

[18] Privilege Log Entries 52, 213, 240-41, 600, 605-06.  Each of these entries relate to "LBO Structure" and "Anticipated Solvency."  Entries 52, 240, 600, 605 and 606 also relate to "Proceeding with LBO."  In addition, entries 52 and 240 relate to "Projections and Forecasts" and "Financial Reports."

[19] Privilege Log Entry 767.

evaluation of solvency in contemplation of the Step Two Transactions, but failed to apprise the Board of material changes in the projection models provided to VRC.[20] The Board meeting was attended by counsel including Tribune's in-house counsel and outside counsel at Skadden, Aprs, Slate, Meagher & Flom LLP ("Skadden") and Sidley Austin LLP ("Sidley").[21]

- The week after the October 17, 2007 Board meeting, Mr. Bigelow exchanged numerous emails with counsel with the subject line "VRC Letter" which requested or provided "legal advice regarding draft VRC rep letters" and related to "Anticipated Solvency."[22] Mr. Bigelow also exchanged emails during that week with counsel with the subject line "Call with Raj [Kapadia of JP Morgan] and [Todd] Kaplan [of Merrill Lynch]" which related to "Anticipated Solvency" and provided "legal advice regarding VRC solvency analysis and lender questions for VRC,"[23] as well as emails with counsel which provided "legal advice regarding VRC solvency analysis and lender meeting and questions for VRC"[24] or requested "legal advice regarding legal issues relating to Leveraged ESOP Transaction regarding VRC meeting."[25]

- In early November 2007, Mr. Bigelow continued to exchange numerous emails with counsel relating to "legal advice regarding VRC analysis of solvency and discussions with lenders,"[26] "legal advice regarding VRC solvency analysis and bank requests for VRC,"[27] "legal advice regarding VRC solvency analysis,"[28] "legal advice regarding VRC solvency analysis and

---

[20] Report of Kenneth N. Klee, Volume 1, at 481-82; *id.* Exhibits 643, 722.
[21] *Id.* Exhibit 643.
[22] Privilege Log Entries 214, 242, 599, 604, 630.
[23] Privilege Log Entries 201, 769-70
[24] Privilege Log Entry 200.
[25] Privilege Log Entry 768.
[26] Privilege Log Entries 202-03, 771
[27] Privilege Log Entries 531. 773
[28] Privilege Log Entries 530, 777-78.

banker list,"[29] or "legal advice regarding VRC representation letters and VRC opinion."[30] During this time period Tribune's counsel (including outside counsel at Wachtell and Sidley) also exchanged emails relating to the "VRC solvency opinion,"[31] the "opinion of counsel re: reliance on VRC solvency opinion,"[32] emails with the subject line "Tribune / Summary of Discussion with MS" which conveyed legal advice "regarding communications with Morgan Stanley relating to second step financing,"[33] and emails with the subject line "Tribune / Cahill Call" which provided "legal advice regarding possible modifications to financing structure pursuant to discussion with counsel for lenders."[34]   In addition, Tribune's counsel prepared certain notes and hard copy documents including a "Draft representation letter to Valuation Research Corporation from Tribune Company containing  handwritten notes of counsel" and "reflecting  legal opinion relating to the representation letter," and "Handwritten notes of telephone conversation with counsel" which relate to "legal advice regarding valuation issues.[35]

- On November 21, 2007, the day of Tribune's next board meeting, Tribune's counsel sent Mr. Bigelow an email and attachment with the subject line "Talking points" which provided "legal advice regarding attached draft talking points for November 21, 2007 board meeting" and related to "Anticipated Solvency."[36]   At the November 21, 2007 Board Meeting, Mr. Bigelow provided the board with a "Solvency Update," but again failed to disclose the

---

[29] Privilege Log Entry 636.
[30] Privilege Log Entry 243.
[31] Privilege Log Entry 503
[32] Privilege Log Entry 467
[33] Privilege Log Entries 492-93, 521.
[34] Privilege Log Entries 302, 353.  These entries each relate to "Projections and Forecasts"
[35] Privilege Log Entries 820-21.
[36] Privilege Log Entry 517.

material changes in VRC's assumptions and in the projection provided by management to VRC.[37]

- The following week, Mr. Bigelow exchanged numerous additional emails with counsel with the subject line "Revised VRC Rep Letters," which reveal that Tribune's attorneys were editing the representation letters which were relied upon by VRC in issuing its solvency opinion. Each of these communications are described as providing "legal advice regarding revisions to attached VRC representation letter, including comments from counsel, and redline of the same," and which relate to each of the five privilege categories.[38]

- On December 2, 2007, Tribune's senior financial management including Donald Grenesko and Chandler Bigelow and Tribune's General Counsel Crane Kenny had a call with Bryan Browning of VRC, during which "Mr. Grenesko and/or Mr. Bigelow reported to Mr. Browning certain statements allegedly made previously by Thomas Whayne of Morgan Stanley to the two of them concerning the question whether Tribune could refinance its indebtedness in 2014."[39] During this conversation, "Mr. Grenesko and/or Mr. Bigelow told Mr. Browning that Morgan Stanley agreed that Tribune could refinance its debt in a 2014 downside scenario."[40] The Examiner found that " (i) the statements of Mr. Grenesko and/or Mr. Bigelow to Mr. Browning on December 2, 2007 concerning Morgan Stanley's views on the refinancing question were not accurate; (ii) these statements appear to have served as a predicate on which VRC concluded that it would accept Tribune's representation on Tribune's ability to refinance; (iii) the statements contained in Tribune's representation letter to VRC on refinancing referring to

---

[37] Report of Kenneth N. Klee, Volume 1, at 82; *id.* Exhibit 702.

[38] Privilege Log Entries 55, 307-08, 608.

[39] Report of Kenneth N. Klee, Volume 2, at 36-37. The Examiner noted that "Tribune General Counsel Crane Kenney was also on the call." *Id.* Vol. 2 n. 112, 147.

[40] *Id.* Vol. 2 at 45.

management's discussions with Morgan Stanley created a false impression that Morgan Stanley

told management it concurred with management's views concerning the refinancing question; (iv)

the statements apparently made by Tribune to the Lead Banks concerning Morgan Stanley's

involvement in VRC's opinion were false; and (v) the preceding events led directly to VRC's

issuance of its Step Two opinion letter, the solvency certificate, the solvency representation, and

hence the Step Two Closing."[41]

- On December 3, 2007, one day before the next Tribune Board meeting, Tribune's

management (including Mr. Bigelow) and counsel (including in-house counsel and outside

counsel at Wachtell and Sidley) exchanged thirteen separate emails with the subject lines "VRC

Rep Letters" or "VRC - Refinancing Rep Letter" with are described as requesting or providing

"legal advice regarding drafts of the VRC representation letters and potential disclosures of

VRC presentations or solvency opinions."[42] Tribune's counsel sent Mr. Bigelow another email

regarding the VRC representation letters on the day of December 4, 2007 Board meeting, which

related to "Financial Reports" and "Anticipated Solvency."[43] Although the evidence adduced by

the Examiner shows that "prior to the Tribune Board's December 4, 2007 meeting, VRC had

revised its analysis to include the extrapolated out-year projections in reaching its valuation

conclusions for Tribune at Step Two," this information was not shared with Tribune's Board.[44]

---

[41] *Id.* Vo. 2 at 42-45.

[42] Privilege Log Entries 15-16, 56, 310-12, 329, 591-92, 609-11, 624.

[43] Privilege Log Entry 313.

[44] The Examiner found "it difficult to accept that the failure to apprise the Tribune Board and Special Committee of this change to the Step One solvency valuation, and to the representation given by Tribune to VRC, was unintentional." Report of Kenneth N. Klee, Volume 2, at 57. The Examiner also found that during this period management misled VRC regarding Morgan Stanley's role in determining whether the Company would be able to refinance its debt, and specifically that "Mr. Bigelow and/or Mr. Grenesko in advance of the scheduled December 4, 2007 Tribune Board meeting pushed the envelope beyond what Morgan Stanley had said to them, in order to get past the final major hurdle standing in the way of the Step Two Closing." *Id.* Vol. 2 at 50.

- Over the course of the following weeks, Tribune's management attempted to address detailed questions concerning the assumptions underlying the VRC representation letters, which culminated in December 17, 2007 "all hands call" with the banks and their advisors, and with Tribune's management and counsel. The VRC representation letters were the subject of numerous purportedly privileged communications in the days leading up to that call. Between the December 10, 2007 and December 11, 2007 alone, counsel at Wachtell and Sidley exchanged fourteen emails with Tribune's management, including Mr. Bigelow, with the subject line "VRC Rep Letter" which all related to "Anticipated Solvency" and/or "Projections and Forecasts."[45] On December 12, 2007, Tribune's counsel and management including Mr. Bigelow and Mr. Grenesko exchanged several additional privileged communications relating to the "VRC solvency opinion,"[46] or "providing legal advice regarding revisions to VRC representation letters."[47] Tribune's outside and in-house counsel also exchanged emails with the subject line "Solvency Cert" which related to "legal advice regarding solvency certificate and definitions of solvent/solvency,"[48] and Tribune's in-house counsel prepared handwritten notes "regarding phone call with counsel. . . requesting legal advice regarding financing and solvency status."[49] Between December 14 and 16, 2007, Tribune and its Counsel exchanged additional purportedly privileged communications relating to "solvency analysis," "VRC solvency opinion," "entity

---

[45] Privilege Log Entries 17-18, 300, 314-17, 593-95, 613-15, 616-17, 637-38. For example, an email dated December 11, 2007 from Steve Rosenblum at Wachtell to Mr. Bigelow and in-house counsel at Tribune with the subject line "RE: VRC Rep Letter" is described as an "Email string providing legal advice regarding Tribune cash flow projections and VRC representation letter," and relates to "Anticipated Solvency." Privilege Log Entry 594.

[46] Privilege Log Entries 318. 612

[47] Privilege Log Entry 319,

[48] Privilege Log Entry 511; see also Privilege Log Entry 453.

[49] Privilege Log Entry 891.

solvency valuation," or "solvency analysis and requests from banks," each of which relate to "Anticipated Solvency."[50]

- On December 17, 2007, Tribune management and counsel (including outside counsel Wachtell, Sidley and Quinn Emanuel) exchanged four emails which apparently related to the conference call to be held that day with representatives of the Lead Banks. Each of these emails has the subject line "Call today," is described as discussing "legal advice received from counsel regarding solvency analysis and communication with banks" and relate to "Anticipated Solvency."[51]  The Examiner found that, on the December 17, 2007 conference call with the Lead Banks, Tribune's management created the misleading impression "that Tribune's views on this question had the benefit of Morgan Stanley's blessing."[52]  Notes taken contemporaneously with that call also suggest that representatives of Wachtell, Sidley and Quinn Emmanuel participated in that call.[53]

- The following day, the Tribune Board and the Special Committee held meetings to review, among other things, the status of the Step Two Transactions, discussions with lenders, and the status of VRC's analysis. The Tribune Board Meeting was attended by representatives of VRC, Morgan Stanley, management (including Messrs. Grenesko and Bigelow), Tribune's in-house counsel, and outside counsel at Skadden, Sidley and Wachtell.[54]  The Special Committee

---

[50] Privilege Log Entries 475, 491, 537-38, 640, 725.

[51] Privilege Log Entries 474, 535, 536, 780.

[52] Indeed, handwritten notes taken contemporaneously with that call state: "Co. has used Morgan Stanley as solvency advisory. Mgt. believes company is solvent and can service debt," "VRC is independent & Morgan Stanley to review solvency," "MS assumptions & recommendations fair & reasonable in light of fairness opinion,'" and ""Fair and reasonable\ - MS believes this as well."  Report of Kenneth N. Klee, Volume 2, at 41-42.  The Examiner found that "a fair inference from the notes is that Tribune told the Lead Banks that VRC's solvency opinion had Morgan Stanley's blessing in a conference call that Morgan Stanley did not attend."  Id..

[53] Id. Vol. 2 at 40-41; id. Ex. 890 at JPM 00499993  (indicating that "All Hands Call" included "Wachtell, Sidley and Quinn Emmanuel" as "TRB law team.")

[54] Id. Ex. 11.

Meeting was also attended by Morgan Stanley counsel at Skadden.[55]   Although the draft minutes

of that meeting suggest that Morgan Stanley believed VRC's solvency analysis was

"conservative," this contention was vigorously disputed by representatives of Morgan Stanley,

and the examiner found (i) that the evidence adduced "contradicted what is stated in portions of

the draft minutes of that meeting attributed to Morgan Stanley, including that VRC's ultimate

solvency opinion was conservative and was something on which directors could reasonably

rely," and (ii) the circumstances surrounding the draft minutes of that meeting constituted yet

"another instance in which Morgan Stanley's alleged seal of approval of VRC's Step Two

solvency opinion does not withstand scrutiny."[56]   Those draft minutes, like all of Tribune's board

minutes, were prepared in consultation with Tribune's counsel.[57]   Indeed, on December 18, 2007,

counsel at Wachtell, Sidley and Skadden exchanged a series emails with Tribune Management

"providing legal advice regarding edits to attached excerpt from minutes from December 18,

2007 Board of Directors meeting" and forwarding legal advice "regarding attached draft Board

minutes  summary relating to VRC solvency analysis."[58]

- Tribune's counsel and management continued to exchange numerous emails (no

less than twenty-four of them) on December 18 and 19 relating to the VRC representation letters,

including emails "regarding suggestions for and edits to VRC representation letters," "regarding

delivery and presentation of VRC solvency opinion," "regarding VRC independence

---

[55] *Id.* Ex. 704.

[56] *Id.* Vo. 1 at 11; *id.* Vol. 2 at 72.

[57] Tribune's counsel regularly assisted management in preparing reports for the Tribune Board.  For
example, in the days preceding the July 18, 2007 Tribune Board meeting, Tribune's counsel and management
including Chandler Bigelow exchanged a series of emails with the subject lines "Board Report" or "Revised Board
Report" which are described as emails "providing legal advice regarding excerpt from draft board report relating to
Step Two financing" or emails "providing legal advice regarding attached board presentation on the Leveraged
ESOP Transaction." *See* Privilege Log Entries 166-68, 671.  Tribune has characterized these emails as relating to
"Projections or Forecasts," "LBO Structure" and "Anticipated Solvency."

[58] Privilege Log Entries 4, 473, 781.

considerations," "regarding attached marked-up VRC solvency opinion and representation

letters," "regarding revised VRC solvency opinion and representation letters," and "regarding

edits and comments to draft solvency certificates."[59]   These entries reveal that the solvency

certificates and representation letters upon which the closing of Step Two depended were

prepared with the significant involvement of counsel.  Final copies of these documents were

prepared by Messrs. Grenesko and Bigelow on December 20, 2007, and Step Two closed on that

day.[60]

        These and other entries on Tribune's privilege log lead to the inescapable conclusion that

Tribune's lawyers were involved in and facilitated every material aspect of the fraud carried out

on Tribune's pre-LBO creditors.  This easily satisfies the "in furtherance of" requirement of the

crime-fraud exception.  *See In re: Grand Jury Investigation*, 445 F.3d at 278 n.4.

**IV.    The Evidence Adduced by the Examiner May Be Used in Support of this
         Motion**

        Finally, although the Debtors do not dispute any of the evidence adduced by the

Examiner, they argue that this evidence may not be used for the purposes of this Motion.  This

argument is meritless.  First, any argument regarding the admissibility of the evidence adduced

by the Examiner is a red herring because a movant may satisfy its burden of making a *prima*

*facie* showing of fraud for the proposes of the crime-fraud exception without producing evidence

which would ordinarily be admissible at trial.  *See, e.g., United States v. Under Seal (In re Grand*

*Jury Subpoena)*, 884 F.2d 124, 127 (4th Cir. 1989) ("This Court and others, when reviewing

whether the crime-fraud exception applies, have permitted district courts to rely on evidence not

ordinarily admissible at trial."); *In re Berkley and Co., Inc.*, 629 F.2d 548, 557 (8th Cir. 1980)

---

[59] Privilege Log Entries 1-3, 5-6, 119, 301, 306, 320-24, 445-46, 496-97, 507, 618-22, 779.  Each of these emails relates to "Anticpated Solvency" and several also relate to "Financials and Projections," Financial Reports," "LBO Structure," and Proceeding with LBO."  *See* Privilege Log Entries 1, 119, 320, 324, 618.

[60] Report of Kenneth N. Klee, Ex. 739.

("The ultimate question of the relevance and admissibility of the documents at trial may then be

determined, but only after all parties have had an opportunity to be heard. The district court's

determination that there was prima facie evidence of criminal or fraudulent activity was based

solely on the documents before it."); *In re Andrews*, 186 B.R. 219, 225 (Bankr. E.D. Va. 1995)

("This prima facie showing of fraud is sufficient to warrant applying the crime/fraud exception to

the attorney-client privilege. At trial, the court is committed to hearing admissible evidence

relating to the transfers, and then I will make an objective determination of the issues on the

merits.").[61] Thus, the evidence adduced by the Examiner may be considered in connection with

this Motion without regard to whether it would be admissible at trial.

In any event, the parties have already stipulated that the Examiner's opinions and the

historical facts on which the Examiner relied in reaching his opinions *are* admissible.

Specifically, the Proposed Stipulation Regarding Use of Examiner's Report At The Confirmation

Hearing ("Examiner Stipulation") [Docket No. 7423] provides that the opinions expressed by the

Examiner shall be "admissible by any entity *in connection with* the Confirmation Hearing *for all*

*purposes* to the same extent as the opinions testified to by an expert witness under the Federal

Rules," and that statements of historical fact, unless disputed by the parties, "will be admissible

for all purposes, including the truth of the matter asserted and will be presumed to be correct,

unless disputed." Any argument that this Motion is not "in connection with" the Confirmation

Hearing defies logic. The Motion seeks to compel documents sought by confirmation-related

discovery requests, which are relevant to the issues that will be tried at the Confirmation Hearing,

and which were withheld by the Debtors and logged on a Privilege Log produced in connection

---

[61] In fact, the crime-fraud exception is regularly applied in the grand jury context, where hearsay and other evidence not ordinarily admissible at trial is often used. *See In re Grand Jury Investigation*, 445 F.3d 266 (3d Cir. 2006) ("The District Court based its finding on the evidence before it, which included the ex parte affidavit provided by the Government. The Supreme Court has made clear that the district courts may use ex parte evidence supplied by the Government in order to make the required findings.") (citations omitted).

with confirmation-related discovery. The parties' stipulation that the Examiner's opinions and the historical facts on which the Examiner relied are admissible "in connection with" the confirmation hearing squarely applies to this Motion.

## CONCLUSION

For the foregoing reasons, and the reasons stated in the Opening Brief, the Noteholder Plan Proponents respectfully request that the Court compel the production of the 79 communications and documents listed on the Debtors' Privilege Log which are identified on Exhibit B. In the alternative, the Noteholder Plan Proponents request that the Court at least conduct an *in-camera* review of these documents and communications to determine whether the crime-fraud exception should apply.

Dated: February 2, 2011
     Wilmington, Delaware

                                   **ASHBY & GEDDES, P.A.**

                                    /s/  William P. Bowden
                                   William P. Bowden, Esq.  (I.D. No. 2553)
                                   Amanda M. Winfree, Esq.  (I.D. No. 4615)
                                   500 Delaware Avenue
                                   P.O. Box 1150
                                   Wilmington, DE 19899
                                   (302) 654-1888

                                   - and -

                                   Daniel H. Golden, Esq.
                                   David M. Zensky, Esq.
                                   Abid Qureshi, Esq.
                                   Sunish Gulati, Esq.
                                   Jason Goldsmith, Esq.
                                   Akin Gump Strauss Hauer & Feld LLP

One Bryant Park
New York, New York 10036
(212) 872-1000

*Counsel to Aurelius Capital Management, LP*

**BIFFERATO GENTILOTTI**

*/s/ Garvan F. McDaniel* _____
   Garvan F. McDaniel, Esq.
   800 N. King St., Plaza Level
   Wilmington, DE 19801
   (302) 429-1900

   - and -

   David S. Rosner, Esq.
   Andrew K. Glenn, Esq.
   Sheron Korpus, Esq.
   Kasowitz, Benson, Torres & Friedman LLP
   1633 Broadway
   New York, New York 10019
   (212) 506-1700

*Co-Counsel for Law Debenture Trust Company of New York*

**SULLIVAN HAZELTINE ALLINSON LLC**

  */s/ William D.  Sullivan* _____
William D. Sullivan, Esq. (Del. Bar No. 2820)
Elihu E. Allinson, Esq. (Del. Bar No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Telephone:  (302) 428-8191
Facsimile: (302) 428-4195
Email: bsullivan@sha-llc.com
Email: zallinson@sha-llc.com

-and-

22

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
      Martin S. Siegel, Esq.
      Gordon Z. Novod, Esq.
Katherine S. Bromberg, Esq.
Seven Times Square
New York, New York 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801
Email: rstark@brownrudnick.com
Email: msiegel@brownrudnick.com
Email: gnovod@brownrudnick.com
Email: kbromberg@brownrudnick.com

*Counsel to Wilmington Trust Company, as
Successor Indenture Trustee for the $1.2
Billion Exchangeable Subordinated
Debentures Due 2029, Generally Referred to
as the PHONES*

**McCARTER & ENGLISH, LLP**


   /s/ James J. Freebery
James J. Freebery, Esq.  (I.D. No. 3498)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

-and-

Steven Beckelman, Esq.
100 Mulberry Street
Gateway Four
Newark, New Jersey 07102
(973) 622-4444

*Counsel to Deutsche Bank Trust Company
Americas*