## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TRIBUNE COMPANY,** *et. al*[1] | : | |
| | : | Case  No. 08-13141 (KJC) |
| Debtors | : | |

## MEMORANDUM AND ORDER[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Currently before the Court is a discovery dispute among parties who are proponents of competing plans of reorganization.  On January 14, 2011, the Noteholder Plan Proponents[3] filed a  Motion to Compel Production of Documents and Information from the Debtor/Committee/ Lender Plan Proponents and Other Parties, or, Alternatively For an Order of Preclusion Respecting Certain Issues (the "Motion to Compel")(D.I. 7527).   On January 19, 2011, the

---

[1]The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08-13236) is being jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors pursuant to the Order dated December 10, 2008 (main case docket no. 43)(collectively, the "Debtors" or "Tribune").  An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) commenced a chapter 11 case on October 12, 2009 as one of the steps necessary to complete a transaction involving the Chicago Cubs and certain related assets.  In all, the Debtors now comprise 111 entities.

[2]This Memorandum constitutes the findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A) and (L).

[3]The Noteholder Plan Proponents are those parties who are proponents of the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its Managed Entities ("Aurelius"), Deutsche Bank Trust Company Americas, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Law Debenture"), and Wilmington Trust Company, in Its Capacity as Successor Indenture Trustee for the PHONES Notes ("Wilmington Trust")(D.I. 7073)(the "Noteholder Plan").

Debtor/Committee/Lender Plan Proponents[4] filed an objection to the Motion to Compel (D.I. 7552).  A hearing to consider the Motion to Compel was held on January 24, 2011.

BACKGROUND[5]

On December 8, 2008,  Tribune Company and certain of its subsidiaries (the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §101 *et seq.*).  On April 12, 2010, the Debtors filed a proposed plan (the "April 2010 Plan") that sought to implement the terms of a settlement agreement regarding certain LBO-Related Causes of Action.[6]  A confirmation hearing for the April 2010 Plan was scheduled for August 16, 2010.

By order dated April 20, 2010, the Bankruptcy Court entered an Agreed Order Directing the Appointment of an Examiner (the "Examiner Order").  On May 10, 2010, the Bankruptcy Court approved the U.S. Trustee's application appointing Kenneth N. Klee as examiner (the "Examiner").  On May 11, 2010, the Bankruptcy Court entered an order approving the

---

[4]The Debtor/Committee/Lender Plan Proponents are those parties who are proponents of the First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan") (D.I. 7136)( the "DCL Plan").

[5]Most of the Background is taken from the Joint Disclosure Statement (D.I. 7134), approved by order dated December 9, 2010 (D.I. 7126), as amended by order dated December 16, 2010 (D.I. 7215).

[6]The "LBO-Related Causes of Action" is defined in the DCL Plan as meaning "any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance powers or rights, liabilities of any nature whatsoever, and legal or equitable remedies against any Person arising from the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

Examiner's proposed work and expense plan and modifying the Examiner Order.  The

Examiner's principal duties were to:

(1)     Evaluate the potential claims and causes of action held by the Debtors' estates
        that are asserted by the Parties (as defined in the Examiner Order) in connection
        with the leveraged buy-out of Tribune that occurred in 2007 [defined as the LBO-
        Related Causes of Action] which may be asserted against any entity which may
        bear liability, including without limitation, the Debtors, the Debtors' former
        and/or present management, former and/or present members of Tribune's board of
        directors, the Debtors' lenders and the Debtors' advisors, said potential claims
        and causes of action including, but not being limited to, claims for fraudulent
        conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary
        duty, and equitable subordination, and to evaluate the potential defenses asserted
        by the Parties to such potential claims and causes of action;

(2)     evaluate whether Wilmington Trust Company violated the automatic stay under
        11 U.S.C. §362 by its filing, on March 3, 2010, of its Complaint for Equitable
        Subordination and Disallowance of Claims, Damages, and Constructive Trust;
        and

(3)     evaluate the assertions and defenses made by certain of the Parties in connection
        with the Motion of JP Morgan Chase Bank, N.A. for Sanctions Against
        Wilmington Trust Company for Improper Disclosure of Confidential Information
        in Violation of Court Order.

The Examiner conducted in-person meetings with the parties and invited the parties to

share their views in writing on the issues to be considered by him.  The Examiner was assisted,

in addition to counsel, by a financial advisor who developed a financial analysis of issues

presented, including issues concerning solvency, unreasonably small capital, the flow of funds,

and matters pertaining to intercompany claims.

On July 26, 2010, the Examiner filed a report containing the results of his investigation.

By Order dated August 3, 2010, the Court ordered the unsealing of the Examiner's Report, with

exhibits and transcripts.[7]  The Examiner did not reach definitive conclusions regarding the issues

considered in the Report, but suggested a range of potential outcomes.[8]  After the Examiner's

Report was filed, the April 2010 Plan and the settlement it embodied were abandoned.

The Debtors' exclusive period within which to file a chapter 11 plan and solicit

acceptances, as extended by court order, expired on August 8, 2010.  After the Examiner's

Report was filed and the settlement in the April 2010 Plan was abandoned, interested parties

continued to negotiate, but failed to reach any consensus.  Thereafter, the Debtors asked the

Bankruptcy Court to appoint a mediator.

On September 1, 2010, I appointed my colleague, the Honorable Kevin Gross, as a

mediator (the "Mediator") to conduct non-binding mediation concerning the terms of a plan of

reorganization, including appropriate resolution of the LBO-Related Causes of Action (the

"Mediation").  The parties to the Mediation included (i) the Debtors, (ii) the Creditors'

Committee, (iii) Angelo Gordon, (iv) the Credit Agreement Lenders, (v) the Step One Credit

Agreement Lenders, (vi) Wells Fargo Bank, N.A. (vii) Law Debenture Trust Company of New

York ("Law Debenture"), (viii) Deutsche Bank Trust Company Americas, (ix) Centerbridge

Credit Advisors, LLC, (x) Aurelius, (xi) EGI-TRB LLC, and (xii) Wilmington Trust Company

(collectively, the "Mediation Parties").  On September 20, 2010, each of the Mediation Parties

submitted to the Mediator a statement setting forth such Mediation Party's position respecting

---

[7]The Examiner's Report (volumes 1 through 4) were docketed as D.I.s 5247, 5248, 5249, and
5250.  The exhibits were docketed as D.I.s 5437, 5438, 5439, 5441, 5442, 5444, 5445, 5447, 5449, 5451,
5453, 5454, 5455, 5456, 5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469, and 5480.

[8]Specifically, the Examiner framed his conclusions about the merits of various claims using the
following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5)
somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.

the structure and economic substance of an acceptable plan of reorganization.

The Mediation began on September 26, 2010, and the Mediation Parties continued settlement discussions on September 27, 2010.  On September 28, 2010, the Mediator filed a report which, among other things, reported a settlement agreement between the Debtors, on the one hand, and Angelo Gordon and Oaktree, on the other.  The Mediator continued settlement discussions with certain parties. On October 12, 2010, the Mediator filed the Mediator's Second Report which included  the terms of an expanded settlement among the Debtors, the Committee, Oaktree, Angelo Gordon, and JP Morgan (the "October Term Sheet").

Pursuant to the deadlines set forth in the Bankruptcy Court's Order dated October 18, 2010 (D.I. 6022), four competing plans of reorganization were filed: (i) the Debtor/Committee/ Lender Plan, (ii) the Noteholder Plan, (iii) the Bridge Lender Plan[9], and (iv) the Step One Credit Lender Plan.[10]  The Step One Credit Lender Plan was withdrawn on December 14, 2010 (D.I. 7190).  Pursuant to the procedures set forth in the Order dated December 9, 2010 (D.I. 7126), as amended by Order dated December 16, 2010 (D.I. 7215), the three competing plans were distributed for solicitation and voting.

On December 20, 2010, the Bankruptcy Court entered the Discovery and Scheduling Order for Confirmation (the "Case Management Order" or "CMO").  The parties commenced discovery, which was quickly followed by a number of discovery disputes.  Through various

---

[9]The Bridge Lender Plan is the Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (D.I. 7089)(as the same may be amended from time to time, the "Bridge Lender Plan").

[10]The Step One Lender Plan is the First Amended Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (D.I. 6683).

"meet and confer" conferences, the parties resolved many of these disputes. However, when they reached an impasse on certain discovery matters, the parties sent letters to the Court, as called for in the CMO.  After a teleconference held on January 10, 2011, the Court directed the parties to file discovery motions on or before January 14, 2011, with replies due by January 19, 2011. Seven discovery motions were filed, and a hearing to consider them was held on January 24, 2011.  The parties are continuing efforts to resolve some of the discovery issues, and some motions have been continued to February 8, 2011.  Even so, new disputes continue to arise.

At the January 24, 2011 hearing, the Court heard argument regarding the Motion to Compel, and took the matter under advisement.

## DISCUSSION

The Noteholder Plan Proponents (the "Noteholders") are seeking production of documents from the DCL Plan Proponents about the proposed settlement of the LBO-Related Causes of Action embodied in the DCL Plan.  To test the arms-length nature and good faith of the settlement negotiations, the Noteholders are seeking documents and communications regarding the parties' discussions concerning the merits of the LBO-Related Causes of Action, specifically in connection with negotiations concerning the DCL Plan, the April 2010 Plan, and any other negotiations during the bankruptcy case.

The parties met and conferred in an attempt to limit the scope of the Noteholders' discovery requests and the objections thereto, but three main objections to discovery remain:

(1)     objections to producing documents protected by a common interest privilege,

(2)     objections to producing documents protected by the Mediation Order, Local Bankruptcy Rule 9019-5(d), and Fed.R.Evid. 408, and

6

(3)     objections to producing documents for the period December 8, 2008 (the petition

date) through December 15, 2009 (the date of the Document Depository Order).[11]

(1)     <u>Community of Interest (or Common Interest) Privilege</u>[12]

The Noteholders argue that the common interest privilege cannot apply in connection

with the settlement and DCL Plan because the parties have no common legal interests.  The

Debtors' and Committee's interests are in maximizing the estate, and the Lenders' interest is in

paying as little as possible to resolve the LBO-related claims.

The DCL Plan Proponents argue in response that "parties to a settlement or proponents of

a plan of reorganization share a common legal interest in gaining court approval of the plan and

settlement pursuant to section 1129 of the Bankruptcy Code and Rule 9019 of the Federal Rules

of Bankruptcy Procedure."

In *Leslie Controls*, Judge Sontchi discussed the common interest privilege as follows:

> The common interest doctrine "allows attorneys representing different clients
> with similar legal interests to share information without having to disclose it to
> others." [*Teleglobe*, 493 F.3d at 364.]  It expands the reach of the attorney-client
> privilege and the work product doctrine by providing that, under certain
> circumstances, the sharing of privileged communications with third parties does
> not constitute a waiver of the privilege.  Thus, the doctrine is only applicable if an
> underlying privilege has been established. [*Louisiana Mun. Police Emp. Ret. Sys.
> v. Sealed Air Corp.*, 253 F.R.D. 300, 309 (D.N.J. 2008).]

---

[11]The Document Depository Order (D.I. 2858) authorized the Debtors to establish and maintain a
centralized document depository program to store certain documents produced to the Committee in
connection with the Committee's investigation and analysis of the LBO-Related Causes of Action.

[12]In *Teleglobe*, the Court distinguished between  "common interest" (i.e., when multiple clients
hire the same counsel to represent them on a matter of common interest), and "community of interest"
(i.e., when clients with separate attorneys share otherwise privileged information in order to coordinate
their legal activities).  *In re Teleglobe Commc'n Corp.*, 493 F.3d 345, 359 (3d Cir. 2007).   While the
matter before me falls into the "community of interest" category, the parties, here, as well as many courts,
refer to the multiple attorney situation as "common interest" privilege.

>**The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege was not otherwise waived.** [*In re Mortg. & Realty Trust,* 212 B.R. 649, 653 (Bankr.C.D.Cal. 1997).]
>. . . .
>
>[T]he doctrine is not limited to communications among co-defendants to ongoing litigation. Indeed, "pending litigation is not necessary to invoke the common interest [doctrine][*Id.*] . . . Rather, the common interest doctrine "applies whenever the communication is made in order to facilitate the rendition of legal services to each of the clients involved in the conference." [*Id.*]
>
>The common interest of the parties must be "at least a substantially similar legal interest." [*Teleglobe*, 493 F.3d at 365]. Nonetheless, the parties need not be in complete accord:
>
>>The common interest privilege does not require a complete unity of interests among the participants. The privilege applies where the interests of the parties are not identical, and it applies even where the parties' interests are adverse in substantial respects. The privilege applies even where a lawsuit is foreseeable in the future between co-defendants. [*Mortg. & Realty Trust*, 212 B.R. at 653.]
>
>When the interests of the parties diverge to some extent the common interest doctrine applies "only insofar as their interests [are] in fact identical; communications relating to matters as to which they [hold] opposing interests . . . lose any privilege."[*In re Rivastigmine Patent Litig.*, 2005 WL 2319005, *4 (S.D.N.Y. Sept. 22, 2005).]

*In re Leslie Controls, Inc.*, 437 B.R. 493, 496-98 (Bankr.D.Del. 2010)(emphasis added).

Even though the DCL Plan Proponents' interests are not completely in accord, they share

the common legal interest of obtaining approval of their settlement and confirmation of the DCL

Plan, thereby resolving the legal disputes between and among them. *See also Teleglobe*, 493

F.3d at 365-66 ("[I]t is sufficient to recognize that members of the community of interest must

share at least a substantially similar legal interest. . . . In the community of interest context, . . .

because the clients have separate attorneys, courts can afford to relax the degree to which

clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer."). Accordingly, the community of interest privilege can apply to parties whose interests are not totally in accord.

The Third Circuit has held that parties engaged in a merger negotiation may share a common interest. *Teleglobe*, 493 F.3d at 364 (noting that the common interest doctrine applies in civil and criminal litigation, and even in purely transactional contexts)). *See also Sealed Air*, 253 F.R.D. at 310 (parties engaged in a transaction may anticipate future claims that they share an interest in defending against, which can form the basis of a common interest privilege). Common interests must be determined on a case by case basis. In *Leslie Controls*, Judge Sontchi held that parties who shared information regarding "preserving and maximizing insurance available to pay asbestos claims" during the plan negotiation process shared the common interest of maximizing the asset pool. *Leslie Controls*, 437 B.R. at 502. I am satisfied that, based upon the chronology of events which took place in connection with the mediation, a community of interests was established.

    (A)   <u>Date the community of interest privilege began</u>

The question of **when** a community of interest privilege arose remains. The DCL Plan Proponents argue that a common interest among the Debtors, Committee, and lenders arose on October 12, 2010, when the mediator filed the October Term Sheet. The Debtors, Oaktree and Angelo Gordon also assert that their common interest began as early as September 27, 2010, when they agreed to resolve the LBO-Related Causes of Action and became proponents of a joint plan, pursuant to the Mediator's filing of the first Term Sheet on that date.

The Noteholders argue that no common interest privilege could arise until November 23,

2010, when the DCL Plan was actually filed with the Court.  The Noteholders argue that the

Term Sheet filings do not establish the emergence of a common interest because the parties

continued to negotiate and certain terms changed.  For example, they argue that the October

Term Sheet relied on a Distributable Enterprise Value ("DEV") of $6.1 billion, while the final

DCL Plan refers to a DEV of $6.75 billion.  The DCL Plan Proponents respond by stating that

DEV was not a material negotiated term, and was changed (ironically, they say) to address

objections of the Noteholders.

Once the DCL Plan Proponents agreed upon material terms of a settlement, it is

reasonable to conclude that the parties might share privileged information in furtherance of their

common interest of obtaining approval of the settlement through confirmation of the plan.  I

conclude that the date the Mediator's Term Sheets were filed - - October 12, 2010 for all DCL

Plan Proponents, and September 27, 2010 for the Debtor/Oaktree/Angelo Gordon group - -

constitute dates upon which the respective parties' community of interest privilege arose.[13]

(B)   <u>Dispute concerning specific documents covered by the community of  interest
      privilege</u>

The Noteholders and the DCL Plan Proponents also disagree about the scope of

communications that are covered by the community of interest privilege.  In particular, the

Noteholders argue that "common interest communications" should include only communications

---

[13]Of course, this does not mean that every communication between the DCL Plan Proponents
occurring after those dates is privileged.  Any party asserting privilege first must demonstrate that the
communication at issue  is subject to an underlying attorney-client or work product privilege, and that
sharing the communication with the common interest parties meets the three-part test adopted by Judge
Sontchi in *Leslie Controls* from the *Mortg. & Realty Trust* decision: (i) the communication was made by
separate parties in the course of a matter of common interest, (ii) the communication was designed to
further that effort, and (iii) the privilege was not otherwise waived.

that were written or made by lawyers,[14] citing *Teleglobe* in support of this view:

> First, to be eligible for continued protection, the communication must be shared
> with the *attorney* of the member of the community of interest. *Cf. Ramada Inns,
> Inc. v. Dow Jones & Co.,* 523 A.2d 968, 972 (Del.Super.Ct. 1986)(emphasizing
> that the relevant Delaware evidentiary rule protects communications disclosed to
> an attorney). Sharing the communication directly with a member may destroy the
> privilege.

*Teleglobe*, 493 F.3d at 364 (emphasis in original).   The DCL Plan Proponents point out that the

*Teleglobe* Court itself notes that this language is dicta.[15]

---

[14]The Noteholders' proposed definition of what might be protected  "Common Interest Communications" is as follows:
> "Common Interest Communications" means oral, written or electronic communications,
> draft pleadings, briefs, plans, disclosure statements or correspondence exchanged
> between counsel and/or non-testifying financial advisors to two or more different parties
> within a Common Interest Relationship and not disclosed or provided to any Person
> outside the Common Interest Relationship provided, however, that qualifying
> communications shall not lose their status as Common Interest Communications merely
> because clients of such outside counsel received any such written or electronic
> communications, or listened to or were told of any such oral communications. Common
> Interest Communications do not include written, electronic or oral communications by
> persons other than outside counsel or non-testifying financial advisors for different
> parties, or written, electronic or oral communications internal to any one party or any one
> financial advisor.

Revised Proposed Common Interest Stipulation and Order (D.I. 7587).

[15]*See Teleglobe*, 493 F.3d at 363 n.18 stating that the issue before the court involved clients of the same attorneys, not clients with separate counsel, and therefore the community of interest analysis may seem "surplusage."  However, because the lower court erroneously ruled that the parties before it were in a community of interest, the Third Circuit Court explained how the community of interest and co-client privilege differ. *Id.*  This guidance is helpful.

The *Teleglobe* Court also considered the "plain text" of a Delaware rule of evidence in its community of interest analysis.  Delaware Rule of Evidence 502(b)(3) recognizes that a client has a privilege to protect from disclosure confidential communications "made for the purpose of facilitating the rendition of professional legal services to the client by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest."  *See Rembrandt Tech. LP v. Harris Corp.,* 2009 Del.Super. LEXIS 46, *25 (Feb. 12, 2009), in which the Delaware Superior Court determined that "separately represented clients sharing a common legal interest may, at least in certain situations and under the close supervision of counsel, communicate directly with one another regarding that shared interest."  *Id.* at *30. The *Rembrandt* Court further decided that "the privilege may be extended to communications among the community of interest if the communications relate to that common interest."  *Id.* at *31.

The community of interest doctrine applies only if the underlying communication was subject to the attorney-client privilege or the work product doctrine. The attorney-client privilege "protects communications between attorneys and clients from compelled disclosure" and applies to a communication that satisfies the following elements: (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. *Teleglobe*, 493 F.3d at 359 *citing* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §68 (2000). "Privileged persons" include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Id.* "When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege." *WebXchange, Inc. v. Dell Inc*., 264 F.R.D. 123, 126 (D.Del. 2010) *quoting Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3d Cir. 1991).

The Third Circuit has adopted a two-part test for ascertaining whether a document is protected by the work product doctrine: (1) the first inquiry is the "reasonable anticipation test," which requires that the court determine whether "litigation could reasonably have been anticipated" (2) the second inquiry is whether the document were prepared "primarily for the purpose of litigation (i.e., documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work product doctrine. *Sealed Air,* 253 F.R.D. at 306-07.

The DCL Plan Proponents argue that the Noteholders' proposal to limit "common interest communications" to those prepared by lawyers limits artificially the community of

interest privilege and would needlessly increase legal costs by requiring parties to funnel all communications through their attorneys.  They contend that the appropriate inquiry is whether the subject matter of the communication at issue would be protected by the attorney-client or work product privilege but for its disclosure to a party with the common interest.[16]  I agree. The Noteholders' proposal to limit common interest communications to attorney-prepared communications is too restrictive.  The DCL Plan Proponents will have the opportunity to assert (and, ultimately demonstrate, if challenged) that requested communications fall within the community of interest privilege.

2.      Whether the DCL Plan Proponents must either (i) waive protections of the Mediation Order and Local Rule 9019-5(d), or (ii) be precluded from introducing any evidence regarding the mediation, including the Mediator's endorsement of the settlement or arguing that the DCL Plan was the result of arm's length bargaining

The Noteholders assert that they are seeking documents and communications related to the Mediation to assess (and challenge) the alleged arms-length nature of the settlement negotiations for the LBO-Related Causes of Action, and the degree to which the Debtors and Committee acted in good faith as estate fiduciaries to maximize recoveries for non-LBO lenders.

---

[16]The DCL Plan Proponents propose the following language for the definition of "Common Interest Communications" in the proposed Common Interest Stipulation:
> "Common Interest Communications" means oral, written or electronic communications, draft pleadings, briefs, plans, disclosure statements or other correspondence exchanged solely between parties within a Common Interest Relationship that, if only exchanged between or among a single party, its counsel and/or advisors, would have been protected from discovery by any applicable attorney-client privileges or work product protections.

DCL Plan Proponents Objection, D.I. 7552, Ex.3.

The Noteholders argue that the DCL Plan Proponents put such discovery "in issue" by arguing that the proposed settlement is fair because it is the product of a mediation conducted by a judge.[17]  In other words, the Noteholders argue, it is not fair to allow the DCL Plan Proponents to use the Mediation Order as a sword and a shield. *See Westinghouse,* 951 F.2d at 1426 n.12 ("If a partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject .").

The DCL Plan Proponents respond that they have offered to waive part of the protections of the Mediation Order[18] by proposing that only the following documents or communications be protected from discovery:

---

[17]I suppose it is conceivable that *who* conducted a mediation may, under some presently unknowable circumstances, be relevant to a determination of whether a settlement should be approved.  I have the deepest respect for my colleague, who willingly undertook this challenging mediation, but I am aware of nothing in the record before me which informs me that this factor should be accorded any special weight.  Whether a settlement should be approved or a plan confirmed must rest upon the application of standards articulated in the Bankruptcy Code and by controlling decisional law.

[18]The Mediation Order provides that:

7.      All: (a) discussions among the Mediation Parties relating to the Mediation, including discussions with or in the presence of the Mediator, (b) Mediation Statements, Ownership Statements and any other documents or information provided to the Mediator or the Mediation parties in the course of the Mediation, (c) correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the Mediation, and (d) communications between the Mediator and the Examiner or the Examiner's Professionals are strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceeding, and no person or party participating in the Mediation, including counsel for any Mediation Party or any other party, shall in any way disclose to any non-party or to any court, including without limitation in any pleading or other submission to any court, any such discussion, Mediation Statement, Ownership Statement, other document or information, correspondence, resolution, offer or counteroffer which may be made or provided in connection with the Mediation.  Except with the express consent of the affected Mediation party, the Mediator shall not share with any Mediation Party any other Mediation Party's Mediation Statement or Ownership Statement.

D.I. 5591, ¶7.

1.      written or oral communications between a "Mediation Party" and Judge Gross;

2.      written or oral communications between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day (i.e., a day when Judge Gross convened a Mediation Session between two or more Mediation Parties)

3.      written or oral communications reflecting the substance of any discussion between or among Mediation Parties on a Mediation Day or documenting any offers or counter-offers exchanged or agreements reached on a Mediation Day; and

4.      written or oral communications between Judge Gross and the Examiner or the Examiner's professionals concerning the Mediation

The DCL Plan Proponents argue that this proposal provides adequate discovery to the Noteholders to assess whether the settlement was at arms-length, while preserving the confidentiality of the Mediation because it permits discovery of (i) communications relating to negotiation and abandonment of the April Plan, (ii) communications prior to the mediation, and (iii) most communications between the Mediation Parties that occurred outside the presence of the Mediator on a day that is not a Mediation Day.  It also allows discovery into the Mediation *process*, but protects the *substance* of the Mediation discussions.

In *Dent v. Westinghouse*, 2010 WL 56054 (E.D.Pa. Jan. 4, 2010), Magistrate Judge Hey discussed the "crossroads" of Fed.R.Civ.P. 26 (which allows discovery of relevant information, even if that information is not admissible at trial, as long as it appears reasonably calculated to lead to admissible evidence) and Fed.R.Evid. 408 (providing that information regarding settlements and negotiations is inadmissible if offered to prove liability for, or invalidity of, the amount of a claim).  The *Dent* Court joined judges in this circuit who require a party requesting discovery about a settlement to make a particularized showing that the evidence related to settlement is relevant and calculated to lead to the discovery of admissible evidence.  *Id.* at *1.

15

There is a strong policy in promoting full and frank discussions during a mediation.

Courts have recognized that confidentiality is essential to the mediation process:

> Absent the mediation privilege, parties and their counsel would be reluctant to lay their cards on the table so that a neutral assessment of the relative strengths and weaknesses of their opposing positions could be made.  Assuming they would even agree to participate in the mediation process absent confidentiality, participants would necessarily "feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute."  The effectiveness of mediation would be destroyed, thereby threatening the well established public needs of encouraging settlement and reducing court dockets.

*Sheldone v. Pennsylvania Turnpike Comm'n*, 104 F.Supp.2d 511, 514 (W.D.Pa. 2000) (citations omitted) *quoting Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608, 928, 930 (2d Cir. 1979).   This policy is also reflected in Local Delaware Bankruptcy Rule 9019-5(d).[19]

---

[19]Local Bankruptcy Rule 9019-5(d) provides, in pertinent part:

(d)      Confidentiality of Mediation Proceedings.

      (i)      Protection of Information Disclosed at Mediation.  The mediator and the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation.  No person may rely on or introduce as evidence in any arbitral, judicial or other proceeding, evidence pertaining to any aspect of the mediation effort, including but not limited to: (A) views expressed or suggestions made by a party with respect to a possible settlement of the dispute; (B) the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator; (C) proposals made or views expressed by the mediator; (D) statement or admissions made by a party in the course of the mediation; and (E) documents prepared for the purpose of, in the course of, or pursuant to the mediation.  In addition, without limiting the foregoing, Rule 408 of the Federal Rules of Evidence, any applicable federal or state statute, rule, common law or judicial precedent relating to the privileged nature of settlement discussions, mediations or other alternative dispute resolution procedures shall apply.  Information otherwise discoverable or admissible in evidence does not become exempt from discovery, or inadmissible in evidence merely by being used by a party in the mediation.

    . . . .

      (iv)      Preservation of Privileges.  The disclosure by a party of privileged information to the mediator does not waive or otherwise adversely affect the privileged nature of the information.

The Noteholders agree, as they must, that discussions with the Mediator are confidential, but complain that barring discovery of communications between Mediation Parties on a Mediation Day might protect discussions by Mediation Parties who are not actively participating in the Mediation that day, which would be discoverable if held on a non-Mediation Day.  The DCL Plan Proponents' proposal to limit the protected Mediation communications generally strikes an appropriate balance between allowing discovery of potentially relevant information and protecting the confidentiality of the mediation.

This chapter 11 case is complex, involving a large, national media company, administration of which has been full of acrimony among the various constituents.  The central disputes surround challenges to an $8 billion prepetition leveraged buyout. This particular mediation involved twelve parties consisting of multiple interests owed collectively billions of dollars of debt, falling into different tranches among the various Debtors.  In balancing these vastly competing interests, I conclude that the DCL Plan Proponents' proposal is reasonable, but further conclude that it is appropriate to adjust it slightly and protect those "written or oral communication between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day" (*see* #2 of the DCL Plan Proponents proposal, *supra*), but only if the communications are between Mediation Parties who were present at the Mediation or were participating in the Mediation off-site.  The protections afforded by the Mediation Order, Fed.R.Evid. 408, and Local Rule 9019-5 will otherwise remain.

3.     Whether the reasonable "start date" for discovery requests is the Petition Date (December
       8, 2008) or the date of the Document Depository Order (December 15, 2009)?

The Noteholders believe that they should be able to reach back to the petition date to

discover information relevant to their opposition to confirmation of the DCL Plan.  The

Noteholders offer examples of hypothetical emails that may have occurred between parties prior

to December 15, 2009, but would not be produced just because of the proposed "random" start

date.[20]  The Noteholders argue that it is possible that in the immediate wake of Tribune's

business failure, key persons involved in the transactions might have assessed what went wrong

or engaged in some degree of finger-pointing.  Further, the Committee's investigation began in

Spring 2009, months before the proposed December 15, 2009 start date.  Because approval of the

LBO settlement is part of plan confirmation, the Noteholders claim they are entitled to discovery

of all potential settlement discussions during the chapter 11 case.

The DCL Plan Proponents argue that December 15, 2009 is a reasonable and logical

discovery start date because most of the events relevant to the negotiation and settlement of the

LBO-Related Causes of Action occurred *after* the Court entered the Document Depository

Order.  The DCL Plan Proponents argue that this date is even earlier than what might also be

considered a reasonable discovery start date of September 2010 - - which is when negotiations

for the current DCL Plan began after the Examiner's Report and the Mediation.  They also argue

---

[20]On December 15, 2009, the Court entered the Document Depository Order (D.I. 2858) which
authorized the Debtors to establish and maintain a centralized document depository related to the LBO-
Related causes of action and provided that written and oral communications between "Negotiating
Parties" regarding the leveraged ESOP Transactions "shall be deemed confidential" and may not be used
or disclosed except in connection with settlement discussions and may not be introduced at any trial or
hearing.  Following entry of that order, the Debtors and a number of parties participated in negotiations
which resulted in a proposed settlement embodied in the April 2010 Plan.

that using December 15, 2009 will help to limit the costs of an already massive document production.  Finally, the DCL parties argue, persuasively, that discovery regarding the merits of the LBO-Related Claims is "well trodden ground" that has been investigated by and comprehensively addressed by the Examiner.

"Discovery of relevant, nonprivileged . . . [information] is limited if the party from whom discovery is sought establishes that it is unreasonably cumulative or duplicative or that the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed.R.Civ.P. 26(b)(2)(B)."  *Helmert v. Butterball, LLC*, 2010 WL 2179180, *3 (E.D.Ark. 2010).

On balance, the proposed discovery start date of December 15, 2009 will allow discovery regarding LBO settlements, while limiting the burden and expense of completing discovery within the time frame provided by the CMO.  The Noteholders have not demonstrated that an earlier discovery start date is likely to yield admissible, relevant information needed to litigate approval of the proposed settlement and plan confirmation.

## EPILOGUE

Lest this decision be read too broadly, I add a cautionary note: A determination involving whether a community of interest privilege applies is an intensely fact-and-circumstance-driven exercise.  The balancing of tensions which arise during the search for truth may, depending upon the particular circumstances involved, fall either way.  Guided by Circuit precedent, other persuasive decisional law, applicable local rule, and orders governing mediation, I have decided that the matter before me involves circumstances warranting a determination that a community of interest privilege may be invoked by co-proponents of a plan.  This is not to say that parties who are co-proponents of a plan or parties who reach settlements arising from mediation are

always entitled to assert this privilege.  Neither should  it be said that the privilege can never be

invoked unless the circumstances involve the proposal of a joint plan or a settlement resulting

from mediation.

## **ORDER**

Upon consideration of the Motion to Compel and the objection thereto, and for the

reasons set forth above, it is hereby ORDERED that the Motion to Compel is GRANTED, in

part, and DENIED, in part, as follows:

(A) The DCL Plan Proponents may assert a community of interest privilege for

  privileged communications that were shared among the community of interest

  parties in furtherance of their common interest beginning on October 12, 2010 for

  all DCL Plan Proponents, and September 27, 2010 for the Debtor/Oaktree/Angelo

  Gordon group;

(B) The following are protected from discovery:

  (i) written or oral communications between a "Mediation Party" and Judge
   Gross;

  (ii) written or oral communications between or among Mediation Parties
   concerning the Mediation to the extent such communications were
   exchanged by Mediation Parties who were present at the Mediation or
   were participating in the Mediation off-site on any Mediation Day (i.e., a
   day when Judge Gross convened a Mediation Session between two or
   more Mediation Parties);

  (iii) written or oral communications reflecting the substance of any discussion
   between or among Mediation Parties who were present at the Mediation or
   participating in the Mediation off-site on a Mediation Day, or
   documenting any offers or counter-offers exchanged or agreements
   reached on a Mediation Day; and

  (iv) written or oral communications between Judge Gross and the Examiner or
   the Examiner's professionals concerning the Mediation;

(C)     The Noteholder Plan Proponents may seek discovery of information for the period

of time beginning December 15, 2009; and

(D)     All other relief requested in the Motion to Compel is **DENIED**.

BY THE COURT:

_____

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: February 3, 2011

cc: Norman L. Pernick, Esquire[21]

---

[21]Counsel shall serve copies of this Memorandum and Order on all interested parties and file a Certificate of Service with the Court.

21