

| | |
|---|---|
| SIDLEY AUSTIN LLP<br>1501 K STREET, N.W.<br>WASHINGTON, D.C. 20005<br>(202) 736 8000<br>(202) 736 8711 FAX | BEIJING         NEW YORK<br>BRUSSELS    PALO ALTO<br>CHICAGO     SAN FRANCISCO<br>DALLAS          SHANGHAI<br>FRANKFURT  SINGAPORE<br>GENEVA        SYDNEY<br>HONG KONG TOKYO<br>LONDON       WASHINGTON, D.C.<br>LOS ANGELES |
| jbendernagel@sidley.com<br>(202) 736 8136 | FOUNDED 1866 |

February 4, 2011

**By Hand**

The Honorable Chief Judge Kevin J. Carey
The United States Bankruptcy Court
 for the District of Delaware
824 N. Market St., 5th Floor
Wilmington, Delaware 19801

    Re:    *In re Tribune Company, et al.*, Case No. 08-13141 (Bankr. D. Del.) (KJC)

Dear Chief Judge Carey:

    We write as counsel to Debtors in response to the February 1, 2011 letter to you from Mitchell Hurley of Akin Gump, as counsel for Aurelius, regarding communications between Donald Liebentritt (former Tribune General Counsel) and members of the Tribune Board of Directors (including members of the Special Committee of the Board of Directors). In doing so, Aurelius strains settled privilege law, ignores the role of Mr. Liebentritt, and mischaracterizes the relationship between the Special Committee and the Company.

    By way of background, in August 2010, the April 2010 Plan of Reorganization and the settlement it embodied were abandoned by the settling creditors. Thereafter, Debtors sought to have a mediator appointed to assist in obtaining a settlement for a new plan of reorganization. During this period, the Debtors also created a Special Committee of Tribune's Board of Directors to formalize the existing process for addressing restructuring related matters. In particular, pursuant to the August 27, 2010 Board Resolutions, the Special Committee was authorized to "review, evaluate and approve . . . the structure, terms or conditions of . . . any plan of reorganization" and to "take such action from time to time . . . to resolve any and all claims." In addition, Mr. Liebentritt, who had been General Counsel of the Debtors beginning in 2008, was appointed Chief Restructuring Officer "(CRO")" so that he could devote all of his efforts to achieving an approved restructuring plan.

    Following these events, the Debtors continued their efforts to obtain a consensual resolution. The Debtors' representatives, with the Special Committee's encouragement, met with various creditor constituents to explore alternatives. The representatives of both the Debtors and the Special Committee also participated fully in the mediation process that was set in motion by the Court's appointment of Judge Gross as the mediator. These efforts bore fruit


SIDLEY AUSTIN LLP

The Honorable Chief Judge Kevin J. Carey
February 4, 2011
Page 2

first in the form of a settlement agreement between the Debtors, Oaktree, and Angelo Gordon on September 27, 2010, and later in a second, more comprehensive settlement on October 12, 2010, which was embodied in the Debtor/Committee/Lender Plan.

The votes for the Debtor/Committee/Lender Plan as well as the Noteholder Plan have now been cast. The preliminary results vindicate the efforts of the Debtors and its Special Committee. On a preliminary basis, the Debtor/Committee/Lender Plan has received overwhelming support from most major creditor constituencies. By contrast, the Noteholder Plan, on a preliminary basis, did not receive widespread support, as it was rejected overwhelmingly by most creditor constituencies, including all lender classes and virtually every class of general unsecured claims at all Debtors.

It is therefore perhaps not a coincidence that immediately following this setback, Aurelius has now redoubled its efforts to confuse the issues and hurl reckless accusations at the Debtors, this time through their claims regarding Debtors' and the Special Committee's privilege logs.[1] These claims are without merit, for a number of reasons.

*First*, the premise of Aurelius' argument is that Mr. Liebentritt had no attorney-client relationship and resulting privilege with the Tribune Board members who were members of the Special Committee, regardless of when those communications occurred. Aurelius takes this position even though nearly half of the communications at issue occurred before the Special Committee was formed, while Mr. Liebentritt was the Debtors' General Counsel, and before the Special Committee had retained Jones Day as Counsel.[2] Aurelius even argues that prior to the formation of the Special Committee, its members could not seek legal advice from Mr. Liebentritt but instead should have retained counsel to advise them whether they should retain counsel.[3] This is absurd.

It is no surprise that the members of the Special Committee would rely on Mr. Liebentritt for legal advice in the weeks leading up to the formation of the Special Committee. Mr. Liebentritt was still the Debtors' General Counsel and had been providing legal advice to all members of the Board, including the Special Committee members, for over two years. Aurelius

---

[1] One such example is the unfounded claim that Debtors "attempt to shield from scrutiny the communications" of Mr. Liebentritt. This is nonsense. Debtors produced over 3,500 documents in which Mr. Liebentritt was either the author/sender or the recipient, including approximately 500 documents between Mr. Liebentritt and the Special Committee, where legal advice was not sought from Mr. Liebentritt and he was not providing, discussing or forwarding legal advice.

[2] *See, e.g.,* SCL Doc. Nos. 16, 19, 21, 23, 24, 33-37, 39-52, 54-57, 62, 126, 127, 423-425, 427, 444-446, and 449; DL Doc. Nos. 480-481, 544-550, and 557. Indeed, certain challenged communications occurred many months before the Special Committee was formed. *See e.g.,* SCL Doc. Nos. 423-424 (April 2010) and 425-427 (March 2010).

[3] *See, e.g.,* DL Doc. Nos. 544-550; SCL Doc. Nos. 30-35.



The Honorable Chief Judge Kevin J. Carey
February 4, 2011
Page 3

provides no explanation as to why Mr. Liebentritt was incapable of providing legal advice during this period of time.

***Second,*** Aurelius cannot provide any reason why Mr. Liebentritt could not have provided legal advice to members of the Special Committee, either by providing legal advice to the full Board or by transmitting and discussing with the Special Committee legal advice provided by the Company's outside counsel.[4] In making this argument, Aurelius ignores the fact that the Special Committee consisted entirely of members of the Board of Directors, and provides no explanation for why an otherwise privileged communication to the full Board would lose its privileged character merely because certain Board members, who were also Special Committee members, were parties to such a communication. *See e.g.*, DL Doc. Nos. 1339-1341, 1343, and 1344 (communications discussing legal advice from Sidley Austin between the entire Board of Directors concerning the 2010 MIP).

Aurelius also ignores the fact that Mr. Liebentritt, once appointed as CRO, frequently forwarded and discussed with the Special Committee legal advice received from the Company's legal counsel. That is precisely what was contemplated by the Board Resolution creating the Special Committee, which provides, in relevant part, that "the Special Committee shall obtain assistance, information and/or services from the officers and employees of the Company and its affiliates and the legal counsel . . . and other professionals retained by the Company" (*id.* at p. 2). There is no question that even a non-lawyer may forward or discuss legal advice received from outside counsel without waiving privilege. *Smithkline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476-77 (E.D. Pa. 2005). Many of the challenged communications fall into exactly this category.[5]

Moreover, even if it were appropriate to treat the Company and the Special Committee as separate and distinct entities for privilege purposes – and it is not – the Debtors and the Special Committee plainly had a common interest in putting forth a plan that would be approved by the

---

[4] Aurelius suggests that Mr. Liebentritt had a conflict with the members of the Special Committee and points to a couple of emails and the testimony of *one* Special Committee member (Mark Shapiro) that he relied on Jones Day after it had been retained for legal advice relating to the restructuring, rather than Mr. Liebentritt. But none of this suggest that Mr. Liebentritt was incapable of providing such advice, as Aurelius suggests, particularly where Mr. Liebentritt was transmitting and discussing the legal advice of the Company's outside counsel, as contemplated by the Resolution.

[5] For instance, DL Doc. Nos. 1339, 1340, 1341, 1343, and 1344 involve the same email string, in which Mr. Liebentritt explains to the entire Board the Bankruptcy Court Order approving the 2010 Management Incentive Plan, and explains Sidley Austin's legal strategy behind the Plan. DL Doc. No. 805 discusses legal advice received from Jones Day regarding claims against Morgan Stanley. DL Doc. Nos. 870 and 885 forwards discussions among Tribune's outside counsel related to the terms of the Disclosure Statement. DL Doc No. 995 forwards legal advice received from Jones Day. DL Doc No. 1096 forwards legal advice received from Jessica Boelter at Sidley regarding the Plan terms.



The Honorable Chief Judge Kevin J. Carey
February 4, 2011
Page 4

Court and supported by the creditors, and that would allow the Company to emerge from the bankruptcy in the most favorable position. As this Court has recently noted, "a community of interest privilege can apply to parties whose interests are not totally in accord." Memo and Order dated February 3, 2011, at 9. Aurelius does not even address the common interest privilege, which serves to protect privileged communications made between parties with a common interest, including, here, the Company and the Special Committee. *See In re Leslie Controls, Inc.*, 437 B.R. 493, 496 (Bankr D. Del. 2010) (recognizing that parties who share a common legal interest and who exchange otherwise privileged communications with each other in furtherance of that common interest may do so under the protection of the common interest privilege); *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 263 F.R.D. 142, 146, (D. Del. 2009) (same).

*Finally*, the parties held a meet and confer held on February 4, 2010 in an attempt to narrow the issues to be brought to the Court. Pursuant to that meet and confer, Debtors and the Special Committee agreed to produce 13 documents that had originally been placed on the logs. Three of the documents are being produced by the Debtors. The remaining documents are being produced by the Special Committee. Further, the Debtors and the Special Committee agreed to provide additional information concerning whether the communication related to the Special Committee members' role as a member of the Special Committee or as a member of the plenary board. Aurelius agreed to review this additional information in good faith and remove from dispute the communications that are no longer at issue. The parties will continue the meet and confer process and will report the results of that process to the Court on Tuesday.

For all of the reasons set forth herein, Aurelius' request should be denied.[6]

Respectfully submitted,

*James F. Bendernagel Jr.*

James F. Bendernagel Jr.

By NLP

Attachment

cc:   All counsel entitled to notice pursuant to Paragraph 35 of the CMO

---

[6] Aurelius makes the baffling assertion that documents on the logs might be subject to production depending on the outcome of the "crime-fraud motion" currently pending before the Court. This is pure rhetoric. All of the documents on the logs were created and sent in 2010; the only conceivable basis for the crime-fraud exception that Aurelius has ever articulated applies to activities and documents from 2007.