**Attachment G**

**Exhibit 5.6**

**Terms of New Senior Secured Term Loan**

**NOTEHOLDER PLAN EXHIBIT 5.6**

Terms of New Senior Secured Term Loan

This Exhibit is subject to all of the provisions of the Noteholder Plan, including, without limitation, Section 13.8, pursuant to which the Proponents have reserved the right, subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, to alter, amend or modify the Noteholder Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to substantial consummation of the Noteholder Plan.

**Exhibit 5.6 to the Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed Aurelius Capital Management, LP, on Behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes (collectively, the "Proponents") (as amended, modified, or supplemented, the "Noteholder Plan")[1]**

## REORGANIZED TRIBUNE

**Senior Secured Term Loan Facility
Summary of Certain Terms and Conditions**

| | |
|---|---|
| **Borrower:** | Reorganized Tribune |
| **Lenders:** | Initially, all Holders of Claims entitled to receive New Senior Secured Term Loan pursuant to the Noteholder Plan (the "**Lenders**"). |
| **Term Loan Facility:** | Senior secured term loan facility (the "**Term Loan Facility**") comprising a single tranche of term loans (the "**Term Loans**") in an amount to be determined by the Proponents and the Debtors, but not to exceed the Term Loan Facility Cap (defined below) and to be issued to the Lenders in accordance with the terms of the Noteholder Plan. |
| **Term Loan Facility Cap:** | The product of (i) two (2) *multiplied by* (ii) the trailing twelve-month Operating Cash Flow ("**OCF**") (to be defined in the Term Facility Documents (defined below) in a manner consistent with the Borrower's pre-petition determination of such amount) of the Borrower and its consolidated subsidiaries, excluding cash flow and other net income from minority equity interests, as of the end of the fiscal quarter most recently ended prior to the Effective Date, but not to exceed $1.1 billion in the aggregate. |
| **Effective Date:** | The effective date of the Noteholder Plan. |
| **Documentation:** | Usual for facilities and transactions of this type and reasonably acceptable to the Borrower and the Proponents, to include, among others, a credit agreement, guarantees and appropriate pledge, security interest, mortgage, deposit account, and other collateral documents and the Intercreditor Agreement (as defined below) (collectively, the "**Term** |

---

[1] Subject to section 13.8 of the Noteholder Plan, the Proponents reserve the right to supplement, modify or revise this Exhibit 5.10 at any time prior to the Effective Date.

**Facility Documents**").

**Guarantors:** Each of the Borrower's wholly owned subsidiaries (other than any entity that is (i) a controlled foreign corporation ("**CFC**") under Section 957 of the Internal Revenue Code if a guarantee by such CFC would result in material adverse tax consequences or (ii) otherwise agreed to by the Borrower and the Proponents) existing on the Effective Date or thereafter created (including through the Restructuring Transactions (as defined in the Noteholder Plan)) or acquired shall unconditionally guarantee, on a joint and several basis, all obligations of the Borrower under the Term Loan Facility, any interest rate protection agreements, foreign exchange agreements and cash management obligations entered into with an institution that is a Lender or an affiliate of a Lender (collectively, the "**Secured Obligations**"), up to the maximum amount possible without violating applicable fraudulent conveyance laws.

Each guarantor of the Term Loan Facility is herein referred to as a "**Guarantor**" and its guarantee is referred to herein as a "**Guarantee.**" The Borrower and each Guarantor are herein referred to collectively as the "**Credit Parties**" and individually referred to as a "**Credit Party.**"

**Related Working Capital Facility:** The Term Facility Documents will contemplate that the Borrower and/or certain of its wholly owned subsidiaries may incur on or after the Effective Date a separate securitization facility, asset-based loan facility or other revolving credit facility (the "**New Working Capital Facility**") under arrangements reasonably satisfactory to the Proponents, in an aggregate principal amount of up to $300 million, with a letter of credit sub-facility of up to $100 million. The New Working Capital Facility will be secured by a first-priority security interest in certain accounts receivable, inventory and other assets of the Credit Parties (the "**New Working Capital Facility Collateral**").

**Security:** The Secured Obligations will be secured by all of the following of the Borrower and each Guarantor, whether owned on the closing date of the Term Loan Facility or thereafter created or acquired, on a first-priority basis (the "**Term Facility Collateral**" and together with the New Working Capital Facility Collateral, the "**Collateral**"): (i) a lien on, and security interest in, and pledge of, all of the capital stock (excluding direct equity interests in joint ventures ("**Joint Venture Interests**"), but including interests in any holding company holding such Joint Venture Interests) and intercompany notes owned by the Borrower and each other Credit Party, except that only 65% of the capital stock of "first-tier" non-U.S. subsidiaries shall be

2

|  |  |
|---|---|
|  | pledged and (ii) a lien on, and security interest in, all other tangible and intangible properties and assets (including, without limitation, all contract rights, inventory, certain real estate assets, intellectual property, trade names, equipment, licenses and proceeds of the foregoing, but excluding in any event (a) the New Working Capital Facility Collateral, (b) FCC licenses, but only to the extent that such security interest would violate applicable law, (c) motor vehicles as to which a security interest and perfection thereof is required to be effected by recordings of certificates of title under applicable state law, (d) all real property, (e) any commercial tort claims held by or assigned to the Distribution Trust, the Litigation Trust or the Creditors' Trust (each as defined in the Noteholder Plan) and (f) those properties and assets for which the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby in the good faith judgment of the Proponents.  Unless the New Working Capital Facility is a securitization facility, the Secured Obligations will also be secured by second priority liens on the New Working Capital Facility Collateral of the Borrower. |
| **Intercreditor Arrangement:** | The lien priority, relative rights and other creditor's rights issues in respect of the Term Loan Facility and the New Working Capital Facility will be set forth in a customary intercreditor agreement that is reasonably acceptable to the administrative agent in respect of the New Working Capital Facility, the Proponents and the Borrower (the **"Intercreditor Agreement"**). |
| **Ranking:** | The Term Loan Facility will be a senior obligation of the Borrower, secured by first priority liens on the Term Facility Collateral of the Borrower and, unless the New Working Capital Facility is a securitization facility, second priority liens on the New Working Capital Facility Collateral of the Borrower.  The Guarantees will be senior obligations of each Guarantor, secured by first priority liens on the Term Facility Collateral of such Guarantor and, unless the New Working Capital Facility is a securitization facility, second priority liens on the New Working Capital Facility Collateral of such Guarantor. |
| **Final Maturity:** | Fifth anniversary of the Effective Date. |
| **Amortization:** | 1.0% of the initial principal amount of the Term Loans on an annualized basis payable in quarterly installments, beginning on the last day of the first full fiscal quarter following the Effective Date. |
| **Interest Rate and Periods:** | The Term Loans will bear interest, at the election of the Borrower, at a per annum rate equal to (i) the sum of |

|  |  |
|---|---|
|  | Adjusted LIBOR in effect from time (subject to the LIBOR Floor referred to below) plus the Applicable Margin or (ii) the sum of the ABR in effect from time to time plus the Applicable Margin. |
|  | As used above: |
|  | "**ABR**" means a rate per annum equal to the highest of (i) the rate of interest publicly announced by the Administrative Agent as its prime rate in effect at its principal office in New York City, (ii) one-month Adjusted LIBOR *plus* 1.0%, and (iii) the federal funds effective rate from time to time *plus* 0.5%. |
|  | "**Adjusted LIBOR**" means LIBOR, as adjusted for statutory reserve requirements for eurocurrency liabilities. |
|  | "**Applicable Margin**" means (i) in the case of Term Loans bearing interest based on Adjusted LIBOR, 4.0% and (ii) in the case of Term Loans bearing interest based on ABR, 3.0%. |
|  | "**LIBOR**" means the rate at which eurodollar deposits in the London interbank market for one, three or six months (as selected by the Borrower) are quoted on the Reuters screen. |
|  | "**LIBOR Floor**" means 1.50% per annum. |
|  | The Borrower may elect interest periods, for Term Loans bearing interest based on LIBOR, of one, three or six months; *provided* that interest is payable not less frequently than quarterly. |
| **Default Rate:** | During the continuance of an Event of Default under the Term Facility Documents, interest on the Term Loans and other obligations under the Term Loan Facility shall bear interest at the applicable interest rate (including the Applicable Margin) plus 2.0% per annum (i) automatically, if the Event of Default relates to a failure by the Borrower to pay principal or interest on the Term Loans (a "**Failure to Pay**") and (ii) at the direction of the Required Lenders, if the Event of Default relates to any event other than a Failure to Pay.  The terms and applicability of default interest may be amended with the consent of the Required Lenders. |
| **Mandatory Prepayments:** | The Term Loans will be required to be prepaid with the following: |
|  | (i)   100% of net cash proceeds of asset sales and other |

4

asset dispositions by any Credit Party or any of its respective subsidiaries (including insurance proceeds and condemnation awards) subject to customary leverage-based step-downs, exceptions and baskets to be agreed upon, including for asset swaps, real estate asset sales and ordinary course sales of inventory; *provided* that net cash proceeds of such sales or dispositions shall be subject to a reinvestment period for a business or other long-term assets used in the Borrower's business, which period shall consist of (i) an initial 18 months to either consummate such investment or enter into a binding agreement for such investment, and (ii) in the case of a binding agreement, (x) a further 6 months to close such investment and (y) an additional 3-month extension beyond such 6-month period if the sole unsatisfied closing condition is pending FCC approval; *provided* that during the reinvestment period, all net cash proceeds shall be deposited in a segregated deposit account and held for the benefit of the Lenders as Term Facility Collateral;

(ii) 100% of the net cash proceeds of the issuance or incurrence of *pari passu* funded debt by any Credit Party or any of its subsidiaries, subject to baskets and exceptions to be agreed upon; and

(iii) 50% of excess cash flow, subject to a minimum cash threshold to be set consistent with the liquidity of the Borrower as of the Effective Date and customary leverage-based step-downs to be agreed upon.

Mandatory prepayments will be applied to reduce, pro rata, all then remaining scheduled amortization payments (with final maturity also treated as a payment).

**Voluntary Prepayments:** The Term Loans may be prepaid at any time in whole or in part at the option of the Borrower, in a minimum principal amount and in multiples to be agreed upon, without premium or penalty (subject, in the case of LIBOR borrowings, to payment of LIBOR breakage costs arising from voluntary prepayments not made on the last day of the relevant interest period).

Voluntary prepayments will be applied to reduce, pro rata, all then remaining scheduled amortization payments (with final maturity also treated as a payment).

**Representations and Warranties:** The Credit Parties will make representations and warranties customary for financings of this type, including, without limitation: (i) material accuracy of disclosure and absence of

|  |  |
|---|---|
|  | undisclosed liabilities as of the Closing Date, (ii) corporate existence, (iii) compliance with law, (iv) corporate power and authority, (v) enforceability of Term Facility Documents, (vi) no conflict with law or contractual obligations, (vii) no material litigation, (viii) no default, (ix) ownership of property, (x) liens, (xi) intellectual property, (xii) no burdensome restrictions, (xiii) taxes, (xiv) Federal Reserve margin regulations, (xv) ERISA, (xvi) Investment Company Act, (xvii) subsidiaries, (xviii) collateral, (xix) environmental matters and (xx) labor matters. |
| **Affirmative Covenants:** | The Credit Parties will comply with affirmative covenants customary for financings of this type, including, without limitation: (i) compliance with laws and material contractual obligations, (ii) payment of taxes and other material obligations, (iii) maintenance of insurance, (iv) conduct of business, (v) preservation of corporate existence, (vi) keeping of books and records, (vii) maintenance of properties, (viii) transactions with affiliates, (ix) reporting requirements, (x) additional guarantors, (xi) ERISA, (xii) right of Lenders to inspect property and books and records, (xiii) notices of defaults, litigation and other material events, (xiv) compliance with environmental laws and (xv) further assurances. |
| **Negative Covenants:** | The Credit Parties will comply with negative covenants customary for financings of this type and other terms deemed reasonably appropriate by the Proponents and the Debtors, including, without limitation, but subject to baskets, limits and incurrence tests to be agreed upon on: (i) indebtedness, (ii) liens, (iii) payment restrictions affecting subsidiaries, (iv) restricted payments, (v) material changes in business, (vi) no further negative pledge, (vii) ERISA, (viii) guarantee obligations, (ix) transactions with affiliates and (x) changes in fiscal year.<br><br>For the avoidance of doubt, the Term Loan Facility will contain no financial covenants, nor will it prohibit purchases of Term Loans by the Credit Parties on a pro rata basis or pursuant to an auction process available to all Lenders. |
| **Events of Default:** | The following will constitute Events of Default, subject to customary exceptions, materiality qualifications and notice periods to be agreed upon and, where applicable (other than clause (i) below), 30-day cure and grace periods: (i) nonpayment of principal when due and nonpayment of interest, fees or other amounts after a grace period of three (3) business days, (ii) material inaccuracy of representations or warranties, (iii) failure to perform or observe negative and certain affirmative covenants set forth in the Term Facility Documents, (iv) bankruptcy and insolvency defaults of any |

|  |  |
|---|---|
|  | Credit Party or any of their subsidiaries, (v) change of control (the definition of which is to be agreed upon), (vi) customary ERISA defaults and (vii) any Guarantee ceases to be in full force and effect. |
| **Assignments and Participations:** | Assignments shall be permitted (except to another Lender or to an affiliate of a Lender and, in the case of the Borrower, if an Event of Default shall be continuing) in minimum amounts not less than $1.0 million (or, if less, the entire amount of the Lender's interest).  Participations shall be permitted without restriction, subject to customary restrictions on participants' voting rights. |
| **Required Lenders:** | Lenders holding a majority of the Term Loans, subject to customary amendments of certain provisions of the Term Facility Documents requiring the consent of Lenders holding a super-majority (or all) of the Term Loans. |
|  | Holders of equity interests of the Borrower (and their affiliates) may hold and vote the Term Loans. |
| **Conditions to Closing:** | The Term Loan Facility shall close on the Effective Date subject to the satisfaction or waiver of customary conditions precedent, including the conditions precedent set forth below, on or prior to the Effective Date: |

(i)     Bankruptcy Court's confirmation of the Noteholder Plan;

(ii)    material accuracy of representations and warranties and absence of default under the terms of the Term Facility Documents;

(iii)   execution and delivery of the Term Facility Documents on terms and conditions reasonably satisfactory to the Proponents and the Debtors, together with customary collateral and other closing documentation (including, without limitation, favorable creation and perfection of security arrangements opinions of counsel for the Credit Parties and local counsel) in form and substance satisfactory to the Proponents; and

(iv)   all governmental and third party consents and approvals (including FCC approvals) required or, in the reasonable discretion of the Proponents, reasonably required for consummation of the Term Loan Facility and the emergence of the Borrower and its subsidiaries from bankruptcy on the terms contemplated by the Noteholder Plan, and the consummation of the other transactions contemplated thereby, shall have been obtained and shall remain in effect without material

|  |  |
|---|---|
|  | adverse condition. |
| **Yield Protection:** | The Term Facility Documents shall contain customary provisions (i) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (ii) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, voluntary or mandatory prepayments. |
| **Expenses and Indemnification:** | The Borrower shall pay (i) all reasonable expenses of the Administrative Agent and the Proponents associated with the preparation, execution, delivery and administration of the Term Facility Documents and any amendment or waiver with respect thereto (including, without limitation, the fees, disbursements and other charges of counsel) and (ii) all expenses of the administrative agent on behalf of the Lenders (including, without limitation, the fees, disbursements and other charges of counsel) in connection with the enforcement of the Term Facility Documents.

The administrative agent and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the Term Loan Facility or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party or to the extent not arising under or out of Term Loan Facility Documents or the transactions contemplated thereby). |
| **Governing Law and Forum:** | State of New York. |