## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | Related to Dkt. No. 7517 |

**DEBTORS' SUR-REPLY IN OPPOSITION TO THE NOTEHOLDER PLAN PROPONENTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INFORMATION BASED ON THE CRIME-FRAUD EXCEPTION**

Debtors respectfully submit this Sur-Reply in Opposition to the Noteholder Plan Proponents' Motion To Compel Production Of Documents And Information Based On The Crime-Fraud Exception ("Motion"). For the reasons set forth below, and in Debtors' Memorandum of Law in Opposition to the Motion ("Debtors' Opp."), the Motion should be denied.

## INTRODUCTION

Not only have the Noteholder Plan Proponents failed to meet their burden of establishing that the crime-fraud exemption is applicable, they have not explained why the discovery they seek by means of the Motion is even relevant to the matters properly at issue at the confirmation hearing. (Debtors' Opp. at 2-3). The Noteholder Plan Proponents' Reply Memorandum does not cure this problem – it still provides *no* explanation as to how the discovery they seek bears on the matters at issue at the confirmation hearing.

Beyond this problem, however, the Noteholder Plan Proponents also have not carried their burden of establishing the applicability of the crime-fraud exception. To prevail in this regard, the Noteholder Plan Proponents must show both (1) a *prima facie* case of crime or fraud;

and (2) that the privileged communications were in furtherance of the crime or fraud. They have

shown neither.

*First*, the Noteholder Plan Proponents claim that "[t]he evidence adduced by the

Examiner is sufficient to establish intentional fraud at Step Two of the LBO transaction as a

matter of law." (Motion at 2.) This assertion is belied by the Examiner's own statements –

statements never mentioned in the Noteholder Plan Proponents' Motion or Reply Memorandum.

In particular, they fail to address that:

- The Examiner specifically found no evidence of fraud or wrongdoing by the Directors
  or Special Committee. (*See* Examiner's Report, Vol. II, 74) ("nothing in the record
  suggests that the Tribune Board or the members of the Special Committee knowingly
  or intentionally committed any fraud or acts of dishonesty.")

- The Examiner did not determine whether there was wrongdoing by any specific
  Tribune officer. (Examiner Report, Vol. II, 54) ("[g]iven the compressed time frame,
  the Examiner simply was not able to conduct the inquiry necessary to conclusively
  identify specific individuals as having engaged in dishonesty. . ."); and

- The Examiner acknowledged that his theory of intentional fraudulent conveyance is
  significantly different than the typical case. (*See* Examiner Report, Vol. II, 76) ("The
  Examiner recognizes that the facts adduced in the Investigation to not fit the ordinary
  patterns of an intentional fraudulent transfer.")

Ignoring these points, the Noteholder Plan Proponents insist that the Examiner's Report

provides "overwhelming" evidence of fraudulent conduct. (Motion at 2, 7). Hardly. Although

the Examiner opines that it is "somewhat likely" that a Court would find an intentional

fraudulent conveyance with respect to Step Two, the evidence cited in the Examiner Report falls

far short of "overwhelming." Indeed, as described at length in the Debtors' Memorandum in

Opposition to the Motion, the evidence cited by the Examiner with respect to the two issues on

which he focused -- (i) a forecast made in 2007 of results for 2013-2017 and (ii) Management

Representations with respect to the ability to refinance in 2014 – does not support a finding of

actual fraud. Tellingly, the Noteholder Plan Proponents Reply Memorandum makes no effort at

all to address that evidence. Nor do the Noteholder Plan Proponents mention that Debtors have offered to provide the privileged documents related to these topics (subject to an agreement that such production will not be deemed to create a subject-matter waiver of the attorney-client privilege).

*Second*, the Noteholder Plan Proponents have failed to show the challenged privileged communications were "in furtherance" of a crime or fraud. In their original Motion, they made no effort to make this showing. The Noteholder Plan Proponents' Reply Memorandum has not cured this defect. Instead, it sets forth a chronological narrative of events (many of which have nothing to do with the ten year forecasts or the management representation) which they creatively intersperse with descriptions of entries on Debtors' privilege log, in an attempt to foster an illusion of impropriety. But the reference to various emails written to and from the Debtors' attorneys establishes nothing more than the entirely unremarkable proposition that lawyers were involved and consulted at Step Two of the LBO transaction, which related to billions of dollars of complicated corporate and financing agreements.

In fact, the Noteholder Plan Proponents seem to prefer their imagined narrative than what the actual documents say. Precisely for the reason that none of the privileged communications in any way involves a "fraud," Debtors offered to provide the vast preponderance of the 79 privileged documents the Noteholder Plan Proponents now seek. But the Noteholder Plan Proponents did not accept that offer, apparently preferring to use this Motion as yet another attempt to denigrate Debtors and their Directors and Officers. The Motion should be denied.

## I.   THE MOTION DOES NOT SEEK EVIDENCE THAT IS RELEVANT TO THE CONFIRMATION HEARING.

As the Debtors previously explained, (Debtors' Opp. at 2-3), the Noteholder Plan Proponents' Motion is not calculated to elicit evidence that has any bearing on the issues to be

determined at the March 7, 2011 confirmation hearing. The centerpiece of the Motion is the

Examiner's discussion of the intentional fraudulent conveyance claim regarding Step Two of the

LBO transaction.

As is clear from the Examiner's Report, however, that issue relates principally to the

claims against the Tribune's Directors and Officers and the Step Two Selling Shareholders.

There is no dispute that any such potential claims against Debtors' Directors, Officers or

employees, against the Step Two Selling Shareholders, or against Debtors' advisors (including

VRC, Merrill Lynch, Citi and Morgan Stanley), are not being compromised under either of the

two competing Plans.  Instead, under both Plans, such claims are being placed into litigation

trusts and will prosecuted at some point in the future.

It is also clear from the Examiner's Report that the principal claims against the Senior

Lenders relating to Step Two of the LBO transactions are the constructive fraudulent conveyance

claims.  Moreover, the Noteholder Plan Proponents admit that to prevail on the intentional

fraudulent conveyance claim it would be necessary to establish the elements of a constructive

fraudulent conveyance.  (*See* Reply at 6) (noting that those elements constitute two for the three

"badges of Fraud" identified by the Examiner).  As such, documents regarding the Company's

actions regarding its forecasts for 2013-2017 or management representations in connection with

the VRC solvency opinion at Step Two are, at best, of marginal relevance to the issues that the

Court must consider in determining whether the settlement embodied in the

Debtor/Committee/Lender Plan is reasonable.

The Noteholder Plan Proponents' Reply Memorandum offers no response to this point.

Instead, they assert that the documents must be relevant because they were produced pursuant to

document discovery in this case.  (Reply at 3-4)  This misses the point entirely.  The issue is not

whether these documents fall within the broad scope of permitted discovery, but instead whether they have any bearing upon any of the issues to be considered at the March 7 hearing. They do not, and the Noteholder Plan Proponents have not offered any reason why they would. The Motion should therefore be denied on this ground alone.

## II.   THE NOTEHOLDER PLAN PROPONENTS HAVE NOT SATISFIED THE ELEMENTS OF THE CRIME-FRAUD EXCEPTION.

### A.   The Noteholder Plan Proponents Misstate the Standard for Determining Whether Conduct Constitutes a "Crime" or "Fraud" Within the Meaning of the Crime-Fraud Exception.

In order to invoke the crime-fraud exception, the Noteholders Plan Proponents must show that "the client was committing or intending to commit a fraud or crime." *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000). In an attempt to meet this element, the Noteholder Plan Proponents rely exclusively on the Examiner's report and assert that, because the Examiner opined that it was "somewhat likely" that Step Two constituted an "intentional fraudulent conveyance," that element is met here. But as the Debtors explained in their response brief, the Noteholder Plan Proponents' argument rests on a faulty understanding of the scope of conduct that falls under the title "intentional fraudulent conveyance" and therefore misstates the applicable standard for determining whether conduct constitutes "fraud" within the meaning of the crime-fraud exception. (Debtors' Opp. at 5-6.)

In their Reply, the Noteholder Plan Proponents mischaracterize the Debtors' argument. They claim that the Debtors contended that "the crime-fraud exception only applies where there is evidence of common law fraud, as opposed to an intentional fraudulent transfer." (Reply Mem. at 4.) But that is incorrect. Instead, the Debtors argued that the Noteholder Plan Proponents bear the burden of establishing that the crime-fraud exception is applicable here, which includes a showing that "the client was committing or intending to commit a fraud or

crime." *In re Grand Jury Subpoena*, 223 F.3d at 217. And because the Noteholder Plan

Proponents do not contend that the Debtors committed any crime, they must show that the

Debtors were engaged in actual fraud -- that is, "a knowing misrepresentation of the truth or

concealment of a material fact to induce another to act to his or her detriment." *In re Enron*

*Corp.*, 349 B.R. 115, 127 (Bankr. S.D.N.Y. 2006); *see also nVidia Corp. v. U.S. Bankr. Ct. for*

*the N. Dist. of Cal.*, 2006 WL 3734297, at *3, *7 (N.D. Cal. Dec. 15, 2006) (requiring plaintiff in

fraudulent transfer action to establish "(1) a false representation of a material fact; (2) knowledge

of its falsity; (3) intent to deceive; and (4) the right to rely on the representation" before crime-

fraud exception could apply).

  As such, the Noteholder Plan Proponents cannot meet their burden by simply relying on

the Examiner's opinion that the "intentional fraudulent conveyance" label may apply to the Step

Two transaction. The title "intentional fraudulent conveyance" encompasses a wide scope of

conduct, only some of which amounts to actual fraud sufficient to support the application of the

crime-fraud exception. *See In re Cohen*, 199 B.R. 709, 716 (BAP 9th Cir. 1996) ("An actually

fraudulent transfer could, in principle, occur without genuine fraud."); *Flushing Savings Bank v.*

*Parr*, 81 A.D.2d 655, 656 (N.Y. Sup. Ct. 1981) (explaining that fraudulent conveyance statute's

use of the "disjunctive" meant that "'hinder' and 'delay' exist independently of an intent to

defraud"). Indeed, the Examiner and this Court have noted the wide scope of conduct – both

fraudulent and non-fraudulent – that could be encompassed by the "intentional fraudulent

conveyance" label. (Debtors' Opp. at 5.)

  While the Noteholder Plan Proponents simply ignore this point, the caselaw makes it

clear. Rather than rely on the "intentional fraudulent conveyance" label, the cases require the

moving party establish that the underlying conduct consists of actual fraudulent activity. *See,*

*e.g., nVidia Corp.*, 2006 WL 3734297, at *3, *7 (refusing to apply crime-fraud exception in fraudulent transfer case where the plaintiff failed to establish that the defendant made "a false representation of material fact"). Indeed, even the cases cited by the Noteholder Plan Proponents make this clear. For example, in *In re Andrews*, (cited at Motion at 5, Reply at 4, 5, 6, 19) the debtor, facing "large judgments" in court, transferred his interest in real property to a third-party for no consideration and pursuant to an agreement that allowed the debtor to continue to reap the benefits of the property without technically having ownership. 186 B.R. 219, 223 (Bankr. E.D. Va. 1995). In addition, this transfer was never recorded in the land records and the debtor failed to list the transfer in his bankruptcy schedules. *Id.* On the basis of these facts, the court determined the crime-fraud exception applied. *Id.* Likewise, in *In re Economou*, (cited at Motion at 5, Reply at 5, 6), the debtor had guaranteed all payments due under a mortgage to a third-party, but when that mortgage went into default, the debtor breached his contract and refused to cure. 362 B.R. 893, 894 (Bankr. N.D. Ill. 2007). Instead, the debtor transferred his interest in real property to his wife, who then sold the property to the couple's daughter. *Id.* The proceeds from the sale were then placed into a newly formed corporation, which carried on the debtor's business interests. *Id.* After reciting these facts, the court found that the crime-fraud exception was available to the plaintiff. *Id.* at 898.

Simply put, the Noteholder Plan Proponents have failed to show that the conduct at issue in the Examiner's report amounted to actual fraud. For that reason, they have failed to meet their burden that the crime-fraud exception is available in this case.

**B.      The Examiner's Opinions and Report Do Not Establish the Existence of a "Fraud".**

The Noteholder Plan Proponents make the puzzling assertion that Debtors "do not attempt to refute the evidence marshaled by the Examiner in support of his conclusion that a

court is "somewhat likely" to find Step Two of the LBO Transaction to have been an intentionally fraudulent transfer." (Reply at 2). That is simply not true. Instead, as the Debtors explained in great detail, the Examiner's tentative and inconclusive opinions regarding the intentions of certain unidentified members of management, coupled with the thinness of the actual evidence adduced by the Examiner,[1] is not sufficient to establish the existence of a "fraud" within the meaning of the crime-fraud exception. (Debtors' Opp. at 6-14.)

Notably, the Noteholder Plan Proponents make almost no effort to respond to these points. Instead, they relegate the issues to a footnote and simply regurgitate the Examiner's opinions, without attempting to address any of the specific points that Debtors made with respect to these issues. (Reply at 8 n. 4). In so doing, the Noteholder Plan Proponents fail to establish that the conduct on which the Examiner focuses in connection with his analysis of intentional fraudulent conveyance even remotely compares to the sort of intentional fraudulent conduct necessary to invoke the crime-fraud exception discussed above.

The Noteholder Plan Proponents' failure in this regard is hardly surprising. In fact, the actual record the Examiner developed does not support a claim that any specific Director or Officer of Tribune acted with any intent to defraud, that any of the issues identified by the Examiner were material, or that any of this had any bearing on VRC's opinions, the Tribune Board's decision to close the merger, or the Lenders' decision to fund at Step Two.

---

[1] The Noteholder Plan Proponents repeatedly assert that the parties have stipulated that the evidence cited by the Examiner is admissible for all purposes, including the truth of the matter asserted. (Motion at 14; Reply at 17). As Debtors previously pointed out, the vast preponderance of the historical facts in the Examiner's Report -- including the "facts" cited by the Noteholder Plan Proponents in their Motion and Reply Memorandum -- are nothing more than quotes, citations and paraphrases from emails, depositions, interviews, analyst reports or other documents. Paragraph 2.b. of the Examiner Stipulation -- a provision nowhere mentioned in the Motion and again ignored in the Reply Memorandum -- makes clear that the parties did *not* stipulate that such statements are admissible for their underlying truth.

*First*, as discussed in detail in Debtors' Opposition, with respect to the issue of the Company's ten year forecast, the only evidence that the Examiner cites regarding the adjustment to the 2013-2017 forecast is an email from the Company to Citibank on September 27, 2007. (Examiner Report, Vol. II, p. 62 & n. 196; Ex. 889). Notably, Citibank agreed that using the 2012 growth rate as a benchmark to project future growth rates was *reasonable* and reflected a *common* approach to computing projections. (*Id.*, Vol. II, 62 & n. 196; Kurmaniak Dep., pp. 137-139.) Moreover, the Examiner does not identify any evidence that any party relied on these growth forecasts or that they were material to the issue of solvency.

*Second*, any suggestion of fraud with respect to the representation regarding the Company's ability to refinance its debt in 2014, is also thinly supported, at best. As an initial matter, there is simply no dispute that the representation letter was *accurate*: Management did, in fact, discuss this issue with Morgan Stanley, and Morgan Stanley provided the Company with precedent transaction information to assist it in its analysis. (*Id.* Vol. II, 37, 44.) Moreover, the Examiner does not point to any evidence that the Company believed that Tribune would not be able to refinance its debt in 2014. To the contrary, even the Morgan Stanley's representative told the Examiner in an untranscribed interview that he personally believed that the representation was not unreasonable, (*id.* Vol. II, 44, n. 140) and later testified under oath that he may have told the Company that it would be reasonable *for the Company* to make the representation, even if Morgan Stanley was unwilling to do so. (*Id.* Vol. II, 43).

This is hardly "overwhelming evidence" of fraud, but there is more. There is no evidence that Management sought to hide this representation from Morgan Stanley. Morgan Stanley was invited to Board meetings where the refinancing assumption was discussed by VRC. . (*Id.* Vol. I, 643-44). And Management sent Morgan Stanley an email from the Lenders which raised

questions about the representation and Morgan Stanley's role in connection with the refinance issue. (Examiner Report, Vol. II, 38-39 & n. 122). If Management was trying to mislead concerning Morgan Stanley's role, why would Management have involved Morgan Stanley in this way?

Even more significantly, there is also no evidence that VRC and the LBO Lenders ever relied on the reference in the representation to Morgan Stanley. The record is clear that VRC had asked for an explicit representation from Morgan Stanley and was told that it would *not* be provided. (Examiner Rep. Vol. II, 46) The record also shows that VRC anticipated that Morgan Stanley would *not* provide written confirmation that Morgan Stanley believed Tribune could refinance in 2014. (*See* VRC Dep., 221-22.). And VRC testified that it probably would have issued the solvency opinion even if it had learned that Morgan Stanley did *not* concur with Management's representation. (*Id.* at 236.)

As to the LBO Lenders, despite the close scrutiny given to VRC's work, and despite having been informed of the management representation regarding refinancing, none of the LBO Lenders ever questioned whether the refinancing representation was itself reasonable. Moreover, not one of the LBO Lenders indicated that they relied on management's statements regarding Morgan Stanley in deciding to proceed with the Step Two financing. To the contrary, representatives of two of the largest LBO Lenders, JPMorgan (Jeffrey Sell) and Bank of American (Daniel Petrik), each testified that it would not have mattered to them whether Morgan Stanley had refused to represent that the Company would be able to refinance. (*Id.*, Vol. II, 40 n. 128.).

C.    **The Noteholder Plan Proponents Fail To Satisfy the requirement that the Privileged Communications be "In Furtherance" Of The Purported Fraud.**

The Noteholder Plan Proponents have also failed to establish that any "attorney-client communications were *in furtherance* of [the] alleged crime or fraud." *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000) (citations omitted) (emphasis added); *see also Robinson*, 2010 WL 4737816, at *3 ("[T]he exception applies only when a communication is made with an intent to further a future unlawful act.") (citation omitted). In their original Motion, they made no effort to make this showing. Instead, they repeatedly misstated the standard, asserting that they only needed to establish "some reasonable relationship and temporal proximity between the alleged fraudulent activity and the communications with counsel." (Motion at 6, 12.) As Debtors' explained, that is simply not the law in this Circuit. (Debtors' Opp. 15-16).

The Noteholder Plan Proponents make no response to this legal point, and their Reply Memorandum still fails to establish that any communications were made "in furtherance" of any purported fraud. Instead, the Noteholders Plan Proponents devote considerable space and creative license to constructing an imaginative narrative of privileged communications using the log and matching various entries to contemporaneous events during the Fall of 2007. But many of the communications they identify have nothing to do with the ten year forecast or the 2014 refinancing representation. As such, they hardly support a claim that legal advice was being provided "in furtherance" of even the fraud that the Noteholder Plan Proponents claim.

Indeed, rather than establishing the "in furtherance" element, the Noteholder Plan Proponents' efforts do little more than demonstrate the obvious:  there were a number of attorneys who were advising on various aspects of the Step Two transaction, including reviewing and commenting on management representation letters to be provided to VRC, as well as

advising with respect to communications with the LBO Lenders. In the context a $4 billion transaction this "revelation" is entirely unremarkable, and hardly establishes that any of these communications were "in furtherance" of any alleged fraud.

Similarly misplaced are the repeated assertions throughout the narrative that management failed to keep the Board informed regarding revisions to the Company's financial projections. It is simply not the case that the Board or other parties were not provided with extensive information regarding the Company's projections. In connection with the October 17 Board meeting, an extensive package of information regarding the projections was presented to the Board and simultaneously shared with VRC, the Lenders and the rating agencies. (Examiner Report, Vol. I, 489- 92). Further, as the Examiner explained, VRC prepared a detailed critique of these projections, which the Examiner noted was very similar to the critique prepared by the Examiner's own financial advisor, LECG, (*see id.* 530-544) thereby debunking any suggestion that the Company's disclosure was inadequate.

Finally, the Noteholder Plan Proponents never mention that the Debtors offered to provide the vast preponderance of the 79 privileged documents the Noteholder Plan Proponents' now seek (and which they used in concocting their fanciful narrative). The Noteholder Plan Proponents' refusal to accept Debtors' offer only serves to underscore the point that the Motion is not being advanced to obtain relevant evidence but instead to provide yet another platform to cast aspersions on Debtors and their directors and officers.

## CONCLUSION

For reasons set forth above and in Debtors' Memorandum in Opposition to the Motion, the Motion should be denied.

Dated: Wilmington, Delaware
        February 7, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
James B. Bendernagel, Jr.
James W. Ducayet
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

                -and-

NOVACK AND MACEY LLP
Stephen Novack
Donald A. Tarkington
100 North Riverside Plaza
Chicago, IL  60606-1501
Telephone:  (312) 419-6900
Facsimile:  (312) 419-6928

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

DCI 1915702v.1