**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | Related to Docket Nos. 6022, 6184, 6185 and 6186 |

## DEBTORS' FIRST REQUEST FOR THE PRODUCTION
## OF DOCUMENTS TO AURELIUS CAPITAL MANAGEMENT, LP

Pursuant to pursuant to Rules 7026, 7034 and 9014 of the Federal Rules of Bankruptcy

Procedure and Rule 26 and 34 of the Federal Rules of Civil Procedure, the debtors and debtors in

possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

"Debtors"), hereby request Aurelius (as defined below) to produce the documents specified in the requests (the "Requests" or "Request") set forth below for inspection and copying at the offices of Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, ATTN: Alan Unger on or before January 17, 2011

## DEFINITIONS

1.     "Advisers" means all persons who provided advice to Tribune, its Board of Directors or any subcommittee thereof in connection with any part of the Leveraged ESOP Transactions.

2.     "All" or "any" means each and every.

3.     "And" or "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be outside of its scope.

4.     "April Plan" means the Plan of Reorganization filed by the Debtors and others with the Bankruptcy Court on April 12, 2010.

5.     "April Proposed Settlement" means the settlement of certain LBO-Related Causes of Action proposed by Angelo-Gordon & Co., L.P., Centerbridge Credit Partners, L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Special Credit Partners, L.P., the Law Debenture defendants, and J.P. Morgan Chase Bank, N.A., described in a Settlement Support Agreement dated on or about April 9, 2010 including Exhibit A attached thereto.

6.     "Aurelius" means (i) Aurelius Capital Management, LP and its affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, employees, partners, members, or managers; (iii) any of its or their board of directors and any

2

committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

7.      "Bankruptcy Cases" means the chapter 11 cases filed by the Debtors in the Bankruptcy Court for the District of Delaware on December 8, 2008.

8.      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

9.      "Bridge Lender Agreement" means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, Merrill Lynch Capital Corporation as administrative agent, JP Morgan Chase Bank, N.A. as syndication agent, Citicorp North America, Inc. and Bank of America, N.A. as co-documentation agents, and various other financial institutions, as amended, restated, supplemented or otherwise modified from time to time.

10.     "Bridge Lender Plan" means the Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P., dated December 7, 2010 as may be amended or modified, and all prior versions of such plan as well as all drafts of any of the foregoing.

11.     "Bridge Lenders" means all persons who lent money or purchased interests in the Bridge Loans.

12.     "Bridge Loans" means the indebtedness issued pursuant to the Bridge Loan Agreement.

13.     "Bridge Loan Claim" means a claim arising under the Bridge Loan Agreement.

14.     "Bridge Loan Guaranty Agreement" means the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries listed on Annex I thereto, and Merrill Lynch Capital Corporation as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

15.     "Centerbridge" means (i) Centerbridge Credit Advisors LLC, Centerbridge Partners L.P., Centerbridge Credit Partners Master, L.P., Centerbridge Credit Partners, L.P., Centerbridge Special Credit Partners, L.P., or any of their affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, employees, partners, members, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

16.     "Communication" or "communications" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) whether by writing, oral conversation, conversation by telephone, meeting or any other method. A "communication" shall also include, without limitation, all copies of documents that contain or evidence the same.

17.     "Confirmation Hearing" means the Confirmation Hearing currently scheduled to commence on March 7, 2011.

18.     "Complaints" means the original and any amended complaints filed in the adversary proceedings commenced by the Official Committee of Unsecured Creditors on November 1, 2010 asserting LBO-Related Causes of Action against various participants in the Leveraged ESOP Transactions.

19.     "Creditors Trust" means the trust to which certain LBO-Related Causes of Action will be assigned for prosecution or settlement.

4

20.     "Debtor/Committee/Lender Plan" means the First Amended Chapter 11 Joint Plan of Reorganization For Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, LP., Angelo, Gordon & Co., L.P., and JP Morgan Chase Bank, N.A., filed with the Bankruptcy Court on December 10, 2010, as may be amended or modified, and all prior versions of such plan as well as all drafts of any of the foregoing, including as described in the press release issued by Tribune on October 12, 2010.

21.     "Deutsche Bank" means (i) Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee for certain series of Senior Notes (ii) any of its past, present or future officers, directors, partners, members, employees, or managers; (iii) any of its board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

22.     "Directors and Officers" means those directors and officers of Tribune or its subsidiaries who were involved in the planning, consideration, implementation or approval of some aspect of the Leveraged ESOP Transactions.

23.     "Distribution Trust Reserve" has the meaning assigned to that term in the Noteholder Plan.

24.     "Document" or "documents" is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34 but also includes electronically stored information ("ESI"). A draft or non-identical copy is a separate document within the meaning of this term.

25. "Effective Date" means the first Business Day on which all of the conditions to the Effective Date specified in the relevant Plan have been satisfied or waived in accordance with the Plan.

26. "Examiner's Report" means "Report of Kenneth N. Klee, As Examiner", *In Re: Tribune Company et. al,* Debtors, Chapter 11, Case Number 08-12141 (KJC) (Jointly Administered), July 26, 2010.

27. "FCC" means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

28. "FCC Applications" means, collectively, each application filed with the FCC in connection with the Debtor's emergence from bankruptcy, including but not limited to those filed in connection with the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors.

29. "FCC Approval" means an action or actions by the FCC (including any action or actions taken by the FCC's staff pursuant to delegated authority and regardless of whether any action or actions may be subject to further administrative or judicial review) on the FCC Applications granting any consent of the FCC necessary to consummate the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and/or otherwise in connection with a plan of reorganization.

30. "General Disclosure Statement" means the General Disclosure Statement for Tribune Company and Its Subsidiaries included in the Joint Disclosure Statement for the Following Plans of Reorganization: 1) First Amended Joint Plan of Reorganization For Tribune Company And its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, LP., Angelo, Gordon & Co., L.P., and JPMorgan Chase

Bank, N.A.; 2) Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed

by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust

Company Americas, in its capacity as the successor indenture trustee for certain series of senior

notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee

for certain series of senior notes and Wilmington Trust Company, in its capacity as the successor

indenture trustee for the PHONES Notes; 3) First Amended Plan of Reorganization for Tribune

Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims;

and 4) Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by

King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset

Management, L.P., filed with the Bankruptcy Court on or about December 10, 2010, as may be

amended or modified, and all drafts or prior versions of such general disclosure statement.

31.     "Including" means including, but not limited to.

32.     "Individual" or "individuals" means any natural Person or Persons.

33.     "Law Debenture" means (i) Law Debenture Trust Company of New York, in its

capacity as successor indenture trustee for certain series of Senior Notes (ii) any of its past,

present or future officers, directors, partners, members, employees, or managers; (iii) any of its

board of directors and any committee or subcommittee of any board of directors; and (iv)

Professionals of any Person within (i), (ii) or (iii) above.

34.     "LBO-Related Causes of Action" means any and all actual or potential pre-

petition, post-petition and/or post-emergence claims, obligations, suits, judgments, damages,

debts, rights, causes of action, avoidance powers or rights, liabilities of any nature whatsoever

arising from or relating to the Leveraged ESOP Transactions that occurred in 2007, including,

without limitation, the claims asserted in the Complaints and any and all potential legal or equitable remedies associated with any such claims.

35.    "Leveraged ESOP Transactions" means the transactions culminating in the leveraged buy-out of Tribune that occurred in December 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007 and the merger and related transactions involving Tribune on or about December 20, 2007.

36.    "Litigation Trust" means the trust to which all LBO-Related Causes of Action preserved under the applicable Plan, other than those assigned to the Creditors Trust, will be assigned for prosecution or settlement pursuant to the applicable Plan.

37.    "MSCS" means Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities, including, without limitation, Morgan Stanley & Co, Inc.

38.    "New Common Stock" means, collectively, the Class A Common Stock and Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, the Noteholder Plan.

39.    "Non-Tribune Bankruptcy" means any bankruptcy other than the above-captioned bankruptcy in which Aurelius has purchased pre-existing claims, notes, equity, debt, or other direct or indirect economic interests in the debtor and has participated in the bankruptcy proceeding.

40.    "Noteholder Plan" means the Joint Plan of Reorganization for Tribune Company and its Subsidiaries proposed by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as the successor indenture trustee for certain series of senior notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of senior notes and Wilmington Trust

Company, in its capacity as the successor indenture trustee for the PHONES Notes dated December 9, 2010 as may be amended or modified, and all prior versions of such plan as well as all drafts of any of the foregoing.

41.     "Noteholder Plan Post-Emergence Ownership and Governance Structure" means the ownership and corporate governance structure under which the Noteholder Plan proposes that Reorganized Tribune operate from emergence until the Trusts have completed their litigation and the final ownership of the shares in Reorganized Tribune has been determined.

42.     "Oaktree" means (i) Oaktree Capital Management, L.P. and its affiliates, as well as its or their investment funds or managed accounts (ii) any of its or their officers, directors, partners, members, employees, or managers; (iii) any of its or their board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above

43.     "Oaktree Plan" means the Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Oaktree, dated September 17, 2010.

44.     "Person" means any natural person or any business, legal or governmental entity or association.

45.     "Petition Date" means December 8, 2008, the date upon which the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

46.     "PHONES Notes" means the issued and outstanding notes under the indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust Company, as successor indenture trustee, as amended, restated or otherwise modified from time to time, including but not limited to any such PHONES Notes which were put to Tribune prior to but not paid as of the Petition Date.

47.    "Plan" means one of the Debtor/Committee/Lender Plan, the Noteholder Plan, the Step One Lender Plan and the Bridge Lender Plan, as the context indicates.

48.    "Plans" means all of the Debtor/Committee/Lender Plan, the Noteholder Plan, the Step One Lender Plan and the Bridge Lender Plan

49.    "Preserved Causes of Action" means the causes of action that will or may be transferred to the Litigation Trust and the Creditors Trust for prosecution under the Noteholder Plan.

50.    "Professional" means any counsel, consultant, advisor, testifying expert, non-testifying expert, agent, representative or other Person engaged to provide or involved in providing at any time any services relating to the Leveraged ESOP Transactions, the LBO-Related Causes of Action, the Plans, the Complaints, the Examiner, the Examiner Report, Settlement Analysis and/or the Settlement Process.

51.    "Relating to" means concerning, constituting, containing, embodying, identifying, dealing with, reflecting, mentioning, defining, explaining, discussing, commenting upon, monitoring, supporting, evidencing, modifying, contradicting, quoting, criticizing, describing, creating or maintaining, bearing upon, referring to, having any relationship to, constituting a basis for, deriving from or arising from, or in any manner whatsoever pertinent to that subject.

52.    "Reorganized Debtors" means Reorganized Tribune and the other reorganized Debtors or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Noteholder Plan.

53.    "Reorganized Tribune" means reorganized Tribune or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with the Noteholder Plan.

54.    "Responsive Statement" means the document filed the proponents of a Plan responding to competing Plans and the statements made in the Specific Disclosure Statements of such competing Plans, as may be modified and amended, as well as all prior versions and all drafts of any of the foregoing.

55.    "Senior Lenders" means all persons who lent money under or purchased interests in the Senior Loans.

56.    "Senior Loan Agreement" means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, JPMorgan Chase Bank, N.A., as administrative agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) those certain Increase Joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and JPMorgan Chase Bank, N.A., as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

57.    "Senior Loans" means the indebtedness issued pursuant to the Senior Loan Agreement.

58.    "Senior Notes" means the eight series of notes issued and outstanding under any of the following indentures:  (i) the indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (ii) the indenture, dated as of March 19, 1996, between

Tribune and Law Debenture Trust Company of New York, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (iii) the indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (iv) the indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank Trust Company Americas, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

59.    "Specific Disclosure Statement" means the document prepared by the proponents of a Plan describing specific aspects and details of such Plan, as may be modified and amended, as well as all prior versions and all drafts of any of the foregoing.

60.    "Step One Lender Plan" means the means the First Amended Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims, dated December 9, 2010, which was withdrawn on December 14, 2010, and all prior versions of such plan as well as drafts of the foregoing.

61.    "Step One Shareholders" means all persons whose stock Tribune redeemed for cash pursuant to the Tender Offer.

62.    "Step Two Shareholders" means all persons whose stock in Tribune was cancelled and who received payments in respect thereof on or about December 20, 2007.

63.    "Tender Offer" means that certain tender offer for 126 million shares of Tribune Common Stock on or about June 4, 2007.

64.    "Tribune" means (i) the entity known as Tribune Company and its direct and indirect subsidiaries, including but not limited to each of the Debtors in the captioned bankruptcy case; (ii) any of their past, present or future officers, directors, partners, members, employees, or

managers; (iii) any past, present or future board of directors, board of managers or similar body and any committee or subcommittee thereof of any Person within (i) above, including but not limited to the Special Committee; and (iv) Professionals of any Person within (i), (ii) or (iii) of this Definition of Tribune.

65.     "Tribune Interests" means any claims against or interest in or positions with respect to the Debtors , including but not limited to any direct ownership, indirect ownership, claims for which a Noteholder Plan Proponent has the ability to control the vote (either contractually or otherwise), long positions, short positions, swap positions, participations, derivative exposures or instruments whose value is impacted by the value of any of the Debtors.

66.     "Trusts" means the Litigation Trust and the Creditors Trust in a particular plan of reorganization.

67.     "Wilmington Trust" means (i) Wilmington Trust Company, in its capacity as the successor indenture trustee for the PHONES Notes dated April 1, 1999; (ii) any of its past, present or future officers, directors, partners, members, employees, or managers; (iii) any of its board of directors and any committee or subcommittee of any board of directors; and (iv) Professionals of any Person within (i), (ii) or (iii) above.

68.     "Wells Fargo" means (i) Wells Fargo Bank. N.A., in its capacity as the successor indenture trustee under the Bridge Loan Agreement; (ii) any of its past, present or future officers, directors, partners, members, employees, or managers; (iii) any of its board of directors and any committee or subcommittee of any board of directors; and (iv)  Professionals of any Person within (i), (ii) or (iii) above.

69.     "You" or "Your" means Aurelius.

## INSTRUCTIONS

1.      Except where otherwise specifically noted, each Request calls for production of all documents in the possession, custody or control of You, including documents with respect to which You (a) own such document in whole or in part; (b) have a right by contract, statute or otherwise to use, inspect, examine, or copy such document or thing on any terms; (c) have an understanding, express or implied, that they may use, inspect, examine or copy such document or thing on any terms; or (d) have, as a practical matter, been able to use, inspect, examine or copy such document when it has sought to do so.

2.      Documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the paragraphs of the Request to which they are responsive.

3.      ESI is to be produced in 300 DPI Group IV Monochrome Tagged Image File Format (.TIFF or .TIF) files.  TIFF files shall be produced in single-page format along with an IPRO image load files (.LFP file).  Metadata is to be extracted and produced in the metadata load files.  The metadata load file should use standard Concordance delimiters; and to the extent available, the following fields should be produced in the metadata load file. Except for redacted documents and hardcopy, extracted text should be provided for all produced documents.

> Data for both Emails and Electronic Files:
> Production Number Begin
> Production Number End
> Production Attachment Range Number Begin
> Production Attachment Range Number End
> Source
> Original Path
> MD5 Hash
> Extracted Text

Metadata from Emails:
Email Subject
Email Author
Email Recipient
Email cc
Email bcc
Email Received Date
Email Received Time
Email Sent Date
Email Sent Time

Metadata from Electronic Files:
File Name
File Author
File Created Date
File Created Time
File Extension

4.      The present tense shall be construed to include the past tense and the past tense shall be construed to include the present tense as necessary to bring within the scope of these Requests any documents that might otherwise be construed to be outside their scope.

5.      The use of the singular form of any word includes the plural and vice versa.

6.      If you are unable to answer or respond fully to any document request, answer or respond to the extent possible and specify the reasons for Your inability to answer or respond in full.

7.      Subject to any mutual agreement in the Court-Ordered Case Management Order regarding the logging of privileged documents by category, in the event that any Document is not produced by reason of a claim of privilege, work product, or any other reason, set forth the following: (1) the author or originator; (2) each addressee or recipient of the document or any copy thereof; (3) the date the document bears, or if it bears no date, the date on which it was made; (4) the title or subject matter of the document and a general description of its contents; (5)

the nature of the document (*e.g.*, memorandum, telegram, chart, etc.); and (6) the basis or bases for the claim of privilege.

8.      Unless otherwise indicated, the relevant time period for these Requests is December 15, 2009 through the date hereof.

9.      These requests shall be deemed continuing so as to require prompt, supplemental production if you discover additional documents subsequent to the date hereof.  If, after responding, you obtain or become aware of any additional documents responsive to these Requests, production of such additional documents shall be made forthwith as required by Rule 7026 of the Federal Rules of Bankruptcy Procedure and Rule 26(e) of the Federal Rules of Civil Procedure.

## DOCUMENTS REQUESTED

A.    The Plans

1.      All documents and communications relating to the Noteholder Plan, including but not limited to (a) its development, (b) its structure or any potential alternative structure (c) its actual or potential strengths or weaknesses, (d) the actual or potential perception of or response to any of its terms, strengths or weaknesses by a creditor or creditor constituency of the Debtors or by any other person and (e) any arguments or assertions that would or could be made in response to any criticism of its terms, strengths or weaknesses.

2.      All documents and communications relating to all or part of any draft, final, modified or amended Specific Disclosure Statement for the Noteholder Plan.

3.      All documents and communications relating to all or part of any draft, final, modified or amended Responsive Statement prepared by any proponents of the Noteholder Plan.

16

4.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Debtor/Committee/Lender Plan.

5.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Bridge Lender Plan.

6.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Step One Lender Plan.

7.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the Oaktree Plan.

8.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the terms, strengths or weaknesses of the April Plan including, without limitation, documents relating to Centerbridge's and Akin Gump's support for, and endorsement of, the April Plan both prior to and after issuance of the Examiner's Report.

B.      The LBO-Related Causes of Action

9.      All documents and communications constituting or relating to any discussion, analysis, assessment or review of the LBO-Related Causes of Action, including but not limited to the strengths and weaknesses of any actual of actual or potential LBO-Related Causes of Action that have, could or might be asserted by any person against any of the Senior Lenders, the Bridge Lenders, the Directors & Officers, the Step One Shareholders, the Step Two Shareholders, or the Advisers.

17

10.    All documents and communications relating to any discussion, analysis, assessment or review of the Examiner's Report, including but not limited to any statement, calculation, annex or exhibit in or to the Examiner's Report.

11.    All documents and communications constituting or relating to any attempt to assign probabilities to various recoveries scenarios discussed in the Examiner's Report, including but not limited to all drafts thereof and sensitivity analyses relating thereto.

12.    All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Debtor/Committee/Lender Plan.

13.    All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Bridge Lender Plan.

14.    All documents and communications relating to the settlement of the LBO-Related Causes of Action embodied in the Step One Lender Plan.

15.    All documents and communications relating to the settlement of the LBO-Related Causes of Action described in the press release issued by Tribune on September 28, 2010.

16.    All documents or communications relating to the settlement of the LBO-Related Causes of Action embodied in the April Plan.

C.    The Litigation and/or Creditors Trusts

17.    All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Noteholder Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board

member; the actual or potential ability of Aurelius to exercise control or influence over any person identified, considered or selected to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of any Preserved Causes of Action that will or might be pursued.

18.    All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Debtor/Committee/Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of Action that will or might be pursued by each of the Trusts.

19.    All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Bridge Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential identification, consideration or selection of any person to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of Action that will or might be pursued by each of the Trusts.

20.    All documents and communications relating to the Litigation Trust or Creditors Trust embodied in the Step One Lender Plan, including but not limited to the actual or potential structure, function, administration and operation of each of the Trusts; the actual or potential

identification, consideration or selection of any person to serve as trustee or advisory board member; any actual or potential timeline or schedule for the pursuit to settlement or judgment of the Preserved Causes of Action; or the actual or potential value of the Preserved Causes of Action that will or might be pursued by each of the Trusts.

D.    Debtors' Current Value

21.    All documents and communications relating to the Reorganized Value Analysis, the Enterprise Value, or the Equity Value (as each of those terms are defined and used in the General Disclosure Statement), including, but not limited to, the allocation of Enterprise Value or Equity Value as between the various Debtor entities, all business plans, projections, forecasts, market reports, financial information, credit analyses and any other Documents and Communications relating to the value of any of the Debtors, the value of any stock or assets of any Debtor, and/or allocation of value between and among the Debtors generated on or after January 1, 2010.

E.    Intercompany Claims

22.    All documents and communications relating to any discussion, analysis, assessment or review of intercompany claims, including but not limited to current claims between or among Debtor entities or Debtor entities and non-Debtor affiliates.

23.    All documents and communications relating to the Intercompany Claims Settlement, as that term is used in the Specific Disclosure Statement relating to the Debtor/Committee/Lender Plan.

24.    All documents and communications relating to the treatment or handling of intercompany claims in the Noteholder Plan.

25.     All documents and communications relating to the treatment or handling of intercompany claims in the Debtor/Committee/Lender Plan.

26.     All documents and communications relating to the treatment or handling of intercompany claims in the Bridge Lender Plan.

27.     All documents and communications relating to the treatment or handling of intercompany claims in the Step One Lender Plan.

F.     Amount of the PHONES Notes Claims

28.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the amount of the PHONES Notes or the PHONES Notes claims, whether in connection with a solvency analysis of in connection with the allowance of claims under any Plan.

G.     Recoveries for Specific Creditor Groups

29.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of actual of potential recoveries actually or potentially available to any individual creditor or class of creditors of any Debtor under any Plan, including but not limited to immediate recoveries, ultimate recoveries, risk of recoveries, the level of ultimate recoveries, and recoveries resulting from litigation under any Plan or from a buyout to prevent or settle litigation under any Plan.

30.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of actual of the actual or potential likelihood or uncertainty of

success with respect to issues that might be actually or potentially litigated either at the Confirmation Hearing or by the Trusts under the Noteholder Plan.

31.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of, or supporting, the different recovery percentages listed for the different scenarios laid out in the Specific Disclosure Statement for the Noteholder Plan.

32.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential ability of the Noteholder Plan Proponents to obtain a 100% recovery on their claims under the Noteholder Plan.

33.     All Documents and Communications constituting or relating to any discussion, analysis, assessment or review of actual of potential impact or consequence of any of the Plans on any individual creditor or class of creditors of any Debtor.

H.     Specific Requests Regarding Aurelius and/or the Noteholder Plan

34.     From the Petition Date through the date hereof, all documents and communications relating to or reflecting Tribune Interests held by a Noteholder Plan Proponent, including but not limited to the type and amount of Tribune Interests, the identity of each and every person or entity for which Aurelius controls such Tribune Interests, the date of purchase and price paid for such Tribune Interests, and the reasons for the purchase or holding of such Tribune Interests.

35.     From the Petition Date through the date hereof, all documents and communications relating to any actual or potential purchase or sale by a Noteholder Plan Proponent of any Tribune Interests.

36.    From the Petition Date through the date hereof, all documents and communications relating to any consideration, value or transfer or payment of money made by a Noteholder Plan Proponent in exchange for any Tribune Interests.

37.    From January 1, 2005 through the present, with respect to entities whose Tribune Interests are within the scope of Requests 34-36 above:

    a.  all documents relating to the creation and structure of each such entity including, with limitation, articles of incorporation, by-laws, operating agreements, and voting agreements;

    b.  all filings made by each such entity regarding its structure and operations with any sovereign, federal, or state government or agency, and with any other regulator or government entity and

    c.  all documents relating to, or sufficient to identity any litigation, (including, without limitation, lawsuits, arbitrations, regulatory and industry proceedings) from January 1, 2005 to the present;

    d.  all documents relating to any plan support, lock-up or voting agreements, or similar arrangements relating to these Bankruptcy Cases.

38.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential effect of the Noteholder Plan on the ability to obtain FCC Approval.

39.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential ability or inability of Step One Lenders to benefit from avoidance of Step Two debt or disgorgement from Step Two Lenders, including but not limited to by reason of the doctrines of equitable estoppels, equitable subordination or otherwise.

40.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the basis on which distribution from the Distribution Trust Reserve under the Noteholder Plan will be made, including but not limited to whether creditors' entitlements will be fixed on the Effective Date, or whether entitlements will be determined in accordance with values at the time of distribution.

41.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the practicality, difficulty, legality or confirmability of the Noteholder Plan Post-Emergence Ownership and Governance Structure.

42.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential impact of the Noteholder Plan Post-Emergence Ownership and Governance Structure upon the business, operations, or value of Reorganized Tribune.

43.    All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential effect of not distributing a substantial proportion of the value of the Reorganized Tribune after the Effective Date upon the market value of the new common stock in Reorganized Tribune actually distributed on the Effective Date.

24

44.     All documents and communications constituting or relating to any discussion or analysis of the actual or potential effect of the Noteholder Plan on the ability to obtain FCC Approval.

45.     All documents and communications relating to the Put Options (as defined in the Noteholder Plan), including, but not limited to, (i) consideration and determination of the amounts proposed to be offered to purchase claims and the actual or potential justifications for each such amounts (ii) contacts with Aurelius' trading desk concerning the actual or potential price at which Tribune Interests would or might trade (iii) acts or omissions considered or undertaken by, on behalf of or at the requests of Aurelius in order to depress or otherwise affect the price at which Tribune Interests would or might trade and (iv) all documents reflecting the purchase by Aurelius of any such claims at those or any other amounts.

46.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the setting of the amount of value to be set aside in the Distribution Trust Reserve under the Noteholder Plan, including but not limited to the various amounts considered, the actual or potential justifications for those amounts and the reasons for the amount ultimately decided upon.

47.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the basis on which distribution from the Distribution Trust Reserve under the Noteholder Plan will be made, including but not limited to whether creditors' entitlements will be fixed on the Effective Date, or whether entitlements will be determined in accordance with values at the time of distribution.

48.     All documents and communications constituting or relating to any discussion, analysis, assessment or review of the actual or potential ability of the Debtors to procure financing pre-emergence and post-emergence from bankruptcy in the context of any actual or potential plan or reorganization, including but not limited to the actual or potential impact or effect of any aspect of the Noteholder Plan on the ability of the Debtors to procure exit financing or replacement financing for the New Senior Secured Term Loan contemplated by Section 5.6.2 of the Aurelius Plan.

49.     All documents and communications relating to any actual or potential discussions, negotiations or agreement between or among Aurelius and any other party to the bankruptcy, including but not limited to Wilmington Trust the Bridge Lenders and the Step One Lenders, relating in any way to any actual or potential plan of reorganization or any actual or potential disposition, resolution or settlement of the LBO-Related Causes of Action.

50.     From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications identifying all claims, notes, equity, debt or other direct or indirect economic interests in the debtor that were purchased by Aurelius, the date that Aurelius purchased, the price at which Aurelius purchased, and the total cost to Aurelius of its purchase.

51.     From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting the total amount paid to Aurelius as a result of an order or settlement in the bankruptcy proceeding as to any pre-existing claims, notes, equity, debt, or other direct or indirect economic interests in the debtor owned or controlled by Aurelius.

52.    From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting any proposal by Aurelius that any potential causes of action be litigated rather than settled or the response of the bankruptcy court to such proposal.

53.    From December 1, 2005 through the date hereof, for each Non-Tribune Bankruptcy, all documents and communications relating to or reflecting whether, after making a proposal that claims be litigated rather than settled, Aurelius was offered and accepted an amount of money in settlement of its claims greater than had previously been offered and, if so, the amount of money accepted and the amount(s) of money previously offered.

I.    Confirmation Hearing Witnesses and Evidence

54.    All documents provided to or relied upon by any expert expected to testify on behalf of Aurelius at the Confirmation Hearing.

55.    All documents that Aurelius intends to introduce or rely upon at the Confirmation Hearing.

Dated: Wilmington, Delaware
        December 19, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James Conlan
James B. Bendernagel, Jr.
Bryan Krakauer
James W. Ducayet
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

                -and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

## CERTIFICATE OF SERVICE

I, _Patrick J. Reilly /bcc_____, an attorney, hereby certify that I have caused a true

and correct copy of the foregoing Debtors' Requests for the Production of Documents to

Aurelius Capital Management, LP to be served on counsel listed below by electronic mail on this

19th day of December, 2010.