**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

In Re:

TRIBUNE COMPANY, et al.,

Debtors.

Chapter 11
Case Number
08-13143(KJC)
Jointly
Administered

---

October 13, 2010
3:11 p.m.

Videotaped deposition of MARY AGNES WILDEROTTER, taken by Aurelius Capital Management, pursuant to Notice and Subpoena, held at the offices of Frontier Communications, 3 High Ridge Park, Stamford, Connecticut, before Joseph R. Danyo, a Shorthand Reporter and Notary Public within and for the State of New York.

HUDSON REPORTING & VIDEO 1-800-310-1769

APPEARANCES:

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
Attorneys for Aurelius Capital Management
1633 Broadway
New York, New York 10019-6708

By: WILLIAM P. WEINTRAUB, ESQ.
EAMONN O'HAGAN, ESQ.

BROWN RUDNICK LLP
Attorneys for Wilmington Trust on behalf of PHONES
185 Asylum Street
Hartford, Connecticut 06103
By: DYLAN P. KLETTER, ESQ.

CHADBOURNE & PARKE LLP
Attorneys for the Committee of Unsecured Creditors
30 Rockefeller Plaza
New York, New York 10112
By: ALEXANDRA K. NELLOS, ESQ.
-and-
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W.
Suite 1000
Washington, D.C. 20036-5807

By: ANDREW GOLDFARB, ESQ.
(Via Teleconference)

APPEARANCES: (Continued)

SIDLEY AUSTIN LLP
Attorneys for the Debtors
1501 K Street, N.W.
Washington, D.C. 20005
By: DAVID M. MILES, ESQ.

WILMER CUTLER PICKERING HALE and DORR LLP
Attorneys for Angelo Gordon & Co.
399 Park Avenue
New York, New York 10022

By: LIPI M. PATEL, ESQ.

JENNER & BLOCK LLP
Attorneys for EGI-TRB LLC and Samuel Zell
353 N. Clark Street
Chicago, Illinois 60654-3456

By: DOUGLAS A. SONDGEROTH, ESQ.

DAVIS POLK & WARDWELL LLP
Attorneys for JP Morgan
450 Lexington Avenue
New York, New York 10017
By: SASHA E. POLONSKY, ESQ.

WHITE & CASE LLP
Attorneys for the Bridge Agent Wells Fargo
1155 Avenue of the Americas
New York, New York 10036-2787
By: BRIAN FRITZ, ESQ.

APPEARANCES: (Continued)

McCARTER & ENGLISH LLP
Attorneys for Deutsche Bank
405 N. King Street
Eighth Floor
Wilmington, Delaware 19801

By: KATE BUCK, ESQ.
(Via Teleconference)

KAYE SCHOLER LLP
Attorneys for Merrill Lynch LLP
425 Park Avenue
New York, New York 10022-3598

By: JOSEPH OTCHIN, ESQ.
(Via Teleconference)

JONES DAY LLP
Attorneys for the Witness
222 East 41st Street
New York, New York 10017-6702

By: FREDRICK E. SHERMAN, ESQ.
BRAD B. ERENS, ESQ.

Also Present:
HENRY MARTE,
Videographer

oOo

THE VIDEOGRAPHER: This marks the beginning of videotape number one in the videotaped deposition of Ms. Maggie Wilderotter in the matter of In Re Tribune Company, et al., filed in the United States Bankruptcy Court for the District of Delaware. This deposition is being held at Frontier Communications, 3 High Ridge Park, Stamford, Connecticut, on Wednesday, October 13, 2010 at approximately 3:11 p.m.

The court reporter is Joe Danyo. The video operator is Henry Marte. We are both here on behalf of Hudson Reporting & Video.

Will counsel please identify themselves for the record.

MR. WEINTRAUB: Yes, I am William Weintraub of Friedman Kaplan Seiler & Adelman representing Aurelius Capital Management.

MR. SHERMAN: Fredrick Sherman, Jones Day in New York City, representing the witness.

Wilderotter

MR. MILES: David Miles, Sidley Austin, representing the debtors.

MS. NELLOS: Alexandra Nellos, Chadbourne & Parke, representing the unsecured creditors committee.

MR. KLETTER: Dylan Kletter, Brown Rudnick, representing the Wilmington Trust on behalf of the PHONES.

MS. PATEL: Lipi Patel, Wilmer Hale, representing Angelo Gordon.

MR. SONDGEROTH: Doug Sondgeroth, Jenner & Block, representing EGI-TRB and Samuel Zell.

MS. POLONSKY: Sasha Polonsky, Davis Polk & Wardwell, representing JP Morgan.

MR. O'HAGAN: Eamonn O'Hagan of Friedman Kaplan Seiler & Adelman, also representing Aurelius Capital.

THE VIDEOGRAPHER: Will the court reporter please administer the oath.

MARY AGNES WILDEROTTER, having been first duly sworn by Joseph R. Danyo, a Notary Public for the State of New York, was examined and testified as follows:

Wilderotter

EXAMINATION BY MR. WEINTRAUB:

Q. Good afternoon, Ms. Wilderotter. My name is William Weintraub. I am an attorney with Friedman Kaplan Seiler & Adelman representing Aurelius Capital Management in this matter. Have you had your deposition taken before?

A. In this matter?

Q. In any matter.

A. Yes.

Q. So you understand that you are required to give truthful answers to my questions today?

A. Yes.

Q. And it would help the court reporter and all of us if you wait until I finish asking my question until you begin to answer it. Do you understand that?

A. Yes.

Q. Thank you. And, if there is a question that you don't understand, if you tell me you don't understand it, I will try to rephrase it as best I can. Is that all right?

A. Yes.

Q. Thank you. Are you a member of the

Wilderotter

special committee of the board of directors of Tribune Company?

A. Yes.

Q. Has the special committee asked to meet with Aurelius Capital Management?

A. Not that I know of.

Q. Is the special committee willing to meet with Aurelius Capital Management?

A. Yes.

Q. Do you think that Aurelius Capital Management should be permitted to participate in the ongoing negotiations concerning the plan of reorganization for the debtors?

A. Sure.

Q. Has anyone told you that Aurelius Capital Management should not be part of the negotiations?

A. No.

Q. Has anyone told you that Aurelius Capital Management is close-minded about the negotiations?

A. No.

Q. Has anyone told you that Aurelius Capital Management is requiring to be paid in

Wilderotter

full, par plus accrued interest, in connection with its distributions in the Tribune case?

A. Not that I know of.

Q. In your role as a member of the special committee, to whom do you owe fiduciary duties?

A. I owe fiduciary duties to the stakeholders, the creditors that own the debt of this company.

Q. Anyone else?

A. I have a fiduciary responsibility first and foremost to help get the company reorganized and out of bankruptcy on behalf of the creditors.

Q. Does one of those goals take precedence over the other, reorganization versus getting out of bankruptcy as quickly as possible?

A. I think they are all-inclusive.

Q. What do you mean by all-inclusive?

A. That reorganization is about getting the company out of bankruptcy.

Q. To whom does Tribune as debtor in possession owe fiduciary duties?

A. Who are you talking about?

Wilderotter

Q. Tribune, the debtor. The debtor in possession.

A. The company?

Q. Yes.

A. I'm not here to speak for the company.

Q. Are you a member of the board of directors of the company?

A. Yes.

Q. Do you have an understanding as to whom the company as debtor in possession has fiduciary duties to?

A. They have fiduciary duties similar to what I talked about. They have a duty to the creditors to reorganize the company and to maximize what the creditors will get from that reorganization to try to meet the needs of the creditors as part of this process.

Q. Do you see any difference between the fiduciary duties of the special committee and the fiduciary duties of Tribune?

A. No.

Q. Why was the special committee formed?

A. The special committee was formed

Wilderotter

because there are a number of members of the board of directors that have or could have conflicts of interest.

Q. Is that the only reason?

A. Yes. The four members of the special committee are the independent members who were not part of the transaction when it took place.

Q. Was there any other reason for forming the special committee, to your knowledge?

A. No, not that I know of.

Q. When was Don Liebentritt made chief restructuring officer?

A. I don't know the exact date, but the title of chief restructuring officer I think was put with Don Liebentritt in August.

Q. Do you know why he was made chief restructuring officer?

A. Well, he was acting as the general counsel of Tribune, and he was basically spending full time on the restructuring, and we felt that he should continue from a continuity perspective to work restructuring on behalf of Tribune.

Q. Was there any change in his duties from being counsel to the corporation to being a

Wilderotter

chief restructuring officer?

A. I think that his duties as chief restructuring officer are the same duties he had before with regard to the company and the bankruptcy.

Q. So what was the purpose of changing his title?

A. Well, the general counsel role does a lot more in a company than just looking at a restructuring. They handle the legal activities on a day-to-day basis for the operations of the company, and Don is no longer doing that.

Q. So Mr. Liebentritt is doing less than he was doing before?

A. His role has been restricted to the restructuring.

Q. Whose decision was it to make Mr. Liebentritt chief restructuring officer?

A. I don't believe that I know who took a leadership role on that, but it was a management decision. Management makes decisions on the people that are involved in the company. It did come to the special committee and asked us if we felt that was a good idea, and we felt for

Wilderotter

continuity, yes, it would be a good idea.

Q. Who at management made that decision?

A. I am sure it was Randy Michaels as the CEO in conjunction with probably Don Liebentritt and Sam Zell also participated, I am sure, in discussions on it as the chairman of the board.

Q. You agree with the decision to make Mr. Liebentritt chief restructuring officer?

A. Yes.

Q. Has there been any friction between Mr. Liebentritt and Mr. Shapiro?

A. Not that I know of.

Q. Did Mr. Shapiro ever express any frustration with Mr. Liebentritt, to your knowledge?

A. Frustration, no.

MR. WEINTRAUB: I am going to mark some documents. I would like to mark this as Exhibit 1. For those on the phone, this is document MW 10. That is the first Bates number.

(Wilderotter Exhibit 1, Document beginning with Bates number MW 10

Page 14

Wilderotter

containing e-mail dated September 20, 2010 from Mark Shapiro to Don Liebentritt, was so marked for identification, as of this date.)

Q. This is an e-mail dated September 20, 2010 from Mark Shapiro to you. Do you recall receiving this?

A. It was sent to Don Liebentritt.

Q. I'm sorry. With a copy to you.

A. Correct.

Q. Do you recall receiving this?

A. I don't recall, but I probably did since it was sent to me.

Q. Do you normally read e-mails that are sent to you?

A. I do.

Q. Do you remember reading this one?

A. Now that you put it in front of me, I do remember it.

Q. In essence, what was going on here, if you recall?

A. Well, if I read it, it sounds like that Mark wanted Don to do a more formal statement that wasn't sent out.

Page 15

Wilderotter

Q. He says in the first sentence, "Don, need to tell you that I am still disturbed that we never sent out a formal statement."

Did, independent of this e-mail, Mr. Shapiro ever express his annoyance or being disturbed to you?

A. About what?

Q. About the fact that they never sent out the formal statement that he is speaking to Mr. Liebentritt about.

A. Not that I recall.

Q. Did you respond to this e-mail?

A. Not that I recall.

MR. WEINTRAUB: I am going to mark this as Exhibit 2.

(Wilderotter Exhibit 2, Document beginning with Bates number MS 37 containing e-mail dated September 20, 2010 from Ms. Wilderotter to Mark Shapiro, was so marked for identification, as of this date.)

MR. WEINTRAUB: This is MS 37. That is the first Bates stamp number. It is another e-mail.

Page 16

Wilderotter

A. Um-hum.

Q. I don't think this was in the production that you gave to us. We can double-check on that, but do you recall sending this e-mail to Mr. Shapiro on September 20, 2010?

A. Yes, as I read it.

Q. It says, "Wow, are you okay, or do we need a committee caucus?"

A. Right.

Q. "Frankly, Don is used to doing what he wants with no accountability. I am sure your e-mail is a shock to him, but rightly so. Let us know if you want to do a quick call. Best, Maggie."

Again, does this refresh your recollection as to what was going on at that time?

A. Well, again I think it states that Mark came on strong with Don. Don has not been used to providing accountability to a special committee, so this was new for him, and I just wanted to make sure that if Mark was frustrated we could talk about it, if that is what he wanted to do.

Page 17

Wilderotter

Q. Why did you punctuate this by beginning with "wow"?

A. Because it was an e-mail that was pretty direct.

Q. When you say in your e-mail, "I am sure your e-mail is a shock to him, but rightly so," what did you mean by rightly so?

A. Well, I think that Mark brought up an accountability for Don to make sure that he follows through on the things that Mark had asked him to do, and he hadn't done that.

Q. What was going on at this time that Don was not doing?

A. Well, it says here he didn't send out a formal statement from the company following Oaktree's filing on Friday.

Q. And do you know why Don didn't do that?

A. I have no idea.

Q. Did you ever inquire?

A. No, because it says here that he gave a reason that Randy's letter to the employees and to anyone in the press that inquired about it was his response.

Wilderotter

Q. Was that response satisfactory to you?

A. It wasn't satisfactory to me, but Mark was the one having the dialogue with him.

Q. As a member of the special committee, did you think any action needed to be taken?

A. Yes, I said, if Mark wanted to have a quick call about it, I would be happy to participate in that.

Q. Did you have that call?

A. No. Mark said he didn't feel he needed to have that call.

Q. So Mark was interacting directly with Mr. Liebentritt?

A. Correct.

Q. Were you interacting at all with Mr. Liebentritt on this?

A. Not that I recall.

Q. Were there any other issues with Mr. Liebentritt during this period that you recall?

MR. SHERMAN: Which period is that?

MR. WEINTRAUB: The period of this e-mail, which was in September 2010.

A. Well, there has been a lot of

Wilderotter

interactions with Don Liebentritt during this period of time.

Q. Were any of them not satisfactory to you?

A. You would have to give me a specific instance for me to respond to that.

Q. Do any stand out in your mind?

A. Do any stand out in my mind? No.

MR. WEINTRAUB: I am going to mark this as 3, and for those on the phone, this is MS 115.

(Wilderotter Exhibit 3, Document beginning with Bates number MS 115, was so marked for identification, as of this date.)

A. Okay.

Q. I am going to start at the bottom of the first page, which is MS 115. Do you recall receiving Mr. Shapiro's e-mail of September 9 at the time that it was sent?

A. Now that you have put it in front of me, yes.

Q. He is saying here towards the end of that very short paragraph, "I would add that Don

Wilderotter

has made some wrong turns and because of it has lost the confidence and trust of several of the constituencies. Further, the process has lacked leadership from the debtors' side."

Do you know what wrong turns Mr. Shapiro is referring to?

A. No.

Q. Did you ask him?

A. No. I asked him if he had any thoughts on course corrections.

Q. No, but my question was did you ask him what the wrong turns were?

A. No.

Q. Were you aware of what the wrong turns were?

A. No.

Q. Do you think as a member of the special committee it would have been within your responsibilities to find out what the wrong turns were?

A. Well, this was an assessment between Mark in a meeting with Don, and it is his observations, so I felt that what I wanted to know from Mark is if he had thoughts on any

Wilderotter

course corrections.

Q. Did he?

A. He said he was arranging a meeting with principals from Angelo, Oaktree and JP Morgan with our legal counsel to see if they could bridge issues.

Q. Were you at that meeting?

A. No.

Q. Were you asked to be at that meeting?

A. No.

Q. Why not?

MR. SHERMAN: Objection to the form.

Q. Why were you not asked to be at that meeting, if you know?

A. I don't think anybody felt it was necessary with the chairman of the special committee going to the meeting why I would have to go too.

Q. Did you think you needed to be at that meeting?

A. No.

Q. Do you know which constituencies Mr. Shapiro was referring to when he said that Don has lost the confidence and trust of several of

Wilderotter

the constituencies?

A. No.

Q. Did you ask him?

A. No.

Q. Do you think that would have been important information for you to know as a member of the special committee?

A. Not at that point in time.

Q. At what point in time would it have been important to you?

A. After he had a meeting with the principals.

Q. Which principals?

A. Angelo, Oaktree, JP Morgan, that meeting, to find out if they could bridge the issues.

Q. Do you know that those are the principals he was referring to in his e-mail?

A. Well, he said he was arranging a meeting with those principals as a follow-up in this e-mail.

Q. Do you know why Angelo Gordon, Oaktree or JP Morgan would have lost confidence in Mr. Liebentritt?

Wilderotter

MR. SHERMAN: Objection to the form.

Q. You can answer the question.

A. Could you ask it again, please.

Q. Do you know why Angelo Gordon, Oaktree and JP Morgan might have lost confidence in Mr. Liebentritt?

MR. SHERMAN: Objection to the form.

THE WITNESS: What does that mean?

MR. SHERMAN: You can answer if you understand it. It is a technical objection. Counsel can either restate it if he wants to. You can answer it if you understand it. That is it.

A. I don't know specifically from this e-mail exchange why they would have any objections at this point.

Q. I wasn't asking about objections, I was asking if you knew why they might have lost confidence and trust.

A. The only thing I could do is give you my thoughts on it. I don't know why specifically, because I never talked to any of the members of these principals, so that would only be my speculation if I were to answer that.

Wilderotter

Q. Did Mr. Shapiro tell you why Oaktree, JP Morgan and Angelo Gordon might have lost trust and confidence in Mr. Liebentritt?

MR. SHERMAN: Objection to the form.

A. I don't recall a specific conversation with Mark Shapiro about each of these specific individuals and why they had lost confidence in terms of what they would have told him specifically.

Q. Did you have a general conversation with Mr. Shapiro about that?

A. I have not had a general conversation with Mr. Shapiro. We have had conversations at the special committee level.

Q. What did the special committee discuss about the possible loss of confidence and trust of Angelo Gordon, Oaktree and JP Morgan in Mr. Liebentritt?

A. Well, that Don Liebentritt has worked for Sam Zell for many years and that relationship could have an impact on the negotiations and the discussions.

Q. Was that relationship taken into account when Mr. Liebentritt was made chief

Wilderotter

restructuring officer?

A. Yes.

Q. And he was made chief restructuring officer despite that relationship?

A. He was made chief restructuring officer with an understanding that he has had a long-term relationship with Sam.

Q. So that was considered to be a benefit?

A. It was never discussed.

Q. It was never discussed with who?

A. But we knew he had a relationship with Sam Zell for years.

Q. So that was not a consideration in the special committee's supporting the appointment of Mr. Liebentritt as chief restructuring officer?

MR. SHERMAN: Objection to the form.

Q. You can answer the question.

A. So ask it again, please.

MR. WEINTRAUB: Could you read it back.

(Record read)

A. It was not.

Page 26

Wilderotter

Q. Was it discussed among the special committee as to whether or not it would be a good idea to appoint someone who has a relationship with Mr. Zell as chief restructuring officer?

A. No.

Q. Why not? Do you know?

A. It just wasn't discussed.

Q. Was it not considered to be an important issue?

A. No.

Q. Do you know if Mr. Liebentritt profited in any way from the LBO transactions through his relationship with EGI?

A. Do I know if he profited in any way?

Q. Yes.

A. From this transaction?

Q. From the LBO -- you know, when I refer to the LBO transaction, you know what I am referring to? The step 1 and step 2 transactions?

A. Right.

Q. Do you know if Mr. Liebentritt profited?

A. I have no idea.

Page 27

Wilderotter

Q. Did you ask him?

A. No.

Q. Did anyone from the special committee ask him?

A. I don't know. You would have to ask the other members.

Q. But, to your knowledge, it was never asked by the special committee?

A. Correct.

MR. WEINTRAUB: I am going to mark as the next exhibit the term sheet.

(Wilderotter Exhibit 4, Term sheet, was so marked for identification, as of this date.)

MR. WEINTRAUB: For those on the phone, this is the term sheet that was attached to the second mediator's report.

(Brad Erens enters the room)

Q. Have you seen this document before?

A. Yes.

Q. When was the first time you saw it?

A. I don't recall. I would have to go back and look at my files to see.

Q. Do you recall if you saw drafts of

Page 28

Wilderotter

this before the version that was attached to the mediator's report was filed with the court?

A. I don't recall.

Q. To the best of your recollection, did you see this term sheet for the first time at or around the time that it was filed with the court?

MR. SHERMAN: Do you want to give her a date?

MR. WEINTRAUB: Yes.

Q. It was filed on October 12th.

MR. SHERMAN: Which was yesterday.

MR. WEINTRAUB: Yes.

A. So did I see it? Yes, I did see it at or around that date.

Q. Do you recall if you saw it before yesterday?

A. Yes.

Q. Do you recall when that was?

A. We had a special committee meeting this week, which was I think on Tuesday.

Q. Today is Wednesday.

A. Monday. I'm sorry.

Q. So that would have been the 11th?

Page 29

Wilderotter

12th?

A. Yes.

Q. It was a holiday.

A. Yes. Some of us had to work.

Q. You weren't the only one.

What is your understanding of what LBO claims are being settled under this term sheet or pursuant to this term sheet?

A. You want me to read this to you or what?

Q. I would just like your understanding of what is being settled.

A. That there are partial settlements of step 1 and step 2 causes of action that were taken into consideration in the settlement with certain principals.

Q. Do you have an understanding of what was being settled separate and apart from reading the term sheet?

A. Yes, I do have an understanding.

Q. Can you give me what that understanding is?

A. Yes, the understanding is that for both step 1 and step 2 what we were trying to do

6ead99f2-00c6-462b-b9d4-0441842280a9

Page 30

Wilderotter

in a settlement with specific debtors, with the debtor, with the creditors, is to make sure that we could give recovery to the appropriate creditors in a fair and equitable way for the restructuring of the company, and it was about a settlement where the lenders would provide specific money and give up some of their recovery to some of the unsecured creditors and other creditors to make sure that there was an equitable settlement for a number of people that had participated in the debt for the company.

Q. The term sheet releases all step 2 claims except for certain claims which would include the bridge loan disallowance claims, disgorgement claims against what are identified in the term sheet as non-settling parties and shareholders redeemed in step 2. Is that a fair statement?

A. Can you repeat that again.

Q. Probably not, but I am sure he can read it back.

(Record read)

A. I don't know what shareholders redeemed in step 2 means.

Page 31

Wilderotter

Q. Those shareholders who in connection with the second step of the two-step transaction tendered their stock and were paid. Those shareholders are not being released under --

A. I don't know if this term sheet takes care of all of those folks and the bridge loan and the disgorgement claims and that is all it does.

Q. Does it include those claims?

A. No, it does not include the bridge loan or it doesn't -- and it doesn't preclude anyone from moving forward with any legal activity that they would need to do.

Q. So the term sheet does not release -- I'm sorry -- so the term sheet does or does not release the bridge loan disallowance claims in your mind, in your view?

A. It does not.

Q. Okay. You are sure about that?

A. Well, I can go back through my notes and take a look at it. If you want to hand me notes I am happy to look at it.

Q. Do you have an independent understanding?

Page 32

Wilderotter

A. I have an independent understanding, but those are complicated settlements, and I would be happy to go back and look at my notes and give you an answer other than the answer I gave you.

Q. You are a member of the special committee which has been charged with exercising fiduciary duties for the benefit of the stakeholders in this case.

A. I am.

Q. You do not have an independent understanding of the settlement you approved?

A. I have an independent understanding of it, but I also take notes as I go through and review a settlement this complicated, and there are a lot of parties that are associated with a settlement like this, so calling out every single party just from my own memory and recollection is hard for me to do.

Q. Do you think the bridge loan is an insignificant part in this Chapter 11 case?

A. I am not going to comment on individual creditors. I think from our perspective as a special committee, we took a

Page 33

Wilderotter

look at trying to maximize the right kind of settlement that would be in the best interests of all of the parties.

Q. So do you recall if the bridge loan, the bridge loan debt was being released or not being released under the settlement?

A. My recollection -- I don't recall. I would have to look at my notes.

Q. According to the term sheet, in exchange for the releases, the senior noteholders get an additional $120 million and a greater percentage of the recoveries from the litigation trust. Is that correct?

A. My understanding is the $120 million is an incremental dollar amount that was given to help with the settlements by the lenders.

Q. What was being released in exchange for that $120 million?

A. Again, I would be happy -- let me go back and look through all of the documentation. If I could look at my documentation, I could tell you specifically.

Q. What would you need to look at to refresh your recollection?

Page 34

Wilderotter

A. My notes and my sheets from the special committee meeting where we went through all of this in great detail --

Q. Is this --

A. -- on Monday --

Q. I didn't mean to interrupt.

A. -- on Monday that I looked at.

Q. Is that anything different or in addition to what you produced to us in connection with our request for documents?

A. No. So you have it.

Q. Do you know how the $120 million figure was arrived at?

A. I was not in the room for those negotiations and discussions, but I know it was through negotiations and discussions on how it was arrived.

Q. Who conducted those negotiations and discussions?

A. Well, there were members of I know Oaktree and Angelo Gordon, JP Morgan, the unsecured creditors committee, Don Liebentritt was there, David Heiman, who represents the special committee, participated in that. The

Page 35

Wilderotter

lawyers from Sidley participated. My understanding is the Lazard folks participated. So there were a number of people, and we have advisors that represent us that participated in the settlement discussions.

Q. Did you participate at all in those discussions?

A. No.

Q. How were you kept abreast of those discussions?

A. Through special committee phone calls, through updates that were sent in e-mail. That is how we were kept abreast.

Q. How many special committee phone calls were there about how the $120 million figure was arrived at?

A. There were no specific calls. There were calls about the entire settlement and progress on the settlement.

Q. Did you ask anyone how the $120 million figure was arrived at?

A. All of those terms were explained as we went through the specific terms and conditions of the settlement.

Page 36

Wilderotter

Q. And how was the $120 million figure explained to you?

A. Well, if you would like to give me my notes, I would be happy to let you know what that is.

Q. I am just trying to --

A. I am just telling you that on the record telling the truth, I would have to refresh my memory to go through all of the terms and conditions that we discussed in making my decision.

Q. Do you have an independent recollection apart from your handwritten notes as to how the $120 million figure was arrived at?

A. I don't have a recognition without being able to look at my information.

Q. Was yesterday the first time you had heard the 120 -- I'm sorry -- the Monday meeting the first time you had ever heard the $120 million figure?

A. If it was not Monday, it was, you know, right around Monday, but, yes, I know there was negotiations that took place over the weekend.

Page 37

Wilderotter

Q. Were different figures used prior to Monday for the payment being made from the lenders?

A. Yes.

Q. What figures were those?

A. I don't recall off the top of my head, but they were less than that number.

Q. Was there a discussion about a figure that was more than that number?

A. Not that I know of or recall.

Q. And you feel $120 million is an appropriate number?

A. Yes, I do.

Q. What is your basis for that statement?

A. For the -- the financial advisors and the advisors that took us through the information, and there was a third-party assessment of the settlement that was also reviewed that felt that this was a very fair settlement.

Q. Apart from what the financial advisors, the other advisors and the third-party assessment, do you have an independent view as

Wilderotter

to whether or not the $120 million is a fair figure?

A. My independent view is based upon advisors advising me on what is right, what is fair and what is equitable.

Q. Did you ask anyone if $120 million was an appropriate figure?

A. Yes.

Q. Who did you ask?

A. Part of the discussion of the special committee with the advisors was was this a good settlement agreement? Is this fair and equitable? And part of my assessment and decision was also based upon the fact that when the examiner's report looked at what would be fair from a settlement perspective, this was -- I think there were five or six different scenarios -- that this overall settlement was better than five of the six scenarios that were actually put on the table.

Q. Have you read the examiner's report?

A. I did.

Q. All of it?

A. I read through most of it.

Wilderotter

Q. Did you read the recovery scenarios?

A. I did.

Q. Did you have access to the examiner's model?

A. No.

Q. Did you ask for access to the examiner's model?

A. No.

Q. Why not?

A. Because it is not up to me to make an assessment on his models.

Q. Who was it up to?

A. It is up to our advisors who were looking at all of the analysis to derive what would be appropriate for a settlement.

Q. Who were your advisors?

A. As I mentioned, the advisors for the company and the special committee include Jones Day and Sidley and Lazard primarily as the advisors.

Q. Sidley is the advisor to the company?

A. Correct.

Q. And Lazard is the advisor to the company?

Wilderotter

A. Correct.

Q. Did you get any independent advice for the special committee, not from Sidley or from Lazard?

A. Yes, from Jones Day.

Q. And how long has Jones Day been involved in the case?

A. Since August.

Q. What date?

A. I don't know the date off the top of my head.

Q. Who selected Jones Day?

A. The special committee selected Jones Day.

Q. When were they selected?

A. In August.

Q. Was that before or after the special committee was appointed by the board?

A. It was in conjunction with the special committee being appointed.

Q. Was there a meeting to determine whether or not to retain Jones Day?

A. Yes.

Q. Who was at that meeting?

Wilderotter

A. The members of the special committee.

Q. Who recommended Jones Day?

A. I recommended Jones Day.

Q. What was your basis for recommending them?

A. Twofold. I have worked with Jones Day in the past. I know they have a strong bankruptcy practice from an understanding perspective, and they were not involved in the case. There were many attorneys from many law firms that are involved in the case.

Q. Do you know if Jones Day represents any of the LBO lenders who might be targets of the LBO litigation?

A. I don't know if they represent any of them on other matters. I know that they are not involved in this specific matter.

Q. Were you looking specifically for conflict-free counsel, or was that not a consideration?

A. I was looking specifically for, yes, conflict-free counsel, yes.

Q. Did you investigate whether or not Jones Day currently represents any of the lenders

Page 42

Wilderotter

who are potential targets of the LBO litigation?

A. Yes, we had Jones Day clear conflicts to make sure that was the case.

Q. I didn't ask you if you had them clear conflicts. Did you investigate whether or not they were --

A. That is how we investigated, whether they were involved or not. And I also checked with Don Liebentritt to make sure that from his understanding since he was interacting with many of the lawyers in the case if Jones Day would have any conflict.

Q. When you say you had them clear conflicts, what do you mean by that?

A. They took a look to make sure that there would be no conflict of interest in them representing the special committee based upon any work that they were doing for folks that were involved in the bankruptcy.

Q. Did you ask them whether or not they were currently representing any of the LBO lenders in unrelated matters?

A. Yes.

Q. And they told you yes, they are?

Page 43

Wilderotter

A. No, they told us that they had no conflicts with regard to the subject.

Q. That wasn't my question.

A. Well, then ask it again, and I will try to answer it.

Q. Did you ask Jones Day whether or not it was currently representing any of the LBO lenders in unrelated matters?

A. No.

Q. Why not?

A. I asked them if they were representing any of the LBO lenders in this matter or had any interaction with regard to this specific matter.

Q. Was there any reason why you didn't ask them if they were currently representing any of the LBO lenders in unrelated matters?

A. No.

Q. Do you think it would have been consistent with your fiduciary duties to seek to find a law firm that was not currently representing any of the LBO lenders in unrelated matters?

A. I think it was my responsibility to

Page 44

Wilderotter

make sure that Jones Day had no conflicts on this matter.

Q. And so far as you are concerned the fact that Jones Day may be representing LBO lenders in unrelated matters is not a conflict?

A. It is not a conflict for me.

Q. Was this discussed with the rest of the committee?

A. Yes.

Q. What did other committees have to say about the issue?

A. We collectively discussed whether Jones Day would be good counsel for us as a special committee, and part of that decision process was the fact that they didn't represent any of the LBO lenders in this matter.

Q. Did the special committee value any of the step 2 claims that are being released pursuant to the term sheet?

A. I don't understand the question.

Q. Did the special committee do an assessment of what the claims might be worth that were being released under the term sheet?

A. What kind of an assessment are you

Page 45

Wilderotter

talking about?

Q. Any assessment.

A. We looked at the information that was given to us by our advisors and went through all of that information in terms of what the total dollar amounts were and then what the settlement amounts were based upon each individual category of the lenders and also the creditors.

Q. What did your advisors tell you about the potential value of the LBO claims?

A. The potential value of the claims? It is over $500 million in terms of the total settlement amount.

Q. I'm not talking about how much was being paid in settlement. I am asking you was there an evaluation done of what those claims might be worth if the plaintiff in those lawsuits was successful in litigation.

A. No.

Q. No valuation was done?

A. No.

Q. Did the special committee consider the probability that if step 2 was found to be a fraudulent conveyance and step 1 was not, that

Page 46

Wilderotter

the step 1 lenders might nonetheless be prevented from recovering on the avoided claims ahead of the non-LBO lenders?

A. I don't understand the question.

Q. I will try to rephrase it. Did the special committee consider the probability or possibility that if step 2 was found to be a fraudulent conveyance and step 1 was not, that the step 1 lenders might be prevented from recovering on those avoided claims ahead of the non-LBO lenders?

A. I don't understand the question, so I can't answer it.

Q. Do you recall the examiner's discussion in the report about theories of equitable estoppel?

A. No.

Q. Did you read the portion of the examiner's report about what might happen and what the issues would be if both step 1 and step 2 loans were set aside as fraudulent conveyances?

A. Do I recall? No.

Q. Do you recall discussion in the

Page 47

Wilderotter

examiner's report about what the result might be if step 2 was set aside but step 1 was not?

A. No.

Q. Was that discussed in the special committee?

A. No, not that I recall.

Q. Was any incremental value assigned to the increase in the percentage from the litigation trust that was being given to the noteholders under this term sheet?

A. Was any incremental value assigned to it? Well, there is incremental value associated with it.

Q. And what is that?

A. It would be the value of what is in the litigation trust.

Q. And was that offset at all by the decrease in the claims that are being assigned to the trust?

A. Was it offset at all by the decrease in the claims? I don't know.

Q. Was that discussed?

A. Not in that -- not in the form of the question that you have asked me. I don't recall

Page 48

Wilderotter

that.

Q. Was there any discussion about why the senior noteholders were being given a step up in terms of the percentage interest in the liquidating trust, the litigation trust?

MR. MILES: Could you read the question back.

(Record read)

A. I don't understand the question.

Q. You are aware that the term sheet provides that the first $90 million coming out of the litigation trust goes to the senior noteholders and then thereafter they get 65 percent of the proceeds?

A. Correct.

Q. Okay. How were those numbers arrived at?

A. Through negotiation.

Q. With the senior noteholders?

A. It was part of the settlement agreement negotiations that were put in place.

Q. Was it negotiated with the senior noteholders?

A. I don't know. I wasn't in the room.

Page 49

Wilderotter

Q. So you don't know who it was negotiated with?

A. No.

Q. And that was not explained to you?

A. Not in particular I don't, no. I know that they all agreed to the settlement agreement, the parties.

Q. And they would be who?

A. The creditors of Oaktree, Angelo Gordon, JP Morgan and the unsecured creditors committee.

Q. Was there any discussion of how the $90 million figure was arrived at?

A. I would have to look at my notes to be able to answer that question.

Q. Was there any discussion as to how the 65 percent figure was arrived at?

A. I would have to look at my notes.

Q. You don't have any independent recollection?

A. I don't have a recollection of it.

Q. Do you recall if that was discussed before the meeting on Monday, October 12?

A. I don't recall it being discussed

Page 50

Wilderotter

before then.

Q. Did the special committee consider the possibility that step 1 lenders who participated in step 2 might be barred from benefiting from step 2 avoidance?

A. I don't know what that means.

Q. There is an overlap of population between, in some instances, between lenders who were in step 1 and lenders who were in step 2.

A. Right.

Q. Was there any discussion with the special committee as to the possibility that step 1 lenders who were also step 2 lenders would be barred from benefiting from a step 2 avoidance?

A. Not that I recall.

Q. Nobody raised that question?

A. I don't recall. So maybe somebody did, but I don't recall.

Q. Do you recall any discussion about that?

A. I would have to look at my notes.

Q. And, if it wasn't in your notes, would that mean there was no discussion of it?

Page 51

Wilderotter

A. It would probably -- no, it wouldn't mean that. It would just give me the opportunity to look to see if I would recall something different than what I am telling you.

Q. So right now, as we sit here, you have no independent recollection?

A. I don't have any recollection of it.

Q. Do you know why the step 1 shareholders are being released for no consideration?

A. I don't understand the question.

Q. What part of the question is confusing to you?

A. You want to tell me which noteholders you are talking about?

Q. I'm sorry. I thought I said shareholders.

(Record read)

A. No.

Q. Was that discussed?

A. I am sure it was.

Q. That would be in your notes?

A. That would be in my notes, so my recollection would have to be after I would read

Page 52

Wilderotter

through my notes.

Q. Then, if it was not in your notes, would that mean it wasn't discussed?

A. No. I would just use my notes for my own personal recollection.

Q. Do you know the reason why the percentage recovery for the unsecured creditors of the subsidiaries increased from 50 percent to 100 percent?

A. I would have to look at my notes. I know it was discussed.

Q. Was there any discussion of buying their claims to support the plan, or I'm sorry, buying the support of the plan by paying them in full?

MR. MILES: Read the question back with the question before it as well.

(Record read)

A. I don't recall that being discussed.

Q. Do you know the basis for giving the other parent general unsecured creditors an option to obtain a higher percentage cash recovery than the senior noteholders?

A. Run that by me again.

Page 53

Wilderotter

Q. Do you know the basis for giving the other parent general unsecured creditors an option to obtain a higher percentage cash recovery than the senior noteholders?

A. Than the senior noteholders? I would have to look at my notes. I know there was discussion about that as well.

Q. Do you recall any of that discussion?

A. No, I would have to refresh my memory on looking at the information.

Q. Do you know why the senior noteholders are being paid in cash as opposed to cash and stock?

A. No.

Q. Was that discussed?

A. No, it was not discussed.

Q. Do you know how the $77 million reserve for the allowance of the bridge loan claims was determined?

A. I would have to look at my notes to refresh my memory.

Q. You don't have an independent recollection of that?

A. There are many pieces to this

6ead99f2-00c6-462b-b9d4-0441842280a9

Wilderotter

settlement, and it is complex, and I would have to look at my notes to make sure that I could truthfully answer your question.

Q. Do you recall if you understood how that reserve was established at the time that you approved the term sheet?

A. I don't recall that as a specific issue being called out, but we went through all of the terms and conditions of the term sheet with our advisors. The entire special committee did.

Q. And that was at a meeting on Monday?

A. Yes.

Q. How long did that meeting last?

A. It was --

MR. SHERMAN: Endless.

A. It was endless, yes.

Q. It couldn't have been endless because we are sitting here now.

A. One to two hours.

Q. One to two hours?

A. Yes.

MR. SHERMAN: It only seemed endless.

Q. Who was present at that meeting?

Wilderotter

A. It was a telephonic meeting, so I can give you a sense. I don't know if I will miss somebody, because there were a number of people that were included as part of the call, but all the members of the special committee were on the call. Jones Day, our counsel, was on the call, Lazard was on the call, our financial advisors, taking us through the settlement issues. Members from Sidley were on the call. Don Liebentritt was on the call. David Kurtz, who was from Lazard, took us through the information.

Q. Did Mr. Kurtz lead the discussion?

A. Part of it, yes.

Q. Who else was leading the discussion?

A. Well, there were many parts of it that were talked about by the Sidley attorneys, by Lazard, by Don Liebentritt, by Jones Day, so there were different facets of the meeting that were led, and discussions were led by different people.

Q. What part did Mr. Kurtz lead?

A. He took us through the financial analysis and the terms and conditions of the settlement itself.

Wilderotter

Q. And what financial analysis would that be?

A. You have that information.

Q. In the deck?

A. It is in the deck. Yes. He took us through the deck.

Q. What portion did Sidley discuss?

A. Sidley participated with Lazard in providing color or information about different parts of the material in the deck.

Q. What portion did Mr. Liebentritt handle?

A. He did the intro in the beginning to talk about that this was an overall proposed settlement for the special committee to consider, that they had been negotiating with the parties all weekend and felt very close, that this was very close to a final settlement that everyone could agree to.

Q. And what part did Jones Day handle?

A. Advice and counsel to the special committee including in our executive session a discussion on the fairness and recommendation that was put in front of us.

Wilderotter

Q. Of this two-hour meeting, what portion of it was the general meeting and what portion of it was the executive session?

A. I don't know from a time split, but probably, you know, at least two-thirds of the time was really going through the information on the settlement itself and Q and A, and the balance maybe 15 or 20 minutes we did in executive session.

Q. Prior to this two-hour conference call, had there been a meeting of the special committee to discuss the terms of this term sheet?

A. Of this term sheet, the final term sheet, no. It was based upon discussions that took place over the weekend, so it was sort of a final -- almost a final term sheet.

Q. When was the last special committee meeting before the October 12 special committee meeting?

A. I would have to go look at my calendar to let you know what that was.

Q. What would you need to look at?

A. My calendar dates.

6ead99f2-00c6-462b-b9d4-0441842280a9

Wilderotter

Q. Will you do that and supplement your answer after?

A. Absolutely.

Q. Did the special committee do any decision trees in connection with this October 12 meeting?

A. What do you mean by decision trees?

Q. Looking at what the consequences would be of making one decision as opposed to another and the probabilities that would result or could result from making one decision as opposed to another.

A. The special committee did a lot of deliberation and Q and A as part of this meeting on what was being proposed.

Q. Other than the two-hour meeting, I assume that there was no decision tree presented in the two-hour meeting?

MR. SHERMAN: Objection to form. Your assumption is really not an issue in the case.

MR. WEINTRAUB: I'm sorry?

MR. SHERMAN: I objected to the form. I was pointing out that what you assume is

Wilderotter

probably not an issue in the case. Why don't you rephrase the question.

Q. Was a decision tree presented to the special committee in connection with the October 12 meeting?

A. Since I don't really know what you mean by a decision tree, I can't answer that question.

Q. No one used that term during the meeting?

A. No one used a decision tree term during the meeting.

Q. And no document that would give different alternative paths depending upon different decisions was used at the meeting?

A. The document that was used at the meeting you have in your possession, so you have everything that was presented at that meeting.

Q. And I take it, since you are not familiar with the term that I am using, decision tree, you don't recall a decision tree being used or discussed in advance of the October 12 meeting by the special committee?

A. I never heard the term "decision

Wilderotter

tree" before in conjunction with this case.

Q. Do you know if -- did the special committee do any weighted average settlement calculations to determine the likelihood or unlikelihood of certain events occurring and certain recoveries being yielded from those events?

A. The special committee had a lot of discussion with our advisors during that telephone call on what the terms and conditions were and what the pros and cons were of those terms and conditions, and that to me is what we spent the time focused on on that call.

Q. Do you remember a discussion about an incremental $12 million recovery for the senior noteholders in certain circumstances?

A. Not that I recall, but I would have to look at my notes.

Q. Do you know the source of cash that is being used to pay $420 million to the senior noteholders as reflected in the term sheet?

A. From the individual parties?

Q. Yes, who is paying what.

A. Yes. You have that in that document.

Wilderotter

Q. That is in the deck?

A. It is in the deck, yes.

Q. Is that on a by lender basis?

A. I would have to look at the deck to see how detailed it is, but it deals with the lenders, yes. The lenders are outlined in the deck.

Q. Do you know how that $420 million figure was arrived at?

A. Yes, it is in the deck.

Q. But, aside from being in the deck, do you know how it got into the deck?

A. It was negotiated as part of the settlement.

Q. And --

A. With the parties.

Q. Do you know who proposed it?

A. No. I don't know which individual proposed it.

Q. Do you know which of the release parties are providing funds under the settlement?

A. Yes, it is in the deck.

Q. Other than in the deck, you have no independent knowledge?

Wilderotter

A. I have independent knowledge based upon, if you want me to recite who it is, I would be happy to do that if you want to pull the deck out.

Q. We are going to get to the deck.

A. All right.

Q. Are you familiar with section 2.13 of the credit agreement?

A. I don't know what 2.13 of the credit agreement is.

Q. You never heard 2.13 mentioned at any of your meetings?

A. Not that I know of.

Q. Have you heard the sharing provision between the step 1 and step 2 lenders mentioned in any of your meetings?

A. The sharing agreement, not that I recall.

Q. Are you generally aware that there is a provision of the credit agreement that would require the step 1 lenders to share recoveries with the step 2 lenders?

A. I don't recall off the top of my head.

Wilderotter

Q. You don't recall if that was discussed in connection with the term sheet?

A. I don't recall. I would have to look at my notes.

Q. The term sheet mentions the retiree settlement. What is your understanding of the retiree settlement?

A. Do you want to tell me where this is on the term sheet so I can look at it?

Q. On page 2 in the box labeled "Other Parent General Unsecured Claims."

A. Okay.

Q. The third bullet point.

A. Okay. What is the question?

Q. What is your understanding of the terms of the retiree settlement agreement?

A. Of the retiree claimant settlement agreement?

Q. Yes. What is being settled under that agreement?

A. The retiree claim, this basically says that it would be allowed based upon what is in that agreement and they would be eligible to receive distributions without reduction, offset,

Wilderotter

counterclaim or subordination.

Q. Did you make an independent determination that the retiree settlement agreement is fair?

A. No, not to that specific agreement.

Q. Have you --

A. Only to the total settlements that were put in front of us.

Q. Have you read the retiree settlement agreement?

A. No.

Q. Has it been described to you?

A. I have to look at my notes to see what kind of notes I have on that or not.

Q. You don't have an independent recollection of what is being settled under the retiree settlement agreement?

A. Correct.

Q. Do you know why the retirees are being given an option under the term sheet?

A. Again, I know that it is part of the settlement agreement overall, and there were puts and takes on all of these terms and conditions.

Q. Did you have any input into the puts

Wilderotter

and takes?

A. No.

Q. Were you consulted about the puts and takes?

A. I was not consulted on the puts and takes. I was asked to review this in a holistic fashion to see if this was fair and equitable and a good settlement for the parties.

Q. And that holistic review was the two-hour meeting on October 12?

A. Correct.

Q. On page 3 of the term sheet, there is a discussion of the step 2 disgorgement settlement. What is your understanding of what is being released under that settlement?

A. Do you want me to just read this to you?

Q. No, I would like to know if you have an understanding based upon the work that you did in approving the settlement agreement as to what is being released.

A. I do have an understanding, but this is a complicated settlement, and I don't want to regurgitate to you anything that would be

6ead99f2-00c6-462b-b9d4-0441842280a9

Page 66

Wilderotter

incorrect. I would be happy to take you through this or I could look at my notes again and take you through what we discussed there, but it is what it is based upon what is said here.

Q. Other than just reading the words to me, is it your testimony you don't have an independent understanding of what is being released?

A. I have an independent understanding, but it is based upon what is on this piece of paper.

Q. Can you explain to me then what is your understanding of what is being released?

A. It is right here on this piece of paper. I am happy to read it to you, but I'm not going to try to take this out of context, because it is complicated, and I don't want to leave anything out, and then it would seem like I didn't answer this truthfully, so I am happy to read this to you if that is what you would like me to do.

Q. Was this explained to you at the meeting on October 12?

A. Yes, it was.

Page 67

Wilderotter

Q. Do you recall what was explained to you?

A. Yes, and I have my notes and I would be happy to look at my notes and talk to you about that further.

Q. Other than what is in your notes, you have no independent recollection of --

A. I have an independent recollection, but I don't want to talk about that unless I look at my notes.

Q. What is your understanding of how the funding and reimbursement arrangement works with respect to this disgorgement settlement?

A. I would be happy to look at my notes and tell you about what my understanding is.

Q. Other than that, do you have any understanding of how the disgorgement and reimbursement arrangements work?

A. I have already answered the question.

Q. Do you know how much the step 2 arrangers were paid? Strike that. Let me start that again. Do you know the dollar amount of exposure that the step 2 arrangers have in the disgorgement claim?

Page 68

Wilderotter

A. I would have to look at my notes.

Q. You don't have an independent recollection of the potential disgorgement claim against the step 2 arrangers?

A. I would have to look at my notes.

Q. Do you know how much of the disgorgement claim against the step 2 lenders was against the incremental lenders as opposed to the bridge lenders?

A. I would have to look at my notes.

Q. You don't have an independent recollection of that?

A. I would have to look at my notes.

Q. You don't have an independent memory?

A. I would have to look at my notes.

Q. Is it your understanding that the arrangers are going to be advancing up to $120 million to pay for the settlement that is set forth in the step 2 disgorgement settlement as described in the term sheet?

A. As soon as I look at my notes, I would be happy to answer the question.

Q. You don't have an independent recollection?

Page 69

Wilderotter

A. I'm not a lawyer, so I need to look at my notes to see what the actual information is to answer that question.

Q. So as we sit here today, which is October 13th, you don't recall the meeting -- what was discussed about this on Monday at the meeting on Monday?

A. I don't recall the intimate details that you are asking me. I would have to refer to my notes to make sure that I answered the question appropriately.

Q. You don't recall where $120 million is coming from under the settlement?

A. Yes. It is in my notes, and it is in the deck that you already have.

Q. Do you have an understanding as to whether or not the parties that would be advancing the $120 million would have a right to be reimbursed for that $120 million?

A. I don't have a recollection of that. I need to look at my notes.

Q. Do you know what claims are being transferred to the litigation trust as opposed to the creditor trust?

Wilderotter

A. I need to look at my notes.
Q. Are you aware that there are two different trusts?
A. Yes.
Q. What is the reason for the two trusts?
A. I would be more than happy to talk about that when I would have my notes in front of me.
Q. Let's go to the deck.
MR. SHERMAN: At some point, if we could have a five or seven-minute break. It is up to you.
MR. WEINTRAUB: No, we can do it now.
THE VIDEOGRAPHER: The time is 4:23 p.m. We are going off the record.
(Recess taken)
THE VIDEOGRAPHER: This marks the beginning of videotape number two. The time is 4:33 p.m. We are going back on the record.
BY MR. WEINTRAUB:
Q. We are back on the record. You are still under oath. You mentioned to me just

Wilderotter

before we went back on the record you checked the date of the meeting prior to the Monday, October 11 meeting.
A. Right, and it looks like it was Tuesday, September 28.
Q. Do you recall what was discussed at that meeting?
A. I think we went through the step 1 settlement agreement that was being proposed with Oaktree and Angelo Gordon.
Q. That was the settlement agreement that emanated or resulted from the two-day mediation in Wilmington?
A. That is my understanding, yes.
Q. Were you present at that meeting in Wilmington?
A. No.
Q. I'm sorry. That mediation in Wilmington.
A. No.
Q. Was anyone from the special committee present?
A. My understanding is David Heiman was there from Jones Day representing the special

Wilderotter

committee.
Q. But none of the members of the special committee were there?
A. Not that I know of.
Q. How were the members of the special committee kept apprised of what was going on in the mediation in Wilmington?
A. From David Heiman, and also Don Liebentritt would give us updates on how it was going usually by e-mail.
Q. How frequently were you getting e-mail updates from Mr. Liebentritt?
A. I would have to look at the updates that I got.
Q. Did you produce those to us in the document production?
A. If I had them, you have them. Yes.
Q. So that means if I don't have them, you don't have them?
A. That's correct.
MR. SHERMAN: Assuming you have been careful with your copies.
MR. WEINTRAUB: I try to be careful. We are going to mark as the next exhibit

Wilderotter

what we will refer to as the deck, which was the document that was discussed at the October 11 meeting, and this is the version which I believe has your handwritten note on it.
THE WITNESS: Okay.
MR. WEINTRAUB: For those on the phone, this document begins at MW 28 and runs through MW 38.
(Wilderotter Exhibit 5, Document bearing Bates numbers MW 28 through MW 38, was so marked for identification, as of this date.)
Q. Have you seen this document before?
A. Yes.
Q. Is this the document that you referred to earlier throughout the deposition when you said you needed to see your notes?
A. Yes.
Q. Do you have any other notes of the October 11 meeting other than the notes that are on this document?
A. No.
Q. On page 1 of the document, in the

Page 74

Wilderotter

background and summary, there is a description in the first paragraph that talks about a framework for a plan of reorganization that aims to settle and release senior lenders and step 1 shareholders with respect to LBO-related causes of action and bridge lenders with respect to their disgorgement exposure. Is that your recollection of what was discussed at the meeting?

A. Yes.

Q. Is this at all inconsistent with the term sheet that we were discussing earlier?

A. I don't think so. I would have to compare page to page to the term sheet in order to make that assessment.

Q. To the best of your knowledge and understanding, was the term sheet that we reviewed which was filed with the bankruptcy court consistent with the settlement that you approved based upon this deck?

A. Yes.

Q. On the first page on the left-hand side, there is some handwriting. Is that your handwriting?

Page 75

Wilderotter

A. Correct.

Q. What does that say with respect to Aurelius? You can't write on the exhibit. You keep that. Do we have another copy?

(Wilderotter Exhibit 5 was remarked)

A. And the question was?

Q. What does the handwriting say with respect to Aurelius?

A. I don't think it says anything with respect to Aurelius.

MR. SHERMAN: Where are you directing her attention?

MR. WEINTRAUB: On page 1 of the deck.

THE WITNESS: Right.

MR. WEINTRAUB: Where the page is entitled "Background and Summary."

THE WITNESS: Right.

Q. Then it says "Aurelius paren."

A. "600 million. They are opposed to this deal and any deal that doesn't give 100 percent payment of their shares."

Q. So whose comment was that? Was that your comment?

Page 76

Wilderotter

A. It was being discussed by the Lazard folks when they were taking us through the deck, when they were taking us through the summary, so David Kurtz, as you can see his name is here along with Don Liebentritt, as I mentioned, did the intros, so I wrote that down because that is what they said.

Q. Now which one of those gentlemen said that, or did they both say it?

A. I don't recall which one said it, because they were both speaking.

Q. Did anyone say that that was not the case? That that was not a correct statement?

A. No.

Q. So the premise that the special committee had was that Aurelius would only take full payment plus interest?

MR. SHERMAN: Objection to the form.

Q. You can answer the question.

A. We made our decision based upon all of the collective input from our advisors including Don Liebentritt and Lazard and Sidley and Jones Day, and this note that I put was what was said in the meeting. There was no other

Page 77

Wilderotter

discussion about Aurelius with regard to that note.

Q. Do you remember exactly or approximately what was said by the person saying it with respect to Aurelius?

A. I don't remember exactly, but this paraphrase -- this was my understanding of what was said.

Q. Were these part of the introductory remarks?

A. Correct.

Q. Was there any discussion beyond that statement?

A. No. Not that I recall.

Q. At the top of the page.

A. Yes.

Q. Can you tell me what that handwriting says?

A. Yes. It was a note that as we look at approval for this settlement that we would need to take not just the step 1 view, but the step 2 deal together, so you would look at this holistically as a good settlement for recovery to the available noteholders and the creditors, so

6ead99f2-00c6-462b-b9d4-0441842280a9

Wilderotter

we shouldn't just take it one piece at a time, but we should take it collectively in how we look at this.

Q. Did someone suggest that it should be taken one piece at a time?

A. No. Someone suggested we should look at it holistically.

Q. Was an explanation given as to why it should be looked at holistically?

A. Because it was a cumulative summary for all of the parties based upon what is in this deck.

Q. On page 2 of the document, there is some more handwriting. Can you tell me what that says?

A. Yes. So in the step 1 settlement, when we first looked at that step 1 settlement previous to the Monday meeting, the value of the settlement was 328 million, and now including both steps as part of the settlement it increased to 521 million.

Q. What were the sources of payment for the increase?

A. I would have to go to a different

Wilderotter

page to go through those if you want to do that.

Q. You can do that.

A. So, if you go, I don't see a page number on it, but it is the page that says summary settlement analysis.

Q. Okay. That would be page 6.

A. Page 6. So if you look at the settlement analysis and you have the 401,468.

Q. Where are you looking?

A. It is the total settlement column, the last column.

Q. Um-hum.

A. If you add the 120 million, which is the settlement payment from the step 2 lenders, and add that to the 401,468, that gives you your 521,468.

Q. What are the components of the 401?

A. If you take a look at the 327,733 payment under the step 1 settlement.

Q. Let's --

A. Under payment. And you add that to the 73,735, which is the step 2 payment, it shows the total of 401,468.

Q. Let's look at the column labeled

Wilderotter

senior loan claim subsidiary. What is your understanding of what that -- I guess not column. It is on the left-hand side, and it goes across the page horizontally. What is your understanding of that horizontal line? What does that represent?

A. I took a look at all of the senior loan claims cumulatively, not just parent, but parent plus subsidiary together, and it would be the value that would be distributed of the $6.6 billion from a recovery perspective.

Q. But I am asking you what does that horizontal line represent? Do you know?

A. I don't have the details of that, no. It is the claim in total and then what the recovery would be, what percentage recovery.

Q. Do you see under the column payment across from senior loan claim subsidiary, a parenthetical and a $40,306,000?

A. I see that, yes.

Q. Do you know what that represents?

A. It would be a payment in the step 1 settlement, right.

Q. With respect to the subsidiaries?

Wilderotter

A. Correct.

Q. And then under the step 2 settlement, do you see the parenthetical, 42,500,000?

A. Yes.

Q. What does that represent?

A. It would represent an incremental increase in payments based upon step 2 added to step 1 to get to the final total settlement amount.

Q. Then the final total settlement amount with respect to that horizontal column is how much? 82 million --

A. 806.

Q. Is it your understanding that that 82,806,000 represents the settlement payment for the fraudulent conveyance claims with respect to the Tribune subsidiaries?

A. I don't understand the question.

Q. The --

A. It represents the total settlement for the senior loan claims.

Q. With respect to the subsidiaries?

A. And the parent at the 401,468.

Q. I'm not looking --

Wilderotter

A. For the subsidiaries.

Q. I am just going horizontally.

A. Yes.

Q. So I am looking at the components for what is being paid with respect to the step 1 and step 2 settlement with respect to the fraudulent conveyance claims with respect to the subsidiaries.

A. Right.

Q. Okay. Do you know the amount of the debt that the subsidiary guarantors guaranteed in connection with the LBO transactions?

A. No, not off the top of my head.

Q. Would the number $12 billion sound about right?

A. In terms of the 12,970 on this page? Is that what you are talking about?

Q. No, in terms of the loans made with respect to step 1 and step 2 that were guaranteed by the subsidiaries.

A. I don't know the answer to that.

Q. Does it sound like it might be something like 10 or $12 billion?

MR. SHERMAN: Objection to the form.

Wilderotter

Q. Do you know?

A. I don't know the number.

Q. Well, whatever the number is, let's start with the asserted claim then. You see that column?

A. Yes.

Q. So that is $8.722 billion?

A. Yes.

Q. So is it your understanding that the claims with respect to the guarantees made by the subsidiaries is being resolved for a payment of $82 million?

A. 82,806, yes. That would be their part of the settlement.

Q. Do you think that is a fair settlement?

A. I think you have to look at the settlement in total. That is how I looked at it. And I felt this was a fair settlement.

Q. Was there any discussion of whether or not there was any benefit to the subsidiaries when they guaranteed the debt of the parent?

A. There was no discussion that I recall.

Wilderotter

Q. Let's go back to page 3. There is a question mark. I assume you put it there next to subsidiary GUC?

A. Right.

Q. Do you recall why you put a question mark there?

A. I didn't know what the GUC stood for when I first went through the deck, so I asked the question and found out it was the unsecured creditors.

Q. Does this refresh your recollection as to my earlier question as to do you know why the recovery for the subsidiary GUCs went from 50 cents on the dollar to 100 percent?

A. No, because my question was about what the acronym stood for.

Q. But --

A. Because I didn't know.

Q. But looking at the 85 million in cash 100 percent recovery, that doesn't refresh your recollection?

A. No.

Q. On page 4, in the lower right-hand corner, there is some handwriting. Can you tell

Wilderotter

me what that means, the reference there?

A. If I recall, we were talking about what percent of the debt the lenders had versus the bonds, the parent, the trade and swap, so it was a breakdown for 81 percent of the debt lenders and 19 percent, and then the lenders would give up 46 percent of that, and that would be added to the bonds, the parent, the trade and the swap, so it would increase what the bonds, parent, trade and the swap got to 65 percent down from 81 percent in terms of their percentage that they would take away based upon this settlement.

Q. So this 65 percent, this is the sharing of the litigation trust, or is this what this settlement returns in terms of cents on the dollar given the face amount of the bond claims?

A. My understanding is that it is how the numbers were derived in terms of the splits between those specific creditors of which lenders were giving up part of what they would have gotten to the bonds, the parent, the trade and the swap.

Page 86

Wilderotter

Q. I'm sorry if I wasn't clear. Splits in terms of sharing in the litigation trust, or this is in terms of recoveries?

A. In recoveries.

Q. I'm sorry. So recoveries on the effective date of the plan when distributions are made to creditors?

A. I don't know the last part of your question in terms of when it would happen, but my understanding is it was a split on the recoveries.

Q. So is it your understanding that the bondholders are recovering 65 cents on the dollar on the effective date of the plan?

A. No. What you have to do is look at -- we can go to the page and look at what each group gets as a percentage.

Q. Okay. Unless I am misreading it, we are looking at 32.7 percent for the bonds on page 6?

A. Yes.

Q. So again my question is what does the 65 percent represent?

A. I would have to go back and look at

Page 87

Wilderotter

recreating the numbers, but it was how originally what -- let me see if I can find the exact number. So if you went to the next page on the summary settlement analysis.

Q. Um-hum.

A. You can see that the pro rata share and the proposed sharing of the 81 and the 19.3 and then the proposed sharing of reducing the senior loan down to 35 and the 65 percent on the proposed sharing for the bonds, the parent, trade and the swap.

Q. And that is proposed sharing of what?

A. This is the litigation trust splits.

Q. That was my original question.

A. Okay.

Q. So you are revising your answer to say that the 65 percent is not the recovery, but it is the sharing?

A. Well, it is the sharing for the distribution.

Q. How is that 65 percent arrived at? I don't mean numerically how it was arrived at.

A. It was arrived at through negotiation of the settlement.

Page 88

Wilderotter

Q. Were those negotiations described to you during the October 11 meeting?

A. The results of the negotiations were described to us based upon this deck that we reviewed.

Q. So you were just given the conclusion as opposed to how the conclusion was arrived at?

A. Correct.

Q. On page 5.

A. Does that start with confirmation considerations?

Q. Yes. The page numbers are on the lower left next to Lazard.

A. I know. My glasses are like this.

Q. I have the same problem. There is a reference to Judge Carey on the upper left-hand corner of that page.

A. Um-hum.

Q. What was said about Judge Carey?

A. We were talking about the likelihood of how different alternatives would be viewed by the bankruptcy judge.

Q. What different alternatives were you discussing?

Page 89

Wilderotter

A. The likelihood of this settlement being accepted by the courts versus alternatives.

Q. What alternatives were being discussed?

A. Well, I think that you can see in the center of this document there was a discussion about a challenge by a number of creditor constituencies including the senior notes, the bridge and the phone classes about this purity plan, which would be all litigation for the LBO would go into the post bankruptcy environment. There would be no settlements, in other words, for any of the parties prior to emerging out of bankruptcy, and that would be an option that the judge could look at versus the settlement proposal that was on the table.

Q. Who gave the name to this litigation plan the purity plan?

A. I don't recall who named it that. That is how it was referred to in the discussion.

Q. Is that an acronym or a value judgment? What does purity mean in connection with the reference to the plan?

A. Just that there was no settlement.

6ead99f2-00c6-462b-b9d4-0441842280a9

Page 90

Wilderotter

Q. Do you know why that is referred to as purity?

A. No.

Q. On your handwritten notes on the lower left it says something about hold up. How long will this hold up the process? Is that what it says?

A. Right. Um-hum.

Q. Then beneath that, it says shouldn't.

A. Right.

Q. What does that handwriting discuss or reference?

A. It was referencing whether the judge would look at one -- the settlement agreement that we were recommending asynchronously to a settlement that might be recommended by other creditors and would that hold up the process, and we were basically told that it wouldn't hold up the process, because all of these would be viewed at the same time by the judge.

Q. Was there any discussion of which plan would more likely be approved by the judge than the other?

A. As you can see here, both could be

Page 91

Wilderotter

viewed depending on what was put in front of the judge. I think that as a member of the special committee, based upon the fact that the judge appointed a mediator, and a mediator worked through this settlement with the parties that came to terms on this settlement, that the judge would take into consideration that his decision on having mediation and having a judge participate in that mediation and the fact that the settlement is a good settlement, that that would be taken into consideration and would be considered a very viable option.

Q. Was there any discussion as to what advantage there was that another judge was the mediator?

A. No.

Q. What was said about this plan being a good plan?

A. Which plan?

Q. The plan that is being proposed by the special committee.

A. What was said about it being a good plan?

Q. Yes.

Page 92

Wilderotter

A. Well, there was a number of things that was said. I think as you go through this document, we went through all of the considerations. If you go to page 8, this is 120 million more than was required, because the step 1 lenders gave up more in the settlement.

It was also viewed and reviewed by an expert, an outside expert, that was involved to take a third-party point of view on this settlement, and this expert found the settlement to be a good settlement and a positive settlement.

It also included the support of the unsecured creditors committee, the support of the mediator. It was a product of extensive negotiations that took place. It also actually was a better settlement, as I mentioned earlier, than five of the six scenarios that were proposed in the examiner's report as possibilities for settlement, and I think that it favors, you know, it showed favor for non-LBO lenders. It has very narrow releases, so it doesn't take away anybody's right on a go-forward basis from a litigation perspective. So there were many

Page 93

Wilderotter

pieces of this settlement consideration that we felt was a positive outcome on behalf of the creditors.

Q. Let's go back over what you were just saying. You said the 120 million. What was the source of that 120 million?

A. It was the lenders.

Q. Which lenders?

A. It is the consortium, I think the lenders would be JP Morgan, Bank of America, Citi and Merrill Lynch.

Q. How was that number determined?

A. I don't know. As I mentioned before, I was not involved in those discussions.

Q. And you mentioned -- well, let me back up. How did you determine that that was a fair number?

A. I think I just told you that I looked -- as a member of the special committee and the entire special committee looked at the holistic view of step 1 and step 2 and the settlement together to decide that this overall settlement was a good settlement.

Q. What claims did that $120 million

Wilderotter

settle?

A. I don't have the detail of what claims that settled. I can go back through here and look at the notes again.

Q. How do you know that it was a fair settlement if you don't know which claims were being settled?

A. Well, it is basically the loan disgorgement settlement fund that was underwritten by the lenders.

Q. What was the extent of the exposure to the lenders who had disgorgement risk?

A. I don't know if that is in here or not.

Q. Do you have an independent recollection of it?

A. I don't, no.

Q. You didn't find it in your notes?

A. I'm not looking for it. No.

Q. Could you look for it?

A. I don't know if it is in here or not. On page 6, the bonds total asserted claim was 1 billion 283, and the step 2 payment of the 120 million was the settlement.

Wilderotter

Q. So the step 2 payment of 120 million was settling the bond claim for 1 million 283? Is that what you are testifying?

A. 1 million 283, no.

Q. 1 billion 283. Then I didn't understand your answer.

A. No, I was saying no to the 1 million 283.

Q. I'm sorry.

A. That is my understanding that, if you look at the asserted claim and the waterfall recovery across the board.

Q. So your understanding --

A. You have 238 million that was part of the step 1 settlement and an additional payment of $120 million in the step 2 settlement payment.

Q. And that is settling the bond claim for 1 billion 283?

A. I can't attest that that is what it would all be inclusive of. It is the line that is on here in this settlement analysis.

Q. But is it your testimony that part of what is being settled with the $120 million payment is the bond claim of 1 billion 283?

Wilderotter

A. It seems to me that that is what this says, yes.

Q. So that is your understanding?

A. Well, I would have to go back and look here to see if -- let me go back and read the rest.

Q. This was explained to you on Monday, the 11th?

A. That's correct.

Q. To the best of your recollection, the 120 million was settling the 1 billion 283 million?

A. It was an amount for the loan disgorgement settlement fund that was underwritten by the senior lenders. It would go to the non-LBO senior noteholders, and it would be actually -- that is basically my knowledge of it.

Q. So the claim that is being released in exchange for the $120 million payment, do you have an understanding what that claim is?

A. I don't have the details of the claim.

Q. But you think it is a fair

Wilderotter

settlement?

A. I think overall it is a fair settlement, yes.

Q. You mentioned an outside expert who I think you said gave an opinion of the fairness of the settlement?

A. Correct.

Q. Was that someone who was present at the October 11 meeting?

A. No.

Q. Who was that outside expert?

A. My understanding is his name is Bernie Black.

Q. Have you read Mr. Black's report?

A. I have not.

Q. Did Mr. Black prepare a written report?

A. He prepared -- I don't know if he prepared a written report, but he prepared a report that was given to our advisors.

Q. Who are your advisors?

A. Lazard is our financial advisor, and Sidley is the law firm that also advised the company.

6ead99f2-00c6-462b-b9d4-0441842280a9

Page 98

Wilderotter
Q. Who retained Mr. Black?
A. The company retained him.
Q. When?
A. In March of this year.
Q. Was that before or after the special committee was --
A. It was before the special committee was formed.
Q. Did the special committee retain its own expert to review the fairness of the settlement?
A. No.
Q. Did Mr. Black make a verbal presentation to the special committee on the day of the October 11 meeting?
A. No.
Q. How was Mr. Black's conclusion of the fairness of the settlement communicated to the members of the special committee?
A. By our financial advisors and our lawyers.
Q. When you say our financial advisors?
A. Lazard and Sidley.
Q. I'm sorry. Let me finish the

Page 99

Wilderotter
question. Did the special committee have its own separate financial advisor?
A. No.
Q. So, when you say our financial advisor, you mean Tribune's financial advisor?
A. Tribune's financial advisors.
Q. And you said Sidley?
A. I said Lazard and Sidley.
Q. Was Sidley counsel to the special committee?
A. No.
Q. Did Jones Day participate in that presentation?
A. Yes.
Q. Do you know whether the October 11 meeting was the first time that Jones Day had heard the results of Mr. Black's analysis?
A. I don't know the answer to that.
Q. Did you --
A. You would have to ask them. I didn't ask them.
Q. You did not ask them?
A. No.
Q. Do you know what Mr. Black's

Page 100

Wilderotter
qualifications are?
A. He is a professor of law at Northwestern, and he is an expert on these types of bankruptcy settlements.
Q. What type of bankruptcy settlement is this?
A. He is an expert on bankruptcy settlements.
Q. Was he a practicing attorney?
A. I have no idea.
Q. Do you know if he is a tenured professor?
A. I have no idea.
Q. Do you know if he ever practiced law?
A. I have no idea.
Q. Do you know if he has ever testified in a case as to the reasonableness of a settlement?
A. I don't know the answer to that.
Q. Did you ask?
A. No.
Q. You mentioned earlier that the releases are narrow. That was one of the reasons you gave as to this being an appropriate

Page 101

Wilderotter
settlement.
A. Correct.
Q. I asked you earlier if you knew whether or not the bridge, the avoiding actions against the bridge were being released or not. Can you answer that question now?
A. On page 3 on the bridge loan, it says that 78 million reserve subject to allowance of the bridge claim, so it implied a 5 percent recovery plus interest in litigation trust proceeds.
Q. Do you know how the 78 million dollar figure was determined?
A. No. In negotiation.
Q. That was a negotiated amount?
A. I would assume so. I don't know.
Q. Did you ask?
A. No.
Q. Did anyone from the special committee ask?
A. Not that I recall.
Q. I would like you to go back to the term sheet which is Exhibit 4.
A. I don't have the exhibits.

Page 102

Wilderotter

THE VIDEOGRAPHER: The time is 5:14 p.m. We are going off the record.

(Recess taken)

THE VIDEOGRAPHER: The time is 5:15 p.m. We are going back on the record.

BY MR. WEINTRAUB:

Q. We have now located Exhibit 4. I would like you to turn to page 5, please. Feel free to look at your handwritten notes on the deck if that would help you answer this question. Under the releases in paragraph 1, it says that current and former holders of senior loan claims and bridge loan claims are being released. I asked you earlier if you knew why the bridge loan claims were being released.

MR. SHERMAN: What is your question?

Q. Do you know why the bridge loan claims are being released?

MR. MILES: Could you read back the question before counsel asked him what his question was.

(Record read)

Q. And I am asking you again now do you know why the bridge loan claims are being

Page 103

Wilderotter

released, and, if you need your notes to assist you with that, please feel free to look at your notes.

A. I don't have the details of that, so, no.

Q. Do you know the size of the bridge loan claims against the subsidiaries? Dollar amount.

A. Are you talking about the bridge reserve?

Q. No. I am talking about how much the bridge lenders are owed by the subsidiaries under --

A. I don't have that information. No, I don't know that.

Q. Was there any discussion at the October 11 meeting about the subsidiary guarantees and the subordination of the bridge loan guarantee claims to the credit agreement lender guarantee claims?

A. Wow. Not that I know of.

Q. You don't recall that?

A. I don't recall that.

Q. Nobody asked about that?

Page 104

Wilderotter

A. Nobody asked me that question.

Q. And you didn't ask that question?

A. I didn't ask that question, no.

Q. It wasn't apparent to you at the meeting? On page 5 of the deck, under the first bullet point, there is a sub-bullet point talking about "JP Morgan will be able to deliver the votes necessary to have an impaired accepting class." Do you see that?

A. Yes.

Q. Do you recall that discussion?

A. I recall the statement being made that Angelo Gordon, Oaktree Group and JP Morgan would be able to deliver votes necessary to have an impaired accepting class.

Q. Do you know what they meant by deliver the votes?

A. Well, I believe that when you have a settlement, all the creditors get to vote on that settlement and make a decision on whether it is acceptable or not, and this would be the percentage of votes associated with that settlement vote.

Q. Did you know how Angelo Gordon,

Page 105

Wilderotter

Oaktree and JP Morgan would go about delivering the votes?

A. No.

Q. Was there ever any discussion of Oaktree pressuring creditors to vote for a plan of settlement?

A. No.

Q. Were you aware Oaktree was pressuring anyone?

A. No.

Q. The next main bullet point, which would be the second darkened bullet point on the page, talks about avoiding potential complications. Do you see that?

A. Yes.

Q. What potential complications is the deck referring to?

A. The complications of deciding how much of the equity or the new stock would be reserved in the litigation trust. That is what it talks about, the complications of making that decision.

Q. The complications of calculating it?

A. I think it is not just calculating

6ead99f2-00c6-462b-b9d4-0441842280a9

Page 106

Wilderotter

it, but also reserving it.

Q. What are the complications of reserving it?

A. Well, we didn't get into the details of what the complications were, but it is the consideration that being able to distribute all of the new common stock at emergence would be a lot cleaner than having to decide what kind of equity would be reserved in the litigation trust.

Q. When you say you didn't get into the complications, is that because you didn't ask?

A. We didn't ask, and it wasn't discussed.

Q. Was there any reason why it wasn't asked by the special committee?

A. Because it wasn't -- it just wasn't discussed. No reason.

Q. Was it not an important consideration then?

A. It is a consideration just like all of the other considerations.

Q. How would you weight that consideration as opposed to other considerations?

A. I wouldn't weight them at all. I

Page 107

Wilderotter

look at this holistically.

Q. Did you consider that particular consideration, being the complications associated with reserving the stock, in determining to approve the settlement?

A. It is one consideration.

Q. Was it given any greater weight than any other consideration?

A. No.

Q. Was the special committee told if any of the other creditor constituencies had approached the debtor about a competing plan or a full reserve plan?

MR. SHERMAN: I'm sorry. Can I hear that again.

(Record read)

A. I think the special committee knew that there could be a competing plan that was outlined on page 5 that was referred to as the purity plan that could be an alternative plan that could be considered.

Q. Was the purity plan discussed at the October 11 meeting?

A. Yes.

Page 108

Wilderotter

Q. How extensive was the discussion of it?

A. The discussion was basically that it would be an alternative plan. We talked about that the major difference is there would be no settlement on the LBO litigation. It would all go into post bankruptcy. That would also complicate matters for the company when it emerges from bankruptcy in terms of dealing with lots of litigation on a go-forward basis.

Q. Is it the special committee's view that the company won't be dealing with litigation under the currently proposed plan?

A. No, we would be, but we would have some settlements that were taken into consideration, so it would alleviate some of the overhang of litigation.

Q. How would that alleviation of overhang of litigation, how was that measured in terms of benefit to the company?

A. It was measured in the context of this settlement that would take a number of the large senior lender creditors, the UCC, so the unsecured creditor committee, and it would take

Page 109

Wilderotter

those folks into consideration that with the settlement it would reduce the risk of some level of litigation, but it still preserves the right for litigation for many of the parties as they look on a go-forward basis.

Q. When you say risk of litigation, risk to whom?

A. To the company in terms of going through litigation with a number of the parties on a number of the subjects.

Q. Why did the special committee think that the releases given under the proposed settlement would be less litigation involving the company than the purity plan?

A. Well, I think it is about getting some of the settlements done up front, getting some of the payments done based upon that settlement up front instead of having years and years of litigation to settle any settlements at all. That is how we looked at it.

Q. What analysis was done as to how involved or uninvolved the company would be in the litigation under the purity plan?

A. I don't know the answer to that.

Page 110

Wilderotter

Q. Was there any thinking that there would be less litigation involving the company under this particular -- under the term sheet plan that is described in the deck?

A. Less litigation for what?

Q. Involving the company.

A. On what? Under what plan are you talking about?

Q. Under the plan that is outlined in this deck versus the purity plan.

MR. SHERMAN: I think I object to form. Can you just try that question front to end again.

MR. WEINTRAUB: I believe the witness has testified that the special committee thought that there would be less risk for the company under the term sheet plan than the purity plan going forward, because the company would be less involved in litigation.

Q. Then correct me where I am wrong.

A. I think what I said is by having some of the settlements done up front, it takes away -- my understanding of what was discussed at

Page 111

Wilderotter

this meeting on the purity plan is that all LBO litigation would go into post bankruptcy. There would be no settlements at all up front in our proposed settlement plan, and, because of that, there would be more overhead on the part of the company to manage a lot more -- the potential to manage a lot more litigation.

Q. When you say overhead, do you mean expense?

A. Not just expense, but time and effort and energy and focus. As we all know, that takes a lot of time, effort, energy and focus.

Q. How did you analyze the difference in terms of what you term overhead between the purity plan and the term sheet plan?

A. I think what we looked at is $520 million of value could be given to a number of the creditors.

MR. WEINTRAUB: I move to strike that.

MR. SHERMAN: Let her finish.

MR. WEINTRAUB: That is not responsive.

MR. SHERMAN: Then you can move to

Page 112

Wilderotter

strike.

You are entitled to finish.

A. For some of the litigation now versus down the road.

MR. WEINTRAUB: I move to strike as non-responsive.

Q. Was an analysis done of the overhead to the company under the purity plan versus the term sheet plan?

A. I don't know if an analysis was done.

Q. Did you do that analysis or any kind of analysis like that?

A. A written analysis, no.

Q. A mental analysis?

A. Yes, there was a discussion that we had on it on the 11th.

Q. What was said during that discussion?

A. I've already told you what was said. It was a discussion of the alternative of a purity plan versus the settlement plan that we voted to approve, and part of that discussion was advancing value to a number of the creditors for some of the litigation now versus down the road, that that was a positive.

Page 113

Wilderotter

Q. My question was not about advancing value to the constituents, my question was about what you referred to as the overhead to the company going forward in litigation.

MR. SHERMAN: Now I have lost track of what your question is. I thought she responded to your last question.

MR. WEINTRAUB: I don't believe she did.

MR. SHERMAN: Why don't you ask -- leave that question and give her a question.

Q. Are the officers and directors being released under the term sheet plan?

A. Not as far as I know.

Q. So the company will be involved under the term sheet plan in litigation involving its officers and directors?

A. It could be.

Q. You said you had a hard stop at 5:50?

A. Yes, I do.

MR. WEINTRAUB: I'm not finished. I know that there are other people that want to ask questions and you may want to ask

6ead99f2-00c6-462b-b9d4-0441842280a9

Wilderotter

some questions, so I am going to stop now, and we'll have to talk about when we can resume at another time.

MR. SHERMAN: We are not going to resume at another time. We had an agreement on a schedule, and we met the agreement, so ask all the questions you want between now and ten to 6, and then we are finished, but we can fight that out in front of a judge eventually.

MR. WEINTRAUB: We will fight that. We don't need to fight that out here. We started at 3 o'clock in the afternoon or a few minutes after.

MR. SHERMAN: We started a few minutes afterwards because technically you weren't ready to proceed. We were here at 3 o'clock, and you told us you would need some time to get set up, but we're talking about a couple of minutes.

MR. WEINTRAUB: We're talking about a couple of minutes. And also I was here. The court reporter was not here.

MR. SHERMAN: Who ordered the court

Wilderotter

reporter?

MR. WEINTRAUB: I ordered the court reporter.

MR. SHERMAN: I guess that is your responsibility.

MR. WEINTRAUB: No, what is the responsibility is we have noticed a deposition and -- let me finish, Counsel. We were given a curtailed day. We could have started at 9 o'clock in the morning, but Ms. Wilderotter was not available at 9 o'clock in the morning, so we were given from 3 to 6. I don't concede -- let me finish, Counsel.

MR. SHERMAN: If you want to take away the rest of your minutes by making speeches, be my guest.

MR. WEINTRAUB: I am going to, because we are going to come back for another deposition, and Judge Carey will decide that, and the speech that I'm going to make in the next few minutes is not going to make a difference one way or the other, but I do want the record to be

Wilderotter

clear that most depositions are not three hours, and we didn't agree to a three-hour deposition. We were given an ultimatum of she is available from 3 to 6. So we didn't agree that that is the only deposition that we would take. We didn't agree that we were going to take a curtailed deposition.

At this point, I'm going to turn it over to anyone else who has questions. I believe Brown Rudnick has some questions.

MR. SHERMAN: Before you turn it over, let me say, one, I think you were offered a time period and you agreed that you would do the deposition in the time period.

I would also point out to you that the notice of deposition that you served called for areas of questioning far more limited than what you have done. You didn't serve a notice, an amended notice, and yet we have allowed you to take and you have probably taken more than half of the time asking questions outside your

Wilderotter

notice of deposition.

I think if you probably restricted yourself to what you noticed the deposition for, you would have been complete about an hour ago. There is nothing in your notice of deposition, you never sent an amendment, that talked about the plan or the proposed plan that you have questioned about for about two hours now.

MR. WEINTRAUB: We can both make speeches.

MR. SHERMAN: If you have more questions, ask them. If not, let somebody else ask questions.

MR. WEINTRAUB: I'm not done with my questions, but I will respond to what you said. Your firm canceled the deposition saying there were new developments, and the new development was the term sheet that we spent a lot of time talking about, because that was a new development, and that is perfectly relevant to the trustee motion, which seeks an independent

Page 118

Wilderotter

fiduciary to take over this case.

I'm not finished with my deposition, and Judge Carey will decide who is right, you or me.

MR. SHERMAN: Ultimately that is true.

MR. WEINTRAUB: Yes. I will turn it over to Brown Rudnick.

EXAMINATION BY MR. KLETTER:

Q. Good afternoon, my name is Dylan Kletter. I'm with Brown Rudnick. We represent the PHONES. Given what you have heard, I am going to try and move a little quickly here. Is that fine with you?

A. Yes.

MR. SHERMAN: As long as we can hear you.

Q. You testified earlier today that the special committee formed because of conflicts of interest?

A. I testified that members of the board of directors that were independent directors on the board could have conflicts based upon the examiner's report and based upon that the special

Page 119

Wilderotter

committee was formed with the four independent directors that were not part of the board or participated in the LBO.

Q. So that conflict, that potential conflict arose in December 2007?

A. I don't know when the conflict arose. It might have been even before that.

Q. Prior to the formation of the special committee, had you ever suggested the need to form a special committee?

A. No.

Q. Has Mr. Zell ever assisted the special committee?

A. No.

Q. You testified throughout today that you received legal advice from Sidley Austin and Jones Day, is that correct?

A. Yes.

Q. Is there any other law firm that you have received legal advice from in these bankruptcy cases?

A. I don't know. There might have been other law firms that participated throughout the last couple of years as part of the process, but

Page 120

Wilderotter

Sidley and Jones Day are who we have been using as the special committee.

Q. Have you ever received legal advice from an individual not affiliated with a law firm?

A. Have I ever --

Q. In connection with your role on the board of directors and the independent committee.

A. No.

MR. SHERMAN: Clarification. You are talking about the special committee?

MR. KLETTER: The special committee or the board of directors, has she ever received legal representation from an individual in connection with these cases from someone who is not affiliated with a law firm.

MR. SHERMAN: Some lawyer?

MR. KLETTER: A lawyer or an individual obviously.

Q. Have you only been receiving legal advice in connection with these cases from law firms, to the best of your knowledge?

A. I am really not quite sure what the

Page 121

Wilderotter

question is.

Q. Let me be more specific. Have you ever considered Don Liebentritt to be your attorney in these cases?

A. He was the general counsel of the company, and then he was the chief restructuring officer.

Q. I understand.

A. He does provide guidance and input to the board and the special committee.

Q. Did you ever consider him your attorney as a member of the board or the special committee in these cases?

A. I have considered him our attorney as the general counsel of the company as a board member, yes.

Q. When he was appointed CRO, did that belief cease?

A. He is still a counselor to the special committee and to the board.

Q. So, even though Mr. Liebentritt is no longer general counsel, you still consider him a legal advisor?

A. I consider him an advisor.

Page 122

Wilderotter

Q. But a legal advisor?

A. I don't necessarily separate out legal versus -- it is advice as part of the whole process, and as the chief restructuring officer he does provide advice to both the special committee and the board.

Q. To the best of your knowledge, has Jones Day worked closely with Sidley and the special committee to assess the status of these bankruptcy cases upon their appointment?

A. Yes, they have worked closely with the advisors to the company.

Q. Are you aware whether Sidley has disclosed certain conflicts of interest in this case?

A. I'm not aware.

Q. Would it concern you if Sidley had conflicts of interest that they were advising Jones Day?

MR. MILES: Can I have the question back.

A. I'm not sure I understand the question.

MR. SHERMAN: You are going to hear

Page 123

Wilderotter

it again, and then we will see if anyone understands it.

(Record read)

MR. SHERMAN: Do you want to restate that?

MR. KLETTER: Sure.

Q. If it was your understanding that Sidley had conflicts of interest in this case, would it concern you that they were bringing Jones Day up to speed in this case?

MR. MILES: I object to the form. Is that a hypothetical?

MR. KLETTER: I guess she didn't know, so, yes, it is a hypothetical.

MR. SHERMAN: Objection to form.

A. I don't know.

Q. To the best of your knowledge, you are not aware of any conflicts of interest with Sidley & Austin?

A. To the best of my knowledge, I'm not aware.

Q. Can you explain to me in layman terms the difference in roles between Sidley and Jones Day in this case?

Page 124

Wilderotter

A. Yes. Sidley has been the lawyer, the legal firm that the company hired to give us advice and counsel with regard to the bankruptcy in the proceedings, and Jones Day was hired to be advice and counsel to the special committee as part of this process.

Q. Did you receive legal advice in connection with the current settlement from Sidley Austin?

A. Yes.

Q. Did you receive legal advice in connection with the settlement attached to the first mediator's report from Sidley Austin?

A. Yes.

Q. Did you receive legal advice from Sidley Austin in connection with the April settlement?

A. The April settlement?

MR. SHERMAN: You are asking her in her role on the special committee?

MR. KLETTER: The special committee wasn't formed in April, so I am asking in her role on the board of directors.

A. I don't know the answer to that

Page 125

Wilderotter

because I don't know what settlement you are talking about in April, but, as I said, Sidley has been our attorneys for the board.

Q. Are you aware that Angelo Gordon, JP Morgan, Centerbridge and Law Debenture entered into a settlement support agreement in April of this year?

A. Yes.

Q. Had you received any legal advice from Sidley in connection --

MR. SHERMAN: I have a problem. You didn't serve a separate notice of deposition or subpoena. I don't think your questioning is within the boundaries of anything that was in either the subpoena or the notice, and, to the extent some parties are complaining we are short of time, I think you probably ought to be careful about that.

Q. During this current settlement, did the special committee ever reach out to creditor constituencies?

A. Did the special committee? As a committee?

Page 126

Wilderotter

Q. Yes.
A. No.
Q. In your view, was JP Morgan a critical component of this settlement plan?
A. Yes.
Q. Why is that?
A. Because they were a big lender as part of the process.
Q. Are you familiar with the law firm of Novack & Macy?
A. No.
Q. Did you have any role in the application seeking to retain Novack & Macy in this case?
A. No.
Q. Did you as the member of the special committee have any role in whether to file a complaint against Morgan Stanley in this case?
A. The board of directors had a role in looking at filing a complaint in this case against Morgan Stanley.
Q. Do you consider the board of directors taking that action consistent with the duties of the special committee in this case?

Page 127

Wilderotter

A. Yes, I do.
Q. What is your view of the special committee in terms of who to resolve or take claims against?
MR. SHERMAN: I --
A. One more time.
Q. Just trying to move quickly here.
A. I know.
Q. Do you have a view of whether it is up to the special committee or the board of directors to initially decide to pursue lawsuits against various entities in this case?
A. I think it is situational. I think you have to look at each instance, and we would make that decision based upon the special committee's role, which our role is really about working to get a settlement, a restructuring, in order to get the company to emerge out of bankruptcy and to maximize value to the creditors as part of that process. That is our scope. So, if there was something in that scope, the special committee would be involved.
Q. Is one of the scopes of the special committee to resolve certain LBO causes of

Page 128

Wilderotter

action?
A. No.
MR. KLETTER: Do you want to go back for these last few minutes?
MR. WEINTRAUB: Sure. Let's go to page 8 of the deck.
MR. SHERMAN: I take it that means none of the other lawyers in the room had questions? Is that right? Yes. Okay. Mr. Brown Rudnick, Mr. Phones, you have now finished your questions?
MR. KLETTER: We have finished our questions, subject to the continuance of this deposition.
MR. SHERMAN: No, somebody is going to say he is finished. We are not playing tag team. He said he was suspending to let you go. You go or you run out the clock or otherwise we are finished for today or you say you are finished. Do you have any more questions?
MR. KLETTER: I don't think that is appropriate.
MR. SHERMAN: I understand you don't.

Page 129

Wilderotter

MR. WEINTRAUB: We are not going to joust because now you are taking up my time. So may I continue?
MR. SHERMAN: Your idea is you guys can ask as many questions as you want and then reserve until next time and pass the baton back and forth. Just so it is clear.
MR. WEINTRAUB: Counsel, may I continue?
MR. SHERMAN: You can continue as soon as I am finished talking.
MR. WEINTRAUB: Are you going to be finished soon?
MR. SHERMAN: If you listen, you will find out. Our position is that you have finished, because you don't have any more questions.
MR. KLETTER: I understand your position.
EXAMINATION (Continued)
BY MR. WEINTRAUB:
Q. On page 8 of the deck.
A. Yes.

Wilderotter

Q. Your handwritten notes towards the top of the page, six scenarios, five of six.
A. Yes.
Q. What does that refer to?
A. It refers to certain scenarios of settlement that were in the examiner's report.
Q. Did you personally review those scenarios?
A. No.
Q. Did anyone on the special committee review those scenarios?
A. I don't know.
Q. Did you discuss it with any of the other members of the special committee?
A. It was discussed at the time that we talked about the settlement considerations on October 11.
Q. So, other than what is printed in the deck and what was discussed by who made the presentation, you didn't make an independent review of the five of six scenarios referred to in your notes?
A. That's correct.
Q. Are you familiar with the

Wilderotter

nomenclature used by the examiner in the report in terms of probability of success in litigation?
A. The nomenclature?
Q. The words.
A. Probability of success in --
Q. Yes. When he says something is reasonably likely or reasonably unlikely, are you familiar with the terminology that he used in the report?
A. I am familiar with that terminology.
Q. Did you attribute any percentages in your own mind to the terms used by the examiner in the report?
A. I didn't -- no, not percentages.
Q. So, when he used the term "highly likely," you didn't associate a percentage with that?
A. No.
Q. Do you have an opinion?
A. It is a high percentage.
Q. How high?
A. I don't know. High. More than 50 percent.
Q. More than 60 percent?

Wilderotter

A. Probably.
Q. More than 70 percent?
MR. SHERMAN: I object to the form.
Q. You can answer the question.
A. Maybe.
Q. More than 80 percent?
A. I don't know. It is highly likely. It is what it is.
Q. What about reasonably likely?
A. Again, I didn't assign a percentage to any of those terms.
Q. So you didn't assign a percentage to somewhat likely?
A. No.
Q. Close but likely?
A. No.
Q. Equipoise?
A. I don't even know what equipoise is. Sorry.
Q. Somewhat unlikely?
A. No.
Q. Reasonably unlikely?
A. No.
Q. Highly unlikely?

Wilderotter

A. No.
MR. WEINTRAUB: I would like to mark as the next exhibit an excerpt of the examiner's report.
(Wilderotter Exhibit 6, Excerpt of examiner's report, was so marked for identification, as of this date.)
Q. You testified earlier that you read portions of the examiner's report?
A. I did.
Q. Can you turn to the first page of the exhibit which -- second page of the exhibit which is page 32.
A. Yes.
Q. Do you see the highlighted language there?
A. Yes.
Q. Can you read that, please? You can read it to yourself.
A. Yes.
Q. Did the special committee take that statement into account in making a determination as to whether or not to accept the term sheet?
A. No.

Wilderotter

Q. Do you agree with this statement?

A. I'm not in a position to agree with the statement. I'm not a lawyer. I haven't reviewed all the facts of the case. It is just a conclusion that the examiner put in here.

Q. So you don't agree with it or disagree with it?

A. I don't agree or disagree with it.

Q. I am going to ask you the same question with respect to the highlighted language on page 54.

A. Okay.

Q. Was that taken into account by the special committee --

A. No.

Q. -- in making its determination?

A. No.

Q. Do you agree with it or disagree with it?

A. I was not on the board or part -- associated with Tribune in October 2007, so I neither agree nor disagree.

Q. Did you make an independent determination as to whether or not there was an

Wilderotter

unjustifiable growth rate assumption for the years 2013 through 2017?

A. No.

Q. You have no opinion on that?

A. No.

Q. Page 63. Do you remember reading this part of the report?

A. Yes.

Q. Was the highlighted language taken into account by the special committee in evaluating the settlement?

A. No.

Q. Do you have a view as to whether Tribune's management was deceitful in the preparation and issuance of this aspect of the October forecast?

A. I was not around during that period of time, so I have no opinion on that at this point.

Q. That is not anything the special committee looked into?

A. No.

Q. The next page of the report is 183. The shaded language. Was this conclusion taken

Wilderotter

into account by the special committee in evaluating the settlement?

A. On all of these specific paragraphs, no.

Q. Can you just, if you want to, quickly, go through the rest of the pages and tell me if any of the shaded language was something that was taken into account by the committee and we can focus on that.

A. Yes. The answer would be what we took into account was to reserve the right for members of this bankruptcy if they want to file lawsuits or litigation to try to narrow releases and make sure that there is still the right and we didn't take a right away from people, that if they wanted to pursue claims, they could do so. That is how we looked at it.

Q. But the step 1 lenders are being released, correct?

A. There is still the case that if -- there is still an opportunity to assess what happened in step 1.

Q. If the settlement is approved there is an opportunity to --

Wilderotter

A. Well, the settlement is one thing. I am talking about from the examiner's report perspective.

Q. I am talking about did you take into account any of the shaded conclusions of the examiner in determining whether or not the settlement was fair and reasonable?

A. I would have to read all of them first before I can answer.

Q. That is what we are doing.

A. Yes. What does equipoise mean?

Q. I believe it means 50-50.

A. Okay.

MR. SHERMAN: Here is a man that knows how to quantify words. It probably means an equal balance is probably what it means.

MR. WEINTRAUB: I will admit I had to look it up when I first read it.

MR. SHERMAN: You thought it had to do with horseback riding, did you?

MR. WEINTRAUB: That's right.

THE WITNESS: It is like a spelling bee. If you could do your question one

Page 138

Wilderotter

more time.

Q. Did the special committee or you as a member of the special committee take into consideration in evaluating the settlement any of the conclusions highlighted in the shaded language in the pages that I have handed to you which are excerpts from the examiner's report?

MR. SHERMAN: Let's be clear the question you are asking. You are asking with respect to each of the highlighted pieces individually, or are you asking whether they gave any consideration in the process to the fact that there was an examiner's report that contained these?

MR. WEINTRAUB: No, each individual.

MR. SHERMAN: You just want her to focus whether they discussed these individual ones? I just want to understand what you are asking.

Q. Let me clarify. I thought we were on the same wavelength, but then you veered away at the last second. I am asking you did the members of the special committee take into consideration the examiner's conclusions as referenced in the

Page 139

Wilderotter

highlighted sections in determining whether to go along with the settlement set forth in the term sheet?

A. Since there is only part of this that is highlighted, I would say that in a restrictive sense we didn't look at each one of these paragraphs and take those into consideration in making our decision.

Q. Are there any -- we can go through them one at a time. I am trying to save time, but maybe I will have to go through them one at a time. Was there anything that you agree with or disagree with in these conclusions?

MR. SHERMAN: In your highlighted conclusions?

MR. WEINTRAUB: Yes.

MR. SHERMAN: You are not asking about the whole? You are not, I take it, suggesting in your questions that they are unaware that there was an examiner's report and didn't consider it at all?

Q. No, did you agree with it? Did you disagree with it?

MR. SHERMAN: But that is why I

Page 140

Wilderotter

wanted the clarification. You obviously prepared an exhibit which has a few pages out of a very lengthy report and you highlighted a few lines on those pages and you focus on those in particular, so your question is specifically did they talk about these particular --

MR. WEINTRAUB: No, I guess we will do it the long way.

A. Well, let me answer the question.

Q. No, I will restart.

A. Okay.

Q. I think we went through the first one and the second one at page 54.

A. Correct.

Q. I think we asked you about page 63. Is that correct?

A. Yes.

Q. Okay. Page 183. Here the examiner's conclusion is "In measuring capital adequacy at the time of step 1, however, a court is highly likely to consider all obligations that were reasonably foreseeable at the time of step 1 including those caused by step 2."

Page 141

Wilderotter

Do you agree with that statement?

A. I don't agree or disagree with the statement.

Q. Did you consider that the examiner's opinion -- that this statement reflects the examiner's opinion? Did you take that into consideration in approving the settlement set forth in the term sheet?

A. Not that specific line, no.

Q. Was there some other aspect of the report that you took into consideration?

A. I think as you look at the settlement, it is about capital and the allocation of capital that was either from the debt that was raised in either step 1 and/or step 2, and in holistic approaches we looked at the capital, not from an adequacy point of view, but in terms of the right amount for settlement and also a litigation trust and the opportunity that, if folks are going to have litigation on a go-forward basis, they could be based on this examiner's report. We took that into consideration as part of the settlement.

Q. How were you using the term "capital"

Wilderotter

in your last answer?

A. Capital in terms of the total amount of debt raised.

Q. Total amount of debt raised at what time?

A. Total amount of debt raised. There is step 1 debt, and then there was step 2 debt. There are two different tranches of debt.

Q. You took the amount of debt into consideration in reaching the settlement?

A. Yes.

Q. Is that what you understand the examiner to be referring to when he uses the term "capital adequacy" on page 183?

A. No, he is referring to -- I'm not going to get into what he is referring to, because I'm not the examiner.

Q. So you don't know what he is referring to?

A. I would have to read not just his conclusion, but what led up in the dialogue of his report to that conclusion to give you an answer.

Q. Did you read that previously?

Wilderotter

A. Not that I remember this section.

Q. With respect to page 187?

A. Okay.

Q. The examiner says in the highlighted carry-over to page 188.

A. Right.

Q. The examiner finds that "A court is highly likely to find that Tribune was solvent as of and after giving effect to the step 1 transactions if the step 2 debt is not included for purposes of that determination. The examiner finds that to the extent that the effects of step 2 including the step 2 debt are considered in connection with step 1 solvency, credible assertions could be made that Tribune was insolvent at step 1, but the examiner concludes that it is somewhat likely, although a very close call, that a court nonetheless would find that Tribune was solvent in that circumstance as well."

Do you agree or disagree with that conclusion?

A. I can't make a judgment on whether I agree or not, because I was not there and I have

Wilderotter

not read all of the details associated with that. The conclusion I draw from that is the examiner feels that it would be highly likely that the company was still considered solvent after the step 1 tranche of debt that was raised.

Q. But then in the second sentence he says, "To the extent the effects of the step 2 including the step 2 debt are considered in connection with step 1 solvency, credible assertions could be made that Tribune was insolvent in step 1."

A. But it also says it would be a close call. Right.

Q. What do you understand a close call to mean?

A. Well, that it would still be somewhat likely that the court would still find that Tribune was still solvent.

Q. So what percentage would you put on somewhat likely?

A. I wouldn't put any percentage on it. I haven't done enough homework on that to have that opinion.

Q. What percentage would you put on

Wilderotter

although a very close call?

A. I wouldn't.

Q. Do you think that although a very close call and somewhat likely are the same percentage?

A. I have no idea.

Q. On page 220, "The examiner finds that a court is highly likely to conclude that the step 2 transactions rendered Tribune insolvent."

Do you agree or disagree with that statement?

A. I don't have an opinion on it, because you would have to look at all of the facts associated with coming to that conclusion.

Q. Was the examiner's determination that a court is highly likely to conclude that step 2, the step 2 transactions rendered Tribune insolvent, was that taken into consideration by the special committee in agreeing to the settlement?

A. No.

Q. It was not? Was it ignored?

A. No, it wasn't ignored, but we all know that that is a backdrop for what the

6ead99f2-00c6-462b-b9d4-0441842280a9

Wilderotter

settlement was. The examiner's report was part of the backdrop of all of the decisions that we made overall.

Q. When you say a backdrop, what do you mean by a backdrop?

A. We know that the examiner's report has come out. We know that he has drawn specific conclusions that would need to be reviewed and looked at and decisions made whether they are true or not. That is part of the backdrop of this settlement process.

Q. When did you join the Tribune board of directors?

A. I don't know the exact date, but it was in the first part of 2008.

Q. Or the end of 2007 possibly?

A. No.

Q. Who approached you about joining the Tribune board?

A. Sam Zell.

Q. How do you know Sam Zell?

A. I have known Sam Zell from a business perspective for a number of years. I sat on several public company boards that he has had a

Wilderotter

majority interest in.

Q. How did you come to sit on those boards?

A. Actually, it was one of his partners. Many years ago I was in the cable television industry and they bought a company, a hardware provider in that industry, and one of his partners asked me if I would like to serve on that board, and I did.

I served on that board for several years. I never met Sam during that period of time. It wasn't until after I left that board of directors that I met Sam subsequently down the road when I served on another board that he happened to be chairman of.

Q. How many boards have you served on where Sam Zell was either a shareholder of the company or on the board?

A. Three.

Q. What companies are those?

A. Antech, Jaycor and Anexter.

Q. Do you still sit on any of those boards?

A. No.

Wilderotter

Q. Why not?

A. I left the Antech board when I took a new job that did not allow me the time and attention to continue to focus on that. I left the Jaycor board because it was sold to Clear Channel. And I left the Anexter board when I took the job here at Frontier, because Anexter is a customer of Frontier, and I felt it was a conflict.

Q. I'm sorry.

MR. WEINTRAUB: Could you read back the answer.

(Record read)

Q. Do you know where Don Liebentritt worked before becoming the chief restructuring officer of Tribune?

A. No. I know he has worked with Sam in the past.

Q. Do you know how extensively he has worked with Sam?

A. No.

Q. How do you know that he worked with Sam in the past?

A. Because he has told me that.

Wilderotter

Q. Since joining the Tribune board, what communications have you had with Mr. Zell?

A. A lot.

Q. How frequently do you speak?

A. It depends. We will talk sometimes once a month, sometimes a couple of times a month, at board meetings.

Q. What do you talk about?

A. We talk about the business. We talk about the business environment. We talk about the economy.

Q. Do you talk about the work of the special committee?

A. Since we formed the special committee, I have not -- I actually talked to Sam about the special committee yesterday.

Q. What was the nature of that conversation?

A. We had approved the settlement, and he and I talked after that approval, and he said how did the meeting go, and I said it went fine and we approved the settlement.

Q. Did you talk before the meeting with Mr. Zell about the settlement?

6ead99f2-00c6-462b-b9d4-0441842280a9

Page 150

Wilderotter

A. No.

Q. Before I think you said yesterday, before yesterday, when was the last time you spoke with Mr. Zell?

A. Last week.

Q. What was that conversation about?

A. It was about The New York Times article.

Q. What did he say about The New York Times article?

A. He of course was disappointed in the article as I think all of us were, and he and I had a conversation with regard to leadership and the instances that were cited in the article.

Q. What communications have you had with Chandler Bigelow since joining the Tribune board?

A. Well, I sit on and chair the compensation committee, and Chandler as the CFO attends those meetings. I have also had interactions with him with regard to budget reviews reporting, board reports on the financials of the company, so I have interacted with him as most board members would interact with a CFO.

Page 151

Wilderotter

Q. Did you interact with him about whether or not he would be released under the plan?

A. Excuse me?

Q. Did you interact with him on whether or not he would be released under the plan?

A. No.

Q. Do you think he should be released under the plan?

A. Under what plan?

Q. The plan term sheet.

A. No.

Q. Why not?

A. Because I believe he is a solid CFO and he is doing a good job for Tribune.

Q. I meant released --

MR. SHERMAN: He is talking about legal release.

Q. From liability.

A. I meant like he is gone.

MR. SHERMAN: No, lawyer's secret language.

A. Sorry. No. I don't think he should be released in your vernacular. Sorry.

Page 152

Wilderotter

Q. Why not?

A. Because I think you have to look at what the examiner's report said about the financial management and the schedules and forecasts that they prepared and take a look at that and decide whether there is anything to it or not.

Q. Is that something that the special committee has undertaken to look --

A. No.

Q. -- into whether or not there was anything to it?

A. No.

Q. Do you agree or disagree with what the examiner has said about Mr. Bigelow?

A. I have my own opinion that I think Chandler Bigelow is an honest CFO with a lot of integrity, but again I wasn't around during that period of time, so I have no knowledge to dispute the examiner's decision or support it.

Q. Do you know if the board as distinct from the special committee has undertaken an investigation into the allegations against Mr. Bigelow?

Page 153

Wilderotter

A. I believe that the board has looked at Chandler Bigelow in light of the examiner's report, and we have concluded that he should continue to be the CFO of the company.

Q. What was the basis for that conclusion?

A. That we don't believe, based upon the investigations that have been done on the information, that Chandler has done anything wrong.

Q. And what investigations were done on the information?

A. How the board has looked at through management and third-party views of what Chandler worked on on behalf of the company, that there was nothing that he did wrong in the position he was in in the financial group, so we have confidence in him and that he should stay as CFO until that is proven otherwise.

Q. Who conducted that investigation?

A. I don't know who in particular, but it was a discussion that took place at a board meeting.

Q. Was there a written report?

Page 150

Wilderotter
A. No.
Q. Before I think you said yesterday, before yesterday, when was the last time you spoke with Mr. Zell?
A. Last week.
Q. What was that conversation about?
A. It was about The New York Times article.
Q. What did he say about The New York Times article?
A. He of course was disappointed in the article as I think all of us were, and he and I had a conversation with regard to leadership and the instances that were cited in the article.
Q. What communications have you had with Chandler Bigelow since joining the Tribune board?
A. Well, I sit on and chair the compensation committee, and Chandler as the CFO attends those meetings. I have also had interactions with him with regard to budget reviews reporting, board reports on the financials of the company, so I have interacted with him as most board members would interact with a CFO.

Page 151

Wilderotter
Q. Did you interact with him about whether or not he would be released under the plan?
A. Excuse me?
Q. Did you interact with him on whether or not he would be released under the plan?
A. No.
Q. Do you think he should be released under the plan?
A. Under what plan?
Q. The plan term sheet.
A. No.
Q. Why not?
A. Because I believe he is a solid CFO and he is doing a good job for Tribune.
Q. I meant released --
MR. SHERMAN: He is talking about legal release.
Q. From liability.
A. I meant like he is gone.
MR. SHERMAN: No, lawyer's secret language.
A. Sorry. No. I don't think he should be released in your vernacular. Sorry.

Page 152

Wilderotter
Q. Why not?
A. Because I think you have to look at what the examiner's report said about the financial management and the schedules and forecasts that they prepared and take a look at that and decide whether there is anything to it or not.
Q. Is that something that the special committee has undertaken to look --
A. No.
Q. -- into whether or not there was anything to it?
A. No.
Q. Do you agree or disagree with what the examiner has said about Mr. Bigelow?
A. I have my own opinion that I think Chandler Bigelow is an honest CFO with a lot of integrity, but again I wasn't around during that period of time, so I have no knowledge to dispute the examiner's decision or support it.
Q. Do you know if the board as distinct from the special committee has undertaken an investigation into the allegations against Mr. Bigelow?

Page 153

Wilderotter
A. I believe that the board has looked at Chandler Bigelow in light of the examiner's report, and we have concluded that he should continue to be the CFO of the company.
Q. What was the basis for that conclusion?
A. That we don't believe, based upon the investigations that have been done on the information, that Chandler has done anything wrong.
Q. And what investigations were done on the information?
A. How the board has looked at through management and third-party views of what Chandler worked on on behalf of the company, that there was nothing that he did wrong in the position he was in in the financial group, so we have confidence in him and that he should stay as CFO until that is proven otherwise.
Q. Who conducted that investigation?
A. I don't know who in particular, but it was a discussion that took place at a board meeting.
Q. Was there a written report?

Wilderotter

MR. SHERMAN: Excuse me. Are you suggesting that the questions, the line of questioning you are now pursuing falls within your notice of deposition and subpoena?

MR. WEINTRAUB: I'm not suggesting one way or the other. I am asking my questions. Are you instructing the witness not to answer?

THE WITNESS: Yes, I have to go too, so.

MR. SHERMAN: I think at that point it becomes moot. What I am suggesting is that you served a notice of deposition and you served a subpoena. You called for questioning on certain subjects, and you are wandering beyond the subjects.

MR. WEINTRAUB: I don't believe I am, Counsel.

MR. SHERMAN: We probably don't have to argue about it at this point.

MR. WEINTRAUB: I am sure we don't right now, but we will argue that in front of Judge Carey, I am sure very shortly.

Wilderotter

MR. SHERMAN: I am sure we have a lot of things to argue about.

MR. WEINTRAUB: But we don't have to fight about the meaning of equipoise.

MR. SHERMAN: No. You have a numbers idea of it, and I have a verbal idea of what it means.

THE WITNESS: Thank you very much. I appreciate your coming here.

MR. SHERMAN: We'll read and sign.

THE VIDEOGRAPHER: The time is 6:11 p.m. We are going off the record.

(Time noted: 6:11 p.m.)

______________________________

Subscribed and sworn to before me this______day of_________, 2010.

___________________________________

CERTIFICATION

I, Joseph R. Danyo, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of October, 2010.

JOSEPH R. DANYO

INDEX

| Witness | Page |
|---|---|
| MARY AGNES WILDEROTTER | 6 |

EXHIBITS

| Wilderotter | | Page |
|---|---|---|
| 1 | Document beginning with Bates number MW 10 containing e-mail dated September 20, 2010 from Mark Shapiro to Don Liebentritt | 13 |
| 2 | Document beginning with Bates number MS 37 containing e-mail dated September 20, 2010 from Ms. Wilderotter to Mark Shapiro | 15 |
| 3 | Document beginning with Bates number MS 115 | 19 |
| 4 | Term sheet | 27 |
| 5 | Document bearing Bates numbers MW 28 through MW 38 | 73 |
| 5 | Remarked | 75 |
| 6 | Excerpt of examiner's report | 133 |

oOo

6ead99f2-00c6-462b-b9d4-0441842280a9

Page 158

OCTOBER 13, 2010 - MARY AGNES WILDEROTTER

ERRATA

I wish to make the following changes, for the following reasons:

PAGE LINE

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

____ ____ CHANGE ______________________
REASON ______________________

Hudson Reporting & Video, Inc. 1-800-310-1769

6ead99f2-00c6-462b-b9d4-0441842280a9