## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, *et al.*,<br><br>Debtors. | CHAPTER 11<br><br>Case No. 08-13141(KJC)<br><br>Pending in the United States Bankruptcy Court for the District of Delaware |

## MOTION TO QUASH
## DEPOSITION SUBPOENA TO KATHLEEN M. WALTZ

Kathleen M. Waltz, a former employee of the Orlando *Sentinel*, a subsidiary of the debtor, Tribune Company ("Tribune" or "Company"), has been subpoenaed for deposition by counsel for one of its noteholders, Aurelius Capital Management LP ("Aurelius"). Ex. 1. The deposition subpoena received by Ms. Waltz on February 3, 2011 and seeking her deposition on February 17, 2011 has been issued in connection with Plan Confirmation proceedings in Delaware. The subpoena is improper, and Waltz hereby moves to quash pursuant to Fed. R. Civ. P. 26(b)(2)(C) and 45(c)(3)(C) and for the following reasons:

1.      Ms. Waltz left the Tribune three years ago and has no information material to the Company's bankruptcy plans that is not already available elsewhere.

2.      Ms. Waltz is an individual defendant, sued personally, in Adversary Actions stayed by the Delaware Bankruptcy Court. The deposition, sought under the guise of Plan Confirmation discovery, would negate the Delaware Court's order that, "[a]ll rights of such defendants . . . shall be fully preserved."

3.      The subpoena is cumulative, seeks information already available more efficiently from other sources, and constitutes an undue burden on Ms. Waltz.

1086895.4

Ms. Waltz respectfully requests that this Court quash the subpoena.

## BACKGROUND

The principal issue in the plan confirmation proceedings is the proposed settlement of Debtors' claims against certain LBO lenders. Ms. Waltz did not participate in any way in the formulation or negotiation of those proposed settlements or, more broadly, in the competing plans at issue in the bankruptcy proceedings. Ms. Waltz left her employment with the Tribune in February 2008 and has had no role with the Company for more than three years.

After Ms. Waltz was served on February 3, 2011, her attorneys contacted Aurelius' counsel to ask why her deposition was being sought in connection with Plan Confirmation discovery. Counsel for Aurelius replied that Ms. Waltz's testimony would be necessary to help determine "the merits and value of potential causes of action related to the Tribune LBO" and that she was "involved in developing and/or providing inputs to Tribune's five year business plans." Ex. 2, Feb. 4, 2011 e-mail from B. Carney to C. Bergen. Counsel also met and conferred telephonically on February 9th and 10th, 2011. When asked, counsel for Aurelius stated that it wants Ms. Waltz's deposition "because she was head of an important segment of the Company in 2007 and presumably should have knowledge regarding projections." Ms. Waltz offered to confirm with Tribune that they do not intend to call her as a witness at the Plan Confirmation hearing – she has never appeared on any witness list – if Aurelius would agree to withdraw her deposition subpoena. Aurelius refused.

Ms. Waltz is also named personally as a defendant in the LBO-related adversary proceedings filed against numerous Tribune and subsidiary directors and officers, *UCC v. FitzSimons, et al.*, No. 10 54010 (KJC) and in the individual "preference" actions filed by the UCC, *UCC v. Kathleen M. Waltz*, Adv. Pro. No. _____ (KJC) (collectively, the "Adversary Actions"). These Adversary Actions have been stayed by the Delaware Court pending resolution

- 2 -

of Plan Confirmation proceedings, with orders prohibiting defendants from moving to dismiss

the complaint or take discovery, but also with the countervailing provision that "All rights of

such defendants . . . shall be fully preserved." Order Granting Unsecured Creditors Committees'

Standing Motion, 10/27/10, Docket No. 6150 at 4 and Order Granting Amended Motion of the

Official Committee of Unsecured Creditors, 11/29/10, Docket No. 6658 at 3 (the "Stay Orders").

(Exs. 3 and 4.) Because the subpoena does not seek information uniquely in Ms. Waltz's

possession, but seriously impairs her rights under the Stay Orders and imposes an undue burden

on her, it should be quashed.

## ARGUMENT

1.      **Ms. Waltz Left The Tribune Three Years Ago And Has No
Information Material To The Confirmation Proceedings That Is Not
Readily Available Elsewhere.**

The benefit and relevance of the discovery requested from Ms. Waltz to the Plan

Confirmation proceedings, if any, is very limited. The parties to the proceedings have properly

been ordered to focus their attention on specific issues that relate to the competing plans. The

Delaware Court has told the parties to focus on the debtors' proposed settlement with the LBO

lenders as the key issue for the Plan Confirmation. Indeed, just last week, the Delaware Court

found that "most of the events relevant to the negotiation and settlement of the LBO related

Causes of Action occurred after the Court entered the Document Depository Order [on

December 15, 2009]." (Feb. 3, 2011 Memorandum and Order at 18.) (Ex. 5.) The Delaware

Court further explained that December 15, 2009 is the "relevant discovery start date" because

that "will allow discovery regarding LBO settlements, while limiting the burden and expense of

completing discovery within the timeframe provided by the CMO." *Id.* at 19. The Delaware

Court then held, "[t]he Noteholders have not demonstrated that an earlier discovery start date is

likely to yield admissible, relevant information needed to litigate approval of the proposed

settlement and plan confirmation." (*Id.*)

Ms. Waltz left Tribune in early 2008, well before the bankruptcy petition was filed, and

well before the December 15, 2009 discovery start date. It is difficult to see how she could

possibly provide relevant testimony on any significant Plan Confirmation issue.

> **2.    Ms. Waltz Is An Individual Defendant In The Stayed Adversary
> Actions, And The Deposition Sought Under The Guise Of Plan
> Confirmation Discovery Would Negate This Court's Order That "All
> Rights Of Such Defendants . . . Shall Be Fully Preserved."**

Complaints have been filed by the Unsecured Creditors' Committee in the Adversary

Actions, but defendants in those actions (including Ms. Waltz) are not yet permitted to move to

dismiss, answer, counterclaim "or otherwise respond." Stay Orders at 3-4. No issues have been

joined. No valid causes of action have been established. Until such time as a valid cause of

action has been established, Aurelius should not be permitted early and unconfined discovery

against Ms. Waltz (or other defendants similarly situated.) To permit this sort of invasive fishing

expedition under the guise of "Plan Confirmation" discovery is unfair, prejudicial to the

defendants in the Adversary Actions and contrary to the Delaware Court's stay orders, which

prohibit any discovery in the Adversary Actions, other than that "necessary for the purpose of

preventing applicable statutes of limitations or other time related defenses from barring any of

the claims asserted in the [Adversary] Actions . . . ." (*Id.*)

Courts have quashed Rule 2004 subpoenas "in order to prevent injustice" when an

adversary proceeding is pending on the same subject. *In re Plainfield Ave., Inc.*, 223 B.R. 440,

445 (Bankr. D. N.J. 1998) (quashing Rule 2004 subpoena); *see also In re Blinder, Robinson &
Co., Inc.*, 127 B.R. 267, 274 (Bankr. D. Co. 1991) ("strong argument" that party will be

irreparably injured if forced to submit to Rule 2004 examination to discover information relevant

1086895.4

to a pending adversary proceeding). *In re Enron Corp.*, 281 B.R. 836, 842 (Bankr. S.D.N.Y. 2002) (Rule 2004 exam inappropriate "where the party requesting the Rule 2004 examination could benefit their pending litigation outside of the bankruptcy court against the proposed Rule 2004 examinee."). Aurelius is plainly not pursuing limited discovery relating only to confirmation issues here. Its subpoena contains no restrictions, plainly circumvents the Stay Orders, and will be used to obtain information relating to the Adversary Actions. *See Harry F. Ortlip Co. v. George Hyman Const. Co.*, 126 F.R.D. 494, 497 (E.D. Pa. 1989) ("In deciding whether a request comes within the discovery rules a court is not required to blind itself to the purpose for which a party seeks information. Thus, when the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery is properly denied." (*Quoting Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978)); *see also Shepherd v. Wellman*, 313 F.3d 963, 969 (6th Cir. 2002) (same). *De facto*, Aurelius seeks to negate the Delaware Court's order providing that "All the rights of such defendants, including their right to move to dismiss the [Adversary Actions] following the expiration of the Stay, shall be fully preserved" and, as such, the subpoena served on Ms. Waltz should be quashed. Stay Orders at 3 and 4.

### 3.    The Subpoena Is Cumulative And Places An Undue Burden On Ms. Waltz.

A subpoena must be quashed or modified if it is cumulative or unduly burdensome. This is particularly true with respect to those who are not parties to the dispute in which the discovery is sought. Fed. R. Civ. P. 26(b)(2)(C) and 45(c)(3)(A). For this reason, too, the subpoena served on Ms. Waltz should be quashed.

The Court has already stated, at least as between the parties to the Plan Confirmation proceedings, that "discovery regarding the merits of the LBO Related Claims is 'well trodden

- 5 -

ground' that has been investigated by and comprehensively addressed by the Examiner." (2/3/11 Order at 19 (emphasis added).) To be sure, Ms. Waltz does not wholly agree with the Examiner's version of the facts, nor with his findings. Those issues can and will be addressed in the Adversary Actions. But there has been a massive, extensive and expensive investigation that the parties to the Plan Confirmation proceedings have agreed to use for the limited purpose of the Plan Confirmation hearing. See February 4, 2011 Order Approving Stipulation Regarding Use of Examiner's Report At The Confirmation Hearing and attached Stipulation. (Ex. 6.) Additional testimony from Ms. Waltz is not necessary.

*      *      *

For the foregoing reasons, the Court should enter an order quashing the subpoena served on Kathleen Waltz.

Dated:  February 11, 2011                    Respectfully submitted,

                                             KATHLEEN WALTZ

                                             By: _____
                                                 One of Her Attorneys

John R. McCambridge
Charles S. Bergen
George R. Dougherty
Maile Solís-Szukala
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 704-7700
Facsimile:  (312) 558-1195
jmccambridge@grippoelden.com
cbergen@grippoelden.com
gdougherty@grippoelden.com
msolis@grippoelden.com

1086895.4

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on February 11, 2011, he caused a true

and complete copy of the foregoing **MOTION TO QUASH DEPOSITION SUBPOENA TO**

**KATHLEEN M. WALTZ** on behalf of Kathleen M. Waltz, to be sent via Federal Express to

the following:

> David M. Zensky
> Brian T. Carney
> Akin Gump Strauss Hauer & Feld, LLP
> One Bryant Park
> New York, New York 10036

Charles S. Bergen

1

B256 (form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

# UNITED STATES BANKRUPTCY COURT

Southern _____ District of _____ Florida

In re  Tribune Co., et al.

**SUBPOENA IN A CASE UNDER
THE BANKRUPTCY CODE**

Case No. * _____ 08-13141(KJC)

Chapter _____ 11

To:  Kathleen M. Waltz
     4310 N. Highway A1A Apt 801S
     Fort Pierce, FL 34949

> Pending in the United States Bankruptcy
> Court for the District of Delaware

☐ YOU ARE COMMANDED to appear in the United States Bankruptcy Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Hilton Palm Beach Airport     (The deposition will be recorded stenographically and by 150 Australian Avenue     sound and visual recording.) West Palm Beach, FL 33406 | February 17, 2011 at 9:00 a.m. EST |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE: | DATE AND TIME |
|---|---|
|  |  |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this proceeding that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Rule 30(b)(6), Federal Rules of Civil Procedure, made applicable in bankruptcy cases and proceedings by Rules 1018, 7030, and 9014, Federal Rules of Bankruptcy Procedure.

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| David M. Zensky /s/ | February 3, 2011 |

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
David M. Zensky, Akin Gump Strauss Hauer & Feld, LLP, One Bryant Park, New York, NY 10036 (212) 872-1075

* If the bankruptcy case is pending in a district other than the district in which the subpoena is issued, state the district under the case number.

B256 (Form 256 – Subpoena in a Case under the Bankruptcy Code) (12/07)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___2/3/11___
                DATE

SIGNATURE OF SERVER

_Jian Mozley_

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2007, made applicable in cases under the Bankruptcy Code by Rule 9016, Federal Rules of Bankruptcy Procedure

(c) Protecting a Person Subject to a Subpoena.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) Duties in Responding to a Subpoena.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

2

## Bergen, Charles S.

**To:** Bergen, Charles S.
**Subject:** FW: In re Tribune: Deposition Subpoenas for Messrs. Grenesko and Landon
**PcgTrack:** Forward

---

**From:** Bergen, Charles S.
**Sent:** Friday, February 04, 2011 5:58 PM
**To:** 'Carney, Brian'
**Cc:** McCambridge, John R.
**Subject:** RE: In re Tribune: Deposition Subpoenas for Messrs. Grenesko and Landon

Brian,
It's late on Friday, so I will refrain from a lengthy or acerbic response to your assertions as to what you think we "probably know from [our] conversations with Debtor's counsel," or things you think should be "self-explanatory" or things you think we "may already have known." We asked you for information in an attempt to evaluate your request that our clients appear on short notice at depositions in a matter in which they are not parties. I had hoped for straightforward answers with respect to each of the three individuals, and if you would like to provide that, that would help us evaluate your requests. If you would like to try again, and send me something useful on Monday, we would appreciate it.
Anyway, since you are still at work, I thought I should also let you know that we have been in contact with Mr. Grenesko today, and he is not available on February 23. Without waiving any right to object, to seek protective orders, to quash or to seek any other relief available, February 25 would be less difficult for him from a scheduling point of view.
--Chuck

---

**From:** Carney, Brian [mailto:bcarney@akingump.com]
**Sent:** Friday, February 04, 2011 5:25 PM
**To:** Bergen, Charles S.
**Cc:** McCambridge, John R.; Zensky, David; Qureshi, Abid
**Subject:** RE: In re Tribune: Deposition Subpoenas for Messrs. Grenesko and Landon

We obviously disagree that serving your clients with deposition subpoenas after you failed to respond in a timely manner to our request for you to accept service on their behalf constitutes "hardball tactics." As you probably know from your conversations with Debtors' counsel, the merits and value of potential causes of action related to the Tribune LBO are relevant to the bankruptcy court's determination of whether the Debtor/Committee/Lender Plan is fair to all parties and should be confirmed. To that end, each of Mr. Landon, Mr. Grenesko and Ms. Waltz were involved in developing and/or providing inputs to Tribune's five-year business plan. Moreover, as you also probably know, the Examiner in the bankruptcy case thought that Mr. Landon and Mr. Grenesko were significant enough players to interview each of them in connection with the Examiner's investigation. (The reason that we want to depose Mr. Grenesko should be self-explanatory: he is the former Senior Vice President of Finance and Administration at Tribune during the time period relevant to the LBO.) We are providing you with this information by way of example only, and we do not intend to limit in any way the topics that may be covered in their respective depositions.

Hopefully this information – which you may have already known – will help you understand why we need to take the depositions of Mr. Landon, Mr. Grenesko and Ms. Waltz. We understand your need to confer with your clients to determine whether they want to object to the subpoenas. Unfortunately, because of the tight timeline for discovery in this case insisted upon by the Debtors and their Plan co-proponents, we need to know as soon as possible whether one or more of your clients intends to object to the subpoenas. Accordingly, please let us know no later than the close of business on Tuesday if any of your clients object to the subpoenas so that we can seek appropriate judicial relief if necessary.

Thanks,
Brian

_____

**From:** Bergen, Charles S. [mailto:CBergen@grippoelden.com]
**Sent:** Friday, February 04, 2011 1:38 PM
**To:** Carney, Brian
**Cc:** McCambridge, John R.
**Subject:** RE: In re Tribune: Deposition Subpoenas for Messrs. Grenesko and Landon


Brian--
Thank you for forwarding a copy of the subpoena your process server delivered yesterday to our client, Ms. Waltz.  We will not reach agreement on whether or not you harassed our clients, so let me just note that we are very disappointed by the hardball tactics you have chosen to pursue against people who are in no way involved in the bankruptcy proceedings.
We will be in touch with Ms. Waltz, and inquire about her schedule.  We will confer with all of our clients and will let you know whether we have objections, and what those objections are, in accordance with the applicable court rules.  While we understand your desire to make travel arrangements as soon as possible, we nonetheless need to take the time necessary to evaluate the situation with concern for what is best for our clients.
In that regard, it might help if you could tell us in what way you think Ms. Waltz, Mr. Grenesko and Mr. Landon possess any information pertinent to the Bankruptcy Plan confirmation proceedings.  If you could share with us your thinking as to why these individuals, who have had no contact with the Tribune for nearly three years, could possibly provide useful testimony concerning the Plan confirmation proceedings, that would help.
As for Tom Garris, we do not represent him, at least not currently.
--Chuck

_____

**From:** Carney, Brian [mailto:bcarney@akingump.com]
**Sent:** Friday, February 04, 2011 9:01 AM
**To:** Bergen, Charles S.
**Cc:** McCambridge, John R.; Zensky, David; Qureshi, Abid
**Subject:** RE: In re Tribune: Deposition Subpoenas for Messrs. Grenesko and Landon

Chuck:  Attached is a courtesy copy of the subpoena that was served yesterday afternoon on Ms. Waltz.  Please let us know immediately if the noticed date does not work for Ms. Waltz's deposition or if you plan to object in any other way to Ms. Waltz's subpoena.  Please also let us know if the noticed dates do not work for the depositions of Messrs. Landon and Grenesko or if you plan on objecting in any way to either of their subpoenas.  Otherwise, we will confirm the arrangements for their respective depositions, including travel arrangements (and, in Ms. Waltz's case, a hotel conference room in West Palm Beach).  Further to my email below, please let me know if you represent Mr. Garris.

Thanks,
Brian

_____

3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>Related to Docket Nos. 3281, 5668, 5698, 6128 |

## ORDER GRANTING UNSECURED CREDITORS COMMITTEE'S STANDING MOTIONS

Upon consideration of the Motion dated February 1, 2010 of the Official

Committee of Unsecured Creditors (the "Committee") for Entry of an Order Granting Leave,

Standing and Authority to Commence, Prosecute and Settle Claims and Counterclaims of the

Debtors' Estates ("First Standing Motion"), the Supplement to the First Standing Motion filed

September 14, 2010, the Motion dated September 13, 2010 of the Official Committee of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347);Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

{698.001-W0010372.}

Unsecured Creditors for Entry of an Order Granting Leave, Standing and Authority to

Commence, Prosecute and Settle Claims of the Debtors' Estates ("Second Standing Motion")

seeking entry of orders granting the Committee standing to prosecute certain LBO-Related

Causes of Action (together, the "Standing Motions") (D.I. 3281, 5668 and 5698), and the partial

and limited objections to the Standing Motions filed by certain other parties (the "Objecting

Parties") (D.I. 3366, 3371, 3374, 3376, 3377, 3389, 5871, 5899, 5909, 5910, 6038); notice of the

Standing Motions having been due and proper under the circumstances; argument on the motions

and objections having been heard at the hearing on October 22, 2010 (the "Hearing"); and after

due deliberation, and good and sufficient cause appearing therefore; it is hereby

        ORDERED that the Standing Motions are granted to the extent set forth herein;

and it is further

        ORDERED that pursuant to sections 105, 1103, and 1109 of the Bankruptcy

Code, the Committee is granted leave, standing and authority to commence and prosecute the

claims of the Debtors' estates set forth in the draft complaints attached to the Standing Motions

as they may be amended or modified consistent with this Order (the "LBO Actions"), and it is

further

        ORDERED that the Committee may prior to filing amend or modify the draft

complaints attached to the Standing Motions: to add other claims relating to the leveraged buy-

out of Tribune in 2007 that i) are within the scope of the Examiner's report; ii) assert fraudulent

conveyance claims arising under state law, including claims against former shareholders of

Tribune; iii) name individual lenders and shareholders or other persons or entities as defendants

or add class action allegations, with respect to claims as to which the Committee is granted

standing by this Order; iv) assert avoidance and disgorgement claims against Samuel Zell and

related entities, including EGI and EGI-TRB; or v) have been consented to by the Debtors.  In

making such amendments or modifications the Committee will consider suggestions of Aurelius

Capital Management LP, Law Debenture Trust Company of New York, Wilmington Trust

Company, Deutsche Bank Trust Company Americas, Wells Fargo Bank, N.A. (as Bridge Agent

and not individually) and the Debtors to ensure that claims of the Debtors' estates are preserved ;

and it is further

ORDERED that the Committee shall commence the LBO Actions by filing its

complaints no later than November 1, 2010; and it is further

ORDERED that, except as provided in the proposed Joint Plan of Reorganization

For Tribune Company And Its Subsidiaries Proposed By The Debtors, The Official Committee

of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo Gordon & Co., L.P. and

JPMorgan Chase Bank, N.A. filed on October 22, 2010 (the "Proposed Plan"), neither the

Debtors nor the Committee shall settle, subject to the Court's approval, any of the claims to be

transferred to the Litigation Trust or the Creditors Trust (under and as defined in the Proposed

Plan) without the other's consent unless and until the earliest to occur of the following: (i) the

Committee and/or the Debtors withdraw their support for the Proposed Plan; (ii) the Court

declines to confirm the Proposed Plan, or (iii) April 1 2011 (each a "Termination Event").  If a

Termination Event occurs, either the Debtors or the Committee shall have the right, subject to

the Court's approval, after notice and an opportunity to be heard, to settle claims that the

Committee has been authorized to pursue, and the Committee shall have the right to file a motion

seeking entry of a court order granting it the exclusive right to settle such claims.  The rights of

any party to object to any such settlement or motion are expressly preserved; and it is further

ORDERED that once commenced the LBO Actions shall be deemed stayed, except as otherwise set forth in this order (the "Stay"), until a Termination Event occurs, provided that if the Termination Event is the withdrawal of support for the Proposed Plan by the Debtors or the Committee, the Committee shall have the right to extend the Stay by, within ten days of such withdrawal of support, filing and serving a notice that the Stay shall continue. All applicable deadlines, other than those applicable to the discovery permitted by this Order, are suspended during the period of the Stay. All motion practice (other than motions respecting confidentiality, motions to lift, extend or otherwise respecting the Stay, motions with respect to the discovery permitted by this order, motions to intervene and motions regarding settlements consistent with the terms of this Order) and contested hearings or trials are prohibited. Notwithstanding the foregoing, during the period this Stay is in effect, the Committee may: a) consistent with governing rules, amend the complaints in the LBO Actions; b) complete service of the complaints in the LBO Actions; and c) take such steps, including immediately pursuing discovery, as are necessary for the purpose of preventing applicable statutes of limitations or other time related defenses from barring any of the claims asserted in the LBO Actions; and it is further

ORDERED that a copy of this Order shall be entered on the docket in the LBO Actions.

ORDERED that during the pendency of the Stay no defendant to the LBO Actions shall answer or otherwise respond to the LBO Actions. All the rights of such defendants, including their right to move to dismiss the LBO Actions following expiration of the Stay, shall be fully preserved; and it is further

{698.001-W0010372.}

4

ORDERED that the Stay may be lifted or extended by the Court for any cause deemed sufficient by the Court after notice and a hearing with an opportunity for all interested parties to be heard; and it is further

ORDERED that nothing in this Order shall affect the rights, if any, of other parties to a) propose settlements subject to this Court's approval; b) seek to modify this Order's provisions regarding settlements or settlement authority; or c) seek any other form of relief respecting settlements or settlement authority with respect to matters not resolved by this Order.

10-27-10

United States Bankruptcy Judge

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Related to Docket Nos.: 6414 and 6485** |

## ORDER GRANTING AMENDED MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, SETTLE AND RECOVER CERTAIN CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES ARISING UNDER AND PURSUANT TO 11 U.S.C. §§ 547 AND 550

Upon consideration of the Amended Motion of the Official Committee of Unsecured Creditors (the **"Committee"**) for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute, Settle and Recover Certain Causes of Action Belonging to the Debtors' Estates Arising Under and Pursuant to 11 U.S.C. §§ 547 and 550 (the **"Preference Standing Motion"**)[1]; and notice of the Preference Standing Motion having been due and proper under the circumstances; and after due deliberation, and good and sufficient cause appearing therefor; it is hereby

ORDERED, that the Preference Standing Motion is GRANTED; and it is further

ORDERED, that any objections to the Preference Standing Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the hearing on the approval of the Preference Standing Motion, and all reservation of rights included therein, are hereby denied and overruled with prejudice; and it is further

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Preference Standing Motion, except that Preference Actions shall also include Section 548 claims based on the same transfers as the Section 547 claims to the extent necessary to preserve those causes of action.

ORDERED, that pursuant to sections 105, 1103 and 1109 of the Bankruptcy Code, the Committee is granted leave, standing and authority to commence and prosecute the Preference Actions of the Debtors' estates set forth in the Preference Standing Motion with any and all recoveries to be for the benefit of the Debtors' estates; and it is further

ORDERED, that pursuant to sections 105, 1103 and 1109 of the Bankruptcy Code, the actions previously brought in the LBO Complaints that are more properly categorized as Preference Actions hereby are confirmed to be brought with standing and may be commenced (if not already commenced) and prosecuted as Preference Actions, and it is further

ORDERED, that the Committee shall commence the Preference Actions by filing its complaints no later than December 7, 2010; and it is further

ORDERED, that neither the Debtors nor the Committee shall settle, subject to the Court's approval, any of the Preference Actions without the other's consent unless and until the earliest to occur of the following: (i) the Committee and/or the Debtors withdraw their support for the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. filed on October 22, 2010 (the "**Settlement Plan**"); (ii) the Court declines to confirm the Settlement Plan, or (iii) April 1, 2011 (each a "**Termination Event**"). If a Termination Event occurs, either the Debtors or the Committee shall have the right, subject to the Court's approval, after notice and an opportunity to be heard, to settle claims that the Committee has been authorized to pursue, and the Committee shall have the right to file a motion seeking entry of a court order granting it the exclusive right to settle such claims. The rights of any party to object to any such settlement or motion are expressly preserved; and it is further

CPAM: 3371708.2

ORDERED, that after they have been filed and served, the Preference Actions shall be deemed stayed, except as otherwise set forth in this Order (the "**Stay**"), until a Termination Event occurs, provided that if the Termination Event is the withdrawal of support for the Settlement Plan by the Debtors or the Committee, the Committee shall have the right to extend the Stay by, within ten days of such withdrawal of support, filing and serving a notice that the Stay shall continue. All applicable deadlines, other than those applicable to the discovery permitted by this Order, are suspended during the period of the Stay. All motion practice (other than motions respecting confidentiality, motions to lift, extend or otherwise respecting the Stay, motions with respect to the discovery permitted by this Order, motions to intervene and motions regarding settlements consistent with the terms of this Order) and contested hearings or trials are prohibited. Notwithstanding the foregoing, during the period this Stay is in effect, the Committee may (a) consistent with governing rules, amend the complaints in the Preference Actions, (b) complete service of the complaints in the Preference Actions, and (c) take such steps, including immediately pursuing discovery, as are necessary for the purpose of preventing applicable statutes of limitations or other time related defenses from barring any of the claims asserted in the Preference Actions; and it is further

ORDERED, that a copy of this Order shall be entered on the docket in each of the Preference Actions when filed; and it is further

ORDERED, that during the pendency of the Stay, no defendant to the Preference Actions shall answer or otherwise respond to the Preference Actions. All the rights of such defendants, including their right to move to dismiss the Preference Actions following expiration of the Stay, shall be fully preserved; and it is further

3

ORDERED, that the Stay may be lifted or extended by the Court for any cause deemed sufficient by the Court after notice and a hearing with an opportunity for all interested parties to be heard.

Dated: November 24, 2010

The Honorable Kevin J. Carey
Chief United States Bankruptcy Judge

CPAM: 3371708.2

5

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TRIBUNE COMPANY**, *et. al*[1] | : | |
| | : | Case  No. 08-13141 (KJC) |
| Debtors | : | |

## MEMORANDUM AND ORDER[2]

**BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Currently before the Court is a discovery dispute among parties who are proponents of

competing plans of reorganization.  On January 14, 2011, the Noteholder Plan Proponents[3] filed

a  Motion to Compel Production of Documents and Information from the Debtor/Committee/

Lender Plan Proponents and Other Parties, or, Alternatively For an Order of Preclusion

Respecting Certain Issues (the "Motion to Compel")(D.I. 7527).   On January 19, 2011, the

---

[1]The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08-13236) is being jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors pursuant to the Order dated December 10, 2008 (main case docket no. 43)(collectively, the "Debtors" or "Tribune").  An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) commenced a chapter 11 case on October 12, 2009 as one of the steps necessary to complete a transaction involving the Chicago Cubs and certain related assets.  In all, the Debtors now comprise 111 entities.

[2]This Memorandum constitutes the findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A) and (L).

[3]The Noteholder Plan Proponents are those parties who are proponents of the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its Managed Entities ("Aurelius"), Deutsche Bank Trust Company Americas, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Law Debenture"), and Wilmington Trust Company, in Its Capacity as Successor Indenture Trustee for the PHONES Notes ("Wilmington Trust")(D.I. 7073)(the "Noteholder Plan").

Debtor/Committee/Lender Plan Proponents[4] filed an objection to the Motion to Compel (D.I.

7552).  A hearing to consider the Motion to Compel was held on January 24, 2011.

BACKGROUND[5]

On December 8, 2008, Tribune Company and certain of its subsidiaries (the "Debtors")

filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11

U.S.C. §101 *et seq.*).  On April 12, 2010, the Debtors filed a proposed plan (the "April 2010

Plan") that sought to implement the terms of a settlement agreement regarding certain LBO-

Related Causes of Action.[6]  A confirmation hearing for the April 2010 Plan was scheduled for

August 16, 2010.

By order dated April 20, 2010, the Bankruptcy Court entered an Agreed Order Directing

the Appointment of an Examiner (the "Examiner Order").  On May 10, 2010, the Bankruptcy

Court approved the U.S. Trustee's application appointing Kenneth N. Klee as examiner (the

"Examiner").  On May 11, 2010, the Bankruptcy Court entered an order approving the

_____

[4]The Debtor/Committee/Lender Plan Proponents are those parties who are proponents of the First
Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the
Debtors, the Official Committee of Unsecured Creditors (the "Committee"), Oaktree Capital
Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase
Bank, N.A. ("JPMorgan") (D.I. 7136)( the "DCL Plan").

[5]Most of the Background is taken from the Joint Disclosure Statement (D.I. 7134), approved by
order dated December 9, 2010 (D.I. 7126), as amended by order dated December 16, 2010 (D.I. 7215).

[6]The "LBO-Related Causes of Action" is defined in the DCL Plan as meaning "any and all
claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance
powers or rights, liabilities of any nature whatsoever, and legal or equitable remedies against any Person
arising from the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the
purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions
involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in
connection with any such transaction, regardless of whether such claims, causes of action, avoidance
powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any
other applicable law.

2

Examiner's proposed work and expense plan and modifying the Examiner Order. The

Examiner's principal duties were to:

(1)    Evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties (as defined in the Examiner Order) in connection with the leveraged buy-out of Tribune that occurred in 2007 [defined as the LBO-Related Causes of Action] which may be asserted against any entity which may bear liability, including without limitation, the Debtors, the Debtors' former and/or present management, former and/or present members of Tribune's board of directors, the Debtors' lenders and the Debtors' advisors, said potential claims and causes of action including, but not being limited to, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and equitable subordination, and to evaluate the potential defenses asserted by the Parties to such potential claims and causes of action;

(2)    evaluate whether Wilmington Trust Company violated the automatic stay under 11 U.S.C. §362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages, and Constructive Trust; and

(3)    evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JP Morgan Chase Bank, N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order.

The Examiner conducted in-person meetings with the parties and invited the parties to

share their views in writing on the issues to be considered by him. The Examiner was assisted,

in addition to counsel, by a financial advisor who developed a financial analysis of issues

presented, including issues concerning solvency, unreasonably small capital, the flow of funds,

and matters pertaining to intercompany claims.

On July 26, 2010, the Examiner filed a report containing the results of his investigation.

By Order dated August 3, 2010, the Court ordered the unsealing of the Examiner's Report, with

exhibits and transcripts.[7] The Examiner did not reach definitive conclusions regarding the issues

considered in the Report, but suggested a range of potential outcomes.[8] After the Examiner's

Report was filed, the April 2010 Plan and the settlement it embodied were abandoned.

The Debtors' exclusive period within which to file a chapter 11 plan and solicit

acceptances, as extended by court order, expired on August 8, 2010. After the Examiner's

Report was filed and the settlement in the April 2010 Plan was abandoned, interested parties

continued to negotiate, but failed to reach any consensus. Thereafter, the Debtors asked the

Bankruptcy Court to appoint a mediator.

On September 1, 2010, I appointed my colleague, the Honorable Kevin Gross, as a

mediator (the "Mediator") to conduct non-binding mediation concerning the terms of a plan of

reorganization, including appropriate resolution of the LBO-Related Causes of Action (the

"Mediation"). The parties to the Mediation included (i) the Debtors, (ii) the Creditors'

Committee, (iii) Angelo Gordon, (iv) the Credit Agreement Lenders, (v) the Step One Credit

Agreement Lenders, (vi) Wells Fargo Bank, N.A. (vii) Law Debenture Trust Company of New

York ("Law Debenture"), (viii) Deutsche Bank Trust Company Americas, (ix) Centerbridge

Credit Advisors, LLC, (x) Aurelius, (xi) EGI-TRB LLC, and (xii) Wilmington Trust Company

(collectively, the "Mediation Parties"). On September 20, 2010, each of the Mediation Parties

submitted to the Mediator a statement setting forth such Mediation Party's position respecting

---

[7]The Examiner's Report (volumes 1 through 4) were docketed as D.I.s 5247, 5248, 5249, and 5250. The exhibits were docketed as D.I.s 5437, 5438, 5439, 5441, 5442, 5444, 5445, 5447, 5449, 5451, 5453, 5454, 5455, 5456, 5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469, and 5480.

[8]Specifically, the Examiner framed his conclusions about the merits of various claims using the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.

the structure and economic substance of an acceptable plan of reorganization.

The Mediation began on September 26, 2010, and the Mediation Parties continued settlement discussions on September 27, 2010.  On September 28, 2010, the Mediator filed a report which, among other things, reported a settlement agreement between the Debtors, on the one hand, and Angelo Gordon and Oaktree, on the other.  The Mediator continued settlement discussions with certain parties. On October 12, 2010, the Mediator filed the Mediator's Second Report which included  the terms of an expanded settlement among the Debtors, the Committee, Oaktree, Angelo Gordon, and JP Morgan (the "October Term Sheet").

Pursuant to the deadlines set forth in the Bankruptcy Court's Order dated October 18, 2010 (D.I. 6022), four competing plans of reorganization were filed: (i) the Debtor/Committee/ Lender Plan, (ii) the Noteholder Plan, (iii) the Bridge Lender Plan[9], and (iv) the Step One Credit Lender Plan.[10]  The Step One Credit Lender Plan was withdrawn on December 14, 2010 (D.I. 7190).  Pursuant to the procedures set forth in the Order dated December 9, 2010 (D.I. 7126), as amended by Order dated December 16, 2010 (D.I. 7215), the three competing plans were distributed for solicitation and voting.

On December 20, 2010, the Bankruptcy Court entered the Discovery and Scheduling Order for Confirmation (the "Case Management Order" or "CMO").  The parties commenced discovery, which was quickly followed by a number of discovery disputes.  Through various

---

[9]The Bridge Lender Plan is the Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (D.I. 7089)(as the same may be amended from time to time, the "Bridge Lender Plan").

[10]The Step One Lender Plan is the First Amended Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (D.I. 6683).

"meet and confer" conferences, the parties resolved many of these disputes. However, when they reached an impasse on certain discovery matters, the parties sent letters to the Court, as called for in the CMO. After a teleconference held on January 10, 2011, the Court directed the parties to file discovery motions on or before January 14, 2011, with replies due by January 19, 2011. Seven discovery motions were filed, and a hearing to consider them was held on January 24, 2011. The parties are continuing efforts to resolve some of the discovery issues, and some motions have been continued to February 8, 2011. Even so, new disputes continue to arise.

At the January 24, 2011 hearing, the Court heard argument regarding the Motion to Compel, and took the matter under advisement.

DISCUSSION

The Noteholder Plan Proponents (the "Noteholders") are seeking production of documents from the DCL Plan Proponents about the proposed settlement of the LBO-Related Causes of Action embodied in the DCL Plan. To test the arms-length nature and good faith of the settlement negotiations, the Noteholders are seeking documents and communications regarding the parties' discussions concerning the merits of the LBO-Related Causes of Action, specifically in connection with negotiations concerning the DCL Plan, the April 2010 Plan, and any other negotiations during the bankruptcy case.

The parties met and conferred in an attempt to limit the scope of the Noteholders' discovery requests and the objections thereto, but three main objections to discovery remain:

(1)    objections to producing documents protected by a common interest privilege,

(2)    objections to producing documents protected by the Mediation Order, Local Bankruptcy Rule 9019-5(d), and Fed.R.Evid. 408, and

6

(3)     objections to producing documents for the period December 8, 2008 (the petition

date) through December 15, 2009 (the date of the Document Depository Order).[11]

(1)     Community of Interest (or Common Interest) Privilege[12]

The Noteholders argue that the common interest privilege cannot apply in connection

with the settlement and DCL Plan because the parties have no common legal interests.  The

Debtors' and Committee's interests are in maximizing the estate, and the Lenders' interest is in

paying as little as possible to resolve the LBO-related claims.

The DCL Plan Proponents argue in response that "parties to a settlement or proponents of

a plan of reorganization share a common legal interest in gaining court approval of the plan and

settlement pursuant to section 1129 of the Bankruptcy Code and Rule 9019 of the Federal Rules

of Bankruptcy Procedure."

In *Leslie Controls*, Judge Sontchi discussed the common interest privilege as follows:

> The common interest doctrine "allows attorneys representing different clients
> with similar legal interests to share information without having to disclose it to
> others." [*Teleglobe*, 493 F.3d at 364.]  It expands the reach of the attorney-client
> privilege and the work product doctrine by providing that, under certain
> circumstances, the sharing of privileged communications with third parties does
> not constitute a waiver of the privilege.  Thus, the doctrine is only applicable if an
> underlying privilege has been established. [*Louisiana Mun. Police Emp. Ret. Sys.
> v. Sealed Air Corp.*, 253 F.R.D. 300, 309 (D.N.J. 2008).]

---

[11]The Document Depository Order (D.I. 2858) authorized the Debtors to establish and maintain a
centralized document depository program to store certain documents produced to the Committee in
connection with the Committee's investigation and analysis of the LBO-Related Causes of Action.

[12]In *Teleglobe*, the Court distinguished between  "common interest" (i.e., when multiple clients
hire the same counsel to represent them on a matter of common interest), and "community of interest"
(i.e., when clients with separate attorneys share otherwise privileged information in order to coordinate
their legal activities).  *In re Teleglobe Commc'n Corp.*, 493 F.3d 345, 359 (3d Cir. 2007).   While the
matter before me falls into the "community of interest" category, the parties, here, as well as many courts,
refer to the multiple attorney situation as "common interest" privilege.

> **The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege was not otherwise waived.** [*In re Mortg. & Realty Trust,* 212 B.R. 649, 653 (Bankr.C.D.Cal. 1997).]
>
> . . . .
>
> [T]he doctrine is not limited to communications among co-defendants to ongoing litigation. Indeed, "pending litigation is not necessary to invoke the common interest [doctrine][*Id.*] . . . Rather, the common interest doctrine "applies whenever the communication is made in order to facilitate the rendition of legal services to each of the clients involved in the conference." [*Id.*]
>
> The common interest of the parties must be "at least a substantially similar legal interest." [*Teleglobe,* 493 F.3d at 365]. Nonetheless, the parties need not be in complete accord:
>
>> The common interest privilege does not require a complete unity of interests among the participants. The privilege applies where the interests of the parties are not identical, and it applies even where the parties' interests are adverse in substantial respects. The privilege applies even where a lawsuit is foreseeable in the future between co-defendants. [*Mortg. & Realty Trust,* 212 B.R. at 653.]
>
> When the interests of the parties diverge to some extent the common interest doctrine applies "only insofar as their interests [are] in fact identical; communications relating to matters as to which they [hold] opposing interests . . . lose any privilege."[*In re Rivastigmine Patent Litig.,* 2005 WL 2319005, *4 (S.D.N.Y. Sept. 22, 2005).]

*In re Leslie Controls, Inc.,* 437 B.R. 493, 496-98 (Bankr.D.Del. 2010)(emphasis added).

Even though the DCL Plan Proponents' interests are not completely in accord, they share the common legal interest of obtaining approval of their settlement and confirmation of the DCL Plan, thereby resolving the legal disputes between and among them. *See also Teleglobe,* 493 F.3d at 365-66 ("[I]t is sufficient to recognize that members of the community of interest must share at least a substantially similar legal interest. . . . In the community of interest context, . . . because the clients have separate attorneys, courts can afford to relax the degree to which

8

clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer."). Accordingly, the community of interest privilege can apply to parties whose interests are not totally in accord.

The Third Circuit has held that parties engaged in a merger negotiation may share a common interest. *Teleglobe*, 493 F.3d at 364 (noting that the common interest doctrine applies in civil and criminal litigation, and even in purely transactional contexts)). *See also Sealed Air*, 253 F.R.D. at 310 (parties engaged in a transaction may anticipate future claims that they share an interest in defending against, which can form the basis of a common interest privilege). Common interests must be determined on a case by case basis. In *Leslie Controls*, Judge Sontchi held that parties who shared information regarding "preserving and maximizing insurance available to pay asbestos claims" during the plan negotiation process shared the common interest of maximizing the asset pool. *Leslie Controls*, 437 B.R. at 502. I am satisfied that, based upon the chronology of events which took place in connection with the mediation, a community of interests was established.

    (A)    <u>Date the community of interest privilege began</u>

The question of **when** a community of interest privilege arose remains. The DCL Plan Proponents argue that a common interest among the Debtors, Committee, and lenders arose on October 12, 2010, when the mediator filed the October Term Sheet. The Debtors, Oaktree and Angelo Gordon also assert that their common interest began as early as September 27, 2010, when they agreed to resolve the LBO-Related Causes of Action and became proponents of a joint plan, pursuant to the Mediator's filing of the first Term Sheet on that date.

The Noteholders argue that no common interest privilege could arise until November 23,

2010, when the DCL Plan was actually filed with the Court. The Noteholders argue that the Term Sheet filings do not establish the emergence of a common interest because the parties continued to negotiate and certain terms changed. For example, they argue that the October Term Sheet relied on a Distributable Enterprise Value ("DEV") of $6.1 billion, while the final DCL Plan refers to a DEV of $6.75 billion. The DCL Plan Proponents respond by stating that DEV was not a material negotiated term, and was changed (ironically, they say) to address objections of the Noteholders.

Once the DCL Plan Proponents agreed upon material terms of a settlement, it is reasonable to conclude that the parties might share privileged information in furtherance of their common interest of obtaining approval of the settlement through confirmation of the plan. I conclude that the date the Mediator's Term Sheets were filed - - October 12, 2010 for all DCL Plan Proponents, and September 27, 2010 for the Debtor/Oaktree/Angelo Gordon group - - constitute dates upon which the respective parties' community of interest privilege arose.[13]

(B)    Dispute concerning specific documents covered by the community of interest privilege

The Noteholders and the DCL Plan Proponents also disagree about the scope of communications that are covered by the community of interest privilege. In particular, the Noteholders argue that "common interest communications" should include only communications

---

[13]Of course, this does not mean that every communication between the DCL Plan Proponents occurring after those dates is privileged. Any party asserting privilege first must demonstrate that the communication at issue is subject to an underlying attorney-client or work product privilege, and that sharing the communication with the common interest parties meets the three-part test adopted by Judge Sontchi in *Leslie Controls* from the *Mortg. & Realty Trust* decision: (i) the communication was made by separate parties in the course of a matter of common interest, (ii) the communication was designed to further that effort, and (iii) the privilege was not otherwise waived.

that were written or made by lawyers,[14] citing *Teleglobe* in support of this view:

> First, to be eligible for continued protection, the communication must be shared
> with the *attorney* of the member of the community of interest. *Cf. Ramada Inns,*
> *Inc. v. Dow Jones & Co.,* 523 A.2d 968, 972 (Del.Super.Ct. 1986)(emphasizing
> that the relevant Delaware evidentiary rule protects communications disclosed to
> an attorney). Sharing the communication directly with a member may destroy the
> privilege.

*Teleglobe*, 493 F.3d at 364 (emphasis in original).  The DCL Plan Proponents point out that the

*Teleglobe* Court itself notes that this language is dicta.[15]

---

[14]The Noteholders' proposed definition of what might be protected "Common Interest
Communications" is as follows:

> "Common Interest Communications" means oral, written or electronic communications,
> draft pleadings, briefs, plans, disclosure statements or correspondence exchanged
> between counsel and/or non-testifying financial advisors to two or more different parties
> within a Common Interest Relationship and not disclosed or provided to any Person
> outside the Common Interest Relationship provided, however, that qualifying
> communications shall not lose their status as Common Interest Communications merely
> because clients of such outside counsel received any such written or electronic
> communications, or listened to or were told of any such oral communications. Common
> Interest Communications do not include written, electronic or oral communications by
> persons other than outside counsel or non-testifying financial advisors for different
> parties, or written, electronic or oral communications internal to any one party or any one
> financial advisor.

Revised Proposed Common Interest Stipulation and Order (D.I. 7587).

[15]*See Teleglobe*, 493 F.3d at 363 n.18 stating that the issue before the court involved clients of the
same attorneys, not clients with separate counsel, and therefore the community of interest analysis may
seem "surplusage." However, because the lower court erroneously ruled that the parties before it were in
a community of interest, the Third Circuit Court explained how the community of interest and co-client
privilege differ. *Id.* This guidance is helpful.

The *Teleglobe* Court also considered the "plain text" of a Delaware rule of evidence in its
community of interest analysis. Delaware Rule of Evidence 502(b)(3) recognizes that a client has a
privilege to protect from disclosure confidential communications "made for the purpose of facilitating the
rendition of professional legal services to the client by the client or the client's representative or the
client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing
another in a matter of common interest." *See Rembrandt Tech. LP v. Harris Corp.,* 2009 Del.Super.
LEXIS 46, *25 (Feb. 12, 2009), in which the Delaware Superior Court determined that "separately
represented clients sharing a common legal interest may, at least in certain situations and under the close
supervision of counsel, communicate directly with one another regarding that shared interest." *Id.* at *30.
The *Rembrandt* Court further decided that "the privilege may be extended to communications among the
community of interest if the communications relate to that common interest." *Id.* at *31.

11

The community of interest doctrine applies only if the underlying communication was subject to the attorney-client privilege or the work product doctrine. The attorney-client privilege "protects communications between attorneys and clients from compelled disclosure" and applies to a communication that satisfies the following elements: (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. *Teleglobe*, 493 F.3d at 359 *citing* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §68 (2000). "Privileged persons" include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Id.* "When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege." *WebXchange, Inc. v. Dell Inc.*, 264 F.R.D. 123, 126 (D.Del. 2010) *quoting Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3d Cir. 1991).

The Third Circuit has adopted a two-part test for ascertaining whether a document is protected by the work product doctrine: (1) the first inquiry is the "reasonable anticipation test," which requires that the court determine whether "litigation could reasonably have been anticipated" (2) the second inquiry is whether the document were prepared "primarily for the purpose of litigation (i.e., documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work product doctrine. *Sealed Air,* 253 F.R.D. at 306-07.

The DCL Plan Proponents argue that the Noteholders' proposal to limit "common interest communications" to those prepared by lawyers limits artificially the community of

12

interest privilege and would needlessly increase legal costs by requiring parties to funnel all

communications through their attorneys.  They contend that the appropriate inquiry is whether

the subject matter of the communication at issue would be protected by the attorney-client or

work product privilege but for its disclosure to a party with the common interest.[16]  I agree. The

Noteholders' proposal to limit common interest communications to attorney-prepared

communications is too restrictive.  The DCL Plan Proponents will have the opportunity to assert

(and, ultimately demonstrate, if challenged) that requested communications fall within the

community of interest privilege.


2.    Whether the DCL Plan Proponents must either (i) waive protections of the Mediation

      Order and Local Rule 9019-5(d), or (ii) be precluded from introducing any evidence

      regarding the mediation, including the Mediator's endorsement of the settlement or

      arguing that the DCL Plan was the result of arm's length bargaining

      The Noteholders assert that they are seeking documents and communications related to

the Mediation to assess (and challenge) the alleged arms-length nature of the settlement

negotiations for the LBO-Related Causes of Action, and the degree to which the Debtors and

Committee acted in good faith as estate fiduciaries to maximize recoveries for non-LBO lenders.

---

[16]The DCL Plan Proponents propose the following language for the definition of "Common
Interest Communications" in the proposed Common Interest Stipulation:
      "Common Interest Communications" means oral, written or electronic communications, draft
      pleadings, briefs, plans, disclosure statements or other correspondence exchanged solely between
      parties within a Common Interest Relationship that, if only exchanged between or among a single
      party, its counsel and/or advisors, would have been protected from discovery by any applicable
      attorney-client privileges or work product protections.
DCL Plan Proponents Objection, D.I. 7552, Ex.3.

The Noteholders argue that the DCL Plan Proponents put such discovery "in issue" by arguing

that the proposed settlement is fair because it is the product of a mediation conducted by a

judge.[17]  In other words, the Noteholders argue, it is not fair to allow the DCL Plan Proponents to

use the Mediation Order as a sword and a shield. *See Westinghouse,* 951 F.2d at 1426 n.12 ("If a

partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the

disclosing party to present a one-sided story to the court, the privilege will be waived as to all

communications on the same subject .").

    The DCL Plan Proponents respond that they have offered to waive part of the protections

of the Mediation Order[18] by proposing that only the following documents or communications be

protected from discovery:

--------

[17]I suppose it is conceivable that *who* conducted a mediation may, under some presently
unknowable circumstances, be relevant to a determination of whether a settlement should be approved.  I
have the deepest respect for my colleague, who willingly undertook this challenging mediation, but I am
aware of nothing in the record before me which informs me that this factor should be accorded any
special weight.  Whether a settlement should be approved or a plan confirmed must rest upon the
application of standards articulated in the Bankruptcy Code and by controlling decisional law.

[18]The Mediation Order provides that:

7.    All: (a) discussions among the Mediation Parties relating to the Mediation, including
      discussions with or in the presence of the Mediator, (b) Mediation Statements, Ownership
      Statements and any other documents or information provided to the Mediator or the
      Mediation parties in the course of the Mediation, (c) correspondence, draft resolutions,
      offers, and counteroffers produced for or as a result of the Mediation, and (d)
      communications between the Mediator and the Examiner or the Examiner's Professionals
      are strictly confidential and shall not be admissible for any purpose in any judicial or
      administrative proceeding, and no person or party participating in the Mediation,
      including counsel for any Mediation Party or any other party, shall in any way disclose to
      any non-party or to any court, including without limitation in any pleading or other
      submission to any court, any such discussion, Mediation Statement, Ownership
      Statement, other document or information, correspondence, resolution, offer or
      counteroffer which may be made or provided in connection with the Mediation.  Except
      with the express consent of the affected Mediation party, the Mediator shall not share
      with any Mediation Party any other Mediation Party's Mediation Statement or Ownership
      Statement.

D.I. 5591, ¶7.

1.    written or oral communications between a "Mediation Party" and Judge Gross;

2.    written or oral communications between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day (i.e., a day when Judge Gross convened a Mediation Session between two or more Mediation Parties)

3.    written or oral communications reflecting the substance of any discussion between or among Mediation Parties on a Mediation Day or documenting any offers or counter-offers exchanged or agreements reached on a Mediation Day; and

4.    written or oral communications between Judge Gross and the Examiner or the Examiner's professionals concerning the Mediation

The DCL Plan Proponents argue that this proposal provides adequate discovery to the Noteholders to assess whether the settlement was at arms-length, while preserving the confidentiality of the Mediation because it permits discovery of (i) communications relating to negotiation and abandonment of the April Plan, (ii) communications prior to the mediation, and (iii) most communications between the Mediation Parties that occurred outside the presence of the Mediator on a day that is not a Mediation Day. It also allows discovery into the Mediation *process*, but protects the *substance* of the Mediation discussions.

In *Dent v. Westinghouse*, 2010 WL 56054 (E.D.Pa. Jan. 4, 2010), Magistrate Judge Hey discussed the "crossroads" of Fed.R.Civ.P. 26 (which allows discovery of relevant information, even if that information is not admissible at trial, as long as it appears reasonably calculated to lead to admissible evidence) and Fed.R.Evid. 408 (providing that information regarding settlements and negotiations is inadmissible if offered to prove liability for, or invalidity of, the amount of a claim). The *Dent* Court joined judges in this circuit who require a party requesting discovery about a settlement to make a particularized showing that the evidence related to settlement is relevant and calculated to lead to the discovery of admissible evidence. *Id.* at *1.

15

There is a strong policy in promoting full and frank discussions during a mediation.

Courts have recognized that confidentiality is essential to the mediation process:

> Absent the mediation privilege, parties and their counsel would be reluctant to lay
> their cards on the table so that a neutral assessment of the relative strengths and
> weaknesses of their opposing positions could be made.  Assuming they would
> even agree to participate in the mediation process absent confidentiality,
> participants would necessarily "feel constrained to conduct themselves in a
> cautious, tight-lipped, non-committal manner more suitable to poker players in a
> high-stakes game than to adversaries attempting to arrive at a just resolution of a
> civil dispute."  The effectiveness of mediation would be destroyed, thereby
> threatening the well established public needs of encouraging settlement and
> reducing court dockets.

*Sheldone v. Pennsylvania Turnpike Comm'n*, 104 F.Supp.2d 511, 514 (W.D.Pa. 2000) (citations

omitted) *quoting Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608, 928, 930 (2d Cir.

1979).  This policy is also reflected in Local Delaware Bankruptcy Rule 9019-5(d).[19]

---

[19]Local Bankruptcy Rule 9019-5(d) provides, in pertinent part:

(d)  Confidentiality of Mediation Proceedings.

  (i)  Protection of Information Disclosed at Mediation.  The mediator and the
  participants in mediation are prohibited from divulging, outside of the mediation,
  any oral or written information disclosed by the parties or by witnesses in the
  course of the mediation.  No person may rely on or introduce as evidence in any
  arbitral, judicial or other proceeding, evidence pertaining to any aspect of the
  mediation effort, including but not limited to: (A) views expressed or suggestions
  made by a party with respect to a possible settlement of the dispute; (B) the fact
  that another party had or had not indicated willingness to accept a proposal for
  settlement made by the mediator; (C) proposals made or views expressed by the
  mediator; (D) statement or admissions made by a party in the course of the
  mediation; and (E) documents prepared for the purpose of, in the course of, or
  pursuant to the mediation.  In addition, without limiting the foregoing, Rule 408
  of the Federal Rules of Evidence, any applicable federal or state statute, rule,
  common law or judicial precedent relating to the privileged nature of settlement
  discussions, mediations or other alternative dispute resolution procedures shall
  apply.  Information otherwise discoverable or admissible in evidence does not
  become exempt from discovery, or inadmissible in evidence merely by being
  used by a party in the mediation.

  . . . .

  (iv)  Preservation of Privileges.  The disclosure by a party of privileged information to
  the mediator does not waive or otherwise adversely affect the privileged nature of
  the information.

16

The Noteholders agree, as they must, that discussions with the Mediator are confidential, but complain that barring discovery of communications between Mediation Parties on a Mediation Day might protect discussions by Mediation Parties who are not actively participating in the Mediation that day, which would be discoverable if held on a non-Mediation Day. The DCL Plan Proponents' proposal to limit the protected Mediation communications generally strikes an appropriate balance between allowing discovery of potentially relevant information and protecting the confidentiality of the mediation.

This chapter 11 case is complex, involving a large, national media company, administration of which has been full of acrimony among the various constituents. The central disputes surround challenges to an $8 billion prepetition leveraged buyout. This particular mediation involved twelve parties consisting of multiple interests owed collectively billions of dollars of debt, falling into different tranches among the various Debtors. In balancing these vastly competing interests, I conclude that the DCL Plan Proponents' proposal is reasonable, but further conclude that it is appropriate to adjust it slightly and protect those "written or oral communication between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day" (*see* #2 of the DCL Plan Proponents proposal, *supra*), but only if the communications are between Mediation Parties who were present at the Mediation or were participating in the Mediation off-site. The protections afforded by the Mediation Order, Fed.R.Evid. 408, and Local Rule 9019-5 will otherwise remain.

17

3.     Whether the reasonable "start date" for discovery requests is the Petition Date (December

8, 2008) or the date of the Document Depository Order (December 15, 2009)?

The Noteholders believe that they should be able to reach back to the petition date to

discover information relevant to their opposition to confirmation of the DCL Plan.  The

Noteholders offer examples of hypothetical emails that may have occurred between parties prior

to December 15, 2009, but would not be produced just because of the proposed "random" start

date.[20]  The Noteholders argue that it is possible that in the immediate wake of Tribune's

business failure, key persons involved in the transactions might have assessed what went wrong

or engaged in some degree of finger-pointing.  Further, the Committee's investigation began in

Spring 2009, months before the proposed December 15, 2009 start date.  Because approval of the

LBO settlement is part of plan confirmation, the Noteholders claim they are entitled to discovery

of all potential settlement discussions during the chapter 11 case.

The DCL Plan Proponents argue that December 15, 2009 is a reasonable and logical

discovery start date because most of the events relevant to the negotiation and settlement of the

LBO-Related Causes of Action occurred *after* the Court entered the Document Depository

Order.  The DCL Plan Proponents argue that this date is even earlier than what might also be

considered a reasonable discovery start date of September 2010 - - which is when negotiations

for the current DCL Plan began after the Examiner's Report and the Mediation.  They also argue

---

[20]On December 15, 2009, the Court entered the Document Depository Order (D.I. 2858) which authorized the Debtors to establish and maintain a centralized document depository related to the LBO-Related causes of action and provided that written and oral communications between "Negotiating Parties" regarding the leveraged ESOP Transactions "shall be deemed confidential" and may not be used or disclosed except in connection with settlement discussions and may not be introduced at any trial or hearing.  Following entry of that order, the Debtors and a number of parties participated in negotiations which resulted in a proposed settlement embodied in the April 2010 Plan.

18

that using December 15, 2009 will help to limit the costs of an already massive document production. Finally, the DCL parties argue, persuasively, that discovery regarding the merits of the LBO-Related Claims is "well trodden ground" that has been investigated by and comprehensively addressed by the Examiner.

"Discovery of relevant, nonprivileged . . . [information] is limited if the party from whom discovery is sought establishes that it is unreasonably cumulative or duplicative or that the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed.R.Civ.P. 26(b)(2)(B)." *Helmert v. Butterball, LLC*, 2010 WL 2179180, *3 (E.D.Ark. 2010).

On balance, the proposed discovery start date of December 15, 2009 will allow discovery regarding LBO settlements, while limiting the burden and expense of completing discovery within the time frame provided by the CMO. The Noteholders have not demonstrated that an earlier discovery start date is likely to yield admissible, relevant information needed to litigate approval of the proposed settlement and plan confirmation.

## EPILOGUE

Lest this decision be read too broadly, I add a cautionary note: A determination involving whether a community of interest privilege applies is an intensely fact-and-circumstance-driven exercise. The balancing of tensions which arise during the search for truth may, depending upon the particular circumstances involved, fall either way. Guided by Circuit precedent, other persuasive decisional law, applicable local rule, and orders governing mediation, I have decided that the matter before me involves circumstances warranting a determination that a community of interest privilege may be invoked by co-proponents of a plan. This is not to say that parties who are co-proponents of a plan or parties who reach settlements arising from mediation are

19

always entitled to assert this privilege. Neither should it be said that the privilege can never be invoked unless the circumstances involve the proposal of a joint plan or a settlement resulting from mediation.

## ORDER

Upon consideration of the Motion to Compel and the objection thereto, and for the reasons set forth above, it is hereby ORDERED that the Motion to Compel is GRANTED, in part, and DENIED, in part, as follows:

(A)     The DCL Plan Proponents may assert a community of interest privilege for privileged communications that were shared among the community of interest parties in furtherance of their common interest beginning on October 12, 2010 for all DCL Plan Proponents, and September 27, 2010 for the Debtor/Oaktree/Angelo Gordon group;

(B)     The following are protected from discovery:

  (i)     written or oral communications between a "Mediation Party" and Judge Gross;

  (ii)    written or oral communications between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged by Mediation Parties who were present at the Mediation or were participating in the Mediation off-site on any Mediation Day (i.e., a day when Judge Gross convened a Mediation Session between two or more Mediation Parties);

  (iii)   written or oral communications reflecting the substance of any discussion between or among Mediation Parties who were present at the Mediation or participating in the Mediation off-site on a Mediation Day, or documenting any offers or counter-offers exchanged or agreements reached on a Mediation Day; and

  (iv)    written or oral communications between Judge Gross and the Examiner or the Examiner's professionals concerning the Mediation;

20

(C)    The Noteholder Plan Proponents may seek discovery of information for the period

of time beginning December 15, 2009; and

(D)    All other relief requested in the Motion to Compel is **DENIED**.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: February 3, 2011

cc: Norman L. Pernick, Esquire[21]

---

[21]Counsel shall serve copies of this Memorandum and Order on all interested parties and file a
Certificate of Service with the Court.

21

*6*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re:                                           :     Chapter 11
                                                 :
TRIBUNE COMPANY, et al.,[1]                      :     Case No. 08-13141 (KJC)
                                                 :
                       Debtors.                  :     Jointly Administered
                                                 :     Related to Docket No. 7423, 7767
-------------------------------------------------x
```

## ORDER APPROVING STIPULATION REGARDING USE OF
## EXAMINER'S REPORT AT THE CONFIRMATION HEARING

Upon the motion (the "Motion"),[2] of the Debtors for entry of an order approving the

stipulation regarding use of the Examiner's Report at the Confirmation Hearing; and adequate

notice of the Motion having been given as set forth in the Motion; and it appearing that no other

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

46429/0001-7278227v2

or further notice is necessary; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having determined that consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that just cause exists for the relief requested in the Motion, and that such relief is in the best interests of the Debtors, their estates, their creditors and the parties in interest; and upon the record in these proceedings; and after due deliberation it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1.    The relief requested in the Motion is GRANTED.

2.    The Stipulation, a copy of which is attached hereto as <u>Exhibit 1</u>, is APPROVED.

3.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: February __, 2011
         Wilmington, Delaware

THE HONORABLE KEVIN J. CAREY
CHIEF UNITED STATES BANKRUPTCY JUDGE

46429/0001-7278227v2

**EXHIBIT 1**
**(Stipulation)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

## STIPULATION REGARDING USE OF EXAMINER'S REPORT
## AT THE CONFIRMATION HEARING

WHEREAS on May 11, 2010, the Bankruptcy Court entered the Examiner Approval

Order [Docket No. 4320], approving the appointment of Kenneth N. Klee, Esq. as Examiner.

WHEREAS on July 26, 2010, the Examiner issued his Report.

WHEREAS the issue of the use of the Examiner's Report at the Confirmation Hearing

was raised in connection with the Court's consideration and approval of the Case Management

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

46429/0001-7277815v

Order [Docket No. 7235] and the Plan Proponent Groups at that time sought additional time to consider the issue.

WHEREAS the Plan Proponent Groups have had an opportunity to engage in such discussions and each of the Plan Proponent Groups agree that the Examiner's Report should be available for use at the Confirmation Hearing and there is agreement as to the terms by which such use should be permitted.

NOW THEREFORE IT IS HEREBY STIPULATED AND AGREED by the undersigned that the Examiner's Report should be available for use in connection with the Confirmation Hearing as follows:

1.      The opinions expressed by the Examiner (the "Examiner's Opinions") regarding the law and/or the facts will be admissible by any entity in connection with the Confirmation Hearing for all purposes to the same extent as the opinions testified to by an expert witness under the Federal Rules. The Examiner's Opinions will not be binding on the Court or any entity, nor will there be any presumption of correctness attributed to such opinions. The Court may accord the Examiner's Opinions whatever weight the Court deems is appropriate. All entities will have an opportunity to state and describe their agreement or disagreement with any of the Examiner's Opinions in their confirmation briefs in connection with the Confirmation Hearing, and to submit appropriate evidence and/or expert testimony in support of their positions during the Confirmation Hearing. For purposes of this Paragraph 1, Volume II of the Examiner's Report and pages 1 through 42 of Volume I of the Examiner's Report shall be considered the Examiner's Opinions.

2.      Statements of Historical Facts (as defined below) contained in pages 43 through 671 of Volume I of the Examiner's Report will be admissible for all purposes, including the truth of the matter asserted and will be presumed to be correct, unless disputed. Any entity may

2

dispute such statements, in accordance with Paragraph 3 below, and submit evidence in support of its position during the Confirmation Hearing.

      a.     For purposes of this paragraph, the term "Statements of Historical Facts" means facts which are capable of being verified by reference to documents or deposition or interview testimony cited by the Examiner.  For the avoidance of doubt, and consistent with Paragraph 4 *infra*, any statements cited or quoted by the Examiner that are contained in analyst reports, rating agency reports, newspaper articles, emails, other documents, or deposition or interview testimony shall be admissible to show that such statements were made, but shall not be admissible for the underlying truth of such statements, solely as a result of this Stipulation.

      b.     Notwithstanding anything in paragraph 2a above, Statements of Historical Facts do not include statements constituting or embodying (i) inferences, characterizations or assessments concerning an individual's state of mind or credibility; (ii) conclusions of law; or (iii) applications of law to fact.  Such statements shall be considered Examiner's Opinions and treated in accordance with Paragraph 1.

      3.     On January 10, 2011, the Debtors, on behalf of the Debtor/Committee/Lender Plan Proponent Group shall serve on all entities entitled to notice pursuant to paragraph 35 of the Discovery and Scheduling Order for Plan Confirmation  (the "Requesting Parties"),a copy of Volume I designating:  (a) in yellow marker all Statements of Historical Facts which the Debtor/Committee/Lender Plan Proponent Group does not dispute, and (b) in blue marker all Statements of Historical Facts which the Debtor/Committee/Lender Plan Proponent Group does

3

dispute. Those portions of the Examiner's Report that the Debtor/Committee/Lender Plan Proponent Group deems not to be Statements of Historical Fact but instead to be Examiner's Opinions should not be highlighted. On January 21, 2011, the Noteholder Plan Proponent Group, the Bridge Proponent Group, and any other Requesting Parties who wish to participate in this designation process shall serve on the other parties a copy of Volume I that is annotated to reflect any areas of disagreement with the designations of the Debtor/Committee/Lender Plan Proponent Group. Thereafter, the Plan Proponent Groups and any other Requesting Parties who wish to participate in this designation process shall meet and confer to discuss any areas of disagreement. To the extent (i) there is disagreement among the Requesting Parties regarding whether portions of the Examiner's Report constitute Statements of Historical Fact or Examiner's Opinions following these discussion and (ii) such portions become material to an issue in dispute at the Confirmation Hearing, the Court shall determine whether such portions shall be deemed Statements of Historical Fact or Examiner's Opinions. By indicating that it does not dispute particular Statements of Historical Facts, an entity does not waive any arguments concerning the relevance of those facts, the weight to be accorded to those facts, or the completeness of those facts. (For example, by not disputing that a document includes a particular statement, a party does not waive any argument that the same document includes other statements.) Additionally, all entities reserve the right to submit amended designations to the extent such amendments are (i) based on newly discovered evidence produced during the course of discovery; or (ii) intended to correct any errors in the original designation process.

    4.    The documents and transcripts relied upon by the Examiner will be deemed authentic. Subject to any further stipulations or orders of the Court, all other objections to the introduction into evidence or use of those documents and transcripts are preserved.

46429/0001-7277815v

5.      This stipulation shall apply only to the Confirmation Hearing.  To the extent there

are further proceedings with regard to the LBO-Related Causes of Action, all entities' rights

regarding the admissibility of any part of the Examiner's Report are reserved.

Dated:  January_, 2011

SIDLEY AUSTIN LLP
James F. Conlan
James F. Bendernagel, Jr.
Ronald S. Flagg
James W. Ducayet
One South Dearborn Street
Chicago, IL  60603
Telephone: (312) 853-0199
Facsimile: (312) 853-7036

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

/s/
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

Counsel for Debtors and Debtors In Possession

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
Thomas J. McCormack
Marc D. Ashley
30 Rockefeller Plaza
New York, NY  10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

LANDIS RATH & COBB LLP

/s/
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

Counsel for the Official Committee of Unsecured Creditors

5

46429/0001-7277815v

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

Special Counsel to the Official Committee of Unsecured Creditors

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian Schaïble
Elliot Moskowitz
Michael J. Russano
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4500

RICHARDS, LAYTON & FINGER, P.A.

/s/
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
One Rodney Square, 920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651 7701

Counsel for JPMorgan Chase Bank, N.A.

WILMER CUTLER PICKERING
HALE & DORR LLP
Andrew N. Goldman
Dawn Wilson
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800

Counsel for Angelo, Gordon & Co., L.P.

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone: (213) 694-1200

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

/s/
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, DE 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.

6

46429/0001-7277815v

AKIN GUMP STRAUSS HAUER & FELD
LLP
Daniel H. Golden
Philip C. Dublin·
Deborah Newman
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000

ASHBY & GEDDES, P.A.

/s/
William P. Bowden (No. 2553)
Amanda M. Winfree (No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888

Counsel for Aurelius Capital Management, LP

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
Telephone: (212) 609-6800

McCARTER & ENGLISH, LLP

/s/
Katharine L. Mayer (No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
Telephone: (302) 984-6300

Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor
Indenture Trustee for certain series of Senior Notes

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Richard F. Casher
Sheron Korpus
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

BIFFERATO GENTILOTTI LLC

/s/
Garvan F. McDaniel (No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor
Indenture Trustee for certain series of Senior Notes

7

46429/0001-7277815v

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Katherine S. Bromberg
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800

SULLIVAN HAZELTINE ALLINSON LLC

/s/
William D. Sullivan (No. 2820)
Elihu E. Allinson, III (No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 428-8191

Counsel for Wilmington Trust Company, solely in its capacity as successor
Indenture Trustee for the PHONES Notes

WHITE & CASE LLP
Thomas E Lauria
David Hille
Andrew Hammond
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200

FOX ROTHSCHILD LLP

/s/
Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
Jay Strock (No. 4965)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington, DE 19801
Telephone: (302) 654-7444

Counsel for King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon
Asset Management, L.P.

8

46429/0001-7277815v