IN THE UNITED STATE BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| TRIBUNE COMPANY, et al.,[1] | ) | Case No. 08-13141 (KJC) |
| | ) | |
| Debtor, | ) | Hearing Date: March 7, 2011 at 10:00 am (ET) |
| | ) | Objection Deadline: February 15, 2011 4:00 pm (ET) |
| | ) | |
| | ) | RE: DI7136; DI7801 |

## OBJECTION OF BRIGADE CAPITAL MANAGEMENT TO "SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO GORDON & CO., L.P. AND JP MORGAN CHASE BANK, N.A. [D.I. 7801]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

OBJECTION TO SECOND AMENDED JOINT PLAN
547929v5

Brigade Capital Management, LLC ("Brigade"),[2] on behalf of its managed entities, that hold over $106 million of Senior Notes[3] of Tribune Company ("Tribune"), hereby objects to the "Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A." [D.I. 7801] (hereinafter the "DCL Plan"). Brigade is a fixed income focused SEC-registered investment advisor with over $8.1 billion in assets under management.

## INTRODUCTION

1. The contest between the two competing plans of reorganization that remain pending before the Court is *not* about reorganizing the Debtors: *Both* plans—the DCL Plan, and the Plan filed by Aurelius Capital Management and the Indenture Trustees[4] (hereinafter, the "Noteholder Plan") provide for the reorganization of the Debtors and their continued operation as viable business concerns. This similarly reflects the fact that it is *not* necessary to impose a settlement of the LBO-Related Causes of Action against the Senior Lenders and the Bridge Lenders (collectively, the "LBO Lenders") on holders of Senior Notes and PHONES Notes (collectively, the "Noteholders") in order to reorganize the Debtors.

2. Where the two plans part company is in their approach to what is basically an intercreditor dispute between: (i) holders of non-priority unsecured claims—principally claims under the Senior Notes and PHONES Notes—that were not incurred to finance the disasterous 2007 leveraged buy-out of Tribune (the "2007 LBO") ("Non-LBO Creditors"), who

---

[2] Brigade is located at 399 Park Avenue, 16th Floor, New York City, New York, 10022.

[3] All capitalized terms used in this Objection that are not otherwise defined herein or referenced to another document have the meaning set forth in the DCL Plan.

[4] "Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its Managed Entities, Deutsche Bank Trust Company Americas, In Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, In Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, In Its Capacity as Successor Indenture Trustee for the Phones Notes." [D.I. 7127]

would be the beneficiaries of prosecuting LBO-Related Causes Of Action against the LBO Lenders; and (ii) the LBO Lenders, whose claims are based on loans used to fund the 2007 LBO (and pay over $8 billion to former Tribune stockholders), and who would be defendants in such an avoidance action. The Noteholder Plan provides for the prompt reorganization of the Debtors in the most equitable manner, without imposing a settlement on either side of this dispute, and has Brigade's support. In contrast, the DCL Plan would impose on one side—the Non-LBO Creditors—a "settlement" advocated by the LBO Lenders, but which Brigade views as wholly inadequate in light of the Examiner's findings, applicable law, and the speed with which the Debtors spiraled into bankruptcy under the crushing debt load to the LBO Lenders that the 2007 LBO inflicted upon the Debtors. Brigade is not alone in this view; that settlement has been rejected overwhelmingly by both classes of Noteholders.[5]

3.  Brigade objects to the DCL Plan on the following grounds: <u>First</u>, the proposed settlement of the LBO-Related Causes of Action against the LBO Lenders under that Plan *significantly* undercompensates the holders of Senior Notes for the value of these claims and is not "fair and equitable" to the dissenting class of Senior Note claims.

4.  <u>Second</u>, to the extent that the DCL Plan may be read to preclude individual creditors from prosecuting their own state law constructive fraudulent conveyance remedies to recover billions of dollars in stock redemption payments made to the Step One Selling Stockholders and Released Step Two Stockholder Parties in the 2007 LBO, the Plan includes what amounts to illegal third party releases of creditor claims against the Step One Selling Stockholders and Released Step Two Stockholder Parties. Because the two-year

---

[5] Although the DCL Plan was accepted by 70% in number of the Senior Notes Claims voted, it was rejected by 87% in amount ($969 million out of $1.1 billion) of the Senior Notes Claims voted and was rejected unanimously by all thirty-one holders of the PHONES Notes Claims voted on the Plan, totaling almost $1.2 billion. *See* "Declaration of Stephenie Kjontvedt on Behalf Of EPIQ Bankruptcy Solutions, LLC Regarding Voting And Tabulation Of

limitations period under section 546(a) of the Bankruptcy Code (the "Code) expired without any suit having been filed on behalf of Tribune's Estate to recover payments made to stockholders whose stock was redeemed as part of the 2007 LBO (collectively, "Selling Stockholders") as constructive fraudulent conveyances, that Estate simply has no viable cause of action to recover those payments as constructive fraudulent transfers. Under applicable case law, because Tribune's Estate has no such cause of action, individual creditors retained their separate state law claims to recover such payments as constructive fraudulent transfers, even after the Petition Date. Those claims being to individual creditors, not the Tribune's Estate. The DCL Plan cannot release, or preclude the assertion of, creditor claims that do not belong to, and are not derived from, any Estate.

5.       Third, the DCL Plan gratuitously limits the liability of non-Released Parties in actions brought by the Litigation Trust for the benefit of holders of Senior Notes and other creditors, by limiting the creditors' potential recovery through the Litigation Trust to amounts sufficient to pay "Allowed" claims, *without* any post-petition interest. This limitation effectively (and gratuitously) "caps" the potential recovery of the Litigation Trust from non-Released Parties. There simply is no justification for so limiting the potential liability of the non-Released Parties who will be sued by the Litigation Trust.

## ARGUMENT

A.   **The Proposed Settlement Of The LBO Related Causes Of Action Against The LBO Lenders Is Not "Fair And Equitable"**

---

Ballots Accepting And Rejecting The Joint Plans Of Reorganization Proposed For Tribune Company and its Subsidiaries." [D.I. 7918]

OBJECTION TO SECOND AMENDED JOINT PLAN -4-
547929v5

6.     The proposed settlement of the LBO-Related Causes of Action against the LBO Lenders is projected to result in a recovery of less than 34% of their claims (excluding post-petition interest) by holders of Senior Notes.[6] To place this recovery in perspective, Brigade understands that (i) if fraudulent conveyance actions against the lenders in Step One (as defined in the Examiner's Report) of the 2007 LBO (the "Step One Lenders") and the lenders in Step Two (as defined in the Examiner's Report) of the 2007 LBO (the "Step Two Lenders") were both unsuccessful, holders of Senior Notes would recover approximately 5% of their claims; and (ii) the successful prosecution of fraudulent conveyance claims against *either* the Step One Lenders *or* the Step Two Lenders (if Step One Lenders were precluded from benefitting from the remedies against Step Two Lenders because of the Step One Lenders' own involvement in financing the 2007 LBO) would result in the Senior Noteholders' receipt of 100% of their claims *plus* post-petition interest. Brigade, like a substantial majority in dollar amount of Senior Noteholders voting on the DCL Plan, is willing to take this calculated risk. Particularly in light of the findings made in the Report of Kenneth N. Klee, as Examiner (hereinafter, the "Examiner's Report"), Brigade believes that its interests as a holder of Senior Notes are best served by pursuing the recovery of par plus accrued interest through the prosecution of the LBO-Related Causes of Action against the LBO Lenders, rather than accepting a substantially inadequate fraction of this amount under the proposed settlement.

7.     When evaluating a proposed settlement under a plan, "the Bankruptcy Court [must] determine that a proposed compromise forming part of a reorganization plan is fair and equitable." *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003). To determine

---

[6] This amount may be augmented by recoveries through the Litigation Trust or the Creditors' Trust, or the prosecution of state law fraudulent conveyance claims against selling stockholders by individual creditors who have opted out of assigning such claims to the Creditors' Trust.

whether a settlement is fair and equitable, courts in the Third Circuit consider four factors: "(1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [sic] and (4) the paramount interest of the creditors." *Exide Techs.*, 303 B.R. at 67 (citing *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002)); see also *Will v. Nw. Univ. (In re Nutraquest)*, 434 F.3d 639, 645 (3d Cir. 2006) (tracing the origin of these four factors). The burden is on the proponent to establish that the settlement should be approved. See *In re Grand Prix Assocs. Inc.*, 2009 Bankr. LEXIS 1779, at *15, 2009 WL 1850966, at *5 (Bankr. D.N.J. June 26, 2009).

8. <u>Probability of Success on the Merits</u>. As indicated, in the event of the successful prosecution of the fraudulent conveyance claims against *either* (i) the Step One Lenders or (ii) the Step Two Lenders (with Step One Lenders not participating in the benefit of that litigation), holders of Senior Notes would recover par plus accrued interest—as opposed to recovering less than one-third of that amount under the DCL Plan. Based on the Examiner's findings, the proposed settlement *significantly* undercompensates holders of Senior Notes for the claims being settled and the potential value which they lose under that settlement.

9. Brigade anticipates that, at most, the proponents of the settlement may convince the Court that the evidence is inconclusive as to the likelihood of the plaintiffs' or the defendants' success on the merits of this litigation. In such an inconclusive situation, it is particularly appropriate to look to the vote of the creditors with an economic interest in the plaintiffs' recoveries (as distinguished from the vote of the potential defendants in that suit) in deciding whether to confirm the Plan. *Cf. Exide Techs.*, 303 B.R. at 69-71.

10. <u>The Likely Difficulties in Collection.</u> To the extent that the LBO-Related Causes of Action seek to avoid the LBO Lender debt, "collection" is not an issue. Further, as to the recovery of payments of principal and interest made on the avoided LBO Lender debt, it is

highly unlikely that the settlement proponents will establish that any meaningful portion of that recovery would not be collectible.

11. <u>The Complexity of the Litigation Involved, And the Expense, Inconvenience, and Delay Necessarily Attending It</u>. Although the settlement proponents will surely argue that the prosecution of the LBO-Related Causes of Action against the LBO Lenders will involve complex issues, cost and delay, "[t]hese elements are present in most litigation" and cannot of themselves justify a settlement. *Exide Techs.*, 303 B.R. at 71; *see In re Resorts Int'l, Inc.*, 145 BR. 412, 451 (Bankr. D.N.J. 1990) (noting that "the Supreme Court in [*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)] rejected the notion that claims that the alternative was extensive litigation at heavy expense and unnecessary delay was sufficient to conclude that a settlement was 'fair and equitable'").

12. Moreover, any claim of the settlement proponents that the settlement will avoid costly, complex and time consuming litigation rings particularly hollow in this case and borders on hypocrisy: The DCL Plan *itself* specifically contemplates the prosecution by the Creditors' Trust (or individual creditors who elect to opt out of the Creditors' Trust) of state law constructive fraudulent conveyance actions against Step Two Selling Stockholders and the prosecution by the Litigation Trust of the Non-Released LBO-Related Causes of Action.[7] These litigations will involve much of the same factual and legal issues as would prosecution of the LBO Related Causes of Action against the LBO Lenders; and the DCL Plan even contemplates that the Debtors will loan the Creditors' Trust and Litigation Trust millions of dollars to pay for

---

[7] Moreover, complex constructive fraudulent conveyance litigation will also likely proceed against the Step One Selling Stockholders, regardless of any settlement of claims against the LBO Lenders under the Plan. As set forth in section B, *infra*, individual creditors retain the right to pursue state law constructive fraudulent conveyance claims against Step One Selling Stockholders as well.

OBJECTION TO SECOND AMENDED JOINT PLAN -7-
547929v5

the costs of prosecuting that litigation. *See* Plan § 5.13.[8] Ironically, the very LBO Lenders who will be released from LBO-Related Causes of Action against them under the proposed settlement (and who will presumably tell the court about the complexity, cost and delay of prosecuting those causes of action against *them*) will be among the purported beneficiaries of the prosecution of LBO-Related Causes of Action against defendants in the Remaining LBO-Related Causes of Action and Step Two Selling Stockholders—which will involve similar issues, complexity, cost and delay. *See generally* Plan §§ 1.1.220, 1.1.221. In short, there will be complex, costly litigation of the LBO-Related Causes of Action *whether or not* this settlement is imposed on the holders of Senior Notes, and the LBO Lenders are insulated from those claims.

13. <u>The Paramount Interest of the Creditors</u>. The Non-LBO Creditors are the economic stakeholders in the claims against the LBO Lenders that the Debtors propose to settle, and the bulk of that economic interest is held by the Noteholders—who have rejected the DCL Plan. According to the DCL Disclosure Statement, the estimated claims of Non-LBO Creditors are as follows:

| Nature of Debt | Estimated Allowed Amount |
| --- | --- |
| Senior Notes | $1.28 Billion |
| Other Parent Claims | $260-350 Million |
| PHONES Notes Claims | $760 Million to $1.2 Billion |
| General Unsecured Claims Against Subsidiaries | $85-150 Million |

*See* DCL Disclosure Statement, at 13-16.

14. The Non-LBO Creditors—particularly holders of Senior Notes and PHONES Notes—voted overwhelmingly to reject the Plan. That Plan was rejected by holders of $969 million out of the $1.1 billion of Senior Notes Claims voted and by all of the roughly $1.2 billion in PHONES Notes Claims voted. *See* p. 3, n.5, *supra*. When this resounding rejection is

---

[8] All citations to "Plan § [section #]" are to the DCL Plan.

OBJECTION TO SECOND AMENDED JOINT PLAN -8-
547929v5

juxtaposed against the other considerations outlined above, Brigade respectfully submits that the Court should defer to the creditors whose money is at stake, abide by their vote, and disapprove the Plan. *See Exide Techs.*, 303 B.R. at 70; *Comm. of Unsecured Creditors of Interstate Cigar, Co. v. Interstate Cigar Distrib., Inc. (In re Interstate Cigar Co.)*, 240 B.R. 816, 825 (Bankr. E.D.N.Y. 1999) (refusing to approve settlement advocated by creditors committee, upon the objection of the largest unsecured creditor with "the most to lose in the event the Settlement is approved" that the terms of the settlement were not fair or reasonable).

15. Although the Committee is a proponent of the DCL Plan, an examination of the Committee's composition, and the particular interests of Committee members, raises legitimate questions as to exactly in whose interests Committee members who voted to support the DCL Plan were acting when they did so. The makeup of the Committee is hardly reflective of the interests of the Non-LBO Creditors of Tribune (the parent), who have the most at stake in the LBO-Related Causes of Action against the LBO Lenders.

16. Brigade understands that, other than JPMorgan (an LBO Lender and potential defendant) and the two Indenture Trustees who serve on the Committee (and are proponents of the Noteholder Plan), the remaining members of the Committee consist of: (i) two subsidiary unsecured creditors, who will receive 100% of their allowed claims under the DCL Plan; (ii) the PBGC, the obligations to which are being assumed under that Plan; (iii) a union whose collective bargaining agreement is being assumed under that Plan and (iv) a retiree, who will presumably be one of the beneficiaries of the Retiree Claims Settlement under that Plan.[9] Thus, other than the two Indenture Trustees, no other member of the Committee has an interest

---

[9] Under the Retiree Claimants Settlement Agreement, the agreed Allowed amounts of the Retiree Claims are conditioned upon confirmation of the DCL Plan, as amended from time to time, or another plan, in each case providing for the classification and treatment of the Retiree Claims consistent with their classification and treatment under the DCL Plan. *See* DCL Disclosure Statement, at 33.

as a Tribune unsecured creditor without some collateral economic interest that is being benefitted under the DCL Plan.

**B.     To The Extent That The Plan Purports To Preclude Individual Creditors From Prosecuting Their Individual State Law Constructive Fraudulent Conveyance Claims Against Step One Selling Stockholders, The Plan Provides For Illegal Third Party Releases and Should Not Be Confirmed**

17.    Tribune paid out over *$4 billion* to Step One Selling Stockholders in the 2007 LBO. *See* Examiner's Report, Vol. 2, at 6. Prior to Tribune's bankruptcy filing, Tribune's creditors had the right to pursue state law constructive fraudulent conveyance remedies against the Step One Selling Stockholders to recover such payments, as well as such remedies to recover payments to the Released Step Two Stockholder Parties. Based on the findings in the Examiner's Report, it is fair to conclude that those claims had real value. It is highly likely that a court would find that none of the Step One Selling Stockholders or Released Step Two Stockholder Parties provided reasonably equivalent value for those payments. *Cf.* Examiner's Report, Vol. 1, at 19. Moreover, the Examiner concluded that the question of collapsing Step One and Step Two together to include the Step Two Debt (as defined in the Examiner's Report) for purposes of assessing solvency at Step One for the analogous financial conditions test of Bankruptcy Code section 548 "is relatively close" (*id.* at 16), and that if a court were to collapse Step One and Step Two and treat the Step Two Debt as a liability for solvency purposes at Step One, it is "an exceedingly close call" whether a court would conclude that the Tribune Entities were rendered insolvent in that scenario. *Id.* at 18. Clearly, the individual creditors' constructive fraudulent conveyance claims against the Step One Stockholders have real value.

18.    Importantly, as set forth below, the creditors *retained* these claims against the Step One Selling Stockholders and Released Step Two Stockholder Parties, notwithstanding the filing of these chapter 11 cases, because Tribune has no viable constructive fraudulent conveyance claim to recover the payments made to those stockholders (or any other Selling

OBJECTION TO SECOND AMENDED JOINT PLAN -10-
547929v5

Stockholders). Tribune has no such claim because of the expiration of the two-year limitation period under section 546(a) of the Code. Under applicable case law, since the Tribune Estate has no such claim, Tribune's creditors retained their individual state law constructive fraudulent conveyance claims against those stockholders—retained claims which are the *creditors'* causes of action, and not causes of action of the Estates.

19. The DCL Plan, however, might be construed to (and may have been intended by its proponents to) *preclude* individual creditors of Tribune from prosecuting their valuable claims against the Step One Stockholders and Released Step Two Stockholder Parties. If that was the design of the Plan, then it provides for an illegal third party release which renders it non-confirmable.

20. As of the Petition Date, individual creditors of Tribune and its subsidiaries had the right to pursue state law constructive fraudulent conveyance claims against, among others, both the Step One Selling Stockholders and the Released Step Two Stockholder Parties. *See generally* 720 ILL. COMP. STAT. 160/2, /5-/6, /10 (2011); N.Y. DEBT. & CRED. §§ 270, 273-75 (2011). Ordinarily, the filing of the Debtors' chapter 11 cases would have had the effect of precluding individual creditors from prosecuting individual fraudulent conveyance remedies, because the Debtors' estates would have the exclusive right to pursue essentially the same causes of action on behalf of all creditors under sections 544 and 548 of the Code. Here, however, the landscape was altered by the expiration of the two-year limitations period for a representative of Tribune's Estate to commence a constructive fraudulent conveyance action against the Selling Stockholders under section 546(a) of the Code on December 8, 2010. The effect of section 546(a) of the Code is that Tribune's Estate *has no* viable constructive fraudulent conveyance claims against the Selling Stockholders, because those claims are now time-barred.

21. Indeed, if Tribune's Estate had such constructive fraudulent conveyance claims under the Code, the gratuitous release of these claims against Step One Selling

OBJECTION TO SECOND AMENDED JOINT PLAN -11-
547929v5

Stockholders and Released Step Two Stockholder Parties who are providing no consideration would itself render the DCL Plan non-confirmable. A gratuitous release of a viable claim for no consideration is not a "settlement" or "compromise." The effect of section 546(a) of the Code, however, is that Tribune's Estate *has no* viable constructive fraudulent conveyance claims against the Selling Stockholders, because those claims are now time-barred. As a result Tribune's creditors *retained* the right to prosecute their own, independent state law constructive fraudulent conveyance remedies against the Selling Stockholders, and are not precluded by the automatic stay from doing so. These creditor claims are not claims of any Estate, are not derived from any Estate, and are not blocked by these bankruptcy cases.

22. Courts have recognized that individual creditors retain the right to prosecute their own, independent state law fraudulent conveyance actions against third party transferees from a debtor, even after bankruptcy, where the trustee does not have a viable cause of action under the Bankruptcy Code to obtain the same remedy on behalf of all creditors. For example, in *Klingman v. Levinson*, 158 B.R. 109, 111-12 (N.D. Ill. 1993), two creditors pursued a pre-petition collection action against the debtor in federal district court, in which they ultimately sought to set aside a transfer by the defendant debtor as a fraudulent conveyance under applicable state law. After the debtor filed for bankruptcy, the bankruptcy trustee failed to bring an avoidance action to recover the alleged fraudulent transfer prior to the expiration of the statute of limitations under section 546(a), and the defendants in the creditors' district court action argued that only the trustee had standing to pursue the action. *Id.* at 112-13, 113 n.3.

23. Rejecting this defense, the district court held that, "[t]he trustee's exclusive right to maintain a constructive fraudulent conveyance cause of action *expires and creditors may step in (or resume actions) when the trustee no longer has a viable cause of action.*" *Id.* at 113 (emphasis added). Since the statute of limitations had run on the trustee's right to bring an avoidance action, the creditors could pursue their individual state law avoidance claims. *Id.*

OBJECTION TO SECOND AMENDED JOINT PLAN -12-
547929v5

24. In *Barber v. Westbay (In re Integrated Agri, Inc.)*, 313 B.R. 419, 422-23 (Bankr. C.D. Ill. 2004), the trustee filed an action to avoid certain transfers under section 544(b) of the Code after the two year statue of limitations applicable to the trustee under section 546(a) had run. In so doing, the trustee argued that an unsecured creditor existed with a still-timely claim to avoid the transfers under state law. *Id.* at 423. In rejecting this argument, the court explained that not only does the trustee lose its standing to pursue avoidance claims once those claims are no longer viable, but the debtor's creditors regain that right to prosecute their own avoidance claims:

> A creditor who had the right to bring, outside of bankruptcy, a UFTA claim to recover prepetition transfers fraudulently made by the debtor, has no standing to commence or continue the suit during the bankruptcy case, until and unless the trustee relinquishes the Section 544(b) claim *or the trustee no longer has a viable cause of action.*
>
> The landscape changes, however, *once it is determined that the [trustee's] claim is no longer viable. A creditor regains standing to pursue a state law fraudulent conveyance action, in its own name and for its own benefit,* once the statute of limitations expires on the bankruptcy trustee's right to bring the claim.

*Id.* at 427-28 (emphasis added) (citations omitted) (citing *Klingman*, 158 B.R. at 113); see also *Fed. Deposit Ins. Corp. v. Davis*, 733 F.2d 1083, 1085 (4th Cir. 1984) ("Once a bankruptcy case has been closed, creditors having unavoided liens on fraudulently conveyed property can pursue their state law remedies independently of the trustee in bankruptcy."); *In re Boyer*, 354 B.R. 14, 32 (Bankr. D. Conn. 2006) (holding that upon expiration of limitations period under section 546(a), the trustee's power to avoid fraudulent transfers expired and, "[a]s a result, the [t]rustee lacks standing to settle any such causes of action"); *Dixon v. Bennett*, 531 A.2d 1318, 1323-25 (Md. Ct. Spec. App. 1987) (holding that "once the trustee's statutory time period has expired, an unsecured creditor can bring an action against a fraudulent transferee under state law

provided the state statute of limitations has not yet expired"), *overruled on other grounds by BAA, plc v. Acaccia Mut. Life Ins. Co.*, 929 A.2d 1, 15 (Md. 2007).[10]

25. Importantly, the court in *Integrated Agri.*, 313 B.R. at 438, emphasized that the trustee's federal cause of action under section 544(b), albeit based upon an actual creditor's rights under the UFTA, "is not identical to the UFTA claim that the creditor may bring in state court." The plaintiff, i.e., the party with standing to bring the claim; the applicable statutes of limitation; the allowable damages and the parties entitled to benefit from the recovery, are *all* different. Thus, the respective rights of the estate and the individual creditor with the state law fraudulent conveyance claims against the transferee are "mutually exclusive." *Id.* at 428, *see also Dixon*, 531 A.2d at 1318 ("Here, appellant is proceeding under an *independent* cause of action under state law.") (emphasis added).

26. Thus, the right of Tribune's creditors to pursue their constructive fraudulent conveyance remedies against the Selling Stockholders (whether Step One or Step Two) is an independent right, and not a function of any purported "disclaimer" by the Debtors, such as the "disclaimer" of claims against Step Two Selling Stockholders under Plan § 14.1. Tribune's Estate has nothing to "disclaim," because any constructive fraudulent conveyance claims that Tribune might have had against shareholders who received LBO stock redemption payments are now time-barred.

27. The principles outlined above make eminent sense. The only reason that the filing of a bankruptcy case generally precludes individual creditors from pursuing their individual remedies to recover fraudulent transfers by the debtor is that the trustee is given the right to pursue the same cause of action on behalf of all creditors. Where, as here, the estate does

---

[10] In *BAA*, the Maryland Court of Appeals overruled only a "portion" of the *Dixon* opinion that created a fraud exception to Maryland's statutory accountant-client privilege. *See BAA*, 929 A.2d at 15. The Court of Appeals did not address or overrule *Dixon's* holding regarding the creditor's ability to bring the fraudulent conveyance action.

not have a "viable cause of action" as a matter of law, there is nothing to preclude individual creditors from pursuing their state law remedies against the recipients of fraudulently conveyed property. Permitting individual creditors to pursue their own state law fraudulent conveyance remedies against third parties where a bankruptcy estate *does not* have a viable parallel claim that it can pursue on behalf of all creditors does no violence to the principle that generally precludes an individual creditor's avoidance action where the trustee *does* have a viable cause of action to assert parallel rights. *See Dixon,* 531 A.2d at 1325. To the contrary, blocking an unsecured creditor from invoking its state law remedies where the trustee does not have a viable parallel federal cause of action on behalf of creditors "would only serve to shield the recipients of fraudulent transfers at the expense of the unsecured creditor." *Id.*

28. With this background in mind, the DCL Plan's treatment of the individual creditors' retained state law constructive fraudulent conveyance claims against the Selling Stockholders should be considered. The Plan treats those creditor claims against the Step One Selling Stockholders and the Released Step Two Stockholder Parties very differently from those against the Step Two Selling Stockholders. In particular, the Plan purports to "disclaim" state law constructive fraudulent conveyance claims against Step Two Selling Stockholders, but not those against Step One Selling Stockholders or Released Step Two Stockholder Parties. *See* Plan § 1.1.80 (definition of "Disclaimed State Law Avoidance Claims," which specifically "shall not include any LBO-Related Causes of Action arising under state fraudulent conveyance law against any Released Parties"); *id.* at § 1.1.197(e)(iv), (vi) (defining "Released Parties" to include "the Step One Selling Stockholders" and "the Released Step Two Stockholder Parties"). In addition to specifically "disclaiming" state law constructive fraudulent conveyance claims against Step Two Selling Stockholders, the DCL Plan specifically permits individual creditors to prosecute their state law constructive fraudulent conveyance claims against the Step Two Selling Stockholders (but not Released Step Two Stockholder Parties). *See* Plan §§ 14.1, 14.3.

OBJECTION TO SECOND AMENDED JOINT PLAN -15-
547929v5

29. But it seems that the Plan has a very different fate in store for the individual creditors' state law constructive fraudulent conveyance claims against Step One Selling Stockholders and the Released Step Two Stockholder Parties. The Debtors do not "disclaim" any fraudulent conveyance claims against those Selling Stockholders, but instead *release* all of the Estates' LBO-Related Causes of Action against the Step One Selling Stockholders and the Released Step Two Stockholder Parties. *See* Plan § 11.2.1 (Debtors and Estates release "Released Parties" from LBO-Related Causes of Action); *id.* at § 1.1.197 (defining "Released Parties"). This construct seems designed to manufacture the argument that, since the Debtors did not "disclaim" the Estates' (now non-existent) constructive fraudulent conveyance claims against Step One Selling Stockholders and the Released Step Two Stockholder Parties, but instead explicitly *released* those claims, individual creditors cannot prosecute their own, independent constructive fraudulent conveyance claims against those Selling Stockholders—in effect, a third party release of the individual creditors' claims against those stockholders. If that is not the intended result of the Plan, then its proponents should make that clear. But if that is the design of that Plan, then it provides for an illegal third party release which prevents confirmation.[11]

30. At most, third party releases under a plan are permitted only in "extraordinary" circumstances. *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3rd Cir. 2000). In *U.S. Bank National Assoc. v. Wilmington Trust Co. (In re*

---

[11] Brigade believes that the term "disclaim" in the DCL Plan is a misnomer, because the effect of section 546(a) of the Code is that the Debtors *have no* constructive fraudulent conveyance claims against Step One or Step Two Selling Stockholders to "disclaim." Moreover, because section 546(a) means that the Estates have no viable constructive fraudulent conveyance claims against those Selling Stockholders, the individual creditors' constructive fraudulent conveyance claims against them survived the Debtors' chapter 11 filings. Those creditor claims are wholly independent from any such cause of action that the Debtors might have had; do not depend on any "disclaimer" by the Debtors, and cannot be released by the Debtors. Nevertheless, Brigade is raising its concerns here out of an abundance of caution.

*Spansion, Inc.)*, 426 B.R. 114, 144-45 (Bankr. D. Del. 2010), the Court identified the following factors as bearing on whether such "extraordinary circumstances" exist:

> whether (1) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release.

*Id.* at 144, *citing In re Genesis Health Ventures*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001).

31. Clearly, any purported third party release of the individual claims of creditors against Step One Selling Stockholders and Released Step Two Stockholder Parties cannot possibly pass muster under this test. First, this non-consensual release is not necessary to the success of the Debtors' reorganization—the Debtors could be reorganized without *any* settlement of the LBO-Related Causes of Action, much less this release. Indeed, the Debtors themselves have recognized that non-consensual third party releases are not necessary to their reorganization, providing for other third party releases only where there is some type of consent by the releasing creditor. *See* Plan § 11.2.2. Second, the Step One Selling Stockholders and Released Step Two Stockholder Parties have not "provided a critical financial contribution to the debtor's plan"; indeed they are contributing nothing at all. Third, for the same reason, their non-existent "financial contribution" is not "necessary to make the plan feasible"—because they are making no financial contribution, and any plan is feasible without them. Finally, the release is not fair to non-consenting creditors, because the non-consenting creditors are not receiving "reasonable compensation in exchange for the release." In fact, the holders of PHONES Notes are receiving nothing under the proposed "settlement" in the DCL Plan, and the holders of Senior Notes are receiving nothing of value from Step One Selling Stockholders and Released Step Two Stockholder Parties. This is hardly "reasonable compensation" for such a release.

C.  **The Plan Gratuitously and Improperly Limits the Recovery of the Plan Trusts From Non-Released Parties by Precluding Any Recoveries That Could Be Used to Pay Post-Petition Interest to Creditors.**

32.  Under the DCL Plan, various Estate causes of action against non-Released Parties will be transferred to the Litigation Trust, and creditors (including holders of Senior Notes) will be given beneficial interests in the Litigation Trust which will entitle them to share in that Trust's recoveries. *See generally* Plan §§ 1.1.132 (defining "Litigation Trust"); *id.* at § 1.1.135 (defining "Litigation Trust Assets"); *id.* at § 13.2 (describing transfer of causes of action to Litigation Trust). However, the DCL Plan limits the potential recovery by the Litigation Trust from non-Released Parties, by precluding beneficiaries of the Litigation Trust from recovering post-petition interest out of recoveries by the Litigation Trust. The Plan accomplishes this result by providing, in the definition of each class of Litigation Trust interests, that, "in no event shall any Holder of an Allowed Class [number and letter of class] Claim be entitled to receive payments that exceed the Allowed Amount of such Holder's Claim." *See, e.g.,* Plan § 1.1.40 (defining "Class 1E Litigation Trust Interests," representing the beneficial interests to be distributed to holders of Senior Notes). Since the "Allowed" claims of unsecured creditors against the Debtors do not include post-petition interest, *see generally* Plan § 7.4 (providing generally that, "post-petition interest shall not be paid on any Claims"), the result is a *de facto* limitation on the liability of non-Released Parties to the Litigation Trust.[12] The amount of post-petition interest on Senior Notes, should it prove recoverable through litigation recoveries from

---

[12] The DCL Plan places a similar limitation on the recovery through the Creditors' Trust by creditors who have not opted out of assigning their individual state law constructive fraudulent conveyance claims against Step Two Selling Stockholders to the Creditors' Trust. For example, the definition of "Class 1E Creditors' Trust Interests" (which will be received by holders of Senior Notes who do not opt out of the Creditors' Trust) similarly provides that the Holder of an Allowed Class 1E Claim may not "receive payments that exceed the Allowed Amount of such Holder's Claim." Plan § 1.1.39. Thus, the DCL Plan artificially limits the potential recovery of the Creditors' Trust against Step Two Selling Stockholders. Although Brigade opted out of assigning its state law fraudulent conveyance claims against Step Two Selling Stockholders to the Creditors' Trust, this gratuitous limitation on the recovery of Senior Noteholders who did not opt out is wholly unjustified.

OBJECTION TO SECOND AMENDED JOINT PLAN -18-
547929v5

third parties, is significant and has the potential to improve materially the ultimate recoveries of Senior Notes.

33. Absent the "Allowed Amount" limitation contained in the Plan's definitions of the various Trust interests, the recovery of the Estates (or the Litigation Trust) would not be limited to the "allowed" claims of creditors. *Cf. Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 811 (9th Cir. 1994) ("Thus, we conclude that the magistrate judge erred by 'capping' Acequia's recovery under section 544(b) at the amount of unsecured claims against the bankruptcy estate."). The disallowance of post-petition interest against bankruptcy estates, is not intended to limit the liability of third parties.[13] Moreover, the DCL Plan's limitation on creditor recoveries through litigation against non-Released Parties cannot be justified as any sort of a "settlement," because the non-Released Parties are giving no consideration in return for this limitation on their liability. Accordingly, the Plan's artificial limitation on the potential recovery of creditors through the two Plan Trusts must be eliminated.

## CONCLUSION

For the reasons and based on the authorities presented above, confirmation of the DCL Plan should be denied.

Dated: February 15, 2011  Respectfully submitted
Wilmington, Delaware

---

[13] For example, creditors are entitled to post-petition interest from non-debtors that have guarantied a debtor's obligations. *See, e.g., Hadar Leasing Int'l. Co. v. D.H. Overmyer Telecasting Co. (In re D.H. Overmyer Telecasting Co.)*, 787 F.2d 589, 1986 U.S. App. LEXIS 25473, at *9 (6th Cir. 1986); *Nat'l Energy & Gas Transmission, Inc. v. Liberty Elec. Power, LLC (In re Nat'l Energy & Gas Transmission, Inc.)*, 492 F.3d 297, 303 n.5 (4th Cir. 2007); *Credit Suisse First Boston Mortgage Capital LLC v. Cohn*, 2004 U.S. Dist. LEXIS 16577, at *25 (S.D.N.Y. Aug. 19, 2004); *Stoller's, Inc. v. Peoples Trust Bank (In re Stoller's, Inc.)*, 93 B.R. 628, 635-36 (Bankr. N.D. Ind. 1988).

By: /s/ Christopher D. Loizides
Christopher D. Loizides (SBN 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801
302-654-0248
302-654-0728
Email: loizides@loizides.com

and

STUTMAN TREISTER & GLATT
Isaac M. Pachulski (CA SBN 62337)
1901 Avenue of the Stars, #1200
Los Angeles, CA 90067
(310) 228-5600
(310) 228-5788
Email: ipachulski@stutman.com

Attorneys for Brigade Capital Management, LLC