IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**Objection Deadline:** 02/15/11
**Hearing Date:** 03/07/11
**Related to Docket Nos.** 7127 and 7801

**OBJECTION OF ROBERT R. MCCORMICK TRIBUNE FOUNDATION AND
CANTIGNY FOUNDATION TO (I) SECOND AMENDED JOINT PLAN OF
REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES
PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON &
CO., L.P., AND JPMORGAN CHASE BANK, N.A. AND (II) JOINT PLAN OF
REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES
PROPOSED BY AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF
OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY
AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR
CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF
NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR
CERTAIN SERIES OF SENIOR NOTES AND WILMINGTON TRUST COMPANY, IN
ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES**

Robert R. McCormick Tribune Foundation ("McCormick") and Cantigny Foundation

("Cantigny" and together with McCormick, the "Foundations"), by its attorneys, hereby object to

the confirmation of (1) Second Amended Joint Plan of Reorganization for Tribune Company and

Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors,

Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank,

N.A. (the "DCL Plan"); and (2) Joint Plan of Reorganization for Tribune Company and Its

Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its Managed Entities,

Deutsche Bank Trust Company of New York, in Its Capacity as Successor Indenture Trustee for

Certain Series of Senior Notes, Law Debenture Trust Company of New York, in Its Capacity as

Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, in Its Capacity as Successor Indenture Trustee for the PHONES Notes (the "Noteholder Plan" and together with the DCL Plan, the "Competing Plans").  In support of this objection, the Foundations state as follows:

## I.  **INTRODUCTION**

1.      The Competing Plans cannot be confirmed because they do not comply with the applicable provisions of title 11 of the United States Code (the "Bankruptcy Code") and because the proponents of the Competing Plans (the "Plan Proponents") have not proposed the Competing Plans in good faith and not by any means forbidden by law.

2.      More specifically, the Plan Proponents attempt to make an end run around section 546(e) of the Bankruptcy Code by creating a "Creditors' Trust," which they believe will have the ability to assert state law constructive fraudulent transfer claims (the "Constructive Fraud Claims") against former shareholders of the Tribune, including the Foundations, that the above-captioned Debtors and Debtors in possession (the "Debtors") or other estate representatives are prohibited from asserting because of section 546(e)'s safe harbor provision.

3.      The Plan Proponents attempt to subvert the Bankruptcy Code by purporting to cause the Debtors to "disclaim" or "abandon" the Constructive Fraud Claims to a Creditors' Trust who allegedly could then assert such claims on behalf of the Debtors' creditors outside the parameters of the Bankruptcy Code and section 546(e).  In other words, the Plan Proponents seek to unravel potentially hundreds of thousands of securities transactions completed more than three years ago that involved billions of dollars and countless parties, all which the Plan Proponents acknowledge are protected by section 546(e).

4.      This unorthodox strategy cannot be approved for two reasons.    First, the Creditors' Trust will not have standing to assert the Constructive Fraud Claims, because only the debtor or its representative has standing to assert fraudulent transfer claims.    The Constructive Fraud Claims cannot be asserted piecemeal by both a representative of the Debtors' estates and the Creditors' Trust.    Second, by enacting section 546(e), Congress made a policy judgment that settlement payments, such as those paid to the Selling Stockholders, cannot be avoided under state law.    Congress' clear intent when enacting section 546(e) was to ensure settlement payment finality and the stability of the securities market.    Therefore, the Bankruptcy Code preempts state law in these circumstances.

## II.      **RELEVANT BACKGROUND**

### A.      **The Foundations**

5.      McCormick is one of the nation's leading charitable organizations created in 1955 from the estate of Colonel Robert R. McCormick, the longtime owner, editor, and publisher of The Chicago Tribune.    The mission of McCormick is to help build a more active and engaged citizenry through six grant-making programs, Cantigny Park, two museums, and a civic outreach program.

6.      Cantigny is a nonprofit organization and receives most of its funding from McCormick.

### B.      **The Bankruptcy Cases**

7.      On December 8, 2008 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.    The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.      The Foundations are not creditors in these Bankruptcy Cases. They have not filed a proof of claim and are not listed on the Debtors' Schedules. However, as discussed below, solely for purposes of this objection, the Foundations are "parties in interest" who may object to the Competing Plans pursuant to section 1128(b) of the Bankruptcy Code.

### C.      The Leveraged ESOP Transaction

9.      As has been discussed at great lengths throughout these cases, in 2007, Tribune returned to private ownership when it approved a series of transactions (collectively, the "LBO") with a newly formed Tribune employee stock ownership plan, EGI-TRB, LLC, and Samuel Zell. More specifically, on April 1, 2007, Tribune entered into the Merger Agreement,[1] by and among, Tribune, GreatBanc, Merger Sub, and, for limited purposes, EGI-TRB. Under the Merger Agreement, Merger Sub would merge with and into Tribune, with Tribune surviving the Merger and becoming a wholly-owned Subsidiary of the ESOP with holders of Tribune Common Stock receiving $34.00 per share in consideration on consummation of the Merger.

10.     Generally, the LBO has been divided into two steps: Step One and Step Two. At Step One, Tribune commenced a tender offer for up to 126 million shares of Tribune Common Stock at $34.00 per share, which represented approximately 52% of the issued and outstanding Tribune Common Stock as of April 1, 2007.

11.     Step One closed on May 31, 2007, at which point Tribune repurchased the 126 million shares it had tendered. As described in much greater detail in the Examiner's Report,[2]

---

[1]      All capitalized, but undefined terms shall have the meaning ascribed to them in the DCL Plan, the Noteholder Plan, or the Report of Kenneth N. Klee (the "Examiner's Report").

[2]      On February 4, 2011, this Court entered an Order Approving Stipulation Regarding Use of Examiner's Report at the Confirmation Hearing [Docket No. 7790], which Stipulation stated that the Examiner's Statement of Historical Facts (as defined in the Stipulation), which includes pages 43 through 671 of Volume I of the Examiner's Report will be admissible for all purposes at the Confirmation Hearing, including the truth of the matter asserted and will be presumed to be correct, unless disputed.

Tribune utilized proceeds of the Credit Agreement to repurchase the shares tendered in the Tender Offer by depositing the aggregate purchase price for the shares, approximately $4.284 billion (the "Step One Consideration"), with Computershare Trust Company, N.A. (the "Paying Agent"), the depository for the Tender Officer, which acted as agent for Tribune for purposes of receiving payments from Tribune and transmitting payment to the tendering stockholders.

12.     Step Two closed on December 20, 2007, at which point Tribune repurchased the remaining outstanding Tribune Common Stock at $34.00 per share.  On the Step Two Financing Closing Date, Tribune disbursed approximately $4 billion (the "Step Two Consideration," and together with the Step One Consideration, the "Consideration") to the Paying Agent, who transmitted the Step Two Consideration to the holders of the remaining outstanding Tribune Common Stock.

13.     Prior to the Tender Offer, McCormick owned approximately 28.0 million shares of Tribune Common Stock, while Cantigny owned approximately 3.3 million shares.  During Step One, the Foundations tendered more than half of their shares to the Paying Agent in exchange for $34.00 per share.  During Step Two, McCormick tendered its remaining shares to the Paying Agent in exchange for $34.00 per share.[3]

### D.     The Committee Complaint

14.     On November 1, 2010, with leave of this Court, the Official Committee of Unsecured Creditors of the Debtors (the "Committee"), on behalf of Debtors, commenced Adversary Proceeding No. 10-54010 (KJC) (the "Committee Action") by filing a complaint (as amended, the "Committee Complaint").  The thirty-six count Committee Complaint names

---

[3]     In the time between Step One and Step Two, Cantigny sold its remaining Tribune Common Stock on the open market, which transactions should not be affected by the litigation contemplated in the Competing Plans.

hundreds of defendants, including the Foundations.  More specifically, the Committee alleges, in part, that the LBO constituted a fraudulent transfer, which the Committee alleges entitles the Debtors' estates to avoid and recover the Shareholder Transfers (as defined in the Committee Complaint) pursuant to sections 544(b), 548(a)(1)(A), and 550 of the Bankruptcy Code.

15.    The Foundations are named in the following four counts:  Count Five (Breach of Fiduciary Duty); Count Six (Aiding and Abetting Breach of Fiduciary Duty); Count Twelve (Unjust Enrichment); and Count Thirteen (Intentional Fraudulent Transfer).

16.    Pursuant to this Court's Order Granting Unsecured Creditors Committee's Standing Motions entered on October 27, 2010 [Docket No. 6150], the Committee Action has been stayed until April 1, 2011 unless there is an intervening Termination Event (as defined in the order).

### E.    The Competing Plans

17.    On February 4, 2011, the proponents of the DCL Plan (the "DCL Plan Proponents") filed the DCL Plan.[4]  On December 9, 2010, the proponents of the Noteholders Plan (the "Noteholder Plan Proponents") filed the Noteholder Plan.[5]

18.    One of the focal points of the Competing Plans is the treatment of the Committee Action and how the Debtors, or some other entity, can assert potential state law constructive fraudulent transfer claims against former holders of Tribune Common Stock, including the Foundations, who sold their stock as part of the LBO (together with the Foundations, the "Selling Stockholders").

---

[4]    On December 9, 2010, this Court approved the DCL Plan Proponents' Specific Disclosure Statement (the "DCL Disclosure Statement") [Docket No. 7126].

[5]    On December 9, 2010, this Court approved the Noteholder Plan Proponents' supported Specific Disclosure Statement (the "Noteholder Disclosure Statement") [Docket No. 7126].

19.     The DCL Plan calls for the release of the Selling Stockholders from all claims, including fraudulent transfer claims, that allegedly may have arisen out of Step One.  (*See* DCL Plan at Art. 11.2.)  The Noteholders Plan does not contain any similar releases.  (*See* Noteholders Disclosure Statement at 5-6.)  The Competing Plans each call for a "Litigation Trust" to replace the Committee as the plaintiff in the Committee Action.  (*See* DCL Plan at Art. 13; Noteholder Plan at Art. 5.17.)

20.     The Competing Plans also create a Creditors' Trust, which will purportedly assert the Constructive Fraud Claims.  (*See* DCL Plan at Art. 14; Noteholder Plan at Art. 5.18.)

21.     The DCL Plan calls for the Debtors, on the Effective Date, to "disclaim all rights to pursue or prosecute the Disclaimed State Law Avoidance Claims such that any and all rights to pursue such Disclaimed State Law Avoidance Claims shall revert to those entities who could have pursued such Disclaimed State Law Avoidance Claims prior to the Petition Date."  (DCL Plan at Art. 14.1.)  Pursuant to the DCL Plan, on the Effective Date, the Creditors' Trust will be established and the Transferred State Law Avoidance Claims will be transferred to the Creditors' Trust.  (DCL Plan at Art. 14.1-14.3.)  Similarly, the Noteholders Plan calls for the establishment of a Creditors' Trust, to which the State Law Avoidance Claims will be contributed. (Noteholders Plan at Art. 5.18.1-5.18.2.)

22.     In short, the Plan Proponents seek to transfer the Constructive Fraud Claims to the Creditors' Trust, which the Plan Proponents assert will represent the Debtors' creditors, not the Debtors.  Once the Constructive Fraud Claims are transferred to the Creditors' Trust, the Creditors' Trust will presumably assert them in a state court action against the Selling Stockholders, including the Foundations.

III.    **THE FOUNDATIONS HAVE STANDING TO OBJECT TO THE COMPETING PLANS**

23.     The Foundations have standing to object to the Competing Plans because they are defendants in the Committee Action and are the targets of the Constructive Fraud Claims.

24.     The Bankruptcy Code confers standing to object to plan confirmation to any "party in interest."  11 U.S.C. § 1129(b).  "Party in interest" is not defined in the Bankruptcy Code, but section 1109(b) provides examples, including "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." 11 U.S.C. § 1109(b).  "[I]t is clear, however, that the term 'party in interest' is not limited by the small list of examples in § 1109(b)."  *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) (providing "courts have not viewed the examples of parties in interest as being exhaustive").  Therefore, courts should consider "party in interest" status on a case-by-case basis to determine "whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation."  *Id.* (citing *In re Penn-Dixie Indus., Inc.*, 9 B.R. 941, 943 n.7 (Bankr. S.D.N.Y. 1981)).

25.     The Foundations are clearly parties in interest with standing to object to the Competing Plans.  First, the Foundations are defendants in the Committee Action, wherein the Committee or, if either Competing Plan is confirmed, the Litigation Trust will apparently attempt to seek to avoid and recover more than $1 billion from the Foundations.   Second, the Foundations are a target of the Plan Proponents' scheme to create the Creditors' Trust and make an impermissible end-run around the Bankruptcy Code.

26.     The Foundations have a sufficient stake in the outcome of the plan confirmation process because the Court's determination of the confirmability of the Competing Plans directly implicates whether the estates can seek recourse against the Foundations for the Constructive

Fraud Claims. If either Competing Plan is confirmed, the Foundations will face the immense legal and financial burden of defending themselves against the ill-conceived Creditors' Trust state law action. The Foundations cannot stand idly while the Plan Proponents attempt to confirm plans that blatantly disregard the Bankruptcy Code, among other established law. Therefore, the Foundations are parties in interest with standing to object to the Competing Plans.

## IV.    ARGUMENT

27.    The Competing Plans violate sections 1129(a)(1) and (a)(3) of the Bankruptcy Code and therefore cannot be confirmed because (a) the proposed Creditors' Trust would not have standing to bring the Constructive Fraud Claims against the Selling Stockholders, and (b) section 546(e)'s safe harbor provision preempts all attempts to assert the Constructive Fraud Claims.

28.    Each Plan Proponent has the burden of proving that its Competing Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. *See In re Spansion, Inc.*, 426 B.R. 114, 128-29 (Bankr. D. Del. 2010); *In re Exide Techs.*, 303 B.R. 45, 58 (Bankr. D. Del. 2003). Section 1129(a)(1) requires that "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). This section "requires the plan conform to the applicable provisions of Title II." *In re PWS Holding Corp.*, 228 F.3d 224, 243 (3d Cir. 2000) (citing Lawrence P. King, Collier on Bankruptcy ¶ 1129.03[1], 1129-25 (15th ed. rev. 1996)).

29.    Therefore, courts will refuse to confirm a plan that fails to comply with the each relevant provision of the Bankruptcy Code. *See*, *e.g.*, *In re Calvanese*, 169 B.R. 104, 113-14 (Bankr. E.D. Pa. 1994) (refusing to confirm plan pursuant to, among other sections, 1129(a)(1) because it contained a provision wherein the debtor attempted to reserve for herself any recovery from her potential avoidance actions); *In re Keller*, 157 B.R. 680, 686 (Bankr. E.D. Wash. 1993)

(refusing to confirm pursuant to section 1129(a)(1) because it violated section 524(e)); *In re Cranberry Hill Assocs. Lim. P'ship*, 150 B.R. 289, 290-91 (Bankr. D. Mass. 1993) (refusing to confirm a plan pursuant to section 1129(a)(1) because it violated section 1122 and 1129(a)(3)); *In re Howell*, 84 B.R. 834, 837 (Bankr. M.D. Fla. 1988) (refusing to confirm plan pursuant to section 1129(a)(1) because it violated section 1141).

30.     Section 1129(a)(3) of the Bankruptcy Code mandates that a court may only confirm a plan if it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1123(a)(3).  Courts interpret "good faith" to require that the plan "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)); *see also Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Prods. N.V.)*, 308 B.R. 672, 675 (D. Del. 2004) (stating that good faith requires "(1) the plan be consistent with the objectives of the Bankruptcy Code; (2) the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; or (3) there was fundamental fairness in dealing with the creditors.").  To determine good faith the bankruptcy court should consider the totality of the circumstances. *In re Madison Hotel Assocs.*, 749 F.2d at 425.

31.     In addition to the requirement of good faith, a plan cannot be confirmed if it can only be implemented by means forbidden by law.  *See*, *e.g., In re Ice Melt Prods., L.L.C.*, No. 05-50549-RLF-11, 2007 WL 1500868, at *2 (Bankr. N.D. Tex. May 21, 2007) (refusing to confirm plan because it called for the violation of a final state court judgment); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 736-37 (Bankr. M.D. La. 1999) (holding that the primary

purpose of proposed plan provision was not "the legitimate and honest purpose to reorganize" because it violated established Louisiana cooperative law).

32.     The Competing Plans violate both section 1129(a)(1) and section 1129(a)(3) for two significant reasons.  First, the Competing Plans attempt to confer standing on the Creditors' Trustee to assert the Constructive Fraud Claims in violation of the Bankruptcy Code's mandate that only the debtor or its representative may assert fraudulent transfer claims.  Second, section 546(e) preempts any attempt by the Creditors' Trust to assert the Constructive Fraud Claims that the Debtors will purportedly "disclaim" or "abandon" pursuant to the Competing Plans.

### A.     The Creditors' Trust Lacks Standing to Bring Constructive Fraud Claims

33.     The Competing Plans cannot be confirmed because the Creditors' Trust provisions violate the Bankruptcy Code's standing requirements.

34.     Several courts have stated that litigation trusts do not have standing to pursue creditor claims, even when those claims were purportedly transferred from the creditor to a trust pursuant to a plan of reorganization.  *See Kipperman v. Onex Corp.*, 411 B.R. 805, 831 n.21 (N.D. Ga. 2009) ("Litigation trustees do not have standing to directly pursue claims on behalf of creditors and creditors may not assign their claims to a litigation trust."); *Mukamal v. Bakes*, 383 B.R. 798, 811-14 (S.D. Fla. 2007) (holding that litigation trust lacked standing to bring creditor claims that were expressly assigned to the trust); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 189-91 (Del. Ch. 2006) (stating that "even if the Litigation Trust Agreement or plan of reorganization did expressly assign the direct claims of [debtor's] creditors to the Litigation Trust, federal bankruptcy law is clear that litigation trusts do not have standing to pursue direct claims of creditors.") (*citing Caplin v. Marine Midland Grace Tr. Co. of N.Y.*, 406 U.S. 416 (1972)).

35.     Moreover, even if the claims could be assigned, the Creditors' Trust's standing only extends as far the standing of creditors, and an individual creditor may not assert a general claim belonging to all creditors. *See Board of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) ("[O]nce a company or individual files for bankruptcy, creditors lack standing to assert claims that are 'property of the estate.'") (citation omitted); *see also Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243 (3d Cir. 2000) ("once avoidable pursuant to [section 544(b)], the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim"); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."); *Official Comm. of Unsecured Creditors v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 884 (Bankr. N.D. Ill. 1991) (holding that state law fraudulent transfer claims were not personal to individual creditors, but were "general" claims of the estate).

36.     In other words, if the Debtors "disclaim" or "abandon" the Constructive Fraud Claims, the Creditors' Trust will not have standing to assert the Constructive Fraud Claims because the Debtors' exclusive standing to bring an action extends to all claims, regardless of whether they have identical elements, if the claims share the same underlying focus. *See Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.*, 187 F.3d 439, 441 (4th Cir. 1999) (holding creditors lacked standing to bring successor liability, tortious interference with contract, and

conspiracy claims because they were "so similar in object and purpose to" the fraudulent transfer claims that were being brought by the bankruptcy trustee).

37.     Hence, the only method by which an individual creditor could be vested with standing to assert any State Law Claim would be the Debtors' total abandonment of any and all claims related to the allegedly fraudulent LBO.  *See id*. at 441-42 ("It is clear that the trustee should have first crack at challenging the [] transaction-the trustee's role is to bring suits such as these on behalf of all the creditors. As a general matter "[t]he trustee's single effort eliminates the many wasteful and competitive suits of individual creditors.") (citations omitted).

38.     However, nowhere do the Competing Plans call for the Debtors to "disclaim" or "abandon" their efforts to challenge the LBO as a fraudulent transfer.  Quite the contrary, the LBO litigation is the primary focus of each Competing Plan.  Essentially, the Plan Proponents want two bites at the fraudulent transfer apple.  Presumably, the Litigation Trust and the Creditors' Trust will sue virtually the same parties, assert virtually the same claims, and attempt to recover from the very same pool of potential damages.

39.     Therefore, the Competing Plans have not been proposed in good faith.  A plan cannot call for two separate entities to go after the same defendants on the same claims.  The LBO-Related Causes of Action, including the Constructive Fraud Claims, are property of the Debtors' estates and the power to bring such claims vests exclusively with the Debtors.  (*See* 11 U.S.C. §§ 544, 548.)  Unless the Plan Proponents are willing to have the Debtors walk away from the LBO-Related Causes of Action in their entirety, only the Debtors or their representative may bring a fraudulent transfer action.[6]  The Plan Proponents cannot pick and choose which

---

[6]     Arguably, the Debtors cannot abandon any power to bring an avoidance action.  Rights and powers of debtors and trustees cannot be abandoned under section 554(a); only property of the estate can be abandoned.  (*See infra* at Sec. IV(B)(2)(b).)

LBO-Related Cause of Action will be transferred to the Litigation Trust, as a representative of the estate, and which will be "disclaimed" or "abandoned" to a Creditors' Trust, which allegedly would be unrelated to the Debtors' estates. Such a procedure contravenes the standing principles embodied in the Bankruptcy Code.

**B.      The Competing Plans Cannot be Confirmed Because Section 546(e) Bars the Creditors' Trust From Bringing the Constructive Fraud Claims**

40.      The Competing Plans cannot be confirmed because the Constructive Fraud Claims are preempted by section 546(e). Any mechanism proposed by the Plan Proponents to assert the Constructive Fraud Claims would be proposed in bad faith and a violation of the Bankruptcy Code and established precedent.

41.      Congress enacted section 546(e) with the stated purpose of preventing the very mechanism the Plan Proponents attempt to implement. Simply stated, through section 546(e), Congress prohibited the use of state fraudulent transfer laws to avoid or recover payments made to stockholders in exchange for their stock. Neither Competing Plan can be confirmed because they both directly contradict Congress' intent.

**(1)      The payments to the Selling Stockholders were settlement payments made by or to a financial institution or other protected entity**

42.      In relevant part, section 546(e), entitled "Limitations of avoiding powers," states:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to . . . [a] financial institution . . . or that is a transfer made by or to . . . [a] financial institution . . . in connection with a securities contract, as defined in section 741(7) . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

43.      Under the plain wording of section 546(e), the Competing Plans' attempts to confer power onto the Creditors' Trust to assert the Constructive Fraud Claims is precluded for

two separate reasons.  First, the transfers that the Creditors' Trustee purportedly seek to avoid are unavoidable "settlement payments" made by a "financial institution."  Second, the transfers were made "in connection with a securities contract."

> **(a)**    **The payments to the Selling Stockholders were "settlement payments" made by a "financial institution"**

44.    The Paying Agent's transfers of the Consideration to the Selling Stockholders in exchange for their shares of Tribune Common Stock constituted "settlement payments," which is defined by the Bankruptcy Code as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).

45.    Courts have interpreted the term "settlement payment" very broadly to mean "the transfer of cash or securities made to complete a securities transaction."  *Lowenschuss v. Resorts Int'l (In re Resorts Int'l)*, 181 F.3d 505, 515 (3d Cir. 1999); *see also Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742, 751 (3d Cir. 1989) (stating that the definition of "settlement payment" in section 741(8) is "extremely broad"); *In re Enron Creditors Recovery Corp.*, No. 01-16034, 2009 WL 3349471, at *6-7 (S.D.N.Y. Oct. 16, 2009) (relying on "20 years of decisions from at least five circuit courts of appeal," that the term "settlement payment" includes public and private transactions not made in the ordinary course and is not restricted to transactions that are "run-of-the-mill"); *Official Comm. of Unsecured Creditors v. Acres of Diamonds, L.P. (In re IT Group, Inc.)*, 359 B.R. 97, 99-102 (Bankr. D. Del. 2006).

46.    The Third Circuit, as well as every other court of appeals that has addressed the issue, has concluded that payments made to acquire securities, such as those made to the Selling

Stockholders, are "settlement payments" within the meaning of section 546(e). *See, e.g., Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258-59 (3d Cir. 2009); *In re QSI Holdings*, 571 F.3d 545, 550 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 986-88 (8th Cir. 2009); *In re Resorts Int'l*, 181 F.3d at 514-15; *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1240 (10th Cir. 1991); *see also Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849-50 (10th Cir. 1990) (the Securities and Exchange Commission took the position that "the consummation of an LBO is a 'settlement payment' exempted from avoidance by section 546(e).").

47.     Hence, no party can, in good faith, dispute that the transfers of Consideration were "settlement payments" within the meaning of the Bankruptcy Code.

48.     The settlement payments to the Selling Stockholders satisfy the second requirement under section 546(e) because they were "made by" financial institutions.  The settlement payments were made by a financial institution:  the Paying Agent.  The Paying Agent fits directly within the Bankruptcy Code's definition of a "financial institution," which is broadly defined as, among other things, "a Federal reserve bank, or an entity that is a commercial or savings bank . . .[or] trust company . . . " 11 U.S.C. § 101(22)(A).

49.     It is also well established that transfers of settlement payments by a bank acting as an escrow agent in connection with payments to selling shareholders are made "by . . . [a] financial institution" for purposes of Section 546(e).  *See In re Resorts Int'l*, 181 F.3d at 516 (payments made through debtor's bank to shareholders were "settlement payments"); *In re Plassein*, 366 B.R. 318, 323-25 (Bankr. D. Del. 2007) (same), *aff'd*, 590 F.3d 252 (3d Cir. 2009); *Loranger Mfg. Corp. v. PNC Bank, Nat'l Assoc. (In re Loranger Mfg. Corp.)*, 324 B.R. 575, 585-86 (Bankr. W.D. Pa. 2005) (same).

50.     Therefore, no party can, in good faith, dispute that the settlement payments were made by a "financial institution" within the meaning of the Bankruptcy Code, which makes such payments unavoidable under the terms of section 546(e).

**(b)**     **The payments to the Selling Stockholders were transfers in connection with a securities contract**

51.     What's more, the Consideration payments made by the Paying Agent should also be considered "transfer[s] made . . . in connection with a securities contract."  11 U.S.C. § 546(e).  The Bankruptcy Code broadly defines the term "securities contract" to include any "contract for the purchase, sale, or loan of a security."  11 U.S.C. § 741(7)(A)(i).  The payments made by the Paying Agent to the Selling Stockholders fall squarely within this definition for two independent reasons.

52.     First, the Paying Agent paid the Consideration "in connection with a securities contract," namely, the Merger Agreement.  According to the Examiner's Report, pursuant to the Merger Agreement, Tribune was contractually bound to purchase the outstanding shares of stock from the Selling Stockholders for $34.00 per share when it entered into the Merger Agreement.  (*See* Examiner's Report, Vol. 1, p. 138.)  Second, the Selling Stockholders' exchange of their stock for the Consideration itself constituted a "securities contract."  *See In re Plassein*, 366 B.R. at 323.  Under the terms of the securities contract, the Paying Agent transferred $34.00 per share to the Selling Stockholders in consideration for the transfer of their Tribune Stock.

53.     Once again, no one can dispute, in good faith, that the Consideration payments made by the Paying Agent were "settlement payments" made by a "financial institution" and therefore cannot be avoided pursuant to section 546(e)'s safe harbor.

### (2)   The Creditors' Trust Proposals Circumvent Federal Law

54.     Given section 546(e)'s express prohibition against avoiding or recovering the Consideration payments made by the Paying Agent, the Plan Proponents' only option to go after the Constructive Fraud Claims is to concoct an unorthodox mechanism by which they will evade the Bankruptcy Code.   Allowing the Creditors' Trust to bring the Constructive Fraud Claims would be an obvious circumvention around section 546(e) and would severely frustrate Congress' deliberate efforts to exclude settlement payments from a debtor's avoidance powers. These attempts violate the Bankruptcy Code in contravention of section 1129(a)(1) and fail to satisfy section 1129(a)(3)'s good faith requirement.   Therefore, confirmation must be denied.

55.     The Plan Proponents apparently believe they can make an end-run around section 546(e) by having the Debtors "disclaim" or "abandon" the Constructive Fraud Claims on the Effective Date.   Continuing with this flawed logic, when the Debtors "disclaim" or "abandon" the Constructive Fraud Claims to the Creditors' Trust to be pursued under some yet-to-be-announced state law, the Constructive Fraud Claims will somehow escape the safe harbor created by Congress in section 546(e).

56.     The Competing Plans explicitly state that every fraudulent transfer cause of action, besides the Constructive Fraud Claims, will be transferred to the Litigation Trust on the Effective Date and will be administered on behalf of the Debtors' estates.   (*See* DCL Plan at Art. 13; Noteholders Plan at Art. 5.17.)   In other words, the *only* avoidance action the Debtors will not retain on the Effective Date will be the very same avoidance action that section 546(e) prohibits.   The Plan Proponents' attempts are tacit admissions that any attempt by the Debtors,

the Litigation Trust, or any other representative of the Debtors' estates would fail pursuant to section 546(e).[7]

57.     Therefore, if this Court confirms either Competing Plan, the Litigation Trust and the Creditors' Trust will likely assert virtually the same causes of action and will seek to avoid the very same transactions against the very same defendants.  The Plan Proponents' desperate attempts to nullify the Bankruptcy Code constitute bad faith and make the Competing Plans unconfirmable.

**(a)     The Constructive Fraud Claims are Preempted by the Bankruptcy Code**

58.     Pursuant to the Supremacy Clause of the United States Constitution, state laws that interfere with or are contrary to federal law are preempted by federal law.  *See* U.S. Const. art. VI, § 2; *see also Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 96 (D. Del. 2002) ("Under the Supremacy Clause . . . state laws that interfere with or are contrary to federal laws are preempted and without effect.") (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).

59.     Congress may preempt state law in three general ways:  (1) expressly, "when there is an explicit statutory command that state law be displaced;" (2) "field preemption" when "federal law so thoroughly occupies a legislative field as to make reasonable the inference the Congress left no room for the States to supplement it;" and (3) "conflict preemption" when "a

---

[7]     In the DCL Disclosure Statement, the DCL Proponents admitted as much.  (*See* DCL Disclosure Statement, at p. 26, n.48.) ("Constructive fraudulent transfer Claims against shareholders arising under state law are being disclaimed by the Debtors as of the Effective Date.  Unless they opt out, Holders of such Claims are transferring them to the Creditors' Trust on the Effective Date because all constructive fraudulent transfer Claims against shareholders <u>could be subject to unique defenses under the Bankruptcy Code if such Claims were asserted by or on behalf of the Debtors</u> while the same is not true for intentional fraudulent transfer claims against shareholders which have been asserted by the Creditors' Committee on behalf of the Debtors in the Committee Complaint and will be transferred to the Litigation Trust on the Effective Date.") (emphasis added); *see also infra* at Sec. IV(C).

state law makes it impossible to comply with both state and federal law or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hi Tech Trans, LLC v. NJ*, 382 F.3d 295, 303 (3d Cir. 2004) (citing *The St. Thomas-St. John Hotel and Tourism Assoc., Inc. v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 237-38 (3d Cir. 2000)); *see also Hechinger*, 274 B.R. at 96.  Preemption is particularly appropriate in areas that traditionally are of national interest and for which there is a need for nationwide uniformity.  *Hines v. Davidowitz*, 312 U.S. 52, 67-68, 72 (1941).

60.    Bankruptcy law is precisely one of the areas that is traditionally of national interest and where the need for uniformity is great.  The Constitution provides that Congress has the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. I, § 8, cl. 4.  Therefore, "[w]here Congress has chosen to exercise its authority, contrary provisions of state law must accordingly give way."  *Integrated Solutions, Inc. v. Servs. Specialties, Inc.*, 124 F.3d 487, 491 (3d Cir. 1997) (quoting *In re Roach*, 824 F.2d 1370, 1373 (3d Cir. 1987)).  With "respect to bankruptcies the intention of Congress is plain . . . the national purpose to establish uniformity necessarily excludes state regulation . . . " *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929).

61.    These same principles apply directly to the numerous sections of the Bankruptcy Code addressing avoidance and recovery of fraudulent transfers made by a debtor.  More specifically, sections 544(b) and 548 detail the trustee's powers to avoid fraudulent transfers and defenses to such powers, sections 550 and 551 provide the exclusive remedial framework for avoidance, sections 502(d) and (h) discuss allowing or disallowing claims relating to avoidable transfers, and section 546, among others, provides limitations on the trustee's avoidance powers. *See also Hechinger*, 274 B.R. at 97 (stating that "the Bankruptcy Code, particularly sections 544

and 546(e), provides an exclusive framework for addressing claims that seek to avoid transfers made more than one year before bankruptcy.").   To that end, the Bankruptcy Code vests the power to avoid fraudulent transfers exclusively in the debtor in possession or trustee, who is authorized to pursue such actions on behalf of creditors for the benefit of the estate.  *See* 11 U.S.C. §§ 544(b), 548, 550.

62.   Moreover, Congress incorporated state fraudulent transfer law into the Bankruptcy Code by authorizing the trustee to avoid pre-petition transfers of the debtor's property that are "voidable under applicable law by a creditor" of the debtor.   11 U.S.C. § 544(b).  Section 544 "allows a debtor to avoid, under certain circumstances, payments that would be avoidable outside of bankruptcy by a creditor under state law."  *Hechinger*, 274 B.R. at 97. However, "the Code explicitly limits and displaces state law by setting forth federal limits on the use of state law avoidance powers under section 544 . . . ." *Id.*

63.   These limits include the prohibition on avoiding settlements payments pursuant to section 546(e):  "[n]otwithstanding section[] 544 . . . the trustee may not avoid a  . . . settlement payment."  11 U.S.C. § 546(e) (emphasis added).   By enacting federal legislation to exempt settlement payments from avoidance, Congress sought to promote the public's confidence in, and the stability of, the securities markets.  *See* H.R. Rep. No. 97-420, at 1 (1982); *see also Bevill, Bresler*, 878 F.2d at 747 ("Congress was concerned about the volatile nature of the commodities and securities markets . . .").  As Congress stated when drafting section 546(e),

> The thrust of [section 546(e)] is to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities markets. The amendments will ensure that the avoiding powers of a trustee are not construed to permit . . . settlement payments to be set aside except in the cases of fraud . . . and minimizes the potentially massive losses and chain reactions that could occur if the market were to move sharply in the wrong direction.

H.R. Rep. No. 97-420, at 1.

64.     In other words, Congress' purpose in enacting section 546(e) was to prevent "[t]he danger of a 'ripple effect' on the entire market [which] is at least as inherent in the avoidance of an LBO as it is in the avoidance of a routine stock sale." *Kaiser Steel Corp.*, 913 at 849. "To address this danger, Congress passed 546(e) to narrow the trustee's avoidance power under certain circumstances to protect 'the nation's financial markets from the instability caused by the reversal of settled securities transactions.'" *Hechinger*, 274 B.R. at 88 (quoting *Kaiser Steel Corp.*, 913 F.2d at 848).

65.     Therefore, section 546(e) signifies Congress' intent that settlement payments, such as those at issue here, "should remain unavoidable in order to insulate the clearing and settlement system of the nation's securities industry, and participants in that system, from the potentially devastating effect of a substantial recovery by a trustee that would require the undoing of possibly thousands of settled securities transactions." *Id.*

66.     Courts have routinely rejected attempts by plaintiffs to circumvent section 546(e) by alleging state law claims not expressly prohibited by section 546(e). *See*, *e.g.*, *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009) (disallowing state law claims for unjust enrichment and illegal dividends because such claims "would render the § 546(e) meaningless, and would wholly frustrate the purpose behind the section."); *In re Hechinger*, 274 B.R. at 96 (holding that section 546(e) preempts state law claims for unjust enrichment).

67.     In *Hechinger*, the court noted that section 546(e)'s purpose would be frustrated if the court entertained the creditor committee's unjust enrichment claim, because such a claim "effectively acts as an avoidance claim against the shareholders in a transaction that the court ha[d] already found [to be] an unavoidable settlement payment." 274 B.R. at 96.  In other words, courts will not allow parties to make an end-run around section 546(e) simply by re-labeling claims that arose from an alleged fraudulent transfer as unjust enrichment claims.  *See id*. at 97 ("the Code preempts the field and precludes supplemental state remedies because the Code alone comprehensively addresses such claims.").

68.     The Competing Plans cannot be confirmed.  The proposed Creditors' Trust would circumvent section 546(e) and, therefore, the Creditors' Trust provisions in the Competing Plans violate sections 1129(a)(1) and (a)(3) because they contravene the provisions of the Bankruptcy Code and have not been proposed in good faith.

> **(b)**     **The Plan Proponents Cannot Avoid Preemption by "Disclaiming" or "Abandoning" the Constructive Fraud Claims**

69.     The Plan Proponents cannot evade Congress' prohibition on avoiding settlement payments by "disclaiming" or "abandoning" the Constructive Fraud Claims.  As noted above, when a debtor subjects itself to federal bankruptcy jurisdiction, its estate inherits all fraudulent transfer claims, which cannot be "disclaimed" or "abandoned" in a piecemeal fashion.

70.     Section 554(a) of the Bankruptcy Code states that, "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  The Plan Proponents' contention that the Constructive Fraud Claims can be "disclaimed" or "abandoned" is not

supported by the Bankruptcy Code.  The only burden the Constructive Fraud Claims pose to the Debtors' estates is that the Bankruptcy Code expressly precludes them.

71.     Moreover, section 554 only authorizes the trustee to abandon "property of the estate," which does not include the trustee's avoidance powers under section 544.  Instead, only the property that the trustee <u>recovers</u> through the successful exercise of its avoiding powers under section 550 of the Bankruptcy Code is considered property of the estate.  *See* 11 U.S.C. § 541(a)(3) (defining property of the estate to include "[a]ny interest in property that the trustee <u>recovers</u> under sections 329(b), 363(n), 543, 550, 553, or 723 of this title") (emphasis added).

72.     Congress did not enact section 546(e) with the intention of simply limiting the "trustee" from avoiding settlement payments and surely could not have intended for the trustee to have the option of simply "disclaiming" or "abandoning" its statutory avoiding powers. Therefore, if either Competing Plan is confirmed, section 546(e) would be rendered meaningless. Whenever 546(e) poses a problem, a debtor could simply "disclaim" or "abandon" its claim to a creditors' trust who would then assert the very same claim Congress sought to prohibit by enacting section 546(e).

73.     Accordingly, the Plan Proponents should not be permitted to indirectly accomplish what the Bankruptcy Court explicitly forbids.  The Creditors' Trust should not be allowed to circumvent Congressional intent through a plan provision that merely masks the identity of the plaintiff bringing the avoidance action.   These blatant attempts to avoid application of a Bankruptcy Code provision violate sections 1129(a)(1) and do not exhibit good faith, in violation of section 1129(a)(3).

C.      **The Debtors Themselves Have Argued that the Proposed Creditors' Trust Contravenes the Bankruptcy Code and Established Precedent**

74.     The lack of good faith in proposing the DCL Plan could not be more apparent than when reading the proposed Creditors' Trust provision alongside the Brief of Debtors to the Examiner, which the Debtors submitted to the Examiner in accordance with the Examiner's May 10, 2010 Letter Order.

75.     In their Brief, the Debtors argued that the premises underlying the proposed "sidestep" of section 546(e) is "highly problematic."  (*See* Br. to Examiner 55.)  They contend that "the state fraudulent conveyance claims at issue are not individual, personal claims of the non-LBO unsecured creditors but rather claims belonging to the creditors as a whole which may only be asserted on behalf of the entire creditor class."  (*Id.*)  Moreover, "any other result would simply allow an end run around Section 546(e) through the simple expedient of having the debtor or trustee refrain from bringing fraudulent conveyance suits during the bankruptcy and instead having the individual creditors assign them to a litigation trust for pursuit post-confirmation."  (*Id.* at 56.)

76.     Moving on to preemption, the Debtors noted that

> the decided cases make clear that Section 546(e) is not limited solely to the enumerated federal statutes but also applies to or preempts state law causes of action (such as fraudulent conveyance, unjust enrichment and recovery of illegally declared dividends) that seek to avoid settlement payments made to shareholders.  And, there seems to be no valid reason why these conclusions would not also hold true when the Section 546(e) "trustee" is the trustee of a litigation trust.

(*Id.*)

77.     Nevertheless, on October 22, 2010, less than five months after submitting its Brief, the Debtors filed the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed By the Debtors, the Official Committee of Unsecured Creditors, Oaktree

Capital Management, L.P., Angelo Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 6089], which was the precursor to the DCL Plan and which directly contradicted their arguments to the Examiner by incorporating a Creditors' Trust provision.  Therefore, the Debtors' drafting and filing of the DCL Plan, despite their clear understanding of the problems posed by the Creditors' Trust provision, illuminates the fact that the DCL Plan was not filed in good faith and should not be confirmed pursuant to section 1129(a)(3).

V.    **CONCLUSION**

        Based on the foregoing, the Foundations respectfully request that this Court enter an order denying confirmation of the Competing Plans and granting such further relief as is just and equitable.

Dated:  February 15, 2011                    Respectfully submitted,

                                             **ROBERT R. MCCORMICK TRIBUNE**
                                             **FOUNDATION and CANTIGNY**
                                             **FOUNDATION**

                                             By: /s/ *Richard W. Riley*
                                             Richard W. Riley (DE 4052)
                                             DUANE MORRIS LLP
                                             222 Delaware Avenue, Suite 1600
                                             Wilmington, DE 19801-1659
                                             Tel:  (302) 657-4900
                                             Fax: (302) 657-4901
                                             E-Mail: rwriley@duanemorris.com

                                             and

                                             John P. Sieger (admitted *pro hac vice*)
                                             KATTEN MUCHIN ROSENMAN LLP
                                             525 West Monroe Street
                                             Chicago, Illinois 60661-3693
                                             Tel:  (312) 902-5200
                                             Fax:  (312) 902-1061
                                             E-Mail: john.sieger@kattenlaw.com