## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,<br><br>                     Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br><br>Jointly Administered<br><br>**Hearing Date: 3/7/11 at 10:00 a.m.**<br>**Objection Deadline: 2/15/11 at 4:00 p.m.**<br>**Related Dkt. No. 7801** |

**THE AD HOC COMMITTEE OF TRIBUNE SUBSIDIARY TRADE CREDITORS'
OBJECTION TO THE DEBTORS' PLAN OF REORGANIZATION**

TO:    THE HONORABLE KEVIN J. CAREY
         CHIEF UNITED STATES BANKRUPTCY JUDGE

The Ad Hoc Committee (the "OpCo Trade Committee") of Tribune Subsidiary Trade Creditors (the "Trade Creditors"), by its undersigned counsel, for its objection (the "Objection") to the Second Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, et al. (collectively, the "Plan Proponents"), dated February 4, 2011 (the "Debtors' Proposed Plan") [Docket No. 7801], respectfully represents:

### INTRODUCTION

1.    Based on the claims estimate set forth in the specific disclosure statement (the "Specific Disclosure Statement"), the Debtors' Proposed Plan provides for Trade Creditors to be paid in full, in cash, on the Effective Date. There is, however, an aggregate "cap" of $150 million, for all of the Trade Creditors' claims against the OpCo Subsidiaries (as defined below). Upon information and belief, well in excess of $1 billion claims have been filed, in the aggregate, against the various operating subsidiary Debtors against which the Trade Creditors hold claims (the "OpCo Subsidiaries"). As a consequence, there is simply no way for Trade Creditors to know what they will actually receive under the Debtors' Proposed Plan - - and when

NYC:224559.5

they will receive it - - though it appears that the Debtors' Proposed Plan does not provide for payment of Trade Creditors in full. Given the size of the claims pool and the fact that the Plan Proponents felt it necessary to impose a "cap" on the amounts payable on account of the Trade Creditors' claims, the anticipated "100%" or full cash recovery to Trade Creditors on the Effective Date may well be illusory, as the OpCo Trade Committee has previously suggested to this Court and parties in interest.

2. The Debtors' Proposed Plan provides that the holder(s) of equity interests of the OpCo Subsidiaries will have their interests reinstated "for administrative convenience." Stated differently, equity interests in the OpCo Subsidiaries are unimpaired and the value of the OpCo Subsidiaries will inure to the benefit of their respective corporate parent(s). Numerous classes of Trade Creditors (of various OpCo Subsidiaries) voted to reject the Debtors' Proposed Plan.[1] Because Trade Creditors are not receiving payment in full on account of their claims under the Debtors' Proposed Plan, reinstatement or unimpairment of the equity interests in the OpCo Subsidiaries would violate the "absolute priority rule" under Section 1129(b)(2)(B) of the Bankruptcy Code.

3. The Debtors' Proposed Plan likewise may not be confirmed because it violates the "good faith" requirement of Section 1129(a)(3). Throughout these cases, the undersigned has attempted to engage with Debtors' counsel to provide "back-up" or other data that would support the Debtors' contention that Trade Creditors are being paid in full. (Indeed, the undersigned as well as a member of the OpCo Trade Committee offered to sign a confidentiality agreement prior

---

[1] As reflected in the Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Plans of Reorganization Proposed for Tribune Company and its Subsidiaries (the "<u>Voting Certification</u>"), filed by Epiq Bankruptcy Solutions, LLC on February 11, 2011, [Docket No. 7918], Classes 8E, 21E, 50E, 56E, 59E, 62E, 63E, 73E, 75E, 76E, 77E, 78E, 80E, 82E, 83E, 84E, 88E, 94E, 99E and 100E voted to reject the Debtors' Proposed Plan.

NYC:224559.5

to receiving any "confidential" information with respect to claims.  The Debtors declined such offer.)  The Debtors and their counsel have refused to provide any such information, other than high level advice that both the Debtors and the Official Committee of Unsecured Creditors were "confident" that the aggregate allowed amount of Trade Claims at the OpCo Subsidiaries would not exceed $150 million and that such allowed claims would, on the Effective Date, receive payment in full, in cash.  Notwithstanding these representations (and the statements included in the Specific Disclosure Statement), however, the Voting Certification states that approximately $167 million of Trade Claims voted on the Debtors' Proposed Plan.[2]  As holders of disputed claims are not entitled to vote (unless their claims were estimated solely for voting purposes), the Plan Proponents appear to admit that the aggregate amount of Trade Claims exceeds $150 million.

## ARGUMENT

### The Debtors' Proposed Plan Violates Section 1129(b) of the Bankruptcy Code if Equity Interests in the OpCo Subsidiaries Are Reinstated (or Unimpaired) and Trade Creditors Are Not Paid In Full.

4. Twenty Classes of Trade Creditors holding claims against OpCo Subsidiaries voted to reject the Debtors' Proposed Plan.  See Voting Certification, Exh. 1.  Accordingly, the Debtors' Proposed Plan may not be confirmed unless it satisfies the "cram-down" standards of Section 1129(b) of the Bankruptcy Code with respect to these Classes.  In order to "cram down" a dissenting class of unsecured creditors, the plan must be "fair and equitable" to such dissenting class and, with respect to an unsecured class, either "(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the amount of such claims; or (ii) the holder of any claim or

---

[2] As set forth in Exhibit A-1 to the Voting Certification, a total of $166,981,601.95 in claims voted in Classes 2E - 111E.

3

interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property. See 11 U.S.C. § 1129(b)(2)(B).[3]

5. Based on the claims estimates included in the Specific Disclosure Statement, the Debtors' Proposed Plan provides that Trade Creditors will be paid in full. The Debtors' Proposed Plan, however, contains a $150 million aggregate "cap" with respect to the Trade Creditors' claims. According to the Voting Certification, approximately $167 million of Trade Claims were counted for voting on the Debtors' Proposed Plan. Notwithstanding the Trade Claims "cap" and that nearly $167 million of Trade Claims were counted for voting purposes, the Plan Proponents and their professionals have consistently represented that Trade Creditors will be paid in full, in cash, on the Effective Date, under the Debtors' Proposed Plan. Whether the Trade Creditors are, in fact, paid in full on the Effective Date depends entirely on the ultimate amount of allowed claims against the OpCo Subsidiaries and the timing of resolution of such claims. The Plan Proponents estimated that the aggregate amount of allowed trade claims against all OpCo Subsidiaries will be between $85 million to $150 million. See Specific Disclosure Statement, at p. 16. This claim is belied by the amount of Trade Claims solicited by the Plan Proponents to vote on the Debtors' Proposed Plan (or that were actually counted for voting purposes). In addition, upon information and belief, the face value of claims filed against such subsidiary Debtors far exceeds $1 billion. It is no surprise that the Specific Disclosure Statement did not contain any meaningful information as to how the Plan Proponents arrived at their aggregate claims estimate. Similarly, it is no surprise that the Debtors' professionals declined to engage

---

[3] See In re Armstrong World Indus., Inc., 432 F.3d 507, 511 (3rd Cir. (Del.) 2005); First State Operating Company v. Holbrook (In re Lotspeich), 328 B.R. 209, 220 (BAP 10th Cir. 2005); In re Coltex Loop Cent. Three Partners, L.P., 138 F.3d 39, 42 (2d Cir. 1998); In re Johnston, 21 F.3d 323, 329 (9th Cir. 1994); In re Justice, 972 F.2d 951, 954 (8th Cir. 1992).

NYC:224559.5

with the undersigned in efforts to determine the actual likely amount of allowed Trade Claims against the OpCo Subsidiaries.

6.     As we have indicated, the provisions in the Debtors' Proposed Plan providing for payment in full to the Trade Creditors may well be illusory and the Plan Proponents have the clear burden of establishing that Trade Creditors will, in fact, be paid in full.  No assurance has been provided to the Trade Creditors - - other than the unsubstantiated representations by the Plan Proponents and their professionals - - that the claims estimate set forth in the Specific Disclosure Statement is accurate.  Indeed, it is unclear what purpose the $150 million claims "cap" (which apparently was an "integral" part of the negotiated settlement between the Debtors and the Senior Lenders) would serve if the Plan Proponents believed that Trade Creditors would be paid in full under the Debtors' Proposed Plan.  If the Plan Proponents intend that Trade Creditors will be paid in full, such a "cap" is unnecessary.

7.     Notwithstanding that payment in full on account of the Trade Creditors' claims is very much in doubt, the Debtors' Proposed Plan provides that equity interests in the OpCo subsidiaries will be unimpaired and reinstated "for administrative convenience."  In order for such equity interests to be reinstated, all allowed claims of all Trade Creditors must be paid in full - - otherwise, the Debtors' Proposed Plan would violate the absolute priority rule and may not be confirmed under Section 1129(b)(2)(B) of the Bankruptcy Code for the reasons set forth herein.

**The Debtors' Proposed Plan and Specific Disclosure Statement Were Misleading and Violated the "Good Faith" Requirement of Section 1129(a)(3) of the Bankruptcy Code**

8.     Section 1129(a)(3) of the Bankruptcy Code provides that a plan may not be confirmed unless it has been proposed in "good faith."  The "central inquiry" for purposes of Section 1129(a)(3) "is whether the plan will fairly achieve a result consistent with the objectives

5

and purposes of the Code." In re Rusty Jones, Inc., 110 B.R. 362, 375 (Bankr. E.D. Ill. 1990). Some courts in this District have expanded on the good faith standard. For example, in Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Products, N.V.), the Delaware District Court summarized the good faith standard confirmation standard as follows:

> The Bankruptcy Code does not define the term 'good faith,' but case law has defined the term as requiring, alternatively that (1) the plan be consistent with the objectives of the Bankruptcy Code; the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; or (3) there was fundamental fairness in dealing with creditors.

308 B.R. 672, 675 (D. Del. 2004).

Other courts have used similar tests with respect to the "good faith" confirmation requirement. See In re Coram Healthcare Corp., 271 B.R. 228 (Bankr. D. Del. 2001); In re Greater Bay Hotel & Casino, Inc., 251 B.R. 213, 237-38 (Bankr. D. N.J. 2000); In re Rivers End Apartments, Ltd., 167 B.R. 470, 475-76 (Bankr. S.D. Ohio 1994); In re Gregory Boat Co., 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992). Courts have also found that gerrymandering classes to meet the class acceptance rule of Section 1129(a)(10) of the Bankruptcy Code can evidence a lack of good faith. Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.), 881 F.2d 1346 (5th Cir. 1989); see also In re Waterways Barge P'ship, 104 B.R. 776 (Bankr. N.D. Miss. 1989); In re Lettick Typografic, Inc., 103 B.R. 32 (Bankr. D. Conn. 1989).

9.  The Specific Disclosure Statement provided to the Trade Creditors states that the estimated recovery to Trade Creditors is 100%. See Specific Disclosure Statement, at pp. 5, 16. The Plan Proponents and their professionals have also consistently represented that the Trade Creditors would be paid in full, in cash, under the Debtors' Proposed Plan on the Effective Date. These statements were made notwithstanding the $150 million "cap" on the Trade Creditors'

6

NYC:224559.5

claims against all OpCo Subsidiaries. (As noted above, it is not clear what purpose a "cap" would serve if the Plan Proponents believed that Trade Creditors will be paid in full under the Debtors' Proposed Plan. If the Plan Proponents intended that Trade Creditors would be paid in full (and had any faith in their claims estimate), such a "cap" would be superfluous.)

10.     It would appear that the representations that Trade Creditors would be paid in full - - notwithstanding the "cap" and the Plan Proponents' counting, for voting purposes, approximately $167 million in Trade Claims - - were made to mislead the Trade Creditor classes into voting to accept the Debtors' Proposed Plan. Such statements evidence the Plan Proponents' "bad faith" in proposed the Debtors' Proposed Plan and were neither "honest" nor fundamentally fair (and are certainly inconsistent with the objectives of the Bankruptcy Code). Twenty classes of Trade Creditors nonetheless voted to reject the Debtors' Proposed Plan. The Debtors' Proposed Plan should not be confirmed because it violates Section 1129(a)(3) of the Bankruptcy Code.

**The OpCo Subsidiaries' LBO Guarantees Are Avoidable Fraudulent Transfers**

11.     It has been suggested by some that Trade Creditors are *pari passu* with massive amounts of guarantee debt at the OpCo Subsidiaries. Yet, at the same time, the "equity value" of the OpCo Subsidiaries - - which constitute a substantial portion of the Debtors' overall enterprise value - - cannot inure to the benefit of "parent" creditors unless and until Trade Creditors (at the OpCo Subsidiaries) are paid in full. Similarly unless Trade Creditors at the OpCo Subsidiaries are paid in full - - and to the extent they are not paid in full - - the massive LBO debt guarantees at the OpCo Subsidiaries should be avoided, by disinterested OpCo Subsidiary estate fiduciaries, as fraudulent conveyances or transfers under applicable federal and/or state law.

7

12. The Bankruptcy Code and applicable state debtor/creditor laws permit the avoidance of the incurrence of debt if the debtor/obligor received less than reasonably equivalent value or fair consideration in exchange therefor, became insolvent as a result of such incurrence, or was left with unreasonably small capital or the inability to pay its debts as they matured as a consequence of such incurrence.  See e.g., Cooper v. Ashley Communications (In re Morris Communications NC, Inc.), 914 F.2d 458, 466 (4th Cir. 1990).  The incurrence of the LBO guarantee debt by the OpCo Subsidiaries is avoidable.  Creditors of the parent Debtor may not reap the benefits of the value of the OpCo Subsidiaries unless Trade Creditors are being paid in full.

13. The OpCo Trade Committee reserves the right to amend and/or supplement this objection.

WHEREFORE, for all of the foregoing reasons, the OpCo Trade Committee respectfully requests that this Court (i) deny confirmation of the Debtors' Proposed Plan pursuant to Sections 1129(b)(2)(B) and/or 1129(a)(3) of the Bankruptcy Code, and (ii) grant such other and further relief consistent therewith.

Dated: February 15, 2011
       Wilmington, Delaware

Respectfully submitted,

THE ROSNER LAW GROUP LLC

By: /s/ Scott J. Leonhardt
Frederick B. Rosner (No. 3995)
Scott J. Leonhardt (No. 4885)
824 Market, Suite 810
Wilmington, DE 19801
Telephone Number: (302) 319-6301
Leonhardt@teamrosner.com

-and-

ANDREWS KURTH LLP
Paul N. Silverstein (NYS Bar No. PS 5098)
Jeremy B. Reckmeyer (NYS Bar No. JR 7536)
450 Lexington Avenue
New York, New York 10017
Telephone Number: (212) 850-2800
Facsimile Number: (212) 850-2929

*Counsel to the Ad Hoc Committee*
*of Tribune Subsidiary Trade Creditors*