M. PATRICIA SMITH
Solicitor of Labor
TIMOTHY D. HAUSER
Associate Solicitor of Labor
MICHAEL A. SCHLOSS
Counsel for Financial Litigation
LEONARD H. GERSON
ELIZABETH S. GOLDBERG
Trial Attorneys
United States Department of Labor
Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C.  20013
Tel (202) 693-5600
Fax (202) 693-5610

JOAN E. GESTRIN
Chicago Regional Solicitor
CHRISTINE Z. HERI
Senior Trial Attorney
United States Department of Labor
Office of the Solicitor
230 South Dearborn, Room 844
Chicago, Illinois  60604

**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| In re: | * | Chapter 11 |
| | * | |
| TRIBUNE COMPANY, <u>et al</u>, | * | Case No. 08-13141 (KJC) |
| | * | |
| | * | Jointly Administered |
| Debtors. | * | |
| | * | Related to Docket Nos: 7127 and 7136 |
| | * | |
| | * | |
| | * | Hearing Date:  March 7, 2011 - 10:00 a.m. |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | | |

**OBJECTION OF THE SECRETARY OF THE UNITED STATES DEPARTMENT
OF LABOR TO THE CONFIRMATION OF EACH OF THE PROPOSED JOINT
PLANS OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS
SUBSIDIARIES**

TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTORY STATEMENT ...................................................................................................2

SUMMARY OF ARGUMENT ........................................................................................................3

ARGUMENT ....................................................................................................................................5

    I.  THE DEPARTMENT OF LABOR CLAIMS ...................................................................5

        A.  Claims Based on Tribune's Fiduciary Violations of ERISA
        §§404(a)(1)(A) § (B) – Tribune's Disloyalty and Imprudence as an
        Appointing Fiduciary .......................................................................................................5

        B.  Claims Based on Tribune and Subsidiaries' Knowing Participation in
        Violations of ERISA §406 and 407 – Knowing Participation in prohibited
        Transactions ...................................................................................................................10

        C.  Claims Based on Tribune and Subsidiaries' Knowing Participation in
        Violation of ERISA §404(a)(1)(D) – Knowing Participation in Violation
        of the ESOP Documents .................................................................................................12

        D.  Claims Based on Tribune and Subsidiaries' Knowing Participation ion
        Violation of ERISA §404(a)(1)(B) and 406(a)(1)(A)and (D) – Knowing
        Participation in the ESOP's Overpayment of its Shares ......................................12

        E.  Recovery for Department of Labor Claims ......................................................14

            (1)  Recovery based upon Losses...............................................................14

            (2) Disgorgement – Unjust Enrichment....................................................15

    II.  THE CHAPTER 11 PLANS WRONGLY SEEK TO SUBORDINATE THE
        SECRETARY'S CLIAMS UNDER SECTION 510(b) ..............................................16

        A.  Subordination of the DOL Claims Fails to Further Congress's Purpose
        in Enacting §510(b)....................................................................................................16

        B.  The Secretary's ERISA Claims Are Not Claims "Arising From" the
        Purchase or Sale of a Security ................................................................................26

C.  Section 510(b) Is Inapplicable to the DOL Claims Arising from the Merger in Step 2, Because Such Claims Arose After the Step 1 Purchase and Sale Was Completed ......................................................................................30

D.  DOL Claims That Are Not Rescission or Damages May Not Be Subordinated Under 510(b).................................................................................31

E.  The Competing Plans Subordinate the DOL Claims Without Stating the Basis for Subordination...................................................................................33

F.  The Debtors' Plan Wrongly Subordinates the DOL Claims Against the Tribune Subsidiaries to the Claims Against the Parent Company........................34

III.    THE EXCULPATION PROVISION IN &11.5 OF THE DEBTORS' PLAN IS IMPERMISSIBLE...............................................................................................36

CONCLUSION.................................................................................................................38

CERTIFICATE OF SERVICE .......................................................................................39

TABLE OF AUTHORITIES

**Cases**

Abraham v. Norcal Waste Sys., Inc.,
265 F.3d 811 (9th Cir. 2001) ................................................... 28

Baroda Hill Investments, Ltd. et al. v. Telegroup, Inc. (In re Telegroup, Inc.),
281 F.3d 133 (3d Cir. 2002).................................................. 17, 19, 20, 21, 30

Beck v. Levering,
947 F.2d 639 (2d Cir.1991)....................................................... 27

Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund,
12 F.3d 1292 (3d Cir. 1993)...................................................... 8

Bowen v. Massachusetts
487 U.S. 879 (1988).............................................................31

Brock v. Gillikin,
677 F.Supp. 398 (E.D.N.C.1987).................................................. 27

Canale v. Yegen,
782 F. Supp. 963 (D.N.J. 1992) ................................................. 28

Chao v. Hall Holding Co.,
285 F.3d 415 (6th Cir. 2002) ................................................... 14

Chicago Housing Authority v. J.A. Hannah Inv. Advisory Service, Inc.,
1996 WL 328033 (N.D. Ill. 1996) ............................................... 9

Coyne & Delany Co. v. Selman,
98 F.3d 1457 (4th Cir. 1996) .................................................. 7

Donovan v. Bierwirth
680 F.2d 263 (2d Cir.),........................................................ 6, 21, 37

Donovan v. Cunningham,
716 F.2d 1455 (5th Cir.1983) ................................................ 13, 14, 27

Eddy v. Colonial Life Ins., Co.,
919 F.2d 747 (D.C. Cir. 1990)..................................................8

Eyler v. Commissioner of Internal Revenue,
88 F.3d 445 (7th Cir. 1996) .................................................. 13

F.T.C. v. Trudeau,
579 F.3d 754 (7th Cir. 2009) ................................................................... 32

FCC v. NextWave Personal Communications, Inc.,
537 U.S. 293 (2003).................................................................................. 26

Firestone Tire & Rubber Co. v. Bruch,
489 U.S. 101 (1989).................................................................................. 24

Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.,
93 F.3d 1171 (3d Cir. 1996)....................................................................... 8

Great-West Life & Annuity Inc., Co. v. Knudson,
534 U.S. 204 .............................................................................................31

Guidry v. Sheet Metal Workers Nat'l Pension Fund,
493 U.S. 365 (1990).................................................................................. 26

Harris Trust v. Salomon Smith Barney,
530 U.S. 238 (2000)............................................................... 10, 11, 31, 32

Herman v. South Carolina National Bank,
140 F.3d 1413 (11th Cir. 1998) ............................................................... 27

Horn v. McQueen,
215 F. Supp. 2d 867 (W.D. Ky. 2002)..................................................... 20

In re Audre, Inc.,
210 B.R. 360 (Bankr. S.D.Cal. 1997) ..................................................... 30

In re Betacom of Phoenix, Inc.,
240 F.3d 823 (9th Cir. 2001) ................................................................... 21

In re Deep Marine Holdings, Inc.,
2011 WL 160595 (Bankr. S.D. Tex. 2011)............................................... 19

In re Enron Corp. Securities, Derivative & ERISA Litigation,
284 F. Supp. 2d 511 (S.D. Tex. 2003) ......................................... 11, 27, 28

In re Exide Technologies,
303 B.R. 48 (Bankr. D. Del. 2003) .......................................................... 37

In re Geneva Steel Co.,
281 F.3d 1173 (10th Cir. 2002) ......................................................... 19, 21

In re Granite Partners, L.P.,
208 B.R. 332 (Bankr. S.D.N.Y. 1997) ........................................................................... 20

In re Lernout & Hauspie Speech products, N.V.,
264 B.R. 336 (Bankr. D. Del. 2001) .........................................................................34, 35

In re Med Diversified, Inc.,
461 F.3d 251 (2d Cir. 2006) ........................................................................................19

In Re National Farm financial Corp.,
2008 WL 410236 (Bankr. N.D. Cal 2008)...................................................................34

In re PWS Holding Corp.,
228 F.3d 224 (3d Cir. 2000)................................................................................... 36, 37

In re RCN Litigation,
2006 WL 753149 (D.N.J. 2006) ..................................................................................... 6

In re Seaquest Diving, L.P.,
579 F.3d 411 (5th Cir. 2009) ........................................................................................19

In re Swift Instruments, Inc.,
2010 WL 5156118 (Bankr N.D. Cal. 2010)..................................................................30

In re Touch America Holding, Inc.,
381 B.R. 95 (Bankr. D. Del. 2008) ..........................................................................23, 24

In re Washington Mutual, Inc.,    B.R.
2011 WL 81549 (Bankr. D. Del. 2011) ......................................................................... 37

In re WorldCom, Inc.,
263 F. Supp. 2d 745 (S.D.N.Y. 2003)............................................................................ 28

Jackson v. Truck Drivers' Union Local 42 Health and Welfare Fund,
933 F. Supp. 1134 (D. Mass. 1996) ................................................................................ 9

Leib v. IRS,
88 T.C. 1474 (T.C. 1987)............................................................................................... 25

Leigh v. Engle,
727 F.2d 113 (7th Cir. 1984) .......................................................................................... 7

Levy v. Local Union Number 810,
20 F.3d 516 (2d Cir. 1994).............................................................................................. 24

Levy v. Martin,
504 U.S. 909 (1992)........................................................................................ 27

Liss v. Smith,
991 F. Supp. 278 (S.D.N.Y. 1998)................................................................... 8

Martin v. Feilen,
965 F.2d 660 (8th Cir. 1992) ...................................................................... 7, 28

Martin v. Harline,
1992 WL 12151224 (D. Utah 1992) .............................................................. 8, 9

Mehling v. New York Life Ins. Co.,
163 F. Supp. 2d 502 (E.D. Pa. 2001) ............................................................... 7

Mertens v. Hewitt,
508 U.S. 248 (1993)........................................................................................ 31

Moench v. Robertson,
62 F.3d 553 (3d Cir. 1995)............................................................................. 22

Nathanson v. N.L.R.B.,
344 U.S.25 (1952)........................................................................................... 33

Neil v. Zell,
677 F. Supp. 2d 1010 (N.D. Ill. 2009) .............................. 5, 10, 12, 13, 16

New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
514 U.S. 645 (1995)........................................................................................ 19

Patterson v. Shumate,
504 U.S. 753 (1992)........................................................................................ 26

Pegram v. Herdrich,
530 U.S. 211 (2000)........................................................................................ 27

Raven Media Investments LLC v. DirecTV Latin America LLC (In re DirecTV Latin
America LLC),
2004 WL 302303 (D. Del. 2004) .................................................................... 17

Reich v. Compton,
57 F.3d 270 (3d Cir. 1995)......................................................................... 6, 11

Reich v. Valley Nat'l Bank,
837 F. Supp. 1259 (S.D.N.Y. 1993)............................................................... 20

Secretary of Labor v. Fitzsimmons,
805 F.2d 682 (7th Cir.1986) ................................................. 27

Shaw v. Delta Airlines, Inc.,
463 U.S. 85 (1983) ................................................................ 24

Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.,
793 F.2d 1456 (5th Cir. 1986), ......................................... 6, 28

Trustees of Amalgamated Ins Fund v. McFarlin's, Inc.,
789 F.2d 98 (2d Cir. 1986) ................................................. 33

Udell v. United States (In re Udell),
454 F.3d 180 (3d Cir. 2006) ............................................... 26

Valley Corp. v. Howe,
516 U.S. 489 (1996) ............................................................ 27

Walling v. Brady,
125 F.3d 114  (3rd Cir. 1997) ............................................ 17

**Statutes**

11 U.S.C. § 507(a) ............................................................... 20
11 U.S.C. § 510(b) ........................................................ passim
11 U.S.C. § 1122(b) ............................................................ 35
11 U.S.C. § 1129(a)(1) ........................................................ 36
26 U.S.C. § 409(l) ............................................................... 10
26 U.S.C. § 4975 ........................................................... 25, 26
26 U.S.C. § 4975(f)(5) ........................................................ 25
26 U.S.C. § 4975(h) ............................................................ 25
26 U.S.C. § 4975(a) ............................................................ 25
29 U.S.C. § 1001 ................................................................... 2
29 U.S.C. § 1001(a) ............................................................ 24
29 U.S.C. § 1001(b) ............................................................ 21
29 U.S.C. § 1002(21)(A) ....................................................... 5
29 U.S.C. § 1002(18) ........................................................... 13
29 U.S.C. § 1104 ............................................................. 3, 21
29 U.S.C. § 1104(a)(1)(A) ........................... 5, 6, 9, 18, 27
29 U.S.C. § 1104(a)(1)(B) ....................... 6, 7, 9, 12, 13, 18
29 U.S.C. § 1104(a)(1)(D) .............................................. 12, 21
29 U.S.C. § 1105(a) ............................................................... 8
29 U.S.C. § 1105(a)(1)-(3) ..................................................... 9
29 U.S.C. § 1106 .......................................................... 3, 5, 10
29 U.S.C. § 1106(a) ..................................................... 5, 11, 18
29 U.S.C. § 1106(a)(1)(A) ................................................... 13

29 U.S.C. § 1106(a)(1)(D) ................................................................................................ 13
29 U.S.C. § 1106(b) ..........................................................................................................18
29 U.S.C. § 1107 .....................................................................................................3, 5, 10
29 U.S.C. § 1107(d)(5) ......................................................................................................12
29 U.S.C. § 1107(d)(6)(A) ................................................................................................ 14
29 U.S.C. § 1108(e) ........................................................................................................... 13
29 U.S.C. § 1109 ................................................................................................................11
29 U.S.C. § 1109(a) ............................................................................................... 14, 25, 32
29 U.S.C. § 1132(a)(2)....................................................................................................... 11
29 U.S.C. § 1132(a)(3)............................................................................................ 2, 10, 11, 32
29 U.S.C. § 1132(a)(5).................................................................................... 2, 10, 11, 15, 31
29 U.S.C. § 1132(l) ........................................................................................................... 11
IRC § 409(l) .................................................................................................................. 7, 15

## Regulations

29 C.F.R. § 2509.75-8(D-4) ................................................................................................ 6

## Other Authorities

Securityholders and the Issuer's Creditors,
48 N.Y.U. L. Rev. 261 (1973) .......................................................................................... 21

Report of the Commission on Bankruptcy Laws of the United States,
H.R. Doc. No. 93-137 ...................................................................................................... 20

1974 U.S.C.C.A.N. 4838 .................................................................................................. 27

1978 U.S.C.C.A.N. 5963 .................................................................................................. 21

H.R. Rep. No. 95-595 ................................................................................................... 20, 21

Restatement (Second) of Trust § 184 (1987 App.) ...........................................................9

D. Dobbs, Handbook on the Law of Remedies .............................................................31

The Secretary of the United States Department of Labor (hereinafter "Secretary" or "DOL"), hereby files this objection (the "Objection") to confirmation of each of the proposed Joint Plans of Reorganization (the "Plans") proposed by (a) the above-referenced Debtor (the "Debtor" or "Tribune") and its Subsidiaries (the "Subsidiaries," and collectively, the "Debtors"), the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., (the "Debtors' Plan"), and (b) Aurelius Capital Management, L.P., on Behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the Phone Notes (the "Noteholder Plan" and collectively with the Debtors' Plan, the "Competing Plans" or " Reorganization Plans"), and represents as follows:

## INTRODUCTORY STATEMENT

The Secretary has primary responsibility for regulating and enforcing Title I of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq. ("ERISA"), including the responsibility to conduct investigations to determine whether any person has violated the fiduciary requirements of ERISA.  The Secretary also has the authority to institute actions in United States district courts for any losses to an ERISA plan resulting from fiduciary breaches, for restitution of plan losses, for equitable and remedial relief, and for injunctive relief pursuant to ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5).

Pursuant to her statutory authority to investigate possible violations of Title I of ERISA, the Secretary has initiated an investigation with respect to the Tribune Company Employee Stock Ownership Plan ("Tribune ESOP" or "ESOP") for possible violations of Title I of ERISA,

2

including ERISA §§ 404, 406 and 407, 29 U.S.C. §§ 1104, 1106 and 1107.  This investigation is

ongoing and the Secretary has filed unliquidated proofs of claim against Tribune and seventy of

its Subsidiary Debtors[1] in connection therewith (the "DOL Claims" or "Claims").

### SUMMARY OF ARGUMENT

The Competing Plans seek to subordinate the DOL Claims based upon the incorrect

assumption that ERISA claims fall within the scope of section 510(b) of the Bankruptcy Code.

ERISA protects the interests of workers in their retirement plans by imposing strict duties of

loyalty, care and prudence upon those responsible for administering these funds.  These duties

run from ERISA fiduciaries to participants and beneficiaries of ERISA plans.  Section 510(b)

protects a different set of relationships.  It protects the relationship among creditors by

preventing the unfair elevation of equity interests by subordinating claims arising from those

interests to the claims of other creditors.  The Competing Plans ignore this central difference by

seeking to subordinate the DOL Claims, which arise not from the interests of ERISA plan

participants as equity holders, but as participants in an ERISA plan.

The breaches of fiduciary duty which lie at the heart of the DOL Claims do not arise from

breaches of duty by the Tribune to its investors.  They arise from the Tribune's failure to comply

with its own fiduciary duty to monitor and correct the performance of GreatBanc, the ESOP

fiduciary the Tribune appointed.  These same responsibilities apply regardless of the nature of

the ESOP investments; the Tribune would be similarly liable as a fiduciary for investments in

entities other than the Debtors.  The DOL Claims thus are not the claims of equity holders, but

claims on behalf of ERISA participants against a fiduciary who was supposed to protect them.

---

[1] Capitalized terms have the meaning provided in the Debtors' Plan, and accompanying Specific
Disclosure Statement, and the General Disclosure that is an adjunct to each of the Competing
Plans, unless otherwise defined herein.

3

The inapplicability of section 510(b) to claims under ERISA is magnified by the facts in this case. This bankruptcy resulted from a failed ESOP leveraged buyout designed by the existing and subsequent executive management of the Tribune and blessed by the LBO Lenders. Section 510(b) is directed at preserving the equity cushion that equity investors provide. In contrast, in the Tribune ESOP leveraged buyout the existing equity cushion was decimated by borrowing to purchase the stock of existing equity holders. More than eighty percent of the Tribune's debt is debt created in the ESOP leveraged buyout. Thus, rather than relying upon a substantial equity cushion, the Tribune's predominant creditor body chose the tax and other advantages that an ESOP would afford. They now seek to change the bargain they struck by treating the ESOP as a traditional equity investor rather than a pawn in their failed venture.

Employees of the Debtors had no voice in the design of this structure. Thus, section 510(b)'s goal of preventing equity holders from avoiding the risk that they knowingly assumed bears no relationship to the decision by Sam Zell and Tribune management to replace the Tribune's existing 401(k) plan with an ESOP. Under the Competing Plans, those who knowingly assumed the risk inherent in an ESOP leveraged buyout will be paid billions of dollars, while those who had no decision making power will be paid nothing on their ERISA claims. Such an unfair allocation of assets bears no resemblance to the allocation of risk that section 510(b) seeks to preserve.

Aside from the basic infirmity in the Competing Plans' view of the relationship between ERISA and section 510(b), there are other important ways in which the Debtors' Plan requires modification. For example, in contrast to the language of section 510(b) and existing case law, the Debtors' Plan subordinates the DOL Claims against the Subsidiaries to the claims of the parent company creditors. Both Reorganization Plans go so far as to subordinate all ESOP

claims even if section 510(b) is inapplicable.  Finally, the exculpation provision in the Debtors'

Plan wrongly encompasses claims under ERISA and appears to extend to pre-petition actions.

**ARGUMENT**

**I.    THE DEPARTMENT OF LABOR CLAIMS**

This bankruptcy arose in the aftermath of a failed leveraged buyout of Tribune utilizing

the Tribune ESOP.  Although the Secretary's investigation is still continuing, at least one court

has already concluded that the Tribune ESOP's involvement in the leveraged buyout in Step One

was improper and in violation of ERISA.  In Neil v. Zell, ___ F. Supp.2d ____, 2010 WL

4670895 (N.D. Ill. 2010), the District Court ruled that the sale of unregistered stock by Tribune

to the ESOP constituted a prohibited transaction under ERISA §§ 406(a) and 407, 29 U.S.C. §§

1106(a) and 1107.  The court determined:

> For all these reasons, the court finds that the ESOP's purchase of unregistered
> stock subject to a trading restriction did not meet the definition of "employer
> security" found in IRC § 409(l), 26 U.S.C. § 409(l), and that the purchase was,
> therefore, a transaction prohibited by ERISA.

Neil, 2010 WL 4670895, *6.  The findings of the Neil court are consistent with the Secretary's

Claims and her investigatory findings thus far.  To date, the Secretary has found evidence of

multiple separate and distinct ERISA violations supporting her Claims against Tribune and its

Subsidiaries.

**A.    Claims Based on Tribune's Fiduciary Violations of ERISA §§ 404(a)(1)(A) &
(B) – Tribune's Disloyalty and Imprudence as an Appointing Fiduciary**

The Tribune is a fiduciary to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), and the terms of the ESOP, and as such liable for all violations of its fiduciary

responsibilities to the ESOP, and in particular, as described below, its failure to monitor

GreatBanc.  Tribune was a fiduciary in connection with the April 1, 2007 purchase by the ESOP

of the Tribune stock as well as the December 20, 2007 merger with the Tribune (the " Merger")

because it was the entity responsible for appointing, monitoring and removing GreatBanc, the

Employee Benefits Committee, and the ESOP's Administrator.  ESOP, §§ 1.3, 1.4 and 17.1.[2]

Tribune was also a fiduciary pursuant to ERISA § 3(21)(A), because it was the entity with the

power to appoint, retain and remove plan fiduciaries, and therefore, had discretionary authority

over the management or administration of the ESOP.  E.g., In re RCN Litigation, 2006 WL

753149, * 9 (D.N.J. 2006) ("This power to appoint, retain and remove members of the

Administrator Committee leaves the Company and Board of Defendants [sic] with fiduciary

duties under ERISA); see also ERISA Interpretative Bulletin 75-8, 29 C.F.R. § 2509.75-8(D-4)

(members of a board of directors "responsible for the selection and retention of plan fiduciaries"

have "'discretionary authority or discretionary control respecting the management of such plan'

and are, therefore, fiduciaries with respect to the plan").

    As a fiduciary, Tribune is subject to ERISA's fiduciary obligations, including the "duty

of loyalty" and the "duty of care." ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A)

and (B).  These duties are taken directly from the common law of trusts and are the "highest

known to the law." E.g., Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan

Enters., Inc., 793 F.2d 1456, 1468 (5th Cir. 1986), cert. denied, 479 U.S. 1089 (1987).  The "duty

of loyalty" required Tribune to carry out all of its fiduciary obligations with "complete and

undivided loyalty to the beneficiaries of the trust" and with an "eye single to the interests of the

participants and beneficiaries."  Reich v. Compton, 57 F.3d 270, 291 (3d Cir. 1995), citing

Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir.), cert. denied, 459 U.S. 1069 (1982).  The

"duty of care" required Tribune to carry out all of its fiduciary obligations on behalf of the

---

[2] A true and correct copy of the ESOP document is filed concurrently herewith as Exhibit "A".

ESOP's participants and beneficiaries "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

These duties applied to Tribune's appointment, retention and removal of other fiduciaries, and in particular GreatBanc, including with respect to the December 2007 Merger in Step 2 occurring after the April 1, 2007 transaction.  In this role, Tribune was obligated to monitor its appointees' performance to ensure that the appointees were themselves complying with their own duties to the ESOP because "implicit in [a fiduciary's] power to select the Plans' named fiduciaries is the duty to monitor the fiduciaries' actions, including their investment of plan assets." Mehling v. New York Life Ins. Co., 163 F. Supp. 2d 502, 509-10 (E.D. Pa. 2001). Thus, Tribune, as an appointing fiduciary, had a duty to oversee GreatBanc's performance of its own duties in connection with the ESOP's investments in Tribune stock to make sure that GreatBanc was complying with its own fiduciary obligations and to prevent misconduct or injury to the ESOP.  E.g., Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1465 (4th Cir. 1996); Martin v. Feilen, 965 F.2d 660 (8th Cir. 1992); Leigh v. Engle, 727 F.2d 113, 134-35 (7th Cir. 1984). The Tribune was obligated to monitor its appointees' conduct (also known as a duty of "surveillance and oversight," Leigh, 727 F.2d at 135 n.33), and to take appropriate action if its appointees were not protecting the interests of the ESOP's participants and beneficiaries.

Concomitant with its monitoring obligation, Tribune was also required to make sure that its appointees, including GreatBanc, had the information needed to comply with their own duties of loyalty and prudence.  ERISA requires appointing fiduciaries to "ensure that the appointed fiduciary clearly understands his obligations, that he has at his disposal the appropriate tools to perform his duties with integrity and competence, and that he is appropriately using those tools."

7

<u>Martin v. Harline</u>, 15 E.B.C. 1138, 1149 (D. Utah 1992).  Because the ESOP's only assets were

its Tribune stock holdings, this duty to monitor included a duty that Tribune ensure its appointees

had accurate information regarding Tribune's financial condition (particularly in light of

Tribune's own alleged complicity in deceiving its investors, including the ESOP, in connection

with its solvency projections in 2007).  <u>Cf.</u> <u>Glaziers and Glassworkers Union Local No. 252</u>

<u>Annuity Fund v. Newbridge Sec., Inc.</u>, 93 F.3d 1171, 1181-82 (3d Cir. 1996) (if securities firm

was an ERISA fiduciary it had an obligation to disclose to plans that firm's former employee had

resigned because of investment improprieties before the plans hired the former employee).

Indeed, fiduciary disclosure goes to the very "core of a fiduciary's responsibility."  <u>Bixler</u>

<u>v. Central Pennsylvania Teamsters Health & Welfare Fund</u>, 12 F.3d 1292, 1300 (3d Cir. 1993)

(quoting <u>Eddy v. Colonial Life Ins, Co.</u>, 919 F.2d 747, 750 (D.C. Cir. 1990)).  The failure of

Tribune to disclose that if Step 2 closed, the Debtors likely would be rendered insolvent, left the

ESOP's appointed fiduciaries without critical information they needed to prudently protect the

ESOP and thereby cleared the way for them to approve the Merger.  Tribune violated its

fiduciary obligations by standing idly by and silently watching its appointees make decisions

based on incomplete information that obscured the catastrophic financial condition of Tribune

and the ESOP's investments.

Separately and in addition to its liability as the appointing fiduciary for its failure to

monitor, Tribune may also be liable as a co-fiduciary for the breaches perpetrated by other

fiduciaries, including GreatBanc.  Under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary is

responsible for his co-fiduciaries' breaches if: (1) he knowingly participates in or conceals

knowledge of a breach by the other fiduciaries, unless he makes reasonable efforts under the

circumstances to remedy the breach. <u>Liss v. Smith</u>, 991 F. Supp. 278, 311 (S.D.N.Y. 1998); <u>see</u>

8

also Martin v. Harline, 15 Employee Benefits Cas. (BNA) at 1148-50) (fiduciary responsible for appointment and removal of plan's trustee, breached duty under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), to prudently appoint, periodically review, and generally oversee trustee's performance of his responsibilities, and therefore enabled trustee's breaches and is liable for them).

Fiduciaries thus have a duty to "use reasonable care to prevent a co-trustee from committing a breach of trust or to compel a co-trustee to redress a breach of trust."  Restatement (Second) of Trusts § 184 (1987 App.).  A fiduciary's inaction and failure to act promptly to halt another fiduciary's breach can give rise to co-fiduciary liability. E.g., Chicago Housing Authority v. J.A. Hannah Inv. Advisory Service, Inc., 1996 WL 328033 at *5 (N.D. Ill. 1996) (rejecting investment advisor's argument that it cannot be liable for another fiduciary's theft from plans, which advisor knew about for months; advisor may have enabled fiduciary breach); Jackson v. Truck Drivers' Union Local 42 Health and Welfare Fund, 933 F. Supp. 1134, 1141 (D. Mass. 1996) ("A fiduciary who becomes aware that a co-fiduciary has breached a fiduciary duty to plan beneficiaries may not escape liability by simply casting a blind eye toward the breach").

Here, according to the Examiner, Tribune knew that Tribune's solvency would be compromised if it carried through with the Merger.  Even so, Tribune failed to provide that information to GreatBanc and failed to act promptly to halt GreatBanc when it imprudently decided to consummate the Merger.  Thus, Tribune failed to act solely in the interests of the ESOP's participants and beneficiaries in violation of ERISA §§ 404(a)(1)(A) & (B).  Tribune is therefore liable for knowingly participating in, enabling, and failing to prevent or remedy GreatBanc's violations of ERISA.  ERISA §§ 405(a)(1)-(3), 29 U.S.C. §§ 1105(a)(1)-(3).

**B.** **Claims Based on Tribune and Subsidiaries' Knowing Participation in Violations of ERISA §§ 406 and 407 – Knowing Participation in Prohibited Transactions**

Based upon the above duties, Tribune, as well as its Subsidiaries, are also liable for knowingly participating in the April 1, 2007 transaction, which constituted a prohibited transaction under ERISA §§ 406 and 407, 29 U.S.C. §§ 1106 and 1107.  The United States District Court for the Northern District of Illinois has already ruled as a matter of law that the April 1, 2007 transaction constituted such a prohibited transaction.  Specifically, the court held that the stock purchased did not meet the definition of "employer security" found in IRC § 409(l), 26 U.S.C. § 409(l), since, as Tribune and its Subsidiaries knew, the stock was not readily tradable on an established securities market because "the ESOP could not sell its own shares." Neil, 2010 WL 4670895, *4-*5.  See Examiner's Report, Vol. I at 156-157 (Tribune, EGI-TRB and ESOP entered into agreements which constrained the ESOP's right to vote its shares and its ability to transfer its shares).  Consequently, Tribune and its Subsidiaries knowingly participated in a prohibited transaction in violation of ERISA §§ 406 and 407 by participating in the April 1, 2007 transaction.

The Tribune and its Subsidiaries' liability in this regard does not depend on having been a fiduciary with respect to the April 1, 2007 transaction.  Although the Secretary believes that Tribune was a fiduciary even as to that portion of the ESOP transaction, under ERISA anyone who knowingly participates in a breach of fiduciary duty is liable under ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).  In Harris Trust v. Salomon Smith Barney, 530 U.S. 238 (2000), the Court held that Salomon Smith Barney, a non-fiduciary party in interest, could be held liable under the parallel provisions of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for its knowing participation

in a transaction prohibited by ERISA § 406(a).[3]  Id. at 248-49.  Rejecting Salomon Smith

Barney's arguments that ERISA § 502(a)(3) provided for recovery only against fiduciaries, the

Court noted that "§ 502(a)(3) admits of no limit . . . on the universe of possible defendants . . .

the focus, instead, is on redressing the 'act or practice which violates any provision of [ERISA

Title I].'"  Id. at 246.  In so deciding, the Court contrasted ERISA § 502(a)(3) with other

provisions, such as ERISA § 409, 29 U.S.C. § 1109, which limit the possible class of defendants

to fiduciaries.  Id.  The Court also noted that ERISA § 502(l), 29 U.S.C. § 1132(l), allows the

Secretary to assess a civil penalty against any "'other person' who 'knowing[ly] participat[es] in'

'any . . . violation of . . . part . . . by a fiduciary.'"  530 U.S. at 248 (ellipses in original, emphasis

added).  The amount of such penalty is defined by reference to the amount ordered by a court to

be paid by such "other person" in a suit instituted by the Secretary under ERISA §§ 1132(a)(2)

or (a)(5).  Therefore, the Court reasoned, the "plain implication is that the Secretary may bring a

civil action under § 502(a)(5), 29 U.S.C. § 1132(a)(5), against any 'other person' who

'knowing[ly] participat[es]' in a fiduciary's violation."  Id.  This language applies with equal

force to both violations of ERISA §§ 404 and 406.  In re Enron Corp. Securities, Derivative &

ERISA Litigation, 284 F. Supp. 2d 511, 571-572 (S.D. Tex. 2003).

---

[3] ERISA § 502(a)(5) allows the Secretary to bring an action "(A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter."  This section gives the Secretary the same right in the same words to bring suit for knowing participation in fiduciary violations as the statute provides for participants and beneficiaries in ERISA § 502(a)(3).  E.g., Reich v. Compton, 57 F.3d at 282 ("Although the Supreme Court has not directly discussed the scope of section 502(a)(5), its discussion of section 502(a)(3)in Mertens provides considerable guidance due to the close relationship between those two provisions").

Thus having knowingly participated in the April 1, 2007 prohibited transaction, Tribune

and its Subsidiaries are liable whether or not they were fiduciaries with respect to that portion of

the ESOP deal.

**C.      Claims Based on Tribune and Subsidiaries' Knowing Participation in
Violations of ERISA § 404(a)(1)(D) – Knowing Participation in Violations of
the ESOP Documents**

As a consequence of its participation in the April 1, 2007 transaction described above,

Tribune and its Subsidiaries also knowingly participated in violations of ERISA § 404(a)(1)(D),

29 U.S.C. § 1104(a)(1)(D).  That section of ERISA requires fiduciaries to act "in accordance

with the documents and instruments governing the plan insofar as such documents and

instruments are consistent with [ERISA]."  Here, the Tribune ESOP document required that

stock purchased by the ESOP satisfy the requirements of ERISA § 407(d)(5), 29 U.S.C. §

1107(d)(5).  ESOP, § 5.1.  Again, because Tribune and its Subsidiaries knew, or should have

known, that the stock was subject to restrictions so that it was not readily tradable and therefore

failed to comply with the provisions of ERISA § 407(d)(5), their participation in the April 1,

2007 transaction violated their duty to act in accordance with the plan documents.  E.g., Neil,

2010 WL 4670895, *3-*6.

**D.      Claims Based on Tribune and Subsidiaries' Knowing Participation in
Violations of ERISA §§ 404(a)(1)(B) and 406(a)(1)(A) & (D) – Knowing
Participation in the ESOP's Overpayment for its Shares**

The DOL also has found that the Tribune ESOP overpaid for the Tribune stock in

violation of ERISA, and that Tribune and its Subsidiaries are liable for their knowing

participation in this breach.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), requires an

ERISA fiduciary to discharge his duties "with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims."
Pursuant to this duty, Tribune could not permit the ESOP to overpay for stock.  Nor is the
Tribune's imprudent reliance on a faulty appraisal a defense.  Although an independent
assessment of value is a factor in the prudence analysis in the ESOP context, it is not the end of
the analysis.  See Neil v. Zell, 677 F. Supp. 2d 1010, 1019-20 (N.D. Ill. 2009) ("An independent
appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that
their responsibilities are fulfilled") (citing Donovan v. Cunningham, 716 F.2d 1455, 1474 (5th
Cir. 1983)).  Instead, in determining whether an ERISA fiduciary has complied with the
prudence requirement of ERISA § 404(a)(1)(B), the inquiry focuses upon whether the fiduciary
justifiably relied on an independent expert.

The Tribune knowingly participated in GreatBanc's breach of its duties with respect to
the stock purchase.  Specifically, it violated ERISA §§ 406(a)(1)(A) and 406(a)(1)(D) because
the transaction involved the exchange of assets between a plan and a party in interest, the
Tribune.  Although ERISA § 408(e), 29 U.S.C. § 1108(e), provides an exemption for such a
prohibited transaction under certain circumstances, the ESOP's purchase did not meet the terms
of that exemption because the shares were purchased for more than adequate consideration.
Adequate consideration is defined by ERISA § 3(18), 29 U.S.C. § 1002(18), as follows:

> [I]n the case of an asset other than a security for which there is a generally
> recognized market, the fair market value of the asset as determined in good faith
> by the trustee or named fiduciary pursuant to the terms of the plan and in
> accordance with regulations promulgated by the Secretary.[4]

---

[4] Fair market value is "the price at which the property would change hands between a willing
buyer and willing seller, neither being under any compulsion to buy or to sell and both having
reasonable knowledge of relevant facts."  Eyler v. Commissioner of Internal Revenue, 88 F.3d
445, 451 (7th Cir. 1996).  The willing buyer and seller referenced in the definition are
hypothetical and the purchase price should not reflect any particularities or specificities of the
business that relate to the current owners or a captured buyer such as an ESOP.  Id.

"Adequate consideration" has two distinct parts: (1) the trustee has to follow a prudent process in purchasing the stock; and (2) the stock must be purchased for no more than fair market value.  A fiduciary's failure to comply with either part constitutes a breach of 406(a).  See Chao v. Hall Holding Co., 285 F.3d 415, 436 (6th Cir. 2002) ("the focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed") (quoting Donovan v. Cunningham, 716 F.2d 1455, 1467-68 (5th Cir. 1983)).

Here, the fiduciaries failed to meet the requirements of both parts of the adequate consideration test.  In particular, the fiduciaries failed to "follow a prudent process in purchasing the stock," as GreatBanc failed, in connection with its decision to engage in the ESOP transactions, to properly consider such factors as: (a) the fact that the lower range of its own calculated values was negative; (b) the illiquid nature of the shares; and (c) the limited control rights the ESOP was obtaining.  The fiduciaries also failed to ensure that the shares were even appropriate for an ESOP (because the shares were not tradable); and failed to ensure that the ESOP was actually qualified by the IRS as required by ERISA § 407(d)(6)(A), 29 U.S.C. § 1107(d)(6)(A).  As set forth above, the Tribune was well aware of each of these problems at the time and, even so, knowingly participated in the ESOP Transactions.

### E.   Recovery for Department of Labor Claims

#### (1)      Recovery based upon Losses

Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Tribune is liable for the fiduciary violations set forth above, which resulted from the April 1, 2007 transaction.  Had Tribune complied with its fiduciary duties, the ESOP would not have purchased any Tribune stock, much less overpaid for the stock in a $250 million transaction.  Instead, as a result of the Tribune's fiduciary misconduct, the ESOP expended $250 million that it never should have spent on the

stock.  Tribune, therefore, is liable for the ESOP's losses totaling $250 million plus interest from the date of the breach.

Similarly, had Tribune complied with its fiduciary obligations in connection with the December 20, 2007 Merger, the ESOP would not have approved the Merger and would have been left with stock in a solvent company.  As the Examiner has opined, "Tribune was rendered insolvent as a result of the Step Two Transactions by approximately $1,965 billion," (Examiner's Report, Vol. 2, at 225) after it purchased all outstanding shares for approximately $4,177 billion. Tribune's August 22, Schedule at 13E-3.  Although these are admittedly rough estimates, they demonstrate that, had the Merger not occurred on December 20, 2007, the ESOP would have retained approximately $167 million in value as of that date.[5]

### (2)    Disgorgement – Unjust Enrichment

Beyond Tribune's fiduciary liability for the losses it caused to the ESOP, Tribune and its Subsidiaries are also liable for equitable remedies in connection with their "knowing participation" in fiduciary breaches as set forth above under ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).  Tribune and its Subsidiaries knew that the ESOP was purchasing non-compliant shares (i.e., knew that the shares were not tradable) and, nonetheless, participated in the purchase of the shares (Tribune) and the Merger (Tribune), and took advantage of the ESOP's tax and financing benefits based upon the inflated prices and release of non-compliant shares to participant accounts (Tribune and its Subsidiaries).[6]

---

[5] The total outstanding shares at the time were approximately, 118,282,175 of which the ESOP owned only 8,928,571.  Assuming that the Examiner's Report supports a pre-Merger equity value of $2.2 billion, the ESOP's shares would each have been worth approximately $18.70.  As set forth more fully in the Examiner's Report, that equity value was lost when the Merger was consummated.

[6] The Examiner's Report makes it clear that tax and other financing advantages were substantial drivers behind the ESOP/S-Corporation structure of the transactions.  E.g., Examiner's Report,

Similarly, evidence provided to the DOL indicates that Tribune and its Subsidiaries may have obtained financial benefits by claiming to provide their employees with ESOP benefits generally and benefits based upon an inflated price in particular, even though they knew that the ESOP's shares were neither tradable nor worth their stated value.  For example, the Secretary understands that the Tribune and its Subsidiaries reported in their tax filings (federal, state and local) that they were providing benefits to ESOP participants concomitant with the stated value of the ESOP shares even though they knew, or should have known, that the ESOP stock was not worth the claimed value and that it was not tradable.[7]  Tribune and its Subsidiaries must therefore disgorge any benefit they obtained through their participation in the ESOP transactions.

## II.      THE CHAPTER 11 PLANS WRONGLY SEEK TO SUBORDINATE THE SECRETARY'S CLAIMS UNDER SECTION 510(b)

### A.      Subordination of the DOL Claims Fails to Further Congress's Purpose in Enacting § 510(b)

Section 510(b) of the Bankruptcy Code states:

For the purpose of distribution under this title, a claim arising from rescission of a or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or

---

Vol. I at 99, 125, 204 (discussing tax advantages of the subchapter S-Corporation, ESOP, eliminations of the 401(k) contributions, and other benefits).

[7] Discovery into the financial benefits claimed by the Tribune and its Subsidiaries is continuing. The Secretary also understands that the Tribune and its Subsidiaries justified their discontinuance of the prior 401(k) plans to the ESOP participants, in part, by telling ESOP participants that those 401(k) benefits would be replaced by ESOP benefits (even though they knew, or should have known, that the stock was overpriced and not tradable).  See Neil v. Zell, et al., 08-cv-06833 (N.D. Ill.) (dkt # 204), Third Amended Complaint, ¶ 133 ("Zell informed Tribune ESOP participants that 'What would have been discretionary company contributions to 401(k) accounts going forward are what's financing the ESOP'").  Even so, the Secretary's claims do not, at this time, seek relief based upon the discontinuance of the 401(k).

interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

Neither the text of the statute nor its legislative history compel a finding that section 510(b) sweeps so broadly as to encompass the Secretary's claims.  Not every claim that concerns the purchase or sale of securities is properly subordinated, even if brought by a shareholder *qua* shareholder, much less if the claim is brought by the Secretary of Labor in a quite different capacity.  Baroda Hill Investments, Ltd. et al. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133, 144 n.2 (3d Cir. 2002) ("We agree that in enacting § 510(b), Congress did not intend to subordinate every claim brought by a shareholder, regardless of the nature of the claim").  Even if a claim arises out of an equity interest which affords the claimant the right to share in a debtor's up-side potential, that claim still may not necessarily be subordinated under section 510(b).  Raven Media Investments LLC v. DirecTV Latin America LLC (In re DirecTV Latin America LLC), 2004 WL 302303, *4 (D. Del. 2004) (focusing on whether claimants "accepted the risk of business failure" in determining whether their claims may be subordinated under 510(b)).

ERISA fiduciary breach claims that relate to a plan's holdings in company stock are not claims "arising from the purchase or sale of . . . a security" within the meaning of section 510(b).  ERISA claims are not based on the company's status as an issuer of securities nor on the participants' status as investors in company stock, but rather on the company's distinct status as a plan fiduciary charged with a unique obligation to safeguard the interests of the pension plan and its participants.  E.g. Walling v. Brady, 125 F.3d 114, 118-119 (3d Cir. 1997) (ERISA claims attach to plan administration and fiduciary behavior).  Tribune owed a fiduciary duty to the ESOP and its participants not because it was the issuer of securities or because the Plan was an

17

investor in Tribune stock, but because Tribune was an ERISA fiduciary obligated to safeguard the ESOP's interests in conformity with its duties to act with prudence and loyalty under ERISA and to refrain from transactions prohibited by the Act.  ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B);  ERISA §§ 406(a) and (b), 29 U.S.C. §§ 1106(a) and (b).

Section 510(b) takes aim at an entirely different set of legal relationships than those governed by ERISA and, accordingly, does not subordinate the Secretary's claims.  The Secretary's claims under ERISA are not brought on behalf of stock investors, as such, to vindicate their interests as mere equity holders against the debtor by virtue of its status as the issuer of a "security of the debtor" within the meaning of section 510(b).  Rather, the Secretary brings her claims against the Tribune based on its status as an ERISA plan fiduciary to vindicate the interests of plan participants in proper plan fiduciary conduct.  Section 510(b) focuses on the relationship between the debtor, as issuer of securities, and the stockholder, as an investor in those securities.  ERISA instead focuses on the relationship between plan fiduciaries, as fiduciaries of federally regulated plans, and plan participants, as participants in those plans.

From an ERISA perspective, it is irrelevant whether the Tribune was the issuer of the securities at issue.  Thus, the plan documents could just as easily have made some party other than the Tribune the monitoring fiduciary, without raising any issue of subordination under section 510(b).  The mere fact that, in this case, Tribune voluntarily chose to take on the role of ERISA fiduciary, as well as issuer of Tribune stock, does not change the analysis.  Section 510(b) governs the relationship between the debtor's stockholders, as such, and the debtor, as issuer of stock, not the entirely distinct legal relationship between ERISA plan participants and their plans' fiduciaries.  Under ERISA, the Tribune's fiduciary status was wholly independent of its status as an issuer of stock.  Similarly, the Tribune would have had the same duties of

prudence and loyalty to the Plans' participants, regardless of whether the Plan had invested in stock or some completely different asset.

The ESOP and its participants were not ordinary equity investors that chose to share the risk of their company's failure. Rather, the ESOP and its participants are entities uniquely protected by the special duties imposed upon all plan fiduciaries by ERISA. For that reason, section 510(b) does not, by its terms or intent, subordinate these ERISA-based claims to the claims of other unsecured creditors.

The Third Circuit has determined that the language of section 510(b) limiting subordination to claims "arising from the purchase or sale of . . . a security," is ambiguous, at best. Telegroup, 281 F.3d at 138. This ambiguity in the text of the statute has been repeatedly recognized, not only by the Court of Appeals for the Third Circuit, but by circuit courts throughout the country. In re Deep Marine Holdings, Inc., 2011 WL 160595, *4 (Bankr. S.D. Tex. 2011); e.g., In re Seaquest Diving, L.P., 579 F.3d 411, 255 (5th Cir. 2009); In re Med Diversified, Inc., 461 F.3d 251, 259 (2d Cir. 2006); In re Geneva Steel Co., 281 F.3d 1173, 1179 (10th Cir. 2002). As the Third Circuit explained in Telegroup: "For a claim to 'aris[e] from the purchase or sale of . . . a security,' there must obviously be some nexus or causal relationship between the claim and the sale of the security, but § 510(b)'s language alone provides little guidance in delineating the precise scope of the required nexus." Id. at 138.[8] In fact, no circuit court has found such a nexus exists with respect to claims arising from the violation of ERISA.

---

[8]  Similarly, in construing the term "relate to" in ERISA's preemption provision, 29 U.S.C. § 1144(a), the Supreme Court has recognized that, despite its apparent breadth, the Court must look to ERISA's statutory purposes to determine the term's scope. New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656 (1995) ("We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive."). So too here: the phrase "arising from the purchase or

Given section 510(b)'s ambiguity, courts have been guided by the statute's legislative history in delineating its scope.  E.g., In re Telegroup, 281 F.3d at 138-41.  One revealing piece of legislative history is the Report of the Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pts. I & II (1973) (Commission Report), reprinted in Collier on Bankruptcy app. B, pt. 4(c) (Alan N. Resnick et al. eds., 15th ed. rev. 2004), which contained proposed language very similar to section 510(b)'s final language.  See In re Granite Partners, L.P., 208 B.R. 332, 336 n.8 (Bankr. S.D.N.Y. 1997).  According to the accompanying explanation, the proposed provision was "intended to reach claims by holders of the debtor's securities that were based on 'federal and state securities legislation, rules pursuant thereto, and similar laws,' but would not affect any other claim (e.g., a wage claim) which the investor also held."  Id. (quoting Commission Report, pt. II, at 116, reprinted in Collier, supra, app. B, pt. 4(c) at 4-684).  If the same intent is attributed to the Congress that later adopted the same statutory language, it is strong evidence that section 510(b) was not designed to apply to ERISA claims, particularly benefit claims, which are similar to wage claims.  See Horn v. McQueen, 215 F. Supp. 2d 867, 879 (W.D. Ky. 2002) (benefits provided by retirement plans, including ESOPs, "are not a mere gratuity . . . but a form of deferred wages"); Reich v. Valley Nat'l Bank, 837 F. Supp. 1259, 1286-87 (S.D.N.Y. 1993); see also 11 U.S.C. § 507(a)(4), (5) (giving wages and employee benefits similar priority in bankruptcy).

The key report that accompanied the enacted version of section 510(b) revealed the same intent – to ensure that shareholders with securities law claims would not be treated in the same manner in bankruptcy as general unsecured creditors.  See H.R. Rep. No. 95-595, at 194 (1977),

---

sale of . . . a security" in § 510(b) of the Bankruptcy Code must be read, not in the broadest possible sense to encompass every claim that touches on securities, but in the sense that best gives effect to the more limited statutory purpose to subordinate claims arising from a claimant's status as a shareholder, given the assumption of risk attendant to that status.

reprinted in 1978 U.S.C.C.A.N. 5963, 6154.  In determining that such claims should be

subordinated, Congress relied heavily on a law review article written by Professors John J. Slain

and Homer Kripke entitled, The Interface between Securities Regulation and Bankruptcy –

Allocating the Risk of Illegal Securities Issuance between Securityholders and the Issuer's

Creditors, 48 N.Y.U. L. Rev. 261 (1973) (herein "Slain & Kripke").  See H.R. Rep. No. 95-595,

at 194-96, reprinted in 1978 U.S.C.C.A.N. at 6154-56; In re Betacom of Phoenix, Inc., 240 F.3d

823, 829 (9th Cir. 2001).  As the title of their article indicates, the law professors focused their

attention on allocating losses arising from the illegal issuance of securities, and argued that

shareholders, rather than general creditors, should bear the risk of illegal issuance of securities as

well as the risk of enterprise insolvency.  Slain & Kripke at 286-88.  In their view, both risks are

voluntarily assumed by shareholders, who hope to obtain profits through an equity investment,

and neither is assumed by creditors, who assert a fixed dollar claim and rely on the equity

cushion provided by the shareholders in case of bankruptcy.  Id.  The bill enacted by Congress

"generally adopt[ed] the Slain/Kripke position."  H.R. Rep. No. 95-595, at 196, reprinted in 1978

U.S.C.C.A.N. at 6156; see also Geneva Steel, 281 F.3d at 1176 (describing Slain & Kripke

argument and legislative history); Telegroup, 281 F.3d at 140-41 (same).

The Slain & Kripke rationale for subordinating shareholder claims does not apply to

ERISA claims.  Under the strict legal regime of fiduciary duties imposed by ERISA, a

participant or beneficiary in an ERISA plan does not assume the type or degree of risk borne by a

typical equity investor in the securities market.  ERISA is designed to minimize the risk to

retirement savings by interposing fiduciaries subject to strict duties of prudence and loyalty

between plan participants and the market.  See 29 U.S.C. § 1001(b) (ERISA purposes); 29

U.S.C. §§ 1104(a)(1)(A)-(D), 1106 (ERISA fiduciary duties); Donovan v. Bierwirth, 680 F.2d

263, 272 n.8 (2d Cir. 1982) (ERISA imposes upon plan fiduciaries duties of prudence and loyalty that are the "highest known to the law").  The interests of ERISA participants in their plans, including ESOPs, are thus protected by a detailed legal regime that has no equivalent in the laws protecting ordinary shareholders.  See Moench v. Robertson, 62 F.3d 553, 568-70 (3d Cir. 1995) (discussing fiduciary duties of ESOP fiduciaries).  Consequently, the underlying rationale for section 510(b) – to make equity investors bear the risks of corporate insolvency – does not apply when ERISA participants challenge investment decisions made by their fiduciaries.

Recognizing the primary importance of Slain & Kripke, Collier on Bankruptcy states that the rationale underlying section 510(b) was that (i) subordination was required to prevent unhappy investors from eviscerating the equity cushion that protected a debtor's general creditors, and (ii) only the security holders should bear the risk of illegality in the issuance of such securities.  4 Collier on Bankruptcy § 510.04[2] (16th ed.).  As described below, unlike the typical equity investor which served as the model for the Slain & Kripke analysis, none of the ESOP's participants assumed these risks.

In the view of Professors Slain and Kripke, only equity investors assume the risk of illegality in the issuance of securities.[9]  ERISA plan participants, however, are not similarly situated to an ordinary shareholder.  Rather than deciding to assume that risk, any losses resulting from the issuance of Tribune's common stock to the ESOP was imposed upon the ESOP's participants, when the Tribune scuttled their 401(k) plan and replaced it with an ESOP.  The ESOP participants did not "choose" to purchase Tribune stock.  Unlike the equity investor that is the focus of section 510(b), ESOP participants could not pick a different retirement

---

[9]  Professors Slain and Kripke explicitly declined to discern the exact boundary between those shareholder claims that should be subordinated and those that should not.  See Slain & Krikpe, at 267 ("We are only incidentally concerned with the precise predicate of a disaffected stockholder's efforts to recapture his investment from the corporation").

benefit, could not sell their shares freely, and could not protect themselves from loss. Subordinating the Secretary's ERISA claims does not, therefore, serve section 510(b)'s purpose of preventing equity investors from shifting the risk of insolvency that they voluntarily assumed to other creditors.

On the facts of this case, in particular, the purposes of section 510(b) are ill-served by any argument that ERISA's purposes should be sacrificed to ensure the preservation of the equity cushion provided by the ESOP.  Slain & Kripke states:

> [I]n any case of issuer insolvency the claims of rescinding stockholders can be satisfied only out of the assets which otherwise would be allocated to making innocent parties whole.  These parties did nothing to create the rescinder's problems and in the overwhelming majority of the cases advanced money, credit or labor in reliance on the existence of equity or junior debt cushion which the rescinder purported to provide.

Slain & Kripke  at 286.  The Tribune ESOP deal did not seek to create an equity cushion but just the opposite: the ESOP leveraged buyout was funded by the company's borrowing, not new equity.  If anything, the retirement plan participants here were victimized by the Tribune's other creditors who sought to exploit the ESOP's tax and financing advantages for their own benefit. Yet, these same creditors would now benefit from the subordination of ERISA claims if the Reorganization Plans were approved.  For this reason as well, subordinating the ERISA Claims does not satisfy Congress's purpose in enacting section 510(b).

In In re Touch America Holdings, Inc., 381 B.R. 95 (Bankr. D. Del. 2008), there was no similar allegation that the 401(k) plan's stock purchases were aimed at benefiting the debtor and its creditors to the detriment of the ERISA plan.  Moreover, the 401(k) plan at issue in that case gave participants a measure of control over the decision to invest in employer stock that was not present in this case in which the Tribune ESOP's fiduciaries controlled the decision.  For these reasons – and because the claims in Touch America were asserted by private litigants, rather than

the Secretary (who clearly is not an equity investor) – the Court's subordination of ERISA

claims under section 510(b) in that case is distinguishable.  To the extent, however, that the

Court believes that Touch America would similarly mandate subordination of the ERISA claims

in this case, the Secretary respectfully disagrees with Touch America for all the reasons set forth

above, and would ask the Court to rule in her favor notwithstanding its prior decision.

Subordination of the DOL Claims would undermine Congress's purpose in enacting

ERISA by conflating ERISA fiduciary breach claims with the claims of ordinary equity

investors.  Congress enacted ERISA based upon its recognition that the prudent and honest

management of retirement plans was critical to "the continued well-being and financial security

of millions of employees and their dependents."  29 U.S.C. § 1001(a).  The underlying purpose

of ERISA is set forth in section 2 of ERISA which provides, in part:

> It is hereby declared to be the policy of this Act to protect . . . the interests of
> participants in employee benefit plans and their beneficiaries, by requiring the
> disclosure and reporting to participants and beneficiaries of financial and other
> information with respect thereto, by establishing standards of conduct,
> responsibility, and obligation for fiduciaries of employee benefit plans, and by
> providing for appropriate remedies, sanctions, and ready access to the Federal
> courts.

29 U.S.C. § 1001(b).  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989)

(ERISA was enacted to promote the interests of employees and their beneficiaries in employee

benefit plans); Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90 (1983) (same).  ERISA advances

these policies by imposing exacting fiduciary duties upon plan fiduciaries.  Levy v. Local Union

Number 810, 20 F.3d 516, 519 (2d Cir. 1994) (Section 404 (a)(1)(a) "has been understood to

impose strict fiduciary obligations on the trustees of such employee benefit funds."  The

Secretary alleges Tribune breached these duties, which are wholly independent of the Tribune's

status as an issuer of stock.  By confusing ERISA fiduciary breach claims with the sort of

stockholder claims that are properly subordinated under section 510(b), the Reorganization Plans would undermine these duties and the underlying purposes they protect.

Subordinating the DOL Claims also would violate the relationship that Congress has established between ERISA and the Internal Revenue Code.  Congress created a parallel system for enforcing ERISA's prohibited transaction rules in section 4975 of the Internal Revenue Code. Leib v. IRS, 88 T.C. 1474, 1480 (T.C. 1987).  Section 4975 imposes a 15% tax on the amount involved in a transaction prohibited by ERISA § 406, and that tax increases to 100% if the ERISA violation is not corrected.  26 U.S.C. §§ 4975(a) and (b).  Section 4975 also provides that before the tax is imposed that "the Secretary [of Treasury] shall notify the Secretary of Labor and provide him a reasonable opportunity to obtain a correction of the prohibited transaction or to comment on the imposition of such tax." 26 U.S.C. § 4975(h).

Under both Title I and Title II of ERISA, correction of a prohibited transaction ideally involves making the ERISA plan whole rather than imposing payment of a section 4975 tax to the Treasury.  See ERISA § 409(a) (providing for recovery of all losses and unjust profits resulting from a fiduciary breach) and 26 U.S.C. § 4975(f)(5) (providing that "'correction' and 'correct' mean . . .  placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards").  However, the opposite results if the Secretary's claims are subordinated under section 510(b) so that no recovery is obtained for the ESOP participants, while the section 4975 tax claims are not subordinated (so that some recovery is obtained by the Treasury only).  In such a case, the Treasury would receive payment in full on the claim as a priority excise tax and the plan would receive no return on a subordinated ERISA claim.  Thus, section 510(b) would be interpreted in a

way which directly conflicts with the priorities Congress carefully established in enacting 26 U.S.C. § 4975 of the Internal Revenue Code and section 406(b) of ERISA.

It is well established that potential conflicts between statutes should be avoided by harmonizing both statutory schemes to give effect to both. E.g., Udell v. United States (In re Udell), 454 F.3d 180, 184 (3d Cir. 2006).  "When two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  FCC v. NextWave Personal Communications, Inc., 537 U.S. 293, 304 (2003) (Bankruptcy Code and Communications Act of 1934); see also Patterson v. Shumate, 504 U.S. 753 (1992) (ERISA and Bankruptcy Code); Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365 (1990) (ERISA and Labor Management Reporting and Disclosure Act).

This Court can avoid creating a conflict between ERISA and the Bankruptcy Code by concluding that section 510(b) does not subordinate the Secretary's ERISA claims.  Such a holding is proper because, as described above, section 510(b) is ambiguous in the context of ERISA claims involving company stock and the legislative history and purposes of both statutes demonstrate that fiduciary breach claims involving employee benefit plans are not the type of claims that section 510(b) was designed to encompass.  Congress' goal for protecting the financial integrity of employee retirement plans would be unfairly degraded if an unwarranted and broad interpretation of section 510(b) prevailed and this Court subordinated ERISA claims. Instead, this Court should preserve the effectiveness and intent of both section 510(b) and ERISA by holding that mandatory subordination does not apply to ERISA claims.

**B.      The Secretary's ERISA Claims Are Not Claims "Arising From" the Purchase or Sale of a Security**

The Secretary does not bring her ERISA claims simply to vindicate the interests of the ESOP and its participants as shareholders, the ordinary province of section 510(b), but also to

vindicate the national interest in enforcing adherence to stringent standards of fiduciary conduct.

E.g., Herman v. South Carolina National Bank, 140 F.3d 1413, (11th Cir. 1998):

> Every circuit addressing the issue has held that the Secretary is not bound by prior private litigation when the Secretary files an independent action to address ERISA violations.  See, e.g., Beck v. Levering, 947 F.2d 639, 642 (2d Cir.1991), cert. denied sub nom., Levy v. Martin, 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992);  Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 690-94 (7th Cir.1986); Donovan v. Cunningham, 716 F.2d 1455, 1462-63 (5th Cir.1983); see also Brock v. Gillikin, 677 F.Supp. 398, 402 (E.D.N.C.1987).  Each court recognized that the Secretary's national public interests in bringing an ERISA enforcement action are wholly distinct and separate from those of private litigants who seek to redress individual grievances or recoup plan losses for their personal benefit as plan beneficiaries.  See, e.g., Fitzsimmons, 805 F.2d at 693-94.  The courts note that under ERISA's statutory framework, private plaintiffs do not adequately represent, and are not charged with representing, the broader national public interests represented by the Secretary.

ERISA affords pension plan participants strong protections based upon well-established trust law obligations that exist independently of securities laws and claims.  See Varity Corp. v. Howe, 516 U.S. 489, 496 (1996) (fiduciary duties under ERISA "draw much of their content from the common law of trusts"); see also Sen. Rep. No. 93-127, 2d Sess. 1974, reprinted in 1974 U.S.C.C.A.N. 4838, 4865 ("The fiduciary responsibility section, in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts"); Pegram v. Herdrich, 530 U.S. 211, 224 (2000) ("The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty . . . It is the duty of a trustee to administer the trust solely in the interest of the beneficiaries."); In re Enron Corp., 284 F. Supp. 2d at 546 (fiduciaries must discharge their duties prudently and "solely in the interest of the participants and beneficiaries. . .  [pursuant to] 29 U.S.C. § 1104 (a) (1) (A)").  These duties exist whether or not there is any sale of a security.  Therefore, a breach of these duties does not arise from the purchase or sale of a security for purposes of section 510(b).

Courts recognize that the duties corporations owe to all their shareholders, including

plans or plan participants, are distinct from the ERISA duties that corporations owe to plans and

plan participants when they act as fiduciaries.  "The state law and ERISA duties are parallel but

independent: as director, the individual owes a duty, defined by state law, to the corporation's

shareholders, including the plan; as fiduciary, the individual owes a duty, defined by ERISA, to

the plan and its beneficiaries."  Sommers Drug Stores Co. Employee Profit Sharing Trust v.

Corrigan Enters., Inc., 793 F.2d 1456, 1468 (5th Cir. 1986); accord Abraham v. Norcal Waste

Sys., Inc., 265 F.3d 811, 822 (9th Cir. 2001); In re WorldCom, Inc., 263 F. Supp. 2d 745, 765

(S.D.N.Y. 2003) (recognizing the existence of separate but "overlapping duties" under ERISA

and the securities laws); In re Enron Corp., 284 F. Supp. 2d at 565-66 (similar).

Courts have been careful to distinguish cases brought against employers in their capacity

as ERISA fiduciaries, as opposed to claims involving corporate actions.  In Martin v. Feilen, 965

F.2d 660, 666 (8th Cir. 1992), for example, the court held that, although the company's

controlling stockholders and directors were also fiduciaries of the company's ESOP, ERISA did

not authorize claims for corporate transactions that harmed the value of the stock:

> Virtually all of an employer's significant business decisions affect the value of its
> stock, and therefore the benefits that ESOP plan participants will receive.
> However, ERISA's fiduciary duties under section [404] attach only to
> transactions that involve investing the ESOP's assets or administering the plan.

See also Canale v. Yegen, 782 F. Supp. 963, 968 (D.N.J. 1992) ("the basis for this ERISA action

is not the perpetration of the fraud on [the company's] shareholders itself, but the fact that,

knowing the Plan's investments had been impaired by their own fraudulent acts, defendants,

acting as fiduciaries, failed to take any steps to protect the Plan's assets from dissipation").

Thus, Tribune's ERISA liability is wholly independent of its status as an issuer of the company's

stock, and its liability to ERISA plan participants for breach of its fiduciary obligations is wholly

independent of and separate from any liability that it may have to its shareholders generally as mere investors in Tribune stock.

In addition, on the facts of this case, subordinating the DOL Claims would benefit those creditors who sought to capitalize in the first place from the very prohibited and imprudent ESOP transaction that forms the basis for the DOL Claims.  Rather than being innocent and passive buyers, the LBO Lenders supported the ESOP equity structure because they stood to benefit from the special tax advantages to the company that they determined would result uniquely and solely from the ESOP's ownership of the company.  See Examiner's Report, Vol. 1 at 130, n.439 (Michael Costa stated to the Examiner: "I look at tax shield as equity cushion.").  Accordingly, there is no basis for arguing that the subordination of the DOL Claims is necessary to protect the legitimate expectations of creditors who relied upon the equity investment provided by the ESOP.

In fact, the opposite is true: the facts of this case demonstrate the injustice of subordinating the claims Congress created for protection of retiree benefits to the claims of the very creditors that sought to exploit the ESOP.  This is not a case in which innocent creditors, having played no role in creating the debt or exploiting the plan, seek to subordinate the claims of mere equity investors –a circumstance more appropriate for section 510(b) subordination.  Rather, in this case, eighty to eighty five percent of the Tribune debt arose from the Tribune ESOP leveraged buyout.  Moreover, the Examiner has found that it was "highly likely" that at least $ 3.7 billion of this LBO debt constituted a fraudulent conveyance. Examiner's Report, Vol. 1 at 18 and Vol. 2 at 80.  Even if one puts aside the claims for a fraudulent conveyance, it is clear that where the claims at issue arise from the same set of transactions from which the vast majority of a debtor's debts arose, and where those creditors knew no new equity was being

29

created in the transaction to protect them (but instead was being almost totally eliminated), the

basis for imposing section 510(b) subordination disappears.

C.    **Section 510(b) Is Inapplicable to the DOL Claims Arising from the Merger in Step 2, Because Such Claims Arose After the Step 1 Purchase and Sale Was Completed**

Separate and apart from whether section 510(b) applies to ERISA claims generally, it

should not apply to the DOL Claims arising from the Merger in Step 2, because such claims

arose after the purchase of Tribune stock.  As described above, the DOL asserts Claims relating

to Tribune's monitoring and disclosure obligations, including during the December 2007 Merger

in Step 2.  These breaches partially occurred after the ESOP's Step 1 purchase of the Tribune

stock was completed.  Claims relating to the post-purchase violations of ERISA simply do not

arise from the "purchase or sale" of the Debtor's securities as required for 510(b) subordination.

Nor should the claim fall within the scope of section 510(b) based on an argument that the

breaches would not have arisen, "but for" the sale having not occurred.  See In re Swift

Instruments, Inc., 2010 WL 5156118*3 (Bankr. N.D. Cal. 2010) ("but for" analysis does not

create a sufficient nexus to make section 510(b) applicable).  Otherwise the Third Circuit's

warning in Telegroup that not every shareholder claim is subject to section 510(b), see

Telegroup, 281 F.3d at 144, n.2, has no meaning, especially given that unlike the facts in

Telgroup, the ESOP's obligation to participate in a subsequent merger was not a requirement of

the agreement for the ESOP's purchase of the Tribune stock.[10]  See also In re Audre, Inc., 210

B.R. 360 (Bankr. S.D.Cal. 1997) (merger related tort committed subsequent to purchase of

security not subject to section 510(b)).  The attempt in each of the Competing Plans to treat "any

---

[10] Certain "Post-Merger" obligations of Tribune are identified as covenants of Tribune in Section 6(a) of the ESOP Purchase Agreement dated April 1, 2007 between Tribune and GreatBanc, as Trustee.  The agreement does not create any obligations of the ESOP with respect to the merger.

claim asserted by or on behalf of the ESOP" as a claim subject to subordination also ignores the

fact that some ESOP claims are unrelated to the Step 1 transaction, and thus conflicts with the

Third Circuit's requirements for the subordination of a claim pursuant to section 510(b).

> **D.    DOL Claims That Are Not For Rescission or Damages May Not Be Subordinated Under 510(b)**

In addition, some of the Secretary's claims, even if they were categorized as being related

to a "purchase or sale" within the meaning of 510(b), do not fall into any of the three categories

that may be subordinated pursuant to section 510(b).  In particular, section 510(b) subordinates

only claims for "damages," for "recission" or "for reimbursement or contribution allowed under

section 502."  None of the Secretary's claims seek "reimbursement or contribution allowed under

section 502" and some of the Secretary's claims seek neither "damages" nor "recission."  Those

claims which do not fall within any of these three categories therefore may not be subordinated

under section 510(b).

 First, some of the Secretary's claims simply require the return by the Tribune of the

excess purchase amount and any unjust profits made by the Tribune and its Subsidiaries as a

result of the ESOP transactions and consequently may not be treated as "damages" claims.[11]  In

particular, the Secretary's "knowing participation" claims against Tribune and its Subsidiaries set

forth above are brought under ERISA § 502(a)(5), which permits recovery of "appropriate

equitable relief."  See Mertens v. Hewitt, 508 U.S. 248, 262 (1993).  See also Harris Trust v.

---

[11] The Supreme Court has long recognized the difference in nature between damages claims and claims for disgorgement.  Compare Bowen v. Massachusetts, 487 U.S. 879, 893-901 (1988) ("Damages are given to the plaintiff to *substitute* for suffered loss") (citing D. Dobbs, Handbook on the Law of Remedies, 135 (1973)) (emphasis in the original) with Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 229 ("The fundamental substantive basis for restitution is that the defendant has been unjustly enriched by receiving something, tangible or intangible, that properly belongs to the plaintiff.") (citing 1 D. Dobbs, Law of Remedies, § 4.1(2), p. 557 (2d ed. 1993)).

Salomon Smith Barney, 530 U.S. 238, 239 (2000) (ERISA provides exclusively for "appropriate equitable relief" for the purpose of "redress[ing any] violations" of ERISA).  Consequently, the Secretary's claims for Tribune and its Subsidiaries' return of unjust profits may not be subordinated under section 510(b) because they do not seek a remedy that includes "damages."

Similarly, the Secretary's fiduciary claims under ERISA § 502(a)(2) also seek, among other things, a remedy requiring Tribune to disgorge any unjust profits it made as a result of its breaches of its own fiduciary duties (i.e., either by causing the ESOP to purchase stock that was untradable or because it is liable as a monitoring fiduciary for causing the ESOP to purchase untradable stock at an inflated price).  ERISA § 409(a),  29 U.S.C. § 1109(a), which is enforced through ERISA § 502(a)(2), provides for recovery of "losses to the plan resulting from each such breach, **and** to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary)." ERISA § 409(a),  29 U.S.C. § 1109(a) (emphasis added).  Pursuant to these provisions of ERISA, disgorgement of unjust enrichment (which forms a part of the Secretary's claims), is available separate and apart from any damages claims which the Secretary may also have.  Consequently, the Secretary's claims that seek recovery of unjust profits may not be subordinated as claims for "damages" under section 510(b).

Similarly, disgorgement of unjust profits under both ERISA §§ 502(a)(2) and (a)(5) also does not constitute "rescission."  E.g., F.T.C. v. Trudeau, 579 F.3d 754, 774 (7th Cir. 2009) (distinguishing cases where the remedy was "rescission, not restitution and disgorgement") (internal citation omitted).  The Secretary's claims for disgorgement of unjust profits do not seek to unwind the transactions (i.e., undo the Merger, return the shares, undo the loans, etc.), but rather to recover the overpayment obtained by the Tribune and its Subsidiaries as well as any unjust profits they earned in any way as a result of the ESOP transactions.  Consequently, the

Secretary's claims for the return of any unjust profits may not be subordinated under section 510(b) because the claims do not seek a "rescission" of a purchase or sale.

A basic goal in bankruptcy is equality of distributions among creditors.  E.g., Nathanson v. N.L.R.B., 344 U.S. 25, 29 (1952).  Therefore, statutory departures from this principle should be narrowly construed.  Trustees of Amalgamated Ins Fund v. McFarlin's, Inc., 789 F.2d 98, 1001 (2d Cir. 1986).  This basic principle would be violated if the scope of section 510(b) were interpreted to extend beyond the language of the statute to encompass claims that were not for rescission, damages or reimbursement or contribution allowed under section 502.

> **E.** **The Competing Plans Subordinate the DOL Claims Without Stating the Basis for Subordination**

Despite the numerous objections to applying section 510(b) to the Secretary's claims, the Debtors' Plan and the Noteholder Plan go so far as to subordinate any claim "asserted by or on behalf of the ESOP," (Debtors' Plan at § 1.1201(iv); Noteholder Plan at § 1.1.259), even in situations as to which there is no argument whatsoever that section 510(b) would apply.[12]  The Debtors' Plan provides no basis for this far reaching application of section 510(b), and instead leaves it to the Secretary and ESOP participants (and to the Court) to imagine the grounds for such.  No precedent exists for granting such broad subordination, without so much as a rationale.

In fact, only a few years ago the drafters of the Bankruptcy Rules made clear that due process requirements with respect to the subordination of a claim must be strictly enforced.  Specifically, Bankruptcy Rule 3007(b) was amended in 2007 to bar the practice of using a claims objection rather than an adversary proceeding to subordinate a claim.  See Bankruptcy Rule 7001(8) (claim may be subordinated either by commencing an adversary proceeding or in a

---

[12] As described in the following section of this Objection, the Noteholder Plan differs from the Debtors' Plan to the extent it does not seek to subordinate the DOL Claims against the Subsidiaries.

plan). It makes no sense that the Bankruptcy Rules would be revised to insure that debtors would be unable to utilize the less demanding requirements of a claims objection rather than an adversary proceeding in order to subordinate a claim while, at the same time, permitting debtors to subordinate claims in a chapter 11 plan without describing the basis for the subordination. The lack of due process inherent in the Debtors' Plan provides yet another reason why the attempted subordination of the DOL Claims should be rejected by this Court.

F.    **The Debtors' Plan Wrongly Subordinates the DOL Claims Against the Tribune Subsidiaries to the Claims Against the Parent Company**

The Debtors' Plan, in contrast to the Noteholder Plan, wrongly subordinates the claims of the DOL against the Tribune Subsidiaries to the claims against the parent company. The Debtors' Plan leaves the common stock in the Subsidiaries wholly unimpaired by reinstating those interests, see § 3.3.8 of the Debtors' Plan, while providing no distribution to the Securities Litigation Claims, the classes in which the DOL Claims are placed. See § 3.3.7 of the Debtors' Plan. In contrast, § 510(b) of the Bankruptcy Code explicitly states that if a subordinated claim arises from common stock, "such claim has the same priority as common stock." 11 U.S.C. § 510(b). If the DOL Claims against the Subsidiaries were being accorded the same priority as common stock under the Debtors' Plan, as required by section 510(b), the DOL Claims would be paid in full under the Debtors' Plan rather than receiving no distribution.

In addition to being in conflict with the clear language in section 510(b), courts have repeatedly rejected attempts by debtors to use section 510(b) to subordinate claims against a subsidiary to claims against a parent company. In re National Farm Financial Corp., 2008 WL 410236, *4 (Bankr. N.D. Cal 2008). In the seminal case of In re Lernout & Hauspie Speech Products, N.V., 264 B.R. 336 (Bankr. D.Del. 2001), a shareholder of the parent company also had a claim against the parent company's subsidiary; both companies were chapter 11 debtors.

The court in Lernout & Hauspie rejected the debtors' attempt to subordinate the claims against the subsidiaries to the claims against the parent company.  The court wrote that if the debtors' interpretation of section 510(b) were accepted, "[s]uch a reading would convert the term 'subordinate' as used in § 510(b), into 'disallow.'"  Id. at 343.  However, that is exactly what the Debtors' Plan is seeking by wrongly subordinating the DOL Claims against the Subsidiaries to the claims against the parent company.

The Debtors' Plan wrongly seeks to justify its failure to follow the dictates of section 510(b), as simply a matter of "administrative convenience."  Debtors' Plan at § 3.3.8(b). However, Congress already has determined in section 1122(b) those claims whose treatment can be altered for administrative convenience.  Those claims are limited to "every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."  11 U.S.C. § 1122(b).  Thus, administrative convenience cannot be used as a means of altering Congress's explicit requirement that a claim subordinated pursuant to section 510(b) has no less than "the same priority as common stock."  11 U.S.C. § 510(b).

A chapter 11 plan may not alter Congress' dictates simply because it "may benefit … the holders of Senior Guaranty Claims or because of "the Debtors' and Reorganized Debtors' agreement under this Plan to make certain Cash distributions to Holders of Allowed Claims." Debtors' Plan at § 3.3.8(b).  Such a rationale denies the protection Congress afforded section 510(b) claims by explicitly providing that such claims could not be subordinated to a level less than the priority afforded common stock.  4 Collier on Bankruptcy § 510.04[1].  A chapter 11

plan which fails to comply with "the applicable provisions of this title [the Bankruptcy Code]"

may not be confirmed.  11 U.S.C. § 1129(a)(1).[13]

III.    **THE EXCULPATION PROVISION IN § 11.5 OF THE DEBTORS' PLAN IS
        IMPERMISSIBLE**

In addition to subordinating the Secretary's claims, the Debtors' Plan includes an

impermissible exculpation provision in section 11.5.  In In re PWS Holding Corp., 228 F.3d 224

(3d Cir. 2000), the Third Circuit ruled that a chapter 11 plan could include an exculpation

provision which limited the liability of members of a creditors' committee, officers and directors

of a debtor and the professionals who assisted them to a standard of willful misconduct or gross

negligence.  It reasoned: "this standard of liability is the standard that already applies in this

situation;" thus, there is no violation of the prohibition against the release of non-debtors

established in section 524(e).  Id. at 246-247.  It took this standard from section 1103(c) of the

Bankruptcy Code and the existing case law.

Although instructive, the exculpatory provision validated in PWS cannot be a guide for

the treatment of ERISA claims.  PWS was decided before the enactment of section 704(a)(11) of

the Bankruptcy Code in 2005, which explicitly gave a chapter 7 trustee and debtor-in-possession

the obligation to continue to fulfill a debtor's pre-petition plan administrator role.  In the 2005

revision of the Bankruptcy Code, Congress also made clear in section 541(b)(7) that the assets of

an ERISA plan were excluded from a bankruptcy estate.  It is clear from the case law and ERISA

---

[13] Section 6.8 of both the Debtors' Plan and Noteholder Plan, entitled "Termination of ESOP,"
also may violate section 1129(a)(1) to the extent that it may provide for relief beyond what
section 1122(b) of the Bankruptcy Code may allow.  The Secretary is not objecting to the
termination of the ESOP, but may find objectionable the other relief that these Competing Plan
proponents may seek pursuant to section 6.8, such as "the legal effect of the forgiveness of the
ESOP Note."  However, at this juncture, no request for any additional relief has been sought.
Accordingly, the Secretary reserves any objection she may have to such relief, including a lack
of due process, until such time as a request for such relief is made.

itself that an ERISA fiduciary is obligated to act in accordance with the fiduciary duties of

loyalty and prudence.  ERISA §§ 404(a)(1)(A) and (B).  The applicable standard of care is "the

highest known to law" (Bierwith, 680 F.2d at 272, n.8), rather than the lesser standard provided

for the members of a creditors' committee in section 1103 of the Bankruptcy Code.

Accordingly, in keeping with the analysis by the Third Circuit, the lower standard of willful

misconduct or gross negligence found acceptable for reorganization breach of fiduciary claims in

PWS should not be applied with respect to claims under ERISA.

The exculpation provision in the Debtors' Plan also goes beyond the dictates of  PWS.

First, the provision is not limited to actions taken during the reorganization, but instead extends

to "any act or omission in connection with…the management or operation of the Debtors."

Debtors' Plan at § 11.5.  The Third Circuit has carefully limited its approval of exculpation

provisions to post-petition acts.  PWS, 228 F.3d at 245-246.  By extending the scope of an

exculpation provision to encompass pre-petition acts, an exculpation provision becomes an

impermissible, non-consensual third party release.  In re Exide Technologies, 303 B.R. 48, 75

(Bankr. D. Del. 2003).  Second, as described last month in the opinion in In re Washington

Mutual, Inc., __B.R.__ 2011 WL 81549 (Bankr. D. Del. 2011), an "exculpation clause must be

limited to the fiduciaries who have served during the chapter proceeding: estate professionals,

the Committee and their members, and the Debtors' directors and officers."  Id. at *29.  In

contrast, the exculpation clause proposed by the Debtors encompasses "Related Persons," which

is defined to include "predecessors, successors and assigns…current and former…employees,

managers" and a long list of other categories of persons. Debtors' Plan at § 1.1.188.  The scope

of the provision is therefore, too broad to survive confirmation.  In order for the Debtors' Plan to

be confirmed, its proposed exculpation provision must be sharply curtailed.

**CONCLUSION**

Based on the foregoing, the Secretary respectfully requests that the confirmation of either of the Competing Plans be denied until the required revisions are made and that the Court grant such other and further relief that it deems just and proper.


Dated: Washington, D.C.

      February 15, 2010                     M.PATRICIA SMITH
                                          Solicitor of Labor

                                          TIMOTHY D. HAUSER
                                          Associate Solicitor of Labor

                                          _/s/ Michael Schloss_____
                                          MICHAEL SCHLOSS
                                          Counsel for Financial Litigation
                                          LEONARD H. GERSON
                                          ELIZABETH S. GOLDBERG
                                          Trial Attorneys
                                          Plan Benefits Security Division
                                          Office of the Solicitor
                                          U.S. Department of Labor
                                          P.O. Box 1914
                                          Washington, D.C.  20013
                                          Tel (202) 693-5600
                                          Fax (202) 693-5610

                                          JOAN E. GESTRIN
                                          Chicago Regional Solicitor
                                          CHRISTINE Z. HERI
                                          Senior Trial Attorney
                                          United States Department of Labor
                                          Office of the Solicitor
                                          230 South Dearborn, Room 844
                                          Chicago, Illinois  60604

I, Michael Schloss, hereby certify that I am over the age of 18 years, am employed by the U.S. Department of Labor and that on February 15, 2011, I caused the foregoing **OBJECTION OF THE SECRETARY OF THE UNITED STATES DEPARTMENT OF LABOR TO THE CONFIRMATION OF EACH OF THE  PROPOSED JOINT PLANS OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES** to be served through the CM/ECF System for the United States Bankruptcy Court for the District of Delaware and by electronic mail upon the following plan proponents:

**<u>Counsel to Tribune Company, et al.</u>**

**Jessica C.K.Boelter**
Sidley, Austin, Brown & Wood LLP
One S. Dearborn Street
Chicago, IL 60603
312-853-7000
312-853-7036  (fax)
jboelter@sidley.com

**J. Kate Stickles**
Cole, Schotz, Meisel, Forman & Leonard,
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
302-652-3131
302-652-3117 (fax)
 kstickles@coleschotz.com

**<u>Counsel to Official Committee of Unsecured Creditors</u>**

**David M. LeMay**
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
212-408-5100
212-541-5369 (fax)
dlemay@chadbourne.com

**Adam G. Landis**
Landis Rath & Cobb LLP
919 Market Street
Suite 1800
Wilmington, DE 19801
usa
302-467-4400
302-467-4450 (fax)
 landis@lrclaw.com

**Counsel to JPMorgan Chase Bank, N.A.**

**Mark D. Collins**
Richards Layton & Finger
One Rodney Square
PO Box 551
Wilmington, DE 19899
302 651-7700
302-651-7701 (fax)
collins@RLF.com

**Damian S. Schaible**
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
212-450-4000
212 701-5800 (fax)
damian.schaible@davispolk.com

**Counsel to Oaktree and Angelo Gordon**

**Bruce Bennett**
Hennigan, Bennett & Dorman LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
213-694-1200
213- 694-1234 (fax)
bbennett@dl.com

**Robert S. Brady**
Young, Conaway, Stargatt & Taylor
The Brandywine Bldg.
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899-0391
302-571-6600
302-571-1253 (fax)
bankfilings@ycst.com

**Co-Counsel to Angelo Gordon**

**Andrew N. Goldman**
Wilmer Cutler Picking Hale & Dorr, LLP
399 Park Avenue
New York, NY 10022
212-230-8836
212-230-8888 (fax)
andrew.goldman@wilmerhale.com

**Counsel to Law Debenture Trust Company of New York**

**David S. Rosner**
Kasowitz, Benson,Torres & Friedman LLP
1633 Broadway
New York, NY 10019
212-506-1700
212- 506-1800 (fax)
drosner@kasowitz.com

**Richard F. Casher**
Kasowitz, Benson,Torres & Friedman LLP
1633 Broadway
New York, NY 10019
212-506-1700
212- 506-1800 (fax)
rcasher@kasowitz.com

**Garvan F. McDaniel**
Bifferato Gentilotti LLC
800 N. Market Street, Plaza Level
Wilmington, DE 19801
302-429-1900
302-429-8600 (fax)
gmcdaniel@bglawde.com

**Counsel to Deutsche Bank Trust Company Americas**

**Katharine L. Mayer**
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
302-984-6300
302-984-6399 (fax)
kmayer@mccarter.com

**David J. Adler**
McCarter & English, LLP
245 Park Avenue
New York, NY 10167
(212) 609-6800
(212)  645-1025(fax)
dadler@mccarter.com

**Counsel to Aurelius Capital Management, LP**

**William Pierce Bowden**
Ashby & Geddes
500 Delaware Avenue
8th Floor, P.O. Box 1150
Wilmington, DE 19899
usa
302 654-1888
302-654-2067 (fax)
wbowden@ashby-geddes.com

**Philip C. Dublin**
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
212-872-1000
212-872-1002 (fax)
pdublin@akingump.com

**Daniel H. Golden**
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
212-872-1000
212-872-1002 (fax)
dgolden@akingump.com

**Amanda Marie Winfree**
Ashby & Geddes, P.A.
500 Delaware Avenue
8th Floor, PO Box 1150
Wilmington, DE 19899
302-654-1888
302-654-2067 (fax)
awinfree@ashby-geddes.com

**<u>Counsel to Wilmington Trust Company</u>**

**Robert J. Stark**
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
(212) 209-4940
(212) 209-4801 (fax)
rstark@brownrudnick.com

**Martin S. Siegel**
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
(212) 209-4940
(212) 209-4801 (fax)
msiegel@brownrudnick.com

**Gordon Z. Novod**
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
(212) 209-4940
(212) 209-4801 (fax)
gnovod@brownrudnick.com

**William David Sullivan**
Sullivan Hazeltine Allinson LLC
4 East 8th Street, Suite 400
Wilmington, DE 19801
302-428-8191
302-428-8195 (fax)
bsullivan@sha-llc.com

   /s/ Michael Schloss_____