**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, *et al.*, | ) Case No. 08-13141 (KJC) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Re:  Dkt. Nos. 7801 & 7127 |
| | ) |
| | ) |

**EGI-TRB LLC'S OBJECTION TO CONFIRMATION OF (A) THE SECOND
AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY
AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL
MANAGEMENT, L.P., ANGELO GORDON & CO., AND JPMORGAN CHASE
BANK N.A. AND (B) THE JOINT PLAN OF REORGANIZATION FOR
TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY AURELIUS
CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES,
DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS
SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR
NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS
CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES
OF SENIOR NOTES AND WILMINGTON TRUST COMPANY, IN ITS
<u>CAPACITY AS INDENTURE TRUSTEE FOR THE PHONES NOTES</u>**

EGI-TRB LLC ("EGI-TRB") respectfully submits this Objection to confirmation

of the Second Amended Joint Plan of Reorganization for Tribune Company and its

Subsidiaries filed by the Debtors and certain other creditors (the "Debtors' Plan,"

Doc. 7801), and the Joint Plan filed by Aurelius Capital Management, LP and certain

creditors (the "Aurelius's Plan," Doc. 7127) and states as follows in support:

**INTRODUCTION**

A central feature of both the Debtors' Plan and Aurelius's Plan is the wholesale

assignment of causes of action to a litigation trust without consideration of whether the

assigned claims have merit or whether it is in the best interests of creditors and the

Debtors' estates to fund the pursuit of those claims without regard to the likelihood of

success.   This misuse of Estate funds to pursue meritless lottery-ticket litigation is improper and should prevent confirmation.   That defect is compounded by an inappropriate effort to strip potential defendants of statutory safe-harbor defenses and disable them from asserting their own rights of indemnification, contribution, and affirmative claims against third parties.  In short, the Plans seek to launch unfounded litigation and to prevent the fair defense of those claims.

No party would be more unfairly prejudiced by these Plan provisions—and no party would be more inappropriately left subject to baseless claims—than EGI-TRB and its president, Mr. Zell.

As this Court knows, the Debtors' estates have already incurred substantial cost to obtain the findings of an independent and highly-regarded examiner about the merits of these claims—an examination demanded by many of the same creditors that now lead the litigation charge.   But Examiner Klee's Report (Dkt. Nos. 5247, 5248, 5249, 5250) showed exactly why these claims should not be pursued.  In the case of EGI-TRB and claims related to the 2007 LBO, the Examiner found:

- It is **"highly unlikely"** a court would "conclude that any claims for aiding and abetting breach of fiduciary duty could be sustained based on the conduct of any potential defendants [including Mr. Zell and EGI-TRB] at Step One." (Examiner's Report, Vol. II. at 395.)  In addition, it is **"reasonably unlikely"** that any aiding and abetting claim could succeed as to Step Two because there is no "sufficient basis to conclude that the Zell Group aided and abetted a breach of any fiduciary duties in connection with the Leveraged ESOP Transactions."  (*Id*. at 395, 397.)

- It is **"reasonably unlikely"** that any unjust enrichment claims would be meritorious, including any such claim against Mr. Zell or EGI-TRB.  (*Id*. at 404, 406.)

- It is **"reasonably unlikely"** that a court would find that the Debtors incurred their obligations under the Step One Transactions with the actual intent to delay, hinder, or defraud their creditors.  (*Id*. at 22.)

2

- There is **no "plausible basis** . . . to justify equitable subordination of the EGI-TRB Notes" or equitable disallowance of EGI-TRB's claims. (Examiner's Report, Vol. II. at 338-39.)

- Even if satisfaction of the Exchangeable EGI-TRB Note at Step Two could be a preferential transfer, it is **"reasonably likely"** that a court would find that the transaction is **subject to an ordinary course of business defense**. (*Id*. at 311.)

Further, and as an overriding matter, Examiner Klee's Report contained no suggestion and identified no evidence that Mr. Zell and EGI-TRB acted with anything other than good faith—though Examiner Klee did conclude that other parties may not have acted in good faith in connection with the Step Two Transactions. (*Id*. at 74-75, 264, 281, 283, 338.)  Accordingly, regardless of any potential Step Two claims that he may have identified against other parties, the Examiner found no credible basis to assert any liability against EGI-TRB or Mr. Zell for claims related to Step Two.

Despite those preclusive findings, the proponents of both the Debtors' Plan and Aurelius's Plan seek to assign purported claims against EGI-TRB to their respective litigation trusts anyway.  In doing so, the Plan proponents have included inequitable provisions designed for the sole purpose of preventing EGI-TRB and other defendants from fairly defending themselves.  In taking this unprecedented step of not only seeking to pursue litigation that has been found to be baseless, but also seeking to strip the targets of their defenses and rights, the plan proponents have gone too far.

For those reasons, and for others detailed below, both Plans contain provisions which run afoul of 11 U.S.C. §1129.  Neither Plan should be confirmed.

**ARGUMENT**

**I.      Neither Plan Is Fair And Equitable Nor In The Best Interests Of The Debtors' Estates To The Extent That The Plans Authorize The Prosecution Of Litigation That The Examiner Found Is Unlikely To Succeed.**

The premise of both the Debtors' Plan and Aurelius's Plan is litigation.  But pursuing litigation for litigation's sake without regard to the merits of the claims is not in the best interests of the Debtors; nor is doing so fair and equitable to junior creditors who ultimately will bear the cost of this litigation.  As the Third Circuit has recognized, it is appropriate to allow a debtor to abandon causes of action where those claims "were unlikely to succeed and potentially costly to the debtors to pursue." *In re PWS Holding Corp.*, 228 F.3d 224, 237 (3d Cir. 2000).  That result is particularly appropriate where—as in *PWS Holding* and in this case—an Examiner has determined that the claims at issue have a low likelihood of recovery.  *Id.* at 239.

Additionally, this Court should not sanction the pursuit of litigation that is frivolous and as to which the Committee, which filed the only arguably timely LBO claims, had no standing to bring.  Merely because a party wants to administer a cause of action does not mean the court must allow that party to do so. In *Maxwell v. KPMG LLP*, 520 F.3d 713, 718 (7th Cir. 2008), the Seventh Circuit cautioned that bankruptcy courts should police the litigation decisions of trustees to ensure that lawsuits which are not likely to succeed are not filed merely because the claim is large and the pocket is deep. In that case, the Seventh Circuit criticized a trustee for pursuing a claim against an accounting firm simply because the claim had the potential for a large damage award, without regard to how likely that recovery might be.  *Id.*  "[F]rivolousness must depend not on the net expected value of a suit in relation to the cost of suing, but on the probability of the suit's succeeding.  If that probability is very low, the suit is

4

frivolous . . . ." *Id.* (citations omitted). Applying similar principles, the court in *In re Metropolitan Elect. Mfg. Co.*, 295 B.R. 7, 14-15 (Bankr. E.D.N.Y. 2003), refused to allow a trustee to sell the estate's causes of action because they lacked merit, reasoning that "[i]f [the creditor] is permitted to purchase the Trustee's rights and pursue alleged wrongdoers, there will be no end in sight to litigation in this case and the only benefit to the estate is the purchase price of $25,000 plus a highly unlikely recovery . . . . [Allowing these claims to proceed] is clearly  not necessary and beneficial to the fair and efficient resolution of this bankruptcy case." *Id* at 15.

As set forth above, the Examiner has concluded that the claims that have been filed against EGI-TRB and Mr. Zell are not likely to succeed.  In other words, the claims against EGI-TRB and Mr. Zell are, under the standards set forth in *Maxwell*, "frivolous." This Court can and should limit this litigation frenzy to only those claims that the Examiner has concluded have a reasonable chance of success and only allow the Debtors to assign to the litigation trust those causes of action that satisfy that minimum threshold. Aurelius has recognized the Examiner Report is "a unique aspect of this case," and that "appropriate deference" should be given to "the conclusions the Examiner made after exhaustive investigation."  (February 8, 2011 Transcript at 32.)

At a minimum, if this Court confirms any plan that permits claims that the Examiner found unlikely to succeed, it should do so subject to a further hearing on whether those claims are in the best interest of the Estate and whether the Committee had standing to assert those claims.   The Court is currently considering whether the Committee had standing to file suit against EGI-TRB and Mr. Zell.  [Bankr. Docs. 7164, 7613.]  To the extent the Committee lacked standing, the claims against EGI-TRB would

be time-barred and unavailable for assignment under either Plan.  Thus, in all events, the Court should defer authorizing the assignment of claims against EGI-TRB until the issue of standing is determined.

*      *      *

Although the Plans are fatally defective for other reasons addressed below, many of those objections would be moot if this Court foreclosed the transfer of claims against EGI-TRB and Mr. Zell that the Examiner found unlikely to succeed.

## II.    Both Plans Violate 11 U.S.C. §§ 1129(a)(1) and 1129(a)(3) Because They Seek To Eliminate The Safe Harbor Defense.

Both the Debtors' Plan and the Aurelius's Plan are defective for the independent reason that they improperly seek to deprive EGI-TRB and the other defendants of the benefit of the safe harbor defense found in 11 U.S.C. § 546(e).

The safe harbor provisions of Section 546(e), as interpreted by the Third Circuit and multiple other courts, provide that transfers made in connection with a leveraged buy-out, like the 2007 LBO at issue here, are "settlement payments" and excepted from avoidance as constructive fraudulent transfers or preferences under Section 546(e).  *See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 516 (3d Cir. 1999).[1]  The safe harbor defense reflects an important Congressional policy of avoiding systemic risk in the financial marketplace that would occur if trustees were able to avoid these types of pre-petition transfers.  *See* H.R. Rep. No. 97-420, at 1 (1982), reprinted in 1982 U.S.C.C.A.N. 583, 583.  Recognizing the importance of this policy, the Third Circuit concluded that the "term 'settlement payment' is a broad one that includes almost

---

[1] *Accord QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985-86 (8th Cir. 2009); *Kaiser Steel Corp. v. Pearl Brewing Co.* (*In re Kaiser Steel Corp.*), 952 F.2d 1230, 1239-40 (10th Cir. 1991).

all securities transactions.  Including payments made during LBOs within the scope of the definition is consistent with [this] broad meaning . . . ."  *Resorts*, 181 F.3d at 515.

The safe harbor defense forecloses constructive fraudulent transfer and preference claims against EGI-TRB and Mr. Zell.  Indeed, the Debtors recognize as much, explaining that the constructive fraudulent transfer claims are "subject to unique defenses under the Bankruptcy Code" that would defeat the Debtors' claims. (Debtors' Specific Disclosure Statement at 20 n.37, 26 at n.48.)

Recognizing that these claims cannot succeed under the Bankruptcy Code, the plan proponents seek to evade the Bankruptcy Code's provisions through a contrived "abandonment" of the claims by the Debtors, and an "assignment" of the claims to a "Creditor Trust."  More specifically, both Plans provide that the Debtors will abandon the estates' rights to pursue state law constructive fraudulent transfer claims pursuant to 11 U.S.C. § 544(b) related to the 2007 LBO.  (*See* Debtors' Plan at §§14 and 5.13; Aurelius Plan at §§5.18, 1.1.1 and 1.1.53.)  The abandoned claims would ordinarily revert to creditors, but, here, both Plans establish a procedure by which the claims will be automatically assigned to the Creditor Trust unless a creditor specifically opts out of the assignment.  (*See* Plan Ballots for Debtors and Aurelius.)  The Plans are undoubtedly structured in this manner to ensure that the Plan proponents are able to keep most of these claims, and use the estates' funds in pursuing them, because it is unlikely creditors will take the affirmative steps necessary to opt out.

The only benefit of "laundering" the claims in this manner is to attempt to strip the safe harbor defense of 11 U.S.C. § 546.  (Debtors' Specific Disclosure Statement at 20 n. 37, 26 n.48.)  Under that contrivance, the Creditor Trust would be acting in the name of

the assigning creditors, rather than by operation of Section 544(b), thereby allegedly rendering Section 546(e) inapplicable. Since the most likely applicable state laws do not contain safe harbor provisions like Section 546(e), the Plan proponents will assert post-confirmation that the safe harbor defense no longer applies. They admit that this is their intent in the Debtors' Disclosure Statement. But for all practical purposes, the Creditor Trust will be acting just as a trustee would under 11 U.S.C. §544(b)—using estate funds to prosecute what the Plan proponents believe will be most, if not virtually all, creditors' claims that are the very same claims that would be brought under Section 544(b). This effort to manipulate the Bankruptcy Code to avoid a key statutory provision—the safe harbor defense of Section 546(e)—is impermissible and renders both Plans unconfirmable.

A plan of reorganization "must comply with the applicable provisions of [the Bankruptcy Code]" and a bankruptcy court has the broad authority to prevent a debtor from attempting to create loopholes in the Bankruptcy Code. *See* 11 U.S.C. §1129(a)(1); *In re Taylor*, 81 F.3d 20, 25 (3d Cir. 1996) (holding that bankruptcy court has equitable authority to ensure that a debtor does not frustrate Congressional intent by manipulating the Bankruptcy Code); *Tidewater Fin. Co. v. Williams*, 498 F.3d 249, 258 (4th Cir. 2007) ("Congress has provided bankruptcy courts with several tools to remedy any 'loophole' [a party may attempt to exploit]"); *In re Weatherford*, 413 B.R. 273, 288 n.13 (Bankr. D.S.C. 2009) (bankruptcy court authorized to "take any action necessary to prevent abuse of process that would undermine the integrity of the bankruptcy system.") (citations omitted).

In this case, the statutory provision that Debtors and Aurelius want to avoid – the safe harbor provisions of Section 546(e) – reflects an important Congressional policy and a fundamental avoidance defense. *E.g., Resorts* 181 F.3d at 515-16. This Court looks dimly upon efforts to nullify that defense. For example, in *Official Committee of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 96 (D. Del. 2002), the Court refused to allow a committee to "circumvent Section 546(e) by asserting a state law claim for unjust enrichment based on the same facts and seeking essentially the same relief" as the fraudulent transfer claims that Section 546(e) barred. *Id.* at 96. Rather, the Court held that Section 546(e) preempts state law claims that, while technically not within the scope of Section 546(e), would serve to undermine its purpose. *Id.* at 97. The Eighth Circuit followed *Hechinger* in *Contemporary Industries Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009), holding that to "the extent state laws "conflict[ ] with, or frustrate[ ], federal law, the former must give way." In that case, as in *Hechinger,* the Court of Appeals refused to allow a constructive fraudulent transfer claim brought under 11 U.S.C. §544(b) that would be barred under Section 546(e) to be repackaged as a state law claim. The Plans' proposed end around Section 546(e) smacks of bad faith and violates 11 U.S.C. § 1129(3).

Thus, the Court should reject the plan proponents' effort to read Section 546(e) out of the Bankruptcy Code, just as the courts rejected similar sleights of hand in *Hechinger* and *Contemporary Industries*. Indeed, as the Third Circuit has explained, when a debtor takes actions that undermine substantive components of the Bankruptcy Code, the debtor's plan may not be confirmed. For example, In *In re Machne*

*Menachem, Inc.*, 233 Fed. Appx. 119, 121-122 (3d Cir. 2007), the Third Circuit held that a debtor's plan was unconfirmable because "debtor's orchestration of the purchase of claims outside the plan of reorganization undermined the critical confirmation requirements of the bankruptcy code." *Id.* at 122.

The same principles apply here. Debtors and Aurelius seek to orchestrate an end-run around section 546(e) to achieve liability in circumstances in which Congress clearly did not intend liability to accrue. Both plans fail to satisfy 11 U.S.C. §§ 1129(a)(1) and 1129(a)(3).

## III.    The Bar Order Contained In The Debtors' Plan Is An Impermissible Third Party Release That Cannot Be Confirmed.

The Debtors' Plan is defective for the additional reason that it seeks to disable EGI-TRB from asserting its lawful rights against third parties. Specifically, the Debtors' Plan provides that all creditors, including Mr. Zell and EGI-TRB, will be barred from asserting claims against a variety of creditors that the Examiner concluded may have liability in connection with the LBO-Related Causes of Action, but who are settling with the Debtors under the Plan. (*See* Debtors' Plan at §11.3.) This "Bar Order" is a non-consensual third party release that should only be approved in exceptional circumstances. *See, e.g.*, *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010). Among the factors to be considered when addressing non-consensual third party releases is the fairness of the release to non-consenting creditors. *Id.* In addition, courts consider whether creditors affected by the release will receive a substantial payment on account of their claims, holding that where the payment is minimal, a third-party release is not justified. *See In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003); *accord In re Medford Crossings North, LLC,* 07-25115, 2001 WL182815 at *19 (Bankr. D. N.J. Jan.

20, 2011) (declining to approve third party release where several classes of creditors objecting to the plan would receive nothing); *In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 336 (Bankr. E.D. Pa. 2010) (declining to approve plan that does not provide for payment of "substantially all" of the claims affected by third party releases).

The proposed Bar Order is manifestly unfair to EGI-TRB and Mr. Zell and should not be confirmed.  It would protect parties whom the Examiner found are likely liable for their conduct, while preventing EGI-TRB and Mr. Zell—for whom the Examiner reached the opposite conclusions—from asserting rights against those same parties.  (*Compare* Examiner's Report Vol. II at 22, 373, 395, 397, 404 , 406, 411 *with* Examiner's Report Vol. I at 20-21, and Examiner's Report Vol. II at 79-80, 264-72.)  Although the Bar Order purports to remedy this unfairness by providing for a reduction in any judgment amount that is entered against a person or entity that would be subject to the Bar Order (defined in the Debtors' Plan as a "Barred Person"), that limited exception only helps a party that is *found liable* for its conduct.  A party that has no liability stands only to lose its rights under this provision.

In other words, if EGI-TRB and Mr. Zell are successful in defending themselves (which, given the Examiner's conclusions, is likely), they will be left without any ability to recover on independent claims they may have against certain of the Released Parties related to defense costs or independent damages they may have suffered directly as a result of the Released Parties' conduct in connection with the 2007 LBO.  The Bar Order would purport to eliminate the right to pursue such claims, limiting EGI-TRB and Mr. Zell only to a potential judgment reduction in the unlikely event that the litigation trust was to prevail against them.  Particularly given the Examiner's conclusions about who

11

may have been at fault here, the Bar Order is unfair and should not be approved.  This unfairness is compounded by the fact that EGI-TRB is not projected to receive a distribution under either Plan and opted out of granting any third party releases under Section 11.2.2 of the Debtors' Plan.

**IV.   Both Plans Fail To Account For The Seniority Of The EGI-TRB's Note Over The Claims Of Holders of PHONES Notes And Therefore Both Plans Violate The Absolute Priority Rule And May Not Be Confirmed.**

In addition, both Plans unfairly fail to account fully for the fact that EGI-TRB is a creditor of the Debtors with priority over the PHONES Notes.  EGI-TRB does not, by this objection, demand that it be paid monies by the Estate; rather, EGI-TRB contends that if the PHONES, who are plainly subordinate to EGI-TRB, are to receive monies under a Plan, then EGI-TRB is necessarily entitled to be paid in full first.

The Court may only confirm the Plans if they are fair and equitable with respect to EGI-TRB's claims.  A plan of reorganization fails to satisfy the "fair and equitable" test with respect to a class of unsecured claims if it does not comply with the absolute priority rule.  11 U.S.C. §1129(b)(2)(B)(ii). The absolute priority rule requires that senior creditors be paid in full before a junior creditor may be allocated any payment on account of its junior interest.  *See, e.g., Group of Institutional Investors v. Chicago M., St. P. & Pac. R.R.*, 318 U.S. 523, 565 (1943) (absolute priority rule met only if "each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered."); *In re WebSci Techs., Inc.*, 234 Fed. Appx. 26, 30 (3d Cir. 2007) ("[T]he absolute priority rule [] requires that senior classes receive full compensation for their claims before other classes can participate.").  Further, 11 U.S.C. §510(a) requires the Court to enforce a subordination agreement to the same extent that such agreement is enforceable outside of bankruptcy.

Applying those principles here requires that EGI-TRB, which voted against both Plans, be paid in full before the PHONES Notes receive any recoveries. Although both the EGI-TRB Note and the PHONES Notes are subordinated unsecured claims, the PHONES Notes are subordinated to EGI-TRB's claims. To comply with the absolute priority rule and Section 1129(b)(2)(B) of the Bankruptcy Code, any plan must expressly provide that EGI-TRB will be paid in full before any distribution is made on account of the PHONES Notes.

The PHONES Notes are explicitly subordinated to every other debt of Tribune unless the documents governing that other debt expressly state otherwise. The Indenture dated April 1, 1999 which provides for the creation of the PHONES Notes (the "PHONES Indenture") states that the PHONES Notes are "subordinated to Senior Indebtedness" (PHONES Indenture at 61 (Ex. A hereto)).[2] "Senior Indebtedness" is defined broadly as *any* obligation of Tribune, with only four exceptions. Of those exceptions, only the first is relevant here.[3] It provides that the PHONES Securities are not subordinated to a debt of Tribune if the other debt instrument "expressly provides that [the debt] shall be subordinated to or pari passu with [the PHONES Securities]." (*Id*. at 62.) In other words, the PHONES Notes are subordinated to every other debt unless the documents governing that other debt expressly state that the debt is subordinated to or equal to the PHONES Notes.

---

[2] The PHONES Indenture states that it and PHONES Notes "shall be governed by and construed in accordance with the laws of the State of Illinois…." (Phones Indenture at 11.)

[3] The other three exceptions are:  Other debt of Tribune with respect to the PHONES Securities, "trade payables arising in the ordinary course of [Tribune's] business," and any debt Tribune may have to a Tribune subsidiary.  (PHONES Indenture at 62.)

The documents governing the EGI-TRB Note do not subordinate that debt to the PHONES Notes.  The EGI-TRB Note was created pursuant to a December 20, 2007, Subordinated Promissory Note (the "EGI-TRB Note" (Ex. B hereto)).  In a Subordination Agreement (the "EGI-TRB Agreement") also dated December 20, 2007, EGI-TRB subordinated its right to payment on the EGI-TRB Note to "all Senior Obligations." (EGI-TRB Agreement at 2 (Ex. C hereto).)[4]  The EGI-TRB Agreement defines "Senior Obligations" as "all obligations, indebtedness and other liabilities of [Tribune] other than (i) any such obligations, indebtedness or liabilities that by their express terms rank pari passu or junior to [Tribune's] obligations under the [Note]."  (*Id.* at 1.)  Notably, that language does not expressly reference the PHONES Notes.

The plain language of both the PHONES Indenture and the EGI-TRB Agreement thus establish that the EGI-TRB Note has priority over the PHONES Notes.  Under both Illinois and Delaware law, subordination agreements and clauses are to be strictly construed according to their terms.[5]  As shown, the PHONES Notes are subordinated to any other Tribune debt as long as that debt does not expressly provide that it is

---

[4] Both the EGI-TRB Note and the EGI-TRB Agreement state that they are to "be governed by and interpreted in accordance with the laws of the State of Delaware, without giving effect to any laws or principles of conflicts of laws that would cause the laws of any other jurisdiction to apply." (EGI-TRB Note at 3; EGI-TRB Agreement at 4.)

[5] *Guarantee Bank v. Magness Const. Co.*, 462 A.2d 405, 408-09 (Del. 1983) ("In construing the terms of a subordination clause … Delaware law requires such agreement to be strictly construed where their terms are unambiguous."); *Masten Lumber & Supply Co. v. Suburban Builders, Inc.*, 269 A.2d 252, 254 (Del. Super. Ct. 1970) (subordination agreement "must be strictly construed" because under a "liberal construction … a judicial decision would almost always be required to establish priority … as factual situations vary and lending institutions … would be in an intolerable position."); *PPM Fin., Inc. v. Norandal USA, Inc.*, 297 F. Supp. 2d 1072, 1081 (N.D. Ill. 2004) ("A subordination agreement [] is nothing more than a contractual modification of lien priorities and must be construed according to the expressed intention of the parties and its terms.") (internal quotations omitted); *Bank of Am. v. North LaSalle St. LP (In re 203 N. LaSalle St. P'ship.)*, 246 B.R. 325, 329 (Bankr. N.D. Ill. 2000) ("Illinois law provides that, in the absence of ambiguity, the terms of subordination agreements are to be construed according to their plain language.")

subordinated to the PHONES Notes.  Therefore, the PHONES Notes could have priority over only two types of debt instruments.  First, the PHONES Notes could have priority over a debt instrument that expressly stated that it was subordinated to the PHONES Notes.  Second, the PHONES Notes could have priority over a debt instrument that provided that it was subordinated to every other claim against Tribune without exception. The EGI-TRB Agreement does neither.  The lack of any such provisions in the EGI-TRB Agreement is evidence that Tribune and EGI-TRB did not intend for EGI-TRB to be subordinated to the PHONES Securities.  *See Grove v. Winter*, 197 Ill. App. 3d 406, 409 (Ill. App. Ct. 1990) (absence of provision from contract is evidence of an intent to exclude such provision); *Domeyer v. O'Connell*, 4 N.E. 2d 830, 832 (Ill. 1936) (same); *New Zealand Kiwifruit Marketing Bd. v. City of Wilmington*, 825 F.Supp. 1180, 1195 (D. Del. 1993) (Delaware law does not condone a court implying a term in a contract as the "absence of a [] provision is ... assumed to be clearly intended."); *Conley v. Dan-Webforming Intern. A/S (Ltd.)*, 1992 WL 401628 at *14 (D. Del. Dec. 29, 1992) (refusing to "supply an omission in [a contractual] provision.") (applying Delaware law). Consequently, the EGI-TRB Agreement does not fit into the narrow subordination exception created by the PHONES Indenture and EGI-TRB's claims therefore have priority over the PHONES Notes.

Conversely, the PHONES Notes comfortably fall within the subordination exception contained in the EGI-TRB Agreement.  Unlike the PHONES Indenture, the EGI-TRB Agreement does not require another debt instrument to specifically state that it is subordinated to EGI-TRB's claims.  Instead, the EGI-TRB Agreement looks to the overall priority structure of the other debt instrument to determine EGI-TRB's priority.

Given that the PHONES Indenture provides priority in limited and discrete circumstances -- circumstances not met by the terms of the EGI-TRB Agreement -- the PHONES Indenture's "express terms rank" the PHONES Notes below EGI-TRB's claims.  (EGI-TRB Agreement at 1.)

In addition, the PHONES Indenture was drafted in a way that contemplated that the PHONES Notes would be subordinated to Tribune's future debt.  Specifically, the PHONES Indenture states that Senior Indebtedness, which the PHONES Notes are subordinated to, includes all debts of Tribune "incurred, assumed or guaranteed by [Tribune], whether outstanding on the date of [the PHONES Indenture] or hereafter incurred. . . ."  (PHONES Indenture at 62.)  Given the PHONES Indenture's intent to broadly subordinate the PHONES Notes even to debt that had not yet been incurred, it is not surprising that the PHONES Indenture requires another debt instrument to unambiguously subordinate itself to the PHONES Notes.  Under those terms, the PHONES Notes are subordinated to the EGI-TRB Agreement.

That conclusion is confirmed by the Debtors' own acknowledgement that EGI-TRB's claims have priority over the PHONES Securities.  The Debtors have represented in their court filings that "the PHONES [Securities] . . . are contractually subordinated to all other funded indebtedness at Tribune."  (Dkt. No. 19 at 8).  The Debtors have also contended that "[EGI-TRB's claims] is subordinate to the indebtedness under the Credit Agreement, the Bridge Facility and the Notes" but not to the PHONES Notes.  (*Id*. at 9.) Likewise, the Examiner's Report notes that the "PHONES [Securities] are contractually subordinated to all funded indebtedness at the Tribune level (in other words, all obligations represented by notes or indebtedness for borrowed money). . . ." (Examiner's

Report, Vol. II at 4).  The Debtors and the Examiner, therefore, have represented to the Court what the underlying documents clearly show to be true—that the PHONES Indenture is subordinated to the EGI-TRB Agreement.

Given EGI-TRB's priority over the PHONES Securities, both of the Plans must explicitly provide that EGI-TRB will be paid in full before any distribution is made on account of the PHONES Notes in order to comply with the absolute priority rule and Section 1129(b)(2)(B) of the Bankruptcy Code.  Under both Plans, EGI-TRB should be entitled to be paid from any distributions to be paid to the holders of the PHONES Notes. Neither Plan makes this priority clear and unambiguous.  Although the Plans recognize the subordination of the PHONES Notes to other creditors, the Disclosure Statement submitted in support of the Aurelius's Plan projects distributions to the holders of the PHONES Notes, while reflecting no distribution to EGI-TRB, in violation of the absolute priority rule.  (Aurelius's Specific Disclosure Statement at 32, 35, 39, 42, 46, 48-49, 51-52.)  Under Aurelius's Plan, the holders of the PHONES Notes will only turn over their recoveries to senior creditors following a showing that the PHONES Notes are subordinated. (Aurelius's Plan at §3.2.9(c).)  The Debtors' Plan also does not expressly acknowledge EGI-TRB's right to be paid ahead of the PHONES.  (Debtors' Plan at §3.2.8.)  Accordingly, both plans fail to satisfy the absolute priority rule and cannot be confirmed.

**V.      Both The Debtors' Plan And Aurelius's Plan Contain Numerous Provisions That Are Not Fair And Equitable To Junior Creditors.**

Both Plans also contain other provisions that are not fair and equitable to junior creditors such as EGI-TRB and, therefore, both Plans violate 11 U.S.C. §1129(b)(1) and cannot be confirmed.  Even assuming that the proponents of the Debtor's Plan and

17

Aurelius's Plan make it express and clear that EGI-TRB is senior to the PHONES Notes, merely satisfying the absolute priority rule set forth in Section 1129(b)(2)(B) does necessarily make a plan "fair and equitable." The specific provisions of Section 1129(b) are not "the exclusive gauges of what is fair and equitable. Consulting the legislative history of § 1129(b)(2) and the definition of the word 'includes' used in its text, the courts have concluded the statute sets only the minimum standards for what is fair and equitable." *See In re Sunflower Racing, Inc.*, 219 B.R. 587, 603 (Bankr. D. Kan.), *aff'd*, 226 B.R. 673 (1998).

Here, both Plans contain provisions that inappropriately divert assets that might be available to pay the claims of junior creditors making the Plans unfair and inequitable. These provisions include:

- Both the Debtors' Plan and Aurelius's Plan provide that the trustees of their respective litigation and creditor's trusts and various related parties will enjoy unlimited broad indemnification rights, covering both acts or omissions in pursuing or not pursuing litigation. (Debtors' Plan at §§13.3.7; 14.4.7; Aurelius's Plan at §§5.17.10; 5.18.4; 7.16.10.) If either Plan is confirmed with these provisions intact, the result will be to insulate these individuals from any liability for their decisions to pursue claims that the Examiner found were not likely to succeed, making it all the more probable that frivolous litigation will be filed in the name of the litigation and creditor trusts. Instead of allowing the individuals who will control these litigation decisions the right to proceed without concern for their decisions, the Plans should make clear that liability may be imposed on the trustees and related parties individually if they improperly choose to prosecute litigation that is ultimately determined to be without merit.

- Aurelius's Plan improperly gives Aurelius control over the litigation and creditor trusts. Aurelius's Plan establishes a litigation trust advisory board, a creditor trust advisory board and a distribution trust advisory board. (Aurelius's Plan at §§5.17.3; 5.18.4; 7.16.4.) Aurelius's Plan provides that it will appoint two of three members of each of these advisory boards, effectively giving itself control over the decisions of these bodies. (*Id.*; *see also* Aurelius's Plan Supplement Attachment I, §6.4; Attachment J, §6.4; Attachment K, §6.4) Further, Aurelius's Plan provides that these boards will not owe any fiduciary duties to the creditors that are named as defendants in the actions brought by the litigation or creditor trusts. (Aurelius's Plan at §§5.17.3; 5.18.4; 7.16.4.) The removal of any

obligation to target defendants, who are or may also beneficiaries of the trusts, coupled with Aurelius's control over these boards, impermissibly removes any constraints on Aurelius's board members from doing anything other than pursuing every conceivable cause of action without regard to the merits of the claims.  This provision also renders Aurelius's Plan objectionable under 11 U.S.C. §1129(a)(5)(A)(ii).

- The Debtors' Plan does not establish the compensation to be paid to the trustees of the Litigation and Creditor Trusts.  The Debtors' Plan provides that such compensation will be as set forth in the litigation trust and creditor trust Agreements.  (Debtors' Plan at §§13.3.5; 14.4.5.)  The trust agreements, however, place no parameters on the compensation or bankruptcy court oversight and simply provide that the trustees will receive the compensation approved by the respective trust advisory boards.  (Debtors' Plan Supplement, Attachment K, §3.11;  Attachment L, §3.10.)

- Neither the Debtors' Plan nor Aurelius's Plan provide for any Bankruptcy Court oversight or notice to beneficiaries of the retention of professionals by the litigation or creditor trust.  (Debtors' Plan at §§13.3.4; 14.4.4; Aurelius's Plan at §§5.17.6(ii); 5.18.7(ii); 7.16.6(a)(ii).) Thus, there will be no check on professional compensation.

## VI.    The Debtors' Plan Impermissibly Rewards The Bridge Lenders To Obtain Their Support For The Debtors' Plan Rendering The Debtors' Plan Unconfirmable.

Finally, the Debtors' Plan impermissibly proposes to pay the Bridge Lenders up to $8 million for their professional fees and expenses incurred during the pendency of the Debtors' bankruptcy cases, without any oversight from this or any other Court.  (Debtors' Plan at §9.1.2).  The Debtors' generosity, however, comes with an important condition: for their $8 million potential payment, the Bridge Lenders must "support[] the [the Debtors'] Plan, [and] take[] no action inconsistent with confirmation of the [Debtors'] Plan . . . and vote[] all Bridge Loan Claims held by them to accept the [Debtors'] Plan . . . ."  (*Id.*)[6]  In short, the proponents of the Debtors' Plan seek to entice the Bridge Lenders into supporting their Plan by offering them something that they would not

---

[6] Consistent this provision of the Debtors' Plan, the Bridge Lenders withdrew their own Plan of Reorganization on February 7, 2011.  (Doc. 7821.)

otherwise be entitled to receive under the Bankruptcy Code.  Doing so, however, renders the Debtors' Plan unconfirmable.  *E.g.*, *In re Quigley Co.*, 437 B.R. 102, 131-32 (Bankr. S.D.N.Y. 2010) (denying confirmation where creditor paid other creditors outside of the plan of reorganization and conditioned payment on acceptance of plan); *In re Cook*, 69 B.R. 235, 236-37 (Bankr. W.D. Mo. 1986) (rejecting plan where debtor offered legally unsupportable priority payment for acceptance of debtor's plan).

Debtors' Plan provides no justification for this proposal.  This is unsurprising—the law is clear that unsecured creditors such as the Bridge Lenders are not entitled to reimbursement for post-petition fees and expenses.  *See, e.g.*, *In re FINOVA Group, Inc.*, 304 B.R. 630, 638 (D. Del. 2004); *In re Loewen Group Intern., Inc.*, 274 B.R. 427, 444 (Bankr. D. Del. 2002) ("Thus, like post-petition interest, post-petition fees and costs may only be recovered by creditors to the extent theirs claims are oversecured."); *In re Pride Companies, L.P.*, 285 B.R. 366, 372 (Bankr. N.D. Tex. 2002) (collecting cases). Likewise, a creditor also may not attempt to recover fees and expenses incurred in pursuing an alternative plan or reorganization because such an effort is primarily done in the interest of that particular creditor and not the estate generally.  *In re Aspen Limousine Serv., Inc.*, 193 B.R. 325, 336 (D. Colo. 1996) ("[The creditor] was acting in its own interest in objecting to the [Debtor's] plan and furthering its competing plan.  The attorney fees and expenses incurred in doing so should therefore be paid by [the creditor]").  In short, the Debtors have offered the Bridge Lenders substantial benefits under the Debtors' Plan that they would not otherwise be entitled to receive under the Bankruptcy Code.  Therefore, the Debtors' Plan cannot be confirmed.

## CONCLUSION

For all of the foregoing reasons, EGI-TRB respectfully requests that confirmation of both Plans be denied and that the Court grant such other relief as may be just.

Dated: February 15, 2011

Respectfully submitted

By:      /s/ *David W. Carickhoff*
         David W. Carickhoff (DE No. 3715)
         BLANK ROME LLP
         1201 Market Street, Suite 800
         Wilmington, DE 19801
         Telephone: (302) 425-6400
         Facsimile: (302) 425-6464

                          and

         David J. Bradford (admitted *pro hac vice*)
         Catherine L. Steege (admitted *pro hac vice*)
         Andrew W. Vail (admitted *pro hac vice*)
         JENNER & BLOCK LLP
         353 N. Clark St.
         Chicago, IL 60654
         Telephone: (312) 222-9350
         Facsimile: (312) 527-04844

         *Counsel for EGI-TRB, LLC*