## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| | ) Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*, | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Re: Docket Nos. 6184, 6601, 6676, 7073, and 7127 |
| | ) |
| | ) **Hearing date**: March 7, 2011 at 10:00 a.m. (Eastern) |
| | ) |
| | ) **Objection deadline**: February 15, 2011 |
| | ) |

### JOINT OBJECTION OF THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, ANGELO, GORDON & CO. L.P., OAKTREE CAPITAL MANAGEMENT, L.P. AND JPMORGAN CHASE BANK, N.A. TO CONFIRMATION OF THE NOTEHOLDER PLAN

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), the Official Committee of Unsecured Creditors (the "**Committee**"), Angelo, Gordon & Co., L.P., Oaktree Capital Management, L.P., and JPMorgan Chase Bank, N.A. (collectively, the "**Lender Proponents**" and together with the Debtors and the Committee, the "**DCL Plan Proponents**"), as proponents of the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries [D.I. 7801] (the "**DCL Plan**"), hereby object to confirmation of and respond to the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries [D.I. 7127] (the "**Noteholder Plan**") proposed by Aurelius Capital Management, L.P. ("**Aurelius**"), Deutsche Bank Trust Company Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company (collectively, the "**Noteholders**").[1]

---

[1] Each capitalized term used and not otherwise defined herein has the meaning ascribed to it in the Noteholder Plan.

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION .................................................................................................... 1

ARGUMENT ......................................................................................................... 3

I.      The Noteholder Plan Is Facially Unconfirmable Because It Fails to Comply with § 1129(a)(10) ................................................................................... 3

II.     The Noteholder Plan Fails to Comply with §§ 1123(a)(3) and 1123(a)(5) ............ 9

III.    The Noteholder Plan Fails to Provide the Court with Information Necessary to Assess Compliance with §§ 1129(b) and 1129(a)(7) ............................................ 13

       A.       The Noteholder Plan's Failure to Specify the Treatment of Impaired Classes Renders Impossible a Showing of Compliance with § 1129(b) ....................................................................................... 13

       B.       The Noteholder Plan's Failure to Determine Debtor-by-Debtor Distributable Enterprise Value and Resolve Intercompany Claims Renders Impossible a Showing of Compliance with § 1129(b) ............... 15

       C.       The Noteholder Plan's Failure to Specify Distributions, Determine Debtor-by-Debtor Distributable Enterprise Value and Resolve Intercompany Claims Renders Impossible a Showing of Compliance with § 1129(a)(7) ................................................................... 18

       D.       Initial Distributions to Other Guarantor Debtor Claims Cannot be Shown to Comply with § 1129(b) and the Noteholder Plan's Treatment of such Claims Results in a *De Facto* Substantive Consolidation of the Debtors' Estates ..................................................... 19

IV.    The Noteholder Plan Was Not Proposed in Good Faith and Violates § 1129(a)(3) .................................................................................................. 20

       A.       The Noteholder Plan Destroys Value ......................................................... 21

            1.      Ownership Uncertainty Could Harm Enterprise Value ................ 22

            2.      The Noteholder Plan's Trust Structure Would Depress the Value of the Minority Shares ....................................................... 24

            3.      The Distribution Trust Structure Causes Adverse Tax Consequences ....................................................................... 25

i

B.     The Noteholder Plan Is Fundamentally Unfair to Creditors .....................27

C.     The Noteholder Plan Excessively Delays Creditor Recoveries ................29

D.     The Noteholder Plan Was Proposed with Ulterior Motives .....................32

       1.     Establishment of Litigation Leverage .............................................33

       2.     Improper Control ..............................................................................35

       3.     Coercive "Put Option" ....................................................................36

V.     The Noteholder Plan Impermissibly Purports to Release Non-Debtor Guarantors .............................................................................................................38

VI.     The Noteholder Plan Improperly Classifies the Senior Loan Claims and the Swap Claim, In Violation of 11 U.S.C. §§ 1122 and 1129(b) ..............................40

A.     The Noteholders Offer No Reasonable Basis to Distinguish Between Step One Senior Lenders and Step Two Senior Lenders ...........41

B.     The Noteholder Plan Improperly Classifies the Swap Claim with the Step One Senior Loan Claims ...............................................................43

VII.     The Noteholder Plan Is Not Fair and Equitable to the Senior Lenders ................44

CONCLUSION .......................................................................................................................47

TABLE OF AUTHORITIES

CASES

PAGE

*In re AbitibiBowater, Inc.*, 2010 Bankr. LEXIS 3987 (Bankr. D. Del Sept 13, 2010) .................7

*In re Armstrong World Indus.*, 432 F.3d 507 (3d Cir. 2005) ...........................................44

*Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) .......................................................................................44

*In re Briscoe Enters., Ltd.*, 994 F.2d 1160 (5th Cir. 1993) ...........................................14

*Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*, 914 F.2d 810 (6th Cir. 1990) .............41

*In re Butler*, 42 B.R. 777 (Bankr. E.D. Ark. 1984) ................................................. 9-10

*In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715 (Bankr. M.D. La. 1999) ..............................35

*In re Century Glove, Inc.*, 74 B.R. 958 (Bankr. D. Del. 1987) ......................................45

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) ...........................................................................39

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) ..................................... 20-21

*Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177 (B.A.P. 9th Cir. 2003) .........35

*In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001) .....................................21, 27

*Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994 (E.D. Va. 1994) .......................9, 13, 18, 30

*In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631 (Bankr. E.D. Pa. 1996) .............................42

*In re Diplomat Constr., Inc.*, 2009 Bankr. LEXIS 4250 (Bankr. N.D. Ga. Nov. 20, 2009) .........35

*In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000) ........................................40

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............... 7-8

*In re EFH Grove Tower Assocs.*, 105 B.R. 310 (Bankr. E.D.N.C. 1989) .....................................45

*Eisenberg v. Commissioner of Internal Revenue*, 155 F.3d 50 (2d Cir. 1998) ..............................24

iii

*In re Enron Corp.*, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004)..............................8

*In re Executive House Assocs.*, 99 B.R. 266 (Bankr. E.D. Pa. 1989) ............................................45

*In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003) .................................................................14

*Fed. & Sav. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr., Inc.)*,
    865 F.2d 673 (5th Cir. 1989) ....................................................................................................45

*In re G-1 Holdings Inc.*, 420 B.R. 216 (Bankr. D.N.J. 2009)........................................................22

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001)....................................14

*Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000) .........39

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) .............................................................5

*Grogan v. Garner*, 498 U.S. 279 (1991)........................................................................................23

*In re Haardt*, 65 B.R. 697 (Bankr. E.D. Pa. 1986) ........................................................................21

*In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34 (Bankr. S.D. Ind. 1986) ...............................................29

*Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC)*,
    556 F.3d 247 (4th Cir. 2009) ....................................................................................................44

*In re Idearc, Inc.*, 423 B.R. 138 (Bankr. N.D. Tex. 2009).............................................................16

*In re Integrated Telcom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004).............................................21

*In re Int'l Wireless Commc'ns Holdings Inc.*, Case No. 98-2007 (Bankr. D. Del. Mar. 26, 1999).7

*In re Jersey City Medical Ctr.*, 817 F.2d 1055 (3d Cir. 1987).......................................................40

*John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993).....................................................................................................40

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................................................................. 8, 21-22

*Kaiser Aerospace & Elec. Corp. v. TeleDyne Indus. (In re Piper Aircraft Corp.)*,
    244 F.3d 1289 (11th Cir. 2001) ................................................................................................37

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*,
    115 F.3d 650 (9th Cir. 1997) ............................................................................................. 42-43

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491 (D.N.J. 2005)................................40

*In re Mediq, Inc.*, Case No. 01-252 (MFW) (Bankr. D. Del. May 16, 2001)............................6, 7

*In re N.S. Garrott & Sons*, 48 B.R. 13 (Bankr. E.D. Ark. 1984).....................................................14

*In re Neenah Enters.*, 2010 Bankr. LEXIS 3058 (Bankr. D. Del. July 6, 2010) .............................7

*Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns. Corp.)*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ........33

*In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695 (Bankr. S.D.N.Y. 1993)...................41

*In re Oneida Ltd.*, 351 B.R. 79 (Bankr. S.D.N.Y. 2006) ..................................................21, 32-33

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005)...................................................................9, 20

*In re Pike's Peak Water Co.*, 779 F.2d 1456 (10th Cir. 1985) ......................................................29

*In re Porcelli*, 319 B.R. 8 (Bankr. M.D. Fla. 2004)......................................................................41

*In re Reading Broadcasting, Inc.*, 2009 Bankr. LEXIS 2593 (Bankr. E.D. Pa. Jan. 17, 2009).....44

*In re SGPA, Inc.*, 2001 Bankr. LEXIS 2291 (Bankr. M.D. Pa. Sept. 28, 2001) ..............................8

*Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346 (5th Cir. 1989) ..................................................................................................9

*Schaeffer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.)*, 591 F.3d 350 (5th Cir. 2009) ....................................................................................10, 12

*Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Prods. N.V.)*, 308 B.R. 672 (D. Del. 2004) ...........21, 27, 37

*In re Sutton*, 78 B.R. 341 (Bankr. S.D. Fla. 1987)...................................................................9, 30

*In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010)....................................................36

*U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) .......................................................................5

*U.S. Bank N.A. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114 (Bankr. D. Del. 2010) ...................................................................... 14, 39-40

*In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003) ....................................................39

v

*In re VIP Motor Lodge, Inc.*, 133 B.R. 41 (Bankr. D. Del. 1991) ..................................................45

<u>STATUTES & RULES</u>

11 U.S.C. § 524(e) ......................................................................................................................39

11 U.S.C. § 546(g) ......................................................................................................................44

11 U.S.C. § 548(d)(2)(D) ....................................................................................................... 43-44

11 U.S.C. § 1122 .........................................................................................................................40

11 U.S.C. § 1122(a) ....................................................................................................................40

11 U.S.C. § 1123(a)(3) ........................................................................................................ *passim*

11 U.S.C. § 1123(a)(5) ........................................................................................................ *passim*

11 U.S.C. § 1129(a) ...........................................................................................................3, 40, 47

11 U.S.C. § 1129(a)(1) ................................................................................................................40

11 U.S.C. § 1129(a)(3) ..............................................................................................20, 21, 37, 38

11 U.S.C. § 1129(a)(7) ..................................................................................................13, 18, 19

11 U.S.C. § 1129(a)(10) ...................................................................................................... *passim*

11 U.S.C. § 1129(b) ............................................................................................................ *passim*

11 U.S.C. § 1129(b)(2) ...........................................................................................................14, 44

11 U.S.C. § 1129(b)(2)(B) ...........................................................................................................44

Fed. R. Bankr. P. 1001 ...............................................................................................................29

Treas. Reg. § 1.468B-9 ...............................................................................................................25

<u>OTHER AUTHORITIES</u>

7 Collier on Bankruptcy ¶ 1122.03 .............................................................................................41

7 Collier on Bankruptcy ¶ 1123.01[3] .........................................................................................10

7 Collier on Bankruptcy ¶ 1129.03 .............................................................................................43

### INTRODUCTION

There are now just two plans to be considered at the confirmation hearing in these cases. The DCL Plan is the product of a Court-ordered mediation conducted by Judge Kevin Gross, and is supported by (i) the Debtors, as the fiduciaries for all parties in interest, (ii) the Committee, as the fiduciary for all unsecured creditors and as the party vested with standing to pursue the LBO-Related Causes of Action, (iii) the administrative agent for the Senior Lenders and virtually all of the Senior Lenders, (iv) the administrative agent for the Bridge Loan Lenders and virtually all of the Bridge Loan Lenders and (v) the vast majority of the Debtors' other general unsecured creditors. In fact, nearly 70% in number of the Senior Noteholders who voted—the very constituency whom the Noteholders claim is harmed by the DCL Plan—cast ballots to *accept* the DCL Plan.[2]

The Noteholder Plan, on the other hand, is proposed by a professional investor and the indenture trustees who answer to it. That "plan" contains no settlements and resolves nothing, providing only for continued litigation of each and every controversy that has mired the Debtors in bankruptcy.

Votes have been cast on these two plans, and the creditors have resoundingly voted to reject the Noteholder Plan and its failure to provide a viable resolution of any part of these cases. Beyond the Senior Notes and PHONES Notes classes controlled by the Noteholders, the only impaired class (out of a total of 256 impaired classes solicited to vote) that actually voted to accept the Noteholder Plan contained a single voting claim in the amount of $47.10, the holder of

---

[2] 69% of the voting Noteholders voted to accept the DCL Plan, while 73% of the voting Noteholders voted to accept the Noteholder Plan. Only 88 of the approximately 383 voting Noteholders indicated their preference between the two plans, with approximately 65% preferring the Noteholder Plan and 35% preferring the DCL Plan.

which *also* voted to accept the DCL Plan. The absence of support for the Noteholder Plan is so stark, in fact, that it cannot meet the basic statutory threshold of a single impaired accepting class at 61 of 63 Debtors with an impaired class.[3]

This result is unsurprising. The Noteholder Plan is a creature of the current bankruptcy landscape and a case study in how the competing plan process can be used by aggressive claims purchasers for inappropriate ends that are contrary to the purposes of the Bankruptcy Code and, more importantly, destructive of estate value. The Noteholder Plan purports to offer an option that in fact does not exist—namely, allowing Tribune to exit bankruptcy while neither litigating nor settling any of the LBO-Related Causes of Action or addressing with any specificity a host of other issues that are traditionally dealt with in a plan of reorganization or before a plan is even proposed (including value allocation and the resolution of Intercompany Claims).

Creditors have rejected this illusory plan, which would ultimately destroy estate value and could, in many respects, be worse than simply not confirming any plan at all. When subjected to scrutiny, the Noteholder Plan reveals itself to be fatally and structurally flawed, making it impossible to confirm or implement. On essential issues, the Noteholders either impermissibly abdicate to the Court the responsibility for the crafting of key terms of their plan, either at confirmation or after its effective date, or simply leave the critical questions unaddressed and unresolved. In short, the Noteholder Plan is not a plan at all.

In fact, as shown below, the Noteholder Plan fails to satisfy several of the Bankruptcy Code's basic requirements. A plan must be accepted by at least one class of impaired creditors.

---

[3]At an additional 13 Debtors, general unsecured creditors failed to vote at all and all other classes voted to reject the Noteholder Plan.

A plan must specify the treatment of impaired classes of claims and provide adequate means for its implementation. A plan that is rejected by classes of impaired creditors must satisfy the cramdown requirements of section 1129(b) and, of course, provide the Court with information sufficient to determine it has done so. A plan must be proposed in good faith and not as a litigation tactic that will diminish the value of the estates and unduly delay creditor distributions. The Noteholder Plan fails each of these tests; it does not satisfy the requirements of section 1129(a) or 1129(b) and thus cannot be confirmed.[4]

## ARGUMENT

I.    **The Noteholder Plan Is Facially Unconfirmable Because It Fails to Comply with § 1129(a)(10)**

As to 61 of the 63 Debtors that have an impaired class, the Noteholder Plan is unconfirmable on its face because it fails to satisfy the requirements of section 1129(a)(10) of the Bankruptcy Code.[5] A plan of reorganization that impairs any class cannot be confirmed unless "at least one class of claims that is impaired under the plan has accepted the plan . . . ." 11 U.S.C. § 1129(a)(10). As a threshold matter, the Noteholder Plan by its own terms is not a single "plan of reorganization" within the meaning of section 1129(a)(10), but rather a collection of separate plans of reorganization for each of the Debtors jointly proposed for administrative purposes. The Noteholders repeatedly emphasize that the Noteholder Plan is to be treated as a separate and distinct plan of reorganization for each Debtor:

---

[4] In addition to the issues discussed herein, the Debtors have raised with the Noteholders a number of more technical issues, which are listed in Appendix A hereto.

[5] At an additional 48 Debtors, the only impaired classes are Intercompany Claims, which were not solicited to vote and cannot be deemed to have accepted the Noteholder Plan. The Noteholders have conceded that Intercompany Claims cannot be deemed to accept and cannot satisfy the requirements of section 1129(a)(10). The DCL Plan Proponents reserve all rights should the Noteholders later attempt to take a different position.

3

- "The Noteholder Plan described herein constitutes a separate plan of reorganization for each of the 111 Debtors." Noteholder Plan Disclosure Statement [D.I. 7128] at 5.

- "The Noteholder Plan constitutes *a separate chapter 11 plan of reorganization for each Debtor*. For purposes of *brevity* **and** *convenience*, the classification and treatment of Claims and Interests has been set forth in four groups . . . ." Noteholder Plan, § 3.1.1(b) (emphasis added).

- "[T]he Proponents reserve the right to modify or withdraw the Noteholder Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Noteholder Plan *as it applies to any particular Debtor* is not confirmed." Noteholder Plan § 4.6.3 (emphasis added).

The Noteholder Plan therefore cannot be confirmed unless each of its separate plans of reorganization that impairs a class of claims has been accepted by at least one impaired class of claims.

The Noteholder Plan, however, has dramatically failed to achieve the necessary level of creditor support. Out of the 256 classes of creditors solicited to vote on the 63 plans with impaired classes included in the Noteholder Plan, only three classes of claims in which creditors actually voted, spread among just two Debtors (Debtors 1 and 93), voted to accept that plan. *See* Declaration of Stephenie Kjontvedt Regarding Voting and Tabulation of Ballots ("**Tabulation of Ballots**") [D.I. 7918], Ex. B-1. That fact bears repeating: *only three out of 256 voting impaired classes voted to accept the Noteholder Plan*. Notably, two of those three accepting classes are dominated by the proponents of the Noteholder Plan, and in the third, only *one* creditor holding a claim for forty-seven dollars and ten cents ($47.10) arising from an un-cashed paycheck voted to accept the Noteholder Plan, and even this creditor also voted to accept the DCL Plan. *See id.*, Ex. B-2(a) at 163, A-2(a) at 169. Creditors in all other voting classes voted (generally by enormous margins approaching unanimity) to reject the Noteholder Plan. *See id.*, Ex. B-1. Consequently, the Noteholder Plan only satisfies the requirements of section 1129(a)(10) with

4

respect to two of the 63 Debtors for which claims were voted.  For all other Debtors with voting

creditors, the plan has failed to satisfy the requirements of section 1129(a)(10) and cannot be

confirmed.

The Noteholders cannot escape the requirements of section 1129(a)(10) by arguing that

the presence of an impaired accepting class in one or two of their plans is sufficient to satisfy the

requirements of section 1129(a)(10) as to all of the other plans described in the Noteholder Plan.

Perhaps anticipating overwhelming rejection of their plan, the Noteholders include in their plan

the unsupported assertion that "Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for

purposes of Confirmation by acceptance of the Noteholder Plan by an Impaired Class of

Claims."  Noteholder Plan, § 4.6.1.  The application of section 1129(a)(10), however, is

governed by the Bankruptcy Code, not the Noteholders' *ipse dixit*.  Where a statute is clear, it

should be interpreted according to its plain meaning.  *See U.S. v. Ron Pair Enters., Inc.*, 489 U.S.

235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare

cases [in which] the literal application of a statute will produce a result demonstrably at odds

with the intentions of its drafters.'" (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564,

571 (1982))).  Here, the plain language of section 1129(a)(10) compels the conclusion that the

statutory requirements—acceptance by "at least one class of claims that is impaired under the

plan"—must be satisfied on a plan-by-plan basis, and the fact that the Noteholders' desire to treat

their plan as, in effect, a single, substantively consolidated plan for this sole purpose does not

make it so.

Courts considering section 1129(a)(10) have agreed.  For example, in *In re Mediq, Inc.*,

the United States Bankruptcy Court for this District expressly rejected the argument that

acceptance by one impaired class at one debtor was sufficient to satisfy the requirements of

5

section 1129(a)(10) as to all other debtors in a jointly-administered case, as shown by the

following colloquy with Judge Walrath:

> THE COURT: [H]ow can ... I confirm the plan if there is not [a] class of [Parent] creditors who have voted to accept it?
>
> MR. LEVITAN [Debtors' counsel]: I think that's always the case where you have multiple Debtors.
>
> THE COURT: No, it isn't. *If you're not substantively consolidating you have to have an accepting class for each Debtor.*
>
> MR LEVITAN: I think the part of being a joint plan is I think you need classes to vote in favor of the joint plan.  I don't think you need to have a separate plan for every entity that's not in a substantively consolidated group.  I don't think -
>
> THE COURT: This has not been substantively consolidated.
>
> ****
>
> MR. LEVITAN: I mean, it does say, section 1129(a)(10) does say that at least one class of claims under the plan have to vote in favor.  It doesn't say that there has to be a separate plan for each entity.  It doesn't say -
>
> THE COURT: If that were the rule then any joint plan would be - could be filed with respect to any affiliated Debtors where it is not a consolidated entity, *but you're suggesting that if the creditors of one of the Debtors vote in favor of the plan then you have met 1129(a)(10).  I can't believe that's the case.*

*In re Mediq, Inc.*, No. 01-252 (MFW) (Bankr. D. Del.), Hr'g Tr. (May 16, 2001), at 122-125,

124 (emphasis added), attached as Exhibit A to the Declaration of Norman L. Pernick ("Pernick

Decl."), filed herewith.[6]  Ironically, Aurelius, now the primary proponent of the Noteholder Plan,

has previously urged this Court to reject this very interpretation.  Less than six months ago, in a

case before this Court, Aurelius objected to the joint plan of reorganization of the

---

[6] In *Mediq*, the Court did not ultimately issue a decision on the substance of section 1129(a)(10), because, following the above colloquy, the plan was amended in a manner that mooted the concerns raised by Judge Walrath.

AbitibiBowater debtors, arguing that the AbitibiBowater plan of reorganization was

unconfirmable, in spite of impaired accepting classes at all but one debtor, because the special

purpose debtor against which Aurelius had claims did not have an impaired accepting class. In

Aurelius' own words:

> The requirement of an impaired accepting class must be met with respect to
> *each* debtor covered by a joint plan, if the debtors are not consolidated. A
> single impaired accepting class can support multiple debtors only where a
> substantive consolidation is requested and ordered.

*In re AbitibiBowater, Inc.*, No. 09-11296 (Bankr. D. Del. Sept 13, 2010), Objection of Aurelius

and Contrarian Capital Management, LLC to Joint Plan of Reorganization and Debtors' Request

for Approval Thereof (Pernick Decl. Ex. B) (citing *In re Mediq, Inc.*, Transcript of May 16,

2001) (emphasis in original). Aurelius' argument in that case was correct and the

AbitibiBowater joint plan was confirmed only after the chapter 11 case of the debtor that had no

consenting impaired class was dismissed. *See In re AbitibiBowater, Inc.*, 2010 Bankr. LEXIS

3987, at *11-12, 44-45 (Bankr. D. Del. Nov. 22, 2010).

Other decisions have similarly observed the need for an accepting impaired class at each

debtor where a proposed plan is actually composed of separate plans for a number of jointly

administered debtors. *See In re Neenah Enters.*, 2010 Bankr. LEXIS 3058, at *33 (Bankr. D.

Del. July 6, 2010) ("In accordance with the requirements of section 1129(a)(10) of the

Bankruptcy Code . . . at least one Impaired Class of Claims *against each Debtor* has accepted

the Plan . . . Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code."

(emphasis added)); *In re Int'l Wireless Commc'ns Holdings Inc.*, 1999 Bankr. LEXIS, at *44

(Bankr. D. Del. Mar. 26, 1999) (noting that section 1129(a)(10) requires a class of impaired

accepting creditors at each debtor); *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723,

7

761 (Bankr. S.D.N.Y. 1992) (noting that at least one impaired class in each substantively

consolidated group of debtors voted to accept the plan). Given that the United States Bankruptcy

Court for this District, other courts and the chief proponent of the Noteholder Plan have all

previously rejected the notion that a single accepting impaired class can satisfy the requirements

of section 1129(a)(10) for multiple non-substantively consolidated debtors, and given the

Noteholder Plan's failure to garner an accepting impaired class at almost all of the Debtors other

than Tribune—including the Debtors owning the vast bulk of assets to be distributed—the

Noteholder Plan cannot be confirmed.

    The Noteholders may now seek to repudiate Aurelius' prior position by citing a few cases

that purportedly support a contrary argument. Such cases are inapposite. In *In re Enron Corp.*,

2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004), the court approved a plan absent

impaired accepting classes at every debtor entity. There, however, the plan settlement

implemented a partial substantive consolidation, which, as noted above, alters the analysis under

section 1129(a)(10). *Id.* at *235. The courts in *In re SGPA, Inc.*, 2001 Bankr. LEXIS 2291

(Bankr. M.D. Pa. Sept. 28, 2001) and *JPMorgan Chase Bank, N.A. v. Charter Communications

Operating, LLC (In re Charter Communications)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), also

approved plans of reorganization absent impaired accepting classes at each debtor. In both cases,

however, the plans at issue consisted of a single plan of reorganization and were not intended to

be separate plans for each debtor. Indeed, in considering section 1129(a)(10), the court in

*Charter Communications* held that "it is appropriate to test compliance with section 1129(a)(10)

on a per-plan basis, not . . . on a per-debtor basis." 419 B.R. at 266. Here, where it is abundantly

clear that the Noteholder Plan constitutes a separate plan for each individual Debtor, analysis on

a "per-plan basis" does nothing to ameliorate the Noteholder Plan's failure to satisfy section

8

1129(a)(10) at all but two of the 63 applicable Debtors for whom a separate plan has been proposed.

In any event, the Third Circuit has made clear that the separateness of individual debtors must be respected absent substantive consolidation. *See In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). To the extent the foregoing cases stand for the general proposition that section 1129(a)(10) does not need to be satisfied by each debtor of a non-substantively consolidated group, their holdings should be rejected as directly contrary to the view of corporate separateness expressed in *Owens Corning* and contrary to the controlling statutory language.

## II.    The Noteholder Plan Fails to Comply with §§ 1123(a)(3) and 1123(a)(5)

A plan must "specify the treatment of any class of claims or interests that is impaired under the plan," under section 1123(a)(3) of the Bankruptcy Code, and "provide adequate means for the plan's implementation," under section 1123(a)(5) of the Bankruptcy Code. In simple terms, a plan must tell creditors what they will get and provide a workable means of giving it to them. Failure to satisfy these most basic requirements renders a plan unconfirmable. *See Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1352-53 (5th Cir. 1989) (where plan was "completely devoid of specificity" as to the division of real property as a means to satisfy creditors' claims, it did not meet requirements of §1123(a)(3)); *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1003-04 (E.D. Va. 1994) (plan violated section 1123(a)(5), where it failed to provide specific details as to mechanics of how it would achieve a sale of real property in order to satisfy creditors); *see also In re Sutton*, 78 B.R. 341, 342 (Bankr. S.D. Fla. 1987) (plan did not provide adequate means of implementation, as required by section 1123(a)(5), where it provided no details as to proposed sale of stock); *In re Butler*, 42 B.R. 777, 780 (Bankr. E.D. Ark. 1984) (failure of plan to specify percentage that class will

9

receive or time of payment violated section 1123(a)(3)); *Schaeffer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.)*, 591 F.3d 350, 354 (5th Cir. 2009) (plan did not violate section 1123(a)(3) because it "identified the source of distributions, ***the proportionate share of distributions among classes***, and the respective priority of distributions." (emphasis added)); 7 Collier on Bankruptcy ¶ 1123.01[3] ("If a plan proposes conversion of debt to equity, the class will be impaired and the terms of the conversion must be described in detail.").

By leaving virtually all distributions contingent on subsequent determinations to be made without reference to any specified standards, the Noteholder Plan patently fails to satisfy both the plain language and the spirit of the statute. This is especially so because the Noteholder Plan is not consensual, and, as a result, the Court will be required to determine at confirmation—and not at some future date—whether the Noteholder Plan is fair and equitable and whether it unfairly discriminates against rejecting classes. Among the principal reasons why the Bankruptcy Code requires a plan to specify treatment is to permit the Court to apply the statutory standards required for confirmation, many of which are directly tied to the distributional scheme proposed in the plan at issue. Here, because so many issues remain unresolved under the Noteholder Plan, the Court cannot even begin to determine whether the requisites for confirmation have been satisfied.

For example, Article 3 of the Noteholder Plan purports to describe the treatment of each class of claims; however, the size and timing of distributions for each impaired class is, in fact, unspecified and speculative. Although the vast majority of creditors are to receive little or nothing other than "Distribution Trust Interests," the best that the Noteholder Plan can muster to describe these critical instruments is an opaque circularity. Distribution Trust Interests are said to entitle the holders to distributions, if any, from the Distribution Trust as determined, *inter alia*,

by post-confirmation "Litigation Distribution Orders." *See* Noteholder Plan § 1.1.34. Litigation

Distribution Orders are defined as one or more orders of the bankruptcy court "determining,

among other things, the entitlement of each series of Distribution Trust Interests to distributions,

*if any*, from the Distribution Trust based on the resolution of the Litigation Trust Causes of

Action and the Senior Loan Claim Sharing Resolution." *See id.* § 1.1.146 (emphasis added).

The Distribution Trust has no distribution scheme; nor does it specify the criteria to be applied

by the Court in crafting a distribution scheme under the Litigation Distribution Orders. This

makes it impossible to say today whether the distributions under the Noteholder Plan will satisfy

section 1129(b) and other confirmation requirements.

    Under the Noteholder Plan, the bulk of the estate's value—up to 65% of distributable

enterprise value, totaling *more than $4.3 billion*—is locked up in a reserve for an indefinite

amount of time. Although the Distribution Trust Interests are presented as value distributed, they

entitle the holders to no fixed payout or even a set percentage of recoveries, only the right to

continue to litigate every issue impacting their entitlement. Before receiving any material

distributions, creditors would have to await resolution of extraordinarily complex issues

determining claims allowance and the prosecution of all other claims and causes of action in any

way related to Tribune's leveraged ESOP transactions and the Senior Loan Agreement, along

with other avoidance claims and the resolution of billions of dollars of Intercompany Claims.

    Creating even more confusion, prosecution of all of these disputes would be left to the

discretion of a Litigation Trustee with unclear and potentially conflicting duties. The Litigation

Trustee would have fiduciary duties to all holders of Distribution Trust Interests; however, many

holders of such trust interests would be defendants with respect to the claims the Litigation

Trustee is charged with bringing. *See* Noteholder Plan § 5.17.4. In an attempt to reconcile this

11

conflict, the Noteholder Plan provides that the Litigation Trustee has no duty to any defendants in their capacities as such. *See id.* These potentially conflicting duties raise serious concerns over whether the Litigation Trustee would be able to fulfill its duties to maximize the value of the trust's assets while "not unduly prolong[ing] the duration of the Litigation Trust." Noteholder Plan § 5.17.1.

Stripping away the layers of verbiage, creditors are essentially told that they will receive "whatever the Court decides, whenever the Court decides it," and the Court is being asked to determine now that the requirements for confirmation have been met without knowing whether, how or when distributions will eventually be allocated. Creditors and the Court have absolutely no idea as to the "proportionate share of distributions" to which each class is entitled, *see In re Superior Offshore*, 591 F.3d at 354, or even the basis on which their distributions will be determined. Every issue impacting entitlements is left unresolved, and creditors and the Court would know little more at "emergence" than they do today. In effect, the Court is being asked to write the plan long after the effective date.

Moreover, as discussed in more detail below, the Noteholder Plan completely fails to resolve—or even to provide a feasible framework for resolving—other key issues necessary to implement the plan, including the resolution of Intercompany Claims, the determination of the distributable value of each Debtor and the basic entitlements of each class of creditors. Because of the absence of such a framework, the plan is bound to *maximize* the complexity, delay and expense in determining creditor recoveries and hold value hostage while a Litigation Trustee pursues potentially drawn-out and uncertain litigation. In the absence of "reasonably specific provisions for an adequate means of implementation," creditors "have no reasonable means by which to assess whether [the Noteholder Plan] can achieve the results contemplated by the

12

Code," and this Court is left with "no objective criteria by which to make confirmation judgments." *In re Walker*, 165 B.R. at 1003-04.

For these reasons, the Noteholder Plan does not comply with the Bankruptcy Code, the most basic notions of fairness to creditors or the basic precepts for what a plan must be and do. By postponing nearly all issues necessary to resolve the rights of the parties to the distributable assets of the estates until post-confirmation and failing even to set a timetable or ground rules for making such determinations, the Noteholder Plan fails to adequately specify the treatment of creditors or the means of implementation. The Noteholder Plan thus denies creditors their fundamental right to due process in the bankruptcy context—notice of the distributions that a plan proponent would propose to make on account of their claims under the proposed plan—making it impossible for the Court to determine whether the Noteholder Plan meets confirmation requirements. This core, structural defect renders the plan unconfirmable for failing to satisfy sections 1123(a)(3) and 1123(a)(5).

### III.   The Noteholder Plan Fails to Provide the Court with Information Necessary to Assess Compliance with §§ 1129(b) and 1129(a)(7)

#### A.   The Noteholder Plan's Failure to Specify the Treatment of Impaired Classes Renders Impossible a Showing of Compliance with § 1129(b)

The failure to specify the treatment of impaired classes is basis enough to deny confirmation of the Noteholder Plan under any circumstances, but it is especially damning here, where virtually all creditor classes other than those of its own proponents have resoundingly voted to reject the Noteholder Plan. In this context, it is critical that a plan provide adequate information to enable the Court to determine whether the plan's treatment of non-accepting classes satisfies the Bankruptcy Code's cramdown standards under section 1129(b).

To be confirmable under section 1129(b) of the Bankruptcy Code, the Noteholders must prove by a preponderance of the evidence that their plan does "not discriminate unfairly" and "is fair and equitable" with respect to each of the impaired rejecting classes in order to satisfy the requirements of section 1129(b). *See U.S. Bank N.A. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 129 (Bankr. D. Del. 2010) (plan proponent bears burden of showing that plan complies with § 1129(a) and (b)); *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003) (same); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001) (proponent must show compliance with § 1129(b)(2) by a preponderance of the evidence (citing *In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1165 n.26 (5th Cir. 1993))).

The Noteholders cannot make this showing because to do so requires information that the Noteholder Plan does not and cannot provide. As noted above, each rejecting class receives some class of Distribution Trust Interests, which have an unspecified and purely speculative value. By failing to specify treatment, the Noteholders essentially ask the Court to confirm a heavily contested plan while leaving the analysis of whether that plan is in fact confirmable— and what creditors will actually receive—to post-emergence litigation. In so doing, they have failed to give the Court any basis on which to conclude that the Noteholder Plan complies with the cramdown provisions of the Bankruptcy Code and thus have failed to meet their burden of proof. *Cf. In re N.S. Garrott & Sons*, 48 B.R. 13, 16 (Bankr. E.D. Ark. 1984) (explaining that the "[f]ailure to provide for a class of interest holders and its treatment renders impossible a correct consideration of the absolute priority rule and its application in a cram down hearing" under section 1129(b)). A plan yet to be written is not a plan at all and cannot satisfy the "fair and equitable" test.

14

**B.**     **The Noteholder Plan's Failure to Determine Debtor-by-Debtor Distributable Enterprise Value and Resolve Intercompany Claims Renders Impossible a Showing of Compliance with § 1129(b)**

The Noteholders also fail to provide the Court the necessary factual basis on which to assess whether the few distributions they propose satisfy the requirements of section 1129(b). The Noteholder Plan proposes small initial distributions to be made to a number of creditor classes across many different Debtors. *See* Noteholder Plan §§ 3.2.3, 3.2.4, 3.2.5, 3.2.7, 3.3.3 and 3.4.6. These initial distributions purport to be the minimum recovery each creditor would receive under its "own worst outcome of the Trust Causes of Action." *See* Noteholder Plan Disclosure Statement at 24. The Noteholder Plan fails, however, to provide the Court with any legitimate basis on which to test this assertion. This is a critical failing. If the Noteholders insist on litigating all issues in an effort to achieve maximum upside for themselves, they must allow for the possibility that the Noteholders will lose and that their opponents will win. The Noteholders therefore cannot propose to distribute any consideration to which either side of the disputes might be entitled following conclusion of the litigation the Noteholders want to bring. Said another way, the Noteholder Plan should not be confirmed if it purports to distribute even one dollar more than the minimum distribution to which any party would be entitled if all issues were adjudicated in a manner unfavorable to it.

The Noteholder Plan fails miserably in this regard. Initial distributions at the Tribune parent company level are calculated with reference to the portion of the Debtors' overall distributable enterprise value ("**DEV**") ascribed to the parent company. *See* Noteholder Plan §§ 1.1.195, 1.1.204, 1.1.205 and 1.1.243. Although the Noteholder Plan is unclear on this point, the Noteholders apparently intend for subsidiary level distributions to be based on consolidated

15

subsidiary DEV. *See id.* §§ 1.1.262 and 1.1.263.[7] Recognizing that resolution of DEV is

essential to the confirmation of their plan, the Noteholders have proposed to force the Court to

undertake its own DEV analysis, without even setting forth what they believe correct valuations

should be.

On the most basic level, the Noteholders have not offered any expert opinion on

valuation, or even stated their view on what valuation should be. How can the Court possibly

conduct the necessary valuation analysis without expert testimony on the subject? Further, the

Noteholder Plan completely fails to reconcile—or even suggest an appropriate mechanism for

reconciling—Intercompany Claims among the Debtors. In a cramdown, dissenting impaired

creditors are entitled to distributions based on the value available at the specific debtor against

which they hold a claim. *See In re Idearc, Inc.*, 423 B.R. 138, 150 (Bankr. N.D. Tex. 2009)

(confirming a plan of reorganization on the basis of section 1129(b) analysis of each impaired

class of claims and interests "on a Debtor-by-Debtor basis"). Because the Noteholder Plan fails

to reconcile the more than *$83.7 billion* of Intercompany Claims among those entities reflected

on the Debtors' books,[8] it provides no mechanism for determining any particular Debtor's DEV

and the Noteholders thus cannot make the showing necessary to support its initial distributions to

creditors of any Debtor.

Contrary to their stated principle of neutrality, the Noteholders have put their thumb

heavily on the scale in critical respects. At the Tribune parent level, for example, although initial

---

[7] This is problematic in its own right, as discussed in detail in Section III.C, *infra*.

[8] In fact, the Noteholder Plan provides that the treatment of Intercompany Claims may be determined following the Effective Date. *See* Noteholder Plan, §§ 3.2.10 and 3.4.7 (Intercompany Claims shall be "reinstated, discharged or otherwise satisfied in accordance with the terms of the Confirmation Order and/or the Litigation Distribution Orders.")

distributions are explicitly tied to the Parent DEV, the Noteholders ignore more than *$31 billion* in Intercompany Claims against the Tribune parent reflected on the books of the Debtors in calculating the distributions to be made. *See* Noteholder Plan § 1.1.203. The Noteholders cannot simply wish away issues that serve to reduce the value of the Debtor against which they assert claims and increase the value of other Debtors.

The Noteholders themselves have acknowledged, yet have failed to remedy, this flaw. The Noteholders admit that ultimate resolution of Intercompany Claims may result in "value shifting" among Tribune and the Guarantor Debtors. *See* Noteholder Disclosure Statement § I.B.4. Moreover, Aurelius, a chief proponent of the Noteholder Plan, has previously stressed the central importance of clarity as to the resolution of Intercompany Claims. Specifically in the context of seeking additional disclosure relating to the DCL Plan, counsel for Aurelius argued that resolution of Intercompany Claims was the critical basis for determining DEV as between Tribune and the Debtor Subsidiaries, stating "I can't think of a more important piece of information for voters to have." *See* Hr'g Tr. (Nov. 29, 2010) at 84. Yet, Aurelius now seems to believe that the issue is irrelevant even to *confirmation* of its own plan.

Given that the Court cannot confirm the Noteholder Plan absent multiple value calculations, it is impossible to postpone resolution of Intercompany Claims until after the Effective Date (as the Noteholders propose to do). Moreover, even if resolution of the Intercompany Claims were undertaken in connection with confirmation, it is not reasonable (or even remotely realistic) to expect this Court to resolve the validity of hundreds of thousands of Intercompany Claims, essentially *sua sponte*. Nor is it reasonable to effectively require any creditor that wishes to make sure its Debtor entity is appropriately valued and that its interests

17

are effectively protected to appear at confirmation, with no prior notice about what actually is to be litigated.

Simply put, the Noteholder Plan is unconfirmable because it fails to resolve fundamental valuation and value allocation issues *before* confirmation. To be sure, plans often defer determination of total value to be distributed to creditors. The Noteholder Plan, however, fails to specify even the portion of the total value to which each creditor (or even class of creditors) is entitled. In a highly contested situation, creditors are thus left to face ambiguous recoveries, knowing neither the total size of the pie, nor their allocable share thereof. This failure to provide any meaningful resolution underscores the fact that the Noteholder Plan is in fact not a true plan of reorganization at all, and provides no foundation on which the Court could possibly conclude that the Noteholder Plan satisfies the requirements of section 1129(b).

C.    **The Noteholder Plan's Failure to Specify Distributions, Determine Debtor-by-Debtor Distributable Enterprise Value and Resolve Intercompany Claims Renders Impossible a Showing of Compliance with § 1129(a)(7)**

The Noteholders must also prove that their plan satisfies the "best interests of creditors" test, which requires that all dissenting creditors (irrespective of whether any such creditors' class voted to accept the Noteholder Plan) receive at least what they would in a hypothetical chapter 7 liquidation. *See* 11 U.S.C. § 1129(a)(7). The lack of adequate information provided by the Noteholder Plan prevents the Court from determining whether the Noteholder Plan complies with the "best interests of creditors" test as well as the cramdown provisions. *See In re Walker*, 165 B.R. at 1005. For example, the liquidation analysis provided in the Noteholders' Specific Disclosure Statement acknowledges that the information they provide is only "for illustrative purposes." *See* Noteholder Plan Disclosure Statement at 43. Without determining a conclusive allocation of value between the parent company and its subsidiaries or providing the other

18

information necessary to assess compliance with section 1129(a)(7) of the Bankruptcy Code, the

Noteholders cannot show that their plan provides a superior alternative to liquidation, and the

Noteholder Plan cannot be confirmed.

**D.      Initial Distributions to Other Guarantor Debtor Claims Cannot be Shown to Comply with § 1129(b) and the Noteholder Plan's Treatment of such Claims Results in a *De Facto* Substantive Consolidation of the Debtors' Estates**

The Noteholder Plan provides for initial distributions to each of the non-Senior Lender,

non-Bridge Loan general unsecured claims against Guarantor Debtors ("**Other Guarantor**

**Debtor Claims**") equal to 8% of each such claim's allowed amount. *See* Noteholder Plan

§ 1.1.186. As discussed above, however, the actual entitlement of Other Guarantor Debtor

Claims is a function of (i) the distributable value of the applicable Guarantor Debtor and (ii) the

total allowed claims against the applicable Guarantor Debtor. Here, the Noteholders make no

effort to show—and, given the ***more than $10 billion*** in Senior Lender and Bridge Loan Lender

guarantee claims at each and every one of these Debtors, cannot show—that this distribution

equates in any way to the minimum entitlement of the Other Guarantor Debtor Claims.

In other words, for many if not all of the Guarantor Debtors, the 8% initial distribution on

account of the Other Guarantor Debtor Claims exceeds the distribution that such claims would

receive were all of the Senior Loan Claims and Bridge Loan Claims allowed in full.[9] Thus, the

proposed 8% distribution is vastly ***better*** than a "worst-case scenario" for such holders of Other

Guarantor Debtor Claims. This is directly contrary to the stated guiding principle of the

---

[9] Each of the DCL Plan Proponents reserves all of its positions and rights in the event that the LBO-Related Causes of Action were to be litigated. Because the DCL Plan is a negotiated compromise of opposing interests, it is not surprising that the positions of the DCL Plan Proponents would differ radically from each other in any such litigation.

19

Noteholder Plan, and is not permissible absent the affirmative vote of the Senior Lenders and Bridge Loan Lenders or an actual disallowance or subordination of their claims.

Moreover, the Noteholder Plan's identical treatment of Other Guarantor Debtor Claims, despite the differing valuations of the different Debtors and their varying debt-to-equity ratios, disregards the boundaries of each Debtor's estate and effects a *de facto* or "deemed" substantive consolidation. Whether intentional or merely careless, this flexibility cannot pass muster under well-established Third Circuit law.

The Third Circuit, under the standard set out in *Owens Corning*, strictly limits the use of substantive consolidation to those rare cases in which: (i) prepetition, debtors "disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition [debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d at 211. Absent such a "perfect storm," or the consenting vote of affected creditor classes, substantive consolidation cannot pass muster in the Third Circuit, "no matter how it is packaged." *Id*. at 209.

Especially in order to satisfy the requirements of § 1129(b), it is imperative that the Noteholder Plan abide by *Owens Corning* by carefully observing Debtor separateness. The Noteholder Plan fails to do so.

## IV.    The Noteholder Plan Was Not Proposed in Good Faith and Violates § 1129(a)(3)

In order to confirm a plan of reorganization, its proponents must prove by a preponderance of the evidence that it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A plan is proposed in good faith if it "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re*

20

*Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004) (citations omitted). Among other

things, "good faith" requires that a plan have been "proposed with honesty and good intentions

and with a basis for expecting that reorganization can be achieved," and/or demonstrates

"fundamental fairness in dealing with the creditors." *Stonington Partners, Inc. v. Official Comm.*

*of Unsecured Creditors (In re Lernout & Hauspie Speech Prods. N.V.)*, 308 B.R. 672, 675 (D.

Del. 2004); *see also In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)

(court must examine "totality of circumstances" in assessing good faith). By contrast, a plan

proposed for "ulterior" motives, *In re Oneida Ltd.*, 351 B.R. 79, 84-85 (Bankr. S.D.N.Y. 2006),

or as a "delaying tactic," *In re Haardt*, 65 B.R. 697, 703 (Bankr. E.D. Pa. 1986), fails the good

faith test.

The Noteholder Plan should not be confirmed because it is apparent on its face that it was

not proposed in good faith. As noted in Section III above, under the Noteholder Plan the vast

majority of creditors receive little or no recovery at "emergence" and are forced to litigate every

aspect of their entitlements for the foreseeable future, without even a defined plan for how to do

so. The Noteholder Plan destroys value, delays distributions, does not further fundamental

fairness and is structured to further the ulterior motives of the Noteholders. The Noteholder Plan

is not a viable basis for reorganization, it was not proposed in good faith and it cannot be

confirmed under section 1129(a)(3).

### A.    The Noteholder Plan Destroys Value

Maximizing the value of the estate is a fundamental purpose of the Bankruptcy Code, and

a key element of a showing of good faith under section 1129(a)(3). *In re Integrated Telecom*

*Express, Inc.*, 384 F.3d 108, 120 (3d Cir. 2004) (noting that "maximizing the value of the

debtor's estate" is "valid bankruptcy purpose"); *In re Charter Commc'ns*, 419 B.R. at 260 (good

faith requirement satisfied because plan "maximized value" and provided "greater recovery" to creditors); *In re G-1 Holdings Inc.*, 420 B.R. 216, 263 (Bankr. D.N.J. 2009) (good faith requirement satisfied because plan was "proposed with the legitimate purpose of . . . maximizing the returns available to creditors"). The Noteholder Plan's failure to preserve, let alone maximize, value is clear evidence of a lack of good faith.

### 1.    Ownership Uncertainty Could Harm Enterprise Value

The Noteholder Plan would leave up to 65% of the equity ownership of reorganized Tribune unresolved, held in a Distribution Trust until the resolution of complex litigation that could last years. Instead of distributing as much equity in reorganized Tribune as possible and funding the reserve with alternative currency, the Noteholder Plan would maximize the amount of equity that is *held back* by funding the reserve with a "strip" of equity, newly issued debt securities and cash. This structure would *maximize* uncertainty as to reorganized Tribune's ownership, harming Tribune and reducing value for all creditors.

With uncertain ownership and thus an uncertain future, Tribune could face substantial difficulty in recruiting and retaining the best senior managers and directors. Top-notch executives and directors are normally hesitant to join an organization whose ownership is in flux, where there is an omnipresent risk that at any time, new ownership could bring in a new leadership team to embark on a different strategic course. Similarly, it also follows from the inherent ownership uncertainty caused by the Noteholder Plan that reorganized Tribune could face difficulty in executing strategic transactions, particularly those that would require stock issuances. Potential partners would want to know who they are dealing with and would reasonably be wary of accepting equity in reorganized Tribune when as much as 65% of its ownership is subject to change at any time, including through a block sale.

22

These risks are particularly acute here, given that Tribune operates in an industry that is in a period of flux, restructuring and consolidation. It is thus essential that Tribune be well-positioned at emergence to capitalize immediately on opportunities, consummate strategic transactions and restructure its assets to focus on its core businesses in a value-maximizing fashion. The Noteholder Plan's trust structure poses substantial risks to Tribune's ability to maximize value at this important time.[10] By maximizing reserved equity, and thus ownership uncertainty, while leaving the means by which ownership will be resolved entirely vague and ambiguous, the Noteholder Plan increases these risks rather than attempting to mitigate them. The Court should not permit the Noteholders to impose these risks upon the Company and its ongoing stakeholders.

The ability of the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, to sell the assets held by the Distribution Trust, including the reserved equity in reorganized Tribune (Noteholder Plan § 7.16.6(a)), would not cure the diminution-in-value risks identified above. This ability merely offers the Distribution Trustee a Hobson's choice: watch the value of the business erode as a result of ownership uncertainty or irrevocably lock in the artificially depressed price that would likely be obtained through a potentially contested court-supervised sale process, given the potential for delay and uncertainty inherent in such a process.

---

[10] Moreover, because Tribune operates in the media industry, it is subject to regulation by the Federal Communications Commission ("FCC"), which would need to approve certain ownership changes. The extraordinary nature of the Distribution Trust—which is far different than the types of testamentary and divestiture trusts that are familiar to the FCC—may also raise issues that could delay or prevent FCC approval, which in turn would prevent Tribune from achieving a necessary step toward the "fresh start" that is the core purpose of the Bankruptcy Code. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) (explaining that the "central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life and a clear field for future effort" (citation omitted)).

## 2.    The Noteholder Plan's Trust Structure Would Depress the Value of the Minority Shares

In addition to risking diminution in the overall enterprise value of Tribune, the trust structure of the Noteholder Plan would reduce the value the Initial Distributions actually made to creditors under the plan, which would likely include 35% of the total equity in reorganized Tribune. It is well-settled that the presence of a concentrated block of equity reduces the trading price of minority holdings on account of the "minority shareholder's inability to influence corporate decisions." *See, e.g., Eisenberg v. Commissioner of Internal Revenue,* 155 F.3d 50, 53 n.7. (2d Cir. 1998). The Noteholder Plan contemplates just such a concentrated position: as much as 65% of reorganized Tribune's equity would be held in the Distribution Trust at emergence, which would represent a potential control block of reorganized Tribune's equity.[11] The Distribution Trustee would have the power to sell this control block at the direction of the Distribution Trust Advisory Board, subject to court approval. *See* Noteholder Plan § 7.16.6(a). Notably, however, and in contrast to other publicly traded stocks that also reflect the lack of an ability to control the outcome for their respective companies, the Noteholder Plan contains no explicit or implicit minority shareholder protection structures that would allow the minority shareholders to participate in and enjoy the economic benefit of a control transaction. As a result, devoid of any minority protections, the 35% of the equity of reorganized Tribune to be

---

[11] The Noteholder Plan is ambiguous as to the form of equity that would be held in the Distribution Trust. If held in the form of Class A stock, the Distribution Trust would have immediate control of 65% of the voting equity. *See* Noteholder Plan Supplement [D.I. 7802], Attachment E, Exhibit 5.3.1(1) (Certificate of Incorporation of Reorganized Tribune) (**"Certificate of Incorporation"**) § 4.A.i (stating that Class A Common Stock is accorded full voting rights). If held in the form of Class B shares, the Distribution Trust could block certain strategic transactions requiring the use of equity, and such shares could be converted to Class A shares if required FCC approvals could be obtained. *See* Certificate of Incorporation, § 4(A)(ii)(b). Finally, if held in the form of warrants, a buyer could convert the Warrants into Class A or Class B shares with approval. Noteholder Plan Supplement, Attachment C, Exhibit 1.1.170 (New Warrant Agreement) (**"New Warrant Agreement"**) § 4.

distributed to creditors at emergence under the Noteholder Plan would be worth less because of the artificially-created control block that would be maintained by the trust.

### 3.    The Distribution Trust Structure Causes Adverse Tax Consequences

The Distribution Trust that is the centerpiece of the Noteholder Plan would hold up to 65% of the estates' value (more than $4.3 billion) for an indeterminate period.  It is highly likely that any income earned on the Distribution Trust Assets and any appreciation in their value while held by the Distribution Trust would be taxed at corporate or higher rates, destroying value to creditors on a potentially massive scale.

U.S. federal income tax law generally provides that reserves of consideration held back on account of disputed claims are treated as "disputed ownership funds" that are subject to entity-level tax.[12]  The Noteholder Plan acknowledges this, providing that consideration reserved for certain disputed claims will be treated as owned by taxable disputed ownership funds, absent a ruling or other definitive guidance from the IRS or a court.  *See* Noteholder Plan § 7.16.12(b)(iv); Noteholder Plan Supplement, Attachment K, Ex. 7.16.1 (Distribution Trust Agreement) § 8.1(b).[13]

Inconsistently, however, the Noteholder Plan and the Noteholder Plan Disclosure Statement fail to treat the entirety of the Distribution Trust Assets as held in a taxable disputed

---

[12] Section 1.468B-9 of the Treasury Regulations sets forth the rules for taxation of disputed ownership funds.  Absent a ruling from the IRS, a disputed ownership fund is taxed at corporate or higher rates.

[13] The tax disclosure for the Noteholder Plan is internally inconsistent regarding the taxation of these reserves.  Initially the disclosure states that the assets of a Disputed Claims Reserve treated as a disputed ownership fund would be treated as directly owned by Reorganized Tribune, which is a clear misstatement of law.  The disclosure promptly contradicts itself, correctly stating that each Disputed Claims Reserve would likely be subject to a separate entity-level tax.  *See* Noteholder Plan Disclosure Statement § IX. G.

ownership fund. Although the Noteholder Plan is not clear in this regard, its strong implication is that the Distribution Trust Assets must be treated by all parties as owned directly by creditors, because the Distribution Trust is purportedly a "liquidating trust" treated as a non-taxable "grantor trust" for tax purposes. This implication is misleading.

It is self-evident that ownership of the Distribution Trust Assets is disputed—otherwise they would be distributed as part of the Initial Distribution rather than held back. Until the ownership of these assets is settled, after what may be years of litigation, there is no proper way to satisfy the requirement for grantor trust treatment that the Distribution Trust allocate the income earned by these assets among the Distribution Trust beneficiaries. Rather, absent a ruling from the IRS—and there is no reason to believe one would be forthcoming based on current law—the Distribution Trust Assets should be treated as owned by a taxable disputed ownership fund. As a consequence, appreciation in the value of Distribution Trust Assets between the Effective Date and the time these assets are distributed to creditors would be subject to tax at corporate or higher rates, as would any income earned on the assets, including interest on the portion of the New Senior Secured Loan held by the Distribution Trust as well as earnings on the cash held by the Distribution Trust. These taxes, payable by the Distribution Trust, represent value that could have gone to creditors but instead is lost.

For example, assume that the Distribution Trust Assets include equity (stock or warrants) of reorganized Tribune with an initial value of $2.8 billion, the estimated high end of the Noteholder Plan's proposed reserve of equity. If the value of this equity were to increase to $3.8 billion by the time the Distribution Trust had litigated to conclusion the question of who was entitled to a distribution of the equity, the Distribution Trust would be required to pay corporate-level tax on the $1 billion in equity appreciation. Assuming a blended federal and state corporate

26

rate of 40%, the tax cost would be $400 million, diminishing value distributable to creditors by that amount. In contrast, were Tribune to stay in bankruptcy during the litigation that is inevitable under the Noteholder Plan, the $3.8 billion of equity would simply be distributed to creditors upon conclusion of the litigation, with no depletion on account of taxes.

As a consequence, from a tax perspective the Noteholder Plan is worse than no plan at all. If the Debtors, which are not currently subject to meaningful taxes by reason of Tribune's S corporation election, were to remain in bankruptcy while the entitlement to distributable estate value was litigated, they could continue to accumulate cash on a tax-free basis. When distributions were finally made, there would be more cash, and any increase in their equity value would not be depleted by unnecessary tax liability.

**B.**     **The Noteholder Plan Is Fundamentally Unfair to Creditors**

The Noteholder Plan also lacks the "fundamental fairness in dealing with creditors" that is required of a plan proposed in good faith. *See In re Lernout*, 308 B.R. at 675; *In re Coram Healthcare Corp.*, 271 B.R. at 234. The Plan presents the Distribution Trust as a means of postponing substantial distributions until all LBO-Related Causes of Action are resolved in their entirety. Under the Noteholder Plan, however, Aurelius and Wilmington Trust Company would appoint not only the Litigation Trustee, but also the three members of the Distribution Trust Advisory Board that will control the majority of Tribune's equity. *See* Noteholder Plan §§ 7.16.4, 7.16.5. The Noteholder Plan thus would thus effectively hand that control to Aurelius and Wilmington Trust Company, *before* any adjudication that Senior Loan claims might be avoided, subordinated or disallowed. The Noteholder Plan would accordingly turn due process on its head.

27

As noted above, *see* note 10, *supra*, it is unclear what form the up to 65% of equity to be reserved in the Distribution Trust would take, but in all events, the trust structure would either deprive the Senior Lenders of their appropriate role in corporate governance outright, or it would create the risk that control could be seized by a third party at an indeterminate time in the future—allowing the plaintiffs in the LBO-Related Causes of Action to hold and control all disputed property before litigation has been resolved. Although the Noteholder Plan allows the Senior Lenders to appoint five of seven members of the board of directors of reorganized Tribune, *see* Noteholder Plan § 5.3.2, this protection rings hollow due to the ability of the Distribution Trustee at any time to assume or sell control of 65% of the voting equity.

Class A stock would grant the Distribution Trust clear majority control. Class B stock would allow the Distribution Trust to block certain strategic transactions that would require the issuance of equity, which would almost certainly hinder reorganized Tribune's pursuit of post-emergence strategic alternatives.[14] Even non-voting warrants would give the Distribution Trust the power at any time to seek to convert the warrants to Class A or Class B shares or sell them (with Court approval), at which time the acquirer could convert the warrants, and by virtue of its Class C stock the Distribution Trust would still retain the right to veto certain strategic transactions.[15] Beginning immediately upon emergence, all decisions regarding the exercise of

---

[14] Class B Common Stock may vote on certain matters, including "any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking *pari passu* with or senior to the Class A Common Stock or Class B Common Stock", "any amendment to this Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation", "any sale, lease or other disposition of all or substantially all of the assets of the Corporation" or "any recapitalization, reorganization, share exchange, consolidation or merger of the Corporation or its capital stock." *See* Certificate of Incorporation, § 4.A.ii.

[15] *See* Certificate of Incorporation, § 4.A.i, ii; New Warrant Agreement, § 4; Noteholder Plan § 5.4.1 (Distribution Trust approval rights include any increase in the size of the board of directors and any amendment of the charter or by-laws that would adversely affect the rights of the New Class C Common Stock).

these powers would be made by an advisory board controlled by Aurelius and Wilmington Trust

Company, allowing these creditors to make the most important decisions about property that

does not belong to them absent a litigation victory. Depriving the Senior Lenders of their role in

the governance of reorganized Tribune, and thus their ability to protect their interests—all

without any adjudication or process—demonstrates the Noteholder Plan's fundamental

unfairness and that it was not proposed in good faith.

### C.    The Noteholder Plan Excessively Delays Creditor Recoveries

Enabling "expeditious resolution of disputes" and "speedy payment to creditors" are two

of the fundamental purposes of the Bankruptcy Code. *See In re Hoosier Hi-Reach, Inc.*, 64 B.R.

34, 38 (Bankr. S.D. Ind. 1986) (holding speedy payment of creditors a purpose of Bankruptcy

Code); *see also* Fed. R. Bankr. P. 1001 (providing that the Bankruptcy Rules are to be construed

to secure the just, speedy, and inexpensive determination of every case and proceeding). The

structure of the Noteholder Plan improperly frustrates, rather than facilitates, these essential

purposes. *See In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34 at 38 (holding that such plan did not

meet good faith requirement where it failed to provide speedy payments to creditors); *see also In

re Pike's Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985) ("Not confirming the plan for

lack of good faith is appropriate particularly when . . . it is evident that the debtor seeks merely to

delay or frustrate the legitimate efforts of secured creditors to enforce their rights.").

Given the Noteholder Plan's failure to settle *any* of the LBO-Related Causes of Action or

otherwise resolve remaining questions of ownership, valuation or allocation, the Noteholder Plan

maximizes the amount of value that must be held back from creditors, a goal squarely at odds

with the purpose of Chapter 11. After minimal initial distributions are made to creditors,

distribution of the remaining 65% of available value depends on the outcome of plenary

litigation of all claims arising from Tribune's leveraged ESOP transactions. Although this litigation is the only means by which the Noteholder Plan could deliver value to creditors, the Noteholder Plan fails to address how it would be conducted. Creditors' claims are transferred to a Litigation Trust for pursuit and resolution, with no explanation of how or when these claims would be determined, including the timing or order in which the claims would be pursued, nor any explanation of how or when distributions would ultimately be made. This structure leaves creditors with little more than uncertainty and confusion, and, due to its failure to provide adequate means of implementation, is further evidence that the Noteholder Plan was not proposed in good faith *See In re Walker*, 165 B.R. at 1003-1004 ("[A] plan of reorganization which does not reasonably articulate an adequate means by which it is to be implemented simply requires the creditors and courts to rely upon the 'honesty and good intentions' of [its proponents]. This is an insufficient basis to satisfy creditors, courts or the standards imposed by the Bankruptcy Code."); *In re Sutton*, 78 B.R. at 342 (plan's "nebulous" means of implementation under section 1123(a)(5) evidence it was not proposed in good faith).

Under the DCL Plan, the ownership of reorganized Tribune and entitlement to available value are resolved, meaning all estate value is distributed at emergence and any proceeds of the causes of action transferred to the litigation trust can be distributed immediately upon receipt. In contrast, under the Noteholder Plan, claim allowance, and thus entitlement to available value, is completely unresolved.[16] In addition to holding back 65% of the estate's value upon emergence

---

[16] The "Litigation Trust Causes of Action" transferred to the Litigation Trust under the Noteholder Plan include both causes of action for avoidance of LBO related claims and causes of action against non-lender third parties. Noteholder Plan § 1.1.142. A single trustee is therefore responsible not only for recovery of new value but for determination of which parties are entitled to whatever value is available.

pending resolution of claim allowance, entitlement to any proceeds of the Litigation Trust

Causes of Action is left undecided. These issues would likely be resolved in the context of

extraordinarily complex all-encompassing litigation. It is therefore possible under the

Noteholder Plan that, even when proceeds were recovered from pursuit of third party claims,

claim allowance would remain unresolved, and even the newly recovered value would have to be

held back at least in part. Although this delay in receiving distributions may be consistent with

Aurelius' investment strategy, many of the other creditors in these cases are not in the same boat.

Through the Noteholder Plan, Aurelius would force the delay occasioned by its litigation strategy

on others (including retirees and trade creditors) that do not support that strategy and indeed may

be harmed by it.

    Even if claim allowance were prioritized, however, the Noteholder Plan still offers no

effective means of resolving the substantial number of claims it seeks to dispute. In bankruptcy,

a settlement can be reached among competing creditor classes through the plan process and

individual dissenting creditors can be bound if class acceptance is achieved. This is in fact one

of the chief purposes of bankruptcy—to provide a forum for collective action without which

many complex restructurings would not be possible, given the broadly dispersed constituencies

of large modern enterprises. Under the Noteholder Plan, however, after emergence, the estates

would no longer be seeking claim avoidance against groups that could be bound if class

acceptance was obtained. For instance, without a plan process to bind dissenters, there would be

hundreds of individual Senior Loan claimholders, all of whom would have to receive identical

treatment in order to satisfy the absolute priority rule, and each of whom could refuse to accept a

settlement. Barring actual litigated disallowance or subordination of all of the claims of the

Senior and Bridge Loan Lenders, each such party would be entitled to its full natural recoveries

and could not be forced to accept less.  Unlike a typical disputed claims reserve where individual

claims are disputed on factual grounds and thus can be resolved individually, the Noteholder

Plan proposes to dispute allowance of entire classes of claims (in fact, the vast bulk of claims

against the estates) after emergence.

More than 400 Senior Lenders were listed on the Agent's register as of the voting record

date, and over 99% of them rejected the Noteholder Plan.  *See* Tabulation of Ballots, Ex. B-1.  In

order to conclusively resolve these Senior Loan claims under the Noteholder Plan, the Litigation

Trustee would have to either litigate allowance or subordination to conclusion or achieve

universal acceptance of a proposed settlement, since no dissenting lenders could be bound to a

settlement.  By depriving the estate of the ability to strike sensible and beneficial settlements, the

Noteholder Plan would create needless delay and destroy value that could otherwise go to

creditors.[17]

### D.    The Noteholder Plan Was Proposed with Ulterior Motives

The Noteholder Plan not only destroys estate value and delays creditor distributions, but

it does so gratuitously.  At every step where structural changes could have mitigated the harm

done, the Noteholder Plan instead maximizes harm.  The ulterior motives underlying the

Noteholder Plan fail the good faith test, and the plan cannot be confirmed.  *See In re Oneida Ltd.,*

---

[17] Moreover, after an indeterminate number of years of expensive litigation, additional FCC approval would be required any time there would be any transfer of control of the company within the meaning of the FCC's rules as a result of a creditor's receipt of reserved equity interests in the company.  This would result in further delay of distributions.  Unlike the DCL Plan, which requires only a single FCC approval process for emergence, the Noteholder Plan could require multiple successive approval processes (depending on the ultimate resolution of claims allowance and the timing of distributions of the reserved equity).  Moreover, those processes could require that the company seek anew some or all of the FCC ownership rule waivers that it is currently seeking.  This would add further delay, expense and uncertainty.

351 B.R. at 85 (noting that "[g]ood faith has been found to be lacking where a plan is proposed

for ulterior purposes").

## 1.   Establishment of Litigation Leverage

Through the Noteholder Plan, the Noteholders hope to extract value from the estates in

the form of higher settlement payments for the classes they control by threatening to endlessly

delay recoveries to all creditors.  Wilmington Trust Company, the indenture trustee for the

PHONES Notes, previously sought standing to pursue the LBO-Related Causes of Action and

was not successful.  Indeed the Noteholders have never concealed their desire to litigate the

LBO-Related Causes of Action, even though the Committee has been vested with standing to

pursue these claims.[18]

The Noteholder Plan would provide a vehicle for the Noteholders to wrest control of the

LBO-Related Causes of Action away from the Committee and pursue their "swing for the

fences" legal strategy on a slanted playing field in which they hold the company hostage until

they are paid their price.  In spite of the professed guiding theory of neutrality behind the

Noteholder Plan, certain structural elements reveal this ulterior motive.  For example, the 65% of

available value that is reserved under the Noteholder Plan could be distributed exclusively to

Senior Lenders and Bridge Loan Lenders were the LBO-Related Causes of Action unsuccessful.

The Noteholder Plan nonetheless entrusts management of all of these assets, including the

---

[18] Absent a showing that withdrawal of standing from the Committee is in the best interests of the estate, the Noteholders may not seize the control they seek.  Given the numerous deficiencies of the Noteholder Plan and the powerful evidence that it was not proposed in good faith, withdrawal of standing from the Committee is assuredly not in the best interests of the estates. *Cf. Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns. Corp.)*, 371 B.R. 660, 667 (S.D.N.Y. 2007) ("[A] bankruptcy court may exercise its equitable power to withdraw derivative standing if the court concludes . . . that allowing the litigation to continue would be detrimental to either the estate's best interest, or to the fair and efficient resolution of the bankruptcy proceeding."), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

decision to liquidate them, to a trustee chosen by Aurelius and an advisory board controlled

exclusively by designees of Aurelius and Wilmington Trust Company.[19]  Magnifying this

unfairness, the Noteholder Plan funds the reserve with value vastly in excess even of the

maximum amount that could be required to satisfy all non-LBO creditors in full with four full

years of postpetition interest (which, assuming a blended interest rate of 4%, in itself would add

over $400 million to the reserve).  This is achieved by adding to the reserve all value that in

theory could be distributed to different LBO lender constituencies, with the end result putting

Aurelius and Wilmington Trust in exclusive control of the management of approximately *$1.3

billion* in value to which they could *never* be entitled, regardless of litigation outcomes.  In

addition to holding back the value that is claimed both by the Senior Lenders and the Bridge

Loan Lenders, the Noteholders hold back any distributions to the Step Two Senior Lenders

pending litigation over the enforceability of the sharing provisions of the Senior Loan Agreement

in spite of the absence of any colorable basis for their invalidation or, indeed, any current dispute

between the Step One Senior Lenders and the Step Two Senior Lenders over this issue.[20]  *See*

Noteholder Plan § 3.2.4.  The enforceability of the sharing provision is an issue in which the

Noteholders have no interest, and yet the Noteholders use this pretense to increase the amount of

value they have the power to hold in limbo by between $718 million and $813 million.

---

[19] This is through the composition of the "Distribution Trust Advisory Board," which is charged with management of the reserved 65% of available value, including the decision to liquidate the assets held in reserve. Noteholder Plan § 7.16.4.

[20] The small group of Senior Lenders that initially challenged the enforceability of the provisions has withdrawn their proposed plan rather than pay their small share of competing plan solicitation costs, and both Step One and Step Two Senior Lenders voted overwhelmingly for the DCL Plan, which enforces the sharing provisions.

Rather than attempting to preserve a neutral forum in which to litigate the LBO-Related Causes of Action, the Noteholder Plan is an effort to stack the deck in favor of the Noteholders. This improper use of the plan process is the antithesis of good faith. *See In re Diplomat Constr., Inc.*, 2009 Bankr. LEXIS 4250, at *11-12 (Bankr. N.D. Ga. Nov. 20, 2009) (refusing to approve a plan which "essentially place[d] all the risk on [one particular creditor by withholding its] right to amortization while the Debtor waits for market conditions to improve"); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999) (holding that a plan that included the preservation of the cooperative status of a utility was not proposed in good faith because it did not give debtor a "fresh start" but only preserved a particular creditor's benefit); *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 197-98 (B.A.P. 9th Cir. 2003) (remanding for further findings regarding whether the bankruptcy filing was made for the sole purpose of avoiding the need to post an appeal bond in separate litigation).

## 2.    Improper Control

In addition to taking control of the reserved assets through the Distribution Trust Advisory Board, the Noteholder Plan would allow Aurelius itself to appoint two members of reorganized Tribune's board of directors. Noteholder Plan § 5.3.2. These directors could be replaced by the Distribution Trust Advisory Board; but this board is in turn controlled by Aurelius. *See id.*; § 7.16.4. Courts have recognized that inappropriate strategic goals can be indicia of a lack of good faith, both in the plan voting context and in the analysis under section 1129(a)(3). *See, e.g., In re TCI 2 Holdings, LLC*, 428 B.R. 117, 171 (Bankr. D.N.J. 2010) (analyzing, as part of good faith analysis, whether plan proponents sought to take "improper control" of debtor). Although Aurelius' claims may recover little or no equity ownership, while it is pursuing its litigation strategy it proposes to control two out of seven (28.57%) of the seats

35

on the board of directors of reorganized Tribune upon emergence. Aurelius would take this

control on the basis of a theoretically possible total victory in litigation, before litigation had

even gotten underway. As noted above, this approach of "I win until you prove I lose" turns due

process on its head. Through the Noteholder Plan, Aurelius attempts to reap the benefits of

avoidance of all Senior and Bridge Loan Claims without even having to litigate the case, while it

strips from other creditors the Court-supervised governance protections they would enjoy if the

same litigation were pursued prior to emergence.

### 3.      Coercive "Put Option"

Through the Noteholder Plan's "put option" for general unsecured creditors, Aurelius has

attempted to take advantage of general unsecured creditors by buying their claims at prices

depressed by the risk and confusion created by the Noteholder Plan. *See* Noteholder Plan § 5.14.

This ulterior motive is likewise a clear violation of section 1129(a)(3).

The Noteholder Plan is a "pot plan" that contemplates minimal initial distributions to

creditors followed by massive litigation.[21] As a result, implementation of the Noteholder Plan

would expose unsecured creditors to great uncertainty as to the amount and time of receipt of the

balance of their distributions. Recognizing that such uncertainty is untenable for many

unsecured creditors, Aurelius built into the Noteholder Plan a "put option," by which creditors

could sell their claims to Aurelius—at a dramatic discount to the initial distributions to be made

---

[21] Under the Noteholder Plan, Holders of Other Parent Claims would receive initial distributions of only 4.3% of their allowed claims. Likewise, holders of Other Guarantor Debtor Claims would initially receive only 8% of their allowed claims.

under the DCL Plan—in exchange for escaping the delay and uncertainty created by the

Noteholder Plan.[22]  *See* Noteholder Plan § 5.14; *id.*, Introduction at 12.

The nature of the put option, when assessed in the context of the Noteholder Plan's larger

structure, is evidence that the plan was not "proposed with honesty and good intentions," as

required under section 1129(a)(3).  *In re Lernout*, 308 B.R. at 675 (noting that case law has

defined "good faith" under section 1129(a)(3) as requiring, *inter alia*, that a plan "be proposed

with honesty and good intentions" (citing *Kaiser Aerospace & Elec. Corp. v. TeleDyne Indus. (In

re Piper Aircraft Corp.)*, 244 F.3d 1289, 1300 (11th Cir. 2001)).  The Noteholder Plan forces

unsecured creditors to choose between (i) the indefinite delay and uncertainty of receiving

distributions while the Noteholders pursue their litigation strategy, and (ii) selling the right to

any such distributions to Aurelius in exchange for minimal recoveries.  While the Noteholders

may suggest that the discount represents a "risk premium" and a time value of money adjustment

for the uncertainties assumed by Aurelius, the degree of the discount bears no resemblance to the

scope of the risk that Aurelius, by its own assessment, proposes to assume.  The uncertainties

unsecured creditors would seek to avoid, of course, are those that the Noteholders created.

The price offered under Aurelius' put option is significantly lower than the initial

recoveries that the relevant creditors would receive under the DCL Plan (35.18% in the case of

Tribune creditors and 100% in the case of subsidiary creditors).  If the Noteholders honestly

believe, as they profess to do, that the DCL Plan is "highly unfair to the parties whose recoveries

---

[22] The Noteholder Plan, however, was overwhelmingly rejected by creditors, including by the classes that were offered the put option. Out of 63 classes (across 63 Debtors) offered the put option on condition of class acceptance of the plan, only 1 voted to accept the Noteholder Plan. *See* Tabulation of Ballots, Ex. B-1.  As such, even if the Noteholder Plan were ultimately approved by this Court, the put option would be inoperative for the vast majority of classes to which it was proposed.

are dependent on the success or failure of [the LBO-related] causes of action," *see* Noteholder Further Revised Responsive Statement [D.I. 7205] at 8, it is hard to imagine a good faith basis for their offer to pay such creditors substantially *less* under the put option. The fact that the Noteholders are unwilling to match the initial recoveries under the DCL Plan—which they decry as grossly insufficient—demonstrates that (i) the Noteholders were insincere in claiming that payments offered by the DCL Plan were insufficient and/or (ii) the Noteholder Plan was designed to enrich Aurelius by taking advantage of non-Noteholder creditors.

The fact that the classes offered the put option overwhelmingly voted to reject the Noteholder Plan in no way negates the Noteholders' lack of good faith in proposing it. The Noteholders obviously did not propose the Noteholder Plan in the hope that it would be overwhelmingly rejected, nor did they conceive the put option with the aim that no party should exercise it. According to the plain language of section 1129(a)(3) of the Bankruptcy Code, a plan cannot be confirmed unless it was *proposed* in good faith. The plan *proposed* by the Noteholders contained an improperly coercive put option. That creditors overwhelmingly rejected the Noteholder Plan in favor of the DCL Plan does not sanitize the coercive effect of the put option; rather, it shows that creditors were unwilling to subject themselves to such coercion when a vastly superior alternative was readily available.

**V.    The Noteholder Plan Impermissibly Purports to Release Non-Debtor Guarantors**

Section 11.2.1 of the Noteholder Plan provides that all holders of Senior Loan and Bridge Loan Guaranty Claims against Guarantor Non-Debtors—entities that are *not Debtors* in these cases—are "deemed" to have released all Senior Loan Guaranty Claims and Bridge Loan Guaranty claims. The Noteholders thus attempt to force the Senior Lenders to grant third-party releases in favor of the Guarantor Non-Debtors without the Senior Lenders' consent and without

38

providing the Senior Lenders with fair consideration.  Such mandatory terminations of non-debtor obligations are contrary to the Bankruptcy Code, and yet another reason why the Noteholder Plan is unconfirmable.

Section 524(e) of the Code provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).  It is well-settled in the Third Circuit that a plan may not force creditors to grant releases to non-debtors unless such releases are fundamentally fair, necessary to the reorganization, and given in exchange for reasonable consideration.  *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 212-15 (3d Cir. 2000); *see also In re United Artists Theatre Co.*, 315 F.3d 217, 227 (3d Cir. 2003) (quoting *Continental Airlines*); *U.S. Bank., N.A. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144-45 (Bankr. D. Del. 2010) (proposed nonconsensual third-party releases by any holders held impermissible under *Continental*).  The Noteholder Plan does not satisfy this standard.

Specifically, the Noteholder Plan's forced release of Guarantor Non-Debtors is fundamentally unfair, as demonstrated by the fact that the classes required to grant the releases—the Senior Loan Claims and the Bridge Loan Claims—have voted overwhelmingly against the Noteholder Plan.  *See* Tabulation of Ballots, Ex. B-1.  Terminations of non-debtor obligations can be accomplished over the objection of a few holdouts of a class if agreed to by the "overwhelming" majority of that class as part of a larger settlement, but not as yet another nonconsensual element of a bargain that an entire class has flatly rejected.  *See Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002) (plan may release dissenting creditors' claims against non-debtors only if, *inter alia*, the "impacted class, or classes, has overwhelmingly voted to accept the plan"); *In re Spansion, Inc.*,

39

426 B.R. at 144-45 (finding that plan could not be confirmed, *inter alia*, due to presence of proposed nonconsensual third-party releases, but noting that releases were permissible to the extent that entities voted in favor of the plan or received a mutual release as consideration).

## VI.   The Noteholder Plan Improperly Classifies the Senior Loan Claims and the Swap Claim, In Violation of 11 U.S.C. §§ 1122 and 1129(b)[23]

In order to satisfy section 1122(a) and thus section 1129(a)(1), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). "Substantially similar" claims are "those which share common priority status and other legal rights against the debtor's assets." *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 510 (D.N.J. 2005) (citations omitted); *see also In re Dow Corning Corp.*, 255 B.R. 445, 495 ( E.D. Mich. 2000) (citation omitted) ("'Substantially similar' has been defined as 'similar in legal nature, character or effect'"). Further, "the classification of the claims or interests must be reasonable." *In re Jersey City Medical Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) ("11 U.S.C. § 1122 was meant to codify pre-[Bankruptcy] Code law," which followed the "general rule that claims of the same kind and rank be placed in the same class."). The determination of whether a classification is reasonable "must be informed by the two purposes that classification serves under the [Bankruptcy] Code:  voting to determine whether a plan can be confirmed and treatment of claims under the plan." *John Hancock*, 987 F.2d at 159 (citations omitted).

---

[23] Because the issues raised in Sections VI and VII pertain primarily to the Senior Lenders, the Committee takes no position on these issues and does not join in Sections VI and VII.

Conversely, separate classification of claims with similar characteristics must be based upon a decision that "does not offend one's sensibility of due process and fair play." *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993). It is not reasonable to separately classify claims when "the only rationale offered for such separate classification is that the claims are disputed." 7 Collier on Bankruptcy ¶ 1122.03; *see also Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*, 914 F.2d 810, 815 (6th Cir. 1990) (bankruptcy court did not err in rejecting separate classification of claims of creditor subject to breach of contract and preferential transfer allegations); *In re Porcelli*, 319 B.R. 8, 10-11 (Bankr. M.D. Fla. 2004). The Noteholder Plan's classification of the Step Two Senior Loan Claims and the Swap Claim fails to meet these standards.

A.     **The Noteholders Offer No Reasonable Basis to Distinguish Between Step One Senior Lenders and Step Two Senior Lenders**

The Noteholder Plan creates two separate classes, Class 1C (Step One Senior Loan Claims) and 1D (Step Two Senior Loan Claims), for what should be a single class—the class of Senior Loan Claims. *See* Noteholder Plan §§ 3.1.2, 3.1.4. Each member of Classes 1C and 1D is party to the same Senior Loan Agreement and the claims separated into Class 1C and 1D both arise directly from that agreement. Nonetheless, the Noteholder Plan creates two classes, and treats one less favorably, holding back the distribution to Class 1D unless the applicability of the "Sharing Provisions" of the Senior Loan Agreement is litigated and conclusively affirmed by the Court before the plan's effective date. *See* Noteholder Plan at 6, § 3.2.4.

The only rationale offered for classifying Step Two Claims separately from Step One Claims in the Noteholder Plan is the asserted possibility that the "Sharing Provisions" of the Senior Loan Agreement (including §§ 2.13 and 2.15 thereof) might not be enforced, leading to a

41

zero dollar recovery if the Step Two Claims are avoided or subordinated in their entirety. The Noteholder Plan Disclosure Statement notes that the Sharing Provision is "silent . . . as to whether the sharing provisions are enforceable by Senior Lenders whose Claims are avoided." Noteholder Plan Disclosure Statement at 17.

That alleged "silence," however, provides no reasonable basis for this separate classification, and serves only as a pretext for the infliction of harm on the Senior Lenders. Claims in Class 1C arise under the same agreement as Claims in Class 1D and have exactly the same rights as Claims in Class 1D. *See In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 642 (Bankr. E.D. Pa. 1996) ("[T]here is no difference between the legal characteristics of Sumitomo's unsecured deficiency claim and the claims of the Debtor's other unsecured creditors, simply because Sumitomo's unsecured deficiency claim is the subject of pending litigation."). No colorable basis has been offered for the invalidation of the Senior Loan Agreement's Sharing Provisions, and there has been no Court or other determination to that effect. By holding back distributions to Step Two Senior Lenders on the basis of an unsupported assertion that the Sharing Provisions might not be enforced, the Noteholder Plan effectively presumes that these provisions are unenforceable until proven enforceable, an approach that finds no justification in law or logic.[24] This discrimination among Senior Loan Claims is neither supported by a reasonable basis nor necessary to consummate the Noteholder Plan (given that almost all classes voted against the Noteholder Plan), and thus the plan cannot be confirmed. *See Liberty Nat'l*

---

[24] Indeed, the so-called "Step One Credit Agreement Lenders"—the only claimants who would benefit from the nullification of the Sharing Provision—initially challenged the enforceability of the provision in a state-law action premised on this very argument, but ultimately dismissed their action and withdrew their proposed Plan of Reorganization. *See* Notice of Withdrawal [D.I. 7190]. Moreover, the holders of Step One Senior Loan Claims voted overwhelmingly to reject the Noteholder Plan and to accept the DCL Plan, which expressly upholds the Sharing Provision.

*Enters. v. Ambanc La Mesa Ltd. P'ship. (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 656

(9th Cir. 1997) (among other factors, plan proponent must show that discrimination is "supported

by a reasonable basis" and that that the proponent "could not confirm or consummate the Plan

without the discrimination"); 7 Collier on Bankruptcy ¶ 1129.03.

### B.    The Noteholder Plan Improperly Classifies the Swap Claim with the Step One Senior Loan Claims

In contrast to its improper *separate* classification of the Senior Loan Claims, the

Noteholder Plan improperly classifies the Swap Claim *together* with the Step One Senior Loan

Claims. Noteholder Plan § 3.2.3. The Swap Claim represents Tribune's liability under an

interest rate swap agreement executed by Tribune to hedge its obligations in respect of the

variable interest rates under the Senior Loan Agreement. Tribune's obligations in respect of the

Swap Claim are governed by a separate agreement and are entirely distinct from its obligations

under the Senior Loan Agreement. The Noteholder Plan disregards the basic principles

governing classification outlined above by classifying the Swap Claim together with the Step

One Senior Loan Claims, apparently on the ground that the Swap Claim is held by an entity that

also holds Senior Loan Claims.

Furthermore, while the Senior Loan Claims arise from a transaction alleged to be subject

to avoidance, no plausible claim for avoidance of the Swap Claim has been or could be made.

By definition, the interest rate swap agreement giving rise to the Swap Claim provided

reasonably equivalent value to Tribune at the time it was executed—the value derived from

effectively converting a variable rate loan into one with a fixed interest rate. Section 548 of the

Bankruptcy Code explicitly provides that "a swap participant . . . that receives a transfer in

connection with a swap agreement takes for value to the extent of such transfer." 11 U.S.C.

§ 548(d)(2)(D); *see also Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC)*, 556 F.3d 247, 259 (4th Cir. 2009) (noting that section 546(g) exempts transfers made in connection with swap agreements from avoidance under section 548).[25]

In other words, not only does the Swap Claim arise from a different agreement than the Senior Loan Clams, there has been no allegation that it may be vulnerable to avoidance. Accordingly, the legal rights and entitlements of the Swap Claim differ materially from the legal rights and entitlements of the Senior Loan Claims, and the Swap Claim is not properly classified with the Senior Loan Claims under the Noteholder Plan.[26]

## VII.    The Noteholder Plan Is Not Fair and Equitable to the Senior Lenders

A plan must be fair and equitable with respect to each non-accepting impaired unsecured class. The "fair and equitable standard requires that (i) the unsecured creditors in each such class are paid in full or (ii) no junior class of claims receives or retains any property on account of such claims. 11 U.S.C. § 1129(b)(2)(B); *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999); *In re Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. 2005). These requirements, however, are not exhaustive. *In re Reading Broadcasting, Inc.*, 2009 Bankr. LEXIS 2593, at *30 (Bankr. E.D. Pa. Jan. 17, 2009) ("[T]echnical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.'"

---

[25] Section 546(g) of the Bankruptcy Code also provides that "the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant . . . under or in connection with any swap agreement and that is made before the commencement of the case" unless such transfer was actually fraudulent. 11 U.S.C. § 546(g).

[26] Tribune's obligations in respect of the Swap Claim were guaranteed by the Guarantor Debtors through the same guarantee executed with respect to Tribune's obligations under the Senior Loan Agreement. Accordingly, in contrast to the Swap Claim itself, the claims for guarantee of the Swap Claim are properly classified together with the claims for guarantee of the Senior Loan Claims. Both the DCL Plan and the Noteholder Plan correctly classify such guarantee claims together.

(quoting *Fed. Sav. & Loan Ins. Corp. v. D & F Constr. Inc. (In re D & F Constr., Inc.)*, 865 F.2d

673, 675 (5th Cir. 1989)); *In re Century Glove, Inc.*, 74 B.R. 958, 960 (Bankr. D. Del. 1987)

(recognizing that a plan must "at a minimum" satisfy the delineated requirements).

      The Noteholder Plan is not fair and equitable with respect to the Senior Lenders because

it unfairly shifts the risks relating to the reorganization onto the Senior Lenders.  Courts have

held that plans that provide unduly delayed or risky payments to non-accepting impaired

creditors are not "fair and equitable" within the meaning of section 1129(b).  *See, e.g., In re VIP*

*Motor Lodge, Inc.*, 133 B.R. 41, 45 (Bankr. D. Del. 1991) (where junior creditors and equity

holders received value, repayment of a senior claim with a 30-year deferred cash payment at

10% interest violated absolute priority rule and was unfair and inequitable); *In re EFH Grove*

*Tower Assocs.*, 105 B.R. 310, 314 (Bankr. E.D.N.C. 1989) (18-month moratorium on

undersecured lender's claim followed by small payments with a large balloon in five years after

moratorium ends not fair and equitable); *cf. In re Executive House Assocs.*, 99 B.R. 266, 281

(Bankr. E.D. Pa. 1989) (payout of a secured claim at 9.75% over 15-years, with a $18.9 million

balloon payment at maturity, was "so risky" that it did not afford adequate protection).

      In the instant case, the Noteholders have proposed a Plan that would tie up as much as

65% of the distributable value of the estates, potentially for many years.  As noted above, this

would slant the playing field in favor of the Noteholders, effectively putting the plaintiffs in

control of the disputed value until they are determined ***not*** to be entitled to it.  The Senior

Lenders and other non-accepting creditors would receive none of that value while the Litigation

Trustee, hand-picked and controlled by the Noteholders, pursues the Litigation Trust Causes of

Action to their conclusion, in whatever order he or she sees fit, possibly not resolving claim

allowance for years to come.  By depressing distributable value through the additional tax burden

associated with the trust structure, the Noteholder Plan magnifies this unfair treatment; the value of the Senior Lenders' ultimate recovery will be reduced by taxes on any appreciation in value of the Distribution Trust Assets, whether or not the Senior Lenders ultimately win the LBO-Related Causes of Action. Moreover, the Noteholder Plan would force these same non-accepting creditors to fund a pro rata share of the $40 million seed money gift used to establish the Litigation Trust, and empower the Litigation Trustee to use money from any recoveries to continue funding its expenses. *See* Noteholder Plan § 7.16.2; Noteholder Plan Supplement, Attachment I, Ex. 5.17.1 (Litigation Trust Agreement) § 2.3(a). Money that the Senior Lenders strongly believe is theirs would be taken from them and used to sue them, and money that could be used to pay general unsecured creditors would instead fund litigation they do not support. It is neither fair nor equitable for the Noteholders to require others to fund their aggressive litigation strategy and force all other creditors to bear the risks of the reorganization while they pursue that strategy.

## CONCLUSION

For the foregoing reasons, the DCL Plan Proponents respectfully submit that the Court

should deny confirmation of the Noteholder Plan pursuant to 11 U.S.C. §§ 1129(a) and (b) and

grant such other relief as the Court may determine to be just and proper.


Dated: Wilmington, Delaware
      February 15, 2011

Respectfully submitted,

*/s/ Norman L. Pernick*
Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
Patrick J. Reilley (Bar No. 4451)
COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

- and-

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-0199
Facsimile:  (312) 853-7036

*Attorneys For Debtors And Debtors*
*In Possession*

47

/s/ Matthew B. McGuire
Adam G. Landis (Bar No. 3407)
Matthew B. McGuire (Bar No. 4366)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

- and-

Howard Seife
David M. LeMay
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

*Attorneys for the Official Committee of Unsecured Creditors*

- and -

Graeme Bush
James Sottile
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

*Special Counsel to the Official Committee of Unsecured Creditors*

48

*/s/ Drew G. Sloan*
Mark D. Collins (Bar No. 2981)
Robert J. Stearn, Jr. (Bar No. 2915)
Drew G. Sloan (Bar No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651 7701

-and-

Donald S. Bernstein
Dennis E. Glazer
Damian S. Schaible
Elliot Moskowitz
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY  10017
Telephone:  (212) 450-4500

*Attorneys for JPMorgan Chase Bank, N.A.*


*/s/ M. Blake Cleary*
Robert S. Brady (Bar No. 2847)
M. Blake Cleary (Bar No. 3614)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building—17th Floor
1000 West Street, Post Office Box 391
Wilmington, DE  19899
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

Bruce Bennett
James O. Johnston
Joshua M. Mester
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, CA  90071-1530
Telephone:  (213) 621-6000
Facsimile:  (213) 621-6100

*Attorneys for Oaktree Capital Management, L.P.*
*and Angelo, Gordon & Co., L.P.*

49