# EXHIBIT B

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
:
In re                                                        :   Chapter 11
:
**AbitibiBowater, Inc., *et al.*[1]**                        :   Case No. 09-11296 (KJC)
:   (Jointly Administered)
Debtors.                          :
-------------------------------------------------------------x

## OBJECTION OF AURELIUS CAPITAL MANAGEMENT, LP AND CONTRARIAN CAPITAL MANAGEMENT, LLC TO JOINT PLAN OF REORGANIZATION AND DEBTORS' REQUEST FOR APPROVAL THEREOF

Aurelius Capital Management, LP ("Aurelius") and Contrarian Capital Management, LLC ("Contrarian" and together with Aurelius, the "Noteholders"), each on behalf of its managed fund entities, by and through their undersigned counsel, hereby submit this objection (the "Objection") to the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of August 2, 2010 (the "Plan") [Docket No. 2796], and in support hereof state as follows:

## PRELIMINARY STATEMENT[2]

1.     Throughout these cases, the Debtors and their counsel and advisors have used the restructuring process to subvert the interests of Bowater Canada Finance Corporation ("BCFC") and its creditors.  The board of directors (the "BCFC Board") and officers of BCFC, who have a

---

[1]   The Debtors in these chapter 11 cases are: AbitibiBowater Inc., AbitibiBowater US Holding 1 Corp., AbitibiBowater US Holding LLC, AbitibiBowater Canada Inc., Abitibi-Consolidated Alabama Corporation, Abitibi-Consolidated Corporation, Abitibi-Consolidated Finance LP, Abitibi Consolidated Sales Corporation, Alabama River Newsprint Company, August Woodlands, LLC, Bowater Alabama LLC, Bowater America Inc., Bowater Canada Finance Corporation, Bowater Canadian Forest Products Inc., Bowater Canadian Holdings Incorporated, Bowater Canadian Limited, Bowater Finance Company Inc., Bowater BCFC LLC, Bowater Incorporated, Bowater LaHave Corporation, Bowater Maritimes Inc., Bowater Newsprint South LLC, Bowater Newsprint South Operations LLC, Bowater Nuway Inc., Bowater Nuway Mid-States Inc., Bowater South American Holdings Incorporated, Bowater Ventures Inc., Catawba Property Holdings, LLC, Coosa Pines Golf Club Holdings LLC, Donohue Corp., Lake Superior Forest Products Inc., and Tenex Data Inc.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan or elsewhere in this Objection.

fiduciary obligation to BCFC, have been willing participants in this process. The Plan is simply one more attempt by the Debtors to strip value from BCFC and its creditors and cannot be confirmed.

2.      BCFC is an entity without any prospect of reorganization. Any plan for BCFC could only accomplish a distribution of its existing assets to the creditors of BCFC. Because its assets are comprised solely of claims against other Debtors and against insider officers and directors, every dollar of possible recovery for BCFC's estate would come directly from the estates of other Debtors -- the same Debtors who are controlling the Plan process. The conflict is obvious yet the Debtors have done little to address it - and what little they have done was only after forcing the Noteholders to expend their own money and time to protect BCFC's interest.

3.      During these cases:

- • BCFC filed for both chapter 11 and CCAA protection despite the fact that BCFC should not have been in a reorganization process because it had no legitimate prospects for reorganization. The BCFC Board never met to determine whether BCFC should have been in a reorganization process or would have been better served by a liquidation proceeding.

- • The BCFC Board and the other Debtors agreed to allow BCFC to become obligated on the debtor-in-possession financing despite it having no assets beyond the claims described herein. BCFC was only removed as an obligor after objection by certain of the Noteholders.

- • BCFC had no independent advisors until the Noteholders filed a motion in Canada seeking an independent trustee.

- • Even after conceding the need for BCFC to have some limited independent representation (although not disinterested directors), the Debtors opposed the Noteholders request to receive the report of the independent representative until ordered to provide such report by this Court.

- • The BCFC Board agreed to allow BCFC to be a proponent of the Plan despite the initial draft of such Plan depriving BCFC of any recovery on its assets. The Plan was only modified to provide for a potential recovery on the Wind-up Claim after objection by the Noteholders.

- BCFC is still a proponent of the Plan which, even after modification, strips it of any value in the BCHI Interests, the BCHI Transactions Claim and the BCFC Litigation Claims.

- The Debtors structured a Rights Offering that deprived BCFC and its creditors of an ability to participate on account of the Wind-up Claim and the BCHI Transactions Claim. The Rights Offering was amended to allow for participation solely on account of the Wind-up Claim only after the objection of the Noteholders. Even the ability to participate on account of the Wind-up Claim is subject to limitations not imposed on the creditors of other Debtors.

- The Debtors have proposed to release and/or retain avoidance actions and other causes of action for the benefit of the reorganized Debtors without providing any value to BCFC for such claims.

- The officers and directors of BCFC concede that they have done nothing to protect the interests of BCFC during the restructuring process.

- In spite of their failure to protect the interests of BCFC, the officers and directors of BCFC are to receive releases from liability and injunctive protection under the Plan.

- The Guarantee Claims are not allowed under the Plan, in spite of the fact that the merits of such Claims have not been challenged and the fact that all other Unsecured Note Claims (as defined in the Plan) are being allowed.

- The Plan does not provide for a distribution on account of the Wind-up Claim, despite the fact that it is a valid claim arising on account of the structure utilized to issue the BCFC Notes.

4.     The Plan is the product of a process that has been conducted to the detriment of BCFC and, moreover, the Plan is not confirmable as to either BCFC or the other Debtors. As an initial matter, because the Plan does not substantively consolidate the Debtors, the confirmation standards must be met for each Debtor standing alone. The Plan cannot be confirmed as to BCFC because the only impaired, voting class of BCFC creditors has voted to reject the Plan[3]

---

[3] The Noteholders hold in excess of one-third of the BCFC Notes and accordingly have sufficient votes to block acceptance of the Plan. The Noteholders voted to reject the Plan.

*NY 240,556,780v11 9-13-10*

and thus BCFC has failed to satisfy the voting requirements for plan confirmation set forth in section 1129(a)(8) and section 1129(a)(10) of the Bankruptcy Code.  Moreover, the Plan cannot be crammed down on creditors of BCFC under section 1129(b) because there is no impaired, accepting class.  Further, the Plan does not meet the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.  Therefore, confirmation of the Plan must be denied as to BCFC.

5.      In addition, the Plan cannot be confirmed as to any of the Debtors because:

- The Plan was not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.

- The Plan inappropriately classifies the BCHI Transactions Claim.

- The Plan treatment unfairly discriminates against the Wind-up Claim and the BCHI Transactions Claim.

- The discharge, release, injunction and exculpation provisions provided under the Plan violate section 524(e) of the Bankruptcy Code.

- The Plan violates the absolute priority rule.

6.      Accordingly, the Noteholders respectfully submit that the Court should deny confirmation of the Plan.

## BACKGROUND

A.    **Procedural Background**

7.      On April 16, 2009 (the "Petition Date"), Bowater Incorporated ("Bowater"), BCFC and certain of their affiliates filed petitions for relief pursuant to chapter 11, title 11, of the United States Code (the "Bankruptcy Code") in this Court.  The Debtors are authorized to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4

8.      On April 17, 2009, one day after the commencement of the chapter 11 cases, the Cross-Border Debtors and the CCAA Debtors[4] filed for protection from their creditors under the CCAA in the Judicial District of Montreal, Canada (the "Quebec Superior Court"). The Debtors' chapter 11 cases in the Bankruptcy Court have been recognized by the Quebec Superior Court as a "foreign proceeding" pursuant to section 18.6 of the CCAA.

9.      On May 4, 2010, the Debtors filed the initial version of the Plan. The Debtors subsequently filed amended versions of the Plan on May 24, 2010 and August 2, 2010. Concurrent with the filing of the Plan on May 24, 2010, the Debtors filed their *CCAA Plan of Reorganization and Compromise* (the "CCAA Plan") in the Quebec Superior Court.

10.      On June 22, 2010, the Debtors filed their motion seeking approval of the disclosure statement (the "Disclosure Statement") and solicitation procedures (the "Solicitation Motion") [Docket No. 2460]. By order dated August 3, 2010 (the "Solicitation Order") [Docket No. 2824], the Court approved the Solicitation Motion and scheduled the hearing on confirmation of the Plan (the "Confirmation Hearing") for September 24, 2010.

---

[4]      The Cross-Border Debtors include certain Debtors that also filed for protection from their creditors under the Canadian *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"). The Cross-Border Debtors are BCFC, Bowater Canadian Holdings Incorporated, AbitibiBowater Canada Inc., Bowater Canadian Forest Products Inc., Bowater Maritimes Inc., Bowater LaHave Corporation and Bowater Canadian Limited.

The CCAA Debtors are non-Debtor subsidiaries of AbitibiBowater Inc. that filed for protection from their creditors under the CCAA. The CCAA Debtors are Bowater Mitis Inc., Bowater Guérette Inc., Bowater Couturier Inc., Alliance Forest Products (2001) Inc., Bowater Belledune Sawmill Inc., St-Maurice River Drive Company Limited, Bowater Treated Wood Inc., Canexel Hardboard Inc., 9068-9050 Québec Inc., Bowater Canada Treasury Corporation, Bowater Canada Finance Limited Partnership, Bowater Shelburne Corporation, 3231378 Nova Scotia Company, Bowater Pulp and Paper Canada Holdings LP, Abitibi-Consolidated Inc., Abitibi-Consolidated Company of Canada, Abitibi-Consolidated (U.K.) Inc., Abitibi-Consolidated Nova Scotia Incorporated, Abitibi-Consolidated Finance LP, 3217925 Nova Scotia Company, Terra-Nova Explorations Ltd., The Jonquière Pulp Company, The International Bridge and Terminal Company, Scramble Mining Ltd., 9150-3383 Québec Inc., Star Lake Hydro Partnership, Saguenay Forest Products Inc., 3224112 Nova Scotia Limited, La Tuque Forest Products Inc., Marketing Donohue Inc., Abitibi-Consolidated Canadian Office Products Holdings Inc., 3834328 Canada Inc., 6169678 Canada Incorporated, 4042410 Canada Inc., Donohue Recycling, and 1508756 Ontario Inc.

5

11.    On September 3, 2010, the Debtors filed their last Plan Supplement document [Docket Nos. 3093, 3109 and 3122].  That filing included Plan Supplement 3 - List of Merged or Dissolved Debtors and Plan Supplement 12 - Restructuring Transactions.  Plan Supplement 3 provides that BCFC will be liquidated "only if the BCFC Affected Unsecured Creditors approve the CCAA Plan by the affirmative vote of the Required Majority."  Plan Supplement 3, 5, n. 8. None of the Plan Supplement documents, nor the Plan itself, explain what will happen to BCFC in the event the CCAA Plan is not approved by the Required Majority of the BCFC Affected Unsecured Creditors.  Given that the Noteholders will vote against the CCAA Plan, the Required Majority of BCFC Affected Unsecured Creditors will not approve the CCAA Plan for BCFC.

## B.    **Bowater Canada Finance Corporation**

12.    BCFC was formed as an unlimited company (a "ULC") organized under the laws of Nova Scotia for the purpose of engaging in tax-advantaged financing of the Canadian operations of Bowater.  In 2001, BCFC issued $600 million of unsecured notes due November 2011 (the "BCFC Notes"), which are guaranteed by Bowater and are BCFC's only material liabilities.  The Noteholders, through their managed fund entities, hold in excess of one-third of the BCFC Notes.

13.    BCFC is a wholly-owned subsidiary of Bowater and has no employees or independent business operations.  BCFC has no business to restructure.  BCFC is not an obligor on any post-petition financing.

14.    BCFC's only material assets are claims against other Debtors, the BCFC Board, and its officers.  These assets include a claim (the "Wind-up Claim")against Bowater, as the sole shareholder of BCFC, under section 135 of the *Companies Act* (Nova Scotia) (the "Companies Act"), which provides:

> In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up

*Companies Act* (Nova Scotia), R.S.N.S., ch. 81, §135 (1989) (attached hereto as <u>Exhibit A</u>). The Wind-up Claim is triggered by, among other things, a BCFC bankruptcy.[5]

15.    BCFC is also the owner of preferred shares (the "<u>BCHI Interests</u>") in Bowater Canada Holdings Inc. ("<u>BCHI</u>"), which, according to the Debtors, is a wholly-owned subsidiary of Bowater and a holding company for Bowater's Canadian activities. This ownership of the BCHI Interests arose from a series of complicated and poorly disclosed intercompany transactions (the "<u>Intercompany Transactions</u>") occurring between October 2001 and April 16, 2009. The value of the BCHI Interests depends on BCHI challenging the Intercompany Transactions and recovering from other Debtors and their affiliates. In addition, through the Intercompany Transactions, BCFC may have given up significant value for very little consideration, potentially giving rise to significant claims by BCFC and its creditors against various parties. BCFC also has potential claims against its officers and the BCFC Board for breach of fiduciary duties in connection with both the Intercompany Transactions and the abdication of their fiduciary duty in these chapter 11 cases.

## C.    **The BCFC Board**

16.    The BCFC Board and BCFC's officers are irreconcilably conflicted by the fiduciary roles they hold for the other Debtors. According to the Nova Scotia Registry of Joint Stock Companies, the directors of BCFC are: David J. Paterson, Alain Grandmont, Pierre Rougeau, William G. Harvey and Jacques P. Vachon, all of whom are also officers of BCFC and

---

[5] In the Plan, the Debtors use the defined term "BCFC Contribution Claim" to refer to the Wind-up Claim. Plan §1.96.

7

several of whom are officers and/or directors of other Debtors. All five are also officers of AbitibiBowater Inc. ("ABH") and are officers and directors of BCFPI. See AbitibiBowater Inc., Annual Report (Form 10-K) at 17, (Mar. 31, 2010); Company Profile of Bowater Canadian Forest Products Inc., Nova Scotia Registry of Joint Stock Company. Paterson, Harvey and Rougeau are directors and officers of BCHI, while Vachon is a BCHI officer. Company Profile of Bowater Canadian Holding Inc., Nova Scotia Registry of Joint Stock Company. Mr. Harvey is a director and officer of Bowater Canada Treasury Corporation and Mr. Vachon is an officer. Company Profile of Bowater Canada Treasury Corporation, Nova Scotia Registry of Joint Stock Company. Both Mr. Harvey and Mr. Vachon are officers of Bowater. Tr. of Depo. of William G. Harvey, 28:13-21, May 20, 2010 (hereinafter "Harvey Canadian Depo.") (attached hereto as Exhibit B). All five BCFC directors are solely paid by ABH. It also appears that all of these directors will have positions with the reorganized Debtors that will result in substantial compensation to them. Plan Supplement 5A-5B.

**D.      Actions of the Debtors in These Cases**

17.      Although BCFC has no business to reorganize, BCFC filed a chapter 11 case in the United States and for CCAA protection in Canada. The conflicted BCFC Board did not consider the interests of BCFC when it authorized the filing of these cases. Indeed, William Harvey, a member of the BCFC Board and Vice President and Treasurer of BCFC, testified that he was not aware whether the BCFC Board ever met to determine whether BCFC should be in a reorganization process. Harvey Canadian Depo., 31:14-20.

18.      On the Petition Date, the Debtors filed a motion (the "DIP Motion") seeking approval of a post-petition financing agreement (the "DIP Financing Agreement"), pursuant to which BCFC was to be an obligor, notwithstanding that BCFC would derive no benefit from that

8

financing. [Docket No. 18]. Once again, the BCFC Board did not consider the interests of BCFC or its creditors in agreeing to obligate BCFC under the DIP Financing Agreement. The Debtors and the DIP lenders removed BCFC as an obligor only after an objection by certain of the Noteholders to the DIP Motion, thereby implicitly recognizing that there was no legitimate basis for BCFC to assume obligations under a DIP Financing Agreement. [Docket No. 407].

19.    As with the bankruptcy filings and the post-petition financing, the BCFC Board neglected the interests of BCFC and its creditors in connection with the negotiation and proposal of the Plan. BCFC is a proponent of a Plan that, in its first version, effectively stripped BCFC of substantially all its assets by expunging claims that make up its assets without any recovery and depriving BCFC and its creditors of the right to participate in the Rights Offering in connection with substantially all of BCFC's claims and interests, including the Wind-up Claim and the BCHI Transactions Claim (as defined below). The Debtors subsequently amended the Plan to allow for classification of the Wind-up Claim as a general unsecured claim against Bowater to the extent allowed – although the Plan still provides significant barriers to the allowance of the Wind-up Claim in full. The Debtors also subsequently amended the terms of the Rights Offering to allow for participation on account of the Wind-up Claim only after objection by the Noteholders (on a less advantageous basis than other creditors); however, BCFC and its creditors are still not permitted to participate on account of any of the other BCFC assets that the Debtors do not acknowledge, including the BCHI Transactions Claim.

20.    As the Debtors have admitted, the BCFC Board never considered the merits of the Wind-up Claim or other claims held by BCFC that it agreed to abandon. Harvey Canadian Depo., 116:9-21. Tr. of Depo. of William G. Harvey, 61:21-62:12, Sept. 1, 2010 (hereinafter, "Harvey Depo.") (attached hereto as Exhibit C); Tr. of Depo. of Jacques Vachon, 35:8-23, Sept.

2, 2010 (annexed hereto as Exhibit D). Upon information and belief, the BCFC Board simply supported the Rights Offering and the Plan because they benefit creditors of other Debtors (and possibly the directors themselves) not BCFC. As Mr. Harvey -- who was selected by the Debtors to be deposed because he allegedly had the most knowledge of BCFC's business and organization -- testified, he had no opinion as to whether it is in BCFC's best interest (i) to walk away from the Wind-up Claim; or (ii) not to contest the cancellation of its preferred shares in BCHI. Harvey Canadian Depo., 117:8-19, 120:20-24. Moreover, Mr. Harvey stated that to his knowledge the BCFC Board never met to consider the merits of the Wind-up Claim and had not taken any steps to prosecute that claim. Harvey Canadian Depo., 45:11-46:4, 57:13-16. Well in advance of the proposal of the Rights Offering and the Plan, the Noteholders sent a letter to the BCFC Board, dated September 2, 2009, annexed hereto as Exhibit E. In this letter, the Noteholders highlighted the conflicts among the Debtors, including between Bowater and BCFC. The BCFC Board failed to provide any substantive response to this letter and, by their own admission, failed to take any action to address the conflicts discussed in the letter.

E.     **Efforts For An Independent Fiduciary**

21.     Following the Petition Date, the Noteholders repeatedly expressed their concerns to the Debtors, both orally and in writing, regarding the hopelessly conflicted BCFC Board. Unfortunately, the Debtors steadfastly refused to address - or even acknowledge - the serious conflicts. Accordingly, on March 10, 2010, the Noteholders filed the *Motion for the Issuance of an Order Directing Bowater Canada Finance Corporation to File an Assignment in Bankruptcy or Alternatively, an Order Seeking the Appointment of an Independent and Disinterested Third Party to Investigate, Assert, Protect and Pursue the Claims and Remedies of Bowater Canada Finance Corporation* (the "Canadian Trustee Motion") in BCFC's CCAA proceeding, attached

10

hereto as Exhibit F.  The relief sought in the Canadian Motion, including the appointment of an independent and disinterested third party, was based, *inter alia*, on the direct conflicts between BCFC and the other Debtors.

22.    Following the filing of the Canadian Trustee Motion, the Debtors filed applications seeking to retain (i) the law firm Togut, Segal & Segal, LLP (the "Togut Firm") as conflicts counsel to BCFC (the "Togut Application") and (ii) AP Services, LLC as special advisor to BCFC and Lisa Donahue as BCFC's Vice President – Restructuring (the "Donahue Application" and together with the Togut Application, the "Applications").  Though the Debtors ostensibly filed the Applications in an effort to provide independent fiduciaries for BCFC, the Applications failed to address the need for independence of BCFC itself through an independent governance body, *i.e.*, independent directors, a chapter 7 or chapter 11 trustee, or an assignment in bankruptcy under the *Bankruptcy and Insolvency Act* (the "BIA") appointing a trustee of the estate nominated by the Noteholders.

23.    On June 25, 2010, the Court entered an order approving the Togut Application (the "Togut Order") [Docket No. 2497] and, on July 7, 2010, the Court entered an order approving the Donahue Application (the "Donahue Order") [Docket No. 2614].  The Donahue Order provides, *inter alia*, that Ms. Donahue is authorized to investigate (i) any claims against the BCFC Board and its officers in connection with the BCFC Notes and (ii) causes of action based on the use of the proceeds of the BCFC Notes.  Donahue Order, ¶¶ 5-6.  The Donahue Order further provides that Ms. Donahue prepare a report discussing the investigation of, and making recommendations with respect to, such claims, in addition to the Wind-up Claim.  *Id.* at ¶ 7.  Incredibly, the Debtors would not agree to provide a copy of Ms. Donahue's report to the Noteholders until ordered to do so by the Court.

NY 240,556,780v11 9-13-10

24.     On August 26, 2010, Ms. Donahue was authorized by the BCFC Board to file (but not to prosecute) a proof of claim against Bowater on account of the Wind-up Claim. This proof of claim was filed on September 1, 2010. Shortly thereafter, Bowater filed the *Motion for Order Pursuant to the Court-to-Court Protocol Authorizing Bowater Incorporated to Seek Advice and Direction from the Canadian Court* (the "Canadian Advice Motion") [Docket No. 3091]. Pursuant to the Canadian Advice Motion, Bowater is seeking authorization from this Court to seek "advice and direction" from the Quebec Superior Court with respect to the merits of the Wind-up Claim. The Noteholders have filed or will shortly file an objection to the Canadian Advice Motion. Subsequent to the filing of the Canadian Advice Motion, Ms. Donahue was apparently granted the authority to prosecute the Wind-up Claim.

**F.     The Plan and Claims Relevant to the Noteholders' Recovery**

      **(i)     Direct Claims Against BCFC and Guarantee Claims Against Bowater**

25.     The Noteholders and other holders of BCFC Notes have a direct claim against BCFC on account of the BCFC Notes (the "Direct Claims") and a guaranty claim against Bowater, also on account of the BCFC Notes (the "Guarantee Claims"). The Direct Claims are treated as Unsecured Claims against BCFC (Class 6M) under the Plan and the Guarantee Claims are treated as Unsecured Claims against Bowater (Class 6S).

26.     Under the Plan, each holder of an Allowed Class 6 Claim, including the Direct Claims and the Guarantee Claims shall, in full satisfaction of such Claim, (i) receive its pro rata share of the number of shares of New ABH Common Stock allocated to the Debtor against which such claim is allowed, subject to dilution; and (ii) to the extent eligible, be entitled to participate in the portion of the Rights Offering allocated to the Debtor against which such claim is allowed based on the allocations of New ABH Common Stock allocated to such Debtor as set

*NY 240,556,780v11 9-13-10*

forth in Exhibit B6 to the Plan.  Plan, § 2.13(c).  The Direct Claims and the Guarantee Claims are properly classified under the Plan.  The Direct Claims also receive treatment under the Plan although such treatment is based on a value for the assets of BCFC that assumes no value for the BCHI Transactions Claims, the BCFC Litigation Claims or the BCHI Interests.

27.    As with all things related to BCFC, the Debtors have made recovery more difficult for BCFC's creditors by refusing to allow the Guarantee Claims in the Plan, despite having allowed all other Unsecured Note Claims.  The Debtors have not challenged the merits of the Guarantee Claims and do not argue that the Guarantee Claims are not enforceable.

28.    Whether the Guarantee Claims and the Wind-up Claim are duplicative (which they are not) has no effect on the validity of the Guarantee Claims.  To the extent the Debtors believe the Wind-up Claim is duplicative of the Guarantee Claims (which it is not), the Debtors should attack the Wind-up Claim, not the clearly valid Guarantee Claims.  There is no basis not to allow Guarantee Claims outright other than to establish another obstacle to recovery by BCFC's creditors.  Because all other Unsecured Note Claims are being allowed, the Guarantee Claims should likewise be allowed under the Plan and holders of the Guarantee Claims should receive a distribution on the Initial Distribution Date.  Failure to allow the Guarantee Claims constitutes unfair discrimination against the Guarantee Claims.

(ii)    **BCFC's Wind-up Claim Against Bowater**

29.    As described above, BCFC holds the Wind-up Claim against Bowater in an amount sufficient to satisfy all of BCFC's debts and obligations to it creditors.  The Plan does

NY 240,556,780v11 9-13-10

not provide that the Wind-up Claim is an Allowed Claim or provide any process for determining its allowance. Plan, § 2.13(b)(ii).[6]

30.    The Plan also impermissibly attempts to limit the Wind-up Claim by defining it inappropriately under the Plan. Specifically, the Plan defines the Wind-up Claim as "the contingent claim in an amount that is not less than $619,875,000 minus the aggregate amount of distribution to holders of (a) Allowed Class 6M Claims against BCFC and (b) any Allowed Guarantee Claims against Bowater that certain holders of the 7.95% Notes have asserted that BCFC may hold against Bowater pursuant to section 135 of the *Nova Scotia Companies Act*, R.S.N.S., 1989, c. 81, as amended, based on BCFC's incorporation as an unlimited liability company under Nova Scotia law." Plan, § 1.96. This definition characterizes the Wind-up Claim as a deficiency claim, a characterization inconsistent with applicable case law. There is no basis to reduce the amount of the Wind-up Claim. The Debtors are attempting to address a recovery issue through the claims allowance process. This is inappropriate and the Plan must be revised to provide that the Wind-up Claim may be asserted and receive treatment based upon its full value.

31.    The Solicitation Order provides that, with respect to the Rights Offering, the Wind-up Claim "is deemed to be an Eligible Claim against Bowater Incorporated and will be allocated Subscription Rights for the benefit of, and to be exercised by, creditors of BCFC." Solicitation Order, at ¶ 64(a). However, any creditors wishing to exercise such Subscription Rights will be required to fund at the time of exercise, while the related Rights Offering Notes will be escrowed and not released until the Wind-up Claim is allowed under the Plan. Therefore, instead of receiving Rights Offering Notes on the effective date of the Plan (the "Effective

---

[6] Bowater acknowledges that at least one of the Guarantee Claim or the Wind-up Claim will be an Allowed Claim in Class 6S against Bowater. Plan § 2.13(b)(ii).

14

Date") which could be sold in the open market, the subscribers on behalf of the Wind-up Claim have a disincentive to subscribe because they are forced to take the risk of the performance of the reorganized Debtors between the Effective Date and whenever they receive their Rights Offering Notes.

   (iii)    **BCFC's Preferred Shares in BCHI**

32.    BCFC's ownership of the BCHI Interests came about through a series of Intercompany Transactions about which minimal information has been disclosed.    No information concerning the BCHI Transactions Claim was disclosed prior to the Petition Date or during the pendency of these cases beyond a cursory discussion in the Forty-Ninth Report of the Monitor submitted in the Debtors' Canadian proceeding.

33.    BCFC may have given up significant value for very little consideration by the Intercompany Transactions, and these transactions could give rise to significant claims by the BCFC estate and its creditors against various parties.    The Noteholders believe that the Intercompany Transactions should be avoided and BCFC should be permitted to assert a general unsecured claim (the "BCHI Transactions Claim") against BCFPI, which is where it appears the value from the issuance of the BCFC Notes ultimately was held. *See, e.g.,* Forty-Ninth Report of the Monitor, dated July 7, 2010, as amended, ¶¶ 22-90.    To the extent BCFC is successful avoiding the Intercompany Transactions, the resulting BCHI Transactions Claim should be classified in Class 6 against BCFPI and should receive the same treatment as other Class 6 claims against BCFPI.    The Plan provides no value for the BCHI Transactions Claim.    At a minimum, the Plan should provide a mechanism for allowance or disallowance of the BCHI Transactions Claim and for appropriate reserves in the event the BCHI Transactions Claim is allowed.

*NY 240,556,780v11 9-13-10*

34.    To the extent the Intercompany Transactions are not voidable, the BCHI Interests would fit within the definition of Intercompany Interests in the Plan and thus would be classified in Class 8.  Under the Plan, Intercompany Interests do not receive any distribution.  Even in the event that the Intercompany Transactions are not unwound and the BCHI Transactions Claim not allowed, the BCHI Interests are not receiving any distribution under the Plan and are not properly classified or treated under the Plan.  They should be classified in a separate class for preferred interests and, to the extent Debtors holding common stock in other Debtors are retaining those interests, BCFC must receive a distribution on account of the BCHI Interests.

(iv)    **Restructuring Transactions**

35.    Although the Plan is unclear as to what happens to the common equity in the various subsidiaries of the Debtors, it appears that the Plan leaves the Debtors significant flexibility to retain Intercompany Interests.  Plan, §§ 2.15, 6.17.

36.    Plan Supplement 12 sets forth certain "Restructuring Transactions" that the Debtors intend to effectuate beginning upon confirmation of the Plan.  Certain of these transactions appear to allow the reorganized Debtors to retain their equity interests or the assets of certain subsidiaries while failing to pay the creditors and preferred interest holders in such subsidiaries in full.  Plan Supplement 3 provides a list of merged or dissolved Debtors.  According to the chart set forth in Plan Supplement 3, a series of subsidiary Debtors will be merged or liquidated and dissolved into other Debtors.  It appears the assets of the merged or dissolved Debtors will be retained by the reorganized Debtors again without satisfying unsecured claims and preferred interests at those Debtors.

16

37.     The retention of the equity or assets as structured in the Plan violates the absolute priority rule, as it effectively allows reorganized ABH to retain its equity interest in its subsidiaries without paying senior classes of claims and interests in full at each subsidiary.

**(v)     Claims Against Other Debtors and BCFC's Officers and Directors**

*Related Party Claims Against the BCFC Board and BCFC's Officers*

38.     As set forth herein, BCFC may be able to assert claims arising from the Intercompany Transactions against the BCFC Board and its officers.  In addition, as described in detail above, the BCFC Board and BCFC's officers are irreconcilably conflicted by the fiduciary roles they hold for the other Debtors.  As outlined in detail above, BCFC's conflicted directors never evaluated whether it was in BCFC's best interest (i) to walk away from the Wind-up Claim or (ii) not to contest the cancellation of its preferred shares in BCHI.  Harvey Canadian Depo., 117:8-19, 120:20-24.  They also failed to meet to consider the merits of the Wind-up Claim and had not taken any steps to prosecute that claim or pass resolutions (i) approving BCFC's bankruptcy filing or (ii) affirming BCFC's support of the Plan.  They simply ignored their duty to take any steps to preserve BCFC's claims, despite the written request of the Noteholders that they do so.

39.     The testimony obtained from the recent depositions of the five BCFC directors tells the same story.  Four of the five directors had no knowledge that BCFC was an unlimited company or that the Wind-up Claim existed.  Tr. of Depo. of Alain Grandmont, 7:5-9, 16:16-17:10, Sept. 2, 2010 (attached hereto as Exhibit G); Harvey Depo., 15: 18-23, 19:12-21; Tr. of Depo. of David Paterson, 9:17-10:15, 10:22-11:6, 19:16-19, Sept. 1, 2010 (attached hereto as Exhibit H); Tr. of Depo. of Pierre Rougeau, 5:24-6:3, Sept. 2, 2010 (attached hereto as Exhibit I).  Not one of them had bothered to review BCFC's Certificate of Incorporation (attached hereto

17

as Exhibit J) or the company's Articles of Association (attached hereto as Exhibit K), or any of the BCFC board resolutions relating to BCFC's claims against Bowater or its affiliates. Grandmont Depo., 7:15-22; 9:4-12, 9:13-10:8; Harvey Depo., 21:17-25, 41:21-42:8, 49:18-50:6; Paterson Depo., 12:1-7, 13:3-13, 14:24-15:10; Rougeau Depo., 6:11-14, 7:2-9:1; Vachon Depo., 9:12-25, 14:16-24, 18:4-14, 19:5-9.

40.    Specifically, not one director had seen the first page of the Certificate of Incorporation, which provides that BCFC "was incorporated this date under the Companies Act and that the liability of the members is unlimited."  Grandmont Depo., 7:15-22; Harvey Depo., 21:17-25; Paterson Depo., 12:1-7; Rougeau Depo., 6:11-14; Vachon Depo., 9:12-25.  Likewise, the directors were unaware that the Articles of Association contains an entire section dealing with BCFC being permitted to make a demand on Bowater to obtain payment of a debt owing by Bowater.  Paragraph 21 provides, "The directors may from time to time make such calls as they think fit upon the shareholders in respect of all monies unpaid on the shares held by them . . . ." Paragraph 24 further provides that "If the sum payable in respect of any call or installment is not paid on or before the day appointed for the payment thereof, the holder for the time being of the share in respect of which the call has been made or the installment is due shall pay interest on such call or installment at the rate of ten percent per annum from the day appointed for the payment thereof up to the time of actual payment."

41.    Consistently, not one director recalled seeing an October 19, 2001 resolution of BCFC (attached hereto as Exhibit L), which specifically recognizes the obligation of Bowater to make payment and for BCFC to secure payment from Bowater under the Companies Act.  The resolution provides "BE IT RESOLVED as a Special Resolution of the Company:  1.  THAT the members of the Company in a general meeting assembled hereby sanction the exercise by the

Company of all and every power to borrow money *and to secure repayment conferred upon it by the Companies Act* and that the Directors of the Company be and they are hereby authorized and empowered to exercise at any time from time to time any and all such powers in the name and on behalf of the Company." (Emphasis added).

42.     The inherent divergence of interests as between BCFC and Bowater was clearly recognized in paragraph 91 of the Articles of Association, which provides that "No shareholder [*i.e.* Bowater] shall be entitled to be present or to vote on any question, either personally or by proxy or as proxy for another shareholder, at any general meeting or upon a poll, or be reckoned in a quorum whilst any call or other sum is due and payable to the Company in respect of any of the shares of such shareholder."  Notwithstanding this provision, it is clear that Bowater was present at the few meetings the BCFC Board decided to hold.  Three of the directors, David Paterson, William Harvey and Jacques Vachon, are all members of the board and officers of Bowater.  Harvey Depo. 2, 7:4-11, Paterson Depo., 5:4-7, Vachon Depo., 4:16-20.

43.     Not one BCFC director had bothered to review the Certificate of Incorporation, Articles of Association or any of BCFC's resolutions to understand the rights BCFC holds against Bowater.  Of the members of the BCFC Board, only Mr. Vachon acknowledged at his deposition that he understood that BCFC was an unlimited company, and that Bowater had unlimited liability for BCFC's debts.  Vachon Depo., 9:2-11.  He also testified that BCFC could have made a call against Bowater to demand payment for the Wind-up Claim, and that the Wind-up Claim would have accrued interest at a rate of 10% from the date of the demand and the ultimate payment by Bowater.  *Id.* at 15:6-17:14.

44.     Notwithstanding the inherent conflicts as between BCFC and Bowater, and the duties the BCFC Board held to assert the Wind-up Claim against Bowater, on April 15, 2009,

19

BCFC directors Harvey and Vachon signed the Bowater Canada Finance Corporation Shareholder's Resolution (attached hereto as Exhibit M) that permitted Bowater to assume any and all rights held by the BCFC Board. The resolution provides:

> Notwithstanding the provisions of any of these Articles (including without limitation, sections 132 and 133 thereof) or any resolution of the shareholders passed from time to time, the authority of the directors to manage the business of the Company and to exercise other powers and authorities by these Articles or any resolution of the shareholders bestowed upon them shall not be exclusive to the directors, and the shareholders acting in general meeting or by written resolution may exercise all such powers and do all such acts and things as may be exercised or done by the directors of the Company and are not by statute expressly directed or required to be exercised or done by the directors.

45.     Thus, by this Shareholders' Resolution, Bowater gave itself all of the rights held by the BCFC Board to make decisions on BCFC's behalf. Remarkably, this Shareholders' Resolution was signed by two of BCFC's directors, Messrs. Harvey and Vachon, yet not one of the five directors even knew that the Shareholders' Resolution, and the authorities given to Bowater thereunder, even existed.

46.     BCFC should not be a proponent of the Plan. Yet, because of their conflicted loyalties to the other Debtors, the BCFC Board and BCFC's officers have subordinated their duties to BCFC by affirmatively misusing their control of and neglecting their duties to BCFC to benefit BCFC's affiliated Debtors, all to the harm and prejudice of BCFC and its creditors. Indeed, not one of BCFC's directors had any understanding of the treatment of BCFC's claims against Bowater under the Plan. Grandmont Depo., 17:7-10, Harvey Depo., 61:12-20; Paterson Depo., 25:23-26:11; Rougeau Depo., 10:12-16; Vachon Depo., 30:6-25. As a result of the abdication of their fiduciary duties by the BCFC Board, BCFC has meritorious related party claims against the BCFC Board and its officers (the "Related Party Claims" and together with BCHI Transactions Claim, the "BCFC Litigation Claims"), which should be pursued for the

20

benefit of BCFC's creditors. Although no specific reference is made to the BCFC Litigation Claims in the Plan, it appears that these claims are simply released without consideration.

47.     The actions of Bowater and the BCFC Board are particularly egregious given that Bowater formed BCFC in order to take advantage of the tax benefits of a ULC financing vehicle. Simply put, use of a ULC financing vehicle allows the U.S. parent corporation, in this case Bowater, to take what amounts to a double tax deduction. Here, Bowater wants to avoid the associated costs, namely payment of the Wind-up Claim.

*Avoidance Actions and Other Litigation Claims*

48.     In connection with the Rights Offering, the Debtors filed a motion (the "Backstop Motion") seeking Court approval of a backstop commitment agreement (the "Backstop Agreement") with certain parties, including Fairfax Financial Holdings, Limited ("Fairfax"). As part of the Backstop Motion, the Debtors requested approval of a release of a potential avoidance action by Bowater against Fairfax (the "Fairfax Avoidance Action") on account of Bowater's guarantee of $350 million in convertible notes issued by ABH on or about March 24, 2008 (the "ABH Guarantee"). Following an objection by the Noteholders, the Court approved a stipulation among the Debtors, Fairfax, and the Official Committee of Unsecured Creditors (the "Committee") pursuant to which the Committee and the Debtors agreed not to pursue the Fairfax Avoidance Action until the occurrence of certain events, including denial by the Court of confirmation of the Plan. [Docket 2452, ¶8(a).] The Plan provides releases for Fairfax (the "Fairfax Release") for the Fairfax Avoidance Action. Plan, ¶ 8.5(a). Interestingly, Fairfax, which is a significant creditor of certain of the Debtors, will also have two seats on the Board of Directors of reorganized ABH.

49.     Under the Plan, it appears that the avoidance actions (including the Fairfax Avoidance Action) will simply revest in the reorganized Debtors without any requirement that they be pursued for the benefit of creditors. Plan, § 8.1. This seems to include the potential Fairfax Avoidance Action.

50.     With regard to the Fairfax Avoidance Action, the information available to the Noteholders as of the date hereof establishes that the ABH Guarantee bears the hallmarks of a classic fraudulent transfer.   Bowater entered into the guaranty in favor of Fairfax on approximately March 24, 2008, which is within 2 years of the Petition Date, the statutory timeframe for fraudulent transfers.   There is no evidence that Bowater received reasonably equivalent value (or any value at all) on account of the ABH Guarantee, another fact supporting a finding that the ABH Guarantee is a fraudulent transfer.  Neither the Debtors nor Fairfax have ever asserted that Bowater received any direct value on account of the ABH Guarantee nor have the Debtors or Fairfax ever offered any evidence that Bowater received an indirect benefit in exchange for the ABH Guarantee.  In fact, the Debtors admitted that Bowater did not receive any of the proceeds of the ABH Notes. Tr. of Depo. of Steven M. Zelin, 85:5-86:10 (June 15, 2010) (attached hereto as Exhibit N).

51.     In addition, there is evidence that Bowater was insolvent and/or undercapitalized at the time it executed its ABH Guarantee for the benefit of Fairfax.  For example, the Disclosure Statement states that the Debtors were incurring "significant recurring losses" as early as late 2007, months before Bowater guaranteed ABH's note obligations and over a year prior to the Debtors' bankruptcy filings.  Disclosure Statement, at 39.  Also, in a statement of claim filed by the Debtors in a recent international arbitration, the Debtors admitted that they were "devastated" in 2007 as a result of declining newsprint demand and high delivery costs, which resulted in

2007 operating losses totaling $400 million. *Notice of Arbitration and Statement of Claim Under the Arbitration Rules of the United Nations Commission on International Trade Law and the North American Free Trade Agreement, AbitibiBowater Inc. v. Canada,* ¶¶ 50-51 (February 25, 2010). Also, at the time Bowater executed the ABH Guarantee, there is evidence that its notes were trading for substantially below par value.

52.     The Fairfax Release is worth nearly $200 million, which would otherwise be available to be distributed to Bowater's other creditors. Pursuit of the Fairfax Avoidance Action would result in an approximate 8.4% increase in recovery to Bowater's other creditors. Disclosure Statement, at 72.

53.     Accordingly, the Fairfax Avoidance Action may provide substantial value to the creditors of the Debtors, and should not be allowed to simply revest in the Debtors without them taking action to pursue it for the benefit of such creditors.

54.     More recently, the Debtors filed settlement motions in the U.S. and Canada related to certain claims made by certain of the Debtors, which alleged that the Government of Newfoundland and Labrador expropriated the property of these Debtors, including real property and equity interests hydroelectric facilities in the province (the "NAFTA Settlement"). Pursuant to the settlement agreement the Government of Canada has agreed to pay CAD$130 million to the Debtors' primary reorganized Canadian operating subsidiary. In exchange, the NAFTA Settlement purports to settle claims that are assets of the estates of various Debtors and/or CCAA Debtors. It is unclear which Debtors and/or CCAA Debtors should be entitled to the proceeds of the NAFTA Settlement. However, the value of the NAFTA Settlement is being diverted to the reorganized Debtors rather than being apportioned to the creditors who are entitled to receive it.

NY 240,556,780v11 9-13-10

**ARGUMENT**

I.    **As a Preliminary Matter, the Guarantee Claims and the Wind-up Claim are Valid
and Enforceable Claims and Should Both Receive a Distribution Under the Plan**

55.    If a claim is enforceable under non-bankruptcy law, it is a claim in a U.S. chapter

11 case.  *See In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).  A U.S.

bankruptcy court has a non-delegable duty to adjudicate claims that are enforceable under non-

bankruptcy law.  *Isaacs v. Hobbs Tie & Timber Co.*, 282 U.S. 734, 739 (1931) (citing *U.S. Fid.

& Guar. Co. v. Bray*, 225 U.S. 205, 217 (1911)); *Pepper v. Litton*, 308 U.S. 295, 304 (1939).

The United States Supreme Court has stated that the bankruptcy court must undertake, with

respect to a bankruptcy case, *inter alia*, "all matters of administration, such as the allowance,

rejection, and reconsideration of claims, the reduction of the estates to money, and its

distribution."  *U.S. Fid. & Guar.*, 225 U.S. at 217.

56.    Because Bowater is solely a U.S. debtor, this Court will ultimately determine

whether the Wind-up Claim should be allowed.  *See In re RHTC Liquidating Co.*, No. 09-11492-

TPA, 2010 WL 761211, at *9 (Bankr. W.D. Pa. Mar. 5, 2010) (declining to grant "special

deference" to Canadian court applying Canadian law in a situation involving U.S. interests and

noting "[i]t is not readily apparent why a court in the United States should voluntarily restrain

itself from acting[,] purely out of a sense of comity in these circumstances").  Whether allowing

both the Wind-up Claim and the Guarantee Claims somehow violates the Bankruptcy Code is a

question of U.S. bankruptcy law, and does not implicate the laws of Canada or any other nation.

Under U.S. law, it is clear that both the Wind-up Claim and the Guarantee Claims are valid and

enforceable claims.

57.    Bankruptcy courts are required to apply the law and enforce the terms of

agreements as written, and may not use their equitable powers to alter the rights of parties arising

24

from statues or agreements. The Third Circuit in *IUE-CWA v. Visteon Corp. (In re Visteon Corp.)*, -- F.3d --, Case No. 10-1944, 2010 WL 2735715 (3d Cir. July 19, 2010), most recently reconfirmed this basic principle that courts must apply and enforce the statute exactly as written, and may not seek to modify its terms by looking behind the statute. In *Visteon*, both the bankruptcy court and the district court held that the debtors were not obligated to comply with the provisions of section 1114 of the Bankruptcy Code concerning the termination of retiree health and life insurance plan because, under non-bankruptcy law and applicable contracts, the debtors retained the right to unilaterally terminate the retiree plans. The Third Circuit overturned the lower courts' decisions, holding that where a statute is unambiguous, "'the sole function of the courts . . . is to enforce it according to its terms.'" *Id.* at *7 (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)). The court found that, had Congress wanted to carve out debtors that retained the right to cancel their retiree benefit plans under the applicable contracts, Congress would have written such a carve-out into the statute. The Third Circuit also rejected the debtors' reliance on legislative history to argue that section 1114 was not intended to apply to a situation where the debtor retained the right to cancel its retiree benefit plans, stating "'only the most extraordinary showing of contrary intentions in the legislative history will justify a departure' from the plain language of a statute." *Id.* at *15 (quoting *U.S. v. Albertini*, 472 U.S. 675, 680 (1985)). Thus, to the extent a claim derives clearly from a statute, this Court must enforce that statute as written. Courts in the Third Circuit have consistently abided by this fundamental rule of statutory interpretation. *See, e.g., Rosenberg v. XM Ventures,* 274 F.3d 137, 141 (3d Cir. 2001) ("The role of the courts in interpreting a statute is to give effect to [legislative] intent. . . . Where the statutory language is plain and unambiguous, further inquiry is not required.") (citations omitted); *U.S. Trustee v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.),* 33

25

F.3d 294, 300 (3d Cir. 1994) (interpreting the standing of the Office of the United States Trustee under section 345 of the Bankruptcy Code stating "[w]hen a statute is clear and unambiguous, the courts must give effect to Congress's intent as Congress expressed it with that writing") (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 290 (1988) ("If the statute is clear and unambiguous 'that is the end of the matter, for the court . . . must give effect to the unambiguously expressed intent of Congress.'"); *United States Trustee v. Price Waterhouse,* 19 F.3d 138, 141 (3d Cir. 1994) ("As the Supreme Court and our court have repeated many times in recent years, when statutory language is clear and unambiguous it ordinarily must be followed."). The rule that unambiguous statutes must be strictly interpreted applies with equal force when a bankruptcy court is interpreting a non-bankruptcy statute. *See, e.g., Prof'l. Ins. Mgmt. v. Ohio Casualty Group (In re Prof'l. Ins. Mgmt.)*, 285 F.3d 268, 284 (3d Cir. 2002) (upholding bankruptcy and district court decisions interpreting New Jersey state insurance statute and stating "As a general rule, 'the meaning of a statute must . . . be sought in the language in which the act is framed, and if that is plain . . . , the sole function of the courts is to enforce it according to its terms.'") (quoting *Caminetti v. U.S.*, 242 U.S. 470, 485 (1917)); *Am. Classic Voyages, Co. v. Kanoa Inc. (In re Am. Classic Voyages, Co.)*, 328 B.R. 686, 688 (Bankr. D. Del. 2005) (finding language of Hawaii state statute "sufficiently clear and unambiguous as to preclude any reference to any legislative history as to what the legislature had in mind when it passed this statute . . .").

58.     Courts also may not modify or otherwise override the terms of an enforceable agreement based on general equitable concerns. *Nextel Retail Stores, Inc. v. LTCW Trust (In re Tel. Warehouse Inc.),* 124 Fed. Appx. 724, 728, Case No. 04-1616, 2005 WL 351246, *4 (3d Cir. Feb. 15, 2005) ("there is no room for equity to interfere with the unambiguous and

enforceable terms to which the parties have agreed to be bound") (citing *In re 1616 Reminc Ltd. P'ship*, 13 B.R. 948, 951 (Bankr. D. Va. 1981)); *Delta Mills Inc. v. GMAC Commercial Fin. LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 106 (Bankr. D. Del. 2009) (where the terms of a contract are unambiguous, "effect must be given to the intent as indicated by the language used"). Thus, where a claim derives from the terms of a contract, this Court must enforce that contract.

59.    Here, both the Wind-up Claim and the Guarantee Claim are valid, enforceable claims that must be allowed as a matter of law and cannot be modified due to equitable principles. The Wind-up Claim arises from Section 135 of the Companies Act. The Section provides in part:

> In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up . . . .

60.    There is no ambiguity in the statute. Once an unlimited company is "being wound up," its members are required to contribute assets to satisfy the debts and liabilities of the unlimited company. It is undisputed that BCFC is an unlimited company. By virtue of being a debtor under both the Bankruptcy Code and the CCAA, its business and affairs are "being wound up" within the meaning of the term as interpreted by the Canadian courts. There is no provision in Section 135 that provides that the claim against the member should be discounted or eliminated if a creditor of the unlimited company happens to hold a guarantee issued by the member. If the Nova Scotia legislators wanted to so limit the claims arising under Section 135, they could have added the necessary provisions to so limit the claims. They did not. Under the clear guidance provided by the Third Circuit, this Court a U.S. bankruptcy court may not look behind the otherwise clear provisions of Section 135. It must apply the statute exactly as written, which mandates that the Wind-up Claim be allowed in full, with accrued post-petition interest.

27

61.    With respect to the Guarantee Claim, Bowater unquestionably guaranteed BCFC's obligations under the Notes.  Pursuant to section 1301 of the indenture pursuant to which the BCFC Notes were issued (the "Indenture") (attached hereto as Exhibit O), Bowater, defined as the "Guarantor" under the Indenture "unconditionally and irrevocably guarantee[d] to each [Noteholder]" the payment of all amounts due on account of the Notes.  Indenture, § 1301. The Indenture further provided that:

> The Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the [Notes] or this Indenture . . . . The Guarantor hereby waives the benefit of diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of [BCFC], any right to require a proceeding first against [BCFC], protest, notice and all demands whatsoever and covenants that its Guarantee shall not be discharged except by complete performance of the obligations contained in the [Notes], this Indenture and this Guarantee. *Id.*

62.    By the plain terms of the Indenture, Bowater is obligated to guarantee all of BCFC's obligations on account of the Notes.  There has been no suggestion that the Indenture is invalid but, by its terms, Bowater's guarantee would be valid regardless of whether the terms of the Indenture were otherwise enforceable.  There has been no attack on the merits of the Guarantee Claims because there is no basis to make such an attack.  The above authorities demonstrate that a U.S. bankruptcy court is not free to modify the clear provisions of the contract based on principles of equity.  Moreover, courts have held that where creditors have bargained for particular rights, abrogating such rights in order to provide the same treatment to all creditors is itself inequitable.  *Chem. Bank N.Y. Trust Co. v. Kheel (In re Seatrade Corp.)*, 369 F.2d. 845, 848 (2d Cir. 1966) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite").  Thus, the Guarantee Claims will be allowed.  Both Section 135 and the terms of the guarantee are unambiguous.  The Debtors made the decision to

28

form BCFC as an unlimited company under the Companies Act for the purpose of triggering the favorable tax treatment afforded to Nova Scotia unlimited companies. Bowater also chose to guarantee BCFC's obligations under the BCFC Notes for the purpose of attracting investors to purchase the BCFC Notes. Having benefitted from the decisions they made, the Debtors must bear the consequences of those decisions.

63.    The Debtors have suggested that the Wind-up Claim is equivalent to a contractual guarantee, and BCFC should not have to guarantee the BCFC Notes twice, once on the Wind-up Claim and again on the Guarantee Claims. The two claims are not equivalent. The Wind-up Claim is a statutory claim in favor of BCFC. The Guarantee Claims are contractual claims in favor of the Noteholders.

64.    The assertion that they are the same claim is belied by the plain provisions of Section 135. There is no provision in the statute that states that the Section 135 claim against the members is a guarantee claim. Nor is there any provision in the statute that provides that the claim should not be enforced if a creditor holds a separate guarantee claim against the members. The statute states unambiguously that the members must pay assets to the unlimited company to satisfy the debts of the unlimited company. Nothing in the statute provides that the claim arising under Section 135 is compromised under any circumstance, irrespective of what other claims the creditors of the unlimited company may hold against the members. Third Circuit case law mandates that a U.S. bankruptcy court must apply Section 135 as written, and may not look outside of its clear provisions to try and create an analogy to a guarantee.

65.    Even if a U.S. bankruptcy court were willing to ignore Third Circuit precedent, there is no logical basis to treat the Wind-up Claim as another guarantee of the BCFC Notes by Bowater. A guarantee is a contractual obligation of the guarantor to a third party. *See* Indenture,

§ 1301 (by terms of the guarantee, Bowater became obligated to make payments to the Noteholders upon the failure of BCFC to meet its obligations under the Notes). It is an agreement that brings the guarantor into privity of contract with the creditor. Once the guarantor agrees to be bound to a guarantee, its obligations under the guarantee may not be discharged by the sale of its shares of the corporation. *See* Indenture, § 1312(7) (the obligations of the Guarantor shall not be affected, impaired or diminished by "any change in ownership . . . of [BCFC] or [Bowater]").

66.    By contrast, liability under Section 135 of the Companies Act is a statutory incident of membership and runs to the entity, not its creditors. If a company becomes a new member of an unlimited company, it takes on the existing liabilities of the unlimited company. Unlike a guarantee, a member that relinquishes its membership interest is no longer liable for the debts of the unlimited company under Section 135 of the Companies Act after the passage of one year while a contractual guarantee continues as provided in the guarantee contract. Companies Act, § 135(a). The claim under Section 135 of the Companies Act can be released without the consent of the creditor. A member's obligations under Section 135 of the Companies Act can be discharged through the passage of time. Thus, the protections afforded under Section 135 of the Companies Act are fundamentally different from a guarantee of the unlimited company's obligations. The claim under Section 135 of the Companies Act runs to the entity and covers all of its obligations (not just those covered by a specific guarantee). For that reason, creditors might insist on a separate guarantee from its members before agreeing to invest in an unlimited company, as they did here. *See* L.C.B. Gower, at 298-99 ("[i]n the case of a small private company the advantages of limited liability tend to be exaggerated, and indeed illusory, since

those who afford the company formal credit facilities will in practice insist on personal guarantees from its directors and major shareholders").

67.     Any attempt to disregard the plain provisions of Section 135 to conflate the Wind-up Claim with the Guarantee Claims has no basis in the law.  The Guarantee Claims and the Wind-up Claim are distinct claims to different entities.  The Wind-up Claim under Section 135 of the Companies Act is a distinct statutory right of BCFC.  It is separate and separable from the contractual guarantee right the Noteholders obtained under the Indenture.  Had Bowater transferred the shares of BCFC to another entity, Bowater would have remained liable on the guarantee indefinitely under the terms of the Indenture, but would not have liability under Section 135 after the passage of one year.  The legal foundation of the two claims and their legal effect are entirely different.

68.     The Debtors have also argued that if the Wind-up Claim is allowed, the BCFC Noteholders will effectively receive a double recovery on account of the same claim, in violation of law.  This argument is completely devoid of merit, and is directly contradicted by the governing authorities.

69.     As stated, while the Wind-up Claim is based on Nova Scotia law, whether the allowance of that claim and the Guarantee Claims will violate principles of the Bankruptcy Code is governed by U.S. bankruptcy law.  U.S. bankruptcy law is clear.  A creditor may assert multiple claims arising from the same injury.  Indeed, limiting a creditor's claim to just one debtor would fundamentally deprive a creditor of the rights it bargained for.  Not surprisingly, the Third Circuit in *In re Owens Corning*, 419 F.3d 195, 212-13 (3d Cir. 2005), specifically rejected the debtors' efforts to take away the creditors' right to assert multiple claims arising from the same debt.  The Third Circuit stated:

31

> To the contrary, [Owens Corning] (no less than [the banks])
> negotiated the 1997 lending transaction premised on the
> separateness of all [Owens Corning] affiliates . . . . In this context,
> [Owens Corning] and the other Plan Proponents cannot now
> ignore, or have us ignore, the very ground rules [Owens Corning]
> put in place. Playing by these rules means that obtaining the
> guarantees of separate entities, made separate by [Owens
> Corning]'s choice of how to structure the affairs of its affiliate
> group of companies, entitles a lender, in bankruptcy or out, to look
> to any (or all) guarantors for payment when the time comes.

*Id.* at 212-13. As a result of the Third Circuit's decision, the banks were able to assert separate

direct and guarantee claims against the appropriate debtors. That a creditor should be permitted

to assert its claims against all appropriate debtors is well established. Indeed, the Debtors' own

proposed plan specifically permits creditors to recover on their direct claim against the Debtors

that issued notes and their guarantee claims against the Debtors that guaranteed the obligations

under such notes.

70.   The only limitation for a creditor asserting claims against multiple debtors is that

the creditor may not recover more than 100% of the debt plus accrued pre-petition and post-

petition interest that is owed. *Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores

Co. of Am.)*, 73 F.2d 296, 298 (2d Cir. 1934) ("In no case can the appellant recover from all

sources more than the full amount of its claim"); *In re F.W.D.C.*, 158 B.R. 523, 528 (Bankr. S.D.

Fla. 1993) (allowing a creditor to prove the total amount of a claim against guarantor-debtor

while noting that such creditor may not collect more than the total amount of the indebtedness).

Here, it has never been the position of the Noteholders that they should be permitted to recover

more than the full amount of the BCFC Notes, plus accrued pre-petition and post-petition

interest. They merely have sought to assert their direct Guarantee Claims against Bowater, and

their Direct Claims against BCFC, which will have resources to pay the direct claim by

recovering on the Wind-up Claim under Section 135.

32

71.     The law is clear that all such claims must be allowed, and the Debtors may not seek to compromise those claims based on the argument that the same claim may not be paid twice. This exact same argument was recently rejected by the Second Circuit in *Northwestern Mutual. Life Insurance Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, Case Nos. 08-5002, 08-5230, 08-5236, 2010 WL 2490021 (2d Cir. June 22, 2010), where the court held that "where claims arise under agreements (1) between different parties, (2) addressing different events, and (3) providing for different remedies", the claims are both allowable. In *Delta*, owner participants in leveraged leases of aircraft filed claims under their tax indemnity agreements (the "TIA") for tax losses that arose when indenture trustees foreclosed on the aircraft and thereby forced participants to recapture prior depreciation.  In addition to the TIA, the stipulated loss value clause (the "SLV") of the leases also provided a protection mechanisms intended to ensure that an owner participant could take full advantage of the accelerated depreciation provisions of the leveraged leases. The TIA required Delta to compensate each owner participant if an aircraft was foreclosed upon and the IRS sought to 'recapture' deductions that the owner participant had taken for accelerated depreciation. The SLV required Delta to pay the lessor (*i.e.*, the Indenture Trustee) an agreed amount if Delta defaulted under the lease.

72.     The Court of Appeals for the Second Circuit considered Delta's assertion that "a single loss can only give rise to a single claim in bankruptcy." The court rejected this assertion and found that Delta may not repudiate its obligations under the contracts to pay the same claim twice. In quoting the bankruptcy court's decision, the Second Circuit stated "we agree with the bankruptcy court that":

> Each agreement was freely negotiated and fully supported by fair consideration on both sides.  If a component of the SLV claim under the Lease is calculated by reference to the owner participant's tax consequences which are indemnified under the

33

TIA (the 'overlap' Delta objects to), so be it. That is what Delta agreed to and what both the owner participant and the indenture trustee relied upon in negotiating the agreements. *If Delta has contracted to pay duplicate claims, then it must pay both – it cannot repudiate its duty to party A under contract A by asserting that it contracted to pay the same amount to party B under contract B.*

*Id.* at \*9 (quoting *In re Delta Airlines*, 370 B.R. 552, 557 (Bankr. S.D.N.Y. 2007)) (emphasis added).

73.     Here, as in *Delta*, the Wind-up Claim and the Guarantee Claims are claims of different creditors, address different events, and provide for different remedies. The Wind-up Claim arises from statutory obligations of Bowater to its unlimited company subsidiary, BCFC. The Guarantee Claims arise from contractual obligations of Bowater under a guarantee to creditors of BCFC. The remedies also differ. Under the guarantee, the beneficiaries of the guarantee are entitled to the amount due in accordance with the terms of the guarantee. The Wind-up Claim entitles BCFC to a claim equal to all of its unpaid obligations to all of its creditors. As in *Delta*, a debtor should not be permitted to repudiate its duty to its unlimited subsidiary under Nova Scotia law by asserting that it contracted to pay the same amount to certain creditors under a guarantee. Accordingly, under Nova Scotia law, the Wind-up Claim has arisen. Further, under U.S. bankruptcy law, there is no impediment to the Wind-up Claim being allowed in addition to the Guarantee Claims.

74.     As noted above, there is no process in place to resolve the Wind-up Claim. BCFC creditors should not be prejudiced by not receiving a distribution on the Effective Date that can be monetized. Therefore, the Plan should provide for a distribution on both the Wind-up Claim and the Guarantee Claims.

NY 240,556,780v11 9-13-10

## II.    BCFC Should Be Required to Vote the Wind-up Claim Against the Plan

75.    The Noteholders requested that BCFC, acting through its independent representative, vote the Wind-up Claim against the Plan. Notwithstanding that request, it is the Noteholders' understanding that BCFC did not vote the Wind-up Claim under the Plan despite the fact that BCFC filed a proof of claim with respect to the Wind-up Claim. Under Section 502(a) of the Bankruptcy Code, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). As of the voting deadline, no objection had been filed to the Wind-up Claim and therefore it is deemed allowed and, like all other General Unsecured Claims (as defined in the Plan) against Bowater, is entitled to vote on the Plan.

76.    There can also be no legitimate question that BCFC should vote against the Plan. BCFC's only material assets are the Wind-up Claim, the BCHI Interests, the BCHI Transactions Claim and the BCFC Litigation Claims. Under the Plan, only the Wind-up Claim retains even the possibility of a recovery. Even in the case of the Wind-up Claim, the Plan creates significant barriers to recovery on that Claim.

77.    The definition of Wind-up Claim in the Plan defines the Wind-up Claim as a deficiency claim, which artificially limits the recovery on that Claim. The Plan suggests only the Guarantee Claims or the Wind-up Claim should be allowed against Bowater. Plan, 2.13(b)(ii). The Plan also purports to extinguish the BCHI Interests and to release the BCHI Transactions Claim, insofar as all Intercompany Claims in Class 8 are to be disallowed. Section 2.15 of the Plan provides that the holders of Intercompany Claims and Interests are not entitled to receive any distributions under the Plan but are deemed to vote in favor of the Plan. Section 8.5 of the Plan releases the Debtors and their officers and directors from all pre-petition claims, which

35

would include the BCHI Transactions Claim and the BCFC Litigation Claims. In addition, the Plan purports to release the Fairfax Avoidance Action, pursuit of which could result in up to $200 million in additional assets being made available to Bowater's creditors.

78.    BCFC effectively receives no distributions under the Plan and as a result, its creditors are receiving a *de minimis* 0.9% recovery on account of their Direct Claims against BCFC. Therefore, BCFC should vote the Wind-up Claim to reject the Plan (or be deemed to reject the Plan on account of such Claim) and the votes in Class 6S, in which the Wind-up Claim is classified if Allowed, should be recalculated to account for such rejection.

## III.    The Plan Cannot Be Confirmed As to BCFC

### A.    Section 1129(a)(10) of the Bankruptcy Code is Not Satisfied as to BCFC Because it Has no Impaired Accepting Class

79.    For confirmation of a chapter 11 plan, section 1129(a)(10) of the Bankruptcy Code requires that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The requirement of an impaired accepting class must be met with respect to *each* debtor covered by a joint plan, if the debtors are not consolidated. A single impaired accepting class can support multiple debtors only where a substantive consolidation is requested and ordered. *See e.g., In re Mediq, Inc.,* Case No. 01-252 (MFW) (Bankr. D. Del. May 16, 2001) (court, *sua sponte*, commented on the need for an impaired class voting in support of a plan for each affiliated debtor in a jointly administered case, rejecting the notion that impaired creditors of one debtor could vote in favor of a joint plan and thereby satisfy section 1129(a)(10) as to all debtors); *In re Wireless Commc'ns. Holdings, Inc.,* Case No. 98-2007 (Bankr. D. Del. Mar. 26, 1999) (observing that in order to confirm a joint plan, each debtor must have a class of impaired accepting creditors in

36

order to satisfy section 1129(a)(10)); *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (where the court noted that at least one impaired class in each substantively consolidated group had accepted the plan). Here, because the Debtors are not seeking substantive consolidation, *each* Debtor must satisfy the voting requirement of section 1129(a)(10).

80.     Under the Plan, BCFC has the following classes of creditors:

- Class 1M:       Priority Non-Tax Claims

- Class 5M:       Other Secured Claims

- Class 6M;       Unsecured Claims

- Class 7M:       Convenience Claims

81.     Class 1M and Class 5M are unimpaired and therefore are not entitled to vote on the Plan (even if there were creditors holding Claims within those classes, which the Noteholders believe there are not). Plan, §§ 2.8(d), 2.12(d). Class 6M and Class 7M are impaired and are entitled to vote on the Plan. Plan, §§ 2.13(d), 2.14(d). Upon information and belief, there are no creditors holding claims in Class 7M because the Noteholders are the only creditors of BCFC.[7] Moreover, acceptance by such a class would not appropriately satisfy section 1129(a)(10) because such a class would be created only to satisfy the confirmation standard. Class 6M is solely comprised of holders of the BCFC Notes and has not accepted the Plan.

82.     Thus, BCFC does not have an impaired accepting class, and the Plan fails to satisfy section 1129(a)(10) of the Bankruptcy Code and cannot be confirmed with respect to BCFC.

---

[7] "Convenience Claims" are defined in the Plan as Unsecured Claims that are Allowed in an amount of $5,000 (CAD$ 6,073), or less, or are reduced to $5,000 (CAD$ 6,073) by irrevocable written election by the holder of such claim. Plan, §1.154, CCAA Plan, §1.1, at C-19.

**B.    The Plan Does Not Satisfy the Requirements for
        Cramdown Under Section 1129(b) With Respect to BCFC**

83.    Under section 1129(a)(8) of the Bankruptcy Code, a plan may only be confirmed if each class of claims or interests is unimpaired or has accepted the plan.  However, if a plan satisfies all the other confirmation requirements set forth in section 1129(a) of the Bankruptcy Code, under certain circumstances, it may be "crammed down" and confirmed despite its failure to satisfy section 1129(a)(8).  Section 1129(b)(1) of the Bankruptcy Code provides that "if all the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court . . . shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan."

84.    The Plan fails to satisfy section 1129(b)(1) with respect to BCFC because it indisputably does *not* satisfy all the applicable requirements of Bankruptcy Code section 1129(a) other than paragraph (8).  Cramdown under 1129(b) is not available with respect to BCFC because there is no impaired accepting class as required by 1129(a)(10).  For the reasons set forth below in this Objection, the Plan also fails to satisfy several other applicable requirements of Bankruptcy Code section 1129(a) other than paragraph (8).

**C.    The Plan Fails to Meet the "Best Interests" Test With Respect to BCFC**

85.    Section 1129(a)(7) of the Bankruptcy Code, which is commonly referred to as the "best interests of creditors" test, "requires that each holder of a claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated in a hypothetical liquidation under chapter 7 of the Bankruptcy Code." *In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997); *In re Stone & Webster, Inc.*, 286 B.R. 532, 544-45

38

(Bankr. D. Del. 2002) ("A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a 'hypothetical Chapter 7 distribution' to those classes.") (internal citation omitted). This test is a guarantee to individual creditors and interest holders that they will receive at least as much under a plan as they would in a chapter 7 liquidation. *Leslie Fay*, 207 B.R. at 787. This provision provides "perhaps the strongest protection creditors have in Chapter 11." *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990).

86. It is obvious that the creditors of BCFC would receive a greater recovery on their claims in a chapter 7 liquidation than under the proposed Plan. In a chapter 7 liquidation, the court would appoint a chapter 7 trustee -- an independent fiduciary who would not be compromised by the conflicts of the BCFC Board/officers. The chapter 7 trustee would have a duty to maximize the assets of BCFC for distribution to its creditors, and thus, the chapter 7 trustee would be obligated to pursue recovery for BCFC's on the Wind-up Claim, the BCHI Interests, the BCHI Transactions Claim, the BCFC Litigation Claims, and any fraudulent transfer or preference actions.

87. Under the Plan, the Debtors are seeking to extinguish these claims and the BCFC Board has made no challenge to these provisions. Only the Wind-up Claim retains even the prospect of receiving any value; however, although the Plan acknowledges the Wind-up Claim, it does not provide a process for resolution and allowance of that claim and seeks to define it in such a way as to limit recovery. The Wind-up Claim should be allowed in its full value, which under Nova Scotia statute is equal to the total of BCFC's debts and liabilities plus the costs associated with the winding up of BCFC's businesses. Likewise, the other above-listed causes of

action should, at the least, be preserved and prosecuted for the benefit of BCFC's creditors.  To the extent the transactions that led to BCFC holding the BCHI Interests are not voidable, the BCHI Interests should be allowed and BCFC should receive a distribution on account of such BCHI Interests.

88.    Accordingly, BCFC's creditors would manifestly be better off in a chapter 7 case where all of BCFC's assets could be maximized by an independent fiduciary who would pursue claims of BCFC in its capacity as a creditor of the other Debtors, rather than in the Plan process, where BCFC's assets have been disregarded to benefit other Debtors.  Therefore, the Debtors have failed to meet their burden under section 1129(a)(7) of showing that the Plan satisfies the "best interests" test with respect to BCFC.

## IV.    **The Plan Cannot Be Confirmed As to All Debtors**

## A.    **The Plan Was Not Proposed in Good Faith**

89.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  The Third Circuit has held that "'[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004) (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)).  "Most courts agree that the determination of whether a [debtor's] plan has been proposed in good faith 'requires a factual inquiry of the totality of the circumstances.'"  *In re Pierce County Hous. Auth.*, 414 B.R. 702, 720 (Bankr. W.D. Wash. 2009).  Relevant factors include, among other things, "whether a plan's terms or the process used to seek its confirmation was fundamentally fair." *Id.*

NY 240,556,780v11 9-13-10

90.    Courts generally require a demonstration that the plan was "proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (internal quotations omitted); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984). "A plan is proposed in good faith only if it has a legitimate and honest purpose to reorganize the debtor." *Mercury Capital Corp. v. Milford Connecticut Assocs., L.P.*, 354 B.R. 1, 7 (D. Conn. 2006) (internal quotations omitted).

91.    Here, the evidence is overwhelming that the Plan was structured to deprive BCFC's creditors of recovery on BCFC's assets despite there being no reorganizational purpose for BCFC.  At their depositions, each director admitted that he had no understanding of the purpose of filing BCFC's chapter 11 case nor of what purpose BCFC would serve upon its emergence from chapter 11 or what the company would look like.  Grandmont Depo., 18:1-7; Harvey Depo., 87:22-88:7; Paterson Depo., 27:16-28:5; Rougeau Depo., 11:11-21; Vachon Depo., 30:24-32:19.    None of the directors even knew if BCFC would exist after the reorganization, although, according to the Plan Supplement filed by the Debtors on September 1, 2010, BCFC will be liquidated following the Effective Date if the CCAA Plan is confirmed as to BCFC.  It is unclear what will happen to BCFC if, as expected, BCFC's CCAA Plan is not confirmed.  Plan Supplement 3, at 5.  Accordingly, BCFC has *no reorganizational purpose* and it is evident that the only possible purpose of filing BCFC's chapter 11 case was to frustrate BCFC's ability to assert and prosecute the Wind-up Claim and the Intercompany Claims.

92.    In proposing the Plan, BCFC admittedly failed to consider the interests of BCFC and its creditors.  *See* Harvey Canadian Depo., 117:8-19, 120:20-24; *see also* Grandmont Depo., 17:22-25; Harvey Depo., 87:18-21, 90:20-25, 91:13-92:1; Paterson Depo., 27:13-15; Rougeau Depo., 11:6-10; Vachon Depo., 18:1-3, 30:19-23, 35:8-23.  Instead, the other Debtors have used

their control of BCFC to propose a plan that advantages the creditors of the other Debtors (particularly [Bowater]) to the detriment of the creditors of BCFC. "[D]ebtors in possession have fiduciary duties, which include, among others, the duty of loyalty. . . . The duty of loyalty 'includes an obligation to . . . maximize the value of the estate.'" *In re Adelphia Commc'ns. Corp.*, 336 B.R. 610, 669-70 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006). Although case law makes clear that debtors have a duty to maximize value to the estate, the BCFC Board subordinated the interests of BCFC to the interests of other Debtors by proposing a Plan that strips BCFC of its assets (by wiping out the BCHI Interests and the BCFC Litigation Claims) thereby leaving BCFC bereft of funds to distribute to its creditors, while providing a windfall to the other Debtor to benefit their creditors.

93.    Moreover, as discussed above, the BCFC Board and BCFC's officers are irreconcilably conflicted by the fiduciary roles they hold for the other Debtors. It is axiomatic that transactions among debtors and insiders are subject to a heightened standard of scrutiny. *See Pepper v. Litton,* 308 U.S. at 308*; Matter of Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997) ("Insider's dealings with debtor-corporation are ordinarily subject to rigorous or strict scrutiny.").

94.    The good faith of the Plan also has to be questioned because Fairfax, which will have two post-confirmation directors, is receiving a release of the Fairfax Avoidance Action. Such a release cannot be justified on the factual record before this Court.

95.    Here, the Debtors have disregarded claims against other Debtors in an effort to advantage certain creditors at the expense of others. This type of self-dealing warrants more intense scrutiny that the Debtors' Plan cannot withstand. For all of the reasons set forth herein, the Debtors have not proposed the Plan in good faith as to BCFC, rendering it unconfirmable.

42

B.    **The Plan Improperly Classifies the BCHI Interests**

96.     Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).    Accordingly, the Bankruptcy Code prohibits debtors from placing dissimilar claims and interests in the same class. *Boston Post Road Ltd. P'ship v. F.D.I.C. (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir 1994); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987).    The separate classification of equity interests is justified where the holders of such interests "own distinct securities and possess different legal rights." *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715-16 (Bankr. S.D.N.Y. 1992).

97.     As discussed above, there is no specific reference in the Plan to the BCHI Interests, but it appears that the BCHI Interests are classified as Intercompany Interests in Class 8.  Intercompany Interests are defined to include both preferred and common equity interests of the various Debtors.  Plan, § 1.207.

98.     The BCHI Interests are preferred equity interests although the Intercompany Transactions giving rise to them are subject to avoidance.  As an initial matter, the Plan ignores the fact that if the Intercompany Transactions are voided, the BCHI Transactions Claim would properly be classified in Class 6 against BCFPI and should receive the same treatment as other BCFPI unsecured creditors.  While the Debtors clearly dispute the BCHI Transactions Claim, the classification scheme of the Plan should not be allowed to pre-determine the outcome of the litigation around allowance.

99.     In any event, these preferred BCHI Interests necessarily entitle BCFC to rights superior to the rights held by holders of common stock in BCHI or any of the other Debtors.  The

43

only purpose of classifying the BCHI Interests with Intercompany Interests is to avoid providing the BCHI Interests with appropriate treatment under the Plan. Thus, it is improper for the BCHI Interests to be classified along with common equity interests of the Debtors. The Plan cannot be confirmed unless the Debtors form a separate class for preferred equity interests and provide for appropriate treatment in the event that the BCHI Transaction Claim is allowed.

100.    Thus, the Plan violates section 1122 of the Bankruptcy Code with respect to the BCHI Interests and cannot be confirmed.

## C.    The Plan Improperly Characterizes the Wind-up Claim as a Deficiency Claim

101.    The Plan also improperly characterizes the Wind-up Claim as a deficiency claim. The Plan defines the Wind-up Claim as:

> the contingent claim in an amount that is not less than $619,875,000 minus the aggregate amount of distributions to holders of (a) Allowed Class 6M Claims against BCFC and (b) any Allowed 7.95% Notes Guaranty Claim against Bowater that certain holders of the 7.95% Notes have asserted that BCFC may hold against Bowater pursuant to section 135 of the Nova Scotia Companies Act, R.S.N.S., 1989, c.81, as amended, based on BCFC's incorporation as an unlimited liability company under Nova Scotia law. To the extent Allowed, the BCFC Contribution Claim shall be classified and treated as a Class 6 Claim against Bowater for purposes of this Plan.

Plan, § 1.96.

102.    According to this definition, the allowed amount of the Wind-up Claim must be reduced by any recovery the holders of the BCFC Notes receive on account of the Guarantee Claims. Such a requirement is inappropriate and is not supported by case law. *See, e.g., In re Owens Corning*, 419 F.3d at 212-13 (rejecting debtors' effort to limit creditors' ability to assert direct and guarantee claims on account of the same debt); *In re F.W.D.C.*, 158 B.R. at 528 (allowing a creditor to prove the total amount of a claim against guarantor-debtor while noting that such creditor may not collect more than the total amount of the indebtedness) (citing

44

*Reconstruction Finance Corp. v. Denver & Rio Grande W. R.R. Co.,* 328 U.S. 495, 529 (1946); *Ivanhoe Building & Loan Ass'n v. Orr*, 295 U.S. 243, 245-46 (1934)). For example, in *F.D.W.C.*, the court held that a creditor is allowed to prove the total amount of its indebtedness against a debtor, without deducting the value of any collateral received from a third party, so long as the creditor did not ultimately receive more that 100% of the value of its claim. *Id.* The court found that Supreme Court precedent set forth in *Ivanhoe Building & Loan Ass'n v. Orr*, 295 U.S. 243 (1934), and *Reconstruction Finance Corp. v. Denver & Rio Grande W. R.R. Co.,* 328 U.S. 495 (1946), were still applicable, even though both decisions were based on the Bankruptcy Act. In both *Ivanhoe* and *Reconstruction Finance*, the Supreme Court held that a claim of a secured creditor against a guarantor did not need to be reduced by the value of collateral, or its proceeds, pledged by the primary obligor. *F.D.W.C.*, 158 B.R. at 527 (citing *Reconstruction Fin.,* 328 U.S. at 529; *Ivanhoe*, 295 U.S. at 245-46). Based on this precedent, the court in *F.D.W.C.* held that the creditor had the right to prove its claim against the debtor in the full amount, but made clear that the creditor could not collect from the debtor a recovery that would result in the creditor recovering more than the full amount of its debt when taking into account any distribution it received from the primary obligor. *F.D.W.C.*, 158 B.R. at 528.

103. Simply put, while the Noteholders admittedly cannot recover anything more than the full value of their claim, plus accrued pre-petition and post-petition interest, the applicable case law in no way bars the Noteholders from proving the Guarantee Claims for their full value and BCFC from proving the Wind-up Claim for its full value. The attempt by the Debtors to limit the allowed amount of the Wind-up Claim through Plan language is inappropriate and the Plan cannot be confirmed so long as it includes this provision.

45

**D.    The Plan Cannot Be Confirmed Because the Rights Offering
Included in the Plan Unfairly Discriminates Against BCFC and Its Creditors**

104.    The concept of unfair discrimination is not defined in the Bankruptcy Code.  *In re*

*Lernout & Hauspie Speech Prods., N.V.,* 301 B.R. 651, 661 (Bankr. D. Del. 2003).  Courts have

examined the following factors when determining that a proposed plan unfairly discriminates:

> (1) a dissenting class; (2) another class of the same
> priority; and (3) a difference in the plan's treatment of the
> two classes that results in either (a) a materially lower
> percentage recovery for the dissenting class (measured in
> terms of the net present value of all payments), or (b)
> regardless of percentage recovery, an allocation under the
> plan of materially greater risk to the dissenting class in
> connection with its proposed distribution.

*Id.* (quoting *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)); *see also In*

*re Exide Techs., Inc.*, 303 B.R. 48, 79-80 (Bankr. D. Del. 2003).

105.    The Debtors have structured the eligibility for the Rights Offering in a way that

disadvantages creditors of BCFC.  The Rights Offering is a significant component of the value

being provided to unsecured creditors under the Plan because, to the extent the Rights Offering is

actually consummated, the convertible notes which are issued in the Rights Offering will be of

substantially more value than the New ABH Common Stock and will rank senior to such New

ABH Common Stock in the capital structure of reorganized ABH.

106.    As the Debtors have structured the Rights Offering procedures, creditors of BCFC

are not entitled to exercise subscription rights on account of the BCHI Interests or the BCHI

Transactions Claim.  Thus, unlike other similarly situated creditors, creditors of BCFC will not

receive the potentially valuable convertible notes to which they should be entitled.  As discussed

further below, such disparate treatment is not permissible under the Bankruptcy Code.

*Schroeder v. New Century Liquidating Trust (In re New Century Holding, Inc.)*, 407 B.R. 576,

46

592 (D. Del. 2009).    Thus the Plan cannot be confirmed as currently structured because it unfairly discriminates with respect to the structure of the Rights Offering.

**E.    The Disparate Treatment of the BCHI Transactions Claim, the Wind-up Claim and the Guarantee Claims Violates Section 1123(a)(4)**

107.    The Plan provides disparate treatment to (i) the BCHI Transactions Claim because no reserve is established by the Plan to provide it a distribution once allowed;  (ii) the Wind-up Claim because creditors are required to fund their exercise of Subscription Rights immediately but will not receive notes until such Claim is finally allowed, and (iii) the Guarantee Claims because they are treated differently than all other Unsecured Note Claims.

108.    Section 1123(a)(4) of the Bankruptcy Code provides that "a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ."  If a plan fails to provide the same treatment to all claims in a class, the plan violates section 1123(a)(4) and cannot be confirmed.  *See, e.g., In re Machne Menachem Inc.,* 223 Fed. Appx. 119, 122 (3d Cir. 2007) (upholding district court finding that debtors violated section 1123(a)(4) where plan provided for full payment to all creditors in a given class but two of the four claims in such class were paid in less than full).  Courts make a fact-specific determination as to whether a plan of reorganization satisfies section 1123(a)(4).  *See, e.g., Computer Task Group, Inc. v. Brotby (In re Brotby),* 303 B.R. 177, 186 (B.A.P. 9th Cir. 2003) (plan violated section 1123(a)(4) because of deferred payment to one creditor in class); *In re AOV Indus., Inc.,* 792 F.2d 1140, 1152 (D.C. Cir. 1986) (plan requiring some members of class to release derivative claims, while requiring other members to release direct claims in exchange for same distribution violated section 1123(a)(4)); *Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.),* 407 B.R. 576 (D. Del. 2009) (plan providing for different distributions to members of same class violated section 1123(a)(4)).  Section 1123(a)(4) is in furtherance of the important policy of equality of

47

distribution of similarly situated claims. *See Combustion Eng'g.*, 391 F.3d at 239 ("The Bankruptcy Code furthers the policy of equality of distribution among creditors by requiring that a plan of reorganization provide similar treatment to similarly situated claims.") (internal quotations omitted).

109.   If allowed, the BCHI Transactions Claim should be classified and treated as a Class 6 Unsecured Claim, and treated like all other Class 6 Unsecured Claims.   However, the Debtors are not providing any distribution on the BCHI Transactions Claim - neither subscription rights nor new common stock -- on account of that claim.   Thus, the Plan treats allowed claims differently from disputed claims, despite such claims being classified together under the Plan. Neither the Bankruptcy Code nor case law permits disparate treatment of undisputed and disputed claims. *In re Planet Hollywood Int'l*, 274 B.R. 398 (Bankr. D. Del. 2001) (holding creditor's proposed modification, which would treat its disputed claim differently from other disputed claims by requiring immediate payment of own escrow fund, was impermissible).

110.   The Plan also provides disparate treatment because pursuant to the Backstop Agreement, the Debtors have not reserved any notes to be issued as part of the Rights Offering that would permit a distribution on account of the BCHI Transactions Claim should it be allowed. Courts in this and other jurisdictions have required debtors to establish sufficient reserves in order for a plan to be confirmable.  See, e.g., *Plan Comm. of Northwestern Corp. v. Northwestern Corp. (In re Northwestern Corp.)*, 362 B.R. 131, 134-35 (D. Del. 2007) (remanding matter to bankruptcy court to determine whether claims reserve contained sufficient assets to allow creditors to recover fully on their claims and ensure equal treatment for similarly situated creditors); *In re Linens Holding Co.*, No. 08-10832, 2009 WL 2163235, at *9 (Bankr. D.

Del. June 12, 2009) (confirming plan requiring establishment of disputed claims reserve that contained sufficient assets to pay the full asserted amount of each disputed claim, should such claim eventually become allowed); *In re ASARCO L.L.C.*, 420 B.R. 314, 391 (S.D. Tex. 2009) (approving plan that required debtor to establish disputed claims reserve with assets sufficient to pay disputed claims in full as if they had been allowed as of the effective date of the plan); *In re Charis Hosp., L.L.C.*, 360 B.R. 190, 200-01 (Bankr. M.D. La. 2007) (forcing chapter 11 liquidator to disgorge fees and refusing to approve attorneys' fees where, inter alia, the liquidator failed to establish a disputed claims reserve for administrative priority claims such that similarly situated creditors would not receive payment should such claims eventually become allowed).

111.    Similarly, the Wind-up Claim is also receiving disparate treatment under the Plan. The Backstop Agreement provides that all Eligible Holders must fund the subscription price under the Rights Offering by a date certain. However, while the Debtors will release Rights Offering Notes to holders of undisputed Eligible Claims on the Effective Date, holders of Unresolved Claims will not receive their Rights Offering Notes until their claims have been approved by Final Order. This appeals process could take years, while the subscription price is held in escrow, unavailable for use by either the Debtors or the claimholders. Requiring holders of Unresolved Claims to fund the exercise of their Subscription Rights possibly years before being issued their notes, while releasing notes to other Eligible Holders shortly after payment constitutes disparate treatment of Unresolved Claims, including the Wind-up Claim. There is no basis to treat the holders of the Unresolved Claims differently from the holders of undisputed Claims where such claims are classified together under the Plan. The Noteholders should receive a distribution on account of the Wind-up Claim, in addition to the Guarantee Claims and the Direct Claims, on the Initial Distribution Date. Failure to make distributions in that

49

timeframe will constitute unfair discrimination against BCFC and its creditors by denying them the same treatment as other creditors who are similarly classified.

112.    In addition, the Plan provides for disparate treatment of the Guarantee Claims, as it is the sole Unsecured Note Claim that is not being allowed outright under the Plan.  The Plan provides that the Debtors acknowledge that either the Guarantee Claims or the Wind-up Claim are allowable against Bowater and leaves it to this Court to determine which of these Claims is allowable.  However, the allowability of the Wind-up Claim has no bearing on the validity and allowability of the Guarantee Claims.  As discussed above, there is no basis to attack the validity of the Guarantee Claims.  The Guarantee Claims arise out of the terms of the Indenture and there has been no allegation that the Indenture or the guarantee contained therein are invalid.  The Debtors' sole basis for not allowing the Guarantee Claims outright is that the Wind-up Claim is duplicative of the Guarantee Claims.  This allegation should not have any bearing on the allowance of the Guarantee Claims.  Every other Unsecured Note Claim is being allowed under the Plan without reservation.  Given that there is no basis to invalidate the Guarantee Claims, the Plan must provide for the allowance of these Claims, otherwise it provides disparate treatment.

113.    Thus, the Plan cannot be confirmed the Plan violates section 1123(a)(4) by failing to provide the same treatment to all claims in a class.

**E.    The Rights Offering Must Be Reduced to Account for the Debtors'
Excess Exit Financing and to Reduce Dilution of the New ABH Common Stock**

114.    The Debtors have consistently described the Rights Offering as "an insurance policy" that will ensure that the Debtors have sufficient funds on exit from chapter 11 to support their reorganized business.  H'rg Tr., 200:16-17 (June 17, 2010) (attached hereto as Exhibit P). In addition, the Debtors have stated that they will only use the proceeds of the Rights Offering to the extent they are unable to raise sufficient exit financing from other sources.  Bid Procedures

Motion, at ¶ 14 (". . . in the event that the Company requires financing in addition to the capital that it is able to raise in the exit financing markets, it will have access to proceeds from the Rights Offering. *As proposed, the Rights Offering is an alternative capital source that the parties intend to utilize only to the extent necessary to supplement the Company's available exit financing package.*"). At the time the Debtors initially proposed the Rights Offering, they stated they will likely be able to raise up to $600 million as part of an asset-based credit facility and an additional $500 million through a term loan. Zelin Depo., 7:25-8:6; H'rg Tr., 161:13-162:4 (June 17, 2010) (assuming a $500 million term loan facility on exit). The Debtors' financial advisor went so far as to say that if the Debtors could secure additional exit financing on favorable terms, in excess of the $500 million term loan, he would recommend that they use less of the proceeds generated by the Rights Offering.

115.    The Exit Financing recently proposed by the Debtors provides for a $750 million private rights offering or secured term loan to the extent the Debtors are not able to issue the notes on favorable terms. Given that the Debtors have exceeded their anticipated available exit financing by $250 million, the Debtors should accordingly reduce the amount of the Rights Offering to $250 million. Such a reduction will mitigate the dilution of the value of the New ABH Common Stock being distributed to creditors under the Plan. Plan, §§ 1.162, 2.13(c). Further, such a reduction would be consistent with representations made to this Court by the Debtors that the Rights Offering would only be used to the extent the Debtors could not secure exit financing from other sources.

## F.    The Plan Violates the Absolute Priority Rule

116.    Certain of the proposed Restructuring Transactions violate the absolute priority rule by allowing the Debtors to effectively retain their equity interests in the assets of their

subsidiaries without paying the creditors of these subsidiaries in full. *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (refusing to confirm plan of reorganization that allowed transfer of property to equity holders where unsecured creditors were not being paid in full); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 463 (2d Cir. 2007) ("[A] settlement presented for approval as part of a plan of reorganization . . . may only be approved if it, too, is 'fair and equitable' in the sense of conforming to the absolute priority rule.") (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

117.    The absolute priority rule was codified as part of the "fair and equitable" requirement of section 1129(b)(2) of the Bankruptcy Code, which "requires that certain classes of claimants be paid in full before any member of a subordinate class is paid" and "reflects the different degree to which each class assumes the risk of the debtor's insolvency." *Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 139-40 (3d Cir. 2002); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180 n. 4 (10th Cir. 2002).

118.    In *Armstrong World Industries*, the Third Circuit considered a similar situation, and there, the court determined that a chapter 11 plan that was structured to return equity to the parent company of the debtor could not be confirmed. *Armstrong World Industries*, 432 F.3d at 509. The *Armstrong* plan provided that certain unsecured creditors would receive a distribution equal to approximately 60% of their claims while the debtor's equity holder (the debtor's parent company) would receive warrants to purchase stock in the reorganized debtor. *Id.* If the unsecured creditors rejected the plan, a class comprised of present and future asbestos claimants of the debtor would receive these warrants. *Id.* However, the plan further provided that these asbestos claimants would automatically waive receipts of the warrants, which would then be

52

issued to the debtor's parent as equity holder. *Id.* The unsecured creditors objected to the plan and the District Court "concluded that the plan could not be confirmed because the distribution of warrants to [the debtor's] equity interest holders over the objection of the class of unsecured creditors violated the absolute priority rule." *Id.* On appeal to the Third Circuit, the debtor suggested to the court that it "should apply a flexible interpretation of the absolute priority rule." *Id.* at 512. The Third Circuit declined to do so and found that the plan violated the absolute priority rule. *Id.* at 513 (concluding the Plan violates the absolute priority rule because it would give property to equity holders with claims junior to those of the unsecured creditors). The Third Circuit further rejected the debtor's argument that it was permissible for the asbestos claimants to distribute property they received under the plan without violating the absolute priority rule. *Id.* at 513-514. "[T]he structure of the Plan makes plain that the transfer between [asbestos claimants] and [equity holder] was devised to ensure that [the equity holder] received the warrants, with or without [the unsecured creditor]'s consent." *Id.* at 514. "Allowing this particular type of transfer would encourage parties to impermissibly sidestep the carefully crafted strictures of the Bankruptcy Code, and would undermine Congress' intention to give unsecured creditors bargaining power in this context." *Id.*; *see also In re OCA, Inc.*, 357 B.R. 72, 87 (Bankr. E.D. La. 2006) (rejecting plan that provided new stock to equity holders because of the debtor's "attempts to circumvent the absolute priority rule").

119.    Like the Debtors' attempt to sidestep the strictures of the Bankruptcy Code in *Armstrong*, the retention of interests in certain subsidiary Debtors under the Plan renders it unconfirmable. Specifically, it appears that the common shares of BCHI will remain outstanding even though BCFC is not receiving a distribution on account of its preferred shares in BCHI. The BCHI Interests are senior to any common stock in BCHI held by other Debtors.

Accordingly, unless BCFC receives a distribution on account of its preferred interest in BCHI, the Plan cannot be confirmed as currently drafted.

120.    The Restructuring Transactions that the Debtors have put forth in the Plan that allow them to retain their equity ownership are unjustified and violate the absolute priority rule.

**G.    The Release, Discharge and Exculpation
Provisions of the Plan are Improper and Impermissible**

121.    As described above, the Plan grants releases to certain non-debtor parties, including to Fairfax in connection with the Fairfax Avoidance Action and to the BCFC Board and its officers.  These releases are inappropriate.  Further, the Plan provides that the claims against the BCFC Board and its officers are discharged and these parties are exculpated from liability with respect to their actions in these chapter 11 proceedings.

122.    These provisions are improper and render the Plan unconfirmable.  Specifically, the release of the Fairfax Avoidance Action renders the Plan unconfirmable because (a) based on the ABH Guarantee in the amount of approximately $387.3 and information provided by the Debtors in the Disclosure Statement, the Fairfax Avoidance Action could be worth close to $200 million to Bowater's unsecured creditors, including the Noteholders and BCFC and (b) Fairfax has provided no consideration to justify the release and the Debtors have failed to provide any credible justification for agreeing to release the valuable Fairfax Avoidance Action.  The discharge, release and exculpation provisions as they relate to the BCFC Board and its officers are impermissible and render the Plan unconfirmable because these provisions purports to discharge, release and exculpate BCFC's officers and directors and enjoin actions against them without consideration, when colorable BCFC Litigation Claims and other causes of action exist against them.  Plan, §§ 8.4-8.6.

(i)    **The Fairfax Avoidance Action Should Not Be Released**[8]

123.    As discussed above, although section 524(e) of the Bankruptcy Code, by its terms, applies only to discharge claims against a debtor, courts have approved the release of claims by a debtor against a non-debtor under certain, limited circumstances. *In re Exide Techs.*, 303 B.R. 48, 72-74 (Bankr. D. Del. 2003) (applying five factor test for third party release by debtor) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)).   Courts in Delaware apply a five-factor test to determine whether a debtor's release of claims against a non-debtor is appropriate.  The five factors include:

> (1) the identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*Exide Techs.*, 303 B.R. at 72 (citing *Zenith*, 241 B.R. at 110).

124.    When the Fairfax Release is evaluated in light of these five factors, it is evident that that the Fairfax Release should not be approved.

125.    With respect to the first factor, Fairfax and the Debtors do not have an identity of interest.  Two parties have an identity of interest where a suit against one would "deplete the assets of the estate." *In re Congoleum Corp.*, 362 B.R. 167, 192 (Bankr. D. N.J. 2007) (finding release of debtors professionals inappropriate where debtors were under no obligation to

---

[8] The Noteholders are still reviewing the discovery provided by the Debtors and anticipate deposing William Harvey with regard to the solvency issues which are relevant to the release of the Fairfax Avoidance Action prior to the Confirmation Hearing.  Therefore, the Noteholders reserve their right to supplement this Objection with additional information as appropriate.

*NY 240,556,780v11 9-13-10*

indemnify these parties such that a suit against the professionals would not deplete estate assets). If the release were not granted, a suit against Fairfax would not be akin to a suit against any of the Debtors. *Id.*; *In re Coram Healthcare Corp.*, 315 B.R. 321, 335-36 (Bankr. D. Del. 2004) (citing the relationship between a debtor and its insurer as an example of an identity of interest). The Debtors and Fairfax are not jointly liable on the Fairfax Avoidance Action and such a suit, rather than depleting estate assets may instead increase these assets. Accordingly, the first factor of the *Zenith* test weighs against approval of the Fairfax Release.

126.    With respect to the second factor, it is unclear what, if any, contribution Fairfax has made to the Debtors' estate in exchange for the release of an approximately $200 million (in Plan value) Fairfax Avoidance Action, but it is clear that such contribution is not substantial enough to warrant the Fairfax Release. Courts evaluate "substantial contribution" by considering what the proposed releasees have contributed to a debtor's estate in light of the assets necessary to fund such debtor's reorganization and what other consideration the proposed releasees have received on account of their contribution. For example, the court in *Congoleum* found that the debtors' professionals, directors and officers did not make a substantial contribution to the debtors' reorganization where (i) these parties made no tangible contribution to the debtors' reorganization and (ii) were paid for the intangible contributions they did make to the debtors' reorganization. 362 B.R. at 193. Specifically, the debtors argued that their professionals, officers and directors "contributed by 'negotiat[ing] the consensual Tenth Plan in the face of substantial insurer opposition while also managing to continue Congoleum's profitability.'" *Id.* The court found that this did not constitute substantial contribution given that (i) professional fees in the cases exceeded $50 million and (ii) the debtors' officers and directors were paid to negotiate the plan and keep the debtors profitable. *Id.*   In contrast, the court in *Coram*

*Healthcare* found that noteholders made a substantial contribution to the debtors' reorganization where their $56 million contribution to plan funding allowed the debtors to (i) pay their creditors in full and (ii) make a $40 million distribution to their creditors. *Coram Healthcare*, 315 B.R. at 335. Here, Fairfax is receiving a release of a claim that may be worth nearly $200 million. Although Fairfax's contribution to the Debtors' reorganization has not been quantified, it is clear that Bowater's unsecured creditors, the class directly affected by the Fairfax Release, are not being paid in full or even close to such a substantial figure. While the Debtors have previously argued that Fairfax's participation in the Backstop Agreement is a "substantial contribution" to the Debtors' reorganization, Fairfax has already been compensated for its participation in the form of the fees to which is entitled to in the Backstop Agreement. Accordingly, this participation cannot be considered part of Fairfax's substantial contribution. *See, e.g., Congoleum*, 362 B.R. at 193 (where officers and directors were paid for work negotiating plan and operating business, such work did not constitute "substantial contribution"); *Exide Techs.*, 303 B.R. at 73-74 (no substantial contribution by lenders that converted claims to equity where debtor undervalued its reorganized business and accordingly, conversion to equity allowed lenders to recoup more than 100% of their claims). The Debtors have offered no evidence of any additional contribution Fairfax has made to these cases other than its participation in Plan negotiations.

127.    The third *Zenith* factor is whether the release is essential to the debtor's reorganization. Although the Debtors have made conclusory statements that the Debtors would be unable to reorganize without Fairfax's support and that Fairfax would refuse to support the Plan absent the Fairfax Release, they have offered no evidence that they would be unable to reorganize absent Fairfax's support. In approving the release of noteholders in *Coram*

57

*Healthcare*, the court explained that the noteholders were effectively funding the entirety of the debtors' reorganization and that the noteholders would not make this contribution absent a release under the plan. 315 B.R. at 335. The court in *Zenith* reached a similar conclusion, finding that where the debtor's largest shareholder, also a creditor, funded the plan and would not have done so without receiving a release, the third factor weighed in favor of approving the release. Here, the Debtors themselves have explained that their reorganized business will be financed through three sources: the Rights Offering and the two forms of exit financing they have secured. Based on the information contained in the Exit Financing Motions, there is no evidence that Fairfax is participating in these exit facilities. In addition, other than Fairfax's participation as a backstop investor under the Backstop Agreement, Fairfax is not contributing to the Rights Offering in a manner that differs from any other Class 6 creditor that participates in the Rights Offering. On these facts, there is no evidence that the Plan would collapse absent Fairfax's support. Accordingly, the third *Zenith* factor weighs against approval of the Fairfax Release.

128.    Finally,[9] the fifth *Zenith* factor, payment of all or substantially all of the claims of the affected creditor class, weighs against approval of the Fairfax Release. The only class affected by the Fairfax Release is Class 6S, general unsecured claims against Bowater. The guarantee underlying the Fairfax Avoidance Action is classified in Class 6S meaning that its

---

[9] The fourth *Zenith* factor, whether the plan is supported by an "overwhelming" majority of the affected creditors, cannot yet be evaluated, as the voting results for Class 6S, general unsecured claims against Bowater, have not been disclosed. To the extent Class 6S overwhelmingly votes to support the Plan, this would be the sole factor weighing in favor of approving the Fairfax Release. In addition, although Class 6S is the group of creditors most directly affected by the release of the Avoidance Action, to the extent the broad release affects groups of creditors without the right to vote on the Plan, the votes of Class 6S creditors would not be determinative of whether the fourth factor of the *Zenith* analysis weighs in favor of release approval. *See Congoleum*, 362 B.R. at 194 (noting that although votes of creditors in favor of plan support release approval, the release was so broad that it affected employees and others without the right to vote on the plan).

*NY 240,556,780v11 9-13-10*

allowance directly affects the distribution to other creditors in Class 6S. As of the date hereof, the Debtors estimate that Class 6S claims will receive a 48.4% recovery on their claims. This level of recovery does not qualify as "all or substantially all" of their claims. In *Coram Healthcare*, creditors were paid in full in cash on account of their claims. 315 B.R. at 335. In *Zenith*, although it appears that creditors received a 50% recovery, their entire recovery was funded by the party being released and such creditors would have received nothing absent the releasee's contribution. 241 B.R. at 111. Here, Bowater's creditors are receiving a 48.4% recovery and there is no evidence that this recovery is in any way financed by Fairfax. As noted by the court in *Congoleum*, although a plan may provide for a distribution to all classes affected by a release, this in and of itself does not make such distribution substantial. 362 B.R. at 194. The recovery to Bowater's unsecured creditors is not quantitatively significant, nor is it the result of any contribution by Fairfax.

129.    For the reasons set forth above, the *Zenith* factors weigh overwhelmingly against approval of the Fairfax Release. Accordingly, the Fairfax Release should not be approved and the Plan cannot be confirmed so long as it includes the Fairfax Release.

### (ii)    The Plan's Discharge, Release, Injunction and Exculpation Provisions As Applied to the BCFC Board and Officers Are Impermissible

130.    Section 8.5 of the Plan purports to release all claims against, among others, the BCFC Board and its officers, and to enjoin any actions against such persons in connection with their position as officers and directors of BCFC. The release provisions cover claims of third-party creditors and thus are inappropriate and overly broad. Section 8.6 of the Plan similarly provides that no Released Party, defined to include the BCFC Board and its officers, shall have any liability to any party or person for actions taken (i) subsequent to the Petition Date or (ii) in connection with the Debtors' bankruptcy proceedings in both the U.S. and in Canada. Section

59

8.4 of the Plan purports to discharge all claims held by entities receiving distributions under the

Plan on account of such claims and to enjoin holders of such claims from commencing a suit

against the Debtors or other related parties, including the BCFC Board and its officers, or from

otherwise attempting to recover on account of their claims.

131.    As described above, BCFC and its creditors have significant meritorious claims

against the directors and officers of BCFC and the other Debtors.  Of the five members of the

BCFC Board, only Mr. Vachon understood that BCFC was an unlimited company, and that

Bowater had unlimited liability for BCFC's debts.  Mr. Vachon admitted that BCFC could have

made a call against Bowater to demand payment for the Wind-up Claim, and that the Wind-up

Claim would have accrued interest at a rate of 10% from the date of the demand.  Nonetheless,

BCFC did *not* make such a call, and thus squandered the opportunity to claim significant interest

from Bowater, to the detriment of BCFC and its creditors.  In addition, on the eve of the chapter

11 filing of BCFC, BCFC directors Harvey and Vachon signed the Bowater Canada Finance

Corporation Shareholder's Resolution that granted Bowater the authority of BCFC directors to

manage BCFC and exercise all the powers and authorities normally belonging to the BCFC

directors.

132.    In addition, at their depositions, none of the directors of BCFC could provide a

reason for the filing of BCFC's chapter 11 case, or describe the purpose of the filing.  The

directors admitted that they did not consider the claims of BCFC against the other Debtors or

understand the Wind-up Claim.  Grandmont Depo., 16:16-17:10; Harvey Depo., 19:12-21;

Paterson Depo., 19:16-19; Rougeau Depo., 5:24-6:3.  Indeed, not one of BCFC's directors had

any understanding of the treatment of BCFC's claims against Bowater under the Plan.  The

directors also admitted that that they did not request or conduct a fairness analysis with respect to

any of the Intercompany Transactions. Because of their conflicted loyalties to the other Debtors, the BCFC Board and BCFC's officers have subordinated their duties to BCFC by affirmatively misusing their control of and neglecting their duties to BCFC to benefit BCFC's affiliated Debtors, all to the harm and prejudice of BCFC and its creditors.

133.    The Bankruptcy Code provides no authority for the non-consensual release of the obligations of non-debtors, and therefore, the inclusion of such provisions in the Plan renders it patently unconfirmable. *See In re Market Square Inn,* 163 B.R. at 68 (denying approval of disclosure statement where plan contained unauthorized non-debtor releases). "While the Bankruptcy Code expressly alters the contractual obligations of the bankrupt, it does not contemplate the same effect on the obligations and liabilities of third parties to a creditor." *Mellon Bank v. Siegel,* 96 B.R. 505, 506 (E.D. Pa. 1989), quoted in *First Fid. Bank v. McAteer,* 985 F.2d 114, 118 (3d Cir. 1993). The equitable powers of the bankruptcy courts "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206 (1988). Section 105(a) of the Bankruptcy Code does not give bankruptcy courts "the power to create substantive rights that would otherwise be unavailable under the Code." *In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3d Cir. 1989).

134.    Further, the inclusion of third party releases in the Plan violates section 524(e) of the Bankruptcy Code. In applying section 524(e) of the Bankruptcy Code, courts in the Third Circuit have unanimously held, except in extraordinary circumstances plainly not present in this case, that a bankruptcy court has no authority to release an obligation owing from one non-debtor to another without the individual consent of the party prejudiced by the release. *See, e.g., Zenith Elec.,* 241 B.R. at 111 (release of non-derivative third-party claims against non-debtor "cannot be accomplished without the affirmative agreement of the creditor affected"); *In re Arrowmill*

*Dev. Corp.*, 211 B.R. 497, 506-07 (Bankr. D. N.J. 1997) (holding that section 524(e) of the Bankruptcy Code prohibits the release of a third-party from liability, except where the affected creditor expressly consents to the release and receives consideration in exchange for that agreement); *In re West Coast Video Enters.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) (refusing to enforce releases with respect to movants who did not vote on plan because "each creditor bound by the terms of the [non-debtor] release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise").

135.   Although such non-consensual "third party" releases may be approved in rare circumstances where (i) substantial value is provided by the released parties, (ii) substantial distributions are made to all creditors, (iii) a substantial majority of creditors impacted by the release support the plan and (iv) without the release there is little likelihood of success of confirming a plan, none of these circumstances exist here to justify the releases. *See Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000) (concluding release provision permanently enjoining lawsuits against non-debtor D&O defendants did not pass muster under even the most flexible tests for the validity of non-debtor releases and finding that "[t]he hallmarks of permissible non-consensual releases – fairness, necessity to the reorganization, and specific factual findings to support these conclusions – [were] all absent"); *Zenith Elecs.*, 241 B.R. at 110 (adopting five-factor test set forth in *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

136.   The five factors courts consider when determining whether to allow a release of a third party as part of a plan of reorganization are described in detail above, and even the most cursory of review of these factors establishes that none of these factors could be met here.

62

BCFC's officers and the BCFC Board clearly do not have an identity of interest with BCFC;[10] the officers and directors have provided *no* consideration to BCFC's creditors and/or its estate; no credible argument could be made that the reorganization will fail if BCFC's officers and directors are subject to suit; and the Noteholders and other affected parties will not vote in favor of the Plan.  Accordingly, the release provisions in favor of BCFC's officers and the BCFC Board are blatantly improper.  Consequently, the Plan cannot be confirmed.

---

[10]  As the court in *Continental Airlines* recognized, although someday the reorganized debtors "may face litigation or experience some financial ramification based on liabilities of the D&Os," such ramifications do not constitute an "identity of interest."  203 F.3d at 217.

*NY 240,556,780v11 9-13-10*

## CONCLUSION

137.    As set forth herein, he Debtors cannot meet the confirmation requirements under

1129(a) and the Court should deny confirmation of the Plan.


Dated:        September 13, 2010
              Wilmington, Delaware

                                    GREENBERG TRAURIG, LLP

                                    /s/ Dennis A. Meloro
                                    Dennis A. Meloro
                                    The Nemours Building
                                    1007 North Orange Street, Suite 1200
                                    Wilmington, Delaware 19801
                                    Telephone: (302) 661-7000
                                    Facsimile: (302) 661-7360
                                    melorod@gtlaw.com

                                    -and-

                                    Bruce R. Zirinsky
                                    Nancy A. Mitchell
                                    John H. Bae
                                    Gary D. Ticoll
                                    MetLife Building
                                    200 Park Avenue
                                    New York, New York  10281
                                    Telephone:  (212) 801-9200
                                    Facsimile:  (212) 801-6400
                                    zirinskyb@gtlaw.com
                                    mitchelln@gtlaw.com
                                    baej@gtlaw.com
                                    ticollg@gtlaw.com

                                    *Attorneys for Aurelius Capital Management, LP
                                    and Contrarian Capital Management, LLC*

NY 240,556,780v11 9-13-10