## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 11 |
| TRIBUNE COMPANY, *et al.*, | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
|  | **Related to Docket Nos. 8013, 8014** |

## NOTICE OF FILING OF REDACTED OBJECTION OF THE NOTEHOLDER PLAN PROPONENTS TO CONFIRMATION OF THE DEBTOR/COMMITTEE/LENDER PLAN OF REORGANIZATION

**PLEASE TAKE NOTICE** that on February 15, 2011, the Noteholder Plan Proponents filed under seal the *Objection of the Noteholder Plan Proponents to Confirmation of the Debtor/Committee/Lender Plan of Reorganization* [Docket No. 8013] (the "Plan Objection").

**PLEASE TAKE FURTHER NOTICE** that on February 16, 2011, the Noteholder Plan Proponents filed an amended version of the Plan Objection to make certain formatting changes, to add tables of contents and authorities and to make other non-substantive changes (the "Amended Plan Objection").

**PLEASE TAKE FURTHER NOTICE** that on February 16, 2011, the Noteholder Plan Proponents have filed a redacted version of the Amended Plan Objection (the "Redacted Plan Objection"), attached hereto as Exhibit A.

{00460688;v1}

Dated: February 16, 2011

ASHBY & GEDDES, P.A.

_[signature]_

William P. Bowden (#2553)
Amanda M. Winfree (#4615)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899
Telephone: 302-654-1888

-and-

Daniel H. Goldman (Admitted pro hac vice)
David M. Zensky (Admitted pro hac vice)
Abid Qureshi (Admitted pro hac vice)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: 212-872-1000

*Counsel to Aurelius Management, LP*

# EXHIBIT A

**[Redacted Plan Objection]**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) )  Chapter 11 |
|  | )  Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, *et al.*, | )  Jointly Administered |
|  | ) ) |
| Debtors. | ) ) ) |

## AMENDED OBJECTION OF THE NOTEHOLDER PLAN PROPONENTS TO CONFIRMATION OF THE DEBTOR/COMMITTEE/LENDER PLAN OF REORGANIZATION (PART I)[1]

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
One Bryant Park
New York, NY 10036
(212) 872-1000
*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David S. Rosner
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

---

[1] The Objection is amended only to add the Table of Contents, Table of Authorities, and to correct misspellings and formatting issues

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ..................................................................................1

SUMMARY OF FACTS ........................................................................................22

The LBO Transaction.............................................................................................22

The LBO-Related Causes of Action .....................................................................28

The DCL Plan .........................................................................................................30

Evolution of the DCL Plan and the Corresponding
Reduction in Non-LBO Creditor Recoveries........................................................32

    A. The April Plan ...............................................................................................32

    B. The First Mediation Term Sheet (September 28, 2010).................................33

    C. The Second Mediation Term Sheet (October 12, 2010).................................36

    D. The DCL Plan................................................................................................38

    E. The Bridge Loan Settlement...........................................................................41

    F. The DCL Plan Valuation is Grossly Depressed ...........................................42

ARGUMENT...........................................................................................................43

I. THE PROPOSED SETTLEMENT OF THE LBO-RELATED
CAUSES OF ACTION DOES NOT SATISFY BANKRUPTCY RULE 9019.............43

    A. The Terms of the Proposed Settlement Fall Well Below the
    Lowest Point in the Range of Reasonableness .................................................47

        1. The Expected Value of the LBO-Related Causes of Action is $1.57 billion—
        three times more than the Proposed Settlement Consideration ..................48

        2. The DEV upon which the DCL Plan is Premised is Further Evidence that the
        Proposed Settlement is Unreasonable........................................................54

        3. The Fraudulent Transfer LBO-Related Causes Of Action At Both Step One
        And Step Two Have A Very High Likelihood Of Success.........................58

            a. The Non-LBO Creditors have a 57% chance of achieving a full
            recovery by litigating the LBO-Related Causes of Action .........................58

b. The Step One and Step Two Financings Are Subject to Avoidance as Intentional Fraudulent Conveyances. ...........................................................63

    (1) The Step One Financing is Avoidable as an Intentional Fraudulent Conveyance ....................................................................65

    (2) The Step Two Financing is Likewise Avoidable as an Intentional Fraudulent Conveyance ................................................66

    (3) The Contemporaneous Valuations of the Debtors' Own Advisors Show that the LBO Rendered the Company Insolvent, and Thus Show the Fraudulent Transfer Was Intentional .................68

c. The Step One And Step Two Financings Are Also Avoidable As Constructively Fraudulent..........................................................................69

    (1) The Debtors Clearly Did Not Receive Reasonably Equivalent Value From the LBO Transaction at Either Step One or Step Two ......................................................................71

    (2) All Three Financial Conditions Under Section 548(a)(1)(B)(ii) are Easily Satisfied for Both Step One and Step Two ....................................................................72

        (a) The Debtors' Projections Were a Sham and Should Not be Used to Assess the Debtors' Financial Condition at Step One or Step Two........................72

            (i) The February 2007 Management Projections used for the Step One Financing were Not Reasonable ................................................................75

            (ii) As the Examiner found, the October 2007 Management Projections for the Step Two Financing were too optimistic....................................80

        (b) When Assessing the Debtors' Financial Condition at Step One, the Step Two Debt Must be Considered................82

            (i) The parties intended the LBO Transaction to be considered one, singular transaction .................86

            (ii) Tribune's Statements About the LBO Transaction Confirm that Tribune considered It to be a Single Transaction......................................87

            (iii) The LBO Lenders Also Considered the LBO Transaction to be a Single Transaction .............88

(iv) Step One and Step Two Were Interdependent, and the Benefits of the LBO Transaction Were Derived From the Steps Taken Together ...................89

(v) The Examiner was Incorrect to Conclude that the Court is "Somewhat Unlikely" to Consider Step Two Debt at Step One .......................89

(c) Step One was a Constructively Fraudulent Transfer.......91

(i) Balance Sheet Insolvency .....................................91

(ii) Inadequate Capitalization and Inability to Pay Debts As Due ...................................................96

(iii) The Examiner's Conclusions Regarding the Debtors' Financial Condition at Step One Were Erroneous ......................................................................99

(d) Step Two was a Constructively Fraudulent Transfer.......101

(i) Balance Sheet Insolvency .....................................101

(ii) Inadequate Capitalization and Inability to Pay Debts As Due ...................................................102

d. The LBO Debt Should Be Avoided In Full and the Value That is Restored at the Guarantor Debtors Should Be Upstreamed to Tribune to Pay Tribune's Non-LBO Creditors ......................103

(1) Avoidance Of Debt Under Bankruptcy Code Section 548 is Not Limited By The Benefit to the Estate Requirement of Bankruptcy Code Section 550; if Avoidable as a Fraudulent Transfer, the LBO Debt Should be Avoided in Its Entirety .............104

(2) Creditors of Tribune Have Direct Standing to Avoid the Obligations Incurred at the Subsidiary Level and May Benefit from Avoidance Thereof........................................................114

(3) Benefits From Avoidance of the LBO Debt And Recovery of LBO-Related Transfers Should Flow To Non-LBO Creditors And Not To The LBO Lenders ...................116

(a) The Non-LBO Creditors Should Receive the Benefits of Avoidance of the LBO Debt And Recovery Of LBO-Related Transfers............................116

(i) The Examiner's Report ........................................116

(ii) Equity Requires That Following Avoidance And/Or Recovery, Surplus Remaining After Satisfaction of Creditors at Subsidiaries Should be Paid to Non-LBO Creditors at Parent .......118

(iii) Because Tribune Is a Creditor of the Guarantor Debtors, Tribune Creditors Can Benefit from Avoidance of Step Two at the Subsidiary Level .................................................121

(4) Step One Lenders cannot participate in the recovery if the Step Two Financing avoided as a constructive fraudulent conveyance ...................................................................122

(5) If the Step Two Financing is an intentional fraudulent conveyance, the Step One Lenders come with "unclean hands" and cannot share in the recovery ...........................126

e. The LBO Lenders' affirmative defenses to avoidance are without merit ....................................................................................127

(1) The LBO Lenders have no defenses under Section 546(e) .........128

(2) The LBO Lenders cannot establish "good faith" at Step One or Step Two ...........................................................129

(a) The LBO Lenders cannot establish a good faith defense at Step One ..............................................131

(b) The LBO Lenders cannot establish a good faith defense at Step Two ..............................................133

(c) The LBO Lenders Did Not Extend Sufficient Value Cognizable Under Section 548(c) to Materially Affect the Outcome of the LBO-Related Causes of Action ..............134

f. The Estate Has Many Other Valuable Claims Against the LBO Lenders That The Proposed Settlement Releases For Insufficient Consideration ...............................................................136

(1) The Proposed Settlement ascribes virtually no value to the valuable claims for equitable subordination ......................................136

(2) Equitable Disallowance ...............................................................144

(3) Given the Examiner's exhaustive findings, the LBO-Related Causes of Action for aiding and abetting breaches of fiduciary duty are strong .................................................145

iv

            (4) The Debtors' estate claim of unjust enrichment also has a strong chance of prevailing ...................................................................146

B. Likely Difficulties in Collection ..............................................................148

C. The Benefit of Prosecuting the LBO-Related Causes of Action Outweighs Any Cost, Expense or Delay Resulting from Litigation ..........................................149

D. The Proposed Settlement Is Not in the Paramount Interest of Creditors .........150

E. Remaining Texaco Factors ....................................................................152

      1. The Proposed Settlement Was Not The Product Of Arm's-Length Bargaining....152

            a. The Counsel Negotiating the Proposed Settlement were Conflicted ........153

            b. The Debtors' Special Committee created to evaluate and approve any plan of reorganization was a sham.................................................................155

            c. JPMorgan Actively Participated in Settlement Negotiations, Even Though it Was Conflicted as a Pre-LBO Creditor and an LBO Lender ........157

            d. The Proposed Settlement Unfairly Favors Certain Unsecured Creditors .158

            e. The Mediation Term Sheets show that the Debtors and the Creditors' Committee failed to fulfill their duties to maximize recoveries ...................160

      2. Releases ..............................................................................161

II. The Release and Exculpation Provisions in the DCL Plan are Impermissibly Broad and are Not Supported by Adequate Consideration ..........................................161

A. The Debtors Cannot Release Causes of Action They Do Not Own.................162

B. The Proposed Plan Releases are Not Permissible Under Third Circuit Law ..................165

      1. Identity of Interest....................................................................165

      2. Substantial Contribution by the Released Parties .............................167

      3. Necessity of the Releases to the Debtors'Reorganization ...................172

      4. Overwhelming Acceptance by the Affected Creditors.........................172

      5. Payment of All or Substantially All Claims.....................................173

C. The Proposed Releases Contain Ambiguous and Overly Broad Terms ..........................174

D. The Exculpation Provision is Overly Broad and Violates Third Circuit Precedent.........175

E. The Bar Order is Highly Unfair and Should Not be Approved ........................176

III. THE DCL PLAN IS UNCONFIRMABLE AS A MATTER OF LAW ....................176

A. The DCL Plan Was Not Proposed in Good Faith ..........................................176

B. The DCL Plan Inappropriately Provides for the LBO Lenders to Share
in the Proceeds of the Remaining LBO-Related Causes of Action ....................184

1. Inasmuch as the LBO Lenders Would Be Estopped from Bringing the
Remaining LBO-Related Causes of Action They Should Not Receive Trust
Proceeds ..........................................................................................................185

2. Allowing the LBO Lenders to Benefit from the Proceeds of LBO-Related
Causes of Action Violates Basic Principles of Tort Liability ...........................188

3. The LBO Lenders Should Be Precluded From Receiving Any Benefit
From the Litigation Trust Under the Doctrine of In Pari Delicto .....................194

C. The Parent GUC Trust Preference Inappropriately Discriminates Against Creditors
Who Opt Out of the Creditors' Trust ...............................................................196

D. The Governance and Structure of the Litigation Trust Is Inappropriate ..........197

1. The Creditors' Committee Should Not Control the Litigation Trust ..............197

2. The Trusts Under the DCL Plan are Inappropriately Funded .......................201

3. The Reorganized Debtors should be Required to Cooperate with the Trusts .......202

4. Work-Product, Attorney-Client, and Other Privileges Should Transfer
to the Trusts....................................................................................................203

5. Additional Objections to the Litigation Trust Agreement.............................204

E. The DCL Plan Treatment Unfairly Discriminates Against Pre-LBO Funded Debt .........205

F. Preemptively Barring the Payment of Postpetition Interest to Class 1E (Senior
Noteholder Claims) and Class 1J (PHONES Notes Claims) Contravenes the
Requirements of Bankruptcy Code Sections 1129(b)(2) and 1129(a)(7) ..........206

G. The DCL Plan Impermissibly Classifies the Swap Claim as an Other Parent Claim ......208

1. The Swap Claim.........................................................................................208

2. The Swap Claim Should Not be Classified as an Other Parent Claim ..........210

H. The Allocation of the Plan and "Settlement Consideration" Violates
Bankruptcy Code Sections 510(a), 1129(a)(1), 1129 (a)(3), 1129(b)(1) and Bankruptcy
Rule 9019 ................................................................................................................213

IV. CONCLUSION ................................................................................................................217

# TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*AboveNet, Inc. v. Lucent Techs., Inc. (In reMetromedia Fiber Network, Inc.),*
Adv. Proc. No. 04-08564A, 2005 Bankr. LEXIS 3168, at *28 (Bankr. S.D.N.Y. Dec.
20, 2005) ..................................................................................................................................115

*Acequia, Inc v. Clinton (In re Acequia, Inc.),*
34 F.3d 800 (9th Cir. 1994) ........................................................................................106

*Adelphia Recovery Trust v. Bank of America,*
390 B.R. 80 (S.D.N.Y. 2008) ......................................................................................107

*Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus.*
*Complex, Inc.)*
No. 01-67457-59 2007 WL 2509709 (Bankr. N.D.N.Y. Aug. 20, 2007) ......................140

*Am. Nat'l Bank & Trust Co. v. Powell,*
178 So. 21 (Ala. 1938) ................................................................................................122

*ASARCO LLC v. Ams. Mining Corp.,*
396 B.R. 278 (S.D. Tex. 2008) ......................................................................................64

*Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC),*
362 B.R. 624 (Bankr. S.D.N.Y. 2007) ........................................................................129

*Benjamin v. Diamond (In re Mobile Steel Co.),*
563 F.2d 692 (5th Cir. 1977) ......................................................................................137

*Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),*
195 B.R. 971 (Bankr. D. Mass. 1996) ........................................................................129

*Brown v. Chubb,*
31 N.E. 1030 (N.Y. 1892) ..........................................................................................126

*Brown v. Third Nat'l Bank (In re Sherman),*
67 F.3d 1348 (8th Cir. 1995) ..............................................................................131, 132

*Cames v. Joiner (In re Joiner),*
319 B.R. 903 (Bankr. M.D. Ga. 2004) ................................................................11, 58, 59, 60

*Cenco v. Seidman & Seidman,*
686 F.2d 449 (7th Cir. 1982), *cert. denied,* 459 U.S. 880 (1982) ................188, 189, 190, 191

i

*Decker v. Voisenat (In re Serrato),*
   214 B.R. 219 (Bankr. N.D. Cal. 1997) ................................................................113

*Dixon v. Bennett,*
   531 A.2d 1318 (Md. App. 1987) ........................................................................164

*Dobin v. Hill (In re Hill),*
   342 B.R. 183 (Bankr. D.N.J. 2006) ....................................................................130

*Dorocke v. Farrington,*
   193 N.E.2d 593 (Ill. App. Ct. 1963) .....................................................................64

*Douglass v. Wones,*
   458 N.E.2d 514 (Ill. App. Ct. 1983) ...................................................................147

*Drabkin v. L & L Construction Assocs.(In re Latin Investments Corp.),*
   168 B.R. 1 (Bankr. D.D.C. 1993) .............................................188, 189, 192, 193

*Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.),*
   328 B.R. 58 (Bankr. S.D.N.Y. 2005) .................................................................128

*Federal Deposit Ins. Corp. v. Davis,*
   733 F.2d 1083 (4th Cir. 1984) ............................................................................164

*First Nat. Bank of Cincinatti v. Flershem,*
   290 U.S. 504 (1934) .................................................................................185, 187

*Fry's Metal's, Inc. v. Gibbons (In re RFE Indus., Inc.),*
   283 F.3d 159 (3d Cir. 2002) .................................................................................44

*Gambone v. Lite Rock Drywall,*
   No. 05-5181, 2008 WL 2875949 (3d Cir. July 25, 2008) ..................................188

*Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.),*
   338 B.R. 583 (Bankr. S.D.N.Y. 2006) .................................................................64

*Hargreaves v. Tennis,*
   88 N.W. 486 (Neb. 1902) ..................................................................................126

*Harris v. Huff (In re Huff),*
   160 B.R. 256 (Bankr. M.D. Ga. 1993) ...............................................................123

*Hayes v. FPI Nursery Partners 1984-I,*
   No. 90-15224, 1991 U.S. App. LEXIS 12650 (9th Cir. June 11, 1991)..............130

*HBE Leasing Corp. v. Frank,*
   48 F.3d 623 (2d Cir. 1995) ..................................................................................71

*Hogg v. Walker,*
  622 A.2d 648 (Del. 1993)................................................................148

*In re 604 Columbus Ave. Realty Trust,*
  968 F.2d 1332 (1st Cir. 1992)........................................................137

*In re Adelphia Comm. Corp.,*
  327 B.R. 143 (Bankr. S.D.N.Y. 2005).............................................152

*In re Adirondack Ry. Corp.,*
  95 B.R. 867 (N.D.N.Y. 1988).........................................................49

*In re Aleris Int'l, Inc.,*
  No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)............47

*In re Anchorage Marina, Inc.,*
  93 B.R. 686 (Bankr. D.N.D. 1988)...................................................63

*In re Bayou Group, LLC,*
  372 B.R. 661 (Bankr. S.D.N.Y. 2007).......................................119, 120

*In re Best Prods. Co.,*
  168 B.R. 35 (Bankr. S.D.N.Y. 1994)........................................123, 186

*In re Boyer,*
  354 B.R. 14 (Bankr. D. Conn. 2006).................................................163

*In re Calpine Corp.,*
  377 B.R. 808 (Bankr. S.D.N.Y. 2007)...............................................119

*In re Carla Leather, Inc.,*
  44 B.R. 457 (Bankr. S.D.N.Y. 1984).................................................49

*In re Cellular Info. Sys., Inc.,*
  171 B.R. 926.........................................................................47

*In re Coleman,*
  426 F.3d 719 (4th Cir. 2005)..................................................106, 111

*In re Combustion Eng'g, Inc.,*
  391 F.3d 190 (3d Cir. 2005)...................................................177, 210

*In re Conley,*
  159 B.R. 323 (Bankr. D. Idaho 1993)...............................................140

*In re Continental Airlines,*
  203 F.3d 203 (3d Cir. 2000).............................................162, 166, 176

*In re Coram Healthcare Corp.,*
271 B.R. 228 (Bankr. D. Del. 2001) ................................................................. 153, 177

*In re Coram Healthcare Corp.,*
315 B.R. 321 (Bankr. D. Del. 2004) ............................................ 166, 168, 175, 210

*In re Crowthers McCall Pattern, Inc.,*
120 B.R. 279 (Bankr. S.D.N.Y. 1990) ........................................................... 108

*In re Cybergenics Corp.,*
226 F.3d 237 (3d Cir. 2000) ....................................................................... 16, 105

*In re Cyrus II P'nship,*
413 B.R. 609 ............................................................................................... 188

*In re Drexel Burnham Lambert Group, Inc.,*
134 B.R. 493 (Bankr. S.D.N.Y. 1991) ........................................................... 152

*In re eToys, Inc.,*
331 B.R. 176 (Bankr. D. Del. 2005) .............................................................. 175

*In re Exaeris, Inc.,*
380 B.R. 741 (Bankr. D. Del. 2008) .............................................................. 152

*In re Exide Technologies,*
303 B.R. 48 (Bankr. D. Del. 2003) ........................................................... passim

*In re Fairfield Residential LLC,*
2010 WL 2904990 ...................................................................................... 168

*In re FBN Food Services, Inc.,*
No. 93-6347, 1995 U.S. Dist. LEXIS 5009 (N.D. Ill. April 13, 1995) ................... 113

*In re Federal-Mogul Global Inc.,*
2007 WL 4180545 (Bankr. D. Del. 2007) ................................... 168, 170, 171

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerseon & Corey,*
160 B.R. 882 (Bankr. S.D.N.Y. 1993) ........................................................... 141

*In re G-1 Holdings, Inc.,*
313 B.R. 612 (Bankr. D.N.J. 2004) .............................................................. 123

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
55 F.3d 768 (3d Cir. 1995) ...................................................................... 49, 50, 52

*In re Genesis Health Ventures, Inc.,*
266 B.R. 591 (Bankr. D. Del. 2001) ........................................... 166, 172, 177

iv

*In re Global Charter Services, Ltd.,*
    2010 WL 3493031 (Bankr. D. Del. 2010) ................................................168

*In re Global Ocean Carriers Ltd.,*
    251 B.R. 31 (Bankr. D. Del. 2000) ......................................................162

*In re Goss,*
    43 F.2d 746 (N.D. Ga. 1930) .............................................................119

*In re Greate Bay Hotel & Casino, Inc.,*
    251 B.R. 213 (Bankr. D. Del. 2000) .............................................177, 211

*In re Greater Southeast Community Hosp. Corp. I,*
    No. 02-02250, 2008 WL 2037592 (Bankr. D.D.C.) ...................................74

*In re Healthco Intern., Inc.*
    208 B.R. 288 (Bkrtcy.D.Mass.,1997) ...................................................145

*In re Iridium Operating LLC,*
    478 F.3d 452 (2d. Cir. 2007) .............................................................152

*In re J.S.II. LLC,*
    389 B.R. 570 (Bankr. N.D. Ill. 2008) .............................................138, 140

*In re James River Coal Co.,*
    360 B.R. 139 (Bankr. E.D. Va. 2007) ....................................................63

*In re JMK Construction Group, LTD.,*
    2010 LEXIS 4352, at *28-40 (Bankr. S.D.N.Y. Dec. 9, 2010) .....................153

*In re Kraft,*
    3 F. 892 (S.D.N.Y. 1880) ...................................................................122

*In re Kraft, LLC,*
    429 B.R. 637 (Bankr. N.D. Ind. 2010) ..................................................119

*In re Lernout & Hauspie Speech Prods. N.V.,*
    208 B.R. 672 (Bankr. D. Del. 2004) .....................................................176

*In re Lids,*
    281 B.R. at 544-45 ................................................................... passim

*In re M. Fabrikant & Sons, Inc.,*
    394 B.R. 721 (Bankr. S.D.N.Y. 2008) ....................................................83

*In re Morse Tool,*
    148 B.R. 97 (Bankr. D. Mass. 1992) .................................................73, 74

*In re New Century TRS Holdings, Inc.*,
    407 B.R. 558 (Bankr. D. Del. 2009) ................................................................200, 201

*In re New Valley Corp.*,
    168 B.R. 73 (Bankr. D.N.J. 1994) ...........................................................................177

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ..........................................................................45

*In re O'Day Corp.*,
    126 B.R. 370 (Bankr. D. Mass. 1991) ................................................................ passim

*In re Okura & Co.*,
    249 B.R. 596 (Bankr. S.D.N.Y. 2000) .....................................................................141

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ..............................................................................152

*In re Parkview Hospital-Osteopathic Medical Ctr.*,
    211 B.R. 603 (Bankr. N.D. Ohio 1996) ...................................................................148

*In re Pers. & Bus. Ins. Agency*,
    334 F.3d 239 (3d Cir. 2003) .............................................................................. passim

*In re Plassein Int'l Corp.*,
    No. 03-11489, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008) ................73, 74, 75, 76

*In re PPI Enterprises (U.S.), Inc.*,
    324 F.3d 197 (3d Cir. 2003) .....................................................................................207

*In re Project Orange Assocs., LLC*,
    431 B.R. at 374 n.4 ............................................................................................152, 153

*In re PWS Holding Corp.*,
    228 F. 3d 224 (3d Cir. 2000) ............................................................................. passim

*In re Refco, Inc. Securities Litig.*,
    No. 07-1402, 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) .....................................186

*In re Remsen Partners, Ltd.*,
    294 B.R. 557 (Bankr. S.D.N.Y. 2003) .....................................................................148

*In re Revelle*,
    256 B.R. 905-06 (Bankr. M.D. Ga. 2004) .................................................................59

*In re Saxby's Coffee Worldwide, LLC*,
    436 B.R. 331 (Bankr. E.D. Pa. 2010) ......................................................................173

*In re Seven Seas Petroleum, Inc.*,
   522 F.3d 575 (5th Cir. 2008) ................................................................................163

*In re Southwest Equip. Rental, Inc.*,
   1992 WL 684872 (E.D. Tenn. July 9, 1992) ......................................................83, 84

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ...........................................................165, 172

*In re Spansion, Inc.*,
   No. 09-10690 (KJC), 2009 WL 1531788 (Bankr. D. Del. June 2, 2009) ....................... passim

*In re Spoor-Weston, Inc.*,
   139 B.R. 1009 (Bankr. N.D. Okla. 1992) ....................................................114, 117

*In re Stat-Tech Securities Litigation*,
   905 F. Supp 1416 (D. Col. 1995).............................................................188, 189

*In re Suburban Motor Freight, Inc.*,
   124 B.R. 984 (Bkrtcy.S.D.Ohio,1990) ...........................................................96,97

*In re Sweetwater*,
   884 F.2d 1323 (10th Cir. 1989) ...................................................................203

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D. N.J. 2010) ..............................................................175

*In re Telesphere Comm'ns, Inc.*,
   179 B.R. 544 (Bankr. N.D. Ill. 1994) ......................................................187, 188

*In re TSIC, Inc.*
   393 B.R. 71 (Bankr. D. Del. 2008) ................................................................43

*In re Vitreous Steel Prods. Co.*,
   911 F.2d 1223 (7th Cir. 1990) ...................................................................137

*In re Washington Mut., Inc.*,
   No 08-12229, 2011 WL 57111 (Bankr. D. Del. Jan. 7, 2011).......................... passim

*In re West Coast Video Enterprises, Inc.*,
   74 B.R. 906 (Bankr. E.D. Pa. 1994) .............................................................165

*In re World Health Alts., Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) ..............................................................47

*In re Yellowstone Mountain Club*,
   436 B.R. 598 (Bankr. D. Mont. 2010) ................................................73, 74, 195,196

*In re Yellowstone Mountain Club, LLC,*
No. 08-61570-11, 2009 WL 3094930 (Bankr. D. Mont. May 12, 2009) ....................140, 141

*In re Zenith Electronics Corp.,*
241 B.R. 92 (Bankr. D. Del. 1999) ....................................................................165, 173

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.),*
987 F.2d 154 (3d Cir. 1993) ...........................................................................210, 211

*JPMorgan Chase Bank, N.A. v. Charter Comm'cns Operating, LLC (In re Charter Commc'ns),* 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ....................................92

*Judson v. The Courier Co.,*
8 F. 422 (S.D.N.Y. 1881) ...................................................................................122

*Kathy B. Enterprises, Inc. v. United States,*
779 F.2d 1413 (9th Cir. 1986) ...........................................................................164

*Keystone Driller Co. v. Gen. Excavator Co.,*
290 U.S. 240 (1933) ..........................................................................................111

*Klingman v. Levinson,*
158 B.R. 109 (N.D. Ill. 1993) ...........................................................................164

*LaChance v. Harrington,*
965 F. Supp. 630 (E.D. Pa. 1997) ....................................................................49, 52

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids),*
381 B.R. 535 (Bankr. D. Del. 2002) ................................................................73, 92

*Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.),*
327 B.R. 537 (D. Del. 2005), *aff'd,* 278 Fed. Appx. 125 (3d Cir. 2008)..............64, 83, 84, 85

*Lobstein v. Lehn,*
12 N.E. 68 (Il. 1887) ..........................................................................................126

*Loos v. Wilkinson,*
21 N.E. 392 (N.Y. 1889) ....................................................................................126

*LWD Trucking v. LWD, Inc. (In re LWD, Inc.),*
342 B.R. 514 (Bankr. W.D. Ky. 2006) ..............................................................140

*Malpiede v. Townson,*
780 A.2d 1075 (Del. Supr. 2001)........................................................................145

*Matter of Jersey City Medical Center,*
    817 F.2d 1055 (3d Cir. 1987)............................................................................210

*MC Asset Recovery, LLC v. The Southern Company,*
    2006 WL 5112612 (N.D. Ga. Dec. 11, 2006)..................................................106

*McKloskey v. Galva Foundry Co.*
    *(In re Art Unlimited, LLC),* 356 B.R. 700 (Bankr. E.D. Wis. 2006)................130

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.),*
    92 F.3d 139 (3d Cir. 1996)........................................................................70, 73

*Mervyn's Holdings, LLC v. Lupert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC),*
    426 B.R. 488 (Bankr. D. Del. 2010)..........................................................83, 84, 85

*Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC),*
    426 B.R. 96 (Bankr. D. Del. 2010)............................................................83, 90

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.,*
    910 F.Supp. 913 (S.D.N.Y.,1995)..................................................................96

*Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Bus. Fin. Servs.),*
    361 B.R. 747 (Bankr. D. Del. 2007)..............................................................146

*Moody v. Sec. Pac. Bus. Credit,*
    971 F.2d 1056 (3d Cir. 1992)..........................................................65, 96, 97

*Moore v. Bay,*
    284 U.S. 4 (1931)........................................................................................124

*Morin v. OYO Instruments, L.P. (In re Labelon Corp.),*
    No. 02-22582, 2006 WL 2516386 (Bankr. W.D.N.Y. Aug. 28, 2006)........123, 186

*Morse Operations, Inc. v. Goodway Graphics, Inc. (In re Lease-A-Fleet, Inc.),*
    155 B.R. 666 (Bankr. E.D. Pa. 1993)............................................................84

*Myers. v. Martin (In re Martin),*
    91 F.3d 389 (3d Cir. 1996)..................................................................7, 44, 150

*Nextwave Personal Commc'ns, Inc. v. Federal Commc'ns Comm'n*
    *(In re Nextwave Personal Commc'ns, Inc.),*
    235 B.R. 305 (Bankr. S.D.N.Y. 1999)..........................................................105

*NCP Litigation Trust v. KPMG,*
    901 D.2d 871 (N.J. Sup. Ct. 2006)..................................................189, 192, 193

*Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp., Inc. (In re Buckhead Am. Corp.),*
    178 B.R. 956 (D. Del. 1994)................................................................................84

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,*
    330 F.3d 548 (3d Cir. 2003)....................................................................153, 154

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Co. of Del.),*
    274 B.R. 71 (D. Del. 2002)............................................................85, 128, 147

*Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.),*
    330 B.R. 67 (Bankr. D. Del. 2005) ........................................................123, 185

*Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.),*
    277 B.R. 493 (Bankr. S.D.N.Y. 1999).....................................................137, 138

*Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.),*
    326 B.R. 301 (Bankr. D. Del. 2005) ...............................................................140

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,*
    267 F.3d 340 (3d Cir. 2001)...................................................................194, 195

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.),*
    389 B.R. 357 (Bankr. D. Del. 2008) .......................................................194, 195

*Orr v. Kinderhill,*
    991 F.2d 31, 35-36 (2d Cir. 1993) ............................................................83, 84

*Peltz v. Hatten,*
    279 B.R. 710, 743 (D. Del. 2002)......................................................................92

*Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Freuhauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.),*
    444 F.3d 203 (3d Cir. 2006)..............................................................................70

*Pepper v. Litton,*
    308 U.S. 295 (1939)........................................................................114, 144

*Phar-Mor, Inc. v. Coopers & Lybrand (In re Phar-Mor, Inc. Securities Litig.),* 900 F. Supp. 784 (W.D. Pa. 1995).........188, 189, 192

*Phoenix Canada Oil Co. Ltd. v. Texaco Inc.,*
    560 F. Supp. 1372 (D. Del. 1983).....................................................................147

*Pinter v. Dahl,*
    486 U.S. 622 (1988)..........................................................................................194

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
 390 U.S. 414 (1968) ...................................................................................................43, 44, 149

*Reitsch v. McCarty,*
 35 N.D. 555 (1916) .........................................................................................................................122

*Reliant Interactive Media Corp. (In re GeneralSearch.com),*
 322 B.R. 836, 842 (Bankr. N.D. Ill. 2005) ..................................................................................130

*Reynolds v. Beneficial Nat'l Bank,*
 288 F.3d .................................................................................................................................8, 49, 52

*Roeder v. Lockwood (In re Lockwood Auto Grp., Inc.),*
 05-13558, 2010 Bankr. LEXIS 1377 (Bankr. W.D. Pa. May 14, 2010) ...............................130

*Rosener v. Majestic Mgmt. (In re OODC, LLC),*
 321 B.R. 128 (Bankr. D. Del. 2005) ................................................................................... passim

*Russo v. McLaughlin (In re McLaughlin),*
 No. 06-1620, 2006 U.S. Dist. LEXIS 92350 (D.N.J. Dec. 20, 2006) .....................................130

*Schacht v. Brown,*
 711 F.2d 1348 (7th Cir. 1983), *cert. denied,* 464 U.S. 1002 (1983) .....................188, 189, 191

*Schubert v. Lucent Tech. (In re Winstar Commc'ns, Inc.),*
 554 F.3d 382 (3d Cir. 2009) .................................................................................................136, 138

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),*
 403 F.3d 43 (2d Cir. 2005) .............................................................................................................83

*Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.),*
 No. 01-10370 2007 Bankr. LEXIS 4004 (Bankr. D. Del. Nov. 20, 2007) ....................133, 134

*Sierra Indus., LLC v. SHC, Inc. (In re SHC, Inc.),*
 329 B.R. 438 (Bankr. D. Del. 2005) ....................................................................................137, 140

*Smithberg v. Ill. Mun. Retirement Fund,*
 735 N.E.2d 560 (Ill. 2000) ............................................................................................................148

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.),*
 295 B.R. 593 (B.A.P. 8th Cir. 2003) ...........................................................................................123

*Tindall v. Mavrode (In re Mavrode),*
 205 B.R. 716 (Bankr. D.N.J. 1997) ..............................................................................................45

*United States v. Gleneagles Inv. Co.,*
 565 F. Supp. 556 (M.D. Pa. 1983) ................................................................................................71

*United States v. Tabor Court Realty Corp.,*
803 F.2d 1288 (3d Cir. 1986).........................................................................passim

*Vinarov v. Motorola, Inc.,*
No. 05c2063 2008 U.S. Dist. LEXIS 25363 (N.D. Ill. Mar. 26, 2008) ...................147

*Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero Corp.),*
735 F.2d 740 (2d Cir. 1984)......................................................107, 109, 110, 111

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,*
919 F.2d 206 (3d Cir. 1990)...........................................................................64

*Welt v. Sirmans,*
3 F. Supp. 2d 1396 (S.D. Fla. 1997) .........................................................188, 189

*Westmoreland Human Opportunities, Inc. v. Walsh,*
246 F.3d 233 (3d Cir. 2001).........................................................................160

*Whiteford Plastics Co. v. Chase Nat'l Bank,*
179 F.2d 582 (2d Cir. 1950)......................................................107, 108, 109

*Whyte v. Williams,*
152 B.R. 123 (Bankr. N.D. Tex. 1992)...........................................................203

*Wieboldt Stores, Inc. v. Schottenstein,*
94 B.R. 488 (N.D. Ill. 1988) ....................................................................64, 72

*Will v. Northwestern Univ. (In re Nutraquest, Inc.),*
434 F.3d 639 (3d Cir. 2006)....................................................................44, 149

*Williams v. Marlar (In re Marlar),*
267 F.3d 749 (8th Cir. 2001) .......................................................................124

*Wooten v. Robins,*
30 So. 681 (Ala. 1900)...............................................................................122

## STATUTES

6 Del C.
§ 1310...................................................................................................123

11 U.S.C.
§ 101(32)(A) ............................................................................................91
§ 327(a) and 1107 .....................................................................................153
§ 329.....................................................................................................153
§ 502(d).................................................................................................213

§ 510(a)...............................................................................................178, 213, 214, 216
§ 510(c)...............................................................................................136, 139
§ 541...................................................................................................195
§ 544(b)...............................................................................................106, 107, 123, 188
§ 546(a)(1)(A).......................................................................................163
§ 546(a)...............................................................................................163
§ 546(e)...............................................................................................passim
§ 546(g)...............................................................................................212
§ 548(a)...............................................................................................passim
§ 548(c)...............................................................................................passim
§ 550...................................................................................................passim
§ 550(a)...............................................................................................108
§ 550(b)(1)...........................................................................................130
§ 553...................................................................................................182
§ 1102.................................................................................................205
§ 1103(a).............................................................................................154
§ 1122.................................................................................................213
§ 1122(a).............................................................................................210
§ 1123.................................................................................................152
§ 1123(b)(3)(A).....................................................................................43
§ 1123(b)(3)(B).....................................................................................199, 203
§ 1129(a)(1).........................................................................................214
§ 1129(a)(3).........................................................................................passim
§ 1129(a)(7).........................................................................................21, 207
§ 1129(b).............................................................................................207
§ 1129(b)(1).........................................................................................206, 207
§ 1129(b)(2).........................................................................................21, 207

## OTHER AUTHORITIES

Bankruptcy Rule 3013 ................................................................................28

Bankruptcy Rule 9019 ...................................................................... passim

Fed. R. Civ. Pro. R. 23 ....................................................................8, 49, 50

Fed. R. Civ. Pro. R. 2004 ...........................................................................89

H.R. Rep. No. 97-420 (1982)....................................................................128

Hoffer, Decision Analysis as a Mediator's Tool, 1 HARV. NEGOT. L. REV. ..................................48

Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius"),

Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for

certain series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York,

in its capacity as successor Indenture Trustee for certain series of Senior Notes ("Law

Debenture"), and Wilmington Trust Company, in its capacity as successor Indenture Trustee for

the PHONES Notes ("Wilmington Trust" and, together with Aurelius, Deutsche Bank and Law

Debenture, the "Noteholder Plan Proponents"), each by and through its undersigned counsel,

respectfully submit this objection (the "Objection") to confirmation of the Second Amended

Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (the "DCL Plan")

Proposed by the Debtors, the Official Committee of Unsecured Creditors (the "Creditors'

Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P.

("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan" and, collectively with the

Debtors, the Creditors' Committee, Oaktree and Angelo Gordon, the "DCL Plan Proponents").

In support of this Objection, the Noteholder Plan Proponents respectfully submit as follows:

## PRELIMINARY STATEMENT[2]

### Introduction

1.     The Debtor/Committee/ Lender Plan of Reorganization (the "DCL Plan") cannot

be confirmed.  At the heart of that plan is the proposed settlement (the "Proposed Settlement") of

valuable estate causes of action (the "LBO-Related Causes of Action") arising out of the failed

December 2007 leveraged buyout transaction (the "LBO Transaction") that saddled the Debtors

with more than $10.7 billion of new debt and, not surprisingly, ultimately caused the Debtors to

file bankruptcy just twelve months later in December 2008.  The LBO-Related Causes of Action,

among other things, seek to avoid billions of dollars in debt owed to the banks and arrangers who

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DCL Plan.

facilitated and financed the destructive LBO Transaction (the "LBO Lenders"), to subordinate and disallow the LBO Lenders' claims, to obtain disgorgement of over $2 billion[3] in payments made to the LBO Lenders in respect of the LBO-related debt, to recover over $8 billion in payments to Tribune's pre-LBO shareholders and to challenge the misconduct of Debtors' management, their advisors and the LBO Lenders themselves for allowing such a disastrous transaction to take place.

2.    Just three months ago, one of the proponents of the DCL Plan, the Official Committee of the Unsecured Creditors (the "Creditors' Committee"), commenced two actions asserting these LBO-Related Causes of Action. However, the Debtors and three LBO Lenders— JPMorgan, Oaktree and Angelo Gordon, who stand to lose billions of dollars in claims should the LBO-Related Claims against the LBO Lenders be litigated—have joined forces with the conflicted Creditors' Committee to propose the DCL Plan that casts most of the LBO-Related Causes of Action aside and offers woefully insufficient settlement consideration to the Senior Noteholders, and the holders of the PHONES Notes.

3.    The LBO-Related Causes of Action are immensely valuable to those creditors of the Debtors whose claims do not arise from the failed LBO Transaction (the "Non-LBO Creditors")—primarily, the Senior Noteholders and holders of the PHONES Notes, whose $2.5 billion of funded debt was issued before the Debtors leveraged themselves beyond sustainability under the LBO Transaction, as well as various other general unsecured creditors. If the claims are successful, and the debt incurred as part of the LBO Transaction (the "LBO Debt") is avoided, then the Non-LBO Creditors would be entitled to payment in full, including postpetition interest. On the other hand, when the LBO-Related Causes of Action seeking to avoid the LBO

---

[3] All parties with potential disgorgement liability arising from the LBO-Related Causes of Action also face liability for prejudgment interest. Accordingly, all references to such disgorgement liability should assume additional liability in respect of such prejudgment interest.

Debt are settled as part of the Proposed Settlement, the Senior Noteholders' "settlement consideration" is just $369 million, or 28.76% of their claims; the holders of the PHONES Notes stand to recover nothing on account of the Proposed Settlement.

4.     The DCL Plan proposes to pay the Non-LBO Creditors just $488 million in cash consideration for their natural recovery and settlement of the majority of the LBO-Related Causes of Action. For those LBO-Related Causes of Action that are not settled, the DCL Plan proposes to create two litigation trusts to prosecute them, yet remarkably allows the LBO Lenders, whose debt is ostensibly challenged by those trust litigations, to share in any proceeds from the successful litigation of the Remaining LBO-Related Causes of Action that are not settled under the DCL Plan.

5.     In the voting for the DCL Plan, the holders of the Senior Noteholder Claims and the PHONES Notes Claims—the parties who are the principal beneficiaries of the LBO-Related Causes of Action—have spoken loud and clear. 94% of dollar-amount voting of the Senior Noteholder Claims and the holders of PHONES Notes Claims have voted *against* the DCL Plan. Thus, the overwhelming majority of these holders would rather forgo the proposed meager "settlement consideration" from the LBO Lenders and take their chances litigating the allowance of the LBO Debt claims and related disgorgement claims. The Proposed Settlement, therefore, should be rejected, and the DCL Plan should not be confirmed.

**The LBO Transaction**

6.     The LBO Transaction that underlies the LBO-Related Causes of Action took place in two stages in June and December 2007. Because the deal involved a change in ownership, regulatory approvals were needed before the deal could close. However, some large Tribune shareholders, including some Board members, were concerned that these regulatory

3

approvals would cause too long of a delay in the sale of their shares. Therefore, the Tribune Board ultimately decided to close the LBO Transaction in two steps.

7. In the first step ("Step One"), which closed on June 4, 2007, four lead banks provided Tribune over $7 billion in financing, of which Tribune used $4.3 billion to purchase and retire 126 million of its outstanding common stock. When the LBO Transaction ultimately closed on December 20, 2007 with the consummation of the second step of the transaction ("Step Two"), Tribune borrowed an additional $3.7 billion to, among other things, purchase the remaining 117 million shares of outstanding stock for $4 billion, and transferred equity ownership of the company to the employee stock ownership plan, or "ESOP," formed for the LBO Transaction.

8. Valuation Research Corp. ("VRC"), engaged by Tribune, rendered solvency opinions in connection with both Step One and Step Two. To ensure that VRC would opine that the LBO Transaction did not render Tribune and its subsidiaries insolvent, Tribune provided VRC and the banks and arrangers financing the LBO Transaction with overly optimistic financial projections.

### Bankruptcy and the LBO-Related Causes of Action Lawsuits

9. The baseless optimism in management's pre-LBO projections almost immediately subsided to reality. The amount of the new LBO Debt greatly exceeded the value of the Tribune enterprise. Ultimately, but not surprisingly, Tribune and its subsidiaries collapsed under the strain of the leveraged deal and, on December 8, 2008, filed for bankruptcy with over $12.7 billion in funded debt obligations.

10. Shortly after the Debtors filed bankruptcy, on December 18, 2008, the Creditors' Committee was appointed. After finally obtaining standing to prosecute the LBO-Related Causes of Action on behalf of the Debtors' estates in October 2010 (approximately 22 months

4

after its appointment), the Creditors' Committee filed two complaints against two sets of defendants regarding the LBO Transaction—one against the LBO Lenders and affiliates, and the other against the Debtors' current and former directors and officers, Zell and other of Tribune's largest pre-LBO shareholders, certain advisors, and these parties' aiders and abettors. Together, the two complaints assert over 40 causes of action, all seeking to redress the wrong perpetrated by the LBO Transaction and provide Non-LBO Creditors with a full recovery on their claims.

**The Evolution of the DCL Plan**

11. The Debtors initially filed a proposed plan of reorganization on April 12, 2010 (the "April Plan"). The April Plan contemplated the settlement of all LBO-Related Causes of Action. However, the April Plan was doomed to fail as the PHONES Notes Trustee sought and obtained the appointment of an examiner to investigate the viability of fraudulent conveyance and other claims arising out of the LBO.

12. On July 26, 2010, after conducting an exhaustive investigation of the LBO that involved the review of more than 3 million pages of documents and interviews of 38 case-critical witnesses, the Court-appointed Examiner, Kenneth Klee, issued his 1,200-plus page report (the "Examiner's Report"). In the Examiner's Report, the Examiner made a series of damning findings about the LBO Transaction. Among the Examiner's conclusions were (*i*) that under multiple analyses the Step Two Debt was highly likely to be avoided as a constructively fraudulent conveyance and (*ii*) that in connection with Step Two, management was reasonably likely to have committed actual fraud against the pre-LBO lenders. As a result, it was likely that a court would avoid the Step Two debt obligations owed to the LBO Lenders and that such lenders would be required to disgorge the $318 million in LBO-related payments they received in connection with Step Two. Based on the overwhelming evidence that both Step One and Step

Two debt faced substantial exposure to their claims being avoided, the April Plan was quickly abandoned.

13.     Incredibly, despite the critical findings of the Examiner and a concomitant substantial increase in the Debtors' distributable enterprise value ("DEV") since the filing of the April Plan, the DCL Plan Proponents have proposed that the Senior Noteholders receive *less* in recovery under the DCL Plan than initially proposed in the April Plan. In the April Plan, the Senior Noteholders were set to receive a $450 million recovery, or 35.18% of their total claim, which included both the $59 million "natural recovery" they would receive if the LBO Debt were not avoided, plus $391 million in consideration to settle the LBO-Related Causes of Action. But in the DCL Plan, the Senior Noteholders will only receive $431 million in distributions, or just 33.59% of their total claim, comprised of a $62 million natural recovery and $369 million in total settlement consideration. (The holders of the PHONES Notes are to receive no recovery under the DCL Plan, just as the April Plan proposed.)

14.     Worse, the DCL Plan calls for the LBO Lenders to receive a substantially *higher* recovery on their claims than initially proposed in the April Plan, and to pay *less* in settlement consideration to the Senior Noteholders for the settlement of the LBO-Related Causes of Action. Specifically, under the April Plan, the Step One Lenders and Step Two Lenders would have recovered 62.85% of their claims; but under the DCL Plan their recovery is proposed to be 71.04% (an improvement of approximately $720 million). And under the April Plan, they offered to settle the LBO-Related Causes of Action with $391 million of consideration to the Senior Noteholders. In the DCL Plan, that consideration is only $369 million.

15.     These unreasonable shifts in recoveries and consideration are unjustified. In the face of a rising DEV and a set of Examiner findings that support the LBO-Related Causes of

Action, there is simply no reasonable basis for the Debtor or Creditors' Committee to propose, or for the Court to approve, both a *reduction* in the recovery to the Senior Noteholders and an *increase* in the LBO Lenders' recoveries, especially the Step Two Lenders.

### Rejection of the Proposed Settlement under Rule 9019

16.     Bankruptcy Rule 9019 grants this Court the power to reject the unreasonable Proposed Settlement. As this Court did in *Exide* and *Spansion*, the determination of whether to approve a settlement under Rule 9019 involves evaluating four factors established by the Third Circuit in *Myers. v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996): (*i*) the probability of success in litigation; (*ii*) the likely difficulties in collection; (*iii*) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (*iv*) the paramount interest of the creditors. Each of these factors weighs heavily against approval of the Proposed Settlement. *See infra* at pp. 43-163.

### A. The Probability of Success in the Litigation is High

#### 1. The Terms of the Proposed Settlement are well below the lowest point in the range of reasonableness

17.     Under the first *Martin* factor, courts should "canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness." *In re Spansion, Inc.*, No. 09-10690 (KJC), 2009 WL 1531788, at 7 (Bankr. D. Del. June 2, 2009) (*quoting In re Exide Technologies*, 303 B.R. 48, 68 (Bankr. D. Del. 2003) (internal quotations omitted)). Here, there is no question that the Proposed Settlement terms fall well outside the lowest range of reasonableness. And this determination can be made by looking at *only the findings of the Examiner*—an independent, neutral third party. *See infra* at p. 81.



18.

19.

As Judge Posner explained in a decision reversing a district court's approval of a Rule 23 class settlement, a settlement of an action should not be approved if the settlement consideration is below the expected value of litigating the lawsuit, rather than settling it.[4]

20.     Here, the Examiner Report's many legal and factual findings are well suited for this analysis. In the report, the Examiner provided a range of conclusions for the issues that are at the heart of the LBO-Related Causes of Action. The Examiner described his conclusions consistently in a range of seven assessments, from "highly likely" (the strongest likelihood assessment in his report) to "highly unlikely" (the lowest likelihood assessment in his report). For example, the Examiner concluded that it was *"highly likely"* that a court would conclude that the Debtors received less than reasonably equivalent value at Step Two.

---

[4] *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002).

21.    The Noteholder Proponents' expert, Dr. Bruce Beron, has conducted [Redacted]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ *See infra* at
pp. 81-89.

22.    ████████████ Redacted ████████████—well
in excess of the consideration that the Proposed Settlement offers the Senior Noteholders. Since
this analysis is based on the independent findings of the Examiner, it is a truly neutral assessment
of the LBO-Related Causes of Action (as compared to the Debtors' expert who took it upon
himself to redo the Examiner's work). ████████ Redacted ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Because it makes clear that the recovery and settlement consideration
being offered the Senior Noteholders are well below the lowest range of reasonableness, it is
sufficient reason to reject the Proposed Settlement.

**b. The Proposed Settlement is unreasonable because the $6.75 billion DEV is too low, and as it increases, the Senior Noteholders recoveries remain the *same*, while the LBO Lenders recoveries *increase***

23.     The $6.75 billion DEV upon which the DCL Plan is based is artificially low because a number of assumptions and calculations upon which it is derived are not supportable. For example, it is based on months-old data for critical portions of its analysis, including stale and outdated stock prices, distributable cash flow, and projections. Indeed, it will be shown at trial that the DCL Plan Proponents' decision to present this Court with a flawed DEV valuation is motivated by a desire to preserve the upside of the Debtors' improving fortunes and the substantial improvement in market conditions solely for the benefit of the LBO Lenders. *See infra* at pp. 90-95.

24.     Moreover, the low-ball DEV valuation further underscores the unreasonableness of the Proposed Settlement. First, as discussed above, there is a high probability that the Step Two debt will be avoided. Yet if the DEV is just $150 million higher than the DCL Plan currently provides and, as expected the Step Two Debt is avoided, the Step One Lenders (and general unsecured creditors at the Subsidiary Debtors) would be paid in full, and enough value would remain to also pay the Senior Noteholders materially in excess of the DCL Plan's Proposed Settlement.

25.     Second, under the DCL Plan, if the Debtors' DEV increases even a billion dollars or more beyond the $6.75 billion alleged plan value, the total amount to be distributed to the Non-LBO Creditors remains *unchanged* since they are paid in cash, not stock like the Senior Lenders. In fact, because the "natural recovery" of the Non-LBO Creditors increases with any increase in DEV, the settlement consideration being paid for the proposed release of LBO-Related Causes of Action must decrease under the DCL Plan as DEV increases.

26.     Third, as the DEV increases, the recoveries to be enjoyed by the Senior Lenders

on their claims increase while the Senior Noteholders' recovery remains steady, and the holders

of PHONES Notes continue to have no recovery. None of this makes sense, and it demonstrates

that the Proposed Settlement is unreasonable on its face. *See infra* at pp. 90-95.

**2.  The LBO-Related Causes of Action are likely to prevail**

27.     The Proposed Settlement should also be rejected under the first *Martin* factor

because the LBO-Related Causes of Action are very likely to succeed.

████████████████████████ Redacted ████████████████████████

28.     When assessing the likelihood of success of the LBO-Related Causes of Action

under the first *Martin* factor ██████████ Redacted ██████████ Bankruptcy

courts have rejected compromises that settled causes of action that, based on an expert's

expected value calculations, had a better than 50% chance of success.[5] This Court should do the

same here. ██████████████ Redacted ██████████████

████████████████████████████████████████████

██████████. *See infra* at pp. 95-119.

29.     Therefore, the mere fact that the probability of achieving a full recovery for the

Non-LBO Creditors is 57% is alone reason for this Court should to reject the Proposed

Settlement. That determination can be made by relying solely on the court-appointed

Examiner's independent findings, without even assessing the merits of the LBO-Related Causes

of Action.

---

[5] *See, e.g., Cames v. Joiner (In re Joiner)*, 319 B.R. 903, 905-06 (Bankr. M.D. Ga. 2004) (rejecting settlement of cause of action where expert analysis of unsecured creditors' opposing settlement demonstrated that cause of action "ha[d] better than a 50 percent chance of prevailing").

**b. The fraudulent conveyance claims are strong and likely to succeed**

30. The Proposed Settlement should also be rejected because, independent of the Examiner's Report, it will be proven at trial, that the LBO-Related Causes of Action have a very strong likelihood of successfully yielding a full or close to full recovery for the Noteholder Plan Proponents.

**i. The Step One and Step Two debt obligations were intentional fraudulent conveyances that must be avoided**

31. First, discovery has shown that the LBO-Related Causes of Action are likely to succeed in avoiding both the Step One and Step Two transfers and obligations as intentional fraudulent conveyances. Although the Examiner determined that it was "reasonably unlikely" that there was an intentional fraudulent transfer at Step One, at trial, we will demonstrate, based on the document and deposition discovery taken, that there are several "badges of fraud" that overwhelmingly indicate that the Debtors incurred the Step One debt (and made the associated payments contemplated thereby) with an intent to defraud its pre-LBO creditors. For instance, several presentations prepared by Tribune's advisors before the close of Step One show that these advisors knew, or should have known, that the Debtors would be rendered insolvent by the incurrence of the Step One debt to cash out shareholders. ███ Redacted ███

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ *See infra* at pp. 63-69.

32. With respect to Step Two, a compelling case exists that the Step Two transfers and obligations will be avoided as intentional fraudulent conveyances. As the Examiner found, and as will be shown at trial, VRC's solvency opinion for Step Two was deeply flawed, Tribune management intentionally skewed its Step Two projections to support that flawed solvency

opinion, and Tribune's board ignored all of this in the hopes of closing the LBO Transaction. *See infra* at pp. 63-69.

### ii. The Step One and Step Two debt obligations were constructive fraudulent conveyances that must be avoided

33.     Second, it will be shown at trial that both the Step One and Step Two financings constituted constructive fraudulent transfers, and thus the obligations incurred at both steps must be avoided.  For both Step One and Step Two, as the Examiner found, and what should be beyond dispute, the Debtors did not receive reasonably equivalent value for this part of the LBO Transaction.  In fact, the Examiner concluded that it was "highly likely" that a court would find that reasonably equivalent value was lacking at both Step One and Step Two, and nothing in discovery has altered that view.

34.     The Examiner determined it was unlikely that a court would find that the Debtors were insolvent at the time of Step One, with inadequate capital or an inability to pay their debts as they would come due.  However, even though the Examiner concluded the "question is close," the Examiner decided to assess insolvency at Step One assuming that the Step Two debt should not be considered at the time Step One closed.

35.     That is not correct, however.  Just as they do in collapsing two sets of transfers in one transaction for purposes of determining whether reasonable equivalent value was received, courts routinely combine two separate steps of a transaction, even when months apart, when analyzing them as fraudulent conveyances.  That is especially true here, where all parties involved in the LBO Transaction considered it to be an integrated transaction, despite the fact that it was consummated in two steps. *See infra* at pp. 82-90.

36.     In addition, in conducting the three financial condition tests for both Step One and Step Two, the contemporaneous management projections should be wholly disregarded.  For the

13

Step One financing, management produced, and VRC relied on, projections created in February 2007. Later, for the Step Two financing, management created and VRC and the Lead Banks relied on a set of projections finalized in October 2007.

37. . As for the October 2007 projections that VRC blindly followed for Step Two, nothing in discovery alters the Examiner's stark finding that it was "implausible" for Tribune management to have a "good faith" belief in the assumptions and reasonableness of these projections at the time. *See infra* at pp. 72-82.

38. The report prepared by the Noteholder Plan Proponents' expert, Ralph S. Tuliano, shows that [Redacted]

Moreover, at both Step One and Step Two, Mr. Tuliano's analysis shows that [Redacted] —thus confirming, in part, that the Examiner correctly concluded that it was "highly likely" that the Debtors were insolvent and inadequately capitalized at Step Two. *See infra* at pp. 91-102.

39.    Therefore, given what has been learned in discovery, there is a strong likelihood of success of avoiding the LBO Debt at both Step One and Step Two as fraudulent conveyances.

### iii. With the avoidance of the LBO Transaction transfers and obligations, the Non-LBO Creditors will recover ahead of the LBO Lenders

40.    With a successful prosecution of the fraudulent conveyance LBO-Related Causes of Action, the Senior Noteholders will have a substantial recovery that materially exceeds the consideration being offered under the Proposed Settlement.

41.    Although the Senior Noteholders' claims are at the Tribune parent level and over 90% of the value of the Debtor enterprise purportedly resides at the Subsidiary Debtors, the Senior Noteholders will still have a significant recovery because the subsidiary value should "upstream" to the parent upon avoidance of the LBO Lenders' claims. At the DCL Plan contemplated DEV of $6.75 billion (a valuation that is far too low), and the Debtors' proposed allocation of DEV, about $6.186 billion, or 91.6%, of the value is at the Subsidiary Debtors, on a consolidated basis; the remaining $564 million (or 8.4%) of value is at Tribune. Besides the LBO Lenders, the only other creditors at the subsidiary level are the Non-LBO Creditors of the Subsidiary Debtors, whose claims are only $85 million to $150 million. Thus, after satisfying these subsidiary creditor claims, over $6 billion in Subsidiary Debtor value is still available to be "upstreamed" to the Tribune estates and their creditors, including the Senior Noteholders. *See infra* at pp.102-121.

42.    Upstreaming subsidiary value to the parent is available because the LBO Lenders will not be allowed to recover from the Subsidiary Debtors after each Subsidiary Debtor satisfies all other claims at the subsidiary level. Instead, the Subsidiary Debtors' obligations to the LBO Lenders are avoided under Bankruptcy Code section 548(a) in their entirety; they are not avoided only to the extent necessary to pay off that Subsidiary Debtors' creditors. As the Third Circuit

has held, "once avoidable ..., the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim."[6] Moreover, there is, as the Examiner correctly concluded, simply no "substantial issue" at all as to whether an avoidance action can be brought to seek a recovery for the creditors of the Tribune estate from the value of the Subsidiary Debtors.[7] *See infra* at pp. 102-121.

43.      However, if only Step Two obligations are avoided, then the Step One Lenders are still not permitted to recover ahead of the Non-LBO Creditors. Principles of estoppel and waiver prevent the Step One Lenders from benefitting from the avoidance of a transaction that they actively participated in. Indeed, the Examiner ultimately concluded that there was a 50% chance that a court would find that the Step One Lenders are equitably estopped from benefiting from such an avoidance.[8] As the Examiner also correctly noted, the Step One Lenders are "the same creditors (or their successors) who ... participated in, funded, and made possible the Step Two Transactions." Thus, if the Step Two debt is avoided as an intentional fraudulent transfer, the Step One Lenders are estopped from benefitting from that avoidance since a party cannot benefit from a fraud that it was involved in. Likewise, if the Step Two debt is avoided as a constructively fraudulent transfer, then the Step One Lenders have waived any right to benefit from that avoidance because they consented to, and assumed the risks associated with, the Step Two financing. *See infra* at pp. 121-127

### iv. The LBO Lenders do not have valid affirmative defenses

44.      The LBO Lenders do not have affirmative defenses that would defeat the avoidance of the Step One or Step Two debt. First, there is no defense under Bankruptcy Code section 546(e), a conclusion with which the Examiner agreed. *See infra* at pp. 127-129.

---

[6] In re Cybergenics Corp., 226 F.3d 237, 243 (3d Cir. 2000).
[7] Examiner's Report, Vol. II at 290.
[8] See Examiner's Report, Vol. II at 303 (leaving question "in equipoise").

45.     Second, the LBO Lenders also do not have any "good faith" defenses under Bankruptcy Code section 548(c) that would allow them to limit the extent of the avoidance. Even if the LBO Lenders could establish good faith at Step One or Step Two, which they cannot, they did not extend sufficient value under section 548(c) that would impede the Non-LBO Creditors from obtaining a full recovery, plus interest. *See infra* at pp. 130-136.

46.     Moreover, although the Examiner concluded that a court would be "reasonably likely" to find that a good faith defense may be available to the LBO Lenders in connection with the Step One transaction, discovery in this case has shown, and it will be demonstrated at trial, that the LBO Lenders *knew* that the Debtors could not handle the enormous LBO-related debt burden and that the management projections used to validate the Step One financing were unreasonable and overly optimistic. As for Step Two, there is clearly no "good faith" defense for the LBO Lenders. They knew (*i*) that the Debtors' financial condition was deteriorating, (*ii*) that the Debtors were indeed insolvent, (*iii*) that the VRC Step Two solvency opinion was meaningless and (*iv*) that bankruptcy was likely. In fact, the Examiner concluded that it was "reasonably likely" that a court would not allow a good faith defense for the LBO Lenders for Step Two.

### c.   The other LBO-Related Causes of Action are likely to succeed

47.     In addition to the fraudulent conveyance claims, the other LBO-Related Causes of Action are also likely to succeed. For one, it will be shown at trial that the conduct and knowledge of the LBO Lenders during Step One and Step Two will establish that their claims should be both equitably subordinated and disallowed. In addition, Tribune management, its advisors (especially VRC) and the Lead Banks all had a role in either manipulating projections to facilitate the closing of the financings or in knowing but ignoring that the LBO Transaction would render the Debtors insolvent. Therefore, claims for unjust enrichment, breach of fiduciary

17

duty and adding and abetting those breaches are well-founded and have strong chances of success. *See infra* at pp. 136-147.

**B. There Are No Difficulties In Collection Presented Here**

48. The second *Martin* factor for rejecting a settlement under Rule 9019 is whether there is any risk associated with collection on a judgment in prosecution of the LBO-Related Causes of Action. That is easily satisfied here, and supports rejection of the Proposed Settlement. The distributions of the reorganized Debtors' cash, debt and equity can be held in reserve, thus ensuring that all Non-LBO Creditors can be paid as the result of any judgment resulting from the prosecution of the LBO-Related Causes of Action. *See infra* at pp. 147-148.

**C. The Complexity and Expense of A Litigation Do Not Outweigh the Benefits of Prosecuting the LBO-Related Causes of Action**

49. The third *Martin* factor considered by courts in assessing whether a proposed settlement is fair and reasonable is the complexity of the litigation involved and the expense, inconvenience and delay attending it. This too weights in favor of rejecting the Proposed Settlement. Although the LBO-Related Causes of Action are complex, they have been thoroughly evaluated by an Examiner, much of the discovery needed to litigate these claims has taken place, and most of the parties who would be involved in such a litigation are actively involved in these bankruptcy cases. Moreover, even under the DCL Plan, this litigation (whether complex or expensive, or not) will still be prosecuted with respect to the unsettled Remaining LBO-Related Causes of Action. *See infra* at pp. 148-150.

**D. The Proposed Settlement Is Not in the Paramount Interest of the Creditors**

50. Finally, under the fourth *Martin* factor, it is clear that the Proposed Settlement embodied in the DCL Plan is not in the "paramount interest of creditors." As discussed above, the primary creditor constituencies that stand to receive consideration for the settlement of the

LBO-Related Causes of Action have overwhelmingly voted against the DCL Plan. In fact, holders of the PHONES Notes and the Senior Noteholders—the parties most significantly harmed by the Proposed Settlement—vigorously oppose the Proposed Settlement and the DCL Plan and voted overwhelmingly to reject the DCL Plan (94% in dollar amount voting). *See infra* at pp. 150-151.

### E. Other Reasons to Reject the Proposed Settlement Under Rule 9019

51.    Not only is rejection of the Proposed Settlement supported by the *Martin* factors that this Court typically applies in applying Rule 9019, the *Texaco* Factors that other courts consider in assessing settlements also weigh in favor of rejecting the Proposed Settlement.

52.    The DCL Plan Proponents cannot carry their burden of proving that the Proposed Settlement was the result of good faith, arm-length negotiations because the two groups owing fiduciary duties to the unsecured creditors—the Debtors and the Creditors' Committee—suffered from serious conflicts of interest. Moreover, the Special Committee formed in the wake of the Examiner's Report to evaluate plan proposals did not act independently of the Debtors' Board of Direcrs as it was supposed to. *See infra* at pp. 157-160.

53.    Documents produced in discovery provide clear evidence of such conflicts. For example, documents show that the members of the Special Committee felt an obligation to curry favor with Tribune's new proposed owners instead of seeking to maximize recoveries for the Debtors' estates. In addition, in February 2010, one Special Committee member signed an email Redacted Other documents show that a member of JPMorgan's senior management both sat on the Creditors' Committee and negotiated on JPMorgan's behalf in connection with the proposed settlement—a clear conflict of interest. And a close analysis of the term sheets leading up to the ultimate settlement shows that certain DCL Plan Proponents assured the support for that settlement of

several members of the Creditors' Committee by unimpairing them offering them payment in full, or providing that the proposed "settlement consideration" would equal an amount that at least one member of the Committee was contractually bound to support.

54.     Moreover, the releases and exculpations provided to, among others, the Debtors' directors, officers, management and professionals are impermissible under applicable Third Circuit law because they are overly broad and not supported by adequate consideration. *See infra* at pp. 160-176.

## The DCL Plan Was Not Proposed In Good Faith Under Section 1129(a)(3)

55.     The DCL Plan in and of itself is unconfirmable. For the reasons stated above, and because it was the result of an effort to secure preferential treatment for the LBO Lenders at the expense of innocent Non-LBO Creditors, the DCL Plan was not proposed in good faith. The DCL Plan also inappropriately provides for the LBO Lenders—who were perpetrators of a massive fraud on the Non-LBO Creditors—to share in the proceeds of the remaining LBO-Related Causes of Action. Indeed, the DCL Plan allows the LBO Lenders to receive Litigation Trust Interests and Creditors' Trust Interests as part of their consideration under the Plan. This violates numerous principles of law, equity and public policy. Because the bad acts of the LBO Lenders and/or Debtors may be imputed to the Trustees if the LBO Lenders participate in the LBO-Related Causes of Action, the LBO Lenders could jeopardize the Litigation Trustee's ability to prosecute the Remaining LBO-Causes of Action through application of the doctrines of estoppel and *in pari delicto*. *See infra* at pp. 183-195.

56.     The DCL Plan is also unconfirmable because it inappropriately discriminates against creditors who opt out of the Creditors' Trust and against holders of Pre-LBO funded debt. Creditors like the Noteholder Plan Proponents, who opted out of the Creditors' Trust in order to avoid the risk that such causes of action deposited in such trust will be barred by the

defenses discussed herein, will not receive any portion of the preference derived from the Creditors' Trust (to the extent such Trust is vested with any causes of action). In addition, through the provision of 100% of the New Common Stock to the Senior Lenders, the DCL Plan proponents have created a structure that ensures if the Debtors' DEV is greater than the $6.75 billion valuation upon which the DCL Plan is premised, all of the increased value would inure solely to the benefit of the Senior Lenders at the expense of other unsecured creditors who, based on their cash-only recoveries, would not realize this increase in value. *See infra* at p. 196.

57. The governance and structure of the litigation trust is also inequitable. The DCL Plan allows the Litigation Trust to be controlled by members of the Creditors' Committee, including JPMorgan who was responsible for the damages ultimately sought to be recouped by the Litigation Trustee. It also inappropriately funds the Litigation Trust and Creditors' Trust through loans as opposed to outright grants, and does not include any requirement that the Reorganized Debtors cooperate with the Litigation Trustee and/or Creditors' Trustee as and when necessary. In addition, the DCL Plan does not contemplate the transfer of work-product, attorney-client and other privileges critical to the prosecution of the Litigation Trust Causes of Action. *See infra* at pp. 197-204.

58. The DCL Plan also impermissibly and preemptively bars holders of Allowed Senior Noteholder Claims and holders of PHONES Notes Claims from receiving postpetition interest on account of their Claims, regardless of the value recovered by the respective Trusts, and thereby violates the "fair and equitable" requirement of Bankruptcy Code section 1129(b)(2) and the "best interests test" under Bankruptcy Code section 1129(a)(7). Moreover, it impermissibly classifies the Swap Claim as an Other Parent Claim in an effort to secure an inflated recovery for Oaktree --an LBO Lender and a DCL Plan Proponent. This classification,

which would allow the Swap Claim to recover in excess of 100%, violates section 1122(a). In the DCL Plan Proponents' efforts to give preferential treatment to an important ally evidences a lack of good faith and constitutes the type of abuse in the classification system that alone is grounds to deny confirmation. *See infra* at pp. 175-176.

59.    Finally, the DCL plan is also unconfirmable because it does not apply the subordination provisions of the PHONES Notes Indenture and EGI-TRB LLC Notes correctly. This violates numerous Bankruptcy Code provisions including sections 510(a), 1129(a)(1), 1129 (a)(3), and 1129(b)(1), as well as Bankruptcy Rule 9019.

## SUMMARY OF FACTS[9]

### The LBO Transaction

60.    The year before consummating the doomed LBO Transaction, Tribune Company's Board (the "Board") retained the services of Merrill Lynch and Citigroup Global Markets to conduct a strategic review of potential changes to the Debtors' ownership structure. Examiner's Report Vol. 1 at 65-67, 101-103, 189. As a part of the retention, the Board guaranteed that, should any transactions stem from the review, Merrill Lynch and Citigroup would not be disqualified from taking part in any transactions they had recommended, notwithstanding their obvious conflicts. *Id.* at 50-52, 272-274.

---

[9] This objection seeks to provide the Court with the legal framework for the issues to be heard at the Confirmation Hearing, and to preview some of the evidence that the Noteholder Plan Proponents intend to submit at trial. As this Court is aware, discovery is ongoing with a fact discovery cut-off date of February 25, 2011. At this juncture, only four depositions have been taken and the majority of depositions (including all witnesses on the parties' trial witness lists) have yet to occur. Moreover, document production is ongoing with tens of thousands of documents currently being produced. Indeed, a minimum of approximately 1.4 million pages of documents have been produced during the past six weeks, of which approximately 300,000 pages were produced since February 1 and have not been fully reviewed. Accordingly, this summary of facts in no way reflects the totality of evidence that has been marshaled or shall be presented by the Noteholder Plan Proponents at the confirmation proceedings.

61.     With the assistance of Merrill Lynch and Citigroup, the Debtors ultimately reviewed a number of transactions, finally settling on a proposal for a highly leveraged buyout led by a group controlled by Samuel Zell ("Zell"). As part of the proposed LBO, Tribune would be saddled with over $10.7 billion in additional debt and existing public shareholders would be bought out. Under this proposal, the Debtors would be owned by their employees but controlled by Zell. *Id.* at 113-133. On April 1, 2007, despite a general deterioration of the Debtors' business model, the Board, upon the advice of, among others, Merrill Lynch, Citigroup and some other interested lenders, approved the proposal. *Id.* at 133-34, 143.

62.     In an effort to expedite the return of capital to shareholders, this LBO, as approved by the Board and recommended by its advisors, would take place in two interrelated steps. The LBO was to be done in two steps because regulatory approval would be required before the full buyout of the shareholders could be consummated but large shareholders, including Board members, did not want to wait until such approvals were obtained before beginning to receive their money. Examiner's Report, Vol. 1 at 262. For the first part of the related two step transaction ("Step One"), Tribune's employee stock ownership plan, or "ESOP," would purchase shares of Tribune's common stock and Tribune would, in turn, make a tender offer for nearly 50% of the company's outstanding common stock. Then, in the second step of the transaction ("Step Two" and, together with Step One, the "LBO Transaction"), following certain regulatory approvals, Tribune would cash out its remaining stockholders and merge with a Delaware corporation that was wholly-owned by the ESOP, with Tribune as the surviving entity of the merger.

63.     In March 2007, Tribune retained Valuation Research Corp. ("VRC") to render solvency opinions in connection with both Step One and Step Two. To ensure that VRC would

opine that the LBO Transaction did not render Tribune and its subsidiaries insolvent, Tribune agreed to pay VRC one of the largest fees VRC had ever received, and fed VRC an endless stream of rosy projections that proved inaccurate from the moment they were issued.

64.     Of course, to consummate the LBO, Tribune needed significant infusions of capital. Four banks stepped in to provide commitments of up to $12.2 billion (the "LBO Debt") to finance the LBO Transaction —JPMorgan and Bank of America, N.A. ("Bank of America"), as well as two entities affiliated with Tribune's financial advisors, Merrill Lynch Capital Corporation and Citigroup Inc. (collectively, the "Lead Banks). In connection with the incurrence of the LBO Debt, the Lead Banks required Tribune's subsidiaries to guarantee the financing that they committed to provide. Like the guarantees, these transactions were nothing more than a naked attempt to jump ahead of the pre-existing debt held by the Non-LBO Creditors.

65.     Step One closed on June 4, 2007, with Tribune purchasing and retiring 126 million of its shares of common stock for approximately $4.3 billion and the LBO Lenders disbursing over $8 billion to finance that purchase and pay, among other things, associated fees and expenses aggregating approximately $150 million. On December 20, 2007, Tribune completed Step Two of the LBO Transaction. As part of this final leg of the deal, Tribune purchased the remaining 117 million outstanding shares of its common stock for approximately $3.982 billion, and borrowed an additional approximately $3.7 billion from the LBO Lenders.

66.     The LBO Debt was incurred pursuant to two loan agreements:

- Senior Loan Agreement:   On May 17, 2007, Tribune entered into an $8.028 billion senior secured credit agreement (the "Senior Loan Agreement") with JPMorgan, as administrative agent, and financial institutions from time to time party thereto.  The Senior Loan Agreement consists of the following loan facilities: (i) a $1.5 billion Senior Tranche X Term Facility; (ii) a $5.515 billion Senior Tranche B Term Facility; (iii) a $263 million Delayed Draw Senior Tranche B

24

Term Facility; (iv) a $750 million Revolving Credit Facility ((i)-(iv), the ("Step One Financing"); and (v) $2.105 billion in new incremental term loans under the Tranche B Term Facility (the "Step Two Debt"). On December 27, 2007, Tribune entered into a number of increase joinders pursuant to which the incremental facility became a part of the Tranche B Term Facility under the Senior Loan Agreement.

- Bridge Loan Agreement: On December 20, 2007, Tribune entered into a $1.6 billion Senior Unsecured Interim Loan Agreement (the "Bridge Loan Agreement") with Merrill Lynch as administrative agent, JPMorgan as Syndication Agent, Citicorp and Bank of America as Co-Documentation Agents, and the Initial Lenders named therein. Pursuant to the Bridge Loan Agreement, Tribune borrowed $1.6 billion under a 12-month bridge facility (the "Bridge Facility" and, together with the Step Two Debt, the "Step Two Financing"). The Bridge Facility indebtedness is unsecured but is guaranteed, on a senior subordinated basis, by the Guarantor Debtors.

The below diagrams set forth the sources and uses of cash for the LBO:

## Sources & Uses – Step One ($ in millions) [10,11]



| STEP 1 - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| A  Tranche B Term Loan | $5,515.0 |
|     Tranche X Term Loan | 1,500.0 |
|     Delayed Draw Tranche B Term Loan ($263 capacity) | 0.0 |
|     Revolving Credit Facility ($750 capacity) | 0.0 |
| B  EGI-TRB Equity Investment (1.47 million shares @ $34) | 50.0 |
|     Exchangeable EGI-TRB Note | 200.0 |
|     **Total Sources** | **$7,265.0** |
| | |
| **Uses** | **Amount** |
| C  Repay Bridge Credit Agreement (a)(b) | $1,325.0 |
|     Repay Term Loan (b) | 1,500.0 |
| D  TRB repurchases 126 million shares @ $34 | 4,284.0 |
|     Bank Fees | 134.1 |
|     Other Fees | 21.9 |
|     **Total Uses** | **$7,265.0** |

---

[10] Source: Joint Disclosure Statement.

[11] Notes: ESOP's $250 million purchase of Tribune equity not shown as this transaction did not involve the actual transfer of any cash. Part B of the transaction was completed on April 23, 2007. Parts A, C and D were completed on June 4, 2007.

(a)   Repayment of Amended and Restated Bridge Credit Agreement dated as of June 27, 2006 (as subsequently amended, the "Old Bridge Credit Agreement"). This repayment includes $300 million that was paid between April 23, 2007 and June 3, 2007.

(b)   In addition to payment of principal, interest expense of $3.1 million and $6.3 million was paid on the Old Bridge Credit Agreement and old term loan, respectively.

**Sources & Uses – Step Two ($ in millions)[12]**



| STEP II - SOURCES & USES | |
|---|---|
| **Sources** | **Amount** |
| Cash from Balance Sheet | $582.9 |
| E    Tranche B Term Loan | 2,105.0 |
| Bridge Facility | 1,600.0 |
| F    EGI-TRB Net Cash Payment | 56.1 |
| Total Sources | $4,344.0 |
| | |
| **Uses** | **Amount** |
| G    Cash Settlement of Stock Based Awards | $134.9 |
| H    TRB repurchases 117.1 million shares @ $34 | 3,981.9 |
| Cash Distribution triggered by Change of Control (a) | 104.0 |
| Bank Fees | 73.4 |
| Other Fees | 49.7 |
| Total Uses | $4,344.0 |
| | |
| **MEMO: Details to Step F** | |
| Subordinated EGI-TRB Note Investment | $225.0 |
| EGI-TRB Warrant | 90.0 |
| Credit for TRB Shares | (50.0) |
| Credit for Exchangeable EGI-TRB Note | (200.0) |
| Subtotal | 65.0 |
| | |
| Credit for PIK Interest on Exchangeable EGI-TRB Note | (6.4) |
| Credit for Reimbursed Legal Fees | (2.5) |
| Total Net Cash To Be Invested by EGI-TRB | $56.1 |

67.     The amount of the LBO Debt greatly exceeded the value of the Tribune enterprise. Not surprisingly, Tribune and its subsidiaries collapsed under the strain of the leveraged deal and, on December 8, 2008, filed for bankruptcy with the following funded debt obligations:

---

[12] Source: Joint Disclosure Statement.

    Note: Schedule details payments made on December 20, 2007, or shortly thereafter.

    (a)   Includes payments related to deferred compensation, non-qualified retirement and transitional compensation plans.

| Debt Instrument | Approximate Principal Amount Outstanding as of the Petition Date |
| --- | --- |
| Senior Loan Agreement | $8.622 billion[13] |
| Bridge Loan Agreement | $1.600 billion |
| Senior Notes | $1.263 billion |
| EGI-TRB LLC Notes | $0.235 billion |
| PHONES Notes[14] | $0.761 billion -$1.197 billion |
| Receivables Facility | $0.225 billion |
| Total | $12.706 billion – $13.142 billion |

## The LBO-Related Causes of Action

68.     Shortly thereafter, on December 18, 2008, the Creditors' Committee was appointed.  On February 1, 2010, the Creditors' Committee moved the Court for an order granting it standing to prosecute, on behalf of the Debtors' estates, claims arising out of the LBO Transaction.  The Court granted the Creditors' Committee's motion on October 27, 2010.

69.     On November 1, 2010, the Creditors' Committee filed two different complaints against two different sets of defendants regarding the LBO Transaction.  One complaint is asserted against the LBO Lenders and affiliates (the "Lender Complaint").[15]  The second complaint names as defendants the Debtors' current and former directors and officers, Tribune's

---

[13] The amount outstanding on account of the Senior Loan Agreement includes the Swap Claim (which is defined and described below).

[14] The amount of PHONES Notes outstanding is the subject of a pending dispute before this Court for the reasons set forth in Wilmington Trust Company's Motion for (I) Estimation of the PHONES Claims and (II) Classification of PHONES Claims Pursuant to Bankruptcy Rule 3013 [ECF No. 7352].

[15] *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A., et al. (In re Tribune Co., et al.)*, Adv. Pro. 10-53963 (Bankr. D. Del. Nov. 1, 2010) [ECF No. 1].

largest pre-LBO shareholders, VRC, Zell, certain advisors, and these parties' aiders and abettors (the "Third-Party Complaint").[16]

70.    Collectively, the two complaints filed by the Creditors' Committee assert over 40 causes of action, all seeking to redress the wrong perpetrated by Tribune's management, directors and advisors, the LBO Lenders and other parties in allowing the LBO Transaction to close and harm the Non-LBO Creditors.  In the Lender Complaint, the Creditors' Committee brings six counts alleging intentional or constructive fraudulent conveyance, as well as seven other counts for, among others, breaches of fiduciary duty, aiding and abetting those breaches, unjust enrichment, equitable subordination and equitable disallowance.  The Third-Party Complaint asserts 30 causes of action, including fraudulent conveyance and breach of fiduciary duty, among many others.  Central to the Lender Complaint are the following LBO-Related Causes of Action that the DCL Plan Proponents now seek to sweep under the rug for pennies on the dollar:

- claims to avoid, as intentional and constructive fraudulent conveyances, more than $6.6 billion in loan and guaranty obligations incurred by the Debtors in connection with Step One;

- claims to avoid, as intentional and constructive fraudulent conveyances, more than $3.7 billion in loan and guaranty obligations incurred by the Debtors in connection with the Step Two;

- claims to avoid and recover, as intentional and constructive fraudulent conveyances, more than $2.1 billion of principal, interest, and fees paid in connection with or subsequent to Step One and Step Two;

- claims to estop the Step One Lenders from benefiting from the avoidance of Step Two.

- claims to equitably disallow or subordinate all claims held by the LBO Lenders; and

- common law claims for, among other things, unjust enrichment, estoppel, aiding and abetting breach of fiduciary duty, and professional malpractice.

---

[16] *The Official Committee of Unsecured Creditors v. Fitzsimmons et al. (In re Tribune Co., et al.),* Adv. Pro. 10-54020 (Bankr. D. Del. Nov. 1, 2010) [ECF No. 1].

**The DCL Plan**

71.     On February 4, 2011, the DCL Plan Proponents filed the DCL Plan. The terms of the DCL Plan are summarized in the Specific Disclosure Statement Relating to First Amended Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Creditors' Committee, Oaktree, Angelo Gordon, and JPMorgan [ECF No. 6090] (the "DCL Specific Disclosure Statement").

72.     The DCL Plan is predicated on a distributable enterprise value ("DEV") of $6.75 billion, with 8.4% (or $564 million) allocated to Tribune and 91.6% (or $6.19 billion) allocated to the Subsidiary Debtors (on a consolidated basis). *See* DCL Joint Disclosure Statement, Exhibit F. As discussed below and will be shown at trial, this is an unsupportable, grossly depressed valuation, and DEV is likely to be found to be at least $1 billion more.

73.     The DCL Plan proposes a series of settlements to resolve billions of dollars in claims and causes of action that the Debtors' estates hold against, among others, the current and former banks and arrangers who provided the financing for Step One of the LBO Transaction (the "Step One Lenders"), the current and former banks and arrangers who provided the financing for Step Two of the LBO Transaction (the "Step Two Lenders"), and the Bridge Lenders (collectively, the "LBO Lenders") other than certain Preserved Causes of Action specifically enumerated in the DCL Plan. *See* DCL Plan, § 5.15, 5.16. These settlements are summarized in the table on page 40.

74.     The following table sets forth the Classes of Claims against the Debtors, the estimated recovery percentage for such Claims on the Effective Date and the treatment for such Classes:

| Claims | Class | Estimated Recovery % on Effective Date[17] | Treatment |
|---|---|---|---|
| Senior Loan Claims (Step One Claims at Tribune/Step Two Claims at Tribune) | 1C | 1.09% | (i) 1.50% of the Remaining Distributable Cash, 1.50% of the New Senior Secured Term Loan, and 1.50% of New Common Stock; (ii) pro rata share of the Class 1C Litigation Trust Interests; and (iii) if such Holder has not opted out of an assignment pursuant to section 14.3.1 of the DCL Plan (whereby Holders transfer any Disclaimed State Law Avoidance Claims to the Creditors' Trust) (the "State Law Avoidance Claims Assignment"), pro rata share of the Class 1C Creditors' Trust Interests. |
| Bridge Loan Claims at Tribune | 1D | 4.04% (assumes arrangers elect Option 1) | Option 1 for Arranger Bridge Lenders: pro rata share of (i) $64.5-$65.5 million; (ii) Class 1D Litigation Trust Interests; and (iii) if such Holder has not opted out of the State Law Avoidance Claims Assignment, Class 1D Creditors' Trust Interests.

Option 2 for Arranger Bridge Lenders: forego pro rata share of the above distributions, which will instead be distributed to Non-Arranger Bridge Lenders. In exchange, the Non-Arranger Bridge Lenders and the Bridge Loan Agent will be deemed to have released each and all of the Arranger Bridge Lenders that elect this option. |
| Senior Noteholder Claims | 1E | 33.59% | Pro rata share of: (i) $62 million in Cash on account of "natural recoveries"; (ii) $238 million in Cash on account of Step One Allowance/Step One Disgorgement Settlement; (iii) $120 million in Cash on account of Step Two Disgorgement Settlement; (iv) 82.9% of the Remaining Bridge Loan ($10.19-11.03 million); (v) Class 1E Litigation Trust Interests; and (vi) if such Holder has not opted out of the State Law Avoidance Claims Assignment, Class 1E Creditors' Trust Interests. |
| Other Parent Claims (General Unsecured Claims at Tribune/Swap Claims) | 1F | 33.59%-36.04% | Option 1: (i) Cash equal to 35.18% of the Allowed Claim; (ii) pro rata share of 17.1% of the Remaining Bridge Loan Reserve; and (iii) if such Holder has not opted out of the State Law Avoidance Claims Assignment, pro rata share of the Class 1F Creditors' Trust Interests.

Option 2: (i) Cash equal to 32.73% of the Allowed Claim; (ii) pro rata share of 17.1% of the Remaining Bridge Loan Reserve; (iii) Class 1F Litigation Trust Interests; and (iv) if such Holder has not opted out of the State Law Avoidance Claims Assignment, pro rata share of the Class 1F Creditors' Trust Interests. |
| Convenience Claims | 1G | 100% | Payment in full, in Cash without postpetition interest. |
| EGI-TRB LLC Note Claims | 1I | 0% | Pro rata share of (i) Class 1I Litigation Trust Interests; and (ii) if such Holder has not opted out of the State Law Avoidance Claims Assignment, Class 1I Creditors' Trust Interests |
| PHONES Notes Claims | 1J | 0% | Pro rata share of (i) Class 1J Litigation Trust Interests; and (ii) if such Holder has not opted out of the State Law Avoidance Claims Assignment, Class 1J Creditors' Trust Interests, calculated based on the aggregate amount of Allowed PHONES Notes Claims. |
| Intercompany Claims at Tribune | 1K | N/A | Treatment as provided in the Intercompany Claims Settlement. |
| Senior Guaranty Claims (Step One Guaranty Claims/Step Two Guaranty Claims/Swap Claims) | 50C-111C | 69.95% | (i) 98.50% of the New Senior Secured Term Loan; (ii) 98.50% of the Remaining Distributable Cash; and (iii) 98.50% of the New Common Stock. |
| Bridge Loan Guaranty Claims | 50D-111D | 0% | |
| Subsidiary GUCs | 2E-111E | 100% | Cash from the Distributable Cash Pool in an amount equal to the lesser of (i) 100% of the Allowed Claim or (ii) a pro rata share of $150,000,000. |
| Intercompany Claims at Subsidiaries | 2K-111K | N/A | Treatment as provided in the Intercompany Claims Settlement. |

---

[17] Projected recovery amounts do not include potential recoveries from the Litigation Trust or the Creditors' Trust.

**Evolution of the DCL Plan and the Corresponding
Reduction in Non-LBO Creditor Recoveries**

### A. The April Plan

75.     The Debtors' first plan of reorganization was filed in April 2010 (the "April

Plan") and was premised on a settlement support agreement among Angelo Gordon, JPMorgan

and Centerbridge that was then adopted by the Debtors and supported by the Creditors'

Committee.  The April Plan based distributions on a $6.1 billion total DEV with 8.8% (or $540

million) of the DEV allocated to Tribune and 91.2% (or $5.56 billion) allocated to the

subsidiaries (on a consolidated basis).  The April Plan contemplated that the Senior Noteholders

would receive a "strip" of consideration consisting of 7.4% of the New Common Stock, 7.4% of

the New Senior Secured Term Loan and 7.4% of the Distributable Cash (as defined in the April

Plan) for a projected aggregate recovery of $450 million (or 35.18%) on account of their claims

(with $59 million attributable to the Senior Noteholders' "natural" recovery and $391 million in

respect of "settlement consideration").  Since the April Plan consideration to the Senior

Noteholders was payable as a "strip" of stock, notes and cash, the Senior Noteholders were

assured that if the DEV was in fact more than the $6.1 billion estimate upon which the April Plan

was premised (and, thus the New Common Stock was worth more), they would share in the

corresponding increase in value.

76.     Under the April Plan, the Senior Lenders were to receive an aggregate recovery of

approximately 62.85% on their Senior Loan Claims and Senior Guaranty Claims (likewise in a

strip of consideration).  The Swap Claim, classified as a Senior Loan Claim at Tribune and a

Senior Loan Guaranty Claim at the Filed Subsidiary Debtors, was to recover 62.85% (in a

strip).[18] The holders of Other Parent Claims were to receive a recovery of 35.18% on their claims (in cash), and holders of subsidiary General Unsecured Claims (the "Subsidiary General Unsecured Creditors") were to receive a 100% cash recovery. The Bridge Loan Claims were disputed under the April Plan, but if such claims were ultimately allowed, the Bridge Lenders would have received their pro rata share of $74 million in cash. The PHONES Notes Claims and EGI-TRB LLC Notes Claims were not to receive any recovery under the April Plan.

77.     Ultimately, the April Plan was abandoned following the issuance of the July 26, 2010 Examiner Report (the "Examiner's Report"), which made it abundantly clear that the settlement underlying the April Plan did not provide sufficient value to the Non-LBO Creditors.

## B. The First Mediation Term Sheet (September 28, 2010)

78.     Following the abandonment of the April Plan, the proponents of the DCL Plan, the Noteholder Plan and other parties in interest engaged in Court-ordered mediation over the plan process. At no time during this plan mediation process were there ever substantive plan negotiations involving or including the Senior Noteholders or the holders of the PHONES Notes. Rather, the DCL Plan Proponents sought to use the mediation to cleanse the negotiations already underway under a veneer of respectability. In fact, following the release of the Examiner Report, and prior to or outside the scope of the mediation, Tribune management was in regular contact with the Senior Lenders respecting settlement, but made no effort to communicate with the Noteholder Plan Proponents.

79.     The first mediation term sheet (the "First Mediation Term Sheet") was attached to the first Mediator's Report (Docket No. 5831) filed on September 28, 2010 (the "Mediator's First Report") and set forth the terms of a settlement among only the Debtors, Oaktree and

---

[18] In order to show recoveries on an "apples to apples" basis, the recoveries for the Swap Claim are shown separate from the recoveries for holders of Other Parent Claims and the Senior Lenders.

Angelo Gordon to "settle claims surrounding 'Step 1' of Debtors' 2007 going private transaction." Mediator's First Report at 1. The First Mediation Term Sheet, like the April Plan, was premised on a $6.1 billion total DEV.

80.     This term sheet did not provide for a settlement of the Step Two LBO-Related Causes of Action, making Step Two Lender Claims and Bridge Loan Claims disputed claims. The First Mediation Term Sheet did provide, however, that Step One Lender Claims would be allowed in full and that Step One Lenders would receive an aggregate recovery of $5.618 billion on their claims, which they would then share *pro rata* with the Step Two Lenders pursuant to their reading of section 2.13 of the Senior Loan Agreement.[19] Thus, under this term sheet, the Step One Lenders and Step Two Lenders each would have received an aggregate recovery of 64.43% on account of their claims plus "interests in [a] Litigation Trust that are co-extensive in amount and priority to that which such holders enjoyed with respect to the Debtors." The form of the initial distributions to the Step One Lenders (and Step Two Lenders through application of section 2.13 of the Senior Loan Agreement) was to be 100% of the New Common Stock, 100% of the New Senior Secured Term Loan, and cash.

81.     Unlike the April Plan, the First Mediation Term Sheet contemplated that the Senior Noteholders would only receive a cash recovery (no longer a "strip" of consideration) of just $300 million (or 23.38%) on account of their claims, plus interests in a litigation trust. Of the $300 million cash recovery, $59 million was attributable to the Senior Noteholders' "natural" recovery, and the remaining $241 million to the settlement of Step One LBO-Related Causes of Action. With the removal of the "strip" of consideration, in addition to the reduced settlement

---

[19] The First Mediation Term Sheet contemplated that "Step Two Senior Loan Claims will not be Allowed under the Plan. Distributions on account of Senior Loans governed by the Senior Loan Credit Agreement will be distributed ratably in accordance with section 2.13 of the Senior Loan Credit Agreement."

amount, the Senior Noteholders would no longer benefit from an increase in the DEV beyond the $6.1 billion estimate from April.

82.    In addition, the First Mediation Term Sheet provided that the Swap Claim, which is owned by an affiliate of Oaktree, would be classified as an Other Parent Claim at Tribune as opposed to a Senior Lender Claim (as it was in the April Plan), and that all Other Parent Claims would receive a recovery of 23.38% in cash plus litigation trust interests. The Swap Claim, however, also received the benefit of being classified as a Subsidiary Guaranty Claim and, thus, was contemplated to receive an additional 62.99% recovery on its claim for a total projected recovery of 86.37%. The Subsidiary General Unsecured Creditors were to receive a cash recovery of 50% on their claims if the applicable class voted in favor of the plan contemplated by the First Mediation Term Sheet, but only 10% if they voted against the plan. Bridge Lender Claims were again disputed under the First Mediation Term Sheet, but if such claims were ultimately allowed, the Bridge Lenders would have received their pro rata share of $77.7 million plus litigation trust interests.

83.    The PHONES Notes Claims and EGI-TRB LLC Notes Claims were to receive only interests in the litigation trust under the First Mediation Term Sheet. It is assumed that the litigation trust contemplated by the First Mediation Term Sheet would have included all of the claims contemplated to be transferred to the Litigation Trust under the DCL Plan plus, among other things, disgorgement claims against the Step Two Lenders and claims against Tribune's prepetition shareholders. The First Mediation Term Sheet settled $6.6 billion of avoidance claims, and $1.9 billion of disgorgement claims (before prejudgment interest) for a mere $241 million, a fraction of its true value.

## C. The Second Mediation Term Sheet (October 12, 2010)

84.     Approximately two weeks after the First Mediation Term Sheet, a second mediation term sheet (the "Second Mediation Term Sheet") was filed as an attachment to the Mediator's Second Report [ECF No. 5936] dated October 12, 2010. The Second Mediation Term Sheet set forth the terms of a settlement among the Debtors, Oaktree, Angelo Gordon, JPMorgan and the Creditors' Committee to "settle certain claims surrounding both 'Step 1' and 'Step 2.'" Mediator's Second Report at 1. The Second Mediation Term Sheet was still premised on a $6.1 billion total DEV with 8.8% (or $540 million) of the DEV allocated to Tribune and 91.2% (or $5.56 billion) allocated to the subsidiary Debtors (on a consolidated basis). The Second Mediation Term Sheet contemplated "partial settlements of 'Step One' and 'Step Two' LBO-Related Causes of Action in exchange for (a) approximately $402 million[20] in reallocation of value away from holders of Senior Loan Claims and (b) $120 million in cash from the 'Step Two Disgorgement Settlement.'"

85.     The Second Mediation Term Sheet provided that Step One Lender Claims and Step Two Lender Claims would be allowed in full and receive an aggregate recovery of 63.58% on account of their claims, plus trust interests. The form of the initial distributions to the Step One Lenders and Step Two Lenders, like in the First Mediation Term Sheet, would be 100% of the New Common Stock, 100% of the New Senior Secured Term Loan and cash.

86.     The Second Mediation Term Sheet provided that the Senior Noteholders would receive only a cash recovery, but this time equal to $420 million (or 32.73%) on account of their claims (with $59 million attributable to the Senior Noteholders' "natural" recovery, $241 million in respect of "settlement consideration" on account of allowing claims arising out of Step One

---

[20] A portion of the $402 million is improperly allocated to the Swap Claim.

and Step Two of the LBO[21] and $120 million in settlement of Step Two Disgorgement Claims), plus trust interests.

87.     The primary difference between the First Mediation Term Sheet and the Second Mediation Term Sheet was the allowance of the Step Two Lender Claims and the settlement of the Step Two Disgorgement Claims.  However, not a single proposed settlement penny was provided to the Senior Noteholders or the holders of PHONES Notes on account of the allowance of the previously disputed $2.1 billion in Step Two Lender Claims.

88.     The Second Mediation Term Sheet again provided that the Swap Claim would be classified as an Other Parent Claim at Tribune as opposed to a Senior Lender Claim and that all Other Parent Claims would now be entitled to receive either (i) a recovery of 32.73% in cash, plus trust interests or (ii) an all cash recovery of 35.18% (not coincidentally, the amount necessary to ensure that the retiree member of the Creditors' Committee would support the settlement). See Retiree Settlement, attached as Exhibit 5.15.4 to the DCL Plan.  The Swap Claim again received preferential treatment by being classified as a Subsidiary Guaranty Claim and, thus, was contemplated to receive an additional 62.5% recovery for a total projected recovery of 97.68%.  The Subsidiary General Unsecured Creditors were now to receive a 100% recovery in cash.  For the third time, the Bridge Lender Claims were to be disputed, but if such claims were ultimately allowed, the Bridge Lenders would have received their pro rata share of $77.7 million but no trust interests.

89.     The PHONES Notes Claims and EGI-TRB LLC Notes Claims were to receive only trust interests under the Second Mediation Term Sheet.

---

[21] As noted above, the Senior Noteholders were to receive the same $241 million in settlement consideration under the First Mediation Term Sheet where only claims arising out of Step One of the LBO were to be settled.

90.     Accordingly, a comparison of the April Plan to the Second Mediation Term Sheet reflected that the value of the Senior Noteholders' guaranteed recovery had been reduced from $450 million to $420 million (which encompassed a reduction in settlement consideration from $391 million to $361 million) and the upside afforded to the Senior Noteholders through distribution of New Common Stock in the event the Debtors' DEV increased above $6.1 billion had been removed. Conversely, the Second Mediation Term Sheet provided that the Senior Lenders would receive 100% of the New Common Stock (and thus all of the benefits associated with an increased DEV), 100% of the New Secured Term Loan and cash and, notwithstanding the glaring infirmities in the Senior Lenders' claims, including a substantial likelihood that Step One of the LBO would be avoided and the virtual certainty that Step Two would be avoided, an increase in their aggregate recoveries from 62.85% under the April Plan to 63.58%.

### D. The DCL Plan

91.     The DCL Plan evidences even more egregious changes for the benefit of the Senior Lenders. In the 10-day period between the filing of the Second Mediation Term Sheet and the filing of the initial version of the DCL Plan, the DCL Plan Proponents increased the DEV from $6.1 billion to $6.75 billion. Despite this $675 million increase in value, the DCL Plan provided no additional consideration to the Senior Noteholders or holders of Other Parent Claims under the DCL Plan. The Senior Noteholders' initial distribution remained constant at $420 million – meaning that the amount of "settlement consideration" to the Senior Noteholders proportionately decreased as aggregate recoveries to the Senior Lenders (considerably) increased. In fact, from the date of the filing of the April Plan to the filing of the DCL Plan, the Senior Lenders' recoveries on their claims increased over $700 million, from 62.85% to 71.05% of the amount allegedly owed. Under the DCL Plan, the Swap Claim recovery increased to 100% -- an increase of recovery value of over $56 million.

92.     In addition to the significant increase in the DEV from the Second Mediation Term Sheet to the initial DCL Plan, the scope of the contemplated releases was broadened to include, among others, the Debtors' officers and directors (other than in connection with LBO-Related Causes of Action), the Debtors' professionals, the members of the Creditors' Committee and their professionals, the other proponents of the DCL Plan and their professionals, and shareholders.

93.     An additional change from the Second Mediation Term Sheet to the initial DCL Plan was the insertion of a provision to address the ramifications if the Bridge Loan Claims were disallowed.  Under the initial DCL Plan, if the Bridge Loan Claims were disallowed, the amount of the Bridge Loan Reserve ($77.819 million) would be allocated 71.64% ($55.7 million) to the Senior Lenders, 23.51% ($18.3 million) to the Senior Noteholders and 4.85% ($3.8 million) to the holders of Other Parent Claims (including the Swap Claim).  Thus, if the Bridge Loan Claims were avoided (which the Examiner found was highly likely), the Senior Lenders would have received an additional $55.7 million in value, Senior Noteholders would have received an additional $18.3 million in value and holders of Other Parent Claims would have received an additional $3.8 million in value.

94.     The chart attached on the following page summarizes the relevant terms of the April Plan, First Mediation Statement, Second Mediation Statement, and the initial and final versions of the DCL Plan.

| | Proponents / Supporters | Settling Claims / Causes of Action | Amount | Allocation | Recovery (Natural / Settlement) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *April Plan* | Debtors, based on settlement support agreement among Angelo Gordon, JPMorgan and Centerbridge, supported by UCC | All LBO-Related Causes of Action (other than Allowance of Bridge Loan Claims) | $6.1 billion | 8.9% ($549 million) to Tribune and 91.2%, ($5.56 billion) to Subsidiary Debtors | 35.18% ($550 million) – 7.4% of the New Common Stock, 7.4% of the New Senior Secured Term Loan and 7.4% of distributable cash ■ Natural Recovery: $391 million ■ Settlement Consideration: $391 million | 62.55% in a strip of New Common Stock, New Senior Secured Term Loan and cash | 62.55% in a strip of New Common Stock, New Senior Secured Term Loan and cash | | 100% in cash |
| *Mediation TSM* | Debtors, Oaktree and Angelo Gordon | Step 1 Lender Claims (Allowance and Disgorgement) | $6.1 billion | 8.9% ($549 million to Tribune and 91.2%, ($5.56 billion) to Subsidiary Debtors | 23.33% ($300 million) in cash plus litigation trust interests ■ Natural Recovery: $59 million ■ Settlement Consideration: $241 million in cash plus litigation trust interest | 64.43% in a strip of 100% of the New Common Stock, 100% of the New Senior Secured Term Loan and cash plus litigation trust interests | 86.37% consisting of a 23.33% cash recovery at 62.99% plus litigation trust interests and interests in Tribune (or all such recovery of 62.99% recovery as the Guarantor Subsidiaries in the form of strip | 23.33% in cash plus litigation trust interests | (i) 59% in cash if the applicable class votes in favor of the plan or (ii) 10% in cash if it votes against the plan |
| *Mediation TSM* | Debtors, UCC, Oaktree, Angelo Gordon and JPMorgan | Step 1 Lender Claims (Allowance and Disgorgement), additional LBO-Related Causes of Action | $6.1 billion | 8.9% ($540 million) to Tribune and 91.0% ($5.56 billion) to Subsidiary Debtors | 32.73% ($420 million) in cash plus litigation trust interests ■ Natural Recovery: $59 million ■ Settlement Consideration: $361 million – $241 million on account of claims arising out of Step 1 and Step 2 of the LBO other than Step 2 Disgorgement Claims | 65.58% in the form of 100% of the New Common Stock, 100% of the New Senior Secured Term Loan and cash plus litigation trust interests | 95.23% consisting of 32.73% cash recovery plus litigation trust interests and interests in Tribune (or all such recovery of 35.18%) and a 62.5% recovery as the Guarantor Subsidiaries in the form of a strip | (i) 32.73% in cash plus litigation trust interests and creditors' trust interests or (ii) 35.18% in cash | 100% in cash |
| *Initial DCL Plan* | Debtors, UCC, Oaktree, Angelo Gordon and JPMorgan | Step 1 Lender Claims (Allowance and Disgorgement), additional LBO-Related Causes of Action | $6.75 billion | 8.4% ($564 million) to Tribune and 91.6% ($6.19 billion) to Subsidiary Debtors | 32.73% ($420 million) in cash plus litigation trust interest ■ Natural Recovery: $42 million ■ Settlement Consideration: $358 million – $238 million on account of claims arising out of Step 1 and Step 2 of the LBO other than Step 2 Disgorgement Claims [If Bridge Loan Claims are disallowed] $18.3 million in cash from Bridge Loan Reserve / Bridge Loan Claims are avoided | 71.04% in the form of 100% of the New Common Stock, 100% of the New Senior Secured Term Loan and cash plus litigation trust interest [If Bridge Loan Claims are disallowed] $55.5 million in cash from Bridge Loan Reserve if Bridge Loan Claims are avoided | 100% consisting of 32.73% cash recovery plus litigation trust interests and creditors' trust interests in Tribune (or all such recovery of 35.18%) and a 69.95% recovery as the Guarantor Subsidiaries in the form of a strip [if Bridge Loan Claims are disclosed where reduction in recoveries will be to limit recovery to 100%] | (i) 32.73% in cash plus litigation trust interests or (ii) 35.18% in cash [If Bridge Loan Claims are disallowed] $5.77 million in cash from Bridge Loan Reserve if Bridge Loan Claims are avoided | 100% in cash |
| *Final DCL Plan (including Bridge Loan Settlement)* | Debtors, UCC, Oaktree, Angelo Gordon and JPMorgan | Step 1 Lender Claims (Allowance and Disgorgement), Bridge Loan Claims, Additional LBO-Related Causes of Action | $6.75 billion | 8.4% ($564 million) to Tribune and 91.6% ($6.19 billion) to Subsidiary Debtors | 33.99% ($431 million) [excludes $10.2 or $11.04 million from Bridge Loan Reserve on account of bridge settlement] plus litigation from settlement ■ Natural Recovery: $42 million ■ Settlement Consideration: $368-369 million – $238 million on account of claims arising out of Step 1 and Step 2 of the LBO other than Step 2 Disgorgement Claims; $130 million in settlement of Step 2 Disgorgement Claims; $10.2 million or $11.04 million on account of Remaining Bridge Loan Reserve | 71.84% in the form of 100% of the New Common Stock, 100% of the New Senior Secured Term Loan and cash plus litigation trust interest | 100% consisting of 33.99% cash recovery (including value from Bridge Loan Reserve on account of Bridge Loan Settlement in the form of interest in Tribune (or all such recovery of 36.0%) and a 69.95% recovery as the Guarantor Subsidiaries in the form of a strip [also disclosed where reduction in recovered will be to limit recovery to 100%] | (i) 32.73% in cash plus litigation trust interests and creditors' trust interests (including value from Bridge Loan Reserve on account of Bridge Loan Settlement) or (ii) 36.04% in cash | 100% in cash |

### E. The Bridge Loan Settlement

95.　　On the eve of the Voting Deadline, the proponents of the DCL Plan and the
Bridge Lenders reached a settlement (the "<u>Bridge Loan Settlement</u>").  Pursuant to the Bridge
Loan Settlement, the DCL Plan has been amended to provide that the Bridge Loan Claims will
be allowed in the amount of $1.6 billion and, on account of such claims, the Bridge Loan
Lenders will receive their pro rata share of $64.5 million; provided, that if three or more of the
Bridge Loan Arrangers do not agree to waive their rights to receive a recovery in respect of their
Bridge Loan Claims, the consideration to the Bridge Loan Lenders will increase to $65.5 million.
As a result of the Bridge Loan Settlement, the amount of the Remaining Bridge Loan Reserve
has been reduced from $77.8 million to either $12.3 million or $13.3 million.  Based on this
reduction of the Remaining Bridge Loan Reserve, the Senior Lenders have been "gracious"
enough to forgo receipt of their otherwise allocable share.  As such, interests in the Remaining
Bridge Loan Reserve have been reallocated such that the Senior Noteholders receive 82.9% and
the holders of Other Parent Claims (including the Swap Claim) receive 17.1% of the Remaining
Bridge Loan Reserve.

96.　　As a result of the Bridge Loan Settlement, instead of the high likelihood of
receiving $18.3 million from the Remaining Bridge Loan Reserve, the Senior Noteholders will
now only receive either $10.2 million or $11.04 million.

97.　　The graph below shows the evolution (degradation) of recoveries to the Senior
Noteholders and the corresponding substantial increase in recoveries to the Senior Lenders from
the April Plan to the current version of the DCL Plan, despite the substantial findings in the
Examiner Report (which will also be proven at the confirmation hearing) that the LBO Debt
should be avoided and all Non-LBO Creditors should be paid in full in these cases.



## F. The DCL Plan Valuation is Grossly Depressed

98.     The DCL Plan is premised on a DEV of $6.75 billion (which the Noteholder Plan

Proponents vigorously oppose as being materially too low), with $564 million (or 8.4%)

allocated to Tribune, and about $6.196 billion (or 91.6%) allocated to its subsidiaries, on a

consolidated basis. This valuation was prepared by Lazard, the Debtors' financial advisor, in

October 2010 and is premised on projections prepared in March 2010, a full year before the

confirmation hearing is scheduled to begin. As a result of this artificially low valuation (and

questionable allocation of value between Tribune and its subsidiaries), the recoveries to the

Senior Noteholders under the DCL Plan do not comply with Bankruptcy Code section 1129(b)

and the actual "settlement consideration" being provided by the LBO Lenders to the Non-LBO

Creditors is significantly less than the already unreasonably low asserted amount of $488 million.[22]

## ARGUMENT

## I. THE PROPOSED SETTLEMENT OF THE LBO-RELATED CAUSES OF ACTION DOES NOT SATISFY BANKRUPTCY RULE 9019

99.     The Proposed Settlement at the core of the DCL Plan is not fair and reasonable and cannot be approved under the law of this jurisdiction.  Pursuant to Bankruptcy Code section 1123(b)(3)(A), a plan of reorganization may provide for the settlement of any claims or causes of action belonging to the debtor's estate.  *See* 11 U.S.C. § 1123(b)(3)(A); *In re Exide Techs.*, 303 B.R. 48, 66 (Bankr. D. Del. 2003) ("A plan may include a provision that settles or adjusts any claim belonging to the debtor or the estate.").  Nevertheless, as with all settlements proposed by a debtor in the bankruptcy context, a settlement contained in a plan may be approved only if it is fair and reasonable and complies with the requirements of Bankruptcy Rule 9019.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); Fed R. Bankr P. 9019 ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.").

100.     The proponents of a plan containing a proposed settlement bear the burden of establishing that the court should approve the settlement.  *See In re Spansion, Inc.*, No. 09-10690, 2009 WL 1531788, at *4 (Bankr. D. Del. June 2, 2009) ("[T]he [d]ebtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved.").  Under Bankruptcy Rule 9019, a proposed settlement can be approved only if it is shown to be "fair, reasonable and in the best interests of the estate." *In re TSIC, Inc.* 393 B.R. 71, 78 (Bankr. D. Del. 2008) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (Bankr. D. Del.

---

[22] Such amount does not include "settlement consideration" inappropriately allocated to the Swap Claim.

1997); *see also Fry's Metal's, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002) (directing district court to assess the "fairness, reasonableness and adequacy" of proposed settlement). Moreover, in determining whether this standard has been met, courts must carefully scrutinize the terms of the proposed settlement. *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("[T]he unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.").

101.    The inquiry into whether a settlement should be approved under Bankruptcy Rule 9019 is fact-intensive. As explained by the Supreme Court, a court must undertake a searching and thorough analysis of the claims being settled and the terms of the proposed compromise:

> apprise[] [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

*TMT Trailer Ferry*, 390 U.S. at 424. The evidence presented to the court must enable it to "make detailed enough findings so that a reviewing court knows that the proper factors were considered and an informed judgment made." *Id.*

102.    In determining whether a proposed settlement is fair and reasonable, courts in this Circuit consider the following factors: (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors (collectively, the "*Martin* Factors"). *Myers. v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). In addition, this Court has recognized that other courts have considered the following additional factors in deciding whether to approve a settlement (collectively, the "*Texaco* Factors"):

(a) The balance between the likelihood of plaintiff's or defendant's success should the case go to trial vis a vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures;

(b) The prospect of complex and protracted litigation if the settlement is not approved;

(c) The proportion of the class of creditors who do not object or who affirmatively support the proposed settlement;

(d) The competency and experience of counsel who support the settlement;

(e) The relative benefits to be received by individuals or groups within the class;

(f) The nature and breadth of releases to be obtained by the directors and officers as a result of a settlement; and

(g) The extent to which the settlement is truly the product of "arm's-length" bargaining, and not of fraud or collusion.

See *In re Exide Tech.*, 303 B.R. at 67-68 (citing *In re Texaco*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988)).

103.     Courts give substantial weight to whether the settlement is fair to non-settling parties when analyzing whether a proposed settlement is fair and reasonable. *See In re Spansion*, 2009 WL 1531788, at *3 ("Under the 'fair and equitable' standard, [the court looks] to the fairness of the settlement to other persons, i.e., the parties who did not settle") (quoting *In re Nutraquest*, 434 F.3d at 645). Where a proposed settlement is not fair to non-settling parties, it should not be approved. *See, e.g., In re Nutritional Sourcing Corp.*, 398 B.R. 816 (Bankr. D. Del. 2008) (ruling that proposed settlement was not fair and reasonable where interests of non-settling creditors were not represented and such creditors were adversely affected by the settlement); *In re Exide Techs.*, 303 B.R. at 70 (rejecting proposed settlement and giving substantial weight to rejection of plan containing the proposed settlement by unsecured creditors who were not party to settlement agreement); *Tindall v. Mavrode (In re Mavrode)*, 205 B.R. 716,

721 (Bankr. D.N.J. 1997) ("It is the duty of the bankruptcy court to ensure that the proposed settlement will not result in further injury to other creditors. A proposed settlement will necessarily fail where one creditor benefits at the other creditors' expense.").

104.    As set forth below, the application of the *Martin* Factors to the Proposed Settlement and the consideration of the facts and circumstances of these cases demonstrate that the Proposed Settlement should not be approved:

- **The "lowest point in the range of reasonableness."** As this Court has explained, in assessing the first Martin factor regarding likelihood of success, courts should assess whether the settlement "falls below the lowest point in the range of reasonableness." Here, the Proposed Settlement cannot satisfy this consideration for two reasons. ▮Redacted▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Second*, the DEV upon which the DCL Plan is artificially low, and as DEV increases, the insufficiency of the settlement consideration grows, and the inequities between the recoveries to the Noteholders and the LBO Lenders are prominently revealed.

- **The probability of success on the merits**. The LBO-Related Causes of Action are also likely to succeed on the merits, thus weighing in favor of rejecting the Proposed Settlement under the first *Martin* factor. ▮▮▮▮▮▮ Redacted ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Second*, as discovery has confirmed and as will be demonstrated at trial, there is a substantial likelihood that if the Proposed Settlement is denied, the LBO-Related Causes of Action will be successful and all Non-LBO Creditors will be paid in full (including postpetition interest).

- **Likely difficulties in collection**. Collection of litigation proceeds to be obtained from the LBO-Related Causes of Action is not at issue because (i) substantially of the litigation "proceeds" are in the form of LBO Debt avoidance and (ii) avoidance of the LBO Debt alone will yield sufficient value to pay Non-LBO Creditors in full. Moreover, the primary parties with disgorgement liability are the arrangers of the LBO Debt who are among the most prominent banking institutions in the country.

- **The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it**. A material issue that the DCL Plan Proponents ignore in seeking approval of the Proposed Settlement is that the litigation they are "settling" will still occur in connection with the prosecution of the remaining LBO-Related Causes of Action. In fact, the only way to ensure that there is not

inconvenience or delay in the Debtors' emergence from chapter 11 while this litigation proceeds is through confirmation of the Noteholder Plan, which permits the Debtors' emergence from chapter 11 while preserving all parties' rights to receive the recoveries for which they are justly entitled. Moreover, based on the high probability of success in avoiding the LBO Debt, the benefits to be obtained from permitting the LBO-Related Causes of Action against the LBO Lenders to proceed far outweighs any expense, inconvenience and delay that may result from such litigation. Accordingly, this factor militates heavily in favor of denying the Proposed Settlement and confirmation of the DCL Plan.

- **Paramount Interests of Creditors**. The Proposed Settlement has been overwhelmingly rejected by those creditors that would be most significantly harmed by the Proposed Settlement (over 94% in dollar amount of the Senior Noteholders and holders of PHONES Notes voting on the DCL Plan voted to reject such plan). In addition, the Proposed Settlement fails to provide Non-LBO Creditors with adequate value for the LBO-Related Causes of Action contemplated to be settled, especially the Senior Noteholders and holders of PHONES Notes who were most harmed by the LBO Transaction. Accordingly, the Proposed Settlement is not in the "paramount interest of creditors."

- **Remaining *Texaco* Factors**. The remaining *Texaco* Factors weigh against approval of the Proposed Settlement. First, the Proposed Settlement is not the product of arm's-length negotiations. Second, the releases to be granted to the Debtors' directors and officers in connection with the Proposed Settlement are overbroad, not supported by adequate consideration and impermissible under applicable law. Accordingly, the Proposed Settlement and confirmation of the DCL Plan must be denied.

A.    **The Terms of the Proposed Settlement Fall Well Below the Lowest Point in the Range of Reasonableness**

105.    The first *Martin* Factor instructs courts to "canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness." *In re Spansion, Inc.*, 2009 WL 1531788, at *7 (quoting *In re Exide Techs.*, 303 B.R. at 68 (internal quotations omitted)); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *19 (Bankr. D. Del. May 13, 2010) (same); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (same); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994 ("[T]he purpose is not to make findings of fact and conclusions of law, but to canvass the issues to assess the risks associated with prosecuting the various claims."). Here, there is little doubt that the Proposed Settlement fails this test.

47

1. [Redacted]

106.   The Examiner's own findings—opinions that the parties have stipulated are admissible for all purposes and may be considered by the Court[23]—establish that the Proposed Settlement falls "below the lowest point in the range of reasonableness." [Redacted]

According to the Notehlder Plan Proponents' expert, Dr. Bruce Beron [Redacted]

[Redacted] For this reason alone, the Proposed Settlement must be rejected by the Court.

107.   The "expected value" of a litigation is determined using well-accepted decision-tree analysis, which can reliably generate the value of a litigation that involves multiple outcomes. "Developed in the 1960's for use in business education, . . . [p]rofessionals in the fields of business, economics, medicine, public policy, engineering, and law all use decision trees when multiple uncertainties complicate the decision process."[24]  In conducting a decision-tree analysis to evaluate a litigation, potential outcomes of the litigation are identified, and then percentage probabilities are assigned to each of the outcomes.  For each outcome, the percentage

---

[23] *See* Stipulation Regarding Use of Examiner's Report At The Confirmation Hearing [D.I. 7423].
[24] David P. Hoffer, Decision Analysis as a Mediator's Tool, 1 HARV. NEGOT. L. REV. 113, 134 (Spring 1996).

probability is multiplied by the dollar-value of the outcome, and the sum of these weighted-probability outcomes is the total expected value of the litigation. [25]

108.    Decision-tree analysis is commonly used by courts to assess the reasonableness of settlements. For example, it is often recognized that the process of approving class-action settlements under Federal Rule of Civil Procedure 23 directly parallels the inquiry required under Bankruptcy Rule 9019. [26] And in Rule 23 class action settlement cases, courts have regularly concluded that a "settlement for less than the net expected value of continued litigation . . . would not be adequate." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3.d 277, 284-85 (7th Cir. 2002); *see also LaChance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997) ("a settlement is fair to the plaintiffs in a substantive sense . . . if it give them the expected value of their claim if it went to trial."). In fact, the Third Circuit has expressly held that "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement" when evaluating whether a settlement is fair, reasonable, and adequate. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995).

109.    The Third Circuit is not alone in this regard. In *Reynolds v. Beneficial Nat'l Bank*, for instance, the Seventh Circuit reversed the district court's approval of a class settlement that was less than the net expected value of the pending litigation. 288 F.3d 277, 285 (7th Cir.

---

[25] With the facts narrowed and the potential outcomes identified by legal analysis, it is possible to use economic analysis to graphically depict and value various scenarios in a litigated case. . . . After the potential outcomes are identified and the probabilities are assigned, we do some basic arithmetic to determine [the "net expected value," or "NEV,"] for each outcome (the product of multiplying the outcome by its probability. Donald R. Philbin, The Value of Economic Analysis in Preparing For Mediation, 63 DRJ 49, 50 (Feb-Apr 2008).

[26] *See, e.g., In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984) (recognizing that a Rule 9019 inquiry "should parallel that contemplated by Rules 23 and 23.1 of the Federal Rules of Civil Procedure, pursuant to which courts are called upon to consider settlement of a class or derivative action."); *In re Adirondack Ry. Corp.*, 95 B.R. 867, 873 (N.D.N.Y. 1988) (agreeing that the court in *Carla Leather* "accurately analogized the bankruptcy court's review of a settlement to court consideration of a class or derivative action pursuant to [Rules 23 and 23.1]").

2002). In doing so, Judge Posner explained the proper inquiry for evaluating, and the rationale

for rejecting, a proposed settlement that is less than the expected value:

> [A] settlement for less than [the expected value] would not be adequate.
> Determining that value would require estimating the range of possible
> outcomes and ascribing a probability to each point on the range . . . .
> Some arbitrary figures will indicate the nature of the analysis that we are
> envisaging. Suppose a high recovery were estimated at $5 billion,
> medium at $200 million, low at $10 million. Suppose the midpoint of the
> percentage estimates for the probability of victory at trial was .5% for the
> high, 20% for the medium, and 30% for the low (and thus 49.5% for zero).
> Then the net expected value of the litigation, before discounting, would be
> $68 million; discounting, depending on an estimate of the likely duration
> of the litigation, would bring this figure down, though probably not to $25
> million — and any discounting might be inappropriate, as we explained.

*Id.*; *see also In re Gen. Motors Corp.*, 55 F.3d at 806 (explaining that likelihood-of-success

inquiry under Rule 23 "attempts to measure the expected value of litigating the action rather than

settling it at the current time.").

110.    Here, the Examiner Report's many legal and factual findings are well suited for

decision-tree analysis. Following an exhaustive investigation that included the review of more

than 3 million pages of documents and 38 interviews of case-critical witnesses, the Examiner

submitted a 1,200-plus page report, which identified dozens of legal issues relating to each of the

LBO-Related Causes of Action. The Examiner described each of his conclusions consistently in

a range of seven assessments, from "highly likely" (the strongest likelihood in his report) to

"highly unlikely" (the lowest likelihood assessment in his report). As an example, the Examiner

concluded that it was "highly likely" that a court would hold that the Debtors received less than

reasonably equivalent value at Step Two.[27]

111.    Each one of these Examiner's assessments can be ascribed a percentage

probability. With these probabilities, standard decision-tree analysis can be performed to

---

[27] Examiner's Report, Vol. II at 90.

determine, using the Examiner's conclusions, the probability that the LBO-Related Cause of Action against the LBO Lenders would be successful, and thus the expected dollar-value of litigating those causes of action. The probability-weighted value of litigating the claims can then be compared to the Proposed Settlement.

112. The Noteholder Plan Proponents' expert, Dr. Beron, 

113.



- Redacted;
- Redacted;
- Redacted
- Redacted
- Redacted

This scenario has a 7% overall probability of occurring, and would provide a *full* recovery for the Noteholders. Dr. Beron weighted this 7% outcome of full recovery with the 47 other recovery outcomes, using their respective percentage probabilities, and calculated the total weighted-probability value of litigating the LBO-Related Causes of Action.

114. Redacted



[29] Redacted

[29] Redacted
Redacted

*See Reynolds,* 288 F.3d at 285; *LaChance,* 965 F.Supp at 638; *In re Gen. Motors,* 55 F.3d at 806.

Redacted

Redacted [30]

Redacted

115. Redacted

Redacted

Redacted

[30] See Expert Report of Bruce Beron, at 11-12; App. B.4.

Redacted

**Redacted**

[32]

116. For this reason alone, rejection of the Proposed Settlement is warranted, especially since doing so would be based solely on the independent findings of the court-appointed Examiner.

### 2. The DEV upon which the DCL Plan is Premised is Further Evidence that the Proposed Settlement is Unreasonable

117. The DCL Plan is premised upon a DEV of $6.75 billion. In support, the Debtors have submitted the expert report of their financial advisor, Lazard (the "Lazard Report"), together with a second expert report of a former Lazard banker, John Chachas, **Redacted** **Redacted** With the correction of just a few demonstrably wrong assumptions and errors in applying basic valuation methodology in the Lazard Report, however, it is apparent that the DEV is in fact substantially higher than the DCL Plan value.

118. **Redacted**

**Redacted**

- **Redacted**

- **Redacted**

- **Redacted**

---

[32] Beron Report at 18.

- [Redacted]

119.    In addition to being stale and outdated, Lazard's Report is [Redacted]

[Redacted]

[Redacted]

120.    Among the most basic principles of accepted valuation practice is that experts rely in their analysis upon the most recently available market information, and the most up-to-date actual performance history and projections of the company being valued. As will be demonstrated through the cross-examination of Lazard and the presentation of evidence at the Confirmation Hearing, the DCL Plan Proponents' decision to present this Court with a stale and outdated valuation is motivated by a desire to preserve the billion dollar *plus* upside of the Debtors' improving fortunes and the substantial improvement in market conditions solely for the benefit of the Senior Lenders – primarily DCL Plan Proponents Angelo Gordon, Oaktree and JPMorgan who, collectively, own over 31% of the Step One Lender Claims and over 71% of the Step Two Lender Claims [Redacted]

[Redacted]

[Redacted]

121.    Three key consequences flow from the Debtors' material under valuation of DEV, and further demonstrate that the Proposed Settlement is unreasonable in light of the strength of the LBO-Related Causes of Action against the LBO Lender, and the artificially low settlement consideration provided to Non-LBO Creditors, primarily the Senior Noteholders and holders of PHONES Notes.

122.    First, if the LBO-Related Causes of Action against the LBO Lenders are prosecuted, there is a very high probability that at least Step Two will be found to be an

intentional or constructive fraudulent transfer. The Noteholder Plan Proponents maintain that if Step Two is avoided but Step One is not, the Non-LBO Creditors (and not the Step One Lenders) at both Tribune and the Guarantor Debtors (and not the Step One Lenders) would receive the benefits both of the avoidance of the Step Two claims and all associated disgorgement recoveries. *See* Examiner Report, Vol. 2 at 302-303 (discussing equitable estoppel and assumption of risk). The DCL Plan Proponents disagree and maintain that a low settlement is warranted because even if the Step Two obligations are avoided, there will be no benefits to the Non-LBO Creditors at Tribune from avoidance at the Guarantor Debtors, and little benefit at the Tribune level, because the Step One Lenders, who are not being paid the full amount of their allowed claims under the DCL Plan, would be entitled to participate in the value that otherwise would have gone to the Step Two Lenders and any disgorgement recovered on account of payments to holders of Step Two Debt. Critically, as the Debtors' DEV rises, any defense of the settlement on this ground becomes untenable.

| Noteholder Recoveries as a Percentage of Claim[33] | | | | | | |
|---|---|---|---|---|---|---|
| Distributable Enterprise Value (DEV) | Natural Waterfall Recovery | | DCL Plan Recovery | | Natural Waterfall Recovery if Step Two is Avoided[34] | |
| | Senior Notes | PHONES Notes | Senior Notes | PHONES Notes | Senior Notes | PHONES Notes |
| $6,750 | 4.8% | 0% | 33.59% | 0% | 26.4% | 0% |
| $6,900 | 4.9% | 0% | 33.59% | 0% | 37.5% | 0% |
| $7,050 | 5.0% | 0% | 33.59% | 0% | 48.5% | 0% |
| $7,200 | 5.1% | 0% | 33.59% | 0% | 59.6% | 0% |
| $7,350 | 5.2% | 0% | 33.59% | 0% | 70.6% | 0% |
| $7,500 | 5.3% | 0% | 33.59% | 0% | 81.7% | 0% |
| $7,650 | 5.4% | 0% | 33.59% | 0% | 92.7% | 0% |
| $7,800 | 5.6% | 0% | 33.59% | 0% | 100.0% | 6.9% |
| $7,950 | 5.7% | 0% | 33.59% | 0% | 100.0% | 27.0% |
| $8,100 | 5.8% | 0% | 33.59% | 0% | 100.0% | 47.2% |
| $8,250 | 5.9% | 0% | 33.59% | 0% | 100.0% | 67.3% |
| $8,400 | 6.0% | 0% | 33.59% | 0% | 100.0% | 87.4% |
| $8,550 | 6.1% | 0% | 33.59% | 0% | 100.0% | 100.0% |
| $8,700 | 6.2% | 0% | 33.59% | 0% | 100.0% | 100.0% |
| $8,850 | 6.3% | 0% | 33.59% | 0% | 100.0% | 100.0% |
| $9,000 | 6.4% | 0% | 33.59% | 0% | 100.0% | 100.0% |

123.     Assuming, *arguendo*, Step Two is avoided but Step One is not, as shown in the above chart, if DEV is found to be just $150 million higher than the DCL Plan provides and then the Step One Lenders (and General Unsecured at the Subsidiary Debtors) would be paid in full and enough value would remain to pay the Senior Noteholders materially in excess of the DCL Proposed Settlement. At a $7.5 billion DEV, Step One Lenders are paid in full and the Senior Notes receive 81.7% of their claims (putting holders of PHONES Notes close to a recovery on account of their Litigation Trust Interests). At a $7.95 billion DEV, Step One Lenders are paid in full and PHONES Notes will receive an initial distribution from the prosecution of the LBO-Related Causes of Action. This is true even if one assumes the DCL Plan Proponents are correct

---

[33] The table assumes no postpetition interest because there is no one subsidiary that is solvent as evidenced by, among other things, the magnitude of intercompany claims that cannot be satisfied in full.
[34] Assumes disgorgement of Step Two fees, costs and expenses.

that Step One Lenders would receive the benefits of both the avoidance and disgorgement at Step Two (a proposition with which the Noteholder Plan Proponents vigorously disagree. [Redacted]

124. Second, it cannot be denied that as the Debtors' DEV increases, so do the natural waterfall recoveries due to the Non-LBO Creditors independent of any settlement. The increase in these recoveries at certain reasonable DEV estimates is shown in the above chart. Incredibly, as the Debtors' DEV goes up, the total amount to be distributed to the Non-LBO Creditors under the DCL Plan *remains unchanged*, given that the DCL Plan pays them in cash, not New Common Stock like the Senior Lenders. Consequently, as the Debtors' value goes up, the settlement consideration being paid for the proposed release of LBO-Related Causes of Action continues to decline, as it has since the April Plan.

125. Finally, as a corollary of the above chart, based on the fact that Senior Lenders are receiving 100% of the New Common Stock, it is painfully obvious that as the Debtors' DEV increases under the DCL Plan, the recoveries to be enjoyed by the Senior Lenders on their claims increase to 80%, 90% and even par, their haircut to settle the claims declines, while the Senior Noteholders' recovery remains a dismal 33.59% and 0% for the holders of PHONES Notes.

3. The Fraudulent Transfer LBO-Related Causes Of Action At Both Step One And Step Two Have A Very High Likelihood Of Success

126. The first Martin factor—likelihood of success—also weights against approval of the Proposed Settlement because it releases valuable fraudulent transfer claims that are likely to prevail on the merits and successfully avoid the Step One and Step Two debt obligations.

58

a.       ██████████ Redacted ██████████

127.    With respect to evaluating the likelihood of success of the LBO-Related Causes of Action, ██████████ Redacted ██████████ Bankruptcy courts have rejected compromises that settled causes of action that, based on an expert's expected value calculations, had a better than 50% chance of success. The Court should do the same here. ██Redacted██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

128.    For instance, in *Cames v. Joiner (In re Joiner)*, a Chapter 7 trustee commenced an avoidance action to recover certain estate property. 319 B.R. 903, 905-06 (Bankr. M.D. Ga. 2004). Shortly thereafter, the debtor and the trustee reached and sought court approval of a compromise that would "return a dividend of approximately 38%" to unsecured creditors. *Id.* at 906. However, unsecured creditors holding more than 60% of the unsecured claims objected that the settlement was unreasonable because, according to an analysis performed by their expert witness, the trustee "ha[d] better than a 50 percent chance of prevailing" in the litigation, and "[i]f here were successful . . . the unsecured creditors would receive a 100 percent dividend including post-petition interest." *Id.* at 906-07. The Bankruptcy Court for the Middle District of Georgia agreed that the settlement was unreasonable and refused to approve it. *Id.* at 909. In so doing, ***the court held that "when there is [greater than 50%] chance of success in a case that will result in a 100 percent payout, settling the case for what amounts to less than a 40% dividend over the objection of the parties with the most to lose is not reasonable."*** *Id.*

129.    Similarly, in *In re Revelle*, a Chapter 13 trustee investigated a potential avoidance action to recover certain estate property. 256 B.R. 905-06 (Bankr. M.D. Ga. 2004). Before the

action was commenced, however, the Debtor and the trustee reached and sought court approval of a compromise that returned a dividend to unsecured creditors of "no more than 69 percent of their allowed claims" before payment of administrative expenses. *Id.* at 912. However, unsecured creditors holding more than 50% of the unsecured claims objected that the settlement was unreasonable because "if they or the . . . trustee were successful in bringing a fraudulent conveyance action . . . they would be paid in full . . . and would be able to collect on any judgment they receive." *Id.* The Bankruptcy Court for the Western District of Missouri agreed that the settlement was unreasonable and refused to approve it. *Id.* at 913. In so doing, the court found that the creditors and/or the trustee "ha[d] a substantial probability of prevailing in the fraudulent transfer litigation," and "ha[d] a substantial probability of recovering 100 percent of their allowed claims." *Id.* Because the objecting creditors had "a substantial basis" to "believe that in contested litigation they w[ould] ultimately prevail and be paid 100 percent," and even "[we]re prepared to walk away from as much as 69 percent payout," the court concluded that "they should be allowed their day in court." *Id.*

130.    Based solely on the Examiner's independent findings, this Court can reach the same result with Dr. Beron's analysis. ████████ Redacted ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Expert Report of

Bruce Beron, at 12. ████████ Redacted ████████

████████

Redacted

131. Redacted

[Redacted]

[Redacted]

[Redacted]

[Redacted]

[35] [Redacted]

[Redacted]

[Redacted]

[Redacted] [37]

132. Redacted

[Redacted]

[Redacted]

[Redacted]

[Redacted]

[Redacted]

[Redacted]

[Redacted] Expert Report of Bruce Beron, at 6 Table 2. Redacted

[35] Expert Report of Bruce Beron, at 11–12,; *id.* App. B.4.
[36] *Id.*
[37] *Id.* at 12–14; *id.* App. B.4.

Redacted

133. That the Proposed Settlement so grossly underestimates the Non-LBO Creditors' likelihood of success on the merits, alone, is sufficient reason to reject it. Therefore, the Court should reject the Proposed Settlement as unfair and unreasonable—a result that would be entirely consistent with how courts generally treat settlements that under-compensate for a better-than 50% chance recovering payment in full.

134. Significantly, the eight so-called "Recovery Scenarios" in the Examiner's Report do not suggest a different result. Examiner's Report, Vol. 2, Annex B. According to the Examiner, these scenarios "evaluate and quantify recoveries to the estates of the Tribune Entities according to eight different cases." *Id.* Annex B at B-1. They are, however, deficient for a number of reasons. First, the Examiner omits a number of valuable scenarios from the eight he identifies in the Examiner's Report. Indeed, the eight Examiner Recovery Scenarios represent only a tiny fraction of the potential litigation outcomes that could result from prosecution of the LBO-Related Causes of Action.

135. Second, the Examiner's eight scenarios fail to sufficiently account for several statistically relevant remedies that would result in a *full recovery* for the Non-LBO Creditors. For instance, according to the Examiner, the scenarios "only address the effect of fraudulent transfer actions on creditor recoveries," and "do not take into account the potential effect on

recoveries" resulting from equitable subordination or disallowance. Examiner's Report, Annex B at B-1. Likewise, the Examiner concluded that there is a 50% likelihood that, "under equitable estoppel [or] other theory, the LBO Lender[s] may not be entitled to share in recoveries on Step One Debt from Step Two avoidance and recoveries, even though the Step One Debt is not avoided."[38] However, only one of the Examiner's Recovery Scenarios accounts for this possibility. *Id.* App. B.5.

136.    Third, the Examiner's eight Recovery Scenarios Recovery bear almost no statistical relation whatsoever to the Examiner's own conclusions regarding which litigation outcomes are likely to occur. ████████ Redacted ████████ ████████ Redacted ████████ . *Id.* at 10-11; *Id.* App B-3. Yet only three Examiner Recovery Scenarios are based on this more-likely-than-not litigation outcome. Similarly, ████████ Redacted ████████ ████████ yet only five Examiner Recovery Scenarios take this near-certain litigation outcome into account. Finally, while just three Recovery Scenarios are based on the scenario in which *both* the Step One *and* Step Two debt obligations are avoided, ████████ Redacted ████████ *Id.*

**b.    The Step One and Step Two Financings Are Subject to Avoidance as *Intentional* Fraudulent Conveyances.**

137.    Section 548 of the Bankruptcy Code provides that a transfer can be avoided if the transferor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted . . . ." 11 U.S.C. § 548 (a)(1)(A). In determining whether a corporation had the requisite knowledge and intent, courts

---

[38] Examiner's Report, Annex B at B-8 ("As discussed in the Report, the Examiner considered the possibility that a court may determine that, under equitable estoppel other theory, the LBO Lender may not be entitled to share in recoveries on Step One Debt from Step Two avoidance and recoveries, even though the Step One Debt is not avoided. The Report leaves this question in equipoise.").