look to the knowledge and intent of the corporation's directors, officers, and other agents who act for the corporation. *See In re Pers. & Bus. Ins. Agency*, 334 F.3d 239, 242-43 (3d Cir. 2003) (reversing the district court's dismissal of intentional fraudulent conveyance claim based on analysis of officer's conduct); *In re James River Coal Co.*, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007) (stating that "for the purpose of recovering impermissibly transferred corporate assets and thereby facilitating creditor recovery, the intent of the officers and directors may be imputed to the corporation"); *In re Anchorage Marina, Inc.*, 93 B.R. 686, 691 (Bankr. D.N.D. 1988) (noting that "where the Debtor is a corporation the intent of the controlling officers and directors is presumed to be the Debtor's intent").

138.     Although the intention and knowledge of a debtor is at the heart of such claims, the law is well-settled that proof of genuine fraud is not required. Instead, the plaintiff need only demonstrate "[a] general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent [to defraud]." *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 504 (N.D. Ill. 1988) (citing *Freehling v. Nielson (In re F & C Servs.)*, 44 B.R. 863, 872 (Bankr. Fla. 1984)); *see also Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 213-14 (3d Cir. 1990). Further, because "[d]irect evidence of fraudulent intent . . . is often unavailable and courts usually rely on circumstantial evidence, including the circumstances of the transaction, to infer fraudulent intent," in evaluating the transferor's actions, courts have looked to various "badges of fraud" that include: (1) the relationship between the debtor and the transferee; (2) consideration for conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor; and (6) secrecy or concealment of the transaction. *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re*

*Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 550-51 (D. Del. 2005), *aff'd*, 278 Fed. Appx. 125 (3d Cir. 2008). Importantly, however, it is not necessary for an estate representative to show all of these badges of fraud (or any one in particular) to prove fraudulent intent. *See Geltzer v. Artists Mktg. Corp. (In re Cassandra Grp.)*, 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (upholding an actual fraud claim under the state law based on the presence of only one badge of fraud: inadequate consideration).

139.    It is well recognized that a leveraged buyout transaction or other "general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent [to defraud]." *Voest-Alpine*, 919 F.2d at 213-14; *see also ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 370-71 (S.D. Tex. 2008); *Wieboldt*, 94 B.R. at 504 (N.D. Ill. 1988); *Dorocke v. Farrington*, 193 N.E.2d 593, 596 (Ill. App. Ct. 1963). In the context of leveraged buyouts, the "badges of fraud" analysis is supplemented with a determination of the "natural consequence" of the debtor's actions. *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d Cir. 1986) (affirming avoidance of LBO transactions as intentionally fraudulent transfers). If the "natural consequence" of the debtor's actions is that its creditors will be hindered, delayed, or defrauded, the court will find that an intentional fraudulent transfer occurred. *See id.*; *see also Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1075 (3d Cir. 1992) ("In *Tabor Court Realty Corp.*, we relied in part on the principle that 'a party is deemed to have intended the natural consequences of his acts' in upholding the district court's finding of intentional fraud."); *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (holding that complaint adequately alleged intentional fraudulent transfer where "Trustee alleges that the Defendants were aware of the creditors' claims and that the LBO would leave the Debtor with too much debt, making it unable to pay those claims").

*(1)     The Step One Financing is Avoidable as an Intentional Fraudulent Conveyance*

140.     Here, the Lender Complaint alleges that Step One and Step Two were both intentional fraudulent transfer. The evidence adduced by the Examiner, coupled with evidence obtained in discovery, demonstrates that the Step One financing bore several badges of fraud:

- The main beneficiaries of Step One were the Step One Selling Stockholders— many of whom were the very members of Tribune's management who orchestrated the LBO.[39] Accordingly, the first badge of fraud – "a close relationship among the parties to the transaction" – could not be more evident. The parties to the LBO were not merely close. In certain important respects, they were identical.

- No reasonably equivalent value provided. The Examiner concluded that the Debtors did not receive reasonably equivalent value for their participation in Step One.[40]

- Tribune's management provided VRC with unrealistic projections in order to manipulate VRC's solvency analysis. Management knew that its projections were unsound and materially out of date, but failed to rectify them and failed to notify VRC of its defective projections.[41]

- Tribune's advisors and management knew, or certainly should have known, that the value VRC was attributing to Tribune for purposes of preparing the VRC Step One Solvency Opinion was significantly inflated. Indeed, a March 30, 2007 presentation prepared by Merrill Lynch and Citigroup in their capacity as advisors to the Board shows that Merrill and Citigroup valued Tribune's equity to be between $26.58 - $33.00 per share, with a midpoint value of $29.79.[42] VRC, by contrast, concluded that the company's total enterprise value was $15.147 billion, which translated to an implied per share value of $41.51 – *approximately $10.00 more* than the midpoint of the per share values calculated by Morgan Stanley and Citibank for the exact same time frame. [43]

---

[39] *See* Examiner's Report Volume I at 435-438.

[40] *See id.* at 19.

[41] *See* Examiner's Report Volume II at 54; VRC0005506-678 at VRC0005507; TRB0149983-150012 at TRB0149992; TRB0149983-150012 at TRB0149992; MS00000001-38 at MS00000012-15.

[42] *See* Confidential Discussion Materials Prepared for Committee of Independent Directors of the Board of Directors of Tribune dated March 30, 2007 prepared by Merrill Lynch and Citigroup at 14.

[43] *See* Tribune Company Solvency Opinion Analysis dated May 9, 2007 prepared by VRC at 10.

141.    The Examiner identified several different badges of fraud at Step Two and, on

that basis, concluded that the Step Two Financing is "somewhat likely" to be avoided as an

intentional fraudulent conveyance.[44] The badges of fraud identified by the Examiner at Step Two

– which have subsequently been confirmed in discovery – include the following:

- <u>No reasonably equivalent value provided</u>.  The Step Two Financing gave the Debtors "far less than reasonably equivalent value for the obligations incurred and payments made."[45]

- <u>Tribune's management manipulated the information it gave to VRC—information that was essential to VRC's issuance of the solvency opinion required to close Step Two</u>.  Before issuing its solvency certificate, VRC became concerned about certain debt payments that were due from Tribune in 2014.  Tribune executives then represented to VRC that Morgan Stanley had told Tribune that it would be able to refinance its debt load in 2014, even though Morgan Stanley *made no such representations*.[46]  VRC accepted, and based its solvency certification on, these misrepresentations.[47]

- <u>Management's October 2007 projections were skewed and unrealistic</u>.  In October 2007, Tribune prepared its projections for 2010-2015 (the "<u>October 2007 Management Projections</u>").  The October 2007 Management Projections rested on a deeply flawed premise that the growth rate in 2011-2012 (an election year during which time high growth rates are expected) would be identical to the growth rate during 2013-2017 (years without elections during which time high growth rates should not be expected).[48]  As a result, the October 2007 Management Projections predicted an annual growth rate as high as 2.4% for 2013-2017, which was in stark contrast to the growth rate of only 0.47% that management had predicted in February 2007.[49]  VRC then relied on the defective October 2007 Management Projections to perform its solvency analysis and issue the solvency certificate that was required to close Step Two.[50]  Further, in order to offset a deterioration in Tribune's traditional business lines, management inflated

---

[44] Examiner's Report Volume II at 32 ("A court is somewhat likely to find that the Tribune Entities incurred the obligations and made the transfers in the Step Two Transactions with actual intent to hinder, delay, or defraud creditors to which the Tribune Entities were or became liable . . . .").

[45] *Id.* Volume II at 35.

[46] *Id.* at 36-38, 40-42.

[47] *Id.* at 43.

[48] *Id.* at 54-55.

[49] *Id.*

[50] *Id.* at 55-56.

projections with respect to its "interactive businesses," knowing that VRC would not critically analyze its projections.[51]

- <u>Tribune's Board turned a blind eye to each of the foregoing badges of fraud.</u> The Tribune Board should have known that (i) management projections were unreliable, (ii) those unreliable projections formed the basis of VRC's Step Two solvency opinion, (iii) VRC's solvency opinion rested on non-standard valuation methods, and (iv) Tribune's financial condition had seriously deteriorated by December 2007.[52]

142.    The "natural consequence" of the above-mentioned badges of fraud was the Debtors' plunge into bankruptcy. Accordingly, based on the foregoing authorities and facts identified by the Examiner and obtained in discovery, the intentional fraudulent conveyance claims at Step Two have a high likelihood of success.

> (3)    *The Contemporaneous Valuations of the Debtors' Own Advisors Show that the LBO Rendered the Company Insolvent, and Thus Show the Fraudulent Transfer Was Intentional*

143.    

---

[51] *Id.* at 59-63.
[52] *Id.* at 72-74.
[53]

144. 

145. **Redacted**

c. ***The Step One And Step Two Financings Are Also Avoidable As Constructively Fraudulent***

146.    The Step One and Two transfers and obligations are also avoidable as constructive fraudulent transfers.  Section 548 of the Bankruptcy Code deems constructively

---

[54] **Redacted**

[55] Tribune Company Solvency Opinion Analysis dated May 9, 2007 prepared by VRC at 10.

fraudulent—and, therefore, avoidable—any "transfer of an interest of the debtor in property" or

"any obligation . . . incurred by the debtor" that was "made" or "incurred" within two years

before the petition date if, in pertinent part, (i) the debtor received "less than reasonably

equivalent value in exchange" for such transfer or obligation; and (ii) either (I) the debtor "was

insolvent on the date th[e] transfer was made or [the] obligation was incurred," or "became

insolvent as a result," (II) the debtor was, or was about to be, engaged in a business or

transaction for which the debtor's remaining property was "an unreasonably small capital," or

(III) the debtor actually "intended to," or merely "believed that" it would, incur debts that

"would be beyond [its] ability to pay" upon maturity. 11 U.S.C. § 548(a)(1)(B).

147. The Third Circuit has established a two-step process for performing a "reasonably

equivalent value" analysis. *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment*

*to Freuhauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212

(3d Cir. 2006)  First, the court must make a threshold determination as to whether the debtor

received, either directly or indirectly, "any value at all" from the transfer. *Id.* In making this

determination, the court must consider whether, "based on the circumstances that existed at the

time of the transfer," it was "legitimate and reasonable" to expect that some "economic benefit"

or "realizable commercial value" would accrue to the debtor. *Id.; Mellon Bank, N.A. v. Official*

*Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 148-49 (3d Cir. 1996).  Second,

if the bankruptcy court initially finds that the debtor "gained at least some value as a result of the

transfer," the court must evaluate "whether the debtor got roughly the value it gave." *In re*

*Fruehauf Trailer Corp.*, 444 F.3d at 212-13. To make this assessment, the court must look to the

"totality of the circumstances," including, (i) the fair market value of the benefit received by the

debtor, (ii) the existence of an arm's-length relationship between the debtor and the transferee, and (iii) the transferee's good faith. *Id.*

148.     To avoid a transfer or obligation as a constructive fraudulent conveyance, the party challenging the transaction must also plead and prove that the debtor either: (1) "was insolvent on the date th[e] transfer was made or [the] obligation was incurred," or "became insolvent as a result"; (2) was, or was about to be, engaged in a business or transaction for which debtor's remaining property was "an unreasonably small capital"; or (3) actually "intended to," or "believed that" it would, incur debts that "would be beyond [its] ability to pay" upon maturity. 11 U.S.C. §§ 548(a)(1)(B)(ii)(I)-(III).

        (1)    *The Debtors Clearly Did Not Receive Reasonably Equivalent Value From the LBO Transaction at Either Step One or Step Two*

149.     For each of Step One and Step Two, the Debtors did not receive reasonably equivalent value for the LBO Transaction. Typically, leveraged buyouts like the one here are effected through a series of separate transactions, which by themselves may not lack reasonably equivalent value but which, when combined and considered as a whole, cannot be deemed to have provided the debtor with reasonably equivalent value.

150.     Courts can and generally do "collapse" multiple transfers involved in an integrated transaction like a leveraged buyout for purposes of analyzing whether the debtor received reasonably equivalent value. *See Tabor Court Realty Corp.*, 803 F.2d at 1302-03. As the Third Circuit held in *Tabor Court Realty Corp.*, when a series of transactions are part of "one integrated transaction," courts may look "beyond the exchange of funds" and "collapse" the individual transactions of a leveraged buyout. *Id.* at 1302. In fact, the collapsing approach "finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent[.]" *HBE Leasing Corp. v. Frank*, 48 F.3d 623,

635 (2d Cir. 1995). In such cases, leveraged buyout financing is routinely "collapsed" with the transactions pursuant to which the target is acquired. *See, e.g., United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556 (M.D. Pa. 1983), *aff'd sub nom., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (collapsing an LBO for fraudulent transfer analysis).

151.     As a result, for each of Step One and Step Two, the incurrence of debt and guaranty obligations in exchange for the loans provided by the LBO Lenders must be collapsed with the payment of cash to Tribune's shareholders when assessing reasonable equivalent value. When these transfers are collapsed within each of Step One and Two, it is clear that the Debtors did not receive any reasonably equivalent value for either step. Indeed, courts have regularly concluded that a company does not receive any benefit, let alone "reasonably equivalent value," when it repurchases its own stock as part of a leveraged buyout. *See, e.g., Wieboldt*, 94 B.R. at 505 (in refusing to dismiss fraudulent transfer action against controlling shareholders, officers and directors of target company, as well as lenders involved in LBO where the loan proceeds were used to pay the selling shareholders for their stock, court held that receipt of 99% of its outstanding stock from shareholders "was virtually worthless" to target company).

152.     The Examiner reached the same conclusions. He found that it was "highly likely" that a court would collapse these transfers *within* each of Step One and Step Two, Examiner's Report, Vol. 2 at 77, and that it was "highly likely" that a court would find that, in the aggregate, the Tribune Entities did not receive reasonably equivalent value for each of Step One and Step Two. *Id.* at 90.

>           (2)     *All Three Financial Conditions Under Section*
>                   *548(a)(1)(B)(ii) are Easily Satisfied for Both Step One and*
>                   *Step Two*

153.     Having established the lack of reasonably equivalent value for both Step One and Step Two, the next analysis is whether the Debtors satisfy any one of the three financial

condition tests of section 548(a)(1)(B)(ii). The Debtors clearly satisfy each of these tests given the facts brought to light in discovery, the Examiner's findings, and the compelling Expert Report of Ralph Tuliano (the "Tuliano Report"), the solvency expert for the Noteholder Plan Proponents.

      (a)     The Debtors' Projections Were a Sham and Should Not be Used to Assess the Debtors' Financial Condition at Step One or Step Two

154.     In assessing the three financial condition tests, the financial projections created by the Debtors' management at the time and ultimately relied upon by VRC in issuing its solvency opinions warrant no deference whatsoever from this Court. Indeed, as the Noteholder Plan Proponents will prove at the Confirmation Hearing, these management projections were at all times a self-serving sham. Accordingly, they should not be used in determining the Debtors' financial condition at the time of the LBO Transaction. *See, e.g., In re Yellowstone Mountain Club*, 436 B.R. 598, 646-647 (Bankr. D. Mont. 2010); *In re O'Day Corp.*, 126 B.R. 370 (Bankr. D. Mass. 1991).

155.     For a court to rely on management's projections, the projections must have been reasonable when made. *See Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids)*, 381 B.R. 535, 544-45 (Bankr. D. Del. 2002); *In re Morse Tool*, 148 B.R. 97, 133 (Bankr. D. Mass. 1992); *In re Plassein Int'l Corp.*, No. 03-11489, 2008 WL 1990315, at *8 (Bankr. D. Del. May 5, 2008). "Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance." *In re Morse Tool*, 148 B.R. at 133. In testing management projections, a court must "determine[] whether the debtor's belief that [] future event[s] would occur" was justifiable. *In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996) (applying the balance sheet solvency test); *In re O'Day Corp.*, 126 B.R. 370, 404 (D. Mass. 1991) (stating that in determining whether an LBO left an entity undercapitalized, the role

of the court was to determine "whether the projections employed prior to the LBO were prudent"). "The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising liabilities) [of the debtor] to reflect the debtor's true financial condition at the time of the alleged [fraudulent] transfers." *Id.*

156.    To be reasonable and reliable, management projections must be based on the company's actual historical performance. Projections that deviate from the company's historical performance cannot form the basis of a court's solvency or capitalization analysis. *See In re O'Day Corp.*, 126 B.R. 370, 406 (Bankr. D. Mass. 1991) (rejecting management projections because, inter alia, there existed "unwarranted deviation[s] between projected data and actual historical figures"); *In re Yellowstone Mountain Club*, 436 B.R. 598, 646-647 (Bankr. D. Mont. 2010) (rejecting experts' solvency, cash flow and capitalization analyses because the analyses uncritically "relied on [] management's over-inflated cash flow projections" and ignored the fact that the "[d]ebtors' actual historical financial performance did not support [the] [d]ebtor's future projections"). Courts should be especially skeptical of relying on projections made by a management team that has a track record of producing inaccurate projections. *See In re Lids*, 281 B.R. at 544-45 (rejecting experts' analysis based on management projections because the debtor had "consistently failed to meet its projections").

157.    Moreover, management cannot simply make financial projections and continue to blindly rely on them in the face of new and contrary data. A critical part of the reasonableness of management's projections rests on management updating those projections as new information develops. *See In re O'Day*, 126 B.R. at 406. Where a management team fails to update its projections, those projections are of no utility in a solvency or adequate capitalization analysis. *See In re O'Day*, 406 (a failure to use up-to-date information in rendering projections and a

failure to update those projections "prior to the closing of [the allegedly fraudulent transfer-engendering] LBO" with information about unfavorable factors renders those projections unreliable); *In re Pleissein Int'l*, 2008 WL 1990315, at *9-10 (holding that management's failure to update its projections between two phases of an LBO process raised a question as to the reasonableness and prudence of the projections); *see also In re Morse Tools*, 148 B.R. at 122-25, 133 (finding that management's inadvertent failure to impound into its projections newly available information relating to the debtor's inability to increase prices undermined the projections' utility in the court's capitalization analysis); *cf. In re Greater Southeast Community Hosp. Corp. I*, No. 02-02250, 2008 WL 2037592, at *31 (Bankr. D.D.C.) (rejecting an independent consultants' earnings projections because the projections did not "take into account the massive downturn in revenue that occurred…prior to the sale" and were thus too "hopelessly outdated" to inform a solvency analysis).

158.    Finally, beyond the reasonableness of the substance of management projections, the actual process by which the projections were created bears scrutiny. If that process is infected by bias or a lack of diligence, courts should refuse to rely on company projections. *See, e.g., In re Pleissein Int'l*, 2008 WL 1990315, at *9-10 (holding that evidence that members of the debtor's management team and its lender were questioning the projections undermined the utility of those projections in the court's solvency analysis).

159.    Redacted

**Redacted**

**Redacted**

> (i)  The February 2007 Management Projections used for the Step One Financing were Not Reasonable

160.  There are a number of reasons why the February 2007 Management Projections were not reasonable at the time. **Redacted**

**Redacted** [56] **Redacted**

**Redacted** [57]

**Redacted**

**Redacted** [58] **Redacted**

**Redacted**

**Redacted**

**Redacted** [59] These changes were structural, not cyclical, and represented a fundamental shift of advertising away from print media.

161.  Second, six newspapers which accounted for more than 91% of Tribune's publishing business—the *Los Angeles Times, Chicago Tribune, South Florida Sun-Sentinel, Orlando Sentinel, Newsday,* and *Baltimore Sun*—were performing so poorly in 2007 that no reasonable forecast would have been optimistic about their future. **Redacted**

---

[56] See the Tuliano Report at 25.
[57] *Id.* at 4.
[58] *Id.* at 25.
[59] *Id.* at 28.

Redacted

162. Redacted

---

[60] See Tuliano Report at 66, Fig. 13.
[61] Id at 72.
[62] See Tuliano Report at 67-71, Table 5, Figs. 14-16.
[63] *Id.* at 72.

163.     Redacted

[64]

164.     Redacted

[64] See Tuliano Report at 73.



165.    Redacted



166.    Redacted

---

[65] See Tuliano Report at 75-77, Figs. 19-21.
[66] *Id*. at 43-47.

79

Redacted

Redacted [67] Redacted

Redacted

Redacted

(ii)    As the Examiner found, the October 2007 Management Projections for the Step Two Financing were too optimistic

167.    Although the October 2007 Management Projections reflected a decline in Tribune's expected financial performance relative to the February 2007 Management Projections, these later projections were still excessively optimistic, and presented an unreasonable expectation for Tribune's financial performance after the LBO Transaction, as depicted in the figure below. As such, they cannot be utilized to assess the Debtors' financial condition at Step Two.



168.    As observed by the Examiner, "after Step One closed, the Tribune Entities financial performance deteriorated significantly, both in relation to comparable periods in prior

years and in comparison to the February 2007 [Management Projections]." Examiner's Report Vol. 2 at 58.

Redacted

169. Perhaps most importantly, the October 2007 Management Projections were prepared using a process that was infected by a biased management team incentivized to inflate the company's performance expectations. The Examiner specifically considered whether "Tribune management improperly 'boosted' the projected performance in the October forecast," and concluded that it had:

> [T]he Examiner finds it *implausible* that members of Tribune's senior financial management *believed in good faith* that the out-year growth assumption contained in the October 2007 forecast (or the related Tribune representation letter) *represented a reasonable estimate* of Tribune's future performance. Rather, this assumption bears the earmarks of a *conscious effort to counterbalance the decline in Tribune's 2007 financial performance* and other negative trends in Tribune's business, in order to furnish a (very significant) source of additional value *to support a solvency conclusion.*

Examiner's Report Vol. 2 at 63. Indeed, the Examiner found little to like about VRC's solvency opinion for Step Two, which blindly relied on these dubious October 2007 Management Projections (and contained numerous methodological errors). As the Examiner aptly noted, "VRC would accept almost any estimate of future performance that management presented to

VRC." *Id.* The Court should follow the Examiner's example, and not VRC's, and disregard these projections.

<ol start="b" type="b">
<li>**When Assessing the Debtors' Financial Condition at Step One, the Step Two Debt Must be Considered**</li>
</ol>

170.  Turning to the financial condition of the Debtors at Step One, it is clear that the debt expected to be incurred at Step Two should be considered. Generally, the "collapsing" principles used to assess reasonably equivalent value can also be used to assess whether the debt expected to be incurred in a subsequent step of a transaction should be considered when evaluating the financial condition of a debtor at a prior step of the transaction.[68] "The Third Circuit has recognized that multi-step transactions ... can be collapsed when the steps of the Transaction are 'part of one integrated transaction'" *Liquidation Trust of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Co. of Del.)*, 327 B.R. 537, 546 (D. Del. 2005) (quoting *Tabor Court*, 803 F.2d at 1302). Thus, instead of focusing on individual pieces of an overall transaction, courts consider the totality of the obligations incurred and the overall financial consequences those transactions have on creditors. *See Mervyn's Holdings, LLC v. Lupert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 497 (Bankr. D. Del. 2010) (in fraudulent transfer action, collapsing various transactions integral to LBO of parent corporation's former subsidiary that had "devastating" financial consequences on creditors).[69]

---

[68] Examiner's Report, Vol. 2 at 166 ("Although the collapse principle typically has been applied for purposes of testing reasonably equivalent value, there is no principled reason why the collapse principle could not apply to the question of solvency consistent with the bankrupt court's broad powers to look to the substance and disregard the form of a transaction.")

[69] In those cases where courts have declined to collapse separate steps in a multi-step transaction, they did so based on facts demonstrating that, unlike here, the parties to the separate transactions sought to be collapsed did not have a common plan or shared intentions with respect to a plan as a whole and/or did not even have knowledge of all of the component transactions. *See, e.g., Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 55 (2d Cir. 2005) (refusing to collapse loan with subsequent transactions where lender had no knowledge of use of loan proceeds); *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 104-105 (Bankr. D. Del. 2010) (refusing to collapse series of transactions as against certain defendant when there was insufficient evidence that such defendant was involved in or had sufficient knowledge of the failed LBO; as noted above, in a separate opinion this Court did collapse the transactions involved in Mervyn's as against

171.     Whether a series of transactions is executed on the same day or over some period of time is irrelevant for purposes of assessing whether they should be combined for fraudulent conveyance purposes. Indeed, courts have combined separate steps of a transaction separated by many months. For example, in *Orr v. Kinderhill Corp.*, in analyzing fraudulent transfers relating to mortgages taken on a subsidiary's asserts, the Second Circuit combined Kinderhill's sale of properties over the course of nine months with the subsequent distribution to Kinderhill's shareholders. 991 F.2d 31, 35-36 (2d Cir. 1993). "[A]n allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a Step One in a general plan, the plan must be viewed as a whole with all its composite implications." *Id.* at 35. The court stated that it would "not turn a blind eye to the reality that the transfer [of the land] and the spin-off of [the] shares constituted a single, integrated transaction." *Id.* at 35. All of the transactions were "elements of a single restructuring plan adopted by Kinderhill's board of directors in December 1985." *Id.* at 36. Likewise in *In re Mervyn's Holdings, LLC,* 426 B.R. 488 (Bankr. D. Del. 2010), the court held that two transactions, separated by several weeks, should be combined in analyzing the debtors' capital adequacy because the transferee had constructive knowledge of the second step transaction, because the transaction steps were dependent on one another and because the second step of the transaction could not have occurred without the transferee's cooperation. *Id.* at 497-498; *see also In re Sw. Equip. Rental, Inc.*, 1992 WL 684872, at *14 (E.D. Tenn. July 9, 1992) (combining, in the failed LBO context, a series of transactions that occurred over a several-week

---

defendants that were involved in and had knowledge of the LBO); *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 737-38 (Bankr. S.D.N.Y. 2008) (no plausible argument that fraudulent transfer defendants knew or should have known of the debtors' scheme to make constructive fraudulent transfers); *In re Southwest Equip. Rental, Inc.*, 1992 WL 684872, at *14 (E.D. Tenn. July 9, 1992) (refusing to collapse subsequent loans with prior transaction where there was no evidence to show that parties contemplated such loans with original transaction).

period to "determin[e] whether [the debtor] received fair consideration or was rendered insolvent" by the transactions).[70]

172.    As the bankruptcy court in *Hechinger* explained, when combining various components of a transaction the focus is "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction." *Hechinger*, 327 B.R. at 546. In that case the court combined "a series of complex steps—including the formation of new corporations and several intercompany transactions" that took place over a two-month period in a leveraged buyout transaction. *See Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Co. of Del.)*, 274 B.R. 71, 78 (D. Del. 2002). The bankruptcy court relied on the key parties' knowledge and understanding that there really was just one singular transaction even though it involved separate, discrete steps:

> In this case, the steps of the Transaction should be collapsed and considered jointly as one transaction. The Director Defendants, the Bank Defendants and Leonard Green all knew about the multiple steps of the transaction. Each step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent and merge Builder's Square and Hechinger. Therefore, in evaluating the validity of the Transaction, the court considers it as one transaction.

327 B.R. at 546-47.

173.    Following *Hechinger*, the bankruptcy court in *Mervyn's* developed three factors to consider when analyzing whether to combine separate steps of a transaction. These factors, which the Examiner also used to assess the combination of Step One and Two are: (*i*) whether all of the parties involved had knowledge of the multiple transactions; (*ii*) whether each

---

[70] *See also, Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp., Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 959-60 (D. Del. 1994) (in order to assess "the economic reality of the transactions," collapsing LBO occurring in 1988 with LBO occurring in 1989 for analysis of unlawful dividend/stock redemption claim against director defendants); *Morse Operations, Inc. v. Goodway Graphics, Inc. (In re Lease-A-Fleet, Inc.)*, 155 B.R. 666, 671, 676 (Bankr. E.D. Pa. 1993) (in order to "appreciate their impact upon the Debtor," collapsing into one transaction numerous transfers by the Debtor to different entities over the course of years).

transaction would have occurred on its own; and (*iii*) whether each transaction was dependent or conditioned on other transactions. *See Mervyn's*, 426 B.R. at 497-98; *Hechinger*, 327 B.R. at 546-47. Applying these factors here, it is clear from the transaction documents, Tribune's numerous public disclosures at the time the LBO Transaction was announced and approved, and the LBO Lenders' internal deliberations, that the parties knew and intended that both Step One and Step Two would be consummated in order to effectuate their ultimate objective of merging Tribune with the Zell interests.

(i)     The parties intended the LBO Transaction to be considered one, singular transaction

174.    The transaction documents clearly demonstrate that the LBO Transaction and its components were one integrated and interdependent transaction. At the Confirmation Hearing, the evidence will show that all of the transactions that were necessary to complete the LBO Transaction were laid out in the Agreement and Plan of Merger, dated April 1, 2007 (the "Merger Agreement"), which contemplated one complete, integrated transaction. Examiner Ex. 151 (Agreement and Plan of Merger, dated April 1, 2007).

175.    The evidence at the Confirmation Hearing will also show, among other things, that:

- The LBO was only done in two steps because regulatory approval would be required before a full buyout of the shareholders could be consummated, but large shareholders (including Board members) did not want to wait until such approvals were obtained before beginning to receive their money.[71]

- At the same time Tribune's Board approved the Merger Agreement, it also approved Tribune's entry into both the Amended and Restated First Step Commitment Letter, dated April 5, 2007 (the "Step One Commitment Letter") (a commitment for $8.028 billion in financing in connection with Step One) and the Amended and Restated Second Step Commitment Letter, dated April 5, 2007 (the "Step Two Commitment Letter" and,

---

[71] Examiner's Report Vol. 1 at 262.

together with the Step One Commitment Letter, the "Commitment Letters") (a commitment for $4.205 billion in financing in connection with Step Two).[72]

- The two Commitment Letters cross-referenced each other, and the Step One Commitment Letter made the execution and delivery of the Merger Agreement without waiver, amendment or modification a condition precedent to the initial borrowing under each of the Step One Financing Documents (as defined in the Commitment Letters).

- Both commitment letters thus explicitly conditioned the borrowing under these facilities on the continued existence of the financing commitments (for both Step One and Step Two) set out in the Merger Agreement.[73]

- The Senior Loan Agreement, entered into at Step One, also made clear that the LBO Transaction was one integrated transaction.[74]

- Like the Commitment Letters, the Credit Agreement conditioned borrowing under the Step One Financing Documents on the continued existence of all the financing commitments set out in the Merger Agreement.[75]

- The fairness opinions on shareholder consideration issued by Merrill and Morgan Stanley, on which the Board relied in approving the LBO Transaction in April 2007, evaluated and referred to the Merger Agreement as the governing document and considered share acquisitions at Step One and Step Two together."[76]

- The pricing of the Step One Debt took into account the Step Two Debt.[77]

> (ii) Tribune's Statements About the LBO Transaction Confirm that Tribune considered It to be a Single Transaction

176.  Like the transaction documents themselves, Tribune's contemporaneous representations also make clear that the LBO Transaction was conceived, approved, documented, and implemented as a single transaction. For example:

- On April 2, 2007, Tribune announced that its Board had approved the LBO Transaction, describing it as "*a transaction* which will result in the company going private and

---

[72] See Examiner Ex. 146 (Tribune Co., Board of Directors Meeting Minutes (Apr. 1, 2007) at pp. 9, Exhibit A; Examiner Ex. 305 (Amended and Restated First Step Commitment Letter, dated April 5, 2007); Examiner Ex. 309 (Amended and Restated Second Step Commitment Letter, dated April 5, 2007); Examiner Exs. 305, 309 at p. 2;
[73] *Id.* at Annex II, Section 7.
[74] Examiner Ex. 179 (Senior Credit Agreement, dated May 17, 2007) at pp. 35-36.
[75] *Id.* at § 3.01(h).
[76] Examiner Ex. 145 (Morgan Stanley Fair Consideration Letter, April 1, 2007).
[77] Examiner Ex. 179 (Senior Credit Agreement, dated May 17, 2007) at pp. 2-3 (Applicable Margin).

Tribune shareholders receiving $34 per share." Examiner's Ex. 148 (emphasis added). The announcement went on to state that "[u]pon completion of *the transaction*, the company will be privately held, with an Employee Stock Ownership Plan (ESOP) holding all of Tribune's then-outstanding common stock and Zell holding a subordinated note and a warrant entitling him to acquire 40% of Tribune's common stock." *Id.* (emphasis added).

- In a letter dated April 3, 2007, Tribune's CEO described the leveraged buyout to Tribune's shareholders, stating that, "[c]urrent Tribune shareholders will receive a premium price of $34 per share in cash for all of their shares in a two-stage merger transaction expected to be completed by Dec. 31, 2007." CEO Letter to Shareholders, dated April 3, 2007. He also noted that "Tribune will become a privately-held company through a newly formed Employee Stock Ownership Plan" and that the transaction "offers a premium price for each outstanding share of Tribune stock."

- On April 5, 2007, Tribune issued a current report on Form 8-K announcing that its Board of Directors had approved the LBO Transaction, describing it as a singular "LBO Transaction." Examiner Ex. 168.

- On May 9, 2007, following its annual meeting of shareholders, Tribune issued a press release describing the LBO Transaction as a single transaction, notwithstanding its multiple steps.[78]

- Tribune made similar public disclosures in (i) its proxy statement seeking shareholder approval for the LBO Transaction, (ii) its 2007 annual report on Form 10-K, (iii) each Form 10-Q Quarterly Report from the first quarter of 2007 through the third quarter of 2008, and (iv) various Form 8-Ks filed over the course of 2007.[79]

        (iii)    The LBO Lenders Also Considered the LBO Transaction to be a Single Transaction

177.    The LBO Lenders' internal deliberations provide further evidence that the parties knew the LBO Transaction was a single integrated whole with two interdependent steps. For example, **Redacted**

---

[78] See Press Release, Tribune Co., Tribune Annual Meeting Held in Chicago (May 9, 2007)
[79] Examiner Ex. 168 (Tribune Co. Form 8-K (April 1, 2007)) at 2-3; Examiner Ex. 327 (Proxy Statement, dated June 1, 2007) at 9-10; Examiner Ex. 4 (Tribune Co. SEC Form 10-K for the fiscal year ended December 30, 2007 (March 20, 2008)) at 1-6, 98-100; Examiner Ex. 55 (Tribune Co. SEC Form 10-Qs for the Quarter Ending April 1, 2007) at 22-24; Examiner Ex. 628 (Tribune Co. SEC Form 10-Qs for the Quarter Ending July 1, 2007) at 25-29; Examiner Ex. 629 (Tribune Co. SEC Form 10-Qs for the Quarter Ending September 30, 2007) at 27-31; Examiner Ex. 577 (Tribune Co. SEC Form 10-Qs for the Quarter Ending March 30, 2008) at 25-31; Tribune Co. SEC Form 10-Qs for the Quarter Ending June 29, 2008, at 30-35; Examiner Ex. 942 (Tribune Co. SEC Form 10-Qs for the Quarter Ending September 28, 2008) at 33-39)



Redacted

(iv)    Step One and Step Two Were
Interdependent, and the Benefits of the LBO
Transaction Were Derived From the Steps
Taken Together

178.    From inception, it was contemplated by the parties that all of the various steps

necessary to effect the LBO Transaction constituted a single integrated transaction with one

common purpose.  Indeed, the benefits of the LBO Transaction, which would allow Tribune to

(i) avoid paying federal income taxes by becoming private and qualifying as a Subchapter S

corporation, (ii) avoid the costs associated with operating as a public company, and (iii) avoid

making matching 402(k) contributions on behalf of employees, could not be accomplished unless

and until all of Tribune's stock was acquired by the ESOP, which could not occur until the LBO

Transaction was effectuated, i.e., after Step Two.  Conversely, completion of only Step One

would have left Tribune in public hands and left its earnings subject to federal tax.  The two

---

[80] ML-TRIB-0081409 (emphasis added).
[81] JPM_00492986 (emphasis added).
[82] *See* Kowalczuk Rule 2004 Exam. at 116:3-9 (Jan. 22, 2010).

steps were thus interdependent, as neither standing alone could have achieved this central intended benefit of the LBO Transaction.

<div style="margin-left:40%">

(v) The Examiner was Incorrect to Conclude that the Court is "Somewhat Unlikely" to Consider Step Two Debt at Step One

</div>

179. Although the Examiner acknowledged that the question is close, he concluded that a court is "somewhat unlikely" to include the Step Two Debt for purposes of determining solvency at Step One. Examiner's Report, Vol. 2 at 160. In considering the *Mervyn's* three-part analysis, the Examiner found that the first prong (*i.e.*, the parties' knowledge of the multiple transactions) was undisputed and clearly favored combining Step One with Step Two, and that the second factor (*i.e.*, whether each transaction would have occurred on its own), though a closer question, also favored combination. *See* Examiner's Report Vol. 2 at 167-68. The Examiner found that the third consideration (*i.e.*, whether each transaction was dependent or conditioned on the other) was "relatively close," but ultimately disfavors combining the two steps because "[o]n balance, the Examiner cannot conclude that the conditions to the Step Two Closing were without substance or that a Step Two Closing was assured from the outset to the end." *Id.*, Vol. 2 at 137, 180. Based on this analysis, the Examiner concluded that, "[a]lthough the question is admittedly close, . . . a court is somewhat unlikely to collapse Step One and Step Two for solvency analysis." *Id.* at p. 182.

180. This conclusion was incorrect. The Examiner seems to take the position that if just one of the three *Mervyn's* factors is not satisfied, then combination is not warranted. *Mervyn's*, however, clearly held that these considerations do not comprise a formal test to be applied mechanically, but rather a pragmatic approach for assessing whether to combine a series of transactions for analytical purposes. *See* 426 B.R. at 104. Thus, *Mervyn's* only suggests that courts "can" consider the three factors, and makes clear they are not the exclusive or mandatory

basis for determining combinations of transaction steps. Rather, the "court needs to consider the overall financial consequences and the effects these transactions have on the creditors." Id.[83] Similarly, in Hechinger, the courts focused on the "knowledge and intent" of the parties.

181.     In the instant case, as in *Hechinger*, the parties all knew about the multiple steps of the LBO Transaction and each step would not have occurred on its own. Moreover, there can be no question that the closing of Step Two was required to fulfill the parties' intent at Step One – i.e., to merge the Tribune with the Zell interests. While the Examiner goes to great lengths to find that Step One theoretically could have stood on its own had the conditions for Step Two not been satisfied, *Tabor*, *Mervyn's*, and *Hechinger* all make clear that this is not the end of the inquiry. Instead, the focus is on the knowledge and intent of the parties, and whether both steps were necessary to fulfill the parties' intent. It was never the intent of the parties that there be half a leveraged buyout, or a tender offer for 50% of the outstanding stock. To the contrary, it was the clear and express intent of the parties that the Zell entities complete a leveraged buyout of Tribune using the S-Corporation/ESOP structure, and the parties relied on the occurrence of both Step One and Step Two. Indeed, the only reason for the LBO's two-step structure was that large shareholders, including Board members, did not want to wait for the regulatory approvals would be required for a full buyout before beginning to receive their money. Examiner's Report Vol. 1 at 262.

        (c)    Step One was a Constructively Fraudulent Transfer

182.     As set forth in the expert report of Ralph Tuliano, the Noteholder Plan Proponents' solvency expert, ████████████ Redacted ████████████

---

[83] Notably, in *Tabor*, the case cited by the *Mervyn's* Court as the leading Third Circuit authority on the collapse issue, the Third Circuit articulated the standard simply as whether the two exchanges "were part of one integrated transaction." 803 F.2d at 1302. In concluding that the two loans should be treated as "one integrated transaction," the court focused on the knowledge and expectations of the lender, not on whether the loans were dependent or conditioned on one another—the seeming dispositive factor in the Examiner's analysis.

Redacted

     (i)     Balance Sheet Insolvency

183.     The Bankruptcy Code defines insolvency as a "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at fair valuation." 11 U.S.C. § 101(32)(A).[84] Courts rely on a variety of accepted valuation methodologies used by experts to determine the fair value of a debtor's assets at the time of a challenged transfer, including the discounted cash flow method (commonly referred to as "DCF"), adjusted balance sheet method, market multiple method, comparable transactions method, and market capitalization. *See, e.g., JPMorgan Chase Bank, N.A. v. Charter Comm'cns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 235 (Bankr. S.D.N.Y. 2009) (valuation methodologies include "comparable companies, precedent transactions, publicly available market data (including the views of Wall Street analysts) and [DCF]"); *Lids Corp. v Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 541 (Bankr. D. Del. 2002) (same). Redacted

---

[84] Peltz v. Hatten, 279 B.R. 710, 743 (D. Del. 2002), aff'd, In re USN Commc'ns, Inc., 60 Fed. Appx. 402 (3d Cir. 2003).
[85] Tuliano Report at 17.

Redacted

[86]

184.    Redacted

[87]

185.    Redacted

---

[86] *Id.* at 99, 100.
[87] *Id.* at 92.
[88] *Id.* at 91.
[89] *Id.* at 93.
[90] *Id.*
[91] *Id.*

Redacted [92]

Redacted

Redacted

[93]

Redacted

[94]

186.    Redacted

[95]    Redacted

[96]    Redacted

[97]

187.    Redacted

[92] *Id.*
[93] *Id* at 94..
[94] *Id.* at 99, 100.
[95] *Id.* at 94.
[96] *Id.*
[97] *Id.* at 95.

Redacted [98] Redacted

Redacted [99] Redacted

[100] Redacted

[101] Redacted

[102]

188. Redacted

[103] Redacted

[104] Redacted

[105] Redacted

[106]

189. Redacted

[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.* at 96.
[105] *Id.*
[106] *Id.*



190.



    (ii)  Inadequate Capitalization and Inability to
       Pay Debts As Due

  191.  The second financial test examines whether the debtor, as a result of the challenged transfer, had "unreasonably small capital"—a financial condition that leaves the debtor with insufficient capital to sustain operations. *See MFS/Sun Life Trust*, 910 F. Supp. at 944. The inquiry is fact-specific and requires "a case-by-case review of the capital structure of a debtor's business." *Suburban Motor*, 124 B.R. at 998. The "unreasonably small capital" analysis also typically involves consideration of the debtor's cash flow and available operating capital. *See Suburban Motor*, 124 B.R. at 999 (assessing debtor's ability "to generate enough

---

[107] *Id.* at 97, 100.
[108] *Id.* at 98.
[109] *Id.*
[110] *Id.* at 99, 100.

cash from operations and sales of assets to pay its debts and remain financially stable") (citing *Vadnais Lumber*, 100 B.R. at 137). If management's projections of cash flows are unreasonable, they suggest the debtor's inability to generate sufficient cash flow from operations. *See Moody*, 971 F.2d at 1073. ██████████ Redacted ██████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████ [111]

192.    Finally, the "inability to pay debts when due," is met where the debtor incurred the subject obligation or made the transfer with an intent or belief that subsequent creditors likely would not be paid as their claims matured.    11 U.S.C. § 548(a)(1)(B)(ii)(III). Contemporaneous communications demonstrating conscious awareness on the part of participants in a LBO of the substantial risk that a debtor's capital resources would be insufficient to meet their financial obligations as they matured is sufficient to satisfy Section 548(a)(1)(B)(ii)(III). *See Suburban Motor*, 124 B.R. at 1001 (inferring intention to incur debts beyond ability to pay where, on several occasions preceding the challenged transfer, shareholders of the debtors "expressed serious concerns over [the debtors'] financial health" and minutes of the board of directors that were "replete with references to [the debtors'] uncertain future viability.") While section 548(a)(1)(B)(ii)(III) suggests a standard based on subjective intent for the third financial condition test, direct expression of the subjective belief by the debtor of its future inability to pay its debts is not necessary to satisfy this financial condition test.

---

[111] *Id.* at 19-20.

193.    Based on these standards, it is clear that Tribune was also inadequately capitalized and unable to pay its debts as they came due as of June 4, 2007. ███████ Redacted ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ [112] For example,

███████████████ Redacted ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████ [113] ███████████ Redacted ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████ [114]

194.    ███████████████ Redacted ███████████████

███████████████████████████████████████████████████████████ [115]

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████ [116] ███████████ Redacted ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[112] *Id.* at 102-110.
[113] *Id.* at 103-106.
[114] *Id.* at 118-119.
[115] *Id.* at 111-115.
[116] *Id.* at 112-113.

**Redacted** [117]

195.    **Redacted**

[118] It was reported that Tribune's management, including its CEO, as well as certain board members, were nervous about the leverage in the Zell proposal.  For example,

**Redacted**

[119]    **Redacted**

[120]

196.    **Redacted**

[121]    **Redacted**

[122]    **Redacted**

[123]    **Redacted**

[117] *Id.* at 113-114.
[118] *Id.* at 115-117.
[119] *Id.* at 115-116.
[120] *Id.* at 117.
[121] *Id.* at 119-125.
[122] *Id.* at 119-125.
[123] *Id.* at 126.



Redacted [124] Redacted

125

   (iii) The Examiner's Conclusions Regarding the Debtors' Financial Condition at Step One Were Erroneous

197. With respect to the Debtors' financial condition at the close of Step One, the Examiner concluded (i) that although the issue is "exceedingly close," a court would be "somewhat unlikely" to conclude that Tribune was rendered insolvent, (ii) a court would be "reasonably likely" to find that the Debtors were adequately capitalized, and (iii) a court would be "reasonably unlikely" to conclude that the Debtors intended to or believed they would be unable to pay their debts as due, using either a subjective or an objective test. The Noteholder Plan Proponents respectfully submit that the Examiner underestimated the likelihood that a court would find that the Debtors were insolvent, inadequately capitalized and unable to pay their debts as due as of June 4, 2007.

198. 



Redacted [126] Redacted

[127] Redacted

---

[124] *Id.* at 128 -129.
[125] *Id.* at 129.
[126] *Id.* at 162.
[127] *Id.* 99-100.



Redacted

[128]

199.     Redacted

[129]

[130]     Redacted

[131]     Redacted

[132]     Redact

Redacted

[133]

    (d)     Step Two was a Constructively Fraudulent Transfer

        (i)     Balance Sheet Insolvency

200.     As one would expect given the Debtors' deteriorating financial performance between June 4, 2007 and December 20, 2007, the incurrence of the Step Two Debt easily satisfies the financial condition tests necessary for a constructively fraudulent transfer. Redacted

[128] *Id.* at 163.
[129] *Id.* at 164.
[130] *Id.* at 164.
[131] *Id.* at 164.
[132] *Id.* at 164.
[133] *Id.*

Redacted

201.        Redacted

135

202.        Redacted

136

203.        Redacted

---
[134] *Id.* at 132.
[135] *Id.* at 137-139.
[136] *Id.*



**Redacted** [137]

      (ii)    Inadequate Capitalization and Inability to Pay Debts As Due

204.    **Redacted** [138] **Redacted** [139] **Redacted** [140]

> ***d.    The LBO Debt Should Be Avoided In Full and the Value That is Restored at the Guarantor Debtors Should Be Upstreamed to Tribune to Pay Tribune's Non-LBO Creditors***

205.    According to the Examiner, "the value that had been available to Tribune's creditors in the form of equity in the Guarantor [Debtors] before the LBO Transaction was diluted by the Stock Pledge and the joint and several guarantees given by Guarantor Debtors in those transaction." Examiner's Report, Vol. 2 at 294. The Senior Lenders have argued that, even if both Steps One and Two of the LBO Transaction are avoided as fraudulent transfers, none of the value liberated at the Guarantor Debtors will flow up to Tribune because (i) the LBO Debt may only be avoided to the limited extent necessary to benefit the Non-LBO Creditors at the Guarantor Debtors, and (ii) avoidance of the LBO Debt at the Guarantor Debtors cannot benefit creditors of Tribune (which is merely an equity holder of the subsidiaries). In advancing

---

[137] *Id.* at 137-139..
[138] *Id.* at 139-161.
[139] *Id.* at 151.
[140] *Id.* at 139-161.

these arguments, the Senior Lenders have relied on cases that hold an obligation or transfer cannot be *avoided* as a fraudulent transfer under the Bankruptcy Code unless avoidance would benefit creditors of the *particular debtor* that incurred the obligation or made the transfer. The response to these arguments is three-fold.

206.     First, it is far from universally accepted that the avoidance of a debtor's obligation cannot benefit the debtor's corporate parent and/or its creditors. Second, the creditors of Tribune have direct standing to challenge the LBO at the Guarantor Debtor level because the guarantee were the means by which Tribune effectively effected a fraudulent transfer of its equity interest in the Guarantor Debtors. As such, Tribune and its creditors are entitled to benefit from avoidance of the guarantees. Third, because Tribune is a creditor of the Guarantor Debtors, it is a beneficiary of avoidance at such entities. Accordingly, Tribune, in its role as creditor of the Guarantor Debtors, has standing to avoid the fraudulent transfers and is entitled to benefit from avoidance and/or recovery of the LBO Debt at the subsidiary level. Each of these arguments is discussed in turn below. Moreover, even if only Step Two is found to be a fraudulent transfer, Tribune's creditors can still benefit from the avoidance of the Subsidiary Guarantees and the recovery of avoidable payments because equitable remedies will estop the Step One Lenders from soaking up the value that is freed up or realized when the Step Two Debt is avoided.

> (1)     *Avoidance Of Debt Under Bankruptcy Code Section 548 is Not Limited By The Benefit to the Estate Requirement of Bankruptcy Code Section 550; if Avoidable as a Fraudulent Transfer, the LBO Debt Should be Avoided in Its Entirety*

207.     If this Court determines that the LBO Debt is avoidable as a fraudulent transfer, the obligation to repay that debt is avoidable in its entirety. This is the result without regard to the dollar amount of the unsecured claims against a particular debtor. Arguments to the contrary are based upon an improper blurring of the distinction between (i) recovery of a transfer under

Bankruptcy Code section 550 (which requires that recovery be "for the benefit of the estate") and (ii) avoidance of an obligation under Bankruptcy Code section 548 (which has no such limitation).

208.     Here, avoidance – rather than recovery – is the meaningful event because avoidance of the Debtors' obligations to the LBO Lenders (at both Tribune and the Guarantor Debtors) removes massive LBO-related obligations that stand in the way of recovery by the innocent Non-LBO Creditors at Tribune and each of the Guarantor Debtors. Because Bankruptcy Code section 550 deals solely with *recovery* of avoided transfers, it is inapplicable with respect to avoidance of the LBO- related obligations.[141]

209.     Specifically, Bankruptcy Code section 548 permits the trustee to avoid "*any* transfer . . . of an interest of the debtor in property, or *any* obligation . . . incurred by the debtor . . ." 11 U.S.C. § 548(a)(1) (emphasis added). Unlike Bankruptcy Code section 550, section 548 does not limit the trustee's avoidance powers to situations where there would be a "benefit to the estate." 11 U.S.C. § 548 ("The trustee may avoid ... any obligation ..."); 11 U.S.C. § 550 ("[T]o the extent that a transfer is avoided ..., the trustee may recover, for the benefit of the estate, the property transferred . . .").

---

[141] The Noteholder Plan Proponents do not concede that the "benefit to the estate" limitation on recovery under Bankruptcy Code section 550 would bar the Non-LBO Creditors under the facts of this case. The "estate" includes the rights and interests of the holders of equity in each of the subsidiaries. Because Tribune owns the equity in each of the Guarantor Debtors, a benefit to each apposite estate can include a benefit to Tribune. As will be discussed in further detail below, given the parent company/subsidiary structure of Tribune and the harm to Tribune's Non-LBO Creditors caused by the subsidiary guarantees, a benefit to Tribune qua shareholder is *not* a windfall of the type criticized in some cases where a surplus is returned to the debtor with no concomitant benefit to creditors. Rather, any benefit to Tribune as equity holder will flow through to Tribune's Non-LBO Creditors who are the injured parties in these cases and who relied on the value of the subsidiaries in extending credit to Tribune. Thus, even though it is not applicable to avoidance of obligations, section 550 is *not* a limit in a case like Tribune where, in order to properly remedy the damage caused by an integrated transaction involving a corporate parent and its subsidiaries, the "benefit to the estate" should include the parent and, by extension, the parent's creditors. Because of Tribune's organizational structure, avoidance and/or recovery that delivers value to Tribune's creditors is the only way to remedy the wrong that occurred when the equity value of Tribune's subsidiaries was destroyed upon issuance of the subsidiary guarantees.

210.     Courts have interpreted the language in section 548 to mean that a trustee may avoid a transfer or obligation *in its entirety*, despite the fact that such transfer or obligation may exceed the aggregate amount of unsecured claims against a particular debtor. *See, e.g., In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) ("[O]nce avoidable . . ., the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim."); *Nextwave Personal Commc'ns, Inc. v. Federal Commc'ns Comm'n (In re Nextwave Personal Commc'ns, Inc.)*, 235 B.R. 305, 307-09 (Bankr. S.D.N.Y. 1999) ("The literal terms of Section 544 as well as 548 . . . appear to call for avoidance of the entire obligation where the statutory criteria for avoidance are met[.]")

211.     Moreover, Bankruptcy section 544(b) provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b). Courts have interpreted this section to mean that the presence of a "triggering" unsecured creditor who could avoid the transfer or obligation at issue under state law as of the commencement of the case is all that is needed for a trustee to avoid that transfer or obligation *in its entirety. Acequia, Inc v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809-10 (9th Cir. 1994) (holding that "[a] transaction that is voidable by a single, actual unsecured creditor [under § 544(b)] may be avoided in its entirety, regardless of the size of the creditor's claim"); *MC Asset Recovery, LLC v. The Southern Company*, 2006 WL 5112612, at *4-5 (N.D. Ga. Dec. 11, 2006) (holding that a trustee who brings an avoidance action under section 544(b) may avoid a transfer in its entirety "even when the value of the transfer exceeds the value of all allowed claims of unsecured creditors.").

212.     Where avoidance of the obligation is the significant event, one need not look at the recovery provision set forth in section 550, and thus, the concept of "benefit to the estate" never arises. *See, e.g., Coleman*, 426 F.3d at 726 ("[o]nce Debtor avoided the deeds of trust, no recovery was necessary; the avoidance itself was the meaningful event. Thus, the recovery statute [section 550] has no application here."). Here, the *avoidance* of the LBO obligations and the Subsidiary Guarantees would be the "significant event." It therefore follows that any attempts by the parties to insist that there must be benefit to the estate to *avoid* the obligations is without merit. Moreover, all recoveries/disgorgements are sought at the parent company level, where the Non-LBO Creditors would benefit.

213.     Notwithstanding that nothing in Bankruptcy Code section 548 prevents the trustee from avoiding an obligation in full despite payment in full of all unsecured creditors, some parties have argued, and some courts have held, that *avoidance* of an entire transfer is inappropriate where unsecured creditors have already been made whole (or will be made whole pursuant to the terms of a plan of reorganization). *See, e.g., Adelphia Recovery Trust v. Bank of America,* 390 B.R. 80, 94 (S.D.N.Y. 2008); *Vintero Corp. v. Corporacion Venezolana de Fomento (In re Vintero Corp.),* 735 F.2d 740, 742 (2d Cir. 1984); *Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582, 584 (2d Cir. 1950). These courts have read a "benefit to the estate" requirement into the *avoidance* (as opposed to *recovery*) sections of the Bankruptcy Code, and stand for the proposition that "an obligation or transfer cannot be avoided as a fraudulent transfer or preference under sections 544, 547 and 548 of the Bankruptcy Code when doing so would not benefit any creditor of the particular debtor that incurred the obligation or made the transfer." *Adelphia,* 390 B.R. at 94 (emphasis added) (citing *Whiteford Plastics* and *Vintero*). Under these cases, "[a] transaction can be avoided under section 544(b) only to the

extent that the avoidance benefits unsecured creditors." *Id.* (quoting *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990)).

214.    However, the Noteholder Plan Proponents and the Examiner disagrees with the holding in this line of cases to the extent that the cases stand for the proposition that there must be a benefit to the estate in order to *avoid* an obligation. Examiner's Report, Vol. 2 at 294-95. While the Examiner notes that the "Third Circuit Court of Appeals has not addressed directly whether avoidance under section 548 is subject to a limitation on the scope of avoidance or that any such limitation would support limiting the effect of avoidance in these circumstances[,]' . . . 'the statutory language largely answers the question posed and *does not* support the limitation advocated by certain Parties." *Id.* at 295-96 (emphasis added). In other words, the Examiner found that there is no requirement to show "benefit to the estate" in order to *avoid* an obligation under Bankruptcy Code section 548 and that, if the LBO obligations are avoidable, they should be avoided in their entirety. *Id.* at 295 ("Avoidance under section 548 is distinguished from an action to recover property transferred or its value under Bankruptcy Code section 550(a), which, by its terms, only allows for recoveries 'for the benefit of the estate.' No similar limitation is found in section 548 avoidance.").

215.    In addition, these cases are distinguishable from the facts here due to their inapposite fact patterns and the equities at work in the Tribune chapter 11 cases. *Whiteford Plastics* is the case most cited for the proposition that an avoidance action cannot be sustained if the proceeds of the action will not benefit the debtor's unsecured creditors. In that case, the bank had failed to properly perfect its security interest in two steam generators. *Whiteford Plastics*, 179 F.2d at 583. While the debtor's avoidance action was pending, the debtor confirmed a plan of reorganization that paid its creditors 10 cents on the dollar (in cash or pro rata shares of the

debtor's common stock) and a share of the proceeds of certain litigation recoveries (not including the debtor's action against the bank with respect to the steam generators), and a share of the proceeds of the debtor's investment in another company. *Id.* at 583-84. The bankruptcy court dismissed the debtor's avoidance action against the bank on the ground that the steam generators "contributed nothing to the confirmation of the arrangement, and that in such circumstances the validity of the contract of conditional sale as between the parties should be recognized where rights of creditors were not involved." *Id.* at 584. The Second Circuit focused on the fact that none of the unsecured creditors complained about not being able to benefit from the avoidance action and concluded from the absence of the complaints that the unsecured creditors were satisfied with the plan as confirmed. *Id.*

216. *Whiteford Plastics* is distinguishable from these cases because the creditors at the Tribune level are complaining and this Court has not yet confirmed a plan of reorganization. While the Second Circuit in *Whiteford Plastics* emphasized that there was not any resulting prejudice to creditors, here, Tribune's Non-LBO Creditors would be seriously prejudiced by limiting avoidance. *Whiteford Plastics* did not involve a fraudulent conveyance of the type and scope of the two-step LBO Transaction. In particular, *Whiteford Plastics* did not involve a parent/subsidiary structure where the creditors of the parent were harmed as a result of an integrated transaction that involved both the parent company and its subsidiary companies. The foregoing differences and the absence of any wrongdoing on the part of the bank in *Whiteford Plastics* (which merely neglected to file its contract in the appropriate office), as distinguished from the conduct of the LBO Lenders in this case, provide strong bases for distinguishing *Whiteford Plastics*.

217.     Likewise, *Vintero* does not stand for the proposition that the innocent Non-LBO

Creditors at the parent level cannot benefit from avoidance and/or recovery at the subsidiary

level. In *Vintero*, the creditor ("CVF") did not perfect a ship mortgage. 735 F.2d at 741. The

basic facts are that the debtor purchased two ships and resold them to an affiliate. *Id.* The

purchaser from the debtor borrowed the money for the purchase price and CVF guaranteed

repayment of the loan. *Id.* In consideration for providing the guaranty, CVF was granted liens

on the two ships, but CVF's reimbursement claim was non-recourse, meaning that if the guaranty

was called, CVF could only seek payment from the ships and not from the purchaser's general

assets. *Id.* Perfection of the lien eventually lapsed as to one of the ships. *Id.* When the

purchaser defaulted, CVF (as guarantor) paid off the loan, the debtor/seller retook title to the two

ships as a consequence of the purchaser's default, and the debtor filed from bankruptcy and listed

both ships among its assets. *Id.* The debtor sued CVF to avoid the unperfected lien that had

lapsed. *Id.*

218.     The issue in *Vintero* was whether CVF was a creditor at all for purposes of

asserting a claim in the debtor's case. *Id.* The principle question before the bankruptcy court

was whether the loss of the lien and non-recourse nature of the obligation precluded CVF from

asserting a claim against the debtor in competition with the debtor's other creditors. *Id.* Both the

bankruptcy court and the district court held that CVF did not have any claim whatsoever against

the debtor. *Id.* The Second Circuit disagreed and crafted an equitable result based on its view of

the facts and the law. *Id.* The Court of Appeals went through a range of options and possible

outcomes to determine the most equitable result under the circumstances. *Id.* at 742-43. From

the opinion, it appears the Court of Appeals was trying to do three things:  first, avoid the lien in

a way that did not give the debtor a windfall by making the debtor the only beneficiary of the

avoidance; second, provide the debtor's creditors with a benefit from the avoidance; and third, provide CVF with a claim so long as the debtor's other creditors would not be adversely affected by CVF's claim. The Court of Appeals concluded that the most equitable outcome would be to provide CVF with a claim to the proceeds from the sale of the ship, but with no priority over the claims of other creditors in such proceeds. *Id.* at 743. In recognition of the non-recourse nature of the obligation, CVF's claim was expressly limited to the proceeds realized from the sale of the ship as to which the lien was avoided. *Id.* The lack of priority over other creditors was the appellate court's way of getting to an equitable result. CVF was not given a claim that could participate in the debtor's general assets.[142] *Id.*

219.    *Vintero* stands for the proposition that, in the context of an avoidance action, a bankruptcy court should do equity when equity is required. The case also stands for the proposition that, notwithstanding *Moore v. Bay*, in the interest of equity, the interests of "innocent" creditors can be paramount to the rights of a creditor with an avoided transfer, even when the transferee is not at fault. *Id.* at 742. As such, *Vintero* is entirely consistent with the argument that, in appropriate circumstances – like those present in these cases – equitable considerations can be used to fashion a remedy that upstreams value to a parent's creditors.

220.    Because the plain language of section 548 of the Bankruptcy Code does not require a benefit to the estate in order to avoid fraudulently incurred obligations in full, courts that require a benefit in order to avoid a fraudulent transfer may do so only if equity demands the result, such as where the court feels the limitation is necessary to prevent a bad-acting debtor from reaping in the benefits of avoidance or where the transferee has acted in good faith.

---

[142]The court's reasoning was that as between the debtor and the putative secured creditor, the unperfected lien should be enforceable, that lien recording statutes such as the UCC were to protect and give notice to the debtor's other creditors, and that having granted the lien to the putative secured creditor, the debtor should not expect to reserve the value of the ship for itself to the exclusion of general creditors. *Id.* at 742-43.

However, in these cases, because the Step One Lenders consented to and/or participated in Step Two, a court need not invoke an equitable limitation. *See Coleman*, 426 F.3d at 727 n.6 ("[I]t is hard to see how the Bank is in a position to request equitable relief from the effects of the § 544 avoidance of the deeds when the Bank's agent's knowledge of the impropriety of the grant of the deeds was the basis for avoidance in the first place."); *see also Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244 (1933) ("It is one of the fundamental principles upon which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands.").

221. Unlike in *Vintero* and *Whiteford Plastics*, where the courts were faced with transferees that gave value to the debtor and came to the table with clean hands, here the LBO Lenders were knowing and willing participants in the fraudulent LBO. Not only did the LBO Lenders acquiesce in the events that led to the Debtors' demise, they also took an active role in structuring and profiting from the events – and, indeed, benefited to the tune of billions of dollars in fees, interest payments and principal. As will be discussed below, even if only Step Two is avoided, the Step One Lenders structured and priced the entire LBO transaction as if Step Two would occur. Many of the initial Step One Lenders were also initial Step Two Lenders. Consequently, the Step One Lenders not only consented to and/or participated in Step Two, but the Step One Lenders also assumed the risk of insolvency and should not benefit from any avoidance or recovery from Step Two Lenders – at Tribune or at any of the Guarantor Debtors. The LBO Lenders also undeniably knew that none of the proceeds of the loans would remain within any of the Tribune entities. No benefit and all burden. Thus, the LBO Lenders did not act in good faith and do not come to the table with clean hands.

222. This also is not a situation where artificially limiting the extent of the avoidance of the LBO Debt is required in order to avoid giving a windfall to the Debtors' owners or to avoid benefitting a bad-acting debtor. Here, because of Tribune's parent/subsidiary structure and the nature of the fraudulent transaction, it is appropriate to avoid the entirety of the obligation - - and not just the relatively small amount necessary to pay the Non-LBO Creditors of the Guarantor Debtors – in order to remedy the wrong and place the innocent Non-LBO Creditors of each of the Debtors (especially Tribune) in the position they would have been had the fraudulent transfers not occurred. Tribune is the parent of the Subsidiaries, and its equity interest in the Subsidiaries is the key asset of its estate. The LBO Transaction effectively destroyed the value of this key asset. If the LBO Transaction is avoidable – as the Noteholder Plan Proponents submit – the extent of the avoidance should not be limited in a way that disregards Tribune's Non-LBO Creditors. Instead, the remedy should be implemented in a manner that permits value to be upstreamed to Tribune from the Guarantor Debtors. This, in turn, will allow the innocent Non-LBO Creditors at Tribune, such as the Senior Noteholders and holders of PHONES Notes, to receive the distributions based upon the value of the Tribune enterprise.

223. Avoidance of the entire obligation is consistent with the purposes of the fraudulent transfer sections of the Bankruptcy Code, including section 550. The law is well established that the underlying purpose of the fraudulent conveyance statutes in the Bankruptcy Code is to restore the bankruptcy estate to the position it was in prior to the fraudulent conveyance. *See, e.g., Decker v. Voisenat (In re Serrato)*, 214 B.R. 219, 232 (Bankr. N.D. Cal. 1997) ("[T]he purpose and thrust of [§ 550] is to restore the debtor's financial condition to the state it would have been had the transfer not occurred"). Courts have held that "[t]his purpose is fulfilled by returning to the estate the full value of the property fraudulently transferred less the

value of any valid liens against the property." *In re FBN Food Services, Inc.*, 1995 U.S. Dist. LEXIS 5009, at *10 (N.D. Ill. April 13, 1995). Here, avoidance of the entirety of the obligations is necessary and appropriate to restore all of the estates to the same position they were in prior to the fraudulent conveyance.

224. Finally, the equities of the case demand the avoidance of the entirety of the obligations. Bankruptcy courts have broad equitable powers that may be invoked when necessary to ensure "that substance will not give way to form, that technical considerations will not prevent substantial injustice from being done." *Pepper v. Litton*, 308 U.S. 295, 304-05 (1939); *In re Spoor-Weston, Inc.*, 139 B.R. 1009, 1015 (Bankr. N.D. Okla. 1992) ("The equitable powers of a bankruptcy court . . . may be relied on to supply any remedy necessary or appropriate to carry out the provisions of the Code, and to prevent fraud or injustice"). Absent full avoidance, the LBO Lenders and shareholders will receive a windfall at the expense of the Non-LBO Creditors. Such a result is patently inequitable and wholly inconsistent with the intent of the drafters of the Bankruptcy Code.

        (2)    *Creditors of Tribune Have Direct Standing to Avoid the Obligations Incurred at the Subsidiary Level and May Benefit from Avoidance Thereof*

225. In connection with the LBO Transaction, Tribune transferred an interest in its property – the equity value of the Guarantor Debtors – to the LBO Lenders by causing such subsidiaries to guarantee the LBO Debt. This was the transfer of an asset by Tribune that is avoidable for the benefit of Tribune's creditors. The basic principle behind a fraudulent transfer action is that the transferor has transferred an asset or interest in property with actual intent to hinder, delay or defraud its creditors or has transferred an asset or interest in property without receiving reasonably equivalent consideration in a transaction that occurred when the transferor was insolvent or rendered insolvent or where the transferor was left without adequate capital or

114

unable to pay its debts as they matured. When Tribune and its lenders orchestrated the LBO Transaction, Tribune caused the Guarantor Debtors to issue guarantees. Those guarantees were not supported by reasonably equivalent value. None of the loan proceeds were given to the Guarantor Debtors, yet massive debt was incurred by the Guarantor Debtors without any corresponding value. The result of the LBO Transaction was that Tribune transferred an interest in its own property – the equity value of its Subsidiaries – to the LBO Lenders by using its control over its subsidiaries to cause those subsidiaries to guarantee the debt it (Tribune) undertook in the LBO Transaction. Thus, Tribune effectively transferred its equity interest in the Guarantor Subsidiaries to the LBO Lenders by giving the LBO Lenders rights against such subsidiaries (the rights of a creditor).

226.     This is not a case in which the Guarantor Debtors incurred obligations in arm's length transactions in the ordinary course of their business. Nor is this a case in which creditors that had given value to the Guarantor Debtors were granted legitimate claims against the assets of the subsidiaries ahead of the parent as equity-holder. Rather, this is a case in which the parent arranged a transaction that transferred the value the parent had in its subsidiaries for less than reasonably equivalent consideration and/or with actual intent to hinder its creditors.

227.     This analysis – of treating the value of a subsidiary company to a parent company as an asset of the parent for purposes of a possible avoidance action by the creditors of the parent – has been discussed favorably in *AboveNet, Inc. v. Lucent Techs., Inc. (In re Metromedia Fiber Network, Inc.)*, Adv. Proc. No. 04-08564A, 2005 Bankr. LEXIS 3168, at *28 (Bankr. S.D.N.Y. Dec. 20, 2005) ("Without deciding the point (which has not been addressed by the parties either factually or legally), it is a sufficient caveat to the limited scope of this ruling to observe generally that a direct or indirect subsidiary of a corporate debtor is indeed an asset which is

property of a debtor's estate, as are the net proceeds from the sale of such an asset. Moreover, and again without deciding the point, if a parent corporation were to prefer a particular creditor over other creditors by causing a solvent subsidiary to guarantee the parent's debt to the preferred creditor within three months of the parent's bankruptcy filing to the potential prejudice of other creditors, there might be a basis to argue that such a guarantee constituted a transfer within the ambit of Section 547(b).").[143]

> (3) *Benefits From Avoidance of the LBO Debt And Recovery of LBO-Related Transfers Should Flow To Non-LBO Creditors And Not To The LBO Lenders*
>
> (a) <u>The Non-LBO Creditors Should Receive the Benefits of Avoidance of the LBO Debt And Recovery Of LBO-Related Transfers</u>
>
> (i) The Examiner's Report

228. The Examiner's Report agrees with the foregoing conclusions and makes it clear that if the LBO-Related Causes of Action are successful and both Step One Lender Claims and Step Two Lender Claims are avoided, the Non-LBO Creditors will be paid in full.

229. Specifically, the Examiner found that it is "reasonably likely" that a court would find that "if the estate representatives for Tribune and the Guarantor [Debtors] were to successfully avoid the LBO Lender Debt [the Step One Lender Claims and the Step Two Lender Claims], the value available from avoidance at the Guarantor [Debtor] estates would not be limited just to satisfaction of the Non-LBO Debt at those levels[,]" but also would flow up to Tribune, the parent. Examiner's Report, Vol. 2 at 289, 297 ("The Examiner finds it reasonably unlikely that a court would allow the LBO Lenders to recover ahead of Tribune's creditors from

---

[143] Although the Examiner did not analyze the avoidance action in this manner, he did recognize the basic inequity of how the LBO Transaction gutted the value of the Guarantor Debtors to the detriment of Tribune's Non-LBO Creditors: "The value that had been available to Tribune's creditors in the form of equity in the Guarantor Debtors before the LBO Transaction was diluted by the Stock Pledge and the joint and several guarantees given by the Guarantor Debtors in those transactions." Examiner's Report, Vol. 2 at 294.

the Guarantor Debtors"). In other words, the Examiner determined that, if found to be a fraudulent transfer, the LBO Debt could be avoided in full at the subsidiary level, irrespective of the fact that all creditors at the subsidiary level had been paid in full.

230. In so finding, the Examiner addressed whether the benefits of avoidance at the subsidiary level would inure to the benefit of Tribune's creditors. To do this, the Examiner "considered whether, if all of the estates avoided the LBO Lender Debt, avoidance at the Guarantor [Debtor] levels would solely inure to the benefit of the Non-LBO Creditors of the Guarantor [Debtors], with the remainder of the consideration going to satisfy the LBO Lender Debt[,]" or instead, whether the remainder of the consideration would go to satisfy the innocent Non-LBO Creditors' debt. Examiner's Report, Vol. 2 at 293.

231. The Examiner found that, if both Step One and Step Two Debt were avoided, any surplus resulting from the avoidance would be upstreamed to Tribune's Non-LBO Creditors. This was not even a close question for the Examiner: "[I]t would be implausible for a court to find that avoidance is required as to each and every Debtor, only to reverse that avoidance for a moment in time to allow the LBO Lenders to recover the value from Guarantor Debtors on account of their avoided obligations." *Id.* at 94. If the LBO Lenders step back into the queue as soon as the Non-LBO Creditors of the Guarantor Debtors are paid, this would negate any potential benefit that the avoidance of all of the LBO Debt might provide to the creditors of the parent. The Examiner concluded that it would be inconsistent with the objectives of the Bankruptcy Code, and thus, "reasonably unlikely" that a court would permit the claims of the LBO Lenders under the subsidiary guarantees to snap back to life upon payment of the Non-LBO Creditors of the Guarantor Debtors and recover ahead of Tribune's creditors from the Guarantor Debtors. *Id.* at 297.

232. To support his view that the Court should avoid all of the LBO Debt at the Guarantor Debtors and not just enough of it to pay the few Non-LBO Creditors of the Guarantor Debtors, the Examiner points to the language of Bankruptcy Code section 548 which renders an avoided obligation unenforceable. *Id.* at 294-95. Unlike circumstances where property is recovered in an avoidance action, in which case the "benefit of the estate" limitation contained in Bankruptcy Code section 550 would apply, no similar limitation is found for avoidance in section 548. *Id.* at 295. In other words, the statute simply permits avoidance of avoidable obligations, without limit. The Examiner further explains that even though section 550 is only applicable where property is recovered and not where debt has been avoided, there is case law authority decided under section 550 that would permit recovery of the transferred property beyond what is necessary to pay creditors in full. *Id.* The Examiner distinguishes cases where courts have imposed a limitation on avoidance in circumstances where avoidance would only benefit the equity holder or would exceed the damages suffered by creditors. *Id.* at 296-97. The Examiner notes that the facts of those other cases are clearly distinguishable from these cases because avoidance would benefit the creditors of Tribune as opposed to the owners of Tribune. *Id.*

233. Significantly, the Examiner explains that even though Tribune's creditors did not bargain as a matter of law for recourse to the Guarantor Debtors, it would be inequitable for a court to permit lenders whose debt has been avoided "to enforce their structural seniority in this avoidance scenario." *Id.* at 297.

234.   Even if Step One is not avoided as a fraudulent transfer but Step Two is avoided, then, for the same reasons discussed above, all of the Step Two Debt should be set aside, not just the amount necessary to pay off the small amount of Non-LBO Debt at the Guarantor Subsidiaries. The resulting value can and should be upstreamed to Tribune and made available to Tribune's Non-LBO Creditors. In addition, because of their pervasive involvement in both Step One and Step Two of the LBO Transaction, the Step One Lenders would be precluded from sharing in such value. While the Noteholder Plan Proponents are not aware of any cases with similar fact patterns to the one at issue here, one thing is clear: the same logic employed by the Examiner to support his conclusion that, if all of the LBO Debt was avoided it would be implausible that a court would permit the LBO Lenders to consume the fruits of avoidance and recovery at the subsidiary level *before* value could flow up to the parent level (*i.e.*, Tribune), also supports the conclusion that if only the Step Two Debt is avoided as a fraudulent transfer, the Step One Lenders should not be permitted to consume all of the liberated and recovered value ahead of the Non-LBO Creditors of Tribune.

235.   Although some courts have held that equity (as distinct from aggrieved creditors of a parent) may never benefit from an avoidance action, other courts have held to the contrary. *See, e.g., In re Kraft, LLC*, 429 B.R. 637, 667-68 (Bankr. N.D. Ind. 2010) (holding that equity could receive surplus if creditors are paid in full); *In re Goss*, 43 F.2d 746, 747-48 (N.D. Ga. 1930) (holding that, while normally any surplus in recoveries over and above that which is necessary to pay creditors goes back to the fraudulent transferee, where the transferee has engaged in the fraud and comes to the court with unclean hands, the debtor is permitted to keep

the surplus.); *In re Bayou Group, LLC*, 372 B.R. 661, 664 (Bankr. S.D.N.Y. 2007) (holding that it "is *not* clear that fraudulent conveyance claims can *never* be brought in whole or in part to benefit equity...."); *In re Calpine Corp.*, 377 B.R. 808, 813 n.3 (Bankr. S.D.N.Y. 2007) (quoting *Bayou*). Of note, the court in *Bayou* said:

> In most cases, from the perspective of Bankruptcy Code objectives, it makes sense to say that fraudulent conveyance claims may be asserted only to the extent necessary to benefit creditors, as opposed to the debtor and the debtor's equity. But I decline to embrace an all-encompassing bright line rule holding that a fraudulent conveyance claim can never be brought to benefit equity. It is not difficult to imagine circumstances where stockholders or "equity" (such as the non-redeeming investors here) have no knowledge of, responsibility for or timely capacity to deter a fraudulent scheme by rogue management and suffer precisely the same harm as creditors of a corporate entity which has been victimized by the scheme. In such a case, permitting a debtor-in-possession or Chapter 11 or Chapter 7 trustee to assert fraudulent conveyance claims for the benefit of innocent equity investors, as well as creditors, would not offend any statutory language and would serve Bankruptcy Code objectives.

372 B.R. at 664 n.2.

236. Equity demands such a result in this case. The benefit that would accrue to Tribune from avoidance of the subsidiary guarantees will not simply reside with Tribune or its former owners. To the contrary, the benefit would be used to compensate the Non-LBO Creditors of Tribune. Like the scenario discussed in *Bayou*, Tribune's Non-LBO Creditors had "no knowledge of, responsibility for or timely capacity to deter a fraudulent scheme by rogue management" and they "suffer[ed] precisely the same harm as [the] creditors" of their Subsidiaries. *Id.* If ever there were a fact pattern that would call for a distribution of surplus to the creditors of the parent (*i.e.*, to Tribune and *its* creditors), this would be it. To do anything to the contrary would directly conflict with the purposes of the fraudulent conveyance statutes in the Bankruptcy Code and the intent of the drafters. It would be gravely inequitable to allow the surplus of any recovery to flow to the Step One Lenders because those Lenders were actively

involved in negotiating and structuring the fraudulent transfer, priced Step One to include Step Two, knew the funds would not be retained by Tribune or its subsidiaries and, consequently, gave less than reasonably equivalent value to the Debtors. Recovery by Tribune will not result in a windfall to the Debtors or its owners. Instead, it would merely restore the innocent Non-LBO Creditors to the same position they were in prior to the LBO Transaction. Such a result is plainly in line with the fraudulent transfer provisions in the Bankruptcy Code and applicable case law.

237.    In sum, in the event that only Step Two is avoided as a fraudulent transfer, the value at the Guarantor Debtors that results from the avoidance of the Step Two Debt should not be soaked up by, paid to, or shared with the Step One Lenders. This is the appropriate and equitable result at both. The Step One Debt - whether asserted against Tribune as primary obligor and borrower or against the subsidiaries as guarantors - should not continue to be used as a tool to frustrate the rights of the Non-LBO Creditors at Tribune. Instead, that value liberated by the avoidance of Step Two should be upstreamed to Tribune for distribution to Tribune's Non-LBO Creditors. For the reasons discussed in Section B, *infra*, such upstreamed value should not be shared with or paid to the Step One Lenders against Tribune until Tribune's Non-LBO Creditors have been paid in full (including postpetition interest).

238.    The Examiner acknowledged one could argue that it would be inequitable for the Step One Lenders "to benefit from avoidance payments made and obligations incurred in the Step Two Transactions while non-LBO Creditors holding claims against the same estates remain unpaid." Examiner's Report, at Vol. 2 at, 301. However, because the Examiner believed that the law "is not clear," the Examiner left this important question in "equipoise." Examiner's Report, Annex B at B-8 ("As discussed in the Report, the Examiner considered the possibility that a

court may determine that, under equitable estoppel other theory, the LBO Lender may not be entitled to share in recoveries on Step One Debt from Step Two avoidance and recoveries, even though the Step One Debt is not avoided. The Report leaves this question in equipoise.").

<div style="margin-left: 2em;">

(iii) Because Tribune Is a Creditor of the Guarantor Debtors, Tribune Creditors Can Benefit from Avoidance of Step Two at the Subsidiary Level

</div>

239. Tribune's status as a creditor of the Guarantor Debtors also provides Tribune with direct standing to avoid the LBO Debt in its entirety and recover transfers made at the subsidiary level. Pursuant to the terms of the Intercompany Claims Settlement as embodied in the Intercompany Claims Settlement Agreement at Exhibit 1.1.122 to the DCL Plan, Tribune's accounting system provides that Tribune has an aggregate of $22,500,727,798.97 in potential claims against the Guarantor Subsidiaries of which $2,406,406,375.34 is deemed to be Allowed pursuant to the terms of the DCL Plan and the Intercompany Claims Settlement. Accordingly, Tribune is a substantial creditor of the Guarantor Debtors, has standing to avoid the LBO Transaction at the Guarantor Debtors and is entitled to recover transfers made at the subsidiary level for the benefit of Tribune's creditors.

<div style="margin-left: 2em;">

(4) *Step One Lenders cannot participate in the recovery if the Step Two Financing avoided as a constructive fraudulent conveyance*

</div>

240. The Step One Lenders should also be prohibited from sharing in the benefits from avoidance of Step Two Debt and any recoveries of payments made in connection with Step Two because the Step One Lenders consented to, and assumed the risks associated with, the Step Two Transactions.

241. Long before the enactment of the Bankruptcy Code and uniform state laws governing the avoidance of fraudulent transfers, courts recognized the principle that a creditor

who consented to an allegedly fraudulent transfer is estopped from seeking its avoidance. *See Judson v. The Courier Co.*, 8 F. 422, 425 (S.D.N.Y. 1881) ("A transfer is not, then, a fraud upon the act if made with the consent of all persons in interest . . . . Such consent is a virtual waiver of all the benefits of the bankruptcy act, and, when acted on by the transferee, is an estoppel against subsequent incompatible claims under the act."); *In re Kraft*, 3 F. 892, 892 (S.D.N.Y. 1880) (stating that creditors who consent to a transfer are precluded from challenging it); *Reitsch v. McCarty*, 35 N.D. 555, 574 (1916) (same); *Am. Nat'l Bank & Trust Co. v. Powell*, 178 So. 21, 29 (Ala. 1938) ("We are fully aware of the rule of law that a conveyance in fraud of creditors made with the full knowledge of existing creditors is valid, as far as the creditors who assent to or affirm the conveyance are concerned."); *Wooten v. Robins*, 30 So. 681, 682 (Ala. 1900) ("A fraudulent conveyance is merely voidable, and consequently capable of confirmation, either by assent at the time or by subsequent ratification." (citation and internal quotations omitted)).

242.    The adoption of the Bankruptcy Code and state laws governing avoidance has not supplanted this basic tenet. *See, e.g.*, Uniform Fraudulent Transfer Act § 10 (1984) ("Unless displaced by the provisions of this Act, the principles of law and equity, including . . . estoppel . . . supplement its provisions."); 6 Del C. § 1310 (same).   Accordingly, courts continue to recognize estoppel as a basis for precluding fraudulent transfer claims asserted under both the Bankruptcy Code and state law. *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 602 (B.A.P. 8th Cir. 2003) (explaining that under section 544(b) of the Bankruptcy Code, "[t]he trustee bears the burden of proving the existence of a qualified unsecured creditor, and if the creditor is estopped or barred from recovery for some reason, so is the trustee."); *In re G-I Holdings, Inc.*, 313 B.R. 612, 633 (Bankr. D.N.J. 2004) (same); *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer is not void, but voidable; thus it can be

ratified by a creditor who is then estopped from seeking its avoidance."); *see also Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 77 (Bankr. D. Del. 2005) (holding that creditors' committee was estopped from challenging payments as fraudulent transfers where the committee had previously supported the debtor's assumption of the contracts under which the payments were made); *Morin v. OYO Instruments, L.P. (In re Labelon Corp.)*, No. 02-22582, 2006 WL 2516386, at *4 (Bankr. W.D.N.Y. Aug. 28, 2006) ("[O]n equitable grounds, this Court would not make a finding of avoidance and recovery on the proposed Section 548 and [state law] causes of action when the only entity that would benefit from that avoidance and recovery would be [a creditor] which specifically approved the [subject] transaction in writing and significantly benefitted from the transaction."); *Harris v. Huff (In re Huff)*, 160 B.R. 256 (Bankr. M.D. Ga. 1993) (where creditor consented to a transfer prepetition, the trustee was estopped from challenging the transfer as a fraudulent conveyance).

243.    The Supreme Court's holding in *Moore v. Bay*, 284 U.S. 4 (1931), does not change this result. In *Moore*, the Supreme Court held that once a transfer is avoided in bankruptcy, any recovery inures to the benefit of all unsecured creditors, including those creditors who themselves could not avoid the transfer. *See Moore*, 284 U.S. at 4. *Moore* is distinguishable from and does not control on the issue of whether the Step One Lenders may benefit from the avoidance of Step Two. First, the *Moore* Court involved application of state law, as opposed to bankruptcy law, to a post-transaction creditor's ability to bring or benefit from an avoidance action. Second, the *Moore* Court did not address whether there were equitable considerations that might limit a creditor's ability to share in the proceeds of an avoidance action. To the contrary, *Moore* simply stands for the proposition that under certain mechanical, non-judgmental circumstances, all estate creditors benefit from avoidance. The rule

of *Moore v. Bay* is not a rule of inclusion that requires the claim of each creditor to be allowed without question or review, or that mandates permitting a creditor to benefit from an avoidance action regardless of the defects or defenses that might attach to such creditor's claim.

244.   Indeed, subsequent decisions have recognized exceptions to the assumption that all creditors are entitled to benefit from an avoidance action, particularly where permitting the creditor to benefit would be inequitable. *See e.g.*, *Williams v. Marlar (In re Marlar)*, 267 F.3d 749, 756 (8th Cir. 2001) (refusing, on res judicata grounds, to allow creditor to share in recoveries resulting from trustee's fraudulent transfer action where creditor earlier attacked transfer in state court and lost). Indeed, courts have specifically recognized that equitable principles such as estoppel and assumption of risk can prohibit certain creditors from sharing in fraudulent transfer recoveries. *In re PWS Holding Corp.*, 228 F. 3d at 229, 239-40 (affirming district court's conclusion that fraudulent transfer claims to be released under chapter 11 plan were of questionable value since district court had concluded "that there was some likelihood that the Banks and subordinated noteholders, as participants in the leveraged recapitalization, would be estopped from recovering on the claims."). The pertinent inquiry, therefore, is whether a claim is allowable or subject to partial subordination once avoidance recovery is obtained. Here, the claims of the Step One LBO Lenders are subject to equitable infirmities that prevent them from sharing in the benefits of avoidance and/or recovery.

245.   As noted in the Examiner's Report, the lenders participating in Step One are "the same creditors (or their successors) who . . . participated in, funded, and made possible the Step Two Transactions." Examiner's Report at 301. Apart from the overlap between the Step One and Step Two Lenders, a number of factors reflect that Step One and Step Two were simultaneously planned, structured, and approved:

- The Step One and Step Two Lenders entered into a contractual loss-sharing arrangement in connection with the LBO Transaction. The Senior Loan Agreement §§ 2.13, 2.15

- Step One Lenders received enhanced pricing based on the knowledge that Step Two would occur. Examiner Ex. 179 (Senior Credit Agreement, dated May 17, 2007) at 2-3 (Applicable Margin)

- The Step One Lenders underwrote the credit with the explicit expectation that Step Two would occur. Examiner Ex. 305 (Amended and Restated First Step Commitment Letter, dated April 5, 2007); Examiner Ex. 309 (Amended and Restated Second Step Commitment Letter, dated April 5, 2007).

246. Based on the foregoing, the facts demonstrate that the Step One Lenders not only contemplated Step Two, but explicitly consented to it. Therefore, the Step One Lenders are estopped from avoiding the Step Two transactions. So to should the Step One Lenders be estopped from benefiting from another party's successful avoidance of Step Two Debt by sharing in any value resulting from avoidance. In other words, the Step One Lenders should not be allowed to do indirectly what they are barred from doing directly—namely, attacking Step Two of the LBO Transaction. *See, e.g., In re PWS Holding Corp.*, 228 F.3d at 229, 239-40.

247. It would be wholly inequitable to permit the Step One Lenders to benefit from the avoidance of the Step Two Transaction, and neither the Bankruptcy Code nor applicable case law mandates such a result. This is particularly true where, as is the case here, the size of the claims asserted by the Step One Lenders would consume virtually all of the value obtained for the Estates by the avoidance of the Step Two Debt, thereby depriving Non-LBO Creditors of substantially all of the benefit to which they should be entitled. As such, any value resulting from the avoidance of the Step Two Transaction should insure solely to the benefit of creditors who would not otherwise be estopped from seeking avoidance.

248.    Likewise, if the Step Two Transaction is deemed an intentional fraudulent conveyance, then the Step One Lenders cannot participate in any recovery obtained from that avoidance.   Principles of equity limit the rights of a creditor who participated in an actual intent fraudulent conveyance.   For example, if a lender received a security interest in collateral as part of an intentionally fraudulent transfer, that lender's right to assert a claim against the collateral "is absolutely void." *Loos v. Wilkinson*, 21 N.E. 392, 393 (N.Y. 1889); *see also Lobstein v. Lehn*, 12 N.E. 68, 69 (Il. 1887); *Brown v. Chubb*, 31 N.E. 1030 (N.Y. 1892).   This is based on the old, but well-established principle that "one who comes into a court of equity seeking its aid must come with clean hands." *Wilkinson*, 21 N.E. at 393.   Thus, avoidance of an obligation goes beyond depriving a lender of its guarantee.   The lender cannot assert any rights with respect to it, and it cannot share on equal terms with the other creditors. *See Hargreaves v. Tennis*, 88 N.W. 486, 488 (Neb. 1902) ("The conveyance being of no effect as to creditors, no advantage could accrue to him as against them by reason thereof.   He was bound to restore the stock or its value to the creditors, who had a charge thereon in equity to the amount of their claims . . . .").

249.    The Step One Lenders cannot escape this result if the Step Two Transaction is voided as an intentional fraudulent conveyance.   Step One and Step Two were simultaneously planned, structured, and approved, and the Step One Lenders and the Step Two Lenders are essentially the same.   They even entered into a contractual loss-sharing arrangement in connection with the LBO Transaction, and the Step One Lenders received enhanced pricing based on the knowledge that Step Two Financing would ultimately occur.   As the Examiner summarized, the Step One Lenders are "the same creditors (or their successors) who . . .

participated in, funded, and made possible the Step Two Transactions." Examiner's Report, Vol. 2 at 301.

250. Moreover, as discussed above, the Step One Lenders knew of and participated in the fraud. Therefore, if a court were to find that the Step Two Financing was an intentional fraudulent conveyance, as participants in that scheme, the Step One Lenders are far from innocent creditors. They would be stopped on equitable grounds from sharing in any recoveries from the Non-LBO Creditors who had no involvement or knowledge of the intentional fraudulent transfer.

### e. *The LBO Lenders' affirmative defenses to avoidance are without merit*

251. The affirmative defenses of the LBO Lenders to the LBO-Related Causes of Action are without merit and would not preclude a full or substantial recovery by the Non-LBO Creditors.

#### (1) *The LBO Lenders have no defenses under Section 546(e)*

252. Section 546(e) of the Bankruptcy Code exempts certain "settlement payments" made by or to "a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency . . ." from avoidance actions, and was enacted primarily to protect entities in the settlement payment chain from disruptive avoidance actions when the entities merely had settled ordinary securities transactions. *See, e.g., Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.)*, 328 B.R. 58, 66 (Bankr. S.D.N.Y. 2005) (noting that it has been repeatedly stated that the purpose of 546(e) is to minimize instability "caused by the reversal of settled securities transactions'").[144]

---

[144] *See also* H.R. Rep. No. 97-420, at 1 (1982) (stating that the purpose of 546(e) is not to confer advantages on particular claimants of a bankruptcy estate, but to minimize the risk that the insolvency of a securities or commodity

253.     This provision has no application to the avoidance of the obligations incurred by

Tribune in connection with the LBO Transaction.  First, Section 546(e), by its terms, is

inapplicable to intentional fraudulent conveyance claims and, in any event, the Debtors' Estates

possess substantial Section 548(a)(1)(A) claims against the LBO Lenders, among others.  *See,*

*e.g., Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.),* 274 B.R. 71, 75 (D.

Del. 2002).  More to the point, Section 546(e) shelters only "transfers" from avoidance attack,

not debt "obligations" like the obligations incurred by Tribune under the Credit Agreement for

the benefit of the LBO Lenders.[145]     Specifically, Section 546(e) provides, in relevant part, that

"[n]otwithstanding sections 544 ..., 548 (a)(1)(B), and 548(b) of this title, the trustee may not

avoid a transfer that is a margin payment . . ., or settlement payment,...or that is a transfer...in

connection with a securities contract[.]" (emphasis added); *see also Brandt v. Hicks, Muse & Co.*

*(In re Healthco Int'l, Inc.),* 195 B.R. 971, 981 (Bankr. D. Mass. 1996) ("By its own terms,

section 546(e) applies only to a 'transfer' made by or to one of the named entities.").  In contrast,

Section 548 empowers the trustee to avoid both a "transfer" and an "obligation."  The fact that

Section 546(e) – which specifically references the avoidance powers created pursuant to Section

548 – omits any reference to the avoidance of "obligations," compels the conclusion that this

section does not protect against avoidance of the obligations incurred under the Credit

Agreement.

254.     In addition, although the Stock Pledge may be characterized as a "transfer"

(unlike the obligations incurred in connection with the Credit Agreement), the avoidance of the

---

firm would spread and disrupt the complex system of accounts and guarantees called the "clearance and settlement system").

[145] As noted by the Examiner, there is a significant distinction between "transfers" and "obligations" under the Bankruptcy Code.  *See* Examiner Report, Vol. 2 at 246-50 ("A right to payment starts its life as an obligation to pay something to someone else; when that obligation is honored and funds move from one party's hands to another, a transfer on account of the obligation occurs, but the fact that an obligation may give rise to a transfer does not make an obligation a transfer. The two are very different things.")

obligations incurred under the Credit Agreement would render moot any application of a 546(e) defense to the Stock Pledge. Indeed, as found by the Examiner, the Stock Pledge "only existed to secure the obligations under the Credit Agreement and is meaningless except as security for the LBO Debt. If the LBO Debt is avoided, the Stock Pledge secures nothing." Examiner Report, Vol. 2 at 251-52. Thus, Bankruptcy Code section 546(e) can afford "no protection for the [LBO] Debt or any security, promissory notes, or guarantees given in connection therewith. *Id.*

> (2) *The LBO Lenders cannot establish "good faith" at Step One or Step Two*

255. The LBO Lenders cannot establish a good faith defense under Section 548(c) to escape the avoidance of their debt. That provision provides that a transferee or obligee may enforce its claim only if it "takes for value and in good faith" and only "to the extent that such transferee or obligee gave value to the debtor. . . ." *See* 11 U.S.C. § 548(c); Ta*bor Court Realty Corp.*, 803 F.2d at 1298-99; *Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) (transferee has burden of proving good faith).[146] In evaluating good faith, "the court takes an objective approach to determine what the transferee knew or should have known 'such that a transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer.'" *See Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203 (Bankr. D.N.J. 2006) (quoting *In re Burry*, 309 B.R. 130, 136 (Bankr. E.D. Pa. 2004)). Good faith is also determined on the

---

[146] The Section 548(c) good faith defense does not apply to the LBO Lenders that were the subsequent purchasers. Only initial transferees and obligees can use this defense. See *Hayes v. FPI Nursery Partners 1984-I*, 1991 U.S. App. LEXIS 12650 (9th Cir. June 11, 1991) (holding that subsequent transferees do not comply with Section 548(c) as they do not take for value); *McKloskey v. Galva Foundry Co. (In re Art Unlimited, LLC)*, 356 B.R. 700, 711 (Bankr. E.D. Wis. 2006) ("[A]n immediate or mediate transferee is protected by 11 U.S.C. § 550(b)(1) if it gives 'value,' not necessarily 'value to the debtor,' the term used in 11 U.S.C. § 548(c) to protect an initial transferee") (emphasis added); *Reliant Interactive Media Corp. (In re GeneralSearch.com)*, 322 B.R. 836, 842 (Bankr. N.D. Ill. 2005).

"totality of the circumstances." *See Russo v. McLaughlin (In re McLaughlin)*, 2006 U.S. Dist.

LEXIS 92350, at *28 (D.N.J. Dec. 20, 2006). Further, in the leveraged finance context, "good

faith" requires the transferee to prove a lack of actual or constructive knowledge of the

impairment of the debtor's financial condition. *See Tabor Court Realty Corp.*, 803 F.2d at 1296

(lenders' knowledge that debt would render the debtor insolvent precluded finding of good faith).

256.    Under the objective test for good faith, the court determines "what the transferee

knew or should have known 'such that a transferee does not act in good faith when it has

sufficient knowledge to place it on inquiry notice of the voidability of the transfer." *Roeder v.*

*Lockwood (In re Lockwood Auto Grp., Inc.)*, 2010 Bankr. LEXIS 1377, at *12-13 (Bankr. W.D.

Pa. May 14, 2010). As the Eight Circuit aptly noted, a lender cannot sit idly by when it knows

the debt may be avoided as a fraudulent transfer:

> [I]f a transferee possesses knowledge of facts that suggest a
> transfer may be fraudulent, and further inquiry by the transferee
> would reveal facts sufficient to alert him that the property is
> recoverable, he cannot sit on his heels, thereby preventing a
> finding that he has knowledge. In such a situation, the transferee is
> held to have knowledge of the voidability of the transfer.

*Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1353-54 (8th Cir. 1995) (citations

omitted).

(a)     The LBO Lenders cannot establish a good faith
defense at Step One

257.    Although the Examiner concluded that the Court would be "reasonably likely" to

conclude that a good faith defense may be available to the LBO Lenders in connection with the

Step One transaction, the Examiner's conclusion regarding good faith at Step One was based in

large part on his conclusion that it is "highly likely that the Step One Transactions did not render

the Tribune Entities insolvent or without adequate capital."[147]    The Examiner's conclusion was also reached without the benefit of significant confirmation-related discovery which proves otherwise.

258.    The evidence to be presented at trial will show that as of June 4, 2007 (the "Step One Financing Closing Date"), ████████████ Redacted ████████████

████████████████████████████████████████

████████████████████████████████████████

████████    *See* Tuliano Report at 90-129.  Moreover, the evidence will show that the LBO Lenders had at least constructive knowledge of Tribune's potential insolvency prior to the closing of Step One.  ████████ Redacted ████████

████████████████████████████████████████

████████████    *See, e.g.*, Persily Dep. Tr. at 44:17-23; 48:20-50:11.  In addition, there is significant evidence that the LBO Lenders did not believe Tribune could handle the LBO Debt but proceeded with the transaction anyway because of business concerns.  *See, e.g.*, Persily Exs 19, 21-22, 35-36, 40-43, 45, 57, 58; Grimminck Ex. 7; Kowalczuk Ex. 8.

259.    Importantly, much of this evidence has been produced in connection with confirmation-related discovery and was not before the Examiner at the time he issued his report.

████████████████ Redacted ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[147] *See* Examiner's Report, Vol. 2 at 264 (finding that even if the Lenders were placed on inquiry notice that Step One might render Tribune insolvent or without adequate capital "an inquiry into the actual facts and circumstances would lead a reasonable prospective lender in JPMCB 's position to conclude that the Tribune Entities would not be rendered insolvent.").



**Redacted** *See* Persily, Ex 19. Testimony adduced after the filing of the

Examiner's Report also indicates that **Redacted**

*See* Tuliano Report at 8, 75-77.

260.     Applying an objective test for good faith, these facts indicate that the LBO

Lenders had, at least, constructive knowledge of the voidability of the transfer at Step One.[149]

Specifically, had they used their own projections for Tribune to test solvency at Step One, they

should have known (and are charged with the knowledge) that the Step One Transactions would

render Tribune insolvent. *See Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.)*,

2007 Bankr. LEXIS 4004, at *25 (Bankr. D. Del. Nov. 20, 2007) (stating that the Third Circuit

has established that the "[good faith] defense is not available if the transferee has knowledge of

facts that would lead a reasonable person to believe that the property was recoverable by a

debtor"). In light of these facts, the LBO Lenders cannot establish a good faith defense at any

point during the LBO period.

---

[148] *See,* Persily Dep. Tr. at 44:17-23; 48:20-50:11 **Redacted**

[149] *See Sherman in re*, 76 F.3d at 1357 ("If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer.").

(b)     The LBO Lenders cannot establish a good faith
         defense at Step Two

261.     As discussed at length in the Examiner's Report, there is extensive evidence

showing that the LBO Lenders lacked good faith at Step Two of the LBO Transaction. The

evidence produced since the date of the Examiner's report only supports this conclusion. This

evidence demonstrates that, in the months leading up to the closing of Step Two, the LBO

Lenders, collectively and individually, knew (i) that the Debtors' financial condition was

deteriorating, (ii) that the Debtors were indeed insolvent, and (iii) that the VRC Step Two

solvency opinion was meaningless. For example, the executives at the LBO Lenders knew that

Tribune "was in more trouble than [they had previously] thought," that "the market had

completely collapsed," and that the "company's performance was deteriorating." Examiner's

Report Volume I at 595, 605. The LBO Lenders also understood that the Debtors had either

already slipped into insolvency or would become insolvent upon the close of Step Two. For

example, in September 2007, JPM worried that "the current valuation of Tribune is

approximately $[10] to [13] billion, potentially failing the solvency tests (i.e., debt amount

exceeds the value of Borrower)." Examiner's Report Volume I at 603. At Bank of America,

employees were questioning the solvency of the Debtors. *Id.* at 605. On a conference call

amongst the Lead Banks on December 14, 2007, a Merrill employee apparently stated that it was

"[r]easonable that [Tribune] was not a solvent company." *Id.* at 617. And in the weeks ***before***

Step Two closed, Citibank was already preparing for the reality of bankruptcy proceedings. *Id.*

at 617. Indeed, in the run-up to the close of Step Two, the LBO Lenders' (and especially the

Lead Banks') "analyses suggest[ed] . . . [that they] were aware of the significant possibility that

Tribune would be rendered insolvent by the consummation of Step Two." *Id.* at 605-606.

262.     The Examiner also found that the LBO Lenders understood that the solvency analysis, dated December 20, 2007 (the "Step Two VRC Solvency Opinion")[150] was fatally flawed, and that they "knew or had reason to know that the case for insolvency was, to say the least, closer than VRC had opined." Examiner's Report Volume II at 276.[151] Thus, as succinctly stated by the Examiner, "[b]ased on the record...JPMCB and the other Lead Banks had sufficient knowledge to be placed on inquiry notice regarding Tribune's possibly insolvency as Step Two approached," Examiner's Report Volume 2 at 265-66, and did not have a good faith defense. *Id.* at 277-78.

        (c)    <u>The LBO Lenders Did Not Extend Sufficient Value Cognizable Under Section 548(c) to Materially Affect the Outcome of the LBO-Related Causes of Action</u>

263.     Even if the LBO Lenders could establish good faith at Step One or Step Two, which they cannot, they did not extend sufficient value cognizable under Section 548(c) that would impede the Non-LBO Creditors from obtaining a full recovery, plus interest. The Examiner carefully analyzed whether and, if so, to what extent seven components of purported consideration given by the participants in Step One and Step Two would constitute "value" for purposes of Section 548(c). But the Examiner concluded that only a small fraction of the Step One and Step Two consideration *might* constitute "value" for such purposes.

264.     For example, the Examiner concluded that a court is "highly likely" to conclude that the LBO Lenders *did not* confer value on Tribune or the Guarantor Subsidiaries in the Step

---

[150] Examiner Ex. 1045.

[151] For example, in a Merrill Lynch email on December 7, 2007, Redacted (Examiner's Report Volume I at 628.) Indeed, Citigroup began searching for another entity to check VRC's Solvency Opinion. As employees of Houlihan Lokey wrote, Redacted *Id.* at 632.

One Transactions or Step Two Transactions for the $8.26 billion that was used to redeem the Selling Stockholders' common stock. Examiner's Report, Vol. 2, at 91 ("Payments to stockholders to redeem stock are not transfers for which a debtor receives reasonably equivalent value because the debtor's stock is worthless to the debtor as a matter of law. Thus, no value was conferred on any Tribune Entity for obligations incurred to the LBO Lenders to make these payments.").

265.     The Examiner also concluded that a court is "highly unlikely to conclude that the Credit Agreement lenders conferred any value on one or more Tribune Entities" resulting from the $3.9 billion of LATI Note transactions effectuated at the Step One Financing Closing Date. Id., at 93, 96 ("This was not a case in which any obligor was ever called on to pay so much as a penny from its own resources toward satisfaction of the LATI Notes. This course of dealing simply does not manifest anything resembling a real economic transaction."). In fact, the Examiner concluded that "the LATI Notes do not [even] constitute debt" for purposes of Section 548(c). Id., at 96 n. 307.[152]

266.     Redacted

Expert Report of Bruce Beron, App. B.6.  Redacted

Id.  Redacted

---

[152] The amount and/or cognizablity of the other elements of alleged conferred "value" are to varying degrees suspect as a matter of law and/or fact, and will be addressed further at the Confirmation Hearing.

Redacted

**f.** ***The Estate Has Many Other Valuable Claims Against the LBO Lenders That The Proposed Settlement Releases For Insufficient Consideration***

267.     The Proposed Settlement should also not be approved because it wrongfully settles many other valuable claims that would otherwise provide the Non-LBO Creditors with substantial recoveries.

*(1)      The Proposed Settlement ascribes virtually no value to the valuable claims for equitable subordination*

268.     Bankruptcy Code section 510(c) authorizes the subordination of claims of creditors who engaged in fraudulent or inequitable conduct to the claims of innocent creditors. The Third Circuit recognizes that equitable subordination pursuant to section 510(c) is "designed to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Schubert v. Lucent Tech. (In re Winstar Commc'ns, Inc.),* 554 F.3d 382, 411 (3d Cir. 2009).

269.     In considering whether to equitably subordinate a claim, courts in the Third Circuit rely on the three-part test set forth in *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir. 1977). Under the *Mobile Steel* test "(1) the claimant must have engaged in some type of inequitable misconduct ... ; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant ... ; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]." *563 F.2d 700.* Misconduct warranting equitable subordination includes

unfair dealing, fraud, illegality, breach of fiduciary duties, over-reaching, and undercapitalization. *See OODC,* 321 B.R. at 146 (Bankr. D. Del. 2005); *Sierra Indus., LLC v. SHC, Inc. (In re SHC, Inc.),* 329 B.R. 438, 447 (Bankr. D. Del. 2005). Whether to subordinate a claim is made on a case-by-case basis focusing on fairness to other creditors. *See In re Vitreous Steel Prods. Co.,* 911 F.2d 1223, 1237 (7th Cir. 1990).

270. Moreover, a claim may be equitably subordinated even when the claimant did not intentionally commit bad acts. *See, e.g., In re O'Day,* 126 B.R. 370, 412 (Bankr. D. Mass. 1991) (even without intent to hinder, delay or defraud creditors, lender conduct sufficient to warrant equitable subordination). Although "courts have struggled to define precisely the misconduct necessary to support equitable subordination against a creditor who is not an insider ... [s]omething less than actual fraud ... will suffice," and the "minimum level of offending conduct appears to be conduct that shocks the conscience of the court." *In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1361 (1st Cir. 1992); *see also OODC,* 321 B.R. at 146 (need "egregious misconduct").[153]

271. The Third Circuit recognizes a claim for equitable subordination even where the lender's actions may be lawful, but egregious vis-à-vis the estate's other creditors. *Schubert,* 554 F.3d at 412-13. In *Schubert,* a lender deliberately withheld the release of a refinancing notice in order to induce other creditors to provide funds to the debtor before its collapse. *Id.* at 412-13. Although the Third Circuit expressly acknowledged that the lender had the legal right to issue the refinancing notice at its sole discretion, it nonetheless affirmed the bankruptcy court's

---

[153] To satisfy the second *Mobile Steel* element, it need only be shown that the "general creditors are less likely to collect their debts as a result of the allegedly inequitable conduct." *See, e.g., Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.),* 277 B.R. 493, 515 (Bankr. S.D.N.Y. 1999). The subordination of an inequitable party's claim to that of an innocent party's claim itself satisfies the third *Mobile Steel* element. *See In re J.S.II. LLC,* 389 B.R. 570, 581 (Bankr. N.D. Ill. 2008). *The LBO Lenders'* claims here easily satisfy the second and third elements of the *Mobile Steel* test. *J.S. II. LLC,* 389 B.R. at 581 (inequitable conduct "led the Debtors' descent into bankruptcy"); *In re KDI Holdings, Inc.,* 277 B.R. at 515.

subordination of its creditor's claim. *Id.* at 412. As the bankruptcy court stated, the lender hid from other creditors what it already knew; that the debtor "was in significant financial distress and indeed … was insolvent … ; [the lender] reaped a substantial benefit but at the expense of the Debtors' other creditors"). *See* Memorandum of Decision Including Findings of Fact and Conclusions of Law, *In re Winstar Commc'ns, Inc.*, Adv. Proc. No. 01-1063 (JBR) (Bankr. D. Del. Dec. 21, 2005) [Docket No. 369].

272.    *OODC* is especially instructive. There, the court sustained an equitable subordination claim in the wake of a failed LBO. 321 B.R. at 145-46. Specifically, the *OODC* court found sufficient allegations that the banks:

> (1) knowingly facilitated the removal of at least $40 million in assets of the Debtor (by obtaining a security interest in them) at a time when the Debtor was insolvent, (2) that they knowingly and recklessly disregarded the Debtor's insolvency, (3) that they knowingly and recklessly intended to hinder, delay or defraud the Debtor's creditors, (4) that they knowingly or recklessly disregarded the fact that the LBO would force the Debtor into bankruptcy, and (5) that they *knowingly and recklessly disregarded the impact of these transactions on the Debtor's unsecured creditors*.

*Id.* at 145 (emphasis added). The court concluded that "the Trustee has alleged sufficient facts to support claims against the Bank Group for actual and constructive fraud and aiding and abetting breach of fiduciary duty. If proven, these allegations would provide the basis for a finding of egregious misconduct which could warrant the subordination of the Bank Groups' claims under section 510(c)." *Id.* at 146.

273.    Just as in *OODC*, the LBO Lenders in this case structured and effectuated the LBO Transaction: (i) knowing or foreseeing that the debt incurred would render the Debtors insolvent; (ii) in exchange for huge fees, knowing that that the Debtors would be unable to service their debt to direct detriment unsecured creditors; (iii) knowing that the projections they relied upon were false or unreliable; and (iv) knowing that the LBO Transaction would have a

devastating effect on the Debtors' Non-LBO Creditors, especially the Senior Noteholders and the holders of PHONES Notes. For example, as discussed above, the evidence shows that the LBO Lenders were well aware prior to Step One that the LBO debt likely would render Tribune insolvent and drive Tribune into bankruptcy.[154] Moreover, JPMorgan was fully aware of the risks it undertook by proceeding with the LBO.[155] As in *OODC*, these facts, when proven, will result in the equitable subordination of the LBO Lenders' claims. 321 B.R. at 146.[156]

---

[154] *See, e.g.*, Examiner's Report, Vol. 1 at 266 (quoting JPMorgan internal email) ("There is a wide speculation that the company might have put so much debt that all of its assets aren't gonna cover the debt in case of (knock, knock) you-know-what [bankruptcy]."); *id.* at 282 (quoting Michael Costa (Former Managing Director of Mergers and Acquisitions - part of the investment banking division of MLPFS) E-Mail, dated March 10, 2007) ("Short answer is in light of recent operating performance *no comfort inputting the kind of leverage necessary for Zell proposal to work* ... Also numerous issues in Zell proposal we could not solve.) (emphasis added). *See also id.* at 304 (quoting Julie Persily (Managing Director and Head of North American Leveraged Finance for Citigroup) E-Mail, dated March 22, 2007) ("Declining ebitda is scary. Until yesterday I did not know that Q1 cash flow was down 20 from last year. All I heard was that pub was 6mm off plan and broadcast was 5mm higher. I'm very concerned."); *id.* at 284 (quoting Julie Persily E-Mail, dated March 24, 2007) ("[g]iven that the interest expense will be a lot higher, the Company may not be able to handle this much debt."); *id.* at 284, quoting (David Tuvlin (Managing Director at Merrill Lynch) E-Mail, dated March 28, 2007) ("Citi said they need a condition in order to fund step 2 that ratings are no less than they are today!!!"); *id.* at 199 (quoting Standard & Poor's Rating Evaluation Service letter to Chandler Bigelow, dated March 29, 2007) ("Under our scenario, the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."); *id.* at 200-201 (citing Standard & Poor's Recovery Report, dated April 19, 2007) ("Tribune's corporate credit rating was BB-/Watch Neg. Once again, Standard & Poor's concluded that, under its default scenario, assuming the consummation of the Step One Transactions and the Step Two Transactions, Tribune was expected to default in 2009.").

[155] *See, e.g.*, Examiner's Report, Vol. 1 at 626 (quoting (Darryl Jacobson (Vice President at J.P. Morgan Securities Inc.) E-Mail, dated August 24, 2007) ("Mr. Jacobson's e-mail reflects [JPMorgan]'s conclusion that contractual and practical impediments (including 'the potential for creating diverging economic interests') prevented [JPMorgan] from participating in the transaction proposed by Mr. Zell, and that if [JPMorgan] were to nonetheless do so, any claim in a hypothetical future reorganization proceeding could be equitably subordinated.").

[156] A number of recent cases have permitted equitable subordination claims to proceed based on similar factual allegations. *See Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*, 326 B.R. 301, 311 (Bankr. D. Del. 2005) (allegations that non-insider knew or should have known that debtors' trust was insolvent at time debtors transferred funds to it, which funds were then transferred to defendants, sufficient to warrant finding of inequitable conduct); *J.S. II. LLC*, 389 B.R. 581 (claim that entities undercapitalized and grossly mismanaged debtor resulting in descent into bankruptcy sufficient to state claim for equitable subordination); *Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 01-67457-59 2007 WL 2509709, at *2 (Bankr. N.D.N.Y. Aug. 20, 2007) (denial of motion to dismiss claim for equitable subordination based on allegation that debtor was undercapitalized at time it took on affiliate debt); *LWD Trucking v. LWD, Inc. (In re LWD, Inc.)*, 342 B.R. 514, 520 (Bankr. W.D. Ky. 2006) (denial of motion to dismiss claim for equitable subordination based on allegation that defendants acted in concert to improperly transfer or otherwise dissipate estate assets); *SHC*, 329 B.R. at 447 (claim that creditor, on eve of debtors' insolvency, collaborated with debtors to enter into assignment without any consideration given to debtors sufficient to state claim for equitable subordination); *In re Conley*, 159 B.R. 323, 325 (Bankr. D. Idaho 1993) (court denied individual creditor derivative

274.    Even in the absence of a fraudulent transfer claim, courts have subordinated

lender claims where, as here, the lender's conduct was motivated by making significant fees in

disregard of the inability of the borrower to service its debt load. *See In re Yellowstone*

*Mountain Club, LLC*, No. 08-61570-11, 2009 WL 3094930, at \*9 (Bankr. D. Mont. May 12,

2009*). In Yellowstone*, the court subordinated a lender's claim where the lender acted with

"naked greed" in "complete disregard" of the debtor's unsecured creditors. There, the majority

of loan proceeds for the repayment of which the debtor would become obligated to repay were

not for use by the debtor, but were to pass directly to a principal shareholder and subsidiaries for

purposes outside of, and unrelated to, the debtor's business. *Id.* at \*5, \*9. The court found that

the lender "turned a blind eye" to the debtor's financial records and that the lender could not

have believed that the debtor could service such an increased debt load in light of their historical

financial performance. *Id.* at \*9. The court concluded that the lender, despite various "red

flags" concerning the debtor's financial condition, *id.* at \*5-6, granted a substantial loan because

"it was driven by the fees it was extracting from the loans it was selling, and letting the chips fall

where they may." *Id.* at \*9. Because the lender "lined its pockets on the backs of the unsecured

creditors," the lender's conduct was so far overreaching and self-serving that it shocked the

court's conscience. *Id.* at \*8. Therefore, the court concluded that equitable subordination was

the appropriate remedy. *Id.*[157]

275.    Just like the lender in *Yellowstone*, the LBO Lenders here participated in the LBO

Transaction notwithstanding their concern that the LBO could render the Debtors insolvent so

---

standing to pursue §§ 547 and 548 actions, but, on same operative facts, permitted creditor to prosecute direct claim
for equitable subordination).

[157] Although, the court in *Yellowstone* agreed, on consent of the parties, to vacate this ruling as part of a subsequent
settlement, the court's analysis is instructive to equitable subordination claims against LBO defendants, and still can
be considered by this Court. *See In Re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerseon & Corey*,
160 B.R. 882, 898 (Bankr. S.D.N.Y. 1993); *In re Okura & Co.*, 249 B.R. 596, 611 n.12 (Bankr. S.D.N.Y. 2000)
("the act of vacating an opinion ... has no effect on the persuasiveness of the decision").

that they could obtain lucrative fees. For example, the Examiner noted that Peter Cohen, the

Tribune client executive at JPMorgan, gushed about the lucrative fees JPMorgan would receive

from the LBO:

> [Mr.] Cohen, the Tribune client executive at JPMorgan, [used] terms such
> as "ka-ching!!" to express enthusiasm about fees due [to JPMorgan] in
> connection with the LBO Transactions. Mr. Cohen's emails are crass and
> undoubtedly would have been highly embarrassing to JPMorgan had they
> come to light even before Tribune became a debtor in bankruptcy. They
> are particularly inappropriate in light of what subsequently transpired.")
> (emphasis added).

*Id.* at 265. One could understand Mr. Cohen's exuberance, as the LBO Lenders walked away

from the LBO Transaction with over $200 million in fees, and had little expectation of actually

owning the debt that Tribune incurred to do the LBO Transaction that they were syndicating.

This type of conduct warrants the equitable subordination of the LBO Lenders' entire claims.

*See Yellowstone,* 2009 WL 3094930, at *9.

     276. In *O'Day,* the court equitably subordinated a lender's claims arising out of a

failed LBO based on lender's misconduct very similar to that which occurred here. 126 B.R. at

370. In finding that the liens the debtor incurred in connection with the financing of the LBO

constituted fraudulent transfers, the *O'Day* court found the bank's own financial projections to

be unreasonable. *See id.* at 406. Specifically, the court compared the company's historical and

year-to-date financial performance with the bank's projections. *Id.* at 405. The court recognized

that, even the bank's "worst case" projections assumed an EBIT that was well above the five-

year historical average contained in the offering memorandum and its gross revenue projections

were similarly inflated over historical financial data. *Id.* The court criticized the lender for

giving "little weight" to those indicators that showed the company's earnings declining in the

months leading up to the LBO. *Id.* at 405-06. Indeed, the court found that the deviation between

the bank's projected gross profit figures and the figures available in the months preceding the

close of the LBO were "irreconcilable," and that, had the actual figures been taken into account, the projections would have revealed that working capital needs could only have been met by stretching accounts payable. *Id.* The court stated that the bank had full access to the debtor's records, facilities, and management, and that the "reasonableness of the projections ... is further impugned by evidence that clearly established that [the bank was] well aware of the decrease in gross profit margin and consequent decline in EBIT prior to the LBO closing." *Id.* at 406.

277.    The *O'Day* court also observed that there was a well-known decline in the industry in which the debtor operated and that, prior to the LBO, the company documented concerns about increasing costs having a negative impact on the company's financial health going forward. *Id.* at 380-81, 387. Notwithstanding these concerns and the debtor's declining financial performance, the bank took no steps to revise their projections. *Id.* at 381. According to the court, the lender "suffered from an overweening optimism about the debtor's financial abilities ... permit[ting] them to disregard the cyclical nature of the Debtor's business and the industry." *Id.* at 412. The court stated that many of the debtor's problems were "readily predictable" prior to the LBO, including labor problems, material costs, and the cyclical nature of the industry. *Id.* at 407. On those facts, the court concluded that the bank's claims should be subordinated. *See id.* at 412.

278.    As in *O'Day*, here the parties to the LBO Transaction similarly ignored relevant financial information about Tribune. As shown above, the parties to the LBO Transaction knew of Tribune's declining financial condition, its failure to meet its own projections, and the secular decline in the publishing business.[158] The LBO Lenders deliberately disregarded this

---

[158]    See, e.g., Examiner's Report, Vol. 1 at 263-264 (quoting Jeff Sell (senior credit officer at JPMorgan) E-Mail, dated March 28, 2007) ("I've told the team I'm not comfortable approving the new structure for the reasons cited but would understand if [senior management] wanted to do this to further the Zell [relationship]. It's a question of lost income and leverage in a bankruptcy negotiation."); *id.* at 603-604 ("JPMorgan deal team's

information, and similar to the bank in *O'Day*, took no steps to alter their own projections to properly reflect the total obligations involved, or the most recent, and therefore most relevant, financial information.[159] Like the lenders in *O'Day* and *Yellowstone*, the claims of the LBO Lenders should be equitably subordinated to the claims of the Senior Noteholders, holders of PHONES Notes and other Non-LBO Creditors.

### (2) Equitable Disallowance

279.    In cases where injustice would otherwise result, parties may also seek judicial intervention in the form of equitable disallowance. *See Pepper v. Litton*, 308 U.S. 295, 304 (1939) (noting that bankruptcy courts have the power to disallow claims under equitable doctrines). Equitable disallowance of a claim is appropriate where a party engages in a "planned and fraudulent scheme." *Id.* at 312. In fact, where a fraudulent scheme is perpetrated in several steps, the Court must look beyond such formalities. As the Supreme Court has said:

> No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the

---

DCF and sum-of-the-parts analysis based on revised July projection[s] indicate that the current valuation of Tribune is approximately $[10] to $[13] billion, potentially failing the solvency tests (i.e., debt amount exceeds the value of Borrower.")); *id.* at 304 (quoting Julie Persily E-Mail, dated March 22, 2007) (Having seen the book I am still extremely uncomfortable with Zell. No matter the rating . . . . Declining ebitda is scary . . . . I'm very concerned."); *id.* at 304-305 (quoting John Apostolides (Citigroup Associate) E-Mail, dated March 24, 2007) ("The Leveraged Finance group was 'still debating internally if we want to do this deal even with low ratings.' and '[g]iven that the interest expense will be a lot higher, the Company may not be able to handle this much debt.'"); *id.* at 352 (quoting Michael Costa E-Mail, dated March 10, 2007) ("[s]hort answer is in light of recent operating performance no comfort in putting the kind of leverage necessary for Zell proposal to work and have board get comfortable with employees owning the equity. Also numerous issues in Zell proposal we could not solve."); *id.* at 630 (quoting Michael Costa E-Mail, dated October 17, 2007) ("Todd where are we in thinking thru solvency issue if company's advisor thinks solvent but we think otherwise?"). *See also id.* at 375-376 (quoting McCormick Foundation Letter, dated March 1, 2007) ("The McCormick Foundation expressed 'important concerns regarding the ESOP Proposal and whether it should be pursued for the reasons that follow, namely, Price, Timing and Execution Risk in comparison to the self-help proposal presently under consideration.' The letter then described these concerns in further detail."); *id.* at 603-604 n. 2520 (citing Tribune Company Financing Memo dated "September [  ], 2007") ("JPMorgan deal team's analysis indicates that the Company will potentially fail the solvency tests pro forma for Step 2.").

[159] *See, e.g., id.* at 214 n. 883 (citing Brian Litman (VP/Controller at Tribune Company) E-Mail, dated March 5, 2007) ("[o]ne of the Parties cited an e-mail exchange between the Citigroup Entities and members of management as evidence that management inquired whether there ought to be adjustments to Tribune's 2007 and 2008 projections (which management ultimately concluded not to make).").

> bankruptcy court in the exercise of its equity jurisdiction to undo it. Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart.

*Id.*

280. For the reasons described above with respect to equitable subordination, disallowance is similarly warranted. Here, the LBO Lenders engaged in an elaborate fraud that left the Debtors with a crushing debt load while simultaneously making use of a multistep approach meant to thwart the remedies provided for creditors in the Bankruptcy Code. Such conduct should not, and cannot, be tolerated by this Court. *See, e.g.,* Examiner's Report, Vol. 1 at 266 (discussing JPMorgan's knowledge that bankruptcy was likely and that the company's assets would only cover the bank debt).

> (3)    *Given the Examiner's exhaustive findings, the LBO-Related Causes of Action for aiding and abetting breaches of fiduciary duty are strong*

281. One set of valuable LBO-Related Causes of Action are the Estates' claims for aiding and abetting a breach of fiduciary duty against various parties involved in the LBO Transaction. To establish a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must prove four elements: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. Supr. 2001) (internal citations omitted); *see also Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 144 (Bankr. D. Del. 2005). In the LBO context, a claim for aiding and abetting a breach of fiduciary duty arises if the defendants influenced the directors or management to

proceed with a wrongful LBO and knew the essential details of the LBO. *HealthCo Int'l II*, 208 B.R. 288, 301, 309 (Bankr. D. Mass. 1997).

282.    The Examiner's extensive investigation uncovered substantial evidence that Tribune's officers and financial management breached their fiduciary duty in connection with Step Two of the wholly integrated Tribune LBO Transaction. *See* Examiner's Report, Vol. 2, § IV.B.4.c.  As a consequence, the Examiner concluded that given the actions of Tribune's management, under Delaware Law, a breach of fiduciary claims would be strong against them:

> These acts [by management] go well beyond gross negligence or recklessness but enter into the terrain reserved for intentional misconduct. Based on the acts of dishonesty or lack of candor in the record, it is reasonably likely that a court would find that such individual[s] . . . also breached their fiduciary duties during this time frame, whether it be the duty of care or loyalty.[160]

These claims are valuable estate assets and should not be settled cheaply.

283.    All parties who assisted Tribune's officers and financial management in their breach, *i.e.* by facilitating the consummation of the LBO Transaction, aided and abetted the breach of fiduciary duty.  It is well established in this Circuit that lenders who aid and abet a breach of fiduciary duty are liable therefor. *See Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Bus. Fin. Servs.)*, 361 B.R. 747, 758 (Bankr. D. Del. 2007).  The conduct of each of the lead arrangers demonstrates that they knew or should have known that the LBO Transaction was extremely risky, even turning a blind eye to facts demonstrating that the transaction would render Tribune insolvent or unable to pay its debts as they became due.  Yet, these lead arrangers plowed forward to close the deal and reap the rich fees bestowed upon them for completing this transaction.  Of course, through their participation in the transaction, the LBO Lenders profited

---

[160] While the Examiner left the question in equipoise, he noted that the actions of the Guarantor Subsidiaries' directors were "troubling" and may very well constitute a violation of their fiduciary duty as well. *See* Examiner's Report, Vol. 2 at 387-89.

to the tune of $200 million in financing fees and $70 million in advisory fees. *See* Examiner's Report, Vol. 2 at 6-9.

> (4) *The Debtors' estate claim of unjust enrichment also has a strong chance of prevailing*

284.     The Debtors' estates also have valuable claims of unjust enrichment against various participants in the LBO Transaction, including claims against the LBO Lenders for the fees that they received in conjunction therewith; against the LBO Lenders for the wrongfully obtained claims they now assert against the Debtors' Estates and any value they will receive upon the exercise of the subsidiary guarantees; and against Tribune's shareholders for their receipt of funds for the Tribune shares cashed out at Steps One and Two of the LBO Transaction. Because the LBO Lenders, for example, have been unjustly enriched by their wrongful conduct in the LBO Transaction, equitable remedies are appropriate to prevent the receipt of distributions from the Debtors' Estates, regardless of the alleged seniority of their claims in the debt structure of the Debtors' Estates.

285.     The elements of an unjust enrichment claim are an "unjust retention of a benefit, including money, by one party to the detriment of another party, against the fundamental principles of justice, equity, and good conscience." *Douglass v. Wones*, 458 N.E.2d 514, 521 (Ill. App. Ct. 1983);[161] *see also Vinarov v. Motorola, Inc.*, No. 05c2063 2008 U.S. Dist. LEXIS 25363, at *39 (N.D. Ill. Mar. 26, 2008) (under Illinois law, the elements of unjust enrichment claim are: (a) defendant received a benefit; (b) defendant was aware of the benefit; and (c) the benefit was accepted by the defendant under circumstances that would make the acceptance thereof inequitable).

---

[161]Delaware looks to the "most significant relationship" in determining which jurisdiction's law applies to an unjust enrichment claims. *See Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*, 560 F. Supp. 1372, 1383 (D. Del. 1983). Here, Illinois likely has the most significant relationship to the LBO. Even if Delaware law applied, principles underlying the doctrine of unjust enrichment are the same.

286. Courts have found that a failed LBO, in which shareholders, lenders and professionals deplete the target company of its assets knowing that it will render the target insolvent, and for unreasonable consideration in exchange, gives rise to an unjust enrichment claim against those participants. *See OODC*, 321 B.R. at 144-45; *Official Comm. of Unsecured Creditors v. Fleet Retail Finance Grp. (In re Hechinger Inv. Co.)*, 274 B.R. 71, 94 (D. Del. 2002).[162]

287. Upon establishing that any or all of the foregoing parties have been unjustly enriched at the expense of the Debtors' estates, the estates are entitled to restitution of the value stripped from them by the defendants. *See Smithberg v. Ill. Mun. Retirement Fund*, 735 N.E.2d 560, 565 (Ill. 2000); *see also, e.g., Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993).

**B. Likely Difficulties in Collection**

288. In addition to the strength of the underlying claims, courts often will consider the risk associated with collection in any conceivable judgment in the litigation in assessing the desirability of a settlement. When there is no payment risk associated with succeeding on the claims, the desirability of settling such claims is reduced. *See, e.g., In re Parkview Hospital-Osteopathic Medical Ctr.*, 211 B.R. 603, 609 (Bankr. N.D. Ohio 1996) (Guarantee of collection "weighs against ... settlement.").

289. The LBO-Related Causes of Action contemplated to be settled under the DCL Plan consist primarily of (i) actions to avoid the obligations incurred in connection with Step One and Step Two, and (ii) actions to require the disgorgement of principal, interest, and/or fees paid to current and former LBO Lenders. With respect to those causes of action that seek to avoid the incurrence of an obligation, no collection efforts will be necessary. *See, e.g., Exide*, 30

---

[162] Ultimately, the *Hechinger* court dismissed the committee's unjust enrichment claim, finding that Section 546(e) of the Bankruptcy Code preempted such a claim.

B.R. 69-70 (holding that no collection efforts may be necessary if creditors' committee succeeded in its equitable subordination claim). With respect to the claims for disgorgement, there is no evidence that the LBO Lenders would not be able to satisfy any judgment rendered against them. To the contrary, the following Step Two Arrangers who have already agreed to fund the Step Two/Disgorgement Settlement: (i) JPMorgan; (ii) Bank of America, N.A.; (iii) Merrill Lynch Capital Corporation; and (iv) CitiCorp North America, Inc. Moreover, if the Senior Lender Claims are avoided in full, all Non-LBO Creditors will be paid in full, with interest, even without the benefit of any disgorgement recoveries. Accordingly, this factor counsels towards rejecting the settlement. *See, e.g., In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. S.D.N.Y. 2003) (settlement rejected where there was little or no risk associated with collecting on the claims).

### C. The Benefit of Prosecuting the LBO-Related Causes of Action Outweighs Any Cost, Expense or Delay Resulting from Litigation

290. The third factor considered by courts in assessing whether a proposed settlement is fair and reasonable is the complexity of the litigation involved and the expense, inconvenience and delay attending it. Courts in this jurisdiction have recognized that "it is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation." *In re Nutraquest, Inc.*, 434 F.3d at 646 (3d Cir. 2006). In order to properly apply this factor, courts must weigh the expense, inconvenience and delay of pursuing litigation against the probable outcome of the litigation. *See TMT Trailer/Ferry*, 390 U.S. at 434 ("Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasonable judgment as to the probable outcome of litigation."); *In re Spansion, Inc.*, 2009 WL 1531788, at *8 (finding that reasonableness of settlement could not be assessed

149

where there was insufficient information to make a reasoned decision as to the likelihood of success of litigation).

291.   This case is the exception to the rule set forth in *Nutraquest*. Indeed, approval of the settlements embodied in the DCL Plan will not reduce the complexity or inconvenience of the litigation at all. In fact, every single underlying legal and factual issue that is purported to be settled in the DCL Plan will still need to be litigated in connection with the prosecution of the Remaining LBO Related Claims including solvency at Step One and Step Two, and the knowledge, intent and motives of the Debtors and the Lead Banks. In addition, all of the same witnesses will testify and this Court will be required to make all of the same findings of fact and conclusions of law. However, some of the costs of litigation will be reduced because a substantial amount of the discovery that is needed to prosecute the LBO-Related Causes of Action has been completed in connection with the plan confirmation process

292.   Denying the Proposed Settlement does not mean, however, that the Debtors need to remain mired in chapter 11 while the litigation ensues. Rather, confirmation of the Noteholder Plan will permit the Debtors to emerge from bankruptcy with a restructured balance sheet and a bright future while the LBO-Related Causes of Action are prosecuted by the Litigation Trust under the Noteholder Plan.

293.   Analyzing the costs, inconvenience, complexity and delay associated with denying the settlement is just one element of this *Martin* Factor. Courts must also examine the benefits flowing from allowing the litigation to unfold. Indeed, if benefits of litigation were not considered, debtors would have *carte blanche* to settle any potentially complex and protracted causes of action for insufficient consideration no matter how unjustified or harmful such settlement would be to innocent creditors. It is for this reason that a bankruptcy court, in

applying this factor, must "balance" the potential costs, inconvenience, complexity and delay with the likelihood of success and a comparison of potential and future benefits. When applied to the Proposed Settlement, a balancing of these factors reveals that the potential detriments involved in litigating the LBO-Related Causes of Action is far outweighed by the high likelihood of success of the litigation, the enormous potential recoveries for Non-LBO Creditors, and the meager Settlement Consideration provided by the Proposed Settlement. Accordingly, this factor weighs heavily against approval of the Proposed and confirmation of the DCL Plan.

### D. The Proposed Settlement Is Not in the Paramount Interest of Creditors

294. The Court should also reject the Proposed Settlement because it is not in the "paramount interest of creditors," *Martin*, 91 F.3d at 393. In examining the fourth *Martin* Factor, courts consider, among other things, whether interested parties have supported or opposed the settlement and whether such settlement results in significant benefits for the debtor's estate. *See, e.g., Exide*, 303 B.R. at 71 (rejecting a settlement of actions against pre-petition secured lenders where the overwhelming majority of unsecured creditors voted to reject the plan and the proposed settlement provided little value in light of the potential value achievable in litigation); *Spansion*, 2009 WL 1531788 at *8 (finding that a proposed litigation settlement was not in the "paramount interest of creditors" where it was vigorously opposed by an ad hoc group of senior secured creditors).

295. Here, the Proposed Settlement embodied in the DCL Plan is not in the "paramount interest of creditors" as it has been overwhelmingly rejected by approximately 84% in dollar amount of the Non-LBO Creditors voting on the Plan, including over 94% in dollar amount of the Senior Noteholders and holders of PHONES Notes. *See* Declaration of Stephanie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Plans of Reorganization Proposed for Tribune

Company and Its Subsidiaries (the "Final Voting Tabulation Report) [ECF No. 7918], at Ex. A-1. The Holders Senior Noteholder Claims and PHONES Notes Claims have spoken loud and clear: they would rather forgo the proposed meager "settlement consideration" from the LBO Lenders and take their chances litigating the allowance of the LBO Debt claims. *See Spansion*, 2009 WL 1531788 at *3 ("'[the court looks] to the fairness of the settlement to the other persons, i.e., the parties who did not settle.'") quoting *Nutraquest*, 434 F.3d at 645). As in *Spansion*, the Noteholder Plan Proponents have vehemently objected to the Proposed Settlement from its inception, and in addition to filing this objection, have filed a competing plan that does not seek to unfairly settle the LBO-Related Causes of Action for pennies on the dollar.

296.    Further, like *Exide*, the Proposed Settlement offers little benefit to the creditors most harmed by the LBO Transaction in light of the potential value achievable in litigating the LBO-Related Causes of Action. Accordingly, the Proposed Settlement in the DCL Plan is not in the "paramount interest of creditors."

## E.    Remaining Texaco Factors

### 1.    The Proposed Settlement Was Not The Product Of Arm's-Length Bargaining

297.    Given the significant conflicts among the counsel and fiduciaries who negotiated the Proposed Settlement, the Debtors cannot carry their burden of showing the settlement was proposed and negotiated in good faith.[163] When counsel for the estate representative that is a proponent of the settlement is operating under significant conflicts of interest when negotiating a compromise, the Court also must evaluate carefully that conflict in determining whether the

---

[163] *See In re Iridium Operating LLC*, 478 F.3d 452, 465 (2d. Cir. 2007) (discussing good faith in the context of Rule 9019 analysis); *see also In re Adelphia Comm. Corp.*, 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005) (approving the proposed settlement but noting that Texaco's collusion factor would be entitled to "much greater weight" if the court "ever thought it had not been satisfied"); *see also In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 132 (S.D.N.Y. 1997) (approving class action settlement, but explaining that "collusion might prevent the approval of the Settlement, and at the very least would raise the Court's scrutiny and rebut the presumption of deference to the recommendations of counsel").

resulting settlement is "fair and equitable." *In re Project Orange Assocs.*, LLC, 431 B.R. 363, 374 n.4 (Bankr. S.D.N.Y. 2010). Moreover, a bankruptcy settlement (whether under Bankruptcy Rule 9019 or section 1123 of the Bankruptcy Code) is subject to heightened scrutiny when it involves benefits to insiders, like the Proposed Settlement here.[164]

### a. *The Counsel Negotiating the Proposed Settlement were Conflicted*

298. The Debtors and the Creditors' Committee, both of whom owe fiduciary duties to the Senior Noteholders, holders of the PHONES Notes, and other unsecured creditors, negotiated and executed the Proposed Settlement despite serious conflicts of interest. Courts do not approve settlements negotiated by conflicted counsel.[165]

299. Debtors' counsel, Sidley Austin LLP, currently represents JPMorgan and Merrill Lynch in matters unrelated to the Debtors, represented Tribune in connection with the LBO Transaction itself and was involved in negotiating LBO financing agreements.[166] Sidley is the last firm in the world one could expect to maximize recoveries from the LBO Lenders. The Creditors' Committee itself has represented to this Court that the Debtors are conflicted.[167]

---

[164] *See, e.g., In re Exaeris, Inc.*, 380 B.R. 741, 747 (Bankr. D. Del. 2008) ("[A] court can and should consider whether an insider is receiving a release when evaluating the "good faith" criterion" in approving a settlement); *see also In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) ("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable.").

[165] *See In re JMK Construction Group, LTD.*, 2010 LEXIS 4352, at *28-40 (Bankr. S.D.N.Y. Dec. 9, 2010) ("[c]ourt[s] will not consider approving a settlement" where parties were represented by conflicted counsel); *In re Project Orange Assocs., LLC*, 431 B.R. at 374 n.4 (court withdrew approval of settlement that was negotiated and presented by conflicted law firm); *see also In re Coram Healthcare Corp.*, 271 B.R. 228, 234-240 (Bankr. D. Del. 2001) (denying confirmation based on section 1129(a)(3) after finding a lack of good faith as a result a conflict of interest).

[166] *See* Affidavit of James F. Conlan in Support of Application for an Order Authorizing the Employment and Retention of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession Pursuant to 11 U.S.C. § 327(a) and 1107, *Nunc Pro* Tunc to the Petition Date, and Disclosure of Compensation Pursuant to 11 U.S.C. § 329, dated December 26, 2008 (ECF No. 139, Exhibit A) at Exhibit A (listing as "Agents Under Credit Agreements" JPMorgan Chase Bank, N.A., JPMorgan Securities, Inc., and Merrill Lynch Capital Corporation).

[167] "[T]he Debtors themselves approved the LBO and will not want to pursue an action that attacks the LBO Debt . . . . [Additionally], the Debtors have no interest in litigating against the interests of future owners of the Debtors." *See* Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Leave, Standing and

300.   The Debtors, the supposed "honest brokers" during the settlement negotiations, failed to seek to maximize the recoveries to the Non-LBO Creditors from the LBO-Related Causes of Action, presumably because of their conflicts and in an effort to appease the future owners of Tribune. *See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) ("In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, i.e., the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.") For example, ███

████████████ Redacted ████████████

████████████████████████

████████████████████████

██████████████ , SCTRIB – 0002313.

301.   A conflict similar to the one that the Debtors' have here was addressed in the Third Circuit's ruling in *Cybergenics*:

> the debtor's management . . . bears a fiduciary duty to avoid fraudulent transfers that it itself made. . . . [C]ourts and commentators have acknowledged that the debtor-in-possession 'often acts under the influence of conflicts of interest.' These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin. For example, a debtor may be unwilling to pursue claims against individuals or businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging. . . . In any of these situations, the real losers are the unsecured creditors whose interests avoidance actions are designed to protect.

Id. at 573 (internal citations omitted).

---

Authority to Commence, Prosecute and Settle Claims and Counterclaims of the Debtors' Estates [ECF No. 3281] at 10.

302.    Chadbourne & Parke LLP ("Chadbourne"), counsel to the Creditors' Committee, is also seriously conflicted.  Chadbourne counts JPMorgan, Merrill Lynch, Citigroup, Morgan Stanley, Bank of America and Barclays—all defendants in the Creditors' Committee's LBO litigation—among its valuable clients.[168]  Citigroup and Morgan Stanley alone account for up to 7% of Chadbourne's annual gross revenues.[169]  Aurelius addressed these conflict issues in detail in its motion to disqualify Chadbourne as counsel to the Creditors' Committee (the "Motion to Disqualify").  Because Chadbourne's conflicts have already been extensively briefed in this case, the Noteholder Plan Proponents incorporate herein by reference arguments made by Aurelius in the Motion to Disqualify, but will not separately address those same arguments in this Objection.

303.    Even though the Creditors' Committee hired Zuckerman Spaeder LLP as Special Counsel because of Chadbourne's conflicts, Chadbourne continued to play a central role in the settlement negotiations.  For example, Chadbourne's fee applications to the Court revealed that Chadbourne was expend[ing] great effort" and conducting "significant" analysis "in the negotiations and various settlement permutations."[170]  In fact, time records indicate that Chadbourne spent more than double the amount of time that Zuckerman did in representing and advising the Creditors' Committee on matters for which Chadbourne was conflicted.[171]

---

[168] *See* Affidavit of David M. LeMay, dated January 16, 2009 [ECF No. 243, Exhibit A] at Exhibit 2 (listing as "Active Unrelated Representations" for unsecured creditors, for the pre-petition lenders, and for agents under pre-petition credit agreements: JPMorgan Chase & Co., JP Morgan Securities, Inc., JPMorgan Capital Corporation, JPMorgan Banks, S.A., Institution of Multiple BA, Merrill Lynch & Co., Citigroup Global Markets, Inc., Citigroup/Bank Handlowy W Warszawie, and Citigroup Property Investors);  First Supplemental Declaration of David M. LeMay in Connection with the Retention and Employment of Chadbourne & Parke LLP as Counsel to the Official Committee of Unsecured Creditors, dated February 17, 2009 [ECF No. 395]; *see also* Affidavit of Adam G. Landis in Support of Application to Employ and Retain Landis, Rath & Cobb LLP as Co-Counsel to the Official Committee of Unsecured Creditors, *Nunc Pro Tunc* to the Retention Date, Pursuant to Bankruptcy Code Section 1103(a), dated January 16, 2009 [ECF No. 242, Exhibit A] at Exhibit 2 (disclosing that LRC represents J.P. Morgan Chase Bank, N.A. in matters unrelated to this case).
[169] *See* Affidavit of David M. LeMay, dated January 16, 2009 [ECF No. 243, Ex. A] ¶¶ 10-11
[170] *See* Monthly Application for Compensation of Chadbourne & Parke LLP (Sixteenth) for the Period April 1, 2010 to April 30, 2010 [ECF No. 4601].
[171] *See* Motion of Aurelius Capital Management, LP to Disqualify Chadbourne & Parke LLP from Acting on Behalf of the Official Committee of Unsecured Creditors in Matters in Which it Has Conflicts of Interest [ECF No. 5669]

**b.** ***The Debtors' Special Committee created to evaluate and approve any plan of reorganization was a sham***

304. The Special Committee – which was formed in the wake of the Examiner's Report – did not act independently of the Debtors' Board of Directors and also abdicated its responsibilities in connection with the settlement negotiations. At his deposition, Mark Shapiro, the Chair of the Special Committee, admitted a fundamental misunderstanding of the Special Committee's role that worked to the detriment of the Senior Noteholders and holders of PHONES Notes.



Tr. at 30:21-31:1, 32:16-19. *Id.* at 31:4-14, 34:12-35:1. *Id.* at 160:21-24. *See, e.g., Id.* at 44:24-45:2 ; *Id.* at 45:9-20

305. Notwithstanding the Special Committee Chairman's fundamental misunderstanding of his and the Special Committee's role, the Special Committee approved the Proposed Settlement, despite not knowing who, on behalf of the Debtors, was involved in negotiating the settlement or how the settling parties arrived at the settlement figures. Redacted

[Redacted] *Id.* at 13:3-14:15. [Redacted]

[Redacted] *Id.* at 12:22-13:2. [Redacted]

[Redacted]

[Redacted] *Id.* at 25:21-26:7.

306.    In its retention application filed with the Court, Jones Day represented that it would advise the Special Committee on, among other things, "reviewing, evaluating and approving . . . the structure, terms or conditions of . . . any plan of reorganization." Application to Employ Jones Day as counsel to the Special Committee, August 30, 2010 [Docket No. 5562], ¶7.  Despite its mandate, the Special Committee elected to permit Sidley – who answered to the conflicted management of the Debtors and represented Tribune itself in the challenged transaction – to lead the important negotiations respecting the Proposed Settlement.  Jones Day took a back seat. [Redacted]

[Redacted]

[Redacted]

[Redacted] *See* [Redacted] (FW-0000050-0000062). [Redacted]

[Redacted]

[Redacted]

*See* [Redacted] (SCTRIB-0000456).

     *c.*     ***JPMorgan Actively Participated in Settlement Negotiations, Even Though it Was Conflicted as a Pre-LBO Creditor and an LBO Lender***

307.    JPMorgan is truly on both sides of the "v." in the LBO-Related Causes of Action as both a plaintiff and a defendant because it is both a member of the Creditors' Committee and an LBO Lender. Even though JPMorgan recognized this conflict in 2009 and recused itself from Creditors' Committee sessions devoted to analyzing the potential LBO-Related Causes of Action, JPMorgan participated in settlement negotiations and mediation sessions in its individual capacity. JPMorgan helped negotiate the Proposed Settlement that eliminated *all* of its potential liability in connection with its role as an LBO Lender while failing to maximize value for the Debtors' unsecured creditors. Chadbourne, JPMorgan's longtime trusted counsel and advisor, willingly played along.

308.    Documents produced during discovery show that ███ Redacted ███ ████████████████████████████████████████ *See e.g.* ███ Redacted ███ ████████████████ CHAD-0052863; ███ Redacted ███ ████████████████████████ SCTRIB-0000806. Other documents produced in discovery show that ███ Redacted ███ ████████████████████████████████████████ SCTRIB-0002303. ███ Redacted ███ ████████████████████████████████████████ ████████████████████████████████████████ ███████████ SCTRIB-0001946

### d. The Proposed Settlement Unfairly Favors Certain Unsecured Creditors

309.    The Proposed Settlement negotiated by the DCL Plan Proponents improperly favors a subset of unsecured creditors—some of which are the targets of the LBO-Related Causes of Action that the DCL Plan purports to settle.  The Creditors' Committee did not adequately represent the interests of the Senior Noteholders and the holders of the PHONES Notes in connection with the negotiations of the Proposed Settlement, as evidenced by the more than 94% of Senior Noteholders and holders of PHONES Notes voting on the Plan that voted to reject the Proposed Settlement and DCL Plan.

310.    Five members of the Creditors' Committee are not proponents of either the DCL Plan or the Noteholder Plan in their individual capacities.[172]  Four of those five members will either have their claims paid in full or reinstated under the DCL Plan and were not appropriately acquitting their fiduciary obligations to the Senior Noteholders and holders of PHONES Notes when they approved a settlement that they would benefit from.

311.    The one Committee member not getting his claim paid in full or reinstated is William Niese.  Niese also failed to fulfill his fiduciary duties to all unsecured creditors.  In May 2010, the Debtors and a group of retiree claimants, including Niese and which group was represented by Niese's counsel, entered into the Stipulation Between Debtors and Retiree Claimants Settling and Allowing Claims (the "Retiree Settlement").  In relevant part, the Retiree Settlement provided that the "agreed allowed amounts" of the Retiree Claims were conditioned on "confirmation of the [April Plan] . . . or another plan of reorganization, in each case providing for the classification and treatment of the Retiree Claims consistent with their classification and

---

[172] Those five members are: Warner Brothers Television ("Warner Brothers") Buena Vista Television, Pension Benefit Guaranty Corporation ("PBGC"), Washington-Baltimore Newspaper Guild, Local 32035 (the "Guild") and William Niese.

treatment under the [April Plan]." DCL Plan at 5.15.4 ¶ 8. Pursuant to the April Plan, holders of Other Parent Claims (including the Retiree Claimants) were to receive a 35.18% cash recovery on their claims.

312.    On July 26, 2010, the Examiner issued his report and shortly thereafter the April Plan was abandoned. At the same time, the value of the Retiree Claimants' claims presumably increased significantly in the wake of the Examiner's findings.

313.    On September 28, 2010, the Debtors, Angelo Gordon and Oaktree agreed to the First Mediation Term Sheet that provided a 23.38% recovery for the holders of allowed Other Parent Claims, only a portion of which recovery was in cash. This recovery was significantly below the amount that was offered *before* the Examiner's Report increased the value of the Non-LBO Creditors' claims at Tribune and the Guarantor Debtors. As this value was substantially less than the value provided to the Retiree Claimants in the April Plan, Niese had no incentive to support such a plan. The subsequent mediation term sheet, which was executed less than two weeks later and formed the basis for the DCL Plan, magically provided the Retiree Claimants with a 35.18% recovery – the *exact* same amount offered to the Retiree Claimants in the April Plan and the amount that Niese was contractually required to approve pursuant to the terms of the Retiree Settlement. By accepting a 35.18% recovery for allowed Other Parent Claims – the same amount that was offered before the Examiner issued his report which dramatically increased the value of the Non-LBO Creditors' claims – Niese breached his fiduciary duty to secure the maximum recovery for *all* unsecured creditors. *See Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3d Cir. 2001) ("A committee member violates its fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members.").

160

*e.* ***The Mediation Term Sheets show that the Debtors and the
Creditors' Committee failed to fulfill their duties to maximize
recoveries***

314.     The product of the settlement process confirms that the DCL Plan could not have

been the product of arm's-length negotiations.  The Proposed Settlement enables the Senior

Lenders to forego a mere $402 million of plan distributions in exchange for the release of $8.7

billion of avoidance claims with respect to Step One senior loans ($6.6 billion) and Step Two

senior loans ($2.1 billion), and more than $1.8 billion of disgorgement claims against the Step

One Lenders.  The $402 million settlement is only approximately $73 million more than what the

Debtors, Oaktree, and Angelo Gordon previously agreed was sufficient to settle the avoidance of

the Step One claims alone following the first official mediation session.  Thus, the Proposed

Settlement essentially settles $2.1 billion of Step Two senior loan avoidance claims for only $73

million, which is unsurprising considering that JPMorgan, Angelo Gordon and Oaktree own in

excess of 71% of the Step Two debt.  Moreover, 100% of that $73 million is proposed to be

distributed under the DCL Plan to holders of Other Parent Claims including Oaktree as the

owner of the Swap Claim and General Unsecured Creditors at the Subsidiary Debtors, while

none of it is going to the Senior Noteholders -- the creditors most hurt by the LBO.  Such a

settlement is not in the best interests of all unsecured creditors.

2.     Releases

*315.*     Another consideration in evaluating 9019 settlements identified by this Court in

*Exide* is "[t]he nature and breadth of releases to be obtained by the directors and officers as a

result of a settlement."  *In re Exide Tech.*, 303 B.R. 48,8 (Bankr. D. Del. 2003) (Carey, J.) (citing

*In re Texaco*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988)).  As discussed at length in Section II

*infra*, the releases and exculpations provided to, among other Released Parties, the Debtors'

directors, officers, management, and professionals are overly broad, not supported by adequate consideration, and impermissible under applicable Third-Circuit law. Therefore, when applied to the DCL Plan, this factor does not support approval of the Proposed Settlement. *See Exide*, 303 B.R. at 71 (Applying this factor and rejecting the proposed settlement upon finding that "[t]he nature and breadth of the Plan's releases of the Debtor, its management, and the Prepetition Lenders is not permissible.").

## II. THE RELEASE AND EXCULPATION PROVISIONS IN THE DCL PLAN ARE IMPERMISSIBLY BROAD AND ARE NOT SUPPORTED BY ADEQUATE CONSIDERATION

316. The DCL Plan contemplates a broad array of releases for non-debtor third parties that are not supported by adequate (and in some cases, any) consideration. As set forth below, such releases are impermissible under applicable law.

317. Although the Third Circuit has declined to adopt a bright-line test for determining whether releases in a proposed plan are permissible, courts within the Third Circuit (including this Court) typically consider the following five factors:

(i) An identity of interest between the debtor and the non-debtor such that a suit against the non-debtor will deplete the estate's resources;

(ii) A substantial contribution to the plan by the non-debtor;

(iii) The necessity of the release to the reorganization;

(iv) The overwhelming acceptance of the plan and release by creditors and interest holders (with a focus on affected creditors); and

(v) The payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*Exide*, 303 B.R. at 72 (citing *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999). These factors (the "*Zenith* Factors") are not exclusive, but provide guidance in a bankruptcy court's determination of the fairness and appropriateness of a proposed release. *See Exide*, 303 B.R. at 72 (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)). In addition, it is the plan proponent's burden to prove that the proposed releases are

appropriate under applicable law. *See In re Continental Airlines*, 203 F.3d 203, 214-217 (3d Cir. 2000) (rejecting releases because the debtors failed to establish a sufficient evidentiary record supporting the releases); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 43 (Bankr. D. Del. 2000) (denying confirmation in part because the debtors had not "met their burden of establishing that the revised releases are appropriate").

### A.    The Debtors Cannot Release Causes of Action They Do Not Own

318.    Under the DCL Plan, the Debtors and other estate representatives grant broad releases in favor of the Released Parties. DCL Plan § 11.2.1. The Released Parties include, among others, the Senior Lenders, the Step One Selling Stockholders, the Released Step Two Stockholder Parties, the Bridge Lenders and the Debtors' directors and officers. DCL Plan at § 1.1.19. As a threshold matter, however, neither the Debtors nor their respective estates any longer own or possess certain of the causes of action they purportedly intend to release and, thus, have no basis upon which to release them. *See In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 -590 (5th Cir. 2008) (holding that a debtor cannot release claims it does not own); *In re Boyer*, 354 B.R. 14, 32 (Bankr. D. Conn. 2006) ("trustee cannot settle cause of action which he does not own") (citing *Barber v. Westbay (In re Integrated Agri, Inc.)*, 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 2004) and *In re Balonze*, 336 B.R. 160, 171 n. 23 (Bankr. D. Conn. 2006)).

319.    Specifically, the DCL Plan contemplates a release by the Debtors' Estates of Step One Selling Stockholders and Released Step Two Stockholder Parties of all "claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance actions)." DCL Plan § 11.2.1. The Debtors likely intended the Step One Selling Stockholder and Released Step Two Stockholder