release to include state law constructive fraudulent conveyance claims. The Debtors cannot release these claims for three inter-related reasons.

320. First, the Debtors are not empowered to grant releases to the Step One Selling Stockholders or Released Step Two Stockholder Parties for state law constructive fraudulent conveyance claims because *the right to bring such claims is no longer property of the Debtors' Estates*. Under Bankruptcy Code section 546(a), absent an enforceable tolling agreement, a trustee or debtor in possession may only bring a constructive fraud action based on state law within "2 years after the entry of the order for relief." 11 U.S.C. § 546(a)(1)(A). Accordingly, the Debtors (or an estate representative) had until December 8, 2010 (two years from the Petition Date) to bring state law constructive fraudulent conveyance actions against the Step One Selling Stockholders and/or the Released Step Two Stockholder Parties. However, constructive fraudulent conveyance claims were never commenced against the Step One Selling Shareholders or any Step Two Selling Stockholders (including the Released Step Two Stockholder Parties) during this two-year period. Therefore, as of December 9, 2010, only Non-LBO Creditors have the right to bring any potential state law constructive fraudulent conveyance claims against the Step One Selling Stockholders and Step Two Selling Stockholders (including the Released Step Two Stockholder Parties). *See Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993); *Kathy B. Enterprises, Inc. v. United States*, 779 F.2d 1413 (9th Cir. 1986); *Federal Deposit Ins. Corp. v. Davis*, 733 F.2d 1083, 1085 (4th Cir. 1984); *Dixon v. Bennett*, 531 A.2d 1318, 1324-1325 (Md. App. 1987).

321. Because the Debtors no longer possess state law constructive fraudulent conveyance claims against their former stockholders, the DCL Plan cannot provide for their release. Article 11.2.1 provides that the "Reorganized Debtors on their own behalf and as a

representatives of their Estates and any Person *seeking to exercise any rights of the Debtors'*
*Estates*...release unconditionally . . . each and all of the Released Parties." DCL Plan § 11.2.1
(emphasis added).  Thus, Article 11.2.1 must apply solely to the Debtors and those seeking to
exercise the rights of the Debtors' Estates.  Because the right to pursue constructive fraudulent
conveyance claims against the Step One Stockholders and Step Two Stockholders is once again,
only vested in individual creditors, such claims cannot be released under the DCL Plan – no
matter what the words say.

322.    Finally, to the extent the DCL Plan could be interpreted to require the release of
the state law constructive fraud claims against the Step One Selling Shareholders and Released
Step Two Stockholder Parties, Article 11.2.1 would constitute an impermissible third party
release.  As stated above, the constructive fraud claims are now held solely by creditors of these
Estates, principally the Non-LBO Creditors, many of which voted against the DCL Plan and
opted out of the third party releases (and Creditors' Trust) contained therein.  None of these
creditors consented to the release of state law constructive fraud claims arguably contained in
Article 11.2.1, rendering any such release void under applicable law.  *See In re Spansion, Inc.*,
426 B.R. 114, 144 (Bankr. D. Del. 2010) ("third party release may only be included in a plan if
the release is consensual and binds only those creditors voting in favor of the plan"); *In re*
*Washington Mut., Inc.*, 2011 WL 57111, *30 (Bankr. D. Del. 2011) ("any [third party] release
must be based on consent of the releasing party (by contract or the mechanism of voting in favor
of the plan)") (citations omitted); *Zenith*, 241 B.R. at 111 (requiring release provision to be
modified to permit third parties' release of non-debtors only for those creditors who voted in
favor of the plan).

**B.    The Proposed Plan Releases are Not Permissible Under Third Circuit Law**

1.    Identity of Interest

323.    The Debtors' proposed release of causes of action that *are* property of the Estates is not supported by any of the *Zenith* Factors outlined above. The first of the five *Zenith* Factors requires an "identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010). This element is satisfied when there are "numerous interlocking and competing claims of the [d]ebtors [and the released non-debtors] to the various assets which are sought to be resolved by the [settlement]" or when the released non-debtors "may be viewed as the successor to [a former debtor subsidiary]." *In re Washington Mut., Inc.*, 2011 WL 57111, *25 (Bankr. D. Del. 2011); *see also In re West Coast Video Enterprises, Inc.*, 74 B.R. 906, 911 (Bankr. E.D. Pa. 1994) (noting that an identity of interest is "usually an indemnity relationship"). There is no evidence before the Court that any of the Debtors have competing claims with, owe indemnity obligations to, or otherwise share an identity of interest with the Step One Lenders, the Step Two Senior Lenders, the Bridge Lenders, the Released Step Two Stockholder Parties, or the Step One Selling Stockholders. The Debtors therefore have not met their burden of demonstrating that the releases satisfy the first factor as to these parties.

324.    The Debtors may argue that they share an identity of interest with certain of the Related Parties (which include directors and officers) because they *might* face corporate indemnification obligations in the future. A purported identity of interest between the Debtors and their officers and directors based on the existence of speculative indemnification obligations does not, however, support the expansive release contained in the DCL Plan. *See, e.g., Continental*, 203 F.3d at 216 (holding that even if the debtor might face an indemnity claim in

166

the future, this does not make the release and permanent injunction of claims against the debtor's directors and officers "necessary" to the reorganization and such a ruling would "would turn bankruptcy principles on their head"). Further, numerous bankruptcy courts in the Third Circuit, including this Court, have rejected similarly drafted debtor releases for directors, officers and professionals. *See, e.g., Exide*, 303 at 74 ("Applying the five-part *Zenith* test to the Release of the officers, directors and others for prepetition conduct in this case, I conclude that the equities do not weigh in favor of approving a release of their prepetition conduct."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 337 (Bankr. D. Del. 2004) ("No evidence has been presented of any contribution made by any director or officer of the Debtors supporting any release of them by the Debtors or any third party."); *Genesis Health*, 266 B.R. at 606-07 ("[T]here is no showing that the individual [directors and officers] have made a substantial contribution of assets to the reorganization. [Although] the officers and directors of the debtors no doubt made a meaningful contribution to the reorganization by designing and implementing the operational restructuring of the companies, and negotiating the financial restructuring with parties in interest[,] the officers, directors and employees have been otherwise compensated for their contributions . . . [and] the rationale offered does not support the release of debtor's management."). As Judge Walrath recently held:

> [T]he Court finds that there is no basis whatsoever for the Debtors to grant a release to directors and officers or any professionals of the Debtors, current or former. The Debtors may argue that there is an identity of interest between them and the directors and officers who served prepetition because their charter (or by laws) provide that those parties will be indemnified by the Debtors for certain claims that may be brought against them by creditors or shareholders. While this does satisfy the first factor of Zenith, this alone is insufficient to justify the releases. With respect to the other four factors, no evidence has been presented in this case sufficient to convince the Court that releases of the Debtors' directors, officers or professionals are warranted. Specifically, there has been no evidence presented of any "substantial contribution" made to the case by the

directors, officers, or professionals, justifying releases for those parties. Nor is there any evidence that any of the legends of directors, officers, or professionals covered by the Debtors' releases are necessary for the reorganization . . . Finally, while the Plan has been accepted by many of the creditor classes, that is not because of any contribution by the directors, officers or professionals; it is because the creditors are getting paid in full. Further, some of the creditor classes did not accept the Plan and none of the equity classes (which are getting nothing under the Plan) voiced any support for the Plan. There is quite simply no basis for the Debtors' releases of their directors, officers or professionals.

*In re Washington Mut., Inc.*, 2011 WL 57111 at *28. As was the case in Washington Mutual, the

identity of interest prong is not sufficient to warrant the release of any of the Released Parties

under the DCL Plan.

        2.    Substantial Contribution by the Released Parties

325.    The second Zenith Factor examines whether the proposed released party has made

a substantial contribution to the debtor's plan. *Exide*, 303 B.R. at 72. A "substantial

contribution" may be found to exist where the released party has (i) made a significant financial

contribution to the debtor's estate, (ii) released significant claims against the debtor's estate or

property of the estate, (iii) agreed to provide critical funding, or (iv) made a significant financial

contribution to the trust(s) established pursuant to the chapter 11 plan for the benefit of

unsecured creditors. *See, e.g., In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del.

2004) (approving release of noteholder group because of the "repayment in full in cash of all

creditors . . . [and] a substantial distribution to shareholders made possible by the substantial

contribution by the [noteholder group] to the Plan funding"); *In re Washington Mut., Inc.*, 2011

WL 57111, at *25 (Bankr. D. Del. 2011) (finding release of certain non-debtors appropriate

because the released parties "made a substantial contribution to the Plan by waiving claims they

had asserted against numerous assets of the Debtors . . . and by waiving the proofs of claim they

have filed which the Debtors have estimated to be in excess of $54 billion"); *In re Fairfield*

*Residential LLC*, 2010 WL 2904990, at *6 (finding substantial contribution element satisfied because "of the agreement with [the released parties] to finance the chapter 11 cases and to fund the Plan"); *In re Global Charter Services, Ltd.*, 2010 WL 3493031, at *2 (Bankr. D. Del. 2010) (finding substantial contribution element satisfied because "the Released parties have, directly and indirectly, made substantial contributions of assets to the Debtor's reorganization"); *In re Federal-Mogul Global Inc.*, 2007 WL 4180545, at *32 (Bankr. D. Del. 2007) (finding substantial contribution element satisfied in light of the benefits provided, or to be provided, to the Trust by or on behalf of any such Protected Party").

326. The terms of the DCL Plan automatically eliminate (ii) and (iii) above – none of the Released Parties have released significant claims against the Debtors' Estates or agreed to provide critical funding under the DCL Plan. The remaining two forms of substantial consideration identified by courts in this district both require a financial contribution – either to the debtor's estate in (i), or to any trusts established under a plan for the benefit of unsecured creditors in (iv). As discussed in detail above, the LBO Lenders have failed to provide substantial consideration to obtain the release of the LBO-Related Causes of Action against them. In addition, as set forth below, many of the Released Parties have contributed either minimal value to these Estates or simply *no value at all* and, thus, are not entitled to a release under the law of this circuit.

327. Specifically, the DCL Plan proposes to release, among others, the following parties in exchange for inadequate or non-existent consideration:

- **Former Step One Lenders**: The DCL Plan seeks to release more than $1.8 billion in Step One Disgorgement Claims against former Step One Senior Lenders for *no consideration* from the Former Step One Lenders. Accordingly, no basis exists for these releases.

- **Current Step One Lenders**: The DCL Plan seeks to release the current Step One Lenders for all claims and causes of action against them (including allowance in full of

their prepetition claims of approximately $6.621 billion) in exchange for the Step One Lenders' "agreement" to redirect consideration they would otherwise receive under the Plan to Non-LBO Creditors. As discussed above and evidenced by the First Mediation Term Sheet, despite the fact that the Noteholder Plan Proponents' decision tree expert determined that ███████████ Redacted ████████████ Step One LBO-Related Causes of Action are to be settled for an aggregate consideration of only $328 million, just $238 million of which will go the Senior Noteholders. The remaining $90 million is spread among the holders of Other Parent Claims including Oaktree's Swap Claim and General Unsecured Claims at the Subsidiary Debtors. Accordingly, the Step One Senior Lenders cannot be deemed to have provided adequate consideration for the release contemplated under the Plan.

- **Step Two Lenders**: The DCL Plan purports to release all of the Estates' LBO-Related Causes of Action against the Step Two Lenders (including allowance of in full of their prepetition claims of approximately $2.101 billion), but the evolution of the DCL Plan reveals that this release is supported by practically no consideration. Pursuant to the DCL Plan, both Step One *and* Step Two LBO-Related Causes of Action are to be settled for an aggregate consideration of approximately $402 million. Subtracting the initial $328 million proposed settlement of Step One LBO-Related Causes of Action discussed above from the proposed $402 million settlement of both Step One and Step Two LBO-Related Causes of Action demonstrates that a mere $73 million in settlement consideration is allocable to the Step Two LBO-Related Causes of Action. Stated differently, the Debtors are releasing the lenders who funded Step Two of the LBO (which, according to the Examiner, is "somewhat likely" to have been an intentional fraudulent transaction[173] and is "highly likely" to have satisfied the two elements for a constructive fraudulent transaction[174]) for virtually no value, whereas the Noteholder Plan Proponents' decision-tree expert determined that, based on the Examiner's findings, the Step Two Senior Lenders faced a probability-weighted risk of claim avoidance of 93%. Moreover, *none* of the $73 million of additional "settlement consideration" is contemplated to be shared with the Senior Noteholders, who stand to receive only $238 million in cash on account of the settlement of Step One *and* Step Two LBO-Related Causes of Action. The unreasonableness of this settlement is further evidenced by a comparison to the equally unreasonable settlement of Step Two disgorgement claims for 37.5 cents on the dollar (based on a $120 million aggregate payment by the Settling Step Two Payees) – see next bullet below. Indeed, there is no basis or logic for $2.1 billion in Step Two Claims being allowed in exchange for a redirection of plan consideration equaling, at most, $73 million, while $318 million in Step Two disgorgement claims are being settled for a payment of $120 million or 37.5% of the related exposure when both Step Two allowance and Step Two disgorgement have the same likelihood of success –

---

[173] *See* Examiner Report, Vol. 1, p. 8 ("it is somewhat likely that a court would conclude that the Step Two Transactions constituted intentional fraudulent transfers and fraudulently incurred obligations").

[174] *See id.* at Vol. 1, pp. 18-19 ("it is *highly likely* that a court would conclude that Tribune was rendered insolvent and left without adequate capital after giving effect to the Step Two Transactions) (emphasis added); *id.* at Vol. 2, p. 90 ("it is *highly likely* a court would conclude that, in the aggregate, the Tribune Entities received less than reasonably equivalent value in each of Step One and Step Two") (emphasis added).

and an extremely high likelihood at that. As the Step Two Lenders have not provided adequate consideration for a release, such release must be denied.

- **Settling Step Two Payees:** As noted, the Settling Step Two Payees are being released from their $320 million disgorgement exposure in respect of prepetition payments made to such parties in respect of the Step Two Senior Loans and Bridge Loans in exchange for a $120 million. Based on the Expert Report of Bruce Beron, ███████ Redacted ███████
  Accordingly, the Settling Step Two Payees have not provided adequate consideration in exchange for their release.

- **Bridge Lenders:** The Debtors seek to release approximately $1.6 billion in avoidance claims against the Bridge Lenders for a paltry $13.3 million in plan consideration being redirected from the Bridge Lenders to the Senior Noteholders and holders of Other Parent Claims. In return, (i) the Bridge Lenders would receive (x) $64.5 million in cash and (y) a share of the Litigation Trust Interests and Creditors' Trusts Interests and (ii) all of the Estates' LBO-Related Causes of Action against the Bridge Lenders would be released. *See* Bridge Loan Settlement Term Sheet, ¶¶ 1-3. Additionally, by the Arranger Bridge Lender Treatment Option, the respective arrangers (including each of their affiliates) of the Bridge Loans (collectively, the "Bridge Arrangers"),[175] will have the option to exchange mutual releases with the other Bridge Lenders and the current Bridge Loan Agent in lieu of receiving a portion of the $64.5 million cash distribution and their pro rata share of the Litigation Trust Interests and Creditors' Trust Interests. *See id.,* ¶ 3. To the extent any Bridge Arranger elects the Arranger Bridge Lender Treatment Option, its pro rata share of the $64.5 million cash distribution and the Litigation Trust Interests and Creditors' Trust Interests will be reallocated and distributed ratably among those Bridge Lenders who are not Bridge Arrangers. *See id.* Finally, if three or more of the Bridge Arrangers do not elect the Arranger Bridge Lender Treatment Option, then the cash distribution to the Bridge Lenders will be increased to $65.5 million and the remaining $12.3 million of the Bridge Loan Reserve (as opposed to $13.3 million) will be distributed ratably to holders of Allowed Claims in Class 1E (Senior Noteholders) and Class 1F (Other Parent Claims). *See id.* Accordingly, for merely $13.3 million of settlement consideration (and only $12.3 million if three Bridge Arrangers elect the Arranger Bridge Lender Treatment Option), the Bridge Loan Settlement seeks to settle $1.6 billion of avoidance claims with respect to Bridge Loans. This consideration is clearly not adequate for the global releases to the Bridge Lenders. ███ Redacted ███
  ███████████████████████████████████████
  *See* Expert Report of Bruce Beron at 11.

- **Step One Selling Stockholder Parties:** As noted above, the DCL Plan proponents failed in their efforts to provide the Step One Selling Shareholders releases from constructive fraudulent transfer claims because such claims no longer belong to the Debtors' Estates. However, the DCL Plan still contemplates releases for the Step One Selling Shareholders from intentional fraud claims *for no consideration*. These claims

---

[175] The Bridge Arrangers are JPMorgan, Citibank, Merrill Lynch and Bank of America and their respective affiliates.

are included in the pending Third-Party Complaint and cannot be defended based on 11 U.S.C. § 546(e). As there is no consideration being provided for these releases, these releases cannot be permitted.

- **Released Step Two Stockholder Parties**: The Debtors similarly seek to release all Estate claims against the Released Step Two Stockholder Parties (which again consist solely of intentional fraud claims) for no consideration.

- **Professionals and D&O's**: The DCL Plan releases all Estate causes of action (other than certain LBO-Related Causes of Action) against Related Parties, which include the Debtors' and the Debtor Affiliates' current and former officers, directors, and professionals, for no consideration. DCL Plan § 11.2.1; §1.1.188. These releases must be denied.

- **Creditors' Committee**: The members of the Creditors' Committee and its professionals have provided no consideration for the releases that they are contemplated to receive under the DCL Plan. Moreover, the Noteholder Plan Proponents have asserted that the members of the Creditors' Committee breached their fiduciary duty to the pre-LBO creditors through their support of the DCL Plan. For example, as noted in the Noteholder Plan Proponents' Responsive Statement, of the five members of the Creditors' Committee who are neither an LBO Lender nor a representative of the pre-LBO notes, four will have their claims paid in full or reinstated under the DCL Plan and the fifth previously contracted to support any plan filed by the Debtors that provided such creditor with at least a 35.18% recovery on its claims. An additional example of the Creditors' Committee's lack of representation of the pre-LBO debtholders is the fact that when the Creditors' Committee agreed to the terms of the DCL Plan, as outlined in the Second Mediation Term Sheet, including the $420 million in aggregate consideration to the Senior Noteholders, the presumed DEV was $6.1 billion. Accordingly, the $420 million of DCL Plan consideration consisted of $59 million in natural recovery and $361 million in settlement consideration. However, when the DCL Plan was filed, and the DEV was increased to $6.75 billion (which the Noteholder Plan proponents vigorously dispute as being too low), the aggregate consideration to the Senior Noteholders did not increase commensurately. Indeed, the Creditors' Committee did not seek to maintain the same amount of settlement consideration for pre-LBO debtholders. Rather, the amount of settlement consideration decreased as the valuation and, thus, the Senior Noteholders' "natural" recovery, increased. In sum, there is no basis for the release of the Creditors' Committee or its professionals.

### 3. Necessity of the Releases to the Debtors' Reorganization

328. The third *Zenith* Factor questions whether the release is essential to the success of the reorganization. *Exide*, 303 B.R. at 72. The applicable standard under this factor is whether, "absent [the releases] the reorganization has little likelihood of success." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-608 (Bankr. D. Del. 2001) ("The question of necessity requires

172

demonstration that the success of the debtors' reorganization bears a relationship to the release of the non-consensual parties [and is] hinged on the approval of certain releases.") (citations omitted). In order to evaluate whether the Debtor releases contained in the DCL Plan are necessary to the Debtors' restructuring such that without the releases there would be little hope of a reorganized Tribune, this Court need only turn to the Noteholder Plan. The Noteholder Plan, as will be demonstrated at the Confirmation Hearing, is a feasible plan predicated on the maximization of value for all Non-LBO Creditors of these Estates *without* releases or exculpation. The DCL Plan Proponents have not, and indeed cannot, demonstrate that the excessively broad Debtor releases are a prerequisite to the Debtors' successful restructuring.

        4.    <u>Overwhelming Acceptance by the Affected Creditors</u>

     329.    The fourth *Zenith* Factor turns on whether there is "an agreement by a substantial majority of creditors to support the [non-debtor release], specifically if the impacted class or classes overwhelmingly votes to accept the plan." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (finding the fourth factor satisfied where "four of the five classes of creditors entitled to vote on the Plan voted overwhelmingly in favor of the Plan [and] ... the record does not reflect that there is any pending litigation in this case that would be discontinued by such a release"); *see also In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (approving non-debtor release because "the overwhelming majority of the creditors have agreed to the releases. Over 80% of the Bondholders have voted in favor of the Plan (in excess of 98% in amount and 97% of those actually voting for the Plan accepted it) .... No impaired class of creditors has rejected the Plan."). Clearly, the DCL Plan has not satisfied this factor. Specifically, the Senior Noteholders and holders of PHONES Notes who should be the largest constituencies to benefit from the global settlement embodied in the DCL Plan oppose the releases, and have overwhelmingly voted against the DCL Plan (in excess of 94% of the Senior

173

Noteholders and holders of PHONES Notes voting on the DCL Plan voted to reject). The Senior Noteholders and holders of PHONES Notes would rather pursue litigation against the LBO Lenders than receive the artificially low settlement consideration contemplated by the DCL Plan and permit the Debtors' grant of the releases thereunder. Thus, the fourth *Zenith* Factor is not satisfied.

### 5. Payment of All or Substantially All Claims

330. The fifth and final *Zenith* Factor asks whether the plan granting the releases also provides for the payment of all or substantially all of the creditors' claims. *Exide*, 303 B.R. at 74 (rejecting releases because "the Debtor's Plan provides only for a minimal payment of claims of the class affected by the injunction"); *In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 336 (Bankr. E.D. Pa. 2010) (rejecting debtors' plan because it "has not received the support of the majority of creditors who voted [and does not] provide for payment of 'substantially all' of the claims affected by the Release"). In these cases, the only creditors being paid in full are General Unsecured Creditors at the Subsidiary Debtors. And, importantly, no pre-LBO debtholders are being paid in full. Indeed, other than the contractually subordinated Bridge Lenders, the holders of pre-LBO funded debt are receiving the lowest recoveries under the DCL Plan and have voted overwhelmingly to reject to the DCL Plan. The DCL Plan proponents therefore cannot argue that the DCL Plan provides for the payment of substantially all creditor claims, or that the majority of those affected by the release provisions have voted to accept the Plan. In light of the foregoing, the fifth *Zenith* Flement has not been satisfied and the releases must be stricken from the DCL Plan.

## C. The Proposed Releases Contain Ambiguous and Overly Broad Terms

331. The releases also contain several vague and, in at least one instance, undefined terms that serve to impermissibly extend the release provisions to innumerable unidentified parties. For example:

- The DCL Plan shields "participants" of the Senior Lenders and/or Bridge Lenders from liability to the Litigation Trust and Creditors' Trusts without defining the term "participant." DCL Plan § 5.15.5. Without any information as to, among other things, the identity of such "participants" and the form or amount of any consideration they may have provided in exchange for the proposed release, the DCL Plan proponents have not met their burden to demonstrate that the release of "participants" is either necessary or appropriate.

- Similarly, the DCL Plan proposes to release all Related Persons from all non-LBO Related Causes of Action belonging to the Estates.[176] The proposed released Related Persons include Related Persons of the Debtors, non-Debtor Affiliates, current and former Senior Lenders, current and former Bridge Lenders, Settling Step Two Payees, the Creditors' Committee, individual members of the Creditors' Committee, the Senior Loan Agent, the Bridge Loan Agent, the former Bridge Loan Agent, the Step One Selling Stockholders, the DCL Plan proponents, and the Released Step Two Stockholder Parties.[177] The DCL Plan proponents offer no justification for extending the release provisions to all Related Persons who, like many others caught in the wide net of the defined term "Released Parties," presumably played no role in these chapter 11 cases and have provided no consideration for a release.

## D. The Exculpation Provision is Overly Broad and Violates Third Circuit Precedent

332. In addition to the overly broad releases described above, the DCL Plan contains an impermissible exculpation provision that insulates a multitude of parties, including third party non-debtors, from liability arising from or relating to events that extend far beyond these chapter

---

[176] Related Persons is defined as "with respect to any Person, such Person's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former members, partners, shareholders, equity-holders, officers, directors, employees, managers, trustees, trust beneficiaries, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, or other representatives, nominees or investment managers, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, trustees, trust beneficiaries, shareholders, partners, employees, members and professionals)." DCL Plan, § 1.1.194.

[177] See DCL Plan § 1.1.197 ("Released Parties means . . . Related Persons of Released Parties listed in clause (a) of this paragraph . . . and Related Persons of Persons listed in clause (b), (c), (d), and (e) of this paragraph . . .").

11 cases (the "Exculpation Clause"). DCL Plan § 11.5. The Exculpation Clause violates established Third Circuit precedent and should be stricken from the DCL Plan because, among other reasons:

- The Exculpation Clause does not contain a carve-out for gross negligence or willful misconduct as is required by courts in the Third Circuit. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (upholding a release provision, in part, because "members of the Committee and professionals who provided services to the Debtors remain liable for willful misconduct or gross negligence"); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 138 (Bankr. D. N.J. 2010) (citing *PWS Holding* for the proposition that release provisions must exclude willful misconduct and gross negligence); *In re eToys, Inc.*, 331 B.R. 176, 187 (Bankr. D. Del. 2005) (same); *Coram*, 315 B.R. at 337 (holding that plan third-party releases could not be approved because the releases were not limited to gross negligence or willful misconduct); *Washington Mut.*, 2011 WL 57111, at *26 n.35 (finding that the original version of the plan "did not comply with the applicable standards of the Code because it did not exclude willful misconduct or gross negligence").[178]

- The Exculpation Clause impermissibly extends to entities that are not fiduciaries in these chapter 11 cases. *See Washington Mut.*, 2011 WL 57111, at *29 (citing to *PWS* for the proposition that "exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers").

**E.      The Bar Order is Highly Unfair and Should Not be Approved**

333.      In addition, the DCL Plan contains a "Bar Order" that significantly prejudices the beneficiaries of the preserved causes of action. Pursuant to the terms of the Bar Order, any judgment obtained by the Litigation Trust against a non-settling defendant will be reduced by amounts that such non-settling defendant potentially could have recovered for contribution from a settling defendant (collectively, the "Settling LBO Defendants"). While this provision is clearly in the best interest of the Settling LBO Defendants, it is highly unfair to the parties whose

---

[178] The proposed releases similarly do not contain a carve-out for gross negligence and willful misconduct relating to the Released LBO-Related Causes of Action, and should therefore also be rejected on this basis. DCL Plan, §11.2.1 ("with the exception of the Released LBO-Related Causes of Action, nothing in this Section shall be construed to release any party from liability for actions or omissions constituting a willful misconduct or gross negligence as determined by a Final Order").

recoveries are dependent on the success or failure of these causes of action, such as the Non-LBO Creditors. Because of the inherent unfairness of such a provision to the Non-LBO Creditors, the Bar Order should not be approved. *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213-214 (3d Cir. 2000) (overturning bankruptcy court's approval of a chapter 11 plan containing a bar order).

## III. THE DCL PLAN IS UNCONFIRMABLE AS A MATTER OF LAW

### A. The DCL Plan Was Not Proposed in Good Faith

334. Bankruptcy Code section 1129(a)(3) provides that a plan cannot be confirmed unless it has been proposed "in good faith and not by any means prohibited by law." 11 U.S.C. 1129(a)(3); *In re PWS Holdings Corp.*, 228 F.3d 224, 242 (3d Cir. 2000). Although the Bankruptcy Code does not specifically define the term "good faith," courts in the Third Circuit have found that the requirement is satisfied where (i) the plan fosters a result consistent with the Bankruptcy Code's objectives, (ii) the plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, and/or (iii) there has been fundamental fairness in dealing with creditors. *See In re Lernout & Hauspie Speech Prods. N.V.*, 208 B.R. 672, 675 (Bankr. D. Del. 2004); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 237 (Bankr. D. Del. 2000).

335. In determining whether the good faith requirement is satisfied, the Third Circuit has stated that "the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2005) (quoting *In re PWS Holdings Corp.*, 228 F.3d at 224). Moreover, in making a determination of whether the good faith standard has

177

been met, courts must consider the totality of the circumstances surrounding the plan, and courts have "considerable judicial discretion" in finding good faith. *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001); *In re Genesis Health Ventures, Inc.*, 266 B.R. at 609; *In re New Valley Corp.*, 168 B.R. 73, 81 (Bankr. D.N.J. 1994).

336.    The DCL Plan was not proposed in good faith and, thus, does not satisfy Bankruptcy Code section 1129(a)(3) because, among other reasons:

- The settlement of Released LBO-Related Causes of Action contained in the DCL Plan is not supported by adequate consideration and thus does not satisfy the lowest rung of reasonableness necessary for approval under Bankruptcy Rule 9019.

- Although the Examiner estimated that the debt incurred in connection with Step Two (the Step Two Debt and Bridge Loans) is "somewhat likely" to be avoidable as an intentional fraudulent transaction and is "highly likely" to be found to have satisfied the two elements for a constructive fraudulent transaction, the DCL Plan proposes to settle these claims – which seek to avoid obligations in excess of *$3.7 billion* – for at most approximately $86 million, and only approximately $11 million (all associated with the Bridge Settlement) of which goes to the Senior Noteholders. *See* Examiner Report, at Vol. 1, p. 8; Vol. 1, pp. 18-19; Vol. 2, p. 90.

- Notwithstanding the Examiner's findings, Step Two Lenders are estimated to receive a recovery that is approximately 13% higher under the DCL Plan than they would have received under the April Plan, which was filed prior to the issuance of the Examiner Report.

- The DCL Plan is predicated on an artificially (and intentionally) low valuation, aimed at prejudicing Non-LBO Creditors who will receive their deflated "natural" recoveries and artificially low "settlement consideration" in the form of a reduced amount of cash, as opposed to the more valuable New Common Stock being distributed to the LBO Lenders.

- The Creditors' Committee's support for the DCL Plan was secured by preferential treatment for its individual members. To illustrate, of the five members of the Creditors' Committee who are neither an LBO Lender nor a representative of the pre-LBO notes, four will have their claims paid in full or reinstated under the DCL Plan. *See* Responsive Statement of Proponents of the Noteholder Plan, ECF No. 7205, pg. 7.

- The DCL Plan contains impermissibly broad release and exculpation provisions in violation of applicable Third Circuit Law. *See* DCL Plan, at Arts. 11.2, 11.5.

- The DCL Plan provides that LBO Lenders will receive Litigation Trust Interests and, potentially, Creditors' Trust Interests, notwithstanding their involvement in and ratification of the fraudulent transaction that forms the basis of the LBO-Related Causes of Action to be pursued by the Litigation Trust. *See* DCL Plan, at Art. 3.2.3.

- The DCL Plan allows the perpetrators of the fraudulent LBO and architects of the artificially and unreasonably low settlement upon which the DCL Plan is premised to control the Litigation Trust. *See* DCL Plan §§ 1.1.133, 13.3.1.

- The DCL Plan inadequately funds the Litigation Trust. *See* DCL Plan §§ 5.13, 13.5.

- The DCL Plan impermissibly classifies the Swap Claim, which is owned by the affiliate of a Plan Proponent, as an Other Parent Claim in order to provide such creditor with an inflated recovery. *See* DCL Plan, at Art. 3.2.6.

- The DCL Plan improperly gives effect to subordination provisions in the PHONES Indenture and EGI-TRB LLC Notes, allowing holders of unidentified Other Parent Claims to siphon additional value from the Senior Noteholders in violation of Bankruptcy Code section 510(a). *See* DCL Specific Disclosure Statement at 5 n. 6.

337.    The arguments summarized herein reflect that the DCL Plan violates both the Bankruptcy Code and its underlying policy concerns in a transparent effort to secure preferential treatment for the LBO Lenders at the expense of innocent Non-LBO Creditors. A plan which, at its heart, seeks to benefit the perpetrators of a fraudulent act cannot be said to have been "proposed with honesty and good intentions." Nor can a plan that richly rewards LBO Lenders while most Non-LBO Creditors recover a fraction of the allowed amount of their claims be said to "fairly deal" with creditors. Two striking examples of the lack of good faith in the DCL Plan involve (i) the treatment of Step Two Lender Claims and (ii) the Intercompany Claims Settlement.

338.    As detailed above, under the DCL Plan, the Step Two Lenders are contemplated to receive the same treatment as the Step One Lenders despite the substantially greater likelihood that the debt incurred with Step Two is avoided as an intentional or constructively fraudulent

conveyance as opposed to Step One Debt. The DCL Plan Proponents have steadily maintained that the reason that the Step Two Lenders receive the same recovery as the Step One Lenders is because of the sharing provisions contained in the Senior Loan Agreement. While the Noteholder Plan Proponents do not take a position on whether the Step One Lenders should share their recoveries with the Step Two Lenders, the undisclosed motivations of certain DCL Plan Proponents, and countenanced by the remaining DCL Plan Proponents, hide the true economic incentives behind this structuring of the DCL Plan evidence a complete absence of good faith and honest intentions.

### The Step Two Lender Claims Issues

339.    As the Court may recall, in connection with the hearing to approve the various disclosure statements for the competing plans, the Noteholder Plan Proponents and others sought disclosure of the specific debt holdings of the three LBO Lender proponents of the DCL Plan – Angelo Gordon, Oaktree and JPMorgan. The Noteholder Plan Proponents sought this disclosure because they believed that the economic interests of these lenders were heavily weighted in Step Two Lender Claims. Indeed, the questions that the Noteholder Plan Proponents were pondering at the time included (i) why the Step One Lenders would share their recoveries with Step Two Lenders when the Step Two Lenders had a much greater risk that their claims would be avoided; (ii) why the DCL Plan Proponents were giving no credence to the Examiner's conclusion that, if only the debt incurred with Step Two of the LBO was avoided, there was a 50/50 chance that Step One Lenders would be estopped from sharing in the recoveries otherwise allocable to Step Two and the corresponding value would flow solely to Non-LBO Creditors at both the Guarantor Debtors and Tribune; and (iii) why the Step Two Lenders are not required to forgo more than the *de minmis* $73 million in "settlement consideration" in connection with the allowance of their

claims but the Step Two Arrangers had to pay approximately 37.5% of their disgorgement exposure to "settle" Step Two Disgorgement Claims. The answer to these questions became readily apparent upon the filing of the voting and tabulation results for the DCL Plan and the Noteholder Plan: Oaktree, Angelo Gordon and JPMorgan collectively own approximately 71.2% of the Step Two Lender Claims. The chart below depicts the Step One Lender and Step Two Lender Claims held by the three institutional proponents of the DCL Plan and their affiliates:[179]

## Tribune - Senior Loan Holdings by DCL Plan Proponents

Based on Voting Results and Holdings as of December 6, 2010 Record Date

| | Step One Lender Claims | Step Two Lender Claims | Total Senior Lender Claims |
|---|---|---|---|
| Oaktree Entities | $1,294,248,103 | $551,754,471 | $1,846,002,574 |
| Angelo Gordon Entities | $524,812,923 | $341,633,003 | $866,445,926 |
| JPMorgan Entities | $213,864,861 | $603,257,366 | $817,122,227 |
| **Total** | **$2,032,925,887** | **$1,496,644,840** | **$3,529,570,727** |
| **% of Total Claims** | **31.4%** | **71.2%** | **41.2%** |

**Holdings of DCL Lender Proponents**

| | % Step One | % Step Two | |
|---|---|---|---|
| Oaktree Entities | 70.1% | 29.9% | 52.3% |
| Angelo Gordon Entities | 60.6% | 39.4% | 24.5% |
| JPMorgan Entities | 26.2% | 73.8% | 23.2% |
| **Total** | **57.6%** | **42.4%** | **100.0%** |

| | Step One | Step Two | Total |
|---|---|---|---|
| Outstanding Claims | $6,470,227,955 | $2,100,964,167 | $8,571,192,122 |

**Source**

(*Cf.* Ex. Report, Vol. 2 page 6)

---

[179] *See, generally*, Final Voting Tabulation Report; Ninth Amended Joint Verified Statement of Representation of More than One Creditor By Hennigan Bennett & Dorman LLP and Young, Conaway, Stargatt & Taylor, LLP (D.I. 5984), dated October 15, 2010.

340.   The holdings information and the now readily apparent answers to the questions above raise serious questions about the good faith intentions of these three proponents and, perhaps more importantly, the willingness of the Debtors and the Creditors' Committee to agree to a settlement that deprives the Non-LBO Creditors at Tribune of their just recoveries. Indeed, knowing this information and adding to it the inflated recovery to the Swap Claim owned by Oaktree and the artificially low valuation propounded by Lazard render the DCL Plan patently unconfirmable.

### The Intercompany Claims Settlement

341.   The Intercompany Claims Settlement is embodied in the Intercompany Claims Settlement Agreement at Exhibit 1.1.122 to the DCL Plan. According to the Intercompany Claims Settlement Agreement, as of the Petition Date, the Debtors' accounting systems reflected, among other things, that (i) certain amounts were owing to each of the subsidiaries party to the Intercompany Claims Settlement Agreement (the "Specified Subsidiaries") from Tribune (the "Initial Tribune Payables") and (ii) certain amounts were owing to Tribune from each of the Specified Subsidiaries (the "Initial Tribune Receivables"). Following an analysis by the Debtors' legal and financial advisors, the Debtors party to the Intercompany Claims Settlement Agreement agreed to, among other things, (i) the aggregate amount of each of the Initial Tribune Payables that would be Allowed Claims against Tribune (the "Tribune Payables Allowed Claim Amount") and (ii) the aggregate amount of each of the Initial Tribune Receivables will be Allowed Claims against the Specified Subsidiaries (the "Tribune Receivables Allowed Claim Amount"). The Tribune Payables Allowed Claim Amount for each Specified Subsidiary (i.e., the Allowed Claim amount that each Specified Subsidiary has against Tribune) is set forth on Schedule I to the Intercompany Claims Settlement Agreement. The Tribune Receivables

Allowed Claim Amount for each Specified Subsidiary (i.e., the Allowed Claim amount that Tribune has against each Specified Subsidiary) is set forth on Schedule II to the Intercompany Claims Settlement Agreement and aggregate $2,406,406,375.34.

342.     Inasmuch as the DCL Plan is not premised on the substantive consolidation of the Debtors' Estates and there is not mutuality of parties and obligations with respect to each of the Intercompany Claims, the aggregate Tribune Payables Allowed Claim Amounts cannot be set off against the aggregate Tribune Receivables Allowed Claim Amounts under applicable law. See 11 U.S.C. §553. In an attempt to solve for the conundrum raised by the absence of mutuality and the strong desire of the Senior Lenders to avoid substantive consolidation (as to do so would material reduce such lenders' DCL Plan recoveries), the Debtor parties to the Intercompany Claims Settlement Agreement agreed that "the Allowed Claims are being used in connection with the Plan for the purposes of calculating the allocation of value among Tribune and Specified Subsidiaries. No specific distributions on account of intercompany claims is otherwise anticipated pursuant to the Plan." Intercompany Claims Settlement Agreement, Article 1.2.

343.     The terms of the DCL Plan attempt to be consistent with the terms of the Intercompany Claims Settlement Agreement. First, the DCL Plan is premised on a $6.75 billion valuation with such value allocated 8.4% to Tribune and 91.6% to the Subsidiary Debtors (with such allocation determined, in part, by the Intercompany Claims Settlement). Second, the treatment for Class 1K (Intercompany Claims against Tribune) and Classes 2K-111K (Intercompany Claims against the applicable Subsidiary Debtors provides "[i]n full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims . . . Holders of Intercompany Claims . . . shall receive the treatment afforded to them in the Intercompany Claims Settlement. DCL Plan, Articles 3.2.10, 3.3.6. The foregoing treatment, however, is

183

discriminatory to Tribune and its Non-LBO Creditors and evidences a failure on the part of the Debtors and the Creditors' Committeee specifically to propose the DCL Plan in good faith and with honest intentions.

344.    As noted above, all Non-LBO Creditor Claims at each of the Subsidiary Debtors (i.e., the General Unsecured Creditors) are receiving a 100% recovery on account of their claims. Thus, in order for Tribune (and, thus, its creditors) to be treated fairly at the Subsidiary Debtors, Tribune should receive a full recovery on its $2,406,406,375.34 Tribune Receivables Allowed Claim Amount. To the extent that Tribune does not receive such full recovery on its Tribune Receivables Allowed Claim Amount for each Specified Subsidiary, the DCL Plan inappropriately allocates too much value to the Subsidiary Debtors and, thus, the Senior Lenders in violation of Bankruptcy Code section 1129(a)(3).

345.    For the foregoing reasons, the DCL Plan has not been proposed in good faith.

**B.    The DCL Plan Inappropriately Provides for the LBO Lenders to Share in the Proceeds of the Remaining LBO-Related Causes of Action**

346.    Holders of Senior Loan Claims and Bridge Loan Claims will receive Litigation Trust Interests and Creditors' Trust Interests as part of the their consideration under the DCL Plan. DCL Plan, at Art. III. These Litigation Trust Interests and Creditors' Trust Interests will entitle holders of Senior Loan Claims and Bridge Loan Claims to 35% of any proceeds recovered by the Litigation Trust or the Creditors' Trust, respectively, after (i) holders of Allowed Senior Noteholder Claims, EGI-TRB LLC Notes Claims, PHONES Claims, and those Allowed Other Parent Claims (who elect to receive Creditors' Trust Interests) receive the Parent GUC Trust Preference (defined as $90 million in the aggregate from the Litigation Trust and/or the Creditors' Trust, *excluding* 90% of the proceeds of claims against the Non-Settling Step Two Payees until any portion of the Step Two/Disgorgement Settlement required to be backstopped

by the Step Two Arrangers has been repaid) and (ii) the Trusts' Loan has been repaid. *Id.* at Art. I.[180]

347. Allowing the LBO Lenders to benefit at all from the prosecution of the Remaining LBO-Related Causes of Action when innocent Non-LBO Creditors have not been paid in full (including postpetition interest) violates principles of equity and public policy recognized throughout the country. Specifically, the LBO Lenders must be prohibited from recovering proceeds from the Litigation Trusts because: (i) the LBO Lenders consented to the fraudulent transaction upon which all of the remaining LBO-Related Causes of Action are premised and, therefore, are estopped from challenging its validity; (ii) the LBO Lenders' and/or the Debtors' bad acts may be imputed to the Trustees if the LBO Lenders participate in LBO-Related Causes of Action; and (iii) the LBO Lenders could jeopardize the Litigation Trustee's ability to prosecute the Remaining LBO-Causes of Action through application of *in pari delicto*, under which a plaintiff who shares fault with the defendant is barred from recovering on an action;.[181] Each of these arguments is discussed in detail below.[182]

---

[180] In addition, the LBO Lenders have "agreed" not to benefit from the subordination provisions contained in the PHONES Notes Indenture and the EGI-TRB LLC Notes with respect to their recovery of proceeds from the Trusts. *Id.*

[181] While the Noteholder Plan provides for Distribution Trust Interests and Creditors' Trust Interests to be provided to the LBO Lenders, the Noteholder Plan does not dictate that the LBO Lenders will actually share in recoveries from the causes of action transferred to such trusts under the Noteholder Plan. Rather, the Noteholder Plan Proponents anticipate that the Litigation Distribution Orders and Creditors' Trust Distribution Orders (each as defined in the Noteholder Plan) will provide that LBO Lenders are not entitled to recover from the applicable trust causes of action at least until Non-LBO Creditors are paid in full (including postpetition interest) for the reasons set forth in this Section [_].

[182] Each of the arguments contained in this Section applies with equal force to the Litigation Trust and Creditors' Trust established under the DCL Plan. However, as noted herein, the Noteholder Plan Proponents and many other similarly situated creditors opted out of the Creditors' Trust under the DCL Plan because, among other things, (i) control of the Creditors' Trust was put in the hand of the Creditors' Committee, which has already proven itself to be unwilling or incapable of acquitting its fiduciary obligations to the innocent Non-LBO Creditors, and (ii) the beneficiaries of the Creditors' Trust risk losing the benefits of the causes of action in such trust (to the extent there are any) based on the objections contained herein. Accordingly, the analyses focus primarily on the LBO Lenders receiving interests in the Litigation Trust.

1.    <u>Inasmuch as the LBO Lenders Would Be Estopped from Bringing the Remaining LBO-Related Causes of Action They Should Not Receive Trust Proceeds</u>

348.    A creditor that has participated in or agreed to a fraudulent transfer is in "no position" to later challenge the propriety of the transaction. *First Nat. Bank of Cincinatti v. Flershem*, 290 U.S. 504, 518-521 (1934) (holding that voluntary transfer of assets agreed to by 95% of debenture holders was fraudulent "as to dissenting debenture holders," and that consenting debenture holders "are in no position to complain that [the dissenting debenture holders] will fare better than they"). Accordingly, courts have held that fraudulent transfer claims are barred where they are asserted by or on behalf of a party that participated in or agreed to the challenged transfer. *See, e.g., Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 77 (Bankr. D. Del. 2005) (holding that creditors' committee was estopped from challenging payments as fraudulent transfers where the committee had previously supported the debtor's assumption of the contracts under which the payments were made); *In re Refco, Inc. Securities Litig.*, 2009 WL 7242548, *11 (S.D.N.Y. Nov. 13, 2009) (finding that party's "intimate involvement in the transaction" prevented such party from being a legitimate creditor for purposes of asserting avoidance action); *Morion v. OYO Instruments, L.P. (In re Labelon Corp.)*, No. 02-02-22582, 2006 WL 2516386, at *4 (Bankr. W.D.N.Y. Aug. 28, 2006) ("[O]n equitable grounds, this Court would not make a finding of avoidance and recovery on the proposed Section 548 and [state law] causes of action when the only entity that would benefit from that avoidance and recovery would be [a creditor] which specifically approved the [subject] transaction in writing and significantly benefited from the transaction."); *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer is not void, but voidable; thus it can be ratified by a creditor who is then estopped from seeking its avoidance.").

349.     Consistent with the foregoing, the Third Circuit has recognized that participants in a leveraged buyout transaction may properly be excluded from recovering on fraudulent transfer claims arising out of the transaction. *In re PWS Holding Corp.*, 228 F.3d 224, 239-240 (3d Cir. 2000) (upholding district court's determination that leveraged buyout lenders may be estopped from recovering on leveraged buyout-related claims and citing examiner's report concluding that "there was a reasonable possibility that the [leveraged buyout lenders] would be estopped from sharing in any fraudulent transfer recoveries"). The Third Circuit's decision in *PWS Holdings* applies with particular force in case like this one where the pre-LBO creditors were not cashed out in connection with the transaction and, thus, such creditors bear the risks of the leveraged buyout. *Id.* at 234 (citing examiner's report as stating that fraudulent transfer claims were "not promising" because, among other reasons, "the risks of the transaction were born by the acquirer...and not by pre-transaction creditors").

350.     The foregoing principles of fraudulent transfer law should be familiar to DCL Plan proponent JPMorgan. Indeed, JPMorgan, in its capacity as a shareholder in the *Lyondell* chapter 11 cases, recently filed a motion to prevent the LBO Lenders in that case from participating in recoveries of fraudulent transfer actions against pre-LBO shareholders because such lenders consented to and participated in the underlying transaction. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint at pp. 44-49, *Edward S. Weisfelner v. Morgan Stanley & Co., Inc., et al., (In re Lyondell Chemical Co., et al.)*, Adv. Pro. 10-04609 (Bankr. S.D.N.Y. January 11, 2011), [ECF No. 72]. These widely-accepted policies dictate that the LBO Lenders should not be entitled to benefit from the LBO-Related Causes of Action in these cases either.

187

351.    The LBO Lenders knowingly and willingly participated in the fraudulent transfer that forms the basis for the Remaining LBO Related Causes of Action. The LBO Lenders, therefore, are estopped from pursuing the Remaining LBO-Related Causes of Action under the law of this and other jurisdictions. Allowing the LBO Lenders to benefit from the prosecution of causes of action they do not have standing to bring violates the same principles of equity and culpability articulated by the Supreme Court and the Third Circuit – namely, that value recovered from a fraudulent transfer should go to innocent creditors. *First Nat. Bank of Cincinatti v. Flershem*, 290 U.S. 504, 518-521 (1934); *In re PWS Holding Corp.*, 228 F.3d 224, 239-240 (3d Cir. 2000); *but see In re Telesphere Comm'ns, Inc.*, 179 B.R. 544 (Bankr. N.D. Ill. 1994).[183]

2.    Allowing the LBO Lenders to Benefit from the Proceeds of LBO-Related Causes of Action Violates Basic Principles of Tort Liability

352.    Basic canons of tort liability likewise militate against permitting the LBO Lenders to benefit from LBO-Related Causes of Action. *Gambone v. Lite Rock Drywall*, 2008 WL 2875949 at *4 (3d Cir. July 25, 2008) (stating that fraudulent conveyance is a "species of the intentional tort of fraud").; *In re Cyrus II P'nship*, 413 B.R. 609, 619 (Bankr. S.D. Tex. 2008 (holding that avoidance actions under Bankruptcy Code section 544(b) are "appropriately characterized as tort actions"). Underlying the tenets of tort liability are the fundamental objectives of (i) compensating the victims of wrongdoing and (ii) deterring future misconduct. *See Cenco v. Seidman & Seidman*, 686 F.2d 449, 455 (7th Cir. 1982), *cert. denied*, 459 U.S. 880

---

[183] The *Telesphere* Court held, among other things, that LBO lenders could receive a portion of the proceeds they were required to pay into the debtor's estate in settlement of fraudulent transfer claims asserted by the creditors' committee. The *Telesphere* decision is distinguishable for at least two fundamental reasons. First, debtor Telesphere obtained loans from the LBO lenders to acquire another business and retire its then-existing secured working capital facility – not to pay shareholders. Second, the *Telesphere* Court expressly found that the LBO lenders were "quite likely to be found to have acted in good faith in making their loans to Telesphere" and that "there has been no indication that [the LBO lenders] engaged in inequitable conduct." *Telesphere*, 179 B.R. at 559, 561.

(1982) (stating that the "underlying objectives of tort liability . . . are to compensate the victims of wrongdoing and to deter future wrongdoing"); *see also Schacht v. Brown*, 711 F.2d 1348 (7th Cir. 1983), *cert. denied*, 464 U.S. 1002 (1983) (citing *Cenco*, 686 F.2d at 455) (explaining the *Cenco* Court's rationale as a "two-pronged analysis to determine whether [ ] imputation should occur: whether a judgment in favor of the plaintiff corporation would properly compensate the victims of the wrongdoing, and whether such recovery would deter future wrongdoing" and applying the same). Several courts have employed these axioms to determine whether the fraud of certain officers and directors should be imputed to the corporation such that representatives of the corporation may not recover on account of alleged negligence committed by third parties in connection with the same bad acts. *See, e.g., Cenco*, 686 F.2d at 455; *Schacht v. Brown*, 711 F.2d at 1348; *Welt v. Sirmans*, 3 F. Supp. 2d 1396 (S.D. Fla. 1997); *Phar-Mor, Inc. v. Coopers & Lybrand (In re Phar-Mor, Inc. Securities Litig.)*, 900 F. Supp. 784 (W.D. Pa. 1995); *In re Stat-Tech Securities Litigation, 905 F. Supp 1416 (D. Col. 1995); Drabkin v. L & L Construction Assocs. (In re Latin Investments Corp.)*, 168 B.R. 1 (Bankr. D.D.C. 1993); *NCP Litigation Trust v. KPMG*, 901 D.2d 871 (N.J. Sup. Ct. 2006).

353. Where the parties that stand to benefit from the action were complicit in the tortuous conduct, courts have imputed the culpable parties' conduct to the plaintiff, thereby barring recovery by innocent beneficiaries. *See e.g., Cenco*, 686 F.2d at 455 (discussing the two-prong liability analysis in the context of a suit brought against an independent auditor and holding that the fraud of the officers was imputed to the corporation). Where, however, the beneficiaries of potential recovery are innocent creditors (and do not include culpable parties), courts have rejected a broad reading of *Ceno* and permitted actions by a liquidating trustee against third parties. *See, e.g., Schacht*, 711 F.2d at 1348 (discussing the tort liability analysis in

the context of a suit brought by a liquidating trustee and finding that the officers' fraud should not be imputed to the corporation); *Welt*, 3 F. Supp. 2d at 1396 (finding that a claim by a trustee against directors of a corporation was not barred where such action benefited the corporation's creditors); *In re Phar-Mor, Inc. Securities Litig.*, 900 F. Supp. at 787 (declining to grant summary judgment to independent auditors in connection with an imputation defense because the policy concerns of *Cenco* were absent); *In re Stat-Tech Securities Litigation, 905 F. Supp at 1423 (D. Col. 1995)* (holding that a corporate officer's fraud was not imputed to the corporation and, therefore, that the trustee of a liquidating trust was not precluded from bringing suit against the corporation's officers and directors); *In re Latin Investments Corp.*, 168 B.R. at 6 (holding that a trustee had standing to bring a suit against a third party in connection with fraud committed by the debtor's principals); *NCP Litig. Trust*, 901 A.2d at 873 (holding that the trustee of a litigation trust may recover against an independent auditor who was negligent in failing to report fraud of corporate officers and directors because the equitable principles of tort liability did not require imputation).

354.    In *Cenco*, the issue presented to the court was whether a corporation's shareholders could maintain an action against allegedly negligent independent auditors for failing to uncover an officer's fraudulent conduct, or whether management's fraud should be imputed to the corporation. *See* 686 F.2d at 456. The *Cenco* Court found that imputation was a valid defense in favor of the auditors and, therefore, the innocent shareholders were barred from bringing suit. *See id.* The court evaluated the relevant issues through the lens of tort liability. The court identified the "beneficiaries" of the instant suit as *all* of Cenco's shareholders, regardless of when they purchased the stock, and found that allowing the corporation to recover

would run afoul of the first policy objective of tort liability – compensating the victims of a fraudulent act and not its perpetrators. *See id.* at 455. The court stated:

> Such a judgment would be perverse from the standpoint of compensating the victims of wrongdoing. Among the people who bought stock in Cenco before the fraud began are the corrupt officers themselves. To the extent they are still stockholders in the company, they would benefit pro rata from a judgment in favor of Cenco.

*Id.* Turning to the second objective of tort liability, the court opined that future fraud of the kind committed by Cenco's management would not be deterred if Cenco was permitted to shift the entire cost of the fraud from itself, and therefore its shareholders, to the outside auditor. *See id.* Finally, the court evaluated whether the fraudulent conduct of Cenco's management benefitted or harmed the corporation and noted:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-à-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are the beneficiaries of the fraud.

*Id.* at 456. Concluding that the fraudulent acts of Cenco's officers were for the benefit of the corporation, the court accepted the auditor's defense and barred suit. *See id.*

355. One year later, in *Schacht*, the Seventh Circuit again evaluated whether a corporate officer's fraud should be imputed to a corporation. *See Schacht,* 711 F.2d at 1345. In that case, however, relying on the same tort principles, the court came to the opposite conclusion. There, the court examined the imputation defense in the context of an action brought by a liquidation trustee on behalf of the creditors and policyholders of an insurance company liquidating under Illinois state law. *See id.* at 1348-49. With respect to compensation of victims, the *Schacht* Court distinguished *Cenco* on the grounds that, in the instant case, the beneficiaries

of any recovery would be innocent creditors and not parties complicit in the fraudulent conduct. *See id.* The court stated that:

> any recovery by the . . . [liquidator] from the instant suit will inure to . . . [the debtor's] estate. And under the distribution provisions of the governing liquidation statute, it is the policy holders and creditors who have first claim (after administrative costs and wages owed) to the assets of the estate. Thus, ***the claims of these entirely innocent parties must be satisfied in full*** before . . . [the debtor's] shareholders, last in line for recovery, receive anything.

*Id.* at 1348 (emphasis added). The court similarly distinguished *Cenco* with respect to the principle of deterrence, noting "there is no evidence that the wrongdoing officers of . . . [the debtor] would benefit directly from the instant suit." *Id.* at 1349. The *Schacht* Court made clear that when the ultimate beneficiaries of the claims brought by a liquidation trustee are creditors, who did not participate in or benefit from the fraud, the officers and directors' actions will not constitute a defense to recovery. *See id.*

356.     Other courts have similarly declined to extend the holding of *Cenco* and enforce the imputation defense to bar recovery by innocent creditors, emphasizing the fact that in their respective cases, the malfeasors would not benefit from any potential recovery awarded. *See In re Phar-Mor, Inc. Securities Litig.*, 900 F. Supp at 787 (finding that because the relevant claims would be assigned to a litigation trust pursuant to the debtors' plan of reorganization, any potential recovery would not benefit the culpable parties); *In re Latin Investment Corp.*, 168 B.R. at 6 (finding the same and further noting that "there is no possibility in this case of shareholders receiving any distribution from the estate. This alleviates any concern of the suit facilitating a 'perverse' compensation scheme at odds with one of two underlying objectives of tort liability . . . ."); *NCP Litig. Trust*, 901 A.2d at 885 (finding the same).

357.    In *In re Phar-Mor, Inc. Securities Litig.*, the District Court for the Western District of Pennsylvania explained that:

> any recovery by . . . [the debtor] in the case *sub judice* would inure to the benefit of the secured and unsecured creditors having an interest in the trust. Neither the fraudulent actors, nor . . . [the debtor's] equity holders would benefit from a recovery by . . . [the debtor] in this action. Thus, the objectives of tort liability . . . would arguably be served should . . . [the debtor] ultimately prevail and recover on its claims.

*Id. at 1348.* In *NCP Litig. Trust*, the Supreme Court of New Jersey engaged in an extensive review of the above precedent and came to the same conclusion, stating that "[l]ike *Schacht*, those courts have reasoned that allowing creditors to recover against a negligent auditor would serve the objectives of tort liability because, unlike *Cenco*, neither the fraudulent actors nor the corporation's shareholders would benefit from a recovery." *Id.* at 885. Thus, the court held that while the *Cenco* Court's application of tort principles was instructive, the conclusion that the imputation defense should universally prohibit suits by representatives of the corporation against allegedly negligent auditors was overly broad. *See id.* In *NCP Litig. Trust*, two Justices dissented on the grounds that the third-party auditors reasonably relied on representations made by management and therefore their negligent conduct was insufficient to defeat the imputation defense. *See id.* at 890-91 (LaVecchia, J., dissenting), 892-93 (Rivera-Soro, J., dissenting).  The *NCP Litig. Trust* Court opined on the dissenting positions and stated:

> We agree with the dissent that 'no one should profit from a fraud he himself perpetrated.' Because the imputation defense only protects the innocent and not the guilty, shareholders seeking to recover must themselves be 'innocent' of the wrongdoing. As such, imputation may be asserted against those shareholders who engaged in the fraud.

*Id.* at 885-86.

358.    The Litigation Trustee is vested under the DCL Plan to pursue claims and cause of action held by the Debtors' Estates. *See, e.g.*, DCL Plan, Article 1.1.180. As described in more detail below in subsection (c), the Litigation Trust takes these causes of action subject to whatever legal infirmities might exist – including defenses. Accordingly, if the Debtors' bad acts in connection with the LBO are imputed to the Litigation Trust, it could be barred from bringing suit under *Cenco*. The critical inquiry, as determined by virtually every court to have considered the issue, is whether any of the bad actors will benefit from the prosecution of the causes of action. If the beneficiaries of the action are innocent creditors, courts have reasoned that it would be inequitable to impute the bad actor's behavior to the trustee or representative. If, on the other hand, the bad actors will retain a stake in the litigation, courts have prohibited the trustee or representative from bringing suit. Accordingly, the LBO Lenders' guaranteed participation in the Litigation Trust could jeopardize the successful prosecution of the Remaining LBO-Related Causes of Action to the detriment of the innocent Non-LBO Creditors. The Litigation Trust should therefore be empowered to pursue LBO-Related Causes of Action solely for the benefit of the innocent Non-LBO Creditors.

3.    The LBO Lenders Should Be Precluded From Receiving Any Benefit From the Litigation Trust Under the Doctrine of In Pari Delicto

359.    Courts in the Third Circuit have recognized that a party's ability to recover on a claim may be limited by the doctrine of *in pari delicto*. *In pari delicto* is an equitable defense that provides that "a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 354 (3d Cir. 2001). In principle, *in pari delicto* is similar to the equitable doctrine of unclean hands, and is based on the notion that a plaintiff's own wrongful conduct may preclude it from recovering on its claim. *OHC Liquidation Trust v. Credit Suisse First Boston (In re*

*Oakwood Homes Corp.),* 389 B.R. 357, 365 (Bankr. D. Del. 2008) (noting that *in pari delicto* is analogous to the doctrine of unclean hands and "rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct").

360.    While its application may vary by jurisdiction, *in pari delicto* is generally available as a defense where the plaintiff has engaged in the same type of wrongdoing that has been attributed to the defendant. *See Pinter v. Dahl,* 486 U.S. 622, 632 (1988) (noting that contemporary courts have applied the doctrine "where the plaintiff has participated in some of the same sort of wrongdoing as the defendant"). In such circumstances, courts have concluded that denying the plaintiff relief is appropriate in order to prevent the plaintiff from profiting from its own misconduct. *In re Oakwood Homes Corp.,* 389 B.R. at 365 (noting that to grant a plaintiff relief "would contravene the public good by aiding one to profit from his wrong").

361.    In the bankruptcy context, *in pari delicto* may be employed by a defendant to preclude a trustee (or a party exercising the trustee's powers) from recovering on a claim where the debtor engaged in wrongful conduct or where wrongful conduct can be imputed to the debtor or trustee. *See, e.g., R.F. Lafferty & Co., Inc.,* 267 F.3d at 360 (dismissing deepening insolvency claim asserted against third parties by creditors' committee on behalf of debtor on the basis of *in pari delicto* where wrongful conduct was imputed to debtor); *In re Oakwood Homes Corp.,* 389 B.R. at 372 (granting summary judgment in favor of third party defendant on claims asserted by liquidating trust on the basis of *in pari delicto* where debtor participated in alleged misconduct). If a trustee asserts a claim that comprises property of the estate under Bankruptcy Code section 541, the trustee is subject to the same equitable defenses that could have been asserted against the debtor.[184] *See, e.g., R.F. Lafferty & Co., Inc.,* 267 F.3d at 356-57 (stating that "[t]rustee is, of

---

[184] For example, in these cases, the Examiner has noted that certain potential defendants may be able to rely on the doctrine of *in pari delicto* in defending against claims for aiding and abetting breaches of fiduciary duty, unjust

course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor"). By contrast, where a trustee is exercising the debtor's avoidance powers, *in pari delicto* will not operate to bar a claim if the claim has been brought for the benefit of the debtor's innocent creditors and no wrongful conduct can be imputed to the trustee. *See, e .g., McNamara v. PFS (In re The Personal and Business Insurance Agency)*, 334 F.3d 239, 246 (3d Cir. 2003) (finding that *in pari delicto* defense did not bar fraudulent transfer claim asserted by trustee where wrongful conduct of debtor's former CEO could not be imputed to trustee and trustee represented interests of innocent creditors).

362.    The doctrine of *in pari delicto* may be employed to bar the claims of specific creditors that have engaged in wrongful conduct. In *In re Yellowstone Mountain Club, LLC*,[185] the court refused to find that a trust established pursuant to a confirmed plan of reorganization to pursue fraudulent transfer claims against the debtor's former owner was tainted by unclean hands or any wrongful conduct. Nevertheless, the court ruled that certain prepetition lenders who were trust beneficiaries were not entitled to share in distributions from the trust. *Id.* at 679. The court's ruling was based on its finding that the prepetition lenders had participated in the transactions giving rise to the fraudulent transfer action pursued by the trust, and their claims were therefore barred by the doctrine of *in pari delicto*. *Id.* at 675-76. Instead of permitting the prepetition lenders to receive distributions, the court limited the damages awarded to the trust to the amount necessary to pay the debtor's innocent creditors. *Id.* at 679.

363.    Based on the above legal principles, the inclusion of the LBO Lenders as beneficiaries of the Litigation Trust threatens the Litigation Trustee's ability to pursue the

---

enrichment and professional malpractice. *See* Examiner's Report, Vol. 2 at 392-97, 403-04, 413-21. As noted by the Examiner, however, the ability of such potential defendants to successfully invoke the doctrine of *in pari delicto* would depend on whether certain exceptions to the doctrine apply and would also require further factual development with respect to the prepetition conduct of the Debtors' officers and directors. *See id.*
[185] 436 B.R. 598, 674-75 (Bankr. D. Mont. 2010).

Remaining LBO-Related Causes of Action successfully. As set forth in detail herein, the LBO Lenders willfully and knowingly participated in the conduct and transactions that form the basis of the Remaining LBO-Related Causes of Action to be pursued by the Litigation Trustee. The participation of the LBO Lenders in the Litigation Trust (and the membership of the LBO Lenders on the Litigation Trust Advisory Board) therefore creates the risk that the wrongful conduct of the LBO Lenders will be imputed to the Litigation Trust, and that the defendants will be able to assert the defense of *in pari delicto* against the Litigation Trust to the detriment of all other innocent creditors that are receiving Litigation Trust Interests under the DCL Plan. Accordingly, the LBO Lenders should not be entitled to risk the recovery of innocent creditors by participating in the Litigation Trust.

### C. The Parent GUC Trust Preference Inappropriately Discriminates Against Creditors Who Opt Out of the Creditors' Trust

364. As reflected above, the LBO Lenders recover 35% of the proceeds from all Trust causes of action after the payment of the Parent GUC Trust Preference and the Trusts' Loan. Pursuant to the DCL Plan, the Parent GUC Trust Preference means 100% of the Net Creditors' Trust Proceeds plus 100% of the Net Litigation Trust Proceeds until holders of Claims in Classes 1E (Senior Noteholder Claims), 1I (EGI-TRB LLC Notes Claims), 1J (PHONES Notes Claims) and 1F (Other Parent Claims) (to the extent such Holders elect to receive Trust Interests) have received $90 million in the aggregate from the Litigation Trust and/or the Creditors' Trust. DCL Plan, Article 1.1.174. Accordingly, creditors, like the Noteholder Plan Proponents, who opted out of the Creditors' Trust in order to, among other things, avoid the risk that such causes of action deposited in such trust will be barred by the defenses discussed herein, will not receive any portion of the $90 million preference derived from the Creditors' Trust (to the extent such Trust is vested with any causes of action). If, for example, the Creditors' Trustee succeeds in

procuring a $100 million settlement for distribution to holders of Creditors' Trust Interests before the Litigation Trust recovers on any of the Remaining LBO-Related Causes of Action, *none* of the Parent GUC Trust Preference will be distributed to creditors who have opted out of the Creditors' Trust. This potential outcome should not be permitted. Instead, the payment of the Parent GUC Trust Preference should come solely from the proceeds of the Litigation Trust Causes of Action, ensuring that all Non-LBO Creditors will benefit equally.

### D.    The Governance and Structure of the Litigation Trust Is Inappropriate

#### 1.    The Creditors' Committee Should Not Control the Litigation Trust[186]

365.    Under the DCL Plan, the Litigation Trust shall be managed and operated by the Litigation Trustee. DCL Plan, Article 13.3.1. The Litigation Trustee shall be responsible for, among other things, "prosecuting through judgment and/or settling the Litigation Trust Assets." *Id.* at 13.3.2. The Litigation Trustee will be assisted and supervised by a Litigation Trust Advisory Board, the members of which shall consist of members of the Creditors' Committee. *Id.* at 13.3.1. More specifically, the Litigation Trust Advisory Board will be comprised solely of those members of the Creditors' Committee "who are beneficiaries of Litigation Trust Interests." *Id.* at 1.1.128.[187]

366.    The DCL Plan Proponents have yet to disclose who will serve as Litigation Trustee and on the Litigation Trust Advisory Board. Moreover, neither the DCL Plan nor the Litigation Trust Agreement filed with the DCL Plan Supplement indicates how or by whom the Litigation Trustee will be selected. Without such disclosures, the Noteholder Plan Proponents

---

[186] The arguments set forth herein apply with equal force to the Creditors' Trust, notwithstanding the Noteholder Plan Proponents' determination to opt out of participating in the Creditors' Trust under the DCL Plan.

[187] Although Article 1.1.128 limits participation on the Litigation Trust Advisory Board to those Creditors' Committee members who are beneficiaries of the Litigation Trust, article 13.3.1 states that the initial members of the Litigation Trust Advisory Board "shall be the members of the Creditors' Committee." It is therefore unclear which members of the Creditors' Committee are actually contemplated to serve on the initial Litigation Trust Advisory Board.

have no way of knowing whether, for example, the Litigation Trustee will be a conflicted party in interest such as counsel to the Creditors' Committee or a designee of JPMorgan. Although the DCL Plan provides more guidance on who will serve on the Litigation Trust Advisory Board, the Plan is silent as to whether the Litigation Trust Advisory Board will be comprised of *all* Creditors' Committee members who receive Litigation Trust Interests. Indeed, of the *at most* four members of the Creditor' Committee who will receive Litigation Trust Interests, the two members best suited to oversee the prosecution of the Remaining LBO-Related Causes of Action – Deutsche Bank and Wilmington Trust – have not been asked to serve on the Litigation Trust Advisory Board as of the date hereof.

367.    Accordingly, it is possible, if not probable that JPMorgan may be the only member of the Litigation Trust Advisory Board. In fact, the DCL Plan not only impermissibly and inequitably seeks to distribute the proceeds of the Remaining LBO-Related Causes of Action to the LBO Lenders, but also seems to place control over the prosecution of these actions in the hands of those most responsible for the damages ultimately sought to be recouped by the Litigation Trustee.

368.    Even if the Litigation Trust Advisory Board was composed of Creditors' Committee members other than JPMorgan, the Creditors' Committee's actions to date undermine its ability to prosecute (or oversee the prosecution of) the Remaining LBO-Related Causes of Action aggressively. Specifically, the Creditors' Committee has vocally and publically supported the settlements contained in the DCL Plan, believing them to be "highly beneficial to Non-LBO Creditors." Creditors' Committee's Responsive Statement, at page 4. The Creditors' Committee further states that the Noteholder Plan, which preserves all of the LBO-Related Causes of Action for the benefit of Non-LBO Creditors, contemplates scenarios that are "fraught

with risk and do not provide Non-LBO Creditors with any certainty of achieving the distributions provided in the DCL Plan." *Id.* at 6.

369.    By supporting an artificially low settlement value in respect of the settled LBO-Related Causes of Action, the Creditors' Committee has effectively communicated to each potential trust cause of action defendant its views on the merits of the actions – namely, the benefits of prosecution simply do not outweigh the inherent "risks, costs and time delay." *Id.* at 4. Although the Creditors' Committee may nominally qualify as an "estate representative" under Bankruptcy Code section 1123(b)(3)(B), it cannot appropriately oversee the prosecution of claims that it believes have little value. Control of the Litigation Trust should instead reside in the hands of those who have the most to gain, and alternately the most to lose, by the prosecution of the trust's assets – the Senior Noteholders.

370.    Moreover, allowing a constituency with no economic stake in a trust to effectively dictate how and if the trust's causes of action are to be pursued runs contrary to precedent in this Circuit. The chart below reflects cases in this Circuit in which the beneficiaries of a trust were directly involved in the trust's governance.

| Case Name | Trust Governance Controlled By | Trust Beneficiaries Include |
|---|---|---|
| *In re CTC Commc'ns Grp, Inc.* (D. Del.) | Creditors' committee and prepetition lenders. (*Litigation Trust Agreement* § 5.1) | Holders of general unsecured claims and prepetition lenders. (*Litigation Trust Agreement* § 3.6; *Plan* Art I(A)(93), Art III (C)(4)) |
| *In re Fruit of the Loom, Inc., et al.* (D. Del.) | The beneficiaries of the respective trusts control the trusts. (*Plan* § 7.23) | |
| *In re Harvard Indus., Inc.* (D.N.J.) | Holders of senior secured claims. (*Litigation Trust Agreement* §§ 3.6; 5.1) | Holders of senior secured claims. (*Litigation Trust Agreement* § 6.1; *Disclosure Statement* at p. 3) |
| *In re Insilco Tech., Inc.* (D. Del.) | Creditors' committee and senior lenders. (*Plan* §§ 7.3(a); 1.2; 7.3(g); 6.9) | All holders of allowed claims. (*Plan* § 9.1) |
| *In re The IT Grp., Inc.* (D. Del.) | Creditors' committee and prepetition lenders. (*Plan* § 7.7) | Holders of general unsecured claims and lender claims. (*Litigation Trust Agreement* § 1.1.2) |

| Case Name | Trust Governance Controlled By: | Trust Beneficiaries Include: |
|---|---|---|
| In re MDIP Inc. (D. Del.) | Prepetition lenders, the creditors' committee, and a neutral third party. (*Plan* § 1.40) | Holders of prepetition secured claims and general unsecured claims. (*Plan* §§ 4.4; 4.5) |
| In re Meridian Auto. Systems-Composites Op'ns, Inc. (D. Del.) | Holders of prepetition first lien claims, prepetition second lien claims and general unsecured claims. (*Plan*, §§ 1.2; 3.3; 3.4; 3.5; *Litigation Trust Agreement* § 9.1.1) | Holders of prepetition first lien claims, prepetition second lien claims and general unsecured claims. (*Litigation Trust Agreement* § 1.1(e)) |
| In re Semcrude, L.P. (D. Del.) | Creditors' committee and a lender steering committee. (*Plan* § 1.81) | Holders of senior notes claims, lender deficiency claims, and general unsecured claims. (*Plan* § 1.85) |

Confirmation of the DCL Plan would simultaneously strip the Non-LBO Creditors of their ability to direct and/or supervise the prosecution of the Remaining LBO-Related Causes of Action, while vesting such authority in, at best, the disincentivized (and likely conflicted) members of a creditors' committee that sold out the Senior Noteholders and holders of PHONES Notes with an artificially low settlement for their own personal gain.

371. As this Court recently recognized when considering whether privileges held by a creditors' committee could properly transfer to a liquidating trustee, a liquidating trustee "is certainly the functional successor to the constituency whose economic interests were and are directly at stake." *In re New Century TRS Holdings, Inc.*, 407 B.R. 558, 568 (Bankr. D. Del. 2009). Accordingly, the Litigation Trustee and Litigation Trust Advisory Board appointed under any plan confirmed in these cases should also represent that "constituency whose interests were and are directly at stake." Therefore, if the DCL Plan is to be confirmed by this Court, Senior Noteholders and holders of PHONES Notes must be put in control of the Litigation Trust.

2. The Trusts Under the DCL Plan are Inappropriately Funded

372. The DCL Plan requires Reorganized Tribune to fund the Litigation Trust and the Creditors' Trust with a term loan in an aggregate principal amount of $20 million. DCL Plan at 1.1.237, 5.13. The DCL Plan also requires the Trusts' Loan to be repaid after the Parent GUC

Trust Preference has been satisfied in full. *Id.* at 1.1.238, 5.13. Funding the Trusts through a loan as opposed to an outright grant is wholly inappropriate and inconsistent with applicable precedent in this Circuit. Moreover, the amount of the Trusts' Loan is insufficient to fund the various causes of action required to be prosecuted by the Litigation Trustee and Creditors' Trustee.

373. Each cause of action to be transferred to the Litigation Trust is an estate cause of action. If these causes of action had been prosecuted during the pendency of the Chapter 11 Cases, all fees and expenses incurred in connection therewith would have been borne by the estates. The trust beneficiaries should not be penalized, and their recoveries negatively impacted, simply because the Debtors and the Committee waited two years to commence the LBO-Related Causes of Action and other litigations to be transferred to the Litigation Trust. Among the cases this and other jurisdictions that have appropriately funded their respective post confirmation trusts with a grant to avoid the inequitable result presented by the DCL Plan are the following: *In re CTC Commc'ns Grp., Inc.* (D. Del.); *In re Fruit of the Loom, Inc., et al.* (D. Del.); *In re Globe Manufacturing* (W.D. Ala.); *In re IDEARC Inc., et al.* (W.D. Tx.); *In re Imperial Home Decor Group Inc.* (D. Del.); *In re Insilco Technologies, Inc.* (D. Del.) ; *In re The IT Grp., Inc.* (D. Del.); *In re Lyondell Chemical Company, et al.* (S.D.N.Y.); and *In re Semcrude, L.P.* (D. Del.)

374. In addition, based on the fact that this Court will still be required to conduct all of the same litigation through the Litigation Trust that it will be required to oversee if the settlement in the DCL Plan is not approved, the amount of funding must be sufficient to ensure adequate resources are available to prosecute the claims to completion. In that regard, the funding provided under the Noteholder Plan is a far more reasonable estimate of the costs necessary to

undertake this litigation – $40 million. The DCL Plan $20 million Trusts' Loan should thus be increased to a $40 million grant as contemplated by the Noteholder Plan.

3.    <u>The Reorganized Debtors should be Required to Cooperate with the Trusts</u>

375.    Noticeably absent from the DCL Plan, the Litigation Trust Agreement and the Creditors' Trust Agreement is a requirement that the Reorganized Debtors cooperate with the Litigation Trustee and/or Creditors' Trustee as and when necessary. Because the Litigation Trust Assets and Creditors' Trust Assets consist solely of causes of action related to a fraudulent LBO consummated by the Debtors, the Reorganized Debtors' participation and cooperation in the Remaining LBO-Related Causes of Action will be critical. Thus, the DCL Plan should include an appropriate provision requiring the Reorganized Debtors to cooperate with the respective Trustees to the extent required and at their own expense. Similar provisions, as reflected in the chart below, are commonly included in trust documents by debtors in this and other jurisdictions.

| Case Name | Reorganized Debtors Required to Cooperate? | Reorganized Debtors Required to Bear Costs of Cooperation? |
|---|---|---|
| *In re Congoleum Corp.* (D.N.J.) | Yes. (*Plan Trust Agreement* § 7.12) | Yes |
| *In re CTC Commc'ns Grp., Inc.* (D. Del.) | Yes. (*Litigation Trust* § 10.3) | Yes |
| *In re Fruit of the Loom, Inc., et al.* (D. Del.) | Yes. (*Liquidation Trust Agreement* § 13.3) | Yes |
| *In re Globe Manufacturing Corp.* (W.D. Ala.) | Yes. (*Plan* § VII(D)) | Yes |
| *In re Imperial Home Decor Group Inc.* (D. Del.) | Yes. (*Litigation Trust Agreement* § 14.3) | Yes |
| *In re Lyondell Chemical Company, et al.* (S.D.N.Y.) | Yes. (*Litigation Trust Agreement* § 2.6; *Plan* § 8.2(c)) | Yes |
| *In re Meridian Auto.* | Yes. (*Amended Litigation Trust Agreement* § | Yes |

---

[188] Unless otherwise specified, an affirmative response to this inquiry indicates either (1) express language in the Plan documents requiring the Reorganized Debtors' to bear the expense of cooperation or (2) the absence of contrary language allocating the costs to the Litigation Trust or another party in interest.

| Case Name | Reorganized Debtors Required to Cooperate? | Reorganized Debtors Required to Bear Expense of Cooperation? |
|---|---|---|
| *Systems-Composites Op'ns, Inc.* (D. Del.) | 4.2; *Plan* § 1.2) | |
| *In re National Steel Corp., et al.* (N.D. Ill.) | Yes. (*Litigation Trust Agreement* § 8.1) | Yes |
| *In re Semcrude, L.P.* (D. Del.) | Yes. (*Litigation Trust Agreement* § 1.2(d)) | Yes |
| *In re Trenwick America Corp.* (D. Del.) | Yes. (*Litigation Trust Agreement* § 11.6) | Yes |

### 4. Work-Product, Attorney-Client, and Other Privileges Should Transfer to the Trusts

376.    Similarly, the DCL Plan currently does not contemplate the transfer of work-product, attorney-client and other privileges critical to the prosecution of the Litigation Trust Causes of Action.  These privileges, as they relate to the Litigation Trust Assets, should transfer to the Litigation Trust as a matter of law.  *See, e.g., In re Sweetwater*, 884 F.2d 1323, 1327 (10th Cir. 1989) ("if § 1123(b)(3)(B) is to function…a reorganization plan must empower a representative of the estate to enforce claims of the estate."); *Whyte v. Williams*, 152 B.R. 123, 130 (Bankr. N.D. Tex. 1992) (holding that the trustee must determine whether to invoke or waive applicable privileges depending on the trustee's ability to realize benefit from the causes of action).  Although the DCL Plan contemplates that the Reorganized Debtors and the Litigation Trustee will enter into the LT Confidentiality Agreement and Common Interest Agreement, the Litigation Trustee's access to privileged information should not be proscribed by the terms of an agreement that will undoubtedly be dictated by the Debtors.  DCL Plan, at 13.3.8.  Moreover, as summarized in the chart below, debtors regularly transfer all privileges to the fiduciary vested with control over trust causes of action.

| Case Name | Transfer of Attorney-Client and Work Product Privileges to Litigation Trust? |
|---|---|
| *In re CTC Commc'ns Grp., Inc.* (D. Del.) | Yes. (*Litigation Trust Agreement* § 10.2) |

204

| In re Fruit of the Loom, Inc., et al. (D. Del.) | Yes. (*Liquidation Trust Agreement* § 13.2) |
|---|---|
| In re IDEARC Inc., et al. (N.D. Tx.) | Yes. (*Litigation Trust Agreement* § 1.1) |
| In re Lyondell Chemical Company, et al. (S.D.N.Y.) | Yes. (*Litigation Trust Agreement* § 2.2(b)) |
| In re Meridian Auto. Systems-Composites Operations, Inc. (D. Del.) | Yes. (*Ligation Trust Agreement*, § 4.1) |
| In re National Steel Corp. (N.D. Ill.) | Yes. (*Litigation Trust Agreement* § 11.14) |
| In re Semcrude, L.P., et al. (D. Del.) | Yes. (*Litigation Trust Agreement* § 1.2) |
| In re Trenwick America Corp. (D. Del.) | Yes. (*Litigation Trust Agreement* § 11.2) |

5.  Additional Objections to the Litigation Trust Agreement

377.  In addition to the foregoing, the Noteholder Plan Proponents also object to the

Litigation Trust Agreement filed with the Plan Supplement on the following bases:

- The Litigation Trust Agreement currently contemplates that the Reorganized Debtors may receive an as-of-yet undefined indemnification by the Litigation Trust. Litigation Trust Agreement, § 7.2. The Noteholder Plan Proponents object to the Reorganized Debtors receiving any form of an indemnification by the Litigation Trust.

- The Litigation Trust Agreement inappropriately restricts the transferability of Litigation Trust Interests by conditioning the transfer of such interests on certain determinations to be made by the Litigation Trustee and the Litigation Trust Advisory Board in their sole discretion. Litigation Trust Agreement, § 2.5. These restrictions should be stripped from the Litigation Trust Agreement and the transferability sections should be conformed to those contained in the Noteholder Plan's Distribution Trust Agreement. *See* Noteholder Plan Distribution Trust Agreement, § 3.5.

- The Litigation Trust Agreement should be required to disclose the compensation of the Litigation Trustee, and should provide that such compensation can only be modified with approval of the Court. Litigation Trust Agreement § 3.11(a) (providing that "the Litigation Trustee shall receive the compensation set, from time to time, by the Litigation Trust Advisory Board. The Litigation Trust Advisory Board, without application or approval by the Bankruptcy Court, may reasonably modify the Litigation Trustee's compensation and other terms regarding the retention of the Litigation Trustee"). The Noteholder Plan's

Litigation Trust Agreement, by contrast, sets forth the compensation of the proposed litigation trustee, and requires Court approval for modifications thereto. Noteholder Plan Litigation Trust Agreement, § 5.2; Exhibit C.

- The Litigation Trust Agreement should require the Litigation Trustee to obtain Court approval to settle claims where the stated amount in controversy exceeds $1 million. *See* Noteholder Plan Litigation Trust Agreement, § 4.3(a) (providing that "Bankruptcy Court authority must be obtained to settle, dispose of or abandon any affirmative Litigation Trust Causes of Action where the stated fact amount in controversy exceeds $1,000,000").

- The Litigation Trust Agreement should be amended to explicitly impose fiduciary duties upon the Litigation Trustee. *See* Noteholder Plan Litigation Trust Agreement, § 4.1 (providing that the "Litigation Trustee shall have fiduciary duties to the Beneficiary consistent with the fiduciary duties that a member of an official committee of creditors appointed pursuant to section 1102 of the Bankruptcy Code has to the creditor constituents represented by such committee").

### E. The DCL Plan Treatment Unfairly Discriminates Against Pre-LBO Funded Debt

378.    The DCL Plan provides that the form of consideration to be received by the Senior Noteholders, Other Parent Claims and holders of General Unsecured Claims at the Subsidiary Debtors is all Cash (plus trust interests to the extent applicable), and the consideration to be received by the Senior Lenders is a "strip" consisting of New Common Stock, New Senior Secured Term Loan and Cash (plus trust interests to the extent applicable). Through the provision of 100% of the New Common Stock to the Senior Lenders, the DCL Plan proponents have created a structure that ensures if the Debtors' DEV is greater than the $6.75 billion valuation upon which the DCL Plan is premised as determined by Lazard, all of the increased value would inure solely to the benefit of the Senior Lenders at the expense of other unsecured creditors who, based on their Cash-only recoveries, would not realize this increase in value.

379.    As noted above, the Noteholder Plan Proponents believe that the $6.75 billion DEV upon which the DCL Plan is premised is artificially and, thus, the provision of New

Common Stock to the Senior Lenders permits such creditors to receive recoveries that are substantially greater than estimated in the DCL Specific Disclosure Statement. As the form of the consideration to be received by the Senior Lenders is more valuable than the form of consideration to be received by the Senior Noteholders (cash), the DCL Plan unfairly discriminates against the Non-LBO Creditors and, thus, violates Bankruptcy Code section 1129(b)(1). *See* 11 U.S.C. § 1129(b)(1) (Providing that a chapter 11 plan of reorganization may only be confirmed "if the plan does not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.").

F. **Preemptively Barring the Payment of Postpetition Interest to Class 1E (Senior Noteholder Claims) and Class 1J (PHONES Notes Claims) Contravenes the Requirements of Bankruptcy Code Sections 1129(b)(2) and 1129(a)(7)**

380. Under the DCL Plan, holders of Senior Noteholder Claims receive, among other forms of consideration, Class 1E Litigation Trust Interests and Class 1E Creditors' Trust Interests (assuming such Holders do not opt out of the Creditors' Trust). DCL Plan, at Art. III. Similarly, holders of PHONES Notes Claims receive Class 1J Litigation Trust Interests and Class 1J Creditors' Trust Interests (assuming such Holders do not opt out of the Creditors' Trust). The definitions for these trust interests are defined to expressly prohibit holders of Allowed Senior Noteholder Claims and holders of PHONES Notes Claims, respectively, from receiving postpetition interest on account of their Claims, regardless of the value recovered by the respective Trusts. *Id.* at 1.1.35, 1.1.45. By preemptively denying holders of Senior Noteholder Claims and holders of PHONES Notes Claims the opportunity to recover postpetition interest under *any* scenario (including one in which LBO Lenders are prohibited from sharing in the proceeds of the Trust causes of action until all Non-LBO Creditors are paid in full, with

interest), the DCL Plan violates the "fair and equitable" requirement of Bankruptcy Code section 1129(b)(2)[189] and the "best interests test" under Bankruptcy Code section 1129(a)(7).[190]

381.    The law is well established in this Circuit and elsewhere that, if a debtor is ultimately adjudicated solvent, the best interests test and the fair and equitable requirement mandate the payment of postpetition interest to holders of unsecured claims. *See, e.g., In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 205-206 (3d Cir. 2003) (confirming the bankruptcy court's holding that "a solvent debtor must now pay post-petition and pre-confirmation interest on a claim to have a class considered 'unimpaired'" and holding that "[a]n impaired creditor in a solvent debtor case can demand postpetition interest under the 'fair and equitable' test of § 1129(b)(2)."); *In re Washington Mut., Inc.*, 2011 WL 57111, *35 (Bankr. D. Del. 2011) (finding that a solvent debtor must pay "non-consenting impaired creditors" postpetition interest "to meet the best interest of creditors test in section 1129(a)(7).") (citation omitted).

382.    If the DCL Plan is confirmed, the Non-LBO Creditors who hold Litigation Trust Interests should be entitled to receive the equivalent of post-petition interest from the Remaining LBO-Related Causes of Action. Indeed, the Litigation Trust Assets consist of the Remaining LBO-Related Causes of Action which, if successfully prosecuted, further evidence the fact that the LBO Lenders' Claims should have been avoided. In such circumstance, the Debtors would have been solvent and, thus, Non-LBO Creditors would have been paid in full (including postpetition interest). Accordingly, the DCL Plan cannot be confirmed as proposed, and must be amended to require the payment of postpetition interest to holders of Senior Noteholder

---

[189] Bankruptcy Code section 1129(b) provides that a chapter 11 plan of reorganization may only be confirmed "if the plan . . . is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

[190] Under the best interests test, unsecured creditors of chapter 11 debtors are entitled to receive at least the same recovery that they would receive under a chapter 7 liquidation. *See* 11 U.S.C. § 1129(a)(7) ("With respect to each impaired class of claims or interests – each holder of a claim or interest of such class . . . will receive . . . value . . . that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7."

Claims and PHONES Notes Claims if the proceeds of the Remaining LBO-Related Causes of Action exceed the Allowed amount of such Claims.

### G. The DCL Plan Impermissibly Classifies the Swap Claim as an Other Parent Claim

#### 1. The Swap Claim

383. Under the Senior Loan Agreement, Tribune was required to enter into hedge arrangements to offset, among other things, a percentage of its interest rate exposure under the Senior Loan Agreement. *See* Joint Disclosure Statement, § III.A.2(a). Pursuant to this hedging requirement, Tribune entered into an International Swap and Derivatives Association, Inc., Master Agreement dated July 2, 2007 (together with any schedules thereto, the "1992 ISDA Master Agreement") and three accompanying interest rate swap confirmations, each dated as of July 3, 2007 (collectively, with the 1992 ISDA Master Agreement, the "Swap Agreement") with Barclays Bank PLC ("Barclays"), a co-documentation agent and lender under the Senior Loan Agreement. *See id.*

384. In connection with the Senior Loan Agreement and Swap Agreement, Tribune and the Guarantor Debtors entered into a guarantee agreement dated June 4, 2007 (the "Senior Guaranty Agreement") with JPMorgan, the administrative agent under the Senior Loan Agreement. *See id.* Pursuant to the Senior Guaranty Agreement, the Guarantor Debtors guaranteed Tribune's obligations under both the Senior Loan Agreement and the Swap Agreement. *See id.*

385. Barclays terminated all transactions under the Swap Agreement by letter dated December 18, 2008. *See id.* at § V.I. In connection therewith, Barclays calculated the amount owed by Tribune and the Guarantor Debtors under the Swap Agreement to be $150,948,822.00 (the "Swap Claim"). On July 14, 2010, the Swap Claim was transferred from Barclays to

Oaktree FF Investment Fund, L.P. ("Oaktree FF"), an affiliate of Oaktree, one of the proponents of the DCL Plan. *See* Notices of Partial Transfer of Claim, Doc. No's: 5018, 5019, 5020, 5021, 5023 and 5024.

386. Under the April Plan, the Swap Claim was classified as a Senior Loan Claim at Tribune together with all claims arising under the Senior Loan Agreement. The DCL Plan, however, classifies the Swap Claim as (i) an Other Parent Claim (*i.e.*, a general unsecured claim) at Tribune and (ii) a Senior Guaranty Claim (*i.e.*, a claim under the Senior Guaranty Agreement) at the Guarantor Debtors. *See* DCL Plan, §§ 3.2.6, 3.3.3. The proponents of the DCL Plan maintain that the Swap Claim was classified as an Other Parent Claim at Tribune because, "among other things, the Swap Claim *might* have the benefit of certain statutory defenses to avoidance that other Claims do not have." DCL Specific Disclosure Statement, p. 11 n.17 (emphasis added).

387. The DCL Specific Disclosure Statement provides, in relevant part, that holders of Allowed Claims in the Classes identified below will receive the following estimated recoveries on the Effective Date (taking into account the allocation of "settlement consideration"):

| *Class* | *Estimated Effective Date Recovery* |
|---------|-------------------------------------|
| Other Parent Claims (includes Swap Claim) (at Tribune) | 32.73% in Cash (plus Litigation Trust Interests) or 35.18% in Cash (and no Litigation Trust Interests)[191] |
| Senior Guaranty Claims (includes Swap Claim) (at subsidiaries) | 69.95% |

*See* DCL Specific Disclosure Statement at 14, 16. As reflected in the table above, the current classification of the Swap Claim under the DCL Plan contemplates that the Swap Claim under the DCL Plan will recover in excess of 100%.

---

[191] The natural, base-line recovery for the Other Parent Claims absent the "settlement consideration" being "provided" by the LBO Lenders is 4.3-4.4%. *See* Noteholder Plan, pp. 6-7. These recovery percentages have increased slightly as a result of the Bridge Loan Settlement.

2. The Swap Claim Should Not be Classified as an Other Parent Claim

388. By its express language, Bankruptcy Code section 1122(a) requires claims within a single class to be "substantially similar" to one another. 11 U.S.C. §1122(a); *see also In re Combustion Engineering, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) ("Section 1122(a) provides that only 'substantially similar' claims may be classified together under a plan of reorganization."); *Matter of Jersey City Medical Center*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class."). Moreover, although similar claims may be separately classified, the plan proponent must demonstrate that the separate classification is reasonable. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158 (3d Cir. 1993) ("[I]t seems clear that the Code was not meant to allow a [plan proponent] complete freedom to place substantially similar claims in separate classes. . . . [Thus] the classification of claims or interests must be reasonable."); *accord In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) ("Even though similar claims may be placed in separate classes, plan proponents cannot do so when it would be unreasonable."). The separate classification of similar claims is not reasonable where such classification is made in bad faith or constitutes "an abuse of the classification system." *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D. N.J. 2000) (Finding that courts have permitted separate classification of similar claims only where it is found that "the classification is offered in good faith, does not foster an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11.") (citations omitted). Further, a plan proponent may not "gerrymander" the classification system in order to obtain an affirmative vote on a plan of reorganization. *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Associates*, 987 F.2d 154, 159 (3d Cir. 1993) ("[T]he one clear rule that emerges

from otherwise muddled caselaw on § 1122 claims classification is that thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.") (quoting *Matter of Greystone III Joint Venture*, 948 F.2d 134, 139 (5th Cir. 1991)).

389.    As noted above, the Debtors initially classified the Swap Claim as a Senior Loan Claim in April.  The Debtors did so in apparent acknowledgement of the substantial similarities between the Swap Claim and the remaining Senior Loan Claims.  Indeed, both the Swap Claim and the Senior Loan Claims, among other things, (i) involved the same parties, (ii) arose in connection with the same fraudulent LBO transaction, and (iii) share the same guarantees. Moreover, by its express terms, the Senior Loan Agreement required Tribune to enter into the Swap Agreement.  Notwithstanding the foregoing, the Swap Claim has been "reclassified" by the Debtors and their new co-proponents as an Other Parent Claim in a transparent effort to secure an inflated recovery for a friendly creditor and fellow plan proponent – Oaktree.

390.    Under the DCL Plan, Other Parent Claims are estimated to receive approximately a 33.59%[192] recovery funded, in substantial part, by the LBO-related settlements – "settlements" which contemplate the reallocation of consideration from the LBO Lenders to Non-LBO Creditors.  *See* DCL Disclosure Statement, p. 4.  Classification of the Swap Claim as an Other Parent Claim will therefore entitle Oaktree FF to recover, using the Debtors' estimates, approximately $51 million, of which approximately $43 million comes from "settlement consideration."  In other words, the classification of the Swap Claim as an Other Parent Claim will entitle an LBO Lender to receive tens of millions of dollars *of settlement consideration* on account of an LBO-related claim at the expense of innocent Non-LBO Creditors.  The DCL

---

[192] Takes into account the Bridge Loan Settlement and assumes holders of Other Parent Claims elect to receive cash plus trust interests.

Plan's classification scheme thus constitutes exactly the type of abuse and bad faith behavior proscribed by courts in the Third Circuit.

391.     The DCL Plan Proponents attempt to rationalize what amounts to a $43 million gift to Oaktree by claiming that the Swap Claim "*might* have the benefit of certain statutory defenses to avoidance that other [Senior Loan] Claims do not have." DCL Specific Disclosure Statement, p. 11 n.17 (emphasis added).  This articulated justification does not withstand scrutiny.  Bankruptcy Code section 546(g) provides that a trustee may not avoid "a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title."  11 U.S.C. § 546(g).  Without addressing whether the Swap Claim constitutes a valid claim for purposes of section 546(g), section 546(g) expressly carves out from its safe harbor provisions transfers made with "actual intent to hinder, delay, or defraud."  *Id.*  Stated differently, swap claims that arise out of an intentionally fraudulent transfer are not subject to protection under section 546(g).  The DCL Plan Proponents' unilateral determination that the Swap Claim should not bear the taint of avoidance liability is undermined by the fact that numerous parties in interest, including the *Committee* – one of the proponents of the DCL Plan – has alleged that the LBO transaction constituted an *intentionally* fraudulent transfer of estate assets.  *See* Complaint and Objection to Claims, at pp. 45-49, *Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A., et al. (In re Tribune Co., et al.)*, Adv. Pro. 10-53963 (Bankr. D. Del. Nov. 1, 2010), [ECF No. 1].  Thus, the Swap Claim *is* subject to avoidance.[193]

---

[193] The Swap Claim may also suffer from another infirmity.  As noted above, Oaktree FF obtained the Swap Claim from Barclays.  As an agent under the Senior Loan Agreement, Barclays received substantial fees and expenses in connection with the LBO transaction, amounts that it may have to disgorge if the Senior Noteholders are successful

392.     Accordingly, the DCL Plan Proponents have no reasonable or good faith basis to classify the Swap Claim apart from the Senior Loan Claims, and their efforts to give preferential treatment to an important ally evidences a lack of good faith and constitutes the type of abuse in the classification system that alone is grounds to deny confirmation.  Moreover, the DCL Plan Proponents have not put forth any justification (other than the misguided inference that neither the Swap Claim nor the Other Parent Claims are subject to attack as fraudulent conveyances) to support their conclusion that the Swap Claim is "substantially similar" to Other Parent Claims as opposed to the Senior Lender Claims Class as is required by Bankruptcy Code section 1122.  At a minimum, the Debtors should be required to separately classify the Swap Claim to prevent Oaktree from inappropriately receiving settlement proceeds at the expense of innocent Non-LBO Creditors.

**H.      The Allocation of the Plan and "Settlement Consideration" Violates Bankruptcy Code Sections 510(a), 1129(a)(1), 1129 (a)(3), 1129(b)(1) and Bankruptcy Rule 9019**

393.     Section 7.15 of the DCL Plan provides in pertinent part as follows:

> The distributions and treatment provided to Claims . . . under this Plan take into account and/or conform to the relative priority and rights of such Claims . . . under any applicable subordination and turnover provisions in any applicable contracts, including without limitation, the PHONES Notes Indenture and the EGI-TRB LLC Notes, and nothing in this Plan shall be deemed to impair, diminish, eliminate, or otherwise adversely affect the rights or remedies of beneficiaries . . . of any contractual subordination and turnover provisions.

DCL Plan at § 7.15.

394.     The DCL Plan included Section 7.15 presumably to comply with the provisions of Bankruptcy Code sections 510(a) and 1129(a)(1).  Bankruptcy Code section 510(a) provides that

---

in defeating the LBO settlements.  Pursuant to section 502(d), "any claim of any entity from which property is recoverable" is disallowed until the property is returned to the estate.  11 U.S. C. § 502(d).

"[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). Bankruptcy Code section 1129(a)(1) in turn provides that in order for a chapter 11 plan to be confirmed, the plan must "compl[y] with applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). Accordingly, in order for a plan to be confirmed, it must give effect to valid subordination agreements. The DCL Plan does not, however, apply the subordination provisions of the PHONES Notes Indenture and EGI-TRB LLC Notes correctly.

395. Under the DCL Plan, the baseline treatment (including settlement consideration) for Classes 1E (Senior Noteholder Claims) and 1F (Other Parent Claims (including the Swap Claim)) provides for the holders of the Claims in both Classes to receive a Cash payment equal to approximately 33.59%[194] plus Litigation Trust Interests and Creditors' Trust Interests (unless the applicable creditor opts out of the Creditors' Trust).[195] In order to achieve these percentage recoveries, the DCL Plan (i) fails to appropriately apply the subordination provisions of the PHONES Notes Indentures and EGI-TRB LLC Notes in connection with "natural" recoveries and (ii) disregards the PHONES Notes and EGI-TRB LLC Notes completely in connection with the allocation of the $446 million in aggregate "settlement consideration" provided to Non-LBO Creditors at Tribune.[196]

396. The proper "waterfall" allocation of the $446 million in "settlement consideration" allocable to Tribune would be as follows: First, there would be a pro rata

---

[194] Includes value in respect of Remaining Bridge Loan Reserve (and assumes that all Bridge Loan Arrangers elect the treatment provided in Section 3.2.4(d)(ii) of the DCL Plan.
[195] Holders of Other Parent Claims also have the option to receive an all Cash recovery at 35.18% (plus Creditors' Trust Interests and 17.1% of the Remaining Bridge Loan Reserve).
[196] The $446 million in aggregate "settlement consideration" at Tribune is comprised of the approximately $432 million of settlement consideration originally contemplated by the DCL Plan plus the additional $13.3 million made available to Non-LBO Creditors in connection with the Bridge Loan Settlement.

allocation of the $446 million among Senior Noteholder Claims, the Swap Claim,[197] Other Parent Claims (excluding the Swap Claim), PHONES Notes Claims and EGI-TRB LLC Notes Claims. Second, the initial allocations to the PHONES Notes Claims and EGI-TRB LLC Notes Claims would be reallocated on a pro rata basis to Senior Noteholder Claims and the Swap Claim, but not to Other Parent Claims because such claims are not entitled to the benefit of the subordination provisions according to the erms of the PHONES Notes Indenture and the EGI-TRB LLC Notes. Third, the reallocation would yield appropriate recoveries. Based on a proper implementation of the waterfall and reallocation of the settlement consideration, recoveries in respect of Other Parent Claims (excluding the Swap Claim) would drop by *approximately 42% from the 33.59% contemplated by the DCL Plan to only 19.4%.* Recoveries on Senior Noteholder Claims ($1.283 billion) and Swap Claim ($150.9 million) would increase if the waterfall and subordination provisions were applied correctly from 33.59% to 34.7%.

397.    The DCL Plan (i) blatantly ignores the "waterfall" upon which all available consideration must flow, (ii) misapplies the subordination provisions of the PHONES Notes Indenture and EGI-TRB LLC Notes, and (iii) yields an inappropriately high recovery to holders of Other Parent Claims.

398.    The same defect exists with respect to the "natural" recoveries provided under the DCL Plan to Other Parent Claims. The DCL Plan proponents again disregard the subordination provisions of the PHONES Notes Indenture and the EGI-TRB LLC Notes, giving the Other Parent Claims Class the same percentage "natural" recovery as the Senior Noteholders in violation of Bankruptcy Code section 510(a). *See DCL Specific Disclosure Statement at 5, n. 6*

---

[197] As noted above, the Noteholder Plan proponents do not believe that the Swap Claim should be entitled to receive any "settlement consideration" under the DCL Plan. However, for purposes of showing the impact of the blatant misapplication of the subordination provisions contained in the PHONES Notes Indenture and EGI-TRB LLC Notes, the Swap Claim is included in this Section for illustrative purposes.

216

("Although some Other Parent Claims may not be entitled to the benefit of the contractual subordination of the PHONES Notes Claims and the EGI-TRB LLC Notes Claims, as part of the Settlement, the Senior Lenders have allocated sufficient settlement consideration necessary to enable all Allowed Other Parent Claims to receive the same distributions under the [DCL] Plan.").

399.    As evidenced by the foregoing, the DCL Plan proponents have blatantly preferred the Other Parent Claims Class to the detriment of the Senior Noteholders Claims Class in violation of applicable law.  The preferential treatment provided to the holders of Other Parent Claims and the failure of the DCL Plan to (i) provide for the settlement consideration to flow through the "waterfall" and (ii) otherwise ensure that creditor recoveries comply with applicable law and relevant subordination provisions render the DCL Plan patently unconfirmable under Bankruptcy Code sections 510(a), 1129(a)(1), 1129(a)(3) and 1129(b)(1) and provides clear evidence of the unreasonableness of the proposed settlement of the LBO-Related Causes of Action under Bankruptcy Rule 9019.

## IV.    CONCLUSION

For all the foregoing reasons, the Proposed Settlement does not satisfy the standards for approval under Bankruptcy Rule 9019, and the DCL Plan does not comply with applicable provisions of the Bankruptcy Code necessary for such plan to be confirmed.  Accordingly, the Court should deny confirmation of the DCL Plan.

**Dated:  February 16, 2011**

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
David Zensky
Philip C. Dublin
Abid Qureshi
One Bryant Park
New York, NY 10036
(212) 872-1000
*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.

_____
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP

Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Andrew K. Glenn
Sheron Korpus
Christine A. Montenegro
Matthew B. Stein
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

BIFFERATO GENTILOTTI LLC

Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel: (302) 429-1900
Fax: (302) 429-8600

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC

William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| TRIBUNE COMPANY, *et al.*, | ) | Case No. 08-13141 (KJC) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) | **Objection Deadline: February 15, 2011 at 11:59 p.m.** |
|  | ) | **(Extended per agreement)** |
|  | ) | **Hearing Date: March 7, 2011 at 10:00 a.m.** |

## OBJECTION OF THE NOTEHOLDER PLAN PROPONENTS TO CONFIRMATION OF THE DEBTOR/COMMITTEE/LENDER PLAN OF REORGANIZATION (PART II)

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
2000 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970
*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
(212) 609-6800
*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre, 405 N. King Street
Wilmington, DE 19801
(302) 984-6300

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
(302) 429-1900

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
(212) 209-4800

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
(302) 428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

# I. The DCL Plan Is Not Feasible Under Bankruptcy Code Section 1129(a)(11)

1.     Because Tribune holds licenses issued by the Federal Communications Commission (the "FCC") for television and radio broadcast stations, any plan of reorganization confirmed by this Court will be subject to the further consent of the FCC. As the DCL Plan Proponents concede in their disclosure statement – because the Debtors' business operations are subject to the regulation of the FCC – "their emergence from bankruptcy will require the consent of the FCC." (*See* DCL Disclosure Statement at 38). As discussed in detail below and in the report of Noteholder Plan Proponents' FCC expert, to be offered at the confirmation hearing, the DCL Plan will not be approved by the FCC because of ownership interests Angelo Gordon, JPMorgan and Oaktree currently hold in other broadcast stations and newspapers.

2.     Bankruptcy Code section 1129(a)(11) requires a plan to be "feasible" in order to be confirmed. 11 U.S.C. § 1129(a)(11); *see In re Cont'l Airlines*, 91 F.3d 553, 563 (3d Cir. 1996); *see also In re The Leslie Fay Cos.*, 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997) (holding that the Bankruptcy Court is required to determine whether a plan is workable and has a reasonable likelihood of success); *In re G-1 Holdings, Inc.*, 420 B.R. 216, 267 (D.N.J. 2009) (citing *In re Am. Family Enters.*, 256 B.R. 377, 404 (D.N.J. 2000)). The key inquiry in the feasibility analysis is whether there exists a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against visionary or speculative plans. *See In re Congoleum Corp.*, 362 B.R. 198, 203 (Bankr. D.N.J. 2007); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).

3.     In the context of this proceeding, the Court must consider, in evaluating the feasibility of the DCL Plan, whether the DCL Plan Proponents will have any impediments to obtaining the necessary FCC regulatory approvals for the reorganized debtors. *See In re TCI 2*

*Holdings, LLC*, 428 B.R. 117, 154, 175 (Bankr. D.N.J. 2010) ("To establish the feasibility of

their plan . . . the proponents of the AHC/Debtor Plan must also show that the new owners of the

Reorganized Debtors will not face material hurdles to achieve the necessary regulatory approvals

from the New Jersey Casino Control Commission('CCC')," and noting with respect to a

competing plan that"[t]he feasibility of the [competing] Beal/Icahn Plan depends upon the

prospect that the plan proponents can achieve licensure for the Reorganized Debtors from the . . .

[CCC], and can withstand antitrust scrutiny by the Federal Trade Commission."); *Sound Radio,*

*Inc. v. WNJR Radio 1430*, 93 B.R. 849, 857 (Bankr. D. N.J. 1988) (in assessing whether the plan

was feasible the court evaluated whether the necessary approvals from the FCC could be timely

obtained); *In re Cajun Elec. Power Co-op.*, 230 B.R. 715, 747 (Bankr. M.D. La. 1999)

(evaluating whether the debtor could obtain necessary approvals from the Federal Energy

Regulatory Commission).

4.       The FCC, in deciding whether to approve the reorganization of Tribune proposed

by the DCL Plan will be obliged to consider, among other things, whether the parties receiving

5% or more of reorganized Tribune's voting common stock under the DCL Plan will comply

with the FCC-related ownership requirements and restrictions. *See* DCL Disclosure Statement at

43. Based on Media Ownership Certifications provided pursuant to the Solicitation Order

(Docket No. 7126), JPMorgan, Angelo Gordon and Oaktree will own more than 5% of the voting

stock of reorganized Tribune under the DCL Plan.  In addition, the DCL Plan (at section 5.3.2)

provides that JPMorgan, Angelo Gordon and Oaktree will designate six of the seven members of

the board of directors of reorganized Tribune – Oaktree, two members; Angelo Gordon, one

member; JPMorgan, one member; and Oaktree, Angelo Gordon and JPMorgan together, two

members.  Furthermore, the party designating the initial director shall have the sole right to

designate such director's replacement during the initial term of each of the directors. *Id.* As a consequence, based on both the amount of voting stock that they will own as well as their right to designate directors, JPMorgan, Angelo Gordon and Oaktree will each have an "attributable interest" in Tribune – that is, an interest that counts for determining compliance with the FCC's ownership rules. *See* Report of Mark J. Prak (Feb. 14, 2011) at 22, 26-27, 30 ("Prak Report").

5.    To assess whether Angelo Gordon, Oaktree and JPMorgan's interest in Tribune under the DCL Plan would create regulatory impediments to the implementation of the DCL Plan, Aurelius retained an expert on FCC matters, Mark J. Prak. Aurelius asked Mr. Prak to review information supplied by Angelo Gordon, Oaktree and JPMorgan to Debtors and the FCC, as well as information obtained from discovery and other public sources. On the basis of this information, Mr. Prak has concluded that the interests in Tribune to be held by Angelo Gordon and JPMorgan under the DCL Plan would violate the FCC's ownership rules and therefore that the FCC would not approve the DCL Plan. Prak Report at 33-35.[1]  Mr. Prak specifically found:

- JPMorgan holds an attributable interest in Gannett Company, Inc., which owns daily newspapers and television stations in many of the same markets as Tribune. The FCC's ownership rules prohibit this cross-ownership.

- One of JPMorgan's directors, Stephen Burke, is an officer of NBC Universal, Inc., which owns television stations in many of the same markets as Tribune. The FCC's ownership rules prohibit this cross-interest.

- Angelo Gordon and JPMorgan hold attributable interests in ██████ ███████████████████████, which owns television stations and a daily newspaper in three of Tribune's markets. The FCC's ownership rules prohibit this cross-ownership.[2]

---

[1] The applicable FCC rules with respect to attribution and ownership are identified and discussed in the Prak Report.
[2] In addition, Mr. Prak found, based on the incomplete information provided to date by Angelo Gordon in discovery, that Angelo Gordon may also hold an attributable interest in the ██████████████, which is a daily newspaper published in ████████. Tribune also owns a television station in ████████, and the cross-ownership of the Tribune's television station and the ██████████████████ is prohibited under the FCC's ownership rules. *See* Prak Report at 35.

3

In light of these violations, the DCL Plan is not feasible and it would be futile for the Court to confirm the DCL Plan because it will not be approved by the FCC.

6.    To be sure, JPMorgan has argued to the FCC that Mr. Burke should be exempt from the attribution rules, but the FCC has made no determination on JPMorgan's request for exemption (and JPMorgan has not disclosed to the FCC Mr. Burke's interest in NBC). Similarly, JPMorgan has indicated to the FCC that it will reduce its interest in Tribune if the FCC concludes that JPMorgan's interest in Gannett is attributable, but the FCC has not yet made any such determination, and may not make any such determination until it rules on the application for consent to approval of the DCL Plan, which will not occur unless the Court confirms the plan. In the same vein, Angelo Gordon has ███████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████. (JPMorgan has not produced any similar agreement with ███████████████████.)

7.    The DCL Plan (at section 5.2.3) further provides that each of Angelo Gordon, Oaktree and JPMorgan may relinquish its director designation rights, in each case in its sole discretion, if the DCL Plan Proponents determine that such rights will prevent the FCC from approving the DCL Plan. JPMorgan and Angelo Gordon have not disclosed to the FCC, however, their interests in ███████████████; Angelo Gordon has not disclosed to the FCC its interest in the ███████████; and the DCL Plan Proponents have not disclosed to the FCC the director designation rights.

8.    It is therefore irrelevant to confirmation of the DCL Plan that mechanisms may be in place that would allow Angelo Gordon or JPMorgan to restructure their interests in Tribune or Gannett, NBC, ███████████████ and the ███████████████ so as to render them

4

non-attributable. Debtors do not have the power to compel Angelo Gordon or JPMorgan to restructure their interests, and whether Angelo Gordon or JPMorgan decides to do so is in each of Angelo Gordon's and JPMorgan's sole discretion.

9.     Even if Angelo Gordon and JPMorgan were to restructure their interests in Gannett, NBC, ████████████ and the ████████████ so as to render them non-attributable for purposes of the FCC's ownership rules, that is far from the end of the inquiry. The Court must also consider whether these and other media interests held by Angelo Gordon, Oaktree and JPMorgan will impair Debtors' ability to obtain FCC approval of the DCL Plan. Significantly, more than literal compliance with the FCC's ownership rules is at issue in this case. Tribune is seeking waivers of several of the FCC's broadcast multiple ownership and cross-ownership rules to permit continued ownership of combinations of television stations and daily newspapers or more than one television station in various markets. (*See* Joint Disclosure Statement at 38-39).[3] The waivers that Tribune has requested are controversial and have been opposed by a coalition of public interest groups. (*See* DCL Disclosure Statement at 51-52). Presumably because of the contentiousness of Tribune's FCC waiver requests, the proponents of the DCL Plan claim that "[n]o waivers will be sought and no special showing will be submitted to accommodate separate media interests of prospective stockholders independent of their interests in the Reorganized Debtors." (DCL Disclosure Statement at 41).

10.     Mr. Prak also considered whether Angelo Gordon, Oaktree and JPMorgan's extensive other broadcast and newspaper interests (including interests in addition to those discussed above) will adversely affect Tribune's request for continued waivers of the FCC's ownership rules. Without these waivers, Tribune would be required to divest television and/or newspapers in order to obtain FCC approval. The DCL Plan, however, does not provide for any

---

[3] These markets include: New York, Los Angeles, Chicago, Miami, Indianapolis and Hartford-New Haven.

divestitures necessary to obtain FCC approval, so if divestitures are required, the DCL Plan

would fail. Mr. Prak concluded that Angelo Gordon, Oaktree and JPMorgan's other broadcast

and newspaper interests will adversely affect the FCC's decision. *See* Prak Report at 2-3, 35-38.

These other broadcast and newspaper interests include:

- In Los Angeles, where Tribune has requested a waiver to permit the continued ownership of KTLA(TV) and the Los Angeles Times – Oaktree's ownership interest in a television station and seven radio stations; and Angelo Gordon and JPMorgan's ownership interest in the ███████████████ [4]

- In Chicago, where Tribune has requested a waiver to permit the continued ownership of WGN-TV, WGN(AM) and the Chicago Tribune – Angelo Gordon's ownership interest in eight radio stations.

- In Hartford-New Haven, where Tribune has requested two waivers, one to permit the continued ownership of WTIC-TV and WCCT-TV, and the second to permit the continued ownership of these two television stations and the Hartford Courant – JPMorgan's ownership interest in the ███████ ███████.

- In Miami, where Tribune has requested a waiver to permit the continued ownership of WSFL-TV and the South Florida Sun Sentinel – Angelo Gordon's ownership interest in ████████████ that serves the same market as Tribune's newspaper.

Indeed, Mr. Prak expresses "substantial doubts" and "serious reservations" about whether the

FCC would grant Tribune the required waivers under these circumstances. Prak Report at 3, 36.

The likelihood that the FCC would not grant these necessary waivers significantly undercuts the

feasibility of the DCL Plan, and the Noteholder Plan Proponents submit it would be futile for the

Court to confirm the DCL Plan in the face of substantial doubts about whether the FCC will

grant Tribune the necessary waivers to continue to own the otherwise prohibited combination of

newspapers and television stations that it currently owns.

---

[4]     Tribune represented to the FCC that the other media outlets in which Angelo Gordon, Oaktree and JPMorgan have ownership interests are independent competitors to Tribune that justify grant of the waivers of the FCC's ownership rules. Tribune has not, however, disclosed to the FCC the ownership interests of Angelo Gordon, Oaktree and JPMorgan in these other media outlets.

11.    Finally, even if it could be determined that the FCC would ultimately approve the DCL Plan and grant the necessary continued waivers to Tribune, the complexity of the issues presented by Angelo Gordon, Oaktree and JPMorgan's interests in Tribune and other media companies assures that the FCC approval process will be substantially delayed in comparison to a plan that is not so constrained, such as the Noteholder Plan.[5]  Indeed, the DCL Plan Proponents themselves have effectively conceded that FCC approval of the DCL Plan will be significantly delayed:

- The DCL Plan itself (at Section 5.3.2) provides Angelo Gordon, Oaktree and JPMorgan may restructure their other investments, relinquish their director designation rights, or make other commitments to the FCC, if DCL Plan Proponents determine that the FCC's approval will not be obtained due to these rights.  Angelo Gordon, Oaktree and JPMorgan are each, however, given 60 days to decide what to do once the DCL Plan Proponents make such a determination, and even then the DCL Plan provides that Angelo Gordon, Oaktree and JPMorgan will have director nomination rights, unless the FCC raises further objections.

- JPMorgan has asked the FCC to make an exception to the ownership attribution rules for JPMorgan's board director, Stephen Burke.  JPMorgan has not, however, disclosed to the FCC that this exception is necessary because Mr. Burke holds a conflicting interest in NBC.

- JPMorgan has indicated to the FCC that it is willing to reduce its voting interest in Tribune to below 5% if the FCC ultimately concludes that JPMorgan holds an attributable interest in Gannett.  JPMorgan has not, however, disclosed its director designation right to the FCC, much less offered to relinquish the right.

- Oaktree has committed to the FCC to restructure its attributable interest in Liberman Broadcasting Inc.  Liberman owns, among other things, a television station and seven radio stations in the Los Angeles television market.  Unless this interest is restructured, Oaktree's interest in Tribune under the DCL Plan would violate the FCC's ownership rules.

---

[5]    Angelo Gordon, Oaktree and JPMorgan will not have director designation and replacement rights under the Noteholder Plan.  In addition, the Noteholder Plan Proponents have the discretion under their plan to require Angelo Gordon, Oaktree and JPMorgan to hold less than 5% of the voting stock of Tribune, and the Noteholder Plan Proponents intend to exercise this discretion in light of the determination that a 5% or greater voting interest would impair the ability to obtain the necessary FCC approval.

- Angelo Gordon has a ████████████████████████ (which has not been disclosed to the FCC) permitting Angelo Gordon to ██████████████████████ if in the context of an application to be filed ████████████ with the FCC, the FCC concludes that Angelo Gordon holds an attributable interest in ████████████████████. Angelo Gordon ████████████ has yet to submit the required application to the FCC.

Based only upon the facts that have been disclosed to the FCC to date by the DCL Plan Proponents, the DCL Plan will require a much lengthier review by the FCC than otherwise would be required. There are, moreover, further reasons that the DCL Plan will delay FCC approval of the reorganization of Tribune.

    12.    Mr. Prak observes that in his 30 years of practice before the FCC, he has never encountered such a tangled web of cross-ownership interests as presented by Angelo Gordon, Oaktree and JPMorgan. Prak Report at 40. Based on his experience, the proposed ownership by Angelo Gordon, Oaktree and JPMorgan will elicit further petitions to deny or objections from third parties, such as public interest groups and unions that have opposed Tribune's requests for continued waivers. Prak Report at 3. Mr. Prak concludes that these proceedings will result in at least six to eight months of additional delay at the FCC, which will also substantially delay the effective date of the DCL Plan. Prak Report at 3, 40. And the six to eight month additional delay is from the date that Angelo Gordon and JPMorgan finally come clean to the FCC about their other media interests, which they have not yet done. *See* Prak Report at 3.

## II.    CONCLUSION

    For all the foregoing reasons, the DCL Plan is not feasible under Bankruptcy Code Section 1129(a)(11). Accordingly, the Court should deny confirmation of the DCL Plan.

Dated: February 15, 2011

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
2000 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970

*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.

William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP

Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BIFFERATO GENTILOTTI LLC

/s/ Garvan F. McDaniel
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
(302) 429-1900
Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor
Indenture Trustee for certain series of Senior Notes

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
(212) 209-4800

SULLIVAN HAZELTINE ALLINSON LLC

William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
(302) 428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for
the PHONES Notes*

## CERTIFICATE OF SERVICE

I, Amanda M. Winfree, hereby certify that on February 16, 2011, I caused one copy of the

foregoing document to be served upon the parties on the attached service list via electronic mail.

Amanda M. Winfree (#4615)

| Email Address | Attorney |
|---|---|
| jconlan@sidley.com | James F. Conlan |
| bkrakauer@sidley.com | Bryan Krakauer |
| klantry@sidley.com | James Bendernagel |
| jbendernagel@sidley.com | James W. Ducayet |
| jducayet@sidley.com | Patrick J. Wackerly |
| dmiles@sidley.com | Jen Peltz |
| pwackerly@sidley.com | Colleen M. Kenney |
| jpeltz@sidley.com | Dale E. Thomas |
| ckenney@sidley.com | **Sidley Austin LLP** |
| sbierman@sidley.com | One South Dearborn Street |
| dthomas@sidley.com | Chicago, IL 60603 |
| rflagg@sidley.com | |
| ahart@sidley.com | Kevin T. Lantry |
| mmelen@sidley.com | **Sidley Austin LLP** |
| | 555 West Fifth Street |
| | Los Angeles, CA 90013 |
| | |
| | David M. Miles |
| | Ronald S. Flagg |
| | **Sidley Austin LLP** |
| | 1501 K Street, N.W. |
| | Washington, D.C. 20005 |
| | |
| | Steven M. Bierman |
| | Andrew D. Hart |
| | **Sidley Austin LLP** |
| | 787 Seventh Avenue |
| | New York, New York 10019 |
| msiegel@brownrudnick.com | Martin S. Siegel |
| kbromberg@brownrudnick.com | Katherine S. Bromberg |
| gnovod@ brownrudnick.com | G. Novod |
| jellias@brownrudnick.com | Jared A. Ellias |
| adash@brownrudnick.com | Andrew Dash |
| | **Brown Rudnick LLP** |
| | Seven Times Square |
| | New York, NY 10036 |
| hseife@chadbourne.com | Howard Seife |
| dlemay@chadbourne.com | David M. LeMay |
| mashley@chadbourne.com | Marc D. Ashley |
| tmccormack@chadbourne.com | Thomas J. McCormack |
| anellos@chadbourne.com | Alexandra K. Nellos |
| ddeutsch@chadbourne.com | Douglas E. Deutsch |
| eprzybylko@chadbourne.com | Eric J. Przybylko |
| rschwinger@chadbourne.com | Robert A. Schwinger |
| | **Chadbourne & Parke LLP** |
| | 30 Rockefeller Plaza |
| | New York, NY 10112 |

| Email Address | Attorney |
|---|---|
| gbush@zuckerman.com<br>agoldfarb@zuckerman.com<br>jsottile@zuckerman.com | Graeme Bush<br>Andrew N. Goldfarb<br>James Sottile<br>**Zuckerman Spaeder LLP**<br>1800 M Street, NW, Suite 1000<br>Washington, DC 20036-5807 |
| hobartd@hbdlawyers.com<br>johnstonj@hbdlawyers.com<br>mesterj@hbdlawyers.com | Dana C. Hobart<br>James O. Johnston<br>Joshua M. Mester<br>**Hennigan Bennett & Dorman**<br>865 South Figueroa Street, Suite 2900<br>Los Angeles, CA 90017 |
| donald.bernstein@davispolk.com<br>elliott.moskowitz@davispolk.com<br>michael.russano@davispolk.com<br>sasha.polonsky@davispolk.com<br>ben.kaminetzky@davispolk.com<br>damian.schaible@davispolk.com<br>dennis.glazer@davispolk.com<br>karen.luftglass@davis polk.com | Donald S. Bernstein<br>Elliott Moskowitz<br>Michael Russano<br>Sasha Polonsky<br>Benjamin S. Kaminetzky<br>Damian S. Schaible<br>Dennis E. Glazer<br>Karen Luftglass<br>**Davis Polk & Wardwell LLP**<br>450 Lexington Avenue<br>New York, NY 10017 |
| skorpus@kasowitz.com<br>mstein@kasowitz.com<br>drosner@kasowitz.com<br>cmontenegro@kasowitz.com | David S. Rosner<br>Sheron Korpus<br>Matthew B. Stein<br>Christine A. Montenegro<br>**Kasowitz, Benson, Torres & Friedman LLP**<br>1633 Broadway<br>New York, NY 10019 |
| dadler@mccarter.com<br>afaccone@mccarter.com<br>jboccassini@mccarter.com<br>kmayer@mccarter.com | David Adler<br>**McCarter & English LLP**<br>245 Park Avenue, 27th Floor<br>New York, NY 10167<br><br>Alitia Faccone<br>Joseph T. Boccassini<br>**McCarter & English LLP**<br>Four Gateway Center<br>100 Mulberry Street<br>Newark, NJ 07102<br><br>Katherine L. Mayer<br>**McCarter & English LLP**<br>Renaissance Centre<br>405 N. King Street, 8th Floor<br>Wilmington, DE 19801 |

| Email Address | Attorney |
|---|---|
| hkaplan@arkin-law.com<br>jyeh@arkinlaw.com | Howard J. Kaplan<br>Johnny Yeh<br>**Arkin Kaplan Rice LLP**<br>590 Madison Avenue<br>New York, NY 10022 |
| lsilverstein@potteranderson.com<br>rmcneill@potteranderson.com | Laurie Selber Silverstein<br>R. Stephen McNeill<br>**Potter Anderson & Carroon LLP**<br>Hercules Plaza<br>1313 North Market St.<br>Wilmington, DE 19801 |
| mprimoff@kayescholer.com<br>jagudelo@kayescholer.com<br>jparver@kayescholer.com<br>jdrayton@kayescholer.com | Madlyn Gleich Primoff<br>Jonathan Agudelo<br>Jane W. Parver<br>Joseph M. Drayton<br>**Kaye Scholer**<br>425 Park Avenue<br>New York, NY 10022-3598 |
| bbutwin@omm.com<br>dcantor@omm.com<br>dshamah@omm.com | Bradley J. Butwin<br>Daniel L. Cantor<br>Daniel S. Shamah<br>**O'Melveny & Myers LLP**<br>Times Square Tower<br>7 Times Square<br>New York, NY 10036 |
| schannej@pepperlaw.com<br>strattond@pepperlaw.com | John Henry Schanne<br>David B. Stratton<br>**Pepper Hamilton LLP**<br>Hercules Plaza, Suite 5100<br>1313 Market Street<br>P.O. Box 1709<br>Wilmington Delaware 19899-1709 |
| dbrown@paulweiss.com<br>agordon@paulweiss.com<br>emccolm@paulweiss.com<br>alevy@paulweiss.com | David W. Brown<br>Andrew G. Gordon<br>Elizabeth McColm<br>**Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br><br>Andrew J. Puglia Levy<br>**Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>2001 K Street, NW<br>Washington, DC 20006-1047 |

{00469456;v1}

| Email Address | Attorney |
|---|---|
| dgheiman@jonesday.com<br>bberens@jonesday.com<br>dahall@jonesday.com<br>lmarvin@jonesday.com | David G. Heiman<br>Brad Erens<br>**Jones Day**<br>North Point<br>901 Lakeside Avenue<br>Cleveland, OH 44114-1190<br><br>Lynn DiPaola Marvin<br>**Jones Day**<br>222 East 41st Street<br>New York, New York 10017-6702<br><br>David A. Hall<br>**Jones Day**<br>77 West Wacker<br>Chicago, Illinois 60601-1692 |
| andrew.goldman@wilmerhale.com<br>charles.platt@wilmerhale.com<br>dawn.wilson@wilmerhale.com | Andrew Goldman<br>Charles Platt<br>Dawn Wilson<br>**WilmerHale**<br>399 Park Avenue<br>New York, NY 10022 |
| dgolden@akingump.com<br>dzensky@akingump.com<br>nchung@akingump.com<br>aqureshi@akingump.com<br>djnewman@akingump.com<br>jgoldsmith@akingump.com<br>bcarney@akingump.com<br>cdoniak@akingump.com<br>mhurley@akingump.com<br>sgulati@akingump.com | Daniel H. Golden, Esquire<br>Philip C. Dublin, Esquire<br>Jason Goldsmith<br>Brian Carney<br>Nancy Chung<br>Abid Qureshi<br>Mitchell P. Hurley<br>Deborah Newman<br>Sunny Gulati<br>**Akin Gump Strauss Hauer & Feld LLP**<br>One Bryant Park<br>New York, NY 10036 |
| avail@jenner.com<br>dbradford@jenner.com<br>dsondgeroth@jenner.com | Andrew W. Vail<br>David J. Bradford<br>Douglas Sondgeroth<br>**Jenner & Block LLP**<br>353 N. Clark Street<br>Chicago, IL 60654-3456 |

| Email Address | Attorney |
|---|---|
| charles.jackson@morganlewis.com<br>ddavidson@morganlewis.com<br>tbecker@morganlewis.com<br>jbayles@morganlewis.com<br>gabrams@morganlewis.com<br>marussell@morganlewis.com<br>mzelmanovitz@morganlewis.com<br>rmauceri@morganlewis.com | Charles C. Jackson<br>Deborah S. Davidson<br>Theodore M. Becker<br>James E. Bayles<br>Gregory P. Abrams<br>Matthew A. Russell<br>**Morgan, Lewis & Bockius LLP**<br>77 West Wacker Dr.<br>Chicago, IL 60601-5094<br><br>Menachem O. Zelmanovitz<br>**Morgan, Lewis & Bockius LLP**<br>101 Park Avenue<br>New York, NY 10178-0060<br><br>Rachel Jaffe Mauceri<br>**Morgan, Lewis & Bockius LLP**<br>1701 Market St.<br>Philadelphia, PA 19103-2921 |
| evan.flaschen@bgllp.com | Evan Flaschen<br>**Bracewell & Giuliani**<br>225 Asylum Street<br>Suite 2600<br>Hartford, CT 06103-1516 |
| gerson.leonard@dol.gov<br>goldberg.elizabeth@dol.gov<br>heri.christine@dol.gov<br>schloss.michael@dol.gov | Leonard Gerson<br>Elizabeth Goldberg<br>Christine Heri<br>Michael Schloss<br>**United States Department of Labor** |
| dhille@whitecase.com<br>ahammond@whitecase.com<br>bfritz@whitecase.com | David G. Hille<br>Andrew W. Hammond<br>Brian E. Fritz<br>**White & Case**<br>1155 Avenue of the Americas<br>New York, NY 10036-2787 |
| kstickles@coleschotz.com | J. Kate Stickles<br>**Cole, Schotz, Meisel, Forman & Leonard, P.A.**<br>500 Delaware Avenue<br>Suite 1410<br>Wilmington, DE 19801 |
| bbennett@dl.com<br>jmester@dl.com<br>jjohnston@dl.com | Bruce Bennett<br>Joshua M. Mester<br>James O. Johnston<br>**Dewey & LeBoeuf**<br>333 South Grand Avenue, Suite 2600<br>Los Angeles, CA 90071-1530 |