## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| TRIBUNE COMPANY, *et al.*,[1] | ) Chapter 11 |
| | ) Case No. 08-13141 (KJC) |
| Debtors. | ) Jointly Administered |
| | ) |

## MEMORANDUM OF LAW OF NOTEHOLDER PLAN PROPONENTS (I) IN SUPPORT OF CONFIRMATION OF THE NOTEHOLDER PLAN AND (II) IN RESPONSE TO OBJECTIONS TO THE NOTEHOLDER PLAN

Dated:   Wilmington, DE
         February 25, 2011

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
Philip C. Dublin
Kristina M. Wesch
Meredith A. Lahaie
One Bryant Park
New York, New York 10036
(212) 872-1000

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
200 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970
*Counsel for Aurelius Capital Management, LP*

ASHBY & GEDDES, P.A.
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP
Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre, 405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

---

[1]The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the following page.

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Sheron Korpus
Christine Montenegro
1633 Broadway
New York, New York 10019
(212) 506-1700
*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BIFFERATO GENTILOTTI LLC
Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
(302) 429-1900

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800
*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

SULLIVAN HAZELTINE ALLINSON LLC
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
4 East 8th Street, Suite 400
Wilmington, DE 19801
302-428-8191

The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634);

Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WCCT Inc., f/k/a WTXX Inc. (1268).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## Table of Contents

Page No.

I.   PRELIMINARY STATEMENT ...............................................................................1

II.  BACKGROUND ...................................................................................................8

    A.   Introduction...................................................................................................8

    B.   Significant Events Leading to Chapter 11 .................................................9

    C.   Events Leading Up to the Competing Plan Process................................10

    D.   The Mediation and the Competing Plan Process ....................................13

    E.   Solicitation of the Competing Plans ........................................................16

        1.   The Disclosure Statement Order.......................................................16

        2.   Ballots and Ranking..........................................................................17

        3.   The Noteholder Plan's Claims Purchase Election .............................21

        4.   The Noteholder Plan's Creditors' Trust Election ..............................21

    F.   Objections to the Noteholder Plan...........................................................22

    G.   The Modifications to the Noteholder Plan...............................................22

III. ARGUMENT......................................................................................................24

    A.   Burden of Proof..........................................................................................24

    B.   The Noteholder Plan Complies with Applicable Provisions of the
        Bankruptcy Code (Section 1129(a)(1))....................................................25

        1.   The Noteholder Plan Satisfies the Classification Requirements
            of 11 U.S.C. § 1122 .........................................................................25

        2.   The Noteholder Plan Complies with the Requirements of 11
            U.S.C. § 1123(a) ..............................................................................31

        3.   The Noteholder Plan Complies with the Requirements of 11
            U.S.C.  § 1123(b) .............................................................................42

    C.   The Noteholder Plan Proponents Have Complied with the
        Applicable Provisions of the Bankruptcy Code – 11 U.S.C. §
        1129(a)(2) ....................................................................................................46

        1.   The Noteholder Plan Satisfies Bankruptcy Code Section 1125..........47

        2.   The Noteholder Plan Satisfies Bankruptcy Code Section 1126..........48

    D.   The Noteholder Plan Has Been Proposed in Good Faith and Not
        by any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3)......................52

        1.   The Noteholder Plan Does Not Create Uncertain Ownership,
            Harm Enterprise Value or Depress the Value of New Common
            Stock ................................................................................................54

2. The Value of the Minority Interests Will Not Be Noticeably Impaired ................................................................59

3. The Distribution Trust Tax Structure Is Not Intended to Have Adverse Tax Consequences ..................................62

4. The Noteholder Plan Does Not Give Aurelius Control Over Reorganized Tribune ...........................................63

5. The Noteholder Plan Does Not Excessively Delay Creditor Recoveries ...........................................................66

6. The Noteholder Plan Contains Appropriate Claims Reconciliation Procedures .................................................67

7. The Noteholder Plan was Not Proposed with Ulterior Motives to Attempt to Extract Value from the Estates in the Form of Higher Settlement Payments for the Classes the Noteholder Plan Proponents Control ....................................69

E. **The Noteholder Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments – 11 U.S.C. § 1129(a)(4)** .......................**70**

F. **The Proposed Disclosure Regarding Post-Emergence Directors and Officers Is Appropriate – 11 U.S.C. § 1129(a)(5)** ..............................**71**

G. **The Noteholder Plan Does Not Contain Rate Changes Subject to the Jurisdiction of any Government Commission – 11 U.S.C. § 1129(a)(6)** .............................................................................**73**

H. **The Noteholder Plan Is in the Best Interests of Creditors and Interest Holders – 11 U.S.C. § 1129(a)(7)** ....................................**73**

I. **Acceptance of Impaired Classes – 11 U.S.C. § 1129(a)(8)** .........................**76**

J. **The Noteholder Plan Provides for Payment of Priority Claims – 11 U.S.C. § 1129(a)(9)** .........................................................**77**

K. **The Noteholder Plan Has Been Accepted by at Least One Impaired Class Entitled to Vote – Section 1129(a)(10)** ..............................**78**

L. **The Noteholder Plan Is Not Likely to Be Followed by Liquidation or the Need for Further Financial Reorganization – 11 U.S.C. § 1129(a)(11)** ...........................................................................**84**

M. **The Noteholder Plan Provides for the Payment of All Statutory Fees – 11 U.S.C. § 1129(a)(12)** .................................................**88**

N. **The Noteholder Plan Provides for the Appropriate Treatment of Retiree Benefits – 11 U.S.C. § 1129(a)(13)** ...................................**89**

O. **The Noteholder Plan Satisfies the "Cram Down" Requirements – 11 U.S.C. § 1129(b)** .............................................................**89**

1. The Noteholder Plan Does Not Unfairly Discriminate with Respect to Impaired Classes that Have Rejected the Noteholder Plan ...........................................................................90

ii

2. The Noteholder Plan Is Fair and Equitable with Respect to the Rejecting Classes ...................................................................93

3. The Noteholder Plan Provides More Than Adequate Information to Meet the "Cram Down" Requirements.......................93

4. The Remaining DCL Plan Proponents' 1129(b) Objections Do Not Withstand Scrutiny.......................................................................95

**P. The Replacement Guaranty Provision of the Noteholder Plan Should Be Approved** ........................................................................**98**

**Q. Confirmation of the Noteholder Plan Will Not Violate FCC Regulations or Result in Additional Delay**....................................**99**

**R. Responses to Miscellaneous Objections Identified by the DCL Plan Proponents**..................................................................................**103**

**S. The Noteholder Plan Modifications Are Immaterial and Comply with Bankruptcy Code Section 1127** ...........................................**105**

**IV. CONCLUSION** ......................................................................................**108**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Prod. & Chems., Inc. v. Airgas, Inc.*,
    Nos. 5249-CC, 5256-CC, 2011 WL 519735 (Del. Ch. Feb. 15, 2011) ..................................64

*Ash v. McCall*,
    No. A-17132, 2000 WL 1370341 (Del. Ch. Ct. Sept. 15, 2000) ...........................................64

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)...............................................................................................................74

*Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank)*
    201 B.R. 376 (E.D. Pa. 1996) ............................................................................................106

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*,
    372 F.3d 154 (3d Cir. 2004)...................................................................................................45

*Caminetti v. U.S.*,
    242 U.S. 470 (1917)...............................................................................................................79

*Consol. Rock Prods. Co. v. Du Bois*,
    312 U.S. 510 (1941)...............................................................................................................95

*Crestar Bank v. Walker (In re Walker)*
    165 B.R. 994 (E.D. Va. 1994)................................................................................................35

*Eisenberg v. Comm'r of Internal Revenue*,
    155 F.3d 50, 53 n.7. (2d Cir 1998).........................................................................................59

*Enron Power Corp. v. New Power Co. (In re New Power Co.)*,
    438 F.3d 1113 (11th Cir. 2006) ...........................................................................................106

*Guth v. Loft, Inc.*,
    5 A.2d 503 (Del. 1939) ..........................................................................................................64

*Howell v. Maytag*,
    168 F.R.D. at 505.......................................................................................................103, 105

*U.S. v. Reorganized CF & I Fabricators of Utah, Inc.*,
    518 U.S. 213, 228 (1996).......................................................................................................74

*In re 203 N. LaSalle St. Ltd. P'ship*,
    190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) ...........................................................................90

*In re 203 N. LaSalle St. Ltd. P'ship*,
    526 U.S. 434 (1999)...............................................................................................................90

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143, 150 n. 5 (3d Cir. 1986) .................................................................. 52

*In re AbitibiBowater, Inc.*,
    No. 09-11296 (KJC) (Bankr. D. Del. Nov. 23, 2010) ............................................. 83

*In re Adelphia Commc'ns Corp.*,
    Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Nov. 21, 2005) ................................. 98

*In re Aleris Int'l, Inc.*,
    No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ....................... 52, 85

*In re Allegheny Int'l, Inc.*,
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ................................................................. 66

*In re Applied Safety, Inc.*,
    200 B.R. 576 (Bankr. E.D. Pa. 1996) ................................................................. 34

*In re Armstrong World Indus.*,
    348 B.R. 111 (D. Del. 2006) .......................................................................... 24, 59

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985) ................................................................. 90, 92

*In re Burns & Roe Enters.*,
    No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ............................... 52

*In re Butler*,
    42 B.R. 777 (Bankr. E.D. Ark. 1984) ................................................................. 35

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) ................................................................. 92

*In re Cajun Elec. Power Co-op.*,
    230 B.R. 715, 747 (Bankr. M.D. La. 1999) ........................................................ 85

*In re Calpine Corp.*,
    No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) ...................... 106

*In re Capmark Fin. Grp. Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) ................................................................. 68

*In re Charter Commc'ns Inc.*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................................................... 79, 80, 81

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004) .......................................................................... 25, 52

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ...................................................................26

*In re Credentia Corp.*,
   Case No. 10-10926 (BLS) (Bankr. D. Del. May 24, 2010) ...................................98

*In re Crowthers McCall Pattern, Inc.*,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) .................................................................74

*In re CTC Commc'ns Grp., Inc.*
   Case No. 02-12873 (PJW) (Bankr. D. Del. Oct. 14, 2003) ...................................98

*In re Drexel Burnham Lambert Grp. Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............................................................37, 82

*In re Eagle-Picher Indus.*,
   No. 91-10100 (BR) (Bankr. S.D. Ohio 1991) .......................................................59

*In re Eddington Thread Mfg. Co.*,
   181 B.R. 826 (Bankr. E.D. Pa. 1995) ..................................................................84

*In re Enron Corp.*,
   No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. Jul. 15, 2004) ................79

*In re Exide Tech.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................93

*In re Fed.-Mogul Global Inc.*,
   No. 01-10578 (JKF), 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007)........................52, 59

*In re Fuller-Austin Insulation Co.*,
   No. 98-2038 (JJF) (Bankr. D. Del. Sept. 4, 1998) ................................................59

*In re First Magnus Fin. Corp.*,
   No. 4:07-BK-01578 (JMM) (Bankr. D. Ariz. Oct. 30, 2007)..................................68

*In re Formica Corp. Shareholders Litig.*,
   No. 10598, 1989 WL 25812 (Del. Ch. Ct. Mar. 22, 1989)....................................64

*In re G-I Holdings Inc.*,
   420 B.R. 216, 263 (D.N.J. 2009) .........................................................................66

*In re Hardwood P-G, Inc.*,
   (LMC) Case No. 06-50057 (Bankr. W.D. Tex. Nov. 1, 2006)................................98

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007)................................................................26

*In re Hernandez*,
   287 B.R. 795 (Bankr. D. Ariz. 2002) .................................................................34

*In re Insilco Techs., Inc.*,
   Case No. 02-13672 (KJC) (Bankr. D. Del. Feb. 13, 2004) ................................98

*In re Int'l Wireless Commc'ns Holdings Inc.*,
   No. 98-2007 (MFW), 1999 WL 33483582 (Bankr. D. Del. Mar. 26, 1999) ..........82

*In re ION Media Networks Liquidating Trust*,
   24 FCC Rcd. 14579 (2009) ...............................................................................100

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987) .............................................................................26

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..............................................................59, 92

*In re Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ...........................................................................59, 92

*In re Kaiser Aluminum Corp.*,
   No. 02-10429 (JKF) (Bankr. D. Del. Feb. 25, 2005) ........................................59

*In re Kensington Int'l Ltd.*,
   368 F.3d 289 (3d Cir. 2004) ...............................................................................37

*In re Kmart Corp.*,
   No. 02-02474 (SPS), 2006 WL 952042 (Bankr. N.D. Ill. Apr. 11, 2006) ............106

*In re Lason, Inc.*,
   300 B.R. 227 (Bankr. D. Del. 2003) ...............................................................74, 75

*In re Leslie Controls, Inc.*,
   No. 10-12199 (CSS), 2010 WL 4386935 (Bankr. D. Del. Oct. 28, 2010) ............106

*In re Levy*,
   54 B.R. 805, 807 (Bankr. S.D.N.Y . 1985) ........................................................37

*In re License Renewal Application of E. Carolina Broad. Co., Inc.*,
   6 FCC Rcd. 6154 (1991) ...................................................................................101

*In re Lyondell Chem. Co.*,
   Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 15, 2010) .........................83, 98

*In re Madison Hotel Assocs.*,
   749 F.2d 410, 424-25 (7th Cir. 1984) ................................................................52

*In re MEDIQ, Inc.*,
  Case No. 01-252 (MFW) (Bankr. D. Del.), Hr'g Tr. (May 16, 2001) at 122-125) ................83

*In re Mirant Corp.*,
  334 B.R. 800 (Bankr. N.D. Tex. 2005) .................................................................................95

*In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp. I*,
  79 B.R. 305 (Bankr. S.D. Ohio 1987) ................................................................................107

*In re Nat'l Gypsum Co.*,
  No. 90-37213 (HDH) (Bankr. N.D. Tex. Sept. 18, 1992) .....................................................59

*In re Neenah Enters., Inc.*,
  No. 10-10360 (MFW), 2010 Bankr. LEXIS 3058 (Bankr. D. Del. July 6, 2010) ..................82

*In re Nellson Neutraceutical, Inc.*,
  No. 06-10072 (CSS), 2007 WL 201134 (Bankr. D. Del. Jan. 18, 2007) ...............................94

*In re Pegasus Satellite Television Inc.*,
  et al., No. 04-20878 (Bankr. D. Me. Jan. 31, 2005) ...........................................................68

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ..........................................................................................46, 52

*In re Raytech Corp., et al.*,
  No. 89-00293 (AHWS) (Bankr. D. Conn. July 20, 2006) ....................................................59

*In re Resorts Int'l Inc.*,
  145 B.R. 412 (Bankr. D.N.J. 1990) ...............................................................................79, 83

*In re SemCrude, L.P.*,
  Case No. 08-11525 (BLS) (Bankr. D. Del. Sept. 25, 2009) ................................................98

*In re SGPA, Inc.*,
  No. 01-02609 (RJW), 2001 Bankr. LEXIS 2291 (Bankr. M.D. Pa. Sept. 28, 2001)..................
  ...............................................................................................................................79, 80, 83

*In re Sierra-Cal.*,
  210 B.R. 168, 171-172 (Bankr. E.D. Cal. 1997)..................................................................75

*In re Sound Radio, Inc.*,
  93 B.R. 849 (Bankr. D.N.J. 1988) ...............................................................................53, 85

*In re Summit Wireless WOW, LLC*,
  19 FCC Rcd. 23759 (2004) ..............................................................................................101

*In re Sutton*,
  78 B.R. 341 (Bankr. S.D. Fla. 1987)..................................................................................35

*In re TCI 2 Holdings*, LLC,
     428 B.R. 117, 154, 175 (Bankr. D.N.J. 2010) .......................................................85

*In re Texaco Inc.*,
     84 B.R. 893 (Bankr. S.D.N.Y. 1988).................................................................84

*In re The IT Grp., Inc.*,
     Case No. 02-10118 (MFW) (Bankr. D. Del. Feb. 9, 2004) ....................................98

*In re Transkaryotic Therapies, Inc.*,
     954 A.2d 346 (Del. Ch. 2008).........................................................................64

*In re U.S. Truck Co., Inc.*,
     47 B.R. 932 (E.D. Mich. 1985) .......................................................................84

*In re U.S. Truck Co., Inc.*,
     800 F.2d 581 (6th Cir. 1986) ..........................................................................84

*In re Union Meeting Partners*,
     165 B.R. 553 (Bankr. E.D. Pa. 1994) ..............................................................25

*In re UNR Indus. Inc.*,
     No. 82-B-9841 (Bankr. N.D. Ill. 1982)..............................................................59

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
     987 F.2d 154 (3d Cir. 1993)......................................................................26, 90

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
     843 F.2d 636 (2d Cir. 1988)...............................................................25, 59, 92

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
     337 F.3d 314 (3d Cir. 2003)............................................................................47

*LaSalle Bus. Credit, Inc. v. Toth*
     (*In re Toth*), 269 B.R. 587 (Bankr. W.D. Pa. 2001) ..........................................35

*Lee Servicing Co. v. Wolf (In re Wolf)*,
     162 B.R. 98 (Bankr. D.N.J. 1993) ..................................................................107

*Liberty Nat'l. Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship.)*,
     115 F.3d 650 (9th Cir. 1997) ..........................................................................90

*Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.)*,
     913 F.2d 873 (11th Cir. 1990) ........................................................................29

*Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy Ridge Dev. Corp.)*,
     881 F.2d 1346 (5th Cir. 1989) ........................................................................35

*Schaefer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.),*
    591 F. 3d 350 (5th Cir. 2009) ..............................................................36

**STATUTES**

8 Del. C.
    § 102 (b)(7) ..............................................................................................61
    § 141 ..........................................................................................................61
    § 144 ..........................................................................................................61

11 U.S.C.

    § 101(31) ....................................................................................41, 42, 72, 73
    § 365 ..........................................................................................................43
    § 503(b)(4) ..................................................................................................70
    § 507 ..........................................................................................................88
    § 507(a) ......................................................................................................77
    § 507(a)(2) ............................................................................................31, 88
    § 507(a)(8) ..................................................................................................32
    § 546(g) ......................................................................................................30
    § 1104(c) ....................................................................................................10
    § 1107(a) ......................................................................................................9
    § 1108 ..........................................................................................................9
    § 1114 ........................................................................................................89
    § 1122 ..................................................................................25, 26, 27, 29, 31
    § 1122 and 1123 ..............................................................................105, 107
    § 1122(a) ..............................................................................................25, 26
    § 1123(a)(3) and 1123(a)(5) ..............................................................32, 33
    § 1123(a) ....................................................................................................31
    § 1123(a)(1) ........................................................................................31, 32
    § 1123(a)(2) ................................................................................................32
    § 1123(a)(3) ..............................................................................32, 33, 36, 38
    § 1123(a)(4) ................................................................................................38
    § 1123(a)(5) ..............................................................................32, 33, 38, 39
    § 1123(a)(6) ................................................................................................39
    § 1123(a)(7) ......................................................................................40, 41, 42
    § 1123(b) ....................................................................................................42
    § 1123(b)(1) ........................................................................................42, 43
    § 1123(b)(2) ........................................................................................43, 44
    § 1123(b)(3) ........................................................................................44, 45
    § 1123(b)(4) ................................................................................................45
    § 1123(b)(5) ................................................................................................45
    § 1123(b)(6) ....................................................................................42, 45, 46
    § 1125 ..............................................................................................46, 47, 48
    § 1125(b) ....................................................................................................47
    § 1125 and 1126 ........................................................................................46
    § 1126 ..................................................................................................48, 49

§ 1126(a) .......................................................................................................................48, 49
§ 1126(c) .......................................................................................................................49, 76
§ 1126(f) ...................................................................................................................49, 75, 76
§ 1126(g) .......................................................................................................................49, 89
§ 1127 ...............................................................................................................................105
§ 1127(a)(d) ......................................................................................................................105
§ 1127(d) ..........................................................................................................................107
§ 1129 ........................................................................................................................... passim
§ 1129(a) .............................................................................................................................24
§ 1129(a)(1) ....................................................................................................................25, 46
§ 1129(a)(2) ....................................................................................................................46, 51
§ 1129(a)(3) ...............................................................................................52, 53, 66, 70
§ 1129(a)(4) ....................................................................................................................70, 71
§ 1129(a)(5) ....................................................................................................................40, 71
§ 1129(a)(5)(A) ....................................................................................................................72
§ 1129(a)(5)(B) ................................................................................................................72, 73
§ 1129(a)(6) ..........................................................................................................................73
§ 1129(a)(7) .....................................................................................40, 73, 74, 75, 76
§ 1129(a)(7)(A)(i)-(ii) .........................................................................................................73
§ 1129(a)(8) ...........................................................................................24, 76, 77, 89
§ 1129(a)(9) ....................................................................................................................77, 78
§ 1129(a)(9)§ 2.1 ................................................................................................................79
§ 1129(a)(9)(C) ....................................................................................................................78
§ 1129(a)(10) ................................................................................................................. passim
§ 1129(a)(11) ...............................................................................................84, 87, 88
§ 1129(a)(12) ......................................................................................................................88
§ 1129(a)(13) ......................................................................................................................89
§ 1129(b) ...................................................................................................................... passim
§ 1129(b)(1) ....................................................................................................................24, 90
§ 1129(b)(2)(B)(ii) and (C)(ii) ...........................................................................................93
§ 1145 .................................................................................................................................. 46

18 U.S.C.
§ 1519 ...............................................................................................................................103

26 U.S.C.
§ 6001 ...............................................................................................................................103

28 U.S.C.
§ 1930 ...............................................................................................................................88

47 U.S.C.
§ 1 et seq. .........................................................................................................................58
§ 310(d) (1996) .................................................................................................................57

**OTHER AUTHORITIES**

7 COLLIER ON BANKRUPTCY ¶ 1123.01[7] (Alan N. Resnick & Henry J. Sommer, 16th ed. 2010) ...................................................................................................................................40

7 COLLIER ON BANKRUPTCY ¶ 1129.02[2] .................................................................................46

H.R. Rep. No. 95-595 (1977) ..........................................................................................................25

Ronald J. Gilson and Jeffrey N. Gordon, *Controlling Controlling Shareholders*, 152 U. Pa. L. Rev. 785, 841 (2003) ...................................................................................................61

S. Rep. No. 95-989 (1978) ..............................................................................................................25

Treas. Reg.
   § 1.468B-9(b)(i) .......................................................................................................................63
   § 1.468B-9(b)(iv) .....................................................................................................................63
   § 1.468B-9(c)(2)(ii) ..................................................................................................................63

Aurelius Capital Management, LP, on behalf of its managed entities ("<u>Aurelius</u>"), Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee[2] for certain series of Senior Notes ("<u>Deutsche Bank</u>"), Law Debenture Trust Company of New York, in its capacity as successor Indenture Trustee for certain series of Senior Notes ("<u>Law Debenture</u>") and Wilmington Trust Company, in its capacity as successor Indenture Trustee for the PHONES Notes ("<u>Wilmington Trust</u>" and, together with Aurelius, Deutsche Bank and Law Debenture, the "<u>Noteholder Plan Proponents</u>"), by and through their undersigned counsel, submit this Memorandum of Law (the "<u>Memorandum</u>") (i) in Support of Confirmation of the Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes *[ECF No. 7127]* (as it may be amended, modified or supplemented, the "<u>Noteholder Plan</u>") pursuant to section 1129 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the "<u>Bankruptcy Code</u>") and (ii) in Response to Objections to the Noteholder Plan. In support of this Memorandum, the Noteholder Plan Proponents respectfully state as follows:

## I.   PRELIMINARY STATEMENT

1.      Over two years after commencing their highly complex and, at times, hotly contentious Chapter 11 Cases, the Debtors find themselves in the midst of an unprecedented competing plan process as they seek to finally emerge from bankruptcy.  To date, six plans of reorganization have been filed in these Chapter 11 Cases, four of which were proposed in

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Noteholder Plan.

connection with the current competing plan process.  As disclosed in the Joint Disclosure
Statement and revealed in greater detail through the Specific Disclosure Statements, at the crux
of the Debtors' emergence from chapter 11 is the treatment of the claims and causes of action
against the participants in Tribune's disastrous 2007 leveraged buyout (the "LBO"), in
connection with which Tribune and the Guarantor Debtors incurred over $10.7 billion of new
debt and were rendered insolvent.

2.     As the Debtors head toward a contested confirmation hearing for the second time,
only two proposed plans remain – the Noteholder Plan and the Second Amended Joint Plan of
Reorganization for Tribune Company and its Subsidiaries (the "DCL Plan") Proposed by the
Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree
Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon") and
JPMorgan Chase Bank, N.A. ("JPMorgan" and, collectively with the Debtors, Creditors'
Committee, Oaktree, and Angelo Gordon, the "DCL Plan Proponents").  The proponents of the
two plans are polarized by the proper treatment of the claims and causes of action arising out of
the LBO, with the holders of non-LBO related debt overwhelmingly supporting the Noteholder
Plan and the holders of LBO-related debt (the "LBO Lenders") overwhelmingly supporting the
DCL Plan.  This divide is hardly surprising since, although both plans provide for the Debtors to
emerge from chapter 11 in substantially identical form, with identical assets, liabilities,
financing, operations and corporate organizational structure, they contemplate drastically
different treatments of the LBO-Related Causes of Action and the LBO Lenders' Claims.  The
varying treatment of these issues and the impact that such treatment will have on Creditors
constitutes the core of the controversy embodied in the competing plan process.

3.      The Noteholder Plan is distinguishable from all other plans that have been

proposed in the Chapter 11 Cases in that it is the only plan that does not seek to abuse the chapter

11 process to impose an objectively unfair settlement of LBO-Related Causes of Action, for

unreasonably low consideration, on those most harmed by the LBO.[3]  Instead, the Noteholder

Plan recognizes that successful prosecution or a reasonable settlement of the LBO-Related

Causes of Action (which is clearly not contemplated by the DCL Plan) represents the only

avenue for a just and equitable recovery by Tribune's non-LBO Lender creditors (the "Non-LBO

Creditors").  Indeed, the primary difference between the Noteholder Plan and the DCL Plan is

that the DCL Plan settles the LBO-Related Causes of Action for a fraction of their true value.  As

demonstrated by the Final Voting Tabulation Report (defined below), holders of non-LBO debt

securities overwhelmingly agree, with over 90% in dollar amount of the Senior Noteholder

Claims and PHONES Notes Claims voting, voting to accept the Noteholder Plan and to reject the

DCL Plan.

4.      In order to provide the Debtors with a viable option to emerge from chapter 11

while, at the same time, ensuring that Creditors receive the recoveries to which they are legally

entitled, the Noteholder Plan provides that all litigation related to the LBO will be preserved and

prosecuted through a multi-trust structure comprised of the Litigation Trust and the Creditors'

Trust.[4]  The causes of action to be prosecuted by the two trusts include litigation regarding,

among other things, (i) the avoidability of the indebtedness incurred by the Debtors in

connection with the LBO, (ii) whether recipients of pre-Effective Date payments in respect of the

---

[3] In fairness to the then proponents of the April Plan (as defined below), the terms of that plan were agreed to by its proponents before the Examiner undertook his investigation and published a comprehensive report with damning allegations of intentional fraud against the Debtors' management and analyses making it evident that the LBO Lenders face significant risks of having their Claims avoided as intentionally and/or constructively fraudulent conveyances.

[4] The Noteholder Plan also contemplates the establishment of a Distribution Trust to hold consideration for ultimate distribution to Creditors based on the outcome of the Litigation Trust Causes of Action.

debt incurred pursuant to the LBO will be required to disgorge such payments (together with applicable prejudgment interest), (iii) whether the shareholders that had their stock redeemed in connection with the LBO will be required to disgorge such payments (together with applicable prejudgment interest), (iv) claims against the Debtors' officers, directors and advisors, (v) claims against Sam Zell and his Affiliates and (vi) the applicability of the subordination provisions in the Bridge Loan Agreement (to the extent required) (the foregoing, together with any other causes of action that may be prosecuted by the Litigation Trust and the Creditors' Trust, are referred to as the "Trust Causes of Action").  The appropriate treatment for Intercompany Claims was originally contemplated to be one of the Trust Causes of Action under the Noteholder Plan. At this time, in an effort to reduce the extent of confirmation litigation (and despite an inadequate record on this issues) the Noteholder Plan Proponents are prepared to integrate the Intercompany Claims Settlement (as defined in the DCL Plan)[5] into the Noteholder Plan as well as the allocation of the Debtors' distributable enterprise value ("DEV") in a manner consistent with the DCL Plan such that 8.4% of the DEV is allocable to Tribune and 91.6% of the DEV is allocable to the Subsidiaries.

5.     Despite the preservation of the Trust Causes of Action, as detailed in the illustrative recovery charts in the Noteholder Specific Disclosure Statement (the "Illustrative Recovery Charts"), based on the DCL Plan's proposed distributable enterprise value ("DEV") of $6.75 billion, the Noteholder Plan provides that between 34.7% and 51.2%[6] of the DEV will be

---

[5] The Intercompany Claims Settlement is memorialized in the Intercompany Claims Settlement Agreement set forth at Exhibit 1.1.122 to the DCL Plan, as filed in the DCL Plan Supplement.  The Noteholder Plan Proponents adopt the Intercompany Claims Settlement only for the express purposes, and on the terms and conditions, as set forth in Section 5.19 of the Noteholder Plan, and do not adopt the Intercompany Claims Settlement for any other purposes. Should the Noteholder Plan fail to be confirmed, the Noteholder Plan Proponents reserve all of their rights to challenge the Intercompany Claims Settlement on any ground.

[6] This range is premised upon on a DEV of $6.75 billion and an allocation of the DEV at 8.4% to Tribune and 91.6% to the Subsidiaries.

distributed to Creditors immediately upon the Debtors' emergence from chapter 11. However, as demonstrated in the Revised Estimated Recovery Charts attached hereto as Exhibit A,[7] under the Noteholder Plan Proponents' proposed $8.331 DEV,  the DEV distributed on the Effective Date increases to 40.5% to 57.7% of the Debtors' total DEV.   Under either valuation, the Initial Distributions to each Class of Claims generally represent a recovery that assumes the resolution of all Trust Causes of Action that has the least favorable outcome vis-à-vis such Class.

6.        With few limited exceptions, Classes of Claims entitled to receive Initial Distributions shall receive consideration in the form of a "strip," consisting of New Common Stock (or New Warrants, to the extent the applicable Creditor so elects), New Senior Secured Term Loan and Distributable Cash.[8]  The DEV not distributed on the Effective Date will be held in reserve at the Distribution Trust pending the outcome of the Litigation Trust Causes of Action. On the Effective Date, Holders of Allowed Claims will also receive, in addition to any Initial Distributions, (i) Distribution Trust Interests corresponding to the Class of such Creditor's Allowed Claim under the Noteholder Plan, which may entitle such Creditor to distributions from the proceeds of the Litigation Trust Causes of Action as well as distributions of the DEV being held in reserve at the Distribution Trust, and (ii) for each Creditor of Tribune who did not opt out of contributing its individual causes of action to the Creditors' Trust, Creditors' Trust Interests corresponding to the Class of such Creditors' Allowed Claim under the Noteholder Plan, which may entitle such Creditor to distributions from the proceeds of the State Law Avoidance Claims.

---

[7] The Noteholder Plan Proponents have submitted the Rebuttal Report (the "Raymond James Report") to Expert Valuation Report Submitted by Lazard Frères & Co. LLC (the "Lazard Report") prepared by Raymond James, challenging the $6.75 billion DEV upon which the DCL Plan is based.  The Raymond James Report, among other things, states that the mid-point DEV for the Debtors should be $8.331 billion and not the $6.75 billion DEV as set forth in the Lazard Report.  Accordingly, attached hereto as Exhibit A are revised estimated recovery charts (the "Revised Estimated Recovery Charts") based on Raymond James' DEV of $8.331 billion, with such DEV allocated, like the DCL Plan, 8.4% to Tribune and 91.6% to the Subsidiaries.

[8] The exceptions to this are Holders of Other Guarantor Debtor Claims, who will receive Cash equal to 8% of their Allowed Claim, and Holders of Other Non-Guarantor Debtor Claims, who will receive payment in full, in Cash (including Postpetition Interest).

The resolution of the Trust Causes of Action will determine the relative rights and priorities of distributions to be made on the Distribution Trust Interests and Creditors' Trust Interests. Accordingly, like all plans with litigation trusts, ultimate recoveries for each Impaired Class of Claims receiving Trust Interests under the Noteholder Plan will be based on the final resolution of the Trust Causes of Action.

7.      As a result of its trust components, the Noteholder Plan will be able to go effective expeditiously and with fewer conditions than the DCL Plan.  For example, confirmation and effectiveness of the Noteholder Plan are not conditioned upon, among other things (i) the Bankruptcy Court reaching a particular conclusion on certain aspects of the causes of action arising from the LBO, (ii) the Bankruptcy Court approving a transparently self-serving settlement reached between the principal targets of the Examiner's Report and a Creditors' Committee rife with conflicts or (iii) the Bankruptcy Court granting sweeping and unjustified releases, exculpations and indemnification to parties that, through their fraudulent activities, materially and adversely harmed the Debtors' Estates and their Creditors, including innocent Non-LBO Creditors.  And, despite what the proponents of the DCL Plan might wish the Bankruptcy Court and Creditors to believe, the trust structure of the Noteholder Plan is no less efficient and no more economically burdensome than the trust structure created under the DCL Plan.

8.      While the DCL Plan may seek to impose settlements of, among other things, the allowance of the LBO Lenders' Claims and their disgorgement exposure, the unresolved LBO-Related Causes of Action that would be transferred to the litigation trust under the DCL Plan will require the same fact finding and litigation, involving many of the same parties, as required to resolve the Trust Causes of Action under the Noteholder Plan.  The settlements contained in the

DCL Plan therefore leave it no more efficient or economical than the Noteholder Plan.  Indeed, the only purpose served by the settlements contained in the DCL Plan is to inappropriately shield the LBO Lenders from the substantially greater liability they would be certain to face in a court of law if the LBO-Related Causes of Action against them were permitted to proceed.

9.      Put simply, a plan, such as the Noteholder Plan, that encompasses a reserve and litigation trust structure is the only way to facilitate a fair and equitable outcome in these Chapter 11 Cases and ensure Creditors receive the recoveries they are legally entitled to receive, not fractions of their legal entitlements as contemplated by the DCL Plan.  Bearing this in mind, contrary to the rhetoric-filled objection filed by the DCL Plan Proponents, the Noteholder Plan was proposed in utmost good faith and is in the best interests of the Creditors of Tribune.

10.      Notwithstanding the virtues of the Noteholder Plan, as expected, the DCL Plan Proponents oppose its confirmation.  *See* Joint Objection of the Debtors, The Official Committee of Unsecured Creditors, Angelo, Gordon & Co. L.P., Oaktree Capital Management, L.P. and JPMorgan Chase Bank, N.A. to Confirmation of the Noteholder Plan *[ECF No. 8011]* (the "DCL Objection").  The DCL Objection is, on the whole, without merit.  The DCL Plan Proponents make a feeble and altogether ironic attempt to argue that the Noteholder Plan was not filed in good faith and even have the tenacity to assert that the Noteholder Plan should not be confirmed because it does not contain settlements of the LBO-Related Causes of Action.  As noted in the Noteholder Plan Proponents' objection to the DCL Plan, it is that plan, not the Noteholder Plan, that cannot withstand scrutiny or satisfy the provisions of Bankruptcy Rule 9019 or Bankruptcy Code section 1129.  Each of the DCL Plan Proponents' objections to the Noteholder Plan is addressed in the sections that follow.  Objections to the Noteholder Plan by other parties in

interest are summarized and responded to in the chart attached hereto as Exhibit B (the

"Objection Chart").

11.     Simply put, the DCL Plan is the product of: (i) the LBO Lenders demanding the

proposed settlements as the price of admission to allow the Debtors to emerge from chapter 11;

(ii) the Debtors (intentionally or hopelessly) capitulating to the LBO Lenders' demands; and (iii)

the Creditors' Committee – the one estate fiduciary who should have had the backbone to stand

up to the LBO Lenders – folding like a house of cards once it negotiated plan treatment for the

members of its Committee (other than the Indenture Trustees).  The LBO Lenders must be

required to face the consequences of providing the financings that caused the Debtors'

insolvency, and innocent Creditors must be provided the opportunity to receive recoveries on

account of their Claims to which they are entitled.  The Noteholder Plan achieves this result and,

unlike the DCL Plan, satisfies all applicable requirements of Bankruptcy Code section 1129.

Accordingly, all objections should be overruled and the Noteholder Plan should be confirmed.

## II.     BACKGROUND

### A.     Introduction

12.     On December 8, 2008 (the "Petition Date"), Tribune and certain of its

Subsidiaries filed voluntary petitions for relief  under chapter 11 of the Bankruptcy Code.[9]  The

Debtors comprise 111 entities.

13.     The Debtors' chapter 11 cases (the "Chapter 11 Cases") have been consolidated

for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule

1015(b).  The Debtors are authorized to continue to operate their businesses and manage their

---

[9] On October 12, 2009, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC), Tribune's
subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major League Baseball
franchise (the "Chicago Cubs"), commenced a chapter 11 case, as one of the steps necessary to complete a
transaction involving the Chicago Cubs and certain related assets.

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.      Significant Events Leading to Chapter 11

14.      On or about April 1, 2007, Tribune's board of directors approved the LBO, which resulted in the transfer of ownership of Tribune and its Subsidiaries to a newly formed employee stock ownership plan (the "ESOP").  The LBO was structured in two interrelated steps.  "Step One" of the LBO closed in June 2007 and involved the ESOP's purchase of shares of Tribune common stock and the consummation by Tribune of a cash tender offer for nearly 50% of its outstanding common stock.  In order to finance the tender offer, Tribune entered into the $8.028 billion Senior Loan Agreement.  A number of Tribune's domestic Subsidiaries (the "Guarantor Debtors") provided unsecured guarantees of Tribune's indebtedness under the Senior Loan Agreement.  "Step Two" of the LBO was completed in December 2007 and involved Tribune cashing out its remaining stockholders and merging with a Delaware corporation that was wholly-owned by the ESOP, with Tribune surviving the merger.  In order to finance, among other things, the consummation of the merger, on December 20, 2007, Tribune borrowed an additional $2.1 billion under the Senior Loan Agreement and entered into the Bridge Loan Agreement, pursuant to which it borrowed approximately $1.6 billion.  The financing incurred in connection with Step Two was also guaranteed by the Guarantor Debtors.

15.      As a result of the LBO, the Debtors incurred more than $10.7 billion of loans financed by various banking entities, including JPMorgan, Merrill Lynch & Co., Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank, PLC, pursuant to advice given by the investment banking arms of some of these same banks.  These banking entities received more than $200 million in fees and expenses for arranging the LBO debt.  The officers and directors of Tribune, the banks and others involved in the LBO imposed the risk of these loans on Tribune's

9

existing bondholders who, pending avoidance of the debt arising in connection with the LBO, are now structurally subordinated to more than $10.3 billion in bank debt that was guaranteed by the Debtors' cash-generating operating Subsidiaries.[10]

### C.    Events Leading Up to the Competing Plan Process

16.    On or about April 9, 2010, certain significant Creditors of Tribune, comprised of Angelo Gordon, Centerbridge Credit Partners, L.P. and certain of its affiliated entities ("Centerbridge"), Law Debenture and JPMorgan entered into an agreement (the "Support Agreement") by which such parties agreed to support a settlement of the LBO-Related Causes of Action.  The Support Agreement was filed with the Bankruptcy Court on April 12, 2010 and contained a term sheet summarizing the primary terms of the settlement (the "April Term Sheet").  On that same date, the Debtors filed a plan of reorganization (the "April Plan") that reflected and sought to implement the terms of the April Term Sheet.

17.    Shortly thereafter, on April 20, 2010, the Bankruptcy Court entered the Agreed Order Directing the Appointment of Examiner (the "Examiner Order") *[ECF No. 4120]*.  Entry of the Examiner Order was the result of the consensual resolution among parties in interest of a motion filed by Wilmington Trust on January 13, 2010, seeking the appointment of an examiner pursuant to Bankruptcy Code section 1104(c) for certain limited purposes, including investigating the LBO and any potential claims related thereto *[ECF No. 3062]*.  On April 30, 2010, the United States Trustee for the District of Delaware appointed Kenneth N. Klee as examiner (the "Examiner") and filed an application with the Bankruptcy Court requesting approval of such appointment.  On May 10, 2010, the Bankruptcy Court approved the appointment of the Examiner, and on May 11, 2010, the Bankruptcy Court entered an order

---

[10] For a detailed discussion of the grounds for avoidance of the LBO-related debt, *see* Noteholder Plan Proponents' Amended Objection to Confirmation of the Debtor/Committee/Lender Plan of Reorganization *[ECF No. 8025]* (the "Noteholder Plan Proponents' Objection").

approving the Examiner's proposed work and expense plan and modifying the Examiner Order

(the "Supplemental Examiner Order").  Pursuant to the Examiner Order and the Supplemental

Examiner Order, the Examiner was to investigate and evaluate, among other things, whether the

Debtors' Estates had potential claims and causes of action in connection with the LBO.[11]

18.    As the Examiner undertook his investigation of the LBO, the prosecution of the

April Plan continued and, on June 7, 2010, the Bankruptcy Court entered an order approving the

disclosure statement and solicitation procedures related to the April Plan.  The order set the

hearing on confirmation of the April Plan for August 16, 2010.  Yet, on July 26, 2010, less than a

month prior to the scheduled confirmation hearing, and following an exhaustive investigation

that included the review of more than three million pages of documents and thirty-eight

interviews, the Examiner submitted (under seal) a comprehensive report (the "Examiner's

Report") in which he identified dozens of factual and legal issues regarding the potential claims

related to the LBO and opined on the likelihood of success of such claims using a range of

qualitative probabilities.  Among other things, the Examiner concluded that it is (i) "highly

likely" that the loans and resulting repayment obligations extended as part of the Step Two

---

[11] Specifically, the Examiner's principal duties in connection with the LBO were to

> [E]valuate the potential claims and causes of action held by the Debtors' estates
> that are asserted by the Parties, [(as defined in the Examiner's Order)] in
> connection with the leveraged buy-out of Tribune that occurred in 2007 (the
> "LBO"), which may be asserted against any entity which may bear liability,
> including, without limitation, the Debtors, the Debtors' former and/or present
> management, including former/present members of Tribune's Board, the
> Debtors' lenders and the Debtors; [sic] advisors, said potential claims and causes
> of action including, but not being limited to, claims for fraudulent conveyance
> (including both avoidance of liability and disgorgement of payments), breach of
> fiduciary duty, aiding and abetting the same, and equitable subordination, and
> the potential defenses asserted by the Parties to such potential claims and causes
> of action.

Supplemental Examiner Order at ¶3.

Transactions[12] constituted avoidable fraudulent conveyances at Tribune, (ii) "reasonably likely" that the Step Two Transactions constituted a fraudulent conveyance at the Guarantor Debtors and (iii) "somewhat likely" that the Tribune entities committed intentional fraud in connection with the Step Two Transactions. While the Examiner found that the Step One Transaction[13] loans were less vulnerable than the Step Two Transaction loans, he found that there were colorable claims against the Step One Lenders under each of four alternative definitions of fraudulent conveyance and that the Step One Lenders also face serious risk of having their claims equitably subordinated or disallowed.

19.     On August 3, 2010, the Examiner's Report was unsealed, along with exhibits and transcripts related to the Examiner's Report.[14]  Thereafter, JPMorgan and Angelo Gordon withdrew from the Support Agreement and, as a result, the April Plan was abandoned. Just one day prior to the termination of the Support Agreement – on August 8, 2010 – the Debtors' exclusive period within which to file a chapter 11 plan and solicit acceptances, as extended by Bankruptcy Court order, expired.

---

[12] The Step Two Transactions are defined in the Examiner's Report as (a) the merger of Tribune with Tesop Corporation, with Tribune surviving the merger and becoming a wholly-owned subsidiary of the ESOP, (b) the execution, delivery, and performance of the Bridge Loan Agreement, (c) the making of $2.105 billion in incremental advances under the $8.028 billion credit agreement, dated May 17, 2007, (d) all other transactions necessary to effect or incidental to the forgoing and (e) the payment of fees, costs and expenses related to the forgoing.

[13] The Step One Transactions are defined in the Examiner's Report as (a) that certain prepetition tender offer, (b) the repayment of the debt under those certain credit agreements, dated June 27, 2006, (c) the investment of EGI-TRB LLC in Tribune with respect to the purchase of $50 million of Tribune's common equity and the EGI-TRB LLC Notes and issuance of the EGI-TRB LLC Notes, (d) the formation of the ESOP, (e) the execution and delivery of the merger agreement among Tribune, Tesop Corporation and EGI-TRB LLC, (f) the Step One purchase transaction by EGI-TRB LLC of newly issued shares of Tribune common stock and the EGI-TRB LLC Notes, (g) the execution, delivery and performance of that certain $8.028 billion credit agreement, dated May 17, 2007, (h) the ESOP loan and the pledge of shares by ESOP to secure the ESOP loan, (i) the transactions related to Tribune Finance, LLC and Tribune Broadcasting Holdco, LLC, (j) all other transactions necessary to effect or incidental to the forgoing and (k) the payment of fees, costs and expenses related to the forgoing.

[14] The Examiner's Report (volumes 1 through 4) were docketed as Docket Nos. 5247, 5248, 5249 and 5250.  The exhibits were docketed as Docket Nos. 5437, 5438, 5439, 5441, 5442, 5444, 5445, 5447, 5449, 5451, 5453, 5454, 5455, 5456, 5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469 and 5480.

### D.    The Mediation and the Competing Plan Process

20.    In the wake of the issuance of the Examiner's Report, the abandonment of the

April Plan and the failure of parties in interest to reach a consensus on a new settlement plan, on

September 1, 2010, at the Debtors' request, the Bankruptcy Court entered an order (the

"Mediation Order") *[ECF No. 5591]* appointing the Honorable Kevin Gross, Bankruptcy Judge

(the "Mediator"), to conduct a non-binding mediation (the "Mediation").  The parties to the

Mediation included: (i) the Debtors; (ii) the Creditors' Committee; (iii) JPMorgan, as

administrative agent and lender under the Senior Loan Agreement; (iv) Angelo Gordon; (v) the

"Credit Agreement Lenders" (as defined in the Mediation Order and including Oaktree); (vi) the

"Step One Credit Agreement Lenders" (as defined in the Mediation Order); (vii) Wells Fargo

Bank, N.A., as administrative agent under the Bridge Loan Agreement; (viii) Law Debenture;

(ix) Deutsche Bank; (x) Aurelius; (xi) EGI-TRB LLC; and (xii) Wilmington Trust (collectively,

the "Mediation Parties").  On September 20, 2010, each of the Mediation Parties submitted to the

Mediator a statement setting forth such Mediation Party's position respecting the structure and

economic substance of a plan of reorganization that would be acceptable to such party.

21.    While the Mediation Order stayed all motions and proceedings seeking relief in

connection with any claims or causes of action arising out of the LBO (other than motions with

respect to standing) for the pendency of the Mediation, it did not prohibit parties in interest from

filing plans of reorganization in the Debtors' cases during the pendency of the Mediation.  On

the eve of the first Mediation session, Oaktree and Angelo Gordon filed the Joint Plan of

Reorganization for Tribune Company and its Subsidiaries Proposed by Oaktree Capital

Management, L.P. and Angelo, Gordon & Co., L.P. (the "Oaktree/Angelo Gordon Plan") *[ECF*

*No. 5729]*.  Among other things, the Oaktree/Angelo Gordon Plan contemplated the allowance of

the Step One Lender Claims in full and the creation of a litigation trust to prosecute, in addition

to other claims, claims and causes of action against the Step Two Lenders and Morgan Stanley arising out of the LBO.

22.     The Mediation began on September 26, 2010.  On September 28, 2010, the Mediator submitted the Mediator's First Report, which annexed a term sheet reflecting the terms of the Oaktree/Angelo Gordon Plan, with certain modifications to garner the support of the Debtors (the "First Mediation Term Sheet").[15]  In the following weeks, despite an ongoing mediation process, none of the DCL Plan Proponents ever engaged in substantive Mediation discussions with the Noteholder Plan Proponents.  On October 12, 2010, the Mediator submitted the Mediator's Second Report, which included an expanded settlement term sheet (the "Second Mediation Term Sheet")[16] that was supported by Angelo Gordon, Oaktree, JPMorgan, the Debtors and the Creditors' Committee.  The Second Mediation Term Sheet contained proposed settlements with respect to the potential claims and causes of action against Step One Lenders and Step Two Lenders arising in connection with the LBO.  The Second Mediation Term Sheet formed the basis for the DCL Plan.

23.     On October 18, 2010, the Bankruptcy Court entered an order establishing a schedule for parties in interest to file and solicit competing plans of reorganization.  *See* Order Scheduling a Hearing and Establishing Certain Deadlines to Consider Approval of Certain Disclosure Documents (the "Competing Plan Timeline Order") *[ECF No. 6022]*.  Despite the entry of the Competing Plan Timeline Order, the Bankruptcy Court made clear that the Mediation would remain open during the competing plan process.

24.     Pursuant to the Competing Plan Timeline Order, the Bankruptcy Court ordered the Debtors to file their proposed plan of reorganization no later than October 22, 2010, and any

---

[15] For a detailed discussion of the First Mediation Term Sheet, *see* Noteholder Plan Proponents' Objection at 33-35.

[16] For a detailed discussion of the Second Mediation Term Sheet, *see* Noteholder Plan Proponents' Objection at 36-38.

other party-in-interest wishing to file a competing plan of reorganization to do so no later than

October 29, 2010.  Among other things, the Competing Plan Timeline Order also directed (i) the

Debtors to file the Joint Disclosure Statement relating to, among other things, the Debtors'

businesses, properties, prepetition liabilities and events leading up to the Chapter 11 Cases, (ii)

the various plan proponents to submit their respective Specific Disclosure Statements describing

their plans of reorganization and (iii) the various plan proponents to file their respective

responsive statements in support of their plans to be included in the solicitation packages for

those Creditors entitled to vote.

      25.     On October 22, 2010, the DCL Plan Proponents filed an initial version of the

DCL Plan *[ECF No. 6089]*.[17]  In accordance with the Competing Plan Timeline Order, on

October 29, 2010, three competing plans of reorganization were filed: (i) the initial version of the

Noteholder Plan;[18] (ii) the Chapter 11 Plan of Reorganization for Tribune and its Subsidiaries

Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon

Asset Management (the "Bridge Lender Plan") *[ECF No. 6186]*; and (iii) the Chapter 11 Plan of

Reorganization For Tribune Company and its Subsidiaries Proposed by Certain Holders of Step

One Senior Loan Claims (the "Step One Lender Plan" and, together with the DCL Plan, the

Bridge Lender Plan and the Noteholder Plan, the "Competing Plans") *[ECF No. 6185]*.  On

December 14, 2010, the proponents of the Step One Lender Plan filed a Notice of Withdrawal of

---

[17] In accordance with the terms of the DCL Plan, the Debtors filed the Debtor/Committee/Lender Plan Supplement (the "DCL Plan Supplement") on January 31, 2011 *[ECF No. 7701]*.

[18] In accordance with the terms of the Noteholder Plan, the Noteholder Plan Proponents filed the Noteholder Plan Supplement on February 4, 2011 *[ECF No. 7802]*.  The Noteholder Plan Supplement identified or otherwise provided information regarding the following: (i) the Claims Purchase Agreement; (ii) a non-exclusive list of LBO-Related Causes of Action and defendants; (iii) the terms of the New Warrant Agreement; (iv) the Restructuring Transactions; (v) the Certificate of Incorporation of Reorganized Tribune; (vi) the By-Laws of Reorganized Tribune; (vii) the terms of the New Senior Secured Term Loan; (viii) the terms of the Exit Facility; (ix) the Litigation Trust Agreement (including the identity of the Litigation Trustee and members of the Litigation Trust Advisory Board); (x) the Creditors' Trust Agreement (including the identity of the Creditors' Trustee and the members of the Creditors' Trust Advisory Board); and (xi) the Distribution Trust Agreement (including the identity of the Distribution Trustee and the members of the Distribution Trust Advisory Board).

the Step One Lender Plan *[ECF No. 7190]*.  To date, the proponents of the Step One Lender Plan

have not actively endorsed any of the other Competing Plans and the reason for the withdrawal

of the Step One Lender Plan remains unknown.

26.     On January 28, 2011, which was also the deadline established under the

Disclosure Statement Order (discussed below) for submitting votes on the three remaining

Competing Plans, the Mediator filed the Mediator's Third Report and an annexed "Bridge Loan

Settlement Term Sheet."  By the Bridge Loan Settlement Term Sheet, the proponents of the

Bridge Lender Plan agreed to support the DCL Plan in exchange for the integration of the Bridge

Loan Settlement Term Sheet into such plan.[19]  On February 4, 2011, the DCL Plan in its current

form, incorporating the Bridge Loan Settlement Term Sheet, was filed with the Bankruptcy

Court *[ECF No. 7801]*.  In furtherance of the Bridge Loan Settlement, on February 7, 2011, the

proponents of the Bridge Lender Plan filed a Notice of Withdrawal of the Bridge Lender Plan

*[ECF No. 7821]*.  Although the proponents of the Bridge Lender Plan have stated their support

for the DCL Plan, which now embodies the Bridge Loan Settlement Term Sheet, to date, the

proponents of the Bridge Lender Plan have not become a proponent of the DCL Plan.

Accordingly, there now remain only two Competing Plans for the Bankruptcy Court to consider

for confirmation – the Noteholder Plan and the DCL Plan.

E.      **Solicitation of the Competing Plans**

1.      *The Disclosure Statement Order*

27.     After the November 29, 2010 hearing to consider the Joint Disclosure Statement,

Specific Disclosure Statements and procedures relating to solicitation and tabulation, the

Bankruptcy Court entered the Order (I) Approving Joint Disclosure Statement and Specific

Disclosure Statements; (II) Establishing Procedures for Solicitation and Tabulation of Votes to

---

[19] For a detailed discussion of the Bridge Loan Settlement, *see* Noteholder Plan Proponents' Objection at 43.

Accept or Reject Plans of Reorganization; (III) Approving Forms of Ballots, Master Ballots and Related Instructions; (IV) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (V) Fixing Voting Record Date; (VI) Establishing Notice and Objection Procedures in Respect of Confirmation; (VII) Setting Confirmation Schedule and Establishing Parameters on Confirmation-Related Discovery; (VIII) Establishing New Deadline for Return of Media Ownership Certifications; (IX) Authorizing Expansion of Balloting and Tabulation Agent's Retention and Allocation of Costs of Same; and (X) Granting Related Relief (as amended, the "Disclosure Statement Order") *[ECF No. 7126]*.[20]  Pursuant to the Disclosure Statement Order, the Bankruptcy Court approved, among other things, the Joint Disclosure Statement, Specific Disclosure Statements and other materials to be transmitted to Holders of Allowed Claims in Classes entitled to vote on each of the Competing Plans (the "Solicitation Package"), along with the procedures for soliciting acceptances and rejections of the Competing Plans (the "Solicitation Procedures").

### 2.   *Ballots and Ranking*

28.    The Disclosure Statement Order established January 28, 2011 at 4:00 PM (EST) as the deadline for voting to accept or reject the Competing Plans (the "Voting Deadline").  On December 23, 2010, Epiq Systems Inc. (the "Voting Agent") distributed the Solicitation Package[21] containing, among other things, (i) the Noteholder Plan, (ii) the Noteholder Specific Disclosure Statement, (iii) the General Disclosure Statement and (iv) appropriate forms of ballots

---

[20] The confirmation schedule and parameters on confirmation-related discovery are the subject of a separate order, entered on December 20, 2010 (*see* the Discovery and Scheduling Order for Plan Confirmation) *[ECF No. 7239]*.

[21] *See* Affidavit of Solicitation Mailing *[ECF No. 7813]*.

(the "Ballots") to vote to accept or reject the Noteholder Plan to Holders in the following Classes

of Claims (collectively the "Noteholder Plan Voting Classes"):[22]

- 1C (Step One Senior Loan Claims);
- 50 C-111C (Step One Senior Loan Guaranty Claims);
- 1D (Step Two Senior Loan Claims);
- 50D-111D (Step Two Senior Loan Guaranty Claims);
- 1E (Bridge Loan Claims);
- 50E-111E (Bridge Loan Guaranty Claims);
- 1F (Senior Noteholder Claims);
- 1G (Other Parent Claims);
- 50G-111G (Other Guarantor Debtor Claims);
- 1H (EGI-TRB LLC Notes Claims);
- 1I (PHONES Notes Claims); and
- 1K (Subordinated Securities Claims).

29.    On February 11, 2011, the Voting Agent filed the Declaration of Stephenie

Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of

Ballots Accepting and Rejecting the Joint Plans of Reorganization Proposed for Tribune

Company and its Subsidiaries (the "Final Voting Tabulation Report") *[ECF No. 7918]*.  Pursuant

to the Final Voting Tabulation Report, the following three Classes of Claims affirmatively voted

in favor of the Noteholder Plan:

- Class 1F (Senior Noteholder Claims);
- Class 1I (PHONES Notes Claims); and
- Class 93G (Other Guarantor Debtor Claims against Tribune CNLBC, LLC).

---

[22] While all Intercompany Claims are deemed Disputed Claims under the Noteholder Plan and were not solicited, as noted above, the Noteholder Plan Proponents are prepared to integrate the Intercompany Claims Settlement contemplated by the DCL Plan into the Noteholder Plan and adopt the allocation of DEV (but not the DEV) contemplated by the DCL Plan at 8.4% to Tribune and 91.6% to the Subsidiaries.

30.    The Noteholder Plan and Noteholder Specific Disclosure Statement initially contemplated that for each impaired Class of Claims that was entitled to vote on the Noteholder Plan and for which no votes were cast, such Class would be deemed to accept the Noteholder Plan.  The Debtors have disputed the legality of this position.  *See* Discl. Stmt. Hr'g Tr., 143-144, Nov. 29, 2010 *[ECF No. 6699]* ("Your Honor, the one issue that the debtors have, and I think the committee has a couple, involves the deemed treatment of intercompany claims.  Until last night they were impaired under the Noteholder plan, but deemed to accept when there's a competing plan that the debtors' [sic] support that's contrary to this one, the deemed acceptance, without being able to vote and being impaired, seemed to us contrary to the law.").  Accordingly, the Noteholder Plan has been modified to provide that for each impaired Class of Claims that was entitled to vote on the Noteholder Plan and for which no votes were cast, such Class will be deemed to reject the Noteholder Plan.  No Holders of Claims in the following thirteen Classes voted to accept or reject the Noteholder Plan and, thus, such Classes are deemed to have rejected the Noteholder Plan:

- Class 58G (Other Guarantor Debtor Claims against Distribution Systems of America, Inc.);

- Class 60G (Other Guarantor Debtor Claims against Eagle Publishing Investments, LLC);

- Class 64G (Other Guarantor Debtor Claims against Homeowners Realty, Inc.);

- Class 67G (Other Guarantor Debtor Claims against Internet Foreclosure Service, Inc.);

- Class 79G (Other Guarantor Debtor Claims against Stemweb, Inc.);

- Class 85G (Other Guarantor Debtor Claims against TMLH 2, Inc.);

- Class 86G (Other Guarantor Debtor Claims against TMLS I, Inc.);

- Class 87G (Other Guarantor Debtor Claims against TMS Entertainment Guides, Inc.);

- Class 91G (Other Guarantor Debtor Claims against Tribune Broadcasting Holdco, LLC);

- Class 92G (Other Guarantor Debtor Claims against Tribune California Properties, Inc.);

- Class 96G (Other Guarantor Debtor Claims against Tribune Finance, LLC);

- Class 98G (Other Guarantor Debtor Claims against Tribune Manhattan Newspaper Holdings, Inc.); and

- Class 102G (Other Guarantor Debtor Claims against Tribune NM, Inc.).

31.     Finally, the following Classes of Claims affirmatively voted against the Noteholder Plan (the following Classes, together with Class 1L (which is deemed to reject the Noteholder Plan) and the Classes listed above in Paragraph 30, are collectively referred to as the "Rejecting Classes"):

- Class 1C (Step One Senior Loan Claims);

- Classes 50C-111C (Step One Senior Loan Guaranty Claims);

- Class 1D (Step Two Senior Loan Claims);

- Classes 50D-111D (Step Two Senior Loan Guaranty Claims);

- Class 1E (Bridge Loan Claims);

- Classes 50E-111E (Bridge Loan Guaranty Claims);

- Class 1G (Other Parent Claims);

- Classes 50G-57G, 59G, 61G-63G, 65G-66G, 68G-78G, 80G-84G, 88G-90G, 93G-95G, 97G, 99G-101G and 103G-111G (Other Guarantor Debtor Claims against various Guarantor Debtors);

- Class 1H (EGI-TRB LLC Notes Claims); and

- Class 1K (Subordinated Securities Claims).

32.     Concurrent with the solicitation of votes on the Noteholder Plan, votes were also solicited from Creditors entitled to vote on the DCL Plan and the Bridge Lender Plan.[23] Creditors who (i) were entitled to vote on more than one plan of reorganization and (ii) voted to accept more than one plan were also permitted to rank the plans in order of preference in the event that more than one plan received the requisite number of votes to be confirmed.  The

---

[23] Because the Bridge Lender Plan was not withdrawn until after the Voting Deadline, votes were solicited on such plan.  Further, because the Step One Lender Plan was withdrawn prior to the transmission of the Solicitation Packages, no votes were solicited with respect to such plan.

ranking system provides no value, however, as only approximately 0.21% in dollar amount of Claims entitled to vote on the Competing Plans voted in favor of both the DCL Plan and the Noteholder Plan and ranked their votes.[24]

### 3.    The Noteholder Plan's Claims Purchase Election

33.    Pursuant to the Noteholder Plan, subject to the satisfaction of certain conditions, each Holder of an Other Parent Claim and Other Guarantor Debtor Claim had the option to make an election on its respective Ballot to put (i.e., sell) its Other Parent Claim or Other Guarantor Debtor Claim, as the case may be, to the Claims Purchaser in exchange for Cash.  As reflected in the Final Voting Tabulation Report, no Creditors eligible to participate in the Claims Purchase under the Noteholder Plan elected the Claims Purchase Option.  Accordingly, the Claims Purchase will not be consummated upon the effectiveness of the Noteholder Plan.[25]

### 4.    The Noteholder Plan's Creditors' Trust Election

34.    Section 5.18.2 of the Noteholder Plan provides that, on the Effective Date of the Noteholder Plan, the State Law Avoidance Claims held by each Creditor of Tribune will automatically be contributed to the Creditors' Trust established under the Noteholder Plan *unless*

---

[24] As noted in the Final Voting Tabulation Report, any preference for the Bridge Lender Plan was not included in the report because the Bridge Lender Plan was withdrawn prior to the filing of the Final Voting Tabulation Report.

[25] The DCL Plan Proponents objected to the Put Options under the Noteholder Plan, asserting that it was an inappropriate attempt to take advantage of general unsecured creditors by buying their claims at depressed prices. This could not be further from the truth. The Put Options were included in the Noteholder Plan to enable general unsecured creditors, which consist mostly of trade creditors and vendors that engaged in ordinary course transactions with the Debtors as opposed to making investments in the Debtors, to receive an immediate distribution instead of bearing the risk and time-delay of litigation.  Moreover, the Noteholder Plan Proponents did not offer the Put Options at higher prices equivalent to the "recoveries" contemplated under the DCL Plan, which the DCL Plan Proponents suggest would have been more appropriate, because the Put Options were an attempt to provide a liquidity mechanism, not an attempt to inappropriately influence the votes of Classes of Creditors — as is the case with the DCL Plan.  However, as the Claims Purchase will not be consummated, this objection is now moot. Nonetheless, had the Claims Purchase been consummated, it would have constituted permissible claims trading and was offered in good faith.  *See* Third Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, et al. Art. VII § G (*In re Rhodes Cos., LLC*, No. 09-14814 (LBR) Bankr. D. Nev. Feb. 18, 2010 (ECF No. 1013) confirmed on Mar. 12, 2010 ( ECF No. 1053)); Second Amended Joint Consolidated Plan of Reorganization under Chapter 11 of the Bankruptcy Code for Uno Restaurant Holdings Corporation and Its Affiliated Debtors and Debtors in Possession § 5.8 (*In re Uno Restaurant Holdings Corp.,* No. 10-10209 (MG) Bankr. S.D.N.Y. June 29, 2010 (ECF No. 516) confirmed on July 6, 2010 (ECF No. 559)).

a Creditor has made the Non-Contribution Election on its Ballot with respect to its State Law Avoidance Claims.  Specifically, Holders of Senior Loan Claims, Bridge Loan Claims, Senior Noteholder Claims, Other Parent Claims, PHONES Notes Claims, EGI-TRB LLC Notes Claims and Subordinated Securities Claims were given the opportunity to opt out of the automatic assignment of the State Law Avoidance Claims to the Creditors' Trust (the "Non-Contribution Election").  Holders making the Non-Contribution Election will not be permitted to receive Creditors' Trust Interests and, accordingly, will not be entitled to share in the proceeds of any recoveries ultimately obtained by the Creditors' Trust.  As reported in the Final Voting Tabulation Report, seventeen creditors made the Non-Contribution Election.[26]

### F.    Objections to the Noteholder Plan

35.    Objections to the Noteholder Plan have been received from the DCL Plan Proponents and the parties set forth on the Objection Chart (attached hereto as Exhibit B).  As noted above, the DCL Objection is addressed in detail herein and responses to the other objections are contained in the Objection Chart.

### G.    The Modifications to the Noteholder Plan

36.    The Noteholder Plan Proponents have modified certain provisions of the Noteholder Plan to make technical, non-material changes and to (i) address objections filed or asserted by various parties, (ii) resolve concerns that were communicated to the Noteholder Plan Proponents outside of the context of the objections, (iii) make clarifying changes to the Noteholder Plan and (iv) make certain changes to more easily facilitate the post-Effective Date administration of the Noteholder Plan (collectively, the "Noteholder Plan Modifications").  The Noteholder Plan Modifications include:

---

[26] The Non-Contribution Elections for Holders of Claims in Classes 1F (Senior Noteholder Claims) and 1I (PHONES Notes Claims) were not reflected in the Final Voting Tabulation Report.  *See* Final Voting Tabulation Report at 456.

- Providing the Distribution Trustee with the authority to act as Disbursing Agent with respect to Initial Distributions.  *See* Noteholder Plan §§ 7.16.3 and 7.16.8.

- Moving the resolution process for all Disputed General Unsecured Claims, other than those unsecured Claims that are disputed in connection with the LBO-Related Causes of Action, to the Distribution Trust.  *See* Noteholder Plan §§ 7.16.2, 7.16.15 and 8.1.

- Clarifying certain matters relating to the Noteholder Plan Supplement, including (i) which Exhibits to the Noteholder Plan are found in the Noteholder Plan Supplement Documents and which Exhibits rely on the DCL Plan Supplement Documents and (ii) revising the date on which the Registration Rights Agreement is due to be filed with the Bankruptcy Court.  *See* Noteholder Plan §§ 1.1.26, 1.1.47, 1.1.85, 1.1.110, 1.1.154, 1.1.176, 1.1.177, 1.1.239, 5.3.1 and 6.5.

- Refining the federal income tax treatment of the Litigation Trust, Creditors' Trust and Distribution Trust.  *See* Noteholder Plan §§ 5.17.12, 5.18.13 and 7.16.14.

- Providing that the CEO of Reorganized Tribune will only serve on the Board of Reorganized Tribune if such CEO's employment agreement so provides.  *See* Noteholder Plan § 5.3.2.

- Clarifying that the Debtors must obtain the consent of the Noteholder Plan Proponents prior to entering into the Exit Facility Credit Agreement.  *See* Noteholder Plan § 5.10.

- Refining certain indemnification provisions in connection with the Litigation Trust, the Creditors' Trust and the Distribution Trust.  *See* Noteholder Plan §§ 5.17.10, 5.18.15 and 7.16.12.

- Clarifying the provisions for the transfer of State Law Avoidance Claims and certain causes of action commenced on behalf of Tribune's Estate to the Creditors' Trust.  *See* Noteholder Plan §§ 5.15 and 5.18.2.

- Providing that Classes of Claims entitled to vote in which no Creditor voted are deemed to reject the Noteholder Plan.  *See* Noteholder Plan § 4.5.

- Clarifying that the Noteholder Plan is a single joint plan for all of the Debtors, but is not premised on substantive consolidation.  *See* Noteholder Plan § 5.1.

- Incorporating the Intercompany Claims Settlement.  *See* Noteholder Plan §§ 1.1.138, 3.2.10(b), 3.3.4(b), 3.4.7(b), 3.5.3(d) and 5.19.

- Clarifying the rate at which Postpetition Interest will be paid to Creditors entitled to receive Postpetition Interest.  *See* Noteholder Plan § 1.1.224.

- Clarifying the time at which (i) the duties, responsibilities and powers of the Litigation Trustee shall terminate and (ii) the Litigation Trust shall dissolve.  *See* Noteholder Plan § 5.17.11.

- Clarifying the Reorganized Debtors' document retention responsibilities.  *See* Noteholder Plan §§ 5.17.15, 5.18.18, and 7.16.17.

- Reinstating certain officers, directors and employees rights to retain bonuses and equity based compensation.  *See* Noteholder Plan § 6.5.

- Clarifying Reorganized Tribune's indemnification obligations with respect to prepetition Claims of certain directors, officers and employees.  *See* Noteholder Plan §§ 6.5 and 6.7.

- Modifying the procedures pursuant to which professionals can seek to have their reasonable fees and expenses reimbursed.  *See* Noteholder Plan § 9.1.1.

- Clarifying the tax treatment of the CT Reserves.  *See* Noteholder Plan § 5.18.12.

- Incorporating additional modifications to address a number of the objections reflected in the Objection Chart.  *See* Noteholder Plan §§ 2.2, 2.3, 5.7, 6.5, 6.8, 6.9, 11.1.1(b), 11.1.2, 11.6, 12.2 and 13.7.

## III.   ARGUMENT

### A.   Burden of Proof

37.    To confirm the Noteholder Plan, the Noteholder Plan Proponents must demonstrate that the Noteholder Plan satisfies the provisions of Bankruptcy Code section 1129 by a preponderance of the evidence.  *See In re Armstrong World Indus.*, 348 B.R. 111, 120-22 (D. Del. 2006).  As discussed in detail below, the Noteholder Plan satisfies all of the applicable requirements of Bankruptcy Code section 1129(a), other than Bankruptcy Code section 1129(a)(8) with respect to the Rejecting Classes.  Notwithstanding the fact that the Rejecting Classes have not accepted the Noteholder Plan, the Noteholder Plan may be confirmed so long as it is "fair and equitable" with respect to each Rejecting Class and does not unfairly discriminate against each such Class.  *See* 11 U.S.C. § 1129(b)(1).[27]  As set forth herein and in the *Declaration of Dan Gropper in Support of Confirmation of the Noteholder Plan (as Amended)* (the "Gropper Declaration") filed contemporaneously herewith, the Final Voting Tabulation Report and the Certification of Publication of Notice of Confirmation Hearing *[ECF No. 7639]* (the "Publication Affidavit"), the Noteholder Plan Proponents submit that the Noteholder Plan satisfies these requirements, complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules and applicable non-bankruptcy law and should therefore be confirmed.

---

[27] *See* section III.O below for a further discussion of the standard of proof applicable to cram down of the Rejecting Classes.

**B.     The Noteholder Plan Complies with Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1))**

38.     Pursuant to Bankruptcy Code section 1129(a)(1), a plan must comply with the applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(1); *see also In re Union Meeting Partners,* 165 B.R. 553, 574 (Bankr. E.D. Pa. 1994), *aff'd*, 52 F.3d 317 (3d Cir. 1995). The legislative history of Bankruptcy Code section 1129(a)(1) explains that this provision encompasses the requirements of Bankruptcy Code sections 1122 and 1123 (governing classification of claims and contents of a plan, respectively).  *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in this subsection to mean provisions of Chapter 11 . . . such as section 1122 and 1123.").  As demonstrated below, the Noteholder Plan complies fully with the requirements of Bankruptcy Code sections 1122 and 1123, as well as other applicable provisions of the Bankruptcy Code, in all respects.

**1.     *The Noteholder Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122***

39.     Bankruptcy Code section 1122(a) provides as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).

40.     Bankruptcy Code section 1122 provides a plan proponent with significant discretion in classifying claims and interests.  Under this section of the Bankruptcy Code, a plan may place claims or interests in the same class so long as they are substantially similar to the other claims or interests in that class.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d

Cir. 2004) ("Section 1122(a) provides that only 'substantially similar' claims may be classified together under a plan of reorganization."); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("The express language of [section 1122(a)] explicitly forbids a plan from placing dissimilar claims in the same class."). At the same time, Bankruptcy Code section 1122 permits a plan to separately classify substantially similar claims or interests if the separate classification of such claims or interests is reasonable. *See, e.g.*, *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158-59 (3d Cir. 1993) (noting that "the classification of . . . claims or interests must be reasonable") (quoting *In re Jersey City Med. Ctr.*, 817 F.2d at 1061); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) ("Even though similar claims may be placed in separate classes, plan proponents cannot do so when it would be unreasonable."). In determining whether the separate classification of claims or interests is appropriate, courts have identified several grounds upon which claims may be validly placed in separate classes, including where creditors possess different legal rights. *See, e.g.*, *In re Heritage Org., L.L.C.*, 375 B.R. 230, 299 n. 86 (Bankr. N.D. Tex. 2007) (finding that if creditors had different legal rights under equitable subordination, then separate classification would be appropriate).

41. Article 3 of the Noteholder Plan provides for the classification of Claims and Interests. Administrative Claims, Priority Tax Claims and DIP Facility Claims are treated separately in Article 2 of the Noteholder Plan. The Noteholder Plan's classification scheme is summarized in the charts below:

**Classes of Claims Against and Interests in Tribune (Debtor 1)**

| CLASS | CLAIM OR INTEREST | IMPAIRED | ENTITLED TO VOTE |
|-------|-------------------|----------|------------------|
| 1A | Priority Non-Tax Claims | No | No |
| 1B | Other Secured Claims | No | No |
| 1C | Step One Senior Loan Claims | Yes | Yes |
| 1D | Step Two Senior Loan Claims | Yes | Yes |

26

| 1E | Bridge Loan Claims | Yes | Yes |
| 1F | Senior Noteholder Claims | Yes | Yes |
| 1G | Other Parent Claims | Yes | Yes |
| 1H | EGI-TRB LLC Notes Claims | Yes | Yes |
| 1I | PHONES Notes Claims | Yes | Yes |
| 1J | Intercompany Claims | Yes | To Be Determined in Connection with Confirmation |
| 1K | Subordinated Securities Claims | Yes | Yes |
| 1L | Tribune Interests | Yes | No |

### Classes of Claims Against and Interests
### in Non-Guarantor Debtors (Debtors 2 through 49)[28]

| CLASS | CLAIM OR INTEREST | IMPAIRED | ENTITLED TO VOTE |
|-------|-------------------|----------|------------------|
| 2A-49A | Priority Non-Tax Claims | No | No |
| 2B-49B | Other Secured Claims | No | No |
| 2G-49G | Other Non-Guarantor Debtor Claims | No | No |
| 2J-49J | Intercompany Claims | Yes | To Be Determined in Connection with Confirmation |
| 2L-49L | Interests in Non-Guarantor Debtors | No | No |

### Classes of Claims Against and Interests
### in Guarantor Debtors (Debtors 50 through 111)[29]

| CLASS | CLAIM OR INTEREST | IMPAIRED | ENTITLED TO VOTE |
|-------|-------------------|----------|------------------|
| 50A-111A | Priority Non-Tax Claims | No | No |
| 50B-111B | Other Secured Claims | No | No |
| 50C-111C | Step One Senior Loan Guaranty Claims | Yes | Yes |
| 50D-111D | Step Two Senior Loan Guaranty Claims | Yes | Yes |
| 50E-111E | Bridge Loan Guaranty Claims | Yes | Yes |
| 50G-111G | Other Guarantor Debtor Claims | Yes | Yes |
| 50J-111J | Intercompany Claims | Yes | To Be Determined in Connection with Confirmation |
| 50L-111L | Interests in Guarantor Debtors | No | No |

42.     Notwithstanding the Debtors' complex organizational structure, the Noteholder

Plan's classification scheme is quite simple and satisfies the requirements of Bankruptcy Code

section 1122.  For each Debtor, the various types of bank and, where applicable, bond debt are

---

[28] Because the Noteholder Plan does not substantively consolidate any of the Debtors' Estates, each Class of Claims and Interests is separately applicable to each individual Non-Guarantor Debtor.

[29] Because the Noteholder Plan does not substantively consolidate any of the Debtors' Estates, each Class of Claims and Interests is separately applicable to each individual Guarantor Debtor.

classified separately to give effect to relative rights, priorities and legal attributes of each type of

debt.  The Claims or Interests in each Class are substantially similar to the other Claims or

Interests in such Class, and all Claims or Interests in each Class differ from the Claims and

Interests in each other Class in a legal or factual nature, or based on other relevant criteria.

43.     Notwithstanding the DCL Objection (*see* pages 41-43 thereof), the separate

classification of the Step One Lender Claims and Step Two Lender Claims is no exception to the

foregoing rule.  The Step One Lender Claims and Step Two Lender Claims are each the subject

of significant dispute under the Noteholder Plan and the Litigation Trust that will be established

pursuant to the Noteholder Plan on the Effective Date.  Notwithstanding the fact that the Step

One Lender Claims and Step Two Lender Claims arise under the very same Senior Loan

Agreement, the disputes with respect to such Claims are premised on varying legal and factual

arguments against each group of Senior Lenders, and the resolution of such disputes (in tandem

with the outcome of the Senior Loan Claims Sharing Resolution) could ultimately result in

different recoveries for Step One Lenders and Step Two Lenders.

44.     As noted in the Illustrative Recovery Charts (and the Revised Estimated Recovery

Charts attached hereto that reflect the results derived from a proper DEV) as well as in the

Noteholder Plan Proponents' Objection, if (i) Step Two Lender Claims are avoided, (ii) Step One

Lender Claims are not avoided and (iii) the sharing provisions in the Senior Loan Agreement do

not require Step One Lenders to share their recoveries with Step Two Lenders, the Step One

Lenders would receive a recovery while the Step Two Lenders likely would not.  Accordingly,

the Noteholder Plan's separate classification of Step One Lender Claims and Step Two Lender

Claims is appropriate and will facilitate distributions to Holders of Claims in those Classes, and

therefore does not violate Bankruptcy section 1122.  *See Olympia & York Fla. Equity Corp. v.*

*Bank of N.Y. (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting).

45.     The DCL Plan Proponents also object to the classification of the Swap Claim as a Senior Lender Claim, arguing that the Swap Claim originates from a "separate agreement" and that Tribune's obligations thereunder are "entirely distinct from its obligations under the Senior Loan Agreement."  DCL Objection at 43.  The DCL Plan Proponents' objection on this point is both ill-founded and disingenuous for numerous reasons.

46.     First, the Swap Claim and the Step One Senior Loan Claims are "substantially similar" and should therefore be classified together.  Although the DCL Plan Proponents, in an attempt to support this argument, cite in their objection that the Swap Claim is governed by a separate agreement (DCL Objection at 43), on the *very next page* of their objection the DCL Plan Proponents concede that the Noteholder Plan correctly classifies the Swap Claim as a Step One Senior Loan Guaranty Claim because both the Senior Loan Agreement Claims and the Swap Claim are guaranteed by the *same* Guarantor Debtors through the *same* guaranty agreement. DCL Objection at 44, n. 26.  The Swap Claim and the Step One Senior Loan Guaranty Claims share a guaranty agreement because both Claims arise from the *same* transaction involving the *same* parties.  Indeed, the Swap Claim originates from a requirement in the Senior Loan Agreement that Tribune enter into hedge arrangements to offset, among other things, a percentage of its interest rate exposure under the Senior Loan Agreement.  *See* General Disclosure Statement, § III.A.2(a).  Moreover, the Debtors themselves classified the Swap Claim as a Senior Loan Claim in the April Plan in apparent acknowledgment of the substantial similarities between the Swap Claim and the Senior Loan Claims.  Either the Debtors are now

(implausibly) conceding that classifying the Swap Claim as a Senior Loan Claim rendered the April Plan patently unconfirmable, or (more likely) the Debtors have simply elected (or been forced) in the intervening months to prioritize the Claim of a fellow plan proponent (Oaktree) over the Claims of innocent Non-LBO Creditors in violation of the Bankruptcy Code and in spite of the facts before this Court.

47.    Second, the DCL Plan Proponents' argument that the Swap Claim should not be classified together with Step One Senior Loan Claims because the Swap Claim is not subject to avoidance is without merit.  Bankruptcy Code section 546(g) provides that a trustee may not avoid "a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, *except under section 548(a)(1)(A) of this title*."  11 U.S.C. §546(g) (emphasis added). Thus, swap claims that arise out of an intentionally fraudulent transfer are not subject to protection under Bankruptcy Code section 546(g).  Numerous parties in interest – including the Creditors' Committee, a DCL Plan Proponent – have asserted that both Step One and Step Two of the LBO Transaction constitute *intentionally fraudulent transfers*.  Because, as stated above, the Swap Claim originates from and is wholly integrated with that same LBO Transaction, the Swap Claim is similarly subject to avoidance if the LBO-Related Causes of Action are prosecuted.

48.    Third, the classification of the Swap Claim with the Step One Senior Loan Claims under the Noteholder Plan does not adversely affect the Holders of the Swap Claim or the Step One Senior Loan Claims.  Indeed, the Swap Claim will receive a greater Initial Distribution under the Noteholder Plan if it is classified as a Step One Senior Loan Claim than if it were classified as an Other Parent Claim (as the Swap Claim is impermissibly classified under the

DCL Plan).  Under the Noteholder Plan, Holders of Step One Senior Loan Claims are projected to receive an initial distribution of *at least* 34.2% at a $6.75 billion DEV, and 49.5% at an $8.331 billion DEV, on account of their Claims.  By contrast, Holders of Other Parent Claims are projected to receive an initial distribution of 4.3-4.4% at a $6.75 billion DEV, and 5.3% at an $8.331 billion DEV, on account of their Claims.  Moreover, if following the prosecution of the LBO-Related Causes of Action, the Swap Claim is not avoided, it will be entitled to receive an even greater distribution.  Accordingly, the DCL Plan Proponents' objection to the classification of the Swap Claim under the Noteholder Plan both fails as a matter of law, and is contrary to the DCL Plan Proponents' own pecuniary interests.

49.    Because valid business, factual and legal reasons exist for classifying the Claims and Interests into the applicable Classes under the Noteholder Plan, the Noteholder Plan's classification of Claims and Interests satisfies Bankruptcy Code section 1122.

## 2. *The Noteholder Plan Complies with the Requirements of 11 U.S.C. § 1123(a)*

50.    Bankruptcy Code section 1123(a) sets forth seven mandatory requirements with which every chapter 11 plan of reorganization must comply.[30]  *See* 11 U.S.C § 1123(a).  As demonstrated below, the Noteholder Plan fully complies with each enumerated requirement.

### a. The Noteholder Plan Designates Classes of Claims and Interests – 11 U.S.C. § 1123(a)(1)

51.    Bankruptcy Code section 1123(a)(1) requires a plan to designate classes of claims, other than claims of a kind specified in Bankruptcy Code sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap" period in an involuntary case) and 507(a)(8) (priority tax claims).  *See* 11 U.S.C. § 1123(a)(1).  Article 3 of

---

[30] Bankruptcy Code section 1123(a) contains an eighth requirement, applicable only in a case where the debtor is an individual.  Because the Debtors in these Chapter 11 Cases are corporations, and not individuals, Bankruptcy Code section 1123(a)(8) is inapplicable.

the Noteholder Plan designates Classes of Claims and Interests as required by Bankruptcy Code

section 1123(a)(1).  Specifically, Article 3 designates twelve Classes of Claims and Interests at

Tribune, five Classes of Claims and Interests at each Non-Guarantor Debtor and eight Classes of

Claims and Interests at each Guarantor Debtor.  Additionally, Article 2 of the Noteholder Plan

provides for the treatment of Administrative Claims, Priority Tax Claims and DIP Facility

Claims.  Based upon the foregoing, the Noteholder Plan satisfies Bankruptcy Code section

1123(a)(1).

> b.   *The Noteholder Plan Specifies Unimpaired Classes –*
>      *11 U.S.C. § 1123(a)(2)*

52.     Bankruptcy Code section 1123(a)(2) requires that a plan "specify any class of

claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  Article 3 of the

Noteholder Plan specifies whether each Class of Claims and Interests is Impaired under the

Noteholder Plan.  Based upon the foregoing, the Noteholder Plan satisfies Bankruptcy Code

section 1123(a)(2).

> c.   *The Noteholder Plan Adequately Specifies the Treatment of*
>      *Impaired Classes – 11 U.S.C. § 1123(a)(3)*

53.     Bankruptcy Code section 1123(a)(3) requires that a plan "specify the treatment of

any class of claims or interests that is impaired under the plan."  11 U.S.C. § 1123(a)(3).  Article

3 of the Noteholder Plan details with specificity the treatment of Claims and Interests that are

Impaired under the Noteholder Plan.  Nevertheless, the DCL Plan Proponents allege that the

Noteholder Plan violates Bankruptcy Code sections 1123(a)(3) and 1123(a)(5) and, therefore,

cannot be confirmed because the Noteholder Plan (i) fails to specify how creditors will be treated

and (ii) contains no mechanism for implementing distributions thereunder.  In support of its

argument, the DCL Objection contends that the "size and timing of distributions for each

impaired class is, in fact, unspecified and speculative."  DCL Objection at 10.  In substance, the

DCL Plan Proponents object to the Noteholder Plan on the basis that the Noteholder Plan

Proponents cannot quantify the value to be received by Creditors on account of their Pro Rata

share of Trust Interests, or when distributions will be made on account of such Trust Interests.[31]

Aside from the fact that the DCL Plan suffers from the same "infirmity," the Noteholder Plan's

treatment of Classes and Creditors is more than sufficient to satisfy the requirements of

Bankruptcy Code sections 1123(a)(3) and 1123(a)(5).

        54.    The DCL Plan Proponents' objection appears to apply generally to the treatment

of all Classes of Claims receiving Trusts Interests under the Noteholder Plan.  Article 3 of the

Noteholder Plan, however, clearly articulates exactly what each Holder of an Allowed Claim will

receive on or shortly after the Effective Date on account of Initial Distributions.  For example,

Section 3.2.7 of the Noteholder Plan provides that each Holder of an Other Parent Claim shall

receive its Pro Rata share of (i) the Other Parent Claims Initial Distribution (defined as a Pro

Rata share of a "strip" of consideration consisting of New Common Stock, New Senior Secured

Term Loan and Distributable Cash allocable to Allowed Other Parent Claims), (ii) the Class 1G

Distribution Trust Interests and (iii) to the extent such Holder of an Other Parent Claim has not

made the Non-Contribution Election, the Class 1G Creditors' Trust Interests.  Moreover, the

Noteholder Specific Disclosure Statement assigns estimated values to the Initial Distributions

contemplated by the Noteholder Plan under *four different* scenarios (which have been updated in

the Revised Estimated Recovery Charts to reflect recoveries based on the Noteholder Plan

Proponents' expert's $8.331 DEV).  *See* Revised Estimated Recovery Charts (Exhibit A hereto).

---

[31] The DCL Plan Proponents also argue that the Noteholder Plan does not provide adequate means for implementation because the Noteholder Plan does not provide for the resolution of Intercompany Claims.  As set forth herein, the Noteholder Plan has been revised to adopt the Intercompany Claims Settlement set forth at Exhibit 1.1.122 to the DCL Plan, as filed in the DCL Plan Supplement.

55.    The Noteholder Plan Proponents do not ascribe a value to the Trust Interests contemplated by the Noteholder Plan for the simple reason that the Noteholder Plan Proponents cannot predict with certainty the *exact* outcome of the LBO-Related Causes of Action and, thus, how much value will ultimately be distributed on account of each Class of Trust Interests.  The Noteholder Plan Proponents do, however, believe that the recoveries to be obtained by the Non-LBO Creditors through their ownership of Trust Interests will materially exceed recoveries contemplated by the DCL Plan – a belief that is confirmed by the Examiner's Report, which pronounces that certain of the LBO-Related Causes of Action have a *high likelihood* of success. *See* Examiner's Report, at Vol. 1, p. 9; Vol. 1, pp. 18-19; Vol. 2, p. 90.  Notwithstanding the uncertainty of the exact outcome of the LBO-Related Causes of Action – an uncertainty that is common to every litigation plan approved by courts across the country[32] – the recovery charts included in the Noteholder Specific Disclosure and the Revised Estimated Recovery Charts provide estimates of what each Class of Claims will ultimately receive based on a number of outcomes of the LBO-Related Causes of Action.

56.    Indeed, courts have held that plans *wholly* premised on a contingent litigation outcome can be confirmed where the litigation at issue has a reasonable likelihood of success. *See, e.g.*, *In re Applied Safety, Inc.*, 200 B.R. 576, 586 (Bankr. E.D. Pa. 1996) (holding that "[a]s long as a lawsuit has a reasonable chance of success, depending on it for funding is no more contingent than depending on sales projections or other more traditional indicia of business success"); *see also In re Hernandez*, 287 B.R. 795, 808 (Bankr. D. Ariz. 2002) (finding that "[c]hapter 11 plans which depend for funding on the outcome of litigation may be confirmable

---

[32] For examples of recent cases in which courts have confirmed plans wherein creditors' recoveries are conditioned upon the outcome of pending litigation, *see In re Trenwick America Corp., et al.*, Case No. 03-12635 (Bankr. D. Del. Oct. 25, 2004); *In re Meridian Auto Systems-Composites Operations, Inc., et al.*, Case No. 05-11168 (Bankr. D. Del. Oct. 25, 2006); *In re Hawaiian Telcom Commun's, Inc., et al.*, Case No. 08-02005 (Bankr. D. Hawaii Dec. 30, 2009); *In re Adelphia Commun's Corp., et al.*, Case No. 02-41729 (Bankr. S.D.N.Y. Nov. 21, 2005).

under the right circumstances."); *LaSalle Bus. Credit, Inc. v. Toth* (*In re Toth*), 269 B.R. 587,

590 (Bankr. W.D. Pa. 2001) (citing *In re Applied Safety, Inc.*, 200 B.R. at 586) (noting that "[t]he

fact that Debtor depends on litigation . . . to fund a plan is not in and of itself cause for

dismissal").

57.    The cases cited by the DCL Plan Proponents in support of their contention that the

Noteholder Plan is impermissibly vague are wholly inapposite to the facts of this case.  Virtually

all of the cases cited involved a proposed plan in which the plan proponents either failed to

delineate how value would be allocated across creditor constituencies or failed to disclose how

value would be obtained to satisfy creditor claims.  *See Sandy Ridge Dev. Corp. v. La. Nat'l

Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1352-53 (5th Cir. 1989) (holding that a

liquidating chapter 11 plan that failed to specify how a tract of property was to be divided among

creditors, and what interest each creditor would have in the property, was "completely devoid of

specificity"); *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1003-04 (E.D. Va. 1994)

(denying confirmation on the basis that, among other things, the plan proposed to sell only

certain of the debtors' assets to pay the claims of creditors and left open numerous factors,

including how the real property would be sold and the timing of payment of creditors); *In re

Sutton*, 78 B.R. 341, 342-343 (Bankr. S.D. Fla. 1987) (finding that the plan at issue lacked the

requisite support for debtor's contention that he could sell his stock for the value necessary for

implementation of the plan and therefore converting the case to a chapter 7); *In re Butler*, 42

B.R. 777, 780-781 (Bankr. E.D. Ark. 1984) (denying confirmation because the plan did not,

among other fatal flaws, (i) provide at all for the treatment of unsecured claims valued at $500 or

more, (ii) properly classify secured creditors' claims, or (iii) fully capture the value of debtors'

assets).

58.     Ironically, the most analogous case cited by the DCL Plan Proponents – *Superior Offshore Int'l* – held that the plan at issue did *not* violate Bankruptcy Code section 1123(a)(3).  *Schaefer v. Superior Offshore Int'l, Inc. (In re Superior Offshore Int'l, Inc.)*, 591 F.3d  350, 354 (5th Cir. 2009).  In *In re Superior Offshore International, Inc.*, the court considered the confirmability of a plan that allowed for shareholders to pursue certain securities litigation claims and established a post-confirmation equity subcommittee to review, prosecute, and settle all such claims.  *See id.* at 352-353.  The class of security litigation claims was to have equal priority with a class of equity interests, providing for *pro rata* allocation of any additional litigation proceeds if all senior claims were satisfied.  *See id.*  The plan did not, however, provide a formula for converting security litigation claims to comparable units of equity interests and instead provided that such a system would be devised only if proceeds were sufficient to satisfy all senior claims.  *See id.* at 352-53.  The court affirmed confirmation of the plan, stating:

> [t]he interrelation of Classes 7 [security litigation claims] and 8 [equity interests] is contingent and presently unknowable.  The court's decision to approve a plan that provides, at the end of the day, for statutorily correct pro rata treatment of Classes 7 and 8, adjudicated in an adversary proceeding if necessary, furnished adequate specificity and complied with § 1123(a)(3).

*Id.* at 354.

59.     The DCL Plan Proponents also object to the trust structure contained in the Noteholder Plan on the basis that the prosecution of the Litigation Trust Causes of Action will be "left to the discretion of a Litigation Trustee with unclear and potentially conflicting duties." DCL Objection at 11.  At the same time, the DCL Plan Proponents acknowledge that the Noteholder Plan specifically states that the Litigation Trustee has a fiduciary duty to all Holders of Distribution Trust Interests.  *Id.*  Specifically, the Noteholder Plan provides that:

> The Litigation Trustee shall have fiduciary duties to the Litigation
> Trust Beneficiary for the benefit of the Holders of Distribution Trust
> Interests, in the same manner that members of an official committee
> of creditors appointed pursuant to section 1102 of the Bankruptcy
> Code have fiduciary duties to the creditor constituents represented by
> such committee; ***provided, however, that the Litigation Trustee shall
> not owe fiduciary obligations to any defendants of Litigation Trust
> Causes of Action in their capacities as such, it being the intent of
> such fiduciary duties to ensure that the Litigation Trustee's
> obligations are to maximize the value of the assets of the Litigation
> Trust, including the Litigation Trust Causes of Action***.

Noteholder Plan at § 5.17.4 (emphasis added).  The Noteholder Plan thus clearly provides that (i)

the Litigation Trustee owes a fiduciary duty to Holders of Distribution Trust Interests and (ii) the

fiduciary duty owed does not extend to Holders of Distribution Trust Interests in their individual

capacities (i.e., in their capacity as a defendant in one or more of the Litigation Trust Causes of

Action).  The Noteholder Plan and the fiduciary duty it imposes on the Litigation Trustee closely

mirror the duty owed by members of an official creditors' committee to the universe of

unsecured creditors.  Under the law of this Circuit, members of a creditors' committee owe "a

fiduciary duty to the unsecured creditors as a whole, ***not to the individual members***."  *In re*

*Kensington Int'l Ltd.*, 368 F.3d 289, 315 (3d Cir. 2004) (emphasis added) (citing *In re Drexel*

*Burnham Lambert Grp.*, *Inc.,* 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992), *aff'd,* 140 B.R. 347

(S.D.N.Y. 1992); *In re Levy*, 54 B.R. 805, 807 (Bankr. S.D.N.Y . 1985)).  Similar to an official

creditors' committee, the role of the Litigation Trustee is to maximize value for all Holders of

Trust Interests, irrespective of what role such Holders may play in the Litigation Trust Causes of

Action in their individual capacity.  Therefore, providing the Litigation Trustee with fiduciary

duties akin to a creditors' committee is fair and appropriate.  Accordingly, the DCL Plan

Proponent's allegations that the Litigation Trustee has "unclear and conflicting duties" are

unfounded and belied by the clear language of the Noteholder Plan.

60.     Based upon the foregoing, the Noteholder Plan satisfies Bankruptcy Code section 1123(a)(3).

>    d.    *The Noteholder Plan Provides for the Same Treatment for Claims or Interests Within the Same Class – 11 U.S.C. § 1123(a)(4)*

61.     Bankruptcy Code section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). This provision provides creditors of the same class with a right to equality of treatment. Article 3 of the Noteholder Plan provides for equality of treatment for each Claim or Interest within a particular Class.[33] Based upon the foregoing, the Noteholder Plan satisfies Bankruptcy Code section 1123(a)(4).

>    e.    *The Noteholder Plan Provides Adequate Means for Its Implementation – 11 U.S.C. § 1123(a)(5)*

62.     Bankruptcy Code section 1123(a)(5) requires a plan of reorganization to "provide adequate means for the plan's implementation" and sets forth several examples of such means, including retention by the debtor of property of the estate, sales of the debtor's property, satisfaction or modification of liens and issuance of securities of the debtor in exchange for claims or interests. 11 U.S.C. § 1123(a)(5).

63.     Articles 5 and 7 of the Noteholder Plan, as well as certain other provisions of the Noteholder Plan, provide adequate means for the Noteholder Plan's implementation as required by Bankruptcy Code section 1123(a)(5). Specifically, Articles 5 and 7 of the Noteholder Plan provide for, among other things: (i) the Debtors' entry into the Restructuring Transactions; (ii)

---

[33] Although it will not be consummated upon Confirmation of the Noteholder Plan, the Claims Purchase is no exception to this requirement and also complies with Bankruptcy Code section 1123(a)(4) insomuch as each Holder of a Claim in the Other Parent Claims Class and the Other Guarantor Debtor Claims Classes had the same right to elect to participate in the Claims Purchase on the same economic terms as all other Holders of Claims in such Holder's respective Class.

the post-Effective Date corporate governance and management of the Reorganized Debtors; (iii)

disbursement of Initial Distributions and Trust Interests; (iv) creation, funding and administration

of the Creditors' Trust, the Distribution Trust and the Litigation Trust; (v) post-Effective Date

financing of Reorganized Tribune, including execution and implementation of the New Senior

Secured Term Loan and the Exit Facility, to the extent necessary; (vi) issuance of New Common

Stock; and (vii) cancellation and, where applicable, surrender of existing securities and

agreements.  Based upon the foregoing and the response to the DCL Objection in subsection *(c)*

above, the Noteholder Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy

Code.

> f.    *The Noteholder Plan Prohibits the Issuance of Non-Voting Equity Securities – 11 U.S.C. § 1123(a)(6)*

64.    Bankruptcy Code section 1123(a)(6) requires that a plan "provide … a provision

prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of

securities possessing voting power, an appropriate distribution of such power among such

classes."  11 U.S.C. § 1123(a)(6).  Section 5.3.1 of the Noteholder Plan mandates that the

Reorganized Debtors' organizational documents will include a provision prohibiting the issuance

of non-voting equity securities in full satisfaction of Bankruptcy Code section 1123(a)(6).  In

accordance with Section 5.3.1 of the Noteholder Plan, the form Certificate of Incorporation filed

with the Noteholder Plan Supplement explicitly prohibits the issuance of non-voting equity

securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  *See* Noteholder

Plan Supplement, Exhibit 5.3.1(1) at ¶ 4.  Based upon the foregoing, the Noteholder Plan

satisfies Bankruptcy Code section 1123(a)(6).

    g. *The Noteholder Plan Contains Appropriate Provisions with Respect*
     *to the Selection of Post-Confirmation Directors and Officers –*
     *11 U.S.C. § 1123(a)(7)*

  65. Bankruptcy Code section 1123(a)(7) requires that a plan provide for the selection

of officers, directors and trustees in a manner that is "consistent with the interests of creditors

and equity security holders and with public policy."  11 U.S.C. § 1129(a)(7).  This provision is

supplemented by Bankruptcy Code section 1129(a)(5), which directs the scrutiny of the

Bankruptcy Court to the methods by which the management of the reorganized corporation is to

be chosen to provide adequate representation of those whose investments are involved in the

reorganization, such as creditors and equity holders.  *See* 7 COLLIER ON BANKRUPTCY

¶ 1123.01[7] (Alan N. Resnick & Henry J. Sommer, 16th ed. 2010).

  66. Section 5.3.2 of the Noteholder Plan complies with Bankruptcy Code section

1123(a)(7) by properly and adequately disclosing or otherwise identifying the procedures for

determining the identity and affiliations of all individuals or entities proposed to serve as

members of the board of directors of Reorganized Tribune.  Specifically, Section 5.3.2 of the

Noteholder Plan provides that the initial board of directors of Reorganized Tribune will be

composed of seven members, one of which shall be the chief executive officer of Reorganized

Tribune (to the extent the position is not vacant, and only in the event that the employment

agreement with such chief executive officer so provides).  Four of the remaining members will

be designated by the Senior Lenders, who will hold a majority of the New Common Stock issued

on the Effective Date, while the remaining two members will initially be designated by Aurelius.

The designation of the members of the initial board of directors of Reorganized Tribune is

subject to final approval by the Bankruptcy Court upon entry of the Confirmation Order.  Those

members designated by Aurelius (i) must be independent of Aurelius and (ii) until the

Distribution Trust is wound down or otherwise liquidated, (a) may be replaced at any time with

or without cause by the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, and (b) upon the expiration of their terms will have their successors selected by the Distribution Trustee, at the direction of the Distribution Trust Advisory Board.

67.     Pursuant to the Noteholder Plan, the identities of the initial directors of Reorganized Tribune shall be filed with the Bankruptcy Court no later than five days prior to the commencement of the Confirmation Hearing.  In addition, to the extent any such director is an insider (as defined in Bankruptcy Code section 101(31)) other than by virtue of being a director, the nature of any compensation for such person will also be disclosed.  Section 5.3.2 of the Noteholder Plan provides for the contingency if the Senior Lenders, who do not support the Noteholder Plan, fail to designate the four initial members of the board of directors of Reorganized Tribune allotted to them prior to the deadline for the Noteholder Plan Proponents to disclose the proposed initial board members with the Bankruptcy Court.  In such event, Reorganized Tribune shall, as soon as practicable after the Effective Date, hold a special election to appoint the four initial board members otherwise allocable to the Senior Lenders, and the members elected to the initial board in connection with such special election shall be deemed to be the designees of the Senior Lenders under the Noteholder Plan.  Based upon the foregoing, the Noteholder Plan complies with Bankruptcy Code section 1123(a)(7) with respect to the initial members of the board of directors of Reorganized Tribune.[34]

68.     Section 5.3.2 of the Noteholder Plan also complies with Bankruptcy Code section 1123(a)(7) with respect to the initial officers of Reorganized Tribune.  The Noteholder Plan Proponents intend to adopt the officers disclosed by the Debtors in Exhibit 5.3.2(1) of the DCL Plan Supplement (as may be modified by the Noteholder Plan Proponents in their sole discretion,

---

[34] As the Senior Lenders will hold a substantial majority of the New Common Stock issued and outstanding on the Effective Date, as a result of this special election, the spirit of Section 5.3.2 of the Noteholder Plan will remain as the Senior Lenders' votes will control who is appointed to the board.

provided that the Noteholder Plan Proponents shall file an amended Exhibit 5.3.2(1) with the

Bankruptcy Court in the event they make any such modifications). The Noteholder Plan

Proponents intend to rely on Exhibit 5.3.2(1) of the DCL Plan Supplement to disclose whether

any such officer is an insider (as defined in Bankruptcy Code section 101(31)) other than by

virtue of being a officer (provided that, to the extent the Noteholder Plan Proponents modify

Exhibit 5.3.2(1) of the DCL Plan Supplement, they shall make a separate disclosure as to any

Person listed on such modified Exhibit).

69.     Based on the foregoing, the Noteholder Plan satisfies Bankruptcy Code section

1123(a)(7).

### 3.     *The Noteholder Plan Complies with the Requirements of 11 U.S.C. § 1123(b)*

70.     Bankruptcy Code section 1123(b) sets forth the permissive provisions that may be

incorporated into a chapter 11 plan, including any "provision not inconsistent with the applicable

provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). The permissive provisions

contained in the Noteholder Plan are discussed below.

### a.     *The Noteholder Plan Impairs Certain Classes and Leaves Others Unimpaired – 11 U.S.C. § 1123(b)(1)*

71.     Bankruptcy Code section 1123(b)(1) provides that a plan may "impair or leave

unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1).

Pursuant to Articles 3 and 4 of the Noteholder Plan, the following Classes are Impaired under the

Noteholder Plan:

- Class 1C (Step One Senior Loan Claims);
- Classes 50C-111C (Step One Senior Loan Guaranty Claims);
- Class 1D (Step Two Senior Loan Claims);
- Classes 50D-111D (Step Two Senior Loan Guaranty Claims);
- Class 1E (Bridge Loan Claims);

- Classes 50E-111E (Bridge Loan Guaranty Claims);
- Class 1F (Senior Noteholder Claims);
- Class 1G (Other Parent Claims);
- Classes 50G-111G (Other Guarantor Debtor Claims);
- Class 1H (EGI-TRB LLC Notes Claims);
- Class 1I (PHONES Notes Claims);
- Classes 1J-111J (Intercompany Claims);
- Class 1K (Subordinated Securities Claims); and
- Class 1L (Interests in Tribune).

72.    Pursuant to Articles 3 and 4 of the Noteholder Plan, the following Classes are Unimpaired under the Noteholder Plan:

- Classes 1A-111A (Priority Non-Tax Claims);
- Classes 1B-111B (Other Secured Claims);
- Classes 2G-49G (Other Non-Guarantor Debtor Claims);
- Classes 2L-49L (Interests in Non-Guarantor Debtors); and
- Classes 50L-111L (Interests in Guarantor Debtors).

73.    Based on the foregoing, the Noteholder Plan satisfies Bankruptcy Code section 1123(b)(1).

>    b.    *Treatment of Executory Contracts and Unexpired Leases –*
>        *11 U.S.C. § 1123(b)(2)*

74.    Bankruptcy Code section 1123(b)(2) allows a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to Bankruptcy Code section 365.  *See* 11 U.S.C. § 1123(b)(2).  Section 6.1.1 of the Noteholder Plan provides that, as of the Effective Date, the Debtors will be deemed to have assumed each executory contract and unexpired lease to which they are a party unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or terminated pursuant to its own terms, (c) is included in the Global Contract Motion, (d) is included in a

43

pending motion to reject such executory contract or unexpired lease, (e) is a prepetition

obligation to indemnify any target of any Litigation Trust Cause of Action, (f) is expressly

excluded from the assumptions set forth in Section 6.3 of the Noteholder Plan or the Noteholder

Plan Supplement or (g) is set forth on Exhibit 6.3 of the DCL Plan Supplement (as may be

modified by the Noteholder Plan Proponents in their sole discretion, provided that the

Noteholder Plan Proponents shall file an amended Exhibit 6.3 with the Bankruptcy Court in the

event they make any such modifications).  In addition, the Confirmation Order will contain

provisions for the resolution of cure claims that may be asserted by non-Debtor parties to

contracts that are to be assumed.  Based on the foregoing, the Noteholder Plan satisfies

Bankruptcy Code section 1123(b)(2).

              c.    <u>Settlement or Retention of Claims or Interests –<br>11 U.S.C. § 1123(b)(3)</u>

       75.    Bankruptcy Code section 1123(b)(3) permits a plan to provide for the settlement

or retention of any claim or interest belonging to the debtor.  *See* 11 U.S.C. § 1123(b)(3).

Pursuant to Section 5.15 of the Noteholder Plan, all Litigation Claims will be retained by the

Estates; *provided*, *however*, that such claims and causes of action shall not include (i) any claim,

right of action, suit or proceeding that has been settled on or prior to the Confirmation Date, (ii)

the Litigation Trust Causes of Action or (iii) the State Law Avoidance Claims.  Pursuant to

Section 5.17.2 of the Noteholder Plan, all Litigation Trust Causes of Action, including (i) the

LBO-Related Causes of Action, (ii) the Morgan Stanley Claims, (iii) all claims and causes of

action against the Debtors' officers, directors and advisors, (iv) all claims and causes of action

against Sam Zell and his Affiliates, (v) all other claims and causes of action belonging to the

Estates in any way related to the LBO and (vi) all claims and causes of action under chapter 5 of

the Bankruptcy Code will be transferred and assigned to the Litigation Trust, free and clear of all

Claims and Liens.  In addition, the Noteholder Plan has been modified to adopt the Intercompany

Claims Settlement.  Based on the foregoing, the Noteholder Plan satisfies the requirements of

Bankruptcy Code section 1123(b)(3).

d.    *Sale of Estate Property – 11 U.S.C. § 1123(b)(4)*

76.    Bankruptcy Code section 1123(b)(4) permits a plan to provide for the sale of "all

or substantially all of the property of the estate."  11 U.S.C. § 1123(b)(4).  Because the

Noteholder Plan does not contemplate a sale of Estate assets, Bankruptcy Code section

1123(b)(4) is inapplicable.

e.    *Modification of Debt – 11 U.S.C. § 1123(b)(5)*

77.    Bankruptcy Code section 1123(b)(5) allows a plan to modify the rights of holders

of secured or unsecured claims with certain exceptions.  *See* 11 U.S.C. § 1123(b)(5).  Because

the Noteholder Plan does not contemplate any such modifications, Bankruptcy Code section

1123(b)(5) is inapplicable.

f.    *Other Appropriate Measures – 11 U.S.C. § 1123(b)(6)*

78.    Bankruptcy Code section 1123(b)(6) is a catch-all provision that permits inclusion

in a plan of any appropriate provision so long as it is consistent with the applicable provisions of

the Bankruptcy Code.  *See* 11 U.S.C. § 1123(b)(6).  Article 12 of the Noteholder Plan provides,

among other things, that the Bankruptcy Court shall retain jurisdiction over matters arising in,

arising under and related to the Debtors' Chapter 11 Cases, the Noteholder Plan, the Litigation

Trust and the Distribution Trust.  This provision of the Noteholder Plan is appropriate because

the Bankruptcy Court otherwise has jurisdiction over all of these matters during the pendency of

the Chapter 11 Cases, and case law establishes that a bankruptcy court may retain jurisdiction

over the debtor or the property of the estate following confirmation.  *See Binder v. Price

Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 167 (3d Cir. 2004) ("[m]atters

45

that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus" to warrant post-confirmation bankruptcy jurisdiction).  Accordingly, the continuing jurisdiction of the Bankruptcy Court is consistent with applicable law and is permissible under Bankruptcy Code section 1123(b)(6).[35]

79.     Additionally, pursuant to Bankruptcy Code section 1145, any securities contemplated by the Noteholder Plan will be exempt from the registration requirements of section 5 of the Securities Act of 1933 and any other applicable law requiring registration or qualification prior to the offering, issuance, distribution or sale of securities.  *See* Noteholder Plan § 5.4.1.

80.     Based on the foregoing, the Noteholder Plan satisfies the requirements of Bankruptcy Code section 1123(b)(6).

### C.     The Noteholder Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2)

81.     Bankruptcy Code section 1129(a)(2) requires the proponent of a plan to comply "with the applicable provisions of this title."  11 U.S.C. § 1129(a)(2).  Whereas Bankruptcy Code section 1129(a)(1) focuses on the form and content of a plan itself, Bankruptcy Code section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code.  *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[2].  The legislative history discussing this section indicates that it principally requires compliance with the disclosure and solicitation requirements of Bankruptcy Code sections 1125 and 1126.  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

---

[35] Notwithstanding the broad retention of jurisdiction set forth in the Noteholder Plan, Section 12.2 of the Noteholder Plan explicitly provides that the Bankruptcy Court shall not retain jurisdiction over the Creditors' Trust or the Creditors' Trust Assets, including, without limitation, the prosecution, settlement or resolution of the State Law Avoidance Claims.  This is appropriate because the State Law Avoidance Claims are not Estate causes of action, but are instead causes of action belonging to the individual Creditors that contributed such causes of action to the Creditors' Trust established under the Noteholder Plan.

1.    *The Noteholder Plan Satisfies Bankruptcy Code Section 1125*

82.    Bankruptcy Code section 1125 prohibits the solicitation of acceptance or rejection

of a plan of reorganization unless, prior to or contemporaneously with solicitation, the plan

proponent transmits the plan or a summary of the plan and a written disclosure statement that

was approved by the court as containing "adequate information."  11 U.S.C. § 1125(b).  The

purpose of Bankruptcy Code section 1125 is to ensure that parties in interest are fully informed

regarding the condition of the debtor so that they make an informed decision whether to accept

or reject the plan.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337

F.3d 314, 321 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11

bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement

containing 'adequate information' to 'enable a creditor to make 'an informed judgment' about

the [p]lan.'") (quoting 11 U.S.C. § 1125(a)(1)).

83.    On December 9, 2010, the Bankruptcy Court entered the Disclosure Statement

Order, which, among other things, approved the Noteholder Specific Disclosure Statement and

the General Disclosure Statement and found that each contains adequate information as required

by the Bankruptcy Code.  Pursuant to the Disclosure Statement Order, the Bankruptcy Court also

approved the Solicitation Package and the Solicitation Procedures.  The Solicitation Procedures

set forth, among other things: (a) the method of distribution of the Solicitation Package; (b)

procedures for temporary allowance of Claims for voting purposes; (c) the method of distribution

of notices to non-voting Creditors and other interested parties; (d) the qualifications for Creditors

entitled to vote on the Noteholder Plan; (e) instructions on making elections under each of the

Competing Plans, including the Noteholder Plan; and (f) procedures for tabulating the Ballots

and master ballots submitted to the Voting Agent.

84.     On or about December 23, 2010, the Voting Agent caused the Solicitation

Packages to be mailed to Holders of Claims entitled to vote under the Competing Plans,

including the Noteholder Plan.  The Joint Disclosure Statement, the Competing Plans, the

responsive statements filed by the respective plan proponents and the Disclosure Statement

Order contained in the Solicitation Package were also made available to interested parties and the

general public at http://chapter11.epiqsystems.com/tribune.  In addition, timely notice of the

Confirmation Hearing, as well as a copy of the Disclosure Statement Order, were mailed to non-

voting Creditors and other parties entitled to receive such notice as described in the Solicitation

Procedures.  Further, as reflected in the Publication Affidavit and as required by the Disclosure

Statement Order, notice of the Confirmation Hearing was published in *The Wall Street Journal*,

*The New York Times*, the *Los Angeles Times* and the *Chicago Tribune*.

85.     The Noteholder Plan Proponents did not solicit the acceptance or rejection of the

Noteholder Plan from any Creditor prior to the approval of the Joint Disclosure Statement and

the transmission of the Solicitation Packages.  Hence, the Solicitation Packages were transmitted

in compliance with Bankruptcy Code section 1125 and the Disclosure Statement Order, and the

Noteholder Plan Proponents solicited and tabulated votes on the Noteholder Plan in accordance

with the Solicitation Procedures approved by the Bankruptcy Court.  Based on the foregoing, the

Noteholder Plan Proponents satisfy Bankruptcy Code section 1125.

### 2.     *The Noteholder Plan Satisfies Bankruptcy Code Section 1126*

86.     Bankruptcy Code section 1126 specifies the requirements for acceptance of a plan

of reorganization.  *See* 11 U.S.C. § 1126.  Under Bankruptcy Code section 1126, only holders of

allowed claims and allowed equity interests in impaired classes of claims or equity interests that

will receive or retain property under a plan on account of such claims or equity interests may

vote to accept or reject such plan.  11 U.S.C. § 1126(a), (f), (g).

48

87.     Holders of Claims in Classes 1A-111A (Priority Non-Tax Claims), 1B-111B (Other Secured Claims), 2G-49G (Other Non-Guarantor Debtor Claims), 2L-49L (Interests in Non-Guarantor Debtors) and 50L-111L (Interests in Guarantor Debtors) are Unimpaired under the Noteholder Plan.  As a result, pursuant to Bankruptcy Code section 1126(f), Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Noteholder Plan.  Holders of Interests in Class 1L (Tribune Interests) will neither receive nor retain any property under the Noteholder Plan on account of such Interests and are accordingly deemed to have rejected the Noteholder Plan pursuant to Bankruptcy Code section 1126(g).

88.     As to impaired classes entitled to vote to accept or reject a plan, Bankruptcy Code section 1126(c) specifies the requirements for acceptance of a plan by classes of claims:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected the plan.

11 U.S.C. § 1126(c).

89.     Holders of Claims in the Noteholder Plan Voting Classes are Impaired under the Noteholder Plan and are entitled to receive Distribution Trust Interests and, where applicable, Creditors' Trust Interests and, to the extent applicable, Initial Distributions under the Noteholder Plan.  As a result, pursuant to Bankruptcy Code section 1126(a), Holders of Claims in such Impaired Classes were entitled to vote to accept or reject the Noteholder Plan.  As set forth in the Noteholder Specific Disclosure Statement and in the Final Voting Tabulation Report, in accordance with Bankruptcy Code section 1126, acceptances or rejections of the Noteholder Plan were solicited from the Holders of all Allowed Claims in the Noteholder Plan Voting Classes.

As described in the Final Voting Tabulation Report and Section II.E.2 above, the following three Classes affirmatively voted to accept the Noteholder Plan:

- Class 1F (Senior Noteholder Claims);
- Class 1I (PHONES Notes Claims); and
- Class 93G (Other Guarantor Debtor Claims against Tribune CNLBC, LLC).

90. As of the date hereof, Holders of Claims in Classes 1J-111J (Intercompany Claims) have not voted on the Noteholder Plan. Pursuant to Section 4.3 of the Noteholder Plan, the Bankruptcy Court will determine in connection with Confirmation whether Holders of Intercompany Claims will be entitled to vote to accept or reject the Noteholder Plan. Accordingly, acceptances or rejections of the Noteholder Plan were not solicited from Holders of Intercompany Claims.

91. Additionally, as described in the Final Voting Tabulation Report and Section II.E.2 above, the following Classes of Claims voted to reject the Noteholder Plan:

- Class 1C (Step One Senior Loan Claims);
- Classes 50C-111C (Step One Senior Loan Guaranty Claims);
- Class 1D (Step Two Senior Loan Claims);
- Classes 50D-111D (Step Two Senior Loan Guaranty Claims);
- Class 1E (Bridge Loan Claims);
- Classes 50E-111E (Bridge Loan Guaranty Claims);
- Class 1G (Other Parent Claims);
- Classes 50G-57G, 59G, 61G-63G, 65G-66G, 68G-78G, 80G-84G, 88G-90G, 93G-95G, 97G, 99G-101G and 103G-111G (Other Guarantor Debtor Claims against various Guarantor Debtors);
- Class 1H (EGI-TRB LLC Notes Claims); and
- Class 1K (Subordinated Securities Claims).

92.    Finally, as described in the Final Voting Tabulation Report and Section II.E.2
above, no Holders of Claims in the following thirteen Classes voted to accept or reject the
Noteholder Plan and are therefore deemed to have rejected the Noteholder Plan:

- Class 58G (Other Guarantor Debtor Claims against Distribution Systems of America, Inc.);

- Class 60G (Other Guarantor Debtor Claims against Eagle Publishing Investments, LLC);

- Class 64G (Other Guarantor Debtor Claims against Homeowners Realty, Inc.);

- Class 67G (Other Guarantor Debtor Claims against Internet Foreclosure Service, Inc.);

- Class 79G (Other Guarantor Debtor Claims against Stemweb, Inc.);

- Class 85G (Other Guarantor Debtor Claims against TMLH 2, Inc.);

- Class 86G (Other Guarantor Debtor Claims against TMLS I, Inc.);

- Class 87G (Other Guarantor Debtor Claims against TMS Entertainment Guides, Inc.);

- Class 91G (Other Guarantor Debtor Claims against Tribune Broadcasting Holdco, LLC);

- Class 92G (Other Guarantor Debtor Claims against Tribune California Properties, Inc.);

- Class 96G (Other Guarantor Debtor Claims against Tribune Finance, LLC);

- Class 98G (Other Guarantor Debtor Claims against Tribune Manhattan Newspaper Holdings, Inc.); and

- Class 102G (Other Guarantor Debtor Claims against Tribune NM, Inc.).

93.    Despite the rejection of the Noteholder Plan by the Rejecting Classes, the
Noteholder Plan nonetheless may be confirmed pursuant to Bankruptcy Code section 1129(b)
because the Noteholder Plan does not discriminate unfairly and is fair and equitable with respect
to such Classes.  *See* 11 U.S.C. § 1129(b); *see also infra* III.O.

94.    Based upon the foregoing, the requirements of Bankruptcy Code section
1129(a)(2) have been satisfied.

D.     **The Noteholder Plan Has Been Proposed in Good Faith and Not by any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3)**

95.     Bankruptcy Code section 1129(a)(3) requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  The Bankruptcy Code does not define "good faith" as that term is used in section 1129(a)(3).  "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code" in light of the particular facts and circumstances of the case.  *In re Combustion Eng'g, Inc.,* 391 F.3d at 246-247 (quoting *In re PWS Holding Corp.*, 228 F.3d at 242-243 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n. 5 (3d Cir. 1986) and *In re Madison Hotel Assocs.*, 749 F.2d 410, 424-25 (7th Cir. 1984)); *see also In re Burns & Roe Enters.*, No. 08-4191 (GEB), 2009 WL 438694, at *27 (D.N.J. Feb. 23, 2009).  This inquiry typically focuses on whether a plan has been proposed with a legitimate purpose and with a basis for expecting that reorganization consistent with the Bankruptcy Code's objectives can be effectuated.  *See In re Aleris Int'l, Inc.,* No. 09-10478 (BLS), 2010 WL 3492664, at *22 (Bankr. D. Del. May 13, 2010) ("The good faith standard requires only that a debtor propose a plan with the expectation that the debtor can effect a reorganization with results consistent with the purposes and objectives of the Bankruptcy Code.").

96.     As proposed, the Noteholder Plan's purpose and contents are honest, legitimate and viable.  The Noteholder Plan has been proposed with good intentions and a desire to effectuate a full and feasible financial restructuring of the Debtors' enterprise while maximizing value for the benefit of stakeholders and, unlike the DCL Plan, ensuring that all Creditors receive the recoveries to which they are legally entitled.  *See In re Fed.-Mogul Global Inc.*, No. 01-10578 (JKF), 2007 WL 4180545, at *23-24 (Bankr. D. Del. Nov. 16, 2007) (finding the plan was

proposed for the legitimate purpose of maximizing returns to creditors while providing the reorganized debtors with sufficient liquidity and capital). The Noteholder Plan accomplishes this by striking a balance – the balance between the Debtors' ability to emerge from chapter 11 with a restructured, viable capital structure and the preservation of the LBO-Related Causes of Action. These objectives are accomplished in a manner that leaves the Estates themselves unencumbered by litigation regarding the LBO-Related Causes of Action (with such litigation being prosecuted by a Litigation Trust). However, unlike other plans proposed in these Chapter 11 Cases, the Noteholder Plan does not seek to abuse the Bankruptcy Code to impose an unjustifiable settlement for unreasonably low consideration upon the parties that were most injured by the LBO. The Noteholder Plan Proponents believe that once the Debtors emerge from bankruptcy with a capital structure that will afford them with sufficient liquidity and capital resources to satisfy their obligations and otherwise conduct their businesses, the Debtors will have a strong foundation to operate as a profitable enterprise.

97.     In no way does the Noteholder Plan attempt to abuse judicial process, or delay or frustrate the legitimate efforts of creditors to enforce their rights. *See In re Sound Radio, Inc*., 93 B.R. 849, 853 (Bankr. D.N.J. 1988), *aff'd in part*, *remanded in part*, 103 B.R. 521 (D.N.J. 1989) (stating that a finding of bad faith may be appropriate where a plan proponent intends to abuse the judicial process or delay the legitimate efforts of secured creditors). Not surprisingly, the DCL Plan Proponents, nevertheless, object to the Noteholder Plan on the grounds that it was not proposed in good faith. Specifically, the DCL Plan Proponents assert that the Noteholder Plan violates section 1129(a)(3) for the following reasons:

    i.    Uncertainty over who will own the New Common Stock under the Noteholder Plan could harm enterprise value;

ii.    Because a concentrated block of the equity in Reorganized Tribune will be held in the Distribution Trust, minority shareholders would be unable to influence corporate decisions;

iii.    The Noteholder Plan's trust structure would depress the value of minority shares distributed in connection with Initial Distributions;

iv.    The Distribution Trust tax structure likely has adverse tax consequences because it must be treated as owned by a "disputed ownership fund;"

v.    The Noteholder Plan would hand over control over Reorganized Tribune's equity to Aurelius and Wilmington Trust before any adjudication that the Senior Loan Claims might be avoided, subordinated or disallowed;

vi.    The Noteholder Plan fails to settle any of the LBO-Related Causes of Action which results in excessively delaying creditor recoveries;

vii.    The Noteholder Plan offers no effective means of resolving the large number of Claims it seeks to dispute; and

viii.    The Noteholder Plan was proposed with ulterior motives to attempt to extract value from the Estates in the form of higher settlement payments for the Classes controlled by the Noteholder Plan Proponents.

Each of the above objections evidences either a complete lack of understanding of the terms of the Noteholder Plan, or an attempt to mislead the Court as to the fundamental fairness evidenced by the structure of the Noteholder Plan. Each of these objections is addressed below.

   **1. *The Noteholder Plan Does Not Create Uncertain Ownership, Harm Enterprise Value or Depress the Value of New Common Stock***

98.    The DCL Plan Proponents assert that the Noteholder Plan's retention of up to 65% of the equity of Reorganized Tribune within the Distribution Trust creates a situation of "uncertain ownership." This uncertainty, they claim, could result in unspecified "difficulty" finding high-quality "senior managers and directors" and in "executing strategic transactions," since the unidentified future partners "would want to know who they are dealing with" and would be "wary of accepting equity . . . when as much as 65% of its ownership is subject to change at any time, including through a block sale." DCL Objection at 22. *See also* DCL

Objection at 28 ("the ability of the Distribution Trustee at any time to assume or sell control of 65% of the voting equity.").[36]

99.     The DCL Plan Proponents (intentionally) misapprehend the purpose, structure and intent of the Distribution Trust.  First, other than one share of New Class C Common Stock, which as set forth herein and in the Certificate of Incorporation has very limited voting rights, the Distribution Trust will not hold voting equity.  Rather, the Distribution Trust will primarily exist to hold DEV of Reorganized Tribune in the form of New Warrants, New Senior Secured Term Loan and Cash to make distributions in satisfaction of Claims, as indicated in, *inter alia*, the Noteholder Plan, the Noteholder Specific Disclosure Statement, the Distribution Trust Agreement, and numerous other documents.  Second, the Distribution Trust will not be established, and is not intended, to somehow assume control of Reorganized Tribune itself.  The Distribution Trust Agreement provides that the Distribution Trustee "shall act in the best interests of all Beneficiaries and in furtherance of the purpose of the Distribution Trust," that the Trustee shall have "fiduciary duties to the Beneficiaries . . . and shall exercise his, her or its responsibilities accordingly."  Distribution Trust Agreement at ¶ 4.1.  The DCL Plan Proponents offer no reason to assume the Distribution Trustee will not act in furtherance of the purposes of the Distribution Trust or of the Distribution Trustee's own fiduciary duties.

100.     In fact, the Distribution Trust's ability to carry out other functions is extremely limited.  The Distribution Trust, as set forth in the Noteholder Plan, will hold New Warrants with terms and conditions as set forth in the New Warrant Agreement, not New Class A or New Class B Common Stock as the DCL Plan Proponents aver.  The New Warrants bestow on their holder

---

[36] The DCL Plan Proponents also allege that although the Senior Lenders are initially granted the right to appoint five of seven members of the Reorganized Tribune board,  such right does not provide the Senior Lenders with control because the Distribution Trustee can sell control of 65% of the voting equity at any time.  The responses contained in this section apply equally to this unsubstantiated argument.

no voting power and, therefore, no ability to influence the composition of the board of directors of Reorganized Tribune.  Further, the Distribution Trustee is *not specifically empowered to exercise the New Warrants* and therefore cannot "at any time assume . . . control of [any, let alone] 65% of the voting equity" as a result thereof.  DCL Objection at 28.[37]  As holder of one share of New Class C Common Stock, the Distribution Trust is entitled to appoint two of the seven members to the board of directors of Reorganized Tribune, but the Distribution Trustee cannot transfer its share of New Class C Common Stock without the approval of the board of directors.  *See* Proposed Certificate of Incorporation § 4(A)(iii)(d); Noteholder Plan, § 5.4.1 ("New Class C Common Stock may not be transferred without the approval of the board of directors of Reorganized Tribune.").

101.    Moreover, the possibility that the Distribution Trustee would sell New Warrants sufficient to give a single purchaser control over Tribune is too remote to concern potential investors, officers, or strategic partners.  The Distribution Trustee would have to be directed to do so by the Distribution Trust Advisory Board and obtain approval from the Bankruptcy Court.  *See* Noteholder Plan ¶ 7.16.6(a) ("The powers of the Distribution Trustee shall be specified in the Distribution Trust Agreement and shall include the power to: . . . sell assets in the Distribution Trust Reserve at the direction of the Distribution Trust Advisory Board and subject to an order of the Bankruptcy Court."); Distribution Trust Agreement at 4.1 ("the Distribution Trustee shall, subject to the approval of the Distribution Trust Advisory Board . . . calculate and implement all distributions . . . have all such other responsibilities as may be vested in the

---

[37] The Noteholder Plan Proponents believe that the Distribution Trust Agreement is clear regarding the Distribution Trustee's inability to exercise the New Warrants; however, to reconcile any perceived ambiguity, the Distribution Trustee can only exercise the New Warrants in connection with making distributions pursuant to the Litigation Distribution Orders, in which case the Distribution Trust will be able to convert New Warrants, on behalf of the applicable Holder of Distribution Trust Interests, into New Class A Common Stock and/or New Class B Common Stock, based upon the applicable Holder's elections and any applicable FCC restrictions.  If the Noteholder Plan is confirmed, the Distribution Trust Agreement and New Warrant Agreement will be modified to clarify that the Distribution Trustee cannot exercise the New Warrants.

Distribution Trustee pursuant to the Directives and all other orders of the Bankruptcy Court."). Indeed, the Bankruptcy Court must approve all sales of assets valued at $1 million or more from the corpus of the Distribution Trust, and the Distribution Trustee must provide "notice of, and the opportunity for, a hearing on all such motions to all entities who request notice of such matters . . . ."  (*See* Noteholder Plan at ¶ 7.16.7; Distribution Trust Agreement ¶ 4.9(i).)  Any sale of New Warrants sufficient to afford a single purchaser a controlling interest in Reorganized Tribune would most definitely total more than $1 million in value, and would therefore require Court approval and a hearing.  Consequently, the Distribution Trustee could face opposition from numerous entities in any such prospective attempt to persuade the Court to permit a block sale—which sale the Distribution Trust was not established to effect in the first place.

102.    The Distribution Trust would also have to obtain approval of the Federal Communications Commission (the "FCC") for any transaction that effected a change in control, since such change would also transfer control of Tribune's FCC licenses to the new controlling shareholder.[38]  *See* 47 U.S.C. § 310(d) (1996) ("No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of . . . by transfer of control of any corporation holding such permit or license . . . except upon application to the Commission . . . ."); Noteholder Plan Specific Disclosure Statement, § VI(A)(8) ("Except in the case of 'involuntary' assignments, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licenses may be consummated.").  Indeed, the DCL Plan Proponents acknowledge this very fact, albeit without citation or support.  *See* DCL Objection at 23, n. 10 ("because Tribune operates in the media industry, it is subject to regulation by the [FCC], which would need to approve certain ownership changes.").

---

[38] Akin Gump Strauss Hauer & Feld LLP takes no position on matters expressed herein pertaining to the FCC. Lerman Senter PLLC is Aurelius's counsel with respect to FCC matters and has signed this Memorandum in that regard.

103.    The Noteholder Plan and related documents also limit, or provide Reorganized

Tribune with the ability to prevent, the Distribution Trustee from taking any action with respect

to the New Warrants that might run afoul of the Communications Act of 1934, as amended, 47

U.S.C. § 1 et seq. (the "Communications Act") or FCC regulations.  Section 5.4.2(g) of the

Noteholder Plan, for instance, contains procedures for ensuring, in coordination with

Reorganized Tribune, that any distribution of New Common Stock or New Warrants complies

with the Communications Act and the FCC's rules.  Section 5.4.2(g) further expressly prohibits

the Distribution Trustee from undertaking "any distribution to the Holders of Distribution Trust

Interests" requiring FCC consent prior to obtaining such consent.  Further, the proposed

Certificate of Incorporation and the New Warrant Agreement empower Reorganized Tribune to

restrict the transfer of shares, the exercise of warrants, and the conversion of non-voting stock to

voting stock, if any such action would violate communications laws, impair Tribune's business

under communications laws, limit Tribune's ability to acquire television or radio stations or daily

newspapers, or subject Tribune to FCC regulations that would have a material effect on

Tribune's business.  *See* Proposed Certificate of Incorporation § 5A; New Warrant Agreement ¶

4.5.  Notably, Reorganized Tribune's board of directors, not the Distribution Trustee, determines

when to make such a restriction.  *See* Proposed Certificate of Incorporation § 6A.

104.    Additionally, a recipient or purchaser will only be able to exert control over

Reorganized Tribune if it receives, or exercises New Warrants to convert to, New Class A

Common Stock, the only class that may vote to elect members to the board of Reorganized

Tribune.  *See* Proposed Certificate of Incorporation ¶ 4(A)(i)(a).

105.    Finally, the DCL Plan Proponents' assertions of "uncertainty" resulting in

"difficulty" in obtaining quality management or engaging in transactions are bereft of citation or

empirical example.  The DCL Plan Proponents cannot simply utter "difficulty" and expect that such self-serving speculation and *ipse dixit* will carry any weight against the concrete benefits of the Noteholder Plan.  Indeed, the proposed Distribution Trustee and members of the Distribution Trust Advisory Board are highly qualified and experienced individuals backed by equally established organizations, and an excellent predictor of the caliber of directors and officers to which Reorganized Tribune itself can look forward under the Noteholder Plan.  Notably, the DCL Plan Proponents have failed to provide a single example of such "difficulties" despite the fact that dozens of reorganizations have utilized an equity trust on their way to emergence and subsequently prospered on their own or through a merger transaction.[39]

## 2. *The Value of the Minority Interests Will Not Be Noticeably Impaired*

106.    The DCL Plan Proponents also assert that concentration of up to 65% of the equity of Reorganized Tribune in the Distribution Trust will depress the value of the approximately 35% of equity initially distributed.[40]  DCL Objection at 24.  The DCL Plan Proponents explain that this potential  65% "control block," and the Distribution Trustee's purported power to sell the control block without accompanying "minority shareholder

---

[39] *See, e.g.*, *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF) (Bankr. D. Del. Feb. 25, 2005); *In re Fed.-Mogul Global Inc.,* No. 01-10578 (JKF) (Bankr. D. Del. Nov. 5, 2007); *In re Armstrong World Indus. Inc.,* No. 00-4471 (JKF) (Bankr. D. Del. Feb. 21, 2006); *In re Fuller-Austin Insulation Co.*, No. 98-2038 (JJF) (Bankr. D. Del. Sept. 4, 1998); *In re Eagle-Picher Indus.*, No. 91-10100 (BR) (Bankr. S.D. Ohio 1991); *In re Nat'l Gypsum Co.*, No. 90-37213 (HDH) (Bankr. N.D. Tex. Sept. 18, 1992); *In re Raytech Corp., et al.*, No. 89-00293 (AHWS) (Bankr. D. Conn. July 20, 2006); *In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 843 F.2d 636 (2d Cir. 1988); *In re UNR Indus. Inc.*, No. 82-B-9841 (Bankr. N.D. Ill. 1982).

[40] The only precedent the DCL Plan Proponents cite to "support" this argument is contained in a footnote in the Second Circuit's decision in *Eisenberg v. Comm'r of Internal Revenue*, 155 F.3d 50, 53 n.7. (2d Cir 1998). However, this footnote does support the DCL Plan Proponents' assertion that "[i]t is well-settled that the presence of a concentrated block of equity reduces the trading prices of minority holdings on account of 'the minority shareholder's inability to influence corporate decisions.'" DCL Objection at 24.  Rather, the cited footnote merely provides a definition of the term "minority discount."  *Eisenberg*, 155 F.3d at 53 n. 7. Further, *Eisenberg* is inapposite, as the case itself addresses the impact of capital gains tax liabilities on the value of gifted stock for tax purposes, and the value of minority stock was specifically not at issue.  *See id.* at 52.  Accordingly, there is no evidence that the placement of New Warrants in the Distribution Trust Reserve will have any impact on the value of minority shares.

protection structures,"[41] would not "allow the minority shareholders to participate in and enjoy the economic benefit of a control transaction."  *See* DCL Objection at 24.  Notably, the DCL Plan Proponents assert that the Noteholder Plan is ambiguous as to "the form of equity that would be held in the Distribution Trust," and admits that, if that form is New Warrants (which it unambiguously is), then "a buyer could convert the warrants into Class A or Class B shares with approval."  *Id.* at 24, n. 11.

107.    The DCL Plan Proponents' claim once again both misapprehends the purpose of the Distribution Trust and fails to provide any specifics or quantification for the purported harm on which they base their request that the Court reject the Noteholder Plan.  First, as noted above, the chances of, and ability and motivation to execute, the sale of a control block of the equity through a sale of the New Warrants are remote at best, and therefore should not affect the position or value of the minority interests.  The DCL Plan Proponents do not even repeat their assertion that the Distribution Trustee could exercise the New Warrants itself and thereby obtain control of Reorganized Tribune (which it is not authorized to do).  Additionally, as noted above, plans like the Noteholder Plan that include a trust that retains value of the reorganized debtor after emergence are regularly approved.  Finally, the DCL Plan Proponents' concerns ring hollow, since, at emergence, the Senior Lenders will have the greatest ability to shape the composition of the board of Reorganized Tribune, as they will designate four directors and, as the charts below indicate, always control a majority of the New Common Stock.[42]

---

[41]Interestingly, the DCL Plan does not contemplate any minority shareholder protections; yet, the DCL Plan Proponents complain about the perceived lack of minority shareholder protections under the Noteholder Plan.

[42] Under every conceivable outcome in these cases, the Senior Lenders will own a majority of the New Common Stock.  Further, the timing of the Senior Lenders' receipt of much of their interests is entirely within their control. Pursuant to the terms of the Noteholder Plan, the New Common Stock will be allocated among 5 buckets:  (i) Initial Distributions to Step One Lenders; (ii) potential Initial Distributions to Step Two Lenders; (iii) a reserve for the Bridge Lenders; (iv) Initial Distributions to Non-LBO Creditors; and (v) reserves for the Distribution Trust.  The charts below show how the New Common Stock will be allocated (based on both a $6.75 billion DEV and $8.331 billion DEV) among the five groups where (a) the Senior Loan Claims Sharing Resolution is unresolved or resolved



**Initial Equity Allocations – at $8.331B DEV\*, \*\***



■ Step One Lender Claims - Initial Distribution
■ Step Two Lender Claims - Initial Distribution/Reserve
■ Bridge Loan Claims - Reserve
■ Non-LBO Creditors - Initial Distribution
■ Non-LBO Debt Reserve DEV

**Initial Equity Allocations – at $6.750B DEV\*, \*\***



■ Step One Lender Claims - Initial Distribution
■ Step Two Lender Claims - Initial Distribution/Reserve
■ Bridge Loan Claims - Reserve
■ Non-LBO Creditors - Initial Distribution
■ Non-LBO Debt Reserve DEV

\*       *Percentages assume that all Initial Distributions are in the form of New Class A Common Stock and New Warrants allocable to the Distribution Trust on an as-converted basis.*

\*\*     *Percentages assume PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

108.    Moreover, even if the remote possibility of a control sale does result in some (unquantified) decrease in the value of the minority shares, such a discount will not be significant in Delaware, given the state's restrictions on the actions of controlling shareholders.  *See* 8 Del. C. § 102 (b)(7) (discussing liability of directors for breach of fiduciary duty); 8 Del. C. § 141 (describing limits on the actions of directors and committees); 8 Del. C. § 144 (setting forth restrictions on interested director actions); *see also* Ronald J. Gilson and Jeffrey N. Gordon, *Controlling Controlling Shareholders*, 152 U. Pa. L. Rev. 785, 841 (2003).

109.    Additionally, the DCL Plan Proponents' assertion that the New Class C Common Stock provides the Distribution Trust with a "veto" over "certain strategic transactions" is unsupported.  *See* DCL Objection at 28; n. 15.  In fact, the New Class C Common Stock permits the Distribution Trust to vote only on a handful of governance issues, which are limited to protecting and preserving the existing rights and preferences of the New Class C Common Stock and which do not give the holder of the New Class C Common Stock the general power to

---

such that sharing among the Step One Lenders and Step Two Lenders does not apply if only the Step Two Lender Claims are avoided and (b) the PHONES Notes Claims are allowed in the amount of $1.197 billion –which is the scenario where the *least* amount of initial distributions will be made to the Senior Lenders.

approve or veto "certain strategic transactions."  The DCL Plan Proponents cite the proposed

Certificate of Incorporation, § 4, the New Warrant Agreement, § 4, and the Noteholder Plan,

§ 5.4.1, in support of this assertion, but none of these actually indicate that the Distribution Trust

has veto power.  Instead, these citations describe the limited governance issues upon which New

Class C Common Stock may be voted.  Indeed, even if a proposed transaction fell under the type

of transaction upon which the New Class C Common Stock has a separate class vote, there is no

reason to presume that the Distribution Trust would oppose a transaction that would benefit

Reorganized Tribune – as to do so would run afoul of the fiduciary duties imposed on the

Distribution Trustee and Distribution Trust Advisory Board.  *See* Noteholder Plan §§ 7.16.6,

7.16.7; Distribution Trust Agreement §§ 4.1, 6.2.  Again, the DCL Plan Proponents' attack on

the Noteholder Plan offers only rank speculation and misinterpretation in an effort to derail its

confirmation.

        **3.**    ***The Distribution Trust Tax Structure Is Not Intended to Have Adverse Tax Consequences***

110.    The DCL Plan Proponents dispute the veracity of the good faith nature of the

Noteholder Plan through their assertions that the Distribution Trust structure will likely have

adverse tax consequences because any income earned on the Distribution Trust Assets would

likely be taxed at corporate or higher rates because the Distribution Trust must be treated as

owned by a "disputed ownership fund."  This objection, like the rest of the DCL Plan

Proponents' objections, lacks merit.  First, the Distribution Trust DOF shall be equal *only* to the

amount of Net Distribution Trust Proceeds necessary to satisfy the distributions to which the

Holders of Disputed General Unsecured Claims and Step Two Senior Loan Claims (to the extent

entitled to Initial Distributions under the Senior Loan Claim Sharing Resolution) may be entitled.

Second, the Noteholder Plan and the Distribution Trust Agreement demonstrate clear intent to

treat the Distribution Trust as a liquidating trust taxable as a grantor trust from the date of its inception. *See* Noteholder Plan § 7.16.14(a)(i); *see also* Distribution Trust Agreement at 1. Under Treasury Regulation § 1.468B-9(b)(i)(iv), a liquidating trust is not treated as a disputed ownership fund unless the trustee elects such treatment under Treasury Regulation § 1.468B-9(c)(2)(ii). *See* Treas. Reg. § 1.468B-9(b)(i); 1.468B-9(b)(iv); 1.468B-9(c)(2)(ii) Otherwise, the presumption is that the trust is taxable as a grantor trust. Treatment as a grantor trust avoids an entity-level tax, as the Distribution Trust Assets will be treated as owned directly by the Creditors. The Distribution Trust Agreement provides that the Distribution Trustee, subject to the approval of the Distribution Trust Advisory Board, will determine an appropriate method for allocating all items of income, gain, loss, deduction and credit among the trust beneficiaries and the disputed ownership fund in accordance with the Distribution Trust's treatment as a grantor trust. Distribution Trust Agreement at ¶ 4.2. The Distribution Trustee is also empowered by the Distribution Trust Agreement to seek a private letter ruling regarding the tax treatment of the Distribution Trust to ensure the Distribution Trust's treatment as a grantor trust. *See* Distribution Trust Agreement at ¶ 4.8(i). Accordingly, the Distribution Trust is not intended to have adverse tax consequences to Creditors.

### 4. *The Noteholder Plan Does Not Give Aurelius Control Over Reorganized Tribune*

111.    Contrary to the DCL Plan Proponents' objections, the Noteholder Plan does not give Aurelius control over Reorganized Tribune through its ability to designate two members to the initial board of Reorganized Tribune, and Aurelius's ability to designate the Distribution Trustee and two members of the Distribution Trust Advisory Board.

112.    First, there is no support for the assumption that the two initial directors designated by Aurelius, who must be independent of Aurelius, will ignore their proper roles and

clear fiduciary duties and act instead in Aurelius's interest.  Delaware has long imposed strict

fiduciary duties upon directors.  *See, e.g.*, *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)

("[c]orporate officers and directors are not permitted to use their position of trust and confidence

to further their private interests … public policy . . . has established a rule that demands of a

corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his

duty . . . .").  Asserting that a director will act contrary to this duty turns the presumption on its

head*.  See Ash v. McCall*, No. A-17132, 2000 WL 1370341, at *7 (Del. Ch. Ct. Sept. 15, 2000)

(rejecting conclusory allegations of dominance and control of "non-management, outside

directors"); *In re Formica Corp. Shareholders Litig.*, No. 10598, 1989 WL 25812, at *11 (Del.

Ch. Ct. Mar. 22, 1989) (dismissing motion for preliminary injunction due, in part, to movants'

failure to provide "substantial evidence that the independent directors abdicated their fiduciary

responsibilities").  In fact, independent directors regularly act in the interest of the corporations

on whose boards they serve and against the interest of the concerns that appointed them.  *See,*

*e.g.*, *Air Prod. & Chems., Inc. v. Airgas, Inc.*, Nos. 5249-CC, 5256-CC, 2011 WL 519735 at *46

(Del. Ch. Feb. 15, 2011) (directors elected to the Airgas board by Air Products joined in rejecting

Air Products' tender offer as inadequate, believing "it is their fiduciary duty to keep Airgas's

defenses in place.").  Notably, a Delaware court will not even conclude, without further inquiry,

that an *interested* director has acted in breach of his fiduciary duty.  *See In re Transkaryotic*

*Therapies, Inc.*, 954 A.2d 346, 366-369 (Del. Ch. 2008) (court found no breach of duty where

corporate director of target company had relationship with CEO of acquirer).  Consequently, the

Court should likewise presume that the two independent directors whom Aurelius initially

designates to the board of Reorganized Tribune, subject to final approval by the Bankruptcy

Court in the Confirmation Order, and further subject to removal by the Distribution Trustee at

the direction of the Distribution Trust Advisory Board at any time, with or without cause, will abide by their fiduciary duties and thereby avoid personal liability and professional embarrassment.

113.    Second, like its designees to the board of Reorganized Tribune, the Distribution Trustee and two members of the Distribution Trust Advisory Board initially designated by Aurelius, but subject to final appointment by the Bankruptcy Court in the Confirmation Order, must also be independent of Aurelius.

114.    The proposed initial Distribution Trustee is Quest Turnaround Advisors, LLC ("Quest"), which has specialized in turnaround and distressed situations for more than a decade and is overseeing the reorganization plan of Adelphia Communications.  *See* Distribution Trust Agreement Ex. A.  Plainly, Aurelius sought out and appointed a highly qualified Distribution Trustee that understands its independence and other obligations in a reorganization.

115.    Aurelius's designees to the Distribution Trust Advisory Board are likewise highly qualified and above reproach.  Appointee Jon Lukomnik is the managing partner of an asset management and corporate governance consulting concern, as well as the trustee of a family of mutual funds and two litigation trusts, and an experienced member of creditor committees and boards of directors.  *See* Distribution Trust Agreement Ex. B.  Appointee Kurt Schacht is the managing director for the CFA Institute's advocacy and policy division, and therefore responsible for developing and promoting the Code of Ethics and Standards of Professional Conduct for CFA charter holders and the Asset Manager Code of Professional Conduct.  He also has two decades of investment management experience.  *See id.*  Like their appointed Distribution Trustee, Aurelius's Distribution Trust Advisory Board appointees undoubtedly

understand the nature of their obligations and duties, and have the experience to execute them well and faithfully.

116.     Accordingly, the DCL Plan Proponents' assertion that Aurelius will have any control, much less improper control, over Reorganized Tribune lacks merit.

### 5.    *The Noteholder Plan Does Not Excessively Delay Creditor Recoveries*

117.     The DCL Plan Proponents allege that the Noteholder Plan was not proposed in good faith because it fails to settle LBO-Related Causes of Action and excessively delays creditor recoveries.  *See* DCL Objection at 29-32.  To the contrary, the fact that the Noteholder Plan does not settle LBO-Related Causes of Action for artificially low consideration but, rather, ensures the maximization of creditor recoveries is one of the primary reasons why the Noteholder Plan, and not the DCL Plan, satisfies Bankruptcy Code section 1129(a)(3).  *See* DCL Objection at 22, citing *In re G-I Holdings Inc.*, 420 B.R. 216, 263 (D.N.J. 2009) (plan satisfied 1129(a) where it is "proposed with the legitimate purpose of . . . maximizing the returns available to creditors"); *see also In re Allegheny Int'l, Inc.*, 118 B.R. 282, 299 (Bankr. W.D. Pa. 1990) ("The purpose of reorganization is to offer an opportunity to maximize results for all creditors and interest holders.").

118.     The Noteholder Plan, despite its reserve structure, also does not excessively delay creditor recoveries.  Contrary to the arguments advanced in the DCL Objection, the Noteholder Plan does not preclude a settlement of any of the Trust Causes of Action and, in fact, will enable the parties to conduct true arms-length negotiations without forcing the Debtors to prolong their stay in chapter 11.  In addition, notwithstanding the likely avoidance of the LBO Lenders' Claims, the Noteholder Plan estimates that between at least 34.7% and at least 40.5% of the

DEV[43] will be distributed on the Effective Date, a substantial portion of which will be distributed

to the LBO Lenders.  Indeed, after taking into account Initial Distributions to Non-LBO

Creditors and sufficient reserves to pay Non-LBO Creditors in full, the Noteholder Plan

Proponents estimate that at least approximately 52.3% of the DEV at a $6.75 billion valuation or

61.4% of the DEV at an $8.331 billion valuation will be distributed to the LBO Lenders even if

all of their Claims are avoided.  And substantially all of this value can be distributed to the

Senior Lenders on the Effective Date if the Senior Loan Claims Sharing Resolution is resolved.

In that regard, if the Step One Lenders and Step Two Lenders stipulate that if, notwithstanding

the avoidance of the Step Two Lender Claims, the Step One Lenders will be required to share

their recoveries with the Step Two Lenders, the Holders of such Claims are estimated to receive

Initial Distributions of at least 34.2% (at a $6.75 billion DEV) or 49.5% (at an $8.331 billion

DEV), accounting for 44.2% and 51.9% of the New Common Stock, respectively.  Accordingly,

the DCL Plan Proponents' assertion that the Noteholder Plan delays distributions and is

structured in a manner to further the ulterior motives of the Senior Noteholders and Holders of

PHONES Notes Claims rings hollow.

### 6.   *The Noteholder Plan Contains Appropriate Claims Reconciliation Procedures*

119.    The DCL Plan Proponents take issue with the Trust structure of the Noteholder

Plan on the grounds that it will prevent the effective resolution of Disputed Claims.  This

objection is especially tenuous.  Claims in chapter 11 cases are routinely resolved by litigation

trusts and liquidation trusts using the same mechanisms provided for in the Noteholder Plan.

---

[43] The range of DEV distributed in Initial Distributions is dependent on multiple factors including the actual DEV determined by the Court, whether the Senior Loan Claims Sharing Resolution is resolved in connection with Confirmation and the ultimate classification and treatment of the PHONES Notes Exchange Claims. The low end of the range assumes a DEV of $6.75 billion as proposed by the DCL Plan Proponents, and the high end of the range assumes a DEV of $8.331 billion as advocated by the Noteholder Plan Proponents.

*See, e.g., In re Pegasus Satellite Television Inc., et al.*, No. 04-20878 (Bankr. D. Me. Jan. 31, 2005); *In re First Magnus Fin. Corp.*, No. 4:07-BK-01578 (JMM) (Bankr. D. Ariz. Oct. 30, 2007).

120.    Indeed, assertions that every single Step One Lender or Step Two Lender would need to approve a proposed settlement under Bankruptcy Rule 9019 (to the extent the Senior Lenders would ever actually engage the Litigation Trustee in good faith settlement negotiations as they have failed to do with the Noteholder Plan Proponents) are not supported by applicable law. *See, e.g., In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 517-518 (Bankr. D. Del. 2010) (approving settlement of fraudulent transfer action against debtor's prepetition secured lenders and resolving such lenders' claims outside of plan of reorganization over objection of creditors committee). In *Capmark*, the settlement agreement was negotiated between the debtors and an ad hoc committee of prepetition secured lenders. Based on the Bankruptcy Rule 2019 statement filed by counsel to the ad hoc committee, the ad hoc committee members held approximately $620.5 million of the $1.1 billion of obligations under the prepetition secured credit facility. The settlement agreement addressed the issue of binding the lenders that were not part of the ad hoc committee by providing for the distribution of opt-out notices to all of the lenders under the prepetition secured credit facility. The lenders were bound unless they returned the opt-out notice. If the debtors reached a subsequent settlement with any opt-out lender that was more favorable to such opt-out lender than the settlement approved by the court, the debtors were required to offer each of the settling lenders the option to accept the treatment provided to the opt-out lender. There is no reason why, if a settlement is reached among the Litigation Trust and certain Senior Lenders, why a process similar to the foregoing could not be utilized.

Accordingly, the DCL Plan Proponents' objection that a settlement of the LBO-Related Causes

of Action or any Disputed Claim could not bind dissenters is unavailing.

      **7.**    ***The Noteholder Plan was Not Proposed with Ulterior Motives to Attempt to Extract Value from the Estates in the Form of Higher Settlement Payments for the Classes the Noteholder Plan Proponents Control***

121.    Contrary to the DCL Plan Proponents' protestations, the Noteholder Plan was not

proposed in an attempt to obtain a higher settlement payment than the "consideration"

contemplated by the DCL Plan for the release of all LBO-Related Causes of Action against

current and former Step One Lenders, Step Two Lenders and Bridge Lenders.  Rather, it was

proposed to ensure that Non-LBO Creditors would receive the recoveries to which they are

legally entitled and to implement procedures to ensure that objective is achieved.  In fact, all of

the "examples" of ulterior motives cited by the DCL Plan Proponents further this basic tenet of

bankruptcy law:

- The establishment of the Distribution Trust Reserve ensures sufficient value is reserved to satisfy Non-LBO Creditors' Claims in full if the LBO-Related Causes of Action are successfully prosecuted.  The selection of a Distribution Trustee and Distribution Trust Advisory Board members who are independent of Aurelius, subject to fiduciary duties and subject to Bankruptcy Court approval, ensures that (i) no party can allege bias by such parties in favor of Aurelius and (ii) the Bankruptcy Court believes such parties are qualified to serve in the positions for which they have been designated.

- The provision of $40 million in funding for the Trusts is appropriate to ensure that the Trusts have sufficient financing to satisfy their duties and obligations.  Moreover, the funding by the Estates of a grant is eminently appropriate in light of the fact that the LBO-Related Causes of Action should have been commenced and prosecuted shortly after the filing of these Chapter 11 Cases, in which case the Estates would have borne the cost of litigation, and not over two years later.  Furthermore, any portion of the Distribution Trust Initial Funding that has not been utilized prior to the wind-up of the Distribution Trust will revert back to the Reorganized Debtors.

- The Noteholder Plan Proponents do not seek to unnecessarily hold back DEV. First, it is contemplated that a portion of the DEV held in the Distribution Trust Reserve will be distributed upon a determination of the Senior Loan Claims Sharing Resolution, to the extent it is not determined in connection with Confirmation. As noted elsewhere herein, the Noteholder Plan Proponents do not have a stake in the outcome of the Senior Loan Claims Sharing Resolution and, were the Senior Lenders to obtain a court order or otherwise stipulate to a resolution regarding the applicability of the sharing provisions of section 2.13 of the Senior Loan Agreement in the event that Step Two Senior Lender Claims are avoided, the dedicated amount held in the Distribution Trust Reserve pending such resolution will be released to the Step Two Lenders. Similarly, the Bridge Lenders are not precluded from sharing in the DEV held in the Distribution Trust Reserve and may, in fact, be entitled to share in distributions of such DEV if certain issues related to the Bridge Loan Claims, including their right to share in distributions Pro Rata with the Senior Lenders, are determined in favor of the Bridge Lenders.

122.    In sum, the Noteholder Plan accomplishes the goals of the Bankruptcy Code —

providing the Debtors with a fresh start while maximizing value for stakeholders. Based on the

foregoing, the Noteholder Plan has been proposed in good faith and not by any means forbidden

by law and, therefore, satisfies Bankruptcy Code section 1129(a)(3).

### E.    The Noteholder Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments – 11 U.S.C. § 1129(a)(4)

123.    Bankruptcy Code section 1129(a)(4) requires that certain professional fees and

expenses paid by the plan proponent, the debtor or by certain other parties be subject to approval

of the Bankruptcy Court as reasonable. *See* 11 U.S.C. § 1129(a)(4).

124.    In accordance with Bankruptcy Code section 1129(a)(4), and except as otherwise

provided for in Section 9.1 of the Noteholder Plan, all payments made or to be made by the

Debtors for compensation or reimbursement of fees of any professional employed pursuant to

sections 327 or 1103 of the Bankruptcy Code or otherwise in the Chapter 11 Cases, including

any Claims for making a substantial contribution under Bankruptcy Code section 503(b)(4), will

70

be paid only after allowance of such Claims by the Bankruptcy Court to the extent not already

approved and paid in accordance with orders of the Bankruptcy Court. *See* Noteholder Plan

§ 9.2. In addition, the fee examiner appointed in the Chapter 11 Cases will continue to perform

its services after the Effective Date and the Bankruptcy Court will retain jurisdiction after the

Effective Date to grant or deny applications for allowance of Claims for professional fees or

reimbursement of expenses authorized pursuant to orders of the Bankruptcy Court.

125.     In addition, as noted in the Objection Chart attached hereto as Exhibit B, in order

to address the U.S. Trustee's objection to the Noteholder Plan, the following language has been

added to Section 9.1 of the Noteholder Plan:

> Within ninety (90) days of the Effective Date, each of the
> professionals retained by the [Noteholder Plan] Proponents shall
> file with the Bankruptcy Court an application, together with
> detailed invoices annexed thereto, requesting payment for
> reasonable fees and expenses incurred during the period from the
> Petition Date through and including the Effective Date, in
> connection with the Chapter 11 Cases, the Noteholder Plan, or the
> transactions contemplated therein (including, without limitation,
> investigating, negotiating, documenting, and completing such
> transactions and enforcing, attempting to enforce, and preserving
> any right or remedy contemplated in the Chapter 11 Cases).
> Within ten (10) Business Days of the entry of a Final Order by the
> Bankruptcy Court approving the payment thereof, in whole or in
> part, the Disbursing Agent shall pay such fees and expenses so
> approved.

Noteholder Plan at 9.1.1.

126.     Based upon the foregoing, the Noteholder Plan satisfies the requirements of

Bankruptcy Code section 1129(a)(4).

**F.     The Proposed Disclosure Regarding Post-Emergence Directors and Officers
Is Appropriate – 11 U.S.C. § 1129(a)(5)**

127.     Bankruptcy Code section 1129(a)(5) requires that, prior to confirmation, the

proponent of a plan disclose the identity and affiliations of the individuals proposed to serve as

directors and officers of the reorganized debtors and that the appointment or continuance of such

officers and directors be consistent with the interests of creditors, equity security holders and

with public policy.  11 U.S.C. § 1129(a)(5)(A).  Bankruptcy Code section 1129(a)(5)(B) also

requires disclosure of the identity of any "insider," within the meaning of section 101(31), to be

employed or retained by the reorganized debtor and the "nature of any compensation for such

insider."  11 U.S.C. § 1129(a)(5)(B).

128.    Here, in accordance with Section 5.3.2 of the Noteholder Plan, the Noteholder

Plan Proponents will provide the identity of directors and officers of Reorganized Tribune at

least five days prior to the Confirmation Hearing.[44]  None of the initial directors proposed by

Aurelius under the Noteholder Plan will be "insiders" within the meaning of the Bankruptcy

Code, nor will any initial director, other than the chief executive officer (to the extent the

position is not vacant on the Effective Date; *provided*, *however*, that the chief executive officer

shall serve as an initial director only in the event that the employment agreement with such chief

executive officer so provides) be a prior officer or director of Tribune.

129.    The Noteholder Plan Proponents intend to adopt the officers for Reorganized

Tribune that will be disclosed by the Debtors in Exhibit 5.3.2(1) of the DCL Plan Supplement (as

may be modified by the Noteholder Plan Proponents in their sole discretion, provided that the

Noteholder Plan Proponents shall file an amended Exhibit 5.3.2(1) with the Bankruptcy Court in

the event they make any such modifications).  Upon information and belief, many of the Persons

listed in Exhibit 5.3.2(1) of the DCL Plan Supplement may be prior officers and/or directors of

---

[44] Notwithstanding the above, Section 5.3.2 of the Noteholder Plan explicitly provides for the contingency if the Senior Lenders fail to designate the four initial members of the board of directors of Reorganized Tribune allotted to them under the Noteholder Plan prior to the deadline for the Noteholder Plan Proponents to disclose the proposed initial board members of Reorganized Tribune with the Bankruptcy Court.  In such an event, Reorganized Tribune shall, as soon as practicable after the Effective Date, hold a special election to appoint the four initial board members otherwise allocable to the Senior Lenders, and the members elected to the initial board in connection with such special election shall be deemed to be the designees of the Senior Lenders under the Noteholder Plan.

the Debtors.  Further, to the extent any such officers qualify as "insiders" within the meaning of

Bankruptcy Code section 101(31), the Noteholder Plan Proponents intend to rely on the

disclosure of such insider status as may be set forth in Exhibit 5.3.2(1) of the DCL Plan

Supplement (unless modified by the Noteholder Plan Proponents, in which case the Noteholder

Plan Proponents shall make any relevant disclosure in the amended Exhibit 5.3.2(1)).

130.    Based upon the foregoing, the Noteholder Plan satisfies the requirements of

Bankruptcy Code section 1129(a)(5)(B).

### G.    The Noteholder Plan Does Not Contain Rate Changes Subject to the Jurisdiction of any Government Commission – 11 U.S.C. § 1129(a)(6)

131.    Bankruptcy Code section 1129(a)(6) permits confirmation only if any regulatory

commission that will have jurisdiction over the debtor after confirmation has approved any rate

change provided for in the plan of reorganization.  *See* 11 U.S.C. § 1129(a)(6).  Bankruptcy

Code section 1129(a)(6) is inapplicable to these Chapter 11 Cases because the Debtors'

businesses do not involve the establishment of rates subject to approval of any governmental

regulatory commission.

### H.    The Noteholder Plan Is in the Best Interests of Creditors and Interest Holders – 11 U.S.C. § 1129(a)(7)

132.    Bankruptcy Code section 1129(a)(7) sets forth the "best interests test," which

mandates that, within each class, each holder of a claim or an equity interest in such class either:

(i)     has accepted the plan; or

(ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtors were liquidated under chapter 7 of [the Bankruptcy Code] on such date.

11 U.S.C. § 1129(a)(7)(A)(i)-(ii).

133.    The focus of the best interests test is on individual dissenting creditors rather than

classes of claims.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526

U.S. 434, 441 (1999).  Under the best interests test, the court must find that each non-accepting

creditor will receive or retain value that is not less than the amount it would receive if the debtor

were liquidated in a hypothetical proceeding under chapter 7 of the Bankruptcy Code.  *See id.*;

*U.S. v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996); *see also In re*

*Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003).  As Bankruptcy Code section 1129(a)(7)

makes clear, the best interests test applies only to non-accepting holders of impaired claims or

equity interests.  A court, in considering whether a plan satisfies the best interests test, is not

required to consider any alternative to the plan other than the distribution projected in a

liquidation of all of the debtor's assets under chapter 7 of the Bankruptcy Code.  *See In re*

*Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297-298 (Bankr. S.D.N.Y. 1990).

134.    The Noteholder Plan contemplates distributions to 252 Impaired Classes,[45] as well

as to 269 Unimpaired Classes.[46]  In addition, Intercompany Claims (Classes 1J-111J) are

Impaired under the Noteholder Plan.  However, Holders of such Intercompany Claims will not

receive any distributions under the Noteholder Plan but, rather, value will be allocated to the

applicable Debtor entities based on, among other things, the allowed amount of Intercompany

Claims under the Intercompany Claims Settlement and in accordance with the Court's ultimate

determination on DEV in connection with Confirmation.  The Noteholder Plan contemplates no

distributions to Holders of Interests in Classes 1L-111L (Tribune Interests, Interests in Non-

---

[45] The Impaired Classes entitled to receive distributions under the Noteholder Plan are Classes 1C and 50C-111C (Step One Senior Lender Claims), Classes 1D and 50D-111D (Step Two Senior Lender Claims), Classes 1E and 50E-111E (Bridge Loan Lender Claims), Class 1F (Senior Noteholder Claims), Classes 1G and 50G-111G (Other Parent Claims and Other Guarantor Debtor Claims), Class 1H (EGI-TRB LLC Notes Claims), Class 1I (PHONES Notes Claims) and Class 1K (Subordinated Securities Claims).

[46] The Unimpaired Classes receiving distributions under the Noteholder Plan are Classes 1A-111A (Priority Non-Tax Claims), Classes 1B-111B (Other Secured Claims) and Classes 2G-49G (Other Non-Guarantor Debtor Claims).

Guarantor Debtors and Interests in Guarantor Debtors); however, while Holders of Interests in

Class 1L (Interests in Tribune) will have their Interests extinguished and are therefore Impaired

under the Noteholder Plan, Holders of Interests in Classes 2L-111L (Interests in Non-Guarantor

Debtors and Interests in Guarantor Debtors) will have their Interests reinstated under the

Noteholder Plan for administrative convenience, and are therefore Unimpaired under the

Noteholder Plan.

135.    In the instant case, the best interests test is inapplicable to Classes 1A-111A

(Priority Non-Tax Claims), Classes 1B-111B (Other Secured Claims), Classes 2G-49G (Other

Non-Guarantor Debtor Claims) and Classes 2L-111L because each Class is Unimpaired and,

pursuant to Bankruptcy Code section 1126(f), deemed to have accepted the Noteholder Plan.  To

satisfy the best interests test with respect to the remaining Classes, the Noteholder Plan

Proponents must demonstrate that each Holder of Claims or Interests in such Classes will receive

at least as much under the Noteholder Plan as it would receive in a liquidation under chapter 7 of

the Bankruptcy Code.  *See In re Lason, Inc*., 300 B.R. at 232 ("Section 1129(a)(7)(A) requires a

determination whether 'a prompt chapter 7 liquidation would provide a better return to particular

creditors or interest holders than a chapter 11 reorganization.'") (citing *In re Sierra-Cal.*, 210

B.R. 168, 171-172 (Bankr. E.D. Cal. 1997)).

136.    Here, the Noteholder Plan satisfies the best interests test as demonstrated by

comparing (i) the Noteholder Plan's projected recoveries, set forth in the Illustrative Recovery

Charts (and the Revised Estimated Recovery Charts), (ii) the estimated liquidation recoveries

under the Noteholder Plan, as set forth in Article IV of the Noteholder Specific Disclosure

Statement and (iii) the Liquidation Analysis set forth in Exhibit D to the General Disclosure

Statement.[47]  Such comparisons reveal that Holders of Claims and Interests in all Classes that are

Impaired under the Noteholder Plan likely would realize significantly less upon disposition of

the Debtors' assets in a hypothetical chapter 7 liquidation than the value of the recoveries to such

Classes provided for under the Noteholder Plan and that, in fact, the Noteholder Plan provides a

higher ultimate distribution to Impaired Classes in either a high or low value liquidation

scenario.  Based upon the foregoing, the Noteholder Plan satisfies the requirements of

Bankruptcy Code section 1129(a)(7).

### I.      Acceptance of Impaired Classes – 11 U.S.C. § 1129(a)(8)

137.    Subject to the exceptions contained in Bankruptcy Code section 1129(b),

Bankruptcy Code section 1129(a)(8) requires that each class of impaired claims or interests must

either accept a plan or be unimpaired thereunder.  *See* 11 U.S.C. § 1129(a)(8).  Pursuant to

Bankruptcy Code section 1126(c), a class of impaired claims accepts a plan if the holders who

vote to accept the plan constitute at least two-thirds in dollar amount and more than one-half in

number of the claims in that class that actually vote to accept or reject the plan.

138.    Classes 1A-111A (Priority Non-Tax Claims), Classes 1B-111B (Other Secured

Claims), Classes 2G-49G (Other Non-Guarantor Debtor Claims) and Classes 2L-111L (Interests

in Other Non-Guarantor Debtors and Interests in Guarantor Debtors) are Unimpaired under the

Noteholder Plan and are conclusively presumed to have accepted the Noteholder Plan pursuant

to Bankruptcy Code section 1126(f).

---

[47] All liquidation values set forth in the Noteholder Specific Disclosure Statement apply the Debtors' Liquidation
Analysis, as set forth in Exhibit D to the General Disclosure Statement.  Although the Debtors' Liquidation Analysis
contemplates an entity-by-entity valuation, it does not set forth an illustrative Liquidation Value split between
Tribune and its Subsidiaries.  Accordingly, for illustrative purposes and to facilitate a comparison on an apples-to-
apples basis with the recovery scenarios outlined under the Noteholder Plan, Article IV of the Noteholder Specific
Disclosure Statement assumes that 8.4% of the Liquidation Value is allocable to Tribune and the remaining 91.6%
of the Liquidation Value is allocable to the Subsidiaries.

139.    The following three Classes of Claims affirmatively voted in favor of the Noteholder Plan:

- Class 1F (Senior Noteholder Claims);
- Class 1I (PHONES Notes Claims); and
- Class 93G (Other Guarantor Debtor Claims against Tribune CNLBC, LLC).

140.    Nonetheless, the Rejecting Classes either voted against the Noteholder Plan or are deemed to have voted against the Noteholder Plan.  Accordingly, Bankruptcy Code section 1129(a)(8) is not satisfied with respect to the Rejecting Classes.  Nevertheless, Bankruptcy Code section 1129(b) provides the mechanism by which the Noteholder Plan may be confirmed over the rejection of the Rejecting Classes.  As discussed more fully below, the Noteholder Plan Proponents have satisfied Bankruptcy Code section 1129(a)(10) because at least one Impaired Class has accepted the Noteholder Plan.  *See infra* Section III.K.

**J.**    **The Noteholder Plan Provides for Payment of Priority Claims – 11 U.S.C. § 1129(a)(9)**

141.    Bankruptcy Code section 1129(a)(9) requires a chapter 11 plan to provide that all persons holding claims entitled to priority under Bankruptcy Code section 507(a) will be fully compensated for their claims in cash unless the holder of a particular claim agrees to a different treatment with respect to such claim.  *See* 11 U.S.C. § 1129(a)(9).

142.    In accordance with Bankruptcy Code section 1129(a)(9), Section 2.1 of the Noteholder Plan provides that all Allowed DIP Facility Claims shall be paid in full, in Cash, on or as soon as reasonably practicable after the Effective Date.[48]  Section 2.2 of the Noteholder

---

[48] Section 2.2 of the Noteholder Plan further provides that any unexpired letters of credit outstanding under the DIP Facility shall be, at Reorganized Tribune's option (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit, (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit or (iv) otherwise deemed to be subject to reimbursement pursuant to the terms and conditions of the Exit Facility.

Plan provides that each Allowed Administrative Expense Claim will be paid in full, in Cash on the later of (i) the Effective Date if due on or before that date, (ii) the date upon which such Administrative Expense Claim becomes an Allowed Claim, (iii) such time as the Administrative Expense Claim becomes due in the ordinary course of business or (iv) such other date that is agreed upon by the Holder of an Administrative Expense Claim and the Reorganized Debtors. Section 2.3 of the Noteholder Plan provides that each Holder of an Allowed Priority Tax Claim will receive, at the Reorganized Debtors' option, either (i) payment in full, in Cash, (ii) regular installment payments in Cash equal to the Allowed amount of such Priority Tax Claim over a period ending not later than the fifth anniversary of the Petition Date (as permitted by Bankruptcy Code section 1129(a)(9)(C)) or (iii) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors. Based upon the foregoing, the Noteholder Plan satisfies the requirement of section Bankruptcy Code 1129(a)(9).

**K.    The Noteholder Plan Has Been Accepted by at Least One Impaired Class Entitled to Vote – Section 1129(a)(10)**

143.    Bankruptcy Code section 1129(a)(10) requires that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As set forth in the Final Voting Tabulation Report, excluding insider votes, the following Impaired Classes have voted to accept the Noteholder Plan: (i) Class 1F (Senior Noteholder Claims); (ii) Class 1I (PHONES Notes Claims); and (iii) Class 93G (Other Guarantor Debtor Claims against Tribune CNLBC, LLC). Although the Noteholder Plan has not garnered the support of an Impaired Class at each of the 111 Debtors, the requirement of Bankruptcy Code section 1129(a)(10) is nevertheless satisfied with respect to the Noteholder Plan because it is a per plan, not a per debtor, requirement.

144.     Nonetheless, the DCL Plan Proponents, relying exclusively on dicta and findings of fact and conclusions of law in cases where this issue was not adjudicated, argue that the Noteholder Plan fails to satisfy the requirements of Bankruptcy Code section 1129(a)(10) because the Noteholder Plan cannot demonstrate an Impaired accepting Class at each Debtor.[49] They make this argument even in light of the plain language of Bankruptcy Code section 1129(a)(10), which clearly states that the impaired accepting class requirement is a *per plan*, not a per debtor, requirement.  11 U.S.C. § 1129(a)(10) ("at least one class of claims that is impaired *under the plan* has accepted the plan") (emphasis added).  It is widely accepted that when a statute's language is plain, "the sole function of the courts is to enforce it according to its terms." *Caminetti v. U.S.*, 242 U.S. 470, 485 (1917).

145.     In keeping with the plain language rule, courts that have ruled on the impaired accepting class requirement of Bankruptcy Code section 1129(a)(10) have overwhelmingly ruled that, when all debtor entities are the subject of the same joint plan of reorganization, it is a per plan, not a per debtor, requirement.  *See In re SGPA, Inc.*, No. 01-02609 (RJW), 2001 Bankr. LEXIS 2291, at *21 (Bankr. M.D. Pa. Sept. 28, 2001) (holding that it is not necessary to have an impaired accepting class at each debtor to confirm a joint plan of reorganization); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns Inc.*), 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) (holding that the impaired accepting class requirement is tested on a per plan, not per debtor, basis); *see also In re Resorts Int'l Inc.*, 145 B.R. 412 (Bankr. D.N.J. 1990) (confirming a reorganization plan that had an impaired accepting class at only three of the four debtor entities); *cf. In re Enron Corp.*, No. 01-16034 (AJG), 2004 Bankr. LEXIS

---

[49] Notably, while the DCL Plan Proponents argue that Bankruptcy Code section 1129(a)(10) imposes a per debtor impaired accepting class requirement, the Final Voting Tabulation Report reveals that the DCL Plan itself lacks an impaired accepting class at 39 of 111 Debtors.  To the extent that the Noteholder Plan fails to satisfy section 1129(a)(10) with respect to Debtors for which there is not an Impaired accepting Class, the DCL Plan likewise fails to satisfy the statute.

2549, at *235 (Bankr. S.D.N.Y. Jul. 15, 2004) (finding that the plain meaning of section

1129(a)(10) indicates it is satisfied by the acceptance of at least one impaired class under a joint

plan of reorganization, but going on to state that, plain meaning aside, the requirement is also

satisfied because of the substantive consolidation component of a global compromise in the

cases).  In fact, the *SGPA* court, which confirmed a joint plan wherein only one of the eleven

debtor entities obtained the support of an impaired accepting class, went so far as to criticize the

per debtor argument as being a "form over substance argument" that would jeopardize a "fair

and equitable plan."  *In re SGPA,* 2001 Bankr. LEXIS 2291, at *21-*22.

146.    In *Charter*, the debtors proposed a joint plan of reorganization for ten groups of

debtors aggregating 130 debtor entities, each with multiple classes of claims and interests.  *See*

Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy

Code, *Charter*, No. 09-11435 (JMP) (Bankr. S.D.N.Y. May 7, 2009) *[ECF No. 320]*.  Excluding

insider votes, impaired classes in seven of the ten groups of debtors voted to accept the plan;

however, there was not an impaired accepting class at each debtor entity.  *See* Findings of Fact,

Conclusions of Law and Order Confirming the Debtors' Joint Plan of Reorganization, *Charter*,

No. 09-11435 (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009) *[ECF No. 921]*.  In arguing that the

bankruptcy court should nevertheless confirm the proposed plan, the debtors asserted that where

a joint plan is proposed, compliance with Bankruptcy Code section 1129(a)(10) is determined on

a per plan basis.  *See* Reorganizing Debtors' Memorandum of Law (A) in Support of

Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United

States Bankruptcy Code and (B) in Response to Objections Thereto, *Charter*, No. 09-11435

(JMP) (Bankr. S.D.N.Y. July 16, 2009) *[ECF No. 634]*; Reorganizing Debtors' Post-Trial Brief

in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11

of the United States Bankruptcy Code, *Charter*, No. 09-11435 (JMP) (Bankr. S.D.N.Y. Sept. 18, 2009) *[ECF No. 841]*. Despite arguments to the contrary, including arguments that the impaired accepting class requirement must be treated as a per debtor requirement because (i) joint administration is a purely procedural tool that cannot affect the substantive rights of creditors and (ii) case law prohibits the subordination of the wishes of one creditor to those of a creditor of another debtor (*see* Law Debenture Trust Company of New York's Post Trial Brief in Further Support of Its Objection to Confirmation of the Debtors' Joint Plan of Reorganization, *Charter*, No. 09-11435 (JMP) (Bankr. S.D.N.Y. Sept. 18, 2009) *[ECF No. 844]*), the *Charter* court ultimately agreed with the *Charter* debtors, unequivocally holding that "it is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not … on a per-debtor basis." *Charter*, 419 B.R. at 266.

147.    The DCL Plan Proponents argue that the case law referenced above is inapposite because the Noteholder Plan is not a single plan of reorganization, but rather constitutes a separate plan for each Debtor. *See* DCL Objection at 8. Grasping at technicalities, the DCL Plan Proponents rely on statements in Sections 3.3.1(b) and 4.6.3 of the Noteholder Plan, as well as statements in the Noteholder Specific Disclosure Statement, that the Noteholder Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. This language, which was intended to assure Creditors that the Noteholder Plan does not contemplate any form of substantive consolidation, does not on its own operate to transform the nature of the Noteholder Plan nor the manner in which Bankruptcy Code section 1129(a)(10) applies to the Noteholder Plan. Notwithstanding the impotence of the offending language, the Noteholder Plan Proponents have removed it from the Noteholder Plan and the DCL Plan Proponents' objection has, accordingly,

been rendered moot to the extent it was ever even applicable.  *See* Noteholder Plan, §§ 3.3.1(b) and 4.6.3.

148.    The DCL Plan Proponents, in an effort to conceal the lack of case law supporting their position that Bankruptcy Code section 1129(a)(10) should be construed as a per debtor requirement, point to several recent cases in which courts make boilerplate statements, in the context of findings of fact and conclusions of law, that Bankruptcy Code section 1129(a)(10) has been satisfied because there is an impaired accepting class at each debtor.  The DCL Plan Proponents' attempt to fabricate support for their position should be dismissed as the cited cases (most of which are just copies of confirmation orders and not actually written decisions) do not operate as applicable precedent here for the simple reason that satisfaction of the impaired accepting class requirement of Bankruptcy Code section 1129(a)(10) was not a contested issue in any of those cases and the courts did not consider, much less adjudicate, whether Bankruptcy Code section 1129(a)(10) operates as a per debtor or per plan requirement.  *See In re Neenah Enters., Inc.,* No. 10-10360 (MFW), 2010 Bankr. LEXIS 3058, at *33 (Bankr. D. Del. July 6, 2010) (confirmation order with provision stating that section 1129(a)(10) was satisfied because at least one impaired class of claims against each debtor had accepted the plan); *In re Int'l Wireless Commc'ns Holdings Inc.*, No. 98-2007 (MFW), 1999 WL 33483582 at *8 (Bankr. D. Del. Mar. 26, 1999) (confirmation order with provision stating that there was an impaired accepting class for each debtor); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (stating only that the plan had been accepted by at least one class of impaired creditors or equity interest holders at three different debtors, not stating that acceptance at each debtor was required).

149.    The statements made during the confirmation hearing in *In re MEDIQ, Inc.*,
which are also heavily relied upon by the DCL Plan Proponents as demonstrating the Delaware
Bankruptcy Court's "express rejection" of the per plan argument, are equally inapplicable as
precedent. *See* DCL Objection at 6 (citing *In re MEDIQ, Inc.*, Case No. 01-252 (MFW) (Bankr.
D. Del.), Hr'g Tr. (May 16, 2001) at 122-125). In fact, the DCL Plan Proponents overtly admit
this lack of authoritative value by their categorization of the language as "colloquy with Judge
Walrath." DCL Objection at 6. *Cf. SGPA,* 2001 Bankr. LEXIS 2291 at *18 (finding "the
[*MEDIQ*] colloquy to have been little more than an intellectual exercise, unpersuasive as
precedent in the matter before [the court]."). It is nonetheless worth noting that, in *MEDIQ*, the
impaired accepting class issue was rendered moot by an amendment to the plan and therefore
was never adjudicated in that case.[50]

150.    In sum, both the plain language of Bankruptcy Code section 1129(a)(10) and the
only applicable precedential authority on point firmly establish that the impaired, accepting class
requirement is a per plan requirement. Like the *Charter*, *SGPA* and *Resorts* cases, and the DCL
Plan itself, the Noteholder Plan is proposed as a joint plan of reorganization on behalf of all
Debtors. Because Tribune's business is managed on an integrated basis, it is reasonable and

---

[50] The DCL Plan Proponents also use over half a page discussing that Aurelius objected to the plan of reorganization
in *In re AbitibiBowater Inc.*, on the ground that the plan failed to satisfy Bankruptcy Code section 1129(a)(10)
because there was not an impaired accepting class at each debtor. *See* DCL Objection at 6-7. To the extent there is
any value in responding to this "objection," it is worth noting that the issue of whether section 1129(a)(10) is a per
plan or per debtor requirement was never considered in AbitibiBowater. *See* Findings of Fact, Conclusions of Law
and Order Confirming Debtors' Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code
(As Amended), *In re AbitibiBowater, Inc.*, No. 09-11296 (KJC) (Bankr. D. Del. Nov. 23, 2010) *[ECF No. 3940]*. In
addition, Aurelius would be remiss in failing to point out that it is not uncommon for an entity engaged in litigation
to take a position that, on its face, appears to be contrary to such entity's position in a different case. This is
exemplified by JPMorgan, which, as a DCL Plan Proponent, is advocating for the establishment of a creditors' trust
to pursue state law claims of individual creditors on behalf of, among others, the LBO Lenders, but at this very
moment is seeking to dismiss causes of action brought by a similar trust created in conjunction with a plan of
reorganization in *In re Lyondell Chem. Co., et al.*, on various grounds, including that the creditors' trust does not
have standing to pursue such causes of action and that LBO lenders in that case are not entitled to share in the
proceeds of any recoveries in the event the LBO is ultimately deemed a fraudulent transfer. *See* Memorandum of
Law in Support of Defendants' Motion to Dismiss the Complaint, Weisfelner v. Morgan Stanley & Co., No. 09-
10023, Adv. Pro 10-04609 (REG) (Bankr. S.D.N.Y. Jan. 11, 2011) *[ECF No. 72]*.

administratively convenient to propose a joint plan.  *See Affidavit of Chandler Bigelow III,*

*Senior Vice President and Chief Financial Officer of Tribune Company in Support of First Day*

*Motions* (discussing integrated nature of the Tribune businesses) *[ECF No. 3]*; *see also Charter*,

419 B.R. at 266 ("the evidence supports a finding that the business of Charter is managed … on

an integrated basis making it reasonable and administratively convenient to propose a joint

plan").  Accordingly, because the Noteholder Plan has received the necessary affirmative votes

from three Impaired Classes, Bankruptcy Code section 1129(a)(10) has been satisfied.

> **L.      The Noteholder Plan Is Not Likely to Be Followed by Liquidation or the Need for Further Financial Reorganization – 11 U.S.C. § 1129(a)(11)**

151.    Bankruptcy Code section 1129(a)(11) requires that, as a condition precedent to

confirmation, a court determine that a plan is feasible.  Specifically, a court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

152.    The key element of feasibility is whether there exists a reasonable probability that

the provisions of the plan can be performed and that the debtor will be commercially viable after

the plan's effective date.  *See In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D.

Pa. 1995) ("a plan satisfies 11 U.S.C. § 1129(a)(11) so long as there is a reasonable prospect for

success and a reasonable assurance that the proponents can comply with the terms of the plan");

*In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be

a reasonable assurance of commercial viability.").  Just as speculative prospects of success

cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The mere

prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.  *See In re*

*U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

153.    In evaluating a plan's feasibility, courts have identified the following factors as probative: (i) the adequacy of the capital structure; (ii) the earning power of the business; (iii) economic conditions; (iv) the ability of management; (v) the probability of the continuation of the same management; and (vi) any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Aleris Int'l, Inc.*, 2010 WL 3492664 at *27-29.

154.    Because Tribune holds licenses issued by the FCC for television and radio broadcast stations, any plan of reorganization confirmed by this Court will be subject to the further consent of the FCC. In evaluating the feasibility of the Noteholder Plan, the Court must therefore also consider whether the Noteholder Plan Proponents will have any impediments to obtaining the necessary FCC regulatory approvals for Reorganized Tribune. *See In re TCI 2 Holdings*, LLC, 428 B.R. 117, 154, 175 (Bankr. D.N.J. 2010) ("To establish the feasibility of their plan . . . the proponents of the AHC/Debtor Plan must also show that the new owners of the Reorganized Debtors will not face material hurdles to achieve the necessary regulatory approvals from the New Jersey Casino Control Commission ('CCC')," and noting with respect to a competing plan that "[t]he feasibility of the [competing] Beal/Icahn Plan depends upon the prospect that the plan proponents can achieve licensure for the Reorganized Debtors from the . . . [CCC], and can withstand antitrust scrutiny by the Federal Trade Commission."); *Sound Radio, Inc. v. WNJR Radio*, 1430, 93 B.R. 849, 857 (Bankr. D. N.J. 1988) (in assessing whether the plan was feasible, the court evaluated whether the necessary approvals from the FCC could be timely obtained); *In re Cajun Elec. Power Co-op.*, 230 B.R. 715, 747 (Bankr. M.D. La. 1999) (evaluating whether the debtor could obtain necessary approvals from the Federal Energy Regulatory Commission).

155.    It is important to note at the outset that, except as to the initial ownership of the New Common Stock, New Warrants and the composition of the board of directors of Reorganized Tribune, the Reorganized Debtors as they would emerge under the Noteholder Plan are, in form and substance, identical to the Reorganized Debtors that would emerge under the DCL Plan.  In fact, the Noteholder Plan mirrors the DCL Plan in every respect that could arguably affect the post-Effective Date viability of the Debtors.  Under both plans the Debtors will have the same operations and businesses, the same corporate organizational structure, the same capital structure, the same financial and contractual obligations, the same liquidity, the same post-Effective Date financing and the same officers.  For example, each of the two plans contemplates the same calculation with respect to the Distributable Cash Pool, thereby leaving the Reorganized Debtors with the same amount of available Cash on the Effective Date to fund Cash distributions to Creditors, pay requests for professional compensation and satisfy other administrative requirements of the Chapter 11 Cases.  Similarly, both the Senior Secured Term Loan and the Exit Facility (to the extent it is determined necessary) under the two plans are identical.  In fact, the only difference between the two plans is whether the LBO-Related Causes of Action are settled in exchange for a pittance of a payment to the aggrieved parties, or whether they are instead contributed to trusts and prosecuted and/or settled by true fiduciaries to the aggrieved parties – something that has no effect whatsoever on the Reorganized Debtors. Therefore, the financial projections prepared by the Debtors and attached as Exhibit E to the General Disclosure Statement (the "Financial Projections"), and the assumptions, assets, liabilities, operations and organizational structure relied upon therein, are equally as relevant in determining the feasibility of the Noteholder Plan as they are in determining the feasibility of the DCL Plan.

156.    As described in the Gropper Declaration, the Noteholder Plan Proponents believe that the Noteholder Plan satisfies the feasibility requirement of Bankruptcy Code section 1129(a)(11).  The Noteholder Plan Proponents believe that the Debtors will be able to satisfy their postpetition obligations, as well as their obligations under the Noteholder Plan to fund, among other things, the payment of Allowed Priority and Administrative Claims, the payment of cure amounts related to assumed executory contracts, professional compensation obligations, the Initial Distributions and the Distribution Trust Initial Funding, all while maintaining more than sufficient liquidity for the ongoing operations of the Reorganized Debtors.  The elimination of over $10 billion of debt obligations of the Debtors, combined with the Debtors' ability to generate revenue in a manner consistent with that reflected in the Financial Projections, will enable the Debtors' enterprise to be strategically positioned for future growth and long term viability.

157.    The Noteholder Plan Proponents also believe that the Noteholder Plan will be approved by the FCC.  In order to ensure compliance with the Communications Act and the FCC's rules and to avoid substantial delay in obtaining the necessary FCC approvals, the Noteholder Plan Proponents currently intend to exercise their discretion under Section 5.4.2(b) of the Noteholder Plan to limit the amount of New Class A Common Stock allocated to JPMorgan, Angelo Gordon and Oaktree to less than 5% each.  Thus, under the Noteholder Plan, only the Distribution Trustee, the members of the Distribution Trust Advisory Board, and the officers and directors of Reorganized Tribune would have "attributable interests" in Reorganized Tribune under the FCC's rules.  The Noteholder Plan Proponents are vetting the Distribution Trustee, the members of the Distribution Trust Advisory Board and the independent directors of Reorganized Tribune to be initially of designated by Aurelius to ensure that such persons do not raise any

FCC issues.  Therefore, the Noteholder Plan will not introduce new parties with conflicting or potentially conflicting other media interests to the ownership or governance structure of Reorganized Tribune.  As a consequence, the Noteholder Plan Proponents believe that the FCC will grant, without additional delay, the approvals necessary in order for the Noteholder Plan to become effective, including the waivers of the ownership rules that are required in order for Reorganized Tribune to retain its current broadcast and newspaper properties.  *See also* Section II.Q below.

158.    Based upon the foregoing, the Noteholder Plan Proponents have demonstrated that confirmation of the Noteholder Plan is not likely to be followed by liquidation or the need for further reorganization of any or all of the Reorganized Debtors and that the Noteholder Plan has a more than reasonable likelihood of success.  Accordingly, the Noteholder Plan satisfies Bankruptcy Code section 1129(a)(11).

**M.    The Noteholder Plan Provides for the Payment of All Statutory Fees – 11 U.S.C. § 1129(a)(12)**

159.    Bankruptcy Code section 1129(a)(12) requires the payment of all fees payable under section 1930 of title 28 of the United States Code.  *See* 11 U.S.C. § 1129(a)(12). Bankruptcy Code section 507 provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(2).  In accordance with Bankruptcy Code sections 507 and 1129(a)(12), Section 13.7 of the Noteholder Plan provides that all such fees and charges, to the extent not previously paid, will be paid on the Effective Date.  Based upon the foregoing, the Noteholder Plan satisfies the requirements of Bankruptcy Code section 1129(a)(12).

**N.    The Noteholder Plan Provides for the Appropriate Treatment of Retiree Benefits – 11 U.S.C. § 1129(a)(13)**

160.    Bankruptcy Code section 1129(a)(13) requires that all retiree benefits continue to be paid post-confirmation at any levels established in accordance with Bankruptcy Code section 1114.  *See* 11 U.S.C. § 1129(a)(13).  Section 6.5 of the Noteholder Plan provides that all Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors and the applicable Reorganized Debtors will continue to perform their obligations under the Employee Benefit Plans.  Based upon the foregoing, the Noteholder Plan satisfies Bankruptcy Code section 1129(a)(13).

**O.    The Noteholder Plan Satisfies the "Cram Down" Requirements – 11 U.S.C. § 1129(b)**

161.    Bankruptcy Code section 1129(a)(8) requires that each class of claims and interests either accept a plan or be unimpaired under the plan.  *See* 11 U.S.C. § 1129(a)(8).  As described above, the Rejecting Classes either voted to reject the Noteholder Plan or were deemed to reject the Noteholder Plan pursuant to Bankruptcy Code section 1126(g).  As a result, Bankruptcy Code section 1129(a)(8) has not been satisfied and the Noteholder Plan Proponents are seeking confirmation of the Noteholder Plan pursuant to Bankruptcy Code section 1129(b).

162.    Bankruptcy Code section 1129(b) provides a mechanism for confirmation or "cram down" of a plan in circumstances where the plan is not accepted by all impaired classes of claims and equity interests.  Section 1129(b) of the Bankruptcy Code provides in pertinent part:

> Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

89

11 U.S.C. § 1129(b)(1).  Thus, under Bankruptcy Code section 1129(b), a court may "cram

down" a plan over the rejection (and/or deemed rejection) by impaired classes of claims or

equity interests so long as the plan does not "discriminate unfairly" and is "fair and equitable"

with respect to such classes.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,

987 F.2d 154, 157 n. 5 (3d Cir. 1993).  As discussed below, the Noteholder Plan satisfies the

"cram down" requirements of Bankruptcy Code section 1129(b).

> **1.** ***The Noteholder Plan Does Not Unfairly Discriminate with Respect to Impaired Classes that Have Rejected the Noteholder Plan***

163.    The Bankruptcy Code does not provide a standard for determining when "unfair

discrimination" exists.  *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D.

Ill. 1995), *rev'd on other grounds*, 526 U.S. 434 (1999) (noting "the lack of any clear standard

for determining the fairness of a discrimination in the treatment of classes under a Chapter 11

plan" and that "the limits of fairness in this context have not been established.").  Rather, courts

typically examine the facts and circumstances of each particular case to determine whether there

is unfair discrimination.  *See, e.g., In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985)

("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-

by-case basis.").  At a minimum, however, the unfair discrimination standard prevents creditors

and interest holders with similar legal rights from receiving materially different treatment under

a proposed plan without sufficient justifications for doing so.  *See Liberty Nat'l. Enters. v.

Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship.)*, 115 F.3d 650, 656-657 (9th

Cir. 1997).

164.    The Noteholder Plan does not "discriminate unfairly" with respect to the

Rejecting Classes.  In fact, other than the Classes under the Noteholder Plan who are not entitled

to receive any distribution at all, all Classes of similarly situated Creditors will receive

substantially similar treatment, irrespective of their Class, subject only to a holdback pending

resolution of those Claims which are Disputed under the Noteholder Plan.  While Holders of

Step One Claims are entitled to receive Initial Distributions in the form of a strip of consideration

consisting of Cash, New Common Stock and New Senior Secured Term Loan (in addition to

Distribution Trust Interests and, to the extent not making the Non-Contribution Election,

Creditors' Trust Interests), the Initial Distribution for Holders of Step Two Lender Claims will

be held in trust pending a resolution of (i) the Senior Loan Claims Sharing Resolution and/or (ii)

the claims and causes of action against such Creditors.

165.     In considering the propriety of the facially disparate treatment among the Step

One Lenders and Step Two Lenders, the threshold inquiry in assessing whether a proposed plan

of reorganization unfairly discriminates against a non-accepting class is whether the non-

accepting class is equally situated to a class allegedly receiving more favorable treatment.  Here,

this seemingly disparate treatment does not amount to unfair discrimination because the Classes

are not equally situated.  Although the Claims of the Step One Lenders and Step Two Lenders all

arise under the Senior Loan Agreement, the claims and causes of action preserved by the

Litigation Trust against the Step Two Lenders are of a different factual and legal nature than

those preserved against the Step One Lenders.  Indeed, based on the Examiner's findings alone,

there is a substantially greater likelihood that Step Two Debt would be avoided as compared to

Step One Debt (93% compared to 51% according to the Noteholder Plan Proponent's decision

tree expert's analysis of the Examiner's Report), thus providing ample justification to withhold

the Step Two Lender's initial distribution pending a determination on the Senior Loan Sharing

Resolution.  In the event the Step Two Lender Claims are avoided, but the Step One Lender

Claims are not and the Senior Loan Claims Sharing Resolution is not determined in favor of the

Step Two Lenders, the Step Two Lenders may not receive a recovery at all, while the Step One

Lenders will nonetheless receive their Initial Distribution and, possibly, further recoveries on

account of their Trust Interests or other amounts held in reserve.[51]

166.    In light of the foregoing, it is entirely appropriate that the Step Two Lenders are

separately classified from the Step One Lenders under the Noteholder Plan, and the separate

classification and varying treatment of these two Classes are justified under the particular facts

and circumstances of the Chapter 11 Cases.  Such separate classification and treatment will, in

fact, aid in the implementation of the Noteholder Plan insomuch as it avoids the possibility that

any Initial Distributions will be subject to disgorgement or otherwise clawed back in the event

the Step Two Lender Claims are avoided, equitably subordinated or the Senior Loan Claims

Sharing Resolution is not decided in favor of the Step Two Lenders.  *See In re Johns-Manville*

*Corp.*, 68 B.R. 618, 636 (Bank. S.D.N.Y. 1986), *aff'd*, 843 F.2d 636 (2d Cir. 1988) (finding that

the unfair discrimination standard of section 1129(b) "ensures that a dissenting class will receive

relative value equal to the value given to all other similarly situated classes."); *In re Buttonwood*

*Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (there is a reasonable basis for

discrimination where claims have different priorities even if arising under the same agreement

and individualized treatment is permissible based on the particularities of each claim); *In re*

*Bowles*, 48 B.R. at 507 (the bankruptcy court has significant discretion in determining whether

the circumstances warrant a finding of unfair discrimination).  Based upon the foregoing, the

Noteholder Plan satisfies the first prong of the cram down analysis.

---

[51] As noted above, if the Step One Lenders and Step Two Lenders are willing to stipulate that the loss sharing provisions in the Senior Loan Agreement apply if Step Two is avoided and Step One is not, the Noteholder Plan Proponents will modify the Noteholder Plan accordingly.

2.    *The Noteholder Plan Is Fair and Equitable with Respect to the Rejecting Classes*

167.    Bankruptcy Code section 1129(b) provides that a plan is fair and equitable with respect to a particular class of unsecured claims or impaired interests if the holder of any claim or interest in a class junior to the claims or interests of that particular class will not receive or retain property under the plan on account of such junior claim or interest.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii) and (C)(ii).  This central tenet of bankruptcy law – the "absolute priority rule" – requires that if holders of claims or interests in a particular class that vote to reject a plan receive less than the full value of their claims or interests, no holder of claims or interests in a junior class may receive or retain any property under the plan.  *In re Exide Tech.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003).

168.    In the instant case, the "absolute priority" rule is satisfied with respect to the Rejecting Classes because, as evidenced by the valuations and estimates contained in the General Disclosure Statement, the Noteholder Specific Disclosure Statement and the Revised Estimated Recovery Charts, no Class of Claims senior to the Rejecting Classes is receiving more than payment in full on account of such Claims and no Class of Claims or Interests junior to the Rejecting Classes will receive any distribution under the Noteholder Plan.  Based upon the foregoing, the Noteholder Plan satisfies both requirements of cram down under Bankruptcy Code section 1129(b).

3.    *The Noteholder Plan Provides More Than Adequate Information to Meet the "Cram Down" Requirements*

169.    The DCL Plan Proponents contend that the Noteholder Plan does not provide sufficient information to support a finding that the "cram down" requirements are met because: (i) the Noteholder Plan fails to provide the Bankruptcy Court with any legitimate basis on which to test the appropriateness of the Initial Distributions; (ii) the Noteholder Plan requires the

Bankruptcy Court to conduct a valuation analysis to determine the amount of the Initial

Distributions; and (iii) the Noteholder Plan fails to reconcile Intercompany Claims to determine

DEV at each Tribune Entity.  *See* DCL Objection, at 13-17.  The DCL Plan Proponents'

objection in this regard is both erroneous and mooted by the evidence submitted by the

Noteholder Plan Proponents in support of an $8.331 billion DEV.  *See* Raymond James Report.

170.    The DCL Plan Proponents' contention that there is insufficient support for the

Initial Distributions fails because the Noteholder Plan, together with the Raymond James Report

and accompanying exhibits, provide more than adequate information for the Court to find that

the Initial Distributions (and any further distributions to Creditors) do not discriminate unfairly

and are fair and equitable with respect to Impaired Rejecting Classes.  The Initial Distributions

contemplated by the Noteholder Plan and the Noteholder Specific Disclosure Statement were

based on a hypothetical DEV for the Tribune Entities of $6.75 billion, the same value adopted by

the DCL Plan Proponents in the DCL Plan, to allow Creditors to compare the Competing Plans

on an "apples to apples" basis.  As no party in these Chapter 11 Cases asserts a DEV for the

Tribune entities less than that amount and, in fact, the Noteholder Plan Proponents believe that

the DEV significantly exceeds that figure, Initial Distributions could only *increase* in value.  *See*

Raymond James Report; Revised Estimated Recovery Charts.  Accordingly, there is sufficient

evidence to demonstrate the appropriateness of the Initial Distributions.

171.    Further, contrary to the DCL Plan Proponents' assertions, it is entirely

appropriate, and in fact necessary, for a bankruptcy court to undertake a valuation analysis in

connection with confirmation of a plan of reorganization.  *See, e.g., In re Nellson Neutraceutical,

Inc.*, No. 06-10072 (CSS), 2007 WL 201134, at *1-2 (Bankr. D. Del. Jan. 18, 2007) (noting that

the court's task was to determine enterprise value by evaluating and weighing expert opinions);

*In re Mirant Corp.*, 334 B.R. 800, 824 (Bankr. N.D. Tex. 2005) (noting that in order for a court to assign a specific value or narrow range of values to the subject, it must either adopt an expert's opinion or be able to adjust the number generated by the expert to account for changes in assumptions considered necessary by the court); *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 527 (1941) (finding that a determination of a reorganized debtor's value is appropriately determined by the courts). At the Confirmation Hearing, the Noteholder Plan Proponents will present valuation-related evidence which, in addition to the Raymond James Report, will provide ample information for the Court to determine the DEV and conclude that the Initial Distributions are fair and equitable to the Creditors receiving them.

172.    Finally, the DCL Plan Proponents also argue that the Noteholder Plan does not provide sufficient information to satisfy the "cram down" standards by failing to reconcile Intercompany Claims to determine the amount of DEV available for each Debtor entity's Creditors. *See* DCL Objection at 16-18. However, as mentioned above, the Noteholder Proponents have agreed to adopt the Intercompany Claims Settlement, as well as the allocation of DEV between Tribune and its Subsidiaries of 8.4% and 91.6%, respectively. *See* Noteholder Plan at 11. Thus, this objection is now moot. Based on the foregoing, the Noteholder Plan satisfies the "cram down" requirements of Bankruptcy Code section 1129(b).

### 4.    *The Remaining DCL Plan Proponents' 1129(b) Objections Do Not Withstand Scrutiny*

#### a.    *The Initial Distributions to Holders of Other Guarantor Debtor Claims are Fair and Equitable.*

173.    The DCL Plan Proponents further object to the Noteholder Plan on the grounds that the Initial Distributions to Holders of Other Guarantor Debtor Claims violate section 1129(b) of the Bankruptcy Code by granting such Creditors a uniform recovery of 8% of their Allowed Claims, an amount the DCL Plan Proponents believe exceeds the minimum

distributions on Other Guarantor Debtor Claims in a "worst-case scenario" where all of the

Senior Loan Claims and Bridge Loan Claims are Allowed in full.  *See* DCL Objection at 19.

This objection, however, is irrelevant in light of the nature of the Initial Distributions to the

Holders of Other Guarantor Debtor Claims.

174.    Based on an entity-by-entity valuation analysis performed by the Debtors and

relied upon by the Examiner, the Noteholder Plan Proponents determined that the highest

recovery any unsecured Claims Class would receive at any Guarantor Debtor is approximately

7%.  While a uniform 8% recovery may be slightly in excess of what a particular Class would

receive if Initial Distributions were calculated on an entity-by-entity basis, the Initial

Distributions were proposed for purposes of administrative convenience.  Notably, the cost of

this incremental recovery to Holders of Other Guarantor Debtor Claims is at most $12 million,

which, for illustration, pales in comparison to the approximately $50 million of unauthorized

professional fees paid by the Debtors to the LBO Lenders' professionals during the pendency of

these Chapter 11 Cases.  *See* Supplement to Reinstated Motion of Law Debenture Trust

Company of New York to Terminate Debtor Affiliates' Undisclosed Payment of LBO Lenders'

Fees and Expenses, For an Accounting, and for Disgorgement of Past Payments, *[ECF No.*

*5925]*, at ¶ 4.  In any event, the Cash used to make the Initial Distributions to Holders of Other

Guarantor Debtor Claims will not be taken from Distributable Cash, but will instead come from

the company's remaining Cash balance after accounting for Distributable Cash.  Accordingly,

the recoveries afforded to Holders of Other Guarantor Debtor Claims under the Noteholder Plan

will in no way diminish the recoveries to which the Senior Lenders and Bridge Loan Lenders are

otherwise entitled.  *See* Noteholder Plan § 5.12.

175. The DCL Plan Proponents further assert that the Noteholder Plan's identical treatment of Other Guarantor Debtor Claims, despite differing valuations and debt-to-equity ratios, effects a "deemed" substantive consolidation. *See* DCL Objection at 20. As noted above, the uniform Initial Distributions to Other Guarantor Debtor Claims Classes was proposed for administrative convenience and has an immaterial impact on the Debtors' restructuring. Moreover, to the extent that this identical treatment of Other Guarantor Debtor Claims under the Noteholder Plan effects a "deemed" substantive consolidation, the DCL Plan effects a similar "deemed" substantive consolidation on an even greater scale by providing for identical treatment of general unsecured claims at each of 110 Filed Subsidiary Debtors (as defined in the DCL Plan) and providing all such claims with a 100% recovery. *See* DCL Plan § 3.3.5.

### b.    *The Distribution Trust Initial Funding is Fair and Equitable*

176. The DCL Plan Proponents also object to the $40 million Distribution Trust Initial Funding, alleging that it is not fair and equitable to force non-accepting Creditors to fund the cost of litigating the LBO-Related Causes of Action. *See* DCL Objection at 45-46. However, the Noteholder Plan requires the Reorganized Debtors, and not the non-accepting Creditors, to provide the Distribution Trust Initial Funding. Noteholder Plan § 1.1.90. It is neither unfair nor inequitable to require the Reorganized Debtors to fund the costs of prosecuting the Litigation Trust Causes of Action because each and every cause of action to be transferred to the Litigation Trust is an Estate cause of action.[52] If these causes of action had been prosecuted during the pendency of the Chapter 11 Cases, all fees and expenses incurred in connection therewith would have been borne by the Debtors' Estates. The trust beneficiaries should not be penalized, and

---

[52] It is important to note that the funding for the Creditors' Trust is through a loan by the Distribution Trust, which must be repaid with proceeds from the State Law Avoidance Actions. In addition, if the full $40 million in funding is not utilized by the Distribution Trust and Litigation Trust, the remainder will be refunded to the Reorganized Debtors.

their recoveries negatively impacted, simply because the Debtors and the Creditors' Committee determined not to prosecute the LBO-Related Causes of Action until after the Debtors emerge from bankruptcy (if ever).[53]  Moreover, as with the nominal excess Cash used to fund a fraction of the recovery to Holders of Other Guarantor Debtor Claims, the Cash used to make the Distribution Trust Initial Funding will not be taken from Distributable Cash, but will instead come from Reorganized Tribune's Cash balance after accounting for Distributable Cash.  *See* Noteholder Plan § 5.12.

> **P.    The Replacement Guaranty Provision of the Noteholder Plan Should Be Approved**

177.    Section 11.2.1 of the Noteholder Plan provides for the Holders of Senior Loan Guaranty Claims against Guarantor Non-Debtors to exchange such Claims for the applicable Guarantor Non-Debtors' agreement to become guarantors of the New Senior Secured Term Loan and provide security for such guaranty (the "Replacement Guaranty Provision").  The DCL Plan Proponents argue that the Replacement Guaranty Provision should not be approved because (i) the Senior Lenders have not consented to the Replacement Guaranty Provision and (ii) the Replacement Guaranty Provision is not fair consideration for the Holders of Senior Loan Guaranty Claims to forgo such Claims against the Guarantor Non-Debtors.  *See* DCL Objection at 38-40.

178.    The Noteholder Plan Proponents believe that the Replacement Guaranty Provision is fair consideration for the Holders of Senior Loan Guaranty Claims to forgo such Claims

---

[53] Debtors in this and other jurisdictions typically craft plans of reorganization to provide that post-effective date litigation will be funding by the reorganized estate, thus ensuring that creditors are not inequitably forced to cover what would otherwise be administrative expenses.  *See, e.g.*, *In re Credentia Corp.*, Case No. 10-10926 (BLS) (Bankr. D. Del. May 24, 2010); *In re SemCrude, L.P.*, Case No. 08-11525 (BLS) (Bankr. D. Del. Sept. 25, 2009); *In re The IT Grp., Inc.*, Case No. 02-10118 (MFW) (Bankr. D. Del. Feb. 9, 2004); *In re Insilco Techs., Inc.*, Case No. 02-13672 (KJC) (Bankr. D. Del. Feb. 13, 2004); *In re CTC Commc'ns Grp., Inc.* Case No. 02-12873 (PJW) (Bankr. D. Del. Oct. 14, 2003); *In re Lyondell Chem. Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 15, 2010); *In re Hardwood P-G, Inc.*, (LMC) Case No. 06-50057 (Bankr. W.D. Tex. Nov. 1, 2006); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Nov. 21, 2005).

against the Guarantor Non-Debtors.  Such Holders will hold a majority of the New Common

Stock and the continuance of such guaranties will depress the value of such stock and the

Guarantor Non-Debtors are required to guaranty the New Senior Secured Term Loan and grant a

lien on certain property in connection with the New Senior Secured Term Loan.   In addition, the

Replacement Guaranty Provision is the same as the one contained in the DCL Plan — both

provisions exchange the Guarantor Non-Debtors' guarantees for the same consideration.  *See*

Noteholder Plan §§ 5.6.2, 11.2.1; DCL Plan § 11.2.5.  Notwithstanding the foregoing, if the DCL

Plan Proponents, including the Debtors, continue to insist that the Replacement Guaranty

Provision contemplated under the Noteholder Plan is impermissible, the Noteholder Plan

Proponents will strike the Replacement Guaranty Provision from the Noteholder Plan.

> **Q.    Confirmation of the Noteholder Plan Will Not Violate FCC Regulations or Result in Additional Delay**

179.    The DCL Plan Proponents argue that the trust structure contemplated by the

Noteholder Plan (i) "may raise issues that could delay or prevent FCC approval," and (ii) may

ultimately require additional FCC approvals upon the issuance of the Litigation Distribution

Orders, which could delay distributions under the Noteholder Plan.  *See* DCL Objection at 23 n.

10, 32 n.17.  These allegations are unfounded, unsupported by law and simply incorrect.  The

Noteholder Plan complies in all respects with FCC rules and regulations and, if confirmed, is

unlikely to delay the attainment of any necessary FCC approvals.

180.    As an initial matter, the creation and implementation of the Distribution Trust

under the Noteholder Plan would not violate FCC- related ownership requirements or

restrictions.  These requirements and restrictions are applicable to persons who hold "attributable

interests" in Reorganized Tribune – generally its officers and directors and any shareholder who

will hold 5% or more of Reorganized Tribune's voting stock.  In addition, the FCC treats any

person having the right to appoint a director as having an attributable interest.  Although the

Distribution Trust will hold only *non-voting* New Warrants, non-exercisable by the Distribution

Trust,[54] the Distribution Trust will hold one share of limited-voting New Class C Common

Stock[55] entitling it to appoint two members of the board of directors of Reorganized Tribune.

Noteholder Plan §§ 1.1.173, 5.4.1; Noteholder Plan Supplement Exhibit 1.1.170, New Warrant

Agreement § 4.5(a).   Therefore, the Distribution Trust, the Distribution Trustee and members of

the Distribution Trust Advisory Board, who have the authority to direct the Distribution Trustee

to take certain actions, would be deemed to hold "attributable interests" in Reorganized Tribune.

As discussed in the Gropper Declaration, the Noteholder Plan Proponents are vetting the

proposed appointees to ensure that they do not also have attributable or other interests in media

entities that would raise issues under the FCC's ownership rules or cause any delay in the FCC's

review of the FCC applications for approval of the Noteholder Plan.

　　　181.    Not surprisingly, the DCL Plan Proponents offer no support for their assertion

that the "extraordinary nature" of the Distribution Trust "may raise issues that delay or prevent

FCC approval."  DCL Objection at 23 n. 10.  The simple fact that the Noteholder Plan requires

the transfer of a very limited interest in Reorganized Tribune to the Distribution Trust will *not*

trigger heightened FCC scrutiny.   Indeed, the FCC has approved bankruptcy-related transfers of

control to trusts on numerous occasions.  *See, e.g., In re ION Media Networks Liquidating Trust*,

---

[54] If the Noteholder Plan is confirmed, the Distribution Trust Agreement will be modified to clarify that the Distribution Trustee cannot exercise the New Warrants.  Only Holders of Distribution Trust Interests who ultimately receive distributions from the Distribution Trust in connection with the Litigation Distribution Orders will have the right to exercise the New Warrants.  *See generally* Noteholder Plan § [7.16].  If the Noteholder Plan is confirmed, corresponding clarifications will be made to the New Warrant Agreement.

[55] Pursuant to the proposed Certificate of Incorporation for Reorganized Tribune filed with the Noteholder Plan Supplement, the holder of the New Class C Common Stock has the right to vote only on matters that alter or adversely affect its rights (including amendments to the Certificate of Incorporation of Reorganized Tribune or By-Laws of Reorganized Tribune that adversely affect its rights), change the number of authorized New Class C Common Stock shares or that constitute an issuance of, or agreement to, issue additional New Class C Common Stock shares, or change the size of the board of directors of Reorganized Tribune.  *See* Noteholder Plan Supplement Exhibit 5.3.1(1), Article 4A (iii)(a).

24 FCC Rcd. 14579, 14580 (2009) (noting the FCC's prior approval of the transfer of new common stock to the ION trust); *In re Summit Wireless WOW, LLC*, 19 FCC Rcd. 23759, 23764 (2004) (approving the assignment of PCS licenses from the debtors to a liquidating trust); *In re License Renewal Application of E. Carolina Broad. Co., Inc.,* 6 FCC Rcd. 6154 at n. 1 (1991) (noting that the FCC has previously approved the assignment of station licenses to the liquidating trust). In contrast to the foregoing cases, the Noteholder Plan provides for the Distribution Trust to hold only New Warrants and one share of Class C Common Stock, which will not convey voting control to the Distribution Trust. Accordingly, the Distribution Trust will not delay or prevent FCC approval.

182. Finally, the Noteholder Plan Proponents contest the DCL Plan Proponents' assertions that (i) confirmation of the Noteholder Plan would require additional FCC approval before the Distribution Trust could distribute the New Warrants to the ultimate recipients and (ii) the requirement for additional approval would delay final distributions and, by implication, could put Reorganized Tribune's ownership rule waivers in jeopardy. *See* DCL Objection at 32 n. 17. When the time comes for the Distribution Trustee to make distributions of equity in Reorganized Tribune to Creditors, Creditors entitled to receive distributions may elect to receive New Warrants and/or New Common Stock, which may be either New Class A Common Stock (voting) or New Class B Common Stock (limited voting). Noteholder Plan § 5.4.1. A change of control would result only in the unlikely event that those Creditors receiving equity distributions from the Distribution Trust elected to exercise a sufficient number of New Warrants and to convert a sufficient number of shares of New Class B Common Stock to voting New Class A Common Stock to cause a change of control in Reorganized Tribune. It is therefore not at all certain that any FCC approval will be required prior to a distribution of New Warrants and/or

New Common Stock by the Distribution Trustee.  It should be noted that a change in control could also happen at any time under the DCL Plan, which also provides for the issuance of New Warrants exercisable for New Common Stock and the ability to convert New Class A Common Stock to New Class B Common Stock.

183.    If FCC approval is required because of elections by the ultimate recipients, then Section 5.4.1(g) of the Noteholder Plan provides that the Distribution Trustee may not implement a distribution that would result in a change of control of Reorganized Tribune unless any required consent of the FCC has been obtained.  If FCC consent were required, and if, in ruling on an application for approval of a change of control, the FCC declined to renew Reorganized Tribune's then-existing ownership rule waivers, Reorganized Tribune could refuse to allow the proposed conversion under § 5(A) of the Certificate of Incorporation of Reorganized Tribune, which provides that Reorganized Tribune may "restrict the ownership, conversion, or proposed ownership, of shares of capital stock … by any person if such ownership, conversion or proposed ownership … would … materially limit or materially impair any existing business activity … under the Federal Communications Laws."  *See also* Noteholder Plan Supplement Exhibit 5.3.1(1), Certificate of Incorporation of Reorganized Tribune § 5(A).  Thus, under no circumstances would Reorganized Tribune's ability to retain its ownership of television stations and newspapers be put in jeopardy due to the Distribution Trust.  Based on the above, the DCL Plan Proponents' allegations that there is an increased regulatory risk that would accompany confirmation of the Noteholder Plan should not be countenanced by this Court.

### R.    Responses to Miscellaneous Objections Identified by the DCL Plan Proponents

184.    In addition to those set forth above, the DCL Plan Proponents raise a number of miscellaneous objections to confirmation of the Noteholder Plan in Appendix A to the DCL Objection.  Each miscellaneous objection, identified in bold, is addressed below.

- **OBJECTION:  The Noteholder Plan improperly provides for the full allowance of Senior Noteholder Claims without providing any mechanism for reduction to reflect the potential outcome of causes of action asserted by the Creditors' Committee against Morgan Stanley Capital Services Inc.  *See* DCL Objection Appendix A (citing Noteholder Plan § 3.2.6).**  RESPONSE:  Morgan Stanley has been named as a defendant in the Creditors' Committee Directors, Officers, Employees and Shareholders Complaint filed by the Creditors' Committee on November 1, 2010.  Accordingly, the Morgan Stanley Claims constitute Disputed Claims, which will be reserved for and treated in accordance with § 7.2.1 of the Noteholder Plan.  *See* Noteholder Plan § 7.2.1.

- **OBJECTION:  The Noteholder Plan improperly provides the Litigation Trustee with the power to settle virtually all Disputed Claims, including disputed trade claims, without providing a mechanism for transferring such Claims to the Litigation Trust.  The Noteholder Plan must be revised to implement appropriate procedures for transferring the relevant facts and information to the Litigation Trustee, and to require reimbursement of the reasonable expenses incurred by the Debtors in connection therewith.  *See* DCL Objection Appendix A (citing Noteholder Plan § 8.1).**  RESPONSE:  The Noteholder Plan has been amended to reflect that the Distribution Trust will resolve the applicable Disputed Claims other than those related to the LBO-Related Causes of Action, and now contains provisions (i) ensuring the appropriate transfer of such rights to the Distribution Trust and (ii) clarifying the Reorganized Debtors' document retention duties and duties to cooperate.  *See* Noteholder Plan § 7.16.2; 7.16.16 and 7.16.17.  Moreover, the Noteholder Plan provides that the Distribution Trustee must obtain Bankruptcy Court approval prior to settling any Disputed Claims where the stated face amount in controversy exceeds $1,000,000.  *See* Noteholder Plan § 7.16.9.  Finally, the Reorganized Debtors will not be reimbursed for (i) retaining documents they are otherwise obligated to retain[56] or (ii) costs incurred to perform functions typically

---

[56] *See* 18 U.S.C. § 1519; 26 U.S.C. § 6001; *see also Howell v. Maytag*, 168 F.R.D. 502, 505 (M.D. Pa. 1996) (holding that a party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit).

performed by a debtor's estate, such as cooperating with the resolution of Disputed Claims.

- **OBJECTION:  The Noteholder Plan restricts Reorganized Tribune's board of directors from distributing equity grants or bonus awards to directors, officers or employees that are named as defendants in the Committee's Complaint, infringing on the Reorganized Debtors' ability to issue such grants or awards if determined to be in the best interests of the Reorganized Debtors' businesses.  *See* DCL Objection Appendix A (citing Noteholder Plan §§ 5.11, 6.5).**
  RESPONSE:  The Noteholder Plan has been modified to lift this restriction. *See* Noteholder Plan § 6.5.

- **OBJECTION:  The Noteholder Plan must be clarified to apply the reasonable contract rate of interest where the applicable contract specifies an interest rate, and the federal judgment rate if no such contract rate is specified, when calculating Postpetition Interest.  *See* DCL Objection Appendix A (citing Noteholder Plan §§ 1.1.175, 1.1.217, 1.1.218 and 3.3.3).**
  RESPONSE:  The Noteholder Plan has been revised to apply the reasonable contract rate of interest where the applicable contract specifies an interest rate, and the federal judgment rate if no such contract rate is specified, when calculating Postpetition Interest.  *See* Noteholder Plan § 1.1.224.

- **OBJECTION:  The fixed number of directors provided for in the Noteholder Plan inappropriately divests the Reorganized Debtors of flexibility.  The Noteholder Plan must be amended to enable the Reorganized Debtors to increase the number of board seats if necessary.  Moreover, the Noteholder Plan must be amended to reduce the disproportionate number of board seats held by Aurelius if resolution of the Litigation Trust Causes of Action results in no additional recovery to Senior Noteholders or in the event the Senior Noteholders receive a substantial portion of the distributions to which they are entitled under the Noteholder Plan.  *See* DCL Objection Appendix A (citing Noteholder Plan § 5.3.2).**
  RESPONSE:  In the event that the Noteholder Plan is confirmed, a revised version of the Certificate of Incorporation for Reorganized Tribune will be filed providing for the potential to add two additional seats to the board of directors of Reorganized Tribune.

- **OBJECTION:  The Noteholder Plan must be amended to require the Trusts to pay costs associated with preserving records and documents related to Trust Causes of Action, as the Noteholder Plan requires the Debtors to transfer all such information to the applicable Trust.  *See* DCL Objection Appendix A (citing Noteholder Plan §§ 5.17.15 and 5.18.17).**
  RESPONSE:  As noted above, the Debtors are required by law to preserve all

documents related to the LBO.  *See* 18 U.S.C. § 1519; 26 U.S.C. § 6001; *see also Howell v. Maytag*, 168 F.R.D. at 505 (holding that a party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit).  Moreover, if the Litigation Trust Causes of Action had been brought during the pendency of the Chapter 11 Cases, all fees and expenses incurred in connection therewith (including costs incurred to preserve records and documents) would have been borne by the Estates.   Accordingly, the Trusts should not be obligated to pay such costs simply because the Trust Causes of Action will instead be prosecuted after the Effective Date.

- **OBJECTION:  The Noteholder Plan must be revised to reflect that Tribune and the Noteholder Plan Proponents may agree to exclude any Reorganized Subsidiary Debtors and/or U.S. Subsidiary Non-Debtors from guaranteeing the New Senior Secured Term Loan as more appropriately set forth in Exhibit 5.10 to the Noteholder Plan.  *See* DCL Objection Appendix A (citing Noteholder Plan § 5.6.1).**
  RESPONSE:  The Noteholder Plan has been revised to reflect that Tribune and the Noteholder Plan Proponents may agree to exclude any Reorganized Subsidiary Debtors and/or U.S. Subsidiary Non-Debtors from guaranteeing the New Senior Secured Term Loan.  *See* Noteholder Plan § 1.1.175.

### S.    The Noteholder Plan Modifications Are Immaterial and Comply with Bankruptcy Code Section 1127

185.    The Noteholder Plan Modifications do not materially or adversely affect the way any Claim or Interest is treated under the version of the Noteholder Plan distributed in the Solicitation Package.

Bankruptcy Code section 1127 provides, in relevant part:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of section 1122 and 1123 of the [Bankruptcy Code].  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan . . . .

> Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

11 U.S.C. § 1127(a), (d).[57]

186.     Bankruptcy Code section 1127 provides a plan proponent with the right to modify a plan "at any time" before confirmation.  This right would be meaningless if the promulgation of all plan modifications, ministerial or substantive, adverse to certain claimants or not, necessitated the resolicitation of votes.  Courts have therefore typically allowed a plan proponent to make non-material changes to a plan without any special procedure or resolicitation.  *See Enron Power Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117-18 (11th Cir. 2006) ("[T]he bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated."); *Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank)*, 201 B.R. 376, 380 n. 4 (E.D. Pa. 1996) (immaterial modifications require no further disclosure or solicitation); *In re Leslie Controls, Inc.*, No. 10-12199 (CSS), 2010 WL 4386935, at *10 (Bankr. D. Del. Oct. 28, 2010) ("changes that do not materially adversely affect or change the treatment of any [c]laims or [e]quity [i]nterests and shall be considered part of the [p]lan . . . [and] do not require additional disclosure . . . or re-solicitation of votes"); *In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 4565223, at *6 (Bankr. S.D.N.Y. Dec. 19, 2007) (approving immaterial modification to plan without requiring debtors to resolicit the plan); *In re Kmart Corp.*, No. 02-02474 (SPS), 2006 WL 952042, at *27 (Bankr.

---

[57] Bankruptcy Rule 3019, designed to implement Bankruptcy Code section 1127, provides, in relevant part:

> In a  . . . chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice of the trustee, any committee appointed under the [Bankruptcy Code], and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

N.D. Ill. Apr. 11, 2006) (resolicitation not required where modification does not adversely change the treatment of claims); *In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp. I*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (all creditors were deemed to have accepted plan as modified because "[n]one of the changes negatively affects the repayment of creditors, the length of the [p]lan, or the protected property interests of parties in interest.").

187.    As noted above, the Noteholder Plan Modifications consist of technical, non-material changes and other changes to the Noteholder Plan to (i) address objections filed or asserted by various parties, (ii) resolve concerns that were communicated to the Noteholder Plan Proponents outside of the context of the objections, (iii) make clarifying changes to the Noteholder Plan and (iv) make certain changes to more easily facilitate the post-Effective Date administration of the Noteholder Plan.  As (a) the Noteholder Plan Modifications are non-material and do not materially adversely affect the treatment of any Creditor that has previously accepted the Noteholder Plan and (b) the Noteholder Plan continues to comply with the requirements of Bankruptcy Code sections 1122 and 1123, the Noteholder Plan Proponents submit that resolicitation is not required.

188.    Moreover, the Noteholder Plan Proponents submit that the requirements of Bankruptcy Code section 1127(d) have been met because all Holders of Claims and Interests in these Chapter 11 Cases have received notice of the Confirmation Hearing and will have an opportunity to object to the Noteholder Plan Modifications at that time.  *See Lee Servicing Co. v. Wolf (In re Wolf)*, 162 B.R. 98, 108 (Bankr. D.N.J. 1993) (where the creditor is given notice of the plan modification, the appropriate time to object is at confirmation).  Accordingly, all Creditors in the Noteholder Plan Voting Classes that previously voted to accept the Noteholder Plan should be deemed to accept the Noteholder Plan as modified.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, the Noteholder Plan complies with and

satisfies all applicable requirements of the Bankruptcy Code.  Accordingly, the Noteholder Plan

Proponents respectfully request that the Bankruptcy Court overrule the Objections and confirm

the Noteholder Plan.

Dated:  Wilmington, DE
        February 25, 2011

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
Philip C. Dublin
Kristina M. Wesch
Meredith A. Lahaie
One Bryant Park
New York, NY 10036
(212) 872-1000

ASHBY & GEDDES, P.A.

William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

LERMAN SENTER PLLC
Meredith S. Senter, Jr.
Sally A. Buckman
200 K Street NW, Suite 600
Washington, DC 20006
(202) 429-8970
*Counsel for Aurelius Capital Management, LP*

McCARTER & ENGLISH, LLP
David J. Adler
245 Park Avenue
New York, NY 10167
212-609-6800

McCARTER & ENGLISH, LLP

Katharine L. Mayer (I.D. No. 3758)
Renaissance Centre
405 N. King Street
Wilmington, DE 19801
302-984-6300

*Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
David S. Rosner
Sheron Korpus
Christine A. Montenegro
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700
Fax:  (212) 506-1800

BIFFERATO GENTILOTTI LLC

Garvan F. McDaniel (I.D. No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Tel:  (302) 429-1900
Fax:  (302) 429-8600

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes*

BROWN RUDNICK LLP
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

SULLIVAN HAZELTINE ALLINSON LLC

William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

*Counsel for Wilmington Trust Company, solely in its capacity as successor Indenture Trustee for the PHONES Notes*

## EXHIBIT A

**Revised Estimated Recovery Charts**

**REVISED ESTIMATED RECOVERIES UNDER THE NOTEHOLDER PLAN**[1]

All estimated recoveries contemplated in the following charts are based solely on consideration related to the DEV.  Based upon the Rebuttal Report to Expert Valuation Report Submitted by Lazard Frères & Co. LLC, prepared by Raymond James and dated February 21, 2011, the following recoveries use a mid-point DEV of $8.331 billion, with such DEV allocated 8.4% to Tribune and 91.6% to the Subsidiaries (on a consolidated basis).  The actual DEV and allocation of the DEV among Tribune and its Subsidiaries will be determined by the Bankruptcy Court in connection with Confirmation.

The following charts illustrate Initial Distributions of DEV only, and do not include any distribution of any amounts recoverable through the Trust Causes of Action, including, but not limited to, recoveries on account of disgorgement or breach of duty.  Distributions of recoveries obtained on account of Trust Causes of Action will be made in accordance with the Litigation Distribution Orders or Creditors' Trust Distribution Orders, as applicable, and such further recoveries will not affect the distribution of DEV set forth herein.  Accordingly, to the extent a Creditor is entitled to share in the proceeds of the Trust Causes of Action, the recoveries set forth herein will be enhanced by such proceeds.  Nonetheless, regardless of litigation results, all Creditors will be entitled to keep their Initial Distributions.  For the avoidance of doubt, all value contained in the Distribution Trust Reserves, net of costs and expenses, will ultimately be distributed to Holders of Distribution Trust Interests in accordance with the terms of the Litigation Distribution Orders.

---

[1] Each capitalized term used, but not defined, herein shall bear the meaning ascribed to such term in the Memorandum or the Noteholder Plan.

*Chart 1 – Assumptions: (i) Step Two Lenders share in all Step One Lender recoveries even if Step Two Lender Claims are avoided; (ii) PHONES Notes Claims are Allowed in the amount of $703 million; and (iii) PHONES Notes Exchange Claims are classified as Subordinated Securities Claims and Allowed in the amount of $56 million.*

The following chart depicts estimated recoveries for each Class of Claims and Interests under the Noteholder Plan using the Chart 1 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $4.810 billion or 57.7% of the DEV using these assumptions.[2]

| Class | Estimated Claim Amounts[3] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 54.1% | 54.1% or 64.1%[4] | 70.9% | 75.9%[5] | 93.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 54.1% | 54.1% or 64.1%[6] | 70.9% | 75.9% | 93.3% |

---

[2] For purposes of this chart, after Initial Distributions are made to Creditors on the Initial Distribution Date, subsequent distributions are calculated based upon each Class's deficiency Claim – i.e., the aggregate Initial Distributions made to each Class are deducted from the aggregate amount of such Class's Allowed Claims and subsequent distributions to such Class are based on such "deficiency" claim amount.

[3] For the exclusive purpose of making Initial Distributions under the Noteholder Plan, the Step One Senior Loan Claims and Step Two Senior Loan Claims have been provisionally Allowed in the amounts listed above.  For the avoidance of doubt, the Claims of the LBO Lenders continue to be subject to challenge by the Litigation Trust.

[4] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[5] The recovery of Step Two Lenders in this scenario assumes the Sharing Provisions of the Senior Loan Agreement are enforceable.  Accordingly, because amounts recovered by Step Two Lenders in this scenario actually represent, in the first instance, recoveries of Step One Lenders on account of their Claims against the Debtors, when calculating the Step One Senior Lender deficiency claim amount for purposes of this chart, the aggregate value of Initial Distributions to Step One Lenders and Step Two Lenders is deducted from the aggregate amount of the Step One Lenders' Claims.

[6] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[3] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 54.1% or 0.0%[7] | 0.0% | 0.0% | 5.9% |
| Senior Noteholder Claims (Class 1F).[8] | $1.283 billion | 5.9% | 100.0% | 100.0% | 100.0% | 5.9% |
| Other Parent Claims (Class 1G). | $154 million[9] | 5.5% | 100.0% | 95.3% | 76.2% | 5.5% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[10] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[11] | 8.0% | 100.0% | 100.0% | 100.0%[12] | 8.0% |

---

[7] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[8] Estimated percentage recoveries shown for the Senior Noteholder Class are gross percentages. The actual estimated recovery percentages retained by the Senior Noteholders will be reduced to account for any payments required to be made on account of the Other Non-Guarantor Debtor Claims. Thus, for example, the net Initial Distribution for Senior Noteholder Claims will be 5.5%.

[9] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[10] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[11] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[12] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the Holders of such claims are not increased under this scenario. As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

| Class | Estimated Claim Amounts[3] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $703 million | 0.0% | 100.0% | 86.6% | 28.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $56 million | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

*Chart 2 – Assumptions: (i) Step Two Lenders share in all Step One Lender recoveries even if Step Two Lender Claims are avoided; and (ii) PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

The following chart depicts estimated recoveries for each Class of Claims and Interests under the Noteholder Plan using the Chart 2 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $4.410 billion or 52.9% of the DEV using these assumptions.[13]

| Class | Estimated Claim Amounts[14] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 49.5% | 49.5% or 58.7%[15] | 70.9% | 75.9%[16] | 93.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 49.5% | 49.5% or 58.7%[17] | 70.9% | 75.9% | 93.3% |

[13] For purposes of this chart, after Initial Distributions are made to Creditors on the Initial Distribution Date, subsequent distributions are calculated based upon each Class's deficiency Claim – i.e., the aggregate Initial Distributions made to each Class are deducted from the aggregate amount of such Class's Allowed Claims and subsequent distributions to such Class are based on such "deficiency" claim amount.

[14] For the exclusive purpose of making Initial Distributions under the Noteholder Plan, the Step One Senior Loan Claims and Step Two Senior Loan Claims have been provisionally Allowed in the amounts listed above.  For the avoidance of doubt, the Claims of the LBO Lenders continue to be subject to challenge by the Litigation Trust.

[15] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[16] The recovery of Step Two Lenders in this scenario assumes the Sharing Provisions of the Senior Loan Agreement are enforceable. Accordingly, because amounts recovered by Step Two Lenders in this scenario actually represent, in the first instance, recoveries of Step One Lenders on account of their Claims against the Debtors, when calculating the Step One Senior Lender deficiency claim amount for purposes of this chart, the aggregate value of Initial Distributions to Step One Lenders and Step Two Lenders is deducted from the aggregate amount of the Step One Lenders' Claims.

[17] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[14] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 49.5% or 0.0%[18] | 0.0% | 0.0% | 5.9% |
| Senior Noteholder Claims (Class 1F). [19] | $1.283 billion | 5.9% | 100.0% | 100.0% | 100.0% | 5.9% |
| Other Parent Claims (Class 1G). | $154 million[20] | 5.3% | 100.0% | 77.9% | 62.8% | 5.3% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[21] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[22] | 8.0% | 100.0% | 100.0% | 100.0%[23] | 8.0% |

---

[18] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[19] Estimated percentage recoveries shown for the Senior Noteholder Class are gross percentages. The actual estimated recovery percentages retained by the Senior Noteholders will be reduced to account for any payments required to be made on account of the Other Non-Guarantor Debtor Claims. Thus, for example, the net Initial Distribution for Senior Noteholder Claims will be 5.5%.

[20] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[21] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[22] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

| Class | Estimated Claim Amounts[14] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $1.197 billion | 0.0% | 100.0% | 53.1% | 18.2% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $0 | N/A | N/A | N/A | N/A | N/A |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Debtors (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Debtors (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

---

[23] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the Holders of such claims are not increased under this scenario.  As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

*Chart 3– Assumptions: (i) Step Two Lenders do not share in Step One Lender recoveries if Step Two Lender Claims are avoided; (ii) PHONES Notes Claims are Allowed in the amount of $703 million; and (iii) PHONES Notes Exchange Claims are classified as Subordinated Securities Claims and Allowed in the amount of $56 million.*

The following chart depicts estimated recoveries for each Class of Claims and Interests under the Noteholder Plan using the Chart 3 – Assumptions.  The Initial Distribution to all Classes in the aggregate is $3.674 billion or 44.1% of the DEV using these assumptions.[24]

| Class | Estimated Claim Amounts[25] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 54.1% | 54.1% or 64.1%[26] | 93.3% | 100.0% | 93.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 0.0% | 54.1% or 64.1%[27] | 0.0% | 0.0% | 93.3% |

---

[24] For purposes of this chart, after Initial Distributions are made to Creditors on the Initial Distribution Date, subsequent distributions are calculated based upon each Class's deficiency Claim – i.e., the aggregate Initial Distributions made to each Class are deducted from the aggregate amount of such Class's Allowed Claims and subsequent distributions to such Class are based on such "deficiency" claim amount.

[25] For the exclusive purpose of making Initial Distributions under the Noteholder Plan, the Step One Senior Loan Claims and Step Two Senior Loan Claims have been provisionally Allowed in the amounts listed above.  For the avoidance of doubt, the Claims of the LBO Lenders continue to be subject to challenge by the Litigation Trust.

[26] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if LBO Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[27] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO-Debt is avoided.  The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

| Class | Estimated Claim Amounts[25] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 54.1% or 0.0%[28] | 0.0% | 0.0% | 5.9% |
| Senior Noteholder Claims (Class 1F). [29] | $1.283 billion | 5.9% | 100.0% | 100.0% | 100.0% | 5.9% |
| Other Parent Claims (Class 1G). | $154 million[30] | 5.5% | 100.0% | 95.3% | 76.1% | 5.5% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[31] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[32] | 8.0% | 100.0% | 100.0% | 100.0%[33] | 8.0% |

[28] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[29] Estimated percentage recoveries shown for the Senior Noteholder Class are gross percentages. The actual estimated recovery percentages retained by the Senior Noteholders will be reduced to account for any payments required to be made on account of the Other Non-Guarantor Debtor Claims. Thus, for example, the net Initial Distribution for Senior Noteholder Claims will be 5.5%.

[30] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[31] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[32] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[33] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the

| Class | Estimated Claim Amounts[25] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PHONES Notes Claims (Class 1I). | $703 million | 0.0% | 100.0% | 86.6% | 28.0% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $56 million | 0.0% | 100.0% | 0.0% | 0.0% | 0.0% |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Subsidiaries (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Subsidiaries (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |

Holders of such claims are not increased under this scenario. As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

*Chart 4– Assumptions: (i) Step Two Lenders do not share in Step One Lender recoveries if Step Two Lender Claims are avoided; and (ii) PHONES Notes Claims are Allowed in the amount of $1.197 billion.*

The following chart depicts estimated recoveries for each Class of Claims and Interests under the Noteholder Plan using the Chart 4 – Assumptions. The Initial Distribution to all Classes in the aggregate is $3.370 billion or 40.5% of the DEV using these assumptions.[34]

| Class | Estimated Claim Amounts[35] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Step One Senior Loan Claims (Class 1C)/Step One Senior Loan Guaranty Claims (Classes 50C-111C). | $6.621 billion | 49.5% | 49.5% or 58.7%[36] | 93.3% | 100.0% | 93.3% |
| Step Two Senior Loan Claims (Class 1D)/Step Two Senior Loan Guaranty Claims (Classes 50D-111D). | $2.101 billion | 0.0% | 49.5% or 58.7%[37] | 0.0% | 0.0% | 93.3% |
| Bridge Loan Claims (Class 1E)/Bridge Loan Guaranty Claims (Classes 50E-111E). | $1.620 billion | 0.0% | 49.5% or 0.0%[38] | 0.0% | 0.0% | 5.9% |

[34] For purposes of this chart, after Initial Distributions are made to Creditors on the Initial Distribution Date, subsequent distributions are calculated based upon each Class's deficiency Claim – i.e., the aggregate Initial Distributions made to each Class are deducted from the aggregate amount of such Class's Allowed Claims and subsequent distributions to such Class are based on such "deficiency" claim amount.

[35] For the exclusive purpose of making Initial Distributions under the Noteholder Plan, the Step One Senior Loan Claims and Step Two Senior Loan Claims have been provisionally Allowed in the amounts listed above. For the avoidance of doubt, the Claims of the LBO Lenders continue to be subject to challenge by the Litigation Trust.

[36] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[37] The lower percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided. The higher percentage recovery is based on the outcome where all LBO Debt is avoided and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[38] The higher percentage recovery is based on the outcome where all Step One Lender Claims, Step Two Lender Claims and Bridge Loan Lender Claims are treated *pari passu* if all LBO Debt is avoided. The lower percentage recovery is based on the outcome where all LBO Debt is avoided

| Class | Estimated Claim Amounts[35] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| Senior Noteholder Claims (Class 1F). [39] | $1.283 billion | 5.9% | 100.0% | 100.0% | 100.0% | 5.9% |
| Other Parent Claims (Class 1G). | $154 million[40] | 5.3% | 100.0% | 77.9% | 62.7% | 5.3% |
| Other Non-Guarantor Debtor Claims (Classes 2G-49G). | $6 million[41] | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Other Guarantor Debtor Claims (Classes 50G-111G). | $112 million[42] | 8.0% | 100.0% | 100.0% | 100.0%[43] | 8.0% |
| EGI-TRB LLC Notes Claims (Class 1H). | $235 million | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

and all DEV remaining after non-LBO debt is paid in full is deemed to reside at the Guarantor Subsidiaries and the Bridge Loan Lenders remain contractually subordinated to the Step One Lenders and Step Two Lenders.

[39] Estimated percentage recoveries shown for the Senior Noteholder Class are gross percentages. The actual estimated recovery percentages retained by the Senior Noteholders will be reduced to account for any payments required to be made on account of the Other Non-Guarantor Debtor Claims. Thus, for example, the net Initial Distribution for Senior Noteholder Claims will be 5.5%.

[40] For illustrative purposes, the estimated Claim amount utilized herein for the Other Parent Claims is equal to the mid-point estimated Other Parent Claims amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan.

[41] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[42] The combined estimated Claim amounts utilized herein for the Other Guarantor Debtor Claims and Other Non-Guarantor Debtor Claims equal the mid-point estimated amount utilized in the specific disclosure statement to the Debtor/Committee/Lender Plan for the General Unsecured Claims (as defined in the Debtor/Committee/Lender Plan) against the Filed Subsidiary Debtors. The actual Allowed amounts of Other Parent Claims, Other Guarantor Debtors Claims and Other Non-Guarantor Debtor Claims may differ substantially depending on the outcome of the Claims reconciliation process.

[43] The Proponents do not believe that recoveries to Other Guarantor Debtor Claims will increase materially from the Initial Distributions if the Step One Lenders are entitled to benefit from the avoidance of Step Two Lender Claims and, therefore the estimated recovery percentage for the Holders of such claims are not increased under this scenario. As with all estimated recoveries contained herein, the recoveries under this scenario are for illustrative purposes only and actual ultimate recoveries are dependent upon, among other things, the outcome of the Litigation Trust Causes of Action, the DEV and the allocation of the DEV among Tribune and its subsidiaries.

| Class | Estimated Claim Amounts[35] | Estimated Recovery On Account of the Initial Distribution | Estimated Total Recovery if All LBO Debt is Avoided | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are not* Entitled to Benefit Therefrom | Estimated Total Recovery if Only Step Two LBO Debt/Bridge Loan Debt/EGI-TRB Notes are Avoided and Step One Lenders *are* Entitled to Benefit Therefrom | Estimated Total Recovery if the LBO Debt is Allowed (Not Avoided) |
|---|---|---|---|---|---|---|
| PHONES Notes Claims (Class 1I). | $1.197 billion | 0.0% | 100.0% | 53.1% | 18.2% | 0.0% |
| Subordinated Securities Claims (Class 1K). | $0 | N/A | N/A | N/A | N/A | N/A |
| Tribune Interests (Class 1L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Non-Guarantor Subsidiaries (Classes 2L-49L). | N/A | N/A | N/A | N/A | N/A | N/A |
| Interests in Guarantor Subsidiaries (Classes 50L-111L). | N/A | N/A | N/A | N/A | N/A | N/A |