# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al.,[1] | Jointly Administered |
| Debtors. | **Hearing Date: March 7, 2011** |

**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION AND OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION OF SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A.**

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Jessica C.K. Boelter
Allison Ross Stromberg
One South Dearborn Street
Chicago, IL 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telecopier: (302) 652-3117

*Counsel For Debtors and Debtors In Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel For the Official Committee of Unsecured Creditors*

DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253

*Counsel For Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701 5800

RICHARDS LAYTON & FINGER
Mark Collins
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel For JPMorgan Chase Bank, N.A.*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384);WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); and WLVI Inc. (8074); WPIX, Inc. (0191).  The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611

**Table of Contents**

I.      PRELIMINARY STATEMENT ...........................................................................1
II.     THE PROPOSED SETTLEMENTS OF CERTAIN LBO-RELATED CAUSES OF
        ACTION ARE FAIR AND EQUITABLE AND SHOULD BE APPROVED ................12
        A.     Background to the Proposed Settlement...............................................15
               1.     The Leveraged ESOP Transactions .........................................15
               2.     The LBO-Related Causes of Action .........................................17
               3.     The Proposed Settlement Is the Product of Years of Extensive
                      Investigation and Arm's Length Negotiations and Mediation before Judge
                      Gross .............................................................................19
        B.     Summary of the Proposed Settlement..................................................24
               1.     Allowance Settlement ............................................................25
               2.     Step Two/Disgorgement Settlement .........................................26
               3.     Releases...............................................................................27
               4.     Settlement Consideration .......................................................27
               5.     Competing Plans And Voting Results .......................................28
        C.     The Proposed Settlement Satisfies the Martin Factors and Should Be
               Approved ...........................................................................................28
               1.     Probability of Success on the Merits .......................................29
               2.     The Likely Difficulties in Collection.........................................65
               3.     Complexity, Expense, and Delay.............................................66
               4.     Paramount Interests of Creditors ............................................68
        D.     The Proposed Settlement Was Negotiated in Good Faith.....................70
               1.     The Noteholder Plan Proponents' Baseless Attacks on the
                      Debtor/Committee/Lender Plan Proponents................................72
III.    THE OTHER SETTLEMENTS IMPLEMENTED IN THE
        DEBTOR/COMMITTEE/LENDER PLAN ARE FAIR AND EQUITABLE AND
        SHOULD BE APPROVED ........................................................................81
        A.     The Intercompany Claims Settlement is Fair, Equitable and Reasonable and
               Should be Approved ...........................................................................81
        B.     The Retiree Claimant Settlement is Fair, Equitable and Reasonable and
               Should be Approved ...........................................................................85
IV.     THE CONTESTED ELEMENTS OF THE DEBTOR/COMMITTEE/LENDER PLAN
        ARE APPROPRIATE AND REASONABLE.................................................87
        A.     The Release, Exculpation, Injunction and Indemnification Provisions of the
               Debtor/Committee/Lender Plan are Appropriate and Should be Approved.89
               1.     The Direct Releases by the Debtors Satisfy the Zenith Factors.................89
               2.     The Holder Releases are Consensual and Should be Approved..............104
               3.     The Exculpation Provisions are Appropriate and Should be Approved..108
               4.     The Bar Order Is a Necessary and Appropriate Component of the
                      Settlement and Should be Approved.......................................111
               5.     The Indemnification Provisions are Appropriate and Should be Approved117
        B.     Objections to the Creditors' Trust and Litigation Trust Should be Overruled122
               1.     The Creditors' Trust Was Proposed in Good Faith ..................123

|   | 2. | The Objections of the Creditors' Trust Objectors to the Creditors' Trust are Meritless...................................................................................126 |
|---|---|---|
|   | 3. | The Objections by the Noteholder Plan Proponents and Wilmington Trust to the Creditors' Trust and Litigation Trust are Meritless.......................139 |
|   | 4. | The Parent GUC Trust Preference Does Not Inappropriately Discriminate Against Creditors Who Opted Out of the Creditors' Trust........................141 |
|   | 5. | The LBO Lenders Are Entitled to Receive Proceeds From the Litigation and Creditors' Trusts [37].....................................................................142 |
| C. | | **The Classification of Claims and Interests in the Debtor/Committee/Lender Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code** ...........................................................................144 |
|   | 1. | The Classification of the Swap Claim in Class 1F is Appropriate ..........145 |
|   | 2. | The Classification of the Department of Labor (the "DOL") and ERISA Claims in Classes 1L through 111L is Appropriate................................148 |
|   | 3. | The Classification of the IRS Claims is Appropriate..............................154 |
|   | 4. | The Classification of Senior Notes Indenture Trustee Claims in Class 1E is Appropriate .............................................................................155 |
| D. | | **The Debtor/Committee/Lender Plan is Feasible**............................................158 |
|   | 1. | The Purported FCC Issues Identified by the Noteholder Plan Proponents Relate to Matters Within the FCC's Exclusive Jurisdiction and at the Core of Its Regulatory Expertise .......................................................159 |
|   | 2. | The Purported FCC Issues Identified by the Noteholder Plan Proponents Have No Basis in FCC Rules or Case Law and Are Not Impediments to FCC Approval..............................................................................161 |
|   | 3. | The Remainder of the FCC Issues Identified by the Noteholder Plan Proponents Are Common to Both Plans and Thus Cannot Logically Be Raised as Objections to Confirmability of the Debtor/Committee/Lender Plan .......................................................................................169 |
| E. | | **The Debtor/Committee/Lender Plan's Treatment of Claims and Interests Complies with the Applicable Provisions of the Bankruptcy Code** ..............170 |
|   | 1. | The Debtor/Committee/Lender Plan Appropriately Applies Subordination Provisions of the PHONES Notes Indenture and the EGI-TRB LLC Notes170 |
|   | 2. | The Debtor/Committee/Lender Plan Appropriately Treats the Claims of the Other Objectors ................................................................174 |
| F. | | **The Debtor/Committee/Lender Plan Satisfies the Best Interests Test**..........177 |
| G. | | **The Debtor/Committee/Lender Plan Does Not Improperly Subordinate Securities Litigation Claims to Interests in the Filed Subsidiary Debtors** ...180 |
| H. | | **The Debtor/Committee/Lender Plan Does Not Unfairly Discriminate With Respect to the Senior Noteholders in Class 1E**...............................................182 |
| I. | | **The Debtor/Committee/Lender Plan Properly Provides for the Debtors' Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases**....................................................................183 |
| J. | | **All Other Unresolved Objections Should be Overruled**..................................185 |
|   | 1. | Neil Plaintiffs' Objection..........................................................185 |
|   | 2. | Limited Objection of Warren Beatty ..................................................187 |
|   | 3. | Caption Colorado, LLC ..............................................................187 |

K.      The Debtor/Committee/Lender Plan Proponents Submit that Certain Objections Are or Should Be Resolved Through Modifications to the Debtor/Committee/Lender Plan or Proposed Language in the Confirmation Order..................................................................................................188

    1.     Discharge and Injunction Provisions ......................................188
    2.     Treatment of Administrative Expense Claims and Priority Tax Claims .189
    3.     U.S. Trustee's Objection........................................................194
    4.     Ad Hoc Committee of Tribune Subsidiary Trade Creditors' Objection..195
    5.     ACE Companies' Objection .................................................196
    6.     Objection of the United States on Behalf of the U.S. Environmental Protection Agency (the "EPA Objection") .............................197
    7.     Illinois Secretary of State.......................................................198
    8.     The California Franchise Tax Board.......................................200
    9.     Miscellaneous Tax Authority Objections .............................201
    10.    Internal Revenue Service .......................................................201
    11.    Objection of Brigade and the Noteholder Plan Proponents to the Failure to Pay Post-Petition Interest.....................................................202
    12.    Tribune Employee Defendants ...............................................202
    13.    Federal Communications Commission ("FCC") ....................203

V.    THE DEBTOR/COMMITTEE/LENDER PLAN COMPLIES WITH ALL OTHER REQUIREMENTS OF SECTION 1129 OF THE CODE............................................203
    A.      The Debtor/Committee/Lender Plan Complies With All Other Applicable Provisions of 11 U.S.C. § 1129(a)........................................................203
    1.     The Debtor/Committee/Lender Plan Complies with All Applicable Provisions of the Bankruptcy Code as Required by 11 U.S.C. § 1129(a)(1)204
    2.     The Debtor/Committee/Lender Plan Proponents Have Complied with the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2)215
    3.     Appointment of the Debtors' Directors and Officers and Disclosure of All Necessary Information Related Thereto – 11 U.S.C. § 1123(a)(7) and § 1129(a)(5) ..............................................................................216
    4.     The Debtor/Committee/Lender Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6)......................................................217
    5.     The Debtor/Committee/Lender Plan Has Been Accepted by the Impaired Voting Classes – 11 U.S.C. § 1129(a)(8), Subject to Section 1129(b) of the Bankruptcy Code ...............................................................218
    6.     The Debtor/Committee/Lender Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9) ...................219
    7.     At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10) ......................................................................220
    8.     The Debtor/Committee/Lender Plan is Feasible – 11 U.S.C. § 1129(a)(11)222
    9.     The Debtor/Committee/Lender Plan Provides for the Continuation of the Debtors' Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13)............223
    10.    Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code are Inapplicable .224
    11.    The Debtor/Committee/Lender Plan Is Not An Attempt to Avoid Tax Obligations – 11 U.S.C. § 1129(d) ..........................................224

|       | B.     | The Debtor/Committee/Lender Plan Satisfies the "Cram Down" Requirement for Confirmation Under Section 1129(b) of the Plan | 224 |

VI.    PLAN MODIFICATIONS.................................................................................225
     A.     Request for Authorization to Make Plan Modifications ...................226
     B.     Authority for Requested Relief.........................................................227
VII.   SECTION 1129(C) OF THE BANKRUPTCY CODE FAVORS CONFIRMATION OF THE **DEBTOR/COMMITTEE/LENDER** PLAN.......................................................228
     A.     The Debtor/Committee/Lender Plan Should be Confirmed Because it is Preferred by Creditors ................................................................................230
     B.     Additional Factors Considered by Courts Evaluating Competing Plans also Support Confirming the Debtor/Committee/Lender Plan...........................231
          1.     The Debtor/Committee/Lender Plan should be Confirmed because it Provides Better Treatment to Creditors ...................................................232
          2.     The Debtor/Committee/Lender Plan should be Confirmed because it is More Feasible than the Noteholder Plan.................................................234
          3.     The Debtor/Committee/Lender Plan should be Confirmed because it is More Focused on Reorganizing the Debtors than the Noteholder Plan...238
VIII.  CONCLUSION................................................................................................240

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adelphia Recovery Trust v. Bank of America,
    390 B.R. 80 (S.D.N.Y. 2008).................................................................55

Barber v. Westbay (In re Integrated Agri., Inc.),
    313 B.R. 419 (Bankr. C.D. Ill. 1993)..........................................131, 132

Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,
    296 F.3d 164 (3d Cir. 2002)..................................................................132

Board of Commissioners v. Hurley,
    169 F. 92 (8th Cir. 1909) ........................................................................62

Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.),
    388 B.R. 46 (D. Del. 2008)....................................................................52

Brown v. Owens Corning Inv. Review Comm.,
    541 F. Supp. 2d 958 (N.D. Ohio 2008)................................................151

Buckley v. O'Hanlon,
    Case No. 04-955 (GMS) 2007 WL 956947 (D. Del. Mar. 28, 2007)....................129

Buffum v. Peter Barceloux Co.,
    289 U.S. 227 (1933)..............................................................................143

Butler v. Becton, Dickinson And Co. (In re Loomer),
    198 B.R. 755 (Bankr. D. Neb. 1996) ...................................................100

Caplin v. Marine Midland Grace Tr. Co. of N.Y.,
    406 U.S. 416 (1972)..................................................126, 127, 129

Casey Nat'l Bank v. Roan,
    282 Ill. App. 3d 55 (Ill. App. Ct. 1996) ..............................................131

Celotex Corp. v. Edwards,
    514 U.S. 300 (1995)..............................................................................116

Christian v. Mason,
    219 P.3d 473 (Idaho 2009)....................................................................131

Christy v. Alexander & Alexander of New York Inc. (In re Finley),
    130 F.3d 52 (2d Cir. 1997)......................................................................65

Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,
    160 F.3d 982 (3d Cir. 1998)................................................................46, 133

Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),
    280 F.3d 648 (6th Cir. 2002) ................................................................215

Denney v. Deutsche Bank AG,
    443 F.3d 253 (2d Cir. 2006)................................................................113

Dixon v. Bennett,
    531 A.2d 1318 (Md. Ct. App. 1987)................................................131, 134

Eichenholtz v. Brennan,
    52 F.3d 478 (3d Cir. 1995)................................................111, 112, 113, 114

FDIC v. Davis,
    733 F.2d 1083 (4th Cir. 1984) ................................................................131

Gerber v. MTC Elec. Techs. Co., Ltd.,
    329 F.3d 297 (2d Cir. 2003)................................................................111

Grede v. Bank of New York Mellon,
    598 F.3d 899 (7th Cir. 2010) ................................................................127

Guidry v. Sheet Metal Workers,
    493 US 365 (1990)................................................................99

Hatchett v. United States,
    330 F.3d 875 (6th Cir. 2003) ................................................................131, 132

Heartland Fed'n Sav. & Loan Ass'n v. Briscoe Enters. Ltd. II (In re Briscoe Enters., Ltd. II),
    994 F.2d 1160 (5th Cir. 1993) ................................................................88

Heins v. Ruti-Sweetwater, Inc. (In re Ruti Sweetwater, Inc.),
    836 F.2d 1263 (10th Cir. 1988) ................................................................221

Hutson v. E.1. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC),
    556 F.3d 247 (4th Cir. 2009) ................................................................146

In re 203 N. LaSalle St. Ltd. P'ship.,
    190 B.R. 567 (Bankr. N.D. Ill. 1995) ................................................................182, 183

In re AbitibiBowater Inc.,
    Case No. 09-11296 (KJC) (Bankr. D. Del. Nov. 23, 2010)................................................................175

In re Adelphia Communications Corp.,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)................................................................221

vi

In re Adelphia Communications Corp.,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) ...................................................................69

In re Affiliated Media, Inc.,
    Case No. 10-10202 (Bankr. D. Del.) (KJC) ........................................................209

In re Aleris Int'l, Inc.
    (Case No. 09-10478) ...........................................................................................109

In re Allegheny Int'l, Inc.,
    134 B.R. 814 (Bankr. W.D. Pa. 1991) ................................................................123

In re Am. Family Enters.,
    256 B.R. 377 (D. N.J. 2000) ...............................................................................178

In re Armstrong World Indus., Inc.,
    348 B.R. 111 (D.Del. 2006) ..........................................................................88, 182

In re Autolend Group, Inc.,
    Case No. 97-15499 (MBM) (Bankr. D.N.M. Aug. 14, 2000) .............................121

In re Baldwin-United Corp., D.H.,
    43 B.R. 443 (S.D. Ohio 1984) .....................................................................118, 121

In re Berg,
    376 B.R. 303 (Bankr. D. Kan. 2007) ..................................................................130

In re Best Prods. Co.,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ..................................................................143

In re Betacom of Phoenix, Inc.,
    240 F.3d 823 (9th Cir. 2001) ..............................................................................152

In re Blackwell,
    267 B.R. 732 (Bankr. W.D. Tex. 2001) ................................................................55

In re Buffets Holdings, Inc.,
    Case No. 08-10141 (MFW) (Bankr. D. Del. April 17, 2009)...............................107

In re Capmark,
    438 B.R. 471 (Bankr. D. Del. 2010) ...............................................................63, 69

In re Celotex Corp.,
    204 B.R. 586 (Bankr. M.D. Fla. 1996) .........................................................226, 228

In re Century Glove, Inc.,
    74 B.R. 958 (Bankr. D. Del. 1987) ......................................................................225

In re Chemtura Corp.,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010)................................................................124

In re Citadel Broadcasting Corporation et al.,
    Case No. 09-17442 (Bankr. S.D.N.Y.) (BRL)....................................................209

In re Continental Airlines,
    203 F.3d 203 (3d Cir. 2000)..............................................................................115

In re Coram Healthcare Corp.,
    315 B.R. 321 (Bankr. D. Del. 2004) ..........................................................passim

In re Crabtree & Evelyn, Ltd.,
    2010 WL 3638369 (Bankr. S.D.N.Y. Jan. 14, 2010).........................................119

In re Crdentia Corp.
    (Case No. 10-10926).........................................................................................109

In re Dana Corp.,
    412 B.R. 53 (S.D.N.Y. 2008)...................................................................141, 206

In re Dana Corp.,
    2007 Bankr. LEXIS 4404 (Bankr. S.D.N.Y. Dec. 26, 2007).............................119

In re Deep Marine Holdings, Inc.,
    2011 WL 160595 (Bankr. S.D. Tex. Jan. 19, 2011) .........................................154

In re Delta Airlines, Inc.,
    Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 24, 2007).......................................209

In re Drexel Burnham Lambert Group Inc.,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)......................................................144, 216

In re Dura Automotive Sys. Inc.,
    Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008) ...............................107

In re EBHI Holdings, Inc.
    2010 WL 3493027 (Bankr. D. Del. Mar. 18, 2010)..........................................109

In re Enron Corp.,
    341 B.R. 141 (Bankr. S.D.N.Y. 2006)......................................................148, 152

In re Enron Corp. Secs.,
    2008 U.S. Dist LEXIS 48516 (S.D. Tex. June 24, 2008) ..................................112

In re Exide Techs.,
    303 B.R. 48 (Bankr. D. Del. 2003) ...............................................12, 28, 29, 91

In re Federal-Mogul Global Inc.,
    2007 WL 4180545 (Bankr. D. Del. 2007) ............................................................91

In re Federal-Mogul Global Inc.,
    Case No. 01-10578 (Bankr. D. Del. Nov. 8, 2007) .............................................209

In re Foxmeyer,
    296 B.R. 327 (Bankr. D. Del. 2003) ....................................................................55

In re Freymiller Trucking, Inc.,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ............................................................182

In re G Survivor Corp.,
    171 B.R. 755 (Bankr. S.D.N.Y. 1994) ................................................................210

In re Genesis Health Ventures, Inc.,
    266 B.R. 591 (Bankr. D. Del. 2001) ............................................................91, 178

In re Geneva Steel Co.,
    281 F.3d 1173 (10th Cir. 2002) ..........................................................................151

In re Gillette Assoc., Ltd.,
    101 B.R. 866 (Bankr. N.D. Ohio 1989) ..............................................................156

In re Great Bay Hotel & Casino,
    251 B.R. 213 (Bankr. D.N.J. 2000) ...............................................222, 232, 235

In re Handel,
    301 B.R. 421 (Bankr. S.D.N.Y. 2003) ................................................................100

In re Hilex Poly Co. LLC,
    Case No. 08-10890 (KJC) (Bankr. D. Del. June 26, 2008) ................................175

In re Holley Garden,
    238 B.R. 488 (Bankr. M.D. Fla. 1999) ......................................229, 232, 234, 238

In re Hotel Assocs. of Tucson,
    165 B.R. 470 (B.A.P. 9th Cir. 1994)..................................................................123

In re Int'l Wireless Commc'n Holdings, Inc.,
    1999 Bankr. LEXIS 1853 (Bankr. D. Del. 1999) ...............................................182

In re Integrated Telecom Express, Inc.,
    384 F.3d 108 (3d Cir. 2004)...............................................................................123

In re Jersey City Med. Ctr.,
    817 F.2d 1055 (3d Cir. 1987)......................................................................144, 145

In re Kennedy,
    158 B.R. 589 (Bankr. D. N.J. 1993) ....................................................................183

In re Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.),
    336 B.R. 87 (D. Del. 2005)..............................................................13, 69, 86

In re Lenco, Inc.,
    116 B.R. 141 (E.D. Mo. 1990)................................................................151, 152

In Re Leslie Fay Companies, Inc.,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997)..................................................................182

In re Machne Menachem,
    233 F. App'x 119 (3d Cir. 2007) ....................................................................138

In re Master Mortgage,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)..................................................................91

In re Masters Mates & Pilots Pension Plan,
    957 F.2d 1020 (2d Cir. 1992)....................................................................112

In re Matter of Sound Radio, Inc.,
    93 B.R. 849 (Bankr. D. N.J. 1988) ....................................................................234

In re Maxim Indus., Inc.,
    22 B.R. 611 (Bankr. D. Mass. 1982) ....................................................................124

In re Mayer Pollack Steel Corp.,
    174 B.R. 414 (Bankr. E.D. Pa. 1994) ....................................................................222

In re McGhan,
    288 F.3d 1172 (9th Cir. 2002) ....................................................................116

In re Michener,
    342 B.R. 428 (Bankr. D. Del. 2006) ....................................................................123

In re Monroe Well Service, Inc.,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ....................................................................106

In re Mount Vernon Community Plaza Urban Redevelopment Corp. I,
    79 B.R. 305 (Bankr. S.D. Ohio 1987)................................................................226, 228

In re Mrs. Fields' Original Cookies, Inc.,
    Case No. 08-11953 (PJW) (Bankr. D. Del. Oct. 2, 2008) ....................................................................107

In re Munford, Inc.,
    172 B.R. 404 (N.D. Ga. 1993) ....................................................................113

In re Murphy,
    331 B.R. 107 (Bankr. S.D.N.Y. 2005) ................................................................55

In re Natural Products Group, LLC,
    2010 WL 2745983 (Bankr. D. Del. Feb. 22, 2010) ............................................110

In re Neenah Enters., Inc.,
    2010 Bankr. Lexis 3058 (MFW) (Bankr. D. Del. July 6, 2010) ............................175

In re Nellson Nutraceutical, Inc.,
    Case No. 06-10072 (CSS) (Bankr. D. Del. Sept. 10, 2008)..................................107

In re New Century TRS Holdings, Inc.,
    390 B.R. 140 (Bankr. D. Del. 2008) ............................................................28, 29

In re NexPak Corp.
    2010 WL 5053973 (Bankr. D. Del. May 18, 2010)............................................109

In re NextMedia Group, Inc.
    2010 WL 2745970 (Bankr. D. Del. Mar. 27, 2010)...........................................109

In re NII Holdings, Inc.,
    288 B.R. 355 (Bankr. D. Del. 2002) ...............................................................119

In re NII Holdings, Inc.,
    288 B.R. 356 (Bankr. D. Del. 2002) .................................................................91

In re Nutritional Sourcing Corp.,
    398 B.R. 816 (Bankr. D. Del. 2008) .................................................................87

In re Oaks Partners. Ltd.,
    141 B.R. 453 (Bankr. N.D. Ga. 1992) .............................................................238

In re Orchards Village Investments,LLC,
    2010 WL 143706 (Bankr. D. Or. Jan. 8, 2010) .................................................229

In re Orion Pictures Corp.,
    4 F.3d 1095 (2d Cir. 1993)............................................................................210

In re Panolam Holdings Co.,
    2009 WL 7226968 (Bankr. D. Del. Dec. 10, 2009)...........................................119

In re PCAA Parent, LLC
    2010 WL 2745980 (Bankr. May 17, 2010)......................................................109

In re Placid Oil Co.,
    92 B.R. 183 (Bankr. N.D. Tex. 1988)......................................................226, 228

In re Prussia Assocs.,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...................................................................222

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000)...............................................................97, 98, 109, 215

In re Reading Broadcasting, Inc.,
    2009 Bankr. LEXIS 2593 (Bankr. E.D. Pa. Jan. 17, 2009) ..................................225

In re Reading Broadcasting, Inc.,
    386 B.R. 562 (Bankr. E.D. Pa. 2008) ..................................................................159

In re Resorts Int'l Inc.,
    145 B.R. 112 (Bankr. D.N.J. 1990) .....................................................................215

In re River Village Associates,
    181 B.R. 795 (E.D. Pa. 1995) .............................................................................232

In re Sacred Heart Hospital of Norristown,
    182 B.R. 413 (Bankr. E.D. Pa. 1995) ....................................................................62

In re Sea Containers Ltd.,
    2008 WL 4296562 (Bankr. D. Del. Sept. 19, 2008) ...............................................69

In re Seaquest Diving, L.P.,
    579 F.3d 411 (5th Cir. 2009) .......................................................................149, 153

In re Smurfit-Stone Container Corp.,
    Case No. 09-10235 (BLS) (Bankr. D. Del. June 21, 2010) ...................................175

In re Spansion, Inc.,
    Case No. 09-10690 (KJC) (Bankr. D. Del. April 7, 2010) ....................................175

In re Spansion, Inc.,
    No. 09-10690, 2009 WL 14531788 (Bankr. D. Del. June 2, 2009).........................12, 115, 123

In re Student Finance Corp.,
    382 B.R. 212 (Bankr. D. Del. 2007) ......................................................................18

In re Stylesite Marketing, Inc.,
    253 B.R. 503 (Bankr. S.D.N.Y. 2000)..................................................................153

In re Submicron Systems Corp.,
    432 F.3d 448 (3d Cir. 2006)...........................................................................82, 83

In re Summit Metals, Inc.,
    379 B.R. 40 (Bankr. D. Del. 2007) ......................................................................120

In re T-H New Orleans Ltd. P'ship,
    116 F.3d 790 (5th Cir. 1997) ......................................................................222

In re TCI 2 Holdings, LLC,
    428 B.R. 117 (Bankr. D.N.J. 2010) ..............................................159, 229, 230

In re Telegroup, Inc.,
    281 F.3d 133 (3d Cir. 2002).......................................................... passim

In re Telesphere Commc'ns, Inc.,
    179 B.R. 544 (N.D. Ill. 1994) ...................................................................142

In re Temple Zion,
    125 B.R. 910 (Bankr. E.D. Pa. 1991) ......................................................159

In re Teton Energy Corp.
    (Case No. 09-13946)..................................................................................110

In re Texaco, Inc.,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...................................................28, 29

In re THC Fin. Corp.,
    446 F. Supp. 1329 (D. Haw. 1977).......................................................118, 120

In re Touch Am. Holdings, Inc.,
    381 B.R. 95 (Bankr. D. Del. 2008) ........................................151, 152, 153

In re Toy & Sports Warehouse, Inc.,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ........................................................222

In re Trans World Airlines, Inc.,
    185 B.R. 302 (Bankr. E.D. Mo. 1995).................................................226, 228

In re Valley View Shopping Center L.P.,
    260 B.R. 10 (Bankr. D. Kan. 2001) ..........................................................238

In re Washington Mut., Inc.,
    2011 WL 57111 (Bankr. D. Del. 2011) .....................................................141

In re Washington Mutual, Inc.,
    2011 Bankr. LEXIS 56 (Bankr. D. Del. Jan. 7, 2011) ...............................63

In re Washington Mutual, Inc.,
    Case No. 08-12229 (MFW) (Bankr. D. Del. Jan. 7, 2011) .....................89, 93

In re WebSci Techs., Inc.,
    234 Fed. Appx. 26 (3d Cir. 2007) .............................................................174

xiii

In re West Coast Video Enters., Inc.,
    174 B.R. 906 (Bankr. E.D. Pa. 1994) .........................................................92, 106

In re Woolley's Parkway Ctr., Inc.,
    147 B.R. 996 (Bankr. M.D. Fla. 1992) ..................................................................124

In re Worldcom, Inc.,
    2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .........................................110

In re Worldcom Inc., ERISA Litig.,
    339 F. Supp. 2d 561 (S.D.N.Y. 2004).....................................................................112

In re Zenith Elecs. Corp.,
    241 B.R. 92 (Bankr. D. Del. 1999) ............................................................... passim

In re: Smurfit-Stone Container Corp.,
    Case No. 09-10235 (Bankr. D. Del. 2010) ...............................................................62

Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion
    Media Networks, Inc.),
    419 B.R. 585 (Bankr. S.D.N.Y. 2009).........................................................180, 181

John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.,
    987 F.2d 154 (3d Cir. N.J. 1993) ..................................................................154, 156

Kathy B. Enters. Inc. v. United States,
    779 F.2d 1413 (9th Cir. 1986) ................................................................................131

Kipperman v. Onex Corp.,
    411 B.R. 805 (N.D. Ga. 2009) ......................................................................128, 129

Klingman v. Levinson,
    158 B.R. 109 (N.D. Ill. 1993) .......................................................................130, 131

Martorana v. Board of Trustees of Steamfitters Local Union 420 Health, Welfare and
    Pension Fund,
    404 F.3d 797 (3d Cir. 2005)......................................................................................99

Maxwell v. KPMG LLP,
    520 F.3d 713 (7th Cir. 2008) ..................................................................................139

Mervyn's Holdings, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings,
    LLC),
    2010 Bankr. LEXIS 670 (Bankr. D. Del. Mar. 17, 2010).......................................38

Mukamal v. Bakes,
    383 B.R. 798 (S.D. Fla. 2007) ................................................................................129

Munford v. Munford, Inc. (In re Munford, Inc.),
    97 F.3d 449 (11th Cir. 1996) .......................................................................112

Myers v. Martin (In re Martin),
    91 F.3d 389 (3d. Cir. 1996)...................................................................... passim

Neil v. Zell,
    2010 WL 4670895 (N.D. D. Ill. Nov. 9, 2010).....................................149, 186, 187

NLRB v. Bildisco & Bildisco,
    465 U.S. 513 (1984)...............................................................................210

Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit
    Partners L.P. (In re Fedders N. Am., Inc.),
    405 B.R. 527 (Bankr. D. Del. 2009) ...............................................................47

Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group.
    (In re Hechinger Inv. Co.),
    274 B.R. 71 (D. Del. 2002).................................................49, 136, 137, 138

Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),
    226 F.3d 237 (3d Cir. 2000)...............................................................130, 133

Official Comm. of Unsecured Creditors v. Citicorp N.A., Inc. (In re Aluminum Mills
    Corp.),
    132 B.R. 869 (Bankr. N.D. Ill. 1991) ...................................................129, 132

Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants,
    Inc.),
    287 B.R. 41 (Bankr. D.N.J. 2002) .................................................................66

Patterson v. Shumate,
    504 U.S. 753 (U.S. 1992).........................................................................99

PHP Liquidating, LLC v. Robbins,
    291 B.R. 603 (D. Del. 2003)......................................................................137

Rickel & Assocs. Inc. v. Smith (In re Rickel & Assocs.),
    272 B.R. 74 (Bankr. S.D.N.Y. 2002).............................................................77

Sears Petroleum & Transp. Corp. v. Burgess Constr. Servs., Inc.,
    417 F.Supp.2d 212 (D. Mass. 2006) .......................................................130, 131

Semi-Tech Litigation, LLC v. Bankers Trust Co.,
    272 F. Supp.2d 319 (S.D.N.Y. 2003)............................................................127

Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.,
    872 F.2d 36 (3d Cir. 1989).......................................................................210

xv

Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),
    403 F.3d 43 (2d Cir. 2005)........................................................................52

St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,
    884 F.2d 688 (2d Cir. 1989)............................................................130, 132

Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co.),
    800 F.2d 581 (6th Cir. 1986) ...................................................................145

Telemundo Communications Group, Inc.,
    17 FCC Rcd 6958 (2002)........................................................163, 164, 165

Thrifty Oil Co. v. Bank of America Nat'l Trust and Savings Assoc.,
    322 F.3d 1039 (9th Cir. 2003) .................................................................146

Trenwick Am. Lit. Trust v. Ernst & Young, L.L.P.,
    906 A.2d 168 (Del. Ch. 2006)..................................................................129

U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion),
    426 B.R. 114 (Bankr. D. Del. 2010) ................................................ passim

Unisys Corp. v. Dataware Prods., Inc.,
    848 F.2d 311 (1st Cir. 1988)....................................................................131

United States v. Cunan,
    156 F.3d 110 (1st Cir. 1998) ......................................................................79

United States v. Doyle,
    276 F. Supp.2d 415 (W.D. Pa. 2003)......................................................131

Velis v. Kardanis,
    949 F.2d 78 (3d Cir. 1991).......................................................................100

VFB LLC v. Campbell Soup Co.,
    482 F.3d 624 (3d Cir. 2007)......................................................................41

Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),
    161 B.R. 107 (E.D. Pa. 1993......................................................................47

Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Serv. Sys., Inc.),
    246 F.3d 233 (3d Cir. 2001)......................................................................77

Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Serv. Sys., Inc.),
    327 B.R. 561 (W.D. Pa. 2005)...................................................................77

Whyte v. Kivisto (In re SemCrude, L.P.),
    2010 Bankr. LEXIS 4160 (Bankr. D. Del. Nov. 19, 2010) ..................111, 113, 114

Will v. Northwestern Univ. (In re Nutraquest, Inc.),
    434 F.3d 639 (3d Cir. 2006)........................................................28, 111

Zurich Ins. Co. v. Baxter Int'l, Inc.,
    670 N.E.2d 664 (Ill. 1996) ...................................................135

**STATUTES**

805 ILCS 5/1.01, *et. seq.*.........................................................198

11 U.S.C. 524(e) ...........................................................................64

11 U.S.C. § 102(3) ......................................................................225

11 U.S.C. §§ 328 and 1103 ..........................................................79

11 U.S.C. §§ 365 and 1123(b)(2).................................................209

11 U.S.C. §§ 502 (d), (h) .............................................................142

11 U.S.C. § 503(b) ...............................................................122, 155

11 U.S.C. § 544(b) ................................................................. passim

11 U.S.C. § 546(a) ...............................................................131, 132, 140

11 U.S.C. § 548(a)(1).....................................................................43

11 U.S.C. § 548(a)(1)(A) ...............................................................18

11 U.S.C. § 548(a)(1)(B) ...............................................................18

11 U.S.C. § 548(d)(2)(D) .............................................................146

11 U.S.C. §§ 726(a)(5), 1129(a)(7), 1129(b) ...............................63

11 U.S.C. § 1122(a) .............................................................. passim

11 U.S.C. § 1123(a)(4)........................................................141, 205, 206

11 U.S.C. § 1123(a)(5)................................................................207

11 U.S.C. § 1123(a)(6)..........................................................208, 209

11 U.S.C. § 1123(a)(7) and § 1129(a)(5) ...................................216

11 U.S.C. § 1123(b)(3)(A)......................................................85, 90

11 U.S.C. § 1129(a)(1)..........................................................122, 204

11 U.S.C. § 1129(a)(2) ............................................................215, 216

11 U.S.C. § 1129(a)(4) ............................................................194, 204

11 U.S.C. § 1129(a)(6) ...................................................................217

11 U.S.C. § 1129(a)(8) .................................................................88, 218

11 U.S.C. § 1129(a)(9) ............................................................219, 220

11 U.S.C. § 1129(a)(10) ..........................................................220, 221

11 U.S.C. § 1129(a)(12) ..........................................................195, 204

11 U.S.C. § 1129(a)(13) ..........................................................223, 224

11 U.S.C. § 1129(b)(2) ...................................................................225

11 U.S.C. § 1129(d) .......................................................................224

28 U.S.C. § 157(b)(2)(L) ................................................................109

29 U.S.C. § 1056(d)(1) ...................................................................99

47 U.S.C. §§ 309(b), (d) ................................................................161

47 U.S.C. § 310(d) ...................................................................159, 160

Del. Code Ann. tit. 10 § 6304(b) ....................................................113

**OTHER AUTHORITIES**

47 C.F.R. § 73.3555 .................................................................160, 161

47 C.F.R. § 73.3555 .......................................................................166

47 C.F.R. § 73.3555 .......................................................................165

47 C.F.R. § 73.3587 .......................................................................161

Collier Bankruptcy Manual ¶ 550.02 (2009) .....................................65

Fed. R. Bankr. P. 2014 ....................................................................79

Fed. R. Bankr. P. 3019 ..................................................................228

H.R. Rep. No. 95-595 (1977) .........................................................215

H.R. Rep. No. 95-595 (1977) .........................................................182

xviii

S. Rep. No. 95-989 (1978) ................................................................................................215

Tribune Company ("Tribune") and certain of its subsidiaries (collectively, the "Debtors" or the "Company"), the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan") (collectively, the "Debtor/Committee/Lender Plan Proponents") hereby submit this memorandum of law (the "Memorandum") in support of an order confirming the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P. and JPMorgan Chase Bank, N.A. [Docket No. 7801] (as such has been or may be further amended, modified or supplemented from time to time, the "Debtor/Committee/Lender Plan") pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code").[2]  This Memorandum addresses the confirmation standards under the Bankruptcy Code and each of the objections to the Debtor/Committee/Lender Plan.[3]

## I.   PRELIMINARY STATEMENT

### What Is at Stake in the Fraudulent Transfer Disputes?

Because the LBO Lender Debt dwarfs the other claims against the Tribune Entities and, owing to the Subsidiary Guarantees, occupies a structurally senior position, if this indebtedness is not avoided, subordinated, or disallowed, the holders of those claims would recover most of the value available from the Debtors' bankruptcy estates.  Avoidance of the LBO Lender Debt affords the Non-LBO Creditors an opportunity to unravel its structural seniority at the Guarantor Subsidiaries level, and thereby move to the head of the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Debtor/Committee/Lender Plan or related Specific Disclosure Statement for the First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [Docket No. 7135] (the "Debtor/Committee/Lender Specific Disclosure Statement").
[3] To assist the parties that objected to the Debtor/Committee/Lender Plan with locating the Debtor/Committee/Lender Plan Proponents' response to their objection, attached hereto as Appendix A is a chart listing the objections and the location in this Memorandum where such objections are addressed.

line.   Thus, among the above-listed potential avoidances and recoveries underlying Question One, the actions to avoid the LBO Lender Debt are the proverbial "main event."

Report of Kenneth N. Klee, as Examiner ("<u>Examiner Report</u>"), Vol. 2 at p. 10.

For the past two years, the Tribune Debtors, their estate fiduciaries, and their major stakeholders have been combatants in that "main event" where the stakes are high.  If the creditor claims of the so-called "LBO Lenders" (the Senior Lenders and the Bridge Lenders) are fully enforceable, the Senior Lenders would be entitled to a recovery of approximately 76% of the $8.6 billion they loaned the Debtors, and the Bridge Lenders would be entitled to a recovery of approximately 4.8% of the $1.6 billion they loaned the Debtors, with bondholders (holders of the Senior Notes) and most other creditors receiving just a few pennies on the dollar.  On the other hand, if actions to avoid the LBO Lender claims are fully successful, Senior Lender recoveries would be reduced by billions of dollars to approximately 41% and the Bridge Lenders would receive nothing, with bondholders and others being paid in full.  There are a number of other possible litigation outcomes that, in theory, could produce recoveries anywhere between these extremes.

The Debtor/Committee/Lender Plan embodies a compromise that enables stakeholders to avoid the risk and uncertainty of litigated extremes while, like all good settlements, providing outcomes that are not fully satisfactory to any of the constituencies.  That compromise was forged by an independent Mediator after an extended multi-party mediation and a year of almost continuous negotiation among representatives of all major stakeholders – negotiations that produced no fewer than three prior plan proposals that failed to achieve necessary consensus (and, at various times with respect to different plans, were either supported or opposed by one or more of the Debtors, the Creditors' Committee, and representatives of the Senior Lenders, the Bridge Lenders, and the Senior Noteholders).  The proposed compromise is informed (and fully

supported) by the conclusions of an independent Examiner, which served as a backdrop for the

mediation and extensive negotiations conducted since issuance of the Examiner Report.

    The evidence and expert testimony will show that the hard-fought bargain struck among

the Debtors, the Creditors' Committee, the Senior Lenders, and the Bridge Lenders is

fundamentally fair, well within the range of reasonableness, and in the best interests of the

Debtors, their bankruptcy estates, and all creditors.  Among other things –

- The Proposed Settlement (as defined below) provides bondholders, trade creditors, and other general unsecured creditors of Tribune an immediate, <u>all-cash</u> distribution of at least 33% of their claims.  This locks in immediate distributions substantially above the 4.8% "natural recoveries" to which such creditors would be entitled if the Senior Loan Claims and Bridge Loan Claims are not avoided, and it enables those who see merit in the various LBO-Related Causes of Action to participate in the potential upside of future litigation recoveries, as discussed below.  In turn, the compromise obligates the Senior Lenders and the Bridge Lenders to give up at least $413 million in distributions to which they would be entitled if the Senior Loan and Bridge Loan Claims were allowed in full.

- The compromise ensures receipt by the Senior Noteholder class of a guaranteed <u>$120 million in cash</u> from lenders who received pre-petition payments on "Step Two" obligations (the Incremental tranche of the Senior Loans and the Bridge Loans).

- The compromise provides trade and other unsecured creditors of Tribune's subsidiaries recoveries of 100% on their claims, substantially greater than their "natural recoveries" of less than 3% on average and substantially greater than the cumulative 70% recovery for the Senior Loan Guaranty Claims of equal priority asserted against most of those same debtor entities.

- The compromise provides Senior Noteholders and electing trade creditors a disproportionate share, relative to their entitlements based on their "natural recoveries," of recoveries from the Litigation Trust and the Creditors' Trust.  In particular, the first $90 million of distributable value from the Trusts will go solely to those creditors, with no distribution made to the Senior Lenders or the Bridge Lenders.  Trust recoveries will then be applied to repay the Trusts' Loan in full, and the Senior Noteholders and electing trade creditors then will receive 65% of all additional value distributable to creditors beyond the first $110 million.  In contrast, absent disallowance of their claims, the Senior Lenders and the Bridge Lenders would be entitled to approximately 85% of every dollar distributed by the Trusts, with the Senior Noteholders and electing trade creditors limited to sharing the remaining 15%.

- The compromise provides for a <u>$20 million</u> loan to fund the Litigation and Creditors' Trusts.  Those Trusts will pursue claims against certain shareholders who were

3

cashed out in the Leveraged ESOP Transactions, against advisors who assisted in formulating the Transactions, and against directors, officers, and others alleged to have liability as a result of the Transactions.

- The compromise enables Tribune and all of the Debtors to exit bankruptcy in the near future, delivering significant value to creditors without tying up most of the value of the Estates for an indeterminate period of time while litigation over the Claims of the LBO Lenders awaits resolution. This frees the Debtors from the constraints of chapter 11, eliminates value-depressing uncertainty over future ownership, enables pursuit of new business opportunities, and maximizes the future prospects of a multi-billion dollar enterprise that employs more than 12,600 people across the country. It also accelerates the distribution of value to creditors, eliminating the substantial opportunity cost all parties would suffer if their distributions awaited the conclusion of protracted litigation.

The Bankruptcy Court will hear testimony and see an extensive documentary record that will make clear that the Debtor/Committee/Lender Plan was negotiated at arm's length among ably represented, highly adversarial parties, each attempting to generate the best result possible for themselves and their constituencies. The Bankruptcy Court will hear the expert opinion of Professor Bernard Black, Professor of Law and Finance in Northwestern University's School of Law and Kellogg School of Management, that the settlements embodied in the Debtor/Committee/Lender Plan (the "Proposed Settlement") produce recoveries for creditors other than the LBO Lenders that are greater than any realistic probability-weighted assessment of the recoveries they might obtain in litigation. The Bankruptcy Court also will hear the expert opinion of Harrison J. Goldin and David Prager of Goldin Associates demonstrating that the Proposed Settlement provides recoveries for creditors other than the LBO Lenders greater than any reasonable probability-weighted assessment of recoveries based on the Examiner's conclusions. And the Bankruptcy Court will hear the expert opinion of Daniel Fischel, Professor of Law and Business in Northwestern University's School of Law and Kellogg School of Management and Professor of Law and Business Emeritus in The University of Chicago Law School, detailing reasons why, in Professor Fischel's opinion, the economic evidence supports

4

the conclusion that Tribune and its Guarantor Subsidiaries were solvent at the times of the Leveraged ESOP Transactions.

The Bankruptcy Court also will receive evidence and the expert opinions of Lazard Frères, & Co. LLC ("Lazard") and Alvarez & Marsal establishing the value of the Debtors within the range set forth in the Debtor/Committee/Lender Specific Disclosure Statement, the feasibility of the Debtor/Committee/Lender Plan, the superiority of recoveries under the Debtor/Committee/Lender Plan in comparison to recoveries that would be obtained in a chapter 7 liquidation, and the critical need for Tribune to exit bankruptcy with as little uncertainty respecting its ownership as possible.

In addition to all this evidence at the confirmation hearing, some of the most important and compelling evidence in support of the Debtor/Committee/Lender Plan and the reasonableness of its Proposed Settlement is already a matter of public record.  The tabulation of ballots shows that creditors across the entire enterprise overwhelmingly accepted the Debtor/Committee/Lender Plan, with support that is broad and deep.  In total, 1,866 out of the 2,520 who cast conforming ballots received (74.05%) voted to accept, with $10,300,720,738.34 out of $12,871,132,865.22  in claims represented by those ballots accepting (80.03%) in the aggregate across all classes.  This endorsement of the Debtor/Committee/Lender Plan spanned the Debtors' capital structure.  Among other things –

- 105 out of 128 Classes of Claims in which creditors actually voted accepted the Debtor/Committee/Lender Plan:

- 40 out of 60 Classes of general unsecured claims against the Subsidiary Debtors in which creditors actually voted accepted the Debtor/Committee/Lender Plan, representing 67.3% of such creditors, holding 94.88% by dollar amount in the aggregate;

- 392 out of 401 the Senior Lenders (97.76%), holding 97.56% by dollar amount of the voting Senior Loan Claims, voted to accept; and

5

- 26 out of 29 the Bridge Lenders (89.66%), holding 98.62% by dollar amount of the voting Bridge Loan Claims, voted to accept.

Most telling is the vote of the class of Other Parent Claims -- the unsecured trade and other claims against Tribune. This class is comprised of creditors whom the Noteholder Plan Proponents[4] argue were the victims of a "massive fraud." See Amended Objection of the Noteholder Plan Proponents to Confirmation of the Debtor/Committee/Lender Plan of Reorganization ("Noteholder Objection" or "Noteholder Obj.") at ¶ 55. Those creditors, who are offered exactly the same treatment as Aurelius and other senior bondholders, voted overwhelmingly to accept the Debtor/Committee/Lender Plan, with 224 out of 237 voting creditors (94.51%), holding 94.70% by dollar amount of the voting Other Parent Claims, resoundingly endorsing the Debtor/Committee/Lender Plan.5  If the Debtor/Committee/Lender Plan actually "seeks to benefit the perpetrators of a fraudulent act" as the Noteholder Plan Proponents assert (Noteholder Obj. at ¶ 337), this class of allegedly-defrauded creditors obviously would not have voted to accept it, much less by such overwhelming margins.

Similarly, if the best way to maximize value on the LBO-Related Causes of Action was to litigate all of them, rather than reach a reasonable settlement of the claims against the LBO Lenders that permits Other Parent Claims to receive 33% to 36% of the value of their Claims now while leaving other LBO-Related Causes of Action for litigation later, the Other Parent Claims class would have embraced the Noteholder Plan, the entire premise of which is to

---

[4] The "Noteholder Plan Proponents" are Aurelius Capital Management, LP ("Aurelius"), on behalf of its managed entities, Deutsche Bank Trust Company Americas ("DBTCA"), in its capacity as successor indenture trustee for certain series of senior notes, Law Debenture Trust Company of New York ("Law Debenture"), in its capacity as successor indenture trustee for certain series of senior notes, and Wilmington Trust Company ("WTC"), in its capacity as successor indenture trustee for the PHONES Notes.
[5] Even excluding the Swap Claim, which the Noteholder Plan Proponents incorrectly assert should be classified with the Senior Loan Claims see Noteholder Obj. at ¶ 55, the class of Other Parent Claims overwhelmingly accepted the Debtor/Committee/Lender Plan, with 223 out of 236 voting creditors (94.49%), holding 88% by dollar amount of the voting Other Parent Claims, accepting.

6

prosecute "all litigation related to the leveraged buyout." Noteholder Plan at p. 1. But the Other

Parent Claims rejected the Noteholder Plan almost unanimously, with 233 out of 254 voting

creditors (91.73%), holding 91.81% by dollar amount of the voting Other Parent Claims, voting

no.

Also instructive is the vote of the Senior Noteholder class itself. This is the class

controlled by Aurelius (which, by its own report, holds $658 million (52%) of the Senior Notes).

See Responsive Statement of Proponents of the Noteholder Plan at p. 3 n.1 [Docket No. 7205].

The Noteholder Plan Proponents claim that "the overwhelming majority of these holders [of

Senior Notes] would rather forgo the proposed meager 'settlement consideration' from the LBO

Lenders and take their chances litigating the allowance of the LBO Debt claims and related

disgorgement claims." Noteholder Obj. at ¶ 5. But this is not so. Almost 70% of the Senior

Noteholders who cast ballots voted to accept the Debtor/Committee/Lender Plan. Because

Aurelius alone has accumulated a "blocking position" in the Senior Notes, this class naturally

failed to receive the two-thirds by claim amount of vote necessary for class acceptance. It is

telling, however, that nearly seven of every ten Senior Noteholders who voted apparently

rejected the Noteholder Plan Proponents' conspiracy theories and did not share their harsh

assessment of the Proposed Settlement embodied in the Debtor/Committee/Lender Plan. The

Noteholder Plan Proponents cannot explain why the very constituency on whose behalf they

purport to speak seems not to share their views.

Tribune's creditors have spoken, and these voting results prove that the Proposed

Settlement is in the paramount interest of creditors. By the same token, Tribune's creditors also

have spoken loudly – if not shouted – that the Noteholder Plan is not in the interest of creditors

other than Aurelius ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████ and the holders of deeply subordinated PHONES Notes, whose only prospect for recovery lies in a litigation "home run." Specifically, the Noteholder Plan – held up by Aurelius as a viable alternative to the Debtor/Committee/Lender Plan – was rejected by virtually every class of impaired claims that voted on it. Indeed, a full 253 out of 256 impaired classes failed to accept the Noteholder Plan. Further, of the three classes that voted to accept it, two are controlled by the Noteholder Plan Proponents (the class of Senior Notes and the class of PHONES Notes), and one had a single voting claim in the amount of $47.10 (which also voted to accept the Debtor/Committee/Lender Plan). These voting results thus wholly discredit the Noteholder Plan Proponents' efforts to trumpet themselves as defenders of the "Pre-LBO Creditors" and, more broadly, of the integrity and fairness of the bankruptcy process.

Stripped of their self-appointed role as defenders of truth and justice, ████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



. Yet, given that virtually all of the Debtors' enterprise value was held by the Guarantor Subsidiaries (who had billions of dollars less debt than Tribune), it is literally impossible for the Guarantor Subsidiaries to be insolvent when Tribune is solvent.

---

[6] In fact, even Dr. Beron recognizes the absurdity of this result and arbitrarily adjusts his model to attempt to account for it, which, as discussed below, causes still other problems with his model.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

Cash flow solvency is a subset of capital adequacy.  A large corporate debtor who is found to

have adequate capital will be able to pay its debts as they become due something close to 100%

of the time.  Similarly, balance sheet solvency is correlated with capital adequacy and cash flow

solvency.  A debtor who is found to have assets that exceed its liabilities will in most cases be

found to have adequate capital and an ability to pay its debts as they come due.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.

          ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████.  The

Examiner concluded that two of the three "badges of fraud" present in this case for intentional

fraudulent transfer purposes were insolvency and lack of reasonably equivalent value – the

precise elements for constructive fraudulent transfer.  See Examiner Report, Vol. 2 at p. 35.  Put

simply, the Examiner's analysis indicates that a court would be highly unlikely to find that the

Senior Loan obligations were incurred by Tribune with an intention to hinder, delay, and defraud

creditors if it could not be shown that those obligations rendered Tribune insolvent (and, as a result, that they were a constructive fraudulent conveyance). ███████████████

███████████████████████████

██████████████████████████████

██████████████████████████████

█████████████████████████████

████████████.

███████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

█████████████████████████

██████████████████████████████

█████████████████████.

       \*       \*       \*

The remainder of this brief summarizes the evidence and expert opinion to be presented in support of confirmation of the Debtor/Committee/Lender Plan and responds to the objections made by the Noteholder Plan Proponents and others.  Part I addresses the Proposed Settlement, explaining the Leveraged ESOP Transactions, detailing the extensive negotiations regarding potential claims arising from those Transactions, describing the settlement terms, and demonstrating why the compromise is reasonable and appropriate under the circumstances.  Parts IV and V establish that the Debtor/Committee/Lender Plan, as modified, satisfies all of the

statutory standards for confirmation of a plan of reorganization, to the extent not covered

elsewhere, and respond to the various objections raised to the Debtor/Committee/Lender Plan.

Finally, Part VII demonstrates why the Debtor/Committee/Lender Plan should be confirmed over

the Noteholder Plan in the event that the Bankruptcy Court determines that, despite the

objections lodged to the Noteholder Plan, both plans otherwise meet the statutory prerequisites

for confirmation.

Taken together, all of this leaves no question that the Debtor/Committee/Lender Plan not

only is the only confirmable plan, but that it is in the best interests of creditors and the estates

and should be confirmed as soon as possible.

## II.    THE PROPOSED SETTLEMENTS OF CERTAIN LBO-RELATED CAUSES OF ACTION ARE FAIR AND EQUITABLE AND SHOULD BE APPROVED

The core of the Debtor/Committee/Lender Plan is the Proposed Settlement of certain

LBO-Related Causes of Action arising out of the leveraged buy-out of Tribune, a series of

transactions that took place in 2007 through which Tribune Company became a privately held

company solely owned by the Tribune ESOP.

"[C]ompromises are favored in bankruptcy" because they "minimize litigation and

expedite the administration of a bankruptcy estate.  "Myers v. Martin (In re Martin), 91 F.3d 389,

393 (3d. Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (9th ed. 1993)).   This Court

has broad discretion to approve the Proposed Settlement under Bankruptcy Rule 9019, so long as

it determines, after "canvassing" the issues, that the settlement falls above the "lowest point in

the range of reasonableness" and is "fair and equitable."   In re Exide Techs., 303 B.R. 48, 67-68

(Bankr. D. Del. 2003) (Carey, J.) (citing Protective Comm. For Indep. Stockholders of TMT

Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968));  see also In re Spansion, Inc., No. 09-

10690, 2009 WL 14531788, at *3 (Bankr. D. Del. June 2, 2009) (Carey, J.) ("The court must

decide whether the compromise is fair, reasonable, and in the best interest of the estate.")
(quotation omitted).

In making that determination, the Bankruptcy Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Martin, 91 F.3d at 393. The Bankruptcy Court should consider "all relevant information that will enable it to determine what course of action will be in the best interest of the estate," but it need not "conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement." In re Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.), 336 B.R. 87, 93 (D. Del. 2005); see also In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004). In addition to satisfying the fair and equitable standard of Rule 9019, the Proposed Settlement also is subject to scrutiny under section 1129 of the Bankruptcy Code. As discussed in greater detail, infra, the Plan as a whole, including the Proposed Settlement, satisfies all applicable standards under section 1129, including having been proposed in good faith.

An extraordinary record has been developed on which the Bankruptcy Court can base its determination here. In the course of discovery regarding confirmation alone, more than half a million pages of documents have been produced, more than 30 depositions have been taken, and 10 expert witnesses have offered reports and opinions. This is all on top of the millions of pages of discovery resulting from the Creditors' Committee's extensive Rule 2004 investigation, as well as the 1,200-page Examiner Report that all parties have stipulated to admit into evidence for the Bankruptcy Court to consider. As explained below, that extraordinary record conclusively

demonstrates that the Proposed Settlement should be approved and that the

Debtor/Committee/Lender Plan should be confirmed.

In considering the discussion that follows, it is important to note that the

Debtor/Committee/Lender Plan Proponents arrived at the Proposed Settlement from very

different starting places. The Creditors' Committee believes strongly in the merits of the LBO-

Related Causes of Action, while the Senior Lenders believe with at least equal conviction in the

strength of their defenses. The Examiner Report supported the Creditors' Committee's views in

some respects while also offering support for the positions of the Senior Lenders in other

respects.

Unsurprisingly, given that the parties started from opposite ends of the spectrum, the

negotiations leading to the Proposed Settlement took many months, were hard fought and were

marked by many twists and turns. As the result of these investigations and negotiations and the

thorough analysis of the LBO-Related Causes of Action set forth in the Examiner Report, all of

the Debtor/Committee/Lender Plan Proponents came to recognize both the strengths and

weaknesses of their arguments. That is not to say the Debtor/Committee/Lender Plan Proponents

agree on all issues – they do not.[7] But all have come to appreciate the risks that they might lose

key arguments in litigation and the advantages of compromising in a way that fairly reflects

those risks, as well as the expense and opportunity costs entailed in protracted litigation of the

claims. The result is a settlement that the Debtors, Creditors' Committee, and the Senior Lenders

---

[7] While the Debtor/Committee/Lender Plan Proponents agree that there are arguments on both sides, there are occasions in this brief where more pages are devoted to describing the defenses the LBO Lenders would assert should litigation ensue than there are pages to describing what a plaintiff would argue in response. The descriptions of the LBO Lenders' defenses in this brief do not imply a uniformity of opinion amongst the Debtor/Committee/Lender Plan Proponents as to the relative merits of the defenses vis-à-vis the claims or an endorsement by the other Debtor/Committee/Lender Plan Proponents of the Lenders' arguments, but rather reflect only the reality that the arguments that would be asserted by a plaintiff in response to such arguments are already described in great detail in the Noteholder Objection.

14

all believe is both reasonable and far preferable to litigation and in the best interests of the

stakeholders in these cases.

As shown below, the Proposed Settlement appropriately balances the complex arguments

on both sides of the key issues.  We explain, for example, that a fair reading of the Examiner

Report demonstrates that the Proposed Settlement plainly is a reasonable one.[8]  We further

explain that the Debtors' expert, Professor Black, conducted his own independent assessment of

the strengths and weaknesses of the key issues and concluded that the Proposed Settlement is

reasonable with respect to the LBO-Related Causes of Action.  ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████.  The

Debtor/Committee/Lender Plan Proponents submit that this Court can and should find that,

taking account of the arguments on both sides of the key issues, including solvency, the

Proposed Settlement appropriately reflects the merits of those competing arguments.

A.    **Background to the Proposed Settlement**

1.    **The Leveraged ESOP Transactions**

In late 2006, Tribune commenced a process to explore strategic business initiatives,

including transactions with strategic financial partners and "self-help" transactions, such as a

leveraged spin-off of its broadcasting segment.  This process concluded on April 1, 2007, when

---

[8] Each of the Debtors/Committee/Lender Plan Proponents takes issue with some of the Examiner's conclusions.  If the claims against the LBO Lenders were litigated rather than settled, many of the Examiner's conclusions would be hotly disputed.  The Debtors/Committee/Lender Plan Proponents analyze the Examiner's conclusions to the extent set forth herein solely for purposes of examining their implications, if correct, for confirmability of the Plan, and reserve the right to dispute those conclusions for any other purpose.

Tribune's then-Board of Directors, based on the recommendation of a special committee of independent directors, authorized the Leveraged ESOP Transactions to proceed.

The Leveraged ESOP Transactions were consummated in two principal steps, commonly called the "Step One Transactions" and "Step Two Transactions."9   In Step One, consummated in June 2007, a newly formed Tribune employee stock ownership plan (the "ESOP") purchased shares of Tribune common stock and Tribune completed a cash tender offer (at a price of $34 per share) for approximately fifty percent (50%) of its outstanding common stock.  To finance the tender offer, Tribune entered into the $8.028 billion Senior Loan Agreement and a number of Tribune's domestic subsidiaries (the "Guarantor Subsidiaries") provided unsecured guarantees of Tribune's obligations.

In Step Two, consummated in December 2007, Tribune merged with a Delaware corporation wholly owned by the ESOP, with Tribune surviving the merger.  Upon completion of the merger, all issued and outstanding shares of Tribune's common stock (other than shares held by Tribune or the ESOP) were cancelled and Tribune became wholly owned by the ESOP. The merger was financed through additional borrowings of $2.1 billion under the Senior Loan Agreement (the so-called "Incremental" loans) and $1.6 billion under the Bridge Loan Agreement.  The proceeds of the additional borrowings were used for, among other things, the consummation of the merger and the payment redemption of outstanding Tribune shares not held by the ESOP at $34 per share.

The Leveraged ESOP Transactions as approved by the Tribune Board of Directors anticipated that Tribune would complete both Step One and Step Two.  However, consummation of the Step Two merger was subject to several conditions precedent, including stockholder

---

[9] By using the term "steps," which has been adopted colloquially as shorthand by various parties in the chapter 11 cases, the Debtor/Committee/Lender Plan Proponents do not adopt a position that the June 2007 and December 2007 transactions described below were "steps" of a single transaction, an issue on which they have differing views.

16

approval, approval of the Federal Communications Commission (the "FCC"), the consent of

Major League Baseball, and Tribune's receipt of an opinion from Valuation Research

Corporation ("VRC") or another nationally recognized valuation firm that Tribune was and

would be solvent after giving effect, respectively, to the Step One tender offer and the Step Two

merger.  In recognition of the possibility that the conditions to the Step Two merger ultimately

would not be satisfied, the Step One Tender Offer was designed to stand alone and could not be

rescinded or modified in the event that the Step Two merger did not occur.

### 2.    The LBO-Related Causes of Action

At their core, the LBO-Related Causes of Action are based on the assertion that the

Senior Loan and Bridge Loan debt incurred by Tribune and the Guarantor Subsidiaries as a part

of the Leveraged ESOP Transactions rendered the Debtors insolvent and/or with unreasonably

small capital to operate their businesses, thereby harming all of the Debtors' creditors.

The principal causes of action against the LBO Lenders are claims for intentional

fraudulent conveyance and constructive fraudulent conveyance to avoid the Senior Loan

obligations incurred in connection with the Step One Transactions and the Senior Loan and

Bridge Loan obligations incurred in connection with the Step Two Transactions.  Those claims

seek, for Step One, to avoid approximately $6.6 billion in outstanding Senior Loan obligations

and to recover the approximately $1.6 billion in fees, interest, and principal paid in connection

with those Senior Loan obligations prior to the Petition Date; and, for Step Two, to avoid

approximately $3.6 billion in outstanding Senior Loan and Bridge Loan obligations and to

recover the approximately $318 million in fees, interest, and principal paid in connection with

those Senior Loan and Bridge Loan obligations prior to the Petition Date.

In order to prevail on a claim for intentional fraudulent conveyance, a plaintiff would

have to prove that the Debtors made transfers or incurred obligations with "actual intent to

17

hinder, delay, or defraud" creditors.  11 U.S.C. § 548(a)(1)(A).  In order to prevail on a claim for

constructive fraudulent conveyance, a plaintiff must demonstrate that the Debtors transferred an

interest in property or incurred an obligation in return for "less than a reasonably equivalent

value" and were insolvent, undercapitalized, or unable to pay their debts at the time or as a result

of the Transactions.  See 11 U.S.C. § 548(a)(1)(B); see also In re Student Finance Corp., 382

B.R. 212, 215 (Bankr. D. Del. 2007) (Carey, J.).

   The solvency analysis here is complicated by a number of unique facts.  First, the

solvency of Tribune (the primary obligor in respect of the Senior Loans and Bridge Loans) must

be considered separately from the solvency of the Guarantor Subsidiaries.  Because the

Guarantor Subsidiaries held the vast majority of assets of the Tribune enterprise but had at least

$2 billion less debt than Tribune itself (due to the fact that the Guarantor Subsidiaries were not

obligated in respect of Tribune's Senior Notes or PHONES Notes), there is a real prospect that

the Guarantor Subsidiaries could be found to be solvent even if Tribune itself were found to be

insolvent.  Second, one of the key issues in determining solvency is the question of whether the

indebtedness incurred in the two "steps" of the Transactions, consummated six months apart, and

subject to independent conditions, can be "collapsed" and treated as a single integrated

transaction for purposes of determining solvency.  Third, there are substantial questions

regarding whether the tax savings generated by Tribune's conversion to an ESOP-owned

S Corporation in connection with the merger should be counted as an asset in determining

Tribune's solvency after the Step Two Transactions.  Finally, there is the question of whether

statutory or other defenses are available to the LBO Lenders, such whether value was given by

the LBO Lenders in good faith, that could reduce or eliminate the value to the Estate of the LBO-

Related Causes of Action against the LBO Lenders.

3.    **The Proposed Settlement Is the Product of Years of Extensive Investigation and Arm's Length Negotiations and Mediation before Judge Gross**

The Proposed Settlement is the foundation of the Debtor/Committee/Lender Plan. It is the product of extensive, highly contentious, arm's length negotiations resulting from and predicated on almost two years of investigation and analysis by the Creditors' Committee and other parties, an extensive investigation conducted by the Bankruptcy Court-appointed Examiner and careful analysis and consideration of the Examiner's findings, and weeks of mediation before the Bankruptcy Court-appointed mediator, the Honorable Kevin Gross, Bankruptcy Judge for the United States Bankruptcy Court for the District of Delaware.

Indeed, from the outset of these cases, it was apparent that the investigation and resolution of potential LBO-Related Causes of Action would be a central issue. Accordingly, the Creditors' Committee began its investigation not long after the Debtors filed for bankruptcy and retained Zuckerman Spaeder LLP in August 2009 as special litigation counsel with respect to claims against the LBO Lenders. During the course of its investigation, the Creditors' Committee took discovery from over 30 entities and persons involved in the Leveraged ESOP Transactions, obtained and reviewed nearly 4.5 million pages of documents, and deposed a number of critical participants. The Debtors cooperated extensively with the Creditors' Committee, providing informal discovery and access to information regarding the Leveraged ESOP Transactions, while also undertaking their own substantial efforts to review and analyze the LBO-Related Causes of Action.

Throughout the cases, the Debtors worked diligently to bring about a consensual resolution of those claims. As an initial step, the Debtors facilitated parties' access to the discovery material through a centralized document depository so that each stakeholder could make its own evaluation of the LBO-Related Causes of Action. Starting in the Fall of 2009, the

19

Debtors and their advisors met with key stakeholders in an effort to understand each party's perspective and facilitate a settlement dialogue. Those discussions led, in turn, to a series of meetings in January, February, and March of 2010, in which the principal parties, including representatives of the Senior Lenders and the Senior Noteholders, actively negotiated for the resolution of the LBO-Related Causes of Action.

The parties started those negotiations very far apart. The Senior Lenders took the position that the LBO-Related Causes of Action had little or no value and their early settlement positions reflected that point of view. The Creditors' Committee and the Noteholder representatives participating in those negotiations vigorously advocated the strength of the LBO-Related Causes of Action and made settlement proposals that reflected their views of the claims.

Those negotiations eventually led to a proposed "Global Settlement" of all LBO-Related Causes of Action, which was first embodied in a Settlement Support Agreement dated April 9, 2010, entered into by Angelo Gordon (a holder of substantial Senior Loan Claims), Centerbridge Credit Partners, L.P. and affiliates (holders of substantial Senior Note Claims), Law Debenture, and JPMorgan Chase Bank, N.A. (Senior Loan Agent and a holder of substantial Senior Loan Claims), and then in the Joint Plan of Reorganization for Tribune and Its Subsidiaries (the "April Plan") filed by the Debtors with the support of the Creditors' Committee. The core of the Global Settlement was the allocation of a "strip" of cash, equity, and debt in the Reorganized Debtors representing 7.4% of the total Distributable Enterprise Value ("DEV"), which, at that time, was estimated to be $6.1 billion. At that DEV, the Senior Noteholders would receive consideration worth some $450 million which would increase or decrease depending on the Debtors' DEV at any given point in time. Oaktree Capital Management, a major holder of the Senior Loans and a party to the Proposed Settlement now before the Bankruptcy Court, was not a party to the Global

Settlement because it believed the consideration to be paid to Senior Noteholders and Other

Parent Creditors was too high.  Liang Dep. Tr. 142:18-143:7 and 151:9-12, Feb. 16, 2011.

　　　　After the April Plan was filed, the Bankruptcy Court entered an order appointing Kenneth

N. Klee as Examiner charged with evaluating the merits of the LBO-Related Causes of Action.

The Examiner subsequently met with major stakeholders and invited them to share their views in

writing, resulting in a briefing process that produced more than 730 pages of briefs submitted by

eight different stakeholders.  The Examiner and his advisors (including two law firms and a

financial advisor who developed a financial analysis of issues presented, including issues

concerning solvency, unreasonable capital, the flow of funds, and matters pertaining to

intercompany claims) were given access to all discovery materials produced in these cases and

conducted their own interviews of 38 witnesses during the course of the Examiner's

investigation.

　　　　On July 26, 2010, the Examiner filed a four volume report detailing the results of his

investigation.  The first two volumes, which concern the background to and evaluation of the

potential LBO-Related Causes of Action, are over 1,100 pages.[10]  The Examiner established a

range of potential conclusions.  Among other conclusions, the Examiner found that:

- A court is reasonably likely to conclude that the Step One Transactions did not
  constitute an intentional fraudulent transfer.  See Examiner Report, Vol. 2 at pp.
  22-77, 246-78.

- It is "highly unlikely" (the Examiner's lowest probability) that the Debtors would
  be found to have been insolvent at the time of the Step One Transactions if the
  Step One and Step Two Transactions are not collapsed, (Examiner Report, Vol. 2
  at 187), and it is "somewhat unlikely" that the Transactions should be collapsed
  for purposes of determining solvency.  See id. at p. 181.  Further, if the Step One
  and Step Two Transactions were collapsed, it is "somewhat likely," although a

---

[10] On July 29, 2010, the full unredacted Examiner Report, setting forth the Examiner's assessment of these issues
was made available to the core parties in interest, and on August 3, 2010 the Examiner Report was made publicly
available [Docket Nos. 5247, 5248, 5249, 5250, 5437, 5438, 5439, 5441, 5442, 5444, 5445, 5447, 5449, 5451, 5453,
5454, 5455, 5456, 5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469, 5480].

close call, that a court would nonetheless find Tribune to be solvent.  In any event, the Guarantor Subsidiaries are more likely than Tribune to be found solvent even if the Step One and Step Two Transactions were collapsed.  See id. at p. 211.

- It is somewhat likely to highly likely that a plaintiff would prevail on constructive fraud claims related to the Step Two (id. at pp. 220-240), and "somewhat likely" that a plaintiff would prevail on intentional fraudulent conveyance claims related to Step Two (see id. at p. 32).

After the issuance of the Examiner Report, the parties to the Global Settlement independently reviewed the Examiner's findings and conclusions and assessed the implications of the Examiner Report on their respective claims and on the Global Settlement as a whole.  All the parties identified findings in the Examiner Report that supported their views on the merits of the LBO-Related Causes of Action and findings that cut against their views.  The Senior Lenders believed, for example, that the Examiner's conclusions regarding fraudulent conveyance claims with respect to the Step One Transactions reinforced their views that those claims were weak. The Creditors' Committee disagreed with that reading of the Examiner Report and believed that the Examiner's conclusions regarding the Step Two Transactions demonstrated the strength of fraudulent conveyance claims against the LBO Lenders and claims against third parties relating to Step Two.  On August 9, 2010, in light of the Examiner Report and unable to reconcile their differing views of its implications, the Global Settlement was terminated.

After the termination of the Global Settlement, the Debtors redoubled their efforts to strive for a consensual resolution of the LBO-Related Causes of Action and, throughout the month of August, the Debtors and all major stakeholders negotiated to achieve a new compromise that would reflect the parties' assessment of the Examiner Report and his findings. In addition, the Debtors created a Special Committee of the Board of Directors to oversee the process.  After those efforts were unsuccessful, the Debtors requested a mediator to assist with

22

negotiations and, on September 1, 2010, the Bankruptcy Court appointed Judge Gross as

mediator.[11]

After submitting mediation briefs, mediation began on September 26, 2010.  The parties

to the mediation included the Debtors, the Creditors' Committee, Angelo Gordon, Oaktree, a

group of "Step One Credit Agreement Lenders," Wells Fargo Bank, N.A. (the Bridge Loan

Agent), Law Debenture Trust Company of New York and Deutsche Bank Trust Company

Americas (indenture trustees for the Senior Notes), Aurelius, EGI-TRB LLC, and Wilmington

Trust Company (indenture trustee for the PHONES Notes).

On September 28, 2010, with the assistance of Judge Gross, the Debtors, Angelo Gordon,

and Oaktree, which had not been a party to the April Global Settlement, reached a settlement

agreement (the "September Settlement").  See Mediator's Certificate of Completion, Sept. 28,

2010 [Docket No. 5831].  The Creditors' Committee was not a party to the September Settlement

and issued a press release saying that, in its view, the September Settlement did not provide fair

value to all creditors.  The Creditors' Committee also announced that it would oppose a plan

embodying the September Settlement unless it was modified to make it fair to all creditors.

Because that settlement was not as consensual as feasibly possible, the Debtors – with the

full support of the Judge Gross – redoubled their efforts within the framework of the mediation.

On October 12, 2010, under the continued auspices of Judge Gross, the Debtors reached an

expanded settlement that included the Debtors, the Creditors' Committee, Oaktree, Angelo

Gordon, and JP Morgan (the "October Settlement").  See Mediator's Second Report, Oct. 12,

2010 [Docket No. 5936].  The Creditors' Committee supported that modified settlement, which

provided substantially greater consideration to the Holders of Senior Noteholder Claims, Other

---

[11] Shortly thereafter, Centerbridge notified the parties that it had sold its entire position to Aurelius.  From that point forward, Aurelius took an active role in the chapter 11 cases, and is the main advocate of the Noteholder Plan Proponents.

Parent Claims, and General Unsecured Creditors, because, unlike the September Settlement in its

judgment, the October Settlement was fair and equitable to all creditors.

Thereafter, the parties continued to engage in mediation, and on January 28, 2011, with

the continued oversight of Judge Gross, reached a settlement with the Bridge Lenders. See

Order Approving Mediator's Third Report, Jan. 28, 2010 [Docket No. 7656].

It is these settlements – the culmination of years of investigation and negotiations and

months of mediation overseen and endorsed by a respected judge of this very Court – that the

Debtor/Committee/Lender Plan Proponents seek to have confirmed as part of their Plan.

**B.     Summary of the Proposed Settlement**

The Debtor/Committee/Lender Plan provides for the settlement of certain avoidance and

other LBO-Related Causes of Action against the Senior Lenders, the Senior Loan Agent and the

Senior Loan Arrangers, and the Bridge Lenders and Bridge Loan Agents (the "Avoidance

Settlement"). It also includes a "Step Two/Disgorgement Settlement" of claims for

disgorgement of pre-petition payments made by Tribune on account of the debt incurred in

connection with the Step Two Transactions (the Incremental Senior Loans and the Bridge Loans)

against parties who elect to participate in the settlement, with a backstop feature that ensures that

the Senior Noteholder class will receive a minimum of $120 million for such payment recipients.

Notably, unlike in the April Plan, all other LBO-Related Causes of Action will be transferred to

either the Litigation Trust or the Creditors' Trust (collectively, the "Trusts") for pursuit after the

Effective Date for the benefit of Tribune's creditors. The Preserved Causes of Action not subject

to settlement that will be pursued by the Litigation Trust include:

- Claims to recover $4.0 billion in payments made to stockholders in connection with
  the Step Two Transactions. The Examiner found that it was "somewhat likely" that
  the Step Two transactions were an intentional fraudulent conveyance. Examiner
  Report, Vol. 2, at p. 32. If a court so found, the stockholders would face liability for
  the full $4 billion paid to them in the Step Two Transactions.

24

- Claims against the Debtors' officers, directors, and professionals for breach of fiduciary duty.  The Examiner found that claims against the Debtors' officers were "reasonably likely" to succeed with respect to conduct relating to the Step Two Transactions.  Examiner Report, Vol. 2, at pp. 386-87.  The Debtors have $200 million in potentially applicable directors and officers' liability insurance.

- Claims against EGI-TRB LLC and Sam Zell.

- Claims against the Advisors, including Merrill Lynch, Citigroup Global Markets, Inc., and Valuation Research Corporation to recover approximately $25 million in advisory fees.

- The Morgan Stanley Claims.[12]

In addition, there are both Transferred State Law Causes of Action not subject to settlement that will be pursued by the Creditors' Trust, as well as those Disclaimed State Law Avoidance Claims that individual creditors may have chosen to pursue on their own.

Each component of the Proposed Settlement is described in more detail below.

1.    **Allowance Settlement**

In exchange for allowance of the Senior Loan Claims and the Bridge Loan Claims, (i) the Senior Lenders will relinquish to the Non-LBO Creditors approximately $401 million in cash to which they would be entitled if the Senior Loan Claims were allowed in full, (ii) the Bridge Lenders will relinquish to the Non-LBO Creditors at least $12.3 million (possibly $13.3 million) in cash to which they would be entitled if the Bridge Loan Claims were allowed in full, (iii) the Senior Lenders and Bridge Lenders have agreed that the first $90 million of distributable value from the Trusts will be allocated to the so-called Non-LBO Creditors and, after repayment of the

---

[12] The Morgan Stanley Claims include rights, claims and actions arising from or related to (a) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS, (b) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, and (c) any advisory engagement or potential advisory engagement of, and/or advice given by, or information analyses withheld, MSCS, including but not limited to (i) services provided by MSCS as an Advisor, and (ii) the agreement between Tribune and MSCS dated as of November 30, 2008, regardless of whether such rights, claims and actions may be asserted pursuant to the Bankruptcy Code or any other applicable law.

loan to the Trusts, the Non-LBO Creditors will be entitled to 65% of the value distributable to creditors from the Trusts beyond the first $110 million, and (iv) Reorganized Tribune will make a $20 million loan to fund the Trusts, thereby ensuring that the Preserved Causes of Action are pursued fully and diligently.[13]  Notably, in addition to their entitlements under subsidiary guarantees, the Senior Lenders and Bridge Loan Lenders would be entitled to approximately 85% of all distributions from the Tribune Estate (including litigation recoveries) if their claims were allowed in full.  As a consequence, the agreement as part of the Proposed Settlement to provide Non-LBO Creditors with the exclusive right to the first $90 million in distributions from the Trusts, followed by the right to 65% of net recoveries above $110 million, is a significant concession by the LBO Lenders, particularly if the Preserved Causes of Action are as valuable as the Noteholder Plan Proponents assert.

2.    **Step Two/Disgorgement Settlement**

Pursuant to the Step Two/Disgorgement Settlement, current or former Senior Lenders or Bridge Lenders who received principal, interest or fees in respect of the Incremental Senior Loans or the Bridge Loans prior to the Petition Date will have the opportunity to settle the estate claims for avoidance and recovery of such payments for a collective contribution of $120 million in cash.  To ensure that the full $120 million will be available on the Effective Date, the Step Two Arrangers (JPMorgan, Merrill Lynch, Bank of America and Citigroup), have agreed to "backstop" the Step Two/Disgorgement Settlement by advancing any portion of the $120 million allocable to the Senior Lenders or Bridge Lenders that do not elect to participate, subject to

---

[13] Holders of Allowed PHONES Notes Claims and EGI-TRB LLC Notes Claims will participate in the Trust proceeds subject to enforcement of applicable subordination turnover provisions.  As part of the Proposed Settlement, however, the Senior Lenders and Bridge Lenders have agreed to waive enforcement of those turnover provisions and will share only in the remaining thirty-five percent (35%) of the Trusts' distributable recoveries.

reimbursement of such advances from any recoveries of the Litigation Trust on ~~account~~ of the

relevant claims against the non-participating Senior Lenders and Bridge Lenders.

In exchange, the bankruptcy estates will release all claims against any settling current or

former holder of Senior Loans and/or Bridge Loans for disgorgement of principal, interest and

fees paid on account of the Incremental Senior Loans and/or the Bridge, and all claims against

the Step Two Arrangers and each of their affiliates in their capacity as agents and arrangers of

the Incremental Senior Loans and Bridge Loans.

### 3.    Releases

In exchange for the settlement consideration, the Proposed Settlement provides for the

release of certain estate claims against the Senior Lenders and others.  As explained in Part IV.A

below, those releases are narrowly drawn and, as outlined above, supported by the settlement

contributions made.  In all cases, the releases do not include claims against the released parties in

their capacities (if any) as Step Two Selling Stockholders or Advisors.  Furthermore, all claims

against Tribune's directors and officers related to the Transactions are preserved for prosecution

after the Effective Date for the benefit of Tribune's creditors.

### 4.    Settlement Consideration

The Proposed Settlement provides substantial consideration to the Non-LBO Creditors

and, in fact, makes up the vast majority of the distributions to be made to them under the

Debtor/Committee/Lender Plan.  Specifically, the Non-LBO Creditors will receive cash

recoveries totaling approximately $611 million, of which $535 million is being provided as

settlement consideration, with $415 million provided on account of the Avoidance Settlement

and an additional $120 million provided on account of the Step Two/Disgorgement Settlement.

Additionally, Non-LBO Creditors will receive the first $90 million in distribution from the

Trusts and 65% of all distributions above $110 million, amounts above the share to which they

would be entitled based upon their "natural recoveries" in these cases.

### 5.    Competing Plans And Voting Results

As noted in the Preliminary Statement above, with the votes now cast and counted,

creditors across the spectrum of the Debtors' capital structure have voted in favor of the

Debtor/Committee/Lender Plan and its Proposed Settlement and against the alternative

Noteholder Plan, by overwhelming margins.[14]

There can be no more powerful evidence in support of the reasonableness of the Proposed

Settlement than this resounding vote by diverse constituencies in favor of confirmation of the

Debtor/Committee/Lender Plan. See, e.g., In re New Century TRS Holdings, Inc., 390 B.R. 140,

169 (Bankr. D. Del. 2008), rev'd on other grounds, 407 B.R. 576 (D. Del. 2009) ("The voting

results show vividly that the Plan is supported broadly by a diverse creditor body.  Only one

class of the sixteen entitled to vote on the Plan voted against the Plan . . . .").

### C.    The Proposed Settlement Satisfies the Martin Factors and Should Be Approved

The Third Circuit has set forth four factors for the Bankruptcy Court to consider in

analyzing whether a proposed settlement is fair and equitable:  (1) the probability of success in

litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved,

and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount

interest of creditors.  Martin, 91 F.3d at 393; Will v. Northwestern Univ. (In re Nutraquest, Inc.),

434 F.3d 639, 644 (3d Cir. 2006).[15]  After evaluating these criteria, the Bankruptcy Court need

---

[14] See Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Plans of Reorganization Proposed for Tribune Company and its Subsidiaries filed on February 11, 2011 [Docket No. 7918] (the "Epiq Voting Declaration").

[15] In assessing the reasonableness of a proposed settlement in the Exide case, this Court also considered a seven-factor test set forth in the decision In re Texaco, Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).  See Exide, 303

not find that the Proposed Settlement is the best possible compromise for the estate. Instead, the

threshold for approval is whether the Proposed Settlement "falls within the reasonable range of

litigation possibilities." Coram, 315 B.R. at 330. The Proposed Settlement here is well within

the range of reasonableness. It should be approved.

### 1.    Probability of Success on the Merits

In evaluating the merits of the potential claims against the LBO Lenders, "the Court's

task is not to decide the numerous questions of law and fact raised by objections but rather to

canvass the issues to see whether the settlement falls below the lowest point in the range of

reasonableness." Exide, 303 B.R. at 68 (internal quotation marks and alterations omitted); see

also New Century TRS Holdings, Inc., 390 at 168. The Examiner Report, Professor Black's

independent evaluation of the LBO-Related Causes of Action, and the conflicting evidence the

Bankruptcy Court will hear at trial on key issues, including the testimony from the solvency

experts retained by the Noteholder Plan Proponents and the Senior Lenders, make clear that the

Proposed Settlement is well within the range of reasonableness and far above the lowest point in

that range. The Proposed Settlement therefore satisfies the first Martin factor.

### a.    The Examiner Report supports the reasonableness of the Proposed Settlement

The Examiner analyzed recoveries to the creditors of the Debtors, other than the Senior

Lenders and Bridge Lenders (the "Non-LBO Creditors") in six different litigation scenarios.[16]

Only one of the six, the complete victory scenario, results in Non-LBO Creditors recovering

more than the $611 million, which is awarded to them in total cash consideration under the

---

B.R. at 67-68. For the most part, the Texaco factors overlap the Third Circuit's four-factor test. New Century, 390 B.R. 140 at 167 n.33.

[16] The Examiner also included two additional scenarios, Cases 7 and 8, which are variants of Case 3 (Step Two fraudulent transfer at Tribune and Guarantor Subsidiaries). Cases 7 and 8 add disgorgement proceeds from actions against Step Two Selling Stockholders. These claims are included in the Preserved Causes of Action under the Proposed Settlement.

Debtor/Committee/Lender Plan ($535 million of which is incremental settlement value and $77

million of which is "natural" or "base case" value, assuming no litigation recoveries).  See

generally Examiner Report, Vol. 2 Annex B.  Moreover, the $535 million in incremental

settlement consideration does not take into account the additional value provided to Non-LBO

Creditors from their disproportionate share of recoveries from the Trusts under the Proposed

Settlement.  In the complete victory scenario, the Non-LBO Creditors would be paid in full,

recovering some $2.3 billion.  In the other five scenarios, the incremental recoveries to Non-

LBO Creditors resulting from the LBO-Related Causes of Action range from $0 (complete loss)

to approximately $205 million to $244 million (avoidance of all Senior Loan and Bridge Loan

Claims against Tribune and avoidance of claims incurred in connection with the Step Two

Transactions against the Guarantor Subsidiaries).[17]

With respect to LBO-Related Causes of Action arising out of Step One, the Examiner

identified three principal litigation scenarios:  (i) complete loss, which results in no recoveries to

the Non-LBO Creditors; (ii) success in avoidance of claims against Tribune but failure in

avoidance of claims against the Guarantor Subsidiaries, which results in approximately $197

million to $235 million in litigation recoveries to the Non-LBO Creditors; and (iii) complete

victory in avoidance claims against both Tribune and the Guarantor Subsidiaries, which results in

full recovery.[18]

---

[17] These recovery amounts are derived from the Examiner's Recovery Scenarios, taking Case 5 (Step One fraudulent transfer at Tribune and Step Two fraudulent transfer at Tribune and Guarantor Subsidiaries) less the "natural recoveries" in Case 1 (base case-no litigation recoveries) and using assumed high and low intercompany balances, respectively, from an intercompany claims settlement.  As reflected in the Intercompany Claims Settlement, the Proposed Settlement assumes a settlement of Intercompany Claims at the midpoint in the settlement range, between the high and low intercompany balances.  See Examiner Report, Vol. 2, Annex B ("Recovery Scenarios").

[18] These recovery amounts are derived from the Examiner's Recovery Scenarios: (i) corresponds with Case 1 (base case – no litigation recoveries); (ii) corresponds with Case 4 (Tribune only avoidance in connection with Step One and Step Two) less the "natural recoveries" in Case 1 (base case – no litigation recoveries) and using assumed high and low intercompany balances, respectively, from an intercompany claims settlement; and (iii) corresponds with

30

With respect to Step One, the Examiner concluded that Step One avoidance claims were significantly more likely than not to end in a complete loss. In so concluding, he analyzed separately each of the arguments that could lead to a finding of a fraudulent transfer at Step One. For instance, the Examiner found that there was "no credible evidence" that the Tribune Entities entered into the Step One Transactions in order to hinder, delay, or defraud creditors. See Examiner Report, Vol. 2 at p. 23. He further concluded that it was "highly unlikely" (the Examiner's lowest probability) that the Debtors would be found to have been insolvent at the time of the Step One Transactions if the Step One and Step Two Transactions were not collapsed, and that it was somewhat unlikely that the Transactions should be collapsed. See id. at pp. 181, 187, 194. The Examiner also found that, even if the Transactions were collapsed, it was somewhat likely, although a very close call, that Tribune would be found to be solvent. See id. at pp. 187-88. Finally, the Examiner concluded that the Guarantor Subsidiaries were more likely than Tribune to be found solvent in the event that the Transactions were collapsed. See id. at p. 211.

With respect to the Step Two avoidance actions, the Examiner concluded that it was somewhat likely to highly likely that a plaintiff would prevail on a claim of constructive fraud and somewhat likely a plaintiff would prevail on a claim for intentional fraudulent conveyance. However, the Examiner also concluded that a complete victory in these scenarios would only result in an additional $45 million to $53 million in distributable value resulting from litigation recoveries for holders of Non-LBO Creditor claims[19] unless the Senior Lenders were equitably

Case 6 (Tribune and subsidiary avoidance in connection with Step One and Step Two). See generally Examiner Report, Vol. 2, Annex B.
[19] Litigation recovery amounts derived from the Examiner's Recovery Scenarios, taking Examiner's Case 3 (Step Two fraudulent transfer at Tribune and guarantor subsidiaries) less the "natural recoveries" in Case 1 (base case—no litigation recoveries) and assumed high and low intercompany balances, respectively, from an intercompany claims settlement. See Examiner Report, Vol. 2, Annex B, at B-10-B-13, B-18-B-21.

31

estopped or otherwise barred from sharing in Step Two disgorgement recoveries (a question the Examiner left in "equipoise"). See Examiner Report, Vol. 2 at pp. 302-03. Even in this latter situation, the Examiner concluded that successful disgorgement would only result in approximately $275 million for Non-LBO Creditors.[20]

Even Aurelius, the primary proponent of the Noteholder Plan, has acknowledged through contemporaneous documents that certain conclusions reached by the Examiner support the reasonableness of the settlement. ███████████████████████████████

████████████████████████████████████████████████████

In fact, after the Examiner Report came out, Aurelius modified certain assumptions in spreadsheets used to model both the probabilities of particular litigation outcomes and the resulting expected recoveries, which resulted in significantly lower projected recoveries for the Senior Noteholders.[21]

While the Debtor/Committee/Lender Plan Proponents all disagree (in varying respects) with some of the Examiner's conclusions, the Debtor/Committee/Lender Plan Proponents nevertheless believe that the Proposed Settlement strikes a reasonable balance between scenarios the Examiner found more probable, which would result in recoveries substantially less than the

---

[20] The Examiner's Case 3 (Step Two fraudulent transfer at Tribune and Guarantor Subsidiaries) includes $298 million of net disgorgement proceeds. This amount is based on a gross number of $344 million, comprised of prepetition principal, interest, and fee payments to LBO Lenders ($318 million) and advisory fee payments ($25.6 million), from which the Examiner makes deductions for value conferred, collectability risk, and costs, resulting in a recovery of $298 million. See Examiner Report, Vol. 2, Annex B at B-18-B-21. Removing the advisory fee payments (which are not released under the Proposed Settlement) and their share of the deductions results in $275 million in recoveries on the Step Two Disgorgement Claims.

[21] 

Proposed Settlement, and the significantly less likely complete victory scenario that would result in a full recovery for Non-LBO Creditors.  The Debtor/Committee/Lender Proponents also agree that the issues are complex and highly dependent on factual and legal matters as to which the outcome of litigation is uncertain, as the Examiner Report makes manifest, and that the Proposed Settlement fairly reflects the risks and costs that all parties would face in litigation.

> b.   Professor Black will testify that the payouts to Non-LBO Creditors under the Debtor/Committee/Lender Plan are higher than under any likely litigation scenario

Professor Black will testify that the Proposed Settlement is reasonable and indeed favorable for the Non-LBO Creditors.[22]  Similar to the Examiner, Professor Black has undertaken a comprehensive analysis of the potential claims.  He also has assessed the expected recoveries under both his own view of the facts and the Examiner's view.  To do so, he assessed the likelihood of different outcomes, if various claims were litigated to conclusion, under both his own and the Examiner's views (which he did by using probabilities generated by the Examiner's assessments of the claims – which range from "highly likely" to "highly unlikely").

As a basis for his opinions, Professor Black developed and analyzed six principal scenarios to illustrate the potential outcomes that might result from litigation to final judgment. These scenarios are similar to the six scenarios that the Examiner considered in his Report. Based on the different scenarios, Professor Black estimated the distributions to different creditor classes if the claims were litigated to final judgment and compared those expected recoveries to the distributions provided under the Debtor/Committee/Lender Plan.  Professor Black's analysis shows that, for all Non-LBO Creditors, and even before any third-party recoveries obtained by the Trusts, payments under the Debtor/Committee/Lender Plan exceed those in all of Professor

---

[22] The Creditors' Committee and the Senior Lenders do not agree with many of Professor Black's particular conclusions but do agree that his analysis supports the reasonableness of the Proposed Settlement.

Black's scenarios except one – the "total victory" scenario involving full avoidance of claims against Tribune and the Guarantor Subsidiaries:

## Table 1.  Distributions in Fully Litigated Scenarios[23]
### (Before Third-Party Recoveries)

Estimated distributions to different creditor classes in different Scenarios.  Scenarios assume claims are litigated to final judgment.  Bank distributions are net of disgorgement; Bridge Lender distributions are before disgorgement ($143M in Scenarios B-F).  All Scenarios assume full payout to Sub Trade Creditors.  Amounts in $ millions.

| Creditor Class | Scenario | | | | | | Debtor/ Committee/ Lender Plan |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | A | B | C | D | E | F | |
| Senior Lenders (net of disgorgement) | 6,410 | 6,576 | 6,471 | 6,374 | 6,344 | 4,073 | 6,008 |
| Bridge Lenders (before disgorgement) | 78 | 0 | 0 | 0 | 0 | 243 | 65 |
| Senior Notes | 61 | 105 | 169 | 272 | 286 | 1433 | 432 |
| Interest Rate Swap | 111 | 117 | 153 | 138 | 153 | 154 | 151 |
| Tribune GUC | 5 | 9 | 15 | 24 | 25 | 114 | 41 |
| Subsidiary GUC | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| PHONES | 0 | 0 | 0 | 0 | 0 | 791 | 0 |
| All Non-LBO Creditors | 263 | 317 | 422 | 519 | 549 | 2,577 | 709 |

Table 1, which summarizes expected recoveries to each major creditor class for each scenario, before third-party recoveries, with $6.75 billion of DEV,[24] makes clear that the Proposed Settlement is reasonable.  Because of the sheer size of the Senior Loan and Bridge Loan claims, in only one of six scenarios can the Non-LBO Creditors achieve more value than they will receive under the Debtor/Committee/Lender Plan, namely the scenario where they achieve full avoidance of all obligations incurred in connection with both Step One and Step

---

[23] Professor Black's scenarios are (A) No Avoidance; (B) Step Two Avoidance at Tribune; No Avoidance at Guarantor Subsidiaries; (C) Step Two Avoidance at both Tribune and Guarantor Subsidiaries; (D) Full Avoidance at Tribune; No Avoidance at Guarantor Subsidiaries; (E) Full Avoidance at Tribune; Step 2 Avoidance at Guarantor Subsidiaries; and (F) Full Avoidance at Both Tribune and Guarantor Subsidiaries.

[24] Professor Black assumes that Tribune enterprise value is $873M (including value available to pay Intercompany Claims), value at non-debtor Guarantor Subsidiaries is $1.7 billion, and value at Debtor Guarantor Subsidiaries is $4.177 billion.

Two at both the Tribune and Guarantor Subsidiary levels – i.e., a total litigation victory on the LBO-Related Causes of Action.[25]  As explained above, the Examiner concluded that this scenario was unlikely, and Professor Black believes it is even less likely than the Examiner did.

Moreover, Professor Black will testify that the Proposed Settlement is even more favorable to the Non-LBO Creditors when one accounts for the fact that, if the settlement is not approved, the avoidance claims against the LBO Lenders almost certainly will be settled at some point, rather than litigated to a final judgment.  In other words, the possible outcome of full litigation provides an incomplete comparison.  To consider the reasonableness of the Proposed Settlement as compared to another settlement some time hence, Professor Black developed six "cases" in which he assigns probabilities to outcomes to illustrate the likely range of expected outcomes today, and thus also the likely range of a reasonable settlement:

- **Low Settlement Case**, in which the probabilities of different factual and legal issues are assessed and then settled in a manner that is strongly favorable to the Senior Lenders, with a relatively low Senior Noteholder recovery;

- **Low-Mid Settlement Case**, with probabilities and settlement values assessed in a manner moderately favorable to the Senior Lenders;

- **Mid-High Settlement Case**, with probabilities and settlement values assessed in a manner moderately favorable to the Senior Noteholders;

- **High Settlement Case**, with probabilities and settlement values assessed in a manner strongly favorable to the Senior Noteholders;

- **Black Case**, with probabilities and settlement values based on Black's own best judgment; and

- **Examiner Case**, with probabilities and settlement values based on Black's best understanding of the Examiner's views.

---

[25] Importantly, the distributions shown in Table 1 are before any litigation recoveries obtained by the Litigation Trust.  Those recoveries – on claims that the Noteholder Plan Proponents assert have a strong likelihood of success – are disproportionately assigned to the Non-LBO Creditors under the Debtor/Committee/Lender Plan.

Professor Black then uses these scenario and case probabilities to estimate distributions to each major creditor class in each case:

### Table 2.  Distributions in Different Cases (With Third-Party Recoveries)

Estimated distributions to different creditor classes in different cases, including $300 million in assumed recoveries from third parties, net of litigation costs.  Senior Lender distributions are net of disgorgement; Bridge Lender distributions are before disgorgement.  Amounts in $ millions.

| Creditor Class | Case | | | | | | Debtor/ Committee/ Lender Plan |
|---|---|---|---|---|---|---|---|
| | Low Settle | Low-Mid | Mid-High | High Settle | Black | Examiner | |
| Senior Lenders (net of disgorgement) | 6,610 | 6,528 | 6,395 | 6,172 | 6,539 | 6,287 | 6,070 |
| Bridge Lenders (before disgorgement) | 57 | 61 | 68 | 97 | 60 | 96 | 77 |
| Senior Notes | 227 | 303 | 430 | 609 | 297 | 488 | 659 |
| Interest Rate Swap | 131 | 135 | 142 | 147 | 135 | 140 | 151 |
| Tribune GUC | 20 | 26 | 36 | 51 | 25 | 41 | 41 |
| Subsidiary GUC | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| PHONES | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| All Non-LBO Creditors | 463 | 549 | 693 | 892 | 543 | 754 | 936 |

Table 2 summarizes recoveries in the six settlement cases as compared to the Debtor/Committee/Lender Plan, assuming $300 million in net recoveries from third parties from claims litigated by the Trusts.  Professor Black will testify that this settlement analysis shows just how attractive the Proposed Settlement is for the Non-LBO Creditors.  When potential recoveries from third parties are considered, the distributions to Non-LBO Creditors under the Debtor/Committee/Lender Plan exceed even the High Settlement Case because the Debtor/Committee/Lender Plan funnels most of those recoveries to the Non-LBO Creditors.  More significantly, the six settlement cases provide distributions to all Non-LBO Creditors ranging from $463 million in the Low Settlement Case to $892 million in the High Settlement Case.  Under the Debtor/Committee/Lender Plan, however, the Non-LBO Creditors stand to

recover $936 million.  Simply put, whether viewed from the perspective of potential outcomes of

full litigation or potential settlement outcomes, Professor Black's analysis indicates that the Non-

LBO Creditors are not likely to get a significantly better distribution if the claims against the

LBO Lenders are litigated as compared to the result available now in the Proposed Settlement.

> c.    The Proposed Settlement fairly reflects the obstacles to avoiding
> the Step One and Step Two Claims at both Tribune and the
> Guarantor Subsidiaries

As the Examiner Report and Professor Black's analysis demonstrate, the only litigation

scenario that produces a recovery for the Non-LBO Creditors greater than that provided for in

the Proposed Settlement is a complete litigation win in which all Senior Loan Claims (including

those incurred in connection with the both the Step One and Step Two Transactions) and all

Bridge Loan Claims are avoided as to both Tribune and each of the Guarantor Subsidiaries.

Both the Examiner and Professor Black believe that such a complete win is unlikely.  Moreover,

the existence of competing testimony as to the key issue of solvency, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

demonstrates that there are arguments to be made on both sides of the issue – a reality that the

Proposed Settlement reflects.

> (i)    Constructive fraudulent transfer

In order to obtain full avoidance on a constructive fraudulent transfer theory, a plaintiff

would need to prove that <u>both</u> Tribune and the Guarantor Subsidiaries were balance sheet

insolvent, had unreasonably small capital, or were unable to pay their debts at the time of the

Step One Transactions.[26, 27]

---

[26] As shown above, insolvency at the time of the Step Two Transactions only has relatively little effect on recoveries for the Senior Noteholders and holders of Other Parent Claims absent estoppel arguments.  If Tribune and the Guarantor Subsidiaries are solvent at Step One, therefore, the Proposed Settlement is reasonable whether they are solvent at Step Two or not.
[27] Establishing constructive fraudulent transfer would also, of course, require proving that the LBO Lenders did not provide reasonably equivalent value to Tribune (which the Examiner found only for certain aspects of the

The Examiner concluded that it was "highly unlikely" (the Examiner's lowest probability) that the Debtors would be found to have been insolvent at the time of the Step One Transactions if only the debt incurred in connection with those Transactions is considered. The Examiner's conclusion in this regard is consistent with the opinion that will be offered by Professor Black, who has concluded that Tribune and the Guarantor Subsidiaries were "almost certainly" solvent at the time of the Step One Transactions. Likewise, Professor Fischel, looking at Step One alone, concluded that Tribune was left with equity value in excess of $3.7 billion.

The Noteholder Plan Proponents do not contend that Tribune was insolvent at the time the Step One debt was incurred if the debt at the time of Step Two is not considered in the solvency analysis. ████████████████████████ ████████████████████████ ████████████████████████. Accordingly, the Noteholder Plan Proponents offered no evidence that Tribune or its Guarantor Subsidiaries were rendered insolvent or left unable to pay their debts or with inadequate capital as a result of the Step One Transactions if the obligations incurred in connection with the Step Two Transactions more than six months later are not taken into account.

With regard to the question of whether the Step Two debt should be "collapsed" and considered in connection with the solvency of the Debtors at the time of the Step One Transactions, the Examiner concluded in connection with the balance sheet test that "[a]lthough the question is close . . . a court is somewhat unlikely to include the Step Two Debt for purposes of determining solvency at Step One." See Examiner Report, Vol. 2 at p. 160. Relying on Mervyn's Holdings, LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC), Nos.

---

Transactions). See Examiner Report, Vol. 2 at pp. 90-127. It is unnecessary to address this issue other than to observe that a court's findings on this element of the claim would impact the amount of debt subject to avoidance.

08-11586, 05-51402, 2010 Bankr. LEXIS 670, at *17-18 (Bankr. D. Del. Mar. 17, 2010), the

Examiner concluded that a court could treat a series of separate steps as a single transaction only

if (a) "all of the parties involved had knowledge of the multiple transactions," (b) "[no]

transaction would have occurred on its own," and (c) "each transaction was dependent or

conditioned on other transactions." See Examiner Report, Vol. 2 at pp. 165-73. The Examiner

then noted that the case for collapse encounters difficulties on the third inquiry. Specifically, the

Examiner pointed to evidence showing "that participants in the Leveraged ESOP Transactions

not only contemplated the possibility that Step Two might not happen, they structured the

documents so that Step One could stand alone if necessary." See id. at pp. 173-77. The

Examiner identified the "time lag" between the Step One and Step Two Transactions as well as

the separate and independent conditions to the consummation of the Step Two Transactions,

including FCC approval, Major League Baseball approval, and the receipt of a solvency opinion

and solvency certificate, as creating genuine uncertainty about whether Step Two would happen.

See id.

The Examiner also highlighted market evidence supporting a conclusion that the

transactions were separate, including "the fact that the Tribune Common Stock traded at a

discount to the Merger price in the months following Step One," indicating uncertainty about

whether the Merger would close. See id. at pp. 177, 179-80. Finally, the Examiner cited "the

relatively modest $25 million break-up fee" as an additional factor militating against

"collapsing" the transactions. See id. at p. 180.

For these reasons, the Examiner concluded that, in order to collapse the Step One and

Step Two Transactions for solvency purposes, a court "would not just have to expand on the

existing law" but that doing so "would entail disregarding . . . , in a very tangible way,

substantive aspects of the Leveraged ESOP transactions." See id. at pp. 181-82.

Professor Black also considered the question of "collapse" or "Step Integration" (as he

calls it) and concluded that the possibility of a court collapsing the two sets of transactions is

remote. Professor Black agrees with the Examiner that: (i) a court would have to "expand on

the existing law" to apply collapse; (ii) more is required for collapse than a plan to complete both

steps, even a plan that is likely to succeed; and (iii) there would be important practical

difficulties in applying collapse under the circumstances of this case that might, in the

Examiner's words, lead a court to "veer away from that path." See id. at pp. 181-82.  Professor

Black also notes that (i) the Step One Tender Offer was designed to stand on its own and could

have occurred without the Step Two Merger; (ii) the Step One Tender Offer would, to a high

probability, have occurred on its own, in a slightly different form, if Zell had not proposed the

Leverage ESOP structure; and (iii) there were important conditions to the Step Two Merger and

business risks between the two sets of Transactions that could have prevented the Merger from

closing.  Professor Black concludes that these factors, taken together, counsel strongly against

collapse.[28]

████████████████████████████████████████████

██████████████.[29] ███████████████████████.  The Noteholder Plan Proponents do

---

[28] The Creditors' Committee does not agree with much of the Examiner's and Professor Black's analysis of the likelihood that a Court would collapse the Step One and Step Two Transactions. The Creditors' Committee does, however, recognize the complexity of the collapse issue as a matter of fact and law and its critical importance to the issue of solvency at Step One and believes the settlement appropriately takes the litigation risks into account.
[29] ████████████████████████████████████████████████

little better in their objection, simply reciting the evidence that the Examiner found to weigh in favor of collapse and ignoring the evidence the Examiner found to weigh against it. The reality is that, as with many of the legal and factual arguments that drive the Proposed Settlement, arguments have been made on both sides of the collapse issue. ██████████ the Noteholder Plan Proponents ignore this reality and assume that collapse is a certainty (as they must in order to assert entitlement to recoveries greater than those provided by the Debtor/Committee/Lender Plan). The Proposed Settlement, which is a compromise among parties with competing views on this and other issues, attempts to strike a middle ground that recognizes the risks both sides face should they choose to litigate.

Moreover, even if the Step One and Step Two Transactions are "collapsed" for solvency purposes, that would not necessarily equate to a finding that Tribune was insolvent as of the time of the Step One Transactions. In fact, the Examiner examined solvency assuming collapse and concluded that it still would be "somewhat unlikely (but, to emphasize, a very close call) that a court would conclude that Tribune was rendered insolvent at Step One even in a collapse scenario that includes the Step Two Debt" and that it was more likely that the Guarantor Subsidiaries would be solvent even in a collapse scenario. See Examiner Report, Vol. 2 at pp. 206. In this regard, the Examiner observed that "Tribune's bond prices exhibited little negative price reaction after the announcement of the Leveraged ESOP Transactions through the Step One Financing Closing Date" and noted that, "[r]egardless of what might have influenced the pricing, the bonds certainly did not trade at levels that would be associated with Tribune insolvency." See id. See also VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007) (holding

that district court did not err "in choosing to rely on the objective evidence from the public equity and debt markets").

The Examiner concludes that it is likely that the Step Two debt would be considered on the cash flow and capital adequacy tests but finds that it is reasonably likely that a court would conclude that Tribune met these tests at the time of the Step One Transactions and even more likely that the Guarantor Subsidiaries did so.  See Examiner Report, Vol. 2 at pp. 211, 219-20. Professors Black and Fischel will testify that it is highly probable that both Tribune and the Guarantor Subsidiaries were solvent after the Step One Transactions even with collapse,



---

[30] The Creditors' Committee does not agree with this testimony by Professors Black and Fischel but recognizes that the fact of their testimony supports the reasonableness of the settlement.

42

███████████████████████████████████████████████.

In short, although arguments can be made on both sides of the question of solvency at the time of the Step One Transactions, the Examiner concludes that it is significantly more likely than not that a court would conclude that the Debtors were solvent.  The reports of the competing experts only underscore the reasonableness of the Proposed Settlement, which gives appropriate weight to the merits of both sides of the arguments.

(ii)    Intentional fraudulent transfer

In order to obtain avoidance on an intentional fraudulent transfer theory, a plaintiff would need to prove that the Debtors made transfers of property with "actual intent to hinder, delay or defraud" present or future creditors." 11 U.S.C. § 548(a)(1).  The Examiner "did not find credible evidence that the Tribune Entities entered into the Step One Transactions to hinder, delay, or defraud creditors."  See Examiner Report, Vol. 1 at p. 7; see also id., Vol. 2 at pp. 26, 28.  As such, he concluded that "a court is reasonably likely to conclude that the Step One Transactions did not constitute an intentional fraudulent transfer."  See id., Vol. 2 at 26, 28. (emphasis added); see also id. at p. 22 ("A court is reasonably unlikely to find that the Tribune Entities incurred the obligations and made the transfers in the Step One Transactions with actual intent to hinder, delay, or defraud . . . .").

Professor Black's view is even stronger.  He will testify that, given the specific facts of this case, it would be implausible to find actual intent to defraud at Step One absent a finding that Tribune was insolvent.  Given Professor Black's opinions on solvency at the time of the Step One Transactions, he will testify that a finding of actual intent at Step One is highly remote.  Moreover, Professor Black points out that because, in his view, a finding of actual intent in this case is dependent on a finding of insolvency, the claim for intentional fraudulent transfer does

43

not materially impact the probability-weighted value of the litigation against the Senior Lenders.

Instead, the intentional fraudulent transfer claim would be pertinent only to the claims against

Tribune's officers and directors and selling stockholders, which are largely preserved under the

Debtor/Committee/Lender Plan for prosecution by the Trusts.

The Noteholder Plan Proponents assert that the "evidence adduced by the Examiner,

coupled with evidence obtained in discovery, demonstrates that the Step One financing bore

several badges of fraud." See Noteholders Obj. at p. 67.  The Examiner, however, looked at this

same evidence and reached a very different conclusion:  "Application of the traditional 'badges

of fraud' to the record adduced and the circumstances giving rise to the Step One Transactions

weigh against the conclusion that the Step One Transactions were entered into to hinder, delay,

or defraud creditors." See Examiner Report, Vol. 1 at p. 7.  Indeed, the Examiner analyzed the

evidence and contentions of the parties regarding "badges of fraud" at length in his Report.  See

Examiner Report, Vol. 2 at pp. 23-32.  At most, the Noteholder Plan Proponents' argument in

this regard simply shows their disagreement with the Examiner as to the import of the facts.  It

does not show that the Proposed Settlement unreasonably values these claims.

The Noteholder Plan Proponents also argue that actual intent can be inferred because

Tribune's officers and directors could have performed "a few simple calculations" based on

valuations prepared by Merrill Lynch, Citigroup, and Morgan Stanley and, had they done those

calculations, they would have realized that Tribune would be rendered insolvent as a result of the

transactions.  See Noteholders Obj. at ¶ 143.  As an initial matter, it is important to note that the

Noteholder Plan Proponents' argument assumes collapse – that is, assumes that the Step Two

debt should be considered in assessing solvency at Step One – which, as discussed above, is a

hotly contested issue.  Without collapse, these valuations plainly showed that Tribune was

44

solvent.  As noted above, according to both the Examiner and Professor Black, it is more likely that a court would <u>not</u> collapse the two steps.

Moreover, as Professor Black will testify, one cannot simply take balance sheet value at Step One, subtract expected debt at Step Two, and arrive at balance sheet capital.  Instead, one must recognize that Tribune would accumulate cash between the two Steps, would benefit from an equity investment by Zell, but would pay merger-related fees and expenses.  This results in a net increase to balance sheet value.  The Noteholder Plan Proponents also tacitly assume that the tax benefits associated with the S-Corp./ ESOP structure that Tribune adopted pursuant to Step Two would not be included in the solvency analysis, even after collapse.  While the Examiner finds it "reasonably likely that a court would not include the value associated with Tribune's ability to avoid paying taxes following Step Two," <u>see</u> Examiner Report, Vol. 2 at p. 204, Professor Black opines that, had the Examiner correctly understood the ability of Tribune to realize increased amounts for the disposition of certain assets, he would have included these amounts in his Balance Sheet Solvency analysis, and that it is moderately likely that a court <u>would</u> count that value toward balance sheet solvency, in which case balance sheet solvency (with collapse) is highly probable.  Professor Fischel also will testify that the S-Corp./ESOP related tax benefits should be counted in assessing asset value.  These issues are nuanced; they are not the matter of "a few simple calculations."[31]

(iii)    Equitable subordination

---

[31] With respect to the Step Two Transactions, the conclusions reached by the Examiner and Professor Black diverge.  The Examiner found that it was "somewhat likely" that a court would find that an intentional fraudulent conveyance occurred, although he noted that the facts gathered during his investigation "do not fit the ordinary pattern of an intentional fraudulent transfer."  <u>See</u> Examiner Report, Vol. 2 at p. 76.  Professor Black judges the possibility of an actual fraudulent conveyance in connection with the Step Two Transactions as remote.  But the Bankruptcy Court need not resolve this dispute in order to find that the Proposed Settlement is above the lowest point in the range of reasonableness.  That is because the principal consequence of a finding of intentional fraudulent conveyance would be to increase potential third party recoveries.

The Noteholder Plan Proponents assert that the alleged claims for equitable subordination of the LBO Lenders' claims are settled for insufficient consideration under the Proposed Settlement. See Noteholder Obj. at ¶ 267. The Senior Lenders believe that this argument ignores the case law describing the circumstances in which equitable subordination may be available and the Examiner's specific conclusion that there was no evidence that the LBO Lenders engaged in the type of egregious conduct he concluded was necessary to support a claim of equitable subordination. See Examiner Report, Vol. 2 at pp. 332-33. In addition, the Noteholder Plan Proponents fail to acknowledge the LBO Lenders' arguments that a finding that the LBO Lenders engaged in misconduct such that their claims could be equitably subordinated is especially implausible if a court does not first find that Tribune was rendered insolvent by the Transactions.

Thus, equitable subordination does not remove the obstacles to recovery presented by the need to show insolvency and in fact imposes additional elements that must be proved in respect of the LBO Lenders' conduct in order to prevail. To establish equitable subordination, a party must prove that: (a) the claim holder engaged in inequitable conduct; (b) the misconduct resulted in injury to other creditors or conferred an unfair advantage on the claim holder; and (c) equitable subordination of the claim is not inconsistent with the Bankruptcy Code. Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 986-87 (3d Cir. 1998).

The Examiner noted that "courts have cautioned that equitable subordination is an 'extraordinary measure' which should not be lightly invoked." See Examiner Report, Vol. 2 at p. 324 (citing Cohen v. KB Mezzanine Fund II, L.P. (In re Submicron Sys. Corp.), 291 B.R. 314, 327 (D. Del. 2003), aff'd, 432 F.3d 448 (3d Cir. 2006)). Further, where the defendant is a non-

46

insider, "[t]he law is well-settled that . . . the party seeking to apply equitable subordination . . .

must show that the [defendant] engaged in egregious conduct such as fraud, spoliation, or

overreaching." Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman

Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.), 405 B.R. 527, 554 (Bankr. D. Del. 2009)

(quotation omitted); see also Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons,

Inc.), 161 B.R. 107, 117-19 (E.D. Pa. 1993), aff'd, Am. Cigar Co. v. MNC Commercial Corp. (In

re Paolella & Sons, Inc.), 37 F.3d 1487 (3d Cir. 1994) ("Equitable subordination has seldom

been invoked, much less successfully so, in cases involving noninsiders and/or non-

fiduciaries.").

     The LBO Lenders were not company insiders and the Examiner concluded that there was

not "sufficient evidence to support a finding that the Lead Banks engaged in the kind of

egregious behavior that would justify equitable subordination or equitable disallowance," and

that it was therefore somewhat unlikely a court would impose such a remedy in the event any

claims were avoided. See Examiner Report, Vol. 2 at pp. 332, 336. Professor Black likewise

was unable to identify any evidence that shows that, at the time of the Step One Transactions, the

LBO Lenders believed that Tribune had insufficient cash flow to pay or refinance its debts as

they came due. Accordingly, Professor Black opines that a finding of misconduct in connection

with Step One would be remote, even assuming that Tribune was insolvent at that time.[32]

     In support of their contention that the equitable subordination claims are valuable, the

Noteholder Plan Proponents do not cite any new evidence, but instead rely on the same

---

[32] Professor Black also finds it unlikely that a court would find misconduct sufficient to justify equitable
subordination of claims arising in connection with the Step Two Transactions. In Professor Black's view, the
evidence clearly shows that the LBO Lenders lent reluctantly in connection with the Step Two Transactions. And
the Examiner himself noted that "the fact that the Lead Banks had preexisting contractual funding obligations
(entered into when the Tribune Entities probably were solvent) is a significant mitigating factor." See Examiner
Report, Vol. 2 at p. 336.

documents that the Examiner found insufficient to support a claim for equitable subordination.

For example, the Noteholder Plan Proponents cite an August 24, 2007 e-mail from a JPMorgan

employee to support their assertion that JPMorgan "was fully aware of the risks it undertook by

proceeding with the LBO." See Noteholder Obj. at ¶ 273.  They quote the Examiner's

interpretation of this e-mail – which noted that the e-mail reflected JPMorgan's conclusion that it

could not participate in a potential share repurchase due to practical and legal impediments, and

that if it nonetheless participated, "any claim in a hypothetical further reorganization proceeding

could be equitably subordinated" – to further support their assertion.  See id. at ¶ 273 n.155

(quoting Examiner Report, Vol. 1 at p. 626).  The Noteholder Plan Proponents omit, however,

the sentence in the Examiner Report immediately following the quoted language in the Examiner

Report:  "Mr. Jacobson's concerns in this regard do not suggest to the Examiner that JPM was

anticipating a future Tribune bankruptcy." See Examiner Report, Vol. 1 at p. 626 (emphasis

added).  Again, the Noteholder Plan Proponents omit reference to these statements in their

discussion.

    Similarly, with respect to other documents cited by the Noteholder Plan Proponents in

support of their assertion that the LBO Lenders were aware that the Transactions would render

Tribune insolvent, the Examiner states:

> [T]here is plenty of evidence that one or more of the Lead Banks
> were concerned, before Step One, about the amount of leverage in
> the Zell transaction and, before Step Two, about the deterioration
> in Tribune's operating performance and the corresponding level of
> leverage.  Healthy skepticism followed by due diligence is not a
> ground to equitably subordinate the Lead Bank's claims.

See id., Vol. 2 at pp. 333-34 (emphasis added).

    Finally, with respect to the LBO Lenders' knowledge of their structural superiority vis-à-

vis creditors of Tribune (such as the Senior Noteholders), the Examiner notes that "there was

nothing per se improper about exploiting an opportunity presented by the Tribune Entities'

capital structure and the absence of a contractual prohibition against the incurrence of debt at the

Guarantor Subsidiary levels." See id. at p. 333.  The Examiner also considered and discounted

the e-mails cited by the Noteholder Plan Proponents allegedly evidencing an improper profit

motive as a basis for equitable subordination:  "the profit motive evidenced by these isolated,

informal communications was not unique to JPM, nor is there credible evidence that JPMCB was

improperly motivated in its Tribune credit decisions." See id., Vol. 1 at p. 265.

The Creditors' Committee does not agree with the above descriptions of the merits of the

equitable subordination claims.  The Debtor/Committee/Lender Plan Proponents agree, however,

that, given the Examiner's findings concerning equitable subordination, that claim is reasonably

valued by the Proposed Settlement.[33]

(iv)    Unjust enrichment

The Noteholder Plan Proponents also contend that the bankruptcy estates have valuable

unjust enrichment claims. See Noteholder Obj. at ¶ 284.  In contrast, the Examiner found that a

claim for unjust enrichment holds little potential value.  Although the Examiner concluded that it

is unclear whether a court would follow Official Comm. of Unsecured Creditors of Hechinger

Inv. Co. v. Fleet Retail Fin. Group. (In re Hechinger Inv. Co.), 274 B.R. 71, 97 (D. Del. 2002),

and find that unjust enrichment claims are preempted by the Bankruptcy Code, he also concluded

that, in any event, a court was "reasonably unlikely" to find such claims meritorious.  See

Examiner Report, Vol. 2 at p. 404.  Specifically with respect to the LBO Lenders, the Examiner

explained that, "absent facts justifying avoidance of obligations or transfers or demonstrable

---

[33] The Noteholder Plan Proponents also suggest that the Proposed Settlement fails to consider the value of a claim for equitable disallowance.  The Examiner concluded that it is unclear whether equitable disallowance is even an available remedy in the Third Circuit.  See Examiner Report, Vol. 2 at pp. 331-32.  Further, such a claim "requires creditor misbehavior at least as repugnant as that which would warrant equitable subordination."  See id.  Because, as discussed above, the Examiner concluded that the evidence is insufficient to support a claim of equitable subordination, the same holds true with respect to equitable disallowance.

49

wrongdoing such as tortious acts, it is difficult to envision" how the elements of a claim for

unjust enrichment could be satisfied.  See id. at p. 405.

For that reason, the Examiner commented that unjust enrichment claims are "largely

derivative" of other claims.  See id.  As a result, accepting the Examiner's conclusions, any claim

for unjust enrichment against the LBO Lenders, even if ultimately successful, would provide

little, if any, incremental value to the Estates.

> (v)    Aiding and abetting breach of fiduciary duty

The Noteholder Plan Proponents also misstate the record with respect to alleged claims

against the LBO Lenders for aiding and abetting breaches of fiduciary duty, claiming that the

Examiner determined such claims to be "strong."  See Noteholder Obj. at p. 145.  In reality, the

Examiner concluded that aiding and abetting claims are unlikely to be successful.

In order to establish a claim for aiding and abetting breach of fiduciary duty, there must

be an underlying breach.  With respect to the Step One Transactions, the Examiner found "no

credible basis to conclude that Tribune's officers or directors, the Guarantor Subsidiary officers,

or the Large Stockholders breached any fiduciary duties."  See Examiner Report, Vol. 2 at p.

395.  As a result, the Examiner did not even discuss the possibility of aiding and abetting claims

in connection with those Transactions.  See id.

With respect to the Step Two Transactions, the Examiner concluded that breach of

fiduciary duty claims were "reasonably likely" to be sustained against Tribune's senior financial

management.  See id. at pp. 386-87.  Those claims are Preserved Causes of Action under the

Debtor/Committee/Lender Plan to be pursued by the Trusts and are, therefore, not "settled

cheaply" as the Noteholder Plan Proponents suggest.  See Noteholder Obj. at ¶ 282.  With

respect to alleged aiding and abetting claims against the Senior Lenders, however, the Examiner

concluded that there was "no credible evidence to support the conclusion that the Lead Banks or

the Financial Advisors aided and abetted a breach of fiduciary duty" and that the there was no

"nexus between the conduct of the Lead Banks and the conduct of any member of Tribune's

senior financial management at Step Two that would be sufficient to demonstrate assistance,

encouragement, or advocacy of a potential breach of fiduciary duty by such person." See

Examiner Report, Vol. 2 at p. 396. The Noteholder Plan Proponents thus point to nothing that

would suggest that this Court should disregard the Examiner's conclusions in this regard in

assessing the reasonableness of the Proposed Settlement.

(vi)    Lender good faith

The Examiner recognized that the LBO Lenders potentially can shield portions of the

Senior Loan Claims from avoidance under the "good faith for value given" defense provided by

section 548(c) of the Bankruptcy Code.[34] The Examiner concluded that it is "reasonably likely"

that at the time of the Step One Transactions the LBO Lenders acted in good faith (preserving a

claim of nearly $3 billion) and noted:

> The evidence supports the conclusion that JPMCB acted in good faith in
> connection with the step one transactions. . . . Even if the JPMCB [sic] were
> placed on inquiry notice that Step One might render Tribune insolvent or without
> adequate capital, an inquiry into the actual facts and circumstances would lead a
> reasonable prospective lender in JPMCB's position to conclude that the Tribune
> entities would not be rendered insolvent.

See Examiner Report, Vol. 2 at p. 264.[35]

With respect to Step Two, the Examiner concluded that the LBO Lenders were

"reasonably likely" not to have acted in good faith for purposes of the section 548(c) safe

---

[34] Value conferred in connection with the Step One Transactions arguably includes at least $2.5 billion used to
refinance antecedent debt incurred to fund the 2006 tender offer (Examiner Report, Vol. 2 at pp. 92-93); $193
million incurred under the Delayed Draw Facility used to repay maturing notes (id. at pp. 98-99); and no less than
$265 million drawn on the Revolving Credit Facility for general corporate purposes (id.), amounting to a total of at
least $2.96 billion. Value conferred in connection with the Step Two arguably includes at least $457.5 million in
401(k) savings and about $482.5 million in S-Corp./ESOP tax savings. (Id. at pp. 115-16.)

[35] The Creditors' Committee disagrees with the Examiner on this point and believes there are arguments that the
Lenders did not act in good faith at the time of Step One for purposes of the section 548(c) safe harbor.

harbor.[36]  The LBO Lenders vigorously dispute this conclusion,[37] while the Creditors'

Committee believes the probability is greater than the Examiner concluded.  In no event,

however, is the risk associated with this issue minimal.

Further, in the event of litigation, the LBO Lenders would argue that the extension of the

loans themselves constitutes consideration or value given to the Debtors in exchange for the

incurrence of the loan obligations if the loans were made in good faith.[38]  The Examiner

disagreed and found it "highly likely" that a court would collapse the transactions within each

step for purposes of analyzing reasonably equivalent value.  Examiner Report, Vol. 2 at p. 89.

The Creditors' Committee believes the LBO Lenders' argument is without merit.  Nevertheless,

accepting the Examiner's "highly likely" conclusion, there is a risk that the LBO Lenders would

prevail on this defense that the Noteholder Plan Proponents have not taken into account, and that

supports the reasonableness of the Proposed Settlement.

(vii)    "Waiver and estoppel" arguments

The Noteholder Plan Proponents also make a series of arguments based on "equitable

estoppel" and "waiver," alleging that the Senior Lenders holding claims arising from the Step

One Transactions should not benefit from any avoidance of the debt incurred in connection with

the Step Two Transactions.  The Examiner considered one of these arguments – that the Step

---

[36] The Examiner did, however, state that the Lenders were contractually obligated to close the Step Two Transactions and expressed "sympathy for the predicament that the Lead Banks found themselves in at Step Two," while also noting that the Lenders did "not put their collective heads in the sand."  Examiner Report, Vol. 2 at pp. 268, 270.

[37] The LBO Lenders would argue that they conducted extensive diligence of the VRC opinion underlying Tribune's solvency certificate, and that they were contractually obligated to fund – a fact the Examiner both recognized and affirmed in noting that the Lenders were primarily motivated by their contractual obligations (and likely would not have funded otherwise).

[38] See, e.g., Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.), 388 B.R. 46, 49 (D. Del. 2008), aff'd on other grounds, 590 F.3d 252 (3d Cir. 2009) (affirming dismissal of fraudulent conveyance action, in part because "courts in [the Third] Circuit have typically required proof of bad faith or intent to defraud to justify collapsing otherwise independent transactions."); Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 55 (2d Cir. 2005) (collapsing has no applicability where loan is made in good faith).

One Lenders should not share in <u>disgorgement</u> recoveries obtained from Step Two Lenders.  The

Examiner concluded that "[a]bsent a basis to equitably subordinate the Step One Debt consistent

with the standard governing equitable subordination . . . it is difficult to find a doctrinal basis that

would support barring the debt from participating in avoidance recoveries."  Examiner Report,

Vol. 2 at pp. 301-02.  Further, he noted that equitable estoppel is "at best an imperfect fit"

because it requires some form of representation from the party against whom estoppel is sought

(and the Lenders made no representations to the non-LBO creditors).  <u>Id.</u> at pp. 302-03.

However, because the Examiner found the law "unclear," he left this question in "equipoise."  <u>Id.</u>

at p. 303.[39]

    The Noteholder Plan Proponents' theory appears to be premised on the idea that, because

the same lenders supposedly funded, or, at a minimum, contemplated the funding, of both the

Step One and Step Two Transactions, even if the Step One claims are allowed in full, the current

holders of such allowed claims should not be permitted to share in any recoveries on account of

avoidance of Step Two claims.  The Senior Lenders believe this to be inconsistent with the

Examiner Report.  The Examiner stated:  "The evidence shows that the participants in the

Leveraged ESOP Transactions . . . structured the documents so that Step One could stand alone

if necessary."  <u>See id.</u> at p. 173.  As Professor Black further notes, the position advanced by the

Noteholder Plan Proponents effectively would put the Step One Lenders in a worse position for

amounts that Tribune paid to the Step Two Lenders and Bridge Lenders, and later recovered,

than if Tribune had never paid these amounts at all.  While the Creditors' Committee, for its part,

does not agree with the Senior Lenders' or Professor Black's assessment of the estoppel remedy,

---

[39]

██████████████████████████████████████████

██████████████████████████████████████████

the Noteholder Plan Proponents totally ignore that there might be credible arguments on the other side of the issue.

In their Objection, the Noteholder Plan Proponents assert a different "estoppel" argument not contemplated by the Examiner.  Specifically, the Noteholder Plan Proponents now argue that, if the Step Two debt is avoided, the value otherwise distributable by the Guarantor Debtors on account of such debt should be upstreamed to Tribune and be used to pay Tribune's Non-LBO Creditors to the exclusion of holders of the unavoided Step One debt.  See Noteholder Obj. at ¶¶ 205-06.  Yet the Noteholder Plan Proponents neither cite to any authority for the proposition, nor did the Examiner Report in any way suggest, that the creditors of a parent company should be permitted to benefit from avoidance before a debtor's own unavoided creditor claims have been satisfied.

The Noteholder Plan Proponents suggest at several places that the Examiner addressed this issue and left it in "equipoise," but it is clear from the Examiner Report that he addressed only whether Step One Lenders could share in disgorgement proceeds – not whether the Step One Lenders somehow could be disqualified from sharing in increased distributions made possible by the disallowance of the Step Two claims themselves.  Moreover, even assuming that non-avoided LBO debt may not participate in distributions or recoveries from avoidance of Step Two,

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████.

The Senior Lenders believe that the Noteholder Plan Proponents' new theory fails for a number of reasons. Professor Black will testify that the Noteholder Plan Proponents' new argument would mean, in effect, that the Step Two claims actually would be allowed (not avoided), but the money that would have been paid by the Guarantor Subsidiaries in respect of such claims would instead be diverted to the Tribune Pre-LBO Creditors. This remedy would, in substance, turn the Pre-LBO Creditors of <u>Tribune</u> into priority creditors at each Guarantor <u>Subsidiary</u>, holding a $3.7 billion claim at each subsidiary. The Noteholder Plan Proponents point to no basis, equitable or otherwise, for this remedy and Professor Black concluded that this argument has no chance of success.

(viii)   Limits to avoidance of the Subsidiary Guarantees

The Senior Lenders believe that any avoidance of the Subsidiary Guarantees would be limited to the extent necessary to satisfy the claims of the Guarantor Subsidiaries' creditors. <u>See Adelphia Recovery Trust v. Bank of America</u>, 390 B.R. 80, 93 (S.D.N.Y. 2008) (dismissing claim to avoid loan obligations where avoidance would benefit only the creditors of the obligors' parent corporation); <u>In re Blackwell</u>, 267 B.R. 732 (Bankr. W.D. Tex. 2001) (transfer of assets "may be recovered for the benefit of . . . the creditors of the corporation itself, not the creditors of the equity owner"); <u>In re Murphy</u>, 331 B.R. 107, 121 (Bankr. S.D.N.Y. 2005) (avoidance limited "to the extent necessary to satisfy . . . creditor claims"); <u>In re Foxmeyer</u>, 296 B.R. 327, 342 (Bankr. D. Del. 2003) ("[O]nly . . . damages consequently suffered by the creditor body of a debtor may be recovered via a fraudulent conveyance action."). The Examiner considered this argument and concluded that it was reasonably unlikely to prevail, and the Creditors' Committee

believes it is even less likely to prevail.  The Proposed Settlement reflects these competing

views.



d.





This confirms that the Proposed Settlement is not just above the lowest point in the range of reasonableness, but indeed highly favorable to the Senior Noteholders.

        e.       <u>Distorted arguments concerning valuation in no way undermine the reasonableness of the Proposed Settlement</u>

Finally, the Noteholder Plan Proponents attack the Proposed Settlement on the ground that Tribune's DEV is actually higher than the DEV of $6.75 billion on which the Debtor/Committee/Lender Plan is premised (the "<u>Plan DEV</u>"), and that this higher DEV renders the Proposed Settlement unreasonable because the all-cash payment to the Senior Noteholders does not allow them to benefit in the event the DEV of the Company exceeds Plan DEV.

In October 2010, the Debtors' valuation was prepared by valuation experts at Lazard using standard industry valuation methodologies which in its judgment were appropriate for the circumstances. In that October 2010 valuation, Lazard estimates that the Distributable Value of the Reorganized Debtors as of the Emergence Date would be between $6.299 and $7.104 billion. In January 2011, Lazard refreshed the October 2010 valuation to reflect year-end 2010 information and preliminary forward-looking 2011 estimates, as appropriate. The January refresh of the October valuation used the most up to date financial information available from the Company, including prevailing valuation multiples of publicly traded peer companies as of that date. Another of the Debtors' experts, John Chachas, who has 24 years of investment

58

banking, valuation, and reorganization experience in the publishing and broadcasting industries, concluded that the valuation estimates as provided in the Lazard October valuation do not vary materially from the results of the January refresh.



---

[41] The Debtors' non-controlled interests are comprised primarily of minority interests in TV Food Network, CareerBuilder, and Classified Ventures.

███████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████.

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

███████.

      The Noteholder Plan Proponents also mischaracterize the effect of this inflated valuation. The Debtors' financial advisors will testify that even if DEV were above $6.75 billion, the Senior Noteholders' natural recovery would not increase in any material respect.  The Senior Noteholders have claims only against Tribune, which is a holding company with no operating

assets; the majority of its value is attributable to cash and real estate holdings.42  These discrete, non-operating assets are subject to little valuation subjectivity or fluctuation, and thus would not be materially impacted by an increase in the overall enterprise value of the Debtors' businesses.

Accordingly, any increase in DEV above $6.75 billion would be driven almost entirely by increases in the market value of the Guarantor Subsidiaries and investments.  Because any increase in DEV would be primarily attributable to the Guarantor Subsidiaries, even were DEV to increase to $9 billion, the "natural recovery" of the Senior Noteholders would be limited to less than 6.5% (in the Noteholder Plan Proponents' estimation), as compared to the roughly 33.6% initial cash recovery plus the opportunity for significant further Trust recoveries offered under the Debtor/Committee/Lender Plan.  Absent success on the LBO-Related Causes of Action, even extreme increases in DEV such as those postulated by the Noteholder Plan Proponents would have minimal impact on the Senior Noteholders' natural recovery.43

Cognizant of this reality, the Noteholder Plan Proponents adopt an unlikely combination of assumptions to suggest that a rising DEV of as little as $150 million could materially improve their recovery.  See Noteholder Obj. at ¶ 24.  To make this argument, the Noteholder Plan Proponents "assume their conclusion" by assuming they will prevail on a number of hotly disputed issues they could well lose, including (i) complete disallowance of all Step Two Senior Loans and Bridge Loans as against both Tribune and the Guarantor Debtors; and (ii) full, costless disgorgement of all fees and payments made in respect of that Step Two debt.  See id. ¶ 123.

Moreover, even were all Step Two debt disallowed (as the Noteholder Plan Proponents suggest the Bankruptcy Court should assume), the Senior Lenders are likely to be entitled under

---

42 The Lazard Report allocates approximately $837 million of the $6.75 billion of DEV to Tribune Company (before redistribution of value on account of Intercompany Claims).  See Lazard Expert Report at p. 93.
43 In fact, without success on the LBO-Related Causes of Action, DEV would have to reach over $10.8 billion for Holders of Senior Notes to achieve the recovery offered to them under the Debtor/Committee/Lender Plan.

applicable law to recover post-petition interest on their Allowed Step One Claims before any

value of the Guarantor Debtors could flow to creditors of Tribune.44  The Noteholder Plan

Proponents' chart purporting to show "Noteholder Recoveries as a Percentage of Claim" See

Noteholder Obj. at ¶ 122 improperly assumes that the Step One Lenders' recovery is capped at

100%, such that the Guarantor Subsidiaries' equity holders would recover before all Allowed

Claims against the Guarantor Subsidiaries are paid in full with post-petition interest.  The

Noteholder Plan Proponents cite no legal basis for this limitation.  To the contrary, where, as

here, a creditor has multiple sources of recovery, it is well-settled that such creditor may prove

its claim against all sources, subject only to an aggregate recovery equal to the amount owing

under the applicable contract including post-petition interest.[45]  If only the Step One Loan Claims

outstanding as of each relevant Debtor's petition date were allowed, the Senior Lenders would be

entitled to collect their full pro rata distributions from Tribune and each Guarantor Subsidiary

until they have reached an aggregate recovery equal to the full amount of such claims plus all

post-petition interest.[46]

---

[44] Even assuming full avoidance of all Step Two Debt, adding the post-petition interest with respect to the Step One Senior Loans means that DEV would have to increase by at least a full billion dollars above the Plan DEV, plus full, costless disgorgement of all Step Two payments of principal, interest, and fees, in order to yield the initial recovery to the Senior Noteholders provided by the Debtor/Committee/Lender Plan.

[45] See, e.g., Board of Commissioners v. Hurley, 169 F. 92 (8th Cir. 1909) ("The obligee in a bond, or the holder of a claim, upon which several parties are personally liable, may prove his claim against the estates of those who become bankrupt and may at the same time pursue the others at law, and, notwithstanding partial payments after the bankruptcy by other obligors or their estates, he may recover dividends from each estate in the full amount of his claim at the time the petition in bankruptcy was filed therein until from all sources he has received full payment of his claim, but no longer."); Ivanhoe Building & Loan Ass'n of Newark, N.J., 295 U.S. 243, 245-46 (1935); In re Sacred Heart Hospital of Norristown, 182 B.R. 413, 417 (Bankr. E.D. Pa. 1995) ("a creditor can seek to prove its entire claim in the bankrupt's case notwithstanding the existence of third party collateral or guarantees of payment so long as the claimant does not seek to recover more than one full payment of its claim from whatever source").

[46] Indeed, Aurelius has taken this same position in other cases. See Reply of Aurelius Capital Management, LP and Columbus Hill Capital Management, L.P. to Objections to Motion for Temporary Allowance of the Intercompany Claim and Wind-Up Claim for the Purpose of Voting to Accept or Reject the Amended Plan and Request for Classification of the Intercompany Claim and Wind-Up Claim, In re: Smurfit-Stone Container Corp., Case No. 09-10235, at ¶¶ 57-61 (Bankr. D. Del. 2010) [Docket No. 6728].

Denying the Step One Lenders recovery of post-petition interest in the scenario posited

by the Noteholder Plan Proponents would violate the "best interests of creditors test" under

section 1129(a)(7), as well as the absolute priority rule under section 1129(b). See 11 U.S.C. §§

726(a)(5), 1129(a)(7), 1129(b).  Under these rules, equity cannot recover before payment in full

of allowed claims plus post-petition interest. In re Washington Mutual, Inc., 2011 Bankr. LEXIS

56, at *106 (Bankr. D. Del. Jan. 7, 2011) ("where the debtor is solvent, a creditor must receive

post-petition interest on its claim before shareholders receive any distribution."). By definition,

if the Step One Lenders could be paid in full, certain of the Guarantor Debtors would be solvent,

contrary to the assertion made in the Noteholder Objection. See Noteholder Obj. at p. 57 n.33.

Indeed, these entities would have to be solvent for their value to flow to Tribune as their parent

company, as the Noteholder Plan Proponents assume.  The Noteholder Plan Proponents ignore

this fundamental principle of corporate reorganization law in asking the Bankruptcy Court to

accept their assertion that significant value will accrue to Tribune on account of its equity

interests in its Guarantor Subsidiaries.[47]

Moreover, one Debtor Guarantor (Chicago National League Ball Club, Inc. n/k/a Tribune

CNLBC, LLC) has a later filing date than the other Debtors, and the Non-Debtor Guarantors

(Tribune (FN) Cable Ventures, Inc. and Tribune National Marketing Company) have not filed

---

[47] The Noteholder Plan Proponents contradict their own chart by halfheartedly arguing in a footnote that intercompany claims would render the Guarantor Debtors insolvent.  The Noteholder Plan Proponents have provided no evidence whatsoever to support this assertion, and the Debtor/Committee/Lender Plan Proponents reserve the right to respond should the Noteholder Plan Proponents attempt to put forth any such evidence in the future. Moreover, as detailed in the Whittman Report on the Intercompany Claims Settlement, resolution of intercompany claims transfers more value from Tribune to the Guarantor Subsidiaries, collectively, than vice versa.  Nor can the Noteholder Plan Proponents assert that because the full amount of the Step One Loan Claims can be asserted against each Guarantor Subsidiary, the Guarantor Subsidiaries can be individually insolvent even if the Guarantor Subsidiaries taken as a whole are not. See, e.g., In re Capmark, 438 B.R. 471, 488 (Bankr. D. Del. 2010) (dismissing as "inappropriate" the argument that a guarantee should be treated as an absolute liability for full face value when multiple guarantors guaranteed the obligations, specifically noting the offset of subrogation or reimbursement claims).

for bankruptcy.[48] Thus, the Senior Lenders submit that they are entitled to recover from Tribune CNLBC, LLC interest that accrued prior to its October 12, 2009 filing date and from the Non-Debtor Guarantors all interest that has accrued through the Effective Date.[49] In light of the foregoing, the Senior Lenders would be entitled to recover post-petition interest at the contractual rate before Tribune Company (and its creditors) would benefit from increased value of the Guarantor Subsidiaries.

Simply put, despite the Noteholder Plan Proponents' self-serving and inappropriate assumption that the Step Two Loans and Guarantees are certain to be avoided in full, and their incorrect assumption that Tribune Company as the owner of the Guarantor Debtors could recover before the payment of post-petition interest on the Step One Loan Claims, it is clear that increases in DEV cannot be assumed to materially improve the Senior Noteholders' entitlement. To achieve recoveries in excess of the consideration provided by the Debtor/Committee/Lender Plan, the Noteholder Plan Proponents would have to achieve an extremely unlikely combination of significantly escalating DEV plus unprecedented remedies for full avoidance of all Step Two Debt. Neither the theoretical possibility of DEV reaching much higher levels nor the Noteholder Plan Proponents' conjectures as to what might happen in assumed litigation outcomes come close to establishing that the Proposed Settlement is below the low point of the range of reasonableness. Indeed, although the Creditors' Committee does not agree in all respects with the arguments set forth in this section, it does agree that the settlement fairly reflects the parties' competing positions.

---

[48] The Lazard Expert Report allocates approximately $449 million of DEV to Tribune CNLBC, LLC, approximately $1,330 million of DEV to the Company's interest in Tribune (FN) Cable Ventures, Inc. and approximately $376 million of DEV to Tribune National Marketing Company (in each case, before redistribution of value on account of Intercompany Claims). See Lazard Expert Report at p. 99.

[49] See 11 U.S.C. 524(e) ("Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt").

### 2.    The Likely Difficulties in Collection

The second Martin factor also weighs in favor of the Proposed Settlement.  The

Noteholder Plan Proponents assert that there are no difficulties in collection here.  With respect

to the avoidance claims, in the Noteholder Plan Proponents' view, "distributions of the

reorganized Debtors' cash, debt, and equity can be held in reserve" awaiting a judgment on the

avoidance claims.  See Noteholder Obj. at ¶ 48.  That statement is true as far as it goes, but

ignores the impact on Tribune and its subsidiaries of having their assets (or, under the

Noteholder Plan, their equity) tied up, possibly for years.  Professor Black will testify that the

Debtors would be significantly constrained in their ability to sell assets, buy assets, participate in

joint ventures, or make acquisitions.  This continued lack of flexibility would, in his view, have a

negative impact on Tribune given the rapid changes in the newspaper publishing and

broadcasting businesses.  Professor Black will testify that a rough estimate of these business

costs, taking into account the likely multiyear duration of the litigation, might be 2% to 10% of

Tribune's enterprise value.

The disgorgement claims also pose unique collection challenges that the Noteholder Plan

Proponents try to sweep under the rug.  Although the Creditors' Committee would surely

disagree in the event of litigation, JPMorgan and/or Merrill Lynch would argue that the total

disgorgement liability cannot be recovered from them as agents under the Senior Loan

Agreement and Bridge Loan Agreement, respectively, on the theory that they were mere

conduits – not transferees for purposes of recovery under section 550(a).  See Collier Bankruptcy

Manual ¶ 550.02 (2009); see also Christy v. Alexander & Alexander of New York Inc. (In re

Finley), 130 F.3d 52, 59 (2d Cir. 1997) ("[C]ommercial entity that, in the ordinary course of its

business, acts as a mere conduit for funds and performs that role consistent with its contractual

undertaking in respect of the challenged transaction, is not an initial transferee within the

meaning of § 550(a)(1)."); <u>Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re</u>

<u>Parcel Consultants, Inc.)</u>, 287 B.R. 41, 46-47 (Bankr. D.N.J. 2002).

If JPMorgan and/or Merrill Lynch were to prevail on this argument, in order to recover

disgorged payments, each of the over eleven hundred individual lenders that received payments

would need to be pursued individually.  Indeed, the Examiner applied a 10% discount to any

disgorgement recoveries "due to potential collectability issues" and costs of collection.  <u>See</u>

Examiner Report, Annex B at p. B-2.  The Senior Lenders contend that there is reason to believe

that the discount should be higher.  First, the Examiner appears to have understated the number

of individual lenders that would need to be pursued, citing "dozens or hundreds," whereas in

reality there are over eleven hundred.  <u>See</u> Examiner Report, Vol. 2 at p. 120.  Second, several of

these individual lenders are investment vehicles and financial institutions that, because of events

in the financial markets in recent years, either no longer exist or have undergone changes of

control or other restructuring, which would further complicate any efforts to seek recovery from

them.[50]  Third, many recipients of payments likely would raise a defense under section 550(b) of

the Bankruptcy Code, which provides that a debtor cannot recover from a transferee of an

avoided transfer if the transferee "takes for value in good faith, and without knowledge of the

voidability of the transfer avoided."  This type of individualized defense, to the extent available,

obviously complicates the ability to recover amounts that would otherwise be subject to

disgorgement.

### 3.    Complexity, Expense, and Delay

The third Martin factor clearly weighs in favor of settlement.  The

Debtor/Committee/Lender Proponents estimate that litigation of these claims could cause a

---

[50] For example, some of the payees include entities controlled by Lehman Brothers and Bear Stearns.

multi-year delay in distribution to creditors and substantially increase professional fees.  Such

delay and expense would have a very real and negative impact both on unsecured creditors, who

do not have the resources, risk tolerance, or desire to wait years for an uncertain recovery, and on

the Debtors.  As set forth above, the Debtors will present evidence that the Debtors' ability to

operate their businesses, raise new capital, and enter into strategic deals will be impaired while

their assets remain tied up in bankruptcy or, under the Noteholder Plan, their equity remains tied

up in trust awaiting the outcome of litigation for distribution to creditors.  As for creditors, there

is significant value loss in holding an illiquid right to an uncertain recovery years from now over

a certain distribution of cash or tradable securities today.

     In addition, the litigation at issue here is highly complex.  The Examiner repeatedly

commented on the number and complexity of the issues raised by the potential LBO Lender

Claims.[51]  Indeed, in the absence of a settlement, the Bankruptcy Court would be forced to

decide all of the complicated issues described above, and many more.  To list a few:

- whether any of the loans made by the LBO Lenders can be "collapsed" with the payout to Tribune's shareholders;

- whether, in considering solvency, the Step One and Step Two Transactions should be analyzed as separate transactions or a single transaction;

- whether, even if the Step One and Step Two Transactions are treated as a single transaction, the Debtors were rendered insolvent by the Transactions;

- whether the Subsidiary Guarantors of Tribune were rendered insolvent by the Guarantees;

---

[51] See, e.g., Examiner Report., Vol. 1 at p. 5 ("Some of the issues discussed in this Report, moreover, are difficult, nuanced, and not conducive to summary treatment."); id. at p. 17 n.9 (noting that the questions of solvency and capital adequacy are "dense and highly technical"); id. at p. 29 ("The investigation relates to a series of transactions involving billions of dollars, potential claims against numerous parties, intricate financial analyses and other factual matters as to which the Parties had substantial disagreements, and a lengthy list of wide-ranging legal claims, defenses, and issues under state and federal law."); id. at p. 31 ("The Parties raised dozens of claims and defenses, each with sub-issues and special complexities that required the Examiner's careful evaluation.").)  Indeed, in the time period allotted to him, the Examiner was unable to "reach definitive conclusions regarding certain of the issues considered in the Report, because, as noted, certain issues presented are difficult and nuanced."  See id. at p. 5.

- whether the Subsidiary Guarantees can be challenged for the benefit of Tribune's creditors;

- whether the recently-amended section 546(e) of the Bankruptcy Code presents a complete bar to recovery; and

- whether, even if the Estates prevailed on the LBO-Related Causes of Action, the appropriate remedy would leave the Lenders with unsecured claims that are pari passu with the other unsecured creditors of Tribune.

It can hardly be disputed that there will be significant time and cost savings from settling the vigorously contested claims against the biggest targets of the LBO-Related Claims, the Senior Lenders. This factor strongly supports approval of the Proposed Settlement.

### 4.    Paramount Interests of Creditors

Finally, the Proposed Settlement is in the paramount interests of all creditors. First, the creditors (not just the Senior Lenders) voted overwhelmingly in favor of the Debtor/Committee/Lender Plan. At the Tribune level, the class of Other Parent Claims – the unsecured trade and other claims against Tribune offered exactly the same treatment as Aurelius and the other Senior Noteholders – voted overwhelmingly to accept the Debtor/Committee/Lender Plan, with 224 out of 237 voting creditors (94.51%), holding 94.70% by dollar amount of the voting Other Parent Claims, resoundingly endorsing the Plan. Moreover, as noted in the Preliminary Statement above, almost 70% of the Senior Noteholders who cast ballots voted to accept the Debtor/Committee/Lender Plan. These allegedly defrauded creditors obviously would not have voted to accept the Debtor/Committee/Lender Plan, much less by overwhelming margins, if it was not in their best interests and in the best interests of the estates.

Second, the Proposed Settlement is supported by the Creditors' Committee, which includes representatives from a wide breadth of creditor groups, including trade creditors, retirees, PBGC, and one of the Debtors' unions, as well as the LBO Lenders and Noteholders.

Finally, the Proposed Settlement has been endorsed by Judge Gross, who, as the

Bankruptcy Court-appointed mediator, made sure that nearly a dozen different creditor

constituencies participated in the mediation.

The Bankruptcy Court should not allow the Noteholder Plan Proponents to block a

Proposed Settlement that is in the interests of <u>all</u> creditors in an attempt to extract hold-up value.

While certain of the Senior Noteholders may have the time and resources to roll the dice on a

potentially adverse outcome after highly complex, costly and protracted litigation, that is not true

of the Debtors' many other creditors, who have voted for the immediate distribution of estate

value under a plan of reorganization that fairly and reasonably accounts for the value of the

Settled Claims.  The Proposed Settlement should be approved.  Courts have regularly found that

settlements should be approved, notwithstanding that there are some creditors who oppose the

settlement.  <u>See</u> <u>In re Capmark Fin. Group, Inc.</u>, 438 B.R. 471, 519 (Bankr. D. Del. 2010)

(approving settlement over objection of unsecured creditors:  "There is no <u>per se</u> rule that the

views of a committee or other creditors are dispositive on the reasonableness of a settlement.  A

<u>per se</u> rule would unduly expose the Debtors to the demands of creditors preferring to risk estate

assets in a litigation lottery or litigate under blackmail or strong-arm strategies."); <u>In re Sea</u>

<u>Containers Ltd.</u>, 2008 WL 4296562, at *11 (Bankr. D. Del. Sept. 19, 2008) (Carey, J.)

(approving settlement over objection of creditors most impacted by settlement where creditors

failed to convince court "the [s]ettlement so affects their position as to be unfair"); <u>Key3Media</u>

<u>Group, Inc.</u>, 336 B.R. at 97 (approving settlement of avoidance claims by debtor over objection

of largest creditors and noting that their objections "cannot be permitted to predominate over the

best interests of the estate as a whole"); <u>see also</u> <u>In re Adelphia Communications Corp.</u>, 327 B.R.

143, 165 (Bankr. S.D.N.Y. 2005) ("[A]pproval of a settlement cannot be regarded as a counting

exercise.  Rather, it must be considered in light of the <u>reasons</u> for any opposition, and the more

fundamental factors – such as benefits of settlement, likely rewards of litigation, costs of

litigation and downside risk . . . .").

     **D.**     <u>**The Proposed Settlement Was Negotiated in Good Faith**</u>

     As explained above, the Proposed Settlement is the end result of more than a year of

arm's length negotiations and weeks of mediation overseen by Judge Gross.  Upon even a

cursory review of these events, the good faith of the Debtor/Committee/Lender Plan Proponents

in crafting the settlement is manifest.

     From the outset, the Debtors and the Creditors' Committee worked to ensure that all

parties had full and equal access to the discovery produced in this case prior to the

commencement of negotiations, going so far as to institute the Bankruptcy Court-approved

document depository to collect and redistribute these documents.  The Debtors then spent months

meeting and negotiating with the various constituencies to arrive at the April Plan, with all the

major constituencies invited to participate in those negotiations.

     After the release of the Examiner Report and the termination of the April Plan, the

Debtors continued to negotiate in good faith, going so far as to request the aid of a Bankruptcy

Court-appointed mediator.  As a result of those efforts, all the key parties, including the

Noteholder Plan Proponents, were invited to return to the bargaining table and work with Judge

Gross in mediation.[52]  Moreover, even after reaching the agreement embodied in the September

Settlement, the Debtors continued to work with all the parties to ensure the broadest possible

---

[52] The Noteholder Plan Proponents now complain that "[a]t no time during this plan mediation process were there ever substantive plan negotiations involving or including the Senior Noteholders or the holders of the PHONES Notes."  <u>See</u> Noteholder Obj. at ¶ 78.  To be clear – the Noteholder Plan Proponents were parties to the mediation. To the extent they used the mediation only to make unreasonable demands and refused to move from untenable positions, the fault lies at their feet, not with Judge Gross or the Debtor/Committee/Lender Plan Proponents.

consensual resolution of claims. The final proposed settlement is the end result of those negotiations and further mediation, and has been expressly endorsed by Judge Gross.

Although the Noteholder Plan Proponents argue repeatedly that the evolution of the settlement terms somehow reveals a bias, nothing could be farther from the truth. As an initial matter, it is not clear why earlier settlement agreements and term sheet iterations matter at all: The Bankruptcy Court's task is to assess the reasonableness of the final Proposed Settlement, not an earlier draft or proposal that was never implemented.

More to the point, the Senior Noteholders' argument that they do worse under the Proposed Settlement than under the April Settlement is simply wrong. The Noteholder Plan Proponents seize on the April Settlement to say that the Proposed Settlement, which provides some $431 million in cash, rather than a strip, must be unreasonable because $431 million is less than $450 million and even further below $500 million.[53] In so arguing, they simply ignore the second element of consideration in the Proposed Settlement -- the potential recoveries from pursuit of the Preserved Causes of Action by the Litigation Trust and from pursuit of the Transferred State Law Avoidance Claims by the Creditors' Trust, all of which will be shared disproportionately in favor of the Senior Noteholders. Instead of receiving approximately 15% of such recoveries, which would be the case absent disallowance or subordination of the LBO Loans, the Senior Noteholders and holders of Other Parent Claims receive 100% of the first $90 million of recoveries and 65% of net recoveries above $110 million. The Senior Noteholders assert that the fraudulent conveyance claims against the LBO Lenders, including claims based on intent to hinder, delay and defraud, are very strong. If they are right, the value of their

---

[53] The April Settlement provided for consideration equal to 7.4% of the Debtors' DEV in the form of a strip of debt, equity and cash estimated to be worth $450 million given the $6.1 billion DEV then assumed. Given the $6.75 billion DEV assumed with respect to the Plan at issue, that 7.4% strip would be worth some $500 million and could increase or decrease as the DEV rises or falls. There was, however, no possibility of additional recoveries under the April Plan because it was a global settlement that resolved all of the putative LBO related claims against all parties.

71

disproportionate share of recoveries from third parties under the Proposed Settlement will be very high and will far exceed the difference between the value of the strip from the April Settlement and the $431 million in cash paid under the Proposed Settlement.

### 1. The Noteholder Plan Proponents' Baseless Attacks on the Debtor/Committee/Lender Plan Proponents

In their objection, the Noteholder Plan Proponents attack virtually every person, entity, and professional that was involved in the Proposed Settlement. The Noteholder Plan Proponents' trumped-up arguments about a purported lack of good faith are meritless and do not undermine the fairness of the Proposed Settlement to all creditors.

### a. Debtors

First, the Noteholder Plan Proponents attack the conduct of the Debtors themselves, who, as set forth above, have served as a driving force in settlement negotiations throughout these proceedings. See Noteholder Obj. at ¶¶ 300-01. The Noteholder Plan Proponents assert that the Debtors have failed to uphold their fiduciary duty to the estate because the Debtors allegedly view themselves as beholden to the "new owners" of Tribune. Although the Senior Noteholders have participated in the negotiation efforts since 2009 and were parties to the mediation before Judge Gross, they cannot provide a single example of collusive behavior that has occurred during the settlement process.[54]

Creating allegations of collusion out of whole cloth is not a new strategy for the Noteholder Plan Proponents. As this Court has recognized, the Noteholder Plan Proponents have



raised these very same arguments in the past, always without any support in the evidence, as they did, for example, when trying to impose unreasonable discovery demands on the Debtor/Committee/Lender Plan Proponents. See Transcript of Proceedings, Jan. 24, 2011, at pp. 78-79 ("[T]here seem to be presented now to the Court new theories of collusion and bias whenever someone presents a settlement plan or says hey, we've agreed on what a plan should say. I hate to see that develop as a trend, but I'll tell you what, it's certainly been asserted here at least in part."). Given the complete absence of evidence, the Bankruptcy Court should give no credence to the unsupported allegations of collusion that the Noteholder Plan Proponents have once again trotted out.

> b.    Sidley Austin LLP

Next, the Noteholder Plan Proponents cast aspersions on the conduct of Debtors' counsel, Sidley Austin LLP ("Sidley"), by raising once again the well-known fact that Sidley represents JPMorgan and Merrill Lynch in matters unrelated to these Cases, and the fact that Sidley represented Tribune during the course of the Leveraged ESOP Transactions. See Noteholder Obj. at ¶ 299. From the start of these proceedings, Sidley has openly disclosed its relationships with JPMorgan and Merrill Lynch, while at the same time taking pains to ensure that it does not hold or represent an interest adverse to the Debtors' estates and is a "disinterested person" within the meaning of section 1011(4) of the Bankruptcy Code. Despite the transparency with which Sidley has acted, the Noteholder Plan Proponents try to raise the specter of impropriety in an attempt to derail the Debtor/Committee/Lender Plan. Tellingly, however, the Noteholder Plan Proponents put forth zero evidence that Sidley's representation of the Debtors has been in any way deficient due to its relationships with JPMorgan and Merrill Lynch. Not only is the allegation of Sidley's impropriety baseless, it is especially outrageous coming from the Noteholder Plan Proponents, given that counsel for Aurelius has concurrently represented

73

adverse parties – Aurelius, Oaktree, and Angelo Gordon – in proceedings directly related to Tribune and these Cases.  See Motion of Oaktree Capital Management, L.P., and Angelo, Gordon & Co. L.P., for an Order Disqualifying Akin Gump Strauss Hauer & Feld LLP from Representing Aurelius Capital Management LP [Docket No. 6433].

        c.        The Special Committee

The Noteholder Plan Proponents also attempt to disparage the actions of Tribune's Special Committee, trying to portray the Chairman of the Special Committee and its other members as somehow inefficient or ineffective for not being directly involved in the settlement negotiations or personally negotiating the contents of the mediation term sheets.  See Noteholder Obj. at ¶¶ 304-06.  This argument misconstrues the role of the Special Committee.  The Special Committee was constituted to review and approve any potential settlement on behalf of the Debtors – not to be the individuals to actually sit at the negotiating table and hammer out settlement terms.  Likewise, Jones Day, as counsel to the Special Committee, was tasked with advising the Special Committee in its review of a proposed settlement.  It was not retained to act as the lead negotiator on behalf of the Debtors.  The Noteholder Plan Proponents do not and cannot say that the Special Committee or its counsel has failed to discharge their actual duties, or that the actions of the Special Committee in any way reflect an absence of good faith or reasonableness in reviewing or approving the settlement negotiations that have occurred.

        d.        The Creditors' Committee

The Noteholder Plan Proponents contend that both the Creditors' Committee's members and its counsel failed to discharge their fiduciary duties to unsecured creditors in negotiating the Proposed Settlement.  See Noteholder Obj. at ¶¶ 303-13.  The argument that certain Creditors' Committee members breached their fiduciary duties by supporting the Debtor/Committee/Lender Plan is incoherent and indefensible.  Upon examination of the claims of these Creditors'

74

Committee members and the treatment they receive under the competing plans, the invective

directed at Creditors' Committee members is revealed as containing not one shred of merit. The

Noteholder Plan Proponents not only utterly fail to support their ad hominem attacks, but

affirmatively undermine them through the Noteholder Plan itself.

From a policy standpoint, the Noteholder Plan Proponents' personal attacks on Creditors'

Committee members are an affront to the fabric of the chapter 11 process. Creditors' Committee

members are volunteers, have other full time jobs, and do not receive any compensation for their

substantial investment of time and effort. Unlike certain of the Noteholder Plan Proponents, the

Creditors' Committee members are not professional investors who purchased a distressed

position in this case seeking to gain leverage over or profit from the bankruptcy process. In this

case, the Creditors' Committee members have devoted thousands of hours (including late nights

and weekends) attending meetings, reviewing documents, and taking part in mediation, all for

the purpose of maximizing value for unsecured creditors and helping the Debtors reorganize.

The collateral attacks now leveled against the Creditors' Committee members are not only

despicable, but could have a chilling effect on the willingness of creditors to volunteer for

Creditors' Committee membership in future cases.

A brief review of the Creditors' Committee members' claims reveals just how deficient

the Noteholder Plan Proponents' objection is. To start, two of the Creditors' Committee

members – the Pension Benefit Guarantee Corporation (the "PBGC") and the Washington-

Baltimore Newspaper Guild, Local 32035 (the "Guild") – are treated identically under the

Noteholder Plan and the Debtor/Committee/Lender Plan and, therefore, have absolutely no

individual or special economic incentive to prefer one plan over the other.[55] The Noteholder

---

[55] All claims of the PBGC are specifically reinstated in full by the Noteholder Plan. See Noteholder Plan § 11.2.2.
As to the Guild, both the Debtor/Committee/Lender Plan and the Noteholder Plan provide that all executory

Plan Proponents' argument that imagined preferential treatment somehow induced these Creditors' Committee members to abandon their duties to unsecured creditors should be summarily discarded.

The accusations leveled against Warner Brothers Television ("Warner Brothers") are also without merit. The majority of the claims held by Warner Brothers arise under executory contracts that will be assumed under either the Debtor/Committee/Lender Plan or the Noteholder Plan. This is powerful evidence that the decision to assume is not the result of a nefarious scheme to buy off Creditors' Committee members, but was instead a rational decision by each proponent group not to deprive Tribune of access to "very long-term syndication contracts for . . . television programming that . . . perform[s] extremely well." See Smith Dep. at pp. 250:5-10, Feb. 16, 2011. Such programming will provide a steady and iterative source of revenue for the reorganized Debtors See id. at pp. 250-54. Given that Warner Brothers will have the majority of its claims paid in full under either plan, the Noteholder Plan Proponents' allegations rest on the dubious premise that Warner Brothers would be willing to disregard its fiduciary duties to unsecured creditors – and thereby expose itself to significant litigation risk – in order to potentially enhance its recoveries on the relatively small portion of its claim that will not be covered by contract assumption.[56] It is often said that extraordinary claims require extraordinary

---

contracts or unexpired leases of the Debtors will be deemed assumed on the Effective Date except for those contracts that are listed on Exhibit 6.3 (Rejected Executory Contracts and Unexpired Leases) to each of the respective plans. The Noteholder Plan Proponents have formally evidenced their determination to adopt as part of their own plan the very same schedule of rejected executory contracts that was filed as Exhibit 6.3 to the Debtor/Committee/Lender Plan. Accordingly, the Guild's claims will be assumed and paid in full regardless of which plan is confirmed and, like the PBGC, the Guild has absolutely no individual or special economic incentive to prefer one plan over the other.

[56] The less than $9 million of Warner Brother's claim that does not arise under executory contracts represents less than 0.04% of Time Warner's total revenue for fiscal year 2010 ($26.9 billion). Time Warner Inc., Form 10-K, at p. 40, Feb. 18, 2011.

proof, yet here the Noteholder Plan Proponents seek to substitute invective for even the barest

shred of evidence supporting their argument.[57]

The Noteholder Plan Proponents have also alleged that William Niese, a retired Times

Mirror Company executive who represents the Retiree Claimants on the Creditors' Committee,

breached his fiduciary duties by advancing the interests of the Retiree Claimants at the expense

of other unsecured creditors. The facts make clear that he did not.[58] Allowed Retiree Claims

receive identical treatment to all other Other Parent Claims and receive substantially similar

treatment as Holders of Senior Noteholder Claims. The only material difference is the option

available to Holders of Other Parent Claims to elect to forego participation in the Litigation and

Creditors' Trusts in exchange for a slightly increased initial distribution of cash (an option which

the Noteholder Plan Proponents would be unlikely to exercise).

Thus, any argument that Mr. Niese breached his fiduciary duties is contingent on

accepting the Noteholder Plan Proponents' theme that those who disagree with them regarding

valuation or appetite for risk must be acting in bad faith. Mr. Niese is not a professional investor

in distressed securities. He is, and acts as the voice of, a group of retirees whose claims consist

primarily of pension and deferred compensation obligations. Given the constituency he

represents and their need to fund their retirement years in the wake of Tribune's default on its

---

[57] The allegations against Buena Vista Television are similarly baseless. The amount of Buena Vista Television's
claims that will not be assumed or cured represents an inconsequential percentage of The Walt Disney Company's
total revenue for fiscal year 2010 ($38.1 billion). The Walt Disney Company, Form 10-K, at p. 28, Nov. 24, 2010.
[58] While the Noteholder Plan Proponents cite Westmoreland Human Opportunities, Inc. v. Walsh (In re Life Serv.
Sys., Inc.), 246 F.3d 233, 256 (3d Cir. 2001), for the proposition that "[a] Committee member violates its fiduciary
duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee
members," they fail to identify any interest that Mr. Niese advanced at the expense of other creditors. Moreover,
even were such an interest identified, the Noteholder Plan Proponents ignore the caveat that "[t]his is not to say that
the members of a committee (and unsecured creditors in general) are somehow precluded from acting in their
respective financial interests related to the bankruptcy estate . . . ." Westmoreland Human Opportunities, Inc. v.
Walsh (In re Life Serv. Sys., Inc.), 327 B.R. 561, 573 (W.D. Pa. 2005); see also Rickel & Assocs. Inc. v. Smith (In
re Rickel & Assocs.), 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002) (citing Krafsur v. UOP (In re El Paso Refinery,
L.P.), 196 B.R. 58, 74 (Bankr. W.D. Tex. 1996) (a creditor "may assert his rights as a creditor to the detriment of the
creditor body as a whole without running afoul of his fiduciary obligations.").

retirement payments to them, it would be shocking for Mr. Niese to adopt – or for a court to

punish him for failing to adopt – the Noteholder Plan Proponents' appetite for litigation risk.

e.    Chadbourne

As for the Noteholder Plan Proponents' attacks on Chadbourne & Parke LLP

("Chadbourne") (Noteholder Obj. at ¶¶ 302-03), those have already been raised, pursued, and

dismissed with prejudice. Aurelius filed a motion to disqualify Chadbourne from participating

in, among other things, settlement negotiations over the LBO-Related Causes of Action.[59]

Indeed, the Noteholder Plan Proponents state that they "incorporate herein by reference

arguments made by Aurelius in the Motion to Disqualify . . . ." See id. at ¶ 302. Aurelius's

motion was opposed by the Creditors' Committee,[60] and was ultimately withdrawn in its entirety

with prejudice by Aurelius and the other Noteholder Plan Proponents.[61] By seeking to

incorporate the disqualification motion by reference, the Noteholder Plan Proponents are

incorporating a nullity. In any event, having withdrawn that motion with prejudice, the

Noteholder Plan Proponents have voluntarily and irrevocably forfeited their right to litigate those

---

[59] See Motion of Aurelius Capital Management, LP to Disqualify Chadbourne & Parke LLP from Acting on Behalf of the Official Committee of Unsecured Creditors in Matters in Which it Has Conflicts of Interest [Docket No. 5669]. Aurelius's motion to disqualify Chadbourne was joined by other Noteholder Plan Proponents, including Deutsche Bank [Docket No. 5740] and Wilmington Trust [Docket No. 5742]. Curiously, Aurelius's Chairman, Mark Brodsky, when deposed on Tribune matters, was unable to recall Aurelius's litigation threats regarding Chadbourne's alleged conflicts and further stated, "I'm certainly not aware that [malpractice or breach of fiduciary duty] happened in this instance." See Brodsky Dep. 121:25-123:2, Feb. 14, 2011.

[60] To the extent that Aurelius's motion is deemed to be incorporated by reference in the Noteholder Objection, the Creditors' Committee's objection to the Aurelius disqualification motion and the Creditors' Committee's reply to the response and joinder of the other Noteholder Plan Proponents to the Aurelius disqualification motion should be deemed incorporated herein by reference. See Objection to Motion of Aurelius Capital Management, LP to Disqualify Chadbourne & Parke LLP from Acting on Behalf of the Official Committee of Unsecured Creditors in Matters in Which it Has Conflicts of Interest [Docket No. 5737]; Reply of the Committee to the Response of Deutsche Bank Trust Company Americas and the Joinder of Wilmington Trust Company to the Motion of Aurelius Capital Management, LP to Disqualify Chadbourne from Acting on Behalf of the Committee in Matters in Which it Has Conflicts of Interest [Docket No. 5764].

[61] See Notice of Withdrawal of Motion, With Prejudice, of Aurelius Capital Management, LP to Disqualify Chadbourne & Parke LLP [Docket No. 5919].

claims in connection with plan confirmation or at any other time. See United States v. Cunan,

156 F.3d 110, 114 (1st Cir. 1998) (voluntary dismissal with prejudice triggers res judicata).

Even if the Noteholder Plan Proponents' allegations against Chadbourne were properly

before this Court, they are completely without merit. From the beginning of these Chapter 11

Cases, Chadbourne has fully disclosed all potential conflicts of interest.[62] During the course of

its deliberations, the Creditors' Committee determined to retain Zuckerman Spaeder as special

counsel that could pursue litigation against those parties that Chadbourne could not sue.[63]

Chadbourne and Zuckerman have represented the Creditors' Committee in the manner they said

they would in their Bankruptcy Court-approved retention applications. Any allegations by the

Noteholder Plan Proponents to the contrary are wholly without merit, and should be viewed for

what they are: a tactical move by creditors unhappy with positions taken by the Creditors'

Committee. The Noteholder Plan Proponents' unfounded accusations should not be used as an

excuse to impede confirmation of the Debtor/Committee/Lender Plan.

      f.     JPMorgan

Finally, the Noteholder Plan Proponents attempt to cast doubt on the propriety of

JPMorgan's involvement in settlement negotiations, without success. See Noteholder Obj. at ¶¶

307-08. It is well-known that JPMorgan serves as co-chair of the Creditors' Committee and

advocated on its own behalf in settlement negotiations. The Noteholder Plan Proponents

acknowledge, as they must, that JPMorgan "recognized this conflict in 2009 and recused itself

from Creditor's Committee sessions devoted to analyzing the potential LBO-Related Causes of

---

[62] See Committee's Application to Employ and Retain Chadbourne & Parke LLP as Co-Counsel to the Committee and the attached LeMay Affidavit in Support of Chadbourne Retention Application [Docket No. 243]. See also First Supplemental Affidavit in Connection with the Chadbourne Application [Docket No. 395], which was filed after discussions with the U.S. Trustee.

[63] See Application of the Official Committee of Unsecured Creditors of Tribune Company Pursuant to 11 U.S.C. §§ 328 and 1103 and Fed. R. Bankr. P. 2014, for an Order Authorizing the Employment and Retention of Zuckerman Spaeder as Special Counsel Nunc Pro Tunc to August 6, 2009 [Docket No. 1953].

Action." See id. Despite the fact that JPMorgan has conducted itself responsibly and

appropriately, the Noteholder Plan Proponents note that JPMorgan participated in settlement

negotiations in its individual capacity, while simultaneously accusing it of "failing to maximize

value for the Debtors' unsecured creditors," presumably in its role as Creditors' Committee

member – precisely what the Creditors' Committee and JPMorgan recognized JPMorgan could

not do given its role as LBO Lender and Agent.  This is precisely why JPMorgan and the

Creditors' Committee agreed that JPMorgan should be recused from the Creditors' Committee's

deliberations regarding the LBO-Related Causes of Action, and accordingly JPMorgan had no

role in the Creditors' Committee's determination of the value of the LBO-Related Causes of

Action or whether (or not) the Proposed Settlement does (or does not) serve the interests of

unsecured creditors of these estates.  Once again, the Noteholder Plan Proponents are attempting

to create an issue where none exists, essentially vilifying JPMorgan for recognizing its role as the

target of the Creditors' Committee's investigation and potential litigation, and withdrawing from

Creditors' Committee deliberations relating to such matters.



The Noteholder Plan Proponents' arguments about good faith have no colorable support and should be rejected out of hand. They do not serve as a basis for denying approval of the Proposed Settlement.

## III.    THE OTHER SETTLEMENTS IMPLEMENTED IN THE DEBTOR/COMMITTEE/LENDER PLAN ARE FAIR AND EQUITABLE AND SHOULD BE APPROVED

In addition to the settlements related to LBO-Related Causes of Action, the Debtor/Committee/Lender Plan includes a settlement resolving Intercompany Claims and a settlement resolving certain retiree Claims. The Noteholder Plan Proponents have objected to the Intercompany Claims Settlement, arguing that it violates section 1129(a)(3) of the Bankruptcy Code. Noteholder Obj. at ¶¶ 342-344. While the Noteholder Objection does not directly object to the Retiree Claimant Settlement, certain arguments made in the Noteholder Objection appear to call into question the propriety of the Retiree Claimant Settlement. See Noteholder Obj. at ¶¶ 311- 312. As demonstrated below, both the Intercompany Claims Settlement and the Retiree Claimant Settlement are fair and reasonable and should be approved.

### A.    The Intercompany Claims Settlement is Fair, Equitable and Reasonable and Should be Approved

The Debtor/Committee/Lender Plan incorporates a settlement of all intercompany claims between and among the Debtors and various non-Debtor affiliates (the "Intercompany Claims Settlement"), the terms of which were recommended to the Debtors by Mr. Brian Whittman, Managing Director in the Commercial Restructuring practice of Alvarez & Marsal. Mr. Whittman's expert report (the "I/C Report") ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████.

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████.

    Each of the four <u>Martin</u> factors, as set forth in Part II. C <u>supra</u>, supports approval of the

Intercompany Claims Settlement as part of Plan confirmation. ████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████. This is

consistent with <u>In re Submicron Systems Corp.</u>, 432 F.3d 448, 454 (3d Cir. 2006), in which the

Third Circuit declined to endorse a specific test to determine whether an intercompany advance

should be treated as debt or equity (and thus whether a claim should be allowed or disallowed),

instead holding that such tests:

> devolve to an overarching inquiry: the characterization as debt or
> equity is a court's attempt to discern whether the parties called an
> instrument one thing when in fact they intended it as something
> else. That intent may be inferred from what the parties say in their

contracts, from what they do through their actions, and from the
economic reality of the surrounding circumstances. Answers lie in
facts that confer context case-by-case.

SubMicron, 432 F.3d at 456. "[T]he determinative inquiry in classifying advances as debt or

equity is the intent of the parties as it existed at the time of the transaction." Id. at 457. █

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████. As

SubMicron shows, determining whether a transaction should be characterized as debt or equity is

a fact-specific inquiry.  432 F. 3d at 454. ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████.

        Application of the remaining three Martin factors further confirms the fairness of the

Intercompany Claims Settlement Agreement.  Requiring all of the Intercompany Claims to be

litigated would involve substantial delay, expense and difficulty of implementation.  Resolution

of the Intercompany Claims impacts the distributable value of the various Debtors and, therefore,

directly affects the distributions that will be made by those Debtors to third-party creditors.[64]

Litigation of the allowance of the Intercompany Claims would be complex and expensive given

the thousands of claims and numerous factual and legal issues involved, and treating unresolved

Intercompany Claims as Disputed Claims would require the establishment of significant reserves

to ensure collectability.  These reserves would inevitably significantly dilute and delay

distributions to third-party creditors pending the outcome of the Intercompany Claims litigation.

---

[64] Notably, the Intercompany Claims Settlement in fact increases the value allocated to the Tribune parent company,
against which the Noteholder Plan Proponents hold claims, when compared to the blanket allowance of all
Intercompany Claims.

The overwhelming support for the Debtor/Committee/Lender Plan by numerous Classes of

creditors of each of the Debtors further underscores the fairness of the Intercompany Claims

Settlement and confirms that its approval as part of the Debtor/Committee/Lender Plan is in the

paramount interest of creditors.

The Noteholder Plan Proponents' argument that the Intercompany Claims Settlement

somehow evidences bad faith is misguided and meritless.  See Noteholder Objection at ¶¶ 341-

345.  The Intercompany Claims Settlement clearly satisfies the Martin requirements for the

reasons explained.  Moreover, the treatment of the Allowed Intercompany Claims under the

Debtor/Committee/Lender Plan is straightforward and non-controversial.  Each Debtor pays

Intercompany Claims the same pro rata share as other third-party unsecured claims against such

Debtor, exclusive of any settlement amounts that may be paid to such other unsecured creditors

(i.e., General Unsecured Creditors and the Noteholders at Tribune Company and General

Unsecured Creditors at the Subsidiaries).  These payments are no more and no less than the

holders of Intercompany Claims, as unsecured creditors, are entitled to receive.  Although money

does not actually change hands on account of Intercompany Claims, the distributable value of the

recipient Debtor is increased by an equivalent amount.  Each Debtor's distributable value, in

turn, is available to pay that Debtor's third-party creditors.  This process is performed at each

individual Debtor based on their Allowed Intercompany Claims with no aggregation or set-off of

amounts among groups of Debtors.  This treatment of Intercompany Claims is common in multi-

debtor bankruptcies and demonstrates the good faith of the Debtor/Committee/Lender Plan

Proponents contemplated by section 1129(a)(3).

84

**B.**     **The Retiree Claimant Settlement is Fair, Equitable and Reasonable and Should be Approved**

The settlement of Retiree Claims is fair, reasonable and should be approved pursuant to 11 U.S.C. § 1123(b)(3)(A) and Bankruptcy Rule 9019.  As previously discussed, the policies behind the Bankruptcy Code favor settlement and a settlement proposed in bankruptcy should be approved if it is fair and equitable.  The settlement of the Retiree Claims (the "Retiree Settlement") embodied in Exhibit 5.15.4 of the Debtor/Committee/Lender Plan (the "Retiree Claims Settlement Agreement") is fair, reasonable and in the best interests of the Debtors' Estates and should be approved.

The Retiree Claims arise mostly from non-qualified pension and deferred compensation claims by former employees of The Times Mirror Company, which the Debtors acquired in 2000.  A dispute as to the appropriate amount and treatment of these Retiree Claims arose early in these Chapter 11 Cases as a result of differences between the scheduled amounts of such Retiree Claims and the amounts claimed in the individual proofs of claim filed by the Retiree Claimants. While the Debtors scheduled the Retiree Claims at approximately $82 million in aggregate, proofs of claim filed by Retiree Claimants aggregate to approximately $113 million. Based on analyses performed by various actuaries and financial advisors to the Debtors, the retirees and the Committee, it was determined that the approximately $31 million difference between the claimed and scheduled amounts stemmed from the different discount rates and other actuarial assumptions employed by the Debtors and the Retiree Claimants in determining the net present value of the Retiree Claims.

After lengthy negotiations between the Retiree Claimants and the Debtors, and consultation with the Committee, on May 18, 2010 the parties entered into the Retiree Claims Settlement Agreement, which allows the Retiree Claims in an aggregate amount of

85

approximately $103 million, contingent upon, among other things, the Retiree Claims receiving

treatment consistent with that proposed in the April Plan.[65] The Debtor/Committee/Lender Plan

would give Retiree Claimants an additional option as Holders of Other Parent Claims to elect to

receive a slightly decreased initial distribution of cash in exchange for participation in the

Litigation and Creditors' Trusts. See Debtor/Committee/Lender Plan § 3.2.6.

As noted above, courts generally defer to a debtor's business judgment in deciding

whether to approve a settlement and will approve such a settlement if it falls above the lowest

point in the range of reasonableness. See In re Key3Media Group, Inc., 336 B.R. at 93; Coram

Healthcare., 315 B.R. at 330. The Martin factors support approval of the Retiree Settlement.

Litigating all of the various Retiree Claims would be a needlessly costly, complicated and

uncertain undertaking. Given the varying health, age and physical conditions of the individual

Retiree Claimants, arguments over which mortality scale to apply, which discount rate to use,

what lookback period to reference, and all the other actuarial minutiae that are essential for

calculating the net present value of a pension claim, such litigation would impose undue burdens

on the Debtors with no assurance of success on the merits. By settling the amounts of the

Retiree Claims, the Debtors have reduced the aggregate claim amount of Retiree Claims asserted

against their Estates by approximately $10 million and avoided complex, inconvenient and

potentially costly litigation.[66]

The value of the Retiree Settlement to the Debtors' Estates is in effect conceded by the

Noteholder Plan Proponents in the Noteholder Objection. The Noteholder Plan Proponents point

out that under the Retiree Settlement, Retiree Claimants will receive a 35.18% recovery on their

---

[65] Specifically, the April Plan provided that Retiree Claimants would receive 35.18% of the amount of their Allowed Claims, paid in cash. See April Plan § 3.2.5.
[66] The Retiree Settlement and the process that led to it also provided the estate with additional value in the form of various agreed-upon metrics and actuarial data used in assessing and resolving the claims of parties (mostly other retirees) who were not involved in the Retiree Settlement.

claims, "the same amount that was offered before the Examiner issued his report which [according to the Noteholder Plan Proponents] dramatically increased the value of Non-LBO Creditors' Claims," including those of the Retiree Claimants. See Noteholder Objection at ¶ 313. The Noteholder Plan Proponents, in fact, argue that, as a result of the Examiner Report and increases in distributable enterprise value, the Retiree Claims have increased in value. See id. at ¶¶ 312, 313. By the Noteholder Plan Proponents' own assessment, the Retiree Settlement is a favorable one for the Debtors' Estates.

        In considering whether to approve the Retiree Settlement, the relevant issue is whether the Debtors' Estates and non-settling creditors are treated fairly. See In re Nutritional Sourcing Corp., 398 B.R. 816, 837 (Bankr. D. Del. 2008) (citing Nutraquest, 434 F.3d at 645). The Noteholder Plan Proponents have made explicit their belief that the Retiree Settlement's only substantive flaw is that it is *insufficiently generous* to the Retiree Claimants. See Noteholder Objection at ¶ 313. They cannot complain that it fails to satisfy the Martin factors because they have acknowledged that it successfully preserves value for the Debtors' Estates. Rhetoric aside, their complaint is not that the Retiree Settlement gives the settling retirees too much; it is that the overall settlement of the LBO-Related Causes of Action does not give the Noteholder Plan Proponents as much as they want.[67]

## IV.    THE CONTESTED ELEMENTS OF THE DEBTOR/COMMITTEE/LENDER PLAN ARE APPROPRIATE AND REASONABLE

        A number of objections (the "Objections") to confirmation of the Debtor/Committee/Lender Plan were filed by February 15, 2011. As of the date of this filing, several of the Objections have been resolved on a consensual basis or the

---

[67] The Noteholder Plan Proponents have also asserted that in negotiating and ultimately accepting the Retiree Settlement, Committee member William Niese violated his fiduciary duty to the Noteholder Plan Proponents. See Noteholder Objection at ¶¶ 309-313. As explained in Part II.D.1.d, that argument is as groundless as it is scurrilous.

Debtor/Committee/Lender Plan Proponents are proposing herein amendments to the Debtor/Committee/Lender Plan or language to the proposed Confirmation Order that they believe will resolve several objections. In addition, the Debtor/Committee/Lender Plan Proponents anticipate that continued discussions may result in the consensual resolution of further Objections.

The Debtor/Committee/Lender Plan Proponents bear the burden of establishing that the requirements of confirmation set forth in section 1129 of the Bankruptcy Code have been met by a preponderance of the evidence. See Heartland Fed'n Sav. & Loan Ass'n v. Briscoe Enters. Ltd. II (In re Briscoe Enters., Ltd. II), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that the Bankruptcy Court must find that the debtors have satisfied the provisions of section 1129 by a preponderance of the evidence); In re Armstrong World Indus., Inc., 348 B.R. 111, 120 (D.Del. 2006) ("In the context of a cramdown, the debtor's standard of proof that the requirements of § 1129 are satisfied is the preponderance of the evidence."). As set forth herein, the evidence will demonstrate that (i) the unresolved Objections are without merit, (ii) the Debtor/Committee/Lender Plan satisfies the requirements of section 1129(a) of the Bankruptcy Code with respect to all classes of Claims or Interests, other than section 1129(a)(8) with respect to the Rejecting Classes, and (iii) the Debtor/Committee/Lender Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to each of the Rejecting Classes.[68] Accordingly, the unresolved Objections should be overruled and the Debtor/Committee/Lender Plan should be confirmed.

---

[68] Part IV, infra, addresses those confirmation requirements that are not contested by any party.