A.    **The Release, Exculpation, Injunction and Indemnification Provisions of the Debtor/Committee/Lender Plan are Appropriate and Should be Approved**

1.    **The Direct Releases by the Debtors Satisfy the Zenith Factors**

Certain parties[69] objected to the Debtor/Committee/Lender Plan's direct releases of certain estate claims and causes of action.  The proposed releases in Section 11.2.1 of the Debtor/Committee/Lender Plan comport with the Third Circuit requirements, and any objections challenging such approval are unfounded and should be overruled.

As an integral component of the compromises and settlements effected by the Debtor/Committee/Lender Plan, Section 11.2.1 provides for releases of all claims and causes of action belonging to the Debtors against the Released Parties[70] (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims) that are or may be based, in whole or in part, on any act or omission taking place or existing on or prior to the Effective Date (the "Debtor Releases"), excluding (i) the Preserved Causes of Action[71] and (ii) any liability for actions or omissions constituting willful

---

[69] (a) Certain Current and Former Officers and Directors (joined by (i) Mark W. Hianik, John Birmingham, Tom E. Ehlmann and Peter A. Knapp; (ii) Robert R. McCormick Tribune Foundation and Cantigny Foundation; (iii) Crane Kenney; (vi) Timothy Knight) and (b) Noteholder Plan Proponents.

In addition, the United States Trustee reserved its rights to object pending evidence at the Confirmation Hearing.  As set forth herein, the Debtor/Committee/Lender Plan Proponents establish that the Debtor Releases meet Third Circuit requirements for approval of such releases.

[70] Certain objecting parties cited to the recent decision in In re Washington Mutual, Inc., Case No. 08-12229 (MFW) [Docket No. 6528] (Bankr. D. Del. Jan. 7, 2011) ("Wamu") in support of their objections to certain of the releases in the Debtor/Committee/Lender Plan.  In response to these objections, the Debtor/Committee/Lender Plan Proponents intend to amend the Debtor/Committee/Lender Plan so that the terms will no longer include the Creditors' Committee and its members.

[71] The term "Preserved Causes of Action" is defined to include (a) any and all LBO-Related Causes of Action that the Tribune Entities or the Debtors' Estates may have or are entitled to assert on behalf of their respective Estates (whether or not asserted) against the Non-Settling Defendants under any provision of the Bankruptcy Code or any applicable non-bankruptcy law including, without limitation, any and all claims under chapter 5 of the Bankruptcy Code; (b) Advisor Claims; (c) Morgan Stanley Claims; (d) objection, claims, and causes of action for avoidance and disallowance of Bridge Loan Claims and Bridge Loan Guaranty Claims; (e) claims and causes of action against Non-Settling Step Two Payees to the extent such claims or causes of action seek recovery of payments (i) under the Senior Loan Agreement on account of the Incremental Senior Loans or (ii) under the Bridge Loan Agreement, in each case whether based on avoidance or disallowance of Senior Loan Claims or Bridge Loan Claims or any other theory; and (f) Disclaimed State Law Avoidance Claims; provided, however, that Preserved Causes of Action shall

misconduct or gross negligence, with the exception of the Released LBO-Related Causes of Action. These releases are an integral component of the overall settlement and compromise implemented by the Debtor/Committee/Lender Plan. Furthermore, these releases are appropriate under the facts of these Chapter 11 Cases and should be approved under the standards established in the Third Circuit.

Courts in this circuit recognize that Debtors are permitted to release claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion), 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citation omitted). The Debtors submit that the releases contained in the Debtor/Committee/Lender Plan are critical to its successful implementation and it is thus a valid exercise of the Debtors' business judgment to settle any claims the Debtors may have against Released Parties. See id.

More specifically, courts in this Circuit assess the propriety of releases by a debtor of claims against non-debtor third parties based on the "specific facts and equities of each case," usually through an analysis of the following five factors:  (i) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) substantial contribution by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (iv) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (v) provision in the plan for payment of

---

not include any claims, causes of action, suits or proceedings that have been released or settled on or prior to the Effective Date.

all or substantially all of the claims of the class or classes affected by the injunction.  <u>See</u> <u>In re</u> <u>Zenith Elecs. Corp.</u>, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (applying the factors identified in <u>In re Master Mortgage</u>, 168 B.R. 930, 934 (Bankr. W.D. Mo. 1994)).

While the above <u>Zenith</u> factors guide the examination of debtor releases for courts in this jurisdiction, they are recognized as neither exclusive nor conjunctive, but rather, as helpful in weighing the equities of a particular case after a fact-specific review.  <u>See</u> <u>Exide</u>, 303 B.R. at 72; <u>Spansion</u>, 426 B.R. at 142-43 (citing <u>Zenith</u>, 241 B.R. at 110).  Thus, Third Circuit courts rely on some, all, or a combination of the factors to ultimately decide whether direct debtor releases are appropriate.  <u>See, e.g.</u>, <u>In re Federal-Mogul Global Inc.</u>, 2007 WL 4180545, *41 (Bankr. D. Del. 2007); <u>Coram Healthcare</u>, 315 B.R. at 335; <u>In re NII Holdings, Inc.</u>, 288 B.R. 356, 368 (Bankr. D. Del. 2002); <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591 (Bankr. D. Del. 2001).  A fact-specific review demonstrates that the releases contained in the Debtor/Committee/Lender Plan meet each of the five <u>Zenith</u> factors and should be approved.

First, there is a clear identity of interest between the Debtors and certain third parties in connection with the negotiation, documentation and implementation of the Debtor/Committee/Lender Plan, the Plan Supplement, the settlements incorporated in the Debtor/Committee/Lender Plan and the Debtors' successful reorganization.  For instance, many of the Released Parties have alleged indemnification claims against the Debtors such that a suit against the Released Party will merely result in a claim back to the Debtors.  For example, the current and former officers, directors, employees and agents of the Debtors are entitled to indemnification to the fullest extent authorized by Delaware law, pursuant to the Debtors' certificates of incorporation and bylaws.  A suit against such Released Parties would likely give rise to indemnification claims against the Debtors' estates, thereby depleting those estates and

diluting creditor recoveries. This is paradigmatic of an "identity of interest." See In re West Coast Video Enters., Inc., 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) (in referring to what would later become the first Zenith factor, stating that "[t]here is an identity of interest between the debtor and the third party, usually an indemnity relationship"). Similarly, the Senior Lenders, Bridge Lenders, Agents and Arrangers would assert that they have contractual indemnities that are enforceable.

Second, with respect to most of the Released Parties, they have been instrumental to the Debtors' reorganization efforts and have made important contributions to the Chapter 11 Cases by, among other things, (a) compromising claims and accepting diminished recoveries, contributing funds or otherwise making other economic contributions of settlement consideration for the benefit of the Debtors' estates, (b) participating in countless hours of complex arms'-length discussions, including the vigorous Mediation process overseen by Judge Kevin Gross, (c) developing the ultimate compromises embodied in the Debtor/Committee/Lender Plan, and (d) negotiating, preparing, disseminating, soliciting and/or supporting the Debtor/Committee/Lender Plan. See, e.g., Zenith, 241 B.R. at 111 ("[A]ll the Releasees have made substantial contributions to the reorganization: the Officers and Directors by designing and implementing the operational restructuring and negotiating the financial restructuring with [lender]; [lender] by funding the Plan and agreeing to the compromise of its claim; and the Bondholders' Committee by negotiating the pre-packaged Plan and assisting in the solicitation of the Bondholders, who voted overwhelmingly in favor of the Plan."); Coram Healthcare, 315 B.R. at 335 (finding the noteholders' funding to be a substantial contribution as it allowed for repayment to all creditors and a substantial distribution to shareholders).[72]

---

[72] In order for the Released Parties (in particular, Released Parties like the Senior Lenders, Bridge Lenders and the agents for the same) to get the full benefit of their bargain, their affiliates, successors and advisors, among other

As discussed in greater detail below, the significant time, effort and assets devoted by most of the Released Parties – in each of their varying but critical roles – have been absolutely essential to the Debtors' ability to formulate a plan which has the support of their key constituents and maximizes recovery to their respective estates.  Not only has the participation of the Released Parties contributed substantially to the Debtors' reorganization process thus far, these parties will continue to participate and play a major role in the Debtors' ongoing efforts to emerge from chapter 11, including in confirming, administering, implementing and consummating the Debtor/Committee/Lender Plan.

Third, the Debtors' releases of the non-debtor Released Parties are necessary to the Settlement and the viability of the Debtors' reorganization.  The Settlement and the Debtor/Committee/Lender Plan were negotiated with the understanding that the Released Parties would receive protection in exchange for their efforts in crafting, contributing significant value to and supporting the Debtors' reorganization, and the Debtor Releases are a mutually-interdependent aspect of the Settlement and the Debtor/Committee/Lender Plan.  Without the proposed releases, the Debtor/Committee/Lender Plan Proponents would have been unable to reach the settlement that serves as the basis for the Debtor/Committee/Lender Plan, including the significant economic concessions by various parties contained in the Debtor/Committee/Lender Plan.  Without these release provisions, the Debtor/Committee/Lender Plan would not only be inequitable to all those who relied on such protection and worked in good faith to craft the Debtor/Committee/Lender Plan, it would eviscerate the support for the Debtor/Committee/Lender Plan of parties essential to the Debtor/Committee/Lender Plan's

---

parties, in such capacities, must also be Released Parties.  As noted above, certain parties objected to the releases under the Debtor/Committee/Lender Plan, citing the recent <u>Wamu</u> decision.  In response to these objections, the Debtor/Committee/Lender Plan Proponents intend to amend the Debtor/Committee/Lender Plan to narrow the scope of the Related Persons definition.

implementation, including parties providing the key economic concessions that are the basis of the Debtor/Committee/Lender Plan. Accordingly, the Debtor Releases are essential to the reorganization and there is little likelihood that it would succeed without them.

Fourth, the Debtors fully disclosed the terms and scope of the proposed releases in the Disclosure Statement and Debtor/Committee/Lender Plan and described therein in detail the entities that would be protected by the Debtor Releases. As set forth in the Epiq Voting Declaration, the overwhelming majority of the Classes of Claims and the Holders of Claims entitled to vote on the Debtor/Committee/Lender Plan voted in favor of the Debtor/Committee/Lender Plan, including the overwhelming majority of Holders of Other Parent Claims and General Unsecured Claims against the Filed Subsidiary Debtors. Thus, the releases provide creditors with the benefit of their bargain in accepting the Debtor/Committee/Lender Plan.

Lastly, the Debtor/Committee/Lender Plan provides significant recoveries to the creditors potentially affected by the Debtor Releases. Accordingly, any impact the Debtor Releases may have on such parties is significantly overshadowed by the real consideration that such claimants will be receiving from Released Parties under the Debtor/Committee/Lender Plan.

In sum, the proposed Debtor Releases are a product of good faith, arms'-length negotiations in connection with the Settlement, and are a central and important element of the Debtor/Committee/Lender Plan, which enables the Debtors to exit bankruptcy sooner than otherwise would be possible, provides creditors with a meaningful and more certain recovery compared to alternative structures that have been examined, and allows the Reorganized Debtors upon emergence to devote their time and attention to their businesses without distraction from litigation. Therefore, the Debtor/Committee/Lender Plan Proponents believe that the proposed

Debtor Releases clearly satisfy the <u>Zenith</u> factors as required by this circuit, and that the equities

of the case warrant their inclusion in the Debtor/Committee/Lender Plan.

As a more detailed response to specific objections challenging the propriety of the Debtor

Releases, including that of the Noteholder Plan Proponents, a discussion justifying the releases is

set forth below for each of the Released Parties:

<u>Senior Lenders, Bridge Lenders and Settling Step Two Payees.</u>  The nature and

reasonableness of the settlement consideration provided by the Senior Lenders, Bridge Lenders

and Settling Step Two Payees is discussed extensively in Section II above.  As the foundation of

the overall settlement underlying the Debtor/Committee/Lender Plan, this settlement

consideration has not only contributed substantially to the Debtors' reorganization, it has been

the foundation upon which the reorganization was built.  As reflected by the voting results on the

Debtor/Committee/Lender Plan, the settlement of LBO-Related Causes of Action against the

current and former Senior Lenders and Bridge Lenders is broadly supported by the Debtors'

creditors, indeed it is the element of the Debtor/Committee/Lender Plan without which no true

reorganization could have been achieved.  In addition to their substantial contribution of

economic value to enable a reorganization, all of these parties have worked tirelessly with the

Debtors, the Creditors' Committee and other parties in interest to reach a constructive and value-

maximizing settlement for the benefit of all creditors.  Resolution of the LBO-Related Causes of

Action has been the "main event" of these chapter 11 cases, and without the active and

constructive participation of the Senior and Bridge Lenders and their substantial contribution of

settlement consideration to the reorganization, this resolution would have been impossible.  For

these reasons, and as set forth in detail in Part II, the Debtors submit that the <u>Zenith</u> factors are

clearly satisfied with respect to the Senior Lenders, Bridge Lenders, and Settling Step Two
Payees, and these releases are justifiable under all other binding and persuasive case law.

Wilmington Trust objects to confirmation of the Debtor/Committee/Lender Plan on the
grounds that it allegedly "renders futile" Wilmington Trust's complaint against certain Senior
Lenders for equitable disallowance, equitable subordination, and imposition of constructive trust
by purportedly causing the release and discharge of the claims asserted in the complaint. WTC
Obj. at ¶¶ 25-27.

In fact, however, nothing in the Debtor/Committee/Lender Plan releases any direct claims
that are actually held or owned by Wilmington Trust. The only releases at issue in this regard
are the Plan's releases of *estate* causes of action and voluntary Holder Releases (as defined
below). To the extent that the Wilmington Trust complaint raised estate claims, it was violative
of the automatic stay in the first place, and such claims appropriately are released by the entities
that own them. To the extent that the claims asserted in the complaint are personal to
Wilmington Trust, they will survive confirmation.

Step One Selling Stockholders.[73] The Noteholders object to the
Debtor/Committee/Lender Plan's release of claims against the Step One Selling Stockholders,
arguing that (i) the Estates' cannot release constructive fraudulent transfer causes of action
against the Step One Selling Stockholders because the two-year statute of limitations on these
causes of action has lapsed and (ii) Step One Selling Stockholders provide no consideration for
the proposed release of intentional fraudulent transfer causes of action against them.

---

[73] The Creditors Committee does not agree with some of the arguments advanced in this section or with the Debtor's
belief that intentional fraudulent transfer causes of action against the Step One Selling Stockholders should be
released. The Debtors believe that differences like these among the settling parties support the overall
reasonableness of the Proposed Settlement.

As set forth below in Part IV.B.2.a of this Memorandum, the Noteholders' legal

conclusion that the Estates no longer possess and therefore cannot release any constructive

fraudulent transfer causes of action against the Step One Stockholders is accurate.  The

Creditors' Committee, which is the Estates' representative with Court-approved standing to bring

the LBO-Related Causes of Action, decided not to include constructive fraudulent transfer

causes of action in its complaint filed against the Step One and Step Two Selling Stockholders

for the reasons set forth in Section IV.B.2 of this Memorandum.  As a matter of law, when the

two-year statute of limitations expired, these constructive fraudulent transfer causes of action

automatically reverted to the applicable individual creditors who can now pursue those causes of

action as they see fit under applicable state law.  See infra at footnote 95.  Accordingly, no

release of the Estates' constructive fraudulent transfer claims against the Step One Selling

Stockholders will occur pursuant to the Debtors/Committee/Lender Plan.

The Estates release of the intentional fraudulent transfer causes of action against

the Step One Selling Stockholders is consistent with the fact that the Examiner "did not find

credible evidence that the Tribune Entities entered into the Step One Transactions to hinder,

delay or defraud creditors," (See Examiner Report. Vol. I, p. 7), and therefore concluded that "a

court is reasonably likely to conclude that the Step One Transactions did not constitute an

intentional fraudulent transfer." See id.  It is also consistent with Professor Black's opinion that

given the specific facts of this case a finding of actual intent to defraud at Step One is a highly

remote possibility.  See supra at p. 43.  In light of these assessments, the Debtors believe that the

intentional fraudulent transfer causes of action against the Step One Selling Stockholders have

little to no value, and the considerable cost of pursuing such claims would not be a justifiable use

of Estate funds.  See In re PWS Holding Corp., 228 F.3d 224, 240-242 (3rd Cir. 2000) (Court

relied on Examiner's findings that "the claims had little to no value" in concluding the plan's

releases for no consideration were appropriate). In light of these facts and the Third Circuit's

ruling in PWS, the Debtors believe the release of the intentional fraudulent transfer causes of

action against the Step One Selling Stockholders is appropriate.

Released Step Two Stockholder Parties. The Noteholder Plan Proponents apparently take

issue with the release of "Released Step Two Stockholder Parties" from LBO-Related Causes of

Action. The objection, however, wholly disregards the limited scope of parties that are subject to

the release and the important legal and business justifications behind the release. As an initial

matter, it is important to understand precisely who is a Released Step Two Stockholder Party:

> (1) Persons that redeemed stock through the Tribune Company
> 401(k) Savings Plan;
> (2) Persons employed by the Debtors from October 22, 2010
> through the Effective Date solely with respect to the first $100,000
> of Cash received from the redemption of common stock, stock
> equivalents or options;
> (3) Retiree Claimants and similar claimants that elect to receive
> Cash under the Plan (instead of Cash and Trust Interests); and
> (4) Retiree Claimants and similar claimants that elect to receive
> Cash and Trust Interests solely with respect to the first $100,000 of
> Cash received from the redemption of common stock, stock
> equivalents or options.

Furthermore, with respect to the first two categories above, individuals named as

defendants in the First Amended Complaint, dated December 7, 2010, filed by the Committee

(Adversary Proceeding No. 10-54010 (KJC)), are excluded from the definition of Released Step

Two Stockholder Parties if there is a Judicial Determination against such individuals.

401(k) Redemption and Current Employees. Thousands of Tribune rank and file

employees held common stock of Tribune through their 401(k) accounts prior to the Leveraged

ESOP Transactions. As with any other major corporation, these employees depend upon their

401(k) investments for their livelihood upon retirement. These individuals, many of whom are

still current employees contributing to the ongoing operations of the Debtors, had nothing to do with the Leveraged ESOP Transactions.  The financial and emotional harm to these current and former employees in the event they were required to disgorge amounts in their 401(k) accounts cannot be overstated, and would undoubtedly result in severe damage to employee morale, which is already strained given the length and litigiousness of these Chapter 11 Cases.

Moreover, the Debtors believe that it is likely a court would decline to avoid payments made on account of stock held through the Tribune Company 401(k) Savings Plan.  The Tribune Company 401(k) Savings Plan is a qualified employee benefit plan, pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA").  ERISA contains a general prohibition on the assignment or alienation of pension benefits.  See ERISA, 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.").  Courts have consistently declined to permit creditors to recover assets held in qualified plans in derogation of the anti-alienation provision.  In Guidry v. Sheet Metal Workers, 493 US 365 (1990),  the Supreme Court noted that the anti-alienation provision "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them." Id. at 376 (holding that a judgment creditor was precluded from imposing a constructive trust on the defendant's qualified pension plan account as a means to recover on its fraud claim).  See also Patterson v. Shumate, 504 U.S. 753, 760 (U.S. 1992) ("Declining to recognize any exceptions to [the anti-alienation] provision within the bankruptcy context minimizes the possibility that creditors will engage in strategic manipulation of the bankruptcy laws in order to gain access to otherwise inaccessible funds."); Martorana v. Board of Trustees of Steamfitters Local Union 420

Health, Welfare and Pension Fund, 404 F.3d 797 (3d Cir. 2005) (following Guidry's "cautionary advice" in reversing an order allowing equitable set-off an award of attorney's fees against the pension benefits of a participant who brought suit against the plan); In re Handel, 301 B.R. 421 (Bankr. S.D.N.Y. 2003) (rejecting a third party creditor's attempt to challenge the ERISA anti-alienation provision where it was alleged that the plan fiduciaries had violated ERISA); Butler v. Becton, Dickinson And Co. (In re Loomer), 198 B.R. 755 (Bankr. D. Neb. 1996) (holding that a chapter 7 trustee could not recover funds held by an ERISA-qualified plan, even though such funds were otherwise avoidable as intentional fraudulent transfers, because ERISA's restriction on alienation controlled).[74] Accordingly, the Debtors believe the release of LBO-Related Causes of Action on account of stock redemptions held through the Tribune Company 401(k) Savings Plan is more than amply justified.

As for the release of current employees from LBO-Related Causes of Action, as noted above, it is extraordinarily narrow—the release applies solely to individuals that are continuously employed through the remainder of these bankruptcy proceedings and only with respect to the first $100,000 of stock redeemed. These individuals have made tremendous efforts to facilitate the Debtors' reorganization and are vital to the Debtors' businesses. The Debtors believe it is essential to maintain the trust, confidence and morale of their current employees. The dollar amount at issue is sufficiently small and, when balanced against the harm to these individuals and the Debtors' businesses, the Debtors believe this release is more than justified.

---

[74] But see Velis v. Kardanis, 949 F.2d 78, 82 (3d Cir. 1991) (stating in dicta that because "there can be no doubt that Congress has expressed a deep and continuing interest in the preservation of pension plans. . . [w]e believe it reasonable to conclude that Congress intended to provide protection against the claims of creditors for a person's interest in pension plans, unless vulnerable to challenge as fraudulent conveyances or voidable preferences"). Velis concerned the scope of section 541(c)(2) with respect to property excluded from the estate. The court did not provide any analysis on whether ERISA's anti-alienation provision would bar any such recovery from a pension plan, even where an individual debtor engaged in pre-petition transfers of assets to a qualified plan in order to avoid the reach of creditors.

Retiree Claimants. The Noteholder Plan Proponents have challenged a series of releases included in the Debtor/Committee/Lender Plan, including releases granted to retirees as Released Step Two Stockholder Parties related to claims arising from the redemption of common stock, stock equivalents or options of Tribune in connection with the leveraged buy-out of Tribune that occurred in 2007. See Noteholder Objection at ¶ 327; Debtor/Committee/Lender Plan § 1.1.198. The Noteholder Plan Proponents' unqualified assertion that the Debtor/Committee/Lender Plan proposes to release the Retiree Claimants "for no consideration" is flatly false. See Noteholder Objection at ¶ 327. The release of the Retiree Claimants was a negotiated provision of the Retiree Settlement, for which the Debtors, as discussed above, received substantial consideration. See Retiree Claims Settlement Agreement ¶ 7. In providing for the limited release to the Retiree Claimants necessary to obtain the benefits of the Retiree Settlement for the Debtor/Committee/Lender Plan, the Debtor/Committee/Lender Plan Proponents made a conscious decision not to expose the Retiree Claimants, all of whom are retired and a great many of whom depend on their now-diminished pensions for day-to-day living expenses, to litigation. Such litigation would have a negligible effect on overall creditor recoveries, but would force long retired elderly people to endure lawsuits that would primarily benefit certain professional investors in defaulted securities.

While the Noteholder Plan Proponents argue that claims against the Released Stockholder Parties, including the Retiree Claimants, consist solely of claims for intentional fraud, no party can seriously contend that the Retiree Claimants were anything other than innocent – and injured – bystanders in the Leveraged ESOP Transaction: they neither advanced nor implemented the LBO and the vast majority of them were no longer even active employees at the time of the LBO. Moreover, pursuing causes of action against the Retiree Claimants

would likely hurt morale of current employees, who could not help but wonder about the security

of their own retirement should they continue in the employ of the Debtors.

Directors, Officers and Professionals of Debtors.  The Noteholder Plan Proponents have

objected to the release of Estate causes of action against professionals, directors and officers of

the Debtors for alleged lack of consideration.   This argument is in complete disregard of the

limited scope of the releases granted to such parties, the facts in these Chapter 11 Cases and the

role that such parties have and will continue to play in connection with the successful

restructuring process of the Debtors.

Importantly, the direct releases applicable to the Debtors' professionals, directors and

officers have been narrowly tailored to ensure that the following claims and causes of action are

NOT released:

- Any and all LBO-Related Causes of Action

- Any liability for actions or omissions constituting willful misconduct or gross
  negligence as determined by Final Order

- Any obligations of the Debtors' officers or directors to repay loans or advances of
  money or other property contractually owed to the Debtors or their Estates

- Any defenses, claims, causes of action, or other rights with respect to the
  interpretation, application or enforcement of any Employee Benefit Plan or the
  payment of any Employee Benefit Claim[75]

Under applicable law and the Debtors' charter and bylaws, the Debtors are generally

obligated to indemnify current and former directors and officers.  Pursuant to the

Debtor/Committee/Lender Plan, any prepetition indemnification claims likely would be entitled

to a 35% recovery for directors and officers of Tribune and a 100% recovery for directors and

officers of Tribune's subsidiaries, and any post-petition indemnification claims likely would be

entitled to payment in full.  Accordingly, if the Debtors' estates were to bring claims against

---

[75] See Debtor/Committee/Lender Plan § 6.5.

current and former directors and officers, such Related Parties will likely have indemnification claims back against the Debtors. Thus, there is a clear alignment of interest between the Debtors and these parties. With respect to the Debtors' professionals, most will also have indemnification claims based on the terms of their retention. See, e.g., Amended Letter of Agreement between Tribune Company and Edelman [Docket No. 146]; Letter Agreement between Tribune Company and Lazard Frères & Co. LLC [Docket No. 147].

Furthermore, the Debtors' Related Parties, including professionals, directors and officers, have made extraordinary efforts towards the Debtors' reorganization. They were involved in the rigorous process of designing, negotiating and implementing the operational and financial restructuring of the Company. In addition to reorganizing the Debtors' business operations from top to bottom for the more immediate and direct purposes of chapter 11, the Debtors' various professionals, directors and officers have undertaken extensive efforts to adapt to the changing, competitive industry for a durable approach. See generally Transcript of November 10, 2010 Hearing, at pp. 32-39. In this regard, such Persons have played a large role in the revitalization of the Company by, for example, launching a number of innovative sales initiatives, and creating new products and sources of revenue. Id. As a result, the Company has successfully increased its relevance and connections to audiences, clients, and communities. Id. The fact that the Company has been able to preserve and maximize value – and thus be in a position today to provide significant recovery to creditors – notwithstanding the imposing industry as well as macroeconomic pressures, speaks volumes of the contributions of the Debtors' directors and officers, as well as professionals retained by and working in conjunction with such Company management.

103

There is no doubt that the efforts of the Company's directors and employees during these Chapter 11 Cases far exceed those required of an average professional, director or officer. See generally Transcript of November 10, 2010 Hearing, at pp. 32-41. What is more, since the bankruptcy was filed, officers and management employees generally have not received equity compensation or other long-term incentive grants enjoyed by their competitors, and directors are subject to claims arising from a contentious bankruptcy, all while meeting these above-average performance demands on a daily basis for years. Specifically, over two hundred insiders of the Company, including current and former directors, officers and employees, have been personally sued for preference actions, and many have also been personally sued for LBO-Related Causes of Action. Notwithstanding, the directors and officers have worked and continue to work with the Debtors. It is precisely these types of contributions provided by the professionals, directors and officers, and which can only be provided by such Persons in their capacity as Company professionals, directors and officers, that has substantially and directly benefited the Debtors' estates for the benefit of all stake holders.

2.      **The Holder Releases are Consensual and Should be Approved**

Certain parties[76] have objected to the Debtor/Committee/Lender Plan's voluntary releases given by assenting creditors. The Debtor/Committee/Lender Plan Proponents believe that the discussion below, which clarifies any purported ambiguity in respect of the third party releases, establishes that the Debtor/Committee/Lender Plan's third-party releases are permissible,

---

[76] (a) State of California Franchise Tax Board ("CFTB") (joined by State of Illinois, Departments of Revenue and Employment Security (the "IL Taxing Agencies")), (b) Brigade Capital Management, (c) GreatBanc Trust Company, (d) Warren Beatty, (e) Certain Current and Former Officers and Directors (joined by (i) Mark W. Hianik, John Birmingham, Tom E. Ehlmann and Peter A. Knapp); (ii) Robert R. McCormick Tribune Foundation and Cantigny Foundation; (iii) Crane Kenney; (vi) Timothy Knight)), (f) IL Taxing Agencies (in addition to joining in all objections set forth in the CFTB objection), (g) the Internal Revenue Service and (h)Wilmington Trust Company.
    In addition, the United States Trustee reserved its rights to determine whether the Holder Releases are "truly consensual" and as set forth herein, the Plan Proponents establish that they are.

consensual releases supported by an "affirmative agreement."[77] Thus, any arguments challenging the consensual releases set forth in Section 11.2.2 are meritless and should be overruled.

Section 11.2.2 of the Debtor/Committee/Lender Plan provides for voluntary releases by Holders of Claims and Interests that are entitled to vote on the Plan, of claims and causes of action (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims) that such Holders of Claims or Interests may have against the Released Parties related to the Debtors, the Chapter 11 Cases or the Plan, Disclosure Statement or the Restructuring Transactions (the "Holder Releases"), subject to certain exclusions. The Holder Releases apply to any Person:

    a)   that has voted to accept the Debtor/Committee/Lender Plan and has not opted out from granting the releases in Section 11.2.2;

    b)   that has voted to reject the Debtor/Committee/Lender Plan but has opted to grant the releases set forth in Section 11.2.2;

    c)   that is deemed to accept the Debtor/Committee/Lender Plan and has been provided an opportunity but has not opted out of granting the releases in Section 11.2.2;[78] or

    d)   who otherwise agrees to provide the releases set forth in Section 11.2.2.

The Holder Releases will not apply to any Person:

    a)   that has voted to accept the Debtor/Committee/Lender Plan and has opted out from granting the releases set forth in Section 11.2.2;

    b)   that has voted to reject the Debtor/Committee/Lender Plan and did not opt to grant the releases set forth in Section 11.2.2;

---

[77] In response to specific concerns raised by the CFTB and IL Taxing Agencies in their respective objections, the Debtor/Committee/Lender Plan Proponents confirm that none of those entities submitted a ballot providing its "affirmative agreement" and thus will not be subject to the release provisions set forth in Section 11.2.2 of the Debtor/Committee/Lender Plan.

[78] Holders of Convenience Claims in Class 1G received an election form by which such Holders were given the ability to opt out of the Holder Releases. No other class that was deemed to accept the Debtor/Committee/Lender Plan received an opt-out election form and, thus, Holders of Claims in such other Classes shall not be deemed to have granted the Holder Releases.

    c)  that has been deemed to accept the Debtor/Committee/Lender Plan and has not been provided with an opportunity to opt out of granting the releases in Section 11.2.2;

    d)  that is in a deemed rejecting class; or

    e)  who is not a claimant of the Debtors or is a claimant but whose Claim is not classified.

Courts have been clear that consensual third-party releases supported by an "affirmative agreement" from an affected creditor are permissible. See Zenith, 241 B.R. at 111. Although the existence of an "affirmative agreement" is fact-specific, courts have held that, by voting in favor of a plan with non-debtor releases, a creditor has affirmatively agreed to such releases. See Coram Healthcare, 315 B.R. at 336 (holding creditors voting in favor of a plan bound by its releases); Zenith, 241 B.R. at 111 (approving non-debtor releases by creditors that voted in favor of the plan); West Coast Video, 174 B.R. at 911 (stating that "each creditor bound by the terms of the release must individually affirm same, either with a vote in favor of a plan including such a provision or otherwise"). The Debtor/Committee/Lender Plan provides even creditors voting in favor of the Debtor/Committee/Lender Plan the opportunity to opt out of granting the Holder Releases. Only those that either vote to accept and do not opt out of the releases or vote to reject but affirmatively opt into the releases are bound by them.[79] The mechanics by which creditors were able to consent to the Holder Releases were built into the ballots and the solicitation procedures, which the Bankruptcy Court approved after full notice to creditors and a hearing. Under the terms of the Debtor/Committee/Lender Plan, the Holder Releases are clearly consensual and supported by a strong "affirmative agreement." See, e.g., In re Monroe Well Service, Inc., 80 B.R. 324, 334-35 (Bankr. E.D. Pa. 1987) (determining that releases were

---

[79] Section 11.2.3 of the Debtor/Committee/Lender Plan provides that any Holder of a Claim or Interest that has timely submitted a Ballot or election form opting not to grant the releases set forth in Section 11.2.2 will not receive the benefit of such Holder Releases, even if otherwise entitled.

consensual when creditors had the option of granting such releases). The consensual Holder Releases – which are based on the affirmative agreement of the creditor affected – are uncontroversial and plainly permissible pursuant to established legal precedent in the Third Circuit. See, e.g., Zenith, 241 B.R. at 111 (Bankr. D. Del. 1999) (indicating that third party releases of non-debtors may be accomplished consensually). See also In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) [Docket No. 2345] (Bankr. D. Del. April 17, 2009); In re Mrs. Fields' Original Cookies, Inc., Case No. 08-11953 (PJW) [Docket No. 144] (Bankr. D. Del. Oct. 2, 2008); In re Nellson Nutraceutical, Inc., Case No. 06-10072 (CSS) [Docket No. 2258] (Bankr. D. Del. Sept. 10, 2008); In re Dura Automotive Sys. Inc., Case No. 06-11202 (KJC) [Docket No. 3352] (Bankr. D. Del. May 13, 2008). Therefore, there is ample basis for the Court to approve the Holder Releases proposed in the Debtor/Committee/Lender Plan.

As for GreatBanc's specific request seeking clarification on whether the consensual release provision in Section 11.2.2 of the Debtor/Committee/Lender Plan would inadvertently release any indemnification and/or contribution claims that it may have against the Released Parties, the Plan Proponents clarify that (1) GreatBanc's setoff rights, if any, against the Debtors constitute Other Secured Claims which are Unimpaired under the Debtor/Committee/Lender Plan and thus not subject to the release provision in Section 11.2.2 unless otherwise consensually granted by GreatBanc; and (2) as a possible Holder of an Other Secured Claim, GreatBanc was not given an opportunity to opt out of granting the releases in Section 11.2.2 and therefore never granted such release.

### 3.    The Exculpation Provisions are Appropriate and Should be Approved.

Four parties[80] objected to the Debtor/Committee/Lender Plan's exculpation provisions on the basis that they are impermissibly broad.  Two of these objections[81] will be resolved with an amendment to the Debtor/Committee/Lender Plan specifying that the exculpation provisions shall only apply to post-petition conduct.  The remaining objections[82] should be overruled as discussed below and the exculpation provisions set forth in Section 11.5 of the Debtor/Committee/Lender Plan should be approved.

Section 11.5 of the Debtor/Committee/Lender Plan contains customary exculpation provisions which, with certain limitations, protect Debtor/Committee/Lender Plan Proponents and present or former members of the Creditors' Committee (in their capacity as members of the Creditors' Committee), and the Related Persons of the foregoing, from liability in connection with the postpetition actions relating to the reorganization of Tribune.  Unlike the consensual third party releases, the exculpation provisions do not affect the liability of third parties, rather they specifically set a standard of care of gross negligence or willful misconduct in future

---

[80] (i) New York State Department of Taxation and Finance ("NYDTF"), (ii) Secretary of the United States Department of Labor ("DOL") (joined by Neil Plaintiffs), (iii) United States Trustee ("U.S. Trustee") and (iv) Noteholder Plan Proponents.

[81] DOL and U.S. Trustee.

[82] With respect to the specific objection points which are not otherwise addressed above, the Debtor/Committee/Lender Plan Proponents note the following:
    (i) The Noteholder Plan Proponents make the objection that the Debtor/Committee/Lender Plan's exculpation clause does not contain a carve-out for gross negligence or willful misconduct.  Such objection is simply erroneous as the Debtor/Committee/Lender Plan specifically provides in Section 11.5 that exculpation excepts liability "that results from willful misconduct or gross negligence as determined by a Final Order."
    (ii) The NYDTF makes the objection that the Debtor/Committee/Lender Plan's exculpation clause would preclude it from pursuing non-debtor individuals who are potentially liable.  The Plan Proponents stand behind the terms of the Debtor/Committee/Lender Plan and are in the process of working with the NYDTF to ascertain the basis of their objection and take appropriate steps for the resolution thereof.
    (iii) The DOL makes the objection that the Debtor/Committee/Lender Plan's exculpation clause is impermissible as to ERISA claims based on the heightened standard of care applicable to such claims.  However, Section 11.5 expressly notes that the exculpation described therein shall apply only "[t]o the fullest extent permitted under applicable law."  Thus, the Debtor/Committee/Lender Plan's exculpation clause does in fact account for the appropriate standard of care with respect to liability resulting from all claims, including claims under ERISA.

litigation by a party against an exculpated party for acts arising out of the Debtors' restructuring.

See PWS Holding Corp., 228 F.3d at 245 (holding that an exculpation provision "is apparently a

commonplace provision in chapter 11 plans, [and] does not affect the liability of these parties,

but rather states the standard of liability under the Code."). As such, an exculpation provision

flows inevitably from several different findings a bankruptcy court must reach in confirming a

plan, such as the good faith of its proponents, which are undeniably core matters. See 28 U.S.C.

§ 157(b)(2)(L).

Courts in this circuit have customarily approved exculpations to prevent future collateral

attacks against parties that have contributed in good faith to a debtor's reorganization in large

chapter 11 cases based on the particular circumstances of a case. Such authorization has not

been limited to estate fiduciaries, but has included other parties who have been instrumental to

the debtors' reorganization efforts. See, e.g., In re Crdentia Corp. (Case No. 10-10926) (BLS),

2010 WL 3313383, at *6 (Bankr. D. Del. May 26, 2010) (granting exculpation for the secured

lender and DIP lender); In re NexPak Corp. (Case No. 09-11244) (PJW), 2010 WL 5053973, at

*8 (Bankr. D. Del. May 18, 2010) (granting exculpation for the pre-petition lenders); In re

PCAA Parent, LLC (Case No. 10-10250) (MFW), 2010 WL 2745980, at *15 (Bankr. D. Del.

May 17, 2010) (granting exculpation for various lender parties and agents); In re Aleris Int'l, Inc.

(Case No. 09-10478) (BLS), 2010 WL 3492664, at *44 (Bankr. D. Del. May 13, 2010) (granting

exculpation for various agent banks and indenture trustees); In re NextMedia Group, Inc. (Case

No. 09-14463) (PJW), 2010 WL 2745970, at *21 (Bankr. D. Del. March 22, 2010) (granting

exculpation for the disbursing agent, DIP lenders, various agents and pre-petition lenders); In re

EBHI Holdings, Inc. (Case No. 09-12099) (MFW), 2010 WL 3493027, at *20 (Bankr. D. Del.

March 18, 2010) (granting exculpation for the pre-petition term agent and lenders, and the

109

indenture trustee); In re Natural Products Group, LLC (Case No. 10-10239) (BLS), 2010 WL

2745983, at *19 (Bankr. D. Del. Feb. 22, 2010) (granting exculpation for various lender and

agent parties); In re Teton Energy Corp. (Case No. 09-13946) (PJW), 2010 WL 2822056, at *18

(Bankr. D. Del. Jan. 20, 2010) (granting exculpation for the indenture trustee, debenture holders

and various lender and agent parties).  In such cases, granting exculpation for parties beyond

estate fiduciaries was considered fair, reasonable, necessary to the reorganization and in the best

interests of all parties in interest.

Here, the Debtors, working with the Debtor/Committee/Lender Plan Proponents and

other representatives of major creditor constituencies, worked tirelessly to formulate and

negotiate the Debtor/Committee/Lender Plan in good faith.  The extensive efforts that resulted in

the Settlement of certain LBO-Related Causes of Action and the other key negotiations and

compromises embodied in the Debtor/Committee/Lender Plan were essential to the Debtors'

reorganization and likely could not have occurred without protection from liability for the

constituents involved.  Indeed, absent such protection from future collateral attacks, the

willingness of the diverse Debtor/Committee/Lender Plan Proponents to come together to reach

consensus on a resolution that maximizes value for all stakeholders would have been severely

impaired.  Under these circumstances, it is appropriate to offer protection to precisely those

parties who were integral to the restructuring process in the form of an exculpation.  See In re

Worldcom, Inc., 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003).  The scope of the

exculpation and identity of the exculpated parties in the Debtor/Committee/Lender Plan are

appropriate in light of, among other things, the significant roles played by such parties in

connection with the negotiation and execution of all of the various components of the

Debtor/Committee/Lender Plan, including through participation in the Court-approved

Mediation, and all of the related documents, all of which are instrumental to the Debtors'
successful emergence from chapter 11. The Debtor/Committee/Lender Plan's narrowly crafted
exculpation provisions are fully consistent with the Bankruptcy Code and Third Circuit courts'
interpretation thereof and should be approved.

### 4.    The Bar Order Is a Necessary and Appropriate Component of the Settlement and Should be Approved

As in many cases in which some defendants settle while others do not, the settlement
embodied in the Debtor/Committee/Lender Plan includes a contribution bar (the "Bar Order").
The Bar Order contained in Section 11.3 of the Debtor/Committee/Lender Plan ensures that
settling defendants are entitled to the benefit of their bargain; namely, that they cannot be held
liable on account of the settled claims beyond the consideration that was already paid pursuant to
the settlement. As with any contribution bar, the Bar Order here provides that settling
defendants cannot be sued by non-settling defendants for contribution or non-contractual
indemnity on account of the settled claims; at the same time, the Bar Order ensures that the non-
settling defendants get the full benefit of any such claims by reducing any judgment against them
by an amount equal to the proportionate fault of the party that settled.

The Bar Order in the Debtor/Committee/Lender Plan has received very few objections.
Indeed, just a single paragraph in the 217-page Noteholder Objection is directed at the Bar
Order. This is unsurprising, as courts in the Third Circuit and elsewhere have routinely approved
bar orders. See, e.g., Nutraquest, Inc., 434 F.3d at 649-50; Eichenholtz v. Brennan, 52 F.3d 478,
487 (3d Cir. 1995); Whyte v. Kivisto (In re SemCrude, L.P.), Case No. 08-11525 (BLS), 2010
Bankr. LEXIS 4160, at *20 (Bankr. D. Del. Nov. 19, 2010); see also Gerber v. MTC Elec.
Techs. Co., Ltd., 329 F.3d 297, 305 (2d Cir. 2003); Official Comm. of Unsecured Creditors v.
Citibank, N.A. (In re Lyondell), Adv. Pro. No. 09-01375, [Docket No. 371], (Bankr. S.D.N.Y.

Mar. 11, 2010); <u>Munford v. Munford, Inc. (In re Munford, Inc.)</u>, 97 F.3d 449, 455-56 (11th Cir. 1996). Here, the Bar Order of the Debtor/Committee/Lender Plan – a plan that settles claims against most, but not all, potential defendants – is vital to the settlement. There is a strong public policy in favor of settlement, and by extension, a strong public policy in favor of bar orders such as the one contained in the Debtor/Committee/Lender Plan. <u>In re Masters Mates & Pilots Pension Plan</u>, 957 F.2d 1020, 1031 (2d Cir. 1992) ("[S]ettlement bars are often desirable because they facilitate settlement."); <u>In re Enron Corp. Secs.</u>, MDL-1446, 2008 U.S. Dist LEXIS 48516, *45 (S.D. Tex. June 24, 2008) ("Indeed bar orders provide a powerful incentive for a party . . . to enter into a settlement." (internal marks omitted)). Without a bar order, settling defendants would have no assurance that the consideration they pay on account of settled claims is the only consideration they will ever be required to pay on account of those claims. <u>Masters Mates</u>, 957 F.2d at 1028 ("If a nonsettling defendant . . . were allowed to seek payment from a defendant who had settled, then settlement would not bring the latter much peace of mind."); <u>In re Worldcom Inc., ERISA Litig.</u>, 339 F. Supp. 2d 561, 568 (S.D.N.Y. 2004) ("Without the ability to limit the liability of settling defendants through bar orders it is likely that no settlements could be reached." (citation and internal marks omitted)). Moreover, as described below, the Bar Order is narrowly tailored to ensure that it provides the necessary peace to the Released Parties without unfairly infringing on the rights of the non-settling defendants. <u>See</u> <u>Eichenholtz</u>, 52 F.3d at 486-87.

The sole objection raised by the Noteholder Plan Proponents is that the Bar Order contains a judgment reduction provision. Noteholder Obj. at ¶ 333. That objection is easily dismissed. In almost all circumstances, courts require the inclusion of judgment reduction provisions to ensure that non-settling defendants are not prejudiced by the imposition of the bar

order. <u>Eichenholtz</u>, 52 F.3d at 487 & n.16 (approving bar order because proportionate judgment

reduction method adequately protects non-settling defendants' contribution rights), <u>SemCrude</u>,

2010 Bankr. LEXIS 4160, at *19-20 (approving bar order as fair because judgment reduction

provision preserved setoff rights); <u>see also</u> <u>Denney v. Deutsche Bank AG</u>, 443 F.3d 253, 274 (2d

Cir. 2006) ("Ordinarily, the potential harshness of a bar order is mitigated by a judgment credit

provision that protects a nonsettling party from paying damages exceeding its own liability."); <u>In</u>

<u>re Munford, Inc.</u>, 172 B.R. 404, 411 (N.D. Ga. 1993) ("Judgment reduction provisions serve as

an alternative to contribution after entry of a bar order and provide a means for fairly

compensating nonsettling defendants for the loss of contribution or indemnity claims.").[83]

The only other objections to the Bar Order are raised by Certain Current and Former

Officers and Directors ("<u>Certain Officers and Directors</u>") in their objection (along with the

joinders filed thereto, the "<u>Officers and Directors Objection</u>") and, to a lesser extent, EGI-TRB

LLC ("<u>EGI-TRB</u>") in its objection (the "<u>EGI-TRB Objection</u>").[84]   The objections raised by these

parties can be placed into three categories:  (1) objections that the Bar Order constitutes a

disfavored "third-party release" (EGI-TRB Obj. at pp. 10-12; Officers and Directors Obj. at pp.

3-13); (2) objections about the timing of the operation of various provisions of the Bar Order

(Officers and Directors Obj. at pp. 7-12); and (3) concern that another U.S. court will ignore an

---

[83] In this way, judgment reduction provisions are entirely consistent with state law rights to contribution and offset.
<u>See</u>, <u>e.g.</u>, Del. Code Ann. tit. 10 § 6304(b) (providing that there is no right of contribution against a settling
tortfeasor if the release provides for a judgment reduction to the extent of the pro rata share of the released
tortfeasor); <u>see also</u>, <u>e.g.</u>, <u>SemCrude, L.P.</u>, 2010 Bankr. LEXIS 4160, at *15-19 (finding that the bar order was
consistent with state contribution rights because state law extinguished such rights upon settlement and permitted
setoff).

[84] Wilmington Trust, as successor indenture trustee for the PHONES, filed an objection containing a single sentence
to the effect that the Bar Order prohibits the PHONES from receiving any recoveries against the settling defendants.
WTC Obj. at p. 14. To the extent the PHONES complain they will not receive recoveries under the
Debtor/Committee/Lender Plan because of the way that recoveries by the Litigation Trust are to be distributed, this
is not an objection to the Bar Order at all.

order of this Court and fail to apply the provisions of the Bar Order (Officers and Directors Obj. at pp. 8-11).

Although these objections flow from a misunderstanding of the Bar Order, for the avoidance of doubt, the Debtor/Committee/Lender Plan Proponents will revise the language of the Bar Order to address each of these concerns. Each of the objections, as well as an explanation of the clarifying language to be included in the plan amendment, is addressed in turn.

First, the Bar Order plainly does not constitute a third-party release. The Bar Order applies only to contribution or non-contractual indemnity claims (whether or not denominated as such) arising out of the same facts and circumstances as the claims released by the settlement. Debtor/Committee/Lender Plan § 11.3. In precluding non-settling defendants from asserting contribution and non-contractual indemnity claims – and only those claims – against settling defendants, the Bar Order uses a formulation that is almost identical to the language approved by the Third Circuit in Eichenholtz and by Judge Shannon in SemCrude.[85]   And, the instant Bar Order goes even further than these Third Circuit precedents by including "for the avoidance of doubt language" that makes crystal clear that all other third-party claims are preserved. See Debtor/Committee/Lender Plan § 11.3.

---

[85] The Bar Order only applies to Barred Claims, which are defined as any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Barred Person is the liability of the Barred Person to the Plaintiff (as defined below)), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims or the Preserved Causes of Actions, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims. Debtor/Committee/Lender Plan, § 11.3. Compare id. with SemCrude Settlement Agreement, Docket No. 8593, § 5 ("any request, claim, or cause of action for or otherwise seeking contribution or common law indemnification, however denominated, against a Third Party where the injury to the Released Parties is based upon the Released Parties' liability to the Trustee, the Litigation Trust, the Debtors, the Reorganized Debtors, or the Preserved Contributing Lenders") and Eichenholtz, 52 F.3d at 493 (barring a person who may assert a claim "based upon, relating to, or arising out of the Settled Claims, the Action or the settlement of this Action . . . from commencing, prosecuting, or asserting any such claim or claims for contribution or indemnity or otherwise denominated, against the Settling Defendants . . . .").

Accordingly, the objectors' arguments that the Bar Order fails the <u>Spansion</u> test for third-party releases are simply inapposite. EGI-TRB Obj. at pp. 10-12; Officers and Directors Obj. at pp. 4-5.[86] As this Court knows, <u>Spansion</u> involved an express third-party release of "any and all claims" existing as of the effective date of the plan, 426 B.R. at 143 and had nothing to do with a contribution bar. Citations to this decision and others like it evidence a fundamental misunderstanding by the objectors of the instant Bar Order and this body of law.[87] Nonetheless, in order to remove even a scintilla of doubt, the Debtor/Committee/Lender Plan Proponents will modify the third decretal paragraph to read:

> ORDERED that nothing herein shall prejudice or operate to preclude the rights of any Barred Person to assert any claims or causes of action (including, without limitation, any direct or personal claims or causes of action), other than claims for non-contractual indemnity or contribution against any Released Party as set forth above, against any party.

Second, the concerns raised by the Officers and Directors about the timing of the operation of the Bar Order's notice and judgment reduction provisions are likewise without merit. Specifically, the Officers and Directors object that the Bar Order does not have to be brought to the attention of the court presiding over the lawsuit against the non-settling defendant (the "<u>Litigation Court</u>") until after a judgment is obtained against the non-settling defendant. <u>See</u> Officers and Directors Obj. at pp. 8-11. The objectors worry that this will prevent them from litigating the judgment reduction provision during the primary case against them and that they might have to satisfy a judgment before any reduction has been made pursuant to the judgment

---

[86] The Noteholder Plan Proponents cite to <u>In re Continental Airlines</u>, 203 F.3d 203 (3d Cir. 2000), which involved a rejection of a release provision encompassing "any and all claims and causes of action," <u>id.</u> at 206 and is similarly not relevant to the Bar Order. <u>See</u> Noteholder Obj. at ¶ 333.

[87] Similarly unavailing is EGI-TRB's complaint that the Bar Order only aids those parties "found liable," while those parties with "no liability stand[] only to lose . . . rights." EGI-TRB Obj. at p. 11. Again, this argument misunderstands the Bar Order and its narrow application to contribution claims. Only those parties who are ultimately found liable would ever be in a position to seek contribution or indemnity from other potential defendants (in this case the settling defendants).

reduction provision. Id. at pp. 10-11. While we have not seen any precedent that specifically requires it, the Debtor/Committee/Lender Plan Proponents will address this "timing" concern by inserting language that requires the plaintiff to provide notice of the Bar Order to the Litigation Court "prior to entry of any judgment or arbitration award." This makes clear that the provisions of the Bar Order can be litigated at, before, or after a judgment is obtained.[88]

Finally, the Officers and Directors worry that the Bar Order is ineffective because either the Litigation Trustee or the Litigation Court will disregard its provisions. See Officers and Directors Obj. at pp. 8-11. Frankly, the Litigation Trustee is not free to disregard the Bar Order and fail to bring it to the Litigation Court's attention. Sections 13.3.3 and 14.4.3 of the Debtor/Committee/Lender Plan clearly state that both the Litigation Trustee and Creditors' Trustee "shall agree to comply with, and shall not take any actions inconsistent with, the Bar Order as set forth in Section 11.3." Debtor/Committee/Lender Plan §§ 13.3.3, 14.4.3. In any event, the Bar Order does not operate to prevent any non-settling defendant from bringing the Bar Order to the Litigation Court's attention, and this reservation of rights is now made clear in the amended Bar Order. Moreover, as a valid order of the U.S. Bankruptcy Court, the Bar Order must be recognized in all courts in the United States, as with any properly issued order. See, e.g., Celotex Corp. v. Edwards, 514 U.S. 300, 313 (1995) (explaining that valid orders of bankruptcy courts are to be "respected," and cannot be collaterally attacked, in other courts); In re McGhan, 288 F.3d 1172, 1179-80 (9th Cir. 2002) ("[S]tate courts should not intrude upon the plenary power of the federal courts in administering bankruptcy cases by attempting to modify or

---

[88] The Officers and Directors also object that the Bar Order improperly burdens the non-settling defendants. Officers and Directors Obj. at pp. 10- 11. The Bar Order is clear, however, that the only burden is imposed on the plaintiff, the Litigation Trustee or the Creditors' Trustee, to file the Bar Order with the Litigation Court. Debtor/Committee/Lender Plan § 11.3. Any other implied burdens, such as the need to show joint or several liability in order to obtain the judgment reduction, are inherent to all contribution or indemnity claims. The Bar Order does not create any burdens beyond those already existing at law with respect to these kinds of claims.

116

extinguish federal court orders"). The Litigation Court is not free to disregard the Bar Order, either. Although the Bar Order already provided for the continuing jurisdiction of the bankruptcy court with respect to all matters concerning the Bar Order, for the avoidance of all doubt, the language will be revised expressly to include matters related to the enforcement of the Bar Order.

The Bar Order is fully consistent with applicable law, and the scant objections to its inclusion in the Debtor/Committee/Lender Plan – to the extent the objectors are still pressing those objections in light of the language changes set forth above – should be overruled

### 5.    The Indemnification Provisions are Appropriate and Should be Approved

Samuel Zell ("Mr. Zell") filed an objection to the Debtor/Committee/Lender Plan (the "Zell Objection") objecting to, among other things, Section 11.6.1 of the Plan, which excludes indemnification claims "related to, based upon, or in connection with any LBO-Related Causes of Action arising prior to the Petition Date" from claims eligible for administrative expense treatment. Mr. Zell asserts that the Debtors' certificate of incorporation constitutes an executory contract that must be assumed or rejected in full under section 365 of the Bankruptcy Code, and argues that the Debtors may not "selectively honor" their indemnification obligations. Additionally, Mr. Zell argues that the Debtor/Committee/Lender Plan's treatment of indemnification obligations for LBO-Related Causes of Action is unfair and contrary to state law and public policy. For the reasons set forth below, these objections are without merit and should be overruled.

### a.    The Debtors' Certificate of Incorporation Is Not an Executory Contract

Mr. Zell asserts that the Debtors' certificate of incorporation constitutes an executory contract, and, therefore, the Debtor/Committee/Lender Plan " may not selectively pick and

117

cho[o]se provisions to assume or reject." Zell Obj. at pp. 4-5. Despite Mr. Zell's assumption

that the Reorganized Debtors seek to selectively "assume" portions of the Debtors' certificate of

incorporation as an executory contract, Zell Obj. at p. 5, the DCL Plan provides nothing of the

kind. The Debtor/Committee/Lender Plan does not treat the certificate of incorporation as an

executory contract because it is not an executory contract and is not subject to the requirements

of section 365.

Certificates of incorporation and bylaws do not constitute executory contracts with

directors and officers. See In re Baldwin-United Corp., D.H., 43 B.R. 443, 459-60 (S.D. Ohio

1984) (rejecting debtors' argument that bylaws constituted executory contract to indemnify

directors and officers because whether contract was between corporation and shareholders or

between corporation and directors and officers, contract was non-executory due to lack of

ongoing mutual obligations); In re THC Fin. Corp., 446 F. Supp. 1329, 1331 (D. Haw. 1977)

(finding, under the Bankruptcy Act, that indemnification provisions in articles of incorporation

were not executory contracts because "the officers and directors in question having already

served in such capacities, they have performed their side of the agreements and nothing now

remains save the corporations' obligation to indemnify.").

Specifically, in Baldwin-United, the court noted that even if bylaws constituted a contract

with the directors and officers, such contract would fail to meet the definition of an executory

contract under the Bankruptcy Code. 43 B.R. at 459-60. ("there is nothing that the directors

could do which would constitute a breach of contract such that [the debtors] would be excused

from performing the analysis called for in the by-laws to determine whether an individual

covered by the indemnification provisions is entitled to indemnification.").

Citing to three confirmation orders – two of which are unpublished – Mr. Zell states that it "is well-established that a debtor's certificate of incorporation constitutes an executory contract." Zell Obj. at p. 4. This assertion is simply incorrect. The confirmation orders cited by Mr. Zell contain no reasoning and in fact state only that the bylaws will be "deemed and treated as" executory contracts under section 365, not that they *are* executory contracts as a matter of law. See In re Panolam Holdings Co., No. 09-13889 MFW, 2009, 2009 WL 7226968, at *20 (Bankr. D. Del. Dec. 10, 2009) (pursuant to prepackaged plan, indemnification obligations under certificates of incorporation and bylaws "shall be *deemed* and *treated as* executory contracts to be assumed") (emphasis added); In re NII Holdings, Inc., 288 B.R. 355, 376 (Bankr. D. Del. 2002) (indemnification obligations under certificates of incorporation and bylaws "are *deemed and treated as* executory contracts that are assumed) (emphasis added); In re Crabtree & Evelyn, Ltd., No. 09-14267(BRL), 2010 WL 3638369, at *14 (Bankr. S.D.N.Y. Jan. 14, 2010) (indemnification obligations under certificate of incorporation and bylaws "shall be *deemed to be*, and shall be *treated as though they are*, Executory Contracts that are assumed and assigned pursuant to section 365 of the Bankruptcy Code") (emphasis added). Moreover, even courts that have "deemed" indemnification obligations under certificates of incorporation and bylaws to be executory contracts have nevertheless permitted selective assumption and rejection. See In re Dana Corp., No. 06-10354 (BRL), 2007 Bankr. LEXIS 4404, at *72-73 (Bankr. S.D.N.Y. Dec. 26, 2007) (obligation to indemnify current directors and officers would be "deemed and treated as" executory contract and assumed, but obligation to indemnify former directors and officers would be rejected).

Thus, the Reorganized Debtors need not, and, in fact, legally cannot, assume or reject the indemnification obligations in the certificate of incorporation "in total" as Mr. Zell urges. See Zell Obj. at p. 5.

> b.   Debtors Are Entitled to Deny Administrative Expense Treatment to Indemnification Claims for LBO-Related Causes of Action Because These Claims Are Not Actual and Necessary Expenses of Preserving the Estates

In his Objection, Mr. Zell attacks what he inaccurately describes as the Debtor/Committee/Lender Plan's "retroactive removal of indemnification obligations." Zell Obj. at p. 7. The Debtor/Committee/Lender Plan does not "remove" the Debtors' indemnification obligations to Mr. Zell; he will have the same indemnification rights under the Debtor/Committee/Lender Plan that he currently possesses. Rather, the Debtor/Committee/Lender Plan merely clarifies that, should Mr. Zell prevail in the LBO-Related Causes of Action, his indemnification claim will be treated as a prepetition claim pursuant to general priority rules of the Bankruptcy Code's distribution scheme. See, e.g., In re Summit Metals, Inc., 379 B.R. 40, 56 (Bankr. D. Del. 2007) ("[A]n indemnification claim based upon pre-petition services or conduct . . . is a form of prepetition compensation for services that is not entitled to administrative expense priority."); In re THC Fin. Corp., 446 F. Supp. at 1332 ("Allegations in a lawsuit of corporate management misconduct contributing to bankruptcy relate, ipso facto, to pre-petition activity, and so cannot be said to be administrative costs in the strict sense.").

Regardless of Mr. Zell's likelihood of success in defending against the LBO-Related Causes of Action, he cannot credibly argue that indemnification of the costs of defending him against the Estates is an actual and necessary cost of preserving the Estates. Nor can Mr. Zell successfully argue that the Debtor/Committee/Lender Plan's denial of administrative priority for

his indemnification claims for LBO-Related Causes of Action "is inconsistent with Delaware

corporate law and sound public policy." Zell Obj. at p. 5.  Courts have considered and rejected

these very arguments in denying administrative priority to indemnification claims of directors

and officers:

> Federal bankruptcy law frequently intervenes and provides relief to a debtor on a
> variety of common law rights and remedies and state statutory provisions.  The
> most basic of the state statutes which are, in effect, abrogated by federal
> bankruptcy law include those which require payments pursuant to contracts for
> goods or services and those which otherwise govern commercial relations.  There
> is no indication that Congress has provided an exception to this basic tenet of
> federal bankruptcy law in regard to indemnification obligations.

Consol. Oil & Gas, Inc., 110 B.R. at 538 (rejecting directors' and officers' argument that debtor

was required to honor indemnification obligations to extent provided under state law).

Similarly, general fairness or public policy concerns based on directors' and officers'

reliance on full indemnification are insufficient, standing alone, to "defeat the well-established

principles of administrative prioritization."  Baldwin-United Corp., 43 B.R. at 457 (court

considered "potentially disastrous implications" for former directors and officers if

indemnification were denied and arguments that "public policy prefers that large corporations

secure the services of nonmanagement directors somehow justifies deviation from the body of

law requiring narrow construction of prioritization statutes" and "d[i]d not find them

compelling."); see also, e.g., Consol. Oil & Gas, Inc., 110 B.R. at 539 (examining public policy

concerns virtually identical to those described on page 5 of the Zell Objection and concluding

that regardless of those concerns, the court "is required to look at the specific issues before it" in

determining whether to grant priority to indemnification claims); See In re Autolend Group, Inc.,

Case No. 97-15499 (MBM) [D.I. 455] (Bankr. D.N.M. Aug. 14, 2000) (Dismissal Order [D.I.

456] (Aug. 14, 2000)) (denying former's director's motion for administrative expense treatment

for defense costs from adversary proceeding seeking to avoid fraudulent because "a claim for

indemnification based on state statute does not automatically give rise to a priority claim for

administrative expense under 11 U.S.C. § 503(b))."

If a debtor could be prohibited from discharging its liabilities on the grounds that

discharge was "contrary to state law" wherever state law created an otherwise-enforceable

obligation, or on the grounds that it was unfair to deny full payment, the Bankruptcy Code's

distribution scheme would be rendered a nullity. Thus, Mr. Zell's objection fails to state any

meritorious argument and should be overruled.

**B.    Objections to the Creditors' Trust and Litigation Trust Should be Overruled**

Robert R. McCormick Tribune Foundation and Cantigny Foundation (the

"Foundations"), EGI-TRB, Mr. Zell, Brigade Capital Management ("Brigade") and Certain

Directors and Officers (collectively, the "Creditors' Trust Objectors") have filed objections with

respect to the Creditors' Trust that will be established pursuant to the Debtor/Committee/Lender

Plan (the "Creditors' Trust Objections"). The majority of the Creditors' Trust Objectors assert

that the Creditors' Trust was not proposed in good faith as required by section 1129(a)(3) of the

Bankruptcy Code, and therefore violates section 1129(a)(1). Upon examination of the Creditors'

Trust Objections, it is evident that (i) the Creditors' Trust was clearly proposed in good faith in

accordance with section 1129(a)(3), (ii) the Creditors' Trust Objectors' arguments are premature

and misplaced, and (iii) even disregarding the aforementioned issues, the Creditors' Trust

Objectors' arguments are erroneous. The Noteholder and WTC Objections contain certain

additional limited objections with respect to the Litigation and Creditors' Trusts, which are also

addressed below.

1.    **The Creditors' Trust Was Proposed in Good Faith**

The Creditors' Trust was created to provide a mechanism pursuant to which the

individual state law constructive fraudulent transfer actions (the "State Law Avoidance Claims")

might be pursued in an efficient manner in an effort to provide the Creditors' Trust beneficiaries

with maximum value. This Court, in Spansion, stated that "[f]or purposes of determining good

faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether

such a plan will fairly achieve a result consistent with the objectives and purposes of the

Bankruptcy Code." 426 B.R. 114, 137 (Bankr. D. Del. 2010) (quoting PWS Holding Corp., 228

F.3d at 242).

It is axiomatic that maximizing value for creditors of the estate is an objective of the

Bankruptcy Code. See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d 108, 128-29 (3d

Cir. 2004) ("[T]he purposes of the Code are to preserve going concerns and to maximize the

value of the debtor's estate"); In re Michener, 342 B.R. 428, 435 (Bankr. D. Del. 2006)

(acknowledging the dual purposes of the Bankruptcy Code: "first, to maximize the creditors'

recovery and second, to provide the debtor with a fresh start"); In re Allegheny Int'l, Inc., 134

B.R. 814, 820 (Bankr. W.D. Pa. 1991) ("The purpose of a Chapter 11 proceeding is to maximize

the result for all creditors."). The Creditors' Trust is clearly consistent with the objectives and

purposes of the Bankruptcy Code. As such, the Creditors' Trust was proposed in good faith for

the purposes of section 1129(a)(3).

The Creditors' Trust Objections provide absolutely no legal support for the assertion that

proposing a mechanism by which individual creditors may aggregate claims evidences a lack of

good faith under the Bankruptcy Code, and indeed there is no such authority. Cases finding a

lack of good faith are strikingly different from the case at bar. See, e.g., In re Hotel Assocs. of

Tucson, 165 B.R. 470, 475 (B.A.P. 9th Cir. 1994) ("[T]he act of impairment in an attempt to

gerrymander a voting class of creditors is indicative of bad faith."); In re Chemtura Corp., 439

B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (good faith requirement speaks more to process of plan

development than to content of plan); In re Woolley's Parkway Ctr., Inc., 147 B.R. 996, 1003

(Bankr. M.D. Fla. 1992) (finding that plan was proposed in bad faith where debtor made

unsubtle attempt to manipulate chapter 11 by artificially creating an impaired class once it

became clear that to achieve confirmation it would need the affirmative vote of at least one

impaired class); In re Maxim Indus., Inc., 22 B.R. 611, 612-13 (Bankr. D. Mass. 1982) (plan was

not proposed in good faith where tax motivations were the only purposes of having a shell

corporation acquire all of the stock of a solvent corporation).  None of the hallmarks of bad faith

exist here.

     In the absence of legal support for their theories, the Creditors' Trust Objections rely on a

conclusory and unsupported argument that because prospective defendants in the State Law

Avoidance Claims may have a defense to those claims if they were brought in bankruptcy, the

Creditors' Trust was proposed in bad faith and fails to meet the requirements of section

1129(a)(3).  In other words, rather than address the issue of good faith, the Creditors' Trust

Objections, which are more properly characterized as premature motions to dismiss the State

Law Avoidance Claims, discuss the merits of the underlying State Law Avoidance Claims,

which are not currently at issue.  Assuming, arguendo, that the Creditors' Trust Objectors are

indeed correct with respect to the standing and preemption issues (which are discussed in detail

below), the Creditors' Trust Objectors will have still failed to properly allege that the Creditors'

Trust was proposed in bad faith for the purposes of section 1129(a)(3).

     The Debtor/Committee/Lender Plan provides individual creditors with the option to

transfer their State Law Avoidance Claims to the Creditors' Trust so that those claims may be

efficiently prosecuted and their validity determined.  See Debtor/Committee/Lender Plan §

14.3.1.  The Creditors' Trust does not create new claims to be brought against the Creditors'

Trust Objectors, it simply preserves existing claims and provides a vehicle for their prosecution.

Providing creditors with an avenue to collectively recover on their potentially valuable claims is

hardly evidence of a lack of good faith.

Whether the claims transferred to the Creditors' Trust might ultimately be precluded by

the application of section 546(e) is of no relevance to the task before this Court -- the

determination of the confirmability of the Debtor/Committee/Lender Plan.  These issues will be

properly addressed by the court that hears the State Law Avoidance Claims, and are therefore

premature and misplaced.  These issues certainly have no bearing on whether the Creditors'

Trust was proposed in good faith.

It should be noted that the Bankruptcy Court for the Southern District of New York

recently approved a plan of reorganization that provides for a creditors' trust under nearly

identical circumstances.  In the Order Confirming Third Amended Joint Chapter 11 Plan of

Reorganization for the LyondellBasell Debtors [Case No. 09-10023, Doc. No. 4418] (the

"Lyondell Confirmation Order"), Judge Gerber approved the plan of reorganization proposed by

Lyondell Chemical Company (the "Lyondell Plan").  Section 5.8 of the Lyondell Plan provides

for a creditors' trust very similar to the one in the instant case.  See Lyondell Plan at § 5.8 [Case

No. 09-10023, Doc. No. 3930].  The Lyondell Confirmation Order expressly provides that the

Lyondell Plan comports with section 1129(a)(3).  See Lyondell Order at p. 8 ("The Debtors have

proposed the Plan in good faith . . . [and] with the legitimate and honest purpose of maximizing

the value of the Debtors' estates and to effectuate a successful reorganization of the Debtors").

Indeed, no argument that proposing a creditors' trust was evidence of bad faith was even made in

that case.  While not controlling, this is further persuasive evidence that the Creditors' Trust was

proposed in good faith.

> **2.    The Objections of the Creditors' Trust Objectors to the Creditors' Trust are Meritless[89]**

In addition to lacking a basis in law, a review of the Creditors' Trust Objections reveals

that they are founded in misunderstandings of (i) the nature of creditors' state law fraudulent

transfer claims, (ii) section 544 of the Bankruptcy Code, (iii) what is or is not the property of the

estate and (iv) the form and function of the Creditors' Trust.  What case law the Creditors' Trust

Objectors do cite is both factually and legally distinguishable – none of the cases deal with plan

confirmation, let alone present analogous facts or issues.

> a.    The Creditors' Trust has Standing to Bring the State Law Avoidance Claims

The Foundations argue in their objection (the "Foundations' Objection") [Doc. No. 7972]

that litigation trusts do not have standing to pursue creditor claims for two reasons.  See

Foundations' Objection at ¶¶ 33-39.  First, they argue that the State Law Avoidance Claims

cannot be transferred to the Creditors' Trust.  See id. at ¶ 34.  Second, they argue that the

Creditors' Trust may not assert general claims belonging to all creditors unless the Debtors

totally abandon all claims of the estate related to the LBO-Related Causes of Action.  See id. at

¶¶ 35-39.

In support of their first argument, the Foundations rely primarily on several decisions

traceable to the Supreme Court decision, Caplin v. Marine Midland Grace Tr. Co. of N.Y., 406

U.S. 416 (1972).  See Foundations' Objection at ¶ 34.  Caplin and its progeny, however, are

factually distinguishable from the present situation and the Foundations' reliance on them reveals

---

[89] While the Senior Lenders are supportive of the inclusion of the Creditors' Trust in the Debtor/Committee/Lender Plan, the Senior Lenders do not join in Part IV.B.2.

a mischaracterization or fundamental misunderstanding of the form and function of the

Creditors' Trust. In Caplin, the chapter X bankruptcy trustee, a representative of the estate, was

attempting to bring suit on behalf of certain debenture holders. See Caplin, 406 U.S. at 416. The

claims, while not assigned to the bankruptcy trustee, were brought while the bankruptcy was still

pending. See id. at 420. The Court held that under the Bankruptcy Act, the bankruptcy trustee

had no standing to bring the creditors' claims. See id. at 434. Caplin is distinguishable for

several obvious reasons. Here, any suits based on the State Law Avoidance Claims would be

brought post-confirmation and only after the Debtors have emerged from bankruptcy.

Furthermore, the State Law Avoidance Claims are assigned and transferred explicitly to the

Creditors' Trust. Courts have recognized similar differences as critical factual distinctions

rendering Caplin inapplicable.[90] Most importantly, the Creditors' Trustee is not a bankruptcy

trustee or a successor to or representative of Tribune's estate.

---

[90] Several cases have distinguished Caplin and its progeny on this basis. In Grede v. Bank of New York Mellon, 598 F.3d 899 (7th Cir. 2010), the Seventh Circuit reversed the district court's holding that a liquidating trust lacked standing to bring claims assigned to it by creditors. The Seventh Circuit held that the trustee did in fact have such authority, rejecting the argument that Caplin applies even after the termination of a bankruptcy, stating that none of the reasons Caplin provided in support of its conclusion "applies to [a] suit by a liquidation trustee on assigned claims." Id. at 902. While "the terms of the Bankruptcy Code govern the permissible duties of a trustee *in* bankruptcy, the terms of the plan of reorganization (and of the trust instrument) govern the permissible duties of a trustee *after* bankruptcy." Id. at 902. Similarly, because the trust only held voluntarily assigned claims, the Seventh Circuit recognized that "[b]y proceeding on the investors' voluntary assignments rather than a bankruptcy judge's directive, [the debtor's] plan of reorganization cures Caplin's third problem" of inconsistent recoveries. As a result, it held that "Caplin does not apply to the activities of a liquidating trust created by a plan of reorganization." Id. at 903.
Similarly, in Semi-Tech Litigation, LLC v. Bankers Trust Co., 272 F. Supp.2d 319 (S.D.N.Y. 2003), the district court held that Caplin did not preclude creditors from assigning claims to a liquidating trust. That decision was subsequently affirmed and adopted as the law of the Second Circuit. 450 F.3d 121, 126-27 (2d Cir. 2006). In Semi-Tech, a number of individual creditors had assigned their claims to a liquidating trust pursuant to a plan. The district court held that Caplin was distinguishable on the grounds that the creditors in Caplin "had not assigned their claims to the trustee." It noted that "Caplin involved an effort to discern whether Congress intended trustees to exercise [the power to bring claims on behalf of third parties] whereas the issue in both Williams and here is whether assignments should be stripped of legal effect because the assignee is a creature of bankruptcy." Semi-Tech, 272 F.Supp. 2d at 323. Finding that the concerns raised in Caplin were "considerably less compelling" when creditors actually assigned their claims to the trust, the court held that there was "no basis for treating an assignee created by, or assignments made pursuant to, a Chapter 11 plan any differently." Id. at 324.

The Litigation Trustee, on the other hand, is a bankruptcy trustee and representative of

the estate by the express terms of the Debtor/Committee/Lender Plan.  Section 13.2.4 of the

Debtor/Committee/Lender Plan provides:

> The Litigation Trust, acting through the Litigation Trustee, shall be
> authorized to exercise and perform the rights, powers, and duties held by
> the Estate with respect to the Litigation Trust Assets, including, without
> limitation, the authority under Section 1123(b)(3) of the Bankruptcy Code,
> and shall be deemed to be acting in the capacity of a bankruptcy trustee,
> receiver, liquidator, conservator, rehabilitator, creditors' committee or any
> similar official who has been appointed to take control of, supervise,
> manage or liquidate the Debtors . . . .

See Debtor/Committee/Lender Plan § 13.2.4 (emphasis added).  There is no such corresponding

language concerning the establishment of the Creditors' Trust, and those omissions are

intentional.  The Debtor/Committee/Lender Plan neither describes, nor establishes the Creditors'

Trust as being "a bankruptcy trustee" who will "exercise and perform the rights, powers and

duties held by the Estate."  The Creditors' Trust has no rights in the estate, does not represent the

estate, is not a successor to the estate and is wholly independent from the estate.

The three other cases cited by the Foundations are cited for the similar proposition that

creditors may not assign claims to a litigation trust.  However, these cases are also

distinguishable for the reason that they all involved a bankruptcy trustee, successor to, or

representative of the debtors' estate.  See Foundations' Objection at ¶ 34 (citing Kipperman v.

Onex Corp., 411 B.R. 805, 831 (N.D. Ga. 2009); Mukamal v. Bakes, 383 B.R. 798, 811-814

(S.D. Fla. 2007); Trenwick Am. Lit. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 189-91 (Del.

Ch. 2006)).  As an initial matter, the Kipperman court observed in dicta that "[l]itigation trustees

do not have standing to directly pursue claims on behalf of creditors and creditors may not assign

their claims to a litigation trust."  See Kipperman, 411 B.R. at 831 n.21.  The litigation trust in

Kipperman, however, was explicitly established as "the successor to and the representative of the

[d]ebtors' [b]ankruptcy estate." See Kipperman, 411 B.R. at 831.  Both Mukamal and Trenwick

also deal with litigation trusts established as estate representatives who are bringing claims

belonging to, and on behalf of, their respective estates.  See Mukamal, 383 B.R. at 808;

Trenwick, 906 A.2d at 175, 189-90.  Here, the Creditors' Trust was carefully designed as an

entity wholly divorced from and independent of Tribune's bankruptcy estate and is not imbued

with any powers afforded estate representatives under section 1123(b)(3)(B).  Accordingly, the

general prohibition asserted by Caplin and its progeny is simply not relevant to the case sub

judice.[91]

The Foundations' second standing argument alleges that individual creditors may not

assert general claims belonging to all creditors unless the Debtors totally abandon all claims of

the estate related to the LBO-Related Causes of Action.  See Foundations' Objection at ¶¶ 35-39.

Again, the Foundations' assertions are based on a misunderstanding of both the facts and

relevant law.  As an initial matter, the inability of individual creditors to assert claims belonging

to all creditors while a bankruptcy case is pending is an unremarkable proposition of bankruptcy

law.  Most of the cases cited to by the Foundations on this point deal with controversies over

whether or not individual creditors were bringing estate claims in conflict with the actions of a

bankruptcy trustee or debtor-in-possession during the pendency of a bankruptcy case.[92]  See

Foundations' Objection at ¶ 35 (citing Bd. of Trs. of Teamsters Local 863 Pension Fund v.

---

[91] Indeed, in Buckley v. O'Hanlon, Case No. 04-955 (GMS)2007 WL 956947 (D. Del. Mar. 28, 2007), the District Court for the District of Delaware acknowledged that a trust could assert claims assigned to it by creditors.  There, the creditors' committee filed suit against certain officers alleging deepening insolvency, breach of fiduciary duties and other fraud claims.  See id. at *2.  The trustee of the liquidating trust established pursuant to a confirmed plan was subsequently substituted as the plaintiff in the action.  The court "acknowledge[d] that, in theory, a bankruptcy trustee can pursue claims that the debtors' creditors assigned to it."  Id. at *3.  The court ultimately dismissed the assigned claims because the complaint had been filed before the assignment became effective.  See id.

[92] The remaining case cited by the Foundations dealt with a creditors' committee asserting standing to bring estate claims.  See Official Comm. of Unsecured Creditors v. Citicorp N.A., Inc. (In re Aluminum Mills Corp.), 132 B.R. 869 (Bankr. N.D. Ill. 1991) (court found claims were general claims belonging to estate; standing granted).

Foodtown, Inc., 296 F.3d 164, 170 (3d Cir. 2002) (court found that creditors were asserting personal claims, not estate claims; held that creditor rather than trustee can pursue); Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.), 226 F.3d 237, 243 (3d Cir. 2000) (court noting that state law fraudulent transfer claims were not "assets" of debtor; held that sale of all debtors' assets did not foreclose creditors from pursuing such claims); St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 702 (2d Cir. 1989) (court found that creditor was asserting estate claims, not personal claims; held that only trustee may pursue).  That proposition has no bearing here, however, for the simple reason that the Creditors' Trust is not attempting to bypass the section 544 strong-arm powers afforded to a bankruptcy trustee or violate the automatic stay.  The Creditors' Trust will only be pursuing the State Law Avoidance Claims by assignment of the State Law Avoidance Claims from the individual creditors, where the right to assert such claims has already reverted to the beneficiaries of the Creditors' Trust by operation of law due to the expiration of the two-year period set forth in section 546(a)(1)(A) of the Bankruptcy Code.

A return to the basics may better highlight the futility of the Foundations' arguments. Outside of bankruptcy, a creditor of an insolvent transferor may seek to recover transfers from the recipient of those transfers under the UFTA or UFCA.  Once the transferor files for bankruptcy, however, the Bankruptcy Code prohibits creditors from commencing (or continuing their prosecution of) these causes of action and vests in the bankruptcy trustee the exclusive right to pursue such causes of action.[93]  The rights of creditors to prosecute such claims, however, are

---

[93] We note that there is no single articulation as to the basis for the trustee's exclusive right. Courts refer alternatively to section 544(b), section 546(a) or simply cite to prior decisions as support for the trustee's exclusivity.  See, e.g., In re Berg, 376 B.R. 303, 314 (Bankr. D. Kan. 2007) ("The well-established interpretation of § 544(b) . . . bar[s] an unsecured creditor from pursuing any claims under the UFTA."); Klingman v. Levinson, 158 B.R. 109, 113 (N.D. Ill. 1993) (citing 11 U.S.C. § 546(a) for the proposition that "the commencement of bankruptcy gives the trustee the right to pursue fraudulently conveyed assets to the exclusion of all creditors"); Sears Petroleum & Transp. Corp. v. Burgess Constr. Servs., Inc., 417 F.Supp.2d 212, 221 (D. Mass. 2006) (citing to case law for the

130

not extinguished; they are only suspended in recognition of the trustee's exclusive (but not

permanent) power.[94]

It is well-established that should the limitations period expire and the trustee has not

exercised its strong-arm powers, the power to assert (or to continue) state law fraudulent transfer

claims under the UFTA and the UFCA reverts to the creditors.[95] For example, in Klingman v.

Levinson, 158 B.R. 109, 112-113 (N.D. Ill. 1993), creditors brought suit to set aside a transfer

under applicable state law.  The court held that the bankruptcy trustee's exclusive right to pursue

avoidance claims under section 546(a) expires and "creditors may step in (or resume actions)

when the trustee no longer has a viable cause of action."  See id. at 113.  Similarly, the Sixth

Circuit held in Hatchett v. United States, 330 F.3d 875 (6th Cir. 2003), that although the trustee

---

proposition that the trustee can bring a fraudulent conveyance claim at the exclusion of the creditors once the bankruptcy has commenced).  Courts have also relied on the automatic stay arising under section 362 in holding that creditors are prohibited from pursuing state law fraudulent conveyance actions while the bankruptcy case is pending, reiterating that the ability to pursue these actions during this time resides solely with the trustee.  See, e.g., Unisys Corp. v. Dataware Prods., Inc., 848 F.2d 311, 314 (1st Cir. 1988) (allowing creditors to pursue fraudulent transfer claims after termination of automatic stay).  In any event, it is well settled that only the trustee may pursue these actions upon commencement of a bankruptcy case.

[94]See Sears Petroleum, 417 F.Supp.2d at 221 (citing to case law for the proposition that the trustee can bring a fraudulent conveyance claim at the exclusion of the creditors once the bankruptcy has commenced); FDIC v. Davis, 733 F.2d 1083, 1085 (4th Cir. 1984) (finding that once a bankruptcy case had been closed, creditor could pursue state law fraudulent conveyance claims independently of the trustee).

[95]See, e.g., Hatchett v. United States, 330 F.3d 875, 886 (6th Cir. 2003), cert. denied, 541 U.S. 1029 (2004) (acknowledging that after a bankruptcy case was closed, the creditors could bring their fraudulent conveyance causes of action); Kathy B. Enters. Inc. v. United States, 779 F.2d 1413, 1415 (9th Cir. 1986) (concluding that the IRS could pursue its fraudulently conveyed assets, even if it did violate the automatic stay, because the bankruptcy proceedings were over); FDIC v. Davis, 733 F.2d at 1085 (finding that once a bankruptcy case had been closed, creditor could pursue state law fraudulent conveyance claims independently of the trustee); Barber v. Westbay (In re Integrated Agri., Inc.), 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 1993) ("A creditor regains standing to pursue a state law fraudulent conveyance action, in its own name and for its own benefit, once the statute of limitations expires on the bankruptcy trustee's right to bring the claim"); Klingman, 158 B.R. at 113 (holding that creditors could pursue fraudulent transfer claim once the trustee's statute of limitations had run); Casey Nat'l Bank v. Roan, 282 Ill. App. 3d 55, 62 (Ill. App. Ct. 1996) (holding that creditors may pursue a fraudulent conveyance claim when the trustee no longer has a viable cause of action); Christian v. Mason, 219 P.3d 473, 480 (Idaho 2009) ("[A] creditor is entitled to bring a state law action after the trustee is barred from doing so"); Dixon v. Bennett, 531 A.2d 1318, 1324 (Md. Ct. App. 1987) (overruled on other grounds) ("[O]nce the trustee's statutory time period has expired, an unsecured creditor can bring an action against a fraudulent transferee under state law provided the state statute of limitations has not yet expired").  See also United States v. Doyle, 276 F. Supp.2d 415, 428-29 (W.D. Pa. 2003) (specifically adopting rationale of Hatchett and Davis, and permitting the government to pursue a fraudulent transfer claim because the bankruptcy case had concluded).

has the exclusive right to bring fraudulent conveyance claims during an ongoing bankruptcy, the

Bankruptcy Code does not extinguish the rights of creditors to bring state law fraudulent

conveyance claims after debtors receive a discharge in bankruptcy. See id. at 886.

Indeed, while a bankruptcy trustee's federal cause of action under section 544(b) is based

on the creditor's rights under the UFTA or UFCA, it is not identical to the UFTA or UFCA

claims that the creditor may bring in state court. See, e.g., Barber v. Westbay (In re Integrated

Agri., Inc.),313 B.R. 419, 428 (Bankr. C.D. Ill. 2004) (court holding that trustee's cause of action

under section 544(b) was not identical to creditor's UFTA claim).  Here, by virtue of expiration

of the two-year time period set forth in section 546(a), under the foregoing authorities, the ability

to bring the State Law Avoidance Claims has automatically reverted to the Creditors' Trust

beneficiaries by operation of law.  Accordingly, the conflicts and concerns present in Foodtown,

Cybergenics I, St. Paul Fire and Aluminum Mills have no implication here to the Creditors'

Trust.[96]

Despite this, the Foundations argue that the State Law Avoidance Claims cannot be

brought, unless the Debtors totally abandon all claims "related to the allegedly fraudulent LBO,"

which, according to the Foundations, includes the State Law Avoidance Claims.  See

Foundations' Objection at ¶¶ 37, 39.  This is a misstatement of the applicable law.  It should be

noted first that, here under the Debtor/Committee/Lender Plan, the Debtors are not "abandoning"

---

[96]We are aware that one party has taken exception to the Debtor/Committee/Lender Plan's use of the words "disclaim" or "disclaimed" when describing the State Law Avoidance Claims.  See Brigade Objection at ¶¶ 26-29 ("Tribune's Estate has nothing to "disclaim," because any constructive fraudulent conveyance claims that Tribune might have had against shareholders who received LBO stock redemption payments are now time-barred.").  This assertion is not disputed and as clarification, the language "disclaim" or "disclaimed" was intended only to convey the intent of the Debtors not to exercise strong-arm powers under section 544 of the Bankruptcy Code with respect to such claims and allow the powers to assert such claims to revert to individual creditors.  In order to avoid all doubt, the defined term "Disclaimed State Law Avoidance Claims" in the Debtor/Committee/Lender Plan and Section 14.1 of the Debtor/Committee/Lender Plan will be amended to clarify these issues.

the State Law Avoidance Claims.[97]  That is because the Third Circuit has already established that

state law fraudulent conveyance claims do not constitute "property of the estate."  See

Cybergenics I, 226 F.3d at 241 (holding that fraudulent transfer claims could not have been sold

by the debtors as such claims "have long belonged to a transferor's creditors") (emphasis in

original).  Accordingly, the Debtors cannot, as a matter of law, "abandon" the State Law

Avoidance Claims as insisted by the Foundations.  See Foundations' Objection at ¶ 37 (citing

Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., 187 F.3d 439, 441 (4th Cir. 1999)).  Indeed, the

Foundations actually recognize this notion, see Foundations' Objection at ¶¶ 39, n.6, 70-71, but

make no attempt to reconcile their disparate statements.

Setting this misstatement of the law aside, the Foundations further imply that because the

Debtors have not "abandoned" actual fraudulent conveyance claims, which are being pursued by

the Litigation Trust, the similarity between those claims and the State Law Avoidance Claims to

be pursued by the Creditors' Trust results in two plaintiffs pursuing identical claims against

identical parties.  See id. at ¶ 38.  The Foundations assert, therefore, that the

Debtor/Committee/Lender Plan was not proposed in good faith.  See id. at ¶ 39.  The

Foundations mischaracterize the Debtor/Committee/Lender Plan as calling for "two separate

entities to go after the same defendants on the same claims."  See id.  To point out the obvious,

---

[97]Several of the Creditors' Trust Objectors incorrectly characterize the Debtor/Committee/Lender Plan's treatment of the State Law Avoidance Claims as "abandoned" or "abandonment."  See, e.g., Foundations' Objection at ¶ 55; EGI-TRB Objection at p. 7; Certain Directors and Officers' Objection at p. 13.  Nowhere in the Debtor/Committee/Lender Plan is the term, "abandon" (or derivations thereof) used or implied when referencing the State Law Avoidance Claims or the Creditors' Trust.

EGI-TRB also goes so far as to imply that this "abandonment" results in the Debtor/Committee/Lender Plan Proponents "keep[ing] most of these claims, and us[ing] the estates' funds in pursuing them" and "acting just as a trustee would under 11 U.S.C. § 544(b)."  See EGI-TRB Objection at pp. 7-8.  This mischaracterization reflects another basic misunderstanding of the Creditors' Trust.  Pursuant to Section 5.13 of the Debtor/Committee/Lender Plan, the Creditors' Trust (along with the Litigation Trust) will be borrowing $20 million from Reorganized Tribune in a delayed draw term loan where it is fully liable for repayment.  Such a mechanism does not transform the Creditors' Trust into a bankruptcy trustee.  EGI-TRB's lack of comprehension on the form and functions of the Creditors' Trust is punctuated by the dearth of case law or legal analysis on how such mechanisms would implicate section 1129(a)(3), if at all.

the respective claims are different: (a) the Litigation Trust is asserting claims under federal law on actual fraud theories; whereas (b) the Creditors' Trust is asserting claims arising under state law on constructive fraud theories.

While the respective causes of action may implicate similar operative facts, it cannot be disputed that (i) the prima facie elements of the different claims asserted by the Litigation Trust and the Creditors' Trust are demonstrably different; for example, the Litigation Trustee will be required to demonstrate actual intent to hinder, delay or defraud creditors, whereas the Creditors' Trustee is under no such obligation; (ii) the recovery by the Litigation Trust is not constrained by the amount of the creditors' claims, whereas the Creditors' Trust recovery is limited to the amount of the creditors' claims that are actually transferred to the Creditors' Trust; (iii) different burdens of proof will apply; (iv) the respective statutes of limitations differ; and (v) the defenses potentially available to the defendants will be different in the actions brought by the Litigation Trustee and the Creditors' Trustee. Thus, the Litigation Trust and Creditors' Trust will be pursuing separate and independent causes of action. See, e.g., Dixon, 531 A.2d at 1318 ("Here, appellant is proceeding under an independent cause of action under state law.") (emphasis added).

Glossing over these significant differences, the Foundations imply that there is a per se rule preventing separate actions involving similar operative facts from being prosecuted simultaneously. The Foundations offer no case law supporting such a notion because no such rule exists. Generally speaking, states have -- through judicial doctrine or by statute -- adopted rules whereby a state court has discretion to dismiss, stay, or transfer a lawsuit that otherwise is jurisdictionally proper if a parallel lawsuit is pending in a separate state or federal jurisdiction.

For example, courts in Illinois have the discretion to decide whether a stay or dismissal (or neither) is appropriate. See, e.g., Zurich Ins. Co. v. Baxter Int'l, Inc., 670 N.E.2d 664, 668 (Ill. 1996) (section 2-619(a)(3) of the Illinois Code of Civil Procedure gives Illinois courts discretion to consider comity, multiplicity, harassment, obtaining complete relief, and presence of res judicata). In consideration of the unhindered ability of prospective State Law Action defendants to raise such issues in the courts in the future, and the discretionary standards by which those courts may decide such issues if brought, there is a conspicuous gap in reasoning here whereby the legitimate pursuit of both actual and constructive fraudulent conveyance claims can somehow be equated to a bad faith plan proposal under section 1129(a)(3). Unsurprisingly, the Foundations provide absolutely no case law to bridge this gap or support this erroneous assertion.

b.    Section 546(e) Does Not Preempt the State Law Avoidance Claims

Each of the Creditors' Trust Objectors asserts that the Debtor/Committee/Lender Plan cannot be confirmed because the State Law Avoidance Claims are allegedly preempted by section 546(e) and that any mechanism permitting the prosecution of State Law Avoidance Claims amounts to a bad faith plan proposal. As discussed above, the creation of the Creditors' Trust is consistent with the objectives and purposes of the Bankruptcy Code and the Debtor/Committee/Lender Plan cannot seriously be considered as having been proposed in bad faith. See Part II supra. Rather than evaluate and approach the Creditors' Trust this way, the Creditors' Trust Objectors cite to wholly inapplicable statutes and case law in support of their erroneous allegations. We address these in turn.

The Foundations allege that "section 546(e) signifies Congress' intent that settlement payments, such as those at issue here, 'should remain unavoidable in order to insulate the clearing and settlement system of the nation's securities industry, and participants in that system,

135

from the potentially devastating effect of a substantial recovery by a trustee that would require the undoing of possibly thousands of settled securities transactions.'" <u>See</u> Foundations' Objection at ¶ 65 (citing <u>Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group</u> (<u>In re Hechinger Inv. Co. of Del.</u>), 274 B.R. 71, 88 (D. Del. 2002)). There is no dispute that as long as such a claim is asserted by a trustee, debtor in possession or other authorized estate representative during the bankruptcy, the policy behind section 546(e) should control. The Foundations, however, completely ignore the fact that there is no "settlement payment" defense under applicable non-bankruptcy law, <u>i.e.</u>, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act. The only two cases the Foundations rely on were decided in a procedural posture that differs markedly from that which is contemplated under the Debtor/Committee/Lender Plan.

Both <u>Hechinger</u> and <u>Contemporary Industries Corp. v. Frost</u> involved creditors' committees bringing fraudulent conveyance claims in an ongoing bankruptcy proceeding under section 544(b), which were subsequently barred by the "settlement payment" defense under section 546(e). <u>See</u> <u>In re Hechinger</u>, 274 B.R. at 97-98; <u>Contemporary Indus.</u>, 564 F.3d 981, 987-88 (8th Cir. 2009). The Foundations proceed to allege that both cases are representative examples of courts "routinely reject[ing] attempts by plaintiffs to circumvent section 546(e)" because both creditors' committees attempted to disguise fraudulent conveyance claims as state law unjust enrichment claims, which were ultimately rejected by the courts as frustrating section 546(e)'s protections. <u>See</u> Foundations' Objection at ¶ 66. Both cases, however are factually and legally distinguishable.

The Debtor/Committee/Lender Plan's establishment of the Creditors' Trust, by contrast, does not invoke section 544(b), nor does it require the appointment of an estate representative or

successor-in-interest to the Debtors. Indeed, it is clear that the Creditors' Trust is neither an

estate representative, nor a successor-in-interest. See Part IV.B.1., supra. The

Debtor/Committee/Lender Plan proposes an efficient mechanism whereby creditors may pursue

fraudulent transfer claims, free of the section 546(e) impediment applicable to estate

representatives acting under sections 544(b) or 548(a)(1)(B), which claims may be asserted by

individual creditors whether or not the Creditors' Trust exists. The one case most nearly on

point – from the District Court for the District of Delaware – concluded that where creditors have

a personal remedy under state law that is assignable, an assignee, acting in such capacity and not

as a trustee or successor to a trustee or debtor-in-possession, is not barred by section 546(e). See

PHP Liquidating, LLC v. Robbins, 291 B.R. 603, 607 (D. Del. 2003), aff'd, 128 Fed. App'x. 839

(3d Cir. 2005). Conspicuously, despite a lengthy discussion of the issue in which the

Foundations discuss a number of cases, nowhere do they cite PHP, which is a controlling

Delaware district court decision subsequently affirmed by the Third Circuit. See id. at 607. In

PHP, the district court held that § 546(e) did not bar claims brought by a liquidation trustee

pursuant to a confirmed plan. It "conclude[d] that if the avoidance action were brought by a

trustee or a debtor-in-possession (or the successor to a debtor-in-possession), the avoidance

action would be barred by Section 546(e)." Id. However, the liquidation trust had not asserted

its claims in any of those capacities. Rather, it brought the claims "as a direct assignee of the

unsecured creditors. As such, Section 546(e) is not a bar to [the trust's] claims." Id. The failure

of the Foundations to even cite PHP, much less attempt to deal with the District Court's holding

contrary to the Foundations' position, is telling.

     Furthermore, the Creditors' Trust has not engaged and will not be engaging in the same

behavior as the respective creditors' committees in Hechinger or Contemporary Industries. Here,

137

there is no attempt to surreptitiously disguise an unjust enrichment claim to avoid section 546(e) applicability as was the case in both <u>Hechinger</u> and <u>Contemporary Industries</u>.  The State Law Avoidance Claims are exactly what they are: state law fraudulent conveyance actions for which the ability to pursue automatically reverted to the beneficiaries of the Creditors' Trust by operation of law.  Most damaging to the Foundations' claims of bad faith though, is the plain fact that neither <u>Hechinger</u>, nor <u>Contemporary Industries</u> dealt with plan confirmation or questions of bad faith under section 1129(a)(3).  A plan mechanism by which a creditor (or creditors) pursues its state law claims outside of bankruptcy properly, subject to any applicable defenses thereto, is not bad faith under section 1129(a)(3).  The Foundations' allegations to the contrary are completely unsupported by case law.

EGI-TRB, for its part, makes similar allegations, "[i]n this case, the statutory provision that Debtors and Aurelius want to avoid – the safe harbor provisions of Section 546(e) – reflects an important Congressional policy and a fundamental avoidance defense.  This Court looks dimly upon efforts to nullify that defense." <u>See</u> EGI-TRB Objection at p. 9 (citing <u>Hechinger</u>, 274 B.R. at 96; <u>Contemporary Indus.</u>, 564 F.3d at 988).  For the reasons discussed above, those cases are wholly inapposite here.

EGI-TRB further cites to <u>In re Machne Menachem</u>, 233 F. App'x 119 (3d Cir. 2007), for the proposition that "when a debtor takes actions that undermine substantive components of the Bankruptcy Code, the debtor's plan may not be confirmed." <u>See</u> EGI-TRB Objection at p. 9.  As stated earlier, the ability to pursue the State Law Avoidance Claims will have automatically reverted to the beneficiaries of the Creditors' Trust because the trustee's exclusive period to pursue the State Law Avoidance Claims has expired, and the Debtors will have been discharged

by operation of bankruptcy law.  Whether section 546(e) applies to those claims will be decided by the appropriate court, and is not at issue here.

> c.  Creditors' Trust Objectors' Remaining Assertions Are Equally Baseless

Among other things, EGI-TRB asserts that the Examiner Report's "preclusive findings" make certain claims assigned to the respective litigation trusts "frivolous" under Maxwell v. KPMG LLP, 520 F.3d 713 (7th Cir. 2008).  See EGI-TRB Objection at pp. 2, 4.  Therefore, it alleges, the Debtor/Committee/Lender Plan runs afoul of section 1129.  See id. at p. 3.  There are several reasons why this argument has no merit here.  First and foremost, the Examiner Report's findings are not "preclusive" of such issues.  This Court has indeed commented that the Examiner Report should be afforded "appropriate deference."  See id. at p. 5 (citing Transcript of Record at 32, In re Tribune Co., No. 08-13141 (KJC) (Bankr. D. Del. Feb. 8, 2011).  Appropriate deference, however, should not be conflated with the concept of preclusive effect.  Second, with respect to the Creditors' Trust, none of the cited Examiner Report's findings actually describe the State Law Avoidance Claims.  See EGI-TRB Objection at pp. 2-3.  Third, Maxwell was not decided in the context of plan confirmation.  The Seventh Circuit's brief treatment on "frivolous claims" was made in connection with granting an aggrieved defendant leave to file a motion for reasonable attorney's fees in defending an "outlandish" and "preposterous" case.  See Maxwell, 520 F.3d at 717-18.  It is clear, therefore, that EGI-TRB's attempted (or mistaken) arguments that the Examiner Report's findings have preclusive effect rendering the Trusts' claims frivolous and somehow implicate section 1129 are without merit.

> **3.  The Objections by the Noteholder Plan Proponents and Wilmington Trust to the Creditors' Trust and Litigation Trust are Meritless**

The Noteholder Plan Proponents also raise a handful of other limited protests relating to trust governance, funding, transferability of trust interests, settlement authority and trust

indemnification. See Noteholder Objection at ¶¶ 365-377. None of these criticisms, individually or collectively, amounts to anything more than an expression of disapproval for the Debtor/Committee/Lender Plan and certainly does not constitute any infirmity that would prevent confirmation of the Debtor/Committee/Lender Plan.

Wilmington Trust has also objected to the application of contractual subordination to those Net Creditors' Trust Proceeds payable to holders of Class 1J Creditors' Trust Interests. See WTC Objection at ¶¶ 11-17. To the extent that the Debtor/Committee/Lender Plan subjects the Net Creditors' Trust Proceeds payable to Class 1J Creditors' Trust Interest holders that have not opted out of making the assignment in Section 14.3.1 of the Debtor/Committee/Lender Plan to the contractual subordination under the PHONES Notes Indenture, the Plan will be amended accordingly.[98] In footnote 11, Wilmington Trust also alludes to an argument that the State Law Avoidance Claims have "ceased to exist" and cannot be assigned. See WTC Objection at ¶ 11, n.11. The Debtor/Committee/Lender Plan Proponents do not dispute that the section 546(a) statute of limitations has run, as stated above. See Part IV.2.a. supra. The ability to bring these claims, however, has reverted back to the individual creditors and this is also not in dispute. With respect to assignment, the Debtor/Committee/Lender Plan does not purport to assign any claims to the Creditors' Trust. Rather, it creates a mechanism by which individual creditors may assign their interests into the Creditors' Trust. Any argument with respect to assignment is made based on a misreading of the Debtor/Committee/Lender Plan. Accordingly, any arguments to be made in this regard by Wilmington Trust are without merit.

---

[98] As Wilmington Trust itself recognizes, Section 1.1.172 of the Debtor/Committee/Lender Plan reflects that, among others, Class 1J Creditors' Trust Interest holders who have not opted out are paid their interests in the Net Creditors' Trust Proceeds before Class 1C or Class 1D. See WTC Objection at ¶ 11 (citing Debtor/Committee/Lender Plan § 1.1.72).

4.      **The Parent GUC Trust Preference Does Not Inappropriately Discriminate Against Creditors Who Opted Out of the Creditors' Trust**

The Noteholder Objection also asserts that the Debtor/Committee/Lender Plan's trust structure inappropriately discriminates against creditors who opted out of contributing their State Law Avoidance Claims to the Creditors' Trust, because those creditors may forfeit their recoveries in the Parent GUC Trust Preference to the extent that the Parent GUC Trust Preference is funded with proceeds from the Creditors' Trust. This argument is erroneous for two reasons. First, all creditors holding State Law Avoidance Claims, including the Noteholder Plan Proponents, had the option to participate in the Creditors' Trust or to "opt out" of such participation. See Debtor/Committee/Lender Plan § 14.3.1. It is well established that a plan may treat similarly situated creditors differently so long as those creditors are given the opportunity to receive the same treatment. See 11 U.S.C. § 1123(a)(4); In re Washington Mut., Inc., No. 08-12229, 2011 WL 57111 at *34 (Bankr. D. Del. 2011) ("What is important is that each claimant within a class have the same opportunity to receive equal treatment."); In re Dana Corp., 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."). Accordingly, there is no discrimination for the purposes of section 1123(a)(4). Second, the Noteholder Plan Proponents' argument ignores the fact that while creditors electing to opt out of the Creditors' Trust may not share in the Parent GUC Trust Preference to the extent it is funded from proceeds of the Creditors' Trust, such creditors will be entitled to receive the Parent GUC Trust Preference to the extent funded from the Litigation Trust. Moreover, such opting-out creditors will be entitled to keep *all* recoveries in connection with the State Law Avoidance Claims they independently pursue and will not be required to share them with any other party.

141

As such, rather than discriminating, the Creditors' Trust mechanism provides creditors with options as to their preferred route to a potential recovery.

**5.      The LBO Lenders Are Entitled to Receive Proceeds From the Litigation and Creditors' Trusts [37]**

Sharing by all Holders of Allowed Claims – including the LBO Lenders – in recoveries by the Litigation Trust and Creditors' Trust is entirely appropriate and consistent with basic principles of fraudulent transfer law.  On the basis of their Allowed Claims, the LBO Lenders are in fact entitled to a vast bulk of the Trusts' recoveries.  In order to provide additional settlement value, however, the LBO Lender agreed to a disproportionate split of Trust recoveries in favor of non-LBO creditors, further supporting the reasonableness of the Proposed Settlement.  See In re Telesphere Commc'ns, Inc., 179 B.R. 544, 553, 560 (N.D. Ill. 1994) (one consideration in evaluating reasonableness of a settlement value is fact that the settling defendants would recover a portion of the judgment they would be required to pay if avoidance claims were successful).  The Noteholder Plan Proponents have offered no cogent reason that the LBO Lenders should be barred from recoveries and their objection should accordingly be overruled.

On the basis of several equity-based arguments, the Noteholder Plan Proponents assert that it is inappropriate for the LBO Lenders to share in proceeds recovered by the Trusts at all, and that all such proceeds should be paid to non-LBO creditors, effectively subordinating all LBO Lender claims.  The Noteholder Plan Proponents cannot obtain this extreme remedy, however, based solely on their vague and unsupported assertions.  Absent a showing of inequitable conduct – which the Examiner found no evidence of – claims simply cannot be equitably subordinated to all other creditors or disallowed entirely.  See, e.g., 11 U.S.C. §§ 502

---

[37] While the Creditors' Committee does not dispute the Senior Lenders' rights under the Debtor/Committee/Lender Plan to participate in recoveries from the Litigation and Creditors' Trusts, the Creditors' Committee takes no position on the issues raised in this Part IV.B.5 and does not join in Part IV.B.5.

142

(d), (h) (permitting the transferee of an avoided transfer to retain a claim in certain circumstances); Buffum v. Peter Barceloux Co., 289 U.S. 227, 237 (1933) ("The defendant may participate on the same basis with other creditors in the distribution of the assets.").

The Noteholder Plan Proponents argument is tantamount to arguing that all claims of the LBO Lenders, even though they have not been avoided, should be either equitably subordinated to all creditors or disallowed entirely, all without any showing that the very high standard for equitable subordination has been met.   See In re Best Prods. Co., 168 B.R. 35, 57-59 (Bankr. S.D.N.Y. 1994) ("Invalidation [of a claim] seems particularly draconian in a legitimate LBO because the creditors actually parted with value.") (citation and quotation omitted).  Indeed, all the Noteholder Plan Proponents would require for such a draconian remedy is their own suggestion that the Step Two Loans are vulnerable to avoidance.  In arguing for this preemptive punishment, the Noteholder Plan Proponents essentially assume that the lenders "knowingly and willingly" participated in a fraudulent transfer or were "complicit in tort[i]ous conduct." See, e.g., Noteholder Objection at ¶¶ 351, 353, 363.  This assumption, the LBO Lenders would argue, is unsupported by the record.  The Examiner concluded there was not "sufficient evidence to support a finding that the Lead Banks engaged in the kind of egregious behavior that would justify equitable subordination or equitable disallowance."  Examiner Report, Vol. 2 at p. 336.

Absent actual, successful equitable subordination of all LBO Lender claims to all other creditors or complete disallowance of such claims there is no basis on which to deny the LBO Lenders their pro rata share of Litigation Trust or Creditors' Trust recoveries.  Under the Debtor/Committee/Lender Plan as discussed extensively in Section II above, the LBO Lenders have provided significant value to settle the Allowance of their Claims.  That they agreed to accept less than their pro rata share of Trust recoveries and instead to allow a distribution scheme

143

that is disproportionately favorable to non-LBO creditors underscores the reasonableness of the Proposed Settlement. The Noteholder Plan Proponents have offered no cogent argument that their retention of a small portion of the Trust proceeds is in any way inappropriate.

### C.   The Classification of Claims and Interests in the Debtor/Committee/Lender Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

Four parties -- Wilmington Trust, the Noteholder Plan Proponents, the DOL and Deutsche Bank -- have objected to the classification of certain Claims in the Debtor/Committee/Lender Plan. Each of the objectors argues that the objecting parties' claims are not "substantially similar" to the other claims in their respective classes pursuant to 1122(a). Wilmington Trust's objections, which questioned the classification of Wilmington Trust's indenture trustee fees in connection with its service as PHONES Indenture Trustee will be resolved by amendments to the Debtor/Committee/Lender Plan clarifying that such Claims shall be classified as Class 1F Other Parent Claims. The remaining objections are unfounded and should be overruled.

Section 1122(a) provides that for claims or interests to be classified together they must be "substantially similar," but does not mandate that "substantially similar" claims be classified together. See 11 U.S.C. § 1122(a); see also In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir. 1987) (section 1122 permits the grouping of similar claims in different classes); Coram Healthcare Corp., 315 B.R. at 348 ("[C]laims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes"); In re Drexel Burnham Lambert Group Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (stating that section 1122 prohibits identical classification of dissimilar claims, but does not require grouping of similar claims together). Furthermore, section 1122 provides plan proponents with significant flexibility in classifying claims and interests based on the

144

specific facts of each case.  See Jersey City Med. Ctr., 817 F.2d at 1060-61 ("Congress intended to afford bankruptcy judges broad discretion [under section 1122] to decide the propriety of plans in light of the facts of each case"); Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co.), 800 F.2d 581, 586 (6th Cir. 1986) (noting the "broad discretion" of courts to determine proper classifications).

The Debtor/Committee/Lender Plan's classification scheme complies with section 1122(a) of the Bankruptcy Code because each Class contains only Claims or Interests that are substantially similar to each other and such classification scheme is based on the similar nature of the Claims or Interests contained in each Class.

### 1.    The Classification of the Swap Claim in Class 1F is Appropriate[99]

The Noteholder Plan Proponents argue that the Debtor/Committee/Lender Plan improperly classifies the Swap Claim as an Other Parent Claim rather than a Senior Loan Claim against Tribune.  Specifically, the Noteholder Plan Proponents contend that the Swap Claim is substantially similar to the Senior Loan claims because (a) the April Plan included the Swap Claim in the Senior Loan Claim class; (b) the claims involve the same parties; (c) arose in connection with the LBO transactions; and (d) share the same guarantees. See Noteholder Obj. at ¶ 391.

In fact, however, several substantial differences between the Swap Claim and the Senior Loan Claims mandate the separate classification of the claims.  First, the basic nature of the Swap Claim is not substantially similar to the Senior Loan Claims.  As the Ninth Circuit has recognized, "[a] fundamental characteristic of an interest rate swap is that the counter-parties never actually loan or advance the notional amount.  The swap involves an exchange of periodic

---

[99] The Creditors' Committee takes no position on the issues raised in this Part IV.C.1 and does not join in Part IV.C.1.

payments calculated by reference to interest rates and a hypothetical notional amount." <u>Thrifty Oil Co. v. Bank of America Nat'l Trust and Savings Assoc.</u>, 322 F.3d 1039, 1048 (9th Cir. 2003). The Senior Loan Claims, on the other hand, are for money loaned.

Second, the Swap Claim is governed by a different agreement than the Senior Loan Claims. As the Noteholder Plan Proponents concede in their objection, the Swap Claim arises under the 1992 ISDA Master Agreement and associated confirmations, <u>not</u> the Senior Loan Agreement. <u>See</u> Noteholder Obj. at ¶ 383  The Examiner recognized as much, concluding that "[t]he obligations of Tribune under the Swap Documents do not constitute Credit Agreement Debt." <u>See</u> Examiner Report, Vol. 2, at B-5.

Third, no plausible claim for avoidance of the Swap Claim has been or could be made. By definition, the interest rate swap agreement giving rise to the Swap Claim provided reasonably equivalent value to Tribune at the time it was executed – the value derived from effectively converting a variable rate loan into one with a fixed interest rate. Section 548 of the Bankruptcy Code in fact explicitly provides that "a swap participant . . . that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer." 11 U.S.C. § 548(d)(2)(D); <u>see also</u> <u>Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC)</u>, 556 F.3d 247, 259 (4th Cir. 2009) (noting that section 546(g) exempts transfers made in connection with swap agreements from avoidance under section 548).

The Noteholder Plan Proponents attempt to evade section 546(g) by asserting that the Swap Claim would not be protected under section 546(g) <u>if</u> the Swap Claim were found to have arisen out of an intentionally fraudulent transfer.[100] But there has never been any allegation that the Swap Agreement resulted from intentional fraud, nor do the Noteholder Plan Proponents suggest as much here. Instead, they merely argue that because the Swap Claim arose in

---

[100] Noteholder Obj. at ¶ 213.

146

connection with an agreement executed at the same time as the Transactions, a finding of

intentional fraud for any part of the LBO Transactions deprives the Swap Claim of its section

546(g) defenses. This is untenable – the Swap Claim is governed by a different agreement

among different parties than the Senior Loan Agreement and the other documents governing the

Transactions. There is nothing remotely fraudulent about Tribune's desire to hedge the risk of

the variable interest rates under the Senior Loan Agreement by executing the market-based Swap

Documents.

     In fact, the Examiner concluded that the Swap Claim was not subject to avoidance, and

all of his recovery scenario models provide for allowance of the Swap Claim in full:

> Although the Examiner recognizes that the matter is not free from
> doubt, the Examiner believes that it is reasonably likely a court
> would find that the obligations resulting from termination of the
> Swap Documents are not avoidable in accordance with Bankruptcy
> Code section 560. Thus, the Examiner's financial advisor assumes
> that these claims would remain valid obligations of Tribune and
> the Guarantor Subsidiaries notwithstanding any avoidance of the
> LBO Lender Debt.[101]

     Given that the Swap Claim does not have the same risk of avoidance as the Senior Loan

Claims, it is appropriate for the Swap Claim to be classified with the class of Other Parent

Claims. The fact that the Swap Claim is currently owned by a party that also holds Senior Loan

Claims is irrelevant. Accordingly, the Debtor/Committee/Lender Plan properly classifies the

Swap Claim as an Other Parent Claim.[102]

---

[101] Examiner Report, Vol. 2, at B-6 (emphasis added).

[102] The Noteholder Plan Proponents strangely argue that the classification of the Swap Claim as an Other Parent Claim will permit Oaktree to recover more than payment in full of the Swap Claim. In fact, however, the Debtor/Committee/Lender Plan is crystal clear in providing that no claim may receive more than payment in full of its allowed claim plus postpetition interest where appropriate. See Debtor/Committee/Lender Plan § 3.1.1(a).

2.    **The Classification of the Department of Labor (the "DOL") and ERISA Claims in Classes 1L through 111L is Appropriate**

a.    The DOL's Claims are Properly Subordinated Under Section 510(b) in the Debtor/Committee/Lender Plan [103]

The DOL primarily objects the Debtor/Committee/Lender Plan's subordination under section 510(b) of the Bankruptcy Code of the DOL's alleged unliquidated claims against Tribune and seventy of its Subsidiary Debtors and classification of such claims as subordinated Securities Litigation Claims under the Debtor/Committee/Lender Plan.[104]    The DOL asserts that such subordination is improper because it is "based upon the incorrect assumption that ERISA claims fall within the scope of section 510(b) of the Bankruptcy Code."  DOL Obj. at p. 3.  The DOL's arguments, however, misstate or ignore the relevant case law, and have been routinely rejected in the Third Circuit and elsewhere.  The DOL has failed to make any persuasive argument in support of its objection and its objection should therefore be overruled.

b.    By The DOL's Own Description, Its Claims Arise From The Purchase Or Sale Of A Security Of The Debtor

Section 510(b) requires that a "claim arising from … a purchase or sale of a security of the debtor or of an affiliate of the debtor" be "subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security."  The Third Circuit has held that section 510(b) should be construed "broadly." In re Telegroup, Inc., 281 F.3d 133, 135-36 (3d Cir. 2002); see also In re Enron Corp., 341 B.R. 141, 158 (Bankr. S.D.N.Y. 2006) (acknowledging that "the clear trend in the case law is to interpret section 510(b) broadly").  Under the Third Circuit's analysis, a claim falls under the purview of section 510(b) if it "would

---

[104] The Debtor/Committee/Lender Plan's definition of "Securities Litigation Claims" which includes the DOL Claims provides that the DOL Claims will be subordinated under section 510(b) unless the Bankruptcy Court determines otherwise, in which case, such Claims will receive the treatment determined by the Bankruptcy Court.

not have arisen but for the purchase of [the debtor's] stock." Telegroup, 281 F.3d at 135-36,

143; see also In re Seaquest Diving, L.P., 579 F.3d 411, 425 (5th Cir. 2009) (holding that claim

was properly subordinated under section 510(b) when it "would not exist but for the rescission

of" the debtor's equity).

From the DOL's own description of its claims,[105] it is clear that they meet the Third

Circuit's standard. In describing its various claims against Tribune and its subsidiaries, the DOL

explains that its claims are based on allegations that "[h]ad Tribune complied with its fiduciary

duties, the ESOP *would not have purchased any Tribune stock, much less overpaid for the stock*

in a \$250 million transaction," that "had Tribune complied with its fiduciary obligations,"

Tribune would not have "*purchased all outstanding shares*," and the ESOP "*would have been*

*left with stock in a solvent company*," and that "Tribune and its Subsidiaries knew that the ESOP

*was purchasing non-compliant shares … and, nonetheless, participated in the purchase of the*

*shares.*" See DOL Obj. at p. 15 (emphasis added). Thus, the DOL's claims clearly arise from

"a purchase or sale of a security of the debtor."

        c.    Subordination Of The DOL's Claims Achieves The Objectives
             And Purposes Of Section 510(b)

In an attempt to avoid this conclusion, the DOL argues that subordinating its claims

under section 510(b) would not further Congress's purpose in enacting section 510(b). DOL

---

[105] The DOL provides lengthy descriptions of its claims in its objection, although it states that its "investigation is ongoing." DOL Obj. at pp. 3-16. The relevant question for the confirmation hearing is not whether the DOL's claims have merit, but rather whether the Debtor/Committee/Lender Plan properly subordinates the DOL's claims under section 510(b) which it does only to the extent the Bankruptcy Court does not rule otherwise. Debtors, therefore, do not address the merits of the DOL's claims in this brief. However, two points regarding the DOL's descriptions of its claims must be made. First, the court's decision in Neil v. Zell, which the DOL points to as suggesting that Tribune breached its fiduciary duties or participated in the breach of another's duties, was explicitly limited to exclude any binding effect on the Debtors. 2010 WL 4670895, at *8 (N.D. Ill. Nov. 9, 2010) ("The court's ruling will not bind Tribune in a later case about liability under ERISA or the Tax Code."). Second, the DOL's claims against Tribune arise primarily out of its assertion that Tribune was a fiduciary of the ESOP. See, e.g., DOL Obj. at pp. 5-16. However, in determining that Tribune was not a necessary party to that litigation, the Neil court has already determined that "Tribune is not a fiduciary" of the ESOP. Neil v. Zell, 2010 WL 4670895 at *8.

Obj. at pp. 16-26. The DOL points out that the Third Circuit in <u>Telegroup</u> found the language of section 510(b) to be ambiguous. <u>Id.</u> at pp. 17-23. The DOL asserts that its analysis of the legislative history "revealed" that the purpose of section 510(b) was "to ensure that shareholders with securities law claims would not be treated in the same manner in bankruptcy as general unsecured creditors." <u>Id.</u> at p. 20. The DOL then concludes that because its claims are based on ERISA and not the securities laws, section 510(b) was not intended to encompass its claims. <u>Id.</u> at pp. 17-23. Indeed, the DOL argues that its claims do not "arise from" the sale or purchase of securities because the fiduciary duties imposed by ERISA "exist independently of securities laws and claims." <u>Id.</u> at p. 27.

The DOL ignores, however, that the Third Circuit in <u>Telegroup</u> also reviewed the legislative history of section 510(b) and explicitly concluded that section 510(b) was *not* limited to claims based on the securities laws. <u>Telegroup</u>, 281 F.3d at 140. The Third Circuit also explained that Congress determined that equity holders should not be treated the same as unsecured creditors because equity holders reap the benefits of any success of the company and, therefore, should also bear the risk of any failure of the company. <u>Telegroup</u>, 281 F.3d at 141-42. Thus, when a claimant "retained the right to participate in corporate profits if [the company] succeeded, we believe that § 510(b) prevents them from using their ... claim to recover the value of their equity investment in parity with general unsecured creditors." <u>Id.</u> at 142. The DOL's claims fall squarely within this "risk allocation" rationale. The ESOP participants, on whose behalf the DOL asserts its claims, retained the right to enjoy any corporate profits Tribune might have earned, so section 510(b) prevents them from attempting to recover in parity with

unsecured creditors the value of their equity holding through an ERISA or any other type of claim.[106]

The DOL's assertion that ERISA claims do not qualify for subordination under section 510(b) is unsupported by the case law. The DOL has pointed to no court that has determined that it is not proper to subordinate an ERISA claim. In contrast, courts have consistently acknowledged that claims arising under ERISA may fall under the purview of section 510(b). See, e.g., In re Touch Am. Holdings, Inc., 381 B.R. 95, 106 (Bankr. D. Del. 2008); Brown v. Owens Corning Inv. Review Comm., 541 F. Supp. 2d 958, 969-971 (N.D. Ohio 2008) (amended on other grounds by Brown v. Owens Corning Inv. Review Comm., 2008 WL 5378361 (N.D. Ohio, December 24, 2008)); In re Lenco, Inc., 116 B.R. 141, 144 (E.D. Mo. 1990). Indeed, this Court in Touch America Holdings analyzed the same arguments raised by the DOL here and found that ERISA claims were properly subordinated under section 510(b). The Court rejected in that case the argument that "§ 510(b) does not apply to ERISA Litigation because the claims are based upon the Officers' and Directors' breach of fiduciary duties established by ERISA, and those claims do not arise from the 'purchase or sale' of [the company's] stock." Touch Am. Holdings, 381 B.R. at 101-02. Instead, this Court explained that "the § 510(b) analysis does not hinge on whether the Plaintiffs label themselves as Plan participants or shareholders, but requires consideration of the underlying nature of their claims." Id. at 104. This Court concluded that "[a]lthough the Complaint seeks damages for breach of fiduciary duties, the underlying

---

[106] The DOL points to a second policy rationale in the legislative history of section 510(b) – that potential creditors will often extend credit to a company in reliance on the "equity cushion" created by equity holders' investment. DOL Obj. at p. 23. The DOL then asserts that this rationale is not applicable here. Id. Those courts that have acknowledged both the "risk allocation" and the "equity cushion" rationales, have also explained that subordinating a claim need only meet one of these two rationales to further Congress's intent. See, e.g., In re Geneva Steel Co., 281 F.3d 1173, 1180 n.3 (10th Cir. 2002) ("The equity cushion argument may not apply in all cases."). Even if the DOL is correct, which it is not, that the equity cushion rationale is inapplicable here, the risk allocation rationale is clearly met.

allegations center around the ERISA Defendants' decision to continue the Plan's investment in [the company's] stock." Id. at 106.

The DOL's attempts to distinguish Touch America Holdings are unavailing. The DOL states that the plan at issue in Touch America Holdings "gave participants a measure of control over the decision to invest in employer stock that was not present in this case," although the DOL never explains what the measure of control was or why this is a relevant distinguishable factor. DOL Obj. at p. 23. Indeed, this Court, and other courts, have explained that the fact that an employee has no say in his receipt of company stock does not effect the section 510(b) analysis. See, e.g., id. at 104 ("Moreover, the fact that the ERISA Plaintiffs did not choose the form of their employer's matching contribution ... does not affect the 'purchase or sale' analysis."); Enron, 341 B.R. at 151 ("If these Claimants were required to receive a portion of their compensation as options, that was a condition of employment the Claimants willingly accepted in return for their labor.").

The DOL also attempts to distinguish Touch America Holdings by asserting that in this case, the DOL is bringing the claims and the DOL "clearly is not an equity investor." DOL Obj. at p. 24. However, "[n]othing in § 510(b)'s text requires a subordinated claimant to be a shareholder." In re Betacom of Phoenix, Inc., 240 F.3d 823, 829 (9th Cir. 2001). Indeed, the court in In re Lenco held that the DOL's claims asserted against a debtor under ERISA on behalf of an ESOP were properly subordinated under section 510(b). Lenco, 116 B.R. at 144. Further, the DOL's position ignores the reality that its claims are brought on behalf of the Tribune ESOP and seeks to recover the loss in the value of equity held by the ESOP by the Debtors' alleged

breach of their fiduciary duties.[107]  "Bankruptcy Code § 510(b) is intended to apply to claims of

this nature." Touch Am. Holdings, 381 B.R. at 106 n.13.

          d.    Section 510(b) Applies To the DOL's Alleged Disgorgement Claims

      The DOL also argues that its claims for disgorgement, which amount to only a small part

of the recovery sought by the DOL, do not qualify for subordination under section 510(b)

because "section 510(b) subordinates only claims for 'damages,' for 'rescission,' or 'for

reimbursement or contribution allowed under section 502.'" DOL Obj. at p. 31.  Courts have

recognized, however, that limiting section 510(b) by the remedies selected by a claimant would

allow a claimant to consciously sidestep section 510(b) and frustrate Congress's intent in

enacting that section. See, e.g., In re Stylesite Marketing, Inc., 253 B.R. 503, 510-11 (Bankr.

S.D.N.Y. 2000).  In order to give full effect to the purpose of section 510(b), and in compliance

with the principle that section 510(b) should be interpreted broadly, a claim falls under the

purview of section 510(b) if the claim arises from the purchase or sale of a debtor's security,

regardless of what remedy the claimant is requesting. See, e.g., id. at 511 (subordinating claim

for restitution because "whatever TekInsight chooses to call it, its rights depend on its purchase

of the Stylesite stock, and, therefore, arise from that purchase"); see also Seaquest Diving, 579

F.3d at 425 (rejecting claimant's assertion that section 510(b) did not apply to its claims because

its claim arose from a "redemption" transaction and not rescission and explaining that a court

---

[107] The DOL asserts that section 510(b) should not apply to its claims "arising from the Merger in Step 2, because such claims arose after the purchase of Tribune stock." DOL Obj. at 30.  The DOL ignores that the Third Circuit has explicitly rejected the argument that section 510(b) does not apply to claims that arise after the purchase of stock. Telegroup, 281 F.3d at 142; Seaquest Diving, 579 F.3d at 421 ("[T]he circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract").  Instead of focusing on the timing of when a claim arose, the Third Circuit's analysis focuses on whether a claim would have arisen "but for the purchase" of the stock. Telegroup, 281 F.3d at 135-36, 143.  As explained above, by the DOL's own descriptions, all of its claims, including those involving Step 2 of the leveraged ESOP transaction, arise from the purchase of Tribune stock.

must "examine the totality of the circumstances to determine" whether section 510(b) applies); In re Deep Marine Holdings, Inc., 2011 WL 160595, at *7 (Bankr. S.D. Tex. Jan. 19, 2011) (holding that claims for appraisal and accounting were subject to mandatory subordination). The DOL's claims all arise from the purchase of Tribune stock and are therefore properly subordinated under section 510(b) and properly classified as Securities Litigation Claims.

       e.     The Debtor/Committee/Lender Plan Properly Classifies the DOL's ERISA Claims

As discussed above, the DOL's Claims have a sufficient "nexus or causal relationship" to a security of the Debtor, i.e. the ESOP, to be subject to mandatory subordination under § 510(b). Telegroup, 281 F.3d at 140. Because the ERISA Claims arise from security interests and are subject to mandatory subordination under section 510(b), there are substantially similar to and properly classified with the Securities Litigation Claims. See 11 U.S.C. § 1122(a); John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs., 987 F.2d 154, 158 (3d Cir. N.J. 1993); Coram Healthcare Corp., 315 B.R. at 349. Therefore, the DOL's objection should be overruled.

       3.     **The Classification of the IRS Claims is Appropriate**

The IRS objects to the Debtor/Committee/Lender Plan "to the extent it defines the IRS's claim for tax penalties associated with the Leveraged ESOP Transactions as a Section 510(b) claim, which would be subject to subordination." IRS Obj. at ¶ 1. For all of the reasons set forth above by the Debtor/Committee/Lender Plan Proponents in connection with the classification of DOL's claims, to the extent the IRS asserts a Claim for tax penalties arising from the same alleged violations of ERISA relating to the Leveraged ESOP Transactions, such claims should similarly be subject to subordination. For these reasons, the Debtor/Committee/Lender Plan

154

Proponents believe that the IRS's objection is without merit for the same reasons discussed above with respect to the DOL.

### 4.    The Classification of Senior Notes Indenture Trustee Claims in Class 1E is Appropriate

Deutsche Bank, the successor indenture trustee under the 1992 Indenture, the 1995 Indenture and the 1997 Indenture, joined in the objection of Wilmington Trust (the "Deutsche Bank Joinder") to the extent that Deutsche Bank's fee and expense claims arising under the Senior Notes Indenture (the "DB Fee Claims") are not classified as Class 1F Other Parent Claims but are instead classified as Class 1E Senior Noteholder Claims. Deutsche Bank's arguments in support of its objection, however, ignore the relevant case law and fail to justify re-classifying the DB Fee Claims.

The DB Fee Claims, to the extent Allowed, should be classified as Class 1E Senior Noteholder Claims. The definition of Senior Noteholder Claim under the Debtor/Committee/Lender Plan is straightforward and directly encompasses the DB Fee Claims: "Senior Noteholder Claims means all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement." Debtor/Committee/Lender Plan § 1.1.216. As such, any DB Fee Claims that the Senior Notes Indenture Trustees may have "aris[e] under or [are] evidenced by the Senior Notes Indentures and related documents." In addition, Deutsche Bank, to the extent it has objected or otherwise moved to have its fees Allowed, has cited only to the relevant indentures as the bases for its claims. Deutsche Bank 3018 Motion at ¶¶ 9, 12, 15, 21. As the only basis for the Senior Notes Indenture Trustee Fees, separate from a motion under section 503(b), would be the language of the Senior Notes Indentures, the Senior Notes Indenture Trustee Fees should be classified in Class 1E Senior Noteholder Claims.

155

The definition of Senior Noteholder Claim under the Debtor/Committee/Lender Plan is straightforward; however, Deutsche Bank fails to acknowledge this definition nor discuss the fact that the Senior Notes Indenture Trustee Fees should be classified together with the Senior Noteholder Claims due to their substantial similarity.  See John Hancock Mut. Life Ins. Co., 987 F.2d at 160-62 (finding that substantially similar claims should be classified separately only when they have a "voting interest that is sufficiently distinct and weighty to merit a separate voice"); Coram Healthcare Corp., 315 B.R. at 349.  Instead, Deutsche Bank asserts that it is inappropriate for all claims arising under the Senior Notes Indentures to be classified together. Deutsche Bank, however, fails to make any persuasive argument.  Instead, they point to a single case decided for the proposition that claims for indenture trustee fees may not be classified together with general unsecured claims. This citation is *non sequitur* given that the Deutsche Bank Joinder seeks to classify the Senior Notes Indenture Trustee Fees with general unsecured claims in Class 1F.  In re Gillette Assoc., Ltd., 101 B.R. 866, 873 (Bankr. N.D. Ohio 1989). Deutsche Bank, however, still concludes that classification of all claims arising under the Senior Notes Indentures together is inappropriate.  Deutsche Bank Joinder at 2.

This assertion does not withstand scrutiny.  The professional fee and expense claims of the Senior Notes Indentures were classified as Senior Noteholder Claims under the Debtor/Committee/Lender Plan because all such claims arise under the Senior Note Indentures and, as such, are claims of equal priority against the same Debtor.  Moreover, Deutsche Bank included the DB Fee Claims in their proofs of claim together with all other claims arising under the Senior Notes Indentures, and they cannot now perform an about-face and assert that the claims joined together in their proofs of claim – all arising under the same documents – are so dissimilar that their classification together violates the Bankruptcy Code.  (Claim Nos. 3525-32.)

156

Claims of equal priority against the same debtor, arising under a particular contract or contracts (such as the Senior Notes Indentures), satisfy the "substantially similar" test of Section 1122(a) and should be classified together for voting purposes.

Deutsche Bank also objects that including the DB Fee Claims in Class 1E will impermissibly dilute the recoveries of Holders of Class 1E Claims. The DB Fee Claims, if ultimately allowed in their full claimed amount of $2.9 million, would account, however, for less than 0.23% of the Senior Noteholder Claims.[108] To the extent that the DB Fee Claims have a dilutive effect on the Senior Noteholder Claims, it is a rounding error. Further, any dilution is highly unlikely to "diminish the expected recovery of Class 1E claimants to less than 35.18%," because the Debtor/Committee/Lender Plan provides for Class 1E claimants to receive additional distributions from (i) the Remaining Bridge Loan Reserve, (ii) the Litigation Trust, and (iii) the Creditors' Trust. Deutsche Bank Joinder at p. 2; Debtor/Committee/Lender Plan § 3.5.2. The Noteholder Plan Proponents (including Deutsche Bank) have made it clear that they believe that recoveries from the Litigation Trust and Creditors' Trust will likely provide significant additional value to claims in Class 1E. See, e.g., Noteholder Obj. at ¶ 3. The objections to confirmation of the Debtor/Committee/Lender Plan raised in the Deutsche Bank Joinder are wholly without merit and should be overruled.

Because each Class consists of only similar Claims or Interests, the Bankruptcy Court should approve the classification scheme set forth in the Debtor/Committee/Lender Plan as consistent with section 1122(a) of the Bankruptcy Code.

---

[108] Deutsche Bank has asserted Expense Claims totaling approximately $2.9 million. See Deutsche Bank 3018 Motion at p. 6. Under the Debtor/Committee/Lender Plan, Class 1E Claims will be allowed in the total aggregate amount of $1,283,055,743.77. Debtor/Committee/Lender Plan § 3.2.5.

### D.    The Debtor/Committee/Lender Plan is Feasible

The Noteholder Plan Proponents have objected to the Debtor/Committee/Lender Plan on

the basis that it allegedly does not satisfy the feasibility requirement of section 1129(a)(11) of the

Bankruptcy Code.  The Noteholder Plan Proponents have focused their feasibility arguments on

an assortment of purported "issues" regarding the ability of the Debtors to obtain certain

approvals from the Federal Communications Commission ("FCC") under the

Debtor/Committee/Lender Plan — a condition precedent to plan effectiveness.

Debtor/Committee/Lender Plan § 10.1.1(i).  These arguments, however, are a meritless attempt

to mire this Court in matters that lie within the FCC's exclusive jurisdiction.  In particular, the

Noteholder Plan Proponents argue that the Debtor/Committee/Lender Plan is not feasible

because  it will be subject to the further consent of the FCC, which they argue may not be

obtained due to alleged violations of the FCC's ownership rules.  These arguments are specious,

and the Noteholder Plan Proponents' objection should be overruled.

The FCC is presently considering applications[109] seeking approval of a post-emergence

ownership structure for Tribune; however, as a policy matter, the FCC will not act upon the

Applications until this Court has issued its confirmation order.  See Rosenstein Report at p. 27.

The proposed post-emergence ownership structure disclosed in the Applications includes as

"attributable" parties (a concept defined by the FCC's rules) JPMorgan, Angelo Gordon and

Oaktree—the three parties against which the Noteholder Plan Proponents mount their FCC

attacks.  Pre-judgment of the outcome of the FCC's evaluation of the Applications is neither

appropriate nor necessary to the evaluation of the feasibility of the Debtor/Committee/Lender

---

[109] See FCC File Nos. BALCDT-20100428ADP, et al. (filed Apr. 28, 2010, as amended June 10, 2020, June 25, 2010, Aug. 25, 2010, and Aug. 30, 2010) (the "Applications").  A copy of a representative sample of the relevant portions of one of the Applications, as amended, is appended as Exhibit 4 to the Report of Mace J. Rosenstein (Feb. 25, 2011) ("Rosenstein Report").

Plan. Indeed, as the Debtors' expert, Mace Rosenstein, concludes, the various media interests held by JPMorgan, Angelo Gordon and Oaktree present no impediment to the FCC's assessment and approval of the Applications. The arguments to the contrary by Aurelius's expert, Mark Prak, are based on factual inaccuracies, faulty assumptions and misinterpretations of FCC rules and decisions. The media interests of JPMorgan, Angelo Gordon and Oaktree either are not "attributable" interests under FCC rules and policies, or alternatively, have been addressed in the Applications and would not result in impermissible media combinations under FCC multiple or cross ownership rules.

Critically, *even if the FCC were to conclude otherwise* as to any of these interests, the Debtor/Committee/Lender Plan includes, as to each of the interests that the Noteholder Plan Proponents question, mechanisms to address and cure any conceivable FCC-related issue that might arise. This indisputable fact conclusively establishes the feasibility of the Debtor/Committee/Lender Plan from an FCC perspective.[110]

## 1. The Purported FCC Issues Identified by the Noteholder Plan Proponents Relate to Matters Within the FCC's Exclusive Jurisdiction and at the Core of Its Regulatory Expertise

The Communications Act tasks the FCC alone with evaluating transfers and assignments of broadcast station licenses, such as those held by Tribune, to determine whether "the public interest, convenience, and necessity will be served" by approval of the transactions. 47 U.S.C. §

---

[110] Given the presence of such mechanisms in the Debtor/Committee/Lender Plan, the Noteholder Plan Proponents cannot reasonably argue that there is not a "reasonable prospect" of successfully obtaining the required regulatory approvals from the FCC which is all that is required. See, e.g., In re TCI 2 Holdings, LLC, 428 B.R. 117, 154-55 (Bankr. D.N.J. 2010) (explaining that plan proponents must show there are no "material hurdles to achieve the necessary regulatory approvals," and confirming plan where there was a "reasonable prospect of success . . . to obtain regulatory approval"); see also, e.g., In re Reading Broadcasting, Inc., 386 B.R. 562, 573-74 (Bankr. E.D. Pa. 2008) (plan was feasible even though FCC approval had not yet been granted, and there was "no guarantee" the buyer would be able to complete the purchase, because section 1129(a)(11) "did not impose such a high standard" so as to require a guarantee of success); In re Temple Zion, 125 B.R. 910, 916 (Bankr. E.D. Pa. 1991) (plan was feasible even though there was "no guarantee" that certain required variances would be obtained in a timely fashion because it "is impossible for anyone to know what and when the numerous regulatory agencies will take action").

310(d); see id. § 402(b) (providing for exclusive D.C. Circuit jurisdiction to review FCC

decisions on such transfers and assignments).  In furtherance of its statutory duties, the FCC has

adopted detailed rules setting forth the types of interests—so-called "attributable" interests—

which afford a substantial enough degree of control to be considered relevant to its evaluation of

a proposed transaction.  See 47 C.F.R. § 73.3555, Note 2; see also Rosenstein Report at p. 5.

The FCC adopted these "bright line" attribution rules to provide clarity and predictability in

planning transactions and to avoid the confusion and uncertainty that would arise from general

and speculative allegations, such as those that the Noteholder Plan Proponents and Mr. Prak

attempt to raise before this Court.  See generally Rosenstein Report at pp. 4-7.

     As noted above, the FCC already is considering the Applications, which were submitted

by Tribune almost a year ago on April 28, 2010.  Those applications include all of the

information regarding JPMorgan, Angelo Gordon and Oaktree that is required by and relevant to

the FCC, including all of their *attributable* interests in media companies other than Tribune.  See

id. at pp. 4, 12-13.[111]  The Noteholder Plan Proponents suggest that some information submitted

to the FCC to date about these parties is inaccurate or insufficient, see, e.g., Noteholder FCC

Obj. at ¶¶ 7, 10 n.4, 12, but such contentions are simply a disingenuous attempt to muddy the

critical distinction between attributable and non-attributable interests, see Rosenstein Report at

pp. 3-4, 15-24.  Indeed, perhaps recognizing that the FCC would not find their arguments the

least bit persuasive, the Noteholder Plan Proponents have not brought these issues to the FCC's

---

[111] In addition, JPMorgan, Angelo Gordon, and Oaktree have completed Media Ownership Certifications—as provided for in Section 5.4.2(b) of both the Debtor/Committee/Lender Plan and the Noteholder Plan—which set forth information relevant to FCC issues.  By contrast, none of the Noteholder Plan Proponents have done so, even though certain of them will hold attributable interests under their own plan by virtue of the board designation rights that they will hold thereunder.  See Noteholder Plan §§ 5.3.2, 7.16.4; Rosenstein Report at pp. 28-30.

attention to date, despite having had every opportunity to do so.[112]  In fact, one Noteholder Plan

Proponent, Wilmington Trust Company, has appeared repeatedly in the FCC proceeding, but has

not raised any issue with respect to any other media interest of JPMorgan, Angelo Gordon, or

Oaktree.

At its core, the Noteholder Plan Proponents' position boils down to a request that this

Court assume—based on sheer speculation—that the FCC ultimately will accept arguments

(which have not even been presented to it) about media interests that are not relevant under the

FCC's bright-line attribution rules, and therefore are not required to be reported on the FCC

application form.  See id. at 6.  The resolution of these issues, however—including whether the

FCC will act favorably on the waivers that Tribune has requested—is plainly a matter for the

FCC to decide.  This Court need not, and should not, attempt to pre-judge the outcome of the

Applications.  It is enough that the Debtor/Committee/Lender Plan contains mechanisms to

address any potential FCC compliance issue that might arise—which it does—and is reasonably

likely to achieve FCC approval—which it is.  See generally Rosenstein Report at pp. 13-24.

>   **2.    The Purported FCC Issues Identified by the Noteholder Plan
>   Proponents Have No Basis in FCC Rules or Case Law and Are Not
>   Impediments to FCC Approval**

Even if this Court felt compelled to delve more deeply into the matters presently before

the FCC, the Noteholder Plan Proponents' arguments fail for at least three fundamental reasons.

First, the Debtor/Committee/Lender Plan contains provisions specifically designed to convert

any interest deemed by the FCC to be a problematic attributable interest into a non-attributable

interest, thereby ensuring FCC approval.  Second, as more fully set forth in the Rosenstein

Report, the media holdings of JPMorgan, Angelo Gordon, and Oaktree do not include

---

[112] The FCC process permits the filing of Petitions to Deny within a 30-day window following "public notice" of an application, a period which has passed as to the April 2010 applications filed by Tribune, see 47 U.S.C. §§ 309(b), (d), as well as informal objections, see 47 C.F.R. § 73.3587, and ex parte presentations, see id. § 1.1206.

attributable interests that will run afoul of FCC rules in any event. Third, there is no precedent for the suggestion that JPMorgan, Angelo Gordon, and Oaktree's *non-attributable* interests will prevent or unduly delay FCC approval; indeed, that argument is *contrary* to FCC precedent, and even if correct, would apply to the Noteholder Plan as well.

> a.  The Debtor/Committee/Lender Plan Includes Mechanisms to
>     Address Any Conceivable FCC Issues That Might Arise

To deal with the possibility that a Claim Holder might have other media interests that would violate FCC rules if held in combination with an attributable interest in Tribune, the Debtor/Committee/Lender Plan provides that stock holdings and/or other rights of any such Claim Holder (including the Lender co-proponents) may be restructured to ensure compliance with FCC rules. That alone vitiates the Noteholder Plan Proponents' arguments that the Debtor/Committee/Lender Plan is not "feasible" because of FCC issues.

Because any entity holding 5% or more of the Class A Voting Stock generally will be considered to hold an attributable interest in Tribune, the Debtor/Committee/Lender Plan allows the Debtors to issue a sufficient amount of Class B Stock (which has been designed to be non-attributable under FCC rules) to any Claim Holder otherwise eligible to receive 5% or more of the equity of Tribune if the "[h]older has other media interests that could impair the ability of Reorganized Tribune to comply with the Communication Act or the FCC's rules." Debtor/Committee/Lender Plan § 5.4.2(d). This is the same procedure incorporated into the Noteholder Plan to deal with this possibility.[113] By allowing Tribune to issue Class B stock, the Debtor/Committee/Lender Plan ensures that the interest of such a Claim Holder will be deemed non-attributable for purposes of the FCC's rules. See Rosenstein Report at p. 13.

---

[113] Noteholder Plan § 5.4.2(d). Indeed, the Noteholder Plan Proponents claim that they will utilize this mechanism to deal with the regulatory problems they believe would arise from the equity holdings that each of the Lender co-proponents would be eligible to receive under the Noteholder Plan. Noteholder FCC Obj. at ¶ 7 n.5.

Under the Debtor/Committee/Lender Plan, the Lender co-proponents also hold rights to designate members to the board of directors of Reorganized Tribune. <u>See</u> Debtor/Committee/Lender Plan § 5.3.2. Because these rights, standing alone, could separately constitute an attributable interest under the FCC's rules, <u>see</u> <u>Telemundo Communications Group, Inc.</u>, 17 FCC Rcd 6958, 6972-73 ¶ 39 (2002), the Debtor/Committee/Lender Plan provides for the surrender of board designation rights or restructuring of any other potentially conflicting attributable interests in the unlikely event of a significant FCC hurdle. <u>See</u> Debtor/Committee/Lender Plan § 5.3.2. The Noteholder Plan Proponents complain that the affected co-proponent has a role in determining whether the rights shall be relinquished. <u>See</u> Noteholder FCC Obj. at ¶ 8. The Debtor/Committee/Lender Plan, however, provides that board rights may be lost if "a Creditor Proponent and the Debtors reasonably determine, based upon comments received from the FCC, that the required approval of the FCC will not be obtained due to the designation rights afforded to such Creditor Proponent." Debtor/Committee/Lender Plan § 5.3.2. It clearly would be unreasonable for a proponent to insist on retaining its rights if it were faced with an otherwise insurmountable objection from the FCC. In addition, the Debtor/Committee/Lender Plan provides that all parties entitled to receive New Common Stock "shall use their best efforts to cooperate in diligently pursuing and in taking all reasonable steps necessary to obtain the requisite FCC Approvals," further obligating JPMorgan, Angelo Gordon and Oaktree to take actions in furtherance of FCC approval. Debtor/Committee/Lender Plan § 5.17. In sum, the Debtor/Committee/Lender Plan resolves any possible issue relating to board designation rights, in the unlikely event the FCC finds that any such problem exists. <u>See</u> Rosenstein Report at pp. 13-14.