## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al., | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |
| | **Related to Docket Nos. 8099, 8100 and 8166** |

## DEBTOR/COMMITTEE/LENDER PLAN PROPONENTS' OBJECTION TO THE NOTEHOLDER PLAN PROPONENTS' MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF BERNARD BLACK

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

ARGUMENT.......................................................................................................................7

  I.  PROFESSOR BLACK'S TESTIMONY WILL ASSIST THE COURT TO
     RESOLVE A CRITICAL QUESTION OF FACT – WHETHER THE
     DEBTOR/COMMITTEE/LENDER PLAN IS REASONABLE. ..........................7

  II.  PROFESSOR BLACK IS QUALIFIED................................................................14

CONCLUSION...................................................................................................................17

46429/0001-7407402v1

The Debtor/Committee/Lender ("DCL") Plan Proponents,[1] by and through their undersigned counsel, respectfully submit this objection to the Noteholder Plan Proponents' ("Noteholders") Motion *in Limine* to Exclude the Expert Testimony of Bernard Black ("Motion"), filed February 22, 2011, Docket No. 8099. Contrary to Noteholders' claim, Professor Black is *not* offering a "wide-ranging attack of [*sic*] the conclusions" reached by the Examiner, Kenneth Klee. Motion at 1. Rather, he presents a comprehensive analysis of the LBO-Related Claims intended to demonstrate the reasonableness of the settlement of those claims embedded in the DCL Plan of Reorganization ("DCL Plan").

## INTRODUCTION

On March 7, 2011, this Court will hold a hearing to determine whether to confirm the DCL Plan. Because the DCL Plan releases a number of the estate's potential claims, this Court must determine whether it strikes a reasonable balance between "the value of the claim[s] that [are] being compromised" on the one hand and "the value to the estate of accept[ing] [] the compromise" on the other. *Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 96 (D. Del. 2006) (citing Fed. R. Bankr. 9019(a)). The balance need not be perfect—to be acceptable, the DCL Plan must simply be above "the lowest point in the range of reasonableness." *In re Wash. Mut., Inc.*, No. 08-12229, 2011 Bankr. LEXIS 56, at *21 (Bankr. D. Del. Jan. 7, 2011). Whether the DCL Plan falls outside the range of reasonableness turns on four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity, expense, and delay of the litigation involved; and

---

[1] The DCL Plan Proponents are the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), J.P. Morgan Chase Bank, N.A. ("JPMorgan"), Oaktree Capital Management, LP ("Oaktree"), and Angelo, Gordon & Co., L.P. ("Angelo Gordon" and, together with JPMorgan and Oaktree, the "Lenders").

46429/0001-7407402v1

(4) the paramount interest of the creditors." *Id.* at \*23 (citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).

These issues (value of claims, value to the estate, probability of success, etc.) are all questions of *fact* that must be answered by this Court. *See In re Rfe Indus.*, 283 F.3d 159, 165 (3d Cir. 2002) (reversing because the bankruptcy court "did not make any findings of fact on these four issues"); *Travelers Cas. & Sur. Co. v. Future Claimants Representative*, No. 07-2785, 2008 U.S. Dist. LEXIS 23496, at \*25 (D.N.J. Mar. 25, 2008) (the bankruptcy court "has the duty to make findings of fact on all four *Martin* factors"). They are also complex. For example, the first *Martin* factor requires the Court to make dozens of probabilistic assessments regarding how numerous factual and legal disputes might be resolved in future litigation.[2]

Given the nature of the issues before the Court, the DCL Plan Proponents will offer expert testimony from Professor Bernard S. Black, a leading academic with over 22 years of experience teaching classes on corporate law, finance, acquisitions, and economics at the law and business schools of Columbia, Stanford, Texas and Northwestern. Professor Black will opine that the settlement proposed by the DCL Plan falls within the range of reasonableness. *See* Berry Aff., dated Feb. 22, 2011, Docket No. 8100, Ex. A ("Black Report") at 18. In addition, Professor Black will explain, in detail, the areas where he concurs with the Examiner's factual assessments, the areas where he differs, and how those limited differences affect an assessment

---

[2] An assessment of the probability of success in litigation also turns, of course, on a predictive assessment of how the underlying legal standards would be applied if the compromised claims were actually litigated. But the ultimate judgment regarding the probability of success remains a factual one, or at most a mixed judgment of law and fact, as to which expert testimony is permissible. *See Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993) ("Experts may testify on questions of fact as well as mixed questions of fact and law. This sort of testimony is not objectionable merely 'because it embraces an ultimate issue to be decided by the trier of fact.'" (quoting Fed. R. Evid. 704); *accord Standard Oil Co. v. Montedison, S.p.A.*, 664 F.2d 356, 362 (3d Cir. 1981) (the resolution of the adequacy of patent application disclosures is "a mixed question of law and fact" that is often "based on an evaluation of expert testimony").

of expected litigation recoveries. He will also opine that both his assessment and the Examiner's assessment fall within a range of reasonable settlement outcomes, as does the DCL Plan.

Professor Black's opinion, which is discussed in more detail below, is the product of a detailed assessment of the likelihood of different outcomes if the compromised claims were litigated to conclusion. *See generally id.* Expert testimony of the kind offered by Professor Black goes directly to the factual issues to be resolved at the upcoming hearing and, as Judge Walrath recently indicated, is expected practice at a Rule 9019 hearing. *See In re Wash. Mut.*, 2011 Bankr. LEXIS 56, at *27 (noting that it is "helpful" for "the Plan Supporters [to] present the testimony of a legal expert on the strengths and weaknesses" of the claims being settled).

As the Court will see from reading Professor Black's expert and rebuttal reports, the opinions that he reaches as a result of his comprehensive analysis are devastating to the Noteholders' attempt to misread the Examiner's Report, as supporting their position, when in fact it supports the reasonableness of the DCL Plan. As such, it is not surprising that they seek to deny the Court from hearing those opinions at all, even though Professor Black's testimony bears directly on the *Martin* factors that this Court must consider.

The Noteholders have moved *in limine* to strike the entirety of Professor Black's report based on two critiques that do not challenge the substance of anything contained in Professor Black's report. Neither has any merit. *First*, the Noteholders claim that six opinions contained in Professor Black's 172 page report are inadmissible legal opinions. Motion at 3-7. *Second*, the Noteholders cherry-pick six words from Professor Black's report to assert that he is insufficiently qualified. *Id.* at 8-9. As will be shown below, the Noteholders' first argument is premised on a mischaracterization of Professor Black's work. The Noteholders' second argument is simply frivolous.

## BACKGROUND

On April 20, 2010, the Court entered an order directing the United States Trustee to

appoint an Examiner. The Trustee appointed Kenneth N. Klee, Esq., and that appointment was

confirmed on May 11, 2010. The Examiner's 1200 page report was filed on July 26, 2010.

[Docket Nos. 5130-34.] The bulk of the report is devoted to an evaluation of "the potential

claims and causes of action held by the Debtors' estate." Examiner Report, Vol. 1, at 2. That

evaluation, in turn, consists of the Examiner's opinions regarding the likelihood of various

litigation outcomes, which are presented along a seven-point scale ranging from "highly likely"

to "highly unlikely." *Id.* at 5. For instance, the Examiner opines "that a court is reasonably

likely to conclude that the Step One Transactions did not constitute an intentional fraudulent

transfer" because he "did not find credible evidence" of fraudulent intent. *Id.* at 7. Similarly, the

Examiner opines that it is "highly likely that a court would collapse all of the transactions *within*

each of Step One and Step Two" but that "a court is somewhat unlikely to collapse Step One and

Step Two together." *Id.* at 16 (emphasis in the original). These and related "likelihood"

opinions span more than 460 pages of the first two volumes of the Examiner's report.

All parties agree that the Examiner's opinions are relevant to the upcoming hearing. In

order to forestall disputes about the use of the Examiner's opinions at the hearing, the parties

entered into a stipulation, which was approved by court order dated February 4, 2011

(the "Stipulation"). [Docket No. 7790] It provides that:

> The opinions expressed by the Examiner (the "Examiner's Opinions") regarding
> the law and/or the facts will be admissible by any entity in connection with the
> Confirmation Hearing for all purposes to the same extent as the opinions testified
> to by an expert witness under the Federal Rules. The Examiner's Opinions will
> not be binding on the Court or any entity, nor will there be any presumption of
> correctness attributed to such opinions. The Court may accord the Examiner's
> Opinions whatever weight the Court deems is appropriate. All entities will have
> an opportunity to state and describe their agreement or disagreement with any of
> the Examiner's Opinions in their confirmation briefs in connection with the

4

Confirmation Hearing, and to submit appropriate evidence and/or expert testimony in support of their positions during the Confirmation Hearing.

Stipulation ¶ 1. Pursuant to the Stipulation, the parties agreed that the Examiner's opinions are *only* admissible "to the same extent as the opinions testified to by an expert witness under the Federal Rules."[3] *Id.* The parties further agreed that the Examiner's opinions are *not* binding and are in no way presumed correct. *Id.* Finally, the parties stipulated that they were free to agree or disagree with the Examiner's opinions and to submit expert testimony in support of their respective positions. *Id.*

Professor Black's report follows directly from the Stipulation. In important respects, Professor Black's analysis covers similar ground to that covered by the Examiner. For instance, just as the Examiner did, Professor Black assesses the likely resolution of the key issues to be litigated if the compromised claims are pursued (e.g., step integration, solvency, etc.). Like the Examiner, Professor Black assesses likelihood on a seven-point scale. Black Report at 12-13. In some cases, Professor Black reaches likelihood conclusions that are similar to those advanced by the Examiner, but in other cases their opinions differ. *See, e.g., id.* at 25 (noting a disagreement regarding cash flow solvency).[4] Professor Black further assigns numerical probabilities to his (and the Examiner's) qualitative assessments of likelihood. *See id.* at 12-13. The Examiner did not do so. Including numerical probabilities allows Professor Black to value the expected

---

[3] Thus, the Noteholders' assertion that "the Examiner Report is fully admissible," Motion at 1, is, at best, an overstatement.

[4] While the Noteholders' Motion is silent on this point, their own experts disagree in important respects with the Examiner – indeed the Noteholders' experts disagree far more sharply than Professor Black does. Dr. Beron, for example, at times replaces the Examiner's potential outcomes with others of his own (or the Noteholders') invention, which are not even explained in his Report. *See, e.g.,* Supplemental Berry Aff., dated Feb. 25, 2011, Docket No. 8166, Ex. B ("Rebuttal Black Report"), at 25-29, 37. Similarly, Mr. Tuliano concludes that Tribune was both balance sheet insolvent and cash flow insolvent at Step 1, contrary to the Examiner's assessment. *Id.* at 64-67. Mr. Tuliano further assumes that the two steps should be integrated, which is again at odds with the Examiner's conclusion. *Id.* at 39-46. Finally, Mr. Tuliano values the PHONES, when assessing balance sheet solvency, at their nominal value of $1,256M, far more than the value assigned by the Examiner. *Id.* at 61-62. As such, the Noteholders' expert reports suffer from many of the same alleged infirmities the Noteholders attribute to Professor Black's report.

recovery if the claims at issue are litigated to conclusion (and to do so under a number of different sets of assumptions, including the findings of the Examiner) and compare that value to the expected recovery under the DCL Plan. *See id.* at 30, Table 5. Because the DCL Plan value compares favorably to the potential litigation alternatives, including under the findings of the Examiner, Professor Black opines that the DCL Plan is a reasonable compromise of the settled claims. *See id.* at 32, 170-72.

Professor Black also addresses important issues that the Examiner did not address, that are central to an assessment of the expected outcomes of litigation, and thus are likely to assist the Court is reaching its own conclusions. Such issues include, among others:

- The likelihood that if the Step 1 bank loans are allowed, but the Step 2 loans are disallowed, the banks will be able to collect interest on their claims, under one of several possible approaches, *id.* at 83-85;

- The overall likelihood that Tribune, its subsidiaries, or both, will be solvent (balance sheet solvent *and* cash flow solvent *and* not having unreasonably small capital), at Step 1 and Step 2, with and without formal integration of both steps, informal integration, or no step integration, *id.* at 102, 119-21, 126, 139-41;

- Likely litigation trust recoveries, including recoveries for which his expertise in corporate law and corporate governance is directly relevant, *id.* at 159-65;

- How expected litigation recoveries would vary under different possible levels of Tribune's enterprise value, and thus the reasonableness of the DCL Plan at those different values, *id.* at 165-66;

- Extensive robustness testing intended to assess how expected recoveries would change if the Court were to estimate outcomes in a variety of ways, which could differ from Professor Black's views, the Examiner's views, or both, *id.* at 30-31;

- An "operationalization" of the Examiner's qualitative likelihood assessments by assigning estimated numerical probabilities to them, and using those numerical probabilities to assess the reasonableness of the DCL Plan, *id.* at 12-14;[5]

- How the Examiner's assessments should change if clear factual errors by the Examiner were corrected, such as the Examiner's mistaken belief that the Cubs were owned by a non-guarantor subsidiary, and the Examiner's misunderstanding of Tribune's ability to dispose of assets for a higher price than a C-corporation could, in a transaction with an ordinary C-corporation, *id.* at 96, 57-59; and

- Why it is appropriate to value the PHONES, in a balance sheet solvency analysis, at their debt value rather than their face value, *id.* at 81-83.

As the DCL Plan Proponents will now show, the Noteholders' attempts to preclude Professor Black from providing testimony on these issues are wholly without merit.

## ARGUMENT

I.    **PROFESSOR BLACK'S TESTIMONY WILL ASSIST THE COURT TO RESOLVE A CRITICAL QUESTION OF FACT – WHETHER THE DEBTOR/COMMITTEE/LENDER PLAN IS REASONABLE.**

As an initial matter, the Noteholders' Motion is, at best, premature. The Noteholders have asked the Court to strike Professor Black's report and exclude his testimony in advance of a hearing where this Court will sit as the trier of fact. Such a motion is wholly unnecessary. When

---

[5] Dr. Beron provides a similar, but much less defensible, "operationalization" of the Examiner's qualitative assessments. *See* Beron Report at 3. As Professor Black will explain at the hearing, however, many aspects of Dr. Beron's work are misleading. *See generally* Rebuttal Black Report at 35-38.

the court sits as the factfinder, the preferable approach is for the court "to hear the evidence and make its reliability determination during, rather than in advance of, trial." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("the bankruptcy court is quite capable of separating out what the witness is an expert in and what he is not"); *Alco Indus. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 405 (E.D. Pa. 2007) ("In the context of preparing for a bench trial, it is not necessary to apply the *Daubert* standard with full force in advance of trial."); *Premium Motor Cars, Inc. v. Theisen (In re Premium Motor Cars, Inc.)*, No. 07-24294, 2010 Bankr. LEXIS 4011, at *2-3 (Bankr. W.D. Pa. July 23, 2010) ("since this will be a bench trial, [the court] may hear the evidence . . . determine its admissibility, and if admitted, give it the weight it deserves. . . . Both sides will have an opportunity at trial to challenge the opposition's expert testimony evidence, but the Court will not exclude such testimony preemptively.").[6]

        In any event, the Noteholders fail to provide any reason to strike Professor Black's anticipated testimony. The Noteholders assert that some of Professor Black's opinions are "strictly conclusions of law" and argue that they must therefore be stricken because experts may not render legal opinions. Motion at 3, 5. They identify three categories of statements found in Professor Black's report. In particular, they challenge:

- Professor Black's opinion that the DCL Plan is a reasonable settlement, *see* Motion at 3 (first bullet);

- Professor Black's opinions regarding complexity and delay (*i.e.*, the second *Martin* factor), *see id.* at 3 (second bullet); and

---

[6] Indeed, one of the cases cited by the Noteholders indicates that the substantive "ban" on legal opinions is also relaxed during a bench trial, at least where the court must evaluate mixed questions of law and fact. In such cases "the utility of the expert testimony is untarnished by the downside risk that the fact finder will confuse the roles of witness and judge." *See Pfizer Inc. v. Teva Pharm. USA, Inc.*, No. 07-754, 2006 U.S. Dist. LEXIS 77966, at *5-6 n.1 (D.N.J. Oct. 26, 2006) (quoting *Mars, Inc. v. Coin Acceptors, Inc.*, No. 90-49, 1996 U.S. Dist. LEXIS 21514, at *3-4, No. 90-49 (D.N.J. July 2, 1996)); *see also Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F. Supp. 2d 271, 278-79 (D.N.J. 2006) (allowing a lawyer to provide expert testimony regarding "to what extent [a party's actions] have complied with the FDA's statutory and regulatory requirements").

- Professor Black's opinions regarding the probability that various claims and defenses will succeed and/or the likelihood of various litigation outcomes (*i.e.*, the first *Martin* factor), *see id.* at 3 (third through fifth bullets); *id.* at 3-4 (challenging opinions about the likelihood and plausibility of constructive fraud claims, avoidance claims, disgorgement claims, and various defenses); *id.* at 4 (challenging opinions about "the likelihood of six litigation outcomes").

All of the Noteholders' challenges fail at their premise—the opinions in question are conclusions on issues of fact, not law.

It is well established that reasonableness is a factual issue. *See, e.g., Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 n.4 (3d Cir. 2009). Indeed, expert testimony regarding the reasonableness of settlements is routine. *See, e.g., In re Pet Food Prods. Liab. Litig.*, 2010 U.S. App. LEXIS 25628, at *64 (3d Cir. 2010) (describing the use of expert testimony to establish the reasonableness of a settlement under Federal Rule of Civil Procedure 23(e)); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (range of reasonableness for a challenged settlement properly defined by expert testimony); *cf. In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (Bankr. D. Del. 2004) (approving a settlement under Rule 9019 and criticizing the settlement objectors for failing to provide expert testimony on the issue of reasonableness).

Just as reasonableness is a factual issue, so too are the *Martin* factors by which it is measured. *See Rfe Indus.*, 283 F.3d at 165; *see also Travelers Cas. & Sur. Co.*, 2008 U.S. Dist. LEXIS 23496, at *25. Expert testimony with respect to those factors is also routine. *See In re Wash. Mut.*, 2011 Bankr. LEXIS 56, at *27 (it is generally "helpful" for "the Plan Supporters [to] present the testimony of a legal expert on the strengths and weaknesses" of the claims being settled); *In re Capmark Fin. Group Inc.*, 438 B.R. 471, 494, 515-16 (Bankr. D. Del. 2010) (determining that a hypothetical action to avoid the liens and guarantees established by a 2009 secured transaction was "unlikely to succeed" based on "the evidence adduced at the [confirmation hearing]," including testimony from numerous experts); *In re Spansion, Inc.*, No.

9

09-10690, 2009 Bankr. LEXIS 1283, at *19-21, *22-23 (Bankr. D. Del. June 2, 2009) (relying on an expert's assessment of possible patent claims, and specifically the expert's determination that the possibility of counterclaims was "marginal") to conclude that a settlement should not be approved); *In re First City Bancorporation*, No. 392-39474, 1995 Bankr. LEXIS 1683, at *30-38 (Bankr. N.D. Tex. May 11, 1995) (relying primarily on expert testimony, including estimates of expected litigation recoveries and probabilistic assessments regarding how the disputed issues were likely to be resolved in litigation, to find a low probability of success).

None of the cases cited by the Noteholders calls this practice into question. In the *Berckeley Investor Group, Limited v. Colkitt* case, the Third Circuit reversed the admission of expert testimony in a securities case "as to whether [the defendant] complied with the legal duties that arose under the federal securities laws." 455 F.3d 195, 218 (3d Cir. 2006). Similarly, in *McCrink v. Peoples Benefit Life Ins. Co.*, the district court excluded opinion testimony in an insurance dispute that a policy exclusion was ambiguous and that the insurer had not "met its legal burden of proof" with respect to the exclusion. No. 04-1068, 2005 U.S. Dist. LEXIS 5072, at *10-12 (E.D. Pa. Mar. 29, 2005). In *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Plan & Trust Agreement*, the district court excluded expert testimony in an ERISA dispute regarding "whether [a] practice violates ERISA § 410," which the court held to be "a legal issue for the court." 812 F. Supp. 1376, 1378 (E.D. Pa. 1992).

Such cases stand only for the principal that the court, and not an expert, is responsible for instructing the factfinder on the law. More specifically, *Berckeley*, *McCrink*, and *Haberern* teach that if the estate's claims were *actually litigated*, expert testimony regarding central issues of law at issue in those cases would not be admissible *in those cases*. But they provide no support for the proposition that experts may not offer assessments to assist the court in making

the factual findings mandated by the *Martin* factors, including the "probability of success" in litigation; to the contrary, as noted above, such testimony is commonplace in this context.[7]

This point is illustrated by a summary of Professor Black's methodology. He began by grouping the universe of possible litigation outcomes into six distinct "scenarios." *Id.* at 20-22. He then developed a series of six "cases" to summarize the ways in which the issues in dispute could be resolved through litigation,[8] one of which is a resolution that assumes the Examiner's assessments to be correct. *Id.* at 24-25. Those cases aggregate the probabilities that Professor Black assigns to each of the individual issues that would have to be resolved through litigation. Professor Black uses this case analysis to assess the probability that the various scenarios might come to pass. *Id.* at 26.[9] Based on these probabilities, Professor Black estimates the expected recovery for each class of creditors in each of the cases. *Id.* at 29-30. Finally, because the expected recovery under the DCL Plan compares favorably to the expected recoveries under both Professor Black's and the Examiner's assessments, and is within the settlement range that Professor Black develops, Professor Black concludes that the DCL Plan falls within the range of reasonableness. *Id.* at 32.

---

[7] The Noteholders' reliance on *Alumax Inc. v. Commissioner of Internal Revenue* is misplaced for the same reason. In that case, the tax court found Professor Black to be "qualified as an expert on corporate law, mergers, acquisitions, and corporate finance." 109 T.C. 133, 171 (T.C. 1997). However, the tax court declined to rely on Professor Black's reports. *Id.* at 177. In the tax court's view, Professor Black's reports were "not helpful," *id.*, in resolving the legal issue presented in that case—whether various corporations "were members of [an] affiliated group within the meaning of section 1504(a)" of the revenue code, *id.* at 134. In contrast, Professor Black's detailed analysis in this case will be helpful not just making the factual determinations mandated by the *Martin* factors, but also in rebutting and correcting a number of mistaken assertions contained in the Examiner's Report and the reports submitted by the Noteholders' experts.

[8] For instance, Prof. Black's "low settlement" case assumes that the issues are assessed in a manner strongly favorable to the Banks, the "high settlement" case assumes that the issues are assessed in a manner strongly favorable of the Noteholders. Black Report at 24-25. The other four cases fall within the settlement range established by the low settlement and high settlement cases. *Id.*

[9] For example, the odds that a "no avoidance" scenario will occur range from 44% to 23% depending on the case, while the chance of a "full avoidance" scenario ranges from 4% to 27%. Black Report at 26.

11

To be sure, judgments regarding the probable outcome of litigation require assessments about how a future, hypothetical court and/or factfinder would resolve the issues in dispute. Those issues include both strictly factual questions (e.g., solvency and valuation), and questions that might be characterized as mixed questions (e.g., whether transactions will be integrated). *Compare* Black Report at 33-37, *with* Examiner Report, Vol. 1, at 7-25; *cf.* Motion at 3-4. In this regard, both Professor Black and the Examiner reviewed the available evidence and assess how that evidence might be viewed by a future, hypothetical fact-finder. *Compare* Black Report at 37, 148-49, *with* Examiner's Report, Vol. 2, at 74; *cf.* Motion at 4-5. Such judgments are part and parcel of measuring the "probability of success in litigation," *Myers*, 91 F.3d at 393, and they in no way offend the Federal Rules of Evidence 702-704. *See, e.g., Fiataruolo*, 8 F.3d at 941 ("Experts may testify on questions of fact as well as mixed questions of fact and law."); *accord Jones v. Ind. Area Sch. Dist.*, No. 03-1081, 2006 U.S. Dist. LEXIS 97270, at *4 (W.D. Pa. Feb. 6, 2006) ("an expert may draw certain legal conclusions so long as he sets forth explicitly the facts upon which he relied to reach his conclusion in order to enable the jury to evaluate independently his conclusion").

The Noteholders also attempt to malign Professor Black's work simply by pointing out that differences exist between his own conclusions and those of the Examiner. Motion at 2-3. This is both nonsensical and irrelevant. The Noteholders *stipulated* that the Examiner's opinions are no more admissible, and are entitled to no more weight, than the opinions provided by any other expert. Stipulation ¶ 1. The Noteholders further stipulated that the DCL Plan Proponents are entitled to disagree with the Examiner opinions and to proffer an expert witness to rebut the Examiner's opinions. The Noteholders cannot base a *Daubert* motion on a disagreement between experts. *See, e.g., Scott Dairy Farm, Inc. v. Dean Foods (In re Southeastern Milk*

12

*Antitrust Litig.)*, No. 08-1000, 2010 U.S. Dist. LEXIS 130559, at *11 (E.D. Tenn. Dec. 8, 2010)
(denying *Daubert* motions that presented "nothing more than a disagreement between competing
experts"). Indeed, since the Examiner's words are not gospel, the Court may find it useful to
understand where another expert agrees with the Examiner, where the other expert disagrees, and
why.[10] The Court will hear differing views from the Noteholders' experts as well. Moreover,
Professor Black's opinion does not simply criticize or agree with the Examiner. When he
reaches a different conclusion, Professor Black explains his reasons. And he offers the Court his
assessment of reasonableness under the Examiner's views, as well as his own.

Finally, it is worth observing that if the Noteholders' description of Professor Black's
report were accurate – and it is not – this Court would also be required to exclude the Examiner's
opinions. Every single accusation that the Noteholders level at Professor Black can be made
with equal or greater force against the Examiner. For instance, the Examiner opines on the
issues of reasonably equivalent value, fraudulent conveyances, and defenses under the
bankruptcy code. *Compare* Motion at 3-4, *with* Examiner's Report, Vol. II, at 77, 90, 241. If
Professor Black violates the Federal Rules of Evidence by opining on such issues, so does the
Examiner. As a result, the Examiner's work would be excluded by the parties' stipulation and
this Court's Order.[11] *See* Stipulation ¶ 1 (the Examiner's opinions are admissible "to the same
extent as the opinions testified to by an expert witness under the Federal Rules"). But the
Noteholders obviously believe that the Examiner's opinions are admissible. *See* Motion at 1
(contending the Examiner Report is "fully admissible"). If that is true, according to the parties'

---

[10] Indeed, while the Committee does not agree with many of Professor Black's particular conclusions, the Committee fully agrees with the DCL Plan Proponent Group that his analysis supports the reasonableness of the proposed settlement.

[11] The same would be true of any expert who relied on the Examiner's opinions or made similar probabilistic assessments, such as Dr. Beron. *See supra* n.4 & n.5.

46429/0001-7407402v1

Stipulation, the DCL Plan Proponents are free to offer contrary evidence, including expert testimony. The Noteholders cannot have it both ways.[12]

## II.    PROFESSOR BLACK IS QUALIFIED.

Without mentioning Professor Black's lengthy and distinguished *curriculum vitae*, *see* Black Report at Appendix A ("Black *c.v.*"), the Noteholders assert that he is not qualified to provide expert testimony. They suggest that he is not an expert in bankruptcy law and therefore cannot offer "opinions about the likelihood of success" of the claims released by the DCL Plan. Motion at 8. They also assert that he is incapable of conducting "a solvency or valuation analysis." *Id.* On this basis, the Noteholders ask the Court to strike 101 pages of Professor Black's report. *Id.* at 9.

The Noteholders' arguments are utterly devoid of merit. In the first place, the Noteholders seriously mischaracterize Professor Black's report in claiming that he admits that he is not a "not a bankruptcy expert." Motion at 8. In fact, the full quote from Professor Black is as follows:

> Except as it overlaps with my expertise in corporate finance, corporate acquisitions, and corporate law and practice, I am not an expert in bankruptcy law, but have undertaken research sufficient to enable me to have reasonable confidence in the conclusions below, to the extent those conclusions involve mixed questions of fact and bankruptcy law."

Black Report at 3. Thus, when the *actual text* of Professor Black's report is examined, it is clear that Professor Black *does* claim expertise in bankruptcy law as it overlaps with corporate finance, acquisitions, and corporate law and practice, and that he has undertaken sufficient research in other areas of bankruptcy law to provide his opinions. *Id.*

---

[12] As noted above (*see supra* n.4), Mr. Tuliano also offers a number of conclusions that are at odds with the Examiner's opinions, including opinions with respect to whether Step One constituted a fraudulent conveyance and whether Step One and Step Two of the transactions should be treated as a single, integrated transaction.

Nor can it be said that Professor Black merely *claims* expertise—his expertise is patently clear. Professor Black teaches students about solvency and fraudulent conveyance law in his Corporations class. He teaches students about leveraged buyouts in his Corporate Acquisitions class; his textbook on *The Law and Finance of Corporate Acquisitions* includes a chapter on Leveraged Buyouts. He teaches students about assessing projections, including sensitivity analyses in his Corporate Finance class. He also has experience in assessing projections and valuation from his service on the boards of directors of two public companies (Homeland Holdings and Kookmin Bank). *See generally* Black *c.v.* It is apparent from his Report that he has expertise in conducting a market-based valuation of Tribune and its subsidiaries, because he has done so. The Court can assess whether he has done so well or not.

Here, the central issues that would have to be litigated if the compromised claims were pursued are all comfortably within Professor Black's established expertise. There can be no doubt that the central issues revolve around the Leveraged ESOP transactions, and Professor Black's expertise in complicated corporate transactions will be helpful to the Court. Professor Black has published six books and nearly 100 articles in the areas of corporate finance, corporate acquisitions and corporate law, has given countless presentations, speeches and lectures at seminars and conferences around the world, and has testified before state and federal courts around the country. *See generally* Black *c.v.* Professor Black has also been in private practice, served as counsel to the SEC, advised the governments of Russia, the Ukraine, Indonesia, South Korea, Mongolia, Vietnam, and Armenia, and served on the boards and audit committees of public companies. *Id.* He has both academic and real-world experience in the very sorts of transactions at issue in these proceedings. *See* Black Report at 1-3.

15

The Noteholders' assertion that Professor Black is "just a law professor" is also untrue.
Motion at 8. Professor Black *is* a law professor at Northwestern University, and he has held
similar posts at Columbia University, the University of Texas, and Stanford University. *Id.* at 1.
But he is also a Professor of Finance at the Kellogg School of Management at Northwestern
University (and previously held a similar professorship at the Red McCombs School of Business
at the University of Texas). *Id.* In addition to his substantial academic work, he has practiced
securities and corporate law at both a major law firm and the U.S. Securities & Exchange
Commission. *Id.* at 1-2. While a practicing attorney, he participated in a variety of corporate
transactions, and has real-world experience structuring leveraged buyouts. *Id.* at 2. Moreover,
he has served as a director of a publicly listed commercial bank and as a director of a major
supermarket chain with publicly traded debt (which also provided real-world experience in
leveraged buyouts). *Id.* The list of Professor Black's publications and speaking engagements is
24 pages long, and includes articles on the specific topic of settlement practices.[13]  Black *c.v.*
The list of prior cases in which Professor Black has testified as an expert covers another six
pages. Black Report at Appendix B. Professor Black also has extensive experience in the
specific methodologies used in his reports, including valuation, decision trees, probability theory,
and statistics. *See* Rebuttal Black Report at 1.

Equally unfounded is the suggestion that Professor Black is incapable of performing a
solvency or valuation analysis. Motion at 8. Professor Black has taught corporate law and
corporate finance for decades and is an expert in "the valuation of companies and cash flows."

---

[13] *See, e.g.*, Bernard Black, David Hyman and Charles Silver, *O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 379-401 (2010) (http://ssrn.com/abstract=1503125); Bernard Black, David Hyman and Charles Silver, *Settlement at Policy Limits and Insurer Duty to Settle: Evidence From Texas*, 8 JOURNAL OF EMPIRICAL LEGAL STUDIES 48-84 (forthcoming 2011) (http://ssrn.com/abstract=1134202); Bernard Black, David Hyman and Charles Silver, *The Effects of "Early Offers" on Settlement: Evidence From Texas Medical Malpractice Cases*, 6 JOURNAL OF EMPIRICAL LEGAL STUDIES 723-767 (2009) (http://ssrn.com/abstract=1112135).

16

Black Report at 3. The Noteholders' Motion simply ignores his academic work and his decades of *teaching* corporate finance, including techniques for valuation. The Noteholders also ignore Professor Black's extensive publication history, including articles exploring aspects of corporate valuation, one of which was published last year in the Journal of Financial Economics, widely considered one of the top three finance journals in the world.[14]

Finally, Professor Black is not just an expert, but a leader in his field. The website of the Social Science Research Network (www.ssrn.com) provides a quick and useful snapshot of Professor Black's stature in both law and finance. His papers posted on the SSRN website have accumulated over 113,000 downloads (which ranks Professor Black 11th out of over 150,000 authors with papers on SSRN), and 1,750 citations by other papers that are posted on SSRN (thus, these citations represent a fraction of total citations to his work). Many of his most cited and downloaded papers are on finance, corporate law, and corporate governance. *See generally* Bernard S. Black, http://ssrn.com/author=16042 (last visited Feb. 28, 2011).

Put simply, the assertion that Professor Black lacks the expertise necessary to render the opinions contained in his report is frivolous.

## CONCLUSION

For the foregoing reasons, the Debtor/Committee/Lender Plan Proponents respectfully request that the Noteholders' Motion be denied.

---

[14] *See, e.g.*, *See, e.g.*, Vladimir Atanasov, Bernard Black, Conrad Ciccotello & Stanley Gyoshev, *How Does Law Affect Finance? An Examination of Equity Tunneling in Bulgaria*, 96 JOURNAL OF FINANCIAL ECONOMICS 155-173 (2010) (nearly final version at http://ssrn.com/abstract=902766); Vladimir Atanasov, Bernard Black, Conrad S. Ciccotello & Matthew Sass, *Incorporating Tunneling Risk into Equity Valuation: An Application to the Oil and Gas Industry* (working paper 2009) (http://ssrn.com/abstract=1443463); Vladimir Atanasov, Bernard Black & Conrad Ciccotello, *Unbundling and Measuring Tunneling* (working paper December 2008) (http://ssrn/com/abstract=1030529).

17

Dated: Wilmington, Delaware
      February 28, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin Lantry
James W. Ducayet
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

SIDLEY AUSTIN LLP
James F. Bendernagel
Ronald S. Flagg
David M. Miles
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: /s/ J. Kate Stickles
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

Counsel for Debtors and Debtors in Possession

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
Thomas J. McCormack
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

LANDIS RATH & COBB LLP

/s/ Matthew B. McGuire
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

Counsel for the Official Committee of Unsecured Creditors

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

Special Counsel to the Official Committee of Unsecured Creditors

46429/0001-7407402v1

DAVIS POLK & WARDWELL LLP
Benjamin S. Kaminetzky
Elliot Moskowitz
Michael Russano
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4500

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Robert J. Stearn, Jr.*
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
One Rodney Square, 920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651 7701

Counsel for JPMorgan Chase Bank, N.A.

WILMER CUTLER PICKERING
HALE & DORR LLP
Andrew N. Goldman
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800

Counsel for Angelo, Gordon & Co., L.P.

Dewey & LeBoeuf LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
330 South Grand Ave., Suite 2600
Los Angeles, CA 90071
Telephone: (213) 621-6000

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, DE 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.