## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRIBUNE COMPANY, et al.,[1] | ) Case No. 08-13141 (KJC) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) **Hearing Date: March 22, 2011 at 10:00 a.m.** |
| | ) **Objection Deadline: March 15, 2011 at 4:00 p.m.** |

**MOTION OF AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, AND LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, FOR ENTRY OF ORDER (I) DETERMINING THAT CREDITORS HAVE RETAINED THEIR STATE LAW CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS TO RECOVER STOCK REDEMPTION PAYMENTS MADE TO STEP ONE SHAREHOLDERS AND STEP TWO SHAREHOLDERS PURSUANT TO 11 U.S.C. § 546(A); (II) DETERMINING THAT AUTOMATIC STAY DOES NOT BAR COMMENCEMENT OF LITIGATION ON ACCOUNT OF SUCH CLAIMS AGAINST SUCH SHAREHOLDERS OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM AUTOMATIC STAY TO PERMIT COMMENCEMENT OF SUCH LITIGATION; AND**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

## (III) GRANTING LEAVE FROM MEDIATION ORDER TO PERMIT COMMENCEMENT OF SUCH LITIGATION

Aurelius Capital Management, LP, on behalf of its managed entities ("Aurelius"),

Deutsche Bank Trust Company Americas, in its capacity as successor Indenture Trustee for

certain series of Senior Notes ("Deutsche Bank"), and Law Debenture Trust Company of New

York, in its capacity as successor Indenture Trustee for certain series of Senior Notes ("Law

Debenture" and, together with Deutsche Bank, the "Indenture Trustees" and, collectively with

Aurelius, the "Movants") hereby file this motion (the "Motion") for entry of an order (i)

determining that creditors have retained their state law constructive fraudulent conveyance

claims to recover stock redemption payments made to Step One Shareholders and Step Two

Shareholders (as such terms are defined below) due to the expiration of the statute of limitations

under 11 U.S.C. § 546(a); (ii) determining that the automatic stay under 11 U.S.C. § 362 does not

bar the commencement of litigation by or on behalf of creditors with respect to such claims or, in

the alternative, granting relief from the automatic stay to permit the commencement of such

litigation; and (iii) granting leave from the Mediation Order (as defined below) to permit the

commencement of such litigation.  In support of this Motion, the Movants respectfully represent

as follows:

## PRELIMINARY STATEMENT[2]

1.      By the Motion, the Movants seek entry of an order granting the following relief:

(i) determining that when the statute of limitations under Bankruptcy Code section 546(a) for a

representative of the Debtors' estates to commence state law constructive fraudulent conveyance

---

[2] Unless otherwise defined herein, capitalized terms used in this Preliminary Statement shall have the meanings ascribed to such terms subsequently in the Motion or the Noteholder Plan, as applicable.

claims against Step One Shareholders and Step Two Shareholders (collectively, the

"Shareholders") to recover stock redemption payments made to such Shareholders  (collectively,

the "Estate SLCFC Claims" or the "Estate Claims") expired on December 8, 2010 without these

Estate Claims being brought, eligible creditors regained the right to prosecute their own such

claims on their individual behalf against such Shareholders (collectively, the "Creditor SLCFC

Claims" or the "Creditor Claims"); (ii) determining that as a result of the expiration of the

section 546(a) statute of limitations, the estates have no viable Estate SLCFC Claims and, as a

consequence, the Creditor SLCFC Claims may be pursued by individual creditors without

violating the automatic stay or, in the alternative, granting relief from the automatic stay to

permit the immediate commencement of litigation on account of the Creditor SLCFC Claims;

and (iii) leave from the Mediation Order – which prohibits the prosecution of any proceeding

seeking relief in connection with LBO-related causes of action – to permit the immediate

commencement of such state court litigation.

2.      The Creditor SLCFC Claims arise out of the Debtors' ill-fated LBO in 2007,

which saddled the Debtors with more than $10.7 billion of debt and precipitated the Debtors'

plunge into bankruptcy just over a year later.  In connection with the LBO, and the subject of the

instant Motion, Step One Shareholders and Step Two Shareholders received more than *$8.2*

*billion in cash* in exchange for their shares of common stock in Tribune.  Accordingly, the

Creditor SLCFC Claims constitute an important source of potential recovery for eligible

creditors in these cases.

3.      Absent the relief requested herein, however, the Creditor SLCFC Claims may

very well become time-barred.  Specifically, Step One of the LBO transaction closed on June 4,

2007.  The statute of limitations for commencing a creditor's state law avoidance action is

determined by applicable state law. Several states (including, for example, Delaware (the state of incorporation of Tribune), Illinois (the Debtors' principal place of business) and Massachusetts (the state where the Step One Shareholders tendered their Tribune stock in exchange for payment)) that may be the proper jurisdiction or jurisdictions for pursuing the Creditor SLCFC Claims have a four-year statute of limitations for commencing constructive fraudulent conveyance claims. Accordingly, in order to preserve the ability to prosecute the Creditor SLCFC Claims in these states, parties must operate on the assumption that the applicable statute of limitations could be as early as June 4, 2011.[3]

4.      Given the number and nature of unresolved issues that remain pending in these cases, there can be no guarantee that the Debtors will emerge from chapter 11 by that date. Moreover, even if the many outstanding issues in these cases are consensually resolved and/or adjudicated on a timely basis in connection with confirmation, there still remains a very real possibility that the Debtors will not exit chapter 11 before June 4, 2011 due to FCC approvals that must be obtained before either of the now two Competing Plans can go effective. Indeed, as set forth in the accompanying Declaration of Meredith S. Senter, Jr. in Support of the Motion (the "Senter Declaration") being filed contemporaneously herewith, the FCC must undertake a number of different steps, some of which may take several months, before either of the Competing Plans can obtain the requisite approvals from the FCC to enable the Debtors to emerge from chapter 11.

---

[3] For the avoidance of doubt, the Movants have not determined the specific jurisdiction or jurisdictions in which to commence the Creditor SLCFC Claims. Nothing contained in this Motion or any other pleading or document related thereto shall prejudice the Movants' ability to select a venue to commence the Creditor SLCFC Claims.

5.      Pursuant to the plain meaning of section 546(a) of the Bankruptcy Code, the two-year statute of limitations for a representative of the Debtors' estates to commence the Estate SLCFC Claims lapsed on December 8, 2010.  According to well-settled law, as set forth in detail below, when the section 546(a) statute of limitations expired, eligible creditors regained the right to prosecute their Creditor SLCFC Claims to the same extent as if these chapter 11 cases had not been filed.  Accordingly, because the Debtors' estates no longer have the right to commence the Estate SLCFC Claims, creditors should be free to pursue their own Creditor SLCFC Claims without violating the Bankruptcy Code's automatic stay.  Apparently, the proponents of the DCL Plan agree with the foregoing statements of law.  See *Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of Second Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktreee Capital Management, L.P., Angelo, Gordon & Co. L.P., and JPMorgan Chase Bank, N.A.* [Dkt. No. 8173] (the "DCL Plan Confirmation Brief") at 97 ("As a matter of law, when the two-year statute of limitations expired, these constructive fraudulent transfer causes of action automatically reverted to the applicable individual creditors who can now pursue those causes of action as they see fit under applicable state law.").  The Movants nonetheless file the Motion as a matter of prudence and out of an abundance of caution in order to eliminate any risk of potential violation of the automatic stay and also to obtain leave from this Court's Mediation Order, which stays the prosecution of any proceeding seeking relief in connection with LBO-related causes of action while the Court-ordered mediation is ongoing.

6.      The relief requested is not only supported by well-established law but, also, is not inconsistent with the manner in which the Creditor SLCFC Claims are treated under the DCL

5

Plan. Despite what the Debtors, the Creditors' Committee and the Lenders may have intended, a careful reading of the DCL Plan reveals that Creditor SLCFC Claims against Step One Shareholders are not released by the Debtors or their estates under the DCL Plan. Indeed, by the DCL Plan Confirmation Brief, the DCL Plan proponents have now conceded that "no release of the Estates' constructive fraudulent transfer claims against the Step One Selling Stockholders will occur pursuant to the Debtor/Committee/Lender Plan." DCL Plan Confirmation Brief, at 97. Rather, the Creditor SLCFC Claims are now retained by eligible individual creditors unless such Creditor Claims become time-barred under applicable state law. Thus, the relief requested in the Motion is not inconsistent with the DCL Plan's treatment of the Creditor SLCFC Claims against Step One Shareholders and also complements that treatment by ensuring that such Creditor Claims do not become time-barred.

7.        Similarly, the Motion is not inconsistent with the DCL Plan's treatment of Creditor SLCFC Claims against Step Two Shareholders.[4] Specifically, the DCL Plan expressly provides that Creditor SLCFC Claims against Step Two Shareholders are transferred to the

---

[4] Although the DCL Plan purports to release a subset of the Step Two Shareholders – i.e., the Released Step Two Stockholder Parties (defined in the DCL Plan as set forth below) – a careful reading of the DCL Plan reveals that the Creditor SLCFC Claims against the Released Step Two Stockholder Parties are, like the Step One Shareholders, not released by the Debtors or their estates, as a result of the expiration of the section 546(a) statute of limitations. See infra, ¶¶ 37-40.

The DCL Plan defines "Released Step Two Stockholder Parties" to mean "(a) any Person that redeemed shares of common stock of Tribune held through the Tribune Company 401(k) Savings Plan (f/k/a Tribune Company 401(k) Savings and Profit Sharing Plan) in connection with the Step Two Transactions, with the exception of those Persons, and subject to the circumstances, listed on Exhibit 1.1.192 hereto to be filed with the Plan Supplement, (b) any Person employed by the Debtors on October 22, 2010 and that remains employed by the Debtors as of the Effective Date with respect to the first $100,000 of Cash received from the redemption of common stock, stock equivalents or options of Tribune in connection with the Step Two Transactions, with the exception of those Persons, and subject to the circumstances, listed on Exhibit 1.1.192 hereto to be filed with the Plan Supplement, (c) the Retiree Claimants or other Holders of Claims arising from Non-Qualified Former Employee Benefit Plans that elect to receive the treatment set forth in Section 3.2.6(c)(i) of this Plan, and (d) the Retiree Claimants or other Holders of Claims arising from Non-Qualified Former Employee Benefit Plans that elect to receive the treatment set forth in Section 3.2.6(c)(ii) of this Plan, solely with respect to the first $100,000 of Cash received from the redemption of common stock, stock equivalents or options of Tribune in connection with the Step Two Transactions." DCL Plan, §1.1.192.

creditors' trust established under the DCL Plan only to the extent that creditors holding such

Creditor Claims do not elect to "opt out" of the creditors' trust. The majority of the holders of

the Senior Notes and PHONES Notes (in each case, measured by dollar amounts) as well as both

of the Indenture Trustees have elected to "opt out" of the DCL Plan creditors' trust and,

therefore, such creditors' individual Creditor SLCFC Claims against Step Two Shareholders will

not be transferred to the DCL Plan creditors' trust if such plan is confirmed and goes effective.

See *Supplemental Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions,*

*LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Plans of*

*Reorganization Proposed for Tribune Company and its Subsidiaries* [Dkt. No. 8114]. Thus, the

relief requested in the Motion is required to ensure that the Creditor SLCFC Claims against Step

Two Shareholders will likewise not become time-barred.

8.    If the Motion is granted, it is currently contemplated that either the Indenture

Trustees, Wilmington Trust Company, in its capacity as successor Indenture Trustee for the

PHONES Notes (in each of which case, as directed pursuant to the applicable Indentures)

Aurelius, and/or potentially other parties holding Creditor SLCFC Claims (collectively, the

"Original Plaintiff Group")[5] will file a complaint or complaints asserting such Creditor SLCFC

---

[5] If (i) a creditor is initially included in the Original Plaintiff Group, (ii) such creditor did not opt out of the creditors' trust under the DCL Plan, and (iii) the DCL Plan is consummated, then the Creditor SLCFC Claims held by any such creditor shall be transferred to the creditors' trust under DCL Plan upon the effective date of the DCL Plan. The Original Plaintiff Group will not include creditors holding debt incurred in connection with the LBO (collectively, the "LBO Debtholders"), even if such LBO Debtholders have not made a Non-Contribution Election under the Noteholder Plan. The rationale for omitting LBO Debtholders from the Original Plaintiff Group is two-fold. As a threshold matter, the Original Plaintiff Group has no obligation (and presumably no ability) to prosecute the Creditor SLCFC Claims on behalf of LBO Debtholders. The LBO Debtholders are not Pre-LBO Noteholders and, in any event, the Complaint will assert the Creditor SLCFC Claims on behalf of *individual creditors, not the Debtors' estates*. Second, numerous courts have held that a transfer cannot be avoided for the benefit of a creditor that authorized or ratified such transfer. See, e.g., In re Best Prods. Co., 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance."); Harris v. Huff (In re Huff), 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993) ("Thus, an election by the creditor prior to commencement of the case to treat the transfer as valid, or an admission in a proceeding prior

Claims (the "Complaint"). The Original Plaintiff Group will then seek to toll the litigation until the Court rules on the Competing Plans. If the Noteholder Plan is consummated, then the trustee of the Creditors' Trust under the Noteholder Plan will (a) be substituted as the plaintiff for the Original Plaintiff Group in the Complaint, (b) prosecute the Creditor SLCFC Claims set forth in the Complaint on behalf of the Original Plaintiff Group and (c) make distributions in respect of the Creditor SLCFC Claims in accordance with the terms of the orders entered by the applicable state court in respect of such Creditor Claims and the Noteholder Plan.[6]

## JURISDICTION AND VENUE

9.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105(a), 362 and 546(a) of title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

10.      On December 8, 2008 (the "Petition Date"), substantially all of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC), Tribune Company's subsidiary that held the majority of the assets related to the business of the Chicago Cubs Major

---

to commencement of the case with respect to the validity of an obligation, have been held to estop the creditor and in turn the trustee claiming in his stead from asserting any rights [with respect to such allegedly fraudulent transaction]."); Reitsch v. McCarty, 35 N.D. 555, 574 (N.D. 1916) ("Where it is shown that a complainant in an action to set aside a fraudulent conveyance participated in or instigated such conveyance, the court will as a general rule leave him in the position which he was instrumental in creating, and will hold that he is estopped by his conduct from attacking the conveyance . . . . The creditor must not have participated in or assented to the conveyance of which he complains, for if he has he cannot afterwards be heard to assert that the transfer was fraudulent per se as to him."). Here, the LBO Debtholders authorized and ratified the payments made to Step One Shareholders and Step Two Shareholders in connection with the LBO and, therefore, the LBO Debtholders are not entitled to avoid those payments.

[6] If, however, the Noteholder Plan is not consummated, then the Original Plaintiff Group will prosecute the Creditor SLCFC Claims in the Complaint, except as provided in footnote 5 above.

League Baseball franchise, commenced a voluntary chapter 11 case on October 12, 2009.

A.    **The 2007 LBO**

11.    On or about April 1, 2007, the board of directors of the Tribune Company

("Tribune") approved a leveraged buyout transaction (the "LBO"), which resulted in the transfer

of ownership of Tribune and its subsidiaries to a newly formed employee stock ownership plan

(the "ESOP"). The LBO was structured in two interrelated steps. "Step One" of the LBO was

closed on June 4, 2007 and involved the purchase by the ESOP of shares of Tribune common

stock and the consummation by Tribune of a cash tender offer for nearly 50% of its outstanding

common stock. "Step Two" of the LBO transaction was completed in December 2007 and

involved Tribune cashing out its remaining stockholders and merging with a Delaware

corporation that was wholly-owned by the ESOP, with Tribune surviving the merger.

12.    As a result of the LBO, the Debtors incurred more than $10.7 billion of loans

financed by various banking entities, including JPMorgan Chase Bank, N.A., Merrill Lynch &

Co., Citicorp North America, Inc., Bank of America N.A., and Barclays Bank, PLC, pursuant to

advice given by the investment banking arms of some of these same banks. These banking

entities received more than $200 million in fees and expenses for arranging the LBO debt. The

banks and others involved in the LBO imposed the risk of these loans on Tribune's existing

bondholders (collectively, the "Pre-LBO Noteholders") who, pending avoidance of the LBO

debt, are now structurally subordinated to more than $10.3 billion in senior bank debt that was

guaranteed by the Debtors' operating subsidiaries, and are required to share the value of Tribune

with the holders of this additional debt.

13.    In connection with Step One of the LBO transaction, shareholders of Tribune

(collectively, the "Step One Shareholders") received approximately *$4.3 billion* in exchange for

their shares of Tribune common stock.  See Examiner's Report, Vol. II at p. 6.  In connection

with Step Two of the LBO transaction, shareholders of Tribune (collectively, the "Step Two

Shareholders") received approximately *$4.0 billion* in exchange for their shares of Tribune

common stock.  See id. at p. 8.

**B.    The Competing Plans**

14.    On October 18, 2010, the Court entered its Order Scheduling a Hearing and

Establishing Certain Deadlines to Consider Approval of Certain Disclosure Document(s) [Dkt.

No. 6022] (the "Plan Scheduling Order").  Pursuant to the Scheduling Order, the Court

authorized and directed the Debtors to file a plan of reorganization on or before October 22,

2010 and for any other party or parties wishing to propose a competing plan of reorganization

(each, a "Competing Plan") to file such plan on or before October 29, 2010.

15.    Pursuant to the Plan Scheduling Order, on October 22, 2010, the Debtors, the

official committee of unsecured creditors (the "Creditors' Committee"), Oaktree Capital

Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. filed a plan of

reorganization [Dkt. No. 6089] (as amended, the "DCL Plan") and accompanying specific

disclosure statement [Dkt. No. 6091] (as amended, the "DCL Specific Disclosure Statement").

Also pursuant to the Plan Scheduling Order, on October 29, 2010, the Movants filed a competing

plan of reorganization [Dkt. No. 6184] (as amended, the "Noteholder Plan") and accompanying

specific disclosure statement [Dkt. No. 6182] (as amended, the "Noteholder Specific Disclosure

Statement").

**C.    The Creditors' Trusts**

16.    The DCL Plan establishes a litigation trust and creditors' trust to prosecute certain

preserved causes of action if the DCL Plan is confirmed and consummated.  Under the DCL

Plan, the primary responsibility of the creditors' trust is to prosecute "Disclaimed State Law

Avoidance Claims," which are defined to mean "any and all LBO-Related Causes of Action

arising under state fraudulent conveyance law that the Debtors or the Debtors' Estates could

assert pursuant to section 544(b) of the Bankruptcy Code against *Step Two* Selling Stockholders,

solely with respect to funds received in their capacities as such." DCL Plan, § 1.1.75 (emphasis

added).[7] Accordingly, by definition, Disclaimed State Law Avoidance Claims do not include

Estate SLCFC Claims or Creditor SLCFC Claims against *Step One* Shareholders. Indeed, based

on the expiration of the section 546(a) limitations period, there are in fact *no* claims or causes of

action that fit within the definition of Disclaimed State Law Avoidance Claims under the DCL

Plan.

      17.     The DCL Plan provides that, upon its effective date, the Debtors are required to

"disclaim" all rights to pursue the Disclaimed State Law Avoidance Claims, such that all rights

to pursue Disclaimed State Law Avoidance Claims revert to those entities that could have

pursued such Disclaimed State Law Avoidance Claims prior to the Petition Date. See DCL Plan,

§ 14.3. Furthermore, on the effective date of the DCL Plan, any creditor holding a Disclaimed

State Law Avoidance Claim is deemed to transfer any such Disclaimed State Law Avoidance

Claim that it may have to the creditors' trust established under the DCL Plan, unless such

creditor has elected to "opt out" of such assignment in accordance with the procedures

established in the Court's amended solicitation procedures order dated December 9, 2010 [Dkt.

No. 7126] (as amended, the "Solicitation Procedures Order"). See DCL Plan, § 14.3.1.

---

[7] The DCL Plan further provides that Disclaimed State Law Avoidance Claims do not include any intentional fraudulent conveyance claims or any claims against Released Parties, including, without limitation, Released Step Two Stockholder Parties (as such terms are defined in the DCL Plan). See id., § 1.1.75.

18.    The Noteholder Plan contains a similar (although not identical) trust structure. Specifically, the Noteholder Plan establishes three Trusts, including a Creditors' Trust. The primary responsibility of the Creditors' Trust established under the Noteholder Plan is to prosecute "State Law Avoidance Claims," which are defined to mean all "claims, causes of actions, avoidance powers or rights, and legal or equitable remedies of any Person not making the Non-Contribution Election arising under state law against shareholders in Tribune whose stock was redeemed in connection with the Leveraged ESOP Transactions including, without limitation, in respect of Abandoned Claims." See Noteholder Plan, § 1.1.248.[8]

19.    The Noteholder Plan provides that, upon its effective date, the "Abandoned Claims, to the extent commenced, shall be discontinued by the Debtors, the Creditors' Committee and/or the Estates without prejudice and the Debtors shall be deemed to have abandoned, pursuant to section 554 of the Bankruptcy Code, any and all rights to further pursue the Abandoned Claims." See Noteholder Plan, § 5.18.2.[9] Furthermore, on the effective date of the Noteholder Plan, any creditor holding a State Law Avoidance Claim is deemed to contribute any such State Law Avoidance Claim that it may have to the Creditors' Trust established under

---

[8] On February 25, 2011, the Noteholder Plan proponents made certain non-material amendments to the Noteholder Plan [Dkt. No. 8169] (as amended, the "Amended Noteholder Plan"). In the Amended Noteholder Plan, the definition of "State Law Avoidance Claims" has been revised in a non-material manner to mean "the claims, causes of action, avoidance powers or rights, and legal or equitable remedies of any Person not making the Non-Contribution Election arising under state law against shareholders in Tribune whose stock was redeemed in connection with the Leveraged ESOP Transaction, including causes of action in respect of state law avoidance claims previously commenced or that could have been commenced by or on behalf of the Debtors' Estates against such shareholders, which claims, causes of action, avoidance powers or rights, and legal or equitable remedies shall be abandoned by the Debtors' Estates upon the Effective Date."

[9] Under the Amended Noteholder Plan, the above-referenced provision has been modified in a non-material manner to provide as follows: "Any claims or causes of action under chapter 5 of the Bankruptcy Code previously commenced or that could have been commenced by or on behalf of the Debtors' Estates against shareholders arising out of the redemption of their stock in connection with the Leveraged ESOP Transaction shall, as of the Effective Date, be discontinued without prejudice, and the Debtors, the Creditors' Committee and/or the Estates shall be deemed, as of the Effective Date, to have abandoned any and all right to further pursue such claims and causes of action pursuant to section 554 of the Bankruptcy Code."

the Noteholder Plan, unless such creditor has made a Non-Contribution Election.[10] See Noteholder Plan, § 5.18.2.

20.     In sum, both the DCL Plan and the Noteholder Plan contemplate the establishment of a creditors' trust to prosecute LBO-related causes of action of individual creditors (not of the Debtors' estates) under state law against Tribune's pre-LBO shareholders. However, the creditors' trust established under the DCL Plan is established with the intent, but not the ability, to prosecute such claims against only certain *Step Two Shareholders*, while the Noteholder Plan Creditors' Trust is established with the intent and the ability to prosecute state law constructive fraudulent conveyance claims (in addition to state law intentional fraudulent conveyance claims) against both Step One Shareholders and Step Two Shareholders.

## RELIEF REQUESTED

21.     By the Motion, the Movants seek entry of an order substantially in the form attached hereto as Exhibit A (a) determining that, as a result of the expiration of the section 546(a) statute of limitations, eligible creditors have regained the right to prosecute their Creditor SLCFC Claims; (b) determining that the automatic stay of the Bankruptcy Code does not bar the filing of the Complaint or, in the alternative, granting relief from the automatic stay solely to permit the immediate filing of the Complaint, and (c) granting leave from the Mediation Order to permit the immediate filing of the Complaint.

---

[10] "Non-Contribution Election" is defined in the Noteholder Plan to mean "the election presented to certain Classes of Claims against Tribune on the applicable Noteholder Ballot whereby Creditors in such Classes can elect not to contribute their State Law Avoidance Claims to the Creditors' Trust." See Noteholder Plan, § 1.1.172.

**BASIS FOR RELIEF REQUESTED**

A.    **Eligible Creditors Regained the Right to Prosecute their Creditor SLCFC Claims Upon the Expiration of the Statute of Limitations Set Forth in Section 546(a) of the Bankruptcy Code**

22.    Bankruptcy Code section 546(a) establishes a two-year statute of limitations for commencing a state law avoidance action under Bankruptcy Code section 544(b). See 11 U.S.C. § 546(a)(1)(A). The foregoing statute of limitations applies to both debtors in possession as well as designated estate representatives, including official creditors' committees. See In re American Pad & Paper Co., 478 F.3d 546, 554 (3d Cir. 2007) (holding that the 1994 amendments to the Bankruptcy Code clarified that a debtor in possession has a two-year statute of limitations to bring avoidance actions under section 544(b) and applicable state law that begins running on the petition date); In re Mediators, Inc., 105 F.3d 822 (2d Cir. 1997) (holding that section 546(a)'s requirement that trustee bring avoidance proceeding within two years of trustee's "appointment" also applied to unsecured creditors' committee, suing on behalf of chapter 11 debtor in possession); see also 5 Collier on Bankruptcy ¶ 546.02[1][a-c] (Alan N. Resnick & Henry J. Sommer, 16th ed. 2010).

23.    Here, the Petition Date was December 8, 2008. Accordingly, the Debtors and the Creditors' Committee had until December 8, 2010 to commence the Estate SLCFC Claims under Bankruptcy Code section 544(b). None of the Debtors or the Creditors' Committee, however, commenced the Estate SLCFC Claims and, therefore, they are now permanently barred from doing so pursuant to section 546(a).[11]

---

[11] The complaint filed by the Creditors' Committee on December 7, 2010 (the "Creditors' Committee Complaint") in the adversary proceeding, styled The Offic. Comm. Of Unsecured Creditors of Tribune Company v. Fitzsimons, Case No. 10-54010 (Bankr. D. Del. Nov. 1, 2010) alleges state law *intentional* fraudulent conveyance claims against Step One Shareholders and Step Two Shareholders pursuant to section 544(b) of the Bankruptcy

24.    The law is well-settled that, once the two-year statute of limitations in section

546(a) expires, creditors regain the right to prosecute their individual state law fraudulent

conveyance claims to the same extent as if the bankruptcy had never been commenced. See,

e.g., In re Integrated Agri, Inc., 313 B.R. 419, 427-428 (Bankr. C.D. Ill. 2004) ("A creditor

regains standing to pursue a state law fraudulent conveyance action, in its own name and for its

own benefit, once the statute of limitations expires on the bankruptcy trustee's right to bring the

claim. To that point, the bankruptcy court ordinarily would have no jurisdiction to hear the

creditor's suit to recover from a third party transferee.") (citation omitted); Klingman v.

Levinson, 158 B.R. 109, 113 (N.D. Ill. 1993) ("[T]he commencement of bankruptcy gives the

trustee the right to pursue fraudulently conveyed assets to the exclusion of all creditors.

However, the trustee does not retain this exclusive right in perpetuity. The trustee's exclusive

right to maintain a fraudulent conveyance cause of action expires and creditors may step in (or

resume actions) when the trustee no longer has a viable cause of action . . . . [O]nce a trustee's

statutory time period has expired, an unsecured creditor can bring an action against a fraudulent

transferee under state law, provided the state statute of limitations has not yet expired.") (internal

citations and quotations omitted);[12] see also DCL Plan Confirmation Brief, at 131 ("It is well-

established that should the limitations period expire and the trustee has not exercised its strong-

---

Code, but appropriately does not allege any of the SLCFC Claims – i.e, state law *constructive* fraudulent conveyance claims against such parties. See Creditors' Committee Complaint, Count 13, pp. 97-98.

    [12] Accord Sparano v. Southland Corp., 94 C 2098, 1995 WL 470267, *8 (N.D. Ill. Aug. 4, 1995) ("[The Klingman court] recognized that the commencement of a bankruptcy action gives the trustee the exclusive right to pursue fraudulently conveyed assets, but observed that this right 'expires and creditors may step in (or resume actions) when the trustee no longer has a viable cause of action.'") (quoting Klingman, 158 B.R. at 113); IGF Ins. Co. v. Continental Cas. Co., No. 1:01-cv-799-RLY-KPF, 2009 WL 4016608, *44 (S.D. Ind. Oct. 19, 2009) (same); Munson v. Rinke, 919 N.E.2d 438, 442 (Ill. App. Dist. 2009) (same); see also Dixon v. Bennett, 531 A.2d 1318, 1324-1325 (Md. App. 1987) (holding that the Bankruptcy Code does not "prevent[] an unsecured creditor from bringing a state cause of action in state court once the trustee's two-year time limitation has passed . . . . [A]fter the expiration of the trustee's cause of action, a fraudulent transferee may be subject to suit by an unsecured creditor under state law as long as its statute of limitations has not yet expired.").

arm powers, the power to assert (or to continue) state law fraudulent transfer claims under the UFTA and the UFCA reverts to the creditors.").

25.     Consistent with the foregoing cases, several courts have held that, once the section 546(a) statute of limitations expires, a debtor in possession can no longer settle a state law avoidance action because it "cannot settle [a] cause of action which [it] does not own." In re Boyer, 354 B.R. 14, 31-32 (Bankr. D. Conn. 2006) ("In this case, the limitations period for the Trustee to exercise his statutory avoidance powers expired two years after the petition date . . . . As a result, the Trustee lacks standing to settle any such causes of action.") (citing In re Integrated Agri, Inc., 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 2004) (trustee loses standing to prosecute such causes of action after expiration of section 546 limitations period) and In re Balonze, 336 B.R. 160, 171 n. 23 (Bankr. D. Conn. 2006) (same)).

26.     Accordingly, based on the foregoing authorities, and as now acknowledged by the DCL Plan proponents, the right of the Debtors' estates to commence (let alone settle) the Estate SLCFC Claims terminated on December 8, 2010 and, therefore, creditors immediately thereafter regained the right to prosecute their Creditor SLCFC Claims.

**B.      The Filing of the Complaint Does Not Violate the Automatic Stay of Bankruptcy Code Section 362(a)**

27.     Pursuant to section 362 of the Bankruptcy Code, the automatic stay prevents, among other things, "any act . . . to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Upon the filing of a bankruptcy petition, the estate's property includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The phrase "all legal or equitable interests of the debtor in property" includes "rights of action" such as claims based on state or federal law. See In re Seven Seas Petroleum, Inc., 522 F.3d 575, 584 (5th Cir. 2008). Thus, a debtor in possession's right to pursue a cause of

action under Bankruptcy Code section 544(b) is a distinct property right protected by the automatic stay.

28.     The automatic stay, however, remains in effect only "until such property is no longer property of the estate." 11 U.S.C. § 362(c)(1). Accordingly, when the section 546(a) limitation period expires, the debtor's right to commence a state law avoidance action under section 544(b) thereby terminates and ceases to be property of the estate. See In re Boyer, 354 B.R. at 32 (holding that a debtor cannot settle a state law avoidance action that it "does not own"). Under such circumstances, the automatic stay, therefore, no longer bars creditors from pursuing any such state law causes of action. See In re Transcolor Corp., 296 B.R. 343, 359 (Bankr. D. Md. 2003) ("Whether the automatic stay prevents the filing or maintenance of a cause of action outside the bankruptcy court depends upon whether the suit itself is property of the debtor or the debtor's estate. . . . [Because] the instant suit is not property of the debtor [it] therefore is not subject to the automatic stay."); but see Flores v. Hagobian, No. 1:04cv6405, 2007 WL 1792257, *3 (E.D. Cal. June 19, 2007) ("The passing of the two year statute of limitations found in 11 U.S.C. § 546(a) is not listed in 11 U.S.C. § 362(c) as one of the events that concludes an automatic stay . . . . Thus, contrary to Plaintiffs' position, the stay in this action remains in place."); Flores v. DDJ, Inc., No. CV F99-5878, 2007 WL 1521562, *2 (E.D. Cal. May 23, 2007) (same).

29.     Keeping the automatic stay in place, even after the passing of the section 546(a) statute of limitations, would create an unjustified windfall for fraudulent transferees. See Dixon v. Bennett, 531 A.2d at 1325 (explaining that prohibiting creditors from pursuing their own state law actions where the estate's action is barred under section 546(a) "would only serve to shield the recipients of fraudulent transfers at the expense of the unsecured creditor"). Specifically,

creditors' state law avoidance actions are governed by state law statutes of limitation that operate and run independent of chapter 11 proceedings.  See In re Integrated Agri, 313 B.R. at 428 (explaining that trustee's cause of action under section 544(b), albeit based on an actual creditor's rights under the UFTA "is not identical to the UFTA claim that the creditor may bring in state court," because, among other things, the applicable statutes of limitation are different). As a result, if unsecured creditors were barred from pursuing their own state law avoidance actions even after the debtor in possession's statute of limitation had expired, then unsecured creditors could pursue such actions only in those circumstances in which a debtor emerged from chapter 11 before the state law statute of limitation expired.  Accordingly, except in those specific situations, the automatic stay and Bankruptcy Code section 546(a) would operate to protect recipients of fraudulent transfers at the expense of innocent creditors – a perverse result that is inequitable and would make the recipients of fraudulent transfers the beneficiaries of a debtor's bankruptcy filing, a result clearly at odds with the underlying principles of federal bankruptcy law.

**C.**  **To the Extent Applicable, the Court Should Grant Relief from the Automatic Stay**

30.    Section 362(d)(1) of the Bankruptcy Code provides that a bankruptcy court shall grant relief from the automatic stay "for cause."  11 U.S.C. § 362(d)(1).  While the Bankruptcy Code does not define "cause," courts in this and other jurisdictions (including this Court) routinely apply the following three-factor balancing test to determine whether the requisite cause exists to lift the automatic stay:

> (A) whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;
>
> (B) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

(C) whether the creditor has a probability of prevailing on the merits.

See In re Tribune Co., 418 B.R. 116, 126 (Bankr. D. Del. 2009) (J. Carey) (citations omitted).

31.    Here, the equities clearly weigh in favor of lifting the stay.  With respect to the

first factor, the filing of the Complaint would not result in any "great prejudice" to the Debtors or

their estates.  To the contrary, the filing of the Complaint by the Original Plaintiff Group would

result in no prejudice to the Debtors or their estates who, as set forth above, no longer have any

interest in the Estate SLCFC Claims as a result of the expiration of the section 546(a) statute of

limitations.  See supra, ¶¶ 24-26.  Moreover, the filing of the Complaint would not implicate any

of the prejudicial considerations previously identified by this Court.  Specifically, the Complaint

would not (i) allow any creditors "to gain[] a preference for their claims against the debtor," (ii)

"deplete[] the debtor's assets due to legal costs in defending proceedings against it" or (iii)

"interfere[e] with the orderly . . . rehabilitation of the debtor " because the Debtors are not a

party to the Complaint, and the Original Plaintiff Group would seek to toll the prosecution of the

Creditor SLCFC Claims until the Court rules on the Competing Plans.  See In re Tribune

Co., 418 B.R. at 127.

32.    With respect to the second factor, the hardship to the Debtors' creditors by

maintaining the stay would certainly outweigh any hardship to the Debtors.  Lifting the stay, as

set forth above, would cause no prejudice to the Debtors or their estates.  Keeping the stay in

place, however, could render the Creditor SLCFC Claims time-barred, which would constitute a

substantial hardship on the Debtors' creditors and a perverse windfall to the recipients of

fraudulent transfers.

33.    Specifically, the presumed statute of limitations for commencing the Creditor

SLCFC Claims is June 4, 2011 – i.e., the four-year anniversary of the closing of Step One of the

LBO. See supra, at ¶ 3. A very real danger exists that the Debtors will not exit chapter 11 on or before that date. Even assuming that the confirmation hearing concludes sometime in the middle of March 2011, and assuming further that one of the plans is in fact confirmed at the conclusion of that hearing, there nonetheless remains a high likelihood that neither of the Competing Plans will be able to go effective before June 4, 2011. As set forth in the accompanying Senter Declaration, the FCC must undertake a number of different steps, some of which may take several months, before either of the Competing Plans can obtain the requisite approvals from the FCC to enable the Debtors to emerge from chapter 11. See Senter Declaration, ¶¶ 3-7. Accordingly, if the stay is not lifted to permit the filing of the Complaint, the Creditor SLCFC Claims may very well become time-barred.

34.    With respect to the third and final factor, this Court has previously held that, "[e]ven a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case." In re Tribune Co., 418 B.R. at 129 (citations omitted). Here, the record, including the Examiner's Report, contains ample evidence to satisfy the "slight probability of success" standard.

**D.    The Court Should Grant the Original Plaintiff Group Leave from the Mediation Order to Permit the Filing of the Complaint**

35.    On September 1, 2010, the Court entered its Order Appointing Mediator [Dkt. No. 5591] (the "Mediation Order"). Paragraph 10 of the Mediation Order provides:

> Except for motions with respect to standing to file and prosecute LBO-Related Causes of Action, in order to facilitate the Mediation, without leave of the Court for *good cause shown*, the Mediation Parties shall not bring any motion or proceeding during the pendency of the Mediation seeking relief in connection with the LBO-Related Causes of Action or any related causes of action, and any such motions or proceedings currently pending, including any discovery related thereto, shall be stayed sine die.

Mediation Order, ¶ 10 (emphasis added).

36.    Cause exists to grant leave from the Mediation Order. Cf. In re Tribune Co., 418 B.R. 116, 126 (Bankr. D. Del. 2009) (J. Carey) ("Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay."). As set forth above, neither the Debtors nor their estates will suffer any prejudice if the Complaint is filed and then tolled by the Original Plaintiff Group. On the other hand, if the stay imposed by the Mediation Order remains in place, the Creditor SLCFC Claims –an important source of potential recovery to creditors – will be at grave risk of becoming time-barred. Under such circumstances, ample cause exists to grant the Original Plaintiff Group leave from the Mediation Order for the limited purpose of filing the Complaint.

**E.     Even if the DCL Plan Is Confirmed and Can Go Effective Before June 4, 2011, the Relief Requested Herein Should Be Granted**

37.    Creditor SLCFC Claims against Step One Shareholders are not released by the Debtors or their estates under the DCL Plan – a fact now conceded by the DCL Plan proponents. Specifically, the definition of "Debtor Released Claims" is "set forth in Section 11.2.1." See id., § 1.1.65. In turn, section 11.2.1 (governing "Releases by Debtors and Estates") provides:

> Except for the Preserved Causes of Action, on the Effective Date . . . , *the Reorganized Debtors on their own behalf and as representatives of their respective Estates and any Person seeking to exercise the rights of the Debtors' Estates* (including, without limitation, any successor to the Debtors, the Litigation Trustee on behalf of the Litigation Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), and the Creditors' Trustee on behalf of the Creditors' Trust, release . . . the Released Parties of and from any and all claims, . . . (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), . . . . (the "Debtor Released Claims").

See id., § 11.2.1 (emphasis added). Thus, the definition of Debtor Released Claims includes *only* claims held by the Debtors (a) on their own behalf, (b) as representatives of their respective

estates or (c) as representatives of any entity seeking to exercise the rights of their respective

estates. Since (i) the right to prosecute the Estate SLCFC Claims (against both Step One

Shareholders and Step Two Shareholders) ceased to be property of the Debtors' estates upon the

expiration of the section 546(a) statute of limitations on December 8, 2010, see supra, ¶ 24-26,

and (ii) the Creditor SLCFC Claims are property of the individual creditors who hold those

claims, not the Debtors' estates, the Debtor Released Claims, by definition, cannot include the

Creditor SLCFC Claims.

      38.    The foregoing construction is supported by other provisions in the DCL Plan and

accompanying Specific Disclosure Statement. Section 5.15.2 ("Settlement Under the Plan")

provides in pertinent part:

> [T]he provisions of the Plan constitute a good faith compromise and settlement of all **Released Claims** against the Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve such compromise and settlement, to release all of the Released Claims, including, without limitation, the **Released LBO-Related Causes of Action, belonging to the Tribune Entities, the Debtors' Estates** and any other Person that is deemed to have given a release pursuant to Section 11.2 of this Plan against each and every and all Released Parties (the "Settlement").

See id., § 5.15.2 (emphasis added). This provision likewise states that Debtor Released Claims

include only claims of the Debtors or their estates – i.e. claims "belonging to the Tribune Entities

[or] the Debtors' Estates." Id.[13] The DCL Specific Disclosure Statement sums up the foregoing

construction perfectly when it states expressly that "the [DCL] Plan provides for certain

settlements of LBO-Related Causes of Action **held by the Debtors' Estates** against [the Released

Parties]." See DCL Specific Disclosure Statement, p.4 (emphasis added); see also Debtors'

---

[13] Indeed, "Released LBO-Related Causes of Action" is specifically defined to mean "all LBO-Related Causes of Action **that belong to or could be asserted by the Tribune Entities, the Debtors' Estates** or any other Person that is deemed to have given a release pursuant to Section 11.2 of this Plan against the Released Parties." See DCL Plan, § 1.1.190 (emphasis added).

Responsive Statement [Dkt. No. 7199], p. 2 (same).  Of course, the Creditor SLCFC Claims are not "held by the Debtors' Estates," but rather by individual creditors.

39.     In sum, Creditor SLCFC Claims against Step One Shareholders and Step Two Shareholders are treated as follows under the DCL Plan:

(A)     Creditor SLCFC Claims against Step One Shareholders:  Creditor SLCFC Claims are not transferred to the creditors' trust under the DCL Plan.  Furthermore, a careful reading of the DCL Plan reveals that the Debtors and their estates in fact do not release and cannot release such Creditor Claims.  This fact is now conceded by the DCL Plan proponents.  Indeed, any attempt to release the Creditor SLCFC Claims at this stage – claims that belong to creditors, not the Debtors' estates – would amount to an illegal third party release.  See In re Spansion Inc., 426 B.R. 114, 144 (Bankr. D. Del. 2010) (J. Carey) ("[T]hird party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan"); In re Washington Mut., Inc., No. 08-12229, 2011 WL 57111, *30 (Bankr. D. Del. Jan. 7, 2011) (holding that "any [third party] release must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan)") (citations omitted); In re Zenith Electronics Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999) (requiring release provision to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

(B)     Creditor SLCFC Claims against Step Two Shareholders:  Creditor SLCFC Claims are not released by the Debtors or their estates.  Furthermore, while the Creditor SLCFC Claims (other than Creditor SLCFC Claims against the Released Step Two Stockholder Parties) are purportedly transferred to the creditors' trust by holders who do not "opt out" of that transfer, the majority of Pre-LBO Noteholders have elected to not contribute their Creditor SLCFC Claims against Step Two Shareholders to the DCL Plan creditors' trust.  Attempts to release the Released Step Two Stockholder Parties for state law constructive fraudulent transfer claims also must fail as a matter of law for the same reasons that the release of the Step One Shareholders fails.

## NOTICE

40.     Notice of the Motion has been provided to (a) the Office of the United States Trustee; (b) counsel to the Debtors; (c) counsel to the Creditors' Committee; (d) counsel to the administrative agent for the Debtors' postpetition financing facility; and (e) all parties requesting notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure and Local Rule

2002-1(b).  In light of the nature of the relief requested herein, the Movants submit that no other or

further notice is necessary.

## NO PRIOR REQUEST

41.    No previous request for the relief sought herein has been made by the Movants to

this or any other court.

## CONCLUSION

For the foregoing reasons, the Movants request that the Court enter an order substantially

in the form attached hereto as Exhibit A (a) determining that, as a result of the expiration of the

section 546(a) statute of limitations, eligible creditors have regained the right to prosecute their

Creditor SLCFC Claims; (b) determining that the automatic stay of Bankruptcy Code section

362(a) does not bar the filing of the Complaint or, in the alternative, granting relief from the

automatic stay solely to permit the immediate filing of the Complaint; (c) granting leave from the

Mediation Order to permit the immediate filing of the Complaint; and (d) granting the Movants

such other relief as the Court deems just, proper and equitable.

Dated: March 1, 2011
Wilmington, Delaware

Respectfully submitted,

/s/  William P. Bowden
William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor; P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888

Daniel H. Golden
Philip C. Dublin
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000

Meredith S. Senter Jr.
LERMAN SENTER PLLC
2000 K Street NW Suite 600
Washington, D.C. 20006
Telephone:  (202) 429-8970

**COUNSEL FOR AURELIUS CAPITAL
MANAGEMENT, LP, ON BEHALF OF ITS
MANAGED ENTITIES**

/s/   Katharine L. Mayer
Katharine L. Mayer (I.D. No. 3758)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 984-6300

David J. Adler
MCCARTER & ENGLISH, LLP
245 Park Avenue
New York, New York 10167
Telephone: (212) 609-6800

**COUNSEL FOR DEUTSCHE BANK TRUST
COMPANY AMERICAS, SOLELY IN ITS
CAPACITY AS SUCCESSOR INDENTURE
TRUSTEE FOR CERTAIN SERIES OF
SENIOR NOTES**

/s/  Garvan F. McDaniel
Garvan F. McDaniel (I.D. No. 4167)
BIFFERATO GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone:  (302) 429-1900

David S. Rosner
Richard F. Casher
KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700

**COUNSEL FOR LAW DEBENTURE TRUST
COMPANY OF NEW YORK, SOLELY IN ITS
CAPACITY AS SUCCESSOR INDENTURE
TRUSTEE FOR CERTAIN SERIES OF
SENIOR NOTES**