# AKIN GUMP
# STRAUSS HAUER & FELD LLP

■■■■■■■■■ Attorneys at Law

**ABID QURESHI**
212.872.8027/1.212.872.1002
aqureshi@akingump.com

March 7, 2011

**VIA HAND DELIVERY**

Honorable Kevin J. Carey
Chief United States Bankruptcy Judge
United States Bankruptcy Court for the District of Delaware
824 Market Street, Fifth Floor
Wilmington, Delaware 19801

      Re:    **In re Tribune Company, Case No. 08-13141 (KJC)**

Dear Chief Judge Carey:

      We represent Aurelius Capital Management, LP ("Aurelius"). We write on behalf of the proponents of the Noteholder Plan (the "Noteholder Plan Proponents"), to request that Citigroup Global Markets Inc. ("Citigroup") be ordered to (i) for the period December 1, 2007 through December 20, 2007, immediately produce all documents with the terms TRB, Trib! or Tower maintained by Timothy Dilworth, a Managing Director in Citigroup's Leveraged Finance group, and (ii) produce Mr. Dilworth for a deposition this coming week or weekend. Citigroup played a central role in Tribune's 2007 leveraged buyout (the "LBO") that is at the center of these bankruptcy cases, acting as both a financial advisor to the company as well as a lead lender. Although Citigroup is not a proponent of the Debtor/Committee/Lender Plan, Citigroup supports that plan, and stands to receive billions of dollars worth of releases if it is approved.

***Citigroup Has Wrongfully Withheld Highly Relevant Documents Throughout the Pendency of These Cases***

      It has come to light that for the majority of the pendency of these cases Citigroup has withheld key documents regarding its analysis of Tribune's solvency in the days leading up to step two of the LBO on December 20, 2007 ("Step Two"). On Thursday, March 2, 2011, in response to a demand by Aurelius, Citigroup produced — *for the first time* — 123 documents showing that, ████████████████████████████████

████████████████████████████████████████████████████████████

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
Attorneys at Law

Honorable Kevin J. Carey
March 7, 2011
Page 2



These documents should have been produced long ago. Over the course of these cases, Citigroup was served with document requests regarding its involvement in the LBO by (i) the Unsecured Creditors' Committee appointed in these cases (the "UCC"), (ii) Wilmington Trust Company ("Wilmington Trust"), as Successor Indenture Trustee for the $1.2 Billion Exchangeable Subordinated Debentures Due 2029, generally referred to as the PHONES, and (iii) Aurelius, acting on behalf of its managed entities and the other Noteholder Plan Proponents. All of these document requests sought documents relating to the Debtors' solvency during the period January 1, 2007 to the petition date. Nevertheless, Citigroup produced *only one* version of the valuation analyses, which was taken from Mr. Dilworth's hard copy files, and *not a single electronic version of the analyses or substantive email relating to them.* Indeed, it is probable that Citigroup would not have produced these documents at all, had their existence not been revealed at Mr. Sarnobat's deposition on February 27, 2011. In fact, Citigroup purported to produce all electronic information maintained by Mr. Sarnobat for the period November 1, 2007 through December 20, 2007 at 11:30 p.m. the day before Mr. Sarnobat's deposition. That production did not include a single document related to the valuation analyses.

### Citigroup's Testimony Regarding the Valuation Analyses Was, at Best, Incomplete

Additionally, Citigroup's testimony regarding the valuation analyses was, at best, incomplete. When presented by the Examiner with the hard copy version of the valuation

---

[1] Julie Persily, the former co-head of Citigroup's Leveraged Finance group, testified at her deposition in these cases that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Deposition Transcript of Julie Persily dated February 1, 2011 ("Persily Dep. Tr.") 92:10-17. The portions of Ms. Persily's deposition transcript that are cited herein are attached as Exhibit A.
[2] Copies of these documents are attached as Exhibit B.
[3] A copy of this document is attached as Exhibit C.
[4] Copies of these documents are attached as Exhibit D.

AKIN GUMP
STRAUSS HAUER & FELD l.l.p
━━━━━━━━━━ Attorneys at Law

Honorable Kevin J. Carey
March 7, 2011
Page 3

analysis (the only version of the analyses produced by Citigroup prior to last week), Ms. Persily stated that the document showed a "bust or breaking case," and was prepared to determine "how bad does it have to get in order for us to have no value." Transcript of the Examiner's Interview of Julie Persily ("Persily Ex. Tr.") 192:1-14.[5] Counsel for Citigroup also informed the Examiner during Ms. Persily's interview that the analysis does not reflect "what Citi thought were the appropriate assumptions," and that "Citi didn't think they were reasonable marketplace assumptions." *Id.* at 201:16 -202:6.

        The recently produced documents and Mr. Sarnobat's deposition testimony, however, suggest that the story does not end there. Mr. Sarnobat testified that in creating the document (at Ms. Persily's and Mr. Dilworth's request), he started out with "the most unrealistic assumptions, and then refined those assumptions with each iteration." Deposition Transcript of Sachin Sarnobat dated February 27, 2011 ("Sarnobat Dep. Tr.") 136:11-138:17.[6]

*Given Citigroup's Conduct, The Noteholder Plan Proponents Should Not Be Bound By Any "Deal"*

        Accordingly, Aurelius respectfully requests that Citigroup be ordered to (i) for the period December 1, 2007 through December 20, 2007, immediately produce all documents with the terms TRB, Trib! or Tower maintained by Mr. Dilworth, and (ii) produce Mr. Dilworth for a deposition this week or weekend. Citigroup has refused this request, stating that it violates a

---

[5] The portions of the transcript of the Examiner's interview of Ms. Persily that are cited herein are attached as Exhibit E.
[6] The portions of Mr. Sarnobat's deposition transcript that are cited herein are attached as Exhibit F.
[7] A copy of this document is attached as Exhibit G.
[8] A copy of this document is attached as Exhibit H.
[9] A copy of this document is attached as Exhibit I.

AKIN GUMP
STRAUSS HAUER & FELDLLP
━━━━━━━━━━━ Attorneys at Law

Honorable Kevin J. Carey
March 7, 2011
Page 4

"deal" made by the Noteholder Plan Proponents and Citigroup on February 15, 2011, pursuant to which it was agreed that in response to the subpoena served on it by Aurelius, Citigroup would search electronic information maintained by only five custodians from the LBO time period, not including Mr. Dilworth, for the period November 1, 2007 through December 20, 2007. The Noteholder Plan Proponents would never have agreed to such a deal, however, if they had been aware of the documents regarding the valuation analyses and Mr. Dilworth's involvement therein. Moreover, Citigroup's failure to include both Mr. Dilworth and Mr. Samobat in its original electronic searches is contrary to the practice for electronic search methodology endorsed by courts in this and other circuits, which recognize that parties must cooperate in good faith with their adversaries to help devise a search methodology that is designed to capture responsive information. *See, e.g., Romero v. Allstate Ins. Co.*, No. 01-3894, 2010 WL 4138693 at *13-14 (E.D. Pa. Oct. 21, 2010); *William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, No. 07-10639, 2009 WL 724954 at *2 (S.D.N.Y. Mar. 19, 2009). Clearly that is not what happened here.

***

Aurelius requests that this matter be heard by the Court at the hearing scheduled for Monday, March 7, 2011. Thank you for the Court's consideration.

Respectfully submitted,

/s/ Abid Qureshi

Abid Qureshi

cc:    Andrew Gordon (*via email*)
       All Counsel Entitled to Notice Pursuant to
       Paragraph 35 of the CMO (*via email*)

## EXHIBIT A

**[Filed Under Seal]**

## EXHIBIT B

**[Filed Under Seal]**

# EXHIBIT C

**[Filed Under Seal]**

# EXHIBIT D

**[Filed Under Seal]**

# Exhibit E

Persily, Julie H.          CONFIDENTIAL          July 8, 2010
                           New York, NY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

No. 08-13141 (KJC)

(CONFIDENTIAL TRANSCRIPT)

----------------------------------------x

IN RE:

TRIBUNE COMPANY, et al.

----------------------------------------x

DEPOSITION OF:  JULIE H. PERSILY

Thursday, July 8, 2010

New York, New York

Reported in stenotype by:

Rich Germosen, CCR, CRCR, RPR, CRR, CLR

Persily, Julie H.          CONFIDENTIAL          July 8, 2010
                          New York, NY

192

1          A.     You know how I said we're doing

2     quarterly reviews for all of the loans that we

3     hold and risk would want to do -- spent a lot of

4     time measuring the value of what we held and try

5     to take marks against it so that we appropriately

6     reflected our losses on our balance sheet, and so

7     out of a meeting like that would have come an

8     exercise like this where they said show us the

9     value of our debt, show us the value of the

10    equity and hence our debt under various

11    scenarios, management scenario, downside case

12    scenario, and how bad does it have to get in

13    order for us to have no value, and so we would do

14    a, we'd call it a bust case or a breaking case.

15         Q.     All right.

16         A.     How low does the value have to go

17    to break it and so we would do scenarios like

18    that.

19         Q.     All right.

20                And this document is not the

21    easiest in the world to read, but I guess the

22    first thing do you recognize the handwriting on

Persily, Julie H.               CONFIDENTIAL                July 8, 2010
                                  New York, NY

                                                                        201

1   analyzing what other alternatives there were

2   looking back on the transaction?

3          **A.      No, we were thinking about it**

4   **then.  I don't think we thought about it like**

5   **that in March, April, May, but we certainly**

6   **thought about it like that in September, October,**

7   **November, December.**

8          Q.      Okay.

9          MR. MONK:  Anything else you can

10  think of?

11         MR. HALL:  (Indicating.)

12         MR. GORDON:  Charlie, can I make

13  two points and witness can correct or disagree or

14  add commentary?

15         MR. MONK:  Sure.

16         MR. GORDON:  First because I've

17  spoken to Mr. Dilworth, I want to make sure the

18  record is clear that this Citi case was an

19  ultimate downside stress case --

20         THE WITNESS:  The breaking case is

21  what we called it.

22         MR. GORDON:  Right.  It was not

202

1   what Citi thought were the appropriate assumptions

2   and Mr. Dilworth has informed me that in fact

3   ultimately as compared to the management and VRC

4   assumptions these assumptions were rejected, but

5   in other words, we didn't think they were

6   reasonable marketplace assumptions.

7                    MR. MONK:  Okay.

8                    MR. GORDON:  At least that's what,

9   you know, Julie, I don't know if you want to add

10  anything to that?

11                   THE WITNESS:  No.  I mean no.

12                   MR. GORDON:  Okay.

13                   THE WITNESS:  No.

14                   MR. GORDON:  The other thing is is

15  that Julie said the agreement did not require us

16  to be happy with the solvency opinion, I don't

17  want that to be interpreted as meaning we were

18  unhappy with the VRC opinion or ultimately

19  concluded --

20                   THE WITNESS:  Oh, no.  I didn't

21  mean that.

22                   In fact, I think I said they're a

# Exhibit F

Page 1

1

2          IN THE UNITED STATES BANKRUPTCY COURT

3              FOR THE DISTRICT OF DELAWARE

4

5

6    IN RE:                         Chapter 11

7    TRIBUNE COMPANY, et al.,       CASE NO. 08-13141(KJC)

8              Debtors.

9                         /

10

11

12      VIDEOTAPED DEPOSITION OF SACHIN SARNOBAT

13                New York, New York

14                February 27, 2011

15

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 36584

Page 134

1         S. Sarnobat
2    been handed two documents labeled Exhibits 13
3    and 14. Now, I'll give you more time to look at
4    them more closely if you need to do so in
5    response to my questions.
6         Exhibit 13 is a series of e-mails, the
7    top of which is an e-mail from Timothy Dilworth
8    to you and Ms. Persily dated December 17, 2007,
9    and if you look to the bottom e-mail there, it
10   is an e-mail from you to Ms. Persily and Mr.
11   Dilworth dated December 16, 2007, and you say,
12   "Julie, Tim:  Please find attached the latest
13   version of the valuation analysis for Tribune."
14        Is this the valuation analysis that
15   we've been talking about today?
16      A.   When you say "we've been talking
17   about," what do you mean?  Are you referring to
18   the specific iteration or are you referring to
19   the broader process?
20      Q.   Well, is this part of the valuation
21   analysis process that you have been telling me
22   that you did in connection with VRC's work?
23      A.   That is correct.
24      Q.   So this bottom e-mail was sent on
25   December 16. When do you think you created the

TSG Reporting - Worldwide      877-702-9580

Page 135

1         S. Sarnobat
2    first version of the valuation analysis for
3    Tribune?
4       A.   I do not recall the exact date, but
5    probably somewhere around this date.
6       Q.   Okay.
7       A.   Maybe a week prior to this.  I don't
8    exactly recall.
9       Q.   Okay.  Do you know how many versions
10   of this analysis you created?
11      A.   No, but there were plenty.
12      Q.   Okay.  The second line on that bottom
13   e-mail says -- or, the third line, I guess,
14   says, "Key changes from last version are
15   L+400/450bps."  Can you tell me what that means,
16   please?
17      A.   "B-P-S" stands for bps.
18      Q.   And what is L+400?
19      A.   That's "L" is for Libor.  That's 400.
20   One percentage point is 100 bps.
21      Q.   And what is the relevance of that to
22   the analysis that you were doing?
23      A.   That is basically increasing Tribune's
24   interest rate from L plus -- and I'm just
25   reading off this document and not recalling from

TSG Reporting - Worldwide      877-702-9580

Page 136

1         S. Sarnobat
2    memory -- for example, L+200 to L+400.
3       Q.   Okay.
4       A.   So increasing the cost of Tribune's
5    debt by 200 basis points, which would imply a
6    substantial increase in their interest.
7       Q.   Okay.  And you're -- when you say
8    "L+200," you're looking at the interest rate
9    that VRC used in its analysis?
10      A.   Correct.
11      Q.   Okay.  And was there a different
12   interest rate that you had used in a prior
13   iteration of this document?
14      A.   I don't recall because we started off
15   with merely illustrative assumptions and then
16   gradually refined each one along the way.
17      Q.   Okay.
18      A.   All, all -- I think all the analyses
19   that I have done till date.  You start with the
20   biggest assumption that moves the needle, and
21   you keep refining it until you feel comfortable
22   up to a certain point.
23      Q.   Okay.
24      A.   Oftentimes there is no point where you
25   are comfortable.  You just keep moving things

TSG Reporting - Worldwide      877-702-9580

Page 137

1         S. Sarnobat
2    just to see how your assumptions change the
3    valuation or change the number that you are
4    trying to arrive at.
5       Q.   Okay.  So I'm trying to understand how
6    this process works.  So when you say --
7       A.   Okay.
8       Q.   -- that you start out with the biggest
9    assumption, does that mean that you would start
10   out with the highest interest rate that you
11   think could be within the realm of possibility?
12      A.   No.  The biggest assumption is the
13   assumption that's blatantly too far away from
14   reality.
15      Q.   Okay.
16      A.   So --
17      Q.   So it would be an interest rate that
18   is so high that no one would ever have to pay
19   that interest rate?
20      A.   Right, so -- and I'm just illustrating
21   that, as a general process item, I'm not saying
22   that is exactly how it happened in this
23   instance --
24      Q.   Uh-huh.
25      A.   -- but I'm referencing that, because I

TSG Reporting - Worldwide      877-702-9580

1                    S. Sarnobat
2     changed one assumption here, that doesn't have a
3     lot of significance.
4         Q.    Right.
5         A.    I'm highlighting it here because it's
6     over e-mail.
7         Q.    Right. I see.
8         A.    And it was probably part of a
9     conversation that started that morning.
10        Q.    Uh-huh.
11        A.    With every iteration that she got from
12    me, she was okay, change this, change that,
13    change this, change that. This is part of an
14    iteration.
15        Q.    And when you say "she," you're talking
16    about Ms. Persily?
17        A.    Julie.
18        Q.    Okay.
19        A.    But I don't recall that for a fact.
20    I'm just trying to reconstruct things from
21    memory.
22        Q.    Okay. So let's actually turn to the
23    analysis itself, please, and there are -- I'm
24    going to sort of describe how I see the
25    document, and if I get something wrong, please
TSG Reporting - Worldwide        877-702-9580

1                    S. Sarnobat
2     let me know.
3         But it looks like you did a Citi
4     valuation using Citi projections, a Citi
5     valuation using management's projections, and
6     then you show what VRC did; is that correct?
7         A.    I see three columns.
8         Q.    Uh-huh.
9         A.    One that says "Citi Valuation Using
10    Citi Projections." That's just a label that
11    column has.
12        Q.    Okay.
13        A.    The next column is "Citi Valuation
14    Using Management Projections." That's, again,
15    just the label that the column has. And the
16    last one is "VRC."
17        Q.    Okay. So why don't you explain to me
18    what the three different columns show.
19        A.    Okay. So in my -- there's a lot of
20    material on this page. It might be easier if
21    you asked me questions and I can help clarify
22    those --
23        Q.    Okay.
24        A.    -- on an incremental basis.
25        Q.    Okay. So let's look at the first
TSG Reporting - Worldwide        877-702-9580

1                    S. Sarnobat
2     column.
3         A.    Okay.
4         Q.    Which is labeled "Citi Valuation Using
5     Citi Projections."
6         A.    Correct.
7         Q.    Where did those projections come from?
8         A.    I truly do not remember, but I
9     would -- I would imagine that those were more of
10    a downside case that the Leveraged Finance Team
11    created to illustrate what would happen in a
12    downside scenario.
13        Q.    Okay.
14        A.    And so when it says "Citi Valuation,"
15    it just means Citi Leveraged Finance.
16        Q.    Uh-huh. Okay. We talked earlier
17    about the company's projections, and I think you
18    told me that it was an open secret that the
19    people in Leveraged Finance at Citi did not
20    think that the company was going to be able to
21    meet its projections for 2007. Do you remember
22    that?
23            MR. UNGER: Object to form.
24            MR. LEVY: Object to form.
25        A.    Actually, I didn't say that.
TSG Reporting - Worldwide        877-702-9580

1                    S. Sarnobat
2         Q.    Okay.
3         A.    I said that it was open secret that
4     the company was not going to meet its projected
5     budget.
6         Q.    Okay.
7         A.    It was -- it had nothing to do with
8     Leveraged Finance.
9         Q.    Okay.
10        A.    Everyone knew collectively that the
11    company was missing its budget.
12        Q.    Okay.
13        A.    And the use of "open secret" was very
14    poor words. All I meant to convey was everyone
15    had accepted the fact that the weakness in
16    revenues was continuing.
17        Q.    Okay. So did Citi or did anyone in
18    Leveraged Finance put together a set of
19    projections that Citi Leveraged Finance thought
20    the company was going to be able to hit for
21    2007?
22            MR. LEVY: Objection to form.
23        A.    Do you mind repeating the question
24    again?
25        Q.    Sure. The question was, did Citi or
TSG Reporting - Worldwide        877-702-9580

# EXHIBIT G

**[Filed Under Seal]**

# EXHIBIT H

**[Filed Under Seal]**

# EXHIBIT I

**[Filed Under Seal]**