**Exhibit 5.3.1(3)**

**Registration Rights Agreement**

This Exhibit is subject to all of the provisions of the Plan including, without limitation, Section 15.8, pursuant to which the proponents have reserved the right, subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, to alter, amend or modify the Plan or the Exhibits at any time prior to or after to Confirmation Date but prior to the substantial consummation of the Plan.

# REGISTRATION RIGHTS AGREEMENT

dated as of

_____ __, 2011

among

# TRIBUNE COMPANY,

and

# CERTAIN OTHER PARTIES LISTED HEREIN

## TABLE OF CONTENTS

PAGE

### ARTICLE 1
DEFINITIONS

Section 1.01.  *Definitions* ........................................................................................................ 1
Section 1.02.  *Other Definitional and Interpretative Provisions* ...................................... 6

### ARTICLE 2
REGISTRATION RIGHTS

Section 2.01.  *Demand Registration* ..................................................................................... 6
Section 2.02.  *Piggyback Registration* ................................................................................. 10
Section 2.03.  *Lock-Up Agreements* ..................................................................................... 11
Section 2.04.  *Registration Procedures* ............................................................................... 12
Section 2.05.  *Indemnification by the Company* ................................................................ 17
Section 2.06.  *Indemnification by Registering Stockholders* ........................................... 17
Section 2.07.  *Conduct of Indemnification Proceedings* ................................................... 18
Section 2.08.  *Contribution* ................................................................................................... 19
Section 2.09.  *Participation in Public Offering* .................................................................. 19
Section 2.10.  *Other Indemnification* .................................................................................. 20
Section 2.11.  *Cooperation by the Company* ...................................................................... 20
Section 2.12.  *Transfer of Registration Rights* .................................................................. 20
Section 2.13.  *Limitations on Subsequent Registration Rights* ....................................... 20
Section 2.14.  *Free Writing Prospectuses* ........................................................................... 21
Section 2.15.  *Information from Registering Stockholders; Obligations of Registering*
              *Stockholders* ................................................................................................... 21

### ARTICLE 3
TERMINATION

Section 3.01.  *Termination* .................................................................................................... 22

### ARTICLE 4
MISCELLANEOUS

Section 4.01.  *Successors and Assigns* ................................................................................. 22
Section 4.02.  *Notices* ............................................................................................................ 22
Section 4.03.  *Amendments and Waivers* ............................................................................ 24
Section 4.04.  *Governing Law* .............................................................................................. 24
Section 4.05.  *Jurisdiction* ..................................................................................................... 24
Section 4.06.  *WAIVER OF JURY TRIAL* .......................................................................... 25
Section 4.07.  *Specific Enforcement* .................................................................................... 25

PAGE

Section 4.08.  *Counterparts; Effectiveness; Third Party Beneficiaries* ...................................... 25
Section 4.09.  *Entire Agreement* ................................................................................. 25
Section 4.10.  *Severability* ....................................................................................... 25
Section 4.11.  *Sophisticated Parties; Advice of Counsel* ............................................. 26
Section 4.12.  *Certificate of Incorporation Supersedes* ............................................... 26

Exhibit A       Joinder Agreement
Schedule 1
Schedule 2
Schedule 3

# REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT dated as of _____ __, 2011 (this "**Agreement**") among (i) Tribune Company, a Delaware corporation (the "**Company**"), (ii) the parties listed on Schedule 1, (iii) the parties listed on Schedule 2 and (iv) the parties listed on Schedule 3 and (v) other stockholders party hereto from time to time.

## W I T N E S S E T H :

WHEREAS, the Company proposes to issue securities pursuant to the **[Second]** Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "**Plan**") under chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**"), as confirmed pursuant to the order, dated [*Date of Confirmation Order*], of the United States Bankruptcy Court for the District of Delaware;

WHEREAS, the securities are being issued in an offering in reliance on the exemption afforded by section 1145 of the Bankruptcy Code from the registration requirements of the Securities Act (as defined below) and of any applicable state securities or "blue sky" laws and certain stockholders of the Company may be restricted in trading such securities;

WHEREAS, the parties hereto are entering into this Agreement to provide certain registration rights under the Securities Act and applicable state securities laws to each Stockholder Group (as defined below)with respect to Registrable Securities (as defined below) each may hold; and

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01. *Definitions.* (a) As used herein, the following terms have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person; *provided* that no securityholder of the Company shall be deemed an Affiliate of any other securityholder solely by reason of any investment in the Company. For the purpose of this definition, the term "**control**" (including, with correlative meanings, the terms "**controlling**", "**controlled by**" and "**under common control with**"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Angelo Gordon Stockholder**" means, collectively, (i) each Stockholder listed on Schedule 2 under the heading "Angelo Gordon Funds," (ii) their respective Affiliates and (iii) any transferee to whom any registration right hereunder held by the Persons in the foregoing clauses (i) and (ii) are assigned pursuant to <u>Section 2.12</u>.

"**Board**" means the board of directors of the Company or any committee thereof.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized by law to close.

"**Certificate of Incorporation**" means the Amended and Restated Certificate of Incorporation of the Company, as the same may be amended, modified or restated from time to time.

"**Class A Common Stock**" means the Class A Common Stock, par value $.001 per share, of the Company.

"**Common Stock**" means (i) the Class A Common Stock and the Class B Common Stock, par value $.001 per share, of the Company, (ii) any other common stock of the Company, (iii) any securities of the Company or any successor or assign of the Company into which such stock described in clauses (i) and (ii) is reclassified or reconstituted or into which such stock is converted or otherwise exchanged in connection with a combination of shares, recapitalization, merger, sale of assets, consolidation or other reorganization or otherwise or (iv) any securities received as a dividend or a distribution in respect of the securities described in clauses (i), (ii) and (iii) above.

"**Company Securities**" means (i) the Common Stock, (ii) securities convertible into or exchangeable for Common Stock and (iii) any options, warrants (including New Warrants) or other rights to acquire Common Stock.

"**Emergence Effective Date**" means the Effective Date as such term is defined in the Plan.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder.

"**FINRA**" means the Financial Industry Regulatory Authority.

"**Free Writing Prospectus**" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act relating to the Registrable Securities included in the applicable Registration Statement.

"**Initial Public Offering**" means the initial underwritten public offering of any shares of Common Stock of the Company pursuant to an effective registration statement (other than a registration statement filed in connection with an employee benefit plan or business combination

transaction or a registration statement on Form S-4 or S-8 or any similar or successor form thereto) filed under the Securities Act.

"**JPMorgan Stockholder**" means collectively, (i) each Stockholder listed on Schedule 1 under the heading "JPMorgan Parties," (ii) their respective Affiliates and (iii) any transferee to whom any registration right hereunder held by the Persons in the foregoing clauses (i) and (ii) are assigned pursuant to Section 2.12.

"**New Warrants**" means New Warrants as such term is defined in the Plan.

"**Oaktree Stockholder**" means, collectively, (i) each Stockholder listed on Schedule 3 under the heading "Oaktree Funds," (ii) their respective Affiliates and (iii) any transferee to whom any registration right hereunder held by the Persons in the foregoing clauses (i) and (ii) are assigned pursuant to Section 2.12.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof, and shall include any successor (by merger or otherwise) thereto.

"**Public Offering**" means an underwritten public offering of Registrable Securities (or in the case of the Company, Company Securities) pursuant to an effective registration statement under the Securities Act, other than pursuant to a registration statement on Form S-4 or Form S-8 or any similar or successor form under the Securities Act.

"**Registrable Securities**" means, at any time, any Company Securities until (i) a registration statement covering such securities has been declared effective by the SEC and such securities have been disposed of pursuant to such effective registration statement, (ii) such securities are sold pursuant to Rule 144 (or any similar provisions then in force) under the Securities Act or (iii) such securities are otherwise transferred, assigned, sold, conveyed or otherwise disposed of and thereafter such securities may be resold without subsequent registration under the Securities Act.

"**Registration Expenses**" means any and all expenses incident to the performance of or compliance with any registration or marketing of Registrable Securities, regardless of whether such Registration Statement is declared effective, including all (i) registration and filing fees, and all other fees and expenses payable in connection with the listing of securities on any securities exchange or automated interdealer quotation system, (ii) fees and expenses incurred in complying with any securities or "blue sky" laws (including reasonable fees and disbursements of counsel in connection with "blue sky" qualifications of the Registrable Securities as may be set forth in any underwriting agreement), (iii) expenses in connection with the preparation, printing, mailing and delivery of any registration statements, prospectuses and other documents in connection therewith and any amendments or supplements thereto, (iv) security engraving and printing expenses, (v) internal expenses of the Company (including all salaries and expenses of its officers and employees performing legal or accounting duties), (vi) reasonable fees and

3

disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company (including the expenses relating to any comfort letters or costs associated with the delivery by independent certified public accountants of any "comfort" letters requested pursuant to <u>Section 2.04(h)</u> or any special audits incidental to or required by any registration or qualification), (vii) reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (viii) reasonable fees, out-of-pocket costs and expenses of one firm of counsel selected by the holder(s) of a majority of the Registrable Securities covered by each Registration Statement (the "**Holders' Counsel**") up to a maximum amount of $50,000 per Registration Statement, (ix) fees and expenses in connection with any review by the FINRA of the underwriting arrangements or other terms of the offering, and all fees and expenses of any qualified independent underwriter, including the reasonable fees and expenses of any counsel thereto, (x) fees and disbursements of underwriters customarily paid by issuers or sellers of securities, but excluding any underwriting fees, discounts and commissions attributable to the sale of Registrable Securities, (xi) costs of printing and producing any agreements among underwriters, underwriting agreements, any "blue sky" or legal investment memoranda and any selling agreements and other documents in connection with the offering, sale or delivery of the Registrable Securities, (xii) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (xiii) expenses relating to any analyst or investor presentations or any "road shows" undertaken in connection with the registration, marketing or selling of the Registrable Securities, (xiv) fees and expenses payable in connection with any ratings of the Registrable Securities, including expenses relating to any presentations to rating agencies, (xv) all out-of-pocket costs and expenses incurred by the Company or its appropriate officers in connection with their compliance with <u>Section 2.04(m)</u> and (xvi) any liability insurance or other premiums for insurance obtained in connection with any Demand Registration, Piggyback Registration or Shelf Registration pursuant to the terms of this Agreement.

"**Registration Statement**" means any registration statement of the Company under the Securities Act that covers any of the Registrable Securities pursuant to the provisions of this Agreement.

"**Requesting Stockholder**" means, with respect to a Demand Registration or Shelf Registration, as applicable, any Stockholder Group holding at least 5% of the Class A Common Stock (assuming the conversion of all Class B Common Stock and New Warrants into Class A Common Stock).

"**Rule 144**" means Rule 144 (or any successor provisions) under the Securities Act.

"**SEC**" means the Securities and Exchange Commission or any successor governmental agency.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Shares**" means shares of Common Stock.

"**Specified Period**" means, (i) with regard to the period after the effective date of a Registration Statement for an Initial Public Offering, one hundred eighty (180) days; and (ii) with regard to the period after the effective date of a Registration Statement for an offering other than an Initial Public Offering, ninety (90) days; *provided* that if (i) the Company issues an earnings release or other material news or a material event relating to the Company and its Subsidiaries occurs during the last seventeen (17) days of such period or (ii) prior to the expiration of such period, the Company announces that it will release earnings results during the 16-day period beginning upon the expiration of such period, then to the extent necessary for a managing or co-managing underwriter of a registered offering required hereunder to comply with NASD Rule 2711(f)(4), such period shall be extended until eighteen (18) days after the earnings release or the occurrence of the material news or event, as the case may be.

"**Stockholder**" means at any time, any Person (other than the Company) who shall be a party to or bound by this Agreement, so long as such Person shall "beneficially own" (as such term is defined in Rule 13d-3 of the Exchange Act) any Company Securities.

"**Stockholder Group**" means any of the JPMorgan Stockholder, the Angelo Gordon Stockholder and the Oaktree Stockholder.

"**Subsidiary**" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions at the time are directly or indirectly owned by such Person.

(a)    Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Company | Preamble |
| Damages | 2.05 |
| Demand Registration | 2.01(a) |
| Form S-3 | 2.01(a) |
| Indemnified Party | 2.07 |
| Indemnifying Party | 2.07 |
| Inspectors | 2.04(g) |
| Maximum Offering Size | 2.01(e) |
| Piggyback Registration | 2.02(a) |
| Records | 2.04(g) |
| Registering Stockholders | 2.01(a)(ii) |
| Registration Actions | 2.01(f) |
| Shelf Registration | 2.01(g) |
| Stockholder Parties | 2.05 |
| Suspension Notice | 2.01(f) |
| Suspension Period | 2.01(f) |

Section 1.02.  *Other Definitional and Interpretative Provisions.*  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any Person include the successors and permitted assigns of that Person.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

## ARTICLE 2
### REGISTRATION RIGHTS

Section 2.01.  *Demand Registration.*  (a) At any time following the earlier of (x) the Company consummating an Initial Public Offering of the Class A Common Stock or (y) the first anniversary of the Emergence Effective Date, any Requesting Stockholder may give a written request to the Company to effect the registration under the Securities Act (other than pursuant to a registration statement on Form S-4 or S-8 or any similar or successor form under the Securities Act) of all or any portion of such Requesting Stockholder's Registrable Securities, which written request shall specify the number of Registrable Securities to be registered and the intended method of disposition thereof.  At any time the Company is eligible for use of Form S-3ASR, such registration shall occur on such form.  Upon the receipt of such written request, the Company shall promptly give notice (via facsimile or electronic transmission) of such requested registration (each such registration shall be referred to herein as a "**Demand Registration**") at least ten (10) Business Days prior to the anticipated filing date of the Registration Statement relating to such Demand Registration to the other Stockholder Groups.  Thereafter, the Company shall use its commercially reasonable efforts to effect, as soon as possible, the registration under the Securities Act of:

(i)       all Registrable Securities for which the Requesting Stockholder has requested registration under this Section 2.01;

(ii)      all other Registrable Securities of the same class or series as those requested to be registered by the Requesting Stockholder that any other Stockholder Group (all such Stockholder Groups, together with the Requesting Stockholder, and any Stockholder Groups participating in a Piggyback Registration pursuant to Section 2.02,

6

the "**Registering Stockholders**") have requested the Company to register by request received by the Company within ten (10) Business Days after such Stockholder Groups receive the Company's notice of the Demand Registration; and

(iii)         any Company Securities to be offered or sold by the Company;

all to the extent necessary to permit the disposition (in accordance with the intended methods thereof as aforesaid) of the Registrable Securities so to be registered; *provided* that, subject to Section 2.01(d), the Company shall not be obligated to effect (x) more than five (5) Demand Registrations requested by the Oaktree Stockholder, three (3) Demand Registrations requested by the JPMorgan Stockholder and three (3) Demand Registrations requested by the Angelo Gordon Stockholder, in each case, other than Demand Registrations to be effected pursuant to a Registration Statement on Form S-3 (or any successor or similar form) under the Securities Act ("**Form S-3**") for which an unlimited number of Demand Registrations shall be permitted, (y) any such Demand Registration (i) within the Specified Period (or such shorter period as the Company may determine in its sole discretion) after the effective date of any other registration statement of the Company (other than a registration statement filed in connection with an employee benefit plan or business combination transaction or a registration statement on Form S-4 or S-8 or any similar or successor form thereto) or (ii) in accordance with Section 2.01(f) or (z) any Demand Registration if the aggregate proceeds expected to be received from the sale of the Registrable Securities requested to be included in such Demand Registration is less than the lesser of (i) $100,000,000 and (ii) 2.5% of the market capitalization determined in good faith as of the date the Company receives a written request for Demand Registration.

(b)         Promptly after the expiration of the ten (10) Business Day period referred to in Section 2.01(a)(ii), the Company will notify all Registering Stockholders of the identities of the other Registering Stockholders and the number of shares of Registrable Securities requested to be included in the Demand Registration. At any time prior to the effective date of the Registration Statement relating to such Demand Registration, the Requesting Stockholder may upon notice to the Company, revoke such request in whole or in part with respect to the number of shares of Registrable Securities requested to be included in such Registration Statement, without liability to any of the other Registering Stockholders.

(c)         The Company shall be liable for and pay all Registration Expenses in connection with any Demand Registration, regardless of whether such Demand Registration becomes effective; *provided, however,* that if the Requesting Stockholder revokes its request in whole pursuant to Section 2.01(b), the Requesting Stockholder shall reimburse the Company for and/or pay directly all Registration Expenses incurred relating to such Demand Registration.

(d)         A Demand Registration shall not be deemed to have occurred:

(i)         unless the Registration Statement relating thereto (A) has become effective under the Securities Act and (B) has remained continuously effective for a period of at least (x) one hundred eighty (180) days (or such shorter period in which all Registrable Securities of the Registering Stockholders included in such registration have

actually been sold thereunder) or (y) with respect to a Shelf Registration, until the date set forth in Section 2.04(a); *provided* that such Registration Statement shall not be considered a Demand Registration if, after such Registration Statement becomes effective, (1) such Registration Statement is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court and (2) less than 75% of the Registrable Securities included in such Registration Statement have been sold thereunder; or

(ii)     if the Maximum Offering Size is reduced in accordance with Section 2.01(e) such that less than 66$^2$/$_3$% of the Registrable Securities of the Requesting Stockholder sought to be included in such registration are included.

(e)     If a Demand Registration involves a Public Offering and the lead managing underwriter advises the Company and the Requesting Stockholder that, in its view, the number of shares of Registrable Securities requested to be included in such registration (including any securities that the Company proposes to be included that are not Registrable Securities) exceeds the largest number of shares that can be sold without having a material and adverse effect on such offering, including the price at which such shares can be sold (the "**Maximum Offering Size**"), the Company shall include in such registration, in the priority listed below, up to the Maximum Offering Size:

(i)     first, all Registrable Securities requested to be registered by the Requesting Stockholder and all other Registering Stockholders (allocated, if necessary for the offering not to exceed the Maximum Offering Size, to give first priority to the inclusion of the Registrable Securities of the Requesting Stockholder and, thereafter, pro rata among the remaining Registering Stockholders on the basis of the relative number of shares of Registrable Securities so requested to be included in such registration by each such Registering Stockholder);

(ii)     second, any securities proposed to be registered by the Company; and

(iii)     third, any securities proposed to be registered for the account of any other Persons, with such priorities among them as the Company shall determine.

(f)     Notwithstanding anything to the contrary contained in this Agreement, but subject to the limitation set forth in the next succeeding paragraph, the Company shall be entitled to suspend its obligation to file (but not the preparation of) any Registration Statement in connection with a Demand Registration and any Shelf Registration, file any amendment to such a Registration Statement, furnish any supplement or amendment to a prospectus included in such a Registration Statement, make any other filing with the SEC, cause such a Registration Statement or other filing with the SEC to become or remain effective or take any similar action (collectively, "**Registration Actions**") upon (i) the issuance by the SEC of a stop order suspending the effectiveness of any such Registration Statement or the initiation of proceedings with respect to such a Registration Statement under Section 8(d) or 8(e) of the Securities Act, (ii) the Board's determination, in its good faith judgment, that any such Registration Action should

8

not be taken because it would reasonably be expected to materially interfere with or require the public disclosure of any material corporate development or plan, including any material financing, securities offering, acquisition, disposition, corporate reorganization or merger or other transaction involving the Company or any of its subsidiaries or (iii) the Company possessing material non-public information the disclosure of which the Board determines, in its good faith judgment, would reasonably be expected to not be in the best interests of the Company. Upon the occurrence of any of the conditions described in (i), (ii) or (iii) above, the Company shall give prompt notice of such suspension (and whether such action is being taken pursuant to (i), (ii) or (iii) above) (a "**Suspension Notice**") to the Stockholders. Upon the termination of such condition, the Company shall give prompt notice thereof to the Stockholders and shall promptly proceed with all Registration Actions that were suspended pursuant to this paragraph.

The Company may only suspend Registration Actions pursuant to the preceding paragraph on one (1) occasion during any period of six (6) consecutive months for a reasonable time specified in the Suspension Notice but not exceeding ninety (90) days (which period may not be extended or renewed) (each such occasion, a "**Suspension Period**"). Each Suspension Period shall be deemed to begin on the date the relevant Suspension Notice is given to the Stockholders and shall be deemed to end on the earlier to occur of (i) the date on which the Company gives the Stockholders a notice that the Suspension Period has terminated and (ii) the date on which the number of days during which a Suspension Period has been in effect exceeds the ninety (90) day period. If the filing of any Demand Registration is suspended pursuant to this Section 2.01(f), once the Suspension Period ends the Requesting Stockholder may request a new Demand Registration (which request shall not be counted as an additional Demand Registration for purposes of subclause (x) of Section 2.01(a)). Notwithstanding anything to the contrary in this Agreement, the Company shall not be in breach of, or failed to comply with, any obligation under this Agreement where the Company acts or omits to take any action in order to comply with applicable law, any interpretation of the staff of the SEC or any order or decree of any court or governmental agency.

(g)    At any time when (i) the Company is eligible for use of Form S-3 in connection with a secondary public offering of its equity securities and  (ii) a Shelf Registration on a Form S-3 registering Registrable Securities for resale is not then effective (subject to any applicable Suspension Period), upon the request of any Stockholder Group, the Company shall use its commercially reasonable efforts to file a "shelf" Registration Statement (the "**Shelf Registration**"), so long as the Company is eligible for Form S-3 for such Shelf Registration, with respect to the Registrable Securities pursuant to Rule 415 (or any similar provision that may be adopted by the SEC) under the Securities Act and to cause such Shelf Registration to become effective and to keep such Shelf Registration in effect until the date set forth in Section 2.04(a). At any time the Company is eligible for use of Form S-3ASR, such Shelf Registration shall occur on such form.  Any offer or sale of Registrable Securities pursuant to the Shelf Registration in any underwritten Public Offering shall be deemed to be a Demand Registration

subject to the provisions of <u>Sections 2.01(a)</u> through <u>(f)</u> to the extent applicable;[1] <u>provided</u> that, for the avoidance of doubt, a request by any Stockholder Group for a Shelf Registration shall not be counted against the number of Demand Registrations to which such Stockholder Group is entitled as set forth in Section 2.01(a). No Stockholder shall be entitled to include any of its Registrable Securities in a Shelf Registration unless such Stockholder has complied with <u>Section 2.15</u>. The Company shall not be required to amend a Shelf Registration (or the related prospectus) to add or change the disclosure regarding selling securityholders during any Suspension Period.  At any time the Company is not eligible for use of Form S-3 with respect to a secondary public offering of its equity securities, the Company may withdraw any Registration Statement previously filed pursuant to this <u>Section 2.01(g)</u>.

Section 2.02. *Piggyback Registration.* (a) If the Company proposes to register any Company Securities under the Securities Act (other than a registration on Form S-8 or S-4 or any similar or successor form under the Securities Act, relating to Shares or any other class of Company Securities issuable upon exercise of employee stock options or in connection with any employee benefit or similar plan of the Company or in connection with a direct or indirect acquisition by the Company of another Person) other than in connection with a rights offering, whether or not for sale for its own account, the Company shall each such time give prompt notice (via facsimile or electronic transmission) at least ten (10) Business Days prior to the anticipated filing date of the registration statement relating to such registration to each Stockholder Group, which notice shall set forth such Stockholder Group's rights under this <u>Section 2.02</u> and shall offer such Stockholder Group the opportunity to include in such registration statement the number of Registrable Securities of the same class or series as those proposed to be registered as each such Stockholder Group may request (a "**Piggyback Registration**"), subject to the provisions of <u>Section 2.02(b)</u>. Upon the request of any such Stockholder Group made within ten (10) Business Days after the receipt of notice from the Company regarding a Piggyback Registration (which request shall specify the number of Registrable Securities intended to be registered by such Stockholder Group), the Company shall use its commercially reasonable efforts to effect the registration under the Securities Act of all Registrable Securities that the Company has been so requested to register by all such Stockholder Groups, to the extent requisite to permit the disposition of the Registrable Securities so to be registered in accordance with the plan of distribution intended by the Company for such registration statement; *provided* that (i) if such registration involves a Public Offering, all such Registering Stockholders requesting to be included in the Company's registration must sell their Registrable Securities to the underwriters selected as provided in <u>Section 2.04(f)(i)</u> on the same terms and conditions as apply to the Company and (ii) if, at any time after giving notice of its intention to register any Company Securities pursuant to this <u>Section 2.02(a)</u> and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register such securities, the Company shall give notice to all Registering Stockholders and, thereupon, shall be relieved of its obligation to register any Registrable

---

[1] The parties agree to revise the Agreement to address the procedures and mechanics for "take downs" (including Public Offerings) under a Shelf Registration.

Securities in connection with such registration. No registration effected under this Section 2.02 shall relieve the Company of its obligations to effect a Demand Registration or Shelf Registration to the extent required by Section 2.01. The Company shall pay all Registration Expenses in connection with each Piggyback Registration.

(b)    If a Piggyback Registration involves a Public Offering (other than any Demand Registration, in which case the provisions with respect to priority of inclusion in such offering set forth in Section 2.01(e) shall apply) and the lead managing underwriter advises the Company that, in its view, the number of Registrable Securities that the Company and such Registering Stockholders intend to include in such registration exceeds the Maximum Offering Size, the Company shall include in such registration, in the following priority, up to the Maximum Offering Size:

(i)    first, so much of the Registrable Securities proposed to be registered for the account of the Company as would not cause the offering to exceed the Maximum Offering Size;

(ii)    second, all Registrable Securities requested to be included in such registration by any Registering Stockholders pursuant to this Section 2.02 (allocated, if necessary for the offering not to exceed the Maximum Offering Size, pro rata among such Stockholder Groups on the basis of the relative number of shares of Registrable Securities so requested to be included in such registration by each such Stockholder Group); and

(iii)    third, any securities proposed to be registered for the account of any other Persons with such priorities among them as the Company shall determine.

Section 2.03.    *Lock-Up Agreements.* (a) Each Stockholder hereby agrees that it will not effect any public sale or distribution (including sales pursuant to Rule 144) of Registrable Securities, (i) during (A) the fourteen (14) days prior to and the 90-day period (or with respect to an Initial Public Offering, a longer period of up to 180 days, to the extent reasonably requested by the underwriters participating in such Initial Public Offering) beginning on the effective date of the registration of such Registrable Securities in connection with a Public Offering (which period following the effective date may, in each case, be extended to the extent required by applicable law, rule or regulation) or (B) such shorter period as the underwriters participating in such Public Offering may require, and (ii) upon notice from the Company of the commencement of a Public Offering in connection with any Shelf Registration, during (A) fourteen (14) days prior to and the 90-day period beginning on the date of commencement of such Public Offering (or with respect to an Initial Public Offering, a longer period of up to 180 days, to the extent reasonably requested by the underwriters participating in such Initial Public Offering) or (B) such shorter period as the underwriters participating in such Public Offering may require, in each case except as part of such Public Offering. Each Stockholder agrees to execute a lock-up agreement in favor of the underwriters in form and substance reasonably acceptable to the Company and the underwriters to such effect and, in any event, that the underwriters in any relevant offering shall be third party beneficiaries of this Section 2.03(a).

(b) The Company shall not effect any public sale or distribution of Registrable Securities (except pursuant to registrations on Form S-8 or Form S-4 or any similar or successor form under the Securities Act), (i) with respect to any Public Offering pursuant to a Demand Registration or any Piggyback Registration in which the holders of Registrable Securities are participating, during (A) the fourteen (14) days prior to and the 90-day period (or with respect to an Initial Public Offering, a longer period of up to 180 days, to the extent reasonably requested by the underwriters participating in such Initial Public Offering) beginning on the effective date of such registration (which period following the effective date may, in each case, be extended to the extent required by applicable law, rule or regulation) or (B) such shorter period as the underwriters participating in such Public Offering may require, and (ii) upon notice from any holder(s) of Registrable Securities subject to a Shelf Registration that such holder(s) intend to effect a Public Offering of Registrable Securities pursuant to such Shelf Registration (upon receipt of which, the Company will promptly notify all other Stockholders of the date of commencement of such Public Offering), during (A) the fourteen (14) days prior to and the 90-day period beginning on the date of commencement of such Public Offering (or with respect to an Initial Public Offering, a longer period of up to 180 days, to the extent reasonably requested by the underwriters participating in such Initial Public Offering) and (B) such shorter period as the underwriters participating in such Public Offering may require), in each case except as part of such Public Offering.

Section 2.04. *Registration Procedures.* Whenever Stockholder Groups request that any Registrable Securities be registered pursuant to Section 2.01 or 2.02, subject to the provisions of such Sections, the Company shall use its commercially reasonable efforts to effect the registration and the sale of such Registrable Securities in accordance with the intended method of disposition thereof as soon as reasonably practicable, and, in connection with any such request:

(a)    The Company shall as soon as reasonably practicable prepare and file with the SEC a Registration Statement on any form for which the Company then qualifies or that counsel for the Company shall deem appropriate and which form shall be available for the sale of the Registrable Securities to be registered thereunder in accordance with the intended method of distribution thereof, and use its commercially reasonable efforts to cause such filed Registration Statement to become and remain effective for a period of (i) not less than one hundred eighty (180) days (or, if sooner, until all Registrable Securities have been sold under such Registration Statement), or (ii) in the case of a Shelf Registration, until the earlier of the date (x) on which all of the securities covered by such Shelf Registration are no longer Registrable Securities and (y) on which the Company cannot extend the effectiveness of such Shelf Registration because it is no longer eligible for use of Form S-3; subject in each case to any Suspension Period.

(b)    Prior to filing a Registration Statement or related prospectus or any amendment or supplement thereto (including any documents incorporated by reference therein), or before using any Free Writing Prospectus, the Company shall provide to each Registering Stockholder, the Holders' Counsel and each underwriter, if any, with an adequate and appropriate opportunity to review and comment on such Registration Statement, each Prospectus included therein (and each amendment or supplement thereto) and each Free Writing Prospectus proposed to be filed with

the SEC, and thereafter the Company shall furnish to such Registering Stockholder, the Holders' Counsel and underwriter, if any, such number of copies of such Registration Statement, each amendment and supplement thereto filed with the SEC (in each case including all exhibits thereto and documents incorporated by reference therein), the prospectus included in such Registration Statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424, Rule 430A, Rule 430B, Rule 430C under the Securities Act and such other documents as such Registering Stockholder or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such Registering Stockholder; *provided, however,* that in no event shall the Company be required to provide to any Person any materials, information or document required to be filed by the Company pursuant to the Exchange Act prior to its filing other than in connection with a Public Offering (other than information required to be provided pursuant to Section 5.5 of the Plan). In addition, the Company shall, as expeditiously as practicable, keep Holders' Counsel advised in writing as to the initiation and progress of any registration under <u>Sections 2.01</u> and <u>2.02</u> and provide Holders' Counsel with copies of all correspondence (including any comment letter) with the SEC, any self regulatory organization or other governmental agency in connection with any such Registration Statement. Each Registering Stockholder shall have the right to request that the Company modify any information contained in such Registration Statement, amendment and supplement thereto pertaining to such Registering Stockholder and the Company shall use its commercially reasonable efforts to comply with such request; *provided, however,* that the Company shall not have any obligation so to modify any information if the Company reasonably expects that so doing would cause the prospectus to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

(c)     After the filing of the Registration Statement, the Company shall (i) cause the related prospectus to be supplemented by any required prospectus supplement, and, as so supplemented, to be filed pursuant to Rule 424 under the Securities Act, (ii) comply with the provisions of the Securities Act applicable to the Company with respect to the disposition of all Registrable Securities covered by such Registration Statement during the applicable period in accordance with the intended methods of disposition by the Registering Stockholder thereof set forth in such Registration Statement or supplement to such prospectus and (iii) promptly notify each Registering Stockholder holding Registrable Securities covered by such Registration Statement and the Holders' Counsel any stop order issued or threatened by the SEC or any state securities commission and take all commercially reasonable actions required to prevent the entry of such stop order or to remove it if entered.

(d)     The Company shall use its commercially reasonable efforts to (i) register or qualify the Registrable Securities covered by such Registration Statement under such securities or "blue sky" laws of such jurisdictions in the United States as any Registering Stockholder holding such Registrable Securities reasonably (in light of such Stockholder Group's intended plan of distribution) requests, and continue such registration or qualification in effect in such jurisdiction for the shortest of (A) as long as permissible pursuant to the laws of such jurisdiction, (B) as long as any such Registering Stockholder requests or (C) until all such Registrable Securities are sold and (ii) cause such Registrable Securities to be registered with or

13

(g)     Upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Board, the Company shall make available for inspection by any Stockholder Group and any underwriter participating in any disposition pursuant to a Registration Statement being filed by the Company pursuant to this <u>Section 2.04</u> and any attorney, accountant or other professional retained by any such Stockholder Group or underwriter (collectively, the "**Inspectors**"), all financial and other records, pertinent corporate documents and properties of the Company (collectively, the "**Records**") as shall be reasonably necessary or desirable to enable them to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information reasonably requested by any Inspectors in connection with such Registration Statement.  Records that the Company determines, in good faith, to be confidential and that it notifies the Inspectors are confidential shall not be disclosed by the Inspectors unless (i) the disclosure of such Records is necessary to avoid or correct a misstatement or omission in such Registration Statement, (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, (iii) disclosure of such Records is necessary to comply with federal or state securities laws or the rules of any securities exchange or trading market on which the Common Stock is listed or traded or is otherwise required by law, rule, regulation or legal process, (iv) the information in such Records was known to the Inspectors on a non-confidential basis prior to its disclosure by the Company or has been made generally available to the public, (v) the information in such Records is or becomes available to the public other than as a result of disclosure by any Inspector in violation the confidentiality agreements or (vi) is or was independently developed by any Inspector without the benefit of the information in such Records.  Each Registering Stockholder agrees that information obtained by it as a result of such inspections shall be deemed confidential and shall not be used by it or its Affiliates for any other purpose, including as the basis for any market transactions in any securities of the Company, unless and until such information is made generally available to the public.  Each Registering Stockholder further agrees that, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, it shall give notice to the Company and allow the Company, at its expense, to undertake appropriate action to prevent disclosure of the Records deemed confidential.

(h)     The Company shall furnish to each Registering Stockholder and to each such underwriter, if any, a signed counterpart, addressed to such Registering Stockholder or underwriter, of (i) an opinion or opinions of counsel to the Company and (ii) a comfort letter or comfort letters from the Company's independent public accountants, each in customary form and covering such matters of the kind customarily covered by opinions or comfort letters, as the case may be, any Registering Stockholder or the lead managing underwriter therefor reasonably requests.

(i)     The Company shall otherwise comply with all applicable rules and regulations of the SEC, and make available to its security holders, as soon as reasonably practicable, an earnings statement or such other document that shall satisfy the provisions of Section 11(a) of the Securities Act and the requirements of Rule 158 thereunder.

(j)     The Company may require each Registering Stockholder promptly to furnish in writing to the Company such information regarding the distribution of the Registrable Securities

15

as the Company may from time to time reasonably request and such other information as may be reasonably required in connection with such registration.

(k)     Each Registering Stockholder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 2.04(e), such Stockholder shall forthwith discontinue disposition of Registrable Securities pursuant to the Registration Statement (including any Shelf Registration) covering such Registrable Securities until such Stockholder's receipt of (i) copies of the supplemented or amended prospectus from the Company or (ii) further notice from the Company that distribution can proceed without an amended or supplemented prospectus, and, in the circumstances described in clause (i), if so directed by the Company, such Stockholder shall deliver to the Company all copies, other than any permanent file copies then in such Stockholder's possession, of the most recent prospectus covering such Registrable Securities at the time of receipt of such notice. If the Company shall give such notice, the Company shall extend the period during which such registration statement shall be maintained effective (including the period referred to in Section 2.04(a)) by the number of days during the period from and including the date of the giving of notice pursuant to Section 2.04(e) to the date when the Company shall (x) make available to such Stockholder a prospectus supplemented or amended to conform with the requirements of Section 2.04(e) or (y) deliver to such Stockholder the notice described in clause (ii).

(l)     The Company shall use its commercially reasonable efforts to list all Registrable Securities of any class or series covered by such Registration Statement on any national securities exchange on which any of the Registrable Securities of such class or series are then listed or traded (and, in the case of the Initial Public Offering pursuant to a Demand Registration, on a national securities exchange, if then eligible, that is selected by the Board and that is reasonably acceptable to the holders of a majority of the Registrable Securities).

(m)     The Company shall have appropriate officers of the Company (i) upon reasonable request and at reasonable times prepare and make presentations at any "road shows" and before analysts and rating agencies, as the case may be, (ii) take other actions to obtain ratings for any Registrable Securities and (iii) otherwise use its commercially reasonable efforts to cooperate as requested by the underwriters in the offering, marketing or selling of the Registrable Securities.

(n)     The Company shall as soon as possible following its actual knowledge thereof, notify each Registering Stockholder: (A) when a prospectus, any prospectus supplement, a Registration Statement or a post-effective amendment to a Registration Statement has been filed with the SEC, and, with respect to a Registration Statement or any post-effective amendment, when the same has become effective; (B) of any request by the SEC or any other federal or state governmental authority for amendments or supplements to a Registration Statement, a related prospectus (including a Free Writing Prospectus) or for any other additional information; or (C) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceedings for such purpose.

(o)      The Company shall reasonably cooperate with each Registering Stockholder and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made by FINRA.

(p)      The Company shall take all other steps reasonably necessary to effect the registration of such Registrable Securities and reasonably cooperate with the holders of such Registrable Securities to facilitate the disposition of such Registrable Securities.

(q)      The Company shall, within the deadlines specified by the Securities Act, make all required filings of all prospectuses (including any Free Writing Prospectus) with the SEC and make all required filing fee payments in respect of any Registration Statement or related prospectus used under this Agreement (and any offering covered hereby).

(r)      The Company shall, if such registration is pursuant to a Registration Statement on Form S-3 or any similar short-form registration, include in such Registration Statement such additional information for marketing purposes as the managing underwriter reasonably requests.

Section 2.05.  *Indemnification by the Company*.  The Company agrees to indemnify and hold harmless each Registering Stockholder holding Registrable Securities covered by a Registration Statement, its partners, Affiliates, stockholders, members, officers, directors, employees, partners and agents, and each Person, if any, who controls such Registering Stockholder within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, **"Stockholder Parties"**) from and against any and all losses, claims, damages, liabilities and expenses (including reasonable expenses of investigation and reasonable attorneys' fees and expenses) (**"Damages"**) caused by or relating to any untrue statement or allegedly untrue statement of a material fact contained in any Registration Statement or prospectus relating to the Registrable Securities (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or any preliminary prospectus or Free Writing Prospectus relating to the Registrable Securities (including any information that has been deemed to be a part of any prospectus under Rule 159 under the Securities Act), or caused by or relating to any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading; *provided, however*, that the Company shall not be liable to any Stockholder Party for any Damages that are caused by or related to any such untrue statement or omission or alleged untrue statement or omission so made based upon information furnished in writing to the Company by or on behalf of such Registering Stockholder expressly for use therein. The Company also agrees to indemnify and hold harmless any underwriters of the Registrable Securities, their respective officers and directors and each Person who controls any  underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act on substantially the same basis as that of the indemnification of the Registering Stockholders provided in this <u>Section 2.05</u>.

Section 2.06.  *Indemnification by Registering Stockholders*.  Each Registering Stockholder holding Registrable Securities included in any Registration Statement agrees, severally but not jointly, to indemnify and hold harmless (i) the Company, (ii) each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or

approved by such other governmental agencies or authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be reasonably necessary or advisable to enable such Stockholder Group to consummate the disposition of the Registrable Securities owned by such Stockholder Group; *provided* that the Company shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 2.04(d), (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction.

(e)     The Company shall immediately notify each Registering Stockholder holding such Registrable Securities covered by such Registration Statement (i) at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon the discovery that, or upon the occurrence of an event as a result of which, the preparation of a supplement or amendment to such prospectus is required so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and the Company shall promptly (subject to any applicable Suspension Period) prepare and make available to each Registering Stockholder and file with the SEC any such supplement or amendment, (ii) as soon as the Company becomes aware of any request by the SEC or any Federal or state governmental authority for amendments or supplements to a Registration Statement or related prospectus covering Registrable Securities or for additional information relating thereto, (iii) as soon as the Company becomes aware of the issuance or threatened issuance by the SEC of any stop order suspending or threatening to suspend the effectiveness of a Registration Statement covering the Registrable Securities or (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose.

(f)     (i) The Registering Stockholders holding a majority of the Registrable Securities to be included in a Demand Registration or intended to be sold pursuant to a Public Offering pursuant to a "take down" under a Shelf Registration shall have the right to select an underwriter or underwriters in connection with any Public Offering resulting from the exercise of a Demand Registration (which underwriter or underwriters may include any Affiliate of any Stockholder Group so long as including such Affiliate would not require that the separate engagement of a qualified independent underwriter with respect to such offering), subject to the Company's approval (which shall not be unreasonably withheld, conditioned or delayed) and (ii) the Company shall select an underwriter or underwriters in connection with any other Public Offering.  In connection with any Public Offering, the Company shall enter into customary agreements (including an underwriting agreement in customary form) and take all other actions as are reasonably required in order to expedite or facilitate the disposition of such Registrable Securities in any such Public Offering, including, if required, the engagement of a "qualified independent underwriter" in connection with the qualification of the underwriting arrangements with the FINRA.

Section 20 of the Exchange Act, (iii) each other Registering Stockholder participating in any offering of Registrable Securities and (iv) the respective partners, Affiliates, stockholders, members, officers, directors, employees, partners and agents of each of the Persons specified in clauses (i) through (iii) from and against all Damages to the same extent as the foregoing indemnity from the Company to such Registering Stockholder, but only with respect to information furnished in writing by or on behalf of such Registering Stockholder expressly for use in any Registration Statement or prospectus relating to the Registrable Securities, or any amendment or supplement thereto, or any preliminary prospectus or Free Writing Prospectus relating to the Registrable Securities (including any information that has been deemed to be a part of any prospectus under Rule 159 under the Securities Act). Each Registering Stockholder also agrees to indemnify and hold harmless any underwriters of the Registrable Securities, their respective officers and directors and each Person who controls any underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act on substantially the same basis as that of the indemnification of the Company and the other Registering Stockholders provided in this Section 2.06. As a condition to including Registrable Securities in any Registration Statement filed in accordance with Article 2, the Company may require that it shall have received an undertaking reasonably satisfactory to it from any underwriter to indemnify and hold it harmless to the extent customarily provided by underwriters with respect to similar securities and offerings. No Registering Stockholder shall be liable under this Section 2.06 for any Damages in excess of the net proceeds realized by such Registering Stockholder in the sale of Registrable Securities of such Registering Stockholder to which such Damages relate.

Section 2.07. *Conduct of Indemnification Proceedings.* If any proceeding (including any investigation by any governmental authority) shall be instituted involving any Person in respect of which indemnity may be sought pursuant to Section 2.05 or 2.06, such Person (an "**Indemnified Party**") shall promptly notify the Person against whom such indemnity may be sought (the "**Indemnifying Party**") in writing and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to such Indemnified Party, and shall assume the payment of all reasonable fees and expenses; *provided* that the failure of any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent that the Indemnifying Party is materially prejudiced by such failure to notify. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (i) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel or (ii) in the reasonable judgment of such Indemnified Party, representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that, in connection with any proceeding or related proceedings in the same jurisdiction, the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) at any time for all such Indemnified Parties, and that all such fees and expenses shall be reimbursed promptly after receipt of a invoice setting forth such fees and expenses in reasonable detail. In the case of any such separate firm for the Indemnified Parties, such firm shall be designated in writing by the Indemnified Parties. The Indemnifying Party

shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent, or if there be a final judgment for the plaintiff, the Indemnifying Party shall indemnify and hold harmless such Indemnified Parties from and against any Damages (to the extent obligated herein) by reason of such settlement or judgment.  Without the prior written consent of the Indemnified Party, no Indemnifying Party shall effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability arising out of such proceeding.

Section 2.08.  *Contribution.*  If the indemnification provided for in Section 2.05 or 2.06 is unavailable to the Indemnified Parties or insufficient in respect of any Damages, then each such Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Damages in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and the Indemnified Parties in connection with such actions which resulted in such Damages, as well as any other relevant equitable considerations.  The relative fault of such Indemnifying Party and the Indemnified Parties shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action.

The parties agree that it would not be just and equitable if contribution pursuant to this Section 2.08 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph.  The amount paid or payable by a party as a result of the Damages referred to in the preceding paragraph shall be deemed to include, subject to the limitations set forth in Sections 2.05 and 2.06, any legal or other expenses reasonably incurred by a party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 2.08, no Registering Stockholder shall be required to contribute any amount in excess of the net proceeds (after deducting the underwriters' discounts and commissions) received by such Registering Stockholder in the offering.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  Each Registering Stockholder's obligation to contribute pursuant to this Section 2.08 is several in the proportion that the proceeds of the offering received by such Registering Stockholder bears to the total proceeds of the offering received by all such Registering Stockholders and not joint.

Section 2.09.  *Participation in Public Offering.*  No Stockholder may participate in any Public Offering hereunder unless such Stockholder (i) agrees to sell such Stockholder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents

19

reasonably required under the terms of such underwriting arrangements and the provisions of this Agreement in respect of registration rights.

Section 2.10.  *Other Indemnification.*  Indemnification similar to that specified herein (with appropriate modifications) shall be given by the Company and each Registering Stockholder participating therein with respect to any required registration or other qualification of securities under any federal or state law or regulation or governmental authority other than the Securities Act.

Section 2.11.  *Cooperation by the Company.*  At any time following the earlier of (x) the Company consummating an Initial Public Offering of the Class A Common Stock or (y) the first anniversary of the Emergence Effective Date, if any Stockholder shall transfer, assign, sell, convey or otherwise dispose of any Registrable Securities pursuant to Rule 144, the Company shall reasonably cooperate (subject to the terms and conditions of the Certificate of Incorporation) with such Stockholder, provide to such Stockholder such information as such Stockholder shall reasonably request and make publicly available information necessary to permit sales pursuant to Rule 144 for so long as necessary.

Section 2.12.  *Transfer of Registration Rights.*  None of the rights of any Stockholder Group under this Article 2 shall be transferable or assignable by any Stockholder Group to any Person acquiring Company Securities in any Public Offering or any other registered offering or other transaction pursuant to a prospectus which is a part of a Registration Statement or pursuant to Rule 144.  The rights of a Stockholder Group hereunder may be transferred or assigned in connection with a transfer of Registrable Securities to (i) any Affiliate of a Stockholder Group or (ii) any Person other than a Stockholder Group if at least 5% of the Class A Common Stock (assuming the conversion of all Class B Common Stock and New Warrants into Class A Common Stock) is being transferred to such Person in a single transaction or a series of related transactions; *provided*, that, such Person shall not have the right to transfer or assign any rights hereunder in connection with any subsequent transfer or transfers of any Registrable Securities to any Person other than a Stockholder Group .  Notwithstanding the foregoing, such rights may only be transferred or assigned *provided* that all of the following additional conditions are satisfied: (x) such transfer or assignment is effected in accordance with applicable securities laws and (y) the Company is given written notice by such transferor of such transfer or assignment, stating the name and address of the transferee or assignee and identifying the amount of Registrable Securities with respect to which such rights are being transferred or assigned and (z) such transferee or assignee executes and delivers to the Company an agreement to be bound by this Agreement in the form of Exhibit A.  A transferee or assignee of Registrable Securities who satisfies the conditions set forth in this Section 2.12 shall thenceforth be an "Angelo Gordon Stockholder," a "JPMorgan Stockholder" or an "Oaktree Stockholder," as applicable, for purposes of this Agreement.

Section 2.13.  *Limitations on Subsequent Registration Rights.*  The Company agrees that it shall not enter into any agreement with any holder or prospective holder of any securities of the Company (i) that would allow such holder or prospective holder to include such securities in any Demand Registration, Piggyback Registration or Shelf Registration unless, under the terms

of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that their inclusion would not reduce the amount of the Registrable Securities of the Stockholder Group included therein or (ii) on terms otherwise more favorable in the aggregate than this Agreement. The Company also represents and warrants to each Stockholder Group that it has not previously entered into any agreement with respect to any of its securities granting any registration rights to any Person.

Section 2.14. *Free Writing Prospectuses.* Except for a prospectus relating to Registrable Securities included in a Registration Statement, an "issuer free writing prospectus" (as defined in Rule 433 under the Securities Act) or other materials prepared by the Company, each Registering Stockholder represents and agrees that it (i) shall not make any offer relating to the Registrable Securities that would constitute an issuer free writing prospectus or that would otherwise constitute a Free Writing Prospectus, and (ii) has not distributed and will not distribute any written materials in connection with the offer or sale pursuant to a Registration Statement of Registrable Securities without the prior written consent of the Company and, in connection with any Public Offering, the underwriters.

Section 2.15. *Information from Registering Stockholders; Obligations of Registering Stockholders.*

(a)     It shall be a condition precedent to the obligations of the Company to include the Registrable Securities of any Registering Stockholder that has requested inclusion of its Registrable Securities in any Registration Statement or related prospectus, as the case may be, that such Registering Stockholder shall take the actions described in this Section 2.15.

(b)     Each Registering Stockholder that has requested inclusion of its Registrable Securities in any Registration Statement shall (i) furnish to the Company (as a condition precedent to such Registering Stockholder's participation in such registration) in writing such information with respect to such Registering Stockholder, its ownership of Company Securities and the intended method of disposition of its Registrable Securities as the Company may reasonably request or as may be required by law or regulations for use in connection with any related Registration Statement or prospectus (or amendment or supplement thereto) and all information required to be disclosed in order to make the information previously furnished to the Company by such Registering Stockholder not contain a material misstatement of fact or necessary to cause such Registration Statement or prospectus (or amendment or supplement thereto) not to omit a material fact with respect to such Registering Stockholder necessary in order to make the statements therein not misleading and (ii) comply with the Securities Act and the Exchange Act and all applicable state securities laws and comply with all applicable regulations in connection with the registration and the disposition of Registrable Securities.

(c)     Each Registering Stockholder shall promptly (i) following its actual knowledge thereof, notify the Company of the occurrence of any event that makes any statement made in a Registration Statement, prospectus, Issuer Free Writing Prospectus or other Free Writing Prospectus regarding such Registering Stockholder untrue in any material respect or that requires the making of any changes in a Registration Statement, Prospectus or Free Writing Prospectus so

21

that, in such regard, it shall not contain any untrue statement of a material fact or omit any material fact required to be stated therein or necessary to make the statements not misleading and (ii) provide the Company with such information as may be required to enable the Company to prepare a supplement or post-effective amendment to any such Registration Statement or a supplement to such prospectus or Free Writing Prospectus.

(d)      Each Registering Stockholder shall use commercially reasonable efforts to cooperate with the Company in preparing the applicable Registration Statement.

(e)      Each Stockholder agrees that no Stockholder shall be entitled to sell any Registrable Securities pursuant to a Registration Statement or to receive a prospectus relating thereto unless such Stockholder has furnished the Company with all information required to be included in such Registration Statement by applicable securities laws in connection with the disposition of such Registrable Securities as reasonably requested by the Company.

ARTICLE 3
TERMINATION

Section 3.01.  *Termination.*  This Agreement shall terminate on the 10th anniversary of the date hereof; *provided, however,* that any Stockholder Group that ceases to own beneficially any Registrable Securities shall cease to be bound by the terms hereof other than (i) Sections 2.05, 2.06, 2.07, 2.08 and 2.10 applicable to such Stockholder Group with respect to any offering of Registrable Securities completed before the date such Stockholder Group ceased to own any Registrable Securities) and (ii) Sections 4.01, 4.02 and 4.04 through 4.12.

ARTICLE 4
MISCELLANEOUS

Section 4.01.  *Successors and Assigns.*  (a) This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors, legal representatives and permitted assigns.

(b)      Subject to Section 2.12, neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any party.

(c)      Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective heirs, successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 4.02.  *Notices.*  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or electronic transmission) and shall be given,

if to the Company to:

> [Company name]
> [Address]
> Attention: [name]
> Facsimile No.: [number]

with a copy to the each Stockholder Group at the address listed below.

if to the [JPMorgan Stockholder], to:

> [JPMorgan]
> [Address]
> Attention: [name]
> Email:
> Facsimile No.: [number]

with a copy to:

> [Counsel]
> [Address]
> Attention: [name]
> Email:
> Facsimile No.: [number]

if to [the Angelo Gordon Stockholder], to:

> [Angelo Gordon]
> [Address]
> Attention: [name]
> Email:
> Facsimile No.: [number]

with a copy to:

> [Counsel]
> [Address]
> Attention: [name]
> Email:
> Facsimile No.: [number]

if to the [Oaktree Stockholder], to:

> [Oaktree]
> [Address]
> Attention: [name]
> Email:
> Facsimile No.: [number]

with a copy to:

> [Counsel]
> [Address]
> Attention: [name]
> Email:
> Facsimile No.: [number]

or such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto.  All notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.  Any Person that becomes a Stockholder shall provide its address and fax number to the Company, which shall promptly provide such information to each other Stockholder.

Section 4.03.  *Amendments and Waivers.*  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 4.04.  *Governing Law.*  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the choice of law or conflicts of law.

Section 4.05.  *Jurisdiction.*  The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of New York, and each of the parties

24

hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 2.17 shall be deemed effective service of process on such party.

Section 4.06.  *WAIVER OF JURY TRIAL.*  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 4.07.  *Specific Enforcement.*  Each party hereto acknowledges that the remedies at law of the other parties for a breach or threatened breach of this Agreement would be inadequate and, in recognition of this fact, any party to this Agreement, without posting any bond, and in addition to all other remedies that may be available, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available.

Section 4.08.  *Counterparts; Effectiveness; Third Party Beneficiaries.*  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each initial party hereto shall have received a counterpart hereof signed by all of the other initial parties hereto.  Until and unless each initial party has received a counterpart hereof signed by the other initial parties hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

Section 4.09.  *Entire Agreement.*  This Agreement, together with the Schedules and Exhibit hereto and any documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement among the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, among the parties hereto with respect to the subject matter of this Agreement.

Section 4.10.  *Severability.*  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the

parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 4.11. *Sophisticated Parties; Advice of Counsel.* Each of the parties to this Agreement specifically acknowledges that (i) it is a knowledgeable, informed, sophisticated Person capable of understanding and evaluating the provisions set forth in this Agreement and (ii) it has been fully advised and represented by legal counsel of its own independent selection and has relied wholly upon its independent judgment and the advice of such counsel in negotiating and entering into this Agreement.

Section 4.12. *Certificate of Incorporation Supersedes.* Nothing in this Agreement is intended to conflict with any provision of the Certificate of Incorporation and, in the event of any such conflict, the applicable provision of the Certificate of Incorporation shall supersede the conflicting provision of this Agreement. Nothing in this Agreement is intended to limit or restrict in any manner whatsoever, the rights or powers of the Company under the Certificate of Incorporation and the exercise of any such right or power by the Company shall not be, and shall not be construed to be, a breach or violation of, or a default under, this Agreement or any provision hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

TRIBUNE COMPANY

By: _____
    Name:
    Title:

[]

By: _____
    Name:
    Title:

[]

By: _____
    Name:
    Title:

[]

By: _____
    Name:
    Title:

**EXHIBIT A**

## JOINDER TO REGISTRATION RIGHTS AGREEMENT

This Joinder Agreement (this "**Joinder Agreement**") is made as of the date written below by the undersigned (the "**Joining Party**") in accordance with the Registration Rights Agreement dated as of _____, 20__ (the "**Registration Rights Agreement**") among the [Tribune Company] and the other parties thereto, as the same may be amended from time to time. Capitalized terms used, but not defined, herein shall have the meaning ascribed to such terms in the Registration Rights Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Registration Rights Agreement as of the date hereof and shall have all of the rights and obligations of a "Stockholder" thereunder as if it had executed the Registration Rights Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Registration Rights Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

Date: _____ ___, _____

[NAME OF JOINING PARTY]

By: _____
      Name:
      Title:

Address for Notices:

**Schedule 1**

[JPMorgan] Parties

**Schedule 2**

[Angelo Gordon] Funds

30

**Schedule 3**

[Oaktree] Funds

31