# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al.,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Related Dkt. Nos. 7127, 7802, 8169 and |
| | ) | 8225 |

## NOTICE OF FILING OF THE SECOND ADDENDUM TO PLAN SUPPLEMENT IN SUPPORT OF THE AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY AURELIUS CAPITAL MANAGEMENT, LP, ON BEHALF OF ITS MANAGED ENTITIES, DEUTSCHE BANK TRUST COMPANY AMERICAS, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, LAW DEBENTURE TRUST COMPANY OF NEW YORK, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR CERTAIN SERIES OF SENIOR NOTES, AND WILMINGTON TRUST COMPANY, IN ITS CAPACITY AS SUCCESSOR INDENTURE TRUSTEE FOR THE PHONES NOTES

**PLEASE TAKE NOTICE** that, on December 9, 2010 the Joint Plan of Reorganization

for Tribune Company and its Subsidiaries Proposed by Aurelius Capital Management, LP, on

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WA TL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Behalf of its Managed Entities, Deutsche Bank Trust Company Americas, in its Capacity as

Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture Trust Company

of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes,

and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES

Notes (as the same may be further amended, supplemented or modified from time to time, the

"Noteholder Plan")[2] [ECF No. 7127] was filed with the United States Bankruptcy Court for the

District of Delaware (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that, on February 4, 2011, the Notice of Filing of

the Noteholder Plan Supplement [ECF No. 7802] was filed with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that, on February 25, 2011, the Amended Joint

Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by Aurelius Capital

Management, LP, on Behalf of its Managed Entities, Deutsche Bank Trust Company Americas,

in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes, Law Debenture

Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of

Senior Notes, and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for

the PHONES Notes [ECF No. 8169] was filed with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that, on March 2, 2011, the First Addendum to

the Noteholder Plan Supplement [ECF No. 8225] was filed with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that attached hereto is Exhibit 5.3.1(3) to the

Noteholder Plan, the terms of the Registration Rights Agreement.

**PLEASE TAKE FURTHER NOTICE** that a copy of Exhibit 5.3.1(3) to the Noteholder

Plan may be (i) obtained free of charge from Epiq Bankruptcy Solutions, LLC's ("Epiq")

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Noteholder Plan.

dedicated website related to the Debtors' Chapter 11 Cases

(http://chapter11.epiqsystems.com/tribune) or by telephoning Epiq at (646) 282-2400; (ii)

inspected during regular business hours at the Office of the Clerk of the Bankruptcy Court, 3rd

Floor, 824 Market Street, Wilmington, DE 19801; or (iii) viewed on the Internet at the

Bankruptcy Court's website (http://www.deb.uscourts.gov) by following the directions for

accessing the ECF system on such website.

Dated: March 7, 2011
Wilmington, Delaware

AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden
Philip C. Dublin
Kristina M. Wesch
Meredith A. Lahaie
One Bryant Park
New York, NY 10036
(212) 872-1000

ASHBY & GEDDES, P.A.

William P. Bowden (I.D. No. 2553)
Amanda M. Winfree (I.D. No. 4615)
Leigh-Anne M. Raport (I.D. No. 5055)
500 Delaware Avenue, P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Counsel for Aurelius Capital Management, LP*

3

**Plan Supplement – Exhibit 5.3.1(3)**

**Form Registration Rights Agreement**

This Exhibit is subject to all of the provisions of the Noteholder Plan, including, without limitation, Section 13.8, pursuant to which the Proponents have reserved the right, subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, to alter, amend or modify the Noteholder Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to substantial consummation of the Noteholder Plan.

<u>FORM OF REGISTRATION RIGHTS AGREEMENT</u>

by and among

[--]

and

TRIBUNE COMPANY

Dated as of [●]

# TABLE OF CONTENTS

Page

1.   Certain Definitions.................................................................................................1

2.   Registration Rights..............................................................................................4

    2.1    Demand Registrations...............................................................................4
    2.2    Piggyback Registrations............................................................................7
    2.3    Allocation of Securities Included in Registration Statement.................8
    2.4    Registration Procedures..........................................................................11
    2.5    Registration Expenses.............................................................................18
    2.6    Certain Limitations on Registration Rights ..........................................18
    2.7    Limitations on Sale or Distribution of Other Securities ......................18
    2.8    No Required Sale .....................................................................................19
    2.9    Indemnification .......................................................................................19

3.   Underwritten Offerings......................................................................................23

    3.1    Requested Underwritten Offerings ........................................................23
    3.2    Piggyback Underwritten Offerings ........................................................24

4.   General.................................................................................................................24

    4.1    Adjustments Affecting Registrable Securities ......................................24
    4.2    Rule 144 and Rule 144A .........................................................................24
    4.3    Nominees for Beneficial Owners ...........................................................25
    4.4    Amendments and Waivers ......................................................................25
    4.5    Limitation on Subsequent Registration Rights .....................................25
    4.6    Notices .....................................................................................................25
    4.7    Successors and Assigns ..........................................................................26
    4.8    Entire Agreement ...................................................................................26
    4.9    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ......26
    4.10   Interpretation; Construction ...................................................................27
    4.11   Counterparts............................................................................................27
    4.12   Severability .............................................................................................28
    4.13   Specific Performance; Remedies Cumulative .......................................28
    4.14   Further Assurances..................................................................................28

This REGISTRATION RIGHTS AGREEMENT is made as of [●], by and among the Holders listed on Schedule A[1] and Tribune Company, a Delaware corporation (the "Company").

W I T N E S S E T H :

WHEREAS, pursuant to the Joint Chapter 11 Plan of Reorganization for the Company and its subsidiaries proposed by Aurelius Capital Management, LP, on behalf of its managed entities, Deutsche Bank Trust Company Americas, in its capacity as successor indenture trustee for certain series of Senior Notes, Law Debenture Trust Company of New York, in its capacity as successor indenture trustee for certain series of Senior Notes, and Wilmington Trust Company, in its capacity as successor indenture trustee for the PHONES Notes, dated December 9, 2010 (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof, the "Plan"), under chapter 11 of title 11 of the United States Code, as amended, as confirmed pursuant to the order, dated [**Date of Confirmation Order**], of the United States Bankruptcy Court for the District of Delaware, the Company will grant the registration rights set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and obligations hereinafter set forth, the parties hereto hereby agree as follows:

1.      Certain Definitions.  As used herein, the following terms shall have the following meanings:

"Additional Piggyback Rights" has the meaning set forth in Section 2.2(b).

"Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise; provided, however, that, for purposes hereof, neither the Company nor any Person controlled by the Company shall be deemed to be an Affiliate of any Holder.

"Agreement" means this Registration Rights Agreement, as this agreement may be amended, modified, supplemented or restated from time to time after the date hereof.

"automatic shelf registration statement" has the meaning set forth in Section 2.4.

"Board" means the Board of Directors of the Company.

"Business Day" shall mean any day ending at 11:59 p.m. (Eastern Time) other than a Saturday or Sunday or a day on which banks are required or authorized to close in the City of New York.

"Claims" has the meaning set forth in Section 2.9(a).

---

[1] Registration rights are intended to be granted to Holders that do not have the benefit of an exemption or whose Common Equity is not freely transferrable under section 1145 of the Bankruptcy Code.

"Common Equity" means the Class A Common Stock to be issued by the Company in connection with the implementation of, and as authorized by, the Plan, and any and all securities of any kind whatsoever of the Company which may be issued after the date hereof in respect of, or in exchange for, such shares of Class A Common Stock of the Company pursuant to a merger, consolidation, stock split, stock dividend or recapitalization of the Company or otherwise.

"Common Equity Equivalents" means all options, warrants and other securities convertible into, or exchangeable or exercisable for (at any time or upon the occurrence of any event or contingency and without regard to any vesting or other conditions to which such securities may be subject) shares of Common Equity or other equity securities of the Company (including, without limitation, any note or debt security convertible into or exchangeable for Common Equity or other equity securities of the Company).

"Company" has the meaning set forth in the preamble.

"Demand Exercise Notice" has the meaning set forth in Section 2.1(a)(i).

"Demand Registration" has the meaning set forth in Section 2.1(a)(i).

"Demand Registration Request" has the meaning set forth in Section 2.1(a)(i).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Expenses" means any and all fees and expenses incident to the Company's performance of or compliance with Article 2, including, without limitation: (i) SEC, stock exchange or FINRA registration and filing fees and all listing fees and fees with respect to the inclusion of securities on the New York Stock Exchange or on any other securities market on which the Common Equity is listed or quoted, (ii) reasonable fees and expenses of compliance with state securities or "blue sky" laws and in connection with the preparation of a "blue sky" survey, including, without limitation, reasonable fees and expenses of outside "blue sky" counsel, (iii) printing and copying expenses, (iv) messenger and delivery expenses, (v) expenses incurred in connection with any road show, (vi) fees and disbursements of counsel for the Company, (vii) with respect to each underwritten registration in which Holders are participating, the reasonable and customary fees and disbursements of one counsel for the Participating Holder(s) (selected by the Majority Participating Holders), (viii) fees and disbursements of all independent public accountants (including the expenses of any audit and/or "cold comfort" letter and updates thereof) and fees and expenses of other Persons, including special experts, retained by the Company, (ix) fees and expenses payable to a Qualified Independent Underwriter, (x) any other fees and disbursements of underwriters, if any, customarily paid by issuers or sellers of securities and (xi) expenses for securities law liability insurance and, if any, rating agency fees.

"FINRA" means the Financial Industry Regulatory Authority, Inc.

"Holder" or "Holders" means any Person who is a party to this Agreement or any transferee of Registrable Securities to whom any Person who is a party to this Agreement shall

2

assign or transfer any rights hereunder, <u>provided</u> that such transferee has agreed in writing to be bound by this Agreement in respect of such Registrable Securities.

"<u>Initiating Holder(s)</u>" has the meaning set forth in Section 2.1(a)(i).

"<u>Litigation</u>" means any action, proceeding or investigation in any court or before any governmental authority.

"<u>Majority Participating Holders</u>" means Participating Holders holding more than 50% of the Registrable Securities proposed to be included in any offering of Registrable Securities by such Participating Holders pursuant to Section 2.1 or Section 2.2.

"<u>Manager</u>" has the meaning set forth in Section 2.1(c).

"<u>Participating Holders</u>" means all Holders of Registrable Securities which are proposed to be included in any offering of Registrable Securities pursuant to Section 2.1 or Section 2.2.

"<u>Person</u>" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, governmental entity or agency or other entity of any kind or nature.

"<u>Piggyback Shares</u>" has the meaning set forth in Section 2.3(a)(iii).

"<u>Plan</u>" has the meaning set forth in the recitals.

"<u>Postponement Period</u>" has the meaning set forth in Section 2.1(b).

"<u>Qualified Independent Underwriter</u>" means a "qualified independent underwriter" within the meaning of NASD Conduct Rule 2720.

"<u>Registrable Securities</u>" means any shares of Common Equity held by the Holders at any time (including those held as a result of the conversion or exercise of Common Equity Equivalents); <u>provided</u> that in no event shall Registrable Securities include any unvested Common Equity or Common Equity Equivalents. As to any particular Registrable Securities, such securities shall cease to be Registrable Securities when (A) a registration statement with respect to the sale of such securities shall have been declared effective under the Securities Act and such securities shall have been disposed of in accordance with such registration statement, or (B) such securities shall have been sold (other than in a privately negotiated sale) in compliance with the requirements of Rule 144 under the Securities Act, as such Rule 144 may be amended (or any successor provision thereto).

"<u>Rule 144</u>" and "<u>Rule 144A</u>" have the meaning set forth in Section 4.2.

"<u>SEC</u>" means the Securities and Exchange Commission.

"<u>Section 2.3(a) Sale Number</u>" has the meaning set forth in Section 2.3(a).

"<u>Section 2.3(b) Sale Number</u>" has the meaning set forth in Section 2.3(b).

3

"Section 2.3(c) Sale Number" has the meaning set forth in Section 2.3(c).

"Securities Act" means the Securities Act of 1933, as amended.

"Selling Expenses" means the underwriting fees, discounts, selling commissions and stock transfer taxes applicable to all Registrable Securities registered by the Holders.

"Subsidiary" means any direct or indirect subsidiary of the Company organized or acquired after the date hereof

"Valid Business Reason" has the meaning set forth in Section 2.1(b).

"Withdrawn Demand Registration" has the meaning set forth in Section 2.1(d).

"Withdrawn Request" has the meaning set forth in Section 2.1(d).

"WKSI" has the meaning set forth in Section 2.4.

2.    Registration Rights.

    2.1    Demand Registrations.

        (a)    (i) Subject to Section 2.1(b), at any time after the Company has become a reporting company under section 12 of the Exchange Act, each Holder shall have the right to require the Company to file two (2) registration statements under the Securities Act covering all or any part of its and its Affiliates' Registrable Securities by delivering a written request therefor to the Company specifying the number of Registrable Securities to be included in such registration and the intended method of distribution thereof. Any such request by a Holder or group of Holders pursuant to this Section 2.1(a)(i) is referred to herein as a "Demand Registration Request," and the registration so requested is referred to herein as a "Demand Registration" (with respect to any Demand Registration, the Holder or group of Holders making such demand for registration being referred to as the "Initiating Holder(s)"). As promptly as practicable, but no later than ten (10) Business Days after receipt of a Demand Registration Request, the Company shall give written notice (the "Demand Exercise Notice") of such Demand Registration Request to all Holders of record of Registrable Securities.

        (ii)    The Company, subject to Sections 2.3 and 2.6, shall include in a Demand Registration (x) the Registrable Securities intended to be disposed of by the Initiating Holders and (y) the Registrable Securities intended to be disposed of by any other Holder of Registrable Securities which shall have made a written request to the Company for inclusion in such registration pursuant to Section 2.2 (which request shall specify the maximum number of Registrable Securities intended to be disposed of by such Participating Holder) within thirty (30) days after the receipt of the Demand Exercise Notice (or fifteen (15) days if, at the request of the Initiating Holders, the Company states in such written notice or gives telephonic notice to all

4

Holders, with written confirmation to follow promptly thereafter, that such registration will be on a Form S-3 or any similar form successor thereto).

(iii)    The Company shall use its commercially reasonable efforts to (x) effect such registration under the Securities Act (including, without limitation, by means of a shelf registration pursuant to Rule 415 under the Securities Act if so requested and if the Company is then eligible to use such a registration) of the Registrable Securities which the Company has been so requested to register, for distribution in accordance with such intended method of distribution and (y) if requested by the Majority Participating Holders, obtain acceleration of the effective date of the registration statement relating to such registration.

(b)    Notwithstanding anything to the contrary in Section 2.1(a), the Demand Registration rights granted in Section 2.1(a) are subject to the following limitations: (i) the Company shall not be required to effect more than two (2) Demand Registration Requests made by each Holder pursuant to Section 2.1(a)(i), which registration has been declared or ordered effective; (ii) the Company shall not be required to cause a registration pursuant to Section 2.1(a)(i) to be declared effective within a period of ninety (90) days after the effective date of any other registration statement of the Company filed pursuant to the Securities Act; and (iii) if the Board, in its good faith judgment, determines that any registration of Registrable Securities should not be made or continued because it would materially interfere with any material financing, acquisition, corporate reorganization or merger or other transaction or event involving the Company or any of its subsidiaries (a "Valid Business Reason"), then (x) the Company may postpone filing a registration statement relating to a Demand Registration Request for a reasonable time, but in no event for more than ninety (90) days after the date the Board determines a Valid Business Reason exists and (y) in case a registration statement has been filed relating to a Demand Registration Request, if the Valid Business Reason has not resulted from actions taken by the Company, the Company may cause such registration statement to be withdrawn and its effectiveness terminated or may postpone filing or supplementing such registration statement for a reasonable time, but in no event for more than ninety (90) days after the date the Board determines a Valid Business Reason exists (any such period of postponement or withdrawal under this clause (iii), a "Postponement Period"); and the Company shall give written notice of its determination to postpone or withdraw a registration statement and of the fact that the Valid Business Reason for such postponement or withdrawal exists, in each case, promptly after the occurrence thereof.  The combined Postponement Periods relating to all Demand Registrations in any twelve-month period shall not exceed ninety (90) days.

If the Company shall give any notice of postponement or withdrawal of any registration statement pursuant to clause (iii) above, the Company shall not, during the period of postponement or withdrawal, register any Common Equity, other than pursuant to a registration statement on Form S-4 or S-8 (or an equivalent registration form then in effect). Each Holder of

Registrable Securities agrees that, upon receipt of any notice from the Company that the
Company has determined to withdraw any registration statement pursuant to clause (iii) above,
such Holder will discontinue its disposition of Registrable Securities pursuant to such
registration statement and, if so directed by the Company, will deliver to the Company (at the
Company's expense) all copies, other than permanent file copies, then in such Holder's
possession of the prospectus covering such Registrable Securities that was in effect at the time of
receipt of such notice. If the Company shall have withdrawn or prematurely terminated a
registration statement filed under Section 2.1(a)(i) (whether pursuant to clause (iii) above or as a
result of any stop order, injunction or other order or requirement of the SEC or any other
governmental agency or court), the Company shall not be considered to have effected an
effective registration for the purposes of this Agreement (and shall not be considered to have
satisfied a Demand Registration) until the Company shall have filed a new registration statement
covering the Registrable Securities covered by the withdrawn registration statement and such
registration statement shall have been declared effective and shall not have been withdrawn.  If
the Company shall give any notice of withdrawal or postponement of a registration statement,
the Company shall, no later than three (3) months after the date of the postponement or
withdrawal, use its commercially reasonable efforts to effect the registration under the Securities
Act of the Registrable Securities covered by the withdrawn or postponed registration statement
in accordance with this Section 2.1 (unless the Initiating Holders shall have withdrawn such
request, in which case the Company shall not be considered to have effected an effective
registration for the purposes of this Agreement (and shall not be considered to have satisfied a
Demand Registration)), and such registration shall not be withdrawn or postponed pursuant to
clause (iii) of Section 2.1(b) above.

(c)     In connection with any Demand Registration, the Initiating Holder(s) shall
        have the right to designate the lead managing underwriter (any lead
        managing underwriter for the purposes of this Agreement, the "Manager")
        in connection with such registration and each other managing underwriter
        for such registration; provided that in each case, each such underwriter is
        reasonably satisfactory to the Company.

(d)     A Demand Registration Request may be withdrawn prior to the filing of a
        registration statement pursuant to such request by the Majority
        Participating Holders (a "Withdrawn Request") and a registration
        statement pursuant to such request may be withdrawn prior to the
        effectiveness thereof by the Majority Participating Holders (a "Withdrawn
        Demand Registration"), and such withdrawals shall be treated as a
        Demand Registration which shall have been effected pursuant to this
        Section 2.1, unless the Holders of Registrable Securities to be included in
        such registration statement reimburse the Company for its reasonable out-
        of-pocket Expenses relating to the preparation and filing of such Demand
        Registration Statement (to the extent actually incurred); provided;
        however, that if a Withdrawn Request or Withdrawn Registration
        Statement is made (i) because of a material adverse change in the
        business, financial condition or prospects of the Company, or (ii) as
        provided in Section 2.3(d), or (iii) because of a postponement of such
        registration pursuant to Section 2.1(b), then such withdrawal shall not be

6

treated as a Demand Registration effected pursuant to this Section 2.1 (and shall not be counted toward the number of Demand Registrations), and the Company shall pay all Expenses in connection therewith.

2.2    <u>Piggyback Registrations</u>.

(a)    If at any time after the date hereof, the Company proposes or is required (pursuant to Section 2.1 or otherwise) to register any of its Common Equity under the Securities Act (other than pursuant to registrations on Form S-4 or Form S-8 or any similar successor forms thereto), the Company shall give prompt written notice (in any event within ten (10) Business Days after receipt of notice of any exercise of demand registration rights by any Person) of its intention to do so to the Holders. Upon the written request of any Holder, made within twenty (20) days following the receipt of any such written notice (which request shall specify the maximum number of Registrable Securities intended to be disposed and the intended method of distribution thereof), the Company shall, subject to Sections 2.2(c), 2.3 and 2.6 hereof, use its commercially reasonable efforts to cause all such Registrable Securities, which the Holder has so requested the registration thereof, to be registered under the Securities Act with the securities which the Company at the time proposes to register to permit the sale or other disposition by the Holder (in accordance with the intended method of distribution thereof) of the Registrable Securities to be so registered, including, if necessary, by filing with the SEC a post-effective amendment or a supplement to the registration statement filed by the Company or the prospectus related thereto pursuant to a Form 8-K. There is no limitation on the number of such piggyback registrations pursuant to the preceding sentence which the Company is obligated to effect. No registration of Registrable Securities effected under this Section 2.2(a) shall relieve the Company of its obligations to effect Demand Registrations under Section 2.1 hereof.

(b)    The Company, subject to Sections 2.3 and 2.6, may elect to include in any registration statement and offering pursuant to demand registration rights by any Person, (i) authorized but unissued shares of Common Equity or shares of Common Equity held by the Company as treasury shares and (ii) any other shares of Common Equity which are requested to be included in such registration pursuant to the exercise of piggyback registration rights granted by the Company after the date hereof and which are not inconsistent with the rights granted in, or otherwise conflict with the terms of, this Agreement ("<u>Additional Piggyback Rights</u>"); <u>provided</u>, <u>however</u>, that such inclusion shall be permitted only to the extent that it is pursuant to, and subject to, the terms of the underwriting agreement or arrangements, if any, entered into by the Initiating Holders.

(c)    If, at any time after giving written notice of its intention to register any equity securities and prior to the effective date of the registration

7

statement filed in connection with such registration, the Company shall determine for any reason not to register or to delay registration of such equity securities, the Company shall give written notice of such determination to all Holders of record of Registrable Securities and (i) in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Securities in connection with such abandoned registration, without prejudice, however, to the rights of Holders under Section 2.1, and (ii) in the case of a determination to delay such registration of its equity securities, shall be permitted to delay the registration of such Registrable Securities for the same period as the delay in registering such other equity securities.

(d)     Any Holder shall have the right to withdraw its request for inclusion of its Registrable Securities in any registration statement pursuant to this Section 2.2 by giving written notice to the Company of its request to withdraw.

(e)     Notwithstanding anything contained herein to the contrary, the Company shall, at the request of any Holder, file any prospectus supplement or post-effective amendments and otherwise take any action necessary or advisable to include therein all disclosure and language deemed necessary or advisable by such Holder if such disclosure or language was not included in the initial registration statement, or revise such disclosure or language if deemed necessary or advisable by such Holder including filing a prospectus supplement naming the Holders, partners, members and shareholders to the extent required by law.

2.3     Allocation of Securities Included in Registration Statement.

(a)     If any requested registration made pursuant to Section 2.1 involves an underwritten offering and the Manager of such offering shall advise the Company in writing that, in its view, the number of securities requested to be included in such registration by the Holders of Registrable Securities, the Company or any other Persons exercising Additional Piggyback Rights exceeds the largest number (the "Section 2.3(a) Sale Number") that can be sold in an orderly manner in such registration within a price range acceptable to the Majority Participating Holders, then the total number of securities that the Manager advises the Company can be included in such registration shall be allocated in the following order of priority:

(i)     first, all Registrable Securities requested to be included in such registration by the Holders thereof; provided, however, that if the number of such Registrable Securities exceeds the Section 2.3(a) Sale Number, the number of such Registrable Securities (not to exceed the Section 2.3(a) Sale Number) to be included in such registration shall be allocated to give first priority to the inclusion of the Registrable Securities of the Initiating Holders(s) and, thereafter, on a pro rata basis among all remaining Holders requesting that Registrable Securities be included in such registration (including pursuant to Section 2.1 or

8

Section 2.2(a)), based on the number of Registrable Securities then owned by each such Holder requesting inclusion in relation to the number of Registrable Securities owned by all Holders requesting inclusion;

(ii)    second, to the extent that the number of Registrable Securities to be included pursuant to clause (i) of this Section 2.3(a) is less than the Section 2.3(a) Sale Number, any securities that the Company proposes to register, up to the Section 2.3(a) Sale Number; and

(iii)    third, to the extent that the number of Registrable Securities to be included pursuant to clauses (i) and (ii) of this Section 2.3(a) is less than the Section 2.3(a) Sale Number, the remaining securities to be included in such registration shall be allocated on a *pro rata* basis among all Persons requesting that securities be included in such registration pursuant to the exercise of Additional Piggyback Rights ("Piggyback Shares"), based on the aggregate number of Piggyback Shares then owned by each Person requesting inclusion in relation to the aggregate number of Piggyback Shares owned by all Persons requesting inclusion, up to the Section 2.3(a) Sale Number.

Notwithstanding anything in this Section 2.3(a) to the contrary, no employee shareholder of the Company will be entitled to include Registrable Securities in a registration requested by an Initiating Holder pursuant to Section 2.1 to the extent the Manager of such offering shall determine in good faith that the participation of such employee shareholder would adversely affect the marketability of the securities being sold by the Initiating Holder(s) in such registration.

(b)    If any registration made pursuant to Section 2.2 involves an underwritten primary offering on behalf of the Company after the date hereof and the Manager (as selected by the Company) shall advise the Company that, in its view, the number of securities requested to be included in such registration exceeds the number (the "Section 2.3(b) Sale Number") that can be sold in an orderly manner in such registration within a price range acceptable to the Company, then the total number of securities that the Manager advises the Company can be included in such registration shall be allocated in the following order of priority:

(i)    first, all equity securities that the Company proposes to register for its own account;

(ii)    second, to the extent that the number of Registrable Securities to be included pursuant to clause (i) of this Section 2.3(b) is less than the Section 2.3(b) Sale Number, the remaining Registrable Securities to be included in such registration shall be allocated on a *pro rata* basis among all Holders requesting that Registrable Securities be included in such registration pursuant to the exercise of piggyback rights pursuant to Section 2.2, based on the aggregate number of Registrable Securities then owned by each such Holder requesting inclusion in relation to the aggregate number of Registrable Securities owned by all Holders requesting inclusion, up to the Section 2.3(b) Sale Number; and

9

(iii)    third, to the extent that the number of Registrable Securities to be included pursuant to clauses (i) and (ii) of this Section 2.3(b) is less than the Section 2.3(b) Sale Number, the remaining securities to be included in such registration shall be allocated on a *pro rata* basis among all Persons requesting that securities be included in such registration pursuant to the exercise of Additional Piggyback Rights, based on the aggregate number of Piggyback Shares then owned by each Person requesting inclusion in relation to the aggregate number of Piggyback Shares owned by all Persons requesting inclusion, up to the Section 2.3(b) Sale Number.

(c)    If any registration pursuant to Section 2.2 involves an underwritten offering that was initially requested by any Person(s) other than a Holder to whom the Company has granted registration rights which are not inconsistent with the rights granted in, or otherwise conflict with the terms of, this Agreement, and the Manager (as selected by the Company or such other Person) shall advise the Company that, in its view, the number of securities requested to be included in such registration exceeds the number (the "Section 2.3(c) Sale Number") that can be sold in an orderly manner in such registration within a price range acceptable to the Company, then the total number of securities that the Manager advises the Company can be included in such registration shall be allocated in the following order of priority:

(i)    first, the securities requested to be included in such registration shall be allocated on a *pro rata* basis among such Person(s) requesting the registration and all Holders requesting that Registrable Securities be included in such registration pursuant to the exercise of piggyback rights pursuant to Section 2.2, based on the aggregate number of securities or Registrable Securities, as applicable, then owned by each of the foregoing requesting inclusion in relation to the aggregate number of securities or Registrable Securities, as applicable, owned by all such Holders and Persons requesting inclusion, up to the Section 2.3(c) Sale Number;

(ii)    second, to the extent that the number of Registrable Securities to be included pursuant to clause (i) of this Section 2.3(c) is less than the Section 2.3(c) Sale Number, the remaining shares to be included in such registration shall be allocated on a *pro rata* basis among all Persons requesting that securities be included in such registration pursuant to the exercise of Additional Piggyback Rights, based on the aggregate number of Piggyback Shares then owned by each Person requesting inclusion in relation to the aggregate number of Piggyback Shares owned by all Persons requesting inclusion, up to the Section 2.3(c) Sale Number; and

(iii)    third, to the extent that the number of securities to be included pursuant to clauses (i) and (ii) of this Section 2.3(c) is less than the Section 2.3(c) Sale Number, the remaining shares to be included in such registration shall be allocated to shares the Company proposes to register for its own account, up to the Section 2.3(c) Sale Number.

(d)    If, as a result of the proration provisions set forth in clauses (a), (b) or (c) of this Section 2.3, any Holder shall not be entitled to include all

10

Registrable Securities in a registration that such Holder has requested be included, such Holder may elect to withdraw such Holder's request to include Registrable Securities in such registration or may reduce the number requested to be included.

2.4     Registration Procedures.  If and whenever the Company is required by the provisions of this Agreement to use its commercially reasonable efforts to effect or cause the registration of any Registrable Securities under the Securities Act as provided in this Agreement, the Company shall, as expeditiously as possible (but, in any event, within sixty (60) days after a Demand Registration Request in the case of Section 2.4(a) below):

(a)     prepare and file with the SEC a registration statement on an appropriate registration form of the SEC for the disposition of such Registrable Securities in accordance with the intended method of disposition thereof, which registration form (i) shall be selected by the Company and, in the case of Demand Registrations, as shall be reasonably acceptable to the Majority Participating Holders and (ii) shall, in the case of a shelf registration, be available for the sale of the Registrable Securities by the selling Holders thereof and such registration statement shall comply as to form in all material respects with the requirements of the applicable registration form and include all financial statements required by the SEC to be filed therewith, and the Company shall use its commercially reasonable efforts to cause such registration statement to become effective and remain continuously effective for such period as any Participating Holder pursuant to such registration statement shall request (provided, however, that before filing a registration statement or prospectus or any amendments or supplements thereto, or comparable statements under securities or state "blue sky" laws of any jurisdiction, or any free writing prospectus related thereto, the Company will furnish to one counsel for the Participating Holders (selected by the Majority Participating Holders), copies of all such documents proposed to be filed (including all exhibits thereto), which documents will take into account to the reasonable review and reasonable comment of such counsel, and the Company shall not file any registration statement or amendment thereto, any prospectus or supplement thereto or any free writing prospectus related thereto to which the Majority Participating Holders, if any, shall reasonably object);

(b)     (i) prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement continuously effective for such period as any Participating Holder pursuant to such registration statement shall request and to comply with the provisions of the Securities Act with respect to the sale or other disposition of all Registrable Securities covered by such registration statement in accordance with the intended methods of disposition by the Participating Holders thereof set forth in such registration statement and (ii) provide notice to such Participating Holders of the Company's

11

reasonable determination that a post-effective amendment to a registration statement would be appropriate;

(c)    furnish, without charge, to each Participating Holder of the securities covered by such registration statement such number of copies of such registration statement, each amendment and supplement thereto (in each case including all exhibits), the prospectus included in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Securities Act, each free writing prospectus utilized in connection therewith, in each case, in conformity with the requirements of the Securities Act, and other documents, as such Participating Holder may reasonably request in order to facilitate the public sale or other disposition of the Registrable Securities owned by such Participating Holder (the Company hereby consenting to the use in accordance with all applicable law of each such registration statement (or amendment or posteffective amendment thereto) and each such prospectus (or preliminary prospectus or supplement thereto) or free writing prospectus by each such Participating Holder and the underwriters, if any, in connection with the offering and sale of the Registrable Securities covered by such registration statement or prospectus);

(d)    use its commercially reasonable efforts to register or qualify the Registrable Securities covered by such registration statement under such other securities or state "blue sky" laws of such jurisdictions as any Participating Holder of Registrable Securities shall reasonably request in writing, and do any and all other acts and things which may be reasonably necessary or advisable to enable such Participating Holder to consummate the disposition of the Registrable Securities in such jurisdictions (including keeping such registration or qualification in effect for so long as such registration statement remains in effect), except that in no event shall the Company be required to (i) qualify to do business as a foreign corporation in any jurisdiction where it would not, but for the requirements of this paragraph (d), be required to be so qualified, (ii) subject itself to taxation in any such jurisdiction or to consent to general service of process in any such jurisdiction or (iii) consent to general service of process in any such jurisdiction;

(e)    promptly notify each Participating Holder: (i) when the registration statement, any pre-effective amendment, the prospectus or any prospectus supplement related thereto, any posteffective amendment to the registration statement or any free writing prospectus has been filed and, with respect to the registration statement or any post-effective amendment, when the same has become effective; (ii) of any request by the SEC or state securities authority for amendments or supplements to the registration statement or the prospectus related thereto or for additional information; (iii) of the issuance by the SEC of any stop order suspending

12

the effectiveness of the registration statement or the initiation of any proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification of any Registrable Securities for sale under the securities or state "blue sky" laws of any jurisdiction or the initiation of any proceeding for such purpose; (v) of the existence of any fact of which the Company becomes aware which results in the registration statement or any amendment thereto, the prospectus related thereto or any supplement thereto, any document incorporated therein by reference, any free writing prospectus or the information conveyed to any purchaser at the time of sale to such purchaser containing an untrue statement of a material fact or omitting to state a material fact required to be stated therein or necessary to make any statement therein not misleading; and (vi) if at any time the representations and warranties contemplated by any underwriting agreement, securities sale agreement, or other similar agreement, relating to the offering shall cease to be true and correct in all material respects; and, if the notification relates to an event described in clause (v), the Company shall promptly prepare and furnish to each such Participating Holder a reasonable number of copies of a prospectus supplemented or amended so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances under which they were made not misleading;

(f)     comply (and continue to comply) with all applicable rules and regulations of the SEC (including, without limitation, maintaining disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) in accordance with the Exchange Act), and make generally available to its security holders, as soon as reasonably practicable after the effective date of the registration statement, an earnings statement (which need not be audited) covering the period of at least twelve (12) consecutive months beginning with the first day of the Company's first calendar quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(g)     (i) use its commercially reasonable best efforts to (A) cause all such Registrable Securities covered by such registration statement to be listed on the principal securities exchange on which similar securities issued by the Company are then listed (if any), if the listing of such Registrable Securities is then permitted under the rules of such exchange, or (B) if no similar securities are then so listed, to either cause all such Registrable Securities to be listed on a national securities exchange or to secure designation of all such Registrable Securities as a Nasdaq National Market "national market system security" within the meaning of Rule 11Aa2-1 of

13

the Exchange Act or, failing that, secure Nasdaq National Market authorization for such shares and, without limiting the generality of the foregoing, take all actions that may be required by the Company as the issuer of such Registrable Securities in order to facilitate the managing underwriter's arranging for the registration of at least two market makers as such with respect to such shares with FINRA, and (ii) comply (and continue to comply) with the requirements of any self-regulatory organization applicable to the Company, including without limitation all corporate governance requirements;

(h)     provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities covered by such registration statement not later than the effective date of such registration statement;

(i)     enter into such customary agreements (including, if applicable, an underwriting agreement) and take such other actions as the Majority Participating Holders or the underwriters shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (it being understood that the Holders of the Registrable Securities which are to be distributed by any underwriters shall be parties to any such underwriting);

(j)     use its commercially reasonable efforts (i) to obtain an opinion from the Company's counsel and a "cold comfort" letter and updates thereof from the Company's independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, in each case, in customary form and covering such matters as are customarily covered by such opinions and "cold comfort" letters (including, in the case of such "cold comfort" letter, events subsequent to the date of such financial statements) delivered to underwriters in underwritten public offerings, which opinion and letter shall be dated the dates such opinions and "cold comfort" letters are customarily dated and otherwise reasonably satisfactory to the underwriters, if any, and to the Majority Participating Holders, and (ii) furnish to each Participating Holder a copy of such opinion and letter addressed to such Participating Holder;

(k)     deliver promptly to one counsel for the Participating Holders (selected by the Majority Participating Holders) copies of all correspondence between the SEC and the Company, its counsel or auditors and all memoranda relating to discussions with the SEC or its staff with respect to the registration statement, and, upon receipt of such confidentiality agreements as the Company may reasonably request, make reasonably available for inspection by one counsel for the Participating Holders (selected by the Majority Participating Holders) participating in any disposition to be effected pursuant to such registration statement and by any accountant or other agent retained by the Participating Holder, all

14

pertinent financial and other records, pertinent corporate documents and properties of the Company, and cause all of the Company's officers, directors and employees to supply all information reasonably requested by any such counsel for the Participating Holders, accountant or agent in connection with such registration statement;

(l)     use its commercially reasonable efforts to obtain the prompt withdrawal of any order suspending the effectiveness of the registration statement, or the prompt lifting of any suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction;

(m)    provide a CUSIP number for all Registrable Securities, not later than the effective date of the registration statement;

(n)     use its commercially reasonable efforts to make available its employees and personnel for participation in "road shows" and other marketing efforts and otherwise provide reasonable assistance to the underwriters (taking into account the needs of the Company's businesses and the requirements of the marketing process) in marketing the Registrable Securities in any underwritten offering;

(o)     prior to the filing of any document which is to be incorporated by reference into the registration statement or the prospectus (after the initial filing of such registration statement), and prior to the filing of any free writing prospectus, provide copies of such document to counsel for each Participating Holder and make the Company's representatives reasonably available for discussion of such document and make such changes in such document concerning the Participating Holders prior to the filing thereof as counsel for the Participating Holders or underwriters may reasonably request;

(p)     furnish to one counsel for the Participating Holders (selected by the Majority Participating Holders), without charge, at least one signed copy of the registration statement and any post-effective amendments or supplements thereto, including financial statements and schedules, all documents incorporated therein by reference, the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus), any other prospectus filed under Rule 424 under the Securities Act and all exhibits (including those incorporated by reference) and any free writing prospectus utilized in connection therewith;

(q)     cooperate with the Participating Holders to facilitate the timely preparation and delivery of certificates not bearing any restrictive legends representing the Registrable Securities to be sold, and cause such Registrable Securities to be issued in such denominations and registered in such names in accordance with the underwriting agreement at least three (3) Business Days prior to any sale of Registrable Securities to the

15

underwriters or, if not an underwritten offering, in accordance with the instructions of the Participating Holders at least three (3) Business Days prior to any sale of Registrable Securities and instruct any transfer agent and registrar of Registrable Securities to release any stop transfer orders in respect thereof;

(r)     take no direct or indirect action prohibited by Regulation M under the Exchange Act; provided, however, that to the extent that any prohibition is applicable to the Company, the Company will take such action as is necessary and feasible to make any such prohibition inapplicable;

(s)     use its commercially reasonable efforts to cause the Registrable Securities covered by the applicable registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the Participating Holders or the underwriters, if any, to consummate the disposition of such Registrable Securities;

(t)     take all such other commercially reasonable actions as are necessary or advisable in order to expedite or facilitate the disposition of such Registrable Securities;

(u)     take all reasonable action to ensure that any free writing prospectus utilized in connection with any registration covered by Section 2.1 or 2.2 complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related prospectus, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(v)     in connection with any underwritten offering, if at any time the information conveyed to a purchaser at the time of sale includes any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, promptly file with the SEC such amendments or supplements to such information as may be necessary so that the statements as so amended or supplemented will not, in light of the circumstances, be misleading; and

(w)     give the Participating Holders, the underwriter or underwriters, if any, and their respective counsel and accountants, the timely opportunity to participate in the preparation of any registration statement, each prospectus included therein or filed with the SEC and each amendment or supplement to the foregoing items, and give each of them such access to its books and records and such opportunities to discuss the business of the Company with its officers and the independent public accountants who

16

have certified its financial statements as shall be reasonably necessary or advisable, in the opinion of each of such Participating Holders and such underwriters' respective counsel, to conduct appropriate due diligence as contemplated by the Securities Act.

To the extent the Company is a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) (a "<u>WKSI</u>") at the time any Demand Registration Request is submitted to the Company, and such Demand Registration Request requests that the Company file an automatic shelf registration statement (as defined in Rule 405 under the Securities Act) (an "<u>automatic shelf registration statement</u>") on Form S-3, the Company shall file an automatic shelf registration statement which covers those Registrable Securities which are requested to be registered. The Company shall use its commercially reasonable efforts to remain a WKSI (and not become an ineligible issuer (as defined in Rule 405 under the Securities Act)) during the period during which such automatic shelf registration statement is required to remain effective. If the Company does not pay the filing fee covering the Registrable Securities at the time the automatic shelf registration statement is filed, the Company agrees to pay such fee at such time or times as the Registrable Securities are to be sold. If the automatic shelf registration statement has been outstanding for at least three (3) years, at the end of the third year the Company shall refile a new automatic shelf registration statement covering the Registrable Securities. If at any time when the Company is required to re-evaluate its WKSI status the Company determines that it is not a WKSI, the Company shall use its commercially reasonable efforts to refile the shelf registration statement on Form S-3 and, if such form is not available, Form S-1 and keep such registration statement effective during the period during which such registration statement is required to be kept effective.

If the Company files any shelf registration statement for the benefit of the holders of any of its securities other than the Holders, the Company agrees that it shall include in such registration statement such disclosures as may be required by Rule 430B under the Securities Act (referring to the unnamed selling security holders in a generic manner by identifying the initial offering of the securities to the Holders) in order to ensure that the Holders may be added to such shelf registration statement at a later time through the filing of a prospectus supplement rather than a post-effective amendment.

The Company may require as a condition precedent to the Company's obligations under this Section 2.4 that each Participating Holder as to which any registration is being effected furnish the Company such information regarding such Participating Holder and the distribution of such securities as the Company may from time to time reasonably request provided that such information is necessary for the Company to consummate such registration and shall be used only in connection with such registration.

Each Holder of Registrable Securities agrees that upon receipt of any notice from the Company of the happening of any event of the kind described in clause (v) of paragraph (e) of this Section 2.4, such Holder will discontinue such Holder's disposition of Registrable Securities pursuant to the registration statement covering such Registrable Securities until such Holder's receipt of the copies of the supplemented or amended prospectus contemplated by paragraph (e) of this Section 2.4 and, if so directed by the Company, will deliver to the Company (at the Company's expense) all copies, other than permanent file copies, then in such Holder's

17

possession of the prospectus covering such Registrable Securities that was in effect at the time of receipt of such notice. In the event the Company shall give any such notice, the sixty (60) day period to effect a Demand Registration shall be extended by the number of days during such period from and including the date of the giving of such notice to and including the date when each Participating Holder covered by such registration statement shall have received the copies of the supplemented or amended prospectus contemplated by paragraph (e) of this Section 2.4.

If any such registration statement or comparable statement under state "blue sky" laws refers to any Holder by name or otherwise as the Holder of any securities of the Company, then such Holder shall have the right to require (i) the insertion therein of language, in form and substance satisfactory to such Holder and the Company, to the effect that the holding by such Holder of such securities is not to be construed as a recommendation by such Holder of the investment quality of the Company's securities covered thereby and that such holding does not imply that such Holder will assist in meeting any future financial requirements of the Company, or (ii) in the event that such reference to such Holder by name or otherwise is not in the opinion of such Holder's counsel required by the Securities Act or any similar federal statute or any state "blue sky" or securities law then in force, the deletion of the reference to such Holder.

2.5    Registration Expenses.

(a)    All Expenses shall be borne by the Company; provided that all Selling Expenses relating to the Holders' Registrable Securities registered pursuant to this Agreement shall be borne by the Holders.

(b)    Notwithstanding the foregoing, (x) the provisions of this Section 2.5 shall be deemed amended to the extent necessary to cause these expense provisions to comply with state "blue sky" laws of each state in which the offering is made and (y) in connection with any registration hereunder, each Participating Holder shall pay all underwriting discounts and commissions and any transfer taxes, if any, attributable to the sale of such Registrable Securities, *pro rata* with respect to payments of discounts and commissions in accordance with the number of shares sold in the offering by such Participating Holder.

2.6    Certain Limitations on Registration Rights.  In the case of any registration under Section 2.1 pursuant to an underwritten offering, or, in the case of a registration under Section 2.2, if the Company has determined to enter into an underwriting agreement in connection therewith, all securities to be included in such registration shall be subject to such underwriting agreement and no Person may participate in such registration unless such Person (i) agrees to sell such Person's securities on the basis provided therein and completes and executes all reasonable questionnaires, and other documents (including custody agreements and powers of attorney) which must be executed in connection therewith; provided, however, that all such documents shall be consistent with the provisions hereof and (ii) provides such other information to the Company or the underwriter as may be necessary to register such Person's securities.

2.7    Limitations on Sale or Distribution of Other Securities.  (a) Each Holder agrees, (i) to the extent requested in writing by a managing underwriter, if any, of any registration

18

effected pursuant to Section 2.1, not to sell, transfer or otherwise dispose of, including any sale pursuant to Rule 144 under the Securities Act, any Common Equity, or any other equity security of the Company or any security convertible into or exchangeable or exercisable for any equity security of the Company (other than as part of such underwritten public offering) during the time period reasonably requested by the managing underwriter, not to exceed ninety (90) days or such shorter period as the Company or any executive officer or director of the Company shall agree to (and the Company hereby also so agrees (except that the Company may effect any sale or distribution of any such securities pursuant to a registration on Form S-4 or Form S-8, or any successor or similar form which is (x) then in effect or (y) shall become effective upon the conversion, exchange or exercise of any then outstanding Common Equity Equivalent), to use its commercially reasonable efforts to cause each holder of any equity security or any security convertible into or exchangeable or exercisable for any equity security of the Company purchased from the Company at any time other than in a public offering so to agree), and (ii) to the extent requested in writing by a managing underwriter of any underwritten public offering effected by the Company for its own account, not to sell any Common Equity (other than as part of such underwritten public offering) during the time period reasonably requested by the managing underwriter, which period shall not exceed ninety (90) days or such shorter period as the Company or any executive officer or director of the Company shall agree to.

      (b)     The Company hereby agrees that, if it shall previously have received a request for registration pursuant to Section 2.1 or 2.2, and if such previous registration shall not have been withdrawn or abandoned, the Company shall not sell, transfer, or otherwise dispose of, any Common Equity, or any other equity security of the Company or any security convertible into or exchangeable or exercisable for any equity security of the Company (other than as part of such underwritten public offering, a registration on Form S-4 or Form S-8 or any successor or similar form which is (x) then in effect or (y) shall become effective upon the conversion, exchange or exercise of any then outstanding Common  Equity Equivalent), until a period of ninety (90) days shall have elapsed from the effective date of such previous registration; and the Company shall (i) so provide in any registration rights agreements hereafter entered into with respect to any of its securities and (ii) use its commercially reasonable efforts to cause each holder of any equity security or any security convertible into or exchangeable or exercisable for any equity security of the Company purchased from the Company at any time other than in a public offering to so agree.

   2.8   <u>No Required Sale</u>.  Nothing in this Agreement shall be deemed to create an independent obligation on the part of any Holder to sell any Registrable Securities pursuant to any effective registration statement.

   2.9   <u>Indemnification</u>.

      (a)     In the event of any registration of any securities of the Company under the Securities Act pursuant to this Article 2, the Company will, and hereby agrees to, and hereby does, indemnify and hold harmless, to the fullest

19

extent permitted by law, each Participating Holder, its Affiliates, directors, officers, fiduciaries, employees, stockholders, members or general and limited partners (and the directors, officers, fiduciaries, employees, stockholders, members, general and limited partners or other Affiliates thereof), each other Person who participates as a seller (and its directors, officers, fiduciaries, employees, stockholders, members, general and limited partners or other Affiliates thereof), from and against any and all losses, claims, damages or liabilities, joint or several, actions or proceedings (whether commenced or threatened) and expenses (including reasonable fees of counsel and any amounts paid in any settlement effected with the Company's consent to which each such indemnified party may become subject under the Securities Act or otherwise in respect thereof (collectively, "Claims"), insofar as such Claims arise out of or are based upon (i) any untrue statement or alleged untrue statement of a material fact contained in any registration statement under which such securities were registered under the Securities Act or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) any untrue statement or alleged untrue statement of a material fact contained in any preliminary, final or summary prospectus or any amendment or supplement thereto, together with the documents incorporated by reference therein, or any free writing prospectus utilized in connection therewith, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (iii) any untrue statement or alleged untrue statement of a material fact in the information conveyed by the Company to any purchaser at the time of the sale to such purchaser, or the omission or alleged omission to state therein a material fact required to be stated therein, or (iv) any violation by the Company of any federal, state or common law rule or regulation applicable to the Company and relating to action required of or inaction by the Company in connection with any such registration, and the Company will reimburse any such indemnified party for any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such Claim as such expenses are incurred; provided, however, that the Company shall not be liable to any such indemnified party in any such case to the extent such Claim arises out of or is based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission of a material fact made in such registration statement or amendment thereof or supplement thereto or in any such prospectus or any preliminary, final or summary prospectus or free writing prospectus in reliance upon and in conformity with written information furnished to the Company by or on behalf of such indemnified party specifically for use therein. Such indemnity and reimbursement of expenses shall remain in full force and effect regardless of any investigation made by or on behalf of such

20

indemnified party and shall survive the transfer of such securities by such seller.

(b)     Each Participating Holder shall, severally and not jointly, indemnify and hold harmless (in the same manner and to the same extent as set forth in paragraph (a) of this Section 2.9), to the fullest extent permitted by law, the Company, its officers and directors, each Person controlling the Company within the meaning of the Securities Act and all other prospective sellers and their directors, officers, stockholders, fiduciaries, managing directors, agents, Affiliates, consultants, representatives, successors, assigns or general and limited partners and respective controlling Persons from and against any and all Claims insofar as such Claims arise out of or are based upon any untrue statement or alleged untrue statement of any material fact in, or omission or alleged omission of any material fact from, such registration statement, any preliminary, final or summary prospectus contained therein, or any amendment or supplement thereto, or any free writing prospectus utilized in connection therewith, if such statement or alleged statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company or its representatives by or on behalf of such Participating Holder, if any, specifically for use therein and reimburse such indemnified party for any legal or other expenses reasonably incurred in connection with investigating or defending any such Claim as such expenses are incurred; provided, however, that the aggregate amount which any such Participating Holder shall be required to pay pursuant to this Section 2.9(b) and Sections 2.9(c) and (e) shall in no case be greater than the amount of the net proceeds received by such Participating Holder upon the sale of the Registrable Securities pursuant to the registration statement giving rise to such Claim. The Company and each Participating Holder hereby acknowledge and agree that, unless otherwise expressly agreed to in writing by such Participating Holders to the contrary, for all purposes of this Agreement, the only information furnished or to be furnished to the Company for use in any such registration statement, preliminary, final or summary prospectus or amendment or supplement thereto or any free writing prospectus are statements specifically relating to (a) the beneficial ownership of shares of Common Equity by such Participating Holder and its Affiliates and (b) the name and address of such Participating Holder. If any additional information about such Holder or the plan of distribution (other than for an underwritten offering) is required by law to be disclosed in any such document, then such Holder shall not unreasonably withhold its agreement referred to in the immediately preceding sentence. Such indemnity and reimbursement of expenses shall remain in full force and effect regardless of any investigation made by or on behalf of such indemnified party and shall survive the transfer of such securities by such Holder.

(c)     Indemnification similar to that specified in the preceding paragraphs (a) and (b) of this Section 2.9 (with appropriate modifications) shall be given by the Company and each Participating Holder with respect to any required registration or other qualification of securities under any applicable securities and state "blue sky" laws.

(d)     Any Person entitled to indemnification under this Agreement shall notify promptly the indemnifying party in writing of the commencement of any action or proceeding with respect to which a claim for indemnification may be made pursuant to this Section 2.9, but the failure of any indemnified party to provide such notice shall not relieve the indemnifying party of its obligations under the preceding paragraphs of this Section 2.9, except to the extent the indemnifying party is materially and actually prejudiced thereby and shall not relieve the indemnifying party from any liability which it may have to any indemnified party otherwise than under this Article 2.  Any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the indemnifying party's expense, subject to the terms and conditions of this Agreement.

(e)     If for any reason the foregoing indemnity is unavailable, unenforceable or is insufficient to hold harmless an indemnified party under Sections 2.9(a), (b) or (c), then each applicable indemnifying party shall contribute to the amount paid or payable to such indemnified party as a result of any Claim in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and the indemnified party, on the other hand, with respect to such Claim. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. If, however, the allocation provided in the second preceding sentence is not permitted by applicable law, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative faults but also the relative benefits of the indemnifying party and the indemnified party as well as any other relevant equitable considerations. The parties hereto agree that it would not be just and equitable if any contribution pursuant to this Section 2.9(e) were to be determined by *pro rata* allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the preceding sentences of this Section 2.9(e). The amount paid or payable in respect of any Claim shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such Claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities

22

Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. Notwithstanding anything in this Section 2.9(e) to the contrary, no indemnifying party (other than the Company) shall be required pursuant to this Section 2.9(e) to contribute any amount greater than the amount of the net proceeds received by such indemnifying party upon the sale of the Registrable Securities pursuant to the registration statement giving rise to such Claim, less the amount of any indemnification payment made by such indemnifying party pursuant to Sections 2.9(b) and (c).

(f)     The indemnity and contribution agreements contained herein shall be in addition to any other rights to indemnification or contribution which any indemnified party may have pursuant to law or contract and shall remain operative and in full force and effect regardless of any investigation made or omitted by or on behalf of any indemnified party and shall survive the transfer of the Registrable Securities by any such party.

(g)     The indemnification and contribution required by this Section 2.9 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or expense, loss, damage or liability is incurred; provided, however, that the recipient thereof hereby undertakes to repay such payments if and to the extent it shall be determined by a court of competent jurisdiction in a final unappealable decision that such recipient is not entitled to such payment hereunder.

3.     Underwritten Offerings.

    3.1     Requested Underwritten Offerings.  If requested by the underwriters for any underwritten offering pursuant to a registration requested under Section 2.1, the Company shall enter into a customary underwriting agreement with the underwriters. Such underwriting agreement shall contain terms not inconsistent with the provisions of this Agreement and contain such representations and warranties by, and such other agreements on the part of, the Company and such other terms as are generally prevailing in agreements of that type, including, without limitation, indemnities and contribution agreements on substantially the same terms as those contained herein. Upon the Company's request, each Participating Holder shall be a party to such underwriting agreement. The Company shall not be required to make any representations or warranties with respect to written information specifically provided by a Participating Holder for inclusion in the registration statement. Each such Participating Holder shall not be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Participating Holder, its ownership of and title to the Registrable Securities, any written information specifically provided by such Participating Holder for inclusion in the registration statement and its intended method of distribution; and any liability of such Participating Holder to any underwriter or other Person under such underwriting agreement shall be limited to liability arising from breach of its representations and warranties and shall in no case be greater than the amount of the net proceeds

23

received by such Holder upon the sale of the Registrable Securities pursuant to the registration statement.

     3.2   Piggyback Underwritten Offerings. In the case of a registration pursuant to Section 2.2, if the Company shall have determined to enter into an underwriting agreement in connection therewith, all of the Participating Holders' Registrable Securities to be included in such registration shall be subject to such underwriting agreement. Any Participating Holder may, at its option, require that any or all of the representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such underwriters shall also be made to and for the benefit of such Participating Holder and that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement be conditions precedent to the obligations of such Participating Holder; provided, however, that the Company shall not be required to make any representations or warranties with respect to written information specifically provided by a Participating Holder for inclusion in the registration statement. Each such Participating Holder shall not be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Participating Holder, its ownership of and title to the Registrable Securities, any written information specifically provided by such Participating Holder for inclusion in the registration statement and its intended method of distribution; and any liability of such Participating Holder to any underwriter or other Person under such underwriting agreement shall be limited to liability arising from breach of its representations and warranties and shall in no case be greater than the amount of the net proceeds received by such Participating Holder upon the sale of the Registrable Securities pursuant to the registration statement.

4.    General.

     4.1   Adjustments Affecting Registrable Securities. The Company agrees that it shall not effect or permit to occur any combination or subdivision of shares of Common Equity which would adversely affect the ability of any Holder of any Registrable Securities to include such Registrable Securities in any registration contemplated by this Agreement or the marketability of such Registrable Securities in any such registration.

     4.2   Rule 144 and Rule 144A. If the Company shall have filed a registration statement pursuant to the requirements of Section 12 of the Exchange Act or a registration statement pursuant to the requirements of the Securities Act in respect of the Common Equity or Common Equity Equivalents, the Company covenants that (i) so long as it remains subject to the reporting provisions of the Exchange Act, it will timely file the reports required to be filed by it under the Securities Act or the Exchange Act (including, but not limited to, the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144 under the Securities Act, as such Rule may be amended ("Rule 144")) or, if the Company is not required to file such reports, it will, upon the request of any Holder, make publicly available other information so long as necessary to permit sales by such Holder under Rule 144, Rule 144A under the Securities Act, as such Rule may be amended ("Rule 144A"), or any similar rules or regulations hereafter adopted by the SEC, and (ii) it will take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (A) Rule 144, (B) Rule 144A or (C) any similar rule or regulation

hereafter adopted by the SEC. Upon the request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such requirements.

4.3   <u>Nominees for Beneficial Owners</u>. If Registrable Securities are held by a nominee for the beneficial owner thereof, the beneficial owner thereof may, at its option, be treated as the Holder of such Registrable Securities for purposes of any request or other action by any Holder or Holders of Registrable Securities pursuant to this Agreement (or any determination of any number or percentage of shares constituting Registrable Securities held by any Holder or Holders of Registrable Securities contemplated by this Agreement), <u>provided</u> that the Company shall have received assurances reasonably satisfactory to it of such beneficial ownership.

4.4   <u>Amendments and Waivers</u>. No provision of this Agreement may be amended, modified, supplemented or waived without the written approval of each Holder. No waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provision hereof (whether or not similar). No failure or delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof or of any other or future exercise of any such right, power or privilege.

4.5   <u>Limitation on Subsequent Registration Rights</u>. From and after the date hereof, the Company may not enter into any agreement with any holder or prospective holder of any securities of the Company which provides such holder or prospective holder with more favorable information and registration rights than are granted to the Holders by this Agreement.

4.6   <u>Notices</u>. Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, or by facsimile to the Company at the address set forth below and to any subsequent Holder subject to this Agreement at such address as indicated by the Company's records, or at such address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three (3) business days after deposit in the mail, if sent by registered or certified mail; upon confirmation of successful transmission if sent by facsimile (provided that if given by facsimile such notice, request, instruction or other document shall be followed up within one (1) business day by dispatch pursuant to one of the other methods described herein); or on the next business day after deposit with an overnight courier, if sent by an overnight courier:

     (i)    If to the Company:

        Tribune Company
        435 N. Michigan Avenue
        Chicago, IL  60611
        Attention: General Counsel
        Telephone: (312) 222-9100
        Fax: (312) 222-4206

     (ii)    If to [Holder]:

          [___]


    4.7    <u>Successors and Assigns</u>.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and each Holder and his, her and its respective successors, permitted assigns and heirs. Each Holder may assign its rights under this Agreement to any Affiliate of such Holder, <u>provided</u> that such assignment shall not relieve such Holder of its obligations under this Agreement. This Agreement may not be assigned by the Company, without the written approval of Holders holding a majority of the Registrable Securities then held by all Holders. Upon any such assignment, such assignee shall have and be able to exercise and enforce all rights of the assigning Holder which are assigned to it and, to the extent such rights are assigned, any reference to the assigning Holder shall be treated as a reference to the assignee. The parties hereto and their respective successors may assign their rights under this Agreement, in whole but not in part, in connection with the sale, transfer, assignment, pledge, hypothecation or other disposition of shares of Registrable Securities held by them.

    4.8    <u>Entire Agreement</u>.  This Agreement and the other writings referred to herein or delivered pursuant hereto which form a part hereof constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties both written and oral, among the parties, with respect to the subject matter hereof.

    4.9    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>

    (a)    THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN AND IN ALL RESPECTS SHALL BE INTERPRETED, CONSTRUED AND GOVERNED BY AND IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF. The parties hereby irrevocably submit to the personal jurisdiction of the courts of the State of New York located in the County of New York and the Federal courts of the United States of America located in the County of New York solely in respect of the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement, and in respect of the transactions contemplated hereby, and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in such a New York State or Federal court located in the County of New York. The parties hereby consent to and grant any such

26

court jurisdiction over the person of such parties and, to the extent permitted by law, over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 4.6 or in such other manner as may be permitted by law shall be valid and sufficient service thereof.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4.9.

4.10    Interpretation; Construction

(a)    The table of contents and headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(b)    The parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

4.11    Counterparts. This Agreement may be executed in separate counterparts (including by facsimile), all of which taken together shall constitute one and the same agreement.

4.12    Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any person or any circumstance, is invalid or unenforceable in any jurisdiction, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

4.13    Specific Performance; Remedies Cumulative.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each party hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the courts of the State of New York located in the County of New York and the Federal courts of the United States of America located in the County of New York.  None of the rights, powers or remedies conferred under this Agreement shall be mutually exclusive, and each such right, power or remedy shall be cumulative and in addition to any other right, power or remedy, whether conferred by this Agreement or now or hereafter available at law, in equity, by statute or otherwise.

4.14    Further Assurances.Each party hereto shall do and perform or cause to be done and performed all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments, and documents as any other party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the parties hereto have duly executed this agreement as of the date first above written.

[HOLDERS]

By:    _____
     Name:
     Title:


TRIBUNE COMPANY


By:    _____
     Name:
     Title:

**Schedule A**

[To Come]