1.    **The Creditors' Trust Was Proposed in Good Faith**

The Creditors' Trust was created to provide a mechanism pursuant to which the

individual state law constructive fraudulent transfer actions (the "State Law Avoidance Claims")

might be pursued in an efficient manner in an effort to provide the Creditors' Trust beneficiaries

with maximum value. This Court, in Spansion, stated that "[f]or purposes of determining good

faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether

such a plan will fairly achieve a result consistent with the objectives and purposes of the

Bankruptcy Code." 426 B.R. 114, 137 (Bankr. D. Del. 2010) (quoting PWS Holding Corp., 228

F.3d at 242).

It is axiomatic that maximizing value for creditors of the estate is an objective of the

Bankruptcy Code. See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d 108, 128-29 (3d

Cir. 2004) ("[T]he purposes of the Code are to preserve going concerns and to maximize the

value of the debtor's estate"); In re Michener, 342 B.R. 428, 435 (Bankr. D. Del. 2006)

(acknowledging the dual purposes of the Bankruptcy Code: "first, to maximize the creditors'

recovery and second, to provide the debtor with a fresh start"); In re Allegheny Int'l, Inc., 134

B.R. 814, 820 (Bankr. W.D. Pa. 1991) ("The purpose of a Chapter 11 proceeding is to maximize

the result for all creditors."). The Creditors' Trust is clearly consistent with the objectives and

purposes of the Bankruptcy Code. As such, the Creditors' Trust was proposed in good faith for

the purposes of section 1129(a)(3).

The Creditors' Trust Objections provide absolutely no legal support for the assertion that

proposing a mechanism by which individual creditors may aggregate claims evidences a lack of

good faith under the Bankruptcy Code, and indeed there is no such authority. Cases finding a

lack of good faith are strikingly different from the case at bar. See, e.g., In re Hotel Assocs. of

Tucson, 165 B.R. 470, 475 (B.A.P. 9th Cir. 1994) ("[T]he act of impairment in an attempt to

gerrymander a voting class of creditors is indicative of bad faith."); In re Chemtura Corp., 439

B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (good faith requirement speaks more to process of plan

development than to content of plan); In re Woolley's Parkway Ctr., Inc., 147 B.R. 996, 1003

(Bankr. M.D. Fla. 1992) (finding that plan was proposed in bad faith where debtor made

unsubtle attempt to manipulate chapter 11 by artificially creating an impaired class once it

became clear that to achieve confirmation it would need the affirmative vote of at least one

impaired class); In re Maxim Indus., Inc., 22 B.R. 611, 612-13 (Bankr. D. Mass. 1982) (plan was

not proposed in good faith where tax motivations were the only purposes of having a shell

corporation acquire all of the stock of a solvent corporation).  None of the hallmarks of bad faith

exist here.

        In the absence of legal support for their theories, the Creditors' Trust Objections rely on a

conclusory and unsupported argument that because prospective defendants in the State Law

Avoidance Claims may have a defense to those claims if they were brought in bankruptcy, the

Creditors' Trust was proposed in bad faith and fails to meet the requirements of section

1129(a)(3).  In other words, rather than address the issue of good faith, the Creditors' Trust

Objections, which are more properly characterized as premature motions to dismiss the State

Law Avoidance Claims, discuss the merits of the underlying State Law Avoidance Claims,

which are not currently at issue.  Assuming, arguendo, that the Creditors' Trust Objectors are

indeed correct with respect to the standing and preemption issues (which are discussed in detail

below), the Creditors' Trust Objectors will have still failed to properly allege that the Creditors'

Trust was proposed in bad faith for the purposes of section 1129(a)(3).

        The Debtor/Committee/Lender Plan provides individual creditors with the option to

transfer their State Law Avoidance Claims to the Creditors' Trust so that those claims may be

efficiently prosecuted and their validity determined. See Debtor/Committee/Lender Plan §

14.3.1. The Creditors' Trust does not create new claims to be brought against the Creditors'

Trust Objectors, it simply preserves existing claims and provides a vehicle for their prosecution.

Providing creditors with an avenue to collectively recover on their potentially valuable claims is

hardly evidence of a lack of good faith.

   Whether the claims transferred to the Creditors' Trust might ultimately be precluded by

the application of section 546(e) is of no relevance to the task before this Court -- the

determination of the confirmability of the Debtor/Committee/Lender Plan. These issues will be

properly addressed by the court that hears the State Law Avoidance Claims, and are therefore

premature and misplaced. These issues certainly have no bearing on whether the Creditors'

Trust was proposed in good faith.

   It should be noted that the Bankruptcy Court for the Southern District of New York

recently approved a plan of reorganization that provides for a creditors' trust under nearly

identical circumstances. In the Order Confirming Third Amended Joint Chapter 11 Plan of

Reorganization for the LyondellBasell Debtors [Case No. 09-10023, Doc. No. 4418] (the

"Lyondell Confirmation Order"), Judge Gerber approved the plan of reorganization proposed by

Lyondell Chemical Company (the "Lyondell Plan"). Section 5.8 of the Lyondell Plan provides

for a creditors' trust very similar to the one in the instant case. See Lyondell Plan at § 5.8 [Case

No. 09-10023, Doc. No. 3930]. The Lyondell Confirmation Order expressly provides that the

Lyondell Plan comports with section 1129(a)(3). See Lyondell Order at p. 8 ("The Debtors have

proposed the Plan in good faith . . . [and] with the legitimate and honest purpose of maximizing

the value of the Debtors' estates and to effectuate a successful reorganization of the Debtors").

Indeed, no argument that proposing a creditors' trust was evidence of bad faith was even made in

that case. While not controlling, this is further persuasive evidence that the Creditors' Trust was proposed in good faith.

### 2.  The Objections of the Creditors' Trust Objectors to the Creditors' Trust are Meritless[89]

In addition to lacking a basis in law, a review of the Creditors' Trust Objections reveals that they are founded in misunderstandings of (i) the nature of creditors' state law fraudulent transfer claims, (ii) section 544 of the Bankruptcy Code, (iii) what is or is not the property of the estate and (iv) the form and function of the Creditors' Trust. What case law the Creditors' Trust Objectors do cite is both factually and legally distinguishable – none of the cases deal with plan confirmation, let alone present analogous facts or issues.

#### a.  The Creditors' Trust has Standing to Bring the State Law Avoidance Claims

The Foundations argue in their objection (the "Foundations' Objection") [Doc. No. 7972] that litigation trusts do not have standing to pursue creditor claims for two reasons. See Foundations' Objection at ¶¶ 33-39. First, they argue that the State Law Avoidance Claims cannot be transferred to the Creditors' Trust. See id. at ¶ 34. Second, they argue that the Creditors' Trust may not assert general claims belonging to all creditors unless the Debtors totally abandon all claims of the estate related to the LBO-Related Causes of Action. See id. at ¶¶ 35-39.

In support of their first argument, the Foundations rely primarily on several decisions traceable to the Supreme Court decision, Caplin v. Marine Midland Grace Tr. Co. of N.Y., 406 U.S. 416 (1972). See Foundations' Objection at ¶ 34. Caplin and its progeny, however, are factually distinguishable from the present situation and the Foundations' reliance on them reveals

---

[89] While the Senior Lenders are supportive of the inclusion of the Creditors' Trust in the Debtor/Committee/Lender Plan, the Senior Lenders do not join in Part IV.B.2.

a mischaracterization or fundamental misunderstanding of the form and function of the

Creditors' Trust. In Caplin, the chapter X bankruptcy trustee, a representative of the estate, was

attempting to bring suit on behalf of certain debenture holders. See Caplin, 406 U.S. at 416. The

claims, while not assigned to the bankruptcy trustee, were brought while the bankruptcy was still

pending. See id. at 420. The Court held that under the Bankruptcy Act, the bankruptcy trustee

had no standing to bring the creditors' claims. See id. at 434. Caplin is distinguishable for

several obvious reasons. Here, any suits based on the State Law Avoidance Claims would be

brought post-confirmation and only after the Debtors have emerged from bankruptcy.

Furthermore, the State Law Avoidance Claims are assigned and transferred explicitly to the

Creditors' Trust. Courts have recognized similar differences as critical factual distinctions

rendering Caplin inapplicable.[90] Most importantly, the Creditors' Trustee is not a bankruptcy

trustee or a successor to or representative of Tribune's estate.

---

[90] Several cases have distinguished Caplin and its progeny on this basis. In Grede v. Bank of New York Mellon, 598 F.3d 899 (7th Cir. 2010), the Seventh Circuit reversed the district court's holding that a liquidating trust lacked standing to bring claims assigned to it by creditors. The Seventh Circuit held that the trustee did in fact have such authority, rejecting the argument that Caplin applies even after the termination of a bankruptcy, stating that none of the reasons Caplin provided in support of its conclusion "applies to [a] suit by a liquidation trustee on assigned claims." Id. at 902. While "the terms of the Bankruptcy Code govern the permissible duties of a trustee *in* bankruptcy, the terms of the plan of reorganization (and of the trust instrument) govern the permissible duties of a trustee *after* bankruptcy." Id. at 902. Similarly, because the trust only held voluntarily assigned claims, the Seventh Circuit recognized that "[b]y proceeding on the investors' voluntary assignments rather than a bankruptcy judge's directive, [the debtor's] plan of reorganization cures Caplin's third problem" of inconsistent recoveries. As a result, it held that "Caplin does not apply to the activities of a liquidating trust created by a plan of reorganization." Id. at 903.
Similarly, in Semi-Tech Litigation, LLC v. Bankers Trust Co., 272 F. Supp.2d 319 (S.D.N.Y. 2003), the district court held that Caplin did not preclude creditors from assigning claims to a liquidating trust. That decision was subsequently affirmed and adopted as the law of the Second Circuit. 450 F.3d 121, 126-27 (2d Cir. 2006). In Semi-Tech, a number of individual creditors had assigned their claims to a liquidating trust pursuant to a plan. The district court held that Caplin was distinguishable on the grounds that the creditors in Caplin "had not assigned their claims to the trustee." It noted that "Caplin involved an effort to discern whether Congress intended trustees to exercise [the power to bring claims on behalf of third parties] whereas the issue in both Williams and here is whether assignments should be stripped of legal effect because the assignee is a creature of bankruptcy." Semi-Tech, 272 F.Supp. 2d at 323. Finding that the concerns raised in Caplin were "considerably less compelling" when creditors actually assigned their claims to the trust, the court held that there was "no basis for treating an assignee created by, or assignments made pursuant to, a Chapter 11 plan any differently." Id. at 324.

The Litigation Trustee, on the other hand, is a bankruptcy trustee and representative of

the estate by the express terms of the Debtor/Committee/Lender Plan.  Section 13.2.4 of the

Debtor/Committee/Lender Plan provides:

> The Litigation Trust, acting through the Litigation Trustee, shall be
> authorized to exercise and perform the rights, powers, and duties held by
> the Estate with respect to the Litigation Trust Assets, including, without
> limitation, the authority under Section 1123(b)(3) of the Bankruptcy Code,
> and shall be deemed to be acting in the capacity of a bankruptcy trustee,
> receiver, liquidator, conservator, rehabilitator, creditors' committee or any
> similar official who has been appointed to take control of, supervise,
> manage or liquidate the Debtors . . . .

See Debtor/Committee/Lender Plan § 13.2.4 (emphasis added).  There is no such corresponding

language concerning the establishment of the Creditors' Trust, and those omissions are

intentional.  The Debtor/Committee/Lender Plan neither describes, nor establishes the Creditors'

Trust as being "a bankruptcy trustee" who will "exercise and perform the rights, powers and

duties held by the Estate."  The Creditors' Trust has no rights in the estate, does not represent the

estate, is not a successor to the estate and is wholly independent from the estate.

The three other cases cited by the Foundations are cited for the similar proposition that

creditors may not assign claims to a litigation trust.  However, these cases are also

distinguishable for the reason that they all involved a bankruptcy trustee, successor to, or

representative of the debtors' estate.  See Foundations' Objection at ¶ 34 (citing Kipperman v.

Onex Corp., 411 B.R. 805, 831 (N.D. Ga. 2009); Mukamal v. Bakes, 383 B.R. 798, 811-814

(S.D. Fla. 2007); Trenwick Am. Lit. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 189-91 (Del.

Ch. 2006)).  As an initial matter, the Kipperman court observed in dicta that "[l]itigation trustees

do not have standing to directly pursue claims on behalf of creditors and creditors may not assign

their claims to a litigation trust."  See Kipperman, 411 B.R. at 831 n.21.  The litigation trust in

Kipperman, however, was explicitly established as "the successor to and the representative of the

[d]ebtors' [b]ankruptcy estate." See Kipperman, 411 B.R. at 831. Both Mukamal and Trenwick also deal with litigation trusts established as estate representatives who are bringing claims belonging to, and on behalf of, their respective estates. See Mukamal, 383 B.R. at 808; Trenwick, 906 A.2d at 175, 189-90. Here, the Creditors' Trust was carefully designed as an entity wholly divorced from and independent of Tribune's bankruptcy estate and is not imbued with any powers afforded estate representatives under section 1123(b)(3)(B). Accordingly, the general prohibition asserted by Caplin and its progeny is simply not relevant to the case sub judice.[91]

The Foundations' second standing argument alleges that individual creditors may not assert general claims belonging to all creditors unless the Debtors totally abandon all claims of the estate related to the LBO-Related Causes of Action. See Foundations' Objection at ¶¶ 35-39. Again, the Foundations' assertions are based on a misunderstanding of both the facts and relevant law. As an initial matter, the inability of individual creditors to assert claims belonging to all creditors while a bankruptcy case is pending is an unremarkable proposition of bankruptcy law. Most of the cases cited to by the Foundations on this point deal with controversies over whether or not individual creditors were bringing estate claims in conflict with the actions of a bankruptcy trustee or debtor-in-possession during the pendency of a bankruptcy case.[92] See Foundations' Objection at ¶ 35 (citing Bd. of Trs. of Teamsters Local 863 Pension Fund v.

---

[91] Indeed, in Buckley v. O'Hanlon, Case No. 04-955 (GMS)2007 WL 956947 (D. Del. Mar. 28, 2007), the District Court for the District of Delaware acknowledged that a trust could assert claims assigned to it by creditors. There, the creditors' committee filed suit against certain officers alleging deepening insolvency, breach of fiduciary duties and other fraud claims. See id. at *2. The trustee of the liquidating trust established pursuant to a confirmed plan was subsequently substituted as the plaintiff in the action. The court "acknowledge[d] that, in theory, a bankruptcy trustee can pursue claims that the debtors' creditors assigned to it." Id. at *3. The court ultimately dismissed the assigned claims because the complaint had been filed before the assignment became effective. See id.

[92] The remaining case cited by the Foundations dealt with a creditors' committee asserting standing to bring estate claims. See Official Comm. of Unsecured Creditors v. Citicorp N.A., Inc. (In re Aluminum Mills Corp.), 132 B.R. 869 (Bankr. N.D. Ill. 1991) (court found claims were general claims belonging to estate; standing granted).

Foodtown, Inc., 296 F.3d 164, 170 (3d Cir. 2002) (court found that creditors were asserting personal claims, not estate claims; held that creditor rather than trustee can pursue); Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.), 226 F.3d 237, 243 (3d Cir. 2000) (court noting that state law fraudulent transfer claims were not "assets" of debtor; held that sale of all debtors' assets did not foreclose creditors from pursuing such claims); St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 702 (2d Cir. 1989) (court found that creditor was asserting estate claims, not personal claims; held that only trustee may pursue).  That proposition has no bearing here, however, for the simple reason that the Creditors' Trust is not attempting to bypass the section 544 strong-arm powers afforded to a bankruptcy trustee or violate the automatic stay.  The Creditors' Trust will only be pursuing the State Law Avoidance Claims by assignment of the State Law Avoidance Claims from the individual creditors, where the right to assert such claims has already reverted to the beneficiaries of the Creditors' Trust by operation of law due to the expiration of the two-year period set forth in section 546(a)(1)(A) of the Bankruptcy Code.

A return to the basics may better highlight the futility of the Foundations' arguments. Outside of bankruptcy, a creditor of an insolvent transferor may seek to recover transfers from the recipient of those transfers under the UFTA or UFCA.  Once the transferor files for bankruptcy, however, the Bankruptcy Code prohibits creditors from commencing (or continuing their prosecution of) these causes of action and vests in the bankruptcy trustee the exclusive right to pursue such causes of action.[93]  The rights of creditors to prosecute such claims, however, are

---

[93] We note that there is no single articulation as to the basis for the trustee's exclusive right. Courts refer alternatively to section 544(b), section 546(a) or simply cite to prior decisions as support for the trustee's exclusivity. See, e.g., In re Berg, 376 B.R. 303, 314 (Bankr. D. Kan. 2007) ("The well-established interpretation of § 544(b) . . . bar[s] an unsecured creditor from pursuing any claims under the UFTA."); Klingman v. Levinson, 158 B.R. 109, 113 (N.D. Ill. 1993) (citing 11 U.S.C. § 546(a) for the proposition that "the commencement of bankruptcy gives the trustee the right to pursue fraudulently conveyed assets to the exclusion of all creditors"); Sears Petroleum & Transp. Corp. v. Burgess Constr. Servs., Inc., 417 F.Supp.2d 212, 221 (D. Mass. 2006) (citing to case law for the

not extinguished; they are only suspended in recognition of the trustee's exclusive (but not permanent) power.[94]

It is well-established that should the limitations period expire and the trustee has not exercised its strong-arm powers, the power to assert (or to continue) state law fraudulent transfer claims under the UFTA and the UFCA reverts to the creditors.[95] For example, in <u>Klingman v. Levinson</u>, 158 B.R. 109, 112-113 (N.D. Ill. 1993), creditors brought suit to set aside a transfer under applicable state law. The court held that the bankruptcy trustee's exclusive right to pursue avoidance claims under section 546(a) expires and "creditors may step in (or resume actions) when the trustee no longer has a viable cause of action." <u>See id.</u> at 113. Similarly, the Sixth Circuit held in <u>Hatchett v. United States</u>, 330 F.3d 875 (6th Cir. 2003), that although the trustee

_____

proposition that the trustee can bring a fraudulent conveyance claim at the exclusion of the creditors once the bankruptcy has commenced). Courts have also relied on the automatic stay arising under section 362 in holding that creditors are prohibited from pursuing state law fraudulent conveyance actions while the bankruptcy case is pending, reiterating that the ability to pursue these actions during this time resides solely with the trustee. <u>See, e.g.,</u> <u>Unisys Corp. v. Dataware Prods., Inc.</u>, 848 F.2d 311, 314 (1st Cir. 1988) (allowing creditors to pursue fraudulent transfer claims after termination of automatic stay). In any event, it is well settled that only the trustee may pursue these actions upon commencement of a bankruptcy case.

[94]<u>See Sears Petroleum</u>, 417 F.Supp.2d at 221 (citing to case law for the proposition that the trustee can bring a fraudulent conveyance claim at the exclusion of the creditors once the bankruptcy has commenced); <u>FDIC v. Davis</u>, 733 F.2d 1083, 1085 (4th Cir. 1984) (finding that once a bankruptcy case had been closed, creditor could pursue state law fraudulent conveyance claims independently of the trustee).

[95]<u>See, e.g.,</u> <u>Hatchett v. United States</u>, 330 F.3d 875, 886 (6th Cir. 2003), <u>cert. denied</u>, 541 U.S. 1029 (2004) (acknowledging that after a bankruptcy case was closed, the creditors could bring their fraudulent conveyance causes of action); <u>Kathy B. Enters. Inc. v. United States</u>, 779 F.2d 1413, 1415 (9th Cir. 1986) (concluding that the IRS could pursue its fraudulently conveyed assets, even if it did violate the automatic stay, because the bankruptcy proceedings were over); <u>FDIC v. Davis</u>, 733 F.2d at 1085 (finding that once a bankruptcy case had been closed, creditor could pursue state law fraudulent conveyance claims independently of the trustee); <u>Barber v. Westbay (In re Integrated Agri., Inc.)</u>, 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 1993) ("A creditor regains standing to pursue a state law fraudulent conveyance action, in its own name and for its own benefit, once the statute of limitations expires on the bankruptcy trustee's right to bring the claim"); <u>Klingman</u>, 158 B.R. at 113 (holding that creditors could pursue fraudulent transfer claim once the trustee's statute of limitations had run); <u>Casey Nat'l Bank v. Roan</u>, 282 Ill. App. 3d 55, 62 (Ill. App. Ct. 1996) (holding that creditors may pursue a fraudulent conveyance claim when the trustee no longer has a viable cause of action); <u>Christian v. Mason</u>, 219 P.3d 473, 480 (Idaho 2009) ("[A] creditor is entitled to bring a state law action after the trustee is barred from doing so"); <u>Dixon v. Bennett</u>, 531 A.2d 1318, 1324 (Md. Ct. App. 1987) (overruled on other grounds) ("[O]nce the trustee's statutory time period has expired, an unsecured creditor can bring an action against a fraudulent transferee under state law provided the state statute of limitations has not yet expired"). <u>See also</u> <u>United States v. Doyle</u>, 276 F. Supp.2d 415, 428-29 (W.D. Pa. 2003) (specifically adopting rationale of Hatchett and Davis, and permitting the government to pursue a fraudulent transfer claim because the bankruptcy case had concluded).

has the exclusive right to bring fraudulent conveyance claims during an ongoing bankruptcy, the Bankruptcy Code does not extinguish the rights of creditors to bring state law fraudulent conveyance claims after debtors receive a discharge in bankruptcy. See id. at 886.

Indeed, while a bankruptcy trustee's federal cause of action under section 544(b) is based on the creditor's rights under the UFTA or UFCA, it is not identical to the UFTA or UFCA claims that the creditor may bring in state court. See, e.g., Barber v. Westbay (In re Integrated Agri., Inc.),313 B.R. 419, 428 (Bankr. C.D. Ill. 2004) (court holding that trustee's cause of action under section 544(b) was not identical to creditor's UFTA claim). Here, by virtue of expiration of the two-year time period set forth in section 546(a), under the foregoing authorities, the ability to bring the State Law Avoidance Claims has automatically reverted to the Creditors' Trust beneficiaries by operation of law. Accordingly, the conflicts and concerns present in Foodtown, Cybergenics I, St. Paul Fire and Aluminum Mills have no implication here to the Creditors' Trust.[96]

Despite this, the Foundations argue that the State Law Avoidance Claims cannot be brought, unless the Debtors totally abandon all claims "related to the allegedly fraudulent LBO," which, according to the Foundations, includes the State Law Avoidance Claims. See Foundations' Objection at ¶¶ 37, 39. This is a misstatement of the applicable law. It should be noted first that, here under the Debtor/Committee/Lender Plan, the Debtors are not "abandoning"

---

[96]We are aware that one party has taken exception to the Debtor/Committee/Lender Plan's use of the words "disclaim" or "disclaimed" when describing the State Law Avoidance Claims. See Brigade Objection at ¶¶ 26-29 ("Tribune's Estate has nothing to "disclaim," because any constructive fraudulent conveyance claims that Tribune might have had against shareholders who received LBO stock redemption payments are now time-barred."). This assertion is not disputed and as clarification, the language "disclaim" or "disclaimed" was intended only to convey the intent of the Debtors not to exercise strong-arm powers under section 544 of the Bankruptcy Code with respect to such claims and allow the powers to assert such claims to revert to individual creditors. In order to avoid all doubt, the defined term "Disclaimed State Law Avoidance Claims" in the Debtor/Committee/Lender Plan and Section 14.1 of the Debtor/Committee/Lender Plan will be amended to clarify these issues.

the State Law Avoidance Claims.[97] That is because the Third Circuit has already established that state law fraudulent conveyance claims do not constitute "property of the estate." See Cybergenics I, 226 F.3d at 241 (holding that fraudulent transfer claims could not have been sold by the debtors as such claims "have long belonged to a transferor's creditors") (emphasis in original). Accordingly, the Debtors cannot, as a matter of law, "abandon" the State Law Avoidance Claims as insisted by the Foundations. See Foundations' Objection at ¶ 37 (citing Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., 187 F.3d 439, 441 (4th Cir. 1999)). Indeed, the Foundations actually recognize this notion, see Foundations' Objection at ¶¶ 39, n.6, 70-71, but make no attempt to reconcile their disparate statements.

Setting this misstatement of the law aside, the Foundations further imply that because the Debtors have not "abandoned" actual fraudulent conveyance claims, which are being pursued by the Litigation Trust, the similarity between those claims and the State Law Avoidance Claims to be pursued by the Creditors' Trust results in two plaintiffs pursuing identical claims against identical parties. See id. at ¶ 38. The Foundations assert, therefore, that the Debtor/Committee/Lender Plan was not proposed in good faith. See id. at ¶ 39. The Foundations mischaracterize the Debtor/Committee/Lender Plan as calling for "two separate entities to go after the same defendants on the same claims." See id. To point out the obvious,

---

[97]Several of the Creditors' Trust Objectors incorrectly characterize the Debtor/Committee/Lender Plan's treatment of the State Law Avoidance Claims as "abandoned" or "abandonment." See, e.g., Foundations' Objection at ¶ 55; EGI-TRB Objection at p. 7; Certain Directors and Officers' Objection at p. 13. Nowhere in the Debtor/Committee/Lender Plan is the term, "abandon" (or derivations thereof) used or implied when referencing the State Law Avoidance Claims or the Creditors' Trust.

EGI-TRB also goes so far as to imply that this "abandonment" results in the Debtor/Committee/Lender Plan Proponents "keep[ing] most of these claims, and us[ing] the estates' funds in pursuing them" and "acting just as a trustee would under 11 U.S.C. § 544(b)." See EGI-TRB Objection at pp. 7-8. This mischaracterization reflects another basic misunderstanding of the Creditors' Trust. Pursuant to Section 5.13 of the Debtor/Committee/Lender Plan, the Creditors' Trust (along with the Litigation Trust) will be borrowing $20 million from Reorganized Tribune in a delayed draw term loan where it is fully liable for repayment. Such a mechanism does not transform the Creditors' Trust into a bankruptcy trustee. EGI-TRB's lack of comprehension on the form and functions of the Creditors' Trust is punctuated by the dearth of case law or legal analysis on how such mechanisms would implicate section 1129(a)(3), if at all.

the respective claims are different: (a) the Litigation Trust is asserting claims under federal law on actual fraud theories; whereas (b) the Creditors' Trust is asserting claims arising under state law on constructive fraud theories.

While the respective causes of action may implicate similar operative facts, it cannot be disputed that (i) the prima facie elements of the different claims asserted by the Litigation Trust and the Creditors' Trust are demonstrably different; for example, the Litigation Trustee will be required to demonstrate actual intent to hinder, delay or defraud creditors, whereas the Creditors' Trustee is under no such obligation; (ii) the recovery by the Litigation Trust is not constrained by the amount of the creditors' claims, whereas the Creditors' Trust recovery is limited to the amount of the creditors' claims that are actually transferred to the Creditors' Trust; (iii) different burdens of proof will apply; (iv) the respective statutes of limitations differ; and (v) the defenses potentially available to the defendants will be different in the actions brought by the Litigation Trustee and the Creditors' Trustee. Thus, the Litigation Trust and Creditors' Trust will be pursuing separate and independent causes of action. See, e.g., Dixon, 531 A.2d at 1318 ("Here, appellant is proceeding under an independent cause of action under state law.") (emphasis added).

Glossing over these significant differences, the Foundations imply that there is a per se rule preventing separate actions involving similar operative facts from being prosecuted simultaneously. The Foundations offer no case law supporting such a notion because no such rule exists. Generally speaking, states have -- through judicial doctrine or by statute -- adopted rules whereby a state court has discretion to dismiss, stay, or transfer a lawsuit that otherwise is jurisdictionally proper if a parallel lawsuit is pending in a separate state or federal jurisdiction.

134

For example, courts in Illinois have the discretion to decide whether a stay or dismissal (or neither) is appropriate. See, e.g., Zurich Ins. Co. v. Baxter Int'l, Inc., 670 N.E.2d 664, 668 (Ill. 1996) (section 2-619(a)(3) of the Illinois Code of Civil Procedure gives Illinois courts discretion to consider comity, multiplicity, harassment, obtaining complete relief, and presence of res judicata). In consideration of the unhindered ability of prospective State Law Action defendants to raise such issues in the courts in the future, and the discretionary standards by which those courts may decide such issues if brought, there is a conspicuous gap in reasoning here whereby the legitimate pursuit of both actual and constructive fraudulent conveyance claims can somehow be equated to a bad faith plan proposal under section 1129(a)(3). Unsurprisingly, the Foundations provide absolutely no case law to bridge this gap or support this erroneous assertion.

b.    Section 546(e) Does Not Preempt the State Law Avoidance Claims

Each of the Creditors' Trust Objectors asserts that the Debtor/Committee/Lender Plan cannot be confirmed because the State Law Avoidance Claims are allegedly preempted by section 546(e) and that any mechanism permitting the prosecution of State Law Avoidance Claims amounts to a bad faith plan proposal. As discussed above, the creation of the Creditors' Trust is consistent with the objectives and purposes of the Bankruptcy Code and the Debtor/Committee/Lender Plan cannot seriously be considered as having been proposed in bad faith. See Part II supra. Rather than evaluate and approach the Creditors' Trust this way, the Creditors' Trust Objectors cite to wholly inapplicable statutes and case law in support of their erroneous allegations. We address these in turn.

The Foundations allege that "section 546(e) signifies Congress' intent that settlement payments, such as those at issue here, 'should remain unavoidable in order to insulate the clearing and settlement system of the nation's securities industry, and participants in that system,

135

from the potentially devastating effect of a substantial recovery by a trustee that would require

the undoing of possibly thousands of settled securities transactions.'" See Foundations'

Objection at ¶ 65 (citing Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. v.

Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.), 274 B.R. 71, 88 (D. Del. 2002)).

There is no dispute that as long as such a claim is asserted by a trustee, debtor in possession or

other authorized estate representative during the bankruptcy, the policy behind section 546(e)

should control.  The Foundations, however, completely ignore the fact that there is no

"settlement payment" defense under applicable non-bankruptcy law, i.e., the Uniform Fraudulent

Transfer Act or the Uniform Fraudulent Conveyance Act.  The only two cases the Foundations

rely on were decided in a procedural posture that differs markedly from that which is

contemplated under the Debtor/Committee/Lender Plan.

     Both Hechinger and Contemporary Industries Corp. v. Frost involved creditors'

committees bringing fraudulent conveyance claims in an ongoing bankruptcy proceeding under

section 544(b), which were subsequently barred by the "settlement payment" defense under

section 546(e).  See In re Hechinger, 274 B.R. at 97-98; Contemporary Indus., 564 F.3d 981,

987-88 (8th Cir. 2009).  The Foundations proceed to allege that both cases are representative

examples of courts "routinely reject[ing] attempts by plaintiffs to circumvent section 546(e)"

because both creditors' committees attempted to disguise fraudulent conveyance claims as state

law unjust enrichment claims, which were ultimately rejected by the courts as frustrating section

546(e)'s protections.  See Foundations' Objection at ¶ 66.  Both cases, however are factually and

legally distinguishable.

     The Debtor/Committee/Lender Plan's establishment of the Creditors' Trust, by contrast,

does not invoke section 544(b), nor does it require the appointment of an estate representative or

136

successor-in-interest to the Debtors.  Indeed, it is clear that the Creditors' Trust is neither an

estate representative, nor a successor-in-interest.  See Part IV.B.1., supra.  The

Debtor/Committee/Lender Plan proposes an efficient mechanism whereby creditors may pursue

fraudulent transfer claims, free of the section 546(e) impediment applicable to estate

representatives acting under sections 544(b) or 548(a)(1)(B), which claims may be asserted by

individual creditors whether or not the Creditors' Trust exists.  The one case most nearly on

point – from the District Court for the District of Delaware – concluded that where creditors have

a personal remedy under state law that is assignable, an assignee, acting in such capacity and not

as a trustee or successor to a trustee or debtor-in-possession, is not barred by section 546(e).  See

PHP Liquidating, LLC v. Robbins, 291 B.R. 603, 607 (D. Del. 2003), aff'd, 128 Fed. App'x. 839

(3d Cir. 2005).  Conspicuously, despite a lengthy discussion of the issue in which the

Foundations discuss a number of cases, nowhere do they cite PHP, which is a controlling

Delaware district court decision subsequently affirmed by the Third Circuit.  See id. at 607.  In

PHP, the district court held that § 546(e) did not bar claims brought by a liquidation trustee

pursuant to a confirmed plan.  It "conclude[d] that if the avoidance action were brought by a

trustee or a debtor-in-possession (or the successor to a debtor-in-possession), the avoidance

action would be barred by Section 546(e)."  Id.  However, the liquidation trust had not asserted

its claims in any of those capacities.  Rather, it brought the claims "as a direct assignee of the

unsecured creditors.  As such, Section 546(e) is not a bar to [the trust's] claims."  Id.  The failure

of the Foundations to even cite PHP, much less attempt to deal with the District Court's holding

contrary to the Foundations' position, is telling.

     Furthermore, the Creditors' Trust has not engaged and will not be engaging in the same

behavior as the respective creditors' committees in Hechinger or Contemporary Industries.  Here,

there is no attempt to surreptitiously disguise an unjust enrichment claim to avoid section 546(e)

applicability as was the case in both <u>Hechinger</u> and <u>Contemporary Industries</u>.  The State Law

Avoidance Claims are exactly what they are: state law fraudulent conveyance actions for which

the ability to pursue automatically reverted to the beneficiaries of the Creditors' Trust by

operation of law.  Most damaging to the Foundations' claims of bad faith though, is the plain fact

that neither <u>Hechinger,</u> nor <u>Contemporary Industries</u> dealt with plan confirmation or questions of

bad faith under section 1129(a)(3).  A plan mechanism by which a creditor (or creditors) pursues

its state law claims outside of bankruptcy properly, subject to any applicable defenses thereto, is

not bad faith under section 1129(a)(3).  The Foundations' allegations to the contrary are

completely unsupported by case law.

EGI-TRB, for its part, makes similar allegations, "[i]n this case, the statutory provision

that Debtors and Aurelius want to avoid – the safe harbor provisions of Section 546(e) – reflects

an important Congressional policy and a fundamental avoidance defense.  This Court looks

dimly upon efforts to nullify that defense."  <u>See</u> EGI-TRB Objection at p. 9 (citing <u>Hechinger,</u>

274 B.R. at 96; <u>Contemporary Indus.</u>, 564 F.3d at 988).  For the reasons discussed above, those

cases are wholly inapposite here.

EGI-TRB further cites to <u>In re Machne Menachem,</u> 233 F. App'x 119 (3d Cir. 2007), for

the proposition that "when a debtor takes actions that undermine substantive components of the

Bankruptcy Code, the debtor's plan may not be confirmed."  <u>See</u> EGI-TRB Objection at p. 9.  As

stated earlier, the ability to pursue the State Law Avoidance Claims will have automatically

reverted to the beneficiaries of the Creditors' Trust because the trustee's exclusive period to

pursue the State Law Avoidance Claims has expired, and the Debtors will have been discharged

by operation of bankruptcy law.  Whether section 546(e) applies to those claims will be decided by the appropriate court, and is not at issue here.

    c.  Creditors'Trust Objectors' Remaining Assertions Are Equally Baseless

  Among other things, EGI-TRB asserts that the Examiner Report's "preclusive findings" make certain claims assigned to the respective litigation trusts "frivolous" under Maxwell v. KPMG LLP, 520 F.3d 713 (7th Cir. 2008).  See EGI-TRB Objection at pp. 2, 4.  Therefore, it alleges, the Debtor/Committee/Lender Plan runs afoul of section 1129.  See id. at p. 3.  There are several reasons why this argument has no merit here.  First and foremost, the Examiner Report's findings are not "preclusive" of such issues.  This Court has indeed commented that the Examiner Report should be afforded "appropriate deference."  See id. at p. 5 (citing Transcript of Record at 32, In re Tribune Co., No. 08-13141 (KJC) (Bankr. D. Del. Feb. 8, 2011).  Appropriate deference, however, should not be conflated with the concept of preclusive effect.  Second, with respect to the Creditors' Trust, none of the cited Examiner Report's findings actually describe the State Law Avoidance Claims.  See EGI-TRB Objection at pp. 2-3.  Third, Maxwell was not decided in the context of plan confirmation.  The Seventh Circuit's brief treatment on "frivolous claims" was made in connection with granting an aggrieved defendant leave to file a motion for reasonable attorney's fees in defending an "outlandish" and "preposterous" case.  See Maxwell, 520 F.3d at 717-18.  It is clear, therefore, that EGI-TRB's attempted (or mistaken) arguments that the Examiner Report's findings have preclusive effect rendering the Trusts' claims frivolous and somehow implicate section 1129 are without merit.

  **3.**  **The Objections by the Noteholder Plan Proponents and Wilmington Trust to the Creditors' Trust and Litigation Trust are Meritless**

  The Noteholder Plan Proponents also raise a handful of other limited protests relating to trust governance, funding, transferability of trust interests, settlement authority and trust

indemnification. <u>See</u> Noteholder Objection at ¶¶ 365-377. None of these criticisms, individually or collectively, amounts to anything more than an expression of disapproval for the Debtor/Committee/Lender Plan and certainly does not constitute any infirmity that would prevent confirmation of the Debtor/Committee/Lender Plan.

Wilmington Trust has also objected to the application of contractual subordination to those Net Creditors' Trust Proceeds payable to holders of Class 1J Creditors' Trust Interests. <u>See</u> WTC Objection at ¶¶ 11-17. To the extent that the Debtor/Committee/Lender Plan subjects the Net Creditors' Trust Proceeds payable to Class 1J Creditors' Trust Interest holders that have not opted out of making the assignment in Section 14.3.1 of the Debtor/Committee/Lender Plan to the contractual subordination under the PHONES Notes Indenture, the Plan will be amended accordingly.[98] In footnote 11, Wilmington Trust also alludes to an argument that the State Law Avoidance Claims have "ceased to exist" and cannot be assigned. <u>See</u> WTC Objection at ¶ 11, n.11. The Debtor/Committee/Lender Plan Proponents do not dispute that the section 546(a) statute of limitations has run, as stated above. <u>See</u> Part IV.2.a. <u>supra</u>. The ability to bring these claims, however, has reverted back to the individual creditors and this is also not in dispute. With respect to assignment, the Debtor/Committee/Lender Plan does not purport to assign any claims to the Creditors' Trust. Rather, it creates a mechanism by which individual creditors may assign their interests into the Creditors' Trust. Any argument with respect to assignment is made based on a misreading of the Debtor/Committee/Lender Plan. Accordingly, any arguments to be made in this regard by Wilmington Trust are without merit.

---

[98] As Wilmington Trust itself recognizes, Section 1.1.172 of the Debtor/Committee/Lender Plan reflects that, among others, Class 1J Creditors' Trust Interest holders who have not opted out are paid their interests in the Net Creditors' Trust Proceeds before Class 1C or Class 1D. <u>See</u> WTC Objection at ¶ 11 (citing Debtor/Committee/Lender Plan § 1.1.72).

4.     **The Parent GUC Trust Preference Does Not Inappropriately Discriminate Against Creditors Who Opted Out of the Creditors' Trust**

The Noteholder Objection also asserts that the Debtor/Committee/Lender Plan's trust structure inappropriately discriminates against creditors who opted out of contributing their State Law Avoidance Claims to the Creditors' Trust, because those creditors may forfeit their recoveries in the Parent GUC Trust Preference to the extent that the Parent GUC Trust Preference is funded with proceeds from the Creditors' Trust. This argument is erroneous for two reasons. First, all creditors holding State Law Avoidance Claims, including the Noteholder Plan Proponents, had the option to participate in the Creditors' Trust or to "opt out" of such participation. See Debtor/Committee/Lender Plan § 14.3.1. It is well established that a plan may treat similarly situated creditors differently so long as those creditors are given the opportunity to receive the same treatment. See 11 U.S.C. § 1123(a)(4); In re Washington Mut., Inc., No. 08-12229, 2011 WL 57111 at *34 (Bankr. D. Del. 2011) ("What is important is that each claimant within a class have the same opportunity to receive equal treatment."); In re Dana Corp., 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."). Accordingly, there is no discrimination for the purposes of section 1123(a)(4). Second, the Noteholder Plan Proponents' argument ignores the fact that while creditors electing to opt out of the Creditors' Trust may not share in the Parent GUC Trust Preference to the extent it is funded from proceeds of the Creditors' Trust, such creditors will be entitled to receive the Parent GUC Trust Preference to the extent funded from the Litigation Trust. Moreover, such opting-out creditors will be entitled to keep *all* recoveries in connection with the State Law Avoidance Claims they independently pursue and will not be required to share them with any other party.

As such, rather than discriminating, the Creditors' Trust mechanism provides creditors with options as to their preferred route to a potential recovery.

5.    **The LBO Lenders Are Entitled to Receive Proceeds From the Litigation and Creditors' Trusts** [37]

Sharing by all Holders of Allowed Claims – including the LBO Lenders – in recoveries by the Litigation Trust and Creditors' Trust is entirely appropriate and consistent with basic principles of fraudulent transfer law.  On the basis of their Allowed Claims, the LBO Lenders are in fact entitled to a vast bulk of the Trusts' recoveries.  In order to provide additional settlement value, however, the LBO Lender agreed to a disproportionate split of Trust recoveries in favor of non-LBO creditors, further supporting the reasonableness of the Proposed Settlement.  See In re Telesphere Commc'ns, Inc., 179 B.R. 544, 553, 560 (N.D. Ill. 1994) (one consideration in evaluating reasonableness of a settlement value is fact that the settling defendants would recover a portion of the judgment they would be required to pay if avoidance claims were successful). The Noteholder Plan Proponents have offered no cogent reason that the LBO Lenders should be barred from recoveries and their objection should accordingly be overruled.

On the basis of several equity-based arguments, the Noteholder Plan Proponents assert that it is inappropriate for the LBO Lenders to share in proceeds recovered by the Trusts at all, and that all such proceeds should be paid to non-LBO creditors, effectively subordinating all LBO Lender claims.  The Noteholder Plan Proponents cannot obtain this extreme remedy, however, based solely on their vague and unsupported assertions.  Absent a showing of inequitable conduct – which the Examiner found no evidence of – claims simply cannot be equitably subordinated to all other creditors or disallowed entirely.  See, e.g., 11 U.S.C. §§ 502

---

[37] While the Creditors' Committee does not dispute the Senior Lenders' rights under the Debtor/Committee/Lender Plan to participate in recoveries from the Litigation and Creditors' Trusts, the Creditors' Committee takes no position on the issues raised in this Part IV.B.5 and does not join in Part IV.B.5.

142

(d), (h) (permitting the transferee of an avoided transfer to retain a claim in certain circumstances); Buffum v. Peter Barceloux Co., 289 U.S. 227, 237 (1933) ("The defendant may participate on the same basis with other creditors in the distribution of the assets.").

The Noteholder Plan Proponents argument is tantamount to arguing that all claims of the LBO Lenders, even though they have not been avoided, should be either equitably subordinated to all creditors or disallowed entirely, all without any showing that the very high standard for equitable subordination has been met. See In re Best Prods. Co., 168 B.R. 35, 57-59 (Bankr. S.D.N.Y. 1994) ("Invalidation [of a claim] seems particularly draconian in a legitimate LBO because the creditors actually parted with value.") (citation and quotation omitted). Indeed, all the Noteholder Plan Proponents would require for such a draconian remedy is their own suggestion that the Step Two Loans are vulnerable to avoidance. In arguing for this preemptive punishment, the Noteholder Plan Proponents essentially assume that the lenders "knowingly and willingly" participated in a fraudulent transfer or were "complicit in tort[i]ous conduct." See, e.g., Noteholder Objection at ¶¶ 351, 353, 363. This assumption, the LBO Lenders would argue, is unsupported by the record. The Examiner concluded there was not "sufficient evidence to support a finding that the Lead Banks engaged in the kind of egregious behavior that would justify equitable subordination or equitable disallowance." Examiner Report, Vol. 2 at p. 336.

Absent actual, successful equitable subordination of all LBO Lender claims to all other creditors or complete disallowance of such claims there is no basis on which to deny the LBO Lenders their pro rata share of Litigation Trust or Creditors' Trust recoveries. Under the Debtor/Committee/Lender Plan as discussed extensively in Section II above, the LBO Lenders have provided significant value to settle the Allowance of their Claims. That they agreed to accept less than their pro rata share of Trust recoveries and instead to allow a distribution scheme

143

that is disproportionately favorable to non-LBO creditors underscores the reasonableness of the Proposed Settlement.  The Noteholder Plan Proponents have offered no cogent argument that their retention of a small portion of the Trust proceeds is in any way inappropriate.

### C.    The Classification of Claims and Interests in the Debtor/Committee/Lender Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

Four parties – Wilmington Trust, the Noteholder Plan Proponents, the DOL and Deutsche Bank – have objected to the classification of certain Claims in the Debtor/Committee/Lender Plan.  Each of the objectors argues that the objecting parties' claims are not "substantially similar" to the other claims in their respective classes pursuant to 1122(a).  Wilmington Trust's objections, which questioned the classification of Wilmington Trust's indenture trustee fees in connection with its service as PHONES Indenture Trustee will be resolved by amendments to the Debtor/Committee/Lender Plan clarifying that such Claims shall be classified as Class 1F Other Parent Claims.  The remaining objections are unfounded and should be overruled.

Section 1122(a) provides that for claims or interests to be classified together they must be "substantially similar," but does not mandate that "substantially similar" claims be classified together.  See 11 U.S.C. § 1122(a); see also In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir. 1987) (section 1122 permits the grouping of similar claims in different classes); Coram Healthcare Corp., 315 B.R. at 348 ("[C]laims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes"); In re Drexel Burnham Lambert Group Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (stating that section 1122 prohibits identical classification of dissimilar claims, but does not require grouping of similar claims together).  Furthermore, section 1122 provides plan proponents with significant flexibility in classifying claims and interests based on the

specific facts of each case.  See Jersey City Med. Ctr., 817 F.2d at 1060-61 ("Congress intended

to afford bankruptcy judges broad discretion [under section 1122] to decide the propriety of

plans in light of the facts of each case"); Teamsters Nat'l Freight Indus. Negotiating Comm. v.

U.S. Truck Co., Inc. (In re U.S. Truck Co.), 800 F.2d 581, 586 (6th Cir. 1986) (noting the "broad

discretion" of courts to determine proper classifications).

       The Debtor/Committee/Lender Plan's classification scheme complies with section

1122(a) of the Bankruptcy Code because each Class contains only Claims or Interests that are

substantially similar to each other and such classification scheme is based on the similar nature

of the Claims or Interests contained in each Class.

### 1.       The Classification of the Swap Claim in Class 1F is Appropriate[99]

       The Noteholder Plan Proponents argue that the Debtor/Committee/Lender Plan

improperly classifies the Swap Claim as an Other Parent Claim rather than a Senior Loan Claim

against Tribune.  Specifically, the Noteholder Plan Proponents contend that the Swap Claim is

substantially similar to the Senior Loan claims because (a) the April Plan included the Swap

Claim in the Senior Loan Claim class; (b) the claims involve the same parties; (c) arose in

connection with the LBO transactions; and (d) share the same guarantees. See Noteholder Obj. at

¶ 391.

       In fact, however, several substantial differences between the Swap Claim and the Senior

Loan Claims mandate the separate classification of the claims.  First, the basic nature of the

Swap Claim is not substantially similar to the Senior Loan Claims.  As the Ninth Circuit has

recognized, "[a] fundamental characteristic of an interest rate swap is that the counter-parties

never actually loan or advance the notional amount.  The swap involves an exchange of periodic

---

[99] The Creditors' Committee takes no position on the issues raised in this Part IV.C.1 and does not join in Part
IV.C.1.

payments calculated by reference to interest rates and a hypothetical notional amount." Thrifty Oil Co. v. Bank of America Nat'l Trust and Savings Assoc., 322 F.3d 1039, 1048 (9th Cir. 2003). The Senior Loan Claims, on the other hand, are for money loaned.

Second, the Swap Claim is governed by a different agreement than the Senior Loan Claims. As the Noteholder Plan Proponents concede in their objection, the Swap Claim arises under the 1992 ISDA Master Agreement and associated confirmations, not the Senior Loan Agreement. See Noteholder Obj. at ¶ 383 The Examiner recognized as much, concluding that "[t]he obligations of Tribune under the Swap Documents do not constitute Credit Agreement Debt." See Examiner Report, Vol. 2, at B-5.

Third, no plausible claim for avoidance of the Swap Claim has been or could be made. By definition, the interest rate swap agreement giving rise to the Swap Claim provided reasonably equivalent value to Tribune at the time it was executed – the value derived from effectively converting a variable rate loan into one with a fixed interest rate. Section 548 of the Bankruptcy Code in fact explicitly provides that "a swap participant . . . that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer." 11 U.S.C. § 548(d)(2)(D); see also Hutson v. E.1. du Pont de Nemours & Co. (In re Nat'l Gas Distribs., LLC), 556 F.3d 247, 259 (4th Cir. 2009) (noting that section 546(g) exempts transfers made in connection with swap agreements from avoidance under section 548).

The Noteholder Plan Proponents attempt to evade section 546(g) by asserting that the Swap Claim would not be protected under section 546(g) if the Swap Claim were found to have arisen out of an intentionally fraudulent transfer.[100] But there has never been any allegation that the Swap Agreement resulted from intentional fraud, nor do the Noteholder Plan Proponents suggest as much here. Instead, they merely argue that because the Swap Claim arose in

---

[100] Noteholder Obj. at ¶ 213.

connection with an agreement executed at the same time as the Transactions, a finding of

intentional fraud for any part of the LBO Transactions deprives the Swap Claim of its section

546(g) defenses.  This is untenable – the Swap Claim is governed by a different agreement

among different parties than the Senior Loan Agreement and the other documents governing the

Transactions.  There is nothing remotely fraudulent about Tribune's desire to hedge the risk of

the variable interest rates under the Senior Loan Agreement by executing the market-based Swap

Documents.

     In fact, the Examiner concluded that the Swap Claim was not subject to avoidance, and

all of his recovery scenario models provide for allowance of the Swap Claim in full:

> Although the Examiner recognizes that the matter is not free from
> doubt, <u>the Examiner believes that it is reasonably likely a court
> would find that the obligations resulting from termination of the
> Swap Documents are not avoidable in accordance with Bankruptcy
> Code section 560</u>.  Thus, the Examiner's financial advisor assumes
> that these claims would remain valid obligations of Tribune and
> the Guarantor Subsidiaries notwithstanding any avoidance of the
> LBO Lender Debt.[101]

     Given that the Swap Claim does not have the same risk of avoidance as the Senior Loan

Claims, it is appropriate for the Swap Claim to be classified with the class of Other Parent

Claims.  The fact that the Swap Claim is currently owned by a party that also holds Senior Loan

Claims is irrelevant.  Accordingly, the Debtor/Committee/Lender Plan properly classifies the

Swap Claim as an Other Parent Claim.[102]

---

[101] Examiner Report, Vol. 2, at B-6 (emphasis added).

[102] The Noteholder Plan Proponents strangely argue that the classification of the Swap Claim as an Other Parent Claim will permit Oaktree to recover more than payment in full of the Swap Claim.  In fact, however, the Debtor/Committee/Lender Plan is crystal clear in providing that no claim may receive more than payment in full of its allowed claim plus postpetition interest where appropriate.  <u>See</u> Debtor/Committee/Lender Plan § 3.1.1(a).

2.      **The Classification of the Department of Labor (the "DOL") and ERISA Claims in Classes 1L through 111L is Appropriate**

    a.      The DOL's Claims are Properly Subordinated Under Section 510(b) in the Debtor/Committee/Lender Plan [103]

The DOL primarily objects the Debtor/Committee/Lender Plan's subordination under section 510(b) of the Bankruptcy Code of the DOL's alleged unliquidated claims against Tribune and seventy of its Subsidiary Debtors and classification of such claims as subordinated Securities Litigation Claims under the Debtor/Committee/Lender Plan.[104] The DOL asserts that such subordination is improper because it is "based upon the incorrect assumption that ERISA claims fall within the scope of section 510(b) of the Bankruptcy Code." DOL Obj. at p. 3. The DOL's arguments, however, misstate or ignore the relevant case law, and have been routinely rejected in the Third Circuit and elsewhere. The DOL has failed to make any persuasive argument in support of its objection and its objection should therefore be overruled.

    b.      By The DOL's Own Description, Its Claims Arise From The Purchase Or Sale Of A Security Of The Debtor

Section 510(b) requires that a "claim arising from … a purchase or sale of a security of the debtor or of an affiliate of the debtor" be "subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." The Third Circuit has held that section 510(b) should be construed "broadly." In re Telegroup, Inc., 281 F.3d 133, 135-36 (3d Cir. 2002); see also In re Enron Corp., 341 B.R. 141, 158 (Bankr. S.D.N.Y. 2006) (acknowledging that "the clear trend in the case law is to interpret section 510(b) broadly"). Under the Third Circuit's analysis, a claim falls under the purview of section 510(b) if it "would

---

[104] The Debtor/Committee/Lender Plan's definition of "Securities Litigation Claims" which includes the DOL Claims provides that the DOL Claims will be subordinated under section 510(b) unless the Bankruptcy Court determines otherwise, in which case, such Claims will receive the treatment determined by the Bankruptcy Court.

not have arisen but for the purchase of [the debtor's] stock." Telegroup, 281 F.3d at 135-36,

143; see also In re Seaquest Diving, L.P., 579 F.3d 411, 425 (5th Cir. 2009) (holding that claim

was properly subordinated under section 510(b) when it "would not exist but for the rescission

of" the debtor's equity).

From the DOL's own description of its claims,[105] it is clear that they meet the Third

Circuit's standard.  In describing its various claims against Tribune and its subsidiaries, the DOL

explains that its claims are based on allegations that "[h]ad Tribune complied with its fiduciary

duties, the ESOP *would not have purchased any Tribune stock, much less overpaid for the stock*

*in a $250 million transaction*," that "had Tribune complied with its fiduciary obligations,"

Tribune would not have "*purchased all outstanding shares*," and the ESOP "*would have been*

*left with stock in a solvent company*," and that "Tribune and its Subsidiaries knew that the ESOP

*was purchasing non-compliant shares ... and, nonetheless, participated in the purchase of the*

*shares*."  See DOL Obj. at p. 15 (emphasis added).  Thus, the DOL's claims clearly arise from

"a purchase or sale of a security of the debtor."

        c.      Subordination Of The DOL's Claims Achieves The Objectives
                And Purposes Of Section 510(b)

In an attempt to avoid this conclusion, the DOL argues that subordinating its claims

under section 510(b) would not further Congress's purpose in enacting section 510(b).  DOL

---

[105] The DOL provides lengthy descriptions of its claims in its objection, although it states that its "investigation is ongoing."  DOL Obj. at pp. 3-16.  The relevant question for the confirmation hearing is not whether the DOL's claims have merit, but rather whether the Debtor/Committee/Lender Plan properly subordinates the DOL's claims under section 510(b) which it does only to the extent the Bankruptcy Court does not rule otherwise.  Debtors, therefore, do not address the merits of the DOL's claims in this brief.  However, two points regarding the DOL's descriptions of its claims must be made.  First, the court's decision in Neil v. Zell, which the DOL points to as suggesting that Tribune breached its fiduciary duties or participated in the breach of another's duties, was explicitly limited to exclude any binding effect on the Debtors.  2010 WL 4670895, at *8 (N.D. Ill. Nov. 9, 2010) ("The court's ruling will not bind Tribune in a later case about liability under ERISA or the Tax Code.").  Second, the DOL's claims against Tribune arise primarily out of its assertion that Tribune was a fiduciary of the ESOP.  See, e.g., DOL Obj. at pp. 5-16.  However, in determining that Tribune was not a necessary party to that litigation, the Neil court has already determined that "Tribune is not a fiduciary" of the ESOP.  Neil v. Zell, 2010 WL 4670895 at *8.

Obj. at pp. 16-26. The DOL points out that the Third Circuit in <u>Telegroup</u> found the language of section 510(b) to be ambiguous. <u>Id.</u> at pp. 17-23. The DOL asserts that its analysis of the legislative history "revealed" that the purpose of section 510(b) was "to ensure that shareholders with securities law claims would not be treated in the same manner in bankruptcy as general unsecured creditors." <u>Id.</u> at p. 20. The DOL then concludes that because its claims are based on ERISA and not the securities laws, section 510(b) was not intended to encompass its claims. <u>Id.</u> at pp. 17-23. Indeed, the DOL argues that its claims do not "arise from" the sale or purchase of securities because the fiduciary duties imposed by ERISA "exist independently of securities laws and claims." <u>Id.</u> at p. 27.

The DOL ignores, however, that the Third Circuit in <u>Telegroup</u> also reviewed the legislative history of section 510(b) and explicitly concluded that section 510(b) was *not* limited to claims based on the securities laws. <u>Telegroup</u>, 281 F.3d at 140. The Third Circuit also explained that Congress determined that equity holders should not be treated the same as unsecured creditors because equity holders reap the benefits of any success of the company and, therefore, should also bear the risk of any failure of the company. <u>Telegroup</u>, 281 F.3d at 141-42. Thus, when a claimant "retained the right to participate in corporate profits if [the company] succeeded, we believe that § 510(b) prevents them from using their … claim to recover the value of their equity investment in parity with general unsecured creditors." <u>Id.</u> at 142. The DOL's claims fall squarely within this "risk allocation" rationale. The ESOP participants, on whose behalf the DOL asserts its claims, retained the right to enjoy any corporate profits Tribune might have earned, so section 510(b) prevents them from attempting to recover in parity with

unsecured creditors the value of their equity holding through an ERISA or any other type of claim.[106]

The DOL's assertion that ERISA claims do not qualify for subordination under section 510(b) is unsupported by the case law. The DOL has pointed to no court that has determined that it is not proper to subordinate an ERISA claim. In contrast, courts have consistently acknowledged that claims arising under ERISA may fall under the purview of section 510(b). See, e.g., In re Touch Am. Holdings, Inc., 381 B.R. 95, 106 (Bankr. D. Del. 2008); Brown v. Owens Corning Inv. Review Comm., 541 F. Supp. 2d 958, 969-971 (N.D. Ohio 2008) (amended on other grounds by Brown v. Owens Corning Inv. Review Comm., 2008 WL 5378361 (N.D. Ohio, December 24, 2008)); In re Lenco, Inc., 116 B.R. 141, 144 (E.D. Mo. 1990). Indeed, this Court in Touch America Holdings analyzed the same arguments raised by the DOL here and found that ERISA claims were properly subordinated under section 510(b). The Court rejected in that case the argument that "§ 510(b) does not apply to ERISA Litigation because the claims are based upon the Officers' and Directors' breach of fiduciary duties established by ERISA, and those claims do not arise from the 'purchase or sale' of [the company's] stock." Touch Am. Holdings, 381 B.R. at 101-02. Instead, this Court explained that "the § 510(b) analysis does not hinge on whether the Plaintiffs label themselves as Plan participants or shareholders, but requires consideration of the underlying nature of their claims." Id. at 104. This Court concluded that "[a]lthough the Complaint seeks damages for breach of fiduciary duties, the underlying

---

[106] The DOL points to a second policy rationale in the legislative history of section 510(b) – that potential creditors will often extend credit to a company in reliance on the "equity cushion" created by equity holders' investment. DOL Obj. at p. 23. The DOL then asserts that this rationale is not applicable here. Id. Those courts that have acknowledged both the "risk allocation" and "equity cushion" rationales, have also explained that subordinating a claim need only meet one of these two rationales to further Congress's intent. See, e.g., In re Geneva Steel Co., 281 F.3d 1173, 1180 n.3 (10th Cir. 2002) ("The equity cushion argument may not apply in all cases."). Even if the DOL is correct, which it is not, that the equity cushion rationale is inapplicable here, the risk allocation rationale is clearly met.

allegations center around the ERISA Defendants' decision to continue the Plan's investment in [the company's] stock." Id. at 106.

The DOL's attempts to distinguish Touch America Holdings are unavailing. The DOL states that the plan at issue in Touch America Holdings "gave participants a measure of control over the decision to invest in employer stock that was not present in this case," although the DOL never explains what the measure of control was or why this is a relevant distinguishable factor. DOL Obj. at p. 23. Indeed, this Court, and other courts, have explained that the fact that an employee has no say in his receipt of company stock does not effect the section 510(b) analysis. See, e.g., id. at 104 ("Moreover, the fact that the ERISA Plaintiffs did not choose the form of their employer's matching contribution ... does not affect the 'purchase or sale' analysis."); Enron, 341 B.R. at 151 ("If these Claimants were required to receive a portion of their compensation as options, that was a condition of employment the Claimants willingly accepted in return for their labor.").

The DOL also attempts to distinguish Touch America Holdings by asserting that in this case, the DOL is bringing the claims and the DOL "clearly is not an equity investor." DOL Obj. at p. 24. However, "[n]othing in § 510(b)'s text requires a subordinated claimant to be a shareholder." In re Betacom of Phoenix, Inc., 240 F.3d 823, 829 (9th Cir. 2001). Indeed, the court in In re Lenco held that the DOL's claims asserted against a debtor under ERISA on behalf of an ESOP were properly subordinated under section 510(b). Lenco, 116 B.R. at 144. Further, the DOL's position ignores the reality that its claims are brought on behalf of the Tribune ESOP and seeks to recover the loss in the value of equity held by the ESOP by the Debtors' alleged

breach of their fiduciary duties.[107] "Bankruptcy Code § 510(b) is intended to apply to claims of this nature." Touch Am. Holdings, 381 B.R. at 106 n.13.

> d.    Section 510(b) Applies To the DOL's Alleged Disgorgement Claims

The DOL also argues that its claims for disgorgement, which amount to only a small part of the recovery sought by the DOL, do not qualify for subordination under section 510(b) because "section 510(b) subordinates only claims for 'damages,' for 'rescission,' or 'for reimbursement or contribution allowed under section 502.'" DOL Obj. at p. 31. Courts have recognized, however, that limiting section 510(b) by the remedies selected by a claimant would allow a claimant to consciously sidestep section 510(b) and frustrate Congress's intent in enacting that section. See, e.g., In re Stylesite Marketing, Inc., 253 B.R. 503, 510-11 (Bankr. S.D.N.Y. 2000). In order to give full effect to the purpose of section 510(b), and in compliance with the principle that section 510(b) should be interpreted broadly, a claim falls under the purview of section 510(b) if the claim arises from the purchase or sale of a debtor's security, regardless of what remedy the claimant is requesting. See, e.g., id. at 511 (subordinating claim for restitution because "whatever TekInsight chooses to call it, its rights depend on its purchase of the Stylesite stock, and, therefore, arise from that purchase"); see also Seaquest Diving, 579 F.3d at 425 (rejecting claimant's assertion that section 510(b) did not apply to its claims because its claim arose from a "redemption" transaction and not rescission and explaining that a court

---

[107] The DOL asserts that section 510(b) should not apply to its claims "arising from the Merger in Step 2, because such claims arose after the purchase of Tribune stock." DOL Obj. at 30. The DOL ignores that the Third Circuit has explicitly rejected the argument that section 510(b) does not apply to claims that arise after the purchase of stock. Telegroup, 281 F.3d at 142; Seaquest Diving, 579 F.3d at 421 ("[T]he circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract"). Instead of focusing on the timing of when a claim arose, the Third Circuit's analysis focuses on whether a claim would have arisen "but for the purchase" of the stock. Telegroup, 281 F.3d at 135-36, 143. As explained above, by the DOL's own descriptions, all of its claims, including those involving Step 2 of the leveraged ESOP transaction, arise from the purchase of Tribune stock.

must "examine the totality of the circumstances to determine" whether section 510(b) applies); In re Deep Marine Holdings, Inc., 2011 WL 160595, at *7 (Bankr. S.D. Tex. Jan. 19, 2011) (holding that claims for appraisal and accounting were subject to mandatory subordination). The DOL's claims all arise from the purchase of Tribune stock and are therefore properly subordinated under section 510(b) and properly classified as Securities Litigation Claims.

       e.      The Debtor/Committee/Lender Plan Properly Classifies the DOL's ERISA Claims

As discussed above, the DOL's Claims have a sufficient "nexus or causal relationship" to a security of the Debtor, i.e. the ESOP, to be subject to mandatory subordination under § 510(b). Telegroup, 281 F.3d at 140. Because the ERISA Claims arise from security interests and are subject to mandatory subordination under section 510(b), there are substantially similar to and properly classified with the Securities Litigation Claims. See 11 U.S.C. § 1122(a); John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs., 987 F.2d 154, 158 (3d Cir. N.J. 1993); Coram Healthcare Corp., 315 B.R. at 349. Therefore, the DOL's objection should be overruled.

### 3.    The Classification of the IRS Claims is Appropriate

The IRS objects to the Debtor/Committee/Lender Plan "to the extent it defines the IRS's claim for tax penalties associated with the Leveraged ESOP Transactions as a Section 510(b) claim, which would be subject to subordination." IRS Obj. at ¶ 1. For all of the reasons set forth above by the Debtor/Committee/Lender Plan Proponents in connection with the classification of DOL's claims, to the extent the IRS asserts a Claim for tax penalties arising from the same alleged violations of ERISA relating to the Leveraged ESOP Transactions, such claims should similarly be subject to subordination. For these reasons, the Debtor/Committee/Lender Plan

Proponents believe that the IRS's objection is without merit for the same reasons discussed above with respect to the DOL.

### 4. The Classification of Senior Notes Indenture Trustee Claims in Class 1E is Appropriate

Deutsche Bank, the successor indenture trustee under the 1992 Indenture, the 1995 Indenture and the 1997 Indenture, joined in the objection of Wilmington Trust (the "Deutsche Bank Joinder") to the extent that Deutsche Bank's fee and expense claims arising under the Senior Notes Indenture (the "DB Fee Claims") are not classified as Class 1F Other Parent Claims but are instead classified as Class 1E Senior Noteholder Claims. Deutsche Bank's arguments in support of its objection, however, ignore the relevant case law and fail to justify re-classifying the DB Fee Claims.

The DB Fee Claims, to the extent Allowed, should be classified as Class 1E Senior Noteholder Claims. The definition of Senior Noteholder Claim under the Debtor/Committee/Lender Plan is straightforward and directly encompasses the DB Fee Claims: "Senior Noteholder Claims means all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement." Debtor/Committee/Lender Plan § 1.1.216. As such, any DB Fee Claims that the Senior Notes Indenture Trustees may have "aris[e] under or [are] evidenced by the Senior Notes Indentures and related documents." In addition, Deutsche Bank, to the extent it has objected or otherwise moved to have its fees Allowed, has cited only to the relevant indentures as the bases for its claims. Deutsche Bank 3018 Motion at ¶¶ 9, 12, 15, 21. As the only basis for the Senior Notes Indenture Trustee Fees, separate from a motion under section 503(b), would be the language of the Senior Notes Indentures, the Senior Notes Indenture Trustee Fees should be · classified in Class 1E Senior Noteholder Claims.

155

The definition of Senior Noteholder Claim under the Debtor/Committee/Lender Plan is straightforward; however, Deutsche Bank fails to acknowledge this definition nor discuss the fact that the Senior Notes Indenture Trustee Fees should be classified together with the Senior Noteholder Claims due to their substantial similarity. See John Hancock Mut. Life Ins. Co., 987 F.2d at 160-62 (finding that substantially similar claims should be classified separately only when they have a "voting interest that is sufficiently distinct and weighty to merit a separate voice"); Coram Healthcare Corp., 315 B.R. at 349. Instead, Deutsche Bank asserts that it is inappropriate for all claims arising under the Senior Notes Indentures to be classified together. Deutsche Bank, however, fails to make any persuasive argument. Instead, they point to a single case decided for the proposition that claims for indenture trustee fees may not be classified together with general unsecured claims. This citation is *non sequitur* given that the Deutsche Bank Joinder seeks to classify the Senior Notes Indenture Trustee Fees with general unsecured claims in Class 1F. In re Gillette Assoc., Ltd., 101 B.R. 866, 873 (Bankr. N.D. Ohio 1989). Deutsche Bank, however, still concludes that classification of all claims arising under the Senior Notes Indentures together is inappropriate. Deutsche Bank Joinder at 2.

This assertion does not withstand scrutiny. The professional fee and expense claims of the Senior Notes Indentures were classified as Senior Noteholder Claims under the Debtor/Committee/Lender Plan because all such claims arise under the Senior Note Indentures and, as such, are claims of equal priority against the same Debtor. Moreover, Deutsche Bank included the DB Fee Claims in their proofs of claim together with all other claims arising under the Senior Notes Indentures, and they cannot now perform an about-face and assert that the claims joined together in their proofs of claim – all arising under the same documents – are so dissimilar that their classification together violates the Bankruptcy Code. (Claim Nos. 3525-32.)

156

Claims of equal priority against the same debtor, arising under a particular contract or contracts

(such as the Senior Notes Indentures), satisfy the "substantially similar" test of Section 1122(a)

and should be classified together for voting purposes.

Deutsche Bank also objects that including the DB Fee Claims in Class 1E will

impermissibly dilute the recoveries of Holders of Class 1E Claims. The DB Fee Claims, if

ultimately allowed in their full claimed amount of $2.9 million, would account, however, for less

than 0.23% of the Senior Noteholder Claims.[108] To the extent that the DB Fee Claims have a

dilutive effect on the Senior Noteholder Claims, it is a rounding error. Further, any dilution is

highly unlikely to "diminish the expected recovery of Class 1E claimants to less than 35.18%,"

because the Debtor/Committee/Lender Plan provides for Class 1E claimants to receive additional

distributions from (i) the Remaining Bridge Loan Reserve, (ii) the Litigation Trust, and (iii) the

Creditors' Trust. Deutsche Bank Joinder at p. 2; Debtor/Committee/Lender Plan § 3.5.2. The

Noteholder Plan Proponents (including Deutsche Bank) have made it clear that they believe that

recoveries from the Litigation Trust and Creditors' Trust will likely provide significant

additional value to claims in Class 1E. See, e.g., Noteholder Obj. at ¶ 3. The objections to

confirmation of the Debtor/Committee/Lender Plan raised in the Deutsche Bank Joinder are

wholly without merit and should be overruled.

Because each Class consists of only similar Claims or Interests, the Bankruptcy Court

should approve the classification scheme set forth in the Debtor/Committee/Lender Plan as

consistent with section 1122(a) of the Bankruptcy Code.

---

[108] Deutsche Bank has asserted Expense Claims totaling approximately $2.9 million. See Deutsche Bank 3018 Motion at p. 6. Under the Debtor/Committee/Lender Plan, Class 1E Claims will be allowed in the total aggregate amount of $1,283,055,743.77. Debtor/Committee/Lender Plan § 3.2.5.

### D.    The Debtor/Committee/Lender Plan is Feasible

The Noteholder Plan Proponents have objected to the Debtor/Committee/Lender Plan on the basis that it allegedly does not satisfy the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  The Noteholder Plan Proponents have focused their feasibility arguments on an assortment of purported "issues" regarding the ability of the Debtors to obtain certain approvals from the Federal Communications Commission ("FCC") under the Debtor/Committee/Lender Plan — a condition precedent to plan effectiveness. Debtor/Committee/Lender Plan § 10.1.1(i).  These arguments, however, are a meritless attempt to mire this Court in matters that lie within the FCC's exclusive jurisdiction.  In particular, the Noteholder Plan Proponents argue that the Debtor/Committee/Lender Plan is not feasible because  it will be subject to the further consent of the FCC, which they argue may not be obtained due to alleged violations of the FCC's ownership rules.  These arguments are specious, and the Noteholder Plan Proponents' objection should be overruled.

The FCC is presently considering applications[109] seeking approval of a post-emergence ownership structure for Tribune; however, as a policy matter, the FCC will not act upon the Applications until this Court has issued its confirmation order.  See Rosenstein Report at p. 27. The proposed post-emergence ownership structure disclosed in the Applications includes as "attributable" parties (a concept defined by the FCC's rules) JPMorgan, Angelo Gordon and Oaktree—the three parties against which the Noteholder Plan Proponents mount their FCC attacks.  Pre-judgment of the outcome of the FCC's evaluation of the Applications is neither appropriate nor necessary to the evaluation of the feasibility of the Debtor/Committee/Lender

---

[109] See FCC File Nos. BALCDT-20100428ADP, et al. (filed Apr. 28, 2010, as amended June 10, 2020, June 25, 2010, Aug. 25, 2010, and Aug. 30, 2010) (the "Applications").  A copy of a representative sample of the relevant portions of one of the Applications, as amended, is appended as Exhibit 4 to the Report of Mace J. Rosenstein (Feb. 25, 2011) ("Rosenstein Report").

Plan. Indeed, as the Debtors' expert, Mace Rosenstein, concludes, the various media interests held by JPMorgan, Angelo Gordon and Oaktree present no impediment to the FCC's assessment and approval of the Applications. The arguments to the contrary by Aurelius's expert, Mark Prak, are based on factual inaccuracies, faulty assumptions and misinterpretations of FCC rules and decisions. The media interests of JPMorgan, Angelo Gordon and Oaktree either are not "attributable" interests under FCC rules and policies, or alternatively, have been addressed in the Applications and would not result in impermissible media combinations under FCC multiple or cross ownership rules.

Critically, *even if the FCC were to conclude otherwise* as to any of these interests, the Debtor/Committee/Lender Plan includes, as to each of the interests that the Noteholder Plan Proponents question, mechanisms to address and cure any conceivable FCC-related issue that might arise. This indisputable fact conclusively establishes the feasibility of the Debtor/Committee/Lender Plan from an FCC perspective.[110]

> **1.    The Purported FCC Issues Identified by the Noteholder Plan Proponents Relate to Matters Within the FCC's Exclusive Jurisdiction and at the Core of Its Regulatory Expertise**

The Communications Act tasks the FCC alone with evaluating transfers and assignments of broadcast station licenses, such as those held by Tribune, to determine whether "the public interest, convenience, and necessity will be served" by approval of the transactions.  47 U.S.C. §

---

[110] Given the presence of such mechanisms in the Debtor/Committee/Lender Plan, the Noteholder Plan Proponents cannot reasonably argue that there is not a "reasonable prospect" of successfully obtaining the required regulatory approvals from the FCC which is all that is required.  See, e.g., In re TCI 2 Holdings, LLC, 428 B.R. 117, 154-55 (Bankr. D.N.J. 2010) (explaining that plan proponents must show there are no "material hurdles to achieve the necessary regulatory approvals," and confirming plan where there was a "reasonable prospect of success . . . to obtain regulatory approval"); see also, e.g., In re Reading Broadcasting, Inc., 386 B.R. 562, 573-74 (Bankr. E.D. Pa. 2008) (plan was feasible even though FCC approval had not yet been granted, and there was "no guarantee" the buyer would be able to complete the purchase, because section 1129(a)(11) "did not impose such a high standard" so as to require a guarantee of success); In re Temple Zion, 125 B.R. 910, 916 (Bankr. E.D. Pa. 1991) (plan was feasible even though there was "no guarantee" that certain required variances would be obtained in a timely fashion because it "is impossible for anyone to know what and when the numerous regulatory agencies will take action").

310(d); see id. § 402(b) (providing for exclusive D.C. Circuit jurisdiction to review FCC

decisions on such transfers and assignments).  In furtherance of its statutory duties, the FCC has

adopted detailed rules setting forth the types of interests—so-called "attributable" interests—

which afford a substantial enough degree of control to be considered relevant to its evaluation of

a proposed transaction.  See 47 C.F.R. § 73.3555, Note 2; see also Rosenstein Report at p. 5.

The FCC adopted these "bright line" attribution rules to provide clarity and predictability in

planning transactions and to avoid the confusion and uncertainty that would arise from general

and speculative allegations, such as those that the Noteholder Plan Proponents and Mr. Prak

attempt to raise before this Court.  See generally Rosenstein Report at pp. 4-7.

 As noted above, the FCC already is considering the Applications, which were submitted

by Tribune almost a year ago on April 28, 2010.  Those applications include all of the

information regarding JPMorgan, Angelo Gordon and Oaktree that is required by and relevant to

the FCC, including all of their *attributable* interests in media companies other than Tribune.  See

id. at pp. 4, 12-13.[111]  The Noteholder Plan Proponents suggest that some information submitted

to the FCC to date about these parties is inaccurate or insufficient, see, e.g., Noteholder FCC

Obj. at ¶¶ 7, 10 n.4, 12, but such contentions are simply a disingenuous attempt to muddy the

critical distinction between attributable and non-attributable interests, see Rosenstein Report at

pp. 3-4, 15-24.  Indeed, perhaps recognizing that the FCC would not find their arguments the

least bit persuasive, the Noteholder Plan Proponents have not brought these issues to the FCC's

---

[111] In addition, JPMorgan, Angelo Gordon, and Oaktree have completed Media Ownership Certifications—as
provided for in Section 5.4.2(b) of both the Debtor/Committee/Lender Plan and the Noteholder Plan—which set
forth information relevant to FCC issues.  By contrast, none of the Noteholder Plan Proponents have done so, even
though certain of them will hold attributable interests under their own plan by virtue of the board designation rights
that they will hold thereunder.  See Noteholder Plan §§ 5.3.2, 7.16.4; Rosenstein Report at pp. 28-30.

attention to date, despite having had every opportunity to do so.[112]  In fact, one Noteholder Plan

Proponent, Wilmington Trust Company, has appeared repeatedly in the FCC proceeding, but has

not raised any issue with respect to any other media interest of JPMorgan, Angelo Gordon, or

Oaktree.

At its core, the Noteholder Plan Proponents' position boils down to a request that this

Court assume—based on sheer speculation—that the FCC ultimately will accept arguments

(which have not even been presented to it) about media interests that are not relevant under the

FCC's bright-line attribution rules, and therefore are not required to be reported on the FCC

application form.  See id. at 6.  The resolution of these issues, however—including whether the

FCC will act favorably on the waivers that Tribune has requested—is plainly a matter for the

FCC to decide.  This Court need not, and should not, attempt to pre-judge the outcome of the

Applications.  It is enough that the Debtor/Committee/Lender Plan contains mechanisms to

address any potential FCC compliance issue that might arise—which it does—and is reasonably

likely to achieve FCC approval—which it is.  See generally Rosenstein Report at pp. 13-24.

### 2.   The Purported FCC Issues Identified by the Noteholder Plan Proponents Have No Basis in FCC Rules or Case Law and Are Not Impediments to FCC Approval

Even if this Court felt compelled to delve more deeply into the matters presently before

the FCC, the Noteholder Plan Proponents' arguments fail for at least three fundamental reasons.

First, the Debtor/Committee/Lender Plan contains provisions specifically designed to convert

any interest deemed by the FCC to be a problematic attributable interest into a non-attributable

interest, thereby ensuring FCC approval.  Second, as more fully set forth in the Rosenstein

Report, the media holdings of JPMorgan, Angelo Gordon, and Oaktree do not include

---

[112] The FCC process permits the filing of Petitions to Deny within a 30-day window following "public notice" of an application, a period which has passed as to the April 2010 applications filed by Tribune, see 47 U.S.C. §§ 309(b), (d), as well as informal objections, see 47 C.F.R. § 73.3587, and *ex parte* presentations, see id. § 1.1206.

attributable interests that will run afoul of FCC rules in any event. Third, there is no precedent

for the suggestion that JPMorgan, Angelo Gordon, and Oaktree's *non-attributable* interests will

prevent or unduly delay FCC approval; indeed, that argument is *contrary* to FCC precedent, and

even if correct, would apply to the Noteholder Plan as well.

> a.   The Debtor/Committee/Lender Plan Includes Mechanisms to
> Address Any Conceivable FCC Issues That Might Arise

To deal with the possibility that a Claim Holder might have other media interests that

would violate FCC rules if held in combination with an attributable interest in Tribune, the

Debtor/Committee/Lender Plan provides that stock holdings and/or other rights of any such

Claim Holder (including the Lender co-proponents) may be restructured to ensure compliance

with FCC rules. That alone vitiates the Noteholder Plan Proponents' arguments that the

Debtor/Committee/Lender Plan is not "feasible" because of FCC issues.

Because any entity holding 5% or more of the Class A Voting Stock generally will be

considered to hold an attributable interest in Tribune, the Debtor/Committee/Lender Plan allows

the Debtors to issue a sufficient amount of Class B Stock (which has been designed to be non-

attributable under FCC rules) to any Claim Holder otherwise eligible to receive 5% or more of

the equity of Tribune if the "[h]older has other media interests that could impair the ability of

Reorganized Tribune to comply with the Communication Act or the FCC's rules."

Debtor/Committee/Lender Plan § 5.4.2(d). This is the same procedure incorporated into the

Noteholder Plan to deal with this possibility.[113] By allowing Tribune to issue Class B stock, the

Debtor/Committee/Lender Plan ensures that the interest of such a Claim Holder will be deemed

non-attributable for purposes of the FCC's rules. See Rosenstein Report at p. 13.

---

[113] Noteholder Plan § 5.4.2(d). Indeed, the Noteholder Plan Proponents claim that they will utilize this mechanism
to deal with the regulatory problems they believe would arise from the equity holdings that each of the Lender co-
proponents would be eligible to receive under the Noteholder Plan. Noteholder FCC Obj. at ¶ 7 n.5.

Under the Debtor/Committee/Lender Plan, the Lender co-proponents also hold rights to designate members to the board of directors of Reorganized Tribune. See Debtor/Committee/Lender Plan § 5.3.2. Because these rights, standing alone, could separately constitute an attributable interest under the FCC's rules, see Telemundo Communications Group, Inc., 17 FCC Rcd 6958, 6972-73 ¶ 39 (2002), the Debtor/Committee/Lender Plan provides for the surrender of board designation rights or restructuring of any other potentially conflicting attributable interests in the unlikely event of a significant FCC hurdle. See Debtor/Committee/Lender Plan § 5.3.2. The Noteholder Plan Proponents complain that the affected co-proponent has a role in determining whether the rights shall be relinquished. See Noteholder FCC Obj. at ¶ 8. The Debtor/Committee/Lender Plan, however, provides that board rights may be lost if "a Creditor Proponent and the Debtors reasonably determine, based upon comments received from the FCC, that the required approval of the FCC will not be obtained due to the designation rights afforded to such Creditor Proponent." Debtor/Committee/Lender Plan § 5.3.2. It clearly would be unreasonable for a proponent to insist on retaining its rights if it were faced with an otherwise insurmountable objection from the FCC. In addition, the Debtor/Committee/Lender Plan provides that all parties entitled to receive New Common Stock "shall use their best efforts to cooperate in diligently pursuing and in taking all reasonable steps necessary to obtain the requisite FCC Approvals," further obligating JPMorgan, Angelo Gordon and Oaktree to take actions in furtherance of FCC approval. Debtor/Committee/Lender Plan § 5.17. In sum, the Debtor/Committee/Lender Plan resolves any possible issue relating to board designation rights, in the unlikely event the FCC finds that any such problem exists. See Rosenstein Report at pp. 13-14.

b.      None of the Other Media Interests Raised By the Noteholder Plan
Proponents Will Adversely Impact the Ability to Obtain FCC
Approval

Even if the Debtor/Committee/Lender Plan did not include provisions to remedy any

concerns ultimately raised by the FCC about other media interests of JPMorgan, Angelo Gordon,

and Oaktree, those interests either are not attributable, and therefore not relevant, or would not

result in FCC rule violations in the first instance, as explained in detail in the Rosenstein Report.

The Noteholder Plan Proponents' arguments to the contrary ignore the critical distinction in the

FCC's rules between "attributable" and "non-attributable" interests, and are based on faulty

factual assumptions and misinterpretations of well-established FCC precedent.[114]

(i)      JPMorgan

Contrary to the contentions of the Noteholder Plan Proponents (Noteholder FCC Obj.

¶ 5), JPMorgan's interest in Gannett is properly considered *non-attributable*.  See Rosenstein

Report at pp. 18-19.  Under the FCC's rules, a less stringent 20% attribution threshold for certain

"passive" investors (including mutual funds) applies to a portion of the Gannett interest, allowing

the entire interest to be held in tandem with an attributable interest in Tribune.  See id. at 8.  The

Noteholder Plan Proponents' argument that this 20% threshold does not apply because JPMorgan

also acts as investment advisor for its mutual funds is squarely contradicted by FCC precedent.

---

[114] As a preliminary matter, Aurelius's expert Mr. Prak, acknowledges, or at least does not dispute, that certain of the media interests held by JPMorgan, Angelo Gordon and Oaktree are facially non-attributable based on the Lender co-proponents' representations regarding their interests in the relevant entities. See Rosenstein Report at p. 15. These include JPMorgan's interests in the Journal Register Company (Prak Report at p. 24) and ▮▮▮▮▮▮ (id. at 26), Angelo Gordon's interests in ▮▮▮▮▮ (id. at 28) and NextMedia Group, Inc. (id. at 29), and Oaktree's interest in ▮▮▮ (id. at 31).  To the extent Mr. Prak implies that the FCC might have any doubts about these conclusions, he offers nothing more than mere speculation, which should be disregarded by this Court.  See Rosenstein Report at pp. 4, 16-24.  For example, Mr. Prak's bald assertion that Angelo Gordon's interest in NextMedia—which he acknowledges "appears to be non-attributable on its face"— would nonetheless "likel[y]" be deemed attributable by the FCC "in light of the economic realities of the relationship" (Prak Report at pp. 29-30) is plainly contrary to the FCC's bright-line attribution rules, and indeed, the FCC's prior determination (which has long been final) that the specific interest in question is non-attributable. See Rosenstein Report at pp. 17-18.  Moreover, to the extent Mr. Prak suggests that any of the Lender co-proponents' interests would delay, add complexity to or have an adverse impact on the FCC's determinations even if such interests were *non-attributable*, his conclusions are contrary to FCC precedent and without merit. Id. at 6.

Id. at 18-19. In any event, JPMorgan has already committed, in the Applications, to ensuring that its holding in Gannett will be consistent with the holding of an interest in Tribune (including, if necessary, by JPMorgan's taking a sufficient amount of Tribune Class B stock to render its interest in Tribune non-attributable).[115]

The Noteholder Plan Proponents' arguments concerning Stephen Burke, a director of JPMorgan who is also an officer of NBC, are equally unavailing. Noteholder FCC Obj. at ¶ 3. The FCC's rules permit a company having an attributable interest in a broadcast licensee to demonstrate, on a proper showing, that its officers and directors should not be deemed to hold an attributable interest in an underlying broadcast license. See Rosenstein Report at pp. 9, 23-24.[116] Consistent with those rules, Tribune's Applications state that that Mr. Burke (along with JPMorgan's other officers and directors) will not perform duties or have responsibilities related to JPMorgan's investment in Reorganized Tribune.[117] Accordingly, there is no reason to believe that the FCC would find that Mr. Burke would have an attributable interest in Tribune. See Rosenstein Report at pp. 23-24. Thus, Mr. Burke's relationship with NBC is not relevant, and there was (and is) no need to disclose NBC's media holdings in the Applications.

The Noteholder Plan Proponents' argument that JPMorgan has an attributable interest in ██████████████████████████████, Noteholder FCC Obj. at ¶ 5 (citing Prak Report at pp. 33-35), is based on a misreading of the operative ██████ governing document. The only purported basis for an attributable interest ████████████████████████████ ████, but even if such a right would create an attributable interest (which it would not),

---

[115] See Applications, Suppl. to Exhibit 12 (June 2010), at 2 (attached to Rosenstein Report as Exhibit 4-B).

[116] See also 47 C.F.R. § 73.3555, Note 2(g) ("The officers and directors of a parent company of a broadcast licensee . . . with an attributable interest in any such subsidiary entity, shall be deemed to have a cognizable interest in the subsidiary unless the duties and responsibilities of the officer or director involved are wholly unrelated to the broadcast licensee . . . and a statement properly documenting this fact is submitted to the Commission.").

[117] The Applications set forth the basis for JPMorgan's position. See Applications, Comprehensive Exhibit at 19-20 (attached to Rosenstein Report as Exhibit 4-C). Even if the FCC determined that additional information was necessary, the application could be amended to ensure compliance.

███████████████████████████████████████████

███████████████████████████████████████. See Rosenstein Report at pp. 20-

21.

(ii)    Angelo Gordon

The Noteholder Plan Proponents' FCC expert also incorrectly alleges that Angelo

Gordon holds an attributable interest in ████████. See Noteholder FCC Obj. at ¶ 5; Prak Report

at p. 27. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████. See, e.g., Prak Report at p. 27.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████. See Noteholder FCC Obj. at ¶ 5; Prak Report at p. 27.  Such a claim is contradicted by

FCC precedent████████████████████████████████████

███████. See Rosenstein Report at p. 9 n.3. ██████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████. See Rosenstein Report at pp. 21-22.

In addition, Mr. Prak raises supposedly "interesting facts" that lead him to conclude

(incorrectly) that Angelo Gordon "should be seen to have an attributable interest in TTBG, LLC

[("TTBG")]." Prak Report at pp. 28-29 n.11. ████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████. The FCC has already determined, pursuant to its approval of applications

for the assignment of TTBG's station licenses in a Chapter 11 bankruptcy proceeding, that this

insulated interest in TTBG is non-attributable. See Rosenstein Report at p. 20.[118]  In any event,

even if the interest were deemed attributable, the fact that TTBG owns a television station in

Houston, Texas, where Tribune also owns a television station, would not run afoul of the FCC's

multiple ownership rule. Id.  Indeed, Mr. Prak's silence on this point suggests that he concedes

as much. See Prak Report at pp. 28-29.

>           (iii)     Oaktree

Tribune's Applications disclose that  Oaktree has an attributable ownership interest in

Liberman Broadcasting, Inc. ("Liberman") because Oaktree has the right to appoint a member to

Liberman's board and has exercised that right by appointing Mr. Bruce Karsh.[119]  In accordance

with generally accepted FCC practice, the Applications include a pledge by Mr. Karsh to resign

from the Liberman board and a commitment by Oaktree to relinquish its right to appoint a

member to the Liberman board of directors at or prior to the time that Tribune emerges from

bankruptcy.[120]  The Noteholder Plan Proponents concede that such action will remove the

attribution trigger with regard to the directorial appointment. Prak Report at p. 30. Nevertheless,

the Noteholder Plan Proponents claim that Oaktree's 25.84% stock interest in Liberman may

amount to an attributable interest in the future if the FCC ever eliminates its single majority

---

[118] Any disagreement by the Noteholder Plan Proponents with the FCC's conclusion on this matter is irrelevant to this Court's analysis.  The appropriate place to raise such issues would have been before the FCC itself, and in any event, the time period to challenge the FCC's 2009 decision, which is final and no longer subject to further administrative or judicial challenge, has long passed.  See Rosenstein Report at p. 20.

[119] Applications, Comprehensive Exhibit at 39 (attached to Rosenstein Report as Exhibit 4-C).

[120] Id.

shareholder exemption to its attribution rules. Noteholder FCC Obj. at ¶ 11; Prak Report at p.

30. The Noteholder Plan Proponents supply no basis, however, to credit such speculation, which

would run counter to years of FCC practice. See Rosenstein Report at p. 23 n.14.

The Applications also disclose that Oaktree holds an attributable ownership interest in

stations now owned by Townsquare Media, LLC ("Townsquare"). As explained by Mr.

Rosenstein, the FCC's multiple and cross-ownership rules permit Oaktree to hold an attributable

interest in both Tribune and Townsquare. See Rosenstein Report at p. 22. The Noteholder Plan

Proponents do not—and cannot—assert otherwise. See id.[121]

In sum, as Mr. Rosenstein explains, the other media interests of JPMorgan, Angelo

Gordon, and Oaktree are either non-attributable, and thus irrelevant to the FCC's analysis of the

Applications, or would not result in any impermissible combinations under the FCC's media

ownership rules. See Rosenstein Report at pp. 3, 15-24. They thus provide no basis for

challenging the feasibility of the Debtor/Committee/Lender Plan, even if it did not otherwise

provide for mechanisms to solve any FCC problems that unexpectedly arise.

> c.    The Noteholder Plan Proponents' FCC Theory Has Been Rejected
> by the FCC, and Taken to its Logical Conclusion, Undermines The
> Feasibility of Their Own Plan

As the Rosenstein Report explains, the Noteholder Proponents' suggestion that the FCC

may view *non-attributable interests* as an obstacle to approval has been rejected by the FCC.

See Rosenstein Report at p. 6. Moreover, if it were true that the FCC would consider non-

attributable interests of Claim Holders in Tribune, this would also apply to the Noteholder Plan.

The substitution of Class B for Class A stock in the Noteholder Plan, see Noteholder FCC Obj. at

---

[121] The Noteholder Plan Proponents contend, without support, that Oaktree's attributable interest in Townsquare
would "create additional complexity in determining compliance with" the FCC's rules. Prak Report at p. 31.
However, the FCC is perfectly capable of determining compliance with its own multiple and cross ownership rules,
particularly, where as here, it is plain that Oaktree's attributable interest in Townsquare, in combination with the
proposed attributable interest in Reorganized Tribune, would not result in any impermissible combinations under
those rules. See Rosenstein Report at pp. 5, 22.

¶ 11 n.5, while designed to ensure non-attributable status for Claim Holders, would not eliminate the equity positions of JPMorgan, Angelo Gordon and Oaktree in Tribune, and, therefore, would not solve the "problem" that the Noteholder Plan Proponents have manufactured.

> **3.      The Remainder of the FCC Issues Identified by the Noteholder Plan Proponents Are Common to Both Plans and Thus Cannot Logically Be Raised as Objections to Confirmability of the Debtor/Committee/Lender Plan**

The Noteholder Plan Proponents raise a number of additional issues that they claim will delay or otherwise complicate the FCC approval process. Because these issues are common to both the Debtor/Committee/Lender Plan *and* the Noteholder Plan, however, they cannot logically be raised as objections to confirmability of the Debtor/Committee/Lender Plan. For example, both plans call for Tribune to obtain the same waivers of the FCC's ownership rules. See Debtor/Committee/Lender Plan § 10.1.1(i); Debtor/Committee/Lender Disclosure Statement at pp. 52-54; Noteholder Plan § 10.1.1(f); Noteholder Disclosure Statement at pp. 61-63. The Noteholder Plan Proponents also emphasize that those waivers have been opposed by certain groups, Noteholder FCC Obj. at ¶ 9, but none of the oppositions raised any issue with respect to other media interests of JPMorgan, Oaktree, or Angelo Gordon. See Rosenstein Report at p. 27. Similarly, certain litigation concerning the FCC ownership rules now in effect, as well as the pending 2010 Quadrennial Review concerning those rules, see Prak Report at pp. 15-16, 21, have the same potential to impact the questions of ownership rule compliance and the waivers required under both plans, as neither proceeding relates specifically to the interests of JPMorgan, Angelo Gordon, or Oaktree. See Rosenstein Report at pp. 24-25. Finally, the fact that the Applications will be acted on by the full five-member Commission, Prak Report at p. 19, and that the FCC will not make final determinations until the Court confirms a plan, Noteholder FCC Obj. at ¶ 6; Prak Report at pp. 19, 39-40, are equally true of the Noteholder Plan. See

Rosenstein Report at 27-30. Indeed, as set forth in the Rosenstein Report and in Part VII.B.2 *infra*, it is in fact the Noteholder Plan that raises the greater likelihood of problems and delay at the FCC.

E.    **The Debtor/Committee/Lender Plan's Treatment of Claims and Interests Complies with the Applicable Provisions of the Bankruptcy Code**

Certain parties have alleged that the Debtor/Committee/Lender Plan does not provide appropriate treatment of their Claims. Articles II and III of the Debtor/Committee/Lender Plan specify the treatment of each Class of Claims and Interests, as required by sections 1123(a)(3) and 1123(a)(4) of the Bankruptcy Code, and such treatment complies in all respects with the applicable provisions of the Bankruptcy Code. As discussed in Part IV.K, in an effort to resolve many of these objections, however, the Debtor/Committee/Lender Plan Proponents will propose language to be inserted in the Confirmation Order or various modifications to the Debtor/Committee/Lender Plan. To the extent not resolved by these amendments, the objections should be overruled.

1.    **The Debtor/Committee/Lender Plan Appropriately Applies Subordination Provisions of the PHONES Notes Indenture and the EGI-TRB LLC Notes**

As discussed in Part IV.F, *infra*, and in the Joint Disclosure Statement, the PHONES Notes and the EGI-TRB LLC Notes are contractually subordinated to Tribune's funded indebtedness. Joint Disclosure Statement at p. 21. Despite the fact that the Debtor/Committee/Lender Plan properly gives effect to the subordination provisions of the PHONES Notes and the EGI-TRB LLC Notes, certain parties have asserted that the Debtor/Committee/Lender Plan subordinates such Claims in a manner that is contrary to the terms of their governing documents. These objections are meritless, as discussed below.

170

The Noteholder Plan Proponents and Wilmington Trust separately object to the subordination of the PHONES Notes Claims and the EGI-TRB LLC Notes Claims to certain of the Other Parent Claims. See Noteholder Obj. at ¶¶ 393-399; WTC Obj. at ¶¶ 8-9. With respect to the PHONES Notes, in the context of a section 1129(a)(7) "best interests" argument, Wilmington Trust contends that trade claims and retiree claims, which are included within the class of Other Parent Claims, are not "Senior Indebtedness" as that term is defined in the PHONES Notes Indenture. Consequently, Wilmington Trust asserts that the PHONES Notes Claims should not be subordinated to this subset of Other Parent Claims, and that giving this subset of Other Parent Claims the same treatment afforded to creditors that are entitled to such subordination in the Debtor/Committee/Lender Plan results in holders of PHONES Notes Claims receiving less of a distribution than they would in a chapter 7 liquidation. See WTC Obj. at ¶ 11. Because Wilmington Trust has framed this as an 1129(a)(7) issue, the Debtor/Committee/Lender Plan Proponents have addressed it in Part IV.F of this Memorandum. For the reasons discussed herein, the WTC Objection should be overruled as it relates to ordinary course trade claims and retiree claims.

In addition to the fact that the inclusion of Tribune's ordinary course trade claims and retiree claims in the Other Parent Claims class has absolutely no 1129(a)(7) implications, the treatment afforded to the ordinary course trade claimants and retirees pursuant to the Debtor/Committee/Lender Plan is part of the Settlement consideration provided by the Senior Lenders and Bridge Lenders as part of the settlement of the Released LBO-Related Causes of Action. As a gating matter, the value of the trade claims are minimal at Tribune and pale in comparison to the value of Other Parent Claims as a whole. Moreover, the trade creditors are a necessary and integral part of the continued operation of the Debtors' businesses. With respect

to the retiree obligations, while more significant in overall value than that of the trade claims, the

Debtors and the Senior Lenders have a similar incentive to maintain good relations with former

Tribune employees. Most importantly, the Senior Lenders have determined that it is in their best

interests, as consideration for the settlement of LBO-Related Causes of Action, to provide for

the recovery of Tribune's trade claims and retiree claims as Other Parent Claims. Distribution to

trade claimants and retirees ahead of the PHONES Notes Claims and the EGI-TRB LLC Notes

Claims do not reflect inappropriate enforcement of subordination, but rather settlement

consideration from the Senior Lenders and Bridge Lenders.

Wilmington Trust additionally argues that the Debtor/Committee/Lender Plan improperly

subordinates the PHONES Notes to recoveries on Intercompany Clams. See WTC Obj. at ¶ 10.

This stems from a fundamental misunderstanding of the Debtor/Committee/Lender Plan. To be

clear, the PHONES Notes Claims are not subordinated to Intercompany Claims under the

Debtor/Committee/Lender Plan. Rather, Intercompany Claims against Tribune Company receive

the standard pro rata treatment afforded to all non-"Senior Indebtedness," unsecured claims

against Tribune, and such Intercompany Claims do not benefit from the "pay over" provisions

provided in section 14.02 of the PHONES Notes Indenture. In other words, Intercompany

Claims against Tribune Company receive exactly the same treatment as they would receive if

there were no subordination provision in the PHONES Notes Indenture.[122]

Wilmington Trust further asserts that the Debtor/Committee/Lender Plan improperly

enforces the contractual subordination of the PHONES Notes, claiming that the Court must find

---

[122] Amounts paid to Guarantor Debtors on account of their Intercompany Claims against Tribune Company are then redistributed to the Holders of Senior Guarantee Claims pursuant to the terms of the Senior Guaranty Agreement. This redistribution occurring at the Subsidiary Guarantors is required by the provisions of the Senior Guaranty Agreement and is completely unrelated to the subordination provisions of the PHONES Notes Indenture.

that the Senior Lenders acted in good faith before enforcing the plain terms of subordination provisions. WTC Obj. at ¶ 3. This argument fails for at least two reasons.

First, Sections 1.1.45 and 1.1.46 of the Debtor/Committee/Lender Plan provide that the distributions from the Trusts to the PHONES Notes will only be subordinated to Holders of Allowed Senior Noteholder Claims and "any other Allowed Claims that are entitled to share in the Parent GUC Trust Preference and are entitled to the benefit of the contractual subordination of the PHONES Notes." The definition of Parent GUC Trust Preference excludes the Senior Loan Claims and Bridge Loan Claims meaning that the PHONES Notes subordination provisions do not benefit the LBO Lenders. See Debtor/Committee/Lender Plan § 1.1.174

Second, the plain reading of the subordination provision in the PHONES Notes indenture is exactly the opposite of Wilmington Trust's characterization. The subordination provision starts by providing that no rights will be prejudiced. "No right of any present or future holder of any Senior Indebtedness [e.g., the Senior Lenders] to enforce subordination as herein provided shall at any time in any way be prejudiced or impaired." WTC Obj. at ¶ 3 (quoting section 14.09 of the PHONES Notes Indenture) (emphasis added). The provision then describes types of conduct that will not prejudice or impair the right to enforce subordination against the PHONES. Included in the litany of conduct that will not prejudice subordination rights is the "failure to act, in good faith." WTC Obj. at ¶ 3. Under Wilmington Trust's interpretation, holders of Senior Indebtedness must act in good faith to not prejudice or impair their right of subordination. That interpretation is backwards and directly conflicts with the opening clause of the paragraph. Accordingly, this objection fails.

EGI-TRB devotes five pages of its objection to the argument that the Debtor/Committee/Lender Plan violates the absolute priority requirements of section

1129(b)(2)(B)(ii) of the Bankruptcy Code because it does not explicitly provide that the

PHONES Notes Claims are subordinated in their entirety to the EGI-TRB LLC Notes Claims.

See EGI-TRB Objection at pp. 12-17.  This objection is baseless and need not be addressed at

length.  As cited by EGI-TRB, the Third Circuit provides that "[t]he absolute priority rule []

requires that senior classes receive full compensation for their claims before other classes can

participate.  EGI-TRB Objection at p. 12 (In re WebSci Techs., Inc., 234 Fed. Appx. 26, 30 (3d

Cir. 2007)).  To be clear, the Debtor/Committee/Lender Plan does not provide for any up-front

recovery or compensation to the Allowed PHONES Notes Claims or Allowed EGI-TRB LLC

Notes Claims.  Importantly, the Debtor/Committee/Lender Plan does not pass judgment on the

seniority of the PHONES Notes Claims and the EGI-TRB LLC Notes Claims vis-à-vis each

other—these issues are to be determined when distributions, if any, are finally made from the

Litigation Trust and the Creditors' Trust (if applicable) on account of such Allowed Claims.

Consequently, the Debtor/Committee/Lender Plan does not run afoul of the contractual

subordination provisions of the EGI-TRB LLC Notes or the PHONES Notes Indenture and does

not violate the absolute priority rule.

### 2.    The Debtor/Committee/Lender Plan Appropriately Treats the Claims of the Other Objectors

Furthermore, certain objecting parties have objected to the Debtor/Committee/Lender

Plan's treatment of their claims.  As set forth below, the Debtor/Committee/Lender Plan

appropriately treats these objectors' claims and these Objections should be overruled.

The Debtor/Committee/Lender Plans' Treatment of Allowed and Disputed Claims.  The

Debtor/Committee/Lender Plan Proponents have received an objection from the State of

California Franchise Tax Board ("CFTB") [Docket No. 7959] (the "CFTB Objection"), which,

among other things, objects that the exclusion of Claims designated as being contingent,

unliquidated, or disputed on the relevant Debtors' schedules of assets and liabilities from the definition of Allowed Claims conflicts with section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c). CFTB Obj. at ¶ 6. The Debtor/Committee/Lender Plan expressly includes Claims that are listed as contingent, unliquidated, or disputed on the Debtors' schedules in the definition of Disputed Claims. The definitions of Allowed and Disputed Claims in the Debtor/Committee/Lender Plan, respectively, are proper and entirely consistent with chapter 11 cases in this district. See, e.g., In re AbitibiBowater Inc., Case No. 09-11296 (KJC) (Bankr. D. Del. Nov. 23, 2010) (confirming plan with substantially identical definitions); In re Neenah Enters., Inc., 2010 Bankr. Lexis 3058 (MFW) (Bankr. D. Del. July 6, 2010) (same); In re Smurfit-Stone Container Corp., Case No. 09-10235 (BLS) (Bankr. D. Del. June 21, 2010) (same); In re Spansion, Inc., Case No. 09-10690 (KJC) (Bankr. D. Del. April 7, 2010) (same); In re Hilex Poly Co. LLC, Case No. 08-10890 (KJC) (Bankr. D. Del. June 26, 2008) (same).

The Debtor/Committee/Lender Plan's Treatment of the Claims of Kevin Millen. Kevin Millen's ("Mr. Millen") objection [Docket No. 7550] (the "Millen Objection") is substantially similar to the objection that Mr. Millen filed to the Debtor/Committee/Lender Specific Disclosure Statement [Docket No. 6455] and the April Plan [Docket No. 5065]. Although styled in its title as an objection to the Debtor/Committee/Lender Plan, the Millen Objection does not once mention the plan of reorganization or raise any objection thereto. Rather, the substance of the Millen Objection appears to relate to the four proofs of claim that were filed by Mr. Millen against the Debtors' estates asserting damages for alleged defamation (collectively, the "Millen Claims"). The Bankruptcy Court disallowed and expunged the Millen Claims by the Order Sustaining Debtors' Twenty-Eighth Omnibus Objection (Substantive) to Claims entered on June 14, 2010 [Docket No. 4775] (the "June 14 Order"). Mr. Millen did not appeal the June 14 Order,

and the time for appeal has expired. Any assertions raised by the Millen Objection with respect to the allowance of the Millen Claims are substantively and procedurally foreclosed by the Court's June 14 Order, for which Millen offers no factual or legal basis for reconsideration. Accordingly, the Debtor/Committee/Lender Plan Proponents request that the Bankruptcy Court overrule the Millen Objection.

The Debtor/Committee/Lender Plan's Treatment of GreatBanc's Securities Litigation Claims. In the event GreatBanc's Claims are classified as Securities Litigation Claims under the Debtor/Committee/Lender Plan, GreatBanc objects to the extinguishment of its claims and submits that such claims should instead be subordinated pursuant to section 510(b) of the Bankruptcy Code. See Debtor/Committee/Lender Plan § 3.2.11. Securities Litigation Claims are deeply out of the money due to their subordination pursuant to section 510(b) of the Bankruptcy Code and are therefore extinguished under the Debtor/Committee/Lender Plan. Holders of Securities Litigation Claims shall not receive or retain any property under the Debtor/Committee/Lender Plan on account of such Securities Litigation Claims under any recovery scenario. Accordingly, if GreatBanc's Claims are classified as Securities Litigation Claims, GreatBanc's request for subordination is moot because its Claims are already subordinated pursuant to section 510(b) of the Bankruptcy Code and the terms of the Debtor/Committee/Lender Plan.

The Debtor/Committee/Lender Plan's Treatment of General Unsecured Claims Under the Prepackaged Plans for the Guarantor Non-Debtors. GreatBanc contends that Holders of General Unsecured Claims under the Prepackaged Plans for the Guarantor Non-Debtors should be entitled to vote on such Prepackaged Plans as an "impaired" Class pursuant to Section 3.3 of the Debtor/Committee/Lender Plan. GreatBanc entirely misses the distinction between *classification*

and *treatment*. Although the Prepackaged Plan shares the classification nomenclature set forth in

Section 3.3 of the Plan, the Prepackaged Plan provides that these General Unsecured Claims

against Guarantor Non-Debtors are unimpaired. Thus, pursuant to the express treatment

provided under Section 3.4.2 of the Debtor/Committee/Lender Plan, a Holder of a General

Unsecured Claim against a Guarantor Non-Debtor would be left Unimpaired by the Prepackaged

Plan for such entity and would not have the right to vote any General Unsecured Claims.

Accordingly, GreatBanc's request to vote should be denied.[123]

### F.    The Debtor/Committee/Lender Plan Satisfies the Best Interests Test

Three parties objected to the Debtor/Committee/Lender Plan on the basis that the

Debtor/Committee/Lender Plan purportedly does not satisfy the best interests of creditors test

established pursuant to section 1129(a)(7) of the Bankruptcy Code. Two of these objections[124]

will be resolved by amendments to the Debtor/Committee/Lender Plan providing for the

payment of Post-petition interest to various creditor constituencies on account of their Litigation

Trust and Creditors' Trust Interests to the extent permitted under applicable law. See Part IV.K,

infra. The only remaining objection to the "best interests" test was filed by Wilmington Trust,

which is the PHONES Notes Indenture Trustee. As discussed below, Wilmington Trust's

objection is unfounded and should be overruled.

---

[123] GreatBanc's request to vote on the Prepackaged Plans is also untimely. The Solicitation Order provides that "[t]he Proponents are not required to transmit Solicitation Packages to Holders of Claims against and Interests in any Guarantor Non-Debtor or other Subsidiary Non-Debtor in connection with the Prepackaged Plans." Solicitation Order at ¶ 17. Further, the Solicitation Order set a deadline of January 8, 2011 for any Holder of a Claim wishing to have its Claim allowed for purposes of voting to accept or reject one or more the Plans to file a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes. Id. at ¶ 41. A hearing date of Jan. 20, 2011 was also set for such motions. Id. at ¶ 42. GreatBanc did not object or respond to the Solicitation Order or timely file a motion to temporarily allow its Claim for voting purposes as to the Prepackaged Plans and should therefore be precluded from asserting a right to vote at this late date.

[124] See Brigade Obj. at ¶¶ 32-33; Noteholder Obj. at ¶¶ 380-82.

The "best interests" test of Section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or interest either accept a plan of reorganization or receive or retain under such plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7); see also In re Genesis Health Ventures, Inc., 266 B.R. 591, 610 (Bankr. D. Del. 2010) (stating that the best interests tests "mandates that...[each dissenting creditor] receive...an amount not less than they would receive in a liquidation of the debtor under Chapter 7 occurring on the plan's effective date."); In re Am. Family Enters., 256 B.R. 377, 403 (D. N.J. 2000) (finding debtors' burden of proof under section 1129(a)(7) met where debtors showed that creditors would receive at least as much under the plan as they would receive in a liquidation of the debtors' assets under chapter 7).[125]

Based on the liquidation analysis annexed to the General Disclosure Statement as Exhibit D (the "DS Liquidation Analysis") and the Preliminary Report of Brian Whittman, a Managing Director of Alvarez & Marsal, dated February 8, 2011, Expert Report on the Liquidation Analysis (the "Whittman Report" and together with the DS Liquidation Analysis, the "Liquidation Analyses"), it is clear that the best interests test is satisfied as to each non-accepting creditor in each of the Impaired Classes under the Plan, including, without limitation, Class 1J (PHONES Notes Claims). As set forth in the Liquidation Analyses, a chapter 7 liquidation of the Debtors' estates would result in a substantial diminution in the value to be realized by Holders of Claims and Interests in each Class, when compared to the proposed distributions under the

---

[125] Under the Debtor/Committee/Lender Plan, Classes 1C, 1D, 1E, 1F, 1I, 1J, 1K through 111K, 1L through 111L, 1M through 111M, 50C through 111C, 50D through 111D, and 2E through 111E are Impaired; consequently, the best interests test is applicable to non-accepting Holders of Claims and Interests in such Classes. As demonstrated by the Liquidation Analyses, the Debtor/Committee/Lender Plan satisfies the bests interests test with respect to each of these Classes of Claims because, in all instances, Holders of such Claims are receiving at least as much under the Debtor/Committee/Lender Plan (and, in most cases, vastly more) than they would receive in a chapter 7 liquidation of the Debtors.

Debtor/Committee/Lender Plan. See Whittman Report at pg. 3 ("Comparing the estimated

recoveries under the [Debtor/Committee/Lender] Plan to the high end of the range of estimated

liquidation recoveries in the Liquidation Analysis, I conclude that, for each Class of Claims or

Interests under the Plan, liquidation under chapter 7 of the Bankruptcy Code would yield

recoveries that are no better than, and in many cases significantly worse than, the recoveries

available under the Plan.").

Despite the deeply subordinated position of the PHONES Notes, Wilmington Trust

appears to believe that the Debtor/Committee/Lender Plan misapplies the subordination

provisions in the PHONES Notes Indenture vis-à-vis the Holders of Other Parent Claims,

causing the PHONES Notes Claims to receive less under the Debtor/Committee/Lender Plan

than they would under a chapter 7 liquidation. WTC Obj. at ¶ 7. Wilmington Trust's belief is

unfounded – Holders of PHONES Notes Claims simply would not be economically better off in

a chapter 7 liquidation than they would under the Debtor/Committee/Lender Plan. In particular,

the PHONES Notes Indenture expressly provides that upon any distribution of assets of Tribune

in a bankruptcy proceeding, the holders of Senior Indebtedness are entitled to be paid in full

before holders of the PHONES Notes are entitled to receive any distribution, and further, that

any such distributions to PHONES Notes holders must be "paid over" to the person making such

distribution until Senior Indebtedness is paid in full. PHONES Notes Indenture at § 14.02. As

such, any value that would be distributed to Holders of PHONES Notes Claims would be

redistributed to Holders of the Senior Loan Claims, the Bridge Loan Claims, the Noteholder

Claims and the vast majority of other General Unsecured Claims of Tribune. See DS

Liquidation Analysis at p. 7. Consequently, Holders of PHONES Notes would not be "in the

money" and therefore would not be entitled to any distribution. For this reason, this "best interests" objection should be overruled.

**G.    The Debtor/Committee/Lender Plan Does Not Improperly Subordinate Securities Litigation Claims to Interests in the Filed Subsidiary Debtors**

In addition to the arguments addressed in PartIV.C.2 of this Memorandum, the DOL argues that the Debtor/Committee/Lender Plan impermissibly subordinates Securities Litigation Claims to Interests in Filed Subsidiary Debtors. DOL Obj. at pp. 34-36. While the Debtor/Committee/Lender Plan subordinates Securities Litigation Claims to other Claims against the Debtors, Securities Litigation Claims are not in fact subordinated to Interests in the Filed Subsidiary Debtors. Interests in the Filed Subsidiary Debtors are Reinstated for administrative convenience and in recognition of the significant value contribution by Tribune to creditors of the Filed Subsidiary Debtors. Indeed, the value provided to the Holders of Senior Guaranty Claims by Tribune is adequate consideration in exchange for the Tribune Entities' retention of its equity interest in the Filed Subsidiary Debtors and for these reasons, the DOL has failed to make any compelling argument in support of its objection and its objection should therefore be overruled.

The DOL's assumption that the Debtor/Committee/Lender Plan Proponents are relying upon section 1122(b) of the Bankruptcy Code for the treatment of Interests in Filed Subsidiary Debtors is wrong. See DOL Obj. at p. 35. The Debtor/Committee/Lender Plan's reference to "administrative convenience" as a basis for Reinstatement of Interests in Filed Subsidiary Debtors is not based upon section 1122(b) but upon the practice of maintaining the general structure of large, multi-tiered corporate families despite the corporate families' chapter 11 proceedings, which was endorsed in the Ion Media case.

More particularly, in Ion Media Networks, Inc. v. Cyrus Select Opportunities Master

Fund, Ltd. (In re Ion Media Networks, Inc.), 419 B.R. 585 (Bankr. S.D.N.Y. 2009), the United

States Bankruptcy Court for the Southern District of New York rejected the argument that

subsidiary equity could not be reinstate absent payment in full of creditors. Id. at 601. In

rejecting this argument, the court stated that the "technical preservation of equity [was] a means

to preserve the corporate structure" that was without economic significance. Id. Additionally,

the court determined that retention of intercompany interests "constitute[d] a device utilized to

allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of

having to reconstitute that structure" and was influenced by the fact that the interests were

retained with the support of the first lien lenders in recognition that such retention has a positive

effect on enterprise value, which is beneficial to the estate and creditors. Id.

    The DOL's dissatisfaction that equity interests in the Subsidiary Debtors are being

retained by Tribune, while its claims against the Subsidiary Debtors are extinguished, is similar

to the Ion Media objection that intercompany equity cannot be preserved without paying in full

the direct claims against the subsidiaries. The Court should overrule this portion of the DOL

Objection for the same reasons set forth by Judge Peck in Ion Media. The Debtors and their

creditors have a legitimate interest in the preservation of the Debtors' estates as a going concern.

Any costs incurred by the Debtors to reconstitute their corporate structure would not only be

unnecessary and burdensome, but could also diminish the value of the enterprise as a whole. This

would directly harm the claimants that will be receiving New Common Stock under the

Debtor/Committee/Lender Plan. Moreover, like in Ion Media, the Debtor/Committee/Lender

Plan is supported by the Holders of Senior Loan Guaranty Claims, in part because they have an

interest in maintaining the structure and value of the Debtors as a whole.

Consequently, the DOL's objections regarding the Debtor/Committee/Lender Plan's subordination of the Securities Litigation Claims to the Interests in Filed Subsidiary Debtors is without merit and should be overruled.

**H.      The Debtor/Committee/Lender Plan Does Not Unfairly Discriminate With Respect to the Senior Noteholders in Class 1E**

The Noteholder Plan Proponents have argued that the Debtor/Committee/Lender Plan unfairly discriminates against Non-LBO Creditors and thus violates section 1129(b)(1) of the Bankruptcy Code. The "unfair discrimination" standard set forth in section 1129(b)(1) does not prohibit all types of discrimination among holders of impaired, dissenting classes; it merely prohibits *unfair* discrimination. In re Armstrong World Indus., 348 B.R. at 121. This requirement focuses on the treatment of such dissenting class relative to other classes consisting of similar legal rights. See H.R. Rep. No. 95-595, at 416-17 (1977) ("The plan may be confirmed. . . if the class is not unfairly discriminated against with respect to equal classes"). The Bankruptcy Code does not provide a standard for when "unfair discrimination" exists. See In re 203 N. LaSalle St. Ltd. P'ship., 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), aff'd, 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds, 526 U.S. 434 (1999). Rather, courts typically examine the facts and circumstances of the case and determine whether unfair discrimination has occurred in each particular case. See, e.g., In re Freymiller Trucking, Inc., 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of circumstances"); see also In Re Leslie Fay Companies, Inc., 207 B.R. 764, 791 n.37 (Bankr. S.D.N.Y. 1997) (finding "[t]he section 1129(b)(1) test boils down to whether the proposed discrimination between classes has a reasonable basis and is necessary for the reorganization"); In re Int'l Wireless Commc'n Holdings, Inc., 1999 Bankr. LEXIS 1853, *35 (Bankr. D. Del. 1999). As such, a plan unfairly

discriminates under section 1129(b)(1) only if (i) classes comprising similarly situated claims or interests (ii) receive treatment under the plan that is not equivalent, and (iii) there is no reasonable basis for the disparate treatment.  See, e.g., 203 N. LaSalle St. Ltd. P'ship, 190 B.R. at 585-86 ("any discrimination must be supported by a legally accepted rationale"); In re Kennedy, 158 B.R. 589, 599 (Bankr. D. N.J. 1993).

Specifically, Noteholder Plan Proponents have argued that the Debtor/Committee/Lender Plan unfairly discriminates against the Senior Noteholders in Class 1E in favor of the Senior Lenders in Class 1C because these Classes are receiving different forms of consideration.  See Noteholder Obj. at ¶¶ 378-379.  The Debtor/Committee/Lender Disclosure Statement shows that any allegations of unfair discrimination are plainly false, as Senior Lenders in Class 1C will receive a recovery of approximately 1.09% on account of their Senior Loan Claims, while Senior Noteholders in Class 1E will receive a recovery of approximately 32.73% (which has been increased to 33.59% by virtue of the settlement with the Bridge Lenders) on account of their Senior Noteholder Claims.  Thus, there can be no legitimate argument that the Debtor/Committee/Lender Plan unfairly discriminates against Senior Noteholders in Class 1E.

**I.**    **The Debtor/Committee/Lender Plan Properly Provides for the Debtors' Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases**

The Debtor/Committee/Lender Plan provisions regarding the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases are permissible pursuant to sections 365, 1123(b)(2) and 1123(d) of the Bankruptcy Code and should be approved. Certain parties[126] that are counterparties to Executory Contracts with one or more of the Debtors

---

[126] The Debtor/Committee/Lender Plan Proponents received (i) the Limited Objection and Reservation of Rights of CCI Europe A/S (the "CCI Objection"); (ii) the Limited Objection and Reservation of Rights of Comcast Corporation and Comcast Cable (the "Comcast Objection"); (iii) the Limited Objection of Iron Mountain Information Management, Inc. (the "Iron Mountain Objection"); and (iv) the Opposition and Rights Reservation of

have objected to Section 6.2 of the Debtor/Committee/Lender Plan to the extent that the Debtors

propose to assume their executory contracts and unexpired leases without paying known cure

amounts, contrary to the requirements of sections 365, 1123(a) and (b), and 1129(a). As these

Contract Party Objections were filed, the Debtors had not yet filed a schedule setting forth the

proposed payments to contract counterparties that will be required to be made in order to cure

existing monetary defaults under the Debtors' executory contracts and unexpired leases, as

contemplated by Section 6.2 of the Debtor/Committee/Lender Plan. The Debtors will file, prior

to commencement of the Confirmation Hearing, a motion (the "Global Contract Motion") by

which the Debtor/Committee/Lender Plan proponents will attempt to address and resolve each of

the Contract Party Objections.

Specifically, the Global Contract Motion will establish procedures to (i) fix cure amounts

with respect to the assumption of certain executory contracts and unexpired leases that will be

deemed assumed pursuant to the Debtor/Committee/Lender Plan upon the Effective Date, and

(ii) provide notice of the proposed assumption of certain executory contracts and unexpired

leases by a successor to a Debtor, including by an affiliated Reorganized Debtor, and/or potential

assignment to a successor to a Debtor, including to an affiliated Reorganized Debtor, after giving

effect to the Restructuring Transactions that are contemplated to occur pursuant to the

Debtor/Committee/Lender Plan. Attached to the Global Contract Motion will be exhibits that set

---

Oracle America, Inc., successor in interest to Oracle USA, Inc., Oracle Corporation and Sun Microsystems (the "Oracle Objection" and together with the CCI Objection, the Comcast Objection, and the Iron Mountain Objection, the "Contract Party Objections"). In addition, the Greatbanc Objection (as defined herein) also notes that, while that certain Trustee Engagement Agreement dated as of February 26, 2007 (the "Trust Agreement") by and among Tribune and Greatbanc Trust Company ("Greatbanc") was included in the list of Rejected Executory Contracts filed by the Debtor/Committee/Lender Proponents on January 31, 2011 [Docket No. 7701], Greatbanc has not yet filed a proof of claim for any damages it may incur under the Trustee Agreement. The Debtor/Committee/Lender Proponents note for the record that, pursuant to Section 6.4 of the Debtor/Committee/Lender Plan, with respect to contracts included in the list of Rejected Executory Contracts, a Proof of Claim for executory contract rejection damages, if any, must be filed within 30 days after service of the notice of the Rejected Executory Contracts.

forth (i) certain executory contracts and unexpired leases with proposed cure amounts that exceed monetary thresholds determined by the Debtors to be material and (ii) certain of the Customer Program obligations proposed to be assumed that Obligations that the Debtors have determined should not be cured at zero dollars as provided for in Section 6.1.2 of the Debtor/Committee/Lender Plan. The Debtors will propose procedures in the Global Contract Motion for counterparties to the executory contracts and unexpired leases that are identified on such exhibits to object to the cure amounts proposed therein. Additionally, the Debtors have proposed procedures for fixing the cure amounts for those executory contracts and unexpired leases that are not identified on such exhibits by reference to the Debtors' ongoing claims resolution process. The Debtor/Committee/Lender Plan Proponents respectfully submit that the Global Contract Motion will adequately provide for the curing of all defaults under the Debtors' executory contracts and unexpired leases and the resolution of any disputes in connection therewith. Accordingly, the Debtor/Committee/Lender Plan Proponents ask the Bankruptcy Court to overrule the Contract Party Objections, without prejudice to the rights of the Contract Party Objectors to object to the Global Contract Motion.

### J.    All Other Unresolved Objections Should be Overruled[127]

#### 1.    Neil Plaintiffs' Objection

The plaintiffs in the action Neil v. Zell et al., Case No. 08-6833 (N.D. Ill.) (the "Neil Plaintiffs") have objected to Section 6.8 of the Debtor/Committee/Lender Plan, which permits

---

[127]In addition, on February 11, 2011, JoAnn McCormick sent an email to approximately 140 entities, including several local, state and federal agencies and officials, courts, law firms, and the Debtors' personnel, entitled "Dismissal of the Tribune Company Bankruptcy." Ms. McCormick did not address this email to counsel for the Debtor/Committee/Lender Plan Proponents, nor does it appear that a copy was filed with the Court. Ms. McCormick did not object to any provision in the Debtor/Committee/Lender Plan, but rather asserted that the Chapter 11 Cases should be dismissed on the grounds that she is the true owner of Tribune. To the extent that the McCormick email could be considered an informal plan objection, it should be overruled as frivolous and entirely without merit. On February 15, 2011, John H. Aspelin filed a letter with the Court [Docket No. 8015] to state his belief that the Noteholder Plan is in the best interests of small bondholders. Mr. Aspelin did not object to any specific provision of the Debtor/Committee/Lender Plan. Accordingly, to the extent the Court could consider the Aspelin letter as a plan objection, the Debtor/Committee/Lender Plan Proponents request that it be overruled.

the Debtors to seek from this Court "a determination of … the legal effect of the forgiveness of the ESOP note." Neil Plaintiffs' Obj. at p. 5. The Neil Plaintiffs argue that this provision is "unnecessary and improper." Id. The Neil Plaintiffs' objection is based on their contention that "there is no reason for this Court to decide the ESOP's losses in allocating the bankruptcy estate's assets among competing claimants." Id. at 6.

The Neil Plaintiffs ignore, however, the fact that the DOL has filed claims against Tribune and seventy of its subsidiaries for potential violations of ERISA in connection with the Leveraged ESOP Transaction. According to the DOL's descriptions of its claims, the DOL contends that the ESOP is entitled to the full $250 million amount of the ESOP Note in damages as a result of alleged breaches of fiduciary duties by Tribune. See DOL Obj. at pp. 14-15. It is therefore both necessary and proper that the Debtor/Committee/Lender Plan Proponents be able to request that this Court determine the legal effect of the Debtors' decision to forgive the ESOP Note.

The Neil Plaintiffs contend that the Bankruptcy Court should not address this issue because the Neil court "is poised to rule on GreatBanc's Motion for Partial Summary Judgment as to Damages, which raises this same issue." Neil Plaintiffs' Obj. at 6. But as the Neil Plaintiffs also point out, Tribune is not a party to the Neil litigation and the Neil court has already explicitly stated that its rulings "will not bind Tribune in a later case about liability under ERISA or the Tax Code." Id. Thus, the fact that the Neil court may soon rule on issues similar to those raised in Section 6.8 of the Plan is irrelevant. The Neil court's ruling will not represent a binding determination for the Debtors of the legal effect of the forgiveness of the ESOP Note, which is what the DOL objection and claims may compel the Debtors to seek from the Bankruptcy Court. Likewise, in seeking these determinations, the Debtor/Committee/Lender

186

Plan Proponents are not purporting to ask the Bankruptcy Court to make any legal rulings

regarding Great Bank' liability to the ESOP to make good any losses to the ESOP arising from

GreatBanc's alleged violations of ERISA or claims asserted against GreatBanc in the lawsuit

Neil v. Zell. The Neil Plaintiffs and the Debtors are currently in discussions to resolve the Neil

Plaintiffs' Objection.

### 2.    Limited Objection of Warren Beatty

Warren Beatty ("Mr. Beatty") in his Limited Objection (the "Beatty Objection")

requested that the Debtor/Committee/Lender Plan Proponents add language to the Confirmation

Order concerning the effect of the Debtor/Committee/Lender Plan on Mr. Beatty's alleged

interest in the Dick Tracy Rights and the California Action (both as defined in the Beatty

Objection). The Debtor/Committee/Lender Plan, however, does not affect whatever rights Mr.

Beatty may have in or to the Dick Tracy Rights or to modify the Stay Order (as defined in the

Beatty Objection), and Mr. Beatty's requested language is unwarranted.

### 3.    Caption Colorado, LLC

Caption Colorado, LLC ("Caption Colorado") has objected to the extent that the

Debtor/Committee/Lender Plan's calculations of administrative expense claims do not take into

account the value of Caption Colorado's administrative expense claim. Based on ongoing

discussions between the Debtors and Caption Colorado, the Debtor/Committee/Lender Plan

Proponents anticipate that Caption Colorado's objection will be withdrawn prior to the start of

the Confirmation Hearing. Out of an abundance of caution, however, the

Debtor/Committee/Lender Plan Proponents reserve all of their rights and remedies with respect

to Caption Colorado's objection, including without limitation, in respect of the calculation of

administrative expense claims under the Debtor/Committee/Lender Plan.

**K.    The Debtor/Committee/Lender Plan Proponents Submit that Certain Objections Are or Should Be Resolved Through Modifications to the Debtor/Committee/Lender Plan or Proposed Language in the Confirmation Order.**

**1.    Discharge and Injunction Provisions**

The Debtor/Committee/Lender Plan Proponents have received six objections[128] to the discharge and injunction provisions contained in Section 11.1 of the Debtor/Committee/Lender Plan. These objections seek clarification that the discharge and injunction provisions do not foreclose the parties from asserting valid setoff or other similar defenses against the Debtors. Although the Debtor/Committee/Lender Plan Proponents feel that the terms of the Debtor/Committee/Lender Plan are sufficiently clear in this regard,[129] they are prepared to amend Section 11.1.2 of the Debtor/Committee/Lender Plan as follows:

11.1.2    Discharge Injunction.  Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of this Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or

---

[128] (i) GreatBanc (ii) New York State Department of Taxation and Finance, (iii) Commonwealth of Pennsylvania, Department of Revenue, (iv) CFTB, (v) State of Illinois, Departments of Revenue and Employment Security and (vi) the Internal Revenue Service.

[129] Pursuant to the Debtor/Committee/Lender Plan, Secured Claims include setoff rights under section 553 of the Bankruptcy Code to the extent of such setoff, and such setoff rights are classified as Other Secured Claims. See Debtor/Committee/Lender Plan §§ 1.1.171; 1.1.206. Other Secured Claims against Tribune, Filed Subsidiary Debtors, and any Guarantor Non-Debtors that become Debtors, are treated as Unimpaired under the Debtor/Committee/Lender Plan. See Debtor/Committee/Lender Plan §§ 3.2.2(b); 3.3.2(b); 3.4.2.

In addition, with respect to GreatBanc specifically, its setoff and recoupment rights relating to indemnification and/or contribution claims against the Debtors are expressly preserved under Section 7.11.2 of the Debtor/Committee/Lender Plan, which provides that setoff rights shall be preserved for "indemnification, reimbursement, or contribution arising from or relating to the assertion of any claim or cause of action by the Litigation Trust, the Creditors' Trust, the Litigation Trustee or the Creditor's Trustee," subject to the right of the Litigation Trust and the Creditors' Trust to object to the allowance of such claim or to assert any defenses or counterclaims of the Debtors.

their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any form, that does not comply with or is inconsistent with the provisions of this Plan, *provided that this injunction shall have no effect on any right of setoff or recoupment to the extent provided under section 553 of the Bankruptcy Code*.

###      2.      Treatment of Administrative Expense Claims and Priority Tax Claims

####           a.      Administrative Expense Claims Asserted by Taxing Authorities

The Debtor/Committee/Lender Plan Proponents have received two (2) objection to the proposed treatment of Allowed Administrative Expense Claims from the CFTB and the United States, on behalf of the Internal Revenue Service (the "IRS"), [Docket No. 8001] (the "IRS Objection"). The CFTB Objection raises three issues. First, CFTB seeks clarification that governmental units shall not be required to file a request for payment of administrative expense claims as a condition of such claims becoming Allowed Administrative Expense Claims. This objection is without basis, as the plain language in section 503(b)(1)(D) of the Bankruptcy Code sets forth the conditions under which governmental units need to file a request for payment of administrative expense claims. The Debtor/Committee/Lender Plan does not intend to abrogate this Bankruptcy Code provision.

Second, both CFTB and the IRS object to Sections 2.2 and/or 7.4 of the Debtor/Committee/Lender Plan to the extent that such sections preclude the payment of interest to governmental units as required under sections 503(b)(1)(B) and 503(b)(1)(C) of the Bankruptcy Code. Section 7.4 of the Debtor/Committee/Lender Plan properly provides that Holders of Claims shall not be entitled to be paid interest accruing after the Petition Date on any Claim except *as required by applicable bankruptcy law*. Debtor/Committee/Lender Plan § 7.4 (emphasis added). Thus, the rights of governmental entities such as CFTB and the IRS to seek

the allowance of interest accruing on their Allowed Administrative Expense Claims are not

impaired by the Debtor/Committee/Lender Plan, and no amendment to the

Debtor/Committee/Lender Plan or clarifying language in the Confirmation Order should be

necessary.  However, to resolve the CFTB Objection and the IRS Objection on this issue, the

Debtor/Committee/Lender Plan Proponents will include the following language proposed by

CFTB in the proposed Confirmation Order:

> Notwithstanding anything to the contrary in the Plan or in the
> Confirmation Order, an Administrative Expense Claim that is an expense
> under sections 503(b)(1)(B) and/or 503(b)(1)(C) of the Bankruptcy Code,
> including interest due thereon under applicable non-bankruptcy law, shall
> be timely paid in the ordinary course of business without the need of any
> governmental unit to file a request for payment of such Administrative
> Expense Claim or any other document, including a Proof of Claim.

The Debtor/Committee/Lender Plan Proponents believe that this language resolves CFTB's and

IRS's objections on this issue.

Third, CFTB seeks clarification as to the treatment of its claims that relate to tax periods

that commenced prior to the Petition Date but did not end until after the Petition Date.  The

Debtor/Committee/Lender Plan Proponents propose to resolve this issue by striking "or portions

thereof," from Section 1.1.1 of the Debtor/Committee/Lender Plan, which contains the definition

of Administrative Expense Claims.  This change will clarify that claims that are subject to

section 507(a)(8) of the Bankruptcy Code, which provides priority for prepetition claims for

taxable years ending on or before the petition date, are not Administrative Expense Claims.  This

change will also clarify that claims related to taxable years ending after the Petition Date are

properly classified as Administrative Expense Claims.  Accordingly, the

Debtor/Committee/Lender Plan Proponents believe this issue is resolved.

b.    Priority Tax Claims

With respect to the proposed treatment of Priority Tax Claims under Section 2.3 of the Debtor/Committee/Lender Plan, objections have been raised by CFTB, the IRS and Cook County Department of Revenue ("Cook County") [Docket No. 7970]. CFTB and the IRS object to the extent the such treatment does not comply with section 1129(a)(9)(C) of the Bankruptcy Code. Section 2.3 of the Debtor/Committee/Lender Plan provides that, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors shall receive either, at the sole option of the Reorganized Debtors, (a) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, (b) except as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending no later than the fifth anniversary of the Petition Date, together with interest compounded annually from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, which installment payments shall commence after such Priority Tax Claim becomes an Allowed Claim, or (c) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Debtors.

With respect to the first treatment option in Section 2.3, CFTB objects that to the extent a Priority Tax Claim is not Allowed as of the Effective Date, the Holder of such Priority Tax Claim is entitled to receive interest from the Effective Date through the date such Priority Tax Claim is ultimately Allowed and paid, at the rate prescribed by section 511 of the Bankruptcy Code. In response to the CFTB Objection, the Debtor/Committee/Lender Plan Proponents will adopt the amendment proposed by CFTB to Section 2.3 of the Debtor/Committee/Lender Plan proposed by CFTB, so that the sub-part reads as follows:

191

(a) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, or as soon as practicable thereafter, together with interest from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code

The Debtor/Committee/Lender Plan believe this amendment will resolve the CFTB Objection with respect to this point.

Both CFTB and IRS have objected to the second treatment option in Section 2.3, in two respects: (i) the Debtor/Committee/Lender Plan should be amended to specify the frequency of the deferred installment payments proposed to be made on account of Allowed Priority Tax Claims and (ii) interest payable on account of Allowed Priority Tax Claims should be determined as prescribed by section 511 of the Bankruptcy Code. The first prong of this objection does not go to the confirmability of the Debtor/Committee/Lender Plan, as the Debtors' ability to make "regular installment payments" is expressly provided for in section 1129(a)(9)(C) of the Bankruptcy Code. Nonetheless, the Debtor/Committee/Lender Plan Proponents will include clarifying language in the proposed Confirmation Order to provide that the Debtors shall be authorized to satisfy the Allowed Priority Tax Claims of CTFB in equal quarterly installments in Cash and that the Debtors shall be authorized to satisfy the Allowed Priority Tax Claims of the IRS in equal quarterly installments in Cash. The second prong is directed to the language in sub-part (b) of Section 2.3 providing that interest on deferred installment payments will be compounded annually. Section 511 of the Bankruptcy Code provides that with respect to the payment of interest on a tax claim or on an administrative expense tax, "the rate of interest shall be the rate determined under applicable non-bankruptcy law." U.S.C. § 511. As CTFB and the IRS point out, applicable non-bankruptcy law may require that interest compound daily. To resolve this objection, the Debtor/Committee/Lender Plan Proponents will amend sub-part (b) of Section 2.3, so that the sub-part reads as follows:

> (b) except as otherwise determined by the Bankruptcy Court at the
> Confirmation Hearing, regular installment payments in Cash equal
> to the Allowed amount of such Claim over a period ending not
> later than the fifth anniversary of the Petition Date, together with
> interest from the Effective Date on any outstanding balance
> calculated at a rate determined under section 511 of the
> Bankruptcy Code, which installment payments shall commence
> after such Priority Tax Claim becomes an Allowed Claim

The Debtor/Committee/Lender Plan Proponents believe that these modifications resolve the

CFTB Objection and IRS Objection with respect to these matters.

The limited objection raised by Cook County (the "Cook County Objection") does not

actually raise an objection to confirmation of the Debtor/Committee/Lender Plan, but instead

seeks comfort that their claim will be Allowed Priority Tax Claim. As noted by Cook County,

Cook County filed their proof of claim after the bar date (Cook County Obj. at ¶1) and the

Debtors dispute the nature and the amount of the tax liability asserted by Cook County (Cook

County Obj. at ¶2). The extent to which Cook County has an Allowed Claim and the extent to

which Cook County's claim qualifies as a Priority Tax Claim has, therefore, not yet been

determined and will be subject to the ordinary claims administration process. Cook County

admits that the Debtor/Committee/Lender Plan's treatment of Allowed Tax Priority Claims is

consistent with the Bankruptcy Code, and that the definition of "Allowed" is not limited to

include only timely-filed claims. See Cook County Obj. at ¶3. As such, Cook County's rights

are properly protected in the event, and to the extent, the Bankruptcy Court determines it has an

Allowed Claim. The Cook County Objection should be overruled.

        c.       The Commonwealth of Pennsylvania, Department of Revenue
                ("PA DOR")

The PA DOR has objected on the grounds that the Debtor/Committee/Lender Plan fails to

provide that tax debts are not discharged until paid in full in accordance with Section

1129(b)(2)(A)(i)(I). The Debtor/Committee/Lender Plan Proponents stand behind the terms of

the Debtor/Committee/Lender Plan and are in the process of working with the PA DOR to

ascertain the basis of their objection and take appropriate steps for the resolution thereof.

### 3.    U.S. Trustee's Objection

In addition to the objections noted above, the U.S. Trustee also objected to Section 9.1 of

the Debtor/Committee/Lender Plan relating to the payment of certain fee and expense claims and

Section 15.7 of the Debtor/Committee/Lender Plan relating to the payment of statutory fees.  The

Debtor/Committee/Lender Plan Proponents have proposed modifications to these sections to the

U.S. Trustee, and have been advised that the proposed modifications will resolve the U.S.

Trustee's objections.

> a.    The Debtor/Committee/Lender Plan's Provisions Concerning
> Payments Made by the Debtors for Services or Costs and Expenses
> Comply With 11 U.S.C. § 1129(a)(4)

Section 9.1 of the Debtor/Committee/Lender Plan provides for the payment of Senior

Lender Fee/Expense Claims, certain Bridge Lender Fee/Expense Claims, and certain Creditors'

Committee Member Fee/Expense Claims.  The U.S. Trustee objected to Section 9.1 in the

Debtor/Committee/Lender Plan on the basis that it did not include a provision for the U.S.

Trustee or the Bankruptcy Court to test the reasonableness of the fees and expenses in question.

To resolve the U.S. Trustee's objection, the Debtor/Committee/Lender Plan Proponents will

amend Section 9.1 of the Debtor/Committee/Lender Plan to provide in each case that the

payments to be made on account of these claims are subject to challenge on the basis of

reasonableness and to review by the Bankruptcy Court for reasonableness.  Accordingly, the

Debtor/Committee/Lender Plan Proponents have reached an agreement with the U.S. Trustee on

this issue.

b.    All Statutory Fees Have or Will Be Paid – 11 U.S.C. § 1129(a)(12)

In accordance with section 1129(a)(12) of the Bankruptcy Code, Section 15.7 of the

Debtor/Committee/Lender Plan provides for the payment, on the Effective Date, of any fees, as

determined by the Bankruptcy Court at the Confirmation Hearing, due pursuant to section 1930

of title 28 of the United States Code.  Therefore, the Debtor/Committee/Lender Plan meets the

requirements of Bankruptcy Code section 1129(a)(12).  The U.S. Trustee, while acknowledging

that the Debtor/Committee/Lender Plan properly provides that all statutory fees will be paid in

accordance with section 1129(a)(12) of the Bankruptcy Code, has suggested that this provision

of the Debtor/Committee/Lender Plan is insufficient as it does not make reference to filing post-

confirmation reports or payment of quarterly fees.  To resolve this objection, the

Debtor/Committee/Lender Plan Proponents are willing to provide in the proposed Confirmation

Order that the Debtors and Reorganized Debtors will comply with their statutory obligations

under 28 U.S.C. § 1930 and file post-confirmation reports to the extent required by law and, to

the extent applicable, in accordance with any agreements reached between the Debtors and the

United States Trustee during the chapter 11 cases with respect to such matters.

4.    **Ad Hoc Committee of Tribune Subsidiary Trade Creditors' Objection**

The Ad Hoc Committee of Tribune Subsidiary Trade Creditors filed an objection

alleging, among other things, that the Debtor/Committee/Lender/Plan violates the absolute

priority rule requirements of section 1129(b)(2)(B) and good faith requirement of section

1129(a)(3) by placing an aggregate $150 million cap on the payment of Allowed General

Unsecured Claims against the Filed Subsidiary Debtors (the "Ad Hoc Trade Objection").  Ad

Hoc Trade Objection ¶¶ 7, 10.  The Debtor/Committee/Lender Plan Proponents believe that the

Ad Hoc Trade Objection will be resolved through plan amendments that will (i) modify section

3.3.5 of the Debtor/Committee/Lender Plan to remove the aggregate $150 million cap on the

195

payment of Allowed General Unsecured Claims against all Filed Subsidiary Debtors and (ii)

modify Section 10.1 of the Debtor/Committee/Lender Plan to provide that, as a condition

precedent to the Effective Date, the Creditor Proponents shall have determined, in their

reasonable good faith judgment, that the aggregate amount of Allowed General Unsecured

Claims against all Filed Subsidiary Debtors shall not exceed $150 million.  The

Debtor/Committee/Lender Plan Proponents reserve all rights with respect to the Ad Hoc Trade

Objection in the event the aforementioned plan amendments do not resolve the Ad Hoc Trade

Objection.

### 5.    ACE Companies' Objection

In the ACE Objection, ACE American Insurance Company and certain of its affiliates

(collectively, the "ACE Companies") seek certain modifications to Section 6.9 of the

Debtor/Committee/Lender Plan, which concerns the treatment of the Debtors' insurance policies

and agreements under the Debtor/Committee/Lender Plan.  The Debtors and the ACE

Companies have agreed upon the following revisions to Section 6.9 of the

Debtor/Committee/Lender Plan that will resolve the ACE Objection:[130]

> Notwithstanding anything to the contrary in the Disclosure Statements, Plan, any
> other Plan document, the Confirmation Order or any other order of the
> Bankruptcy Court (including, without limitation, any other provision that purports
> to be preemptory or supervening or grants an injunction or release) (collectively,
> the "Plan-Related Documents"), the insurance policies (including, without
> limitation, any policies covering directors' or officers' conduct) issued to, or
> insurance agreements entered into by, any one or more of the Debtors prior to the
> Petition Date (the "Insurance Policies and Agreements") shall continue in effect
> after the Effective Date pursuant to their respective terms and conditions, and
> nothing in the Plan Documents shall relieve any of the Reorganized Debtors from
> performing any of the Debtors' obligations under the Insurance Policies and
> Agreements (including, without limitation, the provision or maintenance of any
> collateral and security required by the Insurance Policies and Agreements), nor
> shall anything in the Plan Documents relieve any insurer from performing its

---

[130] The Debtor/Committee/Lender Plan Proponents believe the plan amendments set forth above will also address
informal concerns raised by Zurich America Insurance Company.

obligations under the Insurance Policies and Agreements, in each case regardless of whether such obligations arise prior to or after the Effective Date. To the extent that any Insurance Policies or Agreements are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume or ratify such Insurance Policies and Agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such Insurance Policy or Agreement assumed by the Debtors. To the extent that the Bankruptcy Court determines that a cure payment is required as to any such Insurance Policy or Agreement, the Proponents reserve the right to seek the rejection of such Insurance Policy or Agreement or other available relief.

      6.      **Objection of the United States on Behalf of the U.S. Environmental Protection Agency (the "<u>EPA Objection</u>")**

The United States on Behalf of the United States Environmental Protection Agency (the "<u>EPA</u>") and the Debtor/Committee/Lender Plan Proponents have agreed to insert the following language into the proposed Confirmation Order in order to resolve the EPA Objection:

As to the United States, its agencies, departments or agents (collectively, the <u>United States</u>), nothing in this Confirmation Order or the Plan discharges, releases or precludes: (i) any environmental liability to the United States that is not a Claim; (ii) any environmental Claim of the United States arising on or after the Confirmation Date; (iii) any environmental liability to the United States on the part of any entity as the owner or operator of real property owned or operated after the Confirmation Date (provided, however, that nothing in this clause (iii) shall be construed to deny a discharge, release or preclusion of any Claim with respect to such real property for: (a) response costs, oversight costs or other monetary costs incurred prior to the Confirmation Date or (b) penalties for all days of alleged violation of law prior to the Confirmation Date; or (iv) any environmental liability to the United States on the part of any Person other than the Debtor or Reorganized Debtors. Nor shall anything in this Order or the Plan enjoin or otherwise bar the United States from asserting or enforcing, outside this Court, any liability described in this paragraph.

Notwithstanding any other provision in this Order or the Plan, the Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by the United States are discharged or otherwise barred by this Order, the Plan or the Bankruptcy Code.

197

### 7.    Illinois Secretary of State

The Illinois Secretary of State (the "SOS") has objected to Section 15.6 of the

Debtor/Committee/Lender Plan, which provides for the reduction of the Paid-in-Capital of each

corporate Reorganized Debtor, as expressly provided by Section 9.20(a)(2) of the Business

Corporation Act of 1983, as amended, 805 ILCS 5/1.01, *et. seq.*  In order to address the SOS's

objection, the Debtor/Committee/Lender Plan Proponents are prepared to amend the

Debtor/Committee/Lender Plan as follows, in addition to other clarifying changes:

> On the Effective Date, after taking into account all other transactions necessary to effect
> this Plan have been consummated of the transactions contemplated by this Plan
> (including, but not limited to, the cancellation of indebtedness pursuant to Section 5.8 of
> this Plan), the Paid-in Capital, as such term is defined in section 1.80(j) of the Illinois
> Business Corporation Act of 1983, as amended, 805 ILCS 5/1.01, *et seq.* (the "BCA"),
> of each corporate Reorganized Debtor shall, pursuant to Section 9.20(a)(2) of the BCA,
> be reduced to the following amounts (such reduced amounts to be referred to individually
> and collectively as the "Article XIII Paid-in Capital Amount" and "Article XIII Paid-in
> Capital Amounts," respectively): (i) in the case of Reorganized Tribune, its Paid-in
> Capital shall be reduced to the aggregate par value, if any, of Reorganized Tribune's
> issued and outstanding shares of capital stock plus such amountamounts as isare recorded
> on Reorganized Tribune's financial statements as paid in capital orand additional paid in
> capital under its fresh start accounting in accordance with Generally Accepted
> Accounting Principles, and (ii) in the case of each other corporate Reorganized Debtor,
> its Paid-in Capital shall be reduced to the aggregate par value, if any, of each such other
> Reorganized Debtor's issued and outstanding shares of capital stock plus such
> amountamounts as isare recorded on each such other Reorganized Debtor's financial
> statements as paid in capital orand additional paid in capital under its fresh start
> accounting in accordance with Generally Accepted Accounting Principles. The amount
> required to reduce the Paid-in Capital of each corporate Reorganized Debtor to its Article
> XIII Paid-in Capital Amount shall be treated as a reduction in Paid-in Capital under
> Section 9.20(a)(2) of the BCA. Any capital of each corporate Reorganized Debtor
> remaining in excess of its Article XIII Paid-in Capital Amount shall not be treated as
> Paid-in Capital for purposes of the BCA. Notwithstanding anything to the contrary, this
> Section 15.6 shall only apply to capital stock of Reorganized Tribune and each corporate
> Reorganized Debtor that is contemplated to be issued pursuant to this Plan.
>
> In any document required to be filed with the Illinois Secretary of State's office on or
> after the Effective Date and on or before the date the Article XIII Paid-in Capital
> Amounts are finally recorded on each corporate Reorganized Debtor's financial
> statements in accordance with the preceding paragraph, such full reduction shall be made
> by good faith estimates of the Article XIII Paid-in Capital Amounts, as of the close of
> business on the Effective Date, after taking into account all of the transactions

contemplated by this Plan (including but not limited to, the cancellation of indebtedness pursuant to Section 5.8 of this Plan). If such good faith estimates differ from the Article XIII Paid-in Capital Amounts as finally recorded on any Reorganized Debtor's financial statements (determined in accordance with the immediately preceding paragraph), a statement of correction will be filed on Form BCA 1.15 to revise such good faith estimate, together with supporting documentation, which shall consist of a copy of the Reorganized Debtor's fresh start accounting certified financial statements. The Reorganized Debtors shall not be required to file Form BCA 1.35, unless the Reorganized Debtors allege a change in apportionment in Form BCA 1.15. Such revisions shall occur without interest or penalties, provided that Form BCA 1.15 is filed no later than 30 days after the date on which the Reorganized Debtor's fresh start accounting financial statements, as of the Effective Date, are certified and made available to the Reorganized Debtors.

For purposes of this Section 15.6, the term "corporate" refers to a corporation as defined in Sections 1.80(a) or (b) of the BCA.

The SOS raised three objections to Section 15.6 of the Debtor/Committee/Lender Plan. The SOS's first objection noted that Section 15.6 arguably creates an ambiguity as to the timing of the reduction of paid-in capital. Accordingly, the Debtor/Committee/Lender Plan Proponents propose to amend Section 15.6 to clarify that the reduction of paid-in capital will occur "[o]n the Effective Date, after taking into account all of the transactions contemplated by this Plan (including, but not limited to, the cancellation of indebtedness pursuant to Section 5.8 of this Plan)." The Debtor/Committee/Lender Plan Proponents desire to satisfy the SOS's objection in this manner to clarify that the cancellation of indebtedness pursuant to Section 5.8 will not increase the paid-in capital amounts following the reduction of such amounts pursuant to Section 15.6.

The SOS's second objection noted that Section 15.6 improperly limits the capital stock to be included in the calculation of paid-in capital to issued and outstanding shares of capital stock. To address this objection, the Debtor/Committee/Lender Plan Proponents propose to delete the limitation to "outstanding" shares in Section 15.6, as requested by the SOS.

The SOS's third objection was that the reduction contemplated by Section 15.6 should only affect transactions contemplated by a confirmed plan of reorganization. Accordingly, the Debtor/Committee/Lender Plan Proponents propose to include language, per the request of the SOS, to clarify that Section 15.6 will "only apply to capital stock of Reorganized Tribune and each corporate Reorganized Debtor that is contemplated to be issued pursuant to the Plan."

In addition, language has been added to clarify certain procedural ambiguities of the paid-in capital reduction. Specifically, the Debtor/Committee/Lender Plan Proponents wanted to clarify the filing procedures in the event franchise tax filings need to be made with the SOS at any time following the Effective Date but before the date that the reduced paid-in capital amounts are finally recorded on the Reorganized Debtor's fresh start accounting financial statements, which are effective as of the Effective Date. The language proposed by the Debtor/Committee/Lender Plan Proponents clarifies that any such filings will be completed with a good faith estimate of the reduced paid-in capital amount, subject to revision to properly reflect the reduced paid-in capital amount that is finally recorded on the Reorganized Debtor's fresh start accounting financial statements.

### 8.    The California Franchise Tax Board

The CFTB Objection also argues that the Debtor/Committee/Lender Plan wrongfully provides for categorical disallowance or subordination of claims for penalties related to taxes. In order to address this objection, the Debtor/Committee/Lender Plan Proponents are prepared to amend Section 11.4 of the Debtor/Committee/Lender Plan as follows:

> The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive

200

damages or any other damages not constituting compensatory damages, *to the extent permissible under the Bankruptcy Code and applicable non-bankruptcy law*.

### 9.    Miscellaneous Tax Authority Objections

Each of the New York State Department of Taxation and Finance, CFTB and Missouri Department of Revenue have objected on the grounds that the Debtor/Committee/Lender Plan fails to include a default provision.  In response to this objection, the Debtor/Committee/Lender Plan Proponents propose that the Confirmation Order in support of the Debtor/Committee/Lender Plan contain the following:

> If the Debtors fail to cure a default with respect to a tax payment owed to a Taxing Authority that is not the subject of a bona fide dispute within 90 days after service of a written notice of such default from Taxing Authority, then such Taxing Authority may (a) enforce the entire amount of its undisputed claim, (b) exercise any and all rights and remedies under applicable non-bankruptcy law, and (c) seek such relief as may be appropriate in this Court.

### 10.    Internal Revenue Service

The IRS has objected on the grounds that the Debtor/Committee/Lender Plan preemptively bars the IRS from asserting valid claims against third parties, and from assessing and collecting prepetition taxes that did not become assessable until after the Petition Date.  The IRS has requested that the following language, as modified to fit the Debtor/Committee/Lender Plan, be added to the Debtor/Committee/Lender Confirmation Order clarifying its rights and remedies in connection with its ability to assert and collect various taxes.  In response to this request, the Debtor/Committee/Lender Plan Proponents propose that the Confirmation Order in support of the Debtor/Committee/Lender Plan contain the following:

> Notwithstanding any provision to the contrary, nothing in the Debtor/Committee/Lender Plan or this Confirmation Order shall affect the rights of the United States, including the Internal Revenue Service (IRS) (1) from seeking, pursuant to applicable nonbankruptcy law, to assess or collect from any non-debtor person or entity that may be liable directly or indirectly for the Debtors' taxes, including but not limited to liability under 26 U.S.C. §§ 4975 &

6672, or (2) from assessing or collecting from the debtor any taxes that the Bankruptcy Code renders nondischargeable.

The IRS has also objected to the Debtor/Committee/Lender Plan to the extent that Sections 13.2.2 and 14.3.2 and Article XII of the Debtor/Committee/Lender Plan attempt to confer jurisdiction on the Bankruptcy Court to determine the tax consequences of the proposed or confirmed plan or the tax liability of a non-debtor. The Debtor/Committee/Lender Plan Proponents stand behind the terms of the Debtor/Committee/Lender Plan and are in the process of working with the IRS to ascertain the basis of this objection and take appropriate steps for the resolution thereof.

### 11.   Objection of Brigade and the Noteholder Plan Proponents to the Failure to Pay Post-Petition Interest

Brigade and the Noteholder Plan Proponents, in their respective objections, have stated that the Debtor/Committee/Lender Plan fails the best interest test set forth in section 1129(a)(7) of the Bankruptcy Code because the recipients of the Litigation Trust Interests and the Creditors' Trust Interests are denied the ability to recover Post-petition interest thereon. See Brigade Obj. at ¶¶ 32-33; Noteholder Obj. at ¶¶ 380-82. In response to these objections, the Debtor/Committee/Lender Plan Proponents will file revisions to the Debtor/Committee/Lender Plan allowing for Post-petition interest to accrue on the Litigation Trust Interests and the Creditors' Trust Interests to the extent permissible under applicable law.

### 12.   Tribune Employee Defendants

A group of the Debtors' current employees who have been sued for various preference avoidance causes of action filed a limited objection noting that although they supported confirmation of the Debtor/Committee/Lender Plan they wanted clarification as to whether the various causes of action brought against them individually in the adversary proceedings would fit

within the definition of "LBO-Related Causes of Action" or "Ordinary Litigation Claims" under the Debtor/Committee/Lender Plan.

The Debtor/Committee/Lender Plan Proponents will be amending their Plan to provide additional clarity on which of the various preference causes of action brought against the current or former officers, directors and/or employees of the Debtors constitute Ordinary Litigation Claims and/or LBO-Related Causes of Action.

### 13.    Federal Communications Commission ("FCC")

In response to an informal request from the Department of Justice (the "DOJ"), acting on behalf of the FCC, the Debtor/Committee/Lender Plan Proponents and the DOJ have agreed to include the following language in the proposed Confirmation Order:

> No provision in the Debtor/Committee/Lender Plan or this Order relieves the Reorganized Debtors from their obligations to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the Federal Communications Commission ("FCC"). No transfer of control to the Reorganized Debtors of any federal license or authorization issued by the FCC shall take place prior to the issuance of FCC regulatory approval for such transfer of control pursuant to applicable FCC regulations. The FCC's rights and powers to take any action pursuant to its regulatory authority over the transfer of control to the Reorganized Debtors, including, but not limited to, imposing any regulatory conditions on such transfer, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

## V.    THE DEBTOR/COMMITTEE/LENDER PLAN COMPLIES WITH ALL OTHER REQUIREMENTS OF SECTION 1129 OF THE CODE

### A.    The Debtor/Committee/Lender Plan Complies With All Other Applicable Provisions of 11 U.S.C. § 1129(a)

As demonstrated above, despite the objections to certain provisions in the Debtor/Committee/Lender Plan, the Debtor/Committee/Lender Plan complies with the Bankruptcy Code requirements of:

- Section 1122(a) (Classification of Claims and Interests),

- Section 1123(b)(3) (Permissive Plan Provisions Pertaining to the Settlement, Retention and Release of Estate Claims),

- Section 1123(d) (Cure of Defaults),

- Section 1129(a)(3) (Good Faith),

- Section 1129(a)(4) (Payment for Services or Costs and Expenses

- Section 1129(a)(7) (Best Interests of Creditors), and

- Section 1129(a)(11) (Feasibility)

- Section 1129(a)(12) (Payment of Statutory Fees)

In addition, as described below, the Debtor/Committee/Lender Plan fully satisfies all other requirements and provisions set forth in section 1129(a) of the Bankruptcy Code.

### 1. The Debtor/Committee/Lender Plan Complies with All Applicable Provisions of the Bankruptcy Code as Required by 11 U.S.C. § 1129(a)(1)

As set forth above, the Debtor/Committee/Lender Plan complies with the classification requirements set forth in section 1122 of the Bankruptcy Code.  In addition, the Debtor/Committee/Lender Plan satisfies the mandatory requirements of section 1123(a) of the Bankruptcy Code and contains discretionary provisions that are permissible pursuant to section 1123(b) of the Bankruptcy Code.

#### a.    The Debtor/Committee/Lender Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code

The Debtor/Committee/Lender Plan meets the seven mandatory requirements of section 1123(a) of the Bankruptcy Code, which specifically require that a plan:

(1)    designate classes of claims and interests;

(2)    specify unimpaired classes of claims and interests;

(3)    specify treatment of impaired classes of claims and interests;

204

(4)     provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

(5)     provide adequate means for implementation of the plan;

(6)     provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and

(7)     contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of section of the reorganized company's officers and directors.

11 U.S.C. § 1123(a).

Article III of the Debtor/Committee/Lender Plan (i) designates Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code; (ii) specifies the Classes of Claims and Interests that are unimpaired under the Debtor/Committee/Lender Plan, as required by section 1123(a)(2) of the Bankruptcy Code; and (iii) specifies the treatment of each Class of Claims and Interests that is Impaired, as required by section 1123(a)(3) of the Bankruptcy Code.

Same Treatment of Claims or Interests Within Each Class – 11 U.S.C. § 1123(a)(4). The Debtor/Committee/Lender Plan complies with section 1123(a)(4) by providing each Claim or Interest in each particular Class with the same as all other Claims or Interests in such Class, with the limited exception of the Other Parent Claims in Class 1F and the Bridge Loan Claims in Class 1D, in which such creditors have the identical option to choose between more than one treatment.

Specifically, Section 3.2.6 provides each Holder of an Allowed Other Parent Claim the option elect to receive either (i) an amount of Cash equal to 35.18% of the aggregate amount of such Holder's Allowed Other Parent Claim and a Pro Rata share of 17.1% of the Remaining Bridge Loan Reserve or (ii) an amount of Cash equal to 32.73% of the aggregate amount of such Holder's Allowed Other Parent Claim and a Pro Rata share of 17.1% of the Remaining Bridge

205

Loan Reserve *plus* interests in the Litigation Trust and Creditors' Trust.  See Debtor/Committee/Lender Plan § 3.2.6(c).  These different treatment options, however, do not violate section 1123(a)(4) because every Holder of an Other Parent Claim in Class 1F has the same opportunity to elect either of the two treatment options.[131]  See 11 U.S.C. § 1123(a)(4) (requiring the same treatment for each claim or interest of a particular class "unless the holder of a particular claim or interest agrees to a less favorable treatment"); In re Dana Corp., 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.")

Likewise, Section 3.2.4 provides each Arranger Bridge Lender the option to either (i) receive their Pro Rata share of the distributions set forth in Section 3.2.4(c) on account of Bridge Loan Claims held for their own account and not receive a release of any claims or causes of action from any Non-Arranger Bridge Lenders or (ii) forgo their Pro Rata share of the distributions set forth in Section 3.2.4(c) on account of Bridge Loan Claims held for their own account, in which case the distributions allocable to such Arranger Bridge Lender shall instead be distributed Pro Rata to the Non-Arranger Bridge Lenders and receive a release by the Bridge Loan Agent and Non-Arranger Bridge Lenders of and from any and all Holder Released Claims and any other claims or causes of action related to or arising out of the Bridge Loan Agreement, any related documents, the Bridge Loan Claims or the Bridge Loan Guaranty Claims.  Again, these different treatment options do not violate 1123(a)(4) because the Arranger Bridge Lenders in Class 1D have the option to elect either of the two treatment options.

---

[131] The voting results reflect that 39% in number and 83% in amount of the Other Parent Claims have elected to forego interests in the Litigation Trust and Creditors' Trust to receive an additional amount of Cash.

Adequate Means for Implementation of the Plan – 11 U.S.C. § 1123(a)(5).[132] The Debtor/Committee/Lender Plan satisfies section 1123(a)(5) of the Bankruptcy Code by providing adequate means for its implementation, including the provisions set forth in Article V, Article VI and Article XI of the Debtor/Committee/Lender Plan.[133]

In addition, as described in the Debtor/Committee/Lender Specific Disclosure Statement, in order for certain combinations of the existing broadcasting and newspaper assets of the Debtors to continue to be held by Reorganized Tribune, waivers of certain FCC broadcast multiple and cross-ownership rules must be obtained. Section 5.17 of the Debtor/Committee/Lender Plan provides that the Debtors, Senior Lenders and Holders of Claims that are eligible to receive New Common Stock will use their best efforts and take all reasonable

---

[132] Section 1123(a)(5) requires a plan to provide for "adequate means" for the plan's implementation, "such as—
    (A)  retention by the debtor of all or any part of the property of the estate;
    (B)  transfer of all or any part of the property of the estate to one or more entities, whether organized before or after confirmation of such plan;
    (C)  merger or consolidation of the debtor with one or more persons;
    (D)  sale of all or any part of property of the estate ... among those having an interest in such property of the estate;
    (E)  satisfaction or modification of any lien;
    (F)  cancellation or modification of any indenture or similar instrument;
    (G)  curing or waiving of any default;
    (H)  extension of a maturity date or change in an interest rate or other term of outstanding securities;
    (I)  amendment of the debtor's charter; or
    (J)  issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;"
11 U.S.C. § 1123(a)(5).

[133] The means for implementing the Debtor/Committee/Lender Plan include, without limitation, (i) the continued corporate existence of the Debtors under Section 5.7 of the Debtor/Committee/Lender Plan, except as otherwise provided under the Debtor/Committee/Lender Plan or the Restructuring Transactions; (ii) the adoption of the corporate constituent documents that will govern the Reorganized Debtors and the identification of the initial boards of directors of the Reorganized Debtors as provided in Sections 5.3.1 and 5.3.2 of the Debtor/Committee/Lender Plan, respectively; (iii) the issuance of new securities for distribution in accordance with the terms of the Debtor/Committee/Lender Plan, as detailed in Section 5.4 of the Debtor/Committee/Lender Plan; (iv) the entry by the Debtors into the Exit Facility, as detailed in Section 5.10 of the Debtor/Committee/Lender Plan, and the issuance of the New Senior Secured Term Loan Agreement, as detailed in Section 5.6 of the Debtor/Committee/Lender Plan; (v) the settlement of certain claims and controversies, as described in Section 5.15 of the Debtor/Committee/Lender Plan; (vi) the various discharges, releases, injunctions, indemnifications and exculpations provided in Article XI of the Debtor/Committee/Lender Plan; (vii) the continuation of certain employee compensation and benefit programs and collective bargaining agreements, as described in Sections 6.5 and 6.6 of the Debtor/Committee/Lender Plan; and (viii) the assumption, assumption and assignment or rejection of executory contracts and unexpired leases to which any Debtors is a party, as stated in Article VI of the Debtor/Committee/Lender Plan.

steps necessary to obtain the requisite FCC Approvals, and shall provide such additional

documents or information as are reasonably requested by the Debtors or

Debtor/Committee/Lender Plan Proponents or that the Debtors or Debtor/Committee/Lender

Plan Proponents deem reasonably necessary for the FCC's review of such applications.

As described in great detail in Part IV.D supra, to ensure that the distribution of New

Common Stock will not hinder the required FCC Approvals, Section 5.4 of the

Debtor/Committee/Lender Plan provides that each Holder of a Claim that is entitled to receive a

distribution of New Common Stock and/or New Warrants pursuant to the

Debtor/Committee/Lender Plan will be required to demonstrate to the Debtors' satisfaction that

the issuance of New Common Stock to such Holder would not impair the ability of the

Reorganized Debtors to comply with FCC-related ownership requirements and restrictions and

would not impair the ability of the Reorganized Debtors to obtain the grant of the FCC

Applications necessary to implement the Debtor/Committee/Lender Plan.

Prohibition on the Issuance of Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6).  In

accordance with Section 5.3.1 of the Debtor/Committee/Lender Plan, paragraph 4 in the form of

Certificate of Incorporation of Reorganized Tribune (filed with the Plan Supplement) prohibits

the issuance of nonvoting equity securities to the extent required under section 1123(a) of the

Bankruptcy Code.  See Debtor/Committee/Lender Plan § 5.3.1.  Also in compliance with Section

1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificate of Incorporation of

Tribune Company provides for the allocation of voting power among New Class A Common

Stock and New Class B Common Stock.[134]  See Debtor/Committee/Lender Plan, Ex. 5.3.1.

---

[134] The New Class B Common Stock is a limited voting equity security that has been structured similarly to limited voting equity securities in other recent chapter 11 cases.  See Findings of Fact, Conclusions of Law and Order (I) Approving the Debtor's (A) Disclosure Statement Pursuant to Sections 1125 and 1126(b) of the Bankruptcy Code, (B) Solicitation of Votes and Voting Procedures and (II) Confirming the Debtor's Prepackaged Plan of

The proposed form of Confirmation Order will provide that the organizational documents of each of the Debtors other than Tribune – all of which are wholly-owned direct or indirect subsidiaries of Tribune – will be deemed to contain provisions prohibiting the issuance of nonvoting equity securities, consistent with the previously-approved practice for non-publicly traded subsidiaries in other large chapter 11 reorganizations. See, e.g., In re Federal-Mogul Global Inc., Case No. 01-10578, [Docket No. 13674] (Bankr. D. Del. Nov. 8, 2007); In re Delta Airlines, Inc., Case No. 05-17923, [Docket No. 5998] (Bankr. S.D.N.Y. Apr. 24, 2007).

> b.    Discretionary Provisions of the Debtor/Committee/Lender Plan are Permissible Pursuant to Section 1123(b) of the Bankruptcy Code

As permitted under section 1123(b), the Debtor/Committee/Lender Plan addresses (i) the assumption or rejection of Executory Contracts and Unexpired Leases, (ii) the implementation of the Restructuring Transactions and (ii) retention, enforcement and settlement of claims held by the Debtors.

The plan provisions regarding the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases are permissible pursuant to 11 U.S.C. §§ 365 and 1123(b)(2) and should be approved. In accordance with sections 1123(b)(2) and 1123(d) of the Bankruptcy Code, Article VI and other provisions of the Debtor/Committee/Lender Plan and the proposed Confirmation Order provide for the assumption, assumption and assignment, or rejection of the executory contracts and unexpired leases of the Debtors and the satisfaction of

---

Reorganization Under Chapter 11 of the Bankruptcy Code at ¶ 60, In re Affiliated Media, Inc., Case No. 10-10202 (Bankr. D. Del.) (KJC) [Docket No. 155] (approving a New Class C Common Stock that is identical in all material respects to the New Class B Common Stock under the Debtor/Committee/Lender Plan); Findings of Fact, Conclusions of Law and Order Confirming the Second Modified Joint Plan of Reorganization of Citadel Broadcasting Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code at ¶ 96, In re Citadel Broadcasting Corporation et al., Case No. 09-17442 (Bankr. S.D.N.Y.) (BRL) [Docket No. 369] (approving capital structure for the reorganized debtors that included a Class B Common Stock with limited voting rights). The New Warrants are exercisable into New Class A Common Stock or New Class B Common Stock for a *de minimis* exercise price and thus satisfy the requirements of Section 1123(a)(6), if applicable.

any monetary amounts by which each executory contract and unexpired lease to be assumed is in

default by payment of the default amount in cash on the Effective Date or on such other terms as

the parties to each such executory contract or unexpired lease may otherwise agree. See

Debtor/Committee/Lender Plan, Art. VI. The proposed cure amount for any executory contract

or unexpired lease that is assumed pursuant to the Plan has been set at zero unless otherwise

indicated in a schedule filed with the Bankruptcy Court. Accordingly, the

Debtor/Committee/Lender Plan provisions comply with sections 1123(b)(2) and 1123(d) of the

Bankruptcy Code.

Section 365(a) provides that a debtor, "subject to the court's approval, may assume or

reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). Courts routinely approve

motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a

showing that the debtor's decision to take such action will benefit the debtor's estate and is an

exercise of sound business judgment. See Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp., 872

F.2d 36, 40 (3d Cir. 1989); NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); In re G

Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) ("In determining whether a debtor

may be permitted to reject an executory contract, courts usually apply the business judgment test.

Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business

judgment will not be altered.") (internal citations omitted); In re Orion Pictures Corp., 4 F.3d

1095, 1099 (2d Cir. 1993), cert. dismissed, 511 U.S. 1026 (1994).

The assumption by the Debtors of their executory and postpetition contracts and

unexpired leases and assignment to the applicable Reorganized Debtor in accordance with and

subject to the terms and conditions of the Debtor/Committee/Lender Plan is both beneficial and

necessary to the Debtors' and Reorganized Debtors' business operations upon and subsequent to

emergence from chapter 11. The assumption and assignment of each of the executory and postpetition contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code and the Debtor/Committee/Lender Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors, their estates and their creditors. Based upon, among other things, the Reorganized Debtors' anticipated financial wherewithal after the Effective Date, including, without limitation, the operating cash and liquidity available to the Reorganized Debtors,[135] to fund their post-emergence business operations, each Reorganized Debtor that is assuming an executory contract or unexpired lease pursuant to the Debtor/Committee/Lender Plan will be fully capable of performing under the terms and conditions of the respective contract or lease to be assumed or assumed and assigned on and after the Effective Date. In addition, although the Restructuring Transactions contemplated in the Debtor/Committee/Lender Plan will convert certain Debtor entities to limited liability companies, the executory contracts that are being assumed and assigned to such entities will otherwise be assumed and assigned to effectively the same parties or successors. Finally, the assumption by the Debtors of (i) Employee Benefit Plans pursuant to Section 6.5 of the Debtor/Committee/Lender Plan and (ii) any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date pursuant to Section 6.6 of the Debtor/Committee/Lender Plan, (a) is of fundamental importance to the Debtors' reorganization process, (b) is a sound exercise of the Debtors' business judgment, and (c) is in the best interest of the Debtors and their estates.

---

[135] Pursuant to the Debtor/Committee/Lender Plan, the Debtors are retaining $325 million in cash to fund operations in addition to retaining cash in an estimated amount sufficient to satisfy Allowed Administrative Expense Claims, Priority Tax Claims estimated to be payable at or in connection with the Effective Date, DIP Facility Claims, Priority Non-Tax Claims, Claims arising from Employee Benefit Plans continuing with current employees, and Cash required to be posted to cash collateralize outstanding letters of credit. See Debtor/Committee/Lender Plan § 1.1.200. In addition, the Debtor/Committee/Lender Plan provides that the Reorganized Debtors may, in their discretion, enter into the Exit Facility in an aggregate amount up to $300 million, with a letter of credit sub-facility of up to $100 million. See Debtor/Committee/Lender Plan § 5.10.

The Restructuring Transactions contemplated in the Debtor/Committee/Lender Plan are not inconsistent with applicable provisions of the Bankruptcy Code. Exhibit 5.2 of the Debtor/Committee/Lender Plan, which was filed with the Plan Supplement, describes the Restructuring Transactions to be consummated by the Debtors and their successors for each of Tribune's primary business groups. The Restructuring Transactions include certain mergers and consolidations within the Company, conversions to limited liability companies, formations of new limited liability companies where conversion is not possible, and intercompany conveyances.

The Restructuring Transactions are intended to accomplish several tax, administrative and strategic business objectives. First, following the completion of the Restructuring Transactions, all of the wholly-owned subsidiaries of Tribune will be limited liability companies. This will allow Reorganized Tribune and its subsidiaries to achieve tax benefits similar to those available to a group of corporations filing a consolidated federal income tax return, simplify the company's organizational structure and more closely align the Tribune organizational structure with its operations, by eliminating certain entities and standardizing the organizational documents of its subsidiaries. The resulting organizational structure, with limited exceptions, will consist of operating subsidiaries that are all Delaware limited liability companies with substantially similar limited liability company agreements. The new structure will reduce the administrative complexity and expense associated with operating and maintaining such a large number of entities in different jurisdictions with different organizational forms. Second, the Restructuring Transactions are intended to realign certain of Tribune's operating subsidiaries, consolidate related operational assets and strategically organize certain of Tribune's businesses into separate legal entities. The new organizational structure will allow Tribune to more

212

efficiently and effectively pursue and consummate new acquisition and disposition opportunities,

financing opportunities and other strategic transactions.

The Debtor/Committee/Lender Plan includes provisions detailing the retention,

enforcement and settlement of claims held by the Debtors in accordance with Section 1123(b)(3).

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Debtor/Committee/Lender

Plan provides that:

- The Debtors will retain Ordinary Litigation Claims.

- The Preserved Causes of Action (other than the Disclaimed State Law Avoidance Trust) will be transferred to the Litigation Trust.

- The Debtors will disclaim the Disclaimed State Law Avoidance Claims to those entities that could have pursued such Disclaimed State Law Avoidance Claims prior to the Petition Date, and those entities have been afforded the option to transfer the Disclaimed State Law Avoidance Claims to the Creditors' Trust and receive Creditors' Trust Interests.

- The Debtor/Committee/Lender Plan will implement the Settlement of the Released LBO-Related Causes of Action, the Intercompany Claims Settlement, the Retiree Claimant Settlement, the Step Two/ Disgorgement Settlement, and the Bridge Lender Settlement.

*Ordinary Litigation Claims.* Section 5.16 of the Debtor/Committee/Lender Plan provides

that, except as otherwise provided in the Debtor/Committee/Lender Plan, the Confirmation

Order, or in any document, instrument, release or other agreement entered into in connection

with the Debtor/Committee/Lender Plan, the Debtors and their Estates shall retain the Ordinary

Litigation Claims. The Debtor/Committee/Lender Plan further provides that the Reorganized

Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle

or compromise (or decline to do any of the foregoing) any or all of the Ordinary Litigation

Claims or any other claims, rights of action, suits or proceedings that any Debtor or Estate may

hold against any Person that are not otherwise released pursuant to the Debtor/Committee/Lender

Plan. See Debtor/Committee/Lender Plan § 5.16.

*Preserved Causes of Action.* Section 11.2.6 of the Debtor/Committee/Lender Plan provides that the Preserved Causes of Action are expressly preserved and shall not be subject to the releases set forth in the Debtor/Committee/Lender Plan. Pursuant to Section 13.2.1 of the Debtor/Committee/Lender Plan, the Preserved Causes of Action, other than the Disclaimed State Law Avoidance Claims, will be transferred to the Litigation Trust to be prosecuted, settled or enforced for the benefit of Holders of Claims against Tribune. On the Effective Date, the Debtors will disclaim all rights to pursue or prosecute the Disclaimed State Law Avoidance Claims such that the rights to pursue such causes of action will revert to the entities who could have pursued the Disclaimed State Law Avoidance Claims prior to the Petition Date. Pursuant to Section 14.3 of the Debtor/Committee/Lender Plan, the Disclaimed State Law Avoidance Claims will then be transferred to the Creditors' Trust (except to the extent Holders of Claims opted out of the transfer of their Disclaimed State Law Avoidance Claims) to be prosecuted, settled or enforced for the benefit of Holders of Claims against Tribune.

The Debtor/Committee/Lender Plan's other provisions that are permissible under Section 1123(b) of the Bankruptcy Code. The Debtor/Committee/Lender Plan contains other provisions that are permitted pursuant to Section 1123(b) of the Bankruptcy Code, including, for example, the impairment of certain classes of Claims and Interests as permitted by section 1123(b)(1). See Debtor/Committee/Lender Plan Art. III. The Debtor/Committee/Lender Plan thus modifies the rights of the Holders of certain Claims and Interests and leaves the rights of others unaffected.

Moreover, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Debtor/Committee/Lender Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, including: (i) the provisions of Article II of the Debtor/Committee/Lender Plan governing treatment on account of Allowed

214

Administrative and Priority Tax Claims; (ii) the provisions of Article VII of the

Debtor/Committee/Lender Plan governing distributions under the Debtor/Committee/Lender

Plan; (iii) the provisions of Article XII regarding retention of jurisdiction by the Bankruptcy

Court over certain matters after the Effective Date, and (iv) the release of Guarantor Non-

Debtors from Senior Guaranty Claims and Bridge Loan Guaranty Claims.[136]

Debtor/Committee/Lender Plan, Art. II, VII, XI and XII.  Such provisions, and all other

provisions of the Debtor/Committee/Lender Plan, are consistent with the Bankruptcy Code in

accordance with section 1123(b)(6) of the Bankruptcy Code.

> **2.     The Debtor/Committee/Lender Plan Proponents Have Complied with
> the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. §
> 1129(a)(2)**

In determining whether a plan proponent has satisfied section 1129(a)(2) of the

Bankruptcy Code, courts focus on whether the proponent has adhered to the disclosure and

solicitation requirements of sections 1125 and 1126.  See In re PWS Holding Corp., 228 F.3d

224, 248 (3d Cir. 2000);  In re Resorts Int'l Inc., 145 B.R. 112, 468 (Bankr. D.N.J. 1990)

(applying section 1129(a)(2) only to disclosure requirements of Bankruptcy Code); see also H.R.

Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of §

1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter

11, such as section 1125 regarding disclosure.").

---

[136] The Guarantor Non-Debtor Release is an integral component of the Debtor/Committee/Lender Plan, as it frees
significant entities directly or indirectly owned by Tribune of their debt obligations to all of the Senior and Bridge
Lenders.  The Senior and Bridge Lender Classes, which are the impacted creditors, have voted overwhelming for
this provision, which represents a fair and equitable settlement of the Loan Guaranty Claims pursuant to Bankruptcy
Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and should be approved.  See Class Five Nev. Claimants
v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir. 2002) (plan may release dissenting
creditors' claims against non-debtors only if, among other things, the "impacted class, or classes, has
overwhelmingly voted to accept the plan").

The Debtor/Committee/Lender Plan Proponents have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Order governing notice, disclosure, and solicitation in connection with the Debtor/Committee/Lender Plan and the Joint Disclosure Statement. Among other things, as evidenced by the Solicitation Affidavit of Service and the Epiq Voting Declaration, it is clear that the Debtor/Committee/Lender Plan Proponents have complied with all previous orders of the Court regarding solicitation of the Competing Plans, including the Solicitation Order and the Amended Solicitation Order, and that the Debtors have complied with solicitation and disclosure requirements set forth in Bankruptcy Code, the Bankruptcy Rules, and other applicable law with respect to the foregoing. Accordingly, the requirements of section 1129(a)(2) have been satisfied. See In re Drexel Burnham Lambert Group Inc., 138 B.R. at 769 (section 1129(a)(2) satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to Plan).

### 3. Appointment of the Debtors' Directors and Officers and Disclosure of All Necessary Information Related Thereto – 11 U.S.C. § 1123(a)(7) and § 1129(a)(5)

Section 5.3.2 of the Debtor/Committee/Lender Plan provides that the initial board of directors of Reorganized Tribune shall consist of seven directors, the members of which are to be chosen by Oaktree, Angelo Gordon, and JPMorgan. As decisions as to the selection of the initial directors of the Reorganized Debtors will be made by those parties holding the most significant equity ownership positions in Reorganized Tribune with the input of current managers of the company and the Creditors' Committee, this method will ensure that the interests of the Holders of Claims and Interests and public policy are protected, and that section 1123(a)(7) is thus satisfied. See Debtor/Committee/Lender Plan §§ 5.3.2 and 5.3.3.

216

As required by section 1129(a)(5) of the Bankruptcy Code, no later than five days before the commencement of the confirmation, the Debtor/Committee/Lender Plan Proponents will disclose in Exhibit 5.3.2(2) all necessary information regarding the persons proposed to serve after the Confirmation Date on the boards of directors of Tribune and the other Debtors, and as officers of such Debtors.  The Debtor/Committee/Lender Plan Proponents anticipate that the persons currently serving in such capacities will continue to serve after the Confirmation Date. The Debtor/Committee/Lender Plan thus complies with section 1129(a)(5) of the Bankruptcy Code.

With respect to persons proposed to serve on the board of directors of Reorganized Tribune upon and after the Effective Date, however, the Debtor/Committee/Lender Plan Proponents shall file a notice specifying all required information regarding any such person as that information becomes available and in any event before the Effective Date.  Any and all rights of any parties to seek Bankruptcy Court review of such directors pursuant to section 1129(a)(5) of the Bankruptcy Code shall be preserved with respect to such filing, notwithstanding that such filing may be made after the Confirmation Date.

### 4. The Debtor/Committee/Lender Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6)

Bankruptcy Code section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor in the operation of its business approve any rate change provided for in the plan.  The Debtor/Committee/Lender Plan does not provide for or contemplate any rate changes because the Debtors' businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction or will have jurisdiction after Confirmation.  Accordingly, section 1129(a)(6) is inapplicable in these Chapter 11 Cases.

5.    **The Debtor/Committee/Lender Plan Has Been Accepted by the Impaired Voting Classes – 11 U.S.C. § 1129(a)(8), Subject to Section 1129(b) of the Bankruptcy Code**

As indicated in Article III of the Debtor/Committee/Lender Plan and as set forth in the Epiq Voting Declaration (as defined below), each Class of Claims against or Interests in the Debtors has accepted or has been deemed to accept the Debtor/Committee/Lender Plan except for the following classes: Classes 1E, 1I, 1J, 1M and the Rejecting Subsidiary Classes. As Class 1E (Senior Noteholders) and Class 1J (PHONES Notes Claims) are dominated by the Noteholder Plan Proponents, these Classes voted to reject the Debtor/Committee/Lender Plan and voted to accept the Noteholder Plan. The 20 Rejecting Subsidiary Classes that were entitled to vote on the Debtor/Committee/Lender Plan all contain claims held by the members of the Ad Hoc Committee of Subsidiary Trade Creditors and all of these classes also voted to reject the Noteholder Plan. Class 1I (EGI-TRB LLC) voted to reject both the Debtor/Committee/Lender Plan and the Noteholder Plan. The Debtor/Committee/Lender Plan Proponents seek confirmation of the Debtor/Committee/Lender Plan despite the actual or deemed rejection by the Rejecting Classes, pursuant to section 1129(b) of the Bankruptcy Code, as described below.

The following chart shows the voting results for the Voting Classes populated by Claims entitled to vote on the DCL Plan:

| | |
|---|---|
| Classes voting to accept the DCL Plan (together with the Deemed Accepting Classes, the "Accepting Classes") | 1C, 1D, 1F, 3E, 9E, 11E, 16E, 17E, 39E, 41E, 44E, 45E, 50C, 51C, 51,E, 52C, 52E, 53C, 53E, 54C, 54E, 55C, 55E, 56C, 57C, 57E, 58C, 59C, 60C, 61C, 61E, 62C, 63C, 64C, 65C, 65E, 66C, 66E, 67C, 68C, 68E, 68C, 69C, 69E, 70C, 70E, 71C, 71E, 72C, 72E, 73C, 74C, 74E, 75C, 76C, 77C, 78C, 79C, 80C, 81C, 81E, 82C, 83C, 84C, 85C, 86C, 87C, 88C, 89C, 89E, 90C, 90E, 91C, 92C, 93C, 93E, 94C, 95C, 95E, 96C, 97C, 97E, 98C, 99C, 100C, 101C, 101E, 102C, 103C, 103E, 104C, 104E, 105C, 105E, 106C, 106E, 107C, 107E, 108C, 108E, 109C, 109E, 110C, 110E, 111C and 111E |
| Classes of Claims against Tribune Company | 1E, 1I, 1J |

| | |
|---|---|
| voting to reject the DCL Plan (toget`her with Class 1L and 1M, the "Rejecting Parent Classes") | |
| Classes of Claims against Non-Guarantor Subsidiary Debtors voting to reject the DCL Plan (together with Classes 2L through 49L, the "Rejecting Non-Guarantor Subsidiary Classes") | 8E, 21E |
| Classes of Claims against Guarantor Subsidiary Debtors voting to reject the DCL Plan (together with Classes 50D through 111D and 50L through 111L, the "Rejecting Guarantor Subsidiary Classes," and together with the Rejecting Non-Guarantor Subsidiary Classes, the "Rejecting Subsidiary Classes") | 50E, 56E, 59E, 62E, 63E, 73E, 75E, 76E, 77E, 78E, 80E, 82E, 83E, 84E, 88E, 94E, 99E, 100E |
| Classes of Claims against Subsidiary Debtors in which no votes were cast to accept or reject the DCL Plan (the "No Vote Classes") | 2E, 4E, 5E, 6E, 7E, 10E, 12E, 13E, 14E, 15E, 18E, 19E, 20E, 22E, 23E, 24E, 25E, 26E, 27E, 28E, 29E, 30E, 31E, 32E, 33E, 34E, 35E, 36E, 37E, 38E, 40E, 42E, 43E, 46E, 47E, 48E, 49E, 58E, 60E, 64E, 67E, 79E, 85E, 86E, 87E, 91E, 92E, 96E, 98E, and 102E |

See Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Plans of Reorganization Proposed for Tribune Company and its Subsidiaries filed on February 11, 2011 [Docket No. 7918] (the "Epiq Voting Declaration"). The Rejecting Parent Classes, Rejecting Non-Guarantor Subsidiary Classes, the Rejecting Guarantor Subsidiary Classes and the Deemed Rejecting Classes are collectively referred to herein as the "Rejecting Classes."

### 6.    The Debtor/Committee/Lender Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9)

Section 1129(a)(9) of the Bankruptcy Code specifies the treatment that a plan must provide to Holders of Allowed Priority Claims. Sections 2.2 and 2.1 of the Debtor/Committee/Lender Plan provide for the payment of Administrative Claims and Allowed

DIP Facility Claims, respectively, in a manner consistent with section 1129(a)(9). In addition,

Section 2.3 of the Debtor/Committee/Lender Plan provides for the payment of Priority Tax

Claims in a manner consistent with section 1129(a)(9). Furthermore, Article III of the

Debtor/Committee/Lender Plan provides that each Holder of an Allowed Claim in Classes 1A

through 111A (Priority Non-Tax Claim) shall have its Claim Reinstated. Accordingly, the

provisions in the Debtor/Committee/Lender Plan comply with section 1129(a)(9) of the

Bankruptcy Code.

### 7.    At Least One Impaired Class Has Accepted the Plan – 11 U.S.C. § 1129(a)(10)

Section 1129(a)(10) of the Bankruptcy Code requires that, to the extent that a plan of

reorganization impairs any class of creditors at a given debtor, at least one impaired class of

claims at that debtor must accept the plan, excluding impaired classes of insiders. See 11 U.S.C.

§ 1129(a)(10). As described in the Epiq Voting Declaration, of the 63 Debtors for which votes

were cast in any class of claims, 61 Debtors had at least one class of impaired claims that voted

to accept the Debtor/Committee/Lender Plan. See Epiq Voting Declaration. Indeed, impaired

creditors generally voted overwhelmingly in favor of the Debtor/Committee/Lender Plan.

The Debtor/Committee/Lender Plan only failed to obtain the support of an accepting

impaired class at Debtors 8 (Chicago Tribune Newspapers, Inc.) and 21 (Los Angeles Times

Newspapers, Inc.). These Debtors are non-operating subsidiaries that possess few, if any, assets.

Between Debtors 8 and 21, a total of six votes were cast with respect to the

Debtor/Committee/Lender Plan, representing total claims of approximately $81,696.00

(significantly less than .001 percent of the total claims asserted in these cases). Moreover, it is

apparent from a review of the Debtor/Committee/Lender Plan Proponents' review of these

220

claims that most, if not all, of them are claims that are properly asserted against different Debtors with similar names that are operating companies.

The Debtor/Committee/Lender Plan Proponents reserve the right to modify the Debtor/Committee/Lender Plan to exclude Debtors 8 and 21, at any time prior to the entry of the Confirmation Order, in which event confirmation of the Debtor/Committee/Lender Plan would not be sought with respect to these Debtors at this time. Because the Debtor/Committee/Lender Plan does not contemplate substantive consolidation and Debtors 8 and 21 do not, in any event, have any material assets to distribute to creditors, creditors at the remaining Debtors would not be adversely impacted in any matter by this modification to the Debtor/Committee/Lender Plan. As to 37 Debtors covered by the Debtor/Committee/Lender Plan, no votes were cast – either in favor of or against – with respect to the Debtor/Committee/Lender Plan.  No party has objected to confirmation of the Debtor/Committee/Lender Plan on the grounds that it has failed to satisfy section 1129(a)(10) of the Bankruptcy Code based on the failure of creditors of these Debtors to casts votes with respect to the Debtor/Committee/Lender Plan.  Nevertheless, it is well-established that in large, jointly-administered chapter 11 cases, a class that casts no votes with respect to a plan, despite the existence of claimholders eligible to vote on the plan, may be treated as having accepted such plan. See Heins v. Ruti-Sweetwater, Inc. (In re Ruti Sweetwater, Inc.), 836 F.2d 1263, 1267 (10th Cir. 1988) (classes of claims in which no claimholder voted either to accept or reject the plan deemed to accept for purposes of 1129(a)(8)); In re Adelphia Comm'cns Corp., 368 B.R. 140, 259-264 (Bankr. S.D.N.Y. 2007) (same).  In short, apathy by creditors of Debtors holding *de minimis* assets is not cause to derail the Debtor/Committee/Lender  Plan.  Consequently, the Debtor/Committee/Lender Plan satisfies the requirements of section 1129(a)(10) and should be confirmed.

8.    **The Debtor/Committee/Lender Plan is Feasible – 11 U.S.C. §
1129(a)(11)**

While the debtor bears the burden of proving plan feasibility, the applicable standard is

by a preponderance of the evidence. A number of courts have held that this constitutes a

"relatively low threshold of proof." In re Mayer Pollack Steel Corp., 174 B.R. 414, 423 (Bankr.

E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low

threshold of support for the Plan as a viable undertaking . . . "). Courts have fashioned a series of

factors to be considered in the determination of whether a plan is feasible. These factors, while

varying from case to case, traditionally include: (i) the adequacy of the debtor's capital structure;

(ii) the earning power of its business; (iii) economic conditions; (iv) the ability of the debtor's

management; (v) the probability of the continuation of the same management; and (vi) other

related matters affecting successful performance under the provisions of the plan. See, e.g., In re

Prussia Assocs., 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); In re Greate Bay Hotel & Casino,

251 B.R. 213, 228 (Bankr. D.N.J. 2000) (citing In re Temple Zion, 125 B.R. 910, 915 (Bankr.

E.D. Pa. 1991)); In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984)

(citing In re Landmark at Plaza Park, Ltd., 7 B.R. 653, 659 (Bankr. D.N.J. 1980)). See also In re

T-H New Orleans Ltd. P'ship, 116 F.3d 790, 801 (5th Cir. 1997) (discussing the factors that the

bankruptcy court examined in its decision that the debtor's plan was feasible).

There can be little doubt that the Debtor/Committee/Lender Plan provides for a

financially and operationally feasible structure for the Reorganized Debtors.   Here, the Financial

Projections filed as Exhibit E to the General Disclosure Statement demonstrate that the

Debtor/Committee/Lender Plan is feasible.  The Debtor/Committee/Lender Plan provides that

the Debtors will retain $325 million in Cash to fund their on-going business operations in

addition to the amount of Cash required for distributions to Holders of Allowed Claims, before

taking into account the discretionary Exit Facility permitted under the Debtor/Committee/Lender

Plan in an amount of up to $300 million. See Debtor/Committee/Lender Plan § 1.1.200

(definition of "Remaining Distributable Cash"); § 5.10 (Exit Facility); Financial Projections, at

11. Accordingly, it is expected that the Reorganized Debtors should have sufficient cash flow to

a) make all payments and other distributions required under the Debtor/Committee/Lender Plan;

b) service all debt obligations contemplated by the Debtor/Committee/Lender Plan; and c)

maintain their business operations and otherwise on and after the Effective Date on a going-

forward basis. See Lazard Expert Rep., Appendix I, at 109.

In addition, the proposed Debtor/Committee/Lender Plan has more than a reasonable

likelihood of success because the transactions contemplated under the Debtor/Committee/Lender

Plan will enable the Debtors to continue their current operations and will eliminate a substantial

portion of debt. See General Disclosure Statement, Article III.A.2, at 21, 72; Article XI.B, at 72

(funded debt on the Petition Date totaled $12.706 billion, whereas upon emergence, the total

estimated funded debt will be $1.1 billion). See also General Disclosure Statement, Article

XI.B, at 72 (the implied value of new equity of the Reorganized Debtors is approximately $4.3

billion).

### 9.    The Debtor/Committee/Lender Plan Provides for the Continuation of the Debtors' Retiree Benefit Obligations – 11 U.S.C. § 1129(a)(13)

Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization

provide for the continued payment of certain retiree benefits "for the duration of the period that

the debtor has obligated itself to provide such benefits." 11 U.S.C. § 1129(a)(13). The

Debtor/Committee/Lender Plan satisfies these requirements. Section 6.5 of the

Debtor/Committee/Lender Plan provides that the Reorganized Debtors shall continue to perform

all obligations under all Employee Benefit Plans and all such Employee Benefit Plans will be

assumed by the applicable Reorganized Debtors, subject to the Debtors' and Reorganized

Debtors' rights under such Employee Benefit Plans. The Plan defines an "Employee Benefit

Plan" to include "any retiree benefit program of the applicable Debtor included in the protections

of section 1114 of the Bankruptcy Code." Debtor/Committee/Lender Plan § 1.1.94.

Accordingly, the Debtor/Committee/Lender Plan provides for the continuation of retiree benefit

obligations included within the protection of section 1114 of the Bankruptcy Code and complies

with Section 1129(a)(13) of the Bankruptcy Code. [137]

> **10.      Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code are Inapplicable**

Based on the facts of these Chapter 11 Cases, sections 1129(a)(14) through (16) of the

Bankruptcy Code are not applicable.

> **11.      The Debtor/Committee/Lender Plan Is Not An Attempt to Avoid Tax
> Obligations – 11 U.S.C. § 1129(d)**

Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if

the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities

Act of 1933. The Debtor/Committee/Lender Plan meets this requirement because the principal

purpose of the Debtor/Committee/Lender Plan is not avoidance of taxes or avoidance of the

requirements of Section 5 of the Securities Act of 1933, and there has been no filing by any

governmental agency asserting such avoidance.

> **B.      The Debtor/Committee/Lender Plan Satisfies the "Cram Down"
> Requirement for Confirmation Under Section 1129(b) of the Plan**

As discussed above, the Debtor/Committee/Lender Plan does not unfairly discriminate

against any rejecting Class pursuant to section 1129(b) of the Bankruptcy Code. In addition, the

Debtor/Committee/Lender Plan is fair and equitable under Section 1129(b) and thus the

---

[137] The Debtor/Committee/Lender Plan provides that the Employee Benefit Plans set forth in the General Disclosure Statement and the Plan Supplement will not be continued. The discontinued Employee Benefit Plans that the Debtors do not include retiree benefit obligations protected by §1114 of the Bankruptcy Code.

Debtor/Committee/Lender Plan can be confirmed notwithstanding the rejection of such Rejecting Classes.

No creditor or interest holder in a dissenting class has raised a legitimate objection (nor can they) that Debtor/Committee/Lender Plan fails to satisfy the absolute priority rule. Section 1129(b)(2), however, sets forth a list of *non-exclusive* conditions that a plan of reorganization must satisfy in order to meet the "fair and equitable" test. See 11 U.S.C. § 1129(b)(2) (providing that the "fair and equitable" test "*includes* the following requirements") (emphasis added); 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"). Indeed, courts have acknowledged that the determination of whether a plan is fair and equitable is not limited to express requirements set forth in Section 1129(b)(2)(B). In re Reading Broadcasting, Inc., 2009 Bankr. LEXIS 2593, at *30 (Bankr. E.D. Pa. Jan. 17, 2009) ("[T]echnical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.'" (quoting Fed. Sav. & Loan Ins. Corp. v. D & F Constr. Inc. (In re D & F Constr., Inc.), 865 F.2d 673, 675 (5th Cir. 1989)); In re Century Glove, Inc., 74 B.R. 958, 960 (Bankr. D. Del. 1987) (recognizing that a plan must "at a minimum" satisfy the delineated requirements). For all of the reasons stated in Part II, supra, the Debtor/Committee/Lender Plan, including the Settlement embodied therein, is fair, equitable and reasonable with respect to the dissenting classes of creditors, including, without limitation, Class 1E. As a result, to the extent this Court were to determine that section 1129(b)(2) imposes additional requirements beyond those expressly enumerated in the statute, the Debtor/Committee/Lender Plan Proponents believe that such requirements are satisfied based upon the inherent fairness of the Settlement to dissenting classes.

## VI.    PLAN MODIFICATIONS

### A.    Request for Authorization to Make Plan Modifications

The Debtor/Committee/Lender Plan Proponents hereby request authority to make certain modifications to the Debtor/Committee/Lender Plan.  In addition to the plan modifications filed on February 4, 2011, the Debtor/Committee/Lender Plan Proponents anticipate filing certain additional modifications to the Debtor/Committee/Lender Plan (collectively, the "Modifications") prior to the Confirmation Hearing.

Section 1127(a) of the Bankruptcy Code permits a plan proponent to modify its plan prior to confirmation so long as the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Bankruptcy Rule 3019, which also governs plan modifications made after a plan has been accepted but before confirmation, has been consistently interpreted to mean that a proposed modification to a plan will be deemed accepted under Bankruptcy Rule 3019 by all creditors and equity security holders who previously accepted the plan where the proposed modification does not cause a material adverse change in the treatment of the claim of any creditor or the interest of any equity security holder.  See, e.g., In re Celotex Corp., 204 B.R. 586, 608-09 (Bankr. M.D. Fla. 1996); In re Trans World Airlines, Inc., 185 B.R. 302, 322 (Bankr. E.D. Mo. 1995); In re Placid Oil Co., 92 B.R. 183, 190 (Bankr. N.D. Tex. 1988); and In re Mount Vernon Community Plaza Urban Redevelopment Corp. I, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987).

The vast majority of the Modifications are technical changes or clarifications that have been made by the Debtor/Committee/Lender Plan Proponents in their continuing review of the Debtor/Committee/Lender Plan or in response to informal and formal objections or requests for clarification made by parties in interest.  The Voting Classes are not adversely affected in any way, and no other Claims or Interests are impaired as a result of the Modifications.

The Bridge Lender Settlement is more than a technical change, but it does not materially adversely change any accepting class's treatment – indeed, it improves the treatment of most classes. Absent the Bridge Lender Settlement, the funds that will now be distributed to Senior Noteholders and Holders of Other Parent Claims pursuant thereto would have been held back in the Bridge Lender Reserve pending final determination or settlement of the allowability of the Bridge Loan Claims. The Bridge Lender Settlement (i) allows these funds to be distributed on the Effective Date, (ii) reallocates the Senior Lenders' share of the Bridge Lender Reserve to non-LBO creditors and (iii) removes the risk to Senior Noteholders and Holders of Other Parent Claims that the Bridge Loan Claims might be allowed in full and that the Bridge Lenders might be entitled to the substantially higher recovery for which they had previously argued.[138]

**B.      Authority for Requested Relief**

Section 1127(a) of the Bankruptcy Code provides as follows:

> (a)      The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

11 U.S.C. § 1127(a). Under this provision, a plan proponent may modify its plan prior to confirmation so long as the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Bankruptcy Rule 3019 provides as follows:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the

---

[138] Pursuant to the terms of the Bridge Lender Settlement, the Debtors also intend to pay the portion of the plan solicitation costs that would otherwise be payable by the Bridge Lenders. This modification will be reflected in the proposed confirmation order for the Debtor/Committee/Lender Plan.

> interest of any equity security holder who has not accepted in
> writing the modification, it shall be deemed accepted by all
> creditors and equity security holders who have previously accepted
> the plan.

Fed. R. Bankr. P. 3019.

Courts consistently have held that a proposed modification to a plan of reorganization under Bankruptcy Rule 3019 will be deemed accepted by all creditors and equity security holders who previously accepted the plan where the proposed modification does not cause a material adverse change in the treatment of the claim of any creditor of the interest of any equity security holder. See, e.g., In re Celotex Corp., 204 B.R. 586, 608-09 (Bankr. M.D. Fla. 1996); In re Trans World Airlines, Inc., 185 B.R. 302, 322 (Bankr. E.D. Mo. 1995); In re Placid Oil Co., 92 B.R. 183, 190 (Bankr. N.D. Tex. 1988); and In re Mount Vernon Community Plaza Urban Redevelopment Corp. I, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987).

Under the authorities discussed above, the Debtor/Committee/Lender Plan Proponents are authorized to make such modifications to the Debtor/Committee/Lender Plan, and such modifications should be deemed accepted by the Holders of all Claims against the Debtors who previously accepted the Debtor/Committee/Lender Plan.

## VII.    SECTION 1129(C) OF THE BANKRUPTCY CODE FAVORS CONFIRMATION OF THE DEBTOR/COMMITTEE/LENDER PLAN

The Debtor/Committee/Lender Plan is the only confirmable plan presently before this Court.[139] As a result, the Debtor/Committee/Lender Plan Proponents believe that this Court need not conduct a competing plan analysis under section 1129(c) of the Bankruptcy Code. In the event, however, the Court decides that section 1129(c) may be pertinent, both the overwhelming

---

[139] See Joint Objection of the Debtors, the Official Committee of Unsecured Creditors, Angelo, Gordon & Co. L.P., Oaktree Capital Management, L.P. and JPMorgan Chase Bank, N.A. to Confirmation of the Noteholder Plan [Docket No. 8011].

preference of voting creditors and the other factors considered by certain courts under section 1129(c) strongly support confirmation of the Debtor/Committee/Lender Plan.

Section 1129(c) of the Bankruptcy Code provides that where multiple plans meet the requirements for confirmation, the Court may confirm only one plan. 11 U.S.C. § 1129(c).[140] The statute further provides that the Court shall consider the preferences of creditors and equity security holders in determining which plan to confirm. Id. Indeed, multiple courts have observed that principal consideration should be given to the preferences of creditors and equity security holders in evaluating competing plans under section 1129(c). See, e.g., In re TCI 2 Holdings, LLC, 428 B.R. 117, 183-184 (Bankr. D.N.J. 2010) (noting that"[t]he most significant element in choosing between two confirmable plans is the statutory direction to the court to consider the preferences of creditors and equity security holders in determining which plan to confirm"); In re Orchards Village Investments, LLC, 2010 WL 143706, at *21, (Bankr. D. Or. Jan. 8, 2010) (giving primary consideration to the preference of creditors and equity security holders when evaluating competing plans of reorganization) (citing In re Coram Healthcare Corp., 315 B.R. 321, 351-352 (Bankr. D. Del. 2004). Courts have further noted the importance of considering the preference of creditors unrelated to the proponents of the competing plans. See In re Holley Garden, 238 B.R. 488, 496 (Bankr. M.D. Fla. 1999) (finding that "[t]he votes of unrelated creditors and equity security holders are an important consideration, despite the overwhelming votes of related creditors in favor of their own plan") (citing In re River Village Associates, 181 B.R. 795, 807 (E.D. Pa. 1995). The preference of creditors is reflected in the

---

[140] Section 1129(c) of the Bankruptcy Code provides as follows:

> Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

voting results. TCI 2 Holdings, LLC, 428 B.R. at 184. Accordingly, this Court approved a

solicitation process that permitted voting creditors to accept more than one plan and identify their

preferred plan by checking the appropriate box on their ballot.[141]

### A.    The Debtor/Committee/Lender Plan Should be Confirmed Because it is Preferred by Creditors

Creditors overwhelmingly prefer the Debtor/Committee/Lender Plan over the Noteholder

Plan.[142]  Indeed, out of 128 Classes of Claims in which creditors actually voted, 105 Classes of

Claims voted to accept the Debtor/Committee/Lender Plan.  In stark contrast, out of 243 Classes

of Claims in which creditors actually voted, only three Classes of Claims voted accept the

Noteholder Plan.   Moreover, of these three accepting classes, two are the Senior Noteholders

and PHONES Notes Classes, which are dominated by the proponents of the Noteholder Plan, and

one is a class comprised of only a $47.10 claim.  Creditors were also permitted to indicate a

preference on their ballot among the plans they voted to accept; however, due, in part, to the fact

that approximately 1,340 out of 2,200 creditors that voted on both plans chose to accept only one

plan, relatively few creditors expressed a preference on their ballot for either plan.[143]

Nevertheless, the overwhelming creditor support of the Debtor/Committee/Lender Plan is clearly

---

[141] See Order (I) Approving General Disclosure Statement and Specific Disclosure Statements; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plans of Reorganization; (III) Approving Forms of Ballots, Master Ballots and Related Instructions; (IV) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (V) Fixing Voting Record Date; (VI) Establishing Notice and Objection Procedures in Respect of Confirmation; (VII) Setting Confirmation Schedule and Establishing Parameters on Confirmation-Related Discovery; (VIII) Establishing New Deadline for Return of Media Ownership Certifications; (IX) Authorizing Expansion of Balloting and Tabulation Agents Retention and Allocation of Costs of Same; and (X) Granting Related Relief [Docket No. 7126].
[142] The interests of equity holders are cancelled and extinguished under both Plans and are deemed to have rejected both plans. Therefore, these interest holders did not express any preferences for either the Debtor/Committee/Lender Plan or the Noteholder Plan.
[143] After aggregating multiple ballots received by individual creditors, approximately (i) Five Holders of Other Parent Claims indicated a preference, with all five preferring the Debtor/Committee/Lender Plan; (ii) 57 Holders of General Unsecured Claims indicated a preference, with 47 of such Holders preferring the Debtor/Committee/Lender Plan and 10 of such Holders preferring the Noteholder Plan; and (iii) 78 Senior Noteholders indicated a preference, with 30 Senior Noteholders preferring the Debtor/Committee/Lender Plan and 48 Senior Noteholders preferring the Noteholder Plan.

evidenced by the range of constituents voting in favor of the Debtor/Committee/Lender Plan, and

voting against the Noteholder Plan, as follows:

| Plan | Creditors | No. of Voting Creditors | % No. Accepting | % No. Rejecting | Amount Voted | % Amount Accepting | % Amount Rejecting |
|------|-----------|-------------------------|-----------------|-----------------|--------------|--------------------|--------------------|
| DCL | Step One Senior Loan /Guaranty Claims | 390 | 97.69% | 2.31% | $6,257,486,913.53 | 96.77% | 3.23% |
| Noteholder | Step One Senior Loan /Guaranty Claims | 360 | 0.83% | 99.17% | $6,316,074,686.53 | 0.32% | 99.68% |
| DCL | Step Two Senior Loan /Guaranty Claims | 63 | 100% | 0% | $2,043,447,524.00 | 100% | 0% |
| Noteholder | Step Two Senior Loan /Guaranty Claims | 59 | 0% | 100% | $2,036,522,449.00 | 0% | 100% |
| DCL | Bridge Loan/Guaranty Claims | 29 | 89.66% | 10.34% | $1,523,704,761.89 | 98.62% | 1.38% |
| Noteholder | Bridge Loan/Guaranty Claims | 29 | 6.90% | 93.10% | $1,523,704,761.89 | 0.88% | 99.12% |
| DCL | Senior Noteholder Claims | 383 | 69.19% | 30.81% | $1,102,838,766.61 | 12.13% | 87.87% |
| Noteholder | Senior Noteholder Claims | 381 | 73.23% | 26.77% | $1,093,796,233.30 | 91.74% | 08.26% |
| DCL | Other Parent Claims | 237 | 94.51% | 5.49% | $270,697,577.45 | 94.70% | 05.30% |
| Noteholder | Other Parent Claims | 254 | 8.27% | 91.73% | $113,952,726.82 | 8.19% | 91.81% |
| DCL | EGI-TRB LLC Notes Claims | 19 | 0% | 100% | $188,819,593.30 | 0% | 100% |
| Noteholder | EGI-TRB LLC Notes Claims | 19 | 0% | 100% | $188,819,593.30 | 0% | 100% |
| DCL | PHONES Notes Claims | 31 | 0% | 100% | $1,166,207,304.00 | 0% | 100% |
| Noteholder | PHONES Notes Claims | 31 | 100% | 0% | $1,166,207,304.00 | 100% | 0% |
| DCL | General Unsecured Claims against the Other Guarantor Debtors | 1,367 | 67.08% | 32.92% | $165,411,810.58 | 94.87% | 5.13% |
| Noteholder | General Unsecured Claims against the Other Guarantor Debtors | 1,110 | 14.59% | 85.41% | $161,833,520.45 | 0.86% | 99.14% |
| DCL | General Unsecured Claims against the Non-Guarantor Debtors | 49 | 73.47% | 26.53% | $1,569,791.53 | 95.93% | 4.07% |
| Noteholder | General Unsecured Claims against the Non-Guarantor Debtors | N/A[144] | | | | | |

The broad support of the Debtor/Committee/Lender Plan should not be overlooked. The

vast majority of voting creditors chose to accept the Debtor/Committee/Lender Plan, whereas,

with the primary exception of the classes dominated by the Noteholder Plan Proponents, the vast

majority of creditors voted to reject the Noteholder Plan. The voting creditors' widespread

support of the Debtor/Committee/Lender Plan serves as clear evidence that the

Debtor/Committee/Lender Plan, and not the Noteholder Plan, should be confirmed pursuant to

the requirements of section 1129(c) of the Bankruptcy Code.

### B.    Additional Factors Considered by Courts Evaluating Competing Plans also Support Confirming the Debtor/Committee/Lender Plan

---

[144] Holders of Other Non-Guarantor Debtor Claims (i.e., general unsecured claims against the Non-Guarantor Debtors) are Unimpaired under the Noteholder Plan and, therefore, were not entitled to vote to accept or reject the Noteholder Plan.

Beyond considering the preferences of creditors and equity security holders, some courts considering competing plans under section 1129(c) of the Bankruptcy Code have also examined the following three factors to determine which plan to confirm: (i) the relative treatment of creditors and equity security holders under the competing plans; (ii) the relative feasibility of the competing plans; and (iii) the type of plan. See, e.g., In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 245 (Bankr. D.N.J. 2000); River Village Assocs., 181 B.R. 795 at 807; Holley Garden Apartments, Ltd., 238 B.R. at 493. Should this Court determine that any of these factors are relevant for purposes of analyzing the requirements of section 1129(c), as demonstrated below, each of these factors also favors confirmation of the Debtor/Committee/Lender Plan over the Noteholder Plan.

1.     **The Debtor/Committee/Lender Plan should be Confirmed because it Provides Better Treatment to Creditors**

Courts evaluating the relative treatment of creditors and equity security holders give preference to the plan that provides better treatment of creditors and equity security holders. See, e.g., Holley Garden, 238 B.R. at 495 (stating that "[t]he court should confirm the plan that provides better treatment for creditors and equity security holders) (citing River Village Associates, 181 B.R. at 795; In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 246-247 (Bankr. D.N.J. 2000) (finding that, among two competing plans, plan that proposed higher recoveries for certain creditors provided better treatment of creditors under section 1129(c)). This factor supports confirmation of the Debtor/Committee/Lender Plan, which provides significantly better treatment of creditors than the Noteholder Plan.[145]

The Debtor/Committee/Lender Plan provides a greater guaranteed recovery to virtually all Classes of creditors. As a result of the settlements in the Debtor/Committee/Lender Plan,

---

[145] The interests of equity security holders are cancelled and extinguished under both plans and are, therefore, treated equally under the Debtor/Committee/Lender Plan and the Noteholder Plan.

including settlement of certain LBO-Related Causes of Action, most Holders of Claims against

the Debtors will receive considerable distributions immediately on the Effective Date.

Moreover, in addition to significant recoveries that may received under the

Debtor/Committee/Lender Plan from the Litigation Trust and the Creditors' Trust, every single

Class of creditors that was entitled to vote will receive initial distributions under the

Debtor/Committee/Lender Plan that are equal to or higher than those proposed by the Noteholder

Plan, as follows:

| Class[146] | Debtor/Committee/Lender | Noteholder |
|---|---|---|
| Step One Senior Loan /Guaranty Claims | 71.14% | 34.2% |
| Step Two Senior Loan /Guaranty Claims | 71.14% | 0% |
| Bridge Loan/Guaranty Claims | 3.98% | 0% |
| Senior Noteholder Claims | 33.59% | 4.3%[148] |
| Other Parent Claims | 36.04% | 4.3% |
| Convenience Claims against Tribune | 100% | 4.3% |
| General Unsecured Claims against Guarantor | 100% | 8.0% |
| General Unsecured Claims against Non-Guarantor | 100% | 100% |
| EGI-TRB LLC Notes Claims | 0% | 0% |
| PHONES Notes Claims | 0% | 0% |

The Noteholder Plan is premised upon no settlements and provides only negligible

guaranteed distributions. Under the Noteholder Plan, most Classes of creditors would receive

only their minimum entitlement on the Effective Date as distributions would be calculated based

upon the assumption that the preserved LBO-Related Causes of Action are decided in the manner

that is least favorable to such Classes, which for certain Classes is simply nothing. In the case of

nearly all creditors, these initial distributions would be much lower than the distributions

provided under the Debtor/Committee/Lender Plan. In addition, further distributions to each

---

[146] The estimated recovery percentages for each Class of Claims do not include any trust recoveries that may be received under either plan following the Effective Date.

[147] The estimated recovery percentages under the Noteholder Plan assume that the Senior Loan Claim Sharing Resolution and the PHONES Notes Claims Resolution are not resolved prior to the Effective Date.

[148] The Senior Noteholders' estimated recovery under the Noteholder Plan is 4.8%; however, after providing value to increase the recovery to the General Unsecured Claims against Non-Guarantor Subsidiaries to 100%, the Senior Noteholders' estimated recovery is reduced to 4.3%.

Class, if any, would only occur after protracted, costly litigation of the LBO-Related Causes of Action and the entry of various Litigation Distribution Orders resolving creditors' relative entitlement to the proceeds of the litigation. Although resolution of the LBO-Related Causes of Action could theoretically result in higher distributions to certain creditors, this hypothetical result is laden with risk.

This prolonged litigation and resultant delay and uncertainty with respect to creditor distributions weigh heavily against confirming the Noteholder Plan. The Noteholder Plan simply cannot guarantee that creditors would ever receive distributions that are nearly as favorable as those provided immediately upon the Effective Date under the Debtor/Committee/Lender Plan. As a result, the Debtor/Committee/Lender Plan provides more favorable treatment of creditors and should be confirmed under section 1129(c) of the Bankruptcy Code.

> **2.    The Debtor/Committee/Lender Plan should be Confirmed because it is More Feasible than the Noteholder Plan**

In evaluating the relative feasibility of competing plans, courts give preference to the plan that is more feasible than the other proposed plans. See, e.g. Holley Garden, 238 B.R. at 496. Multiple courts considering this factor have evaluated a number of elements, including, among others, the relative risks and delays with respect to plan consummation and the relative impact of plan consummation on the business operations of the debtors. See, e.g., Coram Healthcare, 315 B.R. at 352 (finding that, among two competing plans, plan that proposed immediate payment to creditors rather than deferred payment was more feasible plan under section 1129(c)); Holley Garden Apartments Ltd., 238 B.R. at 496 (same); In re Matter of Sound Radio, Inc., 93 B.R. 849, 859 (Bankr. D. N.J. 1988), aff'd in part, remanded in part, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990) (finding that, among two competing plans, plan that did not foster delay, further litigation and dispute was more feasible plan under section 1129(c)); Greate Bay

Hotel & Casino, Inc., 251 B.R. at 247-248 (finding that, among two competing plans, plan that, among other things, positioned the debtors to more quickly obtain required casino licenses and to better meet uncertainties of competitive business environment was more feasible under section 1129(c)). Each of these elements weighs in favor of confirming the Debtor/Committee/Lender Plan, which is more feasible than the Noteholder Plan.

The Debtor/Committee/Lender Plan will undoubtedly be substantially consummated significantly more quickly than the Noteholder Plan. As noted above, the Debtor/Committee/Lender Plan implements settlements that provide for substantial distributions to creditors immediately upon the Effective Date. The Noteholder Plan, however, provides only diminutive distributions to creditors while delaying distribution of the majority of enterprise value—up to 65% of enterprise value—pending litigation of the LBO-Related Causes of Action and entry of Litigation Trust Distribution Orders. As a result, substantial consummation of the Noteholder Plan will likely require several years, during which time creditors will be forced to wait to receive the bulk of their distributions from the Distribution Trust.

Additionally, the unprecedented amount of equity value to be held in the Distribution Trust for an indeterminate amount of time would raise novel FCC issues that could complicate, delay or prevent substantial consummation of the Noteholder Plan. For example, the Noteholder Plan does not make clear to whom equity will be distributed at emergence, or in what amounts despite the fact that the FCC would require such information in order to pass upon the Noteholder Plan's ownership structure. See Rosenstein Rpt. at p. 28. Moreover, the Distribution Trust contemplated by the Noteholder Plan varies significantly from the testamentary and divestiture trusts that are familiar to the FCC. See id. For example, the fact that the Distribution Trust will hold as much as 65% of the DEV of Reorganized Tribune, potentially for years, is

extraordinary from an FCC perspective. See id. at pp. 28-30.  Further, the trustee of the

Distribution Trust, Aurelius (which designates the trustee) and the Advisory Board that governs

the Trust would be "attributable" parties for FCC purposes and subject to the same disclosure

and eligibility requirements as attributable shareholders. See id. at p. 29. The Noteholder Plan,

however, does not have any mechanism to elicit the information necessary to permit the FCC to

determine whether these new attributable parties meet FCC requirements.  Once such

information was collected, the FCC would need to review it, which could cause delay even if the

new parties were ultimately determined to be qualified. See id. at p. 30.

Other terms of the Noteholder Plan may also raise FCC issues that could delay

implementation of the Noteholder Plan.  For example, the Noteholder Plan Proponents have not

disclosed to the FCC the identity of any parties that are likely to be attributable under their plan,

nor, *a fortiori*, any information regarding other attributable media holdings of those parties or

other considerations relevant to their ability to hold attributable interests in Reorganized Tribune.

In contrast, the Debtor/Committee/Lender Plan proponents disclosed the identity of their

"attributable" shareholders (along with their attributable media holdings) to the FCC more than

ten months ago, have engaged with the FCC staff, and anticipate resolving any outstanding

issues before or shortly after plan confirmation.  In addition, the Noteholder Plan has no

mechanism for relinquishment of board designation rights in the event that one or more persons

or entities holding such rights (which include Aurelius, the Distribution Trust Advisory Board,

the Distribution Trustee, and Wilmington Trust Company as the PHONES Notes Indenture

Trustee) have conflicting media interests or are otherwise unqualified under FCC rules to hold

attributable interests in Reorganized Tribune. See Noteholder Plan §§ 5.3.2, 7.16.4. As the

Noteholder Plan Proponents themselves emphasize, see Noteholder FCC Obj. at ¶ 4, any party

holding designation rights is deemed to hold an attributable interest under FCC policies, and all attributable parties must meet FCC qualification requirements. Without appropriate mechanisms for relinquishment of board designation rights, there is a risk that the Noteholder Plan will not obtain the FCC approvals required for substantial consummation.

In addition to providing a timelier substantial consummation, the Debtor/Committee/Lender Plan best positions the Reorganized Debtors for continued commercial success. Indeed, the Debtor/Committee/Lender Plan is designed to enable the Reorganized Debtors to maximize enterprise value by avoiding time consuming litigation and related problematic distribution reserves. In comparison, the Noteholder Plan poses numerous roadblocks to the long-term success of the Reorganized Debtors. As an initial matter, the sizable reserve of equity held by the Distribution Trust would leave the Reorganized Debtors with uncertain ownership that could harm enterprise value. For example, Reorganized Tribune may not be able to immediately execute strategic mergers, joint ventures and many other partnerships requiring stock issuances. Moreover, the terms of the Noteholder Plan could jeopardize the Reorganized Debtors' ability to recruit senior managers and directors, as qualified candidates could be hesitant to join an organization with evolving ownership. These shortcomings will ultimately result in an overall destruction of long-term value, and, therefore, do not weigh in favor of confirming the Noteholder Plan.

On balance, the Debtor/Committee/Lender Plan clearly is the stronger plan in terms of feasibility. In addition to providing distributions to creditors without delay, the Debtor/Committee/Lender Plan better positions the Reorganized Debtors to capitalize on opportunities for business development and revenue enhancement, thereby facilitating a successful emergence as well as the continued success of the Reorganized Debtors. In contrast,

implementation of the Noteholder Plan would result in delayed distributions to creditors and

could negatively impact the Reorganized Debtors' operations and overall value. As a result, the

Debtor/Committee/Lender Plan is the more feasible Plan and should be confirmed pursuant to

the requirements of section 1129(c) of the Bankruptcy Code.

> **3.    The Debtor/Committee/Lender Plan should be Confirmed because it is More Focused on Reorganizing the Debtors than the Noteholder Plan**

Courts evaluating the type of plan proposed for purposes of section 1129(c) of the

Bankruptcy Code generally find that a reorganization plan is usually preferable to a liquidation

plan. See Holley Garden Apartments, Ltd., 238 B.R. at 495; In re Valley View Shopping Center

L.P., 260 B.R. 10, 40 (Bankr. D. Kan. 2001); In re Oaks Partners. Ltd., 141 B.R. 453, 465

(Bankr. N.D. Ga. 1992). For purposes of section 1129(c), courts generally favor restructuring

plans over liquidating plans, in part, because restructuring plans are consistent with the policy of

chapter 11 to successfully rehabilitate a debtor. See Valley View Shopping Center, L.P., 260

B.R. at 40) (evaluating the type of plan proposed under section 1129(c) and noting that "the

policy of Chapter 11 is to successfully rehabilitate the debtor."); Holley Garden Apartments,

Ltd., 238 B.R. at 495 (same). Though both the Debtor/Committee/Lender Plan and the

Noteholder Plan are plans of reorganization, the underlying rationale for preferring

reorganization plans under section 1129(c) weighs in favor of confirming the Debtor/Committee

Lender Plan.

The Debtor/Committee/Lender Plan is the only plan that is truly focused on successfully

reorganizing the Debtors. As set forth herein, the Debtor/Committee/Lender Plan is structured

around the primary goal of advancing the ongoing operations of the Reorganized Debtors.

Comparatively, however, while the Noteholder Plan is proposed as a plan of reorganization, the

terms of the Noteholder Plan are far from centered on the Reorganized Debtors' continued

success. Instead, the key focus of the Noteholder Plan is the liquidation of the LBO-Related Causes of Action.

The Noteholder Plan's overarching focus on liquidating the LBO-Related Causes of Action is evident from the numerous plan provisions intentionally prioritizing the liquidation of the LBO-Related Causes over the Reorganized Debtors' business needs. For example, as discussed in Part VII.B.2 above, far from maximizing the Reorganized Debtors' value, the Noteholder Plan impedes the Reorganized Debtors' ability to freely take advantage of potential business opportunities that may arise while the LBO-Related Causes of Action are being liquidated. In addition, the unpredictable nature of the ultimate owners of Reorganized Tribune, as well the broad and vague cooperation clauses contained it the Noteholder Plan, will likely impair the Reorganized Debtors' ability to retain the best talent. See Noteholder Plan § 5.3.1. As discussed in Part VII.B.2 above, the inability to take advantage of business opportunities or retain top-quality managers and directors will undoubtedly impair the Reorganized Debtors' enterprise value.

The clear motives of the Noteholder Plan should not go unnoticed. Though the Noteholder Plan is proposed as plan of reorganization, unlike the Debtor/Committee/Lender Plan, its key terms are not consistent with and do not seek to prioritize rehabilitation of the Debtors but rather seek to prioritize the leverage of the Litigation Trustee to liquidate the LBO-Related Causes of Action. The Noteholder Plan is, therefore, not consistent with the underlying rationale for preferring restructuring plans under section 1129(c) and should not be chosen as the preferred plan. Instead, the Debtor/Committee/Lender Plan, which prioritizes the continued success of the Reorganized Debtors, should be confirmed pursuant to the requirements of section 1129(c) of the Bankruptcy Code.

239

## VIII.   CONCLUSION

For the reasons set forth in this Memorandum and to be set forth in the other Supporting Materials, the Debtor/Committee/Lender Plan Proponents respectfully request that the Bankruptcy Court enter an order confirming the Debtor/Committee/Lender Plan at the earliest practicable time.

Dated: Wilmington, Delaware
      February 25, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Janet E. Henderson
Kevin T. Lantry
Jessica C.K. Boelter
Allison Ross Stromberg
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

    -and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

*/s/ J. Kate Stickles*
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

*Counsel for Debtors and Debtors in Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier:  (212) 541-5369

    -and-

LANDIS RATH & COBB LLP

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

-and-

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel for the Official Committee of Unsecured Creditors*


DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253

*Counsel For Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*


WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Benjamin S. Kaminetzky
Damian S. Schaible
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
Telecopier:  (212) 701 5800

    -and-

RICHARDS LAYTON & FINGER

*/s/ Drew G. Sloan*
Mark Collins
Drew G. Sloan
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel For JPMorgan Chase Bank, N.A.*