## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered<br>**Related to Docket Nos. 8208 and 8414** |

### DEBTOR TRIBUNE COMPANY'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW PAYMENT AND ADVANCEMENT OF DEFENSE COSTS, FEES, AND EXPENSES UNDER DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICIES

Tribune Company, one of the above-captioned debtors and debtors in possession

("Tribune" or the "Debtor" and collectively, the "Debtors"), hereby files this reply in support of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

its motion (the "Motion") for entry of an order granting relief from the automatic stay, to the extent it applies, to allow payment and advancement by its primary and excess directors and officers liability ("D&O") insurance carriers of past and future defense costs, fees, and expenses incurred by individual insured persons (the "Insured Persons") relating to the FitzSimons Lawsuit[1] and the Preference Lawsuits. This requested relief is important because the Official Committee of Unsecured Creditors (the "Committee") has filed multiple lawsuits against the Insured Persons, and because under the express terms of D&O Policies the Insured Persons have the right to payment or advancement of their costs of defending these lawsuits. But remarkably, the Committee has objected to the Motion and seeks to restrict the Insured Persons' access to their insurance -- which expressly was purchased to protect the Insured Persons under these circumstances -- and to dictate when and to what extent the Insured Persons take steps to defend themselves against the lawsuits filed by the Committee. The Committee's attempt to delay and restrict the Insured Persons' efforts to secure defense coverage from the D&O insurers does not benefit creditors, as it is critical to the ongoing reorganization process and ultimately to any efforts to settle the Committee's Claims that the defense counsel for the Insured Persons and their D&O insurers have an understanding of the Claims and can evaluate them on the merits. The Committee's objection is not supported by applicable case law within this jurisdiction, is contrary to the express terms of the D&O Policies, and should be rejected.

## ARGUMENT

**A.    Delay Will Not Benefit the Creditors of the Debtors.**

The Debtors are in the midst of a critical phase of these chapter 11 cases—the consideration of a plan of reorganization that provides for the Debtors' emergence from

---

[1] Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Motion.

bankruptcy.  Over the next few months it will be essential that fully informed defense counsel and the D&O insurers have a seat at the table in order to understand whether there are colorable claims for which creditors may be able to recover from the D&O policies.  Chubb has advised the Debtors that its payment of defense costs, fees or expenses are subject to the entry of an order granting the relief sought by the Motion.  Consequently, adjourning the hearing with respect to the Motion, as requested by the Committee, and delaying the process by which the D&O insurers and defense counsel become actively engaged will only serve to slow down each party's ability to weigh the merits of the claims asserted against Tribune's current and former directors and officers.  Indeed, the D&O insurers need to be informed by defense counsel on the merits of the claims in order to settle.  While the D&O insurers may find some benefit in pushing off their obligations under the D&O policies, such delay is certainly not in the best interests of the creditors represented by the Committee. Accordingly, for this reason and for all of the reasons set forth below, the Committee's request to adjourn the hearing on the Motion should be denied.

**B.     The Committee May Not Regulate The Defense Of The Lawsuits It Has Brought Against the Insured Persons.**

In objecting to and seeking to adjourn the Motion, the Committee asserts that it may dictate when and the extent to which the Insured Persons it has sued may obtain the benefit of the insurance coverage that was purchased to pay for their defense in exactly these types of cases, so that the insurance coverage instead may be preserved for the benefit of the Debtors' creditors. While Tribune understands the Committee's desire to preserve resources for creditors, the Committee's  assertion simply has no support under the D&O policies or applicable precedent.

One of the reasons Tribune purchased the D&O policies was to protect the Insured Persons in the event they are not indemnified with respect to litigation arising out of their service to the company.  This rationale is unambiguously reflected in the Policies.  The D&O policies

provide coverage to the Insured Persons under Insuring Clause 1 for Loss (including Defense Costs) resulting from a Claim made against them for a Wrongful Act for which Tribune does not indemnify them ("Side A" coverage). Further, the policies contain "Order of Payments" endorsements that expressly subordinate the rights of Tribune to the proceeds payable under the Policies to the rights of the Insured Persons, and endorsements stating that the insurers' obligations to the Insured Persons will not be affected by the bankruptcy of Tribune.

The Insured Persons are entitled to receive these contractual benefits, which include coverage for their defense against lawsuits in which the Committee collectively is seeking tens if not hundreds of millions of dollars in damages from the Insured Person defendants. Indeed, in a case with remarkably similar facts, the Delaware Bankruptcy Court confirmed that claimants such as the Committee cannot, under the guise of preserving any potential (and thus wholly speculative) access to D&O policy proceeds to settle claims, interfere with the Insured Persons' access to these benefits:

> The bottom line is that the Trustee seeks to protect the amount he may receive in his suit against the directors and officers while limiting coverage for the defense costs of the directors and officers. This is not what the directors and officers bargained for. In bringing the action against the directors and officers, the Trustee knew that the proceeds could be depleted by legal fees and he took that chance. The law does not support the Trustee's request to regulate defense costs.

In re Allied Digital Techs., Corp., 306 B.R. 505, 513 (Bankr. D. Del. 2004) (CGC). Thus, in Allied Digital the Delaware Bankruptcy Court rejected the very position asserted by the Committee in its objection to the Debtors' Motion. This Court likewise should reject the Committee's attempt to regulate the Insured Persons' access to payment or advancement of their Defense Costs in this case.

4

**C.      There Is No Reasonable Dispute That The Proceeds Of The Directors And Officers Liability Policies Are Property of the Insured Persons, Not The Estate.**

The Committee next questions whether the Insured Persons are entitled to access the policy proceeds for their defense because, it asserts, "the case law is not uniform on the question of whether the actual proceeds of a D&O policy are property of the estate under section 541." (See Objection at 7.)  But the Committee's representation is misleading.  In cases involving similar D&O policies and similar procedural circumstances, the courts -- and, more importantly, the Delaware Bankruptcy Courts -- repeatedly have held that insurance policy proceeds belong to the insured persons, not the estate.  The cases cited in the Motion make this point clearly and uniformly.  See Miller v. McDonald (In re World Health Alternatives, Inc.), 369 B.R. 805, 810 (Bankr. D. Del. 2007) (KG); Allied Digital, 306 B.R. at 512.  Courts from other jurisdictions have reached similar conclusions on similar facts.  See, e.g., La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.), 832 F.2d 1391, 1401 (5th Cir. 1987); In re Adelphia Commc'ns Corp., 298 B.R. 49, 53-54 (S.D.N.Y. 2003); Ochs v. Lipson (In re First Cent. Fin. Corp.), 238 B.R. 9, 18 (Bankr. E.D.N.Y. 1999).

What is more, the one case disingenuously cited by the Committee for its assertion that case law is "not uniform" regarding policy proceeds, In re Downey Fin. Corp., 428 B.R. 595 (Bankr. D. Del. 2010) (CSS), in fact confirms that the proceeds of D&O liability policies are not estate property under the circumstances present in this case.  In Downey, the D&O policy in question contained an "Order of Payments" provision which "provide[d] a clear chain of priority among the three types of coverages." 428 B.R. at 608.  Under the policy, directors' and officers' defense costs were to be paid first, with the debtor's coverage for indemnification to be paid "only after payment of Loss has been made pursuant to [the clause providing for directors' and officers' defense costs], with respect to whatever remaining amount of the Limit of Liability is

5

available after such payment." *Id.* at 607.  The policy also contained a provision stating that the bankruptcy or insolvency of the debtor "shall not relieve the insurer of any of its obligations to prioritize payment of covered loss under this policy." *Id.* at 608.  The court found the combination of the priority-of-payment provision and the provision preserving the insurer's duty to indemnify in bankruptcy to be "significant" because it meant that finding the proceeds of the policy to be property of the estate would give the trustee greater rights than the debtor had prior to filing for bankruptcy.  *Id.*  The court explained, "[p]rior to bankruptcy, there was no means by which the Debtor's interests in [the indemnification and securities claims coverage] could become superior to, or even equal to, the [directors' and officers'] interests." *Id.*  Consequently, the court found, ruling that the proceeds were property of the estate "would improperly 'expand the debtors rights against others beyond what rights existed at the commencement of the case,'" and, accordingly, held that the proceeds were not property of the estate *Id.* at 607-08.  Thus, the case law cited by the Committee actually supports granting the relief sought in the Motion.

The language and scope of Tribune's D&O policies confirms this conclusion.  As in many of the cases discussed above, Tribune's policies contain an express grant of coverage to the individual Insured Persons for non-indemnified (or "Side A") Claims or a priority of payments provision that subordinates the company's interest in the insurance proceeds -- if any -- to that of the individuals, and involve circumstances in which the Debtors have no entitlement to the insurance.  The existence of insurance potentially covering Debtors under the D&O Policies does not alter this conclusion because, as in the cases cited above, there are no present Claims being asserted against the Debtors and because the Debtors have not indemnified the Insured Persons.

**D.    The Committee Does Not Require Additional Discovery Regarding Tribune's Motion Or The Insurance Before The Insured Persons Can Access The Policy Proceeds To Cover The Costs Of Their Defense.**

Next, the Committee asserts that the Motion should not be considered until the Committee completes discovery that it served on the primary D&O carrier, Federal Insurance Co. ("Chubb"). (See Objection at 7.) There is no need to defer the Motion based on these pending discovery requests -- they are irrelevant to the question of whether the Insured Persons may seek payment or advancement of their Defense Costs. Entitlement to payment or advancement of Defense Costs is governed by the language of the Policies and the nature of the Claims asserted against the Insured Persons. So long as the D&O Policies remain in effect, the Insured Persons are entitled to access the proceeds of the Policies under the terms of the insurance contracts.

Moreover, the Debtors provided the Committee with the primary Chubb D&O policy effective 12/2/0/2007 and the other D&O policies well over a year ago. Indeed, the D&O policies were stored in the dataroom that the Debtors established shortly after the commencement of the chapter 11 cases, which the Committee's advisors had access to. In addition, the Debtors and their advisors have had numerous conversations with the Committee concerning the D&O policies during the course of these chapter 11 cases. For example, as set forth in the Debtors' motion seeking authority to purchase D&O tail coverage[2], which was filed in early January 2010, the Debtors noted that over the several weeks preceding the filing of the D&O Tail Coverage Motion they had engaged in multiple communications with the Committee concerning the D&O tail coverage. These communications included, among other things,

---

[2] See Motion of Debtors for an Order Authorizing Tribune Company to Purchase Tail Coverage Respecting the Debtors' Existing Directors and Officers and Fiduciary Liability Insurance Policies Pursuant to Section 363(b) of the Bankruptcy Code [D.I. 3025] (the "D&O Tail Coverage Motion").

conversations concerning the underlying D&O policies at issue in the current Motion and the transmission of written materials concerning the D&O policies. More recently, during the late summer of 2010, in connection with formulating a plan of reorganization that contemplated future litigation involving the same issues raised in the FitzSimons Lawsuit, the Committee's advisors conducted an extensive review of the D&O policies and participated in multiple teleconferences with the Debtors' advisors concerning the terms of the D&O policies. Finally, after the filing of the FitzSimons Lawsuit and the Preference Lawsuits, the Debtors' advisors have engaged in multiple additional communications with the Committee's advisors concerning the D&O policies and have cooperated with the Committee's requests for information, including, on February 1, 2011, February 14, 2011 and on March 14, 2011, providing the Committee with current information about the erosion of the Limits of the D&O and fiduciary policies. Thus, the Committee has been provided more than ample information to assess the relief requested by the Motion.

The Committee's assertion that it needs additional information concerning the extent to which the Insured Persons have made "requests to draw on" the D&O Policies incorrectly assumes that the Committee has some right to dictate to the Insured Persons when and how to defend themselves and to seek the benefits of the insurance coverage they have for their Defense Costs. And in any event, as detailed in the Motion, the D&O Policies collectively provide hundreds of millions of dollars of limits, which hardly are in imminent danger of being exhausted by the Defense Costs incurred by the Insured Persons to date.

Further, the Committee simply is incorrect in asserting that coverage issues need to determined before Insured Persons may receive Defense Costs for a non-indemnified Claim. (See Objection at 7.) The issue of coverage is between the insurers and their insureds; the

8

Committee has no right to be involved in this determination.   Moreover, Chubb already has acknowledged that it has an obligation to advance Defense Costs with respect to the FitzSimons Lawsuit.

The Committee also makes the meritless assertion that before the Insured Persons may receive payment or advancement of Defense Costs, a "careful examination" of the Policies must be made concerning coverage for "actual fraud claims."   By its terms, the "fraud exclusion" applies only if there is a final adjudication establishing the excluded conduct, and Defense Costs with respect to "fraud" claims must be advanced until there is such a determination  So there is no legitimate reason that the Committee -- the party that is alleging purportedly fraudulent conduct -- needs to engage in a "careful examination" of Policies with respect to this coverage issue, which has nothing to do with the question of whether Defense Costs should be advanced to the Insured Persons.

**E.      The Stays Entered In The Lawsuits Are Irrelevant Because the Insured Persons Have Incurred And Are Continuing To Incur Defense Costs.**

The Committee's next argument is that the stays entered in the FitzSimons and Preference Lawsuits obviate the need for the relief requested in the Motion because, the Committee believes, the Insured Persons' counsel have no present need to do any work.   In bringing these actions, the Committee sued the Insured Persons, who now must defend themselves. The Insured Persons thus have retained defense counsel and are incurring legal fees to defend the Lawsuits.   Irrespective whether the litigation is stayed, it is up to the defense counsel for the Insured Persons – not the Committee -- to make prudent decisions concerning the steps to take in defending their clients in connection with the various claims made by the Committee.   Moreover, notwithstanding the stays of the Lawsuits, as the Court is well aware, certain matters at the heart of the Lawsuits are being considered in connection with confirmation

of the competing plans of reorganization in these chapter 11 cases. Numerous Insured Persons have been subjected to discovery relating thereto, and such Insured Persons are entitled to defend themselves. See Allied Digital, 306 B.R. at 512 (finding that, without funding, the directors and officers would be deprived of bargained-for coverage and "be prevented from conducting a meaningful defense to the Trustee's claims and may suffer substantial and irreparable harm"). The costs of their defense, minimal or not, are recoverable from the proceeds of the Policies. It is not the Committee's role to dictate when and to what extent the Insured Persons should be defending themselves.

**F.      The Insured Persons Are Not Required To Prove "Undue Hardship" To Obtain The Relief Requested In The Motion.**

The Committee's last assertion is that the Insured Persons must establish "undue hardship" to gain access to the proceeds of the D&O Policies. Specifically, the Committee claims that "undue hardship" is a "critical factor" in "most of the cases" cited by the Debtors supporting the requested relief. Even if there was a reasonable argument that the Insured Persons are not facing a potential "undue hardship" in this matter if they are denied access to the insurance that was bargained for, the Committee has misread the cases. Contrary to the Committee's assertion, "undue hardship" is not a factor in the analysis applied by this Court and other courts in deciding the threshold issue of whether policy proceeds are property of the estate. Rather, the touchstone of this analysis is the language of the insurance policies and the procedural posture of the matter. See e.g., Miller, 369 B.R. at 810 (concluding that policy proceeds were not property of the estate simply by reviewing "the language and scope of the Policy at issue," with no reliance on any type of hardship) (internal quotations omitted); Allied Digital, 306 B.R. at 509-13 (concluding that proceeds are not part of the estate without relying upon undue hardship); La. World Exposition, Inc., 832 F.2d at 1401 (without relying upon undue

10

hardship, the court determined that the "*liability proceeds*, which belong only to the directors and officers, are not part of the estate") (emphasis in original); Ochs, 238 B.R. at 15-18 (concluding that policy proceeds are not estate property without mentioning "undue hardship").

The issue of "undue hardship" is relevant only if the policy proceeds are property of the estate, in which case individual Insured Persons still may given access to policy proceeds based on a showing of "cause," which may include "undue hardship" to the individual Insured Persons Here, as explained in the Motion, "cause" would exist for granting the requested relief even if the proceeds of the D&O Policies were estate assets (which the case law and facts establish they are not), because (1) neither Tribune nor the estate will suffer prejudice if the Court grants the requested relief, given that the estate faces no direct exposure in connection with the FitzSimons and Preference Lawsuits; (2) granting the requested relief is in the best interests of the estate, as it relieves the estate of potentially significant claims by the individual defendants for indemnification of Defense Costs if they are not satisfied by the D&O Policies; and (3) the individual Insured Persons are likely to suffer "undue hardship" if their Defense Costs are not paid by the D&O Policies, as reflected by the information provided to the Committee that the individual defendants already have incurred, and continue to incur, substantial Defense Costs. Accordingly, even though denying access to payment or advancement of Defense Costs will constitute an "undue hardship" on the Insured Persons, the Debtors need not prove such hardship to obtain the relief sought by the Motion.

11

## CONCLUSION

For the reasons stated above, Tribune respectfully requests that the Court enter an order (i) authorizing the Insurance Providers' payment of past defense costs, fees, and expenses and advancement of future defense costs, fees, and expenses in connection with the FitzSimons Lawsuit and the Preference Lawsuits, and (ii) granting such other and further relief as is just and proper.

Dated:  Wilmington, Delaware
        March 20, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

REED SMITH LLP
John D. Shugrue
Lana J. Raines
10 South Wacker Drive
Chicago, IL  60606
Telephone:  (312) 207-1000
Facsimile:  (312) 207-6400

COLE, SCHOTZ, MEISEL
FORMAN & LEONARD, P.A.

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

12