IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRIBUNE COMPANY, et al.,<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 08-13141 (KJC)<br>Jointly Administered<br><br>Objection Deadline: 3/15/11 at 4:00 p.m.<br>(extended for the Certain Directors and Officers)<br>Hearing Date: 3/22/11 at 10:00 a.m.<br><br>Related to Docket Nos. 8208 and 8414 |

**CERTAIN DIRECTORS AND OFFICERS' RESPONSE
TO OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO MOTION FOR COMFORT ORDER**

The Debtors' Comfort Order Motion[1] seeks a straightforward and routinely granted order – that the proceeds of directors and officers ("D&Os")[2] liability insurance, which was purchased so that Tribune's D&Os could defend themselves in the event claims were filed against them, should be made immediately available to the D&Os. The proceeds are plainly necessary so that the D&Os can properly defend themselves against the multi-billion dollar claims filed against them by the Committee. To the surprise of all involved, the Committee has objected to the Comfort Order Motion, claiming that the Committee should be allowed to dictate how and when the D&Os defend themselves. The Committee also argues that the Court should

---

[1] Capitalized terms used herein, unless otherwise defined, have the meaning found in Motion of Debtor Tribune Company for an Order Modifying the Automatic Stay to Allow Payment and Advancement of Defense Costs, Fees, and Expenses Under Directors and Officers Liability Insurance Policy, filed March 1, 2011 ("Comfort Order Motion").

[2] This brief is filed on behalf of Harry Amsden, Bob Bellack, Stephen Carver, Dennis FitzSimons, Bob Gremillion, Donald Grenesko, David Hiller, Tim Landon, Tom Leach, Luis Lewin, Mark Mallory, Dick Malone, Durham Monsma, Ruthellyn Musil, John Poelking, John Reardon, Scott Smith, John Vitanovec, Kathleen Waltz and David Williams.

delay a decision on the Comfort Order Motion until after the Committee conducts some (improper and irrelevant) discovery.[3]

The Committee's objection is without merit and should be rejected. Contrary to the Committee's position, the law is clear – the proceeds of the D&O policies are <u>not</u> property of the Estate and should immediately be made available to the D&Os so that they can properly prepare to defend themselves against the Committee's claims. <u>See</u> Comfort Order at 10-13; <u>cf.</u> <u>Ochs v. Lipson (In re First Cen. Fin. Corp.)</u>, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) ("In essence and at its core, a D&O Policy remains a safeguard of officer and director interests . . . ."). The Committee (and the Estate) has no valid claim to the policy proceeds (or to control them), and therefore no grounds to object to the Comfort Order Motion.

I. **The Committee Has No Legitimate Basis On Which To Object To The Comfort Order Motion**

    A. **The Committee Has No Legal Basis for Controlling How the Policy Proceeds Are Used**

The Committee's position is that it has the right to control how and when the D&O policy proceeds are used by the D&Os to defend themselves in the FitzSimons and Preference Lawsuits. <u>See</u> Objection at p. 2 (arguing that the policy proceeds are a "potentially valuable source of recoveries" that "needs to be carefully monitored and preserved"); <u>id.</u> at 3 (suggesting that the Committee has the right to impose "procedures and a protocol to balance the competing interest of the creditors and the Insured Persons to the proceeds of the D&O Insurance Policies"); <u>id.</u> at 1 (expressing the concern that the Comfort Order Motion does not include a "monetary limit or cap on the amounts that might be paid"). The Committee is wrong – it has no right to the policy proceeds, no right to control how the D&Os (its opponents) defend themselves, no right to

---

[3] The Committee's filing of its objection came less than two hours after submitting a statement supporting the position that individual creditors should be allowed to commence actions worth purportedly $4 billion against shareholders, including former D&Os, is particularly troubling.

control what costs the Insurance Providers determine to pay as properly covered costs under the policy, and no right to monitor disbursements to ensure that proceeds are available to pay for a possible settlement. In re Allied Digital Technologies, Corp., 306 B.R. 505 (Bankr. D. Del. 2004), supports each of these points.

First, to the extent the Committee's position rests on the notion that the policy proceeds are property of the Estate, Allied explicitly rejects this position. Id. at 512-13; see also Comfort Order Motion at pp. 10-13. The policy proceeds are not assets of the Estate because the former Tribune D&Os are the beneficiaries of the policy, not the Company.[4] Indeed, as explained in the Comfort Order Motion, the relevant policies contain an "Order of Payment" provision that ensures that policy proceeds are paid fully to protect the D&Os before the policy proceeds can be used for any other purpose. See Comfort Order Motion at pp. 11-13. Second, Allied made short work of the contention that a plaintiff (here, the Committee, there the Trustee) has the right to limit or control defense costs incurred by its opponents because the policy proceeds might be needed for settlement:

> The Trustee's real concern is that payment of defense costs [to the D&Os] may affect his rights as a plaintiff seeking to recover from the D&O Policy rather than as a potential defendant seeking to be protected by the D&O Policy. In this way, Trustee is no different than any third party plaintiff suing defendants covered by a wasting policy. No one has suggested that such a plaintiff would be entitled to an order limiting the covered defendants' rights to reimbursement of their defense costs.
>
> The bottom line is that the Trustee seeks to protect the amount he may receive in his suit against the directors and officers while limiting coverage for the defense costs of the directors and officers. This is not what the directors and officers bargained for. In bringing the action against the directors and officers, the Trustee knew that the proceeds could

---

[4] Tellingly, when this issue last arose in this bankruptcy proceeding in the Neil Lawsuit, the Committee did not take the position that the policy proceeds under a different set of "fiduciary liability policies" were property of the Estate and that comfort order motion was granted without objection. See Comfort Order Motion at ¶ 48. In that case, the D&Os who were sued used policy proceeds to defend themselves and were completely exonerated.

1108052

3

> be depleted by legal fees and he took that chance. The law does not support the Trustee's request to regulate defense costs.

Allied, 306 B.R. at 512-13 (emphasis in original).

Third, the Court rejected the argument that a "procedure[]," "protocol," or "cap" (see Objection at pp. 1, 3) should be imposed on the use of the policy proceeds for defense costs:

> Without funding, the Individual Defendants will be prevented from conducting a meaningful defense to the Trustee's claims and may suffer substantial and irreparable harm. The directors and officers bargained for this coverage. On the other hand, the Trustee, as plaintiff, is not an insured. . . . Therefore the Insurer is authorized to advance defense costs to the Individual Defendants in accordance with the terms of the D&O Policy.

Allied, 306 B.R. at 514. In other words, the terms of the insurance contract controlled, not the Trustee's alleged interest in making sure that money was left for possible settlement.

Allied should control here. The Tribune D&Os are subject to extensive, wide-ranging and complex litigation that the Committee has chosen to file. See, e.g., the FitzSimons Lawsuit, which alone is 135 pages long and contains 36 causes of action against dozens of defendants, including 37 former and current Tribune D&Os and seeks "$4 billion" in damages. See Objection at n.2. In bringing the action against the D&Os, the Committee "knew that the [D&O policy] proceeds could be depleted by legal fees and [it] took that chance." See Allied, 306 B.R. at 513. No case cited by the Committee supports the proposition that a party's adversary can inject itself into a private contractual agreement between a beneficiary of an insurance policy and the insurer. No case holds that the party's adversary is entitled to control, monitor or cap the opponent's defense expenditures.

The Committee's position is unsupported by any legal authority and should be rejected. Indeed, the main case cited by the Committee for the proposition that the law is unsettled on whether policy proceeds are property of the Estate, In re Downey Fin. Corp., 428 B.R. 595

(Bankr. D. Del. 2010), actually devastates the Committee's position and shows that the Comfort Order Motion should be granted. Immediately after the language quoted by the Committee, Downey explains that, in situations like the one presented here, policy proceeds are unquestionably not property of the Estate:

> Cases determining whether the proceeds of a liability insurance policy are property of the estate are controlled by the language and scope of the specific policies at issue. . . When a debtor's liability insurance policy only provides direct coverage to the debtor, courts generally hold that the proceeds are property of the estate. Conversely, when the liability insurance policy only provides direct coverage to the directors and officers, courts generally hold that the proceeds are not property of the estate. When the liability insurance policy provides direct coverage to both the debtor and the directors and officers, 'the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution.'

Id. at 603. The Downey court, which extensively quoted Allied, then went on to hold as did Allied that, where no claims are pending against the Debtor and where the Debtor is not indemnifying the defendant D&Os, policy proceeds are *not* the property of the Estate and can be used by the D&Os to defend themselves. Id. at 608. The facts here are the same and so should be the result. The other case cited by the Committee, In re CyberMedica, Inc., 280 B.R. 12 (Bankr. D. Mass 2002) also supports the D&Os' position here because that court, even after finding that the policy proceeds were property of the Estate (for reasons not adopted in Delaware), lifted the stay to permit payment of the D&Os' defense costs because they were "in need now of their contractual right to payment of defense costs and may be harmed if disbursements are not presently made to fund their defense of the Trustee's Complaint." Id. at 18.

### B. The D&Os Would Be Severely Prejudiced If a Decision on the Comfort Order Motion Were Delayed

The Committee argues that there is no urgency to decide the Comfort Order Motion because "the D&O Defendants here do not face such imminent and actual threats of undue hardship because there is no litigation actively being pursued against them." Objection at p. 11, ¶ 19. The Court should compare the Committee's statement with the decision of courts such as CyberMedica, 280 B.R. at 18 (court lifted stay to permit payment of defense costs because the directors may be irreparably harmed if they were not permitted to exercise their contractual right to the advancement of defense costs); and In re Arter & Hadden, L.L.P., 335 B.R. 666, 674 (Bankr. N.D. Ohio 2005) (lifting stay to allow payment of defense costs because individuals "may suffer substantial and irreparable harm if prevented from exercising their rights to defense payments to fund their defense of the Trustee's Complaint.").

The D&Os are facing a virtual army of long-prepared and well-funded opponents. These entities, represented by several top law firms from around the country, have been investigating and analyzing the Tribune LBO for over two years. See, e.g., Monthly Applications by Landis Rath & Cobb LLP, Co-Counsel to the Official Committee of Unsecured Creditors for Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. §§ 330 and 331 at Docket Nos. 6113, 6636, and 7388 (stating that it "spent significant time researching, analyzing, discussing and resolving potential issues concerning the investigation and prosecution of the LBO related claims."). As soon as the stay is lifted (long scheduled for April 1), the Committee and its allies, with more than 2 years work behind them, will be in a position to aggressively

litigate against the D&Os, with a minimum of $20 million in new money available to prosecute the FitzSimons and Preference Lawsuits after Plan Confirmation.[5]

The D&Os already are confronted with literally millions of pages of produced documents, dozens of transcripts and depositions, multiple expert reports, and thousands of pages of court testimony. More material is being added to the pile every day as the Plan Confirmation hearing proceeds. The Committee, its allies and the Aurelius Group have been preparing their assaults on the D&Os for many months. Not content with the advantage it already has, the Committee now asks the Court to step in and prohibit the 37 D&Os it sued from fully preparing to defend themselves until the Committee says they can start (subject to whatever limitations it may seek to impose). The unfairness of such a result is manifest. The Committee's claim that no "harm" will result from delay is fatuous and has been rejected in published opinions. Its objection should be overruled.

### C.  The Stay In The FitzSimons Lawsuit Does Not Render The Comfort Order Motion Premature

The Committee's argument that the Comfort Order Motion is premature because the FitzSimons and Preference Lawsuits are stayed again ignores reality. See Objection at p. 2 ("it is unclear what defense costs, fees and expenses the named D&O Defendants reasonably could have incurred to date or will incur in the future"). The Committee knows that the D&Os' defense counsel have been active in proceedings relating to Confirmation Plan, including discovery relating to the Examiner's work and Plan Confirmation discovery such as requests from Committee members for depositions and discovery from the D&Os. The Committee also knows that work is critical to the defense of the FitzSimons Lawsuit. For example, in December

---

[5]  This amount does not include the huge dollars Aurelius and other creditors would devote to their proposed fraudulent transfer complaints should the automatic stay be lifted. See n. 3, above.

2010, Aurelius identified for deposition five individuals who were D&Os in 2007 and who are now defendants in the FitzSimons Lawsuit: Donald Grenesko (former Tribune Senior Vice President/Finance & Administration), Chandler Bigelow (former Tribune Treasurer and current Chief Financial Officer), Tim Landon (former President of Tribune Interactive), Crane Kenney (former Tribune General Counsel), and Harry Amsden (former Vice President of Tribune Publishing and current Senior Vice President, Financial Operations of Tribune). A month later, in January 2011, it served deposition subpoenas on additional former D&Os: Bob Bellack (former CFO of the LA Times), Kathleen Waltz (former President and CEO of the Orlando Sentinel), and Peter Knapp (former Controller of Tribune Publishing), as well as Messrs. Grenesko and Landon. It also formally noticed the depositions of Dan Kazan (former SVP of Development) and Mr. Bigelow. Those depositions took place in February and March.

Proper defense of the D&Os, including with respect to the depositions and discovery referenced above, obviously required the D&Os' counsel to gain an understanding of the Tribune LBO, an issue at the heart of the FitzSimons Lawsuit, Preference Lawsuits and the Plan Confirmation proceedings. Even without the work resulting from the actions of the Committee and the Aurelius Group, advance preparation and investigation in anticipation of the stay being lifted would obviously be proper and necessary.

In addition to these requirements, D&Os have been doing their best to monitor and review the filings in the bankruptcy action to attempt to ensure that their rights are not adversely and improperly affected. This process included filing objections to the competing Plans, both of which contained provisions that, as written, could severely harm the D&Os' rights in the FitzSimons Lawsuit. See Certain Directors' & Officers' Objection to the Proposed Plans for Reorganization, Docket No. 7981 (objecting to the DCL Plan's Bar Order, which would

Case 08-13141-BLS    Doc 8443    Filed 03/21/11    Page 9 of 11

effectively eliminate the D&Os' substantial cross-claims against released parties, and joining in the McCormick Foundation and Cantigny Foundation's Objection to the Creditors' Trust arrangement in the competing plans, Docket No. 7972, which objected to the creation of a mechanism designed solely (and inappropriately) to avoid the protections provided by Bankruptcy Code § 546(e)). Sleeping on their rights, as the Committee would have this Court mandate, was not, and is not, something the D&Os (or competent counsel) can, or should, do.

The Committee concedes that "as a result of the monitoring of notices of appearances and requests for access to the document depository," it became aware that the D&Os were "active" in the bankruptcy proceeding. Objection at p. 6, ¶ 7. Notwithstanding this knowledge, however, the Committee never said that the D&Os should not participate, instead choosing to lie in the weeds until after defense costs were incurred. The Committee knew that the D&Os were taking steps to protect themselves. It was essential that they do so. Claiming that the D&Os should not be allowed to prepare their defense or that their opponents should be able to monitor or limit that right is contrary to law and should be rejected.

## II.    The Committee's Demand for an Adjournment Should Also Be Denied

The Court should reject the Committee's arguments for an adjournment for four independent reasons.

First, the Committee's discovery on the D&O insurer is irrelevant to whether the Court should grant the limited relief sought by the Comfort Order Motion, which asks only that the Court modify the automatic stay to the extent necessary to allow defense costs payments <u>in the event</u> the D&O insurers agree that such payments should be made under the Policy. The Comfort Order Motion does <u>not</u> ask the Court to make any substantive determination as to whether payments must be made or whether any incurred costs are covered by the policies. Those decisions are between the D&O insurers and their insureds pursuant to the terms of the

1108052                                    9

insurance contracts and are not the business of the Committee, an outsider to this relationship. Nothing learned in discovery could properly impact whether the Court should grant the Comfort Order Motion.

Second, as explained above, the Committee has no right to control how and when insurance proceeds are used to properly defend the D&Os.

Third, the Committee misleads the Court by claiming that it cannot evaluate coverage for the Lawsuits until the insurance company produces documents in response to the subpoena. All that is needed to evaluate coverage is the Federal primary policy, which, as explained in the Comfort Order Motion, provides that the policy proceeds are for the benefit of the D&Os, not the Committee. Moreover, contrary to what the Committee has told the Court, the Committee's bills prove that the Committee already has the policy and has been evaluating coverage for the Lawsuits since at least August 2010. See, e.g., Thirteenth Monthly Application of Zuckerman Spaeder LLP for Interim Allowance of Compensation and Reimbursement of Expenses at Docket No. 5842, Ex. A at 16.

Fourth, the discovery sought by the Committee is procedurally improper. Discovery is stayed in the FitzSimons Lawsuit and the Committee should not be permitted to manufacture a dispute regarding the Comfort Order as a way to avoid that stay.[6]

---

[6] This is not to suggest that the Committee's subpoena is substantively proper. It seeks production of privileged information exchanged between Federal and the D&Os and their counsel. See Fed. R. Civ. P. 26(b)(3)(A) ("a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney . . . [or] insurer . . .")) (emphasis added); see also United Coal Companies v. Powell Const. Co., 839 F.2d 958, 966 (3d Cir. 1988) ("[F]ederal courts have consistently ruled that the work product doctrine is not inapplicable merely because the material was prepared by or for a party's insurer or agents of the insurer.") (citations omitted); Kingsway Financial Services, Inc. v. PricewaterhouseCoopers LLP, No. 03 Civ. 5560(RMB)(HBP), 2008 WL 4452134, at *10 (S.D.N.Y. Oct. 2, 2008) (finding that "disclosure of materials to an insurer does not waive the work-product protection because such disclosure does not materially increase the likelihood of disclosure to an adversary.") (internal quotations and citations omitted); Railroad Salvage of Conn. Inc. v. Japan Freight Consolidators (U.S.A.), Inc., 97 F.R.D. 37, 40-41 (E.D.N.Y. 1983) (holding that communications between an insured and its insurers were protected by the work product doctrine where the communications were "written as a consequence of pending litigation for the purpose of mounting a defense to the claim."). Ironically, the Committee argues that it wants to

In sum, the Committee has offered no legitimate reason why the Court should delay its ruling on the Comfort Order Motion based on its improper subpoena to Federal.

## CONCLUSION

For these reasons, the Committee's objection should be overruled.

Dated: March 21, 2011

CONNOLLY BOVE LODGE & HUTZ LLP

*[signature]*

Jeffrey C. Wisler (#2795)
Marc J. Phillips (#4445)
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Telephone : (302) 658-9141
Facsimile: (302) 658-0380

-and-

John R. McCambridge
Patrick T. Nash
GRIPPO & ELDEN LLC
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 704-7789
Facsimile: (312) 558-1195

*Attorneys for the Certain Directors and Officers*

#4246991v1

---

preserve the policies for settlement at the same time it seeks improper discovery of privileged communications between the D&Os and their insurers. Settlement will only be an option if the D&Os' lawyers are allowed to freely communicate with the insurers about the strength and weaknesses of the cases without the threat that those communications will later be the subject of discovery request from the D&Os' opponents.