# EXHIBIT 1

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| **TRIBUNE COMPANY,** *et al.*, | ) |
| | ) **Case No. 08-13141 (KJC)** |
| Debtors. | ) |
| | ) **Jointly Administered** |

### SAMUEL ZELL'S MOTION FOR RELIEF UNDER RULE 9011

Samuel Zell ("Mr. Zell") respectfully submits this motion for relief under Federal Rule of Bankruptcy Procedure 9011 against the Official Committee of Unsecured Creditors (the "Committee") and/or its counsel.  Mr. Zell states as follows:

1.      Mr. Zell is entitled to relief because the Committee violated Rule 9011 by asserting in the complaint it filed in *Official Committee of Unsecured Creditors of Tribune Co., et al. v. Fitzsimons, et al.*, Adversary Proceeding No. 10-54010 (the "Complaint") specific claims against Mr. Zell even though it lacks a reasonable basis for those claims.

2.      Because the claims against Mr. Zell are not warranted by existing law and the factual allegations in the complaint do not have evidentiary support, the Committee can have no reasonable basis for any of the claims against Mr. Zell.

3.      For the foregoing reasons and as explained in the accompanying memorandum in support of this motion, the Court should impose sanctions against the Committee and its counsel, including striking the claims against Mr. Zell and awarding reasonable attorneys' fees and costs incurred in defending against the Committee's claims.

Dated: _____          **BLANK ROME LLP**

                               By: _____
                               David Carickhoff (DE No. 3715)

Alan M. Root (DE No. 5427)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400

and

**JENNER & BLOCK LLP**
David J. Bradford (admitted *pro hac vice)*
Catherine L. Steege (admitted *pro hac vice*)
Douglas A. Sondgeroth (admitted *pro hac vice)*
Andrew W. Vail (admitted *pro hac vice)*
353 North Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350

*Counsel for Samuel Zell*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| **TRIBUNE COMPANY,** *et al.*, | ) |
| | ) **Case No. 08-13141 (KJC)** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**MEMORANDUM IN SUPPORT OF
SAMUEL ZELL'S MOTION FOR RELIEF UNDER RULE 9011**

The Unsecured Creditors Committee's claims against Samuel Zell ("Mr. Zell") have no reasonable basis in law or fact and violate Federal Rule of Bankruptcy Procedure 9011. Mr. Zell submits this motion now in an effort to avoid the wasteful litigation of these baseless claims, which will result in no recovery to the estate or its creditors.

Mr. Zell is entitled to relief because the Committee violated Rule 9011 by asserting in the complaint it filed in *Official Committee of Unsecured Creditors of Tribune Co., et al. v. FitzSimons, et al.*, Adversary Proceeding No. 10-54010 (the "Complaint") three claims against Mr. Zell even though it lacks any reasonable basis for those claims. In particular, at least the following claims violate Rule 9011:

- The Committee's claim that Mr. Zell allegedly aided and abetted breaches of fiduciary duties by the Tribune's Special Committee at Step One, at a time when Mr. Zell was sitting across the table from the Special Committee, at its invitation, bargaining at arms-length to purchase Tribune on terms acceptable to the Special Committee. (Count VII). There is no factual basis for depriving Mr. Zell of the well-established legal protections against aiding-and-abetting liability for a party negotiating across the table from a party that allegedly breaches its fiduciary duty. The Examiner found this alleged claim "highly unlikely" to succeed.

- The Committee's claim that Mr. Zell breached his fiduciary duties when he became a director after Step One was approved, notwithstanding that he completely abstained from any board actions related to the transaction. (Count II and a similar claim under Delaware General Corporate Law Sec. 160 in Count XI) This claim is directly contrary to controlling Delaware authority. The Examiner

was not even asked to address whether Mr. Zell could breach fiduciary duties when he abstained from taking action, one way or another, on a transaction in which he had a known and fully disclosed interest.

- The Committee's claim that EGI-TRB's corporate substance should be "pierced" and disregarded so that Mr. Zell should be liable as its alter-ego. The Complaint simply makes the conclusory allegation that EGI-TRB was Mr. Zell's "alter-ego," and is bereft of *any* of the factual allegations that are necessary to state such a difficult claim, including a lack of corporate formalities, inadequate capitalization, or a sham purpose. No party considered this newly-minted theory sufficiently credible to ask the Examiner to consider it, and the Examiner nowhere identified it as a plausible basis for liability. It is well beyond the pale.

Indeed, Professor Black, the DCL Plan Proponents' key expert witness, testified that he agrees with Examiner Klee's conclusion that none of the identified claims against Mr. Zell have merit. Professor Black testified at the confirmation hearing that the claims against Mr. Zell did not "have a meaningful chance of success" and did not have "significant recovery value":

Q   Okay. And do you recall that one of the claims that you did not list among those claims were the alleged [breach] of fiduciary duty and aiding and abetting breach of fiduciary duty claims that have been alleged against my client, Mr. Zell?

A   That's correct.

Q   Okay. And, in fact, *your opinion is that these alleged claims against Mr. Zell do not have a significant recovery value*. Isn't that correct?

A   *That is my opinion.*

Q   And you come to that conclusion, come [to] that opinion because you do not believe that these claims have a meaningful chance of success. Isn't that correct?

A   That's correct. If they were to succeed, there were large dollars attached, but *I do not think they have a meaningful chance of success.*

Q   And that's true both for any claims alleged at Step 1 or any claims alleged at Step 2[?]

A   Yes.

(Ex. A (3/10/11 Tr.) at 51:18-52:12 (emphasis added).)

More specifically, Professor Black testified that there was no basis for claims against Mr. Zell because the record shows that Mr. Zell negotiated at arm's length and abstained from participating in board actions related to the transaction:

> Q [O]ne of the reasons why you reach the opinion that there are not claims with a meaningful chance of success against Mr. Zell at Step 1 is because Mr. Zell was on the other side of the deal from the Tribune. Correct?
>
> A That is an important source of my opinion. ***So he could not be liable for breach of fiduciary duty as a director because he was not a director at the time that Step 1 was negotiated*** and entered into is my understanding.
>
> Q And you have no reason or no evidence that you have seen that the negotiations regarding the acquisition of the Tribune were anything other than arm's length.
>
> A I have seen ***no evidence that they were other than at arm's length***.
>
> Q And, in fact, with regard to Step 2, the evidence that you're aware of is that Mr. Zell abstained from all of the Tribune board's consideration of the second step merger.
>
> A So I believe what I say in my report is he abstained we know is a formal matter, he abstained. So unless he was informally or secretly trying to influence Tribune decision, Tribune's decision, then ***it's hard to see how he is liable as a director and I am aware of no evidence that he was secretly trying to influence Tribune's decision.*** Let me stop there.
>
> Q. Okay. And so you have not seen any evidence in the record based upon your review that you've undertaken for the last year, that the claims against Mr. Zell or EGI-TRB have any significant merit. Correct?
>
> A. That's my view.

(*Id*. at 52:20-53:24 (emphasis added).)

Professor Black also confirmed that in his opinion there is no evidence that Mr. Zell acted with bad faith:

3

Q   And in your opinion, there's no basis in the record to suggest that Mr. Zell [in] any way acted in bad faith here.

A   I have seen no evidence in the record to suggest bad faith on the part of Mr. Zell.

Q   And in your opinion, you've seen no basis in the record to suggest that Mr. Zell knew or thought that the Tribune was insolvent at any point during Step 1 or Step 2?

A   I am not aware of evidence in the record that Mr. Zell believed Tribune was insolvent at either Step 1 or Step 2. And as I testified at deposition, there is some evidence suggesting he believed Tribune continued to be solvent at Step 2.

(*Id*. at 53:25-54:12.)

In response to this fatal testimony by the Committee's expert Professor Black, the Noteholder Plan Proponents offered no rebuttal. The Noteholders' expert, Dr. Bruce Beron, acknowledged at the confirmation hearing that he was not expressing an opinion in disagreement with Professor Black's opinion that the claims against Mr. Zell have no meaningful probability of success. (Ex. B (3/17/11 Tr.) at 254:21-24.)

Because there is no reasonable basis for any of the claims against Mr. Zell, the Committee and its counsel have violated Rule 9011. The Court should impose sanctions against the Committee and its counsel, including striking the claims against Mr. Zell and an award of reasonable attorneys' fees incurred in connection with the defense of those baseless claims.[1]

## ARGUMENT

Rule 9011 requires that, in signing and filing a court pleading, counsel "certif[ies] that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable

---

[1] Although not addressed by this motion, the Committee's claims against EGI-TRB also suffer from multiple legal and factual deficiencies. EGI-TRB reserves all rights with respect to those claims. As a practical matter, however, the withdrawal of the Committee's "piercing the corporate veil" claims against Mr. Zell, or an order striking the same, would likely moot the Committee's claims against EGI-TRB because EGI-TRB's only assets are claims against the Estate.

under the circumstances," that (1) the claims "are warranted by existing law or by a nonfrivolous argument for extension, modification or reversal of existing law or for establishment of new law" and (2) that the factual allegations in the complaint "have evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."   Fed. R. Bankr. P. 9011(b).   When a party knows that one of its alleged causes of action is barred by an affirmative defense, it may not continue to assert that claim consistent with Rule 9011.   *See Brubaker v. City of Richmond*, 943 F.2d 1363, 1383-85 (4th Cir. 1991) (quoting *White v. Gen. Motors Corp.*, 908 F.2d 675, 682 (10th Cir. 1990) ("Part of a reasonable attorney's prefiling investigation must include determining whether any obvious affirmative defenses bar the case.")); *Sieverding v. Colo. Bar Ass'n*, No. Civ.A.02-M-1950(OES), 2003 WL 22400218, at *28 (D. Colo. Oct. 14, 2003).

When a party violates Rule 9011, the Court is authorized to sanction the party's counsel, the party itself, or both, depending on the responsibility of each for the violation. Fed. R. Bankr. P. 9011(c) (providing the court may "impose an appropriate sanction upon the attorneys, law firms, or parties that have violated [Rule 9011(b)] or are responsible for the violation"); *see also In re Hill*, 437 B.R. 503, 532 (Bankr. W.D. Pa. 2010) (sanctioning represented party for factual misstatements).   Sanctions against a represented party like the Committee are appropriate where the party "pursued [a] claim in federal court when it knew, or should have known, that [the] claim was legally and factually baseless." *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1093 (11th Cir. 1994); *In re Collins*, 250 B.R. 645, 665 (Bankr. N.D. Ill. 2000) (finding Rule 9011 violations by counsel and client for failure to make "reasonable inquiry into the state of

existing law").[2]   Here, given the multiple and obvious legal and factual deficiencies in the Committee's claims against Mr. Zell, sanctions against both the Committee and its counsel are appropriate.

The Committee and its counsel can have no reasonable belief that the claims against Mr. Zell are supported by existing law or a non-frivolous argument for modifying existing law, or will have evidentiary support.   The Court should apply sanctions pursuant to Rule 9011, including an order striking the Committee's claims against Mr. Zell and an award of Mr. Zell's attorneys' fees.   *See* Fed. R. Bankr. P. 9011(c)(2) (stating sanctions may include "directives of a nonmonetary nature" and "reasonable attorneys' fees"); Fed. R. Civ. P. 11, 1993 Adv. Comm. Notes (available non-monetary sanctions include "striking the offending paper"); *see also Ivanova v. Columbia Pictures Indus., Inc.*, 217 F.R.D. 501, 512 (C.D. Cal. 2003) (striking unfounded and barred factual allegations of complaint pursuant to Rule 11).   Although many Rule 11 motions are brought at later stages of the proceedings, Mr. Zell brings this motion now in the hope that it will avoid the necessity for wasteful litigation and substantially limit the legal fees expended on these allegations.   Given the factual record established by the Examiner Report, Professor Black's testimony, and the affidavits of Mr. Zell and Mr. Pate that are submitted in support of this motion (Exhibits C and D), there is no reason to delay resolution of whether these claims comply with Rule 9011.

---

[2] Rule 9011 contains an exception that prohibits monetary sanctions against a represented party for frivolous legal contentions (which are the responsibility of counsel), but that exception has no effect here because (i) the exception does not apply to non-monetary sanctions such as the striking of the claims against Mr. Zell; and (2) the exception applies only to legal contentions, while the Committee's claims against Mr. Zell contain multiple factual deficiencies that violate Rule 9011.   *See* Fed. R. Bankr. P. 9011(c)(2)(A); *Collins*, 250 B.R. at 665 n.3.

I.      **The Allegations of Aiding and Abetting Breaches of Fiduciary Have No Merit And No Reasonable Basis in Fact Or Law.**

The centerpiece of the Committee's claims against Mr. Zell is that he supposedly aided and abetted breaches of fiduciary duty by Tribune's officers and directors when he sat across the bargaining table and negotiated at arm's length with the Tribune's Special Committee in early 2007 – nearly two years before the bankruptcy petition.  (Compl. ¶¶ 126-29.)  That claim fails both as a matter of law and under the undisputed factual record.  After reviewing hundreds of thousands of pages of documents and interviewing nearly 40 key witnesses, the Examiner already has concluded in his comprehensive investigation that the claim is without merit and there is no "basis to conclude that the Zell Group aided and abetted a breach of any fiduciary duties in connection with the Leveraged ESOP Transactions."  (Examiner Report, Vol. II, 395, 397.)

It is well-settled, as a matter of law, that a party who negotiates across the table and at arm's-length from a fiduciary is not liable for aiding and abetting a breach of that fiduciary's duties even if the deal works out poorly for the party with whom they were bargaining.  *See Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001); *In re Gen. Motors (Hughes) Shareholder Litig.*, No. Civ.A. 20269, 2005 WL 1089021, at *26 (Del. Ch. May 4, 2005).  Quite simply, "arm's-length negotiations cannot give rise to liability for aiding and abetting." *Malpiede*, 780 A.2d at 1097.  The Committee's aiding and abetting claim fails as a matter of law for those reasons.

If the law permitted liability in these circumstances, parties would be deterred from entering into freely-negotiated contracts for fear that of liability.  It would be both unprecedented and harmful to the fundamental right to contract to purchase property, to impose upon a party,

who negotiates at arm's-length in a competitive process, some duty to determine whether their counter-party is complying with his or her fiduciary duties in connection with the bargaining.

The only exception to that rule is if a party offers personal benefits to their counter-party that were so plainly excessive and represented such a significant percentage of the total transaction value that a court could reasonably infer that the payments were inherently wrongful and made specifically to induce the fiduciaries to breach their duties. *McGowan v. Ferro*, No. CIV.A. 18672-NC, 2002 WL 77712, at *3 (Del. Ch. Jan. 11, 2002). The Committee apparently seeks to shoehorn its claim into that narrow exception by alleging that Mr. Zell "dangled significant financial incentives" before Tribune's officers and directors to entice them to approve the LBO deal. (*E.g.*, Compl. ¶¶ 126-29.)

There is, however, *no* factual basis for that allegation. First, as the Examiner's investigation determined, there is no factual basis to conclude that any actions by Tribune's officers or directors were based on any benefits Mr. Zell offered. (*See, e.g.*, Examiner's Report, Vol. I at 398-399 (citing sworn testimony and interviews of Thomas Whayne, Dennis FitzSimons, Nils Larsen, Chandler Bigelow, and Sam Zell).) Given the thoroughness of the Examiner's review, the Committee can have no reasonable basis to allege otherwise or to contend that contrary facts might reasonably be developed. Second, benefits that Tribune's management stood to receive as a result of a change of control because of the LBO were based not on incentives offered by Mr. Zell, but on the terms of *existing* Tribune compensation plans that predated any negotiations with Mr. Zell, such as the "Transitional Compensation Plan." (*See* Ex. C (Pate Declaration) at ¶ 4; *see also* Ex. D (Zell Declaration) at ¶ 4.) Third, the factual record shows that Mr. Zell actually negotiated to *reduce* the cash benefits paid to management as a result of the transaction by negotiating to convert $37 million of those benefits into an equity

8

incentive plan that placed the benefits "at risk" in the post-transaction Tribune. (*See* Ex. C (Pate Declaration) at ¶ 7.)

For each of those reasons, the Committee and its counsel can have no reasonable basis to continue to assert its aiding and abetting claim against Mr. Zell. The claim violates Rule 9011 and sanctions should apply.

## II.    The Committee's Breach of Fiduciary Duty Claims Also Have No Reasonable Basis.

Another novel claim that the Committee asserts against Mr. Zell is that he allegedly breached fiduciary duties he owed to Tribune while he was a member of Tribune's Board of Directors in connection with "Step Two" of the LBO transaction, when he did *nothing*. This claim (and the related Delaware General Corporation Law §§ 160 and 173 claim) seeks to take the law where it has never gone before, and violates Rule 9011.

"Delaware law clearly prescribes that a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve that transaction was wrongful." *In re Bridgeport Holdings, Inc*., 388 B.R. 548, 566 (Bankr. D. Del. 2008) (citation omitted) (granting motion to dismiss counts against director who played no role in approving challenged transaction); *In re Tri-Star Pictures, Inc., Litig*., Civ. A. No. 9477, 1995 WL 106520, at * 2 (Del. Ch. Mar. 9, 1995) (no liability for directors who "deliberately removed themselves from the decision-making process" and the preparation of challenged proxy materials) (citing *Citron v. E.I. Du Pont de Nemours & Co*., 584 A.2d 490, 499 (Del. Ch. 1990)).

For example, in *Citron*, a shareholder challenged the merger of Remington and DuPont. 584 A.2d 499. In that transaction, because of potential conflicts of interest, directors of Remington who were affiliated with DuPont abstained from decision-making on the transaction,

leaving authority in the hands of independent directors on a "Merger Committee." *Id.* at 499-500. However, when a "logjam" occurred during negotiations, one of the non-independent directors intervened to bring the parties back to the bargaining table. *Id.* at 499. When the merger was later challenged, the Delaware Chancery Court held that the non-independent directors who had abstained from decision-making were not subject to fiduciary duty claims because they "played no role in the Merger Committee's, or the Board's, decisionmaking process." *Id.* As to the director who intervened to break the "logjam," the court held that no claim could be asserted against him because nothing showed that his "limited role in bringing the two sides together . . . caused any actionable harm to the plaintiff class," and he was "not one of the persons whose decisionmaking actions caused that result to come about." *Id.* at 499 n.12.

The rule that a director who abstains from decision-making cannot be liable for conduct in which he or she did not participate applies with force here. It is undisputed (and undisputable in good faith) that Mr. Zell abstained from Board decisions relating to the LBO, including that he had no role in Tribune's decision to approve Step Two. (*See, e.g.*, Ex. E (12/18/07 Tribune BOD Minutes [TRB 00415683-86]) (also identified as Examiner's Exhibit 11, DCLPP Exhibit 879, and NPP Exhibit 1849); Ex. D (Zell Declaration) at ¶ 6.) The Committee tacitly recognizes as much, directing all of its factual allegations purportedly supporting the breach of fiduciary claims against the Special Committee and the other Tribune directors, *not* Mr. Zell. (*See* Compl. ¶¶ 197-201.)

In addition, the Committee can have no reasonable basis to assert that despite Mr. Zell's formal abstention he secretly influenced others to act. (*See* Ex. D (Zell Declaration) at ¶ 6.) Indeed, the Committee's own expert admits he has seen no such evidence and therefore rejects any breach of fiduciary duty claims against Mr. Zell and the Noteholders' expert expresses no

opinion that disagrees with Professor Black's opinion. (Ex. A (3/10/11 Tr.) at 51:18-54:18; Ex. B

(3/17/11 Tr.) at 254:21-24.)  This claim is so fanciful that no one asked the Examiner to address

it – although the Examiner did address potential liability of other directors on the premise that

they had acted to approve Step Two and found it unlikely that they could be held liable.

Accordingly, because Mr. Zell had no role in the challenged decision, he cannot be liable

for breach of fiduciary duty.  *Tri-Star Pictures*, 1995 WL 106520, at * 2.  For the same reason,

he can have no liability under D.G.C.L. §§ 160 and 173.  The Committee can have no reasonable

basis to contend otherwise and cannot maintain this claim consistent with Rule 9011.

**III.   The Committee Does Not Have And Cannot Present A Reasonable Basis To Allege An Alter-Ego Theory of Liability.**

Finally, the Committee's claim that Mr. Zell is the alter-ego of and liable for EGI-TRB's

obligations is well beyond the pale.  The Complaint is bereft of any factual allegations that

would support a "piercing" theory—because no such facts exist.  This claim is also so novel that

no one considered it worth asking the Examiner even to consider.  Rule 9011 requires this claim

to be stricken or withdrawn.

Delaware courts will not lightly set aside the corporate form; a party pursuing such a

theory must meet stringent legal tests.  Meeting those standards under Delaware law "is a

difficult task."  *Wallace v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999).  Under those tests, the

Committee first must show a failure to treat EGI-TRB as a separate corporate entity, through a

disregard of corporate formalities, undercapitalization, and/or treatment of the entity as a façade.

*Mason v. Network of Wilmington, Inc.*, No. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July

1, 2005).  The Committee has offered no factual allegations with respect to any of those factors;

nor is there any basis to make such allegations.

11

Second, the Committee is required to show EGI-TRB was established for an "improper purpose," such as "fraud or similar injustice." *Id.*; *see also La Chemise Lacoste v. Gen. Mills, Inc.*, 53 F.R.D. 596, 603 (D. Del. 1971) (piercing corporate veil requires corporate form to be "used as an instrumentality to perpetuate fraud, justify wrong" or commit another injustice). In other words, the Committee must show that EGI-TRB was "an *artifice and a sham* designed to execute illegitimate purposes in the abuse of the corporate function and the immunity that it carries." *Lacoste*, 53 F.R.D. at 603 (emphasis added). The Committee has not and cannot identify any evidence that would allow it to meet this burden and has no plausible basis to make this assertion. EGI-TRB was formed to—and did—invest over $300 million in Tribune, funds which appear to be entirely lost. It is completely baseless to suggest that there is some basis to "pierce" its existence. Accordingly, the Committee's "alter-ego" theory is baseless and violates Rule 9011.

Because the Committee's Complaint is utterly bare of any factual allegations to support a "piercing" theory—and because the Committee cannot allege otherwise consistent with Rule 9011—any claims against EGI-TRB will result in no recovery for the estate. As noted, EGI-TRB has no assets other than its debt position in the Debtor—which it has offered to relinquish in return for a release—and there is no basis to set aside EGI-TRB's corporate form. Accordingly, proceeding on any claims against EGI-TRB would result only in wasteful litigation that will not benefit the estate.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter an order finding that the Committee's claims against Mr. Zell and the claim that Mr. Zell is an alter ego of EGI-TRB violate Rule 9011. The Court should sanction the Committee and/or its counsel, including by striking the claims against Mr. Zell and by awarding attorneys' fees and costs incurred in defending against the Committee's claims.

Dated: _____

**BLANK ROME LLP**

By: _____
David Carickhoff (DE No. 3715)
Alan M. Root (DE No. 5427)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400

and

**JENNER & BLOCK LLP**
David J. Bradford (admitted *pro hac vice*)
Catherine L. Steege (admitted *pro hac vice*)
Douglas A. Sondgeroth (admitted *pro hac vice)*
Andrew W. Vail (admitted *pro hac vice)*
353 North Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350

*Counsel for Samuel Zell*

13

# EXHIBIT A

```
              IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF DELAWARE


IN RE:                         )    Case No. 08-13141-KJC
                               )
                               )
TRIBUNE COMPANY,               )    Chapter 11
                               )
                               )    Courtroom 5
                               )    824 Market Street
          Debtors.            )    Wilmington, Delaware
                               )
                               )    March 10, 2011
                               )    10:00 a.m.



                   TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JUDGE KEVIN J. CAREY
               UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtors:                   Sidley Austin, LLP
                               BY: JAMES CONLAN, ESQ.
                               BY: JAMES BENDERNAGEL, ESQ.
                               BY: JAMES DUCAYET, ESQ.
                               One South Dearborn
                               Chicago, IL 60603
                               (312) 853-7000


                               Cole, Schotz, Meisel, Forman
                               & Leonard, P.A.
                               BY: NORMAN PERNICK, ESQ.
                               500 Delaware Ave., Ste. 1410
                               Wilmington, DE 19801
                               (302) 652-3131


ECRO:                          BRANDON McCARTHY

Transcription Service:         DIAZ DATA SERVICES
                               331 Schuylkill Street
                               Harrisburg, Pennsylvania 17110
                               (717) 233-6664
                               www.diazdata.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service
```

1  examination?

2          MS. STEEGE:  Good morning, Your Honor.  Catherine

3  Steege on behalf of EGI, TRB, and Mr. Zell.

4  BY MS. STEEGE:

5  Q     Good morning, Professor Black.

6  A     Good morning.

7  Q     Just a few questions for you.  Do you recall that you

8  testified yesterday afternoon on direct that you had

9  allocated $300 million of value to the litigation trust in

10 connection with offering your opinion about the

11 reasonableness of the DCL plan settlement?

12 A     As a moderately conservative estimate, yes.

13 Q     Okay.  And you also testified as to how you arrived at

14 that $300 million which claims you included in arriving at

15 that number.  Do you recall that testimony?

16 A     Yes, I do.

17 Q     Okay.  And do you recall that one of the claims that

18 you did not list among those claims were the alleged bridge

19 of fiduciary duty and aiding and abetting breach of

20 fiduciary duty claims that have been alleged against my

21 client, Mr. Zell?

22 A     That's correct.

23 Q     Okay.  And, in fact, your opinion is that these

24 alleged claims against Mr. Zell do not have a significant

1 | recovery value.  Isn't that correct?

2 | A     That is my opinion.

3 | Q     And you come to that conclusion, come that opinion

4 | because you do not believe that these claims have a

5 | meaningful chance of success.  Isn't that correct?

6 | A     That's correct.  If they were to succeed, there were

7 | large dollars attached, but I do not think they have a

8 | meaningful chance of success.

9 | Q     And that's true both for any claims alleged at Step 1

10 | or any claims alleged at Step 2.

11 | A     Yes.

12 | 

13 | Q     Okay.  Now there's been some questions asked about

14 | your bankruptcy law experience and you've been candid that

15 | you don't hold yourself out as a bankruptcy law expert, but

16 | one of the things you do hold yourself out as, as a

17 | corporate governance expert.  Correct?

18 | A     Corporate law, corporate governance, corporate

19 | acquisitions, yes.

20 | Q     Okay.  And in connection with that expertise, one of

21 | the reasons why you reach the opinion that there are not

22 | claims with a meaningful chance of success against Mr. Zell

23 | at Step 1 is because Mr. Zell was on the other side of the

24 | deal from the Tribune.  Correct?

25 | A     That is an important source of my opinion.  So he

1  could not be liable for breach of fiduciary duty as a

2  director because he was not a director at the time that Step

3  1 was negotiated and entered into is my understanding.

4  Q    And you have no reason or no evidence that you have

5  seen that the negotiations regarding the acquisition of the

6  Tribune were anything other than arm's length.

7  A    I have seen no evidence that they were other than at

8  arm's length.

9  Q    And, in fact, with regard to Step 2, the evidence that

10  you're aware of is that Mr. Zell abstained from all of the

11  Tribune board's consideration of the second step merger.

12

13  A    So I believe what I say in my report is he abstained

14  we know is a formal matter, he abstained.  So unless he was

15  informally or secretly trying to influence Tribune decision,

16  Tribune's decision, then it's hard to see how he is liable

17  as a director and I am aware of no evidence that he was

18  secretly trying to influence Tribune's decision.  Let me

19  stop there.

20  Q    Okay.  And so you have not seen any evidence in the

21  record based upon your review that you've undertaken for the

22  last year, that the claims against Mr. Zell or EGI, TRB have

23  any significant merit.  Correct?

24  A    That's my view.

25  Q    And in your opinion, there's no basis in the record to

1  suggest that Mr. Zell any way acted in bad faith here.

2  A     I have seen no evidence in the record to suggest bad

3  faith on the part of Mr. Zell.

4  Q     And in your opinion, you've seen no basis in the

5  record to suggest that Mr. Zell knew or thought that the

6  Tribune was insolvent at any point during Step 1 or Step 2?

7  A     I am not aware of evidence in the record that Mr. Zell

8  believed Tribune was insolvent at either Step 1 or Step 2.

9  And as I testified at deposition, there is some evidence

10  suggesting he believed Tribune continued to be solvent at

11  Step 2.

12  Q     Okay.  Now, in fact, if a litigation trust or a party

13  pursues a claim without significant merit that has a very,

14  very low probability for success and they don't hit a home

15  run and lose, that can cause the litigation trust or the

16  party bringing that claim to suffer some economic downside.

17  Correct?

18            MR. SOTTILE:  Objection to form, lack of

19  foundation.

20            THE COURT:  Well, let me just ask this.

21  Understanding that almost every question asked on cross is

22  designed in some respect to be self serving --

23  (Laughter)

24            THE COURT:  -- even I get the point.

# EXHIBIT B

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF DELAWARE


IN RE:                          )       Case No. 08-13141-KJC
                                )
TRIBUNE COMPANY                 )       Chapter 11
                                )       Courtroom 5
                                )       824 Market Street
           Debtors.            )       Wilmington, Delaware
                                )
                                )       March 17, 2011
                                )       10:00 a.m.


                     TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JUDGE KEVIN J. CAREY
                 UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:              Sidley Austin, LLP
                          BY: JAMES BENDERNAGEL, ESQ.
                          BY: RONALD S. FLAGG, ESQ.
                          BY: JAMES CANLON, ESQ.
                          BY: JAMES DUCAYET, ESQ.
                          One South Dearborn
                          Chicago, IL 60603
                          (312) 853-7000

                          Cole, Schotz, Meisel, Forman
                          & Leonard, P.A.
                          BY: NORMAN PERNICK, ESQ.
                          500 Delaware Ave., Ste. 1410
                          Wilmington, DE 19801
                          (302) 652-3131

ECRO:                     AL LUGANO

Transcription Service:    DIAZ DATA SERVICES
                          331 Schuylkill Street
                          Harrisburg, Pennsylvania 17110
                          (717) 233-6664
                          www.diazdata.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service
```

1          MR. BRADFORD:  Yes, Your Honor.

2          MR. SOTTILE:  Your Honor, I'm sorry to interrupt.

3    It is my intention to ask the Court to consider a motion to

4    exclude the witness's testimony on the grounds previously

5    described.  I was assuming the Court would want to hear that

6    at the conclusion of the examination, but I'm happy to

7    proceed --

8          THE COURT:  You assumed correctly.

9          MR. SOTTILE:  Thank you, Your Honor.

10          MR. BRADFORD:  David Bradford for EGI TRB and Mr.

11    Zell.

12    BY MR. BRADFORD:

13    Q    Dr. Beron, to be clear your analysis is of the claims

14    against the lenders that are being settled.  Is that

15    correct?

16

17    A    That's correct.

18    Q    And you did not do an analysis of claims against third

19    parties, correct?

20    A    Correct.

21    Q    And you are not offering an opinion about whether the

22    claims against Mr. Zell have no meaningful probability of

23    success as Professor Black testified.  Is that correct?

24    A    That is correct.

25          MR. BRADFORD:  No further questions.

# EXHIBIT C

## <u>DECLARATION OF WILLIAM C. PATE</u>

I, William C. Pate, state the following based on my personal knowledge:

1.       I am a Managing Director of Equity Group Investments ("EGI").  Since March 2007, I have been Vice President of EGI-TRB LLC ("EGI-TRB").  Since December 20, 2007, I have been a member of Tribune Company's Board of Directors.

2.       In early 2007, I worked with my colleagues at EGI-TRB to develop a proposal in connection with an on-going process by Tribune to consider possible strategic transactions for the company.

3.       In February and March 2007, I was involved in the review and analysis of, among other things, existing Tribune plans to compensate its executives if there was a change of control. These plans were established long before any discussions between EGI-TRB and Tribune.

4.       Under the terms of the existing plans, certain Tribune managers stood to obtain financial benefits if a change in control occurred.  These benefits included payments of compensation under the Transitional Compensation Plan, which was created long before any discussions between EGI-TRB and Tribune.  It also included gross-up provisions under which Tribune would pay taxes the executives would incur when they received their benefits.  Other plans provided for the vesting of restricted stock and stock options upon a change in control.  In addition to these plans, in 2006, Tribune had created an additional plan that would pay management a success bonus if a strategic transaction were completed.  These existing plans and compensation arrangements would provide benefits under a variety of change in control circumstances.

5.      EGI-TRB never offered management benefits or incentives to encourage support or favor EGI-TRB's proposal.  It also did not offer to increase the benefits that management stood to gain from a change in control.

6.      EGI-TRB proposed that Tribune create an equity incentive plan that would provide management with phantom equity equal to up to 5% of Tribune's stock.  This plan would have value to management only if, after the transaction, the value of Tribune's equity increased and only if the participants in the plan remained employed by Tribune so that they would vest.  The benefits of this plan were spread among approximately 200 employees, so that the phantom stock allocation to any one individual would be limited.   The incentive plan was intended to provide modest and reasonable incentives to promote the long-term success of Tribune and the retention of management, and did not provide for a quick pay out if a deal was approved.

7.      At the same time that it negotiated to increase incentives that would align management with the long-term financial performance of Tribune, EGI-TRB negotiated to reduce the cash benefits that would be provided to management.  In negotiations with Tribune, EGI-TRB sought to reduce the cost to Tribune of management change in control payments. Ultimately, Tribune and EGI-TRB agreed that $37 million in "management fees" – *i.e.*, cash compensation that would otherwise be paid to management – would instead be invested in a management equity incentive plan, which would reward management based on the long-term financial performance of Tribune.  This $37 million that otherwise would have been paid directly to management as cash compensation in connection with a change of control was instead used to fund a pool of phantom equity equal to 3% of Tribune's stock, which vested over time and therefore promoted retention.  Under this plan, EGI-TRB's intent was to replace a portion of

management's immediate cash benefits from a change of control with an equity plan that would encourage retention and better align management's interests with the long-term interests of the company.

8.      None of the members of the Special Committee who were responsible for determining whether to accept the EGI-TRB proposal were entitled to any financial benefits under the plans proposed by EGI-TRB.

9.      Tribune and EGI-TRB negotiated at arm's length over all aspects of the Transactions, including any benefits that would be paid to management.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _March 18_ , 2011          By: _William C. Pate_

                                      William C. Pate

# EXHIBIT D

## DECLARATION OF SAMUEL ZELL

I, Samuel Zell, state the following, based on my personal knowledge:

1.      I am President of EGI-TRB LLC ("EGI-TRB").  I am also President and Chairman of Equity Group Investments, LLC ("EGI").

2.      I believe that representatives of EGI were first approached about the possibility of a transaction with Tribune in 2006, but after an initial review, we elected not to proceed.  In January 2007, I was approached by Todd Kaplan, who at the time was one of Tribune Company's financial advisors at Merrill Lynch.  Mr. Kaplan encouraged me to submit a proposal in connection with Tribune's then ongoing sale process.  At that time, I had no connection with Tribune.

3.      In February and March 2007, I and others worked on proposing and then negotiating a transaction that was acceptable to Tribune's Special Committee and its independent investment advisors.  Throughout these negotiations, I was on the opposite side of the table from Tribune's Special Committee and bargaining in good faith with the Special Committee and its representatives.

4.      At no time during my negotiations with Tribune did I or, to my knowledge, any one acting on my behalf offer any personal financial incentives, special benefits, compensation, or continued employment to Tribune's officers or directors to encourage them to accept any proposal to Tribune.  In no way did I or, to my knowledge, anyone acting on my behalf suggest to anyone at Tribune that he or she would be personally rewarded for approving the proposal or assisting in advancing it.

5.    I was not a member of the Tribune board at the time it approved entering into the "going private" transaction on April 1, 2007.  I became a member of Tribune Company's board of directors on May 9, 2007.

6.    While I was a Tribune director, I did not have a role in approving the "going private transaction" on behalf of Tribune.  I abstained from the decision of the Tribune Board to approve Step Two of the transactions and abstained from all other Board decisions related to the transaction.  I also did not encourage or advise Tribune Board members to approve the transaction.  To the best of my knowledge, the decision of the Tribune Special Committee to approve the transaction was made by Tribune's Special Committee based on their own independent judgment and advice provided to them by their own independent advisors.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: *March 21*, 2011        By: _____

                                              Samuel Zell

# EXHIBIT E

### TRIBUNE COMPANY
### BOARD OF DIRECTORS MEETING
### DECEMBER 18, 2007

The Tribune Company Board of Directors met at 1:00 p.m. on Tuesday, December 18, 2007, pursuant to notice. The following directors participated in the meeting at Tribune Tower: Dennis J. FitzSimons and William A. Osborn. Enrique Hernandez, Jr., Robert S. Morrison, Dudley S. Taft and Samuel Zell participated in the meeting by telephone. Betsy Holden participated in a portion of the meeting by telephone.

Chandler Bigelow, David P. Eldersveld, Donald C. Grenesko, Crane H. Kenney, Timothy J. Landon, John E. Reardon and Scott C. Smith participated in the meeting. Chip Mulaney of Skadden, Arps, Slate, Meagher & Flom LLP, Thomas Cole of Sidley Austin LLP, Tom Whayne of Morgan Stanley, and Chad Rucker and Bryan Browning of Valuation Research Corporation also participated in the meeting. Steve Rosenblum of Wachtell, Lipton Rosen & Katz participated in the meeting by telephone.

Mr. FitzSimons acted as chairman of the meeting and Mr. Kenney acted as secretary.

Mr. FitzSimons called the meeting to order at 1:00 p.m.

## INTRODUCTION

Mr. FitzSimons provided a brief update on the FCC approval of the going private transaction and the status of the due diligence review being conducted by Valuation Research Corporation ("VRC") and the lead syndication banks in connection with the second step financing.

## APPROVAL OF MINUTES

A motion was made, seconded and approved to adopt the minutes of the December 4, 2007 meetings of the Board of Directors.

## COMPANY PERFORMANCE

Mr. Grenesko reviewed the projected financial performance of each of the Company's lines of business for December and commented on factors impacting the results. A discussion followed the presentation.

## TRANSACTION UPDATE

Mr. Kenney presented an update on the status of the merger and the latest discussions with the lenders. A discussion followed.

Mr. Kenney noted that          **REDACTED**

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

## REDACTED

Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

WHEREAS, the Company has entered into that certain Agreement and Plan of Merger (the "Merger Agreement"), dated as of April 1, 2007, by and among the Company, GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation wholly owned by the ESOP, and EGI-TRB, L.L.C., a Delaware limited liability company (capitalized terms used but not defined herein shall have the meaning ascribed to them in the Merger Agreement);

WHEREAS, pursuant to the Merger Agreement, at the Effective Time of the Merger, the directors of Tesop Corporation as of the Effective Time shall be the initial directors of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal (collectively, the "Post-Merger Directors"); and

WHEREAS, the Post-Merger Directors are expected to be: Dennis J. FitzSimons, Betsy D. Holden, William A. Osborn, William C. Pate, Maggie Wilderotter and Samuel Zell.

NOW, THEREFORE, BE IT RESOLVED, that each of the Post-Merger Directors is hereby approved by the current Board of Directors of the Company, for any and all purposes, to serve as a director of the Surviving Corporation following the Effective Time of the Merger.

Mr. Kenney next discussed certain amendments required to be made to the Director Deferred Stock plans as a result of the going private transaction. Given that deferred stock awards can no longer be tracked in the value of Tribune stock after the closing, management recommends that accounts under the plans be converted to a cash equivalent (at $34 per share) and credited with interest going forward at a rate equal to 120% of the long-term Applicable Federal Rate under the Internal Revenue Code, compounded quarterly. This is the same rate applied to cash deferrals under the Management Deferred Bonus Plan. Account balances, with interest, would then be paid out in accordance with Directors' previous elections. In addition, management recommends that participants in the Tribune Directors' Deferred Stock Plan be given an opportunity to accelerate their prior deferral elections. Following discussion, a motion was made, seconded and approved to adopt the following resolutions:

RESOLVED, that the 1996 Tribune Company Nonemployee Director Stock Compensation Plan and the Times Mirror Company Nonemployee Directors Stock Plan be amended to provide (i) for the conversion of deferred stock account balances from Tribune common stock equivalents to cash equivalents in connection with the ESOP/Zell

2

TRB0415684



merger closing and (ii) for the establishment of an interest component (at 120% of the long-term Applicable Federal Rate, compounded quarterly) on unpaid account balances;

FURTHER RESOLVED, that Directors with deferred stock awards under the 1996 Tribune Company Nonemployee Director Stock Compensation Plan or Tribune Company Incentive Compensation Plan be permitted to change their payment elections prior to December 31, 2007 to provide for the acceleration of payments following termination of Board service; and

FURTHER RESOLVED, that the Tribune Company Employee Benefits Committee be, and hereby is, authorized (with full power of delegation), in the name and on behalf of the Board of Directors (or any committee thereof) to take all steps necessary to effect the foregoing resolution, including preparing, executing, delivering and filing the amendment and such other documents as may be required by law or as may be deemed necessary or proper in connection with the matters set forth in these resolutions.

## SOLVENCY PRESENTATIONS

Messrs. Bigelow and Grenesko first presented management's overview related to VRC's solvency analysis. Messrs. Browning and Rucker of VRC next reviewed its solvency analysis with the Board. Management confirmed its belief that VRC's analysis and the underlying assumptions and projections are reasonable, if not conservative. Diligence questions that had been posed by the banks to VRC and to management were previously made available to the Board. The Board (directly and through its counsel and financial advisors) posed its own questions to VRC and to management and received answers thereto. Without limitation, (i) VRC confirmed that its opinion was the result of its independent, professional advice without improper influence of management, (ii) VRC confirmed that it engaged in a significant testing of both management's base case and downside cases, (iii) VRC confirmed that it had received all the information it had requested from the Company; (iv) VRC described its internal opinion review process as rigorous and confirmed that its fee would be the same whether it opined favorably or unfavorably as to solvency and (v) VRC explained the changes in its approach to PHONES valuation and that such change was not, in any event, outcome determinative. After completion of VRC's review and presentation and all questions and answers, VRC rendered its opinion, and said that it would provide a written opinion brought down to closing. Management then advised the Board that management stands ready to deliver the closing certificate contemplated by the Credit Agreement as to solvency and that such certificate will be based upon its own analysis, as further supported by the VRC opinion and analysis. Thereupon, the Board recessed and the Special Committee met with its counsel and financial advisors. When the board reconvened, it was advised that the Special Committee recommended acceptance of the VRC opinion in satisfaction of the condition to closing set forth in the Merger Agreement.

Based upon the presentations and discussions at the meeting (as well as presentations and discussions at prior meetings of the Board, including on May 9, 2007 and December 4, 2007) and the recommendation of the Special Committee, the Board, with Mr. Zell abstaining,

3

TRB0415685



determined (i) that it could rely in good faith on the VRC opinion and (ii) that the opinion is in form and substance satisfactory to the Company for purposes of Section 6.2(e) of the Merger Agreement.

**EXECUTIVE SESSION**



The Board then met in executive session.

**ADJOURNMENT**

There being no further business to come before the Board, the meeting was adjourned at 3:00 p.m.

_____
Secretary

4

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

TRB0415686