IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>TRIBUNE COMPANY, *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 08-13141 (KJC)<br>Jointly Administered<br>Re: Docket Nos. 8011 and 8509 |

## SUPPLEMENT TO "JOINT OBJECTION OF THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, ANGELO, GORDON & CO. L.P., OAKTREE CAPITAL MANAGEMENT, L.P. AND JPMORGAN CHASE BANK, N.A. TO CONFIRMATION OF THE NOTEHOLDER PLAN" [D.I. 8011]

The debtors and debtors in possession in the above-captioned cases, the Official Committee of Unsecured Creditors, Angelo, Gordon & Co., L.P., Oaktree Capital Management, L.P., and JPMorgan Chase Bank, N.A. (collectively, the "**DCL Plan Proponents**"), as proponents of the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries [D.I. 8580] (the "**DCL Plan**"), hereby supplement their objection [D.I. 8011] (the "**Original Objection**") to confirmation of the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries (as amended, the "**Noteholder Plan**") proposed by Aurelius Capital Management, L.P. ("**Aurelius**"), Deutsche Bank Trust Company Americas, Law Debenture Trust Company of New York, and Wilmington Trust Company (collectively, the "**Noteholders**") in response to certain recently filed amendments to the Noteholder Plan [D.I. 8509] (the "**Amendments**") as follows.[1]

---

[1] Each capitalized term used and not otherwise defined herein has the meaning ascribed to it in the Noteholder Plan.

## INTRODUCTION

The Amendments make two changes to the Noteholder Plan: (i) initial distributions to Senior Lenders and the reserve established for Bridge Loan Lenders are funded purely with equity as opposed to a "strip" of equity, new debt and cash and (ii) Holders of "Step Two Senior Loan Claims" receive their initial distributions (unless the Court decides they cannot), as opposed to presumptively receiving no initial distribution. Distributions to other creditors are unchanged, with initial distributions to Holders of Senior Notes and Other Parent Claims made in the form of a "strip" and initial distributions to general unsecured creditors of the subsidiaries in the form of a flat 8% cash recovery. The DCL Plan Proponents appreciate that the Noteholders have rightly modified their plan to allow Step Two Senior Lenders to receive their initial distributions rather than holding them back, which helpfully narrows the scope of issues in dispute in these cases. The Noteholders' attempt in the notice of filing accompanying the Amendments to incorporate the Bridge Settlement into the Noteholder Plan suggests that the Noteholders no longer object to the Bridge Settlement as a component of the Debtor/Committee/Lender Plan, which also helpfully narrows the scope of issues in dispute.

The Amendments do not, however, achieve the Noteholders' stated objective of "addressing and resolving certain objections" to the Noteholder Plan. The changes only affect the consideration paid to creditors other than the Noteholders, requiring no concession whatsoever in the consideration the Noteholders provide themselves, or in the size of the Non-LBO Debt Reserve, which will still contain sufficient value to pay all non-LBO creditors in full with four years of postpetition interest. If implemented, the Amendments would in some ways in fact render the Noteholder Plan *less* confirmable than its prior incarnation, not more so.

46429/0001-7510009v1

## ARGUMENT

I.   **The Amendments Involve No Concession by the Noteholders and Do Not Improve the Treatment of 252 of the 253 Impaired Rejecting Classes**

Rather than substantively modifying their plan, the Noteholders have made only token changes that do not impact them in any material way. For example, instead of changing *all* initial distributions from a "strip" of cash, equity and debt to equity-only (and thus truly maximizing the amount of equity distributed), the Noteholders changed only the Senior Lenders' distributions, leaving their own distributions unchanged. Although Step Two Senior Lenders' distributions are no longer held back, the Non-LBO Debt Reserve still contains billions of dollars of value, enough to pay all non-LBO creditors, including Holders of the PHONES Notes, in full with four years of postpetition interest. The reserve is simply comprised of more cash and debt and less equity, and this is achieved by taking cash and debt away from the Senior Lenders and Bridge Loan Lenders exclusively. Other than Step Two Senior Lenders, none of the numerous creditors opposed to the Noteholder Plan receive improved treatment. The Amendments do not solve any of the Noteholder Plan's core, structural deficiencies: it continues to impose delay, uncertainty and risk of destruction of value upon the Debtors and all their creditors so that the Noteholders can pursue their risky litigation strategy.

It should also be noted that the impact of the Amendments cannot be known because they may not even take effect. Implementation of the Amendments is contingent on a finding by the Bankruptcy Court that they are not a material modification that would require resolicitation, without which the Amendments fall away. *See* Noteholder Plan §§ 1.1.261, 1.1.266. Creditors thus cannot know with certainty what they will receive in their initial distributions and what the reserve might be funded with.

3

## II. If Implemented, the Amendments Would Not be Fair and Equitable and Would Discriminate Unfairly Against the Senior Lenders

In their attempt to reduce the Noteholder Plan's required equity reserve, the Noteholders have refashioned the distributions to the Senior Lenders only, giving them all equity while the Noteholders and other "non-LBO" creditors continue to receive a "strip" of equity, cash and new debt. In order to justify such different treatment to similarly situated creditors prior to any avoidance of any of the Senior Loans, a plan proponent must show that the discrimination is "supported by a reasonable basis" and that the proponent "could not confirm or consummate the Plan without the discrimination." *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship. (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 656 (9th Cir. 1997). Nonetheless, the Noteholders make no attempt to justify this discriminatory treatment. Changing only the Senior Lenders' initial distributions forces upon them less preferable consideration and deprives them of the downside protection offered by cash, both without their consent. Simply put, it is in no way fair and equitable, nor does it pass the unfair discrimination test, for the Noteholders to attempt to mitigate their plan's infirmities by forcing disparate treatment on the Senior Lenders, leaving distributions to non-LBO creditors unchanged. In a plan that is close to universally non-consensual, the Noteholders cannot simply decide to pay similarly situated classes different forms of consideration as they see fit; they cannot profess to have built their plan on absolute neutrality and yet abandon this neutrality when it suits their purposes.

## III. If Implemented, the Amendments to the Noteholder Plan Would Give the Distribution Trust Advisory Board Substantial Governance Rights in Reorganized Tribune *Even if the Distribution Trust Held No Equity Interest*

The Amendments do not change the Noteholder Plan's governance structure for reorganized Tribune, which gives the Distribution Trustee, at the direction of the Distribution

4

Trust Advisory Board, the ability to appoint two of seven board members for the duration of the Distribution Trust through the New Class C Common Stock the Distribution Trust holds. *See* Noteholder Plan §§ 1.1.174. The New Class C Common Stock further allows the Distribution Trustee, at the direction of the Distribution Trust Advisory Board, to veto certain strategic transactions, as it is entitled to vote separately on any transaction that would expand the board by three or more seats or otherwise impact its right to appoint two directors.[2] Both the Distribution Trustee and two of the three members of the Distribution Trust Advisory Board are appointed by Aurelius, and although Aurelius has made much of the requirement that its appointees be "independent" of Aurelius, this independence would not prevent Aurelius from retaining significant influence over its appointees. Indeed if "independence" and fiduciary duties rendered appointment rights irrelevant, there would be no reason that Aurelius would not be happy for the Senior Lenders to appoint the full board of directors of reorganized Tribune and to have fair representation on the Distribution Trust Advisory Board, subject to an independence requirement.

This level of control for the Distribution Trustee, allowing them a significant voice in the governance of reorganized Tribune *before* any victory in litigation, was inappropriate and unreasonable under the prior incarnation of the Noteholder Plan even with its significant reserve of equity in reorganized Tribune. The reduction in the equity reserve renders these governance rights even more nonsensical. The Amendments, if implemented, would minimize the equity

---

[2] *See* Certificate of Incorporation, § 4.A.i, ii; New Warrant Agreement, § 4; Noteholder Plan § 5.4.1 (Distribution Trust approval rights include any increase in the size of the board of directors and any amendment of the charter or by-laws that would adversely affect the rights of the New Class C Common Stock). Although Professor Rock testified at trial that the governance rights of the New Class C Common Stock are significantly narrower than they might be read to be, the Noteholders have not amended their plan to clarify the scope of these rights.

held back and seek to distribute it as soon as possible. Nonetheless, even if the Distribution Trust held no equity interest in reorganized Tribune and was funded solely with cash or new debt, it would still control two board seats and have the right to veto strategic transactions for the duration of the trust. Because the Noteholder Plan has no mechanism for binding holdouts to a settlement, the Distribution Trust would inexplicably have these governance rights no matter how little equity or other value it held until every single possible claim had been litigated to conclusion and every possible dollar of value had been distributed. This is an absurd result, and indicative of the absence of a genuine effort by the Noteholders to remedy the infirmities in their plan.

### IV.    The Noteholder Plan Cannot Implement the Bridge Settlement

In the notice of filing accompanying the Amendments, the Noteholders suggest that the required equity reserve could be further reduced if "the Senior Lenders and the Bridge Loan Lenders agree to a settlement providing for the same value recovery to the Bridge Loan Lenders under the Second Amended Noteholder Plan as currently contemplated by the Debtor/Committee/Lender Plan." *See* Notice of Filing, p. 6-7 [D.I. 8509-1]. No settlement with the Bridge Loan Lenders has actually been implemented in the Noteholder Plan, however. Indeed, the Bridge Settlement contemplated by the Debtor/Committee/Lender Plan is not a "standalone" settlement that parties in interest would necessarily agree to as part of the Noteholder Plan; it is a component of the larger settlement implemented by the Debtor/Committee/Lender Plan and was agreed to as such. The suggestion that the Bridge Settlement might be grafted onto the Noteholder Plan as a further means of reducing the required equity reserve is simply yet another effort by the Noteholders to have others remedy their plan's infirmities. Like the Amendments, it would require no sacrifice on their part and would not

impact their recoveries or reserves in any way. More importantly, however, the suggestion reflects a fundamental misunderstanding of the nature of the Bridge Settlement implemented in the Debtor/Committee/Lender Plan. The settlement is not between the Senior Lenders and the Bridge Loan Lenders – it is between the Bridge Loan Lenders and the Debtors' estates, and the Creditor's Committee helped lead the negotiations with the Bridge Loan Lenders. The settlement value provided by the Bridge Loan Lenders increases the recoveries of the Senior Noteholders and Holders of Allowed Other Parent Claims. If the Noteholders wish to implement a settlement with the Bridge Loan Lenders, they would have to negotiate such a settlement, not simply suggest yet another way in which others might solve their problems.

## CONCLUSION

For the foregoing reasons and the reasons stated in the Original Objection, the DCL Plan Proponents respectfully submit that the Court should deny confirmation of the Noteholder Plan pursuant to 11 U.S.C. §§ 1129(a) and (b) and grant such other relief as the Court may determine to be just and proper.

Dated: Wilmington, Delaware
April 5, 2011

Respectfully submitted,

/s/ J. Kate Stickles
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

- and-

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Kerriann S. Mills
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-0199
Facsimile: (312) 853-7036

*Attorneys For Debtors And Debtors
In Possession*

/s/ *Adam G. Landis*
Adam G. Landis (Bar No. 3407)
Matthew B. McGuire (Bar No. 4366)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone (302) 467-4400
Facsimile (302) 467-4450

- and-

Howard Seife
David M. LeMay
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone (212) 408-5100
Facsimile (212) 541-5369

*Attorneys for the Official Committee of Unsecured Creditors*

- and -

Graeme Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone (202) 778-1800
Facsimile (202) 822-8106

*Special Counsel to the Official Committee of Unsecured Creditors*

46429/0001-7510009v1

/s/ *Drew G. Sloan*
Mark D. Collins (Bar No. 2981)
Robert J. Stearn, Jr. (Bar No. 2915)
Drew G. Sloan (Bar No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone (302) 651-7700
Facsimile (302) 651 7701

-and-

Donald S. Bernstein
Dennis E. Glazer
Damian S. Schaible
Elliot Moskowitz
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4500

*Attorneys for JPMorgan Chase Bank, N.A.*


/s/ *M. Blake Cleary*
Robert S. Brady (Bar No. 2847)
M. Blake Cleary (Bar No. 3614)
YOUNG CONAWAY STARGATT &
TAYLOR LLP
The Brandywine Building—17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware  19899
Telephone (302) 571-6600
Facsimile (302) 571-1253

-and-

Bruce Bennett
James O. Johnston
Joshua M. Mester
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, CA 90071-1530
Telephone (213) 621-6000

*Attorneys for Oaktree Capital Management, L.P.
and Angelo, Gordon & Co., L.P.*