# Exhibit A

B 10 (Official Form 10) (04/10)

| United States Bankruptcy Court District Of Delaware | PROOF OF CLAIM |
|---|---|

| Name of Debtor: **Tribune Company and/or Chicago Tribune Co.** | Case Number: **08-13141** |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property): **John Birmingham** | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent: <br> c/o Michael Dockterman, Jonathan Young, Patrick Frye <br> Wildman, Harrold, Allen & Dixon LLP <br> 225 W. Wacker Drive, Chicago, IL  60606 <br> Telephone number: <br> 312-201-2000        email: dockterman@wildman.com | Court Claim Number: _____ <br> *(If known)* <br><br> Filed on: _____ |
| Name and address where payment should be sent (if different from above): <br><br><br> Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. <br><br> ☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:** $ 0 - unliquidated, indemnification claim <br> as of date case filed <br><br> If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. <br><br> If all or part of your claim is entitled to priority, complete item 5. <br><br> ☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount. <br><br> Specify the priority of the claim. <br><br> ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:** ___ Claim for indemnification, contribution, or reimbursement (see attachment) ___ <br> (See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **3.** Last four digits of any number by which creditor identifies debtor: _____ <br> **3a.** Debtor may have scheduled account as: _____ <br> (See instruction #3a on reverse side.) | |
| **4. Secured Claim (See instruction #4 on reverse side.)** <br> Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information. <br><br> Nature of property or right of setoff:  ☐ Real Estate    ☐ Motor Vehicle    ☐ Other <br> Describe: <br><br> Value of Property:$_____ Annual Interest Rate___% <br><br> Amount of arrearage and other charges as of time case filed included in secured claim, <br><br> if any: $_____ Basis for perfection: _____ <br><br> Amount of Secured Claim: $_____ Amount Unsecured: $ unliquidated | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5). <br><br> ☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7). <br><br> ☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)* <br><br> DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING. <br><br> If the documents are not available, please explain: | Amount entitled to priority: <br><br> $_____ <br><br> *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |
| Date: 4/7/11 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. <br><br> By his attorney: | **FOR COURT USE ONLY** |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

___DEFINITIONS___

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity owed a debt by the debtor that arose on or before the date of the bankruptcy filing. See 11 U.S.C. §101 (10)

**Claim**
A claim is the creditor's right to receive payment on a debt owed by the debtor that arose on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

___INFORMATION___

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

Mail to:

United States Bankruptcy Court
Attn:  Claims
824 Market Street, 3rd Floor
Wilmington, DE  19801

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors | Jointly Administered |

## ATTACHMENT TO PROOF OF CLAIM OF JOHN BIRMINGHAM

Claimant John Birmingham has been sued in the following adversary proceeding: *Official Committee of Unsecured Creditors of Tribune Co. v. John Birmingham*, Adv. Pro. No. 10-55712 [D.I. 6860]. Claimant asserts a claim against Tribune Co. and Chicago Tribune Co. for indemnification, contribution, and reimbursement of all amounts he is obliged to pay in connection with these lawsuits as well as for the costs for defending these lawsuits, all to the fullest extent permitted by law. To the extent additional claims are asserted against Claimant,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); New River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS 1, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

this claim is intended to pursue all claims for indemnification, contribution, and reimbursement arising from those claims as well.  Claimant reserves the right to seek a judicial estimation of this claim pursuant to 11 U.S.C. § 502(c).

These claims are based on the Delaware General Corporation law, agreements with Tribune Co. or its representatives, Tribune Co.'s and/or Chicago Tribune Co.'s by-laws, certificates of incorporation, or other similar organizational documents (of which Claimant may not be aware of, are not in his possession, or have been designated as Professionals' Eyes Only or Highly Confidential – Attorneys' Eyes Only).

§ 145. Indemnification of officers, directors, employees and agents; insurance [Effective until Aug. 1, 2009]

(a) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

(b) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c) To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(d) Any indemnification under subsections (a) and (b) of this section (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section. Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

(e) Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

(f) The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office.

(g) A corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this section.

(h) For purposes of this section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this section with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

(i) For purposes of this section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this section.

(j) The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(k) The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees).

8 Del. C. 1953, § 145; 56 Del. Laws, c. 50; 56 Del. Laws, c. 186, § 6; 57 Del. Laws, c. 421, § 2; 59 Del.

Laws, c. 437, § 7; 63 Del. Laws, c. 25, § 1; 64 Del. Laws, c. 112, § 7; 65 Del. Laws, c. 289, §§ 3-6; 67 Del. Laws, c. 376, § 3; 69 Del. Laws, c. 261, §§ 1, 2; 70 Del. Laws, c. 186, § 1; 71 Del. Laws, c. 120, §§ 3-11.;

§ 145. Indemnification of officers, directors, employees and agents; insurance [Effective Aug. 1, 2009]

(a) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

(b) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c) To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(d) Any indemnification under subsections (a) and (b) of this section (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section. Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such

directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

(e) Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

(f) The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. A right to indemnification or to advancement of expenses arising under a provision of the certificate of incorporation or a bylaw shall not be eliminated or impaired by an amendment to such provision after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought, unless the provision in effect at the time of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred.

(g) A corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this section.

(h) For purposes of this section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this section with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

(i) For purposes of this section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this section.

(j) The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be

a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(k) The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees).

8 Del. C. 1953, § 145; 56 Del. Laws, c. 50; 56 Del. Laws, c. 186, § 6; 57 Del. Laws, c. 421, § 2; 59 Del. Laws, c. 437, § 7; 63 Del. Laws, c. 25, § 1; 64 Del. Laws, c. 112, § 7; 65 Del. Laws, c. 289, §§ 3-6; 67 Del. Laws, c. 376, § 3; 69 Del. Laws, c. 261, §§ 1, 2; 70 Del. Laws, c. 186, § 1; 71 Del. Laws, c. 120, §§ 3-11; 77 Del. Laws, c. 14, § 3.;



# Form 10-K405

## TRIBUNE CO - TRBCQ

Filed: March 18, 2002 (period: December 30, 2001)

Annual report. The Regulation S-K Item 405 box on the cover page is checked

AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION
OF
TRIBUNE COMPANY

PURSUANT TO SECTIONS 242 AND 245 OF THE
DELAWARE GENERAL CORPORATION LAW

Tribune Company (the "Corporation"), a corporation organized and
existing under the laws of the State of Delaware, hereby certifies as follows:

1. The name of the Corporation is Tribune Company. The date of the
filing of its original Certificate of Incorporation with the Secretary of State
was March 19, 1968.

2. The Board of Directors of the Corporation unanimously adopted
resolutions proposing and declaring advisable the following amendments to the
Restated Certificate of Incorporation:

The first paragraph of Article FOURTH is hereby amended and restated
to read in its entirety as follows:

"FOURTH: The total number of shares of stock which the corporation
shall have authority to issue is one billion four hundred twelve
million (1,412,000,000) shares consisting of (A) twelve million
(12,000,000) shares of Preferred Stock, without par value, issuable
in one or more series as hereinafter provided, and (B) one billion
four hundred million (1,400,000,000) shares of Common Stock, par
value $.01 per share."

A new Article FOURTEENTH is hereby added to read in its entirety as
follows:

"FOURTEENTH: Notwithstanding any other provision in this Amended and
Restated Certificate of Incorporation, no provision of Article VIII
of the by-laws of the corporation (for so long as such Article VIII
is in effect) may be altered, amended or repealed, nor may any
provision inconsistent therewith be adopted, including by means of
merger, consolidation, asset transfer or other transaction with any
affiliated entity in which the corporation is not the surviving or
continuing entity, except by the affirmative vote of all of the
holders of outstanding stock of the corporation entitled to vote or
of all of the members of the Board of Directors."

3. On June 12, 2000, at a special meeting of the stockholders of the
Corporation, the stockholders of the Corporation approved the foregoing
amendments in accordance with the provisions of the Restated Certificate of
Incorporation and the Delaware General Corporation Law.

4. The foregoing amendments and this Amended and Restated
Certificate of Incorporation have been duly adopted by the Board of Directors of
the Corporation and duly executed and acknowledged in accordance with Sections
103, 242 and 245 of the Delaware General Corporation Law.

5. The capital of the Corporation shall not be reduced under or
by reason of the foregoing amendments.

6. Effective as of 5:00 p.m., New York City time, on June 12, 2000,
the text of the Amended and Restated Certificate of Incorporation of the
Corporation is hereby restated to read in its entirety as follows:

* * * *

FIRST: The name of the corporation is TRIBUNE COMPANY.

SECOND: The address of its registered office in the State of
Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle.
The name of its registered agent at such address is The Corporation Trust
Company.

THIRD: The purpose of the corporation is to engage in any lawful act
or activity for which corporations may be organized under the General
Corporation Law of Delaware.

FOURTH: The total number of shares of stock which the corporation
shall have authority to issue is one billion four hundred twelve million

(1,412,000,000) shares, consisting of (A) twelve million (12,000,000) shares of
Preferred Stock, without par value, issuable in one or more series as
hereinafter provided, and (B) one billion four hundred million (1,400,000,000)
shares of Common Stock, par value $.01 per share.

The Common Stock of the corporation may be issued from time to time
by authority of the Board of Directors of the corporation in accordance with
applicable law. All shares of Preferred Stock at any time having the status of
authorized and unissued shares of Preferred Stock may be issued from time to
time in one or more series in such amounts per series and with such designations
as may be provided by the Board of Directors of the corporation, and shares of
any such series (a) may have such full or limited voting powers, or no voting
powers, (b) may have such sinking fund provisions or redemption price or prices
and terms and conditions, (c) may be entitled to receive dividends (cumulative
or non-cumulative) at such rate or rates, on such conditions, and at such times,
and payable in preference to, or in such relation to, the dividends payable on
any other class or classes or series of capital stocks, (d) may have such rights
upon the liquidation or dissolution of, or upon any distribution of the assets
of, the corporation, (e) may be made convertible into, or exchangeable for,
shares of any other class or classes or of any other series of the same or any
other class or classes of the capital stock of the corporation, at such price or
prices or at such rates of exchange, and with such adjustments, and (f) shall
have such other preferences and relative, participating, optional or other
special rights, qualifications, limitations or restrictions thereof, all as
shall be stated and expressed in the resolution or resolutions providing for the
issuance of such Preferred Stock from time to time adopted by the Board of
Directors of the corporation. Authority is hereby granted to and vested in the
Board of Directors of the corporation to establish and designate, by resolution
adopted by

such Board, series of Preferred Stock from the authorized and unissued shares
of the Preferred Stock and in such resolution to determine and fix the
various terms, rights and preferences of the shares of any such series as
specified in clauses (a) through (f) above, subject, however, to such
restrictions and limitations as are, or may be, from time to time provided by
law or contained in this Amended and Restated Certificate of Incorporation in
its present form or as hereinafter amended. The stated value of the shares of
each series of Preferred Stock shall be fixed by the Board of Directors of
the corporation in the resolution establishing such series. All shares of any
one series of Preferred Stock shall be alike in all respects.

The corporation shall not be required to issue fractional shares of
any class of stock or to maintain or record fractional shares upon the books and
records of the corporation. The Board of Directors of the corporation may
determine by resolution from time to time whether or not fractional shares of
any new or existing class or series of stock shall be permitted or recognized.
In the event (a) the Board of Directors determines at any time to eliminate
fractional shares of a class or series of stock as to which fractional shares
are then outstanding or (b) corporate action is taken at any time which would
result in the ownership of fractional interests in shares of any class or series
of stock as to which the Board of Directors has determined that fractional
shares are not permitted or recognized, the corporation shall arrange for the
disposition of such fractional interests in such shares by the persons entitled
thereto or pay in cash the fair value of such fractional interests or make other
provision with respect thereto, in each case in such manner as may be permitted
or required by law.

Each stockholder of record of Common Stock shall be entitled to one
vote for every full share standing in his name on the books of the corporation
on all matters presented for a vote of stockholders at a meeting thereof. A
stockholder of record owning a fractional share of Common Stock (when permitted)
shall be entitled to exercise fractional voting rights, to receive dividends
thereon and to participate in the assets of the corporation in the event of
liquidation, in each case proportionate to such fractional interest.

In consideration of the issue by the corporation, and the purchase
by the holders thereof, of shares of the capital stock of the corporation, each
and every present and future holder of shares of the capital stock of the
corporation shall be conclusively deemed, by acquiring or holding such shares,
to have agreed that the voting rights of such holders and the restrictions and
qualifications thereof shall be as set forth in the Amended and Restated
Certificate of Incorporation of the corporation, as now or hereafter amended
pursuant to law, and in resolutions providing for series of Preferred Stock of
the corporation.

FIFTH: No holder of capital stock of the corporation shall have any
preemptive right to subscribe to any additional issue or sale of the capital
stock of the corporation or to acquire any security convertible into capital
stock of the corporation.

SIXTH: A merger or consolidation to which the corporation is a party

but not the surviving party, or a sale, lease or exchange to any person, firm or corporation of all or substantially all of the assets of the corporation, may be made upon such terms and conditions and for such consideration as the Board of Directors shall approve and deem appropriate, when and as authorized by the affirmative vote of the holders of at least 66 2/3% of the outstanding capital stock of the corporation entitled to vote thereon, or such greater percentage of such stock

as may be required by other applicable provisions of this Amended and Restated Certificate of Incorporation, taken at an annual or special meeting of stockholders. This Article SIXTH may be amended only by the affirmative vote of the holders of at least 66 2/3% of the outstanding capital stock of the corporation entitled to vote thereon, taken at an annual or special meeting of stockholders.

SEVENTH: None of the following transactions may be effectuated unless a meeting of stockholders of the corporation is held to act thereon and the votes of the holders of its voting securities representing at least 80% of the votes entitled to be cast are cast in favor thereof:

(a)    An acquisition by the corporation of stock of an Interested Party;

(b)    A sale, lease or exchange of all or the major portion of the assets of the corporation or an Interested Party to the other;

(c)    A merger or consolidation to which the corporation and an Interested Party are parties; or

(d)    An amendment or repeal of this Article.

As used in this Article, "Interested Party" means any person, firm or corporation, or any group thereof acting in concert, which owns of record or beneficially, directly or indirectly, more than 10% of any class of stock of the corporation.

EIGHTH: The directors of the corporation shall be classified with respect to the time for which they shall hold office by dividing them into three classes, each consisting, as nearly as may be possible, of one-third of the whole number of the Board of Directors. At the 1974 annual meeting of stockholders the directors of the first class shall be elected for a term of one year, the directors of the second class shall be elected for a term of two years and the directors of the third class shall be elected for a term of three years. At each subsequent annual meeting of stockholders the successors to the directors whose terms shall expire that year shall be elected to hold office for the term of three years, so that the term of office of one class of directors shall expire in each year. In any event each director of the corporation shall hold office until his successor is duly elected and qualified.

NINTH: Election of directors need not be by ballot unless the by-laws so provide.

TENTH: The Board of Directors is expressly authorized to make, alter, amend and repeal the by-laws of the corporation.

ELEVENTH: Without limiting the power and authority of the Board of Directors to make, alter, amend and repeal by-laws of the corporation pursuant to Article TENTH or otherwise, by-laws of the corporation may also be made, altered, amended and repealed by the stockholders but only by the affirmative vote of the holders of 80% of the outstanding stock of the corporation entitled to vote. Any action required or permitted to be taken at any annual or

special meeting of stockholders of the corporation may be taken without a meeting only if a consent in writing setting forth the action so taken shall be signed by all stockholders entitled to vote with respect to the subject matter thereof. The affirmative vote of 80% of the outstanding stock of the corporation entitled to vote shall be required to amend or repeal this Article ELEVENTH.

TWELFTH: No person who is or was a director of the corporation shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except that, unless otherwise permitted under applicable laws, this paragraph shall not eliminate or limit liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware

General Corporation Law is amended to authorize corporate action further
eliminating or limiting the personal liability of directors, or extending
similar protection to officers, then the liability of a director or officer, as
applicable, of the corporation shall be eliminated or limited to the fullest
extent permitted by the Delaware General Corporation Law as so amended. No
amendment to or repeal of this Article TWELFTH shall apply to or have any effect
on the liability or alleged liability of any director of the corporation for or
with respect to any acts or omissions of such director occurring prior to such
amendment or repeal.

Each person who was or is made a party or is threatened to be made a
party to or is involved in any action, suit or proceeding, whether civil,
criminal, administrative or investigative (hereinafter, a "proceeding"), by
reason of the fact that he or she, or a person of whom he or she is the legal
representative, is or was a director or officer of the corporation or is or was
serving at the request of the corporation as a director or officer of another
corporation or of a partnership, joint venture, trust or any other enterprise,
including service with respect to employee benefit plans, whether the basis of
such proceeding is alleged action in an official capacity as a director, or
officer or in any other capacity while serving as a director or officer, shall
be indemnified and held harmless by the corporation to the fullest extent
authorized by the Delaware General Corporation Law, as the same exists or may
hereafter be amended (but, in the case of any such amendment, only to the extent
that such amendment permits the corporation to provide broader indemnification
rights than said law permitted the corporation to provide prior to such
amendment), against all expense, liability and loss (including attorneys' fees,
judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid
in settlement) reasonably incurred or suffered by such person in connection
therewith, and such indemnification shall continue as to a person who has ceased
to be a director or officer and shall inure to the benefit of his or her heirs,
executors and administrators; PROVIDED, HOWEVER, that, except as provided in the
next succeeding paragraph, the corporation shall indemnify any such person
seeking indemnification in connection with a proceeding (or part thereof)
initiated by such person only if such proceeding (or part thereof) was
authorized by the Board of Directors of the corporation. The right to
indemnification conferred in this Article shall be a contract right and shall
include the right to be paid by the corporation the expenses incurred in
defending any such proceeding in advance of its final disposition; PROVIDED,
HOWEVER, that, if the Delaware General Corporation Law requires, the payment of
such expenses incurred by a director or officer in his or her capacity as a
director or officer (and not in any other capacity in which service was or is
rendered

by such person while a director or officer, including, without limitation,
service to an employee benefit plan) in advance of the final disposition of a
proceeding shall be made only upon delivery to the corporation of an
undertaking, by or on behalf of such director or officer, to repay all
amounts so advanced if it shall ultimately be determined that such director
or officer is not entitled to be indemnified under this Article or otherwise.
The corporation may, by action of its Board of Directors, provide
indemnification to persons who are or were employees and agents of the
corporation, and persons who serve or have served at the request of the
corporation as employees or agents of another corporation or any other
enterprise as aforesaid, with the same scope and effect as the foregoing
indemnification of directors and officers.

If a claim under the preceding paragraph of this Article is not paid
in full by the corporation within thirty days after a written claim has been
received by the corporation, the claimant may at any time thereafter bring suit
against the corporation to recover the unpaid amount of the claim and, if
successful in whole or in part, the claimant shall be entitled to be paid also
the expense of prosecuting such claim. It shall be a defense to any such action
(other than an action brought to enforce a claim for expenses incurred in
defending any proceeding in advance of its final disposition where the required
undertaking, if any is required, has been tendered to the corporation) that the
claimant has not met the standards of conduct which make it permissible under
the Delaware General Corporation Law for the corporation to indemnify the
claimant for the amount claimed, but the burden of proving such defense shall be
on the corporation. Neither the failure of the corporation (including its Board
of Directors, independent legal counsel or stockholders) to have made a
determination prior to the commencement of such action that indemnification of
the claimant is proper in the circumstances because he or she has met the
applicable standard of conduct set forth in the Delaware General Corporation
Law, nor an actual determination by the corporation (including its Board of
Directors, independent legal counsel or stockholders) that the claimant has not
met such applicable standard of conduct, shall be a defense to the action or
create a presumption that the claimant has not met the applicable standard of
conduct.

The right to indemnification and the payment of expenses incurred in
defending a proceeding in advance of its final disposition conferred in this

Article shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of this Amended and Restated Certificate of Incorporation, by-law, agreement, vote of stockholders or disinterested directors or otherwise. The corporation may enter into separate written agreements with directors, officers, employees and agents of the corporation and of other enterprises, which agreements expressly provide for indemnification and reimbursement of such persons to the fullest extent now or hereafter permitted by this Article or applicable law.

The corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the corporation or another corporation, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

THIRTEENTH: The corporation reserves the right to amend, alter, change or repeal any provision now or hereafter contained in this Amended and Restated Certificate of Incorporation, and to add new provisions, in the manner now or hereafter prescribed by statute,

and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors and officers pursuant to this Amended and Restated Certificate of Incorporation in its present form or as hereafter amended are granted subject to this reservation; provided that any provision in this Amended and Restated Certificate of Incorporation, the amendment of which is expressly required by this Amended and Restated Certificate of Incorporation to be authorized by a higher percentage vote of stockholders than is required by statute, shall be amended or repealed only in accordance with the express requirements of this Amended and Restated Certificate of Incorporation, as amended from time to time.

FOURTEENTH: Notwithstanding any other provision in this Amended and Restated Certificate of Incorporation, no provision of Article VIII of the by-laws of the corporation (for so long as such Article VIII is in effect) may be altered, amended or repealed, nor may any provision inconsistent therewith be adopted, including by means of merger, consolidation, asset transfer or other transaction with any affiliated entity in which the corporation is not the surviving or continuing entity, except by the affirmative vote of all of the holders of outstanding stock of the corporation entitled to vote or of all of the members of the Board of Directors.

IN WITNESS WHEREOF, Tribune Company has caused this certificate to be signed by Crane H. Kenney, its Senior Vice President, General Counsel and Secretary, this 12th day of June, 2000.

TRIBUNE COMPANY

By:    /s/ Crane H. Kenney
       ----------------------------------

Name:  Crane H. Kenney
Title: Senior Vice President,
       General Counsel and Secretary

CERTIFICATE OF CORRECTION

TO THE
AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION

OF
TRIBUNE COMPANY

PURSUANT TO SECTION 103(f) OF THE
DELAWARE GENERAL CORPORATION LAW

Tribune Company (the "Corporation"), a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.      The name of the Corporation is Tribune Company. The date of the filing of its original Certificate of Incorporation with the Secretary of State was March 19, 1968. The date of the filing of its Amended and Restated Certificate of Incorporation (the "Amended and Restated Certificate of Incorporation") with the Secretary of State was June 12, 2000.

2.      The Amended and Restated Certificate of Incorporation requires correction as permitted by Section 103(f) of the Delaware General Corporation Law.

3.      The inaccuracies or defects of the Amended and Restated Certificate of Incorporation to be corrected by this Certificate of Correction to the Amended and Restated Certificate of Incorporation are (a) the omission in Article Fourth of a reference to Exhibit A, containing the terms of the Corporation's Series B Convertible Preferred Stock as have been in effect since April 4, 1989, and (b) the attachment of Exhibit A to the Amended and Restated Certificate of Incorporation.

4. Article Fourth of the Amended and Restated Certificate of Incorporation in corrected form is as follows:

"FOURTH: The total number of shares of stock which the corporation shall have authority to issue is one billion four hundred twelve million (1,412,000,000) shares, consisting of (A) twelve million (12,000,000) shares of Preferred Stock, without par value, issuable in one or more series as hereinafter provided, and (B) one billion four hundred million (1,400,000,000) shares of Common Stock, par value $.01 per share. The terms of the Series B Convertible Preferred Stock of the corporation, as in effect since April 4, 1989, are set forth in Exhibit A.

The Common Stock of the corporation may be issued from time to time by authority of the Board of Directors of the corporation in accordance with applicable law. All shares of Preferred Stock at any time having the status of authorized and unissued shares of Preferred Stock may be issued from time to time in one or more series in such amounts per series and with such designations as may be provided by the Board of Directors of the corporation, and shares of any such series (a) may have such full or limited voting powers, or no voting powers, (b) may have such sinking fund provisions or redemption price or prices and terms and conditions, (c) may be entitled to receive dividends (cumulative or non-cumulative) at such rate or rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or series of capital stocks, (d) may have such rights upon the liquidation or dissolution of, or upon any distribution of the assets of, the corporation, (e) may be made convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of the capital stock of the corporation, at such price or prices or at such rates of exchange, and with such adjustments, and (f) shall have such other preferences and relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof, all as shall be stated and expressed in the resolution or resolutions providing for the issuance of such Preferred Stock from time to time adopted by the Board of Directors of the corporation. Authority is hereby granted to and vested in the Board of Directors of the corporation to establish and designate, by resolution adopted by such Board, additional series of Preferred Stock from the authorized and unissued shares of the Preferred Stock and in such resolution to determine and fix the various terms, rights and preferences of the shares of any such series as specified in clauses (a) through (f) above, subject, however, to such restrictions and limitations as are, or may be, from time to time provided by law or contained in this Amended and Restated Certificate of Incorporation in its present form or as hereinafter amended. The stated value of the shares of each series of Preferred Stock shall be fixed by the Board of Directors of the corporation in the resolution establishing such series. All shares of any one series of Preferred Stock shall be alike in all respects.

The corporation shall not be required to issue fractional shares of any class of stock or to maintain or record fractional shares upon the books and records of the corporation. The Board of Directors of the corporation may determine by resolution from time to time whether or not fractional shares of any new or existing class or series of stock shall be permitted or recognized. In the event (a) the Board of Directors determines at any time to eliminate fractional shares of a class or series of stock as to which fractional shares are then outstanding or (b) corporate action is taken at any time which would result in the ownership of fractional interests in shares of any class or series of stock as to which the Board of Directors has determined that fractional shares are not permitted or recognized, the corporation shall arrange for the disposition of such fractional interests in such shares by the persons entitled thereto or pay in cash the fair value of such fractional interests or make other provision with respect thereto, in each case in such manner as may be permitted or required by law.

Each stockholder of record of Common Stock shall be entitled to one vote for every full share standing in his name on the books of the corporation on all matters presented for a vote of stockholders at a meeting thereof. A stockholder of record owning a fractional share of Common Stock (when permitted) shall be entitled to exercise fractional voting rights, to receive dividends thereon and to participate in the assets of the corporation in the event of liquidation, in each case proportionate to such fractional interest.

In consideration of the issue by the corporation, and the purchase by the holders thereof, of shares of the capital stock of the corporation, each and every present and future holder of shares of the capital stock of the corporation shall be conclusively deemed, by acquiring or holding such shares, to have agreed that the voting rights of such holders and the restrictions and qualifications thereof shall be as set forth in the Amended and Restated Certificate of Incorporation of the corporation, as now or hereafter amended pursuant to law, and in resolutions providing for series of Preferred Stock of the corporation."

5. Except as expressly set forth herein, this Certificate of Correction to the Amended and Restated Certificate of Incorporation does not correct any other provision of the Corporation's (a) Amended and Restated Certificate of Incorporation, (b) Certificate of Designation of Series A Junior Participating Preferred Stock, as amended, (c) Certificate of Designation of the Preferred Stock, Series C, as amended, (d) Certificate of Designation of the Preferred Stock, Series D-1, as amended, or (e) Certificate of Designation of the Preferred Stock, Series D-2, as amended.

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Correction to the Amended and Restated Certificate of Incorporation to be executed this 24th day of October, 2001.

TRIBUNE COMPANY


By:  /s/ Mark W. Hianik
     ------------------------------
     Mark W. Hianik
     Vice President


EXHIBIT A

See Certificate of Designation of Series B Convertible Preferred Stock, dated April 4, 1989 (Exhibit 3.1 to Annual Report on Form 10-K for 1991)

Created by 10KWizard   www.10KWizard.comSource: TRIBUNE CO, 10-K405, March 18, 2002



# Form 8-K

## TRIBUNE CO - TRBCQ

Filed: December 28, 2007 (period: December 20, 2007)

Report of unscheduled material events or corporate changes.

**Exhibit 3.1**

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION

of

TRIBUNE COMPANY

**FIRST:** The name of this corporation is Tribune Company (the "Corporation").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**FOURTH:** The total number of shares of all classes of stock which the Corporation shall have authority to issue is 250,000,000 shares of Common Stock, $.01 par value per share ("Common Stock"). The holders of the Common Stock are entitled to one vote for each share of Common Stock held at all meetings of stockholders (and written actions in lieu of meetings). There shall be no cumulative voting.

**FIFTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the By-laws of the Corporation, provided such repeal, alteration, amendment or rescission is approved by the Board of Directors in accordance with the provisions of that certain Investor Rights Agreement dated April 1, 2007 by and among the Corporation, EGI-TRB, L.L.C., and GreatBanc Trust Company, solely as trustee of the Tribune Employee Stock Ownership Trust which forms part of the Tribune Employee Stock Ownership Plan.

**SIXTH:** Meetings of stockholders may be held within or without the State of Delaware, as the By-laws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the By-laws of the Corporation.

**SEVENTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Seventh to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Seventh by the stockholders of the Corporation shall not adversely affect any right or protection of a director of

the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

EIGHTH: The following indemnification provisions shall apply to the persons enumerated below.

1. Right to Indemnification of Directors and Officers. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "Indemnified Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that such person, or a person for whom such person is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnified Person in such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in Section 3 of this Article Eighth, the Corporation shall be required to indemnify an Indemnified Person in connection with a Proceeding (or part thereof) commenced by such Indemnified Person only if the commencement of such Proceeding (or part thereof) by the Indemnified Person was authorized in advance by the Board of Directors.

2. Prepayment of Expenses of Directors and Officers. The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnified Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Indemnified Person to repay all amounts advanced if it should be ultimately determined that the Indemnified Person is not entitled to be indemnified under this Article Eighth or otherwise.

3. Claims by Directors and Officers. If a claim for indemnification or advancement of expenses under this Article Eighth is not paid in full within 30 days after a written claim therefor by the Indemnified Person has been received by the Corporation, the Indemnified Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Indemnified Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

4. Indemnification of Employees and Agents. The Corporation may indemnify and advance expenses to any person who was or is made or is threatened to be made or is otherwise involved in any Proceeding by reason of the fact that such person, or a person for whom such person is the legal representative, is or was an employee or agent of the Corporation or, while an employee or agent of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust, enterprise or nonprofit entity, including service with respect to

employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person in connection with such Proceeding. The ultimate determination of entitlement to indemnification of persons who are non-director or officer employees or agents shall be made in such manner as is determined by the Board of Directors in its sole discretion. Notwithstanding the foregoing sentence, the Corporation shall not be required to indemnify a person in connection with a Proceeding initiated by such person if the Proceeding was not authorized in advance by the Board of Directors.

5. Advancement of Expenses of Employees and Agents. The Corporation may pay the expenses (including attorneys' fees) incurred by an employee or agent in defending any Proceeding in advance of its final disposition on such terms and conditions as may be determined by the Board of Directors.

6. Non-Exclusivity of Rights. The rights conferred on any person by this Article Eighth shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of this Amended and Restated Certificate of Incorporation, by-laws, agreement, vote of stockholders or disinterested directors or otherwise.

7. Other Indemnification. The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer or employee of another corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

8. Insurance. The Board of Directors may, to the full extent permitted by applicable law as it presently exists, or may hereafter be amended from time to time, authorize an appropriate officer or officers to purchase and maintain, at the Corporation's expense, insurance: (a) to indemnify the Corporation for any obligation which it incurs as a result of the indemnification of directors, officers and employees under the provisions of this Article Eighth; and (b) to indemnify or insure directors, officers and employees against liability in instances in which they may not otherwise be indemnified by the Corporation under the provisions of this Article Eighth.

9. Amendment or Repeal. Any repeal or modification of the foregoing provisions of this Article Eighth shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification. The rights provided hereunder shall inure to the benefit of any Indemnified Person and such person's heirs, executors and administrators.

NINTH: All of the Corporation's issued stock, exclusive of treasury shares, shall be held by not more than 80 shareholders, as determined for Federal income tax purposes and each such shareholder shall be eligible to hold such shares of stock pursuant to Section 1361 of the Internal Revenue Code of 1986, as amended.

* * *

Created by 10KWizard    www.10KWizard.comSource: TRIBUNE CO, 8-K, December 28, 2007

**Exhibit 10.1**
[EXECUTION COPY]

AGREEMENT AND PLAN OF MERGER

by and among
GREATBANC TRUST COMPANY,
solely as trustee of the
TRIBUNE EMPLOYEE STOCK OWNERSHIP TRUST
which forms a part of the
TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN,
TESOP CORPORATION,
TRIBUNE COMPANY
and
EGI-TRB, L.L.C.
(solely for the limited purposes of Section 8.12 hereof)
Dated as of April 1, 2007

## Table of Contents

| | | Page |
|---|---|---|
| **ARTICLE I** | THE MERGER | 2 |
| Section 1.1 | The Merger | 2 |
| Section 1.2 | Closing | 2 |
| Section 1.3 | Effective Time | 2 |
| Section 1.4 | Effects of the Merger | 2 |
| Section 1.5 | Certificate of Incorporation and By-laws of the Surviving Corporation | 3 |
| Section 1.6 | Directors | 3 |
| Section 1.7 | Officers | 3 |
| | | |
| **ARTICLE II** | CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES | 3 |
| Section 2.1 | Effect on Capital Stock | 3 |
| Section 2.2 | Exchange of Certificates | 5 |
| | | |
| **ARTICLE III** | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 7 |
| Section 3.1 | Qualification, Organization, Subsidiaries, etc. | 7 |
| Section 3.2 | Capital Stock | 9 |
| Section 3.3 | Corporate Authority Relative to This Agreement; No Violation | 11 |
| Section 3.4 | Reports and Financial Statements | 13 |
| Section 3.5 | Internal Controls and Procedures | 14 |
| Section 3.6 | No Undisclosed Liabilities | 14 |
| Section 3.7 | Compliance with Law; Permits | 14 |
| Section 3.8 | Environmental Laws and Regulations | 16 |
| Section 3.9 | Employee Benefit Plans | 17 |
| Section 3.10 | Absence of Certain Changes or Events | 19 |
| Section 3.11 | Investigations; Litigation | 19 |
| Section 3.12 | Proxy Statement; Other Information | 19 |
| Section 3.13 | Rights Plan | 20 |
| Section 3.14 | Tax Matters | 20 |
| Section 3.15 | Labor Matters | 21 |
| Section 3.16 | Intellectual Property | 21 |
| Section 3.17 | Real Property | 22 |
| Section 3.18 | Opinion of Financial Advisor | 22 |
| Section 3.19 | Required Vote of the Company Shareholders | 22 |
| Section 3.20 | Material Contracts | 23 |
| Section 3.21 | Finders or Brokers | 23 |
| Section 3.22 | Insurance | 23 |
| Section 3.23 | Affiliate Transactions | 23 |
| Section 3.24 | Indebtedness | 24 |
| Section 3.25 | Cable and Satellite Matters | 24 |
| | | |
| **ARTICLE IV** | REPRESENTATIONS AND WARRANTIES OF THE ESOP AND MERGER SUB | 24 |
| Section 4.1 | Qualification, Organization, Subsidiaries, etc. | 24 |

| | | |
|---|---|---|
| Section 4.2 | Authority Relative to This Agreement; No Violation | 24 |
| Section 4.3 | Investigations; Litigation | 25 |
| Section 4.4 | Proxy Statement; Other Information | 26 |
| Section 4.5 | Capitalization of Merger Sub | 26 |
| Section 4.6 | Lack of Ownership of Company Common Stock | 26 |
| Section 4.7 | Finders or Brokers | 26 |
| Section 4.8 | No Additional Representations | 26 |
| | | |
| ARTICLE V | COVENANTS AND AGREEMENTS | 27 |
| Section 5.1 | Conduct of Business by the Company | 27 |
| Section 5.2 | Investigation | 31 |
| Section 5.3 | No Solicitation | 32 |
| Section 5.4 | Proxy Statement; Company Meeting | 35 |
| Section 5.5 | Stock Options and Other Stock-Based Awards; Employee Matters | 36 |
| Section 5.6 | Reasonable Best Efforts | 39 |
| Section 5.7 | Takeover Statute | 42 |
| Section 5.8 | Public Announcements | 42 |
| Section 5.9 | Indemnification and Insurance | 42 |
| Section 5.10 | Control of Operations | 44 |
| Section 5.11 | Financing | 44 |
| Section 5.12 | Specified Divestitures | 45 |
| Section 5.13 | FCC Matters | 45 |
| Section 5.14 | Company Offer | 46 |
| Section 5.15 | Eagles Exchange | 46 |
| | | |
| ARTICLE VI | CONDITIONS TO THE MERGER | 47 |
| Section 6.1 | Conditions to Each Party's Obligation to Effect the Merger | 47 |
| Section 6.2 | Conditions to Obligation of the Company to Effect the Merger | 47 |
| Section 6.3 | Conditions to Obligations of the ESOP and Merger Sub to Effect the Merger | 48 |
| Section 6.4 | Frustration of Closing Conditions | 49 |
| | | |
| ARTICLE VII | TERMINATION | 49 |
| Section 7.1 | Termination or Abandonment | 49 |
| | | |
| ARTICLE VIII | MISCELLANEOUS | 51 |
| Section 8.1 | No Survival of Representations and Warranties | 51 |
| Section 8.2 | Expenses | 51 |
| Section 8.3 | Counterparts; Effectiveness | 51 |
| Section 8.4 | Governing Law | 51 |
| Section 8.5 | Jurisdiction; Enforcement | 51 |
| Section 8.6 | WAIVER OF JURY TRIAL | 52 |
| Section 8.7 | Notices | 52 |
| Section 8.8 | Assignment; Binding Effect | 54 |
| Section 8.9 | Severability | 54 |
| Section 8.10 | Entire Agreement; Third-Party Beneficiaries | 54 |
| Section 8.11 | Amendments; Waivers | 54 |
| Section 8.12 | Tribune Acquisition Rights | 55 |

Section 8.13    Headings                                    55
Section 8.14    Interpretation                              55
Section 8.15    No Recourse                                 55
Section 8.16    Definitions                                 56

**EXHIBITS**
Exhibit A – Certificate of Incorporation
Exhibit B – By-Laws
Exhibit C – Exchange Agreement

AGREEMENT AND PLAN OF MERGER, dated as of April 1, 2007 (the "Agreement"), among GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee (the "ESOP Fiduciary") of the Tribune Employee Stock Ownership Trust, which forms a part of the Tribune Employee Stock Ownership Plan (the "ESOP"), Tesop Corporation, a Delaware corporation all of the common stock of which is owned by the ESOP ("Merger Sub"), Tribune Company, a Delaware corporation (the "Company"), and EGI-TRB, L.L.C., a Delaware limited liability company ("Tribune Acquisition") (solely for the limited purposes of Section 8.12 hereof).

WITNESSETH:

WHEREAS, the parties intend that Merger Sub be merged with and into the Company (the "Merger"), with the Company surviving the Merger.

WHEREAS, concurrently herewith, the Company, Tribune Acquisition and Samuel Zell have entered into a Securities Purchase Agreement (the "Tribune Purchase Agreement") pursuant to which Tribune Acquisition has, on the terms and subject to the conditions set forth in the Tribune Purchase Agreement, agreed to purchase (a) 1,470,588 shares of Company Common Stock (as defined below) and an unsecured $200,000,000 subordinated exchangeable note (the "Subordinated Exchangeable Note") prior to consummation of the Merger and (b) an unsecured $225,000,000 subordinated promissory note (the "Subordinated Note") and a warrant (the "Warrant") to purchase 43,478,261 shares of common stock of the Surviving Corporation (as defined below) immediately following consummation of the Merger.

WHEREAS, concurrently herewith, the ESOP Fiduciary, on behalf of the ESOP, and the Company have entered into an Equity Purchase Agreement (the "ESOP Purchase Agreement") pursuant to which the ESOP has, on the terms and subject to the conditions set forth in the ESOP Purchase Agreement, agreed to purchase 8,928,571 shares of Company Common Stock prior to consummation of the Merger.

WHEREAS, concurrently herewith, the Company has entered into a Voting Agreement with Chandler Trust No. 1 and Chandler Trust No. 2, pursuant to which Chandler Trust No. 1 and Chandler Trust No. 2 have agreed, among other things, to vote in favor of this Agreement and the Merger.

WHEREAS, concurrently herewith, the Company, Tribune Acquisition and the ESOP Fiduciary, on behalf of the ESOP, have entered into an Investor Rights Agreement (the "Investor Rights Agreement") pursuant to which the parties thereto will have certain rights and obligations as the Surviving Corporation and the stockholders of the Surviving Corporation, as applicable.

WHEREAS, the Board of Directors of the Company, acting upon the recommendation of a special committee of independent directors of the Company (the "Special Committee"), has (a) determined that it is in the best interests of the Company and its shareholders, and declared it advisable, to enter into this Agreement, (b) approved the execution, delivery and performance of this Agreement and the consummation of the transactions

1

contemplated hereby, including the Merger, and (c) resolved to recommend to its shareholders approval and adoption of this Agreement.

WHEREAS, the ESOP Fiduciary, on behalf of the ESOP, and the board of directors of Merger Sub have approved this Agreement and declared it advisable for the ESOP and Merger Sub, respectively, to enter into this Agreement.

WHEREAS, the ESOP, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements specified herein in connection with this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, the ESOP, Merger Sub and the Company agree as follows:

## ARTICLE I
## THE MERGER

Section 1.1    The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with the General Corporation Law of the State of Delaware (the " DGCL "), at the Effective Time (as hereinafter defined), Merger Sub will merge with and into the Company, the separate corporate existence of Merger Sub will cease and the Company will continue its corporate existence under Delaware law as the surviving corporation in the Merger (the " Surviving Corporation ").

Section 1.2    Closing. The closing of the Merger (the "Closing") shall take place at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52 nd Street, New York, New York at 10:00 a.m., local time, on a date to be specified by the parties (the " Closing Date ") which shall be no later than the third business day after the satisfaction or waiver (to the extent permitted by applicable Law (as hereinafter defined)) of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place, date and time as the Company and the ESOP may agree in writing.

Section 1.3    Effective Time. Subject to the provisions of this Agreement, at the Closing, the Company will cause a certificate of merger in a form reasonably satisfactory to the ESOP and Tribune Acquisition (the " Certificate of Merger ") to be executed, acknowledged and filed with the Secretary of State of the State of Delaware in accordance with Section 251 of the DGCL. The Merger will become effective at such time as the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such later date or time as may be agreed by the Company and Merger Sub in writing and specified in the Certificate of Merger in accordance with the DGCL (the effective time of the Merger being hereinafter referred to as the " Effective Time ").

Section 1.4    Effects of the Merger. The Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, all property, rights,

2

privileges, immunities, powers, franchises, licenses and authority of the Company and Merger Sub shall vest in the Surviving Corporation, and all debts, liabilities, obligations, restrictions and duties of each of the Company and Merger Sub shall become the debts, liabilities, obligations, restrictions and duties of the Surviving Corporation. At and after the Effective Time, the officers and directors of the Surviving Corporation shall be authorized to execute and deliver, in the name and on behalf of the Company, its Subsidiaries or Merger Sub, any deeds, bills of sale, assignments or assurances and to take and do, in the name and on behalf of the Company, its Subsidiaries or Merger Sub, any other actions and things to vest, perfect or confirm of record or otherwise in the Surviving Corporation any and all right, title and interest in, to and under any of the rights, properties or assets of the Company, its Subsidiaries and Merger Sub.

Section 1.5    Certificate of Incorporation and By-laws of the Surviving Corporation.  Subject to Section 5.9, at the Effective Time, (a) the Certificate of Incorporation of the Surviving Corporation shall be amended to read in its entirety as the Certificate of Incorporation of Merger Sub read immediately prior to the Effective Time, in the form attached hereto as Exhibit A , except that the name of the Surviving Corporation shall be Tribune Company and the provision in the Certificate of Incorporation of Merger Sub naming its incorporator shall be omitted, and (b) the bylaws of the Surviving Corporation shall be amended so as to read in their entirety as the bylaws of Merger Sub as in effect immediately prior to the Effective Time, in the form attached hereto as Exhibit B , with such changes as may be necessary to comply with any applicable Law or the rules and regulations of any national securities exchange, in each case, until thereafter amended in accordance with applicable Law, except the references to Merger Sub's name shall be replaced by references to Tribune Company.

Section 1.6    Directors.  Subject to applicable Law, the directors of Merger Sub as of the Effective Time shall be the initial directors of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

Section 1.7    Officers.  The officers of the Company as of the Effective Time shall be the initial officers of the Surviving Corporation and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

## ARTICLE II
## CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES

Section 2.1    Effect on Capital Stock.  At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Merger Sub or the holders of any securities of the Company or Merger Sub:

(a)    Conversion of Company Common Stock.  Each share of Common Stock, par value $.01 per share, of the Company outstanding immediately prior to the Effective Time (such shares, collectively, " Company Common Stock ," and each, a " Share "), other than (i) Shares to be cancelled pursuant to Section 2.1(b) and (ii) Dissenting Shares (as hereinafter defined), shall be converted automatically into and shall thereafter represent the right to receive

3

Thirty-four Dollars ($34.00) in cash plus the Additional Per Share Consideration (the "Merger Consideration"). The "Additional Per Share Consideration" shall mean an amount per share, if any, rounded to the nearest whole cent, equal to (1) Thirty-four Dollars ($34) multiplied by (2) eight percent (8%) multiplied by (3) the Annualized Portion (as hereinafter defined). The "Annualized Portion" shall mean the quotient obtained by dividing (x) the number of days actually elapsed from and excluding January 1, 2008 to and including the Closing Date by (y) 365. All Shares that have been converted into the right to receive the Merger Consideration as provided in this Section 2.1 shall be automatically cancelled and shall cease to exist, and the holders of certificates which immediately prior to the Effective Time represented such Shares shall cease to have any rights with respect to such Shares other than the right to receive the Merger Consideration.

(b)        ESOP and Merger Sub-Owned Shares.  Each Share that is owned, directly or indirectly, by the ESOP or Merger Sub immediately prior to the Effective Time or held by the Company immediately prior to the Effective Time (in each case, other than any such Shares held on behalf of third parties) (the "Cancelled Shares") shall be cancelled and retired and shall cease to exist, and no consideration shall be delivered in exchange for such cancellation and retirement.

(c)        Treatment of Company Preferred Stock.  Each share of Series E Preferred Stock of the Company that is owned immediately prior to the Effective Time by an Eagle Entity, which shares constitute all the outstanding shares of Series E Preferred Stock, shall remain outstanding following the Merger in accordance with their terms.

(d)        Conversion of Merger Sub Common Stock.  All the shares of common stock, par value $.01 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become, in the aggregate, 56,521,739 validly issued, fully paid and nonassessable shares of common stock, par value $.01 per share, of the Surviving Corporation with the same rights, powers and privileges as the shares so converted and, together with the shares of Series E Preferred Stock referred to above in Section 2.1(c), shall constitute the only outstanding shares of capital stock of the Surviving Corporation. From and after the Effective Time, all certificates representing the common stock of Merger Sub shall be deemed for all purposes to represent the number of shares of common stock of the Surviving Corporation into which they were converted in accordance with the immediately preceding sentence.

(e)        Dissenters' Rights.  Notwithstanding any provision of this Agreement to the contrary, if required by the DGCL (but only to the extent required thereby), Shares that are issued and outstanding immediately prior to the Effective Time (other than Cancelled Shares) and that are held by holders of such Shares who have not voted in favor of the adoption of this Agreement or consented thereto in writing and who have properly exercised appraisal rights with respect thereto in accordance with, and who have complied with, Section 262 of the DGCL (the "Dissenting Shares") will not be converted into the right to receive the Merger Consideration, and holders of such Dissenting Shares will be entitled to receive payment of the fair value of such Dissenting Shares in accordance with the provisions of such Section 262 unless and until any such holder fails to perfect or effectively waives, withdraws or loses its rights to appraisal and payment under the DGCL. If, after the Effective Time, any such holder fails to perfect or effectively waives, withdraws or loses such right, such Shares shall not be deemed Dissenting Shares and will thereupon be treated as if they had been converted into and have become

4

exchangeable for, at the Effective Time, the right to receive the Merger Consideration, without any interest thereon, and the Surviving Corporation shall remain liable for payment of the Merger Consideration for such Shares. At the Effective Time, any holder of Dissenting Shares shall cease to have any rights with respect thereto, except the rights provided in Section 262 of the DGCL and as provided in the previous sentence. Any portion of the Merger Consideration made available to the Paying Agent pursuant to Section 2.2 to pay Dissenting Shares for which appraisal rights have been perfected shall be paid to the Surviving Corporation upon demand. The Company will give the ESOP (i) prompt notice of any demands received by the Company for appraisals of Shares, withdrawals of such demands, and any other instruments served pursuant to the DGCL and received by the Company that relate to any such demand for dissenters' rights and (ii) the opportunity to participate in and direct all negotiations and proceedings with respect to such notices and demands. The Company shall not, except with the prior written consent of the ESOP, make any payment with respect to any demands for appraisal or settle or offer to settle any such demands.

(f)        Adjustments. If at any time during the period between the date of this Agreement and the Effective Time, any change in the outstanding shares of capital stock of the Company shall occur as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or combination, exchange or readjustment of shares, or any stock dividend or stock distribution is declared with a record date during such period, the Merger Consideration shall be equitably adjusted to reflect such change.

Section 2.2        Exchange of Certificates.

(a)        Paying Agent. At or prior to the Effective Time, the Company shall deposit, or shall cause to be deposited, with a U.S. bank or trust company to act as a paying agent hereunder pursuant to an agreement customary in form and substance (the "Paying Agent"), in trust for the benefit of holders of the Shares, the Company Stock Options (as hereinafter defined) and the Company Stock-Based Awards (as hereinafter defined), cash in U.S. dollars sufficient to pay (i) the aggregate Merger Consideration in exchange for all of the Shares outstanding immediately prior to the Effective Time (other than the Cancelled Shares), payable upon due surrender of the certificates that immediately prior to the Effective Time represented Shares ("Certificates") (or effective affidavits of loss in lieu thereof) or non-certificated Shares represented by book-entry ("Book-Entry Shares") pursuant to the provisions of this Article II and (ii) the Option and Stock-Based Consideration (as hereinafter defined) payable pursuant to Section 5.5 (such cash referred to in subsections (a)(i) and (a)(ii) being hereinafter referred to as the "Exchange Fund").

(b)        Payment Procedures.

(i)        As soon as reasonably practicable after the Effective Time and in any event not later than the second business day following the Effective Time, the Paying Agent shall mail (x) to each holder of record of Shares whose Shares were converted into the Merger Consideration pursuant to Section 2.1, (A) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to Certificates shall pass, only upon delivery of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares to the Paying Agent and shall be in such form and have such other provisions as the ESOP and the Company

may mutually agree), and (B) instructions for use in effecting the surrender of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares in exchange for the Merger Consideration and (y) upon surrender of such documents as may reasonably be required by the Paying Agent, to each holder of a Company Stock Option or a Company Stock-Based Award, a check in an amount, if any, due and payable to such holder pursuant to Section 5.5 hereof in respect of such Company Stock Option or Company Stock-Based Award.

(ii)        Upon surrender of Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares to the Paying Agent together with such letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may reasonably be required by the Paying Agent, the holder of such Certificates or Book-Entry Shares shall be entitled to receive in exchange therefor a check in an amount equal to the product of (x) the number of Shares represented by such holder's properly surrendered Certificates (or effective affidavits of loss in lieu thereof) or Book-Entry Shares multiplied by (y) the Merger Consideration. No interest will be paid or accrued on any amount payable upon due surrender of Certificates or Book-Entry Shares. In the event of a transfer of ownership of Shares that is not registered in the transfer records of the Company, a check for any cash to be paid upon due surrender of the Certificate may be paid to such a transferee if the Certificate formerly representing such Shares is presented to the Paying Agent, accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer Taxes (as hereinafter defined) have been paid or are not applicable.

(iii)        The Paying Agent or the Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable under this Agreement to any holder of Shares or holder of Company Stock Options or Company Stock-Based Awards, such amounts as are required to be withheld or deducted under the Internal Revenue Code of 1986 (the "Code") or any provision of applicable Federal, state, local or foreign Tax Law with respect to the making of such payment. To the extent that amounts are so withheld or deducted and paid over to the applicable Governmental Entity (as hereinafter defined), such withheld or deducted amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the Shares or holder of the Company Stock Options or Company Stock-Based Awards, in respect of which such deduction and withholding were made.

(c)        Closing of Transfer Books. At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the Shares that were outstanding immediately prior to the Effective Time. If, after the Effective Time, Certificates are presented to the Surviving Corporation for transfer, they shall be cancelled and exchanged for a check in the proper amount pursuant to this Article II.

(d)        Termination of Exchange Fund. Any portion of the Exchange Fund (including the proceeds of any investments thereof) that remains undistributed to the former holders of Shares for one year after the Effective Time shall be delivered to the Surviving Corporation upon demand, and any former holders of Shares who have not surrendered their Shares in accordance with Section 2.2 shall thereafter look only to the Surviving Corporation as general unsecured creditors of the Surviving Corporation for payment of their claim for the Merger Consideration, without any interest thereon, upon due surrender of their Shares.

6

(e)    <u>No Liability</u>.  Notwithstanding anything herein to the contrary, none of the Company, the ESOP, Merger Sub, the Surviving Corporation, the Paying Agent or any other person shall be liable to any former holder of Shares for any amount properly delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

(f)    <u>Investment of Exchange Fund</u>.  The Paying Agent shall invest all cash included in the Exchange Fund as reasonably directed by the Company; <u>provided</u> , <u>however</u> , that any investment of such cash shall be limited to direct short-term obligations of, or short-term obligations fully guaranteed as to principal and interest by, the U.S. government, or commercial paper obligations receiving the highest rating from either Moody's Investor Services, Inc. or Standard & Poor's Corporation, a division of The McGraw Hill Companies, or in certificates of deposit, bank repurchase agreements or banker's acceptances of commercial banks with capital exceeding $1 billion (based on the most recent financial statements of such bank that are then publicly available), or a combination thereof.  Any interest and other income resulting from such investments shall be paid to the Surviving Corporation pursuant to Section 2.2(d).

(g)    <u>Lost Certificates</u>.  In the case of any Certificate that has been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by the Surviving Corporation, the posting by such person of a bond in customary amount as indemnity against any claim that may be made against it with respect to such Certificate, the Paying Agent will issue in exchange for such lost, stolen or destroyed Certificate a check in the amount of the number of Shares represented by such lost, stolen or destroyed Certificate multiplied by the Merger Consideration.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as disclosed in the Company SEC Documents (as hereinafter defined) filed prior to the date hereof, other than risk factor and similar cautionary disclosure contained in the Company SEC Documents under the headings "Risk Factors" or "Forward-Looking Statements" or under any other similar heading, or as disclosed in the disclosure schedule delivered by the Company to the ESOP immediately prior to the execution of this Agreement (the " <u>Company Disclosure Schedule</u> "), the Company represents and warrants to the ESOP and Merger Sub as follows:

Section 3.1    <u>Qualification, Organization, Subsidiaries, etc.</u>  Each of the Company and its Subsidiaries and, to the knowledge of the Company, each Company Joint Venture is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing, holding or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  As used in this Agreement, " <u>Company Joint Venture</u> " means CareerBuilder,

7

LLC, ShopLocal, LLC, Topix LLC, Television Food Network, G.P., Comcast SportsNet Chicago, LLC, Eagle New Media Investments, LLC (" Eagle New Media "), and Eagle Publishing Investments, LLC (" Eagle Publishing " and together with Eagle New Media, the " Eagle Entities "). As used in this Agreement, any reference to any facts, circumstances, events or changes having a " Company Material Adverse Effect " means any facts, circumstances, events or changes that are materially adverse to the business, assets, financial condition, results of operations on an ongoing basis or continuing operations of the Company and its Subsidiaries, taken as a whole, or that have a material adverse effect on the ability of the Company to perform its obligations under this Agreement, or to consummate the Merger and the other transactions to be performed or consummated by the Company; provided , however that "Company Material Adverse Effect" shall not include facts, circumstances, events or changes resulting from (a) changes in general economic or political conditions or the securities, credit or financial markets in general, (b) general changes or developments in the industries in which the Company and its Subsidiaries operate, including general changes in law or regulation across such industries, (c) the announcement of this Agreement or the pendency or consummation of the Merger, (d) compliance with the terms of, or the taking of any action required by, this Agreement or consented to by Tribune Acquisition and the ESOP, (e) any acts of terrorism or war (other than any of the foregoing that causes any damage or destruction to or renders unusable any facility or property of the Company or any of its Subsidiaries), (f) the identity of Tribune Acquisition or the ESOP or any of their affiliates as participants in the transactions contemplated by this Agreement or the other agreements described in the recitals hereof or (g) changes in GAAP or the interpretation thereof by the Financial Accounting Standards Board, the Accounting Principles Board, the American Institute of Certified Public Accountants and other similar organizations generally considered authoritative with respect to the interpretation of GAAP, except, in the case of the foregoing clauses (a) and (b), to the extent such facts, circumstances, events, changes or developments referred to therein have a disproportionate impact on the Company and its Subsidiaries, taken as a whole, relative to other companies in the industries or in the geographic markets in which the Company conducts its businesses after taking into account the size of the Company relative to such other companies. For the avoidance of doubt, the parties agree that any decline in the stock price of the Company Common Stock on the New York Stock Exchange or any failure to meet internal or published projections, forecasts or revenue or earning predictions for any period shall not, in and of itself, constitute a Company Material Adverse Effect, but the underlying causes of such decline or failure shall be considered to the extent applicable (and subject to the proviso set forth in the immediately preceding sentence) in determining whether there is a Company Material Adverse Effect. The Company has made available to the ESOP prior to the date of this Agreement a true and complete copy of the Company's amended and restated certificate of incorporation and by-laws and the charter and comparable organizational documents of each Company Joint Venture, each as amended through the date hereof. The amended and restated certificate of incorporation and by-laws of the Company are in full force and effect, and the certificate of incorporation and by-laws or similar organizational documents of each Subsidiary of the Company and, to the knowledge of the Company, each Company Joint Venture are in full force and effect. Neither the Company nor any Subsidiary nor, to the knowledge of the Company, any Company Joint Venture is in material violation of any provision of its certificate of incorporation or by-laws or similar organizational documents.

8

Section 3.2      Capital Stock.

(a)      The authorized capital stock of the Company consists of 1,400,000,000 shares of Company Common Stock and 12,000,000 shares of preferred stock, without par value (" Company Preferred Stock "), of which 6,000,000 shares are designated as Series A Junior Participating Preferred Stock and 380,972 shares are designated as Series D-1 Preferred Stock (the " Series D-1 Preferred Stock "). At the close of business on March 14, 2007, (i) 388,098,408 shares of Company Common Stock were issued and outstanding (including 18,000 Restricted Shares), (ii) 87,035,996 shares of Company Common Stock were held in treasury, (iii) 60,671,319 shares of Company Common Stock were held by the Eagle Entities, (iv) 32,853,240 shares of Company Common Stock were reserved for issuance under the employee and director stock plans of the Company or of the former Times Mirror Company (the " Company Stock Plans ") and (v) 137,643 shares of Series D-1 Preferred Stock were issued and outstanding and held by the Eagle Entities. All outstanding shares of Company Common Stock and Company Preferred Stock, and all shares of Company Common Stock reserved for issuance as noted in clause (iv), when issued in accordance with the respective terms thereof, are or will be duly authorized, validly issued, fully paid and non-assessable and free of pre-emptive rights and all Liens.   As of immediately prior to the Effective Time, there will be (i) no shares of Series D-1 Preferred Stock issued and outstanding and (ii) issued and outstanding shares of Series E Preferred Stock, all of which will be held by the Eagle Entities, as contemplated by that certain Exchange Agreement by and among the Company, Eagle New Media and Eagle Publishing (the " Exchange Agreement "). Such Series E Preferred Stock, when issued in accordance with the terms of the Exchange Agreement, will be fully authorized, validly issued, fully paid and non-assessable and free of pre-emptive rights and all Liens.

(b)      Section 3.2(b) of the Company Disclosure Schedule sets forth as of March 14, 2007, a complete and correct list of all outstanding Company Stock-Based Awards, Restricted Shares, Company Stock Options and each right of any kind, contingent or accrued, to receive shares of Company Common Stock or benefits measured in whole or in part by the value of a number of shares of Company Common Stock granted under the Company Stock Plans, Company Benefit Plans or otherwise (including restricted stock units, phantom units, deferred stock units and dividend equivalents), the number of shares of Company Common Stock issuable thereunder or with respect thereto and the exercise price (if any) and the Company has granted no other such awards since March 14, 2007 and prior to the date hereof. Each grant of a Company Stock Option was duly authorized no later than the date on which the grant of such Company Stock Option was by its terms to be effective by all necessary corporate action, including any required shareholder approval by the necessary number of votes or written consents, and each such grant was made in all material respects in accordance with the terms of the applicable compensation plan or arrangement of the Company, the Exchange Act, and all other applicable Laws and regulatory rules or requirements, including the rules of the New York Stock Exchange. The per share exercise price of each Company Stock Option was equal to the fair market value (as such term is defined in the applicable Company Stock Plan) of a share of Company Common Stock on the applicable grant date.  The Company has not knowingly granted, and there is no and has been no Company policy or intentional practice to grant, Company Stock Options prior to, or otherwise intentionally coordinate the grant of Company Stock Options with, the release or other public announcement of material information regarding

9

the Company or its Subsidiaries or their financial results or prospects. No outstanding Company Stock Option is intended to qualify as an "incentive stock option" under Section 422 of the Code.

(c)        All outstanding shares of capital stock of, or other equity interests in, each Subsidiary of the Company are duly authorized, validly issued, fully paid and non-assessable, were not issued in violation of any preemptive or similar rights, purchase option, call or right of first refusal or similar rights, and are owned by the Company or by a wholly owned Subsidiary of the Company, free and clear of all Liens. To the knowledge of the Company, all of the outstanding ownership interests in each of the Company Joint Ventures are duly authorized, validly issued, fully paid and nonassessable, and were not issued in violation of any preemptive or similar rights, purchase option, call or right of first refusal or similar rights. All the outstanding shares of capital stock of, or other equity interests in, each Company Joint Venture that are owned by the Company or a wholly owned Subsidiary of the Company, are owned free and clear of all Liens.

(d)        Except as set forth in subsection (a) above, as of the date hereof, (i) the Company does not have any shares of its capital stock or other voting securities issued or outstanding other than shares of Company Common Stock that have become outstanding after March 14, 2007, which were reserved for issuance as of March 14, 2007 as set forth in subsection (a) above with respect to awards outstanding as of such date under Company Stock Plans, and (ii) there are no outstanding subscriptions, options, warrants, calls, convertible or exchangeable securities, or other similar rights, undertakings, agreements or commitments of any kind to which the Company or any of the Company's Subsidiaries is a party obligating the Company or any of the Company's Subsidiaries to (A) issue, transfer or sell, or cause to be issued, transferred or sold, any shares of capital stock or other equity interests of the Company or any Subsidiary of the Company or securities convertible into or exchangeable for such shares or equity interests, (B) issue, grant, extend or enter into any such subscription, option, warrant, call, convertible securities or other similar right, undertaking, agreement or arrangement, (C) repurchase, redeem or otherwise acquire any such shares of capital stock or other equity interests, (D) provide a material amount of funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any Subsidiary or Company Joint Venture or (E) give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights occurring to holders of Company Common Stock. Except for the issuance of shares of Company Common Stock that were reserved for issuance as set forth in subsection (a) above, and except for regular quarterly cash dividends, from March 9, 2007 to the date hereof, the Company has not declared or paid any dividend or distribution in respect of the Company Common Stock, and has not issued, sold, repurchased, redeemed or otherwise acquired any Company Common Stock, and its Board of Directors has not authorized any of the foregoing.

(e)        Except for awards to acquire or receive shares of Company Common Stock under a Company Stock Plan, neither the Company nor any of its Subsidiaries has outstanding bonds, debentures, notes or other obligations, the holders of which have the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the shareholders of the Company on any matter.

10

(f)        There are no voting trusts or other agreements or understandings to which the Company or any of its Subsidiaries is a party with respect to the voting of the capital stock or other equity interest of the Company or any of its Subsidiaries.

Section 3.3        Corporate Authority Relative to This Agreement; No Violation.

(a)        The Company has all requisite corporate power and authority to enter into this Agreement and, subject to receipt of the Company Shareholder Approval (as hereinafter defined) in the case of the Merger, to consummate the Merger and the other transactions contemplated hereby.  The Board of Directors of the Company, acting upon the recommendation of the Special Committee, at a duly held meeting has (i) determined that it is fair to and in the best interests of the Company and its shareholders, and declared it advisable, to enter into this Agreement, (ii) approved the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Merger, and (iii) resolved to recommend that the shareholders of the Company approve the adoption of this Agreement (the " Recommendation ") and directed that this Agreement and the Merger be submitted for consideration of the shareholders of the Company at the Company Meeting (as hereinafter defined).  Assuming the accuracy of the representations and warranties of the ESOP and Merger Sub set forth in Section 4.9, (i) the determinations, approvals and resolutions by the Board of Directors of the Company are sufficient to render inapplicable to the ESOP and Merger Sub and this Agreement, the Merger and the other transactions contemplated hereby the restrictions on "business combinations" contained in Section 203 of the DGCL and (ii) to the knowledge of the Company, no other "fair price," "moratorium," "control share acquisition," "business combination" or other similar antitakeover statute or regulation enacted under state or Federal laws in the United States applicable to the Company is applicable to the ESOP and Merger Sub and this Agreement, the Merger or the other transactions contemplated hereby.  Except for the Company Shareholder Approval and the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by the Company and, assuming this Agreement constitutes the legal, valid and binding agreement of the ESOP and Merger Sub, constitutes the legal, valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

(b)        The execution, delivery and performance by the Company of this Agreement and the consummation of the Merger and the other transactions contemplated by this Agreement by the Company do not and will not require any consent, approval, license, authorization, order or permit of, action by, filing with or notification to any Federal, state, local or foreign governmental or regulatory agency, commission, court, body, entity or authority (each, a " Governmental Entity "), other than (i) the filing of the Certificate of Merger, (ii) compliance with the applicable requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the " HSR Act "), (iii) compliance with the applicable requirements of the Securities Exchange Act of 1934, as amended (the " Exchange Act "), including the filing of the Proxy Statement (as hereinafter defined) and the Schedule 13E-3 (as hereinafter defined), (iv) compliance with the rules and regulations of the New York Stock Exchange, (v) filings with the Federal Communications Commission (the " FCC "), the FCC Order (as hereinafter defined), and the state regulatory bodies (the " State Commissions ") set

11

forth on Section 3.3(b) of the Company Disclosure Schedule, (vi) compliance with any applicable foreign or state securities or blue sky laws, (vii) such of the foregoing as may be required in connection with the Financing, and (viii) the other consents and/or notices set forth on Section 3.3(b) of the Company Disclosure Schedule (collectively, clauses (i) through (viii), the "Company Approvals"), and other than any consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not reasonably be expected to, individually or in the aggregate, (A) have a Company Material Adverse Effect or (B) prevent or materially delay the consummation of the Merger.  As used herein, "FCC Order" means one or more orders or decisions of the FCC (or its staff) which grant all consents or approvals required under the Communications Act of 1934, as amended (the "Communications Act") or the rules, regulations and published policies of the FCC promulgated thereunder (the "FCC Rules") for the transfer of control or assignment of all FCC licenses, permits or other authorizations held by the Company or any of its Subsidiaries to the ESOP, Merger Sub or an affiliate of the ESOP or Merger Sub and the consummation of the transactions contemplated by this Agreement, whether or not any (x) appeal or request for reconsideration or review of such order is pending, or whether the time for filing any such appeal or request for reconsideration or review, or any sua sponte action by the FCC with similar effect, has expired or (y) such order is subject to any condition or provision of law or regulation of the FCC (whether such law or regulation is now existing or is proposed in any proceeding pending at the time of receipt of the FCC Order).  There is not pending or, to the knowledge of the Company, threatened by or before the FCC any proceeding, notice of violation, order of forfeiture, complaint or investigation against or relating to the Company, any of its Subsidiaries or a Company Station or, to the knowledge of the Company, any Company Joint Venture, nor, to the knowledge of the Company, is there any fact or circumstance related to the Company, any of its Subsidiaries, any Company Joint Venture or a Company Station, that would reasonably be expected to prevent the FCC from issuing the FCC Order.

(c)    The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the Merger and the other transactions contemplated hereby do not and will not (i) contravene or conflict with the organizational or governing documents of the Company, any of its Subsidiaries or any Company Joint Venture, (ii) assuming compliance with the matters referenced in Section 3.3(b) and the receipt of the Company Shareholder Approval, contravene or conflict with or constitute a violation of any provision of any Law binding upon or applicable to the Company or any of its Subsidiaries or any of their respective properties or assets, (iii) assuming compliance with the matters referenced in Section 3.3(b), conflict with, contravene, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to the loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person (other than employees of the Company) under, any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, instrument, permit, concession, franchise, right or license to which the Company or any of the Company's Subsidiaries is a party or by which any of their respective properties or assets is bound, or (iv) result in the creation of any liens, claims, mortgages, encumbrances, pledges, security interests, equities or charges of any kind (each, a "Lien"), other than any such Lien (A) for Taxes or governmental assessments, charges or claims of payment not yet due, being contested in good faith or for which adequate accruals or reserves have been established on the most recent consolidated balance sheet included in

12

Company SEC Documents filed prior to the date hereof, (B) which is a carriers', warehousemen's, mechanics', materialmen's, repairmen's or other similar lien arising in the ordinary course of business, (C) which is disclosed on the most recent consolidated balance sheet of the Company or notes thereto or securing liabilities reflected on such balance sheet or (D) which was incurred in the ordinary course of business since the date of the most recent consolidated balance sheet of the Company (each of the foregoing, a "Permitted Lien"), upon any of the properties or assets of the Company or any of the Company's Subsidiaries, other than, in the case of clauses (ii) and (iii), any such items that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

        Section 3.4        Reports and Financial Statements.

        (a)        The Company has filed or furnished all forms, documents and reports required to be filed or furnished prior to the date hereof by it with the Securities and Exchange Commission (the "SEC") since December 25, 2005 (the "Company SEC Documents"). As of their respective dates, or, if amended, as of the date of the last such amendment, the Company SEC Documents complied in all material respects with the requirements of the Securities Act of 1933, as amended (the "Securities Act"), and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the Subsidiaries of the Company is, or at any time since December 25, 2005 has been, required to file any form or report with the SEC.

        (b)        The consolidated financial statements of the Company included in the Company SEC Documents (including all related notes and schedules, where applicable) fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries, as at the respective dates thereof, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto), in conformity with United States generally accepted accounting principles ("GAAP") (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), and comply as to form with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Since December 25, 2005, there has been no material change in the Company's accounting methods or principles that would be required to be disclosed in the Company's financial statements in accordance with GAAP, except as described in the notes to such Company financial statements.

        (c)        To the knowledge of the Company, there is no applicable accounting rule, consensus or pronouncement that, as of the date of this Agreement, has been adopted by the SEC, the Financial Accounting Standards Board or the Emerging Issues Task Force that is not in effect as of the date of this Agreement but that, if implemented, could reasonably be expected to have a Company Material Adverse Effect.

Section 3.5    <u>Internal Controls and Procedures</u>. The Company has established and maintains disclosure controls and procedures and internal control over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act. The Company's disclosure controls and procedures are reasonably designed to ensure that all material information required to be disclosed by the Company in the reports that it files or furnishes under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that all such material information is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure and to make the certifications required pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 (the " <u>Sarbanes-Oxley Act</u> "). The Company's management has completed an assessment of the effectiveness of the Company's internal control over financial reporting in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act for the year ended December 31, 2006, and such assessment concluded that such controls were effective.

Section 3.6    <u>No Undisclosed Liabilities</u>. Except (a) as reflected or reserved against in the Company's most recent consolidated balance sheet (or the notes thereto) included in the Company SEC Documents, (b) as expressly permitted or contemplated by this Agreement, (c) for liabilities and obligations incurred in the ordinary course of business since December 31, 2006 and (d) for liabilities or obligations which have been discharged or paid in full in the ordinary course of business, as of the date hereof, neither the Company nor any Subsidiary of the Company has any liabilities or obligations of any nature, whether or not accrued, absolute, contingent or otherwise, that would be required by GAAP to be reflected on a consolidated balance sheet of the Company and its Subsidiaries (or in the notes thereto), other than those that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.7    <u>Compliance with Law; Permits</u>.

(a)    The Company, each of the Company's Subsidiaries, their relevant personnel and operations and, to the knowledge of the Company, each of the Company Joint Ventures are, and since December 31, 2006, have been, in compliance with and are not in default under or in violation of any applicable federal, state, local or foreign law, statute, ordinance, rule, regulation, judgment, order, injunction, decree or agency requirement of any Governmental Entity (collectively, " <u>Laws</u> " and each, a " <u>Law</u> "), except where such non-compliance, default or violation would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. Notwithstanding anything contained in this Section 3.7(a), no representation or warranty shall be deemed to be made in this Section 3.7(a) in respect of the matters referenced in Sections 3.4 or 3.5, or in respect of environmental, Tax, employee benefits or labor Law matters, each of which matters is addressed by other sections of this Agreement.

(b)    The Company, the Company's Subsidiaries and, to the knowledge of the Company, each of the Company Joint Ventures are in possession of and have in effect all franchises, grants, authorizations, licenses, permits (other than the Company FCC Licenses), easements, variances, exceptions, consents, certificates, approvals and orders of any Governmental Entity necessary for the Company and the Company's Subsidiaries to own, lease

14

and operate their properties and assets or to carry on their businesses as they are now being conducted (the "Company Permits"), and no non-renewal, suspension, cancellation or materially adverse modification of any of the Company Permits is pending or, to the knowledge of the Company, threatened, except where the failure to have any of the Company Permits or the suspension, cancellation or materially adverse modification of any of the Company Permits would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, and there has occurred no violation of, default (with or without the lapse or time or the giving of notice, or both) under, or event giving to others any right of termination, amendment or cancellation of, with or without notice or lapse of time or both, any such Company Permit, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. All Company Permits are in full force and effect in accordance with their terms and, to the Company's knowledge, there is no event which would reasonably be expected to result in the revocation, cancellation, non-renewal or adverse modification of any such Company Permit, except where the failure to be in full force and effect, or where such revocation, cancellation, non-renewal or adverse modification, would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

       (c)       Section 3.7(c) of the Company Disclosure Schedule sets forth (i) all main television and radio station licenses, permits, authorizations and approvals issued by the FCC to the Company or any of its Subsidiaries for the operation of the Company Stations ("Company FCC Licenses") and the legal name of the entity to which each such Company FCC License was issued and (ii) all time brokerage agreements and joint sales agreements between the Company or any of its Subsidiaries and any other broadcast licensee with respect to any broadcast television or radio station. The Company FCC Licenses are in full force and effect in accordance with their terms in all material respects and are not subject to any material conditions except for conditions applicable to television or radio broadcast licenses generally or as otherwise disclosed on the face of the Company FCC Licenses. The Company and its Subsidiaries have constructed and operated and currently are constructing and operating the Company Stations in material compliance with the terms of the Company FCC Licenses, the Communications Act, the FCC Rules and applicable requirements of the Federal Aviation Administration (the "FAA"). Without limiting the generality of the foregoing, the Company and its Subsidiaries have timely filed or made all applications, reports and other disclosures required by the FCC or FAA to be filed or made with respect to the Company Stations and have timely paid all FCC regulatory fees with respect to the Company Stations, except for such noncompliance, failure to file or failure to pay as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. The Company and its Subsidiaries hold all Company FCC Licenses necessary for the Company and its Subsidiaries to construct and operate the Company Stations as they are now being constructed and operated, and no suspension, cancellation or adverse modification of any of the Company FCC Licenses is pending or, to the knowledge of the Company, threatened, except where the failure to have any of the Company FCC Licenses or the non-renewal, suspension, cancellation or materially adverse modification of any of the Company FCC Licenses would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. There is not pending or, to the knowledge of the Company, threatened by or before the FCC any proceeding, notice of violation, order of forfeiture, complaint or investigation against or relating to the Company, any of its Subsidiaries, any Company Station or, to the knowledge of the Company, any Company Joint Venture, except for

15

any such proceedings, notices, orders, complaints or investigations that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. There is no order of forfeiture or notice of liability issued by the FCC with respect to the Company, any of its Subsidiaries, any Company Station or, to the knowledge of the Company, any Company Joint Venture that has not been satisfied. As used herein, "Company Station" shall mean each radio broadcast and television station currently owned and operated by the Company or any of its Subsidiaries, including full power radio and television broadcast stations and low power television and television translator stations.

(d)        The transmission towers and other transmission facilities of the Company Stations have been maintained in a manner consistent in all material respects with generally accepted standards of good engineering practice. To the knowledge of the Company, no Company Station causes interference in violation of the Communications Act or the FCC Rules to the transmission of any other broadcast station or communications facility.

(e)        Neither the Company nor any of its Subsidiaries has leased, licensed, assigned, conveyed or otherwise encumbered any portion of the digital spectrum of a Company Station or granted rights to any party to broadcast on any portion of the digital spectrum of a Company Station.

Section 3.8        Environmental Laws and Regulations.

(a)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) the Company and its Subsidiaries have conducted their respective businesses in compliance with all applicable Environmental Laws (as hereinafter defined), (ii) none of the properties owned, leased or operated by the Company or any of its Subsidiaries contains any Hazardous Substance (as hereinafter defined) as a result of any activity of the Company or any of its Subsidiaries in amounts exceeding the levels allowed or otherwise permitted by applicable Environmental Laws, (iii) since December 31, 2006, neither the Company nor any of its Subsidiaries has received any notices, demand letters or requests for information from any federal, state, local or foreign Governmental Entity indicating that the Company or any of its Subsidiaries may be in violation of, or liable under, any Environmental Law in connection with the ownership or operation of its businesses or any of their respective properties or assets, (iv) there have been no Releases or transportation of any Hazardous Substance at, onto, or from any properties presently or formerly owned, leased or operated by the Company or any of its Subsidiaries as a result of any activity of the Company or any of its Subsidiaries during the time such properties were owned, leased or operated by the Company or any of its Subsidiaries and (v) neither the Company, its Subsidiaries nor any of their respective properties are subject to any liabilities relating to any suit, settlement, court order, administrative order, regulatory requirement, judgment, notice of violation or written claim asserted or arising under any Environmental Law. It is agreed and understood that no representation or warranty is made in respect of environmental matters in any Section of this Agreement other than this Section 3.8.

(b)        As used herein, "Environmental Law" means any Law relating to (x) the protection, preservation or restoration of human health or the environment (including air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant or

16

animal life, or any other natural resource), (y) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, Release or disposal of Hazardous Substances, in each case as in effect at the date hereof, or (z) the protection of worker health or safety.

(c)    As used herein, "Hazardous Substance" means any substance, element, compound, mixture, solution, and/or waste presently listed, defined, designated, identified, or classified as hazardous, toxic, radioactive, or dangerous, or otherwise regulated, under any Environmental Law. Hazardous Substance includes any substance, element, compound, mixture, solution and/or waste to which exposure is regulated by any Governmental Entity or any Environmental Law, including but not limited to any toxic waste, pollutant, contaminant, hazardous substance (including toxic mold), toxic substance, hazardous waste, special waste, industrial substance or petroleum or any derivative or byproduct thereof, radon, radioactive material, asbestos, or asbestos containing material, urea formaldehyde, foam insulation or polychlorinated biphenyls.

(d)    As used herein, "Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the environment of a Hazardous Substance, in each case, in violation of any Environmental Law or in a manner which has or may give rise to any liability under any Environmental Law.

Section 3.9    Employee Benefit Plans.

(a)    Section 3.9(a) of the Company Disclosure Schedule lists all material Company Benefit Plans. "Company Benefit Plans " means all employee or director benefit plans, programs, policies, agreements or other arrangements, including any employee welfare plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended (" ERISA "), any employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA), and any bonus, incentive, deferred compensation, vacation, stock purchase, stock option or other equity-based plan or arrangement, severance, employment, change of control or fringe benefit plan, program or agreement (other than any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA and any other plan, program or arrangement maintained by an entity other than the Company or a Company Subsidiary pursuant to any collective bargaining agreements), in each case that are sponsored, maintained or contributed to by the Company or any of its Subsidiaries for the benefit of current or former employees, directors or consultants of the Company or its Subsidiaries.

(b)    Section 3.9(b) of the Company Disclosure Schedule lists all "multiemployer plans" (as defined in Regulation 4001.2 under ERISA) to which the Company or any ERISA Affiliate (as defined below) is obligated to contribute currently or has been obligated to contribute during the immediately preceding three years. The Company has made available to the ESOP all material written information which it has regarding potential withdrawal liability under such multiemployer plans, and, subject to, and in accordance with Section 5.2, the Company will use reasonable best efforts to assist the ESOP and Merger Sub in obtaining any additional, available material information regarding such multiemployer plans as the ESOP or Merger Sub shall reasonably request.

17

(c)       The Company has heretofore made available to the ESOP true and complete copies of each of the material Company Benefit Plans and material related documents, including (i) each writing constituting a part of such Company Benefit Plan, including all amendments thereto, (ii) the three most recent Annual Reports (Form 5500 Series) and accompanying schedules, if any, and (iii) the most recent determination letter from the Internal Revenue Services (the "IRS") (if applicable) for such Company Benefit Plan.

(d)       Except as would not have, individually or in the aggregate, a Company Material Adverse Effect:  (i) each material Company Benefit Plan has been maintained and administered in compliance with its terms and with applicable Law, including ERISA and the Code to the extent applicable thereto, and in each case the regulations thereunder (ii) each of the Company Benefit Plans intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion issued by the IRS, and there are no existing circumstances or any events that have occurred that would reasonably be expected to adversely affect the qualified status of any such plan, (iii) with respect to each Company Benefit Plan that is subject to Title IV of ERISA, the present value of the accrued benefits under such Company Benefit Plan, based upon the actuarial assumptions used for funding purposes in the most recent actuarial report prepared for such Company Benefit Plan's actuary with respect to such Company Benefit Plan, did not, as of its latest valuation date, exceed the then current value of the assets of such Company Benefit Plan allocable to such accrued benefits, (iv) no Company Benefit Plan provides benefits, including death or medical benefits (whether or not insured), with respect to current or former employees or directors of the Company or its Subsidiaries beyond their retirement or other termination of service, other than (A) coverage mandated by applicable Law or (B) benefits under any "employee pension plan" (as such term is defined in Section 3(2) of ERISA), (v) no liability under Title IV of ERISA has been incurred by the Company, its Subsidiaries or any ERISA Affiliate of the Company that has not been satisfied in full (other than with respect to amounts not yet due), and, to the knowledge of the Company, no condition exists that presents a risk to the Company, its Subsidiaries or any ERISA Affiliate of the Company of incurring a liability thereunder, (vi) all contributions or other amounts payable by the Company or its Subsidiaries as of the date hereof with respect to each Company Benefit Plan in respect of current or prior plan years have been paid or accrued in accordance with GAAP, (vii) neither the Company nor its Subsidiaries has engaged in a transaction in connection with which the Company or its Subsidiaries reasonably could be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a material Tax imposed pursuant to Section 4975 or 4976 of the Code and (viii) there are no pending, threatened or anticipated claims (other than routine claims for benefits) by, on behalf of or against any of the Company Benefit Plans or any trusts related thereto which could individually or in the aggregate reasonably be expected to result in any liability of the Company or any of its Subsidiaries.  "ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

(e)       Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in combination with another event, (i) entitle any current or former employee, consultant, director

18

or officer of the Company or any of its Subsidiaries to severance pay, unemployment compensation, forgiveness of indebtedness or any other payment, except as expressly provided in this Agreement or as required by applicable Law, (ii) result in any "excess parachute payment" (within the meaning of Section 280G of the Code), (iii) materially increase any benefits otherwise payable under any Company Benefit Plan, (iv) accelerate the time of payment or vesting, or increase the amount of compensation due any such employee, consultant, director or officer, except as expressly provided in this Agreement, (v) require the funding of any such benefits or (vi) limit the ability to amend or terminate any Company Benefit Plan or related trust.

Section 3.10    Absence of Certain Changes or Events.

(a)    From December 31, 2006 through the date of this Agreement, except as otherwise contemplated, required or permitted by this Agreement, the Tribune Purchase Agreement or the ESOP Purchase Agreement, (i) the businesses of the Company and its Subsidiaries have been conducted, in all material respects, in the ordinary course of business, and (ii) there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)    Since the date of this Agreement, there has not been any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.11    Investigations; Litigation.  As of the date hereof, (a) there is no investigation or review pending (or, to the knowledge of the Company, threatened) by any Governmental Entity with respect to the Company, any of the Company's Subsidiaries or, to the knowledge of the Company, any Company Joint Venture which would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, and (b) there are no actions, suits, inquiries, investigations, arbitrations, mediations or proceedings pending (or, to the knowledge of the Company, threatened) against or affecting the Company, any of its Subsidiaries, any of their respective properties or, to the knowledge of the Company, any Company Joint Venture at law or in equity (and, to the knowledge of the Company, there is no basis for any such action, suit, inquiry, investigation or proceeding) before, and there are no orders, judgments or decrees of, or before, any Governmental Entity, in each case which would have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.12    Proxy Statement; Other Information.  The proxy statement (including the letter to shareholders, notice of meeting and form of proxy, and any amendments or supplements thereto, the "Proxy Statement") and the Rule 13E-3 Transaction Statement on Schedule 13E-3 (the "Schedule 13E-3") to be filed by the Company with the SEC in connection with seeking the adoption of this Agreement by the shareholders of the Company will not, at the time they are concurrently filed with the SEC, or, in the case of the Proxy Statement, at the time it is first mailed to the shareholders of the Company or at the time of the Company Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Company will cause the Proxy Statement and the Schedule 13E-3 to comply as to form in all material respects with the requirements of the

19

Exchange Act and the rules and regulations thereunder applicable thereto as of the date of such filing. No representation is made by the Company with respect to statements made in the Proxy Statement or the Schedule 13E-3 based on information supplied by the ESOP, Merger Sub or any of their affiliates specifically for inclusion or incorporation by reference therein.

Section 3.13    Rights Plan. The Board of Directors of the Company has resolved to, and the Company promptly after the execution of this Agreement will, take all action necessary to render the rights to purchase shares of Series A Junior Participating Preferred Stock of the Company ("Rights"), issued pursuant to the terms of the Rights Agreement, dated as of December 12, 1997, as amended (the "Rights Agreement"), between the Company and Computershare Trust Company, N.A. (formerly First Chicago Trust Company of New York), as Rights Agent, inapplicable to the Merger and the execution and operation of this Agreement.

Section 3.14    Tax Matters.

(a)    Except in the case of clauses (i), (iv) or (v) as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) the Company and each of its Subsidiaries have prepared and timely filed (taking into account any extension of time within which to file) all Tax Returns required to be filed by any of them and all such filed Tax Returns are complete and accurate, (ii) the Company and each of its Subsidiaries have paid all material Taxes that are required to be paid by any of them (whether or not shown on any Tax Return), except, in the case of clause (i) or clause (ii) hereof, with respect to matters contested in good faith or for which adequate reserves have been established in accordance with GAAP, (iii) the U.S. consolidated federal income Tax Returns of the Company have been examined by the IRS (or the period for assessment of the Taxes in respect of which such Tax Returns were required to be filed has expired), (iv) as of the date of this Agreement, there are not pending or, to the knowledge of the Company, threatened in writing, any audits, examinations, investigations or other proceedings in respect of Taxes or Tax matters owed or claimed to be owed by the Company or any of its Subsidiaries, (v) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than Permitted Liens, (vi) none of the Company or any of its Subsidiaries has been a "controlled corporation" or a "distributing corporation" in any distribution occurring during the two-year period ending on the date hereof that was purported or intended to be governed, in whole or in part, by Section 355(a) or 361 of the Code (or any similar provision of state, local or foreign Law) and (vii) neither the Company nor any of its Subsidiaries has ever entered into any "reportable transaction," as defined in Treasury Regulation Section 1.6011-4(b), required to be reported in a disclosure statement pursuant to Treasury Regulation Section 1.6011-4(a) (other than transactions for which Form 8866 was filed with the Company's Tax Returns).

(b)    None of the Company or any of its Subsidiaries will be required to include in a taxable period ending after the Effective Time taxable income attributable to income that accrued (for purposes of the financial statements of the Company included in the Company SEC Documents) in a prior taxable period (or portion of a taxable period) but was not recognized for tax purposes in any prior taxable period as a result of (i) the installment method of accounting, (ii) the completed contract method of accounting, (iii) the long-term contract method of accounting, (iv) the cash method of accounting or Section 481 of the Code or (v) any comparable provisions of state or local tax law, domestic or foreign, or for any other reason, other than any

20

amounts that are specifically reflected in a reserve for taxes on the financial statements of the Company included in the Company SEC Documents.

(c)    As used in this Agreement, (i) "Taxes" means any and all (whether or not disputed) domestic or foreign, federal, state, local or other taxes of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Entity, including taxes on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, unemployment, social security, workers' compensation or net worth, and taxes in the nature of excise, withholding, ad valorem or value added, and including liability for the payment of any such amounts as a result of being either (A) a member of an affiliated, consolidated, combined, unitary or aggregate group or as a transferee or successor, or (B) a party to any tax sharing agreement or as a result of any express or implied obligation to indemnify any other person with respect to any such amounts, and (ii) "Tax Return" means any return, report or similar filing (including the attached schedules) required to be filed with respect to Taxes, including any information return, claim for refund, amended return or declaration of estimated Taxes.

Section 3.15    Labor Matters.  Except for matters in the case of clause (e) below which would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, as of the date hereof, (a) there are no strikes or lockouts with respect to any employees of the Company or any of its Subsidiaries ("Employees") that, individually or in the aggregate, would reasonably be expected to have a material adverse impact on the operations of, or result in material liability to, the Company and its Subsidiaries taken as a whole, (b) to the knowledge of the Company, there is no union organizing effort pending or threatened against the Company or any of its Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a material adverse impact on the operations of, or result in material liability to, the Company and its Subsidiaries taken as a whole, (c) there is no unfair labor practice, labor dispute (other than routine individual grievances) or labor arbitration proceeding pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a material adverse impact on the operations of, or result in material liability to, the Company and its Subsidiaries taken as a whole, (d) there is no slowdown, or work stoppage in effect or, to the knowledge of the Company, threatened with respect to Employees that, individually or in the aggregate, would reasonably be expected to have a material adverse impact on the operations of, or result in material liability to, the Company and its Subsidiaries taken as a whole, and (e) the Company and its Subsidiaries are in compliance with all applicable Laws respecting (i) employment and employment practices, (ii) terms and conditions of employment and wages and hours and (iii) unfair labor practices.  Neither the Company nor any of its Subsidiaries has any material liabilities under the Worker Adjustment and Retraining Act of 1998 as a result of any action taken by the Company (other than at the written direction of the ESOP or as a result of any of the transactions contemplated hereby) that would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.16    Intellectual Property.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, either the Company or a Subsidiary of the Company owns, or is licensed or otherwise possesses legally enforceable rights to use, free and clear of all material Liens, all domestic and foreign trademarks

21

(including call signs), trade names, service marks, service names, assumed names, registered and unregistered copyrights and applications for same, domain names, patents and patent applications and registrations used in their respective businesses as currently conducted, including all rights associated therewith, whether registered or unregistered and however documented (collectively, the "Intellectual Property"). Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, since December 31, 2006, (a) there has not been any pending or, to the knowledge of the Company, threatened claims by any person alleging infringement, misappropriation or other unauthorized use of Intellectual Property by the Company or any of its Subsidiaries, or challenging any aspect of the validity, enforceability, ownership, authorship, inventorship or use of any of the Intellectual Property, (b) to the knowledge of the Company, the conduct of the business of the Company and its Subsidiaries has not infringed, misappropriated or otherwise made unauthorized use of any intellectual property rights of any person, and neither the Company nor any of its Subsidiaries has received an "invitation to license" or other communication from any third party asserting that the Company or any of its Subsidiaries is or will be obligated to take a license under any intellectual property owned by any third party in order to continue to conduct their respective businesses as they are currently conducted, (c) neither the Company nor any of its Subsidiaries has made any claim of infringement, misappropriation or other unauthorized use by others of its rights to or in connection with the Intellectual Property of the Company or any of its Subsidiaries, (d) to the knowledge of the Company, no person has or is currently infringing, misappropriating or otherwise making unauthorized use of any Intellectual Property of the Company or any of its Subsidiaries and (e) the Company and its Subsidiaries have taken commercially reasonable actions in accordance with normal industry practice to protect, maintain and preserve the Intellectual Property.

      Section 3.17    Real Property. Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the Company or a Subsidiary of the Company owns and has good and valid title to all of its owned real property and has valid leasehold interests in all of its leased properties, free and clear of all Liens (except for Permitted Liens and all other title exceptions, defects, encumbrances and other matters, whether or not of record, which do not materially affect the continued use of the property to conduct the business for the purposes for which the property is currently being used by the Company or a Subsidiary of the Company as of the date hereof).

      Section 3.18    Opinion of Financial Advisor. The Board of Directors of the Company has received the opinion of each of Morgan Stanley & Co. Incorporated and Merrill Lynch & Co., Inc., dated the date of this Agreement, substantially to the effect that, as of such date, the Merger Consideration to be received by the holders of shares of Company Common Stock pursuant to the Merger is fair from a financial point of view to the holders of such shares (other than certain affiliated entities).

      Section 3.19    Required Vote of the Company Shareholders. Subject to the accuracy of the representations and warranties of the ESOP and Merger Sub in Section 4.9, the affirmative vote of the holders of outstanding shares of Company Common Stock representing at least a majority of all the votes entitled to be cast thereupon by holders of Company Common Stock is the only vote of holders of securities of the Company which is required to approve this Agreement and the Merger (the "Company Shareholder Approval").

22

Section 3.20    Material Contracts.

(a)    Except for this Agreement, the Tribune Purchase Agreement, the ESOP Purchase Agreement, the Company Benefit Plans or as filed with the SEC, as of the date hereof, neither the Company nor any of its Subsidiaries is a party to or bound by, nor are any of their properties or other assets bound by, any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC) (all contracts of the type described in this Section 3.20(a) being referred to herein as "Company Material Contracts").

(b)    Neither the Company nor any Subsidiary of the Company is in breach of or default under (nor to the knowledge of the Company does there exist any condition which upon the passage of time or the giving of notice or both would cause such a violation of or default under) the terms of any Company Material Contract where such breach or default would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  To the knowledge of the Company, no other party to any Company Material Contract is in breach of or default under the terms of any Company Material Contract where such breach or default would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  Each Company Material Contract is a valid and binding obligation of the Company or the Subsidiary of the Company which is party thereto and, to the knowledge of the Company, of each other party thereto, and is in full force and effect, except that (i) such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally and (ii) equitable remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

Section 3.21    Finders or Brokers.  Except for Morgan Stanley & Co. Incorporated, Merrill Lynch & Co., Inc. and Citigroup Global Markets Inc. (the "Company Financial Advisors"), neither the Company nor any of its Subsidiaries has employed any investment banker, broker or finder in connection with the transactions contemplated by this Agreement who might be entitled to any fee or any commission in connection with or upon consummation of the Merger.  The Company has made available to the ESOP an accurate and complete summary of the fee arrangements with the Company Financial Advisors.

Section 3.22    Insurance.  The Company and its Subsidiaries own or hold policies of insurance, or are self-insured, in amounts providing reasonably adequate coverage against all risks customarily insured against by companies and subsidiaries in similar lines of business as the Company or its Subsidiaries, and in amounts sufficient to comply with all Company Material Contracts to which the Company or any of its Subsidiaries are parties or are otherwise bound.

Section 3.23    Affiliate Transactions.  As of the date hereof, there are no material transactions, agreements, arrangements or understandings between (i) the Company or any of its Subsidiaries, on the one hand, and (ii) any affiliate of the Company (other than any of its Subsidiaries), on the other hand, of the type that would be required to be disclosed under Item 404 of Regulation S-K promulgated by the SEC which have not been so disclosed prior to the date hereof.

Section 3.24    Indebtedness.  Section 3.24 of the Company Disclosure Schedule sets forth, as of April 1, 2007, all of the outstanding indebtedness for borrowed money of, and all the outstanding guarantees of indebtedness for borrowed money of any person by, and all reimbursement obligations (or guarantees thereof) with respect to letters of credit issued on behalf of, the Company and each of its Subsidiaries.

Section 3.25    Cable and Satellite Matters.  Section 3.25 of the Company Disclosure Schedule sets forth a list of the ten largest multichannel video programming distributors (including cable systems, SMATV, open video systems, MMDS, MDS, Broadband Radio Service and DBS systems, collectively, "MVPDs") that carry the analog and/or digital signals of the Company Stations.  No MVPD listed on Section 3.25 of the Company Disclosure Schedule has declined or refused to carry a Company Station or disputed a Company Station's right to carriage pursuant to such Company Station's must-carry or retransmission consent election, as the case may be.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE ESOP AND MERGER SUB

The ESOP and Merger Sub jointly and severally represent and warrant to the Company as follows:

Section 4.1    Qualification, Organization, Subsidiaries, etc.  Merger Sub is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing, holding or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay or materially impair the ability of the ESOP or Merger Sub to consummate the Merger and the other transactions contemplated by this Agreement (an "ESOP Material Adverse Effect").  The ESOP has made available to the Company prior to the date of this Agreement a true and complete copy of the operating agreement of the ESOP and the certificate of incorporation and by-laws of Merger Sub, each as amended through the date hereof.

Section 4.2    Authority Relative to This Agreement; No Violation.

(a)      The ESOP has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  Merger Sub has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the trustee of the ESOP, the Board of Directors of Merger Sub and by the ESOP, as the sole shareholder of Merger Sub, and, except for the filing of the Certificate of Merger with the

24

Secretary of State of the State of Delaware, no other organizational proceedings on the part of the ESOP or corporate proceedings on the part of Merger Sub are necessary to authorize this Agreement or the consummation of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the ESOP and Merger Sub and, assuming this Agreement constitutes the legal, valid and binding agreement of the Company, this Agreement constitutes the legal, valid and binding agreement of the ESOP and Merger Sub, enforceable against each of the ESOP and Merger Sub in accordance with its terms.

       (b)      The execution, delivery and performance by the ESOP and Merger Sub of this Agreement and the consummation of the Merger and the other transactions contemplated by this Agreement by the ESOP and Merger Sub do not and will not require any consent, approval, license, authorization, order or permit of, action by, filing with or notification to any Governmental Entity, other than (i) the filing of the Certificate of Merger, (ii) compliance with the applicable requirements of the HSR Act, (iii) compliance with the applicable requirements of the Exchange Act, (iv) filings with and approvals from the FCC and the State Commissions as set forth on Section 3.3(b) of the Company Disclosure Schedule, (v) compliance with any applicable foreign or state competition, antitrust, securities or blue sky laws, (vi) filings under any applicable state takeover Law and (vii) such of the foregoing as may be required in connection with the Financing (collectively, clauses (i) through (vii), the "_ESOP Approvals_"), and other than any consent, approval, license, authorization, order, permit, action, filing or notification the failure of which to make or obtain would not, individually or in the aggregate, reasonably be expected to have an ESOP Material Adverse Effect.

       (c)      The execution, delivery and performance by the ESOP and Merger Sub of this Agreement and the consummation by the ESOP and Merger Sub of the Merger and the other transactions contemplated hereby do not and will not (i) contravene or conflict with the organizational or governing documents of the ESOP or Merger Sub, (ii) assuming compliance with the matters referenced in Section 4.2(b), contravene or conflict with or result in violation of any provision of any Law binding upon or applicable to the ESOP or Merger Sub or any of their respective properties or assets, or (iii) result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any material obligation or to the loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, any loan, guarantee of indebtedness or credit agreement, note, bond, mortgage, indenture, lease, agreement, contract, instrument, permit, concession, franchise, right or license to which the ESOP or Merger Sub is a party or by which any of their respective properties or assets is bound, or (iv) result in the creation of any Lien (other than Permitted Liens) upon any of the properties or assets of the ESOP or Merger Sub, other than, in the case of clause (ii) through (iv), any such items that would not, individually or in the aggregate, reasonably be expected to have an ESOP Material Adverse Effect.

       Section 4.3      Investigations; Litigation. There is no investigation or review pending (or, to the knowledge of the ESOP, threatened) by any Governmental Entity with respect to the ESOP or Merger Sub which could, individually or in the aggregate, reasonably be expected to have an ESOP Material Adverse Effect, and there are no actions, suits, inquiries, investigations or proceedings pending (or, to the ESOP's knowledge, threatened) against or affecting the ESOP or Merger Sub, or any of their respective properties at law or in equity (and

25

to the ESOP's knowledge there is no basis for any such action, suit, inquiry, investigation, arbitration, mediation or proceeding) before, and there are no orders, judgments or decrees of, or before, any Governmental Entity, in each case which could, individually or in the aggregate, reasonably be expected to have an ESOP Material Adverse Effect.

        Section 4.4      Proxy Statement; Other Information.  None of the information provided by the ESOP or Merger Sub to be included in the Proxy Statement, the Schedule TO or the Schedule 13E-3 will, at the time the Proxy Statement, the Schedule TO and the Schedule 13E-3 are concurrently filed with the SEC, or, in the case of the Proxy Statement, at the time the Proxy Statement is first mailed to the shareholders of the Company or at the time of the Company Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  No representation is made by the ESOP or Merger Sub with respect to statements made in the Proxy Statement, the Schedule TO or the Schedule 13E-3 based on information supplied by the Company, any of the Company's Subsidiaries or any of their respective affiliates.

        Section 4.5      Capitalization of Merger Sub.  As of the date of this Agreement, the authorized capital stock of Merger Sub consists of 1000 shares of common stock, par value $.01 per share, 100 of which are validly issued and outstanding.  All of the issued and outstanding capital stock of Merger Sub is, and at the Effective Time will be, owned by the ESOP.  Merger Sub has outstanding no option, warrant, right, or any other agreement pursuant to which any person other than the ESOP may acquire any equity security of Merger Sub.  Merger Sub has not conducted any business prior to the date hereof, other than business and operations related to the Merger and the transactions contemplated by this Agreement, and has no assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and the other transactions contemplated by this Agreement.

        Section 4.6      Lack of Ownership of Company Common Stock.  Except as contemplated by the ESOP Purchase Agreement, neither the ESOP nor any of its Subsidiaries beneficially owns or, since December 31, 2006 has beneficially owned, directly or indirectly, any shares of Company Common Stock or other securities convertible into, exchangeable into or exercisable for shares of Company Common Stock.

        Section 4.7      Finders or Brokers.  Except for Duff & Phelps, LLC, the ESOP has not employed any financial advisor, investment banker, broker or finder in connection with the transactions contemplated by this Agreement who is entitled to any fee or any commission in connection with or upon consummation of the Merger.

        Section 4.8      No Additional Representations.

        (a)      The ESOP acknowledges that it and its Representatives (as hereinafter defined) have received access to such books and records, facilities, equipment, contracts and other assets of the Company which it and its Representatives have desired or requested to review, and that it and its Representatives have had full opportunity to meet with the management of the Company and to discuss the business and assets of the Company.

26

(b)        The ESOP acknowledges that neither the Company nor any person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company furnished or made available to the ESOP and its Representatives except as expressly set forth in Article III, and neither the Company nor any other person shall be subject to any liability to the ESOP or any other person resulting from the Company's making available to the ESOP or the ESOP's use of such information, including the presentation materials delivered to the ESOP, as subsequently updated, supplemented or amended (the "Information Memorandum"), or any information, documents or material made available to the ESOP in the due diligence materials provided to the ESOP, including in the "data room," other management presentations (formal or informal) or in any other form in connection with the transactions contemplated by this Agreement. Without limiting the foregoing, the Company makes no representation or warranty to the ESOP with respect to (i) the information set forth in the Information Memorandum or (ii) any financial projection or forecast relating to the Company or any of its Subsidiaries, whether or not included in the Information Memorandum or any management presentation.

**ARTICLE V**
**COVENANTS AND AGREEMENTS**

Section 5.1        Conduct of Business by the Company.

(a)        From and after the date hereof and prior to the Effective Time or the date, if any, on which this Agreement is earlier terminated pursuant to Section 7.1 (the "Termination Date"), and except (i) as may be required by applicable Law, (ii) as may be agreed in writing by the ESOP and Tribune Acquisition (which consent shall not be unreasonably withheld), (iii) as may be expressly required or permitted by this Agreement, the Tribune Purchase Agreement, the Financing Commitments, the New Credit Agreements or the ESOP Purchase Agreement, or (iv) as set forth in Section 5.1 of the Company Disclosure Schedule, the Company covenants and agrees that (A) the business of the Company and its Subsidiaries shall be conducted in, and such entities shall not take any action except in, the ordinary course of business and in a manner consistent with past practice and (B) the Company and its Subsidiaries shall use their reasonable best efforts to preserve substantially intact the Company's business, to keep available the services of those of their present officers, employees and consultants who are important to the operation of their business; provided, however, that no action by the Company or its Subsidiaries with respect to matters specifically addressed by any provision of Section 5.1(b) shall be deemed a breach of this sentence unless such action would constitute a breach of such other provision.

(b)        Subject to the exceptions contained in clauses (i) through (iv) of Section 5.1(a), the Company agrees, on behalf of itself and its Subsidiaries, that between the date hereof and the Effective Time, without the prior written consent of the ESOP, the Company:

(i)        shall not, and shall not permit any of its Subsidiaries that is not wholly owned to, authorize or pay any dividends on or make any distribution with respect to its outstanding shares of capital stock or other equity securities (whether in cash, assets, stock or other securities of the Company or its Subsidiaries), except (A) dividends and distributions paid

27

or made on a pro rata basis by Subsidiaries and (B) that the Company may continue to pay dividends on the Company Preferred Stock in accordance with the terms thereof;

        (ii)      shall not, and shall not permit any of its Subsidiaries to, split, combine or reclassify any of its capital stock or other equity securities or issue or authorize or propose the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or other equity securities, except (A) for any such transaction by a wholly owned Subsidiary of the Company which remains a wholly owned Subsidiary after consummation of such transaction and (B) as contemplated by the Exchange Agreement;

        (iii)      except to the extent required by Law (including Section 409A of the Code) or by Contracts in existence as of the date hereof or by Company Benefit Plans, shall not and shall not permit any of its Subsidiaries to (A) increase in any manner the compensation or benefits of any of its employees, directors, consultants, independent contractors or service providers except in the ordinary course of business consistent with past practice (the ordinary course including, for this purpose, the employee salary, bonus and equity compensation review process and related adjustments substantially as conducted each year), (B) pay any pension, severance or retirement benefits not required by any existing plan or agreement to any such employees, directors, consultants, independent contractors or service providers, (C) enter into, amend, alter (other than amendments that do not materially increase the cost to the Company or any of its Subsidiaries of maintaining the applicable compensation or benefit program, policy, arrangement or agreement), adopt, implement or otherwise commit itself to any compensation or benefit plan, program, policy, arrangement or agreement including any pension, retirement, profit-sharing, bonus, collective bargaining or other employee benefit or welfare benefit plan, policy, arrangement or agreement or employment or consulting agreement with or for the benefit of any employee, director, consultant, independent contractor or service provider, other than with respect to any employment, severance or retention agreement (or amendment with respect thereto) entered into in the ordinary course of business consistent with past practice between the Company or one of its Subsidiaries, on the one hand, and any consultant, independent contractor, service provider or employee of the Company or its Subsidiaries who is not an executive officer of the Company or its Subsidiaries, or (D) accelerate the vesting of, or the lapsing of restrictions with respect to, any stock options or other stock-based compensation or otherwise accelerate any rights or benefits, or make any determinations that would result in a material increase in liabilities under any Company Benefit Plan;

        (iv)      shall not, and shall not permit any of its Subsidiaries to, change financial accounting policies, practices or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP, SEC rule or policy or applicable Law;

        (v)      shall not, and shall not permit any of its Subsidiaries to, adopt any amendments to its certificate of incorporation or by-laws or similar applicable organizational documents, except pursuant to the Certificate of Designation;

        (vi)      except for transactions among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, shall not, and shall not permit any of its Subsidiaries to, issue, sell, pledge, dispose of or encumber, or authorize the issuance,

28