# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, et al.,[1]

                    Debtors.

Chapter 11
Case No. 08-13141 (KJC)
Jointly Administered

## POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A. (AS MODIFIED APRIL 26, 2011)

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, Illinois 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telecopier: (302) 652-3117

*Counsel for Debtors and Debtors in Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel for the Official Committee of Unsecured Creditors*

DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253

*Counsel for Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel for Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701-5800

RICHARDS LAYTON & FINGER
Mark Collins (No. 2981)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel for JPMorgan Chase Bank, N.A.*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); and WLVI Inc. (8074); WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ....................................................................................1

II.   THE DCL PLAN SETTLEMENT IS REASONABLE AND IN THE
      BEST INTEREST OF CREDITORS.........................................................................5

      A.   Creditors Overwhelmingly Support The DCL Plan And
           Settlement. ...................................................................................................8

      B.   The DCL Plan Settlement Is The Product Of Good Faith
           Negotiation And Extensive Mediation. ...................................................10

           1.   Initial Investigations, Negotiations, And The April Plan ...............11

           2.   The Examiner Report And Its Aftermath ........................................13

           3.   The Mediation And Proposed Settlement ........................................14

      C.   The DCL Plan Settlement Results In Recoveries Well Within
           The Range Of Reasonableness. .................................................................16

           1.   The Examiner Report Supports The Reasonableness Of The
                DCL Plan Settlement. .......................................................................16

           2.   Professor Black's Analysis Demonstrates That The DCL
                Plan Settlement Is Reasonable. ........................................................20

III.  THE NOTEHOLDERS' OBJECTIONS TO THE DCL PLAN
      SETTLEMENT HAVE NO MERIT .......................................................................26

      A.   The Noteholders Mischaracterize The DCL Plan Settlement
           And Understate The Settlement Consideration Provided To
           The Non-LBO Creditors.............................................................................26

           1.   The Noteholders' "Settlement Percentages" Are False And
                Misleading. ......................................................................................26

           2.   The Noteholders Ignore The Value Of Litigation And
                Creditors' Trust Recoveries. ...........................................................27

           3.   The Noteholders Improperly Apportion The Settlement
                Consideration. ..................................................................................29

      B.   The Examiner Report Was Not A "Game Changer" In Favor
           Of Non-LBO Creditors...............................................................................32

C.     **There Are Substantial Hurdles To Prevailing On A Claim For Full Avoidance** ................................................................................... 35

    1.   Challenges To Collapse ............................................................... 35

    2.   Challenges To Proving Insolvency At Step One Even Assuming Collapse ........................................................................ 39

    3.   Challenges To Proving Intentional Fraudulent Transfer And Equitable Subordination ............................................................. 41

    4.   Potential Defenses Exist To The "Full Avoidance" Claims. ......... 42

D.     **Each of the Noteholders' Other Putative "Paths to Success" Faces Substantial Hurdles.** ....................................................................... 43

    1.   Challenges To Proving Tribune Insolvency At Step One While Eliminating All Step One "Protected Debt" ....................... 44

    2.   The "WEAR" Theory Has No Basis in Law ................................. 46

    3.   Challenges To The Claim Of Increased DEV Coupled With A Prohibition On Postpetition Interest In Respect Of Allowed Step One Senior Loan Guaranty Claims ......................... 52

E.     **Dr. Beron's "Expected Recovery" Analysis Is Fatally Flawed.** ......... 57

F.     **Tuliano's Opinion Regarding "Step One" Solvency Is Unsupportable.** ............................................................................................. 64

    1.   Tuliano's Opinion Regarding Tribune Insolvency At Step One (Including Step Two Debt) Conflicts With The Examiner Report And Is Unsupportable. ...................................... 65

        a.   Contemporaneous Market Evidence Contradicts Tuliano's Opinion. ............................................................ 66

        b.   Tuliano's Opinion Is Based On Methodological Errors. ................................................................................. 69

    2.   Tuliano's Opinion Regarding Guarantor Debtor Insolvency At Step One (Including Step Two Debt) Conflicts With The Examiner Report And Is Unsupportable. ...................................... 75

G.     **Singh's Opinion Regarding Tribune's Current Valuation Is Not Credible.** ............................................................................................. 76

    1.   Erroneous Valuation Of The Core Businesses ............................. 77

      2.   Erroneous Valuation Of The Non-Controlled Investments ......................... 81

      3.   Other Errors ................................................................................................ 84

**IV.   THE NOTEHOLDERS' OTHER OBJECTIONS TO THE DCL PLAN ARE UNFOUNDED.............................................................................85**

   **A.   FCC Approvals And Waivers Do Not Call Into Question The Feasibility Of The DCL Plan. ................................................................85**

   **B.   The DCL Plan Does Not Discriminate Unfairly Against Creditors Who Fail To Assign Claims To The Creditors' Trust. ................................................................................................................88**

   **C.   The DCL Plan Does Not Discriminate Unfairly Against Creditors Who Benefit From PHONES Subordination. ...................90**

      **1.   The Overwhelming Majority Of Other Parent Claims Are Entitled To The Benefit Of The PHONES Subordination. ...........90**

      **2.   Any Discrimination Relating To PHONES Subordination Is Immaterial And Not Unfair. ......................................................92**

   **D.   The DCL Plan Properly Classifies The Swap Claim. .......................95**

   **E.   The DCL Plan's Releases And Bar Order Are Appropriate. ...........96**

      **1.   Releases In Favor Of The Senior Lenders Are Appropriate........97**

      **2.   The Bar Order Is Appropriate. ...............................................98**

      **3.   Limited Releases Of Certain Shareholders Are Appropriate. .....................99**

            **a.   Releases Of The Retiree Claimants Are Appropriate. ...........................................................100**

            **b.   Limited Releases Of Other Shareholders Are Appropriate. ...........................................................101**

**V.   THE NOTEHOLDER PLAN CANNOT BE CONFIRMED...........................102**

   **A.   The Noteholder Plan Violates Section 1129(a)(10). .......................103**

      **1.   The Noteholders' Interpretation Of Section 1129(a)(10) Is Unsupportable. .................................................................103**

      **2.   The DCL Plan Does Not Face A Similar 1129(a)(10) Shortcoming..................................................................106**

B.    The Noteholder Plan Has Other Fundamental Defects.................................107

    1.    The Noteholder Plan Cannot Terminate Claims Against Non-Debtors...................................................................107

    2.    The Noteholder Plan Fails To Implement The Intercompany Claims Settlement. ...................................................108

    3.    The Noteholder Plan Destroys Value Through Unnecessary Taxation.......................................................................110

    4.    The Noteholder Plan Unfairly Discriminates Against Senior Lenders.......................................................................112

    5.    The Noteholder Plan Has No Collective Action Mechanism To Bind Holdouts To Settlements And Would Require Full Litigation. ...................................................................113

VI.    THE DCL PLAN IS SUPERIOR TO THE NOTEHOLDER PLAN. .......................114

    A.    Creditors Overwhelmingly Prefer The DCL Plan..........................................115

    B.    The DCL Plan Provides Better Treatment To Creditors...............................116

    C.    The DCL Plan Is More Feasible Than The Noteholder Plan.........................118

    D.    The DCL Plan Accomplishes A True Reorganization....................................121

VII.    CONCLUSION ....................................................................123

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Adams v. Comm'r,
  T.C. Memo 2002-80........................................................................................71

Board of Comm'rs v. Hurley,
  169 F. 92 (8th Cir. 1909) ...........................................................................55

Boyer v. Crown Stock Distrib., Inc.,
  587 F.3d 787 (7th Cir. 2009) ......................................................................36

Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.),
  388 B.R. 46 (D. Del. 2008).........................................................................43

Dallas v. Comm'r,
  T.C. Memo 2006-212 (September 28, 2006)..............................................71

Del. Open MRI Radiology Assocs., P.A. v. Kessler,
  898 A.2d 290 (Del. Ch. 2006).....................................................................70

Dobler v. Montgomery Cellular Holding Co.,
  2004 Del. Ch. LEXIS 139 (Del. Ch. Oct. 4, 2004), (Del. Supr. 2005)....................70

Eichenholtz v. Brennan,
  52 F.3d 478 (3d Cir. 1995)..........................................................................98

First Trust and Deposit Co. v. Receiver of Salt Springs Nat'l Bank (In re Onondaga
  Litholite Co.),
  218 F.2d 671 (2d Cir. 1955)........................................................................48

Gross v. Comm'r,
  272 F.3d 333 (6th Cir. 2001) ......................................................................71

Heck v. Comm'r,
  T.C. Memo 2002-34......................................................................................71

Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.),
  836 F.2d 1263 (10th Cir. 1988) ................................................................107

In re AbitibiBowater Inc.,
  2010 Bankr. LEXIS 3987 (Bankr. D. Del. Nov. 22, 2010) ......................11

In re AbitibiBowater, Inc.,
  No. 09-11296 (Bankr. D. Del. Sept 13, 2010) ........................................106

In re Adelphia Commc'ns Corp.,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) .............................................................107

In re Armstrong World Indus., Inc.,
    348 B.R. 111 (D. Del. 2006) ...........................................................................92

In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) .........................................................74

In re Bridge Info. Sys.,
    311 B.R. 781 (Bankr. E.D. Mo. 2004) ............................................................73

In re Capmark Fin. Group, Inc.,
    438 B.R. 471 (Bankr. D. Del. 2010) ..............................................................114

In re Cooper,
    147 B.R. 678 (Bankr. D.N.J. 1992) ..............................................................104

In re Coram Healthcare Corp.,
    315 B.R. 321 (Bankr. D. Del. 2004) ....................................................8, 115, 118

In re Dow Corning Corp.,
    244 B.R. 696 (Bankr. E.D. Mich. 1999) .........................................................92

In re Enron Corp.,
    2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) ...............................105

In re Exide Techs.,
    303 B.R. 48 (Bankr. D. Del. 2003) ..........................................................16, 100

In re First Magnus Fin. Corp.,
    No. 07-01578 (JMM) (Bankr. D. Ariz. Oct. 30, 2007) .....................................114

In re Genesis Health Ventures, Inc.,
    266 B.R. 591 (Bankr. D. Del. 2001) ..............................................................104

In re Greate Bay Hotel & Casino, Inc.,
    251 B.R. 213 (Bankr. D. N.J. 2000) ............................................94, 113, 116, 118

In re Hellig-Meyers,
    319 B.R. 447 (Bankr. E.D. Va. 2004) .............................................................74

In re Holley Garden,
    238 B.R. 488 (Bankr. M.D. Fla. 1999) ........................................115, 116, 118, 121

In re Master Mortgage Inv. Fund,
    168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) ...............................................97, 100

In re Matter of Sound Radio, Inc.,
  93 B.R. 849 (Bankr. D.N.J. 1988) ...........................................................................118

In re MEDIQ, Inc.,
  No. 01-252 (MFW) (Bankr. D. Del. May 16, 2001)...................................................105, 106

In re Oaks Partners. Ltd.,
  141 B.R. 453 (Bankr. N.D. Ga. 1992) ......................................................................121

In re Oakwood Homes Corp.,
  449 F.3d 588 (3d Cir. 2006).......................................................................................74

In re Orchards Village Invs., LLC,
  2010 WL 143706 (Bankr. D. Or. Jan. 8, 2010) ......................................................115

In re Owens Corning,
  419 F.3d 195 (3d Cir. 2005)...........................................................................42, 49, 50, 105

In re Pegasus Satellite Television Inc.,
  No. 04-20878 (Bankr. D. Me. Jan. 31, 2005) .........................................................114

In re Penn Central Transp. Co.,
  484 F.2d 1300 (3d Cir. 1973).....................................................................................101

In re Reading Broad., Inc.,
  386 B.R. 562 (Bankr. E.D. Pa. 2008) ........................................................................87

In re River Village Assocs.,
  181 B.R. 795 (E.D. Pa. 1995) ..................................................................................116

In re Sacred Heart Hosp. of Norristown,
  182 B.R. 413 (Bankr. E.D. Pa. 1995) ........................................................................55

In re SGPA, Inc.,
  No. 01-02609 (RJW), 2001 Bankr. LEXIS 2291 (Bankr. M.D. Pa. Sept. 28, 2001).............105

In re Smurfit-Stone Container Corp.,
  Case No. 09-10235 (Bankr. D. Del. 2010) ................................................................55

In re Solutia, Inc.,
  379 B.R. 473 (Bankr. S.D.N.Y. 2007)...................................................................73, 74

In re TCI 2 Holdings, LLC,
  428 B.R. 117 (Bankr. D.N.J. 2010) .....................................................................87, 115

In re Temple Zion,
  125 B.R. 910 (Bankr. E.D. Pa. 1991) ........................................................................88

In re Trans World Airlines, Inc.,
    134 F.3d 188 (3d Cir. 1988)........................................................................74

In re Unbreakable Nation Co.,
    437 B.R. 189 (Bankr. E.D. Pa. 2010) ........................................................94

In re Valley View Shopping Center L.P.,
    260 B.R. 10 (Bankr. D. Kan. 2001) .........................................................121

In re Washington Mut., Inc.,
    442 B.R. 314 (Bankr. D. Del. 2011) ...........................................29, 89, 97

In re Winstar Commc'ns,
    348 B.R. 234 (Bankr. D. Del. 2005) ...........................................................74

In re Zenith Elecs. Corp.,
    241 B.R. 92, 110-11 (Bankr. D. Del. 1999)................................................99

Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC),
    373 B.R. 283 (Bankr. S.D.N.Y. 2007)...................................................69, 70

Ivanhoe Bldg. & Loan Ass'n of Newark, N.J.,
    295 U.S. 243 (1935)....................................................................................55

Kipperman v. Onex,
    411 B.R. 805 (N.D. Ga. 2009) ....................................................................70

Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd.
    P'ship),
    115 F.3d 650 (9th Cir. 1997) ....................................................................112

Mervyn's Holdings, LLC v. Lubert Adler Group IV, LLC (In re Mervyn's Holdings,
    LLC),
    426 B.R. 488 (Bankr. D. Del. 2010) ...........................................................38

Metlyn Realty Corp. v. Esmark Inc.,
    763 F.2d 826 (7th Cir. 1993) ......................................................................69

Myers v. Martin (In re Martin),
    91 F.3d 389 (3d. Cir. 1996)....................................................................8, 16

Paloian v. LaSalle Bank, N.A.,
    619 F.3d 688 (7th Cir. 2010) ......................................................................71

Pengo Indus., Inc. v. Licht,
    962 F.2d 543 (5th Cir. 1992) ......................................................................74

Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),
    403 F.3d 43 (2d Cir. 2005)..................................................................................43

Siegel v. Warner Bros. Entm't, Inc.,
    2009 U.S. Dist. LEXIS 66115 (C.D. Cal. July 8, 2009) ..........................................74

Thrifty Oil Co. v. Bank of America Nat'l Trust and Savings Assoc.,
    322 F.3d 1039 (9th Cir. 2003) .............................................................................95

U.S. v. Ron Pair Enters., Inc.,
    489 U.S. 235 (1989).........................................................................................104

VFB LLC v. Campbell Soup Co.,
    482 F.3d 624 (3d Cir. 2007)................................................................................69

Whyte v. Kivisto (In re SemCrude, L.P.),
    Adv. No. 09-50189, 2010 Bankr. LEXIS 4160 (Bankr. D. Del. Nov. 19, 2010) ....................98

**STATUTES**

11 U.S.C. § 502(b)(2) ..............................................................................................74

11 U.S.C. § 546(g) .................................................................................................96

11 U.S.C. § 548(d)(2)(D) .........................................................................................95

11 U.S.C. § 560.....................................................................................................96

11 U.S.C. § 1129(a)(10)..........................................................................................103

11 U.S.C. § 1129(c) ...............................................................................................115

47 U.S.C. § 308(b).................................................................................................87

47 U.S.C. § 310(d).................................................................................................86

**OTHER AUTHORITIES**

47 C.F.R. § 73.3555................................................................................................86

Rev. Proc. 94-45, 1994-2 C.B. 684.............................................................................111

Richard A. Brealey, Stewart C. Meyers, & Franklin Allen, PRINCIPLES OF CORPORATE
    FINANCE (8th ed. 2006)........................................................................................72

Shannon P. Pratt, VALUING A BUSINESS (5th ed. 2007) ............................................72, 73

Steven Kaplan & Richard Ruback, THE VALUATION OF CASH FLOW FORECAST: AN
    EMPIRICAL ANALYSIS, 50 J. Fin. 1059,1064-66 (1995)................................................72

Timothy A. Luehrman, USING APV: A BETTER TOOL FOR VALUING OPERATIONS, 75
    Harv. Bus. Rev. 145, 146-51 (1997)..........................................................................................72

Treas. Reg. § 1.468B-9(b)..............................................................................................................100

Treas. Reg. § 1.468B-9(c)(2)(ii) ....................................................................................................112

# I. PRELIMINARY STATEMENT[2]

Over the past two and a half years, the major constituencies in these chapter 11 proceedings have worked diligently to develop a plan of reorganization that fairly addressed claims arising from Tribune's 2007 Leveraged ESOP Transactions. The parties' investigations were thorough, negotiations were contentious, and progress was, at times, frustratingly slow. However, with the benefit of the Examiner Report and the assistance of Judge Gross, a settlement was forged late last year that is incorporated into the DCL Plan and has been agreed to by the Committee, the fiduciary with standing to bring the LBO-Related Causes of Action.[3] In addition, the settlement has been endorsed by Judge Gross, and the DCL Plan has the overwhelming support of all creditor constituencies not controlled by the Noteholders, including the very "Non-LBO Creditors" who stand to gain or lose from the litigation being settled.

---

[2] Capitalized terms not otherwise defined have the meanings given in the *Second Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries (As Modified April 26, 2011)* [Docket No. 8769] (the "DCL Plan") proposed by the Debtors, the Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "DCL Proponents"), in the related Specific Disclosure Statement for the First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the DCL Proponents. [Docket No. 7135] (the "Debtor/Committee/Lender Specific Disclosure Statement"), or the Joint Disclosure Statement [Docket No. 7198] (the "Joint Disclosure Statement").

Trial exhibits are cited as "DCL Ex." and "NPP Ex."; designated deposition testimony is cited as "[name] Dep. at [page:line]; and the transcript of the confirmation hearing is cited as "Tr. [date] at [page:line]." The term "DCL Obj." refers to the DCL Proponents' pretrial objection to the Noteholder Plan [Docket No. 8011] and the term "DCL Reply" refers to the DCL Proponents' pretrial memorandum in support of confirmation of the DCL Plan [Docket No. 8173].

The term "Noteholders" refers to the proponents of the *Third Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By Aurelius Capital Management, L.P., Deutsche Bank Trust Company Americas, Law Debenture Trust Company Of New York, And Wilmington Trust Company* [Docket No. 8755] (the "Noteholder Plan"). The term "Noteholder Obj." refers to the Noteholders' pretrial objection to the DCL Plan [Docket No. 8026] and the term "Noteholder Reply" refers to the Noteholders' pretrial memorandum in support of the Noteholder Plan [Docket No. 8171].

[3] The facts that the DCL Proponents include both plaintiff (the Committee) and defendant (JPMorgan, Oaktree, Angelo Gordon) in respect of the LBO-Related Causes of Action subject to the DCL Plan settlement, and that each negotiated and fully supports the settlement as a fair and reasonable middle ground among widely varied and risky potential litigation results, is a strong endorsement of the reasonableness of the settlement. Naturally, each of the DCL Proponents has differing views on the strengths and weaknesses of the claims to be settled, as well as the significance of some of the evidence and testimony regarding those claims. In the course of demonstrating the reasonableness of the settlement, this brief summarizes a number of those potential strengths and weaknesses and refers to the substantial evidentiary record. Each of the DCL Proponents reserves all of its rights in respect of the LBO-Related Causes of Action in the event the Court determines not to approve the settlement, and nothing in this brief is or should be taken as an admission by any of the DCL Proponents as to the merits of the claims or the significance of particular evidence or testimony in a litigation on the merits.

As demonstrated at trial and shown below, the DCL Plan settlement is a fair and reasonable resolution of the LBO-Related Causes of Action against two major creditor constituencies, the Senior Lenders and Bridge Lenders. It couples substantial guaranteed immediate distributions – more than 33% on the unsecured claims of Tribune's Non-LBO Creditors and payment in full of unsecured claims against the Subsidiary Debtors – with the prospect of potentially significant additional recoveries from claims against defendants other than the settling lenders, including selling shareholders, officers, directors, Mr. Zell and EGI-TRB LLC, and various professionals and advisors. All recoveries obtained by the Litigation Trust are allocated predominantly to Non-LBO Creditors.

Not surprisingly, a principal focus of the confirmation hearing was on whether the DCL Plan settlement is fair to holders of Senior Notes and subordinated PHONES Notes, the only two material dissenting classes. The answer to that question is a resounding "yes." The settlement fairly reflects the essential determinations of the Examiner, who found substantial barriers to avoidance of the Senior Lenders' "Step One Claims" and concluded that, while likely, avoidance of the Senior Lenders' "Step Two Claims" would produce only limited incremental recoveries for Senior Noteholders and none for Holders of PHONES Notes. In fact, the DCL Plan provides guaranteed recoveries well in excess of the recoveries the Senior Noteholders would receive if only the Step Two Claims were avoided, while preserving substantially all claims against entities other than the Senior and Bridge Lenders.

The fairness of the DCL settlement was also supported at trial by the testimony of Professor Bernard Black, who, unlike the Noteholders' experts, independently analyzed the claims against the Senior Lenders and demonstrated that the DCL Plan settlement consideration is at the high end of the range of reasonable results that a litigant could plausibly expect to

achieve, even under scenarios weighted heavily in favor of the Senior Noteholders. Like the Examiner, Black concluded that there was a significant likelihood that Step Two would be avoided but that the resulting recoveries would be well below the amounts provided for under the DCL Plan settlement. Black also agreed with the Examiner's conclusion that a plaintiff would have a much more difficult time avoiding the Step One claims. He saw the likelihood of a court collapsing the Step One and Step Two Transactions as remote and concluded that it would be exceptionally difficult to prove insolvency of the Guarantor Debtors as of Step One.

At the hearing, the Noteholders took issue with these conclusions and argued that the settlement was unfair. The centerpiece of the Noteholders' presentation was the testimony of their "decision tree" expert, Dr. Bruce Beron, who opined that the Examiner Report required a settlement almost three times that embodied in the DCL Plan. But the hearing put a spotlight on his analytical errors and methodological deficiencies. For example, Beron ignored significant portions of the Examiner Report and his analysis failed to model accurately key issues underlying the LBO-Related Causes of Action. Indeed, Beron's own testimony made clear that he knew nothing about any of those key underlying issues. Beron also erroneously assumed that all of the elements of the avoidance claims and defenses he purported to model were entirely independent of one another, thereby grossly inflating potential recoveries. Further, at the direction of counsel for the Noteholders, Beron repeatedly departed from his professed strict adherence to the Examiner's stated "conclusions," resulting in further inflation of the projected recoveries. And Beron inexplicably ignored the value of the claims in the Litigation Trust altogether.

Perhaps recognizing the inadequacy of Beron's analysis, the Noteholders presented a second expert, Ralph Tuliano, who directly challenged the Examiner's conclusions regarding the

Step One Transactions. In contrast to both the Examiner's conclusions and the contemporaneous market evidence, Tuliano opined that both Tribune and the Guarantor Debtors were insolvent by a wide margin at Step One. He did not, however, suggest that Tribune and the Guarantor Debtors were insolvent if Step One is viewed on a stand-alone basis. Instead, with virtually no analysis, and with no support at all in the record, he simply assumed that Step One and Step Two should be collapsed. Neither the Examiner nor Professors Black and Fischel, each of whom (in contrast to Tuliano) carefully analyzed this issue, reached a similar conclusion. They instead concluded that collapse was unlikely. Tuliano also took issue with the Examiner's analysis of Tribune's projections and, based on his own after-the-fact revisions and adjustments, concluded that Tribune's value was well below the value ascribed to it by contemporaneous analysts. The Examiner's conclusions regarding Step One solvency – to say nothing of those of Black and Fischel – are a far more reasonable assessment of the Senior Lenders' potential exposure and fully support the settlement.

The Noteholders also argued that, even if the Examiner were right about the unlikely nature of the Step One avoidance claims, the Examiner's findings regarding Step Two render the DCL Plan settlement inadequate. They assert that equitable considerations require the application of an unprecedented remedy preventing Senior Lenders from sharing in the value of the Debtors' estates to the full extent of their allowed Step One Claims if there is a finding of insolvency at Step Two. They also contest the Debtors' valuation and assert that the settlement consideration is inadequate if their view of value is correct. Neither argument undercuts the reasonableness of the DCL Plan settlement. The law and the facts do not support the Noteholders' equitable arguments (their so-called "WEAR" theory). And the Noteholders' valuation argument suffers from numerous defects,

including that their valuation expert, Rajnder Singh, was shown at trial to be wholly unqualified to opine meaningfully about Tribune's value.

In sum, the various alternative "pathways" to success posited by the Noteholders are risky and challenging. The Examiner Report was not, as the Noteholders contend, a "game changer" in their favor. To the contrary, the Examiner Report fully supports the settlement and the settlement fully satisfies the requirements of the Bankruptcy Code. Given this fact, as well as the fact that the DCL Plan has the support of the Committee and virtually all creditor constituents other than the sponsors of the Noteholder Plan themselves, the DCL Plan (which combines substantial certain recoveries now with the prospect of additional future recoveries) should be confirmed. By contrast, the Noteholder Plan is a swing for the fences that jeopardizes recoveries to virtually all creditors in an effort to win a litigation "home run" for the Noteholders. This gamble may be fine for the Noteholder Plan's sponsors, who are professional investors and who either bought their claims deep into the bankruptcy proceedings for the very purpose of making this litigation play, or are far out of the money and have nothing to lose. But it hazards the fortunes of the Debtors' other creditors, many of whom are retirees or trade creditors, not professional investors, and almost all of whom voted against the Noteholder Plan and in favor of the DCL Plan. For that reason alone (to say nothing of its other deficiencies), the Noteholder Plan should not be confirmed.

## II.  THE DCL PLAN SETTLEMENT IS REASONABLE AND IN THE BEST INTEREST OF CREDITORS.

The centerpiece of the DCL Plan is the proposed settlement of LBO-Related Causes of Action asserted against lenders (the Senior Lenders and the Bridge Lenders) who loaned more than $10 billion to Tribune in connection with the Leveraged ESOP Transactions.

The DCL Plan settlement provides Non-LBO Creditors with immediate, guaranteed initial distributions that are many multiples of their "natural recoveries" in the event the Senior Loan and Bridge Loan Claims are not avoided.[4] At the Tribune parent level, Senior Noteholders receive an initial recovery of more than $431 million (either in cash or, at their option, in a "strip" of cash, New Common Stock, and New Senior Secured Term Loans), a distribution that is $369 million greater than their natural recoveries, plus interests in the Litigation and Creditors' Trusts. Holders of Other Parent Claims (trade and other claims) have a choice of (a) a distribution (in the form of cash or a "strip") of 35.18 cents on the dollar plus a *pro rata* share of $2.3 million from the Bridge Settlement Proceeds, approximately $82.7 million in excess of natural recoveries, or (b) a slightly smaller initial distribution of 32.73 cents on the dollar (in cash or a "strip") plus a *pro rata* share of $2.3 million from the Bridge Settlement Proceeds and interests in the Trusts.[5] At the Subsidiary Debtor level, general unsecured claims are paid in cash in full, providing distributions roughly $82.8 million in excess of natural recoveries.[6]

Initial settlement distributions are funded from three sources. First, Senior Lenders forgo approximately $401.5 million in recoveries to which they otherwise would be entitled upon allowance of their claims. Second, recipients of principal, interest, and fee payments on account of the Senior and Bridge Loans made in connection with the Tribune merger consummated in December 2007 (the so-called "Step Two Loans" or "Step Two Claims") contribute $120 million in cash, backstopped by the Step Two Arrangers. Third, Bridge Lenders forgo approximately

---

[4] Unless specified otherwise, "natural recoveries," settlement values, and related calculations are premised upon total distributable enterprise value – or "DEV" – of $6.75 billion, established at trial to be an appropriate valuation. See Section III.D.3, below. If the Court determines DEV to be greater than $6.75 billion, "natural recoveries" increase modestly due to the structural subordination of Tribune parent creditors, while the value of the settlement consideration (at least for creditors who elect to take their distribution in the form of a "strip") increases more rapidly.

[5] Tr. 3/9 at 35:3-4 (Kulnis); see also DCL Plan at § 3.2.6(c); DCL Ex. 1109 at 4; DCL Ex. 1110 at 20.

[6] Tr. 3/9 at 35:2-3 (Kulnis); Tr. 3/8 at 244:25-245:2 (Salganik); see also DCL Plan at § 3.3.5(b); DCL Ex. 1109 at 4; DCL Ex. 1110 at 20.

$13.3 million of their natural recoveries. The following table summarizes the "sources and uses" of the initial settlement distributions:

| Settlement Funding | | Settlement Beneficiaries | |
|---|---|---|---|
| Senior Lenders | $401.5 million | Senior Notes | $369.4 million |
| Step Two Payment Recipients | $120 million | Other Parent Claims | $82.7 million |
| Bridge Lenders | $13.3 million | Subsidiary GUCs | $82.8 million |
| *Total* | *$534.9 million* | *Total* | *$534.9 million* |

The DCL Plan does not settle other LBO-Related Causes of Action. Rather, it preserves – for pursuit by the Litigation and Creditors' Trusts (collectively, the "Trusts") – a multitude of potentially-valuable claims, including claims to recover more than $8 billion in payments made to Tribune shareholders in connection with the 2007 Leveraged ESOP Transactions; claims against the Debtors' officers, directors, and professionals for breach of fiduciary duties; claims against EGI-TRB LLC and Sam Zell; claims against Advisors, including Merrill Lynch, Citigroup Global Markets, Inc., and Valuation Research Corporation; and claims against Morgan Stanley.

An additional source of settlement consideration under the DCL Plan is the agreement by the Senior Lenders and Bridge Lenders to forgo *pro rata* participation in recoveries on the Preserved Causes of Action and the Transferred State Law Avoidance Claims. As part of the settlement, the Senior Notes, PHONES Notes, and Other Parent Claims (the so-called "Non-LBO Claims") are entitled to receive the first $90 million in net recoveries by the Trusts plus 65% of all net recoveries over $90 million once the $20 million Trusts' Loan is repaid. In comparison, if the Senior Loan and Bridge Loan Claims were allowed, Senior Lenders and Bridge Lenders would be entitled to more than *87%* of every dollar of such recoveries. Thus, for

example, if net litigation recoveries under the DCL Plan were to equal $300 million,[7] the Non-LBO Claims would receive an additional $226.5 million on top of their guaranteed initial distributions, almost $190 million more than their natural *pro rata* distribution of such proceeds, increasing recoveries of Senior Noteholders and Holders of Other Parent Claims that elect to receive trust interests to more than 50 cents on the dollar.

As shown at trial and set forth below, the DCL Plan settlement provides creditors fair and reasonable recoveries in light of the probabilities of success on the LBO-Related Causes of Action against the settling lenders, the complexity of the litigation involved, and the attendant expense, inconvenience, and delay.[8] Beyond merely "fall[ing] within the reasonable range of litigation possibilities" – all that is required under applicable law, see In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004) – the evidence shows that the DCL Plan settlement provides recoveries that are near, if not above, the top of the likely range of litigation outcomes. Moreover, the settlement fundamentally satisfies the paramount interest of creditors.

### A.  Creditors Overwhelmingly Support The DCL Plan And Settlement.

We start by addressing the most important of all considerations – the views of creditors. Here, there can be no reasonable debate that creditors overwhelmingly endorse the DCL Plan and its settlement. For one thing, the Committee, as fiduciary to all unsecured creditors, negotiated the DCL Plan settlement. The Committee has standing to pursue and is the plaintiff in pending actions asserting the LBO-Related Causes of Action. The Committee's embrace of the DCL Plan is thus an important indication that the settlement is in the best interest of all creditors.

---

[7] A figure deemed realistic by Professor Black, one of the DCL Proponents' experts. See Section II.C.2, infra.

[8] These well-known factors are summarized in the Third Circuit's decision in Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d. Cir. 1996), and its progeny. As shown in the DCL Reply and reinforced in this brief, the DCL Plan settlement satisfies each of the Martin factors. See DCL Reply at 28-70.

For another, creditors across the Debtors' capital structure resoundingly voted in favor of the DCL Plan.[9] In total, 2,300 out of the 2,520 conforming ballots received (91.27%) voted to accept the DCL Plan, with $10,309,165,026 out of $12,871,132,865 in claims represented by those ballots (80.10%) accepting.[10] Strikingly, the very creditors that, according to the Noteholders, should have reason to reject the DCL Plan voted to accept by enormous margins. The class of Other Parent Claims – unsecured trade and other claims against Tribune offered virtually the same treatment as Senior Noteholders – emphatically supported the DCL Plan, with 226 out of 237 voting creditors (95.36%), holding 94.71% by dollar amount of the claims voted, choosing to accept the DCL Plan.[11] Also telling is the vote of the Senior Noteholders, the class controlled by Aurelius (which holds $658 million, or 51%, of the Senior Notes).[12] Because Aurelius alone has accumulated a "blocking position" in the Senior Notes, this class naturally failed to receive the two-thirds by claim amount of votes necessary for class acceptance. Nonetheless, almost *70%* of the Senior Noteholders that cast ballots voted to *accept* the DCL Plan, with *38% of the Senior Noteholders who stated a preference indicating that they preferred the DCL Plan over the Noteholder Plan.*[13] These voting results severely undercut the Noteholders' repeated assertion that the DCL Plan fails to serve the interests of Non-LBO Creditors.

---

[9] See Docket No. 7918, supplemented at Docket No. 8114 and Docket No. 8882 (as supplemented, the "Epiq Voting Declaration") and Docket No. 8724 (Order Authorizing Changes in Votes). As the Court is aware, due to plan amendments made in response to objections of the Noteholders, the DCL Proponents are in the process of resoliciting the class of Senior Lenders. The DCL Proponents do not anticipate that resolicitation will result in any material change to the voting results.

[10] See Epiq Voting Declaration, Docket No. 8882 at Ex. 1.

[11] Id. Even excluding the Swap Claim, which the Noteholders incorrectly assert should be classified separately (see Section IV.D, infra), the class of Other Parent Claims overwhelmingly accepted the DCL Plan, with 220 out of 231 voting creditors (95.24%), holding 88.02% by dollar amount of the voting Other Parent Claims, accepting.

[12] See Docket No. 7205 (Noteholders' Responsive Statement), at 3 n.1.

[13] See Epiq Voting Declaration, Docket No. 8882 at Ex. 3.

Creditors were equally clear in their disapproval of the Noteholder Plan, which was rejected by virtually every class of impaired claims that voted on it. Indeed, *a full 253 out of 256 (98.8%) impaired classes failed to accept the Noteholder Plan*.[14] Of the three classes that voted to accept it, two are controlled by the Noteholders (the class of Senior Notes and the class of PHONES Notes) and the third represented a single voting claim in the amount of $47 (held by a creditor who also voted to accept the DCL Plan) – a claim so inconsequential that the Noteholders decided not to resolicit its vote in connection with plan modifications negatively impacting the treatment of that claim.[15] The class of Other Parent Claims – the trade and other claims against Tribune whose interests the Noteholders purported to protect – likewise rejected the Noteholder Plan by overwhelming margins, with *233 out of 254 voting creditors (91.73%), holding 91.81% by dollar amount, voting no*.[16] Creditors have thus confirmed that the Noteholder Plan serves the interests of no one other than Aurelius (a professional investor that bought significant amounts of Tribune debt in September 2010[17]), its ally Brigade Capital, and Holders of subordinated PHONES Notes, who have nothing to lose and are therefore willing to roll the dice at the expense of other creditors in the hope of hitting a litigation "home run."

## B.  The DCL Plan Settlement Is The Product Of Good Faith Negotiation And Extensive Mediation.

The record conclusively demonstrates that the DCL Plan settlement was the product of arm's-length bargaining and disproves the Noteholders' oft-repeated allegations of bad faith and conflicts of interest. The testimony and documents presented at trial demonstrate that the settlement was forged through extensive, contentious, arm's-length negotiations, two years of

---

[14] See Epiq Voting Declaration, Docket No. 7918 at Ex. B-1.

[15] See Docket No. 8757 (Noteholders' Motion regarding plan amendments) at ¶ 37.

[16] See Epiq Voting Declaration, Docket No. 882 at Ex. 1.

[17] Tr. 3/8 at 142:17-22 (Kurtz).

analysis by the Committee and other parties, an exhaustive investigation by the Examiner, and extensive mediation before the Court-appointed mediator.

Of course, "the important point of inquiry is the plan itself" rather than the process by which it was negotiated, drafted, and proposed. See In re AbitibiBowater Inc., 2010 Bankr. LEXIS 3987, at *14 (Bankr. D. Del. Nov. 22, 2010) (quotation marks omitted). Nevertheless, as the Noteholders' counsel asserted during opening statements, "when you have an appropriate bargaining process, it can help give the Court confidence in the product that comes out."[18] The record here establishes precisely such an "appropriate process."

### 1. Initial Investigations, Negotiations, And The April Plan

The process started in the very first days of the bankruptcy cases, when both the Committee and the Debtors began investigations into the LBO-Related Causes of Action. Upon formation, the Committee directed counsel and financial advisors first to conduct a legal analysis of possible claims arising out of the Leveraged ESOP Transactions and then to conduct a full factual investigation.[19] In the first phase of the process, the Committee requested documents from more than 30 entities involved in the Leveraged ESOP Transactions, ultimately reviewing more than 4 million pages of documents, and deposed key participants.[20] While the Committee's investigation was underway, the Debtors undertook their own substantial efforts to review, analyze, and understand the facts and potential claims.[21]

With the parties having developed a basic understanding of the applicable facts and law, initial negotiations began in late 2009. At the outset, the Debtors and their advisors met individually with key stakeholders, including the Committee, the Senior Lenders, and

---

[18] Tr. 3/7 at 66:9-11 (Noteholders' Opening Statement).

[19] Tr. 3/8 at 203:11-18, 205:11, 208:4-11 (Salganik).

[20] Tr. 3/8 at 206:21-207:25 (Salganik).

[21] Tr. 3/8 at 37:22-42:6 (Kurtz).

Centerbridge Credit Partners, L.P. (then the largest holder of Senior Notes), each of which presented their views on the merits.[22]  In early January 2010, the key stakeholders met jointly, with representatives of each advocating their positions.[23]

At that time, as would be expected at the start of any negotiation over claims of this magnitude, the parties were far apart and discussions were hostile.[24]  Nevertheless, negotiations continued throughout January, February, and March of 2010, with the Debtors meeting on an individual basis with the various constituencies, presenting to each party the arguments and positions of the other stakeholders and transmitting various settlement bids and proposals.[25]  Concurrently, the Committee actively negotiated with the Debtors, representatives of the Senior Lenders, and representatives of the Senior Noteholders,[26] including meeting with Centerbridge on multiple occasions.[27]

Those negotiations eventually led to a proposed "Global Settlement" of all LBO-Related Causes of Action embodied in a Settlement Support Agreement dated April 9, 2010, among Angelo Gordon (a holder of substantial Senior Loan Claims), Centerbridge (the largest holder of Senior Notes at that time, then represented by Akin Gump), Law Debenture Trust Company of New York (the trustee for certain Senior Notes), and JPMorgan (Senior Loan Agent and a Holder of substantial Senior Loan Claims).[28]  That proposed settlement in turn served as the basis for the plan of reorganization (the "April Plan") that the Debtors filed on April 12, 2010 with the support

---

[22] Tr. 3/8 at 43:13-22, 44:20-45:6 (Kurtz).

[23] Tr. 3/8 at 45:7-46:24 (Kurtz); see also Tr. 3/9 at 18:20-19:16 (Kulnis).

[24] Tr. 3/8 at 46:19-24, 47:21-48:11 (Kurtz); Tr. 3/8 at 216:7-15 (Salganik).

[25] Tr. 3/8 at 46:25-49:15 (Kurtz); Tr. 3/9 at 19:19-20:1 (Kulnis).

[26] Tr. 3/8 at 210:5-211:3 (Salganik).

[27] Tr. 3/8 at 211:4-213:7, 218:4-13 (Salganik); DCL Exs. 5, 29, 182.

[28] DCL Ex. 396; Tr. 3/8 at 49:1-2; 49:18-22 (Kurtz).

of the Committee.[29]  Confirmation of the April Plan was far from a foregone conclusion, however, as Oaktree and certain other holders of Senior Loan Claims indicated that they would attempt to block the plan due to their belief that the settlement was too generous to Non-LBO Creditors and was unfairly funded entirely by Senior Lenders and not other potentially-liable parties.[30]

### 2.  The Examiner Report And Its Aftermath

After the April Plan was filed, the Court entered an order appointing Professor Kenneth N. Klee as Examiner with the charge of evaluating the merits of the LBO-Related Causes of Action.[31]  The major stakeholders supplied the Examiner with briefs and record evidence,[32] and the Examiner and his advisors were given access to the discovery materials compiled by the parties during their investigations and independently interviewed 38 witnesses.[33]

Ultimately, on July 26, 2010, the Examiner filed an extensive, four-volume report detailing the results of his investigation.  The parties to the settlement embodied in the April Plan assessed the implications of Professor Klee's conclusions and, despite identifying findings that supported each of their respective (and conflicting) views on the merits of the LBO-Related Causes of Action, ultimately determined that the April Plan was not likely to be confirmed.[34]

Negotiations in late July and early August attempted to restructure the settlement in order to build broader support that would ensure its success, but the parties were unable to reconcile their differing positions and terminated the April Plan settlement on August 9, 2010.[35] Stakeholders then redoubled their efforts to reach a consensual resolution, negotiating throughout

---

[29] See Docket No. 4008, Ex. A.

[30] See Docket Nos. 3999 and 4376.

[31] See Docket No. 4320.

[32] See, e.g., DCL Exs. 1540-47.

[33] Docket Nos. 5130-5133 ("Examiner Report"), Vol. 1 at 30, 32-38.

[34] Tr. 3/8 at 54:21-55:5, 55:24-56:18 (Kurtz).

[35] Tr. 3/8 at 56:19-58:21, 136:3-5 (Kurtz).

August in an attempt to achieve a new compromise that would reflect the parties' assessment of the Examiner Report.[36] The Senior Noteholders were actively involved in those discussions.[37]

### 3. The Mediation And Proposed Settlement

On September 1, 2010, after efforts to forge a new agreement failed, the Court appointed Judge Gross as mediator.[38] All material stakeholders were parties to the mediation, including the Debtors, the Committee, JPMorgan, Angelo Gordon, Oaktree, a group of "Step One Credit Agreement Lenders," Wells Fargo Bank, N.A. (the Bridge Loan Agent), EGI-TRB LLC, three separate Senior Note representatives (Aurelius, Law Debenture, and Deutsche Bank Trust Company Americas) and a representative of the PHONES (Wilmington Trust).[39]

On September 28, 2010, with the assistance of Judge Gross, the Debtors, Angelo Gordon, and Oaktree agreed to the terms of a proposed compromise (the "September Settlement").[40] Neither the Committee nor JPMorgan supported the September Settlement, however, and the Committee issued a press release indicating that, in its view, the September Settlement did not provide fair value to all creditors.[41]

---

[36] Tr. 3/8 at 60:13-61:17 (Kurtz).

[37] The Debtors spoke frequently with Centerbridge (still the largest holder of Senior Notes at the time) and, on at least one occasion, with Aurelius. Tr. 3/8 at 65:25-67:5 (Kurtz). The Committee, which had given consideration to the views of the Senior Noteholders throughout the process, met with Aurelius on multiple occasions, and the Committee's advisors met or spoke with Aurelius's advisors on numerous additional occasions. Tr. 3/8 at 218:4-13, 227:3-232:13, 235:11-14, 237:1-240:20, 278:6-10; Smith Dep. at 55:18-56:25, 70:16-20, 218:12-21, DCL Ex. 69 (Supplement to Aug. 19, 2010 Committee minutes), 87 (Supplement B to Oct. 7, 2010 Committee minutes). The Noteholders' assertion that they were "frozen out of the [settlement] process," Tr. 3/7 at 67:12-25 (Noteholders opening statement), is patently untrue. The evidence shows that the Senior Noteholders (including Aurelius) were represented continually in settlement negotiations and in mediation.

[38] Tr. 3/8 at 61:8-25 (Kurtz); DCL Ex. 382.

[39] DCL Ex. 382. Centerbridge, although named as a Mediation Party, did not participate in the mediation, having sold its entire position to Aurelius prior to the commencement of mediation. Tr. 3/8 at 142:17-22 (Kurtz).

[40] DCL Ex. 383; Tr. 3/8 at 75:14-77:17 (Kurtz).

[41] Tr. 3/8 at 235:15-236:25 (Salganik); DCL Ex. 273.

Subsequent to the September Settlement, the Debtors resumed discussions with stakeholders in an effort to forge a more broadly supported compromise.[42] On October 12, 2010, under the continued auspices of Judge Gross, the Debtors, Committee, Oaktree, Angelo Gordon, and JPMorgan reached a new settlement (the "October Settlement") that provided approximately $174 million in additional cash settlement consideration to Senior Noteholders and other Non-LBO Creditors, along with a vastly improved split of litigation trust recoveries, and thereby won the support of the Committee as fiduciary to all unsecured creditors.[43]

The Committee did not lightly agree to the October Settlement. It concluded that the settlement was fair for unsecured creditors as a whole after a detailed review of the merits and the negotiation process, including the review of "several hundred" memoranda and other written reports or analyses from its legal and financial advisors;[44] consideration of other potential dissenting views, including those of its members Deutsche Bank and Wilmington Trust;[45] and careful analysis and discussion of Aurelius's model of settlement values for the LBO-Related Causes of Action.[46] In fact, starting in August 2010, the Committee held 21 meetings before voting to support the DCL Plan settlement, including two special weekend meetings that encompassed a detailed review of Aurelius's model.[47]

---

[42] Tr. 3/8 at 81:17-82:10 (Kurtz).

[43] DCL Ex. 384; Tr. 3/8 at 82:11-87:8 (Kurtz); Tr. 3/8 at 244:4-247:11 (Salganik).

[44] Tr. 3/8 197:7-17 (Salganik); DCL Exs. 185-209 (Moelis weekly industry updates from Dec. 2009 to Oct. 2010), 210-255 (AlixPartners weekly financial reports from Dec. 2009 to Oct. 2010).

[45] Tr. 3/8 at 252:24-253:6; DCL Ex. 76 (Supplement A to Sept. 16, 2010 Committee minutes).

[46] Tr. 3/8 at 241:4-244:18 (Salganik); DCL Exs. 87 (Supplement B to Oct. 7, 2010 Committee minutes), 88 (Oct. 9, 2010 Committee minutes), 89 (Committee minutes from Oct. 10, 2010 meeting).

[47] Tr. 3/8 at 241:4-244:18 (Salganik); DCL Exs. 58-89 (Committee minutes from Aug. 2, 2010 to Oct. 10, 2010). These meetings represent only a fraction of the work performed by the Committee, which held 53 meeting in the 10-month period following the entry of the Depository Order. See DCL Exs. 3-95 (Committee minutes from Dec. 17, 2009 to Oct. 21, 2010), 96-131 (Committee agendas dated from Dec. 17, 2009 to Oct. 21, 2010).

Further, the parties continued to mediate, and on January 28, 2011, with the continued oversight of Judge Gross, also reached a settlement with the Bridge Lenders, generating a further $13.3 million in settlement consideration.[48]

## C. The DCL Plan Settlement Results In Recoveries Well Within The Range Of Reasonableness.

As part of its consideration of the DCL Plan settlement, the Court must assess "the probability of success in litigation" of the LBO-Related Causes of Action. In re Martin, 91 F.3d at 393. In so doing, "the Court's task is not to decide the numerous questions of law and fact raised by objections but rather to canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness." In re Exide Techs., 303 B.R. 48, 68 (Bankr. D. Del. 2003) (internal quotation marks and alterations omitted). The evidence presented during the confirmation hearing, including the Examiner Report and Black's analysis, demonstrates that the settlement easily meets this standard. Indeed, Black's analysis showed that the settlement consideration provided in respect of the Senior Notes and other Non-LBO Claims actually exceeds the reasonably-expected range of recoveries.

### 1. The Examiner Report Supports The Reasonableness Of The DCL Plan Settlement.

The Examiner Report – prepared by a neutral, independent, and highly-regarded bankruptcy expert – provides the initial foundation for analyzing the DCL Plan settlement. The Examiner modeled recoveries to Non-LBO Creditors in six different litigation scenarios.[49] Only the Examiner's complete victory scenario (Case 6) – in which the Non-LBO Creditors would be

---

[48] DCL Ex. 385; Tr. 3/8 at 247:12-23 (Salganik).

[49] Examiner Report, Vol. 2, Annex B at B-7-B-9. The Examiner also included two additional scenarios, Cases 7 and 8, which are variants of Case 3 (Step Two fraudulent transfer at Tribune and Guarantor Debtors). Id. Cases 7 and 8 add disgorgement proceeds from actions against Step Two Selling Stockholders. These claims are included in the Preserved Causes of Action to be pursued after emergence under the DCL Plan, the proceeds of which go disproportionately to Non-LBO Creditors. See Section II, above.

paid in full[50] – results in Non-LBO Creditors recovering more than even the initial guaranteed distributions to be made to them under the DCL Plan (before the additional value provided to Non-LBO Creditors from their disproportionate share of recoveries from the Trusts).[51] In the Examiner's other five scenarios, incremental recoveries to Non-LBO Creditors resulting from the LBO-Related Causes of Action range from $0 (complete loss) to approximately $205 million to $244 million (avoidance of all Senior Loan and Bridge Loan Claims against the Tribune parent and avoidance of Step Two Claims against the Guarantor Debtors).[52]

The Examiner analyzed each of the arguments that could lead to a full recovery (avoidance of all claims at Step One and Step Two) and identified a number of problems. For instance, the Examiner found that there was "no credible evidence" that the Tribune entities entered into the Step One Transactions in order to hinder, delay, or defraud creditors.[53] The Examiner also concluded that it was "highly likely" (the Examiner's highest probability) that the Debtors would be found to have been solvent at Step One if the Step One and Step Two Transactions were not collapsed, and that it was "somewhat unlikely" that those Transactions would be collapsed.[54] In addition, the Examiner found that, even if the Transactions were collapsed, it was "somewhat likely (although a very close call)" that Tribune would be found to be solvent.[55] Finally, the Examiner concluded that the Guarantor Debtors – which hold the vast

---

[50] Assuming allowance of the PHONES Notes in the amount of $758.8 million (the "low PHONES" scenario).

[51] See Examiner Report, Vol. 2, Annex B at B-10-B-33.

[52] These recovery amounts are derived from the Examiner's Recovery Scenarios, taking Case 5 (Step One fraudulent transfer at Tribune and Step Two fraudulent transfer at Tribune and Guarantor Debtors) less the "natural recoveries" in Case 1 (base case) and using assumed high and low intercompany balances, respectively, from an intercompany claims settlement. Examiner Report, Vol. 2, Annex B (the "Recovery Scenarios"). Pursuant to the Intercompany Claims Settlement embodied in the DCL Plan, the DCL Plan settlement assumes a settlement of Intercompany Claims at the midpoint in the settlement range, between the high and low intercompany balances. See DCL Reply at 81-84.

[53] Examiner Report, Vol. 2 at 23.

[54] Examiner Report, Vol. 2 at 181, 187, 194.

[55] Examiner Report, Vol. 2 at 187-88.

majority of the Debtors' assets but collectively had substantially less debt than the parent entity –
were even more likely than Tribune to be found solvent in the event the Transactions were
collapsed.[56] The Examiner reached this conclusion despite mistakenly assuming $603 million in
value attributed the Chicago Cubs, and 50% of the interest in Classified Ventures, were not owned
by a Guarantor Debtor.[57] Taken together, the Examiner's conclusions demonstrate that the
Examiner believed that avoidance claims relating to Step One were more likely than not to end in a
complete loss (no avoidance).[58]

With respect to avoidance actions relating to Step Two, the Examiner reached a different
conclusion, finding that it was "somewhat likely" to "highly likely" that a plaintiff would prevail
on a claim of constructive fraud and "somewhat likely" that a plaintiff would prevail on a claim
for intentional fraudulent transfer.[59] Critically, however, the Examiner determined that a
complete victory on Step Two avoidance would result *only in $45 million to $53 million* in

---

[56] Examiner Report, Vol. 2 at 211.

[57] Examiner Report, Vol. 2 at 209, 220. DCL Ex. 1531 (Tribune's interest in Classified Venture equally split
between Tribune Company and Tribune National Marketing Company); DCL Ex. 809 (Tribune National Marketing
Company is a Guarantor Subsidiary).

[58] The testimony of Professor Fischel, the Senior Lenders' solvency expert, illustrates the difficulties the
Noteholders would face in proving insolvency at Step One. Fischel testified that "the contemporaneous economic
evidence demonstrates that Tribune was solvent as of June 4, 2007 . . . whether the recapitalization and the merger
are viewed as two separate transactions or as a single transaction." Tr. 3/10 at 91:16-25 (Fischel). Moreover,
Fischel explained that the "proper view" based on market evidence is to regard Step One and Step Two as separate
transactions. Tr. 3/10 at 91:24-25 (Fischel).

In reaching his conclusions as to solvency, Fischel focused on "what contemporaneous [market] participants at the
time, putting their wealth at stake, thought about the value" of Tribune. Tr. 3/10 at 94:17-95:10 (Fischel). Fischel
cited Zell's investment in Tribune, the Lenders' decision to fund, rating agency data, bond yields, and CDS spreads
as evidence of solvency as of Step One. Tr. 3/10 at 95:14-97:12 (Fischel). Fischel also performed a traditional
balance sheet test and, based on DCF, comparable companies, and comparable transactions methodologies, found
that Tribune was comfortably solvent at Step One irrespective of whether anticipated Step Two debt or S-
Corp./ESOP tax benefits are taken into account. Tr. 3/10 at 106:4-107:10; 119:3-21 (Fischel). Using an average of
third-party downside projections, Fischel similarly determined that Tribune had the ability to pay debts as they
matured and adequate capital at Step One, even taking into account the Step Two debt. Tr. 3/10 at 110:9-112:3;
121:11-125:18 (Fischel).

[59] Examiner Report, Vol. 2 at 32, 220, 229, 236, 240.

distributable value for holders of Non-LBO Claims[60] unless the Senior Lenders were equitably estopped or otherwise barred from sharing in disgorgement recoveries in respect of payments made on the Step Two Loans (a question the Examiner left in "equipoise").[61] Moreover, even if the Senior Lenders were prohibited from sharing in disgorgement, recoveries for Non-LBO Creditors would increase by only approximately $275 million.[62] In other words, even in the Examiner's Step Two avoidance scenario most favorable to the Noteholders, a scenario that includes unique and unprecedented subordination of valid Step One Claims,[63] Non-LBO Creditors would benefit only by $320 to $328 million – *far less than the settlement consideration provided under the DCL Plan*.

As the Examiner Report makes manifest, these issues are complex and dependent on factual and legal issues as to which the outcome of litigation is uncertain. The DCL Plan settlement reflects the risks that all parties would face in litigation and strikes a reasonable balance between scenarios the Examiner found more probable, which would result in recoveries substantially lower than the DCL Plan settlement, and the "home run" (full avoidance at Step One and Step Two) he found unlikely, which would result in a full recovery for Non-LBO Claims.

---

[60] Litigation recovery amounts are derived from the Examiner's Recovery Scenarios, taking Examiner's Case 3 (Step Two fraudulent transfer at Tribune and Guarantor Debtors) less the "natural recoveries" in Case 1 (base case) and assumed high and low intercompany balances, respectively, from an intercompany claims settlement. Examiner Report, Vol. 2, Annex B at B-10-B-13, B-18-B-21.

[61] Examiner Report, Vol. 2 at 302-03.

[62] The Examiner's Case 3 (Step Two fraudulent transfer at Tribune and Guarantor Debtors) includes $298 million of net disgorgement proceeds. This amount is based on a gross number of $344 million, comprised of prepetition principal, interest, and fee payments to LBO Lenders ($318 million) and advisory fee payments ($25.6 million), from which the Examiner makes deductions for value conferred, collectability risk, and costs, resulting in a recovery of $298 million. Examiner Report, Vol. 2, Annex B at B-18-B-21. Removal of the advisory fee payments (which are not released under the DCL Plan settlement) and their share of the deductions results in a maximum of $275 million in recoveries on the Step Two Disgorgement Claims.

[63] See Section III.D.2, infra.

## 2. Black's Analysis Demonstrates That The DCL Plan Settlement Is Reasonable.

The DCL Proponents' expert, Professor Bernard Black, assessed the reasonableness of the DCL Plan settlement and determined that it far exceeds the range of reasonable recoveries that Non-LBO Creditors could expect to receive. Black analyzed both the potential recoveries Senior Noteholders could receive were they to litigate the LBO-Related Causes of Action as well as the probabilities of reaching each possible outcome. After finding that Senior Noteholders could achieve payouts that exceed the proposed DCL Plan settlement's distributions in only one significantly unlikely scenario, Black concluded that the settlement is reasonable and advantageous for Senior Noteholders and other Non-LBO Creditors.

Like the Examiner, Black identified six main "Scenarios" representing the potential litigation outcomes, ranging from Scenario A (total Senior Lender victory and full allowance of all Senior Loan Claims) to Scenario F (total Senior Lender loss with full avoidance of all Senior Loan Claims).[64] Notably, Black's six Scenarios do not model just the possibility of insolvency or intentional fraudulent transfer at each Step, but also capture issues that might affect recoveries. For example, Scenario A includes not just the likelihood that Tribune was solvent at both Step One and Step Two (which would lead to no avoidance at either Step), but also the possibility that statutory defenses would prevent avoidance even if Tribune or the Guarantor Debtors were found to have been insolvent at either Step.[65] Likewise, Scenario F includes the possibility that Senior Lenders

---

[64] Tr. 3/9 at 105:20-109:13 (Black). The other four Scenarios were: Scenario B, with Step Two Loans avoided at the Tribune parent but not at the Guarantor Debtors and no avoidance of Step One Loans; Scenario C, with Step Two Loans avoided at both the Tribune parent and the Guarantor Debtors and no avoidance of Step One Loans; Scenario D, with full avoidance at the Tribune parent and neither Step One or Step Two Loans avoided at the Guarantor Debtors; and Scenario E, with full avoidance at the Tribune parent and Step Two Loans (but not Step One Loans) avoided at the Guarantor Debtors. Id.

[65] Tr. 3/9 at 109:14-110:8 (Black).

might be equitably subordinated to other creditors even if neither Step One nor Step Two were determined to be avoidable.[66]

Having established six possible Scenarios for litigation outcomes, Black then determined the likely recoveries for the relevant stakeholders under each Scenario and compared those recoveries to distributions provided under the proposed DCL Plan settlement.[67] The results, assuming net recoveries of $300 million by the Litigation Trust on causes of action preserved under the DCL Plan,[68] were discussed as part of Black's demonstratives and are summarized in the following table (Table 1):

**Table 1 – Payouts In Fully Litigated Scenarios (With Estimated Third-Party Recoveries)[69]**
Estimated payouts in different Scenarios, including $300 million in assumed net trust recoveries. Senior Lender payouts are net of disgorgement; Bridge Lender payouts are before disgorgement ($143 million in Scenarios B-F). Amounts in $ millions.

| Creditor Class | Scenario | | | | | | DCL Plan |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | |
| Senior Loans (net of disgorgement) | 6,658 | 6,844 | 6,661 | 6,628 | 6,572 | 4,343 | 6,070 |
| Bridge Loans (before disgorgement) | 104 | 0 | 0 | 0 | 0 | 273 | 78 |
| Senior Notes | 83 | 132 | 271 | 310 | 352 | 1,433 | 659 |
| Swap | 113 | 121 | 153 | 142 | 153 | 154 | 151 |
| Other Parent Claims | 7 | 12 | 24 | 28 | 31 | 114 | 41 |
| Subsidiary Unsecured Claims | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| PHONES | 0 | 0 | 0 | 0 | 0 | 791 | 0 |
| *All Non-LBO Creditors* | *$288* | *$349* | *$532* | *$565* | *$621* | *$2,577* | *$936* |

Black (much like the Examiner) found that only in Scenario F, the full-avoidance "total victory" scenario, would the Senior Noteholders achieve more value than they will receive under

---

[66] Tr. 3/9 at 109:6-13 (Black).

[67] Tr. 3/9 at 111:11-112:8 (Black).

[68] Professor Black estimated at least $300 million in third-party recoveries based on his evaluation of settlement values for the preserved causes of action. In particular, Professor Black focused on potential claims against Tribune's officers and directors, who are covered by a $200 million D&O insurance policy, actions to recover insider payments made in connection with the Leveraged ESOP Transactions, and claims against VRC and the financial advisors who assisted Tribune during the Leveraged ESOP Transactions. Professor Black testified that $300 million was a conservative estimate given that he did not include any potential recoveries from third-party shareholders who sold stock during the Leveraged ESOP Transactions. Tr. 3/9 at 147:19-152:2 (Black).

[69] DCL Ex. 1484 at 22-23; DCL Ex. 1492 at 3.

the DCL Plan settlement.[70]  In all other Scenarios, the Senior Noteholders would recover at least

**$300 million less** than the recoveries under the DCL Plan.  As such, Scenario F sets the upper

range on potential recoveries for the Senior Noteholders, while Scenarios A through E, which

offer substantially lower payouts, establish the lower and middle ranges for potential recoveries.

Viewed from this perspective, the DCL Plan settlement provides a middle ground

between Scenarios A through E on the one side and Scenario F on the other side and it is,

therefore, in the position of an archetypal settlement.[71]  Of course, the fact that the DCL Plan

settlement falls between the high and low litigation outcomes does not, by itself, conclusively

establish the reasonableness of the compromise.  Rather, as Black explained, the overall

reasonableness of the settlement depends on the likelihood of achieving each Scenario,

particularly Scenario F (total victory).[72]

Accordingly, to determine a hypothetical reasonable settlement range for the LBO-

Related Causes of Action, Black developed six "Cases," as sets of probabilities that he assigned

to each litigation outcome Scenario.[73]  The first four Cases, designed to reflect the full range of

views as to the strengths and weaknesses of the claims, range from a "Low Settlement Case" in

which probabilities are assigned in a manner strongly favorable to the Senior Lenders to a "High

Settlement Case" in which the assigned probabilities strongly favor the Non-LBO Creditors.  The

last two Cases reflect the views of the Examiner and Black himself, respectively.[74]

---

[70] Tr. 3/9 at 114:25-116:1 (Black).

[71] Tr. 3/9 at 113:19-21 (Black).

[72] Tr. 3/9 at 113:23-124:5 (Black).

[73] Assuming that most of the LBO-Related Causes of Action would end in settlement rather than being litigated to final judgment, the Cases were modeled as settlement outcomes, not full litigation outcomes. Tr. 3/9 at 116:6-9 (Black); DCL Ex. 1484 at 23.

[74] Tr. 3/9 at 116:6-118:11 (Black).  Professor Black also included a "Low-Mid Settlement Case," with probabilities moderately favorable to the Senior Lenders, and a "High-Mid Settlement Case," with probabilities moderately favorable to the Senior Noteholders. Id.

Black next determined the likelihood of success in each Case. To do so, Black had to identify and assess the key drivers of the litigation outcomes, including:

- the likelihood the Court would "collapse" the Step One and Step Two Transactions for purposes of its solvency analysis (i.e., Step Integration);[75]

- whether the tax savings generated by Tribune's conversion to an ESOP-owned S corporation in connection with the Step Two Transactions (which Black called "S-ESOP tax value") should count in assessing balance sheet solvency;[76]

- how Tribune's projections and the state of the broadcasting and publishing markets in 2007 should be viewed as affecting Tribune's cash-flow cushion (its capital adequacy and projected ability to pay debts as they come due);[77]

- the likelihood the Debtors had actual intent to defraud creditors by means of the Step One or Step Two Transactions, or whether the Senior Lenders engaged in sufficiently egregious behavior to warrant equitable subordination of their claims;78 and

- whether the Senior Lenders' defenses would prevent avoidance in situations where it otherwise would occur.[79]

Of particular significance to Black's analysis was the first driver – the question of whether Step One and Step Two should be collapsed. As the Examiner recognized and all parties concede, without collapse, the likelihood of demonstrating Step One insolvency is, at best, very small.[80] As Black explained, there is substantial evidence that strongly supports the conclusion that Step One and Step Two should not be collapsed.[81] On the basis of that evidence, the Examiner concluded that a finding that Step One and Step Two should be collapsed was

---

[75] Tr. 3/9 at 118:12-123:14 (Black).

[76] Tr. 3/9 at 124:2-125:10 (Black).

[77] Tr. 3/9 at 125:13-126:12 (Black).

[78] Tr. 3/9 at 127:2-128:24 (Black).

[79] Tr. 3/9 at 128:25-131:22 (Black).

[80] DCL Ex. 1484 at 38-39; Examiner Report, Vol. 2 at 207, 264. See also Tr. 3/7 at 55:25-57 1 (Noteholder opening statement).

[81] Tr. 3/9 at 141:8-22; 153:17-154:8 (Black).

"somewhat unlikely"; for his part, Black opined that the likelihood of the Noteholders' prevailing on this point was even more remote.[82]

This reality has a profoundly negative effect on the ability of the Noteholders to succeed on what all parties view as the Noteholders' home run scenario – Scenario F (the only Scenario under which litigation recoveries would exceed those provided by the DCL Plan settlement). Additionally, as Black explained, the issue of collapse has a ripple effect on the value of other recovery scenarios. For example, while a finding in favor of formal Step Integration would increase the probability of Scenario F, Black testified that it also would increase the probability of Scenario A (the no avoidance scenario) because there would be no basis or occasion to take a "second look" at solvency at Step Two in the event that Step Two was collapsed into Step One.[83]

At the confirmation hearing, Black elaborated on each of these points and explained how he developed the probabilities associated with each of the litigation Scenarios in each of his Cases.[84] He also explained how, based on that analysis, he was able to derive expected recoveries for each Case.[85] These amounts, which are set out in Table 2 below and were presented to the Court as part of Black's demonstratives, establish the range of reasonable expected recoveries by the Non-LBO Creditors and demonstrate the reasonableness of the DCL Plan settlement.[86] More specifically, Black's analysis shows that when potential recoveries from third parties are considered, the distributions under the DCL Plan exceed *any* potential recoveries the Senior Noteholders or the Non-LBO Creditors as a whole would receive under any of the six Cases, even the High Settlement Case.

---

[82] Examiner Report, Vol. 2 at 181; DCL Ex. 1484 at 38, Tr. 3/9 at 153:17-24 (Black).

[83] Tr. 3/9 at 136:9-15 (Black).

[84] Tr. 3/9 at 118:16-144:21 (Black).

[85] Tr. 3/9 at 145:14-20 (Black).

[86] Tr. 3/9 at 146:21-147:16 (Black).

**Table 2 – Recoveries In Different Cases (With Expected Third-Party Recoveries)[87]**

Estimated payouts in different Cases, including $300 million in assumed net trust recoveries. Senior Lender payouts are net of disgorgement; Bridge Lender payouts are before disgorgement. Amounts in $ millions.

| Creditor Class | Case | | | | | | DCL Plan |
|---|---|---|---|---|---|---|---|
| | Low Settle | Low-Mid | Mid-High | High Settle | Black | Examiner | |
| Senior Lenders (net of disgorgement) | 6,624 | 6,539 | 6,415 | 6,185 | 6,544 | 6,305 | 6,070 |
| Bridge Lenders (before disgorgement) | 57 | 61 | 69 | 95 | 59 | 94 | 77 |
| Senior Notes | 217 | 295 | 409 | 600 | 294 | 475 | 659 |
| Swap | 129 | 134 | 139 | 146 | 134 | 138 | 151 |
| Other Parent Claims | 19 | 25 | 34 | 50 | 25 | 40 | 41 |
| Subsidiary Unsecured Claims | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| PHONES | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *All Non-LBO Lenders* | *$449* | *$539* | *$667* | *$881* | *$538* | *$738* | *$936* |

Finally, having determined that the distributions to be made under the DCL Plan exceed

the range of reasonable litigation and settlement recoveries, Black reconfirmed his results by

running a number of sensitivity tests that analyzed what the range of reasonable recoveries would

be if he adjusted: (i) the probabilities associated with each settlement Case; (ii) the amount of

third-party recoveries; (iii) the Debtors' distributable enterprise value; (iv) the likelihood of the

Senior Lenders receiving post-filing interest; (v) the likelihood of inclusion of S-ESOP tax value in

the balance sheet analysis; (vi) the valuation/amount of PHONES debt; and (vii) the possibility that

Senior Lenders would be prohibited (through equitable subordination or otherwise) from

participating in disgorgement recoveries in respect of the Step Two Transactions.[88]

As Black testified, those tests confirmed that the DCL Plan settlement payouts remained

reasonable even when contested issues affecting the LBO-Related Causes of Action were

changed in favor of the Non-LBO Creditors. Indeed, his analysis showed that the DCL Plan

---

[87] DCL Ex. 1484 at 28-29; DCL Ex. 1492 at 9.

[88] Tr. 3/9 at 155:11-168:18 (Black).

settlement consistently remained either above the resulting settlement range or at the top end of the range.[89]

## III. THE NOTEHOLDERS' OBJECTIONS TO THE DCL PLAN SETTLEMENT HAVE NO MERIT.

The evidence presented in connection with the confirmation hearing demonstrates that the Noteholders' criticisms of the DCL Plan settlement are unfounded and unsupportable. The DCL Proponents address each of the Noteholders' arguments in this Section of the brief.

### A. The Noteholders Mischaracterize The DCL Plan Settlement And Understate The Settlement Consideration Provided To The Non-LBO Creditors.

The Noteholders first try to minimize the settlement consideration by mischaracterizing the DCL Plan settlement and its basic terms.

#### 1. The Noteholders' "Settlement Percentages" Are False And Misleading.

To start, the Noteholders misleadingly characterize the DCL Plan settlement consideration as a percentage of the face amount of the various claims to be allowed and/or released under the DCL Plan. In a demonstrative exhibit referenced repeatedly during the confirmation hearing, for example, the Noteholders calculated a percentage "give up" for allowance of the Senior Loan Claims by dividing the settlement consideration they arbitrarily assign (see below) by the aggregate size of the Senior Lenders' allowed claim, predictably yielding very low percentages.[90]

This is misleading in the extreme. As the Court is aware, avoidance of an $8.6 billion claim (the amount of the Senior Loan Claims) does not result in $8.6 billion in new value flowing into the estate; and the avoidance claim therefore is not an "$8.6 billion claim" as the

---

[89] Tr. 3/9 at 168:23-170:1 (Black). Adjusting the sensitivities had a minimal impact on the upper end of the settlement range, although it did have an impact on the lower end of the range. See Tr. 3/9 at 168:23-169:7 (Black).
[90] See NPP Ex. 2473.

Noteholders disingenuously assert. Rather, the "value" of avoidance of any given claim is the amount by which avoidance could improve the recoveries of remaining creditors, and the estates can recover no more than the amount necessary to pay the remaining creditors in full. In the case of Senior Noteholders, possible litigation outcomes range from natural recoveries of 4.8% (approximately $62 million) if all Senior Loan Claims are allowed (total loss) to 100% (approximately $1.283 billion, excluding post-petition interest) if all such claims are completely avoided (total victory).[91] Thus, the maximum recovery against which settlement consideration is measured vis-à-vis the Senior Noteholders would be $1.221 billion, not $8.6 billion.[92]

Under the DCL Plan, without any of the risks, cost, and delay of litigation, Senior Noteholders recover a guaranteed minimum of roughly *33.5%* (approximately $431 million).[93] If the Litigation Trust nets a combined $300 million on the numerous preserved claims (determined by Black to be a reasonable assumed recovery), Senior Noteholder and Other Parent Claim recoveries go up to *51%* (an additional $226.5 million). This is the appropriate measure of the reasonableness of the DCL Plan settlement.

### 2. The Noteholders Ignore The Value Of Litigation And Creditors' Trust Recoveries.

In another attempt to understate the settlement consideration, the Noteholders completely ignore the value of the disproportionate share of recoveries from the Litigation and Creditors' Trusts that the DCL Plan provides to Non-LBO Creditors.

---

[91] See Examiner Report, Vol. 2, Annex B at B10-B13, B30-B33.

[92] Measurement including the PHONES Notes would add an additional $760 million to $1.26 billion to the calculus, depending on resolution of the dispute regarding the allowed amount of PHONES Notes claims. However, because the PHONES Notes Claims are contractually subordinated, it is appropriate to exclude them from the analysis given that the evidence showed that the expected value of the LBO-Related Causes of Action is far less than the amount necessary to satisfy even the Senior Notes. See e.g., DCL Ex. 1484 at 22.

[93] DCL Plan § 3.2.5; DCL Ex. 384.

As explained in Section II, above, the DCL Plan entitles Non-LBO Creditors to the first

$90 million in net recoveries by the Trusts, plus 65% of all future net recoveries once the Trusts'

$20 million Loan is repaid. In contrast, a pure *pro rata* allocation of recoveries based upon the

ratio of Non-LBO Claims to Senior and Bridge Loan Claims would entitle Senior and Bridge

Lenders to roughly *87%* of every dollar distributed from the Trusts, after repayment of the

Trusts' Loan. Under the DCL Plan, if the Trusts receive just $300 million in net recoveries,

Non-LBO Creditors will receive an additional $226.5 million, as compared to roughly $35

million were proceeds distributed on a *pro rata* basis. By ignoring this beneficial split of Trust

recoveries, the Noteholders render meaningless their comparison of the settlement to the alleged

"expected value" of full litigation.

The Noteholders' disregard of this point also is fundamentally at odds with their own

stated views of the merits of the LBO-Related Causes of Action. For example, taking the

Noteholders' expert (Beron) at his word that there is a 60% chance of a finding of intentional

fraudulent transfer in connection with Step Two, the Litigation Trust would have a 60% chance

of recovering up to $3.9 billion in payments made by Tribune to shareholders in December

2007.[94] The Noteholders thus themselves implicitly assign an "expected value" of over

$2.3 billion to such claims. Under the DCL Plan, Non-LBO Creditors would receive more than

$1.5 billion of such recoveries, on top of their $550+ million in initial, guaranteed, risk-free

distributions, enough to pay the Senior Notes in full and provide a substantial distribution on

account of the subordinated PHONES Notes.

As noted in Section III.E, below, the DCL Proponents disagree with Beron's methods and

opinions. The point here is simply that it is illogical for the Noteholders simultaneously to argue

---

[94] NPP Ex. 2476 at 28; DCL Ex. 376 at 61; DCL Ex. 1400 at 37.

that claims against the Senior Lenders have enormous value and that the favorable allocation of Trust interests somehow has *no* value whatsoever.

### 3. The Noteholders Improperly Apportion The Settlement Consideration.

Lastly, the Noteholders attempt to divide the comprehensive DCL Plan settlement into artificial pieces and arbitrarily assign a "value" to each piece. This piecemeal attack is inconsistent with governing law and basic logic. When many related claims are settled, parties rarely (if ever) assign specific settlement consideration to specific claims – and indeed often disagree regarding the value of each settled claim. The parties instead routinely negotiate a "global" settlement of all related claims without assigning specific settlement values. That is precisely the situation here.

The Washington Mutual case, cited by the Noteholders in support of their effort to slice and dice the settlement, in fact fully supports the assessment of a settlement of *related* claims – like the settlement embodied in the DCL Plan – as a whole. In Washington Mutual, when faced with a package of several settlements of wholly-*unrelated* claims bundled together as a "global" compromise, Judge Walrath divided the settlement into eleven smaller sub-settlements, each of which resolved a group of *related* claims against a particular defendant group. In re Washington Mut., Inc., 442 B.R. 314, 329-44 (Bankr. D. Del. 2011)[95] Notably, Judge Walrath evaluated all fraudulent transfer claims against one group of creditors in the *same* sub-settlement group, without requiring that each alleged claim be assigned a specific settlement value. Id. at 342. The Noteholders' attempt to deconstruct the DCL Plan – which resolves highly-related avoidance claims – would assign weight and value to "settlements" that in fact were never agreed to and

---

[95] The eleven sub-settlements were: (a) deposit accounts, (b) tax refunds, (c) trust preferred securities, (d) intellectual property rights, (e) employee benefit plans, (f) VISA shares, (g) vendor claims, (h) goodwill litigation, (i) *fraudulent transfers and preference claims*, (j) business tort claims and (k) miscellaneous claims.

would not be agreed to in the absence of a comprehensive resolution. <u>Washington Mutual</u> simply does not support this effort.

The Noteholders first set up a false construct by comparing the settlement consideration offered under the September Settlement, which settled only avoidance claims relating to the Step One Loans, to the settlement embodied in the DCL Plan, which resolves avoidance actions in respect of all Senior Loan Claims. The Noteholders assert that the incremental consideration represents the settlement amount for the avoidance claims with respect to the Step Two Claims, which they contend were settled too cheaply.[96] Apart from the inappropriateness of comparing the September Settlement (which was not supported by the Committee or JPMorgan) to the DCL Plan (which is supported by the Committee and JPMorgan), the Noteholders' comparison of the two settlements does not withstand scrutiny. Although the September Settlement did leave Step Two Claims "disputed," the preserved avoidance claim was of little value to Non-LBO Creditors because, given the size of the Step One Claims to be allowed, all of the Debtors' DEV (other than a reserve of approximately $77.7 million for the Bridge Loan Claims) was to be distributed. With no reserve established for the avoidance of Step Two Claims, there would have been little to no net benefit to the estates accruing from avoidance of the Step Two Claims.[97] This was consistent with the Examiner's conclusion that the benefit to Non-LBO Creditors from avoidance of Step Two Claims was only an additional $45 to $53 million.[98] Given the low value to the estate of the additional claims settled under the DCL Plan, the DCL Plan provides a more than ample increased guaranteed recovery for Senior Noteholders and other Non-LBO Creditors, as well as

---

[96] Noteholder Obj. ¶¶ 86-87, 314.

[97] DCL Ex. 383.

[98] Examiner Report, Vol. 2, Annex B at B-10, B-13, B-18, B-21; <u>see also</u> n.60, <u>supra</u>.

substantially improving the potential upside for those creditors through enhanced participation rights in the Litigation Trust recoveries.

The Noteholders next complain that the DCL Plan provides for a "free" release of claims against former Senior Lenders for disgorgement payments made on account of Step One Loans (the "Step One Disgorgement Claims").[99]  In fact, however, resolution of the Step One Disgorgement Claims is an important part of the DCL Plan settlement as a whole, without which the Senior Lenders would not have agreed to provide more than $400 million in settlement consideration.[100]  As an initial matter, many current holders of Senior Loan Claims are the same parties that received prepetition payments of principal and interest on the Step One Loans and, understandably, were not willing to make significant payments to settle allowance of their Step One Claims only to face the risk of being forced to disgorge payments made on those very same allowed claims.  Settlement of disgorgement claims goes hand-in-hand with settlement of allowance claims, and the settlement consideration provided under the DCL Plan takes this into account.

In addition to the overlap between the two potential defendant groups, a failure to resolve the Step One Disgorgement Claims would have created unacceptable risks for all current Senior Lenders, even those with no exposure to disgorgement of prepetition payments.  Specifically, in the event that the Step One Disgorgement Claims were not resolved, Step One payment recipients sued for disgorgement would attempt to recoup their losses by asserting indemnity claims (based upon trading documents) against parties to whom they sold their debt, and would assert the right to share in distributions from the estates on account of claims for the amounts disgorged, both leading to dilution in recoveries by existing Senior Lenders.

---

[99] Noteholder Obj. ¶ 327.

[100] See Tr. 3/9 at 38:20-39:4 (Kulnis).

Thus, because avoidance and disgorgement claims cannot be neatly parceled out, it was

critical that *all* claims respecting the Senior Loans be resolved through the DCL Plan settlement.

Like any settling party, the Senior Lenders understandably were not willing to make significant

settlement concessions to settle one set of claims while still remaining exposed to material risks

due to the failure to resolve other integrally-related claims.[101] Ultimately, the Debtors and the

Committee agreed to the overall settlement with the Senior Lenders because they concluded that

the aggregate settlement consideration provided by current holders of Senior Loan Claims and

the Step Two Arrangers was sufficient to resolve all claims against current and former Senior

Lenders. Because the settlement was not negotiated on a claim-by-claim basis, it cannot fairly

be evaluated on a claim-by-claim basis – it must stand or fall as a whole.

**B.** **The Examiner Report Was Not A "Game Changer" In Favor Of Non-LBO Creditors.**

The Noteholders next attack the DCL Plan by claiming that it is inconsistent with the

Examiner Report. Specifically, in an effort to escape the implications of Centerbridge's

wholehearted endorsement of the April Plan settlement (not to mention Aurelius's own prior

determination not to object to that settlement[102]), Dan Gropper of Aurelius testified that the

---

[101] The Noteholders may point to the $120 million settlement payment backstopped by the Step Two Arrangers as evidence that disgorgement claims can and should be settled separately, but this demonstrates nothing. The claims for disgorgement of payments in respect the Step Two Loans were different than the Step One Disgorgement Claims. Most critically, for all the reasons set forth by the Examiner, the risk profile of avoidance/disgorgement actions for Step One Loans is vastly different than for Step Two Loans, making the Step One Disgorgement Claims significantly less valuable. Moreover, the bulk of payments that are the subject of the $120 million backstopped payment in respect of Step Two Loans were received by a narrow, defined group – the Step Two Arrangers: JPMorgan, Bank of America, Merrill Lynch, and Citigroup. Those parties were substantially involved in the case, "at the table," and prepared to negotiate a contribution of settlement value to achieve a broad consensual resolution of all claims related to the Senior Loans, critically agreeing to "backstop" the settlement for the non-arranger defendants, and ensuring that the full $120 million in settlement consideration would be received by the estates.

[102] See Tr. 3/7 at 66:22-67:11.

Examiner Report was "a complete game changer in these Chapter 11 cases" – one that, in his view, should have driven up the settlement consideration available to Senior Noteholders.[103]

Of all interested parties, however, only Aurelius, seeking to boost the value of its mid-bankruptcy investment, professes the view that the Examiner Report radically altered the framework for analyzing the LBO-Related Causes of Action and assessing potential settlements. In fact, Aurelius's current view not only is inconsistent with the evidence in multiple ways, but is also at odds with Aurelius's own prior, less litigation-driven, perspective.

*First*, it is illuminating that, in the wake of the issuance of the Examiner Report, Centerbridge (then the largest Senior Noteholder) "wanted the [April Plan settlement] to go forward," modified only by a provision for a litigation trust containing claims arising out of Step Two against parties other than the Senior Lenders (the very same claims against shareholders, directors, officers, and advisors now preserved by the DCL Plan settlement).[104] And, after the issuance of the Examiner Report, Aurelius did not "take any steps that caused [the April Plan settlement] to come apart."[105]

*Second*, contrary to the Noteholders' contention that the Examiner Report rendered the April Plan settlement woefully deficient and therefore led to its sudden abandonment, it was certain of the Senior Lenders – *not Centerbridge* – that withdrew from the settlement. JPMorgan's Miriam Kulnis testified that many Senior Lenders, including JPMorgan, "viewed [the Examiner's] findings with respect to Step One as sort of a vindication that Step One was good and, therefore, the [April] settlement was too high," and the Debtors and other supporters

---

[103] Tr. 3/15 at 232:18-233:22 (Gropper).

[104] Tr. 3/9 at 24:24-26:14 (Kulnis).

[105] Tr. 3/15 at 242:23-25 (Gropper).

-33-

of the April Plan were concerned that the Senior Lender class would not vote to accept the April Plan unless it was modified to reduce the settlement cost.[106]

**_Third_**, Aurelius itself appears to have believed that the Examiner's conclusions would reduce, rather than increase, the expected recovery for Senior Noteholders. As Aurelius's analyst, Dennis Prieto, conceded "not every finding that the Examiner made was helpful to the pre-LBO creditors" and, indeed, "numerous of the findings . . . are mixed or even unhelpful."[107] Certain of Aurelius's probability scenarios, which were modeled prior to release of the Examiner Report, were revised by Prieto as of August 2, 2010 (the "<u>August 2 Model</u>"), at least in part to reflect the conclusions in the Examiner Report.[108] After those revisions, the August 2 Model reflected a **_decrease_** in the Senior Noteholders' expected recovery in the "mid avoidance case" of the "mid valuation scenario" – which Prieto described as his "best estimate of [the] outcome" – from $640 million to $581 million.[109]

**_Fourth_**, while the Examiner Report placed a high probability on the likelihood that the Step Two Loans could be avoided, it also recognized that a complete Step Two victory would result in only small incremental gains for Non-LBO Creditors, particularly if the Senior Lenders

---

[106] Tr. 3/9 at 23:25-24:5, 24:18-20 (Kulnis); Tr. 3/8 at 55:6-13 (Kurtz). Oaktree never supported the April Plan because, even before the Examiner Report was issued, Oaktree viewed the amount of consideration provided to the Noteholders by the Senior Lenders as excessive. Liang Dep. at 221:11-23; Baiera Dep. at 41:9-16.

[107] Prieto Dep. at 126:12-14, 128:10-129:15; DCL Ex. 987 (July 30, 2010 e-mail from Prieto to Gropper).

[108] Prieto Dep. at 115:11-116:4, 117:7-9, 125:8-16, 127:14-24.

[109] Prieto Dep. at 106:5-12, 106:24-107:8, 123:8-19, 124:17-125:6; DCL Ex. 449 (e-mail from Prieto to Mark Brodsky concerning February 3 Model), DCL Ex. 1409 at AUR0001700 (February 3, 2010 Model), DCL Ex. 1422 at AUR009427 (August 2 Model). Among other revisions, the "mid avoidance case" in the August 2 Model reflects the lowering of the expected likelihood that both Step One and Step Two would be avoided from 36.5% to 25%, and the lowering of the expected likelihood that Step One and Step Two would be collapsed from 70% to 50%. See Prieto Dep. at 118:5-121:2; DCL Exs. 1409 at AUR0001702, DCL Ex. 1422 at AUR009424.

Indeed, Aurelius's contemporaneous assessment of the implications of the Examiner Report was corroborated by a concurrent analysis of an independent investment research firm, Credit Sights (the "<u>Credit Sights Analysis</u>"), which was circulated internally at Aurelius in August 2010. DCL Ex. 435 (e-mail from Matthew Zloto to Mark Brodsky attaching Credit Sights Analysis), DCL Ex. 1323 (Credit Sights Analysis, dated August 18, 2010). The Credit Sights Analysis estimated that, taking into account the Examiner Report, the Senior Noteholders' expected recovery would be only 32.7% (lower than under the April Plan), explaining, among other things, that "[f]or the senior note holders the problem is that the Examiner held out little hope that the first Step would be counted as a fraudulent transfer." DCL Ex. 1323 at AUR0073623-24.

were not equitably estopped or otherwise barred from sharing in Step Two disgorgement recoveries,[110] and that even this highly unusual estoppel remedy would yield recoveries far less than the settlement consideration provided under the April Plan (and the DCL Plan). The Senior Lenders knew this and their negotiations reflected that assessment.

In sum, the Noteholders' current black-and-white settlement narrative and reading of the Examiner Report is pure fiction. All other interested parties recognized that the Examiner Report is subject to varied interpretations and created risks and uncertainties for all parties, and therefore negotiated accordingly. The DCL Plan provides a reasonable compromise between the possible litigation extremes.

## C.    There Are Substantial Hurdles To Prevailing On A Claim For Full Avoidance.

As noted above, the Noteholders' primary attacks on the DCL Plan are premised on the assertion that the claims of the Senior Loan are avoidable in full – the only litigation outcome that produces a result better than the DCL Plan. Accordingly, much of the evidence at the confirmation hearing focused on the key drivers that impact the prospects of success on the full avoidance claim. As shown below, and as confirmed both by the Examiner and by Black, the evidence regarding each of those sub-issues plainly supports the conclusion that the DCL Plan settlement more than fairly accounts for the probability of success on the full avoidance claim (total victory).

### 1.    Challenges To Collapse

First, full avoidance requires that the Court collapse the Step One recapitalization transactions that occurred in June 2007 with the Step Two ESOP merger transactions that occurred in December 2007, such that all of the Step Two debt (which had not yet been incurred)

---

[110] Examiner Report, Vol. 2 at 226; Examiner Report, Vol. 2, Annex B at B-10, B-13, B-18, B-21; see also n.60, supra.

is considered as an actual liability of the Debtors at the time of Step One. Without collapse (*i.e.*, considering the Step One Claims alone), there is ***no evidence*** on which a court could reasonably conclude that the Tribune parent and the Guarantor Debtors were insolvent as of Step One. Indeed, the Examiner concluded that it was "highly unlikely" (the Examiner's lowest probability) that the Debtors would be found to have been balance sheet insolvent at the time of the Step One Transactions without collapse.[111] Likewise, Professor Daniel Fischel testified that, considering Step One alone, Tribune had equity value (solvency) in excess of \$3.7 billion.[112] Critically, even the Noteholders' expert, Tuliano, simply assumed collapse and conceded that he would have found Tribune to be solvent as of Step One considering the Step One obligations on a standalone basis.[113]

With respect to the issue of collapse, the Examiner concluded that "[a]lthough the question is close . . . a court is somewhat unlikely to include the Step Two Debt for purposes of determining solvency at Step One,"[114] and that "a court would be somewhat unlikely to conclude that the prerequisites established under the applicable law for collapse of Step One and Step Two are met here."[115] In so opining, the Examiner pointed to evidence showing "that participants in the Leveraged ESOP Transactions not only contemplated the possibility that Step Two might not happen, they structured the documents so that Step One could stand alone if necessary."[116] The Examiner also identified the "time lag" between the Step One and Step Two Transactions[117] as

---

[111] Examiner Report, Vol. 1 at 16-18.

[112] Tr. 3/10 at 106:4-107:10 (Fischel).

[113] Tr. 3/18 at 109:20-110:22, 143:11-14 (Tuliano).

[114] Examiner Report, Vol. 2 at 160.

[115] Examiner Report, Vol. 2 at 181.

[116] Examiner Report, Vol. 2 at 173-77.

[117] Time lag is significant because "the balance sheet test looks to the debtor's solvency (or insolvency) at a moment in time, as opposed to the debtor's solvency (or insolvency) at a point in the future." Examiner Report, Vol. 2 at 130 n.391 (citing Boyer v. Crown Stock Distrib., Inc., 587 F.3d 787, 794 (7th Cir. 2009)).

well as the separate and independent conditions to the consummation of the Step Two

Transactions, including FCC approval, Major League Baseball approval, and receipt of a

solvency opinion and solvency certificate, as creating genuine uncertainty about whether Step

Two would happen.[118] The Examiner further cited "the relatively modest $25 million break-up

fee" as an additional factor militating against collapsing the transactions.[119] Finally, the

Examiner highlighted market evidence supporting the conclusion that the transactions were

separate, including "the fact that the Tribune Common Stock traded at a discount to the Merger

price in the months following Step One," indicating uncertainty about whether the Step Two

Transactions would close.[120] Based on these facts, the Examiner concluded that, in order to

collapse the Step One and Step Two Transactions for solvency purposes, "[*a*] *court would not

just have to expand on the existing law" but that doing so "would entail disregarding . . . , in a

very tangible way, substantive aspects of the Leveraged ESOP transactions.*"[121]

    In their opening statement, the Noteholders promised that they would establish that they

have "a very high chance of winning" the collapse question.[122]  The Noteholders, however, failed

to introduce evidence to back up that promise, offering only the testimony of Tuliano.  But

Tuliano did not dispute that the evidence establishes that Step Two was not a foregone

conclusion, nor did he take issue with the fact that Step One could stand on its own.[123]  In fact,

Tuliano conceded that there was considerable risk that Step Two in fact would not close,[124] that

the drop in Tribune's share price during the summer of 2007 was consistent with the fact that the

---

[118] Examiner Report, Vol. 2 at 173-77.

[119] Examiner Report, Vol. 2 at 180.

[120] Examiner Report, Vol. 2 at 177, 179-80.

[121] Examiner Report, Vol. 2 at 181-82 (emphases added).

[122] Tr. 3/7 at 55:21-56:7 (Noteholders' opening statement).

[123] Tr. 3/18 at 113:17-123:17 (Tuliano)

[124] Tr. 3/18 at 144:6-146:2 (Tuliano).

market was uncertain as to whether those transactions would occur,[125] that the participants in the Step One Transactions never assumed that the Step Two Transactions would close,[126] and that Tribune's public filings disclosed that the Step Two Transactions might not close.[127]

Nevertheless, Tuliano insisted that it was necessary to collapse Step Two (consummated six months after Step One) into Step One based solely on the fact that the parties intended and desired to complete both transactions.[128] That fact standing alone, however, is clearly not sufficient to collapse two separate transactions. See Mervyn's Holdings, LLC v. Lubert Adler Group IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 497 (Bankr. D. Del. 2010) (no collapse where first transaction was not "dependent on or conditioned on other transactions"). Indeed, there is significant evidence beyond that cited by the Examiner supporting the conclusion that Step One and Step Two were separate transactions and as such should not be collapsed. For example, Professor Black, who judged the likelihood of collapse as remote,[129] noted that Tribune had planned a major cash distribution to shareholders of $17.50 per share before Zell made his proposal, and that it insisted on a tender offer up front (Step One) so that, whether or not the merger (Step Two) happened, that value would have been distributed to shareholders.[130] See Mervyn's, 426 B.R. at 497 (no collapse where first transaction "would have occurred on its own"). Fischel likewise opined that Step One and Step Two should not be collapsed, citing the

---

[125] Tr. 3/18 at 149:2-150:5 (Tuliano).

[126] Tr. 3/18 at 114:10-115:20 (Tuliano).

[127] Tr. 3/18 at 117:14-25 (Tuliano). Tellingly, Tuliano did not know that Tribune was under no obligation to obtain the Step Two Loans, and did not know that EGI-TRB was provided a mechanism to sell its Tribune shares if the Step Two Transactions did not occur. Id. at 117:7-13, 116:22-117:3.

[128] Tr. 3/18 at 54:20-55:16; 121:24-125:19 (Tuliano).

[129] Tr. 3/9 at 153:18-24 (Black).

[130] Tr. 3/9 at 141:8-20 (Black).

"overwhelming" market evidence, and specifically the stock price data, reflecting the market's belief that there was substantial doubt as to whether Step Two would occur.[131]

### 2. Challenges To Proving Insolvency At Step One Even Assuming Collapse

The evidence further makes clear that prevailing on the issue of collapse alone would not establish insolvency at Step One. Even assuming collapse, taking all of the anticipated Step Two Loans into account, there is a substantial question as to whether the Tribune parent and the Guarantor Debtors were insolvent at Step One.

In examining solvency at Step One in the collapse scenario that includes the Step Two Debt, the Examiner concluded that, under the balance sheet test, it would be "somewhat unlikely (but, to emphasize, a very close call)" that a court would conclude that Tribune was rendered insolvent, but then observed that it was "more likely" that the Guarantor Debtors would be solvent even in a collapse scenario due to the fact that the Guarantor Debtors had more than $2 billion less debt than did Tribune itself.[132]

Importantly, the Examiner reached these conclusions despite the fact that, as explained above, the Examiner mistakenly assumed that $603 million in value attributed to the Chicago Cubs and 50% of Tribune's interest in Classified Ventures were not assets of the Guarantor Debtors.[133] Had the Examiner included that value in his assessment, he undoubtedly would have reached an even more forceful conclusion of Guarantor Debtor solvency. This is a critical weakness in the Noteholders' case for insolvency, because an inability to avoid the guarantees issued by the Guarantor Debtors would prevent the vast bulk of the Debtors' value from flowing to the Tribune parent and being made available to the Tribune parent's creditors.

---

[131] Tr. 3/10 at 219:20-23 (Fischel).

[132] Examiner Report, Vol. 2 at 206-07.

[133] Examiner Report, Vol. 2 at 209.

In addition, the Examiner did not give any credit in his assessment of balance sheet capital to two different forms of tax value that are special to ESOP-owned S Corporations (which Tribune became upon closing of Step Two) – the value of the ability to monetize assets without material tax liabilities and the value of virtually tax-free receipt of operating income.[134] When these sources of value are taken into account, balance sheet solvency at Step One, even assuming collapse, is not a close question.[135]

Regarding cash flow and capital adequacy in the collapse scenario, the Examiner found it "reasonably likely" that a court would conclude that Tribune met those tests at the time of the Step One Transactions and even more likely that the Guarantor Debtors did so.[136] In reaching these conclusions, the Examiner found that management's February 2007 projections were reasonable and that there was no reason to revise those projections based on declines in performance in April and May.[137] While Tuliano took issue with these conclusions, as detailed in Section III.F, below, his analysis is riddled with errors. In fact, Black and Fischel testified that in order to make a determination of insolvency at Step One, a court would either have to ignore the wealth of market evidence indicating to the contrary or conclude that the markets, the lenders, and Zell had all greatly misjudged Tribune's solvency.[138]

---

[134] See DCL Ex. 1484 at 56-73. As Black pointed out, the Examiner appears to have misunderstood these two sources of value. With respect to asset disposition tax value, the Examiner concluded that the S-ESOP structure "would not affect the price paid by a willing buyer for [Tribune's] assets." Examiner Report, Vol. 2 at 27-28, n.87. However, Tribune was able, effectively, to take a write up of the tax basis of its assets to market value without paying tax, which in turn allowed it to dispose of those assets at a higher tax basis. A counterparty could then take higher depreciation deductions, which is something for which that counterparty would be willing to pay. Tr. 3/10 at 19:11-22 (Black). In Black's view, if the Examiner had properly understood this, he likely would have counted this value in his balance sheet test. DCL Ex. 1484 at 66; Tr. 3/10 at 153:1-8 (Black). Similarly, the Examiner gave no weight to the value of not paying federal income tax because he again did not seem to understand the argument. Tr. 3/9 at 153:1-10 (Black).

[135] DCL Ex. 1106 at ¶ 66, Ex. O.

[136] Examiner Report, Vol. 2 at 211, 219-20.

[137] Examiner Report, Vol. 2 at 212-13.

[138] Tr. 3/9 at 142:18-144:5 (Black); Tr. 3/10 at 91:11-94:2, 95:14-96:23 (Fischel).

### 3. Challenges To Proving Intentional Fraudulent Transfer And Equitable Subordination

The Noteholders hold out intentional fraudulent transfer or equitable subordination of the Senior Loan and Bridge Loan Claims as alternative paths to full avoidance. In reality, however, these claims add little to the overall possibility of success.

The Examiner "did not find credible evidence that the Tribune Entities entered into the Step One Transactions to hinder, delay, or defraud creditors."[139] As such, the Examiner concluded that "a court is reasonably likely to conclude that the Step One Transactions did *not* constitute an intentional fraudulent transfer."[140] This is not surprising. As Black explained, it is simply not plausible that a court would determine that Tribune was solvent at Step One and then turn around and determine that Tribune had actual intent to hinder, delay, or defraud creditors by consummating the Step One Transactions.[141] The Noteholders do not seriously dispute this – all of the arguments in the Noteholders' pretrial briefing with respect to alleged intentional fraudulent transfers merely rehashed their insolvency claims.[142]

The Examiner also concluded that there was not "sufficient evidence to support a finding that the Lead Banks engaged in the kind of egregious behavior that would justify equitable subordination or equitable disallowance," and that it therefore was "somewhat unlikely" a court would impose such a remedy.[143] Much like a intentional fraudulent transfer, a finding that the Senior Lenders engaged in misconduct such that their claims could be equitably subordinated is implausible if a court does not first find that Tribune was rendered insolvent by the Transactions. The Noteholders, relying on the same documents that the Examiner found insufficient to support

---

[139] Examiner Report, Vol. 1 at 7; Examiner Report, Vol. 2 at 26, 28.

[140] Examiner Report, Vol. 1 at 7 (emphasis added).

[141] Tr. 3/9 at 127:10-14 (Black); Tr. 4/12 at 143:17-144:1 (Black).

[142] Noteholder Obj. ¶¶ 141-145.

[143] Examiner Report, Vol. 2 at 332, 336.

a claim for equitable subordination, attempt to recast them to show that the Lead Banks knew the transactions would render Tribune insolvent.[144] However, the Noteholders offer no basis to believe that a court that had already determined that the transactions did ***not*** render Tribune insolvent would nevertheless reject the Examiner's interpretation of those emails and conclude that the allowed Senior Loan and Bridge Loan Claims somehow should be equitably subordinated or otherwise disallowed.

The weakness of the Noteholders' arguments of lender "misconduct" is further evidenced by the fact that they focus primarily on the Senior Lenders' efforts to obtain structural seniority through subsidiary guarantees.[145] This transaction structure, which was permitted by the terms of all of Tribune's preexisting non-LBO debt, does not itself support equitable subordination. Indeed, the Noteholders have not made any allegations that the Senior Loan Agreement violated any terms of Tribune's existing debt instruments, and the Examiner and numerous courts have made it clear that it is not inappropriate for a prospective lender to attempt to structure a loan in a way that maximizes the prospect of repayment.[146]

### 4. Potential Defenses Exist To The "Full Avoidance" Claims.

Finally, in assessing the probability of prevailing on a claim for full avoidance or any of the Noteholders' alleged "paths to success" (discussed in Section III.D, below), the Senior Lenders' potential defenses must be taken into account. In this connection, the Examiner noted

---

[144] See Examiner Report, Vol. 1 at 263-65, 624-26; Vol. 2 at 333-38.

[145] Specifically, the Noteholders claim that it was inappropriate for the lenders to seek guarantees of entities that held the vast majority of Tribune's assets, to the detriment of the preexisting Non-LBO Creditors.

[146] See Examiner Report, Vol. 2 at 333 ("[T]here was nothing per se improper with exploiting an opportunity presented by the Tribune entities' capital structure and the absence of contractual prohibitions against the incurrence of debt at the Guarantor Subsidiary levels."); see also In re Owens Corning, 419 F.3d 195, 212-23 (3d Cir. 2005) ("To begin, the Banks did the 'deal world' equivalent of 'Lending 101.' They loaned $2 billion to OCD [the parent] and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt. What the Banks got in lending lingo was 'structural seniority' – a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors of OCD did not have. This kind of lending occurs every business day. ***To undo this bargain is a demanding task***.") (emphasis added).

that the Senior Lenders would argue that the extension of the loans themselves in good faith constituted consideration or value given to the Debtors in exchange for the incurrence of the loan obligations, rendering any constructive fraudulent transfer claim impossible.[147] The Examiner further observed that the Senior Lenders would contend that the recently amended section 546(e) of the Bankruptcy Code presents a complete bar to recovery and that, even if the Senior Loan claims could be avoided at both the parent and the guarantor level, avoidance of the guarantees issued by the Guarantor Debtors would be limited to the extent necessary to satisfy the claims of the existing creditors of those entities, with all remaining value going to satisfy the guarantees.[148]

It is undisputed that if the Senior Lenders were to prevail on any one of these defenses, the avoidance claims would have little or no value. Consequently, the fact that the Examiner recognized some possibility that the Senior Lenders would prevail on each of these defenses[149] is significant in that it adds a further obstacle to a litigant succeeding in achieving full avoidance.

### D. Each of the Noteholders' Other Putative "Paths to Success" Faces Substantial Hurdles.

Tacitly conceding the substantial difficulties in prevailing on a claim for full avoidance, the Noteholders posit three other "paths" to full recovery for Tribune's Non-LBO Creditors.[150] Each of these other supposed "paths to success," however, faces significant legal and factual hurdles. Moreover, as shown below, even if the Noteholders were to prevail on their alternative theories, they likely still would not achieve full recovery.

---

[147] Examiner Report Vol. 2 at 86; see also, e.g., Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.), 388 B.R. 46, 49 (D. Del. 2008), aff'd on other grounds, 590 F.3d 252 (3d Cir. 2009) (affirming dismissal of fraudulent conveyance action, in part because "courts in [the Third] Circuit have typically required proof of bad faith or intent to defraud to justify collapsing otherwise independent transactions"); Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 55 (2d Cir. 2005) (collapsing has no applicability where loan is made in good faith).

[148] Examiner Report, Vol. 1 at 20-21; Vol. 2 at 241-55.

[149] Examiner Report, Vol. 1 at 89, 241, 253-54 (concluding that the latter two defenses were "reasonably unlikely" to succeed and that it was "highly likely" a court would view the loans and the distributions to the shareholders as one transaction).

[150] Tr. 3/7 at 55:16-64:1 (Noteholders' opening statement).

### 1. Challenges To Proving Tribune Insolvency At Step One While Eliminating All Step One "Protected Debt"

The Noteholders first suggest that if the Step One Claims against Tribune (but not the subsidiaries) are avoided as constructively fraudulent, the Tribune estate would be able to recover almost $1.9 billion in prepetition principal, interest, and fee payments made in respect of the Step One Loans and an additional $318 million of such payments made in respect of the Step Two Loans.[151] The Noteholders reason that, if a court found that *none* of the Step One Claims against the Tribune parent were preserved (*i.e.*, that all such Step One obligations were avoided in their entirety), the Tribune parent would have roughly $2.9 billion in value – enough to pay the Non-LBO Creditors in full.[152]

Prevailing on this theory, however, would require a determination in the Noteholders' favor on three issues: (1) that the Tribune parent was insolvent at Step One; (2) that none of the Step One Loans would be preserved on account of reasonably equivalent value provided to the Debtors; and (3) that the Guarantor Debtors' claims against the Tribune parent pursuant to the Intercompany Claim Settlement would not be honored. As noted above, substantial hurdles exist to establishing that the Tribune parent was insolvent at Step One. But even if those hurdles were to be overcome, the Noteholders face challenging hurdles in prevailing on the remaining two issues.

With respect to the issue of protected debt at Step One, the Examiner concluded that it was "highly likely" that Step One Loans used to repay $2.5 billion in preexisting Tribune debt provided reasonably equivalent value to Tribune and "reasonably likely" that $300 million in Step One Loans used for working capital and purposes other than payments to shareholders

---

[151] Tr. 3/7 at 57:22-58:8 (Noteholders' opening statement).

[152] Id.; see also Tr. 3/9 at 171:11-18 (Black).

-44-

similarly provided reasonably equivalent value.[153] The Examiner also found it "reasonably likely" that the Lenders acted in good faith in connection with the Step One Transactions as a general matter, and specifically that there was "no reasonable basis" for a finding of bad faith with respect to the $2.5 billion funds used to repay prior debt.[154] Accordingly, it is very likely that, even if some of the Step One Loans were subject to avoidance, at least $2.8 billion in Step One Claims would be preserved and allowed.[155] In that event, a very high percentage of the third-party distributable value of the Tribune parent would be payable to the Senior Lenders on account of that preserved Step One Claim, even if it were to be determined that Tribune was rendered insolvent by the Step One Loans. The Noteholders made no serious attempt to dispute the Examiner's conclusions in this regard.

Overcoming the second hurdle, *i.e.,* the existence of $6.9 billion in Guarantor Debtor claims against the Tribune parent pursuant to the Intercompany Claim Settlement, would be even more daunting. In order for the Noteholders to prevail on this theory, a court would have to ignore Tribune's intercompany liabilities. The Noteholders, however, did not present any evidence or support for such a result. Rather, the Noteholders embraced the Intercompany Claim Settlement, establishing those claims for purposes of confirmation of their own plan.[156] The Noteholders cannot have it both ways. If the Intercompany Claim Settlement is operative, as all parties have agreed, then its provisions must be enforced, meaning that a substantial portion of Tribune's value would be distributed to the Guarantor Debtors (and then to the Senior Lenders) even if (as the Noteholders posit) Tribune was found to be insolvent, all Step One Claims against

---

[153] Examiner Report, Vol. 2 at 92-93, 97.

[154] Examiner Report, Vol. 2 at 264-88. Although the Examiner did not directly address in this context the $300 million in Step One Loans used for working capital and purposes other than payments to shareholders, no party has suggested or put forward evidence of bad faith with respect to those advances.

[155] Examiner Report Annex B at B-22; see also DCL Ex. 1484 at 74-75.

[156] Tr. 3/14 at 17:20-23 (Golden).

Tribune were avoided, and Tribune was able to recover $2+ billion in prepetition payments on the Senior Loans.

The Noteholders' failure to show how they could overcome these two obstacles completely undermines the credibility of their assertion that this pathway might lead to full payment of their claims. Indeed, in modeling Step One avoidance of the Senior Lenders' claims at Tribune, both the Examiner and Professor Black assumed that there would be protected debt and that the Guarantor Debtors' claims against Tribune would be enforced. For his part, the Examiner estimated in Case 5 that Senior Noteholder recoveries would range between $246.8 and $288.5 million depending on the amount of the Guarantor Debtors' claims against Tribune.[157] Black, who assumed for purposes of his analysis the amounts specified in the Intercompany Claim Settlement, concluded that Senior Noteholder recoveries in this scenario would be $286 million excluding third-party recoveries.[158] In both instances, the projected recoveries are well below the amount provided under the DCL Plan settlement.

## 2. The "WEAR" Theory Has No Basis in Law.

A second alleged alternative path to full recovery contemplates that, even if only Step Two were avoided, Senior Lenders would not be permitted to recover the full entitlement of their allowed Step One Claims; instead, any recoveries that would have been allocated to the Step Two Lenders would be turned over to Non-LBO Creditors.[159] Aurelius has coined this the "WEAR" theory, as an acronym for "waiver, estoppel, assumption of risk,"[160] and has seized on ambiguous passages in the Examiner Report in a attempt to build credibility for its unsupported and unprecedented theory. In reality, however, the Noteholders offered no real legal or factual

---

[157] See Examiner Report, Vol. 2, Annex B at B-26-B-29.

[158] Tr. 3/9 at 113:9; 172:14-23 (Black); DCL Ex. 1484 at 23.

[159] Tr. 3/7 at 58:19-59:18 (Noteholders' opening statement).

[160] Tr. 3/15 at 234:4-9 (Gropper).

support for the WEAR theory and it thus does not call into question the reasonableness of the DCL Plan settlement. WEAR as advocated by the Noteholders is simply an invention of their own making that goes well beyond any remedy that has ever been applied by a court and well beyond any argument considered credible by the Examiner.

The Examiner considered the ability of Senior Lenders to receive a *pro rata* share of ***disgorgement recoveries*** in respect of prepetition payments on avoided Step Two Loans[161] and concluded that "[a]bsent a basis to equitably subordinate the Step One Debt consistent with the standard governing equitable subordination . . . it is difficult to find a doctrinal basis that would support barring the debt from participating in avoidance recoveries."[162] The Examiner considered whether the doctrine of equitable estoppel might apply to preclude Senior Lenders from sharing in such disgorgement recoveries and concluded that the doctrine was "at best an imperfect fit" because it requires some form of representation from the party against whom estoppel is sought, and "the LBO Lenders did not make any representations to the Non-LBO creditors."[163] However, because the Examiner found that "the law is not clear" on this point, he left the question in "equipoise" (in the sense that the Examiner was not willing to predict how a court might rule on the question, and ***not***, as the Noteholders have misleadingly asserted, because the Examiner viewed the theory as having a 50% chance of success).[164]

In contrast, the Examiner was unequivocal in his rejection of a more aggressive form of the WEAR theory, which would go beyond disgorgement recoveries to attempt to bar Senior Lenders from receiving distributions from the estates upon avoidance of the Step Two Loans on account of their allowed Step One Claims in accordance with their nonbankruptcy priorities.

---

[161] Examiner Report, Vo. 2 at 298.

[162] Examiner Report, Vol. 2 at 301-02.

[163] Examiner Report, Vol. 2 at 302-03.

[164] Examiner Report, Vol. 2 at 302-03.

The Examiner initially noted that it was "reasonably likely that if the Step Two Debt, but not

Step One Debt, is avoided, absent an otherwise applicable basis to subordinate or disallow the

Step One Debt or assert rights of unjust enrichment, the Step One Debt would participate in

distributions from the estates in accordance with applicable nonbankruptcy priorities."[165]  A few

pages later, the Examiner reached an even more unequivocal conclusion:

> A straightforward application of the relevant Bankruptcy Code
> provisions makes it ***abundantly clear*** that barring equitable
> subordination, disallowance, or principles of unjust enrichment, if
> the Step Two Debt but not the Step One Debt is [avoided], ***the Step
> One Debt would be entitled to participate in distributions from
> the estates in accordance with their nonbankruptcy priorities***.[166]

The Noteholders have not come forward with any legal authority or facts not considered

by the Examiner that would support the WEAR theory or lead to a different conclusion.[167]

Moreover, even applying one or both of these two forms of WEAR would not increase

recoveries at the Tribune parent level for the Non-LBO Creditors substantially.  As Black

explained, subordinating allowed Senior Loan Claims at the Tribune parent level pursuant to the

WEAR theory does not materially change recoveries to the Senior Noteholders due to the

relatively low value of the Tribune parent company.  For example, a total win on the WEAR

theory would result in recoveries to the Senior Noteholders just slightly above Black's Scenario

D (Full Avoidance at Tribune; No Avoidance at Subsidiaries), or about $500 million – once

---

[165] Examiner Report, Vol. 2 at 298.

[166] Examiner Report, Vol. 2 at 301 (emphasis added).

[167] Indeed, applicable case law suggests that, absent grounds for equitable subordination, a court would not have the power to fashion this sort of remedy, which involves subordinating some creditors at the Tribune parent level in favor of other Tribune parent-level creditors.  See First Trust and Deposit Co. v. Receiver of Salt Springs Nat'l Bank (In re Onondaga Litholite Co.), 218 F.2d 671, 673-74 (2d Cir. 1955) (finding that the bankruptcy court was without power to subordinate a creditor's claim on the basis that such creditor was the recipient of an intentional fraudulent transfer where such creditor had surrendered the fraudulently-transferred assets).

again, less than the DCL Plan's estimated Senior Noteholder recoveries of $659 million (including $300 million in assumed net third-party recoveries).[168]

Recognizing this, the Noteholders invented yet another doctrine to support their WEAR argument, which directly contravenes well-established Third Circuit law respecting entity separateness, as well as section 510(c) of the Bankruptcy Code. The Noteholders contend that if the Step Two Claims are avoided, "all of the Step Two Debt should be set aside," the "value liberated by the avoidance of Step Two should be *upstreamed* to Tribune for distribution to Tribune's Non-LBO Creditors," and the Senior Lenders should be precluded from sharing in such value despite allowance of their Step One Claims.[169] In substance, the Noteholders assert that the Court should apply equitable principles to distribute the value of Guarantor Debtors to the Tribune parent's creditors, even though the Guarantor Debtors' direct claims (the Step One Claims) have not been paid in full. Such a remedy would be unprecedented. The Third Circuit has made it clear that, absent grounds for substantive consolidation (which the Noteholders do not even suggest), corporate boundaries are real and must be respected. See Owens Corning, 419 F.3d at 211, 215. Yet the Noteholders' theory that a Court would require distribution of the Guarantor Debtors' value to Tribune's creditors before the Guarantor Debtors' creditors have been satisfied requires complete disregard of Tribune's and the various Guarantor Debtors' separateness. As such, it amounts to *de facto* substantive consolidation, which Third Circuit's Owens Corning ruling makes clear would be prohibited under these circumstances. Id. at 215.

---

[168] Tr. 3/9 at 176:7-11 (Black). In fact, Aurelius's own waterfall recoveries analysis shows that a total win on the WEAR theory would only result in a $449 million recovery to the Senior Noteholders. See NPP Ex. 31 at 121; Prieto Dep. at 71:18-72:15

[169] Noteholder Obj. ¶¶ 234, 237 (emphasis added). Aurelius' own waterfall recoveries model treats WEAR as insufficient to provide Senior Noteholders with a recovery substantially in excess of their initial distribution under the DCL Plan. Only when combining a total win on the WEAR theory with the independent assumption of "upstreaming" would the Noteholders' recoveries significantly improve. Compare NPP Ex. 31 at 121 (WEAR results in $449 million recovery) with NPP Ex. 31 at 89 (WEAR plus upstreaming results in par recovery).

Absent substantive consolidation, what the Noteholders seek directly violates section 510(c) of the Bankruptcy Code, which does not permit subordination of claims to equity interests. By asserting that the Court should take a portion of the Senior Lenders' recoveries from the Guarantor Debtors (i.e., that portion related to avoidance of the Step Two Guarantee Claims) and pay it over to Senior Noteholders and other Non-LBO Creditors at the Tribune parent, the Noteholders are creating an illegal subordination and turnover obligation out of thin air.[170] Such a remedy would effectively subordinate fully allowed claims against the Guarantor Debtors to the Tribune parent's equity interest in those guarantors. Calling this process as "upstreaming" does not alter its substance. It is an attempt to subordinate the Step One Lenders' allowed claims to Tribune's equity interests in the Guarantor Debtors in violation of section 510(c) of the Bankruptcy Code. It is not surprising, then, that the Examiner did not even consider this remarkable theory, which the Noteholders did not advocate at the time, and that the Noteholders concede has never been applied by a court.

But even assuming a court *could* apply this remedy, there is the additional question of whether it *would and should* do so as a matter of equity. Specifically, Black explained that if a court were to find that the Lenders had "misbehaved," the appropriate remedy would be to "knock them out directly" – *i.e.*, equitably subordinate or disallow their claims – rather than taking this "circuitous route"[171] of allowing distributions to be made on account of Step Two Claims but then inventing from whole cloth an obligation to turn those distributions over to Non-LBO Creditors. Accordingly, because Black had accounted for the possibility of equitable

---

[170] See DCL Ex. 1484 at 153; Tr. 3/9 at 176:12-177:5 (Black).

[171] Tr. 3/9 at 177:6-12 (Black).

subordination and disallowance in assessing his Scenario F (full avoidance), the WEAR theory did not change his opinion as to the reasonableness of the DCL Plan settlement.[172]

Finally, there is another debilitating problem with the WEAR theory. The Noteholders concede that the purpose of fraudulent transfer law is to put parties in the same position they would have been in had the fraudulent transfer never occurred.[173] Thus, if only Step Two is determined to be a fraudulent transfer, the corresponding remedy should place creditors in the position they would have been in if Step Two had never occurred. Avoidance of the Step Two Claims does exactly that. In contrast, application of the Noteholders' WEAR theories to alter the distributions to Senior Lenders would provide the Noteholders with a windfall by putting them in a better position than if Step Two had never occurred. If Step Two had never occurred, valid Step One Claims against Tribune and the Guarantor Debtors would remain. Refusing to honor those allowed Step One Claims to their full extent, as urged by the Noteholders, would be particularly inequitable because a court necessarily would have found that (a) Step One and Step Two were separate transactions, and (b) Tribune was solvent and had sufficient capital after Step One. The Noteholders' WEAR theory does not undermine the reasonableness of the DCL Plan settlement.

With the creative verbiage stripped away, the WEAR theory in its various guises and "upstreaming" are both strikingly similar to other well-established and yet difficult to obtain remedies, with a crucial difference: the Noteholders' concoctions do not require the high standard of proof that those remedies require, and that cannot be satisfied on these facts. WEAR is equitable estoppel without reliance and equitable subordination without a finding of egregious

---

[172] Id.

[173] Noteholder Obj. ¶ 223 ("The law is well established that the underlying purpose of the fraudulent conveyance statutes in the Bankruptcy Code is to restore the bankruptcy estate to the position it was in prior to the fraudulent conveyance.").

misconduct, "upstreaming" is substantive consolidation without the showing required under Owens Corning.

### 3. Challenges To The Claim Of Increased DEV Coupled With A Prohibition On Postpetition Interest In Respect Of Allowed Step One Senior Loan Guaranty Claims

Finally, the Noteholders suggest that they could obtain a full recovery even if the Step One Claims are allowed, if one were to assume that (a) the Step Two Loans are avoided, **and** (b) Tribune's DEV exceeds $7.8 billion, **and** (c) the allowed Step One Claims are denied postpetition interest.[174] This argument, too, fails to establish that the DCL Plan settlement is unreasonable in any way.

As an initial matter, avoidance of the Step Two Loans is not a foregone conclusion. While the Examiner found that it was "highly likely" to "reasonably likely" that the Step Two Loans constituted a constructive fraudulent transfer, he did not rule out the possibility that the Senior Lenders could prevail on this issue. Further, and perhaps more significantly, the Examiner determined that certain of the Step Two debt conferred reasonably equivalent value, including the obligations incurred to pay portions of the transaction fees and amounts equal to various tax and annual 401(k) savings, and therefore would be protected from avoidance.[175]

Moreover, the other two components of this alternative "path" are untenable. First, there is not a shred of evidence that the DEV is anywhere close to $7.8 billion. The Debtors' valuation expert (Lazard), led by Suneel Mandava, applied standard valuation methodologies in a straightforward manner to the Debtors' financial results and projections and concluded that the Debtors' enterprise value would be in the range of $6.3 billion to $7.1 billion as of the

---

[174] Tr. 3/7 at 63:13-64:1 (Noteholders' opening statement); see also Noteholder Obj. at ¶¶ 122-23.

[175] Examiner Report, Vol. 1 at 19-20; Vol. 2 at 110-18.

emergence date, depending on market conditions.[176] Drawing upon its in-depth understanding of Tribune and the industries in which it operates, Lazard chose a sum-of-the-parts methodology to value Tribune, enabling it to value each of the distinguishable parts of Tribune's business, taking into account the unique aspects of each.[177]

In January 2011, shortly before the confirmation hearing, Lazard undertook an effort to validate the reasonableness of its November 2010 valuation.[178] As part of that effort, media industry valuation expert John Chachas was retained.[179] Chachas has over 20 years of experience in valuing publishing and media companies in a variety of settings, including restructurings, and specifically had performed valuation work for Tribune in 2009 and early 2010.[180] This "refresh" of the earlier Lazard valuation used current financial market data and current Tribune results and projections[181] and, as both Mandava and Chachas testified, it confirmed the continuing reliability of Lazard's value range.[182] While the Debtors' DEV had, as a result of market changes, increased somewhat, the midpoint value was still well within Lazard's original value range.[183] The valuation performed by Lazard is the only valuation in the record, and the only DEV that should be credited.

The Noteholders' putative valuation expert, Rajinder Singh, did not perform a bottoms-up valuation, instead attempting only to critique Lazard's analysis.[184] As set forth in detail in Section III.G, below, Singh's critique is riddled with errors, betrays several fundamental

---

[176] Tr. 3/11 at 22:12-21 (Mandava); DCL Ex. 1104 at Ex. 2, p. 13.

[177] Tr. 3/11 at 22:12-21 (Mandava).

[178] Tr. 3/11 at 20:22-21:12 (Mandava).

[179] Tr. 3/11 at 147:22-148:3 (Chachas).

[180] Tr. 3/11 at 141:22-145:22 (Chachas).

[181] Tr. 3/11 at 21:6-21:12 (Mandava).

[182] Tr. 3/11 at 20:13-21:12 (Mandava); id. at 147:22-148:6 (Chachas).

[183] Tr. 3/11 at 77:9-17 (Mandava).

[184] Tr. 3/15 at 14:9-13 (Singh).

misunderstandings of the Debtors' business, and is based on methodological assumptions that conflict with the assumptions of the Noteholders' other expert, Tuliano. Not surprisingly, Singh's assumptions all drive to a high value for the Debtors' current business (a result the Noteholders desire), whereas Tuliano's conflicting assumptions all drive to a low value for the Debtors as of the time of the 2007 Transactions (also a result the Noteholders desire). The two ends-driven approaches discredit each other and highlight the Noteholders' self-serving approach to valuation.

Moreover, the Noteholders' criticisms of Lazard's valuation are a moving target. Despite not having performed his own bottoms-up valuation, Singh initially asserted that an appropriate DEV for the Debtors would be $8.331 billion.[185] That figure was subsequently amended to $8.291 billion.[186] And, in their recently-filed notice of plan amendments, the Noteholders used a further reduced illustrative DEV of $8 billion.[187] On this record, where there is no actual expert valuation opinion other than the Lazard valuation (only a critique of that valuation by Singh, who apparently was unwilling to prepare, or incapable of preparing, his own actual valuation that he would be required to defend), there is no basis to question Lazard's DEV, which is well supported and fairly reflects the Debtors' value.[188]

The other component of this last alternative "path" fares no better. The Noteholders provide no legally-cognizable basis for their assertion that, if the Step Two Claims are avoided, allowed Step One Claims against Tribune's Guarantor Debtors would not be entitled to recover postpetition interest before those subsidiaries could make dividends to their ultimate equity

---

[185] NPP Ex. 958 at 6.

[186] NPP Ex. 2469 at 4.

[187] Docket No. 8509 at 3.

[188] In addition, as the Court is aware, the DCL Plan has been amended to address the Noteholders' contention that DEV is higher than $6.75 billion, and it now provides Senior Noteholders and holders of Other Parent Claims the option to receive a "strip" of consideration, consisting of *pro rata* portions of cash, new debt and equity, in lieu of a cash-only distribution. Based on the "illustrative" $8 billion DEV used in the Noteholders' recent notice, this "strip" option would increase the value of the Senior Noteholders' guaranteed recoveries from roughly $431 million to $510 million, plus their disproportionate share of Litigation Trust recoveries.

holder (Tribune). In fact, the Noteholders muster only a footnote asserting, without citation to any authority, that postpetition interest is assumed not payable "because there is no one subsidiary that is solvent as evidenced by, among other things, the magnitude of intercompany claims held by Tribune against its subsidiaries that cannot be satisfied in full."[189]

That "assumption" mischaracterizes both the facts and the law. It is well-settled that a creditor may recover from multiple obligors, subject only to an aggregate recovery cap to the amount owing plus postpetition interest.[190] Accordingly, if the Step One Claims outstanding as of each relevant Debtor's petition date were allowed, the Senior Lenders would be entitled to collect their full *pro rata* distributions from the Tribune parent and each Guarantor Debtors until they reached an aggregate recovery equal to the full amount of such claims plus all postpetition interest (*i.e.*, the amount owed under the Credit Agreement).[191] Moreover, even if that were not the case, more than 80% of the value of the Guarantor Debtors resides at Debtors that do ***not*** have material intercompany liabilities owing to Tribune Company, rendering Tribune's intercompany claims irrelevant.[192] Further, if only Step Two were avoided, and for some reason Tribune's intercompany claims were required to be paid before postpetition interest could be

---

[189] See Docket No. 8635 at 7 n.5.

[190] See, e.g., Board of Comm'rs v. Hurley, 169 F. 92, 97 (8th Cir. 1909) ("The obligee in a bond, or the holder of a claim, upon which several parties are personally liable, may prove his claim against the estates of those who become bankrupt and may at the same time pursue the others at law, and, notwithstanding partial payments after the bankruptcy by other obligors or their estates, he may recover dividends from each estate in the full amount of his claim at the time the petition in bankruptcy was filed therein until from all sources he has received full payment of his claim, but no longer."); Ivanhoe Bldg. & Loan Ass'n of Newark, N.J., 295 U.S. 243, 245-46 (1935); In re Sacred Heart Hosp. of Norristown, 182 B.R. 413, 417 (Bankr. E.D. Pa. 1995) ("a creditor can seek to prove its entire claim in the bankrupt's case notwithstanding the existence of third party collateral or guarantees of payment so long as the claimant does not seek to recover more than one full payment of its claim from whatever source").

[191] Aurelius itself has taken this same position in other cases in this District. See *Reply Of Aurelius Capital Management, LP To Objections To Motion For Temporary Allowance Of The Intercompany Claim,* In re Smurfit-Stone Container Corp., Case No. 09-10235, at ¶¶ 57-61 (Bankr. D. Del. 2010) [Docket No. 6728].

[192] The initial value of the Guarantor Subsidiaries is $5.721 billion (of a total of $6.75 billion in initial value). See DCL Ex. 1110 at 3. Of this amount, the value of Guarantor Subsidiaries against which Tribune has an Intercompany Claim is $896.4 million, and the value of Guarantor Subsidiaries against which Tribune does not have an Intercompany Claim is $4.825 billion. Id. at 13 (aggregating the value of Guarantor Subsidiaries with a payable to Tribune and subtracting that amount from the total initial value of Guarantor Subsidiaries).

recovered, the Senior Lenders would still be entitled to first recover the principal amount of their claims against all of the Guarantor Debtors that *do* have intercompany liabilities and then to recover any deficiency on their claim, plus full postpetition interest, from those that do not. For example, the Tribune parent has no claims against Tribune (FN) Cable Ventures, Inc., an entity with an initial distributable value that is sufficient to cover most, if not all, of the postpetition interest on the Step One Claims.[193] The Senior Lenders' recovery against this single entity alone would be sufficient to cover almost all postpetition interest on the allowed Step One Claims.[194] Moreover, one Guarantor Debtor (Chicago National League Ball Club, Inc. n/k/a Tribune CNLBC, LLC) has a later petition date (October 12, 2009) than the other Debtors, and the Non-Debtor Guarantors (Tribune (FN) Cable Ventures, Inc., Tribune Interactive, Inc., Tribune ND, Inc., and Tribune National Marketing Company) have not filed petitions for bankruptcy.[195] As a result, the Senior Lenders would be entitled to recover from Tribune CNLBC, LLC all interest that accrued prior to its filing date and from the Non-Debtor Guarantors all interest that has accrued to date.

Accordingly, this last purported "path to success" is illusory. The Senior Lenders *would* be entitled to recover postpetition interest before any value of the Guarantor Debtors could flow to the Tribune parent (and in turn its creditors). An increased DEV thus would not be sufficient for avoidance of Step Two to yield material recoveries for Non-LBO Creditors.

---

[193] DCL Ex. 1108 at Ex. F; Tr. 3/11 at 65:8-11 (Mandava).

[194] Calculated through December 8, 2012 (the date through which the Noteholders reserve postpetition interest on Non-LBO Claims), interest at the non-default rate on the Step One Claims alone would add roughly $1.36 billion to the amount payable in respect of the Senior Loan Claims and would more than absorb the entire value of the Guarantor Debtors even at valuations where DEV exceeds $8 billion.

[195] Lazard allocated approximately $449 million of DEV to Tribune CNLBC, LLC, approximately $1.330 billion of DEV to the Company's interest in Tribune (FN) Cable Ventures, Inc., and approximately $376 million of DEV to Tribune National Marketing Company (in each case, before redistribution of value on account of Intercompany Claims). See DCL Ex. 1104, Ex. 2 at 99.

### E.    Beron's "Expected Recovery" Analysis Is Fatally Flawed.

Moving beyond their illusory "paths to success," the Noteholders attack the proposed

DCL Plan settlement on the ground that in their view it provides unreasonably low consideration

for the LBO-Related Causes of Action.  In this regard, the Noteholders rely on a "decision tree"

analysis of the Examiner Report prepared by Dr. Bruce Beron, which purports to generate an

"expected value" from litigation of the LBO Claims.  Beron, however, knew nothing about the

nuanced legal and factual issues analyzed in the Examiner Report or how they related to one

another.  Instead, he relied blindly on a highly selective reading of the Examiner Report and the

instructions of Aurelius's counsel without applying any informed judgment of his own.  The

narrowly circumscribed nature of his "assignment" from Aurelius and his fundamentally flawed

methodology produced an "expert report" that yielded highly unrealistic and severely skewed

results.

Beron's method was to assign a numerical probability to each of the Examiner's seven

explanatory phrases, ranging from 15% for outcomes labeled "highly unlikely" to 85% for

"highly likely."[196]  He then reviewed sections of Volume Two of the Examiner Report headed

"Examiner's Conclusions" to locate explanatory phrases for particular issues and defenses,[197]

ignoring the much-lengthier sections headed "Examiner's Explanation for Conclusions."[198]  He

next aggregated his artificially assigned probabilities into decision trees, generating percentages

for 48 potential litigation outcomes and then multiplying each by the recovery amount Aurelius

provided for that outcome.[199]  Finally, he added up his probability-weighted recoveries to arrive

---

[196] NPP Ex. 2476 at 6.

[197] Tr. 3/17 at 177:4-7 (Beron).

[198] Tr. 3/17 at 200:2-10 (Beron).

[199] Tr. 3/17 at 213:22-214:8 (Beron).

at a single "expected value" of $1.57 billion.[200]

Before turning to Beron's errors, it is important first to recognize that the very "decision tree" exercise conducted – an exercise advertised to be the centerpiece of the Noteholders' case in opposition to the DCL Plan settlement – is completely inappropriate given the structure and content of the Examiner Report. The Examiner evaluated and assigned qualitative assessments to numerous complicated legal and factual issues that form the constituent parts or elements of the various LBO-Related Causes of Action that he was tasked to evaluate. In the process, the Examiner only rarely combined his qualitative assessments of any particular issue or element into a qualitative assessment that a party would or would not prevail on a specific claim or cause of action. And even when he did do so, the Examiner did not describe the process used to combine qualitative assessments of particular issues or elements into qualitative assessments of the issues in combination. Similarly, the Examiner did not calculate an expected value of any claim or the LBO-Related Causes of Action as a whole. Rather, the Examiner presented a series of scenarios (described in Section II.C.1, above) that he determined to be representative, only one of which generated litigation results nominally greater than even the initial consideration provided in the DCL Plan. Given this framework, the Examiner's extensive discourse simply is not susceptible to a simplistic "decision tree" analysis like that performed by Beron. Indeed, Beron's fundamentally flawed analysis underscores this point.

First and foremost, because Beron's only reviewed the "Examiner's Conclusions" to extract one of the Examiner's seven labels, which he mechanically converted into fixed numerical probabilities, he reached results that do not reflect the substance of the Examiner Report. For example, the Examiner concluded that a finding of an intentional fraudulent transfer

---

[200] Tr. 3/17 at 213:9-12 (Beron).

at Step One was "reasonably unlikely."[201]  Pursuant to his assignment of numerical probabilities derived only from the conclusions, Beron set the chance of such an outcome at 30%.[202]  In doing so, Beron ignored the Examiner's explanation that he had found no "credible evidence" to support an intentional fraudulent transfer at Step One, meaning that Beron's model predicts that this Court (and others like it) would grant relief 30% of the time in respect of claims that lack the support of any credible evidence.[203]

That is an absurd result.  Further, Beron's 30% probability of a Step One intentional fraudulent transfer contributed significantly to his estimates of (i) a 51% chance of avoiding Step One transfers, and (ii) a 47% probability of avoiding both Steps One and Two, at both Tribune and its subsidiaries, as either intentionally or constructively fraudulent – the total victory scenario.[204]  These estimates are inflated and flatly inconsistent with a full and fair reading of the Examiner's legal and factual analysis of Step One, as summarized in Section II.C.1 above.

What is more, Beron ignored important correlations between the Examiners' conclusions. Beron admitted on cross examination that it is important to understand how claims are connected to one another when constructing a decision tree, and that accounting for such connections can have an enormous impact on the ultimate expected value.[205]  However, Beron freely conceded that he did not know whether the Examiner's conclusions about key issues were correlated.[206] Beron had no understanding of fraudulent transfer claims and had never constructed (or even

---

[201] Examiner Report, Vol. 2 at 22.

[202] NPP Ex. 2476 at 8; Tr. 3/17 at 131:18-132:13 (Beron).

[203] Examiner Report, Vol. 2 at 22, 28; Tr. 3/17 at 200:25-201:17 (Beron).

[204] NPP Ex. 2476 at 8, 10.

[205] Tr. 3/17 at 188:24-189:8 (Beron).  As an example, in the model decision tree Beron used during his direct examination, the expected value of a hypothetical two-count suit dropped from $72 to $30 if liability on the second count depended on the same facts needed to prove the first count. Tr. 3/17 at 187:23-188:23 (Beron).

[206] Tr. 3/17 at 186:13-24 (Beron).

seen) a decision tree on fraudulent transfer claims.[207] This lack of familiarity with key concepts undoubtedly contributed to his failure to recognize or appreciate interrelationships among potential claims and remedies. Compounding the problem, Aurelius – perhaps recognizing the fact that taking into account issue correlation would reduce the expected value – did not ask Beron to determine how the Examiner's conclusions were connected, so he did not do so.[208] Accordingly, except in those few instances where a connection was explicitly described in the "Examiner's Conclusion" section, as opposed to the analysis, Beron assumed there were none.[209]

By treating the Examiner's conclusions as to various legal theories as entirely independent, Beron greatly inflated the "expected value" of the LBO-Related Causes of Action he purported to model, adding probabilities of highly correlated outcomes together until several "unlikelies" turned into a "likely." Examples of Beron's failure to account for correlations among the Examiner's conclusions include:

- **Correlation between intentional fraudulent transfer and constructive fraudulent transfer.** The Examiner made clear that his conclusions about an intentional fraudulent transfer finding rested heavily on whether core elements of a constructive fraudulent transfer were present.[210] Beron simply ignored the Examiner's analysis describing the correlation between intentional fraudulent transfer and constructive fraudulent transfer, and added together the respective probabilities of intentional fraudulent transfer and constructive fraudulent transfer, thereby grossly inflating his expected value computation.[211]

- **Correlation among the three constructive fraudulent transfer solvency tests.** Explaining his conclusions about the tests for solvency relevant to a constructive fraudulent transfer, the Examiner said that "[i]f a court were to apply an objective test [for intent to incur], then for all practical purposes the question is whether the Tribune

---

[207] Tr. 3/17 at 255:3-19 (Beron).

[208] Tr. 3/17 at 183:15-184:18, 210:11-21 (Beron). Aurelius's counsel apparently agrees that treating certain of the Examiner's conclusions as independent is incorrect. See Tr. 4/12 at 189:9-190:16 (agreeing with Black that variables Beron addresses are "highly correlated").

[209] Tr. 3/17 at 203:19-204:23, 231:19-233:12 (Beron).

[210] Examiner Report, Vol. 2 at 76–77, 239 (factors influencing his conclusion of intentional fraudulent transfer at Step Two "include[d] that [Step Two] conferred disproportionately unreasonably small consideration on the Tribune Entities and rendered them insolvent and without adequate capital").

[211] Tr. 3/17 at 203:19-25; 204:16-23 (Beron).

Entities had adequate capital" – making those two tests almost completely correlated.[212] Similarly, the Examiner's analysis of both balance sheet solvency and capital adequacy depended on projections of future cash flows.[213] Beron, however, constructed his decision trees so that the probability of winning on any one of the three constructive fraudulent transfer solvency tests did not change based on the outcome of any of the other tests.[214] By adding these probabilities together, Beron's decision trees overstated the likelihood of a court finding a constructive fraudulent transfer at Step One, causing an inflated expected value calculation. He did not attempt to calculate the impact on expected value if the probabilities of success on all three tests are interrelated.

- **Correlation between Tribune parent and subsidiary solvency.** According to the Examiner, if Tribune was solvent it "necessarily follows" that the Guarantor Debtors were solvent, given the companies' capital structure and Tribune's higher debt.[215] Yet Beron found a 39% chance that a court would find subsidiary constructive fraudulent transfer at Step One even when it found no constructive fraudulent transfer at the parent.[216] He testified that this "follows logically" from the Examiner's conclusions, when in fact it is *impossible* given the Examiner's findings.[217]

- **Correlation between equitable subordination and equitable disallowance.** The Examiner reached his conclusion on the likelihood of equitable disallowance "for the same reasons as his conclusions on the question of equitable subordination."[218] Beron admitted that if disallowance was only available on facts that also support subordination, his decision tree should reflect a 20% – rather than 36% – chance of either remedy, yet he did not revise his "expected value" calculations accordingly.[219]

To make matters worse, pursuant to directions from Aurelius's counsel, Beron adjusted

or ignored several of the Examiner's conclusions so as to artificially increase his expected value

---

[212] Examiner Report, Vol. 2 at 239. Tuliano in fact noted that "ability to pay . . . looks at many of the same factors as we do with capital adequacy." Tr. 3/18 at 68:19-25 (Tuliano).

[213] Professor Black also recognized the strong positive correlation between the balance sheet and capital adequacy tests. DCL Ex. 1113 at 17.

[214] Tr. 3/17 at 232:24-233:12 (Beron) (admitting that if losing on one test made it less likely that a plaintiff could prevail on either of the other tests, he would need to construct his decision trees differently); see also Tr. 3/17 at 249:14-250:3 (Beron).

[215] Examiner Report, Vol. 2 at 207, 220.

[216] Cf. NPP Ex. 2476 at 8, 27 (and chart that follows).

[217] Tr. 3/17 at 217:21-218:20 (Beron). Evidencing an acknowledgment of the absurdity of this conclusion, Beron did not ultimately include this scenario in his expected value calculation, referring to the change as a way to "simplify the decision tree." Id. It is nevertheless telling that Beron's method for modeling the Examiner Report yielded a 39% chance of an outcome that, based on the Examiner Report, is impossible.

[218] Examiner Report, Vol. 2 at 239.

[219] Tr. 3/17 at 196:9-18 (Beron).

calculation. This departure from an already-flawed approach further undermines the credibility

of Beron's opinions. For example:

- **Beron altered the probability of Senior Lender participation in Step Two distributions.** The Examiner stated in his conclusions that if only Step Two was avoided, it was "reasonably likely that . . . absent an otherwise applicable basis to subordinate or disallow" participation of Step One Lenders, the Step One debt would participate in Step Two distributions.[220] Consistent with that "reasonably likely" conclusion, Beron initially modeled a 70% chance of Step One participation.[221] However, counsel for Aurelius informed Beron that the Examiner's conclusion on Step One participation in Step Two distributions was "uncertain." Relying on a sentence from the Examiner's explanation regarding Step One debt's participation in Step Two disgorgement *recoveries*, counsel for Aurelius instructed Beron to treat the Step One debt's participation in distributions as in "equipoise."[222] Beron complied with this instruction and modeled Step One debt's participation in distributions at 50%, inflating expected value.

- **Beron omitted the Examiner's conclusion on subsidiary standing.** The Examiner concluded that subsidiary standing to avoid the Senior Loans in full was "highly likely."[223] Had Beron been faithful to his method, he would have modeled a 15% chance that there would be no such standing to challenge the guarantees and/or that Tribune's creditors would not be entitled to benefit from avoidance at the Guarantor Debtor level. Beron, however, testified that Aurelius's counsel told him to ignore that conclusion because the ruling that the subsidiaries had standing "already had been made."[224] This instruction was flatly untrue, and again served to inflate expected value.

- **Beron's expected value calculation failed to account for PHONES subordination.** The Examiner concluded that "although not entirely clear," it was "reasonably likely" that the PHONES would not be subordinated to avoided LBO debt.[225] Consistent with his methodology, Beron therefore should have modeled a 30% chance that holders of the PHONES could not keep their recoveries even if the Senior Loan Claims were avoided – an outcome that would have decreased the expected value of ultimate recoveries to the Noteholders. Beron did not do so, because his "assignment" from Aurelius's counsel was circumscribed to exclude accounting for "what happened to the money . . . afterwards."[226]

---

[220] Examiner Report, Vol. 2 at 298, 304.

[221] Tr. 3/17 at 173:16-175:7 (Beron).

[222] Tr. 3/17 at 175:12-180:19 (Beron).

[223] See Examiner Report, Vol. 2 at 288–89.

[224] Tr. 3/17 at 222:5-25 (Beron).

[225] Examiner Report, Vol. 2 at 303.

[226] Tr. 3/17 at 233:22-235:9 (Beron).

Unsurprisingly, Beron's flawed analysis – which necessarily, and often intentionally, overstates the likelihood of litigation outcomes favorable to the Noteholders – grossly inflated the expected value for the LBO claims to $1.57 billion.[227] This value is facially unreasonable given that it represents roughly two-thirds of the ***maximum*** amount by which Non-LBO Claims could benefit from avoidance of all Senior and Bridge Loans.[228] No one, save perhaps Beron, could fairly read the Examiner Report to support a two in three chance of total avoidance and an expected recovery three times the settlement previously agreed to by Centerbridge.

Beron also shortchanged the DCL Plan by considering only the initial distributions to be made, neglecting substantial value provided to the Non-LBO Creditors by the Litigation Trust and concluding, based on that artificial comparison of his unrealistic "expected value" to the initial distributions in the DCL Plan, that the DCL Plan settlement is low.[229] Once the Preserved Causes of Action are considered, even accepting Beron's flawed decision tree modeling, Senior Noteholders do better under the DCL Plan in comparison to the Noteholder Plan 83% percent of the time.[230] In sum, Beron's testimony shows only that an expert who knows nothing of fraudulent transfer claims, ignores the Examiner's extensive analysis of such claims in favor of the seven select phrases found in the Examiner's conclusions, and accepts instructions from a litigant's counsel that contradict his own reading of the Examiner's conclusions, will produce results entirely unhinged from reality.

---

[227] NPP Ex. 2476 at 4.

[228] See Examiner Report, Vol. 2 Annex B at B-10 (indicating that total Non-LBO Claims are approximately $2.4 billion).

[229] See Tr. 3/17 at 170:4-11 (Beron).

[230] See id. at 10.

Simply put, Beron's method of reducing snippets of the 1,200 page Examiner Report to rigid numerical probabilities and multiplying them together without judgment made it impossible for Beron "to accurately reflect what the [E]xaminer had said."[231]

## F.     Tuliano's Opinion Regarding "Step One" Solvency Is Unsupportable.

To attempt to buttress Beron's flawed "expected value" calculation, the Noteholders argue, contrary to the Examiner's findings, that they are likely to succeed in avoiding all Senior Loan and Bridge Loan Claims in their entirety – the home run scenario. The Noteholders' argument in this regard rests primarily on the allegation that the Tribune parent *and* all of the Guarantor Debtors were insolvent in June 2007 at the time of the Step One Transactions, for which the Noteholders offered the opinion of Tuliano.

As shown below, Tuliano's solvency analysis has many defects. Before examining those defects, however, it is important to note that, in order to opine that the Tribune parent and the Guarantor Debtors were insolvent at Step One, Tuliano *assumes* the Step Two Loans, incurred six months later in connection with Step Two, are considered in assessing solvency as of June 2007.[232] In other words, Tuliano's entire opinion regarding solvency is predicated on the assumption that the Step Two Transactions would be "collapsed" into the Step One Transactions for purposes of the solvency determination, and Tuliano concedes that his own valuation would show solvency if the debt incurred in connection with the Step Two Transactions is not included.[233] As explained in Section III.C.1, above, Tuliano offers no credible argument that the

---

[231] Tr. 3/17 at 161:3-6 (Beron).

[232] Tr. 3/18 at 109:20-110:22 (Tuliano).

[233] Tr. 3/18 at 143:5-14 (Tuliano). Further, Tuliano's argument that anticipated Step Two debt should be considered for assessing capital adequacy, even if it is excluded from the balance-sheet test, buckles under the weight of its own contradictions. Were Tuliano's conclusion as to the impact of Step Two debt on Tribune's solvency at Step One to be believed, there would be a strong argument that it could no longer be reasonably anticipated that the Step Two solvency certificate requirement would be met. Hence, Tuliano's argument hinges on the assumption that it was reasonably foreseeable Tribune would incur debt at the time of Step Two that it would be contractually prohibited from incurring.

Transactions in fact can and should be collapsed, and his entire opinion regarding Tribune's solvency in June 2007 therefore is of marginal relevance, at best. In any event, even assuming collapse, Tuliano's opinion does nothing to call into question the reasonableness of the DCL Plan settlement.

### 1. Tuliano's Opinion Regarding Tribune Insolvency At Step One (Including Step Two Debt) Conflicts With The Examiner Report And Is Unsupportable.

Notwithstanding his determination that, in order to collapse the Step One and Step Two Transactions for purposes of the solvency analysis a court would "have to expand on the existing law" and "disregard[] . . . substantive aspects of the Leveraged ESOP transactions,"[234] the Examiner did consider Tribune's solvency assuming that the two Transactions hypothetically were collapsed. Based on that analysis, the Examiner concluded that, even taking into account all of the indebtedness expected to be incurred in connection with the Step Two Transactions, a court would be "somewhat unlikely" to conclude that Tribune was rendered insolvent in June 2007[235] and "reasonably likely" to conclude that Tribune had adequate capital at the conclusion of the Step One Transactions."[236]

In contrast, Tuliano claimed that, at the closing of the Step One Transactions, Tribune was insolvent by a massive $2.3 billion based on Tribune's own projections and, based on

---

[234] Examiner Report, Vol. 2 at 182.

[235] Examiner Report, Vol. 2 at 206.

[236] Examiner Report, Vol. 2 at 219-20. Tuliano suggested that the Examiner reached an incorrect conclusion as to capital adequacy because of the combined effect of assuming debt could be refinanced in 2014 and an error in the amount of $245-$353 million due to adding rather than subtracting 2007 taxes. NPP Ex. 944 at 164. Not so. The tax error would not substantially affect the Examiner's results and would be offset by adjusting for anticipated positive cash flows of the same magnitude missing from the Examiner's analysis, such as the Bender tax proceeds and Tribune's ability to arrange asset-based financing. See Examiner Report, Vol. 2 at 218 n.592 (Blackstone case would be negative in 2010 and Morgan Stanley Downside Case B would be negative in 2010 and 2011); DCL Ex. 1564; DCL Ex. 1565; DCL Ex. 1566. Tuliano's view that Tribune could not refinance is based on his own faulty analysis of Tribune's balance sheet insolvency and leverage. See Tr. 3/18 at 213:10-15 (Tuliano); NPP Ex. 944 at 127, 160. It is also contradicted by the market belief that Tribune more likely than not had the ability to meet its obligations without default. See page 67-69 infra.

Tuliano's manufactured set of "adjusted" projections, by more than $3 billion.[237]  Tuliano's

opinions in this regard are deeply flawed.

a.    <u>Contemporaneous Market Evidence Contradicts Tuliano's<br>Opinion.</u>

To start, it is clear that Tuliano's opinion, given almost four years after the fact, flies in

the face of the actions of contemporaneous market participants.  In fact, a multitude of entities

and institutions put billions of dollars at risk in the Step One Transactions, actions that would not

have been taken had these entities believed at the time that Tribune was so clearly insolvent.

Evidence that the market did not believe Tribune to be insolvent includes EGI-TRB's investment

of $250 million as part of its proposal to purchase Tribune shares at $34 per share; the counterbid

by a partnership of Ron Burkle and Eli Broad at the same price;[238] the willingness of the

arrangers to commit to provide $8 billion in financing associated with the Step One

Transactions;[239] the ratings provided by the rating agencies;[240] and the yields on Tribune's

debt.[241]  Fischel opined that a trove of undisputed evidence "indicates that market participants

considered Tribune to be a solvent, adequately-capitalized company as of June 4, 2007."[242]

Further, if Tribune truly was insolvent by more than $3 billion, as Tuliano posits, the

PHONES and Senior Notes would have been completely out of the money.[243]  Yet, following the

---

[237] NPP Ex. 944, at 1; Tr. at 3/18 at 65:4-11; 66:3-11 (Tuliano).

[238] DCL Ex. 740.  The $34 per share proposals by EGI-TRB and Burkle/Broad represented a premium to the contemporaneous public market price for Tribune's shares.  However, as Tuliano acknowledges, a competitive bid process can "establish a competitive price for [a] business greater than the public share price."  Tr. 3/18 at 232:4-10 (Tuliano).

[239] Tuliano contended that the arrangers' plans to "spread their exposure through syndication" somehow means that they "did not have very much confidence in Tribune."  Tr. 3/18 at 105:3-107:3; see NPP Ex. 501; NPP Ex. 462 at 5.  Not so.  As Professor Fischel explained, an assertion that the arrangers did not have "confidence" in Tribune is mutually exclusive with the assertion that they expected they could "securitize all the debt."  Tr. 3/10 at 232:4-10 (Tuliano).

[240] DCL Ex. 1106 at ¶¶ 24-28, App'x C.

[241] DCL Ex. 1106 at ¶¶ 29-31; Tr. 3/10 at 95:14-97:12 (Fischel).

[242] DCL Ex. 1106 at ¶ 13.

[243] Tr. 3/18 at 124:5-125:2 (Tuliano).

announcement and close of the Step One Transactions, no PHONES were redeemed and there was no material change in the price of the Senior Notes.[244] The Examiner concluded that this market evidence, including the market prices for Tribune bonds, "corroborates a conclusion that Tribune was solvent at Step One."[245]

At trial, Tuliano asserted that "one really needs to look at the credit default swaps" for market evidence of insolvency.[246] In fact, however, credit default swap ("CDS") spreads clearly cut against Tuliano's opinion of massive insolvency and inability to pay debts as of June 4, 2007. As Black explained, "the price of five-year credit protection tells you that the likelihood of insolvency at June [2007] was about 15 percent over five years."[247] In other words, the market belief at the time was that there was an 85% likelihood that Tribune would pay all its obligations without default in the next five years – a conclusion diametrically opposed to Tuliano's claims of $3+ billion insolvency. Fischel similarly opined that CDS spreads were "nowhere near the point where market participants . . . thought that there was any significant risk of insolvency or bankruptcy in the near term."[248]

Tuliano's reliance on a third-party document indicating a 49% probability of default within five years based on a CDS spread of 780 basis points and 40% recovery rate is

---

[244] Tr. 3/18 at 125:3-126:17, 128:19-127:12 (Tuliano); DCL Ex. 1115 at ¶¶ 3, 6 and Ex. BA.

[245] Examiner Report, Vol. 2 at 194-95, 206. At his deposition, Tuliano claimed that he had not formed an opinion whether he agreed or disagreed with the Examiner on that point. Tr. 3/18 at 139:1-21 (Tuliano).

[246] Tr. 3/18 at 125:20-22 (Tuliano).

[247] Tr. 3/9 at 143:20-23 (Black).

[248] Tr. 3/10 at 197:9-12 (Fischel). Even accepting the 49% default probability which Tuliano presents based on CDS spreads as of late July 2007 – well after the closing of Step One, amidst the tightening in the global credit markets that followed Step One, and after Tribune's disappointing second quarter results became public –the market continued to believe Tribune would more likely than not meet its obligations over the next five years, contradicting Tuliano's view of massive insolvency as of Step One. NPP Ex. 944 at 114; NPP Ex. 955 at 34; Tr. 3/18 at 101:10-13 (Tuliano); Examiner Report, Vol. 1 at 473, n.2167.

misplaced.[249] For one, the data cited by Tuliano is from July 2007, well after the closing of the

Step One Transactions and amidst the tightening in the global credit markets that followed Step

One.[250] Secondly, given that a CDS spread depends on both default probability and loss rate,[251]

and given the loss rate implicit in Tuliano's massive insolvency, a CDS spread of 780 in July

2007 implies a much lower default probability.[252] In fact, as the following chart reveals,[253] had

the market actually shared Tuliano's views as to insolvency at Step One, CDS spreads would

have been much higher in June 2007 – just as they became exponentially higher in December

2008 immediately before Tribune filed for bankruptcy:



As shown, the CDS spreads increased as the Step Two Transactions became more certain, but

did not rise sharply until dramatic events occurred in the market in 2008 (including the rescue of

---

[249] See NPP Ex. 944 at 114; NPP Ex. 955 at 34; NPP Ex. 501 at ML-TRIB-0211277. See also DCL Ex. 1555 at 48
(49% default probability for 5-year CDS, 40% recovery rate and 800 CDS spread).

[250] Examiner Report, Vol. 1 at 473 n.2167.

[251] DCL Ex. 1555 at 48.

[252] Even accepting a 49% default probability would show that in July 2007 the market continued to believe Tribune
would more likely than not meet its obligations over the next five years, contradicting Tuliano's view of massive
insolvency at Step One.

[253] The chart (based on DCL Ex. 2002) shows five-year CDS spreads on Tribune Senior Notes from September 2006
through December 2008.

Countrywide and the failures of Bear Stearns and Lehman Brothers), spiking in anticipation of Tribune's bankruptcy.[254] Tuliano was only able to exaggerate movement in the CDS spreads by truncating his analysis, cutting off data at the end of 2007.

Tuliano's hindsight-driven solvency analysis flies in the face of the Third Circuit's direction that, whenever possible, courts should favor contemporaneous, objective market data over competing expert opinions developed long after the fact: "Absent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses." VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007) (holding that district court did not err "in choosing to rely on the objective evidence from the public equity and debt markets"); see also Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 350 (Bankr. S.D.N.Y. 2007) (rejecting expert valuations that "do not adequately explain, rebut, or analyze contemporaneous market valuations" indicating solvency).[255]

### b. Tuliano's Opinion Is Based On Methodological Errors.

One reason why contemporaneous market evidence contradicts Tuliano's opinion is that Tuliano made a number of methodological errors in his after-the-fact assessment of solvency.[256]

---

[254] The five-year CDS spreads in late 2008 are not out of line for a market that expects a high probability of near-term default. Periodic protection payments end upon the occurrence of a Credit Event. DCL Ex. 1555 at 14-15, 28. Thus, a protection seller who expects a company to default well before five years of premium payments are paid will demand greater payment up front. Those upfront payment may well translate into very high spreads if projected over five years.

[255] In contrast, Professor Fischel has "always emphasized the role of market evidence and the value of market evidence . . . as opposed to after-the-fact judgments by experts in litigation who don't have any of the same reinforcing tendencies of putting any of their wealth . . . at risk." Tr. 3/10 at 94:20-95:6 (Fischel). See Metlyn Realty Corp. v. Esmark Inc., 763 F.2d 826, 836-36 (7th Cir. 1993) ("Drawing on the test of self-interest (will people back up their views with cash?), market prices tend toward the value that the most astute investors place on the assets.").

[256] Professor Fischel testified: "I think it's fair to say that I disagree with virtually every aspect of Mr. Tuliano's report. I think what he did with projections is wrong, what he did with discount rates is wrong, what he did with terminal values is wrong, what he did with cash flows is wrong, and I tried to summarize all that in my rebuttal report." Tr. 3/10 at 131:17-24 (Fischel); see also DCL Ex. 1115.

***First***, contrary to the Examiner's conclusion that "a court would likely conclude that it would be inappropriate to revise the February 2007 projections based on declines in performance in April and May,"[257] Tuliano rejected management's projections and based his analysis on his own hindsight-driven "adjusted projections"[258] without articulating any sound reason for failing to give management's contemporaneous projections the substantial deference courts typically find to be appropriate. See, e.g., Del. Open MRI Radiology Assocs., P.A. v. Kessler, 898 A.2d 290, 333-34 (Del. Ch. 2006); Dobler v. Montgomery Cellular Holding Co., 2004 Del. Ch. LEXIS 139 at *67 (Del. Ch. Oct. 4, 2004), modified on other grounds, 880 A.2d 206 (Del. Supr. 2005).

Tuliano's after-the-fact "projections" do not merit any such deference. Tuliano was not tendered as an expert in preparing projections, is not a specialist in the newspaper or broadcasting industry, and did not prepare his projections from the business level up as did Tribune management at the time.[259] Tuliano did nothing more than take the monthly and annual growth rates from the very projections that he had rejected[260] and apply them mathematically to Tribune's actual results through May 2007.[261] His projections and the analyses based on them should not be credited. See, e.g., Iridium, 373 B.R. at 347-48, 351 ("Without a firm basis to replace management's . . . projections with those developed for litigation, the starting point for solvency analysis should be management's projections.") (internal quotation marks and citations omitted).

---

[257] Examiner Report, Vol. 2 at 213.

[258] Tr. 3/18 at 158:12-21 (Tuliano).

[259] Tr. 3/18 at 18:13-15, 157:1-6 (Tuliano).

[260] The only reason Tuliano offers for using the growth rates from the projections he rejects is that he is being "conservative." Tr. 3/18 at 160:7-11 (Tuliano), NPP Ex. 944 at 80. The Court rightly should be leery of this explanation. See Kipperman v. Onex, 411 B.R. 805, 848 (N.D. Ga. 2009) ("When an expert testifies that he is providing a 'conservative estimate' but he provides no principled model or methodology from which that estimate was produced, his testimony is pure *ipse dixit*.").

[261] NPP Ex. 944 at 80; Tr. 3/18 at 157:10-14 (Tuliano).

***Second***, while Tuliano recognizes that cash is fungible and that the savings (made possible by consummation of the Step Two Transactions) from Tribune's S-Corporation election, elimination of contributions to employees' 401(k) plan, and elimination of stock-based compensation represent real economic benefits that Tuliano himself includes in his capital adequacy analyses,[262] Tuliano failed to account in any way for those economic savings in his analysis of Tribune's balance sheet solvency, and did so without even bothering to investigate the nature of those benefits.[263] In addition, Tuliano's "tax effect" approach – by which he valued Tribune as a C Corporation subject to federal income taxes even though it is an S Corporation not subject to such taxation – has been rejected in several tax court decisions.[264] Gross v. Comm'r, 272 F.3d 333, 354-55 (6th Cir. 2001) (no error in refusing to tax-affect the stock of an S Corporation); Dallas v. Comm'r, T.C. Memo 2006-212, *23-27 (September 28, 2006) (improper to tax-affect the earnings of an S Corporation); Adams v. Comm'r, T.C. Memo 2002-80; Heck v. Comm'r, T.C. Memo 2002-34, *23-27. Notably, the Seventh Circuit recently rejected Tuliano's approach in the valuation of an S Corporation for solvency purposes. See Paloian v. LaSalle Bank, N.A., 619 F.3d 688, 694 (7th Cir. 2010) (no basis for applying "a tax-effect discount to the asset side of a corporation's balance sheet for the purpose of figuring out whether the firm is solvent").[265]

Moreover, Fischel has opined that, even when valued as a C Corporation and even when taking into account all of the anticipated Step Two debt, Tribune was solvent at the time of the

---

[262] Tr. 3/18 at 213:16-214:7, 227:18-20 (Tuliano).

[263] Tr. 3/18 at 213:16-225:15 (Tuliano).

[264] Tr. 3/18 at 232:11-233:23 (Tuliano).

[265] The Examiner did not have the benefit of Paloian, which was decided in August 2010 after the Examiner Report was issued.

Step One Transactions when the value of the interest tax shield arising from its higher debt levels – available to any C corporation[266] – is taken into account.[267]

*Third*, Tuliano's discount rate is higher than that used by contemporaneous market participants.[268] *Fourth*, Tuliano erred by double-counting a "size premium" in computing the discount rate.[269] *Fifth*, in estimating terminal value in his discounted cash flow analysis, Tuliano assumed long-term growth rates that, according to Fischel, are "arbitrary and unsupported by contemporaneous economic evidence."[270] Tuliano's "long-term growth rates imply Tribune would experience negative real growth in perpetuity" and imply terminal multiples "lower than the 10th percentile multiple of [Tuliano's] comparable companies."[271] (This is certainly an ironic contrast to the opinion of the Noteholders' other valuation expert, Singh, who applies a plethora of rosy, unsupported assessments about Tribune's business in claiming that Tribune is now worth more than $8 billion.) A long-term growth rate that implies terminal values not in

---

[266] It is widely recognized that tax savings created by the interest tax shield on debt financing create value, and various approaches exist to capture that value in a business valuation. See, e.g., Shannon P. Pratt, VALUING A BUSINESS (5th ed. 2007) at 218 & n.40; Steven Kaplan & Richard Ruback, THE VALUATION OF CASH FLOW FORECAST: AN EMPIRICAL ANALYSIS, 50 J. Fin. 1059,1064-66 (1995); Timothy A. Luehrman, USING APV: A BETTER TOOL FOR VALUING OPERATIONS, 75 Harv. Bus. Rev. 145, 146-51 (1997); Richard A. Brealey, Stewart C. Meyers, & Franklin Allen, PRINCIPLES OF CORPORATE FINANCE 486-89 (8th ed. 2006).

[267] Tr. 3/10 at 117:5-119:2 (Fischel); DCL Ex. 1106 at ¶¶ 62-64 and Ex. O.

[268] Tr. 3/18 at 177:18-178:5, 178:24-179:5, 182:11-15 (Tuliano). As Dr. Pratt has noted, the use of "a discount rate that deviates from the market consensus rate as of the valuation date" will result in a value that departs from fair market value. Pratt, VALUING A BUSINESS, supra n. 266, at 181 n.5. Ironically, the Noteholders sought unsuccessfully to suggest that Fischel's implied long-term growth rate fell outside the range of contemporaneous analyses by asking him on cross-examination to "assume . . . that the implied long-term growth rate from your analysis is 2.4 percent . . . [to] 2.8 percent." Tr. 3/10 at 152:13-17 (Fischel). Although the Noteholders never introduced testimony as to the implied long-term growth rate using Fischel's WACC (see Tr. 3/18 at 163:13-16 (Tuliano), it in fact ranges from 1.16% to 2.10%. See Formula 3.22(a), DCL Ex. 1375 at 133; DCL Ex. 1106 Ex. M at 38. Unlike Tuliano's assumed long-term growth rate, Fischel's range compares favorably with those used contemporaneously.

[269] As Fischel explained, Tuliano erred by adding a size premium developed by Ibbotson in addition to using a BARRA β, which is incorrect because it double counts the size effect. DCL Ex. 1115 at ¶ 13. Although Ibbotson and BARRA estimate the size premium at different stages of the CAPM model and therefore necessarily use different "measures" as Tuliano testified, they simply represent different paths to the same end-point; i.e., a size premium based on market capitalization. Therefore, using both is improper double counting. Tr. at 3/18 at 169:16-20 (Tuliano); DCL Ex. 1557; DCL Ex. 1373 at 129, 131.

[270] DCL Ex. 1115 at ¶ 12 and Ex. BD.

[271] Id.

line with normalized trading multiples "should be revisited,"[272] yet Tuliano acknowledged that his implied market multiples are lower than those used by contemporaneous market participants.[273]

**Sixth**, Tuliano treated the PHONES as simple debt with a "face value" of $1.256 billion.[274] In so doing, Tuliano disregarded the Examiner's analysis of this issue and improperly ignored the hybrid nature of the PHONES, which include both a debt and an option component. Because a substantial portion of the $1.256 billion proceeds received with respect to the PHONES was not in respect of debt but instead was the purchase price of the option, it is necessary to value the debt and option components separately. See In re Solutia, Inc., 379 B.R. 473, 477 (Bankr. S.D.N.Y. 2007) (where debtor issued an instrument containing a debt component and a warrant component, attributing only portion of proceeds received to the debt component); In re Bridge Info. Sys., 311 B.R. 781, 792 (Bankr. E.D. Mo. 2004) (in valuing hybrid financial instruments that contain both a debt and an option component, the "two components are discrete and must be valued separately").

Contrary to Tuliano's assumption, purchasers of the PHONES did not agree to a simple 30-year loan of $1.256 billion at a below-market 2% interest rate.[275] They agreed to the nominal 2% rate only in exchange for an option on Time Warner shares, which provided PHONES holders a much greater potential return.[276] In fact, Tribune was required by applicable accounting rules to account for the PHONES accordingly, with part of the proceeds treated as discounted debt that would increase each year through the accretion of the amortized discount

---

[272] Tr. 3/18 at 252:4-9 (Tuliano). See also Pratt, VALUING A BUSINESS, supra, n. 266, at 220 n.41 ("Whether one is using a market multiple or the Gordon growth model to estimate the terminal value, the resulting implied growth rate and market multiple, respectively, should be checked for reasonableness.").

[273] Tr. 3/18 at 175:19-176:19, 178:14-179:22, 183:21 (Tuliano).

[274] See NPP Ex. 955 at 37; Tr. 3/18 at 57:13-58:1 (Tuliano).

[275] See Tr. 3/18 at 196:23-197:3 (Tuliano) (2% rate was below risk-free rate).

[276] DCL Ex. 667 at 54.

-73-

and the balance treated as a derivative whose fair value would increase or decrease in tandem with changes in the value of the associated Time Warner shares. In fact, due to market fluctuations in the price of those shares, Tribune at times was required to account for its PHONES liabilities in an amount *greater* than the total face amount of the PHONES Notes.[277]

Tuliano ignored this reality, resulting in a liability for the PHONES that either improperly includes unamortized original issue discount ("OID")[278] or improperly reflects an increase in Tribune's derivative component liability in the absence of a real-world increase in associated share value. On the other hand, the Examiner's and Fischel's use of the book value of the PHONES liability in the solvency analysis correctly reflects both the debt and option components of the PHONES.[279]

**Seventh**, Tuliano's analyses of Tribune's capital adequacy and ability to meet its obligations are infected by his subjective selection of cases and cherry-picking of data. See Siegel v. Warner Bros. Entm't, Inc., 2009 U.S. Dist. LEXIS 66115, at *15, *33 (C.D. Cal. July 8, 2009) (finding non-credible an industry expert who cherry-picked data to determine fair market value); In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 524 F. Supp. 2d 1166, 1175-76, 1179, 1184 (N.D. Cal. 2007) (expert opinions based on cherry-picked studies unreliable). As Fischel explained, "Mr. Tuliano arbitrarily chooses certain pessimistic downside

---

[277] For example, in 1999 Tribune's derivative component liability increased such that its total PHONES liability at year-end 1999 was $1.328 billion, greater than the face value of the PHONES Notes. DCL Ex. 1533 at 51.

[278] Claims for unaccrued OID are not allowable under the Bankruptcy Code. See 11 U.S.C. 502(b)(2) (disallowing claims for unmatured interest); Solutia, 379 B.R. at 486 ("a note issued at a discount . . . is allowable at the face amount less the unaccrued portion of the OID"); In re Oakwood Homes Corp., 449 F.3d 588, 599-600 (3d Cir. 2006) (disallowed interest includes "any portion of prepaid interest that represent an original discounting of the claim, yet that would not have been earned on the date of bankruptcy"); Pengo Indus., Inc. v. Licht, 962 F.2d 543, 546 (5th Cir. 1992) ("the term 'unmatured interest' . . . encompasses OID").

[279] Examiner Report, Vol. 1 at 509 n.2273; DCL Ex. 1115 at ¶¶ 16-17. The approach of the Examiner and Professor Fischel is consistent with Third Circuit caselaw supporting the valuation of debt at book value. See In re Trans World Airlines, Inc., 134 F.3d 188 (3d Cir. 1988) (assuming that debts should be measured at their "net present value"); In re Winstar Commc'ns, 348 B.R. 234, 278 (Bankr. D. Del. 2005) (holding that liabilities measured at their "stated value" in balance sheet test); In re Hellig-Meyers, 319 B.R. 447 (Bankr. E.D. Va. 2004) ("[*TWA*] held that liabilities should be stated at their book amount" for determining solvency).

projections and ignores others that are more positive," and Tuliano compounded that arbitrariness by substituting his own lower projections of cash from equity investments and his own higher projections of working capital requirements and capital expenditures.[280]

## 2. Tuliano's Opinion Regarding Guarantor Debtor Insolvency At Step One (Including Step Two Debt) Conflicts With The Examiner Report And Is Unsupportable.

At the time of the Step One Transactions, Tribune's Guarantor Debtors had virtually no indebtedness (as compared to the Tribune parent's $2+ billion in existing Noteholder debt), yet held virtually all of Tribune's valuable operating assets. As a consequence, as the Examiner concluded, the Guarantor Debtors were more likely than the Tribune parent to be found solvent even in the event that the Step One and Step Two Transactions were deemed to be collapsed for purposes of the solvency analysis.[281] The Examiner reached that conclusion even failing to apprehend that certain Guarantor Debtors owned Tribune's interest in the Chicago Cubs, valued at $603 million, and 50% of Tribune's interest in Classified Ventures.[282] Had the Examiner realized this error, he certainly would have been even more definitive with respect to his conclusions regarding the likelihood of Guarantor Debtor solvency.

In any event, Tuliano's own analysis shows that, while the Tribune parent would be insolvent as of June 4, 2007, the Guarantor Debtors would be *solvent* based on Tuliano's guideline company valuation of $12.78 billion.[283] In fact, massive insolvency at the Tribune

---

[280] DCL Ex. 1115 at ¶¶ 19-22, Ex. BE.

[281] See Examiner Report, Vol. 2 at 211.

[282] See Section II.C.1, supra.

[283] Exhibit A, Unofficial Transcript, at 2921:13-22; Tr. 3/18 at 192. The March 18, 2011 official transcript fails to record Mr. Busath's question: "Could you just verify for me if we were to use the $12.78 billion number . . . from your comparable company analysis, and subtract out the legal entity assets, . . . that would show solvency for the guarantor subsidiaries, is that correct?," to which Mr. Tuliano responded, "Yes, that – by virtue of math, that's correct." Tuliano's analysis corrected for the Examiner's mistaken inclusion of the Chicago Cubs as a Tribune parent asset, but not for the Examiner's mistaken inclusion of 100% of Tribune's interest in Classified Ventures as a Tribune parent asset. See Tr. 3/18 at 67:8-18 (Tuliano).

parent – in excess of $2 billion – is necessary before the Guarantor Debtors would begin to be rendered insolvent. The same market evidence that refutes massive insolvency at the Tribune parent thus also refutes the claim that Tribune's Guarantor Debtors were insolvent.

In short, Tuliano's opinion that Tribune was insolvent by billions of dollars in June 2007 is riddled with errors and serves as no basis for challenging the DCL Plan settlement.

## G. Singh's Opinion Regarding Tribune's Current Valuation Is Not Credible.

The Noteholders also attack the DCL Plan settlement by claiming that – notwithstanding Tuliano's dire assessment of the state of Tribune's businesses and the publishing industry as of 2007 – newspapers have miraculously recovered and Tribune is now worth more than $8 billion. To that end, the Noteholders offered the testimony of Mr. Singh.

Singh stands in stark contrast to Mandava and Chachas, the well-qualified and experienced experts retained by the Debtors. Singh candidly admitted that he did not actually perform a valuation of Tribune, has never submitted an expert report, has never been qualified as an expert, spent a mere 17 days on his analysis, has no industry expertise, and did not consult or work with anyone that had any industry expertise on this matter.[284]

Singh's testimony amply demonstrated that he lacked the industry- and Tribune-specific knowledge necessary to value Tribune or even credibly "critique" Lazard's work. For example:

- Singh had no knowledge or understanding of the companies that he deemed comparable to Tribune in his report;[285]

- Singh did not know the business of Tribune Media Services;[286]

- Singh had no knowledge of Tribune's first quarter 2011 results;[287]

---

[284] Tr. 3/14 at 16:15-21; 168:23-169:2; 169:7-9; 172:13-19; 166:15-18, 173:11-13; 171:9-22 (Singh).

[285] Tr. 3/15 at 30:3-31:21 (Singh).

[286] Tr. 3/15 at 41:25-43:9 (Singh).

[287] Tr. 3/15 at 50:15-17; 51:3-5 (Singh).

- Singh had no knowledge of the agreement or relationship between Tribune and Scripps relating to TV Food Network;[288] and

- Singh could not identify a single analyst that covered the publishing industry.[289]

Not surprisingly, Singh's lack of expertise and experience resulted in multiple deviations from standard valuation methodologies in his "critique" of Lazard's valuation, producing a series of unrealistic and cherry-picked "adjustments" to Lazard's valuation that created a staggering – and unsupportable – DEV calculation of $8.2 billion for the Debtors.[290] Tellingly, Singh recognized that Lazard has the required expertise he lacks, and therefore attempted to replicate Lazard's methodology. In doing so, however, Singh made a number of guesses about what Lazard might have done – most of which were simply incorrect. In other instances, Singh ignored Lazard's methodology completely and substituted his uninformed judgment for that of Lazard and Chachas. His work lacks any credibility and deserves no weight.

### 1. Erroneous Valuation Of The Core Businesses

In valuing Tribune's core broadcasting and publishing businesses, Lazard used standard valuation methodologies – comparable company analysis and discounted cash flow (DCF) analysis.[291] In its comparable company analysis, Lazard carefully selected the companies that were most similar to Tribune and based the multiples it selected on those truly comparable companies. Thus, for Tribune's publishing business, Lazard selected multiples from McClatchy and New York Times as the high end of the multiple range and took a "half turn" discount for the low end of the range to reflect the fact that McClatchy and New York Times, while

---

[288] Tr. 3/15 at 52:5-53:23 (Singh).

[289] Tr. 3/15 at 106:17-107:10 (Singh).

[290] Tr. 3/15 at 14:11-18; 17:2-3 (Singh).

[291] Lazard also considered the precedent transaction methodology. However, because there were no relevant and timely precedent transactions, Lazard relied instead on a comparable company and discounted cash flow analysis. Tr. 3/11 at 38:2-7 (Mandava); id. at 167:1-18 (Chachas).

comparable to Tribune's publishing business, were higher margin businesses.[292] For Tribune's broadcasting business, again basing its selection on the companies that were most comparable to Tribune, Lazard chose the midpoint of the "pure play" broadcasting companies as the high end of the multiple range and established the low end by applying a discount to reflect the fact that Tribune's affiliate mix was not as valuable as those "pure play" companies.[293]

Singh departed from this approach and instead used a novel and unsupportable "indexing" process, pursuant to which Singh guessed what multiple he believed Lazard may have used and then "indexed" those imagined multiples to reflect an increase in market prices from October 2010 to February 2011.[294] As might be expected given his limited expertise, however, Singh's guesses were wrong – he incorrectly guessed that Lazard had used both pure play and diversified companies in selecting multiples and then indexed the mean of both pure play and diversified companies.[295] Notably, Singh used both pure play and diversified companies as the basis for his multiple even though he admitted that, under the sum-of-the-parts methodology being used, only pure play companies should be used to value the businesses.[296] As a result, Singh's results bore no relation to those generated by any valid valuation methodology. To take one example, Singh improbably valued Tribune's publishing assets as more valuable than the New York Times' assets.[297]

In the end, Singh's principal criticism of Lazard's comparable company analysis was that it was not updated based on the most recently available financial market information.[298] But this

---

[292] Tr. 3/11 at 29:21-31:22 (Mandava).

[293] Tr. 3/11 at 40:14-41:9 (Mandava).

[294] Tr. 3/15 at 116:23-118:12 (Singh).

[295] Tr. 3/15 at 25:24-27:8, 34:3-10 (Singh).

[296] Tr. 3/15 at 32:4-7 (Singh).

[297] Tr. 3/15 at 29:14-18 (Singh).

[298] Tr. 3/15 at 21:14-23 (Singh).

criticism ignores that, as Singh acknowledged, Lazard had used current information when it did its work in both October and again in January.[299] Revealing the lack of any principled basis for his critique, Singh maintained his criticism of Lazard at trial even though he acknowledged that most of the increase in market prices from Lazard's January work was lost in the weeks between the issuance of his report and the confirmation hearing.[300] Yet, despite acknowledging that the stock price gains had all but disappeared, Singh did not update his report – apparently because he was not asked to do so by the Noteholders' attorneys.[301] Lazard was well aware that markets can change. As Mandava testified, the estimated enterprise value range of $6.3 billion to $7.1 billion represented a reasonable estimate of the company's value at emergence, "tak[ing] into consideration the chance or risk or opportunity of the valuation either improving between now and then, or going down between now and then."[302]

To make matters worse, Singh also improperly inflated his results when he used both 2010 and 2011 financial information to value the publishing business. Chachas and Mandava both testified that investors look forward, not backward, and that forward-looking financial information provides the appropriate components for a valuation of businesses like those of the Debtors.[303] Without any industry expertise, Singh had no basis to disagree with this testimony. Yet he included both backward-looking 2010 and forward-looking 2011 metrics for all of Tribune's businesses. Where, as here, a business (such as Tribune's publishing business) experiences secular declines year over year, including financial results from a prior period serves to improperly increase the purported value.

---

[299] Tr. 3/15 at 21:24-22:7 (Singh).

[300] Tr. 3/15 at 40:1-5 (Singh).

[301] Tr. 3/15 at 41:3-6 (Singh).

[302] Tr. 3/11 at 77:18-78:12 (Mandava).

[303] Tr. 3/11 at 72:24-73:9 (Mandava); id. at 157:20-158:11 (Chachas).

In another clear example of Singh substituting his own uninformed judgment for that of Lazard and Chachas, Singh ignored the weighting Lazard gave the DCF and comparable company methodologies in determining a value for Tribune's publishing and broadcasting businesses. For the publishing business, Lazard weighted the DCF methodology 30% and the comparable company methodology 70%.[304] As Mandava explained, the comparable company analysis assumes that the publishing industry will somehow revitalize itself, crack the internet challenge, and reverse the secular declines it has faced. The DCF analysis, on the other hand, assumes that the industry will continue to struggle with the secular challenges it is facing and will not be able to turn the business around.[305] Both viewpoints are valid and possible, and using a 70% weighting (as Lazard did) favors an optimistic view of the future of the publishing business (and hence a higher value). For the broadcasting business – which is not experiencing secular decline – Lazard weighted the DCF methodology 60% and the comparable company methodology 40%, slightly underweighting the comparable company methodology based on Lazard's reasoned judgment that the comparable broadcasting companies were more attractive than Tribune's broadcasting business.[306]

Singh, without any industry experience or context, substantially increased the purported value of Tribune's publishing and broadcasting businesses by changing Lazard's weighting of the DCF and comparable company analysis. For broadcasting, Singh weighted each of the DCF and comparable company analysis 50% because he saw no compelling evidence to select any other weighting.[307] Singh then changed the weighting for publishing to 10% DCF and 90%

---

[304] Tr. 3/11 at 34:24-35:5 (Mandava).

[305] Tr. 3/11 at 35:6-36:3 (Mandava).

[306] Tr. 3/11 at 47:2-48:5 (Mandava); id. at 174:12-175:13 (Chachas).

[307] Tr. 3/15 at 100:1-7 (Singh).

comparable company,[308] apparently due to certain analysts' analytics and his four weeks of experience on the engagement.[309] Singh made those adjustments to Lazard's weighting even though he admitted he did not know the analysts whose metrics he adopted, did not know how the analytics were developed, did not know what guidance the companies (as opposed to analysts) were giving, and did not know how accurate the analysts had been.[310] As he conceded, he knew less about the industry than Lazard or Chachas and, in fact, his industry "knowledge" was learned in a couple of weeks.[311]

Mandava explained that giving a 10% weighting to the DCF for publishing is akin to giving management's projections no weight at all. This is improper because management is "in the trenches" and knows its business better than anyone. Here, management's view of continued secular decline is entirely possible, particularly given that Tribune has lost more than a billion dollars of publishing revenue in the space of a few years.[312] Tellingly, the Noteholders' other expert, Tuliano, agreed with Tribune's management and Lazard, giving a 66% weighting to Tribune's DCF when he valued Tribune.[313]

## 2. Erroneous Valuation Of The Non-Controlled Investments

The majority of the increase in Singh's valuation of Tribune as compared to Lazard's valuation results from Singh's increases in the purported value of assets that Tribune does not control or operate, primarily TV Food Network ("TV Food"), Career Builder, and Classified Ventures, with most of the increase coming from TV Food. While Singh made many of the

---

[308] Tr. 3/15 at 102:18-103:3 (Singh).

[309] Tr. 3/15 at 108:15-25 (Singh).

[310] Tr. 3/15 at 106:6-111:8 (Singh).

[311] Tr. 3/15 at 102:1-11 (Singh).

[312] Tr. 3/11 at 36:4-37:3 (Mandava).

[313] NPP Ex. 944 at 98. Singh did not read Tuliano's report. Tr. 3/15 at 17:9-12; 112:11-13 (Singh).

same mistakes in valuing Career Builder and Classified Ventures,[314] the most egregious examples of selective "adjustments" to Lazard's valuation occurred with TV Food.

Lazard valued TV Food based on the comparable company and precedent transaction methodologies. (Lazard did not use a DCF methodology because it did not have current projections that were not confidential and prohibited from public disclosure.[315]) The publically-traded company that Lazard deemed most comparable to TV Food was Scripps Network ("Scripps"), the majority owner of TV Food. Because Scripps is a much larger company with other attractive assets, Lazard used the Scripps multiple to inform the high end of its range and then took a discount to inform the low end of the range.[316] In the precedent transaction methodology, Lazard looked to the relevant precedent transactions in the industry, concluding that most relevant was the 2009 acquisition by Scripps of the Travel Channel.[317] Lazard ultimately weighted the comparable companies' methodology 70% and the precedent transaction methodology 30% to arrive at a value for Tribune's minority interest in TV Food. Lazard underweighted the precedent transaction methodology to take into consideration that Tribune has only a non-controlling 31% minority interest in the partnership.[318]

Despite having no knowledge of the industry or the TV Food partnership, Singh completely discarded Lazard's methodology.[319] Singh used his own uninformed judgment to select different comparable companies, different precedent transactions, and a different weighting of results than Lazard. Singh also ignored adjustments, even factual errors, that would have decreased his

---

[314] For example, Singh inflated the value of Career Builder by including a precedent transaction that represented a control transaction without any adjustment to reflect the control premium. Tr. 3/15 at 74:24-76:22 (Singh). Singh also admitted that he did not understand how the Classified Ventures joint venture was structured and that he did not take any discount for lack of control or lack of marketability. Tr. 3/15 at 78:1-80:7 (Singh).

[315] Tr. 3/11 at 63:7-12 (Mandava).

[316] Tr. 3/11 at 57:21-59:7 (Mandava).

[317] Tr. 3/11 at 59:24-60:8 (Mandava).

[318] Tr. 3/11 at 56:16-19; 64:4-65:7 (Mandava).

[319] Tr. 3/15 at 52:2-54:10 (Singh).

valuation of Tribune's interest in TV Food. For example, even though Singh acknowledged that he had used an incorrect and inflated 2011 EBITDA figure for TV Food, Singh did not adjust his report, apparently because it would have resulted in a $71 million value decrease.[320]

For the comparable company methodology, Singh selected a multiple that was higher than the multiple for Scripps, the company that controls the operations of TV Food, a patently unjustifiable selection. As explained by Chachas, who has more than 20 years of valuation experience (including experience working directly with Scripps),[321] an investor simply would not pay the same price for a 31% interest in a unique asset relative to the distributed collection of assets that it could buy if it purchased stock in Scripps. It is, therefore, not appropriate to use the same (much less a higher) multiple for Tribune's minority stake in a Scripps property as that used for Scripps itself.[322] Likewise, in the precedent transaction methodology, Singh included a transaction, involving the Weather Channel, that both Chachas and Mandava had considered and rejected because, among other things, much of the value of the Weather Channel (unlike TV Food) was derived from its internet site (www.weather.com), not its cable station.[323]

Compounding his multiple errors, Singh then weighted the precedent transaction and the comparable company methodology 50/50. In doing so, Singh gave 50% weight to a methodology that includes control premiums (precedent transaction) even though Tribune owns a non-controlling interest in TV Food, an obviously inappropriate approach.[324]

Indeed, after taking every conceivable adjustment to increase the value of TV Food, Singh failed to make any adjustment to reflect the fact that Tribune owned a non-controlling,

---

[320] Tr. 3/15 at 60:10-18 (Singh). Singh's explanation was that he did not make the correction to his report because he was not directed to do so by the attorneys for the Noteholders. Tr. 3/15 at 60:23-61:4 (Singh).

[321] Tr. 3/11 at 143:8-18 (Chachas).

[322] Tr. 3/11 at 181:24-182:9 (Chachas).

[323] Tr. 3/11 at 60:17-61:2 (Mandava); id. at183:18-184:12 (Chachas).

[324] Tr. 3/11 at 65:14-66:10 (Mandava).

minority interest in the partnership. This was true even though the Noteholders' other expert, Tuliano, took a 16.7% minority discount *for the same asset*,[325] the Examiner criticized VRC's valuation for its failure to apply any minority or marketability discounts in valuing Tribune's minority investments,[326] and well respected authorities, with which Singh generally agreed, instructed that a minority discount ranging from 10% to as high as 45% should be taken.[327]

### 3. Other Errors

Singh also purported to create additional "value" from a pure accounting adjustment – one that does not result from an improvement in Tribune's operations but instead from an accounting methodology referred to as "Fresh Start Accounting." In Fresh Start Accounting, Tribune's entire set of financial statements will be reviewed and revalued based on current market value. Certain Fresh Start Accounting adjustments may result in increases in Tribune's EBITDA, while others may result in decreases in EBITDA.[328] Without doing any analysis to determine the effect of other potential adjustments, Singh selected only one such adjustment (for pensions) and created from whole cloth $182 million of "value" based on that purported adjustment.[329] This is absurd, as Tribune will still have a $198 million unfunded pension liability notwithstanding the Fresh Start adjustment, and accounting revisions do not result in any changes to the actual value of Tribune.

Finally, Singh increased the purported value of Tribune by adding $157 million to reflect what he asserts will be an accumulation of cash between January and an emergence date of June 30, 2011.[330] This, however, is pure double counting, as the cash for the first six months of

---

[325] Tr. 3/15 at 62:12-64:20 (Singh).

[326] Tr. 3/15 at 65:17-66:8 (Singh).

[327] Tr. 3/15 at 66:13-74:5 (Singh).

[328] Tr. 3/15 at 81:3-11 (Singh).

[329] Tr. 3/15 at 80:8-81:23 (Singh).

[330] Tr. 3/15 at 90:13-91:1 (Singh).

2011 was already included in both the DCF and in the 2011 EBITDA metric used in the comparable company multiple methodology.[331] The comparable company methodology is based on the next year's cash flows as reflected in Tribune's EBITDA. Because the EBITDA for 2011 already includes the next six months of cash flows, adding the same cash back under another methodology is improper double counting and yet another example of an obvious methodological error that served to inflate Singh's purported valuation.

Lazard's DEV calculation is clearly appropriate. Nothing in Singh's testimony provides any basis for challenging the reasonableness of the DCL Plan settlement.

## IV. THE NOTEHOLDERS' OTHER OBJECTIONS TO THE DCL PLAN ARE UNFOUNDED.

In addition to their core attack on the DCL Plan settlement, the Noteholders made a barrage of other arguments in opposition to confirmation. As shown in both the pretrial briefing and below, none of those arguments has any more validity than the Noteholders' deficient objections to the settlement.

### A. FCC Approvals And Waivers Do Not Call Into Question The Feasibility Of The DCL Plan.

The Noteholders object to the DCL Plan on feasibility grounds, alleging an assortment of purported "issues" regarding the ability of the Debtors to obtain required approvals from the Federal Communications Commission ("FCC"). Specifically, the Noteholders argue that the FCC will not approve the DCL Plan or grant required waivers because of supposed "violations" of the FCC's ownership rules and fabricated "diversity" concerns and that, in any event, the FCC approval process might delay consummation of the DCL Plan. The record belies these claims.

The FCC is presently considering applications seeking approval of a post-emergence ownership structure for Tribune, although FCC policy is to not take action prior to the issuance

---

[331] Tr. 3/15 at 97:16-98:12 (Singh).

of this Court's confirmation order.[332]  The Communications Act tasks the FCC with evaluating

those applications to determine whether "the public interest, convenience, and necessity will be

served" by their approval.  47 U.S.C. § 310(d).  In furtherance of that statutory duty, the FCC has

adopted detailed rules setting forth the types of interests – so-called "attributable" interests – that

it considers relevant to its evaluation of a proposed transaction's compliance with the ownership

rules.[333]  The FCC's rules are intended to provide clarity and predictability and to prevent the

sorts of general and speculative allegations made by the Noteholders.[334]

     The DCL Proponents' expert Mace Rosenstein demonstrated that the allegedly-

problematic interests of JPMorgan, Angelo Gordon, and Oaktree either are not attributable (and

therefore are irrelevant) or have already been addressed in the pending applications and will not

result in FCC rule violations or delay in obtaining the FCC approvals.[335]  Moreover, even if the

FCC hypothetically were to be concerned about any of those interests, the DCL Plan would

remain eminently feasible because the DCL Plan itself contains provisions (Sections 5.4.2(d)[336]

and 5.3.2[337]) specifically designed to convert any interest the FCC might find to be problematic

into a non-attributable interest, thereby ensuring FCC approval.  In fact, both of the FCC experts

---

[332] A copy of a representative sample of the relevant portions of one of the applications, as amended, is appended as Exhibit 4 to DCL Ex. 1456 (the Report of Mace J. Rosenstein) (Feb. 25, 2011).

[333] 47 C.F.R. § 73.3555 note 2; see also DCL Ex. 1456 at 5.

[334] Tr. 4/12 at 30:7-34:12 (Rosenstein); DCL Ex. 1456 at 4-7.

[335] Tr. 4/12 at 46:19-53:22 (Rosenstein).

[336] Because any entity holding 5% or more of the Class A Voting Stock generally will be considered to hold an attributable interest, the DCL Plan allows the Debtors to issue a sufficient amount of Class B Stock (designed to be non-attributable under FCC rules) to any creditor if the "[h]older has other media interests that could impair the ability of Reorganized Tribune to comply with the Communication Act or the FCC's rules."  DCL Plan § 5.4.2(d).  The DCL Plan thus ensures that the interests of creditors can be deemed non-attributable for purposes of the FCC's rules, thereby preventing outside media interests of creditors from impeding the FCC's grant of the FEE Applications.  See DCL Ex. 1456 at 13.

[337] Under the DCL Plan, JPMorgan, Angelo Gordon and Oaktree hold rights to designate certain members to the board of directors of Reorganized Tribune.  See DCL Plan § 5.3.2.  However, because those rights could constitute an attributable interest under the FCC's rules, the DCL Plan provides for the surrender of board designation rights in the event they become an impediment to FCC approval.  Id.

(Rosenstein and Prak) agreed that these are standard provisions regularly used in media transactions to resolve issues raised by the FCC regarding the media ownership rules.[338]

The Noteholders' suggestion that information submitted to the FCC in connection with the pending applications is inaccurate or insufficient is a bald attempt to have this Court prejudge or second-guess the FCC's own determinations, and it disingenuously ignores the critical distinction between attributable interests (which the FCC considers) and non-attributable interests (which it does not).[339] Tellingly, notwithstanding their ardor before this Court, the Noteholders have not bothered to raise the alleged "attribution" issues with the FCC despite having had ample opportunity to do so. In any event, the FCC has the power to request additional information on matters – including interests in other media companies – that it might deem relevant to its evaluation of the applications.[340]

The Noteholders' arguments about delay are similarly meritless. For one thing, given mechanisms in the DCL Plan that would address and resolve any FCC attribution issue, the Noteholders cannot credibly argue that there is not a "reasonable prospect" of successfully obtaining the required regulatory approvals from the FCC, which is all that is required. See, e.g., In re TCI 2 Holdings, LLC, 428 B.R. 117, 154-55 (Bankr. D.N.J. 2010) (explaining that plan proponents must show there are no "material hurdles to achieve the necessary regulatory approvals," and confirming plan where there was a "reasonable prospect of success . . . to obtain regulatory approval"); In re Reading Broad., Inc., 386 B.R. 562, 573-74 (Bankr. E.D. Pa. 2008) (plan was feasible even though FCC approval had not yet been granted because section 1129(a)(11) "does not impose such a high standard" so as to require a guarantee of

---

[338] Tr. 4/12 at 26:24-27:14, 35:12-38:19, 43:3-44:48 (Rosenstein); Tr. 3/17 at 73:24-77:5, 78:16-79:2 (Prak).

[339] See Tr. 4/12 at 40:6-19 (Rosenstein); DCL Ex. 1456 at 3-4, 15-24. The FCC considers only attributable interests in evaluating *both* rule compliance and waiver requests. Tr. 4/12 at 41:8-43:2 (Rosenstein); DCL Ex. 1456 at 6, 15.

[340] See DCL Ex. 1456 at 11 (citing 47 U.S.C. § 308(b)).

success); In re Temple Zion, 125 B.R. 910, 916 (Bankr. E.D. Pa. 1991) (plan was feasible even though there was "no guarantee" that certain required variances would be obtained because it "is impossible for anyone to know . . . when the numerous regulatory agencies will take action").

Moreover, the opinion of the Noteholders' expert, Mark Prak, regarding delay is entirely speculative, as Prak admitted he could not be certain about the length of the FCC's deliberations.[341] As explained by Rosenstein, the FCC's own processes and mechanisms in the DCL Plan provide routine, efficient, and expeditious means to resolve any potential issues of concern to the FCC.[342] In sum, the Noteholders' FCC objection is baseless.

**B.      The DCL Plan Does Not Discriminate Unfairly Against Creditors Who Fail To Assign Claims To The Creditors' Trust.**

The Noteholders argue that the DCL Plan violates section 1123(a)(4) of the Bankruptcy Code by disadvantaging creditors who elect not to contribute their state law avoidance claims to the Creditors' Trust. Specifically, the Noteholders contend that it is unfair for creditors who choose not to assign their claims to be unable to share in the "Parent GUC Trust Preference" – the priority distribution to Non-LBO Creditors of the first $90 million in net litigation recoveries – to the extent that such distribution is funded with proceeds from the Creditors' Trust rather than the Litigation Trust.

Well-established precedent, however, holds that equality of opportunity, and not of outcome, is the principal concern of section 1123(a)(4). Specifically, as Judge Walrath made

---

[341] Tr. 3/17 at 83:14-23 (Prak).

[342] Tr. 4/12 at 43:3-44:4 (Rosenstein). The Noteholders raise a number of additional issues that they claim will delay or otherwise complicate the FCC approval process. Rosenstein explained that these issues are unlikely to result in delay or complication and, in any case, are common to both the DCL Plan *and* the Noteholder Plan. Tr. 4/12 at 27:14-21, 44:22-46:18 (Rosenstein). For example, both plans call for Tribune to obtain the same waivers of the FCC's ownership rules. See DCL Plan § 10.1.1(i); Noteholder Plan § 10.1.1(f). Similarly, it is true that litigation concerning the FCC ownership rules now in effect, as well as the 2010 Quadrennial Review concerning those rules, is pending, NPP FCC Ex. 65 at 15-16, 21 (Prak Report), but the FCC routinely approves transactions while proceedings concerning its rules are underway, Tr. 4/12 at 45:7-19 (Rosenstein), and these proceedings have the exact same potential to impact the Noteholder Plan as the DCL Plan. Tr. 4/12 at 44:22-46:18 (Rosenstein).

clear in <u>Washington Mutual</u>, a plan of reorganization does not violate section 1123(a)(4) by

providing for different outcomes so long as all similarly situated creditors are given the

***opportunity*** to receive the same treatment. <u>See</u> <u>Washington Mut.</u>, 442 B.R. at 356 ("What is

important is that each claimant within a class have the same opportunity to receive equal

treatment"). Thus, a party given a choice of two or more treatment options cannot claim

discrimination vis-à-vis creditors who elect differently than such party. This is only logical: if a

creditor believes that one option is better than another and elects accordingly, it cannot rationally

claim that the other option is preferable.

Here, the Noteholders have described the Creditors' Trust election as a "Hobson's

choice," apparently due to their unfounded conclusion that the Creditors' Trustee would fail to

diligently pursue claims under its control.[343] This false characterization[344] overlooks the fact that

creditors who elect not to contribute to the Creditors' Trust nonetheless are entitled to receive the

Parent GUC Trust Preference to the extent it is funded with recoveries by the Litigation Trust.

More importantly, non-contributing creditors retain any and all recoveries from state law

avoidance claims that they independently pursue, without any requirement that those recoveries

be shared with anyone. It would be strange indeed to allow non-contributing creditors to retain

all of their own state law avoidance action recoveries while also sharing in, and ratably reducing,

distributions from the Creditors' Trust to creditors who had chosen to contribute the claims that

made those recoveries possible.

The elective nature of participation in the Creditors' Trust should be seen for what it is: a

mechanism to facilitate a ***voluntary*** collective action that is carefully tailored so as to not

---

[343] <u>See</u> Tr. 4/14 at 92:15-24.

[344] A "Hobson's choice" is a free choice in which only one option is actually offered. The Noteholders'
characterization of the Creditors' Trust election as a Hobson's Choice is belied by the fact that numerous creditors
elected to contribute their state law avoidance claims to the Creditor's Trust, the very option that the Noteholders
claim to have been effectively unavailable.

impinge on the rights of creditors who prefer to pursue their own paths. There is nothing unfair or discriminatory about it.

## C.     The DCL Plan Does Not Discriminate Unfairly Against Creditors Who Benefit From PHONES Subordination.

During opening statements, the Noteholders also argued that the DCL Plan unfairly discriminates against Senior Noteholders by providing comparable distributions on account of Senior Noteholder Claims and Other Parent Claims, at least some of which do not benefit from the subordination provisions of the PHONES Notes.

The argument is without merit. First, the DCL Plan is not unfairly discriminatory because the overwhelming majority of the Other Parent Claims are entitled to the benefit of the PHONES subordination and are compensated accordingly. More importantly, even if certain Other Parent Claims are not senior to the PHONES Notes Claims, the total "harm" visited upon Senior Noteholders is an immaterial $100,000 – *roughly .024%* of what Senior Noteholders stand to recover in initial distributions under the DCL Plan.[345] Discrimination under a plan of reorganization is not "unfair" unless it has a material impact on recoveries or allocation of risk under the plan. Given that the Noteholders have not even attempted to address this threshold materiality issue, their claims of unfair discrimination should be disregarded.

### 1.  The Overwhelming Majority Of Other Parent Claims Are Entitled To The Benefit Of The PHONES Subordination.

It appears likely that the overwhelming majority – roughly 97% by value – of the Other Parent Claims are entitled to the benefit of the PHONES subordination. The PHONES indenture contains broad subordination language that subordinates the PHONES Notes to all "Senior Indebtedness" of Tribune. "Senior Indebtedness" is defined to include, among other things, "all obligations represented by notes, bonds, debentures or similar evidences of indebtedness"

---

[345] See Tr. 3/14 at 43:3-8; DCL Ex. 1110 at p. 16.

(excluding the PHONES Notes themselves) and "all indebtedness for . . . the deferred purchase price of property or services . . . ."[346]

The Swap Claim comprises roughly 57% by value of the Other Parent Claims.[347] Prior to trial, all parties were in apparent agreement that the Swap Claim was entitled to the benefit of the PHONES subordination. Indeed, the Noteholders specifically acknowledged the Swap Claim's entitlement to the benefit of the PHONES subordination in their pretrial objection, noting:

> [T]he initial allocations to the PHONES Notes Claims and EGI-TRB LLC Notes Claims would be reallocated on a pro pro rata basis to the Senior Noteholder Claims *and the Swap Claim*, but not to Other Parent Claims because such claims are not entitled to the benefit of the subordination provisions according to the erms [sic] of the PHONES Notes Indenture and the EGI-TRB LLC Notes. . . . Recoveries on Senior Noteholder Claims ($1.283 billion) *and Swap Claim ($150.9 million)* would increase if the waterfall and subordination provisions were applied correctly . . . .[348]

The Noteholders' new argument at trial that the Swap Claim is not entitled to the benefit of the PHONES subordination, an argument that directly contradicts the position espoused in their pleadings, should be disregarded. Brigade's argument concerning the Swap Claim, which was not raised at all in Brigade's own pleadings and was allowed at trial only as a joinder to the Noteholders' position, likewise should be disregarded.[349] In any case, the definition of "Senior Indebtedness" under the PHONES Indenture specifically includes evidence of indebtedness similar to bonds, notes or indentures, which on its face includes a financial instrument such as the Swap Agreement.

---

[346] See DCL Ex. 668 § 14.01.

[347] See DCL Ex. 1110 at p. 15, n.30.

[348] Noteholder Obj. ¶ 396 (emphasis added).

[349] See Tr. 4/13 at 196:23-197:1 ("MR. PACHULSKI: . . . at the opening argument, *I made it clear that we were joining in the – we were joining in the noteholder objection on this point*, and I amplified the point to provide legislative history that was not provided.") (emphasis added).

The Retiree Claims, which are pension and other deferred compensation claims, comprise another 40% of the Other Parent Claims.[350] Although the issue is not entirely free from doubt, such claims are likely the very sort of "indebtedness for . . . the deferred purchase price of . . . services" to which the PHONES subordination provisions were intended to apply. However, even if the Retiree Claims do not enjoy the benefit of the PHONES subordination, the DCL Plan does not unfairly discriminate because, as described below, the impact of granting them that benefit would be entirely immaterial.

### 2. Any Discrimination Relating To PHONES Subordination Is Immaterial And Not Unfair.

In evaluating the Noteholders' assertions of unfair discrimination, it is critical to appreciate the immateriality of the supposed discrimination at issue. As a threshold matter, the Bankruptcy Code prohibits only "unfair" discrimination, as opposed to all discrimination. See In re Armstrong World Indus., Inc., 348 B.R. 111, 121 (D. Del. 2006) ("The pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is 'unfair.'"). Courts have adopted a "rebuttable presumption test" under which a presumption of unfair discrimination exists where there is "(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a *materially* lower percentage recovery for the dissenting class . . . or (b) regardless of percentage recovery, an allocation under the plan of *materially* greater risk to the dissenting class in connection with its proposed distribution." Id., 348 B.R. at 121 (quoting In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)) (emphases added).

Thus, unless the DCL Plan provides for recoveries to the Senior Noteholders that are *materially* worse than those provided to holders of Other Parent Claims (after accounting for all

---

[350] See DCL Ex. 1110 at 15 n.30.

parties' respective rights to benefit from the PHONES subordination), there is no unfair

discrimination. Against the backdrop of this materiality standard, the issue of whether trade

creditors holding Other Parent Claims are entitled to the benefit of the PHONES subordination

can be dismissed as being inconsequential.[351] Uncontroverted testimony of Brian Whittman, one

of the Debtors' expert witnesses, established that providing recoveries to trade creditors as

though they were entitled to the benefit of the PHONES subordination would enhance aggregate

recoveries by creditors holding Other Parent Claims by approximately $30,000 (and would only

negatively impact the Senior Noteholders by approximately *$3,000*).[352]

Likewise, if the DCL Proponents erred by providing holders of Retiree Claims the benefit

of the PHONES subordination, any impact on Senior Noteholders also would be immaterial.

Whittman's uncontested expert testimony established that the total benefit to holders of Other

Parent Claims – excluding the Swap Claim – from the PHONES subordination is approximately

$400,000.[353] Of that amount, only *$40,000* flows from what would otherwise be the recoveries

of the Senior Noteholders.[354] Indeed, even if the Court disregards the Noteholders' prior

concession regarding the Swap Claim and assumes that the entire class of Other Parent Claims is

deemed to not be senior to the PHONES, the total impact on the recoveries of Senior

Noteholders would be approximately $100,000,[355] *roughly .024%* of what Senior Noteholders

---

[351] Unlike the Retiree Claims or the Swap Claim, claims on account of trade payables are expressly excluded from the benefit of the PHONES subordination under the terms of the PHONES Indenture. See DCL Ex. 668 § 14.01(2)(c).

[352] See Tr. 3/14 at 79:16-19 (Whittman); DCL Ex. 1110 at p. 16 n.33.

[353] See Tr. 3/14 at 43:3-5 (Whittman).

[354] See Tr. 3/14 at 43:6-8 (Whittman).

[355] The evidence established that if any party erroneously benefited from the PHONES subordination, only 10% of such benefit flowed from what would otherwise have been the recoveries of the Senior Noteholders. See Tr. 3/14 at 42:25-43:8 (Whittman). The total benefit to holders of Other Parent Claims from the PHONES subordination was approximately $1 million. See DCL Ex. 1110 at p. 16.

stand to recover in initial distributions under the DCL Plan.[356] In the context of the facts of this case and the size of the claims at issue, such discrepancies, individually or collectively, are clearly immaterial.

Where rates of recovery under a plan differ by *de minimis* amounts, no unfair discrimination exists. Indeed, courts have found far more sizable disparities than those alleged by the Noteholders to be immaterial. For example, in the recent Unbreakable Nation case, the court found that proposed recoveries under a plan differing by 0.25% were so close as to not be discriminatory, much less unfairly so. See In re Unbreakable Nation Co., 437 B.R. 189, 202-03 (Bankr. E.D. Pa. 2010). Similarly, in Greate Bay, the court found that a plan providing one class of unsecured creditors approximately 80% and another 76% was not materially discriminatory. See In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 231 (Bankr. D.N.J. 2000).

In short, the recoveries contemplated under the DCL Plan, even if characterized in the light most favorable to the Noteholders' new objections, do not remotely approach the point at which differential treatment becomes unfairly discriminatory. As observed in Greate Bay: "Courts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment (50% or more) to similarly situated creditors." Greate Bay, 251 B.R. at 231. Even if this Court assumes that none of the Other Parent Claims are entitled to the benefit of the PHONES subordination, the difference between the treatment of Senior Noteholders and the holders of Other Parent Claims under the DCL Plan cannot be reasonably characterized as "grossly disparate." Accordingly, the DCL Plan does not unfairly discriminate as a result of alleged misapplication of the PHONES subordination.[357]

---

[356] See Tr. 3/14 at 43:3-8; DCL Ex. 1110 at p. 16.

[357] Indeed, the majority of creditors voting in the Senior Noteholder class appear to agree that the DCL Plan is not unfairly discriminatory, as 69.19% of such creditors (counted by number) voted to accept the DCL Plan. See Appendix A.

## D.     The DCL Plan Properly Classifies The Swap Claim.

Next, the Noteholders argue that the DCL Plan improperly classifies the Swap Claim as an Other Parent Claim rather than as a Senior Loan Claim against Tribune.[358] The undisputed facts,[359] however, demonstrate that several substantial differences between the Swap Claim and the Senior Loan Claims mandate classification of the Swap Claim separately from the Senior Loan Claims and together with the Other Parent Claims.

*First*, the Swap Claim is governed by a different agreement than the Senior Loan Claims, executed among different parties and almost a month after the Senior Credit Agreement.[360] *Second*, the Swap Claim is not substantially similar to the Senior Loan Claims. "A fundamental characteristic of an interest rate swap is that the counter-parties never actually loan or advance the notional amount. The swap involves an exchange of periodic payments calculated by reference to interest rates and a hypothetical notional amount." Thrifty Oil Co. v. Bank of America Nat'l Trust and Savings Assoc., 322 F.3d 1039, 1048 (9th Cir. 2003). The amount of the Swap Claim depended upon interest rate fluctuations and not any money loaned or financing provided to the Debtors. The Senior Loan Claims, on the other hand, are for money loaned.

*Third*, unlike the Senior Loan Claims, no plausible claim for avoidance of the Swap Claim has been or could be made. By definition, the interest rate swap giving rise to the Swap Claim provided reasonably equivalent value to Tribune at the time it was executed – the value derived from enabling Tribune to convert a variable rate loan into one with a fixed interest rate. See 11 U.S.C. § 548(d)(2)(D) ("a swap participant . . . that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer"). Moreover, both

---

[358] Noteholder Obj. ¶¶ 391-392.

[359] Tr. 4/14 at 109:23-25 ("the underlying facts regarding the $150 million swap claim now owned by Oaktree are not really in dispute").

[360] Examiner Report, Vol. 1 at 182 n.727.

sections 546(g) and 560 of the Bankruptcy Code exempt claims like the Swap Claim from avoidance. See 11 U.S.C. § 546(g) ("the trustee may not avoid a transfer made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement"), § 560 (swap termination actions and payments "shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title").[361] Most tellingly, no stakeholder has ever taken action to seek avoidance of the Swap Claim, and the statute of limitations under section 546 of the Bankruptcy Code has now expired in respect of any such action. As a consequence, no credible argument can be made that the Swap Claim has a different risk profile than any other general unsecured claim against Tribune, and the Swap Claim can and should be classified together with and treated the same as the general unsecured claims classified into the class of Other Parent Claims.

**_Fourth_**, there is no evidence that the classification of the Swap Claim is the product of "gerrymandering." To the contrary, the inclusion of the Swap Claim in the class of Other Parent Claims did not affect the voting of claims in that class. Even without considering the vote of the Swap Claim, the Other Parent Claims class overwhelmingly voted in favor of the DCL Plan with 220 out of 231 voting creditors (95.24%), holding 88.02% by dollar amount of the voted claims within the class, accepting the DCL Plan.

## E.     The DCL Plan's Releases And Bar Order Are Appropriate.

Finally, in addition to their general criticism of the DCL Plan settlement, the Noteholders argue that certain of the releases and the Bar Order to be provided as part of that settlement are impermissible. This argument is a thinly-disguised attack on the settlement and should be

---

[361] Based on section 560, the Examiner concluded that the Swap Claim was not subject to avoidance, and all of his recovery scenarios provide for allowance of the Swap Claim in full. Examiner Report, Vol. 2 at B-6.

rejected. Cf. Washington Mut., 442 B.R. at 347 ("The Plan Objectors' opposition to the releases of [the settling parties] are largely premised on their opposition to the Global Settlement and their arguments that the Debtors are simply not getting enough under that settlement. . . . Accepting that the Global Settlement is fair and reasonable, as the Court concludes above, however, leads the Court to conclude that the releases being granted to [settling parties] by the Debtors meet the Master Mortgage standards.") (citing In re Master Mortgage Inv. Fund, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

### 1. Releases In Favor Of The Senior Lenders Are Appropriate.

The releases of the "Related Persons" and participants of the Senior Lenders and Bridge Lenders, to which the Noteholders object, are narrowly tailored and an essential element of the settlement. "Related Persons" of the Lenders are released only "to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person of [a lender]." DCL Plan § 1.1.200. The release, in other words, covers only claims arising from the very transactions for which the Lenders are providing settlement consideration. The release for participants of Senior Lenders (*i.e.*, those who have purchased an interest in Senior Loan Claims held by a Senior Lender) is similarly appropriate, as it ensures that Senior Lenders' counterparties are not exposed to liability for which they would attempt to seek contribution or indemnity from the Senior Lenders. Both releases simply ensure that settling parties are not indirectly exposed to liability on claims they have paid millions of dollars to settle.[362]

---

[362] The Noteholders' citation to Washington Mutual is unavailing. There, a proposed release of "related persons" was disapproved because, "under a plain reading of the Plan definitions, it could be argued that an affiliate (or even a former affiliate) of a creditor is releasing all claims it may have against [such settling party] and any affiliate of [such settling party]." Washington Mut., 442 B.R. at 354. The release was, in other words, of claims that had nothing to do with what had been settled, unlike the narrowly tailored releases of the DCL Plan.

## 2. The Bar Order Is Appropriate.[363]

Similarly, the inclusion of a "Bar Order" in the DCL Plan is wholly appropriate under controlling law. Bar Orders are an essential element to any case involving multiple potential defendants where certain of those defendants settle while others do not, and have been routinely approved by both this Court and the Third Circuit. See, e.g., Eichenholtz v. Brennan, 52 F.3d 478, 487 (3d Cir. 1995); Whyte v. Kivisto (In re SemCrude, L.P.), Adv. No. 09-50189, 2010 Bankr. LEXIS 4160 (Bankr. D. Del. Nov. 19, 2010).

The Bar Order here is carefully crafted to ensure that settling defendants who are resolving claims for valuable consideration cannot be made to pay twice on account of that same liability via a claim for contribution brought by non-settling defendants. To be clear – the Bar Order does not release any independent claims held by third-parties; it merely bars contribution claims that seek to recover from the settling defendants on account of settled claims.[364] Indeed, it is telling that the sole objection raised by the Noteholders in their 217-page pre-trial submission is a single paragraph arguing that the Bar Order is "highly unfair" because it could reduce creditor recoveries.[365]

The Noteholders have missed the mark entirely. The only possible reduction to creditor recoveries as a result of the Bar Order would be on account of liability that the settling defendants already paid the estate – and hence all creditors, including the Noteholders – to settle. While the Noteholders do not like the settlement, there is nothing at all "unfair" about that result;

---

[363] Third party objectors such as "Certain Officers and Directors" and Brigade Capital Management raised legal objections to the Bar Order which were the subject of oral argument and may be reiterated in the post-trial letter briefs the Court permitted these parties to submit. To the extent necessary, the DCL Proponents will respond in the omnibus response to such letter briefs.

[364] This matter is discussed in greater detail in the DCL Proponents' pre-trial submission. DCL Reply at 111-117.

[365] Noteholder Obj. ¶ 333.

indeed, the Bar Order ensures "fairness" by preventing creditors from recovering twice on account of the same liability.

### 3. Limited Releases Of Certain Shareholders Are Appropriate.

Finally, the Noteholders argue that the proposed releases of the "Released Stockholder Parties" do not satisfy the Zenith factors.[366] In re Zenith Elecs. Corp., 241 B.R. 92, 110-11 (Bankr. D. Del. 1999) (citation omitted). To start, it is important to note that these releases are extremely narrow – they cover only claims relating to payments made to shareholders who (a) are parties to the Retiree Claimant Settlement, (b) sold their shares through the Tribune 401(k) plan, or (c) are current employees who remain employed through the DCL Plan effective date, and, as to current employees of the Debtors and certain of the Retiree Claimants, only for the first $100,000 in payments received.[367]

In Zenith, Judge Walrath identified several factors that courts have used to evaluate the propriety of debtor releases:

- an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

- substantial contribution by the non-debtor of assets to the reorganization;

- the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

- an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

- provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

Zenith, 241 B.R. at 110-11. As this Court noted in Exide, while the Zenith factors are "helpful in weighing the equities of the particular case after a fact-specific review," they are "neither

---

[366] See Tr. 4/14 at 49:6-50:15; Noteholder Obj. ¶¶ 323, 327.
[367] See DCL Plan §§ 1.1.200, 1.1.201.

exclusive, nor are they a list of conjunctive requirements." Exide, 303 B.R. at 72 (citing In re Master Mortgage Inv. Fund, 168 B.R. at 935).

Here, a fact-specific evaluation leads to the conclusion that the limited release of the Released Stockholder Parties is reasonable and appropriate.

### a. Releases Of The Retiree Claimants Are Appropriate.

The proposed release of shareholder-based claims against the Retiree Claimants is appropriate under the Zenith factors. The Retiree Claimants filed proofs of claim against the Tribune parent in an aggregate amount of approximately $113 million. After lengthy negotiations, the Retiree Claimants and the Debtors entered into the settlement agreement attached as Exhibit 5.15.4 of the DCL Plan (the "Retiree Claims Settlement Agreement"), which, among other things, allows the claims of Retiree Claimants in an aggregate amount of approximately $103 million.[368] The Retiree Claimants made a substantial contribution to the DCL Plan by agreeing to reduce the aggregate amount of their claims by $10 million, which has the effect of increasing distributions to other creditors of the Tribune parent.

Further, the release of Retiree Claimants is an important component of the reorganization. The Retiree Claimants account for 165 of the 237 ballots submitted by claimants in the Other Parent Claims class, and all 165 Retiree Claimants who submitted ballots voted to accept the DCL Plan.[369] Finally, as explained in Section II.A, supra, the DCL Plan is broadly supported by virtually all constituencies. Accordingly, the Zenith factors are satisfied and the proposed release of the Retiree Claimants as shareholders is reasonable and appropriate.

---

[368] The DCL Proponents refer to the DCL Reply at pages 85-87 for a discussion about the reasonableness of the Retiree Claims Settlement Agreement.

[369] See Epiq Voting Declaration, Docket No. 8882.

b.     Limited Releases Of Other Shareholders Are Appropriate.

Similarly, the release of shareholders who sold or redeemed shares through Tribune's

401(k) plan and current employees for amounts up to $100,000 also is appropriate.

Due to provisions of ERISA that protect 401(k) and related plans, it is highly unlikely

that any avoidance action exists in respect of payments made on account of stock held through

the Tribune 401(k) Plan.[370]  The Noteholders have not challenged the authority cited by the DCL

Proponents in this regard, and the release of such claims arguably is not a release of any claim of

value.

Likewise, the limited release in respect of current employees is appropriate because it

only benefits those parties that have in fact contributed to the Debtors' reorganization. Mr.

Hartenstein's uncontroverted testimony in this regard was clear:

> A.  Well, to those employees that are under, or redeemed under
> $100,000, it takes the cloud away from over their heads of
> worrying that the company that they are loyally working for is
> going to end up clawing back some of those for things and for
> transactions they made where they did no wrong. And for the
> others that are redeemed over 100,000, of which there are still
> many, many of which are my direct employees, it at least mitigates
> the first 100,000 of that claim.
>
> Q.  What impact do you perceive that having on employee
> morale?
>
> A.  To those for the under $100,000 class, it's a great burden
> off of their shoulders. It's a good morale booster. And to the
> extent that it affects the others, there is at least 100,000 less that
> they have to worry about.[371]

In Penn Central, the Third Circuit concluded that a reorganization court must be able "to

deal practically with the ongoing problems of employee morale, retention and recruitment." In

re Penn Central Transp. Co., 484 F.2d 1300, 1305-06 (3d Cir. 1973) (endorsing up to $50,000

---

[370] See DCL Reply at 99-100.

[371] See Tr. 3/14 at 118:21-119:10 (Hartenstein).

per year in pre-petition pension payments (in 1973) to current and former employees). The employees who might benefit from the limited release at issue here are critical and loyal contributors to the Debtors' reorganization efforts. The severe damage to employee morale that would result from the pursuit of collection activities against these faithful current employees on account of amounts received for Tribune common stock would be detrimental to the Debtors' reorganization efforts. Moreover, as discussed at the confirmation hearing, given the cost-benefit analysis of pursuing collections from current employees who received $100,000 or less, both the Committee and the Debtors concluded that the release was appropriate and would not materially affect the ability to recover sufficient amounts to pay the claims of impaired creditors under the DCL Plan.[372]

Finally, it is important to note that the persons identified on Exhibit 1.1.192 to the DCL Plan, who are the current and former officer and director defendants named in the Amended Complaint, dated December 7, 2010, filed by the Committee, are ***excluded*** from all such releases in the event there is a judicial determination that any such person engaged in intentional fraud, willful misconduct or other misconduct or breach of fiduciary duty in connection with the Transactions. This safeguard ensures that the releases are limited solely to those persons who have not been found to have committed wrongdoing.

## V.    THE NOTEHOLDER PLAN CANNOT BE CONFIRMED.

In contrast to the DCL Plan, the Noteholder Plan has several fundamental defects that render it unconfirmable.

---

[372] See Tr. 4/14 at 73:1-75:20 (colloquy).

**A.      The Noteholder Plan Violates Section 1129(a)(10).**

### 1.  The Noteholders' Interpretation Of Section 1129(a)(10) Is Unsupportable.

A plan of reorganization cannot be confirmed unless "at least one class of claims that is impaired under the plan has accepted the plan." 11 U.S.C. § 1129(a)(10). The Noteholder Plan – which is a joint plan for all 111 Debtors – received the affirmative support of only *three* out of 256 impaired classes, yielding an accepting impaired class at only *two* of the 111 Debtors.[373] Two of these classes are controlled by the Noteholders themselves and in the third a single affirmative vote was cast in respect of a claim of $47.[374] All other voting classes rejected the Noteholder Plan, generally by margins approaching unanimity.[375]

In the face of this spectacular rejection, the Noteholders argue that a single accepting class at a single debtor should satisfy section 1129(a)(10). Although the Debtors have not been substantively consolidated, the Noteholders effectively ask the Court to treat all impaired classes as though they are creditors of a single entity for purposes of section 1129(a)(10).[376] This is a remarkable proposition that, if approved, would allow confirmation of a plan over the near uniform opposition of creditors based only on the support of a single class (or a single creditor) of a single debtor in a multi-entity conglomerate reorganization. This nonsensical result contravenes the plain language of section 1129(a)(10) and is directly contrary to the basic purposes and objectives of chapter 11.

The plain language of the Code refutes the Noteholders' view that section 1129(a)(10) is a "per plan" requirement, such that a single "plan" that purports to provide for the reorganization of multiple debtors can satisfy the statute if just a single class at any debtor votes to accept.

---

[373] See Epiq Voting Declaration, Docket No. 7918 at Ex. B-1.

[374] See id.

[375] See id.

[376] See Tr. 4/14 at 155:3-165:1.

Section 1129, like the rest of chapter 11, presupposes that any given plan of reorganization aims to reorganize a single debtor, using the terms "debtor" and "reorganized debtor" only in the singular. Likewise, sections 1121 and 1123 of the Bankruptcy Code, respectively titled "Who may file a plan" and "Contents of a Plan," refer to the "debtor" only in the singular.

Moreover, the Code must not be interpreted in a manner that is manifestly contrary to Congress' intent. See U.S. v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989). The Noteholders' interpretation of section 1129(a)(10) would allow the interests of a given debtor and its creditors alike to be subverted to the interests of a single class of creditors of a separate and distinct legal entity, merely due to the happenstance of joint administration of the bankruptcy cases relating to the entities. Such a reading is manifestly contrary to the fundamental principles of the Bankruptcy Code, and there is no basis for believing that Congress intended to allow a debtor to be reorganized based on the whims of parties having no claims whatsoever against it.

Tellingly, the Noteholders argue that section 1129(a)(10) "is a per plan requirement *when you have a joint Chapter 11 plan*,"[377] relying on the joint administration of these cases to support their proposal of a "joint plan" for the Debtors. It is axiomatic, however, that only substantive consolidation, and not mere joint administration, can impact the substantive rights of creditors in bankruptcy. See In re Genesis Health Ventures, Inc., 266 B.R. 591, 618 (Bankr. D. Del. 2001) (overruled on other grounds) ("[J]oint administration benefits case administration without affecting the creditors while substantive consolidation ensures the equitable treatment of the creditors.") (citing In re Cooper, 147 B.R. 678 (Bankr.D.N.J.1992).) Joint administration without substantive consolidation cannot affect substantive creditor rights, as the Noteholders' proposal would allow, and it is difficult to imagine a more "substantive" right in bankruptcy than the right of a debtor's

---

[377] See Tr. 4/14 at 159:2-3 (emphasis added).

creditors to control the reorganization of their specific debtor. The Noteholders' proposal is simply an attempt to deem the Debtors to be substantively consolidated for voting purposes.[378]

The Noteholders rely on an unpublished decision in SGPA for the proposition that a "per debtor" reading of 1129(a)(10) is "form over substance."[379] SGPA's analysis of section 1129(a)(10), however, turned on a finding that substantive consolidation could be imposed without harming the objecting parties. See SGPA, 2001 Bankr. LEXIS at *16-17. In other words, the Court in SGPA excused failure to comply with section 1129(a)(10) at every individual debtor because, unlike here, the objecting parties would not have been adversely impacted by substantive consolidation. Underlining the importance of this distinction, the Third Circuit has made clear (after issuance of SGPA) that where corporate separateness is at issue, form *is* substance. See Owens Corning, 419 F.3d at 204.

The very scarcity of litigated decisions, combined with the fact that the few decisions on point generally arise in the context of substantive consolidation, speaks volumes. When a joint plan fails to satisfy section 1129(a)(10) at each debtor, the natural response, as demonstrated by the MEDIQ case discussed at the confirmation hearing,[380] and as occurred in the AbitibiBowater case, is to amend the plan and resolve the objection rather than charge headlong into a likely denial of confirmation. In AbitibiBowater, for instance, when Aurelius filed a section 1129(a)(10) objection to plan confirmation asserting that the plan could not be confirmed for the

---

[378] The Enron decision cited by the Noteholders actually involved the substantive consolidation of the Debtors and is therefore inapposite. See In re Enron Corp., 2004 Bankr. LEXIS 2549 , at *55 (Bankr. S.D.N.Y. July 15, 2004).

[379] See Noteholder Reply ¶ 145 (quoting In re SGPA, Inc., No. 01-02609 (RJW), 2001 Bankr. LEXIS 2291, at *21-22 (Bankr. M.D. Pa. Sept. 28, 2001)).

[380] Tr. 4/14 at 157:14-158:23 (Colloquy) (discussing In re MEDIQ, Inc., No. 01-252 (MFW) (Bankr. D. Del. May 16, 2001).

single subsidiary debtor against which Aurelius held a claim,[381] that debtor was severed from the joint plan.

Stated in the extreme formulation, which the Noteholders have no choice but to advance, adoption of the "per plan" rule would allow a *de minimis* class of claims at a functionally irrelevant debtor-subsidiary containing no assets to single-handedly authorize the reorganization of a multi-billion dollar business over the unanimous opposition of all other creditors. To state that proposition is to refute it. The only impaired class that accepted the Noteholder Plan, aside from the two classes controlled by the Noteholders, consisted of a single vote for $47. According to the Noteholders' logic, that single vote of a claim for $47 was independently sufficient to authorize the reorganization of a group of companies worth over $6 billion. As Judge Walrath suggested in <u>MEDIQ</u>, that cannot be the case.[382]

### 2. The DCL Plan Does Not Face A Similar 1129(a)(10) Shortcoming.

In response to the obvious 1129(a)(10) deficiencies of their own Plan, the Noteholders argue tit-for-tat that if the Noteholder Plan fails to satisfy section 1129(a)(10) then the DCL Plan is similarly deficient.[383] The DCL Plan received broad support and was ***accepted by an impaired class at every Debtor for which votes were cast***.[384] The Noteholders' objection to the DCL Plan rests on the "37 debtors where the impaired accepting class had no creditor vote" at all.[385] As even the Noteholders have acknowledged, there is a substantial difference between affirmative

---

[381] See <u>In re AbitibiBowater, Inc.</u>, No. 09-11296 (Bankr. D. Del. Sept. 13, 2010), Objection of Aurelius and Contrarian Capital Management, LLC to Joint Plan of Reorganization and Debtors' Request for Approval Thereof [Docket No. 3202].

[382] See <u>In re MEDIQ, Inc.</u>, No. 01-252 (MFW), Hr'g Tr. at 122-25 (Bankr. D. Del. May 16, 2001) ("If that were the rule then any joint plan would be – could be filed with respect to any affiliate Debtors where it is not a consolidated entity, but you're suggesting that if the creditors of one of the Debtors vote in favor of the plan then you have met 1129(a)(10). *I can't believe that's the case.*") (emphasis added).

[383] See Tr. 4/14 at 155:14-17.

[384] See Section II.A, above.

[385] See Tr. 4/14 at 155:17-21.

rejection of a plan and simple creditor inaction. Indeed, the Noteholders previously urged[386] that

a class in which no creditor chooses to cast a vote may be treated as an accepting class. See

Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.), 836 F.2d 1263, 1267 (10th Cir.

1988); In re Adelphia Commc'ns Corp., 368 B.R. 140, 259-264 (Bankr. S.D.N.Y. 2007) (same).

Apathy of creditors of the Debtors holding *de minimis* claims is not cause to derail the DCL Plan.

In contrast, the affirmative rejection of the Noteholder Plan by the overwhelming majority of the

Debtors' creditors, as measured by number of creditors, claim value, number of classes and

number of Debtors, gives this Court every reason not to confirm the Noteholder Plan.

### B. The Noteholder Plan Has Other Fundamental Defects.

#### 1. The Noteholder Plan Cannot Terminate Claims Against Non-Debtors.

The Noteholders conceded in their confirmation brief that the Noteholder Plan cannot

terminate Senior and Bridge Loan Guaranty Claims against non-debtor entities – the Guarantor

Non-Debtors – without the consent of the Senior and Bridge Lenders. However, in the most

recently-filed Noteholder Plan amendments, the Noteholders inexplicably removed one provision

purporting to terminate these claims[387] but retained several other provisions purporting to

terminate them. See Noteholder Plan §§ 1.1.128, 1.1.177, 5.9 and 11.1.1. The Noteholder Plan

also purports to force these same non-debtors to guarantee the New Senior Secured Term Loan.

See Noteholder Plan § 5.6.1 The Noteholders have offered no grounds on which this Court

could strip non-debtor guarantees without the consent of the beneficiaries, and doing so is clearly

impermissible.[388] Moreover, any attempt to have the Guarantor Non-Debtors, which are

collectively insolvent by billions of dollars, incur *further* debt without a release of the guarantee

claims would be nonsensical and inappropriate.

---

[386] Docket No. 7128 (Noteholders' Specific Disclosure Statement) at 23.

[387] Docket No. 8755-1 at § 11.2.1 (removed in amended Noteholder Plan).

[388] See DCL Obj. at 38-40 for a more detailed discussion of this issue.

Certain of the Guarantor Non-Debtors hold interests in joint ventures, including the Food Network, Career Builder and Classified Ventures, valued in the aggregate at approximately *$1.7 billion*.[389] The Noteholders cannot consensually terminate guaranty claims against the Guarantor Non-Debtors and thus must either leave $10+ billion of claims against these valuable entities outstanding or attempt to file the entities for bankruptcy. Both options are value destructive. Leaving the guaranties in place would prevent approximately $1.7 billion in value from being distributed under a plan. An attempted bankruptcy filing could impair the joint venture partnerships and the value of Tribune's interest in the enterprises;[390] indeed the risk of such value destruction was the primary reason proceedings were not filed for those entities in the first place.[391] The Noteholder Plan thus puts at risk approximately *$1.7 billion* of value, unlike the DCL Plan.

## 2. The Noteholder Plan Fails To Implement The Intercompany Claims Settlement.

In spite of their early objection to it, the Noteholders claim to "adopt" the Intercompany Claims Settlement for purposes of allocating value among individual Debtors to enable distributions. Ultimately, however, the Noteholders attempt to eviscerate the very Intercompany Claims Settlement they purport to adopt, which in fact resolves and *discharges* all intercompany claims. Under the Noteholder Plan, there would be three (completely illogical) phases of treatment of intercompany claims: (1) first, adoption of the Intercompany Claims Settlement solely to allocate value among Debtors and thus enable initial distributions that, strangely, ignore the intercompany claims themselves; (2) next, litigation regarding allowance of Senior Loan Claims would be followed by further distributions that, it would appear, completely ignore intercompany claims (though the Noteholder Plan is far from clear on the point); and (3) finally,

---

[389] DCL Ex. 1104 at Ex. 2 p. 94.

[390] Tr. 3/14 at 112:18-113:9 (Hartenstein); see also id. at 110:9-17, 112:6-17, 134:12-23 (Hartenstein).

[391] Id. at 112:25-113:9.

if at any point the value of the Guarantor Debtors is determined to be sufficient to pay the principal amount of allowed claims against them, intercompany claims *against* the Guarantor Debtors would be resurrected and enforced, such that the remaining value of the Guarantor Debtors would be distributed to Tribune parent creditors *before* creditors of the Guarantor Debtors could recover the postpetition interest to which they otherwise would be entitled.[392]

This ends-driven artifice fails for several reasons. First, the Noteholders' attempt to twist and refashion the Intercompany Claims Settlement into a means of siphoning the value of the Guarantor Debtors is unsupported by any evidence, either regarding the appropriate allowed amount of intercompany claims or in support of their apparent theory that intercompany claims can be partially settled to allocate estate value, ignored for distribution purposes, and then resurrected when convenient to be used as a means of allowing equity (the Tribune parent) to recover ahead of creditors of the Guarantor Debtors.

Even if the Noteholders could selectively adopt and ignore portions of the Intercompany Claims Settlement at their whim, their attempt to siphon the value of the Guarantor Debtors to benefit creditors of the Tribune parent does not work. As explained in Section III.D.3 above, the Senior Lenders are entitled to recover the full amount of their claim from each Guarantor Debtor, subject only to a cap on their aggregate recovery equal to the amount owed, including postpetition interest. Even were that not the case, more than 80% of the value of the Guarantor Debtors resides at Debtors that *do not have* material intercompany liabilities owing to Tribune Company.[393] Thus, even under the Noteholders' construct, the Senior Lenders would be entitled to first recover the principle amount of their claims against all of the Guarantor Debtors that *do*

---

[392] See Noteholder Plan § 5.19 ("before any Holder of an unsecured Claim against Tribune or a Guarantor Debtor receives Postpetition Interest on account of such Claim from any source other than from recoveries on account of Creditors' Trust Interests, the prepetition Intercompany Claims against the relevant Debtor must receive payment in full").

[393] See n. 194, supra.

have intercompany liabilities and then recover the balance of their claim, including full postpetition interest, from those that do not. Calculated through December 8, 2012 (the date through which the Noteholders reserve postpetition interest on Non-LBO Claims), interest at the non-default rate on the Step One Claims alone would add roughly $1.3 billion to the amount payable in respect of the Senior Loan Claims, which in total would more than account for the entire value of the Guarantor Debtors even at valuations where DEV exceeds $8 billion.

### 3. The Noteholder Plan Destroys Value Through Unnecessary Taxation.

As explained in pretrial briefing and argument at the confirmation hearing, the Distribution Trust that would be established under the Noteholder Plan is highly likely to be considered a "disputed ownership fund" that is taxable at corporate rates after bankruptcy and before ultimate distributions to creditors.[394] Indeed, the Distribution Trust has all of the hallmarks of a "disputed ownership fund," in that it would (a) be established to hold money or property subject to conflicting claims of ownership, (b) be subject to the continuing jurisdiction of a court, (c) require the approval of the court to pay or distribute money or property to beneficiaries, and (d) not be a qualified settlement fund, a bankruptcy estate or (for reasons discussed below) a liquidating trust. Treas. Reg. § 1.468B-9(b).

At trial, the Noteholders repeated their "clear intent" that the Distribution Trust be treated as a non-taxable "liquidating trust" and not be taxed as a "disputed ownership fund." Unfortunately for the Noteholders and (if the Noteholder Plan were implemented) all creditors, clear intent is not sufficient to create a liquidating trust and prevent disputed ownership fund treatment. In fact, Revenue Procedure 94-45, which lists the conditions under which the IRS will issue advance rulings classifying entities as liquidating trusts, provides guidance regarding

---

[394] See DCL Obj. at 25-27.

qualification as a liquidating trust. Particularly problematic for the Noteholders, Revenue Procedure 94-45 specifies that (a) a liquidating trust must be a grantor trust pursuant to section 1.671-4(a) of the Income Tax Regulations and (b) "all of the trust's income must be treated as subject to tax on a current basis, and the ruling request must explain, in accordance with the plan, how the trust's taxable income will be allocated and who will be responsible for payment of any tax due." Rev. Proc. 94-45, 1994-2 C.B. 684.

A grantor trust must allocate its tax items among its beneficiaries. The Noteholder Plan purports to grant the Distribution Trustee absolute and unreviewable authority to "determine an appropriate method for allocating all items of income, gain, loss, deduction and credit among the Beneficiaries."[395] But there is no such "appropriate method" sanctioned under the tax law by which to allocate items of income to the trust Beneficiaries because legal entitlement to such income is the very subject of the disputes that necessitate the Distribution Trust.

This is not the extent of the problem. As noted above, Revenue Procedure 94-45 requires the beneficiaries of a liquidating trust to be treated as the grantors of the trust. Consistent with such treatment, the transfer of claims from a bankruptcy estate to a liquidating trust must be treated "as a deemed transfer to the beneficiary-creditors followed by a deemed transfer by the beneficiary-creditors to the trust." Rev. Proc. 94-45, 1994-2 C.B. 684. The Noteholder Distribution Trust Agreement's assertion that all parties are required to treat the transfer of the Distribution Trust Assets in accordance with this fiction is unsustainable, given the inability to determine ownership of the relevant assets when the Distribution Trust is formed.[396]

At trial, the Noteholders focused on whether, absent a trustee election, a liquidating trust would be treated as a "disputed ownership fund" for U.S. federal income tax purposes. While it

---

[395] Noteholder Distribution Trust Agreement § 4.2.
[396] Noteholder Plan § 7.16.14(a)(i).

is true that treatment of a *portion* of a liquidating trust as a disputed ownership fund is elective, the election presupposes that, in the first instance, there is a liquidating trust. Treas. Reg. § 1.468B-9(c)(2)(ii). The Distribution Trust consists *entirely* of assets subject to dispute and, as discussed above, does not meet the requirements of Revenue Procedure 94-45. The Distribution Trust is not eligible to make this election because *all* of its assets are subject to dispute.

If the Distribution Trust is treated as a disputed ownership fund and not a liquidating trust, all of the value not distributed on the effective date of the Noteholder Plan – more than 50% of Tribune's DEV (over $3.375 billion) – would be taxed at corporate or higher rates, destroying value to creditors on a potentially massive scale. To give creditors any comfort the Noteholders would have to receive a favorable ruling from the IRS that the Distribution Trust is, in fact, a good liquidating Trust. The Noteholders have no such ruling, and in light of Revenue Procedure 94-45, one is not likely to be forthcoming.[397] This by itself renders the Noteholder Plan ill-advised and unconfirmable.

### 4. The Noteholder Plan Unfairly Discriminates Against Senior Lenders.

In its original incarnation, the Noteholder Plan provided "strips" of cash, new debt and equity to all creditors of the Tribune parent. The amended Noteholder Plan proposes to pay Senior Lenders *solely* with equity, while Senior Noteholders and holders of Other Parent Claims continue to receive cash, new debt and equity. The Noteholders have offered no basis for the Court to conclude that this discrimination is "supported by a reasonable basis" or essential to the confirmation of the plan. See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115 F.3d 650, 656 (9th Cir. 1997). Indeed the Noteholders have not even argued these points

---

[397] After vaguely alluding to having "consulted" with the IRS and structuring the Noteholder Plan based on that consolation, Tr. 4/14 at 196:3-6, counsel for the Noteholders ignored inquiries seeking further detail on the substance of the consultation and what if any guidance the Noteholders in fact received from the IRS.

The Noteholders argue that the form of consideration provided to the Senior Lenders is irrelevant because "a dollar of stock will be worth a dollar of cash, will be worth a dollar" of term loan.[398] In support, the Noteholders cite Greate Bay, in which the court held that, in a case where trade creditors received cash distributions, an allocation of equity to dissenting noteholders did not impose a materially greater risk on the dissenting class. Greate Bay, 251 B.R. at 232. The holding in Greate Bay, however, was premised on the differing nature and differing risk tolerances of the two classes at issue. Id. The Greate Bay court permitted the debtor to distribute equity to noteholders while distributing cash to trade creditors only after concluding that such distributions were consistent with the respective levels of risk assumed by creditors prepetition, noting that trade creditors generally have short term investment horizons and a preference for cash, while investors in debentures tend to have longer investment horizons, making an equity distribution appropriate. Id.

There is, of course, no analogous difference between Senior Lenders and Senior Noteholders that would justify disparate treatment – both classes are comprised of long term investors. Furthermore, the Greate Bay court found that the discriminatory all-equity distribution was necessary for the reorganization, something that is not the case here given the Noteholders' prior willingness to provide a "strip" to all Tribune parent level creditors. Id. Arbitrarily paying identically-situated creditors different consideration, without even an asserted justification, is textbook unfair discrimination, and it renders the Noteholder Plan unconfirmable.

### 5. The Noteholder Plan Has No Collective Action Mechanism To Bind Holdouts To Settlements And Would Require Full Litigation.

The cases cited by the Noteholders in the Noteholder Reply for the proposition that the Litigation Trust established by the Noteholder Plan will be able to efficiently implement

---

[398] See Tr. 4/14 at 191:22-23.

settlements fail to address the DCL Plan Proponents' objection. None of the cases cited[399] actually involve a collective action mechanism outside the Chapter 11 plan process for implementing a settlement with an entire class of creditors. In addition, the Noteholders rely on Capmark,[400] yet in the Noteholders' own summary of that case, they acknowledge that the proposed settlement in that case was in fact *not binding in any way* on parties that chose to opt-out.[401] Also as acknowledged by the Noteholders, if any creditor that opted out of the proposed settlement in Capmark later reached an agreement with the debtors that provided a better recovery than the settlement, the debtors *were required to offer each of the previously settling parties* the option to select the terms of the more favorable settlement.[402] Using Capmark as their model, the Litigation Trust under the Noteholder Plan not only would be forced to negotiate allowance of the Senior Loan Claims and Bridge Loan Claims on a creditor-by-creditor basis, but any settlement offered also would serve only as a floor on which holdouts could hope to improve. Contrary to the Noteholders' assertions that confirmation of their plan would result in a quick and beneficial settlement, the only means of improving creditor recoveries would be time consuming, expensive and risky litigation.

## VI. THE DCL PLAN IS SUPERIOR TO THE NOTEHOLDER PLAN.

For all the reasons set forth above, the DCL Proponents submit that the Noteholder Plan cannot be confirmed. If, however, the Court concludes that both plans are confirmable, the statute nevertheless still compels the conclusion that the DCL Plan should be confirmed.

---

[399] See Noteholder Reply at ¶ 119, citing In re Pegasus Satellite Television Inc., et al., No. 04-20878 (Bankr. D. Me. Jan. 31, 2005) and In re First Magnus Fin. Corp., No. 4:07-BK-01578 (JMM) (Bankr. D. Ariz. Oct. 30, 2007).
[400] In re Capmark Fin. Grp. Inc., 438 B.R. 471, 517-518 (Bankr. D. Del. 2010). Noteholder Reply at ¶ 120.
[401] "The lenders were bound unless they returned the opt-out notice." Noteholder Reply at ¶ 120.
[402] See id. ("If the debtors reached a subsequent settlement with any opt-out lender that was more favorable to such opt-out lender than the settlement approved by the court, the debtors were required to offer each of the settling lenders the option to accept the treatment provided to the opt-out lender.").

Specifically, section 1129(c) of the Bankruptcy Code provides that, where multiple plans meet the requirements for confirmation, the Court "shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). Interpreting the plain language of section 1129(c), many courts have observed that principal consideration in the comparison of two otherwise confirmable plans is the preference of creditors as expressed by the votes cast. See, e.g., TCI 2 Holdings, 428 B.R. at 183-184 (noting that "[t]he most significant element in choosing between two confirmable plans is the statutory direction to the court to consider the preferences of creditors and equity security holders in determining which plan to confirm"); In re Orchards Village Invs., LLC, 2010 WL 143706, at *21 (Bankr. D. Or. Jan. 8, 2010) (giving primary consideration to the preference of creditors) (citing Coram Healthcare, 315 B.R. at 351-352).

In particular, courts have noted the importance of considering the preference of creditors who are *unrelated to the proponents of the competing plans*. See In re Holley Garden, 238 B.R. 488, 496 (Bankr. M.D. Fla. 1999) (finding that "[t]he votes of unrelated creditors [and equity security holders] are an important consideration, despite the overwhelming votes of related creditors in favor of their own plan").

### A.  Creditors Overwhelmingly Prefer The DCL Plan.

Here, the voting results reveal that creditors overwhelmingly prefer the DCL Plan over the Noteholder Plan. Out of 128 classes of Claims in which creditors actually voted, 125 classes (*97.66%*) voted to accept the DCL Plan.[403] In stark contrast, out of 243 classes of Claims in which creditors actually voted, only *three* classes (*1.2%*) voted accept the Noteholder Plan.[404] Of those three accepting classes, two are the Senior Noteholders and PHONES Notes Classes,

---

[403] Epiq Voting Declaration, Docket No. 7918 at Ex. A-1.

[404] Id. at Ex. B-1.

which are dominated by the Noteholders, and one is a class in which a single creditor holding only a $47 claim voted that claim in favor of both the DCL Plan and the Noteholder Plan.[405]

Creditors also were permitted to indicate a preference on their ballot among the plans they voted to accept; however, due in large part to the fact that approximately 1,340 out of 2,200 creditors that voted on both plans chose to accept only one plan, relatively few creditors expressed a preference on their ballot for either plan. Those that did preferred the DCL Plan.[406] More pertinently, the overwhelming preferences of creditors are revealed by the range of constituents across the Debtors' capital structure voting in favor of the DCL Plan and voting against the Noteholder Plan, as shown by the class-by-class comparison of votes on each plan attached as Appendix A.

This broad support of the DCL Plan cannot be overlooked. The vast majority of voting creditors chose to accept the DCL Plan and reject the Noteholder Plan. The voting results serve as clear evidence of the creditor preferences that section 1129(c) dictates should be followed when there are two otherwise confirmable plans under consideration.

### B.    The DCL Plan Provides Better Treatment To Creditors.

Courts considering competing plans under section 1129(c) also have examined the relative treatment of creditors, giving preference to the plan that provides better treatment. See, e.g., Holley Garden, 238 B.R. at 495 (stating that "[t]he court should confirm the plan that provides better treatment for creditors and equity security holders") (citing River Village, 181 B.R. 795, 807 (E.D. Pa. 1995)); Greate Bay, 251 B.R. at 246-247 (holding that the plan that proposed higher recoveries for certain creditors provided better treatment).

---

[405] Id.

[406] After aggregating multiple ballots received by individual creditors, approximately (a) five holders of Other Parent Claims indicated a preference, with all five preferring the DCL Plan; (b) 57 holders of General Unsecured Claims against Subsidiary Debtors indicated a preference, with 47 preferring the DCL Plan; and (c) 78 Senior Noteholders indicated a preference, with 30 preferring the DCL Plan. See Epiq Voting Declaration, Docket No. 8882 at Exs. 2, 3.

Here, as discussed at length above, the DCL Plan provides a greater guaranteed recovery to virtually all creditors. As a result of the DCL Plan settlement, most creditors will receive substantial distributions immediately on the Effective Date. Indeed, every single class entitled to vote will receive initial distributions under the DCL Plan that are equal to or higher than those proposed by the Noteholder Plan with the possibility of substantially better recoveries through trust distributions:

| Class | DCL Plan[407] | Noteholder Plan[408] |
|---|---|---|
| Step One Senior Loans | 71.14% | 34.2% |
| Step Two Senior Loans | 71.14% | 34.2% |
| Bridge Loans | 3.98% | 0% |
| Senior Notes | 33.59% | 4.3%[409] |
| Other Parent Claims | 36.04% | 4.4% |
| Convenience Claims against Tribune | 100% | 4.4% |
| General Unsecured Claims / Guarantor Subsidiaries | 100% | 0% to 7.3% |
| General Unsecured Claims / Non-Guarantors | 100% | 100% |
| EGI-TRB LLC Notes | 0% | 0% |
| PHONES Notes | 0% | 0% |

The Noteholder Plan is premised upon no settlements and provides negligible guaranteed distributions (if any) for Non-LBO Creditors. Further distributions to each class, if any, would occur only after protracted, risky litigation and the entry of various "Litigation Distribution Orders" resolving creditors' relative entitlement to the proceeds of the litigation. Although resolution of the LBO-Related Causes of Action theoretically could result in higher distributions to certain creditors, this hypothetical result is laden with risk, as amply demonstrated at trial and summarized above.

---

[407] Estimated recovery percentages do not include any Trust recoveries.

[408] Estimated recovery percentages under the Noteholder Plan assume that the PHONES Notes Claims Resolution is not resolved prior to the Effective Date.

[409] The Senior Noteholders' estimated recovery under the Noteholder Plan is 4.8%; however, after providing value to increase the recovery to the General Unsecured Claims against Non-Guarantor Subsidiaries to 100%, the Senior Noteholders' estimated recovery is reduced to 4.3%.

This prolonged litigation and the resultant uncertainty with respect to creditor

distributions weigh heavily against confirming the Noteholder Plan. The Noteholder Plan simply

cannot guarantee that creditors ever would receive distributions that are nearly as favorable as

those provided immediately upon the Effective Date under the DCL Plan. As a result, the DCL

Plan provides "more favorable treatment of creditors and should be confirmed in accordance with

the direction of section 1129(c).[410]

C.    **The DCL Plan Is More Feasible Than The Noteholder Plan.**

Courts considering competing plans under section 1129(c) also examine and give

preference to the plan that is more feasible. See, e.g., Holley Garden, 238 B.R. at 496. In

comparing feasibility, courts evaluate the relative risks and delays with respect to plan

consummation and the relative impact of plan consummation on the business operations of the

debtor. See, e.g., Coram Healthcare, 315 B.R. at 352 (plan that proposed immediate payment to

creditors rather than deferred payment was more feasible); Holley Garden, 238 B.R. at 496

(same); In re Matter of Sound Radio, Inc., 93 B.R. 849, 859 (Bankr. D.N.J. 1988) (plan that did

not foster delay or further litigation and dispute was more feasible), aff'd, 908 F.2d 964 (3d Cir.

1990); Greate Bay, 251 B.R. at 247-248 (plan that positioned the debtors more quickly to obtain

required casino licenses and better to meet uncertainties of competitive business environment

was more feasible).

Each of these elements weighs in favor of the DCL Plan. For one thing, the DCL Plan will

be substantially consummated significantly more quickly than the Noteholder Plan. As noted

above, the DCL Plan implements a settlement that provides for substantial distributions to creditors

---

[410] The so-called "Put Option" incorporated into the Noteholder Plan illustrates this point. Aurelius presumably believed that Non-LBO Creditors with lower risk tolerances would be receiving a fair bargain if they accepted Aurelius's offer to buy Non-LBO Claims for cents on the dollar (although none did). This tacit acknowledgement that many creditors have a lower tolerance for risk confirms that certainty and immediacy in distributions is an important consideration in assessing the interests of creditors.

immediately upon the Effective Date. The Noteholder Plan, however, provides only negligible guaranteed distributions while delaying distribution of the majority of enterprise value pending litigation over the LBO-Related Causes of Action and the Litigation Trust Distribution Orders. As a result, substantial consummation of the Noteholder Plan will likely require at least several years, during which time creditors will be forced to wait to receive the bulk of their distributions.

Additionally, the large amount of equity value to be held in the Distribution Trust for an indeterminate amount of time could raise novel FCC issues that are bound to complicate, delay, or prevent substantial consummation of the Noteholder Plan. For example, the Noteholder Plan does not make clear to whom equity will be distributed at emergence, or in what amounts, despite the fact that the FCC needs such information in order to pass upon the Noteholder Plan's ownership structure.[411] Moreover, the Noteholders have not disclosed to the FCC the identity of any parties that are likely to be attributable under the Noteholder Plan, or any information regarding other attributable media holdings of those parties or other considerations relevant to their ability to hold attributable interests in Reorganized Tribune. In contrast, the DCL Proponents disclosed the identity of their "attributable" shareholders (along with their attributable media holdings) to the FCC more than 10 months ago, have engaged with the FCC staff, and anticipate resolving any outstanding issues before or shortly after plan confirmation. To make matters worse, the Noteholder Plan has no mechanism for relinquishment of board designation rights in the event that one or more persons or entities holding such rights (including Aurelius, the Distribution Trust Advisory Board, the Distribution Trustee, and Wilmington Trust) have conflicting media interests or are otherwise unqualified under FCC rules to hold

---

[411] See DCL Ex. 1456 at 28.

attributable interests in Reorganized Tribune.[412] Without such a mechanism, there is a risk that the Noteholder Plan will not obtain the FCC approvals required for substantial consummation.

The Noteholders' acknowledgement that they cannot terminate the Senior Guaranty Claims against the Guarantor Non-Debtors without the consent of the Senior Lenders, discussed in Section V.B.1, above, also throws the two plans' relative feasibility into sharp relief. Under the DCL Plan, claims against the Guarantor Non-Debtors are released consensually as part of a broad settlement with the Senior Lenders, allowing the Debtors to preserve approximately $1.7 billion in estate value and an important source of operating cash flow.[413] Under the Noteholder Plan, in contrast, over $10 billion in guarantee claims against these entities could not be released, leaving the entire $1.7 billion value of the Guarantor Non-Debtors fully exposed to creditor claims. The Noteholders have no answer to this debilitating problem. The DCL Plan therefore is the only plan before the Court that can achieve a full and value-maximizing reorganization of the Debtors, in a manner that does not potentially destroy or severely impair more than $1.7 billion of value that would otherwise be preserved by the Reorganized Debtors.

Further, as explained in Section V.B.3, above, the Noteholders have provided no assurance (and no authority) that the reserve structure of the Noteholder Plan would not result in an entity-level tax liability imposed on over half of Tribune's DEV, resulting in significant extra and unnecessary destruction of value to the detriment of creditors. In contrast, under the DCL Plan creditors receive guaranteed distributions immediately on the Effective Date, with the possibility of further significant recoveries (which would not be subject to taxation before distribution) through their participation in the Trusts. Creditors that receive the New Senior Secured Term Loan receive

---

[412] Noteholder Plan §§ 5.3.2, 7.16.6.
[413] DCL Plan § 11.2.1

interest payments directly without the imposition of an additional layer of tax liability, and creditors that receive New Common Stock fully benefit from any appreciation in its value.

Finally, the DCL Plan best positions the reorganized Tribune enterprise for continued commercial success. Indeed, the DCL Plan is designed to enable the Reorganized Debtors to maximize enterprise value by avoiding time-consuming litigation and related problematic distribution reserves. In comparison, the Noteholder Plan poses numerous roadblocks to the long-term success of the Reorganized Debtors. The sizeable reserve of equity held by the Distribution Trust would leave the Reorganized Debtors with uncertain ownership that could harm enterprise value by hindering strategic mergers, joint ventures, and many other partnerships requiring stock issuances, and could jeopardize the Reorganized Debtors' ability to recruit senior managers and directors. These shortcomings ultimately would result in the overall destruction of long-term value and, therefore, weigh against confirmation of the Noteholder Plan.

**D.      The DCL Plan Accomplishes A True Reorganization.**

Lastly, courts evaluating competing plans pursuant to section 1129(c) typically find that a reorganization plan is preferable to a liquidation plan. See Holley Garden, 238 B.R. at 495; In re Valley View Shopping Center L.P., 260 B.R. 10, 40 (Bankr. D. Kan. 2001); In re Oaks Partners. Ltd., 141 B.R. 453, 465 (Bankr. N.D. Ga. 1992). This is because restructuring plans are consistent with the "policy of chapter 11 . . . to successfully rehabilitate the debtor." See Valley View, 260 B.R. at 40 (evaluating the type of plan proposed under section 1129(c) and noting that "the policy of Chapter 11 is to successfully rehabilitate the debtor"); see also Holley Garden, 238 B.R. at 495.

Though the Noteholder Plan nominally purports to be a plan of reorganization, the policy underlying section 1129(c) clearly favors the DCL Plan, which is the only plan that truly is focused on a successful reorganization and advancement of the ongoing operations of the

Reorganized Debtors. In fact, the key focus of the Noteholder Plan is the liquidation of the LBO-Related Causes of Action, even where doing so would harm Tribune's business operations. The Noteholder Plan does not attempt to accomplish fundamental goals present in all viable plans of reorganization, including resolution of ownership, determination of creditor entitlements and, most notably, preservation of estate value. Everything is left to future litigation. Indeed, after three weeks of trial, the Noteholders still have failed to provide any clarity as to what exactly the Noteholder Plan would entail. Aside from minimal initial distributions, creditors have not been told what they would receive, when they would receive it, or even the basis on which their recoveries might be determined.

The DCL Plan, in stark contrast, provides for a true reorganization that would allow Tribune to emerge as a revitalized business with clear direction and focus. It resolves significant claims against two major creditor constituencies (the Senior and Bridge Lenders) in a manner that provides for substantial certain recoveries now with the prospect of additional future recoveries. Further, it is the product of rigorous negotiation, it has been endorsed by Judge Gross, and it has the support of both the Committee and most creditors. It also is consistent with the findings set forth in the Examiner Report and fully satisfies the requirements of the Bankruptcy Code. Indeed, it is difficult to imagine how creditors would be better served by the Noteholder Plan, which has none of these attributes. The DCL Plan is clearly the preferable plan and should be confirmed.

## VII. CONCLUSION

For all of the foregoing reasons, the DCL Plan should be confirmed and the Noteholder

Plan rejected.

Dated: Wilmington, Delaware
      May 11, 2011

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.

*/s/ Norman L. Pernick*
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

*Counsel for Debtors and Debtors in
Possession and Certain Non-Debtor
Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

-and-

LANDIS RATH & COBB LLP

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

-and-

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel for the Official Committee of
Unsecured Creditors*


DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

-and-

YOUNG CONAWAY
STARGATT &
TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253
*Counsel For Oaktree Capital Management,
L.P. and Angelo, Gordon & Co., L.P.*


WILMER CUTLER PICKERING HALE
& DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co,
L.P.*


DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Benjamin S. Kaminetzky
Damian S. Schaible
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701 5800

-and-

RICHARDS LAYTON & FINGER

*/s/ Drew G. Sloan*
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Drew G. Sloan (No. 5069)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel For JPMorgan Chase Bank, N.A.*